Marc M. Seltzer (54534)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: 310-789-3100
Fax: 310-789-3150
Email: mseltzer@susmangodfrey.com

Scott Martin
Irving Scher
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
Email: smartin@hausfeld.com
Email: ischer@hausfeld.com

Howard Langer
Edward Diver
Peter Leckman
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Tel: 215-320-5660
Fax: 215-320-5703
Email: hlanger@langergrogan.com

[Additional Counsel Listed in Signature Block]

*Interim Class Counsel*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: NATIONAL FOOTBALL LEAGUE SUNDAY TICKET ANTITRUST LITIGATION** | Case No. ML 15-02668-BRO (JEMx) |
| | **CLASS ACTION** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | **CONSOLIDATED AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO SECTIONS 1 AND 2 OF THE SHERMAN ACT** |

Plaintiffs Ninth Inning Inc. dba The Mucky Duck, 1465 Third Avenue Restaurant Corp. dba Gael Pub, Robert Gary Lippincott, Jr., and Michael Holinko, by and through their attorneys, complain and allege as follows. All allegations herein, except for those relating to the Plaintiffs themselves, are based on information and belief.

**INTRODUCTION**

1.      The 32 professional football teams ("Teams") that compete in the National Football League ("NFL") have agreed among themselves, and with DirecTV, and in concert with others, to eliminate all competition in the broadcasting and sale of live video presentations of professional football games, including specifically for purposes of this complaint, the broadcasting and sale of DirecTV's NFL Sunday Ticket service to residential and commercial subscribers as described below.[1] As the Supreme Court has observed, each team "is a substantial, independently owned, and independently managed business," competing with its rivals "not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel," as well as "in the market for intellectual property." *American Needle, Inc. v. NFL*, 560 U.S. 183, 196-97 (2009) ("*American Needle*"). Yet rather than compete in the multibillion-dollar football broadcasting market, they have joined forces to restrict supply and raise prices.

---

[1] Within this overall market is a submarket of "out-of-market" NFL games played on Sunday afternoon and not broadcast on CBS, Fox, or formerly on NBC within the viewer's local television market. This distinct product, called the "NFL Sunday Ticket" or "Sunday Ticket", has been trademarked by Defendants and is recognized by them as a separate product from NFL games broadcast on Fox, CBS, NBC, ESPN, and the NFL Network.

2

2.      It has been clear for more than half a century that such agreements unreasonably restrain trade. In 1953, the United States Department of Justice ("DOJ") sued the NFL and its teams, alleging among other things that a far more limited agreement—an agreement merely prohibiting teams from broadcasting within 75 miles of another team's city when that team was playing a televised game away from home—was illegal under the Sherman Act. *See United States v. NFL, 116 F. Supp. 319 (E.D. Pa. 1953)* ("*NFL I*"). The United States District Court for the Eastern District of Pennsylvania readily agreed that that agreement was an unjustified attempt to "enable the clubs . . . to sell monopoly rights" and "an unreasonable and illegal restraint of trade." *Id.* at 326-27.

3.      In 1961, the court applied this ruling to prevent the joint selling of broadcast rights. *United States v. NFL,* 196 F. Supp. 445 (E.D. Pa. 1961) ("*NFL II*"). In response to this ruling, the NFL lobbied for and obtained a carefully limited antitrust exemption that allows a league of professional football clubs to jointly sell or transfer sponsored telecasting rights. This bill, known as the Sports Broadcasting Act of 1961 ("SBA") (15 U.S.C. § 1291), exempted only "the free telecasting of professional sports contests," as former NFL Commissioner Pete Rozelle ("Rozelle") "[a]bsolutely" recognized. Congress expressly left the holdings of *NFL I* in place (15 U.S.C. § 1292), and provided no exemption for pay, cable and satellite television distribution.

4.      For some time after the SBA's passage, the NFL and its Teams were content to abide by its limits and jointly produce only free sponsored telecasts, available to anyone with a television and a set of rabbit ears (or the modern equivalent, a digital antenna). As cable and satellite television began to present

lucrative opportunities, however, the Teams chose not to compete in this new sphere. Instead, they agreed to forgo all competition and sell their valuable products only jointly, throttling the supply of professional football telecasts in violation of the holdings of *NFL I* and *II*, and outside the carefully limited exemption of the SBA.

5.     No other major sports league in America has such a drastic, total elimination of competition in the broadcasting of its games. While Major League Baseball ("MLB"), the National Hockey League ("NHL"), and the National Basketball Association ("NBA") have each allocated markets geographically and pooled so-called out-of-market rights, none has agreed to centralize control and sale of *all* broadcast rights.[2]

6.     The anticompetitive effects of this agreement are clear and significant. The agreement has restricted the availability of live video presentations of regular season NFL games. The Teams have agreed not to avail themselves of cable, satellite, or Internet distribution channels individually. In the absence of an agreement, each team would have an incentive to distribute its games nationally in these channels. Given the relatively low cost of internet streaming and satellite and cable television carriage, each team acting independently would offer their games at a competitive price to anybody in the country who wanted to watch that particular team.

7.     Instead, however, the Teams have all forgone this option in favor of creating a more lucrative monopoly. The Teams have agreed to make an offering

---

[2] Although not at issue here, these agreements are themselves anticompetitive and illegal under the antitrust laws. *See generally Laumann v. NHL*, 56 F. Supp. 3d 280, 297-302 (S.D.N.Y. 2014).

4

called "NFL Sunday Ticket" (also referred to herein as "Sunday Ticket") the *only* way to view games other than the limited selection of games broadcast through sponsored telecasts (or, as discussed below, the cable channels ESPN and NFL Network) in any given area. Sunday Ticket bundles all other games into one package, sold jointly by the NFL to DirecTV and then by DirecTV to commercial and residential subscribers.

8.     The NFL Sunday Ticket is an out-of-market sports package that carries all NFL Sunday afternoon games produced by Fox and CBS (except those broadcast on local CBS and Fox affiliates). Sunday Ticket appeals to NFL fans with loyalties to teams located throughout the United States and fans who want to watch more than the six games that the NFL allows to be broadcast by television networks each week.  Additionally, commercial subscribers—primarily bars and restaurants—generate a substantial share of their overall revenue by having the capability to televise multiple professional football games simultaneously in order to attract a diverse range of fans to their establishments on Sunday afternoons during the fall NFL football season.  Indeed, DirecTV specifically markets the NFL Sunday Ticket to restaurants and bars, including, for example, through advertising such as: "Turn your business into the neighborhood's go-to spot with the undisputed leader in sports" and  "[o]nly DIRECTV has the sports packages you need to attract fans of every stripe with NFL SUNDAY TICKET 2015 . . . ."

9.     This scheme restricts competition and harms Sunday Ticket purchasers. *First*, the total elimination of competition allows the NFL, its Teams, and DirecTV to charge supracompetitive monopoly prices, rather than the prices that would exist if the 32 teams were competing for interest and distribution in a

free market. *Second*, Class members must pay for access to all 32 teams' out-of-market games, even if they are only interested in viewing one or two teams' games.

10.    This exclusive deal, along with other contractual arrangements between the NFL, its member teams, and DirecTV, as well as Fox, ESPN, CBS, and NBC (collectively, the "Networks"), results in the blackout or unavailability of out-of-market games, except through the bundled NFL/DirecTV Sunday Ticket.  These arrangements result in substantial injury to competition, including through eliminating distribution of out-of-market games through competing Multichannel Video Programing Distributor ("MVPD") platforms, such as the Dish Network, Comcast Corporation ("Comcast"), and Spectrum Cable (formerly Time Warner Cable); reducing game offerings and package mixes; and imposing supracompetitive pricing for consumers. The supracompetitive price for NFL Sunday Ticket now exceeds $120,000.00 per year for the largest commercial subscribers. As DirecTV says on its own website:  "Only DIRECTV brings you every play of every out-of-market game, every Sunday. Get the action on your TV with NFL SUNDAY TICKET."

11.    Thus, DirecTV's arrangement with the NFL allows the Defendants to restrict the output of, and raise the prices for, the live broadcast of NFL Sunday afternoon out-of-market games. Each NFL member team owns the initial rights to the broadcast of its own games.  However, the teams have collusively agreed to grant the NFL the exclusive right to market games outside of each team's respective home market.  But for the NFL teams' agreements in which DirecTV and others have joined, teams would compete against each other in the market for NFL football programming, which would induce more competitive pricing and content.

6

12.     In addition to allowing Defendants to charge supracompetitive prices for Sunday Ticket, this scheme increases the market share and value of NFL regular season games broadcast by the Networks and the NFL Network. By limiting the availability of competing products, this scheme drives up the market share and value of the broadcasts by the Networks, the NFL Network, and DirecTV. This allows these broadcasters to increase revenues of all parties to the scheme.

13.     DirecTV has willfully joined, encouraged, and entrenched the Teams' conspiracy. It contracted with the NFL to make Sunday Ticket exclusive to DirecTV, so that no other cable or satellite distributor could sell it. In doing so, it required that the NFL and its Teams preserve their anticompetitive agreement not to compete with one another. DirecTV's agreement to carry Sunday Ticket and not to deal individually with NFL teams is premised upon the continued existence of the anticompetitive agreement not to create and distribute individual team telecasts. As explained below, the Teams, in affirming the NFL's successive agreements with DirecTV, have mandated that nothing in the NFL's contracts with the Networks shall in any way impede the exclusive deal between the DirecTV and the NFL.

14.     This exclusive distribution arrangement is unique among American sports. Of the four major professional sports in this country—baseball, basketball, hockey, and football—the only one with an exclusive out-of-market broadcasting arrangement is the NFL/DirecTV Sunday Ticket. Major League Baseball ("MLB"), the National Basketball Association ("NBA"), and the National Hockey League ("NHL") all distribute live out-of-market games through multiple MVPDs, including, for example, DirecTV, the Dish Network, and InDemand (which originated as a consortium of Comcast, Cox Communications and Time Warner

Cable). As a result, DirecTV does not charge nearly as much for access to MLB Extra Innings, NBA League Pass, and NHL Center Ice, which provide access to more games per week over a longer season than the NFL.

