Beth A. Wilkinson (admitted *pro hac vice*)
Jonathan D. Kelley (admitted *pro hac vice*)
**WILKINSON WALSH + ESKOVITZ LLP**
1900 M Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonwalsh.com
jkelley@wilkinsonwalsh.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com

*Counsel for Defendants National Football League,*
*NFL Enterprises LLC, and the Individual NFL*
*Clubs*

[Additional Counsel Listed on Signature Pages]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No. 2:15-ml-02668-BRO (JEMx) |
| | Hon. Beverly Reid O'Connell |
| | Hearing Date:  December 12, 2016 |
| THIS DOCUMENT RELATES TO: | **MEMORANDUM IN SUPPORT OF THE NFL DEFENDANTS' MOTION TO DISMISS** |
| ALL ACTIONS | |

# TABLE OF CONTENTS

ARGUMENT ................................................................................................................... 3

I.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE THAT THE CREATION AND DISTRIBUTION OF SUNDAY TICKET HAS ANTICOMPETITIVE EFFECTS. ............................................................................................................. 3

      A.    Plaintiffs' Bare Allegations Of An Exclusive Distributorship Are Not Sufficient To Plead An Antitrust Claim. ....................................... 5

      B.    Plaintiffs' Horizontal Challenge Runs Directly Into The NFL's Statutory Immunity, Ignores The Cooperation Required To Create The Sunday Ticket Product, And Fails To Allege Plausible Anticompetitive Effects. ........................................................................... 8

II.   PLAINTIFFS FAIL TO ALLEGE A VIABLE RELEVANT MARKET. .... 14

      A.    "Live Video Presentations of Regular Season NFL Games" Is Not A Plausible Relevant Market. ............................................................. 15

      B.    "Out-of-Market" NFL Games Is Not A Plausible Relevant Market. .. 17

III.  PLAINTIFFS LACK ANTITRUST STANDING. ....................................... 19

      A.    Plaintiffs Fail To Allege Antitrust Injury. ......................................... 19

      B.    Because They Are Indirect Purchasers, Plaintiffs Are Barred From Asserting Damages Claims With Respect To The Horizontal Agreement Among The NFL Clubs ...................................................... 21

IV.   PLAINTIFFS' MONOPOLIZATION CLAIMS SHOULD BE DISMISSED. ............................................................................................... 22

      A.    Plaintiffs Have Failed To State A Claim That The NFL And DIRECTV Conspired To Monopolize ................................................. 22

      B.    Plaintiffs Have Failed To State A Monopolization Claim Against The NFL. ............................................................................................. 24

CONCLUSION ............................................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*,
  64 F. Supp. 2d 1097 (D. Kan. 1999) ................................................ 17

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999)........................................................ 19, 20

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ..................................................................... 12, 13

*Apple, Inc. v. Psystar Corp.*,
  586 F. Supp. 2d 1190 (N.D. Cal. 2008)........................................... 15, 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................ 3

*In re ATM Fee Antitrust Litig.*,
  686 F.3d 741 (9th Cir. 2012) .............................................................. 21

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ...................................................................... 20, 21

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012)................................................... 10, 11, 13

*Broad. Music, Inc. v. CBS, Inc.*
  441 U.S. 1 (1979) .............................................................................. 13

*Bushie v. Stenocord Corp.*,
  460 F.2d 116 (9th Cir. 1972)......................................................... 23, 25

*Colonial Med. Grp., Inc. v. Catholic Health Care W.*,
  444 F. App'x 937 (9th Cir. 2011)........................................................ 14

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006) ........................................................... 5, 6, 23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) .......................................................................... 25

1
2

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
   658 F.2d 139 (3d Cir. 1981) ................................................................. 6

*Forsyth v. Humana, Inc.*,
   114 F.3d 1467 (9th Cir. 1997), *aff'd*, 525 U.S. 299 (1999),
   *overruled on other grounds by Lacey v. Maricopa Cty.*,
   693 F.3d 896 (9th Cir. 2012) ............................................................... 24

*Garon v. eBay, Inc.*,
   2011 WL 6329089 (N.D. Cal. Nov. 30, 2011) .................................... 23

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003) ............................................................... 19

*Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*,
   960 F. Supp. 701 (S.D.N.Y. 1997) ...................................................... 15

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ............................................................................. 21

*Ind. Entm't Grp., Inc. v. Nat'l Basketball Assn.*,
   853 F. Supp. 333 (C.D. Cal. 1994) ...................................................... 25

*Kingray, Inc. v. NBA, Inc.*,
   188 F. Supp. 2d 1177 (S.D. Cal. 2002) ........................................*passim*

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ............................................................... 4

*Nat'l Bancard Corp. v. VISA U.S.A., Inc.*,
   779 F.2d 592 (11th Cir. 1986) ............................................................. 11

*Neilson v. Union Bank of Cal.*,
   290 F. Supp. 2d 1101 (C.D. Cal. 2003) ............................................... 10

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ........................................................ 14, 18

*Novation Ventures, LLC v. J.G. Wentworth Co., LLC*,
   --- F. Supp. 3d ----, 2015 WL 9695257 (C.D. Cal. 2015) ................... 14

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   802 F.3d 1049 (9th Cir. 2015) ............................................................... 4

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Online DVD Rental Antitrust Litig.*,
   2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) .................................................. 11

*Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*,
   526 F.2d 1196 (9th Cir. 1975) ........................................................................ 23

*Paladin Assocs., Inc. v. Mont. Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) ........................................................................ 22

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
   507 F.3d 117 (2d Cir. 2007) ........................................................................ 7, 8

*Prime Healthcare Servs., Inc. v. Serv. Emps Int'l Union*,
   --- F. App'x ----, 2016 WL 806110 (9th Cir. 2016) ...................................... 23

*Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos., Inc.*,
   598 F. Supp. 694 (N.D. Cal. 1984) .................................................................. 5

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .......................................................................... 24

*Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*,
   87 F. Supp. 3d 874 (N.D. Ill. 2015) .......................................................... 15, 18

*Rutman Wine Co. v. E. & J. Gallo Winery*,
   829 F.2d 729 (9th Cir. 1987) .................................................................. 4, 5, 6, 7

*Shaw v. Dallas Cowboys Football Club, Ltd.*,
   172 F.3d 299 (3d Cir. 1999) ............................................................................. 9

*Somers v. Apple*,
   729 F.3d 953 (9th Cir. 2013) .......................................................................... 24

*Southaven Land Co. v. Malone & Hyde, Inc.*,
   715 F.2d 1079 (6th Cir. 1983) ................................................................... 20, 21

*Spinelli v. Nat'l Football League*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015) ........................................................ *passim*

*Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc.*,
   405 F. Supp. 2d 1141 (C.D. Cal. 2005), *aff'd in part*, 294 F. App'x
   271 (9th Cir. 2008) ........................................................................................ 23

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  782 F. Supp. 2d 1059 (E.D. Cal. 2011) ......................................................23

*Theatre Party Assocs., Inc. v. Shubert Org., Inc.*,
  695 F. Supp. 150 (S.D.N.Y. 1988) ...................................................16

