1    Marc M. Seltzer (54534)
     **SUSMAN GODFREY L.L.P.**
2    1901 Avenue of the Stars, Suite 950
     Los Angeles, CA 90067-6029
3    Phone: (310) 789-3100
     Fax: (310) 789-3150
4    mseltzer@susmangodfrey.com

5    Scott Martin
     Irving Scher
6    **HAUSFELD LLP**
     33 Whitehall Street, 14th Floor
7    New York, NY 10004
     Tel: (646) 357-1100
8    Fax: (2121) 202-4322
     smartin@hausfeld.com
9    ischer@hausfeld.com

10   [Additional Counsel Listed in Signature Page]

11   *Interim Class Counsel*

12

     Howard Langer
     Edward Diver
     Peter Leckman
     **LANGER GROGAN & DIVER, P.C.**
     1717 Arch Street, Suite 4130
     Philadelphia, PA 19103
     Tel: (215) 320-5660
     Fax: (215) 320-5703
     hlanger@langergrogan.com
     ndiver@langergrogan.com
     pleckman@langergrogan.com

13                  **UNITED STATES DISTRICT COURT**

14                  **CENTRAL DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| 16  IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION <br><br> THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | Case No. 2:15-ml-02668−BRO (JEMx) <br><br> **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE NFL DEFENDANTS' MOTION TO DISMISS** <br><br> DATE:      December 12, 2016 <br> TIME:      1:30 p.m. <br> PLACE:    Courtroom of the Hon. Beverly Reid O'Connell |

24

25               **REDACTED VERSION OF DOCUMENT**

26               **PROPOSED TO BE FILED UNDER SEAL**

27

28

# <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ......................................................................................... 1

II.    BACKGROUND ........................................................................................... 1

III.   ARGUMENT ................................................................................................ 6

       A.     Defendants' Practices are Unquestionably Anticompetitive ......................... 7

       B.     The SBA Does Not Protect Defendants' Horizontal Agreements ................. 8

       C.     The Exclusive Arrangement With DirecTV Is Anticompetitive ................. 12

       D.     Plaintiffs Have Properly Alleged Relevant Product Markets ...................... 16

       E.     Plaintiffs Have Standing to Seek Damages ................................................. 20

       F.     Plaintiffs Have Properly Alleged Monopoly Power .................................... 24

IV.    CONCLUSION ........................................................................................... 25

4527044v1/014918

# TABLE OF AUTHORITIES

## Cases

*Am. Needle Inc. v. NFL*,
  560 U.S. 183 (2010) ...................................................................2, 15, 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................6, 7

*Bd. of Regents of Univ. of Okla. v. NCAA*,
  546 F. Supp. 1276 (W.D. Okla. 1982) ..................................................24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................1, 7

*BMI, Inc. v. CBS, Inc.*,
  441 U.S. 1 (1979) ....................................................................................12

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .........................................................................19, 20

*Buffalo Broad. Co. v. ASCAP*,
  744 F.2d 917 (2d Cir. 1984) ...............................................................11

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ............................................................................22

*Chi. Prof'l Sports Ltd. P'ship v. NBA*,
  961 F.2d 667 (7th Cir. 1992) .................................................................9

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977) .........................................................................12, 13

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006) ...................................................................15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ............................................................................18

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
  744 F.2d 588 (7th Cir. 1984) ...............................................................22

*Group Life & Health Ins. Co. v. Royal Drug Co.*,
  440 U.S. 205 (1979) ..............................................................................9

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ............................................................................20

*In re ATM Fee Antitrust Litig.*,
  686 F.3d 741 (9th Cir. 2012) ......................................................20, 21, 22

*Int'l Boxing Club, Inc. v. United States*,
  358 U.S. 242 (1959) ............................................................................16

*Kingray v. NBA, Inc.*,
188 F. Supp. 2d 1177 (S.D. Cal. 2002) ..................................................................passim

*Laumann v. NHL*,
56 F. Supp. 3d 280 (S.D.N.Y. 2014) ..................................................................11, 14

*Laumann v. NHL*,
907 F. Supp. 2d 465 (S.D.N.Y. 2012) ..................................................................passim

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
726 F.2d 1381 (9th Cir. 1984) ..................................................................16

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
140 F.3d 1228 (9th Cir. 1998) ..................................................................23, 24

*NCAA v. Bd. of Regents of Univ. of Okla., No. 83-271*,
1983 WL 919058 (Dec. 1, 19830 ..................................................................10

*NCAA v. Bd. of Regents of Univ. of,*
*Okla.*, 468 U.S. 85 (1984) ..................................................................passim

*Newcal Indus., Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ..................................................................17

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
507 F.3d 117 (2d Cir. 2007) ..................................................................15

*Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*,
87 F. Supp. 3d 874 (N.D. Ill. 2015) ..................................................................17

*Shaw v. Dallas Cowboys Football Club, Ltd.*,
172 F.3d 299 (3d Cir. 1999) ..................................................................3, 4, 9

*Sidibe v. Sutter Health*,
No. 14-16234, 2016 WL 3844688 (9th Cir. July 15, 2016) ..................................................................17

*Telecasting of Prof. Sports Contests,*
*H. Rep.* No 1178 87th Cong. 1961 ..................................................................3

*United States v. E.I. duPont de Nemours & Co.*,
351 U.S. 377 (1956) ..................................................................24

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ..................................................................25

*United States v. NFL*,
116 F. Supp. 319 (E.D. Pa. 1953) ..................................................................2, 3

*United States v. NFL*,
196 F. Supp. 445 (E.D. Pa. 1961) ..................................................................3

*United States v. Visa U.S.A.*,
344 F.3d 229 (2d Cir. 2003) ..................................................................12

iii

**<u>Statutes</u>**

15 U.S.C. § 1291 .............................................................................................. 3

15 U.S.C. § 1292 .............................................................................................. 3

**<u>Rules</u>**

Federal Rule of Civil Procedure 12(b)(6) .......................................................... 6

4527044v1/014918

# I.   **INTRODUCTION**

Plaintiffs' Consolidated Amended Complaint ("CAC") alleges in detail direct evidence showing that DirecTV and the member teams of the National Football League have agreed to restrain competition by limiting the availability of football telecasts in order to artificially increase the price of that programming. This is not a case based solely on circumstantial evidence where plausibility of an alleged agreement under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), is at issue. Defendants have expressly agreed to make only a fraction of games available on standard television channels, and have agreed that consumers will only be able to access the other games by purchasing "NFL Sunday Ticket" directly from DirecTV.

The NFL Defendants' motion to dismiss rests largely on the false premise that Plaintiffs are challenging the existence of Sunday Ticket itself. But Plaintiffs are not challenging Defendants' right to bundle NFL telecasts. They are challenging agreements that restrain competition *with* Sunday Ticket and the telecasts it includes. *First*, the NFL Defendants and DirecTV have agreed to constrain the number of broadcasts aired on a typical Sunday afternoon to just three games, requiring consumers and businesses to purchase the separate Sunday Ticket bundle if they wish to watch any of the other games aired at that time. *Second*, Defendants have agreed that telecasts not available on local television ("out-of-market telecasts") shall be available *only* through DirecTV, preventing subscribers to other services from having access to those games at all.[1]

The adverse effects of Defendants' anticompetitive restraints are undeniable: NFL programming is strictly limited, and the price of the Sunday Ticket is far higher than any other major league's subscription service—all at the expense of consumers.

