Beth A. Wilkinson (admitted *pro hac vice*)
**WILKINSON WALSH + ESKOVITZ LLP**
1900 M Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonwalsh.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (*pro hac vice* anticipated)
**COVINGTON & BURLING LLP**
One CityCenter, 850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League,
NFL Enterprises LLC, and the Individual NFL
Clubs*

[Additional Counsel Listed on Signature Pages]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No. 2:15-ml-02668-BRO (JEMx) |
| | Hon. Beverly Reid O'Connell |
| | Hearing Date: December 12, 2016 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **REPLY IN SUPPORT OF THE NFL DEFENDANTS' MOTION TO DISMISS** |

1

# TABLE OF CONTENTS

2   I.   PLAINTIFFS FAIL TO IDENTIFY ANY AGREEMENTS THAT COULD
3        BE DEEMED UNLAWFUL UNDER THE ANTITRUST LAWS. ...............1

4        A.   The Vertical NFL-DIRECTV Agreement Is Not Unlawful. .................2

5        B.   The Horizontal Agreement Among the NFL Clubs Is Protected by the
6             Sports Broadcasting Act. ........................................................4

7   II.  PLAINTIFFS FAIL TO CURE THE FLAWS IN THEIR PUTATIVE
8        RELEVANT MARKET. ..................................................................7

9   III. PLAINTIFFS CANNOT DEMONSTRATE ANTITRUST STANDING. ......8

10  IV.  PLAINTIFFS FAIL TO RESUSCITATE THEIR MONOPOLIZATION
        CLAIM. ......................................................................................10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*In re Aluminum Warehousing Antitrust Litig.*,
--- F.3d ----, 2016 WL 4191132 (2d Cir. 2016) .................................................... 9

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) .................................................... 9

*In the Matter of Applications of AT&T Inc. & DIRECTV*,
30 F.C.C. Rcd. 9131 (2015) .................................................... 4

*In re ATM Fee Antitrust Litig.*,
686 F.3d 741 (9th Cir. 2012) .................................................... 10

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982) .................................................... 9

*Brantley v. NBC Universal*,
675 F.3d 1192 (9th Cir. 2012) .................................................... 6

*Cablevision Sys. Corp. v. FCC*,
597 F.3d 1306 (D.C. Cir. 2010) .................................................... 3

*Cablevision Sys. Corp. v. FCC*,
649 F.3d 695 (D.C. Cir. 2011) .................................................... 3

*CBS Corp. v. FCC*,
785 F.3d 699 (D.C. Cir. 2015) .................................................... 5

*Chi. Prof'l Sports L.P. v. NBA*,
961 F.2d 667 (7th Cir. 1992) .................................................... 4

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
472 F.3d 23 (2d Cir. 2006) .................................................... 3

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
612 F. Supp. 2d 330 (S.D.N.Y. 2009) .................................................... 8

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990) .................................................... 10

*Kingray, Inc. v. NBA, Inc.*,

    188 F. Supp. 2d 1177 (S.D. Cal. 2002) ....................................................1, 2, 6, 10

*Knievel v. ESPN*,

    393 F.3d 1068 (9th Cir. 2005) ...............................................................................5

*Laumann v. NHL*,

    907 F. Supp. 2d 465 (S.D.N.Y. 2012) ...............................................................5, 10

*In re Musical Instruments & Equip. Antitrust Litig.*,

    798 F.3d 1186 (9th Cir. 2015) .............................................................................1, 9

*NCAA v. Bd. of Regents of Univ. of Okla.*,

    468 U.S. 85 (1984) ................................................................................................6

*Pittsburgh Athletic Co. v. KQV Broad. Co.*,

    24 F. Supp. 490 (W.D. Pa. 1938) ........................................................................5

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,

    507 F.3d 117 (2d Cir. 2007) .............................................................................3, 8

*In the Matter of Revision of the Commission's Program Access Rules*,

    27 F.C.C. Rcd. 12605 (2012) ...............................................................................3

*Rutman Wine Co. v. E. & J. Gallo Winery*,

    829 F.2d 729 (9th Cir. 1987) ...........................................................................2, 3

*Spinelli v. Nat'l Football League*,

    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ................................................................2, 5, 6

