1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3     HONORABLE BEVERLY REID O'CONNELL, U.S. DISTRICT JUDGE

4

5  IN RE: NATIONAL FOOTBALL LEAGUE      )      Case No.
   SUNDAY TICKET ANTITRUST LITIGATION   )  ML 15-2668 BRO (JEMx)
6                                        )
                                         )
7  _____)

8

9

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                       MOTIONS HEARING
16               MONDAY, FEBRUARY 13, 2017
                          2:50 P.M.
17                LOS ANGELES, CALIFORNIA

18

19

20

21  _____

22      MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
             FEDERAL OFFICIAL COURT REPORTER
23            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
24                   (213) 894-2305

25

1           **APPEARANCES OF COUNSEL:**

2

3    **FOR THE VARIOUS PLAINTIFFS:**

4       SUSMAN GODFREY, LLP
       BY:  MARC M. SELTZER
5          Attorney at Law
       1901 Avenue of the Stars, Suite 950
6       Los Angeles, California  90067
       (310) 789-3102

7

8

    **FOR THE VARIOUS PLAINTIFFS:**
9

       LANGER, GROGAN & DIVER, PC
10     BY:  HOWARD LANGER
      BY:  PETER LECKMAN
11       Attorneys at Law
     1717 Arch Street, Suite 4130
12     Philadelphia, Pennsylvania  19103
     (215) 320-5660

13

14

    **FOR THE PLAINTIFFS NINTH INNING, INC., and VILLAGE PUB, LLC:**
15

      HAUSFELD, LLP
16     BY:  CHRISTOPHER L. LEBSOCK
        Attorney at Law
17     600 Montgomery Street, Suite 3200
     San Francisco, California  94111
18     (415) 633-1949

19     HAUSFELD, LLP
     BY:  SCOTT ALLAN MARTIN
20       Attorney at Law
     33 Whitehall Street, 14th Floor
21     New York, New York  10004
     (646) 357-1100

22

23

24

25

1    **APPEARANCES OF COUNSEL, CONTINUED:**

2

3    **FOR THE DEFENDANT NATIONAL FOOTBALL LEAGUE, INC.:**

4        WILKINSON, WALSH & ESKOVITZ
         BY:  BETH A. WILKINSON
5             Attorney at Law
         1900 M Street, NW, Suite 800
6        Washington, DC  20036
         (202) 847-4000
7
         WILKINSON, WALSH & ESKOVITZ
8        BY:  SEAN ESKOVITZ
              Attorney at Law
9        11726 San Vicente Boulevard, Suite 600
         Los Angeles, California  90049
10       (424) 316-4000

11       COVINGTON & BURLING, LLP
         BY:  GREGG H. LEVY
12       BY:  DEREK LUDWIN
         BY:  JOHN PLAYFORTH
13            Attorneys at Law
         850 Tenth Street, NW
14       Washington, DC  20001
         (202) 662-5429

15

16

    **FOR THE DEFENDANT DIRECTV, LLC:**
17
         KIRKLAND & ELLIS, LLP
18       BY:  MICHAEL E. BAUMANN
         BY:  MELISSA D. INGALLS
19       BY:  ROBYN E. BLADOW
              Attorneys at Law
20       333 South Hope Street
         Los Angeles, California  90071
21       (213) 680-8424

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                MONDAY, FEBRUARY 13, 2017; 2:50 P.M.

 2                    LOS ANGELES, CALIFORNIA

 3                            -oOo-

 4           THE COURTROOM DEPUTY:  MDL 15-2668 BRO, In Re:

 5  National Football League Sunday Ticket Antitrust Litigation.

 6            Counsel, please state your appearances.

 7           MR. SELTZER:  If it please the Court, Marc Seltzer

 8  of Susman Godfrey on behalf of the plaintiffs.

 9           MR. LANGER:  Howard Langer from Langer, Grogan &

10  Diver on behalf of the plaintiffs.

11           MR. LEBSOCK:  Good afternoon, Your Honor.

12  Chris Lebsock from the Hausfeld firm.

13           MR. MARTIN:  Your Honor, Scott Martin, Hausfeld, on

14  behalf of the plaintiffs.

15           MR. LECKMAN:  Good afternoon, Your Honor.

16  Peter Leckman also from Langer, Grogan & Diver.

17           MR. LEVY:  Your Honor, Gregg Levy of Covington &

18  Burling for the NFL defendants.

19           MR. PLAYFORTH:  John Playforth of Covington &

20  Burling for the NFL defendants.

21           MS. WILKINSON:  Good afternoon, Your Honor.

22  Beth Wilkinson from Wilkinson, Walsh & Eskovitz on behalf of

23  the NFL.

24           MR. LUDWIN:  Good afternoon, Your Honor.

25  Derek Ludwin from Covington & Burling on behalf of the NFL.
```

1              MR. ESKOVITZ:  Good afternoon, Your Honor.

2      Sean Eskovitz from Wilkinson, Walsh & Eskovitz for the NFL.

3              MR. BAUMANN:  Good afternoon, Your Honor.

4      Michael Baumann of Kirkland & Ellis on behalf of the DirecTV

5      defendants.

6              MS. INGALLS:  Melissa Ingalls from Kirkland & Ellis

7      on behalf of DirecTV.

8              MS. BLADOW:  Robyn Bladow, the same, on behalf of

9      DirecTV.

10             THE COURT:  Okay.  Anybody else?

11             Okay.  We're here for two motions.  One is the

12     motion by the DirecTV defendants to compel the arbitration.

13     The second is the motion to dismiss.

14             I want to take up the arbitration issue first.  So

15     the DirecTV defendants, you can come to the back table.  It

16     might be more helpful.  Let me ask --

17             Okay.  You're going to be arguing on behalf of

18     DirecTV?

19             MR. BAUMANN:  Yes, Your Honor.

20             THE COURT:  Okay.  Just one second.

21             (Pause in the proceedings.)

22             THE COURT:  Okay.  All right.  Mr. Baumann; right?

23             MR. BAUMANN:  Yes, Your Honor.

24             THE COURT:  Go ahead.  I'll let you briefly begin --

25     from the plaintiffs' side, who's going to talk about the

**UNITED STATES DISTRICT COURT**

 1   arbitration?

 2        MR. LEBSOCK:  (Indicating.)

 3        THE COURT:  Okay.  And then you'll have a chance to

 4   respond.  I have some questions, so I'll be wanting to

 5   interject those as we go along.  But Mr. Baumann, first, I'll

 6   let you begin.  If there's anything -- I've read your papers.

 7   I've read the cases.  I have some questions, but go ahead.

 8        MR. BAUMANN:  Well, Your Honor, I think the papers

 9   addressed the issues adequately.  I don't really have anything

10   to add to the papers.  And if you have questions, I would be

11   happy to go directly to your questions.

12        THE COURT:  Okay.  So here's the conundrum with

13   this.  And I understand that the issue here, as I see it, the

14   big thing that nobody addresses, is that we've got a situation

15   where you may have an agreement -- a contractual obligation.

16   And the landscape now in arbitration is to construe it in favor

17   of arbitration.  But I have a big party that is not -- can't be

18   compelled to arbitrate, and that's the NFL.  And this case

19   can't be completed without the NFL.

20        So, you know, how do I handle that issue from a --

21   from an arbitration perspective?  Because you're not going to

22   be able to somehow arbitrate and resolve all the issues in this

23   case without the NFL.

24        MR. BAUMANN:  Well, let me make sure I understand

25   your question, Your Honor.  I think you could -- I don't think

1   anyone has made the argument that you can't proceed with your

2   case in the absence of DirecTV, which I think is the right

3   question.  I don't think anyone's made that argument.

4            THE COURT:  You folks haven't, but I'm raising that

5   because I got --

6            MR. BAUMANN:  Okay.  That's --

7            THE COURT:  -- more billable hours than here.  And

8   this case is going nowhere.  And I -- you would be requiring me

9   to stay the case in order -- stay the NFL litigation in order

10  to allow you to arbitrate.  So why don't you try to convince me

11  that that's the right thing to do.

12           MR. BAUMANN:  Well, we requested that the case be

13  stayed as to DirecTV to compel arbitration.

14           THE COURT:  Sure.  I get that.

15           MR. BAUMANN:  And I have not made a request -- I

16  don't believe we've made a request --

17           THE COURT:  I don't think you have the ability to

18  make a request that the entire case be stayed --

19           MR. BAUMANN:  Correct, Your Honor.

20           THE COURT:  -- with me involved.

21           MR. BAUMANN:  And we have not.

22           (Telephonic interruption.)

23           THE COURT:  Mr. Seltzer, the last person I'd expect

24  that a phone would go off in a federal courtroom.

25           MR. SELTZER:  I apologize, Your Honor.

1          THE COURT:  Okay.

2          MR. BAUMANN:  Your Honor, DirecTV's position -- and

3   I believe the case law supports the position -- is that the

4   relief that the parties agreed to in their contract, that

5   requires arbitration, that they can obtain the relief that they

6   contracted for in an arbitration.  Whatever rights or remedies

7   they have will be determined in that arbitration.

8          And it is not necessary, in our view, for the NFL to

9   be a participant in the arbitration.  We haven't asked them to

10  be a participant.  We haven't asked you to order them to be a

11  participant.

12          So I believe the claims against DirecTV can be

13  completely determined in the course of an arbitration

14  proceeding, just as the parties have agreed to.

15          THE COURT:  And let me -- just for clarification,

16  you refer to The Mucky Duck arbitration agreement.  My

17  understanding is that you're referring to Mr. Mullins'

18  declaration, Exhibit 2; is that right?

19          MR. BAUMANN:  We are referring to the 2014

20  commercial agreement, yes, Your Honor.  And I --

21          THE COURT:  I want -- no, no.  Mr. Baumann, I want

22  an exhibit number, I want a document number.

23          MR. BAUMANN:  The 2014 commercial agreement,

24  customer agreement is Kellogg Exhibit 16 and appears at page 75

25  of the declaration.

1            THE COURT:  Okay.

2            MR. BAUMANN:  And that is the commercial customer

3    agreement effective as of June 24th, 2014.  It also appears,

4    Your Honor -- you're correct, it appears in other places, in

5    other declarations.

6            THE COURT:  Okay.  And let's talk a little bit about

7    the plaintiffs' ability to get injunctive relief.  Isn't that

8    tied to the class's ability to get injunctive relief?

9            So you say, when you started out, your first -- you

10   have the ability in the arbitration to get the entire relief.

11   And my question to you is:  Isn't the individual plaintiffs'

12   ability to get injunctive relief as a remedy tied to the class

13   relief?

14           MR. BAUMANN:  No.  I don't believe that's correct.

15           THE COURT:  Okay.

16           MR. BAUMANN:  The type of relief that they describe

17   for the first time in their opposition and the reason that they

18   pled a class claim initially is because they want class-wide

19   relief on behalf of third parties and others.  And for that,

20   you do need a class action.

21           The question, I think, to be asked about whether or

22   not the arbitration should go forward is whether the

23   individuals who have agreed to individual arbitration can

24   obtain whatever remedies they're entitled to under the

25   antitrust laws.  And I think the Supreme Court decision in

1    *Italian Colors* answers that very directly and very clearly.

2            This is an argument that they're effectively being

3    precluded from obtaining relief under the statute, under the

4    antitrust laws.

5            And if you look at the Supreme Court discussion of

6    that very issue in *Italian Colors* they walk through the reasons

7    why, in fact, that argument fails.  And it fails for -- the

8    most common sense reason to me is that the antitrust laws

9    predate the creation of the class action procedural vehicle.

10           And if you could effectively vindicate your rights

11   prior to the creation of the ability to act on behalf of others

12   in a class action, then you still have that right once you

13   waive class action, in the case of their contract with DirecTV.

14           THE COURT:  But I guess what I'm not understanding

15   is that you're -- if their ability to get injunctive relief is

16   tied to the class relief, which would take it outside of

17   *Italian Colors* -- because if they have an inability to receive

18   injunctive relief, if it's tied together with the class issues,

19   then I guess I'm not reading *Italian Colors* the way you are.

20           MR. BAUMANN:  I don't agree that they can't get

21   injunctive relief outside of arbitration -- or in arbitration.

22   They get whatever relief they're entitled to under the

23   antitrust laws as applied to an individual bringing an

24   antitrust claim.  It's really not that difficult.

25           I would think, Your Honor, if I could, the -- the

```
 1    quote I would read to you directly out of Italian Colors --
 2            THE COURT:  Okay.
 3            MR. BAUMANN:  -- they put it differently.  They
 4    said -- they talked about the creation of a class action right.
 5    The traditional right under the law is for individuals to be
 6    involved in a lawsuit.  You don't have a right outside the
 7    creation of the class action procedure to bring an action on
 8    behalf of someone else.  And that's why there are all the
 9    safeguards that protect absent class members, because you have
10    representatives suing on their behalf.
11            So the Court explained "The class action waiver" --
12    and I'm quoting here -- "merely limits arbitration to the two
13    contracting parties.  It no more eliminates those parties'
14    right to pursue their statutory remedy than did federal law
15    before its adoption of the class action for legal relief in
16    1938," citing Federal Rule of Civil Procedure 23.
17            Quoting again, "or to put it differently, the
18    individual suit that was considered adequate to assure," quote,
19    "'effective vindication,'" close quote, "of a federal right
20    before adoption of class action procedures did not suddenly
21    become," quote, "'ineffective vindication,'" close quote, "upon
22    their adoption."
23            So, Your Honor, my point -- and I think the point of
24    the Supreme Court -- is that their right to bring an individual
25    antitrust action, their ability to waive it as they have done
```

```
 1    in their agreement with us, coupled with the Supreme Court

 2    decisions, means that they will be litigating individual

 3    claims, their antitrust claims in arbitration with DirecTV.

