REDACTED

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | **ML 15-02668-BRO (JEMx)** | Date | June 30, 2017 |
|---|---|---|---|
| Title | **IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION** **THIS DOCUMENT RELATES TO: ALL ACTIONS** | | |

Present: The Honorable    **BEVERLY REID O'CONNELL, United States District Judge**

| Cheryl Wynn | Not Present | N/A |
|---|---|---|
| Relief Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**       (IN CHAMBERS)

## ORDER RE THE NFL DEFENDANTS' MOTION TO DISMISS [170]

## I.       INTRODUCTION

Pending before the Court is the National Football League ("NFL") Defendants'[1] Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("CAC"). (*See* Dkt. No. 170 (hereinafter, "Mot.").) After considering the papers filed in support of and in opposition to the instant Motion, as well as oral argument of counsel, for the reasons set forth below, Defendants' Motion is **GRANTED**.

//

//

---

[1] The NFL Defendants in this action consist of: Arizona Cardinals, Inc.; Atlanta Falcons Football Club LLC; Baltimore Ravens Limited Partnership; Buccaneers Limited Partnership; Buffalo Bills, Inc.; Chicago Bears Football Club Inc.; Cincinnati Bengals, Inc.; Cleveland Browns LLC; Dallas Cowboys Football Club, Ltd.; Denver Broncos Football Club; Detroit Lions, Inc.; Football Northwest LLC; Green Bay Packers, Inc.; Houston NFL Holdings LP; Indianapolis Colts Inc.; Jacksonville Jaguars Ltd.; Kansas City Chiefs Football Club, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club LLC; NFL Enterprises LLC; National Football League, Inc.; New England Patriots, LP; New Orleans Louisiana Saints LLC; New York Football Giants, Inc.; New York Jets Football Club, Inc.; Oakland Raiders LP; PDB Sports Ltd.; Panthers Football LLC; Philadelphia Eagles Football Club, Inc.; Pittsburgh Steelers Sports, Inc.; San Diego Chargers Football Co.; San Francisco Forty Niners Ltd.; Tennessee Football, Inc.; The Rams Football Company LLC; and, Washington Football Inc. (*See* Dkt. No. 163 ¶ 29.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION | | | |
| | THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

## II.   BACKGROUND

### A.   Factual Background

#### 1.   The Action and the Parties

This action was initially brought as twenty-seven related class actions against various NFL Defendants, various DirecTV entities, CBS Corporation ("CBS"), Fox Broadcasting Company ("Fox"), NBCUniversal Media, LLC ("NBC"), and ESPN, Inc. ("ESPN").  (*See* Dkt. No. 142 (hereinafter, "Order") at 1 & n.1.)  On May 23, 2016, this Court consolidated these actions and ordered the plaintiffs to file a CAC.  (Order at 5–6.)  On June 24, 2016, Plaintiffs Ninth Inning Inc., doing business as The Mucky Duck ("The Mucky Duck"), 1465 Third Avenue Restaurant Corp., doing business as Gael Pub ("Gael Pub"), Robert Gary Lippincott, Jr. ("Mr. Lippincott"), and Michael Holinko ("Mr. Holinko")[2] filed the operative CAC.  (*See* Dkt. No. 163 (hereinafter, "CAC").)

Plaintiffs allege that the exclusive agreement between the NFL and DirecTV, through which DirecTV has created its "Sunday Ticket" programming product and is given the exclusive rights to broadcast all NFL games that are not shown on a broadcast television station within any given geographical area, is anticompetitive and violates the Sherman Act.  (*See id.*)  Plaintiff The Mucky Duck is a pub located in San Francisco, California, that has purchased Sunday Ticket from DirecTV to attract customers on Sunday afternoons during the NFL season.  (CAC ¶ 24.)  Plaintiff Gael Pub is a pub located in New York, New York that has also purchased Sunday Ticket to attract patrons. (CAC ¶ 25.)  Mr. Lippincott and Mr. Holinko are Healdsburg, California, and Belle Mead, New Jersey residents respectively, who have purchased Sunday Ticket to watch out-of-market Sunday afternoon NFL games.  (CAC ¶¶ 26, 27.)

Plaintiffs bring this action against the NFL Defendants, DirecTV Holdings LLC, and DirecTV, LLC.[3]  (*See* CAC ¶¶ 29, 34, 35.)  Until 2015, the NFL was an

[2] The Court will refer to The Mucky Duck, Gael Pub, Mr. Lippincott, and Mr. Holinko collectively as "Plaintiffs."

[3] The Court will refer to DirecTV Holdings, LLC and DirecTV, LLC collectively as the "DirecTV Defendants" and will refer to the NFL Defendants and DirecTV Defendants collectively as "Defendants."

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

unincorporated association of thirty-two professional American football teams, with each team being separately owned and operated and headquartered in different cities across the country.  (CAC ¶ 28.)  In or about 2015, the NFL incorporated as the National Football League, Inc., with its headquarters in New York, New York.  (CAC ¶ 30.)  NFL Enterprises, LLC was also organized to hold the broadcast rights of the thirty-two NFL teams and to license them to various Multichannel Video Programming Distributors ("MVPDs").  (*Id.*)  Through the NFL, the thirty-two teams set game rules and a game schedule and divide their teams into geographic territories.  (CAC ¶ 31.)  According to Plaintiffs, the teams have allowed the NFL to negotiate television contracts with national broadcasters on their behalf, including the broadcast of each team's games outside of its home territory.[4]  (*Id.*)  Defendant DirecTV Holdings LLC is a Delaware limited liability company with its principal place of business in El Segundo, California.  (CAC ¶ 34.)  DirecTV Holdings LLC is a digital television provider with, according to Plaintiffs, approximately 20.4 million subscribers as of December 31, 2014.  (*Id.*)  DirecTV, LLC is a California limited liability company with its principal place of business also in El Segundo, California, that issues bills to its subscribers.  (CAC ¶ 35.)

The NFL is the most significant provider of professional football within the United States and receives approximately $6 billion annually in television revenue.  (CAC ¶¶ 37–38.)  In 2011, the NFL negotiated nine-year extensions to preexisting contracts with Fox, CBS, and NBC.  (CAC ¶ 38.)  Plaintiffs claim that, according to an August 2014 Bloomberg report, ESPN, Fox, CBS, and NBC pay $1.9 billion, $1.1 billion, $1 billion, and $950 million per year respectively for the right to broadcast NFL games.  (*Id.*)  Further, in October 2014, the NFL and DirecTV entered into a telecasting deal worth approximately $1.5 billion per year.  (CAC ¶ 39.)

## 2.  Class Action Allegations

Plaintiffs bring this class action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and two classes, described as the following:

All DirecTV commercial subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011

---

[4] Only approximately six games are shown on broadcast television each week, and the games shown depends on the location of the broadcast.  (*See* CAC ¶ 8.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

and the present ("Commercial Class"). The Commercial Class excludes the Defendants and any of their current or former parents, subsidiaries or affiliates. The Commercial Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

All DirecTV residential subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the present ("Residential Class"). The Residential Class excludes the Defendants and any of their current or former parents, subsidiaries or affiliates. The Residential Class excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

(CAC ¶ 40.) The Mucky Duck and Gael Pub represent the Commercial Class, while Mr. Lippincott and Mr. Holinko represent the Residential Class. (CAC ¶¶ 41–42.)

Plaintiffs claim that the relevant geographic market for both classes is the United States. (CAC ¶ 53.) In addition, Plaintiffs allege that the relevant product market is the live video presentations of regular season NFL games, with a submarket for "out-of-market" games. (*Id.*) NFL games broadcast locally on CBS and Fox on Sunday afternoons are distinct from the multi-game and out-of-market Sunday Ticket offerings. (*Id.*) Further, Plaintiffs claim that new entrants that would dilute the market power over NFL video broadcasts are extremely unlikely, because it "would require the creation of a new professional league playing American football." (CAC ¶ 54.) As Plaintiffs explain, past attempts to establish other professional football leagues have generally failed. (*See* CAC ¶¶ 54–57.) Thus, according to Plaintiffs, the NFL's monopoly power will be tempered only if Sunday Ticket and the corresponding agreement is broken up through antitrust authority. (CAC ¶ 58.)

### 3.    Factual Background

Today, the thirty-two NFL teams have granted the NFL the right to negotiate pooled television rights on their behalf. (CAC ¶ 81.) According to Plaintiffs, this has led to broadcasting NFL games in two principal ways. (CAC ¶ 82.) First, the NFL and its teams sell their rights to broadcast (or "over-the-air") and cable networks. (CAC ¶ 83.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | **ML 15-02668-BRO (JEMx)** | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | **IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION** | | | |
| | **THIS DOCUMENT RELATES TO: ALL ACTIONS** | | | |

Currently, the NFL contracts with five networks: NBC, Fox, CBS, ESPN, and its own NFL Network. (*Id.*) For games that occur on Sunday, CBS holds the exclusive rights to broadcast American Football Conference ("AFC") games, while Fox has the exclusive rights to broadcast National Football Conference ("NFC") games. (CAC ¶ 84.) In addition, there is typically one game on Sunday, Monday, and Thursday nights that is licensed exclusively to NBC, ESPN, and the NFL Network, respectively. (*Id.*) Though multiple games take place on Sunday, the NFL works with CBS and Fox and determines which games will be broadcast in which locations, with usually only one game available at a time in any given location or market. (*Id.*) Games take place in either a 1:00 p.m. Eastern Standard Time ("EST") or a 4:25 p.m. EST time slot, and every week either Fox or CBS has the right to air a game in one time slot, while the other network has the right to air a game in both time slots. (*Id.*) The right to air two games, rather than one game, alternates every week. (*Id.*) Thus, Plaintiffs allege, that on any given Sunday afternoon during football season, there are no more than two regular season football games airing in one location, though there may be as many as seven games occurring simultaneously. (CAC ¶ 85.) Altogether, only six games are broadcast on television in any given week in any one market, which, Plaintiffs claim, has the effect of making the rights more valuable to broadcasters by charging more for advertising and affiliation fees. (CAC ¶ 86.)

