

**RECEIVED**
CLERK, U.S. DISTRICT COURT

8/13/2019

CENTRAL DISTRICT OF CALIFORNIA
BY: _____CR_____ DEPUTY

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE NATIONAL FOOTBALL LEAGUE'S SUNDAY TICKET ANTITRUST LITIGATION, | No. 17-56119 |
| | D.C. No. 2:15-ml-02668-BRO-JEM |
| NINTH INNING, INC., DBA The Mucky Duck; 1465 THIRD AVENUE RESTAURANT CORP., DBA Gael Pub; ROBERT GARY LIPPINCOTT, JR.; MICHAEL HOLINKO, an individual, for himself and all others similarly situated, | OPINION |
| *Plaintiffs-Appellants*, | |
| v. | |
| DIRECTV, LLC; DIRECTV HOLDINGS, LLC; NATIONAL FOOTBALL LEAGUE, INC.; NFL ENTERPRISES, LLC; ARIZONA CARDINALS, INC.; ATLANTA FALCONS FOOTBALL CLUB LLC; BALTIMORE RAVENS, LP; BUFFALO BILLS, INC.; PANTHERS FOOTBALL, LLC; CHICAGO BEARS FOOTBALL CLUB, INC.; CINCINNATI BENGALS, INC.; CLEVELAND BROWNS, LLC; DALLAS COWBOYS FOOTBALL CLUB, LTD.; DETROIT LIONS, INC.; GREEN | |

BAY PACKERS, INC.; HOUSTON NFL
HOLDINGS, LP; INDIANAPOLIS
COLTS, INC.; JACKSONVILLE
JAGUARS, LTD.; KANSAS CITY
CHIEFS FOOTBALL CLUB, INC.;
MIAMI DOLPHINS, LTD.; MINNESOTA
VIKINGS FOOTBALL CLUB, LLC;
NEW ENGLAND PATRIOTS, LP; NEW
ORLEANS LOUISIANA SAINTS, LLC;
NEW YORK FOOTBALL GIANTS, INC.;
NEW YORK JETS FOOTBALL CLUB,
INC.; OAKLAND RAIDERS, LP;
PHILADELPHIA EAGLES FOOTBALL
CLUB, INC.; PITTSBURGH STEELERS
SPORTS, INC.; SAN DIEGO CHARGERS
FOOTBALL CO.; SAN FRANCISCO
FORTY NINERS, LTD.; THE RAMS
FOOTBALL COMPANY, LLC;
BUCCANEERS, LP; TENNESSEE
FOOTBALL, INC.; WASHINGTON
FOOTBALL, INC.; FOOTBALL
NORTHWEST LLC; DENVER
BRONCOS FOOTBALL CLUB,
                   *Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Beverly Reid O'Connell, District Judge, Presiding

Argued and Submitted December 7, 2018
Pasadena, California

Filed August 13, 2019

Before:  Sandra S. Ikuta and N. Randy Smith, Circuit
Judges, and George Caram Steeh III,[*] District Judge.

Opinion by Judge Ikuta;
Dissent by Judge N.R. Smith

## SUMMARY[**]

### Antitrust

The panel reversed the district court's dismissal for
failure to state a claim of an antitrust action brought by a
putative class of residential and commercial subscribers to
DirecTV's NFL Sunday Ticket, a bundled package of all NFL
games available exclusively to subscribers of DirecTV's
satellite television service.

Each NFL team entered into a "Teams-NFL Agreement"
with the NFL to pool their telecasting rights and give the NFL
the authority to exercise those rights.  Acting on behalf of its
teams, the NFL entered into two additional agreements
licensing the teams' telecast rights.  Under the "NFL-
Network Agreement," CBS and Fox coordinate to create a
single telecast for every Sunday-afternoon NFL game, and

---

[*] The Honorable George Caram Steeh III, United States District Judge
for the Eastern District of Michigan, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

the NFL permits CBS and Fox to broadcast a limited number of what are known as local games through free, over-the-air television.  Under the "NFL-DirecTV Agreement," the NFL allows DirecTV to obtain all of the live telecasts produced by CBS and Fox, package those telecasts, and deliver the bundled feeds to NFL Sunday Ticket subscribers.

Plaintiffs alleged that defendants' interlocking agreements work together to suppress competition for the sale of professional football game telecasts in violation of §§ 1 and 2 of the Sherman Act.

The panel held that plaintiffs stated a § 1 claim under the rule of reason because they adequately alleged (1) a contract, combination, or conspiracy among two or more persons or business entities; (2) by which the persons or entities intended to harm or restrain trade; (3) and which actually injured competition; and (4) antitrust standing.  The first and second elements were undisputed.  As to the third element, the panel held that, under *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984), plaintiffs plausibly alleged that the interlocking agreements caused injury to competition.  As to the fourth element, it was undisputed that plaintiffs had standing to challenge the Teams-NFL Agreement and the NFL-DirecTV Agreement. The panel held that plaintiffs also had standing to challenge the Teams-NFL Agreement because they alleged that their injury was caused by a single conspiracy.  The panel concluded that *Illinois Brick*, limiting the standing of indirect purchasers, did not apply.

The panel held that the plaintiffs stated a claim under § 2 of the Sherman Act in alleging that, by entering into interlocking agreements, the defendants conspired to

monopolize the market for professional football telecasts and have monopolized it.

Judge N.R. Smith dissented from Part III(C) of the majority's opinion, addressing antitrust standing.   Judge Smith disagreed with the majority's conclusion that, because plaintiffs alleged a conspiracy among defendants to limit output, the direct purchaser rule of *Illinois Brick* did not apply to plaintiffs' damages claim related to the Teams-NFL Agreement.

---

## COUNSEL

Mark M. Seltzer (argued), Susman Godfrey LLP, Los Angeles, California; Edward Diver, Howard Langer, and Peter E. Leckman, Langer Grogan & Diver P.C., Philadelphia, Pennsylvania; Scott Martin, Hausfeld LLP, New York, New York; for Plaintiffs-Appellants.

Greg H. Levy (argued), Derek Ludwin, John S. Playforth, and Sonia Lahr-Pastor, Covington & Burling LLP, Washington, D.C.; Beth A. Wilkinson, Wilkinson Walsh & Eskovitz LLP, Washington, D.C.; Sean Eskovitz, Wilkinson Walsh & Eskovitz LLP, Los Angeles, California; for Defendants-Appellees.

Craig C. Corbitt, Corbitt Law Office, San Francisco, California, for Amici Curiae Economists.

---

**OPINION**

IKUTA, Circuit Judge:

Every Sunday during football season, millions of National Football League (NFL) fans tune in to watch their team play. If they live in the same area as their favorite team—such as Los Angeles Rams fans who live in Los Angeles—they can tune into their local Fox or CBS station to enjoy their team's game on free, over-the-air television.  But if NFL fans happen to live far away from their favorite team—such as Seattle Seahawks fans residing in Los Angeles—they can watch every Seahawks game only if they purchase DirecTV's NFL Sunday Ticket, a bundled package of all NFL games available exclusively to subscribers of DirecTV's satellite television service.

The plaintiffs, a putative class of Sunday Ticket subscribers, claim that this arrangement harms NFL fans because it eliminates competition in the market for live telecasts of NFL games. Without this arrangement restricting the televising of NFL games, plaintiffs argue, the individual teams would create multiple telecasts of each game and would compete against one another by distributing telecasts of their games through various cable, satellite, and internet channels.   We conclude that at this preliminary stage, plaintiffs have stated a cause of action for a violation of Sections 1 and 2 of the Sherman Act that survives a motion to dismiss.  We therefore reverse the district court's decision to the contrary.

