Marc M. Seltzer (54534)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150
mseltzer@susmangodfrey.com

Scott Martin
smartin@hausfeld.com
Irving Scher
ischer@hausfeld.com
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel Listed in Signature Page]

*Interim Class Counsel*

Howard Langer
hlanger@langergrogan.com
Edward Diver
ndiver@langergrogan.com
Peter Leckman
pleckman@langergrogan.com
**LANGER GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No. 2:15-ml-02668−PSG (JEMx) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DIRECTV'S RENEWED MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS** |
| | DATE: April 19, 2021 |
| | TIME: 1:30 p.m. |
| | COURTROOM: 6A |

# <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION .................................................................................................1

II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY ...........................2

III.   ARGUMENT .......................................................................................................3

    A.    DirecTV Engaged In Litigation Conduct That Waived Any Right To Arbitrate. ...............................................................................................4

    B.    DirecTV's Effort To Prospectively Limit The Range Of Injunctive Relief Renders DirecTV's Arbitration Clause Unenforceable. ..........................6

    C.    DirecTV's Amendments To Its Customer Agreements After Suit Was Filed Do Not Support Arbitration In This Case. ........................................9

        1.  Rule 23 Prohibits Changes To DirecTV's Arbitration Clauses During The Course Of Litigation. ..........................................................9

        2.  Changes To An Arbitration Agreement While Litigation is Ongoing Conflict With The Parties' Legitimate Expectations. ...................12

        3.  California Law Precludes Compelling Arbitration Pursuant To The Post-Filing Versions Of The Arbitration Clauses. ...................16

    D.    All Customers' Claims Are Brought In A "Private Attorney General Capacity" And Thus Are Inarbitrable Under Pre-Dispute Versions Of The Arbitration Clauses. ............................................................................17

    E.    Commercial Customers' Claims Are Excluded From Arbitration Under The Pre-Dispute Version Of The Relevant Arbitration Clause. ...........18

    F.    The Mucky Duck Never Agreed To Arbitrate At All. ...........................19

IV.   CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*14 Penn Plaza LLC v. Pyett,*
  556 U.S. 247 (2009)................................................................................8

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.,*
  98 N.Y.2d 144, 773 N.E.2d 496 (2002)................................................12

*Am. Express Co. v. Italian Colors Rest.,*
  570 U.S. 228 (2013)................................................................................8

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983)..............................................................................18

*AT & T Techs., Inc. v. Commc'ns Workers of Am.,*
  475 U.S. 643 (1986)................................................................................3

*AT & T Mobility LLC v. Fisher,*
  2011 WL 5169349 (D. Md. Oct. 28, 2011) ..........................................7

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990)..............................................................................18

*Avery v. Integrated Healthcare Holdings, Inc.,*
  218 Cal. App. 4th 50 (2013) ...........................................................12, 15

*Badie v. Bank of Am.,*
  67 Cal. App. 4th 779 (1998) ............................................................21, 25

*Balasanyan v. Nordstrom, Inc.,*
  2012 WL 760566 (S.D. Cal. Mar. 8, 2012) .........................................10

*Banh v. Am. Honda Motor Co.,*
  2020 WL 5035095 (C.D. Cal. July 28, 2020)........................................4

*Billingsley v. Citi Trends, Inc.,*
  560 F. App'x 914 (11th Cir. 2014) .......................................................10

*Blair v. Rent-A-Ctr., Inc.,*
  928 F.3d 819 (9th Cir. 2019) ............................................................8, 9

ii

*Brooklyn Sav. Bank v. O'Neil,*
  324 U.S. 697 (1945) .......................................................................................... 8

*Cedars Sinai Med. Ctr. v. Mid-West Nat'l Life Ins. Co. of Tenn.,*
  118 F. Supp. 2d 1002 (C.D. Cal. 2000) ........................................................ 20

*Cheverez v. Plains All Am. Pipeline, LP,*
  2016 WL 861107 (C.D. Cal. Mar. 3, 2016) ..................................................... 9

*Cobb v. Ironwood Country Club,*
  233 Cal. App. 4th 960 (2015) ........................................................................ 12

*Coca-Cola Refreshments, USA, Inc. v. Binghamton Giant Mkts., Inc.,*
  127 A.D.3d 1319, 6 N.Y.S.3d 766 (2015) ..................................................... 16

*Commercial Factors Corp. v. Kurtzman Bros.,*
  131 Cal. App. 2d 133 (1955) ................................................................... 15, 20

*Cory v. Golden State Bank,*
  95 Cal. App. 3d 360 (1979) ........................................................................... 20

*In re Currency Conversion Fee Antitrust Litig.,*
  361 F. Supp. 2d 237 (S.D.N.Y. 2005) ............................................................ 10

*Davis v. White,*
  795 F. App'x 764 (11th Cir. 2020) ................................................................... 5

*Dicarlo v. Moneylion, Inc.,*
  __ F.3d __, 2021 WL 647502 (9th Cir. Feb. 19, 2021) ............................... 6, 18

*DirecTV, Inc. v. Mattingly,*
  376 Md. 302 (2003) .................................................................................. 20, 22

*Enderlin v. XM Satellite Radio Holdings, Inc.,*
  2008 WL 830262 (E.D. Ark. Mar. 25, 2008) ................................................ 11

*Fortner Enters., Inc. v. U.S. Steel Corp.,*
  394 U.S. 495 (1969) .................................................................................... 7, 18

*Gelow v. Cent. Pac. Mortg. Corp.,*
  560 F. Supp. 2d 972 (E.D. Cal. 2008) .............................................................. 4

*Gilmer v. Interstate/Johnson Lane Corp.,*
  500 U.S. 20 (1991) ........................................................................................... 7

*Grammer v. Colo. Hosp. Ass'n Shared Servs.*,
  2015 WL 3938406 (D. Nev. June 26, 2015) ............................................... 25

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972)........................................................................................ 18

*Heller v. Rasier, LLC*,
  2020 WL 413243 (C.D. Cal. Jan. 7, 2020) ...................................................... 14

*Hooper v. Advance Am.*,
  589 F.3d 917 (8th Cir. 2009) ........................................................................... 4

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977).......................................................................................... 18

*India Paint and Lacquer Co. v. United Steel Prods. Corp.*,
  123 Cal. App. 2d 597 (1954) ..................................................................... 21, 22

*Jimenez v. Menzies Aviation Inc.*,
  2015 WL 4914727 (N.D. Cal. Aug. 17, 2015) ................................................. 9

*Kalogeras v. 239 Broad Ave., L.L.C.*,
  202 N.J. 349, 997 A.2d 943 (2010) ................................................................ 12

*Laster v. T-Mobile USA, Inc.*,
  2008 WL 5216255 (S.D. Cal. Aug. 11, 2008)................................................. 11

*Leitner v. Braen*,
  51 N.J. Super. 31 (App. Div. 1958) ................................................................ 16

*Lim v. Helio, LLC*,
  2012 WL 12884440 (C.D. Cal. Apr. 11, 2012) .............................................. 13

*M/S Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972)......................................................................................... 8, 17

*Martin v. Yasuda*,
  829 F.3d 1118 (9th Cir. 2016) ...................................................................... 4, 5

*McGill v. Citibank, N.A.*,
  2 Cal. 5th 945 (2017) ........................................................................................ 8

*McKee v. Audible, Inc.*,
  2018 WL 2422582 (C.D. Cal. Apr. 6, 2018) .................................................. 11

iv

*Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985)..........................................................................8

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  No. 17-56119 (9th Cir. Apr. 6, 2018) ......................................4, 5

*Nat'l Football League v. Ninth Inning*,
  No. 19-1098 (U.S. Feb. 7, 2020) ..................................................5

*Newirth v. Aegis Senior Communities, LLC*,
  931 F. 3d 935 (2019).......................................................................4

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ..............................14, 15, 24, 25

*O'Connor v. Uber Techs., Inc.*,
  2013 WL 6407583 (N.D. Cal. Dec. 6, 2013)...............................9

