1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5    IN RE: NATIONAL FOOTBALL              )
     LEAGUE SUNDAY TICKET                  )
6    ANTITRUST LITIGATION                  ) CASE NO.
                                           ) 2:15-ML-02668-PSG
7                                          )
                                           )
8                                          )
                                           )
9                                          )
     _____)
10

11

12

13
            REPORTER'S TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS
14
                       MONDAY, APRIL 19, 2021
15
                           1:29 P.M.
16
                    LOS ANGELES, CALIFORNIA
17

18

19

20

21

22   _____

23                  MAREA WOOLRICH, CSR 12698, CCRR
                  FEDERAL OFFICIAL COURT REPORTER
                  350 WEST FIRST STREET, SUITE 4311
24                LOS ANGELES, CALIFORNIA 90012
                     mareawoolrich@aol.com
25

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE NFL:**

4         HAUSFELD LLP
          BY:  CHRISTOPHER LEBSOCK
5         600 Montgomery Street, Suite 3200
          San Francisco, CA 94111
6         Telephone:  (415) 633-1949

7         WILKINSON STEKLOFF LLP
          BY:  BETH WILKINSON
8         2001 M Street NW, Suite 10th Floor
          Washington, DC 20036
9         Telephone:  (202) 847-4010

10

11   **FOR DIRECTV:**

12        O'MELVENY & MYERS LLP
          BY:  DANIEL M. PETROCELLI
13        1999 Avenue of the Stars, 8th Floor
          Los Angeles, CA 90067
14        Telephone: (310) 553-6700

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA; MONDAY, APRIL 19, 2021 |
| 2 | 1:29 P.M. |
| 3 | -oOo- |
| 4 | |
| 5 | THE COURTROOM DEPUTY:  Calling Item 2, MDL 15-2668, |
| 6 | National Football Leagues Sunday Ticket. |
| 7 | Counsel, please state your appearances. |
| 8 | THE COURT:  Let's start with plaintiffs first, I |
| 9 | guess. |
| 10 | MR. LEBSOCK:  Good afternoon, Your Honor. |
| 11 | Chris Lebsock from the Hausfeld firm.  I will be arguing the |
| 12 | motion to compel arbitration today. |
| 13 | MS. WILKINSON:  Good afternoon, Your Honor. |
| 14 | Beth Wilkinson on behalf of the NFL. |
| 15 | MR. PETROCELLI:  Good afternoon, Your Honor. |
| 16 | Daniel Petrocelli on behalf of DIRECTV. |
| 17 | THE COURT:  Good afternoon. |
| 18 | I've read the papers.  Let's start with the moving |
| 19 | party, DIRECTV.  The one question that I do have -- again, I've |
| 20 | read everything.  But the last footnote in the opposition talks |
| 21 | about, if I'm going to do anything with the case, to just stay |
| 22 | it, not to dismiss it, to permit discovery on DIRECTV as a |
| 23 | party. |
| 24 | So I just wanted to know your thoughts if there was |
| 25 | a problem if I did grant your petition with keeping DIRECTV |

```
1    around for purposes of discovery as a party.
2              MR. PETROCELLI:  Our position on that, Your Honor,
3    is that we are amenable to discovery as a third party.  There
4    isn't a real lot of difference whether we are a party or a
5    nonparty.  I think the key difference would be things like
6    interrogatories or requests for admissions.
7              But in terms of depositions and document discovery,
8    we, of course, would be available as a third party.
9              THE COURT:  All right.  Go ahead and argue the
10   motion.
11             MR. PETROCELLI:  Your Honor, as the Court is very
12   well aware -- I note that Your Honor has handled a number these
13   matters -- the FAA requires the case to be submitted to
14   arbitration where there's a valid agreement to arbitrate and
15   the agreement encompasses the dispute at issue.
16             And I'll submit that on the evidence before the
17   Court, both those requirements are satisfied with undisputed
18   evidence.  In fact, only one of the four plaintiffs,
19   Mucky Duck, contends there isn't an agreement to arbitrate.
20   And they base it on an untenable position that the owner of the
21   bar didn't read or review any of the materials that were
22   indisputably sent to him by DIRECTV.  And under the mailbox
23   presumption, the presumption arises that those materials were
24   received and that there's no meaningful rebuttal to that.
25             THE COURT:  There's also reference to it in every
```

1    bill.

