```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION - LOS ANGELES




IN RE                          ) CASE NO: 2:15-ML-02668-PSG-JEMx
                               )
NATIONAL FOOTBALL LEAGUES      )              CIVIL
                               )
     SUNDAY TICKET ANTITRUST   )     Los Angeles, California
                               )
         LITIGATION            )    Wednesday, June 30, 2021
                               )
_____ )


                    HEARING RE: MOTION TO COMPEL
                           [DKT.NO.330]


              BEFORE THE HONORABLE JOHN E. MCDERMOTT,
                 UNITED STATES MAGISTRATE JUDGE




APPEARANCES:              SEE PAGE 2


Court Reporter:          Recorded; Zoom; Digital


Courtroom Deputy:        S. Lorenzo


Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

**APPEARANCES:**

| | |
|---|---|
| For Plaintiffs: | RAYMOND K. WRIGHT, ESQ.<br>Susman Godfrey<br>1900 Avenue of the Stars<br>Suite 1400<br>Los Angeles, CA 90067 |
| For Defendants: | BETH A. WILKINSON, ESQ.<br>Wilkinson Stekloff, LLP<br>2001 M Street NW<br>10th Floor<br>Washington, DC 20036 |
| | JEREMY S. BARBER, ESQ.<br>Wilkinson Stekloff, LLP<br>130 West 42nd Street<br>24th Floor<br>New York, NY 10036 |

1          **Los Angeles, California; Wednesday, June 30, 2021**

2                    **(Remote appearances)**

3                      **(Call to Order)**

4          **THE CLERK:**  Calling Case Number 15-ML-2668,

5     *In Re National Football Leagues Sunday Ticket Antitrust*

6     *Litigation;* the Honorable John E. McDermott, United States

7     Magistrate Judge, presiding.

8          You may speak your appearances please.

9          **MR. WRIGHT:**  Good afternoon, Your Honor.  This is

10    Raymond Wright from Susman Godfrey for Plaintiffs.

11         **MS. WILKINSON:**  Good morning, Your Honor.  This is

12    Beth Wilkinson and I'm here with my partner, Jeremy Barber, and

13    we represent the NFL, NFL Enterprises, LLC, and all 32 Club

14    Defendants.

15         **THE COURT:**  Welcome everybody.

16         This is a hearing on Plaintiffs' Motion to Compel

17    Document Production from the Club Defendants.

18         Mr. Wright, you're the Plaintiff, you can proceed.

19         **MR. WRIGHT:**  Thank you, Your Honor.

20         I want to begin this morning by just providing the

21    Court with a brief overview as to what this case is about and

22    why document discovery from the Club Defendants is plainly

23    relevant to Plaintiffs' Sherman Act claims.

24         Plaintiffs allege, at its core in their operative

25    complaint, that there are a series of interlocking agreements

4

1    between the 32 Club Defendants, the League, and various

2    broadcast networks which operate collectively to unreasonably

3    restrain trade in the market for live professional football

4    telecasts.

5            The first set of agreements that are at issue in this

6    case is the Pooling Agreement between each of the 32 Clubs and

7    the League whereby each individual club has allowed the League

8    to sell and license its separately owned intellectual property

9    rights or broadcasting rights.

10            The Club Defendants entered into this agreement with

11    the League in exchange for an equal share of the resulting

12    revenues, as we allege in paragraphs 90 to 92 of the operative

13    complaint.

14            The second set of agreements that are at issue in

15    this case, Your Honor, is the agreement between the League and

16    the 32 Clubs and DirecTV.

17            Pursuant to this agreement, DirecTV is given the

18    exclusive rights to broadcast Sunday afternoon out of market

19    NFL football games.  And as noted in the complaint,

20    specifically at paragraphs 90 to 92, it is the Club Defendants

21    who are in charge of ratifying any subsequent extensions or

22    amendments to this agreement with DirecTV.

23            The third set of agreements that are at issue in this

24    case are the agreements between the clubs in the League and

25    various broadcasting networks, including CBS and Fox.  Under

1   these agreements, CBS is given the exclusive rights to

2   broadcast Sunday afternoon American Football Conference or AFC

3   games; whereas Fox is given the exclusive right to broadcast

4   Sunday afternoon NFC game or National Football Conference

5   games.  These agreements operate collectively to restrain the

6   market for the broadcast of live professional football

7   telecasts.

