MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100/Fax: (310) 789-3150

SCOTT MARTIN (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100/ Fax: (212) 202-4322

HOWARD LANGER (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Tel: (215) 320-5660/ Fax: (215) 320-5703

*Plaintiffs' Interim Co-Lead Class Counsel*

Jay Cohen *pro hac vice pending*
Carter E. Greenbaum *pro hac vice pending*
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10128
Tel: (212) 373-3000/ Fax (212)-492-0955

*Counsel for Non-party Charter Communications, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No. 2:15-ml-02668-PSG (JEMx) |
| | **DISCOVERY MATTER** |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **JOINT STIPULATION REGARDING PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY NON-PARTY CHARTER COMMUNICATIONS, INC.** |
| | Magistrate Judge: Hon. John E. McDermott |
| | Date/Time: January 11, 2022 at 10:00 a.m. |
| | Discovery Cutoff Date: 5/15/2022 |
| | Pretrial-Conference Date: TBD |
| | Trial Date: TBD |

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENTS.................................................................1

    A.   PLAINTIFFS' PRELIMINARY STATEMENT...............................1

    B.   CHARTER'S PRELIMINARY STATEMENT ...............................2

II.  DISCOVERY REQUESTS AND RESPONSES IN DISPUTE....................5

III. PARTIES' CONTENTIONS ........................................................................10

    A.   PLAINTIFFS' STATEMENT .........................................................10

        1.   Factual and Procedural Background..........................10

        2.   Legal Standard ..............................................................13

        3.   Communications Relating to Agreements with
            Individual Clubs and Carriage Rates are Relevant,
            Impose No Undue Burden, and Should Be Produced ..............13

        4.   Conclusion .....................................................................16

    B.   CHARTER'S STATEMENT.............................................................16

        1.   Facts ................................................................................16

            a.   Plaintiffs Issued an Overbroad Subpoena .....................16

            b.   Charter's carriage rates are confidential and
                proprietary ..................................................................17

            c.   Charter met-and-conferred with Plaintiffs in
                good faith.....................................................................19

        2.   Plaintiffs Cite the Wrong Legal Standard ...............................22

        3.   Plaintiffs Cannot Justify Burdening Charter, a Non-
            Party, for Communications Related to Charter's
            Agreements with Defendants Before Seeking Those
            Communications from the Defendants......................................23

        4.   Rule 45 Protects Non-Parties Like Charter from
            Producing Confidential and Sensitive Commercial
            Information ...................................................................26

            a.   Plaintiffs Cannot Meet Their Initial Burden to
                Show Carriage Rates Are Relevant to this
                Litigation ....................................................................26

            b.   Plaintiffs Cannot Meet Their Greater Burden to
                Show Their Substantial Need for Charter's
                Carriage Rates ............................................................28

i

5.    Plaintiffs Articulate No Argument to Compel Charter
      to Produce Documents Responsive to Requests 10, 12,
      or 22 ........................................................................................ 30

6.    Plaintiffs Must Pay Charter's Costs Including
      Reasonable Attorney's Fees ................................................... 31

7.    Conclusion ............................................................................... 31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
966 F.2d 470 (9th Cir. 1992) ......................................................................... 15

*City of Rialto v. U.S. Dep't of Defense*,
492 F. Supp. 2d 1193 (C.D. Cal. 2007) .......................................................... 14

*Covarrubias v. Ocwen Loan Servicing, LLC*,
2018 WL 5914240 (C.D. Cal. June 21, 2018) ................................................. 15

*Cumberland Truck Equip. Co.* v. *Detroit Diesel Corp.*,
2008 WL 11376577 (S.D. Ind. Mar. 21, 2008) ............................................... 29

*Epic Games, Inc. v. Apple Inc.*,
493 F. Supp. 3d 817 (N.D. Cal. 2020) ............................................................ 14

*Folz v. Union Pacific R.R. Co.*,
Case No. 13-cv-579-GPC-(PCL), 2015 WL 12660413 (S.D. Cal.
July 22, 2015) ................................................................................................ 13

*Gonzales* v. *Google, Inc.*,
234 F.R.D. 674 (N.D. Cal. 2006) .............................................................. 23, 26

*In re eBay Seller Antitrust Litig.*,
2009 WL 10677051 (W.D. Wash. Aug. 17, 2009) .......................................... 22

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019) ........................................................... 10, 14, 21

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
2012 WL 4846522 (N.D. Cal. Aug. 7, 2012) .................................................. 22

*In re Pioneer Corp.*,
2019 WL 5401015 (C.D. Cal. Jan. 9, 2019) .............................................. 13, 22

*In re Vitamins Antitrust Litig.*,
267 F. Supp. 2d 738 (S.D. Ohio 2003) ........................................................... 30

*Kamakana* v. *City & Cty. of Honolulu*,
447 F.3d 1172 (9th Cir. 2006) ........................................................................ 30

*Legal Voice* v. *Stormans Inc.*,
    738 F.3d 1178 (9th Cir. 2013)..................................................................26

*Mannington Mills, Inc.* v. *Armstrong World Indus., Inc.*,
    206 F.R.D. 525 (D. Del. 2002)................................................................30

*Mattel, Inc.v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003)..................................................................23

*Moon v. SCP Pool Corp.*,
    232 F.R.D. 633 (C.D. Cal. 2005) ......................................................13, 24

*Robin Singh Educ. Servs., Inc.* v. *Excel Test Prep*,
    2004 WL 2554454 (N.D. Cal. Nov. 9, 2004).........................................28

*Tater v. City of Huntington Beach*,
    2021 WL 4735015 (C.D. Cal. June 7, 2021)..........................................15

*V5 Techs.* v. *Switch, Ltd.*,
    334 F.R.D. 306 (D. Nev. 2019) ..............................................................28

*Wi-Lan Inc.* v. *Rsch. in Motion Corp.*,
    2010 WL 2998850 (S.D. Cal. July 28, 2010)........................................22

**Rules**

Fed. R. Civ. P. 26................................................................................*passim*

Fed. R. Civ. P. 37..............................................................................1, 21

Fed. R. Civ. P. 45................................................................................*passim*

Pursuant to Fed. R. Civ. P. 37 and Local Rule 37-2, Plaintiffs and non-party Charter Communications, Inc. ("Charter") submit the following joint stipulation regarding Plaintiffs' Motion to Compel Production of Documents.

## I.   PRELIMINARY STATEMENTS

### A.   PLAINTIFFS' PRELIMINARY STATEMENT

Plaintiffs bring this motion to compel because, after months of delay, Charter refuses to produce certain documents requested in Plaintiffs' June 18, 2021 subpoena. Specifically, Charter refuses to produce: (1) communications regarding Charter's contractual arrangements with individual NFL Clubs, and (2) carriage rates for channels that carry professional football and college football.

In the nearly six months since service of Plaintiffs' subpoena, Charter has neither argued that production of these documents imposes any burden nor provided any legitimate explanation as to why these categories of documents are irrelevant. Charter's obstinance comes in spite of Plaintiffs' multiple attempts to engage with Charter on the issue. Indeed, Plaintiffs have repeatedly sought to accommodate Charter by reducing its document requests from a list of 28 to a targeted list of 6 and identifying the specific channels for which carriage rates are sought in order to assuage Charter's concerns.

The categories of documents sought in the instant motion are plainly relevant to Plaintiffs' antitrust claims. As discussed further below, internal communications regarding Charter's contractual arrangements with individual Clubs serve two purposes: they would likely rebut any assertions that broadcasts of live NFL games necessitate joint action and may offer exemplars of what models of distribution might exist were individual Clubs free to independently license their regular season games. Carriage rates, for their part, are helpful both for differentiating the market for NFL football from other forms of entertainment and for understanding what broadcast arrangements might exist under a less centralized regime.

