```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION - LOS ANGELES
```

IN RE:                          ) CASE NO: 2:15-ML-02668-PSG-JEM
                                )
                                )              CIVIL
NATIONAL FOOTBALL LEAGUES       )
SUNDAY TICKET ANTITRUST         )    Los Angeles, California
LITIGATION                      )
                                )    Tuesday, January 11, 2022
                                )
_____)    (10:21 a.m. to 10:55 a.m.)

```
                    HEARING RE DKT.NO.377,

                  MOTION TO COMPEL HEARING


            BEFORE THE HONORABLE JOHN E. MCDERMOTT,
                UNITED STATES MAGISTRATE JUDGE
```

<u>APPEARANCES</u>:              SEE PAGE 2


Court Reporter:           Recorded; CourtSmart


Courtroom Deputy:         S. Lorenzo


Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR**</u>:


Plaintiffs:                    SCOTT A. MARTIN, ESQ.
                               Hausfeld, LLP
                               33 Whitehall Street
                               14th Floor
                               New York, NY 10004
                               646-357-1100

                               IAN M. GORE, ESQ.
                               Susman Godfrey, LLP
                               1201 Third Avenue
                               Suite 3800
                               Seattle, WA 98101
                               206-516-3841

                               TYLER M. FINN, ESQ.
                               Susman Godfrey, LLP
                               1301 Avenue of the Americas
                               32nd Floor
                               New York, NY 10019
                               212-336-8330

                               PETER LECKMAN, ESQ.
                               HOWARD LANGER, ESQ.
                               Langer Grogan & Diver
                               1717 Arch Street
                               Suite 4130
                               Philadelphia, PA 19103
                               215-320-5660


Defendants:                    JEREMY BARBER, ESQ.
                               ROXANA C. GUIDERO, ESQ.
                               MAX WARREN, ESQ.
                               Wilkinson Stekloff, LLP
                               11601 Wilshire Blvd.
                               Suite 600
                               Los Angeles, CA 90025
                               424-291-9661


Charter Communications:   PATRICK J. SOMERS, ESQ.
                               Kendall Brill & Kelly
                               10100 Santa Monica Blvd.
                               Suite 1725
                               Los Angeles, CA 90067
                               310-556-2700

**<u>APPEARANCES FOR</u>:**          **(CONTINUED)**


**Charter Communications:**  **CARTER GREENBAUM, ESQ.**
                         **Paul Weiss Rifkind Wharton & Garrison**
                         **1285 Avenue of the Americas**
                         **New York, NY 10019**
                         **212-373-3955**

1    **Los Angeles, California; Tuesday, January 11, 2022; 10:21 a.m.**

2                        **(Remote appearances)**

3                         **(Call to Order)**

4           **THE CLERK:**  Please come to order, this court is now

5    in session; the Honorable John E. McDermott, United States

6    Magistrate Judge, presiding.

7           Beginning with the boxes, could you please state your

8    appearances and on behalf of who for the record.  Thank you.

9           **MR. MARTIN:**  Good morning, Your Honor.  Scott Martin

10   from the Hausfeld firm on behalf of the Plaintiffs.  I'm one of

11   the co-lead counsel, along with Howard Langer who's also on the

12   call.

13          **THE CLERK:**  Mr. Somers?

14          **MR. SOMERS:**  Good morning, Your Honor.  Patrick

15   Somers from Kendall Brill and Kelly on behalf of Non-Party

16   Charter Communications.

17          **MR. GREENBAUM:**  Good morning, Your Honor.  Carter

18   Greenbaum on behalf of Non-Party Charter Communications.  I'll

19   be arguing Motion 377.

20          **THE CLERK:**  Mr. Gore?

21          **MR. GORE:**  Good morning, Your Honor.  Ian Gore from

22   Susman Godfrey on behalf of the Plaintiffs.

23          **THE CLERK:**  Mr. Finn?

