```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION - LOS ANGELES



IN RE:                          ) CASE NO: 2:15-ML-02668-PSG-JEM
                                )
                                )           CIVIL
NATIONAL FOOTBALL LEAGUES       )
SUNDAY TICKET ANTITRUST         )    Los Angeles, California
LITIGATION                      )
                                )    Tuesday, January 11, 2022
                                )
_____)    (10:56 a.m. to 11:38 a.m.)


                    HEARING RE DKT.NO.367,

                 MOTION TO COMPEL HEARING


            BEFORE THE HONORABLE JOHN E. MCDERMOTT,
                UNITED STATES MAGISTRATE JUDGE
```

**APPEARANCES**:              SEE PAGE 2


Court Reporter:              Recorded; CourtSmart


Courtroom Deputy:            S. Lorenzo


Transcribed by:              Exceptional Reporting Services, Inc.
                             P.O. Box 8365
                             Corpus Christi, TX 78468
                             361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR**</u>:


Plaintiffs:                    SCOTT A. MARTIN, ESQ.
                               Hausfeld, LLP
                               33 Whitehall Street
                               14th Floor
                               New York, NY 10004
                               646-357-1100

                               IAN M. GORE, ESQ.
                               Susman Godfrey, LLP
                               1201 Third Avenue
                               Suite 3800
                               Seattle, WA 98101
                               206-516-3841

                               TYLER M. FINN, ESQ.
                               Susman Godfrey, LLP
                               1301 Avenue of the Americas
                               32nd Floor
                               New York, NY 10019
                               212-336-8330

                               KEVIN P. TRAINER, ESQ.
                               PETER LECKMAN, ESQ.
                               HOWARD LANGER, ESQ.
                               Langer Grogan & Diver
                               1717 Arch Street
                               Suite 4130
                               Philadelphia, PA 19103
                               215-320-5660


Defendants:                    JEREMY BARBER, ESQ.
                               ROXANA C. GUIDERO, ESQ.
                               MAX WARREN, ESQ.
                               Wilkinson Stekloff, LLP
                               11601 Wilshire Blvd.
                               Suite 600
                               Los Angeles, CA 90025
                               424-291-9661

**APPEARANCES FOR**:          (CONTINUED)


Non-Parties:               EMILY C. CURRAN-HUBERTY, ESQ.
                           Munger Tolles & Olson, LLP
                           560 Mission Street
                           27th Floor
                           San Francisco, CA 94105
                           415-512-4052

                           YEHUDAH L. BUCHWEITZ, ESQ.
                           Weil Gotshal & Manges, LLP
                           767 Fifth Avenue
                           25th Floor
                           New York, NY 10153
                           212-310-8256

                           JOHN E. SCHMIDTLEIN, ESQ.
                           Williams & Connolly, LLP
                           725 12th Street NW
                           Washington, DC 20005
                           202-434-5901

                           GREGORY S. MORRISON, ESQ.
                           Davis Polk & Wardwell, LLP
                           450 Lexington Avenue
                           New York, NY 10017
                           212-450-4000

4

1    **Los Angeles, California; Tuesday, January 11, 2022; 10:56 a.m.**

2                        **(Remote appearances)**

3                         **(Call to Order)**

4            **THE CLERK:**  Good morning.  We'll call the case as I

5    failed to do earlier.  Case 15-ML-2668, *In Re: National*

6    *Football League Sunday Ticket Antitrust Litigation* for Motion

7    Number 367.

8            Counsel, please state your appearances as you appear

9    on the screen.  Mr. Martin.

10           **MR. MARTIN:**  Yes, Scott Martin of Hausfeld, one of

11   the co-leads for the Plaintiffs.  Mr. Trainer from the Langer

12   Grogan firm will be arguing.

13           **MR. BARBER:**  Good morning, Your Honor, Jeremy Barber

14   on behalf of the NFL Defendants from the law firm of Wilkinson

15   Stekloff.

16           **THE CLERK:**  Mr. Gore, you're next.  Mr. Gore, you're

17   on mute.  If -- I need everyone to identify themselves.  Thank

18   you.

19           **MR. GORE:**  Apologies, ma'am.  Ian Gore from Susman

20   Godfrey on behalf of the Plaintiffs.

21           **THE CLERK:**  Mr. Finn.

22           **MR. FINN:**  Good morning, Tyler Finn, Susman Godfrey,

23   on behalf of Plaintiffs.

24           **THE CLERK:**  Mr. Langer.

25           **MR. LANGER:**  Howard Langer from Langer Grogan Diver

1    on behalf of the Plaintiffs.

2            **THE CLERK:**  Mr. Trainer.

3            **MR. TRAINER:**  Good morning again, Kevin Trainer from

4    Langer Grogan & Diver for Plaintiffs.

5            **THE CLERK:**  Mr. Leckman.

6            **MR. LECKMAN:**  Good morning again, Peter Leckman from

7    Langer Grogan & Diver on behalf of the Plaintiffs.

8            **THE CLERK:**  Mr. Warren.

