Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668−PSG (JEMx) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>JUDGE: Hon. Philip S. Gutierrez<br>DATE: December 16, 2022<br>TIME: 1:30 p.m.<br>COURTROOM:<br>    First Street Courthouse<br>    350 West 1st Street<br>    Courtroom 6A<br>    Los Angeles, CA 90012 |

# REDACTED VERSION OF DOCUMENT

# PROPOSED TO BE FILED UNDER SEAL

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................... 2

LEGAL STANDARD ............................................................................................ 6

ARGUMENT ......................................................................................................... 7

I.     PLAINTIFFS SATISFY THE PREREQUISITES OF RULE 23(a). ............. 7

       A.     The Proposed Classes are Sufficiently Numerous. ............................... 7

       B.     Common Questions of Fact and Law Exist. .......................................... 8

       C.     Plaintiffs' Claims Are Typical of Class Members' Claims. .................. 8

       D.     The Classes are Adequately Represented by Plaintiffs and Counsel. ................................................................................................. 9

       E.     The Identity of Proposed Class Members Need Not Be Known At The Time of Certification. .................................................. 10

II.    PLAINTIFFS SATISFY THE REQUIREMENTS FOR A DAMAGES CLASS PURSUANT TO RULE 23(b)(3). ............................... 11

       A.     Common Questions Predominate Over Any Individual Issues. .................................................................................................. 11

              1.     Common Issues Regarding the Antitrust Violation Predominate. .......................................................................... 13

              2.     Common Issues Regarding Antitrust Impact Predominate. .......................................................................... 15

              3.     Damages Can Be Determined on a Classwide Basis. ............. 17

       B.     A Class Action is Superior to Other Methods of Adjudication. ...................................................................................... 21

III.   PLAINTIFFS SATISFY THE REQUIREMENTS FOR AN INJUNCTIVE RELIEF CLASS PURSUANT TO RULE 23(b)(2). ............ 22

CONCLUSION .................................................................................................... 24

i

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

5

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................12

6

7

*Amgen Inc. v. Conn. Retirement Plans & Trust Funds*,
    568 U.S. 455 (2013) ...........................................................11, 12

8

9

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017)..................................................10

10

*Brown v. DirecTV, LLC*,
    562 F. Supp. 3d 590 (C.D. Cal. 2021)......................................11

11

12

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990) ..................................................................7

13

14

*Castillo v. Bank of Am., NA*,
    980 F.3d 723 (9th Cir. 2020)......................................................8

15

16

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ..................................................................17

17

18

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*,
    24 F.4th 1262 (9th Cir. 2022)...................................................23

19

20

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
    2015 WL 4776932 (C.D. Cal. May 27, 2015)............................8

21

22

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972) ..................................................................7

23

*Hilsley v. Ocean Spray Cranberries, Inc.*,
    2018 WL 6300479 (S.D. Cal. Nov. 29, 2018)..........................11

24

25

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
    276 F.R.D. 364 (C.D. Cal. 2011) .............................................12

26

27

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606 (N.D. Cal. 2015) ...............................................7

28

*In re Glumetza Antitrust Litig.*,
  336 F.R.D. 468 (N.D. Cal. 2020) ................................................................. 13, 15

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...................................................... 13, 22

*In re Korean Ramen Antitrust Litig.*,
  2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ............................................... 17, 23

*In re NFL's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ................................................................... *passim*

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) ................................................................. 7

*In re Polyester Staple Antitrust Litig.*,
  2007 WL 2111380 (W.D.N.C. July 19, 2007) .................................................. 9

*In re Silver Wheaton Corp. Secs. Litig.*,
  2017 WL 2039171 (C.D. Cal. May 11, 2017) .................................................. 7

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) ................................................................... 23

*In re Sunday Ticket*,
  933 F.3d at 1146–47 ........................................................................................ 4

*In re Tableware Antitrust Litig.*,
  241 F.R.D. 644 (N.D. Cal. 2007) ..................................................................... 7

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010), *amended in part*, 2011 WL
  3268649 (July 28, 2011) ............................................................................. 9, 23

*Lambert v. Nutraceutical Corp.*,
  870 F.3d 1170 (9th Cir. 2017) ....................................................................... 17

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978) ...................................................................................... 16

*NCAA v. Board of Regents of University of Oklahoma*,
  468 U.S. 85 (1984) ..................................................................................... 5, 18

*Nguyen v. Nissan N. Am., Inc.*,
  932 F.3d 811 (9th Cir. 2019) ......................................................................... 18

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016) ................................................................ 10

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) (petition for certiorari
  pending) ................................................................................................*passim*

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) .................................................................... 23

*Rannis v. Recchia*,
  380 F. App'x 646 (9th Cir. 2010) ................................................................ 8

*Stockwell v. City & Cnty. of San Francisco*,
  749 F.3d 1107 (9th Cir. 2014) .................................................................. 12

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931) ................................................................................. 17

*Tawfilis v. Allergan, Inc.*,
  2017 WL 3084275 (C.D. Cal. June 26, 2017) ..................................... 8, 9, 10

