UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

———————————————————

IN RE: NATIONAL FOOTBALL LEAGUE
SUNDAY TICKET ANTITRUST LITIGATION

———————————————————

CASE NO. ML 15-02668-PSG (JEMx)

**EXPERT REPORT OF DANIEL A.
RASCHER IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

August 19, 2022

**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

———————————————————

███████████████

1. **Qualifications** ....................................................................................................................**3**
   1.1    Scope of Work & Materials Relied Upon ..................................................................4
2. **Summary of Opinions** .......................................................................................................**6**
3. **The Economics of Antitrust Analysis** ............................................................................**8**
   3.1    Liability ...................................................................................................................10
   3.2    Damages .................................................................................................................11
   3.3    Parties ....................................................................................................................14
       3.3.1    NFL and Teams .......................................................................................14
       3.3.2    DirecTV ...................................................................................................17
       3.3.3    Sunday Ticket Subscribers ......................................................................18
       3.3.4    Other entities that are relevant to the analysis but not parties to the litigation................................20
   3.4    Challenged Conduct ...............................................................................................22
       3.4.1    Teams-NFL Agreements ..........................................................................23
       3.4.2    NFL-Networks Agreements .....................................................................24
       3.4.3    NFL-DTV Agreement ..............................................................................27
4. **History of the NFL, NFL on Television, and the Sports Broadcasting Act as a Limited Exception to the Antitrust Laws** ..........................................................................................**29**
   4.1    Professional Football .............................................................................................30
       4.1.1    History of the NFL ..................................................................................31
   4.2    History of Media in Professional Football .............................................................33
   4.3    Sports Broadcasting ...............................................................................................36
   4.4    Telecast Licenses of NFL ......................................................................................36
   4.5    Defining Output in the Broadcast of Major Professional Football ..........................37
5. **Showing Anticompetitive Harm via Direct Effects is Possible by Means of Class-wide, Common Methods** ...........................................................................................................**38**
   5.1    Direct Effects of Challenged Conduct ....................................................................39
       5.1.1    NFL Output .............................................................................................39
       5.1.2    NFL Output limitations are directly the result of the Challenged Conduct................................40
       5.1.3    The Challenged Conduct was not required to protect output .....................41
       5.1.4    NFL output absent Challenged Conduct ..................................................43
   5.2    Analogies Related to Direct Effects .......................................................................44
       5.2.1    College Football after *Board of Regents* ...............................................45
       5.2.2    Other Major League Sports in North America ..........................................53
       5.2.3    NFL Radio and Preseason Television ......................................................54
6. **Establishing the Relevant Markets and demonstrating Market Power via Indirect Effects is possible by means of class-wide, common methods** ........................................**56**
   6.1    Relevant Markets ...................................................................................................57
       6.1.1    The Merger Guidelines framework ..........................................................58
       6.1.2    The NFL is distinct from other sports: evidence from Sports Economics Literature and Relevant Markets ................................................................59
       6.1.3    Sports Economics Literature and Relevant Markets ................................61
       6.1.4    Relevant market analysis specific to this matter ......................................67
       6.1.5    Geographic Market Definition .................................................................77
       6.1.6    Conclusion ..............................................................................................78
   6.2    Market Power .........................................................................................................78
       6.2.1    Concentration ..........................................................................................80
   6.3    Barriers to Entry ....................................................................................................83
7. **Assessing Competitive Effects and establishing Harm to Competition is possible through class-wide, common methods** .........................................................................**84**
   7.1    Output Restrictions and Pricing .............................................................................86
       7.1.1    Loss Leader .............................................................................................90
       7.1.2    Collusion by Standard Television Networks to Keep Sunday Ticket Small and Expensive............91
   7.2    Indirect effects conclusions. ..................................................................................92
8. **Possible Procompetitive Justifications put forth by Defendants will be evaluated through class-wide, common evidence** ..........................................................................**92**

8.1    Competitive Balance can be demonstrated to not justify the Challenged Conduct by means of evidence common to all Class Members.................................................................93
8.2    The Claim that the Challenged Conduct increases Output can be disproven by means of evidence common to all class members .........................................................................94
8.3    Other Possible PCJs ..............................................................................................98
9.   **Less Restrictive Alternatives, if necessary to assess, will be evaluated  by means of class-wide, common methods** ............................................................................................**99**
10.  **Damages in this matter can be calculated by means of class-wide, common formulas............ 101**
10.1    Damages Methodologies.........................................................................................102
10.2    Econometric Estimates of BFW Prices ...................................................................102
10.2.1    Benchmarks, Yardsticks, and Comparables as Damages Methodologies .....................103
10.3    Damages Estimates ...............................................................................................108
10.3.1    College Football Model ......................................................................................108
10.3.2    NFLST ...........................................................................................................119
10.3.3    The NFL's own conduct outside of the US ..............................................................119
10.3.4    Other Major Sports Leagues ...............................................................................122
10.4    Class Damages .....................................................................................................126
10.4.1    Class Size ........................................................................................................126
10.4.2    Class Damages .................................................................................................127
11.  **Conclusion** .................................................................................................................**132**

# 1.   QUALIFICATIONS

1.      My name is Daniel A. Rascher.  At the University of San Francisco, I am Professor and Director of Academic Programs for the Sport Management Master's Program.  I teach courses in sport economics and finance and applied research methods to graduate students.  I am also a Partner of OSKR, LLC, an economic consulting firm specializing in applying economic analysis to complex legal issues, as well as President of SportsEconomics, LLC, an economic, finance, and marketing research consulting firm focused on the sports industry.  Formerly, I was an Assistant Professor and Associate Professor at the University of San Francisco, an Assistant Professor at the University of Massachusetts, Amherst, and have taught courses at Stanford University, Northwestern University, and the IE Business School in Madrid, Spain.  I was also previously a Principal at LECG, LLC, a provider of expert economic consulting services.

2.      I received a Ph.D. in Economics from the University of California at Berkeley, having focused on the fields of industrial organization, econometrics, and labor economics.  I have published numerous articles, book chapters, and a textbook in the field of sports economics and finance and have worked on over one hundred consulting projects involving the sports, entertainment, and tourism

industries.  I have consulted with counsel for both plaintiffs and defendants on a variety of lawsuits and non-litigation investigations, including the economics of antitrust and class certification.[1]

3.      I am also certified as a valuation analyst (Certified Valuation Analyst) by the National Association of Certified Valuators and Analysts.  Attached as Appendix A is my *curriculum vitae* which includes my qualifications as an expert witness and my testimonial experience, including my publications from the last 10 years and all cases in the last 4 years where I testified at trial or was deposed.

4.      I am being compensated at an hourly rate of $600 per hour, plus reimbursement of expenses.  In my work on this matter, I have been assisted by OSKR staff, working under my supervision and control.  I have no direct financial interest in the outcome of this matter.  I reserve the right to supplement this report.

## 1.1   SCOPE OF WORK & MATERIALS RELIED UPON

5.      In this case, Plaintiffs allege that DirecTV, the NFL, the NFL Teams ("Teams"), and CBS, NBC, ESPN/ABC, and FOX (collectively, "Networks") entered into a series of interrelated and interlocking agreements that had the purpose and effect of restricting the output of live telecasts of out-of-market ("OOM") NFL football games played on Sunday afternoons during the regular season.  As a result of those agreements, which I understand Plaintiffs contend may be viewed as components of one overarching conspiracy, DirecTV, as the exclusive provider of those games, was able to, and did, impose on its subscribers supercompetitive charges for the NFL Sunday Ticket package.

6.      As alleged:

> "The 32 professional football teams ("Teams") that compete in the National Football League ("NFL") have agreed among themselves, and with DirecTV, and in concert with others, to eliminate all competition in the broadcasting and sale of live video presentations of professional football games, including specifically for purposes of this complaint, the broadcasting and sale of DirecTV's NFL Sunday Ticket service to residential and commercial subscribers as described below."[2]

---

[1]  Cases and projects have involved, inter alia, *FTC v. DirecTV, O'Bannon v. NCAA et al., Alston v. NCAA et al., Shields et al. v. FINA, NASL v. USSF, Kentucky Speedway v. NASCAR et al.*

[2]  Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act, p. 2.

7.      I understand that the Plaintiffs fall into two Classes: a class of DirecTV residential subscribers who purchased the NFL Sunday Ticket satellite package and a class of DirecTV commercial subscribers (such as bars and restaurants) who purchased the NFL Sunday Ticket satellite package.

8.      I have been asked to consider, based on well-established and generally accepted principles of antitrust economics and the data and results of discovery in this litigation to date, as well as other information made available to me, whether the economic methodologies available to prove at trial that class members were harmed by this restriction on output will be common to all members of the Classes. I have also been asked to consider on those same bases whether there exist economic methodologies capable of providing reasonable estimates of the amount of damages suffered by each class member by common, formulaic means, and to demonstrate some of those methodologies in order to provide reasonable estimates of those damages.  While this demonstration results in valid estimates of damages for each Class, it is important to recognize that I present these estimates not for their merits, *per se*, but as evidence of the feasibility of such a formulaic, class-wide approach.

9.      My findings on liability issues provide the framework for estimating the price of Sunday Ticket in a market unaffected by anticompetitive conduct.  The impact for every class member flows from the estimated prices of Sunday Ticket in each of the hypothetical worlds modeled absent some or all of the Challenged Conduct, because in all cases those prices are lower than the actual prices class members paid.  My damages model calculates a common "reduction factor" (percentage that the estimated prices are lower, relative to the actual prices) and applies it to the affected purchases of each class member.  I understand that Dr. Zona has concluded that the nature of DirecTV's pricing process is a reliance on national list prices.  Similarly, many of his models as well as my models involve viewers moving from the current Sunday Ticket to lower-priced tiers of channel bundles on cable or satellite and/or over-the-air broadcasts.  In all of these cases, the competitive factors in each but-for world reduce all prices charged to paying customers.  As a result, damages for each class member are what each class member spent in the actual world minus what they would have spent purchasing the same content at a price not artificially inflated by anticompetitive conduct, and each class member experienced pecuniary harm by virtue of having paid more for Sunday Ticket in the actual world than the but-for price.

10.     As I use the term, "telecasts" means simulcasts distributed to consumers live (as the game occurs), unless otherwise noted.  Live distribution can occur via over-the-air broadcasts that are free to viewers ("Standard TV"), and through other television services: such as via cable or satellite distribution, whether through carriage on tiers of channel bundles ("Regular Pay TV") or through "premium" access requiring subscription fees ("Premium Pay TV").[3]

11.     In approaching this assignment, I have relied upon a number of documents and data sets, including material provided by counsel and third-party files, laid out in full in Appendix B.  I also rely on my knowledge of the sports economics literature; to the extent I specifically cite to an article or study, I include that title in this report and in my list of materials in Appendix B.

12.     In addition to the data and documents produced by Defendants and obtained elsewhere, some of the conclusions included in this report rely on analyses conducted by others, including the analysis provided in reports submitted by Dr. J. Douglas Zona and Sarah Butler.

## 2.   SUMMARY OF OPINIONS

13.     Based on my review of the documents produced in discovery, my research, knowledge, and qualifications, and as explained in detail below, class-wide methods of proof are available to prove that all class members were injured as a direct result of this restriction on output and each class member was overcharged by an amount that can measured on a formulaic basis by the difference between what the class members paid for the NFL Sunday Ticket package and what they would have paid in the absence of this restriction.  Specifically, this includes my conclusions that:

   a) The methodology by which an economist would assess whether Defendants have engaged in anticompetitive conduct with respect to the allegations in this matter relies on economic evidence common to all class members (for both Classes), whether one engages in a Direct Effects analysis, by which one shows direct economic evidence of market-wide harm, or an Indirect Effects analysis, by which one identifies the relevant market(s) and assesses Defendants' market power in that/those market(s).

---

[3]  See Crawford, G., Shcherbakov, O., & Shum, M. (2019). Quality Overprovision in Cable Television Markets. *American Economic Review*, *109*(3), 956-995. https://doi.org/10.1257/aer.20151182

b) Under the Indirect Effects analysis, Defendants have market power in a relevant market for major league football telecasts.[4] Defendants and their network television partners, as the only producers, jointly have monopoly power. Through this monopoly power, they have been able to prevent entry from individual teams into portions of the market. The result is that Defendants have been able to package and sell on DirecTV an expensive, premium product, Sunday Ticket. This product is far more expensive and is available to far fewer consumers than it would be in the competitive outcome that would result absent Defendants' Challenged Conduct. If the alleged misconduct were eliminated, the market would likely include competitive products sold by individual NFL teams. Most importantly for this stage of the litigation, the evidence and means of demonstrating this point are common to members of each of the Classes.

c) Absent the alleged misconduct, members of both Classes would have paid lower prices and received better variety of options.[5] The evidence and means of demonstrating these effects on each class member are common to all members of each of the Classes.

d) While I have yet to see all of Defendants' proffered justifications for this conduct, based on what I understand Defendants purport to justify this conduct,[6] I have seen no evidence that there are sufficient pro-competitive efficiencies related to the Challenged Conduct that would mitigate the harm to consumers, as compared to less restrictive alternative conduct. Nevertheless, the methods by which the parties would assess Defendants' claim regarding any such procompetitive benefits would be common to the members of each Class because they would speak to market-wide benefits, if such benefits existed.

---

[4] To be clear, the major league level of most North American sports (e.g., the NBA, the NFL, or MLB) is a distinct level of commercial appeal from minor leagues in the same sport such as the G-League basketball, Arena Football, or Triple AAA baseball.

[5] Increased variety is a form of higher quality of output.

[6] See, for example, the Ninth Circuit's opinion in this case. *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1153-55 (9th Cir. 2019) detailing some of NFL Defendants' justifications for the challenged restraints and the NFL's Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories to the NFL, pp. 4, 6-9. See also Deposition of Roger Goodell, Commission of the National Football League, 140:10-19 ██████████████████████████████████████████████████████ Deposition of Brian Rolapp, Chief Media and Chief Business Officer at National Football League, May 18, 2022, 142:20-144:12 (

14.     There is a common, class-wide methodology that results in a reasonable, non-speculative, formulaic estimate of the damages incurred by the proposed Classes, which shows that every class member suffered economic harm as a result of the Challenged Conduct.  Specifically, this includes my conclusions that:

a) The total overcharge paid by members of the residential Class during the Class Period are as high as ████████ (or ████████ with a conservative carriage rate adjustment).

b) The total overcharge paid by members of the commercial Class during the Class Period are as high as ████████ (or ████████ with a conservative carriage rate adjustment).

15.     All class members will continue to be injured by this restriction on output because it continues in the present.

### 3.   THE ECONOMICS OF ANTITRUST ANALYSIS

16.     As an economist with a specialization in both sports economics and industrial organization, I have analyzed the economics of antitrust throughout my career and implemented the specifics of a Rule of Reason analysis in multiple antitrust matters, particularly those related to sports. Based on that experience, my understanding is that the antitrust legal framework in the United States delineates which conduct by firms is *per se* illegal (presumptively harmful, without any need to examine the effects of the conduct) and which conduct requires further consideration of the effects of the conduct to determine whether it is harmful.  Joint conduct among competing firms can fall within consideration of antitrust law, as can unilateral conduct by a single firm (with sufficient market power), and this delineation comports with the economic concept of whether conduct is pro- or anticompetitive.  I refer throughout this report to the set of conduct by Defendants which Plaintiffs challenged as being anticompetitive and thus illegal as the "Challenged Conduct."  Broadly speaking it consists of the prohibition on NFL Teams competing independently in the broadcast market (which I refer to collectively as the "*Pooling*" elements of the Challenged Conduct), and the prohibition on the Sunday Ticket package being sold by more than one distributor and limitations on DirecTV's ability to offer the

product in a different manner (which I refer to collectively as the "*DirecTV Exclusivity*" elements of the Challenged Conduct).[7]  I define the Challenged Conduct more formally below in Section 3.4.

17.     As an economist, I proffer no opinion whether the Challenged Conduct in this case involves a *per se* violation of the antitrust laws or instead will be judged under the Rule of Reason, or whether the allegations, if true, constitute a violation of the law.  Instead, my focus is on methodology and whether the methods by which evidence related to these issues will be common to all class members. To the extent the Rule of Reason is applied, as I understand it, the Plaintiffs must ordinarily first establish that Defendants engaged in anticompetitive conduct that led to anticompetitive harm, after which an assessment of other effects and means for achieving any benefits of the conduct are assessed to determine its competitive nature overall.

18.     It is also my understanding that the Sports Broadcasting Act (SBA) shields NFL teams from antitrust liability for assigning their Standard Television[8] broadcast rights collectively to the NFL – the "umbrella" of the SBA protects professional teams assigning rights for free, over-the-air, advertiser-sponsored telecasts to the league.  However, it is also my understanding that the SBA does not protect other collective action by NFL teams related to the rights to game telecasts, especially beyond Standard Television broadcasts.

19.     Putting aside the specifics of the SBA, as a matter of economics the possibility that a product (live telecasts, for example) has been produced and to some extent distributed for sale in a manner that is legally protected from antitrust scrutiny has no bearing on the competitive analysis of the protected conduct.  Much less does it bear on the competitive analysis of agreements or other conduct related to non-protected distribution of that same product or of related products.  For example, when two competitors produce and sell a product in one region subject to some legal safe harbor provision or an antitrust exemption, their concerted action to allocate other regions monopolistically to one or the other competitor would likely not be shielded from antitrust scrutiny.  As a matter of economics, the question

---

[7]  Other elements of this portion of the complaint include the prohibition on allowing Sunday Ticket, or the games contained therein, to be configured and distributed differently so it would appeal, potentially, to more consumers.

[8]  Standard Television specifically means content that can be viewed without access to special equipment other than a television equipped with a terrestrial, non-satellite antenna and is supported by advertising rather than subscription or other fees charged to the consumer.

of whether the conduct in those other markets is, or is not, economically anticompetitive is unaffected by whether the conduct is legally immune from scrutiny in the first market.  The first is an economic question, the latter a legal one; the first is one on which I have expertise, the latter one on which I have neither expertise nor any opinion.

20.     It is with that in mind that I assessed Defendants' Challenged Conduct and sought to characterize Plaintiffs' allegations in such a way as to operationalize the claims into a liability and damages analysis so I could assess whether the steps necessary to provide the economic evidence relevant to antitrust liability questions could, at the merits stage of this litigation, be performed by means of methodologies and evidence common to all class members, and also whether a reasonable estimate of damages related to each allegation of anticompetitive conduct could be based on a formulaic methodology common to the Class rather than requiring individualized inquiry into subjective facts specific to each class member.

## 3.1   LIABILITY

21.     The Challenged Conduct in this matter relates to the series of interlocking agreements that limits the availability of NFL football telecasts and increases the prices paid for certain products that include NFL telecasts.  The focus is especially on access to the so-called "Out-of-Market" games available only through Sunday Ticket on DirecTV and the prices charged for Sunday Ticket products. This includes any joint conduct among competing teams (via the NFL) to restrict the quantity of telecasts distributed, as well as harmful restrictions related to exclusive distribution of Sunday Ticket and/or bundling of several telecasts into a single Sunday Ticket product.

22.     The economic assessment of the liability aspects of the Challenged Conduct must assess what would have been the output and price of NFL game telecasts if the teams acted independently (and generated revenue independently) when assigning rights to production, distribution, and sales of the telecasts.

23.     To the extent that output would be higher and/or the price lower than what prevailed in the actual world in the equivalent time period (and as I show below, it is), then the economic conclusion is that the conduct that led to the Sunday Ticket arrangements seen in the actual world had anticompetitive

effects.  As will be shown throughout in the bulk of the remainder of this report, most relevantly for class certification, the proof of that point can be made by means of evidence common to the class.

24.     Under the Rule of Reason framework, once one assesses that the Challenged Conduct harms competition, then the next step is to assess Defendants' potential procompetitive justifications (PCJs), after which (if necessary), Plaintiffs may suggest less restrictive alternatives (LRAs) by which the market outcome can achieve the purported procompetitive benefits of the proffered PCJs without resorting to the level of anticompetitive effects of the Challenged Conduct.  The discussion of these latter steps, and the common nature of the evidence across of class members for demonstrating the lack of PCJs and the presence of LRAs, is discussed in Sections 8 and 9 of this report, though as I explain it remains premature to discuss these in detail until Defendants actually offer up their substantive discussion of the claimed PCJs, if any, for their conduct.

25.     Even at this stage of the litigation, however, it is not too soon to conclude that as an economic matter, the assessment of PCJs and LRAs is inherently subject to common analysis, because they involve analyses of the effects on competition as a whole.  A PCJ is only procompetitive if it effects the competitiveness of the market, which has nothing to do with individualized questions, such as the effect on a given person.  Likewise, an LRA is judged by its ability to generate the asserted benefits the challenged conduct provides to the market as a whole, while avoiding restrictions that harm competition.

### 3.2   DAMAGES

26.     Economic damages in an antitrust matter are linked to the Challenged Conduct alleged to be anticompetitive, reflecting a comparison between the actual world with the Challenged Conduct and a "but-for" world absent that conduct.  The liability allegations in this case allege a series of interlocking agreements among the parties.  For the analysis of damages, I measure the extent of harm by comparing the actual world to the world that would have occurred absent any of the conduct related to the interlocking agreements.  As two alternatives, I also measure the extent of harm by comparing the actual world to worlds that would have occurred absent two subsets of the conduct related to the interlocking agreements.

27.     This is not a statement about whether the misconduct alleged relates to separate agreements among the parties, but rather simply a means of organizing damages so that in the event of a partial liability finding, damages are sufficiently disaggregated to allow a proper matching of damages to each potential conclusion with respect to liability.  Put another way, one can hypothesize a world in which only one or the other part of the misconduct is changed, but the analysis of the effects of a change to either part can only be undertaken in the context of the other agreements to limit competition, which are currently alleged to operate jointly to reduce output and increase prices.

28.     In the current matter, there are two overlapping categories of conduct that Plaintiffs allege have harmed the Classes.  One was to refuse to allow distribution of Sunday Ticket on any platform other than DirecTV – that is, by making Sunday Ticket an *Exclusive* product and requiring that it be sold in a particular manner.[9]  The other was to refuse to allow individual Teams to license telecasts for their own games, separate from any assignment of rights that they make to the NFL (whether under the SBA or through any other league-wide arrangement) – that is, *Pooling* all rights.[10]  My two alternative measures of harm refer to comparing the actual world to a world that would have occurred absent either of these categories of conduct – the *DirecTV Exclusivity* alternative and the *Pooling* alternative.

29.     These two sets of misconduct served in mutually reinforcing ways to harm consumers, so while I have provided the two alternatives, I also assess the impact of eliminating all of the alleged

---

[9]  For example, on the one hand, ███████████████████████████████████
████████████████████████████████████████  See Deposition of Brian Rolapp, May 18, 2022, 121:2-10
███████████████████████████████████████████████████████████████
NFL Team owner (and Chair of NFL's Media Committee) Robert Kraft of the New England Patriots testified that
████████████████████████████████████████████████████  (Deposition of Robert
Kraft, June 23, 2022, pp. 46:11-16 ██████████
███████████████████  See also NFL_0000458 at 0481, paragraph 3a.
████████████████████████████████████████████████
████████████████████  See also *In re NFLST Antitrust Litigation*, 933 at 1148, the Ninth Circuit decision in this case, "Fans who want to watch other out-of-market games cannot purchase games individually or by team, but are required to buy the entire package of NFL games."  In this but-for world, this sort of exclusive arrangement would not be allowed, and instead the NFL would make Sunday Ticket available through multiple MVPDs.

[10]  An example would be that in this but-for world, the NFL could no longer prohibit a team from broadcasting its games on a cable network, such as TBS, or a dedicated cable or streaming channel such as a Dallas Cowboys network comparable to the University of Texas's Longhorn Network (produced in partnership with ESPN and available on most major cable providers).

████████████████

misconduct.  This is the but-for world that aligns most closely with the totality of the interlocking
agreements alleged to have caused harm.

30.     As mentioned above, the impact for every class member flows from the estimated prices
of Sunday Ticket in each of the hypothetical worlds modeled absent some or all of the Challenged
Conduct, because in all cases those prices are lower than the actual prices class members paid.  My
damages model calculates a common "reduction factor" (percentage that the estimated prices are lower,
relative to the actual prices) and applies it to the affected purchases of each class member.  I understand
that Dr. Zona has concluded that the nature of DirecTV's pricing process is a reliance on national list
prices.  Similarly, many of his models as well as my models involve viewers moving from the current
Sunday Ticket to lower-priced tiers of channel bundles on cable or satellite and/or over-the-air
broadcasts.  In all of these cases, the competitive factors in each but-for world reduce all prices charged
to paying customers.

31.     In this report I show that damages can be estimated reliably with a class-wide analysis
based on common formulas, regardless of the alternatives discussed above.  In one such world, the result
would be the complete displacement of the premium television market, to the benefit of all consumers.
In this world the NFL and its teams would move all games to an OTA/Cable TV format similar to the
way college football has been supplied in the United States since 1984, when the *Board of Regents* case
broke up the NCAA's broadcast monopoly.  The existence of these games on these channels would make
Sunday Ticket unnecessary ████████████████████████████████ [11] I also assess damages
based on a but-for world absent the *Pooling* conduct.  Teams would be allowed to control telecast

---

[11] I note that the displacement of ███████████ described here is different from displacement the NFL may claim.  For
example, one such claim may be that the popularity of other telecast distribution options would drive consumers out of the
Standard TV market – pay TV displacing broadcast television.  For one thing, the latter type of displacement can be
addressed with a simple technical change – ████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████  See, for example NFL  0242422—8  ████████████████
████████████████████████████████████████████████████████████
███████████████████████████  Also, it is not economically sound to presume that
suppliers of very popular content would supply that content only into limited distribution channels as part of a competitive
outcome.  The reverse is true – popular sports content tends to go to the most widely viewed channels, to ensure the most
viewing.  And finally, when the effects of competition provide customers with the telecasts they desire on the medium
where they desire it most, this is not harmful to competition.

licensing, including for Standard television,[12] but also including entering into other telecast production and distribution arrangements.  Finally, I consider in this report damage estimates based on a "but-for" world absent the *DirecTV Exclusivity* conduct.  In this but-for world, Sunday Ticket exists on multiple MVPDs and/or as a Direct-To-Customer (DTC) product.  In each of these analyses I show that such damages can be estimated reliably with a class-wide analysis.

32.     I discuss these but-for outcomes in detail in the report below and base my damages estimates on them, thus tying each damages estimate specifically to a particular liability outcome.  And of course, in modeling these damages, my focus is on demonstrating that Class damages can be estimated by means of evidence common to the Class, without the need to resort to individualized inquiry.

## 3.3   PARTIES

33.     The following sections describe the Defendants, the Plaintiff Class, and other related parties, during the Damage Period.

### 3.3.1   NFL and Teams

34.     Prior to 2015, the National Football League ("NFL") was a non-profit association organized for the benefit of 32 individually owned and operated professional football teams, until it reorganized to remove its tax-exempt status.[13]  Each team "is a substantial, independently owned, independently managed business."[14]

> "The NFL teams do not possess either the unitary decision-making quality or the single aggregation of economic power characteristic of independent action.  Each of them is a substantial, independently owned, independently managed business, whose "general corporate actions are guided or determined" by "separate corporate consciousnesses," and whose "objectives are" not "common."[15]

---

[12] The analysis is not altered by the question whether the teams might continue to pool their rights solely for Standard Television broadcasts.

[13] Drew Harrell & Will Hobson, "The NFL is dropping its tax-exempt status. Why that ends up helping them out.", The Washington Post, April 28, 2015, accessed on August 15, 2022 at https://www.washingtonpost.com/news/business/wp/2015/04/28/the-nfl-is-dropping-its-tax-exempt-status-why-that-ends-up-helping-them-out/.

[14] Certiorari to the United States Court of Appeals for the Seventh Circuit, *American Needle, Inc. v. National Football League et. al.*, p. 2.

[15] Certiorari to the United States Court of Appeals for the Seventh Circuit, *American Needle, Inc. v. National Football League et. al.*, p. 2.

35.     Teams generate profits in a manner that is common across all businesses: by developing assets and organizing inputs into creating revenue-generating activities.  Developing assets in this case includes 1) intangible assets (creating a brand, team name, logo, uniforms, etc.) and 2) physical assets (such as securing physical access to a stadium).  Organizing inputs includes 1) engaging players, coaches, and other support staff, and 2) coordinating with other teams to create a series of pairwise competitions ("games") as part of a season.  Games are entertainment products that generate revenue through tickets sales (and ancillary products or services at games) and through the sale and/or licensing of related products, such as telecasts and other broadcasts (radio, for example).  Teams also generate revenue through merchandise sales, and other products and services associated with the rights to the games and the team's brand.

> "NFL teams ... hire various resources—players, coaches, advance scouts, field maintenance personnel, etc.—to produce goods, such as competition, and to obtain other products such as concessions and souvenirs, all of which are then sold to fans.  Like many firms, an NFL team is a multiproduct firm.  The primary product of sports teams is the competition between teams which takes the form of an individual game, an entire regular season, and a championship season.  Teams sell the rights to view the competition through the selling of tickets and media rights."[16]

36.     In professional sports in the United States, teams associate into a group of teams (a "league") by sport to provide various types of coordination, including determining the rules of the competitions, arranging the logistics of scheduling seasons, organizing structures for hiring of inputs, and to varying degrees, arrangements for the sale and licensing of each team's entertainment and other products.  Coordination with other teams includes both logistical and financial agreements.  The output of these coordinating leagues, a full season of a league sport (which itself is comprised of individual games), is importantly different than a single one-off game between two sports teams.[17]  Each team secures a stadium, where its "home" games occur (about half of the games each season), with the opposing team designated as the "away" Team.  The League schedule determines the dates and locations

---

[16] Miller, P. (2012). An Overview of NFL Revenues and Costs. In K. Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 55-77). Springer, p. 55.

[17] Grow, N. (2015). Regulating Professional Sports Leagues. *Washington and Lee Law Review*, *72*(2), 573-652. https://scholarlycommons.law.wlu.edu/wlulr/vol72/iss2/4

of the team matchups, and typically involve more frequent interactions within subcategories of teams ("conferences" or "divisions", for example).[18]  Financial agreements can include determination of how to allocate revenue and costs for the production of games (or other products), as well as negotiating and securing licensing arrangements.

37.     Currently, throughout the Damage Period, and before the Damage Period, the NFL has been acting on behalf of all NFL teams to operate joint activities for generating revenue and sharing that revenue across teams.  The 32 teams in the NFL during the Damage Period consist of two conferences of 16 teams each: the National Football Conference ("NFC") and the American Football Conference ("AFC").  There are four divisions within each conference (North, East, South, West), with four teams in each division.  At the start of the damages period, the NFL had a 16-game season spread over a period of 17 weeks (with each team having one week off during that period, known as a "bye" week), with play beginning in September and extending into January of the following year ("regular season"), along with pre-season and post-season play, though the length of the season was expanded by one week to 17 games per team (still with a bye week) in 2021.  Most games occur between two teams in the same conference, with more frequent matchups among teams in the same division with each team having hosted an equal number of games at home as they spend as a visitor in another team's stadium up until 2021 (with a 17-game schedule, half of the teams have one more home game than away game).

38.     The NFL has arranged for the majority of games to occur on Sunday afternoons (Eastern time zone) during the regular season.  Typically, there is also a single game scheduled for each Sunday and Monday evening, and most weeks include a single game scheduled on Thursday evening (the Thursday games *before* the Sunday games each week are in the same "week" of the NFL Season), as well as afternoon games on Thanksgiving (Thursday, also in the same week as the following Sunday), and on some Saturdays in December (again, in the same week as the following Sunday).[19]

---

[18]  It is important to note that in the college sports context the term "Conference" is often used to describe what is actually a sports league, i.e., the "Southeastern Conference" or "SEC" is a sports league, not a subdivision of some larger league entity.

[19]  "NFL TV Schedule", *SportsMediaWatch*, accessed on August 15, 2022 at https://www.sportsmediawatch.com/nfl-tv-schedule-2022-fox-nbc-cbs-espn-amazon-tnf-snf-mnf/#.

████████████████████

39.     Most important for this case, the activities of the NFL include negotiating the sale of rights to telecasts of games.[20]  Currently and throughout the Damage Period, ████████████ ████████████████████.[21]  By prior agreement, every NFL team assigned to the NFL the rights to telecasts of the team's games – rights that each team could otherwise have retained for its home and/or away games.[22]  The NFL secured with broadcast and cable networks several licensing arrangements related to production and distribution of those telecasts.[23] ████████████████████ ████████████████████████████████.[24]  Having those copyrights, the NFL further secured with Defendant DirecTV additional distribution arrangements involving live retransmission of some games.[25]  The NFL █████████████████████████ ████████████████████.[26]

### 3.3.2   DirecTV

40.     DirecTV is a Multichannel Video Programming Distributor ("MVPD").  DirecTV competes against other MVPDs (such as DISH Network (satellite), Comcast (cable), Charter Communications (cable)) for residential and commercial pay TV customers.[27]  DirecTV is one of two direct broadcast satellite ("DBS") MVPDs, the other being DISH Network, that distribute programming primarily through satellite.

---

[20]  Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act, p. 14.

[21]  See, e.g., the Chicago Bears financial statements: NFL_0117344, NFL_0117349, and NFL_0117507.

[22]  Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act, p. 6.

[23]  Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act, p. 29.

[24]  *In re NFLST Antitrust Litigation*, 933 F.3d 1136, 1148 (9th Cir. 2019), "Under the NFL-Network Agreement, CBS and Fox coordinate to create a single telecast for every Sunday-afternoon NFL game. Pursuant to that agreement, NFL owns the copyright in the telecasts". ███████████████████████████████ ████████████████████████████████████████

[25]  Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act, p. 6.

[26]  Article X of the NFL Constitution states, ████████████████████████ ████████████████████████ (NFL_0012383 at 2433). ████████████

[27]  Carroll, S. (2009). Main Dish with a Side of Voluntary Commitments: Dish Network-DirecTV Revisited. *Administrative Law Review*, *61*(3), 661-673. https://www.jstor.org/stable/40712065

41.     As part of basic DirecTV subscriptions, consumers have Regular Pay TV access to the programming of the broadcast networks that produce and air live NFL games in the local market of each consumer into which DirecTV retransmits.  Most DirecTV customers receive their DirecTV programming through a satellite dish installed at the consumer's location.  In addition, throughout the Damage Period and before the Damage Period, some DirecTV subscribers obtained a premium service that included live Premium Telecasts of additional NFL games, known as NFL Sunday Ticket.  A smaller set of eligible consumers (college students, and some residences who cannot receive satellite signals well) receive Sunday Ticket from DirecTV through broadband internet without having to be subscribers to DirecTV's satellite service.[28]  While the NFL's broadcasting system as a whole is challenged in this legal matter, the Sunday Ticket product that only DirecTV subscribers can buy is the focus of plaintiffs' claims for damages.[29]

### 3.3.3   Sunday Ticket Subscribers

42.     Throughout and before the Damage Period, DirecTV has been the sole distributor of the NFL Sunday Ticket product in the United States.  This service provided access to live telecasts of all NFL games occurring on Sunday afternoons during each regular Season, except the Sunday afternoon games on Standard TV available to each specific viewer in their local market (i.e., games already being broadcast on free television in each Sunday Ticket customer's local area).  "Out-of-market" games refers to the games shown on Sunday Ticket within each area during each week of the regular season, which differs by local broadcast market because the Standard TV broadcast available to viewers differs based on decisions made by the NFL's network partners as to where to air the average of about six possible games in each timeslot.  Sunday Ticket subscribers paying for subscriptions each season for access to Premium Telecasts through this service during the Damage Period are the members of Plaintiff Classes.[30]

---

[28] "Streaming Live NFL Games", *Directv.com*, accessed on August 15, 2022 at https://nflst.directv.com/student.

[29] Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act, pp. 55-56.

[30] The programming on the Sunday Ticket channels is a live retransmission of the feed created by the Networks who have separately contracted with the NFL to televise a limited set of games ███████████████████████████████████

43.     Throughout much of the Damage Period, DirecTV has been offering two different Sunday Ticket products.  Sunday Ticket Basic provides access to live telecasts of NFL games occurring on Sunday afternoons during the Regular Season.[31]  Starting in 2012, the higher priced Sunday Ticket MAX package includes the live telecasts as well as DirecTV RedZone, a channel that switches around among live games in scoring situations, and NFL Shortcuts, a channel which offered commercial-free replays showing every play from a game in 30 minutes or less Mondays through Wednesdays.[32]  In 2014, Sunday Ticket Max saw the introduction of Fantasy Zone, a channel that focused on game-to-game fantasy football analysis and statistics.[33]  In 2011, prior to the launch of Sunday Ticket Max, DirecTV offered Sunday Ticket as a premium TV package, and offered Sunday Ticket To-Go, an add-on that provided internet and mobile access to those with Sunday Ticket on Satellite TV who agreed to pay an additional charge.[34]

44.     The Plaintiff Classes includes residential and commercial classes.  Residential subscribers include those who paid to receive Sunday Ticket through DirecTV satellite transmission.  Commercial subscribers were entertainment venues (such as sports bars) and hospitality providers who each a paid to receive Sunday Ticket through DirecTV satellite transmission.

45.     DirecTV has national "list prices" for each Sunday Ticket product subscription each season, which are shown on Exhibit 1.  Commercial subscribers paid higher rates, with fees set each season according to a fee schedule categorizing the establishment by seating capacity, or, in some cases,

---

[31]   While the primary content for Sunday Ticket Basic is access to live telecasts of NFL games, the package also provides other features such as the Game Mix Channel, which allows users to watch multiple NFL games simultaneously, and the Player Tracker, which allows users to keep tabs on player stats throughout the game day.  In 2016, satellite Sunday Ticket Basic subscribers received the ability to stream games from smartphones, tablets, computers and other connected devices, which was originally a feature exclusive to Sunday Ticket Max.  *See* "Every Minute of Every Game. Every Sunday", *Wayback Machine*, accessed on July 29, 2022 at https://web.archive.org/web/20130928101347/http://www.directv.com/sports/nfl, NFL0410159, and NFL_0853407 at 3408.

[32]   "NFL Sunday Ticket – Get Every Game Every Sunday", *Wayback Machine*, accessed on March 25, 2022 at https://web.archive.org/web/20121012001125/http://www.direcTV.com/sports/nfl. "What are Short Cuts?", *Directv.com*, accessed on March 25, 2022 at https://nflsthelp.direcTV.com/hc/en-us/articles/204503669-What-are-Short-Cuts-.

[33]   NFL_0853407 at 3408. Chris Strauss, "DirecTV is adding a live fantasy football channel to 'NFL Sunday Ticket'", *USA Today Sports*, July 7, 2014, accessed on August 15, 2022 at https://ftw.usatoday.com/2014/07/directv-nfl-sunday-ticket-fantasy-zone-football.

[34]   "NFL Sunday Ticket To Go", *Wayback Machine*, accessed on August 15, 2022 at https://web.archive.org/web/20110923153950/http://www.directv.com/DTVAPP/content/sports/nfl_online_mobile.

subject to a chain-specific pricing schedule or nationwide lump-sum fee.[35]  Also, during the damages

period, many subscribers entering into a two-year commitment to subscribe to DirecTV (at a tier higher

than the most basic level of service) received their first season of Sunday Ticket (specifically, the Sunday

Ticket MAX product) at no additional cost.[36]



Notes:
  General
    NFLST.tv was launched in 2014.

### 3.3.4   Other entities that are relevant to the analysis but not parties to the litigation

46.      The NFL contracts with Standard TV networks (e.g., CBS, FOX, NBC) to produce its

games over-the-air (OTA) through their network of owned and affiliated television stations, generating

for NFL teams licensing revenue of billions of dollars each year.  The networks generate the majority of

their revenue from advertisers and from retransmission fees for providing the channel feed for MVPDs to

---

[35] See for example, DIRECTV-ST-00016222, at 6225 (detailing NFL Sunday Ticket pricing for the period 2012 to 2014).

[36] "Sunday Ticket Every Live Game. Every Sunday", *Wayback Machine*, 2016, accessed on August 9, 2022 at
  https://web.archive.org/web/20160929035855/http://www.directv.com/sports/nfl. "Sunday Ticket Every Live Game. Every
  Sunday", Wayback Machine, 2019, accessed on August 9, 2022 at
  https://web.archive.org/web/20190930025652/http://www.directv.com/sports/nfl.

include in packages of channels (such as "basic cable").  The NFL also contracts with cable networks (ESPN, and the NFL's own subsidiary cable network, NFLN).  The first of these, with ABC/ESPN (broadcast and cable network that are both part of Disney), is for a single Monday Night Football game each week, which is telecast on the ESPN channel on cable, some of which are simulcast nationally on ABC, and the second, with the NFL Network (a cable channel that is owned by NFL Media), telecasts some games during the season, often on Thursday nights.[37]  Telecasts on cable are not Standard TV broadcasts, but rather Regular Pay TV telecasts. Some games broadcast on NFLN, however, were also broadcast nationally on FOX (or previously, CBS or NBC) as Standard TV broadcasts.  Beginning with the 2022-23 season, Amazon Prime Video will show the Thursday night NFL game exclusively, except for the game in the first week.[38]  When there is no national Standard TV broadcast simulcast with an ESPN or NFLN game, the cable network arranges for a Standard TV broadcast on a local station in the local markets of the teams involved in the game.  They are not on Standard TV in the rest of the country, nor are other games made available as Standard TV broadcasts during the same window, leaving most of the country without a Standard Television broadcast option during these windows.[39]

47.     Other MVPDs, such as Time Warner and Comcast (and their pay-per-view venture InDemand) bid for Sunday Ticket during the 2000s.[40]  Through the end of the 2021 season (in January 2022), only DTV sold the Sunday Ticket product in the U.S., and it is currently slated to be the only provider through the 2022 season.

---

[37]  "NFL TV Schedule", *SportsMediaWatch*, accessed on August 15, 2022 at https://www.sportsmediawatch.com/nfl-tv-schedule-2022-fox-nbc-cbs-espn-amazon-tnf-snf-mnf/#.

[38]  "Thursday Night Football 15 Games Starting Sep 15", *Amazon.com*, accessed on August 15, 2022 at https://www.amazon.com/adlp/tnf.

[39]  Also, historically, FOX duplicates Thursday Night Football broadcasts with NFLN on some Thursday nights.  See, for example, "NFL schedule 2019: Dates, times, TV channels for every game, week by week", *The Sporting News*, September 5, 2019, accessed on August 17, 2022 at https://www.sportingnews.com/us/nfl/news/nfl-schedule-2019-dates-times-tv-channels-week-by-week/wbtn4st4xki31f12er7lr2ua4.

[40]  Larry Stewart, "Suitors Vie for Sunday Ticket", *Los Angeles Times*, September 20, 2002, accessed on August 15, 2022 at https://www.latimes.com/archives/la-xpm-2002-sep-20-sp-tvcol20-story.html.

### 3.4   CHALLENGED CONDUCT

48.     Plaintiffs allege that competing NFL teams, acting in concert through the NFL and with DirecTV and the various Networks, agreed to eliminate competition in the broadcasting and sale of live video presentations of professional football games.

> "The 32 professional football teams ("Teams") that compete in the National Football League ("NFL") have agreed among themselves, and with DirecTV, and in concert with others, to eliminate all competition in the broadcasting and sale of live video presentations of professional football games, including specifically for purposes of this complaint, the broadcasting and sale of DirecTV's NFL Sunday Ticket service to residential and commercial subscribers as described below."[41]

49.     The allegation is that these actions restricted live NFL telecasts of competing NFL teams from being output to consumers' households and businesses, and elevated prices some consumers paid for access to telecasts.  This conduct allegedly harmed consumers in the United States (including Plaintiff class members), in addition to increasing profits for teams and DirecTV, in violation of United States antitrust laws.

50.     Plaintiffs allege that Defendants effectuated these restrictions through three sets of interlocking agreements that captured, collectively, the allegedly anticompetitive conduct ("Challenged Conduct"): the concerted action by the teams (through the NFL), their broadcast partners, and DirecTV to restrict output, raise prices, and increase profits.[42]  Those three sets of agreements are the agreements between the NFL's teams and the league (the "Teams-NFL Agreements"), the agreements between the NFL and the television networks (the "NFL-Networks Agreements"), and the agreements between the NFL and DirecTV (the "NFL-DTV Agreement").

51.     The Challenged Conduct in this matter includes elements of *DirecTV Exclusivity*.  I understand that the Defendants have restricted distribution of Sunday Ticket in the United States on any platform other than DirecTV.  I further understand that ███████████████████████

---

[41] Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act, p. 2.

[42] In the Ninth Circuit's opinion in this case, "the plaintiffs have plausibly alleged that the output in this case is the number of telecasts of games, and that the defendants' interlocking agreements reduce that output".  *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1155 (9th Cir. 2019), p. 30.  Other economic measures of output could include the number of viewers watching NFL football, or a specific game being telecast, or the number of viewers able to have the choice of being able to watch a specific game.



And I understand that ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████ [43]

52.     The Challenged Conduct also includes elements of *Pooling*.  I understand that the

Defendants have prohibited individual Teams from licensing telecasts for their own games, separate from

any assignment of rights that they make to the NFL (whether under the SBA or through any other league-

wide arrangement) – that is, *Pooling* all rights.[44]

53.     In sections 3.4.1-3.4.3 I provide more details about the interlocking agreements and my

understanding of how, taken as whole, the agreements facilitate the Challenged Conduct.

### 3.4.1   Teams-NFL Agreements

54.     The NFL teams have agreed among themselves to pool all of their game telecast rights

("television rights"), with the exception of most pre-season games.[45]  This conduct eliminates

competition among horizontal competitors and establishes the NFL as the single exclusive agent for

negotiating distribution arrangements to generate telecast revenue.  ████████████████████

████████████████████████████████████████████████████████████ [46]

Notably, for current purposes, the terms of the Teams-NFL Agreements do not vary among the members

of the proposed Classes.

---

[43]            ████████████████████████████████████████████████████████████████
        See Deposition of Brian Rolapp, May 18, 2022, 121:2-10.  Deposition of Robert Kraft, June 23, 2022, 46:11-16.
NFL_0000458 at 0481, Paragraph 3a.

[44] An example would be that in this but-for world, the NFL could no longer prohibit a team from broadcasting its games on a
cable network, such as TBS, or a dedicated cable or streaming channel such as a Dallas Cowboys network comparable to
the University of Texas's Longhorn Network (produced in partnership with ESPN and available on most major cable
providers).

[45] See *In re NFLST Antitrust Litigation*, 933 F.3d at 1148, noting that "[t]he 32 individual NFL teams . . . entered into an
agreement with the NFL [] to pool their telecasting rights and give the NFL the authority to exercise those rights, rather
than exercising those rights individually," and that "[t]he consequence of this agreement is that an individual team cannot
enter into individual agreements with networks, satellite TV providers, or internet streaming services. . . . only the NFL can
enter into an agreement to sell those rights".

[46] ████████████████████████████████████████████████████████████████

55.     It is my understanding that the SBA establishes certain exceptions to antitrust liability for horizontally competing professional teams playing league-based sports that assign to their league the rights to regular season games shown on Standard Television.[47] ███████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████ [48]

### 3.4.2   NFL-Networks Agreements

56.     The NFL, ████████████████████████████████████

███████████████████████, has been negotiating and executing telecast production and distribution arrangements with Networks (specifically, broadcast networks CBS, FOX, and NBC, and cable networks ESPN and NFLN).  Taken together, these agreements have provided for a telecast *production* of every regular season NFL game, normally 15 or 16 each week.[49]  These agreements have, for at least the past few decades, been a series of multi-year agreements involving bidding between networks or other video programming providers and then payments by each winning bidder to the NFL.[50]

57.     ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████ [51]

---

[47] Subject to some limitations to buffer amateur sports competitions from simultaneous competition (*e.g.*, no Friday evening or Saturday professional football during high school or college football season, per section 1293 of the SBA).  See "Title 15 – Commerce and Trade", *USCode.House.Gov*, accessed on August 15, 2022 at https://uscode.house.gov/view.xhtml?path=/prelim@title15/chapter32&edition=prelim.

[48] See, for example NFL_0331042, NFL_0401290, NFL_0000434, and NFL_0000458.

[49] Some preseason games are produced pursuant to NFL agreements while others are produced locally by both teams.  All pre-season games are televised.

[50] See Appendix D "Telecast Licensing Revenue.xlsx" for multi-year agreements and details.

[51] ██████████████████████████████████████ NFL_0987035 at 7360-1. ████

████████████████████████████ NFL_0987035 at 7362-7375, quoted passage at 64.

24

58.     The NFL-Networks agreements allocate production of telecasts based on when games occur, and to which conference the teams belong.[52]  There have been a series of agreements for NFC teams' regular season games on Sunday afternoons (currently through FOX), and a parallel series of agreements for AFC teams' regular season games on Sunday afternoons (currently through CBS).[53] Other series of agreements provided for production of telecasts for three series of regular season home games scheduled on specific evenings: Thursday, Sunday, and Monday.[54]  Generally, the league scheduled only one game for each primetime slot on each week of the regular season and negotiated the agreements separately for each evening series (e.g., Sunday evenings are licensed as a group to NBC).

59.     These production arrangements also included distribution arrangements for transmitting the telecasts into the residences of consumers or business customers, nationally or only in specified locations, as Standard Television games transmitted over the air, retransmitted on MVPDs as network channels, or included on MVPD programming as cable channels.[55]  For all of these agreements, the licensee who pays an upfront fee to the NFL expects to generate revenue from the telecasts primarily from advertisers purchasing in-game advertising time and from fees paid by MVPDs to carry channels in their packages offered to subscribers.

60.     Notably, because the NFL knowingly schedules many games during the two Sunday afternoon time windows to coincide, and because its agreements with the networks and DirecTV only permit each rights holder to show a single game on a single network in any given location, the distribution arrangements in the AFC and NFC agreements are by their nature designed not to be

---

[52] For games between an AFC team and an NFC team, the rule historically was that the away team determined the broadcast package. ███████████████████████████████████████████████████████████████  See the most recent NFL Fox and CBS Sunday Afternoon Package Television Agreements: Fox (NFL_0458699 at 8706-8708) and CBS (NFL_0458529 at 8534-8536).

[53] See Appendix D "Telecast Licensing Revenue.xlsx" for agreements and details. For inter-conference play, the default is that the visiting conference team playing determines the assignment of the telecasts license. Also, the NFL has added to the rights agreements some options, especially in the second half of the season, to shift some games telecast rights between the two conference packages. Brian Kerhin, "An explanation of the guidelines for NFL TV coverage", *Fox11online.com*, August 28, 2019, accessed on August 15, 2022 at https://fox11online.com/sports/packers-and-nfl/an-explanation-of-the-guidelines-for-nfl-tv-coverage.

[54] See Appendix D "Telecast Licensing Revenue.xlsx" for agreements and details on these days.

[55] See, for example, NFL_0862664 at 2727 – 2728 and NFL_0862550 at 2616 – 2617.

██████████████████████████████

nationwide broadcasts of the same game during the Sunday afternoon time slots, but are instead designed to be a series of simultaneous regionalized broadcasts.[56]  Each Network broadcasting live on Sunday afternoon will (generally) broadcast to all households in the country capable of receiving its signal, but will ordinarily broadcast different live games to different regions of the country.  Thus, while the games broadcast in the Sunday, Monday, and Thursday evening windows are normally telecast nationally, generally none of the Sunday afternoon games are provided as a Standard Television broadcast to every single U.S. household.  Instead, each household will receive a live Standard Television broadcast of one or two of the (on average) six games being played at the same time, and will not receive a live Standard Television broadcast of the other four to five games being shown elsewhere in the country (the out-of-market games).[57]  Should a consumer want to watch one of the approximately nine or ten Standard Television broadcasts  that are not available in that consumer's viewing market during the afternoon (Eastern) time slots of a particular Sunday, the consumer would have to purchase the premium NFL Sunday Ticket service.

61.    ██████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████[58]

62.    Deposition testimony in this case has confirmed that ████████████████████████

████████████████████████████████████████████████

███████████████████████████████████.[59]  As with the agreements between

---

[56]  NFL_0862664 at 2671 – 2672 and NFL_0862550 at 2558.

[57]  "Out-of-market" telecasts in any given location are, by definition, those telecasts not appearing as free over-the-air transmissions in a given market, regardless of which teams are playing.

[58]  NFL_0458529 at NFL_0458542; NFL_0242423.

[59]  Deposition of Brian Rolapp, May 18, 2022, pp. 122 – 129.

███████████████████████

the teams and the NFL, the terms of the NFL-Network Agreements do not vary from one class member to another.

### 3.4.3   NFL-DTV Agreement

63.     In addition to the NFL-Network Agreements to produce and distribute live Standard Television broadcasts on Sunday afternoons (and other live telecasts), the NFL has been negotiating and executing further distribution arrangements for live retransmission of those Sunday afternoon Standard Television out-of-market broadcasts.  Specifically, the NFL and DirecTV entered into a series of multi-year agreements licensing DirecTV to provide to its subscribers a ████████ service created and branded together with the NFL – the previously described NFL Sunday Ticket products.[60]  These multi-year agreements have been exclusive – only DirecTV can provide the NFL Sunday Ticket package to consumers.[61] ████████████████████████████████

████████████████████████████████████████

████████████████   The Networks and the NFL determine the content of these channels for any given location by determining which games are shown as in-market games in each location.

64.     ████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████[62] ████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[60] NFL_0000434 and NFL_0000458.  One set of channels has been providing standard-definition telecasts of out-of-market games, and a corresponding set of channels has been providing high-definition telecasts of the same games.
[61] NFL_0000434 at 0445 and NFL_0000458 at 0481.
[62] NFL_0000458 at 0469.



65. ██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████ [64]

66. ████████████████████████████████████

████████████████

- ██████████████████████████████████████ [65]

- ██████████████████████████████████████

- ████████████████████████" [67]

67. ████████████████████████████████████████████

███████████████████████████████████████████████



[63] Note: █████████████████████████████████████████
████████████████████████████████████████████████
██████(NFL_0000458 at 0487).████████████████████
████████████████████████(NFL_0000434 at 0448).
[64] NFL_0000458 at 0482.
[65] ████████████████████████████████(NFL_0242422).
████████████████████████████████████████████████
[66] █████(NFL_0239782).
[67] Meeting minutes dated September 18, 1996 (NFL_1225300).

██████

██████ The change in viewership occurs because viewers select their preferred option. This is an improvement in quality that is blocked by this policy, and it is not a decrease in quantity.

68. ███████████████████████████████████

███████████████████████████████████

██████████████████████ [68] Granting exclusivity to an inferior means of distribution is anticompetitive because it intentionally keeps a product away from consumers who would seek to purchase it. That deadweight loss is a harm to competition and represents the sort of economic loss the antitrust laws serve to prevent.

69. ███████████████████████████████████



## 4. HISTORY OF THE NFL, NFL ON TELEVISION, AND THE SPORTS BROADCASTING ACT AS A LIMITED EXCEPTION TO THE ANTITRUST LAWS

70. The history and current conduct of major sports operations in the United States include a mix of economic competition and joint cooperation among competing firms (teams), some of which cooperation economists and the law already recognize as beneficial, instead of harmful, some of which has been found to be anticompetitive:

> "Football teams that need to cooperate are not trapped by antitrust law. The fact that the NFL teams share an interest in making the entire league successful and profitable, and that they must cooperate to produce games, provides a perfectly sensible justification for making a host of collective decisions. Because some of these restraints on competition are necessary to produce the NFL's product, the

---



[68] ███████████████████████████████ (NFL_0549451 at 9467 – 9468).
[69] ███████████████████████████████████████████
███████ NFL_023972.
[70] See Deposition of Brian Rolapp, pp. 128, 195, 198, and 201. ██████████
████████████████████████████ (See NFL_0458529, Delman Exhibit 4 at 8542).

███████████████

Rule of Reason generally should apply, and teams' cooperation is likely to be permissible."[71]

71.    To that end, before undertaking the analysis of the Challenged Conduct, it is important to understand the history of the NFL, specifically with respect to its broadcast contracts and the enactment of the SBA.

## 4.1   PROFESSIONAL FOOTBALL

72.    The National Football League consists of the 32 individually operated franchises (the teams) and the operations of the league office and other NFL affiliates.  The league schedules an annual season of 17 games (recently increased from 16 games) played over 18 weeks during the regular season, culminating in a postseason playoff and Super Bowl title game.  This product is distributed live in-person via large state of the art stadiums seating approximately 61,500 - 82,500 people who are charged ticket prices of approximately $109.33 - $194.64.[72]  At the stadium, additional products sold include luxury suites, concessions, merchandise, parking, and sponsorships (to brands wanting to advertise their products).  Additionally, and most relevant to this lawsuit, the games are also distributed live via video and audio media distribution channels.  All of these products compete in various markets, separate from the broadcasts that are the focus of this litigation, and thus are not directly relevant to the issues in dispute.

73.    Media revenues play an important role in the economics of the NFL and its clubs.[73]  As an example, ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ [74]    ████████████████████

---

[71]  Certiorari to the United States Court of Appeals for the Seventh Circuit, *American Needle, Inc. v. National Football League et al.*, p. 3.

[72]  Ben Rolfe, "NFL Stadium Capacity: Which are the biggest and smallest?", *Profootballnetwork.com*, March 28, 2022, accessed on August 15, 2022 at https://www.profootballnetwork.com/nfl-stadium-capacity-which-are-the-biggest-and-smallest/. "03FanCostIndex", accessed on August 15, 2022 at https://teammarketing.com/fancostindex/. Note: 1/4 of family of four price as reported by Team Marketing Report.

[73]  "...[T]he most significant revenue source for a professional sports league such as the NFL is undoubtedly the money received in exchange for the opportunity to purchase broadcast rights". Mondello, M. (2012). Media Economics of the NFL. In K. Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 91–105). Springer, p. 91.

[74]  NFL_0148143.

██████████████████████

████████████████████████████████████████████████████████ [75] Sportico

puts the value of the Dolphins (and related businesses) at $3.53 billion.[76]

### 4.1.1   History of the NFL

74.   The American Professional Football Association was formed in 1920 in Canton, Ohio with a membership fee of $100 to help organize different teams then playing under different rules.  By 1922 it changed its name to the National Football League, re-elected Joe Carr as league president (a position he held into the late 1930s), and established rules such as territorial rights.  It consisted of 18 teams but lacked stability.  During the 1920s there were dozens of expansions, relocations, sales, and franchise abandonments.  In 1925, the league established more player roster rules, added a few more teams, but most importantly for its success, the Chicago Bears signed Harold (Red) Grange, a star at the University of Illinois.[77]

75.   The first of many rival leagues formed in 1926, the American Football League (AFL I), in response to the rejection by the New York Giants owner Mara for an NFL expansion team in New York City owned by Red Grange.  The AFL I lasted one season and then disbanded.  The second incarnation of the AFL (AFL II) was formed ten years later and lasted two seasons.[78]  The NFL did add the AFL's Cleveland Rams as an expansion team (for $10,000).  In 1946 the third rival, All American Football Conference, began play with some franchises in NFL cities and others in smaller cities such as San Francisco, Cleveland, and Miami.  After competing for four seasons, the leagues partially merged, with

---

[75] ████████████████████████████████████████████████████████████████
████████████████████████████████ See NFL_0148145.

[76] "North American Sports Franchise Valuations Ranking", *Sportico*, accessed on August 15, 2022 at https://www.sportico.com/valuations/teams/2021/most-valuable-sports-franchises-1234644354/.

[77] For much of the past century, college football was more popular than its professional counterpart, but that began to change with the proliferation of televised professional football beginning in the 1950s.  See "Football, Collegiate", *Encyclopedia.com*, accessed on August 15, 2022 at https://www.encyclopedia.com/humanities/encyclopedias-almanacs-transcripts-and-maps/football-collegiate.  This also coincided with the NCAA's first effective enforcement of amateurism rules for the first time, which put an end to the common practice of paying college athletes on football teams beyond an athletic scholarship and $15 a month.

[78] Quirk, J., & Fort, R. (1992). *Pay Dirt: The Business of Professional Team Sports*. Princeton University Press. Quirk and Fort (1992) offer concise economic histories of rival leagues.  I cover franchise relocations, expansions, and mergers in professional team sports in the U.S. in Rascher, D. (2008). Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues. In B. Humphreys & D. Howard (Eds.), *The Business of Sports* (pp. 67-106). Westport, Connecticut: Praeger.

the franchises from San Francisco, Cleveland, Baltimore, and New York moving into the NFL (and the NFL's New York Bulldogs closing down).

76.     The NFL enjoyed a period of relative stability and success in the 1950s, then a new incarnation of the American Football League (AFL IV[79]) was formed in 1960 and played until 1966 when the two leagues voted to merge in a process that was finalized in 1970 (when the NFL was split into the NFC and AFC conferences).  However, congressional approval was needed given the fact this was likely to be viewed as a merger to monopoly, which led to an amendment of the SBA focused specifically allowing the merger of "two or more professional football leagues…if such agreement increases rather than decreases the number of professional football clubs so operating…"[80]  The increase in the number of clubs was achieved by the creation of an expansion franchise into New Orleans and reorganization of the teams into balanced American Football Conference (AFC) and National Football Conference (NFC) teams.[81]

77.     Further expansions occurred in 1976 (Seattle Seahawks and Tampa Bay Buccaneers), 1995 (Carolina Panthers and Jacksonville Jaguars), 1998 (Cleveland Browns to replace the old Browns who earlier moved to Baltimore to become the Baltimore Ravens), and 2002 (Houston Texans to replace the old Oilers who moved to Tennessee to become the Tennessee Titans).  Recent relocations of franchises included the Rams' (2016) and Chargers' (2017) moves from St. Louis and San Diego, respectively, to Los Angeles, and the Raiders' move from Oakland to Las Vegas in 2020.

---

[79]  AFL III lasted from 1940 through 1941.

[80]  SBA, Section 1291.  Interestingly, the law also required the NFL and AFL to be tax-exempt leagues, which they were at the time, though the NFL no longer is and so presumably would not be allowed to merge with another league under this exemption in the future.

[81]  Two more failed rival leagues formed in the 1970s (World Football League) and 1980s (United States Football League) but failed in short order.  More recently, the XFL failed (twice), the USFL failed, the AAF failed, and the USFL has begun anew in 2022. The XFL is expected to try yet again in 2023.

## 4.2   HISTORY OF MEDIA IN PROFESSIONAL FOOTBALL

78.     NFL football has a historical place in the emergence of live television in the United States. Initially, Admiral television maker televised Los Angeles Rams games in 1950, followed by DuMont's four seasons of televising NFL games on a (nearly) weekly basis in 1951-1954.[82]

79.     In 1951, the NFL amended its rules to "minimize competition by refraining from telecasting its games into another team's local market whenever that local team was either playing at home or broadcasting its away game in its local territory."[83]  The Department of Justice brought suit to enjoin those limitations on competition between the teams, which resulted in a ruling in *United States v. National Football League* that permitted the limitation on broadcasts when a team was playing a home game, but prohibited the rule that simply prevented two teams' broadcasts from competing with one another.[84]  Following that ruling, "The individual NFL teams competed against each other on the field and in the market for telecasting rights."[85]

80.     Notwithstanding this competition, these television licensing revenues reportedly allowed nine of the NFL's twelve teams to become profitable for the 1953 and 1954 seasons.[86]  Broadcasting continued to grow through the 1950s:

> "In 1956, CBS became the first network to broadcast an entire season of professional football on network television.  After reaching an initial agreement with Commissioner Bert Bell for approximately one million dollars, CBS still needed to negotiate contracts with each team independently, which it managed to do.  The coast-to-coast broadcasts of an entire season was instrumental in moving the league from a regional fan base to more of a national audience, and positioning it as a competitor to the then more popular college game.  The deal also helped CBS compete more formidably with broadcast leader NBC."[87] (citations omitted)

---

[82]  In 1949, Horowitz reports that NFL television rights totaled $75,000. Horowitz, I. & Whittenberg, G. (2012). Network Television Revenue Sharing and Competitive Balance in the NFL. In L. Kahane & S. Shmanske (Eds.), *The Oxford Handbook of Sports Economics: The Economics of Sports Volume 1*  (pp. 223-245). Oxford University Press.

[83]  *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1144 (9th Cir. 2019).

[84]  *United States v. Nat'l Football League*, 116 F. Supp. 319, 326-27 (E.D. Pa. 1953).

[85]  *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1145 (9th Cir. 2019).

[86]  Mondello, M. (2012). Media Economics of the NFL. In K. Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 91–105). Springer, p. 94.

[87]  Mondello, M. (2012). Media Economics of the NFL. In K. Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 91–105). Springer, p. 94.

81.     Yet, beginning under the then-new Commissioner, Pete Rozelle, the NFL gathered up the individual teams' rights to package them and sell them to a single broadcaster, CBS, and to avoid competition among individual teams in the television market.

82.     The league's plan, however, was rejected by Judge Grim, the judge who had decided *United States v. NFL*, because it was prohibited by the injunction he had entered against preventing competition amongst the teams.  "[B]y agreement, the member clubs of the League have eliminated competition among themselves in the sale of television rights to their games."[88]  In response, the NFL lobbied Congress for an exemption that would permit this suppression of competition which Congress granted by passing the SBA in 1961.

> "Rozelle's television strategy was made possible with the help of the Congress of the United States after the 1961 deal between CBS and the NFL ran into trouble when it was found to be in violation of US antitrust laws.  In September 1961, a bill that would legalize individual television package sales by professional sport leagues was introduced in the House of Representatives, and signed into law by President Kennedy shortly thereafter.  This law, the Sports Broadcast Act (SBA), granted sports leagues the antitrust exemption Rozelle wanted, permitting the joint pooling of broadcasts rights to be sold to the highest bidder (Fortunato 2008)."[89]

83.     The immediate effect was a drop in the number of games available to the public, while the revenues earned by the league increased to about $4.5 million from about $280 thousand.[90]  The antitrust exemption allowed the NFL to block home games from being shown to local fans (a clear restriction of output), show fewer games in markets than were shown prior to the SBA, and raise media rights fees by eliminating the competition between sellers of football media rights.[91]

---

[88] *United States v. Nat'l Football League*, 196 F. Supp. 445, 447 (E.D. Pa. 1961).  Kunz, W. (2020). *The Political Economy of Sports Television* (1st Ed.). Taylor & Francis. See also Horowitz, I. (1978). Market entrenchment and the Sports Broadcasting Act. *American Behavioral Scientist*, *21*(3), p. 415-430. https://doi.org/10.1177/000276437802100308.

[89] Mondello, M. (2012). Media Economics of the NFL. In K. Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 91–105). Springer, p. 95.

[90] Horowitz, I. (2012). Network Television Revenue Sharing and Competitive Balance in the NFL. In L. Kahane & S. Shmanske (Eds.), *The Oxford Handbook of Sports Economics: The Economics of Sport Volume 1* (pp. 223-245). Oxford University Press.

[91] "By 1962, the CBS-NFL contract was legal, and two of the four network broadcasts disappeared.  This did not cause revenues to fall—on the contrary revenues increased by one-third between 1961 and 1962 and by tenfold between 1960 and 1970."  Horowitz, I. (1974). Sports Broadcasting. In R. Noll (Ed.), *Government and the Sports Business*. Brookings Institution. p. 306.  Horowitz (1978) notes that the SBA may confer market power to those sponsors able to reach those audiences due to the limitations on the number of games in a market, having a deleterious effect on competition. Horowitz,

34

84.     In 1977, "television revenue exceeded gate receipts for the first time in league history as a source of team income."[92]  Ensuing deals in 1981 (5 years for $2.1 billion) and 1986 for $3.6 billion provided evidence of continued growth in demand by media companies for the NFL's highly rated multi-hour games.[93]  By the end of the 1980s, the NFL added cable channel ESPN to air games on Sunday night.  A new set of media contracts for 1990-1993 were also for $3.6 billion.[94]  In 1993, the NFL signed a four-year set of contracts with ABC, NBC, FOX ( which replaced CBS), ESPN, and Turner Sports for $4.38 billion (about 20% more than its prior deals).[95]  This was followed by an 8-year set of contracts (1998-2005) for $17.6 billion,[96] ████████████████████████████████████████ ████████████████████████████[97]  Finally, the same media companies signed on for 2014-2022 for about $6 billion per year over the length of the contracts.[98]

I. (1978). Market entrenchment and the Sports Broadcasting Act. *American Behavioral Scientist*, 21(3), p. 415-430. https://doi.org/10.1177/000276437802100308, pp. 416, 418, and 428.

[92] Mondello, M. (2012). Media Economics of the NFL. In K. Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 91–105). Springer, p. 96.

[93] "The NFL received an average of approximately $46.5 million per season from 1970 through 1973, $67 million per season from 1974 through 1977, $161.5 million per season from 1978 through 1981, and $420 million per season from 1982 through 1986." Kunz, W. (2020). *The Political Economy of Sports Television* (1st Ed.). Taylor & Francis, p. 55.  "From 1990 through 1993, the league generated an estimated $900 million per season from its broadcast and cable partners." Kunz, W. (2020), p. 56.  "…with the per season total doubling from just under $1.1 billion from 1994 through 1997 to $2.2 billion from 1998 through 2005." Excluding the Sunday Ticket contract. Kunz, W. (2020), p. 57.  "In 2018 and 2019, following the new Thursday deal with FOX, the combined fees for the five packages – *NFC, AFC, Sunday Night Football, Monday Night Football*, and *Thursday Night Football* – totaled $5.6 billion per season.  That total, moreover, did not include the value of the *Thursday Night Football* games reserved for the NFL Network – no small factor behind a carriage fee that surpassed an estimated $1.50 per household per month.  That total also does not include the $1.5 billion that the league received from the AT&T-owned DirecTV for *NFL Sunday Ticket*, which brought the annual total in rights fees to $7.1 billion." Kunz, W. (2020), pp. 57-58.

[94] Bill Carter, "New TV Contracts for NFL's Games Total $3.6 Billion", *The New York Times*, March 10, 1990, accessed on August 15, 2022 at https://www nytimes.com/1990/03/10/business/new-tv-contracts-for-nfl-s-games-total-3.6-billion.html.

[95] Richard Sandomir, "NBC Gets Final N.F.L. Contract While CBS Gets Its Sundays Off", *The New York Times*, December 21, 1992, accessed on August 15, 2022 at https://www nytimes.com/1993/12/21/sports/nbc-gets-final-nfl-contract-while-cbs-gets-its-sundays-off html.

[96] Leonard Shapiro & Paul Farhi, "ABC Keeps Mondays in Record NFL Deals", *The Washington Post*, January 14, 1998, accessed on August 15, 2022 at https://www.washingtonpost.com/archive/politics/1998/01/14/abc-keeps-mondays-in-record-nfl-deals/13e3aff9-ef15-4967-86e4-a61c9aa3c673/.

[97] NFL_1105807, Exhibit H.

[98] Matthew Futterman, Sam Schechner, & Suzanne Vranica, "NFL: The League That Runs TV", *The Wallstreet Journal*, December 15, 2011, accessed on August 15, 2022 at https://www.wsj.com/articles/SB10001424052970204026804577098774037075832.

85.     The NFL's new media rights deal that begins in 2023 will pay the league ███████ per
season (from CBS, FOX, NBC, ESPN/ABC, and Amazon).  Together with the estimated revenue
expected from a new Sunday Ticket deal, its television revenue will be over ██████ per season.

**4.3   SPORTS BROADCASTING**

86.     Currently and throughout the Damage Period, third parties have been paying licensing fees
to the NFL, other professional sports leagues, and NCAA schools and conferences for the rights to
produce and/or distribute telecasts.  The leagues and NCAA schools and conferences have also been
distributing some telecasts themselves, through subsidiary pay TV channels and/or streaming services.

87.     For all U.S. major professional sports leagues as well as the major college programs
(known as FBS[99] for football and NCAA Division 1 for basketball), the largest portion of telecast
revenue comes from the Standard Television contracts and/or Regular Pay TV telecasts (i.e., telecasts
consumers can receive from a distribution system such as cable or satellite).

88.     In addition, the major professional leagues have been earning revenue on the further
distribution of these Standard Television and pay TV telecasts into "premier" pay TV subscription
products, such as DirecTV's Sunday Ticket.  The NBA has League Pass, MLB has Extra Innings, and the
NHL has Center Ice.  All of these are "out-of-market" packages, meaning they provided access in each
specific subscriber location to any live telecasts not otherwise available at that location through Standard
Television or pay TV channels.  But NFL Sunday Ticket is the only such package that has a single
exclusive distributor within the United States; the other packages are offered through multiple MVPDs.
As previously described, the NFL earns revenue by means of exclusive, multi-year licenses allowing
DirecTV to distribute Sunday Ticket.  Sports programming has been considered especially valuable to
networks and distributors in recent years due to consumer preferences for viewing it live.

**4.4   TELECAST LICENSES OF NFL**

89.     The Standard Television packages the NFL has or currently licensed include(d) the NFC
Conference package (FOX), the AFC Conference Package (CBS), and the Sunday Night Football (NBC).

---

[99] FBS stands for the "Football Bowl Subdivision" within the NCAA's Division I. FBS was formerly known as Division 1A.

During the class period, some Monday Night Football and Thursday Night Football games have been aired over terrestrial broadcast channels, although the majority of Monday Night Football games were available only on ESPN (except in the local markets of the participating teams), and many Thursday Night Football games were available only on NFL Network (except locally).[100]  The licensing revenues from the premium product (Sunday Ticket), are shown in Exhibit 2.  In Appendix C, I provide an expanded version of this table, which provides additional data including the revenue per telecast per season the NFL receives.

Exhibit 2:. NFL Licensing Revenue (NFL Sunday Ticket)

| 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|------|------|------|------|------|------|------|------|------|------|------|-------|



*Notes:*
*Revenue figures are pulled from NFL-DTV Contract (NFL_0000434, Deal Year 2009) for 2011-2014.*
*Revenue figures are pulled from NFL-DTV Contract (NFL_0000458, Deal Year 2014) for 2015-2021.*
*These contracts cover both conferences and the Sunday Afternoon broadcast window.*

*Sources:*
*NFL_0000434*
*NFL_0000458*

## 4.5   DEFINING OUTPUT IN THE BROADCAST OF MAJOR PROFESSIONAL FOOTBALL

90.     In the context of televised sports, output is potentially measured in a variety of ways.  As with other products, it can be measured both in terms of quantity – here, the number of consumers obtaining the product – in terms of variety – the number of distinct telecasts available to a given consumer – and in terms of the quality of the product – as reflected in the desirability of the product to potential consumers.  As the Ninth Circuit stated in this case, "the plaintiffs have plausibly alleged that the output in this case is the number of telecasts of games, and that the defendants' interlocking agreements reduce that output."[101]  From an economic point of view, however, each of these is an

---

[100] It is my understanding that, similar to how MNF and TNF games are also shown locally OTA in the markets of the two teams playing, Amazon will be doing this also with its new TNF package.

[101] *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1155 (9th Cir. 2019), p. 30.

important measure of output, so that the reduction in the number of consumers with access to a particular telecast – either because of a physical limitation or an artificially increased price – is also a reduction in output that creates deadweight loss, as it prevents certain consumers from accessing a product that they may prefer.  The NFL has argued that output is simply (1) the number of games that are produced and made available somewhere, or (2) the number of games that are available (at whatever price) for a given set of consumers.  Neither of these is economically supportable, and I understand that the Ninth Circuit has already rejected this view:

> "We disagree that the defendants' definition of output is the only permissible definition for purposes of determining whether plaintiffs have stated a claim.  As noted above, *NCAA* indicated that the relevant output is 'the total amount of televised intercollegiate football,' available to consumers. 468 U.S. at 94, 104 S.Ct. 2948.  We therefore reject the defendants' argument that because all NFL Sunday-afternoon games are broadcast somewhere, there is no limitation on output as a matter of law."[102]

## 5.   SHOWING ANTICOMPETITIVE HARM VIA DIRECT EFFECTS IS POSSIBLE BY MEANS OF CLASS-WIDE, COMMON METHODS

91.     In antitrust economics, economists look for negative consequences (in output, price, and quality) that result from market power.  Where there is market power, a party attempting to restrain trade has a high likelihood of success at profitably achieving a result that harms customers relative to a market without concentrated market power.[103]  If market power in a relevant market is necessary for potentially anticompetitive conduct to succeed, then evidence of the success of that conduct in causing anticompetitive harm proves the existence of market power in a relevant market.  The question then becomes whether sufficient evidence exists to provide the foundation for the Direct Effects approach – namely can it be shown that the alleged restraints constrained the marketplace.

---

[102] *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1155 (9th Cir. 2019).  (citations omitted)

[103] For example, price fixing without market power will tend to cause the firms in question to lose sales to competitors outside of the conspiracy.  As a result, price fixing is generally profitable only if the participants in the agreement have sufficient market power to maintain market share in the face of the price increase.

## 5.1   DIRECT EFFECTS OF CHALLENGED CONDUCT

92.     The Challenged Conduct resulted in substantial output restrictions.[104]  It reduced the
number of games available to most people, it reduced the overall viewership of NFL games, and as a
result, produced substantial increases in the prices paid by class members.  It limited the number of
different telecasts of nearly all games to just one.  It also increased the prices paid by the networks.[105]

### 5.1.1   NFL Output

93.     The Challenged Conduct restricted NFL telecast output to one telecast per game and
allowed broadcasting of each telecast only in a limited manner.[106]  The NFL limits Sunday afternoon
telecasts: in each DMA, the NFL allows for only 3-4 games on Standard Television, which is only 23-
33% of approximately 12-13 games being played.[107]  The remaining games are available only to the
small percentage of those who have secured access to Sunday Ticket.

94.     With this limitation, most of the tens of millions of residences and businesses viewing
NFL Games during the Damage Period were unable to view approximately 9 to 10 of the 16 NFL
telecasts each week over the air or on a general, non-premium MVPD package of channels.  The teams
worked together, through the league, and with DirecTV to allow access to view the full set of games
played each week only to residences and businesses who a) subscribed to DirecTV, and b) subscribed to

---

[104] "Naked restriction on price or output … an agreement not to compete in terms of price or output".  "[W]hen there is an
agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the
anticompetitive character of such an agreement."  *NCAA v. Board of Regents of University of Oklahoma* (1984), 468 U.S.
85, p. 109. Quoting *National Society of Professional Engineers v. United States* (1978), 435 U.S. 679, p. 692.

[105] Robert Kraft testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Deposition of Robert Kraft, June 23, 2022, 29:3-9.

[106] "The total amount of televised intercollegiate football."  *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*,
933 F.3d 1136, 1155 (9th Cir. 2019), p. 23. "We … reject the defendant's argument that because all NFL Sunday-afternoon
games are broadcast somewhere, there is no limitation on output as a matter of law." *In re Nat'l Football League's Sunday
Ticket Antitrust Litigation*, 933 F.3d 1136, 1155 (9th Cir. 2019), p. 30. "… the plaintiffs have plausibly alleged that the
output in this case is the number of telecasts of games." *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*,
933 F.3d 1136, 1155 (9th Cir. 2019), p. 30. "The complaint therefore plausibly alleges a naked restraint on output: that the
defendants' interlocking agreements have the effect of limiting output to one telecast per game, which is then broadcast in
a limited manner." *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1155 (9th Cir. 2019),
p. 31.

[107] A typical week has 16 games, with 3 evening games, leaving 13 games for Sunday afternoon.  Some weeks at the
beginning or end of the season have 4 Sunday afternoon games on standard television.  The number of Sunday afternoon
games can drop below 13 because some weeks have fewer games as teams have a bye week, Thanksgiving week has extra
games on that Thursday, and some weeks in December have Saturday games.

Sunday Ticket for all games. This is an intentional and direct diminution in the "total amount of … football available to consumers."[108]

### 5.1.2   NFL Output limitations are directly the result of the Challenged Conduct

95.     The fact that access to Sunday Ticket games can be purchased does not make the current level of output equal to the competitive market output, absent the challenged conduct. Across all households, the result is that the average household in any DMA has access to approximately ▮▮▮▮ of the telecasts that could otherwise be available if all games were available on Standard Television or widely distributed cable channels.[109]

96.     Even if the monopoly control by the NFL of all telecasts were taken as given (i.e., the *Pooling* Conduct), the NFL further restricted output by limiting distribution to DirecTV, bundling all of the OOM telecasts into a single product, and requiring that product to be sold as ▮▮▮▮▮▮ ▮▮▮▮ (i.e., the *DirecTV Exclusivity* Conduct).

97.     With respect to this *DirecTV Exclusivity*, the NFL did not provide or allow a widespread streaming option direct-to-consumers (DTC) - only the NFLST.tv streaming option sold through DirecTV. Analysis in the Zona Report based on viewership and survey data includes an estimate of the impact of a competitive DTC options for access to Out-of-Market NFL telecasts.[110] ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[111]

---

[108] *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1155 (9th Cir. 2019).

[109] With the challenged conduct, about 5 Sunday afternoon or evening games reach approximately 120 million households through standard television, one game reaches a portion of the 90 million households served by MVPDs, and the other 10 games reach about ▮▮▮▮ (on Sunday Ticket). This sums to 5 times 120 million plus 90 million plus 10 times ▮▮ or ▮▮▮▮ "telecast x households". For 16 games, total unrestricted output could reach 16 times 120 million, or 1.92 billion "telecast x households". Even if 11 of the 16 games only went through MVPDs, and the other 5 through standard television, output would be 11 times 90 million plus 5 times 120 million, which equals 1.59 billion "telecasts x households". The ▮▮▮▮ telecast-households currently being output is ▮▮▮▮ of 1.92 billion or ▮▮▮▮ of 1.59 billion.

[110] Zona Report, section 4.1.8.

[111] The simulation analysis in the Zona Report, Section 4.1.8, estimates that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

98.     With respect to bundling, whenever there is any substitution between products, in this case between different NFL telecasts, the marginal revenue for the products in aggregate sold as a bundle is lower than the sum of the marginal revenue for each specific product sold separately.  Absent a significant change in marginal cost and assuming none of the products exit the market entirely, the output level where the marginal revenue equals the marginal cost is always lower for the aggregate bundle of several products that include substitutes than total output would be if each product were sold separately.[112]  As a result, the Challenged Conduct resulted in a lower level of output of NFL games across the broad market as well as in the premium telecast segment, both nationally as well as in each DMA.

99.     ████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████████████

### 5.1.3   The Challenged Conduct was not required to protect output

100.    The higher level of output described above that would have occurred through premium services, absent only the *DirecTV Exclusivity* conduct, would not have directly lowered the availability of NFL games shown on Standard Television.  It is possible that the addition of more widely available premium telecasts might have drawn viewers away from Standard Television broadcasts and, consequently, lowered the revenue of Standard Television broadcasts.  However, the demand for in-market games is extremely high in the context of television programming overall.  This, together with the

---

[112] Generally, bundling can increase the output of the less desired product by tying it to the purchase of the more desired product.  When separate sellers are supplying components of the bundle, disaggregation may allow the supplier of the desired product to extract higher prices.  See Crawford, G., & Yurukuglu, A. (2012). The Welfare Effects of Bundling in Multichannel Television Markets. *American Economic Review*, *102*(2), 643–685. https://doi.org/10.1257/aer.102.2.643. James, W., & Yellen, J. (1976). Commodity Bundling and the Burden of Monopoly. *Quarterly Journal of Economics*, *90*(3), 475–498. https://doi.org/10.2307/1886045.  Fang, H., & Norman, P. (2006). To Bundle or Not to Bundle. *RAND Journal of Economics, 37*(4), 946–963. https://doi.org/10.1111/j.1756-2171.2006.tb00065.x. Schmalensee, R. (1984). Gaussian Demand and Commodity Bundling. *Journal of Business*, *57*(1), S211–S230. https://www.jstor.org/stable/2352937

██████████████████████

relatively low actual cost of producing a telecast, would prevent a situation where any of the Standard Television broadcasts would not have been produced and distributed, even for the least popular teams.[113] The only effect would have been some possible decline in viewership (because audiences would have more NFL telecast choices) and a decrease in the amount of revenue Defendants could have collected from the Network licensing agreements for each game.

101.   The NFL has asserted a strong commitment to maintaining its presence on OTA networks, particularly in its documents which capture its internal assessment of its Sunday Ticket options.  For example, ████████████████████████████████████████

██████████████████████████████[114]██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████[115]████████████████████████████

████████████████████████████████████████████████████

████████████████████[116]

102.   ████████████████████████████████████████████

████████████████████████████████████████████████████

Preseason games are broadly available on local OTA and are controlled and sold by the individual NFL franchises.  On Saturdays, the best college football games tend to be shown on OTA channels even though those games have far lower ratings than NFL games.  The case for putting higher rated NFL games behind a paywall is poor when the best college games consistently cross the threshold to OTA.

103.   I understand that ████████████████████████████████

████████████████████████████████████████████████

████████████████████, as discussed above in Section 3.4.3.  ████████████████

---

[113] ████████████████████████████████████████
         00749 at 0755.  See also Rolapp Deposition, p. 229.
[114] NFL_1225300.
[115] NFL_0239782 at 9784.
[116] NFL_0235426.

██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ This level of subscribers was a level at which the NFL collected a large amount of revenue from the Premium Telecasts segment, while also maintaining licensing revenue from Networks, ████████████████████████████████[117]

### 5.1.4   NFL output absent Challenged Conduct

104.    These direct restraints on output would not have been possible had the NFL not prevented individual teams from providing consumers access to telecasts, resulting in reduced output, limited choice (which is lower output quality to consumers) and increased prices.  Those teams would have had the ability and financial incentive to enter the telecast market with Standard TV, Regular Pay TV, and/or Premium TV products, such as a "Dallas Cowboys" Cable TV channel or an "Oakland/Las Vegas Raiders Streaming TV App."  It is likely that as a result of these competitive entries, the long-run equilibrium would have been that one or more telecasts of every game was available on a national broadcast or Regular Pay TV television channel, much as major college football is broadcast on Saturdays (and occasional weekdays) during college football season.  A premium one-stop-shopping product might still have been available for consumers who prefer that method of distribution, especially as a streaming product, but at a substantially lower price due to competition.

---

[117] ████████████████████████████████████████████
████████████ See, for example, NFL  0458529 at 8542, Section (c)(i). ████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

█████████████████

105.    The marginal cost to extend the live distribution of any NFL telecast is relatively low, and
such distribution could occur through a variety of distribution channels.[118] If Teams were independently
determining the level of output for the telecasting of their own home games, then each team would have
had an incentive to arrange for distribution to the extent that the marginal revenue for that team exceeded
the very low marginal cost.  With the Challenged Conduct, however, the NFL (all teams collectively) had
an incentive to arrange for a much lower level of distribution, whether through Standard Television or
otherwise.

## 5.2   ANALOGIES RELATED TO DIRECT EFFECTS

106.    In this section, I provide three example of sports leagues providing output absent some or
all of the restraints that directly restrict NFL output.  For the purposes of Class Certification, the
methodology for demonstrating these points is common to all class members.  The examples I give below
demonstrate that the evidence will not vary by class member.

107.    As discussed above in Section 3.4.3, there is evidence in the record showing ████



█████████████████████████████████████████████   The evidence this provides for
any given class member as to the NFL Team Defendants' incentives to accept such a bid, and the
anticompetitive impact of not doing so is identical to the evidence it provides for all other class members,
namely that the ██████████████████████████████████████████████
██████[119]  This is output-limiting conduct, but more importantly at the class certification stage, it is

---

[118] The marginal cost for DirecTV for Sunday Ticket subscriptions addresses only one specific distribution method and is not
the same as the marginal cost to extend live distribution of any NFL telecast, which could include other MVPDs
distributing premium telecast, additional distribution by networks via Regular Pay TV, and/or streaming (through a
streaming service such as Apple TV or Amazon, or Teams distributing telecasts directly.  Also, removing the current
requirement for DirecTV to block telecasts based on zip code and Sunday Ticket subscription status removes a constraint
for DirecTV, which may reduce costs.

[119] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
NFL_0458529 at 8542 (extension of NFL license agreement with CBS).  See also NFL_0458699 at 8742 (extension of
NFL license agreement with Fox ████████████████. As I discussed above in Section 3.4.3, the NFL ████

the same evidence for each class member.  This same commonality of evidence applies for each of the examples that follows.

### 5.2.1   College Football after *Board of Regents*

108.    Major American college football includes teams (representing four-year colleges and universities) that are organized into conferences of approximately a dozen schools/teams.  The top of the pyramid are schools that play in the Power 5 (P5) conferences, which are geographically spread across the US.  These conferences are the Southeastern Conference (SEC), the Big Ten, the Atlantic Coast Conference (ACC), the Big 12, and the Pacific 12 (Pac-12).  The University of Notre Dame is independent in football[120] (meaning that they do not play football in a conference, but schedules games against many top teams in these P5 conferences) and is considered part of this top tier of college football.[121]

109.    Starting in the early 1950s and lasting until 1984, the NCAA engaged in an output limiting agreement among its member schools, an arrangement which was struck down by the Supreme Court in *NCAA v. Board of Regents*.  After the initial televised games put on by the University of Pennsylvania in the 1940s, the NCAA prohibited televising college football games (starting in 1951) claiming that it may negatively affect gate receipts.  The next year, the NCAA launched a television plan that lasted until the *Regents* case in 1984.  This plan initially included showing just one game on Saturday afternoon (or simultaneously shown regional games).[122]  By 1983, the NCAA had expanded the number of games to two to three games.  In the wake of the *Regents* decision, schools began to find ways to market their broadcast rights independently of the large consortiums which had monopolized (or thereafter for several years, duopolized) college broadcasting.  The result was that games which were not being aired in a given market by the consortium reverted back to the home team to license independently.

---

███████████████████████████████████████████████████████ NFL_0239782 at 9784.

[120] Notre Dame has an affiliate relationship for football with the ACC, of which it is a member for all other sports.

[121] BYU also plays major college football, is not in a conference, and has its own television channel (BYUtv).  It has agreed to join the Big 12 in 2023 and thus join the P5.

[122] See Sanderson, A., & Siegfried, J. (2019).  The Economics of the National Collegiate Athletic Association. In P. Downward, B. Frick, B. Humphreys, T. Pawlowski, J. Ruseki, & B. Soebbing (Eds.), *The SAGE Handbook of Sports Economics* (1st Ed.) (pp. 112-122). Sage Publications Ltd.

- "To further protect against charges similar to those successfully leveled against the NCAA, in the CFA contract the rights to those games not chosen by the network for the exclusive Saturday afternoon time slot reverted to the host institution, which could sell them to syndicators or cable stations in an earlier time slot.  By permitting teams to broadcast their games in the late morning or early afternoon independently of the group contract, the CFA expanded the number of televised college football games, addressing directly a concern of the Supreme Court.  The early afternoon time slot also provided a way for the big-time programs to gain more appearances, at least in limited locations, and to expand their broadcast rights revenues."[123]

- "Starting in 1985 the CFA contracts also included a Saturday evening game telecast on ESPN. Although it too was exclusive in its time slot, it added yet another college football game to Saturday television programming guides."[124]

- "The result was that many more college football games were telecast after than before June 1984.  Dunnavant estimates that fans typically could view four times as many games after as before the Supreme Court's decision."[125]

110.    The *Board of Regents* decision (finding the NCAA in violation of antitrust laws in the sale of media rights) created a substantially more competitive environment and the net result, today, is that Saturdays have many more nationally telecast football games compared to Sundays (NFL).  The immediate result of *Board of Regents* was an expansion of the number of televised games, and a decline in the rights fees paid to about one-third of the 1983 level.  With more choices for advertisers, a 30-second spot dropped from $60,000 in 1983 to $15,000 in 1984.  This occurred even under the auspices of the College Football Association (CFA), a large group of prominent football-playing schools negotiating as a group in the sale of their media rights.  In other words, even without each school or each conference competing with each other one on one, advertising fees dropped substantially, and output rose.  This paralleled what happened with respect to rights fees, as they dropped from $700,000 per game per team

---

[123] Siegfried, J., & Burba, M. (2004). The College Football Association Television Broadcast Cartel. *The Antitrust Bulletin 49*(3), 799-819. https://doi.org/10.1177/0003603X0404900309, p. 806.

[124] Siegfried, J., & Burba, M. (2004). The College Football Association Television Broadcast Cartel. *The Antitrust Bulletin 49*(3), 799-819. https://doi.org/10.1177/0003603X0404900309, p. 806.

[125] Siegfried, J., & Burba, M. (2004). The College Football Association Television Broadcast Cartel. *The Antitrust Bulletin 49*(3), 799-819. https://doi.org/10.1177/0003603X0404900309, p. 806.

under the NCAA deal (prior to the dissolution of the cartel) to $300,000 per game per team with the College Football Association deal.[126]

111.    The ruling freed FBS schools to compete among each other for television rights and to massively expand industry output.  Rather than a limited game or two per weekend on one network, CBS broadcast Big Ten and Pac-10 games, while ABC broadcast games played by members of the CFA (College Football Association), which included the SEC, SWC, ACC, Big Eight, WAC, Notre Dame, and Penn State.[127]  In essence, the former NCAA monopoly had split into a duopoly, but this was not the end of the competitive process.  In 1987, the two networks switched between these two groups of schools, but in 1990 Notre Dame broke from the CFA ranks by signing a separate deal with NBC.[128]  This break up was helped by the fact that the FTC sued the CFA and ABC in October 1990:

> "…charging that the CFA had 'entered into restrictive telecast agreements, much like those condemned in Board of Regents … through the collusion with and among its members.'"[129]

112.    By 1994, the SEC had left the CFA for a CBS contract (a relationship it has to this day, though it has contracted to move to ESPN in the near future), the Southwest Conference (SWC) collapsed in the wake of this move, with most of its teams joining the SEC or the Big 8 (which renamed itself the Big 12 after absorbing four SWC teams), and soon the broadcast world began to take the shape we see today, with each conference with its own television contract, negotiated without coordination with its competitors.  Although it took a decade after the initial antitrust breakup in 1984, eventually, schools licensed to their conferences most of their individual team rights to their home games and the conferences competed with each other.  Thus, the SEC packaged those rights and sold them to CBS in 1996[130] and

---

[126] The College Football Association consisted of a group of schools selling their media rights as a whole, but many major football powers were not part of this group. Kunz, W. (2020). *The Political Economy of Sports Television* (1st Ed.). Taylor & Francis.

[127] Dunnavant, K. (2016). *The Fifty-Year Seduction: How Television Manipulated College Football, from the Birth of the Modern NCAA to the Creation of the BCS* (1st Ed.). Thomas Dunne Books, p. 203.

[128] Dunnavant, K. (2016). *The Fifty-Year Seduction: How Television Manipulated College Football, from the Birth of the Modern NCAA to the Creation of the BCS* (1st Ed.). Thomas Dunne Books, p. 216.

[129] Dunnavant, K. (2016). *The Fifty-Year Seduction: How Television Manipulated College Football, from the Birth of the Modern NCAA to the Creation of the BCS* (1st Ed.). Thomas Dunne Books, p. 237.

[130] Michael Wayne Bratton, "Sports media insider believes ESPN will buyout SEC deal from CBS: 'I would put it at 95 percent'", *Saturdays Down South*, accessed on August 15, 2022 at https://www.saturdaysdownsouth.com/sec-football/espn-cbs-sec-football-deal-john-ourand/.

ESPN in 2008[131] (contracts still in effect), while the ACC packaged its rights and sold them to ABC and ESPN in 1996[132] and has continuously renewed agreements with the networks since[133] (with the current deal having gone into effect in 2012[134]).  The market outcome consumers now enjoy is one in which most conference football games are offered free on over-the-air channels or on Regular Pay TV channels.  The viewer only needed a basic cable or satellite subscription to see dozens of games each weekend.[135]

113.    For example, the SEC games are all shown on ESPN, ESPN2, ESPN3, ESPNU, ABC, CBS, CBS Sports Network, FOX, or SEC Network (owned by ESPN).  This arises from a combination of deals that the SEC has negotiated with CBS and ESPN, as well as the conferences scheduling arrangements for inter-conference games, and the relevant telecast deals negotiated by the other conferences.  Most of the games are available on basic cable packages (for about $40 per month, with no contract) or basic satellite packages (for about $65 per month, with a 2-year contract).  To get some of the channels with SEC games currently, a DirecTV subscriber needs to upgrade to a higher tier package (an additional $5/month).  The Big Ten is in the process of negotiating a deal in which its games will appear on FOX, CBS, NBC, and some of their affiliated cable and streaming networks, along with, potentially, independent streaming networks such as Amazon or Apple TV.[136]

---

[131] "ESPN signs 15-year deal with SEC", *ESPN*, August 25, 2008, accessed on August 15, 2022 at https://www.espn.com/college-sports/news/story?id=3553033.

[132] "Around the Colleges", *The Washington Post*, February 15, 1994, accessed on August 15, 2022 at https://www.washingtonpost.com/archive/sports/1994/02/15/around-the-colleges/a993c659-c3ad-4674-8928-4541bc71ef13/.

[133] "ACC agrees to new seven-year TV deal", *ESPN*, May 12, 2004, accessed on August 15, 2022 at https://www.espn.com/college-football/news/story?id=1800339.

[134] Steven Muma, "ACC, ESPN Agree To 15-Year, $3.6 Billion TV Contract", *SB Nation*, May 9, 2012, accessed on August 15, 2022 at https://www.backingthepack.com/2012/5/9/3009974/acc-espn-agree-to-15-year-3-6-billion-tv-contract.

[135] Currently, the ACC has a contract with ABC/ESPN (with some games shown on the ESPN-owned ACC Network), the Big Ten with FOX, ABC/ESPN and the Big Ten Network (co-owned by the conference and FOX), the Big 12 with FOX and ABC/ESPN, the Pac-12 with FOX and ABC/ESPN (with some games shown on the conference-owned Pac-12 Network), and the SEC with CBS and ABC/ESPN (with some games shown on the ESPN-owned SEC Network).  Notre Dame is shown on NBC.  Some of the games may be shown on these media companies' other channels (e.g., ABC/ESPN: ESPN2, ESPNU; FOX: FSN; CBS: CBS Sports Network).

[136] See Nicole Auerbach, "Big Ten media rights: What we know as negotiations enter final stretch", *The Athletic*, August 8, 2022, accessed on August 15, 2022 at https://theathletic.com/3488621/2022/08/08/big-ten-media-rights-facts/.

Exhibit 3 Provider Costs to Watch All In-Conference SEC Games During the 2021 Season

| At this location | On This Telecast Platform | Requires these channels | Which require this Package | At This Added Monthly Cost |
|---|---|---|---|---|
| Baton Rouge, LA Inside SEC Region | DTV | CBS ESPN ESPN2 | Entertainment | $64.99 |
| | | SECN | Choice | $5.00 |
| | | | **Total:** | **$69.99** |
| Omaha, NE Outside SEC Region | DTV | CBS ESPN ESPN2 | Entertainment | $64.99 |
| | | SECN | Choice | $5.00 |
| | | | **Total:** | **$69.99** |
| Baton Rouge, LA Inside SEC Region | Cox | CBS ESPN | Contour TV Starter | $50.00 |
| | | ESPN2 SECN | Contour TV Preferred | $40.00 |
| | | | **Total:** | **$90.00** |
| Omaha, NE Outside SEC Region | Cox | CBS ESPN | Contour TV Starter | $50.00 |
| | | ESPN2 | Contour TV Preferred | $40.00 |
| | | SECN | Sports & Info Pack | $10.00 |
| | | | **Total:** | **$100.00** |
| Atlanta, GA Inside SEC Region | DISH | CBS ESPN ESPN2 SECN | America's Top 120 Plus | $79.99 |
| | | | **Total:** | **$79.99** |
| Detroit, MI Outside SEC Region | DISH | CBS ESPN ESPN2 SECN | America's Top 120 Plus | $79.99 |
| | | | **Total:** | **$79.99** |
| Atlanta, GA Inside SEC Region | Xfinity | CBS ESPN ESPN2 SECN | Popular TV 125+ | $60.00 |
| | | | **Total:** | **$60.00** |
| Detroit, MI Outside SEC Region | Xfinity | CBS ESPN ESPN2 | Popular TV 125+ | $60.00 |
| | | SECN | Ultimate TV 185+ | $20.00 |
| | | | **Total:** | **$80.00** |

*Notes:*
  *Cable providers have more limited availability in certain areas/states - compare regions w/ DTV&Cox and regions w/DISH&Xfinity for CFB.*
  *Xfinity cost est. requires setting location. Atlanta location set to 478 English Ave NW, Atlanta Georgia and Detroit location set to 2066 Hazelwood st, Detroit MI.*
  *Omaha and Baton Rouge are used as examples as they are areas relevant to conference ranges and in which COX is available (Satellite subject to greater availability).*
  *Package costs based on Fall 2021 prices when possible (Xfinity based on current prices). Fixed free, set-up fees, equipment fees, hidden fees, tax, etc. are excluded. Providers require 1-2 year contracts.*
  *Contour TV Preferred on COX is the minimum package requires to qualify for Sports Add-Ons. Ultimate Package comes with all needed channels but costs $130 (more than Preferred+Sports&Info Pak).*

*Sources:*
  *SEC 2021 football TV schedule from https://secfootballonline.com. COX, DirecTV, DISH, and Xfinity Websites.*

114.     The current broadcast situation for FBS (major college) football, reflecting the competitive conditions that resulted from *Board of Regents*, provide a clear example of what basic economic principles would predict: a Saturday afternoon of FBS  football with the schedule packed from 11am (ET) through midnight, and games on most broadcast networks as Standard Telecasts, with additional games offered on streaming networks and basic Regular Pay TV channels dedicated to sports (such as ESPN, FOX's FS1 and FS2, etc.), and/or through competitive telecasts offered by individual universities or conferences.  A comparison of the Saturday afternoon offerings for just the Big Ten and SEC conferences, which combined had 28 teams (as of 2021) versus the Sunday offering for the NFL, with 32 teams, shows the potential for enhanced output from a less restrictive arrangement but-for the alleged misconduct in this case, with the college Saturday schedule substantially fuller than the comparatively meager NFL schedule on Sunday (see Exhibit 4 below).

Exhibit 4.  Television Schedule of Big Ten, SEC, and NFL on October 9/10, 2021

**Saturday 10/9/2021 Big Ten, SEC and NFL Cable TV Schedule**



**Sunday 10/10/2021 Big Ten, SEC and NFL Cable TV Schedule**



| Type | Saturday | Sunday |
|---|---|---|
| Live Football | 11 | 4 |
| Football related | 0 | 3 |
| Live College Sports | 0 | 1 |
| Live Pro Sports | 0 | 1 |
| Sports review | 0 | 0 |
| Not Live Sports | 0 | 0 |
| Not Sports | 1 | 3 |
| Nothing on | 0 | 0 |
| *Total* | *12* | *12* |

*Notes:*

*The Saturday programs are restricted to live football events with both teams from either the Big Ten or the SEC Conferences.*

*The Sunday programs include the events on the same channel and at the same time as the Saturday programs.*

*Includes cable channels only.*
*Region has been set to Chicago.*
*"Live Football" includes both college football and the NFL.*
*"Live College Sports" and "Live Pro Sports" do not include football.*

115.    And the situation is starker still when all nationally broadcast P5 FBS football games are included, as can be seen from the full P5 grid below, Exhibit 9 in Section 10.3.1 which focuses just on Standard TV and Regular Pay TV but includes the entire P5 of FBS, essentially the major league of

college football.  The output on Saturday becomes even greater when streaming options are included, all despite the fact that almost all college games have far lower demand than even the least-watched NFL game.  For example, in the week I depicted, the highest nationally rated college game on the grid above in Exhibit 4 focused on just the two largest conferences, the Big Ten and the SEC, was 4.5, and in that same week, the lowest watched NFL timeslot scored an average rating of 8.6.  Two weeks later, on the weekend of October 23/24 the gap was even larger at 2.6 for the top-rated college game and 8.4 for the lowest watched NFL timeslot.  In 2021, the final week of the 2021 regular season was the only time any regular-season college football game was able to get a ranking over 6.0 while every single NFL Sunday timeslot in 2021 had at least a 6.0 average rating.

116.    As can be seen, Standard TV and Regular Pay TV networks distribute college games nationally, often at the same time, during multiple windows on Saturday afternoons.  While the absence of the equivalent of *DirecTV Exclusivity* – the availability of other competing NCAA football games, especially at the same time – would be expected to make it less attractive to each network to carry games, the existence of multiple competing telecasts has not caused any of the major Standard Television networks to cease to broadcast the games together with the Standard Pay TV networks that are focused on sports-based programming.

117.    This expanded Saturday output was the ultimate result of a process that began after the *Board of Regents* decision.  Games typically aired were still broadcast, but the rights fees for the same games were substantially less than would have been paid under the system the Supreme Court rejected.  However, what changed dramatically was the quantity of games available to any given viewer on any given Saturday, so that in the medium-to-long term, as more viewers had a chance to watch college football, the product actually became more popular, and so rights fees grew again over time, but for procompetitive reasons – because consumers were getting higher value from the product – rather than from the anticompetitive effect of artificial scarcity.  I discuss the process by which the NCAA monopoly was unwound elsewhere.

### 5.2.2   Other Major League Sports in North America

118.    Other major sports' premium channel offerings serve as examples of premium products with more options that are distributed more widely, i.e., they are typically available on multiple MVPDs such as cable and satellite, as well as through streaming options on the internet.  For example, MLB Extra Innings has been estimated to have 3.5 million[137] customers who watch its online video service each season, which is almost double Sunday Ticket telecast subscribers, despite the evidence that national Standard Television viewership is much lower for baseball[138] (about 2 million viewers per game) than for football (about 15 million) and it is generally acknowledged that the NFL is a more popular sport than MLB – "In 2014, 35 percent of fans call the NFL their favorite sport, followed by Major League Baseball (14 percent), college football (11 percent), auto racing (7 percent), the NBA (6 percent), the NHL (5 percent) and college basketball (3 percent)."[139]

119.    As I understand it, some of the current MLB offerings were only made possible because of a litigated settlement, and so when it was implemented it did not represent an organic market outcome made by competition that included MLB itself and its individual teams.  However, I also understand that settlement was time-limited and the end-date has been reached, so that MLB could have chosen to revert to its old system of pricing if it wished, and it has chosen to maintain the a la carte options it had previously litigated to prevent from happening, which are of the same sort of option the NFL maintain would cause some of the calamitous (albeit effectively zero probability) market collapse scenarios described and dispatched with above.  Not only did the sky not fall when MLB was forced through settlement to adopt these changes, it turns out that their view of what was best for their consumers and

---

[137] "The exact number of MLB app subscribers is a tightly held figure by the league. However, based on a year-end 2019 list of the top 10 streaming video apps from research firm Parks Associates, MLB probably has at least 3.5 million subscribers, based on its rank as the seventh-most popular paid streaming service". Joe Lucia, "Refunds for MLB.tv will reportedly exceed $200 million this year", *Awful Announcing*, August 13, 2020, accessed on August 15, 2022 at https://awfulannouncing.com/mlb/refunds-for-mlb-TV-will-reportedly-exceed-200-million-this-year.html.

[138] MLB attempted to enter into an exclusive deal with DirecTV in 2007.  It had a deal, but backed out because of pressure, much of which came from Congress.  They would have kept MLB.TV separate, but the quality of the product wasn't as good at the time. See Richard Sandomir, "Extra Innings Exclusively on DirecTV", *New York Times*, January 20, 2007, accessed on August 17, 2022 at https://www.nytimes.com/2007/01/20/sports/baseball/20base.html.

[139] Darren Rovell, "NFL most popular for 30th year in row", *ESPN*, January 26, 2014, accessed on August 16, 2022 at https://www.espn.com/nfl/story/_/id/10354114/harris-poll-nfl-most-popular-mlb-2nd. See also NFL_0504153.

their own business changed sufficiently that they no longer see enough value in the old system to revert
to the less-consumer friendly "NFL-style" of Hobson's Choice.

120.    Both the NBA and NHL have offered full league packages and single team packages, on
multiple MVPDs or distribution technologies.  Moreover, these are all priced less expensively than NFL
Sunday Ticket.  As I understand it, while the NHL's offering is the result of litigation, the NBA's is not.
And the NBA's product is gaining popularity, especially among younger audiences[140] which bodes well
for its future growth.

### 5.2.3    NFL Radio and Preseason Television

121.    In contrast with regular season television, the NFL allows individual teams to package
and license their preseason television and/or regular season radio rights even though the NFL also
licenses a national radio package with Westwood One and airs select preseason games on NFL Network,
as well as through the NFL's Network partners.  The NFL



[141] As I
understand it, a Dallas Cowboys fan in Arizona has the ability to listen to a Cowboys game on a
Cowboys radio partner network, and also to listen to the Cowboys' own broadcast of the game, even if a
national NFL broadcast of that same game is being aired at the same time.[142]  Obviously, this competitive
choice has not prevented the NFL from securing a national radio deal with SiriusXM for all of its games,
or with Westwood One for its evening games, nor has it prevented the Cardinals from securing a deal to

---

[140] "Poll: NBA more popular among Gen Z, Millennial fans than NFL", *Sports Business Journal*, July 22, 2021, accessed on
August 17, 2022 at https://www.sportsbusinessjournal.com/Daily/Issues/2021/07/22/Leagues-and-Governing-
Bodies/NBA-Poll.aspx.

[141] Many NFL clubs have a radio network with a large geographic footprint.  For example, the Raiders have a network that
covers much of the western U.S.  See "Game Radio Broadcast Info", *Raiders.com*, accessed on August 16, 2022 at
https://www raiders.com/multimedia/game-radio-broadcast-information.

[142] "Welcome to the 2022-2023 Football & Basketball Season", *Compassmedianetworks.com*, accessed on August 16, 2022 at
https://www.compassmedianetworks.com/index.php/sports/.

air its games in Phoenix.[143]  The Raiders games are also aired on the radio in the Phoenix DMA without

any deleterious impact.

122.  

123.

124.  In Mexico, where the NFL has an OTA deal with TUDN and cable deals with ESPN and

FOX,[147] the NFL has a new international marketing program that allows individual teams to sell certain

rights.  For instance, the Dallas Cowboys just contracted with TelevisaUnivision to air all three of the

Cowboys preseason games.  There are nine NFL clubs that have local marketing rights in Mexico,

implying that they can compete with each other in overlapping geographies independently.[148]  As of

August 19, the San Francisco 49ers have also entered the Mexican broadcast market through FOX Sports

---

[143] "Cumulus Media's Westwood One and the NFL Review and Expand Longstanding Audio Media Partnership", Westwood One Sports, March 28, 2022, accessed on August 16, 2022 at https://westwoodonesports.com/2022/03/nfl-and-westwood-one-renew-expand-partnership/. "The NFL & SiriusXM expand agreement: Find out what you'll hear", *SiriusXM*, July 26, 2022, accessed on August 16, 2022 at https://blog.siriusxm.com/nfl-2022-2023-season/.

[144] ████████████████████████████████ (NFL_0987035 at 7347-7348).

[145] ████████████████████████████████ (NFL_0987035 at 7060).

[146] ████████████████████████████████ (NFL_0987035 at 7337).

[147] Ben Fischer, "Cowboys, TelevisaUnivison take on Mexico together", *Sports Business Journal*, August 12, 2022, accessed on August 16, 2022 at https://www.sportsbusinessjournal.com/Daily/Morning-Buzz/2022/08/12/Cowboys-TelevisaUnivison-deal.aspx.

[148] Ben Fischer, "Cowboys, TelevisaUnivison take on Mexico together", *Sports Business Journal*, August 12, 2022, accessed on August 16, 2022 at https://www.sportsbusinessjournal.com/Daily/Morning-Buzz/2022/08/12/Cowboys-TelevisaUnivison-deal.aspx.

Mexico.[149]  As of August 19, the 49ers also struck a radio deal in Mexico "promising full radio coverage of every 49ers game."[150]

### 6. ESTABLISHING THE RELEVANT MARKETS AND DEMONSTRATING MARKET POWER VIA INDIRECT EFFECTS IS POSSIBLE BY MEANS OF CLASS-WIDE, COMMON METHODS

125.    While the direct approach laid out above is the stronger *economic* case for proving a firm has caused anticompetitive harm,[151] it has become common for courts to also assess a full application of the indirect method including determining the relevant product and geographic markets Defendants compete in, and then determining whether Defendants have market power in those relevant market(s).  In what follows I demonstrate this indirect approach, both to show that it concludes that Defendants had sufficient market power in a relevant market to cause the alleged anticompetitive harm that led to the alleged damages (consistent with the direct evidence that the anticompetitive harm occurred), but also to demonstrate that the evidence needed to prove these allegations is common to members of each Class.

126.    The indirect effects analysis complements the direct effects analysis by demonstrating how market forces interact to cause common impact from the challenged conduct.  Markets, from an economic perspective, aggregate diverse consumer preferences and competing supplier capabilities across many transactions into market prices and quantities.  The standard economic assumptions that lead to supply and demand equilibrium also provide the foundation for robust analytical methods to make

---

[149] "49ers Expand Broadcast Reach to Mexico with FOX Sports Partnership", *49ers.com,* August 12, 2022, accessed on August 19, 2022 at https://www.49ers.com/news/49ers-expand-broadcast-reach-to-mexico-with-fox-sports-partnership.

[150] Ben Fischer, "49ers get deal for radio distribution in Mexico", *Sports Business Journal,* August 19, 2022, accessed on August 19, 2022 at https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2022/08/19/49ers.aspx.

[151] As explained via citation to Phillip E. Areeda in "Antitrust Guidelines for Collaborations Among Competitors" (2000), *Antitrust Law,* (Joint Venture Guidelines or "JVGs") published jointly by the FTC and DOJ, accessed on August 18, 2022 at https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf:

> "… 'Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as a reduction of output," can obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects."' JVGs, Fn. 28, quoted "7 Phillip E. Areeda, Antitrust Law ¶1511, at 424 (1986)). *NCAA* 468 U.S. at 104-08, 110 n.42."

JVGs, p. 11.  See also Elzinga, K. & Swisher, A. (2011).  Limits of the Elzinga-Hogarty Test in Hospital Mergers: the Evanston Case.  *International Journal of the Economics of Business*, *18*(1), 133-146.  https://doi.org/10.1080/13571516.2011.542963, p 144. "The exercise of defining a market and calculating market shares is useful only to the extent it accurately circumscribes these economic forces. If direct evidence of a competitive restraint is available, the task of defining a relevant market and estimating market shares and concentration statistics is unnecessary."

economic conclusions about market outcomes.  With economics, the indirect effects approach shows here that all class members commonly experienced market prices that were affected, in common across all market transactions, by the challenged conduct even with the natural heterogeneity present in any consumer market.  The mere fact that human beings have different preferences does not render a class impossible or create class conflict.  Rather, economics as a discipline is designed to address that heterogeneity and develop these market-level assessments so as to assess market-level impacts that affect all consumers in a given relevant market.

127.    The preliminary analysis required for such economic conclusions is to first identify the competitive market interactions through which the indirect effects might percolate – this is the relevant market definition.  The second step is to determine whether the Defendants have the ability to influence market outcomes to achieve indirect effects from the challenged conduct – this is the market power analysis.  The final step is to determine whether potential entrants who might provide additional competitive constraints are able to do so – this is the analysis of barriers to entry.  I complete those three parts of the preliminary analysis of indirect effects in this section, and then in the next section I analyze how the challenged conduct by Defendants indirectly affected transactions in the relevant market through the use of market power and protected from competitive constraints of entrants.

### 6.1   RELEVANT MARKETS

128.    The process of defining a relevant market relies on economic tools that are deployed within a legal framework.  Economists typically assess relevant markets only when asked to do so for litigation or merger reviews.  While the process relies on the same economic concepts that economists use in the course of their academic or industry work, the process itself and the framework are inherently legal.

129.    The purpose for market definition in an antitrust case is to assess whether the alleged anticompetitive conduct had the potential to harm competition.  If it can be established that the product in question is sold in a relevant market that is broad relative to the defendant's share, the potential harm to competition can be lower than if the relevant market is narrower.  Market definition is not an end itself,

but only a step in the process of determining whether anticompetitive harm occurred as an indirect effect of the alleged anticompetitive conduct.

130.    To assess indirect effects from the Challenged Conduct in this matter, the relevant market alleged is for major league professional football telecasts in the United States, including those of the NFL.[152]  This conclusion aligns with prior analysis and litigation, with published economic studies, and with additional analysis specific to this matter.  The analysis to reach this conclusion is common across all class members.

### 6.1.1    The Merger Guidelines framework

131.    My standard starting point for the legal framework of this economic analysis of market definition is the Merger Guidelines published jointly by the U.S. enforcement agencies for antitrust, namely the Department of Justice and the Federal Trade Commission.  The most recent version of these Guidelines was published in 2010 and can be found online at the Federal Trade Commission's website.[153]  When considering indirect effects of possible anticompetitive conduct involving a set of products (in a case about an output market), the market definition derives from the perspective of customers of the products.  "Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service."[154]  That is, the question for an output market comes down to what consumers will do when faced with a price increase in the product at issue, which is commonly called the "reference product."

132.    The definition of a relevant market(s) is the smallest set of products that compete with the reference product(s) sufficiently to constrain prices and maintain aggregate output.  For a relevant market, "sufficiently" means that a hypothetical monopolist (controlling all output of the proposed set of

---

[152] "The relevant product market for both Classes is the live video presentations of regular season NFL games…".
Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act, ¶53.

[153] Horizonal Merger Guidelines, Federal Trade Commission, August 19, 2010, accessed on August 16, 2022 at
https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

[154] Horizonal Merger Guidelines, Federal Trade Commission, August 19, 2010, accessed on August 16, 2022 at
https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf., p. 7.

products) could profitably increase prices above and/or reduce output levels below competitive levels. Here, "competitive levels," means the price and/or output levels that would occur absent the Challenged Conduct.

133.    A hypothetical firm that receives market power via anticompetitive conduct in a previously competitive relevant market would be able to raise prices profitably – gaining more from the price increases on the sales it maintains than the profit forgone from sales it loses.  In contrast, if there are substantial competitive options outside of the proposed relevant market, then sufficient customers could substitute to those products to render the price increase unprofitable.  When this happens, the market has been defined too narrowly.  One way to assess whether a putative relevant market meets this definition is the hypothetical monopolist/"SSNIP" test.  A SSNIP is a small but significant non-transitory increase in price, such as 5% (a common level to check).[155]  When there is evidence that substitution across products does not occur even at large price changes, a SSNIP test is redundant.

### 6.1.2   The NFL is distinct from other sports: evidence from Sports Economics Literature and Relevant Markets

134.    It is the broad consensus in both the economic literature and in prior litigation that, as a general matter, individual sports and their telecasts are in their own markets separate from other sports.

135.    For example, Michael Mondello concluded, "Even the presence of other rival football leagues has not diminished fan enthusiasm for the NFL signifying fans do not perceive there to be any close substitute,"[156] and that "...NFL football has few suitable substitutes for consumer tastes.  Therefore, consumers interested in watching an NFL football game on television have virtually no alternative way to consume the product than to watch the broadcast station with the exclusive rights."[157]  I discuss in more detail below the specific basis for similar conclusions in the economics literature, which addresses sports

---

[155] See Horizonal Merger Guidelines, Federal Trade Commission, August 19, 2010, accessed on August 16, 2022 at https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf., Section 4.  In the context of a merger, the "increase" is the change from the price existing before the merger to the expected price after the merger (the merger is the potentially challenged conduct).  In the context of an antitrust action, the "increase" is the change from the price with the challenged conduct (the existing price) to the expected price absent the challenged conduct.

[156] Mondello, M. (2012). Media Economics of the NFL. In K. Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 91–105). Springer, p. 89.

[157] Mondello, M. (2012). Media Economics of the NFL. In K. Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 91–105). Springer, p. 92.

generally and NFL football in particular.  It is also confirmed by Defendants' behavior in this case

because the artificial limitations on, for example, the distribution of Sunday Ticket to protect the Sunday

afternoon local broadcasts from competition would not make economic sense if NFL games were in the

same market as other kinds of programming that "compete" with NFL telecasts.

136.    In the USFL case, the NFL was found to be a monopolist "in a relevant market consisting

of major league professional football in the United States,"[158] as opposed to the NFL position that the

relevant market was for "entertainment broadcasting."[159]  In the course of that case, the jury determined

that "the N.F.L. had a monopoly power 'to control prices or exclude competition' in the 'relevant market'

of professional football in the United States."[160]

137.    The NFL has also been found to have monopoly power in *Mid-South Grizzlies v. NFL*, a

case in which the Memphis-based team from the short-lived World Football League tried to enter the

NFL, but the league refused.  The franchise sued on antitrust grounds.  In that case, the relevant market

was defined as professional football in the U.S.[161]

138.    Just as the NFL has been found to be a monopolist in professional football, the Supreme

Court has also recognized that college football competes in its own, distinct relevant broadcast market,

separate from the NFL.  In the landmark *NCAA v. Board of Regents* case, the Court determined that the

product market was "live college football television,"[162] and thus the NCAA had monopoly power in the

provision of these games for television.  Implicit in a ruling that college football programming is its own

market is the conclusion that the NFL football is not part of a market that includes college football.[163]

---

[158] *US Football League v. National Football League*, 644 F. Supp. 1040 (S.D.N.Y. 1986), Oct. 2, 1986, accessed on August 16, 2022 at https://law.justia.com/cases/federal/district-courts/FSupp/644/1040/1558759/.

[159] Winters, A. (2012). The NFL and Antitrust Law. In K. Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 277-323). Springer. p. 312.

[160] Michael Janofsky, "USFL Loses in Antitrust Case; Jury Assigns Just $1 in Damages", The *New York Times*, July 30, 1986, accessed on August 16, 2022 at https://www.nytimes.com/1986/07/30/sports/usfl-loses-in-antitrust-case-jury-assigns-just-1-in-damages.html.

[161] *Mid-S. Grizzlies v. Nat'l Football League*, 720 F.2d 772, 783 (3d Cir. 1983).

[162] *NCAA v. Board of Regents of University of Oklahoma* (1984), 468 U.S. 85, accessed on August 16, 2022 at https://supreme.justia.com/cases/federal/us/468/85/.

[163] It is theoretically possible for competition to have a "one-way" aspect, where changes in the price of Product A affect consumption of Product B, but not vice versa, but in the case of college and professional football, there is little schedule overlap, and to the extent there is, the evidence points to NFL football having a much greater impact on college

███████████████

139.     In L.A. Memorial Coliseum Commission, the court stated that "NFL football has limited substitutes from a consumer standpoint."[164]  In the *Laumann* case, which also addressed live television broadcasts, the court concluded, that "there are peculiar and unique characteristics that set major league men's ice hockey and baseball apart from other sports or leisure activities, and that close substitutes do not exist."[165]  As discussed below, these findings are consistent with both the economic literature and my own analysis.

### 6.1.3   Sports Economics Literature and Relevant Markets

140.     The literature in economics of sports demonstrates how the framework laid out in the Merger Guidelines leads to the economic definition of markets for different sports leagues.  In summary, NFL teams compete with each other for television viewers when they are in the same market, less so when they are in the same region, and still less so when the potential competition involves teams that do not share a metropolitan area or region.  Moreover, NFL teams do not compete with other forms of sports entertainment.  All of the evidence from the economics literature is evidence that is common to the class and does not require individualized inquiry.

#### 6.1.3.1   NFL Television Demand

141.     Regarding demand for NFL telecasts specifically, published research supports the position that the only close economic substitutes for NFL telecasts are other NFL telecasts.

142.     In one of the first of many studies of NFL television viewership by Scott Tainsky, he examines the drivers of television ratings in local markets when the home team is playing at home (and separately when the home team is playing on the road).[166]  Among other findings, this research shows a very substantial negative impact on television ratings when the home team shares the market with another NFL team.  This substantially stronger evidence of substitution between NFL teams when compared to the tepid or non-existent substitution between an NFL team and one of the other proffered substitutes

---

consumption than vice versa.  Thus, the finding that college football was a distinct market effectively rules out the possibility that college football is part of a professional football market.

[164] *L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984).

[165] *Laumann v. NHL*, 907 F. Supp. 2d, 465, 491 (S.D.N.Y. 2012).

[166] Tainsky, S. (2010). Television Broadcast Demand for National Football League Contests. *Journal of Sports Economics*, *11*(6), 630-640. https://doi.org/10.1177/1527002509355536

(another sports' team or some more distant non-sports substitute) suggests that there *is* competition between two NFL teams in the same market.

143.    In another examination of the television demand for NFL games in markets without a local NFL team, Tainsky and McEvoy (2011)[167] find that if the closest team in terms of proximity is playing in the televised game, it is associated with higher ratings, lending evidence to the notion that NFL teams are regional in nature (and not just local).[168]  Additionally, when there are concurrent ("adjacent") telecasts of NFL games on, television ratings are lower, all else equal, thus providing evidence that NFL teams compete with each other for ratings in markets without a local NFL team.

144.    In a study of out-of-market NFL games, Tainsky and Jasielec (2014) show that when there is more than one out-of-market game on Sunday afternoon, ratings are lower for the game being analyzed.[169]  Further, when the game includes a team that is closest (but not the local team), ratings are higher, all else equal.  When two games are concurrent and one includes the local team, viewership of the out-of-market contest declines dramatically.  This is consistent with the idea that NFL teams compete with each other and that the sport has regional markets, with fan preferences being stronger for the local team than other nearby teams.  Moreover, this research shows that when a game conflicts with a local Major League Baseball playoff game, it has no statistically significant impact on the NFL ratings.[170]

### 6.1.3.2   *NFL non-television products*

145.    In a number of articles that investigate a particular aspect of the demand for NFL games, the results related to price are consistent with the above findings that sports teams (or NFL teams) operate in the inelastic portion of demand, implying that the teams have pricing or market power in that an

---

[167] Tainsky, S., & McEvoy, C. (2011). Television Broadcast Demand in Markets Without Local Teams. *Journal of Sports Economics*, *13*(3), 1-16. https://doi.org/10.1177//1527

[168] The findings related to distance measured in miles are similar.

[169] Tainsky, S., & Jasielec, M. (2014). Television Viewership of Out-of-Market Games in League Markets: Traditional Demand Shifters and Local Team Influence. *Journal of Sport Management*, *28*(1), 94-108. https://dx.doi.org/10.1123/jsm.2012-0341

[170] In a study of shared markets (markets with more than one NFL team), when both teams are televised at the same time, ratings decline substantially per game indicating some substitution between the two teams.  This is regardless of the teams' quality or the game quality.  See Mondello, M., Mills, B., & Tainsky, S. (2017). Shared Market Competition and Broadcast Viewership in the National Football League. *Journal of Sport Management*, *31*(6), 562-574. https://doi.org/10.1123/jsm.2016-0222.

increase in price would not drive customers away to a competitor.  For instance, Welki and Zlatoper

(1994) estimate price elasticity of demand in the NFL to be -0.275, which is quite inelastic.[171]  In an

update to their earlier study, Welki and Zlatoper (1999) find the price elasticity of demand for NFL

games to be -0.125 or -0.172 depending on the model (one uses OLS and the other uses a Tobit

model).[172]  Depken (2001) estimates a model of demand for the NFL and shows price elasticities of

demand ranging from -0.397 to -0.615, all in the inelastic portion of demand.[173]  Brook and Fenn (2008)

directly test for market power and conclude that "all clubs in the National Football League possess

market power."[174]

146.    Looking directly at the impact of potential substitutes (teams in other sports) on the

quantity demanded for NFL games, my co-authors and I used eleven years' worth of NFL annualized

team-level data in a 2012 paper to investigate the impact of new stadiums on the riskiness of revenue

streams.[175]  Our attendance model shows no statistically significant impact on attendance from the

presence of an additional professional franchise from a different sport in the local market, consistent with

the lack of competition between NFL franchises and other sports' professional franchises.  The local

revenue model shows that an additional pro sports franchise in the marketplace is associated with a loss

of local revenue by an NFL franchise of less than $650,000 (and it is marginally statistically significantly

different from zero), which is economically trivial when compared to the average local revenues of $41.5

million, as it implies a 1.54% decline in revenues from the extreme change in the marketplace of an

---

[171] Welki, A., & Zlatoper, T. (1994). US Professional Football: The Demand for Game-Day Attendance in 1991. *Managerial and Decision Economics*, *15*, 487-495. https://www.jstor.org/stable/2487997

[172] Welki, A., & Zlatoper, T. (1999). U.S. Professional Football Game-Day Attendance. *Atlantic Economic Journal*, *27*(3), 285-298. https://doi.org/10.1007/BF02299579

[173] Depken, C. (2001). Fan Loyalty in Professional Sports: An Extension to the National Football League. *Journal of Sports Economics*, 2(3), 275-284. https://doi.org/10.1177/152700250100200306

[174] Brook, S., & Fenn, A. (2008). Market Power in the National Football League. *International Journal of Sport Finance*, *3*(4), 239-244.

[175] Rascher, D., Brown, M., Nagel, M., & McEvoy, C. (2012). Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues. *Journal of Sports Economics*, *13*(4) 431-450. https://doi.org/10.1177/1527002512450281

additional major professional sports team.[176]  This is consistent with the notion that there is a lack of substitutability between NFL franchises and other professional sports franchises.

### 6.1.3.3   *Sports Economics Literature – Natural experiments*

147.     Some studies investigate substitution across sports products that often involve natural experiments like a league shutting down for a time period or a team moving into a geographic market where other teams already exist.  When a product is taken off the market, economically this is the equivalent of an infinite increase in price, i.e., there is no amount of money one can pay to get the product.  Rather than being a SSNIP, which focuses on a small, but significant, price increase, these studies end up being "ELSNIPs," in that they study extremely large price increases.[177]  The substitution that occurs from an ELSNIP is informative about what would happen with a SSNIP.  If the ELSNIP on product A (football, for example) drives substantial substitution to product B (other sports, for example), then it is possible that an unprofitable SSNIP for product A (football) can be made profitable by expanding the relevant market to include product B (other sports).  On the other hand, if the ELSNIP on product A (football) drives little substitution to product B (other sports), then product B (other sports) is an unlikely candidate for inclusion in the relevant market with product A (football) – if large changes do not drive substitution then neither will small ones.

148.     One example of this type of study, using the natural experiment of the NHL lockout in 2004, comes from my own published work.  Rascher, Brown, Nagel, and McEvoy (2009) showed that when the price of NHL hockey increased to infinity (in other words, no games were played), the NBA saw small increases in attendance (of approximately 3.2%), while minor league hockey saw increases ranging from 0% to 6%.[178]  Given the enormous magnitude of the price increase of the NHL product in the actual world, the relatively low level of substitution towards these alternative sports products strongly

---

[176] This illustrates an important point that occasionally occurs in the literature, that of a statistically significant effect, but one that is relatively small and thus not economically significant.

[177] I use this term as one analogous to a SSNIP, with it standing for an "extremely large significant non-transitory increase in price."

[178] Rascher, D., Brown, M., Nagel, M., & McEvoy, C. (2009). Where did National Hockey League fans go during the 2004–2005 lockout? An analysis of economic competition between leagues. *International Journal of Sport Management and Marketing*, *5*(2), 183-195. https://dx.doi.org/10.2139/ssrn.1690854

suggests they are not substitute products.  NBA games, for example, have very similar attendance per game, on average, to NHL games, which means that only about three percent of the NHL fans substituted to NBA.  If instead a SSNIP test had been run, by raising the NHL price by only 5-10% rather than infinitely, it is unlikely to have generated even these small levels of substitution.  For this to happen, one would have to assume a high level of discretely differentiated NHL fans (easily-substituting fans vs. never-substituting fans), so that always a few percent and only a few percent of those NHL fans substitute away to NBA for a small, medium, large, or extremely large price increase.  Capturing an additional five percent of revenue on the less than three percent of fans that would substitute to the NBA is not going to make up for the more than 97 percent of revenue lost on all the other fans that did not.  Thus, these results provide no reason to add NBA games to the relevant market for a reference product of NHL games.

149.    Thus, while such a natural experiment is not precisely a SSNIP, in some sense it is stronger than a SSNIP test in that with larger changes in price we would expect more dramatic switching behavior, if products are in fact economic substitutes, yet my paper with my co-authors still finds a very small amount of substitution from a very large change in price, consistent with the conclusion that attendance at NHL hockey events and attendance at NBA basketball events are not in the same relevant market.  Other articles in the same vein of literature reach similar conclusions regarding competition between different sports leagues, generally finding low levels of substitutability of sports consumption even within the same geographic markets, too low to suggest the different sports would serve as a price constraint under a SSNIP/hypothetical monopolist test, though without undertaking the full, formal process.[179]

---

[179] Winfree and Fort (2008) had similar findings regarding the NHL lockout in 2004 with the average increase in minor league hockey of about 4.7% in attendance, but insignificant increases for junior league hockey.  Winfree, J., & Fort, R. (2008). Fan Substitution and the 2004-05 NHL Lockout. *Journal of Sports Economics*, *9*(4), 425-434. https://doi.org/10.1177/1527002508316266

Winfree examines fan substitution from the perspective of a team entering or exiting a geographic market and its impact on other teams in the market.  Overall, he concludes "Very few fans will switch their loyalties to rival leagues or other sports, at least in the short run".  Winfree, J. (2009). Fan substitution and market definition in professional sports leagues. *The Antitrust Bulletin*, *54*(4), 801-822. https://doi.org/10.1177/0003603X0905400403. p. 821.  Also, "Given that there seem to

### 6.1.3.4   Sports Economics Literature – drivers of demand

150.     Some studies involve the estimation of drivers of demand, including price.  This can provide an estimate of the own-price elasticity for sports products, which in turn indicates whether there are products providing pricing discipline (i.e., are there competitive products that pertain to relevant product market definition and competition).  For the latter type of research, Fort (2004) surveys the literature on own-price elasticity in sports and conducts his own study and concludes that "all-in-all, inelastic pricing consistent with profit maximization appears easily supported in the general revenue function case."[180]  Research by Depken (2000) finds an own-price elasticity of -0.454 for MLB, which is on the inelastic portion of demand (implying significant market power).  He notes that it is consistent with findings by Siegfried and Eisenberg (1980) and Domazlicky and Kerr (1990).[181]  Fort and Quirk (1996) estimate the price elasticity of demand for the American League (of MLB) at -0.43 and for the National League at -0.50.[182]  Burdekin and Idson (1991) find no statistically significant relationship between price and attendance in the NBA.[183]  Thus, researchers find that sports teams often price at a

---

be few if any close substitutes for most professional sports teams, this does imply that sports markets should be thought of as somewhat narrow and that most leagues have a great deal of market power". Winfree, J. (2009), p. 822.

In a similar study focused on the distance between MLB teams and the impact on attendance, Winfree et al. (2004) find that if an expansion team moved into the Orioles territory, it would lower attendance-related revenue by about 5% in the first year and 1% thereafter.  They state "by the foregoing examples, ongoing attendance impacts are small, even when a team might be placed fairly close to another (the Orioles example)". Winfree et al. (2004), p. 2123. Winfree, J., McCluskey, J., Mittelhammer, R., & Fort, R. (2004). Location and attendance in major league baseball. *Applied Economics*, 36, 2117-2124. ("Winfree et al. (2004)"). https://doi.org/10.1080/0003684042000287664

[180] Fort, R. (2004). Inelastic Sports Pricing. *Managerial and Decision Economics*, 25, 87-94. https://doi.org/10.1002/mde.1008

[181] Depken, C. (2000). Fan Loyalty and Stadium Funding in Professional Baseball. *Journal of Sports Economics*, 1(2), 124-138. https://doi.org/10.1177/152700250000100202. Siegfried, J. J., & Eisenberg, J. D. (1980). The demand for minor league baseball. *Atlantic Economic Journal*, 8, 59-69. https://doi.org/10.1007/BF02299864. Domazlicky, B. R., & Kerr, P. M. (1990). Baseball attendance and the designated hitter. *American Economist*, 34(1), 62-68. http://www.jstor.org/stable/25603837

[182] Fort, R., & Quirk, J. (1996). Over-Stated Exploitation: Monopsony versus Revenue Sharing in Sports Leagues. In J. Fizel, E. Gustafson, & L. Hadley (Eds.), *Baseball Economics: Current Research*. Praeger Publishers: Westport, CT.

[183] Burdekin, R., & Idson, T. (1991). Consumer Preferences, Attendance and the Racial Structure of Professional Basketball Teams. *Applied Economics*, 23(1), 179-186.  https://doi.org/10.1080/00036849108841062. Many other economics studies across rugby, Australian Rules Football, cricket, English soccer get similarly inelastic pricing results. See Borland, J., & Lye, J. (1992). Attendance at Australian Rules Football: A Panel Study. *Applied Economics*, 24(9), 1053-1058. https://doi.org/10.1080/00036849200000083. Hynds, M., & Smith, I. (1994). The demand for test match cricket. *Applied Economics Letters*, 1(7), 103-105, https://doi.org/10.1080/135048594358078. Dobson, S., & Goddard, J. (1995). The demand for professional league football in England and Wales 1925-92. *Journal of the Royal Statistical Society. Series D (The Statistician), 44*(2), 259-277. https://doi.org/10.2307/2348449. Bird, P. (1982). The demand for league football. *Applied Economics*, 14(6), 637-649. https://doi.org/10.1080/00036848200000038

point at which few consumers would substitute away to other products in the event of a price increase. This is not considered the short-term profit-maximizing position, which has led economists to posit alternative explanations for why sports teams take this approach rather than focus purely on profit-maximization in the short-run.  Regardless of the reason, "too little substitution" to other products would be inconsistent with those products being in the relevant market.

151.    If a local monopolist for attendance in a given sport chooses this pricing strategy (perhaps to capitalize on in-stadium concession sales or to encourage repeat purchases over a long season), such pricing can be explained, but these models make less sense if the team shares a city (or even arena facility) with a team in another sport that is actually a close substitute that can compete on price. Therefore, this research supports the idea that substitution for attendance across different sports, even in the same geographic market, is very limited even under extreme conditions such as the elimination of one product.  Additionally, studies involving the price of a sports team's product exhibit inelastic pricing, which is consistent with strong pricing power by those sports teams.[184]

**6.1.4   Relevant market analysis specific to this matter**

152.    To assess whether the facts of this case are consistent with the literature and past cases, the first step to assess the relevant market is the identification of the reference products. Then the analysis proceeds to the question of what other products, if any, are included in the relevant market or markets around the reference products.

153.    The Challenged Conduct involved agreements and activity in the production and distribution of NFL telecasts.  The NFL packaged telecast licenses into slates of games for over-the-air (OTA) Sunday afternoon telecasts, for various evening telecasts, and for the complementary set of Sunday afternoon out-of-market telecasts.

---

[184] Another factor to consider is how important territorial exclusivity is to sports leagues.  If every other team in every other sport, or if broader entertainment products across non-sports industries were all sources of close economic substitution, keeping another NFL team out of, say, Seattle, they would have little value to the Seahawks given how intense the price competition would already be with MLB's Mariners and NHL's Kraken, plus the myriad other entertainment venues in the Seattle-Tacoma area such as cruises, music concerts, and a Starbucks on nearly every corner.

154.     When putting these slates of telecasts out to potential licensees, the NFL considered the same set of licensees for bidding on each of the OTA slates, with the winning bidder occasionally switching among the set of Networks.  The NFL considered how the makeup of the various slates would affect the bidding for the other slates.  In the presence of a noticeable price hike in the Sunday afternoon packages, the broadcasters could and would substitute who bid on Sunday, Monday, and/or Thursday night football.  NBC ultimately did this after losing out on the AFC package to CBS (after CBS lost the NFC package to FOX).  This churn of networks across different NFL packages itself is empirical evidence of the substitutability of these products for each other.  It is not necessary to examine price effects (such as a SSNIP test) to determine that, at a minimum, these reference products are in the same relevant market.

155.     Similarly, there was an overlapping set of potential licensees that the NFL considered for the Sunday Ticket slate.  Also, the NFL considered how the makeup of the Sunday Ticket slate would affect the bidding for the OTA slates.  On the consumer side, the OOM package stands out as requiring a premium payment that other NFL telecasts do not require.  The substitute products constraining this price are the other telecasts that consumers could view without obtaining the OOM package.  Due to the Challenged Conduct, other potential substitute products are not available at any price – this could include more games telecast OTA or on regular pay television, or other forms of distribution of OOM telecasts or wider.  I show elsewhere the evidence that the Networks and NFL were concerned about the possibility that availability of OOM telecasts would diminish consumer demand for the Network telecasts – the substitution goes in both directions.

156.     From the perspective of consumer demand, as per the Merger Guidelines, these telecast licensing slates are aggregations of NFL telecasts that are substitutes for each other.  It is the Challenged Conduct that distinguishes the unique NFL OOM package available on the market, not consumer demand.  Thus, the NFL OOM telecasts are in the same relevant market as the rest of the NFL telecasts.  Furthermore, the Challenged Conduct itself interferes with the possibilities of competitive interaction between OTA telecasts and OOM telecast, which is the competitive interaction that a SSNIP test is

intended to evaluate, so it would not be pertinent to the initial conclusion: that all NFL telecasts are in the same relevant market.[185]

### 6.1.4.1   Other Sports' Standard Television offerings are not in the Relevant Market

157.    The next step is to consider whether other products are in the relevant market.  Consistent with the literature and previous cases, the analysis here shows that no other sports telecasts are in the relevant market with NFL telecasts.

158.    First, college football telecasts are the only other sports telecasts products that involve the same sport as NFL telecasts at anything close to a major-league level.  Functionally, the Sports Broadcasting Act has isolated the telecasts between NFL football on the one hand and NCAA-organized college football on the other: it is a condition of the NFL's SBA safe harbor that they avoid any direct competition with college football on Saturdays in September through the middle of December (and in practice this also extends to late August college football games as well, such that virtually all NFL games take place at a time when almost no college games are played and vice versa).[186]  By the time the Board of Regents court examined the question, more than two decades after the passage of the SBA, that court found (after a full trial) that college football and NFL football were sold in separate markets.  The same is true for the USFL case – after a full trial, college football was not found to participate in the market the NFL was found to have monopolized.  Perhaps most important, in this case, the Ninth Circuit concluded that:

> "Given that professional football games have no substitutes (as fans do not consider NFL games to be comparable to other sports or forms of entertainment), see L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 726 F.2d 1381, 1393 (9th Cir. 1984), the defendants in this case have effective control over the entire

---

[185] In the presence of the Challenged Conduct, the OOM package might be thought of as competing in a submarket, but this is an artifact of the anticompetitive effects alleged.  In that submarket, currently DirecTV has 100% share and the submarket is perfectly concentrated with a 10,000 HHI, but absent the Challenged Conduct, to the extent the premium market remained a distinct relevant market, entry by teams would cause concentration to drop and the HHI to be substantially reduced, or more likely, the price differentials observed would be more obviously consistent with that submarket being fully subsumed within the single broader market and those products simply competing as differentiated goods.

[186] The SBA's safe harbor "… shall not apply to any joint agreement … which permits the telecasting of all or a substantial part of any professional football game on any Friday after six o'clock postmeridian or on any Saturday during the period beginning on the second Friday in September and ending on the second Saturday in December …". See "Title 15 – Commerce and Trade", *USCode.House.Gov*, accessed on August 15, 2022 at https://uscode.house.gov/view.xhtml?path=/prelim@title15/chapter32&edition=prelim.

market for telecasts of professional football games.  The complaint therefore plausibly alleges a naked restraint on output".[187]

159.     The data in this case provide empirical evidence that other professional sports leagues are not close substitutes for NFL telecasts.  Assessing the impact of price on demand, as a SSNIP framework would entail, does not apply directly to consumer interactions with Standard Television broadcasts: the prices consumers pay are not in cash, but rather in providing willing exposure to advertising.  However, patterns when certain sports programs overlap (and do not overlap) make it possible to assess the functional substitutability of other sports telecasts with NFL telecasts.  Even without an explicit cash price for the viewing, the substitution in viewing shows whether consumers may view these products' economic substitutability.  Put simply, if changes in opportunities for consumers to switch viewing to other free sports telecasts (ELSNIPs, effectively) have no effect on the amount that consumers view of free NFL telecasts, then the products are not substitutes – there is no need to introduce hypothetical price changes.

160.     I show this in the two sections below.  I use viewership data to demonstrate that NFL viewership via Standard Television is a distinct product from the Standard Television broadcasts of the NBA or MLB.

### 6.1.4.1.1   *Empirically, when NBA and NFL regular season games overlap, there is no significant reduction in NFL viewership*

161.     A labor dispute in the NBA in 2011 provided an excellent natural experiment to assess consumer viewership substitution.  NBA games did not occur in 2011 that would have typically occurred in most seasons during the weeks and months that NFL games occurred.

162.     Following the expiration of a collective bargaining agreement, the NBA locked players out at 12:01 a.m., July 1, 2011.[188]  The dispute was not resolved until November 26, 2011, when the owners and players announced a tentative agreement to end the lockout, which at that point had lasted

---

[187] *In re Nat'l Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1155 (9th Cir. 2019) , p. 31.
[188] "NBA Lockout Timeline", *Wayback Machine*, January 26, 2012, accessed on August 16, 2022 at https://web.archive.org/web/20120106185038/https://www.nba.com/2011/news/09/09/labor-timeline.

149 days.[189]   Then on December 8, both sides ratified a 10-year agreement, officially bringing the lockout to an end at the 161-day mark.[190]   As a result of the lockout, the 2011-12 season was reduced from 82 games per team to 66.[191]   In total, this corresponds to a reduction of 240 games across the league.[192]

163.   The lockout created a natural experiment: what happened to NFL telecast viewing when the option to watch NBA games went away?

164.   To test this, I compared the viewership for NFL games in 2010 and 2011, the first year being one in which the NBA and NFL had their normal level of seasonal overlap, and the second being the year of the lockout, when no NBA games occurred prior to December 10.   If consumers are typically switching on the margin between the two sports' Standard Television broadcasts, the year of the lockout should have shown substantially better viewership for NFL games during the lockout than the prior year (in that same overlap period), especially relative to viewership in other windows of the season (non-overlap period).

165.   Instead, what we see is little or no impact of the NBA lockout on NFL viewership. Typically, the first three weeks of the NFL season occur prior to the start of the NBA season, and so I treated this as a control period (non-overlap period).   The 2011 NFL viewership was slightly down compared to 2010 for these three weeks.   Then during the lockout, average NFL viewership was down even more (the difference is small and statistically insignificant).   Once the NBA lockout ended, NFL ratings remained lower in 2011 than in 2010, but the difference did not expand (as might be expected if viewers switched from NFL to NBA viewing) – the difference shrunk.   In none of these comparisons is the difference statistically significantly different from zero.   The complete absence of 2011 overlap with

[189] "NBA Lockout Timeline", *Wayback Machine*, January 26, 2012, accessed on August 16, 2022 at https://web.archive.org/web/20120106185038/https://www.nba.com/2011/news/09/09/labor-timeline.

[190] "NBA Lockout Timeline", *Wayback Machine*, January 26, 2012, accessed on August 16, 2022 at https://web.archive.org/web/20120106185038/https://www.nba.com/2011/news/09/09/labor-timeline.

[191] Paul D. Staudohar, "The Basketball Lockout of 2011", *Monthly Labor Review*, December 28, 2012, accessed on August 16, 2022 at https://www.bls.gov/opub/mlr/2012/12/art3full.pdf. Ross, B. (2016). The NBA's New Media Rights Deal: A Look into the Multi-Billion Dollar Cause of What May Become the Next NBA Lockout. *Hofstra Labor & Employment Law Journal 33*(2), 291-328, https://scholarlycommons.law.hofstra.edu/hlelj/vol33/iss2/6/, p. 292.

[192] Berri, D. (2012). Did the Players Give Up Money to Make the NBA Better? Exploring the 2011 Collective Bargaining Agreement in the National Basketball Association. *International Journal of Sport Finance 7*(2), 158-175, p. 159.

the NBA for a period of over a month during both leagues' regular seasons seems to have had no significant effect on 2011 NFL viewership.

166.    There is no natural experiment to assess substitution in the other direction.  The NFL has not had a work stoppage that led to the cancellation of regular season games during the relevant period.[193] However, substitution in that direction would be measuring whether the availability of NFL games constrains viewing of NBA games – this would be pertinent to assessing relevant markets for NBA telecasts, not NFL telecasts.

---

[193] The 2011 NFL lockout resulted in a new collective bargaining agreement between the league and players.  No regular season games were missed.  See "NFL Lockout", *ESPN*, December 5, 2012, accessed on August 18, 2022 at http://www.espn.com/nfl/topics/_/page/nfl-labor-negotiations.

█████████████████

Exhibit 5.  Statistical Tests of the Substitution Between NBA and NFL Games (2010 & 2011)[194]

| Group | Week | Log Difference | Mean | Std | N |
|---|---|---|---|---|---|
| Control A | 1 | -0.0292 | -0.023 | 0.019 | 3 |
| | 2 | -0.0389 | | | |
| | 3 | -0.0017 | | | |
| Treatment 1 | 5 | 0.0407 | -0.025 | 0.152 | 4 |
| | 6 | 0.0079 | | | |
| | 7 | -0.2468 | | | |
| | 8 | 0.0962 | | | |
| Treatment 2 | 9 | 0.0383 | -0.011 | 0.057 | 6 |
| | 10 | 0.0155 | | | |
| | 11 | -0.0611 | | | |
| | 12 | 0.0612 | | | |
| | 13 | -0.0428 | | | |
| | 14 | -0.0781 | | | |
| Control B | 17 | 0.0488 | 0.049 | - | 1 |

**T-test p-values**

| | Treatment 1 | Treatment 2 |
|---|---|---|
| **Control A** | | |
| Unequal Variance | 0.4893 | 0.3272 |
| Equal Variance | 0.4907 | 0.3695 |
| **Control B** | | |
| One Sample | 0.79987 | 0.97491 |

*Notes:*
*Groups are as follows:*
  *Control A: No NBA games in 2010; no planned NBA games in 2011.*
  *Control B: NBA regular season in both 2010 and 2011.*
  *Treatment 1: NBA games in 2010 (preseason and regular season); planned NBA preseason in 2011 but no NBA games due to lockout.*
  *Treatment 2: NBA regular season in 2010; planned NBA regular season in 2011 but no NBA games due to lockout.*
*T-tests are two-sample, right-tailed t-tests comparing weekly log differences of a given control group to those of the treatment group.*
*Because Control B has only one week, a one-sample t-test is used instead. For one sample t-test, t-statistic is calculated as $(\bar{x}-\mu)/(s/SQRT(n))$, where $\bar{x}$ is the mean of the treatment group, $\mu$ is the week-17 log difference, s is the treatment-group standard deviation, and n is the treatment-group sample size. Degrees of freedom is n-1.*
*Weeks column reflects week of the NFL regular season.*
*Omits 2010 broadcast windows with no comparable 2011 widow.*
*Log Difference calculated as ln(2011 Viewers) - ln(2010 Viewers), where Viewers values reflect the sum of broadcast-window-level viewers figures within a given NFL week.*
*Weeks 4, 15 and 16 were excluded from analysis as they fell outside of the treatment and control group criteria.*

*Sources:*
  *SportsMediaWatch Ratings and Viewership (2010-2011), NBA.com preseason schedules and lockout details.*

---

[194] See Text Cite – "NBA Lockout Analysis.xlsx" in Rascher Backup materials.

*6.1.4.1.2   Regular season MLB games also show no significant impact on NFL viewership*

167.    To perform a similar test with MLB regular season games, I analyzed Sunday night NFL games that coincided with MLB's nationally televised Sunday night baseball games.[195]  The MLB games are shown on ESPN.  I compared the NFL viewership audiences for those NFL Sunday night telecasts (which are shown on NBC) overlapping with MLB's nationally televised game to NFL Sunday night telecasts broadcasts when there was no overlap.  The analysis shows that the overlapping MLB games did not reduce NFL telecast viewership.  Depending on the comparison set of NFL games without overlap, either there was no significant effect (in line with the NBA results above) or in fact, the NFL audience was larger when games were shown at the same time as Sunday night baseball.[196]

---

[195] Major League Baseball has just undergone a lockout that delayed the start of the 2022 season, but this was the first work stoppage since 1994, and did not overlap at all with the NFL season.

[196] There are different potential explanations for the somewhat counterintuitive result that NFL viewership increased when head-to-head against MLB games. Perhaps consumers treat NFL and MLB broadcasts as somewhat complementary goods, toggling back and forth between the two telecasts to counteract the frequency of commercials in each.  An MLB broadcast might then be attracting fans who would not otherwise sit for an NFL broadcast but the addition of MLB as a parallel program may bring the joint package of sports' value above the consumers' other options (such as not watching TV at all). Or perhaps the issue is simply something about the Sundays when MLB chooses not to telecast Sunday night baseball versus when they do.  Hence the second analysis, focused only on a common set of Sundays in September across time, shows an effect in the more intuitive direction (i.e., an NFL Standard Television broadcast up against a counter-programmed baseball game shows slightly lower rating), but the effect is not statistically significant.  In other words, even taking out data potentially favorable to NFL ratings to focus on the more conservative comparison, there still is no evidence of significant audience shifts between regular season NFL and MLB telecasts.

**Exhibit 6. Statistical Tests of the Substitution of MLB and NFL Games (2017-2021)**
**NFL Viewership for Crossover Games and Non-Crossover Games**

|  | Control | Treatment |
|---|---|---|
| Observation | Non-Crossover SNF Games | Crossover SNF Games |
| 1 | 16.53 | 24.37 |
| 2 | 16.73 | 20.24 |
| 3 | 18.59 | 17.48 |
| 4 | 17.92 | 22.12 |
| 5 | 18.13 | 20.66 |
| 6 | 24.11 | 19.46 |
| 7 | 15.08 | 22.21 |
| 8 | 17.80 | 17.64 |
| 9 | 17.52 | 18.59 |
| 10 | 26.75 | 18.94 |
| 11 |  | 17.69 |
| 12 |  | 17.64 |
| 13 |  | 19.81 |
| 14 |  | 19.69 |
| **Mean:** | 18.92 | 19.75 |
| **SD:** | 3.63 | 2.05 |
| **N:** | 10 | 14 |
| **P-Value** |  |  |
| Unequal Variance | 0.26 |  |

*Notes:*
*This is a 2-Sample right-tailed t-test.*
*The NFL regular season and MLB regular season only crossover during the month of September. Datasets represent Sunday Night Football viewership (2017-2021) during the first two games of the season when MLB is not nationally televised (Control) and Sunday Night Football viewership (2017-2021) in September when an MLB game is nationally televised (Treatment).*

*Sources:*
*SportsMediaWatch MLB TV Schedules (2017-2021) and NFL TV Ratings (2011-2021).*

|  | Control | Treatment |
|---|---|---|
| Observation | Non-Crossover SNF Games | Crossover SNF Games |
| 1 | 17.92 | 24.37 |
| 2 | 24.11 | 20.24 |
| 3 | 17.80 | 17.48 |
| 4 |  | 22.12 |
| 5 |  | 20.66 |
| 6 |  | 19.46 |
| 7 |  | 22.21 |
| 8 |  | 17.64 |
| 9 |  | 18.59 |
| 10 |  | 18.94 |
| 11 |  | 17.69 |
| 12 |  | 17.64 |
| 13 |  | 19.81 |
| 14 |  | 19.69 |
| **Mean:** | 19.94 | 19.75 |
| **SD:** | 3.61 | 2.05 |
| **N:** | 3.00 | 14.00 |
| **P-Value** |  |  |
| Unequal Variance: | 0.47 |  |

*Notes:*
*This is a 2-Sample right-tailed t-test.*
*The NFL regular season and MLB regular season only crossover during the month of September. Datasets represent Sunday Night Football viewership (2017-2021) in September when MLB is not nationally televised (Control) and Sunday Night Football viewership (2017-2021) in September when an MLB game is nationally televised (Treatment).*

168.    This corroborates the academic findings that other sports telecasts do not provide competitive constraints on NFL telecasts.  Regular season NBA and MLB games have no perceptible impact on NFL viewership.  All of the analysis presented in this section relies on evidence common across all class members.

### 6.1.4.2   Other Sports' OOM products are not in the Relevant Market

169.    The Defendants own documents show that the product the NFL offers on television is in a league of its own and other sports are not substitutes.

170.    For example, the NFL ███████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████[197]████████████████████████
████████████████████████[198]

171.    The NFL's dominance as a distinct product carries over into online media: ███████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████[199]

172.    ████████████████████████████████████████████████
███████████████████████████████████████[200]██████████
██████████████████████████████████████████████████████
███████████,[201]████████████████████████████████

---

[197] DIRECTV-ST-00226773 at 6798. ██████████████████████████████████
████████████
[198] NFL-0193797 at 3800.
[199] DIRECTV-ST-00226773 at 6800.
[200] DIRECTV-ST-00226773 at 6779.
[201] NFL_0370556.

[REDACTED].[202] [REDACTED]

[REDACTED]"[203]

173.    All of this research is consistent with the idea that other sports telecasts are not in the same relevant market as NFL telecasts.

### 6.1.5   Geographic Market Definition

174.    DirecTV offers the same product nationwide: the complement to the Standard TV broadcasts, allowing each subscriber to watch any game being played on a Sunday afternoon.  All NFL out-of-market telecasts (thus, all telecasts of any specific NFL team) are available to all customers in each DMA by the same national provider, DirecTV.  Sunday Ticket everywhere fills in the missing games not nationally available on Sunday afternoons.  Likewise, DirecTV charges the same price for DirecTV everywhere in the United States.

175.    The same MVPDs that could distribute competing OOM NFL telecasts, if available, also serve customers nationally and also provide premium products at national prices (including premium OOM sports telecast packages like Extra Innings and League Pass).  Regardless of location, consumers who might choose to use a MVPD are connected to the same hi-speed internet structure that could provide such an alternative (streaming) service, and the same wireless providers, and so on.  In much the same way that cable television has a locally specific product differentiation (the cable has to reach the location of the consumer), but is served by national MSOs, the differentiation of NFL telecasts, premium or otherwise, across DMAs does not create distinct regions within which suppliers can accumulate or exercise distinct market power for this nationally sold product.[204]

176.    The relevant market of NFL telecasts is served nationally by the same suppliers in any geographic location.  Absent the Challenged Conduct, expanded output would be supplied by the same set of suppliers in any geographic location.  There is no geographic market in which price increases in NFL telecasts can be either protected from competition or constrained by competition in any way

---

[202] NFL_0360635.

[203] DIRECTV-ST-00226773 at 6790.

[204] See Crawford, G., Shcherbakov, O., & Shum, M. (2019). Quality Overprovision in Cable Television Markets. *American Economic Review*, *109*(3), 956-995. https://www.jstor.org/stable/26602974, p. 980.

differently from any other location.  The relevant geographic market for NFL telecasts is the United States.

### 6.1.6  Conclusion

177.    Based on the analysis above, I conclude that there is a relevant market in this matter that can be established by means of economic evidence common to all class members: NFL telecasts in the United States.  This includes all currently offered NFL telecasts, including all Standard Television broadcasts, Regular Pay TV telecasts, and Premium TV telecasts, as well as any NFL telecast offerings that would exist in the but-for world absent the Challenged Conduct.

## 6.2   MARKET POWER

178.    There is little question the NFL is able to generate substantial profits.

- "Forbes estimates that in 2010 the 32 teams combined are worth over $32 billion dollars."[205]

- "Disregard the NFL's 20% drop in revenue during the pandemic-impacted 2020 season, to an average of $381 million per team.  Forget that operating income (earnings before interest, taxes, depreciation and amortization) plummeted to an average of $7.1 million a team, from $109 million the previous season.  The fact is, money came raining down on the NFL over the past year, pushing the value of the average team up 14%, to $3.48 billion, the biggest gain in five years." (Multiplying 32 teams by $3.48 billion equals over $111 billion.)

- In March, the NFL signed $111.8 billion in media rights deals ($112.6 billion including the ESPN payment for extending Monday Night Football a year through 2022 and money received from broadcasters for additional regular-season and playoff games); that represented an 82% average annual increase over the current deals.  As a result, the national media rights payout to each of the league's 32 teams is going to increase from $220 million this season to $377 million in 2032.  And that's not even counting the NFL Sunday Ticket deal with DirecTV, worth an average of $1.5 billion annually through 2022."[206]

---

[205] Winfree, J. (2012). NFL Franchise Values, Locations, and Stadium, Economics. In Kevin Quinn (Ed.), *The Economics of the National Football League: The State of the Art* (pp. 33-54). Springer, p. 33.

[206] Mike Ozanian & Christina Settimi, "The NFL's Most Valuable Teams 2021: Average Team Value Soars To $3.5 Billion As League Shrugs Off Pandemic Year", *Forbes*, August 5, 2021, accessed on February 12, 2022 at https://www.forbes.com/sites/mikeozanian/2021/08/05/the-nfls-most-valuable-teams-2021-average-team-value-soars-to-35-billion-as-league-shrugs-off-pandemic-year/.

179.     The relevant question is whether those profits are the result of market/monopoly power;
monopoly power is the focus of the rest of this section.  One of the most basic definitions of monopoly
power is "the power to…exclude competition."[207]  Though there have been repeated efforts to enter the
major-league professional football space over the decades since the merger of the NFL and the AFL, no
league has succeeded.  The historical narrative provided above, especially the details of the WFL and
USFL efforts in the 1970s and 1980s, has shown the difficulty of competing head-to-head with the NFL.
More recent failed efforts, including the various incarnations of the XFL, the AAF, and the most recent
version of the USFL, have all been much more minor league affairs.  What has been clear is that even
though the NFL makes the majority of its Sunday afternoon games unavailable as Standard Television
broadcasts in any given DMA and therefore requires that fans purchase a product in the premium
segment to view many of its product, nevertheless, this has not provided enough of an opening for a rival
major league to enter.  This is, in essence, the substance of the Direct Effects analysis above.

180.     In an Indirect Effects approach, once a market is defined and the competitors in that
market are identified, market shares are then calculated and from that concentration ratios can be
determined.  From these, the indirect inference of market power is made.  Because this type of evidence,
market shares and concentration ratios, is inherently market-wide data, these are not individualized
inquiries into class member specific facts, but rather formulaic analyses common across the class.
Moreover, in the specific case of the market defined in this matter, all of the products in the market are
sold by a single group of coordinating firms, which (as explained below) makes the concentration ratio
10,000 for the collective group of all Defendants.  And so while I engage in the exercise in the section
that follows, the twin conclusions of class wide commonality and of absolute market power are easy to
reach.  That is, in the market for the telecasts of major league professional football, the NFL, its 32
teams, its network partners, and DirecTV currently have perfect market concentration and thus complete

---

[207] "Market power and monopoly power are related but not the same.  The Supreme Court has defined market power as 'the
ability to raise prices above those that would be charged in a competitive market', and monopoly power as 'the power to
control prices or exclude competition'." Footnotes omitted. See "Competition and Monopoly: Single-Firm Conduct Under
Section 2 of the Sherman Act," U.S. Department of Justice, 2008, accessed on August 16, 2022 at
https://www.justice.gov/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-
2#:~:text=The%20Supreme%20Court%20has%20defined,of%20course%2C%20something%20greater%20than.

market (i.e., monopoly) power.  However, the more interesting conclusion is what would occur if individual teams were allowed to enter the OOM market for NFL games.  Concentration in the OOM market for NFL games would drop dramatically if teams entered.

### 6.2.1   Concentration

181.     The standard means among economists for assessing whether market shares provide alleged participants in anticompetitive conduct with market power is to use the Herfindahl-Hirschman Index, or HHI, which is a measure of market concentration.[208]  The HHI is formed by squaring each firm's individual market share and then summing those squares.  If market share is measured in integers (e.g., if a 10% share is represented as 10 rather than 0.1) then the HHI ranges from a theoretical minimum of 0 (where every firm has *de minimis* market share) to a maximum of 10,000, which is the case when a single firm controls 100% of the market.  **Collectively, the NFL clubs are operating as a monopolist and thus have an HHI of 10,000.**  The federal antitrust authorities provide a handy guide for knowing when a market's HHI crosses into levels of concentration conducive to the exercise of market power.  Markets under 1,500 are considered unconcentrated, and generally no firm acting alone will be capable of exercising market power.  Markets with HHIs over 2,500 are considered highly concentrated and then any single firm with a larger portion of that market will have sufficient share to infer they have market power, i.e., the power to raise prices above (or in this case, to lower payments below) the competitive level.  In between these two thresholds, markets are said to be moderately concentrated.

182.     These calculations of alternative market shares are estimates, but they are not presented specifically for their precise values, but rather to demonstrate two points.  The first is that the perfect concentration of the market would be substantially lessened, to the benefit of consumers as a whole and Class Members in particular, in the absence of the Challenged Conduct.  And more germane to this report, the nature of this analysis, with its focus on market shares and estimates of but-for share at the DMA level, rather than of any assessment of individual class member preferences, makes clear that the data and analysis needed to assess Defendants' market power is class-wide, rather than individualized.

---

[208] See Horizontal Merger Guidelines, Section 5.

183.    The ownership of the teams generating the games that become NFL telecasts is divided
among those 32 teams.  As they all play the same number of games, the supply that each provides to the
total number of telecasts is equal, which would be a HHI of only 313.  Given the different draw to
viewership that different teams may provide, a measure of quality, the concentration of the independent
teams within the NFL can alternatively be assessed based on what NFL estimates to be the fanbase of
each team (see Exhibit 7).  The fact that some teams are more popular than others makes this
concentration of capacity to produce games for telecasts higher, when accounting for the varied levels of
consumer interest across teams, than it would be if all 32 teams were equally popular.  Even with more
popular teams, however, the concentration is about what it would be if there were ▆ equal size teams –
in other words, unconcentrated.[209]  A further step in assessing concentration of capacity would be to
assess the effects of cooperative agreements among suppliers.  That step goes into the heart of the
challenged conduct in this matter – absent the conduct, there may still be cooperative arrangements to
license production and distribution of NFL games on Standard television, but this matter may determine
the extent of that arrangement and the market outcome.  Subject to that constraint, some calculations that
are relevant here are 1) ████████████████████████████████████████ and 2)
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████.[210]

---

[209] HHI for ████████████████████████████

[210] ████████████████████████████████████.

Exhibit 7. Concentration of Team Fanbases



Source: NFL_0057465 @477

184.    Even if the only change in concentration to consumers of OOM telecasts were that NFL allowed Sunday Ticket to be distributed on multiple MVPDs, the concentration of OOM telecasts provided to consumers would be considerably lower than the current single supplier of OOM telecasts.[211]

185.    On the other hand, if each NFL club were to license its own games, competition across the 32 NFL franchises would result in an HHI of approximately ▮ based on the NFL's own estimate of the sizes of its fan bases for each team, as shown on Exhibit 7.[212]  HHI's for in-between BFWs, e.g., 5 NFL franchises license their games independently would be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## 6.3    BARRIERS TO ENTRY

186.    Where entry into a market is easy, a firm or firms will not be expected to maintain market power, as they will quickly face increased competition from new entrants. Where there are significant barriers to entry, however, participants with market power can maintain that power and continue to earn profits at a level about the competitive level.

187.    As shown above, entry of new teams and leagues at the highest level of professional sports is subject to substantial barriers to entry.  To succeed, sports leagues typically need to attract fans, owners, and television (or other forms of media distribution, such as streaming) networks.  While the league can be comprised of owners from the start, often a chicken-and-egg situation develops where networks may want to see fan interest before partnering with a new league and fans may need television coverage to develop a deep rooting interest in the new league.  While this is not an insurmountable barrier, and while the scarcity of media outlets has been much reduced since the earlier days of televised sports, nevertheless, a new league can face difficult barriers to entry because of these network effects, which has been confirmed by the repeated failures of efforts to create new elite professional football

---

[211] Based on 2017 data reported by the FCC: FCC-13-99A1, "Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming", 2017.  DirecTV had a 21.8% share of MVPD subscribers and the HHI for all MVPDs was 1,608, approximately the same as 6 equal sized firms.  The MVPD subscribers inherently interested in Sunday Ticket are already over-represented in the DirecTV subscriber base, which means that Sunday Ticket on all MVPDs would result in a lower share for DirecTV and, if the subscribers diverted from DirecTV flowed equally to other MVPDs, a smaller HHI.

[212] HHI's for in-between BFWs, e.g., 5 NFL franchises license their games independently, would be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

leagues since the AFL more than sixty years ago.  This has even been seen for minor league football, with several of the entrants folding in a short time frame (as discussed elsewhere).[213]

188.    With respect to Defendants' monopoly in the broadcast market for major professional football, there exists a strong, albeit artificial, barrier to entry based on the agreement among Defendants that individual teams cannot enter the market themselves or in small joint ventures.  But for the Challenged Conduct, this market would be very contestable and more competitive.  The analysis of barriers to entry relies on evidence that is common to the Classes.

### 7.    ASSESSING COMPETITIVE EFFECTS AND ESTABLISHING HARM TO COMPETITION IS POSSIBLE THROUGH CLASS-WIDE, COMMON METHODS

189.    As with market definition, market power, and barriers to entry, the economic evidence needed to establish that anticompetitive conduct caused harm to competition (such as harm caused by one side of the market against another side (seller to buyer or buyer to seller) as well as inefficiencies (often described as deadweight loss)) is of the sort that is common to all class members because it is inherently market-wide.

190.    Anticompetitive harm is distinct from the economic evidence that a given plaintiff was individually harmed; the former focuses on whether competition in the marketplace was harmed.  Thus, by its very nature it is class-wide and common to all members of each of the two Classes.  The question one asks when assessing whether a restraint led to anticompetitive harm is whether consumption by buyers (or output from suppliers) was reduced and whether would-be welfare-enhancing transactions[214] failed to occur, not because of the individual decisions of individual marketplace actors, but because of structural effects caused by the restraint, with the recognition that harm includes reduction in wealth, reductions in variety, reductions in quality and decreases in market efficiency.  In essence, one asks

---

[213] The new USFL (owned entirely by Fox) has been renewed for a second season, but it is not claiming to be a competitor to the NFL. Jeff Kotuby, "FOX Provides Glimpse at USFL Relaunch, Are Viewers Ready for More Football?", *The Streamable*, December 8, 2021, accessed on August 16, 2021 at https://thestreamable.com/news/fox-provides-small-glimpse-at-the-future-of-the-usfl-relaunch.

[214] Generally speaking, if a buyer and a seller are willing to exchange goods, services and money, and outside forces prevent that transaction, economic welfare will be reduced.

whether the conduct causes anticompetitive harm in the form of higher prices, lower quantity, lower

quality, less variety, or a transfer of wealth due to abuse of monopoly power.

191.    These questions are all answered with evidence inherently common to the class because,

as with questions of market definition and market power, questions of harm to competition are about

market-wide effects.  If a restraint alleged led to increased prices and reduced output, each individual

class member can point to the same reduction in commercial transactions because a price was raised

above the competitive level as common evidence of that effect.

192.    So, for example, when the NFL intentionally chose DirecTV because ▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[215] this would be the example of

the sort of direct market-wide harm that each class member could rely on were that class member suing

as an individual plaintiff.  Therefore, it is a common source of economic evidence for the entire class, one

which does not require individualized inquiry into each class member's specific facts, circumstances, or

preferences.  Similarly, evidence that the NFL ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ would also be common evidence of anticompetitive

reduction in output through the agreement of the NFL Defendants.

193.    In the examples and analysis which follows, as is the case throughout this report, while

there is a conclusion regarding the merits of the argument, the emphasis is on demonstration that the

methodology itself is common across all class members.

---

[215] NFL_1225300. See also Deposition of Robert Kraft, June 23, 2022, 50:23-52:6, ▉▉▉▉▉▉▉▉▉▉

[216] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ See, for example, NFL_1227118
and NFL_1225300. ▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ NFL_0157225 at 242.  Versus became NBC Sports
Network when Comcast acquired NBC in 2011.  See Dashiell Bennett, *Versus Changes Its Name to NBC Sports
Network*, Business Insider, Aug. 1, 2011, accessed on August 19, 2022 at https://www.businessinsider.com/versus-nbc-sports-network-2011-8.

## 7.1   OUTPUT RESTRICTIONS AND PRICING

194.     As described elsewhere, when the NCAA television monopoly was ended by the Supreme
Court's ruling, output expanded and prices dropped substantially.  The net result is that while in 1983,
college football fans were often able to watch only two televised games per week, now there are as many
as thirty games on television each week, and virtually every game for every FBS team is televised
nationally or locally.

195.     In contrast to the current college football market, where consumers have many choices, on
a typical Sunday afternoon NFL consumers have two or three choices of games on Standard TV.  This by
itself is evidence of far lower output on Sundays than on Saturdays, but the viewership data in this case
also makes it possible to assess whether this definition of increased output is about more than just
increased choice.

196.     As a means of testing whether the simple fact of having more games available via
Standard TV telecasts leads to increased consumption/viewership as measured in households watching
NFL football, I examined the variation in viewership between Sunday afternoon slots where a given
DMA showed only one game on Standard TV versus Sunday afternoon slots where a given DMA
showed two games on Standard TV at the same time for the 2019 season.  My analysis, shown in Exhibit
8 below, concludes that the total audience size for NFL telecasts on Standard TV ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ when consumers were given a second choice of which game they could watch.[217]
Given that the average number of viewers watching a regular season NFL game was 15.4 million in
2019,[218] ▮▮▮▮▮▮▮ for a Standard TV audience ▮▮▮▮▮ the *total* Sunday Ticket subscriber
base, which has been in the two million range through the period in suit.  This confirms the
appropriateness of the intuition behind treating an increase in the number of games available nationally as
a measure of output, since that increase in games has historically led to a large increase in audience size.

---

[217] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See
second regression in Exhibit 8.

[218] Rick Porter, "TV Long View: Even in a Down Year, the NFL's Ratings Are Untouchable", *The Hollywood Report*,
January 30, 2021, accessed on August 16, 2022 at https://www.hollywoodreporter.com/tv/tv-news/tv-long-view-nfl-
ratings-dominance-2020-4124795/.

Exhibit 8.  Analysis of Impact on Viewership of Multiple NFL Games on Television Simultaneously

**Regression — Viewership Duration / Households for the 2019 NFL Season**





*For "2-Games" in Timeslot -*

| Viewership Duration per Household Drop | |
|---|---|
| For a Game airing in 2 Game Slot: | |
| 95% Lower: | |
| 95% Upper: | |

| Viewership Duration per Household Increase | |
|---|---|
| For 2 Games Compared to 1: | |
| 95% Lower: | |
| 95% Upper: | |

*Notes*
  *"Local Subsitute" accounts for games in 2 game time slot that are airing opposite the local team.*
  *"Sun  Late Afternoon" accounts for window effect (compared to early afternoon).*
  *Based on 2019 DirecTV subscriber account data.*
  *Indianapolis, IN is the variable dropped.*
  *Rams, Chargers, and Week 5 Raiders-Bears game not included in viewership data but included in game count.*
  *Scheduled blackouts not included in game count.*
  *Totals based on maximum viewership record for a game for the DMA's FOX and CBS affiliate network.*
  *Viewership duration per household drop for a game airing alongside another game compared to a single game*
    *is calculated as Exp("2 Games in Timeslot Coeff.")-1.*
  *Viewership duration per household increase for two games together compared to one game is calculated as*
    *(Exp(Ln(2)+"2 Games in Timeslot" Coeff.)-1).*

*Sources*
  *506Sports NFL TV Schedules & DMA Maps.*
  *DirecTV viewership data (2019).*
  *Nielsen 2019-2020 DMA ratings ranks based on TV households.*

**Regression — Ratings Share for the 2019 NFL Season**



Regression Statistics



| Variable | Coefficient | SE | T-Value | P-Value |
|---|---|---|---|---|

*For "2-Games" in Timeslot -*

| | |
|---|---|
| *Average Ratings Share:* | |
| *2 Game Coeff.* | |
| *% of Avg. Ratings Share* | |
| *95% Lower* | |
| *95% Upper* | |

*Notes*
 *"Local Subsitute" accounts for games in 2 game time slot that are airing opposite the local team.*
 *"Sun  Late Afternoon" accounts for window effect (compared to early afternoon).*
 *Based on 2019 DirecTV subscriber account data.*
 *Indianapolis, IN is the variable dropped.*
 *Rams, Chargers, and Week 5 Raiders-Bears game not included in viewership data but included in game count.*
 *Scheduled blackouts not included in game count.*
 *Totals based on maximum viewership record for a game for the DMA's FOX and CBS affiliate network.*
 *% of Avg. Ratings Share calculated as 2 Game Coeff./ Avg. Ratings Share.*

*Sources*
 *506Sports NFL TV Schedules & DMA Maps.*
 *DirecTV viewership data (2019).*
 *Nielsen 2019-2020 DMA ratings ranks based on TV households.*

197.    In addition to limiting the quantity of NFL games, the restrictions also limit the quality provided to each viewer who is unable to watch the game that they prefer.  There are many fans in each

DMA who are not able to view their favorite team each week.  As an example, the NFL ███████

██████████████████████████████████████████[219] ████

████████████████████████.  Even if ██████ of these fans subscribed to Sunday Ticket on

DirecTV (this is the typical number of Sunday Ticket subscribers during the damages period), there

would still be ████████████ NFL fans who are unable to watch the team that they prefer during most

weeks of the season.  A more competitive but-for world would help resolve this massive loss in quality

(and consumer welfare) in the market.

198.    Finally, as discussed above at Section 3.4.3, the NFL is quite open about the fact ██

████████████████████████████████████████████

████████████████████████████████████████ it

would seem difficult to contend the evidence of whether the goal was to reduce output is individualized

by class member.

Sunday Ticket Prices

199.    Although Sunday Ticket viewing is only a small share of overall NFL viewing each

season, the price for a subscription demonstrates that DirecTV and the NFL have market power in the

supply of Sunday Ticket.  Specifically, Sunday Ticket is a low elasticity product – consumption of

Sunday Ticket does not drop very much when the price increases.  This is consistent with a high margin

when coupled with low marginal costs.  The ability for suppliers to charge prices that generate high

margins is consistent with having market power.

200.    One way to see this is through the mid-season pricing.  ████████████████

████████████████████████████████████████

██████████████████████████.[220]  This is a way of capturing potential

customers who were not willing to pay for the whole season, but who have learned by mid-season,

possibly from new information about the performance and playoff possibilities for their favorite non-

local team, that they have an interest in paying relatively more per telecast opportunity.  There may be

_____

[219] NFL_0057465 at 7477.
[220] DIRECTV-ST-00002979.

██████████████████

other potential customers at the beginning of the season who decide to wait and then ultimately decide not to sign up for the mid-season package either, possibly from new information about how poorly their favorite-non-local team is doing.  The mid-season package price relative to the full season package price provides a relative price that normalizes for any time trends in the observations that are unrelated to the mid-season purchasing decision.  Using those relative prices and mid-season subscription quantities, the estimated mid-season price elasticity is ████ for Sunday Ticket Basic (2011 through 2015) and ████ for Sunday Ticket Max (2012 through 2015).  Similarly, the mid-season package subscription quantity relative to the full season subscription quantity also normalizes for time trends or demand shifts.  Using both price and quantity ratios of half-season to full season, the estimated price elasticity for Sunday Ticket Basic is ████ for 2011 through 2015, and the estimated price elasticity for Sunday Ticket Max is ████ for 2012 through 2015.[221]  The low estimated price elasticity for each of these simple comparisons shows that DirecTV and the NFL have market power in the supply of the Sunday Ticket product.

201.    Moreover, following certain periods of price increases for Sunday Ticket, DirecTV actually experienced increases in the uptake of paid Sunday Ticket subscriptions.[222]

202.    The Zona Report includes an analysis of the marginal cost for DirecTV to supply Sunday Ticket.  This cost can be tabulated with accounting data, as produced by the NFL, ████████████ ██████████████████████████████████████  This high margin is consistent with low elasticity and with market power.

### 7.1.1   Loss Leader

203.    As alleged, class members suffered damages due to monopoly pricing for Sunday Ticket and the lack of a broader array of choices, but for many DirecTV subscribers, they also were harmed by being forced onto the DirecTV platform in order to get Sunday Ticket (as opposed to having other

---

[221] Based on a log-log regression.

[222] ███████████████████████████████████████████  See Expert Report of J. Douglas Zona, Section 3.1.



choices).  Thus, some customers are paying for a service that they generally do not want, and DirecTV has generally been more expensive than either Dish or cable providers.[223]

204.  █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████[224]

205.  By increasing demand for DirecTV's services through the exclusivity of Sunday Ticket, DirecTV is able to raise its general television services price, thus harming all of its subscribers. Therefore, measures of harm that only look at Sunday Ticket direct damages are a conservative measure of overall harm.

### 7.1.2   Collusion by Standard Television Networks to Keep Sunday Ticket Small and Expensive

206.  █████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████  This restricts output and raises prices.  For example, Dr. Zona's analysis shows that if DirecTV vastly expanded output by offering the Sunday Ticket package on its basic television packages, then DirecTV ████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████[225]

---

[223] Randy Harward, "DirecTV v. Xfinity", *Cabletv.com*, June 20, 2022, accessed on August 16, 2022 at https://www.reviews.org/tv-service/dish-vs-directv/, https://www.cabletv.com/blog/directv-vs-xfinity-comcast; Chantel Buchi, DISH vs. DIRECTV: Satellite TV Review 2022, Reviews.org (Aug 4, 2022), https://www.reviews.org/tv-service/dish-vs-directv/
[224] DIRECTV-ST-00214662.
[225] Zona Report, Section 4.2.

## 7.2   INDIRECT EFFECTS CONCLUSIONS

207.    In this section, I have shown that standard economic analysis on reliable evidence leads to the conclusion that the Challenged Conduct caused anticompetitive harm in the form of higher prices, lower quantity, lower quality, and less variety, and that despite the existence of variation among individual consumer preferences, market-wide factors result in every class member commonly experiencing injury from these indirect effects.  In my later damages section (10), I extend this analysis to show a formulaic model applicable to all class members, with which it is possible to provide reliable numerical measures of these damages for each class member.

## 8.   POSSIBLE PROCOMPETITIVE JUSTIFICATIONS PUT FORTH BY DEFENDANTS WILL BE EVALUATED THROUGH CLASS-WIDE, COMMON EVIDENCE

208.    If anticompetitive effects are proven in an antitrust case, my understanding of the process is that defendants can then put forth business justifications (known as procompetitive justifications or PCJs) that essentially represent the claim that the restraint in suit served to deliver benefits to customers that exceed the anticompetitive harm those restraints imposed on those customers,[226] though Defendants bear the burden of proof to prove these justifications have quantifiable *procompetitive* benefits,[227] rather than merely being favorable to Defendants' profits or business model.  As I understand it, these justifications may be considered reasonable if, on balance, the net benefits are found to exceed the harm, and if there exist no less restrictive alternatives that can deliver similar benefits, but cause less harm, all with the recognition that the benefit put forth must improve efficiency and not just benefit the parties causing the anticompetitive harm.

---

[226] If it were an input case, the focus would be on benefits to suppliers rather than customers.

[227] The economic principles underlying what "procompetitive effects" mean are summarized in Merger Guidelines as well as in the Joint Venture Guidelines published jointly by the FTC and Department of Justice.  For example, the Merger Guidelines explain (at "Example 24") that a transfer of wealth through abuse of market power is an example of anticompetitive harm, not a procompetitive benefit. Horizonal Merger Guidelines, p. 33.  The Joint Venture Guidelines explain that collaboration can produce procompetitive effects if it will "enable firms to offer goods or services that are cheaper, more valuable to consumers, or brought to market faster than would otherwise be possible". Joint Venture Guidelines, p. 23.  Key here is not just that products are more valuable, but that they are more valuable "than would otherwise be possible."  The Joint Venture Guidelines also caution against confusing claims that are "premised on the notion that competition itself is unreasonable" with legitimate procompetitive claims.  Joint Venture Guidelines, p. 9.

209.    To my knowledge, Defendants' procompetitive justifications (PCJs) have not yet been formally advanced and analyzed in this case, but because such justifications, generally speaking, must focus on benefits to the market (rather than, say, mere benefits to the Defendant) these PCJs, if they exist, will almost certainly also be common to all class members.  Specifically, if procompetitive justifications exist, they must improve competitiveness in the market and, similarly, must exceed the harm to competition.  As described below, those sorts of arguments and analyses are common to the class.

## 8.1    COMPETITIVE BALANCE CAN BE DEMONSTRATED TO NOT JUSTIFY THE CHALLENGED CONDUCT BY MEANS OF EVIDENCE COMMON TO ALL CLASS MEMBERS

210.    The NFL may argue that it needs to collude on the sale of telecast rights, offer the regional airing of games, and place Sunday Ticket on a smaller MVPD with high prices because it needs to protect competitive balance (CB).  First, it is unclear how the restrictions at issue in this case tie to CB – how are those restrictions helping to improve or maintain CB?  Second, research shows that CB may not even be an important factor for sports demand.[228]  Third, even if it is, the level of parity that maximizes the value for fans is not perfect parity.[229]  Fourth, the sports economic literature has presented strong evidence that virtually every claimed rule designed to enhance competitive balance has failed in practice to achieve that substantial balance, in the absence of a strong salary floor, which the NFL would have via the team salary minimum contained in the league's collective bargaining agreement (CBA) with the NFL Players

---

[228] Szymanski, S. (2003). The Economic Design of Sporting Contests. *Journal of Economic Literature*, *41*(4), 1137-1187. http://www.jstor.org/stable/3217458. Borland, J. & McDonald, R. (2003). Demand for Sport. *Oxford Review of Economic Policy*, *19*(4), 478-502. http://www.jstor.org/stable/23606855. Rascher, D., Maxcy, J., & Schwarz, A. (2019). The Unique Economic Aspects of Sports, *Journal of Global Sport Management, 6*(1), 111-138. https://doi.org/10.1080/24704067.2019.1605302. Mills, B., & Fort, R. (2014). League-level attendance and outcome uncertainty in U.S. pro sports leagues. *Economic Inquiry*, *52*(1), 205-218. https://doi.org/10.1111/ecin.12037. Lee, Y. H., & Fort, R. (2008). Attendance and the uncertainty-of-outcome hypothesis in baseball. *Review of Industrial Organization*, *33*(4), 281–295. http://www.jstor.org/stable/41799401. Lee, Y., Jang, H., Fort, R. (2016). Just looking for a good game: competitive balance in the Korean Professional Baseball League. *Applied Economics*, *48*(33), 3104-3115. https://doi.org/10.1080/00036846.2015.1136393. Tainsky, S., & Winfree, J. (2010). Short-run demand and uncertainty of outcome in major league baseball. *Review of Industrial Organization*, *37*(3), 197–214. http://www.jstor.org/stable/41799488. Buraimo, B., & Simmons, R. (2008). Do Sports Fans Really Value Uncertainty of Outcome? Evidence from the English Premier League. *International Journal of Sport Finance*, *3*(3), 146-155. https://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.474.7365&rep=rep1&type=pdf

[229] Fort, R., & Quirk, J. (1995). Cross-Subsidization, Incentives, and Outcomes in Professional Team Sports Leagues. *Journal of Economic Literature*, *33*(3), 1265-1299. http://www.jstor.org/stable/2729122. Rascher, D. (1997). A Model of a Professional Sports League. *International Advances in Economic Research*, *3*, 327-328. https://doi.org/10.1007/BF02294925.

Association.  This outcome is independent of the degree of competition in the sale of telecast rights to media companies.[230]  Fifth, to the extent that the NFL argues that the current structure of the NFL's media deals allows for a certain amount and type of revenue sharing and that then allows for a certain level of CB, there are two clear responses.  One is that revenue sharing has been shown to have little to no impact on CB (and maybe a negative impact) and, two, revenue sharing could still occur (as it does in other leagues) without suppressing the output of telecasts (a less-restrictive alternative).[231]

211.    Regardless of the merits of these analyses, each of these factors are class-wide issues, and all of the cited studies and methods to either measure CB or determine its causes or importance to NFL fans uses evidence that is common to all class members.

### 8.2    THE CLAIM THAT THE CHALLENGED CONDUCT INCREASES OUTPUT CAN BE DISPROVEN BY MEANS OF EVIDENCE COMMON TO ALL CLASS MEMBERS

212.    It is often the case in antitrust cases that defendants claim that a restriction or agreement being challenged increases output in some relevant market.



[232]

---

[230] Fort, R., Maxcy, J., & Diehl, M. (2016). Uncertainty by regulation: Rottenberg's invariance principle. *Research in Economics*, *70*(3), 454-467. https://doi.org/10.1016/j rie.2016.06.004. Maxcy, J., and Mondello, M. (2006). The Impact of Free Agency on Competitive Balance in North American Professional Team Sports Leagues. *Journal of Sport Management*, *20*(3), 345-365. https://doi.org/10.1123/jsm.20.3.345. Larsen, A., Fenn, A. J., & Spenner, E. L. (2006). The Impact of Free Agency and the Salary Cap on Competitive Balance in the National Football League. *Journal of Sports Economics*, *7*(4), 374-390. https://doi.org/10.1177/1527002505279345. Fort, R., & Lee, Y. H. (2007). Structural Change, Competitive Balance, and the Rest of the Major Leagues. *Economic Inquiry, 45*(3), 519-532. https://doi.org/10.1111/j.1465-7295.2007.00026.x. Maxcy, J. (2016). From Strikes to Lockouts: Consequences of the Shift in the Balance of Power from the Players' Union to the Owners in the National Hockey League. In B. Frick (Ed.), *Breaking the Ice: The Economics of Hockey*. Springer International Publishing AG.

[231] Kesenne, S. (2006). Competitive Balance in Team Sports and the Impact of Revenue Sharing. *Journal of Sport Management*, *20*(1), 39-51. https://doi.org/10.1123/jsm.20.1.39, p. 50. Rascher, D., Nagel, M., Brown, M., & McEvoy, C. (2011). Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing. *Journal of Sport Management*, *25*, 373-390. http://dx.doi.org/10.2139/ssrn.1690883. Szymanski, S., & Kesenne, S. (2010). Competitive Balance and Gate Revenue Sharing in Team Sports. In S. Szymanski (Ed.) *The Comparative Economics of Sport*. Palgrave Macmillan, London. Horowitz, I. & Whittenberg, G (2012). Network Television Revenue Sharing and Competitive Balance in the NFL. In L.H. Kahane & S. Shmanske (Eds.), *The Oxford Handbook of Sports Economics: The Economics of Sports Volume 1*. Oxford University Press, p. 225. Noll, R. (2007). Broadcasting and Team Sports. *Scottish Journal of Political Economy*, *54*(3), 400-421. https://doi.org/10.1111/j.1467-9485.2007.00422.x, p. 418, where he explains that European soccer clubs and MLB have more creative revenue sharing rules than a simple equal sharing of pooled revenues.

[232] The NFL's Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories, June 1, 2022, pp. 10-11.

Moreover, as shown above in Exhibit 8, for a given fan, having more games available to them means that they are more likely to watch an NFL game that day (and thus in aggregate, total demand will be greater) because the game they have the most interest in watching is more likely to be available to them (or at least the best game available to them is more likely to be of higher interest).  Additionally, they may watch an additional game than they would otherwise have watched for the same reason.

213.    Historically the most popular programs on television (including sports) have been shown on the channels with the highest penetration rates, and those are the OTA networks that are currently partners with the NFL.[233]  This ought not be surprising, since this is also the economically rational approach in a market in which eyeballs translate into revenue – distributors of content rarely want to hide

---

[233] "…but the focus for marquee properties remained on the commercial broadcast and cable networks." Kunz, W. (2020), p. 126.  Additionally, Kunz notes that "While the NFL is the most implausible candidate to migrate to digital platforms…" other leagues have made more moves into digital. Kunz, W. (2020). *The Political Economy of Sports Television* (1st Ed.). Taylor & Francis, p. 151.

their best programming where no one can see it.[234]  For instance, the 2016 Olympics generated over 7,000 hours of content, yet NBC showed 260.5, with over 2,000 shown on other cable channels and 4,500 on NBCOlympics.com.  The bulk of the revenues for NBC came from advertising against the NBC and other cable channel programming.[235]

214.     The number one series on television in 2020-21 (among adults 18-49) was SNF (NBC), followed by TNF on FOX, followed by MNF on ESPN.  TNF on the NFL Network ranked tied for 6th in 2020-21.  Of course, the Super Bowl in 2022 was the highest rated television show so far this year.

215.     The Saturday version of football, college football, has the most popular games shown on the OTA channels (and ESPN, with very high household penetration) followed by less popular games on ESPN2, ESPNU, FS1, FS2, CBSSN, and then generally even less popular matches on conference-affiliated channels like the Pac-12 Network.  Of the 17 college football teams in the AP Top 25 rankings who played games on October 23, 2021, eight played on an OTA or ESPN channel, six played on a lower-tier sports channel and three played on a conference-affiliated channel.  Additionally, the OTA/ESPN teams were ranked higher with an average ranking of 8.6, compared to 15.3 for lower-tier sports channels and 18.0 for conference-affiliated channels.[236]

216.     There is a sound economic basis for this tendency.  The most significant sports-focused Standard Pay TV channels operate as part of families of channels including Standard TV Networks.  For example, ABC and ESPN are jointly owned by Disney, and FOX and the FOX Sports Networks are jointly owned.  When FOX allocates telecasts to its networks, it can maximize revenue by placing the most popular telecasts on the most widely distributed network, which is FOX, because that will allow it to generate the maximum revenue from advertising.  The rights fees, costs, and other revenues, such as carriage fees, are not directly affected by this allocation on a week-to-week basis.  While other considerations may favor distributing some of the more popular games to other networks, the most

---

[234] Indeed, the fact that the NFL does want to keep Sunday Ticket away from consumers stands out so egregiously because it is so contrary to normal profit-maximizing conduct.  It only makes sense when viewed through the light of monopoly conduct.

[235] Kunz, W. (2020). *The Political Economy of Sports Television* (1st Ed.). Taylor & Francis, p. 127.

[236] See "Text Cite – College Football Rankings per Channel.xlsx" in Rascher Backup materials.

█████████████████████████

directly significant economic consideration is that the most popular content be shown on the most widely

available networks, which are the national Standard TV networks, followed by ESPN, and then the other

cable sports networks, such as FOX Sports 1 (FS1).

217.    In Exhibit 8 above, I demonstrated a ████████████████████████████████████

██████████████████████████████████████████████████████ This corresponds

with a related analysis in the economic literature showing the same result: having more NFL games on

television increases overall viewership.  Tainsky and McEvoy (2011) directly test the impact of having

an alternative game available on the viewership of an NFL game (utilizing 1,296 NFL games and ratings

in markets with no local team).  They show that the ratings points do drop for a given game, when there

is an alternate game on, by about 3.46 ratings points,[237] but recognize that (given the average ratings

points from their dataset of 9.165), this implies having two games on at once increases *total* viewership

by about 2.25 ratings points, or 24%.[238]  This is consistent with the analysis by Noll (2007), who

explained the total audience increased as more events that are popular and shown on OTA/ESPN were

added to the schedule, even if the gain for each additional program is diminishing, and that a

"competitive equilibrium has more games but a lower average audience and advertising revenue per

game than the monopoly equilibrium."[239]

218.    The NFL itself, █████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████[240]  Here, an "out-of-market" fan is someone who does not reside in the DMA(s)

where their favorite team's games are always going to be broadcast on Standard TV.[241]  ████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[237] Tainsky, S., & McEvoy, C. (2011). Television Broadcast Demand in Markets Without Local Teams. *Journal of Sports Economics*, *13*(3), 250-256. https://doi.org/10.1177/1527002511406129

[238] This is a conservative measure because the dataset contains games that are on at the same time as other games, thus lowering the average rating.

[239] Noll, R. (2007). Broadcasting and Team Sports. *Scottish Journal of Political Economy*, *54*(3), 400-421. https://doi.org/10.1111/j.1467-9485.2007.00422.x, p. 407.

[240] ████████████████████████████████████████████  NFL_0057465 at 7470.

[241] NFL_0057465 at 7470.

██████████████████████████████████████████████████████████████████[242]

Given that there at millions of NFL fans out there who are unable to watch their favorite team on a weekly basis, output and quality would rise absent restrictions that prevent those fans from watching their favorite team (without subscribing to DirecTV and paying a premium for Sunday Ticket).

## 8.3   OTHER POSSIBLE PCJs

219.   ████████████████████████████████████████████



.[243]  Moreover, as discussed, both economic theory and the empirical evidence taken from NCAA football show that ██ ███████████████████████████████████████████████  These sorts of analyses require evidence that is common to the class, not dependent upon individual class members' situations.

220.   NFL teams do not need to collude in the various markets in which they operate in order to produce all forms of football output, as seen by their conduct in multiple other products they sell.  For instance, NFL teams compete with each other for the sale of tickets to games (subject to league home/away team sharing rules), especially against teams that are in the same region.  They also compete with each other in the sale of sponsorships and merchandise.  Perhaps more important to this lawsuit, NFL teams individually sell various forms of broadcast right (i.e., their radio rights and their preseason NFL games' media rights), as described above in Section 5.2.3, thus providing evidence that NFL teams can compete with each other in the provision of media rights for their games.  These rights overlap with

---

[242] NFL_0057465 at 7467.

[243] The fact that a less desired game is available for free does not inherently overcome the harm that arises when a more desired game is priced out of the reach of consumers.

those of other NFL franchises, further providing proof that this is feasible.  Additionally, NFL franchises each sold their own media rights to regular season games prior to the passage of the SBA.  In major college football, some schools sell their own rights (e.g., Notre Dame and BYU) even in competition with collegiate leagues (i.e., conferences).

### 9.  LESS RESTRICTIVE ALTERNATIVES, IF NECESSARY TO ASSESS, WILL BE EVALUATED BY MEANS OF CLASS-WIDE, COMMON METHODS

221.    To test whether such defenses are valid and thus whether any less restrictive alternatives even need to be considered, and then to test such less restrictive alternatives, requires Defendants first to make those arguments.  Thus, it is premature to assess LRAs given that Defendants have yet to fully offer their PCJs even to determine whether an LRA analysis will be needed.  Nevertheless, it is clear that the process of specifying LRAs, if necessary, will be common to all class members, because the process of specifying and analyzing large-scale structural changes to Defendants' conduct and then to determine whether those changes offer less restrictive means of achieving whatever purported procompetitive benefit Defendants may succeed in proving (as compared to the current Challenged Conduct) will have nothing to do with individualized inquiry into class members' preferences or specific facts.  Less restrictive alternatives are focused on Defendants' conduct and the resulting market outcomes, not class members or their preferences.

222.    To even reach the question of less restrictive alternatives means that there will have been a finding that anticompetitive conduct restricted output and harmed customers, such as discussed in the previous sections of this report, and then the question becomes whether, compared to the existing restraints, there exists some less restrictive alternative conduct that could still achieve whatever purported benefits the NFL proves would have benefited consumers and were caused by the Challenged Conduct. This section presents the evidence supporting the feasibility of a range of less restrictive alternative Defendants could adopt in lieu of the Challenged Conduct, alternatives that would have increased output and benefitted Class Members during the damages period, but could still achieve certain levels of coordination implicit in the Challenged Conduct, to the extent the Court determines that coordination offers some procompetitive benefits.

223.    Whether these arguments have merit is not the question at hand, but rather whether the NFL will need to demonstrate *individualized* rationales for each class member.  It is difficult to conceive of how individualized inquiry into the specific facts of any one class member would be needed to present evidence (assuming it exists) supporting the connection between the restraints in suit and whatever NFL argument there is.

224.    To the extent a Defendant succeeds in demonstrating some valid PCJ, I understand the burden shifts back to Plaintiffs to show there exist less restrictive alternatives (or LRAs) to the existing restraints that can accomplish those PCJs without as much anticompetitive harm.  To do so will require an assessment of market-wide changes in conduct, and so proof of the existence of LRAs are virtually always grounded in methodologies common to all class members.  For example, if Defendants were to succeed in showing that the current availability of Standard TV broadcasts is a PCJ, the obvious response would be that the League could impose a rule requiring the availability of Standard TV broadcasts in the home markets of the two teams playing a game, as it does now.  The economic assessment of the benefits and burdens of such a rule would be class-wide, without resort of individual analysis.

225.    As just one such example, one obvious LRA in this case (compared to the full relief sought by Plaintiffs) ██████████████████████████████████████████████████ ██████████████████████████████████.  The effects on competition of such a decision are measured on a market-wide basis, so that too is a clear example of an analysis appropriate for determination on a class-wide basis.  Another obvious example of an LRA is for Defendants to have adopted a more widely available carrier, ████████████████████████████████████ ███████████████ where the cost of equipment and of the base subscription are expected to be substantially lower than with DirecTV, and the number of customers with access to the service will be of an order of magnitude larger.[244]  Any analysis of these LRAs would focus on the effects on the market as a whole, and thus would be inherently class-wide.

---

[244] These are not the only LRAs that are likely to achieve whatever PCJs Defendants proffer with lower anticompetitive effects, but without knowing the specifics of those purported PCJs, it is difficult to specifically offer up detailed LRAs. Some candidates include adopting a structure similar to the NFL Prior to the Sports Broadcasting Act (as discussed in Noll, R. (2007). Broadcasting and Team Sports. Scottish Journal of Political Economy, 54(3), 400-421.

**10. DAMAGES IN THIS MATTER CAN BE CALCULATED BY MEANS OF CLASS-WIDE, COMMON FORMULAS**

226.    The methods used in this damages analysis are common to the members of the class. Sunday Ticket is sold to class members at listed prices.  Some class members received discounts (which I understand, based on Dr. Zona's review of ███████████████████ ██████████ or a temporary free subscription to Sunday Ticket during some time periods, but every class member has been harmed by the Challenged Conduct.

227.    The analysis of transaction data discussed in the Zona Report demonstrates the ability to segregate the data with respect to payment amounts and product types, and group transactions into distinct time periods, resulting in a tabulation of affected purchases for each class.[245]  With this, I can apply estimates of reduction factors derived from a class-wide model to all class members.  The damage analysis relies on a class-wide, common approach to damages that does not rely on individualized inquiry.

228.    In the remainder of this section, I lay out methodologies that can be used at the merits stage in this case.  My work is a full demonstration of damages calculations that, in my opinion, reflect accurate and reliable, albeit conservative, measures of the harm to the class.  However, I do not present these calculations primarily for the specific quantum of the estimates.  Rather, I present them as examples of potential damages *methods* in order to demonstrate that the harm to class members is measurable by means of common, class-wide, formulaic methods.  To the extent that the nature of the alleged harm differs by year, any damage model must incorporate damages for each year.  This section describes a variety of damage analysis methods applicable to this matter, the reduction factors that each of those methods estimate that are common across the class members, and the full class damages.

229.    Damages analyses are based on a specific assumed finding of liability.  Each of the following damage analyses follows from an assumed finding of liability corresponding to the Challenged

---

https://doi.org/10.1111/j.1467-9485.2007.00422.x, p. 415), ████████████████████████████ (NFL_0057409, NFL_0818630, NFL_1062612, NFL_1062558, NFL_1212477, NFL_0358562, and NFL_1212490) ████████████████████████ (see, for example, NFL_0059025).  In addition, the many less restrictive frameworks that have been adopted by other leagues, such as college football, the NBA, or MLB, or even the NFL in other countries, also serve as viable alternative structures with fewer restrictions on competition.

[245] Zona Report, Sections 3.1 and 3.2. Dr. Zona also tabulated affected purchases for named plaintiffs.

Conduct: one damage analysis related to liability for all of the Challenged Conduct, one limited to

misconduct related to *Pooling*, and one limited to misconduct related to *DirecTV Exclusivity*.  While I

conclude at this stage that both areas of concern involve anticompetitive conduct, my damages analysis

permits the determination of the harm consistent with narrower determinations of liability.

### 10.1  DAMAGES METHODOLOGIES

230.    In this section I support my assertion that the methodologies are standard and reliable

economic methods.

### 10.2  ECONOMETRIC ESTIMATES OF BFW PRICES

231.    Econometric analysis is one standard methodology for estimating the prices of products in

various scenarios.  This type of analysis relies on data about actual economic transactions that occur in

similar scenarios.  The econometric methodology provides a model with parameters that can be estimated

to provide a close fit to the existing transactions.  Then when various alternative scenarios change the

market, those parameters predict the alternative transactions that would occur.  With some basic

assumptions, such as profit maximization, econometric analysis can estimate the percentage reduction in

price of a product in alternative scenarios.

232.    Economist Dr. J. Douglas Zona has submitted a report concurrently with my report that

undertakes these econometric analyses.  For example, he estimates percent price reduction that would

have occurred had the NFL allowed for distribution of Sunday Ticket through means other than DirecTV,

or had teams offered individual team packages directly to consumers.  Dr. Zona also provides

econometric analyses of survey results of NFL fans provided by Sarah Butler.  Dr. Zona has also

estimated the price class members would have paid for all out-of-market games on DirecTV if DirecTV

had not been required to provide Sunday Ticket only as a standalone subscription product at a premium

price, but could have, for example, included Sunday Ticket in a moderately priced tiered service of

bundled programming.

233.    These models, along with my other methods of estimating damages described here,

provide estimates of price reduction that all class members would have experienced for the products they

actually purchased at all times during the Damage Period – a subscription product that provided access to all Sunday afternoon NFL games – absent the specific elements of the Challenged Conduct being assessed in each specific scenario.  Relying throughout on common sources of evidence, common models, and standard analytical methods, these are all examples of common, class-wide methodologies for reliable economic estimates of damages from anticompetitive directly attributable to the Challenged Conduct.  Put another way, these methods establish that every class member suffered economic harm as a result of the Challenged Conduct.

### 10.2.1  Benchmarks, Yardsticks, and Comparables as Damages Methodologies

234.    Measurement of a but-for price is commonly done using some form of comparable market or time period in which the alleged misconduct was not present.  Economists often call these the "yardstick" approach and the "benchmark" approach, respectively.[246]  What economists call a yardstick is more often colloquially referred to as an analysis of comparables[247] ("comps").[248]  Dr. Daniel Rubinfeld, an economist who previously served as the Chief Economist at the Department of Justice, explains the yardstick method as follows:

> "Under the yardstick approach, damages are measured by obtaining a 'but-for price' from a market (the 'comparable market') that closely approximates the market in which the violation occurred.  The 'but-for price' is a measure of what the price of the product would be if the wrongful behavior had not occurred.  A yardstick can come from a different, but related product market in the same or

---

[246] See Blair, R., & Kaserman, D., *Antitrust Economics* (1st Ed.). Richard D. Irwin, p. 81. Connor, J. (2008). Forensic Economics: An Introduction with Special Emphasis on Price Fixing. *Journal of Competition Law and Economics, 4*(1), 31-59, https://ssrn.com/abstract=1159273. Amsterdam Centre for Law and Economics, ARP No. 2006-17888. *Proving Antitrust Damages: Legal and Economic Issues*, American Bar Association Section of Antitrust Law, 1st ed., p. 37. Although some insist on this stark distinction between *benchmark* and *yardstick*, others (myself included) tend to use the terms interchangeably.

[247] In addition to my Ph.D. in economics, I am also a Certified Valuation Analyst with NACVA.  Under standard valuation theory (see Pratt, S., Reilly R., & Schweihs, R. (2000). *Valuing a Business* (4th Ed). McGraw-Hill, pp. 260, 274), what economists call a benchmark approach is essentially what valuation experts call the market approach or comparables approach.  This approach involves comparing the subject asset to a similar asset and appropriately making adjustments for any differences in the comparable assets. See also Niels, G., Jenkins, H., & Kavanagh, J. (2011). *Economics for Competition Lawyers*. Oxford University Press, p. 536.

[248] "The economics and finance literature has developed a wide array of methods and models for quantifying damages.  We use the terms 'methods and models' in a broad sense here, with the intention to encompass all possible methods, models, tools, techniques, frameworks, and approaches". Niels, G., Jenkins, H., & Kavanagh, J. (2011).  *Economics for Competition Lawyers*. Oxford University Press, p. 524.

similar geographic market or from a different, but related geographic market in
which the same product or products are sold."[249]

235.    He goes on to clarify that:

"Ideally, the comparable market product should reflect the same degree of
competition, the same costs, and the same demand conditions that would have
prevailed in the market at issue had there been no wrongful behavior.  Of course, it
is quite possible for there to be no suitable yardstick in some cases.  If an
appropriate yardstick is available, it is important to take into account any
differences in costs and the extent of competition between the yardstick market
and the market at issue in the but-for world."[250]

236.    Thus, the yardstick method (i.e., the use of comparables) requires adopting, or
synthesizing, a control group of other similar situations.  Yardsticking requires controls for the factors
that are different between the subject of interest and the control group.[251]  Valuing a house is an analogy
– this is typically done based on finding comparable houses, but adjusting for the differences in the
control group and subject house (e.g., factors like the number of square feet, number of rooms, size of
garage, curb appeal, school district, whether the house has certain features like a swimming pool or solar
panels, etc.), and accounting for changes in the general real estate market over time that could impact
home values.

237.    There are other ways to measure damages besides yardsticks or comparables.

"US case law, which has explicitly identified three 'common approaches to
measuring antitrust damages': the Before-and-After approach, a yardstick or
benchmark approach, and regression analysis. …Various techniques can be used to

---

[249] See Rubinfeld, D. L. (2009). Antitrust Damages. In E. Elhauge (Ed.) *Research Handbook on the Economics of Antitrust Law*, Edward Elgar Publishing, p. 4. Footnotes omitted.

[250] See Rubinfeld, D. L. (2009). Antitrust Damages. In E. Elhauge (Ed.) Research Handbook on the Economics of Antitrust Law, Edward Elgar Publishing, p. 4. Footnotes omitted.

[251] "Yardstick price movements can also be constructed for a noncartelized product made in the same region that is made with the same inputs, utilizes a similar technology, and is consumed by the same customers." Connor, J. (2014), "Cartel Overcharges," *The Law and Economics of Class Actions*, Ed. James Langenfeld, Emerald Books, p. 378.  "Under the yardstick approach, one obtains a measure of the but-for market prices by relying on the actual prices in comparable markets, i.e., a market or group of markets that closely resemble the market in which the violation allegedly took place (for example, a different geographic market where a similar product is offered).  Because the yardstick markets may not closely match the market in which the alleged violation occurred, it is important to take into account any differences in economic conditions between the yardstick markets and the market at issue.  Economists often rely on regression analysis as a tool to test and incorporate any differences in demand, supply, and market structure between the yardstick markets and the market at issue." Expert Report of Jonathan Orszag, *In re: NCAA Athletic Grant-In-Aid Cap Antitrust Litigation*, 2016 WL 5815786 (N.D.Cal.), August 26, 2016, ¶29.

analyse this comparator data, ranging from the simple such as comparing averages, to the more sophisticated such as panel data regression."[252]

238.    The use of benchmarks refers to a comparison of a period of alleged harm to an outside period (either before, after, or both before-and-after) as relevant information to predict/forecast what would have happened during the period of harm absent the alleged bad act.  It is key to be able to control for other factors that may have caused the variable of interest (often financial revenue or profit) to change over time.  This is typically either done directly by including the impacts of other variables (such as the market in general, competition, product quality, etc.) in a model of damages, or inferred based on studies of each of the other possible causal factors.  For example, one might show that the degree of competition in a market was similar pre- and post-period of harm.  As the litigation reference manual quoted above explains:

> "In essence, the benchmark approach involves using the periods before and/or after the alleged wrongful behavior as a benchmark.  As with the yardstick approach, it is essential that the nonimpact period be as similar as possible to the impact period. This requires that one take into account any cost, demand, or competitive differences between the non-impact behavior and the impact period, but for the wrongful behavior.  However, the benchmark approach does have one potentially important advantage in comparison to the yardstick approach.  If sufficient data are available, regression analysis can be used to distinguish the effects of the alleged wrongful behavior on price from those effects that are not causally related to that behavior."[253]

239.    A similar methodology to the benchmark method is the Before-and-After method; indeed, in some cases these methodologies are sufficiently similar to be identical.  To the extent the two methods differ, generally it is by reserving the term "Before-and-After" for comparisons that do not require multiple regression, while treating a Benchmark methodology as a more rigorous analysis.  Whether regression is required depends on the circumstances.  "The Before-and-After method 'may provide a sufficiently good approximation in cases in which the cartel is stable and the basic conditions of demand and supply do not change too much.'"[254]

---

[252] See Niels, G., Jenkins, H., & Kavanagh, J. (2011). *Economics for Competition Lawyers*. Oxford University Press, p. 515.

[253] Rubinfeld, D. (2012). Antitrust Damages. In E. Elhauge (Ed.), *Research Handbook on the Economics of Antitrust Law*. Edward Elgar Publishing, p. 381.

[254] Davis, P. & Garcès, E. (2010). *Quantitative Techniques for Competition and Antitrust Analysis*. Princeton University Press, p. 354.

240.    Using the analogy of a housing market from above, a benchmark approach would look at
what the subject house actually sold for previously and then adjust for changes in market conditions.  But
those adjustments may be vital.  One could not, for example, assume that because the housing market in a
community performed well for the three years prior to a fire, that absent the fire that same level of
performance would continue on indefinitely.  Whether one could build in those controls via a Before-
and-After or a benchmark approach would depend on the sort of conditions one finds in the industry in
question.  For housing markets, one might have sufficient grounds to use simple before-and-after
controls.

241.    As the number of non-violative factors one should control for grows, multiple regression
analysis provides a powerful methodology to incorporate the needed safeguards against misattributing
normal variation as a cause of economic damages.  As described by Dr. Daniel Rubinfeld in *The
Reference Manual on Scientific Evidence*:

> Multiple regression also may be useful (1) in determining whether a particular
> effect is present; (2) in measuring the magnitude of a particular effect; and (3) in
> forecasting what a particular effect would be, but for an intervening event.  In a
> patent infringement case, for example, a multiple regression analysis could be used
> to determine (1) whether the behavior of the alleged infringer affected the price of
> the patented product; (2) the size of the effect; and (3) what the price of the product
> would have been had the alleged infringement not occurred.

> Over the past several decades the use of multiple regression analysis in court has
> grown widely.[255]

### 10.2.1.1 The Use of Yardsticks in Sports Economics Research

242.    Specific to sports economics, published research shows that comparisons across sports
leagues as a means of understanding questions that arise in sports economics is accepted in the literature.
Comparisons across leagues with various levels of competition and demand is common in sport
management research, not to mention comparative economic systems as a field in economic sciences.
For example, Owen and King (2015) compare competitive balance across thirteen leagues on multiple
continents across multiple sports, while Peeters (2015) compares revenue sharing rules and their impacts

---

[255] Rubinfeld, D. (2000). *Reference Manual on Scientific Evidence* (2nd Ed.). Lexis Publishing, pp. 181-182. Footnotes
omitted.

on attendance and competitive balance across nine sports leagues (of different sports) on multiple

continents.[256]  Velema (2018) studies soccer player labor markets across multiple sports leagues in

multiple countries.  Paul, Weinbach, and Small (2014) compare gambling markets across NFL and

NCAA football.[257]  Thus, it is common to use information derived from analysis of one league to draw

conclusions about another, even if the leagues are not economic substitutes.

243.    Vrooman (2000) compares major professional sports leagues (MLB, NFL, NBA, NHL)

through the lens of labor economics and develops general models that apply to all of the leagues.[258]  This

is one of many articles in sports economics that develops models of sports leagues that are applicable

across the leagues being used in this yardstick methodology.[259]  Because of the many common

underlying factors that are present within these leagues, this analysis is relevant for understanding

counterfactuals and other aspects of markets.

244.    Salaga and Tainsky (2015), studying college football, and Tainsky (2010), focused on

NFL football, both utilize time of game, day of week, income, and team quality as aspects affecting

demand.[260]  Brown and Salaga (2018) use team quality, conference game, progression of the season,

---

[256] Owen, P., & King, N. (2015). Competitive balance measures in sports leagues: the effects of variation in season length. *Economic Inquiry*, *53*(1), 731-744. https://doi.org/10.1111/ecin.12102. Peeters, T. (2015). Profit-maximizing gate revenue sharing in sports leagues. *Economic Inquiry*, *53*(2), 1275-1291. https://doi.org/10.1111/ecin.12184

[257] Velema, T. (2018). A game of snakes and ladders: Player migratory trajectories in the global football labor market. *International Review of the Sociology of Sport*, *53*(6), 706-725. https://doi.org/10.1177/1012690216679967. Paul, R., Weinbach, A., & Small, K. (2014). The Relationship between Sportsbook Volume, Forecast Accuracy, and Market Efficiency: The NFL and NCAA Football. *Journal of Prediction Markets*, *8*(2), 29-42. https://doi.org/10.5750/jpm.v8i2.888

[258] Vrooman, J. (2000). The Economics of American Sports Leagues. *Scottish Journal of Political Economy*, *47*(4), 364-298. https://doi.org/10.1111/1467-9485.00169

[259] El Hodiri, M., & Quirk, J. (1971). An Economic Model of a Professional Sports League. *Journal of Political Economy*, *79*(6), 1302-1319. http://www.jstor.org/stable/1830103. Fort, R., & Quirk, J. (1995). Cross-Subsidization, Incentives, and Outcomes in Professional Team Sports Leagues. *Journal of Economic Literature*, *33*(3), 1265-1299. http://www.jstor.org/stable/2729122. Rascher, D. (1997). A model of a professional sports league. *International Advances in the Economic Research*, *3*, 327-328. https://doi.org/10.1007/BF02294925. Szymanski, S., & Késenne, S. (2010). Competitive Balance and Gate Revenue Sharing in Team Sports. In S. Szymanski (Ed.), *The Comparative Economics of Sport* (pp. 229–243). Palgrave Macmillan, London. https://doi.org/10.1057/9780230274273_7. Andreff, W. (2011). Some comparative economics of the organization of sports: Competition and regulation in north American vs. European professional team sports leagues. *The European Journal of Comparative Economics*, *8*(1), 3-27. http://ejce.liuc.it/18242979201101/182429792011080101.pdf

[260] Salaga, S., & Tainsky, S. (2015). The Effects of Outcome Uncertainty, Scoring, and Pregame Expectations on Nielsen Ratings for Bowl Championship Series Games. *Journal of Sports Economics*, *16*(5), 439-459. https://doi.org/10.1177/1527002513497236. Tainsky, S. (2010). Television broadcast demand for National Football League contests. *Journal of Sports Economics*, *11*(6), 629-640. https://doi.org/10.1177/1527002509355636

time, and day of week, among others, for studying demand in college football.[261]  These are also used by

Tainsky and Jasielec (2014) studying the NFL's demand.[262]

245.    Solberg compares television sports rights across multiple leagues.[263]  And, Southall et al.

(2009) show that major college football postseason games are produced nearly identically to NFL games

in terms of their focus on commercial outcomes.[264]  Each of these show that the academic literature uses

yardsticks as useful scientific tools for comparing across sports and also specifically within professional

and college football.

### 10.3  DAMAGES ESTIMATES

246.    In this section I demonstrate specific damage analyses as they relate to various but-for

overcharge considerations.

### 10.3.1  College Football Model

247.    The actual world of major college football, post-*Board of Regents*, provides a clear

yardstick for professional football absent the challenged conduct.  That 1984 decision created a

substantially more competitive environment and the net result, today, is that Saturdays, when many FBS

football games occur, have many more football games on national television than Sundays, when many

NFL games occur.  Major American college football includes teams (representing schools) that are

organized into conferences of approximately a dozen schools/teams.  As discussed above in Section

5.2.1, the top of the pyramid are schools that play in the P5 conferences: the SEC, Big Ten, ACC, Big 12,

and Pac-12, plus Notre Dame.

---

[261] Brown, K. M., & Salaga, S. (2018). NCAA football television viewership: Product quality and consumer preference
relative to market expectations. *Sport Management Review, 21*(4), 377-390. https://doi.org/10.1016/j.smr.2017.08.008

[262] Tainsky, S., & Jasielec, M. (2014). Television Viewership of Out-of-Market Games in League Markets: Traditional
Demand Shifters and Local Team Influence. *Journal of Sport Management, 28*(1), 94-108.
https://doi.org/10.1123/jsm.2012-0341

[263] Solberg, H. A. (2002). The Economics of Television Sports Rights. Europe and the US - A Comparative Analysis. *Norsk
Medietidsskrift, 9*(2). 57-80, https://doi.org/10.18261/ISSN0805-9535-2002-02-04

[264] Southall, R. M., Southall, C., & Dwyer, B. (2009). 2009 Bowl Championship Series Telecasts: Expressions of Big-Time
College-Sport's Commercial Institutional Logics. *Journal of Issues in Intercollegiate Athletics, 2,* 150-176. http://csri-
jiia.org/old/documents/publications/research_articles/2009/JIIA_2009_9_BCS_Institutional_Logics.pdf

248.     This analogy makes sense because there are strong similarities in terms of economic factors between major college football in the US and the NFL:[265]

- Both major college football universities and NFL teams play American football, and both have been established for over a century.[266]   College Football is actually the older and more established sport.

- They both have a national footprint and have teams that appeal to fans across the country. For example, despite being a regional conference located in the South, the SEC game of the week is commonly the highest rated college football game nationwide.[267]  Similarly, the Big Ten conference championship is highly watched in the South and West. The 2021 SEC Championship game on CBS between Alabama and Georgia had the highest rating of the 2021 college football season at 8.2, with 15.28 million viewers.  The Big 10 Championship was the second highest rated championship game, scoring a rating of 6.2 and 11.66 million viewers.[268]

- They both are very popular in the sporting landscape.  For example, in a survey of 1,000 Gen Z'ers, 18% say they are avid fans of the NFL with 31% claiming to be casual fans. For college football, avid fans constitute 11% of respondents with 26% being casual fans.[269]

- Surveys gauging total fans, average viewership, and attendance show College Football to be the second most popular sport in the United States after the NFL.[270]

---

[265] The Power 5 consist of the most popular and highest resourced conferences at the top level of American college football: Combined, these five conferences have accounted for billions of dollars each year in college football television revenue and end up with nearly 100% of all top 100 recruits.

[266] "NFL Founded in Canton", *Profootballhof.com*, January 1, 2005, accessed on August 16, 2022 at https://www.profootballhof.com/news/2005/01/news-nfl-founded-in-canton/.

[267] "2021 College Football TV Ratings", *SportsMediaWatch*, accessed on August 16, 2022 at https://www.sportsmediawatch.com/college-football-tv-ratings/.  In the 2021 season, for example, the CBS Saturday afternoon SEC broadcasts averaged 5.6 million viewers.  See "Text Cite – SEC CBS Saturday Afternoon Viewership 2021.xlsx" in Rascher Backup materials.  In comparison, the NBA "…six-game Western Conference Finals (Phoenix-Los Angeles Clippers) averaged 5.4 million viewers on ESPN/ABC…The six-game Eastern Conference Finals (Milwaukee-Atlanta) on TNT averaged 4.9 million viewers, the third game was tops averaging 5.6 million viewers." "Ratings: The 2020-21 NBA Season In Review And A Look Ahead", *Forbes*, July 21, 2021, accessed on August 16, 2022 at https://www.forbes.com/sites/bradadgate/2021/07/21/the-2020-21-nba-season-in-review-and-a-look-ahead/?sh=78795c98518a.

[268] "2021 College Football TV Ratings", *SportsMediaWatch*, accessed on August 16, 2022 at https://www.sportsmediawatch.com/college-football-tv-ratings/.

[269] "Crosstabulation Results", *Morning Consult*, accessed on August 16, 2022 at https://assets.morningconsult.com/wp-uploads/2020/09/25151009/200881_crosstabs_GENZ_Gen_Zers_Age_13-23_v2_JB-1.pdf. See Table CGZ24_12 and Table CGZ24_18. Note: NBA 18% and 29% (Table ESPN/ABC…The six College Basketball 10% and 23% (Table CGZ24_19).

[270] Taylor Tepper, "How College Football Sacked the NBA and MLB", *Money.com*, August 28, 2014, accessed on August 16, 2022 at https://money.com/college-football-popularity/. DIRECTV-ST-00226773 at 6790. NFL_0370556.

- A recent analysis by Kantar Sports Monitor found that the College Football Playoff was the second most popular sporting event in the United States, after the Super Bowl.[271]

- Both NFL and P5 football both have teams that play once per week during the late summer, fall, and winter months, typically on a Saturday for P5 and Sunday for NFL, with 4-6 month-long seasons.  P5 teams play 12-game regular seasons with additional conference championship games for some teams, and additional bowl games (one or two) for some teams stretching into January.  NFL teams played 16-game regular seasons until 2021, but they now play 17-game seasons.[272]  Then, post-season games continue for some teams until the Super Bowl in February.

- They both have similar business models in that they generate revenue from fans and businesses attending live football games through ticket sales, luxury suite sales, merchandise,[273] concessions, and parking, from sponsors using the sport as a marketing platform to reach customers, and from media outlets paying millions or billions of dollars to purchase content for programming.  NFL teams sell Club Seats or PSLs to higher tier customers that often serve as annual dues, while college teams sell tickets with large mandatory donations attached to them which function similarly.

- The years of analysis (2011-current) in this process of establishing a yardstick are the same for both P5 and the NFL, thus making common the various factors that may have changed in the sports industry and economy in general over that time period.

- In particular with respect to media, the same media companies license and show P5 and NFL football games, thus establishing commonality among the buyers (and their decision processes) of televised football.  Moreover, the major sports-oriented cable channels are affiliated with Standard TV networks, and P5 games are typically licensed to a media company, rather than a particular network.  For example, the Big Ten contracts with FOX, which allocates its games among FOX, Fox Sports 1, and Fox Sports 2, along with the Big Ten Network.[274]  Similarly, ESPN and ABC both show games throughout the day on a typical Saturday during the college football season, with the games allocated among them

---

[271] "The State of the Sport College Football", *Kantar*, Kantar-SM-Infographic-The_State_of_the_Sport-College_Football-08082022.pdf.

[272] "NFL owners approve enhanced schedule with 17 regular-season games per team", *NFL*, March 30, 2021, accessed on August 16, 2022 at https://www.nfl.com/news/nfl-owners-approve-enhanced-schedule-with-17-regular-season-games-per-team.

[273] Merchandise is also sold through retail outlets and online.

[274] "Big Ten Football Schedule", 2021&2022, *Bigtenonline.com*, accessed on August 16, 2022 at https://bigtenonline.com/bigtenfootballontv html.  Note, as of August 18, 2022, the Big Ten signed a new deal (discussed elsewhere in this report) which will move games off of Fox Sports 2 and on to more prominent channels at other networks.

by ABC and ESPN as well as ESPN's affiliated networks.[275]  CBS owns CBS Sports
Network, which also shows college football games.[276]

- For example, CBS, FOX, and NBC show NFL games on Sunday and CBS and
  ESPN/ABC show SEC games the day before on Saturday during the season.[277]  There are
  more P5 games to show on a given Saturday, thus even though CBS, ABC, NBC, and
  FOX show P5 games, other P5 games appear on affiliate networks such as ESPN2,
  ESPNU, Fox Sports 1, and CBS Sports Network as well as the Power 5 conference
  networks (ACCN, SECN, Pac-12 Networks, and BTN).[278]

---

[275] One exception is the SEC, which currently licenses its OTA rights to CBS, and its cable rights to ESPN.  Starting in 2024,
its games will move to ESPN, which means they will appear either on ABC or ESPN. See Ross Dellenger, "SEC Leaving
CBS for ABC: Inside the 10-Year Deal Starting in 2024", *Sports Illustrated*, December 10, 2020, accessed on August 16,
2022 at https://www.si.com/college/2020/12/10/sec-espn-abc-tv-contract-leaving-cbs.

[276] See Power 5 Broadcasting schedules: "2021 Pac-12 Football Schedule by Week and by Team", accessed on August 16,
2022 at https://sportspac12.com/2021-pac-12-football-schedule-by-week-and-by-team/. "SEC Football TV Schedule, 2021,
accessed on August 16, 2022 at https://secfootballonline.com/sec-football-tv-schedule/. "ACC Football TV Schedule",
2021, accessed on August 16, 2022 at https://accfootballonline.com/acc-football-tv-schedule/. Big Ten Football Schedule.

[277] After 2023, the SEC games will be exclusive to ABC/ESPN's family of networks.

[278] Evident in the mentioned broadcast schedules for Power 5 Conferences Big Ten Football Schedule, SEC Football
Schedule, ACC Football Schedule, Pac-12 Football Schedule, and individual team schedules for the Big 12 at
https://fbschedules.com.

111

Exhibit 9 Television Schedule of Power 5 and NFL on October 9/10, 2021

### Saturday 10/9/2021 Power 5 and NFL Cable TV Schedule

| Channel | Noon | 13:00 | 14:00 | 15:00 | 16:00 | 17:00 | 18:00 | 19:00 | 20:00 | 21:00 | 22:00 | 23:00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BTN | 17 Michigan State at Rutgers | | | Wisconsin at Illinois | | | | | | | | |
| ABC | 6 Oklahoma vs. Texas (in Dallas, TX) | | | | | | | | 14 Michigan at Nebraska | | | |
| ACCN | | | | Virginia at Louisville | | | | | 14 Notre Dame at Virginia Tech | | | |
| CBS | | | | 2 Georgia at 22 Auburn | | | | | 1 Alabama at 15 Texas A&M | | | |
| ESPN | 13 Arkansas at 17 Ole Miss | | | Florida State T North Carolina | | | | TCU at Texas Tech | | | | UCLA at Arizona |
| ESPN2 | South Carolina at Tennessee | | | 19 Wake Forest at Syracuse | | | | | | | | |
| ESPNU | 13 Arkansas at 17 Ole Miss | | | | | | | | | | | |
| FOX | Maryland at 11 Ohio State | | | | 4 Penn State at 5 Iowa | | | | Utah at USC | | | |
| FS1 | West Virginia at 21 Baylor | | | | | | | | | | | |
| SECN | Vanderbilt at 20 Florida | | | | | | | | LSU at 16 Kentucky | | | |
| P12N | | | | Oregon State at Washington State | | | | | | | | |
| NBC | | | | | | | | | The Voice | | | |

### Sunday 10/10/2021 Power 5 and NFL Cable TV Schedule

| Channel | Noon | 13:00 | 14:00 | 15:00 | 16:00 | 17:00 | 18:00 | 19:00 | 20:00 | 21:00 | 22:00 | 23:00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BTN | B1G Women's Soccer: Michigan at Nebraska | | | | B1G Football in 60: Michigan at Nebraska - 10/9/21 | | | | | | | |
| ABC | Not live Sports | | | | | | | | | | | |
| ACCN | | | | Liberty vs. North Carolina (Field Hockey) | | | | 19 Wake Forest vs. Syracuse (Football) replay) | | | | |
| CBS | | | | Chicago Bears at Las Vegas Raiders | | | | | | | | |
| ESPN | Championship Driv Spain vs. France (UEFA Nations League) | | | | | | | SportsCenter | | | | Phx Suns vs. LA Lakers |
| ESPN2 | Formula 1 Roles Turkish Grand Prix | | | Sunday After Latinos | | | | The Equalizer | | | | |
| ESPNU | Championship Drive: College Football Rewind | | | | | | | | | | | |
| FOX | Green Bay Packers at Cincinnati Bengals | | | | NY Giants at Dallas Cowboys | | | | The Simpsons | | | |
| FS1 | NASCAR RaceDay | | | | | | | | | | | |
| SECN | SEC Football Final | | | | | | | | True South: Lake Village | | | |
| P12N | | | | Stanford - Oregon (W Volleyball) | | | | | | | | |
| NBC | | | | | | | | | | | Buffalo Bills at Kansas City Chiefs | |

| Type | Saturday | Sunday |
|---|---|---|
| Live Football | 21 | 4 |
| Football related | 0 | 4 |
| Live College Sports | 0 | 3 |
| Live Pro Sports | 0 | 3 |
| Sports review | 0 | 2 |
| Not Live Sports | 0 | 1 |
| Not Sports | 1 | 5 |
| Nothing on | 0 | 0 |
| Total | 22 | 22 |

Notes:

The Saturday programs are restricted to live football events with both teams from the Power 5
Conferences.

The Sunday programs include the events on the same channel and at the same time as the Saturday
programs.

Includes cable channels only.

Region has been set to Chicago.

"Live Football" includes both college football and the NFL.

"Live College Sports" and "Live Pro Sports" do not include football.

249.    As part of determining the nature of the comparability of college football, which is much more competitive than the NFL in that each of several conferences contracts with media organizations to broadcast its games, an assessment of the nature of the markets in which major college football competes is informative.[279]  Here is a product comparable to NFL football that was sold in an anticompetitive market (prior to 1985) and then that market became much more competitive.  That the transition successfully occurred in the comparable product market is informative about whether such a transition would be feasible or likely for the market of interest (NFL).  Not only is P5 football comparable to NFL football in terms of the market for media revenues, but the history of major college football shows that it was able to successfully transition from monopoly seller of media rights to a competitive market.

250.    The same channels that currently carry major college football games already carry NFL games, namely FOX, ESPN/ABC, CBS, and NBC.  Other NFL games are shown on the NFL Network, and starting in 2022, on Amazon Prime.  Given that NFL games are not played on Saturdays (except outside of the months when regular season college football games occur) and college football games are not shown on Sundays, the availability for showing football is not impeded by the existing contracts.  In order to accommodate all of the NFL games, there are many options that the NFL and its media partners could choose from.  For instance, during any given week there are at most 16 games (15 during bye weeks).  Three of those games are currently carried nationwide on Thursday, Sunday, and Monday evenings.  Thus, thirteen games need to be accommodated.  By only including the four major networks and their associated (non-conference based) cable sports channels that already show P5 football (ESPN, ESPN2, ESPNU, FS1, FS2, and CBSSN), ten games could be shown at one time, easily accommodating the NFL's current format of two Sunday afternoon windows.[280]

---

[279] Note: a few universities (e.g., Notre Dame) have their own media deals for football outside of any conference they may be affiliated with.  Additionally, some inventory from schools is available for them to individually contract with media – these are usually lower demand games against unpopular opponents.

[280] Historically, the NFL has, at times, shown two evening games on Thursdays, Sundays, and/or Mondays.  In the past, the NFL showed Sunday night football games on Turner-owned TNT for nearly a decade.

251.     On Thursday, August 18, 2022 (the day prior to the filing of this report), the Big Ten announced its new media deals for the next seven years.[281]  "The Fox-CBS-NBC triumvirate will provide the Big Ten with an NFL-like lineup of games on over-the-air TV."[282]  Big Ten commissioner Kevin Warren explained he patterned the deals along an NFL model, aiming to provide a portion of his league's football rights across multiple OTA networks.[283]  The result is a three-network deal where the Big Ten's football will be aired primarily over the air on FOX, CBS, and NBC.  In the words of CBS Sports executive Sean McManus, "The Big Ten will be on network television from noon on most Saturdays to 11 o'clock at night, which is unheard-of," for a 16-team college conference that generally hosts 8 games a week during its regular season.[284]

252.     "The conference will conduct a draft among the three networks to determine who gets which games,"[285] with the best games going onto the networks' OTA channels.  Fox will have first choice of each week's lineup to air on FOX.  Then CBS and NBC have second and third choice.  The OTA channels will all have slots of additional games, as each OTA network plans to air more than just one game per week over the 13 week college season,[286, 287] and then Fox's FSN and the Fox/Big-Ten joint venture Big Ten Network will air the remaining spillover games to ensure all Big Ten football

---

[281] Alan Blinder & Kevin Draper, "Topping $1 Billion a Year, Big Ten Signs Record TV Deal for College Conferences", *The New York Times,* August 18, 2022, accessed on August 18, 2022 at https://www.nytimes.com/2022/08/18/sports/ncaafootball/big-ten-deal-tv.html.

[282] Michael Smith, "Big Ten officially agrees to new media deals with CBS, Fox, NBC", *Sports Business Journal*, August 18, 2022, accessed on August 18, 2022 at https://www.sportsbusinessjournal.com/Daily/Issues/2022/08/18/Media/Big-Ten-Media-Deal.aspx.

[283] "Big Ten lands $7 billion, NFL-style TV contracts", *CNBC*, August 18, 2022 accessed on August 18, 2022 at https://www.cnbc.com/2022/08/18/big-ten-lands-7-billion-nfl-style-tv-contracts html.

[284] The Big Ten licenses telecasts only for games hosted by Big Ten schools. See "Big Ten Network FAQ", *Btn.com*, accessed on August 18, 2022 at https://btn.com/btn-faq/.

[285] "Big Ten lands $7 billion, NFL-style TV contracts", *CNBC*, August 18, 2022 accessed on August 18, 2022 at https://www.cnbc.com/2022/08/18/big-ten-lands-7-billion-nfl-style-tv-contracts html.

[286] "Fox's package will range from 24-27 games in 2023 to 30-32 games through the 2029 season." CNBC: Big Ten Agrees to New Media Deals.

[287] "Starting in 2024, CBS will televise up to 15 regular-season football games per season, including an annual Black Friday game in the afternoon."  NBC will produce 14-to-16 games on broadcast television each season as it introduces college football fans to Big Ten Saturday Night. George Winslow, "Big Ten Record-Breaking $7B TV Deal," *Tvtechnology.com*. August 18, 2022, accessed on August 18, 2022 at https://www.tvtechnology.com/news/big-ten-inks-record-breaking-dollar7b-tv-deal.

114

games are available nationally.[288]  In addition, NBC's streaming channel, Peacock, will simulcast any games aired on NBC for consumers who prefer OTT access for football content.[289]

253.    Importantly, the deal makes clear that "…while streaming might be the future, linear television is not dead."[290]  As discussed above, in the process of drafting which games are aired where the first games chosen, i.e., the games the media partners see as most valuable, ensures that those most valuable games be slated for national OTA broadcasts.

254.    The entire FBS broadcast ecosystem provides an excellent example of a comparable situation (e.g., same sport, same product (television rights), same buyers) that went from monopoly to oligopoly then to competition and the result was a decrease in price and increase in output.  The most recent Big Ten development only further demonstrates how the process of competition that was unleashed in 1984 when the NCAA television cartel was broken up has continued to benefit consumers by broadening access and choice.  These events occurred in the opposite order of what happened with the NFL in the 1950s, going from individual teams selling their media rights to collective/collusive rights being sold by the NFL.  College output shifting from a monopolized and restricted outcome to a competitive outcome with expanded output, while the NFL maintained its restraints on competition and has been far outstripped in terms of total output since the breakup of the NCAA cartel.[291]  The result is that college football fans who want to watch any (or every) P5 game have no need to purchase a Premium TV package at all, but receive all their content via OTA and Regular Pay TV channels, e.g., what they can get via a normal DirecTV subscription without a premium add-on like Sunday Ticket.

---

[288] Alan Blinder & Kevin Draper, "Topping $1 Billion a Year, Big Ten Signs Record TV Deal for College Conferences", *The New York Times*, August 18, 2022, accessed on August 18, 2022 at https://www.nytimes.com/2022/08/18/sports/ncaafootball/big-ten-deal-tv.html.

[289] "Each Big Ten game on NBC broadcast will also be simul-streamed on Peacock, NBCUniversal's direct-to-consumer streaming service." George Winslow, "Big Ten Record-Breaking $7B TV Deal," *Tvtechnology.com*, August 18, 2022, accessed on August 18, 2022 at https://www.tvtechnology.com/news/big-ten-inks-record-breaking-dollar7b-tv-deal.

[290] Michael Smith, "Big Ten officially agrees to new media deals with CBS, Fox, NBC", *Sports Business Journal*, August 18, 2022, accessed on August 18, 2022 at https://www.sportsbusinessjournal.com/Daily/Issues/2022/08/18/Media/Big-Ten-Media-Deal.aspx.

[291] Consider the changes in the two forms of football since 1984: the NFL went from 2-3 Sunday afternoon games, plus a Monday night game in any given DMA to 2-3 Sunday afternoon games and three evening games, net growth of two evening games.  College football has gone from 2-3 Saturday afternoon games per week to around 30 national games per week, typically including games on Thursdays, Fridays and Saturdays, and even some Tuesdays, implying net growth that is far larger in terms of the number of available national games.

255.    Therefore, damages using a but-for world that is akin to the yardstick major college football is one in which all Sunday Ticket subscribers would have paid as little as $0 beyond what they paid for their DirecTV subscription in order to watch their favorite NFL teams and games, depending on whether the additional games on Standard TV and Standard Pay TV would affect the amounts paid of their standard DirecTV subscription.  Damages for this BFW are shown in Section 10.4.

### 10.3.1.1 Carriage Rates in the College Football BFW

256.    As described above, in a more competitive environment with individual NFL teams selling their media rights to various channels (most likely to OTA and their sister cable channels, as major colleges and college conferences do), those channels might increase their rights fees to the NFL compared to the actual world (because they would be receiving a higher valued product from the NFL). This might impact those channels' carriage rates received from MVPDs because they would have more in-demand programming.

257.    However, a countervailing force stems from increased competition.  This would put less pressure on carriage rates (on average), all else equal.  In other words, all NFL games are currently sold to OTA networks (along with ESPN) and those networks telecast different games to different regions of the country.[292]  Carriage rates reflect those rights (and fees) in the actual world already.  Therefore, average carriage rates might not be impacted at all or might actually decline.

---

[292] TNF will begin this season on Amazon Prime.

Exhibit 10.  Assessment of changes in the number of NFL games on Carriage Rates



**Network Net Effective Rates**

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |

*Sources:*

*TV Revenue Per Game.xlsx*

258.    Yet, to be conservative in my analysis, below I estimate the impact of this BFW on carriage rates by assuming that the current change in rates that stem from a channel getting additional NFL game rights (or losing them) provides a reasonable estimate.  The analysis using the data below (Exhibit 11) shows ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (using a correlation analysis and a regression analysis).[293]

Exhibit 11.  Analysis of Effect of Changes in NFL Content on Carriage Rates

| Source | SS | df | MS | | |
|---|---|---|---|---|---|
| Model | | | | Number of obs | = |
| Residual | | | | F(5, 22) | = |
| | | | | Prob > F | = |
| Total | | | | R-squared | = |
| | | | | Adj R-squared | = |
| | | | | Root MSE | = |

| rate | Coefficient | Std. err. | t | P>|t| | [95% conf. interval] |
|---|---|---|---|---|---|

---

██████████████████████

259.    Dr. Zona has conducted a separate analysis that confirms the basic conclusion that the economics favor broad distribution at low prices.  In particular, he models the consequences of DirecTV offering the Sunday Ticket games on a standard tier. ████████████████████████████████████████ ████████████████████████.  His conclusion is that, in the presence of competitive OOM options (consistent with the absence of the Challenged Conduct), DirecTV could ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ [294]

260.    While his model assumes a different structure than the carriage rate analysis I present here, it similarly captures the basic economic idea that consumers ultimately would pay for this content as part of their cost of basic service.  The payment occurs either as payment captured directly by DirecTV, as in Dr. Zona's model, or as a part of the cost of their standard tier of service in this carriage rate analysis (reflecting the passed-through carriage rates from the networks carrying the programming). Dr. Zona's analysis is actually conservative relative to this carriage rate analysis, because DirecTV can only spread the costs among its own subscribers, whereas the networks selling to multiple MVPDs could spread the costs across all cable and satellite systems that pay carriage fees.  In addition, networks would be competing against each other to offer their channels to MVPDs, which constrains carriage rate increase.

261.    As a further and additional conservative bound, I consider an upper bound on any increase in carriage rates.  As a matter of economics, revenue flowing from the further distribution of NFL telecasts in a more competitive supply situation could not exceed the revenue flowing from the distribution of the same telecasts with less competitive supply.  Thus, the revenue that the NFL earned from DirecTV licensing deals, ████████████ [295] during the Damage period, provides an upper bound on revenue networks could earn by increasing carriage rates.  An average of 96 million television households had MVPD services each year (between 2011 and 2019), but that number continues to

---

[294] Zona Report, Section 4.2.
[295] ██████████████████████ (Exhibit 2, Section 4.4).

██████████████████

decline.[296]  Thus, increased NFL content during each year of the Damage Period could have increased carriage rates no more than ████ per MVPD subscriber per season.[297]  At a maximum of full pass-through, the pay TV costs for class members would have been no more than ████ per NFL season higher, which is only ██ percent of the Sunday Ticket cost.[298]  This is a reduction factor of ████████

### 10.3.2  NFLST

262.    Under the college football model, Class Members would have no need to purchase NFLST, because the games would be available on a service – DirecTV – that they already paid for.  But that does not imply that there would be no NFLST in the BFW.  Throughout the damages period, internet distribution of live sports was mature both as a technology and a market, and the norm of professional American sports leagues was to provide out-of-market games through standalone streaming packages. Because of DirecTV's exclusive arrangement with the NFL, the NFL was a late entrant, but DirecTV has offered a standalone version of NFLST to certain people since 2014, mostly to those who could not get DirecTV.  NFLST as an inexpensive streaming option is a likely component of any such BFW.

263.    Dr. Zona estimates prices for direct-to-customer streaming Sunday Ticket products using a variety of assumptions in his report.  I discuss here ways of estimating but-for pricing using various yardsticks and other forms of evidence, including other sports, the NFL's own practices outside of the United States, and in reference to analyses conducted by potential distributors of NFLST.

### 10.3.3  The NFL's own conduct outside of the US

264.    In Europe, in 2021, one could purchase all NFL games in a streaming digital format directly from the NFL for about $200, showing that this is a feasible means of distribution of NFL games.[299]

---

[296] Based on 2017 data reported by the FCC: FCC-13-99A1, "Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming," 2017.

[297] ████ / 11 years / 96.4 million MVPD households per year = ████ per year per household, or ████ per month per household.

[298] ████ residential affected purchases / ██ million residential subscriptions = ████ per subscription. ████ / ████ percent.

[299] David Miklos Hazi, "NFL Game Pass Europe Prices and Information", July 3, 2022, at https://www.cordcuttingreviews.com/how-to-watch-nfl-games-in-europe/; *How to watch with NFL Game Pass International* (Nov. 14, 2021), https://www.nfl.com/news/how-to-watch-with-nfl-game-pass-international.

265. In contrast to the situation in the United States, in Canada consumers have multiple ways to watch NFL games even when they are not on over-the-air television in a particular media market. Canadians have the ability to purchase Sunday Ticket from multiple MVPDs, including Rogers,[300] Bell Canada,[301] and Telus, although the number of choices in any given location may be fewer.[302]

266. As of early 2022, the NFL explained that "CTV is home to NFL action all season long, airing matchups every Sunday Afternoon leading up to the NFL Playoffs and Super Bowl LV. CTV2 is home to TNF and SNF." TSN airs some of these same games ("TNF, SUN 1 & 4, SNF and MNF are all on TSN"[303]) while RDS is the French language outlet for the NFL in Canada. In addition, DAZN provides Canadians with "NFL Game Pass," a streaming option, which the NFL states is able "to stream every NFL game, from week 1 through to the Super Bowl, as well as NFL RedZone and NFL Network 24/7."[304]

267. Canadians have had access to some form of a Sunday Ticket package via cable television since 1998.[305] As I understand it, originally the NFL's arrangement in Canada was exclusive to Rogers Communication, and Rogers then sublicensed to other cable companies under provisions of Canadian competition law.[306] Until 2004 there was no Canadian Satellite provider, but starting in that year the Sunday Ticket package also became available through a Satellite provider known as ExpressVu.[307] The

---

[300] "NFL Sunday Ticket", *Rogers*, accessed on August 16, 2022 at https://www.rogers.com/ipTV/nfl.

[301] "Satellite TV programming", *Bell*, accessed on August 16, 2022 at https://www.bell.ca/Bell_TV/TV-Programming-Packages/Sports.tab.

[302] "Catch all the football action – with Optik TV plus NFL Sunday Ticket", *Telus*, accessed on August 16, 2022 at https://www.telus.com/en/deals-and-bundles/nfl-sunday-ticket.

[303] "TV & Streaming – Canada", accessed on August 16, 2022 at https://www nfl.com/ways-to-watch/canada.

[304] DAZN is an OTT company that first launched in Germany, Australia, Switzerland, and Japan in 2016, where it offered a wide variety of sports and launched in 2018 in the U.S. with MMA and boxing offerings. "Perform launches DAZN in Germany, Austria and Switzerland," *SportsBusiness Media*, August 10, 2016, accessed on August 16, 2022 at https://media.sportbusiness.com/news/perform-launches-dazn-in-germany-austria-and-switzerland/. Daniel Roberts, "Exclusive: Launch date, price, and first fights for 'Netflix of sports' DAZN", *Yahoo!Finance*, July 17, 2018, accessed on August 16, 2022 at https://www.yahoo.com/news/exclusive-launch-date-price-first-fights-netflix-sports-dazn-150242578 html. "TV & Streaming – Canada", accessed on August 16, 2022 at https://www nfl.com/ways-to-watch/canada.

[305] Robert Brodie, "Canada Next Stop for NFL Network", *Ottawa Sun*, January 7, 2005, accessed on August 16, 2022 at https://www.pressreader.com/canada/regina-leader-post/20180907/282475709714525.

[306] Robert Brodie, "Beantown Lures Away 'Net's Mae", *Ottawa Sun*, July 30, 2004. Chris Zelkovich, "Two's Company Enough for Telecasts", *Toronto Star*, September 9, 2005.

[307] Robert Brodie, "Beantown Lures Away 'Net's Mae", *Ottawa Sun*, July 30, 2004. Chris Zelkovich, "Two's Company Enough for Telecasts", *Toronto Star*, September 9, 2005.

████████████████

product was briefly exclusive to OTT provider DAZN in 2017,[308] but by October 2017 DAZN began

sublicensing the product to cable providers as well.[309]  Interestingly, the NFL's broadcast arrangements

in Canada have led the NFL ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████[310]

268.    Consistently over this time period, the price of Sunday Ticket in Canada has been lower

than the regular price of Sunday Ticket in the United States.  When launched in 1998, the product was

priced at C$159, when at the time the comparable price for DirecTV's Sunday Ticket product was $139

for early bird pricing and appears to have been $159 for regular pricing, just as it was the prior year.[311]

The current price on satellite and cable is C$199.[312]  This Canadian price has been nearly constant for the

entire Damage Period, as has been the number of providers (six to eight).[313]  In addition, Canadians can

stream games by paying C$20/month (US $15) to get four to five months for $60 to $75, covering the

whole regular NFL season and all their other DAZN programming.[314]

---

[308] "DAZN Launches with Exclusive NFL Game Pass and NFL RedZone Rights in Canada", *Wayback Machine*, July 20, 2017, accessed on August 16, 2022 at https://web.archive.org/web/20190903163929/https://media.dazn.com/en/press-releases/2017/07/dazn-launch-canada/

[309] Sam Carp, "DAZN Canada pens NFL carriage deals", August 9, 2018, accessed on August 16, 2022 at https://www.sportspromedia.com/news/nfl-dazn-canada-carriage-deals/. John Kryk, "Most problems punted away, DAZN streaming service says", *Toronto Sun*, September 3, 2019, accessed on August 16, 2022 at https://torontosun.com/sports/football/nfl/most-problems-punted-away-dazn-streaming-service-says. Jim Cerny, "How to watch live NFL games in Canada", *The Sporting News*, September 22, 2019, accessed on August 18, 2022 at https://www.sportingnews.com/ca/nfl/news/how-to-watch-live-stream-nfl-games-redzone-game-pass-canada-dazn-football-supported-devices/1uoe46cxgtwdm1xyxedapxnhb7.

[310] See NFL_0044914 at 916.

[311] "DIRECTV and the NFL SUNDAY TICKET deliver up to 13 NFL games every Sunday", *Wayback Machine*, accessed on August 18, 2022 at https://web.archive.org/web/19980202150831/http://www.directv.com/sports/nfl.html. "DIRECTV and the NFL SUNDAY TICKET deliver up to 13 NFL games every Sunday", *Wayback Machine,* accessed on August 18, 2022 at https://web.archive.org/web/19970605045022/http://www.directv.com/sports/nfl html. "DIRECTV and the NFL SUNDAY TICKET deliver up to 13 NFL games every Sunday", *Wayback Machine,* accessed on August 18, 2022 at https://web.archive.org/web/19971015170351/http://www.directv.com/sports/nflh html

[312] "Optik TV and NFL Sunday Ticket", *Telus*, accessed on August 19, 2022 at https://www.telus.com/en/deals-and-bundles/nfl-sunday-ticket.

[313] Excludes 2017 season.  See "Text Cite – Canada NFLST Pricing.xlsx" in Rascher Backup materials.

[314] Rudi Schuller, "NFL 2021 Week 18 Schedule: Live Streams, TV Channels, Game Times in Canada", *DAZN*, January 6, 2022, accessed on August 16, 2022 at https://www.dazn.com/en-CA/news/american-football/nfl-2021-week-18-schedule-live-streams-tv-channels-game-times-in-canada/qjnwbx0e758i11eonmcwaea9s.

121

█████████████████

269.     A 5-month streaming subscription would cost C$100, in US dollars it costs approximately $79 to stream Sunday Ticket digitally.  While one might argue there is an inherently lower price in Canada due to lower demand, this does not appear to be the case, and in any event, it can be controlled for.  In order to account for any potential differences in individual demand across the border, I relied upon a yardstick product, NFL licensed jerseys and their prices.  An analysis of NFL licensed jerseys shows similar exchange-rate adjusted prices, thus establishing that the supply and demand factors affecting NFL licensed jersey pricing led to the same pricing across two different geographies with similar market structure (the NFL exclusively licensed the same manufacturer in both areas).[315] Therefore, there is no obvious reason to expect streaming prices to vary dramatically, after taking exchange rates into account.

270.     Hence, ST could have been available at $79 to all digital streaming ST subscribers in the US.  This is conservative in that it does not account for possibly lower streaming prices that would have occurred in past years based on general ST inflation.  Also, some satellite ST subscribers could have switched to a digital subscription if it had been offered at this relatively low price of $79.  Based Dr. Zona's analysis of ██████████████████████████

████████████████████████████████████████████

███████

### 10.3.4  Other Major Sports Leagues

271.     Another comparable product for NFL telecasts can be telecasts for other major sports leagues in the United States.  Both MLB and the NBA choose to license non-exclusive distribution rights for OOM telecasts.

272.     I focus here on Major League Baseball.  When MLB settled the *Garber* lawsuit, part of the settlement included a reduction in the price of the full team package (called MLB Extra Innings) by 12.5% to DTV and Comcast customers, as well as other considerations such as allowing fans to purchase

---

[315] This entailed an analysis of the same jersey sold by Fanatics in the US and Fanatics in Canada.  It is my understanding that Fanatics has an exclusive license with the NFL for certain merchandise.  The actual price in Canada was 4% higher than in the U.S.  This may be a function of a moving exchange rate coupled with set prices that are stickier.  See "Text Cite – Canada to US Jersey Prices.xlsx" in Rascher Backup materials.

a single team package at a discounted price from the full package price.[316]  This settlement lasted through the end of the 2020 MLB season, upon which MLB was free to price its products without the constraints of the settlement.  The resulting price that was chosen for the 2021 season was $130.  This was still 33% lower than the final price MLB charged prior to the settlement.[317]

273.    Although the two sports are not direct economic substitutes, Major League Baseball provides a useful comparable for the NFL in this case because it is a popular and historical national team sport that plays a half-year season with strong fan avidity and sells similar products (live attendance, media, merchandise, sponsorship, concessions, etc.) to the same or similar customers.  While MLB teams license some of their media inventory to local channels (many of which are owned by the same media companies that contract with the NFL), ESPN and FOX (who both telecast NFL games) offer a package of national games.  The demographics and psychographics are similar (albeit older for MLB) to the NFL's, with many fans preferring one team or two.  Ultimately, there are common demand factors across both leagues such as population, income, winning, athlete attributes, and stadium quality.  For the purposes of comparability, the same geography and years are compared, and thus the same economy.

274.    However, the competitiveness of the MLB television marketplace is such that the Sunday Ticket-like product, Extra Innings, is controlled by MLB (as opposed to MLB teams offering up their own OOM rights to media providers).  MLB used to sell an OOM package that included all of the OOM games, but then began offering single team packages.  Thus, it serves as a comparable for the analysis of non-exclusive Sunday Ticket still controlled by the NFL, rather than for a truly competitive market.

275.    In addition to the benchmark analysis for MLB, a yardstick comparison is also helpful.  I analyze both MLB and the NBA OOM telecasts licensing, in relation to the NFL.  From the "OOM Package Costs" at the top of Exhibits 12 and 13 below, it is immediately evident that both MLB and

---

[316] See *Fernanda Garber et. al. v. Office of the Commissioner of Baseball et. al.*, Civil Action No. 12-cv-3704, Plaintiffs' Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement, January 20, 2016, accessed on August 16, 2022 at https://casetext.com/brief/garber-et-al-v-office-of-the-commissioner-of-baseball-major-league-baseball_memorandum-of-law-in-support-re-507-motion-to-approve-preliminarily-class. The MLB.TV full package price was to be lowered by 15% during the 5-yr settlement period.

[317] "DISH Now Offering MLB EXTRA INNINGS", *MLB*, March 31, 2015, accessed on August 18, 2021 at https://www.mlb.com/news/dish-now-offering-mlb-extra-innings/c-115672126. Phillip Swann, "Dish Selling MLB Extra Innings For $130", *TV Answer Man*, March 24, 2021, accessed on August 18, 2021 at https://tvanswerman.com/2021/03/24/dish-selling-mlb-extra-innings-for-130/.

███████████████████

NBA's premium out-of-market packages are sold at prices far lower than the price currently charged for NFL Sunday Ticket – up to 2 or 3 times higher in recent years.[318]

276.    This fact that the NFL charges more than the other leagues could be due to higher restrictions on output from the challenged conduct.  The difference could also be due to quality differences across the OOM packages for which a yardstick comparison requires adjustments.  In order to assess these differences, I considered different sports (as captured by the rights fee per standard television broadcast window) and different extent of game choices in the package.  I measured game choices in two ways: games available, or average games available for a non-local team.  For the NBA, I add the additional measure of telecast windows per season.  The results of my MLB analysis appear below in Exhibit 12 followed by the NBA analysis in Exhibit 13.

277.    With any measure of extent of game choices, the larger output for the NBA and for MLB, as compared to the NFL, more than offsets a higher NFL rights fee measure of sport value.  In other words, both the MLB and NFL NBA OOM packages demonstrate lower quality- and quantity-adjusted OOM package pricing than the NFL.  For example, MLB Extra Innings offers about ██ times as many games per season as does Sunday Ticket, and an even higher multiple of out-of-market games, as compared to the NFL rights fee advantage being only about ██.  Assessing these dimensions of comparability confirms the appropriateness of the analysis above and the conservativeness using these other major league packages as yardsticks for the but-for price of Sunday Ticket.

---

[318] Moreover, the NHL just recently licensed its OOM package to ESPN+.  Customers can subscribe to ESPN+ for $6.99/month and that includes all of the rest of ESPN+'s programming as well as the NHL package.

### Exhibit 12:. OOM Package Comparisons: MLB Extra Innings v. NFLST Max



|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| **OOM Package Costs** | | | | | | | | | | |
| NFL Sunday Ticket Max | | | | | | | | | | |
| MLB Extra Innings | | | | | | | | | | |
| NFL / MLB | | | | | | | | | | |
| **Rights Fees per Window (M)** | | | | | | | | | | |
| NFL | | | | | | | | | | |
| MLB | | | | | | | | | | |
| NFL / MLB | | | | | | | | | | |
| **Games in Package** | | | | | | | | | | |
| MLB Extra Innings | | | | | | | | | | |
| NFL Sunday Ticket Max | | | | | | | | | | |
| MLB / NFL | | | | | | | | | | |
| **Games per Non-Local Team** | | | | | | | | | | |
| MLB Extra Innings | | | | | | | | | | |
| NFL Sunday Ticket Max | | | | | | | | | | |
| MLB / NFL | | | | | | | | | | |

*\* NFL OOM is more expensive than MLB. Each NFL game is more valuable than MLB. MLB OOM has many more games than NFL.*

*Notes*

*Sources*
  *See relevant tabs in MLB "OOM Package Comparison.xlsx" for full list of sources; this exhibit relies on both public sources and documents produced in discovery.*

Exhibit 13:. OOM Package Comparisons: NBA League Pass v. NFLST Max



*\* NFL OOM is more expensive than MLB. Each NFL game is more valuable than MLB. MLB OOM has many more games than NFL.*



*Sources:*
   *See relevant tabs in "NBA OOM Package Comparison.xlsx" for full list of sources; this exhibit relies on both public sources and documents produced in discovery.*

278.    As shown, these analyses use evidence and methods that are common to the class.

## 10.4  CLASS DAMAGES

### 10.4.1  Class Size

279.    According to the Zona Report, ▮▮▮▮▮▮▮▮

280. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ [319]

**10.4.2  Class Damages**

281.     The damages calculations summarized in this section each rely on a common "reduction factor" (percentage the estimated but-for prices are lower than the actual prices), which I apply to the affected purchases of each class member.  As explained above (and is explained in more detail in the Zona Report), Dr. Zona has reviewed DirecTV's transactions data and determined that its prices rely on national list prices.  When he and I each build our but-for worlds, the price differentials are driven by viewers moving from the current Sunday Ticket offering on premium TV to lower-priced tiers of Regular Pay TV or Standard Telecast (i.e., OTA channels).  In all of these cases, the competitive factors in each but-for world reduce all prices charged to paying customers, not just the price charged to a select few.  I summarize my damage estimates for the entire Classes below, followed by tabulations relevant for specific years and for Residential and Commercial Classes.

282.     Absent all of the Challenged Conduct, I estimate damages assuming the NFL and its Teams would move all games to an OTA/Regular Pay TV format.  This is based on the college football yardstick.  The damages for this determination of liability for each class member would be all of their Sunday Ticket payments, less any offsetting price adjustments of their other television products.  As I explained above, the common class-wide evidence provides no support for concluding that carriage rates would have increased or that any such increases would have been passed along to class members.  In any event, a conservative upper bound for such cost increase is about ██ percent of Sunday Ticket payments, which is a reduction factor of ████████.  Total damages would be ████████.

283.     Absent only the *Pooling* elements of the challenged conduct, I estimate damages assuming the NFL and its teams would supply telecasts through a variety of means, but with elements of *DirecTV*

---

[319] Zona Report, sections 3.1 and 3.2

█████████████████

*Exclusivity* still in place.  As described in the Zona Report, the price reduction in this but-for world would be the difference between the actual price and a modest increase in price for the DirecTV subscription amounting to ██████████ of the Sunday Ticket price, which leads to a reduction factor of ██████ █████.[320]  Total damage would be ██████████.

284.     Absent only the *DirecTV Exclusivity* elements of the challenged conduct, I estimate damages assuming the NFL continues to act on behalf of its teams to supply Sunday Ticket, but through other means than only DirecTV.  Considering only the addition of competing DTC option(s) for consumers to receive Sunday Ticket, the DirecTV price for Sunday Ticket (as a premium, standalone product) would have been about lower than the current price.  This is supported by the analysis in the Zona Report, from his simulation based on transaction and viewership data, ██████████, from his simulation based on survey data. ██████████  and from the NFL's own internal analysis, ████ █████.[321]  Additional competition from DTC team packages would have reduced the price further, as shown in the Zona Report, and further reductions are also supported by the Canadian NFL yardstick, the MLB benchmark, and the MLB and NBA yardsticks.  The average of the three estimates above provides a lower bound reduction factor of ██████████.  Total damages would be about ██████████.

---

[320] Zona Report, Section 4.2.
[321] Zona Report, Sections 4.1, 4.3, and 4.4.

Exhibit 14. Commercial & Residential Damages

## All Commercial



## All Residential



*Notes:*

  *A season is defined to start on May 1st and end the following April 30th.*

*[1] Table lists the minimum damages amount for "No Challenged Conduct"*
  *Maximum amount is equal to Total Affected Purchases.*

*Source:*

  *DirecTV produced transaction data.*

285.    To demonstrate how my damages models determines an individual damage amount for each class member for each of these scenarios by means of a common, formulaic method, I also provide examples of damage amounts for each of the Named Plaintiffs.

Exhibit 15. Damages for Named Plaintiffs





### Gael Pub Damages



### The Mucky Duck

Notes:

Named plaintiffs do not have 2021 transactions.

A season is defined to start on May 1st and end the following April 30th.

[1] Table lists the minimum damages amount for "No Challenged Conduct"
Maximum amount is equal to Total Affected Purchases.

Source:

DirecTV produced transaction data.

## 11. CONCLUSION

286.    Based on the foregoing, it is my economic opinion that:

a) Class-wide methods of proof are available to prove that all class members were injured as a direct result of this restriction on output and each class member was overcharged by an amount that can measured on a formulaic basis by the difference between what the class members paid for the NFL Sunday Ticket package and what they would have paid in the absent of this restriction.

b) There is a common, class-wide methodology that results in a reasonable, non-speculative, formulaic estimate of the damages incurred by the proposed Classes for the antitrust claims.

c) The total overcharge paid by members of the residential Class during the Class Period are as high as ▮▮▮▮▮ (or ▮▮▮▮▮ with a conservative carriage rate adjustment).

d) The total overcharge paid by members of the commercial Class during the Class Period are as high as ▮▮▮▮▮ (or ▮▮▮▮▮ with a conservative carriage rate adjustment).

e) All class members will continue to be injured by this restriction on output because it continues in the present.

287.    In this report, I have demonstrated the class-wide application of these methodologies using the existing discovery available to me, thus demonstrating the feasibility of my proposed methodology. This also allowed me to extrapolate from the preliminary discovery record to provide an estimate of total damages, subject to the caveat that discovery, especially data discovery, is still ongoing.

288.    What matters for the present purposes is not whether the estimate is precise, but the fact that the methodologies I have demonstrated are common to all class members.  I have demonstrated that at the merits phase of this case, with fuller discovery, the economic aspects of liability can be proven by means of common proof, and that class-wide damages can be calculated by means of common formula.

**SIGNATURE**

289.   Executed under penalty of perjury this 19th day of August, 2022, at Orinda, California.

Daniel A. Rascher

# Appendix A

## DANIEL A. RASCHER, PH.D.

### EDUCATION

B.A., Economics, University of California at San Diego.

Ph.D., Economics, University of California at Berkeley.
Dissertation Title, *Organization and Outcomes: A Study of the Sports Industry*

Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts

### PRESENT POSITIONS

University of San Francisco
Director of Academic Programs for the Sport Management Program, 2002-current
Professor of Sport Management, 2010-current
Associate Professor of Sport Management, 2005-2010
Assistant Professor of Sport Management, 2000-2005
Adjunct Professor of Sport Management, 1999-2000

- M.A. Course – Sport Economics and Finance
- M.A. Course – Master's Project in Sport Management
- M.A. Course – Sport Business Research Methods

SportsEconomics, LLC (www.sportseconomics.com)
Founder and President, 1998-current

Performed economic analysis for sports industry clients including multiple projects involving the NFL, NBA, NASCAR, NCAA, NHRA, NHL, MLS, ATP, AHL, professional cycling, media companies, sports commissions and government agencies, event management, B2B enterprises, and IHRSA. Specialized in industrial organization, antitrust, valuations, market research, labor issues, financial modeling, strategy, economic impact, and feasibility research.

OSKR, LLC (www.oskr.com)
Co-Founder and Partner, 2008-current

Performed economic analysis for clients involved in sports and other industries, including insurance, technology, automotive, television, and consumer products.

### PREVIOUS ACADEMIC EXPERIENCE

STANFORD UNIVERSITY, taught franchise relocation & stadium financing course, Summer 2020

NORTHWESTERN UNIVERSITY, taught sports economics and finance course, Winter 2014

IE BUSINESS SCHOOL (Madrid, Spain), taught sports economics and finance course, 2010-2013

UNIVERSITY OF MASSACHUSETTS AT AMHERST, Sport Management Department
Assistant Professor, 1997-1998

- \* M.S. Courses—Principles of Sport Business Management, Applied Sport Business Management
- \* B.S. Courses—Sport Business Finance, Sports Economics

UNIVERSITY OF CALIFORNIA AT BERKELEY, Department of Economics
Teaching Assistant

* Economic Principles & Intermediate Microeconomics.

Institute of Sports Law and Ethics (University of the Pacific).  Board Member, 2011-2017

**PREVIOUS CONSULTING EXPERIENCE**

LECG, LLC
Affiliate, 2003-2007; Principal, 2000-2003; Senior Economist, 1998-2000

* Performed economic analysis for sports industry clients including multiple projects involving the NFL, MLB, NBA, NHL, PGA, Formula One racing, CART, and Premier League Football (soccer).  Specialized in industrial organization, antitrust, M&As, valuations, and damages analysis.

* Provided testimony for cases involving sports industry clients, including damages analysis and liability.

* 40% of work related to antitrust litigation, 20% IP and breach of contract damages litigation, 20% merger related, and 20% management consulting.

* 60% of work involved the sports and entertainment industries, 15% involved technology, and 25% in other industries including agriculture, transportation, and energy.

UNIVERSITY OF CALIFORNIA AT BERKELEY, Competitive Semiconductor Manufacturing Program
Visiting Scholar, Institute of Industrial Relations, 1998-2000

Research Fellow, 1995-1997

* Funded by the Alfred P. Sloan Foundation, the CSM study is an interdisciplinary project that analyzes the determinants of high performance in semiconductor manufacturing.

* Research on HR, training, small sample analyses and generalizability of case study results.

NATIONAL ECONOMIC RESEARCH ASSOCIATES, Summer 1994; January-August 1995
Research Assistant

* Research on the energy industry, on transmission pricing, and on the economic damages of contract breaches.

QUANTUM CONSULTING, 1992-1994
Research Assistant

* Developed a model and a software package using spline techniques to weather-normalize energy usage, allowing the PUC to evaluate regulation policies.

**HONORS AND AWARDS**

Outstanding Antitrust Litigation Achievement in Economics (*American Antitrust Institute*), 2021

*Applied Sport Management Association* Lifetime Achievement Award, 2019

Research Fellow of the *North American Society for Sport Management*, 2009

College of Arts & Sciences Collective Achievement Award, 2009

Innovation Award Winner (for the innovative use of technology in teaching), 2004.  From the *Center for Instruction and Technology*, University of San Francisco.

*Alfred P. Sloan Foundation* Research Grant for the Study of Human Resource Systems, 1995-1997.

Newton-Booth Fellowship for graduate study at University of California at Berkeley, 1990-1991.

## PEER-REVIEWED JOURNAL ARTICLES

"Who Are Our Fans: An Application of Principal Component-Cluster Technique Analysis to Market Segmentation of College Football Fans," with Kenneth Cortsen, Mark Nagel, and Tiffany Richardson.  *Journal of Applied Sport Management, 13*(1)*,* 2021.

"Economic Development Effects of Major and Minor League Teams and Stadia," with Nola Agha. *Journal of Sports Economics, 21*(1), 2020.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  *Journal of Applied Business and Economics, 22*(11), 2020.

"Coaching Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt, Alan Morse, and Brian Fowler.  *Journal of Applied Business and Economics, 22*(1), 2020.

"Cartel Behavior in US College Sports: An Analysis of NCAA Football Enforcement Actions from 1990-2011," with Mark Nagel, Richard Southall, and Nick Fulton.  *Journal of NCAA Compliance*, July-August, 2019.

"The Unique Economic Aspects of Sports," with Joel Maxcy and Andrew D. Schwarz.  *Journal of Global Sport Management* (July, 2019).

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community." *Journal of Applied Sport Management, 11*(2), 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  *Journal of Issues in Intercollegiate Athletics, 12,* 2019.  *Article of the year in the publication for 2019.*

"Determining fair market value for Duke's Sporting Goods Store," with Michael Goldman.  In *Case Studies in Sport Management, 6*(1), 2017.

"The Beckham Effect: Examining the Longitudinal Impact of a Star Performer on League Marketing, Novelty, and Scarcity," with Stephen Shapiro and Tim DeSchriver.  In *European Sport Marketing Quarterly, 17*(5), 2017.

"What Drives Endorsement Earnings for Superstar Athletes?" with Terence Eddy and Giseob Hyun.  In *Journal of Applied Sport Management*, Vol. 9, No. 2, Summer 2017.

"A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings.  In *Journal of Intercollegiate Sport,* Vol. 9, No. 1, June 2016.

"If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"An Explanation of Economic Impact: Why Positive Impacts Can Exist for Smaller Sports," with Nola Agha.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"Where is Everyone? An Examination of Attendance at College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.

"Tracking the Dollars: How Economic Impact Studies can Actually Benefit Managerial Decision Making," with Michael Goldman.  In *Sport & Entertainment Review,* Vol 1, No. 1, February 2015.

"Sport Pricing Research: Past, Present, and Future," with Joris Drayer.  In *Sport Marketing Quarterly*, Vol. 22, No. 3, September 2013.

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," with Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

"An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" with Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

"Smooth Operators: Recent Collective Bargaining in Major League Baseball" with Tim DeSchriver, 2012.  In *International Journal of Sport Finance*, 7(2).

"Financial Risk Management:  The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sports Economics*, Vol. 13, No. 3, August 2012.

"Factors Affecting the Price of Luxury Suites in Major North American Sports Facilities" with Tim DeSchriver and Steve Shapiro.  In *Journal of Sport Management,* Vol. 26, No. 3, May 2012.

"Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sport Management,* Vol. 25, No. 5, September 2011.

"Simulation in Sport Finance," with Joris Drayer.  *Simulation & Gaming: An Interdisciplinary Journal of Theory, Practice, and Research* Vol. 41, No. 2, April 2010.

"Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

"The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy.  In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.

"Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Mark Nagel, and Matthew Brown.  In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

"Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes.  In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.

"The Use of Simulation Technology in Sport Finance Courses: The Case of the Oakland A's Baseball Business Simulator" with Joris Drayer.  In *Sport Management Education Journal* Vol. 1, No. 1, May 2007.

"Washington "Redskins" – Disparaging Term or Valuable Tradition?: Legal and Economic Issues Concerning *Harjo v. Pro-Football, Inc.*" with Mark Nagel.  In *Fordham Intellectual Property, Media, and Entertainment Law Journal*, Vol. XVII, No. 3, Spring 2007.

"Treatment of Travel Expenses by Golf Course Patrons: Sunk or Bundled Costs and the First and Third Laws of Demand," with Matthew Brown, Chad McEvoy, and Mark Nagel.  In *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Major League Baseball Anti-Trust Immunity: Examining the Legal and Financial Implications of Relocation Rules" with Mark Nagel, Matthew Brown, and Chad McEvoy.  In *Entertainment and Sports Law Journal,* Vol. 4, No. 3, December 2006.

"The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" with Matthew Brown and Wesley Ward.  In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk.  In *International Journal of Sport Management,* Vol. 7, No. 1, January 2006.

"Revenue and Wealth Maximization in the National Football League: The Impact of Stadia" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Sport Marketing Quarterly*, Vol. 13, No. 4, December 2004.

"NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher.  In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.

"The NBA, Exit Discrimination, and Career Earnings," with Ha Hoang.  In *Industrial Relations*, Vol. 38, No. 1, January 1999.

## BOOKS

"Financial Management in the Sport Industry" 3rd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2021.  A textbook.

"Financial Management in the Sport Industry" 2nd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2015.  A textbook.

"Financial Management in the Sport Industry" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Holcomb Hathaway, Inc., June 2010.  A textbook.

## BOOK CHAPTERS

"The Relevance of a Gamified Football/Soccer Development Platform," with Kenneth Cortsen in *Interactive Sports Technologies: Performance, Participation, Safety*, edited by Michael Filimowicz and Veronika Tzankova for Routledge (2022).

"Sporting Goods and Sports Licensing," with Mark Nagel in *The Governance of Sports*, edited by Bonnie Tiell for Human Kinetics, (2020).

"The application of sports technology and sports data for commercial purposes," with Kenneth Cortsen in *The Use of Technology in Sport – Emerging Challenges,* (2018).

"Valuing Highly Profitable Sports Franchises – A Hybrid Income and Market Approach," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"The Use of Price-to-Revenue Ratios in Valuing Sports Franchises," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice.*  Baltimore: Johns Hopkins University Press, (2017).

"Illustrations of Price Discrimination in Baseball" with Andrew D. Schwarz in L. Kahane and S. Shmanske eds., *Economics Through Sports*, Oxford: Oxford University Press, (2012).

"The Expanding Global Consumer Market for American Sports: The World Baseball Classic" with Mark Nagel, Chad McEvoy, and Matt Brown in G. Mildner, and C. Santo, eds., *Sport and Public Policy*, Champaign, IL: Human Kinetics, 2010.

"Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues." In B. Humphreys, and D. Howard, eds., *The Business of Sports*, pp. 67-106.  Westport, CT: Praeger, 2008.

"Collective Bargaining in Sport" with M. Nagel, M. Brown, and C. McEvoy.  In *Encyclopedia of World Sport*, pp.335-339. Great Barrington, MA: Berkshire Publishing, 2005.

"The Role of Stadia in the USA: Wealth Maximization in the National Football League" with Matthew Brown and Mark Nagel in G. Trosien & M. Dinkel (eds.), *Grenzen Des Sportkonsums* (Frontiers of Sport Commerce), Heidelberg, Germany: SRH Learnlife AG, 2003.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999.  Praeger Press.

"A Model of a Professional Sports League," in W. Hendricks (ed.), *Advances in the Economics of Sport*, vol. 2. June 1997, JAI Press, Inc.

**BOOK REVIEWS**

"Review of: Much More Than a Game: Players, Owners, and American Baseball Since 1921", by Robert F. Burk in *Journal of Economic Literature*, Vol. 40(3), September 2002, pp. 949-951.

**NON-PEER REVIEWED ARTICLES**

"Data Science for Football Business – Clustering Analysis," with Kenneth Cortsen and Bas Schnater in *FCBusiness*, 132, April 2021.

"Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz.  In *Competition, 29*(2), Fall 2019.

"How The $200+ Million Settlement For COA Payments Was Calculated," with Andrew D. Schwarz.  In *Athletic Director U.*, May 2017.

"Rich Men's Toys – Applying Valuation Methods to the Business of Professional Sports" in *Valuation Strategies*, March/April 2015.

"Competitive Balance in Sports: "Peculiar Economics" Over the Last Quarter Century," with Andrew. D. Schwarz.  In *Entertainment, Arts, and Sports Law Journal*, 24(1), Spring 2013.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy.  In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

"The Economics of Competitive Balance on the Field and in the Courts" in *Selected Proceedings of the Santa Clara University Sports Law Symposium*, 2011.

"5 Themes from 50 Economic Impact Studies" in *SportsEconomics Perspectives*, Issue 5, 2010.

"What is the Value of Control of a Sports Enterprise?: Controlling Interest Premiums in Sports Valuations" in *SportsEconomics Perspectives*, Issue 4, April 2008.

"Executive Interview: Charlie Faas, Executive Vice President and CFO of Silicon Valley Sports and Entertainment." in *International Journal of Sport Finance*, Vol. 2, No. 2, June 2007.

"Executive Interview: Dan Champeau, Managing Director, and Chad Lewis, Analyst with Fitch." in *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Executive Interview: Dennis Wilcox, Principal with Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A." in *International Journal of Sport Finance*, Vol. 1, No. 4, November 2006.

"Executive Interview: Randy Vataha, Founder of Game Plan, LLC" with Dennis Howard in *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"Executive Interview: Mitchell H. Ziets, President and CEO of MZ Sports, LLC" in *International Journal of Sport Finance*, Vol. 1, No. 1, February 2006.

"The Oakland Baseball Simworld: Enabling Students to Simulate the Management of a Baseball Organization" in *Journal of Sports Economics*, Vol. 6, No. 3, August 2005.

"Examining the Viability of Various Cities for NBA Expansion or Relocation" with Heather Rascher in *SportsEconomics Perspectives*, Issue 2, April 2002.

"Following a Dollar: the economic impact of a sports event is greater than the sum of its parts" by Nola Agha in *SportsTravel Magazine*, Vol. 6, No. 10, November/December 2002.  Heather Rascher and Daniel Rascher contributed to the article.

"Real Impact: understanding the basics of economic impact generated by sports events" in *SportsTravel Magazine*, Vol. 6, No. 7, July/August 2002.  Reprinted in four regional sports commission newsletters.

"What is the Size of the Sports Industry?," in *SportsEconomics Perspectives*, Issue 1, August 2001.

"Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz.  In *Antitrust* (Spring 2000 Special Sports Issue).

"What Brings Fans to the Ballpark?," with Nola Agha in *FoxSportsBiz.com*, Spring 2000.

## RE-PUBLICATIONS

Republication of "Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz.  In *Entertainment and Sports Law Journal, 31*(1), Winter 2020.

Republication of "Do Fans Want Close Contests? A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association", with John Paul G. Solmes in *Recent Developments in the Economics of Sport*, ed. Wladimir Andreff; *The International Library of Critical Writings in Economics*, 2011, Sudbury, MA: Jones & Bartlett.

Republication of "Variable Ticket Pricing in Major League Baseball", with Chad McEvoy, Mark Nagel, and Matthew Brown The Business of Sports, ed. Scott Rosner and Kenneth Shropshire, 2011, Elgar Pub., United Kingdom.

Republication of "What Brings Fans to the Ballpark?," with Nola Agha in *Brilliant Results* 2005.

Republication of "What is the Size of the Sports Industry?," in *Brilliant Results* 2005.

Republication of "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz in *The Economics of Sport, Vol. I*, ed. Andrew Zimbalist; *The International Library of Critical Writings in Economics* 135, 2001, Elgar, Northampton, MA.

## MONOGRAPHS

"The Effect of Human Resource Systems on Fab Performance," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Inter-industry Comparisons: Lessons from the Semiconductor Industry," with Rene Kamita, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

8

"Problem-Solving Structures; A Case Study of Two U.S. Semiconductor Fabs," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Headcount and Turnover," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Training," with Jumbi Edulbehram in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

## WORKING PAPERS

"Commentary: Maximizing the Emergency Use of Public Stadiums and Arenas," with Mark Nagel and Tiffany Richardson.  2021.

"College Football and Basketball Fans Don't Root for Laundry: A Comparison of the Effect of Winning on Demand between College and Professional Football and Basketball," with Mark Nagel and Giseob Hyun. 2020.

"Optimal Markets for NFL Franchises."  2020.

"Would the Oakland A's Relocation to San Jose Harm the Sharks – A Case Study of Competition Across Professional Sports Teams" with Chad McEvoy, Matt Brown, and Mark Nagel.  2016.

"The Practical Use of Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Matt Brown, and Mark Nagel.  2012.

"Counting Local Residents in Economic Impact Analysis: New Findings from Sporting Events" with Richard Irwin.  2008.

"Perverse Incentives with the NCAA Basketball Tournament Seeding Process" with Matthew Brown, Chad McEvoy, and Mark Nagel.  2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams" with Matthew Brown, Chad McEvoy and Mark Nagel.  2006.

"Forecasting Model of Airport Economic Impacts" with Alan Rozzi and Christopher Gillis.  2004.

"Psychic Impact of Professional Sports: A Case Study of a City Without Major Professional Sports" with Matthew Brown, Mark Nagel, and Chad McEvoy.  2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance", with Clair Brown and Greg Pinnsoneault, Working Paper, University of California at Berkeley, 1999.

## INVITED SPEAKING ENGAGEMENTS

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2022.

"Big Stakes Antitrust Trial: In Re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation," panelist at the 31<u>st Golden State Institute Conference</u> (2021).

"Economics of College Sports," guest speaking in Sports Finance, <u>University of Delaware</u>, 2021.

"The Business of Intercollegiate Sports," guest speaking in Issues in Sports Economics, <u>University of West Florida</u>, 2021.

"Professional Sports Franchise Location & Development."  Guest speaker in Sports Law & Ethics course at <u>California Lutheran University</u>.  2021.

"The Business of Sports." Guest speaker at Sport Administration course, <u>University of Louisville</u>, 2021.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2021.

"Sports Economics, Analytics, and Decision Making - 7 Case Studies," Theme Speaker 1, International Webinar on Sports Management, hosted by <u>Sports Authority of India, Seshadripuram Educational Trust, Seshadripuram Evening Degree College</u>, 2021.

"Economics of College Athletes," guest speaking in Sports Finance, <u>University of Northern Colorado</u>, 2021.

"Sports Antitrust Economics – Raiders & Regents," with Andy Schwarz in Sports Law, <u>University of San Diego Law School</u>, February, 2021.

"Research Thoughts & Methods" in Doctoral Research Seminar, Sport Management Department, <u>University of South Carolina</u>, January, 2021.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact in Sports."  Keynote Speaker at the 1<u>st International Congress of Iranian Scientific Association of Sport Management</u>, Tehran, Iran in March, 2021.

"Government Impact on Financial Aspects of Sports," at the <u>International Conference on Governance and Integrity in Sport, Saudi Arabia</u>, December, 2020.

"State of Play: Antitrust and the NCAA," panelist on a program hosted by <u>the New York State Bar Association and the California Lawyers Association</u>, November 19, 2020.

"Sports Commercialization and the Global Sports Economy" with Kenneth Cortsen.  Masterclass for <u>Australian Sports Technologies Network</u>, November 17, 2020.

"Economic and Financial Management of U.S. Professional Sports" presented at <u>Loyola University, Seville, Spain</u>, November 12, 2020.

"The Importance of Sound Data Analysis for Decision-Making in the Sports Industry" at <u>Sportin Global Summit</u>.  2020.

"The New Normal of the Sport Industry" at HiVE 24HR Liveathon.  2020.

"Play Time Sessions – A Series of Digital Conference Sessions on Gaming & Esports" presented by GIMA Esports.  2020.

"Practicing as a Sports Lawyer: Antitrust and Beyond."  Sponsored by the American Bar Association's Section of Antitrust Law and Trade, Sports and Professional Associations.  2020.

"Economics of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2020.

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2020.

"Economics of College Athletes," guest speaking in Sports Finance, University of Northern Colorado, 2020.

"Stadium Financing," guest speaking in Introduction to Sports Business, UCLA's Anderson School of Business, 2019.

"Economics of College Sports," discussion at the Oregon Law Summer Sports Institute, University of Oregon, 2019.

"Forging Industry Partnerships and Engaging in Applied Sport Management Research," with Weight, E., Love, A., McEvoy, C.  Presentation for the Applied Sport Management Conference, 2019.

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community."  Keynote Address, Applied Sport Management Association, 2019.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2018.

"The Business of Sports", presented at the Sports Business Club at Sonoma State University Business School, May 2018.

"The Business of the Olympics," guest speaker in sports journalism course at Medill School of Journalism at Northwestern University, 2018.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2017.

"College-Sport Research and Litigation: Theory and Practice Leading to Action." Panelist at College Sport Research Institute Symposium at the University of South Carolina, 2017.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2016.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2016.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2015.

"The Business of Intercollegiate Sports" presented in the sport management masters program, <u>University of Arkansas</u>, 2015.

Panelist on "The Future of Intercollegiate Athletics: The Players' Perspective," at the Sports Law and Business Conference at <u>Arizona State University</u>, 2015.

Panelist on "Intersection of Business and Sports Law," at the Sports and Entertainment Law Forum, presented by the <u>University of Oregon Law School</u>, 2015.

"The Economics of College Athletics Departments" presented in the masters in collegiate athletics program, college athletics in a digital era course, <u>University of San Francisco</u>, 2015.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, <u>University of Toronto</u>, 2014.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2014.

"The Finances of College Sports," presented in Matthew Brown's sport finance course, <u>Ohio University</u>, 2014.

"Antitrust Economics and Sports," presented in Professor Robert Elias's Politics and Sport course, <u>University of San Francisco</u>, 2014.

"The Economics of the Sports Industry," presented to the Haas School of Business, <u>U.C. Berkeley</u>, 2014.

"Economic Impact in Sports." Presentation in the masters in sports business program at <u>New York University (NYU)</u> as part of the Faculty-in-Residence program.  2013.

"Pricing the Game Experience," with Stephen Shapiro and Tim DeSchriver.  Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, <u>University of South Carolina.</u>

"Academia and the Industry: Opportunities for Meaningful Research Collaboration."  Invited panelist at *Sport Entertainment & Venues Tomorrow* conference, 2013, <u>University of South Carolina</u>.

"Sports Sponsorships in 2013," Panelist at Court Vision (Sheppard Mullin Sports Law Speaker Series and SLA).  Continuing Legal Education (CLE) units program.  2013.

"Using Contract Law to Tackle the Coaching Carousel – Commentary."  Presented at <u>University of San Francisco</u>, *Sports & Entertainment Law Association*, 2013.

"Sports Economics, Analytics, and Decision Making: 8 Examples." Invited speaker at the *IEG Sports Analytics Innovation Summit*, 2012

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at <u>U.C. Berkeley</u>, Boalt Law School's *Sports and Entertainment Law Society*, 2011.

"Financial Valuation of Sports Assets," presented at the *Sport Management Today Video Conference Series* at the <u>IE Business School</u>, 2011

"Financial Valuation of Sports Assets," presented to the *Sport Management Department* at the <u>University of Northern Denmark</u>, 2011.

"Economic Impact in Sports," presented to the *Sport Management Department* at the <u>University of Northern Denmark</u>, 2011.

"The Economics of the Sports Industry," presented to the *Sports Business Association* at <u>U.C. Irvine</u>, 2011.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at the *Economics Lecture Series* at <u>Sonoma State University Business School</u>, April 2010.

"Economics for Antitrust Lawyers: Application to Class Certification" presented to <u>Lieff Cabraser Heimann & Bernstein</u> for Continuing Legal Education (CLE) units.  November 2009.

"Economics for Antitrust Lawyers: Market Structure and Economic Modeling" presented to <u>Lieff Cabraser Heimann & Bernstein</u> for Continuing Legal Education (CLE) units.  October 2009.

"Sports Stadium Financing in Today's Economy" presented to the <u>Rotary Club of San Jose</u>, May 2009.

"The Economic Impact of Liberty Bowl Memorial Stadium," presented at the <u>University of Memphis</u>, *Issues in College Sports* lecture series (invited panelist), March 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, January 2007.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, <u>Stanford University</u>, 2006.

"Taking the Gown to Town: Research and Consulting for the Sport Industry."  Invited presentation at the Past President's Workshop, *North American Society for Sport Management*, June 2006.

"Various Topics in Sports Economics," presented at the Wednesday Workshop on Economics Research, <u>California State University, East Bay</u>, 2005.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, <u>Stanford University</u>, 2005.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2005.

"The Economic Impact of General Aviation Airports: An Econometric Model," presented at <u>Niche Ventures</u> Spring Meeting, 2004.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2004.

"Oral Testimony Regarding California State Senate Bill 193, Student Athletes' Bill of Rights". 2003.  Testimony to the California State Senate Subcommittee on Entertainment.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance," with Clair Brown and Greg Pinsonneault.  Presented at *The Wharton School*, <u>University of Pennsylvania</u>, 1999.

## CONFERENCE PRESENTATIONS

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Sport Management Association*, February 2020.

"Is there a Consensus?: A Test of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2018.

"College Football and Basketball Fans Don't Root for Laundry: A comparison of the effect of winning on attendance and television viewership between big-time college football and basketball and the NBA and NFL," with Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2017.  (voted Best Paper Award for session)

"Financial Valuation of a Sporting Goods Retail Store," with Mark Nagel and Matthew Brown. Poster presentation at *North American Society for Sport Management*, May 2016.

"Cartel Behavior in United States College Sports: An Analysis of National Collegiate Athletic Association Football Enforcement Actions from 1990 to 2011," with Mark Nagel, Richard Southall, and Nick Fulton.  Presented at *Western Economics Association International*, January 2016.

"The College Basketball Players' Labor Market: *Ex Ante* versus *Ex Post* Valuations" with David Berri and Robert Brown.  Presented at *Western Economics Association International*, July 2015.

"What drives Endorsement Values for Superstar Athletes?" with Terry Eddy and Giseob Hyun. Presented at *Sport Management Association of Australia and New Zealand*, November 2014.

"The Beckham Effect: David Beckham's Impact on Major League Soccer, 2007-2012," with Stephen Shapiro and Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2014.

"Where is Everyone? An Examination of Consumer Demand for College Football Bowl Games," with Terry Eddy and Rebecca Stewart.  Presented at *Collegiate Sports Research Institute* conference, April 2014.

"If We Build It, Will You Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Stephen Shapiro and Tim DeSchriver. Presented at *North American Society for Sport Management*, May 2013.

"Should San Jose say 'No Way' to the Oakland A's," with Mark Nagel and Matt Brown.  Presented at *North American Society for Sport Management*, May 2013.

Panel member for "Financial Issues in Intercollegiate Sports." Presented at the *Santa Clara University Sports Law Symposium*, 2012.

"What's in a Name?: Does the Amount and Source of Public Financing Impact Team Names?" with Nola Agha and Matt Brown.  Presented at *Western Economics Association International*, July 2012.

"When Can Economic Impact be Positive?  Twelve conditions that explain why smaller sports have bigger impacts" with Nola Agha.  Presented at *Western Economics Association International*, July 2012.

"Reflections on the MLB Collective Bargaining Agreement."  Part of a symposium on the Economics of Labor-Management Relations in Sports Today at *Western Economics Association International*, July 2012.

"The Economics of Competitive Balance on the Field and in the Courts." Presented at the *Santa Clara University Sports Law Symposium*, 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *International Association of Venue Managers*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *TicketSummit*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *Western Economics Association International*, July 2011.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *Western Economics Association International*, July 2011.

"A Panel Study of Factors Affecting Attendance at Major League Soccer Contests: 2007-2010" with Tim DeSchriver.  Presented at the *Sport Marketing Association IX* conference in New Orleans, October 2010.

"The NCAA and the Prisoner's Dilemma".  Presented at the *Sports Law Symposium* at the University of Santa Clara Law School, September 2010.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *North American Society for Sport Management*, May 2010.

"An Analysis of the Value of Intercollegiate Athletics to its University: Methods".  Presented at the *Scholarly Conference on College Sport*, April 2010.

"Demand, Consumer Surplus, and Pricing Inefficiency in the NFL: A Case Study of the Secondary Ticket Market Using StubHub" with Joris Drayer and Chad McEvoy.  Presented at *North American Society for Sport Management*, May 2009.

"Luxury Suite Pricing in North American Sports Facilities" with Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2009.

"A Smorgasbord of Lessons Learned from Economic Impact Studies"  Presented at *North American Society for Sport Management*, June 2008.

"Globalization and Sport Finance: What is True and What is Myth?" with Mark Nagel and Ross Booth.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Exploring the Myth that a Better Seed in the NCAA Men's Basketball Tournament results in an *ex ante* Higher Payout" with Mark Nagel, Matt Brown, and Chad McEvoy.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Oakland A's Baseball Simulator" with Joris Drayer.  Presented at *North American Society for Sport Management*, June 2007.

"Teaching Sport Financial Management: A Symposium" with Timothy DeSchriver, Matthew Brown, and Michael Mondello.  Presented at *North American Society for Sport Management*, June 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Practical Strategies for Variable Ticket Pricing in Professional Sports" with Chad McEvoy, Matt Brown, and Mark Nagel.  Presented at *Sport Marketing Association IV*, November 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *Western Economic Association International*, July 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *North American Society for Sport Management*, June 2006.

"Measuring Sponsorship Return on Investment: A Need for Quantitative Analysis" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association III*, November 2005.

"The Use of Economic Impact Analysis for Marketing Purposes" with Dick Irwin and Matt Brown. Presented at *Sport Marketing Association III*, November 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Western Economic Association International*, July 2005.

"Public Funds for Private Benefit: Equity Issues in Sport Stadia Funding and the Question of Who Really Pays," with Matt Brown and Mark Nagel.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Accepted by *Sport Management Association of Australia and New Zealand*, Nov. 2004.

"Redskins: Legal, Financial, and Policy Issues relative to Harjo v. Pro-Football, Inc." with Richard Southall, Matt Brown, and Mark Nagel.  Presented at *North American Society for the Sociology of Sport*, Nov. 2004.

"An Analysis of Distance Traveled and Tourism Economic Impact: A Test of the Alchian-Allen Theorem" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Beyond The Economic Impact Study: Examining Economic Impact Data for Support of the Third Law of Demand" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2004.

"Optimal Variable Ticket Pricing in Major League Baseball" with Mark Nagel, Chad McEvoy, and Matthew Brown.  Presented at *North American Society for Sport Management*, 2004.

"*Clarett v. NFL*: Age Eligibility Rules and Antitrust Law in Professional Sports" with Chad McEvoy, Mark Nagel, and Matt Brown.  Presented at *Sport and Recreation Law Association*, 2004.

"Variable Pricing in Baseball: Or, What Economists Would Just Call 'Pricing'," presented at *Western Economic Association International*, 2003.

"The Impact of Stadia on Wealth Maximization in the National Football League: To Build or Renovate?" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2003.

"Major League Baseball's Antitrust Immunity: Examining the Financial Implications of Relocation Rules," with Matthew Brown and Mark Nagel.  Presented at *Society for the Study of the Legal Aspects of Sport and Physical Activity*, 2003.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation," presented at *North American Society for Sport Management*, 2002.

Panel discussant on the effects of the economy on the business of sports at *Sports Facilities and Franchises Forum*, Dallas, TX 2002 (presented by SportsBusiness Journal).

"Psychic Impact Findings in Sports," presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation" presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Psychic Impact as a Decision Making Criterion," presented at the *North American Society for Sport Management*, 2000.

"Economic Impact Methods," presented at the *North American Society for Sport Management*, 2000.

"Valuation of Naming Rights," presented at the *Sports Finance Forum*, 2000.

" 'Amateurism' in Big-Time College Sports," presented at the *Western Economic Association International*, 1999.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  Presented at the *17th Annual Consumer Psychology Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *North American Society for Sport Management Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *Western Economic Association International*, 1998.

"The NBA, Exit Discrimination, and Career Earnings," presented at the *Western Economic Association International*, 1997.

"Sports Salary Determination," presented at the *International Atlantic Economic Society Conference*, 1997.

"A Model of a Professional Sports League," presented at the *International Atlantic Economic Society Conference*, 1996.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," presented at the *American Society of Training and Development Conference*, 1996.

### EDITORIAL/REVIEWER BOARDS OF PEER-REVIEWED JOURNALS

*Frontiers in Sports and Active Living – Sports Management and Marketing,* 2020 – present
*International Journal of Sport Management and Marketing,* 2011 – present
*International Journal of Sports Marketing and Sponsorship,* 2021 – present
*International Journal of Sport Finance,* 2006 – present (founding member)

*Journal of Risk and Financial Management,* 2019 – present
*Journal of Sport Management,* 2003 – present
  Associate Editor, 2010 – 2012
  Co-Editor of Special Issue, 2022
*Journal of Quantitative Analysis in Sports,* 2005 – 2012 (founding member)
*Case Studies in Sport Management,* 2011 – 2019 (founding member)
*Sport Management Review,* 2001 – 2008

## REFEREE FOR PEER-REVIEWED JOURNALS & GRANTING AGENCIES

*American Behavioral Scientist*, 2008
*Applied Economics Letters,* 2018
*Applied Economics,* 2020, 2021
*Axioms,* 2017
*Case Studies in Sport Management*, 2012, 2014a, 2014b, 2015, 2017, 2019
*Communication & Sport*, 2019, 2020
*Contemporary Economic Policy*, 2004, 2021
*Eastern Economic Journal,* 2010
*Economic Inquiry,* 2008, 2010, 2011
*Economics and Business Letters,* 2018
*European Sport Management Quarterly,* 2012, 2020, 2021, 2022
*Frontiers in Sports and Active Living,* 2021a, 2021b, 2022
*Future Internet,* 2019, 2020
*Industrial Relations*, 1993, 2000, 2000, 2001, 2013
*International Journal of Financial Studies,* 2018
*International Journal of Sport Communication,* 2011
*International Journal of Sport Finance,* 2005, 2006a, 2006b, 2006c, 2007a, 2007b, 2008a, 2008b,
                 2010, 2011, 2012, 2013, 2014a, 2014b, 2014c, 2015, 2017, 2018,
                 2019, 2022a, 2022b
*International Journal of Sport Management and Marketing*, 2005, 2010, 2013, 2014, 2017, 2021
*International Journal of Sports Marketing and Sponsorship*, 2016, 2018a, 2018b, 2019, 2021a,
                 2021b, 2021c, 2021d
*International Journal of Sport Policy and Politics,* 2014
*International Review for the Sociology of Sport*, 2012
*Journal for the Study of Sport and Athletes in Education,* 2021a, 2021b
*Journal of Functional Morphology and Kinesiology,* 2018
*Journal of Global Sport Management,* 2018
*Journal of Industrial Economics*, 1997
*Journal of Intercollegiate Sport*, 2016, 2021, 2022
*Journal of Issues in Intercollegiate Athletics*, 2021
*Journal of Sport Management,* 2001, 2002, 2003a, 2003b, 2004a, 2004b, 2004c, 2004d, 2004e,
                 2005a, 2005b, 2005c, 2005d, 2006a, 2006b, 2006c, 2006d, 2006e,
                 2006f, 2006g, 2006h, 2006i, 2007a, 2007b, 2007c, 2007d, 2008a,
                 2008b, 2008c, 2008d, 2009a, 2009b, 2009c, 2009d, 2009e, 2009f,
                 2009g, 2010a, 2010b, 2010c, 2010d, 2011a, 2011b, 2013, 2013b,
                 2014, 2015a, 2015b, 2016a, 2016b, 2016c, 2016d, 2017a, 2017b,
                 2017c, 2017d, 2018a, 2018b, 2018c, 2018d, 2019a, 2019b, 2019c,
                 2019d, 2019e, 2020a, 2020b, 2020c, 2020d, 2021
*Journal of Sports Economics*, 2003, 2007, 2008a, 2008b, 2009, 2010, 2011, 2012a, 2012b, 2014a,
                 2014b, 2015a, 2015b, 2016, 2018, 2019a, 2019b, 2021, 2022

*Journal of Venue and Event Management,* 2012
*Journal of the Quantitative Analysis of Sports*, 2005, 2006a, 2006b, 2007
*Mathematical Problems in Engineering,* 2018
*Perceptual and Motor Skills*, 2009
*Review of Economics and Statistics,* 2017
*Review of Industrial Organization*, 2012, 2013, 2015
*SAGE Open,* 2021
*Soccer & Society*, 2014, 2015, 2020
*Southern Economic Journal*, 2001, 2007a, 2007b
*Sport, Business and Management: An International Journal*, 2011, 2012, 2013, 2017, 2018
*Sport Management Review*, 2002a, 2002b, 2003a, 2003b, 2003c, 2003d, 2004a, 2004b, 2004c, 2006a, 2006b, 2006c, 2007a, 2007b, 2007c, 2010a, 2010b, 2011, 2015, 2016, 2017, 2020
*Sport Marketing Quarterly*, 2015, 2018
*Sustainability,* 2018, 2021a, 2021b

External review of $250,000 grant proposal for the *Social Sciences and Humanities Research Council of Canada*, 2008

## PROFESSIONAL AFFILIATIONS (CURRENT AND PREVIOUS)

American Bar Association
American Economic Association
National Association of Certified Valuation Analysts
North American Society for Sport Management
North American Association of Sports Economists
Sport and Recreation Law Association
Sport Marketing Association
Sports Lawyers Association
Western Economic Association International

## TESTIMONY

Provided deposition and trial testimony regarding liability and economic damages in *San Francisco Federal Credit Union v. San Francisco Municipal Transportation Agency*.  2021.

Provided expert reports and deposition testimony regarding class certification and damages in *Shields et al. v. FINA*.  2021.

Provided expert report pertaining to alleged financial harm from lost career earnings related to RICO claims in *Bowen v. adidas*.  2021.

Provided expert report and trial testimony pertaining to financial harm of alleged mismanagement of professional tennis client in *Mirjana Lucic v. IMG Worldwide*.  2021.

"An Economics Perspective on NIL at the Community College Level" presented at a public hearing of the Senate Bill 206 (Skinner-D, 2019) Statutory Community College Athlete Name, Image, and Likeness Working Group, November 10, 2020.

Provided expert report and deposition pertaining to financial harm of alleged misleading advertising in *The People of the State of California v. Hertz et al.* 2019.

Financial and economic analysis and testimony at a hearing of baseball and *AT&T Park* for Assessment Appeals Board (property tax dispute). 2018.

Provided arbitration testimony on damages regarding an NBA agent and agency in *ISE v. Dan Fegan*. 2018.

Provided trial and deposition testimony and multiple expert reports pertaining to class certification, liability, damages, and injunction issues in college sports in the federal lawsuit *In Re: NCAA Athletic GIA Cap Antitrust Litigation*. 2015-18.

Provided expert report pertaining to damages in auto racing case between a driver and his agent in *Sports Management Network v. Kurt Busch*. 2018.

Public testimony on forecast of economic impact of Rocky Mountain Sports Park on Windsor, CO to the Windsor City Council. 2017.

Provided expert report pertaining to the economics of ticketing and personal seat licenses (PSLs) in *RCN Capital v. Los Angeles Rams*. 2017.

Provided trial testimony (and multiple reports and depositions) on financial harm pertaining to *FTC v. DirecTV*. 2017.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Glickman et al. v. Live Nation et al.* 2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Pollard v. AEG Live, et al.* 2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Finkelman v. NFL.* 2016.

Provided deposition testimony and submitted two expert reports pertaining to class certification issues in college football in *Rock v. NCAA*. 2014-16.

Submitted an expert report on damages pertaining to an endorsement relationship in *Frank Thomas v. Reebok*. 2015.

Provided deposition testimony and submitted an expert report pertaining to the economic relationship between two boxing entities in *Garcia v. Top Rank, Inc.* 2015.

Provided trial testimony (and multiple reports and depositions) on class certification issues, damages, and antitrust economics in regards to group licensing for former and current college football and basketball players in *O'Bannon et al. v. NCAA*. 2013-14.

Submitted three expert reports regarding lost earnings for a Major League Baseball player in *Backe et al. v. Fertitta Hospitality, LLC et al.* 2013.

Submitted two expert reports on class certification issues in regards to ticket holder lawsuit in *Phillips et al. v. Comcast Spectacor et al.*  2013.

Submitted expert report in a federal case involving defamation of character in the boxing industry (*Pacquiao v. Mayweather Jr. et al.*).  2012.

Provided deposition testimony and prepared expert report regarding an alleged sponsorship breach of contract in motorsports (*Vici Racing, LLC v. T-Mobile USA, Inc.*).  2012.

Prepared expert witness testimony on trade secrets case involving the sports consulting industry (*Sport Management Research Institute v. Keehn*).  2011.

Provided deposition testimony on the value of a minor league baseball team and related damages from an alleged breach of a facility lease permit (*Long Beach Armada v. City of Long Beach*).  2011.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a charter school business in an arbitration proceeding (*D Wade's Place v. Dwyane Wade*).  2010.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a restaurant investment in a state court proceeding (*Rodberg v. Dwyane Wade*).  2010.

Submitted two reports and provided deposition and arbitration testimony regarding damages related to how media coverage has impacted an NFL team's brand (*Kiffin v. Raiders*).  2009.

Submitted expert report, rebuttal report, gave deposition and trial testimony in federal court (*Adderley et al. v NFLPA & NFLPI*).  2008.

Public testimony on economic impact of a Major League Soccer stadium in San Jose to the San Jose City Council.  2008.

Public testimony on economic impact of six sports and cultural events in San Jose to the San Jose City Council.  2007.

Submitted expert report, rebuttal report, and testified at arbitration hearing on the financial valuation of Major League Soccer (*Rothenberg v. Major League Soccer, LLC*).  2006.

Named expert witness for a Major League Baseball club to analyze a punitive damages claim from an injury at a baseball game (*Bueno v. Rangers*).  2006.

Prepared expert testimony on liability and damages related to the operations of a minor baseball league on behalf of the league's owner (*Don Altman et al., v. Jeffrey Mallet, et al.*).  Case was settled prior to deposition.  2004.

Public testimony on economic impact of an existing and new professional football stadium in Irving, TX to the Irving City Council (two council meetings).  2004.

Testimony on college athletics regarding Senate Bill 193 to the California State Senate Subcommittee on Entertainment.  2003.

Public testimony on economic impact of a downtown entertainment district in Sacramento to the Sacramento City Council (two council meetings).  2003.

Determination of IP valuation and damages from a clothing endorsement alleged breach of contract for PGA Tour player (*Stankowski v. Bugle Boy*).  Submitted expert report.  Case was settled prior to deposition.  2000.

Deposition testimony in breach of contract matter concerning sponsorship damages analysis in the auto racing industry (*Parente v. Della Penna Racing*).  2000.

Public testimony on forecast of economic impact of Pan Am Games on San Antonio to the San Antonio City Council.  1999.

Updated July 2022

# Appendix B

Documents Relied Upon
Appendix B

## Legal Filings and Guidelines

*Alston v. NCAA et al.* (2021), 549 US.

Certiorari to the United States Court of Appeals for the Seventh Circuit, *American Needle, Inc. v. National Football League et. al.*

Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act.

*Fernanda Garber et. al. v. Office of the Commissioner of Baseball et. al.*, Civil Action No. 12-cv-3704, Plaintiffs' Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement, January 20, 2016.

*FTC v. DirecTV, O'Bannon v. NCAA et al.,* 802 F.3d 1049 (9th Cir. 2015)

*Kentucky Speedway v. NASCAR et al,* Civil Action No. 05-138-WOB (E.D. Ky. Oct. 12, 2006)

*L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984)

*Laumann v. NHL*, 907 F. Supp. 2d, 465, 491 (S.D.N.Y. 2012)

*Mid-S. Grizzlies v. Nat'l Football League*, 720 F.2d 772, 783 (3d Cir. 1983)

*NASL v. USSF,* 296 F. Supp. 3d 442 (E.D.N.Y. 2017).

*National Society of Professional Engineers v. United States* (1978), 435 U.S. 679

*NCAA v. Board of Regents of University of Oklahoma* (1984), 468 U.S. 85

NFL's Supplemental Objections and Responses to Plaintiffs' Third Set of Interrogatories, June 1, 2022.

*Nat'l Football League's Sunday Ticket Antitrust Litig*, 933 F.3d 1136, 1144 (9th Cir. 2019)

*National Football League's "Sunday Ticket" Antitrust Litigation*, Stipulated Expert Protocol, January 6, 2021, Fn. 2.

*NCAA Athletic Grant-In-Aid Cap Antitrust Litigation*, 2016 WL 5815786 (N.D.Cal.), August 26, 2016

*Shields et al. v. FINA,* 419 F. Supp. 3d 1188 (N.D. Cal. 2019).

*United States v. Nat'l Football League*, 116 F. Supp. 319, 326-27 (E.D. Pa. 1953)

*United States v. Nat'l Football League*, 196 F. Supp. 445, 447 (E.D. Pa. 1961)

*US Football League v. National Football League*, 644 F. Supp. 1040 (S.D.N.Y. 1986)

## Expert Reports

Expert Report of Dr. Douglas Zona, August 19, 2022.

Expert Report of Sarah Butler, August 19, 2022.

## Depositions & Associated Exhibits

Deposition of Brian Rolapp, May 18, 2022.

Deposition of Robert Kraft, June 23, 2022.

Deposition of Roger Goodell, June 16, 2022.

## Data

DTV RC1 Subs 13M 07162021

EV_VIEWING_HISTORY files via Azure

NFL 2018/19/20

NFL_SUBSCR_TRANSACTIONS

NFL_VIEWING_HISTORY files via Azure

SERVICE/EVENT _PRICE_MASTER

SERVICE/EVENT_SELECTIONS

SUBSCR_TRANSACTIONS_FROM_SUBHST files

Documents Relied Upon
Appendix B

**Financial Filings**
  FOX 10-K, Fiscal Year Ending 2021.
  The Walt Disney Company 10-K, Fiscal Year Ending 2021.


**Bates Documents**
  CHARTER-NFL-0005967
  COMCAST_000000286
  DIRECTV-ST-00002979
  DIRECTV-ST-00016222
  DIRECTV-ST-00214662
  DIRECTV-ST-00226773
  Document 00749
  FL_0458529
  NFL_0000434
  NFL_0000458
  NFL_0000469
  NFL_0012383
  NFL_0044914
  NFL_0057409
  NFL_0057465
  NFL_0059025
  NFL_0117344
  NFL_0117349
  NFL_0117507
  NFL_0148143
  NFL_0148145
  NFL_0157225
  NFL_0193797
  NFL_0235426
  NFL_023972
  NFL_0239782
  NFL_0242422
  NFL_0331042
  NFL_0336997
  NFL_0358562
  NFL_0360635
  NFL_0370556
  NFL_0375030
  NFL_0377291
  NFL_0394706
  NFL_0401290
  NFL_0410159
  NFL_0419932
  NFL_0458529
  NFL_0458542
  NFL_0458574
  NFL_0458617
  NFL_0458699
  NFL_0474032
  NFL_0504153
  NFL_0549451

Documents Relied Upon
Appendix B

NFL_0818630
NFL_0853407
NFL_0862550
NFL_0862664
NFL_0987035
NFL_0989539
NFL_1062558
NFL_1062612
NFL_1105807
NFL_1105917
NFL_1212477
NFL_1212490
NFL_1225300
NFL_1227117
VERIZON-0005298


**Articles and Literature**

A. Winters (2012), "The NFL and Antitrust Law", Kevin Quinn (Ed.), Chapter 16 of "The Economics of the National Football League: The State of the Art".

Andreff, W. (2011). Some comparative economics of the organization of sports: Competition and regulation in north American vs. European professional team sports leagues. *The European Journal of Comparative Economics*, 8(1).

Berri, D. (2012). Did the Players Give Up Money to Make the NBA Better? Exploring the 2011 Collective Bargaining Agreement in the National Basketball Association. *International Journal of Sport Finance*, 7(2).

Bird, P. (1982). The demand for league football. *Applied Economics*, 14.

Blair & Kaserman, D. (1985), *Antitrust Economics*, Richard D. Irwin.

Borland, J. & McDonald, R. (2003). Demand for Sport. *Oxford Review of Economic Policy*, 19(4).

Borland, J., & Lye, J. (1992). Attendance at Australian Rules Football: A Panel Study. *Applied Economics*, 24.

Brodie, R, "Beantown Lures Away 'Net's Mae", Ottawa Sun, July 30, 2004. Brodie, R. "Two's Company Enough for Telecasts", Toronto Star, September 9, 2005.

Brook, S., & Fenn, A. (2008). Market Power in the National Football League. *International Journal of Sport Finance*, 3(4), p. 242.

Brown, K., & Salaga, S. (2018). NCAA football television viewership: Product quality and consumer preference relative to market expectations. *Sport Management Review*, 21.

Buraimo, B., & Simmons, R. (2008). Do Sports Fans Really Value Uncertainty of Outcome? Evidence from the English Premier League. *International Journal of Sport Finance*, 3(3).

Burdekin, R., & Idson, T. (1991). Consumer Preferences, Attendance and the Structure of Professional Basketball Teams. *Applied Economics*, 23.

Carroll, S. (2009). Main dish with a side of voluntary commitments: Dish Network-DirecTV revisited. *Administrative Law Review*, 61(3).

Connor, J. (2006). Forensic Economics: An Introduction with Special Emphasis on Price Fixing. Amsterdam Centre for Law and Economics, ARP No. 2006-17888. Proving Antitrust Damages: Legal and Economic Issues, American Bar Association Section of Antitrust Law, 1st Ed.

Connor, J. (2014), "Cartel Overcharges", The Law and Economics of Class Actions, Ed. James Langenfeld, Emerald Books.

Crawford, G. & Yurukuglu, A. (2012). The Welfare Effects of Bundling in Multichannel Television Markets. *American Economic Review*, 102(2).

Crawford, G., Shcherbakov, O., & Shum, M. (2019). Quality Overprovision in Cable Television Markets. *American Economic Review*, 109(3).

Daniel L. Rubinfeld (2009), "Antitrust Damages" in "Research Handbook on the Economics of Antitrust Law", Einer Elhauge.

Documents Relied Upon
Appendix B

Davis, P. & Garcès, E. (2010), "Quantitative Techniques for Competition and Antitrust Analysis", Princeton University Press.

Depken, C. (2000). Fan Loyalty and Stadium Funding in Professional Baseball. *Journal of Sports Economics*, 1(2).

Depken, C. (2001). Fan Loyalty in Professional Sports: An Extension to the National Football League. *Journal of Sports Economics*, 2(3).

Dobson, S., & Goddard, J. (1995). The demand for professional league football in England and Wales 1925-92. *Journal of the Royal Statistical Society*, 44.

Domazlicky, B. R., & Kerr, P. M. (1990). Baseball attendance and the designated hitter. *American Economist*, 34.

El Hodiri, M., & Quirk, J. (1971). An economic model of a professional sports league. *Journal of Political Economy*, 79(6).

Elzinga, K. & Swisher, A. (2011).  Limits of the Elzinga-Hogarty Test in Hospital Mergers: the Evanston Case. *International Journal of the Economics of Business*, 18(1)

Fang, H. & Norman, P. (2006). To Bundle or Not to Bundle. RAND Journal of Economics, 37(4).

FCC-13-99A1, "Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming", 2017.

Fort & Lee (2007). Structural Change, Competitive Balance, and the Rest of the Major Leagues." *Economic Inquiry*, 45(3).

Fort, R. (2004). Inelastic Sports Pricing. Managerial and Decision Economics, 25.

Fort, R., & Quirk, J. (1995). Cross-Subsidization, Incentives, and Outcomes in Professional Team Sports Leagues. *Journal of Economic Literature*, 33.

Fort, R., & Quirk, J. (1996), "Over-Stated Exploitation: Monopsony versus Revenue Sharing in Sports Leagues", Baseball Economics: Current Research, Fizel J, Gustafson E, Hadley L (eds). Praeger Publishers: Westport, CT.

Fort, R., Maxcy, J., & Diehl, M. (2016). Uncertainty by regulation: Rottenberg's invariance principle. *Research in Economics*, 70.

FTC, DOJ (2000). Antitrust Guidelines for Collaborations Among Competitors. *Antitrust Law*.

Grow, N. (2015).  Regulating Professional Sports Leagues.  *Washington and Lee Law Review*, 72(2).

Horowitz, I. & Whittenberg, G (2012). Network Television Revenue Sharing and Competitive Balance in the NFL. The Oxford Handbook of Sports Economics: The Economics of Sports, (1). Eds. Kahane and Shmanske.

Horowitz, I. (1974). Sports Broadcasting, Government and the Sports Business, Brookings Institution, Roger G. Noll ed.

Horowitz, I. (1978). Market entrenchment and the Sports Broadcasting Act. *American Behavioral Scientist*, 21(3).

Horowitz, I. (2012). Network Television Revenue Sharing and Competitive Balance in the NFL. The Oxford Handbook of Sports Economics: The Economics of Sport, (1). Eds. Kahane and Shmanske.

Hynds, M., & Smith, I. (1994). The demand for test match cricket. Applied Economics Letters, 7.

James, W. & Yellen, J. (1976). Commodity Bundling and the Burden of Monopoly. *Quarterly Journal of Economics*, 90(3).

Keith Dunnavant, "The Fifty-Year Seduction: How Television Manipulated College Football, from the Birth of the Modern NCAA to the Creation of the BCS".

Kesenne, S. (2006). Competitive Balance in Team Sports and the Impact of Revenue Sharing. *Journal of Sport Management*, 20.

Kunz, W. (2020). The Political Economy of Sports Television. Taylor & Francis

Larsen, Fenn, A. J., & Spenner, E. L. (2006). The Impact of Free Agency and the Salary Cap on Competitive Balance in the National Football League. *Journal of Sports Economics*, 7(4).

Lee, Y. H., & Fort, R. (2008). Attendance and the uncertainty-of-outcome hypothesis in baseball. *Review of Industrial Organization*, 33(4).

Lee, Y., Jang, H., Fort, R. (2016). Just looking for a good game: competitive balance in the Korean Professional Baseball League. *Applied Economics*, 48(33).

Documents Relied Upon
Appendix B

Maxcy (2016). From Strikes to Lockouts: Consequences of the Shift in the Balance of Power from the Players' Union to the Owners in the National Hockey League. Breaking the Ice: The Economics of Hockey. Bernd Frick (ed.).

Maxcy, J., and Mondello, M. (2006). "The Impact of Free Agency on Competitive Balance in North American Professional Team Sports Leagues." Journal of Sport Management, 20(3).

Miller, P. (2012), "The Economics of the National Football League: The State of the Art.  Kevin Quinn (Ed.).

Mills, Brian, & Fort, R. (2014). League-level attendance and outcome uncertainty in U.S. pro sports leagues. *Economic Inquiry*, 52(1).

Mondello M. (2012), "Media Economics of the NFL", Chapter 6 of The Economics of the National Football League: The State of the Art, Kevin Quinn (Ed.)

Mondello, M., Mills, B., & Tainsky, S. (2017). Shared Market Competition and Broadcast Viewership in the National Football League. *Journal of Sport Management*, 31(6).

Niels, G., Jenkins, H., & Kavanagh, J. (2011), "Economics for Competition Lawyers", Oxford University Press.

Noll, R. (2007). Broadcasting and Team Sports. Scottish Journal of Political Economy, 54(3).

Owen, P., & King, N. (2015). Competitive balance measures in sports leagues: the effects of variation in season length.  Economic Inquiry, 53(1).

Paul, R., Weinbach, A., & Small, K. (2014). The Relationship between Sportsbook Volume, Forecast Accuracy, and Market Efficiency: The NFL and NCAA Football. *Journal of Prediction Markets*, 8(2).

Peeters, T. (2015). Profit-maximizing gate revenue sharing in sports leagues. Economic Inquiry, 53(2).

Pratt, S., Reilly R., & Schweihs, R. (2000), "Valuing a Business", 4th Ed.

Quirk, J. & Fort, R. (1992), "Pay Dirt: The Business of Professional Team Sports", Princeton University Press.

Rascher, D. (1997). A Model of a Professional Sports League. *International Advances in Economic Research*, 3.

Rascher, D. (2008), "Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues", The Business of Sports, Westport, CT: Praeger, B. Humphreys and D. Howard, Eds.

Rascher, D., Brown, M., Nagel, M., & McEvoy, C. (2009). Where did National Hockey League fans go during the 2004–2005 lockout? An analysis of economic competition between leagues. *International Journal of Sport Management and Marketing*, 5(1,2).

Rascher, D., Brown, M., Nagel, M., & McEvoy, C. (2012). Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues.  *Journal of Sports Economics*, 13(4).

Rascher, D., Maxcy, J., & Schwarz, A. (2019). The Unique Economic Aspects of Sports, *Journal of Global Sport Managemen*t.

Rascher, D., Nagel, M., Brown, M., & McEvoy, C. (2011). Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing. *Journal of Sport Management*, 25.

Rubinfeld, D. (2000), "Reference manual on scientific evidence", Lexis Publishing, 2nd Ed.

Rubinfeld, D. (2012), "Antitrust Damages" in "Research Handbook on the Economics of Antitrust Law", Ed. Einer Elhauge, Edward Elgar Publishing.

Salaga, S., & Tainsky, S. (2015). The Effects of Outcome Uncertainty, Scoring, and Pregame Expectations on Nielsen Ratings for Bowl Championship Series Games. *Journal of Sports Economics*, 16(5).

Sanderson, A., & Siegfried, J. (2019).  The Economics of the National Collegiate Athletic Association. *The SAGE Handbook of Sports Economics*.

Schmalensee, R. (1984). Gaussian Demand and Commodity Bundling. *Journal of Business*, 57(1).

Siegfried, J. & Burba, M. (2004). The College Football Association Television Broadcast Cartel. *Antitrust Bulletin*.

Siegfried, J. J., & Eisenberg, J. D. (1980). The demand for minor league baseball. *Atlantic Economic Journal*, 8.

Solberg, H. A. (2002). The Economics of Television Sports Rights. Europe and the US - A Comparative Analysis. Norsk Medietidsskrift, 9(2).

Southall, R., Southall, C., Dwyer, B. (2009). 2009 Bowl Championship Series Telecasts: Expressions of Big-Time College-Sport's Commercial Institutional Logics. Journal of Issues in Intercollegiate Athletics, 2.

Documents Relied Upon
Appendix B

Szymanski, S. (2003). The economic design of sporting contests. Journal of Economic Literature, 41(4).

Szymanski, S., Kesenne, S. (2010). Competitive Balance and Gate Revenue Sharing in Team Sports. The Comparative Economics of Sport. Palgrave Macmillan, London

Tainsky, S. (2010). Television Broadcast Demand for National Football League Contests. *Journal of Sports Economics* , 11(6).

Tainsky, S., & Jasielec, M. (2014). Television Viewership of Out-of-Market Games in League Markets: Traditional Demand Shifters and Local Team Influence. *Journal of Sport Management* , 28(1).

Tainsky, S., & McEvoy, C. (2011). Television Broadcast Demand in Markets Without Local Teams. *Journal of Sports Economics* , 13(3).

Tainsky, S., & Winfree, J. (2010). Short-run demand and uncertainty of outcome in major league baseball. *Review of Industrial Organization* , 37(3).

Velema, T. (2018). A game of snakes and ladders: Player migratory trajectories in the global football labor market. *International Review of the Sociology of Sport* , 53(6).

Vrooman, J. (2000). The Economics of American Sports Leagues. *Scottish Journal of Political Economy* , 47(4).

Welki, A., & Zlatoper, T. (1994). US Professional Football: The Demand for Game-Day Attendance in 1991. *Managerial and Decision Economics* , 15.

Welki, A., & Zlatoper, T. (1999). U.S. Professional Football Game-Day Attendance. *Atlantic Economic Journal* , 27(3).

Winfree, J. (2009). Fan substitution and market definition in professional sports leagues. *The Antitrust Bulletin* , 54(4).

Winfree, J. (2012). NFL Franchise Values, Locations, and Stadium, Economics", Kevin Quinn (Ed.), Chapter 3 of "The Economics of the National Football League: The State of the Art".

Winfree, J., & Fort, R. (2008). Fan Substitution and the 2004-05 NHL Lockout. *Journal of Sports Economics* , 9(4).

Winfree, J., McCluskey, J., Mittelhammer, R., & Fort, R. (2004). Location and attendance in major league baseball. *Applied Economics* , 36.

**Websites**

http://federalgovernmentzipcodes.us/download.html

http://web.archive.org/web/20140831003335/http://nflst.directv.com/DTVAPP/nflws/index.jsp

http://web.archive.org/web/20140831014710mp_/http://nflst.directv.com/DTVAPP/nflws/index.jsp?school=3724&CMP=BAC-TS-NFLSTV-UWA

http://web.archive.org/web/20150829074123/https://nflst.directv.com/

http://web.archive.org/web/20160812043903/https://nflst.directv.com/

http://web.archive.org/web/20180807182908/https://nflst.directv.com/student

http://www.espn.com/nfl/topics/_/page/nfl-labor-negotiations

http://www.thefutoncritic.com/news/2021/05/12/cbs-sports-sets-the-stage-for-nfls-expanded-2021-season-with-networks-strongest-nfl-on-cbs-schedule-501224/20210512cbs03/

http://www.tvtango.com/listings?filters%5Bdate%5D%5Bmonth%5D=10&filters%5Bdate%5D%5Bday%5D=10&filters%5Bdate%5D%5Byear%5D=2021&commit.x=22&commit.y=16

https://12thman.com/sports/football/schedule/2021

https://506sports.com/nfl.php?yr=2019&wk=1

https://506sports.com/nfl.php?yr=2019&wk=10

https://506sports.com/nfl.php?yr=2019&wk=11

https://506sports.com/nfl.php?yr=2019&wk=12

https://506sports.com/nfl.php?yr=2019&wk=13

https://506sports.com/nfl.php?yr=2019&wk=14

https://506sports.com/nfl.php?yr=2019&wk=15

https://506sports.com/nfl.php?yr=2019&wk=16

https://506sports.com/nfl.php?yr=2019&wk=17

Documents Relied Upon
Appendix B

https://506sports.com/nfl.php?yr=2019&wk=2
https://506sports.com/nfl.php?yr=2019&wk=3
https://506sports.com/nfl.php?yr=2019&wk=4
https://506sports.com/nfl.php?yr=2019&wk=5
https://506sports.com/nfl.php?yr=2019&wk=6
https://506sports.com/nfl.php?yr=2019&wk=7
https://506sports.com/nfl.php?yr=2019&wk=8
https://506sports.com/nfl.php?yr=2019&wk=9
https://accfootballonline.com/acc-football-tv-schedule/
https://assets.morningconsult.com/wp-uploads/2020/09/25151009/200881_crosstabs_GENZ_Gen_Zers_Age_
   13-23_v2_JB-1.pdf
https://auburntigers.com/sports/football/schedule/2021
https://awfulannouncing.com/2012-articles/your-2012-nbc-sunday-night-football-schedule.html
https://awfulannouncing.com/mlb/directv-lowers-price-mlb-extra-innings-2017-1-20 html
https://awfulannouncing.com/mlb/refunds-for-mlb-TV-will-reportedly-exceed-200-million-this-year.html
https://awfulannouncing.com/nfl/dazn-recants-on-all-streaming-in-canada.html
https://basketball.realgm.com/nba/info/salary_cap
https://baylorbears.com/sports/football/schedule/2021
https://bigtenonline.com/bigtenfootballontv.html
https://bleacherreport.com/articles/2684568-nfl-playoff-schedule-2017-afc-nfc-postseason-dates-tv-
   schedule-for-each-round
https://blog.dishformytailgate.com/how-to-watch-your-mlb-team-after-you-move
https://blog.siriusxm.com/nfl-2022-2023-season/
https://broadbandnow.com/Cox-Communications
https://btn.com/btn-faq/
https://casetext.com/brief/garber-et-al-v-office-of-the-commissioner-of-baseball-major-league-
   baseball_memorandum-of-law-in-support-re-507-motion-to-approve-preliminarily-class
https://communityforums rogers.com/t5/Archived-Posts/NFL-Sunday-Ticket/td-p/317949
https://crtc.gc.ca/eng/archive/2018/2018-145.pdf
https://deadline.com/2021-22-abc-schedule/
https://deadline.com/2021-22-cbs-schedule/
https://deadline.com/2021-22-fox-schedule/
https://deadline.com/wp-content/uploads/2020/05/cbs-nfl-schedule-2020-wm.pdf
https://deadspin.com/nba-national-tv-espn-tnt-abc-nba-tv-1723767952
https://espnpressroom.com/us/press-releases/2011/04/espns-2011-monday-night-football-schedule-2/
https://espnpressroom.com/us/press-releases/2012/04/espns-2012-monday-night-football-schedule/
https://espnpressroom.com/us/press-releases/2013/04/espns-2013-monday-night-football-schedule/
https://fbschedules.com
https://fbschedules.com/2012-nfl-thursday-night-football-schedule/
https://fbschedules.com/2013-nfl-thursday-night-football-schedule/
https://fbschedules.com/2021-georgia-football-schedule/
https://fbschedules.com/2021-notre-dame-football-schedule/
https://fbschedules.com/2021-ohio-state-football-schedule/
https://fbschedules.com/2021-pitt-football-schedule/
https://fbschedules.com/college-football-rankings-week-8-2021/
https://fbschedules.com/nfl-2014-thursday-night-football-schedule/
https://fbschedules.com/nfl-playoff-schedule/season/2011/
https://fbschedules.com/nfl-playoff-schedule/season/2012/
https://fbschedules.com/nfl-playoff-schedule/season/2013/
https://fbschedules.com/nfl-playoff-schedule/season/2016/
https://fbschedules.com/nfl-playoff-schedule/season/2020/
https://forum.telus.com/t5/Optik-TV/NFL-Sunday-Ticket/td-p/87134

https://fox11online.com/sports/packers-and-nfl/an-explanation-of-the-guidelines-for-nfl-tv-coverage
https://foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2016/12/no-c-
2014-NFL-on-FOX-Schedule.pdf
https://foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2017/04/2017-
FOX-NFL-Broadcast-Schedule-Only-2.pdf
https://foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2019/04/2019-
NFL-Schedule-Schedule-Only-2.pdf
https://foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2020/05/2020-
FOX-SPORTS-NFL-SCHEDULE.pdf
https://foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2021/05/2021-
NFL-Schedule-Grid.pdf
https://foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2021/10/Week-5-NFL
-Regionalization.pdf
https://frontofficesports.com/nfl-sale-amazon-prime-video-nfl-network/
https://ftw.usatoday.com/2014/07/directv-nfl-sunday-ticket-fantasy-zone-football
https://goaztecs.com/sports/football/schedule/2021
https://gobearcats.com/sports/football/schedule/2021
https://godeacs.com/sports/football/schedule/2021
https://goducks.com/sports/football/schedule/2021
https://gopack.com/sports/football/schedule/2021
https://gopsusports.com/sports/football/schedule/2021
https://goutsa.com/sports/football/schedule/2021
https://hawkeyesports.com/sports/football/schedule/season/2021-22/
https://hip2save.com/2017/08/03/college-students-big-savings-on-nfl-sunday-ticket-just-24-99-monthly-
regularly-70/
https://howtodiscuss.com/t/xfinity-sports-package/72905
https://law.justia.com/cases/federal/district-courts/FSupp/644/1040/1558759/
https://m.facebook.com/Rogers/photos/never-miss-a-second-of/10152710887119271/?_se_imp=
0XaHimqhZHwbTQwa9
https://media.dazn.com/en/press-releases/2017/07/dazn-launch-canada/
https://media.foxcorporation.com/wp-content/uploads/prod/2021/09/17193711/FOX-2021-Annual-
Report_Final_Web.pdf
https://media.sportbusiness.com/news/perform-launches-dazn-in-germany-austria-and-switzerland/
https://mgoblue.com/sports/football/schedule/2021
https://money.cnn.com/2016/02/01/media/thursday-night-football-nbc-cbs-deal/
https://money.com/college-football-popularity/
https://msuspartans.com/sports/football/schedule/2021
https://nbcsportsgrouppressbox.com/2011/12/13/nbcuniversals-new-nine-year-nfl-media-rights-agreement-
includes-more-games-three-super-bowls-upgraded-playoff-package-enhanced-flex-scheduling-increased-use-
of-footage/
https://nbcsportsgrouppressbox.com/2011/12/13/nbcuniversals-new-nine-year-nfl-media-rights-agreement
-includes-more-
https://nbcsportsgrouppressbox.com/2011/12/13/nbcuniversals-new-nine-year-nfl-media-rights-agreement-
includes-more-
https://nbcsportsgrouppressbox.com/2013/04/18/2013-sunday-night-football-schedule-announced/
https://ne-np.facebook.com/shawdirectsatellite/photos/a.429954940389432/4534730086578543/?type=3)
https://nflcommunications.com/Documents/2020%20Football%20Information/05%2007%2020%20
-%20Preseason%20Schedule.pdf
https://nflcommunications.com/Documents/2020%20Football%20Information/05%2007%2020%20-%
20Preseason%20Schedule.pdf
https://nflcommunications.com/Pages/2016-Preseason-Schedule-Announced.aspx
https://nflcommunications.com/Pages/2017-NFL-SCHEDULE-ANNOUNCED.aspx

Documents Relied Upon
Appendix B

https://nflcommunications.com/Pages/2017-Preseason-Schedule-Announced-.aspx
https://nflcommunications.com/Pages/2018-Preseason-Schedule-Announced-.aspx
https://nflcommunications.com/Pages/2019-Preseason-Schedule-Announced.aspx
https://nflcommunications.com/Pages/FOX-SPORTS-REACHES-FIVE-YEAR-RIGHTS-AGREEMENT-
    WITH-NFL-TO-BROADCAST--THURSDAY-NIGHT-FOOTBALL-PRESENTED-BY-BUD-
    LIGHT.aspx
https://nflcommunications.com/Pages/NFL-announces-2021-preseason-schedule-dates,-times.aspx
https://nflst.directv.com/student
https://nflsthelp.direcTV.com/hc/en-us/articles/204503669-What-are-Short-Cuts-
https://okstate.com/sports/football/schedule/2021
https://olemisssports.com/sports/football/schedule/2021
https://pac-12.com/womens-volleyball/event/2021/10/10/stanford-oregon
https://pr.nba.com/2010-nba-preseason-begins-sunday-oct-3/
https://pr.nba.com/2011-nba-preseason-schedule/
https://pr.nba.com/nba-league-pass-mobile-view/#:~:text=NBA%20LEAGUE%20PASS%2C%20which%
    20provides,introduction%20of%20NBA%20Mobile%20View.
https://purduesports.com/sports/football/schedule/2021
https://regenerativetherapyforpain.com/wpcontent/plugins/superforms/uploads/php/files/71688d5e9a301
    801b991fe5d37f4cac3/vodugetebanawik.pdf
https://rolltide.com/sports/football/schedule/2021
https://secfootballonline.com
https://secfootballonline.com/sec-football-tv-schedule/
https://smumustangs.com/sports/football/schedule/2021
https://soonersports.com/sports/football/schedule/2021
https://sportsbusinessjournal.com/Daily/Closing-Bell/2022/08/19/49ers.aspx
https://sportsgamestoday.com/2021-10-10-sunday.php
https://sportspac12.com/2021-pac-12-football-schedule-by-week-and-by-team/
https://sunbeltsports.org/schedule.aspx?schedule=1188
https://support.shaw.ca/t5/tv-articles/nfl-sunday-ticket-returns-for-the-2021-2022-season/ta-p/5551
https://supreme.justia.com/cases/federal/us/468/85/
https://teammarketing.com/fancostindex/
https://theathletic.com/3488621/2022/08/08/big-ten-media-rights-facts/
https://thestreamable.com/news/fox-provides-small-glimpse-at-the-future-of-the-usfl-relaunch
https://thestreamable.com/news/how-to-stream-nfl-sunday-ticket-online-without-directv-satellite-in-2021-
    season
https://thestreamable.com/news/its-going-to-be-difficult-expensive-to-stream-nfl-games-out-of-market-in-2019
https://thewaltdisneycompany.com/app/uploads/2022/01/2021-Annual-Report.pdf
https://thewaltdisneycompany.com/espn-and-major-league-baseball-reach-eight-year-regular-season-deal-
    through-2013-enhanced-sunday-and-monday-franchises-home-run-derby-baseball-tonight-more/
https://tobychristie.com/2021/10/10/nascar-television-schedule-sunday-october-10th-2021/
https://tobychristie.com/2021/10/nascar-television-schedule-Sunday-october-10th-2021/
https://torontosun.com/2017/10/13/rogers-reacquires-nfls-sunday-ticket-package
https://torontosun.com/sports/football/nfl/most-problems-punted-away-dazn-streaming-service-says
https://touchdownwire.usatoday.com/2018/08/23/sunday-ticket-red-zone-streaming-nfl-directv-att-package/
https://tvanswerman.com/2018/02/01/directv-raises-price-on-mlb-extra-innings-sort-of/
https://tvanswerman.com/2018/03/07/dish-hikes-mlb-extra-innings-price-by-6/
https://tvanswerman.com/2019/01/23/directv-raises-mlb-extra-innings-price/
https://tvanswerman.com/2019/03/27/dish-raises-mlb-extra-innings-price/#:~:text=DIRECTV%2C%20
    Dish's%20satellite%20rival%2C%20recently,with%20the%20Extra%20Innings%20package.
https://tvanswerman.com/2020/07/14/dish-offers-mlb-extra-innings-discount/
https://tvanswerman.com/2021/01/21/directv-now-selling-2021-mlb-extra-innings/
https://tvanswerman.com/2021/03/10/comcast-directv-slash-price-on-mlb-extra-innings/

Documents Relied Upon
Appendix B

https://tvanswerman.com/2021/03/24/dish-selling-mlb-extra-innings-for-130/
https://twitter.com/sasktel/status/916691039422963718
https://ukathletics.com/sports/football/schedule/season/2021/
https://uscode house.gov/view.xhtml?path=/prelim@title15/chapter32&edition=prelim
https://variety.com/2009/scene/markets-festivals/cbs-fox-extend-nfl-deals-1118003970/
https://variety.com/2009/scene/markets-festivals/nbc-extends-nfl-contract-1118007459/
https://variety.com/2015/tv/news/cbs-nfl-renew-deal-for-thursday-night-football-1201408283/
https://watch nba.com/streaming-subscriptions
https://web.archive.org/web/20101213015240/http://www novusnow.ca:80/services/nflst.php
https://web.archive.org/web/20110605132255/http://www.directv.com/DTVAPP/content/sports/mlb?
    footernavtype=-1
https://web.archive.org/web/20110923153950/http://www.directv.com/DTVAPP/content/sports/
    nfl_online_mobile
https://web.archive.org/web/20110928121835/http://www novusnow.ca:80/services/nflst.php
https://web.archive.org/web/20111103121353/http://www.bell.ca/Bell_TV/Promotions/NFL_Sunday_Ticket
https://web.archive.org/web/20120101022411/http://www nba.com/2011/news/09/23/nba-closes-
    camps-indefinitely.ap/index.html
https://web.archive.org/web/20120104162051/http://nba.com/leaguepass/index.html
https://web.archive.org/web/20120106185038/https:/www nba.com/2011/news/09/09/labor-timeline
https://web.archive.org/web/20120307034218/http://www.directv.com/DTVAPP/content/sports/mlb?
    footernavtype=-1&lpos=header
https://web.archive.org/web/20120921021118/https://www novusnow.ca/
https://web.archive.org/web/20121012001125/http://www.directv.com/sports/nfl
https://web.archive.org/web/20121015142141/http://www.bell.ca/Bell_TV/Promotions/NFL_Sunday_Ticket
https://web.archive.org/web/20121108222805/http://www nba.com/leaguepass/
https://web.archive.org/web/20130121095022/http://www novusnow.ca/services/nflst.php
https://web.archive.org/web/20130304235719/http://www.directv.com/sports/mlb?lpos=Header:3
https://web.archive.org/web/20130906164036/http://www.bell.ca/Bell_TV/Promotions/NFL_Sunday_Ticket
https://web.archive.org/web/20130928101347/http://www.directv.com/sports/nfl
https://web.archive.org/web/20131028115328/http://www nba.com/leaguepass/?ls=iref:nba:gnav:lp
https://web.archive.org/web/20140330184237/http://www.directv.com/sports/mlb?ACM
    =false&lpos=Header:3
https://web.archive.org/web/20140825082844/http://www.shaw.ca/television/programming/sports/nfl-
    sunday-ticket/
https://web.archive.org/web/20140920211019/http://www.bell.ca/Bell_TV/Promotions/NFL_Sunday_Ticket
https://web.archive.org/web/20140928204643/http://www.directv.com/sports/nfl
https://web.archive.org/web/20141002110110/http://www.shawdirect.ca:80/english/promotions/nflsundayticket/
https://web.archive.org/web/20141010133251/http://www.sasktel.com:80/wps/wcm/connect/content/home
    /maxtv/specialty-channel/nfl-sunday-ticket/nfl-sunday-ticket
https://web.archive.org/web/20141028014641/http://www nba.com/leaguepass/
https://web.archive.org/web/20141115024223/http://www novusnow.ca:80/television/
https://web.archive.org/web/20150223220414/http://tvbythenumbers.zap2it.com/2015/02/22/list-of-how-
    many-homes-each-cable-network-is-in-as-of-february-2015
https://web.archive.org/web/20150316235251/http://www.directv.com/sports/mlb
https://web.archive.org/web/20150420191544/http://www.shaw.ca/television/programming/sports/nfl-
    sunday-ticket/
https://web.archive.org/web/20150709001856/http://www.bell.ca/Bell_TV/Promotions/NFL_Sunday_Ticket
https://web.archive.org/web/20150928153810/http://www.directv.com/sports/nfl
https://web.archive.org/web/20151002082320/http://www.sasktel.com/wps/wcm/connect/content/home/maxtv/special
    ty-channel/
https://web.archive.org/web/20151004081830/http://www novusnow.ca/television

Document Relied Upon
Appendix B

https://web.archive.org/web/20151017084625/http://www nba.com/schedules/national_tv_schedule
/NBATV/index.html

https://web.archive.org/web/20151026074536/http://www nba.com/leaguepass/?ls=iref:nba:gnav#
leaguePassLanding

https://web.archive.org/web/20151112130012/http://www.shawdirect.ca:80/english/promotions/nflsundayticket/

https://web.archive.org/web/20160304010234/http://www.directv.com/sports/mlb

https://web.archive.org/web/20160903061153/http://www.shaw.ca:80/television/channels/premium-channels/

https://web.archive.org/web/20160908103642/http://www.bell.ca:80/Fibe-TV/Fibe-Programming-
Packages/Sports.tab#sports-nfl-details-modal

https://web.archive.org/web/20160908184707/http://www.shawdirect.ca/english/promotions/nflsundayticket

https://web.archive.org/web/20160916221144/http://www.bell.ca/Bell_TV/Promotions/Sports-Packages#
sports-nfl-details-modal

https://web.archive.org/web/20160929035855/http://www.directv.com/sports/nfl

https://web.archive.org/web/20161006003127/http://www novusnow.ca/television

https://web.archive.org/web/20161019062536/http://www.sasktel.com/wps/wcm/connect/content/home/
maxtv/specialty-channel/nfl-sunday-ticket/nfl-sunday-ticket

https://web.archive.org/web/20171004001339/http://www.directv.com/sports/nfl

https://web.archive.org/web/20171017094648/http://www nba.com/leaguepass/pricing

https://web.archive.org/web/20171019173343/http://www.shawdirect.ca/english/packages/programming/
premium-sports/

https://web.archive.org/web/20180811183634/https://www.shawdirect.ca/english/packages/programming
/premium-sports/

https://web.archive.org/web/20180826220157/https://www.sasktel.com/store/browse/Personal/TV/maxTV/
Channels-and-Theme-Packs/_/N-upiyt6

https://web.archive.org/web/20180904233618/https://www rogers.com/consumer/tv#/packages

https://web.archive.org/web/20180927051713/http://www.directv.com/sports/nfl

https://web.archive.org/web/20181009233024/http://www novusnow.ca:80/television/theme-packs

https://web.archive.org/web/20181016045440/nba.com/leaguepass

https://web.archive.org/web/20181106152614/http://www.bell.ca/Bell_TV/Promotions/Sports-Packages

https://web.archive.org/web/20181218105804/https://www.bell.ca/Fibe-TV/Fibe-Programming
-Packages/Sports.tab#rsx-tab-icon-container

https://web.archive.org/web/20181224175159/https://www.shaw.ca/television/channels/premium-channels/

https://web.archive.org/web/20190520053157/http://www.bell.ca/Bell_TV/Promotions/Sports-Packages

https://web.archive.org/web/20190804000950/https://www.sasktel.com/store/browse/Personal/TV/maxTV/
Channels-and-Theme-Packs/_/N-upiyt6

https://web.archive.org/web/20190907014844/https://www.shaw.ca/tv/programming/channels/premium

https://web.archive.org/web/20190907104708/https://www.shawdirect.ca/english/

https://web.archive.org/web/20190930025652/http://www.directv.com/sports/nfl

https://web.archive.org/web/20191022060633/http://www nba.com/watch/pricing

https://web.archive.org/web/20191026090220/http://www novusnow.ca:80/television/theme-packs

https://web.archive.org/web/20200227232136/https://assets.ctfassets.net/w9jqaixwsa7r/WsgePwFkJRdN
zI5zLb0Uf/c50fcf61ebff026a2ffd9d44f60b7499d/Optik_TV_CSG_.pdf

https://web.archive.org/web/20200923113240/https://www.telus.com/en/deals-and-bundles/nfl-sunday-ticket

https://web.archive.org/web/20200923140453/https://www.bell.ca/Promotions/Sports-packages

https://web.archive.org/web/20200923170818/https://www novusnow.ca/television/theme-packs/

https://web.archive.org/web/20200929005840/http://www.directv.com/sports/nfl

https://web.archive.org/web/20200929163731/https://www.shaw.ca/tv/programming/channels/premium

https://web.archive.org/web/20201022180101/https://www rogers.com/iptv/nfl

https://web.archive.org/web/20201028144839/https://www.shawdirect.ca/english/packages/programming
/premium-sports/

https://web.archive.org/web/20201031022921/https://www.sasktel.com/store/browse/Personal/TV/maxTV/
Channels-and-Theme-Packs/_/N-upiyt6

Documents Relied Upon
Appendix B

https://web.archive.org/web/20201222014828/https://watch.nba.com/streaming-subscriptions
https://web.archive.org/web/20210723202126/https://www.usdirect.com/packages
https://web.archive.org/web/20210802035733/https://www.directv.com/
https://web.archive.org/web/20210805170229/https://www.mlb.com/live-stream-games/national
-broadcast-schedule
https://web.archive.org/web/20210828002613mp_/https://www.dish.com/
https://web.archive.org/web/20210902004918/https://www.cox.com/residential/tv.html
https://web.archive.org/web/20210904072314/https://www.telus.com/en/deals-and-bundles/nfl-sunday-ticket
https://web.archive.org/web/20211002062538/https://btn.com/shows/
https://web.archive.org/web/20211009194127/https://www.espn.com/watch/schedule/_/type/upcoming
https://web.archive.org/web/20211009194230/https://www.espn.com/watch/schedule/_/type/live
https://web.archive.org/web/20211009194230/https://www.espn.com/watch/schedule/_/type/upcoming
https://web.archive.org/web/20211010081150/https://www.espn.com/watch/schedule/_/type/upcoming
https://web.archive.org/web/20211019222300/https://watch.nba.com/packages
https://web.archive.org/web/20211020123450/.viacomcbspressexpress.com/cbs-sports/media-guides/
the-nfl-on-cbs-2012/
https://web.archive.org/web/20211020123450/.viacomcbspressexpress.com/cbs-sports/media-guides/the
-nfl-on-cbs-2012/
https://web.archive.org/web/20211030233736/https://www.bell.ca/Promotions/Sports-packages
https://web.archive.org/web/20211214003611/https://www.novusnow.ca/television/theme-packs/
https://web.archive.org/web/20220206074407/https://www.viacomcbspressexpress.com/cbs-sports/
media-guides/the-nfl-on-cbs-2019/
https://westwoodonesports.com/2022/03/nfl-and-westwood-one-renew-expand-partnership/
https://www.10news.com/students-can-get-the-nfl-sunday-ticket-streaming-package-for-80-for-the-
entire-season/
https://www.49ers.com/news/49ers-expand-broadcast-reach-to-mexico-with-fox-sports-partnership
https://www.49ers.com/news/49ers-expand-broadcast-reach-to-mexico-with-fox-sports-partnership
https://www.adweek.com/brand-marketing/nbc-espn-snap-nfl-packages-79015/
https://www.allconnect.com/blog/how-to-get-nflst-without-directv
https://www.amazon.com/adlp/tnf
https://www.backingthepack.com/2012/5/9/3009974/acc-espn-agree-to-15-year-3-6-billion-tv-contract
https://www.baseball-reference.com/leagues/majors/2017-schedule.shtml
https://www.baseball-reference.com/leagues/majors/2018-schedule.shtml
https://www.baseball-reference.com/leagues/majors/2019-schedule.shtml
https://www.baseball-reference.com/leagues/majors/2020-schedule.shtml
https://www.baseball-reference.com/leagues/majors/2021-schedule.shtml
https://www.baseball-reference.com/postseason/
https://www.basketball-reference.com/leagues/NBA_2012_games.html
https://www.basketball-reference.com/leagues/NBA_2013_games.html
https://www.basketball-reference.com/leagues/NBA_2014_games.html
https://www.basketball-reference.com/leagues/NBA_2015_games.html
https://www.basketball-reference.com/leagues/NBA_2016_games.html
https://www.basketball-reference.com/leagues/NBA_2017_games.html
https://www.basketball-reference.com/leagues/NBA_2018_games.html
https://www.basketball-reference.com/leagues/NBA_2019_games.html
https://www.basketball-reference.com/leagues/NBA_2020_games.html
https://www.basketball-reference.com/leagues/NBA_2021_games.html
https://www.basketball-reference.com/leagues/NBA_2022_games.html
https://www.basketball-reference.com/playoffs/NBA_2012_games.html
https://www.basketball-reference.com/playoffs/NBA_2013_games.html
https://www.basketball-reference.com/playoffs/NBA_2014_games.html
https://www.basketball-reference.com/playoffs/NBA_2015_games.html

Documents Relied Upon
Appendix B

https://www.basketball-reference.com/playoffs/NBA_2016_games.html
https://www.basketball-reference.com/playoffs/NBA_2017_games.html
https://www.basketball-reference.com/playoffs/NBA_2018_games.html
https://www.basketball-reference.com/playoffs/NBA_2019_games.html
https://www.basketball-reference.com/playoffs/NBA_2020_games.html
https://www.basketball-reference.com/playoffs/NBA_2021_games.html
https://www.bell.ca/Bell_TV/TV-Programming-Packages/Sports.tab
https://www.bellmts.ca/file_source/mts/assets/pdfs/pick-pay-personal-dec2019.pdf
https://www.bls.gov/opub/mlr/2012/12/art3full.pdf
https://www.businessinsider.com/versus-nbc-sports-network-2011-8
https://www.cabletv.com/blog/directv-vs-xfinity-comcast
https://www.cabletv.com/blog/mlb-extra-innings-review#:~:text=Does%20MLB%20EXTRA%20INNINGS%
20have,exclusive%20dibs%20on%20a%20game.
https://www.cabletv.com/xfinity/channel-lineup/ultimate
https://www.cbssports.com/nba/news/2014-15-nba-tv-schedule/
https://www.channelguidemag.com/tv-news/2011/08/29/nbc-sunday-night-football-2011-schedule/
https://www.channelguidemag.com/tv-news/2011/09/09/nfl-on-cbs-2011-schedule/
https://www.channelguidemag.com/tv-news/2011/12/19/2011-12-nba-tv-schedule/
https://www.channelguidemag.com/tv-news/2012/10/24/nba-tv-schedule-2012-13/
https://www.channelguidemag.com/tv-news/2013/07/26/2013-nfl-preseason-tv-schedule/
https://www.channelguidemag.com/tv-news/2013/09/05/cbs-nfl-schedule-2013/
https://www.channelguidemag.com/tv-news/2013/09/05/cbs-nfl-schedule-2013/
https://www.channelguidemag.com/tv-news/2013/10/22/nba-national-tv-schedule-2013-14/
https://www.channelguidemag.com/tv-news/2015/04/22/2015-nfl-tv-schedule/
https://www.channelguidemag.com/tv-news/2015/08/05/2015-nfl-preseason-tv-schedule/
https://www.channelguidemag.com/tv-news/2016/01/04/2016-nfl-playoffs-tv-schedule/
https://www.channelguidemag.com/tv-news/2016/09/02/2016-nfl-tv-schedule/
https://www.channelguidemag.com/tv-news/2016/10/25/2016-17-nba-tv-schedule-and-season-preview/
https://www.cmcsa.com/static-files/8887f574-dfa9-4480-8c8b-ed7771f7ce44
https://www.cnbc.com/2018/01/31/fox-reaches-5-year-deal-with-the-nfl-to-broadcast-thursday-night-
football.html
https://www.cnbc.com/2018/01/31/fox-reaches-5-year-deal-with-the-nfl-to-broadcast-thursday-night-football.html
https://www.cnbc.com/2022/08/18/big-ten-lands-7-billion-nfl-style-tv-contracts.html
https://www.compassmedianetworks.com/index.php/sports/
https://www.cordcuttingreviews.com/how-to-watch-nfl-games-in-europe/
https://www.cox.com/residential/tv/channel-lineup.html?filter-search-select-paks=20
https://www.dazn.com/en-CA/news/american-football/nfl-2021-week-18-schedule-live-streams-tv-channels
-game-times-in-canada/qjnwbx0e758i11eonmcwaea9s
https://www.digitalhome.ca/threads/telus-optik-tv-programming-packages-and-pricing-discussion.196905
/page-13
https://www.digitalhome.ca/threads/telus-optik-tv-programming-packages-and-pricing-discussion.196905
/page-2#post-2218202
https://www.digitalhome.ca/threads/telus-optik-tv-programming-packages-and-pricing-discussion.196905
/page-4#post-2572905
https://www.directv.com/satellite/channel-lineup/
https://www.directv.com/support/satellite/article/KM1180229/
https://www.encyclopedia.com/humanities/encyclopedias-almanacs-transcripts-and-maps/football-collegiate
https://www.espn.com/blog/playbook/dollars/post/_/id/1328/analyzing-the-new-mlb-espn-rights-deal
https://www.espn.com/college-football/news/story?id=1800339
https://www.espn.com/college-sports/news/story?id=3553033
https://www.espn.com/mlb/story/_/id/8453054/major-league-baseball-completes-eight-year-deal-fox-
turner-sports

Documents Relied Upon

Appendix B

https://www.espn.com/nfl/story/_/id/10354114/harris-poll-nfl-most-popular-mlb-2nd

https://www.espn.com/nfl/story/_/id/31159686/nfl-moves-17-game-regular-season-2021-means-teams-
players-revenue-fans

https://www.espn.com/nfl/story/_/id/7353238/nfl-re-ups-tv-pacts-expand-thursday-schedule

https://www.firesticktricks.com/watch-nfl-sunday-ticket-on-firestick.html

https://www.forbes.com/sites/bradadgate/2021/07/21/the-2020-21-nba-season-in-review-and-a-look-ahead/?
sh=78795c98518a

https://www.forbes.com/sites/mikeozanian/2021/08/05/the-nfls-most-valuable-teams-2021-average-team-
value-soars-to-35-billion-as-league-shrugs-off-pandemic-year/

https://www.foxsports.com/presspass/latest-news/2018/01/31/fox-sports-reaches-five-year-rights-
agreement-national-football-league-broadcast-thursday-night-football-presented-bud-light

https://www.foxsports.com/presspass/latest-news/2018/01/31/fox-sports-reaches-five-year-rights-agreement
-national-football-league-broadcast-thursday-night-football-presented-bud-light

https://www.foxsports.com/presspass/latest-news/2018/01/31/fox-sports-reaches-five-year-rights-agreement-
national-football-league-broadcast-thursday-night-football-presented-bud-light

https://www.foxsports.com/presspass/latest-news/2018/04/19/fox-sports-ushers-25th-season-nfl-
coverage-strongest-broadcast-schedule-ever

https://www.foxsports.com/presspass/latest-news/2018/04/19/fox-sports-ushers-25th-season-nfl-coverage-
strongest-broadcast-schedule-ever

https://www.foxsports.com/stories/nfl/here-on-fox-complete-broadcast-schedule-for-2015-nfl-season

https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf

https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-
collaboration-among-competitors/ftcdojguidelines-2.pdf

https://www.hollywoodreporter.com/news/general-news/espn-baseball-deal-mlb-broadcast-365796/

https://www.hollywoodreporter.com/tv/tv-news/tv-long-view-nfl-ratings-dominance-2020-4124795/

https://www.huduser.gov/portal/datasets/usps_crosswalk html#codebook

https://www.interbasket net/news/2015-nfl-playoff-tv-schedule/16780/

https://www.justice.gov/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-
chapter-2#:~:text=The%20Supreme%20Court%20has%20defined,of%20course%2C%20something%
20greater%20than

https://www.latimes.com/archives/la-xpm-2002-sep-20-sp-tvcol20-story.html

https://www.latimes.com/archives/la-xpm-2006-oct-18-sp-tbs18-story html

https://www.latimes.com/business/la-xpm-2011-dec-15-la-fi-ct-nfl-deals-20111215-story.html

https://www.latimes.com/sports/nfl/la-sp-nfl-cbs-thursday-tv-20150119-story.html

https://www.mlb.com/live-stream-games/blackout-mobile

https://www.mlb.com/live-stream-games/help-center/extra-innings-what-is-the-difference-between

https://www.mlb.com/news/dish-now-offering-mlb-extra-innings/c-115672126

https://www.mlb.com/news/dish-now-offering-mlb-extra-innings/c-115672126#:~:text=MLB%20EXTRA%
20INNINGS%20is%20available,more%20than%20400%20supported%20devices.

https://www.nationalmediaspots.com/media-stats/Nielsen-2019-2020-DMA-Ranks.pdf

https://www.nba.com/news/2022-nba-playoffs-schedule

https://www.nfl.com/news/how-to-stream-nfl-games-for-the-2017-season-0ap3000000833701

https://www.nfl.com/news/how-to-watch-with-nfl-game-pass-international

https://www.nfl.com/news/nfl-cbs-partner-on-thursday-night-football-in-2014-0ap2000000323851

https://www.nfl.com/news/nfl-network-2011-primetime-thursday-night-football-schedule-
ann-09000d5d81f58d9b

https://www.nfl.com/news/nfl-network-2011-primetime-thursday-night-football-schedule-ann-
09000d5d81f58d9b

https://www.nfl.com/news/nfl-owners-approve-enhanced-schedule-with-17-regular-season-games-per-team

https://www.nfl.com/news/nflsundayticket-tv-announces-expanded-coverage-0ap3000000508828

https://www.nfl.com/schedules/

https://www.nfl.com/schedules/2021/reg7/

Documents Relied Upon
Appendix B

https://www.nfl.com/ways-to-watch/canada
https://www.nytimes.com/1986/07/30/sports/usfl-loses-in-antitrust-case-jury-assigns-just-1-in-damages.html
https://www.nytimes.com/1990/03/10/business/new-tv-contracts-for-nfl-s-games-total-3.6-billion.html
https://www.nytimes.com/1993/12/21/sports/nbc-gets-final-nfl-contract-while-cbs-gets-its-sundays-off.html
https://www.nytimes.com/2005/04/19/sports/football/monday-nights-are-changing-nfl-off-abc.html
https://www.nytimes.com/2007/01/20/sports/baseball/20base html
https://www.nytimes.com/2022/08/18/sports/ncaafootball/big-ten-deal-tv.html.
https://www.outkick.com/the-15-most-valuable-sports-networks-050715/
https://www.pressreader.com/canada/regina-leader-post/20180907/282475709714525
https://www.profootballhof.com/news/2005/01/news-nfl-founded-in-canton/
https://www.profootballnetwork.com/nfl-stadium-capacity-which-are-the-biggest-and-smallest/
https://www.pro-football-reference.com/boxscores/201910060rai.htm
https://www.pro-football-reference.com/boxscores/201910270ram.htm
https://www.pro-football-reference.com/boxscores/201911030jax.htm
https://www.pro-football-reference.com/boxscores/201911180sdg htm
https://www.pro-football-reference.com/years/2019/games.htm
https://www.raiders.com/multimedia/game-radio-broadcast-information
https://www.rapidtvnews.com/2012100424351/tbs-expands-mlb-coverage-to-include-more-post-season-tv-
    everywhere.html#axzz7P8Mux7ne
https://www.reddit.com/r/Rogers/comments/cvrgx4/nfl_red_zone/
https://www.reuters.com/article/us-espn-nfl/espn-nfl-reach-15-billion-monday-night-football-deal-
    idUSTRE78745B20110908
https://www.reuters.com/article/us-nba/nbas-7-4-billion-tv-deals-boosted-by-new-media-
    idUSN2830146220070628
https://www.reviews.org/tv-service/cox-review/#:~:text=Upgrading%20to%20Cox's%20Preferred%
    20Plus,Sports%20channel%20pack%20and%20Epix
https://www.reviews.org/tv-service/dish-vs-directv/
https://www.reviews.org/tv-service/dish-vs-directv/, https://www.cabletv.com/blog/directv-vs-xfinity-comcast
https://www.rogers.com/ipTV/nfl
https://www.saturdaydownsouth.com/sec-football/espn-cbs-sec-football-deal-john-ourand/
https://www.sbnation.com/2014/10/5/6916597/nba-new-tv-deal-espn-turner-24-billion
https://www.secsports.com/tv-schedule/_/date/20211010
https://www.si.com/college/2020/12/10/sec-espn-abc-tv-contract-leaving-cbs
https://www.si.com/nba/2014/10/06/nba-tv-deal-questions-answers-adam-silver-espn-turner
https://www.si.com/nfl/2014/02/05/cbs-nfl-thursday-night-football-tv-broadcast
https://www.si.com/nfl/2016/02/01/nfl-thursday-night-football-rights-nbc-cbs
https://www.spglobal.com/marketintelligence/en/news-insights/blog/dazns-global-strategies-toward-a-post-
    pandemic-recovery
https://www.sportico.com/valuations/teams/2021/most-valuable-sports-franchises-1234644354/
https://www.sportingnews.com/ca/commercial/news/nfl-baltimore-ravens/1bqpwd3y50h1y1t19c5cweigoo
https://www.sportingnews.com/ca/nfl/news/how-to-watch-live-stream-nfl-games-redzone-game-pass-
    canada-dazn-football-supported-devices/1uoe46cxgtwdm1xyxedapxnhb7
https://www.sportingnews.com/us/nfl/news/nfl-coverage-map-week-5-schedulecbsfox/1n5d9iqmb9zt21
    spcyjoutvipm
https://www.sportingnews.com/us/nfl/news/nfl-coverage-map-week-5-tv-schedule-cbs-fox/
    1v8iiwih0t38m1s6s2o9z2si2f
https://www.sportingnews.com/us/nfl/news/nfl-playoff-schedule-2020-dates-times-channels-
    brackets/1rt1o5y896fks1mkhywwhpi03b
https://www.sportingnews.com/us/nfl/news/nfl-schedule-2019-dates-times-tv-channels-week-by-
    week/wbtn4st4xki31f12er7lr2ua4
https://www.sportingnews.com/us/nfl/news/nfl-schedule-week-7-tv-coverage-
    channels/rc8soezy8hpt1c1rb9xysbed6

Documents Relied Upon
Appendix B

https://www.sportsbroadcastjournal.com/wp-content/uploads/2019/08/NBA_National_TV_Schedule
_2019_20.pdf
https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2022/08/19/49ers.aspx
https://www.sportsbusinessjournal.com/Daily/Issues/2010/11/05/The-Back-Of-The-Book/ESPN-Ranked-
10Th-Among-Cable-Nets-In-Penetration-For-November
https://www.sportsbusinessjournal.com/Daily/Issues/2022/08/18/Media/Big-Ten-Media-Deal.aspx
https://www.sportsbusinessjournal.com/Daily/Morning-Buzz/2022/08/12/Cowboys-TelevisaUnivison-
deal.aspx
https://www.sportsbusinessjournal.com/Journal/Issues/2012/09/24/Media/MLB-12B.aspx
https://www.sportsmediawatch.com/2011/01/2010-11-nfl-numbers-game/
https://www.sportsmediawatch.com/2012/01/2011-12-nfl-numbers-game/
https://www.sportsmediawatch.com/2012/10/fox-cuts-back-on-regular-season-baseball-blackouts-for-
regional-games-to-be-lifted/
https://www.sportsmediawatch.com/2014-nfl-tv-ratings-viewership/
https://www.sportsmediawatch.com/2015-nfl-tv-ratings-viewership/
https://www.sportsmediawatch.com/2016-nfl-tv-ratings-viewership/
https://www.sportsmediawatch.com/2017-nfl-tv-ratings-viewership/
https://www.sportsmediawatch.com/2018-nfl-television-ratings-viewership/
https://www.sportsmediawatch.com/2019-nfl-television-ratings-viewership/
https://www.sportsmediawatch.com/college-football-tv-ratings/
https://www.sportsmediawatch.com/college-football-tv-schedule-2021-week-times-espn-fox-cbs-nbc-abc/
https://www.sportsmediawatch.com/nfl-tv-ratings-viewership-2021/
https://www.sportsmediawatch.com/nfl-tv-ratings-viewership-2021/2/
https://www.sportsmediawatch.com/nfl-tv-schedule-2022-fox-nbc-cbs-espn-amazon-tnf-snf-mnf/#
https://www.sportsmediawatch.com/super-bowl-ratings-historical-viewership-chart-cbs-nbc-fox-abc/
https://www.sportspromedia.com/news/mlb-espn-tv-rights-2022-2028/
https://www.sportspromedia.com/news/nfl-dazn-canada-carriage-deals/
https://www.statista.com/statistics/193466/total-league-revenue-of-the-mlb-since-2005/
https://www.statista.com/statistics/243789/number-of-tv-households-in-the-us/
https://www.telecompetitor.com/att-expands-directv-nfl-sunday-ticket-streaming-options/
https://www.telus.com/en/deals-and-bundles/nfl-sunday-ticket
https://www.theverge.com/2014/7/16/5910149/directv-launching-nfl-sunday-ticket-tv-2014-season
https://www.tvinsider.com/1018642/nba-regular-season-tv-schedule-2021-22/
https://www.tvinsider.com/723974/nba-2018-2019-regular-season-tv-schedule/
https://www.tvinsider.com/809531/nfl-tv-schedule-2019-regular-season/
https://www.tvinsider.com/977387/2020-21-nba-national-tv-schedule/
https://www.tvtechnology.com/news/big-ten-inks-record-breaking-dollar7b-tv-deal
https://www.tvtechnology.com/news/mlb-reaches-rights-agreements-with-fox-sports-and-tbs
https://www.usatoday.com/story/sports/nba/2017/08/14/2017-18-nba-schedule-warriors-rockets-dominate
-national-tv-lineup/566014001/
https://www.viacomcbspressexpress.com/cbs-sports/media-guides/the-nfl-on-cbs-2012/document?id=2
https://www.viacomcbspressexpress.com/cbs-sports/releases/view?id=50019
https://www.washingtonpost.com/archive/politics/1998/01/14/abc-keeps-mondays-in-record-nfl-
deals/13e3aff9-ef15-4967-86e4-a61c9aa3c673/
https://www.washingtonpost.com/archive/sports/1994/02/15/around-the-colleges/a993c659-c3ad-4674
-8928-4541bc71ef13/
https://www.washingtonpost.com/news/business/wp/2015/04/28/the-nfl-is-dropping-its-tax-exempt-status
-why-that-ends-up-helping-them-out/
https://www.wsj.com/articles/SB10001424052970204026804577098774037075832
https://www.wsj.com/articles/SB109995340263868086
https://www.xfinity.com/digital/offers/plan-builder
https://www.xfinity.com/learn/offers?lob=tv|tv-140+tv-200+tv-220+tv-260,internet

16

Documents Relied Upon
Appendix B

https://www.yahoo.com/news/exclusive-launch-date-price-first-fights-netflix-sports-dazn-150242578 html
https://www.yahoo.com/video/why-nbc-sports-network-shutdown-140000947.html

17

# Appendix C

TV Revenue Per Game
Appendix C

**Telecast Rights Revenue Per Game (Including Premium)**

| Season | Conf. | Day of Week | Time of Day | Network | Deal Year | Type | Preseason | Regular Season | Postseason | Super Bowl | Total Games | REG Equiv. Games | Revenue (M) | Rev/Gam (M) | Rev/REG (M) | Notes | Sources |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | AFC | Sunday | Afternoon | CBS | 2004 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [10] | [10], [32] |
| 2011 | NFC | Sunday | Afternoon | FOX | 2004 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [2], [10] | [1], [51] |
| 2011 | Both | Sunday | Afternoon | DTV | 2009 | Premium | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [19] | [2] |
| 2011 | Both | Sunday | Evening | NBC | 2005 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [9], [16] | [4], [10], [31] |
| 2011 | Both | Monday | Evening | ESPN | 2005 | Regular Pay TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | [10], [14] |
| | | | | | | Total: | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | |
| 2012 | AFC | Sunday | Afternoon | CBS | 2009 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [10] | [10], [48] |
| 2012 | NFC | Sunday | Afternoon | FOX | 2009 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [4], [10] | [10] |
| 2012 | Both | Sunday | Afternoon | DTV | 2009 | Premium | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [19] | [2] |
| 2012 | Both | Sunday | Evening | NBC | 2009 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [9], [10] | [4], [9], [12] |
| 2012 | Both | Monday | Evening | ESPN | 2005 | Regular Pay TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | [10], [15], [45] |
| | | | | | | Total: | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | |
| 2013 | AFC | Sunday | Afternoon | CBS | 2009 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [10] | [10], [33], [34] |
| 2013 | NFC | Sunday | Afternoon | FOX | 2009 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [4], [10] | [10] |
| 2013 | Both | Sunday | Afternoon | DTV | 2009 | Premium | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [19] | [2] |
| 2013 | Both | Sunday | Evening | NBC | 2009 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [9], [10] | [4], [9], [23] |
| 2013 | Both | Monday | Evening | ESPN | 2005 | Regular Pay TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | [10], [16], [45] |
| | | | | | | Total: | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | |
| 2014 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [1], [10] | [5], [10] |
| 2014 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [10] | [10], [18] |
| 2014 | Both | Sunday | Afternoon | DTV | 2009 | Premium | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [19] | [2] |
| 2014 | Both | Sunday | Evening | NBC | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [9], [10], [12] | [9] |
| 2014 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [17] | [6], [46] |
| 2014 | Both | Thursday | Evening | CBS | 2014 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [7], [11] | [10], [17], [44] |
| | | | | | | Total: | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | |
| 2015 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [1], [10] | [5], [10], [35], [36] |
| 2015 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [6], [10] | [10], [42] |
| 2015 | Both | Sunday | Afternoon | DTV | 2014 | Premium | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [19] | [3] |
| 2015 | Both | Sunday | Evening | NBC | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [9], [10], [12] | [9] |
| 2015 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [17] | [6], [46] |
| 2015 | Both | Thursday | Evening | CBS | 2015 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [7] | [10], [43] |
| | | | | | | Total: | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | |
| 2016 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [1], [10] | [5], [10], [25], [37] |
| 2016 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [5], [10] | [10] |
| 2016 | Both | Sunday | Afternoon | DTV | 2014 | Premium | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [19] | [3] |
| 2016 | Both | Sunday | Evening | NBC | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [9], [10], [12] | [9] |
| 2016 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [17] | [6], [46] |
| 2016 | Both | Thursday | Evening | CBS | 2016 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | [10], [47] |
| 2016 | Both | Thursday | Evening | NBC | 2016 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | [10], [47] |
| | | | | | | Total: | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | |
| 2017 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [1], [10] | [5], [10], [26] |
| 2017 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [6], [10] | [10], [19], [27] |
| 2017 | Both | Sunday | Afternoon | DTV | 2014 | Premium | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [19] | [3] |
| 2017 | Both | Sunday | Evening | NBC | 2011 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [9], [10], [12] | [9] |
| 2017 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | [17] | [6], [46] |
| 2017 | Both | Thursday | Evening | CBS | 2016 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | [10], [47] |
| 2017 | Both | Thursday | Evening | NBC | 2016 | Standard TV | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | [10], [47] |

TV Revenue Per Game
Appendix C

**Telecast Rights Revenue Per Game (Including Premium)**



| Season | Conf. | Day of Week | Time of Day | Network | Deal Year | Type | Preseason | Regular Season | Postseason | Super Bowl | Total Games | REG Equiv. Games | Revenue (M) | Rev/Gam (M) | Rev/REG (M) | Notes | Sources |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total: | | | | | | | | | | | |
| 2018 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | | | | | | | | [1], [10] | [5], [10], [28], [50] |
| 2018 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | | | | | | | | [10] | [10], [41] |
| 2018 | Both | Sunday | Afternoon | DTV | 2014 | Premium | | | | | | | | | | [19] | [3] |
| 2018 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | | | | | | | | [9], [10], [12] | [9] |
| 2018 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | | | | | | | | | [17] | [6], [46] |
| 2018 | Both | Thursday | Evening | FOX | 2018 | Standard TV | | | | | | | | | | [8] | [10], [38], [39], [40] |
| | | | | | | Total: | | | | | | | | | | | |
| 2019 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | | | | | | | | [1], [10] | [5], [10], [29], [49] |
| 2019 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | | | | | | | | [10] | [10], [20] |
| 2019 | Both | Sunday | Afternoon | DTV | 2014 | Premium | | | | | | | | | | [19] | [3] |
| 2019 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | | | | | | | | [9], [10], [12] | [9] |
| 2019 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | | | | | | | | | [17] | [6], [46] |
| 2019 | Both | Thursday | Evening | FOX | 2018 | Standard TV | | | | | | | | | | [8] | [10], [38], [39], [40] |
| | | | | | | Total: | | | | | | | | | | | |
| 2020 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | | | | | | | | [1], [10], [13] | [5], [10], [13], [24] |
| 2020 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | | | | | | | | [10] | [10], [21] |
| 2020 | Both | Sunday | Afternoon | DTV | 2014 | Premium | | | | | | | | | | [19] | [3] |
| 2020 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | | | | | | | | [10], [12] | [9] |
| 2020 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | | | | | | | | | [17] | [6], [46] |
| 2020 | Both | Thursday | Evening | FOX | 2018 | Standard TV | | | | | | | | | | [8] | [10], [38], [39], [40] |
| | | | | | | Total: | | | | | | | | | | | |
| 2021 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | | | | | | | | [1], [10] | [10], [11] |
| 2021 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | | | | | | | | [10], [15] | [10], [22], [30] |
| 2021 | Both | Sunday | Afternoon | DTV | 2014 | Premium | | | | | | | | | | [20] | [3] |
| 2021 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | | | | | | | | [3], [9], [10] | [7], [9] |
| 2021 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | | | | | | | | | [18] | [6], [8], [46] |
| 2021 | Both | Thursday | Evening | FOX | 2018 | Standard TV | | | | | | | | | | [8], [14] | [10], [38], [39], [40] |
| | | | | | | Total: | | | | | | | | | | | |
| **2011-2021** | | | | | | **Total 2011-2021** | | | | | | | | | | | |

Preseason  Regular  Postseason  Super Bowl

REG-Equivalent Multiplier

*Notes*

REG = Regular Season Equivalent Games, including pre- and postseason adjustments.

Postseason and Super Bowl figures represent average over deal term.

[1] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[2] 17 weeks of regular season broadcasts with 9 double-headers.

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See NFL_0458574 at '615).

[4] Assumes same game package as 2011.

[5] Assumes same package as 2014.

[6] Assumes same preseason package as 2014.

[7] CBS-produced games to be simulcast on NFL Network. NFL Network will produce and distribute remaining TNF games in season.

[8] FOX to broadcast 11 games. All 11 games will also be simulcast to NFL Network. Remaining 7 games are exclusive to NFL Network, but FOX will produce all 18.

[9] Includes Season Kickoff.

TV Revenue Per Game
Appendix C

**Telecast Rights Revenue Per Game (Including Premium)**

[10]   Includes Thanksgiving game.
[11]   Includes two Saturday games in same time slot.
[12]   ███████████████████████████████████████████████████████████████
[13]   NBC was originally set to broadcast the season 2020 Super Bowl and CBS the season 2021 game. In 2019, the networks agreed to trade broadcast years (https //www.sportsmediawatch.com/2019/03/
       super-bowl-nbc-cbs-swap/). "Pre" column reflects actual number of games. Per Broadcast Agreement, CBS entitled to 2 preseason games if each NFL team scheduled to play 4 preseason games.
       Otherwise entitled to 1 game.
[14]   One TNF game is played on a Saturday (Christmas Day).
[15]   Preseason game is Hall of Fame.
[16]   Preseason games includes Hall of Fame game. Deal averaged $600 million per year between 2006 and 2011. See https //www.chicagotribune.com/news/ct-xpm-2005-04-20-0504200288-story.html.
[17]   Rights fees are increased by $100 million relative to the Payment Schedule in the ESPN-NFL agreement due to a Wild Card Game.
[18]   ████████████████████████████████████████████████████████
       ███████████████████████████████████████████   (NFL_0458617 at '23).   ████████████████████
       
[19]   █████████████████████████████████████████████████████████
[20]   ████████████████████████████████████████████████████

Sources
[1]    NFL_0862550
[2]    NFL_0000434 at 0437 and 0456
[3]    NFL_0000458 at 0468 and 0498
[4]    NFL_0375030
[5]    NFL_0377291
[6]    NFL_0401290
[7]    NFL_0458574
[8]    NFL_0458617
[9]    NFL_0474032
[10]   NFL_0331042
[11]   http //www.thefutoncritic.com/news/2021/05/12/cbs-sports-sets-the-stage-for-nfls-expanded-2021-season-with-networks-strongest-nfl-on-cbs-schedule-501224/20210512cbs03/
[12]   https //awfulannouncing.com/2012-articles/your-2012-nbc-sunday-night-football-schedule.html
[13]   https //deadline.com/wp-content/uploads/2020/05/cbs-nfl-schedule-2020-wm.pdf
[14]   https //espnpressroom.com/us/press-releases/2011/04/espns-2011-monday-night-football-schedule-2/
[15]   https //espnpressroom.com/us/press-releases/2012/04/espns-2012-monday-night-football-schedule/
[16]   https //espnpressroom.com/us/press-releases/2013/04/espns-2013-monday-night-football-schedule/
[17]   https //fbschedules.com/nfl-2014-thursday-night-football-schedule/
[18]   https //foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2016/12/no-c-2014-NFL-on-FOX-Schedule.pdf
[19]   https //foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2017/04/2017-FOX-NFL-Broadcast-Schedule-Only-2.pdf
[20]   https //foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2019/04/2019-NFL-Schedule-Schedule-Only-2.pdf
[21]   https //foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2020/05/2020-FOX-SPORTS-NFL-SCHEDULE.pdf
[22]   https //foxsports-wordpress-www-prsupports-prod.s3.amazonaws.com/uploads/sites/2/2021/05/2021-NFL-Schedule-Grid.pdf
[23]   https //nbcsportsgrouppressbox.com/2013/04/18/2013-sunday-night-football-schedule-announced/
[24]   https //nflcommunications.com/Documents/2020%20Football%20Information/05%2007%2020%20-%20Preseason%20Schedule.pdf
[25]   https //nflcommunications.com/Pages/2016-Preseason-Schedule-Announced.aspx
[26]   https //nflcommunications.com/Pages/2017-NFL-SCHEDULE-ANNOUNCED.aspx
[27]   https //nflcommunications.com/Pages/2017-Preseason-Schedule-Announced-.aspx
[28]   https //nflcommunications.com/Pages/2018-Preseason-Schedule-Announced-.aspx
[29]   https //nflcommunications.com/Pages/2019-Preseason-Schedule-Announced.aspx
[30]   https //nflcommunications.com/Pages/NFL-announces-2021-preseason-schedule-dates,-times.aspx
[31]   https //www.channelguidemag.com/tv-news/2011/08/29/nbc-sunday-night-football-2011-schedule/

TV Revenue Per Game
Appendix C

[32]  https //www.channelguidemag.com/tv-news/2011/09/09/nfl-on-cbs-2011-schedule/
[33]  https //www.channelguidemag.com/tv-news/2013/07/26/2013-nfl-preseason-tv-schedule/
[34]  https //www.channelguidemag.com/tv-news/2013/09/05/cbs-nfl-schedule-2013/
[35]  https //www.channelguidemag.com/tv-news/2015/04/22/2015-nfl-tv-schedule/
[36]  https //www.channelguidemag.com/tv-news/2015/08/05/2015-nfl-preseason-tv-schedule/
[37]  https //www.channelguidemag.com/tv-news/2016/09/02/2016-nfl-tv-schedule/
[38]  https //www.cnbc.com/2018/01/31/fox-reaches-5-year-deal-with-the-nfl-to-broadcast-thursday-night-football.html
[39]  https //www.espn.com/nfl/story/_/id/31159686/nfl-moves-17-game-regular-season-2021-means-teams-players-revenue-fans
[40]  https //nflcommunications.com/Pages/FOX-SPORTS-REACHES-FIVE-YEAR-RIGHTS-AGREEMENT-WITH-NFL-TO-BROADCAST--THURSDAY-NIGHT-FOOTBALL-PRESENTED-BY-BUD-LIGHT.aspx
[41]  https //www.foxsports.com/presspass/latest-news/2018/04/19/fox-sports-ushers-25th-season-nfl-coverage-strongest-broadcast-schedule-ever
[42]  https //www.foxsports.com/stories/nfl/here-on-fox-complete-broadcast-schedule-for-2015-nfl-season
[43]  https //www.latimes.com/sports/nfl/la-sp-nfl-cbs-thursday-tv-20150119-story.html
[44]  https //www.nfl.com/news/nfl-cbs-partner-on-thursday-night-football-in-2014-0ap2000000323851
[45]  https //www.nytimes.com/2005/04/19/sports/football/monday-nights-are-changing-nfl-off-abc.html
[46]  https //www.reuters.com/article/us-espn-nfl/espn-nfl-reach-15-billion-monday-night-football-deal-idUSTRE78745B20110908
[47]  https //www.si.com/nfl/2016/02/01/nfl-thursday-night-football-rights-nbc-cbs
[48]  https //web.archive.org/web/20211020123450/.viacomcbspressexpress.com/cbs-sports/media-guides/the-nfl-on-cbs-2012/
[49]  https //web.archive.org/web/20220206074407/https //www.viacomcbspressexpress.com/cbs-sports/media-guides/the-nfl-on-cbs-2019/
[50]  https //www.viacomcbspressexpress.com/cbs-sports/releases/view?id=50019
[51]  https //www.wsj.com/articles/SB10999534026386806

# Appendix D

Telecast Licensing Revenue
Appendix D

## Telecast Licensing Revenues

### Standard and Regular Pay TV

| Season | Conference | Day of Week | Time of Day | Network | Deal Year | Type | Revenue (M) | Notes | Sources |
|--------|-----------|-------------|-------------|---------|-----------|------|-------------|-------|---------|
| 2011 | AFC | Sunday | Afternoon | CBS | 2004 | Standard TV | | | [1], [7], [10] |
| 2011 | NFC | Sunday | Afternoon | FOX | 2006 | Standard TV | | | [6] |
| 2011 | Both | Sunday | Evening | NBC | 2005 | Standard TV | | [1] | [9], [11], [12] |
| 2011 | Both | Monday | Evening | ESPN | 2005 | Regular Pay TV | | | [8], [20] |
| 2011 | Both | Thursday | Evening | NFLN | 2006 | Regular Pay TV | NFL O&O | | [23] |
| | | | | | | Total: | | | |
| 2012 | AFC | Sunday | Afternoon | CBS | 2009 | Standard TV | | | [1], [12], [15] |
| 2012 | NFC | Sunday | Afternoon | FOX | 2009 | Standard TV | | | [1], [15] |
| 2012 | Both | Sunday | Evening | NBC | 2009 | Standard TV | | | [2], [16] |
| 2012 | Both | Monday | Evening | ESPN | 2005 | Regular Pay TV | | | [8], [20] |
| 2012 | Both | Thursday | Evening | NFLN | 2006 | Regular Pay TV | NFL O&O | | [24] |
| | | | | | | Total: | | | |
| 2013 | AFC | Sunday | Afternoon | CBS | 2009 | Standard TV | | | [1], [15] |
| 2013 | NFC | Sunday | Afternoon | FOX | 2009 | Standard TV | | | [1], [12], [15] |
| 2013 | Both | Sunday | Evening | NBC | 2009 | Standard TV | | | [2], [16] |
| 2013 | Both | Monday | Evening | ESPN | 2005 | Regular Pay TV | | | [8], [20] |
| 2013 | Both | Thursday | Evening | NFLN | 2006 | Regular Pay TV | NFL O&O | | [25] |
| | | | | | | Total: | | | |
| 2014 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | [1], [19] |
| 2014 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | [1], [19] |
| 2014 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | [5], [12], [14] |
| 2014 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | [2] | [3] |
| 2014 | Both | Thursday | Evening | NFLN | 2014 | Regular Pay TV | NFL O&O | | [26] |
| 2014 | Both | Thursday | Evening | CBS | 2014 | Standard TV | | | [1], [21] |
| | | | | | | Total: | | | |
| 2015 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | [1], [12], [19] |
| 2015 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | [1], [19] |
| 2015 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | [5], [14] |
| 2015 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | [2] | [3] |
| 2015 | Both | Thursday | Evening | NFLN | 2015 | Regular Pay TV | NFL O&O | | [27] |
| 2015 | Both | Thursday | Evening | CBS | 2015 | Standard TV | | | [1], [17] |
| | | | | | | Total: | | | |
| 2016 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | [1], [19] |
| 2016 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | [1], [12], [19] |
| 2016 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | [5], [14] |
| 2016 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | [2] | [3] |
| 2016 | Both | Thursday | Evening | CBS | 2016 | Standard TV | | | [1], [22] |
| 2016 | Both | Thursday | Evening | NBC | 2016 | Standard TV | | | [1], [13] |
| 2016 | Both | Thursday | Evening | NFLN | 2016 | Regular Pay TV | NFL O&O | | [22] |
| | | | | | | Total: | | | |
| 2017 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | [1], [19] |
| 2017 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | [1], [19] |
| 2017 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | [5], [12], [14] |
| 2017 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | [2] | [3] |
| 2017 | Both | Thursday | Evening | CBS | 2016 | Standard TV | | | [1], [22] |
| 2017 | Both | Thursday | Evening | NBC | 2016 | Standard TV | | | [1], [13] |
| 2017 | Both | Thursday | Evening | NFLN | 2016 | Regular Pay TV | NFL O&O | | [22] |
| | | | | | | Total: | | | |
| 2018 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | [1], [12], [19] |
| 2018 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | [1], [19] |
| 2018 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | [5], [14] |
| 2018 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | [2] | [3] |
| 2018 | Both | Thursday | Evening | FOX | 2018 | Standard TV | | | [1], [18] |
| 2018 | Both | Thursday | Evening | NFLN | 2018 | Regular Pay TV | NFL O&O | | [18] |
| | | | | | | Total: | | | |
| 2019 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | | | [1], [19] |
| 2019 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | | | [1], [12], [19] |
| 2019 | Both | Sunday | Evening | NBC | 2011 | Standard TV | | | [5], [14] |
| 2019 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | | [2] | [3] |
| 2019 | Both | Thursday | Evening | FOX | 2018 | Standard TV | | | [1], [18] |

Telecast Licensing Revenue
Appendix D

## Telecast Licensing Revenues

**Standard and Regular Pay TV**

| Season | Conference | Day of Week | Time of Day | Network | Deal Year | Type | Revenue (M) | Notes | Sources |
|--------|-----------|-------------|-------------|---------|-----------|------|-------------|-------|---------|
| 2019 | Both | Thursday | Evening | NFLN | 2018 | Regular Pay TV | NFL O&O | | [18] |
| | | | | | | **Total:** | | | |
| 2020 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | ■ | [3] | [1], [12], [19] |
| 2020 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | ■ | | [1], [19] |
| 2020 | Both | Sunday | Evening | NBC | 2011 | Standard TV | ■ | | [5], [14] |
| 2020 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | ■ | [4] | [3] |
| 2020 | Both | Thursday | Evening | FOX | 2018 | Standard TV | ■ | | [1], [18] |
| 2020 | Both | Thursday | Evening | NFLN | 2018 | Regular Pay TV | NFL O&O | | [18] |
| | | | | | | **Total:** | | | |
| 2021 | AFC | Sunday | Afternoon | CBS | 2011 | Standard TV | ■ | | [1], [19] |
| 2021 | NFC | Sunday | Afternoon | FOX | 2011 | Standard TV | ■ | | [1], [19] |
| 2021 | Both | Sunday | Evening | NBC | 2011 | Standard TV | ■ | [5] | [4], [5], [12], [14] |
| 2021 | Both | Monday | Evening | ESPN | 2011 | Regular Pay TV | ■ | [6] | [3] |
| 2021 | Both | Thursday | Evening | FOX | 2018 | Standard TV | ■ | | [1], [18] |
| 2021 | Both | Thursday | Evening | NFLN | 2018 | Regular Pay TV | NFL O&O | | [18] |
| | | | | | | **Total:** | | | |
| | | | | | | **Total (2011-2021):** | ■ | | |

*Notes:*
[1]    *Deal averaged $600 million per year between 2006 and 2011. See https://www.chicagotribune.com/news/ct-xpm-2005-04-20-0504200288-story.html.*
[2]    ■
[3]    *NBC was originally set to broadcast the season 2020 Super Bowl and CBS the season 2021 game. In 2019, the networks agreed to trade broadcast years (https://www.sportsmediawatch.com/2019/03/super-bowl-nbc-cbs-swap/).*
[4]    ■
[5]    ■
       *(see NFL_0458574 at '615). NBC was originally set to broadcast the season 2020 Super Bowl and CBS the season 2021 game. In 2019, the networks agreed to trade broadcast years (https://www.sportsmediawatch.com/2019/03/super-bowl-nbc-cbs-swap/).*
[6]    ■
       ■ *(NFL_0458617 at '23).*

*Sources:*
[1]    *NFL_0331042*
[2]    *NFL_0375030*
[3]    *NFL_0401290*
[4]    *NFL_0458574*
[5]    *NFL_0474032*
[6]    *NFL_0862550*
[7]    *NFL_0862664 (Exhibit K)*
[8]    *NFL_1105807 (Exhibit H)*
[9]    *NFL_1105917 (Exhibit K)*
[10]   *https://www.wsj.com/articles/SB109995340263868086*
[11]   *https://www.espn.com/nfl/story/_/id/7353238/nfl-re-ups-tv-pacts-expand-thursday-schedule*
[12]   *https://www.sportsmediawatch.com/super-bowl-ratings-historical-viewership-chart-cbs-nbc-fox-abc/*
[13]   *https://money.cnn.com/2016/02/01/media/thursday-night-football-nbc-cbs-deal/*
[14]   *https://nbcsportsgrouppressbox.com/2011/12/13/nbcuniversals-new-nine-year-nfl-media-rights-agreement-includes-more-games-three-super-bowls-upgraded-playoff-package-enhanced-flex-scheduling-increased-use-of-footage/*
[15]   *https://variety.com/2009/scene/markets-festivals/cbs-fox-extend-nfl-deals-1118003970/*
[16]   *https://variety.com/2009/scene/markets-festivals/nbc-extends-nfl-contract-1118007459/*
[17]   *https://variety.com/2015/tv/news/cbs-nfl-renew-deal-for-thursday-night-football-1201408283/*
[18]   *https://nflcommunications.com/Pages/FOX-SPORTS-REACHES-FIVE-YEAR-RIGHTS-AGREEMENT-WITH-NFL-TO-BROADCAST--THURSDAY-NIGHT-FOOTBALL-PRESENTED-BY-BUD-LIGHT.aspx*
[19]   *https://www.latimes.com/business/la-xpm-2011-dec-15-la-fi-ct-nfl-deals-20111215-story.html*
[20]   *https://www.nytimes.com/2005/04/19/sports/football/monday-nights-are-changing-nfl-off-abc.html*
[21]   *https://www.si.com/nfl/2014/02/05/cbs-nfl-thursday-night-football-tv-broadcast*
[22]   *https://www.si.com/nfl/2016/02/01/nfl-thursday-night-football-rights-nbc-cbs*
[23]   *https://www.nfl.com/news/nfl-network-2011-primetime-thursday-night-football-schedule-ann-09000d5d81f58d9b*
[24]   *https://fbschedules.com/2012-nfl-thursday-night-football-schedule/*
[25]   *https://fbschedules.com/2013-nfl-thursday-night-football-schedule/*
[26]   *https://www.nfl.com/news/nfl-cbs-partner-on-thursday-night-football-in-2014-0ap2000000323851*
[27]   *https://www.latimes.com/sports/nfl/la-sp-nfl-cbs-thursday-tv-20150119-story.html*