UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN RE: NATIONAL FOOTBALL LEAGUE
SUNDAY TICKET ANTITRUST LITIGATION

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO.  ML 15-02668-PSG (JEMx)

**EXPERT REPORT OF
J. DOUGLAS ZONA**

**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

# Contents

Executive Summary ........................................................................................................................... 3

1    Summary and Conclusions ........................................................................................................ 3

2    Background ................................................................................................................................ 6

3    Volume of Business Affected by the Alleged Anticompetitive Conduct ......................... 8

   3.1    Affected Purchases .............................................................................................................. 9

   3.2    Affected Revenue .............................................................................................................. 14

4    The Reduction Factor ............................................................................................................. 21

   4.1    Transaction and Viewership Analysis ........................................................................... 23

      4.1.1    Demand for NFL Sunday Ticket and Other Bundles of NFL Game Telecasts .................... 24

      4.1.2    The Value of NFL Game Telecasts ................................................................................ 25

      4.1.3    The Value of the NFL Sunday Ticket Package ............................................................. 30

      4.1.4    The Value of a DirecTV Subscription .......................................................................... 32

      4.1.5    Using the Estimated Model to Calculate Demand ..................................................... 35

      4.1.6    The Nature of Costs in Supplying NFL Sunday Ticket ................................................ 36

      4.1.7    The Nature of Competitive Interaction ...................................................................... 37

      4.1.8    But-for Simulations ..................................................................................................... 37

   4.2    Facing competition, DirecTV makes NFL Sunday Ticket available on tiers ................. 39

   4.3    Conjoint Analysis and Simulation ................................................................................... 44

      4.3.1    NERA Survey ................................................................................................................. 44

      4.3.2    Demand for OOM Access on MVPDs ........................................................................... 45

      4.3.3    Costs to supply OOM access on MVPDs ..................................................................... 54

      4.3.4    Competitive Interaction .............................................................................................. 54

      4.3.5    But-for Simulations ..................................................................................................... 55

   4.4    Validating Using NFL ███████████████████ ..................................................... 56

5    Conclusion .............................................................................................................................. 58

6    Signature ................................................................................................................................ 58

## Executive Summary

1. In this case, I understand plaintiffs allege that DirecTV, as the exclusive provider of live telecasts of out-of-market NFL football games played on Sunday afternoons during the regular season, was able to and did impose on its subscribers supra-competitive charges for the NFL Sunday Ticket package.

2. I understand that the plaintiffs fall into two classes: a class of DirecTV residential subscribers who purchased the NFL Sunday Ticket package and a class of DirecTV commercial subscribers who purchased the NFL Sunday Ticket package.

3. I have been asked to consider whether based on common evidence it can be proven at trial 1) the amount of NFL Sunday Ticket purchases by class members and 2) whether, if other providers supplied live telecasts of out-of-market NFL telecasts (in a manner that I understand to be consistent with the liability claims), the price for those purchases would have been lower, and by how much, for all class members.

4. In my professional opinion, and as explained in detail below, class-wide methods of proof are available to establish that NFL Sunday Ticket prices would have been lower for all class members if other providers supplied live telecasts of out-of-market NFL telecasts (in a manner that I understand to be consistent with the liability claims).

5. In my professional opinion, the total NFL Sunday Ticket purchases by members of the residential class during the Class Period to date is ███████████ The total NFL Sunday Ticket purchases by members of the commercial class during the Class Period to date is ███████████

## 1     Summary and Conclusions

6. My name is J. Douglas Zona. I am an applied economist specializing in the application of economics and econometrics to issues that arise in the context of litigation. I received a Ph.D. in economics from the State University of New York in Stony Brook. I have published articles in which I applied economic theory and statistical and econometric tools in a variety of applications in the areas of antitrust economics and industrial organization.

7. I have testified in federal and state courts and filed testimony in United States federal regulatory proceedings. I have provided testimony related to antitrust issues in a variety of cases, for both

███████████████████████████

plaintiffs and defendants. A copy of my CV, which includes my list of prior testimony, is attached hereto as Attachment A. My CV includes the cases in which I have submitted one or more expert reports and/or testified as an expert witness at deposition or trial.

8. I am being compensated at an hourly rate of $825 per hour, plus reimbursement of expenses.  In my work on this matter, I have been assisted by OSKR staff, working under my supervision and control. I have no direct financial interest in the outcome of this matter.

9. DirecTV distributes video programming primarily through satellite.  At issue in this case is a product sold by DirecTV as *NFL Sunday Ticket* ("Sunday Ticket" or "ST"). The National Football League ("NFL") is a cooperative association of its 32 teams, each of which is a "substantial, independently owned, independently managed business."[1]  Sunday Ticket is licensed by DirecTV from the NFL and provides access to live telecasts of all NFL games occurring on Sunday afternoons during regular Season, except only those games already being broadcast on local broadcast networks in any given area. Because local broadcasts are included in DirecTV's basic service, satellite subscribers who purchase Sunday Ticket have access to all Sunday afternoon NFL telecasts.[2]

10. According to the Complaint,[3] plaintiffs are all persons who fall within the definition of either of the following two Classes (collectively, the "Classes"):

> i. All DirecTV commercial subscribers ("Commercial Class") that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the present ("Damage Period").[4]

---

[1]  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196 (2010).

[2]  "Out-of-market" (or "OOM") games refers to the games shown on Sunday Ticket within each area during each week of the regular season (note that the teams and game locations included in the OOM category can vary from one location to another, and from one week to the next).

[3]  The operative complaint is Consolidated Amended Complaint, *In re Nat'l Football League Sunday Ticket Antitrust Litig.*, No. 15-ml-02668 (C.D. Cal. June 24, 2016), Dkt. No. 163 (hereinafter "Plaintiffs' Consolidated Complaint" or "Complaint").

[4]  Complaint ¶ 40. The Commercial Class excludes the Defendants and any of their current or former parents, subsidiaries or affiliates. The Commercial Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

██████████████████

      ii.    All DirecTV residential subscribers ("Residential Class") that purchased the NFL
Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011
and the present ("Damage Period").[5]

11. Plaintiffs allege that competing NFL teams, acting in concert through the NFL and with DirecTV,
have agreed to eliminate competition in the broadcasting and sale of live video presentations of
professional football games.

> "The 32 professional football teams that compete in the National Football League
> have agreed among themselves, and with DirecTV, and in concert with others, to
> eliminate all competition in the broadcasting and sale of live video presentations
> of professional football games, including specifically for purposes of this com-
> plaint, the broadcasting and sale of DirecTV's NFL Sunday Ticket service to res-
> idential and commercial subscribers …"[6]

12. It is alleged that this conduct is in violation of United States antitrust laws and has harmed every
Class member.  Plaintiffs allege that Defendants effectuated these restrictions through three sets of
interlocking agreements that capture, collectively, the allegedly anticompetitive conduct ("Challenged
Conduct"): the concerted action by the Teams (through the NFL), their broadcast partners, and
DirecTV to restrict output, raise prices, and increase profits.[7]

13. I have reached the aforementioned general conclusions based on my training and professional
experience working on matters such as this, the relevant economic literature, my investigation into the
economic evidence relevant to Plaintiffs' claims, the Rascher Report, the Butler Report[8], the materials
cited herein or in Attachment B to this report, and my analyses to date.

14. I understand that fact discovery in this case is ongoing, as is my review of the materials produced to
date. Some materials were only recently produced or had been produced by Defendants with errors – I

---

[5]    Complaint ¶ 40. The Residential Class excludes the Defendants and any of their current or former parents,
subsidiaries or affiliates. The Residential Class also excludes all judicial officers presiding over this action and
their immediate family members and staff, and any juror assigned to this action.

[6]    Complaint ¶ 1.

[7]    *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) ("[P]laintiffs'
consolidated complaint alleges that the defendants' interlocking agreements work together to suppress
competition for the sale of professional football game telecasts in violation of Section 1 and Section 2 of the
Sherman Antitrust Act.").

[8]    *See* Expert Report of Sarah Butler, August 19, 2022, filed concurrently with this report ("Butler Report").

continue to work around these shortcomings and may revise my analysis.  Consequently, the opinions I express in this report are subject to revision once this further fact discovery and my review have been completed.

## 2      Background

15.  The NFL is a sports league. The league determines the dates and locations of games, and the terms of certain financial agreements between and among teams (or clubs), each of which is a distinct business entity. The NFL has arranged for multiple NFL games to occur during two time slots on Sunday afternoons. The activities of the NFL include negotiating the sale of rights to telecasts of games.[9] By prior agreement, every NFL team assigned to the NFL the rights to telecasts of the team's non-preseason games – rights that each team could otherwise have retained for its home and/or away games.[10] The NFL secured with broadcast and cable networks several licensing arrangements related to production and distribution of those telecasts.[11]  The written agreements associated with these arrangements identify the NFL as the copyright owner of each telecast produced.[12]  The NFL further secured with Defendant DirecTV additional distribution arrangements involving live retransmission

---

[9]     *See In re NFLST Antitrust Litig.*, 933 F.3d at 1445, 1148; *see also* Plaintiffs' Consolidated Complaint, *supra* note 4, at ¶¶ 53, 81, 83

[10]    *See In re NFLST Antitrust Litig.*, 933 F.3d at 1148 (noting that "[t]he 32 individual NFL teams . . . entered into an agreement with the NFL [] to pool their telecasting rights and give the NFL the authority to exercise those rights, rather than exercising those rights individually," and that "[t]he consequence of this agreement is that an individual team cannot enter into individual agreements with networks, satellite TV providers, or internet streaming services. . . . only the NFL can enter into an agreement to sell those rights"); *see also* Plaintiffs' Consolidated Complaint, *supra* note 4, at ¶¶ 81-88

[11]    *See In re NFLST Antitrust Litig.*, 933 F.3d at 1148.

[12]    *See In re NFLST Antitrust Litig.*, 933 F.3d at 1148 ("Under the NFL-Network Agreement, CBS and Fox coordinate to create a single telecast for every Sunday-afternoon NFL game. Pursuant to that agreement, NFL owns the copyright in the telecasts." (citing registrations submitted to the U.S. Copyright Office)); *see also, e.g.,* NFL_0419932, at -995-96 (NFL Fox Sunday NFC Package Television Agreement) (████████████████ ██████████████████████████████████████); NFL_0377291, at -353-54 (NFL CBS Sunday AFC Package Television Agreement) (████); NFL_0989539, at -599-601 (NFL NBC Sunday Night Package Television Agreement) (████).

of some games.[13] The NFL ████████████████████████████████████████████████████

████████████████ [14]

16. DirecTV is a Multichannel Video Programming Distributor ("MVPD").  DirecTV is one of two direct broadcast satellite ("DBS") MVPDs, the other being DISH Network, that distribute programming primarily through satellite (when dish installation and reception is practical, otherwise digital streaming options are available).[15]  DirecTV competes against DBS providers as well as other MVPDs (such as Comcast (cable), Charter Communications (cable)) for residential and commercial pay TV customers.

17. As part of basic DirecTV subscriptions, consumers have access to the programming of the broadcast networks that produce and air live standard TV telecasts of some NFL games in the local market of each consumer into which DirecTV retransmits, including one or two live games during each of the two Sunday afternoon time slots.[16] In addition, before and throughout the Damage Period, some DirecTV subscribers obtained a "premium" service,[17] known as NFL Sunday Ticket, that included live telecasts of additional NFL games occurring during the Sunday afternoon time slots (OOM telecasts).  The Sunday Ticket product is the focus of the economic damages alleged in this legal matter.[18]

---

[13]  *In re NFLST Antitrust Litig.*, 933 F.3d at 1148.

[14]  ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

[15]  It is my understanding that most DirecTV customers receive their DirecTV programming through a satellite dish installed at the consumer's location. A smaller set of eligible consumers (college students, and some residences who cannot receive satellite signals well) can stream some or all of the programming through broadband internet services.

[16]  *See In re NFLST Antitrust Litig.*, 933 F.3d at 1148.

[17]  Here and throughout this report, "premium" service means that viewers must pay a separate fee above the platform subscription price for access to specific content.

[18]  Plaintiffs' Consolidated Complaint ¶¶ 155-63 (Claims for Relief).

18. Throughout much of the Damage Period, DirecTV has been offering two different Sunday Ticket products. Sunday Ticket Basic includes only the games. At a higher price, Sunday Ticket MAX includes additional highlight channels and streaming service.[19]

19. Throughout the Damages Period to date, only DirecTV sold an NFL premium package like NFL Sunday Ticket.

20. Computing damages in an antitrust case often involves estimating (1) the volume of business affected by the alleged anticompetitive conduct and (2) the difference between the observed prices and the prices that would have prevailed but-for the conduct. I refer to this difference, relative to the observed prices, as the "reduction factor."[20]  Typically, damages are then estimated by taking the product of these two parts: volume of business affected times the reduction factor.[21]  I develop these components – volume of business affected by the Challenged Conduct and the reduction factor – in the sections below.

# 3    Volume of Business Affected by the Alleged Anticompetitive Conduct

21. DirecTV did not produce a table identifying the number of paying NFL Sunday Ticket subscribers for each season of the Damage Period.  I have tabulated the number of NFL Sunday Ticket subscriptions purchased each season during the Damage Period, and the amount of revenue generated by those transactions, and the portion of that revenue specifically related to the basic Sunday Ticket package itself, excluding extensions or add-on products (such as the added content available through the NFL

---

[19]   *See, e.g.*, NFL_0410159; NFL_0853407, at 408. The exact makeup of the features for Sunday Ticket Max changed over the course of the Damage Period.

[20]   As early as 1906 we see this issue arise in *Chattanooga Foundry & Pipeworks v. City of Atlanta*, 203 U.S. 390, 396 (1906). More recent examples of this type of damages computation include In *re Polypropylene Carpet Antitrust Litigation, 996 F. Supp. 18 (N.D. Ga. 1997)*. The computation of reduction factor may, depending on the model, occur for multiple products or at multiple times, in which case there will be multiple reduction factors.

[21]   While this approach is typical, other methods may more accurately measure the total economic damages associated with a conspiracy in some circumstances. For example, the simple reduction factor-times-purchase amount method fails to account for potential volume effects, deadweight loss, and other adverse economic effects throughout the distribution chain. Other methods of computing damages may be able to incorporate these effects.

Sunday Ticket Max Product).  These tabulations rely on transaction data and other documents produced by DirecTV and described below.

