UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE SUNDAY TICKET ANTITRUST LITIGATION | CASE NO. ML 15-02668-BRO (JEMx)<br><br>**CLARIFICATION OF AND ADDENDUM TO:**<br><br>EXPERT REPORT OF DANIEL A. RASCHER ISO MOTION FOR CLASS CERTIFICATION<br><br>October 21, 2022 (original report filed August 19, 2022) |

1. In my report filed August 19, 2022, I was asked to consider whether there exist economic methodologies capable of providing reasonable estimates of the amount of damages suffered by each class member that are common to the class.[1] The analysis in my report fully supports that such class-wide methodologies exist, and nothing I have learned since filing the report alters that conclusion.

2. I was deposed on October 3, 2022, and J. Douglas Zona, another of Plaintiffs' experts, was deposed on October 13, 2022. Dr. Zona's report showed that class-wide methods of proof are available to establish that NFL Sunday Ticket prices would have been lower for all class members if other providers supplied live telecasts of out-of-market NFL games.[2]

3. As a result of certain questions posed to me in my deposition, as well as further explanations by Dr. Zona in his deposition of the analyses that he conducted that I reference in my report, I have come to see that more accurate ways of applying these analyses to calculate damages exist.

4. Although these more accurate ways of calculating damages do not affect the narrow question of the availability of methods capable of calculating damages on a

---

[1] See Expert Report of Daniel A. Rascher, Dkt. No. 633, Ex. 4 ("Rascher Expert Report").
[2] See Expert Report of J. Douglas Zona, Dkt. No. 633, Ex. 3 ("Zona Expert Report").

class-wide basis that I was specifically addressing in my report, these refinements to my original methods improve the accuracy of the methods for determining damages and refine the quantitative demonstration of how to apply them.

5. In Paragraph 284 of my report, I estimated damages assuming the NFL continues to act on behalf of its teams to supply Sunday Ticket, but through other means than only DirecTV. I called this the "No DirecTV Exclusivity" alternative. I concluded that, if consumers had available competing direct-to-consumer options for Sunday Ticket during the class period, the DirecTV price for Sunday Ticket would have been significantly lower than the price DirecTV charged class members for Sunday Ticket during the class period.

6. To calculate class damages in the "No DirecTV Exclusivity" model, I relied on two simulations completed by Dr. Zona and a third analysis based on a study conducted by the NFL.

    a. In the first of Dr. Zona's simulations, using DirecTV's own transactional and viewership data for NFL Sunday Ticket, Dr. Zona concluded that had a second market entrant began offering a Sunday Ticket product during the class period, then the DirecTV price for Sunday Ticket would have ▮▮▮▮▮▮▮▮.

    b. In the second of Dr. Zona's simulations, using data collected from the survey of Sarah Butler,[3] he concluded that the simulated market price for DirecTV selling Sunday Ticket absent any competition is higher than the simulated market price when a second market entrant began offering a Sunday Ticket product ▮▮▮▮▮▮.[4]

    c. Using data collected from an internal analysis conducted by the NFL, Dr. Zona concluded that if a second market entrant began offering a Sunday Ticket product at an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] Dkt. No. 633, Ex. 2 ("Butler Expert Report").
[4] See Zona Expert Report, ¶122.

███████████████████████████████████████████████████████, then the DirecTV price for Sunday Ticket would have ████████.

7. In Paragraph 284 of my report, I treated the price-reduction factors that Dr. Zona calculated as capturing the full overcharge amount in each of the models. Further, for the purposes of demonstrating that class-wide methods exist for proving damages, I concluded that giving the three price-reduction figures equal weight was an appropriate and conservative manner of combining them. I then calculated a lower-bound reduction factor of ████ by averaging the three reported price-reduction figures. I continue to believe that an appropriate method for demonstrating that class-wide methods of proof are available in the "No DirecTV Exclusivity" model is to combine price-reduction figures, such as those listed in Paragraph 284, when there is insufficient information to distinguish one or more figures as more reliable than the others.

8. After my deposition on October 3, and in light of explanations Dr. Zona gave in his deposition regarding the three price-reduction figures, I now see that there is information to distinguish two of the figures as more reliable than the third, so that combining only those two provides a more accurate way to estimate the overcharge under the "No DirecTV Exclusivity" scenario.

9. First, I now understand that Dr. Zona's analysis based on the NFL's ████



████[5] Instead, it was an analysis of ████████████████████ ████████████████████[6] The assumption that ████████████████████████████████████████████████████████████████████████████

---

[5] See Zona Expert Report, ¶¶125-29; Deposition of J. Douglas Zona (Oct. 13, 2022), at 35:6-19, 203:13-208:15 ("Zona Expert Deposition").
[6] Instead, it simply models ████████████████████████████████████████. Zona Expert Deposition Ex. 23 (NFL_0059024). In other words, the ████████████████████████████████████████████████████████████████████████.

3

HIGHLY CONFIDENTIAL

███. Nevertheless, the fact that even under the artificial conditions of that analysis – ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████. However, Dr. Zona's analysis of the NFL's internal analysis is not an appropriate model from which to infer a but-for price. Therefore, I do not use it to calculate the estimated but-for change in prices in the "No DirecTV Exclusivity" model in this Addendum.

