Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*

[Additional Counsel Listed on Signature Pages]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION

---

THIS DOCUMENT RELATES TO: ALL ACTIONS

Case No. 2:15-ml-02668−PSG (JEMx)

**MEMORANDUM IN SUPPORT OF THE NFL DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF DANIEL A. RASCHER**

Judge: Hon. Philip S. Gutierrez

Date: January 13, 2023
Time: 1:30 p.m.
Courtroom:
First Street Courthouse
350 West 1st Street
Courtroom 6A
Los Angeles, CA 90012

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 2

LEGAL STANDARD ........ 8

ARGUMENT ........ 8

I. Dr. Rascher's Proposed But-For Worlds Are Based On Ungrounded Assumptions Contrary To The Factual Record. ........ 8

A. Courts Routinely Exclude Expert Testimony That Is Based On Unsupported Assumptions. ........ 9

B. Dr. Rascher's But-For Worlds Are All Based On Unsupported Assumptions. ........ 11

II. Dr. Rascher's Damages Calculations Are Not The Product Of Sufficiently Rigorous Analysis. ........ 20

III. Dr. Rascher Improperly Treats The Commercial And Residential Classes Uniformly. ........ 22

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Allison v. McGhan Med. Corp.*,
184 F.3d 1300 (11th Cir. 1999) ... 8

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001) ... 10, 22

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
2011 WL 13214315 (C.D. Cal. 2011) ... 10, 13, 18

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
923 F. Supp. 2d 1245 (S.D. Cal. 2013) ... 10, 14

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ... 8

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002) ... 2, 9, 19, 20

*El Aguila Food Prod., Inc. v. Gruma Corp.*,
301 F. Supp. 2d 612 (S.D. Tex. 2003) ... 14

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ... 8

*Fosmire v. Progressive Max Ins. Co.*,
277 F.R.D. 625 (W.D. Wash. 2011) ... 2, 20

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ... 9

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
254 F.3d 825 (9th Cir. 2001) ... 2, 9

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*,
2017 WL 2559615 (C.D. Cal. June 7, 2017) ... 8

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ... 16

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) .......... 3

*In re Live Concert Antitrust Litigation*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) .......... 9, 10 11

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019) .......... 12

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014) .......... 21

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) .......... 1, 3

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .......... 9

*Laumann v. National Hockey League,*
117 F. Supp. 3d 299 (S.D.N.Y. 2015) .......... 10, 11, 16, 18

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .......... 3

*Pottenger v. Potlatch Corp.*,
329 F.3d 740 (9th Cir. 2003) .......... 10

*Rearden LLC v. Walt Disney Co.*,
2021 WL 6882227 (N.D. Cal. July 12, 2021) .......... 9, 10, 16

*Shields v. Fed'n Internationale de Natation*,
2022 WL 425359 (N.D. Cal. Feb. 11, 2022) .......... 3

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
2007 WL 935703 (S.D. Cal. Mar. 7, 2007) .......... 8

*Tawfilis v. Allergan, Inc.*,
2017 WL 3084275 (C.D. Cal. June 26, 2017) .......... 5, 11

*United States v. W.R. Grace,*
455 F. Supp. 2d 1148 (D. Mont. 2006) .......... 10

*Waymo LLC v. Uber Techs., Inc.*,
2017 WL 6887043 (N.D. Cal. Nov. 14, 2017) .......... 2, 20, 21

*Wright v. U.S.*,
2008 WL 820557 (D. Ariz. 2008) .......... 10

**Statutes**

15 U.S.C. § 1291 .......... 5

**Rules**

Fed. R. Evid. 702(b) .......... 9

Federal Rule of Evidence 702 .......... 8, 9

**PRELIMINARY STATEMENT**

In order to obtain class certification, Plaintiffs need to show that the key issues of antitrust injury and damages are capable of resolution by common proof. Plaintiffs have enlisted Dr. Daniel Rascher, an economist, to try to meet that burden. Dr. Rascher does three things of import at this stage of the case. First, he lays out three "but-for worlds"—antitrust terminology for Plaintiffs' visions of how NFL games would be televised absent some or all of the business agreements being challenged in this case. Second, he claims that injury and damages can be measured class-wide in one of those but-for worlds based not on any economic model, but on a factual scenario he has constructed in which every single Sunday afternoon NFL game can be accessed through a basic cable subscription. Third, he claims that injury and damages can be measured class-wide in the other two hypothetical worlds by doing basic arithmetic with numbers lifted from the expert report of Plaintiffs' other economist (Dr. Douglas Zona).

