Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668-PSG (JEMx) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **MEMORANDUM IN OPPOSITION TO THE NFL DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF SARAH BUTLER**<br><br>JUDGE: Hon. Philip S. Gutierrez<br>DATE: January 27, 2023<br>TIME: 1:30 p.m.<br>COURTROOM:<br>    First Street Courthouse<br>    350 West 1st Street<br>    Courtroom 6A<br>    Los Angeles, CA 90012 |

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND .............................................................................................. 3

LEGAL STANDARD ...................................................................................... 9

ARGUMENT .................................................................................................. 11

    I.    The Butler Survey Is Relevant: It Focuses on the Correct
        Target Population and Asks the Right Questions, Which Are
        Not Criteria for Admissibility in Any Event. ..................................... 11

        a.    The Butler Survey Includes Sunday Ticket. ........................... 12

        b.    The Butler Survey Appropriately Addresses a Target
                Population of NFL Fans and Includes Hundreds of
                Class Members ....................................................................... 14

        c.    The Butler Survey Investigates Purchasing
                Preferences ............................................................................. 16

    II.    Expert Disagreements on Survey "Design Flaws" Are Not
        the Stuff of *Daubert* Challenges. .......................................................... 17

        a.    The Butler Survey Appropriately Utilized Two Waves
                in Light of Documents Produced by the NFL in
                Discovery. .............................................................................. 17

        b.    Ms. Butler's Survey Data Permit the Calculation of
                Confidence Intervals, But She Did Not Need to
                Perform Those Calculations to Reach Her Conclusions
                and the Literature Does Not Require It. ................................... 19

    III.    "Irrational" Consumer-Survey Results Do Not Warrant
        Exclusion. ............................................................................................. 21

CONCLUSION ............................................................................................... 25

i

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Page(s)**

4

**Cases**

5

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*,

6

    No. ML 13-2438, 2017 WL 2559615 (C.D. Cal. June 7, 2017) ........................ 10

7

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,

8

    251 F.3d 1252 (9th Cir. 2001) ....................................................................... 10, 11

9

*In re ConAgra Foods, Inc.*,

    90 F. Supp. 3d 919 (C.D. Cal. 2015) ...................................................... 11, 15, 19

10

*Daubert v. Merrell Dow Pharms., Inc.*,

11

    509 U.S. 579 (1993) ......................................................................... 2, 17, 22, 23

12

*E. & J. Gallo Winery v. Gallo Cattle Co.*,

13

    967 F.2d 1280 (9th Cir. 1992) ............................................................................ 11

14

*Elliot v. Google Inc.*,

15

    45 F. Supp. 3d 1156 (D. Ariz. 2014), *aff'd sub nom. Elliott v.*

    *Google, Inc.*, 860 F.3d 1151 (9th Cir. 2017) ..................................................... 20

16

*Elosu v. Middlefork Ranch Inc.*,

17

    26 F.4th 1017 (9th Cir. 2022) ............................................................................ 10

18

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,

19

    618 F.3d 1025 (9th Cir. 2010) ..................................................................... 10, 19

20

*Hardeman v. Monsanto Co.*,

21

    997 F.3d 941 (9th Cir. 2021) ............................................................................. 10

22

*Icon Enters. Int'l, Inc. v. Am. Prods. Co.*,

23

    No. CV 04-1240, 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) .................... 14, 15

24

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*,

25

    No. 19-MD-02913, 2022 WL 2343268 (N.D. Cal. June 28, 2022) .................. 22

26

*Keith v. Volpe*,

27

    858 F.2d 467 (9th Cir. 1988) ............................................................................. 11

28

*MacDougall v. Am. Honda Motor Co.*,
    No. SACV 17-1079, 2020 WL 5583534 (C.D. Cal. Sept. 11, 2020),
    *rev'd and remanded,* No. 20-56060, 2021 WL 6101256 (9th Cir.
    Dec. 21, 2021) ..............................................................................................23, 24

*Marksman Sec. Corp. v. P.G. Sec., Inc.*,
    No. 19-62467-CIV, 2021 WL 8972429 (S.D. Fla. Dec. 15, 2021)...................16

*Messick v. Novartis Pharms. Corp.*,
    747 F.3d 1193 (9th Cir. 2014)........................................................................10

*Morales, et al. v. Kraft Foods Grp., Inc., et al.*,
    LA CV14-04387, 2017 WL 2598556 (C.D. Cal. June 9, 2017) ............11, 14, 15

*Navarro v. Procter & Gamble Co.*,
    No. 1:17-CV-406, 2021 WL 868586 (S.D. Ohio Mar. 8, 2021).................22, 23

*Oracle Am., Inc. v. Google Inc.*,
    No. C 10-03561, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012)..................23, 24

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010)...........................................................................12

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997)...................................................................11, 14

*Weaver v. Champion Petfoods USA Inc.*,
    No. 18-CV-1996, 2019 WL 7370374 (E.D. Wis. Dec. 31, 2019).....................16

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017).........................................................................10

*Wendt v. Host Int'l, Inc.*,
    125 F.3d 806 (9th Cir. 1997)...........................................................................11

*Williams v. Apple, Inc.*,
    338 F.R.D. 629 (N.D. Cal. 2021) ....................................................................22

**Other Authorities**

Fed. R. Evid. 702 ..............................................................................................9, 10

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*AAPOR Guidance on Reporting Precision for Nonprobability Samples*,
   American Association for Public Opinion Research (Apr. 22, 2016)
   https://www.aapor.org/getattachment/Education-Resources/For-
   Researchers/AAPOR_Guidance_Nonprob_Precision_042216.pdf.a
   spx................................................................................................................20

## **PRELIMINARY STATEMENT**

Sarah Butler, a Managing Director at NERA Economic Consulting and Chair of NERA's Survey and Sampling Practice, is frequently called upon—by plaintiffs *and* defendants—in complex litigation to provide her expertise in consumer-survey design and implementation. Over the last two decades, more than 50 federal courts have recognized Ms. Butler's acumen and welcomed her expert testimony in litigation spanning antitrust claims, trademark confusion, secondary meaning, false advertising, patent infringement, and employment matters.

