Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668-PSG (JEMx) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>JUDGE: Hon. Philip S. Gutierrez<br>DATE: January 27, 2023<br>TIME: 1:30 p.m.<br>COURTROOM:<br>  First Street Courthouse<br>  350 West 1st Street<br>  Courtroom 6A<br>  Los Angeles, CA 90012 |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

    I.    Plaintiffs' Class Definition Accords with Their Theory of
        Liability. ................................................................................................. 2

    II.   Common Issues of Antitrust Damages and Injury
        Predominate ........................................................................................... 5

          A.    Plaintiffs' Models of the Three But-For Worlds Are
              Reliable ...................................................................................... 5

          B.    Common Evidence Will Prove Classwide Injury....................... 7

          C.    Plaintiffs' Damages Models Accord with Their Theory
              of Liability ............................................................................... 11

    III.  A Class Action Is the Superior Method of Adjudicating This
        Dispute ................................................................................................ 12

    IV.  The NFL's Rule 23(a) Arguments Fail for the Same Reason
        as Their Predominance Arguments ...................................................... 13

    V.   Certification of the Commercial Class Is Proper ................................. 13

    VI.  Certification of an Injunctive Relief Class Is Proper........................... 14

CONCLUSION................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ................................................................................4

*Andrews v. Plains All Am. Pipeline, L.P.*,
    2017 WL 10543402 (C.D. Cal. Feb. 28, 2017)........................................2

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003)................................................................13

*Bowerman v. Field Asset Servs., Inc.*
    39 F.4th 652 (9th Cir. 2022)..................................................................12

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ..................................................................................6

*Hamilton v. Wal-Mart Stores, Inc.*,
    39 F.4th 575 (9th Cir. 2022)..................................................................12

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) .............................................................11, 12

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*,
    270 F.R.D. 521 (N.D. Cal. 2010) ...........................................................3

*In re Glumetza Antitrust Litig.*,
    336 F.R.D. 468 (N.D. Cal. 2020) ...........................................................7

*In re Google Play Store Antitrust Litig.*,
    2022 WL 17252587 (N.D. Cal. Nov. 28, 2022)......................................3

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015) .......................................................................8

*In re NFL Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019), *cert denied sub nom. NFL v. Ninth
    Inning, Inc.*, 141 S. Ct 56 (2020).........................................1, 2, 7, 11

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015)................................................................13

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) (*Rail Freight I*)................................5, 6, 7

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) (*Rail Freight II*) ....................... 8, 10, 11

*In re Rubber Chemicals Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ...........................................................7

*Kamm v. Cal. City Dev. Co.*,
   509 F.2d 205 (9th Cir. 1975) ................................................................... 4

*Lara v. First Nat'l Ins. Co. of Am.*,
   25 F.4th 1134 (9th Cir. 2022) ................................................................ 13

*Laumann v. NHL*,
   105 F. Supp. 3d 384 (S.D.N.Y. 2015) ................................................... 14

*Laumann v. NHL*,
   117 F. Supp. 3d 299 (S.D.N.Y. 2015) ..................................................... 6

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ............................................................................ 3

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ................................................. 3, 5, 14, 15

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ................................................................ 11

*Smith v. Univ. of Wash. Law Sch.*,
   233 F.3d 1188 ......................................................................................... 15

*Tawfilis v. Allergan, Inc.*,
   2017 WL 3084275 (C.D. Cal. June 26, 2017) ......................................... 7

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) ................................................................ 15

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 422 (2016) ................................................................................ 5

*Ward v. Apple Inc.*,
   2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ........................................... 6

**Statutes**

Sherman Act ................................................................................................. 6

Sports Broadcasting Act ............................................................................. 11

**Rules**

Fed. R. Civ. R. 23 ............................................................................. 6, 13, 15

