# EXHIBIT 14

# To the Declaration of Edward Diver

Before the
**COPYRIGHT ROYALTY JUDGES**
Washington, D.C.

| | | |
|---|---|---|
| | ) | |
| *In re* | ) | |
| | ) | |
| **DISTRIBUTION OF CABLE** | ) | NO. 14-CRB-0010-CD (2010-13) |
| **ROYALTY FUNDS** | ) | |
| | ) | |

# Written Rebuttal Testimony of

# DR. MARK A. ISRAEL

**September 15, 2017**
**Amended February 12, 2018**

# Table of Contents

I.    QUALIFICATIONS ........................................................................................1

II.   INTRODUCTION AND SUMMARY ...........................................................1

III.  DR. GREGORY CRAWFORD'S REGRESSION ANALYSIS ON
      BEHALF OF THE COMMERCIAL TELEVISION CLAIMANTS
      FURTHER CORROBORATES THE 2010-13 BORTZ SURVEY
      RESULTS ........................................................................................................5

IV.   RESPONSES TO OTHER CLAIMANTS' WRITTEN TESTIMONY .......8

      A.  DR. ERDEM'S ANALYSIS ON BEHALF OF DEVOTIONAL CLAIMANTS
          LARGELY CORROBORATES THE BORTZ SURVEY RESULTS, AND HIS
          CRITICISMS OF THE USE OF REGRESSION ANALYSES IN THIS PROCEEDING
          ARE WITHOUT MERIT ...........................................................................................8

          1.  Dr. Erdem's challenges to the use of regression analysis in this
              proceeding are without merit ....................................................................8

          2.  Dr. Erdem's testimony supports a high relative value for Sports
              programming .............................................................................................11

      B.  MR. SANDERS' TESTIMONY ON BEHALF OF DEVOTIONAL CLAIMANTS
          SUPPORTS THE USE OF THE 2010-13 BORTZ SURVEYS TO DETERMINE
          ROYALTY SHARES, AND HIS CRITICISMS OF THE REGRESSION ANALYSES
          IN THIS PROCEEDING ARE WITHOUT MERIT .....................................................13

          1.  Mr. Sanders correctly concludes that the 2010-13 Bortz survey
              results should be the basis for determining each program
              category's royalty share ..........................................................................13

          2.  Mr. Sanders' criticisms of regression analyses in this proceeding
              are incorrect ............................................................................................14

      C.  DR. GRAY'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS RELIES ON
          FUNDAMENTALLY FLAWED MEASURES OF PROGRAMMING VOLUME AND
          VIEWERSHIP THAT PROVIDE NO VALID ECONOMIC BASIS FOR
          DETERMINING RELATIVE MARKETPLACE VALUE ...........................................15

          1.  Dr. Gray's analysis of programming volume is incorrect and does
              not reflect relative marketplace value ....................................................16

          2.  Dr. Gray's analysis of program viewership provides no valid
              method for determining relative marketplace value ...............................21

      D.  DR. STECKEL'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS IS NOT
          VALID ECONOMIC ANALYSIS ...........................................................................25

          1.  In the relevant hypothetical market, the CSO is the buyer and thus
              the relevant focus of the survey ..............................................................27

2.   CSO executives are experts in valuing content ....................................................29

3.   Dr. Steckel's discussion of marginal vs. total values is incorrect.........................30

4.   CSO management of multiple systems does not invalidate the Bortz Survey results ....................................................................................31

5.   Analysis of marketplace data corroborates the Bortz surveys ...............................32

E.   MR. MANSELL'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS MISINTERPRETS THE IMPLICATIONS OF THE RAPIDLY GROWING SOURCES OF CONTENT ....................................................................................32

F.   MY REGRESSION ANALYSIS DOES NOT CORROBORATE THE FINDINGS OF THE HOROWITZ SURVEYS PERFORMED ON BEHALF OF PROGRAM SUPPLIERS .............................................................................35

G.   DR. GEORGE'S TESTIMONY ON BEHALF OF CANADIAN CLAIMANTS IS FLAWED, AND A CORRECTED ANALYSIS SHOWS LOWER VALUATIONS FOR CANADIAN PROGRAMMING ............................................................38

V.   TECHNICAL APPENDIX: THE DETAILS OF DR. GEORGE'S REGRESSION ANALYSIS ...........................................................................1

VI.   TECHNICAL APPENDIX:  DR. GRAY'S TABLE 1....................................................3

# I.    QUALIFICATIONS

1.     I am a Senior Managing Director of Compass Lexecon, an economic consulting firm where I have worked since 2006.  I received my Ph.D. in Economics from Stanford University in 2001.  From August 2000 to June 2006, I served as an Associate Professor at Northwestern University's Kellogg School of Management.  I have served as an expert for both the federal government and private parties in matters involving the cable television, broadcast television, wired and wireless telecommunications and broadband internet service industries (among others), including high profile recent mergers such as Comcast-NBCU, AT&T-Time Warner, AT&T-Leap Wireless, T-Mobile-Metro PCS, and numerous acquisitions for Gray Television, as well as many regulatory matters in front of the FCC and state regulatory agencies on behalf of cable system operators (CSOs), the National Association of Broadcasters, and others.

2.     A more complete description of my qualifications can be found in Appendix A to my written direct testimony in this proceeding on behalf of the Joint Sports Claimants (JSC).[1]

# II.    INTRODUCTION AND SUMMARY

3.     In my original testimony, I explained that observable marketplace behavior corroborates the results of the 2010-13 Bortz surveys.[2]  In particular, my regression analysis—based on an updated and improved version of the methodology used by Professors Rosston and Waldfogel in previous cable royalty distribution proceedings[3]—

---

[1]    Written Direct Testimony of Dr. Mark A. Israel, *In re Distribution of Cable Royalty Funds*, December 22, 2016, (hereinafter *Israel Testimony*).

[2]    "Cable Operator Valuation of Distant Signal Non-Network Programming: 2010-13" (hereinafter *Bortz Report*), attached to the Written Direct Testimony of James M. Trautman, *In re Distribution of Cable Royalty Funds*, December 22, 2016.

[3]    Statement of Joel Waldfogel, *In the Matter of Distribution of the 2004 and 2005 Cable Royalty Funds Before the Copyright Royalty Judges*, Docket No. 2007-3 CRB CD 2004-2005, June 1, 2009 (hereinafter *Waldfogel Report*); Statement of Gregory Rosston, *In the Matter of Distribution of the 1998 and 1999 Cable Royalty Funds Before the Copyright Arbitration Royalty Panel,* Docket No. 2001-8 CARP CD 98-99, December 1, 2002 (hereinafter *Rosston Report*).

Written Rebuttal Testimony of Mark Israel, Ph.D. - 1

produces relative valuations of the Agreed Categories[4] that closely match those in the Bortz surveys.  My analysis of payments made by cable networks to carry JSC and other programming during the years 2010-13 further corroborates the high relative valuations for live team sports (Sports) programming found in the Bortz surveys.

4.      In this report, I respond to written testimony from other parties in the proceeding.[5] I conclude that the testimony from experts on behalf of other parties, as well as the updated analyses I have performed in response to this testimony, further corroborate the results of the 2010-13 Bortz surveys.  I provide a more detailed discussion of my analysis of the testimony of the other experts in the following paragraphs.

5.      First, the regression analysis presented by Dr. Gregory Crawford on behalf of Commercial TV Claimants directly supports the 2010-13 Bortz survey results.  Indeed, although we conducted our analyses entirely independently of each other, we both came to comparable conclusions that corroborate the Bortz results.  Notably, his estimates are similar to mine despite some differences in technical methodological choices (of the type that regularly occur across different regression analyses by different economists).

6.      Second, the alternative versions of my model that Dr. Erkan Erdem produced on behalf of Devotional Claimants also support the results of the 2010-13 Bortz surveys. However, Dr. Erdem's criticisms of "Waldfogel-type" regression analysis in the context of this proceeding generally, and of my regression analysis in particular, are without merit.  As the Copyright Royalty Judges (Judges) and the Copyright Arbitration Royalty

---

[4]      The Copyright Royalty Judges' 11/25/2015 Order, Exhibit A.  The Agreed Categories are 1) Program Suppliers, 2) Commercial Television Claimants (CTV), 3) Joint Sports Claimants (Sports), 4) Public Television Claimants (PTV), 5) Devotional Claimants (Devotional), 6) Canadian Claimants (Canadian).   See *Israel Testimony* ¶15 for more detail.  In addition to these categories, there are the (1) Music Claimants (Music) category, which covers the music works included within broadcast programming and (2) National Public Radio (NPR) category, which covers programming on non-commercial radio stations.  I understand that Music and NPR are no longer parties in this proceeding.

[5]      I address those opinions for which I have a specific response based on my own analysis; any lack of explicit response to a particular opinion or analysis of Claimants' testimony does not imply that I agree with that opinion or analysis.  Instead, it likely implies that my previous testimony and underlying materials are already fully responsive to such opinions and analyses.

Panel (CARP) previously found, such an analysis is useful in assessing whether the actual economic behavior of CSOs corroborates the Bortz survey results.

7.     Third, I agree with Mr. John Sanders' testimony on behalf of Devotional Claimants "that a constant sum survey of cable operators such as that prepared by Bortz is the most appropriate methodology for the Allocation phase of a cable royalty proceeding."[6] However, Mr. Sanders' criticisms of regression analysis in this proceeding are unfounded.

8.     Fourth, Dr. Jeffrey Gray's testimony on behalf of Program Suppliers — in which he focuses upon the volume and viewing of minutes of programming — does not provide a sound basis for determining the relative value of that programming.  Dr. Gray's analysis of volume is fundamentally flawed in that it fails to consider differences in the number of cable subscribers who receive the programming in question.  And his analysis of viewership fails to recognize that CSOs place far greater value per minute on some types of programming (e.g., Sports) than others, as actual marketplace behavior shows.  Bottom line, neither program volume nor program viewing can be equated with program value.

9.     Fifth, Dr. Steckel's criticisms of the Bortz survey, on behalf of Program Suppliers, are incorrect as a matter of economics.  Despite Dr. Steckel's claim to the contrary, surveys of CSO executives provide the best measure of the relative valuation of the Agreed Categories on distant signals, particularly given that in the ordinary course of business those executives must evaluate the relative value of different categories of programming to make programming choices.  Moreover, Dr. Steckel advocates the use of marketplace data to determine relative value of the Agreed Categories, which further emphasizes the importance of regression analyses like mine and Dr. Crawford's (among others) that corroborate the Bortz survey results using actual marketplace data.

10.    Sixth, Mr. John Mansell's analysis of the growth in available content, submitted on behalf of Program Suppliers, actually underscores the high value placed on Sports

---

[6]     Amended Direct Testimony of John S. Sanders, *In re Distribution of Cable Royalty Funds*, March 9, 2017 (hereinafter *Sanders Amended Testimony*), p. 29.

programming. In particular, it points to reasons why the value of Sports, relative to other types of programming, is *increasing*, as reflected in a comparison of the 2004-05 and 2010-13 Bortz results. Mr. Mansell overlooks that recent technological changes in the media environment have negatively and disproportionately impacted the value of other types of programming, such as Program Suppliers content, while the value of Sports programming has remained high.

11.     Seventh, my regression analysis corroborates the findings of the Bortz surveys, but does not corroborate the Horowitz surveys on behalf of Program Suppliers. In particular, the Bortz surveys, the results of my regression, and Dr. Crawford's regression each show the rank order for the top program categories as Sports, Program Suppliers, CTV and PTV, in that order, while Horowitz surveys do not match this rank order. The fact that the Horowitz survey fails to correspond well to actual marketplace evidence, as captured by the regression analyses, is not surprising given the flaws in the Horowitz methodology laid out in the testimony of Mr. James Trautman and Dr. Nancy Mathiowetz.[7] And notably, the fact that my regression analysis, as well as Dr. Crawford's, correctly allocates the minutes in Mr. Horowitz's "Other Sports" category into the appropriate Agreed Categories, and yet still closely matches the Sports values found in the Bortz survey, refutes Mr. Horowitz's claim that the Bortz survey is somehow invalidated by not using a separate valuation question for "Other Sports" programming.

12.     Finally, the testimony of Dr. Lisa George on behalf of Canadian Claimants is flawed. Her finding of a higher value for Canadian Programming comes not from her focus on the Canadian region, but rather from her improper, complete reliance on a model that collapses all types of programming on U.S. signals into a single catch-all category. Once one properly controls for all of the Agreed Categories, Dr. George's model

---

[7]     See Corrected Written Rebuttal Testimony of James M. Trautman, *In re Distribution of Cable Royalty Funds*, September 15October 15, 2017 (hereinafter, *Trautman Corrected Rebuttal Testimony*); and Written Rebuttal Testimony of Nancy A. Mathiowetz, *In re Distribution of Cable Royalty Funds*, September 15, 2017 (hereinafter, *Mathiowetz Rebuttal Testimony*).

produces small shares for Canadian Claimants, consistent with the findings of the Bortz surveys.

## III.   DR. GREGORY CRAWFORD'S REGRESSION ANALYSIS ON BEHALF OF THE COMMERCIAL TELEVISION CLAIMANTS FURTHER CORROBORATES THE 2010-13 BORTZ SURVEY RESULTS

13.      In his testimony, Dr. Crawford describes the results of his regression analysis, with which he estimates the relative marketplace value of the Agreed Categories.[8]  His overall methodological approach is similar to mine, but he uses different data and makes some different econometric implementation decisions.  Despite the technical differences between our approaches, Dr. Crawford finds relative marketplace values for the Agreed Categories that are similar to mine, and his results also corroborate the relative shares implied by the Bortz survey, demonstrating the robustness of this finding.

14.      The Bortz surveys, my analysis, and Dr. Crawford's analysis each identify Sports programming as the most valuable category of compensable programming, with similar shares in each case.  The Bortz surveys estimate a Sports share of 38.2 percent; I find a Sports share of 37.5 percent, and Dr. Crawford finds a Sports share of 35.1 percent.  All three analyses estimate that Program Suppliers should receive the second largest share from the royalty fund, and all find similar shares for CTV.  See Table 1, below, as well as Figure 1 which illustrates the same sets of results graphically.

---

[8]      See Corrected Testimony of Gregory S. Crawford, Ph.D. (April 11, 2017) (hereinafter *Crawford Corrected Testimony*).

**Table 1:  Comparison of Israel, Crawford and Bortz Results**

| Claimant Group | Implied Share of Royalties | | |
|---|---|---|---|
| | Israel | Crawford | Bortz |
| Sports | 37.5% | 35.1% | 38.2% |
| Program Suppliers | 26.8% | 23.4% | 31.0% |
| CTV | 22.2% | 19.5% | 20.6% |
| PTV | 13.5% | 17.0% | 5.1% |
| Devotional | 0.0% | 0.7% | 4.6% |
| Canadian | 0.0% | 4.2% | 0.5% |
| **Total** | **100.0%** | **100.0%** | **100.00%** |

Source: Israel Testimony, December 22, 2016, Table V-2;
  Crawford Corrected Testimony, April 11, 2017, Figure 20.
  Bortz Report, December 22, 2016, Table I-1.
Notes:  Israel analysis spans 2010-2012;
  Crawford analysis spans 2010-2013;
  Bortz analysis spans 2010-2013.

**Figure 1: Comparison of Israel, Crawford and Bortz Results**



15.     One difference between my regression and Dr. Crawford's is that he includes a

regression for the year 2013, while my analysis examined the years 2010-12.  Notably,

Dr. Crawford's regression results using 2013 data also closely match the 2013 Bortz survey results, further corroborating the Bortz survey results.  And Dr. Crawford's results for 2013 are also similar to my overall results for the years 2010-12, indicating that extending my analysis to include 2013 would not materially alter my findings.  Dr. Crawford's 2013 regression implies a royalty share for Sports of approximately 38.6 percent, whereas the Bortz survey for 2013 finds a Sports share of approximately 37.7 percent, and my average result for 2010-12 is 37.54 percent.  (See Table 2, below.) Therefore, Dr. Crawford's analysis corroborates the Bortz survey for 2013 and indicates that my focus on the period 2010-12 does not bias my results.[9]

**Table 2:  Comparison of Bortz 2013 Results to Crawford 2013 Results**

| Claimant Group | 2013 Implied Share of Royalties | |
| --- | --- | --- |
| | Bortz | Crawford |
| Sports | 37.7% | 38.6% |
| Program Suppliers | 27.3% | 19.7% |
| Commercial TV | 22.7% | 18.4% |
| Public Broadcasting | 6.2% | 18.1% |
| Devotional | 5.0% | 0.5% |
| Canadian | 1.2% | 4.7% |
| **Total** | **100.00%** | **100.00%** |

Source: Bortz Testimony, December 22, 2016, Table I-1.
   Crawford Corrected Testimony, April 11, 2017, Figure 20.

---

[9]    In addition, Dr. Crawford gets his highest implied royalty allocation for Sports in 2013, indicating that if I had included data for 2013 in my regression analysis, it likely would have found an even greater average value for Sports programming.

## IV.   RESPONSES TO OTHER CLAIMANTS' WRITTEN TESTIMONY

### A.   Dr. Erdem's analysis on behalf of devotional claimants largely corroborates the Bortz survey results, and his criticisms of the use of regression analyses in this proceeding are without merit

#### 1.   Dr. Erdem's challenges to the use of regression analysis in this proceeding are without merit

16.    Although he acknowledges that "Waldfogel-type" regressions may have some value in corroborating survey evidence,[10] Dr. Erdem criticizes the use of regression analysis in this proceeding on two principal grounds.  First, he claims that "regression approaches cannot inform the Judges on what the CSOs would have paid for each claimant category in a free market," because CSOs are purchasing distant signal programming in a regulated market.  Second, he claims that the regression approach is not valid because it "assume[s] that the 'value' of a program category is measured in minutes of programming."[11]  Both of Dr. Erdem's criticisms are unfounded.

17.    **First,** Dr. Erdem is wrong that regression approaches like mine or Dr. Crawford's (or those of Drs. Waldfogel and Rosston before us) cannot inform the Judges on what CSOs would have paid for each of the Agreed Categories of programming in a hypothetical free market.  As I explained in my original testimony in this proceeding, the regression allows me to determine how much more CSOs pay for each additional minute of a given type of content, holding other factors constant, which is exactly the sort of direct evidence on their willingness to pay for each type of content that one needs to corroborate the Bortz survey results using actual marketplace behavior:[12]

---

[10]    Testimony of Erkan Erdem, Ph.D., *In re Distribution of Cable Royalty Funds*, March 9, 2017 (hereinafter, *Erdem Testimony*), p. 18.

[11]    *Erdem Testimony*, p. 14.

[12]    See *Israel Testimony*, pp. 11-12.  See also *Crawford Corrected Testimony*, p. 13 ("one can exploit the fact that distant broadcast signals are themselves bundles of programming content (and that this content varies across distant signals) to measure their relative marketplace value, even in the presence of regulated prices.")

Although there is no marketplace price for the distant signal content, marketplace information can be gleaned from CSO carriage decisions and, in particular, what CSOs pay as a function of what they choose to carry. The regression enables me to determine the effective price the CSOs pay for each category of content by determining how much their payments go up with an additional minute of each category of content, holding other relevant factors constant.

18.     Dr. Erdem is also mistaken that regression analysis cannot be informative in this context simply because the market is regulated. In past proceedings, the parties have agreed that "the sole governing standard is the relative marketplace value of the distant broadcast signal programming retransmitted by cable systems."[13] And regression analysis is a highly effective tool in this context to use the actual evidence of CSO decisions on distant signal carriage to estimate the average relative value of the Agreed Categories.

19.     Indeed, in the 2004-05 cable royalty proceeding, the Judges found the Waldfogel regression helpful to corroborate the 2004-05 Bortz survey results.[14] Similarly, the Copyright Arbitration Royalty Panel found Dr. Rosston's regression analysis useful in corroborating the 1998-99 Bortz survey results.[15] Accordingly, I employed a similar regression analysis here to help the Judges assess the 2010-13 Bortz surveys results.

20.     My approach is also entirely consistent with standard methods in economics. Indeed an important purpose of much empirical analysis in economics, particularly "industrial organization" economics, is to use observed behavior under one set of conditions to model what would happen under another set of conditions. For example, studies will often use empirical results in the absence of a particular regulation to predict

---

[13]     Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010. Page 57065.

[14]     Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010. Page 57069.

[15]     Report of the Copyright Arbitration Royalty Panel to the Librarian of Congress, October 21, 2003, p. 21. As the Librarian of Congress concluded in affirming this decision, regression analysis measures "actual behavior" and responds to past criticism of the Bortz surveys that those surveys measure only "attitudes" rather than "actual behavior." Federal Register /Vol. 69, No. 16 / Monday, January 26, 2004. Page 3615.

the effects of that regulation, or empirical results in a regulated environment to predict the effects of competition following a change in the extent of regulation.[16]

21.     **Second,** Dr. Erdem is also incorrect to characterize my regression analysis as a simple time-based study (that is, a study in which valuation is determined only by minutes).  I agree with Dr. Erdem that "it would be a significant simplification and mistake to assume that the 'value' of a program category is measured in minutes of programming."[17]  In fact, that is why, in all of my analyses, I account for the fact that not all programming minutes are created equal, and thus do not assume value is measured in minutes, but rather account for the differential value of minutes of different types of programming.  For example, I consistently find and rely on the fact that Sports minutes are more valuable than other types of programming minutes.[18]

22.     Dr. Erdem does not offer a clear alternative to studying the relationship of minutes and royalties, but does offer one specific criticism: that minutes of programming could be replaced by the number of individual programs as a unit of measure, meaning that a 60 minute show or a 30 minute show would each be counted as one unit.[19]  This makes no economic sense.  The exercise here requires a comparison of the value of different types of programming with different lengths.  A baseball game may last three hours, as long as several standard TV shows.  Hence, a viewer watching a baseball game could have instead watched, say, six sitcoms in the same period of time.  It would make no sense to count each of the programs as one unit, but rather makes sense to determine the value of two possibilities for three hours' worth of content.

