Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668−PSG (JEMx) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **MEMORANDUM IN OPPOSITION OF THE NFL DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF J. DOUGLAS ZONA** |
| | JUDGE: Hon. Philip S. Gutierrez |
| | DATE: January 27, 2023<br>TIME: 1:30 p.m.<br>COURTROOM: First Street Courthouse<br>350 West 1st Street<br>Courtroom 6A<br>Los Angeles, CA 90012 |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

SUMMARY OF DR. ZONA'S OPINIONS ....................................................... 4

ARGUMENT ...................................................................................................... 7

    I.    The *Daubert* Standard Focuses on Whether the Expert Has Demonstrated Classwide Methods of Proof. ......................................... 7

    II.    Dr. Zona's Transaction & Viewership Model Is Both Robust and Reliable ..................................................................................... 8

        A.    Dr. Zona's Transaction & Viewership Model Makes Reliable Predictions That Apply Classwide. ............................. 8

        B.    Dr. Zona's Transaction & Viewership Model Does Not Suffer From "Perfect Collinearity." ........................................ 11

    III.    The NFL's Complaints Concerning the Variability Among Consumers and Seasons are Baseless. ............................................. 13

    IV.    Dr. Zona's Analysis of Commercial Customers Is Reliable ............... 14

    V.    Dr. Zona's Use of Marginal Cost Is Textbook Economics ................ 16

    VI.    NFL's Attacks on Marginal Cost Actually Confirm a Core Allegation. ................................................................................... 21

    VII.    Dr. Zona's Use of Butler's Survey Data Is Reliable. ......................... 23

    VIII.    Dr. Zona's Basic-Tier Model Is Reliable for Its Intended Purpose. ..................................................................................... 25

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*City of Pomona v. SQM North America Corp.,*
  750 F.3d 1036 (9th Cir. 2014).................................................................7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) ...............................................................*passim*

*Elosu v. Middlefork Ranch Inc.,*
  26 F.4th 1017 (9th Cir. 2022)....................................................7, 8, 14

*Hardeman v. Monsanto Co.,*
  997 F.3d 941 (9th Cir. 2021)..................................................................7

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.,*
  2017 WL 2559615 (C.D. Cal. June 7, 2017) .........................................7

*In re Capacitors Antitrust Litigation,*
  2018 WL 5980139 (N.D. Cal. Nov. 14, 2018)........................................1

*In re Korean Ramen Antitrust Litigation,*
  2017 WL 235052  (N.D. Cal. Jan. 19, 2017) ........................................20

*In re Nat'l Football League Sunday Ticket Antitrust Litigation,*
  933 F.3d 1136 (9th Cir. 2019)............................................................1, 6

*In re Packaged Seafood Products Antitrust Litigation,*
  332 F.R.D. 308, 327 (S.D. Cal. 2019), *aff'd Olean*, 31 F.4th 651
  (9th Cir. 2022) (en banc) ......................................................................20

*In re Static Random Access Memory (SRAM) Antitrust Litigation,*
  2010 WL 5071694, at *6 (N.D. Cal. Dec. 7, 2010) .............................20

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
  267 F.R.D. 583 (N.D. Cal. Mar. 28, 2010) ..........................................16

*Laumann v. Nat'l Hockey League,*
  117 F. Supp. 3d 299 (S.D.N.Y. 2015).....................................10, 11, 24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
  31 F.4th 651 (9th Cir. 2022)...........................................................1, 8, 15

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.,*
  2019 WL 4780183 (N.D. Cal. 2019), *aff'd*, 20 F.4th 466
  (9th Cir. 2021) ..................................................................................1, 15

*Prime Media Group, LLC v. Acer America Corporation,*
  2015 WL 452192 (N.D. Cal. Jan 22, 2015) .........................................16

*Tawfilis v. Allergan, Inc.,*
  2017 WL 3084275 (C.D. Cal. June 26, 2017) ........................................9

1

2

**Other Authorities**

3
*Competition in Sports Programming and Distribution: Are Consumers Winning?*, Hearing Before the S. Comm. Of the Judiciary, 109th Cong. 24 (2006)......... 6

4

5
Gregory S. Crawford & Ali Yurukoglu, *The Welfare Effects of Bundling in Multichannel Television Markets*, 102 Am. Econ. Rev. 643 (2012) ....... 20, 24

6
Gregory S. Crawford, Robin S. Lee, Michael D. Whinston & Ali Yurukoglu, *The Welfare Effects of Vertical Integration in Multichannel Television Markets*, 86 Econometrica 891 (2018) ........................................................................ 20

7

8
Richard A. Posner & William M. Landes, *Market Power in Antitrust Cases*, 94 Harvard L. Rev. 937 (1980) ..................................................................... 17

9

**Rules**

10
Fed. R. Civ. P. 23.......................................................................................... 1

11
Fed. R. Evid. 702 .......................................................................................... 7

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The NFL's motion to exclude the opinions of Dr. J. Douglas Zona is meritless. Dr. Zona's opinions are relevant and reliable, in line with commonly accepted economic principles, and will assist the Court in determining whether Plaintiffs have satisfied the class-certification requirements of Rule 23. Nothing more is required at this stage. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 661, 667 (9th Cir. 2022) (en banc) (question before the Court is whether Plaintiffs' models are "capable of answering a common question for the entire class in one stroke, and could reasonably sustain a jury verdict in favor of the plaintiffs").

The NFL does not challenge Dr. Zona's extensive professional qualifications. Nor could they. He is an applied economist and has published extensively in the fields of antitrust economics and industrial organization. He has substantial experience testifying in federal and state courts, and recently was qualified as an expert in *Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.*, 2019 WL 4780183 (N.D. Cal. 2019), *aff'd*, 20 F.4th 466 (9th Cir. 2021); *see also In re Capacitors Antitrust Litig.*, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018).

