Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668−PSG (JEMx) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **MEMORANDUM IN OPPOSITION TO THE NFL DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF DANIEL A. RASCHER**<br><br>JUDGE: Hon. Philip S. Gutierrez<br><br>DATE: January 27, 2023<br>TIME: 1:30 p.m.<br>COURTROOM: First Street Courthouse<br>350 West 1st Street<br>Courtroom 6A<br>Los Angeles, CA 90012 |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

SUMMARY OF DR. RASCHER'S OPINIONS ................................................. 2

ARGUMENT ........................................................................................................ 5

    I.    The NFL's *Daubert* Motion Fails Under the Appropriate Legal Standard. ........................................................................... 5

    II.   Dr. Rascher's College Football Model Applies Classwide. ................. 9

    III.   Dr. Rascher's College Football But-For World Is Reliable. ............. 10

        A.   Dr. Rascher's Yardstick Selection Criteria Are Reasonable. ............................................................... 11

        B.   The NFL's Criticisms Confirm the Reliability of Dr. Rascher's Yardstick Analysis. ........................................ 13

    IV.   Dr. Rascher Has a Reliable Basis for Opining That a Bundle of Games May Continue to Exist in a Competitive World. ............... 20

    V.   Dr. Rascher's No-Pooling But-For World Is Reliable. ...................... 22

    VI.   The NFL's Remaining Arguments Are Frivolous. ........................... 23

        A.   Dr. Rascher's Damages Calculations are Sufficiently Rigorous. ................................................................. 23

        B.   Dr. Rascher's Treatment of the Commercial Class Is Reliable. .................................................................. 24

CONCLUSION .................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**CASES**

*Alaska Rent-A-Car, Inc. v. Avis Budget Group,*
    738 F.3d 960 (9th Cir. 2013)................................................................6

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,*
    247 F.R.D. 156 (C.D. Cal. 2007) ..................................................23, 24

*Broad Music, Inc. v. Columbia Broad. Sys., Inc.,*
    441 U.S. 1 (1979) .......................................................................4, 23

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ......................................................................5, 23

*Daubert, v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. at 596 (1993) .................................................................6, 9

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,*
    773 F.2d 1506 (9th Cir. 1985)............................................................11

*Elosu v. Middlefork Ranch Inc.,*
    26 F.4th 1017 (9th Cir. 2022).................................................6, 8, 9, 11

*Herring Broad. v. Time Warner Cable,*
    23 FCC 14787 (FCC Oct. 10, 2008) ...................................................20

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.,*
    2017 WL 2559615 (C.D. Cal. June 7, 2017) ..........................................6

*In re Conagra Foods, Inc.,*
    302 F.R.D. 537 (C.D. Cal. 2014) ......................................................24

*In re Live Concert Antitrust Litigation,*
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ..................................................8

*In re Nat'l Football League Sunday Ticket Antitrust Litig.,*
    933 F.3d 1136 (9th Cir. 2019)......................................................*passim*

*In re Rubber Chemicals Antitrust Litig.,*
    232 F.R.D. 346 (N.D. Cal. 2005) ..................................................10, 11

*Laumann v. Nat'l Hockey League,*
    56 F. Supp. 3d 280 (S.D.N.Y. Aug. 8, 2014).....................................19, 20

*Maldonado v. Apple, Inc.,*
    333 F.R.D. 175 (N.D. Cal. 2019).......................................................23

*Mendoza v. Intuitive Surgical, Inc.,*
    2020 WL 1976472 (N.D. Cal. Apr. 24, 2020) .......................................24

*Monster Energy Company v. Vital Pharmaceuticals, Inc., et al.,*
    2022 WL 1721807 (C.D. Cal. Aug. 2, 2022)..........................................10

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
  468 U.S, 85 (1984) ....................................................................................4, 7, 8, 12

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022)............................................................................9, 10

*Rearden LLC v. Walt Disney Co.*,
  2021 WL 6882227 (N.D. Cal. July 12, 2021)...................................................8, 9

*Tawfilis v. Allergan, Inc.*,
  2017 WL 3084275 (C.D. Cal. June 26, 2017) ................................................10, 11

*Wendell v. GlaxoSmithKline LLC*,
  858 F.3d 1227 (9th Cir. 2017)................................................................................6

**OTHER AUTHORITIES**

6 Newberg and Rubenstein on Class Actions § 20:62 (6th ed.)..............................23

*Competition in Sports Programming and Distribution: Are Consumers Winning?*,
  Hearing Before the S. Comm. Of the Judiciary, 109th Cong. 24 (2006) ..............4

Travis Hughes, *The NHL's new single-team TV package is great, but the
  cost is not* (July 28, 2015),
  https://www.broadstreethockey.com/2015/7/28/9058905/nhl-single-team-tv-
  package-gamecenter-live-center-ice. ...................................................................20

**RULES**

Fed. R. Evid. 702 ...................................................................................................6

Fed. R. Evid. 702, Notes of Advisory Committee, 2000 Amendments ....................8

**INTRODUCTION**

Dr. Rascher's expert report demonstrates, through common evidence and well-accepted economic methodologies, that the NFL's anticompetitive behavior harmed every class member. The Court must deny the NFL's motion to exclude his testimony because the NFL does not actually challenge the relevance of his findings or his conclusion that his methodological approaches apply classwide. Instead, the NFL argues the *merits*, claiming that Dr. Rascher's classwide findings do not align with the factual story that it intends to present to the jury. While the NFL is wrong on the facts (as shown below), this is not the time for that argument. At this stage of the litigation, the question only is whether Dr. Rascher's methods are reliable and support class certification. As to *that* question, there is no meaningful dispute.

