# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

*IN RE: NATIONAL FOOTBALL LEAGUE SUNDAY TICKET ANTITRUST LITIGATION*

*CASE NO: ML 15-02668-PSG (JEMx)*

**Declaration of Michael Sabor**

**December 26, 2022**

## I.     Introduction

1.     I am Senior Vice President and the Chief Technologist at Compass Lexecon, an economic consulting firm where I have worked since 2012.  I oversee the architecture and implementation of cloud resources for Compass Lexecon.  I received an M.S. in Industrial Mathematics from Michigan State University and a B.S. in Mathematics from the University of Illinois Urbana-Champaign.

2.     In my role as Chief Technologist at Compass Lexecon, I have architected a high-performance cloud solution that provides bespoke, highly secured, single tenancy infrastructures for each client engagement for the efficient transfer, processing, and storage of clients' data, including datasets of hundreds of terabytes.  This work has been for some of the most advanced data companies in the world, including Google, Amazon.com, Apple, Meta, Uber, AT&T, DirecTV, American Express, Walmart, Comcast, and T-Mobile.

3.     In addition to my responsibilities as Chief Technologist at Compass Lexecon, I also act as a consultant, providing technical expertise and managing large scale data analyses for litigation and regulatory matters.  I have worked on antitrust matters in a variety of industries including mobile wireless services and telecommunications, internet technologies, airlines, global financial services, healthcare, and semiconductors, among others.

## II.    Summary of Declaration

4.     Dr. Zona provided flawed computer backup materials necessitating additional work to reproduce the analyses related to DirecTV viewership data presented in his report.  The programs and datasets that Dr. Zona produced contained errors that Plaintiffs did not correct for weeks, even as their depositions were fast approaching.  Some of these errors include:

> a.  Dr. Zona's backup materials did not include crucial information about how they were structured including the design of the cloud environment;

1

      b. Dr. Zona's produced code contained errors that prevented successful execution and prevented my team from producing analyses from his report; and

      c. Plaintiffs did not produce intermediate outputs of their computer backup, making it impossible to verify any step of their computer backup process unless the entire computer backup was run without error.

5. Given the importance of these computer backup materials and the necessity to reproduce Dr. Zona's complex analysis in advance of any depositions, my team made every effort to reproduce the analyses in Dr. Zona's report. These efforts continued until October 6, 2022, when Plaintiffs finally acknowledged their produced backup contained clear errors and insufficient information to run the programs in the cloud environment.[1]

6. As further detailed below, given the complexity of the data and the significance of the errors, the expense for Compass Lexecon's efforts to attempt to replicate Dr. Zona's backup data in advance of his deposition, including cloud computing costs and data analysts' billable hours, can conservatively be estimated at $537,300.

7. Even after we received useable computer configuration information and had corrected all of the known errors in Dr. Zona's code on September 23, my team could not execute his computer backup to completion. Ultimately, we relied solely on the intermediate files that were

---

[1] See October 6, 2022 Letter from Ian Gore to Jeremy Barber, ("Plaintiffs' experts also undertook significant efforts—in the few days between finalizing Dr. Zona's (and Dr. Rascher's) report and the deadline to produce the backup materials—to prepare the data and code for production to the NFL. *Those preparations included consolidating pieces of code, identifying where file paths needed to be changed by the NFL's experts, and adding comments into the code to facilitate review by the NFL and its experts.* To date, the NFL has not denied these efforts were made, nor denied the necessity of undertaking them to comply with the expert discovery order. *Nevertheless, given the complexity and magnitude of the data and the code used to process that data, some errors were introduced to the code.* Notably, given the time necessary to run the code because of the amount of data involved, it was impossible to test and re-confirm it all in the short timeframe allotted by the expert discovery order—which was written well before the size of the data involved was known to either party—to produce Dr. Zona's backup materials." Emphasis added.).

2

produced by Plaintiffs on September 29, 2022[2] to reproduce the analyses from Dr. Zona's report, but we were never able to verify that Dr. Zona's computer programs generated those intermediate datasets–or any other significant output–from the original data produced by DirecTV.

