Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | Case No.: 2:15-ml-02668−PSG (JEMx)<br><br>**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY NFL EXPERT DR. ALI YURUKOGLU**<br><br>JUDGE: Hon. Philip S. Gutierrez<br><br>DATE: January 27, 2023<br>TIME: 1:30 p.m.<br>COURTROOM: First Street Courthouse<br>  350 West 1st Street<br>  Courtroom 6A<br>  Los Angeles, CA 90012 |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

    I.    Dr. Yurukoglu Must Be Disqualified. ..................................................... 3

        A.    The NFL's Test for Disqualification Ignores the Governing Law. ................................................................................. 3

        B.    The NFL Ignores the Substantial Conflict of Interest Created By Its Retention of Dr. Yurukoglu ................................. 5

        C.    The Balance of Prejudice Favors Disqualification. .................... 7

    II.    Dr. Zona's Models Have Been Reliable From the Start. ....................... 9

CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

**CASES**

*Bell N. Research, LLC v. ZTE Corp.*,
  2019 WL 1590472 (S.D. Cal. Apr. 12, 2019) ........................................................ 9

*Broadcom Corp. v. Emulex Corp.*,
  2010 WL 11465478 (C.D. Cal. Apr. 5, 2010) ....................................................... 6

*Hewlett-Packard Co. v. EMC Corp.*,
  330 F. Supp. 2d 1087 (N.D. Cal. 2004) ..................................................... 3, 5, 6, 15

*In re Packaged Seafood Prod. Antitrust Litig.*,
  332 F.R.D. 308, 325 (S.D. Cal. 2019), *aff'd sub nom. Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc) ................................................................. 12, 13

*Koch Refining Co. v. Boudreau M/V*,
  85 F.3d 1178 (5th Cir. 1996) ........................................................................ 4, 5, 6

*Koch Refining v. Boudreau M/V*,
  1993 WL 408348 (E.D. La. Oct. 6, 1993). ............................................................ 5

*Laumann v. Nat'l Hockey League*,
  117 F. Supp. 3d 299 (S.D.N.Y. 2015) ........................................................ *passim*

*Oracle Corp. v. DrugLogic, Inc.*,
  2012 WL 2244305 (N.D. Cal. June 15, 2012) ............................................... 2, 3, 4

*Owino v. CoreCivic, Inc.*,
  No. 21-55221 (9th Cir. Dec. 21, 2022) ............................................................... 12

*Pellerin v. Honeywell Int'l, Inc.*,
  2012 WL 112539 (S.D. Cal., Jan. 12, 2012) ........................................................ 4

*Space Systems/Loral v. Martin Marietta Corp.*,
  1995 WL 686369 (N.D. Cal. Nov. 15, 1995) ................................................. 2, 4, 6

**OTHER AUTHORITIES**

ABA's Proving Antitrust Damages Book 219 (3d ed. 2019) ................................. 12

Gregory S. Crawford & Ali Yurukoglu, *The Welfare Effects of Bundling in Multichannel Television Markets*, 102 Am. Econ. Rev. 643 (2012) .............. 12, 13

Model Rules of Professional Conduct 1.9 ............................................................. 9

## INTRODUCTION

The NFL's opposition to Plaintiffs' motion to disqualify Dr. Yurukoglu is a study in misdirection and contradiction. In truth, the matter is straightforward: Throughout the multiyear *Laumann* litigation, Dr. Yurukoglu had a confidential consulting relationship with Plaintiffs' counsel. As a result of that relationship, Dr. Yurukoglu was exposed to significant attorney work-product protected materials regarding litigation strategy, case theories, and the design of econometric models that measure the price effects of output restrictions on major American sports telecasts.

At the start of this litigation, the NFL, led by the same lawyer who represented the lead defendant in *Laumann*, hired Dr. Yurukoglu—even though he had *never* testified in *any* litigation. When asked at his deposition what confidential information from *Laumann* he shared with NFL's counsel, NFL's counsel objected, claiming that those "communications with counsel . . . are shielded by the protective order." Diver Decl. Ex. 2, at 23:11–19. The NFL therefore is using the attorney work-product protections afforded to counsel in this case to prevent Plaintiffs' counsel from discovering the attorney work-product breaches from the last case.

