Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668−PSG (JEMx) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE NFL DEFENDANTS' MOTION FOR SANCTIONS** |
| | JUDGE: Hon. Philip S. Gutierrez<br>DATE: January 27, 2023<br>TIME: 1:30 p.m.<br>COURTROOM: First Street Courthouse<br>350 West 1st Street<br>Courtroom 6A<br>Los Angeles, CA 90012 |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

LEGAL STANDARD ................................................................................................. 9

ARGUMENT ............................................................................................................ 10

    I.      Plaintiffs Obeyed the Expert Protocol. ............................................... 10

             A.     Plaintiffs Submitted Backup Materials That Were Designed for the NFL to Reconstruct Dr. Zona's Analysis. ................................................................................. 11

             B.     Plaintiffs Produced All Data Required by the Expert Protocol. ...................................................................... 14

    II.     Plaintiffs' Good Faith Conduct Does Not Warrant Sanctions. ............ 14

    III.   The Expenses Claimed by the NFL Are Unreasonable and Not Attributable to Any Non-Compliance With the Expert Protocol. ....................................................................................... 18

CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Archie v. Pop Warner Little Scholars, Inc.*,
    2019 WL 13020480 (C.D. Cal. Oct. 10, 2019) ................................................. 10

*Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*,
    2021 WL 1324435 (C.D. Cal. Mar. 12, 2021) ............................................. 9, 15

*Hyde & Drath v. Baker*,
    24 F.3d 1162 (9th Cir. 1994) ................................................................................. 9

*Magee v. Paul Revere Life Ins. Co.*,
    172 F.R.D. 627 (E.D.N.Y. 1997) ...................................................................... 19

*Navellier v. Sletten*,
    262 F.3d 923 (9th Cir. 2001) ............................................................................. 10

*Newell v. Mnuchin*,
    2020 WL 136648 (D.D.C. Jan. 13, 2020) ........................................................ 2, 9

*Pierce v. Underwood*,
    487 U.S. 552 (1988) .............................................................................................. 9

*Sandoz, Inc. v. United Therapeutics Corporation*,
    2020 WL 3567287, at *7 (D.N.J. June 30, 2020) ............................................... 2

*Smith v. Premiere Valet Servs., Inc.*,
    2021 WL 6425552 (C.D. Cal. Sept. 16, 2021) ............................................... 9, 10

*Torres v. City of Los Angeles*,
    548 F.3d 1197 (9th Cir. 2008) ........................................................................... 10

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ........................................................................... 10

**Rules**

Fed. R. Civ P. 16 ............................................................................................... 9, 18

Fed. R. Civ. P. 26 ........................................................................................... 10, 19

Fed. R. Civ. P. 37 ............................................................................................... 1, 9

# INTRODUCTION

The NFL Defendants' motion is an unprecedented attempt to recast Plaintiffs' good-faith efforts to comply with the stipulated expert protocol as a sanctionable ***failure to obey*** a Court order.  Plaintiffs did not "disobey" any order of this Court, which is required for the imposition of sanctions under both Rule 16 and Rule 37. Plaintiffs timely produced backup materials that were prepared specifically for the NFL's[1] experts to "reconstruct the work, calculations, and/or analyses upon which [Dr. Zona] is relying for their opinions," as required by the expert protocol. In addition, Plaintiffs provided instructions so that the NFL's experts could apply that code to their particular hardware configuration and processing environment. Nothing in the order required Plaintiffs to produce files that were created as intermediate steps in the course of Dr. Zona's analysis. That initial production would have allowed the NFL's experts to reconstruct Dr. Zona's work, as Plaintiffs intended, but for minor errors in the code that, unbeknownst to Plaintiffs or their experts, were inadvertently introduced in the process of preparing the code for production to the NFL.

Instead of advising Plaintiffs that they had problems running the code, the NFL's experts spent three weeks trying to make it work. When the NFL did inform Plaintiffs about those problems, Plaintiffs responded immediately and proceeded to fix any problems that might exist. And they did so on numerous occasions over a three-week period. Once the NFL provided sufficient details to inform Plaintiffs about the nature of the problems they were encountering, Plaintiffs produced additional material to assist the NFL's experts. This additional material is what the NFL implies should have produced in the first instance. But the NFL's focus on these "intermediate output files" is misplaced. Dr. Zona did not rely on those files in reaching his conclusions and, moreover, Dr. Zona's code was designed to create those same intermediate output files as it was executed. Once the NFL indicated

---

[1] Throughout this opposition, Plaintiffs use "NFL" to refer to the NFL Defendants.

1

that its experts were unable to run Dr. Zona's code, Plaintiffs in fact **recreated** these files and produced them to the NFL. Plaintiffs provided those additional files to eliminate any issues caused by errors in the code. The expert protocol did not require Plaintiffs to produce them.

The NFL focuses on a limited number of errors that were inadvertently introduced in the production process. Plaintiffs certainly regret those errors, but even the NFL does not claim that they were intentional or known to the Plaintiffs before the NFL raised them during the meet-and-confer process. Nor can the NFL reasonably dispute that when it did identify those errors to the Plaintiffs, Plaintiffs took steps to remedy them. This is a far cry from sanctionable conduct.

