UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

IN RE: NATIONAL FOOTBALL LEAGUE
SUNDAY TICKET ANTITRUST LITIGATION

CASE NO. ML 15-02668-PSG (JEMx)

**DECLARATION OF
ANDREW D. SCHWARZ**

January 6, 2023

*HIGHLY CONFIDENTIAL*

*HIGHLY CONFIDENTIAL*

## 1. INTRODUCTION

1. My name is Andrew D. Schwarz. I am a Partner of OSKR, LLC, an economic consulting firm specializing in the application of economic analysis to complex legal issues. I received a Master's Degree in Business Administration from the Anderson School at UCLA in 1994, a Master's Degree in History from the Johns Hopkins University in 1990, and studied Ph.D.-level economics and marketing at UCLA and UC Berkeley from 1995 through 1997, before starting work as an economist. I then spent ten years with LECG, an international economic consulting firm. In 2007, I co-founded OSKR. I have also worked as a financial analyst for Hewlett-Packard.

2. I have been one of the economists at OSKR working in support of Dr. Daniel A. Rascher and Dr. J. Douglas Zona in the preparation of their expert reports in the *In Re: National Football League Sunday Ticket Antitrust Litigation* matter. One facet of this role was to manage the support staff who organized the backup materials for the expert reports, as I have done on many other cases for which I supported testifying experts or was a testifying expert myself.

.

## 2. OSKR'S CONDUCT CONFORMED TO STANDARD PRODUCTION PROCESS

3. My understanding is that the instant dispute is over the computer backup to a preliminary data processing step related to Dr. Zona's expert report. This step is needed to aggregate the raw viewership event data DirecTV produced into the aggregate telecast viewing time per location. While Dr. Zona's Class Certification analysis incorporates these aggregated viewership data along with several other data sources, the dispute over the aggregation of the viewership data does not implicate the computer backup for the substance of Dr. Zona's Class Certification analysis.

4. OSKR prepared electronic backup for the preliminary viewership data processing along with the backup for Dr. Zona's Class Certification analysis, following processes and policies that are standard for our industry (economic analysis for complex litigation). As such, OSKR prepared the

**HIGHLY CONFIDENTIAL**

material to provide all the information necessary to reconstruct all the analysis in the reports of Dr. Rascher and Dr. Zona, including the preliminary data processing step of aggregating the raw viewership data produced by DirecTV. To the extent that the receiving party required additional assistance using the provided information and materials, as is common in complex analysis supporting litigation, OSKR continued to follow standard processes and policies by promptly providing materials to satisfy specified needs.

5. Computer code provided with the backup materials generally serves a dual purpose. First, the code provides a step-by-step guide for how to conduct the analysis, which the other party can use when generating their own code in whatever programming environment they choose. Second, the code may in some cases be modified to run directly within the receiving party's sufficiently similar programming environment. Generating similar code or modifying the produced code to run directly are both common practices that OSKR has undertaken on many occasions.

6. When providing code with backup materials, OSKR has a policy of preparing the code in a manner expected to require the least amount of work to modify the code to run in a similar processing environment (if that is what the other party decides to do). This means preparing generic file path names specifying where the other party can enter their own system's path names, specific to their data-processing environment and, in some cases, consolidating unnecessarily separated portions of code into a single program. Those generic file paths are quite clearly marked, so that anyone receiving the code would be aware the code had been modified upon receipt; it would have been impossible for a receiving party to undertake any of the steps described in the Sabor Declaration without first appreciating they had received code with generic path names like "[path]\Analyses\Data" and modifying them for their own data-processing environment.

7. In addition, OSKR has a policy to provide assistance when the other party is attempting to run the code that has been produced. To minimize the likelihood of such calls for assistance, OSKR will, whenever feasible, run through the prepared code prior to turning it over (in order to check for any typographical errors and confirm the output of each intermediate step). In this particular matter, however, it was not feasible to conduct this additional step for all the code used for the analysis in

*HIGHLY CONFIDENTIAL*

the Zona Report. The three-business-day schedule for production of backup in this case, combined with DirecTV's choice to produce the disaggregated viewership data, meant that programs that needed to aggregate the viewership data could not be tested in OSKR's customary fashion during the time period allotted to produce backup files.

8. Data files provided with backup materials include only data not already possessed by both parties. The data processing performed in the course of an expert's analysis may result in the creation of intermediate files that are the output of one step and the input to another step. A common example of intermediate files occurs when there are distinct stages of code that happen to be captured in two different code files instead of conjoined into a single program: in such cases, the two programs handing an intermediate file between them could have been written as a single file of code. In that case, instead of an intermediate file being created, there would have only been a transient data set created temporarily during the running of the program but never output as an actual file. Because intermediate files and transient data sets are thus interchangeable, as a general practice OSKR does not save them after a set of programs are run through to completion.

