# Exhibit 18
# to the Declaration of Ian Gore

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| NATIONAL FOOTBALL LEAGUE and<br>NFL ENTERPRISES LLC,<br><br>        Plaintiffs,<br><br> -against-<br><br>U.S. SPECIALTY INSURANCE COMPANY,<br>FREEDOM SPECIALTY INSURANCE<br>COMPANY, STARR INDEMNITY & LIABILITY<br>COMPANY, IRONSHORE INDEMNITY INC.,<br>and EVEREST NATIONAL INSURANCE<br>COMPANY,<br><br>        Defendants. | Index No. _____<br><br><br>**COMPLAINT** |

Plaintiffs National Football League and NFL Enterprises LLC (together, the "NFL Insureds"), by their undersigned counsel, and for their Complaint against U.S. Specialty Insurance Company, Freedom Specialty Insurance Company, Starr Indemnity & Liability Company, Ironshore Indemnity Inc., and Everest National Insurance Company (together, "Excess Insurers"), allege as follows:

### NATURE OF THE ACTION

1. This is an action for money damages and declaratory relief arising out of the Excess Insurers' breach and/or anticipated breach of their contractual obligations owed to the NFL Insureds under excess Directors & Officers liability insurance policies they issued to NFL Ventures, L.P. and which insure the National Football League and NFL Enterprises LLC.

2. The Excess Insurers' policies "follow form" to the terms of the primary D&O policy and expressly cover antitrust claims made against the NFL Insureds.

3. Beginning in June 2015, the NFL Insureds were named as defendants, along with DirecTV entities, in a number of antitrust lawsuits alleging that licensing contracts that give

DirecTV the exclusive right to distribute out-of-market NFL football games allegedly violate antitrust laws. These lawsuits were eventually consolidated in a multi-district litigation styled *In re: National Football League Sunday Ticket Antitrust Litig.*, Case No. 2:15-ml-02668 (C.D. Cal.) (the "MDL" or "*Sunday Ticket* Litigation").

4. The NFL Insureds timely reported the *Sunday Ticket* Litigation under their D&O policies in 2015 and requested insurance coverage from their primary and Excess Insurers. Between July and September 2015, the primary insurer acknowledged its coverage obligations for the *Sunday Ticket* Litigation; thereafter, the Excess Insurers all adopted or acquiesced to the primary insurer's coverage position. By 2017, the NFL Insureds had incurred defense costs, fees, and expenses that exceeded the primary policy's retention. The primary insurer subsequently began reimbursing the NFL Insureds' defense costs, fees, and expenses. By April 2022, the primary insurer had paid in full its policy limits toward the NFL Insureds' *Sunday Ticket* Litigation defense costs, fees, and expenses.

5. Between June 2015 and August 2021, the Excess Insurers abided by the primary insurer's acceptance of coverage for the *Sunday Ticket* Litigation. But as the NFL Insureds continued to incur defense costs, fees, and expenses approaching the excess layers, the first-layer excess insurer reversed course and sought to contrive coverage defenses to avoid its obligation to cover the *Sunday Ticket* Litigation, prompting the other four Excess Insurers subsequently to reverse their earlier acceptances of coverage.

6. By this action, the NFL Insureds seek to enforce their right to coverage for the *Sunday Ticket* Litigation under the terms of the D&O policies issued by the Excess Insurers. The NFL Insureds seek compensatory damages, declaratory relief, prejudgment interest, attorneys' fees and costs, and such further and additional relief that may be available.

2

FILED: NEW YORK COUNTY CLERK 11/18/2022 12:02 AM
NYSCEF DOC. NO. 2
INDEX NO. 654411/2022
RECEIVED NYSCEF: 11/18/2022

Case 2:15-ml-02668-PSG-SK   Document 860-17   Filed 01/06/23   Page 4 of 18   Page ID
#:28664

## PARTIES

7. Plaintiff National Football League is an unincorporated membership association organized under the laws of New York with its principal place of business in New York, New York. The members of the National Football League include corporations organized under the laws of, or with their principal places of business in, numerous jurisdictions.

