```
                     UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    (WESTERN DIVISION - LOS ANGELES)




IN RE:                          ) CASE NO: 2:15-ml-02668-PSG-JEM
                                )
                                )              CIVIL
NATIONAL FOOTBALL LEAGUES       )
SUNDAY TICKET ANTITRUST         )     Los Angeles, California
LITIGATION                      )
                                )     Friday, February 3, 2023
                                )
_____)     (1:30 p.m. to 3:49 p.m.)




                          MOTIONS HEARING

            BEFORE THE HONORABLE PHILIP S. GUTIERREZ,
              CHIEF UNITED STATES DISTRICT JUDGE




CALENDARED MOTIONS:        SEE PAGE 2


APPEARANCES:               SEE PAGE 2


Court Reporter:          Recorded; CourtSmart


Courtroom Deputy:        Wendy Hernandez


Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

<u>CALENDARED MOTIONS:</u>

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [DKT.NO.628];

NFL DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF SARAH BUTLER [DKT.NO.674];

NFL DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF J. DOUGLAS ZONA [DKT.NO.678];

NFL DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF DANIEL A. RASCHER [DKT.NO.682];

PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS OF MARK A. ISRAEL [DKT.NO.743];

PLAINTIFFS' MOTION TO EXCLUDE DISQUALIFY NFL EXPERT DR. ALI YURUKOGLU [DKT.NO.765];

NFL DEFENDANTS' MOTION FOR SANCTIONS [DKT.NO.833]


<u>APPEARANCES FOR:</u>

Plaintiffs:               MARC M. SELTZER, ESQ.
                          Susman Godfrey
                          1900 Avenue of the Stars
                          Suite 1400
                          Los Angeles, CA 90067

                          EDWARD DIVER, ESQ.
                          Langer Grogan & Diver
                          1717 Arch Street
                          Suite 4130
                          Philadelphia, PA 19103

Defendants:               RAKESH N. KILARU, ESQ.
                          BRIAN L. STEKLOFF, ESQ.
                          Wilkinson Stekloff
                          2001 M Street NW
                          10th Floor
                          Washington, DC 20036

                          DEREK LUDWIN, ESQ.
                          Covington & Burling
                          One City Center
                          800 Tenth Street NW
                          Washington, DC 20001

1    **Los Angeles, California; Friday, February 3, 2023; 1:30 p.m.**

2    --oOo--

3    **THE CLERK:**  All rise.  Calling Item 5, MDL-15-2668

4    regarding National Football League.  Counsel, please state your

5    appearances.

6    **MR. SELTZER:**  Good afternoon, Your Honor.  If it

7    please the Court, Marc Seltzer on behalf of the Plaintiffs and

8    with me are my colleagues.  Thank you.

9    **THE COURT:**  Good afternoon.

10   **MR. KILARU:**  Good afternoon, Your Honor, Rakesh

11   Kilaru for the Defendants along with my colleagues Brian

12   Stekloff and Derik Ludwin.

13   **MR. STEKLOFF:**  Good afternoon, Your Honor.

14   **THE COURT:**  Good afternoon.

15   I know you are ready to make a presentation and I'll

16   let you do that.  I just wanted some preliminary thoughts that

17   would assist me if sometime during the course of your

18   presentation you discussed.  I just wanted to step back a

19   second and sort of talk about my preparation for the hearing.

20   I apologize for continuing it a couple times.  It, frankly,

21   just wasn't -- there were a few boxes of things and I wasn't

22   quite ready until today.

23   Just to get myself into the case again, I just

24   started the preparation by going back and reading what Judge

25   Ikuta wrote in this case a while back and I was amused by one

4

1  of her comments when she was talking about impact and injuries.

2  She said, "Here, as in NCAA, an observer with even rudimentary

3          understanding of economics could conclude that the

4          arrangements in question would have an

5          anticompetitive effect on customers and markets."

6          And I thought that was kind of funny because if you

7  had seen the expert reports in this case, whether it was

8  rudimentary, that's beyond my pay grade.  And then I went to go

9  read *Olean* again, another Ikuta opinion and then I also went

10 back and read the *NCA* case and, of course, I've read the

11 papers.

12         My preliminary thoughts on the Daubert motions, my

13 tentative would be to deny the Daubert motions, all five of

14 them.  Of course, you can discuss it further.  Really, it

15 focuses on predominance in the motion for class certification.

16 A couple of side issues, not much time was spent on injunctive

17 relief and I was curious what effect that some of the

18 Plaintiffs weren't subscribers anymore or that the contract is

19 going to end shortly.

20         Also, too, I think from the Plaintiffs' perspective,

21 I just wanted a better understanding of the interplay between

22 the -- between Dr. Zona's and Dr. Rascher's, the use of the

23 materials between them.

24         And then last, this is raised by the Defense.  Is

25 there any impact at least from some perspectives that the

1    commercial users may be different in a different place than the

2    residential class members and, in fact, maybe the commercial

3    folks might even want a more restrictive market?

4          Anyway, those are my preliminary thoughts and I'm

5    looking forward to hearing from you.  Plaintiffs first.

6          **MR. SELTZER:**  Thank you, Your Honor.  And thank you

7    very much for the preliminary thoughts in terms of guiding the

8    discussion here today.  Let me say this at the outset that

9    before the hearing, I agreed with all of our colleagues to

10   divide the argument between us -- between dealing with the

11   class certification motion and also any issues relating to the

12   experts and their testimony.  So with permission of the Court,

13   we would proceed in that fashion.

14         Let me just begin with a couple of points I wanted to

15   make before turning to the questions that the Court is focused

16   on.  In my experience, this is actually much more simple and

17   straightforward as an antitrust class action than many of the

18   cases that have been certified and even tried successfully.

19         In fact, I was involved in helping to try two

20   national antitrust class action cases and I can tell you they

21   were more complicated than this one.  Why is this one so

22   simple?  It involves a single product sold by a single company

23   pursuant to uniform national price lists and the product didn't

24   vary over time.  It was the same product during the entire

25   class period.

6

1          By contrast, there are cases dealing with multiple

2    defendants selling different varieties of products, some coming

3    into the conspiracy, some coming out of the conspiracy during

4    the class period, sold through various chains of distribution

5    up and down the line from manufacturer to direct producer to

6    wholesaler to end user.  All of those complexities don't exist

7    here.

8          **THE COURT:**  I think, the starting point being Judge

9    Ikuta's decision in this case but it seems in reading that she

10   probably has the same perspective that you just gave after you

11   read that decision.

12         **MR. SELTZER:**  Right.  And let me say why her approach

13   to that makes perfect sense as a matter of pure economics.

14   It's an elementary law, the law of supply and demand, that

15   everything else being held equal, if an output of a product is

16   restricted, that will raise the price of the product.  And

17   that's why a restriction on output is deemed to be the flip

18   side of a price-fixing agreement.

19         It's the inevitable effect of the reduction of supply

20   and restricting output that raises prices.  That's why it's a

21   very straightforward case in the sense that this case involves

22   a -- what Judge Ikuta, I think, rightly characterizes a naked

23   restraint on output, on the number of telecasts that can be

24   seen by viewers.  And what she said is that in that

25   circumstance, the logical outcome is that the price of that

1    product is going to be raised.

2         That actually was the teaching of the U.S. Supreme

3    Court years ago.  I think she cited the decision in *United*

4    *States versus Socony-Vacuum* which was a conspiracy to restrict

5    output and the Supreme Court said that was a per se violation

6    in the antitrust laws.  So it's a very straightforward

7    application of elementary, very sound economic theory that

8    applies to this case.

9         Now, the arguments that the Defendants have made with

10   respect to the class involve -- in the first instance, they

11   want to talk about the gerrymandering of the class, that we

12   didn't include people that would have lost the opportunity,

13   according to what they claim the evidence would show the

14   ability to see games for free over the air.

15        We resist that proposition very vigorously.  We don't

16   think that there's any common sense or reality to that

17   proposition but even if it were true -- and we don't think it

18   is true -- it wouldn't affect the fact that here the class

19   consists of people who are charged and paid for a particular

20   product, Sunday Ticket, which wasn't free over the air which

21   required payment of a subscription price -- we think an

22   exorbitant price -- per year to get the out-of-market games.

23        The Plaintiffs are free to fashion a class in the way

24   that they best think will be in the best interest of the class

25   they seek to represent.  So the class we represent is very

8

1    straightforward.  It's the people who bought and paid for the

2    Sunday Ticket program.

3             The argument that they want to make about what would

4    happen if there were the absence of these restraints, it's

5    actually based on confusion, Your Honor.  It doesn't raise any

6    kind of a class action issue.

7             The question that they raise about what would happen

8    in the but-for a world regarding these over-the-air games,

9    that's a merits question.  It goes to the question of whether

10   we have a violation.  Give you this example.  Suppose using the

11   Consumer Welfare Standard of Antitrust, 60 percent of the class

12   members would be harmed by virtue of the restraint.  Forty

13   percent wouldn't.  That would be an anti-competitive restraint.

14            But whether that is the case or not, that is a merits

15   question of a class-wide nature going toward whether there was

16   a violation or not.  So the whole idea of arguing about what

17   class members might or might not prefer in the but-for world,

18   it's based on confusion.

19            It's confusing two issues, confusing the class-wide

20   nature of the proof and the evidence in the case versus the

21   question of whether or not we will succeed at trial and prove a

22   violation of the antitrust laws.  And we feel very strongly

23   that we will at the end of the day.  So it's very important to

24   understand that.

25            And in terms of the questions that the Court talked

1   about that it wanted to have addressed on predominancy, again,

2   why is this an easy case for certification by comparison with

3   many?  The Plaintiffs' experts have offered, according to

4   principles and methods that are really not challenged -- they

5   challenged aspects of the application of the method and what

6   the results of those methods are and they nitpick at certain

7   aspects of it.

8        The experts have offered a means of showing that

9   every single class member was overcharged, that if the

10  restraints on output hadn't existed that in the but-for world,

11  which means the world without the restraints, every single

12  class member would have paid less for Sunday Ticket in the but-

13  for world.

14       That means that there is a class-wide method of

15  demonstrating injury to every class member and a measure of

16  measuring damages to every class member.  Now, whether the jury

17  ultimately accepts that proof at trial, that'll be the horse

18  race that we'll be engaged in with the Defendants but we should

19  have the opportunity to present that evidence on behalf of the

20  class which is why predominance is satisfied here.

21       The argument -- going back to this issue of what

22  happened -- what would happen in the but-for world regarding

23  the over-the-air free broadcasts, that argument -- first of

24  all, the evidence that they cited to support that, it's

25  testimony by network executives who said, we prefer not to have

10

1   competition against our broadcast.  They don't say they

2   wouldn't provide those broadcasts.

3        And, in fact, there's every reason in the world to

4   believe that if they had the chance to continue to broadcast

5   the most popular form of entertainment on television, they

6   would do so, so long as the price is right.  So if, in fact,

7   the games would disappear -- we don't think they would.  It

8   would irrational for that happen -- it would be the choice of

9   the NFL to charge too much to the networks to broadcast those

10  games.

11       That is the essence of that argument and it -- as I

12  say, as a matter of economics and business sense, it makes no

13  sense.  And our experts, by the way, they testified that in the

14  but-for world, there would actually be more over-the-air free

15  television broadcasts available, not less.

16       So, again, it's a battle between both sides on that

17  issue.  What would happen in the but-for world but, again,

18  that's a perfect example of a class-wide issue.

19       **THE COURT:**  But it's -- that's sort of what Judge

20  Ikuta is saying when she looks at the *NCA* case --

21       **MR. SELTZER:**  Right, right.

22       **THE COURT:**  -- and post -- when you look all these

23  years back happened.

24       **MR. SELTZER:**  If you look at what happened -- and

25  this is what -- and by the way, having lived through the

1  argument in the Ninth Circuit, I can tell you that the

2  Defendants there were arguing long and hard that college

3  football is so different than the NFL.  You can't extrapolate

4  from the *Board of Regents* versus *NCAA* case to pro football.

5          **THE COURT:**  That's the argument made here, too.

