# EXHIBIT 40

# To the Declaration of Rakesh N. Kilaru

# GLOBAL ANTITRUST LAW AND ECONOMICS

### SECOND EDITION

EINER ELHAUGE

DAMIEN GERADIN

FOUNDATION PRESS

# GLOBAL ANTITRUST LAW AND ECONOMICS

### SECOND EDITION

*by*

EINER ELHAUGE

Petrie Professor of Law, Harvard University

DAMIEN GERADIN

Partner, Covington & Burling
Professor of Competition Law & Economics, Tilburg University
Cook Global Law Professor, University of Michigan Law School

FOUNDATION PRESS
2011



THOMSON REUTERS

This publication was created to provide you with accurate and authoritative information concerning the
subject matter covered; however, this publication was not necessarily prepared by persons licensed to
practice law in a particular jurisdiction. The publisher is not engaged in rendering legal or other
professional advice and this publication is not a substitute for the advice of an attorney. If you require legal
or other expert advice, you should seek the services of a competent attorney or other professional.

Nothing contained herein is intended or written to be used for the purposes of 1) avoiding penalties imposed
under the federal Internal Revenue Code, or 2) promoting, marketing or recommending to another party
any transaction or matter addressed herein.

© 2007 THOMSON/REUTERS, Einer Elhauge and Damien Geradin

© 2011 By THOMSON REUTERS/FOUNDATION PRESS, Einer Elhauge and Damien Geradin

    1 New York Plaza, 34th Floor

    New York, NY 10004

    Phone Toll Free 1–877–888–1330

    Fax 646–424–5201

    foundation–press.com

Printed in the United States of America

**ISBN** 978–1–59941–747–9

Mat #40881197

# SUMMARY OF CONTENTS

Preface to the Second Edition ------------------------------------------------- iii
Preface to the First Edition --------------------------------------------------- v
Acknowledgements ------------------------------------------------------------ vii
Table of Cases ---------------------------------------------------------------- xxvii

**CHAPTER 1   Introduction** ----------------------------------------------- 1

A. The Framework of Legal Issues Raised by Basic Antitrust Economics ------------------------------------------------------------------- 1
B. The Remedial Structure ---------------------------------------------------- 11
   1. An Overview of U.S. Antitrust Laws and Remedial Structure --- 12
   2. An Overview of EU Competition Laws and Remedial Structure 49
   3. A Brief Overview of Antitrust Laws and Remedies in Other Nations ------------------------------------------------------------------ 70

**CHAPTER 2   Which Horizontal Agreements Are Illegal?** --------- 73

A. Relevant Laws and Basic Legal Elements ----------------------------- 73
   1. Relevant U.S. Laws and General Legal Standards ---------------- 73
   2. Relevant EU Laws and General Legal Standards ----------------- 77
   3. Other Nations -------------------------------------------------------- 84
B. Horizontal Price–Fixing --------------------------------------------------- 85
C. Horizontal Output Restrictions ------------------------------------------ 121
D. Horizontal Market Divisions --------------------------------------------- 140
E. Horizontal Agreements Not to Deal With Particular Firms ---------- 153
   1. Boycotts by Unrelated Rivals -------------------------------------- 154
   2. Exclusions and Expulsions From a Productive Collaboration of Rivals -------------------------------------------------------------------- 162
F. Are Social Welfare Justifications Admissible? ------------------------- 180
G. Does Intellectual Property Law Justify an Anticompetitive Restraint? ---------------------------------------------------------------------- 225
H. Buyer Cartels --------------------------------------------------------------- 249

**CHAPTER 3   What Unilateral Conduct Is Illegal?** ------------------ 265

A. Relevant Laws & Basic Legal Elements --------------------------------- 265
   1. U.S. Laws and Legal Elements -------------------------------------- 265
   2. EU Law and Legal Elements ----------------------------------------- 270
   3. Other Nations -------------------------------------------------------- 273
B. The Power Element --------------------------------------------------------- 276
   1. Economic and Legal Tests of Market Power Generally ---------- 277
   2. Legal Tests of Monopoly Power or a Dominant Position --------- 283
   3. Market Definition --------------------------------------------------- 291
   4. Aftermarkets -------------------------------------------------------- 335
C. Second Element: Anticompetitive Conduct ---------------------------- 344
   1. General Standards -------------------------------------------------- 344
   2. Predatory Pricing --------------------------------------------------- 353

ix

　　3. Predatory Overpaying by a Monopsonist ............................ 399
　　4. Excessive Pricing .................................................................. 404
　　5. Exclusions From Owned Property–Unilateral Refusals to Deal  415
　　6. Price Squeezes ...................................................................... 476
D. Causal Connection Between First and Second Elements Required?  494
E. Attempted Monopolization ............................................................ 500

**CHAPTER 4   Vertical Agreements That Restrict Dealing With Rivals** ...................................................................................... 512

A. Introduction ................................................................................... 512
B. Exclusive Dealing .......................................................................... 516
C. Tying ............................................................................................... 562
D. Loyalty and Bundled Discounts .................................................. 629

**CHAPTER 5   Agreements and Conduct That Arguably Distort Downstream Competition in Distributing a Supplier's Products** ..................................................................................... 695

A. Introduction ................................................................................... 695
B. Intrabrand Distributional Restraints on Resale ....................... 699
　　1. Vertical Nonprice Restraints on Distribution ..................... 699
　　2. Vertical Maximum Price–Fixing .......................................... 735
　　3. Vertical Agreements Fixing Minimum Resale Prices ......... 743
　　4. How to Characterize Agreements ......................................... 773
C. Price Discrimination That Arguably Distorts Downstream Competition ......................................................................................... 780

**CHAPTER 6   Proving an Agreement or Concerted Action** ........ 807

A. Are the Defendants Separate Entities? ...................................... 807
B. Standards for Finding a Vertical Agreement ............................. 830
C. Standards for Finding a Horizontal Agreement or Concerted Action ................................................................................................ 842
　　1. Parallel Conduct Equally Consistent With an Independent Motive ...................................................................................... 843
　　2. Parallel Conduct that Would Be Unprofitable If Not Engaged in by Other Firms ................................................................... 856
　　3. Agreements or Practices that Facilitate Oligopolistic Price Coordination ............................................................................ 884

**CHAPTER 7   Mergers** ...................................................................... 913

A. Horizontal Mergers ...................................................................... 922
　　1. Unilateral Effects .................................................................. 924
　　2. Oligopoly Effects & Collective Dominance ......................... 949
　　3. Post–Merger Entry ................................................................ 981
　　4. Efficiencies & Weighing the Equities .................................. 989
　　5. The Failing Firm Defense ..................................................... 1016
　　6. The Relevance of Buyer Power, Sophistication, or Views .... 1028
B. Vertical Mergers ........................................................................... 1048
C. Conglomerate Mergers ................................................................. 1080

...... 399
...... 404
Deal    415
...... 476
ired?   494
...... 500

**With**
...... 512

...... 512
...... 516
...... 562
...... 629

**tort
s**
...... 695

...... 695
...... 699
...... 699
...... 735
...... 743
...... 773
mpe-
...... 780

...... 807

...... 807
...... 830
Ac-
...... 842
dent
...... 843
aged
...... 856
Price
...... 884

...... 913

...... 922
...... 924
...... 949
...... 981
...... 989
..... 1016
..... 1028
..... 1048
..... 1080

**CHAPTER 8   Markets That Span Multiple Antitrust Regimes** .. 1137

A.  Extraterritorial Conduct Affecting Domestic Commerce ............... 1141
B.  Special Treatment of Conduct Affecting Exports ....................... 1188
C.  The Trade–Antitrust Intersection ..................................... 1196
D.  Anticompetitive Conduct Involving Foreign Sovereigns ............... 1208
E.  International Cooperation in Antitrust Enforcement .................... 1225
F.  The Prospects for International Antitrust Law .......................... 1239

INDEX ...................................................................... 1249

# TABLE OF CONTENTS

PREFACE TO THE SECOND EDITION ---------------------------------------------- iii
PREFACE TO THE FIRST EDITION ----------------------------------------------- v
ACKNOWLEDGEMENTS --------------------------------------------------------------- vii
TABLE OF CASES -------------------------------------------------------------------- xxvii

**CHAPTER 1   Introduction** ------------------------------------------------ 1

A. The Framework of Legal Issues Raised by Basic Antitrust Economics ------------------------------------------------------------------- 1
B. The Remedial Structure ------------------------------------------------- 11
   1. An Overview of U.S. Antitrust Laws and Remedial Structure --- 12
   2. An Overview of EU Competition Laws and Remedial Structure 49
   3. A Brief Overview of Antitrust Laws and Remedies in Other Nations --------------------------------------------------------------- 70
     Questions on Remedies -------------------------------------------- 72

