Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 10th Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5429
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. 2:15-ml-02668−PSG (JEMx)<br><br>**MEMORANDUM IN SUPPORT OF THE NFL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Philip S. Gutierrez<br>Date: October 27, 2023<br>Time: 1:30 p.m.<br>Courtroom: First Street Courthouse<br>   350 West 1st Street<br>   Courtroom 6A<br>   Los Angeles, CA 90012 |

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................1

LEGAL STANDARD ..............................................................................................3

ARGUMENT.............................................................................................................4

I.   Undisputed Record Evidence Shows That Plaintiffs' Claims Are
     Barred By The Sports Broadcasting Act. ........................................................4

     A.   The NFL-Network Agreements Are Exempt From Antitrust
          Scrutiny. ............................................................................................5

     B.   Plaintiffs Are Improperly Attacking The SBA-Protected NFL-
          Network Agreements. ......................................................................6

          1.   Plaintiffs' But-For worlds Without The NFL-Network
               Agreements Fail As A Matter Of Law. ..................................7

          2.   Plaintiffs' Remaining But-For Worlds Would Radically
               And Improperly Transform The NFL-Network
               Agreements. .............................................................................7

     C.   At Minimum, Plaintiffs' Challenges To Horizontal Pooling Of
          Rights Cannot Proceed Consistent With The SBA.............................10

II.  Plaintiffs' Claims Based On Alleged Horizontal Agreements Among
     The NFL And The NFL Clubs Fail As A Matter Of Law. ..........................11

     A.   The NFL And Its Member Clubs A re Properly Considered A
          Single Entity For Purposes Of Licensing Telecasts Of Their
          Joint Product, NFL Football. ..............................................................12

          1.   Plaintiffs Must Show Concerted Action Regarding The
               Production Of NFL Telecasts To Challenge The
               Licensing Of Those Telecasts...................................................12

          2.   The NFL And Its Member Clubs Are Not Engaged In
               Concerted Action With Respect To Licensing Telecasts

Of NFL Football. ........................................................................ 13

             3.      Plaintiffs Have Failed To Offer Any Plausible Account Of How A Member Club, Acting Alone, Could Produce An NFL Telecast. ......................................................................... 16

    B.    Alternatively, Plaintiffs' Horizontal Claims Fail Under The Rule Of Reason Because They Have Not Provided Viable Proof Of Anticompetitive Effects. ........................................................ 18

III.    Plaintiffs Do Not Have Standing To Bring Damages Claims Because They Purchased Nothing From The NFL And Cannot Prove A Conspiracy Involving DirecTV. ..................................................... 20

IV.    Plaintiffs' Claims Based On The Vertical Agreement Between The NFL And DirecTV Fail As A Matter Of Law. .............................. 24

CONCLUSION. ............................................................................... 25

ii

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                 <u>**Page(s)**</u>

*Am. Needle, Inc. v. Nat'l Football League*,

    560 U.S. 183 (2010) ................................................................passim

*Am. Tobacco Co. v. United States*,

    328 U.S. 781 (1946) ......................................................21

*Apple v. Pepper*,

    139 S. Ct. 1514 (2019) ................................................20

*Barry v. Blue Cross of California*,

    805 F.2d 866 (9th Cir. 1986).......................................10

*Broad. Music, Inc. v. Columbia Broad. Sys.*,

    *Inc.*, 441 U.S. 1 (1979) ................................................18

*Celotex Corp. v. Catrett*,

    477 U.S. 317 (1986) ......................................................3

*Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,

    ("Bulls I"), 961 F.2d 667 (7th Cir. 1992)...................5, 8, 9

*Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,

    (*"Bulls II"), 95 F.3d 593 (7th Cir. 1996) .....................13, 14, 15, 18

*City of Mount Pleasant v. Assoc. Elec. Co-op. Inc.*,

    838 F.2d 268 (8th Cir. 1988).......................................12, 13

*Cleary v. News Corp.*,

    30 F.3d 1255 (9th Cir. 1994).......................................4

*Comcast v. Behrend*,

    569 U.S. 27 (2013) ......................................................6, 7

*Copperweld Corp. v. Indep. Tube Corp.*,

    467 U.S. 752 (1984) ....................................................12

*Corbello v. DeVito*,

    777 F.3d 1058 (9th Cir. 2015)....................................22

iii

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,

    36 F.3d 1147 (1st Cir. 1994) ......................................................................... 23

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,

    472 F. 3d 23 (2d Cir. 2006) ...................................................................... 24, 25

*Ferguson v. Greater Pocatello Chamber of Com., Inc.*,

    848 F.2d 976 (9th Cir. 1988) ........................................................................... 4

*Fleer Corp. v. Topps Chewing Gum, Inc.*,

    658 F.2d 139 (3d Cir. 1981) .......................................................................... 25

*Freeman v. San Diego Ass'n of Realtors*,

    322 F.3d 1133 (9th Cir. 2003) ........................................................... 12, 13, 15

*Illinois Brick Co. v. Illinois*,

    431 U.S. 720 (1977) ..................................................................................... 20

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,

    933 F.3d 1136 (9th Cir. 2019) .................................................................. passim

*In re Nat'l Football Leagues Sunday Ticket Antitrust Litig.*,

    2017 WL 3084276 (C.D. Cal. June 30, 2017) .......................................... 9, 11

*Jensen Enterprises, Inc. v. Oldcastle Precast, Inc.*,

    375 F. App'x 730 (9th Cir. 2010) ................................................................. 19

*Kansas v. UtiliCorp United Inc.*,

    497 U.S. 199 (1990) ..................................................................................... 20

*Kingray, Inc. v. NBA, Inc.*,

    188 F. Supp. 2d 1177 (S.D. Cal. 2002) ........................................................ 25

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,

    726 F.2d 1381 (9th Cir. 1984) ...................................................................... 15

*Levi Case Co. v. ATS Prod., Inc.*,

    788 F. Supp. 428 (N.D. Cal. 1992) ............................................................... 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

