# EXHIBIT 15

## To the Declaration of Rakesh N. Kilaru

## REDACTED VERSION OF DOCUMENT FILED PUBLICLY

1

1       UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA
2

3       Civil Action No. 2:15-ml-02668-PSG(JEMx)

4

5

6    IN RE: NATIONAL FOOTBALL
     LEAGUE'S "SUNDAY TICKET"
7    ANTITRUST LITIGATION

8
                _____/
9

10

11

12              DEPOSITION OF
                 BRIAN ROLAPP
13

14

15          Wednesday, May 18, 2022
            9:03 a.m. - 3:22 p.m.
16

17            Remote Location
          Via Zoom Videoconference
18           All Parties Remote

19

20

21

22

23

24       Stenographically Reported By:
              Erica Field, FPR
25

Case 2:15-ml-02668-PSG-SK   Document 955-4   Filed 07/28/23   Page 3 of 26   Page ID
#:30551
NFL Sunday Ticket Antitrust Litigation

Brian Rolapp
May 18, 2022

2

```
 1   APPEARANCES:

 2


 3   On behalf of the Plaintiff:
         LANGER GROGAN & DIVER
 4       1717 Arch Street
         Suite 4130
 5       Philadelphia, Pennsylvania 19103
         (215) 320-5660
 6       BY: PETER LECKMAN, ESQUIRE
             KEVIN TRAINER, ESQUIRE
 7       pleckman@langergrogan.com
         ktrainer@langergrogan.com
 8


 9   On behalf of the Defendant:
         WILKINSON STEKLOFF
10       2001 M Street NW
         10th Floor
11       Washington, DC 20036
         (202) 847-4000
12       BY: RAKESH KILARU, ESQUIRE
         rkilaru@wilkinsonstekloff.com
13


14


15   ALSO PRESENT:
         Kim Ferrari, Paralegal, Langer Grogan
16       Derek Ludwin, Covington & Burling
         Delores DiBella, NFL
17


18   VIDEOGRAPHER:
         Bryan Beltran
19


20


21


22


23


24


25
```

Case 2:15-ml-02668-PSG-SK   Document 955-4   Filed 07/28/23   Page 4 of 26   Page ID
#:30552
NFL Sunday Ticket Antitrust Litigation
Brian Rolapp
May 18, 2022

24

1    document?

2         A.    I am, yes.

3         Q.    Do you know how this case study

4    came to be?

5         A.    If I remember, the professor at

6    Harvard, Anita Elberse, approached us about

7    wanting to write a case on our mobile digital

8    strategy at the time.

9         Q.    And were you interviewed?

10        A.    Yes.

11        Q.    And do you remember who you were

12   interviewed by?

13        A.    I remember Anita.  That's all I

14   remember.

15        Q.    Got it.

16              And were any drafts exchanged

17   before a final version was agreed on?

18        A.    I'm sure there were, yeah.

19        Q.    Okay.  Have you ever contacted the

20   Harvard Business School and asked them to

21   correct anything in this case study?

22        A.    Not that I remember.

23        Q.    Okay.  So, as you described, this

24   case study discusses the NFL's 2009 decision

25   on how to distribute their content in the

```
 1   mobile space; is that fair?

 2       A.    I believe so, yes.

 3       Q.    If you could turn to Page 1, the

 4   third paragraph begins with:  Because

 5   television rights were at the heart of the

 6   NFL's business model.  The NFL's media

 7   partners, which included the broadcasters,

 8   CBS, Fox, and NBC, cable channel ESPN, and

 9   satellite provider DirecTV collectively paid

10   the NFL over $4 billion annually.  Rolapp

11   knew he would have to consider the impact of

12   a wireless deal on the NFL's overall ability

13   the monetize its content.

14            Do you see that?

15       A.    I do.
```

2      Q.    Sure.

3      A.    The mobile rights are essentially

4  in-market games that you can get on the

5  mobile phone or a tablet, rights that we had

6  created and reserved for our broadcast

7  contracts.

