Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668-PSG (JEMx) |
| | **MEMORANDUM IN OPPOSITION TO THE NFL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| THIS DOCUMENT RELATES TO ALL ACTIONS | JUDGE: Hon. Philip S. Gutierrez<br>DATE: October 27, 2023<br>TIME:  1:30 p.m.<br>COURTROOM:<br>  First Street Courthouse<br>  350 West 1st Street<br>  Courtroom 6A<br>  Los Angeles, CA 90012 |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

ARGUMENT ....................................................................................................... 8

    I.     As this Court and the Ninth Circuit Have Held, the Sports Broadcasting Act Does Not Immunize Restraints on the Paid Telecasts at Issue Here. ................................................................... 8

    II.    As the Ninth Circuit Has Held, Defendants Are Not a Single Entity, Including When Licensing Telecasts. ..................................... 15

    III.   As the Ninth Circuit Has Held, Plaintiffs Are Direct Purchasers ................................................................................................. 19

    IV.   As the Ninth Circuit Has Held, the Court May Not Consider the  DirecTV Agreement in Isolation .................................................. 23

CONCLUSION ................................................................................................. 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Needle Inc. v. NFL*,
560 U.S. 183 (2010) ....................................................................*passim*

*Chi. Prof'l Sports Ltd. v. NBA*,
961 F.2d 667 (7th Cir. 1992) ................................................................ 2

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........................................................................... 10

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977) ........................................................................... 24

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
472 F.3d 23 (2d Cir. 2006) ................................................................ 24

*Grp. Life & Health Ins. Co. v. Royal Drug Co.*,
440 U.S. 205 (1979) ......................................................................... 10

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) .................................................................... 19, 20

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1156 (9th Cir. 2019) .....................................................*passim*

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
2017 WL 3084276 (C.D. Cal. June 30, 2017) .................................... 2, 8

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) ................................. 18, 20

*Levi Case Co. v. ATS Prod., Inc.*,
788 F. Supp. 428 (N.D. Cal. 1992) ..................................................... 24

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978) ......................................................................... 10

*NCAA v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) ........................................................................*passim*

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ............................................................... 10

*Parrish v. NFL Players Ass'n*,
   534 F. Supp. 2d 1081 (N.D. Cal. 2007) ........................................ 24

*Relevent Sports LLC v. U.S. Soccer Fed., Inc.*,
   61 F.4th 299 (2d Cir. 2023) ................................................ 14, 22

*Rocky Mountain Farmers Union v. Corey*,
   913 F.3d 940 (9th Cir. 2019) ........................................................ 1

*Shaw v. Dallas Cowboys Football Club, Ltd.*,
   172 F.3d 299 (3d Cir. 1999) ................................................ 2, 8, 14

*Spinelli v. NFL*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015) ............................................. 18

*U.S. Football League v. NFL*,
   842 F.2d 1335 (2d Cir. 1988) ..................................................... 16

*United States v. NFL*,
   196 F. Supp. 445 (E.D. Pa. 1961) ......................................... 16, 17

*Washington v. NFL*,
   880 F. Supp. 2d 1004 (D. Minn. 2012) ....................................... 18

**Statutes**

Capper-Volstead Act ..................................................................... 10

Sherman Act ........................................................................ *passim*

Sports Broadcasting Act of 1961 ............................................. *passim*

**Other Authorities**

H. Rep. No. 87-1178 (1961) ........................................................... 8

**INTRODUCTION**

The Ninth Circuit sustained the validity of Plaintiffs' claims that the interrelated telecasting agreements between the NFL, all of the NFL teams, and their broadcast partners violate Sections 1 and 2 of the Sherman Act. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.* ("*NFLST*"), 933 F.3d 1156 (9th Cir. 2019). The purpose and effect of these agreements was to reduce the output of out-of-market ("OOM") telecasts and raise the price of the NFL Sunday Ticket package to supracompetitive levels. Abundant record evidence now supports Plaintiffs' claims. The teams have agreed not to compete. They have monopolized their telecast rights and agreed to limit competition between NFL telecasts to such a degree that only two NFL telecasts—*at most*—can be aired head-to-head at a given time in a local television market. All Sunday afternoon games not telecast locally are available only through an exclusive and overpriced product: NFL Sunday Ticket. As the Ninth Circuit held, these are such "naked restraints" on competition that "'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" *Id.* at 1156 (quoting *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999)). Given these naked restraints, Defendants will face at trial "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *NCAA v. Bd. of Regents of Univ. of Okla.* ("*NCAA*"), 468 U.S. 85, 113 (1984).

Instead of addressing their heavy burden and attempting to justify the restraints with undisputed evidence, Defendants' motion at bottom rehashes four *legal* arguments that the Ninth Circuit has already rejected. The motion should be denied on that basis alone. *See, e.g.*, *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 951 (9th Cir. 2019) ("The law of the case doctrine generally precludes reconsideration of an issue that has already been decided by the same court, or a higher court in the identical case.") (internal quotation removed).

*First*, Defendants attempt to obtain the same expansive interpretation of the Sports Broadcasting Act of 1961 ("SBA") that this Court rejected long ago when considering their original motion to dismiss. "The NFL Defendants … argue that Sunday Ticket merely re-broadcasts coverage that was initially broadcast on free, over-the-air television—namely, CBS and Fox—and, thus, is protected by the SBA. The Court agrees with Plaintiffs." *See NFLST*, 2017 WL 3084276, at *13 (C.D. Cal. June 30, 2017); *see also Shaw v. Dallas Cowboys Football Club, Ltd*., 172 F.3d 299, 303 (3d Cir. 1999) (holding that the SBA does not immunize Sunday Ticket). Defendants did not challenge this holding on appeal and the Ninth Circuit confirmed that Congress only allowed teams to collectivize their telecast rights for *free* distribution – not the *paid* telecasts that Plaintiffs purchased here. *NFLST*, 933 F.3d 1146-47; *see also Shaw*, 172 F.3d 299 at 302–03 ("The NFL got what it lobbied for; it cannot now expect the federal courts to transform 'narrow, discrete, special-interest' legislation into a far broader exemption."); *Chi. Prof'l Sports Ltd. v. NBA*, 961 F.2d 667, 671 (7th Cir. 1992) (holding that the SBA is a "special-interest law" and that it would be "inappropriate to extend [it] to achieve more of the objective the lobbyists wanted").[1]

