Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | Case No.: 2:15-ml-02668−PSG (JEMx)<br><br>**STATEMENT OF GENUINE ISSUES AND ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE NFL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>JUDGE: Hon. Philip S. Gutierrez<br><br>DATE: October 27, 2023<br>TIME: 1:30 p.m.<br>COURTROOM: First Street Courthouse<br>350 West 1st Street<br>Courtroom 6A<br>Los Angeles, CA 90012 |

# TABLE OF CONTENTS

I.     Plaintiffs' Statement of Genuine Issues in Response to the NFL's Proposed Statement of Undisputed Facts ........................................................... 2

II.    Plaintiffs' Statement of Additional Undisputed Facts ................................. 94

       A.    The Operation of the NFL Clubs and the NFL .................................. 94

       B.    The Clubs' Pooled Their Telecast Rights ........................................... 96

       C.    The NFL-Networks Sunday Afternoon Agreements ........................ 109

       D.    The NFL-DIRECTV Sunday Ticket Agreement ............................. 121

       E.    The NFL's Role in Limiting the Output of NFL Sunday Ticket ....................................................................................... 124

       F.    The NFL's Role in Setting the Price of NFL Sunday Ticket .......... 130

       G.    Plaintiffs' Theory of the Case Remains Consistent ........................ 136

## I. Plaintiffs' Statement of Genuine Issues in Response to the NFL's Proposed Statement of Undisputed Facts

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
| --- | --- |
| 1.    The National Football League ("NFL") is a membership association of 32 NFL member clubs.<br><br>Support: Kilaru Decl. Ex. 1 (NFL Const.) § 3.1(A) | Admit that Section 3.1(A) of the NFL Constitution limits membership in the National Football League to 32 member clubs.<br><br>Dispute the characterization of the NFL as a "membership association" as undefined, vague and ambiguous, and otherwise inaccurate. The NFL is a taxable for-profit entity. See Leckman Decl. Ex. 1 (NFL Const.), 2015 Resolution FC-3. |
| 2.    The NFL member clubs are separately owned.<br><br>Support: Kilaru Decl. Ex. 1 (NFL Const.) § 2.1(A) | Admit. |
| 3.    The 32 NFL member clubs compete against each other in football games organized by the NFL.<br><br>Support: Kilaru Decl. Ex. 1 (NFL Const.) art. XIX. | Admit. |
| 4.    The National Football League Constitution and Bylaws ("NFL Constitution") set forth contractual provisions governing the relationship between the NFL and its member clubs. | Admit that the NFL Constitution sets forth provisions governing the relationship between the NFL and its member clubs. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| Support: Kilaru Decl. Ex. 1 (NFL Const.) arts. I–XXV | |
| 5.    An NFL game requires the participation of two clubs and the NFL.<br><br>Support: Kilaru Decl. Ex. 1 (NFL Const.) arts. 13.2, 19.2–19.11; ████ | Admit that an NFL game requires the participation of two clubs.<br><br>Dispute that a game requires the participation of the League, a proposition that is neither reflected in the cited provisions of the NFL constitution ████ |
| 6.    The NFL Constitution provides that "member clubs participating in any game are authorized to telecast and broadcast such game anywhere," except that (i) no club can permit the telecast of a game into the home territory of another club playing at home, (ii) no game can be telecast within the home territory of a club playing at home except by agreement of the participating clubs, and (iii) each club playing at home grants the visiting club the exclusive right to telecast that game within the visiting club's home territory. | Admit. |

