# EXHIBIT 1

# To the Declaration of

# Peter Leckman

# CONSTITUTION AND BYLAWS

### OF THE

# NATIONAL FOOTBALL LEAGUE



**Effective February 1, 1970**
**(Revised as of September 14, 2016)**

*Provisions of the Constitution relating to players (in particular, Articles XII, XIV, XV, XVI, XVII, and XVIII) remain subject to the provisions of the Collective Bargaining Agreement.

# Table of Contents

| Article | | Page Number |
|---|---|---|
| Article I | Name and Principal Office | 1 |
| Article II | Purposes and Objects | 2 |
| Article III | Membership | 3 |
| Article IV | Territorial Rights | 13 |
| Article V | Meetings of the League | 22 |
| Article VI | Executive and Other Committees | 25 |
| Article VII | Officers | 28 |
| Article VIII | Commissioner | 30 |
| Article IX | Prohibited Conduct | 40 |
| Article X | Broadcasting and Television | 48 |
| Article XI | Playing Rules | 51 |
| Article XII | Eligibility of Players | 52 |
| Article XIII | Schedule | 61 |
| Article XIV | Selection Meeting | 64 |
| Article XV | Player Contracts | 71 |
| Article XVI | Assignment of Player Contracts | 73 |
| Article XVII | Player Limits and Eligibility | 76 |
| Article XVIII | Waivers | 94 |
| Article XIX | Conduct of Regular Season Games | 100 |
| Article XX | Divisional Playoff Games | 110 |
| Article XXI | Conference Championship Games | 116 |
| Article XXII | Super Bowl Game | 119 |
| Article XXIII | Preseason and Postseason Games | 120 |
| Article XXIV | Notices | 122 |
| Article XXV | Amendment of Constitution and Bylaws | 123 |
| Appendix of Resolutions | | A-i |

**NFL_0012384**

# Article I

## Name and Principal Office

1.1     The name of this association shall be National Football League, hereinafter called "League."  The word "League" herein shall refer to the National Football League, unless otherwise specified.

1.2     The Commissioner shall select the location of the office of the League, which shall be located in or adjacent to a city in which a League franchise is operated.

CONFIDENTIAL                                    NFL_0012385                    **NFL_0012385**

# Article II

## Purposes and Objects

2.1    The purpose and objects for which the League is organized are:

(A)    To promote and foster the primary business of League members, each member being an owner of a professional football club located in the United States.

(B)    To do and perform such other functions as may be necessary to carry out the purpose and objects of the League.

2.2    The League is not organized nor to be operated for profit.

*But see*          2015 Resolution FC-3 (approving conversion of the League from a non-profit to a for-profit entity) App., p. 2015-4

2                              Article II

# Article III

## Membership

**Members**

3.1    (A)    Membership in the League shall be limited to the thirty-two (32) member clubs specified in Section 4.5 hereof and such new members as may be thereafter duly elected.

        (B)    The admission of a new member club, either within or outside the home territory of an existing member club, shall require the affirmative vote of three-fourths of the existing member clubs of the League.

        *See*    1995 Resolution G-4 (Los Angeles franchise opportunity), App., p. 1995-1
              1999 Resolution EC-1 (Houston expansion), App., p. 1999-1

**Eligibility of New Members**

3.2    Any person, association, partnership, corporation, or other entity of good repute organized for the purpose of operating a professional football club shall be eligible for membership, except:

        (A)    No corporation, association, partnership, or other entity not operated for profit nor any charitable organization or entity not presently a member of the League shall be eligible for membership.

        (B)    If any privately held corporation, partnership, trust, or other entity owns or operates, directly or indirectly, any substantial non-football business or assets and owns, directly or indirectly, an interest in or otherwise operates a member club, then:

                (1)    The member club shall be held in a separate corporation, partnership, or trust (the "Football Company"), the primary purpose of which shall at all times be and remain the operation of a professional football team as a member club of the League, which such primary purpose shall not be changed, and the only material asset of which shall be the member club;

                (2)    The ownership interest in the Football Company shall be held directly by a holding company that shall have no operating business or material assets but only ownership interests in other entities, and the ownership interests in the holding company shall be owned directly by individuals (or certain

CONFIDENTIAL        NFL_0012387    **NFL_0012387**

# Article IV

## Territorial Rights

**Home Territory Defined**

4.1     "Home Territory" with respect to any club means the city in which such club is located and for which it holds a franchise and plays its home games and includes the surrounding territory to the extent of 75 miles in every direction from the exterior corporate limits of such city, except as follows:

(A)     Whenever any two member clubs, other than the San Francisco 49ers and the Oakland Raiders, are located and hold franchises for different cities within 100 miles of each other measured from the exterior corporate limits of such city, then the territorial rights of each of such clubs shall only extend to and include an area of one-half the distance between such cities.

(B)     The "home territory" of the Green Bay Packers shall extend to and include all of Milwaukee County, Wisconsin, despite the fact that portions of such County are outside the 75 mile limits from the exterior corporate limits of the City of Green Bay.

**Rights Within Home Territory**

4.2     Each member shall have the exclusive right within its home territory to exhibit professional football games played by teams of the League except that:

(A)     Whenever two club franchises in the League are located in the same city, then the owners of each of such franchises shall have equal rights within the home territory of such city.

(B)     In respect to the San Francisco and Oakland franchises the following provisions shall apply:

(1)     The home club in each city shall have the exclusive right to exhibit professional football games played by teams in the League in its city, and neither the San Francisco nor the Oakland club shall have any right to play professional football in the city of the other without the consent of the other club.