15.     Similarly, outside the United States, the NFL distributes Sunday Ticket through numerous distributors, or even offers the games online without tying them to an MVPD subscription. In Canada, the NFL Sunday Ticket is distributed on a non-exclusive basis through the following MVPDs: Shaw Cable;  Shaw Direct; TELUS; Optik TV; TELUS Satellite TV; Bell TV; Access Communications; Cogeco Cable; EastLink Cable; Rogers Cable; Vidéotron; Westman Communications; MTS; and SaskTel.

16.     A bar or restaurant with a fire code occupancy between 51-100 paid $2,314.00 for Sunday Ticket in 2015 (in addition to television package subscription charges, high-definition access fees, and other charges).  And the price for Sunday Ticket is higher the larger the establishment's Fire Code Occupancy ("FCO") (also known as "EVO"—Estimated Viewing Occupancy).  The largest establishments— like Nevada hotels—are charged more than $120,000 per year for Sunday Ticket, as reflected in the following pricing chart from DirecTV (which also shows the pricing differential between the exclusive NFL Sunday Ticket and the non-exclusive MLB Extra Innings package):



| NFL Sunday Ticket | MLB Extra Innings |

| EVO | 1-PAY | 3-PAY | 5-PAY | 1-PAY | 3-PAY |
|---|---|---|---|---|---|
| 1-50 | 1,458.00 | 486.00 | 291.60 | 595.00 | 198.33 |
| 51-100 | 2,314.00 | 771.33 | 462.80 | 805.00 | 268.33 |
| 101-150 | 4,630.00 | 1,543.33 | 926.00 | 1,120.00 | 373.33 |
| 151-200 | | | | 1,600.00 | 533.33 |
| 201-350 | 6,479.00 | 2,159.67 | 1,295.80 | 2,080.00 | 693.33 |
| 351-500 | 9,258.00 | 3,086.00 | 1,851.60 | 2,400.00 | 800.00 |
| 501-750 | 10,419.00 | 3,473.00 | 2,083.80 | 2,800.00 | 933.33 |
| 751-1000 | 13,888.00 | 4,629.33 | 2,777.60 | | |
| 1001-1500 | 20,832.00 | 6,944.00 | 4,166.40 | 3,600.00 | 1,200.00 |
| 1501-2000 | 27,774.00 | 9,258.00 | 5,554.80 | | |
| 2001-5000 | 57,864.00 | 19,288.00 | 11,572.80 | 4,800.00 | 1,600.00 |
| 5001-10000 | N/A | 34,138.33 | 20,483.00 | 6,000.00 | 2,000.00 |
| 10000+ | N/A | 40,965.00 | 24,579.00 | 8,800.00 | 2,933.33 |

17.    Sunday Ticket prices for residential subscribers are also far higher than they would be in a competitive market. The exclusive distribution arrangement agreed upon by the NFL and DirecTV has resulted in Sunday Ticket prices to residential consumers that substantially exceed the price for Sunday Ticket prices in Canada, where no exclusivity exists.  As an example, for 2015, Sunday Ticket pricing in the United States was fixed at $251.94 for the basic package and $353.94 for the "Max" package.  By contrast, in Canada, where there is no exclusivity MVPDs offered Sunday Ticket for approximately $199.00 in Canadian dollars

($155.22 in U.S. dollars) or less.[3] And certain other Canadian cable providers bundle the out-of-market games of the NBA, NHL, MLB and the NFL and in 2015 charged a C$35.95 (U.S. $28.04) monthly fee for access to *all* of them.

18.     DirecTV's ability to offer NFL Sunday Ticket on an exclusive basis is material to its operations.  Indeed, DirecTV's merger with AT&T, which was consummated in July of 2015, depended, in substantial part, on continued exclusivity of this service.  As DirecTV noted in a filing with the Securities and Exchange Commission ("SEC") on December 3, 2014, "[p]ursuant to the Merger Agreement, AT&T had the right to terminate the Merger Agreement or not consummate the Merger if we failed to enter into a contract with the NFL providing for exclusive distribution rights for the NFL Sunday Ticket service."

19.     Given these three sources of supracompetitive pricing and unlawfully protected market power—the agreement not to compete; the agreement to allow only purchases of a bundle of all 32 teams; and the agreement to sell certain games exclusively through DirecTV—it is no surprise that Defendants are able to charge exorbitant prices to Plaintiffs and other class members.

20.     The agreements challenged in this complaint drastically curb output, reduce choice, and increase price. They unreasonably restrain trade in violation of Section One of the Sherman Act (15 U.S.C. § 1), and allow the NFL to unlawfully monopolize the market for live video presentation of professional football games in violation of Section Two of the Sherman Act (15 U.S.C. § 2). Accordingly, Plaintiffs, on behalf of themselves and others similarly situated, seek injunctive

_____

[3] This calculation is based on the assumption of an exchange ratio of a Canadian Dollar to U.S. Dollar conversion ratio of .78, the reported average by *U.S. Forex* for the period from January 1, 2015 – December 31, 2015.  See www.usforex.com.

10

relief putting an end to this anticompetitive scheme and damages to compensate the Classes for the supracompetitive overcharges they have paid.

**JURISDICTION AND VENUE**

21.     Plaintiffs bring this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), for a violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2). This Court has subject matter jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 1337.

22.     Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. The Defendants transact business in this District, and are subject to personal jurisdiction here.

23.     Members of the Classes were injured in this District and DirecTV is headquartered in this District.

**PARTIES**

**A. Plaintiffs**

24.     Plaintiff Ninth Inning Inc. dba The Mucky Duck ("Mucky Duck") is a pub located in San Francisco, California.  Mucky Duck has purchased the Sunday Ticket from DirecTV in order to attract patrons to its establishment on Sunday afternoons during the NFL's professional football season.

25.     Plaintiff 1465 Third Avenue Restaurant Corp. dba Gael Pub ("Gael Pub") is a pub located in New York, New York.  Gael Pub has purchased the Sunday Ticket from DirecTV in order to attract patrons to its establishment on Sunday afternoons during the NFL's professional football season.

11

26.     Plaintiff Robert Gary Lippincott, Jr. ("Lippincott") is a resident of Healdsburg, California.  Lippincott signed up for Sunday Ticket in order to watch out-of-market Sunday afternoon NFL games.

27.     Plaintiff Michael Holinko ("Holinko") is a resident of Belle Mead, New Jersey.  Holinko signed up for Sunday Ticket in order to watch out-of-market Sunday afternoon NFL games.

**B. Defendants**

28.     Until 2015, the NFL was an unincorporated association of 32 American professional football teams in the United States. Each of the 32 NFL member teams, headquartered in various cities across the country, is separately owned and operated, acting in its own economic self-interest and competing in most respects with one another.

29.     The 32 Teams are owned and operated by the following entities, each of which is a defendant in this action:

| NFL Defendant Team Owner | State of Organization | Team Name (City) |
| --- | --- | --- |
| Arizona Cardinals, Inc. | Arizona | Arizona Cardinals |
| Atlanta Falcons Football Club LLC | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership | Maryland | Baltimore Ravens |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Panthers Football LLC | North Carolina | Carolina Panthers |
| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |
| Cleveland Browns LLC | Delaware | Cleveland Browns |

| | | |
|---|---|---|
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| Denver Broncos Football Club | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston NFL Holdings LP | Delaware | Houston Texans |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |
| Jacksonville Jaguars Ltd. | Florida | Jacksonville Jaguars |
| Kansas City Chiefs Football Club, Inc. | Texas | Kansas City Chiefs |
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club LLC | Minnesota | Minnesota Vikings |
| New England Patriots, LP | Delaware | New England Patriots |
| New Orleans Louisiana Saints LLC | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders LP | California | Oakland Raiders |
| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| San Diego Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty Niners Ltd. | California | San Francisco 49ers |
| Football Northwest LLC | Washington | Seattle Seahawks |
| The Rams Football Company LLC | Delaware | St. Louis Rams |
| Buccaneers Limited Partnership | Delaware | Tampa Bay Buccaneers |
| Tennessee Football, Inc. | Delaware | Tennessee Titans |

4377761v1/014918

| Washington Football Inc. | Maryland | Washington Redskins |

30.     In or about 2015, the NFL incorporated as the National Football League, Inc., and has its headquarters at 345 Park Avenue, 7th Floor, New York, NY 10154.  On information and belief, NFL Enterprises LLC was organized to hold the broadcast rights of the 32 NFL Teams and license them to MVPDs and other broadcasters, including DirecTV.  NFL Enterprises LLC is also located at 345 Park Avenue, 7th Floor, New York, NY 10154.

31.     Through the NFL, the 32 Teams do cooperate in some respects, including by setting game rules and a game schedule, and dividing their member teams into geographic territories. The teams have also agreed to allow the NFL to negotiate on their behalf television contracts with national broadcasters, including for the broadcast of each Team's games outside its home territory.  These include the Sunday Ticket package sold only through DirecTV.

32.     In *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010) ("*American Needle*"), the United States Supreme Court unanimously rejected the NFL's claim that an agreement regarding the  joint marketing of club-owned intellectual property was the  decision  of a "single entity"—the league—not subject to section 1 of the Sherman Act (15 U.S.C. §1). The Court reaffirmed lower court decisions that sports leagues are subject to the antitrust laws and that league owners must refrain from agreements that unreasonably restrain trade. The Court also reaffirmed its own decision in *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85 (1984), which held that the hallmark of an  unreasonable

4377761v1/014918

restraint is one that raises price, lowers output, or renders output unresponsive to consumer preference.

33. This complaint uses the term "NFL" to refer collectively (unless otherwise indicated) to the 32 Teams, National Football League, Inc., and NFL Enterprises, LLC.

34. Defendant DirecTV Holdings LLC is a Delaware Limited Liability Company and has its principal place of business at 2230 East Imperial Highway, El Segundo, California.  It is the U.S. operating arm of DirecTV, Inc. and describes itself as "a leading provider of digital television entertainment in the United States." It claims that "[a]s of December 31, 2014, [it] had approximately 20.4 million subscribers."

35. DirecTV, LLC is a California Limited Liability Company that has its principal place of business at 2230 East Imperial Highway, El Segundo, California. DirecTV, LLC issues bills to its subscribers.

36. This Complaint uses the term "DirecTV" to refer collectively to these two DirecTV entities.

**TRADE AND COMMERCE**

37. The NFL is by far the most significant provider of professional football in the United States. The three most recent Super Bowls have been the three most-watched programs in U.S. history.  The 2015 Super Bowl was the most-watched program ever, with 114.4 million viewers.