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
  7 F.3d 986 (11th Cir. 1993) ...........................................................17

*U.S. Football League v. Nat'l Football League*,
  842 F.2d 1335 (2d Cir. 1988) ............................................................9

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ........................................................................24

*United States v. Nat'l Football League*,
  196 F. Supp. 445 (E.D. Pa. 1961).....................................................9

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ...........................................................10

*Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*,
  390 U.S. 261 (1968) ........................................................................10

*W. Penn Allegheny Health Sys., Inc.* v. *UPMC*,
  627 F.3d 85 (3d Cir. 2010) .........................................................20, 21

*Washington v. Nat'l Football League*,
  880 F. Supp. 2d 1004 (D. Minn. 2012) .......................................12, 13

*Williams v. I.B. Fischer Nev.*,
  999 F.2d 445 (9th Cir. 1993) ...........................................................25

**Statutes**

Sherman Act Section 1 ...........................................................*passim*

Sherman Act Section 2 ...........................................................*passim*

Sports Broadcasting Act, 15 U.S.C. § 1291 ....................................4, 8, 9, 10

Plaintiffs challenge long-standing and pro-competitive broadcast arrangements of the National Football League that have vastly expanded the number of televised NFL football games available to fans across the country; strengthened fan interest and loyalty; enhanced competition among rival entertainment products as well as between broadcast, satellite and cable providers; and helped to create "tremendous viewership" for NFL football.

Each year, the NFL and its 32 member clubs jointly produce over 250 professional football games, culminating in the Super Bowl championship. Every regular-season Sunday afternoon game is broadcast, at least in the two competing teams' local markets, on free, over-the-air television on CBS and FOX; fans can typically watch three games every Sunday for free. Under the Sports Broadcasting Act (SBA), the NFL's distribution of its games through free, over-the-air broadcasts is immune from antitrust scrutiny.

To provide fans access to even more live NFL football entertainment, in 1994, the NFL licensed DIRECTV to offer Sunday Ticket, an innovative product distributed exclusively by DIRECTV. Under this arrangement, DIRECTV receives the "feeds" from the Sunday afternoon games produced by CBS and FOX, packages them, and delivers the package to residential and commercial subscribers of its satellite television service. Through Sunday Ticket, fans can watch some or all of every Sunday afternoon game, including "out-of-market" games that would not otherwise be available in their home markets.

NFL Sunday Ticket promotes consumer welfare by satisfying demand for more televised football and by enhancing NFL football's ability to compete against robust competition—including from other sports and an ever-growing variety of non-sports entertainment options. It satisfies demand from avid and casual fans alike: some follow teams in distant locations, while others (including those who play fantasy football) enjoy access to a wider variety of games. Sunday Ticket gives commercial subscribers, like bars and restaurants, the capability to televise multiple

professional football games simultaneously in order to attract a diverse range of fans to their establishments on Sunday afternoons during the fall NFL football season. In addition, NFL Sunday Ticket has enabled DIRECTV to compete far more effectively against incumbent cable and satellite providers, benefitting consumers of those services as well.

Plaintiffs concede—but then largely ignore—these competitive benefits in complaining  about two elements of the Sunday Ticket arrangement. First, they claim that the NFL's exclusive distribution agreement with DIRECTV is "anticompetitive" (the "vertical" claim). Second, they challenge the way in which the NFL and its member clubs (but not DIRECTV) jointly create and license the Sunday Ticket package of broadcast rights (the "horizontal" claim). Both challenges should be dismissed for several separate and independent reasons.

I.  Plaintiffs fail to allege facts that, if true, would plausibly suggest that either challenged agreement has anticompetitive effects. With respect to the vertical claim, exclusive distribution arrangements are presumptively legal because they often benefit consumers, including by incentivizing distributors like DIRECTV to invest in promoting and enhancing the product. As a result, to survive a motion to dismiss, a complaint challenging an exclusive distribution agreement must offer plausible allegations of anticompetitive effects. Plaintiffs have not done so.

Similarly, given that the clubs' pooling of rights is necessary to distribute even a single football game, plaintiffs fail to plausibly allege that Sunday Ticket could even exist absent horizontal agreements of the kind that they challenge. Nor have plaintiffs met their pleading burden to identify an alternative arrangement that would better promote competition. To the contrary, plaintiffs concede that any challenged conduct falling outside the scope of the SBA is *pro-competitive*—a "palliative" that mitigates the alleged anticompetitive effects of the SBA-protected joint broadcasting agreements.

II.  Plaintiffs' claims must be dismissed because they fail to allege a viable relevant antitrust market. Plaintiffs rely primarily on a proposed made-for-litigation market consisting solely of "out-of-market" NFL broadcasts. That gerrymandered "market" ignores the indisputable fact that "out-of-market" NFL broadcasts compete with a broad array of other televised sports and entertainment options—including (but certainly not limited to) the free, over-the-air NFL games broadcast by CBS and Fox on Sunday afternoons.

III.  Plaintiffs have not plausibly alleged that they suffered antitrust injury. Plaintiffs point to supposed anticompetitive restraints in the market for "national broadcast rights," in which CBS, NBC, ESPN, FOX, and DIRECTV purchase rights from the NFL, but plaintiffs do not participate in that market. Under the well-settled "market participant" rule, this flaw is fatal to all of plaintiffs' claims. Separately, plaintiffs lack standing to seek damages because they are not "direct purchasers" in any relevant market.

IV.  Plaintiffs have failed to plead any of the elements of a viable monopolization claim. They rely on the NFL-DIRECTV agreement, but that cannot by itself establish a claim under Section 2. And plaintiffs offer no allegations that could support a freestanding monopolization claim.

Plaintiffs' claims should be dismissed in their entirety.

## ARGUMENT

**I.  Plaintiffs Fail To Plausibly Allege That The Creation And Distribution Of Sunday Ticket Has Anticompetitive Effects.**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). Here, plaintiffs challenge a "vertical" agreement between the NFL and DIRECTV—parties "up and down a supply chain"—and a "horizontal" agreement among the NFL clubs—parties at the same level of that supply chain. The first step in the

---

**MEMORANDUM IN SUPPORT OF THE NFL DEFENDANTS' MOTION TO DISMISS**
**3**

1  analysis is to separate the plaintiffs' challenge "into its constituent parts" so that

2  "the respective vertical and horizontal agreements can be analyzed" to determine

3  whether the complaint states a claim to relief. *In re Musical Instruments & Equip.*

4  *Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015).

5       Neither agreement is subject to the "per se" rule of antitrust analysis, which

6  applies a presumption of illegality only to "inherently anticompetitive horizontal

7  agreements." *Musical Instruments*, 798 F.3d at 1191. Instead, each is appropriately

8  analyzed under the "rule of reason," under which courts analyze the context and

9  justifications of challenged agreements to determine whether they unreasonably

10  restrain competition. *E.g.*, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d

11  1049, 1069 (9th Cir. 2015) (rule of reason applies to horizontal agreements among

12  sports teams); *Musical Instruments*, 798 F.3d at 1191 ("Vertical agreements . . . are

13  analyzed under the rule of reason").