# II.   **BACKGROUND**

The NFL is an association of its thirty-two teams. CAC ¶¶28-30. "Each of the

---

[1]  Of the roughly 100 million pay-television subscribers in the United States, only about 20 million are DirecTV subscribers. Satellite distributors, cable companies, and "telco" television providers (like Verizon), are all multichannel video programming distributors ("MVPDs") that carry other sports' games and packages.

1

teams is a substantial, independently owned, and independently managed business. '[T]heir general corporate actions are guided or determined' by 'separate corporate consciousnesses,' and '[t]heir objectives are' not 'common.'" *Am. Needle Inc. v. NFL*, 560 U.S. 183, 196 (2010).

The initial rights in broadcasts of sporting events are held by the home team. *Laumann v. NHL*, 907 F. Supp. 2d 465, 485 n.112 (S.D.N.Y. 2012). Until 1961, each NFL team arranged separately for the broadcasts of its games, as teams continue to do for most games in the other major American sports leagues. CAC ¶¶65, 101. In the absence of any agreements to restrain trade, the teams would freely compete against each other in the telecasting of their games. *Id.* ¶¶11, 103.

By the early 1950s, the NFL had agreed to interfere with such a market by preventing member teams from telecasting their games in the home territories of other teams whenever that team was either playing at home or broadcasting away games back into their home territories. *United States v. NFL*, 116 F. Supp. 319, 321 (E.D. Pa. 1953) ("NFL I"). This effectively prevented nearly all games not involving a local team from being telecast in that team's market. *Id.* Teams were thus afforded monopolies on professional football telecasts in their local territories.

The Department of Justice ("DOJ") challenged the league's restraints. CAC ¶62. Judge Allan Grim held that the restraint on broadcasts while the local team was playing a home game was reasonable insofar as it protected ticket sales, which, he found after trial, were essential to what was then a financially struggling league. *NFL I*, 116 F. Supp. at 325-26. But he found that the restraint against telecasts when the local team was not playing a home game, but was simply showing its game on television, was an unreasonable restraint on trade. The purpose of this restraint was "to enable the clubs in the home territories to sell monopoly rights to purchasers of television rights to away games." *Id.* at 326.

From 1953 to 1961, the teams sold rights to their own games pursuant to this ruling. CAC ¶65. The individual teams entered into agreements with not only local

1    stations, but also national networks. By 1960, professional football was available on all

2    major national networks. *Id.*

3         In 1961, the NFL sought to change its broadcasting structure, by centralizing all of

4    the rights of all of the teams. CAC ¶¶66-67. The league would then enter into broadcast

5    agreements itself, thereby preventing the teams from competing with one another. *Id.* The

6    DOJ objected that the proposal would violate the *NFL I* injunction. Judge Grim agreed,

7    concluding that, "by agreement, the member clubs of the League have eliminated

8    competition among themselves in the sale of television rights to their games." *United

9    States v. NFL*, 196 F. Supp. 445, 447 (E.D. Pa. 1961) ("*NFL II*").

10        In response, the NFL lobbied for an antitrust exemption. CAC ¶68. Congress

11   responded with the Sports Broadcasting Act ("SBA"), which it carefully tailored to

12   address only the holding of *NFL II*—that the league could not jointly sell over-the-air

13   ("OTA") television rights—while otherwise preserving Judge Grim's holdings. CAC ¶¶3,

14   68. The SBA exempts from the antitrust laws a "joint agreement … by which any league

15   of clubs participating in professional football … contests sells or otherwise transfers all

16   or any part of the rights of such league's member clubs in the sponsored telecasting of the

17   games … engaged in or conducted by such clubs." 15 U.S.C. § 1291. By its terms, it

18   applies only to agreements for "sponsored telecasting," meaning free, OTA television—

19   not to paid cable or satellite telecasts. *See Telecasting of Prof. Sports Contests, H. Rep.

20   No 1178*, at 5, 87th Cong. 1961 ("The bill does not apply to closed circuit or subscription

21   television."). "[T]he subscription satellite broadcast of NFL games is not a part of the

22   NFL's rights to the sponsored telecasting of those games and therefore not within the

23   Sports Broadcasting Act's exemption to the antitrust laws." *Shaw v. Dallas Cowboys

24   Football Club, Ltd.*, 172 F.3d 299, 303 (3d Cir. 1999); *accord Laumann*, 907 F. Supp. 2d

25   at 489 n.141; *Kingray v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1183 (S.D. Cal. 2002).

26        The SBA does not apply to any agreement that prohibits a broadcaster from

27   televising the games in "any area, except within the home territory of a member club of

28   the league on a day when such club is playing a game at home." 15 U.S.C. § 1292. Thus,

3

Congress preserved the basic framework of *NFL I*. The league could jointly sell games, but only if it did not impose geographical restraints on distribution (other than to protect ticket sales) and kept the games on free, OTA television. Otherwise, the holdings of *NFL I* and *II*—that the suppression of inter-club competition in broadcasting violates the antitrust laws—would apply.

Despite Congress's efforts to limit the anticompetitive effects of the exemption, the SBA resulted in an approximately one-third reduction in the number of televised professional football games, together with a dramatic increase in revenue for the league.[2] While the NFL now contends that its centralized licensing system is procompetitive, this history shows otherwise, and economists agree that centralization of sports television rights decreases output and increases prices—i.e., that it is presumptively anticompetitive. CAC ¶128; *see also* Roger G. Noll, *Broadcasting and Team Sports*, 54 Scot. J. Pol. Econ. 400, 419 (July 2007).

This was confirmed by the Supreme Court's decision in *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984). Like the NFL, the NCAA strictly controlled broadcasting, limiting college football broadcasts to two television networks.[3] CAC ¶¶130-35. The NCAA defended its restraints on most of the same grounds asserted by the NFL here. The Supreme Court rejected them all, concluding that the NCAA's rules constituted a "naked restraint" on competition. 468 U.S. at 110.

The following season, the number of NCAA games broadcast multiplied and advertising rates plummeted. *See* Brian L. Porto, *The Supreme Court and the NCAA* 74 (2012); CAC ¶¶132-34. Together with technological changes that have increased the number of channels available to consumers, the *NCAA* decision has resulted in an enormous quantity of college football programming being available to consumers in a

---

[2] Ira Horowitz, Sports Broadcasting, in Government and the Sports Business 275, 306-07 (Roger Noll ed., 1974). The same effect was seen with respect to professional baseball, whose national telecasts dropped by half. *Id.* at 304.