*Ty, Inc. v. Publications Int'l Ltd.*,

    292 F.3d 512 (7th Cir. 2002) ...............................................................................8

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,

    7 F.3d 986 (11th Cir. 1993) .................................................................................8

*Washington v. Nat'l Football League*,

    880 F. Supp. 2d 1004 (D. Minn. 2012) ...........................................................3, 5, 6, 10

**Statutes**

Sports Broadcasting Act, 15 U.S.C. § 1291 ......................................................1, 4

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law* (4th ed. 2014) ................................................ 8

Pl.'s Opp'n to NBA Defs.' Mot. to Dismiss,

    *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177 (S.D. Cal. 2002)

    (No. 00-cv-1545), ECF No. 192 ............................................................................. 2

Every NFL Sunday afternoon game is broadcast on free, over-the-air television. Plaintiffs nonetheless contend (Opp. 1) that the NFL's broadcast arrangements unlawfully restrain supply because not *every* NFL game is available on *free* television to *every* consumer. That contention, the core of plaintiffs' *horizontal* agreement claim, cannot be reconciled with the Sports Broadcasting Act, which exempts from antitrust scrutiny agreements by or among the NFL clubs to transfer to broadcast networks "all *or any part*" of their broadcast licensing rights.

Plaintiffs' effort to salvage their challenge to the *vertical* agreement between the NFL and DIRECTV fails as a matter of law. That Sunday Ticket is "available *only* through DirecTV" (Opp. 1) cannot support a claim, as squarely held by precedent that plaintiffs ignore and confirmed by the dismissal of nearly identical claims in *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177 (S.D. Cal. 2002). Plaintiffs cite no case finding an exclusive distributor agreement unlawful, and attempt to mask that failure by asserting irrelevant new facts from inapposite secondary sources like *Law360* and a report in a case about MLB (Opp. 14).

Plaintiffs also fail to cure the flaws in their putative relevant market, which rests on the implausible assertion that although out-of-market games *are* substitutes for one another, in-market games *are not* substitutes for out-of-market games.

Finally, the opposition does not cure plaintiffs' failure to establish antitrust standing or to plead the elements of a monopolization claim.

## I. Plaintiffs Fail To Identify Any Agreements That Could Be Deemed Unlawful Under the Antitrust Laws.

Ignoring controlling Ninth Circuit precedent, the opposition conflates the legal analysis of the two challenged agreements. Where, as here, plaintiffs challenge "a collection of vertical and horizontal agreements," the agreements must be separated into their "constituent parts" so that "the respective vertical and horizontal agreements can be analyzed" under the appropriate legal principles. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015);

---

1   *see also Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 111-18 (S.D.N.Y.

2   2015) (separately analyzing (i) horizontal "collective licensing" agreement among

3   NFL clubs and (ii) vertical "exclusive license" agreement); *Kingray*, 188 F. Supp.

4   2d at 1196-98 (separately analyzing NBA clubs' "Horizontal Conspiracy" and an

5   "Exclusive Distributorship Theory"). Applied to the challenged agreements'

6   "constituent parts," governing precedent precludes plaintiffs' claims.

7          A.    **The Vertical NFL-DIRECTV Agreement Is Not Unlawful.**

8          At the motion to dismiss stage, federal courts have consistently rejected

9   antitrust challenges to vertical agreements based on "exclusive distributorship"

10  claims of the kind asserted here. *Spinelli*, 96 F. Supp. 3d at 116-20; *Kingray*, 188 F.

11  Supp. 2d at 1196-98; *see also Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d

12  729, 735 (9th Cir. 1987). Two of these cases—*Kingray* and *Spinelli*—involved

13  sports licensing arrangements virtually identical to those presented in this case.

14  Plaintiffs do not address *Kingray*'s core rejection of their vertical challenge. And

15  they fail even to cite *Spinelli*, which rejected a challenge to the NFL's exclusive

16  licensing arrangements for photographing NFL game content, holding that

17  "[e]xclusive vertical arrangements of this nature are presumptively legal under the

18  antitrust laws." 96 F. Supp. 3d at 118.