 4    And it doesn't prevent them from vindicating the rights that

 5    existed before the creation of the class action vehicle.

 6              THE COURT:  All right.  Anything further?

 7              MR. BAUMANN:  Well, one other point -- again, I'm

 8    going to Italian Colors one more time, Your Honor.  I think

 9    what they are asking for or suggesting here is a super process

10    overlaying the arbitration that would require you and did

11    require us to guess at what relief they're entitled to, what

12    their claim would be, what the scope of that relief would be,

13    and how it would be configured in order for you to make a

14    decision under their theory of the case about whether or not

15    their rights could be effectively vindicated.

16              And the Supreme Court quite clearly in

17    Italian Colors says, no, no, we're not going to put that

18    overlay, that super structure, and that burden on the federal

19    courts to determine.  That would be inconsistent with our

20    jurisprudence on why we have ordered and believe that

21    arbitration is an effective remedy and should be favored.

22              If there are any other questions on any of the other

23    issues, I'm happy to respond, Your Honor.

24              THE COURT:  I don't have any at this time.  But, of

25    course, it's your motion.  You'll be entitled to reply after I
```

UNITED STATES DISTRICT COURT

```
 1   hear from the plaintiffs.
 2              MR. BAUMANN:  I'm sorry, I missed --
 3              THE COURT:  But I'll hear from you in reply after
 4   the plaintiffs take a seat.
 5              MR. BAUMANN:  Thank you.
 6              MR. LEBSOCK:  Your Honor, I have a handout.  I'm --
 7   with the actual agreements.  And it may be easier for us to use
 8   it.  Can I approach?
 9              THE COURT:  My clerk will approach you.
10              Start with a case, not an agreement.
11              MR. LEBSOCK:  You're right.  I will get to the case
12   in a minute.
13              THE COURT:  Okay.
14              MR. LEBSOCK:  So I think it's important for us to be
15   rooted in the arbitration agreement.  And so I took the liberty
16   at Exhibit 1 of including the 2014 commercial customer
17   agreement.  It's Mullins Exhibit 3.  I think it's also a
18   Kellogg exhibit, and Mr. Baumann referenced that exhibit
19   number.  It was in the papers twice.
20              THE COURT:  Yep.
21              MR. LEBSOCK:  So as a threshold matter, this
22   commercial customer agreement from June 2014 is largely similar
23   to the residential customer agreement from 2014.  In our
24   papers, we noted that the -- the time of the filing of the suit
25   is the time at which you decide what the arbitration
```

```
 1   obligations are between the parties.  Okay?
 2            So the commercial agreement is largely the same.
 3   There is one exception to that, and I will point that out in a
 4   minute.
 5            But if we go to Section 9, which is the arbitration
 6   clause, there is a section there, 9C, I guess, special rules.
 7   And there's a Sub-Clause 2 that says, "Neither you, nor we,
 8   shall be entitled to..."  And then there's a clause, okay, and
 9   there's a number of disjunctive clauses here.
10            If we continue on to the second clause, it says,
11   "Neither you, nor we, shall be entitled to arbitrate any claim
12   as a representative member of a class or in a private attorney
13   general capacity."
14            Now, what I understand the defendants' argument here
15   is -- and Mr. Baumann didn't answer the question, I didn't
16   think, clearly.  But under the Complaint that --
17            THE COURT:  It was probably the question was
18   unartfully phrased.
19            MR. LEBSOCK:  Maybe.
20            Our relief here, Your Honor, is we are asking for an
21   injunction enjoining the exclusive deal arrangement between the
22   direct -- DirecTV and the NFL.
23            THE COURT:  Right.
24            MR. LEBSOCK:  And that is at -- it's in numerous
25   places in our Complaint but paragraph 10.
```

**UNITED STATES DISTRICT COURT**

1              So what I understand them to be saying is that the

2     only injunctive relief that the plaintiff in arbitration is

3     entitled to is some sort of forward-looking rate relief --

4              THE COURT:  Right.

5              MR. LEBSOCK:  -- and not an injunction prohibiting

6     the enforcement of the -- what we allege is the

7     anti-competitive deal.  Okay?

8              And the way that the Courts have looked at that --

9     and I'm talking about the *AT&T Mobile* merger cases -- is that

10    Judge Breyer, for example, in the *Bernardi* case, which is cited

11    in the papers, said we have to look at the substance of what

12    the plaintiff is seeking.  In that case --

13             THE COURT:  Well, I think that was my point with --

14    when you -- when I was trying to get with Mr. Baumann about

15    your relief that you're requesting tied to class relief.

16             MR. LEBSOCK:  Right.

17             THE COURT:  But go ahead.

18             MR. LEBSOCK:  Right.

19             So our point is that you can get an injunction --

20    you don't necessarily need a class action to get an injunction

21    in a Sherman Act case.  But what the Courts have said is it has

22    the hallmark of class relief and that under the terms of that

23    AT&T arbitration clause, which is cited in that *Bernardi* case,

24    which is very similar to the arbitration clause here, the Court

25    said, well, that has the hallmarks of class relief and the

1    parties did not intend to arbitrate those claims.  And that's

2    our position here.

3           Now, as I understand the defendants' position on

4    this, they're saying that, in effect, we have prospective -- or

5    our clients have prospectively waived their right to seek the

6    injunction on the anti-competitive deal.  And that runs afoul

7    of federal case law, including United States case law,

8    United States Supreme Court case law, including *Mitsubishi*

9    *Motors*, reaffirmed in *Italian Colors*.

10          It runs afoul of state law rules prohibiting

11    prospective waiver of statutory rights.  *Iskanian vs. CLS*

12    *Transport* is an example of that.  And what the Courts say is

13    you cannot waive a statutory remedy prospectively.  And that's

14    effectively what DirecTV is asking the Court to order here.

15    Okay?

16          Now, it came to our attention as we were preparing

17    yesterday that there's a second clause here.  So the first part

18    of it is this arbitrate as a representative member of a class.

19    But there's a further clause that says "or in a private

20    attorney general capacity."

21          So we went and we looked up the *Hawaii vs. Standard*

22    *Oil* case.  And I -- I handed that up to Your Honor.  But here

23    is what the United States Supreme Court has said about whether

24    the antitrust laws are a -- the plaintiffs -- private

25    plaintiffs in an -- in an antitrust case are private attorneys

```
 1   general.
 2            And at -- let's see -- it is page 6 of the hand --
 3   of the Westlaw, Page No. 6.
 4            THE COURT:  Okay.
 5            MR. LEBSOCK:  It says -- and I think I've
 6   highlighted it probably.  It says, "By offering potential
 7   litigants the prospect of a recovery in three times the amount
 8   of their damages," which is -- Clayton 4 allows plaintiffs to
 9   get three times their damages, "Congress incurs these persons
10   to serve as private attorneys general."
11            That phraseology has been used by the United States
12   Supreme Court repeatedly to speak of a private plaintiff's role
13   as a private attorney general.  And what --
14            THE COURT:  So what you're saying is -- let me
15   summarize what you're saying --
16            MR. LEBSOCK:  Sure.
17            THE COURT:  -- is that when you were preparing, you
18   thought of this clever additional argument that you are, in
19   effect, private attorneys general which would carve out under
20   the arbitration agreement and be a carveout.
21            MR. LEBSOCK:  Exactly.  Exactly.
22            So either way you look at it, either out in the
23   private attorney general subsection there or under this
24   arbitrate any claim as a representative member of a class,
25   which has the hallmarks of a -- a class litigation, like the
```

1    *AT&T Mobile* cases where the Court said that's the hallmark of a

2    class litigation and there was no intent to arbitrate those

3    claims, either way you look at it, I think this clause keeps

4    DirecTV in the case.

5              THE COURT:  Okay.  And what are the other exhibits

6    that you just --

7              MR. LEBSOCK:  Okay.  Sure.  So the other exhibits

8    relate to the 1H issue, that's the blackout issue.

9              THE COURT:  Okay.

10             MR. LEBSOCK:  Okay.  So, again, if we go -- what

11   Section 9 says in Section D, Subsection D, there's no

12   arbitration, D1, on any claim based on Section 1H above.  Now,

13   this only applies to the commercial subscribers and not to the

14   residentials.  I want to be clear about that.

15             THE COURT:  Right.  And let me ask you this.  How do

16   you define "blackout"?  Consistently or inconsistently with the

17   FCC rule.

18             MR. LEBSOCK:  I believe that the FCC rule as stated

19   by DirecTV is one aspect of what a blackout is.

20             THE COURT:  Okay.

21             MR. LEBSOCK:  It is not the sole definition of what

22   a blackout is.  And that's what I would like to get to,

23   Your Honor.

24             THE COURT:  Okay.

25             MR. LEBSOCK:  So if we look at how does DirecTV --

```
 1    how did DirecTV and the NFL think of the term "blackout"?  And
 2    we -- after the close of the pleadings here -- or the briefing
 3    on this, we did get the contracts or portions of the contracts
 4    from one of the defendants -- and I forget which one.  But at
 5    any rate, Exhibit 2 here is the amended restated agency
 6    agreement dated April 3, 1997, between the NFL and DirecTV.
 7              And if we go to NFL Bates number ending 340,
 8    Section 1.07, blackouts.
 9              THE COURT:  Yep.  Got it.
10              MR. LEBSOCK:  Okay.  So the -- I'm springing this on
11    you, but let me summarize.  There is a definition here of
12    blackouts.  Now, this is not a definition that the common
13    person might necessarily know, but this is how the two -- the
14    defendants in this case were thinking about blackouts.
15              The first clause is the 72-hour rule, the FCC issue.
16    Okay?  The second clause, starting with being broadcast by a
17    terrestrial broadcast station.  The wording is convoluted.  But
18    what they are saying there is that if the game is being
19    broadcast on local television, terrestrial television, it will
20    be blacked out on DirecTV on the Sunday Ticket.  Okay?  And
21    then it goes on to talk more about other blackout issues.
22              But the point of this from our perspective is as
23    follows:  Number one, "blackout" means more than the 72-hour
24    rule, even to DirecTV and even in their private agreements with
25    the NFL.  Point No. 2, blackout is channel specific.  Okay?
```

1    Content delivery platform specific.

2            In this case, in the second clause there, the games

3    are being broadcast in the local reception area over the air.

4    They are blacked out on DirecTV.  And that's our theory, that

5    in this case, there was a blackout of other MVPDs, including

6    all of the cable providers in the United States.  The games

7    were blacked out on terrestrial -- the out-of-market games were

8    blacked out on terrestrial broadcasts.  Okay?  And that they

9    were blacked out even on DirecTV, except on Channels 701

10   through 717 or something like that -- I think those are the

11   channels for the Sunday Ticket -- unless you pay the super

12   competitive toll to get access to them.

13           So our view of this case is that there is a

14   blackout.  All right?  And the clause here, the animating

15   clause here, which is 1H, is written broadly.  It does not

16   limit it to -- it does not say anything about the NFL.  It

17   talks about programming, including sporting events.  So it's

18   written broader than just sporting events.  May be blacked out

19   in your local reception area or otherwise unavailable to

20   customers in your local reception area due to legal,

21   contractual, or other restrictions.

22           And that's exactly what we alleged here, is that

23   there are other -- there are these web of contractual

24   restrictions between the NFL, the terrestrial broadcast

25   systems, and DirecTV that limit access, restrict access to