Beginning in 1994, pursuant to an exclusive agreement with the NFL, DirecTV offered its subscribers "Sunday Ticket," which provided access to Sunday afternoon games that were not otherwise available in their geographic market. (CAC ¶ 89.) Today, DirecTV takes the live game telecast feeds produced by CBS and Fox redistributes them to Sunday Ticket subscribers via DirecTV channels. (CAC ¶ 90.) Thus, if someone wishes to view these out-of-market games, they must subscribe to Sunday Ticket (or, in some circumstances, purchase an online Sunday Ticket live streaming package from DirecTV).[5] (CAC ¶ 91.) The contracts between the NFL and DirecTV are negotiated on behalf of the league and ratified by a vote of the members of the league. (CAC ¶ 92.)

Plaintiffs claim that the NFL and DirecTV's exclusive arrangement results in Sunday Ticket subscribers paying a higher price for Sunday Ticket than they would otherwise pay if the agreements were negotiated competitively. (CAC ¶ 94.) Further,

---

[5] Sunday Ticket has additional components, including "NFL Sunday Ticket Max," which includes the "Red Zone Channel, DirecTV Fantasy Zone Channel, and NFL.com fantasy." (*See* CAC ¶ 97 (internal quotation marks omitted)).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

Plaintiffs claim that the NFL and its teams' agreement to pool broadcasts constitutes a horizontal supply restriction. (CAC ¶ 99.) According to Plaintiffs, the harm this horizontal supply restriction has caused is evident in several ways, including that (1) the availability of football broadcasts on standard over-the-air and cable channels is vastly lower than it would otherwise be, and, (2) the output of NFL broadcasts is only one broadcast per game, compared to other major American sports leagues, where teams may produce two broadcasts of each game. (CAC ¶¶ 100–01.) Further, Plaintiffs aver that these restrictions result in inflated prices for Sunday Ticket. (CAC ¶ 102.) For the 2015 season, for instance, DirecTV charged individual subscribers approximately $359 for a full season of Sunday Ticket and commercial subscribers paid between $1,458 to more than $120,000. (*Id.*) In addition, Sunday Ticket prices increase every year, including most recently, approximately 11.5% from the 2014 to 2015 season. (*Id.*) Plaintiffs claim that but for the agreement to pool the NFL games, each team would create its own broadcasts and sell those broadcasts on their own, which would create a competitive marketplace that would remain profitable for the teams, but would drive down prices for consumers. (CAC ¶ 103.) Moreover, Plaintiffs allege that the NFL's exclusive distribution agreement is not required to assure quality of the broadcast of games, but was "created to artificially raise the price of Sunday Ticket." (CAC ¶ 107.)

Plaintiffs also claim that DirecTV participates in and facilitates the horizontal agreements amongst the NFL teams. (CAC ¶ 114.) According to Plaintiffs, DirecTV requires the NFL and the teams to maintain and expand their exclusive agreement, for example, by limiting online distribution of live games (though currently, those who cannot install DirecTV in their house may access Sunday Ticket online). (CAC ¶ 115.) Further, the NFL and its teams have licensed Sunday Ticket to more than a dozen satellite and cable providers in Canada, which Plaintiffs claim they could also have done in the United States were it not for DirecTV's demands. (*Id.*)

Plaintiffs aver that the output restrictions have no procompetitive benefits and that, even if they did, the same benefits could be achieved through less restrictive means. (CAC ¶ 119.) Plaintiffs contend that NFL broadcasting rights "are an extraordinarily valuable commodity." (CAC ¶ 120.) The Nielsen Company estimates that the 2014 regular NFL season reached approximately 202.3 million unique viewers. (*Id.*) Thus, Plaintiffs maintain that the NFL would have no problem maintaining viewership or game attendance without its horizontal restraint. (CAC ¶¶ 121–22.) Further, Plaintiffs allege

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

that the NFL's exclusive agreement with DirecTV has "a clear negative impact on competition, and serves no pro-competitive purpose." (CAC ¶ 126.) Instead, Plaintiffs maintain that less restrictive alternatives could achieve legitimate, procompetitive goals, such as permitting teams to contract individually with DirecTV and allowing other distributors to purchase and broadcast Sunday Ticket. (CAC ¶ 127.)

Accordingly, Plaintiffs bring two causes of action against Defendants: (1) violation of section 1 of the Sherman Act, (CAC ¶¶ 155–58); and, (2) violation of section 2 of the Sherman Act, (CAC ¶¶ 159–63). Specifically, Plaintiffs allege that Defendants have violated section 1 of the Sherman Act by agreeing to restrain competition in the licensing and distribution of live video presentations of NFL games with the purpose and effect of restraining trade and increasing prices paid by consumers and advertisers. (CAC ¶ 156.) Plaintiffs claim that Defendants have violated section 2 by monopolizing the live video presentation of regular season NFL games and making DirecTV the only source for the majority of NFL games. (CAC ¶¶ 160–62.)

B.     Procedural History

On December 10, 2015, the Judicial Panel on Multidistrict Litigation transferred the six actions pending at the time in the Central District of California and the Southern District of New York, as well as fifteen tag-along actions, to this Court "for coordinated or consolidated pretrial proceedings" under 28 U.S.C. § 1407. (Dkt. No. 1.) On January 29, 2016, Mr. Lippincott filed a Motion to Remand the action to the Superior Court of California, Sonoma County, (Dkt. No. 25), which the Court denied on March 28, 2016, (Dkt. No. 117). On February 1, 2016, the Court scheduled a Case Management Conference and set a briefing schedule for a Motion to Consolidate. (Dkt. No. 27.) The Court held the Case Management Conference on May 18, 2016, (Dkt. No. 140), and consolidated the actions on May 23, 2016, (Dkt. No. 142). Plaintiffs filed the CAC on June 24, 2016. (*See* CAC.) On August 8, 2016, the NFL Defendants filed the instant Motion to Dismiss, (*see* Mot.), along with several exhibits filed under seal, (Dkt. No. 169). On the same day, the DirecTV Defendants filed a Motion to Compel Arbitration.[6] (Dkt. No. 171.) On September 22, 2016, Plaintiffs filed their Opposition to the instant Motion, (Dkt. No. 184 (hereinafter, "Opp'n")), along with an objection to the exhibits

---

[6] Because the Court grants the NFL Defendants' Motion and dismisses the action, the DirecTV Defendants' Motion is **DENIED as moot**.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

that the NFL Defendants included along with their Motion, (Dkt. No. 188 (hereinafter, "Pls.' Objs.")).  On October 24, 2016, the NFL Defendants replied.  (Dkt. No. 199 (hereinafter, "Reply").)  The Court held a hearing on the instant Motion on February 13, 2017.  (Dkt. No. 227.)

## II.   EXTRINSIC EVIDENCE

As noted above, along with their Motion, the NFL Defendants included several declarations and exhibits, arguing that these documents are incorporated by reference into Plaintiffs' CAC.  (*See* Dkt. No. 169;



Plaintiffs object to the consideration of these documents when deciding the instant Motion.  (*See* Pls.' Objs.)

When considering a motion to dismiss, a court typically does not look beyond the complaint in order to avoid converting a motion to dismiss into a motion for summary judgment.  *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).  Notwithstanding this precept, when deciding a motion to dismiss, a court may properly "consider documents that are incorporated by reference but not physically attached to the complaint if they are central to the plaintiff's claim and no party questions their authenticity."  *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1134, 1137 (C.D. Cal. 2010).  A document is "incorporated by reference into a complaint if the plaintiff refers extensively to the document or the documents forms the basis of the plaintiff's claim."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  "The doctrine of incorporation by reference may apply, for example, when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan, . . . or when a plaintiff's claim about stock fraud is based on the contents of SEC filings . . . ."  *Id.* (citations omitted).  The Ninth Circuit has further applied the incorporation by reference doctrine

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION | | | |
| | THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

where the complaint does not mention a document, but "depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

The NFL Defendants allege that Plaintiffs have incorporated the proffered documents by reference into their CAC. ██████████   Plaintiffs argue that the CAC does not incorporate the documents by reference, but rather mentions them only generally and, regardless, that none of the proffered exhibits are complete. (*See* Pls.' Objs.) As explained below, the Court agrees with Plaintiffs as to Exhibits 1 and 2, but finds that Exhibits 3 and 4 are incorporated by reference.

First, as to Exhibits 1 and 2, the Court finds that it may not consider these documents here because Plaintiffs question their authenticity. *See Knievel*, 393 F.3d at 1076 ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ (Pls.' Objs. at 5.) The Court agrees. These ████████ appear to be unsigned, incomplete, and are clearly lacking large portions of their contents. *See Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 948 F. Supp. 2d 1131, 1143 (D. Haw. 2013) (refusing to incorporate only a portion of a contract "when the entire document may be important in deciding the issues in this case"); *see also Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (explaining that incorporation by reference is appropriate where "documents' authenticity is not contested"). As Plaintiffs have reasonably questioned the authenticity of Exhibits 1 and 2, the Court cannot consider them when deciding the instant Motion.

As to Exhibits 3 and 4, however, ████████████████████████████ ████████████████ are central to Plaintiffs' claims and Plaintiffs do not appear to reasonably question these exhibits' authenticity. First, while Plaintiffs do not explicitly reference the exact contents or details of these ████████, Plaintiffs' claims arise in significant part ████████████████████████████████████████████████ ████████████████ unlawfully violate the Sherman Act. (*See, e.g.*, CAC ¶¶ 10, 11, 39, 59, 92, 93, 96.) While Plaintiffs do not quote directly from the ████████

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

███████████████████████████████████████, Plaintiffs explicitly reference ████████████████████████████████████████████████████████████ ██████████████████████████████████. It is these █████████████ that form the basis of Plaintiffs' claims. Plaintiffs also argue that the NFL Defendants have not represented that the ████████████████████████████████████████████████████ ████████████████████████. (Pls.' Objs. at 1–2 & n.3.) But Plaintiffs do not explain what portion of ███████████████ the NFL Defendants have failed to include. Unlike Exhibits 1 and 2, neither Exhibits 3 nor 4 do not appear to be missing any portion, ████████████ ████████████, and they do not appear to have been redacted in any way. (*See* Dkt. Nos. 169-6, 169-7.) Therefore, the Court finds that Plaintiffs' claims are based on these documents and Plaintiffs have not questioned their authenticity. Accordingly, the Court considers Exhibits 3 and 4 incorporated by reference into the CAC and will consider them when deciding the instant Motion.