I

To analyze the challenged arrangement between the NFL teams, the NFL, and DirecTV, it is necessary to understand the history of television broadcasting of NFL games.  The NFL, an association of "separately owned professional football teams," was formed in 1920.  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 187 (2010).  While the NFL had a rocky first two decades, its teams gradually became successful.  *See U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1343 (2d Cir. 1988).  Indeed, by 1959, a majority of NFL team owners felt that there was a "growing interest in professional football and the healthier financial condition of the NFL teams."  *Am. Football League v. Nat'l Football League*, 205 F. Supp. 60, 67 (D. Md. 1962), *aff'd*, 323 F.2d 124 (4th Cir. 1963).  And as professional football gained popularity, so did the telecasts of its games.

In the 1950s, the right to telecast NFL games was "controlled by individual teams," which independently licensed the telecasts of their games to television networks.  *U.S. Football League*, 842 F.2d at 1346.**[1]**  For example, in

---

**[1]** By this time, courts had agreed that sports teams had a property interest in their games.  In *Pittsburgh Athletic Co. v. KQV Broadcasting Co.*, the leading case on this issue, a radio station broadcast play-by-play descriptions of the Pirates' baseball games without the consent of the team.  24 F. Supp. 490, 492 (W.D. Pa. 1938).  The Pirates sued to enjoin the unauthorized broadcasts.  *Id.*  The district court enjoined the radio station, holding that the baseball team, "by reason of its creation of the game, its control of the park, and its restriction of the dissemination of news therefrom, has a property right in such news, and the right to control the use thereof for a reasonable time following the games."  *Id.*; *see Nat'l Exhibition Co. v. Fass*, 133 N.Y.S.2d 379, 380 (Sup. Ct. 1954) (enjoining

1951, the "Dumont network televised five regular season games (twelve by 1954), as well as the championship game each year." *Id.*   Additionally, in the mid-1950s, "the Columbia Broadcasting System ('CBS') began broadcasting certain NFL regular season games for $1.8 million per year, and the National Broadcasting Company ('NBC') acquired the right to televise the NFL championship game." *Id.*

Concerned that too much competition between the teams in the market for broadcast rights might drive some teams out of business, the NFL amended its 1951 bylaws to address this issue.  In Article X of the bylaws, the NFL required each NFL team to agree to minimize competition by refraining from telecasting its games into another team's local market whenever that local team was either playing at home or broadcasting its away game in its local territory.[2]  *United States v. Nat'l Football League*, 116 F. Supp. 319, 321 (E.D. Pa. 1953) (*NFL I*).

In 1951, the Justice Department brought suit in district court to enjoin enforcement of Article X, alleging that it violated Section 1 of the Sherman Act.  *Id.* at 321.  After a

the "defendant from the unauthorized transmission, subsequently broadcast, of detailed accounts of games"); *Sw. Broad. Co. v. Oil Ctr. Broad. Co.*, 210 S.W.2d 230, 234 (Tex. Civ. App. 1947) (granting an injunction to prevent a radio broadcaster from broadcasting play-by-play accounts of football games); *cf. Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 575 (1977) (citing *Pittsburgh Athletic Co.*, 24 F. Supp. at 490).

[2] Article X would have prevented, for example, the New England Patriots from broadcasting their game against the Minnesota Vikings within 75 miles of Washington, D.C. when the Washington Redskins were either (1) playing at home or (2) playing an away game but telecasting that game in Washington, D.C.  *See NFL I*, 116 F. Supp. at 325.

bench trial, Judge Grim held that the NFL could restrict the broadcast of distant games into home territories in order to protect attendance for the local team's game without violating antitrust law.  *Id.* at 325–26.  Because "primarily all of NFL revenues were derived from gate receipts," protecting live attendance at NFL games was important to the league's success.  H.R. Rep. No. 93-483 at 5 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2032, 2035; *see NFL I*, 116 F. Supp. at 325.  However, the NFL could not restrict teams from broadcasting their games into another team's local market when that team was playing away games.  *NFL I*, 116 F. Supp. at 326–27.  Such a restriction, Judge Grim held, would be an impermissible restraint of trade that violated the Sherman Act.  *Id.* at 327.  Judge Grim therefore enjoined the NFL teams from entering into a contract that restricts "the sale of rights for the telecasting of outside games in club's home territory on a day when the home club is permitting the telecast of its away game in its home territory."  *Id.* at 330.

The NFL did not appeal the 1953 injunction imposed by *NFL I*, which remained in force until Congress addressed the issue.  "For a number of years after the 1953 decision, the broadcasting practices of the member clubs of the National Football League stabilized."  H.R. Rep. No. 93-483 at 4 (1973).  The individual NFL teams competed against each other on the field and in the market for telecasting rights.  Indeed, "[b]y the late 1950s, eleven individual teams had signed contracts with the Columbia Broadcasting System; two teams—Baltimore and Pittsburgh—had signed contracts with the National Broadcasting Company; and one team—Cleveland—had organized its own network."  *Id.*

This changed when the NFL began to face competition from its newly formed rival, the American Football League

(AFL).  While the NFL was precluded under *NFL I* from restricting the sale of telecasts, the AFL was not.  *Id.* at 2034. As a result, the AFL "entered into league-wide television contracts," *id.*, and pooled its television rights and revenues in a broadcast contract with ABC, *U.S. Football League*, 842 F.2d at 1346.

In light of this disparity with the AFL, and out of concern "that the league's competitive balance on the field would eventually be destroyed if teams in major television markets continued to sell their broadcast rights individually," in 1961, the NFL teams also decided "to sell their collective television rights as a single package and to share broadcast revenues equally among all franchises." *Id.* (quoting the testimony of Commissioner Rozelle).  In 1961, the NFL filed a petition with Judge Grim seeking to implement a new television contract between the NFL and CBS.  *United States v. Nat'l Football League*, 196 F. Supp. 445, 447 (E.D. Pa. 1961) (*NFL II*).  Under the terms of the NFL-CBS contract, the NFL teams would pool their television rights in the NFL and then the NFL would jointly sell those rights to CBS.  *Id.* at 446–47.  Judge Grim denied the petition, holding that the proposed agreement violated the 1953 injunction because if the agreement went into effect, "the member clubs of the League [would] have eliminated competition among themselves in the sale of television rights to their games." *Id.* at 447.  Judge Grim therefore issued a second injunction (the 1961 injunction) enjoining the implementation of the pooled rights contract between NFL and CBS.  *Id.*

Rather than appeal the 1961 injunction, the NFL sought Congressional relief.  In response to the NFL's lobbying, Congress passed the Sports Broadcasting Act (SBA), which "was specifically designed to establish parity between the

National Football League and the American Football League." H.R. Rep. No. 93-483 at 5 (1973).  The SBA effectively overruled *NFL II*, providing:

> The antitrust laws, as defined in section 1 of the [Sherman] Act . . . shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs.

15 U.S.C. § 1291.  Thus, the SBA provides a tailored exemption for "professional team sports" to sell their rights to "sponsored telecasts" through a joint agreement. *Id.*  In passing the SBA, Congress recognized "that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act," and that therefore an exemption from Section 1 of the Sherman Act was required.  *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 n.28 (1984) (*NCAA*).

For the next 25 years, the NFL teams pooled their telecasting rights to their games and sold them as a single package through free, over-the-air television.  *See* In the Matter of Implementation of Section 26 of the Cable

Television Consumer Protection & Competition Act of 1992, 8 F.C.C. Rcd. 4875, 4879–80 (1993).

Because the SBA applied only to professional sports leagues, it did not apply to college football, which continued to be subject to the Sherman Act. *See* 15 U.S.C. § 1291. Like the NFL, the NCAA had a long-standing restriction on televising team games. *See NCAA*, 468 U.S. at 89–90. Beginning in 1951, the NCAA enforced procedures ensuring that "only one game a week could be telecast in each area, with a total blackout on 3 of the 10 Saturdays during the season," and "[a] team could appear on television only twice during a season." *Id.* at 90. The NCAA maintained this approach for the next two decades.