*Peleg v. Neiman Marcus Grp., Inc.*,
  204 Cal. App. 4th 1425 (2012) ...................................................12

*Piekarski v. Amedisys Illinois, LLC*,
  4 F. Supp. 3d 952 (N.D. Ill. 2013)..............................................10

*Plows v. Rockwell Collins, Inc.*,
  812 F. Supp. 2d 1063 (C.D. Cal. 2011) ........................................5

*Power Replacements, Inc. v. Air Preheater Co.*,
  426 F.2d 980 (9th Cir. 1970) .......................................................18

*The Mucky Duck v. National Football League, Inc. et al.*,
  No. 2:15-05261 (C.D. Cal. 2015), ECF No. 1 ........................2, 23

*The Mucky Duck v. National Football League, Inc. et al.*,
  No. 2:15-02668 (C.D. Cal. 2016) ..............................................1, 3

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
  25 Cal. App. 3d 987 (Cal Ct. App. 1972) .......................15, 20, 23

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969)...................................................................7, 18

**Statutes**

9 U.S.C. §2 ...................................................................................*passim*

15 U.S.C. §1 ................................................................................................................ 7

Cal. Civ. Code §3513 .................................................................................................. 8

Cal. Code Civ. Proc. §1281 ...................................................................................... 16

Cal. Civ. Proc. Code §1281.2 .............................................................................. 2, 17

**Rules**

Fed. R. Civ. P. 23 .................................................................................................. 1, 9

vi

## I.   **INTRODUCTION**

Plaintiffs Ninth Inning Inc. dba The Mucky Duck ("The Mucky Duck"), 1465 Third Avenue Restaurant Corp. dba Gael Pub ("Gael Pub"), Robert Gary Lippincott, Jr. ("Lippincott"), and Michael Holinko ("Holinko") respectfully request that this Court deny the motion to compel arbitration and stay proceedings filed by DirecTV, LLC and DirecTV Holdings LLC (collectively, "DirecTV"). As shown below, DirecTV fails to satisfy its burden of demonstrating that it obtained binding commitments to arbitrate the particular antitrust claims alleged in the Consolidated Class Action Complaint ("CAC") (ECF No. 163) under any version of its Commercial Customer Agreement or its Residential Customer Agreement.[1]

*First*, DirecTV intentionally engaged in litigation in the federal courts on the legal sufficiency of Plaintiffs' complaint. Having failed in that effort, it now seeks to reassert a purported right to arbitrate. But the doctrine of litigation waiver does not provide DirecTV with a second opportunity to compel arbitration. Once it invoked the jurisdiction of the federal courts, it waived any right to proceed in arbitration.

*Second*, with respect to every version of its arbitration clause—those introduced before and after the filing of this litigation—DirecTV contends that Plaintiffs waived the right to pursue injunctive relief necessary to fully remedy DirecTV's antitrust violations. This effort violates public policy and renders the arbitration clause unenforceable.

*Third*, DirecTV materially expanded the scope of its arbitration clause to encompass the Plaintiffs' claims after this litigation was filed in July of 2015, after the appointment of interim class counsel, and after the Plaintiffs had clearly expressed their preference to resolve this antitrust dispute in court. DirecTV did not obtain Plaintiffs' consent to resolve the ongoing claims in arbitration, and even if it did, its post-filing communications with Plaintiffs overstepped its Fed. R. Civ. P. 23 obligations to fully inform class members of their rights. Accordingly, the post-filing versions of DirecTV's arbitration clauses are not

---

[1] Plaintiffs' arguments in opposition to DirecTV's motion to compel are generally organized in the following sections of this brief from broadest application to narrowest.

enforceable in this case.

*Fourth*, the Congressional policy favoring arbitration as expressed in 9 U.S.C. §2 ("FAA §2") does not apply with respect to the post-filing changes that DirecTV made to its arbitration clauses. As to existing controversies, the reach of FAA §2 only extends to "agreement[s] in writing". As a result, the California Arbitration Act controls the result here, and it provides an express exception to arbitration in multi-defendant cases where only one defendant can compel arbitration. Cal. Civ. Proc. Code §1281.2(c).

*Fifth*, the *pre-dispute* versions of DirecTV's customer agreements specifically excluded from arbitration any claims brought in a private attorney general capacity. For decades, the United States Supreme Court has described civil antitrust plaintiffs as private attorneys general. Thus, basic principles of contract construction exclude these antitrust claims from arbitration.

*Sixth*, the *pre-dispute* version of DirecTV's Commercial Customer Agreement, which governed its relationship with, *inter alia*, bars and restaurants, specifically excluded from arbitration any claim based on contractual and other restrictions concerning the distribution of video content, and Plaintiffs' claims fall squarely within this exception.

*Finally*, DirecTV never obtained The Mucky Duck's consent to arbitrate because it became a customer before DirecTV implemented any arbitration policy, and its later efforts to bind The Mucky Duck to arbitration were ineffective and are unenforceable.

## II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

This litigation commenced on July 13, 2015 when The Mucky Duck filed the first of several lawsuits that eventually became consolidated in this multidistrict litigation. *See Ninth Inning Inc. dba The Mucky Duck v. National Football League, Inc. et al.*, No. 2:15-05261 (C.D. Cal. 2015) ECF No. 1. Plaintiffs filed their CAC on June 24, 2016, alleging in part that:

> [the] exclusive deal [between the NFL and DirecTV], along with other contractual arrangements between the NFL, its member teams, and DirecTV, as well as Fox, ESPN, CBS, and NBC (collectively, the "Networks"), results in the blackout or unavailability of out-of-market games, except through the bundled NFL/DirecTV Sunday

2

> Ticket. These arrangements result in substantial injury to competition, including through eliminating distribution of out-of-market games through competing Multichannel Video Programing Distributor ("MVPD") platforms, such as the Dish Network, Comcast Corporation ("Comcast"), and Spectrum Cable (formerly Time Warner Cable); reducing game offerings and package mixes; and imposing supracompetitive pricing for consumers. . . .
>
> But for the NFL teams' agreements in which DirecTV and others have joined, teams would compete against each other in the market for NFL football programming, which would induce more competitive pricing and content.

*See Ninth Inning Inc. dba The Mucky Duck v. National Football League, Inc. et al.*, No. 2:15-02668 (C.D. Cal. 2016) ECF No. 163 at ¶¶10-11.

DirecTV filed an initial motion to compel arbitration and stay proceedings on August 8, 2016. ECF No. 171-1. That motion was briefed and argument was heard by Judge Beverly Reid O'Connell on February 13, 2017. On June 30, 2017, the Court determined that DirecTV's motion was moot based on the dismissal of Plaintiffs' claims against DirecTV on the merits. *See* ECF No. 251.[2] Thereafter, rather than arguing that federal courts lacked authority to decide the claims against it, DirecTV sought a ruling affirming the Court's dismissal order *on the merits* in both the Ninth Circuit and in the United States Supreme Court. *See* Def's Br. at 13:11-21.

The NFL Defendants did not join DirecTV's original motion to compel arbitration and have not joined in DirecTV's renewed motion. The litigation will continue against them in this Court regardless of the outcome of this motion.

## III.   ARGUMENT

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted). DirecTV, as the petitioner, bears the burden of proving the existence of a valid arbitration agreement and

---

[2] DirecTV incorporates the declarations and documentary evidence it proffered in connection with its initial motion. *See* Def's Br. at 2:25-28. Plaintiffs lodged objections to certain aspects of that material, which they renew and continue to assert here. *See* ECF No. 196-3.

that the parties' dispute falls within the scope of such an agreement. *Gelow v. Cent. Pac. Mortg. Corp.*, 560 F. Supp. 2d 972, 978 (E.D. Cal. 2008).