2            MR. PETROCELLI:  Yes.  There's a reference -- at

3    least the evidence before the Court is that there's at least

4    three versions of the customer agreement when the arbitration

5    provision is sent.  There's a reference in the bill, and

6    there's also a reference when they ordered the Big Ten service

7    in 2015.

8            There were multiple, multiple opportunities where

9    they received the material presumptively, and there's no

10   meaningful rebuttal.  The Ninth Circuit case that we cited on

11   that is pretty clear.

12           And there's no dispute at all by any of the

13   plaintiffs that the anti-trust claims at issue are encompassed

14   by the broad scope of the arbitration language.

15   Parenthetically there's a suggestion made that the outcome

16   might be different were the Court to apply the 2014 agreements.

17   And we don't agree with that, and I'll address that.

18           But all that aside, there are a few essential

19   challenges that the plaintiffs make to the first of the two

20   requirements, Your Honor.  And that is whether there's a valid

21   arbitration agreement.  And that's really where the action on

22   this motion is.

23           First of all, they claim that there's been a waiver

24   by DIRECTV.  And I've reviewed Your Honor's decisions on

25   waiver.  I've reviewed -- they go -- have to do with the

1    Ninth Circuit juris prudence.  This isn't even a close call.

2    We literally did nothing to waive our rights.

3             We joined in appellate arguments that others were

4    making.  We didn't ask for the judgment that the NFL got and

5    received --

6             THE COURT:  I agree with your position on waiver.

7             MR. PETROCELLI:  Okay.

8             THE COURT:  And I think the one time that I did find

9    waiver I was reversed.  But in any event...

10            MR. PETROCELLI:  Well, it's a pretty high bar,

11   Your Honor.  It didn't even come close in this case.

12            So let me turn to their next argument which is this

13   attempt to invoke a, frankly, rare exception to the enforcement

14   of arbitration provisions under the FAA known as the Effective

15   Vindication rule.

16            And their argument here is unlike anything the

17   courts have ever addressed before.  They are not arguing, for

18   example, that the arbitration agreement here prohibits damages

19   or prohibits even treble damages or prohibits the issuance of

20   an injunctive relief.  Were that the case, there would then be

21   an argument that there's a conflict between the mandate of the

22   FAA to enforce arbitration agreements and the statutory rights

23   under the anti-trust laws.

24            But we are nowhere near there, Your Honor, because

25   in this case everybody agrees under whatever arbitration

1  agreement is applicable, that the plaintiffs can sue in

2  arbitration for an injunction.  They have every right and

3  ability if they prevail to get an injunction.

4        What they are arguing is that they might not be able

5  to get a public injunction or a market-wide injunction.  And we

6  have several reasons why that's not a valid argument, the first

7  of which it's never been -- the Effective Vindication Doctrine

8  has never been pushed to that extreme, and that would be over

9  the line very clearly.

10        Secondly, Your Honor, because they have sued the NFL

11  in a case where the NFL is not going into arbitration because

12  they are not a party to the arbitral agreement, the plaintiffs

13  can get all the other or additional relief that's not specific

14  to DIRECTV in the action against the NFL were they to prevail.

15        I mean, when you think about it, Your Honor, the

16  gist of their claim is that they don't like the NFL's decisions

17  about how they pool and bundle television rights, nor do they

18  like the NFL's decision about how they distribute those rights.

19        No lawsuit against DIRECTV could ever deliver that

20  kind of outcome for them even if we were in court.  If it were

21  just the plaintiffs versus DIRECTV in court, they couldn't get

22  an injunction stopping the distribution or stopping the

23  pooling.  They'd need an injunction against the NFL for that.

24        The only complaint or gripe they have against

25  DIRECTV is as a consequence of what they don't like about the

1   pooling and distribution arrangements.  They think we are

2   charging too much.  They think they are paying too much.  It's

3   a matter of price.  And if they are right in arbitration, these

4   individual plaintiffs can presumably get an injunction stopping

5   the charging of the allegedly super competitive prices to them.

6           So this is a case where they can get complete

7   relief, and so there's no inhibition of their statutory rights

8   in arbitration.