8          And one of the key arguments and mischaracterizations

9   that is included in the Club Defendants' Opposition to our

10  Motion to Compel is their statement that this case only

11  concerns the second set of agreements I identified, which is

12  the agreement between DirecTV and the NFL.

13         But the history of the case is important with respect

14  to this point, Your Honor, because when the NFL Defendants

15  raised this same argument at the Ninth Circuit and argued

16  before the Ninth Circuit that the Court had to analyze the

17  different agreements at issue separately, the Ninth Circuit

18  specifically rejected this argument at page 1,152 of its

19  opinion where it stated, (Quote):

20             "Contrary to the arguments, Defendant's argument, we

21             are required to take a holistic view of how the

22             interlocking agreements actually impact competition."

23         Now I want to go through the points that are raised

24  -- some of the broader points that are raised by the NFL before

25  the Club Defendants before going into the relevance and burden

1   arguments that they raised specifically with respect to our

2   Requests for Production.  Because an additional argument that

3   is laced throughout their opposition is that the Club

4   Defendants need not produce any documents in discovery because

5   the League, which is a separate and independent entity, has

6   already agreed to produce document discovery.

7          But in the Joint Stipulation at pages 50 and 51, we

8   identified various categories of documents that we seek from

9   the Club Defendants that are not -- and we have no reason to

10  believe would be -- in the League's files.  These include

11  documents such as the internal communications by each Club

12  Defendant as to the Pooling Agreement in the NFL DirecTV

13  agreement, in addition to any considerations as to whether or

14  not to extend or amend that agreement, that also includes

15  documents held by the Club Defendants that relate to valuations

16  of their separately owned intellectual property rights.

17         And in the course of the NFL or the Club Defendants'

18  opposition, when they point to the documents that they have

19  agreed to produce from the League, they provide no response

20  whatsoever to our argument that these documents cannot be

21  obtained without document discovery from the Club Defendants.

22         But in addition to that, Your Honor, another argument

23  that is laced throughout their opposition is that the Pooling

24  Agreement is protected conduct under the SBA; again, the

25  history of this case and the history of the broadcasting

1   practices at issue are relevant in showing why, from

2   Plaintiffs' position and in addition to the analysis performed

3   by the Ninth Circuit, the SBA does not exempt the conduct that

4   is at issue here from Sherman Act scrutiny.

5        The first point with respect to the SBA, Your Honor,

6   is that the SBA, by its own terms -- as the Ninth Circuit noted

7   in Footnote 10 of its opinion -- applies only to Section 1

8   Sherman Act claims, it does not apply at all to Plaintiffs'

9   Section 2 claims or Section 2 claims more broadly.

10       But the second point with respect to the SBA, Your

11  Honor, is that the SBA only exempts what are called, (quote),

12  "sponsored telecasts" from Section 1 Sherman Act scrutiny.  And

13  here we are not dealing with a sponsored telecast which is

14  defined and courts have defined as being telecasts that are

15  offered for free to the general public; rather, what we are

16  dealing with is a telecast, in a series of agreements that have

17  been made, for which consumers have to pay exorbitant prices in

18  order to see football games.  So the argument that the SBA

19  somehow exempts the Pooling Agreement from scrutiny is simply

20  not the case and it has not been the case ever since 1987 when

21  the Club Defendants agreed to pool their rights and show games

22  through ESPN in a way that is charged to consumers for a fee.

23       And so with those broad arguments addressed, Your

24  Honor, I want to address the specific arguments as well that

25  are raised with respect to relevance and also burden.

1            If Your Honor refers to the section on relevance that

2    is included in the Club Defendants' Opposition, what you will

3    see is that the only specific request, which the relevance that

4    they challenge, is our request for the financial statements

5    from the Club Defendants.  And they cite an Eastern District of

6    California case from 2011 which held in the context of a breach

7    of contract case and a breach of warranty case that financial

8    statements were not relevant.