In short, the documents that Plaintiffs seek are relevant and, thanks to Plaintiffs' diligent efforts, will not impose any undue burden on Charter. Yet Charter has responded only with delay and obstinance regarding these documents. Plaintiffs respectfully ask that the Court aid in resolving this subpoena once and for all, and compel Charter to produce: (1) communications about contractual arrangements with individual Clubs, and (2) carriage rates for channels that carry professional football, and carriage rates for channels that carry college football.

### B.   CHARTER'S PRELIMINARY STATEMENT

Charter is not a party to this long-running antitrust litigation. Nonetheless, before even obtaining party discovery, Plaintiffs served an overbroad and burdensome subpoena on Charter, consisting of 28 document requests and more than a dozen additional subparts, to which Charter timely and appropriately objected. *See* Delman Ex. 4.  Charter has spent months attempting to boil down Plaintiffs' overreaching document demands,  searching for responsive material, and producing documents that Plaintiffs reasonably require and that cannot be obtained from any of the dozens of Defendants that are parties to this litigation, a time consuming effort that could have been avoided if Plaintiffs had served appropriately tailored third party discovery in the first instance.

The current dispute has been narrowed to two categories.  The first concerns communications about agreements between Charter and three NFL Club Defendants. Plaintiffs' effort to compel Charter to produce these irrelevant documents is both unwarranted and premature.  Charter has already produced its contracts with individual NFL Club Defendants, notwithstanding the fact Plaintiffs could have easily obtained those contracts from the NFL Club Defendants without burdening Charter.  Charter also searched for studies and reports concerning those agreements. Plaintiffs' articulated justification for additional discovery related to these agreements—that it "would likely rebut any assertions that broadcasts of live NFL games necessitate joint action and may offer exemplars of what models of

distribution might exist"—is easily satisfied by Charter's production of its agreements with the NFL Club Defendants and its search for studies and reports concerning those agreements.

Plaintiffs now seek not only these agreements and studies, but Charter's communications concerning those agreements, dating back ten years. This will necessarily require Charter to rummage through tens of thousands of emails using search terms to identify responsive material and to produce documents, even though Plaintiffs have not requested communications related to these agreements from the NFL Club Defendants who are actually parties to this litigation. If Plaintiffs have not requested these communications from the Clubs, they should be directed to do so before burdening Charter. If the NFL Club Defendants have refused to produce such communications, Plaintiffs should be moving to compel the Clubs, not a third party.

The remainder of this discovery dispute relates to an issue of critical competitive sensitivity for Charter: the rates Charter pays to carry approximately one dozen broadcast or cable networks. As set out in the accompanying declaration of Charter executive Tom Montemagno, *see* Montemagno Decl., the rates Charter negotiates with networks are uniquely important and some of the most confidential information in Charter's possession because of the competitive harm that would result to Charter if its competitors or contracting counterparties (networks) became aware of the details of its carriage deals. *See id.* ¶¶ 5, 8, 9. As a result, each and every one of the carriage agreements sought by Plaintiffs contains a strict confidentiality provision and Charter takes affirmative steps to safeguard the confidentiality of those agreements. *See id.* ¶ 6.

Plaintiffs have identified no colorable reason to demand production of these carriage agreements. They will be of no or, at most, marginal relevance, to their claims that Defendants should have provided NFL programming at lower costs because, unlike NFL Network and RedZone, each of the networks for which Plaintiffs seek information carry not just NFL or other football games, but a broad

array of entertainment, sports and news programming.  The rates that Charter obtains from networks such as CBS, NBC, Fox and ESPN are charged for the entirety of the programming provided by those networks and, as Charter has informed Plaintiffs, no portion of those rates are specific to football.  Plaintiffs' only purported justification for production—that the rates "are helpful both for differentiating the market for NFL football from other forms of entertainment and for understanding what broadcast arrangements might exist under a less centralized regime"—is too broad and vague to require Charter to produce sensitive carriage rate information for a dozen networks that only transmit football programming for a fraction of certain days during a portion of each year.   As a result, Plaintiffs have fallen far short of demonstrating a "substantial need" for this information under Rule 45 and deference should appropriately be given to Charter's compelling interest in maintaining the confidentiality of this vitally competitive information.  Fed. R. Civ. P. 45(d)(3)(C).

Other than a portion of Request 3, which requests documents concerning Charter's contracts with NFL Club Defendants and Request 24, which requests information about Charter's carriage agreements, Plaintiffs make no argument concerning the balance of the Requests identified as "in dispute" pursuant to Local Rule 37-2.1, including Requests 10, 12, and 22.  Charter reached an agreement with Plaintiffs concerning those requests and produced responsive documents, if any. Plaintiffs offer no basis to compel any further production.

In sum, Charter has engaged in a good faith process to respond to Plaintiffs' patently overbroad requests, including by meeting and conferring with Plaintiffs five different times, conducting a robust search for responsive documents to ***each*** of Plaintiffs' six categories (except for carriage rates), and producing over 700 pages of highly confidential and proprietary documents.  Charter has already searched for and produced documents responsive to Plaintiffs' request for documents related to Charter's agreements with three NFL Club teams, and the Court should not compel additional discovery unless and until the NFL Club teams produce documents

concerning the same.  Plaintiffs have also failed to overcome their heavy burden to demonstrate any substantial need for Charter's highly sensitive and confidential carriage rates.

## II.    DISCOVERY REQUESTS AND RESPONSES IN DISPUTE

Pursuant to Local Rule 37-2.1, the subpoena requests at issue served on June 18, 2021, and Charter's responses to them, dated July 2, 2021, are copied verbatim below.

**Subpoena Request No. 3.**

All documents constituting, memorializing, or concerning any agreements between Charter and individual Clubs, such as the Carolina Panthers.

**Charter's Response to Subpoena Request No. 3.**

Charter objects to this request because it is vague and ambiguous; oppressive, overbroad and unduly burdensome; and calls for documents irrelevant to any claim or defense in this litigation, and not proportional to the needs of the case. A request for "all documents" concerning agreements between Charter and individual Clubs is patently overbroad and it would impose an undue burden on Charter to require Charter to collect, review, and produce such an expansive search result.

Charter also objects to this request because it calls for the production of confidential business, financial, or trade documents or data or other sensitive nonpublic documents and information.

Moreover, the request is vague, ambiguous, and overbroad, to the extent it purports to seek documents that might otherwise "concern" any agreement between Charter and the Clubs.

Charter further objects because the request is unduly burdensome in that it seeks documents that (to the extent relevant) can be obtained from parties to this litigation who are in a position to produce documents in this matter already without subjecting Charter to unnecessary burden and expense.

Without waiving this objection or any of Charter's general objections,

1    Charter is prepared to meet and confer with Plaintiffs to attempt to work out an

2    agreement on a production of documents responsive to this request that is not

3    unduly burdensome for Charter as a non-party, and consists of relevant,

4    nonprivileged documents for a limited time period from the files of specified

5    custodians that are responsive to this request which Plaintiffs are unable to

6    otherwise obtain from Defendants.

7    **Subpoena Request No. 10.**

8          All documents constituting, reflecting, or concerning all reports and studies

9    prepared by or for you, or received by you, concerning the possibility of separately

10   or jointly negotiating with individual Clubs for television broadcast rights.

11   **Charter's Response to Subpoena Request No. 10.**

12         Charter objects to this request because it is vague and ambiguous; oppressive,

13   overbroad and unduly burdensome; and calls for documents irrelevant to any claim

14   or defense in this litigation, and not proportional to the needs of the case. A request

15   for "all documents" constituting, reflecting, or concerning reports or studies

16   concerning the possibility of separately or jointly negotiating with individual Clubs

17   for television broadcast rights is patently overbroad and it would impose an undue

18   burden on Charter to require Charter to collect, review, and produce such an

19   expansive search result.

20         Charter objects to this request because it calls for the production of

21   confidential business, financial, or trade documents or data or other sensitive

22   nonpublic documents and information.