24          **MR. FINN:**  Good morning, Your Honor.  Tyler Finn from

25   Susman Godfrey on behalf of the Plaintiff and I'll be arguing

1    Motion 377.

2              THE CLERK:  Mr. Langer?

3          **(No audible response)**

4              You're on mute, Mr. Langer.

5              **MR. LANGER:**  Yes.  Your Honor, Howard Langer from

6    Langer Grogan and Diver.  I'm co-lead counsel for the

7    Plaintiffs and I'm not arguing, I'm observing.

8              **THE COURT:**  Did somebody just come on?

9              **THE CLERK:**  No.

10             Mr. Trainer?

11             **MR. TRAINER:**  Good morning, Your Honor.  Kevin

12   Trainer from Langer Grogan and Diver representing Plaintiffs.

13   I will be observing on 377 and arguing Motion 367.

14             **THE COURT:**  Anybody else?

15             **THE CLERK:**  Your Honor --

16             **MR. BARBER:**  Jeremy Barber from Wilkinson Stekloff on

17   behalf of the NFL Defendants.  I'm here with my colleagues,

18   Ms. Guidero and Mr. Warren.  We are not a party to Motion 377

19   but are observing and I will be arguing Motion 367.

20             **THE CLERK:**  Mr. Leckman and Ms. Roxana?

21             **MR. LECKMAN:**  Good morning, Your Honor.  This is

22   Peter Leckman from Langer Grogan and Diver.  I'll be observing

23   both motions on behalf of the Plaintiffs.

24             **MS. GUIDERO:**  And good morning, Your Honor.  This is

25   Roxana Guidero from Wilkinson Stekloff on behalf of the NFL

1    Defendants, also observing both motions.

2              **THE COURT:**  All right.  Welcome everybody.

3              Let's take care of a preliminary matter.

4              Is there anybody on the call who is not subject to

5    the protective orders?

6              **THE CLERK:**  No, Your Honor.  We went over that before

7    you came out.  Those parties are in a waiting room and cannot

8    hear this session.

9              **THE COURT:**  Okay.  Then we can proceed.

10             This is --

11             **MR. LECKMAN:**  I think it's important to say though --

12   just to clarify, this is Peter Leckman.  I'm not arguing but

13   Charter Communications is a third party.  To the extent the

14   Court intends to discuss the contracts with the other networks:

15   Fox, CBS, and the like, Charter is not subject to the

16   protective order as to those individuals.  I know that's the

17   other motion but I just want to clarify that.

18             **THE COURT:**  All right.  We'll deal with that one when

19   we get there.

20             All right.  I understand that the parties agree that

21   the Charter motion should go first so that counsel can remove

22   themselves before we do the other motion.

23             So who's going to argue the motion for Plaintiffs?

24             **MR. FINN:**  Good morning, Your Honor.  This is Tyler

25   Finn for Susman Godfrey on behalf of Plaintiffs and I'll be

1    arguing today.

2              **THE COURT:**  Go ahead.

3              **MR. FINN:**  Your Honor, Plaintiffs are here on this

4    motion seeking two specific categories of information from

5    Charter Communications.  The first category is Charter's

6    carriage rates from a dozen channels that broadcast football.

7    Now, carriage rates are the prices that cable system operators,

8    like Charter, pay to television networks for the rights to

9    deliver those networks' programming, including football, to

10   their cable subscribers, and they're usually memorialized and

11   what are called "Carriage" or "Affiliation" agreements.

12             The second category of documents that Plaintiffs seek

13   is Charter's communications regarding its broadcasting

14   contracts with the NFL club.

15             Charter, by way of context, has contracts with three

16   NFL teams that contemplate the broadcasting of pre-season games

17   and/or other non-game content produced by these teams.

18             Now, Plaintiffs have tried to explain during numerous

19   meet and confers over the past six months since the subpoena

20   was filed in June.  Both of these categories are relevant to

21   Plaintiffs' anti-trust claims and they are calculated to lead

22   to admissible evidence on specific elements of those claims.