9            **MR. WARREN:**  Max Warren from Wilkinson Stekloff for

10   the NFL Defendants.

11           **THE CLERK:**  Ms. Emily.

12           **MS. CURRAN-HUBERTY:**  Good morning, Your Honor.  This

13   is Emily Curran-Huberty from the law firm of Munger Tolles &

14   Olson on behalf of Non-parties ESPN and ABC.

15           **THE CLERK:**  Mr. Buchweitz.

16           **MR. BUCHWEITZ:**  Good morning, Your Honor, Yehudah

17   Buchweitz from Weil, Gotshal & Manges for Non-party CBS

18   Corporation.

19           **THE CLERK:**  Mr. John.

20           **MR. SCHMIDTLEIN:**  Good morning, Your Honor, John

21   Schmidtlein from Williams & Connolly on behalf of Non-party Fox

22   Corporation.

23           **THE CLERK:**  Mr. Goreson (phonetic), in your video.

24           Ms. Guidero.

25           **MS. GUIDERO:**  Good morning, Your Honor, Roxana

1    Guidero, Wilkinson Stekloff on behalf of the NFL Defendants.

2              **THE CLERK:**  Mr. Morrison.

3              He identified himself earlier, Your Honor, as a

4    non-party.

5              **THE COURT:**  In this motion?

6              **THE CLERK:**  Yes, sir.

7              **THE COURT:**  Or the prior one?

8              **THE CLERK:**  This one.  I guess he may be having some

9    technical difficulties on his video and audio because we can't

10   see or hear him.

11             Ready to proceed when you are.

12             **THE COURT:**  Okay.  All right.  Who's going to argue

13   for the Plaintiff?

14             **MR. TRAINER:**  Good morning, Your Honor, Kevin Trainer

15   from Langer Grogan Diver and I will be arguing for Plaintiffs.

16             **THE COURT:**  You can proceed.

17             **MR. TRAINER:**  Thank you, Judge McDermott.  The Court

18   of Appeals here, in its opinion, confirmed what Plaintiffs have

19   pled which is the broadcast contracts between the NFL and its

20   network partners are key components of the conspiracy that

21   Plaintiffs allege violates the antitrust laws.  At Page 1148 of

22   the Ninth Circuit's opinion, the Court describes the three sets

23   of interrelated agreements that form the basis of the

24   conspiracy.

25             The first set are the pooling agreements between the

1    NFL and the clubs by which the clubs have foresworn their

2    ability to license telecasts of their regular-season games.

3           The second set of agreements is the exclusive

4    licensing agreement between the NFL and DirecTV for the Sunday

5    Ticket package.

6           And the third set of agreements, as the Court of

7    Appeals made clear, is the network contracts at issue here that

8    regulate the distribution of telecasts of regular-season NFL

9    games.

10          Also at 1148 in the Court of Appeals opinion, the

11   Court demonstrated one way that these interrelated agreements

12   work in concert to restrict the output of games that could be

13   seen by out-of-market viewers.  The Court said --

14          **THE COURT:**  Could I stop you for a moment?

15          **MR. TRAINER:**  Sure.

16          **THE COURT:**  Somebody just came on to the screen.

17          **THE CLERK:**  No.

18          **THE COURT:**  Is that the person we were missing or

19   not?

20          **THE CLERK:**  No.

21          **THE COURT:**  Okay.

22          **THE CLERK:**  Oh, yeah, Mr. Morrison.  There he is.

23          **THE COURT:**  That's what I thought.

24          **THE CLERK:**  Yes, sorry about that, Your Honor.

25   You're correct.

1          **THE COURT:**  Do you want to make an appearance,

2    Mr. Morrison?

3          **MR. MORRISON:**  Yes, Your Honor, apologies for the

4    difficulties earlier.  My name is Gregory Morrison of Davis

5    Polk and Wardwell here on behalf of NBC Universal, a non-party.

6    I'm here to observe the arguments.

7          **THE COURT:**  Welcome.

8          All right.  I'm sorry to have interrupted you,

9    Mr. Trainer.  Go ahead.

10          **MR. TRAINER:**  That's okay.  He -- Mr. Morrison

11    allowed me to catch my breath.  So it's okay.

12          As I was saying, Your Honor, the Court of Appeals

13    made clear how these three sets of agreements work together,

14    work in concert, work in tandem to restrict the output of games

15    that could be seen by out-of-market viewers.  So at 1148 in the

16    Court of Appeals opinion, it says, "Fans who do not subscribe

17              to Sunday Ticket have access to, at most, two to

18              three local games each Sunday afternoon.  That is the

19              consequence of the network contracts between the NFL

20              and CBS and Fox."

21          The Court went on to describe that there is no option

22    for these fans to watch any of the other seven to ten games

23    played each Sunday afternoon over the air.  They have to

24    subscribe to the exclusive DirecTV NFL Sunday Ticket package.

25    And even if they do subscribe to the NFL DirecTV Sunday Ticket

1  package, there is no option for these fans to select games that

2  they might want to watch and deflect games that they don't want

3  to watch.