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives &
  Composites, Inc.*,
  209 F.R.D. 159 (C.D. Cal. 2002) .............................................................. 9, 12

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ................................................................. 6, 11

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ................................................................................. 11

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) .................................................................. 18

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................. 23

*Walker v. Life Ins. Co. of the Sw.*,
  953 F.3d 624 (9th Cir. 2020) .................................................................... 12

*Wortman v. Air New Zealand*,
  326 F.R.D. 549 (N.D. Cal. 2018) .............................................................. 12

**Statutes**

Sherman Act Sections 1 and 2 ................................................................*passim*

Sports Broadcasting Act of 1961 ......................................................... 18

**Rules**

Fed. R. Civ. P. 23 ................................................................................ 6

Fed. R. Civ. P. 23(a) ................................................................... 6, 7, 22

Fed. R. Civ. P. 23(a)(1) ....................................................................... 7

Fed. R. Civ. P. 23(a)(4) ....................................................................... 9

Fed. R. Civ. P. 23(b) ........................................................................... 6

Fed. R. Civ. P. 23(b)(2) ................................................................*passim*

Fed. R. Civ. P. 23(b)(2) ..................................................................... 23

Fed. R. Civ. P. 23(b)(3) ................................................................*passim*

Fed. R. Civ. P. 23(b)(3)(A)-(D) ........................................................ 21

Fed. R. Civ. P. 23(g) ........................................................................... 9

Fed. R. Civ. P. 23(g) ......................................................................... 24

Fed. R. Civ. P. 27 ............................................................................. 23

## **INTRODUCTION**

Courts have recognized for many years that antitrust actions are well-suited for class certification. This case—which arises out of a closely-related set of interlocking anticompetitive agreements that had the purpose and effect of limiting live telecasts of NFL football games and raising the prices paid for the NFL Sunday Ticket package—is no exception. Indeed, *all* the central issues in this litigation rest on common questions with common answers. The definition of the relevant geographic and product markets, the NFL Defendants' market power, the terms of these agreements, the anticompetitive effects of the challenged contractual restraints, and any of the NFL Defendants' claimed procompetitive justifications for those restraints are all common issues whose resolution will not vary from one class member to another.

Plaintiffs seek to certify two classes: one comprised of residential subscribers to DirecTV that purchased the NFL Sunday Ticket package since June 17, 2011, and one of commercial subscribers that bought the package during this same period.[1] The members of each class seek common relief. All seek to recover the amounts they overpaid for the NFL Sunday Ticket package—a product subject to the same restraints and that was sold at standardized prices. Although it is well settled that variations in damages among class members do not defeat class certification, the determination of the amount of overcharges each class member suffered here is readily resolvable on a classwide basis through a formulaic method of economic proof applicable to all class members. In this case, Plaintiffs will offer proof that all class members suffered injury in fact and were damaged as a result of the challenged restraints.

---

[1] The term "subscribers" refers to DirecTV's satellite subscribers. Purchasers of the NFLST.tv streaming service are not DirecTV satellite subscribers and are therefore not part of either class.

1

Plaintiffs also seek a declaratory judgment that the NFL Defendants' conduct violates the Sherman Act and an injunction restraining enforcement of these restraints that have dramatically limited competition for the licensing and sale of NFL football telecasts. This judgment and injunction will necessarily apply to all class members because the issues at the heart of this case revolve around the conduct of the NFL Defendants and are common to all class members.

## BACKGROUND

Plaintiffs' antitrust case—brought pursuant to Sections 1 and 2 of the Sherman Act—arises out of explicit intertwined agreements that restrain competition between the NFL, its 32 member clubs, the NFL's television network broadcast company partners, and DirecTV in the output of telecasts of Sunday daytime football games.[2] These restraints force any consumer who wishes to watch a Sunday afternoon "out-of-market" NFL game to purchase DirecTV's Sunday Ticket package, which includes all "out-of-market" games.[3] The conspiracy makes DirecTV the *exclusive* distributor of these "out-of-market" telecasts in the United States.

As the Ninth Circuit recognized in this case, this conspiracy involves a series of interlocking agreements between and among the NFL teams, the NFL, DirecTV, and the network television broadcasters of "in market" NFL games, including CBS and Fox. First, all NFL member clubs—each of which is an "'independently

---

[2] A more detailed recitation of Plaintiffs' claims can be found in the Ninth Circuit's opinion reversing the initial dismissal of Plaintiffs' consolidated complaint. *See generally In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136 (9th Cir. 2019).

[3] Gore Decl. Ex. 1 ███████████████████████████████████████████████████████████████████████████████████████ ; Gore Decl. Ex. 2 ███████████████.

owned, and independently managed business,'" *In re Sunday Ticket*, 933 F.3d at 1148 (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196 (2010))—have agreed not to compete with each other and the NFL by ceding their broadcasting rights to the NFL.[4] The NFL then sold those pooled rights through a set of agreements designed to limit the output of professional football telecasts.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████.[5] The networks coordinate with each other, DirecTV, and the NFL Defendants to ensure that only two or three (or very occasionally four) telecasts are carried on the local CBS and Fox channels on Sunday afternoons, even though ten to thirteen games are played during this same period. ██████████

██████████████████████████████████████████████████████

██████████████████████████████.[6]

To protect these local telecasts from competition with other NFL telecasts,

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[4] ████████████████████████████████████████████████████. Gore Decl. Ex. 3 ████████████████████████.