## 3.1   Affected Purchases

22. The Residential Class includes all customers across the country who purchased NFL Sunday Ticket as part of their DirecTV satellite service.  DirecTV relies on national "list prices" for paid residential NFL Sunday Ticket within each season.[22]  My initial review of the transaction data to date indicates a large variety of service codes that are not indicative of variation in transaction prices. For example, there can be many services for the same residential list prices, depending on payment frequency and automatic renewal, etc., and there can be many service codes for post-purchase discounts related to service problems. All of these are consistent with applying the same reduction factor to all purchases.

23. During the damages period, many residential DirecTV customers entering into a commitment to subscribe to DirecTV (at a tier higher than the most basic level of service) received their first season of NFL Sunday Ticket at no additional cost. These customers did not purchase NFL Sunday Ticket during the initial free season – I do not count their subscriptions in that first season as affected commerce. Their subscriptions in the second year, if any, are counted as affected commerce. DirecTV customers who never paid for NFL Sunday Ticket are not counted as class members, as they never purchased the product.

24. The Commercial Class are establishments (such as sports bars, hotels, and casinos) who each pay to receive Sunday Ticket through DirecTV satellite transmission.  As described below, Commercial Class members bought only NFL Sunday Ticket (not NFL Sunday Ticket MAX).

25. I identified satellite subscribers to NFL Sunday Ticket using DirecTV-produced transactions data.[23]

███████████████████████████████████████████████████████████████

---

[22]   See, for example, NFL_0589091 at 182-3. DirecTV likewise relies on a rate card for commercial subscribers (see, for example, NFL_0589091 at 148).

[23]   DirecTV has produced data from two different systems: "Enabler" and "STMS".  The Enabler data is a more recent system that covers about ████████ subscriber accounts.  STMS is a legacy system, in part of which transactions were kept in a ledger system with a record for each item which may show up on a bill.  The transaction ledgers DirecTV produced in this case contains about ██████████████████████ subscriber accounts. These files show records of payments, charges and adjustments for each subscriber account. The files produced as SUBSCR_TRANSACTIONS_FROM_SUBHST1[-10].txt,

███████████████████████████████████

[REDACTED]

26. DirecTV did not supply a look-up table to determine which of its accounts were associated with commercial customers.  I identify Commercial Class members by the account types and service codes associated with commercial customers.

27. DirecTV also sold access to NFL Sunday Ticket channel content on a pay-per-day ("PPD") basis.

28. In the tables below, I display the number of NFL Sunday Ticket subscriptions purchased by class members.[25]

    i. There have been [REDACTED] affected satellite subscriptions (and PPD purchases) paid for by Residential class members during the Damage Period, from 2011 through 2021.  Of those, [REDACTED] were basic Sunday Ticket season subscriptions, [REDACTED] were Sunday Ticket Max season subscriptions or others, and [REDACTED]

---

NFL_SUBSCR_TRANSACTIONS_SUBRPT.txt  and  NFL 2018[-2020].txt are data sources for these calculations. The data and document sources support my calculations for each season from 2011 to 2020.  I have provided an estimate for 2021, projected from the values in immediately preceding seasons.

[24] The algorithm could also distinguish between full season subscriptions and (a much smaller share of) partial season subscriptions.  The current analysis does not incorporate that distinction.

[25] All Pay-Per-Day transactions are assigned to the Residential Class. The review of transaction data to tabulate subscriptions and revenues by class generated a list of account types ("ACCT_TYPE") that may include commercial accounts.  Of this list, only a few ever appear within the account types of the PPD transaction, and those constitute a de minimis share of the Pay-Per-Day transactions.

[REDACTED]

were PPD purchases.[26]  Per season, the number of Affected Subscriptions ranged
from ████████ in 2011 to ██████████ in 2015.[27]

    ii.    There have been ██████ affected subscriptions purchased by Commercial class
members during the same period.

    iii.    I have not yet conducted an analysis across seasons to determine the total number of
class members for the Damage Period. As a lower bound on the estimated number of
class members, the largest number of subscriptions in a season (prior to 2018 and not
including pay-per-day purchases) was above ██████████.

---

[26]   "Other" Sunday Ticket subscriptions include purchases of Max, To-Go (which was a satellite Sunday Ticket add-on offered in 2011), and mid-season discounted packages. For more on To-Go, see "Every NFL Sunday Ticket game, Every Sunday. Anywhere you go". Accessed on 8/4/2022 at https://web.archive.org/web/20110923153950/http://www.directv.com/DTVAPP/content/sports/nfl_online_ mobile.

[27]   The Transaction Data identify some purchases during the 2018 to 2020 period for which the descriptive label does not match the purchase date.  Although the total number of subscriptions from 2018 through 2020 is well specified in the data, the designation across each of those seasons may not be reliable.





| Year | NFL Sunday Ticket |
|------|-------------------|

Sources:
2011-2020 from produced transaction data.
2021 Estimated subscribers equal to 2020
  subscribers times growth rate
  estimated by NFL.

29. In the table below, I display the number of Paid Residential NFL Sunday Ticket subscriptions within DirecTV subscriptions (this does not include PPD purchases).



Sources:
2011-2021 from DirecTV produced transaction data.

## 3.2   Affected Revenue

30. In the tables below, I display the DirecTV revenue associated with purchases of ST subscriptions by class members.

i.





---

28   To estimate the affected commerce portion of the "other" Sunday Ticket subscriptions, I applied to the "other" Sunday Ticket MAX affected subscription quantity each year the average revenue that class members paid for basic Sunday Ticket affected subscriptions for that same year.  There was an additional amount, about ████████ that Residential Satellite class members paid for the "other" services (such as the MAX upgrade or To-Go service), but I did not include that amount in my tabulation of affected commerce.



Notes:

Sources:

2011-2020 from DirecTV produced transaction data.

2021 Estimated revenue equal to estimated subscribers times 2018-2020 average revenue per subscriber.

2021 Estimated zero Pay Per Day subscriptions or revenue.



Notes:

Sources:
2011-2020 from DirecTV produced
    transaction data.
2021 Estimated revenue equal
    to estimated subscribers times
    2018-2020 average revenue
    per subscriber.

31. In the tables below, I display affected revenue for the Named Plaintiffs.



Notes



Source

    DirecTV produced transaction data.



Notes



Source

   DirecTV produced transaction data.





Notes

Source

DirecTV produced transaction data.



Notes

Source
DirecTV produced transaction data.

# 4     The Reduction Factor

32. After measuring the volume of business affected by Challenged Conduct, the second step in computing damages in an antitrust case often involves computing the difference between the observed prices and the prices that would have prevailed but-for the illegal anticompetitive conduct.  I have used several independent methodologies to measure reduction factors in this

matter based on scenarios of competition that I understand align with removing the Challenged Conduct.

33. My first methodology used to measure reduction factor is based on DirecTV's produced transaction and viewership data (Section 4.1). I use an approach whereby reduction factors are based on a structural representation of the market process in two circumstances.[29] In the first circumstance (the "Actual" world), the outcomes are assumed to be subject to conduct that includes the Challenged Conduct. In the second representation (the "But-for" world), the outcomes are assumed to be subject to conduct that does not include the Challenged Conduct. The difference in market outcomes represents how prohibiting the Challenged Conduct in the market would have resulted in different prices (or other outcomes, such as increased quantity). A reduction factor is then estimated by the difference in (pricing) outcomes between the two market representations, relative to the actual (pricing) outcome.[30]

34. The Challenged Conduct includes joint behavior by independent producers (teams, the NFL, DirecTV, etc.). I assume that consumers seek to maximize individual utility. Using data from actual transactions (both financial transactions and television viewing), I estimate parameters that describe how the market participants achieve their objectives in a manner that fits the actual market outcomes (and the profit-maximizing and utility-maximizing assumptions). These actual market outcomes include the prices for Sunday Ticket and the amount of viewing in each geographic area, across all NFL telecasts (not just Sunday Ticket) and for each specific team. This econometric analysis relies on statistical methodology well-established in economic theory. I provide information on each step of the analysis and the final results to demonstrate the reliability of this standard modelling approach below.

35. I then use this "actual" model to simulate market outcomes when the Challenged Conduct is not part of the behavior. For this "but-for" step of the analysis, I rely on the determination of antitrust liability and theory of harm, as provided in the Rascher Report, and I assume that the Defendants' conduct

---

[29]   J. Douglas Zona, *Structural Approaches to Estimating Overcharges in Price-Fixing Cases*, 77 Antitrust L.J. 473, 475-81 (2011).

[30]   It is convenient to express reduction factors as percentages, equal to the difference in price (Actual minus But-for price) divided by the Actual price.

changes so as not to cause the identified harm. I continue to assume that consumers seek to maximize individual utility. The "but-for" simulation then identifies market outcomes that include "but-for" prices for Sunday Ticket (or comparable telecast access) that are lower than the actual prices. This difference identifies the reduction factor for each Affected Subscription purchased during the Damage Period. This simulation methodology is also well-established in economic analysis.

36. The use of econometric modelling to estimate demand and then simulate market outcomes is a standard approach for assessing price and other market outcomes in alternative competitive scenarios.[31]

37. The second methodology to measure reduction factors is based on an analysis of DirecTV's unilateral economic incentive to offer ST as a product included as part of a tier, rather than as a premium product (Section 4.2).   The third methodology is based on an econometric analysis of the NERA survey data (Section 4.3).  Finally, I look at supporting evidence from the NFL's own surveys and analysis (Section 4.4).

## 4.1   Transaction and Viewership Analysis

38. Market outcomes are determined by the confluence of three factors: demand, costs and competitive interaction.  For this analysis, I use DirecTV's produced transactions data to construct an econometric model of demand for DirecTV and ST services.  An econometric model of demand, with an assumption of profit maximization can be used to compute implied costs – costs that are consistent with observed pricing as profit maximizers.  Finally, alternative competitive scenarios, with the measured demand model from the transactions data and costs can be used to compute market

---

[31]  For example, the U.S. Department of Justice used this methodology in the Worldcom-Sprint Merger.  See *ABA Section of Antitrust Law, Econometrics*, Legal, Practical and Technical Issues, 2005, pp. 422-6. With respect to the econometric models, see Henri Theil, A Multinomial Estimation of the Linear Logit Model, 10 International Economic Review, 1969, p. 251, and Daniel L. McFadden, Prize Lecture, Dec. 8, 2000: "This Nobel lecture discusses the microeconomic analysis of choice behavior of consumers who face discrete economic alternatives." "I called this a *conditional logit model* since in the case of binomial choice it reduced to the logistic model used in biostatistics, and in the multinomial case it could be interpreted as the condition distribution of demand given the feasible set of choice alternatives *C*. Today, [it] is more commonly called the *multinomial logit* (MNL) model…". Accessed on 8/18/2020 at https://www.nobelprize.org/uploads/2018/06/mcfadden-lecture.pdf.

███████████████████

outcomes under these various competitive scenarios.  Reduction factors can be measured as the difference in price between the actual price and the outcomes (relative to the actual price) from various competitive scenarios.

### 4.1.1    Demand for NFL Sunday Ticket and Other Bundles of NFL Game Telecasts

39. This section describes my econometric analysis of transaction and viewership data (provided by DirecTV) to characterize DirecTV's customers' demand for Sunday Ticket.

40. This analysis proceeds as follows. First, I measure different NFL game telecasts, estimating the value of each team in different geographic areas (DMA) based on how the teams participating in the game affect viewing.  Next, I measure the "take rate" for NFL Sunday Ticket from DirecTV in each available zip code depending on the price of the subscriptions, the value of the telecasts that Sunday Ticket provides to that geographic area relative to the standard television alternatives and other factors which vary across zip code areas or factors that are common across zip codes but vary over time.  The third step is to measure the "take rate" for the DirecTV platform in each zip code, depending on a price index for DirecTV platform access, the value of the available NFL Sunday Ticket alternative (including the effect of price) and other factors which vary across zip code areas or factors that are common across zip codes but vary over time.

41. When the process described above is complete, the econometric model can be used to calculate how many households in a particular geographic area (such as the United States) would purchase Sunday Ticket from DirecTV at various prices. I confirm the accuracy of those calculations with standard econometric measures, including verifying that the predicted quantities of subscriptions at actual prices deviate from actual quantities only by a small percentage.  The model can also be used to determine how many households across the country subscribe to DirecTV at a given price for the platform, and at a given price for NFL Sunday Ticket.

42. Economic theory presumes that the choices consumers select from among of set of available alternatives are the choices in the set that they expect will provide them with the greatest utility, or

value.[32]  DirecTV subscribers who consider purchasing NFL Sunday Ticket versus not purchasing it, would consider the value of the additional games that it provides in terms of the viewing options, net of the price required to be paid for NFL Sunday Ticket. Similarly, television-viewing households who consider purchasing satellite service, cable service, or other methods to be able to watch television programming would consider the value of the programming each service makes available, including the value of having the option to purchase additional premium services, such as NFL Sunday Ticket.

### 4.1.2    The Value of NFL Game Telecasts

43.  Consumers' patterns of viewing from among the available choices of games reveal the value, from the perspective of consumers, that OOM telecasts add to what is already available on standard television.  The games that are the most viewed among a set of potential viewers are the games that are, on average, the most valuable to provide to that set of potential viewers.  More generally, the various shares of viewing times that arise among the games that a set of potential viewers can access demonstrate the relative value each of those games provide, on average, to that set of potential viewers.  Economists have a standard method to measure such valuations empirically.[33]

44.  One set of potential NFL game telecast viewers whose viewing habits can demonstrate the values of different NFL game telecasts are DirecTV subscribers in the United States.  Within that set is a subset for which DirecTV has produced detailed viewing data.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

---

[32]  This concept is known as "revealed preference" i.e., that when consumers choose among available options, they reveal their preference among those options by their choice.

[33]  The standard methodology used in this analysis is called multinomial logit ("MNL").

[34]



███████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████

46.  Viewers will choose to watch a live NFL telecast if the value of watching (net the lost value of what
it cost to access the program) exceeds other alternatives at the time.[35]  Under the concept of revealed
preference described above, relative viewership is an indication of relative utility.[36]  This means
viewership data can be used to estimate the parameters measuring relative utility.  The sample of
viewership data used here is all DirecTV subscribers in the Viewership data provided by DirecTV,
some of whom are ST subscribers who have additional NFL games available to them on Sundays.
This can be accomplished with a standard ordinary least squares ("OLS") regression.[37]  Because team
preferences can be expected to be location specific, I estimate separate models for each location
(DMA) using only the NFL telecast viewing choices for that location.[38]

---

██████████████████████████████████████████  For known free days see the following tweets by DirecTV. Accessed on
July 8, 2022. https://twitter.com/DIRECTV/status/1038441077622104065;
https://twitter.com/DIRECTV/status/1061677200011862018;
https://twitter.com/DIRECTV/status/1170411469957160962;
https://twitter.com/DIRECTV/status/1304820482005499904. The additional days I set aside as "free" days for
this purpose are days when there is a large amount of viewing relative to regular season weeks.