10. Second, using data collected from the survey of Sarah Butler, Dr. Zona concluded that the simulated market price for DirecTV selling Sunday Ticket would have ███████ if a second market entrant began offering a Sunday Ticket product.[7] While correct, that figure understates the overall change to the but-for price. In that model, Dr. Zona first calculated a simulated price for Sunday Ticket of ███, within the constraints of the model and survey assumptions, and then calculated the change *from that number* that would result from competition from one other provider of Sunday Ticket.[8] My analysis, however, seeks to measure the change from the prices *actually charged*. Thus, it is incomplete to measure the effect of an additional competitor using a price that DirecTV did not charge in the real world. Rather, the reduction factor is appropriately measured as the difference between the price paid by consumers (approximately $294) and the but-for price with competition that the model reports (███). Using the actual price for Sunday Ticket of $293.94 (which was the price at the time of the survey), the full reduction factor is ███. This number is close to the reduction factor that Dr. Zona derives from an entirely different set of data in his simulation based on DirecTV's actual transaction and viewership data, which is ███.

11. It is my understanding that the econometric models Dr. Zona presented relied upon the standard assumption that firms act to maximize profits. As I discussed in my report at Section 3.4.3 and 7.2.1, there is ample evidence in this case to support Plaintiffs' allegation that Sunday Ticket is priced at an artificially high price to ███

---

[7] Zona Expert Report, ¶122.
[8] Zona Expert Report, ¶122.

████████████████████████████████████████████████████████████████████

██████████████████████████. "Artificially high" means higher than what the model predicts is a profit-maximizing price, absent the constraint to reduce the competitive effect ████████████████. However, when the model incorporates all the behavior that is part of the Challenged Conduct, which in this case includes ███████ ████████████████████████████████████████████████, the modeled price accurately reflects the actual market price. ████████████████████████████ ████████████████, is part of the Challenged Conduct and should be included in calculating overcharges paid by class members.

12. What I had not appreciated fully in my original report was that both of Dr. Zona's simulations provide corroboratory economic support for Plaintiffs' allegations, especially because they arrive at similar conclusions from different angles. In Dr. Zona's model based on transaction and viewership data, he used the demand curve he derived from that data together with the price charged by DirecTV ($293.94) to infer the marginal cost faced by DirecTV, assuming that that price was profit maximizing. The resulting marginal-cost figure, ████, is substantially higher than any realistic estimate of marginal costs for providing Sunday Ticket to satellite subscribers. ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. The most significant marginal costs are likely to be those associated with ████████████████████████ ██████████████████████.[9] In that simulation, Dr. Zona adjusted the artificial marginal cost by dividing it by ████, which represents the ratio of overall subscriptions to paid subscriptions.[10] This is a highly conservative reduction, because the resulting figure, ████████████████, still overstates a reasonable estimate of genuine marginal costs, and further reducing that amount would be expected to result in even lower profit-maximizing but-for prices.

---

[9] Rascher Expert Report, ¶202.
[10] Zona Expert Report, ¶65, fn. 48.

5

13. That the implied marginal cost is so much higher than actual marginal cost in this model supports Plaintiffs' allegations that DirecTV is pricing not only at a supracompetitive level, but also shows the actual-world price is at an even more elevated price as a result of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[11] Dr. Zona has described his understanding of this effect as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[12]

14. Dr. Zona's simulation based on data derived from Ms. Butler's survey also supports the conclusion that DirecTV's actual market price is not profit maximizing unless also accounting for the constraint to reduce the competitive effect ▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Instead, DirecTV's actual market price reflects a certain level ▇▇▇▇▇▇▇▇.[13] The simulation comes to this conclusion from the other direction, however. Instead of the modeled price being "artificially high" from a high marginal cost assumption, as it is in the other analysis, the modeled price is "artificially low" in that it does not match the actual market price (because it does not capture ▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

15. In the analysis using the data derived from Ms. Butler's survey, Dr. Zona estimated marginal cost to be ▇▇▇▇. Using the demand functions derived from the survey data, he estimates that the simulated (monopoly) profit-maximizing price is ▇▇▇▇, about ▇▇▇▇ than the price actually charged by DirecTV of $293.94. He then calculates the effect of competition, which lowers the price to ▇▇▇▇, a further reduction of ▇▇▇▇, which is the price-reduction figure that I used in my original report.[14] A full accounting of the overcharge to consumers should have taken into account not only this ▇▇▇▇, but also the ▇▇▇▇ which is captured by the difference between the actual price (approximately $294) and ▇▇▇▇. The overall reduction factor is ▇▇▇▇ with one competitor.

---

[11] See, e.g., Rascher Expert Report, ¶¶61-62.
[12] See Zona Expert Deposition: 137:5-13, 144:21-145:5, 156:14-15, 159:1-23, and 171:5-173:2.
[13] The analysis based on the NFL's survey data does not account for this ▇▇, which is one reason that I have excluded it. The NFL's proposal in that case, however, confirms the practice of imposing such ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. The proposal was to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. See Zona Expert Deposition, Ex. 23 (NFL_0059024). It would have been ▇▇▇▇▇▇▇▇▇▇.
[14] See Rascher Expert Report, ¶284.

6

HIGHLY CONFIDENTIAL

16. For these reasons, my revised estimate of class damages resulting from DirecTV Exclusivity is the average of the lowest reduction factors (i.e., facing only a single competitor) from the transaction model and the survey model, which is █████. Overall damages from that would be about ████████.

17. Executed under penalty of perjury this 25th day of October, 2022, at Orinda, California.

Daniel A. Rascher

HIGHLY CONFIDENTIAL

## Revisions to Exhibit 15 to Rascher Expert Report

### Frantz Damages (Revised)



### Lippincott Damages (Revised)



### Gael Pub Damages (Revised)



8

HIGHLY CONFIDENTIAL

## Mucky Duck Damages (Revised)

| Year | Total Revenue from Affected Purchases | No DTV Exclusivity |
|------|---------------------------------------|--------------------|
| ■    | ■                                     | ■                  |