These conclusions are inadmissible as a matter of law. As we explain in our separate brief in opposition to class certification, Dr. Rascher's opinions are not valid evidence supporting class certification. The law is clear that the accepted way to show class-wide injury and damages in an antitrust case is to present a reliable economic model, and Dr. Rascher has prepared no such model. *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("*Rail Freight I") ("No damages model, no predominance, no class certification.").

In this motion, we explain why Dr. Rascher's conclusions are not the product of reliable methods and should be excluded under Rule 702. The expert report of Dr. Mark Israel explains in detail the many economic flaws with Dr. Rascher's analysis. *See* Kilaru Decl. Ex. 1 (Expert Report of Mark Israel) ("Israel Report"). Here, we focus on three categories of flaws warranting exclusion under Rule 702.

*First*, Dr. Rascher's conclusions rest on a series of implausible assumptions directly contradicted by the factual record in this case. Dr. Rascher purports to

predict how the NFL, its member clubs, DirecTV, broadcast networks, and other media distributors would act in a world without the agreements being challenged. But he ignored virtually all the documents from those entities, and virtually all the testimony from their representatives. Instead, he offers mere speculation unsupported by the facts. Courts, including in this Circuit, routinely exclude analysis that is based on "nothing but [] *ipse dixit*" and without a factual basis. *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002); *see also Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 831 (9th Cir. 2001).

*Second*, Dr. Rascher's conclusions as to damages are inadmissible because they are not the product of a rigorous methodology. His conclusions involve nothing more than "grade-school arithmetic counsel can do on an easel" often with numbers provided by Dr. Zona. *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 6887043, at *5 (N.D. Cal. Nov. 14, 2017) (excluding expert). And in two of his damages calculations, he simply accepts the results of Dr. Zona's models without doing anything "to ensure [their] reliability." *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 629 (W.D. Wash. 2011). Rule 702 prohibits this approach.

*Third*, while Dr. Rascher purports to address the issues of antitrust injury and damages for both the residential and commercial classes of Sunday Ticket purchasers, he does literally no analysis of the latter. Indeed, the only place his report mentions the commercial class is when he includes their purchases in his damages calculation. This type of drive-by analysis is also inadmissible.

## BACKGROUND

Defendants' Class Certification Opposition lays out the factual and procedural background of this case. In this brief, we focus on the background issues most relevant to understanding the flaws with Dr. Rascher's work.

Dr. Rascher claims that all of the issues in this case can be resolved with common proof. *See generally* Expert Report of Daniel A. Rascher, Dkt. 633-4 ("Rascher Report"). At the class certification stage, however, the key issue is

whether antitrust injury and damages can be resolved on a class-wide basis. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 676 (9th Cir. 2022); *Rail Freight I,* 725 F.3d at 252; *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 566 (N.D. Cal. 2013) (collecting cases). As noted above, Dr. Rascher does not attempt to generate any economic model to address these issues, though he has attempted to do so in other cases. *See, e.g.*, *Shields v. Fed'n Internationale de Natation*, 2022 WL 425359 at *9–10 (N.D. Cal. Feb. 11, 2022) (describing Dr. Rascher's before and after economic model, but deeming the model insufficient to support class certification).

Instead, Dr. Rascher lays out three but-for worlds in his report—in other words, predictions of how NFL games would be distributed absent the agreements being challenged in this case. He then asserts that class members uniformly would be better off in each of those worlds. These but-for worlds provide the critical infrastructure for Plaintiffs' claims that they can prove class-wide injury and damages. Below, we lay out what Dr. Rascher considered in developing those worlds, and his vision of how each world operates.

**Dr. Rascher's limited consideration of the record.** This case contains a robust record that could theoretically inform a robust analysis of the media landscape in which the NFL and its partners distribute NFL games. As the Court well knows, discovery in this case has been extensive. The NFL Defendants produced almost 140,000 documents; DirecTV produced more than twice that many documents (in addition to almost a hundred terabytes of data); and 15 other third parties—including numerous networks, multichannel video programming distributors ("MVPDs"), and other companies—have produced thousands of additional documents. In addition, the parties have deposed dozens of fact witnesses.

Dr. Rascher ignored virtually all of this evidence. His reliance list contains a small fraction of documents produced in the case. *See* Kilaru Decl. Ex. 2 (Transcript of Deposition of Daniel A. Rascher 24:16–20, 32:11–34:17) ("Rascher Tr.").