In this case, Ms. Butler designed and implemented a conjoint survey of 975 respondents—drawn from an invitation pool of roughly 96,000 individuals and 10,165 people who started the survey—to understand the viewing habits and preferences of NFL fans,[1] including current and former Sunday Ticket subscribers. Mirroring the NFL's own market research and consumer surveys, Ms. Butler's survey investigated consumer preferences for different football game-viewing packages at various price points, including access to all out-of-market games (as with Sunday Ticket); access to a single team's games; and access to a single game. ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████ Her survey also measured the extent to which viewers would switch away from, or subscribe to, DirecTV for access to their preferred football viewing package.

Ms. Butler drew two chief conclusions from her survey data, spanning 14,625 choice-set responses (975 respondents x 15 choice sets)—consistent with the NFL's own findings. First, "a substantial number of consumers would prefer package options beyond the current Sunday Ticket offering. . . . [M]any consumers would prefer to have the ability to select access to a single team's games, or access

---

[1] Ms. Butler actually investigates "consumers interested in NFL football games," to be precise, but we will use the term "fans" here for brevity.

1

to single games, and do not want to be limited to a package that provides content they may not want or do not have the time." Gosselin Decl. Ex. 1 (Declaration of Sarah Butler) ("Butler Report") ¶110. Second, "[t]hese data also demonstrate that consumers who are not current DirecTV subscribers would generally be unwilling to switch to DirecTV to access their preferred NFL content." *Id*. As Ms. Butler explained in deposition, her conclusions are *not* limited to the 975 survey respondents but rather are relevant to the broader population of consumers interested in NFL football games and shed light on their preferences.

In conducting her study, Ms. Butler adhered closely to (and cited) best practices for the design of surveys used as evidence in litigation, as set forth in the *Reference Guide on Survey Research* and the *Manual for Complex Litigation*. She also undertook extensive preliminary research to ensure that her final questionnaire appropriately evaluated the key concepts, reflected a set of understandable viewing and game choices, and was clearly worded and understood by survey respondents. That preliminary research included (1) a review of numerous consumer surveys, market-research findings, and questionnaires about NFL viewing habits produced by the NFL and third parties in this litigation; (2) a series of focus groups to understand consumers' current preferences for NFL viewing packages and how consumers might understand viewing alternatives that do not currently exist on the market; and (3) a series of pre-test interviews to evaluate the survey instrument and the data-collection and respondent-selection procedures.

Against this, the NFL's arguments fall short of the demanding standards for exclusion of survey experts in this Circuit. The Ninth Circuit confines *Daubert* challenges of survey experts to two parameters: relevance and whether the survey was conducted according to generally accepted principles. Thus, even if the NFL's criticisms had merit (and they do not), the "follow-on" issues it raises—survey design, sample size, timing, methodology, reliability, and conclusions—go to the weight of the survey rather than its admissibility. The NFL ignores this guidance as

well as the underlying conjoint-survey literature and the standards for survey evidence set forth in the *Reference Guide on Survey Research* and the *Manual for Complex Litigation*. Its motion turns instead on disagreements between its survey expert, Dr. Nancy Mathiowetz, and Ms. Butler about survey design and methodology—and selective and misleading quotations from Ms. Butler's deposition. Neither is reason to exclude Ms. Butler's survey and testimony.

## **BACKGROUND**

Ms. Butler's opening and rebuttal reports detail her methodological rigor and adherence to the *Reference Guide on Survey Research*, *the Manual for Complex Litigation*, and the underlying conjoint-survey literature. We focus here on responding to the "features salient to [the NFL's] motion." Br. 2.

**The survey was unquestionably designed to answer a question tied to this case.** Ms. Butler was asked "to design and implement a survey to understand the viewing habits and preferences of consumers interested in NFL football games," and one focus was "consumer preferences for different football game viewing packages including access to all out-of-market games, access to a single team's games, or access to a single game." Butler Report ¶8. As she explains, "Plaintiffs have alleged that the agreement between the Teams, the NFL, and DirecTV has allowed these parties to charge higher prices for viewing access than they otherwise would. Plaintiffs further allege that the arrangement forces consumers to pay for access to all (32) teams' out-of-market games, when in fact, they may only be interested in a single team's games or a single game. To evaluate consumers' preferences for different viewing options and access to out-of-market NFL games, I designed and implemented a survey." *Id*. ¶¶14, 15. That approach plainly "match[es] up with the issues before the Court." Br. 2.

Nor is it accurate that Ms. Butler merely measured "whether respondents would prefer, rather than purchase, various different out-of-market packages." Br. 2. Her survey asks respondents to choose from among five different packages (or

none), at specific price points, and instructs "[i]t is important that you answer in the way you would *if you were **actually selecting** a viewing package*." Butler Report ¶¶80-81 (emphasis added) ("Thinking about the options you see here, which package would you be most likely to select?").

**Ms. Butler understood out-of-market games.** This case is about the NFL's unlawful restrictions on the output of televised out-of-market games. As a result of those restrictions, fans who wish to watch out-of-market *teams* must subscribe to NFL Sunday Ticket to ensure they receive those games. After all, without Sunday Ticket, fans are only assured access to games played by their in-market teams. Ms. Butler is very clear on this terminology and the distinction between out-of-market teams and out-of-market games. In deposition, for example, Butler confirmed that her survey "

Gosselin Decl. Ex. 2 (Transcript of Deposition of Sarah Butler) ("Butler Tr.") 21:12-25. Dr. Mathiowetz concedes too that Ms. Butler

Gosselin Decl. Ex. 3 (Expert Report of Nancy Mathiowetz) ("Mathiowetz Report") ¶117 (emphasis added).