## INTRODUCTION

The Ninth Circuit held that Plaintiffs' complaint stated a valid claim that the restraints at issue violated the antitrust laws and injured Sunday Ticket subscribers by subjecting them to supracompetitive prices. *In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d 1136 (9th Cir. 2019), *cert denied sub nom. NFL v. Ninth Inning, Inc.*, 141 S. Ct 56 (2020). The claim set forth in Plaintiffs' complaint sets the legal framework for assessing whether the classes of Sunday Ticket subscribers should be certified by the Court. Yet the NFL's[1] opposition never *mentions* the Ninth Circuit's opinion, nor do its experts. As articulated in that opinion, Plaintiffs assert that a set of interrelated agreements among the NFL Clubs, the League, the broadcast networks, and DirecTV work together to reduce the output of NFL game telecasts. *Id.* at 1155. The purpose and effect of these agreements is to limit the output of telecasts of out-of-market games to one exclusive provider (DirecTV) and to charge supracompetitive prices for these games. *Id.* at 1157-58. Every subscriber that purchased Sunday Ticket was injured by paying that overcharge. *Id.* at 1158.

This case readily meets the criteria for class certification. It is a more straightforward candidate than many antitrust class motions. Unlike cases involving disparate products sold through various channels of distribution by multiple defendants, Plaintiffs allege they were overcharged for one product that was sold by one supplier pursuant to uniform price schedules. Whether the restraints on competition imposed by the agreements violate the antitrust laws is indisputably a common question, turning entirely on Defendants' conduct. Common proof will also show that every class member was overcharged for Sunday Ticket. The connection between the output restraints and supracompetitive pricing is supported by economic theory, common sense, and abundant common evidence, including the testimony of Plaintiffs' experts that the restraints had a classwide effect that can be quantified by methodologies that apply equally to all class members.

---

[1] Throughout this brief, Plaintiffs use "NFL" to refer to the NFL Defendants.

Instead of engaging with Plaintiffs' case, the NFL attacks a case that Plaintiffs didn't bring. The NFL criticizes Plaintiffs for suing only on behalf of Sunday Ticket subscribers, based on the fact that NFL telecasts are also available to persons who do not subscribe to that package. According to the NFL, if other telecasts were considered, such as the in-market games on broadcast television, individual issues would predominate. The assertion that individualized factors make certification impossible is a common defense tactic, but "[i]f the Court finds the experts credible and their methods reliable, and that the proposed experts' models account for variation in the class…" it should be certified. *Andrews v. Plains All Am. Pipeline, L.P.,* 2017 WL 10543402, at *5 (C.D. Cal. Feb. 28, 2017).

The NFL's arguments about the inadmissibility of Plaintiffs' expert models cite only to classwide, routine disputes between opposing experts, including criticisms that are fully addressed in Plaintiffs' rebuttal reports. *See generally* Butler Reply Decl.; Zona Reply Decl.; Rascher Reply Decl. The NFL also misstates the law in arguing that the injury is somehow eliminated by alleged offsets in the but-for world. It also misstates the facts. The NFL insists that the restraints are justified because they make over-the-air broadcasts possible. The contention that such broadcasts would disappear in a competitive market defies both common sense and the evidence in this case. More importantly, it is irrelevant at this stage because it is a classwide merits issue.

## ARGUMENT

### I.     Plaintiffs' Class Definition Accords with Their Theory of Liability.

The proposed classes track Plaintiffs' allegations, validated by the Ninth Circuit, that the NFL's antitrust violations harmed Sunday Ticket subscribers. *In re NFL Sunday Ticket,* 933 F.3d at 1155.[2] Plaintiffs have not "gerrymandered" the

---

[2] The class definition properly excludes DirecTV subscribers who accepted a free season of Sunday Ticket but declined to ever purchase it. Those subscribers suffered no injury and are not necessarily consumers of out-of-market games.