---

[16]     See for example Mian Dai and Xun Tang, "Regulation and Capacity Competition in Health Care: Evidence From U.S. Dialysis Markets," *The Review of Economics and Statistics*, December 2015, 97(5): 965–982; Pierre Dubois, Rachel Griffith, Martin O'Connell, "The Effects of Banning Advertising in Junk Food Markets," *Review of Economic Studies* (2017) 0, 1–41; Claudio Lucarelli, Jeffrey Prince, Kosali Simon, "The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies," *International Economic Review* Vol. 53, No. 4, November 2012.

[17]     *Erdem Testimony*, p. 14.

[18]     *Israel Testimony*, pp. 23-30.

[19]     *Erdem Testimony*, p. 14.

23.     Dr. Erdem's claim that "CSOs may value a short program (e.g., 30-minutes) more than they value a longer program (e.g., 90-minutes) or that they may value a weekly program more than a daily program" does nothing to refute my point that one should compare value by minute.[20]  If a 30-minute program is worth more than a 90-minute program, a CSO would surely choose (if possible given other constraints) to replace the 90-minute program with the 30-minute program.  But it would also then have an additional 60 free minutes on which to air other valuable content.  Only by comparing programming values by minute, as I do in my regression analysis, can one accurately compare the full value of two blocks of content that could fill a given time span.

### 2.     Dr. Erdem's testimony supports a high relative value for Sports programming

24.     Dr. Erdem performs several experiments on my regression model.[21]  Although I believe that the methodology used in my regression was appropriate and Dr. Erdem's adjustments are unwarranted,[22] I also note that Dr. Erdem's alternative approaches *actually support* my finding of a high relative value on live Sports programming.  In particular, Dr. Erdem's model 4B, which he notes is "very broadly comparable to the

---

[20]     *Erdem Testimony*, p. 14.

[21]     *Erdem Testimony*, p. 14.

[22]     There are at least three fundamental problems with Dr. Erdem's experiments, each of which renders them econometrically invalid.  First, Dr. Erdem misunderstands the nature of the CDC data, and his calculation of "distant subscribers" double-counts subscribers, and thus results that include this measure are not informative.  Second, Dr. Erdem's addition of log transformed and exponential versions of level variables that I already include in my regression model is not standard practice, and I have never seen it used before.  Instead, it is an example of simply "fishing" for a specification that changes my result – throwing variables into a model until the result changes.  One can nearly always find a way to change a result, but if this is done by simply adding multiple versions of the same variable to the model with no economic justification, it is not informative and cannot invalidate the result.  Third, Dr. Erdem is wrong to exclude what he calls "influential observations" in my regression model.  The purpose of this regression analysis is to study the relationship established by the full set of data, representing all Form 3 CSOs.  Indeed even the authors Dr. Erdem cites for this statistical practice, themselves state "influential data points, of course, are not necessarily bad data points; *they may contain some of the most interesting sample information*." [Emphasis added.] See Belsley, D. E. Kuh, and R. E. Welsch, 1980. *Regression Diagnostics: Identifying Influential Data and Sources of Collinearity*. New York: Wiley, p. 3.

results from both the Bortz and Horowitz surveys"[23] and which Mr. Sanders highlights in his testimony,[24] implies a 45 percent share for Sports programming. In addition, the average of Dr. Erdem's various regression models imply a 41.5 percent share of the royalty fund for Sports programming. Both of these results are similar to (indeed higher than) the average result of the 2010-13 Bortz surveys (38.2 percent), and generally in-line with my results and Dr. Crawford's results.

25.    More generally, Dr. Erdem's results are broadly consistent with the valuations in the 2010-13 Bortz surveys, showing, for example, the same rank order for Sports, Program Suppliers, CTV and Public Television ("PTV").   (See Table 3.)

**Table 3:  Comparison of Erdem Regression Results with Bortz, Israel and Crawford**

| Programming Category | Bortz Survey Average 2010-2013 | Israel Regression 2010-2012 | Crawford Regression 2010-2013 | Erdem Regression 4B 2010-2012 | Erdem Regression Average 2010-2012 |
|---|---|---|---|---|---|
| Sports | 38.2% | 37.5% | 35.1% | 45.0% | 41.5% |
| Program Suppliers | 31.0% | 26.8% | 23.4% | 22.6% | 22.4% |
| CTV | 20.6% | 22.2% | 19.5% | 21.6% | 16.3% |
| PTV | 5.1% | 13.5% | 17.0% | 7.0% | 7.1% |
| Devotional | 4.6% | 0.0% | 0.7% | 3.8% | 2.7% |
| Canadian | 0.5% | 0.0% | 4.2% | 0.0% | 0.0% |

Source: Israel Testimony, December 22, 2016, Table V-2;  Crawford Corrected Testimony, April 11, 2017, Figure 20; Bortz Report, December 22, 2016, Table I-1; Erdem Testimony, March 9, 2017, Exhibit 13

---

[23]    *Erdem Testimony*, p. 18.

[24]    *Sanders Amended Testimony*, p. 18.

**B.** **MR. SANDERS' TESTIMONY ON BEHALF OF DEVOTIONAL CLAIMANTS
SUPPORTS THE USE OF THE 2010-13 BORTZ SURVEYS TO DETERMINE
ROYALTY SHARES, AND HIS CRITICISMS OF THE REGRESSION ANALYSES
IN THIS PROCEEDING ARE WITHOUT MERIT**

1. **Mr. Sanders correctly concludes that the 2010-13 Bortz survey
results should be the basis for determining each program
category's royalty share**

26.     I agree with Mr. Sanders that the 2010-13 Bortz surveys should be the basis for
the Judges' allocation of royalty shares among the Agreed Categories of programming.[25]
As noted above, my empirical analysis of marketplace outcomes supports the results of
the Bortz surveys for royalty allocation.  As such, I support the results of the 2010-13
Bortz surveys for the royalty allocation to all parties, including Devotional Claimants.

27.     However, I also note that the Judges' prior adjustment of the Devotional
Claimants' share was based in part on a conclusion that the 2004-05 Bortz survey results
likely represented a ceiling on the Devotional share due to "the amount and significance
of non-compensable devotional programming contained on WGN-A during the period."[26]
The 2010-13 Bortz surveys included improvements that mitigate (but do not eliminate)
the impact of WGNA non-compensability,[27] and hence, using the same logic, the 2010-13
Bortz survey results should be regarded as a ceiling on the Devotional allocation of the
2010-13 royalties.  Additionally, the results of my regression and Dr. Crawford's, like
those of Dr. Waldfogel in the 2004-05 proceeding, "point[] toward a lower share" for the
Devotional category than the Bortz surveys imply.[28]

---

[25]     *Sanders Amended Testimony*, p. 9.  ("I believe the Bortz Survey, as structured in the
2004-2005 case and as updated for this 2010-2013 proceeding, identifies the appropriate
buyers of retransmission services and presents this category of buyers' views of the
relative marketplace value of specific categories of programs.")

[26]     Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010.  Page 57074.

[27]     *Bortz Report*, pp. 5-7, 18-19, 27-30, 47-49.

[28]     Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010.  Page 57069.

### 2.     Mr. Sanders' criticisms of regression analyses in this proceeding are incorrect

28.     Mr. Sanders is incorrect in asserting that regression analysis is an inappropriate methodology for this proceeding.  In general, his arguments echo Dr. Erdem's criticisms and are incorrect for the same reasons discussed above.

29.     Mr. Sanders also takes issue with the use of "independent variables such as numbers of subscribers, number of channels, population served, and the like, which bear a relationship to programming decisions that is tangential at best…. They may yield a result that, while statistically compelling in an illusory manner, is meaningless for the purpose of an allocation phase royalty distribution."[29]  Mr. Sander's argument makes no sense as a matter of econometrics.  Such variables are also referred to as "control variables" and are a standard component of a regression analysis, used to ensure that my results isolate the effects of additional minutes of programming on CSO payments without instead capturing spurious correlation with other factors that are not controlled for.  By using such control variables, my regression analysis is able to tease out the amount that "CSO royalty payments increase with each additional minute of each category of programming content, *holding other relevant factors that determine royalty payments fixed*[.]"[30]

30.     I also note that the control variables that I use in my regression are essentially those used by Drs. Waldfogel and Rosston in previous proceedings, and are similar to those used by Dr. Crawford.  The reason we have all used such control variables is that they clearly relate to the amount of royalties that CSOs pay for distant signals, and thereby serve as important controls to isolate the main relationship of interest:  the relative marketplace value of a minute of the Agreed Categories of programming.[31]

---

[29]     *Sanders Amended Testimony*, pp. 19-20.

[30]     See *Israel Testimony*, paragraph 34. (Emphasis added)

[31]     For example, CSO royalties are, in part, a function of the number of CSO subscribers.  CSOs pay royalties to the fund based on their gross receipts from the subscribers to whom they transmit distant signals.  Therefore, my regression must include a control variable that measures the number of subscribers for each CSO.  Other independent

**C.** **DR. GRAY'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS RELIES ON FUNDAMENTALLY FLAWED MEASURES OF PROGRAMMING VOLUME AND VIEWERSHIP THAT PROVIDE NO VALID ECONOMIC BASIS FOR DETERMINING RELATIVE MARKETPLACE VALUE**

31.     Dr. Gray's testimony focuses on "two measures of relative economic value of programming: programming volume and programming viewership."[32]  For the purposes of his testimony, programming volume is the "total volume of minutes of programming retransmitted by CSOs" and viewership is the "[a]udience size, which is determined through program viewership."[33]  Although he presents and discusses results on programming volume, Dr. Gray ultimately concludes that programming volume is an "imperfect" and "insufficient" measure of relative marketplace value.[34]  But as to his viewership measure, he concludes that ". . . relative program viewership provides a reasonable and reliable measure of the relative economic value of distantly retransmitted programing."[35]

32.     Dr. Gray's conclusions are without any economic merit.  Neither of Dr. Gray's metrics – volume or viewing – provides a sound measure of the relative economic value of the Agreed Categories.

- His measures of programming volume are meaningless, as they do not account for the number of CSOs that transmit each network, let alone the number of CSO subscribers receiving programming, and thus do not show the extent to which

---

variables, such as the number of local broadcast channels a CSO carries, help me to control for demand factors that might affect a CSO's willingness to pay for additional programming – if a CSO already has an abundance of non-distant broadcast signals, it will less willing to pay for distant signals, all else equal.  This relationship is confirmed in my analysis.  See *Israel Testimony*, Table V-1, p. 18, showing a negative relationship between the number of local broadcast channels carried by a CSO and the distant signal royalties paid by that CSO, holding all other factors constant.

[32]    Corrected Amended Testimony of Jeffrey S. Gray, Ph.D., *In re Distribution of Cable Royalty Funds*, January 22, 2018, (hereinafter, *Gray Corrected Amended Testimony*), p. 9.

[33]    *Gray Corrected Amended Testimony*, p. 9-10.

[34]    *Gray Corrected Amended Testimony*, pp. 10, 11.

[35]    *Gray Corrected Amended Testimony*, p. 22.

CSOs are retransmitting (purchasing) that programming.  In any event, as Dr. Gray appears to acknowledge, relative volume does not equate with relative value.

- His reliance on programming viewership as a measure of relative economic value ignores the fact that not all programming minutes are equal:  Viewers value minutes of different content differently, as I (and others) have shown for the Agreed Categories in this case.  As such, viewership minutes do not determine the value of programming aired on distant signals.  Rather, valid estimates of royalty shares in this proceeding must account for variation in the value per minute across categories.  The Bortz surveys provide a reliable measure of these valuations, as my and Dr. Crawford's regression analyses confirm.

### 1. Dr. Gray's analysis of programming volume is incorrect and does not reflect relative marketplace value

33.    Dr. Gray calculates what he calls "relative volume of programming by claimant category," which he admits is an "imperfect" measure of relative marketplace valuations.[36] According to Dr. Gray, the "total volume of minutes of programming *retransmitted* by CSOs effectively represents the volume of programming purchased by the CSOs . . . ."[37]  He purports to calculate that volume by measuring the number of distant signal programs and minutes of those programs based on his sample of television stations retransmitted during 2010-13.  In Table 1 of his testimony, Dr. Gray reports shares of "All Volume" for each of the Agreed Categories, which show a Sports share of less than 1 percent for each year from 2010 -13 and a Program Suppliers share of approximately 50 percent.[38]

34.    Beyond his own admission that volume is an imperfect measure of valuation, Dr. Gray's Table 1 is flawed and misleading, because it does not account for the number of

---

[36]    See *Gray Corrected Amended Testimony,* pp. 11, 16-18.

[37]    See *Gray Corrected Amended Testimony,* p. 9 (emphasis added).

[38]    See *Gray Corrected Amended Testimony*, pp. 17.

CSOs that receive each distant signal, let alone the number of subscribers to whom the programming is retransmitted.  Thus, it does not measure the "total volume of minutes retransmitted" by CSOs, as Dr. Gray claims.  Instead, Dr. Gray measures the volume of minutes televised by distant signals without regard to the number of CSOs that retransmitted those minutes or to the number of distant subscribers to whom CSOs retransmitted those minutes. Dr. Gray's analysis weights the minutes by a sampling weight, which is unrelated to the number of CSOs that retransmit the signal.[39]

35.      Hence, Dr. Gray's volume analysis is unrelated to how many (or few) CSOs retransmitted that programming or how many (or few) CSOs' subscribers received it.  As a result, a 120 minute movie broadcast on a single station retransmitted to 500 distant subscribers could be given equal weight to a 120 minute NBA telecast on WGNA, which hundreds of CSOs retransmitted to over 40 million distant subscribers.[40]  Therefore, Dr. Gray's measure of volume does not properly account for the fact that distant signals are retransmitted by various CSOs to subscribers.[41]

36.      Dr. Crawford has presented an analysis that demonstrates the large impact of Dr. Gray's errors.  In particular, Dr. Crawford's Figure 12 accounts for both the number of CSOs that transmit a distant signal and the number of subscribers receiving it, yielding a

---

[39]      Dr. Gray's sampling weights simply adjust for the sampling procedure he has implemented and have nothing to do with the number of CSOs who retransmit the signal or the number of subscribers who receive it.  For example, his sampling weight has a correlation of -0.07 with the number of distant subscribers who receive the signal (or the number of CSOs that retransmit the signal), implying that the two phenomenon are statistically unrelated.  Indeed, a version of Dr. Gray's Table 1 that is unweighted looks very similar to Dr. Gray's own results in Table 1.  See my Technical Appendix for details.

[40]      This flaw is highly consequential and not simply theoretical.  As I noted in my original testimony, some distant signals are carried by many more cable systems than others.  For example, during the period 2010-12, WGN was carried in 4,127 system-periods, whereas WIAT is carried in only 10 system-periods.  See *Israel Testimony*, p. Appendix B-5.

[41]      See Analysis of Written Direct Testimony of Jeffrey S. Gray, Ph.D. by William E. Wecker, Ph.D. and R. Garrison Harvey, *In re Distribution of Cable Royalty Funds*, September 15, 2017, amended February 12, 2018 (hereinafter, *Wecker Testimony*), pp. 4-10.

subscriber-weighted share of compensable minutes for Sports of roughly 5.9 percent, as compared to Dr. Gray's figure of a less than 1 percent Sports share.  See Table 4, below.

**Table 4:  Comparison of Gray and Crawford Measures of Volume**

| Claimant Group | 2010-2013 Gray | 2010-2013 Crawford |
|---|---|---|
| Sports | 0.7% | 5.9% |
| Program Suppliers | 48.3% | 33.3% |
| CTV | 14.4% | 15.6% |
| PTV | 27.8% | 36.3% |
| Devotional | 7.8% | 2.3% |
| Canadian | 1.1% | 6.6% |
| **Total** | **100.00%** | **100.00%** |

Source: Crawford Corrected Testimony, April 11, 2017, Figure 12.
Gray Corrected Amended Testimony, January 22, 2018, Table 1.

37.     I also note that the Sports share of program minutes actually received by subscribers (volume) appears to be going *up* over time, indicating that if volume of minutes has any probative value for shares of the royalty fund, the Sports share is going up over time.  A calculation similar to Dr. Crawford's was performed for the 2004-05 proceeding by Dr. Richard Ducey on behalf of CTV claimants.[42]  In Table 5, below, I compare the subscriber weighted shares of compensable minutes calculated in 2004-05 by Dr. Ducey to those calculated in 2010-13 by Dr. Crawford. I note that Sports share has increased slightly from 4.5 percent to 5.9 percent.  However, Program Suppliers' share has decreased from 50.1 percent to 33.3 percent.

---

[42]     Testimony of Richard V. Ducey., *In re Distribution of Cable Royalty Funds*, June 1, 2009, (hereinafter, *Ducey Testimony*), Exhibit 8.

**Table 5:  Share of Compensable Minutes by Claimant Group Weighted by Subscribers**

| Claimant Group | 2004-2005 Ducey | 2010-2013 Crawford |
|---|---|---|
| Sports | 4.5% | 5.9% |
| Program Suppliers | 50.1% | 33.3% |
| CTV | 15.5% | 15.6% |
| PTV | 22.3% | 36.3% |
| Devotional | 2.7% | 2.3% |
| Canadian | 4.5% | 6.6% |
| **Total** | **100.00%** | **100.00%** |

Source: Crawford Corrected Testimony, April 11, 2017, Figure 12.
          Ducey Testimony, June 1, 2009, Exhibit 8.

38.    My analysis of cable network program expenditures also shows that measures of volume do not translate directly into value.  Below I reproduce Table V-5 from my December 22, 2016 testimony (see Table 6).[43]  This analysis shows that despite  the relatively small share of JSC programming hours transmitted (1.06 percent) by the top 25 cable networks during 2010-13, that programming nevertheless commanded more than 22 percent of the top 25 cable networks' 2010-13 programming budgets.  Said another way, JSC programming is worth almost 30 times more per programming hour than non-JSC programming for the top 25 cable networks in 2010-13.

---

[43]    See *Israel Testimony*, pp. 25-26.

**Table 6:  Cable Content Analysis 2010-13, Summary of Top 25 Networks**

| Category | Total Programming Hours | Total HHVH (000) | Expeditures ($M) | Expenditures per Hour of Programming | Expenditures per Hour of Viewing |
|---|---|---|---|---|---|
| | | | | [D] = | [E] = |
| | [A] | [B] | [C] | [C] / [A] | [C] / [B] |
| JSC | 9,274.0 | 15,164,368.9 | $12,524.7 | $1,350,513.0 | $0.826 |
| Non-JSC | 866,726.0 | 496,492,970.2 | $42,702.0 | $49,268.2 | $0.086 |
| JSC / Non-JSC | 0.01 | 0.03 | 0.29 | 27.41 | 9.60 |
| JSC % of Total | 1.06% | 2.96% | 22.68% | | |

Sources:  Economics of Basic Cable 2015; various articles from Sports Media Watch, Sports Business Daily,
ESPN Media Zone, TV By the Numbers, Soccer America, NY Times, USA Today, WSJ, Morgan Wick,
and other various sources.  See my underlying documents for a full list of sources.

39.     Individual cable networks with a mix of JSC and other programming show a
similar pattern.  Below, I reproduce table V-6 from my December 22, 2016 testimony
(see Table 7), an analysis of content expenditures for TBS and TNT.  This analysis shows
that JSC's relatively small share of Total Programming Hours on TBS (1.95%) and TNT
(2.79%) translates into a 44.40 percent and 45.46 percent share, respectively, of the
amount that the cable networks spent on programming.  In other words, an hour of JSC
programming commands more than 40 times the value of an hour of non-JSC
programming on TBS, and nearly 30 times the value of non-JSC programming on TNT.

**Table 7:  Cable Content Analysis 2010-13, TBS & TNT**

| Network | Category | Total Programming Hours | Total HHVH (000) | Expeditures ($M) | Expenditures per Hour of Programming | Expenditures per Hour of Viewing |
|---|---|---|---|---|---|---|
| | | | | | [D] = | [E] = |
| | | [A] | [B] | [C] | [C] / [A] | [C] / [B] |
| TBS | JSC | 684.0 | 1,220,722.6 | $1,031.0 | $1,507,370.6 | $0.845 |
| | Non-JSC | 34,356.0 | 20,880,757.4 | $1,291.2 | $37,581.7 | $0.062 |
| | JSC / Non-JSC | 0.02 | 0.06 | 0.80 | 40.11 | 13.66 |
| | JSC % of Total | 1.95% | 5.52% | 44.40% | | |
| TNT | JSC | 977.0 | 2,513,281.9 | $2,042.0 | $2,090,056.2 | $0.812 |
| | Non-JSC | 34,063.0 | 29,162,878.1 | $2,450.2 | $71,931.9 | $0.084 |
| | JSC / Non-JSC | 0.03 | 0.09 | 0.83 | 29.06 | 9.67 |
| | JSC % of Total | 2.79% | 7.93% | 45.46% | | |

Sources:  Economics of Basic Cable 2015; various articles from Sports Media Watch, Sports Business Daily,
ESPN Media Zone, TV By the Numbers, Soccer America, NY Times, USA Today, WSJ, Morgan Wick,
and other various sources.  See my underlying documents for a full list of sources.