Dr. Zona's opinions are relevant to the disputed issues at this stage of the case, namely, whether there exist common methodologies to establish damages on a classwide basis. Plaintiffs have alleged that the NFL, its member Clubs, the NFL's network broadcast partners, and DirecTV have conspired to suppress the output of "out-of-market" professional football games, making those games available only through DirecTV's exclusive all-or-nothing Sunday Ticket package. *See In re Nat'l Football League Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019). Plaintiffs further have alleged that, were the interlocking agreements at the heart of that conspiracy removed, "those telecasts would be more accessible to more viewers at lower prices." *Id.*

Dr. Zona's opinions provide direct support for those legal claims. In his report, Dr. Zona (i) calculates the potential damages attributable to the alleged

supracompetitive pricing of NFL Sunday Ticket; (ii) concludes that the prices for NFL Sunday Ticket would have been lower for all class members if the vertical and horizontal restraints Plaintiffs challenge were abolished; and (iii) describes in detail a robust set of standard economic tools and models that can calculate overcharge damages on a classwide basis under different scenarios and assumptions. *See* Diver Decl. Ex. 1 (Expert Report of J. Douglas Zona) ("Zona Report") (also located at Dkt. 633-3). Dr. Zona even takes the extra (and, at this stage of the case, unnecessary) step and (iv) deploys those standard economic tools to estimate class but-for prices under various competitive scenarios, even though his opening report on the merits is not due for another two months.

Dr. Zona's opinions also are reliable. To begin, the NFL does not challenge the reliability of most of Dr. Zona's opinions or even criticize his general methodology. Nor does the NFL question the central opinion offered by Dr. Zona at this stage of the case—that the economic tools and models that he uses can determine damages on a classwide basis. On the contrary, the NFL's own economic expert, Dr. Ali Yurukoglu, acknowledges the soundness of Dr. Zona's methodology and, in fact, uses Dr. Zona's models to calculate alternative classwide Sunday Ticket prices. *See* Expert Report of Ali Yurukoglu, Dkt. 707-3 ("Yurukoglu Report"), Figs. 16, 17. Whether Dr. Yurukoglu's use of Dr. Zona's model is to suggest that but-for prices would be higher than Dr. Zona predicts or to suggest that he would have used Dr. Zona's model differently, his use of it proves that Dr. Zona's methodology can answer the questions asked of it on a classwide basis.

Instead of challenging the central opinion offered by Dr. Zona, the NFL limits its *Daubert* motion to two (classwide) components of Dr. Zona's economic models. *First*, without conducting any independent economic modeling of their own, the NFL claims that Dr. Zona's models suffer from what is known as "perfect collinearity" and predict outcomes that are "far removed from actual viewer preferences and tastes." Motion to Exclude the Opinions of J. Douglas Zona, Dkt. 703-1 ("Zona

*Daubert* Motion"), at 2–3 (internal citation omitted). *Second*, the NFL objects to Dr. Zona's decision to use two different (classwide) marginal cost inputs in his economic models, even though the NFL does not claim that that decision renders Dr. Zona's models unable to determine classwide damages. *Id.*

The NFL is wrong both on the economics and the law. Dr. Zona's models are fundamentally sound and produce logical results that conform to common sense. As discussed in detail below, Dr. Zona's models do not suffer from perfect collinearity and the anomalous results that the NFL trumpets were due to a minor programming error that took minutes to fix. That error had little effect on the substantive results, no effect on the question of classwide impact, and since has been corrected. *See* Diver Decl. Ex. 2 (Expert Rebuttal Report of J. Douglas Zona) ("Zona Rebuttal Report"). Accordingly, Plaintiffs have fully resolved each of the NFL's complaints.

The NFL's criticisms of Dr. Zona's calculation of marginal cost to predict but-for Sunday Ticket prices are similarly misplaced. Indeed, Dr. Zona and Dr. Yurukoglu broadly agree on each important classwide component of marginal cost and but-for Sunday Ticket price. They agree (i) that the *actual* marginal cost for providing Sunday Ticket is exceedingly low (approximately $0); and (ii) that the retail price for Sunday Ticket (approximately $300) implies an extremely high margin, which may be explained in several ways, including that Sunday Ticket is priced above a competitive or profit-maximizing level or that consumers' willingness to pay for the product might justify such a margin, possibilities that Dr. Yurukoglu does not analyze. The key point for present purposes is that Dr. Zona's methodology is sound and that whatever the marginal cost input, the results will apply classwide.

There is nothing methodologically exotic about any of Dr. Zona's methods. He does what economists do in virtually every antitrust case at the class-certification stage and, aside from limited disagreements about certain assumptions or interim conclusions, Dr. Zona's economic analyses are very similar to the economic analyses of the NFL's own expert. At most, the arguments the NFL raise in their *Daubert*

motion go to the weight due to Dr. Zona's opinions, not their admissibility. That is not the proper focus of a *Daubert* inquiry, *see* 509 U.S. at 595, and the NFL's motion should be denied.

### SUMMARY OF DR. ZONA'S OPINIONS

Dr. Zona first computes the volume of business affected by the NFL's anticompetitive conduct. Zona Report ¶¶ 21–31. Neither DirecTV nor the NFL produced data in a form that isolated the number of paying Sunday Ticket subscribers for each season of the damages period or the amounts those subscribers paid. Instead, massive amounts of raw transactional and viewership data needed to be processed. Dr. Zona and his team expended considerable time and effort developing programs capable of culling through that data to isolate Sunday Ticket purchases and NFL game viewership. Because Plaintiffs in this case have alleged that Sunday Ticket subscribers were overcharged for the Sunday Ticket product, this portion of Dr. Zona's report identifies the upper bound of possible damages.[1]

Dr. Zona also created two damages models, each of which demonstrates that damages can be determined on a classwide basis:

**Model 1—Transaction & Viewership Model.** Dr. Zona's first model uses massive amounts of data from the Sunday Ticket transaction and viewership databases supplied by DirecTV. From that data, Dr. Zona constructed an econometric model, using standard econometric tools and processes, of demand for DirecTV and

---

[1] Concluding that the entirety of DirecTV's revenues from Sunday Ticket are overcharge damages is not far-fetched. As Dr. Rascher explains in his opening expert report in support of class certification, *see* Dkt. 633-4 ¶¶ 247–55, and in his rebuttal report submitted here, if the challenged restraints were removed, the most likely outcome is that professional football telecasts would be broadly distributed on basic over-the-air television and cable channels in much the same way that college football was distributed on these channels over the class period. Since all class members purchased those channels as a prerequisite to purchasing Sunday Ticket, the entirety of their Sunday Ticket purchase price constitutes damages. This standard yardstick measure of damages—comparing the price of college and professional football telecasts—does not rest on any of Dr. Zona's econometric models.