At this stage of the case, the relevant question is whether there exist common methodologies to establish damages on a classwide basis. Plaintiffs have alleged that the NFL, its member Clubs, the NFL's network broadcast partners, and DirecTV have entered into a series of "interlocking agreements [that] work together to suppress competition for the sale of professional football game telecasts in violation of Section 1 and Section 2 of the Sherman Antitrust Act." *In re Nat'l Football League Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019). Plaintiffs have further alleged that, were the interlocking agreements at the heart of that conspiracy removed, "those telecasts would be more accessible to more viewers at lower prices." *Id.* In contrast to the NFL (which barely cites the Ninth Circuit controlling opinion detailing the challenged restraints and their likely effects) and its economic expert (who did not even review it), Dr. Rascher follows the Ninth Circuit's holdings by providing comprehensive economic analyses demonstrating that if all (or some) of the challenged agreements were removed, the price of the product every class member purchased would have been lower. *See* Diver Decl. Ex. 1 (Expert Report of Daniel A. Rascher) ("Rascher Report") (also available at Dkt. 633-2).

1

Dr. Rascher's opinions are also reliable. The NFL does not challenge most of Dr. Rascher's opinions, including, among others, (1) that the relevant product market is the market for professional football telecasts; (2) that the NFL has market power within that market; (3) that, using their market power, the NFL has restricted the broadcast and sale of out-of-market football telecasts; or (4) that any procompetitive justification or less-restrictive alternative will be assessed using classwide proof.

Nor does the NFL challenge the reliability of the yardstick methodology supporting Dr. Rascher's primary damages model—namely, that damages can be determined by comparing the distribution of professional football telecasts against college football telecasts. *See In re Sunday Ticket*, 933 F.3d at 1151 (concluding the set of interlocking agreements at the heart of this case "*is the exact type of arrangement . . . that the Supreme Court held caused an injury to competition in the context of college football*") (emphasis added). Dr. Rascher also calculates a but-for price of Sunday Ticket based on that well-accepted yardstick comparison to college football, a product market that is substantially similar but lacks the restraints being challenged here. Indeed, the Ninth Circuit in this case effectively adopted college football as an acceptable benchmark, *see id.* at 1147–51, a point the NFL's motion never addresses.

Unable to show that Dr. Rascher's methods are unreliable, the NFL quibbles over the merits and claims that Dr. Rascher's assumptions do not match the NFL's preferred spin on the case. But those *merits* arguments are, at best, matters for cross examination, not exclusion. The Court therefore should deny the NFL's motion challenging Dr. Rascher's opinions.

## SUMMARY OF DR. RASCHER'S OPINIONS

The NFL does not dispute Dr. Rascher's qualifications. Unlike all the NFL's experts, who lack significant experience in sports economics, Dr. Rascher is a recognized sports economist and federal courts have repeatedly welcomed his expert testimony. *See* Rascher Report, Ex. A (curriculum vitae). Dr. Rascher testified at trial

in *O'Bannon v. NCAA* (challenging the NCAA's use of the image and likeness of student athletes) and *In re NCAA Grant-in-Aid Cap Antitrust Litigation* (challenging limits to student athletes receiving benefits). He has written scores of peer-reviewed articles on the subject, and he teaches sports economics at the University of San Francisco. *Id.* His qualifications to present his opinions on the issues in this case are beyond dispute.

In assessing classwide damages calculations, Dr. Rascher analyzes three but-for worlds, representing different competitive situations that might result depending on different findings of liability.

**The College Football But-For World.** Dr. Rascher first models a world in which the individual teams are allowed to act freely, without facing any of the challenged restraints. The best example of this competitive world is college football. Because of a Supreme Court ruling that the NCAA's joint control of college football broadcasts was anticompetitive, *see In re Sunday Ticket*, 933 F.3d at 1146–47, universities (like Notre Dame and BYU), and conferences (like the SEC or other Power 5 conferences) compete for television contracts in a market in which none has market power, and where the relevant broadcast entities are the same (or similar) as those who broadcast NFL games and with the same economic incentives.

**The Non-Exclusivity But-For World.** Dr. Rascher next models a world in which the NFL Clubs are permitted to pool their telecast rights in the NFL as they currently do, but the NFL is prevented from selling Sunday Ticket exclusively to any distributor, as it does now with DirecTV. The current exclusive arrangement between the NFL and DirecTV for the sale of Sunday Ticket—which requires that a consumer be a DirecTV subscriber to even have access to Sunday Ticket—is unique among major American sports leagues, and one that has frequently raised complaints because of its anticompetitive effects on consumers.[1]

---

[1] For decades, consumers, writers, potential competitors, politicians, and others have criticized the anticompetitive agreements that enable DirecTV to be the sole source of these telecasts, an arrangement that exists in no other major American professional

**The No-Pooling But-For World.** For completeness, Dr. Rascher last models the reverse of the non-exclusivity but-for world—that is, a world in which the NFL is permitted to sell a package of out-of-market games to a single distributor, but it is prevented from limiting the teams from independently competing with the league's bundle.[2] While the no-pooling but-for world may be the least likely of the but-for worlds Dr. Rascher has modeled, his ability to do so shows that the methods he has developed can be employed flexibly and on a classwide basis.

Each but-for world that Dr. Rascher constructs derives from and aligns with the Ninth Circuit's governing opinion in this case. Yet, the NFL's motion to exclude his opinions *never once* cites the Ninth Circuit's opinion for that Court's expansive discussion of the interlocking agreements at issue here, how those agreements resemble the agreements struck down by the Supreme Court in the context of college football, or why college football would be a sound market comparison. *See* Motion to Exclude the Opinions of Daniel A. Rascher, Dkt. 705-1 ("Rascher *Daubert* Motion"), at 12 (citing only definition of Sports Broadcasting Act).

As the Ninth Circuit recognized, this conspiracy involves a series of interlocking agreements between and among the NFL teams, the NFL, DirecTV, and the NFL's network television broadcast partners. *In re Sunday Ticket*, 933 F.3d at

---

sports league. *See, e.g.*, *Competition in Sports Programming and Distribution: Are Consumers Winning?*, Hearing Before the S. Comm. Of the Judiciary, 109th Cong. 24 (2006).

[2] This scenario is consistent with the Supreme Court's holding that individual members must be able to offer their products independently even when efficiency might permit a joint product that pools rights. In *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S., 85 (1984), for example, the Court emphasized in a case involving football telecasts, "[e]nsuring that individual members of a joint venture are free to increase output has been viewed as central in evaluating the competitive character of joint ventures." *Id.* at 114 n.58; *see also Broad Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 24 (1979) (upholding joint selling of music licenses under a blanket license, but only where "there was no legal, practical, or conspiratorial impediment to . . . obtaining individual licenses.").