### III.   Plaintiffs' Production of Data

8.   Plaintiffs produced Dr. Zona's original computer backup materials on approximately August 25, 2022. At this point in time, Dr. Zona's backup materials only included computer code that pointed to raw DirecTV data and the final output that appeared in his expert report. In order to verify that Dr. Zona's computer backup produced the analyses in his report, my team and I needed to run his computer code to see if assembled code produced the analyses in his report.

9.   Plaintiffs did not produce significant portions of Dr. Zona's intermediate data output until September 29, 2022.[3]

10.   It was not until October 6, 2022, that Plaintiffs' admitted that the computer code that Plaintiffs produced for Dr. Zona was not the same code that they used to perform the analyses in his expert report, and that the process by which they changed the computer code introduced errors to it.[4]  My team and I have never been able to fully recreate Dr. Zona's analyses by running all of his code, given these errors.

---

[2]   Email from Ian Gore to Jeremy Barber, September 29, 2022 5:37 PM.

[3]   Email from Ian Gore to Jeremy Barber, September 29, 2022 5:37 PM.

[4]   See October 6, 2022 Letter from Ian Gore to Jeremy Barber, ("Plaintiffs' experts also undertook significant efforts—in the few days between finalizing Dr. Zona's (and Dr. Rascher's) report and the deadline to produce the backup materials—to prepare the data and code for production to the NFL. *Those preparations included consolidating pieces of code, identifying where file paths needed to be changed by the NFL's experts, and adding comments into the code to facilitate review by the NFL and its experts*. To date, the NFL has not denied these efforts were made, nor denied the necessity of undertaking them to comply with the expert discovery order. *Nevertheless, given the complexity and magnitude of the data and the code used to process that data, some errors were introduced to the code*. Notably, given the time necessary to run the code

11. Dr. Israel's and Dr. Yurukoglu's expert reports were due on November 4, 2022, only 28 days after we received these intermediate files. Under the protective order and the schedule, we should have received the backup data 73 days in advance of these reports being due.

## IV. Plaintiffs Data Production Was Flawed, Forcing My Team to Expend Significant Immediate Efforts

12. Each of the failings of Plaintiffs in producing Dr. Zona's computer backup—the lack of sufficient information on their cloud computing configuration and the clear errors in their computer code—would prevent any user of that computer backup from reproducing the analyses in Dr. Zona's report.

### A. Plaintiffs produced incomplete computer backup materials

13. As part of their original computer code backup production, Plaintiffs produced limited information on the cloud configuration used by Dr. Zona.[5] The instructions they provided were insufficient to permit me and my team to successfully run their programs start to finish without errors.[6]

---

because of the amount of data involved, *it was impossible to test and re-confirm it all in the short timeframe allotted by the expert discovery order*—which was written well before the size of the data involved was known to either party—*to produce Dr. Zona's backup materials*. As you are aware from your own correspondence to Plaintiffs, some of the code takes days—if not weeks—to run. In any event, Plaintiffs made every attempt to confirm the code before it was produced on August 24, 2022 to the extent possible." Emphasis added.).

[5] See Dr. Zona computer backup materials, "Analyses\Data\Programs\1. Viewership processing\ 2. Key Process and ZIP File Creation in Azure.txt", ("1. Databricks environment running on Azure as backbone (may also run on AWS or Google). 2. Azure DataLake for storing raw data as a BLOB. 3. .IPYNB file (produced, along with duplicate text version for easy viewing of code syntax). 4. Create DataBricks cluster with minimum 1 Master node and 2 Worker nodes.").

[6] Email from Jeremy Barber to Ian Gore, September 14, 2022 2:49PM. In particular, they do not "provide any information regarding cluster settings, Spark environment settings, library versions, or required hardware information, which would be the minimum amount of information needed to run the code."

4

14. On September 23, 2022, about **one month after the deadline,** Plaintiffs finally produced documentation that was adequate to explain Dr. Zona's cloud computing configuration.[7] In particular, they provided their specific hardware configuration, along with details on their software libraries, and cluster and Spark environment settings. In contrast to the documentation that they originally provided in their backup, where the instructions simply stated: "Create DataBricks cluster with minimum 1 Master node and 2 Worker nodes", the new documentation included details such as the cluster "will need around 100 worked [sic] nodes" of the specific type "Standard_DS3_v2", and that a "Master node is needed with good memory", specifically the "Standard_E64d_v4" type. While technical sounding, these additional details are essential to me and my team.