Unable to answer Plaintiffs' serious conflict-of-interest and prejudice arguments on their own terms, the NFL attacks a strawman, insisting that an expert may only be disqualified if (1) "the expert [] had a confidential relationship with a *party* to a litigation," and (2) "the party [] provided the expert with confidential information relevant to the current case." *See* Memorandum in Opposition to Plaintiffs' Motion to Disqualify NFL Expert Ali Yurukoglu, Dkt. No. 807 ("NFL Opp."), at 1 (NFL's emphasis). This standard ignores the governing law and the principles animating expert disqualification. In the class context, the vital information is the work product of counsel, not the particulars of any class plaintiff. Under the NFL's test, class counsel would *never* have independent standing to protect their confidential work product—even if the opposing party hires an expert expressly to gain access to counsel's litigation strategies or relevant confidential materials.

That cannot be the law. The district court has "the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system." *Oracle Corp. v. DrugLogic, Inc.*, 2012 WL 2244305, at *5 (N.D. Cal. June 15, 2012) (quotations and citations omitted). Contrary to the NFL's claims otherwise, an expert's alleged misuse of opposing counsel's work product presents a stronger case for disqualification, not a weaker one. "The concerns raised by the disclosure of litigation-related, privileged information are naturally great, since the integrity of the adversary system could easily be undermined." *Space Systems/Loral v. Martin Marietta Corp.*, 1995 WL 686369, at *5 (N.D. Cal. Nov. 15, 1995). The NFL's opposition systematically fails to grapple with the governing law and the damage it has done to the perception of Dr. Yurukoglu's impartiality.

The NFL's opposition also fails to accept that this is a problem of its own making. It was the NFL—not Plaintiffs—that put Dr. Yurukoglu's previous confidential relationship with Plaintiffs' counsel center stage. *See, e.g.*, Dkt. No. 678-1, at 9 (motion to exclude Dr. Zona) ("The opinion in *Laumann* is directly on point."). Now, to spare Dr. Yurukoglu from disqualification, the NFL disclaims reliance on *Laumann*, admitting that "[Dr. Zona's] model here is fundamentally different from the one in *Laumann*," and that there are only "vague similarities between *Laumann* and the case before this Court." NFL Opp. at 6, 12. But on *the same day* the NFL abandoned *Laumann*, it claimed again in a separate filing that "*Laumann* is directly on point." Dkt. No. 829, at 3.[1] The NFL never reconciles these dizzying shifts. Nor does it explain whether its admission that there are only "vague similarities" between this case and *Laumann* and that the model here is "fundamentally different" from the model in *Laumann* means that it has conceded a central argument in its opposition to Plaintiffs' motion for class certification.

---

[1] The NFL likely did not know when it hired Dr. Yurukoglu that Plaintiffs' counsel would take a different approach to modeling. The NFL likely assumed counsel would build the same type of econometric model as Dr. Yurukoglu tried to do in *Laumann*.

2

The NFL did not need to hire Dr. Yurukoglu. In *Laumann*, Major League Baseball, represented by NFL's counsel here, hired three distinguished economists (including a Nobel Prize winner and Dr. Yurukoglu's thesis advisor) who succeeded in excluding the model Dr. Yurukoglu helped design. After discrediting Dr. Yurukoglu there, the NFL hired Dr. Yurukoglu here. The reason it did so is self-evident: the NFL hired him because of his previous confidential relationship with and access to relevant confidential attorney work-product of Plaintiffs' counsel. To preserve the integrity of this litigation, Dr. Yurukoglu must be disqualified.

## ARGUMENT

### I. Dr. Yurukoglu Must Be Disqualified.

#### A. The NFL's Test for Disqualification Ignores the Governing Law.

The NFL's argument for avoiding the disqualification of Dr. Yurukoglu rests on a single, flawed premise: that the expert-disqualification doctrine protects only the confidential materials of a "party." The root of the NFL's elementary mistake is easy to spot. The NFL is right that district courts routinely disqualify experts "where (i) the party claiming a conflict reasonably could conclude it had a confidential relationship with the expert and (ii) that party disclosed any [relevant] confidential or privileged information to the expert." NFL Opp. at 4 (cleaned up). The NFL is wrong, however, to suppose that because a district court *may* disqualify an expert in that circumstance, a district court may disqualify an expert *only* in that circumstance. The NFL mistakes sufficiency for necessity.

Decades of expert-disqualification precedent refute the NFL's made-up, self-serving standard. Under the expert-disqualification doctrine, the district courts have "the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system." *Oracle*, 2012 WL 2244305, at *5 (quoting *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004); and citing *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980)).