The NFL points to no case in history in which inadvertent errors in one part of backup materials submitted by an expert witness justified sanctions, let alone shifting expenses of this magnitude. Instead, courts have focused on the lack of evidence of bad faith in denying sanctions. For example, in *Newell v. Mnuchin*, 2020 WL 136648 (D.D.C. Jan. 13, 2020), the court declined to impose sanctions where the incompleteness of the defendant's productions was "an inadvertent oversight," there was no evidence of bad faith on the part of counsel, and the plaintiff suffered no litigation prejudice. *Id.* at *9-10. In *Sandoz, Inc. v. United Therapeutics Corporation*, the court similarly denied a motion for sanctions when plaintiffs' filing clerk inadvertently placed confidential material on the public docket in violation of a stipulated confidentiality order. 2020 WL 3567287, at *7 (D.N.J. June 30, 2020). Although it was "undeniable" that Plaintiffs violated the confidentiality order, the Court denied sanctions because the violation was "inadvertent" and "accidental." *Id.* at *7-*8. The NFL's absence of authority is especially glaring in this case, given Plaintiffs' repeated good-faith efforts to resolve the NFL's issues after they were raised.

The NFL also cannot demonstrate any prejudice in this litigation resulting from Plaintiffs' actions. It sought no postponement of any deadline in this case to

accommodate its review or analysis, including the deposition of Dr. Zona or the deadline for the NFL's submissions opposing class certification. That is precisely because of Plaintiffs' efforts to resolve those issues in a prompt and timely manner. The NFL points to expert fees it allegedly incurred, but as further explained below, it cannot plausibly explain why it was reasonable and necessary for its experts to incur $500,000+ *over a 30-day period* spinning their wheels to run computer code that they apparently knew they could not run. Most of that expense could have been avoided had the NFL explained the issue to Plaintiffs in a timely manner. That time and expense was not caused by any failure of Plaintiffs to obey the expert protocol. At most, the NFL would be entitled to reimbursement for the time needed to determine that its experts could not run the code. But the NFL failed to carry its burden of apportioning the time.

None of the NFL's critiques of Dr. Zona's backup materials have any impact on the substance of his class-certification analysis or his ability to show that class-wide proof of damages and impact is available. His opinions on class-wide proof still stand. The imposition of sanctions here would be improper and unjust, and the NFL's motion respectfully should be denied.

## FACTUAL BACKGROUND

The factual background of this dispute is admittedly dense and technical, but walking through the details highlights the good-faith manner in which the Plaintiffs approached the situation raised in the NFL's motion.

Dr. Zona's expert analysis relies largely on two sets of data provided by DIRECTV: "viewership data" and "transactional data." Gore Decl. ¶ 1. DIRECTV produced the final tranche of these datasets to Plaintiffs and the NFL in December 2021. *Id.* ¶ 4. The scope and volume of the data produced by DIRECTV made it complex and time-consuming to process. Indeed, the NFL's motion refers to the data produced by DIRECTV as "massive" in scale. *See* Dkt. No. 833-1 ("Mot.") at 1. Plaintiffs initially requested that DIRECTV produce the viewership dataset in a

more manageable form, either as a sample of the entire dataset or with the data aggregated by the location of the viewer. Gore Decl. ¶ 22. Plaintiffs made this request in order to minimize the burden and expense of processing such a large dataset. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ *Id.* ¶ 22. Both Plaintiffs and the NFL ultimately consented to that decision. *Id.* The production of such a large and disaggregated dataset meant that any party analyzing the data was bound to incur significant cloud-computing costs.

In the months following DIRECTV's production, both parties engaged in a series of informal interrogatories to DIRECTV on how to process and use the data. *Id.* During that time, Plaintiffs incurred significant data-engineering expenses so that their experts could make use of DIRECTV's data in the Databricks environment. The cloud processing cost billed to Plaintiffs for ***all of 2022*** reached approximately $156,000 (as compared to the $298,700 spent in cloud processing claimed by the NFL's experts for ***one month***). Schwarz Decl. ¶¶ 13, 38. This cost encompassed acquiring the data, investigating the data structure, writing code for aggregation, running samples, debugging code, and running the code to prepare aggregated viewership data. *Id.* The NFL's queries to DIRECTV in early 2022 demonstrated that the NFL knew the file structure and variables for both data sets produced by DIRECTV. It was reasonable to assume that the NFL had made a similar investment in understanding the viewership data during the several months that it had access to that same data. Gore Decl. ¶ 22.

Following the service of Plaintiffs' expert reports on August 19, 2022, a team of at least nine people expended over 160 hours preparing the backup materials associated with Plaintiffs' experts. *Id.* ¶ 13. That preparation included, among other things, preparing the computer code written by Dr. Zona and his team for production to the NFL and its experts. For example, file directories that were

4

1    specific to the computer systems used by Dr. Zona and his team needed to be
2    changed to a placeholder "[path]" so that the NFL's experts could adapt the code to
3    their own processing environment (because the file directories on the computers
4    used by Dr. Zona and his team would necessarily differ from the computer systems
5    utilized by their NFL counterparts). *Id.* Plaintiffs' team also drafted a series of "read
6    me" instructional files to help the NFL recreate Dr. Zona's analysis. *Id.* ¶¶ 11-13.
7    However, given the fact that some portions of Dr. Zona's code could take several
8    days to fully run ███████████████████ █ ████████████████████ it
9    was impossible to fully test the code again within the time constraints of the expert
10   discovery stipulation. *Id.* ¶ 14. During this process of conversion, some errors—
11   mainly isolated typographical errors or undefined filepaths—were introduced
12   inadvertently into the code.