9. Unless there is a specific need, OSKR does not customarily include such intermediate aggregations or other manipulation of raw data in the electronic backup materials. As explained above, these files are generally not needed by the receiving party, because they will either develop their own versions when seeking to replicate the results *de novo*, or they will generate these files while re-running the producing party's code. However, when OSKR has information to identify such a need, it can then be worth the additional expense to prepare such intermediate files, which may include running through existing (and produced) code to generate files not saved or verified for production.

10. Similarly, OSKR does not customarily include details about how the receiving party should configure their data processing environment. The party processing the data typically determines the equipment, processing environment and programming language to use for the processing. As a result, in my experience the party providing report backup does not typically provide configuration

HIGHLY CONFIDENTIAL

details for each part of the processing. However, when OSKR has information to identify a need for specific configuration details, it is our practice to respond to those needs promptly.

11. When OSKR encounters difficulties or confusion regarding backup materials produced by another party or related data-processing configuration details, it is our practice to make specific and detailed requests for additional information, so as to minimize the cost of conducting our analysis. It is also our practice to provide additional information to other parties when OSKR receives a similar request regarding data or code OSKR has produced. To the extent that OSKR received such requests for additional assistance in this matter, based on Defendants' choice to modify and run through the code OSKR provided (rather than generate its own similar code), OSKR provided such assistance promptly, consistent with our general practice.

12. The resources apparently expended by Defendants do not reflect any failure by OSKR to provide sufficient backup or respond to specific requests for additional information. The resources required to process viewership data for the analysis in this matter were in large part the result of an unusually large data set provided by DirecTV to both parties one year earlier. Preparing an aggregated version of the viewership data that is useful for the analysis is the step that comprises the bulk of the expenses Defendants apparently incurred, based on what they assert to be inadequacies in the production of electronic backup materials. Had DirecTV produced the viewership data in a smaller and more aggregated format, it would not have imposed nearly as much burden for either party in this case.

13. Nevertheless, my understanding is that DirecTV chose to provide the viewership data in a disaggregated form. The result of this form of production was that any effort to use the viewership data required substantial additional cloud-computing processing time (and expense). OSKR proceeded to conduct data processing on the raw data provided by DirecTV. OSKR's resulting unusual (and large) cloud-computing expense incurred over the course of several months that was required to review the viewership data (which included writing code to transfer the data, prepare samples for review, identify questions to refer to DirecTV, catalog the set of files prepare follow-up samples, and distinguish between viewership data provided initially and then a follow-up

5

production months later) and then prepare and run code to aggregate the data to the level needed for the analysis was about $155,000. To be clear, this $155,000 spans substantially more work than the portion in dispute related to the aggregation of the DirecTV viewership data.

14. As I understand it, the primary dispute over the backup production related to Dr. Zona's analyses is whether the files necessary to convert viewership data that Defendants already possessed into a more aggregated version were deficient. But when Defendants communicated the specific issues with the code and explained why those aggregated intermediate files of viewership data were needed, OSKR provided the intermediate viewership files within three working days, thus allowing Defendants to proceed with their work. Later, OSKR provided replacement code and some details for configuring to the data processing environment (Databricks, in Azure) for the first stage of the aggregation process, thus confirming that the intermediate file already produced was the result of the data processing already described (in the original code) undertaken to aggregate the raw data. The output of the code in question was merely an aggregated version of the viewership data produced by DirecTV to both parties, which was a data processing step preliminary to Dr. Zona's actual econometric analysis to which Defendants' experts were preparing a reply – only one element of Defendants' data that served as an input into that analysis. Thus, even without that code and those configuration details, once Defendants received the aggregated files in question, there should have been no barrier to conducting a complete review of all analyses.

15. As I understand the process of class certification, the question related to a damages model is not whether the experts' analysis is ultimately correct, but rather whether a methodology has been advanced that can reliably generate a class-wide damages estimate by means of a common formulaic approach. If there were an arithmetic error in an otherwise sound methodology, my understanding is that such an inadvertent and modest mistake would not impugn a valid and reliable methodology. In this case, any issues running the produced code for aggregating viewership data were of the nature of addition errors. At most, they caused Defendants initial

6

difficulty in testing Dr. Zona's arithmetic, but testing that arithmetic was not essential to assessing whether Dr. Zona's proposed methodology passes muster.