8. Plaintiff NFL Enterprises LLC is organized under the laws of Delaware and has its principal place of business in New York, New York. NFL Enterprises LLC is a subsidiary of NFL Ventures, L.P.

9. U.S. Specialty Insurance Company ("USSIC") is organized under the laws of Texas and has its principal place of business in Houston, Texas. USSIC is authorized to and is transacting business in New York.

10. Defendant Freedom Specialty Insurance Company ("FSIC") is organized under the laws of Ohio and has its principal place of business in Scottsdale, Arizona. FSIC is authorized to and is transacting business in New York.

11. Defendant Starr Indemnity & Liability Company ("Starr") is organized under the laws of Texas and has its principal place of business in New York, New York. Starr is authorized to and is transacting business in New York.

12. Defendant Ironshore Indemnity Inc. ("Ironshore") is organized under the laws of Illinois and has its principal place of business in Boston, Massachusetts. Ironshore is authorized to and is transacting business in New York.

13. Defendant Everest National Insurance Company ("Everest") is organized under the laws of Delaware and has its principal place of business in Warren, New Jersey. Everest is authorized to and is transacting business in New York.

3

## JURISDICTION AND VENUE

14. This Court has jurisdiction pursuant to CPLR 301, CPLR 302, CPLR 3001, and BCL 1314.

15. Defendant Excess Insurers are licensed to do business in New York, have written insurance policies covering risks for New York citizens, and are otherwise transacting business in New York.

16. Defendant Excess Insurers issued insurance policies to the NFL Insureds in New York, which were to be performed in New York.

17. Venue is proper in this Court pursuant to CPLR 503.

## FACTUAL ALLEGATIONS

**The Insurance Policies**

18. <u>Primary Policy</u>. Non-party National Liability & Fire Insurance Company ("Berkshire"), an affiliate of Berkshire Hathaway Company, issued Directors and Officers Liability and Employment Practices Liability Policy No. 43-PBL-150292-01, to NFL Ventures, L.P. for the period August 17, 2014 to August 31, 2015 (the "Primary Policy").

19. The Primary Policy provides $10 million in limits in excess of the applicable retention. The retention for antitrust claims is $5 million.

20. The Primary Policy states that it "must meet the minimum standards of the New York Insurance Law and Regulations."

21. <u>First Excess Policy</u>. USSIC issued Policy No. 14-MGU-14-A32689 for the period August 17, 2014 to August 31, 2015, providing $10 million in limits in excess of $10 million in underlying limits (the "USSIC Policy").

4

22. The USSIC Policy provides that "[e]xcept as specifically set forth in the terms, conditions or endorsements of this Policy, coverage hereunder shall apply in conformance with the terms, conditions, limitations and endorsements of the Primary Policy."

23. The USSIC Policy states that it "must meet the minimum standards of the New York Insurance Law and Regulations."

24. <u>Second Excess Policy</u>. FSIC issued Policy No. XMF1400791 for the period August 17, 2014 to August 31, 2015, providing $10 million in limits in excess of $20 million in underlying limits (the "FSIC Policy").

25. The FSIC Policy provides that FSIC "shall provide insurance coverage excess of the Underlying Limits in accordance with the same terms, definitions, conditions, exclusions and limitations as are contained in the [Primary Policy], except with respect to the premium, the limit of liability and as otherwise provided herein."

26. The FSIC Policy states that it "must meet the minimum standards of the New York Insurance Law and Regulations."

27. <u>Third Excess Policy</u>. Starr issued Policy No. SISIXFL21128114 for the period August 17, 2014 to August 31, 2015, providing $10 million in limits in excess of $30 million in underlying limits (the "Starr Policy").

28. The Starr Policy provides coverage "in accordance with the terms, conditions, limitations and other provisions of the [Primary Policy]; subject to: A. the Limit of Liability as stated in Item 3 of the Declarations; and B. all other terms and conditions of, and the endorsements attached to, this Policy."

29. The Starr Policy states that it "must meet the minimum standards of the New York Insurance Law and Regulations."

30. <u>Fourth Excess Policy</u>. Ironshore issued Policy No. 001735001 for the period August 17, 2014 to August 31, 2015, providing $10 million in limits in excess of $40 million in underlying limits (the "Ironshore Policy").