6          **MR. SELTZER:**  Exactly.  And the Circuit said, what

7  are you talking about?  It couldn't be a closer comparison to

8  what we're talking about in this case and what was being talked

9  about by the Supreme Court in the *Board of Regents* case, a

10  restriction on the telecast to be seen.  And that restriction,

11  once it was lifted, what happened?  There was an explosion of

12  college football games to be seen on television.

13          **THE COURT:**  I was very frustrated not to be able to

14  watch Notre Dame on a regular basis.

15          **MR. SELTZER:**  I understand that.  In fact, Your

16  Honor, Notre Dame is a perfect example.  If you look at the

17  record --

18          **THE COURT:**  Twice a year and then NBC.

19          **MR. SELTZER:**  Twice a year and then I think it was

20  limited to four times every two years, something like that.

21  Now, every single game except one that they point to as their

22  counter-example is available and that one is on Peacock because

23  it's not that -- it's a very minor game in the schedule of

24  Notre Dame.  All the other games are available.  They can be

25  seen by people across the country.

12

```
 1            That result is a direct function of the Supreme
 2   Court's decision in Board of Regents.  And what Judge Ikuta
 3   said -- and by the way, on this issue, all three judges were
 4   unanimous that there was a showing here based on the pleadings
 5   of a violation of the antitrust laws.
 6            All of them were unanimous on the proposition that
 7   the Board of Regents case is really the controlling authority.
 8   It shows why this kind of restriction is a violation of the
 9   antitrust laws and rejecting all of the arguments they've made.
10   Well, we're a joint venture.  We have to put on -- we have to
11   cooperate to put on games.  Well, of course, you do but you
12   don't have to cooperate in terms of concentrating all of your
13   broadcasting licensing rights in the NFL and then having
14   exclusive arrangements.  That's not required in order to put
15   out a game.
16            But, again, if it were, that's a pro-competitive
17   justification which would be a class-wide issue to be presented
18   at trial.  So it really doesn't respond to the way the facts
19   work as alleged in this case or to sound and very -- really
20   almost elementary principles of economics of the law of supply
21   and demand.
22            Now, let me turn to the question you raised regarding
23   the interplay between the two experts and, again, I would defer
24   to my colleagues because we divided not just the argument but
25   we've divided the work in the case in -- under respects.
```

13

1          Here are the two different models.  Dr. Rascher's

2     model -- and by the way, he is a preeminent expert in the

3     economics of the sports industry.  That's his field.  He

4     teaches it at college as the director of the department on

5     sports -- in the industry of sports.  He's testified in major

6     cases including the *NCAA* cases involving the *O'Bannon* case and

7     the *Alston* case that went to the Supreme Court.

8          So this is his field.  What did he do?  He drew a

9     comparison between college football and the NFL and showed that

10    if you look at what happened to college football and look at

11    the distribution of the games and compared the relevant top 25

12    colleges or there's some -- or the Power Five conferences and

13    compared that with the way they're broadcast and what --

14    without the restraints that were in existence under the pre-

15    Board of Regents regime and the NFL, you show that if there

16    were increased competition against the Sunday Ticket package

17    coming from the teams or some combination of the teams,

18    whatever, so that more out-of-market games could be seen by

19    fans everywhere, that means that the price of Sunday Ticket

20    would be driven down because that's what happened in the *NCAA*

21    case.

22          The output dramatically increased and the price went

23    down.  So he then makes a comparison -- and by the way, the --

24    if there -- they weren't saying in this case that you couldn't

25    have a bundle of games if they wanted to agree to do that, so

14

1    long as they didn't restrict the ability of individual teams to

2    offer their road games which they do, by the way.

3          They do it for radio broadcasting.  They do it for

4    preseason.  You've got all these other games can be available,

5    not subject to this restriction, this chokehold that they have

6    on the Sunday games which they then concentrate in DirecTV.

7          So to go back to the issue of what Dr. Rascher did,

8    he uses college football as a benchmark.  Benchmarking is one

9    of the traditional ways that you enter into a -- or have an

10   economic analysis about what would happen in the but-for world

11   without their restraints.

12         His opinions are well-founded in what actually

13   happened and he made a meticulous study on the industry's --

14   all the points of comparison about game availability and what

15   would happen with NFL's and responded to arguments they made

16   about what would happen if it went on to a basic tier, not a

17   basic tier.

18         He performed economic aggressions which is the kind

19   of thing an economist does to show what the impact would be of

20   their restraints being lifted.  That's perfectly sound.  And

21   his approach is independent entirely of Dr. Zona's using that

22   yardstick.  We could have rested just with Dr. Rascher but,

23   instead, we went beyond Dr. Rascher and had another expert,

24   Dr. Zona, who's also testified in antitrust cases and been

25   accepted by the Courts as an expert about what's called a

1    "structural model."

2         What is a "structural model"?  You -- instead of

3    looking at a benchmark, either another comparable industry or

4    set of businesses that are alike, you look at what are the

5    demands for the product in question.  You perform a study based

6    upon evidence of what viewer preferences are to see what it is

7    they would choose if they had free choice.

8         And he used an enormous amount of data from DirecTV

9    about viewer choice to see what it is that they would select.

10   From that you construct what's called a "demand curve" which is

11   one part of the economic occasion -- equation to come up with a

12   price that would exist in the but-for world.  And then he also

13   looks at what the competitive environment is to compare them

14   with a different environment without the restraints and one

15   environment with the restraints and then look at an imputed

16   marginal cost which is the cost of providing an additional unit

17   of whatever the product is in question.

18        Here, I think everybody agrees the additional

19   marginal cost is either zero or so small you need a microscope

20   to see it because it's the cost of having the additional person

21   have access to one of these broadcasts which is -- it's a

22   quick.  It doesn't cost anything or if it costs something, it's

23   hard to quantify it because it's so small.

24        Then he took from the -- his computations about

25   marginal cost -- and Mr. Diver can speak in detail to how he

1   went about doing business in that regard -- then computed what

2   would be -- what would the price you would expect to take place

3   with these demands and with the marginal cost figures that he

4   used as his -- as calculated values.

5          And that showed that across the board, the cost --

6   the price of the Sunday Ticket would have gone down for all

7   consumers.  Every purchaser of Sunday Ticket would have paid

8   less in the but-for world than they actually paid in the actual

9   world.  So you've got this other technique to show what would

10  have happened in the but-for world.

11         Dr. Rascher, in turn, takes advantage of what

12  Dr. Zona did to look at other alternatives, not the college

13  football alternative but other potential but-for worlds.  Now,

14  why was that done?  Just simply to be overly cautious on our

15  part.

16         We're very familiar with the *Comcast* case.  In fact,

17  that was my partner Barry Barnett's case in the Supreme Court.

18  And there the issue was, well, you've got to -- there were four

19  restraints at issue that were challenged and the expert report

20  didn't -- provided an estimate of damages that didn't

21  distinguish between the various restraints.  So what did the

22  Supreme Court say?  Well, the expert report doesn't respond to

23  the one restraint that was actually found to be a violation.

24  It separated it out as separately measurable.

25         So here what we did is we said, okay.  These are all

17

1    -- it's all one ball of wax.  All these agreements are

2    interrelated.  They work together.  They reinforce each other

3    which is what Judge Ikuta said is the essence of our case.  You

4    can't separate out the contracts at issue here and say, let's

5    hermetically seal one set of contracts between the NFL teams

6    and the NFL, analyze those separately and decide if there's a

7    violation or not.

8           And then after you finished up that analysis, let's

9    go to the contract between the NFL and DirecTV which is alleged

10   to be a vertical contract and separately analyze that.  So we

11   looked instead, well, let's take them separately.  Is there

12   still a class-wide impact and damages from these separate

13   arrangements?  And the answer is, "Yes."

14          And what Dr. Rascher did, he said, okay, I'll take

15   that analysis and then use the reduction factors, which is the

16   difference between the price that was actually charged and

17   which would have been charged in the market and say that even

18   on these alternatives, everyone was overcharged and we can show

19   it by a class-wide method.

20          Now, one point I'd like to make in this in terms of

21   the simplicity of the case in that regard.  You have cases --

22   and there's one possible exception here.  You have cases where

23   you've got different kinds of purchasers who are separately

24   negotiating at different levels of the chain of distribution.

25   And the argument is, well, those separate negotiations need to

18

1  be taken into account in the damages.

2       If you're a subscriber to Sunday Ticket, you can't

3  negotiate with DirecTV over the price.  You might -- maybe

4  someday you'll get a promo or a discount or something which is

5  extended to people generally and which would exist in the but-

6  for world just as well as they would in the actual world.

7       But it's like dealing with a credit card company.

8  How -- you don't get to negotiate your annual percentage rate.

9  Whatever it is they impose, you have to pay.  The exception, of

10 course, is some of the commercial contracts.  Commercial buyers

11 do negotiate but the response to that is that that's something

12 that would be expected in the but-for world just as it is in

13 the actual world.

14      The overprice -- the starting point is the list price

15 which is elevated to a noncompetitive, super-competitive level,

16 the starting point for those negotiations.  I don't know how

17 many cases have dealt with this argument from the Defendants,

18 you can't tell whether somebody was damaged unless you figure

19 out what they negotiated individually.

20      This has been rejected by I don't know how many

21 Courts across the country and was specifically dealt with by

22 the Ninth Circuit in *Olean*.  And in *Olean*, there are really two

23 decisions you have to look at.  One is the panel decision and

24 then you have the en banc.  The panel decision -- and on this

25 aspect, it was not touched by the en banc Court.  It said,

1  look, the fact that you've got some large purchasers

2  negotiating individually, that doesn't defeat predominancy.

3        And the Court -- I don't have the -- I have the

4  language here someplace if I can find it.

5     **(Pause)**

6        I'll just be a second, Your Honor.

7        **THE COURT:**  Sure.

8        **MR. SELTZER:**  Listen to what the panel said.  And,

9  really, I think it would respond directly to arguments by

10  individualized negotiations for some of the commercial class

11  members.  This is what the Court said -- and if you bear with

12  me.

13        It says, "There was variation among the various

14              subclasses, namely that direct purchasers often

15              individually negotiate prices and the prices

16              retailers actually pay may vary based on purchasing

17              power, retail price strategy and other factors.  Some

18              retailers may even have sold Defendants tuna products

19              as a loss leader to drive customers to their stores."

20        And the Defendants argued that Plaintiffs masked all

21  these differences by using averaging assumptions about what

22  overcharge was paid by all these different types of consumers.

23  And the Court rejected that argument.  It said that, "The

24  baseline price for negotiations would have been raised by the

25  anti-competitive conduct."  And there it was actually a price-

20

1   fixing conspiracy.

2          And the model showed that even a company as big as

3   Walmart, the largest, I think, non-post office employer in the

4   country, would have suffered an overcharge even with its

5   bargaining power against the Defendants.  So that's an argument

6   that's been met and rejected time and time again.

7          Now, on the question -- and, again, I want to go back

8   to it because they made such a big issue out of it and I think

9   it's a red herring -- about the over-the-air market and what

10  would have happened to those customers.  Think about the case

11  this way.  Just suppose hypothetically that in the but-for

12  world, all of the games that are able to be seen for free on

13  over-the-air broadcasting disappeared.

14          Now we're talking about the comparison between the

15  but-for world and the actual world for purposes of damages.  In

16  the actual world, none of those games disappeared.  They were

17  there.  So the only difference is the difference in price that

18  someone paid for Sunday Ticket which the difference was the

19  function of the antitrust violation.  They overpaid for the

20  Sunday Ticket price.

21          And then again -- but I want to go back to the point

22  that I made early on and that was regarding the so-called

23  gerrymandering of the class.  This case has always been about

24  Sunday Ticket purchasers and only Sunday Ticket purchasers,

25  people who paid for Sunday Ticket.  Those are the people we

21

1    represent, those are the people we say were overcharged and

2    those are the people that we have offered class-wide means of

3    proving impact and damages.

4           Now, let me turn to the other issue the Court raised

5    regarding the question on the injunction.  And this is actually

6    interesting in this regard.  First of all -- and you consider a

7    (b)(2) class as opposed to a (b)(3) class.