**CHAPTER 2   Which Horizontal Agreements Are Illegal?** --------- 73

A. Relevant Laws and Basic Legal Elements ----------------------------- 73
   1. Relevant U.S. Laws and General Legal Standards ----------------- 73
   2. Relevant EU Laws and General Legal Standards ------------------- 77
   3. Other Nations -------------------------------------------------------- 84
B. Horizontal Price–Fixing -------------------------------------------------- 85
   *United States v. Trenton Potteries* --------------------------------- 85
   Questions on *Trenton Potteries* ----------------------------------- 87
   *Broadcast Music, Inc. (BMI) v. Columbia Broadcasting System* ------- 88
   Questions on *BMI* ------------------------------------------------- 96
   *Arizona v. Maricopa County Medical Soc'y* ------------------------ 98
   Questions on *Maricopa* ------------------------------------------- 106
   *Texaco Inc. v. Dagher* -------------------------------------------- 107
   Questions on *Texaco v. Dagher* ----------------------------------- 109
   Horizontal Price–Fixing Under EU Law ------------------------------ 110
   *Commission Decision of 23 April 1986 No 86/398/EEC, Polypropylene* ---- 111
   Questions on *Polypropylene* -------------------------------------- 113
   *Commission Decision 85/77/EEC of 10 December 1984, Uniform Eurocheques* ---- 114
   Questions on *Uniform Eurocheques* -------------------------------- 118
   Agreements Fixing Other Trade Conditions --------------------------- 119
   Other Nations' Regulation of Horizontal Price–Fixing --------------- 119
C. Horizontal Output Restrictions ------------------------------------------ 121
   *NCAA v. Board of Regents of Univ. of Oklahoma* ----------------- 121
   Questions on *NCAA* ----------------------------------------------- 129
   *Commission Decision 84/380/EEC of 4 July 1984, Synthetic Fibres* ---- 130
   Questions on *Synthetic Fibres* ------------------------------------ 136
   Other Nations' Regulation of Horizontal Output Restraints --------- 139
D. Horizontal Market Divisions --------------------------------------------- 140
   *Palmer v. BRG* ---------------------------------------------------- 141
   Questions on *Palmer v. BRG* -------------------------------------- 142

D. Horizontal Market Divisions—Continued
    *U.S. DOJ/FTC, Antitrust Guidelines for Collaborations Among*
        *Competitors* .......................................................................... 145
    Questions on FTC–DOJ Guidelines ......................................... 147
    EU Law on Horizontal Market Divisions ................................ 148
    *Commission Decision 91/227 of 19 December 1990, Soda–Ash–*
        *Solvay/ICI* .......................................................................... 148
    Questions on Soda–Ash .............................................................. 151
    Specialization Agreements Under EU Law ........................... 152
    Other Nations' Regulation of Horizontal Market Divisions and
        Bid–Rigging ......................................................................... 153
E. Horizontal Agreements Not to Deal With Particular Firms ........... 153
    1. Boycotts by Unrelated Rivals ............................................. 154
        *Klor's Inc. v. Broadway–Hale Stores, Inc.* ..................... 154
        Questions on *Klor's* ........................................................... 156
        *Fashion Originators' Guild of Am. v. FTC* ..................... 157
        Questions on *Fashion Originators'* .................................. 159
        *Commission Decision 1999/60 of 21 October, Pre-Insulated*
            *Pipe Cartel* .................................................................. 161
        Questions on *Pre-Insulated Pipe* ................................... 162
    2. Exclusions and Expulsions From a Productive Collaboration of
        Rivals ............................................................................. 162
        *United States v. Terminal Railroad Ass'n* ..................... 162
        *Associated Press v. United States* ................................. 166
        Questions on *Terminal RR* and *Associated Press* .......... 168
        *Northwest Wholesale Stationers v. Pacific Stationery* .... 170
        Questions on *Northwest Stationers* ................................. 174
        *Joined Cases 96–102, 104, 105, 108 and 110/82, NV IAZ*
            *International Belgium and others v. Commission (ANSEAU)* 175
        Questions on *ANSEAU* ..................................................... 177
        Other Nations' Regulation of Boycotts. ........................... 179
F. Are Social Welfare Justifications Admissible? .............................. 180
    *National Society of Professional Engineers v. United States* ........... 180
    Questions on *Professional Engineers* ..................................... 186
    *FTC v. Indiana Federation of Dentists* .................................. 187
    Questions on *Indiana Dentists* ............................................... 191
    *FTC v. Superior Court Trial Lawyers Ass'n* .......................... 192
    Questions on *Trial Lawyer's Ass'n* ......................................... 196
    *California Dental Ass'n v. FTC* ............................................... 197
    Questions on *California Dental* ............................................... 205
    Burdens and Orders of Theory and Proof after California Dental... 206
    *Case C–309–99, Wouters* .......................................................... 208
    Questions on *Wouters* .............................................................. 212
    Other Nations' Treatment of Social Welfare Justifications .......... 212
    The Policy Relevance of Nonprofit Status .............................. 213
    The Legal Treatment of Nonprofits Under U.S. and EU Law ...... 214
    *United States v. Brown University* .......................................... 216
    Questions on *United States v. Brown* ..................................... 223
G. Does Intellectual Property Law Justify an Anticompetitive Re-
      straint? ................................................................................ 225
    *United States v. General Electric* ............................................ 226
    Questions on *General Electric* ................................................ 228
    *United States v. New Wrinkle, Inc.* ......................................... 230
    Questions on *New Wrinkle* ...................................................... 232
    *Case 27/87, Sprl Louis Erauw–Jacquery v. La Hesbignonne Sc.* ...... 233
    Questions on *Erauw–Jacquery* ............................................... 234

*nong*
....... 145
....... 147
....... 148
*Ash–*
....... 148
....... 151
....... 152
*and*
....... 153
....... 153
....... 154
....... 154
....... 156
....... 157
....... 159
*lated*
....... 161
....... 162
*on of*
....... 162
....... 162
....... 166
....... 168
....... 170
....... 174
*IAZ*
*AU)* 175
....... 177
....... 179
....... 180
....... 180
....... 186
....... 187
....... 191
....... 192
....... 196
....... 197
....... 205
*al* ... 206
....... 208
....... 212
....... 212
....... 213
....... 214
....... 216
....... 223
*Re-*
....... 225
....... 226
....... 228
....... 230
....... 232
....... 233
....... 234

G. Does Intellectual Property Law Justify an Anticompetitive Restraint?—Continued
U.S. DOJ/FTC, Antitrust Guidelines for the Licensing of Intellectual Property (1995) .................... 235
*Commission Regulation (EC) No 772/2004 of 27 April 2004 on the Application of Article [101(3) TFEU] to Categories of Technology Transfer Agreements* .................... 242
*Commission Guidelines on the Application of Article [101 TFEU] to Technology Transfer Agreements* .................... 244
Questions on the U.S. Guidelines and EU Regulation 772/2004 and its Accompanying Guidelines .................... 248
Other Nations' Treatment of the Antitrust–Intellectual Property Intersection .................... 248
H. Buyer Cartels .................... 249
*Mandeville Island Farms v. American Crystal Sugar* .................... 249
Questions on *Mandeville* .................... 252
*Commission Decision 80/917 of 9 July 1980, National Sulphuric Acid Association* .................... 254
Questions on National Sulphuric Acid Association .................... 259
The EU Safe Harbor .................... 260
Countervailing Power and the Problem of the Second Best .................... 260
Other Nations' Regulation of Buyer Cartels .................... 264

**CHAPTER 3   What Unilateral Conduct Is Illegal?** .................... 265

A. Relevant Laws & Basic Legal Elements .................... 265
1. U.S. Laws and Legal Elements .................... 265
2. EU Law and Legal Elements .................... 270
3. Other Nations .................... 273
B. The Power Element .................... 276
1. Economic and Legal Tests of Market Power Generally .................... 277
2. Legal Tests of Monopoly Power or a Dominant Position .................... 283
*Guidance on the Commission's Enforcement Priorities in Applying Article 82 EC Treaty [now 102 TFEU] to Abusive Exclusionary Conduct by Dominant Undertakings* .................... 286
Questions on the Commission's Guidance Paper on Article 102 .................... 289
The Power Element in Other Nations .................... 289
3. Market Definition .................... 291
*United States v. du Pont & Co. (The Cellophane Case)* .................... 291
*du Pont* (The Cellophane Case) and Various Bases for Defining Markets .................... 298
*U.S. DOJ/FTC, Horizontal Merger Guidelines* .................... 304
Note on the U.S. Market Definition Guidelines .................... 315
Is Market Definition Necessary? .................... 317
*Case 27/76, United Brands v. Commission* .................... 319
Questions on *United Brands* .................... 321
*Commission Notice on the Definition of the Relevant Market for the Purposes of Community Competition Law* .................... 322
Note and Questions on the Commission Notice .................... 329
Technical Methods Used in Market Definition .................... 330
Market Definition in Other Nations .................... 334
4. Aftermarkets .................... 335
*Eastman Kodak v. Image Technical Servs.* .................... 335
Questions on *Kodak* .................... 343