    475 U.S. 574 (1986) ..................................................................................... 21

iv

*Monsanto Co. v. Spray-Rite Serv. Corp.*,

     465 U.S. 752 (1984) ................................................................21, 22

*Murphy Tugboat Co. v. Crowley*,

     658 F.2d 1256 (9th Cir. 1981)........................................................7

*Nat'l Football League v. Ninth Inning, Inc.*,

     141 S. Ct. 56 (2020) ..........................................................3, 16, 20

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,

     202 F.3d 1088 (9th Cir. 2000).......................................................10

*Ohio v. Am. Express Co.*,

     138 S. Ct. 2274 (2018) ........................................................6, 7, 18

*Paladin Assocs., Inc. v. Montana Power Co.*,

     328 F.3d 1145 (9th Cir. 2003)........................................................21

*Parrish v. Nat'l Football League Players Ass'n*,

     534 F. Supp. 2d 1081 (N.D. Cal. 2007) ...........................................24

*Shaw v. Dallas Cowboys Football Club, Ltd.*,

     172 F.3d 299 (3d Cir. 1999)......................................................5, 11

*Smith v. Pro Football, Inc.*,

     593 F.2d 1173 (D.C. Cir. 1978) ....................................................14

*Spinelli v. Nat'l Football League*,

     96 F. Supp. 3d 81 (S.D.N.Y. 2015)...............................15, 17, 24, 25

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,

     803 F.3d 1084 (9th Cir. 2015).......................................................19

*Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*,

     2007 WL 2318903 (N.D. Cal. Aug. 13, 2007)..................................18

*Texaco Inc. v. Dagher*,

     547 U.S. 1 (2006) ......................................................................14

*Toscano v. Pro. Golfers Ass'n*,

     258 F.3d 978 (9th Cir. 2001)........................................................21

v

*U.S. Football League v. NFL,*

     842 F.2d 1335 (2d Cir. 1988) .................................................................................5

*Washington v. Nat'l Football League,*

     880 F. Supp. 2d 1004 (D. Minn. 2012) ......................................................15, 17

*WTWV, Inc. v. Nat'l Football League,*

     678 F.2d 142 (11th Cir. 1982) ...............................................................................5

**Statutes**

15 U.S.C. § 1060 .............................................................................................................22

15 U.S.C. § 1291 ...........................................................................................................4, 5

17 U.S.C. § 201(d)(2) .....................................................................................................22

**Rules**

Fed. R. Civ. P. Rule 56(a) ................................................................................................3

**Other Authorities**

S. Rep. No. 1087 ...............................................................................................................5

# INTRODUCTION

While Plaintiffs have often invoked the Ninth Circuit's pleading-stage opinion in this case, the claims they now pursue are irreconcilable with the representations that they made to secure that ruling, fall well outside that ruling's scope, and depend on invalidating lawful and economically rational activity. For this case to proceed, Plaintiffs must have admissible evidence supporting valid and cognizable theories of antitrust liability. After months of discovery—involving the production of hundreds of thousands of documents and dozens of depositions—Plaintiffs have none.

In its ruling, the Ninth Circuit relied on Plaintiffs' representations that that they were challenging the interaction of only two agreements—(i) a purported horizontal agreement among the NFL clubs and the NFL to pool telecast rights to NFL games, and (ii) a vertical agreement in which the NFL exclusively licensed to DirecTV the right to distribute broadcasts of games that are not shown on free over-the-air television ("Sunday Ticket"). The Ninth Circuit understood Plaintiffs were *not* challenging the NFL's separate licensing agreements with CBS and FOX regarding the production and telecast of free Sunday afternoon broadcasts. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.* ("*Sunday Ticket*"), 933 F.3d 1136, 1149 n.4, 1156 (9th Cir. 2019). For good reason: Those agreements—the cornerstone of the NFL's unique, pro-consumer broadcast model—are immune from antitrust scrutiny under the Sports Broadcasting Act ("SBA").

Having evaded dismissal, Plaintiffs now tell a very different story. Their lawsuit encompasses:

- A challenge not just to Sunday Ticket, but to the entire broadcasting structure for NFL Football, *see* SUF[1] ¶¶ 93–96, which in its current form is one of the most consumer-friendly entertainment products in the world;

---

[1] Statement of Uncontroverted Facts in Support of the NFL Defendants' Motion for Summary Judgment, filed along with this Motion.

- The elimination or evisceration of the NFL's agreements with CBS and FOX, SUF ¶¶ 109–28, which enable fans to receive multiple Sunday afternoon NFL telecasts, including all of their local teams' games, on free over-the-air-television, SUF ¶¶ 42, 86—unlike in any other professional sport, SUF ¶ 87;

- Alterations to the NFL's media model such that ███████████████ ████████████████████████, SUF ¶¶ 103, 111, injuring the vast majority of NFL fans—who are part of the alleged relevant market but do not subscribe to Sunday Ticket;

- ████████████████████████████████████████ ███████████, Kilaru Decl. Ex. 30 (Elhauge Rpt.) ¶ 26; Kilaru Decl. Ex. 2 (Elhauge Dep. Tr.) 37:10–16, 42:7–15, on the new, unfounded theory that the antitrust laws ███████████████████ that has contributed to the quality and popularity of the NFL; and

- ███████████████████████████████, SUF ¶ 102.

The sheer breadth of the conduct Plaintiffs are challenging underscores how different their case is today from what they told the Ninth Circuit it was and would be.

The Court should not sanction Plaintiffs' bait and switch. Undisputed evidence shows that Plaintiffs' claims have no support in the law or the record.

*First*, the SBA bars Plaintiffs' claims. Contrary to their position before the Ninth Circuit, Plaintiffs are directly challenging the NFL's broadcast agreements with CBS and FOX. Indeed, all of their theories of injury and damages depend on eliminating or fundamentally altering those agreements. But those agreements cannot be challenged or altered consistent with the SBA. This flaw bars all of Plaintiffs' claims and warrants entry of judgment for the NFL Defendants.

*Second*, the evidence conclusively shows that it is impossible to produce NFL telecasts without the cooperation of the teams and the NFL. Plaintiffs thus cannot satisfy the essential antitrust element of "concerted action" between actual or

2

potential *competitors*. As Justice Kavanaugh noted earlier in this case, "antitrust law likely does not require that the NFL and its member teams compete against one another with respect to television rights" because "[t]he NFL and its member teams operate as a joint venture." *Nat'l Football League v. Ninth Inning, Inc.*, 141 S. Ct. 56, 57 (2020) (statement respecting denial of certiorari). This failure of proof bars Plaintiffs' challenges to the cooperation between the NFL and its member clubs—in other words, their challenges to the alleged "horizontal" or "pooling" conduct—and compels entry of judgment for the NFL Defendants as to such conduct.

*Third*, Plaintiffs have failed to identify a genuine issue of material fact regarding their standing to bring damages claims against the NFL and its member clubs. The bright-line rule under *Illinois Brick* is that plaintiffs may seek damages only from the entity from which they purchased—here, DirecTV. At the pleading stage, the Ninth Circuit allowed Plaintiffs to avoid *Illinois Brick* and sue the NFL and its member clubs because Plaintiffs had *alleged* a single conspiracy between the NFL, its clubs, and DirecTV. But Plaintiffs have produced no evidence of such a conspiracy, precluding their claims for money damages.

*Fourth*, based on the fundamental defects above, what Plaintiffs have left—if anything—is a challenge to the *vertical* agreement between the NFL and DirecTV (and now YouTube). But Plaintiffs cannot show that those agreements, standing alone, are anticompetitive. No principle of law suggests that the holder of intellectual property must license it to anyone who wants it.