8            And our focus at the time was how

9  do we create something that was incremental

10  in value added to the fan's experience.  And

11  so if it was incremental to the fan's

12  experience, it would be valuable to the fan,

13  and then at some point it should be valuable

14  to whoever distributes it, by definition.

15            But I think that's how we were

16  thinking about how this could work with our

17  overall media ecosystem and strategy.

18      Q.    And in what way would providing

19  the in-market games through your phone impact

20  the NFL's overall ability to monetize its

21  content?

22            MR. KILARU:  Object to the form.

23      A.    Well, I'm not sure I understand

24  your question entirely.

25

███████████████

█████████████████████████████

███████████████████████████████

██████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████

█████████████████

```
 9        Q.    Who will carry the over-the-air

10   option?

11        A.    A local station to be determined.

12   That's on a market-by-market basis.

13        Q.    So it won't be Fox or CBS?

14        A.    No.  It's usually -- it could be

15   an ABC affiliate.  It could be a CBS

16   affiliate.  Just really depends on the

17   market.

18        Q.    Most NFL games during the regular

19   season are played on Sunday afternoons,

20   right?

21        A.    Yes.

22        Q.    How many games are played on a

23   given Sunday afternoon during the regular

24   season?

25        A.    I think it varies, but you will
```

NFL Sunday Ticket Antitrust Litigation

Brian Rolapp
May 18, 2022

100

1   probably have -- I don't know the exact

2   number, but you will probably have 8 to 10 at

3   1:00 and then a handful more at 4:00.  So the

4   math is, you know, if there's not a -- on a

5   typical -- if there's not a Saturday game, if

6   there's just a Monday and a Thursday game,

7   you know, that's those two games there and

8   the remaining games are on Sunday afternoon

9   or Sunday night.

10       Q.    And CBS and Fox, I think you

11   testified earlier, produce those games on

12   Sunday afternoons?

13       A.    Correct.

14       Q.    And what does over the air mean in

15   the context of NFL football telecasts?

16       A.    I think it means whenever a game

17   is broadcast on a broadcast network, CBS,

18   Fox, NBC, that that is available free -- on

19   broadcast Spectrum, it should be free in the

20   market.  So all you need is an antenna to

21   pick that up.

22       Q.    And when you say in-market, what

23   is your understanding of what that refers to?

24       A.    It refers to the -- where that

25   game is telecast, which at a minimum is the

Case 2:15-ml-02668-PSG-SK  Document 955-4  Filed 07/28/23  Page 9 of 26  Page ID
#:30557
NFL Sunday Ticket Antitrust Litigation

Brian Rolapp
May 18, 2022

101

1   local market of a participating team, and

2   more often than not, it's broader than that.

3   It's other markets buy that game.

4        Q.    So in-market is not necessarily

5   the same as the playing team's markets?

6        A.    Not necessarily.  Depending on

7   where you live and what the situation is.

8   But at a minimum it is.

9        Q.    Basically in-market means wherever

10  the games are carried over the air in a

11  particular DMA?

12       A.    Yes, but in all situations it's

13  always carried over-the-air in the home

14  market of the participating clubs in that

15  game.

16       Q.    What does out of market mean?

17       A.    Out of market is everything else.

18  So it's all the other markets that aren't

19  carrying that game on free over-the-air

20  television.

21       Q.    Got it.

22            In any given DMA on any Sunday

23  afternoon -- I think we went over this

24  earlier -- you testified just to get the

25  record straight, that there's typically two

1   games played in one of the windows and a

2   single game aired in the other window; is

3   that right?

4       A.    Yeah, there are -- just to be

5   clear, yes, there is a double-header network

6   and a single-header network.  So you will get

7   one game at 1:00, and you will get up to two

8   games at 4:00 in any particular market.  So

9   you will get three games on Sunday afternoon

10  at a minimum.  Sometimes we do more than

11  that.  Sometimes we do a double-double header

12  and you get a fourth game, and then you get

13  your national game obviously throughout the

14  rest of the week.

15      Q.    Got it.

16            You mentioned the double-double

17  headers.  Did that start last season?