Defendants' motion attempts to recast Plaintiffs' claims to make it appear as if Plaintiffs are challenging far more than the collective sale of telecast rights for paid distribution. They claim Plaintiffs are seeking to "invalidat[e] lawful and economically rational activity," Defs' Mem. at 1, "eliminat[e] or eviscerate[] the NFL's agreements with CBS and FOX," *id*. at 2, require telecasts to "move from free television to paid cable," *id*., end revenue sharing, and even reduce player sala-

---

[1] To justify reraising the issue, Defendants have claimed that Plaintiffs engaged in a "bait and switch." Defs' Mem. at 2. This simply isn't so. Plaintiffs have consistently challenged the interrelated and interdependent nature of these agreements and argued that they operate together to restrain the output of OOM telecasts. *See* Plaintiffs' Statement of Genuine Issues and Additional Undisputed Facts ("AUF") ¶¶ 257–263 (providing citations proving there has been no change in theory).

ries. *Id*. Not so, as explained below. But these claims also misstate the parties' respective burdens. Plaintiffs have established, as a matter of fact, contractual arrangements that impose *naked restraints* on competition. If Defendants believe these restraints are necessary to maintain some attendant, countervailing benefit that is procompetitive, it is *their* "heavy burden" to justify their "deviation from the operations of a free market." *NCAA*, 468 U.S. at 113. Their motion does not even begin to attempt to meet this burden.

*Second*, Defendants argue again that the NFL and its member teams are a "single entity" incapable of competing. The Supreme Court *unanimously* rejected this argument as a general matter in *American Needle*, and the Ninth Circuit specifically rejected it in the context of the very telecasts rights at issue in this case. *See Am. Needle Inc. v. NFL*, 560 U.S. 183, 196 (2010) ("Each of the teams is a substantial, independently owned, and independently managed business. '[T]heir general corporate actions are guided or determined' by 'separate corporate consciousnesses,' and '[t]heir objectives are' not 'common.'"); *NFLST*, 933 F.3d at 1153 ("Defendants have failed to identify, and we are unaware of, any binding precedent requiring the teams and the NFL to cooperate in order to produce the telecasts."). As shown by other sports leagues and the NFL's own history, which the Ninth Circuit meticulously recounted, that the teams must act collectively on certain matters such as game rules does not mean that they must act collectively when selling telecast rights. *Id*. at 1153-54. The argument is also inconsistent with the Defendants' first argument. Were the league and teams a single entity, there would be no need for an SBA exemption allowing teams to enter into a contractual arrangement to combine their over-the-air ("OTA") telecast rights because the league, as a single entity, would *already* own them. *See id*. at 1146 ("In passing the SBA, Congress recognized that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act …") (internal quotation removed).

*Third*, Defendants again claim Plaintiffs do not have standing because there is no evidence of an agreement among the NFL Defendants and DirecTV even though DirecTV distributed the teams' collectively licensed OOM telecasts per its *express written contract* with the NFL Defendants—an agreement that the teams collectively approved. To state the argument is to refute it. As the record evidence shows, the agreements at issue were designed to work together to restrain competition among NFL team telecasts that would have otherwise existed, as they did years before, and thereby limited the availability of NFL telecasts to consumers. Plaintiffs are therefore *direct* purchasers with standing to sue, as the Ninth Circuit has already held. *NFLST*, 933 F.3d at 1158.

*Fourth*, Defendants argue that the Court should examine the DirecTV agreement in isolation. This too is an argument the Ninth Circuit rejected. *See id*. at 1152 ("First, the defendants argue that … it is necessary to analyze the horizontal NFL Teams agreement separately from the vertical NFL-DirecTV agreement, and when viewed in that light, the NFL-DirecTV agreement does not injure competition because it is an exclusive distribution agreement of the type that is presumptively legal. We disagree."). The record evidence supports precisely what the Ninth Circuit held would prove an antitrust violation: "Looking holistically at the alleged conduct, we conclude that the complaint adequately pleads that the vertical NFL-DirecTV agreement works in tandem with the Teams-NFL agreement to restrain competition." *Id*.

## BACKGROUND

Each NFL club is an "'independently owned, and independently managed business.'" *In re NFLST*, 933 F.3d at 1148 (quoting *Am. Needle*, 560 U.S. at 196). The teams have nonetheless agreed not to compete in the telecasting of their games. Instead, they have each agreed to convey their telecasting rights to the league, which has entered into a set of agreements designed to limit competition between

NFL telecasts.[2] Under these agreements, CBS and Fox produce telecasts of all Sunday-afternoon games, but each network agrees to make available only one telecast at a time in any local market. AUF ¶¶ 192–95. The networks coordinate with each other, DirecTV, and Defendants to ensure that only two to four telecasts are carried on local CBS and Fox channels during the day on Sunday, even though ten to thirteen games are played during that time. No more than two NFL telecasts can ever be aired head-to-head in a local television market. *Id.* ¶ 194.

Defendants and their television partners (including CBS and Fox) have agreed that all games not aired locally will be available only through a single "premium subscription" pay television product, *id.* ¶ 211, sold on top of a subscriber's television package.[3] That product is Sunday Ticket, which was available in the United States only through DirecTV's satellite service throughout the class period.[4] Because most households subscribe to other pay television services or to no pay television service at all, DirecTV's exclusivity significantly reduced the number of consumers who could watch out-of-market games. ████████████████████

████████████████████████████████████████████████████

---

[2] The teams have agreed to assign their own telecast rights to the NFL pursuant to various articles of the NFL Constitution and bylaws, as Defendants admit. *See, e.g.*, AUF ¶¶ 7, 27, 150–89.