3

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| <u>Support</u>: Kilaru Decl. Ex. 1 (NFL Const.) § 10.2 | |
| 7.      The NFL Constitution further provides that "[a]ny contract entered into by any club for telecasting or broadcasting its games . . . must be approved in writing by the Commissioner in advance of such telecast or broadcast."<br><br><u>Support</u>: Kilaru Decl. Ex. 1 (NFL Const.) § 10.1. | Admit. |
| 8.      The NFL hires game officials and support staff necessary to produce an NFL game.<br><br><u>Support</u>: Kilaru Decl. Ex. 1 (NFL Const.) arts. VIII, XXI; ▇▇▇▇▇ ▇▇▇▇▇▇▇▇ | Admit that Article VIII of the NFL Constitution provides that "The Commissioner shall select … all game officials for all preseason, regular season, and postseason games" that "[a]ll fees and traveling expenses of game officials shall be paid by the League after approval by the Commissioner," and that Article XXI states that "the Commissioner shall select all persons to officiate at the Conference Championship games."<br><br>Dispute that the NFL's hiring of officials and support staff is "necessary" to produce an NFL game, a proposition for which the NFL proffers no support. The cited paragraphs of Dr. Rascher's |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | report states only ███████████████ ██████████████████████ ██████████████████████ ██████████████████████ █████████████ ████████ |
| 9.      The NFL engages in multi-employer bargaining to establish processes for hiring players who comprise the member clubs that compete in the games.<br><br>Support: Kilaru Decl. Ex. 1 (NFL Const.) arts. VIII, XII, XIV, XV; ████████████████████ █████ | Admit that the NFL Constitution establishes certain processes for the hiring of players.<br><br>Dispute the NFL's characterization of those processes as "multi-employer bargaining" as undefined, vague and ambiguous, and not supported by the NFL Defendants' proffered evidence. |
| 10.      The rules of NFL football games are established by the League.<br><br>Support: Kilaru Decl. Ex. 1 (NFL Const.) art. XI; ████████████ ██████████ | Admit. |
| 11.      The NFL provides officiating personnel for NFL football games.<br><br>Support: Kilaru Decl. Ex. 1 (NFL Const.) art. 8.7 | Admit. |
| 12.      The NFL sets the game schedule for the 272 games in the regular NFL season. | Dispute that the NFL determines the schedule in a unilateral fashion. The NFL coordinates with its broadcast |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| Support: Kilaru Decl. Ex. 1 (NFL Const.) arts. XIII, XIX; ███████████████████████ | partners in the formulation of the game schedule. The 2006 Resolution BC-1 requires each club, with proper notice, to switch Sunday regular season games between 1:00 and 4:15 pm (Eastern Time) and to approximately 8:15 P.M. (Eastern Time) to accommodate television broadcasting patterns. Leckman Decl. Ex. 1 (NFL Const.), at 2006 Resolution BC-1. Both CBS and Fox have the contractual right ██████████████████████████ |
| 13. The NFL considers fan engagement and overall interest in the League when setting its game schedule.<br><br>Support: ████████████████████████████ | Admit that the fan's engagement and overall interest in the League are aspects that the NFL considers when setting its game schedule in coordination with its broadcast partners.<br><br>Dispute that fan engagement and overall interest in the League are the predominant considerations the NFL considers when setting its game schedule. The NFL's schedule is dictated in large part by the NFL's contracts with its broadcast partners, and by those broadcast partners themselves. ██████████████████ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| |  |
| 14. The NFL regular season culminates in postseason playoff games and the Super Bowl title game.<br><br>Support: Kilaru Decl. Ex. 1 (NFL Const.) arts. XX, XXI, XXII; ▮▮▮▮▮ | Admit. |
| 15. The average Super Bowl viewership during the class period has exceeded 100 million viewers per year. | Admit. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| Support: Kilaru Decl. Ex. 43 (Super Bowl Ratings History (1967-present), Sports Media Watch (2022)) | |
| 16.     Telecasts of NFL games display the trademarks and intellectual property of both participating clubs.<br><br>Support: ███████████████ | Admit. |
| 17.     Telecasts of NFL games also display the trademarks and intellectual property of the League, such as the NFL shield and game highlights.<br><br>Support: ███████████████ | Admit that the telecasts of NFL games by CBS and Fox display the NFL game shield and game highlights.<br><br>Dispute that "game highlights" constitute the intellectual property of the League, rather than the participating clubs, a proposition for which the Defendants offer no support. Dr. Rascher testified only that the ability to show highlights and the NFL shield would benefit NFL clubs if they were permitted to market their own telecast rights. ███████████████<br><br>Neither cited |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | provision of the CBS and Fox contracts establishes that game highlights are the intellectual property of the League. |
| 18.    Radio broadcasting does not implicate visual trademarks the way telecasting does.<br><br>Support: ███████████████<br>████████ | Admit only to the extent that and with the clarification that Dr. Elhauge testified at the cited location only that a consumer of a radio broadcast of an NFL game would not see any logos. |
| 19.    "[J]oint conduct [is] involved in creating [the] value of an NFL football game."<br><br>Support: ███████████████<br>███████████████ | Dispute to the extent that his fact implies that joint conduct among all thirty-two NFL teams or a substantial number of NFL teams is necessary to create value for an NFL football game, or that all thirty-two NFL teams or a substantial number of NFL teams are "involved in creating the value of an NFL football game." It is also disputed on the basis that "value" is undefined, vague and ambiguous |
| 20.    NFL games are made more valuable by the fact that each game is part of an NFL season and part of a process that determines which teams are going to make the playoffs.<br><br>Support: ████████████<br>████████ | Dispute on the basis that "valuable" is undefined, vague and ambiguous. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| 21.   No individual club or pair of clubs can create a season of NFL games.<br><br>Support: ███████████████ | Disputed. ███████████, Dr. Elhauge opined that two teams could create a season of games. |
| 22.   No individual club holds the rights necessary to create an NFL telecast.<br><br>Support: ███████████████ | Disputed. Dr. Rascher testified only that both the home and visiting teams would have to give "consent" to telecast a game between those two teams, which would be understood if one team was to play another that was telecasting the game. |
| 23.   No NFL game broadcast can be licensed without the consent of the NFL and participating teams.<br><br>Support: ███████████████ | Disputed. The League is permitted to license broadcasts of regular-season and postseason NFL games only because each of the 32 NFL Clubs has ceded all its telecast broadcast rights to the League. ███████████████ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | While each of the 32 NFL Clubs has ceded all its telecast broadcast rights to the League, and only the League is permitted to license broadcasts of regular-season and postseason games, each of the 32 NFL Clubs nevertheless originally owns the telecast rights to their games. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | ██████████████████████████ |
| 24.   The bulk of the NFL's revenues come from its media rights.<br><br>Support: ████████████████ | Dispute the NFL's characterization of their media rights making up the "bulk" of their revenues as vague, ambiguous, and unsupported by the evidence. Mr. Rolapp testified only that television rights are a "very important component" of the "NFL's business model." |
| 25.   The NFL's national revenues, including that from "media and television and sponsorship," is equally shared between the 32 member clubs.<br><br>Support: ████████████████ | Admitted that the NFL's national media, television and sponsorship revenues are shared equally across all 32 teams.<br><br>Dispute that any other "national revenues" are distributed in the same manner, as neither of the documents cited by the NFL references the sharing of revenues other than those deriving from media, television, and sponsorship. |
| 26.   There is no written agreement between the NFL and the 32 member clubs that grants the NFL the exclusive right to license NFL telecasting rights.<br><br>Support: ████████████ | Disputed. The agreement to pool the clubs' rights to license telecasts of their games is enshrined in various provisions of the NFL Constitution and bylaws. *See* Leckman Decl. Ex. 43 (Exhibit 6 to Schroeder 30(b)(6) Dep.) (summary document of constitutional provisions introduced at deposition of the NFL's |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | 30(b)(6) representative Hans Schroeder). |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  |  |
| 27.   The NFL acts as agent for member clubs in negotiating and executing agreements to license telecast rights, and member clubs vote on resolutions ratifying those agreements.<br><br>Support: *E.g.*, Kilaru Decl. Ex. 1 (NFL Const.) NFL 1998 Resolution BC-1; NFL 1998 Resolution BC-2; NFL 2004 Resolution BC-4; NFL 2009 Resolution BC-1A; NFL 2011 Resolution BC-2; NFL 2014 Resolution BC-1; NFL 2015 Resolution BC-1 | Admit that certain broadcasting agreements between the NFL and the Networks operative during the class period state that the NFL "acts as agent" for the NFL Clubs in negotiating and executing agreements to license telecast rights.<br><br>Whether the NFL "acts as agent" for the NFL Clubs, or whether the NFL and the NFL Clubs have established an agency relationship with respect to the licensing of telecast rights is an improper and unsubstantiated legal conclusion. *See,* |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | *e.g., Ironwood Country Club v. Liberty Ins. Underwriters, Inc.,* 2014 WL 12558790, at *8 n.25 (C.D. Cal. Mar. 24, 2014) (excluding legal conclusions from undisputed statement of facts); *Cambridge Elecs. Corp. v. MGA Elecs., Inc.,* 227 F.R.D. 313, 317 (C.D. Cal. 2004) (same). |
| 28.    During the class period, the NFL, | |
| 29.    The FOX Agreements provide for the production of telecasts for the NFC teams' regular season Sunday afternoon games. | Disputed. The Fox Agreements effective during the class period provide |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| Support: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| 30.   The   2006   FOX   Agreement initially covered the 2006 through 2011 NFL seasons and was extended to include the 2012 and 2013 NFL seasons.<br><br>Support: ▓▓▓▓▓▓▓▓▓▓▓▓ | Admit. |
| 31.   The   long-form   2015   FOX Agreement covered the 2014 through 2022 NFL seasons.<br><br>Support: Kilaru Decl. Ex. 11 (NFL-FOX 2015 Agreement) § 14.1 | Admit. |
| 32.   The CBS Agreements provide for the production of telecasts for the AFC teams' regular season Sunday afternoon games. | Disputed.   The   CBS   Agreements effective during the class period provide ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| Support: ▮▮▮▮▮▮ | ▮▮▮▮▮ |
| 33. The 2006 CBS Agreement initially covered the 2006 through 2011 NFL seasons and was extended to include the 2012 and 2013 NFL seasons.<br><br>Support: ▮▮▮▮ | Admit. |
| 34. The 2014 CBS Agreement covered the 2014 through 2022 NFL seasons.<br><br>Support: Kilaru Decl. Ex. 12 (NFL-CBS 2014 Agreement) § 14.1 | Admit. |
| 35. ▮▮▮▮▮ | ▮▮▮▮ |