(2)     In respect to the area included in the home territory of both clubs, but located outside the city limits of both cities, both clubs shall have joint rights of exclusivity, and both of said clubs may play games with other clubs in the League within

CONFIDENTIAL                                              NFL_0012397    **NFL_0012397**

such area without the consent of the other club also operating
in the same home territory or any part thereof.

(C)    Subject to the provisions of Sections 4.2(A) and (B) above, no club
in the League shall be permitted to play games within the home
territory of any other club unless a home club is a participant.

(D)    In the event the Baltimore franchise is forfeited or surrendered, or
is transferred to a city other than Baltimore, all rights to the
Baltimore territory shall revest in the Washington Redskins, and
the area included in the Baltimore territory shall be reconstituted
and become part of the Home Territory of the Washington
Redskins pursuant to the Constitution and Bylaws of the League.

(E)    The Home Territory of the Washington Redskins and the Home
Territory of the Baltimore Ravens, respectively, shall remain as
defined in Article 4.1(A) above except that the Home Territory of
the Redskins shall include all of Montgomery and Prince Georges
Counties and no other part of the State of Maryland and the Home
Territory of the Baltimore Ravens shall include all of Anne
Arundel and Howard Counties in the State of Maryland.

**League Control of Games**

4.3    The League shall have exclusive control of the exhibition of football
games by member clubs within the home territory of each member. No
member club shall have the right to transfer its franchise or playing site to
a different city, either within or outside its home territory, without prior
approval by the affirmative vote of three-fourths of the existing member
clubs of the League.

*See* 2002 Resolution G-7 (confirming League control of sidelines for
marketing and broadcasting purposes), App., p. 2002-8
2008 Resolution JC-1 Net (approving a series of Buffalo Bills games
to be played in Toronto), App., p. 2008-6
2011 Resolution IC-1 (authorizing UK International Game Series),
App., p. 2011-22
2012 Resolution IC-1 (delegating authority to approve additional
Buffalo Bills games to be played in Toronto to the International
Committee), App., p. 2012-10
2014 Resolution IC-1 (establishing parameters for selection of
member clubs to play in regular season United Kingdom games),
App., p. 2014-11
2015 Resolution IC-1 (extending scheduling of regular season games
in the United Kingdom and authorizing exploration of scheduling
regular season games in other international territories), App., p. 2015-
16

CONFIDENTIAL                                    NFL_0012398    **NFL_0012398**

2016 Resolution IC-1 (facilitating the scheduling of regular season games in the United Kingdom by modifying the scheduling parameters applicable to such games), App., p. 2016-12

## Home Marketing Area

4.4     Home Marketing Area Defined.

(A)     Each club shall have a Home Marketing Area in which it may engage in the commercial activities set forth in Section 4.4(B) below. The Home Marketing Area shall be defined as (i) the Home Territory (including the portion of any foreign country within a club's Home Territory, provided however, that activities within a foreign country are coordinated with and approved in advance by the League on behalf of NFL International) and (ii) the State within which the City for which the club holds a franchise is located (the "Home State"), and (iii) the entirety of any other State within which any portion of such Club's Home Territory is located ("Adjacent State"), but excluding any other Club's Home State.

Where two or more clubs share a Home Territory, each club shall have equal rights under Section 4.4(B) below with respect to the Home Territory and Home Marketing Area. Where two or more clubs share a Home State but do not share a Home Territory, each club shall have equal rights within the Home State, except for the Home Territory of another club.  Where two or more Clubs share an Adjacent State but do not share a Home Territory, each Club shall have equal rights within the Adjacent State, except for the Home Territory of another Club.

The Home Marketing Area of any club shall also include the county in which the club's preseason training camp is located (if located within the United States) for the duration of such training camp only, unless the training camp is located within the Home Territory of another member club.

(B)     Club Rights Within Home Marketing Area; Exclusivity and Other Terms

(1)     Subject to the terms of Section 4.4(A), each club shall have exclusive rights vis-à-vis other clubs to use its trademarks, including without limitation, the names, nicknames, logos, colors, slogans, symbols, or any other identifying indicia in their present form or as may be adopted in the future (the "Club Marks") within its Home Marketing Area with respect to NFL football activities involving (i) local advertising, sponsorship, naming rights, and related promotional arrangements; (ii) retail stores and other club-identified physical structures and ventures; (iii) promotional and public

15

Article IV

# Article V

## Meetings of the League

**Annual Meetings**

5.1     The Annual Meeting of the League shall be held not earlier than the second Monday in February of each year and not later than April 1 in such year; such meeting shall be held on such date and at such places and times as the Commissioner shall designate in the notices of the meeting.

**Special Meetings**

5.2     Special meetings of the League may be held at any place upon call by the Commissioner.

**Notice of Annual and Special Meetings**

5.3     (A)     Written notice of the time and place of holding any meeting shall be given to each member at least thirty (30) days in advance of the day fixed for the Annual Meeting or at least seven (7) days in advance of the day fixed for any special meetings.

        (B)     Notice of a special meeting shall state the time, place, and purpose of the meeting. The notice of the Annual Meeting must state the time and place of the meeting, but not the purpose. If any amendments to the Constitution and Bylaws are to be considered at the Annual Meeting, the submission of such proposals must be in accordance with Article XXV hereof, except that, any other provisions of this Constitution notwithstanding, the Commissioner may propose in his sole discretion amendments which he considers to be of an emergency nature, and such amendments at a special meeting will require an affirmative vote of three-quarters or 20, whichever is greater, of the member clubs for passage.

        (C)     Notices of any meeting may be waived by the unanimous consent of all member clubs.