38. In a July 2015 analysis, Bloomberg estimated that the NFL receives about $6 billion annually in total television revenue from all sources. In 2011, the NFL negotiated nine-year extensions of its existing broadcast deals with Fox, CBS

15

and NBC, running through the 2022 season. According to an August 27, 2014 Bloomberg report, ESPN, Fox, CBS and NBC pay $1.9 billion, $1.1 billion, $1 billion and $950 million per year, respectively, for the right to broadcast NFL games. The *Wall Street Journal* reported in September of 2014 that CBS paid $300 million for the right to telecast NFL "Thursday Night Football" for one year.

39.     The commerce between the NFL and DirecTV is equally lucrative.  In October of 2014, it was announced that DirecTV and the NFL entered into a new telecasting deal reportedly worth $1.5 billion annually for the next eight years, a deal that will bring $8 billion more to the NFL (extending over four additional years) than its last deal with DirecTV. Through these and other contractual deals, the NFL, its member teams and DirecTV engage in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.

**CLASS ACTION ALLEGATIONS**

40.     Plaintiffs bring this action on behalf of themselves and as a class action under Fed. R. Civ. P. 23(b)(2) (for injunctive relief) and (b)(3) (for damages) on behalf of all persons who fall within the definition of either of the following two Classes (collectively, the "Classes"):

> All DirecTV commercial subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the present ("Commercial Class").  The Commercial Class excludes the Defendants and any of their current or former parents, subsidiaries or affiliates. The Commercial Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

> All DirecTV residential subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the present ("Residential Class").  The Residential Class

16

excludes the Defendants and any of their current or former parents, subsidiaries or affiliates. The Residential Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

41.    The Commercial Class is represented by Plaintiffs Mucky Duck and Gael Pub.

42.    The Residential Class is represented by Plaintiffs Lippincott and Holinko.

43.    DirecTV has sold its Sunday Ticket service to members of the Classes across the nation during the relevant period. Defendants have charged supracompetitive prices for that service.

44.    Due to the nature of the trade and commerce involved, the Classes consist of many thousands of members.  The exact number and their identities are known to DirecTV.

45.    The Classes are so numerous that joinder of all members is impracticable.

46.    There are questions of law and fact common to the Classes, including:

a.    Whether the NFL and its Teams engaged in a contract, combination, or conspiracy to reduce output and/or fix, raise, maintain or stabilize prices of live video presentations of regular season NFL games by agreeing that all video presentations would be licensed exclusively by the NFL;

b.    Whether Defendants have engaged in and are continuing to engage in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of video

presentations of live Sunday NFL games by eliminating competition among presenters of out-of-market NFL games;

c. Whether Defendants have engaged in and are continuing to engage in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of the Sunday Ticket by preventing any competitor from offering competing products;

d. The effect of Defendants' agreements on the prices of Sunday Ticket in the United States during the class period;

e. The effect of Defendants' agreements on the retransmission consent and affiliate fees for the carriage of NFL games to MVPDs;

f. The effect of Defendants' agreements on the subscription fees charged by MVPDs that carry the Networks that air NFL games;

g. The identities of the participants in the conspiracy;

h. The duration of the conspiracy and the acts performed by Defendants in furtherance of it;

i. Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

j. Whether the alleged conspiracy violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

k. Whether the conduct of Defendants caused injury to the Plaintiffs and the other members of the Classes; and

l. The appropriate measure of damages.

4377761v1/014918

47.     Plaintiffs and the Classes were, during the Class period, commercial or residential subscribers to DirecTV who also purchased the Sunday Ticket package. Their respective claims are typical of the particular Class that they seek to represent, and the named Plaintiffs will fairly and adequately protect the interests of the particular Class that they seek to represent.

48.     Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

49.     Given the high cost of establishing that Defendants' agreements violated the antitrust laws (including, but not limited to, substantial expert witness costs and attorneys' fees), a class action is the only economically feasible means for any Plaintiff to enforce their statutory rights.

50.     The prosecution of separate actions by individual members of the Classes would also create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

51.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

52.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily ascertainable and are ones for which records exist.  Prosecution as a class action will eliminate the possibility of duplicative litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense

that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## FACTUAL ALLEGATIONS

### A.  Relevant Market

53.     The relevant geographic market for both Classes is the United States. The relevant product market for both Classes is the live video presentations of regular season NFL games that includes a distinct submarket for "out-of-market" games as described above. The national broadcast rights to select packages of games are negotiated by the NFL with networks CBS, NBC, ESPN and Fox. In addition to broadcasts of these games, the market includes broadcast rights for out-of-market games, such as those carried in the NFL Sunday Ticket package. Broadcasts of other sports or other content do not compete with broadcasts of NFL games.  Moreover, NFL games broadcast locally on CBS and Fox on Sunday afternoons are distinct from the multi-game offering provided by Sunday Ticket specifically because the local games are different from the multi-game offering provided by Sunday Ticket, which caters to fans that are not located within the geographical confines of their favorite teams' home territories.

54.     New entrants that would dilute the market power over NFL video broadcasts created by the collusive agreements at issue here are extremely unlikely. New entry would require the creation of a new professional league playing American football. Such an undertaking would be enormously expensive, and—based on history—very unlikely to succeed. Even if a new entrant did appear, and even if it were sufficiently successful to sustain itself, it is unlikely that the resulting

4377761v1/014918

video product would compete sufficiently with the NFL's broadcasts to dissipate the NFL's monopoly power.

55.     In the 95 years since the NFL's formation in 1920, there have only been a few noteworthy attempts at entry into the market for American football games. Three times, once each in the 1920s, 1930s, and 1940s, an entity calling itself the American Football League was formed, briefly operated and then failed. In 1960 another entry attempt, also under the name of the American Football League, operated independently for nine years before merging with the NFL in 1970.

56.     The United States Football League ("USFL") was founded in 1982 but disbanded in 1986.  It sued the NFL for monopolization and won a jury verdict. *USFL v. NFL*, 842 F.2d 1335 (2d Cir. 1988). There have also been failed attempts to start and sustain a women's football league and various minor leagues or talent development leagues. The closest thing to a successful entry is the Arena Football League, which plays a substantially different type of football—indoor football. The Arena Football League ("AFL") began play in 1987 and continued through the 2008 season. The league was reorganized in 2010 and continues today.  However, the games of the AFL are played in spring and summer to avoid competition with NFL football broadcasts. In addition, AFL produces an altogether different sport, with a different fan base, that does not compete substantially with the NFL for a broadcast audience.

57.     By contrast, NFL Teams are well established and immensely popular, with 32 regionally diverse teams in or near almost every major population center in the United States. NFL Teams reside within 18 of the 25 most populous metropolitan areas, dramatically limiting the locations and audiences available to

new teams or leagues.  During the NFL's long history not one of the few sporadic attempted entries has been successful at competing for NFL football broadcast audiences. It is virtually impossible that a new league will form to compete away the NFL's monopoly power.

58.    The NFL's monopoly power will only be tempered if the underlying collusive agreement, which created the monopoly power, is broken up through antitrust authority, or if the exclusive deals that propagate that monopoly power are replaced by non-exclusive licenses.

59.    The value of the monopoly power that DirecTV exercises as a result of its exclusive deal with the NFL is illustrated by the recent contract extension with the NFL and the recent acquisition of DirecTV by AT&T.  As *Forbes* noted in an October 1, 2014 article:

> DirecTV has renewed its agreement with the National Football League for another 8 years. However, this time around, the price is increased by 50% to around $1.5 billion a year. This is very expensive and far more than $1 billion that CBS, NBC and Fox pay for their respective NFL coverage. The satellite company offers to its subscribers the popular *NFL Sunday Ticket*, a sports package that broadcasts NFL regular season games that are not available on local affiliates. Aided by the NFL, DirecTV has managed to attract customers even at times when other pay-TV operators were losing subscribers. The extended deal with the NFL will aid to the overall subscriber growth for the company. Moreover, the agreement was of key importance for DirecTV, as its proposed merger with AT&T to some extent was dependent on this deal.

Indeed, AT&T's $48.5 billion offer to purchase DirecTV contained a clause allowing AT&T to cancel the deal if DirecTV loses its exclusive contract for Sunday Ticket.  That clause provided: "[t]he parties also have agreed that in the event that DirecTV's agreement for the 'NFL Sunday Ticket' service is not renewed

4377761v1/014918

substantially on the terms discussed between the parties, the Company [AT&T] may elect not to consummate the Merger." Of course, DirecTV renewed its contract with the NFL for Sunday Ticket and the merger with AT&T was consummated in June of 2015.

**B. Relevant History of NFL Broadcasting Agreements**

60.    Television coverage of NFL games began in 1939, with regular broadcasting beginning after World War II. By 1950, Teams in Los Angeles and Washington, D.C. had negotiated contracts for all of their games to be televised, with many other teams following suit over the course of the 1950s.

61.    As these early clubs worked to get their nascent broadcasting contracts in place, they jointly agreed to restrict broadcasting competition. As of 1953, Article X of the NFL's by-laws prohibited any Team from broadcasting its games within 75 miles of another team's home city if that second team was either playing a game at home or playing a game on the road and broadcasting it back home. These restrictions "effectively prevent[ed] 'live' broadcasts or telecasts of practically all outside games in all the home territories." *NFL I*, 116 F. Supp. at 321.[4]

62.    The DOJ sued to enjoin enforcement of Article X, contending that it was illegal under 15 U.S.C. §1.

63.    The United States District Court for the Eastern District of Pennsylvania considered the competitive effects of the restriction. After noting that, at that time, "less than half the clubs over a period of years are likely to be

---

[4] "Outside games" were defined as games "played outside the home territory of a particular home club and in which that home club [was] not a participant." *Id.*

financially successful" and some teams were "close to financial failure," it found that "[r]easonable protection of home game attendance [was] essential to the very existence of the individual clubs" and that prohibiting broadcasting of outside games while a team was playing a home game was reasonable. *Id.* at 323-25.