14       The challenge to the vertical agreement between the NFL and DIRECTV

15  rests on the bare allegation that the exclusivity of DIRECTV's distribution rights

16  harms competition. But this "exclusive distributorship theory" has been rejected,

17  including by the Ninth Circuit, in similar circumstances. *Rutman Wine Co. v. E. &*

18  *J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987). Without more, plaintiffs fail to

19  allege competitive harm sufficient to sustain their claim.

20       As for the horizontal agreement among the NFL member clubs, the vast

21  majority of the challenged conduct is expressly protected by the Sports

22  Broadcasting Act, 15 U.S.C. § 1291. To the extent that plaintiffs challenge any

23  conduct not covered by the SBA, their burden is to allege facts showing that the

24  incremental coordination reduces competition. Plaintiffs utterly fail to do so;

25  indeed, they admit that the agreement among the NFL clubs to distribute Sunday

26  Ticket has *increased* the supply of games to consumers. (Compl. ¶ 128.)

27

28

---

**MEMORANDUM IN SUPPORT OF THE NFL DEFENDANTS' MOTION TO DISMISS**
**4**

1

2

**A.     Plaintiffs' Bare Allegations Of An Exclusive Distributorship Are Not Sufficient To Plead An Antitrust Claim.**

Plaintiffs challenge the NFL-DIRECTV exclusive distribution agreement on the ground that it allegedly restrains competition among multichannel video programming distributors (MVPDs) in the distribution of out-of-market NFL games. (Compl. ¶ 106.) The Ninth Circuit has squarely rejected this bare "exclusive distributorship theory" of competitive harm. Any exclusive distributorship "restrains competition" at the distributor level; but that "restraint" does not violate the antitrust laws "unless the exclusive agreement is intended to or actually does harm competition in the relevant market." *Rutman*, 829 F.2d at 735 (rejecting "exclusive distributorship" claim). Plaintiffs fail to plead facts that, if true, would demonstrate that the NFL-DIRECTV agreement was designed to, or does in fact, harm competition in the relevant market.

Indeed, the Complaint itself describes the pro-competitive, pro-consumer reasons for offering Sunday Ticket through a single distributor. By affording exclusivity, the NFL has incentivized DIRECTV's substantial investment in innovation and promotion to make Sunday Ticket appealing to consumers. (*See* Compl. ¶¶ 8, 10.) *See, e.g.*, *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006) ( "product promotion" and improved distribution are legitimate benefits of an exclusive distributorship). Nothing in the Complaint suggests that it was unreasonable or inappropriate for the NFL to conclude that Sunday Ticket would be most attractively and effectively distributed by a single licensee with ample, undiluted incentive to enhance and promote the product. *Cf. Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos., Inc.*, 598 F. Supp. 694, 706 (N.D. Cal. 1984) (exclusivity "is a reasonable practice in the television programming industry" because it "gives the licensee the incentive to promote and develop the licensed program").

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Because of their likely pro-competitive and pro-consumer effects, exclusive licensing and distribution agreements are "presumptively legal under the antitrust laws." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 116 (S.D.N.Y. 2015) (citing, among others, *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir. 1981)). Thus, "[a]n exclusive license, which merely confers upon the licensee the right to exploit the licensor's exclusive intellectual property rights, does not violate the antitrust laws." *Id.* at 118; *see also Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 153 (3d Cir. 1981) ("[A]s a licensor, the MLBPA is free to grant licenses to any competitor, or none at all.").

With that presumption of legality, it is no surprise that courts have consistently rejected as insufficient bare assertions that an exclusive distributorship is unlawful. For example, applying the Ninth Circuit's *Rutman* decision, the United States District Court for the Southern District of California rejected a claim against the NBA nearly identical to the vertical claim asserted here. *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177 (S.D. Cal. 2002). In *Kingray*, the plaintiffs alleged that "the NBA Defendants and DIRECTV ha[d] established an exclusive distributorship" for "NBA League Pass"—the NBA's analogue to Sunday Ticket—and argued that such exclusivity was anticompetitive. *Id.* at 1196. The court dismissed the purported class action claims on the pleadings, observing that "'[a]n agreement between a manufacturer and a distributor to establish an exclusive distributorship is not, standing alone, a violation of antitrust laws, and in most circumstances does not adversely affect competition in the market.'" *Id.* (quoting *Rutman*, 829 F.2d at 735). The court concluded that plaintiffs had not pled facts that, if proved, would establish that the exclusive agreement was intended to or actually caused harm to competition. *Id.* at 1196-97.

The same conclusion is warranted here. Like the claim in *Kingray*, plaintiffs' vertical claim rests on nothing more than a bare assertion of DIRECTV's exclusivity; they argue only that "without the exclusive deal [between the NFL and

DIRECTV], some of the monopoly rents created by the collusion among NFL teams would be dissipated by price competition between DirecTV and one or more MVPDs." (Compl. ¶ 106.) In other words, they allege, without further support, that competition at the distributor level would result in lower prices. Those bare assertions are indistinguishable from the allegations rejected as insufficient in *Kingray*, where the plaintiffs alleged an exclusive distributorship "for the purpose of artificially raising and fixing prices and reducing and restricting output." 188 F. Supp. 2d at 1197. Rejecting plaintiff's bid to distinguish *Rutman* as not involving "price related" claims, the *Kingray* court held that "the fact that other satellite providers . . . are not authorized to broadcast the NBA League Pass does not, standing alone, properly allege a violation of antitrust laws." *Id.*

Plaintiffs also claim that the NFL-DIRECTV agreement may be anticompetitive because it "is premised upon the continued existence" of the challenged *horizontal* agreement among the NFL clubs (Compl. ¶ 13), but they allege no facts to suggest that the *vertical* exclusivity could harm competition. The *Kingray* court rejected a nearly identical effort to distinguish *Rutman* premised on the argument that "the NBA as a whole, rather than the 29 individual teams, [had] selected DIRECTV as the satellite distributor of NBA League Pass." 188 F. Supp. 2d at 1197-98. As the court held, that argument failed to establish competitive harm from the alleged *vertical* challenge based "on an exclusive distributorship" and, as a result, it dismissed the vertical claim. *Id.*

Indeed, even when the licensor is a monopolist, courts consistently hold that licensing to only one distributor does not violate the antitrust laws because an exclusive license cannot increase the licensor's market power. *See, e.g.*, *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007) ("[A] monopolist can only extract one monopoly profit on a product; once it enjoys a monopoly at one level of the product's market, there is no further monopoly profit to be had from its expansion vertically.").