[3] *See, e.g.*, http://www.usatoday.com/story/sports/ncaaf/2016/06/15/college-football-tv-schedule-guide-fbs-2016/85930918/http://www.usatoday.com/story/sports/ncaaf/2016/06/15/college-football-tv-schedule-guide-fbs-2016/85930918/.

decentralized, competitive marketplace. CAC ¶¶132-34. On a typical Saturday, over forty games are telecast on OTA networks and national cable networks. All four of the major OTA networks carry college football games, and they do so at the same time that the others are showing different games. *Id.* ¶133.

In stark contrast, NFL games have remained strictly limited. A typical consumer can watch four games on OTA television each week, plus two more on cable channels. *Id.* ¶¶84-87. Sunday afternoon games continue to be limited to two television networks, which together show only a combined total of three games in most markets, even though eleven to thirteen games are played at that time. *Id.* ¶84.

The agreements here are precisely what Judge Grim and Congress understood would violate the antitrust laws. It is an agreement among the teams not to compete amongst themselves, by centralizing rights for sale to a subscription television service, tightly restraining the output of televised games in order to increase Defendants' profits. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ This is a patently anticompetitive agreement limiting horizontal competitors' output.[4]

The agreement between the combination of NFL teams and DirecTV also restrains competition that DirecTV telecasts would otherwise face from other sources of out-of-market programming. The NFL is the only major American league that sells its out-of-market package exclusively through a single MVPD. CAC ¶14. This limitation harms competition in a number of ways in addition to those discussed. First, it permits DirecTV to charge supra-competitive prices for both Sunday Ticket and its standard video

---

[4] Plaintiffs object to the consideration of this extrinsic evidence. But were the Court to consider it over Plaintiffs' objections, the cited contract actually supports Plaintiffs' claims.

packages, which are a required prerequisite to purchase Sunday Ticket. *Id.* ¶¶93-94.[5] Without the challenged agreements, Sunday Ticket would compete with far more NFL programming and that competition would reduce its price. The challenged restraints thus increase the Sunday Ticket price, which directly harms all purchasers of Sunday Ticket.[6]

The second way that DirecTV's exclusivity harms competition is that it limits the competition that other NFL telecasts would otherwise face, especially other Sunday-afternoon network broadcasts. *Id.* ¶¶100, 103. The value of those telecasts to the Networks is increased by the relative lack of competition from other broadcasts—that is the very purpose of the league's centralization of broadcast rights, and the reason that that centralization required an exemption from the antitrust laws.[7] If Sunday Ticket were available more broadly, more consumers would be able to choose to watch games other than those shown on local networks, which would make the OTA broadcasts less valuable. That is why networks have insisted on limiting the availability of Sunday Ticket. *Id.* ¶¶73, 77. Just as limiting the availability of OTA games increases DirecTV's Sunday Ticket revenues, limiting the number of subscribers to Sunday Ticket increases the revenues of the OTA broadcasters. OTA telecasts face less competition, allowing OTA broadcasters to obtain higher advertising profits and higher distribution fees. *Id.* ¶86. This restraint of trade, which the SBA does not protect, has predictable, anticompetitive effects: lower output, higher prices, and monopoly profits for the participants.

## III.   **ARGUMENT**

In addressing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' factual allegations must be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not allege detailed factual allegations, but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

[5] Sunday Ticket is much less expensive in Canada where it is offered on a non-exclusive basis through more than 10 MVPDs. CAC ¶¶15, 17.

[6] Sunday Ticket is by far the most expensive of the major league packages, despite the fact that it offers the fewest games. CAC ¶14.

[7] Indeed, although AT&T now owns the rights to Sunday Ticket, it is prevented from distributing it to customers of its own MVPD, U-Verse.

face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## A.   Defendants' Practices are Unquestionably Anticompetitive

Defendants suggest that this Court should conclude—as a matter of law—that their practices are procompetitive, and that the Plaintiffs have not alleged facts showing injury to competition. This position is remarkable for many reasons, not least of which is that their practices have already been held to be anticompetitive, in *NFL I* and *NFL II*, a conclusion that that has never been disturbed outside of Congress's narrow exemption— an exemption that itself presupposes the anticompetitive consequences of these practices. *See NCAA*, 468 U.S. at 104 n.28. ("The legislative history of this exemption demonstrates Congress' recognition that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act, and in particular reflects its awareness of the decision in [*NFL I*] ….").

It is also remarkable because the facts alleged unequivocally establish that consumers are harmed. CAC ¶¶99-113. The history of NFL broadcasting under the SBA contrasted with the history of college football following *NCAA* shows the consequences of Defendants' practices. NFL football games are among the most popular programming on television, yet most consumers have access to less professional football than any other major sport, which results in the eye-popping prices that are paid for both rights and programming. *See, e.g.*, Derek Thompson, Mad About the Cost of TV? Blame Sports, *The Atlantic*, Apr. 2, 2013 ("[J]ust as sports economics dominate the price of TV, NFL costs dominate the price of sports.").[8] And the strictly limited availability of Sunday Ticket diminishes competition with other NFL telecasts and drives up DirecTV profits. This is a textbook case of supply being held below competitive levels in order to drive up prices.

---

[8]   Available   at   http://www.theatlantic.com/business/archive/2013/04/mad-about-the-cost-of-tv-blame-sports/274575/http://www.theatlantic.com/business/archive/2013/04/mad-about-the-cost-of-tv-blame-sports/274575/

## B.    The SBA Does Not Protect Defendants' Horizontal Agreements

The NFL Defendants attempt to recast Plaintiffs' complaint as alleging that there is a narrow horizontal agreement among the teams—which they contend is protected by the SBA—and an entirely separate, vertical agreement with DirecTV. The agreement with DirecTV is not independent of the horizontal restraint nor is it a vertical agreement between two single entities. The agreement with DirecTV is rather an agreement between a firm that offers out-of-market games and a horizontal combination of teams. The situation is identical to a case where competitors create a horizontal cartel by appointing a firm to be the exclusive sales agent of those competitors.[9]

Even under NFL Defendants' mischaracterization, there would be no immunization by the SBA (which, after all, was specifically written to maintain the holdings of *NFL I* and *NFL II* in the pay-television context). However, the teams' decision to centralize all broadcasting rights is not the primary aspect of the horizontal conspiracy being challenged here. Ultimately, the core agreements at issue are not to manipulate the market in rights, but to limit the availability of telecasts at the consumer level. The NFL Defendants have secured agreements from Fox and CBS to distribute only one of the games they produce at a given time on local television, and that only three such games will be available OTA. CAC ¶¶84-85. They have insisted that Sunday Ticket be limited so as not to put significant competitive pressure on OTA telecasts. *Id.* ¶77. Likewise, DirecTV has insisted that OTA broadcasts not be expanded, in order to protect Sunday Ticket. *See* CAC, ¶¶13, 114-118; ████████████████████ The fundamental restraint, in other words, is on the access that consumers have to game telecasts.