19         Plaintiffs attempt to distinguish the governing precedent on the ground that

20  the challenged exclusive rights here were previously held by the clubs. Opp. 15.

21  That "distinction" is illusory: Plaintiffs in *Kingray* similarly attempted to overcome

22  *Rutman*'s holding with an argument that "29 separate, competing producers have

23  jointly selected DIRECTV as their exclusive distributor," but *Kingray* (like

24  *Spinelli*) explicitly rejected that "distinction" as a basis for departing from the

25  principle that exclusive distribution arrangements are presumed legal. *See* Pl.'s

26  Opp'n to NBA Defs.' Mot. to Dismiss at 15, *Kingray*, 188 F. Supp. 2d 1177

27  (No. 00-cv-1545), ECF No. 192; *Kingray*, 188 F. Supp. 2d at 1197-98; *accord*

28  *Spinelli*, 96 F. Supp. 3d at 116-20.

1    Plaintiffs assert that they have gone "far beyond a mere assertion that there is
2    an exclusive distributor." Opp. 13. But their complaint and opposition demonstrate
3    otherwise; their vertical claim is based solely on the allegation that "[w]ithout the
4    exclusive deal, some of the monopoly rents created by the collusion among NFL
5    teams would be dissipated by price competition between DirecTV and one or more
6    MVPDs [multichannel video program distributors]." Compl. ¶ 106 (cited at
7    Opp. 13). In other words, plaintiffs claim that the mere exclusivity of the NFL-
8    DIRECTV vertical arrangement increases consumer prices.

9    That theory fails as a matter of law. Even if NFL clubs have a monopoly over
10   game broadcasts, any such market power cannot be increased by exclusively
11   licensing that content. *Rutman*, 829 F.2d at 735; *Port Dock & Stone Corp. v.*
12   *Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007) ("[A] monopolist can only
13   extract one monopoly profit on a product; once it enjoys a monopoly at one level of
14   the product's market, there is no further monopoly profit to be had from its
15   expansion vertically."); *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23,
16   30 (2d Cir. 2006) (same); *see also* Mot. 7-8. Accordingly, the "exclusive
17   distributor" theory on which plaintiffs rely cannot state an antitrust claim.

18   That conclusion is not altered by plaintiffs' suggestion (Opp. 15) that
19   DIRECTV is akin to a "sole sales agent" acting on behalf of 32 individual clubs.
20   That *horizontal* theory of harm ignores the fact that rights to broadcast NFL games
21   *cannot* be licensed by a single NFL team acting alone. *E.g.*, *Washington v. Nat'l*
22   *Football League*, 880 F. Supp. 2d 1004, 1006-07 (D. Minn. 2012); *see infra* § I.B.

23   Finally, courts and administrative agencies have recognized that exclusivity
24   benefits competition, including by permitting and incentivizing MVPDs like
25   DIRECTV to differentiate their content offerings—a fact that plaintiffs ignore. *See,*
26   *e.g.*, *In the Matter of Revision of the Commission's Program Access Rules*, 27
27   F.C.C. Rcd. 12605, 12631 (2012); *see also* *Cablevision Sys. Corp. v. FCC*, 649
28   F.3d 695, 721 (D.C. Cir. 2011); *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306,

1  1325-26 (D.C. Cir. 2010) (Kavanaugh, J., dissenting) (noting procompetitive

2  effects of exclusively licensed content; citing the NFL-DIRECTV Sunday Ticket

3  agreement as an example). And the FCC specifically rejected claims that

4  "DIRECTV's exclusive contract for NFL Sunday Ticket has harmed competition in

5  the video distribution market." *In the Matter of Applications of AT&T Inc. &*

6  *DIRECTV*, 30 F.C.C. Rcd. 9131, 9200 (2015). Plaintiffs' attempt to cast doubt on

7  the presumptive legality and procompetitive benefits of exclusivity (Opp. 13-14)

8  cannot be reconciled with these repeated judicial and agency holdings.