```
1    these games.
2            Okay.  So that's our -- that's our Section 1H
3    argument.
4            THE COURT:  Okay.
5            MR. LEBSOCK:  All right.  You haven't asked any
6    questions about contract formation as to Mucky Duck.  I would
7    note that we -- we submitted last week or maybe the week before
8    the Norcia vs. Samsung case.
9            THE COURT:  Yes.
10           MR. LEBSOCK:  In it, it references another case from
11   the Ninth Circuit called Knutson vs. Sirius XM Radio, I believe
12   is the name of the case.  The facts of that case are similar to
13   ours.  In that situation --
14           THE COURT:  I do have one -- go ahead.  I'll let you
15   finish your thought, then I do have one question because you do
16   make the argument about -- and looking at my notes -- is that
17   DirecTV has sued thousands.  And I don't see any admissible
18   evidence or arbitration agreements as it relates to the
19   thousands, quote/unquote, of lawsuits by DirecTV, mainly
20   focusing on -- you know, on unconscionability.
21           MR. LEBSOCK:  Right.
22           THE COURT:  And actually, your own -- is it
23   Mr. Lebock?  His declaration says --
24           MR. LEBSOCK:  That's mine.  Lebsock, Your Honor.
25           THE COURT:  Oh.  Lebsock.  Sorry.
```

 1            You, your declaration, Mr. Lebsock, you say you're

 2    unable to differentiate the arbitration clauses.  So why would

 3    I consider that in any way?

 4            MR. LEBSOCK:  Well, I think it shows -- it shows a

 5    pattern of DirecTV of suing its customers.  I mean, I think

 6    the -- it's probably judicially noticeable, all of those

 7    docket --

 8            THE COURT:  Probably.

 9            MR. LEBSOCK:  Right.

10            And what we did is we went through and we -- we

11    pulled out a few representative examples of the types of cases

12    where DirecTV was suing its customers, and those are part of my

13    declaration as well.  We pulled out -- we actually pulled those

14    complaints.

15            All right.  So our point is that --

16            THE COURT:  But you didn't provide me with the

17    arbitration clause as to those particular -- are you saying

18    there's just -- the arbitration clause is the same?  Is that

19    what you're saying?

20            THE WITNESS:  From everything -- the assumption here

21    is these commercial -- this commercial customer agreement and

22    the residential customer agreement, according to DirecTV,

23    are -- everybody's bound by them.

24            THE COURT:  Well, I don't assume.  So -- and I'm not

25    going to.

```
 1              MR. LEBSOCK:  Right.

 2              THE COURT:  But I just want to get the gravamen of

 3  your argument here.

 4              MR. LEBSOCK:  Sure.

 5              So I want to steer away from the unconscionability

 6  issue and just focus on Mucky Duck and the contract formation

 7  issue.

 8              THE COURT:  Okay.

 9              MR. LEBSOCK:  So we -- we submitted the Norcia vs.

10  Samsung case.  And in it, it references this Knutson vs.

11  XM Radio.  And the facts of that case are similar to what we

12  got here, which is in -- in the Knutson case, there was --

13  Knutson bought a Toyota, and he had an introductory

14  subscription to XM Radio.  XM Radio sends him a welcome kit,

15  and in it is an arbitration clause.

16              And the Court said that's not good enough.  Once

17  the -- once the relationship is formed, under the cases like

18  Windsor Mills, India Paint, and then -- and then in Knutson --

19  that's not good enough, once the relationship is established,

20  to simply send something to somebody and impose arbitration on

21  them.  I was just going to point that out.  Okay?

22              THE COURT:  All right.  But the law, as I

23  understand it, sort of that bill stuffers argument that you

24  were making.

25              MR. LEBSOCK:  Yes.
```

1           THE COURT:  But the case law that you rely upon does

2    not say that all bill stuffers are, per se, invalid.  And my

3    recollection was that it was in bold font about the arbitration

4    agreement and the -- we're required to agree to the terms and

5    conditions, if I'm not mistaken.

6           THE WITNESS:  Right.  So our view on that is that --

7    so arbitration --

8           THE COURT:  Unconscionability.

9           MR. LEBSOCK:  Right.  I'm not talking about

10   unconscionability now.

11          THE COURT:  Okay.  Contract formation.

12          MR. LEBSOCK:  Yeah.  Contract formation only.

13          Our point is that DirecTV, which has the burden here

14   of establishing an enforceable arbitration agreement, has not

15   shown Your Honor that there is an exception to the general rule

16   that silence does not equal consent.  Okay?

17          And the reason for that, the shortcoming, in our

18   view, is that they have not shown that on the -- the envelope

19   or on the bill itself where there is special places for them to

20   call out that there is something important to take a look at,

21   they have not shown you that they did that.

22          They have not shown you what was also included in

23   the bill.  And we showed an example of some of the other

24   material that DirecTV routinely sends out, including

25   advertisements for the NFL Sunday Ticket, other events that are

1   coming that month, certificate -- rebate certificates.  There's

2   just a whole bunch of other stuff in the bill itself.

3          And once -- what *Windsor Mills* says, what *Badie* says

4   is once that relationship is formed, it's not -- it's not

5   sufficient to simply mail something out.

6          In all other cases, we did not bring this formation

7   issue for any of the other plaintiffs because DirecTV went out

8   and actually got people's signature.  But they didn't do that

9   with Mucky Duck.

10          THE COURT:  Okay.

11          MR. LEBSOCK:  Okay.

12          THE COURT:  All right.

13          MR. BAUMANN:  Your Honor, the -- going back to the

14   issue of what ability of rights they have under the antitrust

15   laws.  The antitrust laws are clear.  And the cases have held

16   that you can waive your right to proceed in court on antitrust

17   claims.  That's clearly established under the law, reaffirmed

18   by the Supreme Court.

19          What that means is that you individually arbitrate

20   your antitrust claims.  I understand they are now -- have come

21   up with something that they are trying to sell Your Honor that

22   says, oh, we're going to ask for a really grand injunction

23   that's going to apply.  And if you read their opposition brief,

24   it's going to make the NFL give Sunday Ticket to other people.

25   It's going to make those other people buy it, and then it's

```
 1    going to make them compete with DirecTV to sell it.  And the
 2    end result of that is going to be what they're actually
 3    complaining about with DirecTV, which is they think they're
 4    paying too high a price.
 5            Their claim is not that they don't see it, not that
 6    it's been blacked out and not delivered in their territory,
 7    these out-of-market football games -- can I ask Your Honor,
 8    this may be a little presumptuous, but are you a football fan
 9    at all?  Are you at all familiar with how this --
10            THE COURT:  So Mr. Baumann, I had the privilege of
11    attending the same high school as a gentleman named John Elway.
12    So don't let my gender fool you.
13            MR. BAUMANN:  The biggest football fan in the -- on
14    my team is sitting at counsel's table, and her gender doesn't
15    fool me.
16            THE COURT:  Well, she should maybe be at the
17    lectern.
18            MR. BAUMANN:  She should.  I argued with her about
19    this, Your Honor, but she sort of insisted.
20            THE COURT:  Well, you have to be more assertive,
21    counsel.
22            No, I'm familiar with football.  So you can just
23    skip right past the DirecTV, how it functions and the 700
24    series because I'm with you.
25            MR. BAUMANN:  Okay.  And the complaint is -- again,
```

**UNITED STATES DISTRICT COURT**

```
 1    they've defined the class as out-of-market games, not the
 2    in-market games that were the subject of the blackout rules.
 3    And so I don't think I need to say more on that.
 4              On the issue of the injunctive relief, again,
 5    Your Honor, the -- the point is once parties agree to
 6    individually arbitrate, this is an effective denial of a right
 7    under the statute that they are arguing.  And for -- the
 8    Supreme Court has not applied that to a situation like this.
 9    And, in fact, they addressed it specifically in Italian Colors.
10    They addressed it in the Gilmer decision.
11              And they said it is not effectively depriving you of
12    a right if you agree to individually litigate your claims.  It
13    was both in the ADA context and in the antitrust context.  And
14    the reason is because you can effectively vindicate your
15    individual rights, bringing an individual claim.
16              They could have filed an individual action and not
17    sought class treatment, but they know for a lot of different
18    reasons that Your Honor's probably familiar with that they're
19    better off bringing a class claim.  But that doesn't affect
20    whether or not they are obligated to honor their contractual
21    commitments --
22              THE COURT:  Well, let's talk about that for a
23    second.  Because as it relates to Mucky Duck, I think the
24    argument was by Mr. Lebsock that there was no agreement to
25    arbitrate.  And he was relying on the fact there was no
```

1    signature and that DirecTV did not make it clear, that it --

2    once you form the relationship, you're trying to -- as I

3    understood Mr. Lebsock's argument was that the relationship had

4    already been formed.  And then DirecTV tried to impose this

5    arbitration agreement, but they didn't do enough.

6              So I do think he -- Mr. Lebsock raised the argument

7    about contract formation and agreement.

8              Mr. Lebsock, am I misconstruing your argument to me?

9              MR. LEBSOCK:  No, Your Honor.

10             THE COURT:  Okay.  Thank you.

11             MR. BAUMANN:  Okay.  Your Honor, then --

12             THE COURT:  So why don't you talk to me about that

13   for a second.

14             MR. BAUMANN:  Sure.  This all arises from the fact

15   that unfortunately, given the tens of millions, multiple tens

16   of millions of customers that DirecTV deals with, they couldn't

17   find the original signed agreement.  They don't have it.  We

18   won't have it.  That's a fact of life.

19             Since that time -- now, we're talking about a

20   20-year relationship.  Since that time, they have agreed --

21   this is a commercial business that is taking in NFL Sunday

22   Ticket in order to attract customers.  They have entered into

23   multiple revisions to that agreement on price.  They added

24   additional programming.  It's in the record that the -- that

25   they were sent and received a notice when they got the

1   additional programming that directed them specifically to go

2   look at the commercial customer agreement that they were

3   entering into and to opt out of that agreement if they didn't

4   want it.

5          We put in evidence that they were actually given a

6   very specific notice, not buried in small print somewhere, that

7   said, hey, the commercial agreement has been revised.  Go to

8   this Web site and look at it.  And if you don't want to do

9   that, call this number, and we'll send you a physical copy of

10  it.

11         And all of these notices and each of their billing

12  statements tells them that if you continue to receive the

13  service, if you get the benefits of that for your commercial

14  establishment, then you are agreeing to all of the terms of

15  that contract.

16         And we're not asking for an exception to the law

17  on -- on silence.  This is in the law in the state of

18  California.  The law in the state of California is clearly

19  that, if you continue to accept the benefits of an agreement,

20  you are bound by all of those terms of the agreement.  You

21  don't escape them by saying, oh, I forgot to read the second,

22  third, or fourth paragraph, so I'm not bound by that particular

23  agreement.

24         And, Your Honor, I would urge you even to look at

25  the Mucky Duck declaration that they submitted on behalf of the