## III.  LEGAL STANDARD

Under Rule 8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). If a complaint fails to do this, the defendant may move to dismiss it under Rule 12(b)(6). Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557).

In ruling on a motion to dismiss for failure to state a claim, a court should follow a two-pronged approach: first, the court must discount conclusory statements, which are not presumed to be true; and then, assuming any factual allegations are true, the court

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

shall determine "whether they plausibly give rise to entitlement to relief." *See id.* at 679; *accord Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).  A court should consider the contents of the complaint and its attached exhibits, documents incorporated into the complaint by reference, and matters properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

Where a district court grants a motion to dismiss, it should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.").

## IV.   DISCUSSION

### A.   Plaintiffs' Section 1 Claim

#### 1.   The Nature of the Agreements Here

Plaintiffs' first claim arises under section 1 of the Sherman Act.  Section 1 provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.  Every person who shall make any contract or engage in any combination of conspiracy hereby declared to be illegal shall be deemed guilty of a felony . . . .

15 U.S.C. § 1; *see also Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989) (explaining that section 1 "prohibits conspiracies and agreements that unreasonably restrain trade").  However, "not every agreement that restrains competition violates the Sherman Act; rather, to be unlawful, the agreement must *unreasonably* restrain competition." *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1187 (S.D. Cal. 2002) (citing *McDaniel v. Appraisal Inst.*, 117 F.3d 421, 422 (9th Cir. 1997)).  "In analyzing the reasonableness of an agreement under § 1, the Supreme Court has distinguished between agreements made up and down a supply chain, such as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

between a manufacturer and a retailer ('vertical agreements'), and agreements made among competitors ('horizontal agreements')." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984) (defining a horizontal restraint as "an agreement among competitors on the way in which they will compete with one another").

"The unreasonableness of the agreement is analyzed under either a *per se* rule of illegality or a rule of reason analysis." *Id.* Per se violations are those that, on their face, have no purpose other than to stifle or restrict competition and decrease output. *See Rickards (D.A.) v. Canine Eye Registration Found.*, 783 F.2d 1329, 1332 (9th Cir. 1986) (citing *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 104). "The *per se* rule . . . eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work . . . ." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). "Classic examples include agreements among competitors to fix prices, divide markets, and refuse to deal." *In re Musical Instruments*, 798 F.3d at 1191.

"Agreements that are not presumed unreasonable under the *per se* category are analyzed under the 'rule of reason' test." *Kingray*, 188 F. Supp. 2d at 1187. Under the rule of reason test, a plaintiff must establish three elements: (1) an agreement or conspiracy between two or more persons or business entities; (2) through which the persons or entities intend to harm or restrain competition; and, (3) that actually does restrain competition. *See Thurman Indus.*, 875 F.2d at 1373. When analyzing a vertical agreement under the rule of reason test, the court must "take[] into account the fact that some vertical restraints may have procompetitive justifications that benefit consumers." *In re Musical Instruments*, 798 F.3d at 1192. Further, "[p]roving injury to competition ordinarily requires the claimant to prove the relevant geographic and product markets and to demonstrate the effects of the restraint within those markets." *Thurman Indus.*, 875 F.2d at 1373; *see also Kingray*, 188 F. Supp. 2d at 1187 ("An essential element of a Section 1 violation under the rule of reason is injury to competition in the relevant market." (quoting *All. Shippers, Inc. v. S. Pac. Transp. Co.*, 858 F.2d 567, 570 (9th Cir. 1988)).

//

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

### a.   Whether to View the Agreements as Separable or as an Interrelated Web

At first glance, Plaintiffs' section 1 claim appears to rely on two categories of agreements: (1) horizontal agreements amongst the NFL Defendants that unlawfully restrains trade by pooling their rights to license out-of-market broadcasts of live video presentations of NFL games; and, (2) a vertical exclusive distribution agreement between the NFL Defendants and the DirecTV Defendants.  (*See* CAC ¶¶ 155–58.)  Plaintiffs argue, however, that there is no separate horizontal agreements amongst the NFL teams; rather, "[t]he agreement with DirecTV is . . . an agreement between a firm that offers out-of-market games and a horizontal combination of teams."  (Opp'n at 8.)  At oral argument, Plaintiffs framed their argument slightly differently and suggested that the agreements could be considered a hub-and-spoke arrangement.  Whether considered an interrelated web or a hub-and-spoke conspiracy, however, the Court finds Plaintiffs' argument unpersuasive.

"A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes."  *In re Musical Instruments*, 798 F.3d at 1192.  In this case, as Plaintiffs' counsel explained at oral argument, Plaintiffs allege that the NFL teams contract with each other to grant their rights to the NFL, and the NFL, acting as the teams' agent, then contracts with DirecTV on the NFL teams' behalf.  Plaintiffs argue that, therefore, any agreement between the NFL, its teams, and DirecTV is "all part and parcel of one overall agreement."[7]  But  based on Plaintiffs' allegations and their explanation of the agreements at issue here, they have not alleged the existence of any spokes—i.e., competing "manufacturers" (i.e., NFL teams) who enter into agreements with a "hub" (i.e., DirecTV).  Likewise, there appears to be no interrelated web of agreements.  Rather, Plaintiffs concede that the NFL teams enter into an

---

[7] Though Plaintiffs have cited no authority for how to define a "web" of interrelated agreements, at oral argument, Plaintiffs discussed the "symbiotic" nature of the agreements, explaining that the agreements benefit both DirecTV and the NFL.  Nonetheless, even if the agreements are symbiotic and, when taken together, form one overarching intent to control the broadcasts of NFL games, this does not change the Court's conclusion that, for antitrust purposes, the Court should examine each portion of the overall agreement separately.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

agreement with the NFL, and it is the NFL who enters into an agreement with DirecTV. Therefore, this is not a hub-and-spoke situation or a situation where there is a web of interrelated agreements; instead there are two categories of agreements: a horizontal agreement (or agreements) amongst the NFL teams (as competitors with one another) and the NFL, and a vertical agreement between the NFL and DirecTV (as an agreement that goes up and down the supply chain), with no direct involvement from the NFL teams. A hub-and-spoke scenario or an inseparable web of agreements might arise if the NFL teams directly contracted with the NFL while simultaneously contracting with DirecTV on their own behalf; but that is not the situation here. Accordingly, the Court disagrees with Plaintiffs' characterization that the agreements at issue here are one interrelated, inseparable web of agreements or a hub-and-spoke conspiracy.[8]

The Ninth Circuit has noted that "the line between horizontal and vertical restraints can blur." *In re Musical Instruments*, 798 F.3d at 1192. Thus, where, as here, one alleged conspiracy may involve multiple types of agreements, or different relationships within one agreement, a court is required to break the conspiracy "into its constituent parts," and analyze "the respective vertical and horizontal agreements . . . either under the rule of reason or as violations per se." *Id.* Moreover, in *In re Musical Instruments*, the Ninth Circuit noted that "homespun metaphors for complex economic activities go only so far." *Id.* "Section 1 prohibits agreements that unreasonably restrain trade, no matter the configuration they take or the labels we give them." *Id.* In fact, "[a] hub-and-spoke conspiracy is simply a collection of vertical and horizontal agreements." *Id.* "And once the conspiracy is broken into its constituent parts, the respective vertical and horizontal agreements can be analyzed either under the rule of reason or as violations per se." *Id.* Thus, even if Plaintiffs were correct and the agreements here constituted a hub-and-spoke conspiracy or a web of agreements between the parties, the Ninth Circuit has instructed

---

[8] To the extent Plaintiffs cite other cases in which courts have analyzed similar "webs" of agreements, the Court finds these cases support the proposition that agreements should be analyzed separately based on their constituent parts. *See Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 485–88 (S.D.N.Y. 2012) (analyzing a variety of horizontal and vertical agreements amongst sports teams, professional sports leagues, regional sports networks, and MVPDs separately though the plaintiffs alleged "a multi-level conspiracy"); *Shaw v. Dall. Cowboys Football Club, Ltd.*, No. CIV.A. 97-5184, 1998 WL 419765, at *3 (E.D. Pa. June 23, 1998), *aff'd* 172 F.3d 299 (3d Cir. 1999) (noting that the plaintiffs' allegations challenged only "an agreement among the clubs [i.e., the NFL teams] and the NFL" to raise prices and limit output).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

that where there are multiple agreements involved, the court is to analyze each separately. Therefore, the Court will analyze the horizontal agreements amongst the NFL teams and the NFL (as one category) and the vertical agreement between the NFL and DirecTV (as a second category) separately under any circumstance.

### b.    Whether the Rule of Reason or the Per Se Rule Applies

Courts have applied the rule of reason test both when examining horizontal agreements amongst professional sports teams and when examining vertical agreements. *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1069 (9th Cir. 2015) (explaining that agreement amongst athletic associations should be analyzed under the rule of reason rather than applying a per se rule); *In re Musical Instruments*, 798 F.3d at 1191 (holding that vertical agreements are analyzed under the rule of reason); *see also Bd. of Regents of Univ. of Okla.*, 468 U.S. at 101 (applying the rule of reason when addressing an agreement amongst NCAA athletic teams because the agreement "involves an industry in which horizontal restraints on competition are essential if the product is to be available at all").  Thus, both the horizontal agreements between the NFL teams and the NFL and the vertical agreement between the NFL and DirecTV are analyzed using the rule of reason test.[9]  Accordingly, the Court applies the rule of reason test here and examines the anticompetitive effects of the agreements along with the justifications for those effects.  The Court will first address the vertical agreement between the NFL and DirecTV and will then turn to the horizontal agreements amongst the NFL and the NFL teams.

### 2.    The Vertical Agreement Between DirecTV and the NFL

As to the vertical agreement between the NFL and DirecTV, the NFL Defendants argue that Plaintiffs have failed to state a viable claim because Plaintiffs do not have antitrust standing to challenge the agreement and because Plaintiffs have failed to adequately allege facts indicating that any agreement between Defendants has an anticompetitive effect.  The Court will address each argument in turn.