Finally, in the 1980s, the NCAA's arrangement was challenged by colleges that wanted to negotiate more lucrative television deals for their popular football teams. *Id.* at 90–91. This challenge resulted in the Supreme Court's authoritative opinion on the antitrust law of league sports, *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma,* 468 U.S. 85 (1984).

In *NCAA*, the Supreme Court struck down the NCAA's restrictive telecast agreements as violating the Sherman Act. According to the Court, "[b]y participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint—an agreement among competitors on the way in which they will compete with one another." *Id.* at 99. Such an arrangement violated Section 1 of the Sherman Act because "[i]ndividual competitors lose their freedom to compete," and "[p]rice is

higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." *Id.* at 106–07.

After *NCAA*, commentators documented the changes caused by the increased competition in college football telecasts. "With conferences and teams now free to sign their own deals, the number of televised college football games grew exponentially." Nathaniel Grow, *Regulating Professional Sports Leagues*, 72 Wash. & Lee L. Rev. 573, 617 (2015). Moreover, because college football teams could compete "against one another in the marketplace, broadcasters collectively pa[y] half as much for the rights to televise a larger number of games than the NCAA had previously received for its collective package." *Id.* By contrast, under the SBA, the NFL's control over the pooled broadcasting rights increased revenues from telecasting, *see* Michael A. McCann, American Needle v. NFL: *An Opportunity to Reshape Sports Law*, 119 Yale L.J. 726, 732 (2010), while decreasing the number of telecasts available to consumers, *see* Ariel Y. Bublick, Note, *Are You Ready for Some Football?*, 64 Fed. Comm. L.J. 223, 231, 234–36 (2011).

While the NFL's collective sale of telecast rights to free, over-the-air television networks was squarely covered by the SBA, as television technology advanced, from over-the-air to cable to satellite television, the NFL and other professional leagues began using new methods of distributing telecasts of the games.[3] In 1987, the NFL entered into its first cable deal,

---

[3] Over-the-air television is conveyed by "[b]roadcast stations [that] radiate electromagnetic signals from a central transmitting antenna." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 627 (1994). It is free to

14      IN RE NFL SUNDAY TICKET ANTITRUST LITIG.

selling the right to telecast eight Sunday games to ESPN.  *See* 8 F.C.C. Rcd. 4875, 4879.  Beginning in 1994, the NFL entered into an agreement with DirecTV, allowing DirecTV to sell Sunday Ticket exclusively through its satellite television service.  Babette Boliek, Antitrust, Regulation, and the "New" Rules of Sports Telecasts, 65 Hastings L.J. 501, 541 (2014).

Courts considering challenges to the telecasting arrangements between sports leagues and satellite television services have concluded that "'sponsored telecasting' refers to broadcasts which are financed by business enterprises (the 'sponsors') in return for advertising time and are therefore provided free to the general public." *Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299, 301 (3d Cir. 1999).  Therefore, the SBA does not exempt league contracts with cable or satellite television services, for which subscribers are charged a fee, from antitrust liability.  *Id.* at 303; *see also Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 671 (7th Cir. 1992) (*Bulls I*) (holding that the SBA applies when a league has transferred rights to sponsored telecasting and therefore did not apply to the NBA's efforts to limit distribution by the Bulls of their games

---

"any television set within the antenna's range." *Id.*  Cable television, in contrast, typically relies upon "cable or optical fibers strung aboveground or buried in ducts to reach the homes or businesses of subscribers." *Id.* at 628.  Satellite television providers deliver their "signals via satellite directly into its customers' homes." *DirecTV, Inc. v. Webb*, 545 F.3d 837, 841 (9th Cir. 2008).  As with "conventional radio and television broadcasting, [satellite television] signals are broadcast through the air and can be received—or intercepted—by anyone with the proper hardware." *Id.*  Because satellite signals could be received by anyone with a satellite dish, satellite providers typically "encrypt[] [their] signals to protect against signal theft." *Id.*

on a cable network); *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 595 (7th Cir. 1996) (*Bulls II*) (same); *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1183 (S.D. Cal. 2002) ("'Sponsored telecasting' under the SBA pertains only to network broadcast television and does not apply to non-exempt channels of distribution such as cable television, pay-per-view, and satellite television networks.").

The current arrangements for cable broadcasting of NFL games is as follows.  The 32 individual NFL teams, each of which is a separate "independently owned, and independently managed business," *Am. Needle*, 560 U.S. at 196, entered into an agreement with the NFL ("Teams-NFL Agreement") to pool their telecasting rights and give the NFL the authority to exercise those rights, rather than exercising those rights individually.  The consequence of this agreement is that an individual team cannot enter into individual agreements with networks, satellite TV providers, or internet streaming services.  Instead, only the NFL can enter into an agreement to sell those rights.

Acting on behalf of its teams, the NFL entered into two additional agreements licensing the teams' telecast rights: (1) "the NFL-Network Agreement," which governs "local games," and (2) "the NFL-DirecTV Agreement," which governs "out-of-market games."

Under the NFL-Network Agreement, CBS and Fox coordinate to create a single telecast for every Sunday-afternoon NFL game.  Pursuant to that agreement, NFL owns the copyright in the telecasts.  *See, e.g.*, U.S. Copyright Office, *NFL 2016 Season: Cowboys @ Packers, Week #6*, Reg. No. PA0002069024 (Jan. 4, 2017) (noting that copyright

was held by the NFL pursuant to transfer "[b]y contract"). The NFL, in turn, permits CBS and Fox to broadcast a limited number of games through free, over-the-air television. These are the so-called local games.

Under the NFL-DirecTV Agreement, the NFL allows DirecTV to obtain all of the live telecasts produced by CBS and Fox, package those telecasts, and deliver the bundled feeds to NFL Sunday Ticket subscribers. Thus, Sunday Ticket subscribers have access to both local and out-of-market games.

As a result of these agreements, fans who do not subscribe to Sunday Ticket have access to, at most, two to three local games each Sunday afternoon, in any given geographic area. This means, for example, that Los Angeles fans would be able to use over-the-air cable to watch the Rams play the Chargers at 1:00PM E.T. on Fox, the Vikings play the Patriots at 1:00PM E.T. on CBS, and the Dolphins play the Cowboys at 4:00PM E.T. on CBS. But there is no option for NFL fans to watch any of the other 7 to 10 games played each Sunday afternoon which are not available on free, over-the-air television.

Fans who want to watch other out-of-market games cannot purchase games individually or by team, but are required to buy the entire package of NFL games. Additionally, in order to subscribe to the Sunday Ticket, consumers must also purchase a basic television package from DirecTV. In 2015, the cost of a basic Sunday Ticket package was $251.94 annually for residential subscribers. For commercial subscribers, the price varied depending on the capacity of the establishment, ranging from $2,314 to $120,000 per year.

II

Four plaintiffs (Ninth Inning, Inc., 1465 Third Avenue Restaurant Corp., Robert Gary Lippincott, Jr., and Michael Holinko) filed a consolidated complaint against the National Football League, NFL Enterprises LLC, all 32 individual NFL teams, DirecTV Holdings LLC, and DirecTV, LLC, on behalf of a putative class of residential and commercial NFL Sunday Ticket subscribers. (Our reference to "plaintiffs" refers to the plaintiffs collectively. We will refer to the defendants collectively, or as the NFL, the NFL teams, and DirecTV, as appropriate.)