**A.   DirecTV Engaged In Litigation Conduct That Waived Any Right To Arbitrate.**

"The right to arbitration, like other contractual rights, can be waived." *Banh v. Am. Honda Motor Co.*, 2020 WL 5035095, at *4 (C.D. Cal. July 28, 2020) (quoting *Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016) ("*Martin*")). Waiver may occur where, as DirecTV has done here, "a party has engaged in acts that are inconsistent with its right to arbitrate." *Martin*, 829 F.3d at 1124. Waiver requires showing: "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *Id.* The Ninth Circuit has held that "[s]eeking a decision on the merits of a key issue in a case indicates an intentional and strategic decision to take advantage of the judicial forum." *Newirth v. Aegis Senior Communities, LLC*, 931 F. 3d 935, 941 (2019).

Here, DirecTV's conduct on appeal indicates a "conscious decision to continue to seek judicial judgment on the merits of [the] arbitrable claims." *Martin*, 829 F.3d at 1125. Despite having filed a motion to compel arbitration, DirecTV never objected to this Court's entry of a final judgment—so long as it was in its favor—based on the *merits* of Plaintiffs' claims. *See* Final Judgment, ECF No. 254. And while on appeal in the Ninth Circuit, DirecTV joined the NFL Defendants' brief and the NFL Defendants' petition for rehearing *en banc*. *See* Joinder of DirecTV Defendants-Appellees, *In re Nat'l Football League's Sunday Ticket Antitrust Litig.* ("*Sunday Ticket*"), No. 17-56119 (9th Cir. Apr. 6, 2018), ECF No. 38; Joinder of DirecTV Defendants-Appellees, *Sunday Ticket*, No. 17-56119 (9th Cir. Aug. 27, 2019), ECF No. 67. These joinders claimed to "reserve" DirecTV's rights to seek arbitration, but its actual litigation conduct was to litigate its defenses to Plaintiffs' claims on the merits. *See Hooper v. Advance Am.*, 589 F.3d 917, 922 (8th Cir. 2009) (reserving right to arbitrate, but then litigating on the merits, constituted waiver).

After the Ninth Circuit reversed the District Court's order in *Sunday Ticket*, 933 F.3d

1136, DirecTV again took affirmative action by seeking to stay the Ninth Circuit's mandate. *See* Joinder of DirecTV Defendants-Appellees, *Sunday Ticket*, No. 17-56119 (9th Cir. Oct. 16, 2019), ECF No. 73. And then it hired Paul D. Clement, the former Solicitor General for the United States, in addition to its other counsel of record, to petition the Supreme Court for a Writ of Certiorari. *See* Pet. for a Writ of Certiorari, at Cover, *Nat'l Football League v. Ninth Inning*, No. 19-1098 (U.S. Feb. 7, 2020). As a petitioner, DirecTV expressly invoked the power of the judiciary to resolve Plaintiffs' claims on the merits. The Ninth Circuit, along with other circuits, finds that this type of conduct is sufficient to waive any right to pursue arbitration. *See Martin*, 829 F.3d at 1124 (waiver found "when a party chooses to delay his right to compel arbitration by actively litigating his case to take advantage of being in federal court"); *Davis v. White*, 795 F. App'x 764, 769 (11th Cir. 2020) (finding waiver where party sought to resolve the entire dispute on the merits).

In addition, DirecTV has taken other actions inconsistent with its right to compel arbitration. For example, Lippincott originally filed his claims against DirecTV in state court. Rather than move to compel arbitration in the state court, DirecTV removed Lippincott's case to federal court. *See, e.g.*, ECF Nos. 26-2, 107. Such conduct, in addition to participating in scheduling conferences or negotiating protective orders—all of which DirecTV has done here—are inconsistent with maintaining a right to compel arbitration. *See Plows v. Rockwell Collins, Inc.*, 812 F. Supp. 2d 1063, 1067 (C.D. Cal. 2011).

Plaintiffs have also been prejudiced by DirecTV's conduct. Prejudice can be shown if Plaintiff "would be forced to relitigate an issue on the merits on which they have already prevailed in court." *Martin*, 829 F.3d at 1126. That is the case here, where DirecTV litigated several issues concerning the merits of Plaintiffs' claims, lost on the arguments it was asserting, but now seeks to move the case to a different forum and start fresh. Litigating complex issues of an antitrust violation, impact, and appropriate remedies in two fora—including litigating the scope of any injunctions designed to return competition to the marketplace is inherently inefficient and wasteful. That is textbook prejudice.

By seeking a home run in the appellate courts—and having now lost that effort—

DirecTV has waived its right to compel arbitration.

**B.**  **DirecTV's Effort To Prospectively Limit The Range Of Injunctive Relief Renders DirecTV's Arbitration Clause Unenforceable.**

DirecTV contends that every version of its arbitration clause—the 2017 versions on which it heavily relies, as well as their earlier counterparts—prohibit an arbitrator from awarding the full spectrum of injunctive relief allowed under the Sherman Act, including, for example, an order ending the web of restrictive distribution agreements for Sunday Ticket alleged in this litigation. Indeed, as DirecTV explained in its reply brief in support of its initial motion to compel arbitration:

> Plaintiffs can arbitrate their claim that DIRECTV has charged them "supracompetitive" prices in violation of antitrust laws, and seek treble damages and individual injunctive relief (such as a potential price reduction on their NFL Sunday Ticket package going forward). What they cannot do is seek that relief on behalf of third parties, because they have validly waived the procedures necessary to obtain such broad-based relief.

*See* ECF No. 202 at 5:12-17.[3]  DirecTV here admits that it believes Plaintiffs have waived remedies that would otherwise be available under the Sherman Act for a plaintiff.  An individual can only obtain "individual injunctive relief," and the example it provides is a "potential price reduction" for that individual.  However, under the Sherman Act, every affected plaintiff has broader, structural remedies available, such as to compel changes to the rigid and exclusive distribution arrangements currently in place so that they can benefit—as an individual—from the multitude of viewing options that would be available in a free and unconstrained market.

---

[3] DirecTV's contention is premised on the plain language of the current version of the arbitration clauses, both of which provide that "[t]he arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." *See* ECF No. 306-4 at §8.2(6); ECF No. 306-24 at §10.2(f). These limitations are materially different than those in *Dicarlo v. Moneylion, Inc.*, ___ F.3d ___, 2021 WL 647502 (9th Cir. Feb. 19, 2021) ("*Moneylion*"), where "MoneyLion insist[ed] that DiCarlo can get public injunctive relief in arbitration." *Id.* at *3.

1   This effort to prospectively waive structural remedies that would restore competition

2   in the marketplace violates the fundamental premise of antitrust law—which prohibits

3   "[e]very contract, combination . . . or conspiracy, in [unreasonable] restraint of trade" (*see*

4   15 U.S.C. §1)—and efforts "to monopolize any part of trade or commerce" (*see* 15 U.S.C.

5   §2). *See also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 105, 131 (1969)

6   (affirming, in part, "injunctive relief against further participation in any arrangement to

7   prevent Zenith from exporting equipment into any foreign market" because it "pr[ied] open

8   to competition a market that has been closed by defendants' illegal restraints") (citations

9   omitted) ("*Zenith*").

10   In *AT & T Mobility LLC v. Fisher*, 2011 WL 5169349 (D. Md. Oct. 28, 2011)

11   ("*Fisher*"), AT & T—DirecTV's parent—similarly claimed that its "customers [] waived

12   any right to bring this type of [antitrust] action anywhere, including in court." *Id.* at *5.

13   The *Fisher* court disagreed, noting that "[i]f . . . a litigant waives the right to a particular

14   remedy under the antitrust acts (or even to bring an antitrust action at all), the clause might

15   violate public policy and be unenforceable." *Id.* at *5.[4]

16   That public policy is expressed in a string of Supreme Court decisions recognizing

17   the importance of deputizing private plaintiffs to fully enforce U.S. antitrust law. *See, e.g.*,

18   *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("*Fortner*") ("Congress

19   has encouraged private antitrust litigation not merely to compensate those who have been

20   directly injured but also to vindicate the important public interest in free competition").