9           And secondly, Your Honor, as I just indicated, we

10  think the very premise of their argument is incorrect because

11  even if they were in a court case against DIRECTV, we don't

12  think they could give some broad injunction.

13          And lastly, Your Honor, if you -- even if they could

14  get a broader injunction in court than they could in

15  arbitration, that does not trigger the Effective Vindication

16  Doctrine.  There has to be a direct conflict between the FAA

17  and the anti-trust laws at issue here.

18          The anti-trust laws are Sections 1 and 2 of the

19  Sherman Act.  Section 16 of the Clayton Act expressly

20  authorizes the issuance of an injunction in such a case.  Our

21  arbitration provisions, whether it's 2014 or 2017 or any other

22  version, provide the opportunity to get an injunction.

23          What they are complaining about is that they want,

24  you know, a wish list injunction that I've just explained

25  wouldn't accomplish anything against DIRECTV because the real

1    grievance is against the NFL.

2            But the section -- the doctrine is not -- the

3    Effective Vindication Doctrine is not triggered because they

4    cannot get the biggest injunction that they might want.  There

5    has to be a meaningful inhibition of their ability to get an

6    injunction at all.  And we don't have that situation here

7    because everybody agrees, even the plaintiffs, that were they

8    to prevail, they could get an injunction.

9            And, Your Honor, if you look at the injunction

10   provision in Section 16 of the Clayton Act, it is quite clear

11   that the plaintiffs would only be entitled to an injunction

12   that is necessary to redress the harm to themselves.  They

13   don't have a right under Section 16 to get an injunction with

14   respect to parties not in the arbitration.

15           I mean, the language in Section 16 authorizes a

16   person to sue and obtain an injunctive relief when and under

17   the same conditions and principles as injunctive relief against

18   threatened conduct that will cause loss or damage as granted by

19   courts of equity.

20           So the same principles that would govern any

21   injunction case apply here to these anti-trust claims in

22   arbitration.  They have to show they were harmed in some way in

23   which courts of equity would afford them to redress their harm

24   at the injunctive relief.

25           And that's -- and the cases that we cited, the

1  U.S. Supreme Court case, the *Califano* case, makes clear,

2  Your Honor, that you are not entitled to an injunction that is

3  more burdensome to the defendant than necessary to redress the

4  specific harms to the plaintiff.  And the plaintiffs can get

5  full redress for any specific harms in arbitration.

6          So they make a final argument which I'll briefly

7  address.  Your Honor has actually dispatched this argument, in

8  my view, in a case called *Revitch v. Uber Tech*s back in 2018.

9  But the argument is that this California Supreme Court decision

10  in the *McGill* case somehow applies to thwart their arbitral

11  rights.  And that has no application whatsoever to this case,

12  Your Honor.  *McGill* applies to California claims.  There are no

13  California claims in this case.

14          THE COURT:  I agree on that.

15          MR. PETROCELLI:  Okay.  And then the last argument

16  that I'll touch on, Your Honor, is this suggestion that the

17  Court should disregard the 2017 agreements and only apply the

18  2014 agreements because those were the agreements that were in

19  place prior to the commencement of the litigation and somehow,

20  if the Court were to apply the 2014 agreement, the outcome

21  would be different.

22          Well, just cutting to the chase on that, the outcome

23  would not be different.  There is no difference whether it's

24  under the Effective Vindication Doctrine, *McGill* or any other

25  argument, that they would not be able to under the 2014

```
 1   agreement or the 2017 agreement go into court and get an
 2   injunction if they win -- excuse me.  Go into arbitration and
 3   get an injunction if they win.
 4           Their argument appears to be, first of all, that the
 5   2017 agreement doesn't apply because it didn't exist as of the
 6   time of the lawsuit.  Well, there are a number of cases
 7   including ones that Your Honor has handled, I think, including
 8   the Uber case where if the agreements, the arbitral agreements,
 9   provide for the right to update or revise or amend and a party
10   receives them and doesn't object and continues to use the
11   service, those updated agreements are binding on the plaintiffs
12   here even if they came after the commencement of the
13   arbitration.
14           The cases on which the plaintiffs rely principally
15   involved situations where there was no arbitration agreement at
16   all when the dispute occurred, and then during the pendency of
17   the litigation, the defendant tries to insert an arbitral
18   agreement.  That's obviously a totally different situation, and
19   that's not before -- that's not this case.
20           They cite another case or two where there were
21   overreaching provisions sort of to gain a litigation advantage
22   that were put in by the defendant after the commencement of the
23   arbitration, like getting a release or something like that.
24   Again, that has no application to this case.
25           The 2017 agreements were simply updates when DIRECTV
```

1    got acquired by AT&T.  DIRECTV then modeled their new arbitral

2    agreements over the AT&T version as opposed to the pre AT and

3    DIRECTV versions.  They are different but not in any

4    substantive effect that concerns this case, Your Honor.