9            But here, Your Honor, we are dealing with an

10   antitrust case.  And the financial statements from alleged

11   coconspirators will show both the revenue they received from

12   Sunday Ticket but also the revenue they received from

13   non-Sunday Ticket activities; such as, ticketing revenue which

14   is not pooled among the clubs.  And it will also show, in

15   addition, potentially, and give us the ability to respond to

16   their argument, to the Club Defendants' argument, that these

17   Pooling Agreements are necessary to maintain on-field

18   competitive balance.

19           In addition to that, Your Honor, the financial

20   statements will also show the revenue that the Club Defendants

21   received from their preseason broadcasting agreements and also

22   their radio broadcasting agreements -- which are not done in a

23   pooled manner through the League.

24           And so simply for comparison sake, there are a number

25   of other aspects of the Club Defendants' financial statements

1  beyond simply the revenue from a Sunday Ticket that are plainly

2  relevant to Plaintiffs' Sherman Act claims.

3  　　　　　But moving on next to the argument that they raise as

4  to burden, it's very curious that the position that has been

5  taken by the Club Defendants is that they are not going to

6  produce any documents in discovery.  And since they initially

7  served their responses to our first set of Requests for

8  Production on March 10th, they have not been willing to

9  negotiate with us as to production by the Club Defendants in

10  any manner.  And so for them to now come and tell and represent

11  to the Court that they have a burden that is undue is simply an

12  unfair position to take because, Your Honor, the parties have

13  not been able to have actual negotiations as to document

14  production or the scope of the Requests for Production that

15  Plaintiffs have served on the Club Defendants.

16  　　　　　And the only evidence that was submitted in support

17  of this argument of undue burden was a declaration of counsel,

18  of Kary Klismet -- and apologies for any mispronunciations.

19  But this declaration contains almost no factual representations

20  from which the Court could accurately assess burden on the Club

21  Defendants.

22  　　　　　For example, there is no representation in

23  Mr. Klismet's declaration that he actually reviewed any of the

24  custodial files of the proposed ESI custodians, or that there

25  were any set of search terms that were run against these

1    custodial files to determine hit counts.  The declaration

2    simply lacks foundation for its conclusion that there are

3    potentially 12 terabytes worth of data.

4         So but even more problematic, Your Honor, is that the

5    declaration does not provide an individualized burden analysis

6    as to any particular club; it simply attempts to lump all

7    32 clubs together; which, again, the Ninth Circuit stated --

8    citing the *American Needle* case from the Supreme Court -- that

9    the Club Defendants are each independent entities.  And they've

10   cited no authority in support of their position that the

11   collective burden of the 32 Club Defendants pooled together is

12   the accurate way to assess the burden that would be imposed.

13        But in addition to that, they also provide no

14   analysis as to any burden that is faced in response to a

15   particular Request for Production or why a particular Request

16   for Production is overly broad.  The only representation that's

17   made is that all of the Requests for Production taken with all

18   of the Club Defendants according to back-of-the-envelope

19   calculations -- which there is no factual foundation for --

20   would leave to potentially 12 terabytes of data or millions of

21   documents.

22        At this juncture, Your Honor, we think the

23   appropriate disposition is for the Court to resolve the

24   preliminary issue that is raised in Plaintiffs' Motion to

25   Compel which is whether or not the Club Defendants, as alleged

1   coconspirators, can decline to produce any documents in

2   discovery.  And after the Court resolves that initial hurdle --

3   which we think the answer clearly is they must participate in

4   discovery -- we think it would be appropriate for the Court to

5   order the parties to meet and confer on the scope of the

6   requests before addressing any issues as to burden.

7          If Your Honor has any questions, I would --

8          **THE COURT:**  Thank you, Mr. Wright, for your comments.

9          I have a couple of questions.

10         One is in regard to pages 50 and 51, you identify

11   12 requests which I assume you intend as the best examples of

12   where you would expect to find nonduplicative documents in the

13   possession of the Club Defendants, either because they are

14   internal communications or communications between clubs.

15         Am I right about that?

16         **MR. WRIGHT:**  So Your Honor, I think these certainly

17   were decided because we believe they were clear examples of

18   where the Club Defendants had maintained documents and

19   communications that would only be separate from the League.  So

20   yes, Your Honor is correct.

21         But I would simply represent that those are not the

22   only Requests for Production for which the Club Defendants

23   maintain --

24         **THE COURT:**  I appreciate that but I assume you picked

25   these because they're your best examples.