23         Without waiving this objection or any of Charter's general objections,

24   Charter is prepared to meet and confer with Plaintiffs to attempt to work out an

25   agreement on a production of documents responsive to this request that is not

26   unduly burdensome for Charter as a non-party, and consists of relevant,

27   nonprivileged documents for a limited time period from the files of specified

28   custodians that are responsive to this request which Plaintiffs are unable to

1   otherwise obtain from Defendants.

2   **Subpoena Request No. 12.**

3          All documents constituting, reflecting, or concerning all reports and studies

4   prepared by or for you, or received by you, comparing the market conditions,

5   television broadcasting rights, and revenues associated with producing and

6   distributing telecasts of NFL football games with the market conditions,

7   broadcasting rights, and revenues associated with producing and distributing

8   telecasts of:

9          a.      NCAA football games; and

10         b.      Any other professional sports.

11  **Charter's Response to Subpoena Request No. 12.**

12         Charter objects to this request because it is vague and ambiguous;

13  oppressive, overbroad and unduly burdensome; and calls for documents irrelevant

14  to any claim or defense in this litigation, and not proportional to the needs of the

15  case. A request for "all documents" constituting, reflecting, or concerning reports

16  and studies comparing market conditions, television broadcast rights, and revenues

17  associated with NFL football games with NCAA football games and other

18  professional sports is patently overbroad and it would impose an undue burden on

19  Charter to require Charter to collect, review, and produce such an expansive search

20  result. Moreover, the request is vague, ambiguous, and overbroad, to the extent it

21  purports to seek documents that are related to NCAA football games and other

22  professional sports (and not the NFL), which are not related to the subject matter of

23  this litigation. Such documents are also outside the scope of the discovery that

24  Plaintiffs described as "central to the prosecution of this case" in their Rule 26(f)

25  preliminary report. *See* ECF No. 116 at 5.

26         Charter further objects to this request because the time period (dating back

27  to 2011) is patently overbroad and seeks documents that are wholly irrelevant to

28  this matter.

Charter objects to this request because it calls for the production of confidential business, financial, or trade documents or data or other sensitive nonpublic documents and information.

**Subpoena Request No. 22.**

All documents, communications, studies, or reports regarding the broadcasting of collegiate football, including but not limited to analyses of the effect of non-exclusive licensing arrangements on viewership, pricing, quality of broadcast, and any other relevant metrics.

**Charter's Response to Subpoena Request No. 22.**

Charter objects to this request because it is vague and ambiguous; oppressive, overbroad and unduly burdensome; and calls for documents irrelevant to any claim or defense in this litigation, and not proportional to the needs of the case. A request for "all documents, communications, studies or reports" regarding the broadcasting of collegiate football is patently overbroad and it would impose an undue burden on Charter to require Charter to collect, review, and produce such an expansive search result. Moreover, the request is vague, ambiguous, and overbroad, to the extent it purports to seek documents that are related to collegiate football (and not professional football), which are not related to the subject matter of this litigation. Such documents are also outside the scope of the discovery that Plaintiffs described as "central to the prosecution of this case" in their Rule 26(f) preliminary report. *See* ECF No. 116 at 5.

Charter objects to this request because it calls for the production of confidential business, financial, or trade documents or data or other sensitive nonpublic documents and information.

**Subpoena Request No. 24.**

All documents constituting, memorializing, or concerning any agreements between Charter and ABC, CBS, ESPN, Fox, and NBC, or any other person,

regarding the broadcasting or distribution of televised broadcasts of live collegiate football games.

**Charter's Response to Subpoena Request No. 24.**

Charter objects to this request because it is vague and ambiguous; oppressive, overbroad and unduly burdensome; and calls for documents irrelevant to any claim or defense in this litigation, and not proportional to the needs of the case. A request for "all documents" constituting, memorializing, or concerning agreements between Charter and other third parties regarding the broadcasting of live collegiate football games is patently overbroad and it would impose an undue burden on Charter to require Charter to collect, review, and produce such an expansive search result. Moreover, the request is vague, ambiguous, and overbroad, to the extent it purports to seek other documents that are related to collegiate football (and not professional football), which are not related to the subject matter of this litigation. Such documents are also outside the scope of the discovery that Plaintiffs described as "central to the prosecution of this case" in their Rule 26(f) preliminary report. See ECF No. 116 at 5.

Charter objects to this request because it calls for the production of confidential business, financial, or trade documents or data or other sensitive nonpublic documents and information.

Charter further objects because the request is unduly burdensome in that it seeks documents that (to the extent relevant) can be obtained from parties to this litigation who are in a position to produce documents without subjecting Charter, a non-party, to unnecessary burden and expense.

Charter objects to this request to the extent that it calls for the production of documents that contain privileged attorney-client communications, or are otherwise protected from disclosure by applicable privileges, laws, doctrines, or rules, including but not limited to the work product doctrine, and any applicable foreign law.

## III.   PARTIES' CONTENTIONS

### A.   PLAINTIFFS' STATEMENT

#### 1.   Factual and Procedural Background

This antitrust case—brought pursuant to Sections 1 and 2 of the Sherman Act—revolves around a series of interlocking agreements among and between the NFL, its 32 member Clubs, and DirecTV. *See* Consolidated Amended Complaint ("Compl."), Dkt. No. 163 ¶¶ 1-13. These agreements work two different, but symbiotic, restraints: they prohibit all distributors other than DirecTV from offering telecasts of out-of-market Sunday afternoon NFL games, and they bar the Clubs from separately licensing their own broadcast rights. *Id*. ¶ 11. Together these restraints ensure that consumers who wish to watch the majority of regular season NFL games, or any out-of-market NFL game, have only one option available to them— subscribing to DirecTV's "NFL Sunday Ticket" package. *Id*. ¶ 8. This purposeful restraint on competition results in supracompetitive prices for NFL Sunday Ticket, drastically fewer games available to all consumers, and reduced innovation in broadcasting of live NFL games. *Id*. ¶¶ 10-12, 19.

Following the Ninth Circuit's reversal of the district court's dismissal of this action for failure to state a claim, *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136 (9th Cir. 2019), Plaintiffs served subpoenas for the production of documents on a number of Multichannel Video Programming Distributor ("MVPD") platforms, including Charter, *see* Declaration of Edward Delman ("Delman Decl."), Ex. 3. Plaintiffs sought documents from these MVPDs because they currently license and distribute telecasts of NFL games—such as preseason games—and because, as alternative distributors to DirecTV, they are likely sources of discoverable information relating to the value of NFL football and the feasibility of distribution arrangements less restrictive than the NFL and DirecTV's current exclusive arrangement.

On July 2, 2021, Charter served its responses and objections to the subpoena, broadly objecting to each and every request as vague, overbroad, unduly burdensome, or on grounds of irrelevance and disproportionality. *See* Delman Decl., Ex. 4. The parties met and conferred regarding Charter's responses and objections on August 5, 2021. *See id.*, Ex. 5 (email correspondence between counsel for Plaintiffs and counsel for Charter). Plaintiffs began the first meet-and-confer by proposing to narrow the scope of the subpoena—which consisted of 28 different categories of documents—to a targeted list of six categories. *See id*. Despite multiple efforts by Plaintiffs to schedule a follow-up conversation, Charter did not substantively respond to Plaintiffs' proposal until September 20, 2021. *See id.* And during the meet-and-confer on that date, Charter communicated that it would not produce any contracts, studies, or communications with or about the individual Clubs, and asked for clarification on the relevancy of carriage rates for professional and college football. *See id.* Plaintiffs provided such clarification in its counterproposal of September 24, 2021, in which they reiterated the relevance of documents and communications relating to Charter's agreements with individual Clubs and of carriage rates for channels that carry NFL football and channels that carry college football. *See id.*

Continuing its practice of either ignoring or pushing off conversations with Plaintiffs, Charter failed to respond to that counterproposal or to the Plaintiffs' follow-up email of two weeks later. Faced with Charter's failure to even offer a definitive position on what documents it would produce and when it would produce them—despite it having been four months since service of the subpoena—Plaintiffs served Charter with a Local Rule 37-1 letter on October 19, 2021. Delman Decl., Ex. 6. Plaintiffs' letter explained that Charter had no valid basis for refusing to produce carriage rates or communications about contractual arrangements with individual Clubs. Rather than engage with the substance of Plaintiffs' requests, Charter instead responded that it still had "concerns about certain categories of documents." *Id.*, Ex. 7. In a subsequent meet-and-confer, Charter finally committed to producing valuation

materials and contracts with individual Clubs, but Plaintiffs were left to once again explain why carriage rates were relevant. *See id.*, Ex. 5.