23             And make no mistake, the Court should grant the

24   Motion to Compel on that basis of relevance because that is the

25   dispositive issue here.  And the reason for that is because the

```
 1   supplemental protective order in this case, at Docket 360,
 2   eliminates any risk of injury to Charter from disclosure of its
 3   trade secrets.  And secondly, because identifying and locating
 4   these documents imposes no undue burden on Charter.  But I'll
 5   address the relevance of each category of documents
 6   (inaudible), beginning of course with Charter's carriage rates
 7   for 12 specific channels that show football, whether NFL or
 8   NCAA football.
 9              The principal reason why carriage rates are relevant
10   to Plaintiffs' claims is to show whether the carriage of NFL
11   games carries with it a price premium and that price premium
12   itself goes to proof of whether the NFL and NFL games
13   constitutes a separate and distinct product market.
14              Now this is important because Defendants have
15   continually disputed that NFL football is an economically
16   distinct product market.  And as no party will dispute,
17   establishing the relevant product market from which the
18   Defendants exert market power is a required element of any case
19   under the Sherman Act.
20              Now, in the Ninth Circuit appeal of this case, the
21   Court of Appeals found that Plaintiffs had properly alleged the
22   existence of such a market but Plaintiffs seek to prove that
23   market up using, among other things, carriage (glitch in
24   audio).
25              Now, how will carriage rates help Plaintiffs
```

1   establish that there is a price premium associated with

2   broadcasting the NFL?  The principal way is by showing evidence

3   that there are differences in carriage rates between the

4   channels that show NFL football versus channels that show

5   college football.

6           Now, I think there's a point of clarification here.

7           Charter is correct, as it brings up in its opposition

8   and the accompanying declaration, that there is no expressed

9   surcharge to broadcasting of football or the NFL.  That's

10  exactly why Plaintiffs need to recreate this market price of

11  NFL football using carriage rates as an input.  And Plaintiffs

12  plan to use to carry out an analysis of carriage rates to prove

13  that there is in fact a price premium associated with the

14  National Football League.  And that's another reason why

15  Plaintiff need rates from multiple providers is that analysis

16  just simply would not work in the same way if it was only

17  carriage rates from one provider (glitch in audio) given the

18  necessities of building up a model from carriage rates without

19  an expressed surcharge.

20          The comparison of carriage rates, especially between

21  channels that show college football versus those that show the

22  NFL, to comparable pieces of sports programming is the best way

23  that Plaintiffs have identified to identify this NFL surcharge.

24  And Plaintiffs' request, which have now been limited through

25  the meet and confer process to just 12 channels, that show the

10

1  NFL or college football are specifically tailored to that

2  purpose.

3         The carriage rates are also important for another

4  reason as it inputs for a larger market analysis that

5  Plaintiffs intend to conduct.

6         Now, speaking in broad terms, what Plaintiffs seek to

7  do is model the effects of the restraints that are challenged

8  here, the agreements among the clubs and with DirecTV, on the

9  price of NFL programming because that will tend to show that

10 there is competitive harm associated with what Plaintiffs

11 contend are collusive agreements.

12        The Plaintiffs plan to model the effect of larger --

13 higher prices reduced but at different stages of the market on

14 the chain of distribution of NFL programming.  What do I mean

15 by that?

16        The other motion before Your Honor today, 367,

17 concerns agreements between the NFL and the networks.  That's

18 one stage of the market for NFL programming, the licensing

19 stage.  Carriage rates, by contracts, are the prices that cable

20 companies like Charter pay to distribute or deliver football

21 from networks that have already licensed those games.  But they

22 still provide a benchmark for what the price of football games

23 get is (inaudible) and what the market will bear at that

24 particular stage of distribution.

25        And carriage rates permit a price comparison between

11

1    two different models of broadcasting and licensing football.

2    And that's an important distinction here.  On the one hand you

3    have the NCAA which is a relatively competitive market in which

4    individual universities or conferences can contract directly

5    with television networks to broadcast their games.  That's an

6    example of a freer market.  On the other hand you have the NFL

7    which is a market that is fundamentally restricted by the

8    agreements challenged in this litigation and in which the

9    distribution is centralized and controlled by the league.  And

10   as Plaintiffs allege in their complaint, in paragraph 12, these

11   restraints raise the price of NFL games; and as they allege

12   specifically in paragraph 86, the restraints also raise

13   affiliation fees for NDPD's (phonetic) like Charter, cable

14   companies like Charter.