4        Fans, if they want to watch most out-of-market games,

5  must subscribe to the full Sunday Ticket package which includes

6  all of the out-of-market games.

7        Later in the Court of Appeals opinion -- I'm now at

8  1151 -- the Court confirmed the interrelated nature of the

9  conspiracy.  The Court said, "The interlocking agreements,

10        which is the pooling agreement, the exclusive

11        agreement between the NFL and Sunday Ticket and the

12        network contracts that we're here for today -- those

13        interlocking agreements" -- and I'm quoting -- "limit

14        the amount of televised professional football that

15        one team may televise."  And they are -- and quoting

16        again -- "the exact type of arrangement that the

17        Supreme Court held caused an injury to competition in

18        the context of college football."

19        And these conclusions, Your Honor, are all fours with

20  allegations that Plaintiffs have made in their complaint.  At

21  Paragraph 10, we allege that the network contracts plus the

22  pooling agreements plus the exclusive Sunday Ticket deal

23  "results in the blackout or unavailability of out-of-market

24  games except through the bundle of NFL DirecTV Sunday Ticket

25  package."

1          At Paragraph 11, we described how the agreements work

2     in concert.  "The agreements allow the Defendants -- NFL

3          Defendants and the clubs to restrict the output of

4          and raise the prices for the live broadcasts of NFL

5          Sunday afternoon out-of-market games."

6          Again, at Paragraphs 84 to 87, we detailed the entire

7     ecosystem of football broadcasts and how the NFL conspires with

8     CBS, Fox, NBC and ESPN to restrict the overall output of live,

9     out-of-market football telecasts and thereby raise the prices

10    for those telecasts harming consumers.

11         In short, Your Honor, this is a conspiracy case under

12    The Sherman Act.  We're now beyond the motion to dismiss stage.

13    The operative complaint and the Ninth Circuit's opinion confirm

14    that these network contracts are a key component of that

15    conspiracy.  The network contracts that the NFL has produced

16    with significant redactions are, therefore, directly and

17    immediately relevant to Plaintiffs' antitrust claims and the

18    NFL Defendants have offered no valid justification for their

19    redactions nor could they.

20         At this point, Your Honor, what I'd like to do is

21    just explain in perhaps a little bit more detail exactly why

22    each network contract is relevant to Plaintiffs' antitrust

23    claims.  And, again, in doing so, it's important to remember

24    that the antitrust conspiracy that Plaintiffs have alleged is

25    that these sets of interrelated agreements work together to

1    restrict the ability of the networks and others to compete

2    against the Sunday Ticket package.

3          So, for example, in the NFL's agreements with CBS and

4    Fox, there are contractual terms that limit --

5          **MR. BARBER:**  Your Honor, I apologize for

6    interrupting.  I did want to protect the sealed nature of some

7    of those provisions.  I don't know if Mr. Trainer is planning

8    to get into the specifics of the agreements but, for example,

9    we have counsel on for four of the network partners and the

10   contracts for each network partner are not shared with the

11   other partners.

12         And so I believe we raised this with your courtroom

13   deputy and they said there was the potential for breakout rooms

14   if Mr. Trainer wanted to raise allegations specific to specific

15   contracts and that way, we can avoid disclosing that

16   information with the other network partners.

17         **THE CLERK:**  As long as they agree, I can --

18         **MR. TRAINER:**  Judge McDermott, I'm happy to do

19   whatever the Court suggests.  I think if it is okay with

20   Mr. Barber, I plan only to discuss the contracts in more

21   general terms and if we do need to discuss any particular

22   provisions in more detail, then I can pause before doing so and

23   warn the Court or warn the third parties who are in attendance.

24         **THE COURT:**  Is that acceptable, Mr. Gore -- Barber?

25         **MR. BARBER:**  I -- to the extent that Mr. Trainer is

1   planning to discuss anything that was sealed in the motion and

2   the joint stipulation or in any of the exhibits and that we

3   would request that those discussions be held in breakout rooms

4   but to the extent he's planning to discuss things that were not

5   sealed in those motions, I think -- but I think ultimately if

6   he's getting into specific contracts -- contractual provisions

7   in any of these network agreements, I think it would be

8   inappropriate to have those discussions in front of the other

9   network partners.

10          **THE COURT:**  Can you make your argument without going

11   into the redacted provisions?

12          **MR. TRAINER:**  Well, I'm not sure if I can make it as

13   successfully as with the contract provisions.  The exercise

14   that Plaintiffs would like to go through is to demonstrate to

15   the Court particular provisions that contribute to the

16   antitrust conspiracy that Plaintiffs have alleged.

17          Now, taking a step back, it's important to remember

18   that we're here seeking documents from the NFL Defendants.

19   Unlike Mr. Finn's case -- or the motion under 377 where there

20   is a third-party being subpoenaed, here we're seeking

21   discoverable material from the party Defendants.  There is no

22   issue in this case with burden or undue burden or expenses or

23   things like that.