[5] *See* Gore Decl. Ex. 4 ████████████████████████████████; Gore Decl. Ex. 5 ████████████.

[6] *See, e.g.*, Gore Decl. Ex. 2 ████████████████████████████████.

[7] *See* Gore Decl. Ex. 2 ████████████████████████████████████████████████████████

3

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ████████████████████

4          That product is Sunday Ticket, which has been available in the United States

5  exclusively through DirecTV since 1994.[9] Because most households subscribe to

6  other pay television services or to no television service at all, DirecTV's exclusivity

7  significantly reduces the number of consumers who can watch out-of-market

8  games.[10] This artificial limitation of the output of telecasts is unique in major

9  American sports. Multiple competing college football telecasts, for example, are

10  carried every Saturday by a host of broadcast and cable channels in addition to

11  internet streaming outlets.[11] *See* Rascher Decl. ¶¶ 114-17; *see also In re Sunday

12  Ticket*, 933 F.3d at 1146–47 (comparing the distribution of NFL telecasts with

13  NCAA college football telecasts). The wide availability of college football game

---

[8] *See* Gore Decl. Ex. 6 ████████████████████████████ ; Gore Decl. Ex. 7 █████████████████████████████████████ .

[9] These limitations do not apply internationally. Anyone outside of the United States where such competition is permitted can obtain access to the games at substantially lower prices. In Canada, for example, games are carried on local channels, Sunday Ticket is available on multiple cable and satellite systems, and the streaming version of Sunday Ticket costs just $79 per year. Rascher Decl. ¶ 269.

[10] *See, e.g.*, Gore Decl. Ex. 8 ████████████████████████████████████████████████████ Gore Decl. Ex. 9 ████████████████████████████████████████████████████████████████████████ .

[11] The major professional sports leagues in the United States also offer subscription services through most pay-television providers and offer internet versions that do not require a television subscription. *See* Rascher Decl. ¶¶ 118-20.

telecasts is a direct result of the Supreme Court's *NCAA v. Board of Regents of University of Oklahoma* decision, which held that the NCAA's restrictions on college football broadcasts violated the Sherman Act. *See generally* 468 U.S. 85 (1984); *see also In re Sunday Ticket*, 933 F.3d at 1146-47, 1151-56 (discussing *NCAA*); Rascher Decl. ¶¶ 108-17.

The interconnected agreements at the heart of the conspiracy are designed to work together to benefit DirecTV, the television broadcast networks, and the NFL Defendants—at the expense of the plaintiff classes.

[12] *See, e.g.*, Gore Decl. Ex. 10

Gore Decl. Ex. 11

[13] *See, e.g.*, Gore Decl. Ex. 2           ; Gore Decl. Ex. 4           ; Gore Decl. Ex. 5

1

2

3

4                 . But for these agreements, the NFL Sunday

5 Ticket package could have been available on a non-exclusive basis to multiple

6 competitors of DirecTV and the NFL teams could have distributed their own

7 competing telecasts, lowering the price that DirecTV could charge for the Sunday

8 Ticket package. In this litigation, the classes seek damages for the overcharges they

9 paid DirecTV for Sunday Ticket, declaratory relief, and an injunction restraining

10 the NFL Defendants from enforcing their anticompetitive agreements.

11 **LEGAL STANDARD**

12       To be certified, a proposed class must satisfy all the prerequisites of Rule

13 23(a) and at least one of the three prongs of Rule 23(b). *See Torres v. Mercer*

14 *Canyons Inc.*, 835 F.3d 1125, 1132 (9th Cir. 2016). Plaintiffs must prove that Rule

15 23's requirements are satisfied by a preponderance of the evidence. *Olean*

16 *Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65

17 (9th Cir. 2022) (en banc) (petition for certiorari pending). Under Rule 23(a),

18 certification is appropriate if: "(1) the class is so numerous that joinder of all

19 members is impracticable; (2) there are questions of law or fact common to the

20 class; (3) the claims or defenses of the representative parties are typical of the

21 claims or defenses of the class; and (4) the representative parties will fairly and

22 adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

23       Plaintiffs seek certification under two prongs of Rule 23(b): an injunctive

24 class pursuant to Rule 23(b)(2) and a damages class pursuant to Rule 23(b)(3). Rule

25 23(b)(2) requires that "the party opposing the class has acted or refused to act on

26

27 [14] *See* Gore Decl. Ex. 12

28

grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## ARGUMENT

"Class actions play an important role in the private enforcement of antitrust actions" and "[c]ourts therefore resolve doubts in these actions in favor of certifying the class." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612 (N.D. Cal. 2015) (internal quotation marks omitted); *see also California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) ("Private enforcement of the [antitrust laws] was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition."). Courts have also long recognized that class actions play a vital role in enforcing the antitrust laws and providing a means to compensate consumers who have been harmed by anticompetitive conduct. *See Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972) (stating that class actions enhance the efficacy of private antitrust actions); *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007) ("The court further notes that class actions play a particularly vital role in the private enforcement of antitrust actions."); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 238 (E.D.N.Y. 1998) ("Antitrust claims are well suited for class actions.").