[35]  Formally, with ai and aj the utility of watching team i and j, respectively.  And βpij the disutility of having to pay
pij to watch, if payment is required, the utility of watching a telecast of team i play a game against team j if the
price charged is pij is:

$$a_i + a_j - \beta p_{ij} + \varepsilon$$

[36]  An OLS regression describes a line that explains the variation of a dependent variable with a linear function of
independent variables and estimated coefficients (parameters) and results in the lowest (least) sum of squared
errors (squares). Formally, denoting viewership (in total hours) of a game between team i and j as Vij, if two or
more NFL telecast games are available at the time and in that location, under the assumptions of the model,
the relative viewership for the available games for each of the pairs of games available at that time and in that
location is

$$ln\left(V_{ij}\right) - ln(V_{kl}) = a_i + a_j - (a_k + a_l)$$

[37]  The dependent variable is the logarithm of the ratio of viewership times, and the explanatory variables are a
series of indicator variable for which teams are part of the telecasts.

[38]  I conducted the analysis using 2018 viewing data.  Within the span of the viewership data, 2018 is closest to
the midpoint of the damage period and the period of the subsequent econometric analysis.  2018 is also less

████████████████████████████████████████

47. In the table below, I display some summary statistics for goodness of fit for each of the estimated
models of the first, alphabetically, 25 DMAs.  The identity of teams involved in each game in the
regression, with no other information, explains about █████████ of the viewership quantity.

---

affected by known data errors in the viewership data (such as missing teams).  Every observation in each
regression is a pair of games in the same telecast window: the highest viewed game in the window and one of
the other games in the window.  The windows with only one game provide no choice information and do not
enter into the model. For each DMA, there are about ten pairs of games each week of a 17-week season,
almost always occurring during one of the two Sunday afternoon telecast windows.  The 32 team value
parameters for each DMA are based on about 170 observations of viewing choice (10 pairs of games times 17
weeks).



48. From this, it is possible to identify the top three teams within each of the DMAs, based on the value estimated for each team in each DMA.



49. Any "bundle" of NFL telecasts provides the viewer with access to live telecasts of any of the teams included in the bundle – in other words, it allows the viewer to obtain the value (estimated, by DMA, for the viewers in the regression sample) for each of the teams in the bundle.  Each week during the NFL season, certain games are available to be viewed, with utility depending on location.  A viewer would allocate their time and choose their favorite among those available, which feeds into the overall market demand.

### 4.1.3    The Value of the NFL Sunday Ticket Package

50. Based on the results of the prior section, the expected utility of viewing (or having the option to view) ST each week can be computed as: the sum of the value of viewing each week, net of the value of the price paid.  The value of ST and the games carried on standard television or over-the-air ("OTA") is based on the games that are included and available under each of these packages in each DMA.[39]

51. To calculate these expected utilities, I first consider the value of NFL Sunday Ticket to DirecTV subscribers.  The share of NFL Sunday Ticket subscribers among DirecTV subscribers in a given location, which is equivalent to the probability a DirecTV subscriber choses ST over standard television, is simply the probability that the value of the ST games, net the cost of ST, is greater than the value of the games available on standard television.[40]  Although the formula for share is messy, the logarithm of shares (the log odds ratio) is linear in parameters, which makes it possible to estimate the parameters of the model using simple ordinary least squares.[41]

---

[39] The schedule of games available by location is based on map data available on 506sports.com. In these models, the scheduling of games and availability of sponsored vs. premium (Sunday Ticket) telecasts is taken as fixed and known (in expectation) at the time of the consumer decisions. Subscription demand also can be an input into telecast scheduling and determination of telecasts rights packages, but that is not modelled here.

[40] Formally, under the multinomial logit framework, and with $p$ as the price of the Sunday Ticket package, the probability or share, $S$, of DirecTV subscribers in location $i$ at time $t$, is determined by $V_{st}$, the (expected) utility of the package of ST games, relative to the $V_{ota}$, the (expected) utility of the package of over the air games, as influenced by parameters (theta and beta) that measure the effect of the utilities and the price:

$$S_{it}^{ST} = \frac{\exp(\theta V_{it}{}^{ST} - \beta p)}{\exp(\theta V_{it}{}^{ST} - \beta p) + \exp(\theta V_{it}{}^{OTA})}$$

Using $Diff_{it} = V_{it}{}^{ST} - V_{it}{}^{OTA}$, then

$$S_{it}^{ST} = \frac{\exp(\theta Diff_{it} - \beta p)}{\exp(\theta Diff_{it} - \beta p) + 1}$$

[41] Using DirecTV transaction data, I have identified the share of DirecTV subscribers who chose to purchase ST.  I can construct the logarithm of shares, which leads to the linear equation required to estimate the parameters:

$$\ln\left(\frac{S_{it}^{ST}}{1 - S_{it}^{ST}}\right) = \theta Diff_{it} - \beta p$$

52. In the table below, I present the estimates of the parameter of the model.[42]  The model is a linear
regression with fixed effects for each ZIP Code, to control for factors that differ across locations but
are constant over time within an NFL season.[43]  I also include fixed effects for each year, to control
for factors which are constant across locations but vary from one NFL season to the next.[44]  The
model explains over 90 percent of the variation in Sunday Ticket subscription quantity.

███████████████████████████████████████████████████

---

[42]   The data in the regression span about 25,000 ZIP codes across seven years.  I do not include data from 2019
and 2020, for which the transaction data do not always correctly identify the year of the subscription.

[43]   See, for example, William H. Greene, <u>Econometric Analysis</u>, 3rd Edition, 1993, pp. 615-623.

[44]   Sunday Ticket price in this analysis is the list price for basic Sunday Ticket, applicable across all ZIP codes. For
technical reasons, the regression model will drop out variables that bring no additional information into the
model. In this case, the fact that the price variable only changes from year to year, and not from location to
location, means that having all of the flags for every year is unnecessary – there is one extra flag that brings no
new information. So, absent cross-sectional variation, the prices are an exact linear combination of the year
fixed effect flags, and the model automatically drops any unnecessary flag (for 2018).

███████████████████████████████████████

**Exhibit 12: Estimation results for Sunday Ticket Value**



53. Similar to computing the value of a telecast or package of telecasts, a formula for the value of NFL
    Sunday Ticket for continuing DirecTV customers can be computed from the estimated model, for
    each DMA, or zip code.

### 4.1.4    The Value of a DirecTV Subscription

54. For the next step, I have estimated a model of DirecTV subscription choice which is based on
    whether a household subscribes to DirecTV.

55. In a manner similar to the previous components of the analysis, whether or not a household chooses
    to become a DirecTV subscriber depends on the value of the services that the household would get
    access to with such a subscription.  A DirecTV subscriber would get the choice of whether to
    subscribe to ST as part of that subscription (and, for some it would be included for free for a season).

The value of access to ST can be computed based on the prior results.  Like new DirecTV subscribers, the value of subscribing to DirecTV and the services involved can be computed based on the actual penetration of DirecTV subscriptions.

56. This step of the analysis requires a consideration of prices that DirecTV charges for subscriptions DirecTV has a variety of subscription tiers (with some changes during the course of the Damage Period), ranging from the most basic (and least expensive) select Package to the most substantial (and most expensive) Premier package.  Exhibits 13 and 14 show the details of tier prices and subscriber quantities.



Notes

Sources
Package pricing from publicly available sources.



Source
DirecTV produced transaction data.

57. With this information on DirecTV service tier prices and subscriptions, I calculate a price index for DirecTV tier services.

58. In the table below, I present the estimates of the parameter of the model.  The model includes fixed effects for each zip code, to control for factors which differ across locations, but are constant over time.  I also include fixed effects for each year, to control for factors which are constant across locations but vary over time.[45]  The model explains over 98 percent of the variation in Sunday Ticket subscription quantity.

---

[45]   In the example shown here, the regression only includes years after DirecTV changed their pricing model to bring substantially different services into the tiers as opposed to a la carte. See for example, "DIRECTV's New All-Included Plans: Are They Better?" Accessed on August 17, 2022 at https://www.digitalfind.net/direct-tv/all-included-pricing.



### 4.1.5   Using the Estimated Model to Calculate Demand

59. Demand for NFL Sunday Ticket at existing prices can be calculated using the model developed above. Given the schedule of games by DMA and prices for ST, the value of the ST option and the subsequent value for DirecTV can be computed. Given the number of households and prior DirecTV subscribers in each zip code location, these terms allow the computation of i) the number of DirecTV subscribers, and ii) the number of paid ST subscriptions from new and existing DirecTV subscribers. These can be computed for each zip code and summed across all locations to get aggregate demand for ST.

60. To verify the predictive accuracy of the model, I estimated quantity of Sunday Ticket and DirecTV subscriptions at the list prices for 2018 and compared the results to the actual subscription quantities. The results are shown as part of the summary table in section 4.1.8.

61. Demand for NFL Sunday Ticket from DirecTV can be computed at a given different price, allowing me to calculate an elasticity of demand by comparing the change in demand associated with the amount of a price change. The elasticity of demand will reflect the substitution inherent in households changing their rate of subscription to DirecTV to reflect the new price.

**Exhibit 16: Elasticities of quantities with respect to prices.**



62. I use this elasticity to impute costs.

## 4.1.6 The Nature of Costs in Supplying NFL Sunday Ticket

63. The second component in determining market outcomes is the nature of costs. If profit is maximized, then prices are set in relationship to marginal costs.[46] Generally, marginal costs are not observable and must be estimated.

[47]

---

[46] Marginal cost is the relevant cost concept. It is the increase in cost associated with producing one more unit, on the margin.

[47] The NFL has estimated financial data for DirecTV that imply a small marginal cost. I do not use that estimate here, because the actual behavior of market participants gives us more information. However, I discuss the NFL estimates in the later section on the NERA Survey analysis, Section 4.3.

65. Implied marginal costs can also be computed from the econometric demand model.  With the assumption that DirecTV is maximizing profits, then the observed price is at the point that achieves the maximum profit for some value of marginal cost.  I use that relationship to estimate marginal costs.  The model can forecast demand for ST and DirecTV revenue as a function of the actual ST price and DirecTV prices at any point in time during the Damage Period, and the selected marginal costs ensure that those actual ST and DirecTV prices are profit-maximizing.[48]

### 4.1.7    The Nature of Competitive Interaction

66. For my model of the <u>actual</u> market transactions, I have assumed that DirecTV is the exclusive supplier of OOM access in the actual world.  This is an outcome of the Challenged Conduct, which prevents alternative OOM products.

67. I can then use the model to examine the effect of various alternative kinds of competition, which will imply different market outcomes. The competitive interaction enters the model by making available alternative packages of OOM access (all OOM, Team access, etc.) from alternative providers.

### 4.1.8    But-for Simulations

68. The Actual, or "status quo," version of the simulation limits OOM access to Sunday Ticket on DirecTV. With these settings, the simulation returns results that reflect the actual world – the shares of households subscribing to DirecTV align with actual shares, and the portion of DirecTV customers that purchase Sunday Ticket.

---

[48] I select marginal costs by examining how minor variations in price affect profit for different selections of marginal costs. When the right marginal costs are selected, variations in price only reduce profit – hence, the prices are profit-maximizing. The estimated value of marginal cost for NFL Sunday Ticket that aligns with the actual price being profit-maximizing is ███████  As I understand it, ███████████████████████████ █████████████████████████████████████ To the extent that this impacts DirecTV pricing, the marginal cost estimate would be biased upward. ████████████████████████████████ ███████████████████████████ This means that even a small marginal cost would be carried only by the revenue from the portion of NFL Sunday Ticket subscribers who are paying for the service – a practice that reflects the absence of competing OOM options. In consideration of these factors, an adjustment of dividing the imputed parameter ██ provides a more accurate estimate of marginal cost for determining the profit-maximizing NFL Sunday Ticket price on DirecTV in the presence of competing OOM options and for determining the profit-maximizing price of products competing with NFL Sunday Ticket on DirecTV. The parameter of ██ generally reflects the number of free and paid ST subscriptions per paid subscription during the relevant period.

Highly Confidential – Subject to Protective Order

69. To verify the simulation, I estimated the profit-maximizing price and quantity of Sunday Ticket subscriptions as a premium product exclusively distributed by DirecTV (the actual world) for 2018. The actual and simulated results are shown in the table below:



### 4.1.8.1 Direct-To-Customer OOM Bundle

70. An alternative scenario retains NFL Sunday Ticket on DirecTV, but also provides NFL Sunday Ticket as a Direct-to-Consumer (DTC) option (not purchased from DirecTV). With just one provider setting its own profit-maximizing DTC price, DirecTV's profit-maximizing price for NFL Sunday Ticket ████████████████████[49] With additional content suppliers providing NFL Sunday Ticket as a DTC option, DirecTV's price for NFL Sunday Ticket would drop even more.  For example, with three additional content suppliers providing Sunday Ticket as a DTC option, DirecTV's profit-maximizing price drops by ██████████.

### 4.1.8.2    Additional Direct-To-Customer Team Packages

71. Another alternative scenario retains the Sunday Ticket option on DirecTV and adds one DTC option, while also providing the DTC option to obtain Team-specific packages.[50] Here, I have simulated

---

[49] ████████████████████████████████████████████████████████ Furthermore, DirecTV's NFL Sunday Ticket share would increase. This is due to the change in DirecTV pricing behavior when the Challenged Conduct is removed – DirectTV no longer prices NFL Sunday Ticket as if there were a high marginal cost for the product.