[REDACTED], including from the following witnesses Plaintiffs pushed to depose:

- Any current or former NFL employee besides Roger Goodell and Brian Rolapp. That includes the testimony of Hans Schroeder, one of the NFL's 30(b)(6) witnesses, who explained the NFL's [REDACTED]
- Jerry Jones, the owner of the Dallas Cowboys, and Jed York, the CEO of the San Francisco 49ers—owners of clubs that have voted to [REDACTED];
- Jeff Dunn, Vice President of Business Strategy & Analytics for the Seattle Seahawks, who helped inform club ownership on media issues;
- Every one of the five DirecTV witnesses who testified by the time of Dr. Rascher's deposition, including witnesses who testified to the [REDACTED]
- Larry Jones, the Executive Vice President of Fox Sports, and Sean McManus, Chairman of CBS Sports, who discussed [REDACTED] and
- Witnesses from NBC, ESPN, and Comcast who testified about similar issues.

Rascher Tr. 26:11–31:16. Despite not considering any of this evidence or testimony, Dr. Rascher goes on to describe three but-for worlds predicting how all of these different entities would behave under different economic conditions.

**The College Football But-For World.** Dr. Rascher's primary but-for world involves an analogy to college football. In technical antitrust terms, Dr. Rascher uses college football as a "yardstick." Using the yardstick method to calculate antitrust

damages requires establishing "product, firm, and market comparability." *Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *6 (C.D. Cal. June 26, 2017) (cleaned up). But Dr. Rascher spends virtually none of his report addressing any of those issues.

Dr. Rascher posits that absent the agreements Plaintiffs are challenging, the clubs would stop pooling their telecast rights for distribution on free broadcast television—conduct which is protected from antitrust scrutiny by the Sports Broadcasting Act, 15 U.S.C. § 1291. [REDACTED] Rascher Tr. 178:22–179:16 [REDACTED]. In Dr. Rascher's view, the clubs or divisions would all decide to make their games available through traditional television channels—either broadcast television channels (principally ABC, CBS, Fox, and NBC) or certain cable channels (*e.g.*, ESPN, ESPN2, ESPNU, FS1, FS2, and CBSSN). Rascher Report ¶ 250; Rascher Tr. 182:20–183:2. [REDACTED] *Id.* at 103:21–104:3.

Under Dr. Rascher's model, [REDACTED], *id.* at 166:23–167:1, [REDACTED], *id.* at 165:3–167:18. If a game were televised on, say, FS1 (a cable channel), fans everywhere in the country would have to subscribe to a cable package containing FS1 to watch it.

Dr. Rascher also claims that all of the individual game feeds would be available as part of a bundle provided through some streaming service. Rascher Report ¶ 270. Dr. Rascher claims, [REDACTED] *Id.* ¶¶ 268–269. [REDACTED]

[redacted] Kilaru Decl. Ex. 3 (Transcript of Deposition of Sarah Butler 145:19–147:8) ("Butler Tr.").

Taking these points together, Dr. Rascher concludes that *all* amounts paid by residential and commercial class members for Sunday Ticket [redacted] constitute damages in this case, because class members would have gotten all of the content in Sunday Ticket as part of their satellite subscriptions. Rascher Report ¶ 286. As a "conservative" adjustment, he claims that the cost of the basic cable package would increase by no more than [redacted]. *Id.* ¶ 261. The way he reaches that conclusion is not by any economic modeling, but simple division: He divides the current yearly rights fee paid by DirecTV for Sunday Ticket by the number of households with cable or satellite service. *Id.* ¶ 261 & n.298. With this adjustment, Dr. Rascher ultimately calculates damages of [redacted] (pre-trebling). *Id.* ¶ 282.

**The Non-Exclusive But-For World**. In his second proposed but-for world, Dr. Rascher imagines that DirecTV no longer has exclusive rights to broadcast the NFL's out-of-market games, and that the NFL makes the existing Sunday Ticket package available to multiple distributors. *Id.* ¶ 31. This but-for world is roughly analogous to how out-of-market games are distributed in professional basketball and baseball. *Id.* ¶ 284. [redacted] Rascher Tr. 156:21–157:8.

Dr. Rascher's damages model in this world consists of simple arithmetic pulled from Dr. Zona's separate report. Dr. Zona prepared several economic models to simulate the price of Sunday Ticket if it were distributed by multiple parties. *Id.* ¶ 284. Dr. Zona then compares those simulated prices with DirecTV's residential list prices for Sunday Ticket and comes up with a ratio between the two. *Id.* Dr. Rascher averaged a few of these ratios (which he terms "reduction factors") together, and then multiplied them by Dr. Zona's separate calculation of the total amounts paid by class

members for Sunday Ticket subscriptions. *Id.* Based on this math, Dr. Rascher calculates damages of [REDACTED] in the Non-Exclusivity But-For World (pre-trebling). Clarification of and Addendum to Expert Report of Daniel A. Rascher, Dkt. 663-2 ¶ 16 ("Rascher Addendum").[1]

**The No-Pooling But-For World.** In his third and final but-for world, Dr. Rascher assumes that the NFL clubs are prohibited from pooling their telecast rights in the games that compose Sunday Ticket, but that DirecTV is allowed to keep exclusive rights to the bundle of those games. Rascher Report ¶ 283. Dr. Rascher claims that [REDACTED] Rascher Tr. 76:21–77:16. [REDACTED] *Id.* at 93:10–94:8; 101:12–102:11.