**The choice exercises involved Sunday Ticket.** Through a series of choice exercises, Ms. Butler's survey respondents were asked to select from among five potential football viewing packages (or none), at various price points. The "All Access" package, described as "[a]ccess to <u>all</u> out of market games for the entire season" ("those you cannot see on broadcast television in your local market"), was intended to mimic NFL Sunday Ticket Basic and priced accordingly. Butler Report

4

¶76. The "All Access Plus" package, which adds "the ability to see eight live games at once" and "access game highlights on demand," was intended to mimic NFL Sunday Ticket Max and priced accordingly. *Id*. The remaining viewing packages (access to all games for a preferred or assigned team; access to single games) do not exist, despite considerable consumer demand for them. In deposition, Ms. Butler explained that the "All Access" and "All Access Plus" packages ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ As Ms. Butler testified, ██████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ *Id*. (emphasis added).

Ms. Butler's focus groups, pre-test subjects, and survey respondents understood well the packages being offered to them. In the one instance where her focus group participants flagged ambiguity—about whether respondents would still have access to local broadcasts of football games—Ms. Butler resolved it for future survey respondents with a note that "[a]ll regular season games that are available to you on your local affiliate remain available regardless of the package selected." Butler Report ¶¶60, 77. That admonition appeared in the initial instructions and at the top of each of the 15 choice sets. *Id*. Across more than 1000 people (focus group participants, pre-test participants, and survey respondents), *no one* expressed confusion about or sought clarification of the supposed ambiguities that the NFL

now identifies, including whether "Thursday Night [or] Monday Night Football games were included" in the All Access package or whether the "toggle" feature was available for both All Access packages. Br. 4.

**Ms. Butler employed realistic prices for each package.** In devising potential prices for the different football viewing packages, Ms. Butler used the actual 2021 prices of Sunday Ticket Basic and Sunday Ticket Max, respectively, for the All Access and All Access Plus package midpoints. Butler Tr. 136:23-142:4; Butler Report ¶78. She then used a standard conditional pricing approach to create a 30% spread from the lowest price to the midpoint and another 30% spread from the midpoint to the highest price, adjusting to prevent some overlap between the packages and changing some of the decimal points to look more reasonable to respondents. Butler Tr. 136:23-142:4; Butler Report ¶78. This approach necessarily included prices that ranged " ██████████████████████████ Br. 4, just as the NFL's studies and surveys have. In this limited respect, Ms. Butler's higher and lower prices were not " ████████████████████████████████████ ███████████████ Butler Tr. 137:18-139:11.

Ms. Butler also set the price of the single-team football viewing packages at 50% of the cost of All Access. Butler Tr. 142:13-150:8. In doing so, she ██████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ Butler Tr. 145:23- 146:10. She was not, however, ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Butler Tr. 147:9- 148:17. ██████████████████████████████████████████████████ ██████████████████████████████████████████ Butler Report ¶29; Butler Tr. 149:10-150:8. ██████████████████████████

1 ████████████████████████████████████████████████████████

2 ████████████. Butler Report ¶29; Butler Tr. 149:10-150:8.

3      Finally, for the single game prices, Ms. Butler utilized a range of $4.89 to

4 $9.99 in Wave 1 and $11.99 to $44.99 in Wave 2. Butler Report ¶78. At the two

5 lowest prices in Wave 1 ($4.89 and $5.95), there could hypothetically be some

6 overlap with Team Access preferred pricing—to the extent that those

7 configurations appeared in the randomly generated choice sets and a fan might wish

8 to buy 17 games a la carte instead of the Team Access preferred package (*i.e.*,

9 comparing $83.13 ($4.89 x 17) and $101.15 ($5.95 x 17) to $107.94). But in all

10 other single-game configurations in Wave 1 and Wave 2 (*i.e.*, the other eight per-

11 game prices compared to the five price points for Team Access preferred), no such

12 overlap existed, with Team Access preferred pricing always higher than any 17

13 single games. In any event, Ms. Butler challenged the notion that it would be

14 irrational for NFL fans ever to select Team Access preferred at a higher price point

15 than 17 games a la carte. Butler Tr. 153:14-154:12. As she observed, her survey

16 inquires: █████████████████████████████████████████████████

17 ████████████████████████████████████████████████████?" *Id.*

18 Indeed, the lone survey pre-test participant to identify the possibility of using

19 single-game access to achieve Team Access preferred viewing emphasized the

20 *differences* between the two options, noting that he might not actually purchase all

21 (or even many) of his preferred team's games a la carte and might switch to another

22 team altogether. Butler Tr. 155:2-156:3.

23      **Ms. Butler conducted a single survey with two waves of data collection**

24 **over six weeks.** While conducting her survey, Ms. Butler (and Plaintiffs) received,

25 in discovery, ████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

27 ███████████████████████████████████████ Butler Report ¶79. ██████

28 ████████████████████████████████████████████████████████



.; Butler Tr. 104:1-108:8, 158:18-160:22. In all other respects, Ms. Butler's survey remained the same. Ms. Butler did not, for example, ▮▮▮▮▮ Br. 5; Butler Tr. 159:2-5 (Q: ▮▮▮▮▮ ).