classes by not including *all* viewers of NFL game telecasts. *See* Opp. at 1, 10. Contrary to the NFL's arguments, Plaintiffs have the right to define the theories and class they seek to certify. *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 532 (N.D. Cal. 2010) ("Plaintiffs are permitted to press a theory of . . . liability that affords them the best chance of certification and of success on behalf of the class."). Further, an antitrust class need not include all purchasers of the product in question to be certified. *See, e.g., In re Google Play Store Antitrust Litig.*, 2022 WL 17252587, at *3 (N.D. Cal. Nov. 28, 2022) (certifying class comprising only 17 states). It is true that Plaintiffs will eventually bear the burden of proving "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." Opp. at 10 (quoting *Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2284 (2018)). But that merits element only requires proof of harm to the members of the class. At the class certification stage, Plaintiffs need only prove that they can demonstrate injury to "the class as a whole" through common evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 661, 675 (9th Cir. 2022), *cert. denied sub nom. Starkist Co. v. Olean Wholesale Grocery*, 2022 WL 16909174 (U.S. Nov. 14, 2022). Plaintiffs have met that burden by demonstrating that common evidence is available to show that all subscribers were overcharged for Sunday Ticket.

The NFL's main rejoinder—that consumers of NFL telecasts, i.e., those who never subscribed to Sunday Ticket, will be "worse off" if the challenged restraints were abandoned—is irrelevant to class certification. Whether the anticompetitive impact on the class is justified by a procompetitive effect on other viewers is a merits question. Even if the NFL could show that some procompetitive effect outweighs the harm in a way that makes its restraints legal under the rule of reason, which Plaintiffs vigorously dispute, that showing would apply classwide. It would therefore support, not undermine, class certification. This Court may address merits questions only when they are "necessary to determine the propriety of

certification." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (cleaned up).[3]

Nor is the NFL's purported procompetitive justification supported by the facts. The NFL claims that local games are available on broadcast television only because of the exclusivity of CBS and Fox's rights. *See* Opp. at 1, 3, 11. But that is a classwide merits question. The NFL also miscites the evidence, incorrectly claiming that two network executives gave testimony supporting the NFL's no-free-broadcasts-without-exclusivity theory. ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ The notion that a broadcaster would give up its most popular content from its most viewed channels just because of increased competition defies common sense.

There is no evidence, and certainly no *individualized* evidence, that disrupting the exclusivity of the NFL's broadcasting deals would harm "hundreds of millions" of consumers who enjoy telecasts "for free[6]," Opp. at 11. ████████████ ████████████████████████████████████████████████████

---

[3] The NFL fails to provide context for its statement that the Court should consider the "interests of the public at large," Opp. at 12. A court should adopt the public interests "at large" *only* in determining whether a class action is the superior method of adjudication, *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 212 (9th Cir. 1975), not whether defendants' conduct somehow benefited non-class members. The *Kamm* court affirmed denial of class certification because the proposed action was duplicative of ongoing state litigation. *Id.* No such concerns are present here.

[4] *See* Kilaru Decl. Ex 15, 16.

[5] ████████████████████████████████████████████ ████████████████

[6] The NFL also fails to support its claim that consumers obtain these broadcasts for "free." ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

██████████████████████████████████████████████ While the NFL's experts challenge the reasoning underlying that prediction, none contradict it. The record does not support the argument that removal of those restraints would harm non-class members in the relevant market, let alone the vast majority of them.

## II.    Common Issues of Antitrust Damages and Injury Predominate

Plaintiffs' experts provide three separate models to demonstrate the availability of common evidence to 1) prove a classwide overcharge for Sunday Ticket due to the NFL's restrictive agreements and 2) calculate the amount of that overcharge. None of the NFL's criticisms of the models establishes otherwise.

### A.    Plaintiffs' Models of the Three But-For Worlds Are Reliable

On this motion,[8] the question before the Court is whether Plaintiffs' models are "capable of answering a common question for the entire class in one stroke, and could reasonably sustain a jury verdict in favor of the plaintiffs." *Olean*, 31 F.4th at 667 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 422, 459-60 (2016)). "[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Id.* at 467. In other words, Plaintiffs need only provide a proof of concept of a classwide model.