40.     In sum, simply correcting Dr. Gray's error of failing to account for how many
CSOs retransmitted programming (and how many subscribers they have), significantly
changes his results.  Importantly, however, even with this change, one could not rely on
the volume of minutes received by subscribers to determine relative valuations of the
Agreed Categories without accounting for the differences in the value of each minute, a
topic I discuss in greater depth in the next section in the context of viewership minutes.

### 2.     Dr. Gray's analysis of program viewership provides no valid method for determining relative marketplace value

41.     Dr. Gray also calculates the total amount of what he terms "viewing" of the
Agreed Categories of programming on distant signals.  In his Table 2, Dr. Gray calculates
that live Sports programming constitutes roughly 5.3 to 9.2 percent of 2010-13 distant
viewing.[44]

42.     Dr. Gray's calculation of minutes viewed provides no reliable basis for
determining the relative valuation of the Agreed Categories, most fundamentally because

---

[44]     See *Gray Corrected Amended Testimony*, pp. 19-20.

it treats all viewing minutes as the same and thus does not account for the fact that
minutes of different types of programming have different values. Dr. Gray's assumption
that minutes viewed can be treated equally in determining value is flawed for many
reasons, most notably that it fails to consider the number of minutes of each type of
content that is available. If the same number of minutes of all types of content were
available, then the total amount of each that viewers choose to consume could indicate
their relative value. But given the smaller number of available minutes of Sports
programming, one cannot support such a conclusion. Many viewers may wish there were
more Sports programming available, and choose to watch other programming *only as a
second choice* because Sports programming is not available at certain times. In that
context, a smaller number of minutes of Sports programming may be worth far more to
viewers than a much greater number of other types of programming, which they value
less but watch as a poor substitute when live Sports is not on.[45]

43.     A further problem with Dr. Gray's analysis of viewing minutes is that it ignores
that it is CSOs (not viewers) that pay for programming, using such programming to fill
out their channel lineups. Hence, the appropriate base for analysis of value is the number
of minutes aired by CSOs (accounting for the proportion of its subscribers that receive
the programming) such as I use in my regression analysis.

44.     My regression methodology accounts for these issues by determining the
difference in valuation across minutes of different types of programming and multiplying
this by minutes aired by CSOs to determine relative values. Most notably, as described
in my previous written testimony, my regressions show that a minute of Sports
programming is more valuable than a minute of Program Suppliers programming. Below
I reproduce Table V-2 from my testimony of December 22, 2016 (see Table 8).[46]  It

---

[45]     As an analogy, consider that potatoes are much less expensive and more widely available
than are blueberries. In 2013, U.S. consumers consumed over 33 pounds per person of
fresh potatoes, compared with roughly one and a half pounds of fresh blueberries per
person. But the price of blueberries ($4.73) was roughly 8x greater than potatoes ($0.56),
per pound. Therefore, one cannot conclude that higher consumption equals higher value.

[46]     See *Israel Testimony*, p. 20.

shows that an additional minute of Program Suppliers programming is much less valuable ($0.469) than an additional minute of Sports programming ($4.836). Hence, the fact that CSOs carry many more prorated distant signal minutes of Program Suppliers programming (51,261,616) than they do of Sports programming (6,962,722) cannot be used to infer that they place more value on Program Supplier programming than they do on Sports programming; an adjustment for the value of each type of content per minute is required, such as I provide in my analysis.

**Table 8: Previous Israel Table V-2, Royalty Share Allocation**

| Claimant Group | Value of an Additional Minute[1] | System and Prorated DSE Weighted Compensable Minutes | Value of Minutes | Implied Share of Royalties |
|---|---|---|---|---|
| [A] | [B] | [C] | [D] = [B] * [C] | [E] = [D] /(89,701,903) |
| Sports | 4.836** | 6,962,722 | 33,674,484 | 37.54% |
| Program Suppliers | 0.469*** | 51,261,616 | 24,058,506 | 26.82% |
| Commercial TV | 1.01*** | 19,677,607 | 19,873,956 | 22.16% |
| Public Broadcasting | 0.66** | 18,322,702 | 12,094,957 | 13.48% |
| Devotional | -0.701*** | 4,384,240 | 0 | 0.00% |
| Canadian | -0.973*** | 4,839,825 | 0 | 0.00% |
| **Total** | | **105,448,713** | **89,701,903** | **100.00%** |

Source: TMS/Gracenote; Cable Data Corporation; Kantar Media/SRDS

Notes: *, **, and *** indicate results are significant at the 90, 95, and 99 percent confidence levels, respectively.
[1] Minutes prorated.

45.    Returning to my analysis of cable network expenditures, it shows that measures of viewership also do not translate directly into value. Below I reproduce Table V-5 from my December 22, 2016 testimony (see Table 9).[47] This analysis shows that despite JSC's relatively small share of household viewing hours (HHVH, 2.96 percent) for the top 25 cable networks, JSC programming nevertheless commands more than 20 percent of the top 25 cable networks' programming budgets. Said another way, JSC programming is worth roughly 10 times more per household viewing hour than non-JSC programming for the top 25 cable networks.

---

[47]    See *Israel Testimony*, pp. 25-26.

**Table 9:  Cable Content Analysis 2010-13, Summary of Top 25 Networks**

| Category | Total Programming Hours | Total HHVH (000) | Expeditures ($M) | Expenditures per Hour of Programming | Expenditures per Hour of Viewing |
|---|---|---|---|---|---|
|  |  |  |  | [D] = | [E] = |
|  | [A] | [B] | [C] | [C] / [A] | [C] / [B] |
| JSC | 9,274.0 | 15,164,368.9 | $12,524.7 | $1,350,513.0 | $0.826 |
| Non-JSC | 866,726.0 | 496,492,970.2 | $42,702.0 | $49,268.2 | $0.086 |
| JSC / Non-JSC | 0.01 | 0.03 | 0.29 | 27.41 | 9.60 |
| JSC % of Total | 1.06% | 2.96% | 22.68% |  |  |

Sources:  Economics of Basic Cable 2015; various articles from Sports Media Watch, Sports Business Daily,
ESPN Media Zone, TV By the Numbers, Soccer America, NY Times, USA Today, WSJ, Morgan Wick,
and other various sources.  See my underlying documents for a full list of sources.

46.     Focusing again on the individual cable channels, TBS and TNT, which show a mix of JSC and non-JSC programming, exhibit the same relationship between household viewing hours and value (See Table 10, below).  Specifically, although JSC programming represents only 5.52 percent of HHVH on TBS and 7.93 percent of HHVH on TNT, that programming represents 44.40 percent and 45.46 percent of program expenditures, respectively.  This means that the value of an hour of JSC viewing is worth roughly 13 times more than a viewing hour of non-JSC programming on TBS, and nearly 10 times more than a viewing hour of non-JSC programming on TNT.

**Table 10:  Cable Content Analysis 2010-13, TBS & TNT**

| Network | Category | Total Programming Hours | Total HHVH (000) | Expeditures ($M) | Expenditures per Hour of Programming | Expenditures per Hour of Viewing |
|---|---|---|---|---|---|---|
| | | | | | [D] = | [E] = |
| | | [A] | [B] | [C] | [C] / [A] | [C] / [B] |
| TBS | JSC | 684.0 | 1,220,722.6 | $1,031.0 | $1,507,370.6 | $0.845 |
| | Non-JSC | 34,356.0 | 20,880,757.4 | $1,291.2 | $37,581.7 | $0.062 |
| | JSC / Non-JSC | 0.02 | 0.06 | 0.80 | 40.11 | 13.66 |
| | JSC % of Total | 1.95% | 5.52% | 44.40% | | |
| TNT | JSC | 977.0 | 2,513,281.9 | $2,042.0 | $2,090,056.2 | $0.812 |
| | Non-JSC | 34,063.0 | 29,162,878.1 | $2,450.2 | $71,931.9 | $0.084 |
| | JSC / Non-JSC | 0.03 | 0.09 | 0.83 | 29.06 | 9.67 |
| | JSC % of Total | 2.79% | 7.93% | 45.46% | | |

Sources:  Economics of Basic Cable 2015; various articles from Sports Media Watch, Sports Business Daily,
       ESPN Media Zone, TV By the Numbers, Soccer America, NY Times, USA Today, WSJ, Morgan Wick,
       and other various sources.  See my underlying documents for a full list of sources.

47.     In sum, Dr. Gray is wrong to focus solely on volume and viewership to estimate relative marketplace value for the Agreed Categories.  His measure of volume is simply incorrect and neither measure accounts for the obvious fact that not all minutes are equally valuable.  Proper measures must account for the variation in value across minutes of different types, either by directly asking CSOs to report on the value of the programming (as the Bortz survey does), by using a regression analysis to determine value per minute which can then be multiplied by total minutes (as my first method does),[48] or by relying on the values paid for Sports and non-Sports programming on cable channels (as my second method does).

**D.     DR. STECKEL'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS IS NOT VALID ECONOMIC ANALYSIS**

48.     Dr. Steckel claims that CSO surveys, like those performed by Bortz on behalf of Sports programming and Mr. Horowitz on behalf of Program Suppliers, are not appropriate sources of information for the Judges to use in determining the relative

---

[48]     As does the regression analysis by Dr. Crawford for Commercial TV Claimants.

marketplace value of the Agreed Categories.[49]  He offers several reasons for this opinion and, based on those reasons, he advocates for the use of market data or surveys of customers instead of CSO surveys.[50]

49.     Dr. Steckel is simply incorrect as a matter of economics.  The most relevant source of information on the value of a product is the views of the buyers.  Hence, in this case, the most relevant source of information on the value of distant signal programming is the views of CSO executives, who are the buyers of the programming and who make such programming decisions as part of their job.  Therefore, the Bortz survey of CSOs should be the primary source of information for the Judges.[51]  This is especially true given that regression analyses using available marketplace data on distant signals corroborate the findings of the Bortz surveys, as do market data on cable network expenditures.

---

[49]     Dr. Steckel's opinion in this proceeding is contradicted by much in the previous record, including the Judges themselves, various expert testimony (including my own), and the United States Court of Appeals for the District of Columbia Circuit.  See for example: The Judges (Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010.  Page 57065. "Having carefully reviewed and considered all of the evidence in the record, the Judges find that the values of the program categories at issue among these contending claimants are most reasonably delineated by a range bounded by certain results indicated primarily by the Bortz constant sum survey" ); expert testimony  (e.g., Written Direct Testimony of Dr. Robert Crandall, 2004-05 Phase I (JSC Written Direct Statement Ex. No. 4), 1998-99 Phase I (JSC Written Direct Statement Ex. No. 6), 1989 Phase I (JSC Written Direct Statement Ex. No. 7); Written Direct Testimony of Michelle Connolly, Ph.D., *In re Distribution of Cable Royalty Funds*, December 22, 2016 (hereinafter, *Connolly Testimony*) (supporting Bortz survey and citing prior testimony of experts for CTV, PTV, Canadian and Devotional claimants supporting Bortz survey); and the D.C. Circuit (Program Suppliers v. Librarian of Congress, 409 F.3d 395, 402 (D.C. Cir. 2005), ("Nor did the CARP act unreasonably in declining to rely on Nielsen for direct evidence of viewing, as Bortz adequately measured the key criterion of relative market value. Moreover, as the CARP put it, Bortz 'subsumes inter alia all viewing data that a CSO might consider when assessing relative value of programming groups.").

[50]     Direct Testimony of Joel Steckel, Ph.D., *In re Distribution of Cable Royalty Funds*, December 22, 2016 (hereinafter, *Steckel Testimony*), pp. 7-8.

[51]     For ease of reference, when referring to CSO surveys for the purposes of responding to Dr. Steckel, I will refer to the Bortz surveys.  See Section IV.F, below, which explains why my analysis supports the Bortz survey as superior to the Horowitz surveys.

### 1. In the relevant hypothetical market, the CSO is the buyer and thus the relevant focus of the survey

50.    Dr. Steckel points to the Bortz surveys' reliance on CSO respondents to provide relative valuations for the Agreed Categories as a weakness of the survey. He believes that instead of the opinions of cable executives, one should focus on the opinions of subscribers. However, in both real world and the hypothetical free market for distant signals, the CSO is the buyer of the content. Hence, Dr. Steckel is wrong as a matter of economics: the relevant opinion on value is the opinion of the buyer, which is what the Bortz Survey captures.

51.    In fact, the nature of distant signals is such that the value placed on the content by the CSO is the sole determinant of price for distant signals in a hypothetical free market. In general, as a matter of economics, the price for a product is determined by the marginal benefit to buyers and the marginal cost to sellers. In this case, however, the marginal cost to produce distant signals is zero in all cases, as the signals are simply retransmitted signals that have already been produced. Thus, the only variation in a hypothetical free market for distant signals would come from variation in the marginal benefit that CSOs would derive from retransmitting different distant signals. Therefore CSOs' valuation on distant signals is the relevant determinant of price in a hypothetical free market.

52.    Dr. Steckel's claim that subscriber surveys would be superior to CSO surveys is misguided. Arguing that one should survey cable subscribers instead of cable operators is to argue that one should not ask the actual buyers what they will pay, but rather the people whose valuations the operators are aggregating. This makes no economic sense. An analogy might be that instead of asking the parents how much they would pay for a vacation, you should survey all the family members (i.e. children) whose views the parents are aggregating in arriving at a willingness to pay for various vacation options. This method could not be as accurate as surveying parents directly, as the survey analyst would then have to decide how to aggregate the views of the various family members into an overall value, when what really matters is how the *parent*, who pays for the trip, would aggregate those values. Similarly, surveying subscribers would leave the analyst

to aggregate those values to make inferences about CSO valuation, when the relevant question is how the CSOs perform such aggregation, which can be answered by asking them directly.[52]

53.    In fact, Dr. Steckel ultimately agrees with this.  He says "[i]f you want to know if customers will buy a product, ask them.  If you want to know why customers are not buying a product, ask them. If you want to know what customers (*i.e.*, the market) value, ask them."[53]   I agree with Dr. Steckel's reasoning, but the customers *are* the CSOs.

54.    Dr. Steckel also argues that "[i]f managers really understood what their customers value, every product would be a success. In fact, we know over half of new industrial products fail."[54]   This argument is entirely beside the point.  The purpose of the Bortz survey is not to ask CSOs, as *suppliers*, about the value of new product, rather it is to ask CSOs as *buyers* what they would have spent, on a relative basis, for the Agreed Categories of programming, the relevant question in determining the valuation of those program categories.  Dr. Steckel's argument would apply if Bortz were asking the network executives at the distant signal (e.g. WGN executives) how much they think their content is worth.  In that case, Dr. Steckel would be correct that those executives may not know how much various content is worth to buyers.  In contrast, the CSOs are the buyers of the distant signals.  Therefore the CSOs should be the respondents to the survey valuing distant signal programming.

---

[52]    See also *Connolly Testimony*, pp. 18-19. On the point of CSOs as buyers, Dr. Connolly states:  "Moreover, given that the respondents of the Bortz survey are internalizing their beliefs about subscriber preferences when responding to questions about the relative value of categories of programming, this aspect of the market is reflected in the Bortz survey."  In addition, Dr. Connolly quotes Dr. Steven Wildman, who correctly concludes that "[b]ecause CSOs are the purchasers in the relevant marketplace and subscriber demands are filtered through them, the CSO survey results must be considered more primary and as more directly relevant to the determination of appropriate compensation than the subscriber surveys."

[53]    See *Steckel Testimony*, pp. 40-41.

[54]    See *Steckel Testimony*, p. 41.

## 2.    CSO executives are experts in valuing content

55.    Dr. Steckel believes that cable executives would be unable to respond accurately to the Bortz surveys, because they would give biased answers based on "intuition- and heuristics-based decision-making processes."[55]  In particular, he says that cable executives cannot be expected to value programming, because they "do not make decisions about individual programs or the various categories of programming employed in this proceeding.  They make decisions about television stations and cable networks."[56] This argument is incorrect.

56.    The idea that cable executives do not think about underlying types of programming, but only think about networks as a whole, flies in the face of the realities of the cable television industry.   In my own work, I interact with both cable executives and content providers regularly.  Their discussions about what certain networks are worth – both how cable executives value them and how networks market themselves – are all about breaking down the value of the underlying content.  One particularly salient example:  as cable executives decide what TBS and TNT are worth, they are directly evaluating the individual value of the sports content, the original content, and the reruns. When they consider what HBO is worth, they consider "Game of Thrones", other new content, and movies.  In fact, cable executives change their entire promotional strategy when "Game of Thrones" premieres on HBO, indicating that they are focused on the underlying shows, not the network generically.  When they decide what to pay for an RSN, they value the Sports programming separately from the filler programming.  Cable executives do have the expertise and experience to look across their networks and separately value content along the lines of the Agreed Categories; in fact, this is central to their day to day jobs.[57]

---

[55]    See *Steckel Testimony*, pp. 21-22, 28-34.

[56]    See *Steckel Testimony*, p. 23.

[57]    See Written Rebuttal Testimony of Allan Singer, September 15, 2017, p. 11; Written Rebuttal Testimony of Daniel M. Hartman, September 15, 2017, p. 1-3, 16-18.

### 3.   Dr. Steckel's discussion of marginal vs. total values is incorrect

57.   Dr. Steckel argues that the Bortz survey captures only the "marginal return" (that is, the value created by one more minute of programming) of each category, whereas the marketplace value is captured by the "total return."[58]  This is simply incorrect.[59]

58.   In fact, the Bortz survey asks respondents to focus on the non-network programming on the distant signals they carry, and then asks for the relative value of *each type of programming*, not the marginal value of one more minute of the programming.[60]  And then it clarifies that respondents should consider how they would divide up a fixed budget for "all the programming" broadcast on those distant signals. So this question is not asking how much extra they would spend for one additional minute or hour of the programming; it is asking how much they would spend for "all" of each category of programming.  Hence this is exactly the right question:  it is "marginal" only in the sense that it takes *other, network and cable* programming as given, but it then asks for the total value of the full bucket of minutes of each type of programming broadcast by the distant signals.  In this way, it captures the total value of each category of distant signals – not just the value of the last minute – while correctly recognizing that these distant signals are being added to a lineup of other programming.

59.   Marketplace behavior for other types of programming (e.g. cable networks) confirms that the Bortz survey asks the right question.  For example, in my experience working with multiple CSOs, when they negotiate for a given cable network (or bundle of networks) – from Disney for example – they determine the price they are willing to pay by starting from a base of the other networks they carry and then asking how much additional profit they can make by adding the Disney networks, as a whole. And in doing

---

[58]   See *Steckel Testimony*, p. 26 ("any presumed equivalence between resource allocations and marketplace value rests on total return, not marginal return.")

[59]   Previous testimony on this topic directly contradicts Dr. Steckel.  See Testimony of Robert W. Crandall, Ph.D., (JSC Written Direct Statement Ex. 7), pp. 9-14.  ("It is this latter measure of value – the total value as represented by the area under the demand curves – that is captured by the Bortz survey.")

[60]   See *Bortz Report*, pp. B-5 & B-6, questions 4a and 4b.

so, they consider the value of the various categories of programming (sports on ESPN, animation, etc.) that come with the Disney networks, again as a whole.  This process, carried out by each CSO, determines the overall marketplace value of the content across all CSOs. And it's exactly the process that the Bortz survey mimics, by asking how much CSOs would allocate to each category of distant signal programming, in total.

### 4.    CSO management of multiple systems does not invalidate the Bortz Survey results

60.    Dr. Steckel also argues that the fact that many survey respondents manage multiple cable systems would introduce ambiguity and bias into the survey results.[61] However, this concern is without basis.  First, it ignores that the Bortz survey asks very system specific questions about the precise distant signals carried on each system during the relevant period, so confusion should not be an issue.[62]  And, even where an executive was the respondent for more than one system, in the Bortz survey a separate questionnaire was administered for each system.[63]  Second, cable executives are generally responsible for a *large and changing* number of systems and thus must determine the value of content on the various systems as part of their day to day job.  Hence, Dr. Steckel is once again asserting that cable executives are not qualified to answer questions at the heart of their responsibilities, an unreasonable assertion for which he provides no support.

---

[61]    See *Steckel Testimony*, pp 25-26.

[62]    See for example, *Bortz Report*, p. B-3, question 2a. "Industry data indicate that your system serving (ENTER COMMUNITY LISTED ABOVE; i.e., primary community from SOA) and nearby communities carried the following broadcast stations from other cities in 2010", after which the survey administrator reads off individual distant signal channels by call letters.

[63]    *Trautman Corrected Rebuttal Testimony*, p. 43 n.29.  In contrast, in the Horowitz survey when an executive was the respondent for  more than one system, "he/she was only asked to respond to one survey for all the systems with the same channels."  Corrected Testimony of Howard Horowitz, *In re Distribution of Cable Royalty Funds*, April 25, 2017 (hereinafter, *Horowitz Corrected Testimony*), p. 8.

### 5.    Analysis of marketplace data corroborates the Bortz surveys

61.     Finally, even if one were to accept any of Dr. Steckel's criticisms, and thus question the accuracy of survey results, the appropriate next step would be to make sure those results are corroborated by actual marketplace evidence.  Indeed, Dr. Steckel appears to agree with this approach:  He states his preference for the analysis of "market results" and data on "transactions," as opposed to surveys.[64]   In this case, actual market result and data on transactions *corroborate* the Bortz survey results.   In particular, as explained above, my regression results (as well as Dr. Crawford's) and my analysis of cable network expenditures corroborate the Bortz surveys' findings.  Therefore, even if one takes Dr. Steckel's recommendation and relies on actual marketplace data, the Bortz survey results are simply bolstered.