4

Sunday Ticket services, from which he computed the implied and estimated actual marginal cost for Sunday Ticket. Dr. Zona then used that demand model and the estimated actual marginal cost to predict the price for Sunday Ticket in potential market scenarios based on various forms of increased competition (compared to the real world). *See* Zona Report ¶¶ 38–71.

**Model 2—Conjoint Model.** Dr. Zona's second model uses the survey data collected from Sarah Butler, Plaintiffs' survey expert. Ms. Butler's survey assessed viewing habits and preferences of consumers interested in NFL football games, including their willingness to pay for a broad array of different football-game viewing packages (e.g., all out-of-market games, access to a single team's games, or access to a single game) at different price points. Dr. Zona then uses the resulting survey data to evaluate and estimate consumer demand for Sunday Ticket and simulate prices of alternative out-of-market packages that would likely exist in the absence of the NFL's anticompetitive restraints.

Dr. Zona also conducts two additional analyses that do not purport to be full damages models, but which further support the two models described above. One tests whether DirecTV could have increased profits by placing Sunday Ticket on a basic tier rather than selling it as a stand-alone product (as it is required to do by the NFL). The basic-tier analysis confirms the commonsense notion that the NFL's requirement that Sunday Ticket be offered as a ███████████████████████ results in elevated prices. The other analysis uses NFL survey data to confirm the effect of competition, but only in a limited manner. ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████.

Dr. Zona's methodologies and corresponding modeling derives from, and aligns with, the legal framework governing this case. As the Ninth Circuit

recognized, this conspiracy involves a series of interlocking agreements between and among the NFL teams, the NFL, DirecTV, and the network television broadcasters of "in market" NFL games, including CBS and Fox. *In re Sunday Ticket*, 933 F.3d at 1149–51. By isolating and examining the economic effects of component parts of those interlocking agreements, Dr. Zona's approach not only provides a workable tool for estimating classwide damages, it also can adapt to various legal outcomes. As just one example, Dr. Zona's models enable him to predict the price effects of just removing the NFL's agreement to limit Sunday Ticket telecasts to DirecTV subscribers. *See, e.g.*, Zona Report ¶ 70. Under this scenario, even if the NFL teams still were permitted to pool their broadcast rights, the price of Sunday Ticket would decrease by ███████████████████████████████████████████ ██████. *Id.*[2]

Moreover, Dr. Zona has continued to evaluate and refine his models. Those refinements have tested and addressed the NFL's criticisms and further confirm Dr. Zona's original opinions. But they have had no effect on Dr. Zona's overall conclusion that the amounts consumers overpaid for NFL Sunday Ticket can be calculated on a classwide basis.[3] And none of the refinements alter his fundamental methodology, which plainly is relevant and reliable.

---

[2] That DirecTV's exclusivity is by itself anticompetitive should not be surprising. For decades, consumers, potential competitors, politicians, and others have criticized the anticompetitive agreements that enable DirecTV to exclusively provide out-of-market NFL game telecasts, an arrangement that exists in no other major American professional sport. *See, e.g.*, *Competition in Sports Programming and Distribution: Are Consumers Winning?*, Hearing Before the S. Comm. Of the Judiciary, 109th Cong. 24 (2006).

[3] Expert discovery in this case has been split into two phases. Dkt. 649 (Scheduling Order). To support Plaintiffs' motion for class certification, Plaintiffs served three expert reports, which independently and in concert demonstrate that damages can be determined on a classwide basis. After class certification, Plaintiffs will serve their opening merits expert reports on January 27, 2023; the NFL will serve responsive merits expert reports on April 7, 2023; and Plaintiffs will serve rebuttal merits expert reports on May 19, 2023. Expert discovery does not close until June 9, 2023, over

**ARGUMENT**

**I.      The *Daubert* Standard Focuses on Whether the Expert Has Demonstrated Classwide Methods of Proof.**

The NFL's summary of the *Daubert* standard omits several important qualifications. To be sure, under Federal Rule of Evidence 702, expert testimony is admissible if (1) "the testimony is based on sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, 2017 WL 2559615, at *3 (C.D. Cal. June 7, 2017) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).

To evaluate reliability, the district court "must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014); *see also Hardeman v. Monsanto Co.*, 997 F.3d 941, 961 (9th Cir. 2021). But "[t]he inquiry is 'flexible.'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 594). In applying Rule 702, the district court acts as "a gatekeeper, not a fact finder." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010)). The goal is to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand," *Daubert*, 509 U.S. at 597.

---

six months from now. Accordingly, while Dr. Zona already has described and implemented standard economic tools and models that show that damages can be determined on a classwide basis, his opening merits models and corresponding opinions will not be submitted for another eight weeks. His current modeling, in other words, does not purport to be the final version that he will use to estimate damages at trial. Instead, his expert opinions confirm that common proof will be available to establish more than is necessary at this stage in the case, namely, that all class members were injured by Defendants' anticompetitive conduct.

At the class certification stage, the focus of the district court's gatekeeping function "is not the correctness of the expert's conclusions," *see Elosu*, 26 F.4th at 1024 (internal quotation and citation omitted), but whether the expert's methodology "is capable of resolving a common issue central to the plaintiffs' claims," *Olean*, 31 F.4th at 667 ("A district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue."). And courts apply these standards with a "liberal thrust," favoring admission. *See Daubert*, 509 U.S. at 588.

The NFL ignores these standards and the procedural posture of the case. In fact, with just two exceptions, fully addressed below and in Dr. Zona's reply report, the entirety of the NFL's *Daubert* motion concerns the differences in opinion between Dr. Zona and the NFL's experts regarding the merits of Plaintiffs' claims rather than whether those merits can be addressed in a reliable manner on a classwide basis. Dr. Zona's opinions easily show that damages and antitrust impact can be reliably proven using a methodology that is common to the class. The NFL's arguments do not seriously challenge that Dr. Zona's methodology is capable of being applied on a classwide basis, nor do they argue that Dr. Zona's analysis is divorced from Plaintiffs' theory of a violation. As a result, the NFL's motion to exclude Dr. Zona's opinions should be denied.