4

1151. Those agreements include: (1) an agreement between the NFL and its member Clubs to pool the Clubs' telecasting rights and give the NFL the sole authority to exercise those rights; (2) an agreement between the NFL and its network broadcast partners (currently CBS and Fox) that grants those networks the right to broadcast a limited number of "in-market" Sunday-afternoon games through local affiliates; and (3) an agreement between the NFL and DirecTV granting DirecTV the exclusive right to broadcast a package of all "out-of-market" football games. *See id.* at 1148 (detailing agreements). By differentiating the parts of the overall conspiracy that might potentially be subject to various findings of liability and constructing but-for worlds that align with them, Dr. Rascher's opinions provide a relevant and reliable set of analyses that can estimate classwide damages and respond to various legal outcomes. *Cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (holding that a damages model must be consistent with the underlying theory of antitrust injury).

Moreover, Dr. Rascher has continued to evaluate and refine his but-for worlds. Those refinements have tested and addressed the effect of the challenges the NFL raises in their *Daubert* motion. But they have had no effect on Dr. Rascher's overall conclusion that the amounts consumers overpaid for NFL Sunday Ticket can be calculated on a classwide basis. And none of the refinements alter his fundamental methodology, which plainly is relevant and reliable.

**ARGUMENT**

The NFL's *Daubert* motion to exclude the opinions of Dr. Rascher should be denied for three independent reasons. *First*, the NFL does not identify an appropriate ground on which this Court could exclude Dr. Rascher's opinions under *Daubert*. *Second*, none of the NFL's disagreements with Dr. Rascher render his opinions unable to apply classwide. *Third*, Dr. Rascher's opinions are relevant and reliable.

**I.     The NFL's *Daubert* Motion Fails Under the Appropriate Legal Standard.**

The NFL's primary argument is that it disagrees with the assumptions Dr. Rascher makes to construct the but-for worlds. That is not the proper focus of a

*Daubert* inquiry, *see* 509 U.S. at 595, and the Court should deny the NFL's motion on that basis alone.

Under Federal Rule of Evidence 702, expert testimony is admissible if (1) "the testimony is based on sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, 2017 WL 2559615, at *3 (C.D. Cal. June 7, 2017) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).

But the "[t]he inquiry is 'flexible.'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 594). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Group*, 738 F.3d 960, 969–70 (9th Cir. 2013). Courts are supposed to screen "unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Id.*

In applying Rule 702, then, the district court acts as "a gatekeeper, not a fact finder." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010)). The focus of the district court's gatekeeping function is on "not the correctness of the expert's conclusions but the soundness of his methodology." *Elosu*, 26 F.4th at 1024 (quotations omitted). Courts apply these standards with the "liberal thrust" favoring admission. *See Daubert*, 509 U.S. at 588.

The NFL's *Daubert* motion ignores these standards. Indeed, *none* of the NFL's complaints concern Dr. Rascher's methodology. Rather, the NFL offers *merits* arguments that have no bearing on classwide liability. Even if this were a proper argument at this stage of the litigation (it is not), the NFL is incorrect. As explained below, Dr. Rascher's but-for worlds are based on an exacting analysis of the extensive factual record and real-world evidence.

For example, Dr. Rascher's college-football model—the principal target of the NFL's *Daubert* motion—uses the market for college football as a benchmark against which to study the market for professional football. As the Ninth Circuit recognized when it compared college and professional football telecasts in its decision upholding Plaintiffs' allegations, the relevance and reliability of that benchmark is plain. *See In re Sunday Ticket*, 933 F.3d at 1151–52; *see also infra*, Section III (detailing the economic, factual, structural, and legal similarities between major college football and the NFL).

Both major college football universities and NFL teams play American football. Both have teams that appeal to fans across the country, like the Green Bay Packers and Alabama Crimson Tide. Both have games that are telecast on the *same* over-the-air and cable channels owned by the *same* media networks (Fox, CBS, NBC, and ABC/ESPN) that sell commercial space to similar advertisers. Both generate most of their football-related media revenue from television deals with those same networks. Both typically play games once per week. And both sports are uniquely popular—college football is the second most popular sport in the United States, behind only the NFL. *See* Rascher Report ¶¶ 247–48; *see also* Expert Report of Mark A. Israel ¶ 160, Dkt. 707-2 ("Israel Report").

Indeed, there can be no better comparable market for NFL football than the market for major college football. As the Ninth Circuit recognized, the set of interlocking agreements at the heart of this case "is the *exact* type of arrangement . . . that the Supreme Court held caused an injury to competition in the context of college football." *In re Sunday Ticket*, 933 F.3d at 1151 (emphasis added; internal quotations omitted). Like the NFL now, before 1984 the NCAA limited the total number of televised college football games and the number of games that any one college could televise. The Supreme Court struck down those telecast agreements as violations of the antitrust laws. *NCAA v. Board of Regents*, 468 U.S. 85, 99 (1984). The Court reasoned that the NCAA's restrictive arrangement (identical to the one here) violated

the antitrust laws because "individual competitors lose their freedom to compete," and "price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." *Id.* (brackets removed). Importantly, after the *Board of Regents* Court struck down the NCAA's restrictive agreements, "the number of televised college football games grew exponentially," *In re Sunday Ticket*, 933 F.3d at 1147 (quotations omitted), just as Dr. Rascher predicts would happen for NFL games if the restraints challenged here were removed, Rascher Report ¶ 247–48.

In any event, the NFL's misplaced disagreements with Dr. Rascher's assumptions or factual foundations, or his decision to use major college football as a benchmark, go to the weight owed to his opinions, not their admissibility. "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu*, 26 F.4th at 1026. *Daubert* motions are "not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702, Notes of Advisory Committee, 2000 Amendments (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cnty.*, 80 F.3d 1074, 1078 (5th Cir. 1996)).