### B. Plaintiffs' computer code is riddled with errors

15. The errors in Dr. Zona's computer code are numerous and technical. However, for completeness, I list them at the end of this declaration, in Section VII "Appendix: Errors in Dr. Zona's computer code".

16. Because of these errors, Dr. Zona's computer code did not run as it was intended to. The code broke and did not produce the analyses presented in Dr. Zona's report, nor did it create any of the key pieces of intermediate output that would have provided hints as to the details of his process.

17. Despite repeated inquiries from Defendants about errors in Dr. Zona's computer code, Plaintiffs did not acknowledge (until October 6, 2022[8]) that the code that they produced in their computer backup materials was not the code that they used to produce the analyses in Dr. Zona's expert report, and that the process used to create the code that was produced introduced errors into the code.

---

[7]    "2022-09-23 Databricks Setup Attachment.pdf".

[8]    See October 6, 2022 Letter from Ian Gore to Jeremy Barber.

V.     **My Team's Work in Advance of Dr. Zona's Deposition Was Necessary**

    A.     **The errors in Dr. Zona's computer backup materials would not have been discovered without our initial work**

18.     Evaluating an expert team's computer backup materials is a complex and time-consuming process, especially when the datasets used in the backup materials are very large, like they are in this case. Analyzing very large datasets usually requires a multi-step process, by which the data analyst processes the large, raw datasets to produce smaller, aggregated datasets that are easier to work with.

19.     My team and I started this process with Plaintiffs' backup materials immediately following our receipt of those materials on August 25, 2022. The initial steps of the process involve taking Dr. Zona's computer codes and editing them to make sure that they point to the right datasets in the correct network structure. Then, the data analyst commences running the codes in the specified order. See Figure 1, below, which shows a screen shot of the programs that Dr. Zona produced.

Figure 1:  Dr. Zona's Codes for Processing Viewership Data



20.     It was in the process of running these programs that my team and I discovered that the programs would not run as they were produced. In particular, the program "2a. Key Process and ZIP File Creation Script.ipynb", a program written in a language called Python, which is intended to be run in the Databricks cloud environment, was breaking and not producing the intended output.

21.     By September 7, 2022, we were unable to understand why the code was not working, and we asked Plaintiffs if they could produce some of the intermediate output datasets that this code produced, so that we could potentially understand better what was going wrong in the code.[9] We continued to ask questions of Plaintiffs until they sent us the intermediate datasets on September 29, 2022[10] and finally admitted that the code contained errors on October 6, 2022.[11]

### B.    The size and complexity of the data required my team to utilize cloud computing to analyze it

22.     Cloud computing for economic analyses in litigation is necessary when either the size of data or complexity of computing exceeds on-premises capabilities.  For the size of data produced by Plaintiffs, if a firm tried to build its own on-premises computer environment to perform the same tasks it could do with cloud computing, it could cost into the tens of millions of dollars and take multiple months or years to acquire, install, and configure.  Public clouds, in contrast, can easily store and serve a hundred terabyte dataset to multiple compute nodes in parallel. Then, each of the compute nodes, in parallel, can perform the simple filter on a subset of the dataset.

23.     Given the size of the DirecTV customer data in this case, cloud computing resources are necessary.  The full viewership data consisted of roughly 1.9 million files totaling 57 terabytes, and the viewership data limited to NFL games consisted of roughly 1.4 million files totaling 810 gigabytes.  The size of the DirecTV data, the count of files, and the nature of the analyses necessitates the use of cloud computing.

24.     Cloud computing resources are highly configurable, and the ability to design a cloud environment to exacting specifications is part of what the customer is paying for when they rent cloud computing resources.

25.     However, because individual cloud environments are configured to these exacting specifications, one individual cloud computing environment is often not compatible with

---

[9]     See Email from Jeremy Barber to Ian Gore, Wednesday, September 7, 2022 1:40PM.