3

|   |   |
|---|---|
| 1 | Contrary to the NFL's insistence, courts have rejected bright-line rules for expert disqualification. *Oracle*, 2012 WL 2244305, at *5 ("There is no bright-line rule for expert disqualification."); *see also Koch Refining Co. v. Boudreau M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996) ("In disqualification cases other than those in which the expert clearly switched sides, lower courts have rejected a 'bright-line' rule[.]"). Instead, "courts balance the policy objectives that favor disqualification—ensuring fairness and preventing conflicts of interest—against policies militating against disqualification, including guaranteeing that parties have access to witnesses who possess specialized knowledge and allowing witnesses to pursue their professional callings." *Oracle*, 2012 WL 2244305, at *5. |

Pursuant to these standards, courts have disqualified experts in a variety of circumstances. To be sure, when an expert initially is retained by one party and then switches sides during the litigation, the conflict of interest is obvious, and disqualification is required. *Space Systems*, 1995 WL 686369, at *4; *see also Koch Refining*, 85 F.3d at 1181. The NFL likewise concedes that a court should disqualify an expert where that expert was previously employed by an adverse party and received confidential information from that party relevant to the present litigation. *See, e.g.*, NFL Opp. at 4–8.

But experts have been disqualified in myriad other circumstances driven by the facts of a particular case. *See, e.g.*, *Pellerin v. Honeywell Int'l, Inc.*, 2012 WL 112539, at *2 (S.D. Cal., Jan. 12, 2012) (detailing the "situations" where "disqualification may be appropriate"); *Space Systems*, 1995 WL 686369, at *2 (detailing "[o]ne situation where disqualification may be appropriate" under the principles of the expert-disqualification doctrine). No case cited by the NFL (or found by Plaintiffs) suggests, let alone holds, that an expert's disqualification turns on the technical status of the moving party. Instead, "disqualification of an expert is warranted based on a prior relationship with an *adversary* if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential

information to the expert that is relevant to the current litigation." *Hewlett-Packard*, 330 F. Supp. 2d at 1092–93 (emphasis added). In the context of class litigation, the "confidential information" of "the adversary" that the expert-disqualification protects is not just the information of an adverse *party*, but also the work product and litigation strategies created by opposing counsel. *See Space Systems*, 1995 WL 686369, at *5.

The NFL's reverse-engineered test ignores the principles animating the expert-disqualification doctrine, importing a hyper-technical "threshold bar" that turns not on the threat to the integrity of the litigation but on the status of the entity claiming the breach. *See* NFL Opp. at 7. The NFL pushes this formalistic approach because it enables them to ignore the consequences of its retention of Dr. Yurukoglu.

### B. The NFL Ignores the Substantial Conflict of Interest Created By Its Retention of Dr. Yurukoglu.

The NFL's arguments to avoid disqualification do not withstand scrutiny. *First*, the NFL misunderstands the importance of *Koch Refining*. There, the insurer of a sunk barge retained an expert in its insurance dispute with the barge owners. 1993 WL 408348, at *1 (E.D. La. Oct. 6, 1993). Later, the operators of the tugboat that had been towing the barge when it sank retained *the same expert* in their separate dispute with *the insurer* that had previously employed *that expert*. *Id.* The district court found the insurer had provided the expert with confidential information in the previous dispute and therefore excluded the expert, preventing him from testifying against his former client (the insurer). *See id.* at *2–3. The Fifth Circuit affirmed.

The NFL's suggestion that "the unusual feature of *Koch Refining* was that the *party* that had initially retained the expert had switched sides" misses the point. *See* NFL Opp. at 8 (NFL's emphasis). The Fifth Circuit's analysis (like the district court's) did not turn on the formal status of the entity seeking disqualification, or which entity switched sides. The Fifth Circuit affirmed disqualification because the insurer's "*counsel* spent considerable time with [the expert] explaining his entire theory of the case as well as trial tactics," and the insurer's "*counsel* furnished [the

expert] with documents that had been generated in preparation for the trial[.]" *Koch Refining*, 85 F.3d at 1182 (emphases added). As the NFL admits in its opposition, disqualification was warranted because "the insurer had a reasonable expectation of confidentiality with the expert." NFL Opp. at 8. Disqualification of Dr. Yurukoglu is warranted for the same reason here.