13          On August 24, 2022, Plaintiffs served the NFL with backup materials for
14   their experts. *Id.* ¶ 6. As backup for Dr. Zona, Plaintiffs served the data used for his
15   econometric modeling (except the data produced by DIRECTV that the NFL
16   already had), the sources cited in support of his analysis, and thousands of lines of
17   computer code. *Id.* ¶ 10. Embedded in the computer code were comments and
18   instructions for the NFL's experts to aid in reconstructing Dr. Zona's analysis, as
19   well as several standalone instructional files intended to help the NFL's experts. *Id.*
20   ¶ 11. One such file indicated that the NFL and its experts needed to replace the text
21   "[path]" in the code with the root filepath of the system running the code, while
22   another directed the NFL's experts to "Run SAS programs first." *Id.* ¶ 12. The SAS
23   code is what completed the viewership-data aggregation process. *See* Schwarz
24   Decl. ¶ 37. Yet another file contained specific settings associated with the
25   Databricks environment utilized for parts of Dr. Zona's analysis:

26
27
28
---
[2] One petabyte holds 1000 terabytes, or 1,000,000,000,000,000 bytes.

```
Pre-Requisites
=============
1. Databricks environment running on Azure as backbone (may also run on AWS or
   Google).
2. Azure DataLake for storing raw data as a BLOB.
3. .IPYNB file (produced, along with duplicate text version for easy viewing
   of code syntax).
4. Create DataBricks cluster with minimum 1 Master node and 2 Worker nodes.
```

Gore Decl. ¶ 11.

   The backup materials produced by Plaintiffs also contained a folder labeled "Intermediate" intended as a placeholder for the computer code to deposit Dr. Zona's intermediate output files as the code was executed. *Id.* ¶ 16. These "intermediate output files" are temporary byproducts of Dr. Zona's computer code—they are neither the raw data used in Dr. Zona's analysis (which was provided to the NFL), the process used to cull or analyze that data (which was provided to the NFL in the form of computer code), nor the final outputs of his analysis (also provided to the NFL). Nevertheless, the backup materials provided to the NFL on August 24, 2022 were organized in a manner to facilitate the NFL's creation of those files—if it chose to follow the same procedure as Dr. Zona. An instructional file within that "Intermediate" folder explained to the NFL and its experts that "[t]his directory will populate as programs are run sequentially." *Id.* ¶ 16. Plaintiffs provided these instructions so that the NFL's experts would be able to replicate Dr. Zona's analysis by executing the code themselves on their own system or following the logic presented in the code to create their own program. *See* Schwarz Decl. ¶ 5.

   On September 7, 2022—two weeks after Plaintiffs timely produced Dr. Zona's backup materials—the NFL requested the intermediate output files created by Dr. Zona's code in an email concerning the scheduling of expert depositions. Gore Decl. ¶ Ex. 4. That communication did not explain why the NFL wanted those files. More importantly, the NFL made ***no mention*** of any problems with the code. *See id.* Two days later, Plaintiffs responded that the intermediate files requested were "the output files from the programs that we already provided in Dr. Zona's

backup materials. Dr. Zona did not maintain copies of those files as they are all reproducible by running the programs that we already provided to you. For Plaintiffs to provide them, Dr. Zona would have to re-run the programs, which the NFL's experts can just as easily do given what we've provided." *Id.* Ex. 5. As Plaintiffs had seemingly produced everything for the NFL to re-create those files, and without the NFL indicating a problem existed with the code, Plaintiffs did not understand the basis for the NFL's request.

On September 14, 2022, the NFL indicated (for the first time) that its experts were encountering errors in the code that hampered the recreation of Dr. Zona's analysis. *Id.* ¶ 18. Notably, the NFL made no mention of hours of expert time or machine time spent on those issues in that correspondence. *Id.*

Plaintiffs immediately raised these issues with Dr. Zona and his staff to resolve them. *Id.* ¶ 19. On September 19, 2022, Plaintiffs produced a supplemental version of the backup materials that included updated code and several intermediate output files. *Id.* Because it was not possible to reproduce every step of the analysis in such a short time frame, Plaintiffs provided those intermediate files that were either feasible to verify or could be recreated in a timely fashion. *Id.* Plaintiffs made this supplemental production in an effort to eliminate the data-processing difficulties the NFL and its experts had encountered. That production included three spreadsheets that obviated the need to run the viewership-data-disaggregation code that was run on Databricks—the first and most time-consuming portion of data processing. *See* Schwarz Decl. ¶¶ 13, 27-28.

On September 21, 2022, the NFL informed Plaintiffs of additional errors with the computer code, requesting additional files and further information on the Databricks configuration. Gore Decl. ¶ 20. In that communication, the NFL indicated for the first time that its experts were unable to run the one portion of Dr. Zona's code that was run on Databricks. *Id.* Plaintiffs responded with Dr. Zona's exact Databricks configuration on September 23, 2022. *Id.* ¶ 21.