16. In sum, it is my view that OSKR produced all files and data sets needed to replicate Dr. Zona's results themselves. Moreover, if Defendants had immediately (after spending a few hours to determine that the files didn't run) reached out to OSKR, OSKR would have worked quickly to get the proper information sent over (be it files or data sets), just as we did after later receiving that request. The standard practice in the industry would have been to wait for the producing party to fix any errors in the code rather than expend resources trying to modify code. If the delay were substantial, a request to extend relevant deadlines would be appropriate.

17. With that said, the remainder of my declaration provides the factual basis for my assessments.

### 3.   FACTUAL DETAILS

**3.1   THE BACKUP PRODUCTION FOR THE ZONA REPORT WAS EXTENSIVE AND SUFFICIENT**

18. OSKR produced 9,791 files on Aug. 24, 2022, covering several distinct analyses and spanning multiple sections of Dr. Zona's report and including both data files and program files.

19. These included 31 programs totaling over 9,000 lines of code, and over 9,700 data input files totaling 700 megabytes.[1] This included programs to process raw and disaggregated viewership event data provided by DirecTV (e.g. "1. Azure Directory Hierarchy Weekly File Assignment", "2a. Key Process and ZIP File Creation Script.ipynb", and "3. Viewership Analysis.sas"), which require several days to run through to completion. The production also included other programs that were lengthy to run, such as the programs to process the transaction data DirecTV produced (*e.g.*, "STMS Data Extraction.sas", "st_processing.do"), as well as several other programs that could be run in under a day. OSKR arranged these files into a sandbox environment (*i.e.,* a closed environment designed to emulate the run-time environment, but where the code would not run correctly without user modifications for file paths) – making clear the interrelations between the

---

[1] OSKR did not produce bates-numbered documents previously produced by Defendants.

**HIGHLY CONFIDENTIAL**

inputs, outputs, and programs, and streamlining the production so that Defendants could run it with a few necessary changes.[2] While preparing the code for production, OSKR consolidated pieces of code that were unnecessarily separated – this was to reduce the number of steps required. OSKR also removed extraneous text from the code, such as comments, erroneous routines replaced, or incorrect procedures identified when during debugging the code during the analysis. This is all consistent with OSKR's implementation of industry-standard procedures.

20. Together, this production described every step required to reconstruct the analysis presented in Dr. Zona's report. Due to the length of time required to run through all the code for the viewership and transaction data provided by DirecTV, OSKR could not do a complete run-through of all the produced code prior to the production. This was the one deviation from OSKR's preferred practice, made necessary by the voluminous nature of disaggregated viewership data that was produced to both parties in this matter. Dr. Zona's unscheduled, urgent heart bypass surgery during the run up to the report deadline pushed out the timeline to complete his analysis, thus restricting the allocation of extra time for the unusually lengthy complete run through of viewership data aggregation code.

21. Prior to any communication from Defendants, OSKR made Defendants aware, on August 29, 2022 (three business days after the original production date) and through counsel, of one typo in the viewership data processing code. OSKR discovered this typo after production while attempting to verify that the produced code would run correctly for the portions of the backup that had not been verified for the reasons stated above (*i.e.,* the size of Defendants data and the resulting long processing period). One line of comments had not been fully deleted, which left an extra "%" character, which would have caused the code to halt. This typo would not prevent an experienced analyst from understanding the analysis and modifying the code to run elsewhere. To anyone familiar with the nature of computer code, this disclosure would have made it clear the code produced had been prepared for production (*i.e.,* edited from the version run on OSKR's servers,

---

[2] Specifically, the code was prepared with generic file paths, so that changing the word "[path]" to the defendants' internal directory would make the code immediately operable. This is a standard industry practice.

as is standard within the industry) even prior to Defendants attempting to run the produced computer programs.

### 3.2 OSKR PROMPTLY PROVIDED ADDITIONAL ASSISTANCE WHEN DEFENDANTS COMMUNICATED CLEAR NEEDS

22. Defendants first communicated on September 7, 2022 that they wanted further information about the production. They requested the intermediate products of each step of the data build, which, as previously explained, is not part of the standard package of backup materials in complex litigation. OSKR does not typically produce such intermediate files unless there is a specific need. Also, many of the requested intermediate files were aggregations of large data sets (both viewership and transaction data) that DirecTV had previously provided to both parties, and, in some cases, even the aggregated intermediate files were still unusually large and, thus, potentially costly to produce. At that point Defendants had not provided any information to explain their need for the requested intermediate files. Because OSKR does not generally produce these data (some of which may not exist at the time of such a request because of the transient nature of these files), OSKR informed Plaintiffs' counsel that the products of each step of the data build are all reproducible from what had already been produced.