31. The Ironshore Policy "provide[s] insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the [Primary Policy], except as may be otherwise provided in this Policy."

32. The Ironshore Policy states that it "must meet the minimum standards of the New York Insurance Law and Regulations."

33. <u>Fifth Excess Policy</u>. Everest issued Policy No. SC5ML00004-141 for the period August 17, 2014 to August 31, 2015, providing $10 million in limits in excess of $50 million in underlying limits (the "Everest Policy").

34. The Everest Policy provides that "[e]xcept as otherwise provided in this policy, coverage under this policy shall apply in conformity with and subject to the warranties, limitations, conditions, provisions, and other terms of the 'Primary Policy....'"

35. The Everest Policy states that it "must meet the minimum standards of the New York Insurance Law and Regulations."

36. The USSIC Policy, FSIC Policy, Starr Policy, Ironshore Policy, and Everest Policy are referred to collectively as the "Excess Policies." The Primary and Excess Policies are referred to collectively as the "Policies."

37. The National Football League and NFL Enterprises LLC are insureds under the Policies.

38. The NFL Insureds have paid all premiums due under the Excess Policies, and any conditions to coverage and litigation under the Excess Policies have been performed, have occurred, or have been excused, satisfied, forfeited, or waived.

39. The Policies provide that the primary and Excess Insurers "shall pay on behalf of the [insureds] all Loss as a result of a Claim first made against the [insureds] during the Policy Period for a Wrongful Act and reported to the Insurer as required by this Policy."

40. "Loss" is defined to include (without limitation), "compensatory, punitive, exemplary and multiple damages ... settlements and judgments, including costs and fees awarded to a covered judgment and pre-judgment and post-judgment interest on that portion of a covered judgment ... [and] Defense Costs."

41. The Policies specifically cover the NFL Insureds for "Antitrust Claims," which are defined in part as "any Claim alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations...."

**The Underlying *Sunday Ticket* Litigation**

42. On Sunday afternoons during the regular NFL season, television viewers generally have free, over-the-air access to at least three NFL football games, including their local team's game (if the local team is playing that afternoon).

43. NFL fans can watch all other out-of-market NFL games played on Sunday afternoons by purchasing a subscription to the "NFL Sunday Ticket" package. They can also watch out-of-market games at bars and other commercial establishments that purchase subscriptions to NFL Sunday Ticket and show the games to their patrons.

44. When the underlying *Sunday Ticket* Litigation was filed, DirecTV had the exclusive right to sell the NFL Sunday Ticket package in the United States pursuant to contracts between DirecTV and NFL Enterprises LLC dated 2014.

45. Beginning in June 2015, the National Football League and NFL Enterprises LLC were named as defendants, along with several DirecTV entities, in more than two dozen antitrust lawsuits alleging that the licensing arrangements between DirecTV and NFL Enterprises LLC permit DirecTV to charge supracompetitive prices.

46. In December 2015, the Judicial Panel on Multidistrict Litigation transferred the then-pending lawsuits against the NFL Insureds and the DirecTV entities to the Central District of California for consolidated pre-trial proceedings.

47. In total, 27 similar antitrust suits challenging the NFL/DirecTV exclusive agreement were filed and transferred to the MDL in the Central District of California.

48. In June 2016, a consolidated putative class action complaint was filed by four lead plaintiffs. In addition to naming as defendants the National Football League, NFL Enterprises LLC, and DirecTV entities, the consolidated putative class action complaint also added the 32 NFL member clubs as defendants.

49. The consolidated complaint alleges violations of Sections 1 and 2 of the Sherman Antitrust Act on behalf of two putative classes, residential and commercial subscribers of DirecTV, that purchased NFL Sunday Ticket from DirecTV between June 17, 2011, and the present.