8           A (b)(2) class is different.  Unlike the (b)(3)

9    class, you don't have to show predominancy.  You don't have to

10   show that a class action is superior to other means of

11   litigating the dispute.  All that is by the boards.  It's

12   irrelevant.  So the questions the Court raised regarding impact

13   and damages have no application whatsoever to whether a (b)(2)

14   class should be certified.

15          Now, the two arguments that they raise are mootness

16   and whether or not it's overly broad because it includes former

17   purchasers as opposed to current subscribers to the Sunday

18   Ticket.  On the mootness question -- first of all, the

19   contracts still haven't ended.  They don't end until, I think,

20   April 1st of this year.

21          But what has happened -- and this is a matter of

22   public records.  So I'm not going to go into what has been

23   produced to us so far in a limited fashion about the new deal

24   that's being made -- or has been made by the NFL and Google to

25   distribute Sunday Ticket.

1           The pooling arrangement between the teams and the NFL

2   is continuing unabated.  That's part of the new deal.

3   Individual teams are not going to be able to offer their own

4   licenses to broadcast their games.  So that part of the

5   violation is plainly continuing.

6           Second, what has been announced is that there's a new

7   exclusive arrangement with Google.  Instead of being on

8   DirecTV, you're going to have to be a YouTube subscriber and

9   pay money to see the Sunday Ticket broadcast on YouTube.  So

10  the same arrangement is continuing.

11          This class action is necessary to remedy what is

12  effectively an ongoing violation of the antitrust laws.  This

13  is not something in the past.  This is ongoing currently.

14          Now, on the current and former subscriber point, that

15  issue was exactly dealt with in the *Laumann* case and this is a

16  case -- the Defendants go back and forth on the significance of

17  *Laumann* to Your Honor's consideration of this case.  *Laumann*,

18  as you may recall, was one involving hockey and major league

19  baseball where there was also a restriction on games to be

20  telecast.

21          The Defendants in that case succeeded in persuading

22  Judge Scheindlin not to certify a (b)(3) class but she

23  certified a (b)(2) class anyway and specifically dealt with the

24  argument that the class shouldn't include former and present

25  subscribers.

23

1          What she said -- and she actually dealt with the

2    cases that the Defendants cited here, is that, look, a former

3    subscriber is like anybody else.  People who watch NFL games,

4    they're being denied freedom of choice by virtue of these

5    restrictions.  They are being harmed by the ongoing violation

6    whether they're a present subscriber or a former prescriber.

7          And, therefore, a (b)(2) class is entirely

8    appropriate to protect their interests as well as the interests

9    of people who are current subscribers.  So you couldn't have a

10   more directly on-point authority for the proposition that the

11   two arguments that they've made -- or at least the second one

12   on the former subscriber point is about merit.

13         So on that point, the only other thing I would

14   mention, because the Court raised it, was the question about

15   the commercial class.  The evidence from our experts is that

16   all of the Plaintiffs, commercial class, residential class

17   members -- all of them suffered an overcharge and that the fact

18   is, by restricting the output, that raised the price that they

19   all paid for Sunday Ticket.  So they were all harmed by that

20   violation.

21         And the argument they make that, well, maybe they

22   have -- the commercial establishments have an interest in not

23   changing the current arrangement because if people can watch

24   these games at home, maybe they won't go to the bars or to the

25   sports establishments.  Put aside that.  That's complete

24

1    speculation.  It doesn't take away from the fact that they were

2    all harmed by overpaying for the product.  That kind of

3    collateral issue doesn't defeat predominancy.  It has nothing

4    to do with whether the class should be certified.

5            And it's also contrary to common sense.  After all,

6    the Saturday college football games can be seen at home.

7    People go to patronize these bars and establishments to see the

8    games together, to have all kinds of other reasons to be there.

9    If there were more games available at home, that doesn't mean

10   that their businesses would be adversely affected.

11           But what did adversely affect them was paying tens of

12   thousands and more in dollars to DirecTV to be able to

13   broadcast the Sunday Ticket game.  That was the concrete harm

14   that they suffered.  The speculation about whether they might

15   or might not want to continue the restraint, it's not -- it is

16   just that speculation and it's also legally irrelevant.

17           If you go back to what Judge Scheindlin said in her

18   decision, there was an argument that some class members might

19   prefer the restraint to continue.  She specifically rejected

20   that argument.  The -- she said, in fact, it would be contrary

21   to the purpose of the antitrust laws.  The fact that a class

22   member might like the regime the way it is, his personal

23   preference doesn't change the fact that there's a violation of

24   the antitrust laws which needs to be rectified and enforced.

25           And the issue is one that she actually directly

1   confronted and I think her words in her decision are certainly

2   worth having the Court consider in that regard.  I hope I've

3   responded to the Court's questions and I was supposed to defer

4   to my colleagues on the experts.  So I don't know if any of

5   them wish to speak to that issue.

6          THE COURT:  I think you covered the interplay fairly

7   well.

8          MR. SELTZER:  Okay.  All right.  And they'll tell me

9   if I didn't.  I can assure you of that.

10          THE COURT:  You can go back up once they sit --

11          MR. SELTZER:  They're not bashful, I can tell you.

12          THE COURT:  Okay.  All right.

13          MR. SELTZER:  Now, I must say, we just got these

14   slides from the other side maybe two minutes before the

15   argument.  So I haven't had a chance to read whatever --

16          THE COURT:  Do you want to take a five-minute break

17   or ten-minute break?

18          MR. SELTZER:  Yeah, probably we should take about

19   five minutes just to look at them.

20          THE COURT:  Let's take a ten-minute break.

21          MR. SELTZER:  I have no idea what they have in these

22   slides.

23          THE COURT:  Okay.  So we'll take ten minutes and then

24   we'll --

25          MS. SPEAKER:  Okay.

26

1          **THE COURT:**  Thank you.

2          **MR. SELTZER:**  Thank you, Your Honor.

3        **(A recess is taken from 2:08 p.m. to 2:21 p.m.; resume**

4          **THE CLERK:**  All rise.

5        **(Pause)**

6          **MR. SELTZER:**  Thank you, Your Honor.  I've had a

7   chance to review the slides with my colleagues here.  And with

8   permission of the Court, after the Defendants make their

9   presentation based on the slides, then Mr. Diver, who was

10   deeply involved in working with the experts, can respond to --

11          **THE COURT:**  Okay.

12          **MR. SELTZER:**  -- each of the points that are made.

13          On the *Laumann* case that I mentioned, on the question

14   of the injunction and the argument about what some class

15   members would prefer, I just wanted to invite the Court's

16   attention to the citation of what it's referring to.  It's at,

17   I'm sorry, 105 F. Supp. Third 384 at pages 404 and 405.

18          And in that case, what the court said is that the

19   question of what the preferences might be of a particular

20   consumer, they may bear on whether or not there's an antitrust

21   violation.  That's the merits question.  What would happen in

22   the marketplace absent the restraints?

23          But if there's a violation, that's the end of the

24   matter.  And what Judge Scheindlin said is that if the tryer of

25   fact decides the restraints' pro-competitive benefits are

27

```
1    insufficient to overcome their anticompetitive effects, that
2    will be the end of the matter.  An arrangement that unlawfully
3    restrains the market as a whole cannot be salvaged by the
4    preferences, however fervent, of a subset of class members.
5              So again directly on point on the issue that Your
6    Honor raised.
7              One other -- two -- actually two housekeeping
8    questions.  On the motions concerning the experts, we had a
9    motion regarding Dr. Yurukoglu which was not strictly speaking
10   a Daubert motion.  Is that also included in the Court's
11   tentative?
12             THE COURT:  Correct.
13             MR. SELTZER:  Okay.  And then the other question not
14   addressed is there also is this pending motion for sanctions.
15   And my partner, Mr. Gore, was prepared to address that.
16             THE COURT:  Right.  My tentative would be deny the
17   request for sanctions so --
18             MR. SELTZER:  Okay.  Thank you, Your Honor.
19             And then so after they make their presentation,
20   Mr. Diver will respond.
21             THE COURT:  All right.  Go ahead.
22             MR. KILARU:  Good afternoon, Your Honor.
23             THE COURT:  Good afternoon.
24             MR. KILARU:  As you've seen, we do have a --
25             THE COURT:  Just tell --
```

1              **MR. KILARU:**  -- set of sides --

2              **THE COURT:**  -- us your name for the record.

3              **MR. KILARU:**  Oh, sorry.  Rakesh Kilaru, K-I-L-A-R-U,

4    for the Defendants.

5              **THE COURT:**  Thank you.

6              **MR. KILARU:**  Thanks.  As Your Honor has seen and as

7    counsel mentioned, we do have a set of slides that we think

8    encapsulate the key arguments.  But I'm actually not going to

9    go through them in order because I'd prefer to go through the

10   order of the issues that Your Honor mentioned.  So we may

11   reference some of them but mostly intended as a guide.

12             Start with the Ninth Circuit opinion, which is where

13   I believe Your Honor said Your Honor started.  We think there's

14   three key points to take away as to why the Ninth Circuit

15   opinion doesn't control and compel the outcome here.

16             The first I would note is what it was that the Ninth

17   Circuit was considering when it may have made those -- when it

18   did make those statements about the economics being simple.

19             This is from the very first paragraph of the opinion,

20   I think maybe the first or second paragraph.  They describe the

21   plaintiff's theory as follows:  Without this arrangement

22   restricting the televising of NFL games, plaintiffs argue, the

23   individual teams would create multiple telecasts of each game

24   and would compete against one another by distributing telecasts

25   of their games through various cable, satellite, and internet

29

1    channels.  That was a theory that was before the Ninth Circuit.

2              That is not theory that the Plaintiffs have brought

3    to you for class certification.  None of their models involve a

4    situation that's what was described in that part of the

5    opinion.  None of them involve multiple telecasts of every

6    game.  And none of them involve teams competing against each

7    other for telecasts.  This is clear as day from the two

8    experts.

9              Dr. Rascher admitted in his deposition very clearly,

10   and every exhibit in his deposition show -- in his reports,

11   excuse me, shows that he's imagining a single feed of each

12   game.  And how he gets to that single feed is very unclear.

13   And that's a point I intend to talk about.  But that's not

14   matching what the Plaintiffs have set forth and what the Ninth

15   Circuit observed.

16             So I would note, Your Honor, that to the extent the

17   theory, the idea is that the Ninth Circuit has sort of decided

18   this, there's a *Comcast* problem because the theory and the

19   models that Plaintiffs brought forth do not match that.

20             So to the extent they are relying on the Ninth

21   Circuit to support the class cert. ruling, that's a fundamental

22   mismatch right there.  And that's a class cert. issue under

23   *Comcast*.

24             Second, I think this is relatively clear.  The Ninth

25   Circuit did not say that the issues that it was talking about

1   could necessarily be resolved on a class-wide basis.  It was

2   looking at a motion to dismiss.

3          It wasn't evaluating predominance, it wasn't

4   evaluating commonality.  It wasn't evaluating any of those

5   requirements.  And so that's where the models come in.  That's

6   where the Plaintiffs had to come forth with an approach to give

7   you the tools you need to potentially resolve this case on a

8   class-wide basis with a single trial.

9          And the last point I note on the Ninth Circuit's

10  opinion, Your Honor, is that what they have brought you is not

11  college football.  College football does not involve all games

12  being available on basic cable, which is Dr. Rascher's ultimate

13  conclusion.  He admitted this in his deposition.

14         Just use the local teams here, UCLA, USC.  To get

15  those teams, you have to subscribe not only to a basic cable

16  tier but also to a variety of premium cable channels that cost

17  more money.  That's true of any team in the United States, even

18  the most popular ones.  I believe it's true of Notre Dame as

19  well.

20         You don't just have to have a basic cable

21  subscription.  If you want to watch every game, you have to

22  have basic cable, you have to have premium cable, and you may

23  even need to have a streaming service.

24         And that's very important because when you put those

25  costs together, to the extent their analogy is an analogy based

31

1  on college football, those can often be more expensive than the

2  cost of Sunday Ticket.  We have a slide on this in our deck.

3  But if you talk about streaming services -- and I believe it's

4  number 17, 16 and 17.