C. Second Element: Anticompetitive Conduct ........................ 344
  1. General Standards .................................................... 344
    a. The Conduct Element for Proving Monopolization Under
      U.S. Antitrust Law ............................................. 344
    b. The Conduct Element for Proving Abuse of Dominance
      Under EU Competition Law ................................. 347
      *Guidance on the Commission's Enforcement Priorities in
      Applying Article 82 EC Treaty [now 102 TFEU] to Abu-
      sive Exclusionary Conduct by Dominant Undertakings* 347
      Questions on the Article [102] Guidance Paper .............. 351
    c. The Conduct Element in Other Nations ..................... 353
  2. Predatory Pricing ..................................................... 353
    a. Below–Cost Predatory Pricing ............................... 354
      *Brooke Group Ltd. (Liggett) v. Brown & Williamson Tobac-
      co Corp.* .......................................................... 354
      Note and Questions About *Brooke* ............................. 363
      The U.S. Conflict on the Proper Cost Measure ............ 365
      *Elhauge, Why Above–Cost Price Cuts to Drive out Entrants
      Do Not Signal Predation or Even Market Power—and the
      Implications for Defining Costs* ............................ 366
      *C–62/86, Akzo Chemie BV v. Commission* ................. 368
      Note and Questions on AKZO .................................. 369
      Note and Questions on Recoupment Under EU Law ...... 370
      *Commission Decision 2001/354/EC of 20 March 2001,
      Deutsche Post AG* ............................................. 371
      Questions on *Deutsche Post* ..................................... 375
      Case T–340/03, France Télécom/Commission ................ 375
      Questions on *France Télécom v. Commission* ............... 378
      *Guidance on the Commission's Enforcement Priorities in
      Applying Article 82 EC Treaty [now 102 TFEU] to Abu-
      sive Exclusionary Conduct by Dominant Undertakings* 378
      Questions on the Commission's Guidance Paper ............ 380
      Below–Cost Predatory Pricing in Other Nations ............ 382
    b. Above–Cost Predatory Pricing ............................... 383
      *Joined Cases T–24/93, T–25/93, T–26/93 & T–28/93, Com-
      pagnie Maritime Belge Transps. SA v. Commission* ......... 384
      *Joined Cases C–395/96 P & C–396/96 P, Compagnie Mari-
      time Belge Transps. SA v. Commission* ................... 386
      Note and Questions on *Compagnie Maritime* ............... 387
      *Case T–228/97, Irish Sugar PLC v. Commission* ......... 389
      Questions on *Irish Sugar* ........................................ 391
      *Enforcement Policy Regarding Unfair Exclusionary Conduct
      in the Air Transportation Industry* ........................ 392
      Note and Questions on the Proposed U.S. Department of Trans-
      portation Enforced Policy ..................................... 394
      *United States v. AMR Corp.* ................................... 395
      Questions on *American Airlines* ............................... 398
      Other Nations' Treatment of Above–Cost Predatory Pricing
      Claims ............................................................ 399
  3. Predatory Overpaying by a Monopsonist ...................... 399
    *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber* ........... 399
    Note and Questions on Weyerhaeuser ............................. 403
    Predatory Over–Paying by a Dominant Firm in Other Nations 404

...... 344
...... 344
nder
...... 344
ance
...... 347
s in
Abu-
ings  347
...... 351
...... 353
...... 353
...... 354
bac-
...... 354
...... 363
...... 365
ants
the
...... 366
...... 368
...... 369
...... 370
001,
...... 371
...... 375
...... 375
...... 378
s in
Abu-
ings  378
...... 380
...... 382
...... 383
om-
...... 384
ari-
...... 386
...... 387
...... 389
...... 391
uct
...... 392
ans-
...... 394
...... 395
...... 398
ing
...... 399
...... 399
...... 399
...... 403
ns 404

C. Second Element: Anticompetitive Conduct—Continued
    4. Excessive Pricing................................................................ 404
        Verizon Communications v. Law Offices of Curtis V. Trinko ..... 404
        Case 27/76, United Brands Company and United Brands Conti-
            nental B.V. v. Commission of the European Communities  405
        Note and Questions on Trinko and United Brands ............................... 407
        The Economics of Price Discrimination .................................. 409
        Excessive Pricing in Other Nations .................................... 413
    5. Exclusions From Owned Property–Unilateral Refusals to Deal  415
        Otter Tail Power Company v. United States .................................. 416
        Questions on Otter Tail............................................................ 421
        Should Natural Monopolies Be Immune From Monopolization
            Liability?.............................................................................. 424
        Aspen Skiing Co. v. Aspen Highlands Skiing Corp. .................... 425
        Questions on Aspen Skiing ...................................................... 432
        Eastman Kodak v. Image Technical Servs. .............................. 435
        Questions on the Kodak Duty to Deal With Rivals ..................... 437
        Verizon Commun. v. Law Offices of Curtis V. Trinko ................. 438
        Questions on Verizon v. Trinko ............................................... 444
        Einer Elhauge, Defining Better Monopolization Standards ........ 445
        The U.S. Essential Facilities Doctrine .................................. 446
        The Application of U.S. Antitrust Duties to Deal to Intellectual
            Property ............................................................................ 448
        Cases 6 and 7/73, COMMERCIAL SOLVENTS AND OTHERS V. COMMIS-
            SION ................................................................................. 449
        Questions on Commercial Solvents ....................................... 449
        Joined Cases C–241/91P & C–242/91P, RADIO TELEFIS EIREANN
            (RTE) V. COMMISSION OF THE EUROPEAN COMMUNITIES (MAGILL)  450
        Note and Questions on Magill.................................................. 452
        Case 7/97, OSCAR BRONNER GMBH & CO. KG V. MEDIAPRINT
            ZEITUNGS UND ZEITSCHRITENVERLAG GMBH & CO., KG ............... 453
        Questions on Bronner ............................................................ 456
        Case C–418/01, IMS Health GmbH & Co. OHG v. NDC Health
            GmbH & Co. KG ................................................................ 457
        Questions on IMS ................................................................. 460
        Case T–201/04 Microsoft v. Commission.................................. 462
        Questions on Microsoft .......................................................... 469
        Guidance on the Commission's Enforcement Priorities in Ap-
            plying Article 82 EC Treaty [now 102 TFEU] to Abusive
            Exclusionary Conduct by Dominant Undertakings................. 469
        Questions on the Commission's Guidance Paper ...................... 473
        Unilateral Refusals to Deal in Other Nations ......................... 474
    6. Price Squeezes .................................................................. 476
        Pacific Bell Telephone v. Linkline Communications ................... 477
        Questions on Linkline............................................................ 483
        Case T–271/03, Deutsche Telekom v. Commission, 2008 ECR II
            477................................................................................. 485
        Questions on Deutsche Telekom .............................................. 488
        Case C–52/09, TeliaSonera, not reported yet.............................. 489
        Questions on TeliaSonera ...................................................... 492
        Price Squeezes in Other Nations .......................................... 493
D. Causal Connection Between First and Second Elements Required?  494
        Einer Elhauge, Defining Better Monopolization Standards............. 494
        Monopoly Leveraging ............................................................ 495
        Case C–333/94 P, Tetra Pak v. Commission................................. 496
        Questions on Tetra Pak ......................................................... 499

E.  Attempted Monopolization ------------------------------------ 500
    *Lorain Journal v. United States* ------------------------- 501
    Questions on *Lorain Journal* ----------------------------- 502
    *United States v. American Airlines* ---------------------- 503
    Questions on *American Airlines* Attempted Cartel Case ---- 506
    *Spectrum Sports v. McQuillan* ---------------------------- 507
    Note and Questions on *Spectrum Sports* ------------------- 509
    Attempted Monopolization in Other Nations ---------------- 510

**CHAPTER 4   Vertical Agreements That Restrict Dealing With
            Rivals** ------------------------------------------- 512