The Court should grant summary judgment in favor of the NFL Defendants.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] complete failure of proof concerning an essential element of the nonmoving party's case" entitles the moving party to summary judgment. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Cleary v. News Corp.*, 30 F.3d 1255, 1259 (9th Cir. 1994); *Ferguson v. Greater Pocatello Chamber of Com., Inc.*, 848 F.2d 976, 981 (9th Cir. 1988) (affirming summary judgment where plaintiffs "presented no probative evidence of any illegal concerted activity").

## ARGUMENT

### I.     Undisputed Record Evidence Shows That Plaintiffs' Claims Are Barred By The Sports Broadcasting Act.

The Ninth Circuit's ruling addressed a fundamentally different set of claims. That court determined that Plaintiffs' complaint adequately alleged an antitrust claim based on the interrelationship of two alleged agreements: (i) a horizontal "Teams-NFL Agreement" by which the NFL clubs allegedly agreed "to pool their telecasting rights and give the NFL the authority to exercise those rights," and (ii) a vertical "NFL-DirecTV Agreement," under which "the NFL allows DirecTV to obtain all of the live telecasts produced by CBS and FOX, package those telecasts, and deliver the bundled feeds to NFL Sunday Ticket subscribers." *Sunday Ticket*, 933 F.3d at 1148.

The Ninth Circuit distinguished these alleged agreements from a third, unquestionably lawful set of agreements—the "NFL-Network Agreement[s]." Under those agreements, the NFL, acting as an agent for the clubs, licenses CBS and FOX to "create a single telecast for every Sunday-afternoon NFL" game for free, over-the-air broadcast. *Id.* at 1147–48. As "[t]he defendants argue and the plaintiffs do not dispute . . . the NFL-Network Agreement[s] are covered by the [Sports Broadcasting Act]," which affords those agreements antitrust immunity. *Id.* at 1149 n.4; *see also id.* at 1147 ("the NFL's collective sale of telecast rights to free, over-the-air television networks was squarely covered by the SBA"); 15 U.S.C. § 1291.

Now, however, Plaintiffs rely on a challenge to the NFL-Network Agreements. Kilaru Decl. Ex. 3 (Rascher Rpt.) ¶ 53; *see also* Kilaru Decl. Ex. 34 (Rascher Class Rpt.) ¶ 50; Kilaru Decl. Ex. 35 (Zona Rpt.) ¶ 7; Kilaru Decl. Ex. 36 (Zona Class Rpt.) ¶ 12; ██████████████████████████        ████████████████████████

4

████████████████████. Indeed, all of Plaintiffs' liability theories depend on eliminating or altering those agreements. Because the SBA squarely protects those agreements from antitrust challenges, none of Plaintiffs' claims can proceed.

### A.     The NFL-Network Agreements Are Exempt From Antitrust Scrutiny.

The SBA grants antitrust immunity to agreements by the NFL and its clubs for the sale or transfer of rights to free over-the-air telecasts of their football games:

> The antitrust laws . . . shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football . . . by which any league of clubs participating in professional football . . . sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football . . . .

15 U.S.C. § 1291. The NFL-Network Agreements fall squarely within that text. *See U.S. Football League v. NFL*, 842 F.2d 1335, 1347 (2d Cir. 1988); *see also Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299, 301–02 (3d Cir. 1999). Plaintiffs have not suggested otherwise. *See Sunday Ticket*, 933 F.3d at 1149 n.4.

The SBA's legislative history confirms that Congress specifically intended to protect the pooling of sports telecast rights to facilitate free over-the-air broadcasts. The "purpose of the legislation is to enable the member clubs of a professional football . . . league, to pool their separate rights in the sponsored telecasting of their games and to permit the league to sell the resulting package of pooled rights to a purchaser, such as a television network, without violating the antitrust laws." S. Rep. No. 1087, 87th Cong., 1st Sess. at 1 (1961); *see also WTWV, Inc. v. Nat'l Football League*, 678 F.2d 142, 144 (11th Cir. 1982) (SBA provides "antitrust exemption"). Congress likewise envisioned that "[e]ach grant to a network will be exclusive; what the network owns, a team cannot show separately (without the network's permission)." *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n* ("*Bulls I*"), 961 F.2d 667, 670 (7th Cir. 1992) (Easterbrook, J.).

**B.      Plaintiffs Are Improperly Attacking The SBA-Protected NFL-Network Agreements.**

All of Plaintiffs' liability theories must be rejected because they each depend on eliminating or eviscerating the NFL-Network Agreements. Plaintiffs' lead economist, Dr. Rascher, makes this plain. ██████████████████ ████████████████████████████████ ████████████████████████████████ ████████████, *id.* ¶ 13(c); ████████████████████████████ ██████, *id.* ¶¶ 89, 120, 122, 260; ██████████████████████████████, *id.* ¶¶ 29, 336.

By placing this challenge to the NFL-Network Agreements at the center of their liability case, Plaintiffs seek to impose liability for conduct that is protected by the SBA. That would violate the plain terms of the SBA, as well as the Supreme Court's decision in *Comcast*, which holds that class-wide models of injury and damages may not be used to impose liability for lawful conduct as well as allegedly unlawful conduct. *Comcast v. Behrend*, 569 U.S. 27, 37 (2013). Plaintiffs do not have a valid liability case if their claims are predicated on terminating or altering fundamental provisions of agreements that are immune from antitrust scrutiny. *See Comcast*, 569 U.S. at 35, 37; *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (plaintiffs must "prove that the challenged restraint has a substantial anticompetitive effect" compared to a world in which unlawful (but not lawful) conduct is removed).

A review of Dr. Rascher's "but-for" worlds makes the point clear. Dr. Rascher has offered a series of alternative constructs for the distribution of NFL Football that he claims would generate more competition than the status quo. These "but-for" worlds are an essential aspect of antitrust analysis—they are the benchmark that determines whether the conduct at issue is actually anticompetitive. Each of Dr. Rascher's but-for worlds either (i) assumes that the NFL-Network Agreements no longer exist, or (ii) dramatically alters them. This approach fails.

1.     **Plaintiffs' But-For worlds Without The NFL-Network Agreements Fail As A Matter Of Law.**

Dr. Rascher offers a series of but-for worlds that eliminate the NFL's SBA-protected agreements with CBS and FOX. SUF ¶¶ 109–112. These worlds include ███████████████████████. *Id.* But-for worlds that eliminate unquestionably lawful conduct cannot support a liability finding. *Comcast*, 569 U.S. at 36; *Am. Express Co.*, 138 S. Ct. at 2284.