18      A.    No.  I think we increased it last

19  season.  So it's been -- I don't know how

20  long it's been.  It's been in existence for

21  some time, and then we actually added more

22  weeks where that happens.  So there's more

23  weeks that each market gets four games, and

24  that would be the norm going forward.  It

25  will be more double headers than previously.

NFL Sunday Ticket Antitrust Litigation

Brian Rolapp
May 18, 2022

120

1          Q.    It's not available on Fubu TV?

2          A.    No.

3          Q.    So it's fair to say that the only

4     way to watch those telecasts carried on

5     Sunday Ticket is to be a subscriber to

6     DirecTV?

7          A.    Correct.

121

1    BY MR. LECKMAN:

██████████████████████████████████

████████████████████████████████

███████████████

██████████████████████

███████████████████████████████████

██████████████████████████████

███████████████████████████████████

█████████████

█████████████████

11       Q.   Are you familiar with how other

12   professional leagues distribute their

13   out-of-market packages?

14       A.    In broad terms, yes.

15       Q.   Do you know if consumers can

16   subscribe to Major League Baseballs

17   out-of-market package through DirecTV?

18       A.   Yes, they can.

19       Q.   Comcast?

20       A.   I believe so.

21       Q.   Cox?

22       A.   I believe so.  I'm not certain,

23   but I believe so.

24       Q.   Dish?

25       A.   I believe so.

122

1      Q.    Are you aware that consumers can

2   also buy it through Amazon Prime?

3      A.    Yes.

4      Q.    And YouTube TV?

5      A.    Yes.

6      Q.    And you can also buy Major League

7   Baseball's Internet package, MLB.TV, directly

8   from the league, right?

9      A.    That's correct.

10     Q.    And are you aware you can buy a

11  single team set of games through MLB.TV?

12     A.    I was not aware of that, but that

13  doesn't surprise me.

14     Q.    How about the NBA's out-of-market

15  package?  Do you have to be a DirecTV

16  subscriber to get the out-of-market package

17  -- or out-of-market games carried on the

18  NBA's package?

19     A.    I think DirecTV is one of the

20  places you can get it.

21     Q.    But you can also get it from the

22  other sources that we talked about for Major

23  League Baseball?

24     A.    I believe that's the case.

25     Q.    For the NHL, you can buy the

NFL Sunday Ticket Antitrust Litigation

Brian Rolapp
May 18, 2022

257



```
24     Q.    Okay.  Move on from this.

25           Next one I would like to turn your
```

Case 2:15-ml-02668-PSG-SK   Document 955-4   Filed 07/28/23   Page 15 of 26   Page ID
#:30563

NFL Sunday Ticket Antitrust Litigation

Brian Rolapp
May 18, 2022

258

 1   attention to what was marked as Exhibit 3.

 2   This was the interview in The Jockey Club.

 3           Do you recall discussing this?

 4       A.    I do.

 5       Q.    And I just wanted to turn your

 6   attention to Page 4 of 9 to a portion that I

 7   don't believe was covered before.

 8           Do you see the second full

 9   paragraph on the page, and it reads:  Finally

10   working collectively for commercial purposes

11   national revenue.

12       A.    Yes.

13       Q.    (Reading:)  The league, 32 teams,

14   have contributed certain rights to the

15   national level, including media and

16   television and sponsorship in order to

17   generate better revenues for everybody.  Most

18   importantly, those are all equally shared.

19   So in our view the goal is to have

20   competitive healthy franchises, every single

21   one.  If a team wins, it will be based on the

22   shrewd allocation of those resources, not

23   because of a lack of them.

24           Do you see that?

25       A.    I do.

259

1      Q.    Based on your experience of the

2   league, what role -- what is the relationship

3   between pooled media rights and competitive

4   healthy franchises?

5      A.    I think it's very important, based

6   on my experience, where we have an entire

7   model where collective revenue, equally

8   shared revenue, a collective bargaining

9   agreement that fixes a salary cap essentially

10  creates a system where all teams are equally

11  competitive on the field, and because of

12  that, a team is going to win the Super Bowl,

13  not because of the size of their market or

14  their ability to generate disproportionate

15  economic resources.  It's going to be because

16  they allocated their portion of player costs

17  more effectively than their opponent.