[3] ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[4] YouTube recently purchased the Sunday Ticket rights from Defendants, but, due in significant part to how Defendants and YouTube structured the contract, the price of the residential Sunday Ticket price will actually *increase*. AUF ¶¶ 218–19;



This reduction in output is by design.

because the OTA networks (CBS and Fox) sought to avoid competition from other providers who could make available the competing telecasts that many consumers would have preferred to watch:

[5] The only way for these fans to watch their preferred telecasts was by installing a satellite dish, subscribing to DirecTV, and paying hundreds of additional dollars for the Sunday Ticket package.



By agreeing to monopolize the teams' telecast rights in one centralized agent, namely, the NFL, and creating protected markets that enable supracompetitive prices, the NFL Defendants were able to command extraordinary sums in rights fees. Defendants have been upfront that they insisted Sunday Ticket be sold exclusively on DirecTV at supracompetitive "premium prices" to protect the networks from competing telecasts so that those networks would pay Defendants more. Patriots' owner and chair of the NFL's Media Committee, Robert Kraft, put it plainly:

And just as the suppression of OOM telecasts protects the networks, the limitation on OTA telecasts to just a few games per week protects DirecTV, allow-

7

ing Sunday Ticket to be sold at the supracompetitive prices that each and every class member paid.

## ARGUMENT

### I.   As this Court and the Ninth Circuit Have Held, the Sports Broadcasting Act Does Not Immunize Restraints on the Paid Telecasts at Issue Here.

The SBA provides no exemption for the collective licensing of the *paid* telecasts each class member purchased. *See* Telecasting of Prof. Sports Contests, H. Rep. No. 87-1178, at 5 (1961) ("The bill does not apply to closed circuit or subscription television."). Multiple courts, including this one and the Ninth Circuit, have confirmed this. *See NFLST*, 933 F.3d at 1147; *see also NFLST*, 2017 WL 3084276, at *13; *Shaw*, 172 F.3d at 303.[6]

In an attempt to circumvent these holdings, Defendants mischaracterize Plaintiffs' theory of the case—suggesting (but never actually saying) that Plaintiffs are seeking an injunction barring the teams from collectively licensing their telecasts for free OTA distribution. That is not what Plaintiffs are seeking. That collectivization is indisputably anticompetitive, which is why it needs an exemption from the antitrust laws, but it is covered by the SBA. *See NFLST*, 933 F.3d at 1146 ("In passing the SBA, Congress recognized 'that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act,' and that therefore an exemption from Section 1 of the Sherman Act was required.") (quoting *NCAA*, 468 U.S. at 104 n.28).

The CBS and Fox contracts are nonetheless part of the "Challenged Conduct" because they suppress competition outside the limited area protected by the SBA. *See, e.g.*, AUF ¶¶ 201–04. This is not a new theory. Plaintiffs have consistently claimed that the agreements with CBS and Fox were part of the conspiracy to restrain competition outside of the protection of the SBA. *See* AUF ¶¶ 257–263. Far

---

[6] The SBA applies only to Section 1 of the Sherman Act. It thus has no bearing on Plaintiffs' Section 2 claims. *See NFLST*, 933 F.3d at 1159 n.10.

from presenting an inconsistent argument to the Ninth Circuit, the role of the network agreements is discussed throughout Plaintiffs' briefing before the Circuit, starting with the very first sentence of Plaintiffs' Statement of the Case: "Plaintiffs' Consolidated Amended Complaint ("CAC") alleges that the National Football League ("NFL"), its member teams, and DirecTV, *along with various television networks*, have entered into a set of agreements that, working together, suppress competition for the sale of professional football game telecasts in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2." *See* AUF ¶ 259.[7]

The evidence matches Plaintiffs' consistent position throughout the litigation.

The obvious purpose of these clauses is to protect CBS from the competing OOM telecasts that many local consumers would prefer to watch. They are direct, horizontal agreements in restraint of trade with respect to *non-SBA-protected* telecasts.

Defendants insist that the SBA grants them the ability to enter into agreements with CBS and Fox that maintain those networks' "general exclusivity." Defs'

---

[7] *See also*, *e.g.*, Second Cons. Am. Compl., Dkt.441, ¶ 77 (recounting Fox's reported insistence that the subscriber base to any OOM package be capped); AUF ¶ 261 (Plaintiffs' Opening Brief on Appeal, at 5) ("To protect these local telecasts from the other NFL telecasts, the *NFL and networks* agreed that all other Sunday-afternoon games will be available nationally only through a limited, non-basic, subscription service.").

Mem., at 8. Defendants never define what they mean by "general exclusivity," but what they cannot legitimately claim is that the SBA allows them to protect CBS and Fox's local broadcasts from competition from the *paid* telecasts that Congress excluded from the SBA. If that were correct, Defendants could turn the SBA into a blanket exemption merely by including limitations on *paid* telecasts in their OTA contracts with CBS and Fox.[8]

Defendants then turn the burdens at issue on their head and claim that *Plaintiffs* must prove that the restraints are *unnecessary* to accomplish various NFL behaviors. If Defendants believe their naked restraints are necessary to accomplish some other goal (like maintaining current player salary levels), it is *their burden* to convince the trier of fact that (1) that is so and (2) that goal is procompetitive in the relevant sense, meaning that it increases the output or lowers the prices of NFL telecasts. *See NCAA*, 468 U.S. at 113; *see also Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978) ("the purpose of the analysis is to form a judgment

---

[8] *Comcast* and *American Express* do not hold otherwise. *Comcast* simply holds that damages must be measured in relation to the antitrust injury alleged. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35–37 (2013). *American Express* merely sets forth the rule-of-reason framework. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018). Neither addresses, let alone overturns, the well-settled law "that exemptions from the antitrust laws are to be narrowly construed." *Grp. Life & Health Ins. Co. v. Royal Drug Co*., 440 U.S. 205, 231 (1979). While Plaintiffs are not asserting the argument here and the Court need not consider it, Defendants may have entirely abrogated their right to invoke the SBA exemption by inserting non-SBA protected restraints into their OTA contracts and further contracting with DirecTV to *charge* consumers for those broadcasts. *See id.* at 231 ("In analogous contexts, the Court has held that an exempt entity forfeits antitrust exemption by acting in concert with nonexempt parties. The Court has held, for example, that an exempt agricultural cooperative under the Capper-Volstead Act loses its exemption if it conspires with nonexempt parties. … Similarly, the Court has consistently stated that a union forfeits its exemption from the antitrust laws if it agrees with one set of employers to impose a wage scale on other bargaining units.").

about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is … in the interest of the members of an industry.").