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | It is further disputed that the agreements proffered by the NFL Defendants set forth the complete terms of the parties' understandings and agreements. |
| 36. | Admit. |
| 37. | Admit only that the 2006 agreement between the NFL and CBS so provides. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | It is disputed generally that the agreements proffered by the NFL Defendants set forth the complete terms of the parties' understandings and agreements. |
| 38. | Disputed. Section 1.1(a) of the 2014 NFL-CBS agreement permits CBS

It is further disputed that the agreements proffered by the NFL Defendants set forth the complete terms of the parties' understandings and agreements. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| 39.  | Disputed. Section 1.1(a) of the 2006 Fox-NFL agreement permits Fox [redacted] It is further disputed that the agreements proffered by the NFL Defendants set forth the complete terms of the parties' understandings and agreements. |
| 40. [redacted] | Disputed. Section 1.1(a) of the 2015 NFL-Fox agreement permits Fox [redacted] |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | It is further disputed that the agreements proffered by the NFL Defendants set forth the complete terms of the parties' understandings and agreements. |
| 41.    Once the telecasting rights from the NFL have been transferred to CBS and FOX, the respective broadcast networks produce live game broadcast feeds for Sunday afternoon games.<br><br>Support: Kilaru Decl. Ex. 15 (Rolapp Dep. Tr.) 100:10–13; | Admit that CBS and Fox have obtained the rights to telecast live NFL Games and use those rights to produce live broadcast feeds for Sunday afternoon games.<br><br>Dispute that the telecasting rights originate "from the NFL." The telecasting rights originate with the NFL teams. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | That the telecasting rights originate with the NFL teams is further confirmed by other documentary and testimonial evidence. |

24

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | █████████████████████ |
| 42.   CBS and FOX broadcast their Sunday afternoon game feeds over free, over-the-air television in local markets through affiliated stations.<br><br>Support: Kilaru Decl. Ex. 15 (Rolapp Dep. Tr.) 100:14–101:15; █████████████████████ | Disputed. In a typical NFL week, most CBS and Fox feeds are not "broadcast … in local markets." Of the 12 or 13 Sunday-afternoon games for which CBS and Fox produce feeds, generally only two to four games are "broadcast" in any local market.<br><br>It is further disputed that access to such stations is free to all consumers. Cable and satellite providers pay retransmission fees to Fox and CBS (and/or their affiliates) for the rights to carry those stations in particular markets, and consumers who obtain their games through a cable and satellite provider pay their provider for the ability to watch the content broadcast by Fox and CBS (and/or their affiliates). █████████████████████ |
| 43.  █████████████████████ | Admit. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | |
| 44. | Admit. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | |
| 45. | Admit. |

27

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | |
| 46. | Admit that these agreements so provide. Dispute to the extent it implies that the copyrights are necessarily owned by the NFL and could not be owned by a telecasting club. *See, e.g.*, *In re National Football League Antitrust Litig.*, 933 F.3d 1136, 1154 (9th Cir. 2019). It is further disputed that the agreements proffered by the NFL Defendants set forth the complete terms of the parties' understandings and agreements. |
| 47. | Admit that the contracts so provide. Dispute the implication that the NFL enjoyed discretion to determine the terms and conditions of the resale |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | package. The networks and the NFL agreed that Sunday Ticket would be marketed as a complementary premium product that would not materially compete with the networks' in-market games. |
| | It is further disputed that the agreements proffered by the NFL Defendants set forth the complete terms of the parties' understandings and agreements. |
| 48. | Admit. |



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | |
| 49. | Admit. |
| | |
| 50. | Admit with the clarification |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | It is further disputed that the agreements proffered by the NFL Defendants set forth the complete terms of the parties' understandings and agreements. |
| 51. | Admit that the agreement so provides. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | |
| 52. | Admit that the agreement so provides. |
| 53. | Admit that the agreement so provides. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| ███████████████████████ | |
| 54.    Prior to 1994, the NFL did not license the rights to telecast out-of-market games.<br><br>Support: ████████████████ ██████ | Dispute that prior to 1994 the NFL Clubs did not license the rights to telecast out-of-market games. Prior to the NFL Clubs' collectivization of their independent telecast rights in 1961, the right to telecast football games was owned and controlled by the individual NFL Clubs; and individual NFL Clubs independently licensed the telecasts of their games to television networks. *See, e.g., NFLST*, 933 F.3d at 1144; *USFL*, 842 F.2d at 1346.<br><br>It is further disputed that any licensing (or refusal to license) occurred at the League level. The telecasting rights originate with the NFL teams. ██████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ |
| 55.    Starting in 1994, the NFL obtained from its broadcast partners the right to resell the networks' broadcasts of NFL games where those games were | Dispute that the NFL "obtained" the "right" to resell the networks' broadcasts from the networks. While Mr. Tagliabue testified that the NFL |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| not being broadcasted in-market by the networks.<br><br>Support: ███████████████ | "owned the right to telecast and broadcast television" and the broadcast partners "owned the rights to broadcast television" and therefore the League had to secure "the agreement of the broadcast partners to retransmit their broadcasts," each 32 NFL Clubs owns the telecast rights to their games. ███████ |
| 56.   After obtaining these Resale rights, the NFL entered into an exclusive agreement with DirecTV to distribute out-of-market NFL games through Sunday Ticket.<br><br>Support: ██████████████ | Admit that in 1994 the NFL entered into an agreement with DirecTV to distribute out-of-market NFL games through Sunday Ticket.<br><br>Dispute that it was exclusive or that the NFL did so "after" obtaining Resale rights. The NFL did not "obtain" the "right" to resell the networks' broadcasts from the networks. ██ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | ■■■■■ |
| 57.    The NFL and DirecTV entered into agreements to license the rights to telecast out-of-market NFL games during the class period.<br><br>Support: ■■■■■ | Admit that the NFL and DirecTV entered into such agreements. Dispute to the extent that the NFL Defendants' proffered fact implies that the NFL Clubs did not also agree to enter into such agreements with DirecTV as the Clubs ratified those agreements and their out-of-market telecast rights were in fact distributed by DirecTV. *See, e.g.*, Leckman Decl. Ex. 1 (NFL Const.), 2003 Resolution BC-1. |
| 58.    The first Sunday Ticket agreement operative during the class period was executed on March 13, 2009, and encompassed the 2011 to 2014 NFL seasons.<br><br>Support: ■■■■■ | Admit. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| 59. The second Sunday Ticket agreement operative during the class period was executed on September 18, 2014, and encompassed the 2015 to 2022 NFL seasons.<br><br>Support: ████████ | Admit. |
| 60. ████████ | ████████ |