**Quorum**

5.4     At all meetings of the League, whether Annual or Special, three-fourths or 20, whichever is greater, of the members of the League in good standing, present in person or by authorized representatives, shall constitute a quorum for the transaction of business and shall have the power to adjourn the meeting from time to time without notice other than announcement at the meeting until the requisite numbers of members shall be present.

CONFIDENTIAL                          NFL_0012406      **NFL_0012406**

**Voting and Representation**

5.5     (A)     At each meeting of the League, each member shall be limited to two (2) representatives. Each member shall be limited to only one (1) vote upon any matter presented to the meeting. Each member shall file with the League within the time designated by the Commissioner a written designation of the representative and alternate to vote and act for it. The Commissioner or presiding officer may require proof satisfactory to the Commissioner or presiding officer of the authority of any representative to represent a member. In all meetings, both Executive Session and general, proxy voting is prohibited. If a member is not represented at the time of a vote, the three-fourths requirement for a vote to carry will be based on the number of members present. This special voting procedure when a quorum but not all clubs are represented shall not apply whenever a unanimous vote is required by the Constitution and Bylaws.

        (B)     Any proposal introduced to the membership at a meeting of the League at which a quorum is present or otherwise properly before the membership, may be voted upon either during or following such meeting by NFLNet, e-mail or facsimile or by similar means of communication.

**Number of Votes**

5.6     Except as herein otherwise specifically provided, the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League at any Annual Meeting of the League shall be required for action.

**Order of Business at Annual Meeting**

5.7     The order of business for the Annual Meeting shall be as follows:

        Roll call
        Reading of minutes of the previous meeting
        Report of the Commissioner
        Report of the Chief Financial Officer
        Report of other League personnel
        Report of the Public Relations Department
        Report of other committees
        Unfinished business
        Nomination and election of officers
        Installation of officers
        New business
        Adjournment

**Executive Session**

5.8     Upon call of the Commissioner or by majority vote of the members of the League, the League may go into Executive Session. Each member shall designate its duly authorized representative to act for it in such Executive Session. In any Executive Session, unless otherwise designated by the Commissioner, two representatives of each member and the Commissioner shall be present together with such other persons as either the Commissioner or the members by majority vote shall invite; provided that when two representatives of a member club are present in Executive Session, one of them must own an equity interest in such club. The Commissioner shall be Chairman of the Executive Session and may appoint the Secretary of the Session. Action at any Executive Session shall constitute action of the League.

    *See also* 1984 Resolution (Long Range Planning Committee; League meetings), App., p. 1984-4

**Conduct of Meeting**

5.9     Except in respect to matters covered specifically in the Constitution and Bylaws of the League, Roberts Rules of Order shall prevail in all meetings of the League; provided, however, that any action taken in any meeting of the League involving a matter not covered specifically in the Constitution and Bylaws of the League shall require the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League for approval.

**Action Without a Meeting**

5.10    Any action or resolution which may be taken or adopted at a League meeting may be taken or adopted by an instrument in writing signed by all members of the League.

CONFIDENTIAL                              NFL_0012408          **NFL_0012408**

8.7     The Commissioner shall select and employ a Supervisor of League Game Officials and shall further select and approve all game officials for all preseason, regular season, and postseason games. All fees and traveling expenses of game officials shall be paid by the League after approval by the Commissioner. It shall be the duty of each member to accept as game officials for any game such game officials as the Commissioner shall assign to such game.

**Public Relations Department**

8.8     The Commissioner shall have authority to establish a Public Relations Department for the League, and such department shall be under his exclusive control and direction. He may employ persons to staff said department and shall fix and determine the compensation thereof.

**Broadcasts and Television**

8.9     Subject to the provisions of Article X hereof, the Commissioner shall have the exclusive authority to arrange for and sell all broadcasting and television rights to the Conference Championship games and the Super Bowl game.

**League Contracts**

8.10    The Commissioner shall have authority to arrange for and negotiate contracts on behalf of the League with other persons, firms, leagues, or associations; provided, however, that except in instances where the Commissioner is otherwise specifically authorized herein, any contract involving a substantial commitment by the League or its members shall not be binding unless first approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

**Reports**

8.11    The Commissioner shall render an annual report to the League members at each Annual Meeting.

**Bond**

8.12    The Commissioner shall file and maintain in effect a surety bond with the League in the sum of fifty thousand dollars ($50,000). Said bond shall be conditioned upon faithful performance by the Commissioner of his duties and shall name the League as obligee. The expenses for such bond shall be paid by the League.

**Disciplinary Powers of Commissioner**

32                        Article VIII

# Article X

## Broadcasting and Television

**Contract Conditions**

10.1   Any contract entered into by any club for telecasting or broadcasting its games, and the sponsor or sponsors of each game telecast or broadcast pursuant to such a contract, must be approved in writing by the Commissioner in advance of such telecast or broadcast.

**Television Restrictions**

10.2   Subject to the limitations and exceptions set forth in this Article, member clubs participating in any game are authorized to telecast and broadcast such game anywhere except as follows:

(A)   No club shall cause or permit a game in which it is engaged to be telecast into any area included within the home territory of any other club on the day that such other club is engaged in playing a game at home;

(B)   No telecast of a home game within the home territory of a club shall be caused or permitted, except by agreement between the participating clubs;

(C)   Each home club grants to the visiting club the exclusive right to permit or license the telecast of the game being played between them back to the home territory of the visiting club.

The Commissioner will not approve any contracts that do not contain a provision stating that the contract is subject to Article X as now or hereafter in effect.