64.     At the same time, the court in *NFL I* rejected the argument that Teams could legally agree not to broadcast in each other's territories when the local team was *not* playing a home game, which "obvious[ly] . . . cannot serve to protect game attendance." *Id.* at 326. Rather, it found that "the testimony of defendants' witnesses consistently indicates that the primary reason for the restrictions in this situation actually is to enable the clubs in the home territories to sell monopoly rights to purchasers of television rights to [their] away games." *Id.* (footnote omitted). It therefore held this restriction to be illegal. *Id.* at 327. It similarly condemned a provision prohibiting radio broadcasts of outside games, finding that even when teams were playing at home there was no evidence of "any significant adverse effect on gate attendance" but only an enhancement of "the value of such rights to purchasers." *Id.*

65.     In the years following this ruling, NFL Teams expanded their broadcasting output. By 1960—just a decade after the first clubs obtained distribution for all of their games—most NFL teams were broadcasting their entire seasons, and Sunday games were available on every national network.

66.     Despite this growing success, the NFL and the Teams were not satisfied with competitive results. Instead, they determined that they could make significantly more money by pooling and thus monopolizing their rights, allowing them both to demand higher rights fees from networks and offer networks the

24

ability to be the sole source of NFL games. The Teams therefore transferred their rights to the NFL, which then sold to CBS "the sole and exclusive right to televise all League games." *NFL II*, 196 F. Supp. at 446.

67.     The United States District Court for the Eastern District of Pennsylvania again had no trouble finding that "the member clubs of the League have eliminated competition among themselves in the sale of television rights to their games." *Id.* at 447. It therefore found the CBS contract to violate its judgment in *NFL I* and prohibited the enforcement of the contract. *Id.*

68.     The NFL next turned to Congress, lobbying for an antitrust exemption that would overturn *NFL II* and allow them to pool their rights for the purpose of selling games to over-the-air networks that were available to all viewers for free. This lobbying resulted in the passage of the SBA, which exempted from the Sherman Act

> any agreement by or among persons engaging in or conducting the organized professional team sport[] of football . . . , by which any league of clubs participating in professional football . . . contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the game[] of football . . . engaged in or conducted by such clubs.

15 U.S.C. § 1291. As discussed in greater detail below, the exemption provided by the SBA does not extend to cable, satellite or pay-per-view telecasts.

69.     The NFL and its Teams were content to abide by this limitation for some 25 years, broadcasting on as many as three free, over-the-air networks simultaneously. Once again, however, the lure of increased revenues proved irresistible. With the growth of cable television—which, unlike the sponsored telecasts envisioned by the SBA, are available only to paying subscribers—and its

25

lucrative subscriber base, the NFL and its Teams chose to ignore the limitations on the exemption they had received in the SBA and instead to sell their horizontally-pooled rights to cable networks.

70.     In 1987, ESPN became the first cable broadcaster of NFL games—games that were subject to the same restrictive horizontal agreement that had previously been used only to arrange the publicly available sponsored telecasts.

71.     As a result of the NFL and its Teams' output restrictions, consumers in any given area had no authorized means of watching most regular season NFL games, despite the increasing capacity to distribute the games and the decreasing cost of doing so. Instead, they were artificially limited to those few games, usually no more than four or five per week (and no more than two at any given time), that the Networks and the NFL chose to broadcast in their area. This artificially constrained output created a large, unserved demand for the inaccessible games, leading to a surge in piracy of distant feeds in the 1980s.

72.     The NFL wanted to cut down on this piracy (which, though it fueled interest in football, did not directly profit the NFL or its Teams) and capitalize on the pent-up demand created by the horizontal supply restriction, but without forgoing its monopoly control of all broadcast rights. In 1987, it developed a plan that prefigured the modern Sunday Ticket package: market an encrypted package of all games that could be viewed by consumers who purchased a decoder.

73.     According to sports journalist Gregg Easterbrook, CBS opposed the idea, fearing that the dilution of their ratings would decrease their advertising revenue, and this plan was not implemented as originally conceived.

26

74.     In December of 1993, however, Fox outbid CBS for broadcast rights, removing an important obstacle to the planned package. At the same time, the advent of direct-broadcast satellite television service ("DBS") made distribution of all games easy and inexpensive. Those early DBS providers could carry a larger number of channels than contemporaneous cable providers without running into capacity constraints. (Capacity constraints are no longer a significant factor for either DBS or cable providers.)

75.     For the 1994 season, the NFL bundled together a package of games that could be sold nationwide, allowing the NFL and its Teams to offer a single, monopolized product containing the various products they would otherwise sell individually. This package would become the product known today as Sunday Ticket.

76.     DirecTV, the second commercial DBS provider in America, also launched in 1994, just a few months before the NFL season began. It contracted with the NFL to license Sunday Ticket exclusively, making it the only source for the vast majority of regular season NFL games in any part of the country. Since then, DirecTV has successfully convinced the NFL to continue licensing Sunday Ticket exclusively, even though the technological impediments to carriage by cable providers or on the Internet have long since faded away.

77.     Even with CBS temporarily out of the picture,[5] the NFL still encountered resistance from its other broadcast networks. Moreover, it could not create Sunday Ticket without the Networks' agreement to provide their feeds of games to DirecTV. Some of the networks demanded concessions and limitations on

---

[5] CBS resumed broadcasting NFL games in 1998.

4377761v1/014918

Sunday Ticket in exchange. In 2003, News Corporation, the parent of Fox, acquired 34% of DirecTV that it then transferred to the Fox Entertainment Group. According to Gregg Easterbrook ("Easterbrook"), a reporter at ESPN, Fox insisted that Sunday Ticket subscribers be capped at one million annually.  Easterbrook also reported that, while this cap has increased over the years, it remained an express or implied obligation.

78.     The NFL's own resolutions attached to its 2006 Constitution and By-Laws underscore the significance of these agreements.  NFL 2003 Resolution BC-1 contains this clause:

> It is hereby *Resolved* that the League concurs in the Broadcasting Committee's approval of the DirecTV Agreement, with the Broadcasting Committee to ensure that, during the term of the DirecTV Agreement, no network television agreement containing provisions that would interfere with or preclude NFL Enterprises' performance of the DirecTV Agreement shall be executed.

79.     Similarly, NFL Resolution 2004 BC-3 contains this clause:

> Be it *Resolved* that the League concurs in the Broadcasting Committee's approval of the DirecTV Agreement and directs the Broadcasting Committee to ensure that, during the term of the DirecTV Agreement, no network television agreement containing provisions that would interfere with or preclude NFL Enterprises' performance of the DirecTV Agreement [*sic*].

80.     It is fundamental to carrying out the exclusive deal between the NFL and DirecTV that the latter has access to the feeds of Sunday afternoon NFL games televised by CBS and Fox.

28

4377761v1/014918

## C.  The NFL's Current Broadcast Rights Agreements

81.     As noted above, the NFL's 32 member Teams have given the league authority to negotiate pooled rights television deals on their behalf, in exchange for an equal share of the resulting revenues.

82.     Regular season NFL games are currently broadcast in two principal ways.

### i.     Over-the-Air and Cable Broadcasts

83.     First, as they have done since 1987, the NFL and its Teams sell their pooled rights to over-the-air and cable networks. Currently, they contract with five networks: the over-the-air networks NBC, Fox, and CBS; the subscription network ESPN; and the NFL's own subscription network, NFL Network. When the NFL most recently negotiated these contracts, in 2011, it was reported that the deals lasted at least eight years and until 2022 in some cases, and totaled some $27 billion in licensing fees.

84.     During the regular season, most games take place on Sunday afternoons at approximately 1 p.m. or 4:25 p.m. Eastern time. These games are split between CBS and Fox, with CBS holding the exclusive rights to broadcast American Football Conference ("AFC") games and Fox the exclusive rights to broadcast National Football Conference ("NFC") games. In most weeks, there are between eleven and thirteen Sunday afternoon games. In addition, the NFL typically schedules one game on Sunday, Monday, and Thursday nights. These night games are licensed exclusively to NBC, ESPN, and the NFL Network, respectively, for national distribution. For the Sunday afternoon games, CBS and Fox, in consultation with the NFL, determine which games will be broadcast in

29

which locations. Typically, each network makes only one game available in any given location at a time. Each week, one network has the rights to air one game in each timeslot, while the other network may air a game only in one timeslot. For example, in a given week, CBS would choose one AFC game to make available in a given location at 1 p.m. and one to make available at 4:25 p.m. Fox would have the right to air NFC games in only one timeslot in a week that CBS was permitted to show two games. On another week, CBS's and Fox's roles would be reversed, with Fox broadcasting two games and CBS broadcasting one. League rules further limit the games available in a market in which a team is playing a Sunday afternoon game, such that under certain circumstances only one other game will be available.

85.     Thus, in any location in America, there are no more than two regular-season games available on television at any given time—even though there may be as many as seven games being played simultaneously, by fourteen teams. In total, no more than three NFL Sunday afternoon games are typically shown in a given location, despite as many as thirteen games being played on Sunday afternoon.

86.     This ensures that no more than six games will be broadcast on television in any given week, thereby lessening the competition that each broadcaster would face from fourteen or fifteen games to five. A primary purpose of the restrictions is to make the rights to the games more valuable to broadcasters, which allows them to earn more money from the telecasting of NFL games. Broadcasters are able to charge more to advertisers and more to MVPDs (in the form of affiliation fees or retransmission consent fees).

87.     This effect is particularly pronounced for the Sunday afternoon games broadcasted by CBS and Fox. In a competitive market, up to seven games would be

30

broadcast simultaneously (which would still be significantly less than the number of college football games that are typically broadcast at the same time). This would represent a massive increase in consumer choice—but would give CBS and Fox direct competitors that would reduce their ratings and revenue. Keeping those games off regular television and restricting them only to DirecTV subscribers who are willing to pay for the supracompetitively priced Sunday Ticket increases consumer costs and limits consumer choice.

88.    The participation of cable networks ESPN and NFL Network exacerbates the anticompetitive harms wrought by the agreements. Because of the reduced competition in the broadcasting and sale of live video presentations of professional football games, ESPN and NFL Network are able to charge inordinately large subscription fees to MVPDs, which are then passed on to consumers. In part due to the exclusivity it has purchased from the NFL and its members, ESPN is the single most expensive cable channel in the United States. Indeed, according to a 2014 *Wall Street Journal* analysis, ESPN cost $6.04 a month on average, more than four times as much as the second-most expensive national channel, TNT, which cost just $1.48 a month. MVPDs' robust profit margins confirm that this exorbitant price is passed on to consumers.