1    A recent district court decision applied these principles specifically to the

2  NFL's licensing activities. *See Spinelli*, 96 F. Supp. 3d at 119. The *Spinelli*

3  plaintiffs challenged an NFL licensing agreement that "granted [the AP] the

4  exclusive right to commercially license NFL and NFL Club photographs." *Id.*

5  at 118. The court granted the NFL's motion to dismiss the Section 1 claim, holding

6  that "the fact that NFLP gave an exclusive license to AP" could not support any

7  allegation of anticompetitive injury because any NFL market power preexisted, and

8  could not be enhanced by, the challenged vertical agreement. *Id.* at 119-20. The

9  court concluded, in language equally applicable here, that "Plaintiffs have not

10  alleged facts plausibly suggesting that they suffered anticompetitive injury from the

11  existence or performance of the exclusive license agreements . . .." *Id.* at 119.

12    As a matter of both economics and law, courts have consistently and

13  correctly rejected claims based on a bare "exclusive distributorship theory."

14  Accordingly, plaintiffs' vertical claim should similarly be dismissed.

15    **B.    Plaintiffs' Horizontal Challenge Runs Directly Into The NFL's
16    Statutory Immunity, Ignores The Cooperation Required To
    Create The Sunday Ticket Product, And Fails To Allege Plausible
17    Anticompetitive Effects.**

18    Plaintiffs do not and could not plausibly allege harm to competition from the

19  horizontal agreement among the NFL and its member clubs to create Sunday Ticket

20  by licensing their broadcast rights jointly. Because the NFL's pooling of broadcast

21  rights is immunized from antitrust scrutiny by the Sports Broadcasting Act, 15

22  U.S.C. § 1291, plaintiffs must allege some harm to competition based on conduct

23  falling outside the SBA's protections. They fail to do so. Nor do they suggest how

24  NFL games could be licensed for distribution without horizontal agreements of the

25  kind that they challenge, much less identify any plausible alternative that would

26  better enhance competition. Moreover, plaintiffs do not and cannot allege facts

27  demonstrating that the development, production, and distribution of the Sunday

28  Ticket product harms competition; indeed, and by the complaint's own admission,

Sunday Ticket *increases* the supply of NFL football games available to each consumer.

#### 1. The NFL Clubs' Pooling Of Broadcast Rights Is Authorized By The Sports Broadcasting Act.

In 1961, Judge Grim enjoined a pooled-rights contract between the NFL and CBS, and further enjoined the NFL from entering into any contract with the same purpose or effect. *United States v. Nat'l Football League*, 196 F. Supp. 445, 447 (E.D. Pa. 1961). The Sports Broadcasting Act was enacted "[s]pecifically intending to alter Judge Grim's order." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1347 (2d Cir. 1988). The Act exempts from antitrust scrutiny pooled-rights agreements by the NFL clubs for the sale or transfer of rights to sponsored telecasting of football games. *Id.*; *see also Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299, 301-02 (3d Cir. 1999). The SBA states:

> The antitrust laws . . . shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football . . . by which any league of clubs participating in professional football . . . sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football . . . ."

15 U.S.C. § 1291.

Pursuant to the SBA, the NFL and its member clubs have transferred to CBS and FOX the right to broadcast Sunday afternoon games on over-the-air television. These agreements operate as follows:

- First, FOX and CBS agree to produce and deliver to the NFL a broadcast feed for every Sunday afternoon, regular season NFL football game. NFL-FOX Agreement § 4.4; NFL-CBS Agreement § 4.4.

- Second, the NFL is deemed "the exclusive owner of all rights, title and interest in and to all copyrights worldwide in and to" all such broadcast feeds. *Id.* § 11.1. To the extent that FOX or CBS originates or produces any part of those materials, "all such originated or produced portions thereof, shall be considered 'works made for hire,'" and all copyrights vest automatically in the NFL. *Id.*

- Finally, the NFL licenses FOX and CBS certain rights to distribute live, Sunday afternoon football games. *Id.* § 1.1(a).

As a result of these provisions, the NFL alone owns the broadcast rights for each Sunday afternoon game.[1]

These provisions are constituent parts of "joint agreement[s] by or among [the NFL clubs] . . . by which [the NFL] . . . sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football." 15 U.S.C. § 1291. Each is thus fully exempt from the Sherman Act. *See id.* Accordingly, to state a claim, plaintiffs must allege facts that, if proved, establish (i) harm to competition that (ii) is the result of a horizontal agreement *subsequent* to the vesting of these intellectual property rights in the NFL. *See Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*, 390 U.S. 261, 268 (1968) (because statutory exemption from antitrust scrutiny covered underlying agreement, only follow-on agreement was subject to antitrust scrutiny). Plaintiffs cannot satisfy either of these requirements.

### 2. Plaintiffs Fail To Allege That The Challenged Horizontal Agreement Is Anticompetitive Compared To Any Plausible Alternative.

In antitrust cases, an "allegation[] that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition" as "[b]oth effects are fully consistent with a free, competitive market." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012). Instead, a plaintiff must allege that a challenged agreement harms *competition*, and must do so in comparison to a factually plausible "'but-for' world." *See In re Online DVD Rental Antitrust Litig.*, 2010 WL 5396064, at *7 (N.D. Cal. Dec. 23, 2010). "In order to plead injury to competition" that is

---

[1] These agreements are central to, and incorporated by reference in, plaintiffs' complaint, and they are attached as Exhibits 1 (CBS) and 2 (FOX) hereto. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (in deciding motion to dismiss, courts may consider "documents incorporated by reference in the complaint"); *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1114 (C.D. Cal. 2003) (court may consider "documents crucial to the plaintiff's claims, but not explicitly incorporated in his complaint").

"sufficient[] to withstand a motion to dismiss," a plaintiff "must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail." *Brantley*, 675 F.3d at 1198 (citation omitted) (alteration in original).

Determining the nature of the required but-for world is straightforward when the products at issue would exist without any cooperative agreements. But the situation is different where, as here, members of a joint venture work together "to develop a product" that "none of its members could produce individually." *Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 602 (11th Cir. 1986). In these circumstances, a complaint must plausibly allege facts indicating how the product could have been created in the but-for world, and how such alternative means of cooperation would enhance competition. *See Brantley*, 675 F.3d at 1198, 1202.

Plaintiffs do not come close to meeting that burden. Plaintiffs allege only that "[b]ut for the anticompetitive agreements, each Team would create its own broadcasts and sell those broadcasts in a competitive marketplace." (Compl. ¶ 103; *see also id.* ¶ 6 ("each team acting independently would offer their games at a competitive price to anybody in the country who wanted to watch that particular team").) Those allegations are fatally deficient.

Plaintiffs ignore the fact that the NFL would be well within its statutory rights not to distribute *any* out-of-market NFL football games; indeed, before the launch of Sunday Ticket, these out-of-market broadcasts were not available to fans at all. Plaintiffs plead no factual support for their conclusory (and counterfactual) assertion that individual teams would or even could distribute these games.

Plaintiffs' assertion is particularly implausible because horizontal cooperation and consent are required among at least three entities—the NFL and two participating clubs—to create even a single NFL football game broadcast. The bundled Sunday Ticket package requires such coordination by the NFL and all 32 of its member clubs. *See Spinelli*, 96 F. Supp. 3d at 115 ("the majority of photos at issue here are 'collectively owned' because they contain the trademarks of the NFL

and at least one NFL Club, or the trademarks of more than one NFL Club, and thus neither the NFL nor any individual NFL Club alone could license these photos"; accordingly, "Plaintiffs have not plausibly alleged collective action by the NFL Defendants, and their Section 1 claim fails as a matter of law").