---

[9] *See, e.g., NCAA*, 468 U.S. at 109, n.39 ("a court would not hesitate in enjoining a domestic selling arrangement by which, say, Ford and General Motors distributed their automobiles nationally through a single selling agent. Even without a trial, the judge will know that these two large firms are major factors in the automobile market, that such joint selling would eliminate important price competition between them, that they are quite substantial enough to distribute their products independently, and that one can hardly imagine a pro-competitive justification actually probable in fact or strong enough in principle to make this particular joint selling arrangement 'reasonable' under Sherman Act § 1.").

The SBA does not exempt these anticompetitive horizontal agreements from antitrust scrutiny. [10] While the NFL Defendants do not dispute that the SBA is limited to free, OTA broadcasting, they now seek to turn the SBA into a blanket exemption for their broadcasting practices by contending that, because the NFL *could* eliminate Sunday Ticket altogether and retain OTA broadcasting at existing levels, the Court should view Sunday Ticket as necessarily increasing output. NFL Mem. 14. Leaving aside whether the centralized elimination of out-of-market games would be legal, the question is not what the NFL could theoretically do; it is what the teams, the league, and its broadcast partners *would* do if the Court enjoined their collusive practices, given the realities of the marketplace and their economic incentives. *Cf.* NCAA, 468 U.S. at 107 (rule of reason focuses on reduction of output from what "would otherwise be").

If it were enough that the NFL teams could eliminate access to all "out-of-market" games entirely, then the SBA's limitations would be a nullity. As the court recognized in *Shaw*, "to adopt the construction urged by the NFL would allow the exception to swallow the rule: a sponsored telecast to a limited geographic area would secure an antitrust law exemption for nationwide sales." 172 F.3d at 302. The same would happen under the NFL's current theory. The NFL may not use the fact that it abides by the SBA to some minimal degree in order to engage in precisely the anticompetitive conduct that Congress intentionally left subject to the antitrust laws.

Moreover, in attempting to claim that Sunday Ticket has increased output, Defendants appear to be comparing current output with output before Sunday Ticket launched in 1994. But Plaintiffs are not challenging the existence of Sunday Ticket itself. Plaintiffs are challenging restraints that prevent the addition of other competitive market options. The fact that adding Sunday Ticket increased output is entirely consistent with the fact that adding other competitive market options would have increased output

---

[10] "It is well settled that exemptions from the antitrust laws are to be narrowly construed." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979). This is especially true given the special-interest nature of the SBA. "Special interest laws do not have 'spirits,' and it is inappropriate to extend them to achieve more of the objective the lobbyists wanted." *Chi. Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 671 (7th Cir. 1992).

further.[11] The relevant question, as Professor Noll explained in a statement selectively quoted by Defendants, is whether viewership would be greater if competition were allowed: "[i]f one adopts the right counterfactual, the right but-for world in the competitive environment, it is obvious that NFL Sunday Ticket is a palliative *compared to the output and prices that would exist in a competitive environment*." CAC ¶128 (emphasis added).[12]

Thus, Defendants' position that Plaintiffs have not presented a plausible but-for world is baffling, because it directly contradicts the NFL's own history, as well as the history of the NCAA, the state of modern television distribution, and basic economics. Without these restrictive agreements, telecasts would be more available and viewership would rise. Individual teams would be free to offer competing telecasts and other MVPDs would have access to games currently carried only on DirecTV. Until 1961, NFL teams had no trouble obtaining television coverage without collective decision-making by the joint-venture. *Id*. ¶¶60-65. Indeed, the league's attempts to constrain the teams by this kind of collective control was correctly held to be anticompetitive, a conclusion that has never been undermined. Similarly, the NCAA unsuccessfully argued to the Supreme Court that its restraints were justified by the need for cooperation and were output enhancing, *see* Br. for Pet'r, *NCAA v. Bd. of Regents of Univ. of Okla*., No. 83-271, 1983 WL 919058, at 39, 42 (Dec. 1, 1983). The Supreme Court's rejection of those arguments was correct—output of NCAA football telecasts dramatically increased after its decision.

---

[11] Defendants' argument that they have not limited output because all games are available through Sunday Ticket is wrong. The correct measure of broadcasting output is viewership of games, not the number of telecasts. One would not measure, say, output in the hot dog market by the number of hot dog stands; the correct measure would be the number of hot dogs eaten by consumers.

[12] In *Kingray*, the court compared output with the NBA's package of games against the output before it was available. 188 F. Supp. 2d at 1195. It did so, however, only in the context of analyzing the very narrow question of whether the mere *addition* of the out-of-market package reduced output. It separately addressed the league's policy of preventing the teams from also offering their games on an out-of-market basis, declining to rule on that question because it ruled that the plaintiffs did not have standing to raise that challenge. The question here, by contrast, is whether the teams' collective agreement to *prevent* individual team distribution over pay television is a suppression of output.

1  CAC ¶133.

2      For the NFL Defendants' argument to succeed, they would have to establish that, if

3  Plaintiffs were to prevail, the teams and the league would choose to return to 1980s levels

4  of broadcasts, rendering the majority of games unavailable to consumers at any price.

5  That hypothetical world defies common sense, both technologically, given the changes in

6  video distribution capacity, and financially, given the amount of money at stake. The

7  current out-of-market package earns the league $1.5 *billion* per year, and essentially all of

8  it is net income. CAC ¶96. With the enormous market demand for all NFL football

9  games, it is implausible that the teams would keep these telecasts from the market.

10      Nor would it be unusual for the teams to retain some broadcast rights while

11  transferring others to the league. That is just what every other major sports league in the

12  United States does. *See Laumann v. NHL*, 56 F. Supp. 3d 280, 287-88 (S.D.N.Y. 2014)

13  (describing MLB and NHL broadcasting practices).[13]

14      The league makes much of the need for cooperation among the teams to produce a

15  bundle of games, stressing that some consumers prefer to obtain the games in that

16  fashion.[14] Nothing prevents the league from offering such a bundle, however, just as it

17  does with the radiocasts.[15] Again, Plaintiffs are not challenging the existence of Sunday

18  Ticket, but rather restraints that prevent additional market options from competing with

19  Sunday Ticket. Courts have emphasized that where a package of products from potential

20  competitors is the exclusive source of products, it prevents competition, while a non-

21  exclusive bundled product may simply be "one alternative competing on the basis of

22

23  [13] It is also what the NFL Defendants themselves do with respect to radio rights. Individual team
    radio broadcasts compete with each other, while the league simultaneously offers nationwide
24  bundled packages by Internet and satellite radio. *See* CAC ¶104.
    [14] Plaintiffs do not believe that team cooperation in the selling of television rights would be
25  difficult to achieve, but "[e]ven if certain agreements by sports leagues with respect to
    telecasting games may be 'essential if the product is to be available at all' this does not give
26  league agreements regarding television rights blanket immunity from antitrust scrutiny."
    *Laumann*, 907 F. Supp. 2d at 488.
27  [15] It is not clear that most consumers want a bundle, as such, however. It is likely that many
    simply want access to the games. In a competitive market, all games would almost certainly be
28  available on standard pay-television channels, obviating much of the appeal of the bundle.