9  **B.    The Horizontal Agreement Among the NFL Clubs Is Protected by**
10  **the Sports Broadcasting Act.**

11      Plaintiffs concede that their horizontal claim must challenge an agreement

12  that is not protected by the SBA. The fact that similar horizontal arrangements

13  among NFL clubs were held unlawful *before* enactment of the SBA is wholly

14  beside the point. *See* Opp. 7. The SBA was expressly intended to overturn the pre-

15  SBA precedent on which plaintiffs rely. *See* Mot. 9.

16      Plaintiffs insist that they challenge not "the teams' decision to centralize all

17  broadcasting rights" but instead the NFL's agreements permitting Fox and CBS "to

18  distribute only one of the games they produce at a given time." Opp. 8. That

19  challenge again ignores the SBA: The NFL's agreements with Fox and CBS are

20  "joint agreement[s] by or among [the NFL clubs] . . . by which [the NFL] . . . sells

21  or otherwise transfers all or any part of the rights of such league's member clubs in

22  the sponsored telecasting of the games of football." 15 U.S.C. § 1291; *see also Chi.*

23  *Prof'l Sports L.P. v. NBA*, 961 F.2d 667, 670 (7th Cir. 1992) (Easterbrook, J.)

24  ("The statute allows the transfer of 'all or any part of' the rights in the games; 'part

25  of' implies fewer than all.").

26      Plaintiffs ignore the fact that, as a result of the NFL clubs' protected

27  agreements with the broadcast networks, the NFL itself owns the intellectual

28  property in NFL game broadcasts. Mot. 9-10. There is no "collective agreement to

*prevent* individual team distribution" of out-of-market games. Opp. 10 n.12. Instead, there are only SBA-protected agreements that result in the NFL alone owning broadcast rights for games produced by CBS and Fox. Mot. 9-10. The NFL then licenses those rights to DIRECTV. In short, plaintiffs have not alleged a horizontal restraint arising from any *agreement* among NFL clubs *subsequent to or outside the scope of* broadcast agreements protected by the SBA. Put differently, they have not asserted a horizontal claim for which relief could be granted.[1]

Moreover, plaintiffs offer no support for their premise that an NFL club acting alone could license the broadcast of an NFL game.[2] Their *assumption* that a club could do so is wrong as a matter of law, as *Washington* and *Spinelli* squarely hold. Both cases recognized that NFL clubs could not produce games without the kind of horizontal agreements that plaintiffs challenge and that "claims relating to such collective licensing must be dismissed." *Spinelli*, 96 F. Supp. 3d at 116; *see also id.* at 114 ("the NFL and NFL Clubs must cooperate to produce and sell [game] images"); *accord Washington*, 880 F. Supp. 2d at 1006; Mot. 10-13. As *Washington* explains, to create even a single game broadcast, two clubs and the

---

[1] Plaintiffs' objection to use of passages of the NFL's broadcast agreements ignores the fact that the complaint "depends on the contents of [each agreement], the [NFL] attache[d] the document to its motion to dismiss, and the parties do not dispute the authenticity of the document"; accordingly, the Court is free to rely on those passages in ruling on the motion to dismiss. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). In any event, plaintiffs cannot complain given that, as their related declaration reveals, they waited almost a month to request access to additional provisions of the agreements, and then failed to engage with the networks' counsel regarding safeguards to protect the networks' highly sensitive information. *See CBS Corp. v. FCC*, 785 F.3d 699 (D.C. Cir. 2015).

[2] Plaintiffs mention dicta in *Laumann* addressing MLB's very different rights structure (Opp. 2); that dicta, in turn, relies on a 1938 decision that did not concern the NFL, did not involve television rights, and did not address whether one or both baseball teams must consent to a (radio) broadcast of a game between them. *See Laumann v. NHL*, 907 F. Supp. 2d 465, 485 n.112 (S.D.N.Y. 2012) (citing *Pittsburgh Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490, 492 (W.D. Pa. 1938)).

NFL "must cooperate to produce and sell these images; *no one entity can do it alone*." 880 F. Supp. 2d at 1006 (emphasis added).