```
 1    individual.  He doesn't say he didn't receive this.  He doesn't
 2    say -- he says, "I received things in the mail, and I didn't
 3    look at all of them."
 4             THE COURT:  I think it was "I don't recall," but
 5    okay.
 6             MR. BAUMANN:  Yes.  And again, I don't think that
 7    affects the contract formation argument.
 8             We have established through admissible, relevant
 9    testimony that the agreements were mailed, that notices were
10    mailed, that they continue to receive the benefits of the
11    agreement.  And -- and you know how they would act if they
12    became aware of the arbitration agreement.  Your Honor, we're
13    sitting here -- they're still a customer.  They're fully
14    apprised of the existence of the arbitration agreement and are
15    still accepting the benefits of it while claiming that somehow
16    they're not bound by those specific terms of the agreement.
17             And, Your Honor, I would urge you to do what the
18    Supreme Court has said to do, which is that err on the side of
19    ordering arbitration in these cases.
20             THE COURT:  Okay.  All right.  Thank you,
21    Mr. Baumann.
22             MR. BAUMANN:  Thank you.
23             THE COURT:  That matter will be submitted.
24             Okay.  Let's talk about the motion to dismiss from
25    the NFL defendants.  Your motion, you will go first.  I'll hear
```

1    from you, ask my questions, and then plaintiffs will have an

2    opportunity to respond, back to you to reply.

3              MR. LEVY:  Yes, Your Honor.  Thank you very much.

4    May it please the Court.

5              With due deference to your football heritage, I

6    might spend a moment and set the stage here.

7              THE COURT:  Okay.

8              MR. LEVY:  Each year, the NFL and its member clubs

9    stage a series of professional football games over a 17-week

10   regular season.  The NFL and the member clubs license to

11   television networks, including Fox and CBS, the right to

12   broadcast those games.  The networks take the athletic

13   competition on the field, they choose camera angles and views,

14   they add graphics, commentary, game highlights, videotape

15   replays, and crowd shots.

16             The network's finished product is a game feed that

17   they broadcast on free over-the-air TV.  The live games are one

18   of the network's inputs.  The finished game feeds are the

19   network's output.

20             By contract with --

21             THE COURT:  Go ahead.

22             MR. LEVY:  By contract with the networks, the NFL

23   owns the game feeds, the finished products that the networks

24   produce.

25             Now, as a result of those arrangements, every NFL

1   game is broadcast on free over-the-air TV.  Every fan has

2   access for free to at least five NFL games each week, including

3   the game of his or local team, whether it's home or away.

4           THE COURT:  I guess we shall see in Los Angeles,

5   since we may have more than one team.

6           MR. LEVY:  Fair enough.

7           The NFL licenses the Sunday afternoon game feeds,

8   usually about a dozen each week, to satellite provider DirecTV

9   which, in turn, redistributes the game feeds to its customers

10  on a subscription basis.

11          The game feeds offered by DirecTV in each area are

12  for out-of-market games, games that are not broadcast on -- in

13  that area by the networks.  The collection of those

14  out-of-market games is known as the Sunday Ticket package.

15          Now, Sunday Ticket subscribers are fans who want to

16  watch Sunday afternoon games other than or in addition to the

17  games that are available for free in their home area, includes

18  sports bars, as we've heard, avid fans, fans who follow a team

19  or teams located outside of their home area.

20          Now, against that backdrop, plaintiff -- plaintiffs

21  claim that the NFL has restrained trade in two different

22  markets:  First, the market for television broadcast rights.

23  That's the market in which CBS and Fox purchased the rights to

24  produce and broadcast the Sunday afternoon games.  And second,

25  the market for rights to distribute television content, the

1   market in which DirecTV purchased the right to redistribute the

2   Sunday afternoon game feeds.  Both of those claims should be

3   dismissed.

4            Now, subject to Your Honor's questions, I plan to

5   focus on three respects on which plaintiffs fail to state a

6   claim.

7            THE COURT:  Okay.

8            MR. LEVY:  Their failure to plead harm to

9   competition, their failure to plead a plausible relevant

10  market, and their demonstrable act of antitrust standing.

11           THE COURT:  Right.  And I'm going to want to talk to

12  you about output because I do think you've sort of framed that,

13  your output definition, in the way you've described what the

14  network does and what the NFL owns.  But I'm going to want to

15  talk to you about output and your definition of output and how

16  you distinguish the *Oklahoma University* case from this case.

17  So I may take you off your three points to talk to you a little

18  bit about that.

19           MR. LEVY:  Let me start with that, Your Honor.  And

20  the -- the Supreme Court case in the -- the *NCAA* case --

21           THE COURT:  Right.

22           MR. LEVY:  -- *Board of Regents* dealt with a

23  situation in which there were explicit limits on the number of

24  games that could be broadcast.

25           THE COURT:  Right.

1          MR. LEVY:  There were specific limits on the -- on

2     the games of each individual team that could be broadcast.

3          THE COURT:  Right.  And there were disciplinary -- I

4     understand the facts of that case were disciplinary sanctions

5     if they engaged in more than the six games I think they were

6     entitled to have broadcast.

7          MR. LEVY:  But --

8          THE COURT:  But output is a critical component to

9     this.  And what is output?  Is output -- on the one hand, are

10    you -- is there a restriction in output because I am a consumer

11    in Los Angeles who wants to watch the Broncos and I can't watch

12    them?  Or is there no restriction in output because my friend

13    in Denver can watch the Denver game?

14         So there is no distinction -- there is no -- there

15    is no restriction about -- because I think that the *Regents vs.*

16    *The University of Oklahoma* says it's an antitrust violation in

17    order to restrict output.

18         And what I understand you saying is that there is no

19    restriction on output because every game is televised.

20         MR. LEVY:  That's exactly right, Your Honor.

21         THE COURT:  The only question is where it is

22    televised.  And I want to make sure I understand your argument.

23         MR. LEVY:  That's right, Your Honor.  And that's a

24    fundamental distinction between this situation and the

25    situation in the *Oklahoma Board of Regents* case.

**UNITED STATES DISTRICT COURT**

 1              THE COURT:  Right.

 2              MR. LEVY:  The -- the real -- the source to which

 3   I'd refer you to address this issue is the *Brantley* case, the

 4   Ninth Circuit's decision in *Brantley*, which makes clear that

 5   it's up to the licensor, if you will, the NFL here or -- could

 6   be the licensee, DirecTV.  It can -- it can offer its products

 7   wherever and in whatever combinations it wants to.

 8              That's not a competitive issue.  It's not a

 9   reduction in output for the consumer to be denied a choice, if

10   you will, that they could only watch five games over the

11   weekend and -- or five games on -- it would be over the

12   weekend, on Sunday afternoon --

13              THE COURT:  I think so.

14              MR. LEVY:  -- instead of 12 or 13 games.

15              That's -- the *Brantley* case, the *NBC Universal*

16   addresses that issue and makes clear that the choice of how to

17   conduct one's business, especially in dealing with intellectual

18   property, is up to the -- up to the intellectual property

19   holder.

20              And that's consistent with the general principles of

21   law governing intellectual property; that the owner of the

22   intellectual property, whether it's a producer of a television

23   series or it's a writer of a book or whether it's a licensor of

24   trademarks, the owner of the intellectual property has the

25   right to determine whether to license the product at all or, if

36

1   he -- if he licenses it, he can license it -- license it to one

2   distributor or as many distributors as it wants.  And that

3   principle is -- is sort of a fundamental core principle of

4   intellectual property law.

5           THE COURT:  And that's where you framed it in the

6   beginning with your remarks, that it's much more than simply

7   two teams playing.  I believe you said there's commentary,

8   there's different camera angle shots, they have a camera that

9   goes on top of the field now.  And I understand that that's

10  your point, is that the NFL has created this product which is a

11  creation, an intellectual property creation.

12          MR. LEVY:  Yes.  And the NFL, as the -- as the owner

13  of that intellectual property -- now I'm focused on the game

14  feeds.  The NFL as the owner of that intellectual property has

15  the right to license it to DirecTV alone, to multiple

16  licensees, and it has the right not to license it at all.  And

17  that wouldn't be an antitrust violation at all.

18          So in addition to *Brantley*, I'm going to invite

19  Your Honor's attention to the *Rutman Wine* case, which is the

20  Ninth Circuit case -- the leading case in the Ninth Circuit

21  holding that the owner of an intellectual property has the

22  right to license its intellectual property exclusively or, to

23  put it more generally, the *Brantley* -- in the *Rutman* case, it's

24  not intellectual property.  But -- but an owner of property has

25  the right to license an exclusive distributor or not to

 1    distribute the property at all.

 2              It's -- it's important, Your Honor, here to

 3    recognize the plaintiffs challenge two separate agreements.

 4    And I'm going to weave this back into the output point that

 5    you've raised.

 6              THE COURT:  Okay.

 7              MR. LEVY:  The first is the agreement among the NFL

 8    clubs to pool their broadcast rights for sale to the television

 9    networks.  That's the equivalent of what the Supreme Court was

10    addressing in the *Oklahoma* television case.  In antitrust

11    parlance, that's called a horizontal agreement.

12              THE COURT:  Right.

13              MR. LEVY:  The second is the agreement by which the

14    NFL grants DirecTV rights to broadcast -- or to redistribute

15    the package of Sunday Ticket --

16              THE COURT:  That's a vertical agreement.  I get it.

17              MR. LEVY:  Okay.  And I'll just say that in passing,

18    because I don't believe there's any dispute here, the law is

19    quite clear that the antitrust principles that govern the

20    horizontal agreement are different from the antitrust

21    principles that govern the vertical agreement.  And the Courts

22    have said that when antitrust challenge addresses both

23    horizontal and vertical agreements, they have to be considered

24    separately.

25              THE COURT:  Right.  You have to unwind them.

**UNITED STATES DISTRICT COURT**

 1             But this is an interesting situation where the
 2    horizontal and the vertical agreement are mutually symbiotic.
 3    So if I look at it through -- if I buy the plaintiffs'
 4    argument, you know, in antitrust law, it says you untangle them
 5    and unwind them and look at each agreement separately, but
 6    there haven't been agreements that are mutually symbiotic like
 7    this.  You need the one to get to the other.
 8             MR. LEVY:  Well, Your Honor, I'm not sure I
 9    would agree --
10             THE COURT:  Okay.  Tell me why I'm wrong.
11             MR. LEVY:  -- with the premise that they're mutually
12    symbiotic.
13             THE COURT:  Okay.  Talk to me about that.
14             MR. LEVY:  Because the horizontal -- let's start
15    with the horizontal agreement.  That's the agreement to pool
16    the rights.
17             THE COURT:  Right.
18             MR. LEVY:  That agreement -- and I don't think
19    there's any dispute about it.  That agreement is protected by
20    the Sports Broadcasting Act.  You know, that is -- that is
21    plainly lawful.
22             So the -- the rights are pooled and agreements
23    that -- that -- that authorize the -- the rights are pooled in
24    agreements with Fox and CBS that provide that the ownership of
25    the intellectual property rights to their output, the game