---

[9] Moreover, it appears that Plaintiffs agree with this conclusion, as they do not allege in the CAC, do not argue in their Opposition, and did not argue at oral argument that the per se rule should apply.  (*See* CAC; Opp'n.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

### a.      Whether Plaintiffs Have Antitrust Standing

First, the NFL Defendants argue that Plaintiffs lack antitrust standing to challenge the vertical agreement between DirecTV and the NFL.  Plaintiffs are seeking to recover damages against Defendants pursuant to section 4 of the Clayton Act.  (*See* CAC ¶ 21); *see also* 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.").  "[I]n order to have standing to bring an antitrust claim, a plaintiff 'must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Novation Ventures, LLC v. JG Wentworth Co.*, 156 F. Supp. 3d 1094, 1100 (C.D. Cal. 2015) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  To establish antitrust standing, a plaintiff must "be a participant in the same market as the alleged malefactors," and the plaintiff must "have suffered its injury in the market where competition is being restrained."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999).  "In determining whether a plaintiff has antitrust standing, courts must evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them."  *Kingray*, 188 F. Supp. 2d at 1198 (internal quotation marks omitted).

The NFL Defendants argue that Plaintiffs' alleged injury—inflated prices for the purchase of live NFL game broadcasts—occurs in a different market than the vertical agreement between DirecTV and the NFL.  (Mot. at 19–20.)  "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."  *Am. Ad Mgmt.*, 190 F.3d at 1057.  Here, Plaintiffs allege that the relevant market is "the live video presentations of regular season NFL games."  (CAC ¶ 53.)  According to the NFL Defendants, consumers purchasing live broadcasts of NFL games occurs in a different market than the sale of those broadcast rights at the distribution level.  The Court disagrees; rather, they are two sides of the same coin.

The NFL Defendants attempt to define the two separate markets as "broadcast rights" and as "live video presentations," (Mot. at 19); in other words, the NFL sells the broadcast rights to the live games to DirecTV, and then consumers purchase live video presentations from DirecTV.  However, the more appropriate definition of the relevant

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION  THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

market is the "broadcast rights for live video presentations."  DirecTV purchased the exclusive distributorship of broadcast rights from the NFL, which then becomes the live video presentations that Plaintiffs as consumers access by purchasing Sunday Ticket.  Thus, DirecTV participates in the market at the distributorship level, and Plaintiffs participate *in the same market* at the consumer level.  Consequently, the Court finds that Plaintiffs participate in the same market as the alleged unlawful agreements in this case and, therefore, have standing to sue under the Clayton Act.  Therefore, the Court finds that Plaintiffs have antitrust standing to challenge the vertical agreement between DirecTV and the NFL.

### b.      Whether Plaintiffs Have Alleged Facts Indicating that the Vertical Agreement is Anticompetitive

The NFL Defendants also contend that Plaintiffs have not adequately pleaded facts indicating that the vertical agreement between DirecTV and the NFL is anticompetitive.  First, the NFL Defendants argue that the NFL-DirecTV exclusive distribution agreement is insufficient, on its own, to establish an antitrust violation.  (Mot. at 5.)  The NFL Defendants also argue that by offering Sunday Ticket through a single distributor, the NFL has incentivized DirecTV's substantial investment in innovation and promotion to make Sunday Ticket more appealing to consumers.  (*Id.*)  Plaintiffs, on the other hand, maintain that exclusive distributorships are only lawful where they promote interbrand competition and, according to Plaintiffs, here, the agreement between the NFL and DirecTV *prevents* interbrand competition by preventing viewership competition between different games.  As a result, the exclusive distributorship is unlawful.  (*See* Opp'n at 12.)

"[A]n agreement between a manufacturer and a distributor to establish an exclusive distributorship is not, standing alone, a violation of antitrust laws, and in most circumstances does not adversely affect competition in the market."  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987).  In fact, some courts "have noted that 'exclusive distributorship arrangements are presumptively legal.'"  *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006) (citation omitted).  This is because once an entity has a monopoly in an industry—as the NFL does with professional football here—"there is no additional monopoly profit to be made by creating a monopoly in the retail distribution of the product."  *Id.*  On the contrary, "a monopolist would prefer multiple competing buyers unless an exclusive distributorship arrangement provides other benefits in the way of, for example, product promotion or

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

distribution." *Id.* Further, if the only effect on competition is that a consumer is required to purchase out-of-market NFL games from DirecTV as the only distributor at artificially inflated prices, this effect does not constitute a Sherman Act violation because the NFL, as the monopolist of professional football, could achieve the same results with or without the aid of a distributor. *See id.* Therefore, "[f]or an antitrust violation to occur, the exclusive agreement must intend to or actually harm competition in the relevant market." *Kingray*, 188 F. Supp. 2d at 1196–97.

Plaintiffs argue that the exclusive distributorship agreement between the NFL and DirecTV is anticompetitive because it reduces output, which thereby drives up prices, harms consumers and competition, and is not counterbalanced by sufficient procompetitive effects. (*See* Opp'n at 7–16.) The Court will first address whether the agreement reduces output, then will address whether the agreement artificially inflates prices, and, finally, whether the agreement results in any procompetitive effects.

### i.      Whether the Agreement Reduces Output

The parties dispute whether the exclusive distribution agreement increases or decreases output. Defendants argue that Sunday Ticket has *increased* output, because prior to the creation of Sunday Ticket, viewers were unable to watch any out-of-market Sunday afternoon games. (*See* Mot. at 13–14.) But Plaintiffs claim that Sunday Ticket— and the exclusive distributorship between DirecTV and the NFL—limits output, because it prevents other over-the-air broadcasts from broadcasting the out-of-market games that are exclusively broadcast through Sunday Ticket. (*See* Opp'n at 9.) According to Plaintiffs, if Sunday Ticket were not the exclusive method by which out-of-market games could be broadcast, "other competitive market options would have increased output further." (Opp'n at 9–10.)

Thus, this dispute turns on the proper definition of "output." Plaintiffs argue that the Court should consider "output" to be the number of broadcasts of Sunday afternoon NFL games. (*See* Opp'n at 9–10.) The Court disagrees, and finds the Supreme Court's decision in *Board of Regents of University of Oklahoma* instructive. In *Board of Regents of University of Oklahoma*, the National Collegiate Athletic Association ("NCAA") implemented a television broadcasting plan in order to protect attendance of NCAA football games. *See Bd. of Regents of Univ. of Okla.*, 468 U.S. at 91–94. After the College Football Association ("CFA"), an organization created to protect the interests of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

major college football teams, negotiated its own arrangement with NBC to broadcast additional games and increase the revenues of CFA members, the NCAA announced that it would take disciplinary action against any college that complied with the CFA-NBC agreement. *Id.* at 94–95. Under the NCAA's broadcasting plan, the NCAA "limit[ed] the total amount of televised intercollegiate football and the number of games that any one team may televise," such as by limiting any NCAA institution to six total television appearances (and four nationally) throughout the entire season. *Id.* at 94. The Supreme Court held that "[t]he anticompetitive consequences of this arrangement" were apparent, because prices were "higher and *output lower* than they would otherwise be." *Id.* at 106–07 (emphasis added). Accordingly, the Court found the NCAA's broadcasting plan and conduct in disciplining those who participated in the CFA-NBC plan constituted a section 1 violation.[10] *Id.* at 120.

Thus, the limit on output identified in *Board of Regents of University of Oklahoma* was a limit on the ability to broadcast games at all. *See id.* at 106–07. In this case, however, there is not a similar blanket rule or policy that altogether prevents the television broadcasting of certain games. In fact, under the allegations in Plaintiffs' CAC, it does not appear that any NFL team is limited to only having a certain number of its games broadcast or altogether prevented from having any of its games broadcast. (*See* CAC ¶ 84.) Therefore, unlike *Board of Regents of University of Oklahoma*, there is no limit on output, i.e., no requirement that certain games not be broadcast at all; on the contrary, all NFL Sunday afternoon games *are* broadcast—there are merely limitations

---

[10] At oral argument, the NFL Defendants' counsel cited *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), when discussing whether the agreement between DirecTV and the NFL limits output. *Brantley*, however, does not discuss the definition of output; rather, in *Brantley*, the Ninth Circuit addressed a section 1 claim in which a putative class argued that television programmers should be compelled to sell each cable channel separately, rather than as packages. *See id.* at 1195. The court held that this tying arrangement (i.e., an arrangement where a consumer is required to purchase a product along with a bundle of other products) was not anticompetitive. *Id.* at 1199, 1204. The Ninth Circuit explained that "[e]ven vertical agreements that directly prohibit retail price reductions, eliminating downward competitive pressure on price and thereby resulting in higher consumers prices . . . are not unlawful absent a showing of actual anticompetitive effect," and the plaintiffs had failed to allege any actual harm to competition. *Id.* at 1202. The court did not address whether the television programmers had limited output in the way it is relevant here (i.e., by limiting the number of television broadcasts or television viewership). Thus, while *Brantley* is relevant, as explained below, to whether Plaintiffs have adequately alleged harm to competition, it provides no illumination regarding the proper definition of output. .

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

placed on *where* these games are broadcast and on *who* may broadcast them. Accordingly, the Court disagrees with Plaintiffs' definition of output as being the number of broadcasts, and finds instead that the proper definition of output and, more specifically, limitations on output, is whether the agreement prevents certain games from being broadcast at all. Under this definition, unlike *Board of Regents of University of Oklahoma*, there is no limit on output in this case.

This conclusion is further supported by the decisions of other courts. For instance, in *Kingray*, the plaintiffs brought a proposed class action alleging that an agreement between the National Basketball Association ("NBA") and DirecTV to broadcast all out-of-market basketball games via the "NBA League Pass" (the NBA equivalent of Sunday Ticket) violated section 1 of the Sherman Act. *Kingray*, 188 F. Supp. 2d at 1183–84. One of the plaintiffs' proffered theories was that the NBA League Pass restricted output of broadcast NBA games, because under the terms of the agreement between the NBA and DirecTV, certain games were "blacked out" and not broadcast in some areas to protect the territories of local NBA teams. *See id.* at 1192. The court disagreed with the plaintiffs, because "the NBA-DirecTV contract provides that every NBA game that is 'blacked out' is otherwise available via free local over-the-air broadcasts or via local and national cable channels." *Id.* Thus, the court found that "output has not been restricted"; instead, the blackout provision "only affects what channel the game is available on." *Id.* at 1192, 1194; *see also Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) ("Only a reduction in output allows producers to raise price. If the league arranges for the broadcast of every game (or if the clubs may broadcast every game the league does not), there is no reduction in output.").