The plaintiffs' consolidated complaint alleges that the defendants' interlocking agreements work together to suppress competition for the sale of professional football game telecasts in violation of Section 1 and Section 2 of the Sherman Antitrust Act. Specifically, the complaint alleges that absent the anti-competitive Teams-NFL and NFL-DirecTV Agreements, the telecasts broadcast solely on Sunday Ticket would be available through other distributors. Additionally, each NFL team could make its own arrangements for telecasts of its games, and could contract with competing distribution channels or media, including other cable, satellite or internet carriers or competing networks. As a result of competition, the complaint alleges, a greater number of telecasts of NFL games would be created, and those telecasts would be more accessible to more viewers at lower prices.

The district court dismissed the consolidated complaint for failure to state a claim under either Section 1 or Section 2 of the Sherman Act. "We review a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim de

18      IN RE NFL SUNDAY TICKET ANTITRUST LITIG.

novo." *Bain v. Cal. Teachers Ass'n*, 891 F.3d 1206, 1211 (9th Cir. 2018).   Additionally, we "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *Turner v. City & Cty. of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015).   However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (internal quotation marks omitted).   We examine the district court's dismissal of the Section 1 and Section 2 claims in turn.

It is significant here that the defendants do not argue on appeal that the SBA applies to the Teams-NFL or NFL-DirecTV Agreements.   As the foregoing history indicates, the NFL and the NFL teams' early decision to pool their telecast rights into a single package and share broadcast revenues was invalidated by Judge Grim as a violation of the Sherman Act. *NFL I*, 116 F. Supp. at 329–30.   The NFL recovered its ability to enter into such pooling arrangements only by the enactment of the SBA, which offered the NFL and the NFL teams an exemption from antitrust law.   *See* 15 U.S.C. § 1291.   Because the defendants do not argue that the SBA applies to satellite broadcasting, we assume (without deciding) that it is not applicable to the Teams-NFL or NFL-DirecTV Agreements.   Accordingly, our analysis of the complaint's allegations regarding those agreements is largely governed by the Supreme Court's decision in *NCAA*, 468 U.S. 85, which analyzed a similar league sport broadcasting arrangement under the Sherman Act, without any applicable statutory exemption.[4]

---

[4] The defendants argue, and the plaintiffs do not dispute, that the NFL-Network Agreement is covered by the SBA.  But the parties do not

III

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Although on its face, Section 1 appears to outlaw virtually all contracts, it has been interpreted as "outlaw[ing] only unreasonable restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

We determine whether a particular restraint of trade is unreasonable and thus a violation of Section 1 under the so-called "rule of reason."[5] Under this rule, we examine "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed," to determine the effect on competition in the relevant product market. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

---

argue that the agreements at issue here are exempt from antitrust liability merely because the NFL-Network Agreement has such immunity.

[5] Under antitrust law, some restraints of trade, such as horizontal agreements among competitors to fix prices, restrict output, and divide markets, are generally deemed to be per se unreasonable, and therefore it is unnecessary to apply the rule of reason in order to determine whether such agreements violate Section 1. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015). Although this case concerns a horizontal agreement, the Supreme Court has concluded that the per se rule does not apply to agreements involving teams engaged in league sports, on the ground that such sports "can only be carried out jointly." *NCAA*, 468 U.S. at 101 (quoting Bork, The Antitrust Paradox 278 (1978)). Therefore, when considering agreements among entities involved in league sports, such as here, a court must determine whether the restriction is unreasonable under the rule of reason. *Id.* at 103.

"In order to state a Section 1 claim under the rule of reason, plaintiffs must plead four separate elements." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). "[P]laintiffs must plead facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Id.* (internal quotation marks and citations omitted).  Additionally, the plaintiffs must plead antitrust standing, meaning they must allege that (4) they are the proper parties to bring the antitrust action because they were harmed by the defendants' contract, combination, or conspiracy, and the harm they suffered was caused by the anti-competitive aspect of the defendants' conduct. *Id.*

## A

The defendants do not dispute that the complaint adequately alleges that defendants have contracts for the purpose of restraining trade, the first and second elements. The defendants argue only that the complaint does not adequately allege the third and fourth elements of a Section 1 claim.  We begin with the third element of a Section 1 claim, whether plaintiffs have adequately alleged that the restraint injures competition.

In order to satisfy this third requirement, the plaintiffs must identify a harm that is "attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  A harm that could have occurred under the normal circumstances of free competition fails to satisfy this

requirement. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). An agreement between competitors (a horizontal agreement) satisfies the requirement of showing injury to competition if it reduces competitors' independent decisions about "whether and how often to offer to provide services," *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990), or fixes prices, *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223 (1940), or otherwise limits competitors' "freedom to compete," *NCAA*, 468 U.S. at 106. In order to show that an agreement injures competition, a plaintiff must generally show that the defendants have market power within a relevant market, *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008), meaning that the defendants have "the ability to raise prices above those that would be charged in a competitive market," *NCAA*, 468 U.S. at 109 n.38. Alternatively, plaintiffs can show that a restraint injures competition if they plausibly allege "a naked restriction on price or output," such as "an agreement not to compete in terms of price or output." *Id.* at 109. An agreement between companies at different levels of a supply chain (a vertical agreement) may injure competition if it facilitates "horizontal collusion." *Brantley*, 675 F.3d at 1198.

B

In this case, the plaintiffs' allegations on their face adequately allege an injury to competition. The interlocking agreements at issue are similar to those that have historically required an exemption from antitrust liability by the SBA: they are "joint agreement[s]" whereby a "league of clubs participating in professional football . . . sells or otherwise transfers all or any part of the rights of such league's member clubs" in the telecasting of such games. 15 U.S.C. § 1291.

This is the exact type of arrangement that Judge Grim concluded violated the Sherman Act—and, more importantly, that the Supreme Court held caused an injury to competition in the context of college football. *See NCAA*, 468 U.S. at 104.

Because we assume that the NFL's interlocking agreements are not protected by the SBA, the Supreme Court's decision in *NCAA* controls our analysis. In that case, the Supreme Court held that an agreement among college football teams and the NCAA violated Section 1 of the Sherman Act because the agreement eliminated competition in the market for college football telecasts. *See generally id.* Here, the interlocking agreements impose similar restrictions. First, the Supreme Court noted in *NCAA* that the agreement at issue "limits the total amount of televised intercollegiate football and the number of games that any one team may televise." *Id.* at 94. The complaint here alleges that the interlocking agreements in this case impose analogous limitations: plaintiffs assert that the Teams-NFL and NFL-DirecTV Agreements limit the "amount of televised [professional] football" that one team may televise because they restrict the number of telecasts made to a single telecast for each game.

Second, the Supreme Court noted that the agreements in *NCAA* provided that "[n]o member [college] is permitted to make any sale of television rights except in accordance with the basic plan." *Id.* In our case, plaintiffs allege that the NFL teams are similarly restricted. Under the terms of the Teams-NFL and NFL-DirecTV Agreements, no individual NFL team is permitted to sell its telecasting rights independently. Independent telecasts are forbidden under the terms of the Agreements because they would cause the teams to compete

with each other and with DirecTV.  Just as the University of Oklahoma was forbidden from increasing the number of telecasts made of its games, so too are the Seattle Seahawks forbidden from selling their telecast rights independently from the NFL.

Third, in *NCAA* the Court concluded that the agreement among the member colleges was a horizontal agreement among competitors because "the policies of the NCAA with respect to television rights are ultimately controlled by the vote of member institutions."  *Id.* at 99.  The same type of agreement is alleged here.  According to the complaint, the NFL members vote to approve the contract between DirecTV and the NFL.  Therefore, the complaint adequately alleges that the Teams-NFL Agreement is a "horizontal restraint—an agreement among competitors" that "places an artificial limit on the quantity of  televised football that is available [for sale] to broadcasters and consumers."  *Id.*

Finally, *NCAA* held that the agreements constituted a naked restriction on output, and defined the relevant output to be "the quantity of television rights available for sale," meaning "the total amount of televised intercollegiate football," *Id.* at 94, 99, as opposed to whether each game was broadcast in some market at some time.  In our case, the complaint likewise alleges that the interlocking agreements restrain the production and sale of telecasts in a manner that constitutes "a naked restriction" on the number of telecasts available for broadcasters and consumers.