21   Indeed, the Supreme Court has repeatedly recognized this long-standing public

22   policy exception to private agreements that purport to waive statutory rights, holding that

23   "the [effective vindication] exception [to arbitration] finds its origin in the desire to prevent

24   'prospective waiver of a party's right to pursue statutory remedies,' . . . . *That would*

---

[4] In *Fisher*, AT & T cited *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991) ("*Gilmer*") for the proposition that an arbitration clause could waive a statutory remedy. *See* 2011 WL 5169349, at *5. The *Fisher* court correctly recognized that AT & T's argument is not consistent with existing case law. Indeed, in *Gilmer* "the NYSE rules . . . do not restrict the types of relief an arbitrator may award". *Gilmer*, 500 U.S. at 32.

1  *certainly cover a provision in an arbitration agreement forbidding the assertion of certain*

2  *statutory rights*." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235-36 (2013)

3  ("*Italian Colors*") (quoting *Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.*, 473 U.S.

4  614, 637 n.19 (1985) ("*Mitsubishi Motors*")) (emphasis added); *Brooklyn Sav. Bank v.*

5  *O'Neil*, 324 U.S. 697, 704 (1945) ("It has been held in this and other courts that a statutory

6  right conferred on a private party, but affecting the public interest, may not be waived or

7  released if such waiver or release contravenes the statutory policy."); *see also* *14 Penn*

8  *Plaza LLC v. Pyett*, 556 U.S. 247, 265–66 (2009) ("The decision to resolve ADEA claims

9  by way of arbitration instead of litigation does not waive the statutory right to be free from

10  workplace age discrimination; it waives only the right to seek relief from a court in the first

11  instance."). Accordingly, federal public policy prohibits the waiver of Plaintiffs' statutory

12  right to pursue injunctive relief that returns competition to the marketplace, and, thus,

13  DirecTV's arbitration clause may not be enforced here.

14  California law also recognizes that statutory remedies for public injunctive relief

15  may not be waived by private agreement, and the California Supreme Court recently

16  reaffirmed that principle in the arbitration context, citing with approval the U.S. Supreme

17  Court's opinion in *Mitsubishi Motors. See McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 962

18  (2017); *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 830–31 (9th Cir. 2019). And this

19  California policy—that a private right established to promote public policy cannot be

20  contravened by a private agreement (*see* Cal. Civ. Code §3513)—extends to the two non-

21  California plaintiffs.[5] *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) ("A

22  contractual choice-of-forum clause should be held unenforceable if enforcement would

23  contravene a strong public policy of *the forum in which suit is brought*, whether declared

24  by statute or by judicial decision.") ("*Bremen*") (emphasis added).

25  Furthermore, DirecTV's arbitration clauses state that "[i]f applicable law precludes

26

27  [5] The DirecTV customer agreements state that the law of the place where service is provided shall apply to any disputes. The Mucky Duck and Lippincott are residents of

28  California. Holinko is a resident of New Jersey. Gael Pub is a resident of New York. DirecTV is headquartered in El Segundo, California.

enforcement of any of this paragraph's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from arbitration and may be brought in court." *See* ECF No. 306-4 at §8.2(6); ECF No. 306-24 at §10.2(f). The Ninth Circuit examined this *identical language* in *Blair* and concluded that it severed the entire cause of action. The Ninth Circuit explained that "[a] 'claim for relief,' as that term is ordinarily used, is synonymous with 'claim' or 'cause of action.' . . . We read the clause, as did the district court, to provide that the entire claim be severed for judicial determination." 928 F.3d at 831-32. Therefore, by the express terms of the current DirecTV customer agreements, Plaintiffs' Sherman Act claims must be severed from the arbitration clauses and fully litigated in this Court.

### C. DirecTV's Amendments To Its Customer Agreements After Suit Was Filed Do Not Support Arbitration In This Case.

#### 1. Rule 23 Prohibits Changes To DirecTV's Arbitration Clauses During The Course Of Litigation.

DirecTV relies on the arbitration clauses in its 2017 Commercial and Residential Customer Agreements in seeking arbitration. But that reliance is misplaced. Upon the filing of class litigation, Fed. R. Civ. P. 23 vests district courts with the authority to prevent parties from misleading putative class members or otherwise engaging in coercive conduct that may impair the rights of class members. *See Cheverez v. Plains All Am. Pipeline, LP*, 2016 WL 861107, *2 (C.D. Cal. Mar. 3, 2016)*. This authority extends to a defendant's effort to avoid class litigation by altering its arbitration agreements while the litigation is underway. *See Jimenez v. Menzies Aviation Inc.*, 2015 WL 4914727, at *6 (N.D. Cal. Aug. 17, 2015)* ("[c]ourts routinely exercise their discretion to invalidate or refuse to enforce arbitration agreements implemented while a putative class action is pending if the agreement might interfere with members' rights"); *O'Connor v. Uber Techs., Inc.*, 2013 WL 6407583, at *6-7 (N.D. Cal. Dec. 6, 2013)* (invalidating arbitration provision where defendant made difficult-to-detect post-filing modifications to arbitration clause without providing notice of pending class actions or making counterparty aware of consequences

of assenting to modifications), *rev'd on other grounds*, 904 F.3d 1087 (9th Cir. 2018); *Balasanyan v. Nordstrom, Inc.*, 2012 WL 760566, at *3 (S.D. Cal. Mar. 8, 2012) (defendant's contention that its post-filing amendment to its arbitration clause, which did not describe its purported effect on the litigation, or even mention the existence of the pending class action, was not misleading "def[ies] common sense").[6]

DirecTV's efforts to bind Plaintiffs to the 2017 version of the Commercial and Residential Customer Agreements were misleading and designed to thwart this litigation. DirecTV's post-filing communications to class members concerning revisions to those agreements entirely failed to mention that the terms of the arbitration clause had materially increased the scope of arbitrable disputes in an effort to include the claims made in this litigation. For example, DirecTV claims an email was sent to Holinko and Lippincott on March 15, 2017 notifying them of updates to the Residential Customer Agreement. Decl. of Nancy Fossey ("Fossey Decl."), ECF No. 306-2, at ¶3. But that email states that there were changes to numerous sections of the agreement without alerting the reader to the fact that the scope of the arbitration clause was materially changed. *See* ECF No. 306-3; *see also* ECF No. 306-7 (August 2018 email which similarly does not mention any changes to the arbitration clause); ECF Nos. 306-21, 306-22, 306-23 (various customer bills for Holinko with no mention of changes to arbitration clause); ECF Nos. 306-10, 306-11, 306-12 (same for Lippincott); ECF Nos. 306-26, 306-27, 306-28, 306-29 (same for Gael Pub); ECF Nos. 306-30, 306-31, 306-32, 306-33 (same for The Mucky Duck); ECF No. 306-24 (2017 Commercial Customer Agreement without any notification regarding what sections within the agreement had changed). Moreover, none of the post-filing communications

---

[6] *See also Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 923 (11th Cir. 2014) (collecting cases and affirming district court's invalidation of post-filing version of arbitration clause because "[t]he district court's limited remedial action is not an abuse of its considerable discretion to manage this collective action"); *Piekarski v. Amedisys Illinois, LLC*, 4 F. Supp. 3d 952, 956 (N.D. Ill. 2013) (collecting cases and invalidating post-dispute arbitration clause because it was "obvious" that defendants sought to thwart participation in the lawsuit); In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237, 253 (S.D.N.Y. 2005) (holding arbitration clause offered by defendant credit card companies during litigation was coercive and unenforceable).