5            The plaintiff's only argument in this regard is that

6    they read the 2014 agreements -- I will say they read them

7    incorrectly -- to suggest that, if the matter is a private

8    attorney general matter, it doesn't go into arbitration.

9            Well, the short answer to that is this is not a

10   private attorney general matter.  In fact, private attorney

11   general cases which are a species of California law don't exist

12   in federal law.  In federal law you need Article III standing.

13   You can't have plaintiffs who have no concrete injury come into

14   court and ask for a public injunction or as a private

15   attorney general.

16           In fact, even in California, as Your Honor knows,

17   under Prop 64 they've eliminated these private attorney general

18   claims and say only the government can bring them.  Going

19   forward since Prop 64, even plaintiffs in court who want to

20   bring these unique California claims have to have an injury to

21   themselves before they can bring a claim.

22           But here, Your Honor, these plaintiffs are suing to

23   redress direct injury to themselves.  Not to, you know, untold

24   third parties or the general public.  They are not bringing

25   this case -- in fact, take Mucky Duck.  Do you think Mucky Duck

1    is bringing this case to lower the price to his competitor

2    across the street?  He's bringing this case to lower the price

3    to himself.  These are all direct cases, Your Honor.  And

4    Your Honor made that very point dealing with a similar

5    situation in the *Uber* case.

6          So those are the main challenges that they've made.

7    We think we've fully addressed all of them.  We don't think

8    this is a close call, Your Honor.  Thank you.

9          THE COURT:  Thank you.

10         Ms. Wilkinson, I know you are not a petitioner but

11   anything to add before I hear from plaintiffs?

12         MS. WILKINSON:  No, Your Honor.  Thank you though.

13         THE COURT:  Thank you.

14         Okay.  Let's hear from plaintiff.

15         MR. LEBSOCK:  Thank you, Your Honor.

16         Okay.  So obviously we advocated for waiver.  We'll

17   stand on the pleadings as it relates to that and then --

18         THE COURT:  I thought waiver and *McGill* were -- was

19   the weakest one.  But in any event, let's hear on the other --

20   you can take another bite at waiver as well.

21         MR. LEBSOCK:  Okay.  So since you invited it, all I

22   will say about waiver is the following, Your Honor:  The fork

23   in the road about whether a defendant is going to waive by

24   conduct its -- his right to arbitrate has to be decided at

25   every fork in the road; right?

1           So here it is true that DIRECTV did not initially

2    ask the Court for the judgment that was entered.  But it

3    certainly did after that judgment was entered defend it in an

4    appeal in the Ninth Circuit, and it did that intentionally.

5    And it did it because it knew that, if that judgment was

6    affirmed, there would be res judicata in this case.

7           And so they were perfectly happy to work within the

8    Court system to try and cut this case off at the earliest pass.

9    And by doing that, by focusing on litigation in court, they

10   have now waived their right to go -- to say, you know, that

11   isn't actually what we wanted to do.

12          THE COURT:  There's a difference between driving the

13   car and going along for the ride, isn't there?

14          MR. LEBSOCK:  Well, no.  I think -- I agree that

15   there is a difference.  One is driving, I suppose, if you want

16   to make that analogy.  But when you get in the car knowing

17   where the car is going and you advocate for where it's going,

18   you are -- you are engaging the machinery of the litigation

19   process for your own benefit.  They did it for their own self

20   interest which is to get res judicata in this case and that, in

21   our view, is waiver.

22          THE COURT:  Okay.

23          MR. LEBSOCK:  So that is our position on that.

24          But to focus on -- I think on the main argument that

25   was made here, this effective vindication issue, and I have a

1      few points on that, Your Honor.