12

1      **MR. WRIGHT:**  We believe they are very good examples,

2  Your Honor, yes, but if Your Honor has questions as to any

3  other Requests for Production, I'm happy to also delineate the

4  specific documents with the types of documents for which we

5  think the Club Defendants would have separate documents from

6  the League.  Because we think that that applies to every single

7  Request for Production, not simply the ones that were itemized

8  on pages 50 to 51.

9      **THE COURT:**  I wasn't foreclosing you on other

10  documents.  That doesn't mean you can't stress the ones that

11  you think are best.

12      **MR. WRIGHT:**  Right.

13      **THE COURT:**  My next question has to do with your

14  order, Proposed Order, Document 330-12.  The order simply says,

15  Defendants shall produce documents responsive to these

16  44 Requests for Production.  It doesn't any anything about

17  custodians.

18      And the last line in your Supplemental Memorandum

19  says:

20      "Should the Court grant this motion, Plaintiffs

21      remain prepared to negotiate the number of custodians

22      for the Club Defendants."

23      So can I assume that you're not seeking an order

24  regarding custodial discovery.

25      **MR. WRIGHT:**  Your Honor, the way that I would phrase

1   it for the Court in terms of phrasing the request --

2        **THE COURT:**  Can you answer my question?  Every time I

3   ask you a question, you go down some other avenue.  I'd like to

4   have an answer to my question.

5        **MR. WRIGHT:**  Right.  Your Honor, the short answer to

6   your question is that we are seeking custodial discovery from

7   each of the Club Defendants but what we are not seeking Your

8   Honor is for the Court to --

9        **THE COURT:**  Today in this order?

10        **MR. WRIGHT:**  What we think would be the appropriate

11   disposition of this case is to order the Club Defendants to

12   participate in discovery and respond to the Requests for

13   Document Production, including through ESI custodians.

14        **THE COURT:**  Let's assume I don't let you do custodial

15   discovery yet.  What would you then proceed to do in the way of

16   discovery which I would authorize?

17        **MR. WRIGHT:**  Well I think part of the difficulty,

18   Your Honor, is that -- well the first thing that we want to do

19   at this juncture is to have a meet and confer with the Club

20   Defendants where their position is -- where their position is

21   not what it has been since March that they will not produce any

22   documents.  Because we initially proposed a set of proposed ESI

23   custodians and search terms for the Club Defendants and we

24   intended for that proposal to be the beginning of the

25   discussions between the parties.  But we were stonewalled

14

1   immediately after where they said they're not going to produce

2   anything.  And so we --

3         **THE COURT:**  I'm still not getting an answer to my

4   question.

5         **MR. WRIGHT:**  My apologies, Your Honor.

6         **THE COURT:**  I'll give you one more chance and then

7   I'm going to move on.

8         I'm looking at your Proposed Order.  It says:

9         "The Club Defendants shall produce the documents

10        within 60 days of the date of this Order."

11        You're telling me that you interpret that -- you mean

12   that Proposed Order to include custodial discovery?

13        **MR. WRIGHT:**  With respect to the 60 days that are

14   cited in the Proposed Order, no, Your Honor.  That is not --

15   that is not our intention to include an order that says you

16   must participate in custodial discovery and produce documents

17   from the custodial discovery in 60 days.

18        And what I would simply say is that we've read the

19   Opposition of the Club Defendants to our Motion to Compel.  We

20   understand their position that 60 days is not a reasonable

21   timeframe for them to complete ESI discovery.  We think that is

22   a reasonable point given the number of documents that are at

23   issue here.

24        And so we are not -- with respect to the Proposed

25   Order, I know the Proposed Order says and recommends the Court

15

1  order production within 60 days but that is --

2      **THE COURT:**  What I want to know is, if I do not

3  permit custodial discovery as a result of today's hearing, is

4  there discovery you could obtain from the Club Defendants?

5      **MR. WRIGHT:**  Yes.  We believe so, Your Honor.  We

6  believe that --

7      **THE COURT:**  What would that entail?  What would you

8  be looking for?