Plaintiffs and Charter met and conferred again on November 5, 2021. Although Charter outlined a production schedule for valuation materials and its contracts with individual Clubs, Charter stated that it would not produce its internal documents and communications relating to contracts with individual Clubs. Charter maintained its position, without offering substantiation, that such documents were irrelevant. Charter also refused to provide Plaintiffs with an answer on whether it would produce carriage rates, despite Plaintiffs' L.R. 37-1 letter expressly requesting a position on that issue.

Charter completed its production of documents on November 19, 2021. Its letter accompanying that production finally articulated a position on carriage rates. Charter represented that it would not produce such rates because it viewed them as irrelevant, based on the supposition there is no correlation between Charter's carriage rates for channels that carry football and the pricing of football-game programming in general. *See id.* Ex. 8. Charter also reiterated its position that its communications about its contracts with NFL Clubs were not relevant to the case. Explaining that position for the first time, Charter represented that such communications have no bearing on Plaintiffs' case because they do not involve telecasts of *regular season* football games.

Finally, Plaintiffs and Charter met and conferred on December 6, 2021 to discuss Charter's production. One of the topics of discussion was Charter's failure to produce any internal studies or reports on its contractual arrangements with NFL clubs. Charter's description of its search process assuaged Plaintiffs' concerns that it had not conducted a robust search. As a result, Plaintiffs are no longer pursuing such internal documents from Charter.

Plaintiffs now move to compel Charter to produce: (1) communications about contractual arrangements with individual Clubs, and (2) carriage rates for channels that carry professional football, and for channels that carry college football.

### 2. Legal Standard

Federal Rule of Civil Procedure 45, which governs non-party discovery, incorporates the discovery standards outlined in Rule 26. *See*, *e.g.*, *In re Pioneer Corp.*, 2019 WL 5401015, at *5 (C.D. Cal. Jan. 9, 2019). Rule 26 authorizes a broad range of discovery that encompasses "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering … whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The burden of showing why discovery should not be granted falls on the party resisting discovery, even if it is not party to the underlying litigation. *See Pioneer Corp.*, 2019 WL 5401015, at *5. Likewise, the party who moves to modify a subpoena bears the "burden of persuasion" under Rule 45. *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005). In determining whether a subpoena poses an undue burden, courts "weigh the burden to the subpoenaed party against the value of the information to the serving party." *Id.* (internal quotation marks omitted).

### 3. Communications Relating to Agreements with Individual Clubs and Carriage Rates are Relevant, Impose No Undue Burden, and Should Be Produced

The documents at issue are plainly relevant, and the relevance of the requested categories of documents is the principal question before the Court. *See Folz v. Union Pacific R.R. Co.*, Case No. 13-cv-579-GPC-(PCL), 2015 WL 12660413, at *1 (S.D. Cal. July 22, 2015) ("Because the requested documents are relevant to this action, they must be produced unless they are privileged." (citing Fed. R. Civ. P. 26(b)(1))).

The first such category, communications relating to Charter's contracts with individual Clubs, is relevant for at least two reasons. *First*, the NFL Defendants have

argued that individual Clubs are incapable of independently arranging for broadcasts of their games because NFL game broadcasts "necessarily require[] joint action." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1153. But as indicated by the contracts that Charter has produced, the Clubs already contract independently with MVPDs such as Charter for broadcasts of preseason games. Charter's communications about its preseason contracts with Clubs are thus relevant to rebutting the NFL Defendants' argument that the NFL-Clubs pooling agreement is somehow necessary for the broadcasting of NFL games. This is true even though Charter's contracts do not involve the live airing of regular season games, Charter's sole explanation for the supposed irrelevance of these documents. *See* Delman Decl., Ex. 8. *Second*, insofar as the requested documents discuss alternative distribution models for Club broadcasts, they relate to the numerous broadcasting options that would exist in a world where the challenged restraints have been eliminated. *See* Compl. ¶ 11. In sum, communications relating to Charter's contracts with individual Clubs fall comfortably within Rule 26's understanding of relevance. *See City of Rialto v. U.S. Dep't of Defense*, 492 F. Supp. 2d 1193, 1202 (C.D. Cal. 2007) ("Relevance is broadly construed and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party.").

Similarly, the relevance of carriage rates is twofold. *First*, this evidence goes to whether NFL football constitutes its own market, distinct from other forms of sports programming. *See, e.g., Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 834 (N.D. Cal. 2020) ("A threshold step in any antitrust case is to accurately define the relevant market, which refers to the 'area of effective competition.'" (other internal quotation marks omitted)). For example, differences between the carriage rates for channels that carry NFL football and those carrying college football may show the extent that the two forms of football exist in separate markets. This is true notwithstanding Charter's lone argument for irrelevancy, that its carriage rates do not

include any separate allocation, percentage, or surcharge attributable to football programming. *See* Delman Decl., Ex. 8. *Second*, Plaintiffs contend that the decentralized licensing and distribution regime in place for NCAA football demonstrates how NFL football may be distributed in a world without the challenged restraints, *see* Compl. ¶ 139. Carriage rates permit a greater understanding of how college football games are distributed, the structure of the market for college football games, and the costs associated with those games. The rates for channels that carry NFL and college football are thus clearly relevant and should be produced. *See Covarrubias v. Ocwen Loan Servicing, LLC*, 2018 WL 5914240, at *2 (C.D. Cal. June 21, 2018) ("Relevancy should be construed liberally and with common sense and discovery should be allowed unless the information sought has no conceivable bearing on the case." (internal quotation marks omitted)). Indeed, at least two other MVPDs have already committed to producing carriage rates in this action. *See* Delman Decl. ¶ 11.

Moreover, Charter has at no point represented that either of the categories of documents sought through the instant motion impose any significant burden, beyond boilerplate objections referencing hypothetical burden. *See Tater v. City of Huntington Beach*, 2021 WL 4735015, at *2 (C.D. Cal. June 7, 2021) ("General or boilerplate objections such as 'overly burdensome and harassing' are improper— especially when a party fails to submit any evidentiary declarations supporting such objections." (brackets and internal quotation marks omitted)). It is well-established that such "[b]road allegations of harm" that are "unsubstantiated by specific examples or articulated reasoning" do not suffice as justifications to limit discovery. *Id.* (quoting *Beckman Indus., Inc. v. Int'l Ins. Co*., 966 F.2d 470, 476 (9th Cir. 1992)). Charter has never articulated why it would be unduly burdensome to produce the carriage rates for a dozen channels or its communications concerning agreements with Clubs—agreements that Charter has already located and produced.

In sum, it has been more than five months since Plaintiffs first served document requests on Charter. Throughout that lengthy period—and despite Plaintiffs' good-faith efforts to reduce Charter's burden and engage with any disputes as to relevance—Charter has not once explained why it believes it would be burdensome to produce the documents sought through this motion. Instead, it has either dragged out discussions without committing to a position or simply refused to produce documents. Five months is enough. The Court should compel Charter to produce these relevant and non-burdensome documents.

### 4. Conclusion

Plaintiff respectfully requests the Court compel Charter to produce—in response to its June 18, 2021 subpoena—the following documents: (1) carriage rates for the following channels that carry professional and/or college football: FOX, CBS, NBC, ESPN, NFL Network, NFL RedZone, SEC Network, FS1, ESPNU, Pac-12 Network, ACCN, and Big Ten Network (BTN), and (2) communications about contractual arrangements with individual Clubs, such as the Carolina Panthers.