15         Now, one of the reasons that carriage rates are a

16   very important input for Plaintiffs is they offer a unique way

17   to make a like-for-like comparison between the price of the

18   NCAA and the price of the NFL.

19         As an illustration, there's a fundamental difference

20   between a comparison for the rights that NBC, a network, pays

21   for the rights to broadcast Sunday night football to the rights

22   that it might pay to broadcast a Notre Dame game on Saturday

23   afternoon since the markets are fundamentally different.  NBC

24   does not contract with the NCAA or any other centralized body

25   for that right, it can contract directly through Notre Dame

12

1    because the restraints challenged here are absent.

2         But on the other hand, Plaintiffs can make a

3    meaningful comparison between the carriage rates, the price

4    that is commanded for a cable operator, between the NFL network

5    or the rights that Charter pays to like the PAC-10 network,

6    just as an example, so a network that specifies in professional

7    football to one that specifies in NCAA.

8         This could answer a certain specific question.  Does

9    Charter pay more or less to have access to NFL games versus

10   college games?  Does the volume of games on any given channel

11   affect the price that Charter pays?  And it bears mentioning

12   that a comparison with the NCAA is especially important to

13   Plaintiffs' case; again, alleged in the complaint at

14   paragraph 130.

15        The reason for that is the Ninth Circuit Court of

16   Appeals relied heavily on the 1984 Supreme Court case,

17   NCAA versus Board of Regents, which found that the NCAA

18   violated the Sherman Act by engaging in precisely the type of

19   restraints that are challenged here.  The Court of Appeals went

20   so far, on page 1151 of its Opinion, to say that the Supreme

21   Court's decision in the NCAA controls the analysis of this

22   litigation.

23        But speaking factually, the market for the NCAA

24   football has changed dramatically since that 1984 ruling which

25   then freed up again individual teams and conferences to

13

```
 1  broadcast their games and contract with different cable
 2  providers and for games to be broadcasted simultaneously.  So
 3  comparing the nature of that market to the NFL is especially
 4  probative of the market effects of the challenge agreements
 5  here that is the subject to the NFL.  Now for those reasons,
 6  Plaintiffs have demonstrated a substantial need for this
 7  carriage rate information because what Plaintiffs need to
 8  demonstrate, given Charter's indication of these rates as trade
 9  secrets, according to Rule 45(d)(3)(C).
10          So although the language in the Rule of Substantial
11  Need, courts have consistently within this circuit, interpreted
12  the Substantial Need language as calling for a balance effect
13  between on the one hand, plaintiff's need for the
14  information -- as I just articulated -- and the claim of injury
15  resulting from disclosure on the other hand.  And in that I'm
16  citing to Gonzalez versus Google which is cited by Charter in
17  the joint stipulation.
18          And here, it really bears mentioning, the
19  supplemental protective order -- again at Document 360 --
20  tipped that balance between need and injury decisively in favor
21  of plaintiff.  Charter brings one claim of injury in its
22  opposition which is that it will suffer some kind of
23  competitive disadvantage because carriage rates or affiliation
24  agreements somehow fall into the hands of its contracting
25  counterparts or its competitors, other cable operators.  But
```

14

1   the terms -- under the terms of the protective order, that

2   simply cannot happen.  The protective order specifically

3   protects, and I'm quoting:

4           "Carriage rate information, as well as sensitive

5           material implicated in affiliation agreements."

6           And by way of context, that provision was instituted

7   and negotiated at the request of another third party who is

8   subject to a subpoena by Plaintiffs who has already produced

9   carriage rates in this litigation.

10          Now, Charter knows this because it has already

11  designated documents in this litigation that it has produced to

12  Plaintiffs under the highly sensitive confidential designation

13  that I just mentioned but what does that designation mean?  It

14  means that only outside counsel, court personnel, and experts

15  will have access to those carriage rates.  And specifically, it

16  prohibits any outside counsel that has a relationship, a

17  transactional relationship with the NFL or are somehow involved

18  in negotiating with the NFL from seeing those documents.

19          In a nutshell, the protective order comprehensively

20  addresses all the claims of injury Charter has brought.  So

21  therefore, their claims of injury or the possibility of leakage

22  that are cited in their opposition are nothing more than

23  skepticism of the efficacy of a protective order.  And courts

24  and the circuit have consistently rejected such arguments.