24          The Plaintiffs' position is that we should be given

25   these materials un-redacted immediately because they're crucial

```
 1   to -- a crucial component of the antitrust conspiracy that
 2   Plaintiffs have alleged and the NFL Defendants have offered no
 3   justification for their redaction.
 4           Now, it still, I think, would benefit the Court if
 5   the Plaintiffs could go in a little bit more detail about how
 6   both un-redacted provisions in the contracts that were produced
 7   to Plaintiffs and un -- or -- and redacted provisions that have
 8   been hidden from Plaintiffs likely contribute to the antitrust
 9   conspiracy as Plaintiffs have alleged it.
10           So if the Court thinks it would be better to discuss
11   in a little bit more detail the nature of these contracts and
12   how they work in concert to restrict the output of football
13   games, then I do think it would be better, per Mr. Barber's
14   suggestion, to have a breakout room and send the third parties
15   to that breakout room while we discuss them.
16           THE CLERK:  Let me know.  Would you like to do that
17   at this time?
18           THE COURT:  Well, we're right in the middle of his
19   argument.  Yes.
20           THE CLERK:  Yes.  Okay.  Well, let me create the
21   breakout rooms.
22           MR. BARBER:  And, Your Honor, I hate to further
23   complicate things.  And so I think the request would be to the
24   extent that Mr. Trainer, when he's speaking about provisions
25   from, say, the CBS contract, I think it would be appropriate
```

14

1   for CBS' counsel Mr. Buchweitz to be present for those

2   conversations and similar for conversations regarding Fox, NBC

3   and ESPN.

4           What I would propose, if Mr. Trainer is comfortable,

5   is if we try to move forward with the argument without getting

6   into the particulars and then to the extent the Court is -- has

7   questions that get into the particular provisions of any

8   particular contract, we can handle breakout rooms perhaps at

9   the end.

10          From the NFL Defendants' perspective, we don't think

11  it is -- we don't believe that it's necessary to get into the

12  particular contractual provisions as part of this argument.

13          **THE COURT:**  Mr. Trainer, I'm inclined to agree.

14          **MR. TRAINER:**  Then I'll follow the Court's direction

15  and I think that's a good idea from Mr. Barber.

16          **THE COURT:**  Proceed.

17          **THE CLERK:**  So what are we --

18          **THE COURT:**  We're going to do general contractual

19  provisions but not the redacted provisions that are at issue at

20  the beginning and if there's a necessity to go into a specific

21  network's contract, we'll do breakout rooms at that time.

22          But you can proceed with your general argument,

23  Mr. Trainer.

24          **THE CLERK:**  Okay.  Well, the breakout room -- thank

25  you, Your Honor.  The breakout room has been created.

1        **THE COURT:**  We're not doing breakout rooms right now.

2        **THE CLERK:**  I understand.  I just want the parties to

3   know that it has been created and you can place yourself over

4   there when need be.

5        **THE COURT:**  Okay.  Mr. Trainer, proceed.

6        **MR. TRAINER:**  Sure.  Thank you, Judge McDermott.  So

7   the -- in general terms, the contours of the Plaintiffs'

8   argument in this case is just what I said at the outset.  This

9   is a conspiracy case under The Sherman Act.  We're now beyond

10  the motion to dismiss stage.  We're fulling into robust

11  discovery.  The operative complaint and the Ninth Circuit's

12  opinion confirm that these network contracts are a key

13  component of that conspiracy.

14       The network contracts, therefore, are directly and

15  immediately relevant to Plaintiffs' antitrust claim.  Indeed,

16  the network contracts are the conspiracy.  The network

17  contracts form an important leg of a set of interrelated

18  agreements that allow the NFL Defendants to restrict the output

19  of football games and thereby raise the prices of those games

20  harming consumers.

21       The NFL Defendants have offered no valid

22  justification for those redactions nor could they.  And I think

23  at this point, Your Honor, I should point out, too, that I'm

24  somewhat in agreement with Mr. Barber.  That is, I think that

25  it's not necessary to discuss provision by provision the

1   details of these contracts but I think we come at in exactly

2   different ways.

3          We don't need to discuss these contracts provision by

4   provision because they are central components to the conspiracy

5   that Plaintiffs have alleged violate the antitrust laws.  Our

6   complaint lays that out in detail.  The Ninth Circuit

7   recognized that.  So at this point, Your Honor, that's the

8   general form of the position of the Plaintiffs.  And I would be

9   happy to answer any questions in general or about the contracts

10  specifically.

11         **THE COURT:**  All right.  We should go to Mr. Barber

12  now.

13         **MR. BARBER:**  Thank you, Your Honor, and good morning.

14  I have a number of points I want to make and then I'm, of

15  course, happy to answer any questions Your Honor might have.

16         First, I think it's worth stressing that the

17  contracts that are at issue in the particular motion to compel

18  are among the most important contracts in all of sports

19  broadcasting, if not all of broadcasting.  The declarations

20  that we've attached to the joint stipulation from the network

21  partners detail how sensitive these contracts are.