## I.     PLAINTIFFS SATISFY THE PREREQUISITES OF RULE 23(A).

### A.     The Proposed Classes are Sufficiently Numerous.

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Plaintiffs need only provide a reasonable estimate of the number of class members, *see In re Silver Wheaton Corp. Secs. Litig.*, 2017 WL 2039171, at *6 (C.D. Cal. May 11, 2017), and, generally, "courts find the

numerosity requirement satisfied when a class includes at least 40 members," *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010). The proposed Residential Class includes no fewer than 2.4 million members, Zona Decl. ¶ 28, and the proposed Commercial Class includes no fewer than 48,000 members, *id.*, all of whom are geographically dispersed throughout the country. The proposed classes are plainly sufficiently numerous to render joinder impracticable.

### B.  Common Questions of Fact and Law Exist.

The requirement to show common questions of fact and law is not an onerous one: a single common question will do. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 WL 4776932, at *9 (C.D. Cal. May 27, 2015). "Where an antitrust conspiracy has been alleged," as here, "courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *11 (C.D. Cal. June 26, 2017) (internal quotation marks omitted). Several common questions exist for both classes: the relevant market definitions, whether the NFL possesses market power, whether the defendants entered a conspiracy in restraint of trade, and the extent to which that conspiracy inflicts anticompetitive harm. *See id.*

### C.  Plaintiffs' Claims Are Typical of Class Members' Claims.

Typicality requires that the plaintiffs' claims be typical of the claims of absent class members. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 729 (9th Cir. 2020) (internal quotation marks omitted). "To meet the typicality requirement, plaintiffs must therefore establish that other class members have the same or similar injury as them; the action is based on conduct that is not unique to them as the named plaintiffs; and other class members have been injured by the same course of conduct." *Flo & Eddie*, 2015 WL 4776932, at *9. "In antitrust cases, typicality usually will be established by plaintiffs and all class

members alleging the same antitrust violations by defendants." *Tawfilis*, 2017 WL 3084275, at *8 (internal quotation marks omitted).

Plaintiffs, like all persons in the classes they seek to represent, purchased the NFL Sunday Ticket package, which was sold on a mass-market basis to subscribers across the United States on standardized terms. Plaintiffs and the proposed classes allege the same injuries arising from the NFL Defendants' common course of conduct. Any variations in the amount of damages suffered by a particular class member do not affect whether the plaintiffs' claims are typical because every class member's claim rests on the same violations of the antitrust laws and defendants' common course of conduct. *See Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 165 (C.D. Cal. 2002) (holding that "differences in uses and purchasing practices do not render plaintiffs' claims atypical"). If anything, this case presents a much simpler and easier case for certification than other antitrust class actions involving multiple products sold by multiple suppliers through chains of distribution involving varying pricing methods and strategies that have nonetheless been certified. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 596 (N.D. Cal. 2010) ("Numerous courts have held that variations in products and complexities in a distribution chain do not preclude an estimation of whether an overcharge impacted end users."), *amended in part*, 2011 WL 3268649 (July 28, 2011); *In re Polyester Staple Antitrust Litig.*, 2007 WL 2111380, at *21 (W.D.N.C. July 19, 2007) ("The fact that PSF (once manufactured for the direct purchaser) is not interchangeable across all product types does not warrant a … finding [that the market is not homogenous].").

**D.    The Classes are Adequately Represented by Plaintiffs and Counsel.**

Rules 23(a)(4) and 23(g) require that class representatives and class counsel be capable of fairly and adequately representing the interests of the class. The adequacy inquiry "focuses on (1) whether the named plaintiffs and their counsel

have any conflicts of interest with other class members and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class." *Tawfilis*, 2017 WL 3084275, at *9 (internal quotation marks and brackets omitted).

Plaintiffs—both residential and commercial subscribers—share a common interest "in proving that the Defendants' conduct violated the antitrust laws" and resulted in supracompetitive prices for NFL Sunday Ticket. *See Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 285 (N.D. Cal. 2016). There is no conflict within or between the two proposed classes, all members of which were overcharged. *See, e.g., Tawfilis*, 2017 WL 3084275, at *9 ("If Plaintiffs succeed on the merits, all direct purchasers would benefit from the relief Plaintiffs seek because every direct purchaser could make the same Botox purchases, just at a lower price."). Plaintiffs have produced hundreds of documents, responded to numerous interrogatories and requests for admission, have each been deposed, and have demonstrated their willingness to prosecute the case vigorously. *See generally* Decl. of Gene Lennon; Decl. of Jason Baker; Decl. of Rob Lippincott; Decl. of Jonathan Frantz.