[50] For restricted sets of competitive offerings, such as limited specific Team packages, it can be the case that the competing packages draw quantity from NFL Sunday Ticket on DirecTV with less influence on Sunday Ticket price. This can occur when the customers interested in the Team packages are the marginal Sunday Ticket customers with the least demand for Sunday Ticket. When those customers all have Team packages to purchase, DTV may not attract them back to Sunday Ticket with only a modest price drop. In economic terms, the nature of competition can change the elasticity of NFL Sunday Ticket demand.  However, as I understand

Highly Confidential – Subject to Protective Order

including direct-to-customer team packages supplied by the Dallas Cowboys, the Pittsburgh Steelers, and the New England Patriots.  With one other provider of OOM access and these three teams, the simulated price that DirecTV would charge for NFL Sunday ████████████ from the Status Quo scenario (relative to a ████████████████ absent the three team packages).[51]

**Exhibit 18: Reduction factors – reduction in DirecTV's NFL Sunday Ticket simulated price**

| Scenario | Challenged Conduct | NFL Sunday Ticket Price |
|---|---|---|
| Status quo | Yes | ██ |
| 1 Other DTC | No | |
| *Change* | | |
| | | |
| Status quo | Yes | ██ |
| 3 Other DTC | No | |
| *Change* | | |
| | | |
| Status quo | Yes | ██ |
| 1 Other + 3 Team DTC | No | |
| *Change* | | |

## 4.2   Facing competition, DirecTV makes NFL Sunday Ticket available on tiers

72. This section describes an approach to estimating prices that class members would pay if DirecTV chose to make access to Sunday Ticket as part of its regular service tiers. With the Challenged Conduct, DirecTV does not currently have this choice.[52]

---

it, there is no liability finding consistent with such restricted sets of competitive offerings (meaning that, the modest competition from team packages and only DirecTV would distribute NFL Sunday Ticket, and only as a premium product).

[51] Some of the reduction factor of ██████ is due to the adjustment to marginal cost necessary when DirecTV faces competition for the NFL Sunday Ticket product, and some is due to the competitor.

[52] I do not undertake an econometric analysis of the college football model described by Dr. Rascher in his report. This analysis I provide here, however, is consistent with his conclusion that broad distribution across all or most television subscribers is economically rational. In the model here, DirecTV imposes a charge on its

Highly Confidential – Subject to Protective Order

73. The agreements between NFL and the Networks airing Sunday afternoon games (CBS and Fox)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

74. I assume that DirecTV chooses a price to maximize its own p████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████

75. The demand relationship between Sunday Ticket price and subscription quantity depends on the
number of available alternatives to Sunday Ticket.  The Challenged Conduct ensured that there are no
direct NFL OOM telecast alternatives. The constrained profit-maximizing price that DirecTV chooses
for its stand-alone product, and the resulting profit, is contingent on that Challenged Conduct. The

---

subscribers for the additional NFL programming, whereas in Dr. Rascher's analysis, the television networks
impose charges in the form of changes to their carriage rates to MVPDs, including DirecTV. Because carriage
rates are marginal costs to MVPDs, they may be passed through to consumers as increases in the prices of the
tiers on which those channels are carried. The most relevant difference, economically, between these two
analyses is that, in my model, DirecTV can only spread the cost of the programming across its own subscribers,
but the networks can extract carriage fees from all pay television subscribers.

[53] See, for example, NFL_0458529 at 8542.

[54] The "price" to be determined by DirecTV includes the Sunday Ticket basic and MAX price, the partial season
price, etc., and can also include the price of DirecTV itself.

████████████████████████████████████

profit that flows to DirecTV because of that Challenged Conduct ███████████████████
███████████████████ [55]

76. Absent the Challenged Conduct, DirecTV faces a different type of demand for Sunday Ticket (and for
    its overall service platform) and, consequently, DirecTV would choose a lower constrained profit-
    maximizing price for the stand-alone product.  Competition from NFL OOM access outside of
    DirecTV reduces demand for Sunday Ticket on DirecTV and the ███████████████████
    ███████████████████████████████████████████████████████████
    ███████████████████████████████████  In other words, at a sufficient level of
    competition, ███████████████████████████████████

77. ██████████████████████████████████████████████  it would be up to
    DirecTV to choose between (1) including Sunday Ticket in one or more of these tiers, and (2)
    offering ST as a stand-alone product. The profits available under these two strategies would dictate
    DirecTV's unconstrained profit-maximizing choice.

78. For example, if 1) DirecTV's constrained profit-maximizing choice is a price for NFL Sunday Ticket
    that results in 10 percent of all DirecTV subscribers choosing to also get NFL Sunday Ticket
    subscriptions, and 2) DirecTV's unconstrained choice is to place Sunday Ticket on every tier of
    DirecTV service (███████████████████, then DirecTV is able attract more
    subscribers and/or increase its prices across all service tiers. Distributing the revenue from NFL
    Sunday Ticket across 100 percent of DirecTV subscribers means much lower revenue per subscriber
    (much lower price) than the stand-alone premium NFL Sunday Ticket price.  If, in this example,
    DirecTV increased the service tier prices exactly enough to recoup the stand-alone Sunday Ticket
    revenue and kept the same number of DirecTV subscribers, then the reduction factor would be about
    █████████ [6]  In the full analysis, DirecTV incorporates into its decision any loss of DirecTV
    subscriptions consequent to raising the prices of service tiers.

---

[55] In economic terms, this is a way of stating that ███████████████████████████████
███████████████████████████████

[56] In the event that the change in distribution is accompanied by a change in fee structure (from a flat fee to a
carriage fee per subscriber), the portion of increased carriage cost that DirecTV passes along to subscribers
similarly determines the reduction factor.

79. Exhibit 19 demonstrates an estimated service tier price increase that would cover DirecTV's direct profit from selling a stand-alone Sunday Ticket profit each year.[57] The table shows the number of subscribers on DirecTV and the smaller number of NFL Sunday Ticket subscribers and the corresponding revenue.  Dividing the NFL Sunday Ticket revenue by the larger number of DirecTV subscribers, and then adding the estimated accounting marginal cost, produces a "profitable monthly price." This is the amount by which DirecTV would need to increase its monthly tier prices to compensate for the foregone NFL Sunday Ticket subscription revenue. That price increase is lower than the NFL Sunday Ticket price (across 12 months) – this leads to the reduction factor.

---

[57]   I note that, as a stand-alone product, DirecTV incurs a small marginal cost per customer to supply Sunday Ticket. However, with Sunday Ticket as part of the regular service package, DirecTV would incur a lower marginal cost per customer: DirecTV could obtain cost efficiencies by bringing the Sunday Ticket services into its regular operations spread across all customers, and not all DirecTV subscribers would choose to use Sunday Ticket (and, thus, would not create any marginal cost). █████████████████████████████████████
███████████████████████████████████████████████████████████

███████████████████████████████████



Notes:

Sources:
2011-2021 from DirecTV produced transaction data.
2021 NFL Sunday Ticket satellite subscribers estimated

2021 NFL Sunday Ticket satellite revenue estimated to be equal to estimated subscribers times 2018-2020 average revenue per subscriber.

80. The more competing NFL OOM alternatives available for DirecTV subscribers to consider, the lower the but-for price and the higher the reduction factor. Competing OOM providers drive down the price of NFL Sunday Ticket and, all else equal, the share of DirecTV customers paying for NFL Sunday Ticket. Thus, there is a lower amount of foregone revenue to recoup.

81. The market simulations I present based on survey response in Section 4.3 provide estimates of the revenue and quantity changes, including changes in DirecTV subscription, that are relevant to the above discussion.

- First, having NFL Sunday Ticket available for all DirecTV subscribers increases the desirability of DirecTV and increases its market share from ░░░░░░░░░░ This is a ░░░░░░░ increase in subscribers to DirecTV. The attractiveness of NFL Sunday Ticket on all tiers falls off if DTC

providers are available, so the increase for DirecTV also falls off: ████████ if there is one DTC provider, and ████████ if there are also DTC team providers.

- A price increase by DirecTV would lower subscriptions. ████████████████████████ ████████████████████████████████

- This shows that the price increase contemplated in the analysis above does reduce quantity of DirecTV subscriptions, but that is more than offset by the increased demand for DirecTV when NFL Sunday Ticket is not ████████████

82. As shown by the reduction factor of ████████ on the ████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████████ This leads to a reduction factor range of ████████████

## 4.3   Conjoint Analysis and Simulation

83. This section describes a different set of empirical analyses I performed on the data produced in this case: a conjoint analysis using survey data to evaluate consumer demand for Sunday Ticket and simulate alternative OOM package supply not currently available, in the context of alternative platform choices (satellite, cable, streaming).

### 4.3.1   NERA Survey

84. The data used for conjoint analysis consists of choice selections from about 1,000 respondents in a survey ("NERA survey") designed and implemented by Sarah Butler, as requested by counsel for Plaintiffs (see Butler Report).  Each survey respondent faced 15 different "choice sets" including four out of five different access packages, described as 1) All Access Plus (similar to Sunday Ticket Max), 2) All Access (equivalent to basic Sunday Ticket), 3) Team Access for the respondent's unspecified preferred team, 4) Team Access for a specific Team assigned in the survey, and 5) Single Game Access.  I analyzed the cleaned and unweighted data from those choice set responses.

85. Much like a data set of market transactions, the survey responses provide a set of consumer selections among a variety of available competing products with different characteristics and specific prices.  As such, the tools that economists use to estimate parameters of demand with transaction data can also be used to measure parameters of demand with survey data, and then simulate changes in profit-maximizing prices between the Actual world and BFW scenarios.

86. The survey data is complementary to the viewership and transaction data provided by DirecTV that I also used in the analysis of demand and subsequent simulation in section 4.1.  The survey poses choices among a variety of but-for alternative packages of OOM telecasts, most of which do not occur in the actual word.  The survey data incorporate information from customers who are not DirecTV or Sunday Ticket subscribers, as well as some who are.  However, the survey data have fewer data points than actual transactions and survey responses do not always match actual choices.  For these reasons, the precision and range of results from survey data may differ from the precision and range of results from the DirecTV data.

## 4.3.2    Demand for OOM Access on MVPDs

87.   My conjoint analysis model specifies choice sets with a function that relates the probability of choice to the features available and the price for each choice.  The function used here is Multinomial Logit.  I estimate regression parameters that result in estimated probabilities with the best fit to actual choices, based on responses.  The method for finding the parameter estimates here is Maximum Likelihood.

88. This analysis arranges the five various survey choices: 1) All Access, 2) All Access Plus, 3) Team Access Preferred, 4) Team Access Assigned, and 5) Single Game Access, for access to NFL telecasts into a hierarchy of nests:

- Choose to buy OOM access or not buy OOM access

  o  Choose Package Access or Single Game Access

    ▪  Choose All Access Package or Team Access Package

      •  Chose Team Preferred or Team Assigned

      •  Choose All Access Plus or All Access

89. The parameter estimation proceeds from the bottom upwards. The parameters for a specific choice set result in an estimated utility value that consumers gain from having that choice available to them (a "logsum" calculation).  Then, additional choice sets can "nest" the original choice set by making that value (the logsum) be part of the choices.

90. The basic modelling strategy is use of a Nested Multinomial Logit Model to model substitution across different types of packages.[58]  Similar packages or similar types of access may be closely related by the nesting structure, while other options that are not as closely related are nested further away.

### 4.3.2.1 All Access Nest

91. The first nest is a binary choice between two packages labelled in the survey as "All Access" – All Access, which I will refer to as "All Access Basic" (for clarity), and "All Access Plus". Estimating the model for this nest requires using only the responses that identified one of these two packages as the preferred selection.[59] The explanatory variables are: package price (with coefficient "season_price") and a dummy for AA Plus (with coefficient "plus"). The results are shown below:

**Exhibit 20: Regression results for All Access Nest**

```
Conditional (fixed-effects) logistic regression        Number of obs =  5,166
                                                        LR chi2(2)    = 166.52
                                                        Prob > chi2   = 0.0000
Log likelihood = -1707.1409                             Pseudo R2     = 0.0465
```

| qty | Coefficient | Std. err. | z | P>\|z\| | [95% conf. interval] | |
|---|---|---|---|---|---|---|
| season_price | -.0050557 | .0004798 | -10.54 | 0.000 | -.0059962 | -.0041152 |
| plus | .3395007 | .0701267 | 4.84 | 0.000 | .2020549 | .4769466 |

---

[58] See e.g. Moshe Ben-Akiva and Steven R. Lerman, "Discrete Choice Analysis: Theory and Application to Travel Demand", MIT Press, 1985, pp. 285-299.

[59] The econometric model here and in other nests regresses the respondent's choice (1 equals "yes" to choosing the selection and 0 equals "no" to choosing the selection) on a logistic function of xB, where xB is the sum of each of the regressors and each of the corresponding parameter estimates.

92. The result of the calculation of the logsum for this nest is called "aalogsum."  It is a function of the available All Access packages and their prices. A higher logsum is better, from the consumer perspective, and reflects better choices and/or a lower price. I describe how this estimated measure of value called "aalogsum" feeds into the Package nest in a subsequent subsection, immediately after I describe the Team Access Nest.

### *4.3.2.2 Team Access Nest*

93. The second nest is a binary choice between two packages labelled in the survey as "Team Access" – 1) "Team Access – Preferred", in which the respondent can choose all games for any single team, and 2) "Team Access – Assigned", in which the respondent can choose all games for a specific team assigned in the survey.  These packages do not currently exist for NFL games in the actual world.[60] Estimating the model for this nest requires using only the responses that identified one of these two packages as the preferred selection.  The explanatory variables are: package price (with coefficient "season_price") and a dummy for Team Access – Assigned (with coefficient "assigned").  The model also incorporates fixed effects for three categories of teams: high, medium, low. The results are shown below:

---

[60]   It is my understanding that the NBA and MLB do provide team access packages.

**Exhibit 21: Regression results for Team Access Nest**

```
Conditional (fixed-effects) logistic regression        Number of obs =  6,398
                                                       LR chi2(4)    = 770.23
                                                       Prob > chi2   = 0.0000
Log likelihood = -1832.261                             Pseudo R2     = 0.1737
```

| qty | Coefficient | Std. err. | z | P>\|z\| | [95% conf. interval] | |
|---|---|---|---|---|---|---|
| season_price | -.0072097 | .0009197 | -7.84 | 0.000 | -.0090123 | -.0054072 |
| assigned | -1.333367 | .0775074 | -17.20 | 0.000 | -1.485279 | -1.181456 |
| team_high | .6960591 | .0983053 | 7.08 | 0.000 | .5033843 | .8887339 |
| team_mid | .2941122 | .1074996 | 2.74 | 0.006 | .083417 | .5048075 |

94. The result of the calculation of the logsum for this nest is called "tplogsum".  It is a function of the available Team Access packages and their prices.  As with the earlier logsum ("aalogsum"), this "tplogsum" captures how consumers value better choices and/or a lower The next subsection describes how tplogsum feeds into the Package nest, along with aalogsum from the previous section.