[REDACTED] *Id.* at 77:17–78:7. I[REDACTED]. *Id.* at 111:17–112:13.

---

[1] Initially, Dr. Rascher averaged together three reduction factors from three separate models prepared by Dr. Zona. Rascher Report ¶ 283. After Dr. Zona's deposition, which exposed flaws in one of those models, Dr. Rascher submitted an addendum to his report omitting that model from his average. *See* Rascher Addendum ¶ 8; *see also* Memorandum in Support of the NFL Defendants' Motion to Exclude the Opinion of J. Douglas Zona, at 7 n.3 ("Zona Motion"). Excluding Dr. Zona's less rigorous analysis had the effect of *increasing* the claimed damages in this but-for world. *Compare* Rascher Report ¶ 284 [REDACTED] in the Non-Exclusivity But-For World), *with* Rascher Addendum ¶ 16 [REDACTED] in the Non-Exclusivity But-For World).

[redacted] *Id.* at 43:6–14. Based on Dr. Zona's comparison between the residential list prices for Sunday Ticket and the [redacted] but-for world price offered by Dr. Zona's modeling, Dr. Rascher replicates the same basic arithmetic above to project damages of [redacted] (pre-trebling). Rascher Report ¶ 283.

## LEGAL STANDARD

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), a district court "must act as a 'gatekeeper'" and "mak[e] a preliminary determination that [an] expert's testimony is reliable" before admitting that testimony for evidentiary purposes. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). In the class certification context, "[t]he Ninth Circuit has approved of a rigorous application of [the *Daubert* standard]" and the Court "must consider [] evidentiary objections to Plaintiffs' experts" prior to "addressing the merits of the certification motion." *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, 2017 WL 2559615, at *3 (C.D. Cal. June 7, 2017) (citing *Ellis*, 657 F.3d at 982). As the party offering Dr. Rascher as an expert, Plaintiffs "bear[] the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007) (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

## ARGUMENT

### I. Dr. Rascher's Proposed But-For Worlds Are Based On Ungrounded Assumptions Contrary To The Factual Record.

Dr. Rascher's opinions should be excluded under Rule 702 because they are based on unsupported (and incorrect) assumptions. Courts routinely exclude expert testimony on this basis, and this Court should do the same.

**A. Courts Routinely Exclude Expert Testimony That Is Based On Unsupported Assumptions.**

Rule 702 expressly requires that expert testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b); *see also, e.g.*, *Guidroz-Brault*, 254 F.3d at 831 ("an expert must back up his opinion with specific facts") (cleaned up). In other words, the expert's mere say-so is insufficient to carry the burden of establishing admissibility. As the Supreme Court has repeatedly cautioned, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also*, *e.g.*, *Domingo*, 289 F.3d at 607 (affirming exclusion where "there was nothing but [the expert's] *ipse dixit*").

Courts in the Ninth Circuit and throughout the country have routinely applied these principles to exclude expert testimony where the expert's opinion was not sufficiently supported by the factual record. *See, e.g.*, *Rearden LLC v. Walt Disney Co.*, 2021 WL 6882227, at *5 (N.D. Cal. July 12, 2021) ("Expert testimony is properly excluded where it relies on assumptions that are not sufficiently founded on facts." (citing *Guidroz-Brault*, 254 F.3d at 830–31)). In particular, courts have exercised their gate-keeping responsibility to exclude opinions that were based on assumptions (1) directly contrary to the factual record, and/or (2) without sufficient grounding because the expert undertook no investigation to determine whether the assumptions were supported by the facts.

For example, in *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966 (C.D. Cal. 2012), Judge Wilson excluded a series of economic models in an antitrust case. The models purported to establish concert ticket overcharges based on unfounded assumptions about the marketplace that failed to account for relevant "major variables." *Id*. at 973. One failed model, for example, assumed a conclusion without considering possible alternative outcomes. *Id.* at 975. "The only 'check'"

the expert performed to test his assumptions was "nothing more than a simple tautology," and the assumption was in fact contrary to the record. *Id.* at 975–76.