**Ms. Butler's conclusions derive from extensive preliminary research, months of survey design and execution, and a rich data set comprised of 14,625 choice responses from 975 respondents.** Drawing on her focus groups, her pre-test investigation, and her survey results, Ms. Buter determined that **"**a substantial number of consumers would prefer package options beyond the current Sunday Ticket offering": "many consumers would prefer to have the ability to select access to a single team's games, or access to single games, and do not want to be limited to a package that provides content they may not want or do not have the time to watch." Butler Report ¶110. Moreover, her "data also demonstrate that consumers who are not current DirecTV subscribers would generally be unwilling to switch to DirecTV to access their preferred NFL content." *Id.* As Ms. Butler explained in her deposition, she did not need to calculate a statistical margin of error for purposes of her analysis or to reach her conclusions (although one can do so with her data). Butler Tr. 205:23-208:25, 238:13-243:19. Indeed, the *Reference Guide on Survey Research*, the *Manual for Complex Litigation*, and the American Association for Public Opinion Research (AAPOR) Code uniformly do not require standard-error calculations for surveys drawn from non-probability samples (*i.e.*, units selected from a population using non-random criteria) like Ms. Butler used here.

1    As a formal matter, Ms. Butler was █████████████████████████

2    ████████████████████████████████████ Butler Tr. 205:23-208:25,

3    238:13-243:19. When asked whether ██████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    ███████████████████████████████████ *Id*. 240:25-241:12. ████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████ *Id*. 241:14-242. █████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████

16   ████████████████████████████████ *Id*. Furthermore, ████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████ *Id*. 242:14-243:1 (emphasis

23   added). In sum, ████████████████████████████████████████████████

24   ████████████████████████████████ *Id*. 243:7-19.

## LEGAL STANDARD

26   Federal Rule of Evidence 702 embraces expert testimony if (1) "the

27   testimony is based on sufficient facts or data"; (2) "the testimony is the product of

28   reliable principles and methods"; and (3) "the expert has reliably applied the

principles and methods to the facts of the case." Fed. R. Evid. 702; *see also In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, No. ML 13-2438, 2017 WL 2559615, at *3 (C.D. Cal. June 7, 2017) (Gutierrez, J.) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). When applying Rule 702, the district court acts as "a gatekeeper, not a fact finder." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010)). The focus of the district court's gatekeeping function "is not the correctness of the expert's conclusions but the soundness of his methodology." *Id.* (internal quotation and citation omitted).

District courts evaluate reliability under Rule 702 by asking "(1) whether the theory or technique employed by the expert is generally accepted in the scientific community; (2) whether it's been subjected to peer review and publication; (3) whether it can be and has been tested; and (4) whether the known or potential rate of error is acceptable." *Hardeman v. Monsanto Co.*, 997 F.3d 941, 960 (9th Cir. 2021) (internal quotation and citation omitted). "The inquiry is 'flexible,'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993)), and "should be applied with a 'liberal thrust' favoring admission," *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588).

Notably, the Ninth Circuit has "long held that survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (quoting *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)). Treatment of surveys is a two-step process: "First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001). "Once the survey is admitted, however, ***follow-on issues of***

*methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility*. These are issues for a jury or, in a bench trial, the judge." *Id*. (emphasis added); *see Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go to the weight given the survey, not its admissibility."); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1143 (9th Cir. 1997) (objections to the form of survey questions and the geographic region in which it was conducted "go only to the weight, and not the admissibility, of the survey"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992) (objections to "slanted" survey questions and improper coding of responses go to weight not admissibility); *see also Morales, et al. v. Kraft Foods Grp., Inc., et al.*, LA CV14-04387, 2017 WL 2598556, at *10 (C.D. Cal. June 9, 2017); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 949 (C.D. Cal. 2015). Accusations of "technical inadequacies" in a survey, for example, "including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Volpe*, 858 F.2d at 480.

## ARGUMENT

**I.    The Butler Survey Is Relevant: It Focuses on the Correct Target Population and Asks the Right Questions, Which Are Not Criteria for Admissibility in Any Event.**

Ms. Butler's survey evaluated fan interest in different football game-viewing packages, including NFL Sunday Ticket and single-team and single-game packages that do not currently exist (but are commonplace for other sports), ███████████ ██████████████████████████. It also investigated whether NFL fans would switch away from, or subscribe to, DirecTV for access to their preferred viewing package. ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████. Butler Report

¶¶18-39; Gosselin Decl. Ex. 4 (Rebuttal Declaration of Sarah Butler) ("Butler Rebuttal Report") ¶38. So too here, where Ms. Butler specified a target population of NFL fans over the age of 18 and fielded 975 survey respondents, nearly half of which were current or former Sunday Ticket subscribers. Those respondents' answers to various questions, including 15 conjoint choice sets, yield a rich data set spanning 14,625 discrete responses. Butler Report ¶99, Table 7. From those myriad data, Ms. Butler concludes, consistent with the NFL's own research, "that many consumers would prefer to have the ability to select access to a single team's games, or access to single games, and do not want to be limited to a package that provides content they may not want or do not have the time to watch." *Id*. ¶110. Additionally, she concludes that her data "also demonstrate that consumers who are not current DirecTV subscribers would generally be unwilling to switch to DirecTV to access their preferred NFL content." *Id*.

Ms. Butler's survey and testimony are plainly relevant to the central questions in this case and "fit" Plaintiffs' theory of liability and damages. *See, e.g., Primiano*, 598 F.3d at 565 (emphasizing that "the inquiry must be flexible" and that expert testimony is "relevant to the task at hand" so long as "the knowledge underlying it has a valid connection to the pertinent inquiry"). Her data also provide an appropriate input for one of Dr. Zona's *two* models, further validated by the NFL's own studies and predictions.[2]

### a.    The Butler Survey Includes Sunday Ticket.

Ms. Butler's All Access and All Access Plus viewing packages (mirroring Sunday Ticket Basic and Sunday Ticket Max, respectively) provide "access to all out of market games for the entire season" and clarify further that "out of market games are those that you cannot see on broadcast television in your local market."