The NFL's arguments to exclude Plaintiffs' three models distort this legal standard. For example, none of the NFL's cited authority held that a "quantitative" model "is required for certification," Opp. at 13. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013) (*Rail Freight I*), stated only that the challenged models were "essential to the plaintiffs' claim they can offer common evidence of classwide injury" in that particular case. *Id.* at 254. The same is true of *Ward v. Apple Inc.,* 2018 WL 934544 (N.D. Cal. Feb. 16, 2018), which rejected an 11-page expert declaration that referred only to methodologies employed in a

---

[7]
████████████████████████████████

[8] Plaintiffs address challenges to the *admissibility* of their experts' opinions in their responses to the *Daubert* motions, filed contemporaneously with this reply brief.

separate litigation. None of these courts advanced a requirement for a quantitative model. That is because neither the Sherman Act nor Rule 23 prescribes a specific method of proving classwide injury or damages. In *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), the Supreme Court held that a damages model must be consistent with the theory of antitrust liability. Plaintiffs' models satisfy that test: the three but-for worlds isolate the impact of pooling and exclusivity (as well as the combination of the two) on the price of out-of-market football games available only to Sunday Ticket subscribers. Each model independently satisfies the predominance requirement with respect to antitrust injury and damages.

The NFL's attacks on Dr. Zona's models also go to the weight rather than the admissibility of his opinions. Dr. Zona advances quantitative econometric models, the type that the NFL erroneously insists class certification requires. Dr. Zona has addressed each of the issues raised by the NFL, even where the criticisms are inaccurate or based on basic mischaracterizations of his work.[9]

The critiques of Plaintiffs' primary damages model—the college football "but-for" world—are similarly misplaced. Plaintiffs have indeed shown that this model is "the most likely to occur," Opp. at 14. ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ And the yardstick approach employed by Dr. Rascher is a well-accepted method of estimating antitrust damages. *See, e.g.*, *Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *6 (C.D. Cal. June 26, 2017) (certifying class where damages were calculated on the basis of the yardstick method)*; In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 354 (N.D. Cal.

---

[9] Zona Reply Declaration ¶¶ 12-30. The NFL also makes an erroneous comparison between Dr. Zona's models and the model excluded in *Laumann v. NHL*, 117 F. Supp. 3d 299 (S.D.N.Y. 2015). As detailed in the opposition to the motion to exclude Dr. Zona, the *Laumann* model used a different econometric approach, involved a different market structure, and utilized far less data than Dr. Zona here.

10 ██████████████████████████████████████████████████████████████

2005) (same). The NFL has no basis to characterize Dr. Rascher's methods as "based solely on documentary evidence and economic theory," Opp. at 7, 14. Instead, he calculates the "but-for" price for Sunday Ticket via a benchmark comparison to college football telecasts, a product market that is substantially similar to NFL telecasts but lacks the restraints of the NFL distribution model.[11] The Ninth Circuit's lengthy discussion of the increased output of televised college football following the lifting of the restraints invalidated by *Board of Regents* (and its reliance on that case) demonstrates the appropriateness of Dr. Rascher's comparison. *In re NFL Sunday Ticket*, 933 F.3d at 1146-47, 1154.

### B.   Common Evidence Will Prove Classwide Injury

Each of Plaintiffs' three damages models marshals common evidence to prove that the NFL's conduct injured every class member by inflating the price of Sunday Ticket. Even under the NFL's main authority, common evidence can show that "all class members suffered *some* injury" due to the conspiracy. *Rail Freight I*, 725 F.3d at 252 (emphasis in original). The NFL's entire argument begins from the false legal premise that there is no "antitrust injury" if Plaintiffs would have paid more in aggregate in the but-for world. Opp. at 19. To the contrary, courts in and outside this Circuit have repeatedly held that ***a single overcharge*** is sufficient for antitrust injury—which the NFL does not seriously dispute occurred here—even if the single overpayment is allegedly offset by a lower price paid in a different transaction. *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 481 (N.D. Cal. 2020) ("'antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset.'"); *Tawfilis,* 2017 WL 3084275, at *12 ("how a direct purchaser establishes the fact of damage should not be conflated with possible offsets (i.e., potential secondary effects that could theoretically result in a purchaser recouping the overcharge loss). Potential offsets, if they have any legal relevance, would affect the amount of damages, not the fact of damage."); *In re*

---

[11] Rascher Report ¶¶ 242-245; Rascher Reply Decl. ¶¶ 106-109.

*Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("[D]efendants incorrectly assume that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury.").

The NFL is also wrong on the facts. The only injury for which Plaintiffs seek redress is the overcharge for Sunday Ticket and Plaintiffs' experts' models show that the price for that package would have been lower for every class member absent the challenged restraints. Because the NFL cannot dispute this, it sidesteps the question of overcharge by pointing to hypothetical individuals who the NFL erroneously claims would be "worse off" in Plaintiffs' but-for worlds. But the NFL's concept of "worse off" is unmoored from the injury asserted. None of the NFL's imagined scenarios demonstrates that any class member would pay more for *the product they **actually purchased**, Cf. In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019) (*Rail Freight II*) (rejecting model which showed that 12.7% of class members suffered *negative* overcharges).

Most of the NFL's hypotheticals are irrelevant. Every member of the proposed classes purchased not only a satellite subscription from DirecTV, but also an additional "premium" product, Sunday Ticket. Consumers who "cut the cord" and DirecTV subscribers who cancelled Sunday Ticket before paying first are excluded by definition because the classes include only ***purchasers*** of Sunday Ticket. The hypothetical cost of "watching their local team on free television" during a season in which they did not subscribe is irrelevant. *See* Opp. at 15. Similarly, the cost of a DirecTV subscription without Sunday Ticket cannot be considered an *additional* cost because every class member incurred that cost to be able to watch Sunday Ticket.[12] None of the NFL's hypotheticals establish that any

---

[12] For similar reasons, the potential increase in costs of *other* MVPDs is irrelevant to whether DirecTV subscribers were injured by the conspiracy. The NFL also fails to explain how the loss of the exclusive rights to Sunday Ticket would weaken DirecTV to a point where a class member would be "driven to a more expensive cable provider," Opp. at 16.

class members would have paid more *for Sunday Ticket* in the but-for world. Any potential harm to DirecTV as a result of consumers switching is likewise irrelevant.

The NFL's other scenarios rely on mischaracterizations of Dr. Rascher's opinions. He predicts that the amount of games broadcast over the air would *increase* in each but-for world. Dr. Rascher testified, and reiterates in his rebuttal report, that he expects games to continue being shown on broadcast television in local markets.[13] No record evidence suggests that any NFL team would limit distribution of its games by selling its rights only to a premium cable channel or to a regional sports network, especially within its local television market. Moreover, the class members—who are the only focus at this stage—were already paying for television service by virtue of being DirecTV subscribers.

The NFL fixates on Dr. Rascher's reference to FS2 and CBSSN as evidence that some class members would have to purchase those channels to watch their favorite team. Yet the NFL fails to mention that he cited those channels only to illustrate the possibility of broadcasting *ten* NFL games simultaneously,[14] or that he predicts that games would appear on the most distributed channels because even low-rated NFL games are "premium products."[15] The NFL also claims that Dr. Rascher "offered no real explanation why" an RSN would not likely secure the rights to an NFL team's games, Opp. at 16. Yet he explained that NFL games are national products (as are the more popular college games[16]) and teams have incentives to secure the broadest output for their games.[17] NFL Clubs would, of course, be expected to maximize their exposure to attract fans and increase revenue. There is therefore no reason to expect that blackouts of NFL games would increase

---

[13] *See* Finn Decl. Ex. 5 (Rascher Depo. 191:14-194:9); Rascher Reply Decl. ¶ 169.

[14] Rascher Report ¶ 250.

[15] *See* Finn Decl. Ex. 5 (Rascher Depo. 182:11-19, 185:10-19).