### E.    Mr. Mansell's testimony on behalf of program suppliers misinterprets the implications of the rapidly growing sources of content

62.     Mr. Mansell concludes "that over the past 30 years, the number of live professional and college team sports games on local over-the-air TV stations has significantly declined."[65]  In support of this opinion, Mr. Mansell offers a limited history of Sports broadcasting, describing the expansion of Sports programming to cable, the internet and mobile devices.

63.     Mr. Mansell's analysis is flawed in at least two fundamental ways.  **First**, in his brief summary of this history of Sports programming, Mr. Mansell skips over the most relevant point:  Even as the sources of supply of Sports content have expanded, its value (overall and per minute) has remained high.   Indeed, Mr. Mansell's own testimony shows the continued value and desirability of Sports programming, as he refers to bidding wars for the Sports programming that has migrated from broadcast networks to RSNs and

---

[64]        See *Steckel Testimony*, p. 39.

[65]        Corrected Testimony of John Mansell, *In re Distribution of Cable Royalty Funds*, March 9, 2017 (hereinafter, *Mansell Corrected Testimony*), p. 4.

national broadcasts,[66] and he affirmatively demonstrates that Sports programming is valuable.[67]

64.     Because it ignores the ongoing high value of sports content, Mr. Mansell's analysis is ultimately irrelevant.  The statistical and survey methodologies used by myself, Dr. Crawford, and Bortz compute the value of the various categories of programming *given whatever changes have occurred in the marketplace.*  For example, my analysis uses data on actual minutes of distant signal content during the relevant period, as well as data on royalties paid by CSOs during the same period, to estimate how CSOs valued the broadcasts according to their Agreed Categories.  More generally, to the extent there have been changes in the availability of sports content (or Program Suppler content) from various sources, the data during the relevant time period speak for themselves on the effect of the changes.  Put simply, the results of the Bortz surveys, my analysis, and Dr. Crawford's analysis answer the question of value, *reflecting the effect of all industry trends*, whether those discussed by Mr. Mansell or others.[68]

65.     Moreover, available data show that Mr. Mansell's conclusion is wrong as a matter of fact, as it pertains to distant signal retransmissions during 2010-13.  While Mr. Mansell may be correct that there has been a gradual migration of Sports programming to cable channels and other outlets over the past thirty years, for the comparatively shorter time period between 2004-05 and 2010-13, the relative amount of compensable Sports programming retransmitted on distant signals actually increased.  Below I reproduce as Table 11 an analysis that I performed above, comparing compensable minutes by

---

[66]     See *Mansell Corrected Testimony,* p. 10.

[67]     See *Mansell Corrected Testimony,* p. 36.

[68]     The Judges reached the same conclusion in the 2004-05 proceeding.  See Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010.  Page 57070 n.18.  ("Various arguments are made by some parties concerning whether or not the Judges must consider or require proof of changed circumstances, separate and apart from the estimates of relative value presented by the parties. We find, as did the 1998–99 CARP, that changed circumstances are embedded within the methodologies that provide reliable estimates of relative valuations and, therefore, have already been accounted for and are subsumed within the calculus of results. See 1998–99 CARP Report at 16, 31–2.")

claimant group in 2004-05 as compared with 2010-13.[69]  As this table shows, the percentage of Sports minutes increased slightly from 4.5 percent in 2004-05 to 5.9 percent in 2010-13.  Therefore, at least as it affects distant signal retransmission in the recent past, Mr. Mansell's implication that the quantity of Sports programming has declined is incorrect.

**Table 11:  Share of Compensable Minutes by Claimant Group Weighted by Subscribers**

|  | **2004-2005** | **2010-2013** |
| --- | :---: | :---: |
| **Claimant Group** | **Ducey** | **Crawford** |
| Sports | 4.5% | 5.9% |
| Program Suppliers | 50.1% | 33.3% |
| CTV | 15.5% | 15.6% |
| PTV | 22.3% | 36.3% |
| Devotional | 2.7% | 2.3% |
| Canadian | 4.5% | 6.6% |
| **Total** | **100.00%** | **100.00%** |

Source: Crawford Corrected Testimony, April 11, 2017, Figure 12.
        Ducey Testimony, June 1, 2009, Exhibit 8.

66.     **Second**, Mr. Mansell's analysis overlooks the broader implications of the rapidly evolving media environment, which have had a disproportionately negative impact on the value of other categories of programming, and in particular Program Suppliers, while the value of Sports programming has been remained high.   Contrary to Mr. Mansell's conclusions, the industry recognizes that the category of programming that has primarily lost value due to the explosion of content is not live Sports but rather Program Supplier content.[70]  This has occurred because the relevant period saw the explosion of Subscription Video On-Demand (SVOD) services like Netflix, Hulu and Amazon, and a general explosion in available content similar to that offered by Program Suppliers.

---

[69]     See Table 5, above.

[70]     http://variety.com/2016/tv/news/peak-tv-2016-scripted-tv-programs-1201944237/ .
         During 2010-13, the number of basic cable original scripted shows more than doubled. These statistics only account for the number of new shows, and does not account for the explosion of previously viewed content throughout cable, cable on-demand, and SVOD services.

Indeed, by the end of 2013, Netflix had more than 30 million U.S. subscribers,[71] and by the third quarter of 2013, Netflix was streaming about 5 billion hours of video globally, virtually all of it Program Suppliers programming.[72]  The explosion of content has thus particularly affected Program Supplier content.[73]  Indeed, accepted wisdom today is that the traditional, linear TV model (on which distant signals air) is more dependent on Sports than ever.[74]

### F.   MY REGRESSION ANALYSIS DOES NOT CORROBORATE THE FINDINGS OF THE HOROWITZ SURVEYS PERFORMED ON BEHALF OF PROGRAM SUPPLIERS

67.   The 2010-13 Horowitz surveys (Horowitz surveys) were developed by Howard Horowitz with the intention of replicating the "methods and procedures of the Bortz Survey that was done for the 2005 royalty year" but with certain modifications.[75]  As one example, particularly relevant to my regression analysis, Mr. Horowitz adds a new category to his survey method:  "Other sports," meant to specify non-team sports programming such as horse racing and figure skating, which is not attributable to Joint Sports Claimants, but rather is attributable to Program Suppliers.[76]

---

[71]   https://www.nytimes.com/2014/01/23/business/media/growth-of-netflix-subscribers-surpasses-analysts-expectations.html

[72]   http://variety.com/2014/digital/news/netflix-to-focus-on-adding-higher-rated-and-exclusive-titles-cfo-says-1201187028/

[73]   http://articles.latimes.com/print/2012/sep/30/entertainment/la-et-st-homeland-market-20121001.  Viewership for individual scripted shows had decreased drastically by the relevant time period.

[74]   http://variety.com/2013/tv/news/sports-fans-to-spend-more-money-to-watch-favorite-teams-1200577215/ .  "The price of TV broadcast rights for sports in the age of time-shifted viewing has soared. After all, it's high-demand content that viewers don't DVR. And unlike other video entertainment, it's not available from Netflix or other Internet services."  See also http://www.reuters.com/article/us-facelxlok-mlb-idUSKBN1602MY and https://www.digitaltrends.com/social-media/facebook-and-twitter-are-trying-to-acquire-rights-to-stream-live-tv-content/ , which show that providers like Facebook and Twitter are competing to broadcast Sports games, but are not generally interested in "conventional TV programs."

[75]   *Horowitz Corrected Testimony*, p. 3.

[76]   See *Horowitz Corrected Testimony*, p. 5.

68.     My regression results, as well as those of Dr. Crawford corroborate the Bortz survey results and fail to corroborate the Horowitz survey results.   Hence, actual marketplace evidence supports use of the Bortz survey, not the Horowitz survey, and rejects Mr. Horowitz's claim that not including a separate "Other Sports" category invalidates the Bortz results.

69.     Table 11, below, presents a comparison of the results of the Horowitz and Bortz surveys with the results of my regression analysis and Dr. Crawford's regression analysis. As the Table shows, while the Bortz survey matches the regression results well, the Horowitz surveys fail to match the regression results, particularly for the most important, high value categories.[77]  The Bortz surveys, my regression analysis and the Crawford regression analysis all imply the same rank order for the top 4 categories:  Sports, Program Suppliers, CTV and PTV, in that order.  The Horowitz surveys, in contrast, rank these categories as: Program Suppliers, Sports, PTV and CTV, thus failing to match the regression results.

70.     It is also notable that the Bortz surveys, my regression analysis, and the Crawford regression analysis all value Sports within roughly 3 percentage points of each other, while the Horowitz valuation (30.0 percent) is 5 percentage points below the lowest, and 8 percentage points below the highest valuation from the other studies. For Program Suppliers, the Horowitz surveys (39.0 percent) are 8 percentage points above the highest of the three analyses, and 12 percentage points above the lowest, whereas Bortz, Israel and Crawford are within roughly 4 percentage points of each other.

---

[77]     For ease of comparison, I present a royalty-weighted average of the Horowitz survey results.  Indeed on a year-by-year basis, some of the Horowitz survey results are even more extreme than this average.  See *Horowitz Corrected Testimony,* p. 16, Table 3.2.

**Table 12: Comparison of Bortz, Israel, Crawford and Horowitz Results**

| | Implied Share of Royalties | | | |
|---|---|---|---|---|
| Claimant Group | Israel | Crawford | Bortz | Horowitz average |
| Sports | 37.5% | 35.1% | 38.2% | 30.0% |
| Program Suppliers | 26.8% | 23.4% | 31.0% | 39.0% |
| CTV | 22.2% | 19.5% | 20.6% | 12.6% |
| PTV | 13.5% | 17.0% | 5.1% | 13.2% |
| Devotional | 0.0% | 0.7% | 4.6% | 4.7% |
| Canadian | 0.0% | 4.2% | 0.5% | 0.6% |
| **Total** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

Source: Israel Testimony, December 22, 2016, Table V-2;
     Crawford Corrected Testimony, April 11, 2017, Figure 20.
     Bortz Testimony, December 22, 2016, Table I-1.
     Horowitz Testimony, December 22, 2016, Table 3.2
Notes:  Israel analysis spans 2010-2012;
     Crawford analysis spans 2010-2013;
     Bortz analysis spans 2010-2013.
     Horowitz analysis spans 2010-2013.

71.    The failure of the Horowitz survey to match actual marketplace evidence, as reflected in the regression results, is not surprising given the flaws in the Horowitz survey laid out by Mr. Trautman and Dr. Mathiowetz in their testimony.[78]  In particular, the anomalously high value accorded to Program Suppliers in the Horowitz surveys supports Mr. Trautman's conclusion that the Horowitz surveys tend to bias respondents to overvalue Program Suppliers programming.

72.    Finally, I note the fact that my regression analysis, as well as Dr. Crawford's, correctly allocates the minutes in Mr. Horowitz's "Other Sports" category into the appropriate Agreed Categories (including attributing any program that would be included in Mr. Horowitz's "Other Sports" category to Program Suppliers), and yet still closely matches the values found in the Bortz survey, refutes Mr. Horowitz's claim that the Bortz

---

[78]    See *Trautman* Corrected *Rebuttal Testimony*, pp. 12-28; *Mathiowetz Rebuttal Testimony,* pp. 15-27.

survey is somehow invalidated by not accounting for the Other Sports minutes correctly.[79]

### G. DR. GEORGE'S TESTIMONY ON BEHALF OF CANADIAN CLAIMANTS IS FLAWED, AND A CORRECTED ANALYSIS SHOWS LOWER VALUATIONS FOR CANADIAN PROGRAMMING

73.    Dr. George performs a regression analysis that "shares many features of the regression model presented by Dr. Joel Waldfogel in the 2004-05 proceeding," but which she says is "modified to focus more precisely on the value of Canadian Claimant programming."[80] She concludes that the value of an additional minute of Canadian programming is worth roughly $0.089 within the "Canadian region" of cable operators, and estimates that Canadian Claimants should receive approximately 7.11 percent of the royalty fund.[81]

74.    Importantly, in reaching her conclusions, Dr. George simultaneously makes two main modifications to the Waldfogel methodology, without indicating which drives her results:

- First, for her regression analysis, she limits her sample to those cable systems which reside in what she calls the "Canadian region."[82]  Using this sample, she estimates an implied share of the royalty fund for Canadian Claimants for those

---

[79]    See *Horowitz Corrected Testimony*, p. 5.

[80]    Written Direct Statement of Lisa M. George, *In re Distribution of Cable Royalty Funds*, December 15, 2016 (hereinafter, *George Testimony*), p. 1.  Dr. George amended her testimony on March 8, 2017 (hereinafter, *George Amended Testimony*), and then issued corrections to both the *George Testimony* and the *George Amended Testimony* on May 17, 2017 (hereinafter, *George Corrected Amended Testimony and George Corrected Testimony*).

[81]    *George Corrected Amended Testimony,* Amended Table 3, p. 6.  Dr. George expresses the value of an additional minute of Canadian programming in thousands, at $88.88 per 1,000 minutes.

[82]    Dr. George defines the Canadian region to include both systems that are in the "Canadian Zone" (i.e., the geographic area within which CSOs are permitted to retransmit Canadian signals under the statutory license) and systems "absorbed into the zone through merger." *George Corrected Amended Testimony,* p. 1.

cable systems, and then prorates that share to account for cable systems outside the Canadian region.[83]

- Second, for her programming data, she only separately categorizes programming that appears on Canadian distant signals and lumps all other programming into a single category called "Compensable Minutes on US Distant Signals".[84]

75.    Dr. George focuses her discussion on her choice to limit her sample to only those cable systems that are able to carry Canadian signals, but this is not actually what drives her results.  Instead what drives those results for Canadian Claimants is her decision to lump the vast majority of programming into a single "Compensable Minutes on US Distant Signals" category.  If one instead properly accounts for the specific programming category into which each minute falls, then even when only considering cable systems in the Canadian region, one finds a royalty share for Canadian Programming that is in line with the results of the Bortz surveys.  Hence, Dr. George's higher Canadian share is driven by *only* separately counting minutes on Canadian signals (which is the only source of Canadian minutes), while using a much noisier measure of minutes in other categories.  That is, her results are driven by many important variables on the number of minutes by each other category, thus subjecting her regression to omitted variable bias, not by limiting analysis to the "Canadian region."[85]

76.    In addition to correcting Dr. George's regression analysis, I have also corrected her calculation for estimating the share of royalties to conform more closely to Dr.

---

[83]    *George Corrected Testimony,* p. 22.

[84]    *George Corrected Testimony,* p. 21.

[85]    In Appendix C to my testimony, I estimated a model with only two variables concerning the Agreed Categories:  1) Sports programming and 2) Non-Sports programming.  As I said in my testimony, by focusing on the result of Sports programming, this "model sensitivity is intended to test whether the value for Sports minutes is sensitive to splitting out the individual programming categories."  My key conclusion was that my finding of high Sports value *was not* affected by this alternative categorization, meaning that it was robust to such change in categories.  Hence this finding was the opposite of Dr. George's result, which holds *only if* the programming categories are collapsed and does not hold in a more complete model.

Waldfogel's original method, listed in this table as "Corrected Canadian Royalty Share". Dr. George includes negative coefficient values, such as her estimate for Program Suppliers programming on Canadian signals, in her calculation, rather than setting them to zero, which distorts the royalty shares for categories with positive coefficients. I also remove the weighting scheme that Dr. George used in her calculation, which weighted results by the number of subscribers at each CSO. The Waldfogel-type regression method estimates the royalties per CSO, not the royalties per subscriber, as a function of the CSO's distant signal programming and various control variables. Weighting the total CSO minutes by subscriber is therefore not an appropriate use of the output of this regression, because the functional form of the regression assumes that royalties are measured per CSO, not per subscriber. As a result of these changes to Dr. George's royalty share calculation, even using Dr. George's own regression results yields only a 3.95 percent share of the total royalty pool for Canadian programming.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 12, 2018.

_____
Mark A. Israel

**TECHNICAL APPENDIX**

## V.     TECHNICAL APPENDIX: THE DETAILS OF DR. GEORGE'S REGRESSION ANALYSIS

1.      Table 13, below, compares:

   1)  Dr. George's original base regression results

   2)  Dr. George's regression, breaking out all Agreed Categories (by using the
       measure of minutes from the data used in my regression).[86]

---

[86]      As I only have programming data categorized for 2010-12, this sample excludes the year
2013.  Full regression results and implied royalty share calculations for all Agreed
Categories are provided in my underlying documents.

**Table 13:  Regression Models Concerning the Canadian Region**

|  | (1) | (2) |
|---|---|---|
|  | George Base Model (2010-2013) | George Model with Individual Programming Categories (2010-2012) |
| Corrected Canadian Royalty Share | 3.95% | 1.48% |
| Dr. George's Calculation of Canadian Royalty Share | 7.11% | 2.25% |
| Minutes of Canadian Programming |  | 0.371** |
|  |  | (0.148) |
| Minutes of Commercial TV Programming |  | 1.100*** |
|  |  | (0.384) |
| Minutes of Devotional Programming |  | 0.141 |
|  |  | (0.338) |
| Minutes of Program Suppliers Programming |  | 0.0227 |
|  |  | (0.150) |
| Minutes of Public Broadcasting Programming |  | 1.553*** |
|  |  | (0.291) |
| Minutes of Sports Programming |  | 7.633** |
|  |  | (3.527) |
| Minutes of Other Programming |  | 1.634*** |
|  |  | (0.586) |
| Minutes of Network Programming |  | 1.132*** |
|  |  | (0.429) |
| Distant Canadian Signals - Wtd. Canadian Minutes (1,000) | 88.88*** |  |
|  | (32.92) |  |
| Distant Canadian Signals - Wtd. Sports Minutes  (1,000) | 906.8 |  |
|  | (774.1) |  |
| Distant Canadian Signals - Wtd. Program Supplier Minutes  (1,000) | -293.8** |  |
|  | (121.0) |  |
| Distant Domestic Signals - Wtd. Total Minutes (1,000) | 44.09*** |  |
|  | (5.294) |  |
| Observations | 2,198 | 1,657 |
| R-squared | 0.861 | 0.854 |

Robust standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

2.       As column (2) of Table 13 shows, estimating Dr. George's model with controls for all programming categories (thus avoiding omitted variable bias)—but still limiting analysis only to CSOs from the Canadian region—yields an estimate for Canadian programming of roughly 1.48 percent of the total royalty fund.  This result is much

smaller than Dr. George's own finding of 7.11 percent for Canadian programming's royalty share, and much closer to the Bortz surveys' estimate of 0.5 percent.

3.      As seen in the second column of Table 13, the values on many other categories of programming are quite different from my base model when restricted to the Canadian region.  This is, however, in no way a refutation of my base results, which correctly reflect the full set of CSOs.  Finding different results when restricting only to a small, non-randomly selected set of CSOs is not surprising, but is also irrelevant to the question of the appropriate values, reflecting the full set of CSOs.

## VI.      TECHNICAL APPENDIX:  DR. GRAY'S TABLE 1

4.      Table 14, below, compares the results of Dr. Gray's Table 1 to the results of his analysis but without the use of his sampling weights.  The results for JSC programming in particular are very similar between the two versions.

Table 14:  Comparison of Weighted and Unweighted Gray Table 1 Results

| | Share of All Retransmissions | | | | | | | |
| | Original Gray Table 1 | | | | Unweighted Gray Table 1 | | | |
| | 2010 | 2011 | 2012 | 2013 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|
| Canadian Claimants | 0.5% | 1.4% | 1.5% | 0.8% | 3.4% | 4.0% | 6.3% | 5.7% |
| Commercial Television | 11.7% | 10.2% | 14.6% | 14.4% | 11.5% | 11.0% | 12.2% | 10.7% |
| Devotionals | 7.8% | 12.1% | 5.4% | 6.9% | 5.2% | 4.7% | 2.3% | 2.8% |
| Program Suppliers | 55.5% | 54.0% | 38.3% | 50.7% | 45.5% | 43.7% | 34.2% | 37.3% |
| Public Television | 24.5% | 22.1% | 40.1% | 26.9% | 34.2% | 36.4% | 44.9% | 43.3% |
| JSC | 0.2% | 0.2% | 0.1% | 0.2% | 0.2% | 0.2% | 0.1% | 0.2% |

| | Share of All Volume | | | | | | | |
| | Original Gray Table 1 | | | | Unweighted Gray Table 1 | | | |
| | 2010 | 2011 | 2012 | 2013 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|
| Canadian Claimants | 0.5% | 1.8% | 1.3% | 0.8% | 3.1% | 3.9% | 5.7% | 5.3% |
| Commercial Television | 12.8% | 11.8% | 18.5% | 14.2% | 12.8% | 12.5% | 14.6% | 11.2% |
| Devotionals | 8.1% | 11.5% | 5.3% | 6.4% | 5.2% | 4.5% | 2.3% | 3.0% |
| Program Suppliers | 53.5% | 52.1% | 35.8% | 52.1% | 43.6% | 41.2% | 31.5% | 36.1% |
| Public Television | 24.4% | 22.1% | 38.6% | 25.8% | 34.6% | 37.2% | 45.3% | 43.7% |
| JSC | 0.7% | 0.7% | 0.5% | 0.8% | 0.7% | 0.7% | 0.5% | 0.7% |

Source: Gray 2nd Corrected and Amended Table 1 and Backup Materials, January 22, 2018.