## II.   Dr. Zona's Transaction & Viewership Model Is Both Robust and Reliable.

### A.   Dr. Zona's Transaction & Viewership Model Makes Reliable Predictions That Apply Classwide.

The Transaction & Viewership Model measures the amount that Sunday Ticket's price to class members would fall after the entry of additional providers of out-of-market NFL football game telecasts. Currently, by virtue of the challenged agreements, those out-of-market telecasts are available exclusively through NFL Sunday Ticket. Zona Report ¶¶ 38–71. Using an extensive data set comprised of

actual Sunday Ticket subscribers, Dr. Zona models consumer preferences for various alternative packages of NFL games, including: (a) the games available on free, sponsored broadcast television; (b) the Sunday Ticket package as it currently exists; and (c) three simulated single-team packages comprising all games played by the Dallas Cowboys, Pittsburgh Steelers, and New England Patriots. Zona Report ¶¶ 70–71. Dr. Zona then uses his modeling of those preferences to estimate prices that would be charged under various competitive scenarios. *See id*.

The goal of this model is to estimate but-for price of the Sunday Ticket package in the face of competition. *See Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at \*11–14 (C.D. Cal. June 26, 2017) (antitrust damages are based on the difference between the real world and a hypothetical "but-for world" where defendants' conduct did not exist). The NFL's untested supposition is that the modeled price may be incorrect because when Dr. Zona's model is changed to estimate demand for single-team packages within particular DMAs, it shows that fans would prefer to pay for a package of local games that they currently obtain for free. These results were the consequence of a minor coding error that Dr. Zona has since corrected, and which had no material effect on the *Sunday Ticket prices* the model is designed to estimate. Zona Rebuttal Report ¶¶ 12–16. Much less do they change Dr. Zona's opinion that damages can be resolved on a classwide basis.

In any event, as Dr. Zona makes clear in his Rebuttal Report, by implementing that minor coding change, the preferences of consumers in Dallas, Pittsburgh, and New England refute the NFL's criticisms of his model (*see id.*):

- Dr. Zona's model predicts that consumers in each region value a package of over-the-air telecasts least, a package of over-the-air and all out-of-market games most, and a package of over-the-air and all games of one out-of-market team somewhere in between.
- Dr. Zona's model predicts that consumers in each region would not incrementally value a package of games of their in-market team over the

value of the current over-the-air offering. This too makes sense. A Pittsburgh resident would value a Steelers package no more than she would value the current over-the-air offering because the current over-the-air offering already includes all Steelers games, so access to a package of Steelers games would not increase access to any additional telecasts.

- Dr. Zona's model predicts that consumers in each region would derive additional value from, and be willing to pay for, a package of all of another team's games beyond the handful they can currently view over-the-air. *Id.* A Pittsburgh resident, for example, would incrementally value a Cowboys-only package over a package of just over-the-air games because not all Cowboys games are broadcast by the local television stations in Pittsburgh.

The NFL, through its expert Dr. Yurukoglu, mistakenly claims that the since-fixed anomalous results were the outcome of Dr. Zona failing to include in his model the option to not watch any game in some week. But Dr. Yurukoglu did not test that hypothesis; he simply asserts his speculation as true. Despite his access to Dr. Zona's code and his manipulation of it to generate these immaterial anomalies, Dr. Yurukoglu failed to identify and correct the actual cause, a minor coding error that took Dr. Zona just minutes to fix. *See id.* In his Rebuttal Report, Dr. Zona has corrected this minor error, which eliminates any claimed anomalous result and produces a model that predicts consumer-viewing behavior while scarcely changing the but-for prices the model estimates. *Id.*

For these same reasons, the NFL's insistence that *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299 (S.D.N.Y. 2015), is "directly on point" is misplaced. In *Laumann*, a case involving MLB's and the NHL's out-of-market packages, the court excluded a damages model in part because the model predicted, for example, that a fan of a single team would be far more likely to purchase a bundle of out-of-market games than a fan of many teams. *Id.* at 317–18. Here, however, Dr. Zona's model produces no such counterintuitive results. Moreover, the NFL doesn't even raise the

1   central issue that led to the exclusion of the model in *Laumann*. The *Laumann* court

2   found the expert's data set too narrow, including that the expert failed to conduct a

3   survey of consumer behavior. *Id.* at 318. Here, Dr. Zona's data set covers a much

4   larger population, including not just the actual purchase and viewership data of

5   millions of DirecTV customers but also a consumer-preference survey, the exact data

6   the *Laumann* court suggested would have sufficed in that case. *Id.* at 319

7   ("[Conducting a survey] could have enabled his model to predict more reliably the

8   price sensitivities of various categories of fans.").

9   **B.      Dr. Zona's Transaction & Viewership Model does not suffer from**

10  **"Perfect Collinearity."**

11      The NFL also contends that Dr. Zona's model suffers from perfect collinearity,

12  which it variously describes as a "fundamental" and "elementary" error. But as the

13  NFL and its experts acknowledge, any model that actually suffered from perfect

14  collinearity would be unable to generate any results *at all*. *See* Zona *Daubert* Motion,

15  at 12; *see* also Diver Decl. Ex. 3 (Transcript of Deposition of Ali Yurukoglu 126:11–

16  23) ("Yurukoglu Deposition") (claiming that models with perfect collinearity are

17  "mathematically impossible to run"). The fact that Dr. Zona *is* able to generate results

18  undermines the NFL's argument on its face.

19      The reason why the NFL believes that Dr. Zona's report suffers from this flaw

20  is due to a default feature of STATA, a standard computer-software program widely

21  used by economists and statisticians, and which the NFL and its experts do not

22  criticize Dr. Zona for using for his estimations. *Id.* By design, STATA addresses the

23  potential for collinearity by removing the collinear variable(s) in a model so that that

24  the variable(s) will not prevent STATA from calculating standard regression outputs.

25  Zona Rebuttal Report ¶¶ 38–43.

26      In this case, the potentially collinear variables were price and year (capturing

27  a variety of unknown economic effects that vary from year to year). Thus, Dr. Zona

28  allowed STATA to drop the indicator variable for a single year (2018) in a dataset

that covered eight years (2011 to 2018). Dr. Zona acknowledged this in his original report: "So, absent cross-sectional variation, the prices are an exact linear combination of the year fixed effect flags, and the model automatically drops any unnecessary flag (for 2018)." Zona Report ¶ 52 n.44.