None of the NFL's cited authority suggests (let alone holds) that parties' disagreements over the reasonableness of a model's assumptions renders the overall model unreliable. For example, in *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966 (C.D. Cal. 2012), the district court stressed the need for an expert to account for relevant "major variables." *Id.* at 973. The NFL does not identify any "major variable" Dr. Rascher omitted, or why such a variable would be relevant. Likewise, in *Rearden LLC v. Walt Disney Co.*, 2021 WL 6882227 (N.D. Cal. July 12, 2021), an expert opined that the creators of Beauty and the Beast infringed the plaintiff's intellectual property in designing the movie characters' computer-animated facial expressions. *Id.* at *5. The expert testified "to viewing only a short video depicting a scene showing the development of the Beast's face," and that she

"failed to review any evidence produced by Defendants or speak with anyone who worked on Beauty and the Beast." *Id.* Yet, despite those investigative shortcomings, the court *still* concluded that that expert's opinions were supported by an adequate factual foundation. *Id.* (finding that the expert's testimony passed the "foundation" and "fit" tests of *Daubert*).

The NFL may well disagree with the conclusions reached by Dr. Rascher. But nothing in *Daubert* or its progeny change the fundamental rule that the factual basis of an expert's opinion goes to the credibility of the testimony, not its admissibility. Whether there may be other, better factual foundations "is for the litigants to argue, and for the jury to decide." *Elosu*, 26 F.4th at 1026; *see also City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat.").

As the Supreme Court has explained, if the NFL really believes that college football does not serve as an appropriate benchmark for professional football, or that more football games would not be distributed on basic cable without the output-restricting agreements at issue here, or that any other of Dr. Rascher's assumptions are invalid, it has at its disposal all "the traditional and appropriate means" to explain why, including "[v]igorous cross-examination [and] presentation of contrary evidence." *Daubert*, 509 U.S. at 596. The NFL seeks to circumvent this adversarial process to avoid economic conclusions that it does not like. The NFL's motion consequently should be denied.

## II.    Dr. Rascher's College Football Model Applies Classwide.

The NFL's *Daubert* motion should be denied for a second reason. At the class certification stage, the focus of the district court's gatekeeping function is whether the expert's methodology "is capable of resolving a common issue central to the plaintiffs' claims." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022). "[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to

be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Id.* at 467. In other words, Plaintiffs need only provide a proof of concept of a classwide model of impact and damages.

Here, the only injury for which Plaintiffs seek compensation is the overcharge for the NFL games class members obtained through Sunday Ticket. Dr. Rascher's models show that the price of that package would have been lower for every class member absent the challenged restraints. Either Plaintiffs can show that Sunday Ticket was overpriced, or they cannot. Plaintiffs do not need to provide a complicated model of each class member's individual but-for choices, as the NFL argues, *see* Rascher *Daubert* Motion 11–22, when the only question necessary for an overcharge model is whether, and by how much, the price of what was purchased was inflated.

The NFL's arguments to exclude Dr. Rascher's opinions rest on a distortion of this legal standard. Each of Dr. Rascher's but-for worlds relies on factual foundations and assumptions that apply to all class members. *See, e.g.*, Rascher Report ¶¶ 247–48; *see* also Diver Decl. Ex. 2 (Expert Rebuttal Report of Daniel A. Rascher ¶¶ 147–49 ("Rascher Rebuttal Report"). The NFL may dispute those foundations and assumptions, but they cannot dispute that those foundations and assumptions apply classwide.

## III.    Dr. Rascher's College Football But-For World Is Reliable.

Dr. Rascher predicts that removal of the restraints Plaintiffs have challenged would result in a distribution model that resembles major college football. To do so, Dr. Rascher uses the "yardstick methodology," "a reliable methodology for calculating damages" in antitrust cases. *See, e.g.*, *Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *6 (C.D. Cal. June 26, 2017) (ruling a plaintiffs' expert's "yardstick methodology, therefore, is a reliable methodology for calculating damages and is admissible under *Daubert* and Rule 702"); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 354 (N.D. Cal. 2005) (certifying class and noting that the "yardstick" is a "reasonable and commonly-used approach"); *see also Monster Energy Company*

*v. Vital Pharmaceuticals, Inc., et al.*, 2022 WL 1721807, at \*19 (C.D. Cal. Aug. 2, 2022) (finding expert's yardstick methodology reliable); *see also Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985) (discussing reliability of yardstick methodology in antitrust cases).

The NFL cannot and does not complain that Dr. Rascher's yardstick methodology itself is unreliable. Instead, the NFL narrowly criticizes certain of the criteria Dr. Rascher uses in constructing the college-football yardstick. As explained above, even if those criticisms were sound, they would not be grounds for exclusion. *Elosu*, 26 F.4th at 1026. In any case, Dr. Rascher's selection of his yardstick criteria is reasonable, the NFL's arguments otherwise are mistaken, and Dr. Rascher's college football but-for world is reliable.

## A.    Dr. Rascher's Yardstick Selection Criteria Are Reasonable.

The bedrock principle of the yardstick method (also referred to as a benchmark method) is that it compares the outcome of interest (e.g., price) in the affected market to that same outcome in an unaffected benchmark market. *Tawfilis*, 2017 WL 3084275, at \*5–6; *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 354 (N.D. Cal. 2005). Here, Dr. Rascher concludes that "[t]he actual world of major college football, post-*Board of Regents*, provides a clear yardstick for professional football absent the challenged conduct." Rascher Report ¶ 247. Dr. Rascher's choice of major college football as a yardstick market is reasonable for at least two reasons.

*First*, as Dr. Rascher details in his expert report, *see* Rascher Report ¶¶ 247–48, the structural similarity of Saturday afternoon college football broadcasting and Sunday afternoon NFL broadcasting is striking:

- Like the NFL, major college football teams play American football.
- Like the NFL, major college football teams typically play one game per week on a weekend afternoon or evening during the late summer, fall, and winter months.

- Like the NFL, fans of major college football teams are located across the country.
- Like the NFL, major college football teams (through their universities or conferences) have fixed-fee, multiyear television agreements with major media companies, including Paramount (CBS), Fox, NBC Universal, and Disney (ABC/ESPN).
- Like the NFL, major college football's broadcast partners sell advertising to recoup the rights fees they pay to broadcast the games.
- Like the NFL, major college football is uniquely popular—college football is the second most popular sport in the United States, behind only the NFL.