[10]    Email from Ian Gore to Jeremy Barber, September 29, 2022 5:37 PM.

[11]    See October 6, 2022 Letter from Ian Gore to Jeremy Barber.

another. It is therefore crucial that a data analyst know the precise configuration of the cloud computing environment running their computing task, or they may not be able to complete their computing task.

26. Plaintiffs did not originally produce their cloud computing environment configuration to Defendants, and they repeatedly refused to produce that information when it was requested by Defendants.[12] Without the information on Dr. Zona's cloud computing configuration, it was impossible for me and my team of data analysts to appreciate why we were receiving the errors we experienced.

### C. Plaintiffs did not produce supplemental data until shortly before Dr. Zona's deposition

27. Analyzing very large datasets usually requires a multi-step process, by which the data analyst processes the large, raw datasets to produce smaller, aggregated datasets that are easier to work with. Dr. Zona's computer backup maps out such a strategy, but Plaintiffs only produced code that purported to work from the raw datasets, not any of the intermediate output that their code should have produced.[13] Had Plaintiffs produced the intermediate output from their computer code, it would have offered one way to partially verify the processes that their

---

[12] Email from Jeremy Barber to Ian Gore, September 14, 2022 2:49 PM (explaining that Plaintiffs did "not provide any information regarding cluster settings, Spark environment settings, library versions, or required hardware information, which would be the minimum amount of information needed to run the code."); Email from Jeremy Barber to Ian Gore, September 21, 2022 10:48 AM (asking Plaintiffs to provide the same configuration information Dr. Zona had failed to provide); Email from Jeremy Barber to Ian Gore, September 28, 2022 9:17 AM (outlining a " fundamental coding error that prevents us from reconstructing the work, calculations, and analyses upon which Dr. Zona relies for his opinions.").

[13] Email from Jeremy Barber to Ian Gore, September 7, 2022 1:40 PM, ("Please send us the products of Mr. Zona's data build, or everything that lands in his folder "Analyses\Data\Intermediate." The backup materials previously provided do not include these intermediate datasets."); Email from Ian Gore to Jeremy Barber, September 9, 2022 6:58 PM, ("The materials you requested are the output files from the programs that we already provided in Dr. Zona's backup materials. Dr. Zona did not maintain copies of those files as they are all reproducible by running the programs that we already provided to you. For Plaintiffs to provide them, Dr. Zona would have to re-run the programs, which the NFL's experts can just as easily do given what we've provided.).

computer code was intended to perform. However, they did not produce these intermediate output files until September 29, 2022, more than a month after they produced their computer backup materials.[14]

28. Taken together with the lack of cloud computing configuration, and the errors we now know were present in Dr. Zona's computer code,[15] Plaintiffs' failure to produce the intermediate outputs of their computer backup made it completely impossible to verify the process through which Dr. Zona created the analyses in his expert report. Only when Plaintiffs produced the intermediate outputs of their computer backup materials was my team and I able to even partially verify that Plaintiffs' computer backup produced the analyses in Dr. Zona's report.

29. My team and I were never able to make Dr. Zona's computer backup materials run from start to finish to reproduce the analyses in his expert report in the time allotted before Defendants' experts' reports were due. Plaintiffs admit that their computer backup can take weeks to run.[16] Ultimately, we relied only on the intermediate datasets that Plaintiffs produced on September 29, 2022[17] to partially run Dr. Zona's computer backup materials, but we were never able to verify that Dr. Zona's computer code generated their results from the data originally produced by DirecTV.

---

[14] Email from Ian Gore to Jeremy Barber, September 29, 2022 5:37 PM.

[15] See October 6, 2022 Letter from Ian Gore to Jeremy Barber, ("Plaintiffs' experts also undertook significant efforts—in the few days between finalizing Dr. Zona's (and Dr. Rascher's) report and the deadline to produce the backup materials—to prepare the data and code for production to the NFL. ***Those preparations included consolidating pieces of code, identifying where file paths needed to be changed by the NFL's experts, and adding comments into the code to facilitate review by the NFL and its experts***. To date, the NFL has not denied these efforts were made, nor denied the necessity of undertaking them to comply with the expert discovery order. ***Nevertheless, given the complexity and magnitude of the data and the code used to process that data, some errors were introduced to the code***." Emphasis added.).