*Second*, the NFL is wrong that protecting an attorneys' confidential work product requires "expansion of the expert exclusion doctrine." NFL Opp. at 9. The expert-disqualification doctrine has from the beginning "protect[ed] the integrity of the adversary process" and "protect[ed] privileges that otherwise may be breached." *See, e.g.*, *Hewlett-Packard*, 330 F. Supp. 2d at 1092. In fact, that Plaintiffs seek to disqualify Dr. Yurukoglu because he received and may now be using Plaintiffs' *counsel's* confidential work product makes the case for disqualification stronger, not weaker. *See Space Systems*, 1995 WL 686369, at *5 (holding disqualification more necessary in cases that "involve experts who were privy to an adversary's work product or attorney-client privileged information"). The adversary system depends on counsel's ability to create and share work product with experts without fear that such disclosure will be used against counsel or counsel's client in the future.

The NFL's claimed concern that "an attorney could argue that her work product includes strategy considerations relevant to a large number of only vaguely similar cases" is misplaced. *See* NFL Opp. at 9. Certainly, the integrity of the legal process cautions against "unscrupulous attorneys [that] may attempt to create relationships with numerous potential experts at a nominal fee hoping to preempt the ability of their adversaries to obtain expert assistance." *Broadcom Corp. v. Emulex Corp.*, 2010 WL 11465478, at *1 (C.D. Cal. Apr. 5, 2010). This is not that case. It was the NFL—not Plaintiffs—that hired Dr. Yurukoglu and put at issue his previous confidential relationship with Plaintiffs' counsel and the relevance of *Laumann*.

*Third*, the NFL's self-serving formulation of the expert-disqualification doctrine would eliminate protections for class plaintiffs. The NFL observes that

6

"experts do not typically have any contact with, or share any particularized confidential information with, absent class members." *See* NFL Opp. at 9. The NFL's observation is correct, just not in the way it thinks. In an antitrust class action like this one, Plaintiffs' *counsel* have worked with economic experts (Drs. Rascher and Zona) to demonstrate that all class plaintiffs (both named and absent) were injured by the NFL's anticompetitive conduct. Under the NFL's expert-disqualification test, however, which "requires at a minimum . . . *the party* [to] have provided the expert with confidential information relevant to the current case," Drs. Rascher and Zona could begin working for the NFL tomorrow and Plaintiffs would have no means to stop them. *See* NFL Opp. at 1 (emphasis added).

### C. The Balance of Prejudice Favors Disqualification.

The NFL also never grapples with the substantial policy interests favoring Dr. Yurukoglu's disqualification.

*First*, that the NFL may need to find another expert is a problem of its own making. The lead lawyer for the NFL in this case was a lead defense counsel for the MLB in *Laumann*, in which the MLB retained an array of economists (including Dr. Yurukoglu's thesis advisor) to oppose the model Dr. Yurukoglu helped create. The NFL therefore was fully aware of Dr. Yurukoglu's role in *Laumann* when it hired him and the conflict that role created. The NFL also knew that the schedule in this case meant that there were only two months between the NFL's disclosure of Dr. Yurukoglu and the class certification hearing. The NFL cannot now point to the short time between its disclosure of Dr. Yurukoglu (and thus the date on which Plaintiffs became aware of the conflict) and the class certification hearing. The NFL knew there would be a tight timeframe when it hired Dr. Yurukoglu in 2020. In any case, there is more than enough time for the NFL to retain a new expert. Expert discovery does not close until June 2023; dispositive motions are not due until July 2023; and the trial will not begin until February 2024. "[T]he retention of another expert is unlikely to disrupt the case schedule." *See Broadcom*, 2010 WL 11465478, at *4.

*Second*, the NFL is correct that "[c]ourts have an interest in ensuring that parties can present the testimony of experts with [] appropriate expertise." NFL Opp. at 14. But that favors disqualifying Dr. Yurukoglu, as it will not allow his potentially tainted opinions to stand. The NFL (via Dr. Yurukoglu) opposes Plaintiffs' motion for class certification on the ground that Dr. Zona's models produce "nonsensical results." *See, e.g.*, Dkt. No. 686 at 13 (claiming "Dr. Zona's model generates nonsensical results"). The NFL then repeatedly points to *Laumann*'s discussion that "nonsensical" results may doom an econometric model.[2] *Id.*; *see also Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 318 (S.D.N.Y. 2015).