That same day, Plaintiffs sent a letter to the NFL, which explained that it is not customary for the party producing backup materials to provide configuration details for each part of the processing, given the differences in hardware and software configurations used for the Databricks cluster. *Id.* Ex. 10. The letter also informed the NFL that there was no longer any need for its experts to run the Databricks code; that portion of the code merely culled the raw data provided by DIRECTV into three spreadsheets. *Id.* Plaintiffs had provided those spreadsheets to the NFL on September 19. *Id.*

The NFL did not respond to that letter. Nevertheless, to make sure that the NFL's experts had resolved all issues with the backup materials, Plaintiffs reached out to the NFL on September 28, 2022 with the following email:

> Jeremy,
>
> I'm following up on our correspondence last week regarding Dr. Zona's backup materials. With regard to the viewership data, please let us know if there are any issues with the data in light of the Databricks configuration that was provided and the three spreadsheets that were ultimately utilized for our experts' analysis.
>
> As to the other data, you have not indicated any specific issues with running Dr. Zona's code other than the three typos that we addressed. If the NFL is having problems with the code or output, please let us know the specific issues so that we can look into it and help resolve it.
>
> Regards,
> Ian

*Id.* Ex. 11. The NFL responded later that day, informing Plaintiffs for the first time of the specific issues it had in running the Databricks portion of Dr. Zona's code. *Id.* ¶ 25. That email specified the locations in the code where the errors were encountered and asked for a specific set of intermediate output files. Over the next three days, Plaintiffs sent multiple e-mails to the NFL providing them with updated versions of the code and the requested additional intermediate output files. *Id.* ¶ 27. As the NFL raised no further issues regarding Dr. Zona's backup files, conducted Dr. Zona's deposition as scheduled, and submitted a timely report critiquing his findings, Plaintiffs considered the issue resolved. *Id.* ¶¶ 28, 30. At no point did the NFL ever request to delay Dr. Zona's deposition or request additional time to file its papers opposing class certification.

More than a month went by. On November 11, 2022, the NFL informed Plaintiffs of their intention to move for sanctions and the parties met and conferred on November 16, 2022 regarding this motion. The NFL then waited over yet another month to file its motion, doing so in the middle of the week between the Christmas and New Year holidays. *Id.* ¶ 31.

## LEGAL STANDARD

Rule 16 permits a court to impose sanctions if a party or attorney "fails to obey a scheduling or other pretrial order." Fed. R. Civ P. 16(f)(1)(C). Rule 37 similarly permits sanctions if a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2). In either case, failure to obey a Court order is a prerequisite to the imposition of sanctions. *See, e.g.*, *Smith v. Premiere Valet Servs., Inc.*, 2021 WL 6425552, at *2 (C.D. Cal. Sept. 16, 2021) (denying motion for sanctions in part because "Plaintiff has not presented the Court with evidence that Defendants are disobeying a specific court order"). Even if the court determines that a party "disobeyed" a court order—not the case here—it should not award even reasonably incurred expenses where the party's failure "was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f)(2) and 37(b)(2)(C).

Although the Federal Rules do not require a finding of bad faith to impose sanctions, the Ninth Circuit has stated that a "good faith dispute concerning a discovery question" militates against their imposition. *Hyde & Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir. 1994). The Supreme Court has similarly explained that expenses should not be awarded if "there is a 'genuine dispute' or 'if reasonable people could differ as to the appropriateness of the contested action.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citations and alterations omitted); Consistent with these principles, courts routinely deny motions for sanctions where non-compliance with a court order was inadvertent. *See, e.g., Newell*, 2020 WL 136648, at *9-10; *Sandoz, Inc.*, 2020 WL 3567287, at *7; *Glob. Master Int'l Grp.,*

*Inc. v. Esmond Nat., Inc.*, 2021 WL 1324435, at \*2 (C.D. Cal. Mar. 12, 2021) (declining to award sanctions because violation of order "was not willful or in bad faith, and Plaintiffs' counsel promptly remedied the situation as soon as he learned of the mistake").

## ARGUMENT

The NFL's motion presents ***no case*** supporting the award of sanctions in this context. The scenario presented here—where, at worst, Plaintiffs timely produced computer code that inadvertently included some non-substantive errors as it was being prepared for production to the NFL and promptly remedied those errors— stands in stark contrast to every case cited by the NFL. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105 (9th Cir. 2001) (two-and-a-half-year intentional delay in submitting expert report violated scheduling order); *Navellier v. Sletten*, 262 F.3d 923, 947 (9th Cir. 2001) (willful refusal to answer questions at deposition after special master ordered witness to answer the questions); *Torres v. City of Los Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008) (requiring expert to produce report before testifying at trial as required by Rule 26); *Archie v. Pop Warner Little Scholars, Inc.*, 2019 WL 13020480, at \*4 (C.D. Cal. Oct. 10, 2019) (denying sanctions because Defendant's untimely request to add experts was "harmless"); *Smith*, 2021 WL 6425552, at \*2 (denying motion for sanctions in *pro se* case because "the parties have good faith disagreements over multiple categories of discovery"). The NFL's motion for sanctions asks the Court to do something that is, quite literally, unprecedented.