23. Defendants' follow-up response on September 14, 2022 included details they had not previously mentioned about three examples where the code was not working. These were easily correctible typographical errors introduced when preparing the code for production (similar to the typographical error Plaintiffs had already alerted Defendants to on August 29). To ameliorate any delays from these typographical errors, once the specific reason for Defendants' request was made clear, and given the short time period for the reply report, Dr. Zona approved OSKR's recreating and providing all intermediate files that could be generated and/or verified within a few business days. As discussed above, to recreate some of the intermediate files was a far more time-consuming process than is typical because of the size of the original data produced by DirecTV. It was thus not possible to create and verify every intermediate file in the three-business-day

window. However, it was feasible to verify some intermediate files of aggregated data at the beginning of the process, and then verify that the remainder of the code ran through without error.

24. Once that verification process was complete and the combination of intermediate files and code finished running to generate the results presented in the report, OSKR then provided a supplemental production three working days after Defendants' September 14 request (on September 19). This production contained intermediate files and code that together were sufficient to recreate all of Dr. Zona's analysis.[3]

25. This production included the intermediate files that were the output of the lengthiest and most costly portions of code to run, including the cloud computing aggregation of the viewership data. As such, it was possible for Defendants to start their analysis using these intermediate files and proceed to complete the analysis in less than one day of computer operation. Given this arrangement, it was feasible to completely run through all the remaining produced code to verify that there were no typographic errors created during the production process, which OSKR did. Defendants' declaration acknowledges and Dr. Yurukoglu's report demonstrates that this set of production on September 19, 2022 was sufficient to reconstruct all the results in Dr. Zona's report.

26. Nevertheless, on September 21, 2022 Defendants noted that OSKR had not yet provided all the intermediate files. While this was correct, it was also not new information. As previously stated to them, some of the intermediate files would have taken more than the three business days to recreate and verify. Defendants also requested some additional specific intermediate files (not required to complete the analysis from the set of intermediate files provided on September 19, 2022), such as the 506Sports map review code output that codified locations into which specific telecasts aired each season, which OSKR prepared by September 23, 2022.

---

[3] The September 19, 2022 production contained 31 programs totaling over 9,000 lines of code, as well as 9,717 data files totaling 1.25 gigabytes of data. This included 13 were newly produced intermediate files totaling 580 megabytes. Using the 13 intermediate files and other data sources provided and/or already in the Defendants' possession, OSKR verified that a subset of the 31 program files would correctly process through to the final results.

**HIGHLY CONFIDENTIAL**

27. Also on September 21, 2022, Defendants communicated that they did not know how to configure the cloud processing platform (within which DirecTV had provided the viewership data a year prior) to conduct the first stage of the viewership data processing, and that they observed the processing crashing at a specific line of code. As I discuss above, this issue affected only the limited question of whether DirecTV's disaggregated viewership data was properly aggregated in a pre-analytical step for Dr. Zona's work. Also, this was Defendants' first mention that they were not able to run the program "2a. Key Process and ZIP File Creation Script.ipynb," one of a set of programs to process the raw viewership data.

28. Given Defendants now had received all the downstream intermediate data files (all data files prepared from raw data to become inputs called up by the code to run the analysis), such aggregation of the viewership data was no longer needed to run to assess Dr. Zona's analysis – OSKR's production on September 19, 2022 included the much smaller intermediate spreadsheet output of aggregated viewership data. Nevertheless, OSKR prepared and provided the cloud configuration details to counsel by the next day, September 22, 2022.

29. On September 28, 2022 Defendants communicated that they continued to have problems with the cloud-processing stage. Based on the specific details they provided, OSKR confirmed the necessary typographic corrections for the cloud-computing code to process all the sequential weeks of viewership data. OSKR responded with further intermediate files and corrected code (verified by running through to completion), which were produced to Defendants within two days of their request. I understand that our cloud-computing consultant was able to determine within just three hours that attempting to run the code in the data-processing environment configured as instructed (and without these corrections) would have indicated the typographical problem with the code.

30. At this point in the back-and-forth between the parties, none of the cloud-computing issues impeded the assessment of Dr. Zona's analysis. Even though Defendants chose to undertake this additional analysis, the provision of the intermediate files had made it possible for the actual analysis to proceed unimpeded, even if the NFL opted also to continue to work with the raw data.