50. The NFL Insureds' motion to dismiss the litigation was granted in 2017, but the Ninth Circuit reversed the trial court's ruling in August 2019. The United States Supreme Court denied certiorari in November 2020, with one justice writing separately to explain that the denial

8

of certiorari did not necessarily reflect agreement with the Ninth Circuit's analysis and that the NFL Insureds have "substantial arguments on the law" as to why the challenged arrangements with DirecTV are not anticompetitive.

51. The *Sunday Ticket* Litigation is ongoing. As of November 2022, the NFL Insureds had paid or incurred substantial defense costs, fees, and expenses in connection with the *Sunday Ticket* Litigation that exceed the amounts of the applicable retention and the combined limits of the Primary and USSIC Policies and that currently reach into the FSIC Policy layer by more than $200,000. The NFL Insureds will continue to incur defense costs, fees, and expenses to defend against the *Sunday Ticket* Litigation.

52. The underlying plaintiffs are seeking to hold the NFL Insureds liable in connection with the *Sunday Ticket* Litigation for amounts in excess of the combined limits of insurance provided under all of the Excess Policies.

**Excess Insurers' Acceptance of Coverage and Reversal More than Six Years Later**

53. On or about June 19, 2015, the NFL Insureds notified the primary and Excess Insurers of the first *Sunday Ticket* lawsuit.

54. In a letter sent on July 9, 2015, Berkshire, the primary insurer, accepted coverage for the first of the *Sunday Ticket* lawsuits, stating that "the claim triggers coverage under the … policy."

55. The NFL Insureds promptly reported the subsequent *Sunday Ticket* lawsuits as they were filed.

56. In three supplemental coverage position letters sent to the NFL Insureds between August and September 2015, Berkshire concluded that all of the *Sunday Ticket* lawsuits alleged

9

"Related Wrongful Acts" and would therefore be "considered a single Claim with one applicable retention" and subject to Berkshire's earlier acceptance of coverage.

57. The Excess Insurers adopted Berkshire's acceptance of coverage for the *Sunday Ticket* Litigation through express acknowledgments and knowing acquiescence. For example, FSIC sent a letter to the NFL Insureds on July 28, 2015, "fully adopt[ing] and incorporat[ing]" Berkshire's coverage position.

58. Ironshore similarly expressly "adopt[ed] the position of [Berkshire]" in letters sent to the NFL Insureds on September 18, 2015, November 18, 2015, and December 21, 2015.

59. USSIC and Starr wrote to the NFL Insureds on July 7, 2015 and June 26, 2015, respectively, committing to provide a coverage position after reviewing the matter and Berkshire's coverage position letter. After USSIC and Starr received Berkshire's four coverage letters acknowledging coverage, neither USSIC nor Starr expressed any disagreement with Berkshire's coverage position at any point over the next six years.

60. The Excess Insurers continued to follow Berkshire's position when the NFL Insureds' broker emailed them on or about October 24, 2016, confirming that the Excess Insurers "have acknowledged receipt of notice of [the *Sunday Ticket* Litigation] and 'follow form' to the primary insurer's acceptance of coverage of this Sunday Ticket Package Litigation." None of the Excess Insurers disputed the broker's statement.

61. The NFL Insureds reasonably relied to their detriment on the Excess Insurers' acknowledgements of coverage, including by continuing to pay significant premium to one or more of the Excess Insurers in exchange for D&O and other lines of insurance policies over the years.

62. Beginning in 2015 through the present, the NFL Insureds have provided the Excess Insurers with regular updates on the underlying *Sunday Ticket* Litigation.

63. In 2017, the retention applicable to antitrust claims was exhausted through defense costs, fees, and expenses paid by the NFL Insureds, after which Berkshire began reimbursing the NFL Insureds' defense costs, fees, and expenses.

64. On August 27, 2021, USSIC sent the NFL Insureds a letter purporting to set out "supplemental views regarding coverage," which for the first time contended that coverage for the *Sunday Ticket* Litigation "appears" to be excluded. Ten months later, on or about June 2, 2022, USSIC expressly reversed its earlier acceptance of coverage and denied coverage, after which the four other Excess Insurers followed suit and sent correspondence reversing their earlier acceptances of coverage either by expressly denying coverage (in the case of FSIC and Ironshore) or by contending that they could not then confirm coverage for the *Sunday Ticket* Litigation and reserving rights to deny coverage (in the case of Starr and Everest).