5          First of all, just to start with 16, if you want to

6  watch a team that has games on Fox Sports Two, which is one of

7  the channels that Dr. Rascher said content to could migrate to

8  in his original report, you don't need to just have a basic

9  cable subscription.  You need to have a premium cable

10  subscription.

11          And if you add up the cost that a class member paid

12  to get Sunday Ticket and satellite service with the cost they

13  would need to get Fox Sports Two -- and this is a cost that

14  college football fans pay.  There are lots of college football

15  games on Fox Sports Two every Saturday.  And if you want to be

16  sure that you're getting all your team's games, I think this is

17  true for UCLA, you need to have a subscription to that.  You

18  have to pay more than you have to pay even just for Sunday

19  Ticket.

20          And if the games move to a variety of different

21  channels, if they move not just to premium cable but to

22  regional sports networks, to streaming services, as we know is

23  happening in college football and we know is happening in other

24  sports as well, again consumers would have to pay more.

25          So to the extent the Plaintiffs are saying we brought

32

1  you college football, it's clear from the record, it's clear

2  from the evidence, and it's clear from the real world facts

3  that college football is not a model that necessarily results

4  in lower prices for fans.

5          And we know for a fact that many subscribers to

6  Sunday Ticket subscribe to it because they want to watch a

7  particular team's games and have guaranteed access to all of

8  them.

9          **THE COURT:**  Is what you're saying is -- are you

10  making a merits inquiry?  I mean you're attacking -- you're

11  saying at the end of the day that -- it seems to me you're

12  arguing the merits as opposed to class cert.

13          **MR. KILARU:**  Your Honor, we don't think it's a merits

14  inquiry for the following reason.  And I think it's helpful to

15  think about what a trial would look like even just under the

16  college football model.

17          So I want to start with one thing that the Plaintiffs

18  admit they need to have.  And this is in their briefs.  It's in

19  the brief on Dr. Israel.  They admit that in order to get class

20  certification, not just on the merits, in order to get class

21  certification, you have to have a model of what the content

22  would cost in the but-for world.  The quote is the task is to

23  determine what the price of that same access to all those games

24  would have been in a world without the restraints at issue.

25          And it is clear from Dr. Rascher's deposition -- and

1    this is slide number 14 -- that he has not done that modeling.

2              So in order to have a class-wide inquiry, in order to

3    have a class trial, there needs to be this model -- both sides

4    agree on that -- of what the but-for world would look like

5    because that's how you can decide who will pay what and how do

6    those prices compare to the current world.  But Dr. Rascher

7    admitted he has not done that model.  He has not decided where

8    the games go.

9              So I think first off it's  class issue because the

10   college football model does not give Your Honor and the jury

11   potentially the tools it needs to determine whether or not

12   injury can be decided on a class-wide basis without knowing

13   where the games go.

14             And Dr. Rascher does not commit to where the games

15   go.  There are almost as many charts in his report about

16   possibilities as there are pages.  But he does not commit to

17   where the channels go.  He does not commit to where the games

18   go.  So it is not possible, to Your Honor's point about

19   predominance, to address the question of whether or not there

20   is class-wide injury.

21             He would first need to answer that, which he hasn't

22   done.  And then that would be a first step, but not the only

23   step.  So that's the first failure we think from a class

24   certification perspective.  He hasn't said where the games

25   would go, so you can't figure out how the real world would

34

1    compare to the but-for world.

2            But even if Dr. Rascher had done that, you still in

3    our view could not have a class-wide trial consistent with Rule

4    23 because assume for a moment -- and this is not something

5    that he's done.  Assume for a moment he could come up with an

6    arrangement where all the games migrate to channels that are

7    part of basic cable.  Take that as a given even though it

8    hasn't been done.

9            We would have a right at trial to present evidence

10   that that is not true, that 32 different teams -- and this is

11   his model, to be clear.  Either 32 teams or eight divisions

12   would go out and separately bargain in the marketplace and try

13   to find where their games go on a variety of different media

14   platforms.  So that's his model and that's his approach.

15           We would have a right to show that that -- that his

16   arrangement is not right and that in fact games would go to a

17   variety of different channels.  And we know that this is the

18   case because you can look a literally every sport out there and

19   see that it's happening.

20           The NFL is moving games to streaming services.  We

21   see that with the Amazon deal and also with the future YouTube

22   deal.

23           Major League Baseball is moving games to streaming

24   services.  They have games on Apple TV.

25           College football is moving games to streaming

35

1    services.  We have that in I believe in Notre Dame's example

2    but in a lot of others, too.  And college football involves

3    games going to a variety of different channels that, again,

4    cost more than just basic cable.

5          So we would have a right to present that evidence.

6    And then we don't think you could have a trial without looking

7    at every one of the millions of customers in the class to

8    determine how their welfare would be better or worse off in the

9    current world, where we know what they paid, what they paid was

10   nothing for Sunday Ticket in the first year, and then a list

11   price that is discounted through negotiations.

12         Mr. Seltzer said you can't negotiate for Sunday

13   Ticket.  The record actually says the opposite.  Many class

14   members did negotiate for discounts.

15         So you take the prices that the class members paid.

16   And you have to figure out what each of their individual

17   preferences is for teams and for the content they want to

18   watch.  And then you have to line that up with whatever gets

19   resolved in terms of where the channels go.  We don't have the

20   answer to that now.  But assuming we did have the answer, you'd

21   have to do that comparison.

22         And some people we know would come out worse because,

23   again, if games go to premium cable, if they go to streaming,

24   if they go to other services, they would be worse off.

25         And that is not something that can be resolved

36

1    systematically with the current model.  But it's also not

2    something that could be systematically resolved with this

3    analogy to college football.

4            So we do think it's a class issue, Your Honor, in two

5    different respects.  They haven't given you the model.  But

6    also any model would be subject to our defenses and our ability

7    to show how individual consumers would be better or worse off

8    in the world as it exists versus the world that could be.

9            I think Your Honor mentioned you were focused on

10   predominance.  We think this goes right to predominance because

11   they have to show that they can answer the key class questions

12   without these kind of individualized mini trials, without

13   looking at Jane Doe and John Smith and seeing what their

14   preferences are.

15           And you see it even in the named Plaintiffs.  Some of

16   them enjoyed watching local teams which they can currently

17   access for free, as well as Sunday Ticket.  In the but-for

18   world they may have to pay more just to get the local team's

19   games if the local team negotiates with Fox Sports Two or if

20   the local team negotiates with a streaming service.

21           So you would have to go at a trial class member by

22   class member.  And this is even assuming you had a college

23   football model, which Dr. Rascher hasn't brought forth.

24           So then, Your Honor, I think it might be helpful to

25   talk about *Olean*.  And I direct Your Honor's attention to

37

1    footnote nine of that opinion because we think it's a quite

2    important footnote.  And it talks about the circumstances in

3    which a class may not be certified, even if there's not a Rule

4    702 issue.  And as Your Honor knows, we believe there are 702

5    issues.  And I'd like to talk about them a little bit but --

6    whether or not it's a Rule 702 issue.

7                The opinion in *Olean* talks about two specific

8    scenarios, among others.  The first, and this is where the

9    court says courts have frequently found that expert evidence,

10   while otherwise admissible under *Daubert*, was inadequate to

11   satisfy the prerequisites of Rule 23.  For instance, a class

12   did not meet the prerequisites of Rule 23 where the evidence

13   contained unsupported assumptions.

14               So let's just start there for a minute.  The example

15   that Judge Ikuta gives is a case where the plaintiff's model

16   assumed that absent anticompetitive conduct from the

17   defendants, there would be an influx -- and I'm quoting here --

18   an influx of cars from Canada to the United States sufficient

19   to substantially decrease national prices.  So she gives an

20   example of unsupported assumption.

21               And we think that that is what you have here.  And

22   that's not just in our view a Rule 23 issue.  It's also a Rule

23   702 issue.  But either way, we think Dr. Rascher comes up

24   short.

25               On the unsupported point, it is undisputed that

1    Dr. Rascher did not consider really any of the evidence in this

2    case before coming to his conclusions.  There is, as Your Honor

3    knows from the discovery proceedings earlier, an immense amount

4    of data that was provided by DirecTV about what viewers watch

5    and about the transactions that they come up.

6         And I think it is typical in antitrust cases to see

7    models that are based on that data, data-driven efforts to show

8    certification.  And, in fact, that's what there was in *Olean*.

9    Dr. Rascher ignores all of that.  It's not part of his primary

10   model.

11        There's also testimony from media executives, from

12   DirecTV, from NFL witnesses, and from team owners.  These are

13   all people who in Dr. Rascher's but-for world are going out and

14   negotiating with each other to distribute rights and to reach

15   content deals.  He didn't look at any of those.  This is

16   undisputed, he admitted it in his deposition, before reaching

17   his conclusions.  So you have unsupported right there.

18        And then in terms of assumptions, what Dr. Rascher is

19   saying we think is actually pretty similar to the analogy

20   that's given in *Olean*.  In *Olean*, it's that there's going to be

21   this influx of cars from outside the United States that's going

22   to dramatically lower prices.

23        Here, it's that 32 different teams all negotiating in

24   the modern media climate are going to all come to the exact

25   same conclusion and strategy, which is that they should put

39

 1    their games on linear television.

 2            If we have seen anything over the last five to ten

 3    years, it is that things are moving in the opposite direction,

 4    not in that direction.  Content is moving to streaming

 5    services.  It's moving to premium cable.  It's moving to all

 6    kinds of different places.

 7            And Dr. Rascher just offers the assumption, because

 8    it's not based on the evidence in the case, that that's what's

 9    going to happen.  So that's an unsupported assumption, we

10    think.  And that comes directly from *Olean*.

11            The other example given in *Olean* is nonsensical

12    results, another reason to deny class certification.  And this

13    is where we think the *Laumann* decision that was mentioned on

14    damages class certification is quite relevant because that's

15    what happened in *Laumann* as well.

16            The plaintiffs came forth with a model in a case that

17    was talking about out-of-market packages for baseball -- or,

18    excuse -- for baseball and hockey.  And they had a model that

19    didn't make any sense.  And that's one of the things that Judge

20    Scheindlin concluded.

21            And we think that that is what you have here.

22    Dr. Rascher's primary model is one in which Sunday Ticket is

23    free, it costs nothing, and it's part of basic cable.  And we

24    think that that's a nonsensical result for two reasons.

25            The first is that it stands in contrast to everything

40

1    we know about the way media rights are distributed today.

2    DirecTV and others have paid a lot of money for the rights to

3    out-of-market packages.  People have played (sic) lots of money

4    for rights to Major League Baseball games, to basketball games.

5    And they don't give it away for free.  They don't put it as

6    part of the basic cable package.

7            But it's also nonsensical because you don't see this

8    model anywhere in the real world.  You don't see it in Major

9    League Baseball and basketball where it is a team-driven

10   approach.  So the teams are out there negotiating their rights.

11   You don't see broad-based distribution on free television like

12   you have with the NFL.  It's a fundamentally different media

13   model that costs more for fans and is harder to access.

14           You don't see it, as I mentioned earlier, in college

15   football.  You have to get a lot of different channels in order

16   to access the same content.

17           And Mr. Seltzer mentioned Dr. Rascher using the

18   yardstick method.  I think it's worth pausing on that for a

19   minute.  And this is more of a 702 issue because his yardstick,

20   Your Honor, is not actually college football.  He started with

21   the yardstick of college football and then pivoted away from it

22   because, as I mentioned earlier and as he admitted, college

23   football is more expensive for fans.

24           So then he pivoted to a new product which he called

25   sort of top college football.  But that's not a product you can

41

 1   just purchase in the marketplace.  It's a constellation of

 2   games through a series of different media agreements.

 3            And if you look overall at the yardstick he's using,

 4   in all of the cases that the Plaintiffs' cite and in all of the

 5   cases we cite, the yardstick is directly comparable to the main

 6   product.

 7            So you take a pharmaceutical in the United States and

 8   you compare it to a pharmaceutical abroad.  That's the classic

 9   example of a yardstick.