A.  Introduction ----------------------------------------------- 512
    *Commission Regulation (EU) No 330/2010 of 20 April 2010 on the
    Application of Article 101(3) of the Treaty on the Functioning of
    the European Union to Categories of Vertical Agreements and
    Concerted Practices* -------------------------------------- 514
B.  Exclusive Dealing ----------------------------------------- 516
    *United States v. Griffith* ------------------------------- 521
    Note and Questions on *Griffith* and *Lorain Journal* ----- 524
    *Standard Fashion v. Magrane–Houston* --------------------- 525
    Questions on *Standard Fashion* --------------------------- 526
    *Standard Oil and Standard Stations v. United States* ----- 526
    Questions on *Standard Stations* -------------------------- 532
    *FTC v. Motion Picture Advertising Service* --------------- 533
    Cumulative Foreclosure ------------------------------------ 535
    *Tampa Electric v. Nashville Coal* ------------------------ 538
    Note and Questions on *Tampa Electric* -------------------- 541
    *United States v. Microsoft* ------------------------------ 542
    The U.S. Lower Court Splits on Foreclosure Thresholds and
        Terminability Relevance ------------------------------- 548
    Questions on *Microsoft*'s Exclusive Dealing Holdings ----- 549
    *EU Guidelines on Vertical Restraints* -------------------- 550
    Note and Questions on the EU Guidelines on Vertical Restraints ---- 559
    *Guidance on the Commission's Enforcement Priorities in Applying
    Article 82 EC Treaty [now 102 TFEU] to Abusive Exclusionary
    Conduct by Dominant Undertakings* ------------------------- 559
    Exclusive Dealing in Other Nations ------------------------ 561
C.  Tying ------------------------------------------------------ 562
    *Jefferson Parish Hospital v. Hyde* ----------------------- 575
    Questions on *Jefferson Parish* --------------------------- 585
    *Eastman Kodak v. Image Technical Servs.* ----------------- 588
    Questions on *Kodak* -------------------------------------- 594
    *Illinois Tool Works Inc. v. Independent Ink, Inc.* ------- 595
    Questions on *Illinois Tool Works* ------------------------ 599
    *United States v. Microsoft* ------------------------------ 601
    Questions on *U.S. Microsoft* Case Holdings on Tying ------ 607
    *EU Guidelines on Vertical Restraints* -------------------- 608
    Introduction to EU Cases on Tying as an Abuse of Dominance ---- 610
    *Commission Decision 88/138/EEC, Eurofix–Bauco v. Hilti* -- 610
    *Commission Decision 92/163/EEC, Tetra Pak II* ------------ 613
    Note and Questions on *Hilti* and *Tetra Pak II* ---------- 616
    Case T–201/04, Microsoft v. Commission, [2004] ECR II 4463 ----- 617
    Questions on EU *Microsoft* Case -------------------------- 624
    *Guidance on the Commission's Enforcement Priorities in Applying
    Article 82 EC Treaty [now 102 TFEU] to Abusive Exclusionary
    Conduct by Dominant Undertakings* ------------------------- 626
    Tying Doctrine in Other Nations --------------------------- 628

............ 500
............ 501
............ 502
............ 503
............ 506
............ 507
............ 509
............ 510

g With

............ 512

............ 512

) on the
ning of
ts and
............ 514
............ 516
............ 521
............ 524
............ 525
............ 526
............ 526
............ 532
............ 533
............ 535
............ 538
............ 541
............ 542

ls and
............ 548
............ 549
............ 550
............ 559

plying
ionary
............ 559
............ 561
............ 562
............ 575
............ 585
............ 588
............ 594
............ 595
............ 599
............ 601
............ 607
............ 608
ce ...... 610
............ 610
............ 613
............ 616
............ 617
............ 624

lying
ionary
............ 626
............ 628

D.  Loyalty and Bundled Discounts ............................................ 629
    *United States v. Loew's Inc.* ............................................. 640
    Questions on *Loew's* ...................................................... 642
    *FTC v. Brown Shoe* ...................................................... 643
    Questions on *FTC v. Brown Shoe* ....................................... 644
    *Concord Boat v. Brunswick Corp.* ...................................... 645
    Questions on *Concord Boat* .............................................. 648
    *LePage's Inc. v. 3M* ...................................................... 648
    Questions on *LePage's* ................................................... 655
    *Cascade Health Solutions v. PeaceHealth* .............................. 656
    Questions on *Cascade Health* ............................................ 661
    The U.S. Lower Court Splits on Loyalty and Bundled Discounts .... 662
    *Case 85–76, Hoffmann–La Roche v. Commission* ...................... 664
    Questions on *Hoffmann–La Roche* ....................................... 666
    *Case 322/101, Nederlandsche Banden–Industrie Michelin v. Com-
    mission (Michelin I)* ..................................................... 666
    Questions on *Michelin I* .................................................. 668
    *Case T–203/01, Manufacture française des pneumatiques Michelin
    v. Commission (Michelin II)* ............................................ 669
    Questions on *Michelin II* ................................................. 675
    British Airways Case ...................................................... 677
    *Case T–219/99 British Airways PLC v. Commission* .................. 677
    Questions on the CFI judgment in *British Airways* ................... 683
    *Judgment of the Court of Justice in Case C–95/04 P British
    Airways v. Commission* .................................................. 684
    Questions on the ECJ judgment in *British Airways* .................. 689
    *Guidance on the Commission's Enforcement Priorities in Applying
    Article 82 EC Treaty [now 102 TFEU] to Abusive Exclusionary
    Conduct by Dominant Undertakings* .................................. 690
    Loyalty and Bundled Discounts in Other Nations ..................... 693

**CHAPTER 5  Agreements and Conduct That Arguably Distort
    Downstream Competition in Distributing a
    Supplier's Products** ...................................................... 695

A.  Introduction .................................................................. 695
B.  Intrabrand Distributional Restraints on Resale ....................... 699
    1.  Vertical Nonprice Restraints on Distribution ..................... 699
        *Continental T.V. v. GTE Sylvania* ............................... 701
        Questions on *Sylvania* ........................................... 707
        EU Law on Vertical Territorial Restraints ....................... 708
        *Joined Cases 56 and 58–64, Consten and Grundig v. Commis-
        sion* ............................................................... 708
        Questions on *Consten Grunding* ................................. 710
        *Commission Regulation (EU) No 330/2010 of 20 April 2010 on
        the Application of Article 101(3) of the Treaty on the Func-
        tioning of the European Union to Categories of Vertical
        Agreements and Concerted Practices* ............................ 711
        *EU Guidelines on Vertical Restraints* ........................... 711
        Questions on the Commission Guidelines ......................... 715
        Direct v. Indirect Market Partitioning ........................... 715
        *Commission Decision 98/273/EC, VW* ............................ 715
        *Commission Decision 2001/791 Glaxo Wellcome,* ................ 717
        *Case T–168/01, Glaxosmithkline Services v. Commission* ....... 722

B. Intrabrand Distributional Restraints on Resale—Continued
    Questions on *VW* and *Glaxo–Wellcome* .......................................... 731
    *Cases C 501/06 P, C–513/06 P, C–515/06 P and C 519/06 P,*
        *GlaxoSmithKline v. Commission* ........................................... 732
    Questions on GlaxoSmithKline v. Commission ........................... 734
    Other Nations' Treatment of Vertical Non-Price Restraints on
        Distribution ................................................................................. 735
    2. Vertical Maximum Price–Fixing ............................................... 735
    *State Oil Co. v. Khan* ................................................................... 737
    Questions on *State Oil v. Khan* ................................................ 742
    *Commission Regulation (EU) No 330/2010 of 20 April 2010 on*
        *the Application of Article 101(3) of the Treaty on the Func-*
        *tioning of the European Union to Categories of Vertical*
        *Agreements and Concerted Practices* .................................... 742
    *EU Guidelines on Vertical Restraints* ..................................... 743
    Other Nations' Treatment of Vertical Maximum Price–Fixing .. 743
    3. Vertical Agreements Fixing Minimum Resale Prices ................. 743
    *Leegin Creative Leather Products v. PSKS, Inc.* ..................... 744
    Notes and Questions on *Leegin* ................................................. 764
    *Commission Regulation (EU) No 330/2010 of 20 April 2010 on*
        *the Application of Article 101(3) of the Treaty on the Func-*
        *tioning of the European Union to Categories of Vertical*
        *Agreements and Concerted Practices* .................................... 767
    *EU Guidelines on Vertical Restraints* ..................................... 767
    Questions on the EU Guidelines on Vertical Restraints ....... 770
    *Case 243/83, SA Binon & Cie v. SA Agence et Messageries de la*
        *Presse* ......................................................................................... 770
    Questions on *Binon* ..................................................................... 772
    Other Nations' Treatment of Vertical Minimum Price–Fixing... 772
    4. How to Characterize Agreements .............................................. 773
        a. Are Dual Distribution Agreements Vertical or Horizontal? .. 773
        *Commission Regulation (EU) No 330/2010 of 20 April 2010*
            *on the Application of Article 101(3) of the Treaty on the*
            *Functioning of the European Union to Categories of Verti-*
            *cal Agreements and Concerted Practices* ......................... 775
        *EU Guidelines on Vertical Restraints* ................................. 776
        b. Vertical Agreements to "Boycott" the Rival of a Dealer
            Without Any Procompetitive Justification ....................... 776
        *NYNEX v. Discon* ................................................................... 776
        Questions on *NYNEX v. Discon* ............................................ 779
C. Price Discrimination That Arguably Distorts Downstream Compe-
    tition ................................................................................................. 780
    Robinson–Patman Act § 2, 15 U.S.C. § 13 .................................... 781
    *FTC v. Morton Salt Co.* ................................................................ 781
    Questions on *Morton Salt* ............................................................ 785
    *Texaco v. Hasbrouck* .................................................................... 786
    Questions on *Texaco v. Hasbrouck* ............................................. 792
    *Volvo Trucks N.A. v. Reeder–Simco GMC* ................................. 794
    Questions on *Volvo* ....................................................................... 798
    Other Robinson–Patman Act Provisions ...................................... 800
    *Damien Geradin and Nicolas Petit, Price Discrimination under*
        *EC Law: The Need for a Case-by-Case Approach* .................. 800
    *British Airways PLC v. Commission* ........................................... 803
    Questions on *British Airways* ...................................................... 804
    Other Nations' Treatment of Price Discrimination .................... 804