These but-for worlds also fail as a matter of law because they assume that the NFL Defendants would refrain from lawful and economically rational conduct. Plaintiffs have conceded that in the but-for world, the NFL and its clubs ████ ███████████████████████████████████████████ ███████████████████████████████. SUF ¶ 98 (quoting Kilaru Decl. Ex. 30 (Elhauge Rpt.) ¶ 55), 99; ██████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████; Kilaru Decl. Ex. 13 (Rascher 6/28/23 Dep. Tr.) 48:17–49:11, 58:16–60:10; SUF ¶ 99 (quoting Kilaru Decl. Ex. 2 (Elhauge Dep. Tr.)). It is not permissible to rely on a but-for world that eliminates such conduct. In a "hypothetical economic construction" such as a but-for world, "economic rationality must be assumed." *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981). Liability theories premised on conduct that is economically *irrational* thus cannot proceed.

2.     **Plaintiffs' Remaining But-For Worlds Would Radically And Improperly Transform The NFL-Network Agreements.**

In Dr. Rascher's remaining but-for worlds, the NFL-Network agreements continue to exist but in an unrecognizable form. Because these but-for worlds involve rewriting agreements that are immune from antitrust scrutiny, they again improperly seek to impose liability based on conduct that cannot give rise to a claim of antitrust injury. *Comcast*, 569 U.S. at 36; *Am. Express Co.*, 138 S. Ct. at 2284.

7

1    The but-for world that ███████████████████████ makes the point. That

2    world ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ████████   ███████████████████████████████████████████████████████

5    ████████████   The hypothesized ██████████████████ are both substantial and

6    irrational. Dr. Rascher posits that ███████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   These new conditions would ██████████████████████████████, which

14   have long precluded conduct of the kind just described. ██████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████. SUF ¶¶ 37–40. In other words, subject to specific exceptions,

17   "what the network owns, a team cannot show separately (without the network's

18   permission)." *Bulls I*, 961 F.2d at 670. For present purposes, ██████████████

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ██████████████████   ███████████████████

23   All of these provisions would disappear in Dr. Rascher's but-for worlds. That

24   is so notwithstanding Dr. Rascher' admission that ████████████████████████

25   ████████████████████████████████████████████████████████████████

26   ██████████████   ██████████████████████████████████████████████████

27   ████████   ██████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████

1  ███████████████████████████████████████████████████

2  ██████, Kilaru Decl. Ex. 33 (McManus Dep. Tr.) 42:20–43:3, 72:5–18; Kilaru

3  Decl. Ex. 8 (Pietrycha Dep. Tr.) 134:15–17, 134:18–21, 145:13–14; and ████████

4  ███████████████████████████████████████████████████

5  ██████████████████████████████████████ Kilaru Decl. Ex. 33

6  (McManus Dep. Tr.) 82:2–83:8; Kilaru Decl. Ex. 8 (Pietrycha Dep. Tr.) 134:4–24;

7  *see also* Kilaru Decl. Ex. 37 (Bornstein Dep. Tr.) 249:19–250:01.

8  Similarly, the ███████████████████████████████████

9  ███████████████████████████████████████████████████

10  ██████████████████████████ In Dr. Rascher's but-for worlds, ████

11  ███████████████████████████████████████████████ *Supra*

12  at 8; SUF ¶ 120. Here too, ███████████████████████████████

13  ███████████████████████████████████████████████████

14  ███████████████████████████████████████████████████

15  ████████████████████████████████████ *See* SUF ¶ 139; Kilaru Decl. Ex.

16  32 (L. Jones Dep. Tr.) 85:10–18.

17  Plaintiffs have no basis for claiming that these ██████████████████

18  ███████████████ are anticompetitive and thus escape the purview of the SBA. Nothing in

19  the SBA limits its protections to licenses granting unlimited or unconditional rights.

20  *See Bulls I*, 961 F.2d at 670; *accord In re Nat'l Football Leagues Sunday Ticket*

21  *Antitrust Litig.*, 2017 WL 3084276, at *13 n.12 (C.D. Cal. June 30, 2017). The statute

22  instead assumes that "[e]ach grant to a network will be exclusive." *Bulls I*, 961 F.2d

23  at 670. Indeed, the purpose of the SBA is to afford certain protections to sports

24  leagues for conduct that might otherwise be found to have an anticompetitive effect.

25  *See id.* ("To have any (antitrust) effect at all, the Act must allow the league to keep

26  some games off the air . . . ."). If the SBA applied only when the League arranged

27  for the broadcast of every game in all locations, "it is hard to see why it is cast as an

28  exemption from the antitrust laws." *Id.*

9

In short, Plaintiffs' approach to the NFL-Network Agreements would neuter the SBA. On the one hand, the statute would grant antitrust immunity to licensing agreements that enable NFL games to appear on free over-the-air television. On the other, the statute would permit the restructuring, through antitrust litigation, of ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████ The SBA, and the immunity it provides, would have no meaning if the agreements it protects could be hollowed out so easily.

### C.   At Minimum, Plaintiffs' Challenges To Horizontal Pooling Of Rights Cannot Proceed Consistent With The SBA.

While judgment is warranted for the NFL Defendants on *all* of Plaintiffs' liability theories, it is at minimum clear that Plaintiffs' challenges to what they call "pooling" conduct—*i.e.*, the aggregation of the telecast rights of individual NFL clubs, SUF ¶¶ 90–91, 95, 130–31, cannot proceed. That pooling occurs through the NFL-Network Agreements, SUF ¶¶ 26–28, which are permitted by the SBA and expressly contemplated in its adoption. Plaintiffs have identified no other agreement in which the clubs and NFL pool their telecast rights, and none exists. An attack on pooling is nothing more than an attack on SBA-protected contracts.

In their Complaint, Plaintiffs cited to the NFL Constitution, Kilaru Decl. Ex. 38 (Sec. Consol. Am. Compl.) ¶ 13, but that agreement assigns telecast rights to the *individual member clubs*, SUF ¶¶ 6–7 (citing Kilaru Decl. Ex. 1 (NFL Const.) §§ 10.1, 10.2). The NFL Constitution thus creates no horizontal "agreement [among the NFL and its member clubs] not to compete with one another [and] not to create and distribute individual team telecasts"—just the opposite. *Contra* Kilaru Decl. Ex. 38 (Sec. Consol. Am. Compl.) ¶ 13; *see Barry v. Blue Cross of California*, 805 F.2d 866 (9th Cir. 1986) (affirming summary judgment where evidence of horizontal agreement was insufficient); *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) (affirming summary judgment because "membership

alone is not proof of an agreement" and there was no "evidence of any agreement between [defendant's] retailer members").

Plaintiffs have identified no other pooling agreement, and none exists: The only pooling that occurs relating to Sunday afternoon NFL games is in the NFL-Network Agreements. The NFL acts as an agent for each individual club in negotiating and executing those agreements, and the clubs then vote on resolutions ratifying those agreements. SUF ¶ 27. For example, NFL 1998 Resolutions BC-1 and BC-2 reflect the clubs' approval of the NFL's agreements with CBS and FOX that covered the 1998 to 2005 NFL seasons; the renewals were subsequently approved through resolutions passed in 2004, 2009, 2011, and 2014. Kilaru Decl. Ex. 1 (NFL Const.); *see* SUF ¶ 27.