18          That all to me, at the end of the

19  day, results in a highly competitive league,

20  the most competitive league in the world in

21  my opinion, where on any given year each team

22  has almost -- almost, not entirely, but

23  certainly almost equal probability of winning

24  the Super Bowl.

25          And the competitive parity that is

1   created is one reason why the sport is so

2   popular as it is and the product is so good

3   and that we've created a national sport, not

4   a local sport, which I would argue many of

5   the other sports are.

6        Q.   We can move on from that exhibit

7   now.

Case 2:15-ml-02668-PSG-SK   Document 955-4   Filed 07/28/23   Page 18 of 26   Page ID
#:30566
NFL Sunday Ticket Antitrust Litigation

Brian Rolapp
May 18, 2022

261

████████████████████████████████

███████████████████████████

██████████████████████████████████

██████████████████████████████████

5            But when the clubs are left to

6    their own devices to do that, the quality

7    certainly pales in comparison of the

8    production value of those games versus the

9    national games you will see on any given

10   Sunday, Monday, or Thursday.

11        Q.    Can I turn you now to Exhibit 10.

12   I believe it's the next one up.

13            Do you remember discussing this

14   document that was a deck, I believe, prepared

15   by McKinsey?

16        A.    I do, yes.

17        Q.    Could you turn to Page 9 of that

18   deck?

19            I don't believe this was discussed

20   earlier, but do you see on the bottom right

21   there's a star around a field and the field

22   says:  We haven't yet factored in the loss of

23   value from broadcast partners?

24        A.    I do see that, yes.

25        Q.    Why would that be relevant, the

276

1                    CERTIFICATE OF REPORTER

2

3    UNITED STATES DISTRICT COURT )

4

5

6        I, ERICA FIELD, Stenographic Reporter,

7    certify that I was authorized to and did

8    stenographically report the deposition of

9    BRIAN ROLAPP, pages 1 through 275; that a

10   review of the transcript was not requested;

11   and that the transcript is a true and

12   complete record of my stenographic notes.

13       I further certify that I am not a

14   relative, employee, attorney, or counsel of

15   any of the parties, nor am I a relative or

16   employee of any of the parties' attorney or

17   counsel connected with the action, nor am I

18   financially interested in the action.

19

20       DATED this 19th day of May, 2022.

21       _Erica Field_

22       _____
         Erica Field
23

24

25

1   Beth A. Wilkinson (admitted *pro hac vice*)
2   Brian L. Stekloff (admitted *pro hac vice*)
    Rakesh N. Kilaru (admitted *pro hac vice*)
    Jeremy S. Barber (admitted *pro hac vice*)
3   **WILKINSON STEKLOFF LLP**
    2001 M Street NW, 10th Floor
4   Washington, DC 20036
    Telephone: (202) 847-4000
5   Facsimile: (202) 847-4005
    bwilkinson@wilkinsonstekloff.com
6   bstekloff@wilkinsonstekloff.com
    rkilaru@wilkinsonstekloff.com
7   jbarber@wilkinsonstekloff.com

8   *Counsel for Defendants National Football*
    *League, NFL Enterprises LLC, and the*
9   *Individual NFL Clubs*

10  [Additional Counsel Listed on Signature
    Pages]

11

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14
    IN RE: NATIONAL FOOTBALL            ) Case No. 2:15-ml-02668−PSG (JEMx)
15  LEAGUE'S "SUNDAY TICKET"           )
    ANTITRUST LITIGATION                ) **CORRECTIONS TO THE**
16                                      ) **DEPOSITION TRANSCRIPT OF**
    _____ ) **BRIAN ROLAPP**
17                                      )
    THIS DOCUMENT RELATES TO:           )
18  ALL ACTIONS                         ) Judge:  Hon. Philip S. Gutierrez
19                                      )
                                        ) Deposition Date: May 18, 2022
20                                      ) Final Transcript Received: May 22,
                                        ) 2022
21                                      )
22  _____ )