In any event, nowhere do Plaintiffs or their experts require the "elimination or evisceration of the NFL's agreements with CBS and Fox." Defs' Mem. at 2. Plaintiffs' experts have been clear that the collective sale of OTA rights to CBS and Fox are covered by the SBA and are *not* part of the Challenged Conduct: "[T]he Plaintiffs challenge those agreements taken together, but only challenge specific aspects of the combined agreements. For example, I understand that *a substantial portion of the transactions involved in these agreements are not part of the Challenged Conduct*—including the pooling of rights for the purposes of production and broadcasting NFL telecasts on OTA channels that I understand the SBA provide a degree of protection from antitrust scrutiny." Rascher Reply Report, ¶ 51 (emphasis added); *see also* Rascher Merits Report, ¶ 58.[9]

Nor do Plaintiffs' experts claim that the collective sale of OTA rights must cease in a world without the Challenged Conduct. The most Plaintiffs' experts say in this regard is that the teams may have *voluntarily* decided to end the collectivization of OTA rights if the other restraints were removed. The SBA allows the teams to collectively sell their OTA rights. It does not mandate it.

Professor Rascher analyzed the effects of removing the Challenged Conduct and found that whether the teams *chose* to continue to agree to collectively license their OTA telecasts or not, the result would be the same: the NFL telecast schedule on Sunday would likely look like the college football telecast schedule on Saturday and, as a result, vastly more NFL telecasts would be available on both OTA and cable channels. "Both options—one in which the current OTA packages could have

---

[9] Plaintiffs' expert reports are attached to the Kilaru Declaration, filed along with Defendants' motion. Professor Rascher's opening merits report and rebuttal report are attached as Exhibits 3 and 4, respectively, and the rebuttal report of Professor Einer Elhauge is attached as Exhibit 30.

fundamentally survived as is, or one in which the current OTA packages could have been replaced or reduced in scope—were possible but-for outcomes, *depending on choices of the parties in the BFW [but for world, meaning a world without the restraints]*." Rascher Reply, ¶ 416 (emphasis added). "Whether the NFL Defendants would have opted to continue to pool their Sunday afternoon content for OTA telecasts in the absence of the Challenged Conduct in the BFW is an empirical question that can never be answered with certainty: Defendants actual-world alleged misconduct has precluded any direct empirical comparison and the past cannot be unwound. Nevertheless, my prior report shows that regardless of which version of the BFW would have occurred, damages are the same." *Id.*[10]

Nor do Plaintiffs or their experts claim that the League may not share the revenue generated from the sale of their collectively licensed OTA rights. What the teams cannot do is agree to share *100%* of their *non-SBA immunized* telecast revenue for the purpose or effect of restraining competition among them. ■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■ Accordingly, if a horizontal agreement on pooling OOM telecasts is anticompetitive, a horizontal agreement to share *100%* of OOM telecast revenue would also be anticompetitive. *See* Elhauge Rpt. ¶¶ 8–10, Sec. II; Rascher Reply Rpt. ¶ 199 ("The fact that one type of unnecessary conduct can achieve similar anticompetitive outcomes as another type of conduct does not affect the economic analysis of those anticompetitive outcomes."). It is *Defendants' burden* to prove that

---

[10] Contrary to Defendants' argument and citation to Justice Kavanaugh's remarks, Plaintiffs are not claiming that the teams must, as a matter of law, compete with each other and the NFL so long as they make their own independent business decisions and do not agree with each other not to compete. This is a fundamental premise of the antitrust laws.

the current levels of telecast revenue sharing (which are different than how other sources of NFL revenue are shared[11]) somehow lead to a *procompetitive* effect—something their motion does not even try to do.[12]

Defendants' final argument regarding the SBA is that the exemption immunizes *all* of the teams' horizontal telecast agreements because the only place where the teams pool their rights is in the SBA-protected NFL-Networks agreements. This is factually wrong and legally irrelevant.

*First*, Defendants are wrong on the facts. The NFL-Network contracts presuppose the collectivization of rights in the NFL. Defendants admitted this in their Answer: "NFL Defendants also admit that the NFL is authorized to negotiate on behalf of the NFL member clubs for the collective licensing and distribution of rights to broadcast NFL games." Dkt. 442, ¶ 81.

---

[11] *See, e.g.*, Rascher Rpt. ¶ 271 n.375 (noting, for example, that clubs share only 40% of their ticket sales).

[12] The SBA likewise has nothing to do with player salaries. The only thing Plaintiffs' experts have said is that the current collective bargaining agreement (CBA) sets salary caps based on league revenues. Players would only earn less if the clubs decided to pay them less amid competition over OOM telecasts, which is just one of various sources of team revenue. And again, even if it were true, it would be the NFL's burden to show that the current player salary levels would be affected by telecast competition and that lower salaries would somehow cause viewership to decline or prices to rise.

[REDACTED]

[REDACTED]

Moreover, while such an agreed-upon transfer need not be documented in a separate agreement,[13] contrary to Defendants' representation, there *is* evidence of such agreements. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] And regardless of whether the pooling of OOM rights is written down in a separate document, the indisputable *fact* is that the teams sold their OOM telecasts collectively to DirecTV. AUF ¶ 207. That contract, as much as the agreements with the Networks, reflects the pooling of those rights.