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | |



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| |  |
| 62.   The requirement that Sunday Ticket be offered as a weekly package resulted from the settlement agreement in *Shaw v. Dallas Cowboys Football Club, Ltd.* | Admit. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| <u>Support</u>: ████████████████ ████████████ | |
| 63. ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ | Admit. |
| 64.   Plaintiffs   are   commercial   and residential   DirecTV   subscribers   who purchased Sunday Ticket from DirecTV during the class period.<br><br><u>Support</u>: Kilaru Decl. Ex. 26 (Order on Class Certification, Dkt. 894) at 2, 27 | The Court's Order granting Plaintiffs' motion for class certification is an Order that speaks for itself, and Plaintiffs' dispute and characterization thereof by the NFL Defendants. *See* Dkt. 894. |
| 65.   Plaintiffs   did   not   directly purchase Sunday Ticket from the NFL.<br><br><u>Support</u>: See Kilaru Decl. Ex. 26 (Order on Class Certification, Dkt. 894) at 2, 27 | The Court's Order granting Plaintiffs' motion for class certification is an Order that speaks for itself, and Plaintiffs' dispute and characterization thereof by the NFL Defendants. *See* Dkt. 894. |
| 66.   Sunday   Ticket ████████████ ███████████████████████████ | Disputed. ████████████████ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|


| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | |
| 67. | Disputed. |



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | |
| 68. | Disputed. |







| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | premium product for avid fans," that it |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | commensurate with what we think it is, a premium product"). |
| 70.    Starting in the 2023 season, the residential Sunday Ticket package will be distributed on an exclusive basis through YouTube TV.<br><br>Support: Kilaru Decl. Ex. 29 (NFL-Google 2022 Agreement) | Disputed. Google also has the right ███████ |
| 71. ███████ | Disputed. ███████ |



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | ███████████████████████████ |
| 72.   Prior to 1956, the NFL and member clubs agreed to assign broadcast licensing rights to the clubs, | Disputed. ███████████████ ████████████████ CBS had to obtain agreements with the NFL *and* had to |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| though agreements were subject to League approval.<br><br>Support: ▮▮▮▮▮▮▮▮▮ US v. NFL, 116 F. Supp. 319, 327 (E.D. Pa. 1953); NFL Const. art. X | "negotiate contracts with each team independently[.]"<br><br>It is further disputed because Article X of the NFL's Constitution does not support the NFL's proposed fact. While Article X states that "[a]ny contract entered into by any club for telecasting or broadcasting its games … must be approved in writing by the Commissioner in advance of such telecast or broadcast," NFL Clubs independently broadcast their football games prior to the adoption of Article X, during which time the NFL Defendants have offered no evidence to support their claim that telecasting of NFL Clubs' games required the consent of the NFL or the NFL's Commissioner.<br><br>It is further disputed that those broadcasting licensing rights were "assign[ed] … to the clubs." Game broadcast licensing rights belonged to the home teams, and were not "assign[ed]" by "the NFL and member clubs" "to the clubs." ▮▮▮▮▮▮▮▮▮ |