*See* 1984 Resolution BC-5 (preseason game telecast consent by visiting club), App., p. 1984-1
   1984 Resolution (Broadcasting; preseason television rights contract requirements), App., p. 1984-3

CONFIDENTIAL                          NFL_0012432          **NFL_0012432**

**Television Income**

10.3    All regular season (and preseason network) television income will be divided equally among all member clubs of the League regardless of the source of such income, except that the member clubs may, by unanimous agreement, provide otherwise in a specific television contract or contracts.

*See* 1998 Resolution BC-7 (payments to participants in nationally televised preseason games), App., p. 1998-8

**Network Provisions**

10.4    In any network television contract in effect in the League after 1970, the following provisions shall apply:

(A)    Each regular season road game of the New York Giants, New York Jets, Oakland Raiders, and San Francisco 49ers will be televised live back to the home territory of the club participating in the road game.

(B)    Without the prior consent of the home team, no road game of either the Oakland Raiders or the San Francisco 49ers respectively may be televised back to the home territory of the other club on any day when the other club is playing a game at home.

**Championship Games**

10.5    The sale of radio and television and film rights for the Super Bowl game and Conference Championship games shall be under the sole jurisdiction of the Commissioner and be subject to the provisions of Article X.

In the Super Bowl game and Conference Championship games:

(A)    The participating clubs may broadcast by radio on a non-exclusive basis from a station located in its home territory; provided, (a) said club contributes to the gross receipts of the game (to be divided in the same manner as game receipts are distributed) a fair and equitable sum fixed by the Commissioner in his sole and absolute discretion; and (b) the Commissioner approves all sponsors and broadcasters involved in the game.

(B)    No television station may carry or broadcast the game if its signal is visible in the home territory (75 miles) of the home club in the city where the game is being played. The Commissioner's decision in this matter shall be final.

CONFIDENTIAL                                        NFL_0012433        **NFL_0012433**

**Broadcast Facilities**

10.6     Each club when playing at home shall provide adequate space for use of
         the visiting club in telecasting and/or broadcasting each game.

**Player Depiction and Club Promotion**

10.7     The player grants to the club controlling his contract and to the League
         severally and jointly the privilege and authority to use his name and/or
         picture for publicity and/or advertising purposes in newspapers,
         magazines, motion pictures, game programs and annual roster manuals,
         radio material, television telecasts, and all other publicity and/or
         advertising media, provided such publicity and/or advertising does not in
         itself constitute an endorsement by that individual player of a commercial
         product.

**Judgment**

10.8     All provisions of Article X are intended to conform to and are subject to
         the Final Judgment of the United States District Court for the Eastern
         District of Pennsylvania, entered December 28, 1953, and as thereafter
         modified, against the National Football League and certain of its member
         clubs. In the event of any conflict between the Constitution and Bylaws
         and said judgment, the provisions of said Final Judgment, as modified,
         shall prevail.

**Replays in Stadiums**

10.9     In all NFL stadiums with the capability of displaying television replays
         on the scoreboard of action occurring on the field, such displays may be
         shown at any time during the game, provided, however, that the selection
         of material for the replays shall be at the home club's discretion.

         *See also* CBA, including Article 51 Section 3 (Appearances)

CONFIDENTIAL                                      NFL_0012434          **NFL_0012434**

# Article XIX

## Conduct of Regular Season Games

**Game Receipts and Guarantee**

19.1    (A)    The home club shall deliver to the League office the greater of $30,000 for each regular season and preseason game, or 40% of the gross receipts after the following deductions:

    (1)    All federal, state, and municipal taxes assessed on the sale of tickets, plus any other special charges approved in writing on an individual club basis by the Executive Committee.

    (2)    A stadium rental allowance equal to fifteen (15%) percent of the gross receipts after deducting the taxes and any other approved special charges set out in (1) above.

    (3)    "Gross Receipts," as used in this section, shall mean all receipts derived from the sale of tickets, including taxes and special charges but excluding ticket handling charges. Receipts of the home club from the sale of season tickets shall be included in the gross receipts from each game equally in proportion to the number of regular season games scheduled by the club after the adjustment of any preseason game monies included in the cost of the season ticket.

    *See* 1987 Resolution FC-1 (authorizing Executive Committee to approve exclusion of seat premiums for stadium projects), App., p. 1987-1
1987 Resolution FC-7 (ticket handling and service charges), App., p. 1987-3
1994 Criteria for Approval of Premium Waivers, App., p. 1994-3
1995 Resolution G-6 (revenue sharing pool), App., p. 1995-4
1999 Resolution G-3 (restating and expanding League policy governing waivers of sharing obligations for stadium construction projects), App., p. 1999-2
2001 Resolution G-1 (revisions to definition and calculation of visiting team share for preseason games), App., p. 2001-2
2003 Resolution JC-1 (extending G-3 program), App., p. 2003-7
2006 Resolution BV-1 (scheduling of international regular season games), App., p. 2006-6
2006 Resolution G-1 (approval of CBA; revenue sharing pool), App., p. 2006-9

CONFIDENTIAL

2006 Resolution MC-1 (approval of CBA; revenue sharing pool), App., p. 2006-9

2007 Resolution G-1 (governing implementation of the revenue sharing pool). App., p. 2007-5

2007 Resolution MC-1 (governing implementation of the revenue sharing pool). App., p. 2007-5

2008 Resolution FC-9 (modifying the definition of club seat premiums). App., p. 2008-1

2008 Resolution FC-10 (modifying the calculation of visiting team share for all-inclusive ticket packages). App., p. 2008-3