### ii.    DirecTV and NFL Sunday Ticket

89.    Beginning in 1994, pursuant to its exclusive agreement with the NFL, DirecTV offered its subscribers access to the Sunday afternoon games that were not otherwise available in their market via national broadcasts. These subscribers could purchase NFL Sunday Ticket, a premium subscription-based package that provides

31

access to all Sunday afternoon games broadcast on Fox and CBS, or their predecessors.

90.     Through its exclusive agreement with the NFL, DirecTV today takes the live game telecast feeds produced by CBS and Fox and redistributes them without alteration to NFL Sunday Ticket subscribers via DirecTV channels.  NFL Sunday Ticket subscribers can thus access all Fox or CBS games.

91.     Defendants have colluded to sell the out-of-market NFL Sunday afternoon games *only* through DirecTV. Such an arrangement eliminates competition in the distribution of out-of-market Sunday afternoon games and requires anyone wishing to view these games to subscribe to DirecTV and purchase NFL Sunday Ticket (or, in limited circumstances, purchase from DirecTV a Sunday Ticket live streaming package) at a supracompetitive price created by the exclusive NFL/DirecTV distribution agreement.

92.     The contracts between the NFL and DirecTV are negotiated on behalf of the league and then ratified by vote of the members of the league. For example, in the 2003 Resolution BC-1, attached as an addendum to the 2006 version of the NFL's Constitution and Bylaws, the league members ratified the proposed agreement between NFL Enterprises LLC and DirecTV whereby the latter could telecast out-of-market NFL regular season games during the 2003-08 football seasons. Similarly, in 2004 Resolution BC-3, also attached as an addendum to the 2006 version of the NFL's Constitution and Bylaws, the members of the league ratified the "NFL Sunday Ticket rights agreement" between NFL Enterprises and DirecTV for the 2006-10 football seasons. Subsequent extensions or renewals of the agreements between the NFL and DirecTV have been similarly ratified.

32

93.     The exclusive nature of the NFL's contractual and other arrangements with DirecTV prevents other MVPDs or, indeed, the individual clubs in the league, from offering broadcasts of out-of-market games in competition with each other and with DirecTV. This anticompetitive effect implicates blackouts of out-of-market games, both broadly and as discussed in the NFL's Constitution and Bylaws. For example, NFL Bylaw 10.2(a) imposes the following blackout restriction on televised games: "[n]o club shall cause or permit a game in which it is engaged to be telecast into any area included within the home territory of any other club on the day that such other club is engaged in playing a game at home…."  As a result of bylaws of this type, out-of-market games—as defined in the deal between the NFL and DirecTV—are unavailable to commercial and residential subscribers except pursuant to the anticompetitive conditions imposed upon them by Defendants. But for these conditions, commercial and residential subscribers would have more choices to access out-of-market games at lower prices.

94.     As explained previously, DirecTV's exclusive arrangement with the NFL results in NFL Sunday Ticket subscribers paying a higher price for NFL Sunday Ticket (and other access charges) than they otherwise would pay if the agreements were negotiated competitively.

95.     For example, on December 11, 2002, when the NFL's first contract with DirecTV for NFL Sunday Ticket expired, the cable MVPD consortium InDemand presented a letter proposal to former NFL Commissioner Paul Tagliabue offering $400 million to $500 million annually for the *nonexclusive rights* to carry Sunday Ticket. "We're prepared to accept a license fee around those levels for a three- to five-year term," wrote Stephen A. Brenner, the president of InDemand, at

the time. However, within hours of receiving the proposal, the NFL announced a five-year *exclusive* renewal with DirecTV.

96.    In October of 2014, DirecTV renewed its exclusive agreement with the NFL. The renewal requires DirecTV to pay the NFL an average of $1.5 billion per year for eight years in return for the exclusive right to rebroadcast NFL Sunday afternoon games on Defendants' NFL Sunday Ticket service.

97.    The NFL directly promotes Sunday Ticket as a special product on its website. It states:

> Get in the game with NFL SUNDAY TICKET.
>
>    Only on DIRECTV.
>
> Only DIRECTV brings you every out-of-market game live, every Sunday. Get the 2015 season at no extra charge when you subscribe today! Or up your game to NFL SUNDAY TICKET MAX and get live games anywhere you go, real-time highlights, the RED ZONE CHANNEL®, DIRECTV FANTASY ZONE CHANNEL™, and NFL.com fantasy, all on your laptop, tablet, phone, or game console.

98.    The NFL's webpage then advertises the full-season rates for Sunday Ticket, states that "[b]lackout rules and other conditions apply," and provides a link to DirecTV's website for additional information.

### D.  The Challenged Agreements Harm Competition

99.    The NFL and its Teams' agreement to pool broadcasts is a classic horizontal supply restriction. Bedrock economic principles teach that a horizontal agreement by 32 market participants not to compete, but rather to sell their products collectively, will reduce output, raise prices, and harm consumers.

100.   This harm is evident in many forms. *First*, the availability of football broadcasts on standard over-the-air and cable channels is vastly lower than it would

34

otherwise be. NFL football has the highest ratings of all sports programs. Yet only two or three Sunday afternoon games are available to fans. By contrast, NCAA football, whose similar restraints were found to violate the antitrust laws by the Supreme Court, is now available on dozens of different networks on Saturday afternoons, with no limit on the number of games aired at the same time.

101.   *Second*, the output of NFL broadcasts, considered on a per-game basis, is half the output of the other major American sports leagues.[6] In the NHL, NBA, and MLB, where teams are allowed to negotiate with broadcasters, teams typically produce two broadcasts per game, each with distinct characteristics appealing to different consumers. In the NFL, by contrast, the NFL and the Networks that carry NFL games create just one broadcast for each game.

102.   Unsurprisingly, these supply restrictions come with correspondingly astronomic prices. For the 2015 season, DirecTV and the NFL charged as much as $359 for a full season of Sunday Ticket to individual subscribers, and anywhere from $1,458 to more than $120,000 for commercial subscribers. Sunday Ticket prices increase nearly every year; for example, between the 2014 and 2015 seasons, DirecTV and the NFL increased prices roughly 11.5%.

103.   But for the anticompetitive agreements, each Team would create its own broadcasts and sell those broadcasts in a competitive marketplace. This would naturally force prices down at the same time it increased output. A bundle of games, whether sold as Sunday Ticket or in another form, would continue to be profitable enough that the Teams would have an incentive to continue offering it—but its

---

[6] On an absolute basis, the disparity is even greater, but this is because the NFL season has roughly 10-20% as many games as the other leagues.

35

prices would necessarily decrease in the face of nationwide competition from individual Teams.

104.   The contrast between NFL radio broadcasting and NFL television broadcasting illustrates this harm. NFL Teams negotiate individual radio broadcasting contracts, rather than consolidating all broadcasting in the NFL itself. Each Team produces (or contracts with a third party to produce) its own radio broadcast of its games, so that a fan of each Team in a game can consume a broadcast catering to that fan base. As a result, there are at least twice as many NFL radio broadcasts as there are television broadcasts. The Team or its radio partner licenses those broadcasts to multiple radio stations—many of which broadcast the game free on the Internet nationwide. Thus, despite there being *less* demand for radio broadcasts, the NFL and its Teams produce *more* output and make it more broadly available—a disparity that can only be explained by the anticompetitive effect of the horizontal restraint on television broadcasting.

105.   The NFL and its Teams' agreement to sell the bundled games through an exclusive distributor significantly exacerbates the anticompetitive effect of the agreements. By licensing their artificial, highly valuable monopoly to DirecTV exclusively—rather than offering it through multiple distributors as they do outside the United States and as all other sports leagues do—the NFL and its Teams not only increase prices and restrict availability for Sunday Ticket, but they distort competition among MVPDs and between MVPDs and the Internet. Indeed, in service to this agreement to distribute exclusively, which is unique among major American sports leagues, the NFL does not provide any means of online availability for many consumers, drastically limiting output compared to the other leagues.

36

106.   The exclusive deal between DirecTV and the NFL for the broadcast rights of NFL Sunday Ticket is necessary to preserve the exercise of market power created by the teams' anticompetitive agreement to monopolize the sales of broadcast rights. Without the exclusive deal, some of the monopoly rents created by the collusion among NFL teams would be dissipated by price competition between DirecTV and one or more MVPDs.

107.   The exclusive distribution agreement is not needed to assure a quality broadcast of the games offered on Sunday Ticket or to allow the NFL sufficient oversight of games offered on Sunday Ticket or any other reasonable objective. Instead, the agreement was created to artificially raise the price of Sunday Ticket.

108.   Indeed, the exclusive content enjoyed by DirecTV is rare.  Rob Stecklow, general manager of sports products and marketing for DirecTV, admitted as much:  "[i]n this time and era where there's less and less content that's exclusive, the NFL still reigns as some of the best content out there."  The only way Plaintiffs and members of the Classes can view Sunday afternoon out-of-market NFL football games is by purchasing NFL Sunday Ticket from DirecTV.

109.   Nonetheless, this is not what has happened with the telecasting of out-of-market games for other professional sports leagues in the United States. For example, in March of 2007, MLB was negotiating with DirecTV for a seven-year, $700 million deal for an exclusive contract to carry the Extra Innings package  At that time, InDemand made a $70 million per year ($490 million over seven years) bid for non-exclusive rights to carry Extra Innings, but MLB declined this offer. While MLB and DirecTV were finalizing their exclusive contract, public outcry and Congressional pressure forced cancellation of the deal before the season began.

37

With the prospect of exclusivity eliminated, both DirecTV and InDemand carried Extra Innings, thereby offering greater consumer choice in broadcasting than would have been possible under an exclusive contract.

110.   Subscribers to DirecTV have been concerned about the market leverage it has been able to obtain as a result of its deal with the NFL for Sunday Ticket. The following interchange between a subscriber and business columnist Steven Pearlstein was reported in a *Washington Post* article:

> **[Subscriber]**  What do you make of the current exclusivity arrangement the NFL has with DirecTV to broadcast games? I find that DirecTV will not sell its 'Sunday Ticket' package unless one also purchases a base programming package. I don't feel receiving NFL games on cable is a God-given right, but do feel the NFL is employing monopolistic practices by not opening up the Sunday Ticket to other cable/satellite carriers. When might that arrangement end? Thanks.

> **Steven Pearlstein**: Right now they are using DirecTV as the instrument for extending their football monopoly to the distribution of games on video. They have made it clear, however, that they want to own the distribution channel themselves and now share their monopoly profits with DirecTV. That is their ultimate game plan, which by the way won't include a free, over-the-air broadcast of local team games on local television, unless they are forced to do so.