The production of each NFL game requires the participation of, and features intellectual property owned by, two NFL clubs and the NFL itself. *Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1007 (D. Minn. 2012). Thus, to create even a single game broadcast, two clubs and the NFL "must cooperate to produce and sell these images; no one entity can do it alone." *Id.* at 1006; *accord Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 202 (2010) (NFL clubs "must cooperate in the production and scheduling of games"); *Spinelli*, 96 F. Supp. 3d at 114 (because game images "necessarily contain the intellectual property of more than one entity, . . . the NFL and NFL Clubs 'must cooperate to produce and sell these images'").

Moreover, plaintiffs themselves allege that many Sunday Ticket subscribers seek to acquire not just individual games, but rather the *bundled* NFL Sunday Ticket package of multiple games. (*E.g.*, Compl. ¶ 8 ("[C]ommercial subscribers—primarily bars and restaurants—generate a substantial share of their overall revenue by having the capability to televise multiple professional football games simultaneously in order to attract a diverse range of fans").) The creation of this bundled product—a product that, as plaintiffs concede, consumers want—requires the participation and consent of all 32 clubs and the NFL. *See Washington*, 880 F. Supp. 2d at 1006. Plaintiffs offer no basis for challenging the cooperation required to create and distribute the Sunday Ticket product that they demand.[2]

---

[2] The necessarily joint nature of the broadcast rights at issue here distinguishes this case from *American Needle*. There, the NFL clubs agreed jointly to license *separately owned* intellectual property that each club was capable of licensing on its own. *See* 560 U.S. at 200 ("marketing of property owned by the separate teams").

In short, Plaintiffs have not even attempted to allege a plausible but-for world in which NFL games or the bundled NFL Sunday Ticket product could be created without horizontal arrangements of the kind that they challenge. That is fatal to their ability to plead that defendants' real-world agreements harm, rather than enhance, competition, and independently warrants dismissal of their horizontal claims. *See* _Brantley_, 675 F.3d at 1198.[3]

### 3. Plaintiffs Fail to Allege Anticompetitive Effects From Any Horizontal Agreement That is Not Immunized by the SBA.

According to the Complaint, the horizontal conduct not immunized by the SBA and challenged by plaintiffs—i.e., the creation and distribution of NFL Sunday Ticket—*enhances,* rather than reduces, competition by acting as a "palliative" that relieves any anticompetitive effects of the SBA-protected joint broadcasting agreements. (Compl. ¶ 128.) Put differently, according to plaintiffs' own allegations, the only horizontal agreement that falls outside the scope of SBA immunity is procompetitive, not anticompetitive. In short, as the Complaint admits, against the backdrop of the SBA-protected agreements to license broadcast rights

---

By contrast, plaintiffs here offer no allegations regarding how the Sunday Ticket product could be created without the cooperation of which they complain. *See* _Washington_, 880 F. Supp. 2d at 1006 ("The NFL and its teams can conspire to market each teams' individually owned property, but not property the teams and the NFL can only collectively own."); _Spinelli_, 96 F. Supp. 3d at 115 (same); *see also* _Broad. Music, Inc. v. CBS, Inc._ 441 U.S. 1, 22 (1979) ("[T]o the extent the blanket license is *a different product*, ASCAP is not really a joint sales agency offering the individual goods of many sellers, but is a separate seller offering its blanket license, of which the individual compositions are raw material.") (emphasis added).

[3] Plaintiffs also allege harm from the fact that NFL Sunday Ticket is sold as a package rather than a la carte. (Compl. ¶ 9.) That allegation cannot state a claim against the NFL, as "DIRECTV has the discretion to determine . . . the composition of the subscription packages it will sell" under the Sunday Ticket agreement. Exhibit 3, ¶ 2(c). Moreover, the Ninth Circuit has rejected any claim that a "requirement that channels must be sold to consumers in packages" could harm competition. _Brantley_, 675 F.3d at 1201-04.

---

jointly, "[t]he argument that NFL Sunday Ticket *increased output* is correct." (*Id.*) (emphasis added); *see also* Kingray, 188 F. Supp. 2d at 1195 ("output of out-of-market NBA games increased by virtue of the NBA League Pass").

As plaintiffs themselves recognize, the NFL has a statutory right to limit distribution of Sunday afternoon NFL games to free, over-the-air broadcasts; the NFL's decision to distribute additional games through Sunday Ticket expands output, increases choice, and benefits consumers. Because plaintiffs fail to allege anticompetitive effects from any horizontal agreement outside—*i.e.*, subsequent to—the conduct immunized by the SBA, dismissal is warranted. *See Novation Ventures, LLC v. J.G. Wentworth Co., LLC*, --- F. Supp. 3d ----, 2015 WL 9695257, at *4 (C.D. Cal. 2015) (O'Connell, J.) (plaintiffs must allege harm to competition to avoid dismissal).

## II.   Plaintiffs Fail To Allege A Viable Relevant Market.

Plaintiffs' claims fail for the separate reason that they have failed to allege a plausible "relevant market" in which defendants have market power. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). The relevant market for a given product must include all goods that do or could reasonably compete with that product. *Colonial Med. Grp., Inc. v. Catholic Health Care W.*, 444 F. App'x 937, 938 (9th Cir. 2011) (relevant market "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand") (internal quotation omitted).

Plaintiffs allege two purported product markets: (i) a market for "the live video presentations of regular season NFL games" and (ii) a "distinct submarket for 'out-of-market' games." (Compl. ¶ 53.) The market for "live presentations" of games is implausible; it ignores the competition that NFL games face from other sports and entertainment products, and it fails to account for the numerous free in-market broadcasts of NFL games that are made widely available to consumers. The alleged market for "out-of-market" NFL games is even less plausible; in addition to

1   excluding competition from other entertainment products, it rests on the flawed

2   premise that broadcasts of out-of-market NFL games (i) compete with one another

3   but (ii) *do not* compete with broadcasts of in-market games.

### A.    "Live Video Presentations of Regular Season NFL Games" Is Not A Plausible Relevant Market.

4

5   Plaintiffs first allege a market for "live video presentations of regular season

6   NFL games." (Compl. ¶ 53.) In effect, plaintiffs claim that no other products

7   reasonably compete with the broadcasts of regular season NFL games. In the

8   antitrust context, such "[s]ingle-brand markets are at minimum, extremely rare" and

9   are consistently rejected by courts on the pleadings. *Apple, Inc. v. Psystar Corp.*,

10  586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008). To hold otherwise and "define the

11  market as that group of products over which a defendant exercises control would as

12  an analytic matter read the market definition step out of the Sherman Act." *Spinelli*,

13  96 F. Supp. 3d at 111 (rejecting proposed "product market limited to NFL-related

14  photographs" for improperly excluding non-NFL substitutes).