11

price and services with others." *Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917, 934 (2d Cir. 1984) (Winter, J., concurring). The Supreme Court made this very point in NCAA, where it held, "Ensuring that individual members of a joint venture are free to increase output has been viewed as central in evaluating the competitive character of joint ventures." 468 U.S. at 114 n.54; *see also BMI, Inc. v. CBS, Inc.*, 441 U.S. 1, 24 (1979) (upholding joint selling of music licenses under a blanket license, but only where "there was no legal, practical, or conspiratorial impediment to … obtaining individual licenses."). "Far from being 'presumptively legal,' such arrangements are exemplars of the type of anticompetitive behavior prohibited by the Sherman Act." *United States v. Visa U.S.A.*, 344 F.3d 229, 242 (2d Cir. 2003).

## C.  The Exclusive Arrangement With DirecTV Is Anticompetitive

Adding to the consumer harm, Defendants limit the availability of out-of-market games to DirecTV subscribers, preventing subscribers to all other MVPDs from having access to the games. No other analogous major-league package is so limited. CAC ¶105. Indeed, unlike other leagues, the NFL does not even offer a separate Internet package of games. Instead, NFLSundayTicket.tv is sold only by DirecTV, and is available only to its subscribers and a limited set of non-DirecTV customers.

The NFL Defendants contend that Plaintiffs' purportedly "bare assertions" that this exclusive distributorship arrangement is illegal fail as a matter of law, because such arrangements are "presumptively legal." NFL Mem. 2, 4. However, the reason that exclusive distributorships are often viewed as procompetitive is because they promote *interbrand* competition. *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 (1977). DirecTV is not representing one team's broadcasts in competition against other distributors representing other teams. Rather, Defendants have *prevented* interbrand competition between the separate clubs' games, and the exclusive arrangement with DirecTV is part of the centralized control of the entire market.

Defendants rely on the fact that in *Kingray*, the court found that the plaintiffs presented a truly "bare" argument based on DirecTV's exclusive distribution agreement

12

1   with the NBA, without properly alleging that the defendants "intend[ed] to or actually
2   harm[ed] competition in the relevant market." 188 F. Supp. 2d at 1197. Indeed, the court
3   invited the plaintiffs to amend their complaint to make such allegations, but they declined
4   to do so, resting on conclusory statements of harm. *Id.*[16]

5       By contrast, Plaintiffs here have gone far beyond the mere assertion that there is an
6   exclusive distributor arrangement and have specifically identified harms to competition
7   that result from this arrangement. *See, e.g.*, CAC ¶¶106-28. Not least, as discussed above,
8   is that, as part of DirecTV's exclusive arrangement, it is directly involved in horizontal
9   agreements to limit output of non-Sunday Ticket games, by insisting on limitations on
10  other forms of distribution. CAC ¶¶114-18.

11      The extensive factual allegations in the complaint show that the anticompetitive
12  aims and consequences of the exclusive arrangement are manifest. Defendants suggest
13  that granting exclusivity encourages DirecTV's incentives to invest in and promote
14  Sunday Ticket. There are contexts in which such factors result in increased output overall,
15  and may be procompetitive, *Cont'l T.V.*, 433 U.S. at 55, but that is not the case here.
16  DirecTV does not invest in meaningful "innovation," as Defendants suggest. DirecTV
17  packages and sells telecasts received from the networks that had already created those
18  telecasts for regional broadcast. CAC ¶¶7, 89-98.

19      Although exclusive agreements with those who sell directly to consumers may
20  sometimes have output-increasing promotional effects, there is no plausible claim that
21  more consumers will view out-of-market games because they are promoted by DirecTV.
22  Indeed, it is obvious the opposite occurs because DirecTV only sells Sunday Ticket to its
23  own subscribers and they represent only a fraction of the overall market. Exclusivity here
24  serves to allow DirecTV to increase profits from its subscription base, not to maximize
25  output. CAC ¶105. Millions of subscribers to other MVPDs would subscribe to out of
26  market games if they were available on their services.

27

28  [16] Significantly, the package in *Kingray* was *not* exclusive to DirecTV, as the NBA also licensed
    it to In Demand, a consortium of cable companies. 188 F. Supp. 2d at 1196.

The experience of MLB's failed attempt to obtain similar exclusivity and the uproar it generated confirms this. In 2007, MLB tried to replicate what the NFL has done by reaching a similar, exclusive deal with DirecTV for its MLB Extra Innings package. CAC ¶109. The Senate held hearings on the matter—*Exclusive Sports Programming, Examining Competition and Consumer Choice: Hearings Before the Senate Comm. on Commerce, Sci. and Trans.*, 110th Con. 1067 (2007)—and MLB ultimately agreed to sell its package through other MVPDs. The amount DirecTV agreed to pay for exclusive rights to MLB Extra Innings was not only more than it agreed to pay for the non-exclusive license it ultimately received, it was more than the entire market subsequently paid to MLB for the rights. Decl. of Roger G. Noll, Dkt. 265, 83-84 *Laumann v. NHL*, No. 12-1817 (S.D.N.Y. Sept. 19, 2014). When DirecTV's attempt to obtain exclusivity was unsuccessful, more people got access to more programming, but the parties' monopoly profits were reduced. CAC ¶109. That is the essence of an effect on competition.

The reported $1.5 billion annual rights fee DirecTV pays the NFL confirms that the same thing is happening here. CAC ¶39. As Stephen Ross, the Director of the Penn State Institute for Sports Law, Policy, and Research, recently explained, the NFL necessarily loses customers—and their money—as a result of the exclusive arrangement, but it is "willing to forgo that money because DirecTV is bribing them to do so." Zachary Zagger, NFL Must Play Good Defense in DirecTV Sunday Ticket Row, *Law360*, Aug. 18, 2016. DirecTV's monopoly profits from its exclusivity are so important that when AT&T purchased DirecTV, it insisted on DirecTV maintaining its monopoly over Sunday Ticket as a condition for completing the deal. CAC ¶18.

The NFL has another reason for supporting DirecTV's reduction in output: it limits the competition OTA telecasts face. CAC ¶¶100, 103. Output, in other words, is constrained in order to increase the profits from *all* NFL programming, not just to increase the profits from Sunday Ticket itself. This unquestionably harms competition and consumers.

14

DirecTV's exclusivity also extends to Internet distribution, which is unique in major American sports. CAC ¶105. Not surprisingly, DirecTV strictly constrains the Internet product's availability so as to limit the competitive effect on its television package. DirecTV has less—not more—incentive to promote it than would the league or another entity, sharply limiting the growth that would otherwise occur, in sharp contrast to the success of similar products, such as MLB.tv.

The league cites cases in which the exclusive distribution arrangements were held to be permissible where a manufacturer was a monopolist.[17] The theory underlying these cases is that once a monopolist reduces output to the monopoly level and increases prices accordingly, exclusivity at the distribution level cannot further increase the profitability of the restraint. *E.g., Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007); *E & L Consulting, Ltd. v. Doman Indus. Ltd*., 472 F.3d 23, 30 (2d Cir. 2006). But these cases only highlight how inappropriate it is to construe the present arrangement as a traditional vertical distribution arrangement like that between a manufacturer and a distributor. The situation here is no different than cases where competitors create a horizontal cartel by appointing a firm to be the sole sales agent of those competitors.