Plaintiffs do not even mention these holdings. Nor do they address the fact that, in closely analogous circumstances, both *Washington* and *Spinelli* concluded that plaintiffs had failed to state a claim that "the NFL Clubs' collective licensing is a 'restraint' within the meaning of Section 1," and on that basis dismissed the plaintiffs' claims. *Spinelli*, 96 F. Supp. 3d at 116; *accord Washington*, 880 F. Supp. 2d at 1006-07. The same result is required here.

Finally, plaintiffs cannot reframe their suit as a challenge to an agreement to "limit[] the availability of football telecasts." Opp. 1. As the opposition concedes, the number of games on television does not measure supply; "[t]he correct measure of broadcasting output is viewership." *Id.* 10 n.11. By that measure, the NFL has more output than its competitors among the major sports leagues, the NCAA, and other producers in the broad entertainment market. *See* Compl. ¶ 120. As the complaint admits—against the backdrop of the NFL's SBA-protected agreements— "[t]he argument that NFL Sunday Ticket increased output is correct." Compl. ¶ 128; *see also Kingray*, 188 F. Supp. 2d at 1195 (distinguishing *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984), because "output of out-of-market NBA games increased by virtue of the NBA League Pass").

Plaintiffs concede that consumers can access, for free, NFL game broadcasts in every Sunday time slot when games are played. They nevertheless complain that the NFL and the networks choose which games are broadcast where, with the result that some fans may not be able to watch the game they most prefer. *See* Compl. ¶ 84. But "[b]usinesses may choose the manner in which they do business absent an injury to competition." *Brantley v. NBC Universal*, 675 F.3d 1192, 1202 (9th Cir. 2012). These arrangements seek to enhance competition and consumer welfare by maximizing fan interest, regional team loyalty, and viewership; that individual fans may be disappointed by their available choices does not present an antitrust issue.

1    The results—measured by plaintiffs' own metric—speak for themselves:

2    During the 2014 season, "202.3 million unique viewers, representing 80 percent of

3    all [U.S.] television homes," watched an NFL football game; "every one of the 20

4    most-watched programs in America was an NFL game"; and the "2015 Super Bowl

5    was the most-watched program ever." Compl. ¶¶ 37, 120. These facts demonstrate

6    that the NFL has created a tremendous consumer surplus; as plaintiffs concede,

7    "NFL football has the highest ratings of all sports programming." *Id.* ¶ 100.

8    **II.    Plaintiffs Fail To Cure The Flaws In Their Putative Relevant Market.**

9    Plaintiffs appear to recognize that they must plead a plausible relevant

10   market to state a viable antitrust claim. Because they allege a restraint in a putative

11   market for rights to "out-of-market" professional football broadcasts, plaintiffs had

12   to plead facts showing that (i) out-of-market games *are* substitutes for one another

13   but (ii) in-market games *are not* substitutes for out-of-market games. Mot. 16-17.

14   Plaintiffs' proposed market is not plausible as a matter of law.

15   As the opposition admits, plaintiffs' claims rely on two key premises:

16   - *First*, out-of-market games must be substitutes for one another; otherwise,
17     "competing telecasts" of such games could not "naturally force prices
     down," a necessary condition of plaintiffs' antitrust theory. Opp. 10;
18     Compl. ¶ 103.

19   - *Second*, in-market and out-of-market games *cannot* be substitutes for one
     another; otherwise, the availability of free in-market games would prevent
20     any exercise of market power as to out-of-market games. *See* Opp. 19.

21   These premises defy common sense. A hypothetical fan who seeks to watch only

22   one particular team's games will not consider as a substitute either other out-of-

23   market games *or* in-market games; and a hypothetical fan willing to choose among

24   games based on the cost to view them will consider in-market games *and* other out-

25   of-market games as substitutes. There is no plausible explanation for why two out-

26   of-market games could be substitutes but an in-market game could not. Mot. 17-19.