```
 1   feeds, is vested in the National Football League.
 2            So here we are.  We can stop right there.  The NFL
 3   doesn't have to distribute those -- redistribute those game
 4   feeds at all if it doesn't want to.  But if it does
 5   redistribute those game feeds and make them available to
 6   DirecTV, it's free to do so on an exclusive basis pursuant to
 7   an entirely separate principle of law.
 8            And that's the law that I've just referred to
 9   involving the -- the *Rutman Wine* case and others, which make
10   clear that the exclusive -- a distributor has -- has a right
11   to -- to license its products or to hire a distributor for an
12   exclusive arrangement and that that is not anti-competitive.
13            The two are entirely -- the two are entirely
14   separate.  And that's -- we can go back to the -- the -- what
15   the -- what the District Courts have said in both the *Spinelli*
16   case and the *Washington* case.  They make clear that the rights
17   to the game feeds are different from the broadcast rights that
18   the NFL -- that the NFL clubs pool.  They made clear that the
19   NFL clubs never owned the rights to the game feeds.  From their
20   very creation, the game feed rights were owned by the National
21   Football League itself.
22            So the notion that these two are symbiotic, in my
23   view, is wrong.  They're independent.  And each is -- each is
24   protected from the -- by the -- from antitrust scrutiny by
25   different principles.  The horizontal arrangement is protected
```

1    by the Sports Broadcasting Act, and the vertical arrangement is

2    protected by that body of law that finds that exclusive

3    distributorship arrangements are not simply -- that they're

4    presumptively lawful and that they're pro-competitive.

5              THE COURT:  Okay.  I don't want to move you from

6    your market argument either because I do want to talk to you

7    about that too.

8              MR. LEVY:  Okay.  Well --

9              THE COURT:  But --

10             MR. LEVY:  Let me turn -- let me turn, then, to

11   the -- let me turn, then, to the relevant market issue because

12   I think that it is a -- it is a fundamentally cockeyed notion

13   that they have offered here.  It's -- it's entirely

14   implausible, to use the more proper term.

15             Plaintiffs are obligated to -- to allege a plausible

16   relevant market in which defendants have and exercise market

17   power.  The relevant product market must -- for any product

18   must include all products that could compete with or reasonably

19   substitute for that product.

20             Now, plaintiffs propose a relevant market limited to

21   live broadcasts of out-of-market professional football games,

22   that is, all Sunday afternoon games except those that are

23   available for free.

24             But plaintiffs' proposed relevant market is

25   explicitly premised on the assumption that in-market games do

 1    not and could not compete with out-of-market games.  And that

 2    assertion has -- there is no -- there is no allegation, there

 3    is not an allegation -- there's not a scintilla of factual

 4    support in the complaint for that conclusion.

 5            If a consumer is interested in choosing among

 6    different NFL games -- and that would be any -- any interested

 7    consumer, any consumer interested in watching an NFL game other

 8    than or in addition to the game in which his favorite team is

 9    playing -- his options indisputably include both in-market

10    games and out-of-market games.  That's true whether he makes

11    his decision and chooses his game on the basis of price or the

12    quality of the match-up or the lineup of his fantasy football

13    team.

14            On a typical Sunday afternoon in Los Angeles, there

15    are three in-market games available for free on CBS and Fox.

16    There are nine games, nine out-of-market games available on

17    DirecTV.

18            It would be absurd, implausible to assume that for

19    any fan in the Los Angeles area interested in choosing among

20    different NFL games, one or more of the three in-market games

21    would not be a reasonable substitute for one or more of the

22    nine out-of-market games and vice versa.

23            Accordingly, a relevant market that includes

24    multiple out-of-market games but not a single in-market game is

25    entirely plausible.

1          And let me slow down for a minute and ask the

2   question:  Why is it that plaintiffs limit their proposed

3   relevant market to out-of-market games alone?  Why is it that

4   there aren't any in-market games in that market?

5          Well, the answer is simple.  If the relevant market

6   includes in-market games as well as out-of-market games,

7   plaintiffs couldn't plausibly allege a restraint of trade.  In

8   that market, which is far closer to the real world than any

9   market the plaintiffs have proposed here, DirecTV would not be

10  able to -- would not have any market power and it would not be

11  able to exercise market power.

12         If DirecTV attempted to raise the price of the

13  out-of-market games, above competitive levels, some consumers,

14  not necessarily all, but some would simply substitute one of

15  the free in-market games available on Fox or CBS.  That dynamic

16  would discipline the market and preclude any exercise of market

17  power.

18         If there were any question about the incongruity of

19  this proposed market definition here, it would be resolved by

20  the claim of the plaintiff sports bars.  Plaintiff sports bars

21  assert that they want to attract customers on Sunday afternoons

22  by showing a full range of NFL games on their various screens.

23         Of course, a bar wanting to show a full range of NFL

24  games seeks to show both in-market games and out-of-market

25  games.  The proposed relevant market doesn't -- market

1    definition doesn't fit for those plaintiffs either.

2           Nor does the proposed relevant market definition fit

3    the diehard fan who's interested in watching only the game of

4    his favorite team.  For that fan, there would be no substitute,

5    in-market or out-of-market, for the game he wants to watch.

6    The fans' preference cannot support a market for all

7    out-of-market games or for any other relevant market.

8           On relevant market -- I want to make one further

9    point, if I may.

10          Plaintiffs assert that relevant market issues

11   present inherently factual questions.  That's simply not true.

12   Courts routinely dismiss complaints that fail, as this

13   complaint fails, to allege a plausible relevant market.

14          Among the cases in our brief -- cited in our brief

15   dismissing claims on that basis are *Spinelli*, *Apple v. Psystar*,

16   and *Adidas America*.  Plaintiffs' relevant market claims here

17   are even less plausible than the relevant market by definitions

18   asserted in those three claims, each of which was dismissed at

19   the threshold.

20          Now, with Your Honor's permission, I'd like to spend

21   a few minutes on the standing issue, if I may.

22          THE COURT:  Please.

23          MR. LEVY:  You recall back to the fact where I

24   identified the horizontal claim and the -- and the vertical

25   claim and the -- the two allegations that plaintiffs are

1   making.  The first was -- the first claim was that -- they're

2   challenging is that -- that the NFL clubs violated the

3   antitrust laws by agreeing to pool their broadcast rights for

4   CL to Fox and CBS.  The threshold question on that issue is

5   whether plaintiffs have antitrust standing to pursue a

6   restraint in such a market.  It's clear that they do not.

7          The Ninth Circuit made clear in *American Ad*

8   *Management* that unless a plaintiff that actually participates

9   in the market is directly restrained by the challenged

10  restraint -- challenged conduct, it doesn't suffer antitrust

11  injury and, therefore, doesn't have standing to challenge that

12  restraint.

13         A few months ago, relying on the Ninth Circuit's

14  decision, a Second Circuit reached the same conclusion.  In

15  *Aluminum Warehousing*, that Court unambiguously held that to

16  suffer antitrust injury, the putative plaintiff must be a

17  participant in the very market that's directly restrained.

18         Plaintiffs are not participants in the market

19  allegedly restrained by the challenged horizontal agreement.

20  They're not buyers or sellers of television broadcast rights.

21  They don't produce television content.

22         On the other hand, ESPN, which buys television

23  broadcast rights and produces television content, is a

24  participant in that market.  Warner Brothers, which produces

25  and sells television content, is a participant in that market.

 1   If there were an unreasonable restraint of trade for television

 2   broadcast rights, ESPN or Warner Brothers or others might

 3   suffer antitrust injury.  If so, they would likely have

 4   standing to bring and presumably would have an incentive to

 5   bring an antitrust complaint.

 6          But consumers and sports bars are not buyers or

 7   sellers of television broadcast rights.  They don't buy or sell

 8   or produce content for television.  They're not potential

 9   entrants or suppliers to that market.  They're not licensors in

10   that market.  Accordingly, they don't have antitrust standing

11   to challenge a restraint of that market.

12          Now, there's a separate -- an independent reason

13   with regard to the horizontal claims, why plaintiffs don't have

14   standing.  And that's because they are not direct purchasers of

15   any product from the NFL or any NFL club.  As a result, they

16   are not permitted to assert damages claims against the NFL

17   defendants under the *Illinois Brick* doctrine.  In the *Kingray*

18   case, about ten years ago, just nearly identical claims against

19   the NBA clubs on precisely that basis.

20          Now, the same analysis holds true, Your Honor, with

21   regard to the vertical claim.  On the issue of standing, do

22   plaintiffs have standing to challenge a restraint in the market

23   for rights to distribute television content?  Again, they do

24   not.  *American Ad Management* and *Aluminum Warehousing* both made

25   clear that to suffer antitrust injury, to have antitrust

```
 1    standing, the putative plaintiff must be a participant in the
 2    market that's directly restrained.
 3            Here, the plaintiffs aren't participants in the
 4    allegedly restrained market, the market for rights to
 5    distribute television content.  Comcast is a participant in
 6    that market.  Verizon Fios is a participant in that market.
 7    DISH Satellite is a participant in that market.  If there were
 8    an unreasonable restraint of trade in the market for rights to
 9    distribute television content, any of those three might have
10    and presumably -- might have standing and presumably would have
11    incentive to pursue it.
12            But again -- and I could run through the litany --
13    plaintiffs -- consumers and sports bars aren't participants in
14    that market.  They don't buy and sell rights to distribute
15    television content.  They don't distribute television content
16    at all.  They're not potential entrants.  Accordingly,
17    plaintiffs lack standing to pursue their vertical claims as
18    well.
19            Your Honor, I'm grateful for your attention, but
20    I'll make one last point unless --
21            THE COURT:  Sure.
22            MR. LEVY:  -- you have questions.  And that is the
23    Complaint that was filed and which is before Your Honor now is
24    one that is the product of efforts by multiple plaintiffs'
25    lawyers to come up with their best and most effective and most
```

**UNITED STATES DISTRICT COURT**

```
1    legally sufficient version of a Complaint.
2              There's no reason, if the Court is inclined to
3    dismiss the Complaint, to allow leave to amend.  On the
4    standing issue, there is no basis for them to allege standing,
5    as the analysis that I've just been through makes very, very
6    clear.  On the competitive injury point, again, on the -- on
7    the -- especially on the vertical arrangement, the law is clear
8    that there's no way they can plead around the requirement or
9    the principle of law that says that vertical restraints are --
10   are presumptively legal under the antitrust laws.
11             And on the -- on the relevant market issue, there's
12   no way they can make plausible that which is implausible.  The
13   notion that they can -- there can be a market where NFL clubs
14   and NFL games -- some NFL games compete against each other, but
15   NFL games do not.
16             I'd be happy to answer any questions Your Honor has.
17             THE COURT:  I don't have any at this time, but I'm
18   going to ask you in reply if I have any further questions.
19             MR. LEVY:  Thank you, Your Honor.
20             THE COURT:  Okay.
21             MR. SELTZER:  Good afternoon, Your Honor.  Let me go
22   directly to the question you asked about restrictions on
23   output.
24             THE COURT:  Yep.
25             MR. SELTZER:  We directly allege in our Complaint
```

1   that what has been agreed to here through a web of interlocking

2   agreements -- and Your Honor is correct, they are symbiotic.

3   They are not freestanding agreements.  The defendants would

4   have you compartmentalize them in hermetically sealed

5   containers, analyze them separately.  In fact, they are

6   interrelated.

7           THE COURT:  Well, that's what the antitrust laws

8   say.  And I'm supposed to unwind it.  And I'm not aware of any

9   one that functions other than *Kingray*, for example, that

10  functions like this, these two agreements.

11          MR. SELTZER:  Your Honor, there are cases -- and my

12  colleague, Mr. Langer, was the lead counsel in the *Laumann* and

13  *Garber* cases --

14          THE COURT:  Okay.

15          MR. SELTZER:  -- where precisely the same kind of

16  agreements were at issue even -- but they were even less

17  restrictive than these.  They gave more rights to the teams to

18  enter into separate licensing agreements apart from the -- the

19  rights that they conferred on the -- on the leagues in that

20  question in those cases.

21          And the result of those cases is a perfect

22  illustration of how a Court analyzes the symbiotic relationship

23  between the granting of the rights exclusively to a league by

24  the clubs who have the rights originally all to themselves.

25          No one questions that every team owned the copyright

```
 1   to the broadcast of its home games.  If there never were an

 2   agreement here to license and give the NFL the right to be

 3   their sole agent, they would have -- they would have that right

 4   to decide when and where and with whom to establish

 5   broadcasting arrangements for those games.

 6            What you've got here is not simply a -- a unilateral

 7   licensing agreement by the -- by separate teams.  You have an

 8   agreement by all of the 32 clubs to license all of their rights

 9   jointly to the NFL.  That's subject to antitrust scrutiny all

10   by itself.  That's an agreement of multiple parties who are

11   ostensible competitors in many respects to jointly confer on

12   one end of the right to market their rights.

13            But the licensing that was done here by the NFL to

14   DirecTV, that's not simply a unilateral license without any

15   reciprocal obligations.  Indeed, Your Honor, in the Ludwin

16   declaration which was submitted in support of the motion to

17   dismiss, there's attached a copy of the DirecTV-NFL agreement.