At oral argument, Plaintiffs' counsel argued that "output" should be measured by "viewership," i.e., "the availability of viewers to see the games." Even using this definition of output, however, it is not clear that Sunday Ticket and the exclusive distribution agreement between DirecTV and the NFL limits output. For example, the *Kingray* court noted that rather than diminishing output, NBA League Pass actually *increased* output, because prior to NBA League Pass's creation in the 1990s, "out-of-market games were not available to the public." *Kingray*, 188 F. Supp. 2d at 1195. Thus, "[i]n contrast to the plan in [*Board of Regents of University of Oklahoma*] which limited the number of broadcasts permitted, beginning in the 1994-95 season, the NBA League Pass has made available for purchase 'up to forty out-of-market regular season NBA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

games per week and more than 1000 regular season games per year.'" *Id.* (citation omitted). The same analysis applies here. Plaintiffs allege that, beginning in 1994, "pursuant to its exclusive agreement with the NFL, DirecTV offered its subscribers access to the Sunday afternoon games that were not otherwise available in their market via national broadcasts." (CAC ¶ 89.) In other words, while viewers would have had access to no more than three NFL Sunday afternoon games broadcast in any given broadcasting market, through Sunday Ticket, viewers may now access as many as thirteen games being played on Sunday afternoons—games which, before Sunday Ticket, would have gone unseen outside of the local broadcast market. (*See* CAC ¶ 85.) Thus, Sunday Ticket has also increased the availability—or viewership—of out-of-market games.

Plaintiffs argue that the realities of the situation mean that if the exclusive agreement between DirecTV and the NFL was made non-exclusive, "each team would have an incentive to distribute its games nationally in these channels," and that "[g]iven the relatively low cost of internet streaming and satellite and cable television carriage, each team acting independently would offer their games at a competitive price to anybody in the country who wanted to watch that particular team." (CAC ¶ 6.) However, as addressed further below, (*see* discussion *infra* section IV.A.3.b.), each game involves the collective intellectual property rights of multiple entities. Therefore, it may be that the only way to ensure that each game is broadcast is to allow the NFL and its teams to pool their collective broadcasting rights and establish an exclusive broadcasting agreement, ultimately increasing output.

Therefore, because limitations on "output" occur when an agreement altogether prevents the broadcast of a game—which does not occur here—Plaintiffs have failed to establish that the exclusive distributorship arrangement between DirecTV and the NFL reduces output. Even assuming output was measured by viewership, as Plaintiffs suggest, because Sunday Ticket has increased access to out-of-market games, it has also increased viewership and, thus, Plaintiffs have not established that the agreement limits output under this definition.

//

//

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

### ii. Whether the Vertical Agreement Artificially Inflates Prices

Second, as to Plaintiffs' allegations that the exclusive distributorship agreement results in inflated prices for Sunday Ticket, "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition.  Both effects are fully consistent with a free, competitive market."  *Brantley*, 675 F.3d at 1202; *see also Pioneer Family Invs., LLC v. Lorusso*, No. CV 14-00594-PHX-PGR, 2014 WL 2883058, at *6 (D. Ariz. June 25, 2014) (finding that plaintiff failed to plead a viable Sherman Act claim where "the only alleged injury to competition is increased prices and reduced consumer choice" (quoting *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1011 (N.D. Cal. 2013))).  Thus, the mere fact that DirecTV may be charging inflated prices for Sunday Ticket does not, on its own, constitute harm to competition.  Accordingly, the Court finds Plaintiffs' allegations of price inflation unavailing.

### iii. Other Procompetitive Effects of the Vertical Agreement

Moreover, the Court finds that there are other, various procompetitive effects that arise from an exclusive distributorship agreement.  The NFL Defendants argue, for instance, that exclusivity encourages DirecTV's "substantial investment in innovation and promotion to make Sunday Ticket appealing to consumers."  (Mot. at 5.)  Plaintiffs argue the opposite, because DirecTV merely "packages and sells telecast received from the networks that had already created those telecasts for regional broadcast."  (Opp'n at 13.)  According to Plaintiffs, "[m]illions of subscribers to other MVPDs would subscribe to out of market games if they were available on their services."  (*Id.*)  However, the Court finds that Plaintiffs oversimplify the product that is "Sunday Ticket."  While the out-of-market games themselves are broadcast through DirecTV's product, there are other facets of Sunday Ticket, such as "NFL Sunday Ticket Max," which includes the "Red Zone Channel, DirecTV Fantasy Zone Channel, and NFL.com fantasy."  (*See* CAC ¶ 97 (internal quotation marks omitted)).  By granting DirecTV the exclusive rights to out-of-market broadcasts, DirecTV can create, package, and promote these various products that result in greater fan access and NFL game exposure.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

In addition, DirecTV is required to renegotiate with the NFL Defendants in several-year increments to renew their exclusive distributorship arrangement. (*See* CAC ¶¶ 95–96.) For example, Plaintiffs' CAC alleges that in 2002, another MVPD, InDemand, offered $400 to $500 million for the non-exclusive rights to carry Sunday Ticket. (CAC ¶ 95.) The NFL chose, however, to renew their exclusive agreement with DirecTV. (*See id.*) Thus, it does not appear that Sunday Ticket or incremental exclusive distributorship arrangements prevent—or necessarily *harm*—competition, as other MVPDs have, in fact, competed for the rights to Sunday Ticket.

Accordingly, the Court finds that Plaintiffs have failed to plead facts indicating that the vertical exclusive distributorship arrangement between DirecTV and the NFL Defendants has harmed competition. It does not appear that the agreement reduces output, inflated prices on their own do not constitute harm to competition, and the agreement may, in fact, result in procompetitive effects. Therefore, Plaintiffs have not satisfied the third element of a section 1 claim under the rule of reason test; without harm to competition, there can be no section 1 violation. *See Brantley*, 675 F.3d at 1204 (affirming district court's dismissal of section 1 claim because "[i]njury to competition must be alleged to state a violation of Sherman Act § 1"); *see also Kingray*, 188 F. Supp. 2d at 1196 (dismissing section 1 claim because the plaintiffs had not adequately alleged that the NBA League Pass restricted output). Accordingly, the Court **GRANTS** the NFL Defendants' Motion and **DISMISSES** Plaintiffs' section 1 claims to the extent they are based on the vertical agreement between the NFL and DirecTV.

### 3.    Whether the Horizontal Agreements Amongst the NFL Defendants is Anticompetitive

Next, the Court will address Plaintiffs' section 1 claim as it relates to the horizontal agreements amongst the NFL and the NFL teams. First, Defendants argue that the Sports Broadcasting Act ("SBA"), 15 U.S.C. § 1291, protects any horizontal agreements between the NFL teams to allow the NFL to contract with CBS and Fox to broadcast Sunday afternoon games.[11] (Mot. at 9.) In this case, however, as explained below, the Court agrees with Plaintiffs that the SBA does not immunize the NFL's conduct in selling the rights to its out-of-market games to DirecTV. Nonetheless, the Court finds that

---

[11] The NFL Defendants conceded at oral argument that they do not argue the SBA protects the vertical agreement between the NFL and DirecTV.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

Plaintiffs still fail to plead a viable section 1 claim as to the horizontal agreements, because the collective agreement between the teams involves intellectual property owned by more than one entity (i.e., both teams playing any given game) and thus "constitute[s] 'collectively owned' property," which requires the NFL Defendants to cooperate in order to sell the rights.  *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 114 (S.D.N.Y. 2015) (alteration and citation omitted).  In addition, the Court finds that Plaintiffs lack antitrust standing to challenge the horizontal agreements.  The Court will address each argument.

### a.    Whether the SBA Immunizes the Agreement Between the NFL and the NFL Teams

The SBA, enacted in 1961, exempts professional sports from the antitrust laws "for joint marketing of television rights."  *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 104 n.28; *see also* 15 U.S.C. § 1291.  As the Supreme Court has noted, "[t]he legislative history of this exemption demonstrates Congress' recognition that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act."  *Id.*  However, by passing the SBA, it appears that Congress attempted to immunize this potentially anticompetitive conduct in certain situations.

It is undisputed that the SBA applies only to "network broadcast television and does not apply to non-exempt channels of distribution such as cable television, pay-per-view, and satellite television networks."  *Kingray*, 188 F. Supp. 2d at 1183.  Thus, Plaintiffs argue that, because the NFL agrees to broadcast certain games for certain viewers only on paid-for satellite television, the SBA does not apply.  (CAC ¶¶ 147–54; Opp'n at 8–9.)  The NFL Defendants, however, argue that Sunday Ticket merely re-broadcasts coverage that was initially broadcast on free, over-the-air television—namely, CBS and Fox—and, thus, is protected by the SBA.  (Mot. at 8–10.)  The Court agrees with Plaintiffs.

"The Supreme Court construes exceptions to the antitrust laws narrowly."  *Shaw*, 1998 WL 419765, at *3.  Therefore, when analyzing an antitrust exemption like the SBA, the Court should limit its application and apply it cautiously.  *See id.*  In this case, though Plaintiffs allege that the Sunday Ticket broadcast mirrors Fox and CBS broadcasts from throughout the country, (*see* CAC ¶ 8), out-of-market consumers can only access these broadcasts if they subscribe to DirecTV's satellite subscription service, (*see* CAC ¶ 7).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

Thus, the NFL teams have agreed to permit the NFL to contract on their behalf to broadcast certain games for some consumers via paid-for broadcasting—which, as noted above, is not protected by the SBA. *See Shaw*, 1998 WL 419765, at *5 (holding that Sunday Ticket was not exempt under the SBA because it involved the sale of broadcasting to paid-for satellite television). The fact that some consumers throughout the country may view the same games for free (but who then, in turn, cannot access out-of-market games that a different consumer may watch for free on over-the-air television) does not mean that the NFL is *only* contracting for over-the-air broadcasting services; rather, the NFL and its teams have agreed to permit the NFL to contract for both over-the-air broadcasting *and* paid-for satellite services.[12] Therefore, because the agreement between the NFL and the NFL teams encompasses both broadcasts on over-the-air television as well as paid-for television, the SBA does not immunize the horizontal agreements between the NFL and the NFL teams.