Because the complaint alleges that the interlocking agreements in this case involve the same sorts of restrictions that *NCAA* concluded constituted an injury to competition, we likewise conclude that the complaint plausibly alleges an

24    IN RE NFL SUNDAY TICKET ANTITRUST LITIG.

injury to competition.    Further, because the alleged restrictions on the production and sale of telecasts constitute "a naked restriction" on the number of telecasts available for broadcasters and consumers, the plaintiffs were not required to establish a relevant market. *Id.* at 109.

The defendants make a number of arguments against this conclusion.  We consider each in turn.

1

First, the defendants argue that under *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186 (9th Cir. 2015), it is necessary to analyze the horizontal NFL Teams agreement separately from the vertical NFL-DirecTV agreement, and when viewed in that light, the NFL-DirecTV agreement does not injure competition because it is an exclusive distribution agreement of the type that is presumptively legal.    We disagree.    First, *Musical Instruments* does not require a court to break down an alleged conspiracy into its constituent parts.    *Musical Instruments* merely explained the uncontroversial principle that, in general, horizontal agreements are analyzed under per se rules, while vertical agreements are analyzed under the rule of reason. *Id.* at 1191–92.  But as noted above, both types of agreements are analyzed under the rule of reason in cases involving league sports.  *NCAA*, 468 U.S. at 101–03.

Contrary to the defendants' argument, we are required to take a holistic look at how the interlocking agreements actually impact competition.    *See Nat'l Soc'y. of Prof'l Eng'rs*, 435 U.S. at 692.  Indeed, "the essential inquiry" is "whether or not the challenged restraint enhances competition," which is assessed by considering the totality of

"the nature or character of the contracts." *NCAA*, 468 U.S. at 103–04 (quoting *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 690). Thus, the law requires that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) (quoting *United States v. Patten*, 226 U.S. 525, 544 (1913)). Accordingly, we must give plaintiffs "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401, 1404–05 (9th Cir. 1989), *opinion amended on denial of reh'g*, 886 F.2d 246 (9th Cir. 1989) (quoting *Continental Ore Co.*, 370 U.S. at 699).

Looking holistically at the alleged conduct, we conclude that the complaint adequately pleads that the vertical NFL-DirecTV Agreement works in tandem with the Teams-NFL agreement to restrain competition. The Supreme Court has held that a horizontal agreement among competitors to pool separate property rights and enter into an agreement to license their rights vertically can constitute a Section 1 violation. *See Am. Needle*, 560 U.S. at 201 (holding that an agreement among the NFL and its member teams to create an entity that jointly licensed their separately owned intellectual property constituted concerted action in violation of the Sherman Act). Accordingly, we reject the defendants' argument that we cannot view the effects of both the horizontal and vertical agreements working together.

2

Defendants further argue that plaintiffs have failed to allege an injury to competition because the production of the

telecasts necessarily requires joint action, and therefore the restrictions are pro-competitive. According to defendants, each NFL game broadcast is a copyrighted work jointly authored by the NFL, the two competing teams, and the broadcast network, and the agreement of all participants is necessary in order to create the telecasts at all. Thus, defendants argue, the Supreme Court's decision in *American Needle* is inapposite because that decision concerned separately owned intellectual property, *id.* at 187, whereas here, the telecasts could only be created through cooperation between competitors.

We disagree. Defendants have failed to identify, and we are unaware of, any binding precedent requiring the teams and the NFL to cooperate in order to produce the telecasts.

Under copyright law, it is well-established that the underlying NFL game is not copyrightable subject matter. *See Dryer v. Nat'l Football League*, 814 F.3d 938, 942 (8th Cir. 2016) (noting that "courts have recognized that the initial performance of a game is an 'athletic event' outside the subject matter of copyright"); *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 846 (2d Cir. 1997) ("*NBA*") ("In our view, the underlying basketball games do not fall within the subject matter of federal copyright protection because they do not constitute 'original works of authorship' under 17 U.S.C. § 102(a).").

However, the telecasts of sporting events are plainly copyrightable "motion pictures" under the Copyright Act of 1976. 17 U.S.C. § 102(a)(6); *NBA*, 105 F.3d at 847 ("[R]ecorded broadcasts of NBA games—as opposed to the games themselves—are . . . entitled to copyright protection."). Indeed, "[t]he Copyright Act was amended in

1976 specifically to insure that simultaneously-recorded transmissions of live performances and sporting events would meet the Act's requirement that the original work of authorship be 'fixed in any tangible medium of expression.'" *NBA*, 105 F.3d at 847 (citing 17 U.S.C. § 102(a); H.R. Rep. No. 94-1476, at 52); *see also Nat'l Football League v. McBee & Bruno's, Inc.*, 792 F.2d 726, 732 (8th Cir. 1986) ("[T]he legislative history demonstrates a clear intent on the part of Congress to 'resolve, through the definition of "fixation" . . . , the status of live broadcasts,' using—coincidentally but not insignificantly—the example of a live football game.").

Under general copyright law, copyright ownership vests initially in the author of the work, 17 U.S.C. § 201(a), who, as a general rule, "is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). Thus, in the absence of an agreement otherwise, the person or company that creates the telecast is the "author" of the telecast for the purposes of copyright law.  *See id.*; *see also Garcia v. Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015) (en banc).  Assuming that this rule applies in the league sports setting, the team or network that creates the telecasts would be the sole owner of the copyright in the telecasts, absent some agreement to the contrary.  *See Reid*, 490 U.S. at 737; *see also Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 668–69 (7th Cir. 1986) ("When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent to the public and in which order, there is little doubt that what the cameramen and the director are doing constitutes

'authorship.'" (internal quotation marks and citations omitted)).

In the absence of a legal requirement that the NFL teams, NFL, and broadcasters coordinate in filming and broadcasting live games, the Los Angeles Rams (for instance) could contract for their own telecast of Rams games and then register the telecasts for those games with the Rams (and perhaps the team against whom they are playing). Only the agreements that are the subject of plaintiffs' antitrust action prevent such independent actions. Thus, we reject the defendants' argument that *American Needle*, 560 U.S. at 190, is inapposite; here, like in *American Needle*, the agreements not to compete concern separately owned intellectual property, and impose an unlawful restraint on independent competition.

Indeed, the history of the NFL, as well as the practice in other professional sports leagues, supports our conclusion. As discussed above, prior to the passage of the SBA, the telecast rights in NFL games "were controlled by individual teams" and NFL teams routinely licensed telecasts of their games to television networks. *U.S. Football League*, 842 F.2d at 1346. Indeed, by the late 1950s, thirteen individual teams had signed contracts with either CBS or NBC and one team "had organized its own network." H.R. Rep. No. 93-483 at 4 (1973). Thus, the Supreme Court explained that college football teams "are clearly able to negotiate agreements with whatever broadcasters they choose." *NCAA*, 468 U.S. at 114 n.53 (quoting the district court, *Bd. of Regents of Univ. of Oklahoma v. Nat'l Collegiate Athletic Ass'n*, 546 F. Supp. 1276, 1307–08 (W.D. Okla. 1982)). Further, after the decision in *NCAA*, the NCAA teams arranged telecasting on their own. Grow, *supra*,

72 Wash. & Lee L. Rev. at 617.  Additionally, in comparable sports leagues, namely the National Hockey League and Major League Baseball, "each team owns the initial right to control telecasts of its home games." *Laumann v. NHL*, 907 F. Supp. 2d 465, 473, 485 (S.D.N.Y. 2012); *see also New Boston Television, Inc. v. ESPN*, No. 81-1010-Z, 1981 WL 1374, at *1 (D. Mass. Aug. 3, 1981) ("The copyright of the teleplays of all Red Sox games is owned by the Red Sox."). And in another form of media, radio broadcasting, plaintiffs allege that the NFL Teams already negotiate individual radio broadcasting contracts.