described by DirecTV mention the existence of this litigation, putative class members' rights to participate in it, or otherwise offer a workable method that would allow putative class members to commit to arbitration of unrelated disputes without committing to arbitration of this litigation. Indeed, the 2017 version of the Residential Customer Agreement was rolled out just two weeks after the hearing on DirecTV's motion to compel arbitration. *See* Fossey Decl. ¶¶3, 5. And, DirecTV did so without communicating these changes to Plaintiffs' counsel, whose identities were, by then, known to them. In fact, DirecTV's actions are similar to the defendant's actions in *McKee v. Audible, Inc.*, 2018 WL 2422582 (C.D. Cal. Apr. 6, 2018). In that pre-certification putative class action, Audible modified various user agreements in order to remedy the issues that had led the court to deny its prior motion to compel arbitration, but did so without providing users with notice of the pending putative class action. *See McKee*, 2018 WL 2422582, at *3. The court found that Audible's actions were "(1) unilateral, (2) directed at putative class members following the initiation of the lawsuit and subsequent denial of Audible's motion to compel, (3) did not include notice of the current action, and (4) forced putative class members to waive their rights or give up benefits," and therefore "constitute[d] coercive and misleading communications that … interfered … with the present litigation." *Id.* at *6. As a remedy, the court found "any agreement to arbitrate entered into by a *then current* Audible member, on or after the [the date that the ]Court denied the [motion to compel] through the present null and void only to the extent that it would limit a class member's participation or recovery in this action." *Id.* at *8. Similarly, the post-filing versions of DirecTV's arbitration clauses should not be considered in resolving the question of arbitrability in this case.[7]

---

[7] DirecTV cites *Laster v. T-Mobile USA, Inc.*, 2008 WL 5216255 (S.D. Cal. Aug. 11, 2008), a case that was subsequently reversed, for the proposition that a company can make non-material revisions to its arbitration clause after a dispute has arisen. But *Laster* does not stand for the proposition that a company can expand the scope of its arbitration clause to cover a dispute that had already been filed in court. *Id.* at *7 (noting that the terms of the arbitration clause were modified more favorably to plaintiffs). Similarly, DirecTV's reliance on *Enderlin v. XM Satellite Radio Holdings, Inc.*, 2008 WL 830262, at *7 (E.D.

### 2.  Changes To An Arbitration Agreement While Litigation is Ongoing Conflict With The Parties' Legitimate Expectations.

DirecTV's changes to its customer agreements after this dispute arose also conflict with generally applicable principles of contract law. Under those principles, an arbitration agreement "is illusory if an amendment, modification, or revocation—a contract change—applies to claims that have accrued or are known" when the modification is made. *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1433 (2012). That is because the covenant of good faith and fair dealing implied in every contract requires contracting parties not to deprive another party of "his or her reasonable expectations under the agreement." *Avery v. Integrated Healthcare Holdings, Inc.,* 218 Cal. App. 4th 50, 61 (2013); *see also Cobb v. Ironwood Country Club*, 233 Cal. App. 4th 960, 966 (2015) ("Thus, to the extent Ironwood intended to enact an arbitration bylaw that would govern *this dispute*—a dispute which had not only accrued, but was already being litigated in court by the time the arbitration bylaw became effective—it violated the covenant of good faith and fair dealing implied into the bylaws, and thus exceeded the proper scope of its amendment power."); *Kalogeras v. 239 Broad Ave., L.L.C.*, 202 N.J. 349, 366, 997 A.2d 943, 953 (2010) (implied covenant of good faith and fair dealing exists in every contract under New Jersey law); *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 773 N.E.2d 496, 500 (2002) (same under New York law).

That DirecTV sought to expand the scope of its arbitration agreements *after the Plaintiffs filed their lawsuits in mid-2015* in an attempt to cover the antitrust claims at issue here is undeniable. As argued above, DirecTV failed to provide reasonable notice to the Plaintiffs that the proposed changes to the arbitration clauses would deprive them of their right to continue to pursue their claims—which were already filed—in this Court. For example, with respect to Lippincott, DirecTV says that it sent a March 15, 2017 email that

---

Ark. Mar. 25, 2008) is misplaced because, unlike here, the plaintiff in *Enderlin* did not argue that they were not provided notice of the changes to the arbitration agreement.

purportedly linked to the revised Residential Customer Agreement to Lippincott. But this email was *not* sent to Robert Lippincott; rather, it was sent to Karla Lippincott. *See* Fossey Decl. ¶10. The email does not mention the arbitration clause. *See* ECF No. 306-3. As to a second email on December 1, 2017 that DirecTV purports to have sent Lippincott a link to the revised Residential Customer Agreement, DirecTV concedes that it "could not find the data file confirming" that it was actually sent. Fossey Decl. ¶10. Fossey's speculation that it was is not sufficient. *See Lim v. Helio, LLC*, 2012 WL 12884440, *3 (C.D. Cal. Apr. 11, 2012). DirecTV similarly claims that an "equipment order confirmation email" was sent to Lippincott on August 13, 2018 when it was addressed to Karla Lippincott instead. Fossey Decl. ¶12. But, again, DirecTV fails to provide any "data file" confirming that the email was actually sent or delivered. And even assuming that it was, the order confirmation email does not mention the dispute resolution clause or arbitration anywhere on the initial page of the email. *See* ECF No. 306-7. Arbitration is not mentioned until much lower in the email and is in small gray font that is barely legible at the end of the document. It does not suggest that any changes to the scope of arbitrable disputes were made, or that through these changes DirecTV sought to deny Lippincott his chosen forum for claims that were *already* pending in litigation.

Separately, DirecTV claims that a June 2016 email notified Robert Lippincott that changes had been made to the arbitration provision of the Residential Customer Agreement and that a hyperlink was provided to a webpage containing the updated version of the customer agreement. *See* Decl. of Michelle Harris ("Harris Decl.") at ¶3 (ECF No. 171-5). The email does not say what changed in the arbitration provision or that Lippincott's already-pending antitrust claim would be affected. Nor does DirecTV claim that this email caused Lippincott to click through to DirecTV's website. Moreover, as Plaintiffs previously explained on DirecTV's prior motion to compel arbitration, at least some of the documents posted on DirecTV's website were not viewable through Microsoft's Internet Explorer in summer 2016. *See* ECF No. 196-1 at ¶2. Lastly, DirecTV's evidence shows only that the email was sent to Karla Lippincott rather than Robert Lippincott. Harris Decl.

13

¶5.

DirecTV also offers several of Lippincott's billing statements. These statements, however, do not show that Lippincott was put on notice of a change to the terms of the arbitration clause, or that by agreeing to it he would give up his right to continue pursuing his antitrust claims in this Court. To the contrary, the front page of each statement shows that DirecTV highlights important information for the customer to focus on, including boxes containing information about "[w]hat changed since last month?" and "[w]hat do I need to know?". Nothing in these boxes disclose changes to the scope of the arbitration clause. *See* ECF Nos. 306-10, 306-11, 306-12.

On the second half of the back side of the statements—in tiny gray font—DirecTV states that "[y]ou received your DirecTV Customer Agreement with your order confirmation" and advises that the current terms and conditions are available on DirecTV's website. *See e.g.* ECF No. 306-11. In a separate section at the bottom of the page—entitled "Questions About Your Bill"—DirecTV explains how to dispute a bill, notes that DirecTV will attempt to resolve disputed claims informally, and explains that "[a]ny claims not so resolved may be resolved only through binding arbitration, as provided in the Customer Agreement." *Id.* Again, there is no reference to any change in the scope of arbitrable disputes that would suggest to Lippincott that he would be deprived his day in court despite litigating here for nearly six years.[8]

The evidence proffered by DirecTV misses a critical point. Lippincott, a California

---

[8] DirecTV cites *Heller v. Rasier, LLC*, 2020 WL 413243 (C.D. Cal. Jan. 7, 2020) for the proposition that the use of small gray font does not dispositively resolve the question of contract formation, but the evidence there established that express consent to arbitration was given by the plaintiffs. *Id.* at *11 (observing that plaintiff clicked on the "YES, I AGREE" button"). But context matters. As the Ninth Circuit in *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171 (9th Cir. 2014) ("*Nguyen*") noted, "[w]ere there any evidence in the record that Nguyen had actual notice of the Terms of Use or was required to affirmatively acknowledge the Terms of Use before completing his online purchase, the outcome of this case might be different." *Id.* at 1176.