2              So first of all, when we think about effective

3      vindication, what the DIRECTV is saying here is you can get an

4      injunction.  You can only get an injunction that is a

5      forward-looking, rate-relief-type injunction.

6              And I would note just as a first instance issue,

7      what effectively that is, is that would make the Court or the

8      arbitrator the rate police in a sense.  You know, periodically

9      we would have to go in and we would have to prove somehow that

10     the rate was unfairly high, and then somehow we would decide

11     and the Court would decide or the arbitrator would decide

12     what's the right rate?  What's fair?  And that is not what

13     courts like to do.  There's plenty of examples in cases

14     involving injunctions where courts don't want to be involved in

15     that sort of thing.

16             So what we really need to do is look at what the

17     statute says.  And here we've made two claims.  One is a

18     Section 1 claim and one is a Section 2 claim under the

19     Sherman Act.  And I want to focus just for a minute on the

20     Section 1 claim.

21             What the statute says -- I'm going to excerpt just a

22     little bit of it, but I'm not adding words.  I'm just

23     excerpting.  Every contract, combination or conspiracy in

24     restraint of trade is declared to be illegal.  And what our

25     case is about under Section 1 is declaring, in part, that this

1   exclusive relationship between DIRECTV on the one hand and the

2   NFL on the other hand is through an exclusive contract.  If we

3   prove our claims here, we are entitled to a declaration under

4   the statute that that relationship, that contract is illegal.

5        So what defendants want to say -- and we agree.  We

6   are not contesting the idea that the courts need to be

7   cognizant.  Not too much injunctive relief.  But on the other

8   hand, not too little.  We are asking for what the statute

9   allows and requires.

10       And, in fact, the Supreme Court has said exactly

11  what I have just said which is you can't give too little

12  either, and that comes from *International Salt versus* -- the

13  cite on that is 332 U.S. 392.  The pin is at 400 and 401.  And

14  the Court is talking there about, well, who should -- should

15  the appellate courts or the district courts decide what the

16  scope of the injunction is?  And the Supreme Court is saying

17  leave it to the district courts in the first instance.  Give

18  them discretion.

19       But then it goes on to say, "A public interest

20  served by such civil suits is that they effectively pry open to

21  competition a market that has been closed by defendant's

22  illegal restraints.  If this decree accomplishes less than

23  that, the government has won a lawsuit and lost a cause."

24       And so what effectively DIRECTV is asking for is

25  that we ignore what the statute says, what 15 U.S.C. Section 1

```
 1   says, which is declare contracts that are in the restraint of
 2   trade -- and I would qualify unreasonable restraint of trade --
 3   declare them to be illegal.  And that's what we are asking for.
 4   Declare that contract and a web of other ones potentially to be
 5   illegal.
 6           Congress has given us through the Clayton Act and
 7   the Supreme Court has recognized the private right to go do
 8   this.  And that is recognized in the Zenith case which is cited
 9   in our papers, Your Honor, where a private plaintiff was able
10   to go in and, quote, "pry open the doors to competition."
11           Because of contractual arrangements between the
12   defendants in that case, they had been precluded from a market
13   entry into certain markets around the world.  And what the
14   injunction was is to restrain that, prevent those contracts
15   from being enforced anymore, to pry open competition.
16           And so it is -- one thing is absolutely clear.
17   DIRECTV thinks we cannot get that kind of an injunction in an
18   arbitral proceeding.  We are entitled to it.  And if we can't
19   get it in arbitration, we can't get it anywhere.  And what the
20   Supreme Court has said in cases like Italian Colors, Mitsubishi
21   Motors is that's a deprivation of our right to a statutory
22   remedy.
23           Now, one thing the Court said -- and I just want to
24   clarify our position on this.  It is not just a violation of
25   federal policy, effective vindication.  It is also a violation
```

1    of state policy.  And remember under FAA Section 2, defenses to

2    arbitration are defined by state law.

3          And so in this case, there are policies in the

4    states that prevent the waiver of a public right.  And we cited

5    Civil Code Section 3515 which is the statute that was cited in

6    the *McGill* case.  We don't really care about the *McGill* case

7    for purposes of our litigation here other than to say that it

8    was referencing Civil Code Section 3513 -- 3531.  But it's the

9    policy of the state of California that matters because it's a

10   defense to arbitration that you can't waive those types of

11   public remedies.