9      **MR. WRIGHT:**  So we believe documents such as, for

10  example, our Fourth Request for Production -- which are the

11  financial statements maintained by the Club Defendants.  We

12  believe those could be produced without custodial searches.

13      In addition, Your Honor, we think copies of the

14  contracts and documents that were considered by the Club

15  Defendants, in addition to studies and reports that were done

16  by the Club Defendants as to their own separate broadcasting

17  rights, could also be produced potentially without custodial

18  discovery.

19      **THE COURT:**  What about internal communications and

20  analyses and communications among the Club Defendants?

21      **MR. WRIGHT:**  Right.

22      **THE COURT:**  Are those things that you could obtain

23  without having to do custodial discovery?

24      **MR. WRIGHT:**  The answer, Your Honor, is that

25  presently I am not sure because at this point we have not been

16

given any information as to how the clubs maintain their
documents.  The representations that have been made to us -- at
least with respect to the League -- are that in order to obtain
communications, custodial searches would be necessary.  And so
it's potentially the case as well for the Clubs that custodial
searches will be necessary for us to maintain or receive the
communications that we've asked for.  That might be -- that
might require custodial discovery, yes.

**THE COURT:**  Okay.  Thank you, Mr. Wright.

**MR. WRIGHT:**  Thank you, Your Honor.

Ms. Wilkinson?

**MS. WILKINSON:**  Good afternoon, Your Honor.

I just want to go back to the facts briefly and then
address your issues.

This case is about whether the conduct that
Plaintiffs claim is unlawful violates the antitrust laws.
There is no dispute that there was an agreement and has been
agreement between the clubs and the NFL for over 60 years to
pool their (glitch in audio).  So there's nothing about this
case that suggests that they need to find information to see
whether there was an agreement or whether these parties did not
make that agreement.  There's no dispute about that.

There's also no dispute, despite what Counsel said,
that Plaintiffs do not quibble with the fact that the NFL
Network Agreement, that is the original agreement between the

17

1    NFL and the parties -- and the Club parties to negotiate and

2    engage in media contract with networks are not at issue in this

3    case because they're covered by the <u>Sports Broadcasting Act</u>.

4    And in fact that was noted by the Ninth Circuit on page 18 in

5    footnote 4 that "the Plaintiffs do not dispute the NFL Network

6    Agreements are covered by the SBA.

7            So our position is, all of the information they need,

8    we have agreed to produce at the NFL level and some of that

9    will cover the clubs.  In fact there are some specific

10   agreements we've already made with them to produce documents on

11   behalf of all Defendants -- there's five different categories

12   that fall within that.  And then we've also already agreed to

13   do what they call "go get".  I'm sure Your Honor knows what

14   that is.  They make specific requests and we will go get it

15   wherever it is if it exists.

16           So we have those two procedures already in place

17   which would address most of the issues that Counsel raised in

18   response to your questions; but they also could, as we

19   suggested in our papers, serve written discovery

20   interrogatories to ask whether we have such documents so we

21   don't have to go through this burdensome and disproportional

22   custodial searches which would take forever; and as you saw in

23   our affidavit, which would be very costly and time-consuming

24   and be -- make it impossible for us to meet the deadlines that

25   Judge Gutierrez set.

1          The documents at issue that Counsel wants or gave as

2    his best examples to you, there's reasons perhaps why the

3    financial statements should not be produced in a case,

4    especially where no punitive damages are at issue and where

5    we're already going to give them the contracts; we're already

6    going to give them the committee notes at the NFL level that

7    shows the agreement, shows the votes by all of these clubs.

8          And I would just note for Your Honor, as best as I

9    know from representing this client for quite some time, there's

10   never been a negative vote by any club not to support these

11   media agreements.

12         So there's been no discussion -- and we don't believe

13   -- at least there's been no vote to say, We don't agree with

14   these agreements -- which would suggest, I think, or somehow

15   would have supported Plaintiffs' "supposition," I'll call it,

16   that somehow there's somebody at the Club level who's saying,

17   Oh, wouldn't it be better for us if we could not be part of

18   these pooled rights and we could negotiate these rights

19   individually.

20         I suggest that this entire Motion to Compel is

21   premature.