### B. CHARTER'S STATEMENT

#### 1. Facts

##### a. Plaintiffs Issued an Overbroad Subpoena

Plaintiffs first served their Subpoena on Charter, a non-party, on June 21, 2021. *See* Delman Decl. Ex. 3; Declaration of Carter Greenbaum ("Greenbaum Decl.") ¶ 2. The subpoena sought 28 broad categories of documents with more than a dozen additional subparts. The Subpoena reflected no attempt to "take reasonable steps to avoid imposing undue burden or expense" on non-parties, as required under Rule 45 of the Federal Rules of Civil Procedure. Charter timely served its responses and objections on July 2, 2021. *See* Delman Decl. Ex. 4. Far from "broadly objecting to each and every request" as Plaintiffs contend, Charter carefully vetted each request, identified its objections, and explained that it was willing to negotiate and produce documents responsive to 14 of those 28 requests. *See id.*

On August 5, 2021, Charter met and conferred with Plaintiffs' counsel on its objections to their Subpoena. Instead of negotiating the categories of documents sought in Plaintiffs' Subpoena or the 14 requests for which Charter had agreed to produce responsive documents, Plaintiffs' counsel identified entirely new document requests, styled as a "targeted list of six categories." *See id.* Ex. 5 at 12; Greenbaum Decl. ¶ 7. Those six categories included:

1. Any valuations of NFL Sunday Ticket;

2. Any valuations of NFL Network or NFL RedZone;

3. Carriage rates for any channels that carry professional football;

4. Carriage rates for any channels that carry college football;

5. Contracts, studies, and communications with and about individual Clubs, such as the Carolina Panthers; and

6. Any studies or reports on viewers of NFL football and viewers of college football including studies or reports providing numbers and demographic characteristics.

*See* Delman Decl. Ex. 5 at 12. That "targeted" list bore little relation to the documents sought in the Subpoena and required Charter to expend considerable additional effort to evaluate those new requests. For example, the terms "valuations" and "carriage rates" do not even appear in Plaintiffs' Subpoena. *See id.* Ex. 3.

### b. Charter's carriage rates are confidential and proprietary

Cable system operators such as Charter enter into contracts, commonly called carriage or affiliation agreements, with broadcast and cable television networks for the right to deliver the programming of those networks to subscribers. *See* Montemagno Decl. ¶ 3. These carriage agreements—including specifically each of the agreements implicated by Plaintiffs' motion—contain strict confidentiality provisions, typically restricting access even within Charter to only key personnel with a bona fide business need to know their terms, at Charter or Charter's counter-

party.  *See id.* ¶¶ 6, 7.

Plaintiffs seek carriage rates contained in  agreements with FOX, CBS, NBC, ESPN, NFL RedZone, NFL Network, SEC Network, FS1, ESPNU, Pac-12 Network, ACCN, and Big Ten Network (BTN).  With the exception of NFL RedZone and NFL Network, none of these networks transmit programming that is limited to or focused on football.  *See Id.* ¶ 10.  The broadcast networks of FOX, CBS, and NBC, for example, provide a variety of entertainment programming, including sitcoms, game shows, news programming and a variety of sports.  *See id.* ¶ 11.  NFL  football programming is limited to a few hours, typically on Sundays, for a limited portion of the year.  Similarly, these networks carry college football games, typically on Saturdays, during the season.

ESPN, SEC Network, FS1, ESPNU, Pac-12 Network, ACCN, and Big Ten Network are all sports networks that transmit a wide variety of sports programming, including, but very much not limited to, football.  *See id.* ¶ 13. A number of these networks—ESPNU, ACCN, SEC Network, and Big Ten Network—carry only college sports programming. ESPN and FS1 carry a wide variety of professional and collegiate sports programming.  ESPN typically transmits one NFL football game per week during the season and FS1 carries only ancillary programming relating to NFL football, but not live games.  Professional or college football programming is limited to a few nights per week for a limited period of time.

Critically, Charter's carriage rates with those channels include a single unitary rate for all programming.  *See id.* ¶¶  11, 12, 13.  For example, Charter pays a single per subscriber rate to CBS or ESPN to receive the programming contained on those networks 24 hours per day, 365 days per year.  There is no separate fee schedule for professional or collegiate football; it is just one all-in rate.  As a result, Charter's carriage rates with these networks would not shed any light on the key issues in this case, including whether NFL Sunday Ticket should be cheaper for subscribers to that service.  *See id*.  On the other hand, as described in further detail below, and in the

accompanying declaration of Tom Montemagno, disclosure of Charter's carriage rates would cause significant financial harm to Charter and to its counterparties.

### c.  Charter met-and-conferred with Plaintiffs in good faith

After the parties' first meet-and-confer on August 5, Charter evaluated Plaintiffs' new requests, including their new request for Charter's carriage rates, formulated a counterproposal and identified specific objections.  During the parties' second meet and confer, on September 20, Charter stated that it was willing to search for and produce documents responsive to Plaintiffs' request for valuations of NFL Sunday Ticket and valuations of NFL Network or NFL RedZone.  *See* Greenbaum Decl. ¶ 11.  As to Plaintiffs' request for "contracts, studies, and communications with and about individual Clubs," Charter explained that its contracts with individual Clubs are not relevant to Plaintiffs' claims involving the NFL Sunday Ticket package because they are local, small in scope, and involve select preseason games, and not any Sunday Ticket games.  *See id.* ¶ 12.  During that meet and confer, Plaintiffs' counsel declined to answer whether the NFL Club Defendants had agreed to produce documents related to their contracts with Charter.  *See id.* ¶.  Instead, Plaintiffs' counsel stated that the individual Clubs have not been cooperative with discovery.  *See id.*

Charter also discussed Plaintiffs' request for carriage rates for a broad variety of entertainment and sports networks.  Charter asked Plaintiffs' counsel to articulate the relevancy of the carriage rates and Plaintiffs' counsel could not, instead following up via email by stating that those fees "are a significant cost that influence whether and how MVPDs choose to distribute channels and we need a better understanding of the differences in carriage rates for the channels that air college and/or professional football."  *See id.* ¶ 13; Delman Ex. 5 at 5.  That explanation did not address Charter's confidentiality concerns or its concerns that any differences in carriage rates would not reflect programming for collegiate or professional football.

Plaintiffs refused to negotiate or compromise on any one of their six requests.

Rather than a "counterproposal," as Plaintiffs characterize their communication of September 24, Plaintiffs merely reiterated their demand for the same documents they had previously sought.  Plaintiffs acknowledged "[w]hile the form of [their] requests has changed" in their September 24 counterproposal "the substance of what is being requested has not."  Delman Decl. Ex. 6 at 2 n.2.  That is not consistent with a good faith effort to negotiate Plaintiffs' requests and it is certainly not a "counterproposal" by any definition of the term.

Given Plaintiffs' refusal to negotiate any of their requests, Charter focused its attention on conducting a thorough and robust search, which included interviewing executives and employees across multiple departments, reviewing numerous files of current and departed employees, and corresponding with even more employees to attempt to identify relevant information.  *See* Greenbaum Decl. ¶ 17.  Amidst its search for responsive documents, Charter received Plaintiffs' October 17 Rule 37-1 letter.  Charter immediately responded, indicated its availability to meet-and-confer, and agreed to consider searching for and producing documents responsive to four remaining categories of requests.