25          And I'd point the Court to the Gradias (phonetic) and

1    AFMS (phonetic) cases which are cited on page 3 of Plaintiffs'

2    memo.   And on that note, concerns about disclosure and trial

3    are similarly misplaced.

4           For an initial matter, Plaintiffs have no present

5    intention of exhibiting carriage rates at trial.   This is not

6    their function.   As I've already articulated, these rates are

7    necessary to Plaintiffs only as inputs for an expert analysis

8    about the existence of a distinct product market for NFL

9    football.   In that regard, I think any concerns about

10   disclosure at trial are misplaced.

11          And I just think that *Gonzalez versus Google* is

12   instructive here.   The fact patterns are substantially similar

13   and the Court should reach the same results that the Court

14   reached there.

15          In that case, the Northern District of California

16   found the government had substantial need for certain trade

17   secret information from Google, search index information, which

18   the government was planning to use in a study of filtering

19   software as part of its defense of a statute being challenged

20   by the ACLU.   And the Court found that that study would have

21   been significantly hampered if Google, the largest search

22   engine in the market, was not -- would not provide its input.

23   And the Court found that even though Google's competitors,

24   Yahoo, AOL -- Microsoft, I believe, had already provided that

25   information to the government.   The Court also found that any

1   concerns about trade secrets would be alleviated by an

2   appropriately tailored protective order.  That's exactly the

3   case here.

4        Plaintiffs planned model to identify and quantify the

5   market for NFL football and to quantify the price effects of

6   these restraints would be significantly hampered if the second

7   largest cable company in the United States did not provide its

8   carriage rates.  And for that reason, the fact that DirecTV and

9   Dish Network have already provided carriage rates to Plaintiff

10  simply does not alter the analysis.

11        In sum, on the issue of carriage rates, balanced

12  against no claim of injury, no cognizable claim of injury for

13  Charter, Plaintiffs' demonstrated need for these rates more

14  than satisfies the requirements of Rule 45.

15        I'm next going to move on to talk about the second

16  category of documents which is the communications about

17  Charter's contract with the NFL clubs.

18        And first, a point of clarification.

19        Plaintiffs have indeed sought these communications

20  from -- with the NFL clubs from the NFL Defendants themselves.

21  Plaintiffs' Fourth Request for Production seeks, among other

22  things, "all documents reflecting communications relating to

23  the licensing and distribution of NFL football games over

24  television."  Putting that aside.

25        But going to the key issue here which is relevance,

17

1  communications surrounding those contracts are relevant for

2  three reasons.  The primary reason is to rebut the NFL

3  Defendants' pro-competitive justification, a justification that

4  has continually furthered throughout this litigation, including

5  in the Ninth Circuit Court of Appeals.

6       The NFL claims that some kind of joint action between

7  the clubs and the leagues is somehow necessary from a technical

8  point of view to broadcast NFL games.  They've consistently

9  argued that the teams are just simply not able to separately

10 contract directly with broadcasters or distributors the

11 licensing of those broadcasts.  But the contractual

12 arrangements that Charter has produced here for pre-season

13 games directly contradicts that position.  I'm not going to get

14 into too many details about the nature of these contracts, in

15 light of the protective order, despite the efforts the court

16 has made to (inaudible) this proceeding, but in broad strokes

17 Charter has produced six agreements with three different NFL

18 teams.  Those contracts (glitch in audio) grant Charter's local

19 affiliates the rights to broadcast certain content, the teams

20 pre-season games or other non-game content within a relevant

21 local market.  And given the teams and the distributors ability

22 to contract there is direct evidence that joint action, as the

23 NFL Defendants have claimed, is simply not necessary.  And the

24 communications underlying those contracts just provide

25 additional evidence to rebut that justification.

1          Second, these contracts provide insight into what the

2    nature of the market for broadcasting NFL games might look like

3    but for the restraints challenged in this case.  And again,

4    modeling the but-for world, what kind of distribution and price

5    agreements would exist if not for the restraints is a way the

6    Plaintiffs can prove that there is competitive harm associated

7    with the agreements challenged here.  And thus the contractual

8    agreements and the communications surrounding those agreements

9    that do exist for pre-season games where those restraints are

10   absent are evidence of what may exist throughout the league if

11   the restraints were removed from regular season games.