22         In some instances, they talked about keeping these

23  contracts under lock and key within their own businesses and

24  limiting who within their own company has access to this

25  information.  Defendants do not dispute that these are

1   incredibly sensitive and important contracts.

2          Second, Plaintiffs claim in their joint stipulation

3   that these contracts with these network partners are the heart

4   of this litigation.  They made similar claims during oral

5   argument today.  And in their joint -- in their supplemental

6   memorandum, they claimed that this case is more broadly about

7   the ecosystem of restraints surrounding the distribution of

8   live professional football.

9          I think that certainly overstates things.  This is a

10  putative class action filed by the class.  The alleged class is

11  DirecTV subscribers that purchased NFL Sunday Ticket which

12  offers only out-of-market regular-season NFL games.  And those

13  contracts with DirecTV have been produced without any

14  redactions in their entirety.  So the contracts that are at the

15  heart of this litigation have been produced in un-redacted

16  fashion.

17          Mr. -- my colleague referenced the Ninth Circuit

18  decision.  I think the Ninth Circuit decision makes clear that

19  the agreements that aren't under attack in Plaintiffs'

20  complaint are the agreements between the NFL clubs and the

21  league and then the contract between the league and DirecTV and

22  not the contracts with the network partners.

23          So, for example, on Page -- Pin Cite 1144, the Court

24  references the challenged arrangements between the NFL teams,

25  the NFL and DirecTV and doesn't mention the -- any of the

1  network partners.  On Pin Cite Page 1149, the Court of Appeals,

2  when talking about the interlocking agreements that Mr. Trainer

3  was referencing, specifically noted that the complaint alleges

4  that absent the NI competitive agreements between the teams and

5  the league and the league and DirecTV that that is the heart of

6  what they are claiming is the antitrust violations in this

7  case.

8          And to be clear, the network agreements are protected

9  from antitrust scrutiny by The Sports Broadcasting Act.  And so

10 it cannot be that Plaintiffs are challenging the legality of

11 those.  They are not raised in their complaint and they're not

12 -- wouldn't be permitted to do so in any event.  Certainly,

13 these network partners are non-parties to this litigation.

14         Third, I think Plaintiffs, in their joint

15 stipulation, argued that the redactions like the one that the

16 NFL Defendants made in consultation with its network partners

17 are manifestly improper and contrary to law.  And that was

18 incorrect.  There's certainly case law supporting the types of

19 redactions that have occurred in this case and we've cited them

20 on Pages 17 through 19 of the joint stipulation.

21         And in their supplemental memorandum, Plaintiffs

22 tempered their claim and now that they are -- now they only

23 argue that these types of redactions are disfavored and may be

24 appropriate in rare cases.

25         And given the importance of the contractual

provisions at issue in this case and the lack of relevance to

Plaintiffs' claims, this is exactly the type of case where

these types of redactions are appropriate.

     And just -- it's worth flagging, I think, that

Plaintiffs initially took the position -- and I think they took

the position just now during oral argument that they would not

agree to any redactions whatsoever, that they're seeking these

contracts being produced entirely un-redacted.  But in their

supplemental memorandum at Footnote 2 on Page 3, they agreed

that at least some redactions would be appropriate.

     Additionally, the network partners here undeniably

have an interest in these contracts and whether they're

produced and in what form.  The Plaintiffs certainly indicated

that earlier when we first met and conferred with them.  They

are part of this oral argument.  I don't think it can be

disputed that they have an interest in whether these

contractual provisions are produced.

     And, lastly, it is undisputed that Plaintiffs did not

meet and confer with these network partners appropriately in

order to see if an agreement could be reached that would

satisfy all parties and would prevent this Court from having to

weigh in on the relevancy of particular provisions on very

lengthy contracts.

     First, I'll point that there was a Court-ordered

stipulation signed by Your Honor on December 1st, 2016 that set

1   forth a specific protocol for Plaintiffs to negotiate with CBS

2   and Fox about the scope of any redactions to the network

3   agreements that were produced.  Plaintiffs in this case did not

4   comply with those protocols and have not claimed any -- have

5   not claimed otherwise.

6          They do claim that that stipulation is no longer in

7   effect but the NFL Defendants would point out that the order

8   that Your Honor signed adopting the stipulation remains on the

9   docket and has no sunset provision.  But even if Plaintiffs

10  were correct that the stipulation reached in 2016 about how to

11  handle redactions to these network agreements were not in

12  effect, the better course is certainly that Plaintiffs at least

13  meet and confer with the network partners.

14         Here Plaintiffs have not done so and they admit as

15  much in their supplemental memorandum at Page 5.  We set up a

16  call and initially Plaintiffs said that they invited the

17  network partners -- they would be comfortable with the network

18  partners joining but because of confidentiality issues, we

19  couldn't have -- we needed to have individualized conversations

20  with each network.

21         So representatives for Fox appeared at the first

22  meet-and-confer, made clear that they understood Plaintiffs'

23  position and planned to get back them.  Fox did get back to

24  Plaintiffs on November 22nd, I believe, and Plaintiffs did not

25  respond to those outreach efforts and instead moved to file the

1    joint stipulation.