Regarding class counsel, Plaintiffs are represented by highly experienced counsel with an extensive record of success in prosecuting antitrust cases and class actions. *See* accompanying Declarations of Marc M. Seltzer, Howard Langer, and Scott Martin. The Court previously appointed Plaintiffs' counsel to serve as Co-Lead Class Counsel in this case based on these same considerations, *see* Dkt. No. 150, and they have devoted substantial time and resources to prosecuting this case.

**E.    The Identity of Proposed Class Members Need Not Be Known At The Time of Certification.**

The Ninth Circuit does not impose any free-standing ascertainability requirement. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017) (declining to "impose a freestanding administrative feasibility prerequisite to class

certification"); *see also Hilsley v. Ocean Spray Cranberries, Inc.*, 2018 WL 6300479, at *18 n.18 (S.D. Cal. Nov. 29, 2018) ("[T]he Ninth Circuit has declined to adopt an ascertainability and/or administrative feasibility requirement[.]"); *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 602-03 (C.D. Cal. 2021) (affirming that the Ninth Circuit does not impose an administrative feasibility requirement). Regardless, both proposed classes are defined using entirely objective criteria that allows a prospective plaintiff to identify whether he or she belongs to the class, and DirecTV's own records identify every class member in any event.

## II. PLAINTIFFS SATISFY THE REQUIREMENTS FOR A DAMAGES CLASS PURSUANT TO RULE 23(B)(3).

Rule 23(b)(3) permits a class to be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### A. Common Questions Predominate Over Any Individual Issues.

Predominance "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 459 (2013) (emphasis in original); *see also Olean Wholesale Grocery Coop.*, 31 F.4th at 666-67. The rule "does *not* require" that every element of a plaintiffs' claim be susceptible to classwide proof. *Amgen*, 568 U.S. at 469 (emphasis in original). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016) (internal quotation marks omitted); *accord Torres*, 835 F.3d at 1134.

The "purpose of class certification is merely to select the method best suited to adjudication of the controversy fairly and efficiently." *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1112 (9th Cir. 2014) (internal quotation marks and alteration omitted). So while the predominance inquiry may entail some overlap with the merits of plaintiffs' claims, it is not a license to engage in "free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 465-66. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining" whether class certification is appropriate. *Id.* at 466.

In antitrust cases, "courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present." *Thomas & Thomas Rodmakers*, 209 F.R.D. at 167 (internal quotation marks omitted); *see also Wortman v. Air New Zealand*, 326 F.R.D. 549, 558 (N.D. Cal. 2018) ("Plaintiffs satisfy this part of the predominance inquiry due to the nature of Defendant's alleged antitrust violation."). As the Supreme Court has observed, "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

The Court's assessment of predominance begins with the elements of the underlying claims for relief. *See Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020). "The essential elements of Plaintiffs' antitrust claim are: (1) violation of antitrust law; (2) injury—or 'impact'—resulting from that violation; and (3) measurable damages." *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 369 (C.D. Cal. 2011). For each of these elements, common issues predominate.

### 1.      Common Issues Regarding the Antitrust Violation Predominate.

Evidence common to all class members will prove the NFL Defendants violated the antitrust laws. To show an antitrust violation, plaintiffs must show that: "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1187 (N.D. Cal. 2013) (internal quotation marks omitted). Violations of the Sherman Act are, by definition, subject to classwide proof: "The violation turns on *defendants'* conduct and intent along with the effect on the market, *not* on individual class members." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (emphases in original). Consistent with these principles, each component of the NFL Defendants' conduct here turns on answers to questions that are common to the class.

Common evidence will prove the existence of a conspiracy to restrain competition. The various agreements among the NFL Defendants, DirecTV, CBS, Fox, and the other broadcasters provide *direct* evidence of this conspiracy.[15]

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

---

[15] *See, e.g.,* Gore Decl. Ex. 2 ██████████████████████████
███████████████ ; Gore Decl. Ex. 13 ████████████████████
█████████████ ; Gore Decl. Ex. 14 ████████████████████████
████████ .

[16] *See, e.g.,* Gore Decl. Ex. 5 ██████████████████
███████████████████████████████████████████████ .

13



[20] All of this direct evidence and proof of conspiracy is plainly common to all class members.

Proof that this conspiracy unreasonably restrains trade also applies equally to all class members. Under the rule of reason, plaintiffs may establish that the Sherman Act was violated if they prove that the conspiracy was "intended to harm or restrain trade" and "actually injures competition." *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1150 (internal quotation marks omitted). Here, Plaintiffs will show

_____

[17] *See, e.g., id.*

[18] *See, e.g., id.*

[19] *See, e.g.,* Gore Decl. Ex. 13 ; Gore Decl. Ex. 14 .

[20] *See supra* note 2 (NFL-DirecTV agreements).

1  ████████████████████████ [21] The anticompetitive harm of the conspiracy—reduced

2  output[22] and innovation[23] as well as supracompetitive pricing—likewise applies to

3  all class members.