### 4.3.2.3 Package Nest

95. The third nest is a binary choice between the first two nests.  Here, the model specifies a choice between the All Access nest or the Team Access nest, having already estimated how to estimate consumers' values for each of those two nests, as captured by the values of "aalogsum" and "tplogsum". The All Access nest has value that derives from the packages available within it: either All Access Plus or All Access Basic (or both or neither) and the package prices.  The actual survey specifies each element of this nest and, with the previous results, this leads to a value for aalogsum. Similarly, the Team Access nest has value that derives from the packages available within it: either Team Access – Preferred or Team Access – Assigned (or both or neither) and the package prices. The actual survey specifies each element of this nest and, with the previous results, this leads to a value for tplogsum.

96. Estimating the model for this nest requires using only the responses that identified one of the four access packages (All Access Plus, All Access Basic, Team Access – Preferred, Team Access –

Assigned) as the preferred selection.  The explanatory variables are: aalogsum, tplogsum and a
dummy for Team Access (with coefficient "team"). The results are shown below:

**Exhibit 22: Regression results for Package Choice Nest**

```
Conditional (fixed-effects) logistic regression        Number of obs = 16,058
                                                       LR chi2(3)    = 672.57
                                                       Prob > chi2   = 0.0000
Log likelihood = -5228.9934                            Pseudo R2     = 0.0604
```

| qty2 | Coefficient | Std. err. | z | P>\|z\| | [95% conf. interval] | |
|---|---|---|---|---|---|---|
| aalogsum | .5051669 | .0561578 | 9.00 | 0.000 | .3950997 | .6152341 |
| tplogsum | .8993796 | .0490073 | 18.35 | 0.000 | .803327 | .9954321 |
| team | .4670885 | .0950586 | 4.91 | 0.000 | .2807771 | .6534 |

97. The result of the calculation of the logsum for this nest is called "pklogsum". It is a function of the
values of the two package access nests, with their respective available access packages and their
prices. In the next subsection, I describe how pklogsum feeds into the Access Type nest.

### *4.3.2.4 Access Type Nest*

98. The fourth nest is a binary choice between the two types of access – 1) a package of games over the
course of the whole season, as captured by the Package nest, or 2) each single game available at a per
game price, as captured by the "Single Game" choice in the survey.  Here, the model specifies a
choice between the Package nest, having already estimated how to estimate consumers' values for the
various package options feeding into this nest, or the Single Game choice.

99. The Package nest has value that derives from the packages available within the two branches inside
the nest, All Access or Team Access (or both or neither) and the corresponding package prices.  The
actual survey specifies each element of this nest and, with the previous results, this leads to a value
for pklogsum. The Single Game choice has a price.

100.    Estimating the model for this nest requires using only the responses that chose to buy some type
of access, rather than "none of the above."  The explanatory variables are: pklogsum, Single Game
price (with coefficient "sg_price"), and a dummy for Package (with coefficient "package").

**Exhibit 23: Regression results for Access Type Nest**

```
Conditional (fixed-effects) logistic regression      Number of obs = 16,836
                                                      LR chi2(3)    = 2243.27
                                                      Prob > chi2   =  0.0000
Log likelihood = -4713.2781                           Pseudo R2     =  0.1922
```

| qty3 | Coefficient | Std. err. | z | P>\|z\| | [95% conf. interval] | |
|---|---|---|---|---|---|---|
| pklogsum | 1.007769 | .1255101 | 8.03 | 0.000 | .7617734 | 1.253764 |
| sg_price | -.0788187 | .0043564 | -18.09 | 0.000 | -.087357 | -.0702804 |
| pkg | -.0373128 | .0498941 | -0.75 | 0.455 | -.1351034 | .0604778 |

101.    The result of the calculation of the logsum for this nest is called "buylogsum." It is a function of the values of the Package nest and the Single Game choice, with the respective access availability and prices. In the next subsection, I describe how buylogsum feeds into the OOM Nest.

### 4.3.2.5 OOM Nest

102.    Up to this point, the model has specified values related to choosing among several types of access to NFL Out-of-market telecasts.  The final remaining option available to a platform subscriber is not to choose any type of access at all. This fifth nest is the buy/no-buy nest: a binary choice between purchasing OOM Access and not purchasing OOM Access.

103.    The buy Access nest has value that derives from the access choices available within the two branches inside the Package nest, All Access or Team Access (or both or neither) and the corresponding package prices, along with the availability and price for Single Game access. The actual survey specifies each element of this nest and, with the previous results, this leads to a value for buylogsum.

104.    The no-buy option has no additional value above being subscribed to the MVPD.

105.    Estimating the model for this nest requires using only the responses that have some sort of MVPD platform subscription.  The explanatory variables are: buylogsum, and a dummy for the Access nest (with coefficient "buy").

**Exhibit 24: Regression results for Buy / No Buy Nest**

```
Conditional (fixed-effects) logistic regression        Number of obs  =  29,250
                                                        LR chi2(2)     = 2882.69
                                                        Prob > chi2    =  0.0000
Log likelihood = -8695.9311                             Pseudo R2      =  0.1422
```

| qty4 | Coefficient | Std. err. | z | P>\|z\| | [95% conf. interval] | |
|---|---|---|---|---|---|---|
| buylogsum | 1.275811 | .0973705 | 13.10 | 0.000 | 1.084969 | 1.466654 |
| buy | .3763554 | .043548 | 8.64 | 0.000 | .2910029 | .4617079 |

106.    The result of the calculation of the logsum for this nest is called "mvpdlogsum". It is a function of the values of the access choices, with their respective available access packages and their prices, or not having access at all.

### 4.3.2.6 MVPD Nest

107.    Up to this point, the model has specified values related to choosing among several types of access to NFL Out-of-market telecasts or choosing no access at all, for any subscriber of a given MVPD. The MNL model can encapsulate the MVPD platform choice with a sixth nest. This nest includes options of MPVD platforms, each of which may have different OOM access choices (different types of access, different packages, different prices) and a platform price.

108.    The "access choice" questions in the survey direct the respondent to assume the choices are available on the platform that they currently use to watch NFL games. At the end, the survey asks respondents to consider possible choices among MVPDs – primarily, choosing DirecTV or not at various prices under various scenarios regarding NFL OOM access. The survey did not present the MVPD choices in the same manner as the OOM access choices. Thus, instead of estimating a maximum likelihood model to fit the responses, as a conjoint analysis does, I estimate parameters for this nest directly to best fit the answers to the small set of platform choice questions at the end of the survey and to actual market observations.

109.   This nest requires the following parameter estimates: a coefficient for MVPD price ("mvpd_price"), a coefficient for mpvdlogsum (the value of the access choices for the mvpd), and coefficients for a dummy variables identifying MVPDs other than DirecTV ("mvpd2", "mvpd3", "mvpd4").

110.   **MVPD Price:** For the "mvdp_price" parameter, I use the following approach. Questions 17 and 18 of the survey address the first parameter, a coefficient for MVPD prices.  These questions were presented to respondents who subscribed to Sunday Ticket on DirecTV.  First, question 16 asked them to consider whether they would keep or drop DirecTV if their current Sunday Ticket package were available at their current Sunday Ticket price on another platform (such as cable) with the same platform cost as current platform cost.  For the 137 respondents that answered Keep, a follow-up question 18 asked the same question, but with a DirecTV price that was 5 or 10 or 15 percent higher. For the 24 that answered Drop, a follow-up question 17 asked the same question, but with a DirecTV price that was 5 or 10 or 15 percent lower. The results of those responses lead to the table of DirecTV subscriptions at various prices.

**Exhibit 25: DirecTV Demand Table from NERA Survey Responses**

|  | Q17 | | | Q16 | Q18 | | |
|---|---|---|---|---|---|---|---|
|  | 15% Discount | 10% Discount | 5% Discount | Current Price | 5% Increase | 10% Increase | 15% Increase |
| Number Who Answered Question | 6 | 11 | 7 | 161 | 50 | 44 | 43 |
| Number Who Would Keep DTV | 149 | 145 | 139 | 137 | 131 | 121 | 110 |
| Number Who Answered Q16 | 161 | 161 | 161 | 161 | 161 | 161 | 161 |
| *% Keep* | *93%* | *90%* | *86%* | *85%* | *81%* | *75%* | *68%* |

111.   Due to the small number of respondents for question 178, this analysis proceeds only on the results from question 18.

112.   Using the Question 16 response as a baseline, responses to question 18 show how consumers respond to variations in the DirecTV price, with different resulting DirecTV shares (equivalently, probabilities of selecting DirecTV).  This leads to an estimate of the coefficient for MVPD price – which quantifies how the probability of selecting a platform changes as relative platform prices change.  For these questions there are no changes in the logsum (because the questions identify that the access is the same on both platforms).  An estimate of this parameter comes from regressing the share changes associated with each of the six price variations on those price variations.

**Exhibit 26: Regression results for MVPD_price coefficient**

| Source | SS | df | MS | | | |
|--------|-----|-----|-----|-----|-----|-----|
| | | | | Number of obs | = | 3 |
| | | | | F(1, 2) | = | 212.95 |
| Model | .001436952 | 1 | .001436952 | Prob > F | = | 0.0047 |
| Residual | .000013496 | 2 | 6.7479e-06 | R-squared | = | 0.9907 |
| | | | | Adj R-squared | = | 0.9860 |
| Total | .001450448 | 3 | .000483483 | Root MSE | = | .0026 |

| pr_diff | Coefficient | Std. err. | t | P>|t| | [95% conf. interval] | |
|---------|-------------|-----------|-----|-------|--------|------|
| price_diff | -.2026222 | .0138851 | -14.59 | 0.005 | -.2623651 | -.1428794 |

113.   The model has only three observations (three price options) but the price variations explain about 99 percent of the variation shares from the answers to question 18 of the survey, and the estimate for the coefficient on MVPD price that best fits the answers to question 18 is -0.2026 (which is statistically significant).[61]

114.   **MVPD logsum:** Conceptually, the logsum parameter relates to how responsive consumers are to the OOM options offered by particular MVPDs in their decisions to choose an MVPD. Question 16 of the survey asks current subscribers of Sunday Ticket on DirecTV whether their decision to subscribe to DirecTV would change in a scenario where other providers began to offer the Sunday Ticket package – in other words, how responsive are these consumers to changes in the availability of other OOM options.[62] About 15 percent of current ST subscribers said they would switch.

115.   To determine the logsum parameter, I simulate a scenario comparable to what the survey asked the respondents to assume in Q16. Assuming a market with four MVPDs – including DirecTV – I first simulate a status-quo scenario where only DirecTV has Sunday Ticket and determine the share of customers that would be expected to get ST on DirecTV. I then simulate the same market for a

---

[61]   The 95 percent confidence interval for this parameter is [-0.2637, -01429]

[62]   The survey asked Respondents to assume that they could buy Sunday Ticket on the non-DirecTV provider at the same cost they currently pay for the service. The question also specifically stated that there would be no additional costs associated with switching providers.

scenario in which all four MVPDs offer ST. If the model is correctly calibrated, then about 15 percent would switch from DirecTV to another MVPD.  I set a value for the logsum parameter that results in the correct percentage of switching.

116.    **MVPD dummies:** Conceptually, the coefficients on the MVPD dummies relate to consumers' relative preferences for particular MVPDs, holding provider price and OOM offerings constant. I therefore set these coefficients such that the share of customers on each MVPD that the simulation will predict closely matches customers' choices in the real world.[63]

### 4.3.3    Costs to supply OOM access on MVPDs

117.    

### 4.3.4    Competitive Interaction

118.    The competitive interaction enters the model in two ways.

119.    First, MVPDs, such as DirecTV, can offer access options for a price.  The MVPD chooses the prices for the access option available on the MVPD to jointly maximize profit – both the direct profit from the access packages plus the profit from attracting additional customers to the MVPD. Likewise, other MVPDs that could provide OOM access would simultaneously choose their prices with a similar profit-maximizing objective. These various choices can be modelled by setting

---

[63]    FCC data indicates 22 percent of the MVPD market share falls to DirecTV.  Twelve percent of MVPD customers subscribe to DISH, 55 percent have cable, and the remaining 11 percent have some other provider, see FCC-18-181A1, "Communications Marketplace Report", Fig B-1, p. 41.  Using these figures as target shares, I simulate a market where consumers can choose between these same four MVPD options but where Sunday Ticket is only available from DirecTV. I set the coefficients so that the predicted share of customers in this scenario choosing each MVPD matches the target shares.

[64]    NFL_0537793 excel document produced by the NFL describing ████████████ .

[65]    I do not use the estimates of elasticity here, as I do in section 4.1.6 because the data here involve survey responses instead of actual market transactions.  For my estimate, I select only customer service costs from the identified accounting costs, which leads to a marginal cost estimate of ██████ .

[66]    ████████████████████████████████████████████████████

availability and pricing in the various access choice nests feeding into each MVPD. For all current simulations, the MVPD prices are assumed to all be equal and fixed.

120.     Second, content providers can allow access to one or more MVPDs, or allow access directly to customers ("DTC") by streaming content to anyone, regardless of their MVPD choice. For this competitive interaction, the content provider seeks to maximize total content revenue (I assume marginal costs are negligible), regardless of the MVPD used by the consumer choosing the DTC product.

### 4.3.5     But-for Simulations

121.     The Actual, or "status quo," version of the simulation sets all OOM access options to zero, with the sole exception of AA Basic on MVPD1 (DirecTV). With these settings, the simulation returns results that are similar to the actual world – the shares going to various MVPD choices align with actual shares, and a portion of DirecTV customers purchase the All Access Basic package. As the survey focuses on avid NFL fans, the proportion of Sunday Ticket purchasers is higher in the simulation that in the actual world. This does not affect the simulated prices. DirecTV chooses a profit-maximizing price for AA Basic that aligns with the actual price (average revenue) that DirecTV receives for basic Sunday Ticket.

#### *4.3.5.1 Direct-To-Customer OOM Bundle*

122.     An alternative scenario retains the AA Basic option on MVPD1 (DirecTV), but also provides AA Basic as a DTC option for any MVPD user. With just one provider setting its own profit-maximizing DTC price, DirecTV's profit-maximizing price for AA Basic drops by ▮▮▮▮▮▮[67] Also, the quantity of Sunday Ticket subscribers on DirecTV drops by ▮▮▮▮▮▮[68] With additional content suppliers providing AA Basic as a DTC option, DirecTV's price would drop even more.