Similarly, in *Laumann v. National Hockey League*, an analogous case involving a challenge to the distribution of professional baseball and hockey games, Judge Scheindlin excluded an antitrust model as unreliable because its measurements of consumer demand were "largely untethered from the actual facts of this case." 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015). Plaintiffs in *Laumann*, represented by some of the same lawyers for Plaintiffs here, presented an expert who "substituted mathematical assumptions for actual, readily-obtainable information in determining how hockey and baseball fans will behave in the BFW." *Id.* If the expert had done "some extra legwork," he might have "uncovered data" that further supported his model. *Id.* at 318–19. Because he did not do so, there was "too great an analytical gap between the data and the opinion proffered," and the court excluded the testimony as "based on *insufficient* facts and data." *Id.* at 319; *see also Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041–42 (N.D. Cal. 2001) (excluding antitrust model that contained "too many assumptions and simplifications that are not supported by real-world evidence").[2]

---

[2] *See also*, *e.g.*, *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 748 (9th Cir. 2003) (excluding expert whose report took "into account only two variables" and "fail[ed] to account for other relevant variables"); *Rearden*, 2021 WL 6882227, at *7 (rejecting expert who "focus[ed] only on the data that supports the hypothesis and ignore[d] the data that undermines it"); *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1255 (S.D. Cal. 2013) (excluding testimony where the "expert has not grounded his assumption with the real world facts of this case"); *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *20 (C.D. Cal. 2011) (excluding damages calculation that was "based on factual assumptions that are entirely unsupported in the record"); *Wright v. U.S.*, 2008 WL 820557, at *8 (D. Ariz. 2008) (excluding testimony that "provided no factual or scientific support" and "fail[ed] to address facts in the record contrary to her opinion"); *United States v. W.R. Grace,* 455 F. Supp. 2d 1148, 1154 (D. Mont. 2006) (excluding expert testimony that was "an untested hypothesis unsupported by any facts or data").

**B. Dr. Rascher's But-For Worlds Are All Based On Unsupported Assumptions.**

The legal principles just described compel exclusion of each of Dr. Rascher's but-for worlds. Each world is based on a series of unfounded assumptions that are directly contradicted by record evidence that Dr. Rascher does not even know about—let alone address. There is too great an "analytical gap" between his opinions and reality. *Laumann*, 117 F. Supp. 3d at 319.

Indeed, the case for exclusion is even stronger here than in *Live Concert* and *Laumann*. There, the experts purported to do the traditional work of economists in antitrust cases, *i.e.*, economic modeling of a but-for world. *Live Concert*, 863 F. Supp. 2d at 974–75; *Laumann*, 117 F. Supp. at 315–19. The shortcoming was that their models were not supported by the evidence. Here, Dr. Rascher has not even prepared a model, making his failure to account for the facts even more damning. That is particularly so given the sheer volume of unfounded assumptions and how integral they are to each of his models.

1. *Improper Assumptions In The College Football But-For World.*

In every material aspect, Dr. Rascher's College Football But-For World relies on assumptions contrary to the factual record:

<u>Dr. Rascher assumes college football is comparable to the NFL.</u> To use college football broadcasting as a "yardstick," Dr. Rascher needed to confirm similarity of "product, firm, and market" between television distribution of NFL football and college football. *Tawfilis*, 2017 WL 3084275, at *6. The *Tawfilis* court admitted the yardstick method in that case because the expert "conducted the necessary analyses." *Id.* Dr. Rascher did not.

In particular, Dr. Rascher does not meaningfully consider three material factual differences between NFL and college football television distribution. First, Dr. Rascher acknowledges that NFL telecasts are uniquely popular, with "almost all

college games hav[ing] far lower demand than even the least-watched NFL game."[3] Rascher Report ¶ 115. As Dr. Rascher admitted at his deposition, [REDACTED] Rascher Tr. 173:21–24. Following that logic, the distribution options for more popular content (NFL games) might be more varied than for college—a point Dr. Rascher does not consider.

Second, the Sports Broadcasting Act "provides a tailored exemption for 'professional team sports' to sell their rights to 'sponsored telecasts' [*i.e.*, over-the-air broadcast games] through a joint agreement," and does not offer this same exemption to amateur team sports such as college football. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1146 (9th Cir. 2019). The ability to pool broadcast rights free from antitrust scrutiny is an obvious distinction between the sports that affects the media distribution landscape, and Dr. Rascher does not account for it in his selection of a yardstick.