---

[2] We address the criticisms of Dr. Zona's use of the survey data in our separate brief opposing the NFL's motion to exclude Dr. Zona's opinions.

Butler Report ¶76. The NFL and its expert strain to ████████████████

████████████████████████████████████████████████ Br. 8, but

the minutiae they come up with were never a source of confusion for Ms. Butler's

focus groups, pre-test participants, or survey respondents: not a single individual

articulated the concerns now voiced by the NFL. Notably, too, neither the NFL nor

DirecTV has ever used Dr. Mathiowetz's preferred package description, to her

knowledge. Gosselin Decl. Ex. 5 (Transcript of Deposition of Nancy Mathiowetz)

("Mathiowetz Tr.") 94:3-22.

The NFL nitpicks, for example, in demanding that the package description

████████████████████████████████████████████████████

████████████████████████████████████████████ Br. 8 (emphasis

added). Similarly, the NFL complains that the All Access description does not

████████████████████████████████████████████████████

████████████ *Id*. (emphasis added). ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. Butler Rebuttal

Report ¶¶64-67.

Ms. Butler also confirmed the inclusion of Sunday Ticket in her survey. In

deposition, Ms. Butler testified ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Butler Tr. 119:16-

121:19 ████████████████████████████████████ "). ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ *Id*. As

1  Ms. Butler explained, ████████████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  ███████████████████████████████████ *Id*. (emphasis added).

5      **b.      The Butler Survey Appropriately Addresses a Target Population**

6          **of NFL Fans and Includes Hundreds of Class Members.**

7  ████████████████████████████████████████████████████████████

8  ██████████ Br. 9. In fact, █████████████████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ████████████. Butler Rebuttal Report ¶¶36-48.

14      Nevertheless, the NFL complains that, in its estimation, "[t]he survey

15 population is both overinclusive and underinclusive." Br. 9. It forgets the "general

16 rule" that "courts within the Ninth Circuit are reluctant to exclude survey evidence

17 on the basis of an overinclusive or underinclusive target population." *Icon Enters.*

18 *Int'l, Inc. v. Am. Prods. Co.*, No. CV 04-1240, 2004 WL 5644805, at *26 (C.D. Cal.

19 Oct. 7, 2004) (inventorying cases and approving an approach in which "the

20 universe is more narrowly drawn" to include "actual consumers of products like the

21 defendant's"); *Morales, et al.*, 2017 WL 2598556, at *12 (noting the "general rule,"

22 the paucity of in-circuit cases going in the other direction, and the survey expert's

23 "reasoned explanation for his decision not to limit the survey audience to

24 purchasers of the Product"). Notwithstanding the NFL's protest, "there is no

25 requirement that the universe of those surveyed overlap entirely with the

26 class." *Morales, et al.*, 2017 WL 2598556, at *13; s*ee Southland*, 108 F.3d at 1143

27 (objection that a survey tested only a subset of the class went "only to the weight,

28 and not the admissibility, of the survey").

Nor would it *matter* if Ms. Butler's survey results were restricted to the subset of respondents who are current or former Sunday Ticket subscribers. As Ms. Butler's data reflect, even that subset of respondents provides a rich source of information, including 7,125 conjoint choice-set responses (*i.e.*, 475 respondents x 15 choice sets), that again support her conclusion that "many consumers would prefer to have the ability to select access to a single team's games, or access to single games, and do not want to be limited to a package that provides content they may not want or do not have the time to watch." Butler Report ¶110. Tellingly, ▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Br. 9;

Butler Report Ex. M; Butler Rebuttal Report ¶20.

Ms. Butler was not required to survey commercial class members either. She investigated the consumer preferences of NFL *fans*, including those who watch football games in commercial establishments. To be sure, that investigation sheds some light on what packages commercial establishments might wish to purchase to court customers. But the NFL is wrong that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ compels exclusion. Br. 9. At most, its charge of "underinclusive[ness]" goes to weight, and it further ignores that Butler's survey included a measure of the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇ (Butler Rebuttal Report ¶20) and sidesteps Dr. Rascher's methods for estimating damages to commercial class members. *See, e.g.*, *Morales, et al.*, 2017 WL 2598556, at *13 ("there is no requirement that the universe of those surveyed overlap entirely with the class" and objections that a survey tested only a subset of the class go to weight); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 949; *Icon Enters. Int'l, Inc.*, 2004 WL 5644805, at *25 (collecting cases).

The NFL's out-of-circuit cases address very different situations in which surveys targeted "the entire U.S. adult population, without any attempt to reach potential buyers of the services in question . . . or otherwise to achieve a meaningful

universe of individuals whose perceptions are relevant to this litigation". *Marksman Sec. Corp. v. P.G. Sec., Inc.*, No. 19-62467-CIV, 2021 WL 8972429, at *3 (S.D. Fla. Dec. 15, 2021); *see Weaver v. Champion Petfoods USA Inc*., No. 18-CV-1996, 2019 WL 7370374, at *5 (E.D. Wis. Dec. 31, 2019) ("The Survey did not even attempt to sample the population which would form a class," drawing from the general adult population as opposed to anyone likely to consider purchasing the product in question; as a result, "less than one percent actually [fell] within the proposed class"). By contrast, Ms. Butler took care to recruit NFL fans, including current and former Sunday Ticket subscribers—the same population that the NFL has targeted for its own market research and consumer surveys.