[16] As Dr. Rascher reiterates in his rebuttal report, only high-profile college games are apt comparisons to NFL games. For example, the only Notre Dame games shown on Peacock were against obscure opponents. Rascher Reply Decl. ¶ 109.

[17] *See* Finn Decl. Ex. 5 (Rascher Depo. 211:7-212:20).

in any of the "but-for" worlds, *see* Opp. at 16.[18]

Lastly, none of the supposed "gains" from the NFL's unlawful conduct offset the injury of the overcharge. Dr. Rascher specifically testified that promotions and discounts on Sunday Ticket would continue in a competitive market.[19] The NFL's only rejoinder to that evidence is the fact that Dr. Rascher did not cite examples of discounts offered by other leagues during his deposition.[20] Moreover, any such discounts are addressed by Dr. Rascher's model because the overcharge is based on what class members actually paid for Sunday Ticket. While it is irrelevant to the question of antitrust injury, no class member derived a net economic benefit from the challenged conduct because, among other reasons, none of the alleged "gains" resulted in any class member paying less for Sunday Ticket games. None of those alleged gains show that some class members were "unharmed" by the restraints. Opp. at 17. Each of them applies to the entire class or not at all.

In sum, common evidence establishes that all class members were overcharged for the product they purchased. Unlike the model rejected in *Rail Freight II*, which did not distinguish injured from uninjured class members, Plaintiffs' models establish injury to each class member. 934 F.3d at 624-25. "[D]etermining whether any given individual was injured," therefore, does not turn "on an assessment of the individual facts concerning that person." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 55 (1st Cir. 2018) (reversing class certification because approximately 10% of class was uninjured because they "would have continued to purchase a brand drug … even if a cheaper, generic version had been

---

[18] The NFL also lacks any basis to suggest that a customer would have to purchase multiple out-of-market packages at a price higher than Sunday Ticket in the non-pooling but-for world, *id.* As Dr. Rascher made clear in deposition, the basic premise of that model is every team selling its rights to DirecTV. *See* Finn Decl. Ex. 5 (Rascher Depo. 98:19-99:21).

[19] *See* Finn Decl. Ex. 5 (Rascher Depo. 131:12-132:6) (citing example of HBO).

[20] In fact, T-Mobile offers MLB.TV for free to all of its subscribers every year. *See* https://www.t-mobile.com/mlb.

available" but could not be separately identified). No such complexity exists here.

**C.  Plaintiffs' Damages Models Accord with Their Theory of Liability**

The NFL presents two critiques of Plaintiffs' methods of proving classwide damages. Neither withstands scrutiny.

The first is wrong as a matter of law—presenting yet another classwide dispute. The NFL argues that the identified damages are "not the result of the wrong" because one aspect of its conduct—the pooling of team rights to over-the-air game broadcasts—is immunized by the Sports Broadcasting Act. *See* Opp. at 20. Yet the SBA cannot immunize the NFL's conduct with respect to Sunday Ticket because it "does not exempt league contracts with cable or satellite television services." *In re NFL Sunday Ticket,* 933 F.3d at 1147. Moreover, it has no bearing on Plaintiffs' models because Plaintiffs need only prove that damages stemmed from anti-competitive conduct. The principal case cited by the NFL states that the inquiry turns on the nature of the conduct, not its legality. *See Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1433 (9th Cir. 1995) ("To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." (cleaned up)). Common evidence demonstrates that pooling restrains competition. It matters not if that conduct is partially covered by a legal exemption, especially when that exemption does not apply to these claims—as the Ninth Circuit recognized here.

The NFL's second argument replicates the claim that individual complexities prevent classwide proof of injury and fails for the same reasons. Plaintiffs' models calculate damages by applying a uniform reduction to the standard Sunday Ticket prices that class members paid. The NFL criticizes this method as inaccurate. But that criticism relies on the same "host of complexities" that supposedly show that certain categories of class members were unharmed. Opp at 21. As detailed above, these considerations are extraneous to Plaintiffs' damages—the overcharge to

Sunday Ticket. A market analysis can calculate that figure "without any excessive difficulty." *Cf. Bowerman v. Field Asset Servs., Inc.* 39 F.4th 652, 662 (9th Cir. 2022) (vacating certification because there was no method for calculating damages "other than the class members' individualized testimony" about hours worked and expenses incurred). Here, uniform discounts can be applied to actual prices paid.