# EXHIBIT F

Before the
**COPYRIGHT ROYALTY JUDGES**
Washington, D.C.

| | | |
|---|---|---|
| | ) | |
| *In re* | ) | |
| | ) | |
| **DISTRIBUTION OF CABLE** | ) | NO. 14-CRB-0010-CD (2010-13) |
| **ROYALTY FUNDS** | ) | |
| | ) | |

# Written Rebuttal Testimony of

# DR. MARK A. ISRAEL

**September 15, 2017**
**<span style="color:red">Amended February 12, 2018</span>**

**Table of Contents**

I.      QUALIFICATIONS ........................................................................................1

II.     INTRODUCTION AND SUMMARY ........................................................1

III.    DR. GREGORY CRAWFORD'S REGRESSION ANALYSIS ON
        BEHALF OF THE COMMERCIAL TELEVISION CLAIMANTS
        FURTHER CORROBORATES THE 2010-13 BORTZ SURVEY
        RESULTS ......................................................................................................5

IV.     RESPONSES TO OTHER CLAIMANTS' WRITTEN TESTIMONY .......................8

        A.  DR. ERDEM'S ANALYSIS ON BEHALF OF DEVOTIONAL CLAIMANTS
            LARGELY CORROBORATES THE BORTZ SURVEY RESULTS, AND HIS
            CRITICISMS OF THE USE OF REGRESSION ANALYSES IN THIS PROCEEDING
            ARE WITHOUT MERIT ...........................................................................8

            1.  Dr. Erdem's challenges to the use of regression analysis in this
                proceeding are without merit ....................................................8

            2.  Dr. Erdem's testimony supports a high relative value for Sports
                programming ...........................................................................11

        B.  MR. SANDERS' TESTIMONY ON BEHALF OF DEVOTIONAL CLAIMANTS
            SUPPORTS THE USE OF THE 2010-13 BORTZ SURVEYS TO DETERMINE
            ROYALTY SHARES, AND HIS CRITICISMS OF THE REGRESSION ANALYSES IN
            THIS PROCEEDING ARE WITHOUT MERIT ...............................................13

            1.  Mr. Sanders correctly concludes that the 2010-13 Bortz survey
                results should be the basis for determining each program category's
                royalty share ..........................................................................13

            2.  Mr. Sanders' criticisms of regression analyses in this proceeding are
                incorrect .................................................................................14

        C.  DR. GRAY'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS RELIES ON
            FUNDAMENTALLY FLAWED MEASURES OF PROGRAMMING VOLUME AND
            VIEWERSHIP THAT PROVIDE NO VALID ECONOMIC BASIS FOR
            DETERMINING RELATIVE MARKETPLACE VALUE ....................................15

            1.  Dr. Gray's analysis of programming volume is incorrect and does
                not reflect relative marketplace value ......................................16

            2.  Dr. Gray's analysis of program viewership provides no valid
                method for determining relative marketplace value ...................21

        D.  DR. STECKEL'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS IS NOT
            VALID ECONOMIC ANALYSIS ...............................................................25

            1.  In the relevant hypothetical market, the CSO is the buyer and thus
                the relevant focus of the survey ...............................................27

    2.   CSO executives are experts in valuing content........................................................29

    3.   Dr. Steckel's discussion of marginal vs. total values is incorrect..........................30

    4.   CSO management of multiple systems does not invalidate the Bortz
        Survey results....................................................................................................31

    5.   Analysis of marketplace data corroborates the Bortz surveys .............................32

E.   Mr. Mansell's testimony on behalf of program suppliers
     misinterprets the implications of the rapidly growing sources
     of content ..............................................................................................................32

F.   My regression analysis does not corroborate the findings of
     the Horowitz surveys performed on behalf of Program
     Suppliers ................................................................................................................35

G.   Dr. George's testimony on behalf of Canadian claimants is
     flawed, and a corrected analysis shows lower valuations for
     Canadian programming ............................................................................................38

**V.**      **TECHNICAL APPENDIX: THE DETAILS OF DR. GEORGE'S
          REGRESSION ANALYSIS** ..............................................................................1

**VI.**    **TECHNICAL APPENDIX:  DR. GRAY'S TABLE 1**..................................................**43**

# I.    QUALIFICATIONS

1.      I am a Senior Managing Director of Compass Lexecon, an economic consulting firm where I have worked since 2006.  I received my Ph.D. in Economics from Stanford University in 2001.  From August 2000 to June 2006, I served as an Associate Professor at Northwestern University's Kellogg School of Management.  I have served as an expert for both the federal government and private parties in matters involving the cable television, broadcast television, wired and wireless telecommunications and broadband internet service industries (among others), including high profile recent mergers such as Comcast-NBCU, AT&T-Time Warner, AT&T-Leap Wireless, T-Mobile-Metro PCS, and numerous acquisitions for Gray Television, as well as many regulatory matters in front of the FCC and state regulatory agencies on behalf of cable system operators (CSOs), the National Association of Broadcasters, and others.

2.      A more complete description of my qualifications can be found in Appendix A to my written direct testimony in this proceeding on behalf of the Joint Sports Claimants (JSC).[1]

# II.    INTRODUCTION AND SUMMARY

3.      In my original testimony, I explained that observable marketplace behavior corroborates the results of the 2010-13 Bortz surveys.[2]  In particular, my regression analysis—based on an updated and improved version of the methodology used by Professors Rosston and Waldfogel in previous cable royalty distribution proceedings[3]—produces relative valuations of the Agreed Categories[4] that closely match

---

[1]      Written Direct Testimony of Dr. Mark A. Israel, *In re Distribution of Cable Royalty Funds*, December 22, 2016, (hereinafter *Israel Testimony*).

[2]      "Cable Operator Valuation of Distant Signal Non-Network Programming: 2010-13" (hereinafter *Bortz Report*), attached to the Written Direct Testimony of James M. Trautman, *In re Distribution of Cable Royalty Funds*, December 22, 2016.

[3]      Statement of Joel Waldfogel, *In the Matter of Distribution of the 2004 and 2005 Cable Royalty Funds Before the Copyright Royalty Judges*, Docket No. 2007-3 CRB CD 2004-2005, June 1, 2009 (hereinafter *Waldfogel Report*); Statement of Gregory Rosston, *In the Matter of Distribution of the 1998 and 1999 Cable Royalty Funds Before the Copyright*

those in the Bortz surveys.  My analysis of payments made by cable networks to carry JSC and other programming during the years 2010-13 further corroborates the high relative valuations for live team sports (Sports) programming found in the Bortz surveys.

4.      In this report, I respond to written testimony from other parties in the proceeding.[5] I conclude that the testimony from experts on behalf of other parties, as well as the updated analyses I have performed in response to this testimony, further corroborate the results of the 2010-13 Bortz surveys.  I provide a more detailed discussion of my analysis of the testimony of the other experts in the following paragraphs.

5.      First, the regression analysis presented by Dr. Gregory Crawford on behalf of Commercial TV Claimants directly supports the 2010-13 Bortz survey results.  Indeed, although we conducted our analyses entirely independently of each other, we both came to comparable conclusions that corroborate the Bortz results.  Notably, his estimates are similar to mine despite some differences in technical methodological choices (of the type that regularly occur across different regression analyses by different economists).

6.      Second, the alternative versions of my model that Dr. Erkan Erdem produced on behalf of Devotional Claimants also support the results of the 2010-13 Bortz surveys.  However, Dr. Erdem's criticisms of "Waldfogel-type" regression analysis in the context of this proceeding generally, and of my regression analysis in particular, are without merit.

---

*Arbitration Royalty Panel,* Docket No. 2001-8 CARP CD 98-99, December 1, 2002 (hereinafter *Rosston Report*).

[4]    The Copyright Royalty Judges' 11/25/2015 Order, Exhibit A.  The Agreed Categories are 1) Program Suppliers, 2) Commercial Television Claimants (CTV), 3) Joint Sports Claimants (Sports), 4) Public Television Claimants (PTV), 5) Devotional Claimants (Devotional), 6) Canadian Claimants (Canadian).   See *Israel Testimony* ¶15 for more detail.  In addition to these categories, there are the (1) Music Claimants (Music) category, which covers the music works included within broadcast programming and (2) National Public Radio (NPR) category, which covers programming on non-commercial radio stations.  I understand that Music and NPR are no longer parties in this proceeding.

[5]    I address those opinions for which I have a specific response based on my own analysis; any lack of explicit response to a particular opinion or analysis of Claimants' testimony does not imply that I agree with that opinion or analysis.  Instead, it likely implies that my previous testimony and underlying materials are already fully responsive to such opinions and analyses.

As the Copyright Royalty Judges (Judges) and the Copyright Arbitration Royalty Panel (CARP) previously found, such an analysis is useful in assessing whether the actual economic behavior of CSOs corroborates the Bortz survey results.

7.     Third, I agree with Mr. John Sanders' testimony on behalf of Devotional Claimants "that a constant sum survey of cable operators such as that prepared by Bortz is the most appropriate methodology for the Allocation phase of a cable royalty proceeding."[6] However, Mr. Sanders' criticisms of regression analysis in this proceeding are unfounded.

8.     Fourth, Dr. Jeffrey Gray's testimony on behalf of Program Suppliers — in which he focuses upon the volume and viewing of minutes of programming — does not provide a sound basis for determining the relative value of that programming.  Dr. Gray's analysis of volume is fundamentally flawed in that it fails to consider differences in the number of cable subscribers who receive the programming in question.  And his analysis of viewership fails to recognize that CSOs place far greater value per minute on some types of programming (e.g., Sports) than others, as actual marketplace behavior shows.  Bottom line, neither program volume nor program viewing can be equated with program value.

9.     Fifth, Dr. Steckel's criticisms of the Bortz survey, on behalf of Program Suppliers, are incorrect as a matter of economics.  Despite Dr. Steckel's claim to the contrary, surveys of CSO executives provide the best measure of the relative valuation of the Agreed Categories on distant signals, particularly given that in the ordinary course of business those executives must evaluate the relative value of different categories of programming to make programming choices.  Moreover, Dr. Steckel advocates the use of marketplace data to determine relative value of the Agreed Categories, which further emphasizes the importance of regression analyses like mine and Dr. Crawford's (among others) that corroborate the Bortz survey results using actual marketplace data.

10.    Sixth, Mr. John Mansell's analysis of the growth in available content, submitted on behalf of Program Suppliers, actually underscores the high value placed on Sports

---

[6]     Amended Direct Testimony of John S. Sanders, *In re Distribution of Cable Royalty Funds*, March 9, 2017 (hereinafter *Sanders Amended Testimony*), p. 29.

programming.  In particular, it points to reasons why the value of Sports, relative to other types of programming, is *increasing*, as reflected in a comparison of the 2004-05 and 2010-13 Bortz results.  Mr. Mansell overlooks that recent technological changes in the media environment have negatively and disproportionately impacted the value of other types of programming, such as Program Suppliers content, while the value of Sports programming has remained high.

11.     Seventh, my regression analysis corroborates the findings of the Bortz surveys, but does not corroborate the Horowitz surveys on behalf of Program Suppliers.  In particular, the Bortz surveys, the results of my regression, and Dr. Crawford's regression each show the rank order for the top program categories as Sports, Program Suppliers, CTV and PTV, in that order, while Horowitz surveys do not match this rank order.  The fact that the Horowitz survey fails to correspond well to actual marketplace evidence, as captured by the regression analyses, is not surprising given the flaws in the Horowitz methodology laid out in the testimony of Mr. James Trautman and Dr. Nancy Mathiowetz.[7]  And notably, the fact that my regression analysis, as well as Dr. Crawford's, correctly allocates the minutes in Mr. Horowitz's "Other Sports" category into the appropriate Agreed Categories, and yet still closely matches the Sports values found in the Bortz survey, refutes Mr. Horowitz's claim that the Bortz survey is somehow invalidated by not using a separate valuation question for "Other Sports" programming.

12.     Finally, the testimony of Dr. Lisa George on behalf of Canadian Claimants is flawed.  Her finding of a higher value for Canadian Programming comes not from her focus on the Canadian region, but rather from her improper, complete reliance on a model that collapses all types of programming on U.S. signals into a single catch-all category.

---

[7]     See Corrected Written Rebuttal Testimony of James M. Trautman, *In re Distribution of Cable Royalty Funds*, SeptemberOctober 15, 2017 (hereinafter, *Trautman Corrected Rebuttal Testimony*); and Written Rebuttal Testimony of Nancy A. Mathiowetz, *In re Distribution of Cable Royalty Funds*, September 15, 2017 (hereinafter, *Mathiowetz Rebuttal Testimony*).

Once one properly controls for all of the Agreed Categories, Dr. George's model produces small shares for Canadian Claimants, consistent with the findings of the Bortz surveys.

## III.  DR. GREGORY CRAWFORD'S REGRESSION ANALYSIS ON BEHALF OF THE COMMERCIAL TELEVISION CLAIMANTS FURTHER CORROBORATES THE 2010-13 BORTZ SURVEY RESULTS

13.     In his testimony, Dr. Crawford describes the results of his regression analysis, with which he estimates the relative marketplace value of the Agreed Categories.[8]  His overall methodological approach is similar to mine, but he uses different data and makes some different econometric implementation decisions.  Despite the technical differences between our approaches, Dr. Crawford finds relative marketplace values for the Agreed Categories that are similar to mine, and his results also corroborate the relative shares implied by the Bortz survey, demonstrating the robustness of this finding.

14.     The Bortz surveys, my analysis, and Dr. Crawford's analysis each identify Sports programming as the most valuable category of compensable programming, with similar shares in each case.  The Bortz surveys estimate a Sports share of 38.2 percent; I find a Sports share of 37.5 percent, and Dr. Crawford finds a Sports share of 35.1 percent.  All three analyses estimate that Program Suppliers should receive the second largest share from the royalty fund, and all find similar shares for CTV.  See Table 1, below, as well as Figure 1 which illustrates the same sets of results graphically.

---

[8]     See Corrected Testimony of Gregory S. Crawford, Ph.D. (April 11, 2017) (hereinafter *Crawford Corrected Testimony*).

**Table 1: Comparison of Israel, Crawford and Bortz Results**

| Claimant Group | Implied Share of Royalties | | |
| --- | --- | --- | --- |
| | Israel | Crawford | Bortz |
| Sports | 37.5% | 35.1% | 38.2% |
| Program Suppliers | 26.8% | 23.4% | 31.0% |
| CTV | 22.2% | 19.5% | 20.6% |
| PTV | 13.5% | 17.0% | 5.1% |
| Devotional | 0.0% | 0.7% | 4.6% |
| Canadian | 0.0% | 4.2% | 0.5% |
| **Total** | **100.0%** | **100.0%** | **100.00%** |

Source: Israel Testimony, December 22, 2016, Table V-2;
Crawford Corrected Testimony, April 11, 2017, Figure 20.
Bortz Report, December 22, 2016, Table I-1.

Notes: Israel analysis spans 2010-2012;
Crawford analysis spans 2010-2013;
Bortz analysis spans 2010-2013.

**Figure 1: Comparison of Israel, Crawford and Bortz Results**



15.     One difference between my regression and Dr. Crawford's is that he includes a regression for the year 2013, while my analysis examined the years 2010-12.  Notably, Dr.

Crawford's regression results using 2013 data also closely match the 2013 Bortz survey results, further corroborating the Bortz survey results. And Dr. Crawford's results for 2013 are also similar to my overall results for the years 2010-12, indicating that extending my analysis to include 2013 would not materially alter my findings. Dr. Crawford's 2013 regression implies a royalty share for Sports of approximately 38.6 percent, whereas the Bortz survey for 2013 finds a Sports share of approximately 37.7 percent, and my average result for 2010-12 is 37.54 percent. (See Table 2, below.) Therefore, Dr. Crawford's analysis corroborates the Bortz survey for 2013 and indicates that my focus on the period 2010-12 does not bias my results.[9]

**Table 2:  Comparison of Bortz 2013 Results to Crawford 2013 Results**

| Claimant Group | 2013 Implied Share of Royalties | |
|---|---|---|
| | **Bortz** | **Crawford** |
| Sports | 37.7% | 38.6% |
| Program Suppliers | 27.3% | 19.7% |
| Commercial TV | 22.7% | 18.4% |
| Public Broadcasting | 6.2% | 18.1% |
| Devotional | 5.0% | 0.5% |
| Canadian | 1.2% | 4.7% |
| **Total** | **100.00%** | **100.00%** |

Source: Bortz Testimony, December 22, 2016, Table I-1.
   Crawford Corrected Testimony, April 11, 2017, Figure 20.

---

[9]   In addition, Dr. Crawford gets his highest implied royalty allocation for Sports in 2013, indicating that if I had included data for 2013 in my regression analysis, it likely would have found an even greater average value for Sports programming.

## IV.    RESPONSES TO OTHER CLAIMANTS' WRITTEN TESTIMONY

### A.    DR. ERDEM'S ANALYSIS ON BEHALF OF DEVOTIONAL CLAIMANTS LARGELY CORROBORATES THE BORTZ SURVEY RESULTS, AND HIS CRITICISMS OF THE USE OF REGRESSION ANALYSES IN THIS PROCEEDING ARE WITHOUT MERIT

#### 1.    Dr. Erdem's challenges to the use of regression analysis in this proceeding are without merit

16.    Although he acknowledges that "Waldfogel-type" regressions may have some value in corroborating survey evidence,[10] Dr. Erdem criticizes the use of regression analysis in this proceeding on two principal grounds.  First, he claims that "regression approaches cannot inform the Judges on what the CSOs would have paid for each claimant category in a free market," because CSOs are purchasing distant signal programming in a regulated market.  Second, he claims that the regression approach is not valid because it "assume[s] that the 'value' of a program category is measured in minutes of programming."[11]  Both of Dr. Erdem's criticisms are unfounded.

17.    **First,** Dr. Erdem is wrong that regression approaches like mine or Dr. Crawford's (or those of Drs. Waldfogel and Rosston before us) cannot inform the Judges on what CSOs would have paid for each of the Agreed Categories of programming in a hypothetical free market.  As I explained in my original testimony in this proceeding, the regression allows me to determine how much more CSOs pay for each additional minute of a given type of content, holding other factors constant, which is exactly the sort of direct evidence on their willingness to pay for each type of content that one needs to corroborate the Bortz survey results using actual marketplace behavior:[12]

---

[10]    Testimony of Erkan Erdem, Ph.D., *In re Distribution of Cable Royalty Funds*, March 9, 2017 (hereinafter, *Erdem Testimony*), p. 18.

[11]    *Erdem Testimony*, p. 14.

[12]    See *Israel Testimony*, pp. 11-12.  See also *Crawford Corrected Testimony*, p. 13 ("one can exploit the fact that distant broadcast signals are themselves bundles of programming content (and that this content varies across distant signals) to measure their relative marketplace value, even in the presence of regulated prices.")

Although there is no marketplace price for the distant signal content, marketplace information can be gleaned from CSO carriage decisions and, in particular, what CSOs pay as a function of what they choose to carry. The regression enables me to determine the effective price the CSOs pay for each category of content by determining how much their payments go up with an additional minute of each category of content, holding other relevant factors constant.

18.    Dr. Erdem is also mistaken that regression analysis cannot be informative in this context simply because the market is regulated. In past proceedings, the parties have agreed that "the sole governing standard is the relative marketplace value of the distant broadcast signal programming retransmitted by cable systems."[13] And regression analysis is a highly effective tool in this context to use the actual evidence of CSO decisions on distant signal carriage to estimate the average relative value of the Agreed Categories.

19.    Indeed, in the 2004-05 cable royalty proceeding, the Judges found the Waldfogel regression helpful to corroborate the 2004-05 Bortz survey results.[14] Similarly, the Copyright Arbitration Royalty Panel found Dr. Rosston's regression analysis useful in corroborating the 1998-99 Bortz survey results.[15] Accordingly, I employed a similar regression analysis here to help the Judges assess the 2010-13 Bortz surveys results.

20.    My approach is also entirely consistent with standard methods in economics. Indeed an important purpose of much empirical analysis in economics, particularly "industrial organization" economics, is to use observed behavior under one set of conditions to model what would happen under another set of conditions. For example, studies will often use empirical results in the absence of a particular regulation to predict

---

[13]    Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010. Page 57065.

[14]    Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010. Page 57069.

[15]    Report of the Copyright Arbitration Royalty Panel to the Librarian of Congress, October 21, 2003, p. 21. As the Librarian of Congress concluded in affirming this decision, regression analysis measures "actual behavior" and responds to past criticism of the Bortz surveys that those surveys measure only "attitudes" rather than "actual behavior." Federal Register /Vol. 69, No. 16 / Monday, January 26, 2004. Page 3615.

the effects of that regulation, or empirical results in a regulated environment to predict the effects of competition following a change in the extent of regulation.[16]

21.    **Second,** Dr. Erdem is also incorrect to characterize my regression analysis as a simple time-based study (that is, a study in which valuation is determined only by minutes). I agree with Dr. Erdem that "it would be a significant simplification and mistake to assume that the 'value' of a program category is measured in minutes of programming."[17] In fact, that is why, in all of my analyses, I account for the fact that not all programming minutes are created equal, and thus do not assume value is measured in minutes, but rather account for the differential value of minutes of different types of programming. For example, I consistently find and rely on the fact that Sports minutes are more valuable than other types of programming minutes.[18]

22.    Dr. Erdem does not offer a clear alternative to studying the relationship of minutes and royalties, but does offer one specific criticism: that minutes of programming could be replaced by the number of individual programs as a unit of measure, meaning that a 60 minute show or a 30 minute show would each be counted as one unit.[19] This makes no economic sense. The exercise here requires a comparison of the value of different types of programming with different lengths. A baseball game may last three hours, as long as several standard TV shows. Hence, a viewer watching a baseball game could have instead watched, say, six sitcoms in the same period of time. It would make no sense to count each of the programs as one unit, but rather makes sense to determine the value of two possibilities for three hours' worth of content.