It thus was not a "fundamental error" but a conscious choice to use STATA's standard function to constrain the 2018 indicator variable to be equal to the reference year (2011). And it did not result in a model with perfectly collinear variables, because such a model would not produce *any* regression output. The NFL effectively is arguing that any time a standard, default function of a computer-software program, widely accepted and used by economists and econometricians, is employed, the results are *per se* outside of accepted practice in the field, which is nonsense. At the very least, Dr. Zona's decision was more than reasonable in a model designed to demonstrate that there is a methodology to determine damages on a classwide basis. In any event, Dr. Zona has continued to refine his model. He has added new data, including price data for those who received Sunday Ticket at no cost as a promotion, which avoids having STATA drop any variables. Zona Rebuttal Report ¶ 40.

This refinement has not altered the model's ability to show classwide damages. It has simply changed the regression output, albeit only slightly. At the end of the day, this is nothing more than a dispute about what choices to make in implementing a model. As Dr. Yurukoglu testified: ███████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████."
*See* Yurukoglu Deposition, at 31:25–32:2, 34:1–3.

At bottom, these "fundamental errors" are nothing but. At his deposition, Dr. Yurukoglu ████████████████████████████████████████████
███████████████████████████████████. *See id.* 125:13–127:9. Further, Dr. Yurukoglu ██████████████████████████████████████████
████████████████████████████. *Id.* Given the posture of this case, attacks of

this kind are not relevant, because they do not address the feasibility of determining damages on a classwide basis.

### III.   The NFL's Complaints Concerning the Variability Among Consumers and Seasons are Baseless.

The NFL's argument that Dr. Zona "improperly" ignores variations between years and between different kinds of fans is incorrect. The purpose of Dr. Zona's model, after all, is to isolate the effect of DirecTV's exclusivity on the price of Sunday Ticket from the other variables that might have affected demand and pricing during the class period. There is no reason to think the effect of exclusivity would vary considerably from year to year, and Dr. Zona's assumption that that is the case certainly does not make his model unreliable.

Indeed, this sort of assumption is standard practice in economics, as shown from Dr. Yurukoglu's use of the results of his own 2012 paper, which used data from 2007 and earlier, to advocate against regulation requiring unbundling of cable channels in a paper published in 2016—four years after the paper was published and nine years after the most recent data used in the model. At his deposition, held ten years after the original paper was written, and with all the changes to the television market since then, Dr. Yurukoglu continued to rely on results from data that was more than 15 years old. Yurukoglu Deposition, at 150:12–14 (████████████ ████████████████████████).

At most, the NFL's criticisms are differences of opinion between the parties' experts that go to the weight of the evidence rather than their admissibility. *See Elosu*, 26 F.4th at 1024. Dr. Zona already models whatever modest variation there is year-to-year in the effect of exclusivity by, for example, adding to the model information about team quality, which captures much of the yearly variation in team interest. *See* Zona Rebuttal Report ¶¶ 8, 27–29. None of the NFL's critiques come close to a question of reliability—and it certainly does not suggest the presence of any issues that are individual as to any class member.

Similarly misplaced is the NFL and Dr. Yurukoglu's claim that Dr. Zona improperly assumed that all consumers in each DMA have the same preferences for NFL clubs. This is simply false. The implication of that would be that all consumers would watch exactly the same games and either all buy Sunday Ticket or not. Dr. Zona makes no such assumption. *See, e.g.*, *id.* Rather, he aggregates and averages consumer tastes into a single aggregate demand function in each DMA in the country, in which different people have different likelihoods of valuing different teams. This is just the kind of aggregate demand function that DirecTV faces in setting prices, and it is actually more detailed than necessary for determining the but-for price of a single product that is sold at a single, national list price across all DMAs. *Id.* Dr. Yurukoglu ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. *See* Yurukoglu Deposition, at 143:7–10 ████████████████████████████████ ███████████████████████████████████[4]

## IV.    Dr. Zona's Analysis of Commercial Customers Is Reliable.

The NFL's claim that Dr. Zona's analysis of commercial consumers is unreliable also is baseless. Dr. Zona's use of residential viewership data in analyzing commercial markets is not only reliable, but also sensible. While it is true that commercial establishments typically pay for Sunday Ticket to satisfy the demand of their customers, those customers are NFL fans of all stripes, including those who have Sunday Ticket and those who do not. The ultimate demand for the product is the same cross-section of consumers represented in the Transaction & Viewership data as a whole.

Likewise, using the same overcharge percentages for residential and commercial customers is sensible because the effect of the restrictions on the

---

[4] Dr. Yurukoglu also ████████████████████████████████████████████
████████████████████████████████ Yurukoglu Deposition, at 41:24.

14

structure of the market is the same. *See e.g.*, Zona Rebuttal Report ¶¶ 69–70. There is only one supplier (the NFL) and no direct negotiations between customers and the content creators (the teams and networks). That identical market structure implies that the effect of the challenged restrictions on market outcomes will be similar for both residential and commercial class members. *See id.* Indeed, the Ninth Circuit recently affirmed a jury verdict based on Dr. Zona's testimony that rested on a comparison of conspiracies in *separate* product markets on the basis that those markets had similar characteristics. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 477–78 (9th Cir. 2021).

Here, of course, the residential and commercial class members face an identical market composition and purchased the same product from the same supplier. Additionally, true marginal cost is close to zero for commercial customers just as it is for residential customers. *See infra* Section V (detailing broad agreement that marginal cost approaches $0 for commercial and residential Sunday Ticket). Even if that were not true, it would not change the fact that commercial class members' damages could be calculated on a classwide basis.

Moreover, as a legal matter, courts routinely recognize that it is reasonable and reliable to apply a common overcharge even in a market with far more variation than that here. *See, e.g., Olean*, 31 F.4th at 684–85 (affirming certification of a class "[i]n a complex market such as the one at issue here, where different purchasers with different bargaining power purchased a range of products at different prices from different suppliers"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 603 (N.D. Cal. Mar. 28, 2010) ("Numerous courts have held that variations in products and complexities in a distribution chain do not preclude an estimation of whether an overcharge impacted end purchasers."); *cf. Prime Media Group, LLC v. Acer America Corporation*, 2015 WL 452192, at *4 (N.D. Cal. Jan 22, 2015) (denying motion to exclude expert testimony) ("Extrapolating results from a sample

to a population is a routine statistical technique and indeed is often necessary in the face of an incomplete or intractably large data set.").