*Second*, the Ninth Circuit's opinion in this case recognizes major college football as providing an ideal natural benchmark against which Plaintiffs could test their legal claims. Like the NFL now, before 1984, the NCAA limited the total number of televised intercollegiate football games and the number of games that any one college could televise. *In re Sunday Ticket*, 933 F.3d at 1146. Universities sued, and the Supreme Court struck down those telecast agreements as violations of the antitrust laws. *Board of Regents*, 468 U.S. 85, 99 (1984).

The Supreme Court found the NCAA's plan to be "a horizontal restraint" that both "create[d] a limitation on output" and "constitut[ed] horizontal price fixing." *Id.* at 99–100. Those conditions created "a significant potential for anticompetitive effects"—a potential that "ha[d] been realized." *Id.* at 104–05. The Supreme Court even agreed with the trial court's finding, "if member institutions were free to sell television rights, many more games would be shown on television"; prices were not only inflated, but "unresponsive to viewer demand and unrelated to the prices that would prevail in a competitive market." *Id.* at 105–06.

The market conditions in major college football before and after *Board of Regents* thus makes it an ideal benchmark. The set of interlocking agreements at the heart of this case are "the exact type of arrangement . . . that the Supreme Court held

caused an injury to competition in the context of college football." *In re Sunday Ticket*, 933 F.3d at 1151 (internal quotations omitted). After the NCAA's plan was abolished, the Supreme Court's prediction that "many more games would be shown on television" proved true. Today, major college football is among the most heavily televised sports in the country. *See, e.g.*, Israel Report ¶ 160 (███████████████████████████████████████████████████████████████████████████████); Rascher Report ¶ 248 (noting that the conference championship between Alabama and Georgia drew 15.28 million viewers). All four major broadcast networks televise college football games nationally, *see* Israel Report ¶ 158 n.20, as do at least three ESPN channels (ESPN, ESPN2, and ESPNU), Fox Sports 1, CBS Sports Network, and NBC Sports Network, as well as a growing number of university-specific channels and over-the-top or direct-to-consumer streaming options, *see id.* ¶ 163. And they all do so at the same time and almost entirely on a national basis. After the *Board of Regents* Court invalidated the NCAA's rules preventing individual colleges and conferences from reaching independent broadcast contracts, "the number of televised college football games grew exponentially" and "broadcasters collectively paid half as much for the rights." *In re Sunday Ticket*, 933 F.3d at 1147 (quotations and citation omitted).

In short, the structure, economics, and legal framework make major college football a clear benchmark against which to assess the anticompetitive broadcast ecosystem that now prevails in the NFL.

## B. The NFL's Criticisms Confirm the Reliability of Dr. Rascher's Yardstick Analysis.

Because the NFL cannot challenge the reliability of the yardstick methodology as a common tool of antitrust economics, or that major college football before and after *Board of Regents* provides an ideal natural environment to assess the anticompetitive conditions that now prevail in the NFL, it instead offers factual criticisms of certain aspects of Dr. Rascher's yardstick selection criteria. Not only

are the NFL's criticisms remarkably weak (and as discussed above, irrelevant for present purposes), properly understood, they *confirm* Dr. Rascher's choice of college football as an appropriate yardstick.

*First*, Dr. Rascher has a reliable basis for opining that college football is like the NFL. The "three meaningful differences between NFL and college football distribution," Rascher *Daubert* Motion 11, make Dr. Rascher's college football but-for world more likely to occur, not less. The NFL suggests that because "NFL telecasts are uniquely popular," if the challenged restraints were removed, "the distribution options for more popular content (NFL games) might be more varied than for college—a point Dr. Rascher does not consider." *Id.*

Of course, Dr. Rascher did consider the various channels on which broadcasters would put NFL games if the challenged restraints were removed. Dr. Rascher examined the channels that broadcast college football on Saturdays and observed that "[b]y only including the four major networks and their associated [] cable sports channels that already show [major college] football (ESPN, ESPN2, ESPNU, FS1, FS2, and CBSSN), ten games could be shown at one time, easily accommodating the NFL's current format of two Sunday afternoon windows." Rascher Report ¶ 250. His reply report further discusses these possibilities. *See, e.g.*, Rascher Rebuttal Report ¶ 147–70.

Dr. Rascher also considered whether networks would be incentivized to place games on platforms less accessible than over-the-air television. Dr. Rascher analyzed the newly signed television broadcast deal between the Big Ten and Fox, CBS, and NBC, in which the three networks will "draft" each week which games are placed on which over-the-air and cable-affiliated channels. Rascher Report ¶ 252. In his analysis, Dr. Rascher pointed out that the deal makes clear that "while streaming might be the future, linear television is not dead," *id.* ¶ 253 (quoting television deal), and that, in selecting which games are placed on which channels, the "most valuable games [will] be slated for national [over-the-air] broadcasts." *Id.* Given that the NFL

is even more popular than college football, a point the NFL acknowledges, the evidence indicates that NFL content is even more likely to be on over-the-air networks.

Dr. Rascher also shows that when looking at the top 25 college teams (the number ranked weekly for the College Bowl Series, major college football's playoff system), the substantial majority are on national, over-the-air broadcasts, whereas in the NFL, over-the-air broadcasts are typically only shown regionally. Rascher Rebuttal Report ¶ 53. And even counting what the NFL calls the "national" Sunday afternoon games, which are in truth rarely shown to the whole country, typically only one or two games out of twelve or thirteen are shown to large parts of the country. *Id.* ¶ 108.

The NFL also suggests that Dr. Rascher did not account for the Sports Broadcasting Act (SBA) in developing his college-football yardstick. Not so. The SBA "provides a tailored exemption for 'professional team sports' to sell their rights to 'sponsored telecasts' through a joint agreement." *In re Sunday Ticket*, 933 F.3d at 1146. The NFL suggests that "[t]he ability to pool broadcast rights free from antitrust scrutiny is an obvious distinction between the sports that affects the media distribution landscape, and Dr. Rascher does not account for it in his selection of a yardstick." Rascher *Daubert* Motion 12.