[16] Letter from Ian Gore to Jeremy Barber, October 6, 2022, at 3–4 (acknowledging that Plaintiffs had not tested the code Dr. Zona used "to produce his backup materials" because "some of the code takes days—if not weeks—to run.").

[17] Email from Ian Gore to Jeremy Barber, September 29, 2022 5:37 PM.

## VI. The Cost of Compass Lexecon's Work Necessitated By Plaintiffs' Faulty Production

30.     Although we first received Dr. Zona's computer backup materials as early as August 25, 2022, it was not until August 29, 2022 that we began to encounter problems related to their errors. My team spent weeks attempting to recreate Dr. Zona's backup materials until we ultimately were forced to just rely on the intermediate datasets produced on September 29, 2022.[18]

31.     Therefore, I calculate the relevant costs attempting to fix Dr. Zona's faulty backup production, as those incurred for the period August 29, 2022 through September 29, 2022.

32.     Calculating the relevant costs starting on August 29, 2022, and ending on September 29, 2022, is conservative, as it excludes times after September 29, 2022 where my team and I were still engaged in trying to make Dr. Zona's errant backup materials work. However, some of the set-up work from August 25 to August 29 would have been performed even if Dr. Zona's computer backup materials had not been deficient. And, even though we continued trying to make Dr. Zona's computer backup materials work between September 29 and October 6, by September 29 we finally had the materials that we would ultimately rely on for Defendants' experts' reports.

33.     All calculations of expenses are limited to the work that was required by my team solely because of Plaintiffs' faulty production. Some of Dr. Zona's data backup was functional and I did not include that as part of the relevant costs here. The computer backup materials related to DirecTV transaction data (i.e., data related to monthly billings of DirecTV customers) was relatively functional and is excluded from my cost calculations. Only the costs related to the DirecTV viewership data, in both cloud computing costs and the billable hours of data analysts, is included in my cost calculations.

---

[18]     Email from Ian Gore to Jeremy Barber, September 29, 2022 5:37 PM.

34.     The cloud computing costs related to this work were significant. During the relevant period, Compass Lexecon incurred total Microsoft Azure costs of approximately $338,000.

35.     The vast majority of those costs were related to my team's attempts to fix Dr. Zona's irreparably broken computer backup, but some cloud computing costs would have been incurred under reasonable circumstances and some of the costs are related to work on functional parts of Dr. Zona's computer backup concerning DirecTV transactions data. In my calculations, I excluded costs that would have been incurred under reasonable circumstances had Dr. Zona's computer backup not been deficient, and I excluded all cloud computing costs for storage and networking during the relevant period in my calculations. In addition, I excluded all cloud computing costs unrelated to the DirecTV viewership data.

36.     At the beginning of the relevant period, cloud computing resources were shared between the two kinds of data (transactions and viewership), but as of September 8, 2022, I created a separate "Databricks cluster" to process only the DirecTV viewership data. Therefore, 100% of the cloud computing costs for the separate cloud computing cluster dedicated to viewership data reproduction efforts are included in my cost calculations for the relevant period. Prior to the point when I created this separate cluster, I include only 50% of those cloud computing costs in my calculations for the viewership portion of those costs.

37. Table 1, below, summarizes the relevant cloud computing costs that the NFL incurred during the relevant period, totaling approximately $298,700.