The NFL and Dr. Yurukoglu's criticisms are unfounded—most are wrong, others are irrelevant. *See* Diver Decl. Ex. 3, at 2–3. But that is not the central problem. Dr. Yurukoglu was one of the architects of the *Laumann* model. By citing *Laumann* and arguing that Dr. Zona's models produce "nonsensical results," the NFL and Dr. Yurukoglu have made Dr. Yurukoglu's opinions about the *Laumann* model and the *Laumann* Court's view of it directly relevant to *his* opinions *here*.

The NFL's observation that "[t]he parties in this case are not litigating the merits (or the admissibility) of the model submitted in *Laumann*" is inapposite. *See* NFL Opp. at 14. The NFL and Dr. Yurukoglu have argued that *Laumann* dictates a certain result here. If Dr. Yurukoglu were to remain in the litigation, Plaintiffs' counsel would be placed in the untenable position of asking Dr. Yurukoglu about *their* work product, which would violate *their* duties from *Laumann*. Plaintiffs' counsel therefore are unable to zealously advocate for their clients in *this case*, the exact result the NFL was after.

---

[2] Among its other mistakes, the NFL misreads *Laumann*. There, the court concluded that nonsensical results alone "is irrelevant—what matters is that [the expert's] failure to obtain information about consumer tastes and preferences and failure to study baseball and hockey viewing patterns more thoroughly create too great an analytical gap between the data and the opinion proffered." *Laumann*, 117 F. Supp. 3d at 319 (quotation omitted). The NFL makes no similar argument here.

8

*Third*, adopting the NFL's position would permit Dr. Yurukoglu to harm a class member with whom he had a previous confidential relationship. Vincent Birbiglia was a named plaintiff in *Laumann* and, because he was a Sunday Ticket subscriber at the relevant time, would be a member of the proposed class in this case. *See* Diver Decl. ¶ 2. Allowing Dr. Yurukoglu to remain in this case will force Dr. Yurukoglu to advance opinions that would deny relief to a previous client. While expert economists may not be bound by any set of rules of professional conduct, "[t]he Court cannot allow an expert to attempt to divide his loyalties in this way" and should disqualify Dr. Yurukoglu as a result. *See Bell N. Research, LLC v. ZTE Corp.*, 2019 WL 1590472, at *7 (S.D. Cal. Apr. 12, 2019) (citation omitted); *cf.* Model Rules of Prof'l Conduct 1.9 (prohibiting a lawyer from "represent[ing] another person in . . . a substantially related matter in which that person's interests are materially adverse to the interests of the former client").[3]

Each of the NFL's prejudice arguments were perfectly foreseeable to the NFL when it hired Dr. Yurukoglu two years ago. Since Plaintiffs were made aware of the conflict, Plaintiffs have worked expeditiously to assess and address the prejudice they face. But Plaintiffs have been rebuffed by the NFL and its counsel at each turn. The only way to protect the integrity of this litigation is to disqualify Dr. Yurukoglu.[4]

**II.     Dr. Zona's Models Have Been Reliable From the Start.**

The NFL's shifting discussion of *Laumann* is relevant for another reason: it exposes fresh economic mistakes made by Dr. Yurukoglu.[5]

---

[3] Even if the expert-disqualification doctrine demanded overlap between parties, the NFL ignores the substantial overlap of class members here. The class in *Laumann* and the proposed class here both consist of DirecTV subscribers who were harmed by the MLB's or NFL's output restrictions on major American sport broadcasts.

[4] Plaintiffs also have requested the Court compel the production of communications between Dr. Yurukoglu and the NFL. *See* Dkt. No. 765-1, at 15–16.

[5] The NFL, in submitting its Reply in support of its motion to exclude Dr. Zona's opinions, appended a supplemental declaration by Dr. Yurukoglu. In that Reply, the

9

To begin, Dr. Yurukoglu's complaints about Dr. Zona's model *still* do not question the central opinion offered by Dr. Zona at this stage of the case—that the economic tools and models he has developed can determine damages on a classwide basis. Even if Dr. Yurukoglu's criticisms were appropriate at this stage of the case (they are not), each is incorrect. For example, Dr. Yurukoglu contends that Dr. Zona's ▇▇▇▇. *See* Dkt. No. 829-2 ¶ 15 ("Yurukoglu Suppl. Decl."). Dr. Yurukoglu believes this indicates "▇▇▇▇." *Id.* at 3. Not so. As Dr. Zona explained in his reply report, his model ▇▇▇▇. Dkt. No. 779-2 ¶¶ 21–26 ("Zona Reply Decl."). Thus, a fan's ▇▇▇▇. *Id.*[6]

▇▇▇▇

---

NFL continues to cite *Laumann* along with Dr. Yurukoglu's new opinions. Plaintiffs address the NFL's inconsistent use of *Laumann* here, and Dr. Zona has submitted a short declaration in response. *See* Diver Decl. Ex. 1.