## I.    Plaintiffs Obeyed the Expert Protocol.

Sanctions are inappropriate here because the NFL has not presented sufficient evidence to establish that Plaintiffs disobeyed the stipulated expert protocol. *See Smith*, 2021 WL 6425552, at \*2. On the contrary, the evidence shows that Plaintiffs made every effort to provide the NFL's experts with materials

required to replicate Dr. Zona's analysis. Sanctions cannot be awarded where, as here, no court order was disobeyed.

### A. Plaintiffs Submitted Backup Materials That Were Designed for the NFL to Reconstruct Dr. Zona's Analysis.

Plaintiffs provided backup materials for Dr. Zona in accordance with the deadline specified in the stipulated expert protocol. And Plaintiffs understood those materials to be "sufficient to reconstruct the work, calculations, and/or analyses upon which [Dr. Zona] is relying for [his] opinions," Stip. Expert Protocol, Dkt. 289 at 3. Because the NFL had access to the DIRECTV data on which Dr. Zona conducted his analysis, the data used for his econometric modeling, the sources cited, the computer code utilized to process that data, and the final outputs of Dr. Zona's analysis, Plaintiffs understood that the NFL's experts would be able to replicate Dr. Zona's work.

The intermediate output files were not necessary to replication. As explained above, intermediate output files are temporary byproducts of Dr. Zona's programs. Those files are necessarily created by the programs (which were produced to the NFL) in the course of processing the data. One of the "read_me" files produced to the NFL indicated as much, explaining that the Intermediate folder would populate as the programs were executed. Because the NFL's experts would understandably want to run the code for themselves (and therefore create the same intermediate files), it was unnecessary to produce them. While the NFL points to the fact that Dr. Zona and his team did not maintain the intermediate files that had been created when they ran the code, the NFL omits in its brief to the Court the reasons why, all of which were explained by Dr. Zona: those files are not necessary to Dr. Zona's final analysis, can be reproduced by running the code, and tend to be large in size. Barber Decl., Ex. 1 ("Zona Tr."), 233:25-234:6.

Nor is it standard practice to produce them. Schwarz Decl. ¶¶ 8-9. Dr. Zona made clear in his deposition ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Zona Tr. 233:2-5.

The NFL is therefore incorrect to describe those files as "essential building blocks" to Dr. Zona's end results, Mot. at 2, or to claim that Plaintiffs "omitted all intermediate *data* used by Dr. Zona," Barber Decl. ¶ 3 (emphasis added). Indeed, the declaration submitted by the NFL's expert recognizes that the intermediate files lack any independent value: Mr. Sabor stated that the absence of intermediate outputs made it "impossible to verify any step of their computer backup process *unless the entire computer backup was run without error*." Sabor Decl. ¶ 4(c) (emphasis added). The NFL's experts consulted the intermediate data sets only because they were unable to run the code, a problem that the NFL did not raise with Plaintiffs until nearly ***three weeks*** after the code was produced.

The NFL is also mistaken in describing the code as "error-ridden." Mot. at 1. In fact, its expert identified only seven errors or typos. Sabor Decl. ¶ 44. These errors fall into three broad categories: typographical errors (such as an extra period or percentage symbol); failure to define certain filepaths; and one error in the coding of an "iterative loop construction." *See id.* These errors affected a small portion of 9,000 lines of code provided by Plaintiffs. Schwarz Decl. ¶ 37. The bulk of these errors were limited to the program that aggregated the viewership data provided by DIRECTV into more manageable sets of data, a step that was preliminary to Dr. Zona's analysis. *Id.* Yet the September 19 supplemental production—particularly the three spreadsheets of aggregated viewership data— obviated the need for the NFL's experts to complete that pre-analytical step. *Id.* ¶ 28. Apart from that step, only two lines of code required minor corrections. *Id.* ¶ 37. While these errors evidently prevented the NFL's experts from running the code to completion, none affected the validity of Dr. Zona's models. And the NFL does not claim as much. Dr. Zona ran the original code to completion in the course of his analysis. Each of these errors was committed only in the process of

modifying the code so that it could be produced to the NFL. Even the NFL does not claim that any of these errors were intentional or otherwise reflected any sort of deliberate attempt to flout this Court's orders.

The NFL's claimed surprise "that the computer code that Plaintiffs produced for Dr. Zona was not the same code that they used to perform the analyses in his expert report" is head-scratching. Sabor Decl. ¶ 10. It is standard practice to modify code before production so that the receiving party can apply it on its systems: the computer systems utilized by Dr. Zona and his team are not the same computers utilized by the NFL's experts. Schwarz Decl. ¶¶ 5-6. It was clear from the face of Plaintiffs' production that their expert team had modified the code. For example, one instructional file indicated that the NFL's experts needed to replace the placeholder "[path]" in the code with an entry that applied to their local computer systems. The NFL's expert Dr. Yurukoglu made similar modifications to his code. *Id.* ¶ 36. The NFL similarly exaggerates the import of the fact that "Dr. Zona had not run that code in its entirety prior to producing it to the NFL Defendants." Mot. at 1, 4. He ran the code to make his calculations. Then he and his team expended 160 hours preparing the code for production for the benefit of the NFL, including the insertion of several comments and instructional files designed to assist the NFL and its experts. Dr. Zona did not run the entirety of *that* version of the code again. *See* Zona Tr. 252:4-7 ██████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████

Similarly, as to the exact details of the data configuration that Dr. Zona used in the Databricks environment, because the NFL had access to DIRECTV's data for as long as Plaintiffs did, Plaintiffs reasonably believed that the NFL's experts had formulated their own method of processing data in that environment. Plaintiffs could not guarantee that the configuration information requested by the NFL would work. The party processing the data typically determines the equipment, processing

environment and programming language to use for the processing. Schwarz Decl. ¶ 10. As a result, the party providing report backup does not typically provide configuration details for each part of the processing. *Id.*

In sum, the backup materials submitted by Plaintiffs were designed specifically to allow the receiving party to recreate Dr. Zona's analysis.