11

*HIGHLY CONFIDENTIAL*

### 3.3 THE BACK-AND-FORTH BETWEEN PARTIES OVER SMALL DATA QUESTIONS EXPERIENCED IN THIS MATTER IS COMMON IN COMPLEX CASES

31. I have worked as an economic consultant in litigation for over twenty-five years in over a hundred antitrust cases. It is commonplace in large antitrust matters with enormous data sets for one or both parties to encounter difficulties with assessing the other side's data production. When this occurs, at least in my experience, the parties work collaboratively to identify and solve these issues, with the mutual understanding that the complexity of the data analysis may, in some cases, necessitate modest extensions of relevant deadlines.

32. OSKR commonly encounters problems like this in data and programs produced by opposing parties. When such problems occur in the normal course of business, it is OSKR's practice to immediately inform counsel and request clarification from the other side of the litigation. While waiting for a response, if we determine it is likely that OSKR's analysts can resolve the problem on our own at minimal cost, then we might attempt to fix things like typographical errors. But we would do so only if the process of repair is likely to expedite the case while waiting for a reply from opposing counsel. Requests to opposing counsel for clarification and/or production of additional code or data to fix the run-of-the-mill data problems like typographic errors in code or a missing data file are standard.

33. The Sabor Declaration lays out a process that deviates from standard industry practice in complex litigation. Rather than immediately alert Plaintiffs of any problems they encountered and wait for Plaintiffs to provide the requested files, Defendants chose to expend staff and computing resources for three weeks, only to fail to produce a solution that took OSKR three business days (primarily driven by computer-processing time). As I discussed before, it is OSKR's practice, and I believe it to be an industry standard, that if a problem in data processing occurs with code and files produced by another party in a litigation to alert opposing counsel of any issues and request they be fixed *prior* to any attempts to resolve the issues within OSKR, and then only if it is our best judgment that we can resolve the problem quickly and efficiently.

12

*HIGHLY CONFIDENTIAL*

34. For example, in this case, OSKR encountered expensive and time-consuming delays in data processing resulting from DirecTV's provision of disaggregated (and incomplete, missing some NFL teams entirely) viewership data. In response, Plaintiffs requested an extension to allow Dr. Zona to finish his work despite the delays in receiving a workable, albeit overly large, set of data from Defendants. Had OSKR encountered the issues described in the Sabor Declaration in the timeframe available for producing a report, it is my belief we would have done this again, *i.e.*, propose an extension (if necessary) and collaborate rather than expending resources in search of a unilateral solution.

35. In other respects, the Sabor Declaration lays out facts that are consistent with my experience of complex matters involving large data sets. Receiving code that has been explicitly modified by removing unnecessary comments or making file paths more generic is the industry norm. Here, OSKR provided Defendants with a "readme" text file with the following instructions: "1. Replace [path] in programs with root filepath of the backup folder." OSKR's submission thus flagged these standard modifications for Defendants' attention, and it should have been obvious that path names included in the code such as "[path]\Analyses\Data" were exemplars rather than the actual line in the code run on OSKR's systems.

36. The Defendants followed the same industry practice when producing backup for their expert reports. For example, the Yurukoglu report backup programs included file paths such as ""----" // location of this backup", ""[Backup Path]"", and "[[Insert location of backup directory]]".

37. In this case, OSKR provided more than 9,000 lines of code detailing how every step of the analysis should proceed to reconstruct Dr. Zona's results. Apart from the aggregation of the viewership data from the raw form provided by DirecTV to the input needed for the analysis, there were only two lines of code requiring minor corrections to run the code to completion on intermediate files provided upon request. With respect to the aggregation of viewership data, which, as I stated previously, was a pre-analytical data step, preliminary to Dr. Zona's Class Certification analysis, there were four lines of code requiring correction on the cloud-computing data processing stage

13

*HIGHLY CONFIDENTIAL*

and a handful of other corrections (proactively identified by OSKR) in the SAS code that completed the aggregation process.

38. The entirety of expense the Plaintiffs incurred over a one-year period for the work limited to the raw, disaggregated cloud-computing data side of the viewership data amounted to $155,685.85, including work prior to aggregating the raw viewership event data (acquiring the data and investigating the data structure) and the following: writing code for aggregation, running samples and debugging code, and running the code through each year of data to prepare aggregated intermediate data. My understanding is that this final step (running the code to prepare aggregated intermediate data) is the entirety of what the Defendants are claiming caused them $298,700 in cloud-computing expense.

## SIGNATURE

39. Executed under penalty of perjury this 6th day of January, 2023, at Lafayette, California.

*[signature]*

Andrew D. Schwarz

14