65. In the meantime, as of April 2022, Berkshire paid its full $10 million in primary policy limits to reimburse the NFL Insureds' defense costs, fees, and expenses for the *Sunday Ticket* Litigation, thereby exhausting the primary layer.

66. The Excess Insurers have continued to refuse to acknowledge coverage on the purported grounds that the *Sunday Ticket* Litigation is "related"—as that term is used in the Policies and construed under the law—to a different antitrust lawsuit filed against the National Football League in 1997, 18 years before the commencement of the *Sunday Ticket* Litigation.

67. The Excess Insurers contend that, because the *Sunday Ticket* Litigation is ostensibly "related" to the 1997 lawsuit, it is excluded from coverage under the Excess Policies because the two proceedings—separated by nearly two decades—purportedly constitute a single

"Claim" that should be deemed to have first been "made" before the Excess Policies incepted and/or falls within the scope of "pending and prior litigation" exclusions in the Policies.

68. In addition to the untimely nature of the reversals of their coverage positions, the Excess Insurers' coverage positions ignore fundamental differences between the *Sunday Ticket* Litigation and the 1997 lawsuit that defeat any suggestion that the suits are "related" for exclusionary purposes as that term is construed under the Policies and law. On the merits, the Excess Insurers will not be able to meet the burdens they face under the Excess Policies and the law sufficient to avoid their coverage obligations.

69. For example, beyond the extraordinary temporal gap between the filing of the two litigations, the two lawsuits challenge different versions of the NFL Sunday Ticket product, involve different licensing agreements, different claimants, different defendants, allege different theories of anticompetitive activity and alleged damages, and challenge conduct that took place no less than ten to twenty years apart.

70. The Excess Insurers' coverage denials are inconsistent with the policy language, the relevant case law, governing regulations, and the Excess Insurers' obligations as "follow form" excess insurers to follow the coverage-affirming position of the primary insurer, which accepted coverage and paid its limits in full for this matter.

71. As of the date of this filing, the NFL Insureds have paid or incurred defense costs, fees, and expenses in connection with the *Sunday Ticket* Litigation in an amount that exceeds the applicable retention, the limits of the Primary Policy and the limits of the USSIC Policy, and which partially erode the limits of the FSIC Policy.

72. The NFL Insureds have demanded reimbursement of their defense costs, fees, and expenses, from USSIC and FSIC, both of which have denied coverage for the *Sunday Ticket* Litigation.

73. All Excess Insurers have either expressly denied coverage or have effectively denied coverage in recent months by refusing, after demand, to acknowledge any coverage obligation for the *Sunday Ticket* Litigation.

74. Upon information and belief, the Excess Insurers will continue to deny coverage for any defense costs, fees, expenses, and other liabilities or losses the NFL Insureds have paid or incurred or that they may pay or incur in connection with the *Sunday Ticket* Litigation.

## FIRST CAUSE OF ACTION
**(Breach of Contract Against U.S. Specialty Insurance Company and Freedom Specialty Insurance Company)**

75. The NFL Insureds repeat the allegations of Paragraphs 1 through 74 as if fully set forth herein.

76. The NFL Insureds have fully complied with all of the terms and conditions of the Policies.

77. The NFL Insureds have paid or incurred defense costs, fees, and expenses in connection with the *Sunday Ticket* Litigation that currently exceed the applicable retention, the limits of the Primary Policy and the limits of the USSIC Policy, and which partially erode the limits of the FSIC Policy, and which will continue to increase.

78. The NFL Insureds will continue to incur defense costs, fees, and expenses in connection with the *Sunday Ticket* Litigation.

79. The NFL Insureds have demanded reimbursement from USSIC and FSIC of the defense costs, fees, and expenses the NFL Insureds have incurred or paid to date that fall within

13

USSIC and FSIC's insured limits, but USSIC and FSIC have failed and refused to reimburse these or any other losses in connection with the *Sunday Ticket* Litigation.