10            Dr. Rascher's comparing two fundamentally different

11   products.  And while the Ninth Circuit did talk about the NCAA

12   case and college football, it first of all was talking about a

13   very different form of college football, when as Your Honor

14   mentioned there were very few games available on television.

15   Right now every NFL game's available on free television in

16   local markets.  And then every other game is available through

17   an out-of-market package.

18            But also we don't think that it's an appropriate

19   yardstick because either he's using college football, in which

20   case people would have to pay more, or he's using some other

21   form of college football and they've lost the yardstick to

22   begin with.

23            So a lot of this, Your Honor, is both Rule 702 issues

24   and Rule 23 issues.  But I'd say overarching the issue with

25   Dr. Rascher and the free model is that it doesn't satisfy the

42

1   basic requirements that we think you need to make a finding of

2   predominance because it doesn't actually mode the but-for

3   world, it doesn't say what prices would be in the but-for

4   world, which both sides agree is essential.  And so it's not

5   possible to say on a systematic basis that everyone is worth

6   (phonetic) off.

7           Like to talk for a moment if I could about the

8   gerrymander argument that we mentioned because we do think it's

9   relevant and we do think it's a class issue and not a merits

10  issue.

11          This issue is most acute with Dr. Rascher's kind of

12  fallback model, which we talked about in the deck.  First he

13  says all of this content will just be part of basic cable.

14          Then he says, well, maybe it won't be part of basic

15  cable but it'll be part of basic -- it won't be free as part of

16  basic cable but basic cable will cost about $13 more for every

17  customer.  There are a couple problems with that.

18          The first again we think is a *Comcast* problem.  The

19  Plaintiffs' theory should be, and I think the theory in almost

20  every antitrust cases is, that competition is what lowers

21  prices.  People competing in the marketplace lowers prices.

22          But the way this model works is by saying that the

23  price goes down for class members because everyone has to

24  purchase a product that they don't want.  And this is about as

25  clear as it could get in Dr. Rascher's report how he does the

43

1    math.

2           This is slide eight.  He says, take the rights fee

3    for Sunday Ticket and just make everyone pay for it who has

4    basic cable instead of just the class members.  So the model is

5    basically let's make premium cable cheaper for everyone by

6    forcing everyone to purchase it.  Let's make high speed

7    internet cheaper for everyone by making everyone purchase it.

8           That's not an antitrust theory.  That's not a theory

9    that matches the Plaintiffs' allegation that competition should

10   lower prices.  It's a theory of a wealth transfer.  Basically

11   some people in the market should pay a lot more so other people

12   can pay less.  That's not we think a class -- that's -- that

13   theory doesn't match -- that approach doesn't match their

14   theory of liability.

15          But, second, it's a class issue because they

16   acknowledge that the market is all professional football

17   telecasts.  And so consumers affected by the decision are

18   consumers of those games.  And their model is increasing costs

19   for some of those people.  And we don't think that's a merits

20   decision because it affects the integrity of the class that

21   they're trying to certify.

22          I note that we made this argument, and the Plaintiffs

23   in response cited one case on this point.  They cited the

24   Google Play antitrust litigation.  And what you have in that

25   case is a situation of a class of 17 different states or a

44

```
1   claim brought on behalf of 17 different states.
2           But one thing I will assure you of, Your Honor, is
3   that the model of damages for the people in those 17 states
4   wasn't that they would pay less by making people in the other
5   33 states pay more.  The model was a uniform reduction in price
6   in the market.
7           And what the Plaintiffs are doing here is admitting
8   that the market is much broader, and then trying to sort of
9   gerrymander the class down to only the people who were injured.
10  And we don't think that's appropriate under Rule 23.
11          We think it's actually somewhat analogous to an
12  effort to create a failsafe class, which Olean said you can't
13  do.  You can't have a class that just sort of consists of the
14  injured people when you have a broader market.
15          So we think that that's a class issue, not just a
16  merits issue, which is why we raised it in the briefs.
17          So I think those are the key points on Dr. Rascher
18  and the primary model that they have brought forth.
19          So Mr. Seltzer also mentioned Dr. Zona.  And I think
20  it's worth taking a moment to look at exactly how he reached
21  the conclusions he reached.
22          Overall, Your Honor, I think there's again a Comcast
23  class certification problem here.  And this is something that
24  Judge Ikuta recognized.  I mean, the opinion cites Comcast a
25  number of times.
```

45

1           The model that Dr. Zona arrived at is a model in

2    which competition does not change the price of the product.  So

3    we have this here on slide number 26 in the deck.  He's

4    prepared a series at the end of the day, and we'll talk about

5    how he got there, which is also problematic.  He came up with a

6    model that says -- and this is in the reply report that he

7    submitted.  He came up with a model that says no matter how

8    many people are in the marketplace, whether it's just DirecTV,

9    whether it's DirecTV and someone else, whether it's DirecTV and

10   other providers, the price isn't going to change.

11          And, in fact, in one of the scenarios he modeled the

12   price actually goes up as competition increases.  So when you

13   have three or four people in the marketplace, Sunday Ticket

14   costs more than when you have just one.  And we have the

15   citation right there to the table in the report.

16          That is a theory that does not match the liability

17   claim that the Plaintiffs are bringing.  The whole point of

18   this case, I had thought, was that competition will lower

19   prices.  And if you have more people competing to offer the

20   product, the price will go down.  That is not what Dr. Zona's

21   model said.

22          So we think that's again a nonsensical result

23   situation, an unsupported assumption situation, but also just a

24   basic *Comcast* problem with his model.  And that's the model in

25   the reply report that he submitted.

46

1          So then take a step back, and I think it's worth

2   talking if I could for a moment about how he got there.  And

3   this goes more to Rule 702.  But I think it's a little more

4   efficient to address these together, if that's okay, because we

5   do think you have to find, as I think Your Honor is implicit in

6   the decision, you have to find that Rule 702 is satisfied

7   before you can even get to Rule 23.

8          And the key issue we see with Dr. Zona is a results-

9   driven analysis.  We cite the *Lipitor* case, and we have I think

10  some of the key language from the case.

11         But an expert can't start at the conclusion and then

12  try to figure out how to get there.  They can't come up with a

13  model and then throw stuff out when it doesn't support them and

14  use stuff that does support them.  That's what *Lipitor* says.

15  And we think that's a pretty well-established point of *Daubert*

16  law.

17         And that's exactly what Dr. Zona has done.  And

18  there's a few things to say but I'll try to keep it brief by

19  just focusing on two that are raised in the briefs but I think

20  worth emphasizing.

21         The first, as was mentioned, is Dr. Zona's approach

22  to marginal costs.  Everyone agrees.  It's commonly agreed that

23  there should be one marginal cost for Sunday Ticket, for any

24  product.  It's a number.

25         Dr. Zona uses four.  From his original model to his

47

1    final report, he uses four different numbers.  And so that

2    alone shows you that he's not applying a principled method

3    because he's picking and choosing the inputs to generate the

4    results.

5            And if you look at the numbers he used, it kind of

6    shows the fundamental problem.  First, Dr. Zona sets out to

7    build a model that does what you would probably expect a model

8    to do:  figure out the real world price of Sunday Ticket and

9    then make some alterations to see what happens with

10   competition.

11           So he did that.  He built that.  That was the

12   original model he had in his report.  And he cited in his

13   report and then ultimately admitted his deposition that one of

14   the great things about that model was that it accurately

15   predicted the price of Sunday Ticket and the number of

16   subscribers.  And I think it's Exhibit 17 in his report that

17   does that.

18           The problem for Dr. Zona is that when you take that

19   marginal cost and you try to use that model to generate

20   damages, it didn't generate any.  It didn't show damages.  And

21   this is in Dr. Yurukoglu's report, and it's encompassed here in

22   slide number 20.  You don't see damages if you just run his

23   original model to conclusion.

24           So Dr. Zona went in and essentially hijacked a

25   variable.  He divided his marginal cost by two and a half.  And

48

1    he hasn't provided to this date an explanation for why he did

2    that other than using the original number didn't generate any

3    damages.

4         So you have arbitrary division of a number generated

5    by the model to create the new number and to create the

6    damages.  And this doesn't work either way because if you plug

7    86 into his original model, it doesn't predict the real world.

8         So either Dr. Zona has a model that predicts the real

9    world that doesn't generate damages or he has a model that

10   doesn't predict the real world, in which case it's not what he

11   said he was trying to do to begin with.

12        So then Dr. Zona comes up with another number of

13   $13.79.  And the history there is kind of interesting because

14   he could not explain and cannot explain how he came to that

15   number.  He pulled it out of a long spreadsheet document,

16   literally plucked one number out of the field.

17        But he couldn't say who created the document, were it

18   came from, when it was created, why it was created, what he

19   number -- source of the numbers was, or anything about how he

20   came up with that number, other than that it was convenient and

21   supported his conclusions.

22        And I note that the document he pulled it from is one

23   that was in the 30(b)(6) notice that the Plaintiffs issued.  So

24   they had the chance to ask our corporate witness about that

25   document and that number, and they didn't do it.  So, again,

49

1    you have a number that comes kind of out of nowhere.

2            And then, last, you have the number zero, which isn't

3    supported by any of the record evidence here.  Again, the

4    Plaintiffs took a lot of depositions in this case.  They asked

5    a lot of people at DirecTV questions.  They asked a lot of

6    people at the NFL questions.  Never once did they ask a

7    question about this issue of marginal cost.

8            So we think the inputs are flawed and show a flawed

9    process.  But the output's a result, too.  And the process

10   problem is using all of these different numbers.

11           And then last I just note, Your Honor, that the model

12   Dr. Zona came with looks a little bit more like what you

13   typically see in an antitrust case and that involves

14   regressions and actual use of data.

15           But the process for getting from the start to the

16   finish to the model at the end that predicts the competition

17   doesn't increases prices, just involves a series of kind of

18   hijacks along the way.  So, first as I said, he had a model

19   that showed no damages.  So to fix that problem, he just

20   divided the marginal cost.

21           His model had two other problems.  The first problem

22   is it committed a textbook error.  This is in every economics

23   one-oh-one textbook.  It's in the sources that Dr. Zona himself

24   cites called collinearity.  And he admitted at his deposition

25   at the end, the model has odd results because of collinearity.

50

1    So that's a methodological flaw.  It's the type of flaw an

2    expert shouldn't make.

3            And otherwise his model had these absurd results that

4    come out of it.  And this is where I think *Laumann* is again

5    directly on point, the *Laumann* damages decision, because his

6    model predicts that people would prefer to pay for things that

7    they're already getting for free.

8            People in Pittsburgh would rather pay money to get

9    the Steelers' games as opposed to get all the Steelers games

10   and then some for free.  People in Pittsburgh would prefer to

11   pay for New England Patriots' games rather than get their own

12   team's games and two other teams' games for free.  So that was

13   the first model.  And that had a lot of problems in it.

14           So Dr. Zona went back in and worked with the

15   variables to come up with a new model.  The new model involves

16   manipulation of marginal costs again.  It involves the outcome

17   that competition doesn't affect prices.  And it also continues

18   to have these series of very irrational outcomes, like that

19   fans in Pittsburgh value football -- excuse me, fans in New

20   England love football whereas fans in Pittsburgh would prefer

21   to pay to not have it.

22           I mean, these are the outcomes of his model.  They're

23   not things we made up for purposes of cross examination.

24   They're what come out of his model.  So, again, we don't think

25   Dr. Zona has come close to satisfying what needs to -- you need

1    to have to have a rigorous model under Rule 702 and Rule 23.

2            And why I don't think it's -- we hear Your Honor's

3    tentative on the sanctions motion, and we can present some more

4    argument on it.  One point I will just note adjacent to that is

5    that we still are not able to reproduce Dr. Zona's model with

6    the data.

7            So we were able to get from his intermediate files,

8    which are sort of the files along the way, to his conclusions.

9    But we still to date have not been able to make his original

10   code work to generate those files.

11           So what we have presented to you are a series of

12   problems that are kind of the known problems.  But one of the

13   things that I think is essential to the *Daubert* inquiry is can

14   you replicate an expert's analysis.  And it cannot be

15   replicated.  So there may be other errors out there that are

16   impossible to know based on what's been produced.