| | | |
|---|---|---|
| | ......... | 731 |
| *9/06 P,* | ......... | 732 |
| | ......... | 734 |
| ints on | | |
| | ......... | 735 |
| | ......... | 735 |
| | ......... | 737 |
| | ......... | 742 |
| *2010 on* | | |
| *e Func-* | | |
| *Vertical* | | |
| | ......... | 742 |
| | ......... | 743 |
| *ixing* .. | ......... | 743 |
| | ......... | 743 |
| | ......... | 744 |
| | ......... | 764 |
| *2010 on* | | |
| *e Func-* | | |
| *Vertical* | | |
| | ......... | 767 |
| | ......... | 767 |
| | ......... | 770 |
| *es de la* | | |
| | ......... | 770 |
| | ......... | 772 |
| *ixing...* | ......... | 772 |
| | ......... | 773 |
| | ......... | 773 |
| *ntal?* .. | ......... | 773 |
| *il 2010* | | |
| *on the* | | |
| *f Verti-* | | |
| | ......... | 775 |
| | ......... | 776 |
| *Dealer* | | |
| | ......... | 776 |
| | ......... | 776 |
| | ......... | 779 |
| *Compe-* | | |
| | ......... | 780 |
| | ......... | 781 |
| | ......... | 781 |
| | ......... | 785 |
| | ......... | 786 |
| | ......... | 792 |
| | ......... | 794 |
| | ......... | 798 |
| | ......... | 800 |
| *under* | | |
| | ......... | 800 |
| | ......... | 803 |
| | ......... | 804 |
| | ......... | 804 |

**CHAPTER 6   Proving an Agreement or Concerted Action** ........ 807

A.  Are the Defendants Separate Entities?...................... 807
    *Copperweld Corp. v. Independence Tube Corp.* ..................... 807
    Questions on *Copperweld* ................................... 811
    *Case C–73/95 P, Viho Europe BV v. Commission* ..................... 813
    Questions on *Viho* ...................................... 814
    The Relevance of Agency Relations........................ 814
    *American Needle v. National Football League* ..................... 816
    Note and Questions on *American Needle* ..................... 825
    Single Entity Theory in Other Nations ..................... 829
B.  Standards for Finding a Vertical Agreement ..................... 830
    *Monsanto Co. v. Spray–Rite Service Corp.* ..................... 831
    Questions on *Monsanto* ................................... 834
    Cases C–2/01 P and C–3/01P, Bundesverband der Arzneimittel–
        Importeure eV and Commission v. Bayer AG ..................... 836
    Questions on *Bayer* ...................................... 840
    Finding a Vertical Distributional Agreement in Other Nations ...... 841
C.  Standards for Finding a Horizontal Agreement or Concerted Ac-
        tion........................................... 842
    1.  Parallel Conduct Equally Consistent With an Independent
        Motive ........................................ 843
        *Theatre Enterprises v. Paramount Film Distributing* ............... 843
        Questions on *Theatre Enterprises* ..................... 845
        *Matsushita Electric v. Zenith Radio* ..................... 845
        Questions on *Matsushita* ............................. 850
        *Cement Manufacturers Protective Ass'n v. United States*........... 851
        Questions on *Cement Manufacturers* ..................... 853
        Joined Cases 29/83 and 30/83, Compagnie Royale Asturienne
            Des Mines Sa and Rheinzink GmbH v. Commission ............. 853
        Questions on *Companie Asturienne des Mines and Rheinzink v. Com-
            mission* ...................................... 855
    2.  Parallel Conduct that Would Be Unprofitable If Not Engaged
        in by Other Firms ................................ 856
        a.  Where Parallel Conduct Is Implausible Without an Explicit
            Agreement ................................... 856
            *Eastern States Retail Lumber Dealers' Ass'n v. United
                States* ................................... 856
            Questions on *Eastern States Lumber* ..................... 857
            *American Column & Lumber v. United States* ............... 858
            Questions on *American Column* ..................... 863
            *American Tobacco v. United States* ..................... 863
            Questions on *American Tobacco* ..................... 865
            *Case 48/69, Imperial Chemical Indus. v. Commission (Dyes-
                tuffs)* .................................... 866
            Questions on *Dyestuffs* ............................. 871
        b.  Where Parallel Conduct Follows Common Invitations or
            Secret Meetings ............................. 872
            *Interstate Circuit v. United States* ..................... 872
            Questions on *Interstate Circuit* ..................... 876

C.  Standards for Finding a Horizontal Agreement or Concerted Action—Continued
    c.  Where Parallel Conduct Can Be Explained by Oligopolistic
        Price Interdependence .................................................... 877
        *Joined Cases C–89/85, C–104/85, C–114/85, C–116/85, C–*
        *117/85 and C–125/85 to C–129/85, A. Ahlström Osakeyhtiö*
        *and Others v. Commission ("Woodpulp II")* .................... 878
        Questions on *Woodpulp II* ............................................. 883
        Standards for Proving a Horizontal Agreement in Other
        Nations ..................................................................... 883
  3.  Agreements or Practices that Facilitate Oligopolistic Price
      Coordination ................................................................... 884
    *Maple Flooring Manufacturers Ass'n v. United States* .............. 886
    Questions on *Maple Flooring* .............................................. 890
    *United States v. Container Corp.* ......................................... 891
    Questions on *Container* ..................................................... 895
    *United States v. United States Gypsum* ................................ 897
    Questions on *Gypsum* ....................................................... 900
    *FTC v. Cement Institute* ................................................... 901
    Questions on *Cement Institute* ........................................... 906
    *Commission Decision 92/157, UK Agricultural Tractor Regis-*
    *tration Exchange (UK Tractors)* ...................................... 907
    Questions on *UK Tractors* ................................................. 911

**CHAPTER 7   Mergers** .................................................. 913

A.  Horizontal Mergers ............................................................. 922
  1.  Unilateral Effects ............................................................. 924
    *U.S. DOJ/FTC, Horizontal Merger Guidelines* ...................... 924
    *EU Guidelines on the Assessment of Horizontal Mergers* ......... 936
    Questions on the U.S. and EU Guidelines on Unilateral Effects ..... 941
    *FTC v. Staples, Inc.* ......................................................... 941
    Questions on *Staples* ........................................................ 948
    U.S. Agency Enforcement Activity ...................................... 948
  2.  Oligopoly Effects & Collective Dominance ............................ 949
    *U.S. DOJ/FTC, Horizontal Merger Guidelines* ...................... 949
    Questions on U.S. Guidelines on Oligopoly Effects ................... 952
    Qualitative v. Empirical Assessments .................................. 952
    *FTC v. H.J. Heinz Co.* ...................................................... 953
    Questions on *FTC v. Heinz* ................................................ 958
    Early EU Caselaw on Oligopolistic Coordination and Collective
    Dominance ................................................................... 960
    *Case T–102/96, Gencor Limited v. Commission* ...................... 961
    *Case T–342/99, Airtours v. Commission* ............................... 962
    Note and Questions on *Airtours* ......................................... 972
    Proving That a Merger Would Worsen Oligopolistic Coordina-
    tion ............................................................................ 973
    *EU Guidelines on the Assessment of Horizontal Mergers* ......... 974
    Questions on the EU Guidelines on Coordinated Effects ............. 978
    Merger Assessments in Other Nations .................................. 978
  3.  Post–Merger Entry ........................................................... 981
    *U.S. DOJ/FTC, Horizontal Merger Guidelines* ...................... 981
    Questions on U.S. Guidelines on Entry ................................. 983
    *FTC v. Staples, Inc.* ......................................................... 983
    Questions on *Staples* ........................................................ 985
    *EU Guidelines on the Assessment of Horizontal Mergers* ......... 985
    *Case T–342/99, Airtours v. Commission* ............................... 987
    Questions on *Airtours* Analysis of Entry .............................. 988
    Post–Merger Entry Analysis in Other Nations ......................... 988