Plaintiffs' allegation that there is a separate agreement to pool out-of-market telecast rights, *see NFL Sunday Ticket*, 2017 WL 3084276, at *3, *5, thus has no basis in the record.[2] There is no *horizontal* conduct to challenge other than the CBS and FOX agreements, and the SBA squarely forecloses any such challenge.

## II. Plaintiffs' Claims Based On Alleged Horizontal Agreements Among The NFL And The NFL Clubs Fail As A Matter Of Law.

Plaintiffs' challenges to the alleged horizontal or pooling conduct involving the NFL and its member clubs also fail because producing NFL telecasts requires the cooperation and collective action of both participating teams and the NFL. SUF ¶¶ 16–17, 19–23. That undisputed reality precludes Plaintiffs from challenging that conduct.

---

[2] The decision in *Shaw v. Dallas Cowboys Football Club, Ltd.*, addressed the pleadings and thus made no findings regarding the existence of any agreement among the NFL clubs. *See* 172 F.3d 299, 299–300, 303 (3d Cir. 1999).

11

### A. The NFL And Its Member Clubs Are Properly Considered A Single Entity For Purposes Of Licensing Telecasts Of Their Joint Product, NFL Football.

Because the NFL and its clubs must act cooperatively and collectively to produce NFL football and NFL football telecasts, Plaintiffs cannot satisfy the basic Sherman Act element of "concerted action that restrains trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). Under precedent that has evolved since the passage of the SBA, the clubs and the NFL are properly understood as a single entity—*incapable* of concerted action—for the specific purpose of licensing broadcast rights. So even if the SBA did not exist, the NFL Defendants are entitled to judgment as a matter of law on Plaintiffs' horizontal or pooling claims.

### 1. Plaintiffs Must Show Concerted Action Regarding The Production Of NFL Telecasts To Challenge The Licensing Of Those Telecasts.

"Section 1 [of the Sherman Act] applies only to concerted action that restrains trade." *Am. Needle*, 560 U.S. at 190. In determining whether there is "concerted action, "[t]he relevant inquiry . . . is whether there is a 'contract, combination . . . or conspiracy" amongst "separate economic actors pursuing separate economic interests," such that the agreement "deprives the marketplace of independent centers of decisionmaking." *Id.* at 195 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)). The key question is whether (i) "actual []or potential competitors" exercising "independent sources of economic power" are colluding to eliminate competition that would otherwise exist (potentially unlawful), *see id.* at 196 (cleaned up); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148–49 (9th Cir. 2003), or (ii) whether entities are engaging in necessary cooperation in pursuit of a "common goal" (lawful), *see City of Mount Pleasant v. Assoc. Elec. Co-op. Inc.*, 838 F.2d 268, 276–77 (8th Cir. 1988).

The *Copperweld* inquiry, which was articulated in the 1980s and has been developed since, demands "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Am. Needle*, 560 U.S. at 191.

12

A sports league in particular "looks more or less like a [single] firm depending on which facet of the business one examines," and so courts should "ask *Copperweld*'s functional question . . . perhaps one facet of a league at a time." *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n ("Bulls II")*, 95 F.3d 593, 599–600 (7th Cir. 1996) (Easterbrook, J.). In other words, a court must evaluate whether there is any proof of concerted action as to the *specific conduct at issue* in a lawsuit.

For example, where plaintiffs challenged the NFL clubs' grant of "an exclusive license" for apparel manufacturing, the Supreme Court analyzed whether the NFL and its teams were "a single entity for § 1 purposes when it comes to the marketing of the teams' individually owned intellectual property"; there, the "[d]irectly relevant" inquiry was whether there was potential competition between the clubs from the perspective of "a firm making hats." *Am. Needle*, 560 U.S. at 197, 203–04. Similarly, where plaintiffs challenged local associations of realtors' "decision to fix the price of the support services they sell to [their joint venture]," the Ninth Circuit considered whether those associations "function[ed] as an economic unit *in providing support services*." *Freeman*, 322 F.3d at 1148 (emphasis added).

Here, the operative question is whether the NFL and its member clubs are engaging in concerted action, or are instead a single entity, *for purposes of telecast licensing*. As explained below, for this purpose they are indisputably a single entity.

### 2.     The NFL And Its Member Clubs Are Not Engaged In Concerted Action With Respect To Licensing Telecasts Of NFL Football.

Plaintiffs cannot show that the NFL Defendants are either "independent sources of economic power" or "actual or potential competitors" in the licensing of broadcast rights to their games. *Mt. Pleasant*, 838 F.2d at 276–77. The creation of NFL game broadcasts "depends, and has always depended, on the cooperation among" the NFL and the NFL clubs. *Id.* at 277. While clubs may be able to compete with one another along other dimensions—for example, to license their own marks and logos for use on apparel, *cf. Am. Needle*, 560 U.S. 183—they cannot compete to

13

produce telecasts of an NFL game because such productions cannot exist without the cooperation of the NFL and its member clubs.

NFL football games cannot be played, let alone televised, absent such cooperation. Among other things, the NFL engages in multi-employer bargaining to establish processes for hiring players who comprise the member teams that compete in the games. SUF ¶ 9. It establishes the rules by which the football games between the teams are played and selects and employs officials to enforce those rules. SUF ¶¶ 8, 10–11. Seeking to maintain and grow viewership and fan interest in all NFL Football games over the season, the NFL also creates the schedule for the 272 regular season games, culminating in playoffs and the Super Bowl that averages over 100 million television viewers. SUF ¶¶ 12–15.

Plaintiffs have identified no way in which these ends could be achieved other than through coordination and cooperation. Nor can they. The NFL and its clubs "must cooperate in the production . . . of games," *Am. Needle*, 560 U.S. at 202, as it is impossible to produce games "without agreements and joint action with every other team." *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1179 (D.C. Cir. 1978); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006). Like the professional basketball league considered in *Bulls II*, only the NFL "makes professional [football]; only it can make '[NFL Football]' games." 95 F.3d at 599. As a result, "[NFL Football] is one product from a single source[.]" *Id.*; *see also* SUF ¶ 19; Kilaru Decl. Ex. 3 (Rascher Rpt.) ¶ 37; Kilaru Decl. Ex. 9 (Bernheim Rpt.) ¶¶ 39, 178.