23

24

25

26

27

28

1       Defendants National Football League, NFL Enterprises, LLC, and the NFL

2  member Clubs (the "NFL Defendants"), by and through their attorneys, provide the

3  errata sheet to the deposition testimony of Brian Rolapp, attached hereto as "Exhibit

4  A."

5

6  Dated:   September 6, 2022       /s/ *Beth A. Wilkinson*

7                              Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)

8                              Rakesh N. Kilaru (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)

9                              **WILKINSON STEKLOFF LLP**

10                            2001 M Street NW, 10th Floor
Washington, DC 20036

11                            Telephone: (202) 847-4000
Facsimile: (202) 847-4005

12                            bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com

13                            rkilaru@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com

14

15                            Neema T. Sahni (Bar No. 274240)

16                            **COVINGTON & BURLING LLP**
1999 Avenue of the Stars

17                            Suite 1500
Los Angeles, CA 90067-6045

18                            Telephone: (424) 332-4800
Facsimile: (424) 332-4749

19                            nsahni@cov.com

20                            Gregg H. Levy (admitted *pro hac vice*)

21                            Derek Ludwin (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**

22                            One CityCenter
850 Tenth Street NW

23                            Washington, DC 20001
Telephone: (202) 662-6000

24                            Facsimile: (202) 662-6291
glevy@cov.com

25                            dludwin@cov.com

26

27                            *Counsel for Defendants National Football
League, NFL Enterprises LLC, and the*

28                            *Individual NFL Clubs*

1

## Exhibit A

## Errata Sheet to the Deposition Testimony of Brian Rolapp – May 18, 2022

| Page | Line | Original Text | Correction | Reason |
|------|------|---------------|------------|--------|
| 5 | 1 | Delores | Dolores | Typographic error |
| 23 | 8, 16, 17 | Hanna | Hannah | Typographic error |
| 32 | 16 | club's | clubs' | Typographical error |
| 34 | 17 | of | or | Transcription error |
| 36 | 20 | CDA | CBA | Transcription error |
| 38 | 19 | that an | that in an | Transcription error |
| 41 | 17 – 18 | Verizon who has leading market share is | Verizon, who has leading market share, is | Clarify the record |
| 56 | 3 | competitors, but for that, | competitors.  But for that, | Typographical error |
| 64 | 3 | you | we | Transcription error |
| 65 | 24 | connect is | can access | Transcription error |
| 74 | 3, 8, 11 | BCl | BC-1 | Typographical error |
| 75 | 1 | BCl | BC-1 | Typographical error |
| 76 | 19 | EDP | EVP | Transcription error |
| 78 | 4 | promotion | promotion, | Typographical error |
| 79 | 13 | constitution bylaws | Constitution and Bylaws | Transcription error |
| 82 | 17 | event | bent | Transcription error |
| 85 | 21 | 2005 | 2015 | Clarify the record |

2

| Page | Line | Original Text | Correction | Reason |
|------|------|---------------|------------|--------|
| 89 | 10 | to | through | Transcription error |
| 93 | 12 | broadcast network on NFL Network and then on | broadcast network, on NFL Network, and then on | Typographical error |
| 93 | 18 | they're | there are | Transcription error |
| 97 | 22 | abilities | ability | Transcription error |
| 97 | 24 | will | it'll | Transcription error |
| 97 | 25 | subscription minimum | subscription, at minimum | Transcription error |
| 98 | 22 | consumer | consumers | Transcription error |
| 98 | 24 | football that they want to see it | football, that they want to see it | Typographical error |
| 100 | 19 | Spectrum | spectrum | Typographical error |
| 101 | 3 | buy | by | Typographical error |
| 102 | 11 | double-double header | double double-header | Typographical error |
| 103 | 16 | tend | tends | Transcription error |
| 103 | 17 | double-double header | double double-header | Typographical error |
| 104 | 12 | they | the | Transcription error |
| 104 | 25 | is | has | Transcription error |
| 105 | 25 | starts a | starts with a | Transcription error |
| 123 | 21 | I do not | I do | Transcription error |
| 125 | 13 | if | of | Transcription error |
| 125 | 14 | it's | its | Typographical error |