*Second*, even if it were true that the only horizontal telecast arrangement between the teams was contained in the NFL's contracts with the networks, that would not exempt those arrangements from antitrust scrutiny. Sports leagues may not expand the SBA's limited immunization simply by incorporating anticompetitive restraints into contracts that contain SBA-protected provisions. Under Defendants' logic, sports leagues would be allowed to enter into all sorts of anticompetitive agreements merely by including those provisions in OTA television contracts. As the Third Circuit recognized in *Shaw*, "to adopt the construction urged by the NFL [] would allow the exception to swallow the rule: a sponsored telecast to a limited geographic area would secure an antitrust law exemption for nationwide sales." 172 F.3d at 302. The same would happen under Defendants' current theory. Defendants may not use the SBA as a shield to expand the limited protection provided by the

---

[13] *See, e.g., Relevent Sports LLC v. U.S. Soccer Fed., Inc.*, 61 F.4th 299, 309 (2d Cir. 2023) ("A plaintiff challenging an association rule that governs the conduct of members' separate businesses need not allege an antecedent agreement to agree. The promulgation of the rule, in conjunction with the members' 'surrender[ ] ... to the control of the association,' sufficiently demonstrates concerted action.") (quoting *Associated Press v. United States*, 326 U.S. 1, 19 (1945)).

SBA and engage in precisely the anticompetitive conduct—the collective sale of *paid* telecast rights—that Congress left subject to challenge under the antitrust laws.

## II.   As the Ninth Circuit Has Held, Defendants Are Not a Single Entity, Including When Licensing Telecasts.

Having just argued that the SBA protects the combining of the teams' telecast rights, Defendants reverse course and argue that the League and teams are a single entity "*incapable* of concerted action." Defs' Mem. at 12. Leaving aside this obvious inconsistency (if the NFL Defendants were in fact a single entity, there would have been no need for Congress to have passed the SBA), the Ninth Circuit has already rejected each of the Defendants' arguments. *See NFLST*, 933 F.3d at 1153–55. Defendants never cite these holdings let alone explain how they are not controlling.

The Ninth Circuit examined the legal and factual history of NFL telecasts and on that basis rejected the Defendants' argument that "the production of the telecasts necessarily requires joint action[.]" *Id*. at 1153. It observed that "[i]n the absence of a legal requirement that the NFL teams, NFL, and broadcasters coordinate in filming and broadcasting live games, the Los Angeles Rams (for instance) could contract for their own telecast of Rams games and then register [the copyright for] the telecasts for those games with the Rams (and perhaps the team against whom they are playing)," *id*. at 1154, which, the Court noted, was what NFL teams did before the inception of the challenged agreements and the SBA, *see id*. at 1144. "Thus, we reject the defendants' argument that *American Needle* is inapposite; here, like in *American Needle*, the agreements not to compete concern separately owned intellectual property, and impose an unlawful restraint on independent competition." *Id.* at 1154 (citation omitted).

This holding was based on the Ninth Circuit's exhaustive review of court factual findings and congressional testimony. "In the 1950s, the right to telecast NFL games was 'controlled by individual teams,' which independently licensed the tele-

1   casts of their games to television networks." *Id*. (quoting the findings of fact—after

2   trial—in *U.S. Football League v. NFL*, 842 F.2d 1335, 1346 (2d Cir. 1988)).[14]

3       The Ninth Circuit also quoted the findings of Congress that "'[b]y the late

4   1950s, eleven individual teams had signed contracts with the Columbia Broadcast-

5   ing System; two teams—Baltimore and Pittsburgh—had signed contracts with the

6   National Broadcasting Company; and one team—Cleveland—had organized its

7   own network.'" *Id*. at 1145 (quoting H.R. Rep. No. 93-483 at 4 (1973)).

8       Defendants now claim that this "appeal to history actually turns out to be ev-

9   idence of the historical operation of the NFL and its member teams as a single enti-

10  ty for the purpose of producing telecasts." Defs' Mem. at 16–17. This argument,

11  which ignores both history and the record evidence, is based entirely on the De-

12  fendants' misleading and selective quotation from an economics treatise quoted in

13  one of Plaintiffs' expert's report, which when read in full shows that the league was

14  *not* historically a single entity: "In 1956, CBS became the first network to broadcast

15  an entire season of professional football on network television. After reaching an

16  initial agreement with Commissioner Art Bell for approximately one million dol-

17  lars, CBS *still needed to negotiate contracts with each team independently*, which it

18  managed to do." *See* Rascher Report ¶ 77 (emphasis added). Defendants claim that

19  this shows they were historically a single entity because there was an "initial

20  agreement" with the NFL Commissioner, but if Defendants were operating as a sin-

21  gle entity, CBS would not have had to negotiate separate contracts "with each team

22  independently." The fact that the league also signed simply reflects that the *League*

---

[14] The NFL's expert, B. Douglas Bernheim, himself admits that NFL teams sold their broadcast rights individually from 1939 to 1960. *See* Dkt. 956-10 (Bernheim Rpt.) ¶¶ 163–64. In 1960, as the Ninth Circuit recounted, the NFL first adopted a horizontal agreement to collectively pool television rights, which was struck down as an antitrust violation in *United States v. NFL*, 196 F. Supp. 445 (E.D. Pa. 1961). *See NFLST*, 933 F.3d at 1145.

is a separate entity, which no one disputes; not that the league and its 32 teams are a *single* entity.[15]