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| 73. ███████████████████████████████████████████ | Disputed. ████████████████████████████████ |
| 74. The MLB and its member teams agree to a division of telecasting rights under which some regular season games are licensed by MLB—so called "national" telecasts.<br><br>Support: ████████████████████ | Disputed to the extent that this proposed fact implies that the rights to telecast games originates in a source other than the game's participating teams. ████████████████████████████ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | |
| 75.   The MLB and its member teams agree to a division of telecasting rights under which regular season games not telecast nationally are assigned to the participants of that game in their respective home territories.<br><br>Support: ██████████████ | Disputed that "telecasting rights … are assigned to the participants of that game in their respective home territories." |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | ██████████████████████████████████████ |
| 76.    The NBA and its member teams agree to a division of telecasting rights under which some regular season games are licensed by the NBA—so called "national" telecasts.<br><br>Support: ████████████████████ | Disputed to the extent that this proposed fact implies that the rights to telecast games originates in a source other than the game's participating teams. ██████████████████████████████████████ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| 77.    The NBA and its member teams agree to a division of telecasting rights under which regular season games not telecast nationally are assigned to the participants of that game.<br><br>Support: ██████████████ | Disputed that "telecasting rights … are assigned to the participants of that game." |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | ████████████████████████ |
| 78.    The NHL and its member teams agree to a division of telecasting rights under which some regular season games are licensed by the NHL—so called "national" telecasts.<br><br>Support: ████████████████████ | Disputed to the extent that this proposed fact implies that the rights to telecast games originates in a source other than the game's participating teams. ████████████████████████ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | ■■■■■■■■■ ■ |
| 79.    The NHL and its member teams agree to a division of telecasting rights under which regular season games not telecast nationally are assigned to the participants of that game within their respective home territories and to the NHL otherwise.<br><br>Support: ■■■■ | Disputed that "telecasting rights … are assigned to the participants of that game in their respective home territories." ■■■■ |
| 80.    In college football, conferences produce college football games for which networks pay telecast licensing fees. | Admitted only that ■■■■ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| Support: ███████████ | ████████████████████████████████<br><br>Disputed to the extent that the NFL's proposed fact implies that the conferences are (or are not), as a matter of economics, the "producers" of college football telecasts. ███████████████████████████████████████████████████████████<br><br>It is further disputed to the extent that "conferences" are not the only entity that "produce" college football games. For example, many college football games that recur year-over-year include teams that are from different conferences or, as in the case of Notre Dame versus USC, include one team that is a member of a college football conference (USC) and one team that is not (Notre Dame). ████████████████████. |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| 81.   In college football, schools license to their conferences most of their individual team rights to their home games and the conferences compete with each other.<br><br>Support: ███████████ | Admitted to the extent that the fact confirms the case that, in college football, individual schools own the telecasting rights to their games.<br><br>Disputed to the extent that this fact implies that, in college football, all schools license to their conferences most of their individual team rights to their home games and the conferences compete with each other. In college football, not all "schools license to their conferences most of their individual team rights to their home games and the conferences compete with each other." For example, neither Notre Dame nor BYU is a member of a college football conference, and both license the rights to their games directly to broadcast networks (like NBC). ██████ ███████████████████████ Indeed, Notre Dame sells its telecast rights independently and has reached agreements with the NCAA and the teams its plays with respect to the exhibition of their respective trademarks. ████████████████ ███████████████████████.<br>Further, some games between schools that are members of college football |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | conferences are licensed directly to a broadcast network (e.g., bowl games or Army versus Navy). ███████ ███████████ |
| 82. Colleges control their telecast rights with coordinated assignment of rights at the level of college conferences.<br><br>Support: ████████████ | Disputed to the extent that the NFL Defendants misrepresent what Dr. Rascher has said. In Paragraph 43 of his report, Dr. Rascher says "colleges control *some* of their telecast rights and coordinated assignment of rights only at the level of competing conferences, while still achieving broad telecast coverage." Here, Dr. Rascher makes clear that, to the extent there is any coordination in the assignment of rights for college football telecasts, that coordination occurs at the conference level or not at all (for regular season telecasts). Disputed to the extent that the NFL Defendants' proposed fact suggests that Dr. Rascher states that all colleges coordinate their telecast rights at the conference level for all telecast rights. As one example, neither Notre Dame nor BYU is a member of a college football conference, and both license the rights to their games directly to broadcast networks (like NBC). ███████████████████. Further, some games between schools that are members of college football conferences are licensed directly to a |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | broadcast network (e.g., bowl games or Army versus Navy). ███████ |
| 83. Plaintiffs' experts have not identified a single example of a sport where teams produce different, nationally competing telecasts of their games.<br><br>Support: ████████████ | Disputed to the extent that this fact implies that Plaintiffs' experts were tasked with "identif[ying] … example[s] of a sport where teams produce different, nationally competing telecasts of their games" or sought out to do so. It is further disputed to the extent that the NFL Defendants' experts have failed to show that no teams have ever "produce[d] different, nationally competing telecasts of their games."<br><br>Disputed further to the extent that the term "produce" is undefined, and vague and ambiguous. In any case, Plaintiffs' experts have discussed instances in which the same game is broadcast or telecast on different networks or platforms. ████████████ |
| 84. Plaintiffs' experts have not offered a single example where a | Dispute to the extent that this fact implies that Plaintiffs' experts were |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| telecast of a sporting event was produced over the objection of one of the participating teams.<br><br>Support: ██████████████<br>████████████ | tasked with "offer[ing] … example[s] where a telecast of a sporting event was produced over the objection of one of the participating teams."<br><br>It is further disputed to the extent that the NFL Defendants' experts have failed to show that the "objection of one of the participating teams" is sufficient to block the production of a telecast of a sporting event. Plaintiffs finally dispute the term "objection" as undefined, vague and ambiguous, and not supported by the proffered evidence. |
| 85. █████████████████ | |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| 86.   All regular-season NFL game telecasts are available for free over-the-air in local markets.<br><br>Support: ███████████████████<br>████████████ | Disputed. In a typical NFL week, most games played are not "available for free over-the-air in local markets." Of the 12 to 14 Sunday-afternoon games for which CBS and Fox produce feeds, only 2 to 4 games are "available" in any local market. ████████████████ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | |
| 87. Other than the NFL, no professional American sports league offers all of their regular-season game telecasts for free over-the-air in local markets. | Disputed. The NFL does not "offer[] all of their regular-season game telecasts for free over-the-air in local markets." In a typical NFL week, the majority of games played are not available "for free |

65

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| Support: ███████████████ ████████ | over-the-air in local markets." In a typical NFL week, through the NFL's agreements with CBS, Fox, and NBC, most consumers have access to 3 or 4 games on over-the-air channels, even though most weeks there are 15 or 16 games played. ███████████ |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | |





| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|









| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | |



| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|







| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| 109. | |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
| --- | --- |
| | |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|













| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|







| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|





| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| 130. | |







| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
| | |
| 139. Advertising and retransmission fees are two major sources of revenue for networks.<br><br>Support: Kilaru Decl. Ex. 33 (McManus Dep. Tr.) 23:3–10; 67:18–22 | Admit. |
| 140. | |

| NFL's Proposed Undisputed Fact | Plaintiffs' Genuine Issues |
|---|---|
|  | |

## II.  Plaintiffs' Statement of Additional Undisputed Facts

### A.  The Operation of the NFL Clubs and the NFL

| Undisputed Fact | Evidentiary Support |
|---|---|
| 141.  The National Football League ("NFL") is a for-profit entity. | ████████████████ <br><br> Leckman Decl. Ex. 1 (NFL Const.), 2015 Resolution FC-3 |
| 142.  Each NFL club, except for the Green Bay Packers, is a for-profit entity. | Leckman Decl. Ex. 1 (NFL Const.) § 3.2. <br><br> Leckman Decl. Ex. 1 (NFL Const.), 1983 Resolution (Finance) <br><br> ████████████ <br><br> ████████████ |
| 143.  "Any person, association, partnership, corporation, or other entity of good repute organized for the purpose of operating a professional football club shall be eligible for membership, except: (A) No corporation, association, partnership, or other entity not operated for profit … shall be eligible for membership." | Leckman Decl. Ex. 1 (NFL Const.) § 3.2(A). |
| 144.  Each NFL club is an "independently owned, and independently managed business." | Leckman Decl. Ex. 1 (NFL Const.) § 2.1(A). |