2011 Resolution G-1 (with Resolution MC-3) (approving new CBA and supplemental revenue sharing program), App., 2011-26

2011 Resolution G-4 (restating and expanding League policy governing waivers of sharing obligations for stadium construction projects), App., p. 2011-16

2012 Resolution G-2 (establishing NFL Ventures as league-level lender under G-4 program), App., p. 2012-4

2012 Resolution G-4 (modifying G-4 program terms), App., p. 2012-7

2014 Resolution JC-4 (modifying terms of G-3 VTS payment guarantees), App., p. 2014-13

(4)   Each club shall provide the League office by July 15 of each year with ticket manifests for all games to be played in the club's home stadium. Ticket manifests shall list the number and price of all tickets printed to include standing room tickets, and shall include a breakout of the amount of each tax and any special charge included in the price of each category of ticket. In the event ticket manifests are subsequently changed (e.g., bleachers are added subsequent to baseball season at a date different from originally planned and submitted) it shall be the responsibility of each club to update the ticket manifests on file in the League office.

*See*   2012 Resolution JC-1 (authorizing ticket sales in excess of a "base" ticket manifest for the 2012 and 2013 seasons), App., p. 2012-11

2014 Resolution FC-4 (extending 2012 Resolution JC-1 through the 2018 season), App., p. 2014-8

2016 Resolution JC-1 (requiring clubs that sell less than 85% of their general admission tickets at a home game during the 2016 regular season to contribute Visiting Team Share for 85% of general admission tickets), App., p. 2016-14

(5)   All clubs, on or before May 1, shall forward to the League office a certified report by an independent CPA of attendance and income for all home games (preseason, regular season,

CONFIDENTIAL

**1983 RESOLUTION (FINANCE)**
**(MAY 25, 1983)**

*Resolved,* that each club submit to the League office by June 15 of each year commencing with the year 1983 a current list of that club's ownership to include percent of ownership, and that such information be available to the League office for inspection by any person having an ownership interest in a National Football League club, provided however that any application to inspect such information must be submitted by the club's representative on the Executive Committee to the Commissioner and must be approved by the Commissioner. Approval by the Commissioner shall not be unreasonably withheld.

Green Bay, as a publicly-held corporation having in excess of 10 stockholders, is exempt from compliance with this resolution.

1983-2

## 2002 RESOLUTION G-7

*Whereas,* Article 4.3 of the Constitution and Bylaws provides, and has long provided, that "[t]he League shall have exclusive control of the exhibition of football games by member clubs";

*Whereas,* pursuant to that exclusive control, and consistent with the provisions of Article 10 of the Constitution and Bylaws, the League has for decades entered into contracts for the exhibition of NFL games by national broadcast networks and, more recently, by cable and by satellite;

*Whereas,* the stadium interior regularly within the frame of the television broadcast, including but not limited to the field, as well as the benches and surrounding areas ("the sidelines"), has long been considered to be the equivalent of the "stage" for purposes of the exhibition of NFL games and therefore within the League's exclusive control;

*Whereas,* the League's control has been exercised, for example, through restrictions on signs and banners "on end zone walls or on field level walls across from network camera locations or on the field, including sideline areas" (1994 Resolution BC-3) and through control of game-day marketing opportunities, such as branded apparel, on the sidelines (see 2001 Resolution JC-3);

*Whereas,* the League and its affiliates have, and expect to have in the future, strategic relationships with sponsors (e.g., Motorola, Gatorade) and others (e.g., Reebok) that represent collective assets and opportunities of all of the member clubs;

*Whereas,* the maintenance and enhancement of both those strategic relationships and the League's broadcast relationship could be jeopardized in the absence of collective League control over marketing and sponsorship opportunities presented by sideline exposure during NFL games;

*Whereas,* the membership generally, and the Business Ventures and Broadcasting Committees, will continue to explore alternatives for promoting the value of the broadcasting, marketing and sponsorship relationships of the League and its member clubs; and

*Whereas,* the Executive Committee wishes to reaffirm and confirm that Article 4.3's provision for exclusive League control over the exhibition of football games by member clubs includes all marketing and sponsorship opportunities on the sidelines of all NFL games;

CONFIDENTIAL                                                                 NFL_0012618          **NFL_0012618**

It is Hereby *Resolved,* that Article 4.3's provision for exclusive control over the exhibition of football games includes all marketing and sponsorship opportunities on the sidelines of all NFL games; and that prior exercise by the League and its affiliated entities of such control be, and is, hereby ratified and affirmed.

2002-9

CONFIDENTIAL

## 2003 RESOLUTION BC-1
### (AS AMENDED)

*Whereas,* the League's Broadcasting Committee has reviewed and approved the terms of the proposed NFL Sunday Ticket rights agreement between NFL Enterprises and DirecTV for the 2003-08 NFL seasons (the "DirecTV Agreement");

*Whereas,* the Board of Directors of NFL Enterprises has approved the terms of the DirecTV Agreement;

*Whereas,* the DirecTV Agreement creates a distribution opportunity for an NFL television channel (the "NFL Network");

*Whereas,* it is anticipated that the NFL Network will, under the DirecTV Agreement, produce as much as $100 million in subscriber fees from DirecTV to be invested in the development and distribution of the NFL Network;

*Whereas,* the NFL Network creates long-term strategic value and opportunity for the League as a whole, and could reach many more NFL fans and generate substantially more in revenue if it is broadly distributed via cable television systems and potentially via satellite television carriers in addition to DirecTV; and

*Whereas,* the Executive Committee of the League now also wishes to confirm its interest in facilitating the broad distribution of the NFL Network via cable television and satellite television systems in order to reach more NFL fans and to maximize the NFL Network's long-term monetary and strategic value, and associated collective benefits for the League and the member Clubs;