111.   Another columnist made a similar point in a May 2014 article on the website of the *Atlantic Monthly*:

> AT&T's bid to acquire DirecTV includes acquisition of the Sunday Ticket exclusive. The *Los Angeles Times* reports that snapping up Sunday Ticket is a key goal of AT&T's. Professional football is among the most valuable brands on the entertainment landscape. What communications corporation wouldn't want a monopoly over a major NFL product?

> But the Sunday Ticket cartel arrangement assures that only a small share of the American population can enjoy viewer choice on Sunday afternoons. The same voters who are taxed to subsidize the NFL, to the tune around $1 billion annually, are denied a choice about what games to watch.

Adding insult to injury, anyone in Canada and Mexico can sign up for NFL Sunday Ticket, without cable-carrier restrictions. In those nations, telecommunication law forbids sole-carrier contracts. Inside the United States, the NFL's antitrust waiver allows it to screw consumers with impunity. And screwing consumers with impunity is a prerogative AT&T wants too!

When the NFL made its first deal with DirecTV, satellite-relayed signals were exotic and broadband cable did not exist: Initially, Sunday Ticket was seen as a niche product for technophiles. A ratings calculation was at work as well. Sunday Ticket is an annualized pay-per-view, and pay-channel viewership does not count in Nielsen ratings. If large numbers of viewers switched from NFL games aired on local affiliates to football shown on Sunday Ticket, the NFL's Nielsen numbers would decline, even if actual viewership was rising.

But as football has surged in popularity in the last two decades and broadband has become available to nearly all the country, observers have repeatedly expected that Sunday Ticket would become available to everyone. After all, no one now could think the NFL is losing popularity, while Nielsen's scoring of new-viewership habits such as next-day DVR of drama and comedy shows is taken into account in their advertising rates. Today the NBA and MLB both market their extra-price watch-any-game services via cable.

But DirecTV has repeatedly offered the NFL a king's ransom to renew its monopoly. For the 2014 season, DirecTV will pay the league $1 billion for about two million Sunday Ticket subscribers: more than to be paid by NBC, whose NFL games average 10 times as many viewers. DirecTV offers the king's ransom because Sunday Ticket is the loss leader that put the company on the map. And the NFL loves a customer that pays too much!

DirecTV has done the league important favors to sustain its sweetheart relationship. As the 2011 season approached, with the NFL's labor deal expiring and a lockout possible, DirecTV agreed to pay $1 billion even if no games were played that season. CBS, ESPN, Fox, and NBC would have owed nothing for no games. The $1 billion promise from DirecTV afforded the NFL a plush strike fund, ensuring owners and league executives could live in luxury that year even if the season were cancelled.

AT&T badly wants the same sweetheart relationship with the NFL, and has insisted DirecTV renew its monopoly deal before the takeover closes. If so AT&T will acquire something CBS, Comcast, ESPN, Fox, NBC, and Verizon don't have—the sole means to watch the NFL game of your choice.

The Justice Department should insist, as part of any approval it may offer for the AT&T merger bid, that DirecTV divest itself of the Sunday Ticket exclusive. Such a requirement may cause AT&T to back out of the deal, or demand that DirecTV accept a lower price: but that's why there is antitrust law, to provide a cross-check against behavior that harms consumers. The NFL's viewer-choice service should be offered by all cable carriers, as nearly all other entertainment products are available across the cable universe.

Not only is it absurd that Americans subsidize a sports league so Canadian and Mexican viewers can have more choice than Americans do. If Sunday Ticket were available on all cable carriers, more buyers would allow for a lower price, as happened with cell phones. Rather than a tiny number who have good luck with geography paying $200 a year to pick their own NFL game, many millions could pay, say, $50 a year for the same freedom.

Allowing AT&T to acquire DirecTV's Sunday Ticket monopoly would be strongly anti-consumer. Using this moment to divest the monopoly and bring Sunday Ticket to all telecommunications platforms would be strongly pro-consumer. Please don't tell us the Justice Department and the White House will mess this opportunity up.

112.   For years, DirecTV has hypocritically fought with its cable industry competitors to ensure that vital access to sports programming on so-called "regional sports networks" ("RSNs") is available to it on a non-exclusive basis.  For example, on August 31, 2012, DirecTV wrote to the Federal Communications Commission in support of a proposed rule extending a ban on vertically integrated cable companies from withholding access to RSNs from other MVPDs, including DirecTV:

Six years ago, the Commission used a regression analysis to evaluate and quantify the potential harm to competition that results when a cable-affiliated programmer withholds content from rival MVPDs. Among other things, the Commission found that, as a result of the decision by the Cox-affiliated regional sports network ("RSN") in San Diego to deny its programming (including games of the San Diego Padres) to MVPD rivals, DBS penetration in the San Diego market was 40.5% lower than it would have been if that programming had not been withheld.  The attached economic analysis of San Diego subscribership is qualitatively

40

consistent with the Commission's finding about the damage done when cable-affiliated programmers withhold content from competitors.

This updated analysis takes advantage of the fact that the Cox RSN recently lost the rights to telecast Padres games. This season, those games are available to all MVPDs through Fox Sports San Diego ("FSSD"). DIRECTV carries FSSD, as does Cox. These recent developments in San Diego offer a natural experiment through which to evaluate the effects of gaining access to valuable content. Accordingly, DIRECTV asked Professor Kevin Murphy to augment his prior economic analysis in this proceeding with an analysis of subscribership in San Diego in light of this new RSN arrangement.

As more fully detailed in Professor Murphy's attached report, the data from 2012 are consistent with the Commission's finding in 2006. In order to evaluate the effect on DIRECTV's subscribership from gaining access to Padres games, Professor Murphy first calculated the difference in the growth rate in the number of DIRECTV subscribers in San Diego before and after these RSN changes. He then calculated this difference for a set of control markets, and compared the before-and-after difference in DIRECTV's growth rates in San Diego to the before-and-after difference in DIRECTV's growth rates in the control markets. The results of this analysis indicate that DIRECTV has gained substantially more subscribers in San Diego since it gained access to Padres games through FSSD than would have been expected based on its subscribership trends in comparable markets. These gains were achieved in only the first five months of DIRECTV's FSSD carriage; the long run effects likely will be larger, as additional San Diego households revisit their MVPD choice. These conclusions are further supported by customer surveys, which evidence an increase in the number of new subscribers citing "access to sports channels" as the reason for subscribing to DIRECTV since it began carriage of FSSD.

113.   Thus, as DirecTV's own data demonstrates, consumers benefit from the non-exclusive distribution of live sports content by way of enhanced competition amongst MVPDs.

### E.  DirecTV Has Participated in and Facilitates This Anticompetitive Scheme

114.   DirecTV has participated in and facilitates the horizontal agreements among the Teams.

41

115.   DirecTV requires the NFL and its Teams to maintain their anticompetitive agreement, and has paid handsomely to ensure compliance. Indeed, DirecTV has significantly expanded the agreement, preventing online distribution of live games until recent years, and even today limiting online distribution primarily to individuals unable to install DirecTV in their households. Because of DirecTV's participation in the scheme, the United States is one of the only countries in the world where NFL games are not offered online to all consumers. Similarly, the NFL and its teams have licensed Sunday Ticket to more than a dozen satellite and cable providers in Canada, which they would have done in the United States as well but for DirecTV's inducements and demands.

116.   The NFL has described itself as being in a "partnership" with DirecTV. In announcing the 2014 contract renewal, the NFL issued a press release that stated as follows:

> "We are pleased to continue our partnership with DirecTV," said NFL Commissioner Roger Goodell ["Goodell"] "DirecTV and NFL Sunday Ticket have served our fans well for 20 years and continue to complement our broadcast television packages. We also appreciate DirecTV's commitment to NFL Network, which it has carried since the channel launched in 2003."

> "This new agreement is a testament to the terrific long-term relationship we have with the NFL and its millions of fans across the country," said Mike White, chairman, president and CEO of DirecTV. "NFL Sunday Ticket has always been the centerpiece of DirecTV's sports leadership and we're pleased to continue our relationship with the NFL and be a part of the league's future growth and success."

117.   Similar statements were made by Goodell in NFL press releases announcing the contract extensions with DirecTV for Sunday Ticket in 2009 and 2012.  As noted earlier in this Complaint, the NFL directly markets the Sunday Ticket service and its price on the NFL's website.

42

118.   There are no procompetitive benefits to the exclusive distribution arrangement. Exclusive distribution can sometimes promote inter-brand competition, but because the NFL is the only provider of major-league professional football telecasts in the United States, there is no relevant inter-brand competition.

### F.  There Are No Procompetitive Benefits, and Any That Might Exist Could Be Achieved through Less Restrictive Means

119.   These output restrictions have no procompetitive benefits—and even if they did, any such benefits could be achieved through less restrictive means. Even though other major sports leagues engage in anticompetitive horizontal restrictions of their own, none has sought to completely eliminate individual teams' output— and yet none of them have any problems broadcasting all or nearly all of their games. Indeed, as discussed above, the other leagues have *more* per-game output.

120.   Moreover, NFL broadcasting rights—even without the scheme to monopolize and restrict them—are an extraordinarily valuable commodity. The Nielsen Company estimated that the 2014 regular season alone reached 202.3 million unique viewers, representing 80 percent of all television homes and 68% percent of all potential viewers in the United States.[7] Viewership for NFL games regularly eclipses that of any other program on television. During the 2014 regular season, every one of the 20 most-watched programs in America was an NFL game, as were 25 of the next 30. Indeed, for the past three years, an NFL game was the most-watched program on television for each week of the NFL season. This trend shows no signs of abating. For example, a preseason game between the Minnesota

---

[7] On information and belief, the statistics in this paragraph do not include viewership through Sunday Ticket—meaning that even these impressive statistics underestimate the demand for football broadcasts.

Vikings and the Pittsburgh Steelers on August 11, 2015 was the most-watched program in America for the entire week, according to the Nielsen ratings service—despite being a preseason game, rather than a regular season game, and between two relatively small-market teams. As Nielsen summarized earlier this year, "NFL fans make every game a Super Bowl."