15  As courts have consistently held in similar situations, it is simply not

16  plausible that regular season NFL games do not compete for consumer attention

17  with other sports and entertainment options. *Right Field Rooftops, LLC v. Chi.*

18  *Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886-87 (N.D. Ill. 2015) (rejecting

19  relevant market "restricted solely to live Cubs games" because those games

20  "necessarily compete" with non-baseball-related live entertainment); *see also Glob.*

21  *Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705

22  (S.D.N.Y. 1997) ("A consumer might prefer . . . Pepsi because she prefers the taste,

23  or NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R.' . . . but at base, Pepsi

24  is one of many sodas, and NBC is just another television network."); *Theatre Party*

25  *Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988)

26  (rejecting proposed market for *Phantom of the Opera* tickets because plaintiff failed

27

28

---

**MEMORANDUM IN SUPPORT OF THE NFL DEFENDANTS' MOTION TO DISMISS**
**15**

to explain "why other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events are not adequate substitute products").

Moreover, even if "live video presentations of regular season NFL games" were a viable relevant market, the wide availability of free broadcasts of NFL games on Sunday afternoons—at the same time as "out-of-market" games— would be an insurmountable barrier to plaintiffs' claims. Putting aside the implausible theory that NFL football broadcasts face no competition from other sports and entertainment products, plaintiffs still must allege either that NFL games are, or are not, substitutes for one another.

The necessary premise of plaintiffs' "live video presentations" market is that all NFL games must be substitutes for one another. (*See* Compl. ¶ 53.) But if all NFL games *are* substitutes for one another, then the ubiquitous, free availability to consumers of multiple NFL games would render absurd any claim that the NFL restrains the market for "live video presentations of regular season NFL games." Far from restricting the supply of game broadcasts, the NFL and its broadcast partners make multiple NFL games available to fans *for free* every Sunday of the regular season. (*Id.* ¶ 85.)

In other words, the wide and growing availability of free NFL telecasts eviscerates any claim that the NFL and its member clubs could constrain supply and drive up prices in a purported market for "live video presentations of regular season NFL games." If prices for out-of-market games were set at artificially high levels, NFL fans could and would substitute by watching NFL games available for free— at the same time—on broadcast television. On the other hand, if live video presentations of NFL games *are not* substitutes for one another, then it would be impossible for the sale of rights to broadcast different NFL games to "naturally force prices down," a necessary condition of plaintiffs' antitrust theory. (Compl. ¶103.) In other words, absent a relevant market that includes competition among all

live video presentations of NFL games, plaintiffs' but-for world of teams competing to broadcast their games could not possibly yield procompetitive effects.

### B.   "Out-of-Market" NFL Games Is Not A Plausible Relevant Market.

In apparent recognition of the fact that their proposed market for "live video presentations of regular season NFL games" is fatally flawed, plaintiffs offer an alternative market tailored to include only "'out of market' [NFL] games."[4] (Compl. ¶ 53.) This gerrymandered, made-for-litigation "market" fails. Courts routinely reject such attempts to "define a market so as to cover only the practice complained of," because it amounts to inappropriate "circular or at least result-oriented reasoning.'" *Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999); *see also Spinelli*, 96 F. Supp. 3d at 111 (rejecting attempt "to define the market as that group of products over which a defendant exercises control").

Plaintiffs' asserted "out-of-market games" market is implausible because nothing in the Complaint supports, and common sense rejects, a conclusion that out-of-market Sunday afternoon games and in-market Sunday afternoon games do not compete as reasonable substitutes for one another. There is no plausible basis to exclude free, in-market games from the relevant product market.

Plaintiffs offer only a single *ipse dixit* sentence in support of their alleged market for out-of-market NFL game broadcasts:

> NFL games broadcast locally on CBS and Fox on Sunday afternoons are distinct from the multi-game offering provided by Sunday Ticket specifically because the local games are different from the multi-game offering provided by Sunday Ticket, which caters to fans that are not located within the geographical confines of their favorite teams' home territories.

---

[4] Plaintiffs' use of the term "submarket" does not reduce their burden to plead a plausible relevant market, as "defining a 'submarket' is the equivalent of defining a relevant product market for antitrust purposes." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993) (citations omitted).

(Compl. ¶ 53.) This allegation cannot sustain *any* relevant market as a matter of law. The assertion that in-market NFL game broadcasts are "different from" the "multi-game" offering of NFL Sunday Ticket ignores the fundamental question of whether individual in-market game broadcasts are "substitutes" for individual out-of-market game broadcasts. *Newcal*, 513 F.3d at 1045.

Nor can plaintiffs distinguish in-market games from out-of-market games based on their allegation that out-of-market games cater to fans who live away from their favorite teams. As a matter of law, popularity with a particular demographic cannot define a relevant market. In *Right Field Rooftops*, plaintiffs tried to define a market based on the purported popularity of live Chicago Cubs games with a particular group of baseball fans. The court rejected the plaintiffs' proposed market because even if "fans who want to see a live Cubs game are 'unlikely to patronize another team's live games[,]' [s]uch arguments of consumer preferences . . . fall short of rendering it plausible that there exist no interchangeable substitutes for live Cubs games." 87 F. Supp. 3d at 887. The court accepted that "some die-hard Cubs fans" would never attend a live game of another team, but determined that the existence of such fans "does not mean that Cubs games constitute their own market." *Id.*; *see also Psystar Corp.*, 586 F. Supp. 2d at 1198 ("Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market.").

Moreover, if specific fans' preferences to watch "their favorite teams" were an appropriate standard for defining a relevant market, that too would undermine plaintiffs' proposed market of all "out-of-market" games. A market defined by fan preferences might support the assertion that, for example, a Green Bay Packers fan living in San Diego would not regard an (in-market) Chargers-Raiders game as a substitute for an (out-of-market) Packers-Vikings game. But that same logic would undermine any assertion that, from the perspective of that same Packers fan, an

1  (out-of-market) Steelers-Browns game would be a substitute for the (out-of-market)

2  Packers game.

3      Under well-settled law, plaintiffs' claims should be dismissed for failure to

4  plausibly allege any relevant market in which defendants exercise market power.

5  **III.   Plaintiffs Lack Antitrust Standing.**

6      Plaintiffs also lack antitrust standing to bring their claims. *Glen Holly Entm't,*

7  *Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003) ("Only those who meet the

8  requirements for 'antitrust *standing*' may pursue" an antitrust claim). Plaintiffs have

9  not adequately alleged antitrust injury, and their damages claim based on any

10  horizontal agreement among the NFL clubs is barred by the indirect purchaser rule.

11      **A.   Plaintiffs Fail To Allege Antitrust Injury.**

12      A plaintiff lacks antitrust standing unless he or she suffered injury as a

13  "market participant" in the market allegedly restrained by the defendants' conduct.

14  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)

15  ("[The] injured party [must] be a participant in the same market as the alleged

16  malefactors. . . . Antitrust injury requires the plaintiff to have suffered its injury in

17  the market where competition is being restrained.").