In the *E & L Consulting* decision Defendants' rely on, the court reasoned that distributional exclusivity could not add to the harm on competition because "[t]he power to restrict output to maximize profit is complete in the manufacturing monopoly, and there is no additional monopoly profit to be made by creating a monopoly in the retail distribution of the product." 472 F.3d at 30. But that is not what is happening here. The NFL teams reduce viewership by agreeing with DirecTV that DirecTV will be the sole distributor of out-of-market games. Only DirecTV subscribers have access to the product, and must purchase DIRECTV's standard video package in order to have access to Sunday Ticket at all. The restraint is targeted at the retail level—not the "manufacturing" level—

---

[17] As a preliminary matter, of course, the NFL is not a natural monopoly; it is an association of 32 separate commercial entities. *See Am. Needle*, 560 U.S. at 196.

and its effects flow from restricting output at that level.

Moreover, the cases the NFL Defendants cite are inapposite because of the other actual and intended effects on competition discussed above, including that the arrangement is intended to protect other NFL programming from competition. It is also important to note that the simple economic analysis in those cases does not apply here, because DirecTV's profit cannot be assessed only in terms of the revenue it generates from Sunday Ticket sales. DirecTV uses Sunday Ticket as a subscription generator for its general MVPD service, so it is able to extract revenue—in the form of additional subscriptions to and higher prices for *other* programming that is required for purchasing Sunday Ticket—that could not be captured by the NFL prior to its arrangement with DirecTV. CAC ¶146. This inflated revenue flows directly from DirecTV's exclusivity.

## D.   **Plaintiffs Have Properly Alleged Relevant Product Markets**

A "relevant product market" for antitrust purposes is a market "composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Int'l Boxing Club, Inc. v. United States, 358 U.S. 242, 250 (1959)* (quotation omitted). Here, Plaintiffs have alleged that in a competitive market, the 32 professional football teams and their television partners would compete in the broadcasting and sale of "live video presentations of professional football games." CAC ¶1. In addition, through their division of the market, Defendants have also created a submarket for "out-of-market" professional football games. *Id.*

The purpose of the market definition requirement is to show that Defendants have the ability to raise prices above competitive levels or restrict output in the defined market. Plaintiffs have alleged exactly that. CAC ¶¶53-59. The market for professional football broadcasts has extremely high barriers to entry, meaning that new entrants are unable to put downward pressure on the prices Defendants charge. *See, e.g.,* CAC ¶57. Likewise, "[b]roadcasts of other sports or other content do not compete with broadcasts of NFL games." CAC ¶53. Even though there are far fewer games broadcast each NFL season, the price of the NFL's out-of-market package is far greater than any other sports league

16

operating in the United States.

Product markets have long been recognized to be confined to individual sports in general, and for telecasts in particular. Indeed, the Ninth Circuit so recognized with respect to the NFL in affirming the jury's finding in *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984):

> That NFL football has limited substitutes from a consumer standpoint is seen from evidence that the Oakland Coliseum sold out for 10 consecutive years …. A similar conclusion can be drawn from the extraordinary number of television viewers—over 100 million people—that watched the 1982 Super Bowl, the ultimate NFL product. NFL football's importance to the television networks is evidenced by the approximately $2 billion they agreed to pay the League for the right to televise the games from 1982–1986.

Similarly, the Supreme Court recognized that intercollegiate football telecasts were not in the same market as professional football telecasts, which could not be the case if the NFL's position were adopted here. *NCAA*, 468 U.S. at 111. And recently, in *Laumann*, 907 F. Supp. 2d at 491, the court found that it was "well established" that individual sports' telecasts were separate markets.[18]

Moreover, courts do not typically grant motions to dismiss on market definition grounds—as facts needed to properly define the market have yet to be determined at the pleading stage. *See, e.g.*, *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial."); *see also* *Sidibe v. Sutter*

---

[18] *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874 (N.D. Ill. 2015) does not change this analysis. The court there found that "the market for watching Live Cubs Games … cannot stand because it is comprises a single brand product." *Id.* at 886-87. Plaintiffs here do not allege that each NFL club's telecasts constitute a separate market. As the court in *Right Field Rooftops* recognized, the primary competition Cubs games face is from "other Major League Baseball teams." *Id.* Likewise, here, Plaintiffs are contending that in a competitive market each NFL club's telecasts would compete against each other. While the court went on to note that the Cubs also face competition from "sporting events, and other live entertainment," it offered no factual analysis for why or how this "competition" imposed price constraints. Moreover, this ignores the well-established principle that "properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers." U.S. DOJ/FTC Horizontal Merger Guidelines § 4; *see generally id*. §§ 4 & 4.1.1.

17

*Health*, No. 14-16234, 2016 WL 3844688 (9th Cir. July 15, 2016) (reversing dismissal for allegedly failing to plead market with sufficient detail).

The pleading burden is even less onerous where, like here, the anticompetitive nature of Defendants' agreements is so clear. As the Supreme Court held in *NCAA*, where, as here, "there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." 468 U.S. at 109 (quotation omitted). "There was no need for the respondents to establish monopoly power in any precisely defined market for television programming in order to prove the restraint unreasonable." *Id.* at 110 n.42 (quotation omitted). When agreements "raise prices and reduce output" defendants have "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market," *id.* at 113, regardless of whether they have established market power in a "precisely defined market."

The NFL Defendants' claim that they face "competition" from some other unidentified "sports and entertainment products," NFL Mem. 14, is factually unsupported and misses the point. The assessment of whether other products are part of the same market is not resolved by asking whether those products "compete for consumer attention." By that test, nearly everything would be in the same market. The issue is whether other products are sufficiently close substitutes to prevent the possession of market power.[19]

---

[19] Seizing on references in the complaint to live presentations of "NFL" games, Defendants also claim that Plaintiffs have defined a single-brand market. This is incorrect. The first paragraph of the complaint states that the relevant product market is the market for "live video presentations of professional football games." Each team is a separate economic entity with its own brand, and would, in the absence of these restraints, compete, just as they did before the SBA. To define the product as "NFL football," as Defendants suggest, would undermine the holding of *American Needle*. *See* 560 U.S. at 199 n.7 ("defining the product as 'NFL football' puts the cart before the horse: Of course the NFL produces NFL football; but that does not mean that cooperation amongst NFL teams is immune from § 1 scrutiny. Members of any cartel could insist that their cooperation is necessary to produce the 'cartel product' and compete with other products.").