27   Plaintiffs allege no facts to support their putative relevant market under any

28   appropriate analytic framework. The only facts asserted in their opposition (at 20)

are that the integrated Sunday Ticket product enables viewers "to watch all non-local games" and that certain commercial establishments and individuals "want to be able to pick what game to watch." Those facts do not support the conclusion that consumers view out-of-market games as *substitutes* for one another; at most, they suggest that out-of-market games are *complements* for one another, as these consumers seek to view more than one of them. *See Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 517 (7th Cir. 2002) (contrasting substitute and complements).[3]

Unable to support their putative relevant market using the standard tools of market definition, plaintiffs argue (Opp. 20) that because they identified a market of all professional football games, they may plead a "sub-market" using a more liberal standard. That assertion is wrong as a matter of law: "[D]efining a 'submarket' is the equivalent of defining a relevant product market for antitrust purposes." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993); *accord, e.g.*, *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 355 (S.D.N.Y. 2009). "Speaking of 'submarkets' is both superfluous and confusing in an antitrust case;" the "typical result" of efforts to define a submarket is "an overly narrow market designation that exaggerates the defendant's power." IIB Areeda & Hovenkamp, *Antitrust Law* ¶¶ 533, 533c (4th ed. 2014).

## III.   Plaintiffs Cannot Demonstrate Antitrust Standing.

Plaintiffs lack standing because they do not participate in the market that they allege has been directly restrained. As the opposition confirms, plaintiffs allege a restraint in the market for NFL broadcast rights; they claim that the restraint in that market had the *effect* of raising prices in a separate market for "live video

---

[3] If, as plaintiffs' argument could suggest, Sunday Ticket were a relevant market itself, then the NFL would have a natural monopoly for that product. Plaintiffs readily concede that, in the context of a monopoly, "exclusivity at the distribution level cannot further increase the profitability of the restraint" (Opp. 15); as a result, such a market could not sustain an antitrust claim. *See Port Dock*, 507 F.3d at 124.

1  presentations." *See* Opp. 5 ("centralizing rights for sale" had the effect of reducing

2  "output of televised games").

3       The Ninth Circuit has squarely held that unless they participate in the

4  allegedly restrained market, plaintiffs do not suffer antitrust injury and do not have

5  antitrust standing. *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051,

6  1057 (9th Cir. 1999). The Second Circuit recently joined the Ninth Circuit in so

7  holding, ruling that "to suffer antitrust injury, the putative plaintiff must be a

8  participant in the very market that is *directly restrained*." *In re Aluminum*

9  *Warehousing Antitrust Litig.*, --- F.3d ----, 2016 WL 4191132, at *7 (2d Cir. 2016)

10  (emphasis added). Because they do not participate in the allegedly restrained

11  market for broadcast rights, plaintiffs lack antitrust standing.

12       Plaintiffs cannot manufacture standing by asserting that defendants' conduct

13  in the broadcast rights market had the "purpose [] to control output at the retail

14  level." Opp. 21. Courts uniformly reject *intent* as a test for antitrust injury; plaintiffs

15  must show that they were participants in the directly restrained market or that their

16  injuries were "the very means" by which defendants achieved their ends. *See*

17  Mot. 19-20; *Aluminum Warehousing*, 2016 WL 4191132, at *8; *Blue Shield of*

18  *Virginia v. McCready*, 457 U.S. 465, 479 (1982) ("The availability of the § 4

19  remedy to some person who claims its benefit is not a question of the specific intent

20  of the conspirators."). Here, plaintiffs can do neither.

21       *Separately*, as to any horizontal agreement among NFL clubs to license

22  broadcast rights, plaintiffs are indirect purchasers who lack standing to claim

23  damages. Plaintiffs do not (and could not) argue that they purchased directly from

24  the NFL Defendants, or even that they purchased a broadcast rights license at all.

25  Instead, they assert "standing" (Opp. 21) based on the fact that they purchased a

26  different product—a package of televised NFL games—from a different entity.