18            And in paragraph 2B of that agreement, which is at

19   page 5 of the document, it says, "Notwithstanding anything to

20   the contrary, the NFL shall not create a Regionalized Game

21   Broadcast Window other than in a game broadcast window that

22   exists as of December 20th, 2013."  It goes on to describe

23   those games, it being understood that the NFL would have the

24   flexibility to modify the start times of those, only games that

25   were permitted.
```

**UNITED STATES DISTRICT COURT**

1          So what the DirecTV folks did was bargain for a

2     reciprocal agreement by the NFL not to compete with DirecTV.

3     This is not a simple unilateral licensing agreement.

4          We alleged elsewhere in the Complaint about the

5     restrictions that were exacted by other participants in this

6     overall web of agreements.  Fox, for example, according to what

7     we've alleged in the Complaint, is reported to have exacted an

8     agreement that DirecTV will not have more than a million

9     subscribers or some other similar number.  Those are restraints

10    on how the competition in this industry would take place.

11         The restriction on output is the restriction on the

12    availability of viewers to see these games.  The fact that a

13    game may be seen by a New Yorker of a New York broadcast game

14    but can't be seen by -- that same game can't be seen by

15    somebody else in a different state, that's a restriction on the

16    ability of the viewer to see that game.

17         THE COURT:  Well, define "output" for me as you see

18    it, Mr. Seltzer.

19         MR. SELTZER:  I would define "output" as the

20    viewership, in other words, the availability of viewers to see

21    the games.

22         Now, let me call your attention, Your Honor, to

23    another Court decision.  The *Shaw* case, which was briefly noted

24    by the defendants in their motion to dismiss, is just referring

25    to the -- the SBA.  That case is one where plaintiffs brought

1    suit against the NFL and others for this Sunday Ticket game.

2    Same as an antitrust violation.

3           The -- in the lower court, the Court decided two

4    questions:  Had the plaintiffs stated a cause of action for a

5    violation of the antitrust laws?  And, second, whether or not

6    the agreement in question, that DirecTV was protected by the

7    SBA.  The Court rejected both arguments by the defendants.

8           The Second -- the Third Circuit then took up the

9    question of whether the SBA would foreclose a claim arising out

10   of the NFL Sunday Ticket and said it would not because the SBA

11   only protects sponsored telecasts.  That's over-the-air

12   telecasts where you have an advertiser paying for the privilege

13   to advertise on the broadcast.

14          And here's what the plaintiffs in that case alleged.

15   There couldn't be a case more on all fours with this case.  It

16   said "Plaintiffs allege that the agreement by the NFL and its

17   members to market the Sunday Ticket TM package has restricted

18   the options available to fans for viewing non-network

19   broadcasts of NFL games, thereby reducing competition and

20   artificially raising prices."

21          And the Court said in denying the motion to

22   dismiss -- this is at the end of the decision -- "The

23   plaintiffs here have specifically pled the participants (the

24   NFL and its member clubs), the purpose (to restrict output and

25   to so raise prices) and the motive (monetary gain to the

```
 1    defendants).  Plaintiffs allege an agreement among the clubs

 2    and the NFL; they allege that the agreement unreasonably

 3    restricts output of non-network broadcasts of professional

 4    football" -- that's the output issue.  It's the broadcast of

 5    the non-network football games.  And this is the -- the network

 6    ones are the CBS --

 7                   THE COURT:  The free ones.

 8                   MR. SELTZER:  The free ones, the free over-the-air

 9    broadcast.

10                   Quote, "thus raising the market price to tune into

11    those games," close quote.  "That is enough to state a claim

12    that the agreement is illegal.  Hence, the defendants' motion

13    to dismiss must be denied."

14                   And that lower court decision was then lifted to the

15    Third Circuit that we cite.  That's available at 1998 U.S.

16    District Lexis 9896.  It was decided in 1998.

17                   THE COURT:  Okay.  So then you say that I should

18    follow that case and not follow Kingray.

19                   MR. SELTZER:  Well, Kingray is distinguishable for a

20    bunch of reasons, Your Honor.

21                   THE COURT:  Okay.  Let's talk about it.

22                   MR. SELTZER:  Let me give you the reasons.

23                   First of all, there were four claims that the

24    plaintiffs in Kingray brought.  The first claim was a claim for

25    vertical price fixing.  The Court rejected that claim.  Why?
```

UNITED STATES DISTRICT COURT

1    Because the contract between the NBA and DirecTV gave

2    discretion to DirecTV as to the prices it would charge.  There

3    was an argument that was made in that case based upon a

4    provision that had a deemed price that would be paid by -- as a

5    royalty based upon the subscribers to the -- the League Pass,

6    the NBA League Pass.

7               THE COURT:  Right.

8               MR. SELTZER:  And the Court said that's not a

9    vertical price fixing agreement and cited the Ninth Circuit's

10   case, which was *General Cinema vs. Buena Vista*.

11              THE COURT:  Okay.

12              MR. SELTZER:  That's not our claim here.

13              THE COURT:  Okay.

14              MR. SELTZER:  We're not claiming vertical price

15   fixing.  So that claim is completely distinguishable from what

16   we've alleged here.

17              THE COURT:  Okay.

18              MR. SELTZER:  Second, they allege that the agreement

19   between the NBA teams and the NBA and DirecTV had the effect

20   of -- of restricting -- injuring competition.  What was the

21   argument?  The argument was there are certain games that were

22   blacked out for local broadcast on -- on the NBA League Pass.

23              But the Court pointed out, every single game was

24   available everywhere on alternative means of distribution.

25   There were games available on TBS, on TNT, on local broadcasts

1    so that --

2              THE COURT:  And that's your distinguishing point

3    here because every game is not available on multiple avenues.

4              MR. SELTZER:  Exactly.  The Court said -- and I have

5    the decision here.

6              THE COURT:  I've read it probably a million times.

7              MR. SELTZER:  But it said that -- all they were

8    talking about was that it was restricted in one form, but it

9    was available in other forms.  So there were just alternative

10   channels you had to turn to in order to get exactly the same

11   games wherever you were.

12             THE COURT:  Okay.

13             MR. SELTZER:  The third argument that was made was

14   that, while the agreement with DirecTV is exclusive, in other

15   words, as an MVPD, multi channel distributor.  And the Court

16   said, What are you talking about?  In Demand has the ability to

17   sell on a Pay-Per-View basis the same games over its cable

18   system -- over cable.

19             So, in fact, there was no exclusivity.  So that

20   defeated that argument that the plaintiffs were making.

21             And then, finally, there was an argument that there

22   was a horizontal agreement at the -- at the legal level which

23   resulted in a pass-on of the overcharge to the plaintiffs.  And

24   the Court said, well, that's followed by *Illinois Brick*.

25   That's not our case here.

1          Frankly, Your Honor, the plaintiffs in that case,

2     you know, for whatever reason didn't describe the claim, that I

3     would have described it, correctly.  But it's totally

4     distinguishable in terms of how they described it and what was

5     at issue in it before Judge Lorenz in the *Kingray* case.

6          In our case, we're talking about a web of agreements

7     that had the effect of limiting the number of games that are

8     shown and where they are shown.

9          Now, the fact that there's an adverse effect on

10    competition which is, of course, the key here is -- is

11    demonstrated, first of all, by our allegations which show how

12    the economics of this industry operate and why these

13    restrictions have the effect of reducing output and increasing

14    prices to consumers.

15         By comparison, look what happens in Canada.  The

16    Sunday Ticket program is available on multiple competing

17    channels.  The prices for Sunday Ticket are much lower in

18    Canada than they are in the United States, and that's because

19    of the fact of competition which is -- which is eliminated by

20    virtue of these agreements.

21         The Court asked about the *NCAA* case against the --

22         THE COURT:  University of Oklahoma.

23         MR. SELTZER:  -- *Oklahoma Board of Regents*.  There,

24    the question before the house was whether or not agreements

25    that were established by rules by the NCAA that limited the

```
 1   total number of games that could be broadcast on Saturdays,

 2   total number of college football games, and also limited the

 3   rights of teams to market additional games violated the

 4   antitrust laws.

 5           The Supreme Court said that the restriction on the

 6   output imposed by those rules was a violation of the antitrust

 7   laws.  It had the effect of limiting output, and it had the

 8   effect of raising prices.  And guess what happened.  After

 9   those restrictions were lifted, college football games have

10   proliferated all over television.

11           On Saturday, there are literally dozens of games

12   that are available through multiple channels of distribution as

13   a result of lifting the restrictions that NCAA had imposed.

14           THE COURT:  But NCAA vs. The University of --

15   The Regents vs. The University of Oklahoma --

16           MR. SELTZER:  Yes.

17           THE COURT:  -- took output to zero.  How do you

18   respond to the NFL's argument that every game is shown

19   somewhere --

20           MR. SELTZER:  Because --

21           THE COURT:  -- and that is, therefore, not a

22   restriction on output?

23           MR. SELTZER:  But it is a restriction on output

24   because you can't see every game everywhere.  And the point of

25   the restriction of the output is, by having that limitation on
```

 1   the output, DirecTV is able to charge prices that are far in

 2   excess of the prices that comparable channels that have sports

 3   teams on them charge their customers where there is

 4   competition, where there are multiple channels available, for

 5   hockey, for baseball.

 6          THE COURT:  Well, you're also focusing on channels.

 7   But let's say -- I mean, the technology has progressed far

 8   beyond that.  There's streaming, there is Internet-based games,

 9   I mean, there's a lot more than just channels.

10          MR. SELTZER:  Yes, Your Honor.  But the agreement

11   between DirecTV and the NFL restricts the ability of the NFL to

12   license the games for streaming.

13          THE COURT:  Okay.

14          MR. SELTZER:  Except where there might be an

15   inability of a customer by mechanical reasons to be able to buy

16   DirecTV.

17          THE COURT:  Yep.

18          MR. SELTZER:  So they've limited these alternative

19   channels of distribution.

20          And Your Honor put your finger on a very important

21   point.  From the time that this agreement was originally made

22   around '94 or so until now, there have been a lot of changes in

23   the economy and on the availability of alternative channels of

24   distribution.  This agreement has eliminated the ability for

25   the teams and for the NFL to take advantage of all those other

1  channels of distribution.

2         You say, well, why would the NFL agree to that?

3  Well, because they're being paid a lot of money by DirecTV in

4  return for this exclusivity.  So it's profitable to the NFL to

5  do that.

6         But it would be a different world if this

7  restriction didn't exist.  There would be all these

8  alternatives out there, and consumers would benefit from the

9  lower prices being paid.

10         That was exactly the point that Judge Scheindlin

11  made in the -- in the *Laumann* and the *Garber* cases.  And the

12  impact of having the changes in the market that were dictated

13  by -- by the result of that case, the decision in that case is

14  that more output is available.  More viewers can see more games

15  at lower prices.  That's the essence of -- of the benefit that

16  the antitrust laws are designed to provide by eliminating

17  artificial restraints on competition that had the effect of

18  reducing output and driving up prices.

19         And I might add, as I understand it, post *Laumann*

20  and *Garber*, the NBA has changed its tune as well in terms of

21  what it will do, in terms of offering multiple games.  This is

22  having an impact going beyond hockey and baseball.

23         But again, going back, Your Honor, to the question

24  on the -- you know, what is the essence of the claim.

25  Restricting the ability of viewers to see games that they want

```
 1   to see, which has the effect of not making those games
 2   available to them which makes them -- requires them to go to
 3   DirecTV if they want to get those games, is -- is -- is one
 4   that forces them to pay higher prices because that's the
 5   exclusive channel by which they can do that.
 6            Another fact, too -- and, Your Honor, this is the
 7   secondary effect -- the higher prices that DirecTV charges also
 8   have a restrictive effect.  You know, people, you know, make
 9   choices about economics and what they're willing to pay to see
10   a game.  People buy less games, actually, because of the higher
11   prices.
12            And that's one of the effects that's traditionally
13   the hallmark of how a monopoly operates.  You're reducing
14   output, you're raising prices, and you're actually not at an
15   equilibrium which you would have in a free, open, and
16   competitive market.  And actually, less goods, less products
17   are sold in a monopolistic environment.  And that's really
18   another consequence here of these agreements.
19            Now, we had some discussion on standing.  There's
20   been zero discussion on the SBA.  And I think I understand why,
21   because there's no way to distinguish the trial court and the
22   Third Circuit decision saying that the Sunday Ticket contract
23   with DirecTV and the NFL isn't protected by the SBA.  That was
24   the second argument they made.
25            The argument about market definition, the market
```

UNITED STATES DISTRICT COURT

```
 1    definition isn't -- isn't contradictory or incoherent,

 2    Your Honor.  It is very similar to the definitions that were

 3    made in the Laumann case.  In the Laumann case, Your Honor, the

 4    definition of the market was live video presentations of

 5    professional baseball and hockey games over media, such as

 6    cable and satellite television and the Internet.

 7              And it's similar to the definition regarding college

 8    football that was used in the NCAA case in which the market was

 9    defined as "live college football television" and that we've

10    also defined as some market here of out-of-market games.

11    There's nothing incoherent about doing that.  The submarket is

12    really a -- an artifact of this agreement, of this limitation

13    on the availability of out-of-market games.

14              And the fact it has the hallmarks of a submarket is

15    shown by the way that DirecTV markets Sunday Ticket, the way

16    the NFL on its Web site talks about the Sunday Ticket as being

17    a separate product.  So there is validation that you can look

18    at it as a separate submarket.

19              And you have submarkets where everyone's a

20    participant in the same overall market, but there are reasons

21    why there's not necessarily perfect interchangeability or

22    intersubstitutability between various products.  So that's why

23    a submarket is often used.