### b.   Whether the NFL Teams' Pooling of Their Broadcast Rights Otherwise Violates Section 1

However, the Court finds that the NFL teams' decision to collectively pool their rights still does not violate the Sherman Act. In coming to this conclusion, the Court finds two decisions instructive. First, in *Washington v. National Football League*, 880 F. Supp. 2d 1004, 1005–07 (D. Minn. 2012), the plaintiffs, former professional football players, alleged that the NFL violated the antitrust laws when they refused to grant the plaintiffs the rights to game films and images from the games in which they played. The plaintiffs relied on the Supreme Court's decision in *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010), in which the Supreme Court held that "actions by the NFL and its teams could constitute concerted action in violation of the Sherman Act." *Washington*, 880 F. Supp. 2d at 1006. In *American Needle*, the Supreme Court held that an entity created by all of the NFL's teams to make decisions regarding the teams' separately owned intellectual property violated section 1. *See Am. Needle*, 560 U.S. at 201. However, the

---

[12] However, the Court finds that the SBA *does* protect the NFL Defendants' collective decision to limit over-the-air broadcasting of its games to certain areas. As the Seventh Circuit has noted, "[u]nless the [SBA] allows the league to bar broadcasting of at least some games, it is hard to see why it is cast as an exemption from the antitrust laws." *Chi. Prof'l Sports*, 961 F.2d at 670. Further, this comports with the language and history of the SBA, which as explained above, protects professional leagues and their teams' collective contracting of over-the-air broadcasting rights. *See* 15 U.S.C. § 1291.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

*Washington* court held that *American Needle* was distinguishable because "the intellectual property involved [in *Washington* was] historical football game footage, something that the individual teams do not separately own, and never have separately owned." *Washington*, 880 F. Supp. 2d at 1006.  Instead, the NFL owned the footage of the games, "either alone or in conjunction with the teams involved in the game being filmed." *Id.*  Because there were multiple entities involved, "[t]hese entities must cooperate to produce and sell these images; no one entity can do it alone." *Id.* Accordingly, *Washington* held that while the NFL and its teams may potentially violate the Sherman Act when they conspire to market a team's individually owned property, they do not violate the Sherman Act when they market "property the teams and the NFL can only collectively own." *Id.*

Second, in *Spinelli*, 96 F. Supp. 3d at 95, the plaintiffs, professional photographers, alleged that the NFL violated the Sherman Act by entering into exclusive licensing agreements for professional stock photos.  Relying on *Washington*, the *Spinelli* court held that a collective agreement amongst the NFL teams to exclusively license photos did not violate the Sherman Act because "many if not most of the photographs at issue contain intellectual property owned by the NFL and at least one NFL Club." *Id.* at 114. Therefore, because "[s]uch photographs necessarily contain the intellectual property of more than one entity, and constitute 'collectively owned' property under *Washington*," the entities were required to act collectively to produce and sell the images and their conduct did not contravene the Sherman Act.  *Id.* (alteration omitted).  In addition, the court also noted that collective licensing of intellectual property of the NFL-related photographs was "reasonable as a matter of law because collective licensing [was] 'essential if the product is to be available at all,'" *id.* at 114 n.14 (quoting *Am. Needle*, 560 U.S. at 203); "without NFL and NFL Club cooperation, licensees would be unable to obtain from any one entity the rights to use photographs of NFL games and events, which exist only by virtue of that cooperation," *id.*

Here, the property at issue is the right to broadcast NFL games between two NFL teams.  In fact, as Defendants explained at oral argument, broadcasts[13] are owned by the NFL, rather than by the NFL teams.  Like the game footage in *Washington* and the

---

[13] Game "broadcasts" include not only video footage of the games, but the camera angles chosen, the graphics displayed, commentary, game highlights, videotape replays, and crowd shots.  Thus, there are multiple types of intellectual property at issue here that collectively makeup a single "broadcast."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

photographs in *Spinelli*, the broadcasts of the games here necessarily involve intellectual property rights owned by multiple entities, including the NFL and each of the teams participating in the game.  As the *Washington* court explained, and the *Spinelli* court echoed, the multiple entities must act collectively to broadcast the games in order for the games to be broadcast at all.  As the *Spinelli* court acknowledged, this appears to be a situation where the collective issuing of rights is reasonable as a matter of law, because if the teams did *not* work together collectively, it may be difficult to determine the appropriate owner of the intellectual property rights of any given broadcast.  *See Spinelli*, 96 F. Supp. 3d at 114 n.14 ("If a collective license were not available, a photo-by-photo assessment would be required to determine who may hold intellectual property rights in any given photograph, and individual licensing negotiations would be required for every single photograph."); *see also Am. Needle*, 560 U.S. at 202 ("The fact that NFL teams share an interest in making the entire league successful and profitable, and that they must cooperate in the production and scheduling of games, provides a perfectly sensible justification for making a host of collective decisions.").

Because the NFL owns the rights to NFL game broadcasts, the NFL functions differently than Major League Baseball ("MLB") or the National Hockey League ("NHL"), where the League does not necessarily own the rights to every game broadcast. *Compare Washington*, 880 F. Supp. 2d at 1006 ("Here, unlike in *American Needle*, the intellectual property involved is historical football game footage, something that the individual teams do not separately own, and never have separately owned.  Rather, the NFL owns the game footage, either alone or in conjunction with the teams involved in the game being filmed.") *with Laumann*, 907 F. Supp. 2d at 474 ("In both the NHL and MLB, each team owns the initial right to control telecasts of its home games, and keeps the revenues it generates from the sale of these rights.").  Therefore, unlike the MLB or the NHL, the NFL must be involved in the sale of every game's broadcast rights; without an agreement between the NFL and its teams, there would be no way to broadcast the game footage.  *See Spinelli*, 96 F. Supp. 3d at 114 n.14 ("[W]ithout NFL and NFL Club cooperation, licensees would be unable to obtain from any one entity the rights to use photographs of NFL games and events, which exists only by virtue of that cooperation."). As the Court noted in *Spinelli*, "the pro-competitive benefits of collectively licensing intellectual property rights" in NFL property "are abundantly clear." *Id.*  Accordingly, the Court finds that the NFL's conduct in collectively working with its constituent teams to enter into exclusive broadcast agreements of game footage collectively owned by the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

NFL and its teams does not violate section 1 of the Sherman Act because it is not an unreasonable restraint on trade.

Plaintiffs go one step further and argue that it is not necessarily the fact that the teams are collectively working together that violates the Sherman Act, but it is the *content* of that agreement that prevents multiple MVPDs from providing Sunday Ticket (or its equivalent). (*See* Opp'n at 9–12.) Specifically, Plaintiffs argue that by placing a cap on the number of Sunday afternoon games that are available on over-the-air television, Defendants have violated section 1. (*See* Opp'n at 8.) This argument is circular, however, and leads back to whether the NFL Defendants' exclusive vertical agreement with DirecTV constitutes a violation of section 1, as the Court has already addressed above.

The Court finds that Plaintiffs have not adequately alleged facts indicating that the horizontal agreements between the NFL and its teams to collectively sell the broadcast rights to NFL games constitutes a section 1 violation.

### c.   Whether Plaintiffs Have Antitrust Standing to Challenge the Horizontal Agreement Between the NFL and Its Teams

The NFL Defendants next argue that Plaintiffs are barred from challenging the horizontal agreement between the NFL and its teams because they are indirect purchasers. (Mot. at 21–22.) The Court agrees.

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728–29 (1977), the Supreme Court "held that an indirect or remote purchaser lacks standing to seek damages against the manufacturer for alleged violations of federal antitrust laws." *Kingray*, 188 F. Supp. 2d at 1198. The *Illinois Brick* rule "ensures antitrust laws are enforced by those purchasers who have been most directly injured by the antitrust violation." *Id.* at 1199. There are several narrow exceptions to this rule, however: (1) when there is "a preexisting cost-plus contract with the direct purchaser"; (2) the "co-conspirator" exception (the only exception relevant here), where an indirect purchaser "establishes a price-fixing conspiracy between the manufacturer and the middleman"; (3) where customers of the direct purchaser own or control the direct purchaser, or when a "conspiring seller owns or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

controls the direct purchaser"; and, (4) "if there is no realistic possibility that the direct purchaser will sue."[14]  *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012).

In *In re ATM Fee Antitrust Litigation*, the Ninth Circuit discussed indirect purchasing when it examined a situation where automated teller machine ("ATM") users were charged a "foreign ATM transaction fee" when they withdrew money from their bank account at an ATM not owned by their bank.  *In re ATM Fee Antitrust Litig.*, 686 F.3d at 745.  When a user withdrew money at a foreign bank, it generated four fees: (1) one the user paid to the ATM owner for the use of the ATM; (2) one the user paid to his or her bank (the foreign ATM fee); (3) one the bank paid to the ATM network that routed the transaction (the interchange fee); and, (4) one the bank paid to the ATM owner.  *Id.*  There, an ATM network, STAR Network, owned hundreds of thousands of ATMs nationwide.  *Id.*  The plaintiffs alleged that the defendants (including several banks and the company that acquired STAR Network) participated in horizontal price fixing by colluding to fix the ATM network fee, which was then, in turn, passed on to the consumer in the form of the foreign ATM fee. *Id.* at 745–46.  The court held that because the plaintiffs never directly paid the interchange fees, but only indirectly paid the interchange fees by paying inflated foreign ATM fees, the plaintiffs were indirect purchasers who lacked antitrust standing under *Illinois Brick* to challenge the horizontal agreement between the defendants.  *Id.* at 749–50.