Therefore, we reject defendants' argument that the complaint fails to allege a Section 1 violation because the telecasts can be created only through cooperation among competitors.

3

Defendants next assert that plaintiffs' complaint failed to allege injury to competition because the NFL-DirecTV agreement did not reduce the output of NFL game broadcasts. From the supply side, defendants argue, every regular season NFL game is broadcast over free television in some geographic area, and therefore, the entire potential supply of NFL game broadcasts is produced and distributed to the public.  From the demand side, defendants argue, NFL broadcasts receive the most views of any sports league; 202.3 million unique viewers watched an NFL football game in 2014.

We disagree that the defendants' definition of output is the only permissible definition for purposes of determining whether plaintiffs have stated a claim.  As noted above,

*NCAA* indicated that the relevant output is "the total amount of televised intercollegiate football," available to consumers. 468 U.S. at 94.  We therefore reject the defendants' argument that because all NFL Sunday-afternoon games are broadcast somewhere, there is no limitation on output as a matter of law.

The complaint alleges that defendants have limited output by restricting the quantity of telecasts available for sale, and that the NFL has set a uniform quantity of telecasts of football games—one per game—with no regard to the actual consumer demand for the telecasts.  The plaintiffs plausibly allege that "if member institutions were free to sell television rights, many more games would be shown," 468 U.S. at 105, because an individual NFL team would "be free to sell the right to televise its games for whatever price it could get." *Id.* at 106 n.30 (quoting the district court's findings, 546 F. Supp. at 1318).  "The prices would vary for the games, with games between prominent [NFL teams] drawing a larger price than games between less prominent [NFL teams]." *Id.* (quoting the district court's findings, 546 F. Supp. at 1318).  We conclude that for purposes of determining whether plaintiffs have stated an injury to competition, the plaintiffs have plausibly alleged that the output in this case is the number of telecasts of games, and that the defendants' interlocking agreements reduce that output.

4

Finally, defendants claim that the complaint fails to allege injury to competition because it has not alleged a properly defined market in which defendants have market power. Defendants argue that the complaint failed to plausibly allege that they have market power in either the market for live

video presentations of regular season NFL games or the submarket for out-of-market game broadcasts. We reject these arguments. Given that professional football games have no substitutes (as fans do not consider NFL games to be comparable to other sports or forms of entertainment), *see L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1393 (9th Cir. 1984), the defendants in this case have effective control over the entire market for telecasts of professional football games. The complaint therefore plausibly alleges a naked restraint on output: that the defendants' interlocking agreements have the effect of limiting output to one telecast of each game, which is then broadcast in a limited manner, solely according to the NFL's agreements with CBS, Fox, and DirecTV. When there is such an agreement not to compete in terms of output, "no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *NCAA*, 468 U.S. at 109 (quoting *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692). Here, as in *NCAA*, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). Because the complaint adequately alleged that the defendants have imposed "a naked restriction" on output, it has not failed to allege market power. *NCAA*, 468 U.S. at 109.

We conclude that the complaint adequately alleges the element of injury to competition by alleging that the interlocking Teams-NFL and NFL-DirecTV Agreements injure competition.

## C

Defendants next argue that the plaintiffs lack antitrust standing to challenge the Teams-NFL Agreement.[6] To plead the fourth element, antitrust standing or antitrust injury, plaintiffs must allege that they were harmed by the injury to competition. *Brantley*, 675 F.3d at 1197. Further, plaintiffs must allege that their harm was caused directly by the antitrust violator. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977). In *Illinois Brick*, the Supreme Court incorporated "principles of proximate cause" into an action for violation of the Sherman Act, holding "that *indirect* purchasers who are two or more steps removed from the violator in a distribution chain may not sue." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520–21 (2019). The Supreme Court reasoned that allowing every purchaser in a distribution chain to claim damages flowing from a single antitrust violation "would create a serious risk of multiple liability for defendants." *Illinois Brick*, 431 U.S. at 730. The Court also wanted to avoid "the evidentiary complexities and uncertainties" that would be "multiplied in the offensive use of pass-on by a plaintiff several steps removed from the defendant in the chain of distribution." *Id.* at 732. Accordingly, *Illinois Brick* "established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Pepper*, 139 S. Ct. at 1521. Said otherwise,

---

[6] There is no dispute that the plaintiffs have standing to challenge the NFL-DirecTV Agreement because they are direct purchasers of DirecTV. Nor is there a dispute that the plaintiffs have standing to seek injunctive relief based on the Teams-NFL Agreement because "indirect purchasers are not barred from bringing an antitrust claim for injunctive relief against manufacturers." *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998). The dissent agrees on these points, as well. Dissent at 41 n.2.

"purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue." *Id.* To illustrate, under this rule, if "manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A." *Id.* However, "C may sue B if B is an antitrust violator." *Id.*

These "principles of proximate cause," *id.* at 1520, apply differently when the injury to plaintiffs is caused by a multi-level conspiracy to violate antitrust laws. We first considered this issue in *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984). In that case, a class of consumers brought an antitrust action against dairy producers and grocery stores, alleging they had jointly conspired to fix the price of dairy products at the retail level. *Id.* at 1211. Because the consumers alleged a price-fixing conspiracy implicating both the dairy producers and the grocery retailers, we concluded the plaintiffs' claim was not barred. *Id.* at 1210. Under the principles of *Illinois Brick*, we reasoned that the plaintiffs' injuries were caused by the conspiracy itself (the concerted action of the dairy producers and grocery retailers), and thus the case did not require calculating the pass-through effects of an indirect injury or raise the risk of duplicative damage claims. *Id.* at 1213–14; *see also In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 750 (9th Cir. 2012). As we subsequently explained, "[i]f the direct purchaser conspires to fix the price paid by the plaintiffs, then the plaintiffs pay the fixed price directly and are not indirect purchasers (i.e., there is no pass-on theory involved)." *In re ATM Fee Antitrust Litig.*, 686 F.3d at 750. In other words, when co-conspirators have jointly committed the antitrust violation, a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation. *See Pepper*, 139 S. Ct. at 1522.

Here, the plaintiffs allege that DirecTV has conspired with the NFL and the NFL teams.  According to the complaint, the conspiracy involves both the Teams-NFL agreement and the NFL-DirecTV agreement, which work together as a single conspiracy to limit the output of NFL telecasts.  This output limitation in turn results in prices for out-of-market games being higher than they would be in the absence of the conspiracy.  Because, as in *Shamrock Foods*, the complaint alleges that plaintiffs' injuries were proximately caused by a single conspiracy, their complaint does not require calculating the pass-through effects of an indirect injury or raise a risk of claims for duplicative harms.  *See* 729 F.2d at 1213–14.[7]  Even though DirecTV is the immediate seller to the plaintiffs, the plaintiffs' allegation that they were directly injured by the conspiracy among the NFL teams, the NFL, and DirecTV is sufficient to allege antitrust

---

[7] The dissent argues that our holding would require the complex damages calculations that the rule in *Illinois Brick* was intended to avoid. Dissent at 41.  In *Illinois Brick*, the Court expressed concern that the judicial system would be too burdened if it had to determine how much of the antitrust violator's overcharge to the first purchaser was passed on to the second, third, or fourth purchasers in the distribution chain.  431 U.S. at 733 n.13 ("[T]he final purchaser still will have to trace the overcharge through each step in the distribution chain.").  But those sorts of calculations are not required in this context.  Unlike the situation in *Illinois Brick*, the plaintiffs here do not allege that an innocent middleman has passed through damages caused by a higher-level antitrust violator. Because plaintiffs allege that DirecTV is part of the conspiracy, DirecTV directly caused the injury to the consumers.  Thus, to calculate the plaintiffs' damages, a court would not need to determine to what extent the NFL overcharged DirecTV; it would need to consider only the prices consumers paid compared to the prices that would have existed in a competitive market. *See Los Angeles Mem'l Coliseum Comm'n*, 791 F.2d at 1367.

standing for purposes of surviving a motion to dismiss. *See Pepper*, 139 S. Ct. at 1521.