1  resident, is not contesting the fact that there was a pre-dispute version of the arbitration

2  clause that required arbitration of *some disputes* between him and DirecTV. But he did not

3  agree to arbitrate this antitrust dispute, and the version of the arbitration clause in effect at

4  the time he filed suit did not require him to do so. The fact that his post-filing monthly

5  statements and emails from DirecTV generically discussed the existence of an arbitration

6  clause does not alert a reasonable person that DirecTV had changed the scope of the

7  arbitration clause in a way that would require Lippincott to arbitrate his existing antitrust

8  claim. *Nguyen,* 763 F.3d at 1178–79 ("in keeping with courts' traditional reluctance to

9  enforce browsewrap agreements against individual consumers, we therefore hold that

10  where a website makes its terms of use available via a conspicuous hyperlink on every page

11  of the website but otherwise provides no notice to users nor prompts them to take any

12  affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant

13  buttons users must click on—without more—is insufficient to give rise to constructive

14  notice"); *Windsor Mills, Inc. v. Collins & Aikman Corp.,* 25 Cal. App. 3d 987, 993 (Cal Ct.

15  App. 1972) ("*Windsor Mills*") ("an offeree, *regardless of apparent manifestation of his*

16  *consent*, is not bound by inconspicuous contractual provisions of which he was unaware,

17  contained in a document whose contractual nature is not obvious") (emphasis added);

18  *Commercial Factors Corp. v. Kurtzman Bros.*, 131 Cal. App. 2d 133, 135 (1955) ("*CFC*")

19  (no manifestation of assent to terms on back of order forms); Decl. of Robert Lippincott at

20  ¶¶6-12 (no implied consent to arbitrate) (ECF No. 315-1).

21      A close review of DirecTV's evidence reveals similar shortcomings with respect to

22  Holinko (New Jersey), Gael Pub (New York), and The Mucky Duck (California). The

23  evidence fails to demonstrate that any of these plaintiffs expressly consented to arbitrate

24  their existing antitrust disputes with DirecTV when the pre-dispute versions of these

25  clauses did not require them to do so. And, as was the case with Lippincott, DirecTV's

26  contention that it provided sufficient notice of a change in the scope of the arbitration clause

27  after the litigation was filed, falls far short of what is necessary to impute consent through

28  silence. *Avery,* 218 Cal. App. 4th at 67 ("Consent is not mutual, unless the parties all agree

upon the same thing in the same sense . . . . If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation.") (citations omitted); *Coca-Cola Refreshments, USA, Inc. v. Binghamton Giant Mkts., Inc.*, 127 A.D.3d 1319, 1323, 6 N.Y.S.3d 766, 768 (2015) (under New York law, contract implied by conduct requires an objective "course of conduct [that] indicates that they have reached a meeting of the minds"); *Leitner v. Braen,* 51 N.J. Super. 31, 39 (App. Div. 1958) (manifestation of intent is not established where one party's conduct is "uncertain or ambiguous"); Suppl. Decl. of Jason Baker at ¶¶6-10 (no implied consent to arbitrate) (ECF No. 315-2); Decl. of Eugene Lennon at ¶¶7-11 (same) (ECF No. 315-3); Decl. of Michael Holinko at ¶¶5-10 (same) (ECF No. 315-4).

Because DirecTV's changes to its customer agreements after the litigation was filed to cover this litigation would defeat the legitimate expectations of the Plaintiffs as to the scope of arbitrable claims, they cannot serve as the basis to compel arbitration here.

### 3. California Law Precludes Compelling Arbitration Pursuant To The Post-Filing Versions Of The Arbitration Clauses.

The present controversy among the parties "exist[ed]" as of July of 2015 when The Mucky Duck filed suit. For "existing" controversies, FAA §2 makes clear that there must be an "agreement in writing" between the parties to arbitrate that particular controversy. *See* FAA §2 (requiring "an agreement in writing to submit to arbitration an existing controversy"). Here there is no such "agreement in writing" between the parties. Moreover, there is no mention of this case in any DirecTV's agreements, apparently because DirecTV was trying to hide its efforts to short-circuit this litigation from plaintiffs. The added assurance of express agreement to arbitrate an existing dispute required by FAA §2 is entirely appropriate where, as here, Plaintiffs have clearly indicated their intent to proceed in court by filing suit there.

The fact that FAA §2 does not apply to the facts of this case does not end the analysis, however, because the California Arbitration Act also has expressed a policy favoring arbitration in certain circumstances. *See* Cal. Code Civ. Proc. §1281, *et seq*. But California

law contains an exception to arbitration where "[a] party to the arbitration agreement is also a party to a pending court action . . . with a third party arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact." *Id.* at §1281.2(c). Here, Plaintiffs will proceed against the NFL Defendants in this Court on the very same claims that DirecTV seeks to compel to arbitration. That situation gives rise to the possibility of conflicting results and requires this Court to deny DirecTV's motion to compel as to all Plaintiffs in light of California's legislatively expressed policy to centralize multi-party disputes arising out of the same transaction or occurrence in one forum. *Bremen*, 407 U.S. at 15 (contract clauses unenforceable if they conflict with the policy of the forum in which suit is brought).

### D. All Customers' Claims Are Brought In A "Private Attorney General Capacity" And Thus Are Inarbitrable Under Pre-Dispute Versions Of The Arbitration Clauses.

The DirecTV arbitration clause for both commercial and residential subscribers that was in effect as of the filing of this litigation provides in relevant part that "[n]either you nor we shall be entitled to . . . arbitrate any claim . . . in a private attorney general capacity." *See* Decl. of Steven Mullins ("Mullins Decl."), Exh. 3 at §9.2(c) (ECF No. 171-47); Decl. of Amanda Mitchell ("Mitchell Decl."), Exh. 8 at §9.2(c) (ECF No. 171-43). This carve-out applies here, where Congress has vested civil litigants to act as "private attorneys' general" to pursue violations of the Sherman Act. As the Supreme Court has repeatedly recognized:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. *See Northern Pacific R. Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. In enacting these laws, Congress had many means at its disposal to penalize violators. It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations. But, this remedy was not selected. Instead, Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured

17

1
2
in their business or property by an antitrust violation. *By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as "private attorneys general."*

3
*Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972) (emphasis added).[9]

4
5
6
7
Because the relevant DirecTV arbitration clauses expressly prohibit arbitration of any claim in a "private attorney general capacity", and because the Sherman Act vests Plaintiffs with the right and obligation to act as private attorneys' general, the resolution of Plaintiffs' claims do not fall within the scope of arbitrable claims.[10]

8
9
### E.   Commercial Customers' Claims Are Excluded From Arbitration Under The Pre-Dispute Version Of The Relevant Arbitration Clause.

10
11
12
The June 2014 version of the Commercial Customer Agreement provides the following broad arbitration exclusion: "Exceptions. Notwithstanding the foregoing: (i) *any Claim* based on Section 1(h) above . . . may be decided only by a court of competent

13

14
15
16
17
18
19
20
21
22
[9] *See also Zenith*, 395 U.S. at 130-31 ("Moreover, the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but to serve as well the high purpose of enforcing the antitrust laws."); *Fortner*, 394 U.S. at 502 ("As the special provision awarding treble damages to successful plaintiffs illustrates, Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition."); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 345 (1990); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745–46 (1977) (same); *Power Replacements, Inc. v. Air Preheater Co.*, 426 F.2d 980, 983 (9th Cir. 1970) ("A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest.") (citations omitted).