12         That's the law in New York too.  And, in fact, the

13   defendants, DIRECTV, cited to a case out of the Southern

14   District of New York.  It was called *Schatz v. Cellco*, and it's

15   in their papers.  In that case the Court is talking about this

16   waiver of a public remedy, a public right.  And it cites to a

17   New York case.  Let me give that to you.  It's cited in the

18   *Schatz* decision.  But the case is *Berkovich v. Mostovaya*.  It's

19   23 Misc 3d 91.  It's a 2009 case.  And it says the same thing

20   that California law says.  You can't waive the public right.

21         New Jersey also has that type of policy.  We didn't

22   cite it.  No party cited it, but I did go and look at a case,

23   and I'll give that one to you too.  This is New Jersey.  The

24   case is *General Motors Acceptance Corp. v. Cahill*.  It's at

25   868 A.2d 1078, and the pin is 1086.  It is a 2005 case.

 1           And what that says is, "Waiver of a statutory right,

 2  in other words, will not be allowed where it would violate a

 3  public policy expressed in the statute."  So in all three

 4  jurisdictions where we have plaintiffs, there is a state law

 5  defense to contracts that will waive a public right.

 6           So whether you think about it as a federal policy

 7  like *Italian Colors* or *Mitsubishi Motors* where a state law

 8  defense, all three of the jurisdictions have such a policy.

 9           So in our view, what's clear?  You can't get the

10  type of injunctive relief we are allowed to under the

11  arbitration clause.  That's a violation of the Effective

12  Vindication Doctrine under federal law and under state law.

13  And for that reason alone, the arbitration agreement cannot be

14  enforced.

15           There's a severance clause in it so that once you

16  can't get -- there's a severance clause.  Once you are out of

17  arbitration, then you are in court.  The scope -- the question

18  is then how much of the claim comes out.

19           And we briefed this, Your Honor.  Mr. Petrocelli

20  didn't reference it, but *Blair* has dealt with the exact

21  language of the severance clause in our situation here in that

22  case and found that "claim" means "cause of action."  So the

23  whole cause of action comes out.  The injunctive relief portion

24  of it and the damages portion of it come out, and they are

25  litigated.  They are severed from the rest of the clause, and

```
 1    they come into court and are litigated in court.  So that's our
 2    effective vindication argument, Your Honor.
 3            I did want to -- I did want to touch on the other
 4    argument we made which is under the 2015 version of the
 5    residential policy and the 2014 version of the commercial
 6    policy.  Our position -- we are not trying to make a
 7    McGill-type argument in this case.  Okay?  And we are not in
 8    the situation like the MoneyLion case which we know Your Honor
 9    decided at the District Court level, and then it was affirmed
10    on appeal.
11            Our position is very straightforward.  The 20 --
12    those earlier arbitration clauses say no claim based on -- for
13    a private attorney general claim shall be litigated in
14    arbitration.  That's what it says.
15            So the question for us and this is different -- it
16    appears to be different than what happened in MoneyLion, and
17    I'll explain that in a second.  But what we are saying is it's
18    a simple contract question.  What does that mean?  And there's
19    no reference to any California Private Attorneys General
20    statute.  It's not limited like that.  It says, "No private
21    attorney general claim shall be litigated in arbitration."
22            And so we look to the cases, and what does the
23    Supreme Court say about what a private civil anti-trust
24    plaintiff is?  A private attorney general.  That comes from the
25    Supreme Court in multiple, multiple cases.  And they don't just
```

UNITED STATES DISTRICT COURT

1    stop there.  They say Congress has deemed this so important

2    that the free competition of the United States and the policy

3    of free competition, that we are going to deputize these

4    plaintiffs, these private plaintiffs, as private attorneys

5    general, and we will give them an incentive:  Treble damages,

6    the right to attorneys' fees and injunctive relief, to go out

7    and vindicate the public interest in free competition.  And so

8    that's what the -- so it's just a straight contract

9    interpretation issue from our perspective.