22         If Your Honor said to us, go back and negotiate --

23   which is what it sounds like Mr. Wright is really asking for --

24   don't start with club custodial production, and start with

25   either specific requests for documents or interrogatories.  And

1    if (glitch in audio) review those, review the NFL discovery and

2    they believe then there's a basis to find these supposed other

3    documents, then we can negotiate or if we have to come back to

4    Your Honor.  But there's no reason at this stage to say because

5    they didn't want us to automatically agree to 121 custodians at

6    32 clubs who have not been involved with any of the

7    negotiations with these DirecTV contracts for Sunday Ticket,

8    that we should go out and do that kind of burdensome and really

9    disproportionate discovery in a case like this where (glitch in

10   audio) clubs have had no involvement.  So it's really not

11   proportional to the issues that are at stake at this case -- in

12   this case.

13          I'm happy to address any of the individual requests,

14   Your Honor, but I did just want to point out one very specific

15   one that -- let me get it for you.

16          In the list that we gave of all the discovery that

17   we've already agreed to, we specifically agreed -- now this is

18   only from the League's -- in the League's possession -- but we

19   will produce any documents that relate to any clubs' interest,

20   analysis or consideration of its rights to separately license

21   the broadcast of the League's regular season games on

22   television.  So if there's any contact with the NFL -- which

23   there could be -- to say, you know, in theory -- we're

24   interested in maybe seeing whether our rights should be

25   separate, we would produce that; that would give them a basis

1    then to say, Okay, now we see that there might be something;

2    specifically at a club that would show that there was some

3    discussion of this.

4              But otherwise, Your Honor, when I review the

5    121 custodians they have, there's absolutely no rhyme or reason

6    to the folks they picked.  I can speak to my own team, the

7    Washington Football Team.  And the three people they picked:

8    Jason Wright, who's the new president of the team, and the two

9    others, all were just hired by the team last year.  Other folks

10   they picked for other teams, had been there for quite some

11   time.  Sometimes they pick an owner, sometimes they pick a

12   coach.  There's no rational basis for those custodians which to

13   me supports the idea that this is a pure fishing (glitch in

14   audio), you know, see if they can find something that would

15   suggest that these clubs might have at one point or the other

16   discussed internally that they might want to consider the value

17   or engaging in some kind of analysis of their rights

18   separately.  There's literally no basis for that, Judge.  This

19   has been, as you know, a very successful contract and pooling

20   of rights for the NF(glitch in audio).  So unless (glitch in

21   audio) we've produced discovery that they can review or they

22   (glitch in audio) responses from interrogatories that suggest

23   that there's some basis, this kind of fishing expedition should

24   be prohibited by the Court and would be incredibly burdensome

25   and costly for us.

1          **THE COURT:**  Well I notice that in your specific

2     responses to the Requests for Production, you indicate that you

3     will examine NFL document -- documents from the NFL files; you

4     don't say anything about what you will do with respect to

5     potentially nonduplicative documents in the possession of the

6     Club Defendants.  That's where the issue gets difficult for me.

7          In any event, I --

8          **MS. WILKINSON:**  May I address that, Your Honor, just

9     to --

10         **THE COURT:**  Go ahead.

11         **MS. WILKINSON:**  I just want to -- if you want me to,

12    I'm happy to address that specific point.

13         **THE COURT:**  I'll give you a chance when I get done

14    with my questions.

15         I didn't see any authority or example where -- in the

16    papers where one Defendant was able to bar discovery against a

17    separate independent Codefendant.  Am I right about that?

18         **MS. WILKINSON:**  You're right (glitch in audio).  We,

19    the NFL, our client the NFL, is not barring the clubs from

20    engaging in discovery.  We represent the clubs as well.  And

21    they don't want to provide discovery because they think all of

22    this information has been centralized and handled by the NFL

23    for many years.

24         **THE COURT:**  But you haven't provided any case

25    authority or example where, even if there are contracts between

1    the Defendants, that one Defendant could argue for no discovery

2    against a separate independent entity.  And that's what I'm

3    asking for.  I didn't see it anywhere in the papers.

4         **MS. WILKINSON:**  You are right, Your Honor, but we're

5    not arguing against them producing it.