At the subsequent meet-and confer, which Plaintiffs' counsel described as "productive," Plaintiffs' counsel once again demanded each of the categories of documents they had originally sought without any effort to compromise.  *See id.* ¶ 22 Delman Decl. Ex. 5 at 3-4.   Charter agreed to search for and produce documents responsive to each of Plaintiffs' requests, except for carriage fees and communications related to Charter's agreements with NFL Club Defendants.  *See* Delman Decl. Ex. 8.  Instead, Charter agreed to produce the agreements themselves, and subsequently agreed to search for studies or reports concerning those agreements.  *See* Greenbaum Decl. ¶ 20; Delman Decl. Ex. 5 at 3-4.  Charter asked Plaintiffs to "review[] the contracts" and stated, in writing, that it would be "prepared to hear and consider your arguments concerning the relevancy of anything more than the agreements" thereafter.  Delman Decl. Ex. 5 at 2.  Plaintiffs did not offer any further

explanation of the relevancy of those agreements and did not respond to Charter's offer to "consider" further arguments concerning their relevancy.  Greenbaum Decl. ¶ 28.

On November 5, the parties met and conferred to discuss the timing of Charter's production and Charter agreed to complete productions within two weeks. *Id.* ¶ 23.

On November 19, Charter completed productions totaling more than 700 pages.  *Id.* ¶ 24.  Charter searched for and produced documents responsive to *each* of Plaintiffs' burdensome and overbroad categories, except for Plaintiffs' demand for Charter's carriage rates.    Charter explained that its "carriage rates are highly confidential and commercially sensitive."  Delman Decl. Ex. 8.  It also explained that "Charter's carriage rates do not include any separate allocation or percentage attributable to football programming" and Charter does not "pay any football-specific surcharge to carry" programming on the identified list of broadcast channels.  *Id.* Thus, as Charter explained "there is no correlation between Charter's carriage rates for these networks and pricing of *Sunday Ticket* in particular or football game programming in general."  *Id.*

On the Wednesday afternoon before Thanksgiving, Plaintiffs' counsel sent Charter a second Rule 37 letter, taking issue with the breadth of Charter's search for responsive documents related to viewership of NFL and college football as well as internal reports and studies of Charter's contracts with the NFL.  Greenbaum Decl. Ex. A.  Charter responded, and indicated that it was "prepared to discuss search terms" to identify documents responsive to Plaintiffs' request for internal reports and studies.  *Id.* Ex. B.  Charter described its search protocol during the parties' subsequent meet-and-confer on December 6, which Plaintiffs concede was robust. *Id.* ¶ 27.  Plaintiffs represented that they were not asking Charter to use search terms to identify internal reports or studies related to Charter's agreements with the NFL Club Defendants.  *See id.*  During the December 6 meet-and-confer, Plaintiffs did not

mention their request for carriage rate agreements or internal communications related to Charter's contracts with NFL Club Defendants.  *See* Greenbaum Decl. ¶ 28. Plaintiffs' counsel provided  no advance notice that they intended to move to compel production of those documents just three days later, on December 9.  *See id.*  ¶ 29.

To date, Plaintiffs have not sought discovery from the NFL Club Defendants of their communications about agreements with Charter.  *See id.*  ¶ 12.

### 2. Plaintiffs Cite the Wrong Legal Standard

Aside from mischaracterizing the parties' discussions, Plaintiffs also misstate the governing law.  Plaintiffs incorrectly cite *In re Pioneer* for the proposition that Charter has "[t]he burden of showing why discovery should not be granted."  *See supra* at 14.  That case involved a motion to quash a Section 1782 application for discovery, not a motion to compel under Rule 45.   *See Pioneer Corp.*, 2019 WL 5401015, at *5. Where, as here, Plaintiffs move to compel a production of documents under Rule 45 of the Federal Rules of Civil Procedure after a non-party has timely objected, Plaintiffs have the "burden to show [the] appropriateness of the[ir] subpoena. . . ."  *See  Wi-Lan Inc.* v. *Rsch. in Motion Corp.*, 2010 WL 2998850, at *3 (S.D. Cal. July 28, 2010).

"The Ninth Circuit has long held that nonparties subject to discovery requests deserve extra protection from the courts."  *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2012 WL 4846522, at *2 (N.D. Cal. Aug. 7, 2012).  Under Rule 45, a party issuing a subpoena "must take reasonable steps to avoid imposing undue burden or expense" on a non-party. Fed. R. Civ. P. 45(d)(1); *see also* Fed. R. Civ. P.  45(c)(2)(B)(ii) (noting that when issuing an order resolving a motion to compel subpoena compliance, the court "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance").  "The apparent relevance of the information a subpoena seeks informs the extent to which its burden is undue, and the court must balance relevance, the requesting party's need for the information, and the hardship to the subpoena's target."  *In re eBay Seller*

*Antitrust Litig.*, 2009 WL 10677051, at *1 (W.D. Wash. Aug. 17, 2009).

The burden of establishing relevance is heavier when the disclosure would reveal sensitive commercial information of a non-party because Plaintiffs must show that they have a "substantial need" for the discovery which "cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45 (d)(3)(C).  Even then, the status of a person as a non-party weighs heavily against disclosure.  *See Mattel, Inc.v. Walking Mountain Prods.,* 353 F.3d 792, 814 (9th Cir. 2003).

Plaintiffs, of course, have told the Court none of this. Instead, Plaintiffs rely on a talismanic incantation that "[b]ecause the requested documents are relevant to this action, they must be produced unless they are privileged." (citing Fed. R. Civ. P. 26(b)(1))). *Supra* at 14.  That is simply not the standard when seeking discovery of confidential and financially sensitive information from a non-party.

"Once the nonparty shows that the requested information is a trade secret or confidential commercial information, the burden shifts to the requesting party to show a 'substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated.'" *Gonzales* v. *Google, Inc*., 234 F.R.D. 674, 684 (N.D. Cal. 2006) (*quoting* Fed. R. Civ. P. R. 45(d)(3)(C)).

### 3. Plaintiffs Cannot Justify Burdening Charter, a Non-Party, for Communications Related to Charter's Agreements with Defendants Before Seeking Those Communications from the Defendants

Plaintiffs' request for communications concerning Charter's agreements with three NFL Club Defendants is both premature and imposes an undue burden given the largely irrelevant nature of those agreements.  Charter has already produced its telecast agreements with NFL Club Defendants and undertaken a concededly "robust" search for any internal studies and reports concerning those agreements. Plaintiffs' sole objection is that Charter, a non-party, should also be compelled to search for and produce its communications, dating back *ten years*, related to those

agreements before Plaintiffs ask Defendants, for any of the same or related documents.

Charter should not be required to produce any documents related to its agreements with NFL Club Defendants at all, but especially not before Plaintiffs exhaust their efforts to obtain that same category of documents from the NFL Club Defendants.   Rule 26(b) of the Federal Rules of Civil Procedure expressly acknowledges that a court may limit discovery if it determines the discovery sought "is obtainable from some other source that is more convenient, less burdensome, or less expensive."   Fed. R. Civ. P. 26(b).   As the case law cited by Plaintiffs acknowledges, discovery of relevant information should be sought from parties before burdening a non-party with unnecessary requests. *See Moon*, 232 F.R.D. at 638 (C.D. Cal. 2005) ("Since plaintiffs have not shown they have attempted to obtain these documents from defendant, the Court finds that, at this time, requiring nonparty KSA to produce these documents is an undue burden on nonparty KSA.").[1]

Charter suggested that Plaintiffs could seek discovery from the NFL Club Defendants and then determine whether further discovery from Charter is necessary or appropriate.  As this Court explained when it considered Plaintiffs' prior motion to compel custodial ESI discovery from the NFL Club Defendants, "instead of doing all or nothing discovery, I think we will do better if we stage the discovery in a way that allows us to gain knowledge from what we do as a way of indicating what should be allowed next."   *In re National Football League's Sunday Ticket Antitrust Litigation,* No. 2:15-ml-02668-PSG (JEMx), Dkt 341 (June  30, 2021 Hearing). Plaintiffs rejected that approach.   *See* Greenbaum Decl. ¶¶ 12, 15.   Charter subsequently produced its agreements with the NFL Club Defendants and asked Plaintiffs to "review[] the contracts" and, at that point "[Charter] would be prepared

---

[1] To the extent Plaintiffs argue they cannot obtain Charter's *internal* communications related to these largely irrelevant contracts, discovery from the NFL Club Defendants may be able to clarify the limited scope of these arrangements or even focus Plaintiffs' subsequent searches to a specified custodian or time period.

to hear and consider your arguments concerning the relevancy" of further discovery. Delman Ex. 5 at 2.  Plaintiffs rejected that approach as well, never responding to Charter's request to discuss the relevancy of those agreements after its production, even at a meet-and-confer just three days before Plaintiffs filed their Motion to Compel.  *See* Greenbaum Decl. ¶ 20.