12         And Charter's response to this is that the contracts

13   are local, small in scope, and involve select pre-season games,

14   and not any Sunday ticket games.  But that doesn't affect the

15   relevance here because they still demonstrate that the clubs

16   and broadcasters can work bilaterally without the leagues

17   direct involvement and that is important evidence for

18   Plaintiffs to rebut Defendants' pro-competitive justification.

19         And lastly, there's a third reason why these

20   communications are relevant because there's a possibility they

21   can provide evidence that's not contained in the contracts

22   themselves.  The communications may show, for example, that the

23   teams and the distributors wanted to separately contract about

24   certain issues but they couldn't because of other contractual

25   restraints agreed to with the NFL.  In other words, the

19

communications may provide new evidence of additional

restraints that are occasioned by the challenge agreements

among the clubs and just wouldn't be contained within the

contracts themselves.

And I think those three reasons easily meet the broad

definition of relevance as outlined in Rule 26 and incorporated

into Rule 45 and therefore applies to a non-party, Charter.

And lastly to conclude, this request really does not

subject Charter to any undue burden because Charter has already

done the work of locating these documents.

As Charter represented in its opposition to this

Court and as it represented to Plaintiff during the most recent

meet and confer, it has already interviewed potential

custodians of its contracts as part of its search for the

contracts themselves and for internal studies and reports about

those contracts which Charter attested that it could not find.

Also consider the scope of the contracts at stake

here.

There are six contracts in total with three different

counterparties, three different NFL clubs.  The date range of

these contracts is limited in scope from April 2014 to

July 2020.  Charter has already identified who the counterparts

within its own organization are for those contracts because

they're on the face of the contracts themselves.  So it just

doesn't make sense that Charter would have to start from

1   scratch to find the underlying communications of these

2   contracts.

3          But moreover I'd add, Charter's claim of undue burden

4   tends to contradict its relevance argument.  On the other hand

5   -- on one hand, in arguing that Charter's arguments are

6   irrelevant to Plaintiffs' case, Charter claims there's a

7   limited number, that they're local in nature, and that they're

8   small in scope; therefore, they can't have any relevance to a

9   case about Sunday tickets.

10          On the other note, they claim that identifying

11   communications about these six small contracts would require a

12   massive effort costing at least $20,000 with no evidence to

13   back up and it's speculative (inaudible).  And Plaintiffs ask

14   the Court to reject that kind of bluster and grant the Motion

15   to Compel.

16          Thank you (inaudible) and if you have any questions.

17          **THE COURT:**  Yes.  You touched on this but I want to

18   ask you to state as precisely as you can how a carriage, a

19   unitary carriage rate without any surcharge can address the

20   relevancy contentions that you've made.

21          **MR. FINN:**  Yes, Your Honor.

22          So I think what Plaintiffs claim to do with these

23   carriage rates is to collect them from as many providers as

24   they can -- and that's why they subpoenaed multiple providers,

25   satellite and cable providers -- and then conduct a comparison

1  of the rate that a cable company pays for those channels that

2  broadcast NFL football games with those channels that broadcast

3  NCAA football games.  That comparison would also involve

4  viewership data that the Plaintiffs have also collected, as

5  well as the number of games that are broadcast on the NCAA

6  versus the NFL, and use that universe of data to try to

7  establish that there is a price premium that is passed on to

8  distributors like Charter, who then pass it on to their

9  consumers, for those channels that broadcast the NFL.  That is

10  the principle reason for that.

11       The study, as I mentioned, will be used for two

12  principal purposes, to establish the distinct product market

13  for the NFL, which a price premium will tend to prove, and to

14  show that they're -- the prices are raised because of the

15  competitive restraints.  That, in a nutshell, is what these

16  carriage rates are for.

17       **THE COURT:**  Okay.  What is the status of your

18  discussion with the three clubs?

19       **MR. FINN:**  Those discussions remain ongoing.