2            CBS -- as was made clear by -- during the meet-and-

3    confer, CBS, once they were in receipt of Plaintiffs' letter,

4    voluntarily made changes to the redactions and we served those

5    on Plaintiffs.  Plaintiffs never raised any questions, never

6    offered or never agreed to meet and confer with CBS or any of

7    the other network partners at that point.  Instead, they rushed

8    headlong into filing this joint stipulation.

9            What we would request is that the Court deny the

10   current motion and order the parties and the network partners

11   to actually meet and confer on the issues that are -- on the

12   issue of this motion to compel.  I will say we have -- the NFL

13   has had a good relationship with Plaintiffs thus far.  We've

14   been able to work through many of our disputes without having

15   to involve the Court on most issues.  There's only been one

16   previous motion to compel.

17           I'm optimistic that if we were able to meet and

18   confer with Plaintiffs and the network partners that we would

19   at least be able to narrow the issues if not resolve them

20   altogether.  The procedures spelled out in the Court-ordered

21   stipulation have worked in other cases.  They would work here

22   and they provide for very tight timeframes for the parties to

23   work through these things but the steps have not been taken in

24   this case.

25           And so ultimately, Your Honor, our hope is that the

1   parties can work together and avoid involving the Court further

2   but at a minimum, we hope to -- by requiring -- by denying the

3   motion and requiring the parties to meet and confer further,

4   that will at a minimum reduce the issues in dispute and it will

5   minimize this Court's involvement and so -- and focus on

6   whatever remaining issues there might be.  But we are

7   optimistic that we can resolve this without Your Honor having

8   to weigh in to particular contractual provisions.  Thank you,

9   Your Honor.

10          **THE COURT:**  All right.  Some questions.  Am I

11  correct, Mr. Barber, that your contention is that only

12  irrelevant and nonresponsive information has been redacted or

13  put another way, nothing that was redacted is responsive?

14          **MR. BARBER:**  That -- when we served the documents,

15  our goal was to work with the network partners to redact that

16  information that was nonresponsive or non-relevant.  To the

17  extent that Plaintiffs claim that some of the information is

18  relevant, well, the proper course would be to meet and confer

19  with the network partners and the NFL to have discussions about

20  those particular points.

21          **THE COURT:**  All right.

22          **MR. BARBER:**  For example, Plaintiffs spent a number

23  of pages in their supplemental memorandum spelling out why they

24  think certain redacted provisions are relevant.  Those claims

25  have never been made to the NFL Defendants or the network

1   partners and so we haven't had a chance to work through whether

2   we would agree that given Plaintiffs' arguments that those

3   provisions could be un-redacted.

4          And so I expect that if there were further meet-and-

5   confers that the parties would reach compromise.  Presumably,

6   Plaintiffs would agree as they did in Footnote 2 that some

7   provisions are not responsive and the network partners and the

8   NFL Defendants may agree that some currently redacted

9   provisions should be un-redacted because they are relevant to

10  the case.

11         But the first instance, the parties should be able to

12  discuss that amongst ourselves before we raise the issue to

13  Your Honor.

14         **THE COURT:**  Am I also correct that the redactions are

15  those that the third parties made?

16         **MR. BARBER:**  Yes, Your Honor.  The NFL Defendants

17  worked with each of the -- its network partners and each of

18  them are uniquely situated and so the redactions were made at

19  the request of the network partners.

20         **THE COURT:**  Am I correct that whatever the networks

21  were willing to disclose is okay by the NFL?

22         **MR. BARBER:**  Thus far, that has been the case.  I

23  can't imagine --

24         **THE COURT:**  You're not making any independent claim?

25         **MR. BARBER:**  I don't imagine that would be the case.

24

1   I think thus far, we have been comfortable with all of the

2   un-redactions that the network partners were comfortable with

3   and I fully suspect that would be the case going forward.

4        **THE COURT:**  Now, the Plaintiff is disadvantaged by

5   not having seen the agreements.  So it's hard to make any

6   decisions or contentions on their part as to whether something

7   is relevant and responsive which I take it the Defendants would

8   produce if they were convinced it was relevant and responsive,

9   correct?

10        **MR. BARBER:**  I believe so, Your Honor.  I think we'd

11   have to have conversations with the network partners about the

12   specific provisions but, yes, to the extent that the network

13   partners were comfortable, we would certainly produce it.

14        To address the underlying point that Your Honor made

15   about Plaintiffs being disadvantaged, I don't believe that is

16   true.  The un-redact -- the redactions would not -- I don't

17   believe redacted any of the headers.  So it was very clear what

18   the general subject matter in that provision was.

19        **THE COURT:**  But they haven't seen the actual redacted

20   provisions?

21        **MR. BARBER:**  No, they haven't.  And under the -- no,

22   they have not seen the specific language exactly, Your Honor.