4      While the NFL Defendants will be, to say the least, hard-pressed to justify

5  restraints purposefully designed to limit output and increase prices, they may try to

6  argue that their manipulation of the market had procompetitive effects. But

7  whatever these arguments are, they will apply classwide. *See, e.g., Glumetza,* 336

8  F.R.D. at 475 (N.D. Cal. 2020) (finding predominance because "state of the market

9  and defendants' use and maintenance of monopoly power, as opposed to individual

10  plaintiff's conduct, drives the claim").

11      Simply put, *all* the substantive questions related to the NFL Defendants'

12  liability will be resolved through common answers.

## 2.    Common Issues Regarding Antitrust Impact Predominate.

14      Common evidence will also show that the conspiracy caused classwide

15  impact because all class members suffered the same injury in fact. Each class

16  member purchased a product for which they were overcharged, and each class

17  member was subject to the same restraints that prevented them from having access



[21] Gore Decl. Ex. 10 ████████████████████████.

[22] Gore Decl. Ex. 10 ██████████████████████████████████████
████████████████████████████████████████████████.

[23] Gore Decl. Ex. 12 ████████████████████████████████████
██ Gore Decl. Ex. 7 ███████████████████████████████████████
███████ Gore Decl. Ex. 6 ██████████████████████████████████
████████████████████████████████████████████████████.

to the array of choices that would otherwise exist in a free market. "The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978). Accordingly, these common harms are precisely the type of injury that "'the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Olean Wholesale Grocery Coop.*, 31 F.4th at 666 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

The injury for which Plaintiffs seek compensation is the amount that they paid for Sunday Ticket less the price that would have been charged in the absence of these illegal restraints on competition. Determining these damages does not rest on individual differences among class members. All residential class members purchased either the basic Sunday Ticket package or a premium version, now called Sunday Ticket Max, from DirecTV, and all faced the same list prices for these products. *See* Rascher Decl. ¶ 45. Commercial class members were also presented with a uniform pricing schedule based on the occupancy of their establishments. *See id.* Whether those prices would have been higher, lower, or the same in a competitive market is a common question that will be answered through common fact and expert witness evidence.[24] Indeed, as explained below, Plaintiffs' experts have concluded that the games included in the Sunday Ticket package would have been available on class members' primary DirecTV service just as are the most desired college football telecasts. *See id.* ¶¶ 259-60; Zona Decl. ¶¶ 72-82. Having to purchase Sunday Ticket at all, let alone at supra-competitive prices is therefore part and parcel of the antitrust harm suffered by all class members.

---

[24] The proposed classes only include individuals and commercials entities that paid for NFL Sunday Ticket. Those who only received it for free as part of DirecTV's program to entice new customers, for example, are not included.

In addition, Plaintiffs' economists have developed and shown that flexible tools are available to analyze a variety of potential but-for world outcomes. Using actual purchase and viewership data as well as survey analyses conducted by the NFL itself, third parties, and Sarah Butler, Plaintiffs' survey expert, Plaintiffs' econometric expert was able to derive demand curves for a variety of NFL television products. *See* Zona Decl. ¶¶ 32-129. These demand curves were then used to model the pricing of various products, including standalone subscription products, under different competitive conditions to determine how the presence of these options would have affected the price of Sunday Ticket. *See* Zona Decl. ¶¶ 121-24, 126-28. These conclusions do not vary by class member; they are common to each class member's antitrust claim.

### 3. Damages Can Be Determined on a Classwide Basis.

The proposed method for establishing the availability of class-wide proof of damages "need not be exact" but "must be consistent with [the plaintiffs'] liability case." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see also In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *17 (N.D. Cal. Jan. 19, 2017) (stating that damages model at class-certification stage need "only be consistent with plaintiffs' liability theory"). "Uncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages. . . . [T]he law requires only that damages be capable of measurement based upon reliable factors without undue speculation[.]" *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (internal quotation marks omitted); *accord Olean Wholesale Grocery Coop.*, 31 F.4th at 681-82. Because the precise economics of a world absent the alleged anticompetitive conduct cannot be known with certainty, courts only require antitrust plaintiffs to put forth reasonable estimates of antitrust damages. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931). Lastly, differences in

the amount of damages that class members have suffered will not defeat predominance. *See, e.g.*, *Olean Wholesale Grocery Coop.*, 31 F.4th at 668-69; *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

Plaintiffs easily meet these standards here given the persuasive force and strong factual support for the core theory of damages Dr. Rascher has proposed: in a world without the restraints, class members would not have had to purchase a standalone product available from an exclusive distributor to obtain the "out of market" NFL telecasts currently only available through Sunday Ticket. *See* Rascher Decl. ¶¶ 31, 221-25, 283-84. Prior to the enactment of the Sports Broadcasting Act of 1961, the NFL teams licensed their own games, normally pursuant to contracts with national networks, a practice that stopped around 1960 and which, as the Ninth Circuit noted in this case, "decreas[ed] the number of telecasts available to consumers." *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1147 (citing Ariel Y. Bublick, Note, *Are You Ready for Some Football?*, 64 Fed. Comm. L.J. 223, 231, 234–36 (2011)). By contrast, after the Supreme Court invalidated the NCAA's rules preventing individual colleges and conferences from reaching independent broadcast contracts in *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984), "the number of televised college football games grew exponentially." *In re NFL's Sunday Ticket Antitrust Litig.,* 933 F.3d at 1147 (quoting Nathaniel Grow, *Regulating Professional Sports Leagues*, 72 Wash. & Lee L. Rev. 573, 617 (2015)).