---

[67]   Scenario with one AA Basic DTC option simulated price of ▮▮▮▮▮  Status quo simulated price of ▮▮▮▮▮  Reduction factor is (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[68]   Scenario with one AA Basic DTC option simulated Sunday Ticket share of ▮▮▮▮. Status quo simulated Sunday Ticket Share of ▮▮▮▮  Reduction factor is ▮▮▮▮▮▮▮▮▮▮▮.

### *4.3.5.2  Direct-To-Customer Team Packages*

123.    Another alternative scenario retains the AA Basic option on DirecTV and as a DTC option, while also providing the DTC option to obtain Team-specific packages.

124.    As an example, when, in addition to an alternative DTC All Access option, all 32 teams are available DTC (with three price categories for low, middle, and high OOM demand), the simulated DirecTV price for Sunday Ticket drops by ██████████[69] and the number of subscriptions for Sunday Ticket on DirecTV drops by ██████████[70]

## 4.4   Validating Using NFL ████████████████████

125.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
███████████████████████

126.    ██████████████████████████
██████████████████████████
████████████████████████████████████
██████████████████████████████████

---

[69] Scenario simulated price of ████████ Status quo simulated price of ████████ Reduction factor is ████████
████████

[70] Scenario simulated Sunday Ticket share of ████████ Status quo simulated share of ████████ Reduction factor is ████████

[71] NFL_0059024, NFL_0059025.

[72] See, for example, ████████████████████████████████████
████████████████████████████

████████████████████████

127. ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████

128. ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

---

[73] NFL_0753152 at 161.

[74] ██████████████████████████████████████████████████████████████████████████████████████████ I assume that diversion is the negative of Converting OTT ST.

[75] With a differentiated product duopoly, the linear demand curve for the satellite distributor has an additional term for the price, X, of the competing DTC product: $Q(P,X) = a - bP + cX$. As the DTC product's price goes up, demand for the satellite supplier's price goes up and quantity increases. The satellite distributor in this case maximizes price by setting price so that marginal revenue equals marginal cost (zero), just as in the monopoly case, but now the marginal revenue function incorporates the DTC product price as an additional linear term: $MR = a - 2bP + cX$. The satellite distributor maximizes profit by setting price, $P''(X)$, so that marginal revenue is equal to zero: duopoly profit-maximizing price $P'' = (a + cX)/2b$ and quantity $Q'' = (a + cX)/2$. It is helpful to define diverted quantity, DQ, as the quantity change that occurs when the DTC price changes from ($X0$ to $X1$) changes and the satellite price ($P''(X0)$) price does not: $DQ(X0, X1) = Q(P''(X0), X1) - Q(P''(X0), X0)$. It can easily be shown that $DQ(X0, X1)$ is $c*(X1-X0)$. ████████████████████████████████████████ Similarly, it is helpful to define $DP''$ as the difference in the optimal satellite price between when the DTC price is $X0$ and when the streaming price is $X1$: $DP(X0, X1) = P''(X1) - P''(X0) = c*(X1-X0)/2b$. When $DP''$ is divided by $P''(X0)$, the result is the optimal percentage change in satellite price: $D\%P''(X0, X1) = c*(X1-X0)/(a + cX0)$. Thus, the optimal percentage change in satellite price to a change in streaming price is half of the percentage diversion that would occur with no price change: $D\%P''(X0, X1) = c*(X1-X0)/(a + cX0) = 1/2(2*c*(X1-X0) / (a + cX0)) = 1/2 D\%Q(X0, X2)$.

[76] Reduction factor = Predicted Diversion / 2 = -(███████████████ *Competitor Price) / 2. For example, at a competitor price of ███ the reduction factor is ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

129.   These results mirror the analyses done in previous sections, with roughly similar magnitude for expected reduction factors.

## 5   Conclusion

130.   Based on the foregoing, it is my economic opinion that:

    i.   Class-wide methods of proof are available to establish that NFL Sunday Ticket prices would have been lower for all class members if other providers supplied live telecasts of out-of-market NFL telecasts (in a manner that I understand to be consistent with the liability claims).

    ii.   The total NFL Sunday Ticket purchases by members of the residential class during the Class Period to date is ███████████

    iii.   The total NFL Sunday Ticket purchases by members of the commercial class during the Class Period to date is ███████████

## 6   Signature

131.   Executed under penalty of perjury this 19th Day of August, 2022, at Emeryville, California.

_____

J. Douglas Zona

---

77   █████████████████████████████████████████

78   █████████████████████████████████████████

-58-

████████████████████████████

# Attachment A

# J. DOUGLAS ZONA, Ph.D.

510.761.7971  -  Doug.Zona@SquareZResearch.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1986 | **The State University of New York** | Stony Brook, New York |

*Ph.D., Economics*
Fields of concentration:  Microeconomic Theory, Industrial Organization
Dissertation:  "Bid-rigging and the Competitive Bidding Process:  Theory and Evidence"
Committee:  Robert H. Porter, Robert W. Rosenthal and Kenneth Hendricks

| | | |
|---|---|---|
| 1984 | **The State University of New York** | Stony Brook, New York |

*M.A., Economics*

| | | |
|---|---|---|
| 1983 | **The University of New Hampshire** | Durham, New Hampshire |

*B.A., Economics*

## ACADEMIC EXPERIENCE

| | | |
|---|---|---|
| 2003 – 2005 | **New York University** | New York, New York |

*Graduate School of Arts and Science*
*Adjunct Professor of Economics*

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| | **Square Z Research LLC** | |
| 2013 – | *Economist* | Emeryville, California |
| | **CRA International, Inc.** | |
| 2010 – | *Senior Consultant* | |
| 2009 – 2010 | *Vice President* | Oakland, California |
| | **Berkeley Research Group  LLC** | |
| 2013- | *Contractor* | Emeryville, California |
| 2010 – 2013 | *Director* | |
| | **LECG, LLC** | |
| 2005 – 2009 | *Director* | Emeryville, California |
| | **Cornerstone Research, Inc.** | |
| 1999 – 2004 | *Vice President* | New York, New York |
| | **National Economic Research Associates** | |
| 1998 – 1999 | *Vice President* | White Plains, New York |
| 1991 – 1998 | *Senior Consultant* | |
| 1989 – 1991 | *Senior Analyst* | Cambridge, Massachusetts |

| 1988 – 1989 | **Cambridge Systematics** | Cambridge, Massachusetts |
| | *Associate* | |
| 1986 – 1988 | **American Telephone and Telegraph** | Bedminster, New Jersey |
| | *Staff Supervisor/Staff Manager* | |

HONORS AND **AWARDS**

Peter J. Kalman Award for Academic Excellence, 1986.

Aninda K. Bose Memorial Award for "Alternating Patterns of Winners in Repeated Auctions," 1985.

Peter J. Kalman Award for Academic Excellence, 1985.

## BOOK CHAPTERS

"Conjoint Analysis: Applications in Antitrust Litigation," (with Michael P. Akemann and Rebbecca Reed-Arthurs) in *Handbook of Marketing Analytics: Methods and Applications in Marketing Management, Public Policy, and Litigation Support*, Natalie Mizik and Dominique Hanssens, editors, Edward Elgar Publishing. 2018

"Bidding, Bid Rigging, and School Milk Prices: Ohio v. Trauth (1994)" (with R. Porter), in *The Antitrust Revolution: Economics, Competition and Public Policy*, Fifth Edition, edited by J.E.Kwoka, Jr. and L.J. White, Oxford University Press, 2008.

"Collusion," with R. Porter, in *Issues in Competition Law and Policy: Volume II*, Wayne Dale Collins, Ed., ABA Section on Antitrust Law, 2008.

"Simulation in Competitive Analysis," with G. Leonard, in *Issues in Competition Law and Policy: Volume II*, Wayne Dale Collins, Ed., ABA Section on Antitrust Law, 2008.

"Detection of Bid Rigging in Procurement Auctions" with R. Porter, in *Empirical Industrial Organization* edited by Paul L. Joskow and Michael Waterson, Edward Elgar Publishing, Ltd., 2005.

Lessons from the MCI/WorldCom Transaction, in *Econometrics in Antitrust* edited by John Harkrider, ABA Section on Antitrust Law, 2005.

"Energy Trading Strategies in California: Market Manipulation?" with Michael DeCesaris and Greg Leonard, in *Obtaining the Best from Regulation and Competition*, edited by Michael A. Crew and Menahem Spiegel.  Boston, MA: Kluwer Academic Publishers, 2004.

"Bidding, Bid Rigging, and School Milk Prices: Ohio v. Trauth (1994)" (with R. Porter), in *The Antitrust Revolution: Economics, Competition and Public Policy*, Fourth Edition, edited by J.E.Kwoka, Jr. and L.J. White, Oxford University Press, 2004.

## PUBLICATIONS

"GUPPI, the new horizontal merger guidelines and assessing potential competitive effects," with Chris Pleatsikas, *Australian Journal of Competition and Consumer Law*, Vol. 20/2 June 2012.

"Structural Approaches to Estimating Overcharges in Price Fixing Cases," *Antitrust Law Journal*, 77  No. 2 (2011).

"Lessons from the Superior/ICG Merger," with D. Neher and D. Russo, *The George Mason Law Review*, 2005.

"Regulating access:  using economic principles to ensure fair and efficient competition," with P. Hinton, *The Electricity Journal,* August/September 1999, pp. 107-123.

"Ohio School Milk Markets:  An Analysis of Bidding," with R. Porter, RAND *Journal of Economics,* Summer 1999, pp. 263-288.

"Issues in Antitrust Economics Testimony after Daubert," with F. Dunbar, *PLI Course Handbook, Antitrust Litigation:  Strategies for Success,* November 1998, pp. 181-211.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider," with P.J. Hinton, R. Schmalensee and W.E. Taylor, *Journal of Regulatory Economics,* 13 (1998) pp. 183-196.

"Ohio School Milk Markets:  An Analysis of Bidding," with R. Porter, National Bureau of Economic Research Working Paper No. 6037, Cambridge, Massachusetts, May, 1997.

"An Analysis of the State of Competition in Long-Distance Telephone Markets," with W. E. Taylor, *Journal of Regulatory Economics,* 3 (1997) pp. 227-255.

"An Analysis of Asymmetric Demand Response to Price Changes:  The Case of Local Telephone Calls," with M. Bidwell, Jr. and B. Wang, *Journal of Regulatory Economics,* 8 (1995) pp. 285-298.

 "Competitive Analysis with Differenciated Products" with J. Hausman and G. Leonard, *Annales d' Economie et de Statistique,* 34 (1994) pp. 159-180.

"Detection of Bid Rigging in Procurement Auctions" with R. Porter, *Journal of Political Economy,* 3 (1993) pp. 518-538.

"A Proposed Method for Analyzing Competition Among Differentiated Products," with J. Hausman and G. Leonard, *Antitrust Law Journal*, 60 (1992) pp. 889-900.

"Detection of Bid-Rigging in Procurement Auctions" with R. Porter, National Bureau of Economic Research Working Paper No. 4013, Cambridge, Massachusetts, March 1992.

"Bid-Rigging and the Competitive Bidding Process:  Theory and Evidence," Ph.D. Dissertation, Department of Economics, State University of New York at Stony Brook, 1986.

**PAPERS AND PRESENTATIONS**

"Econometrics for Lawyers" with R. Shehadeh, presented for the ABA Section of Antitrust Law, various sessions, 2006.

"Bid-Rigging in School Milk Auctions:  Evidence from Ohio," with N. Moshkin and R. Porter, presented at Barcelona Economics Workshop on Auction Markets, July 2005.

"Toward a Structural Non-Parametric Model of Bidding Behavior," with N. Moshkin and R. Porter, presented at the International Industrial Organization Conference, Boston, April 5, 2003.

"The Merger Investigation in Superior Propane/ICG: Economics Gone Amuck," presented at the

J. DOUGLAS ZONA

George Mason Law Review Annual Symposium, January 15, 2003.

"MCI Worldcom/Sprint Merger Investigation," presented at the Rutgers University Center for Research in Regulated Industries Advanced Workshop in Regulation and Competition, April 20, 2001.

"The Evolution of Competition in Local Exchange Markets:  A Case Study," with W.E. Taylor, presented at the Rutgers University Center for Research in Regulated Industries Advanced Workshop in Regulation and Competition, January 8, 1999.

"Efficient Access to Competitors' Facilities, A Practical Approach," with P. J. Hinton, presented at the International Communications Forecasting Conference – 1998, St. Louis, Missouri, June 9-12, 1998.

"Efficient Access to Competitors' Facilities", presented at the Rutgers University Center for Research in Regulated Industries Advanced Workshop in Regulation and Competition:  Network Industries In Transition, 17th Annual Conference, Vergennes, Vermont, May 27-29, 1998.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider," with R. Schmalensee, W. E. Taylor, and P. J. Hinton, presented at the Rutgers 16th Annual Conference, Lake George, New York, May 21-23, 1997.

"An Analysis of the Welfare Effects of Long Distance Market Entry by an Integrated Access and Long Distance Provider," With R. Schmalensee, W. E. Taylor, and P. J. Hinton, filed on behalf of The United States Telephone Association, March 7, 1997.

"An Analysis of Resale in Telecommunications," presented at the Rutgers 15th Annual Conference, Lake George, New York, May 29-31, 1996.

"Effects of Competitive Entry on Capital Recovery," with T. J. Tardiff, presented to The United States Telephone Association, Capital Recovery Seminar, Chicago, Illinois, October 19, 1995.

"Stranded Investment:  Lessons from the Telephone Industry for the Electric Power Industry," with H. Ware, presented at the Rutgers 14th Annual Conference, Newport, Rhode Island, May 25, 1995.

 "An Analysis of the State of Competition in Long-Distance Telephone Markets, " prepared for the Alliance for Competitive Communications, May 1995.

 "Telecommunications and Antitrust," presented at the New York State Bar Association Annual Meeting of the Antitrust Law Section, New York, New York, January 26, 1995.

"An Analysis of Asymmetric Demand Response to Price Changes:  The Case of Local Telephone Calls," with M. Bidwell and B. Wang, presented at the Rutgers 13th Annual Conference, Newport, Rhode Island, May 25, 1994.

"Rockets & Feathers:  The Asymmetry of Response to Telephone Price Change," with M. Bidwell, presented at the Advanced Workshop in Regulation and Public Utility Economics Twelfth Annual Conference, Brewster, Cape Cod, Massachusetts, May 26-28, 1993.

"Company-Specific Estimates of the Pass-Through of Commodity Taxes:  Theory and Evidence," with R. Schmalensee and M. Klass, presented to the U.S. Department of Commerce, March 12, 1993.