Third, and relatedly, the NFL has different media priorities from college football teams and conferences. [REDACTED] Kilaru Decl. Ex. 4 (Transcript of Deposition of Roger Goodell 45:16–24, 209:16–24) ("Goodell Tr."); Kilaru Decl. Ex. 5 (Transcript of Deposition of Brian Rolapp 28:17–29:4) ("Rolapp Tr."), whereas no college team's games are all guaranteed for free to any customer. *See* Israel Report ¶¶ 34, 163–64. The resulting distinction is critical: Unlike with NFL football, fans of even the most popular college teams often need to purchase multiple different channels and maybe even service from both cable and satellite providers to secure access to all of the teams' games. *See* Israel Report ¶ 165 [REDACTED]

---

[3] As further explained in Dr. Israel's report, [REDACTED] Israel Report ¶ 160.

<u>Dr. Rascher assumes clubs will choose to put games on broadcast or cable.</u> Dr. Rascher concludes that [redacted] Rascher Tr. 182:24–183:2. [redacted], *id.* at 96:10–13, [redacted] *id.* at 102:12–19, [redacted], *id.* at 214:9–15, [redacted], *id.* 215:20–216:5. But he ruled out most of those options based on his conclusion that "the most popular content [is] shown on the most widely available networks." Rascher Report ¶ 216; Rascher Tr. 167:15–22.

This assumption runs directly contrary to the facts. At his deposition, Dr. Rascher admitted to one counterexample after another. [redacted] *See* Rascher Tr. 173:4–20 [redacted] *see also id.* at 174:3–11; 167:15–170:21, 190:15–17. [redacted] *Id.* at 173:25–174:14. [redacted] *Id.* at 174:20–175:1. Expert testimony should be excluded when it is "based on factual assumptions that are entirely unsupported in the record." *Bakst*, 2011 WL 13214315, at *20. Here, Dr. Rascher's assumption is directly *contrary* to the record.

<u>Dr. Rascher assumes that every network broadcaster would want to broadcast games at the same time.</u> [redacted] Rascher Tr. 202:22–203:12. That assumption runs contrary to the evidence: Witness



after witness testified about [REDACTED] *See, e.g.*, Kilaru Decl. Ex. 6 (Transcript of Deposition of Larry Jones 46:6–7) ("L. Jones (Fox) Tr.") [REDACTED]; Kilaru Decl. Ex. 7 (Transcript of Deposition of Sean McManus 42:24–43:3) ("McManus (CBS) Tr.") [REDACTED]; Rolapp Tr. 194:16–19 [REDACTED] Goodell Tr. 128:9–12 [REDACTED] This testimony—much of which Dr. Rascher ignored—directly undermines the idea that [REDACTED] "[I]gnor[ing] market realities and other externalities," as Dr. Rascher has done here, is "sufficient reason[] to exclude" an opinion. *See El Aguila Food Prod., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 625 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005).

<u>Dr. Rascher assumes cable channels would want NFL content.</u> Dr. Rascher also concludes that [REDACTED], but the only record evidence on this point is directly to the contrary. Larry Jones, the Executive Vice President of Fox Sports, testified at his deposition that [REDACTED] *See* L. Jones (Fox) Tr. 29:7–30:8. Again, Dr. Rascher "has not grounded his assumption with the real world facts of this case." *See Brighton*, 923 F. Supp. 2d at 1255.



Dr. Rascher assumes all NFL games will be part of the basic cable package. [redacted]. Rascher Tr. 249:16–21. [redacted] *See id.* 200:5–11. [redacted] *See* Israel Report ¶ 164.

Dr. Rascher assumes a bundle of games will exist. [redacted] *See* Rascher Tr. 230:24–233:11. [redacted] *id.* at 233:5–11, a concept that is contradicted by real-world examples of [redacted] Israel Report ¶ 163. [redacted] Rascher Tr. 80:9–14, [redacted]. Rascher Report ¶ 269, Butler Tr. 145:19–147:8.

Dr. Rascher's conclusion is also the product of a results-driven methodology. Dr. Rascher's basis for concluding that the streaming package will cost [redacted] is that [redacted] Rascher Report ¶¶ 268–69. Dr. Rascher acknowledges that the lower price may be "due to lower demand," but rules that out based upon the fact that the prices for "a yardstick product, NFL licensed jerseys," have "similar exchange-rate adjusted prices" in the United States and



Canada. *Id.* ¶ 269. To state this analysis is almost enough to refute it. But there is more: [redacted] Rascher Tr. 234:14–18; [redacted], *id.* at 234:19–235:5; [redacted], *id.* at 236:11–13. An expert who "cherry-pick[s evidence] that support[s] his conclusion and reject[s] or ignore[s] the great weight of the evidence that contradicts his conclusions" should be excluded. *Rearden*, 2021 WL 6882227, at *7 (quoting *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176, 1184 (N.D. Cal. 2007)).