### c.   The Butler Survey Investigates Purchasing Preferences.

The Butler survey inquires about purchasing behavior by asking fans which football viewing packages they might prefer at specific price points. The NFL mistakenly suggests that by "assessing consumer preferences among packages" Ms. Butler "never intended to measure purchasing behavior." Br. 9. As Ms. Butler's survey instructions made clear, "[i]t is important that you answer in the way you would if you were ***actually selecting*** a viewing package." Butler Report ¶¶80-81 (emphasis added) ("Thinking about the options you see here, which package would you be most likely to select?"). As such, the survey plainly asks "whether they would actually purchase such a package in the real world." Br. 10. Ms. Butler confirmed, moreover, that her survey measures ████████████████████████ ████████████████████████████████████████████████████ Butler Tr. 50:23-51:12. ███████████████████████████████████████████████████

███████████████████████████████████ *Id*. 52:6-17. Ms. Butler did not, however, use her survey data ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████ *Id*. 52:18-53:6. That exercise was not necessary for her analysis or

conclusions, nor was it a part of her assignment. As such, Ms. Butler declined to speculate about how her survey ███████████████████████████ without first considering that new project. Butler Tr. 53:8-12.

## II.  Expert Disagreements on Survey "Design Flaws" Are Not the Stuff of *Daubert* Challenges.

### a.  The Butler Survey Appropriately Utilized Two Waves in Light of Documents Produced by the NFL in Discovery.

The NFL also insists that Ms. Butler conducted *two* different surveys, which might—in the NFL's estimation—be at odds with accepted principles in conjoint survey practice. Which "accepted principles" the NFL cannot say, focusing instead on Dr. Mathiowetz's quarrels with Ms. Butler (also conspicuously without citation). Br. 10-11. In any event, Ms. Butler conducted a *single* survey over six weeks (December 21, 2021 to February 8, 2022), after she conducted her focus groups (in November 2021); after she convened her pre-test interviews (in December 2021); and after she completed extensive preliminary research. Butler Report ¶¶44, 57, 66. Roughly halfway through her survey-data collection, ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ *Id*. ¶79. Given this new information, and Ms. Butler's desire for the richest possible data, Ms. Butler implemented a second "wave" of her survey, in which she changed *only* the price range of her single-game option, from $4.99 to $9.99 in Wave 1 to $11.99 to $44.99 in Wave 2;[3] a few of the specific team matchups in her initial question (from weeks 15-17 to weeks 16-18); and the gender quotas, as an alternative to her gender weighting in Wave 1. Unsurprisingly, as the price of a single game rose, fewer respondents selected that

---

[3] Had she not done so, the NFL would undoubtedly now be protesting the *absence* of those Wave 2 prices for single games.

option, although an appreciable number of respondents selected even the $44.99 option as their preferred viewing package. *Id*. ¶99, Table 7. *In every other respect, Wave 1 and Wave 2 were identical.* For example, both Waves 1 and 2:



Butler Rebuttal Report ¶¶50-51.

In *both* waves, respondents expressed a strong desire for team and single-game alternatives to the current status quo (in the form of all access and all access plus)—even when the price of Sunday Ticket was offered at a significant discount. Butler Report ¶99, Table 7. Consequently, the modification in Wave 2, to incorporate the NFL's own pricing research, only strengthened Ms. Butler's conclusion that (across Wave 1 and Wave 2 responses) "many consumers would prefer to have the ability to select access to a single team's games, or access to single games, and do not want to be limited to a package that provides content they may not want or do not have the time to watch." *Id*. ¶110; Butler Rebuttal Report ¶¶49-54.

Eager to avoid this evidence of widespread dissatisfaction among its fans, the NFL insists something is methodologically awry. Despite the obvious benefits of integrating this information, the NFL accuses Ms. Butler of "stopping [her] survey partway through, creating effectively a new survey, and then presenting this flawed data in litigation." Br. 10. But the integration of new information in a survey, and the fielding of data in waves, is commonplace in survey methodology. *See, e.g.,*

Butler Rebuttal Report ¶54 (detailing how "collecting data in waves and treating them as one set of data . . . is a common and accepted practice").

The NFL and Dr. Mathiowetz supply no authority or survey literature to support their objection. Instead, the NFL notes a few supposedly "meaningful differences between the two waves," Br. 11, ███████████████████████

███████████████. The NFL denounces, for example, ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ *id*., but those data are to be expected: ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████ *See Fortune Dynamic*, 618 F.3d at 1036. ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████. Mathiowetz Tr. 64:17-65:2. Nor has either expert recommended paring the survey data to just (1) Wave 2 respondents (2) ███████████

███████████████████████████████████████████████████████████.

Br. 11. The NFL advances that proposal in service of its companion argument about sample size and confidence intervals, which we address below. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 951 ("Courts regularly find that concerns that a survey's sample size is too small or unrepresentative do not preclude its admission, but go to the weight to be accorded the survey results.").

> **b.** **Ms. Butler's Survey Data Permit the Calculation of Confidence Intervals, But She Did Not Need to Perform Those Calculations to Reach Her Conclusions and the Literature Does Not Require It.**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Br. 12 (emphasis added), and the absence of those calculations are fatal to Ms. Butler's report. Not so. As Dr. Mathiowetz acknowledged in her deposition, ██

1  █████████████████████████████████████████████████████████

2  ████████████████████████████████████████  Mathiowetz Tr. 207:16-

226:4. The American Association for Public Opinion Research, for example, makes

clear in its "Guidance on Reporting Precision for Nonprobability Samples": "For

some surveys (e.g., exploratory, internal research) estimating precision may not be

important to the research goals. . . . Under the AAPOR Code, it is *acceptable* for

researchers working with nonprobability samples [as here] to decline to report an

estimate of variance."[4] The *Reference Guide on Survey Research*, which the NFL

turns to in its brief, goes even further and declares "[e]stimates of the sampling

error" *inappropriate* for non-probability samples. *See* Gosselin Decl. Ex. 6 at 25, 27

(suggesting "[e]stimates of the sampling error" only "where appropriate (i.e., in

probability samples); defining "confidence interval" as "an indication of the

probable range of error associated with a sample value obtained from a probability

sample"). ████████████████████████████████████████

15  █████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████

17  ██████████████████████████  Mathiowetz Tr. 223:4-22. ████████████

18  █████████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████████

20  █████████████████████████████████████████████████████████

21  █████████████████████████  *Id*. 209:5-214:17.