### III.   A Class Action Is the Superior Method of Adjudicating This Dispute

The NFL does not explain its argument that class certification will present administrative challenges (other than repackaging the claim that individual issues of injury and damages predominate). Instead, it relies on Plaintiffs' supposed failure to explain why this Court can manage the proposed class action. The answer is simple: the class-action device presents no manageability problems because Plaintiffs can establish both liability and damages with common evidence. *See Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 586 (9th Cir. 2022) (noting that "manageability" depends on whether individualized issues predominate over common issues).

The manageability of this action is borne out by a comparison with the two cases cited by the NFL. In *Asacol*, the district court's plan of proving liability required each class member to submit an affidavit attesting that they would have purchased a generic drug over defendants' drug if given a choice. 907 F.3d at 51-52. Such individualized inquiry was necessary because approximately 10% of class members would not have switched, and thus suffered no injury, and there was no other way to tell the class members apart. *Id.* The Ninth Circuit similarly concluded that a class action was unmanageable because it would "involve adjudicating issues specific to each class member's claim," namely the comparison of the pre-accident value of each class member's car to the price offered by the defendant insurer. *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139-40 (9th Cir. 2022). There will be no such difficulties in determining injury or damages here because this is an overcharge case about a single product with standardized prices. The actual prices paid by every class member are known. And a single formula can determine the

difference between the actual and but-for prices.

## IV. The NFL's Rule 23(a) Arguments Fail for the Same Reason as Their Predominance Arguments

The NFL's Rule 23(a) arguments are derivative of their predominance arguments. The opposition concedes as much. *See* Opp. at 22.

The only additional argument—that there are conflicts among and between the classes—is wrong. The NFL speculates that "easier access" to out-of-market games might harm commercial class members. The NFL cites no evidence to support the claim that a consumer of a product would want the price to be higher so as to restrict access to other consumers. Defendants argue that there is a conflict among class members because some class members would be "harmed" in some but-for worlds. In an overcharge case such as this, there is no conflict among class members because each had an interest in paying less for the product that they purchased. Contrast this situation with the principal case cited by the NFL, which declined to certify a class challenging blockage of caller ID signals because the "efficiency gains and accompanying cost savings" from caller ID varied between the "sole proprietorships" and "large interstate catalogue companies" who formed part of the class. *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003). In this case, the NFL provides no evidence of an *actual* conflict. And this Circuit does not "favor denial of class certification on the basis of speculative conflicts." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (cleaned up); *see also Laumann v. NHL,* 105 F. Supp. 3d 384, 400 (S.D.N.Y. 2015) (rejecting argument that some class members "would prefer to be injured").

## V. Certification of the Commercial Class Is Proper

Certification of the commercial class is proper for the same reasons as the residential class. Because demand for Sunday Ticket in commercial establishments derives from consumer demand for the games in that package, Plaintiffs' market analysis encompasses both. The opposition overstates differences between the two.

<u>First</u>, members of both classes suffered the same injury of overcharge. That some commercial establishments may have purchased Sunday Ticket for different purposes than some residential subscribers—namely to show more games than one residential consumer may watch—has no bearing on that question. Nor are the consequential benefits that commercial class members supposedly gain from the reduced output of out-of-market games. Lost profits are irrelevant as the damage is the overcharge. On that issue, the NFL exaggerates the testimony that Gael Pub attracted customers by showing Sunday Ticket games, Opp. at 24. That testimony does not prove that patrons of commercial establishments would watch football at home if given the opportunity. No evidence in the record suggests that the broader distribution of college football reduced the profits of sports bars, or that commercial establishments have trouble attracting customers to watch local games. The NFL's entire argument rests on the unsupported and unrealistic assumption that some (but not all) class members would prefer to pay *more* for a product that they purchase.