---

[16]    See for example Mian Dai and Xun Tang, "Regulation and Capacity Competition in Health Care: Evidence From U.S. Dialysis Markets," *The Review of Economics and Statistics*, December 2015, 97(5): 965–982; Pierre Dubois, Rachel Griffith, Martin O'Connell, "The Effects of Banning Advertising in Junk Food Markets," *Review of Economic Studies* (2017) 0, 1–41; Claudio Lucarelli, Jeffrey Prince, Kosali Simon, "The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies," *International Economic Review* Vol. 53, No. 4, November 2012.

[17]    *Erdem Testimony*, p. 14.

[18]    *Israel Testimony*, pp. 23-30.

[19]    *Erdem Testimony*, p. 14.

23.     Dr. Erdem's claim that "CSOs may value a short program (e.g., 30-minutes) more than they value a longer program (e.g., 90-minutes) or that they may value a weekly program more than a daily program" does nothing to refute my point that one should compare value by minute.[20]  If a 30-minute program is worth more than a 90-minute program, a CSO would surely choose (if possible given other constraints) to replace the 90-minute program with the 30-minute program.  But it would also then have an additional 60 free minutes on which to air other valuable content.  Only by comparing programming values by minute, as I do in my regression analysis, can one accurately compare the full value of two blocks of content that could fill a given time span.

## 2.     Dr. Erdem's testimony supports a high relative value for Sports programming

24.     Dr. Erdem performs several experiments on my regression model.[21]  Although I believe that the methodology used in my regression was appropriate and Dr. Erdem's adjustments are unwarranted,[22] I also note that Dr. Erdem's alternative approaches *actually support* my finding of a high relative value on live Sports programming.  In particular, Dr. Erdem's model 4B, which he notes is "very broadly comparable to the results from both the

---

[20]     *Erdem Testimony*, p. 14.

[21]     *Erdem Testimony*, p. 14.

[22]     There are at least three fundamental problems with Dr. Erdem's experiments, each of which renders them econometrically invalid.  First, Dr. Erdem misunderstands the nature of the CDC data, and his calculation of "distant subscribers" double-counts subscribers, and thus results that include this measure are not informative.  Second, Dr. Erdem's addition of log transformed and exponential versions of level variables that I already include in my regression model is not standard practice, and I have never seen it used before.  Instead, it is an example of simply "fishing" for a specification that changes my result – throwing variables into a model until the result changes.  One can nearly always find a way to change a result, but if this is done by simply adding multiple versions of the same variable to the model with no economic justification, it is not informative and cannot invalidate the result.  Third, Dr. Erdem is wrong to exclude what he calls "influential observations" in my regression model.  The purpose of this regression analysis is to study the relationship established by the full set of data, representing all Form 3 CSOs.  Indeed even the authors Dr. Erdem cites for this statistical practice, themselves state "influential data points, of course, are not necessarily bad data points; *they may contain some of the most interesting sample information.*" [Emphasis added.]  See Belsley, D. E. Kuh, and R. E. Welsch, 1980. *Regression Diagnostics: Identifying Influential Data and Sources of Collinearity.* New York: Wiley, p. 3.

Bortz and Horowitz surveys"[23] and which Mr. Sanders highlights in his testimony,[24] implies a 45 percent share for Sports programming.  In addition, the average of Dr. Erdem's various regression models imply a 41.5 percent share of the royalty fund for Sports programming.  Both of these results are similar to (indeed higher than) the average result of the 2010-13 Bortz surveys (38.2 percent), and generally in-line with my results and Dr. Crawford's results.

25.     More generally, Dr. Erdem's results are broadly consistent with the valuations in the 2010-13 Bortz surveys, showing, for example, the same rank order for Sports, Program Suppliers, CTV and Public Television ("PTV").   (See Table 3.)

**Table 3:  Comparison of Erdem Regression Results with Bortz, Israel and Crawford**

| Programming Category | Bortz Survey Average 2010-2013 | Israel Regression 2010-2012 | Crawford Regression 2010-2013 | Erdem Regression 4B 2010-2012 | Erdem Regression Average 2010-2012 |
|---|---|---|---|---|---|
| Sports | 38.2% | 37.5% | 35.1% | 45.0% | 41.5% |
| Program Suppliers | 31.0% | 26.8% | 23.4% | 22.6% | 22.4% |
| CTV | 20.6% | 22.2% | 19.5% | 21.6% | 16.3% |
| PTV | 5.1% | 13.5% | 17.0% | 7.0% | 7.1% |
| Devotional | 4.6% | 0.0% | 0.7% | 3.8% | 2.7% |
| Canadian | 0.5% | 0.0% | 4.2% | 0.0% | 0.0% |

Source: Israel Testimony, December 22, 2016, Table V-2;  Crawford Corrected Testimony, April 11, 2017, Figure 20; Bortz Report, December 22, 2016, Table I-1; Erdem Testimony, March 9, 2017, Exhibit 13

---

[23]     *Erdem Testimony*, p. 18.

[24]     *Sanders Amended Testimony*, p. 18.

**B.    MR. SANDERS' TESTIMONY ON BEHALF OF DEVOTIONAL CLAIMANTS SUPPORTS THE USE OF THE 2010-13 BORTZ SURVEYS TO DETERMINE ROYALTY SHARES, AND HIS CRITICISMS OF THE REGRESSION ANALYSES IN THIS PROCEEDING ARE WITHOUT MERIT**

**1.    Mr. Sanders correctly concludes that the 2010-13 Bortz survey results should be the basis for determining each program category's royalty share**

26.    I agree with Mr. Sanders that the 2010-13 Bortz surveys should be the basis for the Judges' allocation of royalty shares among the Agreed Categories of programming.[25]  As noted above, my empirical analysis of marketplace outcomes supports the results of the Bortz surveys for royalty allocation.  As such, I support the results of the 2010-13 Bortz surveys for the royalty allocation to all parties, including Devotional Claimants.

27.    However, I also note that the Judges' prior adjustment of the Devotional Claimants' share was based in part on a conclusion that the 2004-05 Bortz survey results likely represented a ceiling on the Devotional share due to "the amount and significance of non-compensable devotional programming contained on WGN-A during the period."[26] The 2010-13 Bortz surveys included improvements that mitigate (but do not eliminate) the impact of WGNA non-compensability,[27] and hence, using the same logic, the 2010-13 Bortz survey results should be regarded as a ceiling on the Devotional allocation of the 2010-13 royalties.  Additionally, the results of my regression and Dr. Crawford's, like those of Dr. Waldfogel in the 2004-05 proceeding, "point[] toward a lower share" for the Devotional category than the Bortz surveys imply.[28]

---

[25]    *Sanders Amended Testimony*, p. 9.  ("I believe the Bortz Survey, as structured in the 2004-2005 case and as updated for this 2010-2013 proceeding, identifies the appropriate buyers of retransmission services and presents this category of buyers' views of the relative marketplace value of specific categories of programs.")

[26]    Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010.  Page 57074.

[27]    *Bortz Report*, pp. 5-7, 18-19, 27-30, 47-49.

[28]    Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010.  Page 57069.

## 2. Mr. Sanders' criticisms of regression analyses in this proceeding are incorrect

28.     Mr. Sanders is incorrect in asserting that regression analysis is an inappropriate methodology for this proceeding.  In general, his arguments echo Dr. Erdem's criticisms and are incorrect for the same reasons discussed above.

29.     Mr. Sanders also takes issue with the use of "independent variables such as numbers of subscribers, number of channels, population served, and the like, which bear a relationship to programming decisions that is tangential at best…. They may yield a result that, while statistically compelling in an illusory manner, is meaningless for the purpose of an allocation phase royalty distribution."[29]  Mr. Sander's argument makes no sense as a matter of econometrics.  Such variables are also referred to as "control variables" and are a standard component of a regression analysis, used to ensure that my results isolate the effects of additional minutes of programming on CSO payments without instead capturing spurious correlation with other factors that are not controlled for.  By using such control variables, my regression analysis is able to tease out the amount that "CSO royalty payments increase with each additional minute of each category of programming content, *holding other relevant factors that determine royalty payments fixed*[.]"[30]

30.     I also note that the control variables that I use in my regression are essentially those used by Drs. Waldfogel and Rosston in previous proceedings, and are similar to those used by Dr. Crawford.  The reason we have all used such control variables is that they clearly relate to the amount of royalties that CSOs pay for distant signals, and thereby serve as important controls to isolate the main relationship of interest:  the relative marketplace value of a minute of the Agreed Categories of programming.[31]

---

[29]     *Sanders Amended Testimony*, pp. 19-20.

[30]     See *Israel Testimony*, paragraph 34. (Emphasis added)

[31]     For example, CSO royalties are, in part, a function of the number of CSO subscribers. CSOs pay royalties to the fund based on their gross receipts from the subscribers to whom they transmit distant signals.  Therefore, my regression must include a control variable that measures the number of subscribers for each CSO.  Other independent variables, such as the number of local broadcast channels a CSO carries, help me to control for demand

**C.    DR. GRAY'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS RELIES ON FUNDAMENTALLY FLAWED MEASURES OF PROGRAMMING VOLUME AND VIEWERSHIP THAT PROVIDE NO VALID ECONOMIC BASIS FOR DETERMINING RELATIVE MARKETPLACE VALUE**

31.    Dr. Gray's testimony focuses on "two measures of relative economic value of programming: programming volume and programming viewership."[32]  For the purposes of his testimony, programming volume is the "total volume of minutes of programming retransmitted by CSOs" and viewership is the "[a]udience size, which is determined through program viewership."[33]  Although he presents and discusses results on programming volume, Dr. Gray ultimately concludes that programming volume is an "imperfect" and "insufficient" measure of relative marketplace value.[34]  But as to his viewership measure, he concludes that ". . . relative program viewership provides a reasonable and reliable measure of the relative economic value of distantly retransmitted programing."[35]

32.    Dr. Gray's conclusions are without any economic merit.  Neither of Dr. Gray's metrics – volume or viewing – provides a sound measure of the relative economic value of the Agreed Categories.

- His measures of programming volume are meaningless, as they do not account for the number of CSOs that transmit each network, let alone the number of CSO subscribers receiving programming, and thus do not show the extent to which

---

factors that might affect a CSO's willingness to pay for additional programming – if a CSO already has an abundance of non-distant broadcast signals, it will less willing to pay for distant signals, all else equal.  This relationship is confirmed in my analysis.  See *Israel Testimony*, Table V-1, p. 18, showing a negative relationship between the number of local broadcast channels carried by a CSO and the distant signal royalties paid by that CSO, holding all other factors constant.

[32]    Corrected Amended Testimony of Jeffrey S. Gray, Ph.D., *In re Distribution of Cable Royalty Funds*, ~~April 3, 2017,~~ January 22, 2018, (hereinafter, *Gray Corrected Amended Testimony*), p. ~~8.~~9.

[33]    *Gray Corrected Amended Testimony*, p. ~~9.~~9-10.

[34]    *Gray Corrected Amended Testimony*, pp. ~~9,~~10, ~~17.~~11.

[35]    *Gray Corrected Amended Testimony*, p. ~~20.~~22.

CSOs are retransmitting (purchasing) that programming.  In any event, as Dr. Gray appears to acknowledge, relative volume does not equate with relative value.

- His reliance on programming viewership as a measure of relative economic value ignores the fact that not all programming minutes are equal:  Viewers value minutes of different content differently, as I (and others) have shown for the Agreed Categories in this case.  As such, viewership minutes do not determine the value of programming aired on distant signals.  Rather, valid estimates of royalty shares in this proceeding must account for variation in the value per minute across categories.  The Bortz surveys provide a reliable measure of these valuations, as my and Dr. Crawford's regression analyses confirm.

### 1.    Dr. Gray's analysis of programming volume is incorrect and does not reflect relative marketplace value

33.    Dr. Gray calculates what he calls "relative volume of programming by claimant category," which he admits is an "imperfect" measure of relative marketplace valuations.[36] According to Dr. Gray, the "total volume of minutes of programming *retransmitted* by CSOs effectively represents the volume of programming purchased by the CSOs . . . ."[37] He purports to calculate that volume by measuring the number of distant signal programs and minutes of those programs based on his sample of television stations retransmitted during 2010-13.  In Table 1 of his testimony, Dr. Gray reports shares of "All Volume" for each of the Agreed Categories, which show a Sports share of less than 1 percent for each year from 2010 -13 and a Program Suppliers share of approximately 50 percent.[38]

34.    Beyond his own admission that volume is an imperfect measure of valuation, Dr. Gray's Table 1 is flawed and misleading, because it does not account for the number of CSOs that receive each distant signal, let alone the number of subscribers to whom the programming is retransmitted.  Thus, it does not measure the "total volume of minutes

---

[36]    See *Gray Corrected Amended Testimony,* pp. 11, ~~15~~16~~-17~~.18.

[37]    See *Gray Corrected Amended Testimony,* p. 9 (emphasis added).

[38]    See *Gray Corrected Amended Testimony*, pp. ~~15~~-17.

retransmitted" by CSOs, as Dr. Gray claims.  Instead, Dr. Gray measures the volume of minutes televised by distant signals without regard to the number of CSOs that retransmitted those minutes or to the number of distant subscribers to whom CSOs retransmitted those minutes. Dr. Gray's analysis weights the minutes by a sampling weight, which is unrelated to the number of CSOs that retransmit the signal.[39]

35.     Hence, Dr. Gray's volume analysis is unrelated to how many (or few) CSOs retransmitted that programming or how many (or few) CSOs' subscribers received it.  As a result, a 120 minute movie broadcast on a single station retransmitted to 500 distant subscribers could be given equal weight to a 120 minute NBA telecast on WGNA, which hundreds of CSOs retransmitted to over 40 million distant subscribers.[40]  Therefore, Dr. Gray's measure of volume does not properly account for the fact that distant signals are retransmitted by various CSOs to subscribers.[41]

36.     Dr. Crawford has presented an analysis that demonstrates the large impact of Dr. Gray's errors.  In particular, Dr. Crawford's Figure 12 accounts for both the number of CSOs that transmit a distant signal and the number of subscribers receiving it, yielding a subscriber-weighted share of compensable minutes for Sports of roughly 5.9 percent, as compared to Dr. Gray's figure of a less than 1 percent Sports share.  See Table 4, below.

---

[39]     Dr. Gray's sampling weights simply adjust for the sampling procedure he has implemented and have nothing to do with the number of CSOs who retransmit the signal or the number of subscribers who receive it.  For example, his sampling weight has a correlation of -0.07 with the number of distant subscribers who receive the signal (or the number of CSOs that retransmit the signal), implying that the two phenomenon are statistically unrelated. Indeed, a version of Dr. Gray's Table 1 that is unweighted looks very similar to Dr. Gray's own results in Table 1.  See my Technical Appendix for details.

[40]     This flaw is highly consequential and not simply theoretical.  As I noted in my original testimony, some distant signals are carried by many more cable systems than others.  For example, during the period 2010-12, WGN was carried in 4,127 system-periods, whereas WIAT is carried in only 10 system-periods.  See *Israel Testimony*, p. Appendix B-5.

[41]     See Analysis of Written Direct Testimony of Jeffrey S. Gray, Ph.D. by William E. Wecker, Ph.D. and R. Garrison Harvey, *In re Distribution of Cable Royalty Funds*, September 15, ~~2017~~2017, amended February 12, 2018 (hereinafter, *Wecker Testimony*), pp. 4-10.

**Table 4:  Comparison of Gray and Crawford Measures of Volume**

| Claimant Group | 2010-2013 Gray | 2010-2013 Crawford |
|---|---|---|
| Sports | 0.7% | 5.9% |
| Program Suppliers | 48.3% | 33.3% |
| CTV | 14.4% | 15.6% |
| PTV | 27.8% | 36.3% |
| Devotional | 7.8% | 2.3% |
| Canadian | 1.1% | 6.6% |
| **Total** | **100.00%** | **100.00%** |

Source: Crawford Corrected Testimony, April 11, 2017, Figure 12.
Gray Corrected Amended Testimony, January 22, 2018, Table 1.

37.     I also note that the Sports share of program minutes actually received by subscribers (volume) appears to be going *up* over time, indicating that if volume of minutes has any probative value for shares of the royalty fund, the Sports share is going up over time.  A calculation similar to Dr. Crawford's was performed for the 2004-05 proceeding by Dr. Richard Ducey on behalf of CTV claimants.[42]  In Table 5, below, I compare the subscriber weighted shares of compensable minutes calculated in 2004-05 by Dr. Ducey to those calculated in 2010-13 by Dr. Crawford. I note that Sports share has increased slightly from 4.5 percent to 5.9 percent.  However, Program Suppliers' share has decreased from 50.1 percent to 33.3 percent.

---

[42]     Testimony of Richard V. Ducey., *In re Distribution of Cable Royalty Funds*, June 1, 2009, (hereinafter, *Ducey Testimony*), Exhibit 8.

**Table 5:  Share of Compensable Minutes by Claimant Group Weighted by Subscribers**

| Claimant Group | 2004-2005 Ducey | 2010-2013 Crawford |
|---|---|---|
| Sports | 4.5% | 5.9% |
| Program Suppliers | 50.1% | 33.3% |
| CTV | 15.5% | 15.6% |
| PTV | 22.3% | 36.3% |
| Devotional | 2.7% | 2.3% |
| Canadian | 4.5% | 6.6% |
| **Total** | **100.00%** | **100.00%** |

Source: Crawford Corrected Testimony, April 11, 2017, Figure 12.
      Ducey Testimony, June 1, 2009, Exhibit 8.

38.    My analysis of cable network program expenditures also shows that measures of volume do not translate directly into value.  Below I reproduce Table V-5 from my December 22, 2016 testimony (see Table 6).[43]  This analysis shows that despite  the relatively small share of JSC programming hours transmitted (1.06 percent) by the top 25 cable networks during 2010-13, that programming nevertheless commanded more than 22 percent of the top 25 cable networks' 2010-13 programming budgets.  Said another way, JSC programming is worth almost 30 times more per programming hour than non-JSC programming for the top 25 cable networks in 2010-13.

---

[43]      See *Israel Testimony*, pp. 25-26.

**Table 6: Cable Content Analysis 2010-13, Summary of Top 25 Networks**

| Category | Total Programming Hours | Total HHVH (000) | Expeditures ($M) | Expenditures per Hour of Programming | Expenditures per Hour of Viewing |
|---|---|---|---|---|---|
| | | | | [D] = | [E] = |
| | [A] | [B] | [C] | [C] / [A] | [C] / [B] |
| JSC | 9,274.0 | 15,164,368.9 | $12,524.7 | $1,350,513.0 | $0.826 |
| Non-JSC | 866,726.0 | 496,492,970.2 | $42,702.0 | $49,268.2 | $0.086 |
| JSC / Non-JSC | 0.01 | 0.03 | 0.29 | 27.41 | 9.60 |
| JSC % of Total | 1.06% | 2.96% | 22.68% | | |

Sources: Economics of Basic Cable 2015; various articles from Sports Media Watch, Sports Business Daily, ESPN Media Zone, TV By the Numbers, Soccer America, NY Times, USA Today, WSJ, Morgan Wick, and other various sources. See my underlying documents for a full list of sources.

39.     Individual cable networks with a mix of JSC and other programming show a similar pattern. Below, I reproduce table V-6 from my December 22, 2016 testimony (see Table 7), an analysis of content expenditures for TBS and TNT. This analysis shows that JSC's relatively small share of Total Programming Hours on TBS (1.95%) and TNT (2.79%) translates into a 44.40 percent and 45.46 percent share, respectively, of the amount that the cable networks spent on programming. In other words, an hour of JSC programming commands more than 40 times the value of an hour of non-JSC programming on TBS, and nearly 30 times the value of non-JSC programming on TNT.

**Table 7: Cable Content Analysis 2010-13, TBS & TNT**

| Network | Category | Total Programming Hours | Total HHVH (000) | Expenditures ($M) | Expenditures per Hour of Programming | Expenditures per Hour of Viewing |
|---------|----------|------------------------|------------------|-------------------|--------------------------------------|----------------------------------|
| | | | | | [D] = | [E] = |
| | | [A] | [B] | [C] | [C] / [A] | [C] / [B] |
| TBS | JSC | 684.0 | 1,220,722.6 | $1,031.0 | $1,507,370.6 | $0.845 |
| | Non-JSC | 34,356.0 | 20,880,757.4 | $1,291.2 | $37,581.7 | $0.062 |
| | JSC / Non-JSC | 0.02 | 0.06 | 0.80 | 40.11 | 13.66 |
| | JSC % of Total | 1.95% | 5.52% | 44.40% | | |
| TNT | JSC | 977.0 | 2,513,281.9 | $2,042.0 | $2,090,056.2 | $0.812 |
| | Non-JSC | 34,063.0 | 29,162,878.1 | $2,450.2 | $71,931.9 | $0.084 |
| | JSC / Non-JSC | 0.03 | 0.09 | 0.83 | 29.06 | 9.67 |
| | JSC % of Total | 2.79% | 7.93% | 45.46% | | |

Sources: Economics of Basic Cable 2015; various articles from Sports Media Watch, Sports Business Daily,
ESPN Media Zone, TV By the Numbers, Soccer America, NY Times, USA Today, WSJ, Morgan Wick,
and other various sources. See my underlying documents for a full list of sources.