Accordingly, it is eminently reasonable—both as an economic and legal matter—to apply the same overcharge percentage to all class members.

## V. Dr. Zona's Use of Marginal Cost Is Textbook Economics

The NFL's criticisms of Dr. Zona's use of marginal cost are likewise meritless. Indeed, the NFL's expert broadly agrees with each facet of how Dr. Zona deploys marginal cost in his economic analyses. If anything, Dr. Zona's estimations of marginal cost are conservatively high, which inflates the but-for world prices consumers would have paid for out-of-market NFL football games, thereby *lowering* any estimation of damages. And far from undermining the reliability of Dr. Zona's model, the opinions and testimony of the NFL's expert *corroborates* the central tenet of Plaintiffs' legal claims—that consumers paid supracompetitive prices for Sunday Ticket. In any case, the NFL's misguided arguments concerning Dr. Zona's use of marginal cost are misplaced. As the NFL and its expert concede, whatever the marginal cost for Sunday Ticket is, it applies classwide. *See* Zona *Daubert* Motion, at 18 (noting that "[t]he marginal cost . . . should turn on the structure of the business itself"); Yurukoglu Deposition, at 152:15–19 ████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████).

Both parties' economic experts agree that a reasonable estimate of the marginal cost of Sunday Ticket is crucial to understanding what price would have prevailed but for the anticompetitive conduct. Yurukoglu Report ¶ 53 ("Marginal cost is crucial in DirecTV's price setting."); Zona Report ¶¶ 63 & 63 n.46 ("[P]rices are set in relationship to marginal costs. . . . Marginal cost is the relevant cost concept."). Both parties' experts also agree that "the marginal cost of interest is the incremental cost DirecTV must incur to supply Sunday Ticket to one additional consumer."

Yurukoglu Report, ¶ 53; *see also* Zona Report ("[Marginal cost] is the increase in cost associated with producing one more unit [of Sunday Ticket], on the margin.").

But marginal cost is difficult to determine in practice, so economists use a variety of direct and indirect techniques to estimate it. *See* Yurukoglu Deposition, at 157:9–20 (noting the need to "handle with care" estimations of marginal cost); Zona Report ¶ 63 ("Generally, marginal costs are not observable and must be estimated."); *see also* Richard A. Posner & William M. Landes, *Market Power in Antitrust Cases*, 94 Harvard L. Rev. 937, 941 (1980) ("But because marginal cost is a hypothetical construct—the effect on total costs of a small change in output—it is very difficult to determine in practice, especially by the methods of litigation.").

The two estimations of marginal cost offered by Dr. Zona follow standard practice.

**Transaction & Viewership Model.** The estimation of marginal cost used by Dr. Zona in his Transaction & Viewership Model "backs out" Sunday Ticket's marginal cost from Sunday Ticket's observed retail price and actual purchase and viewership data. The observed retail price for Sunday Ticket is known (approximately $300), and Dr. Zona, using the purchase and viewership data, has derived demand curves for a variety of NFL television products. *See* Zona Report ¶¶ 32–129 (describing construction of Sunday Ticket demand curves in his Transaction & Viewership Model); *see also id.* ¶ 65 ("Implied marginal costs can also be computed from the econometric demand model.").

Using observed price and Sunday Ticket's demand curve, Dr. Zona derives an implied marginal cost for Sunday Ticket of ▮▮▮. Dr. Zona then adjusts the implied marginal cost to account for the challenged conduct "bias[ing] upward" the price for Sunday Ticket and the ratio of free to paid subscriptions. *See* Zona Report ¶ 65 n.48. With that adjustment, Dr. Zona estimates the marginal cost for Sunday Ticket to be ▮▮. *Id.* All parties agree that Dr. Zona's ▮▮▮ marginal cost calculation still is too

high to be a realistic measure of true marginal cost. *See infra* at 19. It is, to that extent, highly conservative.

The NFL complains that Dr. Zona offers no principled justification for adjusting the *implied* marginal cost of ▮▮▮ to the estimated marginal cost of ▮▮▮. Not so. For one, adjusting an implied marginal cost calculation for real-world factors is a sensible economic approach. Dr. Zona and Dr. Yurukoglu both acknowledge that estimating the marginal cost of Sunday Ticket from Sunday Ticket's demand curve and observed price assumes that Sunday Ticket prices are set at DirecTV's profit-maximizing level. Yurukoglu Deposition, at 163:6–15 ("Profit maximization is a typical assumption."); Zona Report ¶ 65 ("With the assumption that DirecTV is maximizing profits, then the observed price is at the point that achieves the maximum profit for some value of marginal cost."); *see also id.* ¶ 63 ("If profit is maximized, then prices are set in relationship to marginal costs.").

But in this case, Plaintiffs have alleged, and the record confirms, that the price for Sunday Ticket is set *above* the profit-maximizing level to optimize the profits of the members of the conspiracy, especially those of the NFL itself.[5] Dr. Zona thus made clear that ▮▮▮ was the *implied* marginal cost for supplying Sunday Ticket, and it needed to be adjusted to account for real-world factors. *See* Zona Report ¶ 38 ("An econometric model of demand, with *an assumption of profit maximization* can be used to compute *implied* costs—costs that are consistent with observed pricing as

---

[5] Throughout the class period, the NFL-DirecTV agreements have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Further, the NFL has ▮▮▮▮▮▮▮▮▮▮▮▮▮ Deposition of Brian Rolapp, 128:15-129:9.

profit maximizers."); *id.* ¶ 65 ("*Implied* marginal costs can also be computed from the econometric demand model.") (emphases added).[6]

Dr. Yurukoglu agrees that Dr. Zona had to adjust the *implied* marginal cost of $215 to some lower value. *See, e.g.*, Yurukoglu Deposition, at 153:20–23 ███████ ██████████████████████████████████████████████████████████████████████ ███████████████████████████); *id.* at 161:14–21 (███████████████████ ████████████████████████████████████████████████████████████████████████████ █████████████████).