Dr. Rascher does account for the SBA in developing the college football but-for world—*see, e.g.*, Rascher Report ¶ 18–19, 28, 52, 55, 158. Moreover, the NFL appears not to understand the implication of its invocation of the SBA. Because the SBA provides limited protection from the antitrust laws for *over-the-air* telecasts, any consideration of the SBA by Dr. Rascher in constructing his college football but-for world would be directly related to *more* games appearing on free, over-the-air channels, not fewer. If the league believes that a different but-for-world is more likely given the SBA, then it is free to develop and present that vision to the jury.

The NFL finally suggests that "the NFL has different media priorities from college football teams and conferences," including that "[t]he NFL prioritizes ensuring that local fans can watch their teams for free, whereas no college team's games are all guaranteed for free to any customer." Rascher *Daubert* Motion 12 (citations omitted). Putting aside the NFL's claimed "priority," this is not true. Dr. Rascher shows in his Rebuttal Report that the top-25 college football teams are shown on free over-the-air television approximately as often as any NFL team. Rascher Rebuttal Report ¶¶ 108, Ex. 4, 192. In any case, the NFL's reliance on free over-the-air games is inapposite. The class here are subscribers to Sunday Ticket who were forced to pay supracompetitive prices for games that were not available to them over-the-air.[3]

*Second*, Dr. Rascher has a reliable basis for opining that currently inaccessible out-of-market games would be broadcast on cable or unused over-the-air networks. The NFL specifically challenges Dr. Rascher's conclusion that "the most popular content [is] shown on the most widely available networks." Rascher *Daubert* Motion 13 (quoting Dr. Rascher's expert report and deposition testimony). To the NFL,

---

[3] The NFL's claim that it "prioritizes ensuring that local fans can watch their teams for free," *see* Rascher *Daubert* Motion 12, also is disingenuous and bespeaks a total ignorance of how class members have been injured in this case. Whatever it is the NFL actually prioritizes, the *effect* of its media deals in no way ensures that "local fans can watch *their* teams for free." *See id.* (emphasis added). Indeed, an essential fact in this case is that millions of local fans *cannot* watch "their team" for free because they do not live in the local geographic region in which that team's games are regularly shown over-the-air. A Philadelphia Eagles fan living in Los Angeles is unlikely to see any Sunday-afternoon Eagles games. For this "displaced" fan, the only option is to pay supracompetitive prices for a package of *all* out-of-market NFL games, even if she just wants to watch the Eagles. In any case, no matter the outcome of the case, the NFL and its members teams likely still will have the ability to ensure that all in-market games are shown over-the-air for free even if distributed primarily on cable. As it does now with ESPN and Monday Night Football, the NFL or its teams could allow its network-broadcast partners show all games for free over-the-air ██████████████████████████████. *See, e.g.*, Diver Decl. Ex. 6 (██████████████████████████████████████████████████████████████████).

"[t]his assumption runs directly contrary to the facts." Rascher *Daubert* Motion 13. The evidence the NFL offers is that the college football playoffs are broadcast on ESPN, a cable channel. It is unclear exactly why the college football playoff being on ESPN undermines Dr. Rascher's opinion that channels such as ESPN would love to carry additional professional football telecasts. ESPN typically broadcasts just one NFL football game per week (on Monday night), while on a typical Saturday, it broadcasts many times that number of less popular college games. *See, e.g.*, Rascher Report ¶ Ex. 9 (showing 9 games across the ESPN family of channels on a Saturday in October 2021).

*Third*, Dr. Rascher has a reliable basis for opining that every network broadcaster would want to broadcast NFL games, even if they broadcast these games simultaneously. The NFL suggests that Dr. Rascher's "███████████████ ███████████████████████████████████████████████ ███████████" "runs contrary to the evidence," and that "witness after witness testified about ███████████████████████ ███████████████████████." Rascher *Daubert* Motion 14 (citing deposition testimony from representatives of Fox, CBS, and the NFL). Here again, Dr. Rascher considered the evidence offered by the NFL and its broadcast partners. But, as that testimony could potentially be self-serving, he also analyzed what those same television executives *actually* do on Saturdays, where the four major networks broadcast college football more-or-less from morning until night. *See* Rascher Report ¶¶ 247–48 & Ex. 9 (showing Saturday college-football schedule).

In addition, the NFL's position is not only contradicted by the example of college football, but also by record evidence concerning NFL football itself. For example, in the last round of contract negotiations, ██████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████

1 ███████████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████████████

4 ███████████████████████████████████████████████████████████

5 ███████████████████████████████████████████████████████████

6 ████████████████████████████████ That is exactly what Dr. Rascher

7 suggests broadcast networks would do with NFL games in his college football but-

8 for world. Further, the ███████ proposal for Sunday-afternoon games suffers none of

9 the adverse consequences the NFL cites—every local game would have been shown

10 over-the-air in the local market of that team.

11     *Fourth*, Dr. Rascher has a reliable basis for opining that cable channels want

12 NFL content, and that NFL games would be part of a basic cable or satellite package.

13 The NFL cites a deposition of a █████████████████████████

14 ███████████████████████████████████████████████████████████

15 █████████████████████████████████████████████ Rascher

16 *Daubert* Motion 14. █████████████████████████████████

17 █████████████████████████████████. *Id.*

18     The NFL claims this shows that "Dr. Rascher has not grounded his assumption

19 with the real world facts of this case." Rascher *Daubert* Motion 14 (internal quotation

20 omitted). It shows just the opposite. As above, Dr. Rascher considered *and rejected*

21 this testimony in favor of real-world facts. Fox shows more college football games

22 on both its over-the-air network and Fox Sport 1 every Saturday than it does NFL

23 games on Sunday, despite direct and simultaneous competition from dozens of other

24 games and channels. No representative from Fox (of the NFL) has stated what other

25 Sunday programming it thinks would be more valuable to show than NFL football

26 games.