**Table 1: Itemized Cloud Computing Costs, August 29 – September 29, 2022**

| Consumed Service | Usage Description | Total Cost (USD) | Relevant Cost (USD) | First Billing Date Within Relevant Time Period |
|---|---|---|---|---|
| Microsoft.Compute | Cluster Dedicated to Databricks Processing of Viewership Data | $60,575.09 | $60,575.09 | 2022-09-08 |
| Microsoft.Compute | Cluster Shared for Databricks Processing of both Transactions and Viewership Data | $15,530.38 | $7,765.19 | 2022-08-29 |
| Microsoft.Compute | Cluster Dedicated to SAS Processing of Transactions Data | $2,397.61 | $0.00 | 2022-09-20 |
| Microsoft.Databricks | Cluster Dedicated to Databricks Processing of Viewership Data | $209,256.37 | $209,256.37 | 2022-09-08 |
| Microsoft.Databricks | Cluster Shared for Databricks Processing of both Transactions and Viewership Data | $42,279.26 | $21,139.63 | 2022-08-29 |
| Microsoft.Network | Networking Costs Not Specific to Databricks | $234.20 | $0.00 | 2022-08-29 |
| Microsoft.Network | Cluster Dedicated to Databricks Processing of Viewership Data | $48.39 | $0.00 | 2022-09-08 |
| Microsoft.Network | Cluster Shared for Databricks Processing of both Transactions and Viewership Data | $36.48 | $0.00 | 2022-08-29 |
| Microsoft.Storage | Storage Costs Specific to Databricks | $15.72 | $0.00 | 2022-08-29 |
| Microsoft.Storage | Storage Costs Not Specific to Databricks | $7,674.43 | $0.00 | 2022-08-29 |
| | Total | | $298,700.00 | |

38. In addition to the cloud computing costs, my team spent many hours trying to fix Dr. Zona's computer backup. The hours were spent identifying and discussing problems in Dr. Zona's computer code, as well as repeatedly running versions of Dr. Zona's computer code, trying to fix problems with it as the code broke without producing any output, and trying again.

39. Despite repeatedly reaching out to Plaintiffs to discuss the failings of their computer backup materials, Plaintiffs insisted that it was correct and complete. So, my team continued to

try to make it work, until Plaintiffs admitted that the computer backup materials contained errors on October 6, 2022.[19]

40. For work on this case, I assembled a team of data analysts that often work on cloud computing projects in my firm, including myself and my frequent collaborator Allan Zhang. Allan Zhang is a Vice President with Compass Lexecon, with a degree in Economics from the University of Chicago, and he has been with the firm since 2016. Allan and I assigned a sub-team of two data analysts, Grace (Jiaxuan) Nie and Zoya Azhar, to help him with work related to DirecTV's viewership data (a separate team was assigned to work with DirecTV's transactions data). Grace has a B.S in Statistics and Healthcare Management and Policy from the Wharton School, as well as a B.S in Nursing from the School of Nursing at the University of Pennsylvania, and Zoya has a B.A. in Quantitative Economics and English Language and Literature from Smith College. Grace and Zoya both started with Compass Lexecon in 2020, and both have worked on multiple consulting engagements with large datasets.

41. To be clear, Compass Lexecon billed the NFL additional hours related to the problem of Dr. Zona's deficient computer backup materials. We held meetings with the broader team and discussed strategies for fixing Dr. Zona's deficient computer backup materials and the best options that we had if we could not fix Dr. Zona's deficient computer backup materials. However, to be conservative, my calculations only include the relevant hours during the relevant period for the core team members focused on the viewership portion of Dr. Zona's computer backup materials.

42. My team spent over 440 hours dedicated solely to trying to fix Dr. Zona's broken computer backup during the relevant period, totaling at least $238,600 in billings to the NFL. All of my hours, and those of Grace and Zoya during the relevant period, that were billed to the NFL were dedicated to this problem of the broken computer backup related to the DirecTV viewership data. I only include 70% of the billable costs of Allan Zhang's time during the relevant period, because he was also involved in the DirecTV transactions data work.

---

[19] See October 6, 2022 Letter from Ian Gore to Jeremy Barber.

43. I conservatively calculate the total costs to the NFL of Compass Lexecon's efforts to fix and correct Dr. Zona's irreparable computer backup materials, including cloud computing costs and data analysts' billable hours, at approximately $537,300.[20]

**Table 2: Total Cost Related to Dr. Zona's Broken Computer Backup Materials**

| Cost | Amount |
| --- | --- |
| Microsoft Azure Costs | $298,700.00 |
| Billable Personnel | $238,600.00 |
| Total | $537,300.00 |

---

[20] As part of my declaration, I include an Excel spreadsheet with all of the work included in my calculations.