[6] ▇▇▇▇



1
2
3
4
5   Dr. Yurukoglu already has acknowledged that
6   . *See, e.g.*, Dkt. No. 779-2 ¶¶ 22 & nn. 18–19 (collecting
7   citations). Dr. Yurukoglu ignores this feature when he purports to
8
9
10
11
12
13
14
15
16
17
18
19
20   .
21   Dr. Yurukoglu compounds his misunderstanding when he
22
23
24
25
26
27
28

11

1 ███████████████████████████████████████
2 ███████████████████████████████████████
3 ███████████████████████████████████████
4 ███████████████████████████████████████
5 ███████████████████████████████████████
6 ██.

In any event, Dr. Yurukoglu's various misunderstandings of Dr. Zona's model—or his attempt to show anomalous results—in no way undermines the reliability of it. The Ninth Circuit last week reiterated that to obtain class certification plaintiffs "did not need to present a fully formed damages model when 'discovery was not yet complete and pertinent records may have still been within Defendant's control.'" *Owino v. CoreCivic, Inc.*, No. 21-55221, slip op. at 19 (9th Cir. Dec. 21, 2022). Here, expert discovery does not close for six months, and Plaintiffs have yet to take discovery of the new Sunday Ticket deal between the NFL and Google.

Moreover, though Dr. Zona's model is sound, "virtually any regression model eventually will fail one or more tests if enough tests and specifications are run, even if nothing is wrong with the model." *In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 325 (S.D. Cal. 2019), *aff'd sub nom. Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc). In fact, a book chapter coauthored by the NFL's other economic expert, Dr. Israel, makes the exact same point. *See* ABA's Proving Antitrust Damages Book 219 (3d ed. 2019) (quoting same); *see also id.* (emphasizing need to focus only on failures of "*critical* assumption[s]") (emphasis in original). The NFL's obsession with *Laumann* has led Dr. Yurukoglu on a hunt for nonsensical results. His supposed findings are wrong, and in no way undermine Dr. Zona's ability to demonstrate impact classwide.[7]

---

[7] Even had Dr. Zona's model ████████████████████████████████████████, that still would not be fatal. *See Olean*, 31 F.4th at 661, 679. A model's estimation process assumes imprecise estimates. A modeler's goal is to minimize the overall extent of imprecision across multiple parameters while avoiding biasing the ultimate results.

12

Dr. Yurukoglu also questions results that show ███████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. Each application of Dr. Zona's model confirms that whatever the results of the model, the effects will be determined on a classwide basis.

Dr. Yurukoglu's remaining complaints are baseless. ██████ ███████████████████████████████████████████████████████████████ ████████████████████████. *See* Yurukoglu Suppl. Decl. ¶¶ 7–10. Dr. Yurukoglu's complaint is a prototypical "genuine conflict between the experts," which does not undermine the reliability of Dr. Zona's methodology. *See In re Packaged Seafood*, 332 F.R.D. at 325. ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████. At bottom, Dr. Zona's

---

Indeed, Dr. Yurukoglu, in his academic work, has artificially constrained his models so that no consumer had a negative willingness to pay for a channel. *See, e.g.*, Gregory S. Crawford & Ali Yurukoglu, *The Welfare Effects of Bundling in Multichannel Television Markets*, 102 Am. Econ. Rev. 643, 656 (2012). His model would otherwise have produced the kind of "irrational conclusions" he claims render a model "fundamentally unreliable." Yurukoglu Suppl. Decl. ¶ 17. Yet the NFL claims that Dr. Yurukoglu's work is "path-breaking" and "a leading contribution in the field." NFL Opp. at 2.

assumption means ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which is logical and certainly not a basis for claiming his methods are unreliable.