### B.   Plaintiffs Produced All Data Required by the Expert Protocol.

The backup materials that Plaintiffs produced on August 24, 2022 also included all of the "data processed or modeled by a computer at the direction of an expert in the course of forming the expert's opinions," and "all data sets as relied upon by the experts." Dkt. 289 at 3.

The NFL's claim that Plaintiffs "omitted all intermediate data used by Dr. Zona in reaching in his opinions" is misleading. *See* Mot. at 3. Again, the NFL mischaracterizes the role of intermediate output files. Dr. Zona did not rely on those intermediate files, or any data contained in those files, to reach his opinions. That is why the stipulated protocol does not require the production of such files. Because those files are temporary byproducts, they are not even maintained after the code is run. Schwarz Decl. ¶ 8. Dr. Zona explained all of this in his deposition. *See* Zona Tr. 233:25-234:25. Indeed, Dr. Zona could have opted to write his code to execute all at once, from raw data to final output, rather than broken down into discrete steps. If he had done so, no intermediate output files would have been created at all. That logistical decision does not imbue these temporary files with any significance.

Nor does their size. The NFL's repeated mentions of that issue is a red herring. *See* Mot. at 2, 3, 4, 5, 6, 7. The substantial size of these transient files is one of the reasons that Dr. Zona did not maintain them. *See* Schwarz Decl. ¶ 23. It is also one of the reasons that Plaintiffs did not initially produce the files that Dr. Zona *did* maintain. *See* Gore Decl. ¶ 17.

### II.   Plaintiffs' Good Faith Conduct Does Not Warrant Sanctions.

Plaintiffs produced Dr. Zona's backup materials on time. There is no

evidence that the small number of errors ultimately identified in the code were anything but inadvertent and accidental byproducts of the production process. Plaintiffs remedied those errors promptly and before Dr. Zona's deposition, and those minor errors did not undermine Dr. Zona's initial analysis or conclusions in any way. They did not affect even the schedule in the case, given Plaintiffs' good faith efforts, and the NFL Defendants never once asked for any extension in the case, including for Dr. Zona's deposition. Under these circumstances, sanctions are not warranted. Even if the Court were to determine that there was a "failure to obey" a court order—which is not the case here—the NFL has no precedent for imposing sanctions in this context. On the contrary and just as one example, in *Globe Master International Group*, a court in this district denied such a motion for violation of a protective order because "Plaintiffs' violation of the protective order was not willful or in bad faith, and Plaintiffs' counsel promptly remedied the situation as soon as he learned of the mistake." 2021 WL 1324435, at *2. The same logic applies here.

On August 24, Plaintiffs produced voluminous materials that they reasonably believed would allow the NFL's experts to replicate and verify Dr. Zona's work. To the extent the NFL's experts could not execute the code because of errors within it, any such errors were inadvertent. As soon as the NFL informed Plaintiffs of its difficulties with the code, Plaintiffs provided all requested information.

Moreover, the issues that the NFL encountered with the code apply only to one portion of Dr. Zona's analysis—of DIRECTV's *viewership* data. That analysis is limited to part of Section 4.1 of his report. The bulk of Dr. Zona's opinions were based either on DIRECTV'S *transactional* data or the survey conducted by Plaintiffs' expert Sarah Butler. The disputed portions of the code did not hamper the NFL's ability to test and verify the analysis underlying those opinions. With respect to viewership data, the bulk of the issues with the code affected only the

initial step of aggregating DIRECTV viewership data into more focused inputs. Schwarz Decl. ¶ 3.

The NFL's motion makes clear that its experts' data-processing difficulties stemmed from errors in portions of the code, not from the absence of intermediate output files. The only reason the NFL requested the intermediate output files was so that they "could potentially understand better what was going wrong in the code." Sabor Decl. ¶ 21. Again, if the NFL's experts had been able to run the code, production of the intermediate output files would have been superfluous. Only the code—and the raw data processed by the code—was required to reconstruct Dr. Zona's analysis. The expert protocol did not contemplate the production of the exact Databricks configuration details used by Dr. Zona because the NFL's experts would be using different equipment and a different processing environment.