80. USSIC's refusal to pay its $10 million in limits to fully reimburse and/or pay on behalf of the NFL Insureds the defense costs, fees, and expenses the NFL Insureds have paid or incurred in connection with the *Sunday Ticket* Litigation is a material breach of the USSIC Policy.

81. FSIC's refusal to fully reimburse and/or pay on behalf of the NFL Insureds the defense costs, fees, and expenses the NFL Insureds have paid or incurred and will continue to incur in connection with the *Sunday Ticket* Litigation up to the amount of the limits of the FSIC Policy is a material breach of the FSIC Policy.

82. USSIC and FSIC's material breaches have proximately caused the NFL Insureds harm, for which the NFL Insureds are entitled to damages in an amount to be determined in this action, plus prejudgment interest and other amounts to be awarded by the Court.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment Against All Defendants)

83. The NFL Insureds repeat the allegations of Paragraphs 1 through 82 as if fully set forth herein.

84. The NFL Insureds have fully complied with all of the terms and conditions of the Policies.

85. The NFL Insureds have incurred defense costs, fees, and expenses in connection with the *Sunday Ticket* Litigation that currently exceed the applicable retention, the limits of the Primary Policy and the limits of the USSIC Policy, and which partially erode the limits of the FSIC Policy. The NFL Insureds will continue to incur defense costs, fees, expenses, and other losses in connection with the *Sunday Ticket* Litigation.

86. The underlying *Sunday Ticket* Litigation plaintiffs are seeking to hold the NFL Insureds liable for an amount that, when combined with defense costs, fees, and expenses incurred to date, exceeds the available limits of insurance provided under all of the Excess Policies.

87. The NFL Insureds contend that defense costs, fees, expenses, any other liabilities or losses it has paid or incurred or may pay or incur in connection with the *Sunday Ticket* Litigation are covered under the Excess Policies.

88. USSIC, FSIC, and Ironshore have expressly denied coverage under their respective policies for the *Sunday Ticket* Litigation, and Starr and Everest have refused to acknowledge coverage and reserved rights to deny coverage for the *Sunday Ticket* Litigation.

89. An actual and justiciable controversy exists between the NFL Insureds and the Excess Insurers concerning the Excess Insurers' obligations to reimburse and/or pay on behalf of the NFL Insureds the NFL Insureds' defense costs, fees, expenses, and any other liabilities or losses the NFL Insureds have paid or incurred, or may pay or incur, in connection with the *Sunday Ticket* Litigation.

90. Pursuant to CPLR 3001, the NFL Insureds request that the Court issue a judicial determination and declaration as to Excess Insurers' obligations under the Excess Policies to reimburse and/or pay on behalf of the NFL Insureds the NFL Insureds' defense costs, fees, expenses, and any other liabilities or losses the NFL Insureds have paid, incurred, or may pay or incur, in connection with the *Sunday Ticket* Litigation.

WHEREFORE, the NFL Insureds respectfully pray for relief as follows:

A.  awarding the NFL Insureds damages in an amount to be determined in this action;

B.  awarding the NFL Insureds prejudgment interest at the statutory rate in accordance with CPLR 5001;

C.  declaring that the Excess Insurers are obligated to fully reimburse and/or pay on behalf of the NFL Insureds the NFL Insureds' defense costs, fees, expenses, and any other liabilities or losses the NFL Insureds have paid or incurred, or may pay or incur, in connection with the *Sunday Ticket* Litigation, subject only to any unambiguously applicable underlying or upper limits of liability stated in their Excess Policies;

D.  awarding the NFL Insureds' attorneys' fees, costs, and disbursements incurred in obtaining the benefits due under the Excess Policies; and

E.  granting the NFL Insureds such other and further relief as the Court may deem just and proper.

Dated: November 18, 2022
      New York, New York

                COVINGTON & BURLING LLP

                By: /s/ *Cléa P.M. Liquard*
                      Cléa P.M. Liquard

The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000
cliquard@cov.com

Mitchell F. Dolin
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000
mdolin@cov.com

*Attorneys for Plaintiffs*
*National Football League and*
*NFL Enterprises LLC*