17           So two last points, Your Honor, one on the injunction

18   and then one on the commercial class.

19           On the injunctive relief piece, we do think that

20   there are problems both of mootness and of the fact that there

21   are current and former subscribers involved in the class that's

22   purportedly seeking this injunction.

23           We do think it's moot because there is a new

24   agreement in place.  The Plaintiffs brought this case to

25   challenge specific agreements.  One of them is the DirecTV, NFL

52

1    agreement.  As was mentioned, that agreement is expiring and

2    someone new will have the rights.

3            And that product is going to be a different product.

4    It's publicly reported it's going to YouTube, which is a

5    streaming service.  It'll be available a la carte, i.e.,

6    without purchasing underlying cable or satellite service.  So

7    it's a different product.

8            And we think the agreement that they've challenged is

9    no longer in effect, so there's a mootness issue there.

10           But there's also an issue created by the fact that

11   they're purporting to represent this broader class and there

12   are some current and former subscribers in it.

13           First, it's not clear that the injunction will

14   benefit everyone, as is required to do, even just accepting

15   that you only have current and former subscribers because the

16   people who aren't subscribing it today aren't subscribing to

17   it.  That includes the named class members.  They are not

18   subscribing to the product.  They discontinued it.  So they're

19   not benefitted by that injunction.

20           But I actually think the problem is much broader, and

21   it goes back to Dr. Rascher's failure to model the world.  The

22   Plaintiffs are trying to get an injunction, and they've made a

23   prediction about what the world will look like after that

24   injunction is issued.

25           And that world is not one that resounds to the

53

1    benefit of every class members because, again, if it's based on

2    college football, some people are going to have to pay more.

3              There are people in the class today who are just

4    watching free content through the NFL.  We know that because

5    the named Plaintiffs mention that.  So there are people sitting

6    in the class today who are just watching content that is free.

7              And under the Plaintiffs' theory of the case and

8    Dr. Rascher's world, which you have to take as sort of the what

9    the injunction will look like, those people may have to pay

10   more because instead of having their local teams available for

11   free, which is a unique feature of the NFL's model, they may

12   have to pay for cable or pay for premium cable to get it.

13             You have people in the class right now who just pay

14   for basic cable.  And, again, if you take Dr. Rascher's models,

15   all of them are going to have to pay more money to access basic

16   cable.

17             So the injunction that they're asking for considered

18   in connection with the world they're saying is on the other

19   side of that is not one that resounds to the benefit of all

20   class members.  So for both of those reasons we don't think the

21   injunctive class is proper.

22             And then on the commercial class, Your Honor, I just

23   note a couple points.  The first is the named Plaintiffs

24   themselves admitted -- the commercial Plaintiffs admitted in

25   their depositions that Sunday is their biggest day with Sunday

54

1  Ticket; bigger than Saturday when college football is, as the

2  Plaintiffs have said on a variety of different channels.  Both

3  of the named Plaintiffs testified to this point.

4        So to the extent Your Honor mentioned the question

5  about are the commercial -- is the commercial class benefitted

6  in the same way, are they benefitted by the status quo, the

7  named Plaintiffs go directly to that point.  They're directly

8  answering that question.

9        But more broadly, the Plaintiffs have not tried to

10  use or analyze the commercial class in any real way.  Dr. Zona,

11  in his models, did not even know when commercial data was being

12  used or not.  We confronted him with the fact that he used it

13  in one step of his model.  And he said, I don't really know if

14  I'm using it or not.  He's mixing and matching along the way

15  residential and consumer commercial data, sometimes using it

16  and sometimes not.

17        And their overall approach is to just say, here's the

18  difference between the price of residential Sunday Ticket and

19  here's the price of it in the but-for world, and that uniformly

20  applies to the commercial class.

21        But the evidence in the case shows that the classes

22  and the consumers are not the same.  They want different

23  things.  For example, the commercial class wants access.  Many

24  at least the named Plaintiffs have said they want access to all

25  the games rather than maybe just one team or two teams.

1          The commercial class has different pricing.  The

2    prices are often individually negotiated, and they vary based

3    on whether you're a hotel or a gym or a bar or a restaurant or

4    a casino.

5          **THE COURT:**  Is the fact that Sunday's bigger than

6    Saturday for the commercial folks, does that change the

7    argument that it's still anticompetitive?  Is it -- it's bigger

8    for other reasons, right?  Maybe NFL is more popular than

9    college football or fans drink more and go to pubs.  I don't

10   know.  Is it -- does it -- does the fact that Sunday's bigger

11   than Saturday, is that dispositive, is that relevant?

12         **MR. KILARU:**  I think it is to the extent that the

13   Plaintiffs are using Saturday as a model of what the world

14   should look like.  I mean, one, they're saying that the world

15   should look like Saturday where the games are spread across the

16   channel.  So I do think it's relevant in that sense.

17         But to the extent the point Your Honor made about the

18   popularity, I think that's a problem for them in a different

19   way, which is that if this content is more popular, as we know

20   it is, that is going to change the media distribution calculus.

21         I mean, Dr. Rascher said this in his deposition.  He

22   called it prized content.  He called it must have content.  He

23   said channels are going to want to have one NFL game or two NFL

24   games because it will drive engagement to their platforms.

25   Those are their expert's words.

1           And that I think goes back to the broader problem

2    with the model that they have brought forth and the approach of

3    making an analogy to college football.  If the NFL is more

4    popular, as we know it is, that would lead to the conclusion

5    that many more people are going to bid on this content, they're

6    going to try to get a slice of it, and so the but-for world is

7    one in which people will have to buy a lot more services, a lot

8    more content, a lot more channels to get access to what they

9    currently get today.

10          And because Dr. Rascher hasn't done that modeling,

11   and because we think that if you just look at the sort of basic

12   facts about how sports are distributed today, those models

13   would be more expensive for Plaintiffs.  That goes back we

14   think to the kind of fundamental predominance question and the

15   predominance problem that they have here.

16          If Your Honor has no more questions, we may ask to be

17   heard depending on what we hear.  But that's --

18          **THE COURT:**  Okay.

19          **MR. KILARU:**  -- what we have for now.

20          **THE COURT:**  I appreciate it.

21          **MR. KILARU:**  Thanks.

22          **THE COURT:**  Thank you.

23          **MR. SELTZER:**  Your Honor, if I may.  Before Mr. Diver

24   talks about some of the specifics on the experts, let me just

25   make a couple of points.

57

1          The argument that you just heard about what the but-

2     for world would have looked like, that's a merits argument.

3     Our experts have said that, if there were more competition, if

4     there were more available out-of-market games to be seen, that

5     would drive down the price of Sunday Ticket.

6          Now, there are a variety of ways that those out-of-

7     market games may reach the -- reach the market and may reach

8     viewers.  But the greater number of games available to be seen,

9     the greater number of choices would enable the -- the price

10    would cause the price to drop down.

11         One thing I should mention, Your Honor, the record

12    shows that, in fact, it was an intended result that the price

13    of Sunday Ticket be kept high.  Part of the contracts at issue

14    here required so-called premium pricing for DirecTV so that it

15    would be priced higher, not to take away from viewership of

16    other -- other broadcasts.

17         It was not only a foreseeable result, it was an

18    intended result, that the product be priced in excess of a

19    super competitive -- excess of a competitive price.

20         The other thing I would mention is that, on college

21    football, the distinctions that they argued about college

22    football are very much the same ones they argued to the Ninth

23    Circuit.

24         The argument that somehow that we're not taking all

25    college football; well, of course we're not considering -- the

58

1    expert's not considering Division, what used to be, 2-A or 3 or

2    4 or 5.  They're looking at what is comparable to the NFL

3    games, in popularity.

4            College football is the next most popular on

5    television to the NFL.  In fact, the NFL is the most popular

6    broadcasting of all.  Which, by the way, goes back to the point

7    Your Honor raised about Saturday versus Sunday for the

8    commercial establishments.

9            If the Defendants were right, and that -- the

10   availability of games to be seen by other channels, after the

11   NCAA case was decided by the Supreme Court, means that people

12   can stay at home and watch the games, then Saturday wouldn't

13   just be less; it would be a ghost town.

14           It doesn't make any sense to say that, just because

15   of the sat -- Sunday is a more popular day to -- to go to the

16   bars, that it somehow shows that college football is not -- not

17   an appropriate yardstick.

18           The other point I would make, Your Honor -- and that

19   is, just as a sidenote.  I may mis-remember the case.  But I

20   think what Judge Ikuta is referring to was the Canadian cars

21   case involving the -- a claim that restrictions on importing

22   cars from Canada to the United States somehow interfered with

23   competition domestically.

24           And the case had a lot of different problems with it.

25   But I think, first and foremost, if I recall correctly -- and I

59

1   haven't read it a long time -- there was a restriction on

2   importation that made the ferry unsound.  So that that was --

3   that was a problem in the Plaintiff's case.  And it was also,

4   as I recall, a real problem with the timeline on the case.  It

5   didn't make any sense.

6           So it's a totally distinguishable kind of situation

7   here.

8           But at any rate, in terms of the detail in talking

9   about our experts, I'd now like to let Mr. Diver say a few

10  words.

11          **MR. DIVER:**  Thank you, Your Honor.  Edward Diver for

12  the Plaintiff class here.

13          I want to -- well, I want to invite you, first of

14  all, to ask any questions you have about anything technical and

15  so forth that you may have.  It's always a bit of a challenge

16  to know what kind of detail to get into in discussing these

17  issues.

18          But what I essentially want to do is -- is respond

19  directly to Mr. Kilaru's arguments that specifically address

20  Dr. Rascher's and Dr. Zona's work.

21          The first thing he says about Dr. Rascher is that he

22  doesn't have an actual model of -- of the -- the but-for world

23  because -- and if you look at his slides, it suggests that we

24  need to model which games would be on which channels, at which

25  time, and so forth.

60

1          And to that extent, of course it's true that

2    Dr. Rascher has not created a model.  But what he has done, as

3    he's modeled the most likely outcome for this programming,

4    which is that it would end up on the Choice tier for DirecTV

5    customers, whether it be on ABC, NBC, CBS, ESPN, Fox Sports 1,

6    et cetera.

7          And he specifically analyses the -- the incentives of

8    the networks, DirecTV, the interests of the people, compares

9    them to the games that are on those channels on -- on Saturday

10   afternoons.

11         And as you know, as a fan of one of the more popular

12   college football teams, the more popular college football teams

13   tend to be on over the air.  And when they're not, they tend to

14   be on ESPN and Fox Sports 1.  Yes, there are occasional games

15   that are not, just are there are in the NFL, on the NFL Network

16   or on Amazon.

17         But what he has done -- why has he focused on not all

18   of college football, but on the top 25?

19         Well, there are only 32 teams in the National

20   Football League.  And to know where they go, we need to look at

21   how many games we need to find places for.

22         There are only four major national over-the-air

23   networks that carry major sports events as a regular course.

24   So to suggest that, you know, a much smaller percentage of

25   college football games are on is being misleading.  Because

61

1    there's only four places for them to go.

2            And there are times when they are -- college football

3    is on all four channels at the same time.  And frequently

4    they're on over-the-air networks from morning until night.

5            Again, responding to a point made at the end of his -

6    - of his argument.  The popularity of the NFL is something that

7    Dr. Rascher directly considered, and determined that it would

8    make it more likely that those games would be on over the air

9    in the most widely distributed cable channels.  That's -- at

10   that point, there's simply no need to figure out which channel

11   or other would have -- it would have to end up on.

12           I should add, too, the NFL has made its own argument.

13   As we noted, the NFL Network was taken off of the basic tier by

14   -- by Comcast and another major provider.  And the NFL sued,

15   claiming that was discriminatory.  Because, given the

16   popularity and the wide-spread interest in the National

17   Football League, its natural place was on a broadly distributed

18   cable tier.

19           And it ended up settling and getting the national --

20   the NFL Network placed on a broad tier, such as Choice, which

21   is where -- in fact, the NFL Network is on DirecTV, is on the

22   Choice tier, which is why Dr. Rascher focuses on that tier.

23           I don't want to spend too much time on the notion

24   that -- that Dr. Rascher has based on unsupported assumptions

25   by -- by focusing on the college football model.