A.  Horizontal Mergers—Continued
    4.  Efficiencies & Weighing the Equities ............................ 989
        *U.S. DOJ/FTC, Horizontal Merger Guidelines* ...................... 989
        *EU Guidelines on the Assessment of Horizontal Mergers* .......... 991
        Questions on U.S. and EU Guidelines ................................. 993
        Merger Efficiencies and Total v. Consumer Welfare ............... 994
        *Commissioner of Competition v. Superior Propane Inc.* ......... 995
        Note and Questions on *Superior Propane* ........................ 1003
        Consumer Trusts and Other Coasian Solutions to the Total v.
           Consumer Welfare Debate ................................... 1004
        Other Nations' Treatment of Efficiencies ........................ 1005
        *FTC v. Staples, Inc.* ............................................. 1006
        Note and Questions on *Staples* .................................. 1009
        *FTC v. H.J. Heinz Co.* ........................................... 1009
        Questions on *FTC v. Heinz* ...................................... 1015
        How to Balance the Equities in Merger Cases .................... 1015
    5.  The Failing Firm Defense ....................................... 1016
        *International Shoe v. FTC* ........................................ 1016
        Note and Questions on *International Shoe v. FTC* ............... 1018
        *Citizen Publishing v. United States* ............................ 1019
        Note and Questions on *Citizen's Publishing* .................... 1021
        *U.S. DOJ/FTC, Horizontal Merger Guidelines* ................... 1022
        Note and Questions on Merger Guidelines on the Failing Firm De-
           fense ....................................................... 1023
        *Joined Cases C–68/94 and C–30/95, French Republic and So-
           ciété commerciale des potasses et de l'azote (SCPA) and
           Entreprise minière et chimique (EMC) v. Commission (Com-
           mission v. France)* ........................................ 1024
        Questions on *Kali und Salz/Commission v. France* .............. 1025
        *Commission Decision 2002/365, BASF/Eurodiol/Pantochim* .... 1026
        *EU Guidelines on the Assessment of Horizontal Mergers* ........ 1026
        Questions on *BASF/Pantochim/Eurodiol* and the Commission Guide-
           lines on the Assessment of Horizontal Mergers .............. 1027
        Treatment of Failing Firms in Other Nations .................... 1027
    6.  The Relevance of Buyer Power, Sophistication, or Views ..... 1028
      a.  Mergers Between Buyers That Create Buyer Power ........... 1028
        *U.S. DOJ/FTC, Horizontal Merger Guidelines* ................. 1030
        *EU Notice on the Definition of the Relevant Market for the
           Purposes of Community Competition Law* ................. 1030
        *EU Guidelines on the Assessment of Horizontal Mergers* ...... 1031
        Questions on U.S.–EU Agency Materials on Buyers That Enhance
           Buyer Power .............................................. 1031
        *Case No. IV/M.784—Kesko/Tuko* ............................. 1032
        Questions on Kesko/Tuko ........................................ 1033
      b.  Should Mergers Between Sellers Be Deemed Constrained by
          Buyer Power? ............................................... 1033
        *U.S. DOJ/FTC, Horizontal Merger Guidelines* ................. 1033
        *EU Guidelines on the Assessment of Horizontal Mergers* ...... 1034
        Questions on Whether Buyer Power Should Alter Assessments of
           Mergers That Otherwise Create Seller Market Power ........ 1035
        *United States v. Baker Hughes, Inc.* ......................... 1035
        Note and Questions on *Baker Hughes* ......................... 1037
        *Commission Decision 1999/641/EC, Enso/Stora* ............... 1038
        Questions on *Enso Stora* ....................................... 1040
        *Commissioner of Competition v. Superior Propane Inc.* ....... 1041
        Note and Questions on *Superior Propane* ...................... 1042

A. Horizontal Mergers—Continued
   c. Should Buyer Views Alter Assessments of Mergers Between
      Sellers? ................................................................ 1043
      *Commission Decision 1999/641/EC, Enso/Stora* ................. 1043
      Questions on *Enso Stora* .............................................. 1043
      *U.S. DOJ/FTC, Horizontal Merger Guidelines* ................ 1043
      Buyer Noncomplaints ................................................. 1045
B. Vertical Mergers ............................................................ 1048
  *U.S. DOJ, 1984 Merger Guidelines* ................................ 1050
  Note and Questions on U.S. Vertical Merger Guidelines............ 1053
  *In the Matter of Cadence Design Systems, Inc.* .................. 1054
  Questions on *Cadence* .................................................. 1061
  *T–210/01, General Electric v. Commission* ...................... 1063
  Questions on Vertical Merger Issues in *GE v. Commission* ....... 1066
  EU Guidelines on the Assessment of Non–Horizontal Mergers
    Under the Council Regulation on the Control of Concentrations
    Between Undertakings (2008) ..................................... 1067
  Question on the EU Guidelines on Non–Horizontal Merger Guidelines ..... 1078
  Vertical Mergers in Other Nations ................................... 1079
C. Conglomerate Mergers...................................................... 1080
  *U.S. DOJ, 1984 Merger Guidelines* ................................ 1083
  *U.S. DOJ/FTC, Horizontal Merger Guidelines* .................. 1085
  Note and Questions on U.S. Guidelines on Mergers Affecting Potential
    Competition .......................................................... 1086
  *United States v. Marine Bancorporation* ......................... 1088
  Note and Questions on *Marine Bancorp* ............................ 1093
  *EU Guidelines on the Assessment of Horizontal Mergers* ....... 1094
  Questions on EU Horizontal Merger Guidelines Regarding Potential
    Competition .......................................................... 1095
  *Commission Decision 98/602/EC, Guinness/Grand Metropolitan* .... 1095
  Questions on *Guinness/Grand Metropolitan* ....................... 1099
  *Case T–5/02, Tetra Laval BV v. Commission* .................... 1100
  *Case C–12/03 P, Commission v. Tetra Laval BV* ............... 1105
  Questions on *Tetra Laval* ............................................ 1108
  When to Block a Merger Based on a Risk of Post–Merger Miscon-
    duct ................................................................... 1109
  *Damien Geradin and Nicolas Petit, Article 230 EC Annulment
    Proceedings Against Competition Law Decisions in the Light of
    the "Modernisation" Process* ..................................... 1110
  *T–210/01, General Electric v. Commission* ...................... 1112
  Questions on *GE/Honeywell* .......................................... 1124
  *William J. Kolasky, Deputy Assistant Attorney General Antitrust
    Division, U.S. Department of Justice, "Conglomerate Mergers
    and Range Effects: It's a Long Way From Chicago to Brussels"* 1127
  Questions on the EU–U.S. Difference on GE–Honeywell ............ 1129
  EU Guidelines on the Assessment of Non-horizontal Mergers
    Under the Council Regulation on the Control of Concentrations
    Between Undertakings (2008)....................................... 1130
  Questions on EU Guidelines on Conglomerate Mergers ............ 1134
  Conglomerate Mergers in Other Nations ............................ 1135

**CHAPTER 8   Markets That Span Multiple Antitrust Regimes** .. 1137

A. Extraterritorial Conduct Affecting Domestic Commerce ............. 1141
  Background on the Extraterritorial Application of U.S. Antitrust
    Statutes.............................................................. 1141
  *Hartford Fire Insur. v. California* ................................. 1146

A. Extraterritorial Conduct Affecting Domestic Commerce—Continued

Questions on *Hartford Fire* ............................................ 1152
U.S. DOJ–FTC, Antitrust Enforcement Guidelines for International Operations ....................................................... 1154
Questions on U.S. International Enforcement Guidelines .............. 1160
F. Hoffmann–La Roche Ltd. v. Empagran S.A. ...................... 1161
Note and Questions on *Empagran* .................................... 1170
Background on the Extraterritorial Application of EU Competition Law ............................................................... 1174
Imperial Chemical Industries Ltd. v. Commission of the European Communities (Dyestuffs), Case 48–69 ......................... 1177
A. Ahlström Osakeyhtiö and Others v. Commission of the European Communities (Wood Pulp), joined Cases 89, 104, 114, 116, 117 and 125 to 129/85 ............................................ 1178
Questions on *Dyestuffs and Wood Pulp* ............................. 1180
The Application of EU Merger Law to Foreign Firms ............... 1181
Gencor Ltd v. Commission ............................................ 1182
Questions on *Gencor* .................................................. 1187
The Treatment of Extraterritorial Conduct in Other Nations ....... 1187