Cooperation is equally essential to producing live telecasts of those games. Plaintiffs' lead economist admits that no NFL game broadcast can be licensed without the consent of the NFL *and* the participating teams. SUF ¶ 23 (citing Kilaru Decl. Ex. 13 (Rascher 6/28/23 Dep. Tr.)); *see* SUF ¶¶ 16–17, 22–23. That is unsurprising. As just explained, NFL broadcasts depict a product that can only be created jointly. Moreover, an NFL broadcast features not only both teams and their trademarks but also the marks of other clubs, the League's own marks (such as the

NFL shield), and other intellectual property that can be licensed only by the NFL, including historical highlights and highlights from other games that are played and telecast contemporaneously. SUF ¶¶ 16–17. Further, ████████████████████ ████████ this cooperation contributes to the economic value of such broadcasts. SUF ¶ 20 (citing Kilaru Decl. Ex. 2 (Elhauge Dep. Tr.)).

Critically, Plaintiffs have not identified a single example of a sport where teams produce different, nationally competing telecasts of a game. SUF ¶ 83. Nor have they offered a single example where a telecast of a sporting event was produced over the objection of one of the participating teams. SUF ¶ 84. These evidentiary gaps confirm that cooperation is inherent in the production of sports telecasts.

The NFL and its member clubs are therefore properly considered a single entity for purposes of creating game telecasts. Products containing the intellectual property of the NFL and the clubs are "something that the individual teams do not separately own, and have never separately owned." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 114 (S.D.N.Y. 2015) (quoting *Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012)). The League and clubs "must cooperate to produce and sell [those products]," unlike apparel bearing the trademarks of only a single team. *Id.* (distinguishing *American Needle*).[3] While *Spinelli* and *Washington* considered different products—game photographs and historical game footage—the same underlying logic holds for current game footage. As Justice Kavanaugh noted, "antitrust law likely does not require that the NFL and

---

[3] The Ninth Circuit's dicta in *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League* ("*Raiders II*") that the NFL and its teams "do not operate as a single entity," 726 F.2d 1381, 1389 (9th Cir. 1984), does not apply to the broadcasting facet of the NFL's business. *Raiders II* considered only whether the NFL could assert a single-entity defense in the specific context of team relocations. *See id.* at 1384–85. Intervening precedent since *Raiders II*—including *American Needle* and *Freeman*—confirms that the single-entity analysis must focus on the specific activity at issue. *See Am. Needle*, 560 U.S. at 203; *Freeman*, 322 F.3d at 1149; *see also Bulls II*, 95 F.3d at 599–600.

its member teams compete against one another with respect to television rights." *Ninth Inning, Inc.*, 141 S. Ct. at 57 (statement respecting denial of certiorari).[4]

### 3. Plaintiffs Have Failed To Offer Any Plausible Account Of How A Member Club, Acting Alone, Could Produce An NFL Telecast.

Plaintiffs offer nothing to create a genuine factual dispute as to whether NFL clubs could telecast games on their own, such that the pooling of rights constitutes concerted action. Plaintiffs' appeals to economic theory and history fail to persuade.

At the pleading stage, Plaintiffs alleged—and the Ninth Circuit accepted—that "prior to the passage of the SBA, telecast rights in NFL games 'were controlled by individual teams' and NFL teams routinely licensed telecasts of their games to television networks." *Sunday Ticket*, 933 F.3d at 1154; *see also* Kilaru Decl. Ex. 3 (Rascher Rpt.) ¶¶ 76–79; Kilaru Decl. Ex. 4 (Rascher Reply Rpt.) ¶¶ 176–179; Kilaru Decl. Ex. 30 (Elhauge Rpt.) ¶ 21. But the record does not support those allegations. NFL clubs' historical broadcast licensing rights were assigned by *agreement among the clubs and the League*, and all licensing agreements were subject to League approval. SUF ¶ 72. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████        █████████████████

████████        Plaintiffs' appeal to history actually turns out to be evidence of the

---

[4] Although Plaintiffs purport also to assert a claim under Section 2 of the Sherman Act, that claim also relies on their allegation that the NFL clubs "agreed to consolidate all licensing rights for live video presentations of regular season NFL games into a single entity." Kilaru Decl. Ex. 38 (Sec. Consol. Am. Compl.) ¶ 161. Because the NFL clubs act as a single entity for broadcast purposes, there are no separately owned broadcast rights for the NFL clubs to "consolidate." Plaintiffs have not identified any *other* purportedly horizontal conduct that could constitute monopolization.

historical operation of the NFL and its member clubs as a single entity for the purpose of producing telecasts.

Plaintiffs' rebuttal expert, Professor Elhauge, ███████████████████████████████████ This thinly reasoned *ipse dixit* cannot create a genuine issue of material fact. Professor Elhauge bases his conclusion on ██████ ███████████████████████████████████ But telecasting, unlike radio, requires *visual* display of the League's and clubs' trademarks—thus implicating the intellectual property rights of multiple entities. *See* SUF ¶ 18 (citing Kilaru Decl. Ex. 2 (Elhauge Dep. Tr.) 123:11–124:3); *see also Spinelli*, 96 F. Supp. 3d at 114; *Washington*, 880 F. Supp. 2d at 1006.

Professor Elhauge likewise fails to create a genuine issue of fact by claiming ███████████████████████████████████ Kilaru Decl. Ex. 2 (Elhauge Dep. Tr.) 125:7–127:5. That bizarre notion of consent ignores, among many other things, the need for the *NFL's* consent to use its intellectual property in a telecast. More broadly, ███████████████████████████████████ *Id.* 133:3–134:17.. But that is different from suggesting that any one NFL club, standing alone, has the right to broadcast any NFL Football game played against another club.

Plaintiffs' ███████████████████ suffers from the same deficiencies. They note, for example, ███████████████████████████████████ . *E.g.*, Kilaru Decl. Ex. 4 (Rascher Reply Rpt.) ¶ 46; Kilaru Decl. Ex. 30

(Elhauge Rpt.) ¶ 23. But these assignments are *also done by agreement* among the relevant league and its member teams. *See* SUF ¶¶ 74–79. The fact that other leagues and their members agree to alternative distribution models does not reduce or eliminate the need for cooperation to distribute the games in the first place.

In short, Plaintiffs have no evidence that the NFL clubs can each license broadcasts of NFL football games acting alone. Instead, the record shows that they operate as a single entity for this purpose.

### B. Alternatively, Plaintiffs' Horizontal Claims Fail Under The Rule Of Reason Because They Have Not Provided Viable Proof Of Anticompetitive Effects.

Even if the NFL and its member clubs were not considered a single entity for purposes of licensing broadcast rights, Plaintiffs' horizontal claims still cannot survive summary judgment. Cooperation that is necessary to create a product does not unreasonably restrain competition as a matter of law. *Am. Needle*, 560 U.S. at 203 (citing *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979)). Plaintiffs have not put forth evidence even suggesting that telecasts could be produced without cooperation between the NFL and its clubs, so such cooperation does not harm competition.