| Page | Line | Original Text | Correction | Reason |
|------|------|---------------|------------|--------|
| 135 | 1 | Exclusivity | exclusivity | Typographical error |
| 143 | 25 | carrier over the year | carried over the air | Transcription error |
| 144 | 9 | that the whatever | whatever | Transcription error |
| 165 | 1 | detention | attention | Transcription error |
| 186 | 4 | change | chase | Transcription error |
| 186 | 10 | multiple.  It's more | multiples more | Transcription error |
| 189 | 17 | 2023 | 2033 | Transcription error |
| 199 | 7 | catches | that's just | Transcription error |
| 206 | 21 | certain | concern | Transcription error |
| 224 | 9 | 180 | 180 million | Transcription error |
| 247 | 10 | are | aren't | Transcription error |
| 262 | 4 | that | I've | Transcription error |
| 269 | 17 | complimentary | complementary | Typographical error |
| 270 | 2 | of viewer | fewer | Transcription error |

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: 8/24/22                    By: _____
                                           Brian Rolapp

1

## **CERTIFICATE OF SERVICE**

2       I, Jeremy S. Barber, attorney at Wilkinson Stekloff LLP, hereby certify that,

3  on September 6, 2022, I caused the foregoing Errata Sheet to the Deposition

4  Transcript of Brian Rolapp to be served via email delivery on the following

5  counsel:

6

7  MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com

8  **SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, 14th Floor

9  Los Angeles, CA 90067
Tel: (310) 789-3100

10  Fax: (310) 789-3150

11  SCOTT MARTIN
smartin@hausfeld.com

12  IRVING SCHER
ischer@hausfeld.com

13  **HAUSFELD LLP**
33 Whitehall Street, 14th Floor

14  New York, NY 10004
Tel: (646) 357-1100

15  Fax: (212) 202-4322

16  HOWARD LANGER
hlanger@langergrogan.com

17  EDWARD DIVER
ndiver@langergrogan.com

18  PETER LECKMAN
pleckman@langergrogan.com

19  **LANGER GROGAN AND DIVER PC**
1717 Arch Street, Suite 4130

20  Philadelphia, PA 19103
Tel: (215) 320-5660

21  Fax: (215) 320-5703

22  ARUN SUBRAMANIAN
asubramanian@susmangodfrey.com

23  WILLIAM CHRISTOPHER CARMODY
bcarmody@susmangodfrey.com

24  SETH ARD
sard@susmangodfrey.com

25  TYLER FINN
tfinn@susmangodfrey.com

26  **SUSMAN GODFREY LLP**
1301 Avenue of the Americas, 32nd FL.

27  New York, NY 10019
Tel: (212) 336-8330/ Fax: (212) 336-

28  8340

5

1  IAN M. GORE
   igore@susmangodfrey.com
2  **SUSMAN GODFREY LLP**
   1201 Third Avenue, Suite 3800
3  Seattle, WA 98101
   Tel: (206) 505-3841/Fax: (206) 516-3883
4
5  MICHAEL D. HAUSFELD
   mhausfeld@hausfeld.com
   Farhad Mirzadeh
6  fmirzadeh@hausfeld.com
   **HAUSFELD LLP**
7  1700 K. Street NW, Suite 650
   Washington, DC 20006
8  Tel: (202) 540-7200/Fax: (202) 540-7201
9  MICHAEL P. LEHMANN
   mlehmann@hausfeld.com
10 BONNY E. SWEENY
   bsweeney@hausfeld.com
11 CHRISTOPHER L. LEBSOCK
   clebsock@hausfeld.com
12 **HAUSFELD LLP**
   600 Montgomery St., Suite 3200
13 San Francisco, CA 94111
   Tel: (415) 633-1908/Fax: (415) 358-4980
14
15 *Co-Lead Plaintiffs' Counsel*

16 Executed on September 6, 2022.
17
18                                By: */s/ Jeremy S. Barber*
19                                    Jeremy S. Barber
20
21
22
23
24
25
26
27
28

6