As Prof. Elhauge, Plaintiffs' expert, testified, the NFL would have every in-centive to agree (as an entity controlled by the 32 teams) to allow its trademarks to be telecast. *See* Leckman Decl. Ex. 3 (Elhauge Dep. Tr.) at 128:15–23 ("Q. Would the New England Patriots have the right to display NFL logos in their game without consent of the NFL? A. No. I think the NFL would own their trademarks. So the logo of the NFL couldn't be shown without their agreement, but the NFL would have incentives to have its logo shown in those games because it wants to promote its brands and because all the teams after all control the NFL."). Defendants' claim that Plaintiffs have failed to offer "a single example where a telecast of a sporting event was produced over the objection of the participating teams," Defs' Mem. at 15, is therefore backwards. The point is that teams, operating independently, can reach agreements even when the telecast rights are not owned by a single entity. Notre Dame, for example, sells its telecast rights independently and has no trouble reaching agreements with the NCAA or the teams its plays over the exhibition of their respective trademarks. *See, e.g.*, AUF ¶¶ 81–82. Indeed, in any given football telecast, dozens of trademarks are exhibited on the screen—including in-stadium advertising and a legion of equipment sponsors—and no one is contending that the joint conduct of these entities is essential for a telecast to be created.[16]

---

[15] The claim that history proves the League is a single entity is also undercut by the 1961 injunction preventing Defendants from consolidating the teams' rights prior to the SBA's passage. *See United States v. NFL*, 196 F. Supp. 445, 447 (E.D. Pa. 1961) (holding that "by agreement, the member clubs of the League have eliminat-ed competition among themselves in the sale of television rights to their games").

[16] Defendants' legal framing is also wrong because the Supreme Court has held that the antitrust laws apply even when the league and teams need to cooperate in some fashion. *See American Needle*, 560 U.S. at 199 n.7 ("Of course the NFL produces NFL football; but that does not mean that cooperation amongst NFL teams is im-mune from §1 scrutiny. Members of any cartel could insist that their cooperation is necessary to produce the 'cartel product' and compete with other products.").

Beyond the NFL's history, the Ninth Circuit recounted the Supreme Court's holding "that college football teams 'are clearly able to negotiate agreements with whatever broadcasters they choose.'" *NFLST*, 933 F.3d at 1154 (quoting *NCAA*, 468 U.S. at 114 n.53). As this Court recognized in its class-certification decision, the Ninth Circuit held that the arrangements here and the arrangements in *NCAA* are "a close analog." *NFLST*, 2023 WL 1813530, at *8 (C.D. Cal. Feb. 7, 2023). College football games require cooperation between two different teams and one or more governing bodies, just as NFL games do. The schools, the NCAA, and, in many cases, one or more conferences possess trademarks, just as the NFL does. And just as the teams of the NFL are interested in the success of the league as a whole, the Court emphasized that the NCAA plays a similar role with respect to college football, describing it as "the guardian of an important American tradition." *NCAA*, 468 U.S. at 101 & n.23. While a "certain degree of cooperation is necessary" in collegiate football, as it is in the NFL, the "specific restraints on football telecasts that are challenged in this case do not … fit into the same mold[.]" *Id*. at 117.[17]

The Ninth Circuit also credited the findings of other courts that in other professional sports leagues, "'each team owns the initial right to control telecasts of its home games.'" *NFLST*, 933 F.3d at 1154 (quoting *Laumann v. NHL*, 907 F.Supp. 2d

---

[17] Defendants elide the production of a *game* with the selling of a *telecast*, citing to Plaintiffs' experts' unremarkable statements that the cooperation required to schedule and create an NFL *game* (on the field of play) would likely survive Rule of Reason scrutiny. Defs' Mem., 19, 19 n.5. There is no economic connection between the need to create common rules and telecasts. "[A]greements on common game rules and similar matters are needed to have a league that sells sporting competitions, whereas agreements to collectively pool telecast rights are not. … Further, in college football today, the NCAA sets common game rules and similar matters without pooling television rights." Elhauge Rep. at ¶ 23. Defendants again cite to *Spinelli v. NFL*, 96 F. Supp. 3d 81 (S.D.N.Y. 2015) and *Washington v. NFL*, 880 F. Supp. 2d 1004 (D. Minn. 2012); two cases they presented to the Ninth Circuit and that the Ninth Circuit ignored. Neither opinion concerned telecast rights, which do not "fit into the same mold" as other types of cooperation. *NCAA*, 468 U.S. at 117.

465, 473, 485 (S.D.N.Y. 2012)); *see also id.* ("'The copyright of the teleplays of all Red Sox games is owned by the Red Sox.'") (quoting *New Boston Television, Inc. v. ESPN*, 1981 WL 1374, at *1).

Remarkably, in the face of this well-documented factual and legal history, which the Ninth Circuit meticulously recounted, Defendants once again claim they are a single entity. The argument must once again fail.

## III.    As the Ninth Circuit Has Held, Plaintiffs Are Direct Purchasers

Defendants next argue that Plaintiffs do not have antitrust standing pursuant to the "direct purchaser" rule set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). This is yet another issue the Ninth Circuit resolved against Defendants, *see NFLST*, 933 F.3d at 1156-58, which they now seek to circumvent with the frankly bizarre claim that DirecTV did not participate in the conspiracy.

*Illinois Brick* addressed a situation in which a cartel sells something at supracompetitive prices to direct purchasers, who resell that product and pass on some of their injury to indirect purchasers further downstream. In those cases, the indirect purchasers lack antitrust standing to recover for their passed-on overcharge. The direct purchasers initially bore the full brunt of the antitrust injury, and are presumed to have adequate incentives to sue, even though they may have passed on some of the injury. *Illinois Brick* reasoned that allowing suits by direct and indirect purchasers would require complicated inquiries into the extent to which the inflated prices were passed on. 431 U.S. at 732–33.[18]

---

[18] *Illinois Brick* is a limitation only on seeking passed-through damages. It has no bearing on injunctive claims, which Plaintiffs also assert here. *See NFLST*, 933 F.3d at 1161 n.2. "[T]he challenged conduct driving this antitrust case remains ongoing, without a commitment from Defendants that it will end. Indeed, at the hearing, the parties acknowledged that, at the end of the 2022-2023 football season, Sunday Ticket will be moving to Google-owned YouTube, behind a subscription paywall." *NFLST*, 2023 WL 1813530 at *14. We now know that the price of NFLST on YouTube is *increasing* to between $349 to $389 for YouTube TV subscribers and between $449 and $489 for non-YouTube subscribers. AUF ¶ 219. ████████

*Illinois Brick* plays no role in this case because Plaintiffs are *direct* purchasers. The NFL's assertion that it is "undisputed that Plaintiffs are indirect purchasers," Defs' Mem. at 20, is simply wrong. Plaintiffs have never claimed that their theory of damages is that Defendants overcharged DirecTV and then DirecTV passed on some of that overcharge to Plaintiffs. Plaintiffs' injuries are a direct result of Defendants' and DirecTV's exploitation of their monopoly over OOM telecasts. Plaintiffs are *directly* harmed because Defendants' agreements restrained competition between Sunday Ticket and the OOM telecasts that would have been available from Defendants, enabling Sunday Ticket's supracompetitive prices.