| | |
|---|---|
| | |
| 145.   The NFL clubs meet at least once per year for an Annual Meeting, which "shall be held not earlier than the second Monday in February of each year and not later than April 1 in such year." | Leckman Decl. Ex. 1 (NFL Const.) § 5.1. |
| 146.   The NFL Clubs may also meet for "special meetings," which "may be held at any place upon call by the Commissioner." | Leckman Decl. Ex. 1 (NFL Const.) § 5.2. |
| 147.   At all meetings of the NFL Clubs, "whether Annual or Special, three-fourth or 20, whichever is greater, of the members of the League in good standing, present in person or by authorized representatives, shall constitute a quorum for the transaction of business." | Leckman Decl. Ex. 1 (NFL Const.) § 5.4. |
| 148.   At all meetings of the NFL Clubs, in general, "the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League at any Annual Meeting of the League shall be required for action." | Leckman Decl. Ex. 1 (NFL Const.) § 5.6. |
| 149.   "The Commissioner shall have authority to arrange for and negotiate contracts on behalf of the League with other persons, firms, leagues, or associations; provided, however, that except in instances where the Commissioner is otherwise specifically authorized herein, any contract involving | Leckman Decl. Ex. 1 (NFL Const.) § 8.10. |

a substantial commitment by the League or its members shall not be binding unless first approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League."

## B.    The Clubs' Pooled Their Telecast Rights

| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
| 150. Each of the thirty-two NFL Clubs independently owns the rights to broadcast its football games on television, which they have ceded collectively to the NFL. | Leckman Decl. Ex. 1 (NFL Const.) §§ 4.3, 10.1. |
|  | Leckman Decl. Ex. 1 (NFL Const.), 2002 Resolution G-7; 2005 Resolution BC-1. |
|  | NFL Defendants' Answer to Plaintiffs' Second Amended Complaint, Dkt. 442, ¶ 81 ("NFL Defendants also admit that the NFL is authorized to negotiate on behalf of the NFL member clubs for the collective licensing and distribution of rights to broadcast NFL games."). |





151.   Prior to 1961, the right to telecast football games was owned and controlled by the individual NFL Clubs.



152. Prior to 1961, individual NFL Clubs independently licensed the telecasts of their games to television networks.



153.   Prior to 1961, the NFL and the NFL Clubs
discussed how the antitrust laws limited their ability

to restrain the NFL Clubs from selling the broadcast rights to their games.





154.   The Minutes of the 1951 Annual Meeting of the NFL  Clubs  state

155.   The Minutes of the 1951 Annual Meeting of the NFL Clubs state

156.   The Minutes of the 1951 Annual Meeting of the NFL Clubs state

157.   The Minutes of the 1951 Annual Meeting of the NFL Clubs state

158.   The Minutes of a 1951 special meeting of the NFL  Clubs,  held  on  March  27,  1951,  state

| | |
|---|---|
| ████████████████████ ███████████████ | |
| 159.   In 1951, the NFL Clubs amended their Constitution and bylaws to adopt Article X. | ████████████ ████ ██ █ ██ ████████ See also *In re NFL Sunday Ticket*, 933 F.3d at 1144. |
| 160.   The Ninth Circuit stated that, in Article X, "the NFL required each NFL team to agree to minimize competition by refraining from telecasting its games into another team's local market whenever that local team was either playing at home or broadcasting its away game in its local territory." | *In re NFL Sunday Ticket*, 933 F.3d at 1144. |
| 161.   The Department of Justice ("DOJ") sued the NFL to enjoin the limitations on television-broadcasting competition among the NFL Clubs imposed by Article X. | *United States v. Nat'l Football League*, 116 F. Supp. 319, 326–27 (E.D. Pa. 1953) ("*NFL I*") |
| 162.   The United States District Court for the Eastern District of Pennsylvania enjoined in 1953 the NFL Clubs and the NFL from executing broadcast agreements that restrict "the sale of rights for the telecasting of out-side games in club's home territory on a day when the home club is permitting the telecast of its away game in its home territory." | *NFL I*, 116 F. Supp. at 326–30. |
| 163.   The NFL did not appeal that 1953 injunction ("NFL I injunction"). | *NFL I*, 116 F. Supp. at 326–30 |

| | |
|---|---|
| 164.   In 1973, findings of Congress state that, "[b]y the late 1950s, eleven individual teams had signed contracts with [CBS]; two teams—Baltimore and Pittsburgh—had signed contracts with [NBC]; and one team—Cleveland—had organized its own network." | H.R. Rep. No. 93-483 at 4 (1973). |
| 165.   The Minutes of the 1954 Annual Meeting of the NFL Clubs state ███████ | ███████ |
| 166.   In 1973, findings of Congress state that, "For a number of years after the 1953 [NFL I injunction], the broadcasting practices of the member clubs of the National Football League stabilized." | H.R. Rep. No. 93-483 at 4 (1973). |
| 167.   The Minutes of a January 1960 special meeting of the NFL Executive Committee, made up of representatives from NFL Clubs, state ███████ | ███████ |
| 168.   The Minutes of the 1960 Annual Meeting of the NFL Clubs state ███████ | ███████ |



169.   The Minutes of the 1960 Annual Meeting of the NFL Clubs state 

170.   The Minutes of the 1960 Annual Meeting of the NFL Clubs state

171.   The Minutes of a subsequent special meeting of the NFL Clubs state

172.   The Minutes of a subsequent special meeting of the NFL Clubs state

173.   The Minutes of the 1960 Annual Meeting of the NFL Clubs state

174.   As of 1960, the NFL Clubs and the NFL did not ███████████████████████████████████████████ ████████████████████████████████████ ██████████

175.   The Minutes of the 1960 Annual Meeting of the NFL Clubs state ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

176.   The Minutes of the 1961 Annual Meeting of the NFL Clubs state ███████████████████████████████████████████████████████████████████████████████████████████

177.   The Minutes of the 1961 Annual Meeting of the NFL Clubs state ███████████████████████████████████████████████████████████████████████████████████████████████

178.   In 1961, the NFL filed a petition with the United States District Court for the Eastern District of Pennsylvania that requested it approve a television contract between the NFL and CBS for the broadcast of the NFL Clubs' games.

*United States v. Nat'l Football League*, 196 F. Supp. 445 (E.D. Pa. 1961) (*NFL II*).