It is hereby *Resolved* that the League concurs in the Broadcasting Committee's approval of the DirecTV Agreement, with the Broadcasting Committee to ensure that, during the term of the DirecTV Agreement, no network television agreement containing provisions that would interfere with or preclude NFL Enterprises' performance of the DirecTV Agreement will be executed;

Further *Resolved,* that the Executive Committee confirms its intent to secure the monetary and strategic value of the NFL Network for the benefit of the League as a whole by obtaining broad distribution for the NFL Network on cable television systems and potentially satellite television carriers in addition to DirecTV;

Further *Resolved,* that in order to secure such broad distribution of the NFL Network on cable television systems and additional satellite television carriers, each member club shall cooperate with NFL Enterprises in the conduct of the NFL Network business and in such club's exploitation of its local media opportunities, in order to permit the financial and strategic value of the collective NFL Network opportunity to be secured and enhanced;

CONFIDENTIAL                    NFL_0012622    **NFL_0012622**

Further *Resolved,* that, to ensure that the NFL Network has attractive programming to help it secure broad distribution and without limiting the manner in which Clubs cooperate in the NFL Network's business, clubs shall make the following programming available to the NFL Network:

1. Beginning with the later of the 2004 NFL preseason and the first NFL preseason following the expiration of such club's current preseason television contract, each club shall

   a. make available to NFL Enterprises the right to reair its preseason game telecasts (i) live outside of such club's home market and (ii) on a non-exclusive, time-delayed basis within and outside such club's home market as part of the programming mix for the NFL Network (the airing of which shall not give rise to any preseason networking charges under then-current League policies on networking of preseason games); and

   b. make available to NFL Enterprises the right to reair such preseason game telecasts on a "video on demand" basis (the airing of which shall not give rise to any preseason networking charges under then-current League policies on networking of preseason games);

2. Beginning with the 2004 NFL season, each club shall make available to NFL Enterprises its season preview shows (if any), to air on the NFL Network and/or on a "video on demand" basis; and

3. Beginning with the 2003 NFL season, each club shall cooperate with NFL Enterprises by producing, at Enterprises' cost and expense, customized shoulder programming related to such club to be aired by the NFL Network on a "video on demand" basis.

Further *Resolved,* that the programming described in the previous section of this resolution, and other "video on demand" programming made available by the NFL Network to subscribers to the various cable television and satellite television services carrying the NFL Channel, shall be the only NFL programming made available on a "video on demand" basis by the League or the member clubs;

Further *Resolved,* that club promotional advertising in any such telecasts will be included in any reairs and current club exclusive advertising relationships will be respected in any reairs within the club's home marketing area, and that a full report on proposed NFL Network advertising patterns and relationships will be presented to the Board of NFL Business Ventures prior to the Fall 2003 Annual Meeting and to the full membership at that Meeting;

Further *Resolved,* that each club shall require that any regional sports network carrying its preseason games limit its distribution of such games to those areas within the club's home territory (i.e., primary and secondary television markets) in which such regional sports network is distributed via cable television systems, and "black out" such games outside the club's home territory if the regional sports

2003-2

network is distributed to wider areas by cable systems or satellite television distribution; and

Further *Resolved,* that member clubs are encouraged, in their distribution of local preseason game and shoulder programming, to promote the NFL Network through advertisements and promotional mentions for the NFL Network.

2003-3

## 2004 RESOLUTION BC-4

*Whereas*, the League has negotiated new television contracts for its Sunday afternoon television packages with CBS and FOX, covering all NFL preseason, regular season and postseason Sunday afternoon games, and no less than 2 Super Bowl games each, for the 2006 through 2011 seasons;

*Whereas*, ratification of those contracts by the membership has been unanimously recommended by the Broadcasting Committee; and

*Whereas*, the membership now desires to ratify and approve such contracts, with specific administrative and cooperation policies with respect to such television contracts to be adopted by membership resolution at a later date following the League's negotiation of television contracts for its prime time television packages;

Be it *Resolved*, that the League's 2006-2011 television contracts with CBS and FOX each are hereby ratified and approved; and

Further *Resolved*, that pending membership adoption of resolutions governing scheduling, game length, overall cooperation, and preseason policies for the new contract term (and in any case, for the 2004 and 2005 seasons, which continue to be subject to the current network television contracts), the member clubs will continue to cooperate fully with the television networks pursuant to and as required by 1998 Resolution BC-2.

CONFIDENTIAL

NFL_0012634            **NFL_0012634**

## 2005 RESOLUTION BC-1

It is hereby *Resolved* that, to protect and enhance the ability of the League to compete effectively with other entertainment providers and to protect the interests of the League as a whole (and specific initiatives thereof, including but not limited to the NFL Network), no member club may launch, operate, or participate in the launch or operation of, a Club-dedicated Network (as defined in the attached Report of the Broadcasting Committee);

*Further Resolved,* that, to avoid any conflicts of interests (including the appearance thereof) and to ensure compliance with the "primary purpose" rule set forth in the NFL Constitution, no member club may acquire or hold an equity or quasi-equity interest in a Club-equity Network (as defined in the attached Report of the Broadcasting Committee) unless prior approval of the terms of such equity interest shall have been obtained from the Commissioner after consultation with the Broadcasting Committee;

*Further Resolved,* that to preserve and enhance the ability of the League and the NFL Network to compete with other entertainment providers on a national basis, clubs may license programming to third-party-owned Regional Sports Networks only if carriage of such programming is expressly limited to the Club's home television market; and

*Further Resolved,* that with respect to an existing Club-equity Network in Dallas and existing and planned Club-dedicated Networks in Atlanta and Tampa Bay, the NFL Network and the involved Clubs will cooperate in good faith in promptly transitioning such existing operations into virtual Club networks as contemplated by, and within the framework of, the NFL Network.