121.   Given this tremendous viewership, there can be no serious argument that NFL Teams would have trouble obtaining distribution without their horizontal restraint. The supply restriction has the effect and purpose of concentrating viewership in a limited number of broadcasts, and allowing for the charging of higher fees for advertising,. But even though revenues—and prices to advertisers and consumers—would be lower without the restraint, they would still be more than sufficient to incentivize Teams to broadcast their individual games as broadly as possible, particularly given the relatively low costs of distribution.

122.   Similarly, restrictions are not necessary to preserve attendance at games, as they were thought to have been in the 1950s. Industry observers and participants widely believe the notion that video broadcasts hurt attendance to be antiquated and wrong; rather, the consensus is that they are complementary products that increase interest and thus increase attendance, merchandise purchases, and other valuable forms of fan engagement. Indeed, many less popular leagues, such as the AFL, give their broadcasts away for free on the Internet in the hopes of generating interest. The NFL itself has now abandoned all blackouts of non-sold-out local games, having been the last major sports league to limit broadcasts to encourage ticket sales.

4377761v1/014918

123.   Even if the restrictions did protect game attendance, that protection is no longer justified as it may have been in the 1950s. The *NFL I* court relied heavily on its findings that "less than half the clubs over a period of years are likely to be financially successful" and that "the very existence of the individual clubs" required "protection of home game attendance." *NFL I*, 116 F. Supp. at 323, 325. Today, the average NFL Team is worth $2 billion, according to Forbes, with even the least valuable team valued at $1.4 billion. There is no plausible risk that any Teams would be driven out of business if required to license its lucrative broadcast rights individually.

124.   Nor are the restrictions necessary to foster competitive balance. Whatever measures may be acceptable in pursuing the goal of competitive balance, they cannot justify eliminating all broadcasting competition and thereby restricting supply, raising prices and revenues. The NFL and its Teams engage in a variety of other measures intended to ensure competitive balance, such as salary caps that are exempt from antitrust scrutiny under labor exemptions; there is no need to monopolize the broadcasting market as well. If the NFL and its Teams were simply interested in competitive balance, they could generate revenues through ordinary competitive means and then engage in some permissible form of revenue sharing, or otherwise participate in less restrictive agreements.

125.   Likewise, Defendants could achieve any legitimate, pro-competitive goals without an exclusive arrangement.  As noted earlier in the Complaint, Sunday Ticket is offered in Canada on a non-exclusive basis through more than a dozen satellite and cable providers.  And in the United States, other football products such

as the NFL's "Red Zone" package (which offers views of selected in-game highlights) are offered on a non-exclusive basis as well.

126.   Defendants' exclusive agreement has a clear negative impact on competition, and serves no pro-competitive purpose. There is no evidence that this agreement was created to assure the quality of Sunday Ticket or to allow the NFL sufficient oversight, or any other permissible objective. Instead, DirecTV and the NFL entered into the agreement with the intent of maintaining a monopoly price for Sunday Ticket. And, because all the NFL teams have colluded to offer the package, they have also prevented individual competition by teams selling their own games to broadcasters.

127.   There are several less restrictive alternatives which would achieve any legitimate, procompetitive goals. Those include letting teams contract individually with DirecTV and allowing other distributors to purchase and exhibit the Sunday Ticket package.

128.   Noll made a similar point in testimony before the United States Senate Judiciary Committee at a November 14, 2006 hearing on "Competition In Sports Programming And Distribution: Are Consumers Winning?":

> The relevant benchmark for whether an action is pro- or anti-competitive is the circumstance that would prevail in a competitive world. The argument that NFL Sunday Ticket increased output is correct, but it increased output in a monopolized market. The issue is what is the alternative in the absence of monopolization, and in the absence of monopolization, the market for televised NFL games would be like other pro sports were or like college sports are today. For example, if all broadcasting of college football games were put together into a single package priced at $150 a month and shown exclusively through DirecTV, the effort would be a profit-enhancing reduction in output. From my perspective, if one adopts the right counterfactual, the right but-for world in the competitive environment, it is obvious that NFL Sunday Ticket is a palliative compared to the output and prices that would exist in a competitive environment.

46

### G. Examples from Other Leagues Confirm That Comparable Agreements Harm Competition

129.   Both empirical evidence and the opinions of sports teams themselves confirm that restrictions such as these harm competition—and that eliminating them produces an explosion in output.

130.   The example of Division I college football is an instructive comparison. Before 1984, the National Collegiate Athletic Association ("NCAA") limited the total number of televised intercollegiate football games and the number of games that any one college could televise. It also prohibited colleges from broadcasting through sources other than ABC and CBS.

131.   Two universities sued the NCAA, leading the United States Supreme Court to find that the NCAA's plan violated 15 U.S.C. §1. After a full trial, the United States District Court for the Western District of Oklahoma found that the NCAA was a "classic cartel" that had "sought and achieved a price for their product which is, in most instances, artificially high." *NCAA v. Board. of Regents of Univ. of Okla.*, 468 U.S. 85, 96 (1984) (quoting *Board  of Regents of Univ. of Okla.*, 546 F. Supp. 1276, 1300-01 (W.D. Okla. 1982)). The district court found the plan to constitute price-fixing, a group boycott, and artificial limit on production. It rejected the NCAA's proffered justifications that competition would adversely affect gate attendance or harm competitive balance.

132.   The United States Court of Appeals for the Tenth Circuit affirmed,[8] as did the Supreme Court. The Supreme Court found the NCAA's plan to be "a horizontal restraint" that both "create[d] a limitation on output" and "constitut[ed]

---

[8] The appellate court did remand to modify the district court's injunctive decree.

47

horizontal price fixing." *Id.* at 99-100. This created "a significant potential for anticompetitive effects"—a potential that "ha[d] been realized." *Id.* at 104-05. As the district court had found, "if member institutions were free to sell television rights, many more games would be shown on television"; prices were not only inflated but "unresponsive to viewer demand and unrelated to the prices that would prevail in a competitive market." *Id.* at 105-06. The "anticompetitive consequences of this arrangement," the Supreme Court said, were "apparent." *Id.* at 106. Nor were there "any procompetitive efficiencies which enhanced the competitiveness of college football television rights; to the contrary . . . NCAA football could be marketed just as effectively without the television plan." *Id.* at 114.

133.   After the NCAA's plan was abolished, the Supreme Court's prediction that "many more games would be shown on television" proved true. Today, Division I college football and basketball are among the most heavily televised sports in the country. All four major broadcast networks nationally televise college football games, as do at least three ESPN channels (ESPN, ESPN 2, and ESPNU), Fox Sports 1, CBS Sports Network, and NBC Sports Network. Most regional sports networks ("RSNs") also carry college football, as do three regional Fox College Sports Networks and various NCAA conference-created channels. Similarly, at least 10 networks carry college basketball nationally, along with many RSNs and the Fox College Sports Networks.

134.   This example confirms that agreements to monopolize and restrict the availability of sports broadcasts raise the prices of those broadcasts and reduce their output, exactly as intended. It strongly suggests that, in the absence of the agreements challenged here, teams would have no difficulty finding national

48

distributors for their currently untelevised games. Indeed, given the far higher popularity of professional football and the far lower number of games, the most likely outcome would be that every team would find a national distributor for every one of its games.

135.   Sports teams themselves have acknowledged these facts, when they have become dissatisfied with the terms under which their league's monopoly rents were shared. In addition to collegiate litigation, professional hockey and basketball teams have sued their leagues, alleging that their broadcasting restrictions unlawfully restrained trade.

136.   Madison Square Garden Company ("MSG"), the owner of the New York Rangers professional ice hockey club and two RSNs, sued the NHL in 2007, alleging that its television and Internet restrictions—which, as noted above, do not eliminate all club broadcasts as the NFL does—were anticompetitive and unlawful. *See Madison Square Garden, L.P. v. Nat'l Hockey League, No. 07-8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008)*. MSG alleged in its complaint that the NHL's restraints "reduced output, diminished product quality, diminished choice and suppressed price competition," and that "[t]here are no legitimate, procompetitive justifications for these 'exclusive' agreements and other competitive restraints, which have harmed consumers in various ways." After the district court denied the NHL's motion to dismiss, MSG and the NHL settled their lawsuit on a confidential basis, allowing the anticompetitive restraint to stay in place (and, presumably, giving MSG a greater share of the bounty).

137.   Similarly, in a bankruptcy adversary action brought by the Phoenix Coyotes hockey club ("Coyotes") against the NHL, the Coyotes alleged that "[t]he

49

NHL and its members have conspired to create exclusive television and radio broadcast rights . . . thereby maintaining monopoly power." *Coyotes Hockey LLC v. NHL*, Av. No. 09-494 (Bankr. D. Ariz. June 5, 2009). This claim was similarly resolved without upsetting the anticompetitive scheme, as the NHL obtained ownership of the Coyotes through the bankruptcy.

138.   In basketball, too, at least one team has acknowledged the anticompetitive effect of broadcasting restraints. The Chicago Bulls challenged NBA limitations on distribution on so-called "superstations," reducing the number of games shown nationwide. The Bulls took the NBA to trial twice and proved the restraints' unlawfulness both times.[9] As the United States District Court for the Eastern District of Illinois found, the restraints "reduce availability and competition in the hope of raising the price of the product in the future. Such a restraint is unreasonable and therefore unlawful." *Chicago Prof'l Sports L.P. v. NBA*, 754 F. Supp. 1336, 1364 (E.D. Ill. 1991), *aff'd*, 961 F.2d 667 (7th Cir. 1992).

139.   Thus, a natural experiment in college football, the views of multiple sports teams, and the verdicts from multiple bench trials all support the same conclusion: sports leagues that restrict their teams' broadcasting rights unlawfully restrain trade.

## H. Plaintiffs and The Classes Have Suffered Antitrust Injury

140.   Plaintiffs have been overcharged for live video presentations of regular season NFL games. The agreements described above have restrained horizontal competition between and among the distributors of NFL games, including

---

[9] Ultimately the NBA defeated the second suit, but on the basis of a "single entity" defense that the Supreme Court definitively rejected in *American Needle*.

4377761v1/014918

competition in the commercial exploitation of televised presentations of live games. The agreements described above have adversely affected and substantially lessened competition in the relevant markets. As a result, prices are higher than they would be in the absence of the agreements to restrict competition.

141.   As subscribers to NFL Sunday Ticket, Plaintiffs have been charged supracompetitive prices for live video presentations of regular season NFL games because of the horizontal output restrictions and the participation of DirecTV in limiting availability and increasing the price of the Sunday Ticket package. In addition, without the exclusive licenses and other restraints, DirecTV, broadcasters, and other MVPDs would compete with each other in the distribution of NFL games to a much greater extent than the limited opportunities now available.