18      The restraints that plaintiffs allege are not in the only market in which they

19  participate—the market for the purchase of "live video presentations of regular

20  season NFL games." (Compl. ¶ 53.) Plaintiffs allege restraints in a different

21  market—the market for "national broadcast rights," in which the NFL sells rights to

22  "CBS, NBC, ESPN, and Fox," as well as to DIRECTV. (*Id.*) Specifically,

23  plaintiffs' vertical claim challenges the "exclusive deal between DirecTV and the

24  NFL for the broadcast rights of NFL Sunday Ticket," and plaintiffs' horizontal

25  claim challenges "[t]he NFL and its Teams' agreement to pool broadcasts." (*Id.*

26  ¶¶ 99, 106.) That is fatal to all of their antitrust claims.

27      "Broadcast rights" and "live video presentations" are not in the same market.

28  They are not the same product; nor are they interchangeable products that could

plausibly be treated as falling within the same relevant market. The Complaint itself illustrates the point: The NFL's "broadcast rights" are sold for prices that range from $300 million to $1.9 billion. (*Id.* ¶¶ 38-39.) Plaintiffs, of course, are not consumers of, or competitors for, such rights. Rather, plaintiffs participate in a different market; they purchased Sunday Ticket for prices typically in the range of $250 for consumers and $2,300 for bars. (*Id.* ¶¶ 16, 17, 24-27.)

Plaintiffs thus cannot satisfy the market participant requirement. Having asserted harm in the alleged market for "live video presentations" (*see id.* ¶ 141), plaintiffs lack standing to challenge restraints in the different market for "broadcast rights." *See Am. Ad Mgmt.*, 190 F.3d at 1057 ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury.").

Plaintiffs cannot rely on the "narrow exception to the market participant requirement" created by *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982). *See Am. Ad Mgmt.*, 190 F.3d at 1057 n.5. That exception applies only if plaintiffs' injuries were "the means by which the defendants seek to achieve their anticompetitive ends." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010); *accord Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir. 1983) (defendants must have used plaintiffs "as a fulcrum, conduit or market force to injure competitors or participants" in the relevant market). Here, plaintiffs do not, and cannot, claim that they were the means by which defendants inflicted injury in the market for licenses to broadcast NFL games. As *Allegheny* and *Southaven* confirm, any injuries plaintiffs claim to have suffered in the alleged "live video presentations" market as an after-effect of alleged upstream restraints would not satisfy the narrow *McCready* exception. *Allegheny*, 627 F.3d at 102; *Southaven*, 715 F.2d at 1086.

**B.     Because They Are Indirect Purchasers, Plaintiffs Are Barred From Asserting Damages Claims With Respect To The Horizontal Agreement Among The NFL Clubs.**

The indirect purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), is an independent bar to plaintiffs' damages claims with respect to any alleged horizontal agreement among the NFL clubs. Plaintiffs do not (and cannot) claim that they purchased Sunday Ticket broadcasts directly from the NFL or its member clubs. Instead, they claim that they contracted with DIRECTV to view broadcasts produced by the NFL. In other words, to the extent that plaintiffs challenge the effects of agreements among the NFL clubs, they are classic indirect purchasers who lack standing to sue for antitrust damages. *Illinois Brick*, 431 U.S. at 735. This conclusion is confirmed by recent Ninth Circuit precedent, *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012), as well as by the Southern District of California decision in *Kingray*, 188 F. Supp. 2d at 1177.

In *ATM Fee*, the Ninth Circuit affirmed a judgment dismissing proposed class claims because the putative class members were "indirect purchasers [who] may not use a pass-on theory to recover damages and thus have no standing to sue." 686 F.3d at 748. Here, as in *ATM Fee*, any harm from the alleged agreements among the NFL clubs would first be borne by their customer, DIRECTV (*i.e.*, the direct purchaser). As purchasers from DIRECTV, plaintiffs could recover damages only under a pass-on theory, and thus lack standing. *Id.*

There are "limited exceptions" to *Illinois Brick*, but none applies here. *See In re ATM Fee*, 686 F.3d at 750. For example, plaintiffs cannot rely on the so-called "co-conspirator exception," which requires that "the conspiracy must *fix the price paid by the plaintiffs*," *id.* at 749 (emphasis added); plaintiffs do not allege that the NFL Defendants and DIRECTV colluded to fix the prices paid for Sunday Ticket. To the contrary, under the NFL-DIRECTV agreement, "DIRECTV has the discretion to determine . . . the prices for any and all subscription packages." Exhibit 3, ¶ 2(c); *see also* Exhibit 4, ¶ 2(c).

---

1    *Kingray* is again instructive. There, the court dismissed a challenge to the

2    horizontal agreement among the NBA teams to create NBA League Pass because

3    the consumer plaintiffs were "indirect purchasers of the NBA League Pass" who

4    "do not have standing" to bring a claim that "the NBA Defendants engaged in a

5    horizontal conspiracy." 188 F. Supp. 2d at 1198. In so holding, the court relied on

6    the fact that, like the NFL-DIRECTV agreements in this case, the agreements

7    between the NBA and DIRECTV did not "require DIRECTV to sell the NBA

8    League Pass for a specific price." *Id.* at 1191. The same conclusion follows here,

9    and the same result—dismissal of the class action complaint—is warranted.

10   **IV.   Plaintiffs' Monopolization Claims Should Be Dismissed.**

11   For their claim under Section 2 of the Sherman Act, plaintiffs allege that the

12   NFL unlawfully conspired with DIRECTV to give DIRECTV a monopoly in the

13   market for distribution of live NFL games. (Compl. ¶ 162.) According to plaintiffs'

14   further assertions, the NFL itself has monopoly power that it allegedly used to limit

15   competition. (*Id.* ¶ 161.) Both of these monopolization claims fail.

16   **A.   Plaintiffs Have Failed To State A Claim That The NFL And DIRECTV Conspired To Monopolize.**

17   Plaintiffs allege that defendants "conspired to give DirecTV a monopoly in

18   the relevant submarket." (Compl. ¶ 162.) To plead a conspiracy to monopolize

19   under Section 2, plaintiffs must show four elements: "(1) the existence of a

20   combination or conspiracy to monopolize; (2) an overt act in furtherance of the

21   conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury."

22   *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). The

23   Complaint does not adequately plead any of these elements.

24   Even if plaintiffs had adequately pled a conspiracy between the NFL and

25   DIRECTV in violation of Section 1—and, for all the reasons discussed above, they

26   have not—that would not suffice for Section 2. *Standfacts Credit Servs., Inc. v.*

27   *Experian Info. Sols., Inc.*, 405 F. Supp. 2d 1141, 1153 (C.D. Cal. 2005), *aff'd in*

28

*part*, 294 F. App'x 271 (9th Cir. 2008). To support a Section 2 claim, plaintiffs must also show a specific intent to monopolize—*i.e.*, an intent to "exclude competition or control prices." *See id.*; *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1078 (E.D. Cal. 2011). Merely reciting the elements of the claim by asserting that the NFL, on behalf of its member clubs, "entered into the agreement with the intent of maintaining a monopoly price" (Compl. ¶ 126), does not meet this burden. *See Stanislaus*, 782 F. Supp. 2d at 1079.