In any event, there is no prohibition on single brand markets—it is simply a presumption that "might be overcome when the defendant's own products are 'so unique or so dominant in the market in which they compete that any action by the manufacturer to increase his control over his product virtually assures that competition in the market will be destroyed.'" Areeda &

18

The NFL Defendants also contend that the fact that a small number of games are offered on OTA television "for free" means that NFL games cannot be substitutes for one another. If they were, Defendants argue, consumers would simply watch the "free" games instead of purchasing Sunday Ticket. NFL Mem. at 16. Plaintiffs have never argued that each NFL game is a perfect substitute for another. NFL broadcasts are "differentiated products," meaning that they have different qualities or characteristics that affect consumer choices. While some fans are content to simply watch the games available on local television, others, including all class members, are forced to purchase an extremely expensive product to watch games they are interested in. It is a fact-specific question, but there is no doubt NFL telecasts would be even more expensive if the demand for football was not slackened to an extent by the fact that a handful of games are available on local television.[20]

Finally, the NFL Defendants contend that the submarket described in the complaint, which includes only "out-of-market" games, is implausible because it is "gerrymandered" to include only the product Plaintiffs believe is supra-competitively priced. Defendants again miss the point. In a competitive market, there would be no such thing as out-of-market games, because all games would be available in all markets, so there would be no such submarket. But Defendants have constrained the market so that consumers are faced with an artificially limited set of choices—and then increased the price for a particular, targeted set of consumers. *See* DOJ/FTC Horizontal Merger Guidelines § 4.1.4 ("If a hypothetical monopolist could profitably target a subset of customers for price increases, the Agencies may identify relevant markets defined around those targeted customers …."). Any gerrymandering is the direct result of Defendants' anticompetitive carving up of the professional football telecast market to create an artificial scarcity of certain professional football telecasts.

---

Hovenkamp, *Antitrust Law* ¶563; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481-482 (1992) ("one brand of a product can constitute a separate market.").

[20] Moreover, this argument is inconsistent with Defendants "all entertainment" argument. For if different NFL football games are not in the same relevant market, then other sports and entertainment could not possibly be as well

It is well established that within a broader market, submarkets may exist which, in themselves, constitute relevant product markets. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). A court may determine the boundaries of such a submarket by examining "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id*. While this is again a fact-specific analysis, it is clear that Defendants have created a submarket for non-local telecasts. Sunday Ticket is recognized and promoted by Defendants as a separate product from locally available games. CAC ¶97. It has peculiar characteristics and uses, namely the ability to watch all non-local games. *Id*. It has distinct customers—commercial establishments and individuals that want to be able to pick what game to watch. *Id*. And Defendants have substantial pricing power as a result of Sunday Ticket's position in the market.

### E.   **Plaintiffs Have Standing to Seek Damages**

The NFL Defendants also challenge Plaintiffs' standing to seek monetary damages, claiming that they are merely "indirect purchasers" under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). This is incorrect. All class members are direct purchasers of Sunday Ticket, and thus all have been directly injured by the challenged restraints.

Illinois Brick only applies when a litigant seeks to use a "pass-on theory" to establish damages. *See, e.g.*, *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012). When a direct purchaser pays an overcharge as a result of an antitrust violation, that purchaser may collect damages, but if another party subsequently purchases from that direct purchaser, the indirect purchaser does not have standing to seek damages under a theory that the overcharges were "passed on." The Supreme Court created this rule to avoid the "evidentiary complexities and uncertainties" of apportioning damages between direct and indirect purchasers. *Illinois Brick*, 431 U.S. at 731-733, 740-43.

The Ninth Circuit's *ATM Fees* decision illustrates why *Illinois Brick* has no application here. There, the plaintiffs were users of automatic teller machines. They

20

alleged that an "interchange fee" paid by a customer's bank to the owner of a foreign ATM were unlawfully inflated, and that those fees, in turn, caused customers to pay their bank inflated "foreign ATM fees." 686 F.3d at 749-50. At issue in that case was the scope of the "co-conspirator exception" to the direct purchaser rule. The court ruled that it did not matter whether the ATM owners were co-conspirators in the fixing of the interchange fee; *Illinois Brick* still applied, because there was no price fixing of the retail, "foreign ATM fee." *Id*. at 755-56. "[W]hile Plaintiffs allege a conspiracy to set interchange fees, they fail to show a conspiracy to set foreign ATM fees." *Id*. at 751.

Here, however, Plaintiffs are not asserting a pass-through theory at all. It is not that the NFL charged inflated prices to DirecTV, which passed on those overcharges to the plaintiffs. Rather, here, the restraints have been directed at the retail level from the get-go. The NFL and DirecTV have agreed to restrain competition between Sunday Ticket and other NFL programming, which raises the price that all class members directly pay for Sunday Ticket. This is not a conspiracy at the league level that has an indirect effect on consumers. It is a multilevel conspiracy whose purpose is to control output at the retail level.[21]

It is as if a particular bank convinced all the manufacturers of ATMs to make the machines only available at their bank. That bank would pay more for the ATMs so as to exploit the monopoly, but any fees they subsequently charged consumers could not be considered a "pass through" under *Illinois Brick*. Likewise, DirecTV pays the NFL a fee so that it can have the exclusive right to create and market Sunday Ticket in an environment where it faces limited competition from other NFL games. In contrast to ATM Fees, the fee paid by DirecTV for these rights is a flat fee, rather than a fee per

---

[21] Defendants' claim that Plaintiffs have not suffered an antitrust injury because they are not in the market for rights thus misses the mark. NFL Mem. 20. Plaintiffs have alleged a conspiracy between a horizontal combination (the NFL teams) and other market levels, which restrains competition between Sunday Ticket and other NFL programing in a way that raises Sunday Ticket prices, restrains viewership of out-of-market games, and increases the profits of the teams, the networks that carry OTA games, and, of course, DirecTV. *See also* CAC ¶¶140-46 (outlining Plaintiffs' antitrust injuries).

subscriber. CAC ¶7, 95-96. Economically, this means that the fee does not impose a marginal cost on DirecTV, so it has no effect on the profit-maximizing price DirecTV charges. If the rights fee were reduced by half—or even eliminated entirely—it would not affect DirecTV's profit-maximizing price. The price consumers pay is a direct consequence of DirecTV's monopoly, which results from agreements between the teams, the league, and DirecTV itself. It does not incorporate any pass-through of another, independently inflated price, as was the case in *ATM Fees*.

Notably, Plaintiffs have suffered other damages that involve a measure of passed-through overcharges. In particular, the networks—ESPN, Fox, NBC, and CBS—charge per-subscriber fees to DirecTV that have been artificially inflated by the scheme. DirecTV passes those overcharges on to consumers, who pay excessive amounts for their basic packages as a result. [22] Plaintiffs are not seeking to recover any passed-through overcharges they suffered because the restraints have increased the fees that networks charge DirectTV, which it passes on in higher basic cable fees. Plaintiffs instead seek only the overcharge they *directly* paid for Sunday Ticket itself, which involves no similar pass-through.[23]

Defendants suggest, by quoting it out of context, that *ATM Fees* should be read to require that multilevel conspiracies are only actionable where the conspirators agree to explicitly fix the retail price. What *ATM Fees* actually holds is that, in a price-fixing case, "the price paid by a plaintiff must be set by the conspiracy and not merely affected by the setting of another price." 686 F.3d at 754.