27  Once "the respective vertical and horizontal agreements" are separated for

28  analytical purposes, *Musical Instruments*, 798 F.3d at 1192, it is clear that plaintiffs

---

**REPLY IN SUPPORT OF THE NFL DEFENDANTS' MOTION TO DISMISS**

**9**

1    are not direct purchasers from the NFL clubs, and that the *Illinois Brick* "bright

2    line" rule bars their claims for damages from any horizontal restraint. *In re ATM*

3    *Fee Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012).[4]

4         Finally, citing a case regarding out-of-market MLB broadcasts, plaintiffs

5    suggest that because they "*directly* paid for Sunday Ticket itself," they have

6    standing to challenge both the horizontal and vertical agreements. *See* Opp. 22

7    (citing *Laumann*, 907 F. Supp. 2d at 481). That reliance is misplaced. Applying

8    Second Circuit precedent, *Laumann* permitted indirect purchasers to proceed, *but*

9    *recognized that application of Ninth Circuit law "would be fatal to the [plaintiffs']*

10   *claims,* as they [like plaintiffs here] do not allege that the Leagues or RSNs had any

11   role in setting prices for television programming." *Laumann*, 907 F. Supp. 2d

12   at 481 (citing *In re ATM Fee Antitrust Litig.* 686 F.3d at 751) (emphasis added); *see*

13   *also Kingray*, 188 F. Supp. 2d 1198 ("indirect purchasers of the NBA League

14   Pass" lacked standing to assert "horizontal conspiracy" claim against NBA teams).

## IV.   Plaintiffs Fail To Resuscitate Their Monopolization Claim.

16         Plaintiffs' inability to plead anticompetitive effect, a relevant market, or

17   antitrust standing also dooms their monopolization claims. Mot. 22-25. Plaintiffs'

18   emphasis on defendants' "pooling" conduct does not alter that conclusion. Opp. 24-

19   25. As set forth above, the relevant pooling occurs in the context of SBA-protected

20   agreements, and no single NFL broadcast (let alone the Sunday Ticket product)

21   could be licensed without the kind of horizontal agreements that plaintiffs ask the

22   Court to unravel. *See Washington*, 880 F. Supp. 2d at 1006.

23                 *      *      *

24         For the above reasons, the complaint should be dismissed with prejudice.

25

---

[4] Plaintiffs implicitly argue for an expansion of the co-conspirator exception (Opp. 21-23), but the Supreme Court and the Ninth Circuit have unambiguously rejected such efforts. *In re ATM Fee Antitrust Litig.*, 686 F.3d at 748-499 (quoting *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216-17 (1990)).

1    October 24, 2016           Respectfully Submitted,

2                              */s/ Beth A Wilkinson*

3

4    Gregg H. Levy (admitted *pro hac vice*)    Beth A. Wilkinson (admitted *pro hac vice*)

   Derek Ludwin (admitted *pro hac vice*)

5    John S. Playforth (*pro hac vice* anticipated)    **WILKINSON WALSH + ESKOVITZ**

   **COVINGTON & BURLING LLP**             **LLP**

6    One CityCenter, 850 Tenth Street NW    1900 M Street NW, Suite 800

7    Washington, DC 20001                Washington, DC 20036

   Telephone: (202) 662-6000         Telephone: (202) 847-4000

8    Facsimile: (202) 662-6291         Facsimile: (202) 847-4005

9    glevy@cov.com                     bwilkinson@wilkinsonwalsh.com

   dludwin@cov.com

10    jplayforth@cov.com

11

12    Neema T. Sahni (Bar No. 274240)    Sean Eskovitz (Bar No. 241877)

13    **COVINGTON & BURLING LLP**    **WILKINSON WALSH + ESKOVITZ**

                                         **LLP**

14

15    2029 Century Park East, Suite 3100    11726 San Vicente Boulevard, Suite 600

   Los Angeles, CA 90067-3044       Los Angeles, CA 90049

16    Telephone: (424) 332-4800         Telephone: (424) 316-4000

   Facsimile: (424) 332-4782         Facsimile: (202) 847-4005

17    nsahni@cov.com                   seskovitz@wilkinsonwalsh.com

18

19                                       *Counsel for Defendants National*

20                                       *Football League, NFL Enterprises LLC,*

                                      *and the Individual NFL Clubs*

21

22

23

24

25

26

27

28