24              If we prevail in this case, Your Honor, it's very

25    likely that this market would disappear and would no longer be
```

1   a distinction because it's really an artifact of what they've

2   done here.

3           THE COURT:  But don't I have to agree -- I mean, the

4   NFL is asking me to -- as consistent with antitrust law cases,

5   to unwind the horizontal from the vertical.  And you're asking

6   me to put it together.  Because if I unwind the horizontal from

7   the vertical, the horizontal relationship, none of the

8   plaintiffs enjoy -- have standing, as counsel has argued.  And

9   if I look separately at the vertical, none of the plaintiffs

10  have antitrust standing.

11          How do you respond to that?

12          MR. SELTZER:  I respond to that, Your Honor, by --

13          THE COURT:  Don't I have to -- to agree with you,

14  have to view them as cohesive and symbiotic, as I stated

15  earlier?

16          MR. SELTZER:  I think under the antitrust laws, you

17  do view them as symbiotic when they're intertwined and

18  interdependent the way these agreements are.

19          If you go back to the *Musical Instruments* case from

20  the Ninth Circuit, it rises out of the totally distinct

21  context.  There, what happened is that the plaintiffs alleged

22  that there were vertical arrangements with Guitar Store that

23  limited competition among the suppliers.  The plaintiffs

24  alleged what was called a hub-and-spoke conspiracy.  What they

25  were trying to prove --

1          THE COURT:  That transcends antitrust.

2   Hub-and-spoke -- you know, criminal law has used that for

3   years.

4          MR. SELTZER:  Exactly.  But they were trying to

5   prove in antitrust parlance that there was a rim.  What's the

6   rim?  That's that each of these manufacturers were in agreement

7   to limit the competition among themselves.  And plaintiffs

8   sought to prove that that occurred and that would be a, per se,

9   violation of the antitrust laws.

10          The spokes without the rim, that was a vertical

11   relationship, and the Court said that should be analyzed for

12   antitrust purposes under the rule of reason.

13          The plaintiffs in that case disclaimed any attempt

14   to show that these vertical relationships violated the

15   antitrust laws in any respect.  Their case stood or fell on

16   whether they can show that there was a rim.  And the Court said

17   that there was insufficient pleading to demonstrate the

18   existence of agreement.  In other words, they failed the

19   *Twombly* test on agreement.  That's what that case was about.

20          And for that purpose, the Court analyzed the

21   horizontal aspect of the case, which was what the plaintiffs

22   were talking about, separately from the vertical aspect of the

23   case.

24          But here, where you have an interdependent set of

25   agreements where the exclusivity of the rights that are granted

1   by the clubs together to the NFL, to have the NFL act as its

2   agent and then have the agent, in turn, act on their behalf

3   with DirecTV and, in turn, impose restraints on what the teams

4   themselves can do as a function of this overall agreement,

5   can't be separated and looked at in isolation.

6          If you didn't have the granting of the rights to the

7   NFL, the NFL couldn't have this agreement with DirecTV.  And

8   DirecTV wouldn't be in a position to exact restraints on the

9   clubs which is -- so it's all part and parcel of one overall

10  agreement.

11         And, therefore, it's wrong as an antitrust matter to

12  say, well, let's take a look at the horizontal arrangement

13  between the clubs and the NFL and say that's -- that's one

14  agreement, and does that violate the antitrust laws?  We didn't

15  bring that claim.  We said in a footnote in our Complaint,

16  could very well be a claim, but we're not asserting that claim.

17         We're asserting a claim that's based upon this

18  overall web of arrangements between the parties, which is

19  exactly -- which was at issue in the *Laumann* and *Garber* cases

20  and in -- in *Shaw* itself involving Sunday Ticket.  It was -- it

21  was the interrelationship of all those agreements that made

22  the -- the agreements actionable.

23         So the questions that were posed to you regarding

24  standing, those are just -- they miss the point.  These are

25  plaintiffs who are the direct purchasers of the subscription

**UNITED STATES DISTRICT COURT**

64

```
 1   service from DirecTV who are being overcharged as a result of

 2   this overall web of agreements who would otherwise have the

 3   ability to buy access to the same games that now they could

 4   only see on DirecTV at lower prices with different choices.

 5   That's the point.

 6         And with respect to the question on Spinelli that

 7   was also cited, Your Honor, that case is so far afield from

 8   this case.  It was one where photographers licensed -- first of

 9   all, they had to get credentials from the NFL to take

10   photographs.  Then they licensed to their agent, first Getty

11   Images and then AP, and then AP gets a -- and Getty gets an

12   agreement with the NFL so they can be licensees themselves,

13   have commercial licenses.

14         The -- the Complaint in that case involved the

15   agreements between Getty and AP and the NFL.  And what the

16   plaintiffs were complaining about is that the deals that AP and

17   Getty made with the NFL were bad deals.  In fact, they sued, as

18   part of their claims against Getty and AP, for breach of

19   contract, breach of fiduciary duty, for making deals that

20   didn't give them as much as they should have gotten from the

21   arrangements with the NFL.

22         That's not this case.  This is a case -- this is a

23   case involving the people who are directly subscribing to

24   DirecTV for the service which is all made -- a function of

25   these overall agreements between them, which not only restrict
```

**UNITED STATES DISTRICT COURT**

 1    what the NFL teams can do, it also restricts what's

 2    available -- what the networks can do.

 3            CBS and Fox, according to our Complaint, agree that

 4    they will not provide other games that compete.  So you've

 5    got -- you've got this web of agreements between all of these

 6    parties so that it limits the number of games that are actually

 7    broadcast.  That's what we're talking about in this case.

 8            Now, with respect to the -- the indirect purchase

 9    report that was made.  And that's based upon the *ATM* decision

10    from the Ninth Circuit.  That case arose in the context of

11    price fixing.  That was the allegation of the Complaint, that

12    the interchange fee charged by banks at the bank level was --

13    was artificially set and that, in turn, was then imposed on the

14    bank that was the credit card issuing bank who, in turn,

15    charged the -- the plaintiff.

16            So the plaintiffs were indirect purchasers with

17    respect to that price fix.  And the Court said in that case

18    we're talking about a price fixing agreement.  Unless you're

19    saying that the card-issuing bank conspired with the -- with

20    the -- the banks that set the interchange fee to -- to a price,

21    you don't fit within the co-conspirator exception, if you want

22    to call it that, to *Illinois Brick*.

23            That's not this case.  This case is not a price

24    fixing case in that sense at all.  This is an output

25    restriction case, which has an effect of raising prices, but

```
 1   the -- the restriction and the prices are felt directly in the

 2   first instance by the subscriber.

 3              This is not a case where the NFL conspires to charge

 4   an excessive price to the -- to DirecTV which is then passed on

 5   by DirecTV to the consumer.

 6              THE COURT:  No.  I get that.

 7              MR. SELTZER:  That -- that would be a price fixing

 8   case, and that would be more in line with what the ATM case was

 9   like.  That's not this case.

10              And similarly, the Kingray decision that was cited

11   where Court made a ruling about indirect purchasers under

12   Illinois Brick, that was the allegation of the plaintiffs.

13   They were challenging as their fourth claim a horizontal

14   agreement and that the overcharge effectively was passed on

15   through DirecTV to the plaintiffs.

16              The reason why the Illinois Brick rule exists is

17   that when you're talking about a pass-on of a price fix, you've

18   got difficult questions sometimes of apportionment, determining

19   what amount of the price was -- of the overcharge was passed

20   on.  You've got problems of proof that -- that make it a very

21   complicated kind of case where you're talking about pass-ons.

22              So the Supreme Court said in order to make the

23   antitrust laws as effective as possible, we'll say that the

24   direct purchaser is the one who's got the claim, even if he

25   does pass on the overcharge to his customer.
```

 1           That's the reason for *Illinois Brick*.  It doesn't

 2   apply in this context.  In fact, the language in the *ATM*

 3   decision, if I get that -- one second, Your Honor.  I misplaced

 4   it for a second.  But there is language in that decision.

 5           Here it is, Your Honor.  The Court said -- this is

 6   at -- it's on page 755 or so of the decision, which is at

 7   688 F.3d.  "Based on our precedent in *Kendall* and *Shamrock*

 8   *Foods*, we recognize the co-conspirator exception only when the

 9   conspiracy involves setting the price paid by the plaintiffs.

10   Therefore, as the District Court concluded, the exception does

11   not apply because the theory of recovery depends on pass-on

12   damages.  We decline to extend the co-conspirator exception

13   further.  As in *Kendall*, plaintiffs 'run into the

14   *Illinois Brick*' wall because plaintiffs do not pay the

15   interchange fees directly and the bank defendants independently

16   set the foreign ATM fees."

17           So again, the theory there was a pass-on theory.

18   The plaintiffs said, well, these guys were -- that we deal with

19   were conspirators with the other defendants.  But the Court

20   said there's no claim that there's an agreement on the prices

21   to be charged to the -- to the plaintiffs in the context of a

22   price fixing case.  That's not this context here.

23           This context is where, as a result of these

24   interlocking agreements, the price that is charged to the

25   plaintiff directly by Direct -- by DirecTV is a function of the

 1   restriction of output.  And where the object and the purpose of

 2   this whole set of restraints is to restrict output, the

 3   plaintiff is the direct purchaser with the right to sue for

 4   whatever damages are sustained as a consequence of that

 5   restriction of output.

 6          That's -- that's the critical difference between the

 7   cases.  And the Supreme -- the Ninth Circuit wasn't, I don't

 8   think, trying to establish a rule that says anytime there's a

 9   vertical agreement, a non-price agreement between a

10   manufacturer and distributor, that means the customer doesn't

11   have a claim for the antitrust violation when there's an

12   antitrust -- an anti-competitive effect from that kind of

13   agreement.  That -- the Circuit says nothing of that sort.

14          Now, a couple of cases have been cited by counsel.

15   One is the *Brantley* decision.

16          THE COURT:  Yep.

17          MR. SELTZER:  The *Brantley* decision is one that

18   involved an attack on program bundling at two levels of

19   distribution made by producers and then by the providers of

20   cable TV service, et cetera.

21          And in that case, the issue was whether or not those

22   agreements operated to foreclose competition, whether they have

23   an anti-competitive effect.  And after the plaintiffs took some

24   discovery, they disclaimed any foreclosure effect from those

25   agreements.

1              And the Court then granted summary judgment --

2    actually, it may have been on the -- I'm not sure if it was in

3    the pleadings or on summary judgment -- but granted dismissal

4    of the case, saying that where there is no claim here, that

5    these -- these vertical arrangements, which are all separate

6    and independent of one another between the programmers and the

7    cable TV show -- the cable channels and their customers, that

8    there was nothing that foreclosed somebody else from competing

9    to provide other programming to the -- to the subscribers.  And

10   in that circumstance, there was no injury to competition.  That

11   was the essence of the holding in that case.

12             Another case that's cited -- and it's been cited

13   repeatedly in the papers, and I don't know why.  This is the

14   *Rutman Wine* case.

15             THE COURT:  Yep.

16             MR. SELTZER:  That's a case involving a wine

17   distributor in Cuyahoga County, Ohio, who was a longtime

18   distributor on a non-submissive basis of Gallo Wines.

19             THE COURT:  Right.

20             MR. SELTZER:  And there was another distributor out

21   there also distributing Gallo Wines.  And they -- the plaintiff

22   claimed that first, you know, he was being mistreated because

23   the other distributor got preferential treatment.  So there was

24   a Robinson-Patman Act claim, but then he was ultimately

25   terminated.  And he said my termination constitutes a violation

```
1    of the antitrust laws.

2              Well, the facts were there was no market power of

3    Gallo Wines in that district and no showing of it at all, that

4    all you had really was replacing one distributor with another.

5    And the antitrust laws have said that when that happens,

6    there's no market effect from replacing one distributor with

7    another distributor.  But had the plaintiffs come forward and

8    shown that there was an anticompetitive effect from that

9    termination, that could cause a violation of the antitrust

10   laws.

11             The way the arguments are here represented,

12   Your Honor, is that there was some sort of a rule of -- a

13   subsequential, per se, legality to a joint licensing agreement

14   and then, per se, legality to an exclusive distribution

15   agreement, here between the NFL and DirecTV.  There is no such

16   rule.

17             The agreements have to be examined in light of their

18   market facts to determine whether they, in fact, injured

19   competition and harmed consumers.  That's a fact question but

20   one that's a presentable analysis of the market facts here.