In *Laumann*, the court analyzed a similar theory as that Plaintiffs proffer here. There, the plaintiffs were subscribers to television and/or internet services that broadcast live hockey and baseball telecasts.  *Laumann*, 907 F. Supp. 2d at 472.  The plaintiffs brought suit against the NHL and the MLB, alleging that they had obtained "centralized control over distribution of live video programming of hockey and baseball games" and that they had "agreed not to compete in business matters related to the video presentation of live major-league men's professional hockey and baseball games."  *Id.* at 473 (alterations and internal quotation marks omitted).  The plaintiffs also brought suit against several regional sports networks and MVPDs who contracted with the NHL and the MLB for the broadcast rights of their games.  *Id.* at 473–74.  Under the agreements between the Leagues and the regional sports networks, certain games were shown within

---

[14] The Ninth Circuit has expressed doubt as to the clarity of this fourth exception.  *See In re ATM Fee Antitrust Litig.*, 686 F.3d at 749.  This exception is not at issue in this litigation, however; therefore, the Court need not address it further.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

specific geographical territories and blacked out in other areas. *Id.* at 474. To obtain the out-of-market games, consumers had to purchase internet or television packages controlled by the Leagues from the MVPDs. *Id.* at 475. The plaintiffs alleged that the Leagues, the regional sports networks, and the MVPDs violated section 1 by agreeing to forbid the broadcast of out-of-market games in designated areas and by agreeing that the NHL/MLB would be the exclusive providers of all out-of-market games. *Id.* at 476. The court explained that, because the plaintiffs purchased programming directly from the MVPDs, they were required to "show why *Illinois Brick* does not bar their claims for damages against the remaining defendants." *Id.* at 481. Relying on the co-conspirator exception mentioned above, the court held that because the plaintiffs were alleging a multi-level conspiracy, as the first purchasers who were not a party to the conspiracy, the plaintiffs had standing to pursue damages—even against entities from whom they had not directly purchased the product. *Id.* at 481–83.

*Laumann*'s holding, however, conflicts in some respects with the Ninth Circuit's holding in *In re ATM Fee Antitrust Litigation*. In *In re ATM Fee Antitrust Litigation*, the Ninth Circuit has limited the boundaries of the co-conspirator exception to apply "only when the conspiracy involves setting the price paid by the plaintiffs." *In re Antitrust ATM Fee Litig.*, 686 F.3d at 755; *see also Laumann*, 907 F. Supp. 2d at 481–82 (explaining that if the court adopted the Ninth Circuit's view of the co-conspirator exception, the plaintiffs would not have had standing). Here, like in *Laumann*, Plaintiffs purchased Sunday Ticket directly from DirecTV as a result of the agreement between the NFL and DirecTV. (*See* CAC ¶¶ 89–90.) DirecTV, however, purchases the rights to the game broadcasts from the NFL, as a result of the agreement between the NFL and its teams. (*See* CAC ¶¶ 91–93.) Plaintiffs do not allege that the NFL Defendants and DirecTV conspired to set a price for DirecTV[15]; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, the co-conspirator exception as defined in *In re ATM Fee Antitrust Litigation* does not apply.

Because Plaintiffs are direct purchasers of the games from DirecTV (which DirecTV may only sell as a result of the agreement between DirecTV and the NFL), Plaintiffs have standing to sue for damages arising from the vertical agreement between DirecTV and the NFL (as discussed above). Plaintiffs do not directly purchase Sunday

---

[15] In fact, Plaintiffs highlighted this point at oral argument in support of the proposition that *Illinois Brick* should not bar claims outside of price-fixing cases.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

Ticket from the NFL Defendants, however, and the co-conspirator exception does not apply. Accordingly, Plaintiffs do not have standing to sue the NFL Defendants with respect to the horizontal agreements. While Plaintiffs urged the Court at oral argument to follow *Laumann* and find that the *Illinois Brick* bar does not apply in cases that do not involve price fixing, *In re ATM Fee Antitrust Litigation* directly precludes this argument in holding that the co-conspirator exception does not apply in cases like this.[16] Consequently, Plaintiffs have not overcome the *Illinois Brick* bar, and their claims against the NFL Defendants regarding the horizontal agreements fail for lack of standing. *See Kingray*, 188 F. Supp. 2d at 1199 (finding that the plaintiffs lacked standing to sue the NBA and its teams when challenging agreements between the NBA, its teams, and television providers to create NBA League Pass because "Plaintiffs purchased the NBA League Pass from DirecTV and iN Demand"—not the NBA Defendants).

Therefore, the Court finds that Plaintiffs have not adequately alleged a section 1 claim as it relates to the horizontal agreements between the NFL and its teams. First, the NFL Defendants' collective action is protected as it is necessary to produce the game broadcasts here and, second, Plaintiffs lack antitrust standing to challenge it, regardless. Accordingly, the Court **GRANTS** the NFL Defendants' Motion and **DISMISSES** Plaintiffs' section 1 claims as they relate to the horizontal agreements between the NFL and its teams.

## 4.   Whether Plaintiffs Have Pleaded a Viable Market

Even assuming that Plaintiffs had adequately alleged prima facie claims for section 1 violations regarding both the vertical and horizontal agreements here, the Court finds that Plaintiffs' claims would fail, regardless, because they have not adequately pleaded a viable relevant market in which Defendants have market power. "In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power

---

[16] Though *Laumann* indicated that "where the relationship between the parties in a multi-tiered distribution chain is such that plaintiffs are the first or only victims of alleged anticompetitive agreements, the rationale for the *Illinois Brick* disappears," *Laumann*, 907 F. Supp. 2d at 481, the court nonetheless examined the co-conspirator exception to the *Illinois Brick* bar. Therefore, *Laumann* does not stand for the proposition that *Illinois Brick* does not apply in non-price-fixing cases or in cases involving a multi-tiered distribution chain. Rather, it stands for a broad reading of the co-conspirator exception—one that has been squarely rejected by the Ninth Circuit—that permits claims involving a multi-tiered conspiracy to proceed despite the *Illinois Brick* bar.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). For antitrust purposes, "a product market is typically defined to include the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand." *Thurman Indus., Inc.*, 875 F.2d at 1374. Further, in some circumstances, "the relevant product market may be narrowed beyond the boundaries of physical interchangeability and cross-price elasticity to account for identifiable submarkets or product clusters." *Id.* "[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus., Inc.*, 513 F.3d at 1045. Here, Plaintiffs allege that the relevant market is "the live video presentations of professional football games." (CAC ¶¶ 1, 53.) Plaintiffs also allege that there is a submarket for the "broadcast rights for out-of-market games, such as those carried in the NFL Sunday Ticket package."[17] (CAC ¶ 53.)

### a. Whether the Live Presentation of Professional Football Games is a Viable Market and Whether the NFL Defendants Have Restrained Trade Within that Market

First, the NFL Defendants argue that the live presentation of professional football games market is "implausible," because "it ignores the competition that the NFL games face from other sports and entertainment products, and it fails to account for the numerous free in-market broadcasts of NFL games that are made widely available to consumers." (Mot. at 14.) The Court disagrees. Multiple courts have recognized that a market may be limited to one professional sport, because these sports (i.e., professional football) have "limited substitutes from a consumer standpoint."[18] *L.A. Mem'l Coliseum*

---

[17] Plaintiffs identify the relevant geographic market as the United States, (CAC ¶ 53), which the NFL Defendants do not appear to dispute.

[18] As Plaintiffs point out, this is different than a "single-brand market." (*See* Opp'n at 17 n.18.) If, for instance, Plaintiffs were alleging that the Los Angeles Rams constituted one market, the New Orleans Saints constituted another market, and the Denver Broncos were an entirely separate market, this would likely constitute an impermissible single-brand market. *See Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886–87 (N.D. Ill. 2015) (explaining that a market consisting of live broadcasts of Chicago Cubs games was impermissible, because "the Cubs necessarily compete with other Major League Baseball teams, sporting events, and other live entertainment for revenue"); *see also*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

*Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1393 (9th Cir. 1984); *see Bd. of Regents of Univ. of Okla.*, 468 U.S. at 111 (holding that "intercollegiate football telecasts generate an audience uniquely attractive to advertisers and that competitors are unable to offer programming that can attract a similar audience"); *Laumann*, 907 F. Supp. 2d at 492 (accepting definition of "the relevant market as the market for television broadcasting of professional hockey and baseball games"). The NFL Defendants argue that this market definition ignores the possibility that non-football-related content may compete with NFL football broadcasts. (Mot. at 15–16.) The Court is unpersuaded by the NFL Defendants' argument. It appears clear that professional sports attract a unique and specific audience; for instance, many viewers would not believe a Sunday afternoon marathon of NCIS, a syndicated drama, or the live broadcast of a tennis tournament to be a viable alternative to a Denver Broncos football game. Therefore, Plaintiffs have properly defined the relevant market as the live broadcast of professional football games.

Second, the NFL Defendants argue that Plaintiffs have not established how Defendants restrain the relevant market because Defendants offer the live broadcast of multiple games for free every Sunday afternoon. (Mot. at 16.) In other words, the NFL Defendants suggest that if the price for out-of-market games was artificially inflated, viewers would simply replace the out-of-market game with a free in-market game instead. Moreover, according to the NFL Defendants, if, on the other hand, different games are not substitutes for one another, Plaintiffs have failed to establish how selling the broadcast rights to out-of-market games would "naturally force prices down." (*Id.*) Plaintiffs argue that these games are not "perfect substitute[s]," but "are 'differentiated products,' meaning that they have different qualities or characteristics that affect consumer choices." (Opp'n at 19.)