The defendants argue (and the dissent agrees) that the plaintiffs do not have standing to challenge the Teams-NFL Agreement because *In re ATM Antitrust Fee Litigation* limited the co-conspirator exception to *Illinois Brick* to cases where an indirect purchaser "establishes a price-fixing conspiracy between the manufacturer and the middleman." *Id.* at 749.  Because the conspiracy in this case involved an output restriction, defendants argue, *Illinois Brick* applies and precludes the plaintiffs from challenging an agreement that did not affect them directly.  This argument misunderstands *ATM Antitrust Fee Litigation*.  As we explained, the "co-conspirator exception is not really an exception at all," but rather describes a situation in which *Illinois Brick* is simply not applicable. *Id.* at 750.  Because the conspiracy alleged in *ATM Antitrust Fee Litigation* was a price-fixing conspiracy, we analyzed that sort of conspiracy, and held *Illinois Brick* did not apply because "[i]f the direct purchaser conspires to fix the price paid by the plaintiffs, then the plaintiffs pay the fixed price directly and are not indirect purchasers." *Id.*[8]

Although *ATM Antitrust Fee Litigation* focused on an alleged price fixing conspiracy, its reasoning is equally applicable to an output-restriction conspiracy, such as the situation here:  if the direct purchaser conspires to limit the

---

[8] Our analysis of *ATM Antitrust Fee Litigation* accords with the Supreme Court's instruction that in a distribution chain where "manufacturer A sells to retailer B, and retailer B sells to consumer C, . . . C may sue B if B is an antitrust violator." *Pepper*, 139 S. Ct. at 1521.  Because this rule applies so long as B is an antitrust violator, it is irrelevant whether B is engaged in a price-fixing or an output-restricting conspiracy. *See id.*

output that will ultimately be available to the plaintiffs, then the plaintiffs are directly impacted by the output limitation and have standing to sue. *See Pepper*, 139 S. Ct. at 1521. In other words, under our caselaw, when plaintiffs adequately allege that their injury was caused by a conspiracy to violate antitrust laws, even when the conspiracy involves multiple levels of producers, distributors, and sales, the plaintiffs sufficiently allege an antitrust injury that can withstand a motion to dismiss.

Defendants argue that we should distinguish between price-fixing and output-restricting conspiracies, but provide no reasoned basis for doing so.[9]  Nor can they, because the Supreme Court has concluded that price-fixing conspiracies are functionally indistinguishable from output-restricting conspiracies. *See Cal. Dental Ass'n*, 526 U.S. at 777. As the Supreme Court explained, "[a]n agreement on output also equates to a price-fixing agreement," because "[i]f firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted." *Id.* (internal quotations omitted). On the other hand, "[i]f instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply." *Id.* (internal quotations omitted). Accordingly, the Supreme Court noted, "with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects." *Id.* (internal quotations omitted). A conspiracy between a cartel of widget producers and their widget retailer to set an artificially high price for widgets is functionally the same as a conspiracy to set an artificially low total output of widgets, which causes prices to

---

[9] The dissent echoes this argument, *see* Dissent at 41 n. 3, but likewise fails to explain a reasoned basis for such a distinction.

rise. *See id.*  Therefore, the consumer of widgets would be directly injured by the antitrust violators at both levels of the distribution chain and would have standing to sue those co-conspirators in both scenarios.  *See Pepper*, 139 S. Ct. at 1521.

Accordingly, we conclude that *Illinois Brick* is not applicable here because the complaint adequately alleges that DirecTV conspired with the NFL and the NFL Teams to limit the production of telecasts to one per game, and that plaintiffs suffered antitrust injury due to this conspiracy to limit output.

IV

We now turn to the question whether the complaint adequately alleges a violation of Section 2 of the Sherman Act.  Section 2 makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2.  Plaintiffs allege two forms of Section 2 violations, a conspiracy to monopolize claim and a monopolization claim.  To establish a conspiracy to monopolize claim under Section 2, plaintiffs must plead: "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  To plausibly plead a monopolization claim, plaintiffs must allege: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury. " *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting *Allied Orthopedic*

*Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010)).[10]

Plaintiffs allege that by entering into interlocking agreements, the defendants conspired to monopolize the market for professional football telecasts and have monopolized it. Defendants argue that the complaint fails to state a claim for the same reason that the Section 1 claim fails: plaintiffs have failed to allege injury to competition or a properly defined relevant market. Defendants also claim that plaintiffs have failed to allege that the defendants had the specific intent to monopolize a relevant market.

We reject this argument. For the reasons explained above, plaintiffs have adequately alleged injury to competition, and have adequately alleged that defendants have market power in the market for professional football telecasts. Moreover, the complaint adequately alleges that the interlocking NFL-Team and NFL-DirecTV agreements were designed to maintain market power, which is sufficient to allege defendants' specific intent. Accordingly, we conclude that the complaint adequately alleges a Section 2 violation.

**REVERSED.**

---

[10] By its terms, the SBA applies only to Section 1 of the Sherman Act and has no relevance to the plaintiffs' Section 2 claims. 15 U.S.C. § 1291.

SMITH, N.R., Circuit Judge, dissenting from Part III(C) of the Majority's opinion[*]

The Majority concludes that the direct purchaser rule articulated in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) does not apply to Plaintiffs' damages claim related to the Teams-NFL Agreement, because Plaintiffs have alleged a conspiracy among Defendants to limit output. Maj. Op. at 33–37. Because this conclusion is controverted by Supreme Court and Ninth Circuit caselaw, I cannot agree.

In *Illinois Brick*, the Supreme Court articulated the direct purchaser rule, which instructs that "indirect purchasers may not use a pass-on theory to recover damages [on an anti-trust claim] and thus have no standing to sue." *Brennan v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741, 748 (9th Cir. 2012) (citing *Illinois Brick*, 431 U.S. at 745–46). The Court created this rule to alleviate the concern that pass-on theories of recovery would require courts to "trac[e] a wholesale overcharge through an intermediary and allocat[e] the retail price between an unlawful wholesale overcharge and market forces." *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1214 (9th Cir. 1984); *Illinois Brick*, 431 U.S. at 737 ("[T]he use of pass-on theories . . . essentially would transform [damages] actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to [damages] suits and seriously undermine their effectiveness.").

---

[*] I concur in the rest of the Majority's opinion.