23
24
25
26
27
28
[10] In *Moneylion*, the plaintiff did not contend that the private attorney general exception in that arbitration clause carved out claims under the UCL and related state statutes under straightforward principles of contract interpretation. And so the question resolved in *Moneylion* was narrow. As framed by the Ninth Circuit, the question was "Must DiCarlo act as a private attorney general to seek public injunctive relief?" 2021 WL 647502, at *5. The Ninth Circuit explained that this was not necessary. Because DiCarlo was entitled to pursue any remedy in arbitration, and she had agreed to arbitrate, that was the appropriate forum for her to resolve her claims. Here, Plaintiffs contend that ordinary principles of contract interpretation exclude their antitrust claims from arbitration because they have been deputized by Congress as "private attorneys' general".

jurisdiction." *See* Mullins Decl., Exh. 3 at §9(d) (June 24, 2014 Commercial Customer Agreement) (ECF No. 171-47); (emphasis added). And Section 1(h) provides as follows:

> Blackouts. Certain programming, including sports events, may be blacked out in your local reception area or otherwise unavailable to commercial customers in your local reception area due to legal, contractual, or other restrictions. Blackout restrictions are decided by the sports leagues and the other entities that own the local broadcast rights. You may visit www.directv.com for more information. If you circumvent or attempt to circumvent any of these blackouts, you may be subject to legal action.

In this case, Plaintiffs challenge the legality of NFL blackout restrictions. *See* CAC ¶10 ("This exclusive deal, along with other contractual arrangements between the NFL, its member teams, and DirecTV, as well as Fox, ESPN, CBS, and NBC (collectively, the 'Networks'), results in the blackout or unavailability of out-of-market games, except through the bundled NFL/DirecTV Sunday Ticket."); and ¶93 ("[t]his anticompetitive effect implicates blackouts of out-of-market games, both broadly and as discussed in the NFL's Constitution and Bylaws."); *see also* ECF No. 232 (NFL-DirecTV agreement defining the term "blackout" to include channel-specific blackouts) and Second Decl. of Christopher Lebsock, Exh. 1 (same) (ECF No. 315-5).

The "contractual" restrictions, including DirecTV's own exclusive agreement with the NFL, render broadcasts of certain out-of-market games "unavailable" to be viewed except through Sunday Ticket. Once these restraints are removed, Plaintiffs allege that many of those games, and likely all, *will* be available within each class member's "local reception area" through multiple distribution channels, including, for example, the traditional broadcast networks, cable providers, and satellite networks. *See, e.g.*, CAC ¶11, ¶14. Commercial Plaintiffs' claims thus fall within DirecTV's blackout provision.

Accordingly, for commercial subscribers, such as The Mucky Duck and Gael Pub, the broadly worded exception of §9(d) excludes arbitration of their antitrust claims.

## F.   **The Mucky Duck Never Agreed To Arbitrate At All.**

The arbitration clauses at issue also do not bind The Mucky Duck because it has never agreed to arbitrate its claims with DirecTV. DirecTV acknowledges that The Mucky

19

Duck has been a DirecTV commercial subscriber since June 6, 1996. Decl. of John Gardner at ¶7 (ECF No. 171-2). DirecTV's Vice President and General Counsel, Steven Mullins ("Mullins") avers that "before fall 2009, the DIRECTV Commercial Viewing Agreement was signed by new commercial customers. The signed agreements were then to be returned to DIRECTV by fax, and are currently archived in an electronic database." *See* Mullins Decl. ¶4. However, no such signed agreement between Mucky Duck and DirecTV has been proffered by DirecTV. This is because arbitration clauses were not part of the terms and conditions when The Mucky Duck initially became a customer. *See DirecTV, Inc. v. Mattingly*, 376 Md. 302, 306-307 (2003) ("*Mattingly*") (noting that the arbitration provision was first included in the 1997 version of the customer agreements).

Furthermore, DirecTV failed to produce The Mucky Duck's "Public Viewing Agreement/Customer Information" sheet signed by its owner Jason Baker ("Baker") on June 6, 1996, and it has admitted that it will never be able to do so. *See* Reporter's Transcript of Proceedings, dated February 13, 2017 (DirecTV "couldn't find the original signed agreement. They don't have it. We won't have it. That's a fact of life"). But that's not actually true because Baker produced it in this litigation. *See* Decl. of Jason Baker ("Initial Baker Decl."), Exh. 1 (ECF No. 196-2). And, not surprisingly, it confirms that no arbitration clause was included in the agreement.

"In California, a party's intent to contract is judged objectively, by the party's outward manifestation of consent." *See Cedars Sinai Med. Ctr. v. Mid-West Nat'l Life Ins. Co. of Tenn.*, 118 F. Supp. 2d 1002, 1008 (C.D. Cal. 2000). "Hence, an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Windsor Mills*, 25 Cal. App. 3d at 993; *see also CFC*, 131 Cal. App. 2d at 135 (no manifestation of assent to terms on back of order forms). This rule of exclusion applies with equal vigor both within and outside of the arbitration context. *See Cory v. Golden State Bank,* 95 Cal. App. 3d 360, 366–367 (1979) (service charge provision on back side of money order not part of contract); *India Paint and Lacquer Co. v. United Steel*

1  *Prods. Corp.,* 123 Cal. App. 2d 597, 606–607, 610–611 (1954) (disclaimer of warranty

2  contained in invoice excluded).

3       DirecTV proffers Mullins' declaration for the proposition that DirecTV sent a letter

4  to "all" of its existing commercial customers in March 2010 "to notify them of the updated

5  [2009] Commercial Viewing Agreement." Mullins Decl. ¶6. Even if that statement were

6  accurate, the copy of the letter proffered—Mullins Decl., Exh. 2—is not personalized to

7  The Mucky Duck, is not signed, and did *not* include the 2009 Commercial Customer

8  Viewing Agreement as an attachment to the letter. Additionally, the letter did not describe

9  any purported changes to the Commercial Customer Viewing Agreement. Nor did it

10  reference any obligation to arbitrate.

11       DirecTV's Alisa Kellogg avers that "[a]ccording to DirecTV's business Rules and

12  based on my review of The Mucky Duck's records, The Mucky Duck's 2014 Commercial

13  Customer Agreement was included in the envelope along with its June 7, 2014 billing

14  statement." *See* Decl. of Alisa Kellogg ¶36 ("Initial Kellogg Decl."). Even assuming that

15  statement is accurate, sending a bill stuffer that purports to add new conditions after a

16  course of dealing has been established is *not* sufficient to bind the party receiving it. *See*

17  *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 803 (1998) ("*Badie*") ("Thus, after analyzing

18  the credit account agreements in light of the standard canons of contract interpretation, we

19  conclude that when the account agreements were entered into, the parties did not intend

20  that the change of terms provision should allow the Bank to add completely new terms

21  such as an ADR clause simply by sending out a notice.").

22       Moreover, Kellogg provides no support for her contention that a Commercial

23  Customer Agreement was actually included as a bill stuffer in 2014, and it is not at all clear

24  what she personally knows or whether her statement is based on information and belief.

25  This is particularly true since, as Kellogg avers, a third-party vendor, "DST Output",

26  prepares and then mails bills for DirecTV. *See* Initial Kellogg Decl. ¶¶8-11. Even if she

27  could lay a proper foundation, she does not state what extraneous materials would also

28  have been included in the envelope, such as advertising circulars; whether there was any

specific warning on either the outside of the envelope or on the bill itself to consult the enclosed Commercial Customer Agreement; the font size or shape of the Commercial Customer Agreement; or in what order additional materials were inserted with the June bill. Nor has she provided DST Output's breakdowns/error rates in or around June 2014—and so there is no way for this Court to judge whether any clause buried deep within the terms and conditions provided reasonable notice to The Mucky Duck of an obligation to arbitrate. *See generally* Initial Lebsock Decl., Exh. 6 (ECF No. 196-1) (exemplar of bill and accompanying bill stuffers). What *is* clear is that Jason Baker, the owner of The Mucky Duck who produced his original 1996 agreement, has no recollection of receiving this document. *See* Initial Baker Decl. ¶9 (ECF No. 196-2).