10           Now, I do want to talk about *MoneyLion* for a second

11   because it was referenced in -- at least to some extent in the

12   briefs.  Your Honor certainly knows more than I do about what

13   exactly was argued there.  But we certainly have closely looked

14   at the District Court opinion in that case and the Court of

15   Appeal opinion.

16           And from what I can perceive divine of the

17   situation, the argument that was made in *MoneyLion* was

18   difficult for the plaintiffs there because they were suing

19   under the UCL and because in 2004 the People of the State of

20   California had taken away the private attorney general right of

21   a private plaintiff in that case.  And that's discussed at

22   length in the Ninth Circuit opinion.

23           So what the plaintiffs there start -- had to argue

24   is they had to say we are -- you must -- to get public

25   injunctive relief, you must be a private attorney general.

 1    Their arbitration clause had that private attorney general

 2    exclusion to arbitration.

 3           But they couldn't argue the issue on contract

 4    construction because the People of the State of California have

 5    said they are no longer private attorneys general for those

 6    types of claims.

 7           So what they did is they -- and the Ninth Circuit

 8    said it very clearly, and we quoted it in our brief.  The

 9    question on appeal was must you be a private attorney general

10    to get public injunctive relief?

11           And the Court said no.  As long as the clause allows

12    you to get all the relief you are entitled to in arbitration --

13    and that clause apparently did.  I think in the District Court

14    there was a reference to that being an all remedies clause.

15    And *MoneyLion* insisted that you could get all the remedies in

16    arbitration.  Then you've got to go to arbitration.  And,

17    frankly, that makes a lot of sense to me.  It makes a lot of

18    sense to us, but that's not our situation here.

19           The implications of that though are important

20    because in this situation -- in this case that's the clause

21    that applied when our clients first sued in July of 2015.  And

22    Mr. Petrocelli has said now, well, the -- you know, that's not

23    the clause anymore.  But there are three reasons at least why

24    it should be the clause that gets applied.

25           And number one is once the litigation is filed as a

UNITED STATES DISTRICT COURT

```
 1    class action, the Court has inherent authority to prevent
 2    misleading communications that thwart the litigation.  And
 3    we've cited a number of cases in our brief about that.  We know
 4    the Court is aware of that from the Cheverez v. All American
 5    Pipeline case about the general concept.
 6              But there are numerous cases out there in the
 7    arbitration context where somebody tries to slip in an
 8    arbitration clause in a way that didn't bind the parties
 9    before.  And the courts have said, well, you have to give
10    informed consent.  You have to give full disclosure.  And in
11    this case, there's no dispute that the lawyers were not
12    contacted and that the clause -- and what was sent to --
13              THE COURT:  The clause itself allows for change,
14    doesn't it?  I mean, Cheverez essentially was kind of an
15    egregious situation.  The case is still pending.  But we are --
16    there were negotiations to basically get rid of claims, if I
17    remember correctly, and I wasn't quite happy about that during
18    the course litigation and told them to stop communicating that
19    way.
20              But in this case, don't you already have an
21    arbitration provision that says we may change it from -- we
22    keep our right to change it from time to time, and if you don't
23    like the changes we make, then stop subscribing to DIRECTV.
24    That's not nefarious, is it?
25              MR. LEBSOCK:  Well, so I think -- I think that it --
```

1   I agree that that clause is in there.  I think when I make

2   sense of the case law, it is true that you can have that type

3   of a clause in a customer agreement in our arbitration clause.

4   And generally I agree with Your Honor that the cases would say

5   you can then unilaterally change the agreement.

6         But there's a time at which you can't do that, and

7   the cases are clear about that too.  And that's once the

8   dispute is crystalized.  In California, you know, when the

9   dispute is crystalized and is known by both parties.  But

10  certainly by the time the litigation was filed.  You can no

11  longer do that.

12        And so if you look at the California cases we cited,

13  for example, *Peleg*, *Avery*, *Cobb v. Ironwood Country Club*, Iron

14  Mountain Country Club, what those cases say is that it defeats

15  the covenant of good faith and fair dealing.  When you didn't

16  have the obligation to arbitrate, the dispute is crystalized.

17  In our case, the dispute is on file.

18        And, in fact, there was no change to these

19  provisions until we had the first hearing on the motion to

20  compel arbitration, and then three weeks later DIRECTV rolled

21  out the change.