6         **THE COURT:**  Okay.  I've read the declaration of Kary

7    Klismet.  It only relates to the burden imposed by custodial

8    discovery but there's no declaration regarding undue burden

9    with respect to other types of discovery against the Club

10   Defendants.  I mean if I were to exclude custodial discovery

11   for now, the Club Defendants could come forward and provide

12   answers or could provide the documents requested except where

13   custodial discovery would be required.  Am I right about that?

14        **MS. WILKINSON:**  They could, Your Honor.  I don't know

15   if you need (glitch in audio) in response to the (glitch in

16   audio) just saying if you can do it without custodial documents

17   or if you mean in response to interrogatories or requesting

18   whether that information exists (glitch in audio).

19        **THE COURT:**  I'm really focusing on Plaintiffs'

20   Proposed Order.  I mean, if I were to take his Order, take

21   Mr. Wright's Order and approve it, except eliminate any

22   custodial discovery, the Club Defendants would then have to

23   respond to whatever they could that wouldn't require custodial

24   discovery, right?

25        **MS. WILKINSON:**  Yes.  There would be documents that

23

1    they could not produce like emails which I think are in large

2    part what they (glitch in audio) want.  We would also ask you

3    to allow us to negotiate on those requests, as Plaintiffs'

4    Counsel has suggested, because some of them are quite overbroad

5    and I think we could come to some agreement with them.  But we

6    could produce -- the clubs could produce some of those

7    documents (glitch in audio).  They could not do it within

8    60 days but they could do some of it without custodial

9    interviews and custodial discovery.

10              **THE COURT:**  Well, okay.

11              I don't see any declaration that club members don't

12   have nonduplicative documents, either in terms of internal

13   communications or communications with other Club Defendants.

14   Is that right?

15              **MS. WILKINSON:**  Well I think if it's that, yes, Your

16   Honor.  Those narrow groups, you're right.

17              **THE COURT:**  Okay.  And there's no declaration from

18   any club members, right?

19              **MS. WILKINSON:**  That's correct.

20              **THE COURT:**  It seems to me that both sides have taken

21   overly aggressive positions.  The NFL, because it doesn't want

22   the Club Defendants to respond to discovery at all; and

23   Plaintiffs, who want to take custodial discovery of 121 people.

24   Mr. Klismet may be exaggerating the burden but there's

25   certainly an enormous burden that would be involved.

24

1          And I think the proportionality and undue burden

2   considerations, while they don't warrant a no-discovery order,

3   do warrant caution with respect to how we proceed with

4   discovery so that we're not wasting a lot of time and money

5   unnecessarily.

6          So what I want to do -- both of you are free to

7   comment on this -- I want to focus on the 12 requests that

8   Plaintiffs identify on pages 50, 51 of the Joint Stipulation.

9   And I want to add to it one more RFP, that being 93.  And

10   instead of doing all or nothing discovery, I think we will do

11   better if we stage the discovery in a way that allows us to

12   gain knowledge from what we do as a way of indicating what

13   should be allowed next.

14          So I'm not inclined at the moment to allow custodial

15   discovery but I do want to grant the order as Defendant -- I

16   mean as Plaintiff as framed it, but without any relief as to

17   custodians.  You can talk to me about whether 60 days would be

18   sufficient -- and by way, the order would be limited to the

19   12 RFPs on pages 50 to 51 and 93.

20          Then I want the parties to meet and confer about what

21   can be done to satisfy the order without custodial review, and

22   what level of custodial review should be permitted going

23   forward.  In other words, if Plaintiff comes back and says, We

24   can't get anywhere without emails that it can only get through

25   custodial discovery, then that'll be an issue the Court will

25

1    consider at that time.

2           We also haven't discussed timeframe.

3           The Proposed Order doesn't speak to timeframe.  I

4    know there's correspondence regarding differing timeframes for

5    differing requests but I don't know that the parties have ever

6    reached agreement on that or where that stands.  So what I want

7    is to have the parties go back to the drawing board.

8           As you say, Mr. Wright, you want to meet and confer.

9           I am going to allow discovery against the Club

10   Defendants.  The only question is, is how much and when.  And I

11   want the parties to spend some time discussing those issues and

12   bring me a proposed order that reflects these considerations.

13          Ms. Wilkinson, you had asked to respond on another

14   issue but you can (glitch in audio) both.