Charter's telecast agreements with NFL Club Defendants appear to be irrelevant to the claims at issue in this litigation.  Charter has only one active agreement with an NFL Club – an agreement to re-air pre-season, rather than regular season, games in a local market on a non-exclusive basis, and other related programming.  *See* Greenbaum Decl. ¶ 25.  Another expired contract allows Charter to air "behind the scenes" programming created by the Los Angeles Chargers.  *See id.*  There is no reasonably conceivable basis to believe that a contract to re-air pre-season games in a local market on a non-exclusive basis offers a "model[] for distribution" of a $1.5 billion per year contract to live telecast regular season games across the country (*i.e.* NFL Sunday Ticket).  And to the extent that they do, Charter's production of the agreements and extensive search for reports or studies concerning those agreements should satisfy Plaintiffs' request.  Compelling Charter, a non-party, to further search and produce ten years of communications concerning comparatively small and largely irrelevant contracts, when Plaintiffs have not sought any discovery whatsoever concerning those same contracts from the Defendants themselves, is inappropriate.

To the extent that the Court orders a production of Charter's communications about those agreements, Plaintiffs should be required to compensate Charter for its costs, including those attributable to searching for and producing documents to date. Rule 45(d)(2)(B)(ii) provides that an order compelling compliance with a subpoena "*must* protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."  Applying relevant search terms to the files of custodians with contact with those NFL Club Defendants would require Charter to

review approximately 10,000 documents, though Plaintiffs have not provided Charter with any search terms or identified any custodians.  Even a conservative estimate of the costs associated with collecting, reviewing, and producing Charter's communications with the NFL Club Defendants concerning these small agreements dating back 10 years will exceed $20,000.  *See Legal Voice* v. *Stormans Inc*., 738 F.3d 1178, 1184 (9th Cir. 2013) (holding a trial court must compensate a non-party for the significant costs associated with producing documents and stating "we have no trouble concluding that $20,000 is 'significant.'").

### 4. Rule 45 Protects Non-Parties Like Charter from Producing Confidential and Sensitive Commercial Information

The Court should deny Plaintiffs' request for Charter's carriage rates, which are highly sensitive commercial information and trade secrets.  Rule 45 protects non-parties from disclosing sensitive "commercial information" unless Plaintiffs can demonstrate a "substantial need" for such documents.  *See Gonzalez*, 234 F.R.D. at 684.

### a. Plaintiffs Cannot Meet Their Initial Burden to Show Carriage Rates Are Relevant to this Litigation

As an initial matter, Plaintiffs cannot even articulate the relevance of Charter's carriage rates.  Without such a showing, it goes without saying that Plaintiffs cannot show any "substantial need" for Charter's carriage rates.

Plaintiffs maintain that Charter's carriage rates with FOX, CBS, NBC, ESPN, NFL Network, NFL RedZone, SEC Network, FS1, ESPNU, Pac-12 Network, ACCN, and Big Ten Network (BTN) are relevant so that they can compare "differences between the carriage rates for channels that carry NFL football and those carrying college football." *Supra* at 15.  Charter's carriage rates reflect a single unitary rate for all programming associated with a particular channel.  Montemagno Decl. ¶¶ 4, 11-13.  They do not include any surcharge or differentiated allocation for the costs of football programming.  *Id.*

FOX, CBS, and NBC are three of the most viewed network channels on television. They provide entertainment, news, and sports programming 24 hours a day, 7 days a week, and 365 days a year. Their programming includes sitcoms, dramas, reality TV shows, game shows, news programming, and more. Sports makes up a small percentage of their overall programming. And football, including both collegiate and professional football, makes up an even smaller percentage, representing just a fraction of the programming day, typically on weekends, for less than half of the year. Charter pays a single fee for all of this programming, with no specification of the value or cost of professional or collegiate football programming as opposed to entertainment, news or other programming on the network. *See id.* ¶ 11.

NBC, Fox, CBS, ESPN, and FS1 carry both professional and college football, and since there is only a single rate for those channels' programming, it is impossible to use those rates to compare differences between college and professional football. *See id.*

SEC Network, FS1, ESPNU, Pac-12 Network, ACCN, and Big Ten Network (BTN) each carry programming associated with a variety of sports including football, basketball, baseball, volleyball, and many more. Those networks carry only college sports programming. Once again, football represents a small portion of these networks' programming. *Id.* at 13.[2]

Plaintiffs also argue that "[c]arriage rates permit a greater understanding of how college football games are distributed, the structure of the market for college football games, and the costs associated with those games." Plaintiffs do not explain their reasoning, how they intend to use Charter's carriage rates, or why carriage rates

---

[2] Plaintiffs have also requested Charter's carriage rates for NFL Network and NFL RedZone. Disclosure of those contracts raise the same confidentiality concerns as with the other channels. *See* Montemagno Decl. ¶ 14. Moreover, both NFL Network and NFL RedZone are owned by the NFL, which is a Defendant in this litigation and in a position to produce any information relating to cost of carriage for those networks by Charter and all of its competitors and distributors.

could possibly provide such "greater understanding of how college football games are distributed"—whatever that means.  To the extent Plaintiffs need to understand the "costs associated" with college football games, the answer will not be found in the carriage rates of the networks that transmit those games because each of those networks charge Charter a single unitary rate for all of their programming. Plaintiffs' theory of relevance is an incoherent and unsupported argument that does not necessitate discovery from a non-party, especially when that discovery seeks highly confidential proprietary information from a non-party.  *See, e.g. V5 Techs.* v. *Switch*, *Ltd.,* 334 F.R.D. 306, 312 (D. Nev. 2019) (denying discovery where "Defendant present[ed] no factual basis to support its theory of relevance or concerns."); *Gonzalez,* 234 F.R.D. at n.4 ("[I]t would not have been unreasonable at this stage to have required the Government to assist the Court in its determination of relevance by providing the Court with more information on its plans for the information sought from Google."); *Robin Singh Educ. Servs.*, *Inc.* v. *Excel Test Prep*, 2004 WL 2554454, at *2 (N.D. Cal. Nov. 9, 2004) (denying motion to compel because "[o]ther than the naked statement of this argument, Plaintiff does not even attempt to show how either of these two bases for relevance [do] in fact obtain.").

### b.   Plaintiffs Cannot Meet Their Greater Burden to Show Their Substantial Need for Charter's Carriage Rates

Plaintiffs' burden is even greater because Charter's carriage rates are unquestionably sensitive commercial information, which deserve strong protection under Rule 45.  Charter takes significant measures to protect its carriage rates.  Tom Montemagno, Charter's Executive Vice President, Programming Acquisitions, offers examples of the types of protections and safeguards Charter has implemented to prevent any disclosure of those agreements, including restricting access for those agreements to Charter's programming executives and managers on a need-to-know basis, and data security measures.  *See* Montemagno Decl. ¶¶ 6, 7.  Charter is also

prohibited by contract from disclosing its carriage rates except in limited circumstances. *See id*. ¶ 6.