20       As I mentioned, we received a large amount of

21  production from the NFL Defendants and I've reviewed, in

22  preparation for this hearing, what has been produced thus far.

23  And we have not received any specific communications from

24  Charter but the NFL Defendants haven't specifically withheld

25  those documents either.

1          **THE COURT:**  Are you also seeking Charter's own

2  internal communications with the three clubs -- I mean

3  regarding the three clubs?

4          **MR. FINN:**  Yes, both external and internal

5  communications.

6          **THE COURT:**  All right.  Am I correct that Requests

7  Numbers 10, 12 and 22 are no longer an issue?

8          **MR. FINN:**  Yes, yes, that's right, Your Honor.  Those

9  requests are no longer at issue.  Those were addressed in the

10  meet-and-confer process and Plaintiffs are not seeking

11  (inaudible).

12          **THE COURT:**  All right.  I'll hear from Charter now.

13          **MR. FINN:**  Thank you, Your Honor.

14          **MR. GREENBAUM:**  Good morning, Your Honor.  Carter

15  Greenbaum on behalf of Charter.

16          I just want to go back to something this Court

17  instructed the parties during Plaintiffs' last Motion to

18  Compel.

19          The Court directed the parties, instead of doing

20  all-or-nothing discovery, we'd do better if we staged discovery

21  in a way that allows us to gain knowledge from what we do as a

22  way of indicating what should be allowed next.

23          **THE COURT:**  A very wise comment.

24          **MR. GREENBAUM:**  I agree, Your Honor.

25          **(Chuckle heard)**

23

1          We really haven't done that here.  They haven't done

2     that with carriage rates, they haven't done that with the

3     communications they're seeking.

4          About the carriage rates, these rates represent some

5     of the most competitive, sensitive and confidential information

6     that Charter has.  And I heard Plaintiff, Mr. Finn say, that

7     relevance is the dispositive issue here.  But when you're

8     dealing with confidential information like this, relevance

9     isn't the dispositive issue.  The dispositive issue is whether

10    you have shown you have a substantial need for the document and

11    information but it's a high burden and the Plaintiffs haven't

12    met that yet.

13         So what did Mr. Finn say?  He said they want to use

14    Charter's carriage rates to compare the cost of channels that

15    carry NFL football against the cost of channels that carry

16    college football.

17         We've put in evidence by way of a declaration from

18    Charter's programming executives that explains that is not

19    possible.  We can't disaggregate those rates; thus, as Your

20    Honor pointed out, they're unitary rates.  So Mr. Finn gave the

21    example of NBC.  Let me use that as an example.

22         NBC carries a lot of programming but it has just one

23    unitary rate with Charter, that Charter pays to carry all that

24    content: news programming, TV shows, sports, including

25    football.  But as Charter's executives explained, you can't

24

1    disaggregate what Charter pays for one piece of programming.

2         And Mr. Finn doesn't explain their methodology and

3    it's all lumped into one number.

4         NBC moreover, like other channels, carries both

5    college football and professional football.  So they've asked

6    for -- they want to compare channels that carry one or the

7    other but they've asked for a bunch of channels' highly

8    sensitive carriage-rate information that carry both.

9         We've asked for an explanation as to how they're

10   going to make this comparison.  They talk about inputs into an

11   expert analysis eventually but they have an obligation to tell

12   this Court, before Charter produces carriage-rate information,

13   how they intend to use it.  That's what the cases they've cited

14   stand for.

15        If you look at -- Mr. Finn mentioned *Gonzalez* and

16   *Gradias*.  In both those cases, in order to show substantial

17   need, parties put in expert declarations explaining why it is

18   they needed information from a non-party in order to prove

19   their claim.  That hasn't been done yet.  And maybe at some

20   point in the future they can.  If and when they have an expert

21   who's able to articulate a theory, who's able to articulate a

22   methodology here to disaggregate this, we'll be in a different

23   position.  But until -- but articulating that methodology will

24   help us assess the substantial need.

25        Now Plaintiffs have said that the protective order

25

1    upends the balance in favor of Plaintiffs.  That is just not

2    the law.  The law is that you have to show substantial need

3    first, you have to cross that threshold, and only then does the

4    court evaluate whether a protective order is sufficient.