23        **THE COURT:**  Well, as you know from the prior motion,

24   I disfavor all-or-nothing rulings that make it impossible to

25   separate out things that matter from things that don't.  The

1  case law doesn't resolve anything definitively here.  There

2  aren't any definitive Ninth Circuit rulings on the various

3  considerations that go into deciding whether to require

4  disclosure or not.

5  There are District Court decisions that disfavor

6  redactions if it's in the context of a motion to compel but

7  more forgiving of redactions if it comes in the form of a

8  motion for protective order and the information is, in fact, of

9  truly commercially sensitive material.

10  The Court takes guidance though from the cases that

11  talk about the inappropriateness of a Defendant in unilaterally

12  deciding what's relevant or not.  I mean, if we were dealing

13  with attorney-client privileged material, a party would be

14  required to produce a privilege log with sufficient information

15  to enable the requesting party to make a determination as to

16  whether the redaction or withholding of the information would

17  be appropriate.

18  And I kind of go down that same path here and along

19  the lines that Mr. Barber has outlined which is there ought to

20  be more meet-and-confer here with some way of bridging the

21  information that would be necessary to determine whether we're

22  dealing with irrelevant, nonresponsive material or generalized

23  context material as opposed to something that's really

24  important.

25  And that seems to me to be something that could be

1   addressed in the form of a meet-and-confer with the networks

2   present who have not had their say in this apparently.  But

3   there has to be some way of providing sufficient information to

4   the Plaintiffs for the Plaintiffs to be able to make informed

5   judgments as to what they care about and what they don't.

6         **MR. BARBER:**  Your Honor, I apologize.  I certainly

7   didn't mean to interrupt, Your Honor.  If I could briefly make

8   one point.  The stipulated order that dealt with redactions in

9   the network agreements with regard to CBS and Fox, at least, in

10   Paragraph 2 adopted a procedure that I think addresses Your

11   Honor's concerns.

12         It says specifically that CBS and Fox have agreed to

13   provide Plaintiffs separately a reasonable identification of

14   the subject matter of each redaction if not apparent from the

15   face of the redacted document.  To this date, Plaintiffs have

16   not requested any clarification from the NFL Defendants or the

17   network partners but I'm sure in future meet-and-confers if

18   they did request verification, we'd be happy to provide that.

19         **THE COURT:**  I'm not sure that's sufficient.  I was

20   thinking something more like either a privilege log as you

21   would prepare for attorney-client privileged information or a

22   procedure I've used on several occasions that seem to work

23   effectively which is the parties agree on one person in the --

24   among Plaintiffs' counsel who would actually see the redacted

25   material but only one and only under circumstances where it

1    would be carefully monitored.  I don't want to -- I'm not going

2    to require it.

3          But I think the parties ought to have a discussion

4    about how to move forward here in a way that allows us to slice

5    and dice.  There's got to be some of the provisions here that

6    Plaintiffs would agree are not relevant or responsive.  And I

7    want to get away from an all-or-nothing approach and enable us

8    to deal with the provisions on a one-to-one basis that also

9    gives the networks an opportunity to have their say as well.

10         So what I'm going to order here is that the motion

11   will be continued until the parties meet and confer on how to

12   proceed with assessing the provisions in the network agreements

13   that have been redacted and respond back to the Court within

14   two weeks.

15         **MR. TRAINER:**  Your Honor, may I ask one question?

16         **THE COURT:**  Go ahead.

17         **MR. TRAINER:**  It seems -- Your Honor may not need it

18   at this point but it, I think, would be helpful at least from

19   Plaintiffs' perspective if we could discuss in some detail the

20   provisions of these contracts to demonstrate not only that the

21   redactions imposed on the contracts are significant but even

22   when comparing contract to contract, Fox to CBS to NBC to ESPN,

23   they're vastly different.

24         So in some cases, one thing is redacted in one and

25   the same thing -- and I can't be specific at this point -- it's

1    not redacted in the other.

2         **THE COURT:**  Well, I understand that.  Each of the

3    networks feels differently about its own material.  The fact

4    that there are differences doesn't surprise me but I don't

5    think that has anything -- I don't think that has much to do

6    with meeting and conferring to see what you can come up with

7    here.

8         **MR. TRAINER:**  Would it be possible, Your Honor, if

9    for -- as Your Honor suggested, for the NFL Defendants to

10   produce under an attorneys'-only provision all of the

11   un-redacted versions of the contract so that we as the

12   Plaintiffs can make an assessment as to the relevancy or

13   irrelevancy of particular provisions?

14        **THE COURT:**  Well, I think what I -- you're either

15   going to have to proceed by a privilege log or by the approach

16   that I outlined of one person to review all of the agreements

17   un-redacted but I'm not requiring or ordering anything today

18   other than to have the parties go and meet and confer and see

19   if they can work out a process that will allow the Plaintiffs

20   to make more specific assessments of what, in fact, is relevant

21   and responsive, if anything.

22        I'm assuming, Mr. Trainer, that if you look at these

23   provisions and you find that none of them are relevant or

24   responsive, you're going to say, okay, there's nothing more to

25   be done.  Right?