The structural similarity of Saturday afternoon college football broadcasting and Sunday afternoon NFL broadcasting is striking. Both occur in the context of similar weekend football telecast programming, and both involve many of the same television networks. All of the NFL's television partners—Fox, CBS, NBC, ESPN, and ABC—broadcast college football games pursuant to contracts with

individual conferences or individual colleges and universities. In fact, these networks carry far *more* college games on Saturdays than NFL football games on Sundays, notwithstanding the increased competition each broadcast faces. There is no reason to think that these networks would not increase their Sunday afternoon NFL football game broadcasting—which is more popular and more valuable to the networks by any measure than college football—if the challenged restraints were removed. *See, e.g.*, Rascher Decl. ¶ 250.

As Dr. Rascher shows, without the challenged restraints, the twelve or so Sunday afternoon "out-of-market" NFL games currently available only through Sunday Ticket would likely be carried on the same widely available traditional television networks and basic cable networks that carry college football. And because there are relatively few NFL games—far fewer than the number of NCAA football games shown nationally on a given Saturday—all of these NFL telecasts would be expected to be available. Put another way, there would be no exclusively available "out-of-market" telecasts, just as there are no out-of-market NCAA college football telecasts. As a result, with relatively minor (market-wide) adjustments discussed by Dr. Rascher, the amount each class member paid for Sunday Ticket is a supra-competitive overcharge because all DirecTV satellite customers—residential and commercial—already purchased a prerequisite television package that contained all or nearly all the channels that would carry NFL football games in a competitive market. *See* Rascher Decl. ¶¶ 281-85.

While this wide distribution of NFL telecasts is the most probable but-for world, Plaintiffs' experts have developed tools flexible enough to assess damages on a classwide basis under alternative scenarios and as to particular restraints as well. For example, Drs. Rasher and Zona have examined a but-for world in which the only change would be to eliminate DirecTV's Sunday Ticket exclusivity. For decades, consumers, writers, potential competitors, politicians, and others have

criticized the anticompetitive agreements that enable DirecTV to be the sole source of these telecasts. *See*, *e.g.*, *Competition in Sports Programming and Distribution: Are Consumers Winning?*, Hearing Before the S. Comm. Of the Judiciary, 109th Cong. 24 (2006). Confining Sunday Ticket to DirecTV is such a clear, intentional limitation on output that the ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Dr. Zona's modelling shows that if Sunday Ticket were not exclusive to DirecTV, and direct-to-consumer packages of the same telecasts were available from other distributors, the price of Sunday Ticket would decrease by 44% to 51% depending on the number of additional distributors that sold the product. *See* Zona Decl. ¶ 70. These decreases would have occurred even without the full range of competition from individual teams that Plaintiffs contend would take place in an unconstrained market. This is not simply a theoretical model creating a world that never existed; it is confirmed by █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See* Rascher Decl. ¶¶ 264-70.

Dr. Zona has also analyzed what would happen if the restraints on DirecTV's ability to package and market the games were removed. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[25] Dr. Zona has calculated that without these restrictions, DirecTV would have been better off

---

[25] *See, e.g.,* Gore Decl., Ex. 13 ████████████; Gore Decl. Ex. 14 ████████; Gore Decl. Ex. 15 ████████████████████████████.

placing the Sunday Ticket games on a basic tier of service, which would have raised the price of its underlying service slightly (while making it significantly more attractive to all consumers not just class members) but would have eliminated the cost of Sunday Ticket itself. *See* Zona Decl. ¶ 82. This finding is consistent with Dr. Rascher's primary finding that, without the challenged conduct, the expected outcome would be a world in which NFL telecasts are broadly available for no (or very little) added cost. *See* Rascher Decl. ¶¶ 282-83.

Defendants may disagree with these various assessments, but they cannot fairly argue that these are not common questions. The market at issue is characterized by the standardized pricing of a finite number of uniform products and determining the difference between the actual prices and the "but-for" world prices is a quintessentially classwide issue.[26]

**B.      A Class Action is Superior to Other Methods of Adjudication.**

Rule 23(b)(3) further requires a class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy." The Rule identifies four factors relevant to that inquiry. *See* Fed. R. Civ. P. 23(b)(3)(A)-(D). Each factor weighs heavily in favor of certification here.