"Detecting Bid-Rigging," Seminar at the Economic Analysis Group of the Antitrust Division of

the United States Department of Justice, Washington, D.C., January 18, 1993.

"Detecting and Proving Bid Rigging Using Bid Data," presented for the Joint Program of Economics and Sherman Act Section 1 Committees, Section of Antitrust Law, American Bar Association Annual Meeting, San Francisco, California, August 11, 1992.

"Passthrough of Commodity Taxes on Color Televisions in Taiwan:  Economic Theory and Empirical Analysis," with R. Schmalensee and B. Reddy, presented to the U.S. Department of Commerce, December 23, 1991.

"Substitution Among Imperfect Substitutes," presented to The American Bar Association Section of Antitrust Law, The Cutting Edge of Antitrust:  Market Power, at the Willard Intercontinental Hotel, Washington, D.C., October 17, 1991.

"Incentive Regulation and the Diffusion of New Technology in Telecommunications," with William E. Taylor and Charles J. Zarkadas, presented to the 19th Annual Telecommunications Policy Research Conference, Solomon's Island, Maryland, September 29, 1991.

"Merger Analysis with Differentiated Products" with J. Hausman and G. Leonard, presented at National Bureau of Economic Research Summer Institute Workshop on Plant and Firm Dynamics and Productivity, Cambridge, Massachusetts, July 11, 1991.

"On the Detection of Bid-Rigging in Procurement Auction Data," with R. Porter, presented at the April 1991 meeting of the National Bureau of Economic Research Industrial Organization Program in Cambridge, Massachusetts, April 19, 1991.

 "Merger Analysis with Differentiated Products," with J. Hausman and G. Leonard, Seminar at the Economic Analysis Group of the Antitrust Division of the United States Department of Justice, Washington, D.C., April 17, 1991.

"The Total Bill Concept:  Defining and Testing Alternative Views," with B. Jacob, presented at Bellcore/Bell Canada Industry Forum, Hilton Head, South Carolina, April 22-25, 1990.

"Two Stage Budgeting and the Total Bill Effect:  An Application to AT&T's Inter- and Intra-State Long Distance Market," presented at the Bellcore/Bell Canada Industry Forum, Key Biscayne, Florida, January 1988.

## EXPERT REPORTS

"Expert Report of J. Douglas Zona, Ph.D" in Chewy, Inc. v. Int'l Bus. Machs. Corp., 21-CV-1319 (JSR), S.D.N.Y., November 21, 2021.

"Calculation of Cobalt's But-for Going Concern Value as of December 2015, J. Douglas Zona, Ph.D."in V5 Technologies, LLC d/b/a Cobalt Data Centers v. Switch, Ltd., et al, United States District Court, District of Nevada, Case 2:17-cv-02349-KJD-NJK, February 6, 2021.

"Supplemental Expert Reply Report of J. Douglas Zona, Ph.D." Submitted on Behalf of Plaintiffs in Re: Aluminum Warehousing Antitrust Litigation, United States District Court, Southern District of New York, Case No. 13 MD 2481, October 16, 2020.

"Supplemental Report of J. Douglas Zona, Ph.D., in " Manmohan Dhillon, et al, v. Anheuser Bush, LLC et al, Superior Court of the State of California in and for the County of Fresno, Case No. 14CECG03039 MBS, September 25, 2020.

"Reply Report of J. Douglas Zona, Ph.D.", in The National ATM Council, Inc., et al v. VISA

INC. et al., United States District Court for the District of Columbia,  Civil Action No. 1:11-cv-01803, September 3, 2020.

"Expert Report of J. Douglas Zona, Ph.D.", in re: US Renal Care -- Certificates of Need, June 8, 2020.

"Reply Report of J. Douglas Zona, Ph.D.", in V5 Technologies, LLC d/b/a Cobalt Data Centers v. Switch, Ltd., et al, United States District Court, District of Nevada, Case 2:17-cv-02349-KJD-NJK, December 26, 2019.

"Expert Report of J. Douglas Zona, Ph.D.", in V5 Technologies, LLC d/b/a Cobalt Data Centers v. Switch, Ltd., et al, United States District Court, District of Nevada, Case 2:17-cv-02349-KJD-NJK, October 25, 2019.

"Supplemental Expert Disclosure  of J. Douglas Zona, Ph.D.", in Optronics Technologies, Inc. v. Ningbo Sunny Electronic Co. LTD., et al, United States District Court for the Northern District of California, Case No. 5:16-cv-06370-EJD, September 24, 2019.

"Expert Report of J. Douglas Zona, Ph.D.", in The National ATM Council, Inc., et al v. VISA INC. et al., United States District Court for the District of Columbia,  Civil Action No. 1:11-cv-01803, September 20, 2019

"Primer on ATM Economics by James J. McAndrews, Ph.D. and J. Douglas Zona, Ph.D.", in The National ATM Council, Inc., et al v. VISA INC. et al., United States District Court for the District of Columbia,  Civil Action No. 1:11-cv-01803, September 20, 2019

"Expert Report of J. Douglas Zona, Ph.D.", in Optronics Technologies, Inc. v. Ningbo Sunny Electronic Co. LTD., et al, United States District Court for the Northern District of California, Case No. 5:16-cv-06370-EJD, January 3, 2019.

"Expert Report of J. Douglas Zona, Ph.D.", in re: Asacol Antitrust Litigation,  United States District Court, District of Massachusetts, Civil Action No. 1:15-cv-12730 (DJC), July 26, 2017.

"Expert Reply Report of J. Douglas Zona, Ph.D.", in re: Capacitors Antitrust Litigation,  United States District Court, Northern District of California, Master File No. 3:14-cv-03264-JD, April 28, 2017.

"Expert Report of J. Douglas Zona, Ph.D.", in re: Capacitors Antitrust Litigation,  United States District Court, Northern District of California, Master File No. 3:14-cv-03264-JD, February 24, 2017.

"Expert Reply Report of J. Douglas Zona, Ph.D., in " Manmohan Dhillon, et al, v. Anheuser Bush, LLC et al, Superior Court of the State of California in and for the County of Fresno, Case No. 14CECG03039 MBS, November 2, 2016.

"Expert Reply Report of J. Douglas Zona, Ph.D." Submitted on Behalf of Plaintiffs in Re: Aluminum Warehousing Antitrust Litigation, United States District Court, Southern District of New York, Case No. 13 MD 2481, August 5, 2016. (Confidential)

"Declaration of J. Douglas Zona, Ph.D. in Support of Plaintiffs' Motion for Class Certification," Manmohan Dhillon, et al, v. Anheuser Bush, LLC et al, Superior Court of the State of California in and for the County of Fresno, Case No. 14CECG03039 MBS, August 3, 2016.

"Expert Report of J. Douglas Zona, Ph.D." Submitted on Behalf of Plaintiffs in Re: Aluminum Warehousing Antitrust Litigation, United States District Court, Southern District of New York,

J. DOUGLAS ZONA

Case No. 13 MD 2481, March 26, 2016 (Confidential)

"Expert Report of J. Douglas Zona, Ph.D." Submitted on Behalf of Whole Food Markets Group, Inc. in MARY GARRISON, and GRACE GARRISON, et al, v. Whole Food Markets Group, Inc. et al., United States District Court, Northern District of California, Case No. 3:13-CV-05222 VC and Case No. 3:14-CV-00334 VC, January 19, 2015 (Confidential)

"Declaration of J. Dougas Zona Ph.D." (Damages) in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, December 11, 2015 (Confidential)

"Expert Report of J. Douglas Zona, Ph.D." Submitted on Behalf of Defendant XPO Logistics, Inc." in C.H. Robinson Worldwide, Inc. v. XPO Logistics, Inc., , et al., State of Minnesota District Court, County of Hennepin, Court File No. 27-CV-12-16003, July 20, 2015 (Confidential)

"Declaration of J. Dougas Zona Ph.D." (Damages) in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, February 3, 2015 (Confidential)

"Declaration of J. Dougas Zona Ph.D." in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, December 19, 2014 (Confidential)

"Affidavit of J. Dougas Zona Ph.D." in Lithium Ion Battery Antitrust Litigation, (Cohen v. LG Chem, et al.) PROVINCE OF QUEBEC, DISTRICT OF MONTREAL, NO: 500-06-000632-121 and 9113-5699 QUEBEC INC., March 26, 2014

"Expert Declaration of J. Dougas Zona Ph.D." in Lithium Ion Battery Antitrust Litigation, (Wilson v LG Chem, et al.)  ONTARIO SUPERIOR COURT OF JUSTICE,  Court File No. CV-13-56893, March 17, 2014

"Expert Rebuttal Report of J. Douglas Zona, Ph.D." in *BNLfood INVESTMENT S.A.R.L., v. MARTEK BIOSCIENCES CORP.*, Maryland District Court, Case No. 1:11-CV-00446-WDQ, June 29, 2012

"Expert Report of J. Douglas Zona, Ph.D." in *BNLfood INVESTMENT S.A.R.L., v. MARTEK BIOSCIENCES CORP.*, Maryland District Court, Case No. 1:11-CV-00446-WDQ, May 15, 2012

"Declaration of J. Douglas Zona, Ph.D.," in *ADVANCED MICROTHERM, INC., et al V. NORMAN WRIGHT MECHANICAL*, et al. United States District Court, Northern District of California, San Jose Division, No. 04-CV-02266-JW., April 13, 2010.

"Expert Report of J. Douglas Zona," in *re Graphics Processing Units*, N.D. Cal., Case No.: M:07-CV-01826-WHA, September 19, 2008.

"Declaration of J. Douglas Zona in Support of Defendant Intel Corporation's Opposition to Plaintiffs' Motion for Class Certification," in  Skold and Dossantos, et al., v. Intel, HP, et al., Superior Court of California for the County of Santa Clara, Case No. 1-05-CV-039231, September 28, 2007.

"Declaration of J. Douglas Zona, Ph.D.," prepared in *re CR Antitrust Litigation*, Case No. 3:05 MD 1642 (PCD) (D. Conn);  *re EPDM Antitrust Litigation*, Case No. 3:03 MD 1542 (PCD) (D. Conn.); and *re Rubber Chemicals Antitrust Litigation*, Master Docket No. C-03-1496 (MJJ)

(N.D. Cal.), May 22, 2006.

"Supplemental Declaration of J. Douglas Zona, Ph.D.," prepared for defendants in an investigation of parcel tanker shipping pending before the Korea Fair Trade Commission, April 19, 2005.

"Declaration of J. Douglas Zona, Ph.D.," prepared for defendants in an investigation of parcel tanker shipping pending before the Korea Fair Trade Commission, December 20, 2004.

"Declaration of J. Douglas Zona, Ph.D.," prepared for plaintiffs in *re: Organic Peroxide Antitrust Litigation*, Case No. 1:02CV00593 (JR) pending in the United States District Court for the District of Columbia, July 27, 2004

"Declaration of J. Douglas Zona, Ph.D.," prepared in *re CR Antitrust Litigation*, Case No. 3:05 MD 1642 (PCD) (D. Conn); *re EPDM Antitrust Litigation*, Case No. 3:03 MD 1542 (PCD) (D. Conn.); and *re Rubber Chemicals Antitrust Litigation*, Master Docket No. C-03-1496 (MJJ) (N.D. Cal.), February 16, 2004.

 "Declaration of J. Douglas Zona, Ph.D.," prepared for plaintiffs in *re: Organic Peroxide Antitrust Litigation*, Case No. 1:01CV01714 (JR) pending in the United States District Court for the District of Columbia, May 7, 2002

"Rebuttal Report of J. Douglas Zona," prepared for plaintiffs in *Specialized Clutch & Brake of Stockton, Inc. v. United Brake Systems, Inc. et al*.  Alameda County Superior Court Case No. 659087-3, March 19, 2002.

"Expert Report of J. Douglas Zona," prepared for plaintiffs in *Sorbates Indirect Antitrust Litigation-Wisconsin,* October 3, 2001.

"Rebuttal Report of J. Douglas Zona," prepared on behalf of defendants in *Amway Corporation v. The Procter & Gamble Company, et al*, U.S. District Court for the Western District of Michigan, Case No. 1:98 CV726, May 16, 2001.

"Declaration of J. Douglas Zona, Ph.D. Regarding Preliminary Damage Estimate," prepared on behalf of plaintiffs in *Charles Shaw, et al. Individually, and On Behalf of All Persons Similarly Situated v. Dallas Cowboys Football Club, Ltd*., *et al.*, U.S. District Court, for the Eastern District of Pennsylvania, Civil Action No. 97-CV-5184, March 1, 2001.

"Preliminary Expert Report of J. Douglas Zona," prepared on behalf of defendants in *Amway Corporation v. The Procter & Gamble Company, et al,* U.S. District Court for the Western District of Michigan, Case No. 1:98 CV726, January 15, 2001.

"Affidavit of J. Douglas Zona, Ph.D., Regarding Class Certification," prepared on behalf of plaintiffs in Charles Shaw, et al. Individually, and On Behalf of All Persons Similarly Situated v. Dallas Cowboys Football Club, Ltd., et al., U.S. District Court, for the Eastern District of Pennsylvania, Civil Action No. 97-CV-5184, October 30, 2000.

"Declaration of J. Douglas Zona, Ph.D.," prepared on behalf of plaintiffs in *re:  Polypropylene Carpet Antitrust Litigation,* U.S. District Court for the Northern District of Georgia, Rome Division, Master File No. 4:95-CV193HLM, September 15, 1999.

"Rebuttal Report of J. Douglas Zona, Ph.D.," prepared on behalf of plaintiffs in *re: Polypropylene Carpet Antitrust Litigation,* U.S. District Court for the Northern District of Georgia, Rome Division, Master File No. 4:95-CV193HLM, June 15, 1999.

"Analysis of Issues Raised by AT&T in AT&T v. NYNEX, FCC File No. E-96-27," with P. Hinton, prepared for NYNEX in connection with *AT&T v. NYNEX*, FCC File No. E-96-27, April 23, 1997.

"An Analysis of Interexchange Carrier Sent-Paid Payphone Fraud," with P. Hinton, prepared for NYNEX in connection with *AT&T v. NYNEX*, FCC File No. E-96-27, April 23, 1997.

"Expert Report of J. Douglas Zona," prepared for Defendant in *AT&T, Corp. v. American Teletronics Long Distance, Inc.,* U.S.D.C. District of New Jersey Civil Actions No. 94-14680, June 30, 1997.  (Confidential)

"An Analysis of Resale in Long Distance Telecommunications Markets," with W. Taylor and T. Tardiff, prepared for plaintiff in connection with *Darren B. Swain, Inc. d/b/a U.S. Communications v. AT&T Corp., v. Mike Maxey, et al.*, U.S.D.C. N.D. Tx., Civil Action 394CV-1088D November 15, 1995.