2. *Improper Assumptions In The "Non-Exclusivity" But-For World.*

Dr. Rascher's conclusions about a scenario where Sunday Ticket is available on multiple platforms are similarly "untethered from the actual facts of this case." *Laumann*, 117 F. Supp. 3d at 315.

<u>Dr. Rascher assumes Sunday Ticket would still consist of CBS and Fox broadcast feeds.</u> [redacted] *See supra* at 14; Kilaru Decl. Ex. 8 (Transcript of Deposition of Paul Tagliabue Tr. 68:8–69:8, 196:6–22); L. Jones (Fox) Tr. 45:22–47:19; McManus (CBS) Tr. 42:13–44:1.

The record also contains uncontroverted testimony [redacted] Rascher Tr. 157:21–158:13. [redacted] *Id.* at

160:13–161:5, Kilaru Decl. Ex. 9 (Transcript of Deposition of Dave Pietrycha 144:17–145:11) ("Pietrycha (NBC) Tr."). [redacted] Rascher Tr. 161:18–162:5.

Witnesses from each network explained that [redacted] Larry Jones of Fox Sports explained [redacted] L. Jones (Fox) Tr. 103:5–8 [redacted] *see also id.* at 67:7–13. Similarly, NBC Universal's corporate representative made clear [redacted] Pietrycha (NBC) Tr. 145:9–14 [redacted] And Sean McManus, Chairman of CBS Sports, testified to the same effect. McManus (CBS) Tr. 71:1–72:15 [redacted]

This example directly undermines Dr. Rascher's conclusion [redacted] Dr. Rascher does not address this example in any way.

<u>Dr. Rascher assumes the NFL's Sunday Ticket contract terms would not change.</u> [redacted]



[redacted]. Rascher Tr. 145:5–146:18. [redacted] *See id.* 137:2–8; Israel Report ¶ 202; Kilaru Decl. Ex. 10 (Transcript of 30(b)(6) Deposition of DirecTV Witness Jamie Dyckes 34:3–37:6) ("Dyckes (DirecTV) 30(b)(6) Tr."). [redacted] Israel Report ¶¶ 76, 238; Dyckes (DirecTV) 30b6 Tr. 37:7–11. [redacted] Israel Report ¶¶ 238–40. Once again, Dr. Rascher does not grapple with the facts or economics. *See Bakst*, 2011 WL 13214315, at *20.

<u>Dr. Rascher assumes that discounts and free years would continue to exist</u>. Dr. Rascher also [redacted], Israel Report ¶¶ 27, 74; Rascher Tr. 110:4–16; 128:4–130:1, [redacted] Again, the record evidence is to the contrary. [redacted] *Id.* at 126:16–127:20 [redacted]

3. *Improper Assumptions In The "No Pooling" But-For World*

"Analytical gap[s]" also pervade Dr. Rascher's but-for world in which DirecTV moves a bundle of games to its basic tier in response to competition from single-team game packages. *Laumann*, 117 F. Supp. 3d at 319.

Dr. Rascher assumes that clubs would make their game broadcasts available to DirecTV for a bundle. [redacted] Rascher Tr. 77:11–16. There is no real-world analogy for the world Dr. Rascher is imagining, which is reason enough to doubt it. But, as noted above, there is also no reason to think [redacted] *See supra* at 15 [redacted] Rascher Tr. 91:19–21; 99:13–15 [redacted]

Dr. Rascher assumes DirecTV would place the bundle on one of its basic tiers. One of the central premises of this but-for world is that DirecTV provides the bundle to every subscriber. As Dr. Rascher admitted, [redacted]. *Id.* at 108:5–109:7. A former Senior Vice President at DirecTV testified that [redacted] Kilaru Decl. Ex. 11 (Transcript of Deposition of Alex Kaplan 187:8–19). There is accordingly "nothing but [] *ipse dixit*" supporting this assumption. *Domingo*, 289 F.3d at 607.

Dr. Rascher assumes DirecTV would make the bundle available on its lowest tier. Dr. Rascher further assumes that DirecTV would put the Sunday Ticket bundle on its lowest priced tier, contradicting DirecTV's demonstrated business practices for sports content. In the real world, DirecTV [redacted]—suggesting DirecTV would not take the approach Dr. Rascher posits. *See* Kilaru Decl. Ex. 12 (Transcript of Deposition of Chris Lauricella 57:4–16).