*Elliot v. Google Inc.*, 45 F. Supp. 3d 1156, 1170 (D. Ariz. 2014), *aff'd sub

nom. Elliott v. Google, Inc.*, 860 F.3d 1151 (9th Cir. 2017), is no help to the NFL

either. *Elliot* did not address conjoint-survey methodology and merely quoted the

---

[4] *AAPOR Guidance on Reporting Precision for Nonprobability Samples*, American
Association for Public Opinion Research (Apr. 22, 2016),
https://www.aapor.org/getattachment/Education-Resources/For-
Researchers/AAPOR_Guidance_Nonprob_Precision_042216.pdf.aspx (emphasis
added).

1  *Reference Guide on Survey Research* as it applies to *probability* samples—not the

2  non-probability sample Ms. Butler used here.

3     That said, Ms. Butler's survey data certainly permit the standard-error

4  calculations the NFL (but not the survey literature) now demands. As Ms. Butler

5  testified, one "can do that mathematical calculation" but it was not necessary or

6  particularly informative for her purposes: her goal, after all, was not to provide a

7  point estimate (an approximate value of a particular parameter for the entire target

8  population) or "model some different population." Butler Tr. 208:17-25, 241:14-

9  243:1. Rather, she "design[ed] and implement[ed] a survey to understand the

10  viewing habits and preferences of consumers interested in NFL football games,"

11  resulting in 14,625 conjoint responses that enable Ms. Butler to advance opinions as

12  to fan preferences generally and offer conclusions "relevant to a broader

13  population." Butler Report ¶8; Butler Tr. 242:25-243:1.

14  **III.   "Irrational" Consumer-Survey Results Do Not Warrant Exclusion.**

15     The NFL's arguments about "irrational results" fare no better. Here, too, the

16  NFL relies on out-of-circuit and superseded authorities; evades the relevant

17  conjoint-survey literature; and relies heavily on disagreements between Dr.

18  Mathiowetz and Ms. Butler that merit consideration—not exclusion.

19     Take Dr. Mathiowetz,

20

21

22  Mathiowetz Report ¶85.

23

24  [5]

25  Mathiowetz Tr. 140:8-146:1; Butler Rebuttal Report ¶¶89-90. In truth, the conjoint

26

27  [5] Just yesterday, Dr. Mathiowetz attempted to

28  Butler Rebuttal Report ¶90.

21

survey literature recommends against imposing prohibitions for irrational behavior or otherwise. Butler Rebuttal Report ¶¶97-99. In deposition, ████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

Mathiowetz Tr. 167:11-168:7. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ *Id*. 162:1-163:17.

      Courts in this Circuit are understandably skeptical of *Daubert* motions premised on "irrational" consumer-survey results given the academic literature. *See, e.g.*, *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, No. 19-MD-02913, 2022 WL 2343268, at *54-55 (N.D. Cal. June 28, 2022); *Williams v. Apple, Inc.*, 338 F.R.D. 629, 656 (N.D. Cal. 2021). For example, "[c]ounterintuitively, some consumers prefer higher prices in certain circumstances." *Williams*, 338 F.R.D. at 656 (citing Harvey Leibenstein, *Bandwagon, Snob, and Veblen Effects in the Theory of Consumers' Demand*, 64 Q. J. Econ., 183, 189 (1950)). "Some consumers may also rationally prefer product simplicity." *Id*. Moreover, "economically irrational decisions are occasionally human nature. . . . For instance, having more choices (such as more syncing options) sometimes "makes us feel worse off than we did before." *Id*. (citing Richard H. Thaler, *From Homo Economicus to Homo Sapiens*, 14 J. Econ. Perspectives 133 (2000); Barry Schwartz, *More Isn't Always Better*, Harv. Bus. Rev. (June 2006)). Scholars "Orme and Johnston"—both cited by Dr. Mathiowetz—"say conjoint analysis permits irrational responses to a random-choice question, as those answer still provide some insight." *Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *21 (S.D. Ohio Mar. 8, 2021). For these reasons, courts will not exclude conjoint survey results that "present certain idiosyncrasies or irrationalities that track some economic theories." *Williams*, 338 F.R.D. at 656.

A recent example is instructive. In *MacDougall v. Am. Honda Motor Co.*, No. SACV 17-1079, 2020 WL 5583534, at *3-8 (C.D. Cal. Sept. 11, 2020) (the district court excluded a survey on the basis, *inter alia*, that "55.4% of individual responses reflected economically irrational choices," arising from the expert's "failure to properly pretest his survey."), *rev'd and remanded,* No. 20-56060, 2021 WL 6101256 (9th Cir. Dec. 21, 2021). But the Ninth Circuit reversed, emphasizing that "'[t]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology'" and "Honda's challenges . . . 'go to the weight given the survey, not its admissibility.'" *MacDougall*, 2021 WL 6101256, at *1 (9th Cir. Dec. 21, 2021) (quoting and citing *Primiano*, 598 F.3d at 564; *Wendt*, 125 F.3d at 814; *Fortune Dynamic, Inc.*, 618 F.3d at 1036).