<u>Second</u>, the difference in the pricing of commercial Sunday Ticket does not preclude classwide calculation of injury or damages. Although individual negotiations were more prevalent among the commercial class than the residential class, the pricing for both derived from standard list prices. It is well-established that individual negotiation of pricing does not defeat certification. *See*, *e.g.*, *Olean*, 31 F.4th at 677–78. Even in markets with "diversity in products, marketing, and prices," common evidence can establish that the "conspiracy artificially inflated the baseline for price negotiations," "for all buyers." *Id.* (cleaned up). The prevalence of individual negotiations does not defeat the utility of the standard reduction factor in Plaintiffs' models. Moreover, Plaintiffs' models account for any discounts because they estimate damages based on actual prices paid. Any similar discounts in the "but-for" world would start from a lower standard price.

**VI.   Certification of an Injunctive Relief Class Is Proper**

Neither the impending expiration of the Sunday Ticket deal nor the inclusion

14

of past purchasers in the class precludes certification of a Rule 23(b)(2) class.

The NFL's claims of mootness are misplaced and premature. Mootness is a merits, not a class certification, issue. And this controversy remains live because the restraints continue. *Cf. Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188 (case mooted by passage of law that provided class members with the relief they sought, the prohibition of racial discrimination in admissions); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 331 (4th Cir. 2006) (case mooted because defendant insurance company was no longer collecting premiums on challenged policies). To moot this case, the NFL must terminate the anti-competitive conduct that gives rise to it. That has not happened.

<u>Second</u>, injunctive relief will benefit all class members, whether or not they currently subscribe to Sunday Ticket. No rule bars past purchasers of a product from seeking injunctive relief. The relevant question is whether such class members are likely to be harmed by the NFL's behavior in the future absent such relief. The answer is yes because each class member is by definition a consumer of out-of-market football games. As noted in Plaintiffs' motion, each participant in that market was injured by the overcharge and from the reduction in choice. The NFL provides no response to that argument.

## CONCLUSION

For the foregoing reasons, Plaintiffs' proposed classes should be certified.

---

21

1    Dated: December 2, 2022          Respectfully submitted,

2

3                                     By: __/s/ Marc M. Seltzer_____

4                                          Marc M. Seltzer

5                                     Marc M. Seltzer (54534)

6                                     mseltzer@susmangodfrey.com
                                      SUSMAN GODFREY L.L.P.

7                                     1900 Avenue of the Stars, Suite 1400

8                                     Los Angeles, CA 90067
                                      Tel: (310) 789-3100

9                                     Fax: (310) 789-3150

10                                    Arun Subramanian (*Pro Hac Vice*)

11                                    asubramanian@susmangodfrey.com
                                      William C. Carmody (*Pro Hac Vice*)

12                                    bcarmody@susmangodfrey.com

13                                    Seth Ard (*Pro Hac Vice*)
                                      sard@susmangodfrey.com

14                                    Tyler Finn (*Pro Hac Vice*)

15                                    tfinn@susmangodfrey.com
                                      SUSMAN GODFREY L.L.P

16                                    1301 Avenue of the Americas, 32nd Fl.

17                                    New York, NY 10019
                                      Tel: (212) 336-8330

18                                    Fax: (212) 336-8340

19

20                                    Ian M. Gore (*Pro Hac Vice*)
                                      igore@susmangodfrey.com

21                                    SUSMAN GODFREY L.L.P.

22                                    401 Union Street, Suite 3000
                                      Seattle, WA 98101

23                                    Tel: (206) 505-3841

24                                    Fax: (206) 516-3883

25                                    Armstead Lewis (*Pro Hac Vice*)

26                                    alewis@susmangodfrey.com
                                      SUSMAN GODFREY L.L.P.

27                                    1000 Louisiana, Suite 5100

28                                    Houston, TX 77002

Tel: (713) 651-9366
Fax: (713) 654-6666

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*