40.    In sum, simply correcting Dr. Gray's error of failing to account for how many CSOs retransmitted programming (and how many subscribers they have), significantly changes his results. Importantly, however, even with this change, one could not rely on the volume of minutes received by subscribers to determine relative valuations of the Agreed Categories without accounting for the differences in the value of each minute, a topic I discuss in greater depth in the next section in the context of viewership minutes.

**2.    Dr. Gray's analysis of program viewership provides no valid method for determining relative marketplace value**

41.    Dr. Gray also calculates the total amount of what he terms "viewing" of the Agreed Categories of programming on distant signals. In his Table 2, Dr. Gray calculates that live Sports programming constitutes roughly 2.15.3 to 4.89.2 percent of 2010-13 distant viewing.[44]

---

[44]    See *Gray Corrected Amended Testimony*, pp. 19-20. See also Wecker Testimony, p. 27, and Written Rebuttal Testimony of Susan Nathan *In re Distribution of Cable Royalty Funds*, September 15, 2017 (hereinafter, *Nathan Rebuttal Testimony*), p. 3.

42.     Dr. Gray's calculation of minutes viewed provides no reliable basis for determining the relative valuation of the Agreed Categories, most fundamentally because it treats all viewing minutes as the same and thus does not account for the fact that minutes of different types of programming have different values.  Dr. Gray's assumption that minutes viewed can be treated equally in determining value is flawed for many reasons, most notably that it fails to consider the number of minutes of each type of content that is available.  If the same number of minutes of all types of content were available, then the total amount of each that viewers choose to consume could indicate their relative value.  But given the smaller number of available minutes of Sports programming, one cannot support such a conclusion.  Many viewers may wish there were more Sports programming available, and choose to watch other programming *only as a second choice* because Sports programming is not available at certain times.  In that context, a smaller number of minutes of Sports programming may be worth far more to viewers  than a much greater number of other types of programming, which they value less but watch as a poor substitute when live Sports is not on.[45]

43.     A further problem with Dr. Gray's analysis of viewing minutes is that it ignores that it is CSOs (not viewers) that pay for programming, using such programming to fill out their channel lineups.  Hence, the appropriate base for analysis of value is the number of minutes aired by CSOs (accounting for the proportion of its subscribers that receive the programming) such as I use in my regression analysis.

44.     My regression methodology accounts for these issues by determining the difference in valuation across minutes of different types of programming and multiplying this by minutes aired by CSOs to determine relative values.  Most notably, as described in my previous written testimony, my regressions show that a minute of Sports programming is more valuable than a minute of Program Suppliers programming.  Below I reproduce Table

---

[45]     As an analogy, consider that potatoes are much less expensive and more widely available than are blueberries.  In 2013, U.S. consumers consumed over 33 pounds per person of fresh potatoes, compared with roughly one and a half pounds of fresh blueberries per person.  But the price of blueberries ($4.73) was roughly 8x greater than potatoes ($0.56), per pound.  Therefore, one cannot conclude that higher consumption equals higher value.

V-2 from my testimony of December 22, 2016 (see Table 8).[46] It shows that an additional minute of Program Suppliers programming is much less valuable ($0.469) than an additional minute of Sports programming ($4.836). Hence, the fact that CSOs carry many more prorated distant signal minutes of Program Suppliers programming (51,261,616) than they do of Sports programming (6,962,722) cannot be used to infer that they place more value on Program Supplier programming than they do on Sports programming; an adjustment for the value of each type of content per minute is required, such as I provide in my analysis.

**Table 8: Previous Israel Table V-2, Royalty Share Allocation**

| Claimant Group | Value of an Additional Minute[1] | System and Prorated DSE Weighted Compensable Minutes | Value of Minutes | Implied Share of Royalties |
|---|---|---|---|---|
| | | | [D] = | [E] = |
| [A] | [B] | [C] | [B] * [C] | [D] /(89,701,903) |
| Sports | 4.836** | 6,962,722 | 33,674,484 | 37.54% |
| Program Suppliers | 0.469*** | 51,261,616 | 24,058,506 | 26.82% |
| Commercial TV | 1.01*** | 19,677,607 | 19,873,956 | 22.16% |
| Public Broadcasting | 0.66** | 18,322,702 | 12,094,957 | 13.48% |
| Devotional | -0.701*** | 4,384,240 | 0 | 0.00% |
| Canadian | -0.973*** | 4,839,825 | 0 | 0.00% |
| **Total** | | **105,448,713** | **89,701,903** | **100.00%** |

Source: TMS/Gracenote; Cable Data Corporation; Kantar Media/SRDS

Notes: *, **, and *** indicate results are significant at the 90, 95, and 99 percent confidence levels, respectively.

[1] Minutes prorated.

45. Returning to my analysis of cable network expenditures, it shows that measures of viewership also do not translate directly into value. Below I reproduce Table V-5 from my December 22, 2016 testimony (see Table 9).[47] This analysis shows that despite JSC's relatively small share of household viewing hours (HHVH, 2.96 percent) for the top 25 cable networks, JSC programming nevertheless commands more than 20 percent of the top 25 cable networks' programming budgets. Said another way, JSC programming is worth

---

[46]     See *Israel Testimony*, p. 20.

[47]     See *Israel Testimony*, pp. 25-26.

roughly 10 times more per household viewing hour than non-JSC programming for the top
25 cable networks.

**Table 9:  Cable Content Analysis 2010-13, Summary of Top 25 Networks**

| Category | Total Programming Hours | Total HHVH (000) | Expeditures ($M) | Expenditures per Hour of Programming | Expenditures per Hour of Viewing |
|---|---|---|---|---|---|
| | | | | [D] = | [E] = |
| | [A] | [B] | [C] | [C] / [A] | [C] / [B] |
| JSC | 9,274.0 | 15,164,368.9 | $12,524.7 | $1,350,513.0 | $0.826 |
| Non-JSC | 866,726.0 | 496,492,970.2 | $42,702.0 | $49,268.2 | $0.086 |
| JSC / Non-JSC | 0.01 | 0.03 | 0.29 | 27.41 | 9.60 |
| JSC % of Total | 1.06% | 2.96% | 22.68% | | |

Sources:  Economics of Basic Cable 2015; various articles from Sports Media Watch, Sports Business Daily,
ESPN Media Zone, TV By the Numbers, Soccer America, NY Times, USA Today, WSJ, Morgan Wick,
and other various sources.  See my underlying documents for a full list of sources.

46.     Focusing again on the individual cable channels, TBS and TNT, which show a mix
of JSC and non-JSC programming, exhibit the same relationship between household
viewing hours and value (See Table 10, below).  Specifically, although JSC programming
represents only 5.52 percent of HHVH on TBS and 7.93 percent of HHVH on TNT, that
programming represents 44.40 percent and 45.46 percent of program expenditures,
respectively.  This means that the value of an hour of JSC viewing is worth roughly 13
times more than a viewing hour of non-JSC programming on TBS, and nearly 10 times
more than a viewing hour of non-JSC programming on TNT.

**Table 10:  Cable Content Analysis 2010-13, TBS & TNT**

| Network | Category | Total Programming Hours | Total HHVH (000) | Expeditures ($M) | Expenditures per Hour of Programming | Expenditures per Hour of Viewing |
|---|---|---|---|---|---|---|
| | | | | | [D] = | [E] = |
| | | [A] | [B] | [C] | [C] / [A] | [C] / [B] |
| TBS | JSC | 684.0 | 1,220,722.6 | $1,031.0 | $1,507,370.6 | $0.845 |
| | Non-JSC | 34,356.0 | 20,880,757.4 | $1,291.2 | $37,581.7 | $0.062 |
| | JSC / Non-JSC | 0.02 | 0.06 | 0.80 | 40.11 | 13.66 |
| | JSC % of Total | 1.95% | 5.52% | 44.40% | | |
| TNT | JSC | 977.0 | 2,513,281.9 | $2,042.0 | $2,090,056.2 | $0.812 |
| | Non-JSC | 34,063.0 | 29,162,878.1 | $2,450.2 | $71,931.9 | $0.084 |
| | JSC / Non-JSC | 0.03 | 0.09 | 0.83 | 29.06 | 9.67 |
| | JSC % of Total | 2.79% | 7.93% | 45.46% | | |

Sources:  Economics of Basic Cable 2015; various articles from Sports Media Watch, Sports Business Daily,
ESPN Media Zone, TV By the Numbers, Soccer America, NY Times, USA Today, WSJ, Morgan Wick,
and other various sources.  See my underlying documents for a full list of sources.

47.      In sum, Dr. Gray is wrong to focus solely on volume and viewership to estimate relative marketplace value for the Agreed Categories.  His measure of volume is simply incorrect and neither measure accounts for the obvious fact that not all minutes are equally valuable.  Proper measures must account for the variation in value across minutes of different types, either by directly asking CSOs to report on the value of the programming (as the Bortz survey does), by using a regression analysis to determine value per minute which can then be multiplied by total minutes (as my first method does),[48] or by relying on the values paid for Sports and non-Sports programming on cable channels (as my second method does).

     **D.**      **DR. STECKEL'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS IS NOT VALID ECONOMIC ANALYSIS**

48.      Dr. Steckel claims that CSO surveys, like those performed by Bortz on behalf of Sports programming and Mr. Horowitz on behalf of Program Suppliers, are not appropriate sources of information for the Judges to use in determining the relative marketplace value

---

[48]      As does the regression analysis by Dr. Crawford for Commercial TV Claimants.

of the Agreed Categories.[49]  He offers several reasons for this opinion and, based on those reasons, he advocates for the use of market data or surveys of customers instead of CSO surveys.[50]

49.     Dr. Steckel is simply incorrect as a matter of economics.  The most relevant source of information on the value of a product is the views of the buyers.  Hence, in this case, the most relevant source of information on the value of distant signal programming is the views of CSO executives, who are the buyers of the programming and who make such programming decisions as part of their job.  Therefore, the Bortz survey of CSOs should be the primary source of information for the Judges.[51]  This is especially true given that regression analyses using available marketplace data on distant signals corroborate the findings of the Bortz surveys, as do market data on cable network expenditures.

---

[49]     Dr. Steckel's opinion in this proceeding is contradicted by much in the previous record, including the Judges themselves, various expert testimony (including my own), and the United States Court of Appeals for the District of Columbia Circuit.  See for example: The Judges (Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010.  Page 57065. "Having carefully reviewed and considered all of the evidence in the record, the Judges find that the values of the program categories at issue among these contending claimants are most reasonably delineated by a range bounded by certain results indicated primarily by the Bortz constant sum survey" ); expert testimony  (e.g., Written Direct Testimony of Dr. Robert Crandall, 2004-05 Phase I (JSC Written Direct Statement Ex. No. 4), 1998-99 Phase I (JSC Written Direct Statement Ex. No. 6), 1989 Phase I (JSC Written Direct Statement Ex. No. 7); Written Direct Testimony of Michelle Connolly, Ph.D., *In re Distribution of Cable Royalty Funds*, December 22, 2016 (hereinafter, *Connolly Testimony*) (supporting Bortz survey and citing prior testimony of experts for CTV, PTV, Canadian and Devotional claimants supporting Bortz survey); and the D.C. Circuit (Program Suppliers v. Librarian of Congress, 409 F.3d 395, 402 (D.C. Cir. 2005), ("Nor did the CARP act unreasonably in declining to rely on Nielsen for direct evidence of viewing, as Bortz adequately measured the key criterion of relative market value. Moreover, as the CARP put it, Bortz 'subsumes inter alia all viewing data that a CSO might consider when assessing relative value of programming groups.").

[50]     Direct Testimony of Joel Steckel, Ph.D., *In re Distribution of Cable Royalty Funds*, December 22, 2016 (hereinafter, *Steckel Testimony*), pp. 7-8.

[51]     For ease of reference, when referring to CSO surveys for the purposes of responding to Dr. Steckel, I will refer to the Bortz surveys.  See Section IV.F, below, which explains why my analysis supports the Bortz survey as superior to the Horowitz surveys.

### 1.   In the relevant hypothetical market, the CSO is the buyer and thus the relevant focus of the survey

50.    Dr. Steckel points to the Bortz surveys' reliance on CSO respondents to provide relative valuations for the Agreed Categories as a weakness of the survey.  He believes that instead of the opinions of cable executives, one should focus on the opinions of subscribers.  However, in both real world and the hypothetical free market for distant signals, the CSO is the buyer of the content.  Hence, Dr. Steckel is wrong as a matter of economics: the relevant opinion on value is the opinion of the buyer, which is what the Bortz Survey captures.

51.    In fact, the nature of distant signals is such that the value placed on the content by the CSO is the sole determinant of price for distant signals in a hypothetical free market.  In general, as a matter of economics, the price for a product is determined by the marginal benefit to buyers and the marginal cost to sellers.  In this case, however, the marginal cost to produce distant signals is zero in all cases, as the signals are simply retransmitted signals that have already been produced.  Thus, the only variation in a hypothetical free market for distant signals would come from variation in the marginal benefit that CSOs would derive from retransmitting different distant signals.  Therefore CSOs' valuation on distant signals is the relevant determinant of price in a hypothetical free market.

52.    Dr. Steckel's claim that subscriber surveys would be superior to CSO surveys is misguided.  Arguing that one should survey cable subscribers instead of cable operators is to argue that one should not ask the actual buyers what they will pay, but rather the people whose valuations the operators are aggregating.  This makes no economic sense.  An analogy might be that instead of asking the parents how much they would pay for a vacation, you should survey all the family members (i.e. children) whose views the parents are aggregating in arriving at a willingness to pay for various vacation options.  This method could not be as accurate as surveying parents directly, as the survey analyst would then have to decide how to aggregate the views of the various family members into an overall value, when what really matters is how the *parent*, who pays for the trip, would aggregate those values.  Similarly, surveying subscribers would leave the analyst to aggregate those values to make inferences about CSO valuation, when the relevant

question is how the CSOs perform such aggregation, which can be answered by asking them directly.[52]

53.    In fact, Dr. Steckel ultimately agrees with this.  He says "[i]f you want to know if customers will buy a product, ask them.  If you want to know why customers are not buying a product, ask them. If you want to know what customers (*i.e.*, the market) value, ask them."[53]   I agree with Dr. Steckel's reasoning, but the customers *are* the CSOs.

54.    Dr. Steckel also argues that "[i]f managers really understood what their customers value, every product would be a success. In fact, we know over half of new industrial products fail."[54]   This argument is entirely beside the point.  The purpose of the Bortz survey is not to ask CSOs, as *suppliers*, about the value of new product, rather it is to ask CSOs as *buyers* what they would have spent, on a relative basis, for the Agreed Categories of programming, the relevant question in determining the valuation of those program categories.  Dr. Steckel's argument would apply if Bortz were asking the network executives at the distant signal (e.g. WGN executives) how much they think their content is worth.  In that case, Dr. Steckel would be correct that those executives may not know how much various content is worth to buyers.  In contrast, the CSOs are the buyers of the distant signals.  Therefore the CSOs should be the respondents to the survey valuing distant signal programming.

---

[52]    See also *Connolly Testimony*, pp. 18-19. On the point of CSOs as buyers, Dr. Connolly states:  "Moreover, given that the respondents of the Bortz survey are internalizing their beliefs about subscriber preferences when responding to questions about the relative value of categories of programming, this aspect of the market is reflected in the Bortz survey."  In addition, Dr. Connolly quotes Dr. Steven Wildman, who correctly concludes that "[b]ecause CSOs are the purchasers in the relevant marketplace and subscriber demands are filtered through them, the CSO survey results must be considered more primary and as more directly relevant to the determination of appropriate compensation than the subscriber surveys."

[53]    See *Steckel Testimony*, pp. 40-41.

[54]    See *Steckel Testimony*, p. 41.

## 2.    CSO executives are experts in valuing content

55.    Dr. Steckel believes that cable executives would be unable to respond accurately to the Bortz surveys, because they would give biased answers based on "intuition- and heuristics-based decision-making processes."[55]  In particular, he says that cable executives cannot be expected to value programming, because they "do not make decisions about individual programs or the various categories of programming employed in this proceeding.  They make decisions about television stations and cable networks."[56]  This argument is incorrect.

56.    The idea that cable executives do not think about underlying types of programming, but only think about networks as a whole, flies in the face of the realities of the cable television industry.   In my own work, I interact with both cable executives and content providers regularly.  Their discussions about what certain networks are worth – both how cable executives value them and how networks market themselves – are all about breaking down the value of the underlying content.  One particularly salient example:  as cable executives decide what TBS and TNT are worth, they are directly evaluating the individual value of the sports content, the original content, and the reruns.  When they consider what HBO is worth, they consider "Game of Thrones", other new content, and movies.  In fact, cable executives change their entire promotional strategy when "Game of Thrones" premieres on HBO, indicating that they are focused on the underlying shows, not the network generically.  When they decide what to pay for an RSN, they value the Sports programming separately from the filler programming.  Cable executives do have the expertise and experience to look across their networks and separately value content along the lines of the Agreed Categories; in fact, this is central to their day to day jobs.[57]

---

[55]    See *Steckel Testimony*, pp. 21-22, 28-34.

[56]    See *Steckel Testimony*, p. 23.

[57]    See Written Rebuttal Testimony of Allan Singer, September 15, 2017, p. 11; Written Rebuttal Testimony of Daniel M. Hartman, September 15, 2017, p. 1-3, 16-18.

### 3.      Dr. Steckel's discussion of marginal vs. total values is incorrect

57.      Dr. Steckel argues that the Bortz survey captures only the "marginal return" (that is, the value created by one more minute of programming) of each category, whereas the marketplace value is captured by the "total return."[58]  This is simply incorrect.[59]

58.      In fact, the Bortz survey asks respondents to focus on the non-network programming on the distant signals they carry, and then asks for the relative value of *each type of programming*, not the marginal value of one more minute of the programming.[60] And then it clarifies that respondents should consider how they would divide up a fixed budget for "all the programming" broadcast on those distant signals. So this question is not asking how much extra they would spend for one additional minute or hour of the programming; it is asking how much they would spend for "all" of each category of programming.  Hence this is exactly the right question:  it is "marginal" only in the sense that it takes *other, network and cable* programming as given, but it then asks for the total value of the full bucket of minutes of each type of programming broadcast by the distant signals.  In this way, it captures the total value of each category of distant signals – not just the value of the last minute – while correctly recognizing that these distant signals are being added to a lineup of other programming.

59.      Marketplace behavior for other types of programming (e.g. cable networks) confirms that the Bortz survey asks the right question.  For example, in my experience working with multiple CSOs, when they negotiate for a given cable network (or bundle of networks) – from Disney for example – they determine the price they are willing to pay by starting from a base of the other networks they carry and then asking how much additional profit they can make by adding the Disney networks, as a whole. And in doing so, they

---

[58]      See *Steckel Testimony*, p. 26 ("any presumed equivalence between resource allocations and marketplace value rests on total return, not marginal return.")

[59]      Previous testimony on this topic directly contradicts Dr. Steckel.  See Testimony of Robert W. Crandall, Ph.D., (JSC Written Direct Statement Ex. 7), pp. 9-14.  ("It is this latter measure of value – the total value as represented by the area under the demand curves – that is captured by the Bortz survey.")

[60]      See *Bortz Report*, pp. B-5 & B-6, questions 4a and 4b.

consider the value of the various categories of programming (sports on ESPN, animation, etc.) that come with the Disney networks, again as a whole.  This process, carried out by each CSO, determines the overall marketplace value of the content across all CSOs. And it's exactly the process that the Bortz survey mimics, by asking how much CSOs would allocate to each category of distant signal programming, in total.

### 4.  CSO management of multiple systems does not invalidate the Bortz Survey results

60.     Dr. Steckel also argues that the fact that many survey respondents manage multiple cable systems would introduce ambiguity and bias into the survey results.[61]  However, this concern is without basis.  First, it ignores that the Bortz survey asks very system specific questions about the precise distant signals carried on each system during the relevant period, so confusion should not be an issue.[62]  And, even where an executive was the respondent for more than one system, in the Bortz survey a separate questionnaire was administered for each system.[63]  Second, cable executives are generally responsible for a *large and changing* number of systems and thus must determine the value of content on the various systems as part of their day to day job.  Hence, Dr. Steckel is once again asserting that cable executives are not qualified to answer questions at the heart of their responsibilities, an unreasonable assertion for which he provides no support.

### 5.  Analysis of marketplace data corroborates the Bortz surveys

61.     Finally, even if one were to accept any of Dr. Steckel's criticisms, and thus question the accuracy of survey results, the appropriate next step would be to make sure those

---

[61]     See *Steckel Testimony*, pp 25-26.

[62]     See for example, *Bortz Report*, p. B-3, question 2a. "Industry data indicate that your system serving (ENTER COMMUNITY LISTED ABOVE; i.e., primary community from SOA) and nearby communities carried the following broadcast stations from other cities in 2010", after which the survey administrator reads off individual distant signal channels by call letters.

[63]     *Trautman Corrected Rebuttal Testimony*, p. 43 n.29.  In contrast, in the Horowitz survey when an executive was the respondent for  more than one system, "he/she was only asked to respond to one survey for all the systems with the same channels."  Corrected Testimony of Howard Horowitz, *In re Distribution of Cable Royalty Funds*, April 25, 2017 (hereinafter, *Horowitz Corrected Testimony*), p. 8.

results are corroborated by actual marketplace evidence.  Indeed, Dr. Steckel appears to agree with this approach:  He states his preference for the analysis of "market results" and data on "transactions," as opposed to surveys.[64]   In this case, actual market result and data on transactions *corroborate* the Bortz survey results.   In particular, as explained above, my regression results (as well as Dr. Crawford's) and my analysis of cable network expenditures corroborate the Bortz surveys' findings.  Therefore, even if one takes Dr. Steckel's recommendation and relies on actual marketplace data, the Bortz survey results are simply bolstered.