The two experts also agree that the *actual* marginal cost of Sunday Ticket is extremely low, approaching ██. *See* Yurukoglu Deposition, at 159:18–161:7 (testifying, in response to the question, "Would it be economically unreliable to assume that the marginal cost is ██," that "you could … a priori, think [that] is a reasonable assumption"); Zona Report ¶ 64 ("In this case, marginal cost for a [Sunday Ticket] subscription is likely to be small.").[7]

---

[6] In his report, Dr. Yurukoglu demonstrates that using ███ as the *actual* marginal cost is meaningless and has no explanatory value. Dr. Yurukoglu inserted ███ as marginal cost to estimate the ████████████████████████████████████. Using ████ as marginal cost, Dr. Yurukoglu estimated ████████████████████████████████████. *See* Yurukoglu Report ¶ 63 & Fig. 17. But that exercise reveals only that Dr. Zona's models yield precise predictions.

[7] The reason the actual marginal cost of Sunday Ticket approaches $0 is that the primary costs of offering Sunday Ticket—the rights fee DirecTV pays to the NFL in particular—are fixed costs. Because of this fixed cost component, the marginal cost of adding an additional subscriber is close to, if not, $0. Decoding a channel so that it can be accessible to one additional consumer is essentially costless. The leading academic work by Dr. Yurukoglu confirms that the marginal cost of Sunday Ticket is approximately $0. *See, e.g.*, Gregory S. Crawford & Ali Yurukoglu, *The Welfare Effects of Bundling in Multichannel Television Markets*, 102 Am. Econ. Rev. 643, 667 (2012) ("[T]he marginal cost of upstream production is commonly known to be zero."); *see also* Gregory S. Crawford, Robin S. Lee, Michael D. Whinston & Ali Yurukoglu, *The Welfare Effects of Vertical Integration in Multichannel Television Markets*, 86 Econometrica 891, 905 (2018) ("assuming" marginal cost for an MVPD like DirecTV to supply additional content to one additional consumer "can be

19

Dr. Zona's conservatively high estimation of marginal cost, therefore, *benefits* the NFL because it inflates the estimated prices that would have prevailed but for the anticompetitive conduct, thus reducing the estimated damages owed to class members. The NFL's complaint essentially is that Dr. Zona's estimation of marginal cost did not go low enough. But the NFL identifies no case in which an expert's model was excluded because his estimation of a data input was too conservative. On the contrary, courts (in this Circuit and out) repeatedly have recognized that such conservative estimates reinforce the reliability of the expert's work. *See, e.g.*, *In re Packaged Seafood Products Antitrust Litigation*, 332 F.R.D. 308, 327 (S.D. Cal. 2019) (rejecting defendants' argument to exclude testimony of direct-purchaser plaintiffs' expert when his estimate of damages was too conservative), *aff'd Olean*, 31 F.4th 651 (9th Cir. 2022) (en banc); *see also In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *19 (N.D. Cal. Jan. 19, 2017) (Finally, [plaintiffs' expert's] use of a conservative pass-through estimate . . . further supports the reasonableness of his approach at this juncture."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5071694, at *6 (N.D. Cal. Dec. 7, 2010) (ruling that plaintiffs' expert's damages estimation was reliable in part because "his subsequent sensitivity analyses indicate overcharges occurred outside of the damages periods he identified," implying "the damages he estimates may be conservative").

**Conjoint Model.** Dr. Zona uses a different marginal cost estimation in his conjoint model: ██████. The NFL makes much of the fact that Dr. Zona used different marginal cost estimations in the different models. But this criticism only reinforces

---

decomposed into the sum of the per subscriber fees that [the MVPD] must pay to the various channels in its market-bundle," which in this case are $0). Dr. Israel, another of the NFL's experts, agrees. *See* Diver Decl. Ex. 14 (Written Rebuttal Testimony of Dr. Mark A. Israel, In re Distribution of Cable Royalty Funds ¶ 51, No. 14-CRB-0010-CD (2010–13) (Sept. 15, 2017, amended Feb. 12, 2018) ("[T]he marginal cost to produce distant signals is zero in all cases, as the signals are simply retransmitted signals that have already been produced."); Diver Decl. Ex 4 (Transcript of Deposition of Mark A. Israel 54:2–5) ████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████ ).

how conservative Dr. Zona has been in designing his models. Having already seen that DirecTV could not be presumed to be profit maximizing with respect to Sunday Ticket itself, which is required for an accurate estimation of marginal cost, it was eminently sensible for Dr. Zona to use a different measure. The ▮▮▮▮ estimation of marginal cost derives from an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Zona Report ¶ 117 n.65. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* That approach to estimating marginal cost is standard in economics, and one the NFL never challenges.[8]

While the ▮▮▮▮▮▮▮▮▮▮▮▮ confirms that Dr. Zona's use of ▮▮▮ as the marginal cost amount in his Transaction & Viewership Model was extremely conservative, the ▮▮▮▮ estimation of marginal cost is itself considerably greater than the ▮ amount the NFL's own experts have supported in the past. In any event, whether marginal cost is ▮ or ▮▮▮ or somewhere in between (or even ▮▮▮) has no bearing whatsoever on the reliability of Dr. Zona's methodology or its applicability on a classwide basis. The dispute is about what estimate to use, not whether that estimate applies across the board to the entire class.

## VI.   The NFL's Attacks on Marginal Cost Actually Confirm a Core Allegation.

At his deposition, Dr. Yurukoglu was asked to reconcile his opinion that (i) the actual marginal cost for Sunday Ticket likely is approximately ▮, *see* Yurukoglu Deposition, at 159:18–161:7, with his separate opinion that (ii) the implied marginal

---

[8] The NFL's efforts to discredit their own modeling and cost estimations are unavailing. For instance, the NFL suggests that Dr. Zona's marginal-cost estimation is unreliable because the underlying cost figures come from a "massive ▮▮▮▮ spreadsheet." Zona *Daubert* Motion, at 20. It is unclear why ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ spreadsheet would render any data contained therein unreliable, or why one would not expect a spreadsheet that modeled the price for Sunday Ticket in various scenarios to be that large or larger.

1   cost of ▮▮▮ derived from the retail price and demand for Sunday Ticket, is

2   implausibly high, *id.* at 153:20–23.