27     The NFL also claims that it is inappropriate for Dr. Rascher to assume that

28 "cable channels would want NFL content." Rascher *Daubert* Motion 14. To say it is

1   to refute it. As the NFL has stated again and again, NFL game programming is the

2   *most desirable programming on television*. ███████████████████████████

3   ████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ███████████████████████████████████████████████. But as the Ninth

9   Circuit recognized, a more competitive market would drive game-telecast rights

10  down toward what networks pay to broadcast college football. *See In re Sunday

11  Ticket*, 933 F.3d at 1147.

12      *Fifth*, Dr. Rascher has a reliable basis for looking to major college football

13  rather than sports like the MLB or the NBA. Rascher *Daubert* Motion 13. Most

14  importantly, those leagues divide the country into protected territories, meaning that

15  teams do not compete for national telecasts. These rules, which led to the creation of

16  Regional Sports Networks (RSNs), have been challenged as anticompetitive market

17  allocations, challenges that survived summary judgment before being settled. *See

18  Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280 (S.D.N.Y. Aug. 8, 2014) ("Far

19  from being implausible, plaintiffs' 'but-for' world is at least as likely as defendants'

20  prognostications."). Those sports have as many as ten times as many games in a

21  season and are less popular than professional and collegiate football. There are few,

22  if any, Power 5 college football games broadcast on RSNs. College football is the

23  right benchmark for the structural reasons described, but also because it is the only

24  major sport (besides college basketball) that is offered in a competitive media market.

25      *Sixth*, Dr. Rascher is correct in assuming that all NFL games would be

26  available on a basic tier, such as DirecTV's Choice Tier. While the most popular

27  sports programming typically ends up on over-the-air channels, when it does not, it

28  nearly always ends up on a standard tier. The NFL's counterexamples from other

sports are telling. The College Football Playoff is on ESPN, one of the most widely distributed networks. Rascher *Daubert* Motion 13. Same for TNT, which broadcasts NBA playoff games. *See id.* And the NFL Network, which has fewer NFL games than the others, is itself on the Choice Tier. Rascher Report ¶ 54.

In fact, when Comcast moved the NFL Network off a basic tier and moved it to a sports-only cable package, the NFL filed an action before the Federal Communications Commission. In it, the NFL alleged that Comcast acted anticompetitively and discriminatorily by *not* putting the network on a basic tier, given the popularity of the NFL, notwithstanding that it only broadcast eight NFL games a season. *See Herring Broad. v. Time Warner Cable*, 23 FCC 14787, 14814 (FCC Oct. 10, 2008). Yet now, the NFL alleges that a recognized expert in sports economics is wholly unreliable for assuming that the economics of this market are just as the NFL said they were. Ultimately, it is a matter of common sense that networks with the sports programming that enjoys the broadest base of popularity will be on the most basic tiers, and there is no programming as broadly popular as NFL games.

## IV. Dr. Rascher Has a Reliable Basis for Opining That a Bundle of Games May Continue to Exist in a Competitive World.

There are multiple examples of bundles existing in a non-exclusive fashion. The NFL itself does this in Canada and other countries. All other major sports leagues offer their out-of-market packages on a non-exclusive basis, and that has not caused telecasts to disappear. The example of the NHL in the United States is perhaps most telling. The NHL's out-of-market package went from being a $132 product as the result of the settlement in *Laumann* (down from $159).[4] Then, the streaming version moved to ESPN+, which charged $6.99 per month (about $42 per season for all its content, not just hockey) until this year, where it is about $60 per season. Rascher

---

[4] *See* Travis Hughes, *The NHL's new single-team TV package is great, but the cost is not (July 28, 2015)*, https://www.broadstreethockey.com/2015/7/28/9058905/nhl-single-team-tv-package-gamecenter-live-center-ice.

Report ¶ 275 n.318. As Dr. Rascher predicts would happen in the NFL if Sunday Ticket were not confined to DirecTV, the competition on price and product from ESPN has led DirecTV to respond. Now DirecTV sells the satellite version of the NHL package for just $60 per season, nearly matching the streaming price. Rascher Rebuttal Report ¶ 46.

And while the networks have complained about broad distribution of the programming, this is a question of economics, not existence. Of course, exclusivity is important to the networks. Each has paid an extraordinary amount of money for that exclusivity. But this a matter of dollars, not structure. There is no economic justification for the claim (which none of the quoted witnesses makes) that they would not continue to participate at the right price. At most, this is simply a contested question of fact.

Finally, the continued existence of the bundle really is only a primary issue for the class in the non-exclusivity but-for-world, which plainly is plausible, given that every other major professional sports league distributes their out-of-market packages on a non-exclusive basis. *See, e.g.*, Rascher Report ¶ 40. The reason is that a class member would not need to purchase a package in the college-football and the no-pooling but-for worlds, because they all already purchased DirecTV service and would have gotten the games without having to buy anything extra. The continued existence of a bundle may be an issue under the rule-of-reason in these scenarios, but it has no import at this stage.

Additionally, whether discounting and free years would continue to exist is irrelevant. DirecTV offered Sunday Ticket to new subscribers *this year*, even though it knows that it will not have Sunday Ticket to sell next year. *See* Rascher Report ¶ 226. DirecTV uses the free year as a customer acquisition device, and it will no doubt find a way to entice customers another way next year. Customers who did receive Sunday Ticket for free were obviously not harmed. Indeed, Plaintiffs allege that but-for the alleged misconduct, getting the Sunday Ticket content for free

(beyond the cost of their DirecTV service) would be the norm for all class members. And any class member discounts will be figured into the calculation of their individual damages. Nothing turns on the issue for purposes of class certification.

Finally, the NFL simply is incorrect that "no other American out-of-market sports package . . . is as significantly and regularly discounted as DirecTV's Sunday Ticket Package." Rascher *Daubert* Motion 17. Subscribers to ESPN+ essentially receive NHL Center Ice for free now as part of ESPN's basic streaming "tier," for $9.99 per month. And MLB.tv is available for free to every one of T-Mobile's customers every year. This is not a one-time teaser offer, either. It has been available since 2016, and T-Mobile users can subscribe every year. *See* Rascher Rebuttal Report ¶ 174. Moreover, T-Mobile has vastly more subscribers than DirecTV, with over 110 million customers to DirecTV's 13.5 million. *Id.* This is simply another example of questioning the basis of Dr. Rascher's analysis based on a factual error.