Executed under penalty of perjury this 26th day of December 2022, in Bethesda, MD.

_____

Michael Sabor

## VII. Appendix: Errors in Dr. Zona's computer code

44. In addition to the inadequate information on their cloud computing configuration, Dr. Zona's computer code included numerous errors that prevented the code from running and producing the analyses that appeared in his expert report. Below I list the errors that were identified in Dr. Zona's computer code:

- Described by Plaintiffs on August 30, 2022[21]:

    - Please note that in the course of preparing Dr. Zona's backup materials, there was a typo made. To correct this typo, please remove the "%" character at the start of line 1011 in the file titled "3. Viewership Analysis.sas."

- Described to Plaintiffs on September 14, 2022[22]:

    - The program "3. Transaction data processing\1. Service & Event Code lookups\U4.r", uses a programming language called R. In this program, the variable "intermediate_folder" is never defined, nor is it defined in any other of the R scripts in Dr. Zona's computer backup. However, Dr. Zona's programs attempt to read and write information from this undefined location, and when they do so the program breaks and stops working.

    - In both versions of the file "2a. Key Process and ZIP File Creation Script" that were provided, there is an extra period at the end of line 197: "dframe = dframe.where(dframe.Source_System == 'XYZ') .". This prevents the code from working as intended.

    - When loading the file "st_processing.do" into the Stata text editor, the first line of the script returns an error as the word "clear" is saved in a different encoding and so the entire script will not run.

---

[21] See Email from Ian Gore to Ludwin Derek, Jeremy Barber, Max Warren, Blake Neal, Caroline Li, Brian Stekloff, Beth Wilkinson, and Gregg Levy, August 30, 2022, 12:47 PM.

[22] See Email from Jeremy Barber to Ian Gore and Max Warren, September 14, 2022, 2:49 PM.

- Described to plaintiffs on September 28, 2022[23]:

    o Related to the program "2a. Key Process and ZIP File Creation Script.ipynb", the following errors occur:

    - At lines 175-176 of Command 4, the following lines of code prohibit successful completion of processing, because the "logs" referenced are not defined in the program.
    1. Command 4, Line 175: log.flush()
    2. Command 4, Line 176: log2.flush()

    o At line 192 of Command 4, the following line includes a period at the end, which breaks execution.
    1. Command 4, Line 192: dframe = dframe.where(dframe.Source_System == 'XYZ') .

    o The following specific error message is produced by line 192: "Union can only be performed on tables with the same number of columns, but the first table has 83 columns and the second table has 78 columns." This error results from your iterative loop construction. Specifically:

    - Dr. Zona created an empty placeholder dataset with 78 columns. This is used as the framework to union data within a loop iteration.

    - In each iteration of the loop, hundreds of individual data files (each containing the same 78 columns) corresponding to a single week of viewership data are read in, stacked with the placeholder dataset through a union command, further processed to yield an additional five columns, and then exported.

---

[23] See Email from Jeremy Barber to Ian Gore and Max Warren, September 28, 2022, 9:17 AM.

17

- In the last step prior to the next iteration of the loop, Dr. Zona clears the dataset of all rows but does not remove the five columns created during the current iteration.
- This leads to an issue on the second iteration of the loop, when the hundreds of data files for the week are stacked with the purged dataset from the first iteration, because the dataset from the current iteration has 78 columns whereas the purged dataset has 83 columns. Databricks explicitly requires the same count of columns present in both datasets being stacked.

- Identified by plaintiffs on September 29, 2022[24]:
    - In reviewing all of this, an issue was identified regarding the production of the code that processes the viewership data into a useful extraction for analysis. This file is named "3. Viewership Analysis_V2.sas". First, two versions of that code exist—one to extract 2018 data for Dr. Zona's analysis and a similar one to extract 2019 data for Dr. Rascher's different analysis. The backup we produced for Dr. Zona, however, was compiled from the code used to extract 2019 data for Dr. Rascher's analysis. As such, the code to extract 2018 data for Dr. Zona's analysis was not produced.

---

[24] See Email from Ian Gore to Jeremy Barber and Max Warren, September 29, 2022, 4:10 PM.