Dr. Yurukoglu also complains that Dr. Zona's use of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Dr. Zona's approach is anything but arbitrary. It is supported by ample evidence and testimony from the NFL's own witnesses.[8]

Moreover, Dr. Zona's understanding of the ▮▮▮▮ has been corroborated by the public reporting concerning the new deal for Sunday Ticket. It was widely reported that Apple abandoned its attempt to obtain the rights to Sunday Ticket in part because of the NFL's premium-pricing requirement. Apple wanted to offer the Sunday Ticket broadcasts on its streaming service (Apple TV+) at no additional charge. According to the reporting, Apple's desire for broad access to out-of-market NFL games proved a "far too magnanimous gesture for the NFL; it needs to protect the interests of its Sunday afternoon broadcast partners at CBS and Fox." Diver Decl. ¶ 8, Ex. 5. That reporting, if true, directly confirms Dr. Zona's understanding of the

---

[8] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

1  ███████████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████████

3  ██████████████████.

At this stage of the case, what Dr. Zona has set out to do, he has done—he has reliably shown that damages can be measured on a classwide basis.

## CONCLUSION

Disqualifying Dr. Yurukoglu will aid the Court's and jury's even-handed consideration of the legal and factual issues presented by this case. If Dr. Yurukoglu remains in the case, however, he will be operating continuously under the cloud of a conflict of interest that will be detrimental to the integrity of the legal process. *Hewlett-Packard*, 330 F. Supp. 2d at 1095 ("It is important . . . to achieve the goal of protecting the integrity of the adversary process and of promoting public confidence in the legal system."). The Court should grant Plaintiffs' motion to disqualify Dr. Yurukoglu.

Dated: December 30, 2022

Respectfully submitted,

By: */s/ Marc M. Seltzer*
    Marc M. Seltzer

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Arun Subramanian (*Pro Hac Vice*)
asubramanian@susmangodfrey.com
William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330

15

|   |   |
|---|---|
| 1 | Fax: (212) 336-8340 |
| 2 | Ian M. Gore (*Pro Hac Vice*)<br>igore@susmangodfrey.com |
| 3 | SUSMAN GODFREY L.L.P.<br>1201 Third Avenue, Suite 3800 |
| 4 | Seattle, WA 98101<br>Tel: (206) 505-3841 |
| 5 | Fax: (206) 516-3883 |
| 6 | Armstead Lewis (*Pro Hac Vice*)<br>alewis@susmangodfrey.com |
| 7 | SUSMAN GODFREY L.L.P.<br>1000 Louisiana, Suite 5100 |
| 8 | Houston, TX 77002<br>Tel: (713) 651-9366 |
| 9 | Fax: (713) 654-6666 |
| 10 | Scott Martin (*Pro Hac Vice*)<br>smartin@hausfeld.com |
| 11 | HAUSFELD LLP<br>33 Whitehall Street, 14th Floor |
| 12 | New York, NY 10004<br>Tel: (646) 357-1100 |
| 13 | Fax: (212) 202-4322 |
| 14 | Christopher L. Lebsock (184546)<br>clebsock@hausfled.com |
| 15 | HAUSFELD LLP<br>600 Montgomery St., Suite 3200 |
| 16 | San Francisco, CA 94111<br>Tel: (415) 633-1908 |
| 17 | Fax: (415) 633-4980 |
| 18 | Sathya S. Gosselin (269171)<br>sgosselin@hausfeld.com |
| 19 | Farhad Mirzadeh (*Pro Hac Vice*)<br>fmirzadeh@hausfeld.com |
| 20 | HAUSFELD LLP<br>888 16th Street, N.W., Suite 300 |
| 21 | Washington, DC 20006<br>Tel: (202) 540-7200 |
| 22 | Fax: (202) 540-7201 |
| 23 | Howard Langer (*Pro Hac Vice*)<br>hlanger@langergrogan.com |
| 24 | Edward Diver (*Pro Hac Vice*)<br>ndiver@langergrogan.com |
| 25 | Peter Leckman (235721)<br>pleckman@langergrogan.com |
| 26 | Kevin Trainer (*Pro Hac Vice*)<br>ktrainer@langergrogan.com |
| 27 | LANGER GROGAN AND DIVER PC<br>1717 Arch Street, Suite 4020 |
| 28 | Philadelphia, PA 19103<br>Tel: (215) 320-5660<br>Fax: (215) 320-5703 |

*Plaintiffs' Co-Lead Counsel*

17