As Dr. Zona successfully ran the code to completion in the course of preparing his report, the small number of inadvertent errors were introduced in the process of preparing the code for production to the NFL. Dr. Zona and his team expended significant effort to ensure that a code designed to work on Dr. Zona's systems would be translatable to the NFL's experts. This included the creation of various instructional files for the NFL's benefit, preparing generic file path names specifying where the NFL's experts could enter their own system's path names, consolidating pieces of code to reduce the number of steps required, and removing extraneous text such as comments or incorrect procedures identified in the course of debugging the code. *See* Schwarz Decl. ¶¶ 6, 19. Because of the sheer volume of data produced by DIRECTV, the Databricks portions of Dr. Zona's code can take several days to run. *Id.* ¶ 19. Given the amount of time needed to run the portions of code related to the data produced by DIRECTV, it was impossible to fully re-test the modified code in the timeframe permitted under the expert discovery order. *Id.* ¶ 20; Gore Decl. ¶ 14.

It was not until September 14, 2022—***three weeks*** after the production of the

backup materials—that the NFL first informed Plaintiffs of its experts' issues running Dr. Zona's code. Gore Decl. ¶ 18. The NFL's prior request for intermediate files made no mention about issues with the code. Plaintiffs declined because the code was sufficient to replicate the analysis. A week later, the NFL identified three typos in Dr. Zona's code. *Id*. Ex. 6. Plaintiffs promptly reviewed the identified issues, made corrections to the code where necessary, and produced several intermediate output files. They did so on September 19, within five days of the NFL's request. Given the timeframe, Plaintiffs produced only the most pertinent intermediate output files. Included among these files were three spreadsheets that culled the viewership data provided by DIRECTV. The production of these spreadsheets eliminated the need for the NFL to run the Databricks code and should have allowed them to complete the analysis in less than one day of computer operation. Schwarz Decl. ¶ 25.

It was not until September 21—four weeks after the initial production—that the NFL informed Plaintiffs of any issues with the Databricks configuration settings. Plaintiffs were surprised that the NFL encountered issues with that platform since they had had access to it and DIRECTV's data for nearly a year. During that time, the NFL made no prior indication of issues processing data in that environment. Nonetheless, upon learning of the issues, Plaintiffs provided the exact Databricks configuration settings used by Dr. Zona. Gore Decl. Ex. 9. And they did so within 48 hours of the request. *See id*. Again, these configuration settings affected only the initial step to disaggregate DIRECTV's viewership data—a step that was rendered unnecessary by Plaintiffs' supplemental production of September 19.

Out of an abundance of caution, Plaintiffs initiated an inquiry after the NFL went silent for several days to make sure that the problems had been resolved. It was only in response to that inquiry that the NFL informed Plaintiffs about its continuing difficulties executing the Databricks portion of Dr. Zona's code. When

the NFL specified locations in the code where the errors were encountered and asked for a specific set of intermediate output files, Plaintiffs responded promptly. Plaintiffs provided the NFL with *all* the information it requested within five days, including additional intermediate output files and updated code.

These good-faith efforts to provide the NFL with all information requested to alleviate difficulties in running the code are a far cry from sanctionable conduct.

Nor did the NFL suffer any apparent prejudice. At no point did the NFL request a postponement in its response to the class certification motion or an extension for the agreed-upon deposition dates as a result of the issues it raised with the expert backup materials. Gore Decl. ¶¶ 29-30. Moreover, it was not until several weeks after Plaintiffs initially produced Dr. Zona's backup materials that any mention of expert time spent looking into these issues was raised.

## III.    The Expenses Claimed by the NFL Are Unreasonable and Not Attributable to Any Non-Compliance With the Expert Protocol.

The NFL's claim that the *$537,300* bill incurred by its experts can be attributed to Plaintiff's violation of the expert protocol is unreasonable and defies common sense. Were this Court to find that the Plaintiffs failed to obey the stipulated protocol (which they did not), the Federal Rules limit the NFL to expenses that were 1) "reasonable" and 2) that were "caused by the failure" to obey a court order, Fed. R. Civ. P. 37(b)(2)(C), or "incurred *because of* any noncompliance" with a pretrial order, Fed. R. Civ. 16(f)(2) (emphasis added). The NFL has not met their burden on either front.

It was not reasonable for the NFL's experts to spend more than half a million dollars attempting to recreate an analysis from a code they admittedly were unable to execute. The NFL insists that a four-person team of experts spent over 440 hours—*11 working weeks*—"trying to recreate Dr. Zona's analysis with the little, error-ridden information to which they had access," Mot. at 6. But the problems with the code should have been apparent to the NFL's experts within a matter of

hours of running the code. Schwarz Decl. ¶ 29. At that point, the reasonable course of action would have been to flag these issues for Plaintiffs and stand down on the analysis, to allow Plaintiffs the opportunity to provide any additional help. *See* Schwarz Decl. ¶¶ 32-34. The NFL fails to explain why it was reasonable for its experts to instead expend so much time and money "trying, in vain, to run Dr. Zona's faulty code," Mot at 9. Notably, during the course of the parties' discussions in September 2022, the NFL Defendants did not explain to Plaintiffs that at the same time the parties were working to solve the issues running the code, the NFL's experts were racking up a six-figure bill that the NFL would later try to foist on the Plaintiffs. The one (inapposite) case cited in the NFL's motion does not permit the NFL to recover expenses that are facially unreasonable. *Magee v. Paul Revere Life Ins. Co.*, 172 F.R.D. 627, 645 (E.D.N.Y. 1997) (discussing the factors to determine the reasonableness of hourly rate for deposition of a non-testifying expert under Rule 26). That case recognized the general principle that limiting expert awards to "reasonable" expenses prevents plaintiffs from being "unfairly burdened by excessive ransoms which produce windfalls for the [defendant's] experts." *Id.* (internal quotation marks omitted).