62

1              Dr. Rascher, as you know, is a leading expert in

2    sports, economics, NCAA sports, in particular.  He has analyzed

3    the incentives of the parties involved, and provided a fulsome

4    explanation for his -- the bases for his conclusions.

5              I also want to respond to the argument that

6    Dr. Rascher's model is based on the idea that we're going to

7    help class members by taking money out of the pockets of other

8    folks.

9              First of all, Dr. Rascher, his actual prediction of

10   the but-for world is that there would be no additional costs

11   for National Football League program.

12             But in order to be especially conservative, he

13   estimates the maximum amount that he expects would be passed

14   through to consumers for the additional NFL content on the

15   Choice tier or broadly distributed tiers of DirecTV.  And

16   that's the figure you get of $12.  And that's per season by the

17   way.  So his analysis is that the cost of Sunday Ticket

18   programming would drop from almost $300 to $12.

19             And why would it do that?  Because it would be so

20   broadly popular that -- amongst DirecTV consumers and other

21   consumers, that they would want that program.  And, in fact,

22   those -- to suggest that folks are harmed because they're

23   paying the market price for popular programming that they want

24   is -- is outside of what the antitrust laws are for.

25             What people are getting is -- the fact that they

63

1  didn't spend $300, in other words, doesn't suggest they

2  wouldn't be happy to pay $12 to get all of this extra

3  programming.  That is amongst the most popular in the world.

4         But nevertheless that's a conservative amount that --

5  that Dr. Rascher uses to conservatively measure damages whereas

6  he thinks that, in fact, because of the elements of competition

7  -- and this is something that comes directly from the

8  experience in NCAA -- when the prices television stations paid

9  for the rights to college football dropped dramatically, and

10  advertising rates dropped dramatically.

11         So the introduction of competition dropped prices.

12  And he thinks the same thing would happen here so that there

13  would be no increase in rights fees.

14         The $12 is a -- is a conservative estimate that is

15  simply designed to accommodate that, but, in any event, does

16  not represent harm.  Because what it represents is what the

17  market would pay for the -- for the product in an non -- a

18  restrained --

19         **THE COURT:**  So I just don't --

20         **MR. DIVER:**  -- competitive market.

21         **THE COURT:**  So I understand you decided.  So let's

22  say, today, I choose not to have the Sunday package --

23         **MR. DIVER:**  Right.

24         **THE COURT:**  -- because I only want to watch one or

25  two games on a Sunday.  I don't want to watch all day or I just

64

1    want to watch the Rams or the Chargers or whatever --

2              **MR. DIVER:**  Right.

3              **THE COURT:**  -- whatever.

4              So you're saying, though, but if I was offered it for

5    $12, I would -- I'd be more than happy to get it because, on an

6    occasion, I want to see the Patriots play or I want to see the

7    Colts play.

8              **MR. DIVER:**  Right.  Certainly.  A lot of people would

9    do that.  And, look, every time you're -- the price goes up for

10   -- for your cable bill, that's not an antitrust violation;

11   that's not an anti-competitive harm.  That's the market meeting

12   the price to the demand for that product.

13             So the reason that, you know, $12 is spread about so

14   many people, because that's something that people really want

15   to watch, generally speaking.  And that's why the NFL Network

16   is broadly distributed.

17             And that price is passed on, in theory at least, to

18   consumers.  And nobody's suggesting that they're -- they have

19   suffered some kind of anti-competitive harm for the fact that

20   they have to pay for that.  That's what the demand requires.

21             I want to turn now to the discussions of Dr. Zona.  I

22   think -- I was somewhat surprised by some of the complaints

23   about Dr. Zona, because many of them have been -- have been

24   addressed already.

25             For instance, Mr. Kilaru stated repeatedly that his

1   model doesn't show any effect from competition.  And while it's

2   true that the model -- the version of the model that was

3   submitted with his reply report did not have any significant

4   effect from competition, as a result of the process of

5   litigation, he went back and noted that there was a problem in

6   the code caused that.

7           And he described the fix for that in his declaration

8   to -- to the reply and response to the motion to exclude

9   Dr. Yurukoglu.

10          Again, that is simply a matter of coding in the but-

11  for world, which he can do in multiple different ways.  And the

12  way he happened to do it, when the reply brief came in, had --

13  had those lines of code, which mis-specified the utility of

14  having a competing product in DirecTV.

15          And you'll see, in his declaration -- which he

16  submitted along with that -- that he pointed that out.  So that

17  is not an irrational result.

18          Another irrational result, quote, unquote -- I don't

19  -- I don't have any exhibit for it -- that was suggested is

20  that fans in New England care about football more or less than

21  fans in some other market.

22          And you can see this by comparing values of the

23  utility that are generated in those markets.  And one is much

24  larger than -- than the other.  And that is a simple,

25  straightforward misunderstanding of how Dr. Zona's model works;

1  a misunderstanding which goes throughout many of the -- of the

2  complaints that the Defendants have made.

3           Dr. Zona's model uses relative values for utility.

4  It never once uses absolute values for utility.  The amount

5  that somebody values a given team, a given game, a given

6  season, is always relative to something else.  It's not

7  relative to no happiness or misery or anything in the real

8  world; it's relative to the value that the Minnesota Vikings

9  generate.

10          And it happens that the Minnesota Vikings have a

11  different level of popularity in different cities.  So in

12  markets where the local team is much more popular than the

13  Minnesota Vikings, the number will be much higher; in other

14  markets, it will be lower.

15          That does not suggest anything.  Those are not

16  directly comparable.  They are combined mathematically at a

17  later stage.  There's nothing in the -- in the utility measures

18  that suggests that -- that the fact -- that the -- that one

19  number is registered in one market is comparable to another, in

20  another market.

21          The same mistake underlies the argument that there

22  are markets in which folks would pay to have games removed from

23  their television.  And, again, they're comparing -- in week

24  one, it's negative eight, utility value.  And in week two, it's

25  negative-something greater -- 20.  So you'd rather just have

67

1    the first week, because that's a higher utility value.

2            That, again, has nothing -- has simply forgotten that

3    fact that negative values do not equal negative utility, and

4    they're always relative to the Vikings.

5            In this case, week one is relative to one week's

6    worth of Vikings games.  And week two is what relative to two

7    weeks' worth of Vikings games.  So what has increased is not --

8    or what's decreased is not -- is not unhappiness.  The

9    difference between the games that are being measured and the

10   Vikings games has increased.

11           Everything is relative.  Negative numbers don't mean

12   negative utility.  And you can't compare one weekend to a

13   season directly without comparing them to the Vikings, which

14   they have not done.

15           So again and again their irrational results analyses

16   fail.  you know, the slides they've used include a, quote,

17   irrational result from the original model.  And it is true that

18   the original model had this -- this unusual result that -- such

19   that a person would have preferred a single team's games over

20   the over the over-the-air games even when the over-the-air

21   games included that teams games.  And that was, again, the

22   result of a coding issue that essentially double-counted those

23   games that was fixed in minutes and has gone away.

24           I will note, however, that, even in that model, the

25   value of Sunday Ticket didn't change one cent.  Because the val

68

1    -- Sunday Ticket was correctly modeled.  And that's the price

2    that was used to generate the damages estimate.

3              So the crazy, irrational result they went hunting

4    for, and found, had zero effect.  It was totally irrelevant to

5    the -- to the resulting damages analysis.

6              Okay.  So now I want to turn quickly -- I mean, just

7    in some.  There are zero irrational results amongst those that

8    he has -- that he has mentioned.  Some were quickly corrected,

9    some were irrational to start with, and some simply reflect the

10   failure to understand the way the model works.

11             On the marginal cost, we hear that this a results-

12   driven process.  This is the opposite of a results-driven

13   process.  This is a process of discovery that Dr. Zona

14   undertook.

15             Everybody understands that the marginal cost of

16   adding an extra channel of programming to a satellite

17   subscriber service that they already have is effectively zero.

18   This is a matter of decoding a channel that's already being

19   beamed into their house.  And it's simply being blocked by

20   their receiver.

21             When you call up or you type in your -- your code, to

22   order Sunday Ticket, and it unblocks that channel, and *voila*.

23   There is no additional cost to providing.  And the marginal

24   cost is the cost of providing the product to one single

25   addition consumer.

1            Dr. Yurukoglu and his paper analyzing, not football,

2    but other television programming, uses zero as the marginal

3    cost, except for the costs imposed by the programmer when they

4    are marginal.  And in this case, there are no marginal costs

5    imposed by the programmer.

6            So Dr. Yurukoglu agrees, and testified at his

7    deposition, that it was (indiscern.) reasonable to assume, in

8    this case, as he did, in his work throughout, that the cost of

9    -- of additional programming is in fact zero.

10            What happened was that -- in many cases, it's not

11    certain what the marginal cost is.  And the typical way of

12    calculating marginal costs is to use the demand function, to

13    use the existing price, and -- and here's the big if -- if that

14    price is the profit maximizing price -- just looking at that

15    product; not looking at anything else -- then you can determine

16    the marginal cost using the demand function.

17            When Dr. Zona did that, he derived a rather odd

18    number; $215 -- which seemed crazy in a product where it's

19    widely understood that the marginal cost is at or close to

20    zero.

21            He then said, "Geez, there must be something going on

22    here."

23            Well, one of the things that was going on is that

24    DirecTV was giving away more subscriptions than it was

25    charging.  So, in effect, it's the actual price it was

70

1  charging, taking into account everybody was sort of the price

2  it charged, divided by two and a half.

3        So he divided by two and a half to sort of spread the

4  marginal cost over all of the subscribers, including the folks

5  who are getting it for free, most of whom in their first year.

6  And that's how he got the $86 number.  That number was still

7  very, very high by -- by any understanding.  But he stuck with

8  it.  Why?  Because this is a class certification motion, it's a

9  class-wide issue it doesn't matter particularly much, and it's

10  conservative.  Because one of the things about marginal cost is

11  higher marginal cost equals higher profit maximizing price.

12        So if he used $86, he would always get a but-for

13  price or a modeled price that was higher than it ought to be,

14  which would lower the amount of damages that he was

15  calculating.  So accepting that as a conservative number, he

16  reported the results.

17        When he did his second model -- which he uses the

18  same general methodology in the second part, but is based

19  instead on survey data instead of the viewership data in

20  deriving the demand functions, they thought, "Okay.  We can't

21  use that.  That didn't work."

22        And they looked for some kind of marginal cost.  They

23  found some -- some accounting data that showed some costs

24  associated with consumer support and help, and thought, "Wow,

25  this is probably too high still.  But, again, being

1  conservative, we'll report this number in our model," which was

2  $13.79.

3           Now, one thing that both of these showed -- and this

4  was sort of a discovery process.  This was not a results

5  driven.  This was a -- this was discovery that, in fact,

6  without intending to or -- Dr. Zona had proven one of the key

7  allegations of the Plaintiffs in this case, which is that the

8  DirecTV price is not in fact the profit-maximizing price, when

9  looking at Sunday Ticket alone.

10          It's a price that's kept artificially high by the

11  pressure of the National Football League, due to pressure from

12  its network partners.

13          And the second model showed that the profit-

14  maximizing price was about $200; not $300.  And that was

15  relatively consistent with the notion that -- in the first

16  model that the -- that the 294 was not a profit-maximizing

17  price.  Because if it were, $215 would be its marginal cost,

18  which is really close to zero.

19          So both of those showed that this -- what Dr. Zona

20  ended up calling "The NFL tax" -- which is consistent with

21  allegations that Plaintiffs have made since the beginning, and

22  are consistent with the facts that have -- that have shown

23  throughout.

24          And it was reported and -- right before the YouTube

25  deal assigned, and Apple dropped out of the running because

1    they wanted to charge too low of a price, and the NFL wouldn't

2    allow it to.  That's the NFL tax.  And that's what these models

3    show.