B. Special Treatment of Conduct Affecting Exports ................... 1188
U.S. DOJ–FTC, Antitrust Enforcement Guidelines for International Operations ....................................................... 1188
Questions on U.S. Guidelines Regarding Exports ................... 1191
EU Law Regarding Exports .......................................... 1193
Javico International and Javico Ag v. Yves Saint Laurent Parfums SA (YSLP) ........................................................ 1193
Questions on *Javico* .................................................. 1195
Other Nations' Antitrust Treatment of Exports ................... 1195

C. The Trade–Antitrust Intersection ................................... 1196
Commissioner of Competition v. Superior Propane Inc. ........... 1196
The Applicability of Trade Law's Nondiscrimination Rule .......... 1197
Introduction to the Tension Between Antitrust and Antidumping Law ............................................................... 1199
U.S. DOJ–FTC, Antitrust Enforcement Guidelines for International Operations ....................................................... 1200
Questions on the Competitive Implications of U.S. Trade Laws ...... 1203
Background on EU Antidumping Legislation ...................... 1204
Extramet Industrie SA v. Council, C–358/89 ..................... 1205
Questions on *Extramet* .............................................. 1207
Trade–Antitrust Intersection in Other Nations ................... 1207

D. Anticompetitive Conduct Involving Foreign Sovereigns ............ 1208
U.S. DOJ–FTC, Antitrust Enforcement Guidelines for International Operations ....................................................... 1208
Questions on U.S. Doctrines Where Foreign Sovereigns Are Involved ... 1213
Foreign Nations as U.S. Antitrust Plaintiffs ..................... 1213
W.S. Kirkpatrick & Co. v. Environmental Tectonics ............... 1214
Questions on *Kirkpatrick* ............................................ 1218
Opinion of Advocate General Fennelly Delivered on 29 October 1998, Joined Cases C–395/96 P and C–396/96 P Compagnie Maritime Melge NV and Dafra-Lines v. Commission of the European Communities ............................................ 1220

..... 1043
..... 1043
..... 1043
..... 1043
..... 1045
..... 1048
..... 1050
..... 1053
..... 1054
..... 1061
..... 1063
..... 1066
ers
ons
..... 1067
..... 1078
..... 1079
..... 1080
..... 1083
..... 1085
tial
..... 1086
..... 1088
..... 1093
..... 1094
tial
..... 1095
..... 1095
..... 1099
..... 1100
..... 1105
..... 1108
on-
..... 1109
ent
of
..... 1110
..... 1112
..... 1124
ust
ers
s" 1127
..... 1129
ers
ns
..... 1130
..... 1134
..... 1135
s... 1137
..... 1141
st
..... 1141
..... 1146

D.  Anticompetitive  Conduct  Involving  Foreign  Sovereigns—Contin-
ued
*Compagnie Maritime Belge Transports SA, Compagnie Maritime
Belge SA and Dafra–Lines A/S v. Commission, Joined Cases C–
395/96 P and C–396/96 P* .................................................. 1223
Questions on *Compagnie Maritime Belge* ............................... 1224
E.  International Cooperation in Antitrust Enforcement ................... 1225
*U.S. DOJ–FTC, Antitrust Enforcement Guidelines for Internation-
al Operations* .......................................................... 1225
Background on U.S.–EU Antitrust Cooperation ............................. 1226
*Agreement Between the Government of the United States of Amer-
ica and the Commission of the European Communities Regard-
ing the Application of their Competition Laws* ........................... 1227
Questions on the 1991 U.S.–EU Coordination Agreement ........................... 1230
*Agreement Between the Government of the United States of Amer-
ica and the European Communities on the Application of Posi-
tive Comity Principles in the Enforcement of Their Competition
Laws* .................................................................. 1231
Questions on the 1998 U.S.–EU Positive Comity Agreement ................... 1234
*Intel Corp. v. Advanced Micro Devices, Inc.* .............................. 1234
Questions on *Intel v. AMD* .................................................. 1238
International Cooperation Involving Other Nations ......................... 1239
F.  The Prospects for International Antitrust Law ......................... 1239
*Damien Geradin and Michel Kerf, "Levelling the Playing Field: Is
the World Trade Organization Adequately Equipped to Prevent
Anti–Competitive Practices in Telecommunications?"* ................... 1240
*Doha Ministerial Declaration* .......................................... 1241
Doha Work Programme Decision Adopted by the General Council
on 1 August 2004 ....................................................... 1242
Explaining  the  Inability  to  Negotiate  International  Antitrust
Rules So Far .......................................................... 1242

INDEX ................................................................. 1249

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

### Note and Questions on *American Needle*

***Formalism v. Functionalism.*** The *American Needle* opinion makes clear that whether separate entities exist for antitrust agreement purposes turns not on formalisms but on whether functionally there exist independent economic decisionmakers that could be restricted by an antitrust agreement. If, without the alleged agreement, the actors would still act in the same way because of common control and an identical economic interest, then any "agreement" between them cannot meaningfully restrain their decisions and thus they are treated as a single entity incapable of conspiring. But if, without the alleged agreement, the actors have enough separate control and divergent economic interests that they could make independent economic decisions, then an agreement between them can restrain their decisions and thus they are treated as separate entities capable of conspiring. Actors are particularly likely to be treated as separate entities if they are actual or potential competitors in the market being restrained.

Consistent with its rejection of formalism, the Court makes clear that single entity status could not be established by the mere fact that the joint venture was a separate corporate entity with its own corporate management. Instead, the Court cited two functional factors to support its conclusion that NFLP decisions reflected a horizontal agreement among the NFL team members: (1) the joint venture was subject to ongoing control by team members that have their own independent management and economic interests, and (2) the ongoing ability of those decisionmakers to unilaterally compete in the relevant market, here because the team members were "potentially competing suppliers of valuable trademarks" given that "the teams still own their own trademarks and are free to market those trademarks as they see fit ... At any point, the teams could decide to license their own trademarks." The Court's holding thus makes it clear that joint venture decisions will receive separate entity treatment when both factors are met.

The Court also made clear that the first factor could not be disproven by showing the members of the joint venture had a *collective* economic interest. As the Court observed, such a collective economic interest generally exists for illegal horizontal agreements, as with the cartel that maximizes collective profits for it members. What matters is whether the members retained some separate control and economic interest so that, freed from the restraint of the alleged agreement, they might make independent economic decisions that could be contrary to that collective economic interest, like the cartel members who have independent incentives to undercut the cartel price. The Court further made clear that the second factor could not be disproven by showing that the members had a recent history of not actually competing in the relevant activity (here that they had for some time marketed trademarks only jointly) because that might simply reflect the results of a successful anticompetitive agreement. In-

stead, the second factor could be met by showing that the members potentially *could* compete by licensing their own trademarks.

   ***When the Two Functional Factors Point in Opposing Directions.***
The Court's decision did not resolve what to do when the two functional factors point in opposing directions. As the Court noted in footnote 9, the Government effectively argued that the second factor should be deemed necessary for separate entity treatment, reasoning that, to the extent the joint venture eliminated actual and potential competition between the members, the joint venture constituted a merger of the members into a single entity. In such a case, the *formation* of the joint venture would itself be a horizontal agreement under the Government standard, and thus subject to antitrust scrutiny under both § 1 and the merger doctrines discussed in Chapter 7. But *subsequent* decisions by the joint venture would be treated as decisions by a single entity (rather than as an agreement among its members) to the extent they were within the scope of merged activities. The Court in footnote 9 declined to hold whether the Government standard was correct because it concluded that the second factor was met in the actual case, as well as in the Government's two hypotheticals. But the Court also emphasized the first factor in response to the government in footnote 9, stating: "It is significant, moreover, that the teams here control NFLP." Thus, the Court's decision left it unresolved whether the first factor might alone suffice for separate entity treatment. Should it?

   The first factor would seem to hold for any joint venture, which by definition is an arrangement where firms engage in some joint business activity (the joint venture) but retain independent status and continue to operate separately to some extent (which is what distinguishes a joint venture from a merger). Thus, if meeting the first factor suffices for separate entity treatment, then all decisions by a joint venture involve an agreement between the members. In contrast, if the second factor is necessary for separate entity treatment, then most but not all joint venture decisions would be agreements among their members. Most would be because most joint ventures do not preclude actual or potential competition by their members with the joint venture on most joint venture activities. But not all would be because sometimes joint ventures preclude actual or potential competition by their members on at least some joint venture activities, which under the government approach would be treated as effectively merging those aspects of their business activities. Thus, under the Government's suggested standard, decisions by a joint venture would be decisions by a single entity only to the extent they involved merged business activities on which the members were not actual or potential competitors.