If the Sherman Act applies to the challenged horizontal agreements at all, such challenges "must be judged under the Rule of Reason." *Am. Needle*, 560 U.S. at 186; *see Bulls II*, 95 F.3d at 599 (sports league "would be subject to the Rule of Reason under § 1" if not considered a single firm); *see also Am. Needle*, 560 U.S. at 203 (restraints may be upheld under the Rule of Reason "in the twinkling of an eye"). Under the Rule of Reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express*, 138 S. Ct. at 2284. Summary judgment must be granted where a plaintiff "offers no evidence of anticompetitive effects" resulting from the challenged practice. *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318921, at *15 (N.D. Cal. Aug. 13, 2007), *aff'd*, 301 F.

18

App'x 959 (Fed. Cir. 2008); *accord Jensen Enterprises, Inc. v. Oldcastle Precast, Inc.*, 375 F. App'x 730, 733 (9th Cir. 2010).

Plaintiffs cannot meet this burden because they have not shown how NFL telecasts could be produced without the challenged cooperation and coordination among the NFL Defendants. Instead, they propose ███████████████████ █████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *Cf. Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1091 (9th Cir. 2015) ("[T]he fact that POSCO did not enter a new market just to compete with its own joint venture is perfectly justifiable . . . ."). As noted above, Plaintiffs have not identified any precedent for such a ruling or any real-world example where it happens.

Because no single NFL club (or even pair of clubs) could unilaterally sell the broadcasting rights to an NFL game, an agreement to act jointly in selling those rights does not reduce competition in the marketplace. *See Am. Needle*, 560 U.S. at 203. As Plaintiffs' expert Professor Elhauge has written about the NFL outside the context of this litigation, "when agreements on issues like the production and scheduling of games are necessary to provide a product at all, such a powerful justification makes the agreement likely to survive Rule of Reason review. Indeed, such a conclusion seems not only likely but inevitable, because if there could be no product without the agreement, then the agreement does not restrain any competition."[5] Kilaru Decl. Ex. 40 (Einer Elhauge & Damien Geradin, *Global Antitrust Law and Economics* ch. 6 (2d ed. 2011)) p. 828. That reasoning applies on all fours to telecasts, and warrants summary judgment on Plaintiffs' horizontal claims.

---

[5] Dr. Rascher agrees: as he explains, courts "generally have held that *sports leagues are pro-competitive joint ventures necessary to create a product, such as NFL football.*" Kilaru Decl. Ex. 39 (Daniel A. Rascher & Andrew D. Schwartz, *Competitive Balance in Sports: Peculiar Economics Over the Last 30 Years*, NYSBA Entertainment, Arts & Sports L. J. (2020)), at 31 n.1 (emphasis added); *see also* Kilaru Decl. Ex. 9 (Bernheim Rpt.) ¶ 177.

**III.    Plaintiffs Do Not Have Standing To Bring Damages Claims Because They Purchased Nothing From The NFL And Cannot Prove A Conspiracy Involving DirecTV.**

Plaintiffs must establish antitrust standing separate and apart from the central merits showing of a contract, combination, or conspiracy to restrain trade. *Sunday Ticket*, 933 F.3d at 1150. It is undisputed that Plaintiffs are indirect purchasers of the NFL telecasts giving rise to their claims, as they bought nothing directly from the NFL. The law is clear that indirect purchasers ordinarily lack antitrust standing to bring damages claims. *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977); *see Apple v. Pepper*, 139 S. Ct. 1514, 1522 (2019) (describing the "bright line" *Illinois Brick* rule); *Ninth Inning*, 141 S. Ct. at 57 (statement of Kavanaugh, J., respecting denial of certiorari) ("The plaintiffs here did not purchase a product from the NFL or any team, and may therefore be barred from bringing suit against the NFL and its teams under *Illinois Brick* . . . .").

At the pleading stage, the Ninth Circuit concluded that the *Illinois Brick* rule was not applicable "because the complaint adequately alleges that DirecTV conspired with the NFL and the NFL clubs to limit the production of telecasts to one per game." *Sunday Ticket*, 933 F.3d at 1158. In other words, the Court accepted as adequately pled the notion that this case involves the so-called "co-conspirator exception" to *Illinois Brick*.[6] But allegations no longer suffice. Plaintiffs have not produced any evidence of a conspiracy between DirecTV and the NFL Teams. And the exclusive distribution agreement between the NFL and DirecTV is not a

---

[6] The Supreme Court has never considered, let alone endorsed, the so-called co-conspirator exception to *Illinois Brick*. On the contrary, the Court has deemed it "an unwarranted and counterproductive exercise to litigate a series of exceptions" to *Illinois Brick*'s bright-line rule. *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 217 (1990). Even the courts that have recognized the exception have typically limited it to situations involving a *price-fixing* conspiracy, as opposed to an *output-restriction* conspiracy of the kind alleged here. *Sunday Ticket*, 933 F.3d at 1158. But the Court need not address this conflict, as Plaintiffs' claims are barred even under the Ninth Circuit's interpretation.

conspiracy that displaces the *Illinois Brick* rule. Accordingly, Plaintiffs' damages claims cannot proceed.

**Legal standard for proving a conspiracy.** Establishing an antitrust conspiracy requires proof that defendants had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks omitted); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (requiring "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement"); *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001).[7]

"To survive a motion for summary judgment . . . a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (internal quotation marks omitted). This demanding standard is critical given that "mistaken inferences in [antitrust cases] are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Id.* at 594.

**No evidence of a conspiracy involving DirecTV and the clubs.** Plaintiffs have failed to produce any evidence of any conspiracy involving DirecTV and the *clubs* regarding out-of-market NFL telecasts. They have not produced any testimony or a single document even hinting that there was such a conspiracy; in fact, there is no evidence of *any* contact whatsoever between the clubs and DirecTV.

As an initial matter, the clubs are not parties to the agreement between the NFL and DirecTV. While the NFL served as an agent for the clubs in negotiating and

---

[7] For their Section 2 conspiracy claims, Plaintiffs must also prove, in addition to establishing the agreement, "an overt act in furtherance of the conspiracy and "the specific intent to monopolize." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). For reasons set forth in this section, Plaintiffs have not established a triable issue of fact as to whether the clubs had a common purpose with DirecTV whatsoever; it necessarily follows that Plaintiffs cannot establish that the clubs agreed with DirecTV *with the specific intent to monopolize.*

21

executing the NFL-Network Agreement, *see supra* at 11, the clubs have no similar role in the NFL-DirecTV agreement, which involves the licensing of copyrights exclusively held by the NFL, *see* SUF ¶¶ 44–46. The clubs do not become "co-conspirators" to that vertical agreement simply because they pooled their broadcast rights at the League level in a *different*, earlier SBA-protected agreement.