The Ninth Circuit agreed that Plaintiffs had adequately alleged that the contracts "work together as a single conspiracy to limit the output of NFL telecasts," which "in turn results in prices for out-of-market games being higher than they would be in the absence of the conspiracy." *NFLST*, 933 F.3d at 1157. "Even though DirecTV is the immediate seller to the plaintiffs, the plaintiffs' allegation that they were *directly* injured by the conspiracy among the NFL teams, the NFL, and DirecTV is sufficient to allege antitrust standing …" *Id.* (emphasis added).

Now, for the first time, Defendants claim that Plaintiffs cannot prove these allegations because they "cannot prove a conspiracy involving DirecTV." Defs' Mem. at 21. This argument is inexplicable given that no one disputes that DirecTV was granted a monopoly over OOM telecasts pursuant to the interrelated agreements and that the monopoly could only be possible if the teams, the NFL, and the networks agreed not to distribute competing OOM telecasts. The primary evidence of these interlocking agreements not to compete are the agreements themselves. *See* AUF ¶¶ 190, 207–11. The NFL-Teams agreement consolidates would-be competing telecasts in the NFL. AUF ¶ 150. ████████████████████████████

████████████████████████ Defendants, in other words, continue to insist on price and distribution conditions to limit the number of OOM telecast viewers. *Id.* ¶ 244.

1

2

3

4

5

6

7 Discovery has con-

8 firmed the very allegations that the Ninth Circuit held would suffice to establish

9 that Plaintiffs are *directly* injured.

10 Ignoring the Ninth Circuit's holding that these agreements must be analyzed

11 collectively, Defendants segregate their agreement with DirecTV and claim that the

12 teams are not part of the conspiracy because they are not signatories to that agree-

13 ment. Defs' Mem. at 21–22. As an initial matter, this is irrelevant. While the NFL,

14 acting as the agent for the teams, may have signed the agreement, any agreement

15 between the league and DirecTV would mean little without the teams' attendant

16 agreement not to offer competing OOM telecasts. *See NFLST*, 933 F.3d at 1148

17 ("The consequence of this agreement is that an individual team cannot enter into

18 individual agreements with networks, satellite TV providers, or internet streaming

19 services. Instead, only the NFL can enter into an agreement to sell those rights.").

20 It also does not matter that the NFL, rather than the 32 teams, entered into the

21 exclusive deal with DirecTV, given that the NFL is an "instrumentality" of the

22 teams. *See Am. Needle*, 560 U.S. at 201 ("[D]ecisions by NFLP regarding the

23 teams' separately owned intellectual property constitute concerted action" because

24 it is "'an instrumentality' of the teams."); *see also, e.g., Relevent Sports*, 61 F.4th at

25 309.

26 It is also factually incorrect that the teams play no role in the DirecTV deal as

27 they, by the NFL's own admission, "ratify those agreements." Defs' Mem. at 22.

28 The Ninth Circuit has already held that if Plaintiffs could prove ratification of this

sort (a fact the NFL now concedes and discovery confirmed[19]), they would have proven a horizontal restraint that restricts output: "According to the complaint, the NFL members vote to approve the contract between DirecTV and the NFL. Therefore, the complaint adequately alleges that the Teams-NFL Agreement is a 'horizontal restraint – an agreement among competitors' that 'places an artificial limit on the quantity of televised football that is available [for sale] to broadcasters and consumers.'" *NFLST*, 933 F.3d at 1152 (quoting *NCAA*, 468 U.S. at 99).[20]

Defendants also claim that there is "no evidence of a conspiracy involving DirecTV and the NFL," because the "Sunday Ticket agreement is a standard exclusive licensing agreement." Defs' Mem., 22–23. This again ignores the fact that the Ninth Circuit's decision requires the combined effect of the agreements to be examined together and not in isolation. *NFLST*, 933 F.3d at 1152. The evidence shows that Defendants made the deal with DirecTV *specifically because* an exclusive deal with DirecTV would not expand OOM telecast output in a way that would jeopardize the massive rights fees that the networks pay the NFL. AUF ¶¶ 231–36. ▮

▮

▮

Accordingly, while discovery has revealed that the NFL's claim that it plays no role in the price or composition of the Sunday Ticket package is false, *see* AUF ¶ 245, that involvement is not the primary output limitation. The primary output limitation was the agreements among the teams, DirecTV, and the networks to *only* make OOM telecasts available to the limited universe of DirecTV subscribers.

---

[19] *See, e.g.*, AUF ¶¶ 149–49, 191; *see also id.* ¶ 27.

[20] Defendants assert that the owners "take such actions on behalf of the League as a whole" as if their own interests were irrelevant. Defs' Mem. at 22. The owners take such actions because they believe they can earn more money as monopolists than as competitors. As the Supreme Court has held that the clubs are nominally acting in the interest of the League is irrelevant because "that commonality of interest exists in every cartel." *Am. Needle*, 560 U.S. at 201 (internal quotation removed).

Competing OOM telecasts, which would have constrained the price of Sunday Ticket, did not exist because of those agreements. Plaintiffs were thus forced to pay supracompetitive prices, a direct injury that confers antitrust standing.