179.   ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

| | |
|---|---|
| | *NFL II*, 196 F. Supp. 445, 446-47. |
| 180.   The United States District Court for the Eastern District of Pennsylvania stated: "[NFL] Defendants concede that the 1961 NFL-CBS contract marks a basic change in National Football League television policy. Prior to this contract each member club individually negotiated and sold the television rights to its games to sponsors or telecasters with whom it could make satisfactory contracts. The NFL-CBS contract sharply departs from this practice. It is implicit in the 1961 contract that the member clubs have agreed among themselves and with the League that each club will not sell its television rights separate and apart from those of the other clubs, but that each club will pool its television rights with those of all of the other clubs, and that only the resulting package of pooled television rights will be sold to a purchaser. The clubs authorized the Commissioner of the League to sell this package of pooled television rights, and under the provisions of the 1961 contract with CBS he sold it. Thus, by agreement, the member clubs of the League have eliminated competition among themselves in the sale of television rights to their games." | *NFL II*, 196 F. Supp. 445, 447. |
| 181.   The United States District Court for the Eastern District of Pennsylvania stated that, "As [NFL] defendants state in their petition for construction: 'Said contract provides that the network (CBS) shall have the right to determine, entirely within its own discretion without consulting the Commissioner or any club of the League which games shall be telecast and where such games be televised." | *NFL II*, 196 F. Supp. 445, 447. |

| | |
|---|---|
| 182.   The United States District Court for the Eastern District of Pennsylvania held "[c]learly this provision restricts the individual clubs from determining 'the areas within which … telecasts of games … may be made,' since [NFL] defendants have by their contract given to CBS the power to determine which games shall be telecast and where the games shall be televised." | *NFL II*, 196 F. Supp. 445, 447. |
| 183.   The United States District Court for the Eastern District of Pennsylvania issued a second injunction (the 1961 NFL II injunction), enjoining the implementation of the pooled rights contract between NFL and CBS. | *NFL II*, 196 F. Supp. at 447 |
| 184.   The NFL did not appeal the 1961 *NFL II* injunction; rather, it lobbied Congress to exempt the pooling of the NFL Clubs' broadcast rights from the antitrust laws. | *In re NFL Sunday Ticket*, 933 F.3d at 1146 |
| 185.   █████████████████████████████ ███████████████████████████ | ██████████████████ |
| 186.   The NFL is now "authorized to negotiate on behalf of the NFL member clubs for the collective licensing and distribution of rights to broadcast NFL games." | Answer    to    Amended Complaint, Dkt. 442, ¶ 81. ████████████████████ |

| | |
|---|---|
| | |
| 187.   The NFL Constitution states that "[a]ll regular season (and preseason network) television income will be divided equally among all member clubs of the League regardless of the source of such income." | Leckman Decl. Ex. 1 (NFL Const.) § 10.3. |
| 188.   With respect to revenues from ticket sales, the NFL Constitution states that "[t]he home club shall deliver to the League office the greater of $30,000 for each regular season and preseason game, or 40% of gross receipts," after certain deductions. | Leckman Decl. Ex. 1 (NFL Const.) § 19.1. |
| 189.   Teams can deduct 15% of the gross receipts from ticket sales to a "stadium rental allowance." | Leckman Decl. Ex. 1 (NFL Const.) § 19.1 (A)(2). |

## C.   The NFL-Networks Sunday Afternoon Agreements

| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
| 190.   During the class period, on behalf on the NFL Clubs, the NFL contracted with CBS and Fox for the production and broadcast of all Sunday-afternoon games. | |



191.    The NFL has entered into those agreements on behalf of the NFL member clubs.



192.    The NFL-Network agreements provide that there are only two windows during the day each Sunday during which CBS or Fox may broadcast professional football games.



193.   The NFL-Network agreements provide that CBS and Fox may make only one NFL telecast available over-the-air during each Sunday daytime window.



194.    The NFL-Network agreements provide that no more than two NFL telecasts can be broadcast over-the-air at the same time.



195.   The most recent agreements between the
NFL and CBS require



196.   Each week during the NFL regular season period, there are 13 to 16 games played.

*See, e.g.*, NFL 2022 Week 1 Schedule, available at nfl.com /schedules/2022/reg1.

197.   During the NFL regular season, 10 to 13 games are played in one of the two Sunday daytime windows.

198.   No game broadcast by Fox or CBS on Sunday afternoon is a national broadcast; instead, games occurring in the two Sunday daytime windows are broadcast regionally.



199.   In a typical week during the NFL regular season, of the 10 to 13 games that are played in the two Sunday-afternoon windows, most consumers will be able to watch just 3 of them over the air.



200.   In a typical week during the NFL regular season, 10 Sunday daytime games are not broadcast over-the-air in most television markets.





202.    The CBS and Fox agreements state



203.   The current NFL-CBS Sunday broadcast agreement provides

204.   The current NFL-Fox Sunday broadcast agreement provides

205.   Brian Rolapp testified



206.   During the class period, the NFL and the NFL Clubs have received approximately ▮ billion from CBS and Fox for the rights to the Sunday-afternoon broadcast packages.

**D.   The NFL-DIRECTV Sunday Ticket Agreement**

| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
| 207.   During the class period, on behalf of the NFL Clubs, the NFL contracted with DirecTV to sell   out-of-market telecasts. | |
| 208.   The NFL-DIRECTV agreements operative during the class period provide ▮ | |



209.   The NFL-DIRECTV agreements operative during   the   class   period   provide

210.   The NFL-DIRECTV agreements operative during   the   class   period   provide

211.   The NFL-DIRECTV agreements operative during the class period require

212.   In 1994, the NFL entered into an exclusive agreement with DirecTV to distribute the out-of-market NFL games.



213.   That product was and is called NFL Sunday Ticket.

214.   The NFL exclusively distributed those out-of-market games through DirecTV from 1994 through the end of the 2022–23 football season.

215.   To subscribe to NFL Sunday Ticket on DirecTV, most consumers must first subscribe to DirecTV's satellite service.

216.

217.   During the class period, the list price for NFL Sunday Ticket on DirecTV for residential customers ranged from $199 to $396.

218.   Beginning   in   the   2023   season,   the residential Sunday Ticket package will only be available via YouTube.

219.   The   price   of   NFL   Sunday   Ticket   on YouTube has been advertised as $349 to $389 for YouTube TV subscribers and between $449 and $489 for non-YouTube TV subscribers.

Pricing for Sunday Ticket on YouTube TV for the upcoming season   is   available,   e.g.,   at https://tv.youtube.com/learn/nflsundayticket/

220.   During the class period, the NFL and the NFL Clubs have received approximately ██ billion from DirecTV for the rights to the Sunday Ticket package.