CONFIDENTIAL

NFL_0012651

**NFL_0012651**

## 2006 RESOLUTION BC-1

*Resolved*, that in the preparation of the official NFL regular season schedule and administration of the new "flexible scheduling" system that will be implemented beginning with the 2006 NFL season for Sunday games to be telecast on CBS, FOX and NBC, the Commissioner and League Office will apply the following policies:

1. Each club will, with proper notice, switch Sunday regular season games between 1:00 and 4:15 P.M. (Eastern Time), and in flexible scheduling weeks (generally weeks 11-17 of each season) to approximately 8:15 P.M. (Eastern Time), to accommodate television broadcasting patterns;

2. The following scheduling provisions will apply to the scheduling of the League's Sunday Night primetime broadcast television package:

   a. Maximum of three scheduled (i.e., Week 1-10) appearances per club, inclusive of the Thursday night opener;

   b. With respect to such scheduled appearances:

      i. If a club is scheduled three times, such club may not be scheduled with all of those games at home, or all such games away, without its prior permission;

      ii. If a club is scheduled twice, both games may be scheduled away, or one may be scheduled at home and one away; and

      iii. If a club is scheduled once, such game may be home or away.

3. In addition to such scheduled Sunday night broadcast appearance, all clubs may have games "flexed" into the Sunday night broadcast package and scheduled in other prime time television packages subject to the following:

      i. No club may, as a result of such "flexing" and scheduling in other prime time television packages, appear more than six times in prime time television packages;

      ii. No more than three clubs may appear six times in prime time television packages;

      iii. No club may appear in the Sunday night broadcast package more than four times, and only three clubs may appear in such package four times);

4. No club will be required to make more than one appearance per season in games scheduled on dates other than Saturday, Sunday or Monday if,

CONFIDENTIAL

NFL_0012662   **NFL_0012662**

as a result of such scheduled appearance, such club will have fewer than five days available for preparation time prior to such games.

2006-2

**2015 RESOLUTION FC-3 &**
**MARCH 2015 ACTION OF THE DIRECTORS OF NFL VENTURES, INC.**
**AND CONSENT OF THE PARTNERS OF NFL VENTURES, L.P.**

*Whereas*, the clubs desire to delegate to the Finance Committee and to the NFL Management Council's Executive Committee (the "CEC") the authority to convert each of the League and the NFL Management Council, respectively, from a tax-exempt, not-for-profit entity to a taxable, for-profit entity, and to take such actions incidental thereto as the Finance Committee or the CEC, as applicable, deems appropriate;

*Whereas*, the loans advanced by the League to clubs participating in the stadium construction support program (the "G-3 Clubs") established by 1999 Resolution G-3, as extended by 2003 Resolution JC-1 (the "G-3 Program") are currently forgiven, if certain conditions are met, on a straight-line annual basis over 15 years following the completion of the applicable stadium project;

*Whereas*, as a result of, among other things, differences between the amortization schedules of the League's G-3 Program debt and the loans advanced by the League to the G-3 Clubs, the forgiveness feature included in the loans advanced by the League to the G-3 Clubs, and the timing of payments that will be made under the club seat premium visiting team share ("VTS") guarantees of the G-3 Clubs, the outstanding principal balance of the debt incurred by the League to fund the G-3 Program exceeds the sum of the outstanding principal balance of the loans advanced by the League to the G-3 Clubs and the cash held in League reserves for repayment of the League's G-3 debt; and

*Whereas*, in order to balance the League's assets and liabilities relating to the G-3 Program and to maintain that balance going forward, the League desires to approve certain of the resolutions set forth herein.

Be it *Resolved*:

1.   That the League and each club hereby delegates to the Finance Committee and to the CEC the authority, in its discretion, to convert each of the League and the NFL Management Council, respectively, from a tax-exempt, not-for-profit entity to a taxable, for-profit entity at any time after March 31, 2015, and to take (and authorize the Commissioner to take) any such actions on behalf of the League and/or NFL Management Council, as applicable, and to enter into (and authorize the Commissioner to enter into) any such documents or agreements (including, without limitation, amendments to the League's Constitution and Bylaws and/or to the NFL Management Council's Articles of Association and By-Laws, with each club hereby consenting to any such amendment as so approved by the Finance Committee and/or the CEC, and waiving any requirement for any further vote, consent or approval of the clubs in respect thereof, whether under the League's Constitution and Bylaws or the NFL Management Council's Articles of Association and Bylaws or otherwise), as the Finance Committee or the CEC, as applicable, deems necessary or appropriate in furtherance of such conversion;

2015-4

2.   That NFL Ventures, L.P. ("NFL Ventures") is hereby authorized and directed to draw up to $300 million under its existing debt facilities (the "Draw Amount"), with such draw to be made on or prior to March 31, 2015 and with the final Draw Amount to be determined by the Commissioner;

3.   That NFL Ventures is hereby authorized and directed to make a distribution on or prior to March 31, 2015, in an aggregate amount equal to the Draw Amount, to the limited partners of record of NFL Ventures as of such date, with such distribution to be made pro rata to each such limited partner;

4.   That each club shall pay to the League, with such funds to be received by the League on or prior to March 31, 2015, a League assessment in an amount up to $9.375 million per club, with the amount of such assessment to be determined by the Commissioner (and with the aggregate amount of such assessments not to exceed the Draw Amount);