142.   As purchasers of MVPD services that includes NFL programming, Plaintiffs have been charged supracompetitive prices for live video presentations of regular season NFL games because of the horizontal output restrictions in limiting competition among and availability of such presentations.

143.   Plaintiffs have been injured by the unavailability of live video presentations of regular season NFL games over the Internet, which would be competitive substitutes if they were made available by NFL Teams or the NFL. The horizontal output restrictions and the participation of DirecTV in limiting competition among and availability of such presentations have prevented such Internet distribution.

144.   Plaintiffs have been injured by the Teams' joint refusal to offer the vast majority of live video presentations of regular season NFL games over the Internet,

on free over-the-air networks, or as part of any pay television service other than DirecTV.

145.   A similar issue was dealt with in the case of _Laumann v. National Hockey League_, Nos. 12–cv–1817 (SAS), 12–cv–3704 (SAS), 2014 WL 3900566 (S.D.N.Y. Aug. 8, 2014). There, Judge Shira Scheindlin was dealing with agreements by MLB and the NHL with DirecTV that involved the telecasting of games outside of a member team's home territory. Judge Scheindlin denied summary judgment, finding triable issues as to antitrust injury:

> Plaintiffs have carried their initial burden of showing an actual impact on competition. The clubs in each League have entered an express agreement to limit competition between the clubs—and their broadcaster affiliates—based on geographic territories. There is also evidence of a negative impact on the output, price, and perhaps even quality of sports programming. Plaintiffs' expert, Dr. Roger G. Noll ["Noll"], attests that consumers pay higher prices for live game telecasts, and have less choice among the telecasts available to them, than they would in the absence of the territorial restrictions.

_Id._ at *8. She went on to rule that there were jury issues as to whether telecasters like DirecTV were participants in the conspiracy between MLB, the NHL and their member clubs. _Id._ at *12-13.

146.   The expert evidence by Noll provided in that case and cited by Judge Scheindlin was as follows:

> The ability to extract more revenues from an exclusive contract arises because out-of market telecasts are a subscription driver for MVPDs. The benefits of exclusivity to the licensee then can be captured by MLB through higher rights fees by auctioning the exclusive rights to the highest bidder. If live telecasts of other sports, or other types of programming, were close competitive substitutes for MLB Extra Innings, DirecTV would not be able to obtain greater revenue from subscribers by obtaining exclusive rights, and so MLB would not be able to extract additional revenue by selling Extra Innings on an exclusive basis.

"Declaration of Roger G. Noll," p. 89 (Feb. 14, 2014), filed in _Laumann v. National_

52

*Hockey League*, Nos. 12–cv–1817 (SAS), 12–cv–3704 (SAS) (S.D.N.Y.).

## I.  The Sports Broadcasting Act Does Not Shield Defendants' Anticompetitive Acts

147.   Congress enacted the Sports Broadcasting Act of 1961 ("SBA") to facilitate the sale of packaged broadcast rights for pro sports leagues. It states:

> The antitrust laws, as defined in section I of the Act of October 15, 1914 [Section One of the Sherman Act] ... shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs.

15 U.S.C. §1291.

148.   In essence, the SBA granted all the major sports leagues an exemption from antitrust liability when entering into pooled-rights contracts.  The exemption is expressly limited to agreements among the teams in the league.

149.   The SBA is also expressly limited to "sponsored telecasting," which courts have construed to mean that the SBA only applies to broadcast television and not to cable or satellite.  In fact, when the SBA was being passed through Congress, former NFL Commissioner Pete Rozelle ("Rozelle") was asked by the House of Representatives, "[y]ou understand . . . that this Bill covers only the free telecasting of professional sports contests, and does not cover pay T.V.?" to which Rozelle responded under oath, "[a]bsolutely." Another former NFL commissioner, Paul Tagliabue, has conceded before a Senate Committee that the term "sponsored telecasts" does not include "pay and cable . . . . This is clear from the legislative history and from the committee reports."

53

150.    Thus, the SBA offers Defendants no protection for their anti-competitive acts.

151.    In *Shaw v. Dallas Cowboys Football Club, Ltd.*, No. Civ. A. 97-5184, 1998 WL 419765 (E.D. Pa. June 23, 1998), *aff'd*, 172 F.3d 299 (3d Cir. 1999), plaintiff Charles Shaw brought suit against several NFL teams and the NFL itself, alleging that the NFL's agreement for Sunday Ticket with DirecTV violated the Sherman Act.

152.    The NFL argued, in moving to dismiss, that Sunday Ticket was exempt from antitrust scrutiny under the SBA because Sunday Ticket "is simply a sale of the [teams'] residual rights in the games which were broadcast on 'sponsored telecasts,' and, so, the package is a sale of 'part of the rights' to the 'sponsored telecasts.'" 1998 WL 419765, at *2.

153.    The court in *Shaw* rejected the NFL's argument, finding that the NFL's sale of Sunday Ticket fell outside the SBA's protections. *Id.* at *3.

154.    Likewise, in *Laumann v. NHL*, 907 F.Supp.2d 465 (S.D.N.Y. 2012), Judge Scheindlin also held that the term "'[s]ponsored telecasting' under the SBA pertains only to network broadcast television and does not apply to non-exempt channels of distribution such as cable television, pay-per-view, and satellite television networks.'" *Id.* at 489 n. 141 (quoting *Kingray v. NBA, Inc*., 188 F. Supp. 2d 1177, 1183 (S.D. Cal. 2002)).

# CLAIMS FOR RELIEF

## COUNT ONE

### Violation of Section 1 of the Sherman Act

155.   Plaintiffs, on behalf of themselves and the Classes that they represent, incorporate and re-allege the preceding paragraphs of the Complaint.

156.   Defendants, by and through their officers, directors, employees, agents, or other representatives, and others acting in concert with them, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrain competition in the licensing and distribution of live video presentations of NFL games in the relevant geographic and product market and submarket described above, with the purpose, intent, and effect of restraining trade and commerce and increasing prices paid by consumers and advertisers to distributors of live video presentations of regular season NFL games.

157.   Defendants' anticompetitive conduct injured Class members by decreasing the availability of live video presentations of regular season NFL games, decreasing choice among game broadcasts and among distributors, and increasing the cost of accessing live video presentations of NFL games, including, but not limited to, increasing the price charged by DirecTV for Sunday Ticket.

158.   Defendants' anticompetitive conduct harms competition and lacks any procompetitive benefits; if any procompetitive benefits do exist, they can be achieved by less restrictive means and do not outweigh the harm to competition. Plaintiffs and other commercial and residential subscribers will continue to suffer

4377761v1/014918

antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT TWO

## Violation of Section 2 of the Sherman Act

159.   Plaintiffs, on behalf of themselves and the Classes that they represent, incorporate and re-allege the preceding paragraphs of the Complaint.

160.   The NFL and its Teams, by and through their officers, directors, employees, agents, or other representatives, and others acting in concert with them, have unlawfully monopolized the relevant market identified above in violation of 15 U.S.C. § 2.  All Defendants have unlawfully monopolized the relevant submarket identified above in violation of 15 U.S.C. § 2.

161.   Specifically, the NFL and its Teams agreed to consolidate all licensing rights for live video presentations of regular season NFL games into a single entity, with the purpose, intent, and effect of monopolizing the relevant market and submarket described above.  These activities have gone beyond those which could be considered "legitimate business activities" and are an abuse of market power. DirecTV has obtained an unlawful monopoly with respect to the out-of-market Sunday afternoon games available through its agreements with the NFL and its Teams.

162.   Defendants, by and through their officers, directors, employees, agents, or other representatives, and those acting in concert with them, have conspired to give DirecTV a monopoly in the relevant submarket described above, making it the only source for the vast majority of NFL games in any given location, including as

many as ten (of eleven to thirteen) Sunday afternoon games. This has allowed the anticompetitive effects described herein to flourish.

163.   Defendants' anticompetitive conduct injured class members by decreasing the availability of live video presentations of regular season NFL games, decreasing choice among game broadcasts and among distributors, and increasing the cost of accessing live video presentations, including, but not limited to, increasing the price charged by DirecTV for Sunday Ticket.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

1.      That the Court determines that litigation may be maintained as a class action under Fed. R. Civ. P. 23, and that Plaintiffs be named representatives of the commercial and residential Classes in which they are members.

2.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants as alleged in this Complaint, be adjudged to have been a violation of Section 1 of the Sherman Act.

3.      That Defendants' actions to illegally acquire and maintain monopoly power in the relevant product market, be adjudged to have been in violation of Section 2 of the Sherman Act.

4.      That judgment be entered for Plaintiffs and members of the Classes against Defendants for three times the amount of damages sustained by Plaintiffs and the members of the Classes as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

4377761v1/014918

5. That Plaintiffs and the Classes be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

6. That Defendants be enjoined from further violations of the antitrust laws; and

7. That Plaintiffs and members of the Classes have such other, further or different relief, as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial on all matters so triable.

Dated: June 24, 2016

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: ___/s/ *Marc M. Seltzer*_____
        Marc M. Seltzer

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: 310-789-3100
Fax: 310-789-3150
Email: mseltzer@susmangodfrey.com

Michael D. Hausfeld
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202)540-7201
Email: mhausfeld@hausfeld.com

Scott Martin

Arun Subramanian
William Christopher Carmody
Seth Ard
Ian M. Gore
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340
Email: asubramanian@susmangodfrey.com
Email: bcarmody@susmangodfrey.com
Email: sard@susmangodfrey.com
Email: igore@susmangodfrey.com

Michael P. Lehmann (SBN 77152)
Bonny E. Sweeney (SBN 176174)

4377761v1/014918

Irving Scher
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
Email: smartin@hausfeld.com
Email: ischer@hausfeld.com

Christopher L. Lebsock (SBN 184546)
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com
Email: bsweeney@hausfeld.com
Email: clebsock@hausfeld.com
Howard Langer
Edward Driver
Peter Leckman
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Tel: 215-320-5660
Fax: 215-320-5703
Email: hlanger@langergrogan.com
Email: ndiver@langergrogan.com
Email: pleckman@langergrogan.com

*Interim Class Counsel*

4377761v1/014918