Plaintiffs rely on only one fact to support their Section 2 claim: the existence of the NFL-DIRECTV exclusive distribution agreement. But an exclusive distribution agreement cannot, by itself, establish a claim under Section 2 any more than it can establish a claim under Section 1. *See Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1205 (9th Cir. 1975) (an "agreement for exclusive distribution of one's own product does not of itself constitute a conspiracy to monopolize"); *see* Section I.A, above. It is well settled that entry into an exclusive distribution agreement does not evidence a specific intent to monopolize; a manufacturer is "free to agree with a third party to give him an exclusive distributorship" even where doing so would cut off other distributors. *See Bushie v. Stenocord Corp.*, 460 F.2d 116, 120 (9th Cir. 1972) (in context of Section 1 claim, even where an agreement has the effect of eliminating competitors, "this alone would not support a conclusion that [defendant's] motive was anticompetitive").

In addition, to support a Section 2 conspiracy claim, plaintiffs must allege that the NFL-DIRECTV agreement actually harms competition. *See E & L Consulting*, 472 F.3d at 31; *Garon v. eBay, Inc.*, 2011 WL 6329089, at *5 (N.D. Cal. Nov. 30, 2011). And plaintiffs must allege a plausible relevant market. *See Prime Healthcare Servs., Inc. v. Serv. Emps Int'l Union*, --- F. App'x ----, 2016 WL 806110, at *2 (9th Cir. 2016). For the reasons set forth in Parts I.A and II above, plaintiffs have failed to do either.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B. Plaintiffs Have Failed To State A Monopolization Claim Against The NFL.

Plaintiffs further claim that the NFL, separately from DIRECTV, has "unlawfully monopolized the relevant market." (Compl. ¶ 160.) To state a plausible "actual monopolization" claim, plaintiffs must allege (1) that the NFL possessed monopoly power in a properly defined relevant market; (2) that the NFL willfully acquired or maintained that power; and (3) an antitrust injury in the relevant market, caused by the monopoly. *Somers v. Apple*, 729 F.3d 953, 963 (9th Cir. 2013). None of these elements is adequately alleged here.

*First*, monopoly power for the purpose of Section 2 is "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). Plaintiffs must allege a relevant market to establish this element. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997) ("The additional issues of monopoly power and the maintenance of monopoly power depend upon a resolution of the relevant market question."), *aff'd*, 525 U.S. 299 (1999), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). But again, as explained in Section II above, plaintiffs have not alleged a plausible relevant product market.

*Second*, even if plaintiffs could establish that the NFL has monopoly power in a relevant market, merely *holding* such power would not violate Section 2. The NFL and its member clubs have exclusive control over the sale, licensing, and distribution of NFL game broadcasts because they own those broadcasts and the applicable copyrights and trademarks. "A manufacturer has 'a natural monopoly over his own products, especially when the products are sold under trademark,'" and "[u]nless the manufacturer use[s] his natural monopoly to gain control of the relevant market in which his products compete, the antitrust laws are not violated." *Bushie v. Stenocord Corp.*, 460 F.2d 116, 120 (9th Cir. 1972) (quoting *Indus. Bldg.*

---

1  *Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1344 (9th Cir. 1970)).

2  Plaintiffs' allegation that the NFL holds a monopoly over its game broadcasts

3  (Compl. ¶ 161) does not state a claim under Section 2.

4       *Third,* plaintiffs do not allege that the NFL willfully acquired or maintained

5  monopoly power through anticompetitive conduct as distinguished from "growth or

6  development as a consequence of a superior product, business acumen, or historic

7  accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481

8  (1992). Because the agreements that plaintiffs challenge are protected by the SBA

9  and incapable of supporting a claim of anticompetitive conduct*, see* Section I

10  above, those agreements "cannot form the basis of a section 2 claim." *Williams v.*

11  *I.B. Fischer Nev.*, 999 F.2d 445, 448 (9th Cir. 1993); *see also Ind. Entm't Grp., Inc.*

12  *v. Nat'l Basketball Assn.*, 853 F. Supp. 333, 339 (C.D. Cal. 1994) ("Conduct that is

13  reasonable under Section 1 of the Sherman Act should not be considered

14  anticompetitive conduct under Section 2.").

15       *Fourth*, plaintiffs have failed to allege any antitrust injury in the market in

16  which the NFL allegedly exercises monopoly power. Plaintiffs allege that they have

17  suffered harm only in the market for "video presentations." (Compl. ¶ 163.) But

18  that is not the "broadcast rights" market in which plaintiffs claim that the NFL

19  possesses a monopoly. *See* Section III.B, above.

20       *Finally*, to the extent plaintiffs allege that the NFL—and not DIRECTV—

21  possesses monopoly power that, in turn, causes antitrust injury, the indirect

22  purchaser rule bars plaintiffs' Section 2 damages claim. *See* Section III.B, above.

23  **CONCLUSION**

24       For all of the above reasons, the Complaint should be dismissed in full and

25  with prejudice.

26

27

28

1   August 8, 2016                          Respectfully Submitted,

2                                           */s/ Beth A. Wilkinson*

3

4   Gregg H. Levy (admitted *pro hac vice*)   Beth A. Wilkinson (admitted *pro hac vice*)
    Derek Ludwin (admitted *pro hac vice*)    Jonathan D. Kelley (admitted *pro hac vice*)

5   **COVINGTON & BURLING LLP**               **WILKINSON WALSH + ESKOVITZ LLP**

6   One CityCenter, 850 Tenth Street NW
    Washington, DC 20001                      1900 M Street NW, Suite 800

7   Telephone: (202) 662-6000                 Washington, DC 20036
    Facsimile: (202) 662-6291                 Telephone: (202) 847-4000

8   glevy@cov.com                             Facsimile: (202) 847-4005
    dludwin@cov.com                           bwilkinson@wilkinsonwalsh.com

9                                             jkelley@wilkinsonwalsh.com

10

11  Neema T. Sahni (Bar No. 274240)           Sean Eskovitz (Bar No. 241877)
    **COVINGTON & BURLING LLP**               **WILKINSON WALSH + ESKOVITZ LLP**

12  2029 Century Park East, Suite 3100
    Los Angeles, CA 90067-3044                11726 San Vicente Boulevard, Suite 600

13  Telephone: (424) 332-4800                 Los Angeles, CA 90049
    Facsimile: (424) 332-4782                 Telephone: (424) 316-4000

14  nsahni@cov.com                            Facsimile: (202) 847-4005
                                              seskovitz@wilkinsonwalsh.com

15

16                                            *Counsel for Defendants National Football
                                              League, NFL Enterprises LLC, and the
17                                            Individual NFL Clubs*

18

19

20

21

22

23

24

25

26

27

28

---

**MEMORANDUM IN SUPPORT OF THE NFL DEFENDANTS' MOTION TO DISMISS**