Defendants have manipulated the market at the retail level, not by an explicit agreement on price, but through a series of agreements to divide the market and restrain

---

[22]  DirecTV participates in the horizontal agreement to inflate these prices by limiting distribution of Sunday Ticket, which would otherwise constrain those prices, and by ███████████████████████████████████████, so it not in the same position as the ATM owners were in *ATM Fees*.

[23]  In *Laumann*, the court addressed the co-conspirator exception where such claims were asserted. Disagreeing with *ATM Fees*, it held that the co-conspirator exception applied. 907 F. Supp. 2d at 481.

output. It is well-settled that "[a]n agreement on output also equates to a price-fixing agreement" and "raising price, reducing output, and dividing markets have the same anticompetitive effects." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594-95 (7th Cir. 1984); *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999) ("[I]t is of course the producers' supply of a good in relation to demand that is normally relevant in determining whether a producer-imposed output limitation has the anticompetitive effect of artificially raising prices."). Because it was a direct price-fixing case, *ATM Fees* speaks in terms of the need to find an agreement on retail price, but it cannot be read to alter decades of settled law on purchasers' ability to recover for price effects that result from reduced output and market division. If the retail price is inflated by a market manipulation at the retail level—by agreeing on a price, limiting output, or dividing markets—rather than by the consequences of an inflated wholesale price, then there is no pass-through and no indirect-purchaser concern.

Defendants rely on the fact that, in *Kingray*, the court concluded that purchasers of the NBA's out-of-market package lacked standing. But the plaintiffs there conceded that they were indirect purchasers, and relied entirely on the co-conspirator exception.[24] Whether that was correct (which depends, in part, on how that product was sold), it is not the case here, where there is no pass-through theory.

Moreover, the Plaintiffs have properly alleged that DirecTV has *directly* participated in horizontal agreements to limit competition, which was not alleged in *Kingray*. 188 F. Supp. 2d at 1199. Indeed, as discussed above, the *Kingray* court found that the plaintiffs had not properly alleged that DirecTV was a co-conspirator at all, because it had not properly alleged a vertical conspiracy either, and on that basis rejected the application of the coconspirator exception. *Id*.

Finally, the NFL Defendants' standing argument is limited in two ways. First, "indirect purchasers are not barred from bringing an antitrust claim for injunctive relief

---

[24] *See* Opp. to NBA Defs. Mot. to Dismiss, *Kingray v. NBA, Inc.*, 188 F. Supp. 2d 1177 (S.D. Cal. 2002), at 18.

1  against manufacturers." *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc*., 140 F.3d

2  1228, 1235 (9th Cir. 1998); *see also* Areeda & Hovenkamp, Antitrust Law ¶¶346a, 346d

3  (2015). Consequently, Defendants' standing arguments, even if they were correct, could

4  not affect Plaintiffs' injunctive claims. Second, Defendants make this argument only

5  "with respect to any alleged horizontal agreement among the NFL clubs." NFL Mem. 21.

6  Thus, it has no effect as to damages flowing from DirecTV's exclusivity or from the

7  horizontal restraints to which DirecTV is a participant.

8  ### F.  Plaintiffs Have Properly Alleged Monopoly Power

9  The NFL Defendants have also moved to dismiss Plaintiffs' claim under Section 2

10  of the Sherman Act, which alleges that "the NFL and its Teams agreed to consolidate all

11  licensing rights for live video presentations of regular season NFL games into a single

12  entity, with the purpose, intent, and effect of monopolizing the relevant market and

13  submarket described above." CAC ¶161. The claim further alleges that "DirecTV has

14  obtained an unlawful monopoly with respect to the out-of-market Sunday afternoon

15  games available through its agreements with the NFL and its Teams." *Id*.

16  In *NCAA*, the district court found the NCAA to have violated Section 2 of the

17  Sherman Act, finding that it was "clear that NCAA exercises monopoly power," because

18  "NCAA controls all of regular season college football television." *Bd. of Regents of Univ.*

19  *of Okla. v. NCAA*, 546 F. Supp. 1276, 1323 (W.D. Okla. 1982) (citing *United States v. E.I.*

20  *duPont de Nemours & Co*., 351 U.S. 377, 394 (1956) ("When a product is controlled by

21  one interest, without substitutes available in the market, there is monopoly power.")).

22  Just as in *NCAA*, Defendants here are maintaining monopoly power by preventing

23  the individual teams from freely competing in the marketplaces for live football

24  programming. No other sports league in America has such a drastic elimination of

25  competition in the broadcasting market. While MLB, the NHL, and the NBA have each

26  allocated markets geographically and pooled so-called "out-of-market" rights, none has

27  agreed to centralize control and sale of *all* broadcast rights as the NFL has done. This is

28  particularly notable because the *Laumann* court denied the defendants' motions to

24

dismiss the plaintiffs' Section 2 claims in the context of professional hockey and baseball—and the arrangements there were not as complete as they are here. *See Laumann*, 907 F. Supp. 2d at 492 ("[P]laintiffs have plausibly alleged that the NHL and MLB have used their monopoly power to restrict the broadcast of television programming in a manner that harms competition."). Because the challenged horizontal agreement creates monopoly power that otherwise would not exist, it is simply not true that Plaintiffs merely allege monopoly power that the NFL would "naturally" hold. NFL Mem. 24.

Unlike in *Laumann*, moreover, the NFL Defendants and DirecTV have conspired to provide DirecTV with an unlawful monopoly with respect to out-of-market Sunday afternoon games. Unlike all other professional sports leagues in the United States, the only way that consumers may watch games not aired locally is by subscribing to DirecTV. This is monopolization actionable under Section 2. *See, e.g., United States v. Grinnell Corp*., 384 U.S. 563, 576 (1966).

## IV.   **CONCLUSION**

For the foregoing reasons, it is respectfully submitted that the NFL Defendants' motion to dismiss should be denied in its entirety.

Dated: September 22, 2016          Respectfully submitted,


By:   */s/ Marc M. Seltzer*
            Marc M. Seltzer


Marc M. Seltzer
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Arun Subramanian

25

4527044v1/014918

asubramanian@susmangodfrey.com
William Christopher Carmody
bcarmody@susmangodfrey.com
Seth Ard
sard@susmangodfrey.com
Ian M. Gore
igore@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Michael D. Hausfeld
mhausfeld@hausfeld.com
HAUSFELD LLP
1700 K. Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Scott Martin
smartin@hausfeld.com
Irving Scher
ischer@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Michael P. Lehmann (SBN 77152)
mlehmann@hausfeld.com
Bonny E. Sweeny (SBN 176174)
bsweeney@hausfeld.com
Christopher L. Lebsock (SBN 184546)
clebsock@hausfled.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908

26

1

Fax: (415) 358-4980

2

Howard Langer

3

hlanger@langergrogan.com
Edward Diver

4

diver@langergrogan.com

5

Peter Leckman
pleckman@langergrogan.com

6

LANGER GROGAN AND DIVER PC

7

1717 Arch Street, Suite 4130
Philadelphia, PA 19103

8

Tel: (215) 320-5660

9

Fax: (215) 320-5703

10

*Interim Class Counsel*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4527044v1/014918