21   And we've alleged the market facts to a fare-thee-well,

22   comparing what happens here in the U.S. with what happens in

23   Canada with Sunday Ticket itself, what happened to college

24   football games after the restraints were lifted, what's

25   happened in other cases where similar restraints are lifted,
```

```
 1   and the experience in the Laumann and the Garber cases.

 2              So what we have here is a demonstration that this

 3   market, the market for watching these games, which is what

 4   we've alleged, is being harmed by this agreement -- by these

 5   series of interrelated agreements.  That's what the case is

 6   about.

 7              And it is not accurate to say that, well, you know,

 8   you can license, you know, or not license if you don't want to.

 9   Fine.  You know, a person that holds a patent doesn't have to

10   grant a license to somebody to -- to the patent.

11              But that rule has to then be placed into context.

12   There are circumstances where, based upon the market facts,

13   somebody can be held liable under the antitrust laws based on

14   their licensing practices.  It happens all the time.  That's --

15   that's a very, very common kind of case.

16              And the Courts have recognized that repeatedly, that

17   just because you have licensing rights to intellectual property

18   doesn't give you freedom to violate the antitrust laws by

19   virtue of how you set up your distribution arrangements.  The

20   cases are legion going back to the 1920s, the '30s, the '40s,

21   all the way to present.

22              So that's -- that's the situation here now.

23              Now, one last point on the Spinelli case, which is

24   one of the cases that they rely on.

25              THE COURT:  Yep.
```

1              MR. SELTZER:  The principle and the first basis for

2     the decision in that case was these photographer plaintiffs

3     lacked standing under what's called the efficient enforcer

4     rule.  They were not efficient enforcers of the antitrust laws.

5              What the District Court said is that if there is an

6     antitrust violation here by virtue of whatever the joint

7     arrangements are with the clubs and the licensing of commercial

8     licenses, the -- there are two different sets of plaintiffs who

9     exist out there who would be more efficient enforcers.  One

10    would be competitors of getting an AP, and the other ones would

11    be getting an AP themselves.  They're the ones who could

12    challenge the legality in those agreements -- illegality of

13    those agreements.  And these plaintiffs were not the right

14    plaintiffs to make that challenge.  That's the first ground of

15    the decision.  And there were multiple other distinctions in

16    that case as well, Your Honor.

17             Well, I think --

18             THE COURT:  I want to ask you one question about

19    your Section 2 claim, which is --

20             MR. SELTZER:  Yes.

21             THE COURT:  -- an exclusive distribution agreement

22    is not sufficient by itself to establish specific intent to

23    monopolize.  And where in your Complaint is there a fact that

24    evidences a specific intent to monopolize or a reasonable

25    inference from a fact rather than a conclusion?

1          MR. SELTZER:  I think the same facts that we allege

2     and that support a Section 1 violation support the Section 2

3     violation.  The monopolization claim fits those facts under the

4     rubric of whether or not this is something that tends to

5     monopolize or does monopolize the market of the sale of the

6     broadcast of these games and the sale to plaintiffs of the

7     ability to see these games.

8               That monopolization is, again, something you look at

9     in terms of the overall facts.

10              Look, for example, at the position of the NFL.  The

11    NFL is -- is unique in many respects, in terms of its

12    viewership, its ability to command high prices for seats, for

13    all different -- all different reasons why professional

14    football games are unique.

15              This is, in effect, monopolizing a market in the --

16    in the viewership of those games.  And that is something that

17    is -- is actionable in Section 2.

18              All the arguments that you heard about Section 2,

19    they say -- and that's how I read their brief.  They stand or

20    fall on whether or not we've got a claim under Section 1.  So

21    if we have a claim under Section 1, we've got a claim under

22    Section 2.  They don't make a separate Section 2 argument, at

23    least that I detected in their motion papers.

24              THE COURT:  Okay.  All right.

25              MR. SELTZER:  Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Seltzer.

2          MR. LEVY:  Your Honor, you've been very patient, and

3    I intend to be very brief.

4          THE COURT:  Okay.

5          MR. LEVY:  I want to start where we began earlier in

6    the day, and that is on the question of output, how do you

7    define "output."

8          Plaintiffs' opposition brief, page 10, Note 11,

9    defines "output," as Mr. Seltzer just said, as "viewership."

10   Now, it's hard for me to imagine how there can be an allegation

11   that the Sunday Ticket arrangements in some way restrain

12   viewership.

13         For reference, I'd invite Your Honor's attention to

14   the *Kingray* case that Mr. Seltzer addressed as well.  On

15   page 1195 of the *Kingray* case, 188 F.Supp.2d 1195, the Court

16   recites, "In contrast to the plan in NCAA," the Board of

17   Regents case, "which limited the number of broadcasts

18   permitted, beginning in the '94-'95 season, the NBA League Pass

19   has made available for purchase 'up to forty out-of-market

20   regular season NBA games per week and more than 1,000 regular

21   season games per year.'  Accordingly, output of out-of-market

22   NBA games increased by virtue of the NBA League Pass, rather

23   than decreased."

24         That's exactly what happened in connection with the

25   Sunday Ticket as well.

 1            Then the Court goes on in *Kingray* to say this,

 2   "Plaintiffs have not cited, nor is the Court aware of, any

 3   authority indicating" when the defendant -- "that when a

 4   defendant offers a new product in a competitive manner (e.g.,

 5   all out-of-market games via the NBA League Pass), a party can

 6   allege a Section 1 violation on the basis that the product is

 7   not being offered in the manner that plaintiffs would prefer."

 8            There, they were talking about out-of-market games

 9   in a non-bundled format.

10            The Court goes on and concludes, "Antitrust laws are

11   to ensure that competition is not unlawfully harmed; economic

12   market forces will dictate whether the product will be

13   successful."

14            So on the issue of viewership -- and we've quoted

15   some of the numbers for you early in our brief.  The extent to

16   which the NFL, as Mr. Seltzer has said, is unique in terms of

17   the vast extent of its dealership, the suggestion that Sunday

18   Ticket has in one way or another diminished or restrained that

19   viewership just doesn't hold water.

20            Second, and related, there is no dispute here that

21   the NFL shows some games -- NFL and DirecTV shows some games in

22   every location in every Sunday afternoon window.  And that --

23            THE COURT:  And it also, does it not, show every

24   game in some locations?

25            MR. LEVY:  Absolutely, Your Honor.  It shows every

1    game -- every game is available on free over-the-air TV.  Every

2    game.

3             And the -- as I indicated earlier, the fan who lives

4    in Los Angeles has the choice usually of three, sometimes of

5    four games on Sunday afternoon.  Mr. Seltzer's dispute is

6    whether -- over whether the fan gets to watch the games he

7    wants to watch.

8             THE COURT:  Right.

9             MR. LEVY:  And that issue of choice is not an

10   antitrust issue.

11            Now, let me -- let me turn to the argument about --

12   with reference to the question of who owns the copyrights.  And

13   here, again, we have to distinguish -- and I tried to do that

14   early in my presentation earlier this afternoon.  We have to

15   distinguish between the live athletic competition on the field

16   and the game feeds.

17            The game feeds are what is broadcast over the air.

18   The game feeds are what DirecTV is authorized to redistribute

19   to its subscribers.  And the copyright -- the NFL clubs never

20   owned a copyright in the game feeds.

21            And for that, we have support in the *Washington*

22   case, which Mr. Seltzer dismissed.  But here -- this is from

23   880 F.Supp.2d at 10 -- 1006.  "Here, unlike in *American Needle*,

24   the intellectual property involved is historical" --

25   "historical football game footage, something that the

```
1    individual teams do not separately own and never have

2    separately owned.  Rather, the NFL owns the game footage,

3    either alone or in conjunction with the teams involved in the

4    game being filmed.  These entities must cooperate to produce

5    and sell those images; no one entity can do it alone."

6              Now, that is fundamentally different, Your Honor, I

7    would submit, from the Laumann case and the Garber case on

8    which Mr. Seltzer relied.  Judge Scheindlin in that case said

9    repeatedly in her opinion that the -- that the ownership

10   interest in the individual games initially belonged to the

11   individual NHL and Major League Baseball clubs.  And there are

12   references to that at 907 F.Supp.2d 473 and 485.

13             Well, that may be the case in baseball, it may be

14   the case in hockey, but it's not true in football, as the

15   Washington case makes clear.  The NFL clubs never owned

16   individually the game -- copyright interest in the game feeds

17   that are distributed.

18             Third, let me say something about the Shaw case.

19   I'll note simply at the outset that the Shaw case predates

20   Twombly.  But in Shaw, the argument that we -- that the

21   defendants made in that case was that the Sports -- Sports

22   Broadcasting Act protected the vertical agreement, the alleged

23   vertical restraint, the deal between the NFL and DirecTV.

24   We're not making that argument here.

25             The only reliance we place on the Sports
```

 1  Broadcasting Act is to make clear that the horizontal

 2  agreement, the pooling of the rights by the NFL clubs to

 3  license to Fox and CBS, is protected by the Sports Broadcasting

 4  Act.  We're not arguing that the Sports Broadcasting Act

 5  protects the resulting vertical arrangement.

 6          THE COURT:  I didn't understand you to be arguing

 7  that.

 8          MR. LEVY:  Pardon?

 9          THE COURT:  I did not understand you to be arguing

10  that the SBA protects the vertical.  I understood you to be

11  arguing the former.

12          MR. LEVY:  Okay.  And now just to sort of close

13  the -- close the loop here.

14          THE COURT:  Okay.

15          MR. LEVY:  I want to go back to the final point, the

16  *Musical Instruments* point --

17          THE COURT:  Okay.

18          MR. LEVY:  -- and the need to separately look at the

19  vertical and horizontal restraints.

20          THE COURT:  Okay.

21          MR. LEVY:  It's not just *Musical Instruments* and

22  hub-and-spokes that we're talking about.  The same principle is

23  reflected in the *Spinelli case*, which is about as close to this

24  case as I think you can find in the football context, and the

25  *Kingray* case, which is a sports broadcasting case, very similar

1    to this one here.

2            In both instances, the Courts following the dictate

3    of the Ninth Circuit in *Musical Instruments* separately analyzed

4    the vertical and the horizontal restraints.  And I respectfully

5    submit that if Your Honor were to do so, you would conclude

6    that there is no restraint here and that the Complaint should

7    be dismissed.

8            THE COURT:  And Mr. Seltzer says to me, Judge, those

9    cases are price fixing cases.  They're distinguishable here.

10   That's not what we've alleged.  Any response to that?

11           MR. LEVY:  *Musical Instruments* doesn't say anything

12   about the principle being limited to price fixing.  *Spinelli*

13   and *King* -- *Kingray* don't say anything about price fixing.

14           But the underlying principle is this:  The legal

15   standards, the antitrust principles that apply to vertical

16   restraints, are different from the antitrust principles that

17   apply to horizontal restraints.  And that doesn't -- that isn't

18   limited to price fixing cases.

19           In order to properly apply the antitrust principles,

20   you have to separate the two.  And that's true whether the

21   horizontal restraint is a price fixing case or whether it's

22   something else.

23           THE COURT:  Well, but he says you can't separate

24   them because -- well, he must have said about 12 times, web of

25   agreements.  And that's what distinguishes this from, says he,

1    the *Kingray* case.

2            MR. LEVY:  Well, Your Honor, he -- in saying that,

3    he is simply conflating the analysis of the vertical agreement

4    and the analysis of the horizontal agreement.

5            The alleged horizontal agreement covers only the

6    pooling of the rights and the agreement with Fox and CBS that

7    results in the copyright ownership of the game feeds being

8    vested in the NFL.  That's what -- the NFL at that point is

9    free to license its rights, sell them to DirecTV, sell them to

10   multiple distributors if it wants.  But it's a separate

11   analysis as to whether the redistribution, the sale of those

12   broadcast feeds or the licensing of those broadcast feeds, to

13   others is separate and distinct from the pooling of the rights

14   that is protected by the SBA and leads to the NFL owning the

15   copyright and the -- and the ownership of those feeds.

16           That's all I have, Your Honor.  Thank you very much

17   for your patience.

18           THE COURT:  All right.  Thank you, folks.  The

19   matter will be submitted.

20           We'll be in recess.

21           (Proceedings concluded at 4:39 p.m.)

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

          DATED THIS 6TH DAY OF MARCH, 2017.

                    /S/ MYRA L. PONCE
     _____
          MYRA L. PONCE, CSR NO. 11544, CRR, RDR
              FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**