The Court agrees with the NFL Defendants on this point. Though Plaintiffs have sufficiently established the relevant market, they fail to show how Defendants have restrained trade within that market or have such significant power as to artificially drive prices up. By offering free game broadcasts on CBS and Fox, the NFL Defendants lack the ability to artificially control out-of-market games pricing because consumers may

---

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (rejecting market composed of the "UCLA women's soccer program" because multiple universities competed for college recruits). Where, as here, Plaintiffs allege that a market consists of all teams within a single league, however, this is not a single-brand market.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

choose to view these free games as alternatives to paid-for out-of-market games, thereby driving market prices down naturally.  If, on the other hand, the out-of-market games available only on Sunday Ticket are *not* competitive with the other free over-the-air NFL game broadcasts because consumers desire to view only certain specific out-of-market games—for example, a consumer wants to watch only the Denver Broncos game every week—then Plaintiffs have failed to establish how selling the rights to all out-of-market games on the open market would prevent artificial price inflation.  Rather, even if these games were sold on the open market, because that same consumer would care about only the Denver Broncos and no other in-market or out-of-market game would be an effective substitute for that consumer, whoever ultimately owned the rights would always have *some* ability to artificially control prices, regardless.  In that case, neither the horizontal agreements between the NFL and the NFL teams nor the vertical agreement between the NFL and DirecTV would affect artificial price inflation; whoever owned the rights to any specific game—whether those rights were obtained through an exclusive distributorship agreement like Sunday Ticket or on the free market—could artificially inflate prices.[19] Accordingly, under either scenario, Plaintiffs have not adequately alleged the existence of a market in which Defendants have the power to artificially control pricing or in which selling the rights on the open market would prevent artificially inflated pricing.

Therefore, even assuming Plaintiffs adequately pleaded a prima facie section 1 claim, their section 1 claims would fail because they have not adequately alleged the existence of a market in which Defendants have the power to restrain trade or artificially inflate prices.

---

[19] To the extent Plaintiffs suggest that *any* exclusive agreement to broadcast out-of-market games violates section 1 (i.e., if the Denver Broncos as a team exclusively distributed the broadcast rights to their games through one channel), and the only way to avoid antitrust violations is to require non-exclusive agreements, this argument does not comport with *Rutman Wine* and the protections for exclusive distributorships, as explained above.  *Rutman Wine Co.*, 829 F.2d at 735.  Moreover, to the extent Plaintiffs are contending that Defendants have market power in multiple individual markets for each team, defining the market by team would result in impermissible single-brand markets, as discussed above.  *See Tanaka*, 252 F.3d at 1063.  Therefore, regardless of how the alleged market is viewed, Plaintiffs have not adequately alleged a viable market in which Defendants have the power to artificially inflate prices.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | Date | June 30, 2017 |
|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION<br>THIS DOCUMENT RELATES TO: ALL ACTIONS | | |

**b.     Whether Plaintiffs Have Pleaded a Viable Submarket for Out-of-Market Football Broadcasts**

As to the submarket defined as out-of-market football broadcasts, the Court agrees with the NFL Defendants that this narrowly-defined market is inappropriate.  "[A]n antitrust plaintiff may not define a market so as to cover only the practice complained of," because "this would be circular or at least result-oriented reasoning."  *Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999) (internal quotation marks omitted).  Unlike a market consisting of all live broadcasts of NFL games, an out-of-market football broadcast market is a post-hoc narrowing of the relevant market to cover only those products over which Plaintiffs allege that Defendants have control.  Further, it is unclear how out-of-market games would not, by definition, also compete with in-market games, as addressed above.[20]  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997) (holding that an antitrust plaintiff must propose a relevant market that encompasses "all interchangeable substitute products"); *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (finding that plaintiff failed to allege an adequate market because it defined the market too narrowly).  Accordingly, the Court finds that Plaintiffs have failed to adequately plead a sufficient submarket.

**B.     Plaintiffs' Section 2 Monopolization Claim**

Plaintiffs' second claim arises under section 2 of the Sherman Act, 15 U.S.C. § 2, and alleges that the NFL Defendants unlawfully conspired with DirecTV "to consolidate all licensing rights for live video presentations of regular season NFL games into a single entity, with the purpose, intent, and effect of monopolizing the relevant market and submarket above," (CAC ¶ 161).  Further, Plaintiffs allege that DirecTV "has obtained an

---

[20] Plaintiff alleges that out-of-market NFL games are distinct from in-market games because the out-of-market games cater "to fans that are not located within the geographical confines of their favorite teams' home territories."  (CAC ¶ 53.)  However, this argument, again, is circular, because if that is the case, then it is unclear how all of the out-of-market games would compete with each other as they cannot be considered reasonable substitutes for one another under Plaintiffs' allegations.  Moreover, if Plaintiffs are arguing that the relevant submarkets for out-of-market games are defined by team—i.e., that Defendants restrain competition within a submarket of out-of-market Denver Broncos games—it would then be an impermissible single-brand market, as noted above.  Therefore, the Court finds this allegation insufficient to establish a relevant submarket.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

unlawful monopoly with respect to the out-of-market Sunday afternoon games available through its agreements with the NFL and its Teams."  (*Id.*)  Thus, Plaintiffs have alleged two monopolization claims: one for conspiracy to monopolize, and one for actual monopolization.  At oral argument, Plaintiffs conceded that their section 2 claim rises and falls along with their section 1 claim.  Because, as explained above, Plaintiffs' section 1 claim fails, their section 2 claim also fails.  Nonetheless, in an abundance of caution, the Court will briefly address Plaintiffs' section 2 claim.

To establish a conspiracy to monopolize claim, Plaintiffs must plead: "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  As addressed above, Plaintiffs have failed to adequately plead antitrust injury.  Thus, Plaintiffs' conspiracy to monopolize claim fails on that ground alone.  *See E & L Consulting*, 472 F.3d at 31 (dismissing section 2 claim where complaint failed to establish injury to competition).

In addition, Plaintiffs have failed to establish facts indicating that Defendants had the specific intent to monopolize.  "'The specific intent element requires proof that the defendant intended his acts to produce monopoly power'; that is, that the defendant intended 'to control prices or to restrain competition unreasonably.'"  *Insignia Sys., Inc. v. New Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009) (quoting *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir. 1987)); *see also Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 441 (D. Del. 2011) (defining specific intent to monopolize as "an intent which goes beyond the mere intent to do the act," but rather, as requiring that "the defendant must have intended to achieve an illegal monopoly").  Plaintiffs appear to rely entirely on the NFL-DirecTV exclusive distributorship agreement to establish intent to monopolize here.  (*See* Opp'n at 24–25.)  An exclusive distributorship agreement on its own, however, does not establish the specific intent to monopolize.  *See Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986) ("[T]he mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize." (citing *Pac. Eng'g & Prod. Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 795 (10th Cir. 1977))).  Moreover, while "[s]pecific intent may be inferred from predatory conduct," *id.*, Plaintiffs do not allege any facts indicating predatory conduct or that by granting DirecTV an exclusive distributorship

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION | | | |
| | THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

agreement, the NFL Defendants explicitly intended to control Sunday Ticket prices, unreasonably restrain competition, or achieve an illegal monopoly on the broadcast of live NFL games. *Cf. Wallach*, 814 F. Supp. 2d at 441–42 (finding specific intent where the plaintiff included allegations that the defendant's employee had said the defendant intended to "kill" a competitor's business). In other words, the fact that the NFL has a practical monopoly on professional football in the United States is not sufficient to establish that they may be liable under section 2 for a conspiracy to monopolize.

Finally, the NFL Defendants argue that Plaintiffs have not sufficiently alleged an actual monopolization claim under section 2. (*See* Mot. at 24–25.) "To state a plausible monopolization claim under this provision requires plaintiff to show: '(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury.'" *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010)). Therefore, a required element of a monopolization claim is antitrust injury. As addressed above, Plaintiffs have failed to establish a viable antitrust injury; accordingly, Plaintiffs cannot state a viable section 2 monopolization claim. Therefore, the Court **GRANTS** the NFL Defendants' Motion and **DISMISSES** Plaintiffs' section 2 claim.

### C.   Whether to Grant Plaintiffs Leave to Amend

In sum, the Court finds that Plaintiffs' section 1 claim fails because: Plaintiffs have failed to plead facts establishing that the vertical agreement between the NFL and DirecTV harms competition; the horizontal agreements between the NFL and its teams is not a section 1 violation because they must cooperate to effectively sell broadcasts of the games and, regardless, Plaintiffs lack antitrust standing to challenge it; and, Plaintiffs have not pleaded a viable market. Plaintiffs' section 2 claim fails for many of the same reasons. Therefore, the Court **GRANTS** the NFL Defendants' Motion and **DISMISSES** Plaintiffs' claims.

The question then becomes whether to grant Plaintiffs leave to amend their Complaint. When deciding whether to grant leave to amend, the court considers five factors: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint. *See Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). Futility is the only relevant factor

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | ML 15-02668-BRO (JEMx) | | Date | June 30, 2017 |
|---|---|---|---|---|
| Title | IN RE: NATIONAL FOOTBALL LEAGUES SUNDAY TICKET ANTITRUST LITIGATION | | | |
| | THIS DOCUMENT RELATES TO: ALL ACTIONS | | | |

here.  In this case, the deficiencies the Court identified above are not deficiencies that may be cured by additional facts; rather, Plaintiffs' allegations fail as a matter of law as they have alleged facts that, though detailed and well-pleaded, are legally insufficient to state a Sherman Act claim.  *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (explaining that the district court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts" (internal quotation marks omitted)); *see also Manzarek*, 519 F.3d at 1031 ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment."); *cf. Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) (finding that the court should have granted leave to amend where it appeared "that plaintiffs had a reasonable chance of successfully stating a claim if given another opportunity").

In fact, there appears to be no way in which Plaintiffs could amend their Complaint to state a claim without contradicting their current allegations.  For instance, as explained above, the Court finds that Sunday Ticket has not limited the output of professional football games because each NFL team may broadcast every game.  Thus, to adequately plead harm to output, Plaintiffs would have to allege that Sunday Ticket *does* prevent certain games from being broadcast—a contradiction the law does not permit in amended pleadings.  *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990) (refusing to grant leave to amend where the only way to adequately plead a claim was to contradict current allegations).  Therefore, Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

## V.   CONCLUSION

For the foregoing reasons, the NFL Defendants' Motion to Dismiss is **GRANTED**.  Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.  The DirecTV Defendants' pending Motion to Compel Arbitration is **DENIED as moot**.  Defendants are **ORDERED** to file a proposed judgment in compliance with this Order **no later than Monday, July 10, 2017 by 4:00 p.m.**

**IT IS SO ORDERED.**

|  | : |
|---|---|
| Initials of Preparer | cw |