The rule has an exception: where a plaintiff alleges a price-fixing conspiracy between a manufacturer and the direct purchaser. We refer to this exception as the "co-conspirator exception." *In re ATM Fee Antitrust Litig.*, 686 F.3d at 750. With a price-fixing conspiracy, "[t]he injury suffered by the [consumer] through the effectuation of a voluntary co-conspiracy [to fix the consumer price] can be determined by computing the retail price of [the product] but-for the alleged price fix, and subtracting that total from the actual purchase price." *Shamrock Foods Co.*, 729 F.2d at 1214 (quoting *In re Mid-Atlantic Toyota Antitrust Litig.*, 516 F. Supp. 1287, 1295 (D. Md. 1981)). In other words, where there is a price-fixing conspiracy, the court need not engage in a complex damages calculation, because the overcharge "was not passed on to the consumers through any other level in the distribution chain." *Id.*

In our case, Plaintiffs' challenge to the horizontal agreement among the NFL Teams is unquestionably based on a pass-on theory of injury, and the co-conspirator exception does not apply. After all, Plaintiffs have not alleged that the NFL Teams set, or conspired to set, the actual price paid by any consumers. Instead, they allege only *that DirecTV has set an artificially high consumer price*—an allegation that would require the court to determine whether the payment DirecTV made to the NFL for the telecast rights was an overpayment,[1] how much of an overpayment it was (relative to what DirecTV would have had to pay had the NFL Teams not agreed to pool all of their broadcast rights), and how much of

---

[1] If DirecTV did not overpay the NFL, then consumers have not been damaged by the NFL's horizontal agreement. Under those circumstances, any arbitrary inflation in the price set by DirecTV could not have stemmed from that agreement, but must stem from some other source.

that overpayment was actually then passed on to the consumers. Thus, Plaintiffs' claim for damages stemming from the alleged horizontal agreement among the NFL Teams would require the very analysis prohibited by the *Illinois Brick* rule. That claim fails.[2]

The Majority disagrees, claiming that, because Plaintiffs have alleged a conspiracy between the manufacturer and the distributor to restrict output, the *Illinois Brick* rule is inapplicable. Maj. Op. at 38. The Majority's theory creates problems for three reasons.

First, this court has already rejected the Majority's notion that the *Illinois Brick* rule does not apply when an alleged conspiracy has the same anti-competitive effect as fixing the consumer price.[3] *See In re ATM Fee Antitrust Litig.*, 686 F.3d

---

[2] On the other hand, Plaintiffs are correct in asserting that, notwithstanding the direct purchaser rule, they "have standing to challenge the agreements between the teams and the league" for injunctive relief. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 (9th Cir. 2003) ("*Illinois Brick* doesn't apply to equitable relief."). Thus, because Plaintiffs seek injunctive relief in addition to their damages requests, their claim challenging the NFL Teams' horizontal Agreement is not entirely precluded by the direct purchaser rule.

[3] The Majority claims that a distinction between price-fixing and output-fixing restrictions is foreclosed by *California Dental Association*. Maj. Op. at 36 (citing *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999)). However, *California Dental Association* does not discuss the *Illinois Brick* rule or the distinction between indirect and direct purchasers. *See generally* 526 U.S. 756. Instead, that case stands only for the uncontested proposition that a conspiracy to price fix and a conspiracy to restrict output both injure consumers by arbitrarily raising the price they pay for a product—i.e., both types of conspiracy have the same anti-competitive effects. *Id.* at 777. That says nothing about whether a particular consumer's injury is direct or indirect, or which consumers are

at 753 (rejecting an argument that *Illinois Brick* did not apply because "conspiring to set a [pre-market] price for the purpose and effect of raising the [market] price . . . *equates to fixing* [*the market*] *price* and makes the payers of the raised [market] price direct purchasers." (emphasis added)). It simply does not matter that the alleged pre-market conspiracy has the same effect as setting a specific market price. *Id.* at 752. Similarly, it does not matter that the ultimate consumers "are purchasing from a violator" of the Sherman Act. *Id.* at 755. As long as a party challenging anti-competitive behavior relies on a pass-on theory of injury, it may recover damages only if it alleges and demonstrates a conspiracy that actually sets the consumer price—not just a conspiracy that may have the same practical effect. *Id.* at 754 ("[U]nder the co-conspirator exception recognized in this circuit, the price paid by a plaintiff must be set by the conspiracy and not merely affected by the setting of another price.").

---

authorized to seek judicial redress (i.e., which consumers do not rely on a pass-on theory of injury). Indeed, in *Illinois Brick* itself, the Court acknowledged that the indirect purchasers were injured by the manufacturer overcharging the distributor, but held that those purchasers were not the proper parties to sue to recover damages. 431 U.S. at 744–46.

The Majority's reliance on *Apple Inc. v. Pepper*, is likewise misplaced, as the plaintiffs in that case purchased the relevant good directly from the monopolizing entity—not from a middleman who conspired with the monopolizing entity down the line. 139 S. Ct. 1514, 1521 (2019). Here, Plaintiffs purchased a service from DirecTV, which is not a party to the NFL's horizontal agreement. While the Majority is correct that "we are required to take a holistic look at how the interlocking agreements actually impact competition," Maj. Op. at 24, determining whether a party has alleged anti-competitive effects is distinct from determining whether the party is a direct or indirect purchaser with respect to a specific agreement—and none of the cases cited by the majority say otherwise, or even address that issue.

Second, the conspiracy alleged by Plaintiffs—that Defendants conspired to reduce the output of television broadcast rights—does not alleviate the concerns expressed in *Illinois Brick*. Unlike a price-fixing conspiracy, the injury to the consumer from an output-reduction conspiracy still depends on a pass-on theory of damages. The initial overcharge occurs between the manufacturer and the distributer—i.e., a distributor pays a manufacturer an anti-competitive price for distribution rights—and that overcharge is passed on by the distributor to the consumer. In such cases, courts must determine how much of the consumer price stems from ordinary market forces, and how much of it stems from the distributor's efforts to recoup its overpayment to the manufacturer.[4] *See Illinois Brick*, 431 U.S. at 744–46. Thus, unlike with a price-fixing conspiracy, the reviewing court must still make the exact determination "sought to be avoided in *Illinois Brick*." *Shamrock Foods Co.*, 729 F.2d at 1214.

Finally, in *In re ATM Fee Antitrust Litigation*, we ruled that the co-conspirator exception "only applies when the co-conspirators *fix the price paid by the plaintiff*." 686 F.3d at 752 (emphasis added). Thus, because Plaintiffs have not alleged that Defendants conspired to fix the price paid by the consumer, the co-conspirator exception—at least in its present form—does not apply. *See Dickson v. Microsoft*

---

[4] Relying exclusively on the fact that Plaintiffs "allege that DirecTV is part of the conspiracy," the Majority conclusively states that "a court would not need to determine to what extent the NFL overcharged DirecTV," because "it would need to consider only the prices consumers paid compared to the prices that would have existed in a competitive market." Maj. Op. at 34 n. 7. However, it is unclear how in practice a court *could* consider what the theoretical consumer price would have been in a competitive market (absent the NFL's horizontal agreement) without considering whether and how much of an overpayment DirecTV made.

*Corp.*, 309 F.3d 193, 215 (4th Cir. 2002) ("[W]e interpret these cases as standing for the more narrow proposition that *Illinois Brick* is inapplicable *to a particular type of conspiracy—price-fixing conspiracies*." (emphasis added)); *In re ATM Fee Antitrust Litig.*, 686 F.3d at 752 (approving of the Fourth Circuit's analysis in *Dickson*). In other words, to conclude that Plaintiffs have anti-trust standing, we must create a new exception to the *Illinois Brick* rule. The Supreme Court has instructed us not to do so. *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990) ("[A]mple justifications exist for the Court's stated decision not to carve out exceptions to the indirect purchaser rule for particular types of markets." (quoting *Illinois Brick*, 431 U.S. at 744)); *Illinois Brick*, 431 U.S. at 745 ("As we have noted . . . *Hanover Shoe* itself implicitly discouraged the creation of exceptions to its rule barring pass-on [theories], and we adhere to the narrow scope of exemption indicated by our decision there.").

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)   A.   Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.   Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
>
> ► The proceeding involves a question of exceptional importance; or
>
> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)   Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)   Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)   Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

**Petition for a Writ of Certiorari**
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                                      **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| **TOTAL:** | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*