DirecTV also proffers several invoices from DirecTV to Mucky Duck as evidence of its intent to commit this litigation to arbitration. *See* Initial Kellogg Decl., Exhs. 21-24 (ECF Nos. 171-29, 171-30, 171-31, 171-32) and the additional Decl. of Alisa Kellogg ("Second Kellogg Decl."), Exhs. 22-25 (ECF Nos. 306-30, 306-31, 306-32, 306-33); *India Paint*, 123 Cal. App. 2d at 607 ("[t]he prevailing rule is that an invoice, standing alone, is not a contract . . . and a buyer is ordinarily not bound by statements thereon which are not a part of the original agreement"). In contrast to the color presentation on the front-side of the invoices, however, the information on the reverse side is presented in gray font, with small lettering. On the back of these invoices is a reference to a "Commercial Viewing Agreement" and an assertion that "*[y]ou received your DirecTV Commercial Viewing Agreement with your contract*. The Commercial Viewing Agreement describes the terms and conditions upon which you accept our service." *See, e.g.,* Initial Kellogg Decl., Exh. 21 (ECF No. 171-29) (emphasis added). DirecTV has failed to offer any evidence of the "terms and conditions" that were contained in its 1996 contract with Mucky Duck. But we do know from *Mattingly*, 376 Md. at 306-307, that they did *not* contain an arbitration clause. *See also* Initial Baker Decl., Exh. 1 (ECF No. 196-2) (no arbitration clause in signed agreement with DirecTV).

The subsequent section on the back-side of the invoice concerns "Errors or

Questions About Your Invoice." In this section, DirecTV describes how one can "dispute" or "question" an invoice. After stating that DirecTV will not report accounts as delinquent during the pendency of a dispute, the invoice states in rather inconspicuous text at the end of the paragraph that "[w]e will make every effort to resolve claims informally. Any claims not so resolved may be resolved only through binding arbitration as provided in the Commercial Viewing Agreement." Initial Kellogg Decl., Exh. 21 (ECF No. 171-29). The invoices variously refer to the document containing the arbitration clause as a viewing agreement or a customer agreement; some provide the location on DirecTV's website where it could be located, but other versions do not do so. At bottom, none of these disclosures demonstrate contract formation under general principles of California law where an agreement to arbitrate does not otherwise exist. *Windsor Mills*, 25 Cal. App. 3d at 990 (rejecting terms and conditions set forth on "reverse" side of order confirmations).

DirecTV's Carine Yahinian further notes that on August 26, 2015—*after* The Mucky Duck's July 13, 2015 complaint was filed (*see* ECF No. 1 in *Ninth Inning Inc. dba The Mucky Duck v. National Football League, Inc. et al*., C.D. Cal. Case No. 2:15-cv-05261)— DirecTV sent an email order confirmation to "Jason Baker of The Mucky Duck" regarding The Mucky Duck's addition of the Big Ten Network. *See* Yahinian Decl. ¶18 and Exh. 8 (ECF No. 171-67), Exhs. 1-2 (ECF Nos. 171-60, 171-61). Yahinian does not aver that the email was opened or viewed by Baker or anyone else associated with The Mucky Duck.

In addition, the "Order Confirmation" email provided by Yahinian states in relevant part: "Below is a summary of your order as well as the terms and conditions of the offer." *See* Yahinian Decl., Exh. 8 (ECF No. 171-67). There appears to be a hyperlink to the "Terms and Conditions"—which may or may not have been visible to the recipient without scrolling. Even assuming, *arguendo*, that it was visible, "proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice . . . ." *See Nguyen*, 763 F.3d at 1178. There is no reference to any purported arbitration clause anywhere on Yahinian Decl., Exh. 8 (ECF No. 171-67).

Yahinian then purports to provide the hyperlinked "terms and conditions"—*see*

23

Yahinian Decl. ¶18 and Exh. 7 (ECF Nos. 171-60, 171-61, 171-62, 171-63, 171-64, 171-65, 171-66)—but the actual title of the hyperlinked document reads "DirecTV Installation Checklist."[11] Well down the page—out of view of the reader without scrolling—is a section entitled "Existing Customer Offer Terms and Conditions", and the second to last bullet point reads: "You and DirecTV agree that any dispute arising under or relating to your agreements or service with DirecTV, which cannot be resolved informally, will be resolved through binding arbitration as fully set forth in your Commercial Viewing Agreement (available at directv.com/commercial_agreement)." *Id.* This set of circumstances provides insufficient notice to impute consent to arbitrate. *See Nguyen*, 763 F.3d at 1177 ("[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement").

Kellogg further states that The Mucky Duck was mailed a copy of the 2017 Commercial Customer Agreement (*see* Second Kellogg Decl. ¶41)—but it's clear from her declaration that DirecTV did not do the mailing and so she can only aver that DirecTV instructed a third-party vendor to do so. *See* Second Kellogg Decl. ¶8. Kellogg does not include The Mucky Duck's May 2017 invoice, which she says included the revised Commercial Customer Agreement. *Id.* ¶41. She provides no information about the third-party vendor's error/break down rates during this period of time, or how many other bill stuffers were included in the envelope, or in what order the various documents were inserted.

Additional defects are evident with respect to Kellogg's testimony concerning the purported mailing of the 2014 Commercial Customer Agreement. *See* Second Kellogg Decl. ¶¶45-46. First, as she notes, some of the disclosure language discusses a "Commercial Viewing Agreement"; at other times a "Commercial Customer Agreement"

---

[11] The DirecTV Installation Checklist is dated August 3, 2016, nearly a year after the "Order Confirmation" email was purportedly sent to The Mucky Duck. *See* Yahinian Decl., Exh. 7 (ECF No. 171-66) (top left-hand corner referencing a date of 8/3/2016).

is referenced. She cites the back of an invoice that states that the viewing agreement was included with The Mucky Duck's "contract" but, as noted above, that contract was executed in 1996, well before DirecTV adopted its arbitration policy. *Id.* ¶46. *Badie*, 67 Cal. App. 4th at 803 (bill stuffers not sufficient to "add completely new terms such as an ADR clause simply by sending out a notice").

In sum, the evidence mustered by DirecTV falls well short of demonstrating that The Mucky Duck consented to arbitration simply by continuing to subscribe to DirecTV's programming services. DirecTV's insertion of arbitration terms in purported agreements with The Mucky Duck after their course of dealing commenced, burying those terms deep inside a bill stuffer, or on the backside of an invoice, or on the bottom of hyper-linked webpages is simply not adequate notice under California law. *Nguyen*, 763 F.3d at 1176 ("Were there any evidence in the record that Nguyen had actual notice of the Terms of Use or was required to affirmatively acknowledge the Terms of Use before completing his online purchase, the outcome of this case might be different."). Arbitration cannot be compelled here.

## IV.    **CONCLUSION**

Plaintiffs respectfully request that DirecTV's motion seeking to compel arbitration be denied in its entirety.[12]

Dated: March 5, 2021                    Respectfully submitted,


                                        By:   */s/ Marc M. Seltzer*
                                              Marc M. Seltzer

                                              Marc M. Seltzer

---

[12] In the event that the Court does compel arbitration, this Court should stay, not dismiss, the claims against DirecTV and permit discovery over DirecTV as a party. *See e.g. Grammer v. Colo. Hosp. Ass'n Shared Servs.*, 2015 WL 3938406, at *2 (D. Nev. June 26, 2015) (denying motion to stay discovery where "discovery [would] proceed regardless of the outcome" of court's remand decision).

mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Arun Subramanian
asubramanian@susmangodfrey.com
William Christopher Carmody
bcarmody@susmangodfrey.com
Seth Ard
sard@susmangodfrey.com
Edward Delman
edelman@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206)

Michael D. Hausfeld
mhausfeld@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Scott Martin
smartin@hausfeld.com
Irving Scher
ischer@hausfeld.com
HAUSFELD LLP

26

33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Michael P. Lehmann (SBN 77152)
mlehmann@hausfeld.com
Bonny E. Sweeny (SBN 176174)
bsweeney@hausfeld.com
Christopher L. Lebsock (SBN 184546)
clebsock@hausfled.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980

Howard Langer
hlanger@langergrogan.com
Edward Diver
diver@langergrogan.com
Peter Leckman
pleckman@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Interim Class Counsel*

27