22        But it defeats the covenant of good faith and fair

23  dealing to then unilaterally try to change those terms.  That

24  is inappropriate under California law, and certainly New Jersey

25  and New York also subscribe to the concept of the implied --

```
 1   you can't do anything to defeat the legitimate expectations of
 2   the party.
 3           So the way we see it is the dividing line is you are
 4   right.  You can uni- -- if you say that you reserve the right
 5   to unilaterally change the terms, a company is allowed to do
 6   that up until the point at which there's a crystalized dispute.
 7   And at that point, different rules come in, and those are
 8   expressed in the cases cited including *Peleg, Avery* and the
 9   *Cobb* case.  Okay.
10           THE COURT:  I don't want you to concede anything,
11   but I want some clarity as to I asked Mr. Petrocelli about
12   Footnote 12.  In the event that I -- if I did grant the motion
13   to compel arbitration, what -- what would you -- what is it
14   that's being requested in Footnote 12?  To permit discovery
15   over DIRECTV as a party.  So how would -- what would the order
16   look like?
17           MR. LEBSOCK:  Well, I think the order -- as I see it
18   and maybe we didn't express it perfectly in our papers, but we
19   see it as the Court would -- taking jurisdiction over DIRECTV
20   and that we would have the right to coordinate through the --
21   through this Court the discovery that's going to take place in
22   this case.  And I think Mr. Petrocelli acknowledged there's not
23   too much difference potentially between what would be done in
24   arbitration and what would be done in this Court.
25           But the point is to have a consolidated -- you know,
```

1    a coordinated place where we would be able to efficiently

2    coordinate discovery.

3                THE COURT:  Okay.  All right.  Thank you.

4                MR. LEBSOCK:  Yeah.

5                THE COURT:  Last word to petitioner.

6                MR. LEBSOCK:  No, Your Honor.  I'm happy to answer

7    any further questions, but I think we covered the main topics

8    on which Mr. Petrocelli argued.

9                THE COURT:  Okay.  Thanks.  Last word,

10   Mr. Petrocelli?

11               MR. PETROCELLI:  (Muted.)

12               THE COURT:  Last word to the petitioner.  I think

13   you are on mute.  There you go.

14               MR. PETROCELLI:  Thank you.  I don't want to repeat

15   myself.  We've addressed all of these points.  If you have any

16   specific questions, I'd be glad to address them.

17               I do want to respond to one thing.  There is no

18   overarching rule of the sort suggested in the cases that once a

19   dispute crystalizes, an arbitration agreement cannot be

20   modified when the arbitral agreements explicitly provide that

21   they can be modified.

22               The only time that (inaudible) such updates have

23   been rejected is if they are overreaching, like trying to get a

24   release or trying to jam down a new arbitration agreement that

25   didn't exist before.  But this issue has come up in a number of

```
 1   cases, Your Honor, and there's absolutely no impediment to

 2   updating these agreements.

 3          And in particular here, there is no consequential

 4   difference between the 2014 and 2017 agreements.  The argument

 5   they are trying to make is that the 2014 agreement had a

 6   provision that said you can't arbitrate private attorney

 7   general cases, but this isn't a private attorney general case.

 8   This is a private plaintiff case.  These plaintiffs are seeking

 9   to redress harm to themselves not harm to the general public.

10          In fact, Article III would even prevent them from

11   bringing such a claim in federal court without any concrete

12   individualized injury.  And that is the point Your Honor made

13   in the Revitch case that I previously addressed.

14          THE COURT:  All right.  Thank you.  The matter will

15   stand submitted.  Thank you.

16          MR. PETROCELLI:  Thank you.

17          MR. LEBSOCK:  Thank you, Your Honor.

18          (At 2:07 p.m. the proceedings adjourned.)

19

20

21

22

23

24

25
```

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5          I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6  COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7  FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8  THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9  THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10 STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11 ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12 IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13 CONFERENCE OF THE UNITED STATES.

14

15

16          DATED THIS  22ND  DAY OF APRIL, 2021.

17

18

19          /S/ MAREA WOOLRICH

20          _____
           MAREA WOOLRICH, CSR NO. 12698, CCRR
           FEDERAL OFFICIAL COURT REPORTER
21

22

23

24

25

**UNITED STATES DISTRICT COURT**