15          **MS. WILKINSON:**  Honestly, Your Honor, I can't

16   remember what that was.  You probably took care of it in your

17   discussion.

18          We are happy to go back with your guidance; that at

19   this point we don't have to do custodial and work with

20   Mr. Wright and his team to see if we can respond to these 12

21   that you're talking (glitch in audio) -- provide the documents

22   and see if we, more importantly, can come up with a proposed

23   joint order that we submit to the Court which will allow that

24   and not pose an undue burden on our clients.  And I think we'll

25   be able to do that; I really do.

1          I think with your guidance, I certainly understand

2    what you want; I'm sure Mr. Wright does.

3          And I think, to me, a lot of this is what we would

4    put in the category of "go-get".  They tell us specifically

5    what they want here.  And there are some categories, as I said,

6    that might be more difficult, then we can have those

7    conversations with Mr. Wright.  But vast majority of them I

8    think are specific and we probably can talk about providing

9    that information without any custodial discovery.  And I hope

10   that we will --

11         **THE COURT:**  Well you understand that ultimately there

12   probably will be custodial discovery.  We just want to have a

13   basis for deciding how much and when.

14         Mr. Wright?

15         **MS. WILKINSON:**  I und -- (glitch in audio) I --

16         **THE COURT:**  I'm sorry.  Ms. Wilkinson, I didn't mean

17   to cut you off.

18         **MS. WILKINSON:**  No, I understand, Your Honor.

19         I do think it is -- it's really disproportionate in

20   this case but I will save that for once we see the initial

21   discovery and show the Plaintiffs what would be left are just

22   these musings they claim may exist which would be an inordinate

23   burden and disproportionate to the case which is about

24   agreements that (glitch in audio) were made; it's just they

25   just dispute whether they were unlawful or not.  But I

27

1   understand that we will start with this first phase and that

2   you're warning me that some individualized custodial discovery

3   is likely.

4           **THE COURT:**  Yes.  And we need to get past this point

5   that there's not going to be any discovery against the Club

6   Defendants.  (Glitch in audio) position (glitch in audio).

7           **MS. WILKINSON:**  Understood.

8           **THE COURT:**  All right.  Mr. Wright?

9           **MR. WRIGHT:**  Thank you, Your Honor.

10          The only suggestion that I would make with respect to

11  the proposal and the Requests for Production that are included

12  in 50 and 51 would be for the Court to also order the Club

13  Defendants to produce documents in response to Request for

14  Production 52 and 53.

15          Request for Production Number 52 was the request that

16  sought all documents relating to the decision by the N (glitch

17  in audio) decision to provide NFL Sunday Ticket exclusively

18  through DirecTV.

19          In Request for Production Number 53, state --

20  requests all documents relating to the decision by the clubs to

21  pool their broadcasting rights with the League.

22          And the reason why I would suggest that these

23  Requests for Production also be included in the Court's order

24  is because these are the requests that go to the heart of the

25  set of agreements that I outlined at the beginning that this

28

1    case is truly about and how they operate together.

2          **THE COURT:**  I don't agree with you on 52 but we will

3    add 53 to the list.  So we now have 14 RFPs.

4          **MR. WRIGHT:**  Noted, Your Honor, thank you.

5          **THE COURT:**  I would like the parties to get together

6    and see if you can agree on a proposed order reflecting the

7    views I've expressed here this morning and submit it as soon as

8    you can.  If you can't agree then you can indicate what your

9    areas of disagreement are and I'll make a ruling.  But

10   hopefully with what I've said -- which I think is pretty clear

11   -- you ought to be able to put together a proposed order.

12          Anything else from either side?

13          **MR. WRIGHT:**  Nothing from Plaintiffs, Your Honor.

14          **THE COURT:**  Your papers were very good and I enjoyed

15   the argument from both sides.

16          **MR. WRIGHT:**  Thank you.

17          **THE COURT:**  Good luck and let's see if we can move

18   this forward.

19          **MS. WILKINSON:**  Thank you, Your Honor.

20          **MR. WRIGHT:**  Thank you.

21          **THE CLERK:**  Court is adjourned.

22       **(Proceeding adjourned)**

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    July 3, 2021

            Signed                                      Dated


                    *TONI HUDSON, TRANSCRIBER*