Plaintiffs note that two other MVPDs have agreed to produce their carriage rates, including Comcast. *See* Delman Decl. ¶ 11. That does not make Charter's information any less confidential and in fact cuts against Plaintiffs' argument that it also has a "substantial need" for Charter's data. To the extent that carriage rates have already been obtained from Comcast, the largest cable operator in the United States, that should more than suffice for Plaintiffs' needs, given the extraordinarily attenuated connection between these rates and the price charged for NFL Sunday Ticket. Moreover, Plaintiffs have told only half the story as we understand that Charter is not the only cable operator or MVPD to object to production of its carriage rates. *See* Greenbaum Decl. ¶ 30.

Charter will suffer significant harm if its carriage rates are disclosed. As explained in the declaration of Mr. Montemagno, Charter negotiates in private with each of these networks, seeking to obtain the best possible rates for its subscribers. It would damage Charter if its MVPD competitors became aware of Charter's rates. *See Cumberland Truck Equip. Co.* v. *Detroit Diesel Corp.*, 2008 WL 11376577, at *6 (S.D. Ind. Mar. 21, 2008) (denying motion to compel highly sensitive pricing data contained in agreements between non-party and truck manufacturers in antitrust lawsuit, despite protective order). Similarly, the disclosure of Charter's rates to other cable networks could result in those networks demanding higher prices from Charter, to the detriment of Charter's subscribers who would have to bear that increased cost. *See* Montemagno Decl. ¶¶ 8, 9. For example, if one network learned that Charter paid higher carriage rates for a similar network, they would demand that Charter pay a higher carriage rate for their network.

Although Charter is aware of the terms of the protective order in this litigation, that order is not in and of itself adequate to protect Charter's competitively sensitive carriage rates, particularly where various of Charter's competitors and/or contracting

counterparts are parties to the litigation.  *See In re Vitamins Antitrust Litig.*, 267 F. Supp. 2d 738, 742 (S.D. Ohio 2003) ("[W]ise course is to nip any potential economic harm to [non-party] in the bud, by not enforcing the subpoena" rather than relying on a Protective Order.); *Mannington Mills, Inc.* v. *Armstrong World Indus., Inc.*, 206 F.R.D. 525, 530 (D. Del. 2002)("Although the protective order allows the designation by [a non-party] that such information is confidential and limits initial disclosure to outside counsel, the parties to this litigation are left with the option of how disclosure of such confidential information is handled at trial.")  Even assuming the good faith adherence of all litigants to the letter of the Protective Order during discovery, the possibility for leakage is increased as counsel, experts, and their staff are given access to Charter's sensitive and confidential information.  And the risk of such disclosure is even greater at trial given this Court's stated preference for granting public access to litigation, even where a non-party relied on a protective order when producing records.  *See Kamakana* v. *City & Cty. of Honolulu*, 447 F.3d 1172, 1183 (9th Cir. 2006).  In circumstances such as this—where sensitive, confidential information is sought from a non-party, far more is required in terms of compelling need to order production.

### 5. Plaintiffs Articulate No Argument to Compel Charter to Produce Documents Responsive to Requests 10, 12, or 22

Pursuant to local rule 37-2, Plaintiffs have included Requests 10, 12, and 22 in their list of "issues in dispute."  Request 10 seeks discovery of reports concerning Charter's agreements with the NFL Club Defendants.  Request 12 seeks reports concerning the market conditions for college and professional football.  Request 22 requests viewership information related to broadcasting of college football.  To the extent that these requests overlap with Plaintiffs' requests for "viewership information about viewers of NFL football and viewers of college football" or "internal studies [or] reports" concerning Charter's contracts with the NFL Club Defendants, Charter has already searched for and produced documents responsive to

those requests.  *See* Delman Ex. 8.  To the extent these requests are new, Plaintiffs never raised them in their Rule 37-1 pre-motion letter and cannot compel production of documents responsive to those requests now.  In any event, Plaintiffs make no argument to support compelling any additional production of documents responsive to those requests.

### 6. Plaintiffs Must Pay Charter's Costs Including Reasonable Attorney's Fees

Where a non-party has shown that a subpoena seeks disclosure of "confidential research, development, or commercial information," and the Court nevertheless orders disclosure, the subpoenaing party must "ensure[] that the subpoenaed person will be reasonably compensated."  Fed. R. Civ. P. 45(d)(3)(C)(ii).  That includes Charter's reasonable costs for a production, for litigating this motion, and for providing notice to third parties if such production is ordered because Charter's carriage rate agreements prohibit Charter from producing its carriage rates unless compelled to do so by law, and only after providing its counter-parties with written notice.  *See* Montemagno Decl. ¶ 6.  In addition, where, as here, Plaintiffs have not taken "reasonable steps to avoid imposing undue burden or expense" on a non-party, Plaintiffs must pay Charter's costs, including its "reasonable attorney's fees."  Fed. R. Civ. P. 45(d)(1).

### 7. Conclusion

Plaintiffs cannot justify imposing an undue burden on Charter, a non-party, to produce largely irrelevant communications related to Charter's agreements with Defendants, particularly when they have not attempt to seek discovery from Defendants related to those agreements.  In addition, Plaintiffs seek trade secrets from Charter without coming close to establishing that these secrets would be relevant in the underlying litigation or that they have a "substantial need" for such documents.  Plaintiffs' motion must be denied with costs imposed for their failure to "take reasonable steps to avoid imposing an undue burden or expense" on Charter.

1

2      Dated:  December 20, 2021

3                                                    *s/ Marc M. Seltzer*
                                                     MARC M. SELTZER
4                                                    mseltzer@susmangodfrey.com
                                                     SUSMAN GODFREY L.L.P.
5                                                    1900 Avenue of the Stars, Suite 1400
                                                     Los Angeles, CA 90067-6029
6                                                    Phone: (310) 789-3100
                                                     Fax: (310) 789-3150

7                                                    SCOTT MARTIN
                                                     smartin@hausfeld.com
8                                                    HAUSFELD LLP
                                                     33 Whitehall Street, 14th Floor
9                                                    New York, NY 10004
                                                     Tel: (646) 357-1100
10                                                   Fax: (212) 202-4322

11                                                   HOWARD LANGER
                                                     hlanger@langergrogan.com
12                                                   EDWARD DIVER
                                                     ndiver@langergrogran.com
13                                                   PETER LECKMAN
                                                     pleckman@langergrogan.com
14                                                   KEVIN TRAINER
                                                     ktrainer@langergrogan.com
15                                                   LANGER GROGAN & DIVER PC
                                                     1717 Arch Street, Suite 4130
16                                                   Philadelphia, PA 19103
                                                     Tel: (215) 320-5660
17                                                   Fax: (215) 320-5703

18                                                   ARUN SUBRAMANIAN
                                                     asubramanian@susmangodfrey.com
19                                                   WILLIAM C. CARMODY
                                                     bcarmody@susmangodfrey.com
20                                                   SETH ARD
                                                     sard@susmangodfrey.com
21                                                   EDWARD DELMAN
                                                     edelman@susmangodfrey.com
22                                                   TYLER FINN
                                                     tfinn@susmangodfrey.com
23                                                   SUSMAN GODFREY LLP
                                                     1301 Ave. of the Americas, 32nd Fl.
24                                                   New York, NY 10019
                                                     Tel: (212) 336-8330
25                                                   Fax: (212) 336-8340

26

27                                                   IAN M. GORE
                                                     igore@susmangodfrey.com
28                                                   SUSMAN GODFREY LLP
                                                     1201 Third Avenue, Suite 3800

Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

*Plaintiffs' Interim Co-Lead Class Counsel*

*s/ Patrick Somers*

Patrick J. Somers (318766)
*psomers@kbkfirm.com*
KENDALL BRILL & KELLY LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone:  310.556.2700
Facsimile:  310.556.2705

Jay Cohen (*pro hac vice* forthcoming)
jaycohen@paulweiss.com
Carter E. Greenbaum (*pro hac vice* forthcoming)
cgreenbaum@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY, 10019
Tel: 212-373-3000
Fax: 212-492-0955

*Counsel for Non-party Charter Communications, Inc.*

*All signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.*

33