5            So in sum, where the Plaintiffs are seeking sensitive

6    highly confidential information, more is needed.  They haven't

7    met their burden.

8            The second issue, Your Honor, is whether the Court

9    should compel a further production of communications about

10   small and largely irrelevant agreements between Charter and the

11   NFL Club Defendants.

12           I submit like -- I submit, Your Honor, that this

13   request too is entirely premature.  We should be staging

14   discovery.

15           Mr. Finn says they haven't received any

16   communications between Charter and the NFL Club Defendants.

17           Our position is simple.  They stop (inaudible) that

18   discovery, let's wait until they get it.  I strongly suspect

19   that Plaintiffs will come to the realization that these

20   agreements are simply irrelevant to their claims; but at the

21   very least it will help focus Plaintiffs' requests to a

22   relevant time and custodian.

23           If Your Honor has any questions for me, that's --

24           **THE COURT:**  Has there been any discovery like

25   depositions with Charter?

26

 1        **MR. GREENBAUM:**  No, Your Honor.

 2        **THE COURT:**  Waiting for the three clubs doesn't

 3   address the -- address Charter's own internal communications.

 4   Why can't they be produced?

 5        **MR. GREENBAUM:**  That's correct, Your Honor.  It won't

 6   address the internal communications but if we allow the clubs

 7   to learn -- if we allow parties to learn from discovery we

 8   conduct between the parties in this case, will help focus the

 9   Plaintiffs on a particular time period or a custodian.

10        Mr. Finn said that these contracts are relevant

11   because they provide a model for other arrangements of how the

12   -- how the -- without the exclusivity restraint between DirecTV

13   and the NFL, or because they show -- allow the clubs to live

14   simulcast pre-season games, but only one agreement allows clubs

15   to simulcast live pre-season games.  So staging discovery in a

16   way that allows the parties to learn from what they do before

17   as a way of determining what should be allowed next makes a lot

18   of sense, literally when it involves a non-party like Charter.

19        **THE COURT:**  Anybody have anything else to add?

20        **MR. GREENBAUM:**  No, Your Honor.

21        **THE COURT:**  All right --

22        **MR. FINN:**  Yes, Your Honor --

23        **THE COURT:**  Who's --

24        **MR. FINN:**  This is Tyler Finn, just a quick response

25   to Charter's argument there.

27

1          I disagree with the characterization of what the

2     legal standard is here.

3          It's well established in the *Gonzalez versus Google*

4     case and *Gradias*, and in other cases cited on page 2 of

5     Plaintiffs' Supplemental Memorandum, that a substantial need

6     ingredient is really a balancing test.  It balances the need

7     against the claim of injury.  And so it's very important to

8     consider the adequacy of the protective order here.

9          And in terms of staging of discovery, I would just

10    stress that discovery is ongoing.  The NFL continues to produce

11    time material but the time period for discovery is fast

12    approaching.  So while staging discovery is in theory a good

13    idea, from Plaintiffs' perspective, we need to secure as much

14    material as we can before discovery ends, and it's possible

15    that the NFL Defendants will not (inaudible).

16              **THE COURT:**  Okay.

17              **MR. FINN:**  Thank you.

18              **MR. GREENBAUM:**  Your Honor, if I may be heard very

19    briefly?

20              **THE COURT:**  Go ahead.

21              **MR. GREENBAUM:**  Mr. Finn talks about the *Gonzalez*

22    case as supporting this balancing test and cites Heat and

23    Control, Inc. versus Hester Industries for that proposition,

24    785 F.2d 1017.  And that case very clearly says if proof of

25    relevancy or need is not established, discovery should be

1  denied.  You need to show substantial need; and then, and only

2  then, do you engage in this balancing test.

3          **THE COURT:**  All right.  We're done with the first

4  motion.

5          **THE CLERK:**  Thank you, Your Honor.

6      **(Proceeding regarding Document Number 377 concluded at**

7  **10:55 a.m.)**

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                              **January 14, 2022**

Signed                                                          Dated


*TONI HUDSON, TRANSCRIBER*