 1          **MR. TRAINER:**  That's true if that were the case but

 2     we can see, for example, from the headings of particularly

 3     redacted provisions that the redacted provisions are central to

 4     Plaintiffs' case.  Again --

 5          **THE COURT:**  And I want -- and you're going to -- you

 6     are going to be able to make that argument to the Defendants

 7     and to the networks.

 8          **MR. TRAINER:**  Sure.  And with respect, Your Honor, we

 9     already have.  The substantial completion --

10          **THE COURT:**  Well, I'm not aware that you've had

11     extensive discussions with the networks over the redactions in

12     question here.

13          **MR. TRAINER:**  And --

14          **THE COURT:**  You've made a -- well, go ahead.

15          **MR. TRAINER:**  Sure.  So we met and conferred on

16     November 18th, so now almost two months ago, regarding the

17     network redactions in these contracts.  We did invite each of

18     the networks to participate.  Fox -- counsel for Fox, in fact,

19     did participate in this meet-and-confer.  It is true that we

20     were unable to resolve all of our differences but that, of

21     course, sometimes happens in discovery disputes and we need the

22     Court to be involved to resolve them.

23          The point that we made clear in our meet-and-confer

24     and we made clear today and in our papers is that we believe

25     that no redactions in these contracts is appropriate because

1  the contracts form a crucial component of the conspiracy that

2  Plaintiffs allege violate the antitrust laws.

3          And it could be the case that at some future date,

4  that's not going to be case but at least in discovery after we

5  survive the motion to dismiss, the Plaintiffs are entitled to

6  proceed under this theory that the network contracts form a

7  crucial component of the conspiracy and if they do so, then we

8  should be able to see these contracts un-redacted.

9          **THE COURT:**  Mr. Barber, do you have anything to add?

10         **MR. BARBER:**  Your Honor, first of all, we're very

11  comfortable proceeding the way Your Honor has suggested working

12  with Plaintiffs to come up with a process to handle this issue.

13         I would just correct for the record Mr. Trainer -- or

14  supplement the record to clarify that Plaintiffs have not yet

15  conferred with any network partner other than Fox.  Fox joined

16  the meet-and-confer on November 18th, heard Plaintiffs out and

17  then got back to them on November 22nd and asked for further

18  conversations and Plaintiffs did not respond to that.

19         I believe there's been outreach from the other

20  network partners with Plaintiffs and, again, there hasn't been

21  any response from Plaintiffs.  So we do agree with Your Honor

22  that at this point, the best course is to have the substantial

23  meet-and-confers and (indisc.) once we've done that.

24         **THE COURT:**  I think that's the appropriate thing to

25  do here.  I mean, I'm not satisfied that the meet-and-confer

1   was completed or that nothing can be accomplished by having

2   further meet-and-confers.

3           So I'm going to stick with the ruling I indicated,

4   that the parties are to meet and confer about a process by

5   which Plaintiffs can get greater information as to the

6   information contained in the disputed redactions so that we can

7   narrow down what's really in dispute here.

8           **MR. TRAINER:**  That sounds good from Plaintiffs'

9   perspective, Your Honor.

10          **THE COURT:**  All right.  So we're all in agreement

11  then.

12          **MR. TRAINER:**  And I may have misheard you before but

13  I -- did you say that we should report back to Your Honor in

14  one week?

15          **THE COURT:**  Two weeks.

16          **MR. TRAINER:**  Two weeks.

17          **THE COURT:**  I'm taking into account that you're

18  spread all over the universe and very busy and you'll need time

19  to have discussions.  So I'm going to make it two weeks and you

20  come back to me with a proposed order if you can.

21          **MR. TRAINER:**  Thank you.

22          **THE COURT:**  So the Court is not making any rulings on

23  the substance of the motion, only that the motion is continued

24  until after the parties get back to the Court with a report on

25  their meet-and-confer efforts.

1              **THE CLERK:**  Your Honor?

2              **THE COURT:**  Yes.

3              **THE CLERK:**  Would you like them to respond in two

4     weeks via a joint status report --

5              **THE COURT:**  Well --

6              **THE CLERK:**  -- and attaching a proposed order or how

7     would you like for them to file a response?

8              **THE COURT:**  A joint status report is fine with,

9     hopefully, an attached proposed order -- stipulated proposed

10    order.  If they don't agree, then presumably they'll make clear

11    what issues are still dividing them.  But, hopefully, they'll

12    make some progress.

13             **THE CLERK:**  Thank you.

14             **MR. TRAINER:**  Thank you, Your Honor.

15             **MR. BARBER:**  Thank you, Your Honor.

16             **THE CLERK:**  Court is adjourned.  Thank you, everyone,

17    for your cooperation.  Have a great day.

18        **(Proceeding adjourned at 11:38 a.m.)**

19

20

21

22

23

24

25

<u>**CERTIFICATION**</u>

    I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>January 14, 2022</u>

       Signed                                          Dated


*TONI HUDSON, TRANSCRIBER*