*First*, no residential or commercial class member has demonstrated any interest in litigating individually, nor does any class member have special circumstances or unique damages that provide them a greater interest in controlling

---

[26] While there was limited individual negotiations (primarily within the commercial class), there is far less individual pricing variation here than in other cases where class certification has been found proper. *See, e.g., Olean Wholesale Grocery Coop.*, 31 F.4th at 676 ("The district court did not err legally or factually in concluding that Dr. Mangum's pooled regression model, along with other evidence, is capable of answering the question whether there was antitrust impact due to the collusion on a classwide basis, thus satisfying this prerequisite of Rule 23(b)(3)."). In every significant regard, all class members present a single fact pattern: they purchased NFL Sunday Ticket, and the amount they paid was either unlawfully inflated to supracompetitive levels or it was not.

the litigation through a separate action. Indeed, class treatment here is necessarily superior to other forms of adjudication because it is the only realistic way for class members to obtain relief from Defendants' antitrust violations. Given the costs and complexities of prosecuting antitrust claims, residential and commercial subscribers would simply be unable to afford to bring suits on their own.

*Second*, there is no other "litigation concerning the controversy already commenced" in which the proposed Class is represented. Plaintiffs' claims were consolidated in this multidistrict litigation proceeding, and this Court has become intimately familiar with the facts and legal arguments of the parties.

*Third*, proceeding as a class action will achieve economies with regard to both the parties' and the Court's time, efforts, and expense. On the other hand, even if individual litigation were possible, repeatedly litigating the same issues in individual suits, if certification were denied, would consume many more judicial resources than addressing them in a single blow. Individual litigation would require the same market-wide analysis of the challenged conduct's effects on competition, the same market-wide analysis of but-for prices, and the same market-wide analysis of potential procompetitive justifications. *See High-Tech*, 985 F. Supp. 2d at 1228 (finding class treatment appropriate because requiring all class members to proceed individually "would merely multiply the number of trials with the same issues and evidence").

*Fourth*, there will be no difficulties in managing this consolidated proceeding as a class action.

## III.   PLAINTIFFS SATISFY THE REQUIREMENTS FOR AN INJUNCTIVE RELIEF CLASS PURSUANT TO RULE 23(B)(2).

Class certification of claims for injunctive relief is appropriate when, in addition to meeting the requirements of Rule 23(a), "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the

class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (internal quotation marks omitted). That is so "when a single injunction or declaratory judgment would provide relief to each member of the class." *Id*. Rule 23(b)(2)'s requirements are "unquestionably satisfied" where, as here, "members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)). Furthermore, class certification pursuant to Rule 23(b)(2) and 23(b)(3) are not mutually exclusive.[27] And, of course, neither predominance of common questions of facts or law nor superiority is requiredto certify claims for injunctive or other equitable relief under Rule 23(b)(2).

The proposed Commercial and Residential Classes meet Rule 23(b)(2)'s requirements because both classes seek injunctive relief—restraining the enforcement of the Defendants' anticompetitive restraints on competition—that will necessarily apply to, and benefit, all class members. In addition to all paying higher prices in the past and continuing to have higher prices imposed on class members who continue to pay for the Sunday Ticket package, all class members suffered a reduction in choice. This is a common classwide antitrust injury. *See, e.g., Ellis v. Salt River Project Agric. Improvement & Power Dist*., 24 F.4th 1262, 1274 (9th Cir. 2022) ("'[C]oercive activity that prevents its victims from making free

---

[27] Courts in this circuit frequently certify classes in antitrust cases under both provisions. *See, e.g., In re TFT-LCD (Flat Panel)*, 267 F.R.D. at 596 (N.D. Cal. 2010); *In re Korean Ramen*, 2017 WL 235052, at *24; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 610-11 (N.D. Cal. 2009) (certifying nationwide injunctive relief class under Rule 23(b)(2) and 27 statewide classes for monetary relief, including disgorgement, under Rule 23(b)(3)).

choices between market alternatives' gives rise to antitrust injury." (quoting *Glen Holly Entm't, Inc. v. Tektronix, Inc*., 352 F.3d 367, 374 (9th Cir. 2003) (in turn quoting *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996))). The challenged restraints restrict the output of "out-of-market" games across the country, making those games available *only* through DirecTV's exclusive all-or-nothing Sunday Ticket package. Absent the restraints, all class members would have had a much wider array of market choices, a remedy applicable and beneficial to all class members. *See* Rascher Decl. ¶ 226.

[redacted].[28]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) grant Plaintiffs' motion for class certification; (2) certify the proposed Commercial Class and Residential Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); (3) appoint the Plaintiffs as class representatives for the proposed classes; and (4) appoint Plaintiffs' co-lead counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g).

---

[28] *See, e.g.,* Gore Decl. Ex. 13 [redacted]; Gore Decl. Ex. 14 [redacted]; *see also* Gore Decl. Ex. 15 [redacted]; [redacted].

Dated: August 19, 2022

Respectfully submitted,

By:   */s/ Marc M. Seltzer*

Marc M. Seltzer

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Arun Subramanian (*Pro Hac Vice*)
asubramanian@susmangodfrey.com
William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Armstead Lewis (*Pro Hac Vice*)
alewis@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
Fax: (713) 654-6666

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*