"An Analysis of Long Distance Telecommunications Markets," with William E. Taylor and Timothy J. Tardiff, prepared for plaintiffs in *US WATS, Inc. and USW Corp. v. AT&T Corp.* U.S.D.C. E.D. Pa. No. 93-CV-1038, August 22, 1995.  (Confidential)

"The Effect of Competitive Entry into Local Exchange and State Toll Markets on the Revenues of Southern New England Telephone," with Timothy J. Tardiff, prepared for *Southern New England Telephone*, February 27, 1995.  (Confidential)

"An Economic Analysis of Ohio School Milk Markets:  Damages" with R.H. Porter, prepared for the Attorney General for the State of Ohio in connection with *The State of Ohio v. Louis Trauth Dairy, Inc. et al.,* U.S.D.C. S.D. Oh. No. C-1-93-553, December 1, 1994. (Confidential)

"An Analysis of Ohio School Milk Markets," with R.H. Porter, prepared for the Attorney General for the State of Ohio in connection with *The State of Ohio v. Louis Trauth Dairy, Inc. et al.,* U.S.D.C. S.D. Oh. No. C-1-93-553, October 31, 1994. (Confidential)

"Passthrough of Commodity Taxes on Color Televisions in Taiwan:  Economic Theory and Empirical Analysis," with R. Schmalensee and B. Reddy, presented to the U.S. Department of Commerce, December 23, 1991.


**TESTIMONY**

Deposition testimony in Chewy, Inc. v. Int'l Bus. Machs. Corp., 21-CV-1319 (JSR), S.D.N.Y., January 19, 2022.

Deposition testimony in Manmohan Dhillon, et al, v. Anheuser Bush, LLC et al, Superior Court of the State of California in and for the County of Fresno, Case No. 14CECG03039 MBS, November 19, 2020.

Deposition testimony in V5 Technologies, LLC d/b/a Cobalt Data Centers v. Switch, Ltd., et al, United States District Court, District of Nevada, Case 2:17-cv-02349-KJD-NJK, February 7, 2020.

Deposition testimony in The National ATM Council, Inc., et al v. VISA INC. et al., United States District Court for the District of Columbia,  Civil Action No. 1:11-cv-01803, November 22, 2019.

Trial testimony in  Optronics Technologies, Inc. v. Ningbo Sunny Electronic Co. LTD., et al,

United States District Court for the Northern District of California, Case No. 5:16-cv-06370-EJD, November 15, 2019

Deposition testimony in  Optronics Technologies, Inc. v. Ningbo Sunny Electronic Co. LTD., et al, United States District Court for the Northern District of California, Case No. 5:16-cv-06370-EJD, May 15, 2019.

Deposition testimony in re: Capacitors Antitrust Litigation,  United States District Court, Northern District of California, Master File No. 3:14-cv-03264-JD, May 11, 2017.

Deposition testimony in Manmohan Dhillon, et al, v. Anheuser Bush, LLC et al, Superior Court of the State of California in and for the County of Fresno, Case No. 14CECG03039 MBS, September 21, 2016

Deposition testimony in Re: Aluminum Warehousing Antitrust Litigation, United States District Court, Southern District of New York, Case No. 13 MD 2481, May 24, 2016

Deposition testimony in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, February 11, 2016

Deposition testimony in C.H. Robinson Worldwide, Inc. v. XPO Logistics, Inc., , et al., State of Minnesota District Court, County of Hennepin, Court File No. 27-CV-12-16003, September 30, 2015

Deposition testimony in Containerboard Antitrust Litigation, (Kleen Products LLC et. al v. International Paper, et al.). United States District Court, Northern District of Illinois, Eastern Division, 1:10-cv-0571, March 30, 2015

Deposition testimony in *BNLfood INVESTMENT S.A.R.L., v. MARTEK BIOSCIENCES CORP.*, Maryland District Court, Case No. 1:11-CV-00446-WDQ,  July 26, 2012

Deposition testimony in *Donald Michalco, et al. v. Comcast of Greater Florida/Georgia, Inc., et al.*,  Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida, Case No. 02-03448 CV-B.

Deposition testimony in *re: Organic Peroxide Antitrust Litigation*, U.S. District Court for the District of Columbia, Case No. 1:02CV00593 (JR)

Deposition and trial testimony in *Specialized Clutch & Brake of Stockton, Inc. v. United Brake Systems, Inc. et al*.  Alameda County Superior Court, Case No. 659087-3

Deposition testimony in *Amway Corporation v. The Procter & Gamble Company, et al,* U.S. District Court for the Western District of Michigan, Case No. 1:98 CV726.

Deposition testimony in Charles Shaw, Bret D. Schwartz, And Steve Promislo, Individually, and On Behalf of All Persons Similarly Situated v. Dallas Cowboys Football Club, Ltd., et al., U.S. District Court, for the Eastern District of Pennsylvania, Civil Action No. 97-CV-5184.

Deposition and trial testimony in re: *Polypropylene Carpet Antitrust Litigation,* U.S. District Court for the Northern District of Georgia, Rome Division, Master File No. 4:95CV193HLM.

Deposition testimony in *Darren B. Swain, Inc., et al.  v. AT&T Corp., v. Mike Maxey, et al.,*  U.S. District Court, for the Northern District of Texas, Dallas Division, Civil Action No. 394CV-1088D.

J. DOUGLAS ZONA

Deposition testimony in *US Wats, Inc., et al. v. AT&T Corp.,* U.S. District Court, Eastern District of Pennsylvania, Civil Action No. 93-CV-1038.

Deposition testimony in *State of Ohio v. Louis Trauth Dairy, Inc., et al.*, Case No. C-1-93-553 in the United States District Court, Southern District of Ohio, Western Division.

Deposition and trial testimony in *Dialogic Corporation v. VMX, Inc. and Rhetorex Inc.,* Civil Action No. 93-1712-(MLP), in the United States District Court for the District of New Jersey.

**REFEREE**

| | |
|---|---|
| Journal of Econometrics | Southern Economic Journal |
| RAND Journal of Economics | Journal of Law and Economics |
| Journal of Industrial Economics | American Economic Review |
| Journal of Regulatory Economics | Construction Management and Economics |

**OTHER PROFESSIONAL ACTIVITIES**

Audit and Evaluation Branch of Industry Canada – Member of Steering Committee to oversee an evaluation of the anti bid-rigging activities of the Canadian Competition Bureau. July 2007.

# Attachment B

Attachment B
Documents Relied Upon

**Legal Filings and Guidelines**

Certiorari to the United States Court of Appeals for the Seventh Circuit, *American Needle, Inc. v. National Football League et. al.*

*Chattanooga Foundry & Pipeworks v. City of Atlanta,* 203 U.S. 390, 396 (1906)

*In re Nat'l Football League's Sunday Ticket Antitrust Litig, 933 F.3d* (9th Cir. 2019), Consolidated Amended Class Action Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act.

*In re Nat'l Football League's Sunday Ticket Antitrust Litig* , 933 F.3d (9th Cir. 2019)

*In re Polypropylene Carpet Antitrust Litigation* , 996 F. Supp. 18 (N.D. Ga. 1997)

**Expert Reports**

Expert Report of Daniel A. Rascher, August 19, 2022.

Expert Report of Sarah Butler, August 19, 2022.

**Bates Documents**

NFL_0012383
NFL_0057465
NFL_0059024
NFL_0059025
NFL_0377291
NFL_0410159
NFL_0419932
NFL_0458529
NFL_0537793
NFL_0589091
NFL_0753152
NFL_0853407
NFL_0989539
NFL_0596234

**Articles and Literature**

*ABA Section of Antitrust Law* , Econometrics, Legal, Practical and Technical Issues, 2005.

FCC-18-181A1, "Communications Marketplace Report".

Henri Theil, A Multinomial Estimation of the Linear Logit Model, 10 International Economic Review, 1969.

Demand",
MIT Press, 1985, pp. 285-299.

William H. Greene, Econometric Analysis, 3rd Edition, 1993.

Zona, D., (2011) Structural Approaches to Estimating Overcharges in Price-Fixing Cases, *Antitrust Law Journal* , 77(2), pp. 473, 475-81.

**Data**

ACCOUNT_ATTRIBUTES_RPT.txt

BAN_Hash_Lookup.txt

DTV Enabler Package  Charge description version_.txt

DTV Enabler Package  Charge description version_10.txt

DTV Enabler Package  Charge description version_2.txt

DTV Enabler Package  Charge description version_3.txt

DTV Enabler Package  Charge description version_4.txt

DTV Enabler Package  Charge description version_5.txt

DTV Enabler Package  Charge description version_6.txt

DTV Enabler Package  Charge description version_7.txt

DTV Enabler Package  Charge description version_8.txt

DTV Enabler Package  Charge description version_9.txt

DTV Promo Discount 07192021 _.txt

DTV Promo Discount 07192021 _2.txt

DTV Promo Discount 07192021 _3.txt

DTV Promo Discount 07192021 _4.txt

DTV RC1 Subs 13M 07162021.txt

EV_VIEWING_HISTORY files via Azure

EVENT_PRICE_MASTER.UNL;1

EVENT_SELECTIONS.UNL;1

Exhibit A - DIRECTV February 2 2022 Transactional Data Dictionary.xlsx

Exhibit B - DIRECTV February 2 2022 Transactional Data Dictionary.xlsx

Exhibit C - DIRECTV February 2 2022 Transactional Data Dictionary.pdf

Exhibit D - DIRECTV February 2 2022 Transactional Data Dictionary.pdf

Exhibit E - DIRECTV February 2 2022 Transactional Data Dictionary.pdf

FEE_MASTER.UNL;1

HST1_SSTRN_NFL_VOID_ACCTS.txt

HST1_SSVHS_NFL_VOID_ACCTS.txt

HST2_SSTRN_NFL_VOID_ACCTS.txt

HST2_SSVHS_NFL_VOID_ACCTS.txt

HST3_SSTRN_NFL_VOID_ACCTS.txt

HST3_SSVHS_NFL_VOID_ACCTS.txt

HST4_SSTRN_NFL_VOID_ACCTS.txt

HST4_SSVHS_NFL_VOID_ACCTS.txt

HST5_SSTRN_NFL_VOID_ACCTS.txt

HST5_SSVHS_NFL_VOID_ACCTS.txt

HST6_SSTRN_NFL_VOID_ACCTS.txt

HST6_SSVHS_NFL_VOID_ACCTS.txt

HST7_SSTRN_NFL_VOID_ACCTS.txt

HST7_SSVHS_NFL_VOID_ACCTS.txt

HST8_SSTRN_NFL_VOID_ACCTS.txt

HST8_SSVHS_NFL_VOID_ACCTS.txt

HST9_SSTRN_NFL_VOID_ACCTS.txt

HST9_SSVHS_NFL_VOID_ACCTS.txt

MLB 2018.txt

MLB 2019.txt

MLB 2020.txt
MLS 2018.txt
MLS 2019.txt
MLS 2020.txt
N=975 Final Wave 1 Wave 2 Combined.xlsx
NBA 2018.txt
NBA 2019.txt
NBA 2020.txt
NFL 2018.txt
NFL 2019.txt
NFL 2020.txt
NFL_ACCT_ATTRIBUTES.txt
NFL_SUB_SERV_HST_SUBRPT.txt
NFL_SUBSCR_MASTER.txt
NFL_SUBSCR_TRANSACTIONS_SUBRPT.txt
NFL_VIEWING_HISTORY files via Azure
NHL 2018.txt
NHL 2019.txt
NHL 2020.txt
SERVICE_PRICE_MASTER.UNL;1
SERVICE_SELECTIONS.UNL;1
SSVHS_ACCTS_FROM_SUBHST1.txt
SSVHS_ACCTS_FROM_SUBHST10.txt
SSVHS_ACCTS_FROM_SUBHST2.txt
SSVHS_ACCTS_FROM_SUBHST3.txt
SSVHS_ACCTS_FROM_SUBHST4.txt
SSVHS_ACCTS_FROM_SUBHST5.txt
SSVHS_ACCTS_FROM_SUBHST6.txt
SSVHS_ACCTS_FROM_SUBHST7.txt
SSVHS_ACCTS_FROM_SUBHST8.txt
SSVHS_ACCTS_FROM_SUBHST9.txt
STMS Transaction and Viewership ACCT_NUM Map_05122022
SUBSCR_BILLTO_MASTER_RPT.txt
SUBSCR_MASTER_RPT.txt
SUBSCR_SERVICE_HST_RPT.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST1.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST10.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST2.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST3.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST4.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST5.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST6.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST7.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST8.txt
SUBSCR_TRANSACTIONS_FROM_SUBHST9.txt
SUBSCR_TRANSACTIONS_RPT.txt
TRANS_MASTER_REASON.UNL;1

**<u>Other Data</u>**

US_IncomeByZipDemographics.csv
zip_code_database_small_business.csv

**<u>Websites</u>**

https://506sports.com/nfl/index.php
https://twitter.com/DIRECTV/status/1038441077622104065
https://twitter.com/DIRECTV/status/1061677200011862018
https://twitter.com/DIRECTV/status/1170411469957160962
https://twitter.com/DIRECTV/status/1304820482005499904
https://web.archive.org/web/20110923153950/http://www.directv.com/DTVAPP/content/sports/nfl_online_
https://www.digitalfind.net/direct-tv/all-included-pricing
https://www.nobelprize.org/uploads/2018/06/mcfadden-lecture.pdf
https://www.pro-football-reference.com/boxscores/201810140rai.htm
https://www.pro-football-reference.com/boxscores/201810210sdg.htm
https://www.pro-football-reference.com/boxscores/201810280jax.htm
https://www.pro-football-reference.com/boxscores/201811190ram.htm
https://www.pro-football-reference.com/boxscores/201910060rai.htm
https://www.pro-football-reference.com/boxscores/201910270ram.htm
https://www.pro-football-reference.com/boxscores/201911030jax.htm
https://www.pro-football-reference.com/boxscores/201911180sdg.htm
https://www.pro-football-reference.com/years/2017/games.htm
https://www.pro-football-reference.com/years/2018/games.htm
https://www.pro-football-reference.com/years/2019/games.htm
https://www.pro-football-reference.com/years/2020/games.htm
https://www.pro-football-reference.com/years/2021/games.htm