* * *

As the foregoing analysis shows, each of Dr. Rascher's but-for worlds is based on a series of assumptions that ignore the extensive factual record in this case. One or two such errors might go to the weight of Dr. Rascher's testimony, but here there is one after another. The sheer volume of instances requires exclusion. An economist who does no modeling and ignores the facts has nothing admissible to offer. *Domingo*, 289 F.3d at 607.

## II. Dr. Rascher's Damages Calculations Are Not The Product Of Sufficiently Rigorous Analysis.

Dr. Rascher's damages calculations should separately be excluded because they are all the type of "grade-school arithmetic" that courts have rejected. *Waymo*, 2017 WL 6887043, at *5.

In the College Football But-For World, Dr. Rascher initially concludes that [REDACTED]

*See supra* at 6. In the other two but-for worlds, Dr. Rascher simply multiplies the total amount of money class members spent on Sunday Ticket, generated by Dr. Zona, by percentages generated from Dr. Zona's models. This is not the stuff of admissible expert testimony. *See Waymo*, 2017 WL 6887043, at *5 (striking expert who "simply multipl[ied] the units of time espoused by [another expert] with dollar amounts lifted" from a separate slide); *id.* ("Straightforward application of grade-school arithmetic to uncomplicated numbers is well within the ken of the average juror.").

Dr. Rascher also fails Rule 702 by simply parroting numbers generated by another expert. Dr. Rascher admitted [REDACTED]

Rascher Tr. 44:10–20, 45:19–46:25. These failures warrant exclusion. *Fosmire*, 277

F.R.D. at 629 (excluding damages model when expert relied on another expert's opinion without testing the "underlying data to ensure its reliability"); *Waymo*, 2017 WL 6887043, at *5 (striking expert who "essentially parroted" another expert).

Finally, Dr. Rascher's application of these reduction factors involves a series of implausible assumptions. To calculate damages, Dr. Rascher simply multiplies every class member's purchases by a uniform percentage reduction. A simple example illustrates the flaw with this approach. The reduction factor in the College Football But-For World is [REDACTED]. Rascher Report ¶¶ 261, 282. Applying that factor to named Plaintiff Frantz's Sunday Ticket purchase in 2014 [REDACTED] suggests Frantz would have paid just [REDACTED] for Sunday Ticket. *Id.* ¶ 285; Rascher Tr. 56:23–57:6. Applying that factor to named Plaintiff Lippincott's Sunday Ticket purchase in 2014 [REDACTED] suggests Lippincott would have paid just [REDACTED] for Sunday Ticket. Rascher Report ¶ 285; Rascher Tr. 59:13–24. These results are disqualifying because they suggest consumers could have gotten a large quantity of a "prized product," *id.* at 80:9, for [REDACTED].

Further, accepting this methodology requires accepting the supposition that every single member of two diverse classes—a consumer in Chicago, a bar in Nebraska, a national restaurant chain, and the operator of a crowded casino in Las Vegas—would have their prices reduced by the exact same amount. *Id.* at 66:12–67:8. It also requires accepting the counterintuitive premise that all prices in the real world—whether list prices, promotional prices, or individually-negotiated deep discounts—would carry over perfectly into the but-for world.

Courts have rejected economic testimony based on such sweeping and unsupported assumptions. *See In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (finding expert report did not "provide an adequate basis for concluding that antitrust injury may be adjudicated on a class-wide basis" where it "ma[de] no attempt to establish, but instead simply assume[d], class-wide impact"). This Court should do the same.

### III. Dr. Rascher Improperly Treats The Commercial And Residential Classes Uniformly.

Consistent with Plaintiffs' decision to seek certification of two separate classes, Dr. Rascher agrees that there are many key distinctions between residential and commercial subscribers. For instance, [REDACTED] Rascher Tr. 69:3–20. Furthermore, [REDACTED] *Id.* at 70:5–15.

Notwithstanding his acknowledgment of these differences, Dr. Rascher [REDACTED] *Id.* at 66:12–67:8. [REDACTED] This approach presents yet another unprincipled assumption "not supported by real-world evidence," justifying the exclusion of Dr. Rascher. *See Am. Booksellers*, 135 F. Supp. 2d at 1041–42 (excluding antitrust model that contained "too many assumptions and simplifications that are not supported by real-world evidence").

## CONCLUSION

For the foregoing reasons, Dr. Rascher's opinions should be excluded under Rule 702.

Dated: November 4, 2022

Respectfully submitted.

/s/ *Rakesh N. Kilaru*
Rakesh N. Kilaru (admitted *pro hac vice*)
Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com

Neema T. Sahni (Bar No. 274240)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
nsahni@cov.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*