The NFL neglects *MacDougall*, but that recent decision from the Ninth Circuit, though unpublished, casts doubt on the NFL's two preferred authorities. *Navarro*, 2021 WL 868586, at *21, for example, relied on *MacDougall* in observing that the inclusion of irrational respondents "undermines the reliability of a survey *only in the rare circumstances* where an expert has failed to exclude a significant number of irrational respondents." *Id*. (emphasis added) ("For example, in *MacDougall v. American Honda Motor Co.*, the [district] court found that a survey was unreliable because the expert failed to exclude 'a remarkable 55.4% of individual responses [that] reflected economically irrational choices as to either price levels.'"). *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561, 2012 WL 850705, at *11 (N.D. Cal. Mar. 13, 2012), meanwhile, formed the bedrock of the district court's reasoning in *MacDougall*, which quoted from *Oracle* at length and cited no other precedent on this issue. *See MacDougall*, 2020 WL 5583534, at *8 (lengthy discussion comparing the "intolerably irrational results" in the present case and in *Oracle*).

Ms. Butler's survey results do not compare to those found in *MacDougall* or *Oracle* in any event, even using the NFL's preferred metrics. At most, and again

accepting for purposes of argument the NFL's criteria for "irrational," Ms. Butler's survey respondents made an irrational choice only 16.5% of the time. Butler Rebuttal Report ¶109. That is a far cry from the 55.4% of individual responses noted in *MacDougall*, and it is categorically different than the 25% of respondents in *Oracle* who preferred or were indifferent to "theoretically identical" products that cost twice as much. ██████████████████████████████████████

██████████████████████████████████████ *Id*. ¶111.

In its delineation of "fundamentally irrational outcome[s]," Br. 13, the NFL neglects two key points. First, ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████ Butler Rebuttal Report ¶¶100-101. ██████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████ Br. 13-14; Butler Rebuttal Report ¶¶100-101. Second, the NFL and Dr. Mathiowetz never examine whether the elimination of their "irrational" survey responses might have any impact on the respondent data overall or Ms. Butler's conclusions. Ms. Butler has performed that analysis and finds no material variation or reason to doubt her earlier conclusions. Butler Rebuttal Report ¶¶96, 112, Ex. E.2.

Nor could a few "speeders" impugn the reliability of Ms. Butler's survey results. As even Dr. Mathiowetz concedes, there is no ████████████████

██████████████████████████████████████████████████████████

1    ████████████████. Mathiowetz Tr. 145:5-17; 174:4-175:17. Tellingly, ████

2    ████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████" Br. 15. And for good reason.

4    As Ms. Butler emphasized in deposition, ████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    █████   Butler Tr. 217:9-19, 218:16-23, 219:9-10; Butler Report ¶86; Butler

9    Rebuttal Report ¶¶113-120.

10       The NFL is incorrect too that "Ms. Butler . . . did nothing," NFL Br. 15, to

11   prevent speeding. Adhering to standard conjoint-survey practice, Ms. Butler

12   imposed time enforcements for her package-descriptions page that prevented

13   respondents from advancing immediately to the next screen. Butler Rebuttal Report

14   ¶120. What is more, only two respondents completed the survey in less than three

15   minutes, and only 13 respondents completed the survey in four minutes or less. *Id*.

16   ¶116. If one were to exclude those few respondents from the survey data (setting

17   aside the debate about cut-offs), the results do not change, demonstrating further

18   that Ms. Butler's rich data reflect the relevant universe. *Id*. ¶¶115-116.

19                              **<u>CONCLUSION</u>**

20       For all these reasons, the Court should not exclude Ms. Butler's opinions and

21   survey from consideration of Plaintiffs' motion for class certification.

22

23

24

25

26

27

28

1   Dated: December 2, 2022                    Respectfully submitted,

2
                                              By: _/s/ Marc M. Seltzer_____
3                                                  Marc M. Seltzer

4                                             Marc M. Seltzer (54534)
5                                             mseltzer@susmangodfrey.com
                                              SUSMAN GODFREY L.L.P.
6                                             1900 Avenue of the Stars, Suite 1400
                                              Los Angeles, CA 90067
7                                             Tel: (310) 789-3100
                                              Fax: (310) 789-3150
8
                                              Arun Subramanian (*Pro Hac Vice*)
9                                             asubramanian@susmangodfrey.com
                                              William C. Carmody (*Pro Hac Vice*)
10                                            bcarmody@susmangodfrey.com
                                              Seth Ard (*Pro Hac Vice*)
11                                            sard@susmangodfrey.com
                                              Tyler Finn (*Pro Hac Vice*)
12                                            tfinn@susmangodfrey.com
                                              SUSMAN GODFREY L.L.P
13                                            1301 Avenue of the Americas, 32nd Fl.
                                              New York, NY 10019
14                                            Tel: (212) 336-8330
                                              Fax: (212) 336-8340
15
                                              Ian M. Gore (*Pro Hac Vice*)
16                                            igore@susmangodfrey.com
                                              SUSMAN GODFREY L.L.P.
17                                            401 Union Street, Suite 3000
                                              Seattle, WA 98101
18                                            Tel: (206) 505-3841
                                              Fax: (206) 516-3883
19
                                              Armstead Lewis (*Pro Hac Vice*)
20                                            alewis@susmangodfrey.com
                                              SUSMAN GODFREY L.L.P.
21                                            1000 Louisiana, Suite 5100
                                              Houston, TX 77002
22                                            Tel: (713) 651-9366
                                              Fax: (713) 654-6666
23
                                              Scott Martin (*Pro Hac Vice*)
24                                            smartin@hausfeld.com
                                              HAUSFELD LLP
25                                            33 Whitehall Street, 14th Floor
                                              New York, NY 10004
26                                            Tel: (646) 357-1100
                                              Fax: (212) 202-4322
27
                                              Christopher L. Lebsock (184546)
28                                            clebsock@hausfeld.com
                                              Samuel Maida (333835)

                                         26

1

smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S, Gosselin (269171)
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*