### E.   MR. MANSELL'S TESTIMONY ON BEHALF OF PROGRAM SUPPLIERS MISINTERPRETS THE IMPLICATIONS OF THE RAPIDLY GROWING SOURCES OF CONTENT

62.     Mr. Mansell concludes "that over the past 30 years, the number of live professional and college team sports games on local over-the-air TV stations has significantly declined."[65]  In support of this opinion, Mr. Mansell offers a limited history of Sports broadcasting, describing the expansion of Sports programming to cable, the internet and mobile devices.

63.     Mr. Mansell's analysis is flawed in at least two fundamental ways.  **First**, in his brief summary of this history of Sports programming, Mr. Mansell skips over the most relevant point:  Even as the sources of supply of Sports content have expanded, its value (overall and per minute) has remained high.   Indeed, Mr. Mansell's own testimony shows the continued value and desirability of Sports programming, as he refers to bidding wars for the Sports programming that has migrated from broadcast networks to RSNs and national broadcasts,[66] and he affirmatively demonstrates that Sports programming is valuable.[67]

---

[64]     See *Steckel Testimony*, p. 39.

[65]     Corrected Testimony of John Mansell, *In re Distribution of Cable Royalty Funds*, March 9, 2017 (hereinafter, *Mansell Corrected Testimony*), p. 4.

[66]     See *Mansell Corrected Testimony,* p. 10.

[67]     See *Mansell Corrected Testimony,* p. 36.

64.    Because it ignores the ongoing high value of sports content, Mr. Mansell's analysis is ultimately irrelevant.  The statistical and survey methodologies used by myself, Dr. Crawford, and Bortz compute the value of the various categories of programming *given whatever changes have occurred in the marketplace.*  For example, my analysis uses data on actual minutes of distant signal content during the relevant period, as well as data on royalties paid by CSOs during the same period, to estimate how CSOs valued the broadcasts according to their Agreed Categories.  More generally, to the extent there have been changes in the availability of sports content (or Program Suppler content) from various sources, the data during the relevant time period speak for themselves on the effect of the changes.  Put simply, the results of the Bortz surveys, my analysis, and Dr. Crawford's analysis answer the question of value, *reflecting the effect of all industry trends*, whether those discussed by Mr. Mansell or others.[68]

65.    Moreover, available data show that Mr. Mansell's conclusion is wrong as a matter of fact, as it pertains to distant signal retransmissions during 2010-13.  While Mr. Mansell may be correct that there has been a gradual migration of Sports programming to cable channels and other outlets over the past thirty years, for the comparatively shorter time period between 2004-05 and 2010-13, the relative amount of compensable Sports programming retransmitted on distant signals actually increased.  Below I reproduce as Table 11 an analysis that I performed above, comparing compensable minutes by claimant group in 2004-05 as compared with 2010-13. [69]  As this table shows, the percentage of Sports minutes increased slightly from 4.5 percent in 2004-05 to 5.9 percent in 2010-13.  Therefore, at least as it affects distant signal retransmission in the recent past, Mr. Mansell's implication that the quantity of Sports programming has declined is incorrect.

---

[68]    The Judges reached the same conclusion in the 2004-05 proceeding.  See Federal Register /Vol. 75, No. 180 / Friday, September 17, 2010.  Page 57070 n.18.  ("Various arguments are made by some parties concerning whether or not the Judges must consider or require proof of changed circumstances, separate and apart from the estimates of relative value presented by the parties. We find, as did the 1998–99 CARP, that changed circumstances are embedded within the methodologies that provide reliable estimates of relative valuations and, therefore, have already been accounted for and are subsumed within the calculus of results. See 1998–99 CARP Report at 16, 31–2.")

[69]    See Table 5, above.

Table 11:  Share of Compensable Minutes by Claimant Group Weighted by Subscribers

| Claimant Group | 2004-2005 Ducey | 2010-2013 Crawford |
|---|---|---|
| Sports | 4.5% | 5.9% |
| Program Suppliers | 50.1% | 33.3% |
| CTV | 15.5% | 15.6% |
| PTV | 22.3% | 36.3% |
| Devotional | 2.7% | 2.3% |
| Canadian | 4.5% | 6.6% |
| **Total** | **100.00%** | **100.00%** |

Source: Crawford Corrected Testimony, April 11, 2017, Figure 12.
Ducey Testimony, June 1, 2009, Exhibit 8.

66.   **Second**, Mr. Mansell's analysis overlooks the broader implications of the rapidly evolving media environment, which have had a disproportionately negative impact on the value of other categories of programming, and in particular Program Suppliers, while the value of Sports programming has been remained high.   Contrary to Mr. Mansell's conclusions, the industry recognizes that the category of programming that has primarily lost value due to the explosion of content is not live Sports but rather Program Supplier content.[70]   This has occurred because the relevant period saw the explosion of Subscription Video On-Demand (SVOD) services like Netflix, Hulu and Amazon, and a general explosion in available content similar to that offered by Program Suppliers.   Indeed, by the end of 2013, Netflix had more than 30 million U.S. subscribers,[71] and by the third quarter of 2013, Netflix was streaming about 5 billion hours of video globally, virtually all of it Program Suppliers programming.[72]   The explosion of content has thus particularly affected

---

[70]   http://variety.com/2016/tv/news/peak-tv-2016-scripted-tv-programs-1201944237/ . During 2010-13, the number of basic cable original scripted shows more than doubled. These statistics only account for the number of new shows, and does not account for the explosion of previously viewed content throughout cable, cable on-demand, and SVOD services.

[71]   https://www.nytimes.com/2014/01/23/business/media/growth-of-netflix-subscribers-surpasses-analysts-expectations.html

[72]   http://variety.com/2014/digital/news/netflix-to-focus-on-adding-higher-rated-and-exclusive-titles-cfo-says-1201187028/

Program Supplier content.[73]  Indeed, accepted wisdom today is that the traditional, linear TV model (on which distant signals air) is more dependent on Sports than ever.[74]

> **F.   MY REGRESSION ANALYSIS DOES NOT CORROBORATE THE FINDINGS OF THE HOROWITZ SURVEYS PERFORMED ON BEHALF OF PROGRAM SUPPLIERS**

67.   The 2010-13 Horowitz surveys (Horowitz surveys) were developed by Howard Horowitz with the intention of replicating the "methods and procedures of the Bortz Survey that was done for the 2005 royalty year" but with certain modifications.[75]  As one example, particularly relevant to my regression analysis, Mr. Horowitz adds a new category to his survey method:  "Other sports," meant to specify non-team sports programming such as horse racing and figure skating, which is not attributable to Joint Sports Claimants, but rather is attributable to Program Suppliers.[76]

68.   My regression results, as well as those of Dr. Crawford corroborate the Bortz survey results and fail to corroborate the Horowitz survey results.   Hence, actual marketplace evidence supports use of the Bortz survey, not the Horowitz survey, and rejects Mr. Horowitz's claim that not including a separate "Other Sports" category invalidates the Bortz results.

---

[73]       http://articles.latimes.com/print/2012/sep/30/entertainment/la-et-st-homeland-market-20121001.  Viewership for individual scripted shows had decreased drastically by the relevant time period.

[74]       http://variety.com/2013/tv/news/sports-fans-to-spend-more-money-to-watch-favorite-teams-1200577215/  .  "The price of TV broadcast rights for sports in the age of time-shifted viewing has soared. After all, it's high-demand content that viewers don't DVR. And unlike other video entertainment, it's not available from Netflix or other Internet services."  See also http://www.reuters.com/article/us-facelxlok-mlb-idUSKBN1602MY and https://www.digitaltrends.com/social-media/facebook-and-twitter-are-trying-to-acquire-rights-to-stream-live-tv-content/ , which show that providers like Facebook and Twitter are competing to broadcast Sports games, but are not generally interested in "conventional TV programs."

[75]       *Horowitz Corrected Testimony*, p. 3.

[76]       See *Horowitz Corrected Testimony*, p. 5.

69.     Table 11, below, presents a comparison of the results of the Horowitz and Bortz surveys with the results of my regression analysis and Dr. Crawford's regression analysis. As the Table shows, while the Bortz survey matches the regression results well, the Horowitz surveys fail to match the regression results, particularly for the most important, high value categories.[77]   The Bortz surveys, my regression analysis and the Crawford regression analysis all imply the same rank order for the top 4 categories:  Sports, Program Suppliers, CTV and PTV, in that order.  The Horowitz surveys, in contrast, rank these categories as: Program Suppliers, Sports, PTV and CTV, thus failing to match the regression results.

70.     It is also notable that the Bortz surveys, my regression analysis, and the Crawford regression analysis all value Sports within roughly 3 percentage points of each other, while the Horowitz valuation (30.0 percent) is 5 percentage points below the lowest, and 8 percentage points below the highest valuation from the other studies. For Program Suppliers, the Horowitz surveys (39.0 percent) are 8 percentage points above the highest of the three analyses, and 12 percentage points above the lowest, whereas Bortz, Israel and Crawford are within roughly 4 percentage points of each other.

---

[77]     For ease of comparison, I present a royalty-weighted average of the Horowitz survey results.  Indeed on a year-by-year basis, some of the Horowitz survey results are even more extreme than this average.  See *Horowitz Corrected Testimony,* p. 16, Table 3.2.

**Table 12: Comparison of Bortz, Israel, Crawford and Horowitz Results**

| Claimant Group | Implied Share of Royalties | | | |
| --- | --- | --- | --- | --- |
| | Israel | Crawford | Bortz | Horowitz average |
| Sports | 37.5% | 35.1% | 38.2% | 30.0% |
| Program Suppliers | 26.8% | 23.4% | 31.0% | 39.0% |
| CTV | 22.2% | 19.5% | 20.6% | 12.6% |
| PTV | 13.5% | 17.0% | 5.1% | 13.2% |
| Devotional | 0.0% | 0.7% | 4.6% | 4.7% |
| Canadian | 0.0% | 4.2% | 0.5% | 0.6% |
| **Total** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

Source: Israel Testimony, December 22, 2016, Table V-2;
　　　Crawford Corrected Testimony, April 11, 2017, Figure 20.
　　　Bortz Testimony, December 22, 2016, Table I-1.
　　　Horowitz Testimony, December 22, 2016, Table 3.2

Notes:  Israel analysis spans 2010-2012;
　　　Crawford analysis spans 2010-2013;
　　　Bortz analysis spans 2010-2013.
　　　Horowitz analysis spans 2010-2013.

71.　　The failure of the Horowitz survey to match actual marketplace evidence, as reflected in the regression results, is not surprising given the flaws in the Horowitz survey laid out by Mr. Trautman and Dr. Mathiowetz in their testimony.[78]  In particular, the anomalously high value accorded to Program Suppliers in the Horowitz surveys supports Mr. Trautman's conclusion that the Horowitz surveys tend to bias respondents to overvalue Program Suppliers programming.

72.　　Finally, I note the fact that my regression analysis, as well as Dr. Crawford's, correctly allocates the minutes in Mr. Horowitz's "Other Sports" category into the appropriate Agreed Categories (including attributing any program that would be included in Mr. Horowitz's "Other Sports" category to Program Suppliers), and yet still closely

---

[78]　　See *Trautman Corrected Rebuttal Testimony*, pp. 12-28; *Mathiowetz Rebuttal Testimony*, pp. 15-27.

matches the values found in the Bortz survey, refutes Mr. Horowitz's claim that the Bortz survey is somehow invalidated by not accounting for the Other Sports minutes correctly.[79]

### G. DR. GEORGE'S TESTIMONY ON BEHALF OF CANADIAN CLAIMANTS IS FLAWED, AND A CORRECTED ANALYSIS SHOWS LOWER VALUATIONS FOR CANADIAN PROGRAMMING

73.     Dr. George performs a regression analysis that "shares many features of the regression model presented by Dr. Joel Waldfogel in the 2004-05 proceeding," but which she says is "modified to focus more precisely on the value of Canadian Claimant programming."[80] She concludes that the value of an additional minute of Canadian programming is worth roughly $0.089 within the "Canadian region" of cable operators, and estimates that Canadian Claimants should receive approximately 7.11 percent of the royalty fund.[81]

74.     Importantly, in reaching her conclusions, Dr. George simultaneously makes two main modifications to the Waldfogel methodology, without indicating which drives her results:

- First, for her regression analysis, she limits her sample to those cable systems which reside in what she calls the "Canadian region."[82]  Using this sample, she estimates an implied share of the royalty fund for Canadian Claimants for those

---

[79]     See *Horowitz Corrected Testimony*, p. 5.

[80]     Written Direct Statement of Lisa M. George, *In re Distribution of Cable Royalty Funds*, December 15, 2016 (hereinafter, *George Testimony*), p. 1.  Dr. George amended her testimony on March 8, 2017 (hereinafter, *George Amended Testimony*), and then issued corrections to both the *George Testimony* and the *George Amended Testimony* on May 17, 2017 (hereinafter, *George Corrected Amended Testimony and George Corrected Testimony*).

[81]     *George Corrected Amended Testimony,* Amended Table 3, p. 6.  Dr. George expresses the value of an additional minute of Canadian programming in thousands, at $88.88 per 1,000 minutes.

[82]     Dr. George defines the Canadian region to include both systems that are in the "Canadian Zone" (i.e., the geographic area within which CSOs are permitted to retransmit Canadian signals under the statutory license) and systems "absorbed into the zone through merger." *George Corrected Amended Testimony,* p. 1.

cable systems, and then prorates that share to account for cable systems outside the Canadian region.[83]

- Second, for her programming data, she only separately categorizes programming that appears on Canadian distant signals and lumps all other programming into a single category called "Compensable Minutes on US Distant Signals".[84]

75.     Dr. George focuses her discussion on her choice to limit her sample to only those cable systems that are able to carry Canadian signals, but this is not actually what drives her results.  Instead what drives those results for Canadian Claimants is her decision to lump the vast majority of programming into a single "Compensable Minutes on US Distant Signals" category.  If one instead properly accounts for the specific programming category into which each minute falls, then even when only considering cable systems in the Canadian region, one finds a royalty share for Canadian Programming that is in line with the results of the Bortz surveys.  Hence, Dr. George's higher Canadian share is driven by *only* separately counting minutes on Canadian signals (which is the only source of Canadian minutes), while using a much noisier measure of minutes in other categories.  That is, her results are driven by many important variables on the number of minutes by each other category, thus subjecting her regression to omitted variable bias, not by limiting analysis to the "Canadian region."[85]

76.     In addition to correcting Dr. George's regression analysis, I have also corrected her calculation for estimating the share of royalties to conform more closely to Dr.

---

[83]     *George Corrected Testimony,* p. 22.

[84]     *George Corrected Testimony,* p. 21.

[85]     In Appendix C to my testimony, I estimated a model with only two variables concerning the Agreed Categories:  1) Sports programming and 2) Non-Sports programming.  As I said in my testimony, by focusing on the result of Sports programming, this "model sensitivity is intended to test whether the value for Sports minutes is sensitive to splitting out the individual programming categories."  My key conclusion was that my finding of high Sports value *was not* affected by this alternative categorization, meaning that it was robust to such change in categories.  Hence this finding was the opposite of Dr. George's result, which holds *only if* the programming categories are collapsed and does not hold in a more complete model.

Waldfogel's original method, listed in this table as "Corrected Canadian Royalty Share". Dr. George includes negative coefficient values, such as her estimate for Program Suppliers programming on Canadian signals, in her calculation, rather than setting them to zero, which distorts the royalty shares for categories with positive coefficients.  I also remove the weighting scheme that Dr. George used in her calculation, which weighted results by the number of subscribers at each CSO.  The Waldfogel-type regression method estimates the royalties per CSO, not the royalties per subscriber, as a function of the CSO's distant signal programming and various control variables.  Weighting the total CSO minutes by subscriber is therefore not an appropriate use of the output of this regression, because the functional form of the regression assumes that royalties are measured per CSO, not per subscriber.  As a result of these changes to Dr. George's royalty share calculation, even using Dr. George's own regression results yields only a 3.95 percent share of the total royalty pool for Canadian programming.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ~~September 14, 2017.~~February 12, 2018.

_____

Mark A. Israel

**TECHNICAL APPENDIX**

## V.  TECHNICAL APPENDIX: THE DETAILS OF DR. GEORGE'S REGRESSION ANALYSIS

1. Table 13, below, compares:

   1) Dr. George's original base regression results

   2) Dr. George's regression, breaking out all Agreed Categories (by using the measure of minutes from the data used in my regression).[86]

---

[86]   As I only have programming data categorized for 2010-12, this sample excludes the year 2013.  Full regression results and implied royalty share calculations for all Agreed Categories are provided in my underlying documents.

**Table 13:  Regression Models Concerning the Canadian Region**

| | (1) | (2) |
|---|---|---|
| | George Base Model (2010-2013) | George Model with Individual Programming Categories (2010-2012) |
| Corrected Canadian Royalty Share | 3.95% | 1.48% |
| Dr. George's Calculation of Canadian Royalty Share | 7.11% | 2.25% |
| Minutes of Canadian Programming | | 0.371** |
| | | (0.148) |
| Minutes of Commercial TV Programming | | 1.100*** |
| | | (0.384) |
| Minutes of Devotional Programming | | 0.141 |
| | | (0.338) |
| Minutes of Program Suppliers Programming | | 0.0227 |
| | | (0.150) |
| Minutes of Public Broadcasting Programming | | 1.553*** |
| | | (0.291) |
| Minutes of Sports Programming | | 7.633** |
| | | (3.527) |
| Minutes of Other Programming | | 1.634*** |
| | | (0.586) |
| Minutes of Network Programming | | 1.132*** |
| | | (0.429) |
| Distant Canadian Signals - Wtd. Canadian Minutes (1,000) | 88.88*** | |
| | (32.92) | |
| Distant Canadian Signals - Wtd. Sports Minutes  (1,000) | 906.8 | |
| | (774.1) | |
| Distant Canadian Signals - Wtd. Program Supplier Minutes  (1,000) | -293.8** | |
| | (121.0) | |
| Distant Domestic Signals - Wtd. Total Minutes (1,000) | 44.09*** | |
| | (5.294) | |
| Observations | 2,198 | 1,657 |
| R-squared | 0.861 | 0.854 |

Robust standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

2.        As column (2) of Table 13 shows, estimating Dr. George's model with controls for all programming categories (thus avoiding omitted variable bias)—but still limiting analysis only to CSOs from the Canadian region—yields an estimate for Canadian programming of roughly 1.48 percent of the total royalty fund.  This result is much smaller

than Dr. George's own finding of 7.11 percent for Canadian programming's royalty share, and much closer to the Bortz surveys' estimate of 0.5 percent.

3.     As seen in the second column of Table 13, the values on many other categories of programming are quite different from my base model when restricted to the Canadian region.  This is, however, in no way a refutation of my base results, which correctly reflect the full set of CSOs.  Finding different results when restricting only to a small, non-randomly selected set of CSOs is not surprising, but is also irrelevant to the question of the appropriate values, reflecting the full set of CSOs.

## VI.     TECHNICAL APPENDIX:  DR. GRAY'S TABLE 1

4.     Table 14, below, compares the results of Dr. Gray's Table 1 to the results of his analysis but without the use of his sampling weights.  The results for JSC programming in particular are very similar between the two versions.

**Table 14:  Comparison of Weighted and Unweighted Gray Table 1 Results**

| | Share of All Retransmissions | | | | | | | |
| | Original Gray Table 1 | | | | Unweighted Gray Table 1 | | | |
| | 2010 | 2011 | 2012 | 2013 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|
| Canadian Claimants | 0.5% | 1.4% | 1.5% | 0.8% | 3.4% | 4.0% | 6.3% | 5.7% |
| Commercial Television | 11.7% | 10.2% | 14.6% | 14.4% | 11.5% | 11.0% | 12.2% | 10.7% |
| Devotionals | 7.8% | 12.1% | 5.4% | 6.9% | 5.2% | 4.7% | 2.3% | 2.8% |
| Program Suppliers | 55.5% | 54.0% | 38.3% | 50.7% | 45.5% | 43.7% | 34.2% | 37.3% |
| Public Television | 24.5% | 22.1% | 40.1% | 26.9% | 34.2% | 36.4% | 44.9% | 43.3% |
| JSC | 0.2% | 0.2% | 0.1% | 0.2% | 0.2% | 0.2% | 0.1% | 0.2% |

| | Share of All Volume | | | | | | | |
| | Original Gray Table 1 | | | | Unweighted Gray Table 1 | | | |
| | 2010 | 2011 | 2012 | 2013 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|
| Canadian Claimants | 0.5% | 1.8% | 1.3% | 0.8% | 3.1% | 3.9% | 5.7% | 5.3% |
| Commercial Television | 12.8% | 11.8% | 18.5% | 14.2% | 12.8% | 12.5% | 14.6% | 11.2% |
| Devotionals | 8.1% | 11.5% | 5.3% | 6.4% | 5.2% | 4.5% | 2.3% | 3.0% |
| Program Suppliers | 53.5% | 52.1% | 35.8% | 52.1% | 43.6% | 41.2% | 31.5% | 36.1% |
| Public Television | 24.4% | 22.1% | 38.6% | 25.8% | 34.6% | 37.2% | 45.3% | 43.7% |
| JSC | 0.7% | 0.7% | 0.5% | 0.8% | 0.7% | 0.7% | 0.5% | 0.7% |

Source: Gray 2nd Corrected and Amended Table 1 and Backup Materials, January 22, 2018.