3       Dr. Yurukoglu could not rule out the possibility that DirecTV was pricing at a

4   supra-profit-maximizing price, noting only that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.* at 157:10–20. Faced

6   with an implausibly high implied marginal cost for Sunday Ticket, Dr. Yurukoglu

7   "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮▮." *Id.* The question is, "▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* at 157:16–17.

11      Plaintiffs, of course, have a straightforward answer ▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Sunday Ticket price is maximizing is the

13  overall profits of the NFL and its broadcasting partners, which does not necessarily

14  mean maximizing the profits of Sunday Ticket itself. The NFL and the networks that

15  produce NFL telecasts have agreed that Sunday Ticket must be offered as a

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ precisely ▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[9]▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, the NFL can extract greater rights

19  fees from the networks, who in turn can extract greater advertising and retransmission

20  revenue from *their* broadcasts.[10]

21  ─────────────

[9] *See, e.g.*, Diver Decl. Ex. 13 (NFL_0458529, at -542) ▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

24

25  [10] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dr. Zona's models reinforce the core point of his analysis by showing that Sunday Ticket is priced above the profit maximizing level. The Transaction and Viewership Model reaches this conclusion by starting with the assumption that the price for Sunday Ticket has been set at a profit maximizing level and showing that it cannot be because of the unrealistic marginal cost that that assumption implies. The Conjoint Model confirms this conclusion from the other direction. The Conjoint Model shows that even with a marginal cost of ███—which represents a conservative upper bound of actual marginal cost—Sunday Ticket's actual price is about ███ higher than a profit-maximizing level. And if he used the ██ marginal cost that both Dr. Yurukoglu and Dr. Israel have used in their own work, Dr. Zona estimates that the actual prices were about ███ too high, even for a monopolist. Zona Rebuttal Report ¶ 66.

## VII.   Dr. Zona's Use of Butler's Survey Data Is Reliable.

The NFL first argues that "Dr. Zona's Conjoint Model . . . should be excluded because it relies entirely on results from the survey conducted by Ms. Butler." Zona *Daubert* Motion, at 22. For reasons explained in the accompanying Butler Rebuttal Report and Plaintiffs' memorandum opposing the NFL's motion to exclude Butler's testimony, Ms. Butler's survey corresponds with the best practices of her industry,

and plainly is both relevant and reliable. *See generally* Memorandum in Opposition to the NFL Defendants' Motion to Exclude the Opinions of Sarah Butler.

The NFL's additional attacks on Dr. Zona's use of Ms. Butler's survey data are baseless. *First*, it is wrong to suggest that Ms. Butler's survey "was not designed to address purchasing behavior." Zona *Daubert* Motion, at 22. As Ms. Butler testified, "███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████." Diver Decl. Ex. 5 (Transcript of Deposition of Sarah Butler 52:13–17) (emphasis added). In any case, the appropriateness of data used as a model input does not turn on the original reasons for its collection. DirecTV did not design the transaction and viewership data, for instance, to be used in this kind of model. But the NFL does not criticize Dr. Zona's use of that data for his modeling. For his part, Dr. Yurukoglu uses survey data in his 2012 paper that also was not specifically designed to be used in the type of model he created. *See* Crawford & Yurukoglu, *Welfare Effects of Bundling*, 102 Am. Econ. Rev. at 653 ("The MRI data comes from surveying a random sample of consumers in the US about their media usage, consumer behavior, and demographics."). *Second*, it is not a flaw but a benefit of the survey data that it includes non-class members. After all, Dr. Zona's task is to estimate *overall* demand for Sunday Ticket and NFL telecast products.

In fact, as NFL's counsel are aware, the defendants in the *Laumann* case successfully challenged the model used there by contending that it did not rest on sufficient data or a consumer survey. 117 F. Supp. 3d at 318–19. The NFL does not make the same contention here because (1) Dr. Zona's Transaction and Viewership model samples all DirecTV subscribers, not just class members; and (2) the conjoint survey provides the very data that the defendants contended was lacking in *Laumann*.

As discussed in Plaintiffs' Butler *Daubert* Opposition, the NFL is also incorrect to claim that the survey should have excluded supposedly "irrational" responses. Survey literature in fact recommends *against* imposing prohibitions of the

sort the NFL advocates for here. *See, e.g.*, Butler *Daubert* Opposition, Sec. III. In any event, none of the NFL's arguments concerning Dr. Zona's use of Ms. Butler's survey results has anything to do with the basic reliability of the methodology used by Dr. Zona and none of their challenges affect whether the model produces common classwide results. *See, e.g.*, Zona Rebuttal Report ¶ 13.

## VIII.  Dr. Zona's Basic-Tier Model Is Reliable for Its Intended Purpose.

As for the NFL's argument that Dr. Zona's basic-tier model is incomplete, it was never intended to be a complete model of a but-for price. Rather, it is a study of the profitability of moving Sunday Ticket from a stand-alone, "premium" product that the NFL and its network partners require to a model of broader distribution at low prices. It is meant only to show that DirecTV could make even more money if the absence of the contractual restraints at issue in this case. This further supports the notion that Sunday Ticket is not priced at DirecTV's profit-maximizing price and adds credence to Dr. Zona's analysis of marginal cost. For that purpose, it is entirely reliable. *See* Diver Decl. 6 (Transcript of Deposition of J. Douglas Zona 72:11–17, 188:18–189:21). Dr. Zona's basic-tier modeling thus provides support for Dr. Rascher's testimony that the market would favor broad distribution of NFL telecasts at low prices, as Dr. Rascher predicts in the college football but-for world.

## CONCLUSION

For these reasons, the Court should deny the NFL's motion to exclude the opinions of Dr. Zona.

Dated:  December 2, 2022                    Respectfully submitted,

By:   */s/ Marc M. Seltzer*
          Marc M. Seltzer

          Marc M. Seltzer (54534)
          mseltzer@susmangodfrey.com
          SUSMAN GODFREY L.L.P.
          1900 Avenue of the Stars, Suite 1400
          Los Angeles, CA 90067
          Tel: (310) 789-3100

Fax: (310) 789-3150

Arun Subramanian (*Pro Hac Vice*)
asubramanian@susmangodfrey.com
William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Armstead Lewis (*Pro Hac Vice*)
alewis@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
Fax: (713) 654-6666

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfled.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*