Ultimately, Dr. Rascher offers objective and transparent reasons for using the chosen criteria to identify college football as a comparable market.

## V.    Dr. Rascher's No-Pooling But-For World Is Reliable.

The NFL contends that the no-pooling but-for-world is unreliable because Dr. Rascher "assumes that clubs would make their game broadcasts available to DirecTV for a bundle." Rascher *Daubert* Motion 19. This is an incorrect summary of Dr. Rascher's opinions. Rather, Dr. Rascher contends that it would be more likely that the clubs would license their broadcasts to the major media companies that broadcast NFL and NCAA football now, and that class members would obtain the Sunday Ticket content that way. Rascher Report ¶¶ 176–79. He looks to the analysis Dr. Zona did of basic tiering to imagine a plausible (albeit less likely) way in which the content might be distributed without the NFL's present imposition of restraints on DirecTV.

Even if it were determined that the NFL could sell a bundle exclusively but could not prevent the teams from offering their content in competition with the bundle, as the Supreme Court did with respect to music rights in *Broadcast Music*

*Inc. v. Columbia Broadcasting System Inc.*, 441 U.S. 1 (1979), it would still be most likely that the teams would offer their games through standard networks. It is at least conceivable, however, that they would offer the games as a part of their basic tiers, and the ████████████ represents an outside, conservative estimate of what that arrangement would look like.

The NFL's complaint really highlights how wide its challenge misses the mark. Dr. Rascher "assumes" these things to be true only for purposes of showing that *if* the facts and the law were to be determined to be a certain way, he would have a classwide method of determining impact and damages. This may be the least likely of the outcomes he has modeled, but the task at this stage is not to prove any but-for-world, but to show that the methods he is using can be employed flexibly no matter what the facts are ultimately determined to be. That is not a failing of his opinions, but a strength.

## VI.    The NFL's Remaining Arguments Are Frivolous.

### A.    Dr. Rascher's Damages Calculations are Sufficiently Rigorous.

At this stage, Plaintiffs' burden is to show "that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. "'Calculations need not be exact,' nor is it necessary to show that the method will work with certainty at this time." *Maldonado v. Apple, Inc.*, 333 F.R.D. 175, 191–92 (N.D. Cal. 2019) (quoting *Comcast*, 569 U.S. at 34). In making this showing, Plaintiffs may "rely on class-wide, aggregate techniques to calculate individual damage awards," *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 175 (C.D. Cal. 2007), and "'the presence of individualized damages issues does not preclude a court from certifying a class because class-wide proof is not required for all issues,'" *Olean*, 31 F.4th at 669 (quoting *In re Urethane*, 768 F.3d 1245, 1255 (10th Cir. 2014); *see also* 6 Newberg and Rubenstein on Class Actions § 20:62 (6th ed.).

Dr. Rascher has exceeded these standards. He has rigorously explained the various but-for scenarios and calculated the difference between the prices consumers

paid for Sunday Ticket and the prices they would have paid for those telecasts in each scenario. That the arithmetic in the college football model is straightforward is not a rationale for exclusion. Dr. Rascher has shown that if the restraints were removed, the telecasts currently available only through Sunday Ticket would be broadly available on the television packages every class member had already necessarily purchased. If a jury accepts his conclusion, then the overcharge damages would be the amount each class member paid for Sunday Ticket. Dr. Rascher does not need an elaborate model to try to approximate a hypothetical world. He can look at the real world of Saturday afternoon football programming. The NFL is essentially arguing that Dr. Rascher should have done something (they do not make clear what) to make the simple more complicated.

The claim that Dr. Rascher should not have relied on Dr. Zona's calculations is similarly silly. There is no prohibition on experts working in conjunction to produce results. Dr. Rascher brought his own expertise (and a wealth of independent evidence) to bear when applying Dr. Zona's findings to the but-for worlds that Dr. Rascher described and analyzed. Dr. Rascher, moreover, independently reviewed Dr. Zona's code and conclusions. *See* Diver Decl. Ex. 7 (Deposition of Daniel A. Rascher 44–47). This division of labor was not only proper, it was sensible. *See, e.g.*, *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014) (holding that "an expert can appropriately rely on the opinions of others if other evidence supports [the expert's] opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence."); *Mendoza v. Intuitive Surgical, Inc.*, 2020 WL 1976472, at \*8 (N.D. Cal. Apr. 24, 2020) (same).

### B.    Dr. Rascher's Treatment of the Commercial Class Is Reliable.

Finally, the NFL complains that "Dr. Rascher improperly treats the commercial and residential classes uniformly." Rascher *Daubert* Motion 22. He does no such thing. He looks to the prices charged to commercial customers for both Sunday Ticket and basic tiers, such as the Choice tier, that carry NFL and NCAA

football games. He has a method for calculating damages that considers these differences. *See, e.g.*, Rascher Rebuttal Report ¶¶ 161–70. And he assumes, for reasons well-grounded in economics, that DirecTV's enhanced market power as a result of its exclusive deal for Sunday Ticket has similar effects in the commercial market, where the market structure is the same as it is for residential consumers. If the NFL believed that the factors it points to were material (to the point of defeating the ability to address impact and damages in the commercial class), then it and its experts would have provided some actual economic analysis themselves. They have not.[5]

## CONCLUSION

The Court should deny the NFL's motion to exclude the opinions of Dr. Rascher.

Dated:  December 2, 2022                   Respectfully submitted,

By:  */s/ Marc M. Seltzer*
        Marc M. Seltzer

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Arun Subramanian (*Pro Hac Vice*)
asubramanian@susmangodfrey.com
William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P

---

[5] The NFL make this same argument in their motion to exclude Dr. Zona. Plaintiffs offer additional responses to this claim in their opposition to that motion. *See* Plaintiffs Memorandum in Support of their Opposition to NFL Defendants' Motion to Exclude the Opinions of J. Douglas Zona.

1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Armstead Lewis (*Pro Hac Vice*)
alewis@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
Fax: (713) 654-6666

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfled.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*