That is exactly what is occurring here.[3] The NFL wants to charge Plaintiffs for every hour billed by its experts between August 29 and September 29 with respect to DIRECTV's viewership data. *See* Sabor Decl. ¶¶ 30-33. But none of the time entries submitted by the NFL's experts indicate that their work was necessitated by errors in Plaintiffs' submission. *See* Sabor Decl. Ex. 1 at 2-5. For example, one analyst Jiaxuan Nie billed ███████████████████—on

---

[3] The NFL informed Plaintiffs of its intention to move for sanctions *two days* before filing—unbeknownst to Plaintiffs at the time—a suit in New York State Court challenging its insurers' decision to deny coverage for the League's costs in defending this very litigation. *See National Football League & NFL Enterprises LLC v. U.S. Specialty Ins. Co. et al.,* No. 654411/2022 (N.Y. Sup. Ct. Nov. 18, 2022). For the Court's convenience, a copy of the NFL's complaint against its insurers is provided as Exhibit 18 to the attached Declaration of Ian Gore.

"Zona backup replication" or "Replicated Plaintiff's backup." *Id.* But the task of replicating Dr. Zona's analysis would have required some amount of time, even if the code was free of errors. That evidence does not allow this Court to distinguish between expenses that would necessarily be incurred in analyzing Dr. Zona's data, and those which were incurred only because of supposed errors in the backup materials.

With respect to the other area of major expense claimed by the NFL, cloud computing, the expenses incurred by the NFL's experts dwarf those incurred by Plaintiffs' experts using the same platform for a larger scope of work. The NFL's experts apparently spent $298,700 in cloud computing costs between August and September 2022 alone, just to replicate Dr. Zona's analysis. *See* Sabor Decl. Ex. 1 at 7. Plaintiffs' experts spent about half of that amount, approximately $155,000, on cloud computing costs ***for the entire year*** and in the course of a broader scope of analysis. Schwarz Decl. ¶ 38. Those costs encompassed the acquisition of the data, the investigation into the data structure, and then the processing of the data for the preparation of Dr. Zona's report. *Id.* These costs were attributable in large part to the nature of the dataset produce by DIRECTV and could have been avoided had the dataset been narrowed prior to production, as Plaintiffs initially requested. Moreover, as discussed above regarding the time spent by the NFL's experts, nothing in the records provided by the NFL distinguishes costs that would necessarily be incurred in analyzing Dr. Zona's data versus those incurred only because of any supposed error in the backup materials. The NFL has not provided sufficient cause to shift these costs onto Plaintiffs and has not shown which costs would have been incurred anyway even if the code were free of errors.

## CONCLUSION

For the foregoing reasons, this Court should deny the NFL's motion for sanctions.

1    Dated: January 6, 2023                    Respectfully submitted,

2                                              By:   /s/ Marc M. Seltzer

3                                                    Marc M. Seltzer

4                                              Marc M. Seltzer (54534)
                                               mseltzer@susmangodfrey.com
5                                              SUSMAN GODFREY L.L.P.
                                               1900 Avenue of the Stars, Suite 1400
6                                              Los Angeles, CA 90067
                                               Tel: (310) 789-3100
7                                              Fax: (310) 789-3150

8                                              Arun Subramanian (*Pro Hac Vice*)
                                               asubramanian@susmangodfrey.com
9                                              William C. Carmody (*Pro Hac Vice*)
                                               bcarmody@susmangodfrey.com
10                                             Seth Ard (*Pro Hac Vice*)
                                               sard@susmangodfrey.com
11                                             Tyler Finn (*Pro Hac Vice*)
                                               tfinn@susmangodfrey.com
12                                             SUSMAN GODFREY L.L.P
                                               1301 Avenue of the Americas, 32nd Fl.
13                                             New York, NY 10019
                                               Tel: (212) 336-8330
14                                             Fax: (212) 336-8340

15                                             Ian M. Gore (*Pro Hac Vice*)
                                               igore@susmangodfrey.com
16                                             SUSMAN GODFREY L.L.P.
                                               401 Union Street, Suite 3000
17                                             Seattle, WA 98101
                                               Tel: (206) 505-3841
18                                             Fax: (206) 516-3883

19                                             Armstead Lewis (*Pro Hac Vice*)
                                               alewis@susmangodfrey.com
20                                             SUSMAN GODFREY L.L.P.
                                               1000 Louisiana, Suite 5100
21                                             Houston, TX 77002
                                               Tel: (713) 651-9366
22                                             Fax: (713) 654-6666

23                                             Scott Martin (*Pro Hac Vice*)
                                               smartin@hausfeld.com
24                                             HAUSFELD LLP
                                               33 Whitehall Street, 14th Floor
25                                             New York, NY 10004
                                               Tel: (646) 357-1100
26                                             Fax: (212) 202-4322

27                                             Christopher L. Lebsock (184546)
                                               clebsock@hausfeld.com
28                                             Samuel Maida (333835)

21

smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*