4            In his reply, Dr. Zona reports both of his models,

5    using zero, 13.79, and 86 to provide full information, which

6    again shows that this is a class-wide issue.  It doesn't really

7    matter, for purposes of class certification, what this number

8    is.  It's a number.  As we've heard there -- it's a -- it's one

9    number.  And what it is, is probably zero or something like a

10   penny.

11           But it will apply on classified basis.  It does not

12   affect the model.  It certainly does not affect the methodology

13   that he's using.

14           I want to quickly address the collinearity issue.

15   You know, we've addressed this issue before.  You know, we

16   continue to hear about collinearity, even though using the

17   NFL's own analysis, that's not an issue with the current issue

18   of the model simply adding more -- more data to the model --

19   made the issue go away.

20           But I also want to clarify that this model never

21   suffered from perfect collinearity.  Why did it not suffer from

22   perfect collinearity?  Because the program that he used, Stata,

23   dropped one of the -- one of the year variables so that it

24   would not be subject to perfect collinearity.

25           In effect, the model used the years 2011 through

1    2018.  And it used prices from 2011 to 2018.  And one of the

2    things about running these regressions is that Stata

3    automatically dropped the 2011 variable because it needed to,

4    mathematically.  Nobody has complained about that.  That's a

5    normal -- that's a normal fact.

6         When there are issues with collinearity, it's quite

7    common for economists to go in an manual -- manually drop

8    another one to prevent any collinearity.

9         And the reason they do that is because -- and the

10   effect of that in this case, to be clear, is that he

11   effectively made what are called the fixed effects of 2018; the

12   economy, the other effects that aren't really captured by the

13   model directly, but were kind of affecting price and demand in

14   2018 instead of -- it fixed it as equal to 2011.

15        And that's a standard thing economists do.  It's a

16   bit of a shortcut perhaps.  But it's standard.  And it's so

17   standard that that's the default action that Stata takes.  So

18   the model never suffered from collinearity.

19        The best that could be said is that it dropped the

20   information about 2018, which is not the argument that was made

21   that supports anything like the notion that rendered this model

22   fundamentally unreliable and outside of the scope of science.

23        In any event, as we've noted, notwithstanding what we

24   just heard, information was added to -- so that that is no

25   longer the case in 2018.  Information is now included in the

74

1    model.

2            One thing I want to say about -- about the use of

3    Laumann in this case.  The Defendants have relied quite heavily

4    on Laumann.  And they've looked at Laumann and saw that the

5    Judge in that case, Dr. Scheindlin, pointed to some -- some

6    results that seemed nonsensical.  And it apparently caused them

7    to go on a hunt for nonsensical results in the hope they could

8    get this model thrown out.

9            I think it's important to note that that was not the

10   basis for the holding, in Laumann.  The basis for the holding,

11   in Laumann, after reviewing what were called nonsensical

12   results and reviewing the explanations by the expert, Dr. Knoll

13   (phonetic), she decided she wasn't going to resolve the issue

14   of whether there was a problem with those results; but rather

15   resolved the case on the basis of the fact that the data that

16   was used was of too narrow a slice of the population.

17           And, in particular, that it only included subscribers

18   to the out-of-market package in question, and that it was

19   estimating avatars of other kinds of fans, creating this --

20   this demand curve from this very small slice across the whole

21   market.

22           And it's interesting, in this case, that they've

23   moved to exclude the survey data.  Because it does include just

24   the data that Dr. -- that Judge Scheindlin decided was missing

25   in Laumann, and was in fact the basis for -- for exclusion of

75

1    the case.

2            In any event, I think those have hopefully addressed

3    most of the issues with respect to the -- to the experts.

4            THE COURT:  Okay.  NFL, would you like more time?

5            MR. KILARU:  I would say three to five minutes, Your

6    Honor; no more.

7            THE COURT:  Let me just make a quick phone call.

8            MR. KILARU:  Of course.

9            THE COURT:  And (indiscern.) was expected to be

10   picked up at 3:30.  So --

11           MR. KILARU:  Oh.

12           THE COURT:  So I had to tell him it would be a bit

13   longer.

14           Okay.  It will be about five minutes.

15       **(Recess taken from 3:33 p.m. to 3:40 p.m.; resume)**

16           MR. KILARU:  Sorry to keep Your Honor.  I promise

17   I'll be very brief.

18           THE COURT:  That's all right.

19           MR. KILARU:  A couple quick points on Dr. Zona and a

20   couple of quick points on Rascher.

21           On Dr. Zona, there was a mention of this rebuttal

22   report that was attached to a motion to exclude a different

23   expert.  We don't think that that rebuttal is properly before

24   the court but I'd also note that it isn't just a situation

25   where Dr. Zona is correcting minor coding errors, he's

76

1    fundamentally changing the way his model works.  He's changing

2    variables and he's changing the way that his model worked from

3    start to finish.

4           Just to give one example, he first said there's a

5    variable about Sunday Ticket and a variable about DirecTV.

6    Look at them separately in his new approach, he just jams them

7    together, doesn't really explain why other than it's needed to

8    cure the absurd result that competition does not produce

9    damages.

10          Second on this point about the Vikings and the

11   irrational results, there's a couple of questions.  One is why

12   build a model that's based on the Minnesota Vikings?

13   Self-evidently it's not clear why you would do that and that's

14   something that Dr. Zona did.  But second, what the model

15   generates are results that don't make any sense and it's his

16   model.  They can say that it's all about relative and not

17   absolute values but the model says that fans in Pittsburgh hate

18   NFL football and fans in New England love it.  It at least says

19   that fans in New England love football way more than fans in

20   Pittsburgh.  And all of the evidence in the actual record in

21   this case says that that is just not true.

22          And then last on this point about marginal costs,

23   much of Mr. Diver's argument seem to be that actually it should

24   be zero all along and that's the right number.  Well if that is

25   so, why did Dr. Zona not start there?  Why build a model that

77

1    predicts marginal costs and predicts behavior if the marginal

2    cost answer was zero all along?  And the reason for that is if

3    you use zero, none of his models work.  They don't predict the

4    real world.  And in the versions that are properly before the

5    court, they don't predict damages.  So it's fine to come in

6    today and say zero is the right answer, it's a process of

7    discovery, but their expert had to come forth with the rigorous

8    methodology and he didn't start where they ended and he only

9    got there after pointing out flaw after flaw after flaw along

10   the way.

11        On Dr. Rascher, again briefly, the first point I'd

12   note is that while the plaintiffs mentioned that Dr. Rascher is

13   sort of a renowned expert, the very last time he proffered a

14   damages model to a court was in the Shields v. FINA case in

15   front of Judge Corley in San Francisco and she rejected his

16   model and said it didn't support damages class certification

17   because it wasn't sufficiently rigorous to answer the questions

18   of injury on a class-wide basis which is the exact problem that

19   we have here.

20        In terms of the channels, as we noted, our

21   fundamental objection to what Dr. Rascher did is he doesn't

22   answer the questions of where content will go.  And when

23   Mr. Diver was arguing it, he said ESPN, TNT, et cetera, et

24   cetera.  The et cetera is doing a lot of the work, Your Honor,

25   because if the content goes to streaming, if it goes to Fox

78

1    Sports II, if it goes to other premium channels, class members

2    will pay more and you have to go through 2.4 million

3    residential class members and lots more commercial members to

4    figure out if they're better or worse.

5              And then last I think it's just worth pausing on two

6    points about what it is that they are asking you to sign off on

7    if you're going to certify a class in this case on damages.

8              The first thing they're asking you to certify to sign

9    off on is a fundamental disruption to a media model that

10   currently provides something that no other sport, including

11   college football does which is the ability for every consumer

12   in America to watch their local team for free.  And for most

13   consumers, their local team is their favorite team.  All of the

14   evidence in the case shows that.  Right now every consumer can

15   get that for free.  They don't have to get a cable

16   subscription, they can put an antenna on their TV and that is

17   not a hypothetical thing.  The studies in this case and even

18   Dr. Rascher cites show that the use of people cutting the cord

19   is going up in today's climate, not down.  And so they are

20   proposing a model that by Dr. Rascher's own admission would

21   force some of those people to pay thousands of dollars to get a

22   cable subscription, maybe they get a streaming subscription, to

23   pay for premium cable to watch content that they currently get

24   for free.  And that is not just people, that is class members

25   because they were members of the class that they have pleaded

1    who stopped getting satellite service and stopped getting cable

2    service during the class period.  They are class members, part

3    of the class today, who are paying nothing to watch

4    high-quality NFL football.  And under the model Dr. Rascher has

5    put forth, they are now going to have to pay potentially a lot

6    of money to get access to that same content.  So that's one, we

7    think, improper result that they're asking you to sign off on.

8         But the other one is in some way even more

9    extraordinary.  They are asking you to sign off on a model in

10   which some of the most popular content in sports media is

11   available to everyone essentially for no cost.

12        Look at every single sport out there, that is not

13   what happens.  In college football, you have to pay to watch

14   the playoff which is the most popular event because it's not

15   ESPN.  In major league baseball, you have to pay to subscribe

16   to Apple TV on top of an expensive cable subscription if you

17   want to watch your favorite team's games.  In the NBA, the most

18   popular games are championship events.  The conference finals

19   for both sports are on TNT.  So to come in here and say that

20   unlike in every real world example we have and every example we

21   have of sports.  And to be clear, on college football, we're

22   not talking about Division 2.  This is true for the most

23   popular teams.  It's true for the playoff, it's true for

24   Alabama, it's true for Ohio State, it's true for UCLA, it's

25   true for USC.  It's true for all of these very popular teams as

80

1    Dr. Rascher admitted in his deposition.  You have to pay money

2    to get that content.  And Dr. Rascher is coming in and saying

3    in the but-for world, you won't.

4            And I would think, Your Honor, that if an expert is

5    going to come in with conclusions like that, they should at

6    least consider the record evidence and try to build a model

7    that tells you where that content is going to go so you can

8    fairly evaluate it.  That happened in Alene (phonetic) which is

9    a decision Your Honor mentioned at the start.

10           In Alene, the expert did come in with a model that

11   purported to say what the outcome would be for all class

12   members.  Dr. Rascher hasn't done even that.  And so as we

13   think Alene actually supports us because the experts there

14   weren't subject to a 702 challenge as they are here and the

15   expert at least brought forth a model like the but-for world

16   should look like to allow for fair evaluation of that under

17   Rule 23 and that hasn't happened here.  Thanks.

18           **THE COURT:**  Thank you.  All right the matter will

19   stand submitted.  Thank you.

20           **MR. SELTZER:**  Your Honor, if I may respond briefly?

21           **THE COURT:**  Real quick.

22           **MR. SELTZER:**  Very, very fast.  Just to make -- just

23   a couple of points.

24           On this Vikings, why pick the Vikings, he had to pick

25   something.  It was an arbitrary choice.  It's the last name in

1   the alphabet so what it is is a choice to use that and then

2   say, "Do I like my game more than the Vikings or less than the

3   Vikings?"  That's how the model works.  There's nothing

4   mysterious about it and nothing arbitrary about it except

5   picking one.  You could have picked the Rams, you could have

6   picked somebody else.

7          On the marginal cost point, what he did was he said,

8   look, if in fact their pricings (indisc.) marginal cost, which

9   is what you would do in a competitive environment, then it

10  would be $215 but the real value is zero marginal cost.  So

11  that means that DirecTV is vastly overpriced based on the

12  actual marginal cost.

13         On the point about disrupting the model, first of all

14  we're talking about and they're talking about the damages

15  issue, what's happened has happened.  People overcharged in the

16  past.  Nothing gets disrupted if they have to pay damages for

17  overcharging people.  So their argument is really it's a

18  non sequitur.

19         The reality is all the arguments you heard about the

20  way it may work in the but-for world based on hockey, baseball,

21  football, these are all arguments on the merits and would be

22  for the jury to decide.

23         Thank you, Your Honor.

24         **THE COURT:**  Thank you.  Good night.

25     **(Proceeding adjourned at 3:49 p.m.)**

## CERTIFICATION

    I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          **February 7, 2023**

        Signed                                Dated


*TONI HUDSON, TRANSCRIBER*