   To see what is potentially at stake in the as-yet unresolved issue, suppose each of the NFL teams had instead irrevocably transferred all their trademark rights to NFLP. An irrevocable transfer of trademark rights would mean that the teams were no longer actual or potential competitors in the licensing market, unless NFLP decided to grant those rights back. The second factor thus would likely be deemed unmet. However, the first factor would still be met because the independent teams would have ongoing control over how NFLP licenses and over whether NFLP grants

trademark rights back to the teams. Under the Government's suggested approach, the teams would be treated as having effectively merged their trademark licensing into the joint venture. Thus, while this merger would be a horizontal agreement, subsequent licensing decisions by NFLP would be treated as decisions by a single entity rather than as horizontal agreements among its members.[11] In contrast, if the first factor suffices for separate entity treatment, then not only would the combination of trademark rights into NFLP be a horizontal agreement, but also each licensing decision by NFLP would reflect a *separate* horizontal agreement that was subject to antitrust scrutiny.

How should such a hypothetical irrevocable transfer of trademark rights to NFLP be treated? The answer to this question does not really alter *whether* an antitrust agreement exists because under the Government approach the merger would still be an agreement. Instead, the answer alters the *timing* and *scope* of the agreement that is subject to antitrust scrutiny. An approach that made the first factor sufficient for separate entity treatment would be less vulnerable to statute of limitations problems and would focus more on specific licensing decisions. An approach (like the Government's) that made the second factor necessary for separate entity treatment means that the effective merger may be hard to challenge after the statute of limitations runs out and would not focus on those specific licensing decisions. The latter approach could be justified by the view that the horizontal combination that created any market power was the irrevocable transfer of rights and that condemning NFLP licensing decisions could not alter that irrevocable combination or create any additional horizontal competition among the members. A possible response is that, while an "irrevocable" rights transfer is irrevocable by an individual team, it is not irrevocable by the joint venture, which could always transfer those rights back. Thus, the choice between approaches may in part turn on whether one thinks that prohibiting particular licensing agreements by the NFLP might lead the independent teams to exercise their joint control over the NFLP to grant those trademark rights back to the teams. But even if the latter is true, it might seem odd to suggest that a horizontal agreement is invalid because it restrains competition that could not exist unless another horizontal agreement restored that competition. It might be simpler to treat the moment of horizontal combination as the key moment whenever individual firms can no longer unilaterally deviate from it, on the expectation that in the future the joint venture would exercise any collective rights in their collective interests.

Is the actual case that different from this irrevocable transfer hypothetical? As the Court describes the facts, in 2000 the teams authorized the NFLP to grant exclusive rights to the club trademarks and then had NFLP grant exclusive rights on headgear to Reebok. Further, the record indicates that the NFL team resolution authorizing the exclusive Reebok license provided that "the member clubs hereby approve the necessary grant of

---

**11.** Such licensing decisions might still be subject to review as unilateral conduct under the doctrines discussed in Chapter 3 (if the NFLP had monopoly power or a dangerous probability of acquiring it) or as vertical agreements between NFLP and its licenses under the doctrines discussed in Chapters 4–5.

licenses'' and that ''the member clubs agree to give their full cooperation as necessary to implement and further the'' exclusive licence with Reebok.[12] Doesn't this language effectively transfer the team trademark rights to NFLP and then Reebok because the teams approved the necessary grants and an individual team decision to license its trademark would violate the exclusive NFLP license that the team authorized and pledged to support? If so, then the teams' agreement to authorize NFLP to grant this exclusive license would seem to make it a single entity when it did so under the Government approach, but the Court seemed to reject that conclusion in footnote 9. Perhaps the fact that the exclusive license to Reebok was only 10 years might suffice to make the teams potential future competitors under the government approach, and also might make it more realistic that the team members might exercise their joint control to decline to renew the exclusive license in the future, thus making it more sensible to focus on the first factor.

*Justifications and the Limited Nature of the Functional Inquiry on Single Entity Status.* Although the Court focused on a functional analysis, it made clear that this focus did *not* mean an inquiry into whether the cooperation furthered some functional goal. For purposes of ascertaining whether separate entities exist, the functional inquiry is simply into whether there exist independent economic decisionmakers whose decisions might be restrained by the alleged agreement. Thus, the Court stressed that the existence of a functional reason for cooperation is not relevant to whether an agreement exists; such a reason just goes to whether the agreement has a *justification* that helps it survive Rule of Reason scrutiny. As the Court stressed, when agreements on issues like the production and scheduling of games are necessary to provide a product at all, such a powerful justification makes the agreement likely to survive Rule of Reason review. Indeed, such a conclusion seems not only likely but inevitable, because if there could be no product without the agreement, then the agreement does not restrain any competition. But the Court observed that the need to cooperate to put on football games did not show that the teams needed to cooperate in marketing intellectual property. Another possible justification in sports leagues is that some restraints might improve product quality by increasing the competitive balance between teams. Whether this justification applied to the joint licensing was a matter the Court left to be determined on remand, but it made clear that, even if it applied, it would just be a factor to be considered under the Rule of Reason, and would not justify treating the joint venture as a single entity. How should this justification be treated on remand?

*Relationship to* **Texaco v. Dagher.** As discussed in Chapter 2, *Texaco v. Dagher* held that, because the formation of the joint venture there was not alleged to be anticompetitive, the joint venture's agreement to fix the price of its product could not violate the per se rule or abbreviated rule of reason. Because this holding was about the right standard to apply to the agreement, rather than to the existence of the agreement, it does not conflict with the holding in *American Needle*. But *American Needle* does seem to cut back on dicta in *Texaco v. Dagher* which stated:

**12.** *See* Joint Appendix in American Needle v. NFL at 465–66.

> Texaco and Shell Oil formed a joint venture, Equilon, to consolidate their operations in the western United States, thereby ending competition between the two companies ... Texaco and Shell Oil did not compete with one another in the relevant market—namely, the sale of gasoline to service stations in the western United States ... In other words, the pricing policy challenged here amounts to little more than price setting by a single entity—albeit within the context of a joint venture—and not a pricing agreement between competing entities with respect to their competing products.... When "persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit ... such joint ventures [are] regarded as a single firm competing with other sellers in the market."

In *American Needle*, under the joint venture the teams also withdrew from the relevant trademark market, and thus did not compete with each other in that relevant market but instead shared profits in that market through a joint venture. Nonetheless, it sufficed in *American Needle* that the joint venture members were *potential* competitors and had independent interests and exercised joint control over the joint venture in which they shared profits, which was also true in *Texaco v. Dagher* because Texaco and Shell Oil could have re-entered the market for selling gasoline in the western United States. Yet the Court deemed the NFLP joint venture not to be a single entity. Hence, the apparent conflict between *American Needle* and the dicta in *Texaco v. Dagher*. However, *Texaco v. Dagher* did not seem fully committed to its single entity conclusion because it held that the plaintiffs "should have challenged [the joint venture conduct] pursuant to the rule of reason," which would have been impossible if the joint venture were a single entity engaged in above-cost pricing. Perhaps the best explanation for the overbroad dicta in *Texaco v. Dagher* was that there the alleged conduct—fixing prices for the joint venture product—was unavoidable because those prices would also have been fixed if the joint venture set different prices for the different brands, so that there was no way to separate the legitimacy of price-setting by the joint venture from the legitimacy of the joint venture itself. Do you find *Needle* consistent with *Dagher* and, if so, how would you reconcile them?

## Single Entity Theory in Other Nations

A Canada statute explicitly provides that, for antitrust purposes, no agreement can exist between principals and agents or between affiliated entities, with the latter defined to include any two firms controlled by the same person.[13] Australia, Israel, and New Zealand deem a parent and subsidiary to be one person incapable of entering into an antitrust agreement as long as the parent owns more than 50% of the subsidiary voting stock; Israel also does so if the parent has the right to appoint more than half the directors.[14] South Africa does the same if the subsidiary is 100%

---

**13.** *See* Canadian Competition Act §§ 45(6)(a), 76(40), 77(4), 90.1(7).

**14.** *See* Australia Trade Practices Act § 4A; Israel Restrictive Trade Practices Law § 1, 3(5); New Zealand Commerce Act §§ 2(7) and 44(1A) and Companies Act § 5(1)(a)(iii).