The only evidence of involvement █████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████ But this conduct does not establish a conspiracy between DirecTV and the clubs. The record is undisputed that ███████████████████████
███████████████████████████████████████████████████████████
███████████████████ ████████████████████████████████ █████
███████████████████████████████████████████████████████████
███████████████ 45:22–46:9 ████████████████████████████████
███████████████████████████████████ Kilaru Decl. Ex. 42 (J. Jones Dep. Tr.) 17:16–18:4 ██████████████████████████████████
█████████████████████████████████████████████████

**No evidence of a conspiracy involving DirecTV and the NFL.** Nothing about the NFL's agreement with DirecTV proves the latter's "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764. The existence of an exclusive distribution agreement is not evidence of the anticompetitive conspiracy Plaintiffs alleged at the pleading stage.

Exclusive licenses are a common, legal way for enterprises to distribute their intellectual property. The Copyright Act explicitly contemplates exclusive licenses. *See* 17 U.S.C. § 201(d)(2); *see also, e.g.*, *Corbello v. DeVito*, 777 F.3d 1058, 1062 (9th Cir. 2015). The Lanham Act likewise authorizes trademark holders to license their marks, *see* 15 U.S.C. § 1060, including through exclusive licenses, *see* 2 *Gilson on Trademarks* § 6.03 (2023). And the same analysis applies to copyright licenses.

1   *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1187 (1st Cir. 1994)

2   ("[A]n author's desire to exclude others from use of its copyrighted work is a

3   presumptively valid business justification for any immediate harm to consumers."),

4   *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).

5         The Sunday Ticket agreement is a standard exclusive licensing agreement. ███

6   ███████████████████████████████████████████████████████████████████

7   ███████████ *See* SUF ¶¶ 60–61 ████████████████████████████████████

8   ████████████████████████████████████████████████████████████ Nor is

9   there any evidence of a separate, unlawful agreement as to price or output. ████████

10  ███████████████████████████████████████████████████████████████████

11  *See* SUF ¶¶ 66 ████████████████████████████████  67 ████████████████

12  ████████████████████████████████████  68 ████████████████████████

13  ███████████████████████  The record contains no evidence of the NFL providing any

14  direction to DirecTV or any form of control as to price.

15        Nor is there evidence to suggest that DirecTV was involved in any conspiracy

16  to limit output. Plaintiffs have suggested that the NFL and DirecTV conspired to not

17  offer a single-team package of out-of-market games. But ████████████████

18  ███████████████████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████████████████

20  ████████████████████████.[8] SUF ¶¶ 60–61.

21  _____

22  [8] Plaintiffs' efforts to cherry-pick deposition testimony to suggest otherwise fail. ███

23  █████████████████████████████████████████ █████████████████████████

24  ██████████ One witness stated only that ███████████████████████████████

25  ████████████████████████████████████████████████████████ *See* Kilaru

26  Decl. Ex. 15 (Rolapp Dep. Tr.) 121:2–10. The second clarified that ████████████

27  *See* Kilaru Decl. Ex. 41 (Kraft Dep. Tr.) 47:2–5. A different NFL witness testified

28  that ███████████████████████████████████████████████████████████████

      ████████████████████████ *See* Kilaru Decl. Ex. 10 (Lawton Dep. Tr.)

34:4–9. As explained above, ████████████

**Memorandum in Support of the NFL Defendants' Motion for Summary Judgment**

For all these reasons, Plaintiffs' unsupported assertion of a "single conspiracy" involving DirecTV is an improper and unsupported attempt to evade *Illinois Brick*.

## IV.   Plaintiffs' Claims Based On The Vertical Agreement Between The NFL And DirecTV Fail As A Matter Of Law.

The foregoing sections leave Plaintiffs challenging—at most—the NFL's vertical conduct, namely its exclusive distribution of Sunday Ticket. But that challenge fails as well. Most fundamentally, Plaintiffs have provided no evidence— expert or otherwise—that this vertical conduct is anticompetitive. Nor would the record support any such claim.

As an initial matter, "[t]he mere existence of an exclusive deal between the [NFL] and its licensee[] does not violate the antitrust laws or significantly threaten competition." *Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1092 (N.D. Cal. 2007). Thus, the Southern District of New York rejected the argument that the NFL and the clubs' limited exclusive licensing arrangements with stock photo agencies violated the Sherman Act. *See Spinelli*, 96 F. Supp. 3d at 116– 19 (S.D.N.Y. 2015). As "the benefits of exclusive licensing agreements are well-recognized," such arrangements are "'presumptively legal.'" *Id.* at 116 (quoting *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F. 3d 23, 30 (2d Cir. 2006)); *see also, e.g.*, *Levi Case Co. v. ATS Prod., Inc.*, 788 F. Supp. 428, 432 (N.D. Cal. 1992) ("[An] exclusive license, by itself, does not constitute an illegal restraint under the antitrust laws."). The law could hardly be otherwise, given how ubiquitous such exclusive licensing is in the entertainment industry, including television and film.

After extensive discovery, Plaintiffs have failed to identify any evidence that could transform a lawful exclusive distribution agreement into an unlawful antitrust conspiracy. ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████ SUF ¶¶ 60–61, 70–71.

24

Nor can Plaintiffs offer evidence that these agreements restrained competition. Prior to 1994, the NFL-Network Agreements did not permit the distribution of telecasts of Sunday afternoon NFL games beyond those broadcasted in-market by CBS and FOX. SUF ¶¶ 54–55 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ the NFL enter into an exclusive agreement with DirecTV to distribute out-of-market game telecasts that were not previously available to viewers, allowing access to those games for the first time. SUF ¶ 56. Thus, "output of out-of-market [NFL] games increased by virtue of [Sunday Ticket], rather than decreased." *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1195 (S.D. Cal. 2002).

Just as the NFL did not violate the antitrust laws prior to licensing the rights to distribute telecasts of its out-of-market games, it did not violate the antitrust laws by licensing those rights exclusively to DirecTV. *See Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 153 (3d Cir. 1981) ("[A]s a licensor, the MLBPA is free to grant licenses to any competitor, or none at all."); *Spinelli* 96 F. Supp. 3d at 116 ("[A]n exclusive license is something that the NFL can legally achieve without the aid of a licensee." (citing *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006))). There is no principle of law that suggests that if a copyright holder wants to license its intellectual property, it must take all comers. On the contrary, the creation of Sunday Ticket is the kind of output-expanding, pro-consumer offering that the antitrust laws encourage.

## CONCLUSION

The Court should grant summary judgment in favor of the NFL Defendants.

Date: July 28, 2023

Respectfully submitted,

/s/ *Rakesh N. Kilaru*

Rakesh N. Kilaru (admitted *pro hac vice*)
Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com

Neema T. Sahni (Bar No. 274240)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
nsahni@cov.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*

26