## IV.   As the Ninth Circuit Has Held, the Court May Not Consider the DirecTV Agreement in Isolation.

Defendants' final argument mimics its standing argument, asking the Court to excise the DirecTV agreement from the other agreements and analyze it separately. The Ninth Circuit's decision precludes such an approach. *See NFLST*, 933 F.3d at 1152 ("Contrary to the defendants' argument, we are required to take a holistic look at how the interlocking agreements actually impact competition.").

As they did before the Ninth Circuit, Defendants pitch the DirecTV agreement as a vanilla arrangement between a single seller and single outlet operating in a competitive market. This gets both sides of the arrangement wrong.

*First*, the NFL is not a single seller. The DirecTV arrangement sets and reinforces horizontal restraints that prevent the teams from offering OOM telecasts in competition with Sunday Ticket. The NFL has offered no precedent supporting the claim that horizontal agreements that impose downstream exclusionary restraints are procompetitive, let alone legal as a matter of law. Nor could they, as the Supreme Court has held that an exclusive vertical agreement made with horizontal competitors would be antitrust violation. *NCAA*, 468 U.S. at 109 n.39 ("[A] court would not hesitate in enjoining a domestic selling arrangement by which, say, Ford and General Motors distributed their automobiles nationally through a single selling agent."). "Decisions by NFL teams to license their separately owned trademarks collectively and to only one vendor are decisions that deprive the marketplace of independent centers of decisionmaking, and therefore of actual or potential competition." *Am. Needle*, 560 U.S. at 197 (citation removed).[21]

---

[21] Plaintiffs are not claiming that intellectual property holders "must take all comers," Defs' Mem. at 25; they are claiming that the League may not prevent intellectual property holders (the individual teams) from taking the comer they would in-

23

*Second*, DirecTV is not operating in a competitive environment. The reason why antitrust laws often allow exclusive licensing deals is because they can promote *interbrand* competition. *See Cont'l T.V., Inc. v. GTE Sylvania Inc*., 433 U.S. 36, 53 (1977). But DirecTV is not representing one team's broadcasts in competition against other distributors representing other teams. Rather, DirecTV's exclusivity has *prevented* interbrand competition between the separate teams' telecasts.[22]

The NFL's final argument is that the creation of NFLST was "output-expanding" because "[p]rior to 1994, the NFL-Network Agreements did not permit distribution of telecasts of Sunday afternoon NFL games beyond those broadcasted in-market by CBS and Fox." Defs' Mem. at 25. Even if those earlier agreements were protected by the SBA (and because they prevented telecasts beyond the SBA's narrow exemptions they would not be), Defendants are asking the Court to compare output now versus output before 1994. That is not how a but-for-world analysis works. Plaintiffs are not challenging the creation of Sunday Ticket in the abstract. Plaintiffs are challenging restraints that prevented the addition of other competitive market options. The fact that adding Sunday Ticket increased output over past levels is entirely consistent with the fact that the challenged restraints decreased output

---

dependently choose in a world without the restraints. *See NFLST*, 933 F.3d at 1154 ("the Los Angeles Rams (for instance) could contract for their own telecast of Rams games and then register the telecasts for those games with the Rams (and perhaps the team against whom they are playing). Only the agreements that are the subject of plaintiffs' antitrust action prevent such independent actions.").

[22] Defendants cite *E & L Consulting, Ltd. v. Doman Indus. Ltd*., 472 F.3d 23 (2d Cir. 2006) to claim that vertical arrangements are "presumptively legal," Defs' Mem. at 24, but neglect to mention that the Second Circuit emphasized it was evaluating a "run-of-the-mill" exclusive vertical agreement. Likewise, *Parrish v. NFL Players Ass'n*, 534 F. Supp. 2d 1081 (N.D. Cal. 2007) held that "the mere existence" of an exclusive deal would not typically threaten competition and *Levi Case Co. v. ATS Prod., Inc*., 788 F. Supp. 428 (N.D. Cal. 1992) noted that an "exclusive license, *by itself*," would not normally be illegal. As the Ninth Circuit held, that "run-of-the-mill" circumstance is not the situation here. *NFLST*, 933 F.3d at 1151.

1  relative to competitive levels. *See* ABA Section of Antitrust Law, Proving Antitrust

2  Damages: Legal and Economic Issues 89 (3d ed. 2017) ("The purpose of this analy-

3  sis is to isolate the effects of the challenged conduct so as to ascertain what would

4  have happened 'but for' the defendant's unlawful activities.").

5      Far from increasing output, Defendants and their television partners manipu-

6  lated the NFL telecast market to limit the output that would have existed absent the

7  restraints. To watch the telecasts they preferred to watch, class members had to sub-

8  scribe to DirecTV and pay hundreds of additional dollars (and many thousands in

9  the case of commercial subscribers) each year for Sunday Ticket. *See* AUF ¶ 217.

10  This had the intended effect of making it so that fewer fans watched these games

11  than otherwise would. This is not only Plaintiffs' position in this litigation. It also is

12  Defendants' position, ███████████████████████████████

13  ████████████████████████████████████████████

14      In addition to the reduction in quantity, DirecTV's exclusivity diminished

15  quality by making telecast availability unresponsive to consumer preference. By de-

16  sign, the restraints force a limited subset of games to be aired in a given market. If

17  OOM content were more widely available, consumer welfare would increase be-

18  cause many fans currently left with the choice to watch a less desired telecast (or

19  not watch at all), would instead be able to watch their first-choice telecast.

20      These are core antitrust injuries. *See NCAA*, 468 U.S. at 106-07 (holding that

21  the "anticompetitive consequences of this arrangement are apparent. Individual

22  competitors lose their freedom to compete. Price is higher and output lower than

23  they would otherwise be, and both are unresponsive to consumer preference.").

### CONCLUSION

24

25  The Court should deny Defendants' motion for partial summary judgment.

26

27

28

Dated: August 28, 2023                    Respectfully submitted,

By:   */s/ Marc M. Seltzer*
                             Marc M. Seltzer

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)

1

fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27