**E.      The NFL's Role in Limiting the Output of NFL Sunday Ticket**

| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
| 221.   During the class period, DirecTV averaged around 2 million subscribers to NFL Sunday Ticket. | |
| 222.   Robert Kraft testified | |
| 223. | |
| 224. | |





| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
| 225. | |
| 226. | |
| 227. | |
| 228. | |
| 229.  Brian  Rolapp  testified | |

| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
| | |
| 230.  Robert  Kraft,  the  owner  of  the  New England Patriots and a chair of the NFL's Media Committee,  testified ███████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████ | █████████████████████████ ██████████████ |
| 231.  In  late  1996  or  early  1997,  the  NFL considered  broadening  distribution  of  Sunday Ticket, but it elected not to. | ███████████████████████ ███████████████ |
| 232. ████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ █████████████████████ | ███████████████████████ ███████████████ |
| 233. ████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ | ████████████████████████ ██████████████ |



| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
| 234. | |
| 235. | |
| 236. | |
| 237. | |



| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
|  | |
| 243. | |
| 244. | |

**F.    The NFL's Role in Setting the Price of NFL Sunday Ticket**

| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
| 245.   The NFL exerts influence over the retail price and package composition of NFL Sunday Ticket. |  |







246. Bidders for the rights to Sunday Ticket beginning in the 2023 season expressed concern about Sunday Ticket's high price



247. Apple produced a document

248.

249.

250. Apple produced a document



251.

252.   Goldman Sachs produced a document

253.

254.



255.   The NFL produced an email

256.

## G.   Plaintiffs' Theory of the Case Remains Consistent

| Plaintiffs' Additional Undisputed Fact | Evidentiary Support |
|---|---|
| 257. Plaintiffs' Consolidated Amended Complaint states: "This exclusive deal [between the NFL and DirecTV], along with other contractual arrangements between the NFL, its member teams, and DirecTV, as well as Fox, ESPN, CBS, and NBC (collectively, the "Networks"), results in the blackout or unavailability of out-of-market games, except through the bundled NFL/DirecTV Sunday | Dkt. 163 ¶ 10 (filed June 24, 2016). |

| | |
|---|---|
| Ticket. These arrangements result in substantial injury to competition[.]" | |
| 258.   Plaintiffs' memorandum in opposition to the NFL Defendants' motion to dismiss states:<br><br>"They are challenging agreements that restrain competition with Sunday Ticket and the telecasts it includes."<br><br>"If Sunday Ticket were available more broadly, more consumers would be able to choose to watch games other than those shown on local networks, which would make the OTA broadcasts less valuable. That is why networks have insisted on limiting the availability of Sunday Ticket."<br><br>"Ultimately, the core agreements at issue are not to manipulate the market in rights, but to limit the availability of telecasts at the consumer level. The NFL Defendants have secured agreements from Fox and CBS to distribute only one of the games they produce at a given time on local television, and that only three such games will be available OTA."<br><br>"Plaintiffs have alleged a conspiracy between a horizontal combination (the NFL teams) and other market levels, which restrains competition between Sunday Ticket and other NFL programing in a way that raises Sunday Ticket prices, restrains viewership of out-of-market games, and increases the profits of the teams, the networks that carry OTA games, and, of course, DirecTV." | *See, e.g.*, Dkt. 184, at 1, 6, 8, 21 n.21 (filed September 22, 2016). |

| | |
|---|---|
| 259.   Plaintiffs opening brief to the ninth circuit states: "Plaintiffs' Consolidated Amended Complaint ('CAC') alleges that the National Football League ('NFL'), its member teams, and DirecTV, along with various television networks, have entered into a set of agreements that, working together, suppress competition for the sale of professional football game telecasts in violation of Sections 1 and 2 of the Sherman Act[.]" | Leckman   Decl.   Ex.   42 (Plaintiffs'   opening   Ninth Circuit brief), at 1, *Ninth Inning, Inc., et al., v. DirecTV, LLC, et al.*, No. 17-56119 (9th Cir. 2018). |
| 260.   Plaintiffs' Opening Brief to the Ninth Circuit states: "Agreements Between the NFL, Television Networks, and DirecTV Artificially Limit the Availability of Professional Football Telecasts." | Leckman   Decl.   Ex.   42 (Plaintiffs'   opening   Ninth Circuit brief), at 3, *Ninth Inning, Inc., et al., v. DirecTV, LLC, et al.*, No. 17-56119 (9th Cir. 2018). |
| 261.   Plaintiffs' Opening Brief to the Ninth Circuit states: "To protect these local telecasts from the other NFL telecasts, the NFL and networks agreed that all other Sunday-afternoon games will be available nationally only through a limited, non-basic, subscription service." | Leckman   Decl.   Ex.   42 (Plaintiffs'   opening   Ninth Circuit brief), at 5, *Ninth Inning, Inc., et al., v. DirecTV, LLC, et al.*, No. 17-56119 (9th Cir. 2018). |
| 262.   Plaintiffs' Opening Brief to the Ninth Circuit states: "The agreements are designed to work together to benefit DirecTV, the networks, and the NFL—at consumers' expense. They benefit the NFL and its teams because distributors will pay more for exclusive rights. They benefit the two networks because DirecTV's exclusivity and high pricing limit the universe of potential subscribers to Sunday Ticket. The networks (and | Leckman   Decl.   Ex.   42 (Plaintiffs'   opening   Ninth Circuit brief), at 6–7, Ninth Inning, Inc., et al., v. DirecTV, LLC, et al., No. 17-56119 (9th Cir. 2018). |

| | |
|---|---|
| their local affiliates) are thus protected from competition from other potential providers of Sunday telecasts, enabling them to raise the prices they charge advertisers and distributors. II-ER-53-54 (CAC ¶¶11, 12). And just as DirecTV's suppression of output protects the networks, the limitation on over-the-air telecasts to just two or three games protects DirecTV, allowing it to charge supracompetitive prices for both Sunday Ticket and its standard programming." | |
| 263.   Plaintiffs' Second Consolidated Amended Complaint states: "This exclusive deal [between the NFL and DirecTV], along with other contractual arrangements between the NFL, its member teams, and DirecTV, as well as Fox, ESPN, CBS, and NBC (collectively, the "Networks"), results in the blackout or unavailability of out-of-market games, except through the bundled NFL/DirecTV Sunday Ticket. These arrangements result in substantial injury to competition[.]" | Dkt. 441 ¶ 8 (filed March 23, 2022). |

Dated:  August 28, 2023

Respectfully submitted,

By:  _/s/ Marc M. Seltzer_

Marc M. Seltzer

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com

HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC

1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*