5.   That the League shall use the funds so received to prepay, on or prior to March 31, 2015, such amount of the League's G-3 debt (and to pay any related swap termination costs and prepayment penalties) so that, following such prepayment, the outstanding principal amount of the League's G-3 debt shall equal the outstanding principal amount of the G-3 Program debt advanced by the League to the G-3 Clubs after taking into account forgiveness granted on March 31, 2015, with the specific tranches of the League's G-3 debt to be so prepaid to be determined by the Commissioner;

6.   That the Board of Directors of NFL Ventures, Inc. hereby delegates to the G-4 Finance Committee of NFL Ventures the authority, in its discretion, to authorize NFL Ventures to incur additional indebtedness which will be used to refinance the draws made on the existing NFL Ventures credit lines pursuant to the resolutions contained in Paragraph 2 above, and to authorize the officers of NFL Ventures to enter into such documents and agreements as may be necessary or appropriate in connection therewith (and the clubs hereby authorize the Commissioner to provide League guarantees of any such indebtedness so incurred by NFL Ventures, on such terms as the Commissioner may deem appropriate); and

7.   In order to implement the foregoing resolutions, the G-3 Program will be revised, and related matters are approved, all as set forth on Exhibit A attached hereto.

2015-5

CONFIDENTIAL

EXHIBIT A

G-3 Program and Other Approvals

1.  The loans advanced by the League to the G-3 Clubs under the G-3 Program shall, effective as of April 1, 2015, no longer be eligible for forgiveness, and each G-3 Club shall, on or prior to March 31, 2015, enter into an amendment to its G-3 credit agreement and related agreements acceptable to the Commissioner evidencing its obligation to repay principal and interest on its remaining G-3 debt commencing April 1, 2015, with the amount to be repaid each year to be equal to the amount that would otherwise have been forgiven in such year under the G-3 Program prior to such amendment; and, furthermore, the interest rate on each such loan will be restated to provide for interest to accrue annually at the Applicable Federal Rate in effect on the accrual date plus 50 basis points;

2.  Subject to each G-3 Club entering into such agreements, each such G-3 Club shall have a waiver from its obligation to share club seat premium VTS and, only to the extent required, gate VTS in an aggregate amount each year (commencing April 1, 2015) equal to the principal and interest owing on its G-3 debt for such year (for clarity, a G-3 Club shall be required to pay club seat premium VTS and gate VTS in excess of the amount of such principal and interest to an NFL agency account as designated by the Commissioner or his designee);

4.  The Finance Committee shall have the authority, on a G-3 Club-by-G-3 Club basis, and with the agreement of the relevant G-3 Club, to implement more limited or otherwise modified waivers and other amendments to the relevant G-3 Club's G-3 credit agreement and related guarantees and other agreements, and to approve modifications to VTS obligations and/or the allocation of club versus stadium company revenue streams for a G-3 Club and any related lease amendments, in each case if determined by the Finance Committee to be necessary or appropriate to implement the intent of the these resolutions and with the goal of providing the clubs with overall economics with respect to the G-3 Program that are equivalent to those in effect prior to the implementation of these resolutions, on a tax-efficient basis;

5.  Except as contemplated by the foregoing resolutions, the other obligations of the G-3 Clubs shall be unaffected by the foregoing resolutions and amendments and, accordingly, all adjacency guarantees and VTS payment guarantees shall remain in full force and effect (subject, in the case of the VTS payment guarantees, to the terms of 2014 Resolution JC-4); and

6.  Each G-3 Club is hereby granted a debt ceiling waiver in the amount of the G-3 Program debt owing from such club.

2015-6

## 2015 RESOLUTION JC-1

*Whereas*, the Broadcast and Finance Committees recommend the suspension of the blackout policy for the 2015 season in order to study the impact of such a suspension on ticket sales and other League interests; and

*Whereas*, 2014 Resolution FC-4 extended, through the 2018 season, the provisions of 2012 Resolution JC-1, which modified certain policies related to the ticket manifest used to determine whether a game is sold out for purposes of the blackout policy;

Be it *Resolved*, that the blackout policy and 2014 Resolution FC-4 be, and hereby are, suspended for the 2015 season;

Further *Resolved*, that for the 2015 regular season, (a) all member clubs must contribute for each home game a 34% visiting team share ("VTS", which shall be calculated in accordance with existing League policies, including the discounted ticket policy, using prices in the club's 2015 ticket manifest as of July 15) equal to at least 85% of the general admission tickets (with no exclusion for Incremental GA Tickets) ("General Admission Tickets"); and (b) any member club that sells 85% or more of the General Admission Tickets for any game must contribute for that game a 34% VTS for those tickets;

Further *Resolved*, that for purposes of this Resolution, complimentary General Admission Tickets provided by a member club in a manner consistent with existing League policy shall be considered "sold" General Admission Tickets;

Further *Resolved*, that for the 2015 regular season, any member club selling less than 85% of the General Admission Tickets for any game may determine at its discretion for such game which unsold General Admission Tickets it will contribute VTS for to reach the 85% threshold;

Further *Resolved*, that this Resolution does not modify any other ticket-related policies, including the treatment of obstructed view seats, standing room tickets, club seats, and suite seats identified in a club manifest;

Further *Resolved*, that the Finance Committee is and remains authorized to establish policies relating to administrative and other matters in respect of such ticket policies (and similar ticket policies); and

Further *Resolved*, that a three-fourths vote of the membership shall be required to extend beyond the 2015 season the suspension of the blackout policy and/or 2014 Resolution FC-4 approved hereunder.

2015-18