Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 10th Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5429
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. 2:15-ml-02668−PSG (JEMx)<br><br>**REPLY MEMORANDUM IN SUPPORT OF THE NFL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Philip S. Gutierrez<br>Date: October 27, 2023<br>Time: 1:30 p.m.<br>Courtroom: First Street Courthouse<br>　　　　　350 West 1st Street<br>　　　　　Courtroom 6A<br>　　　　　Los Angeles, CA 90012 |

## TABLE OF CONTENTS

ARGUMENT ..... 1

I. Plaintiffs' Claims Are Barred By The Sports Broadcasting Act. ..... 1

A. Plaintiffs' Claims Depend On Attacking SBA-Protected [redacted] In The NFL-Network Agreements. ..... 1

B. There Is No Evidence Of A Horizontal Teams-NFL Agreement Separate From The SBA-Protected NFL-Network Agreements. ..... 4

II. Plaintiffs' Horizontal Theories Fail Because The NFL And Its Member Clubs Must Cooperate To Produce NFL Telecasts. ..... 5

A. There Is No Barrier To This Court's Consideration Of The NFL Defendants' Arguments. ..... 5

B. The NFL Defendants Are A Single Entity For Purposes Of Telecast Licensing. ..... 7

C. Plaintiffs Proffer No Evidence That The Challenged Cooperation To License NFL Football Telecasts Had Anticompetitive Effects. ..... 9

III. Plaintiffs Lack Evidence Of DirecTV's Involvement In The Alleged Conspiracy And Therefore Lack Standing Under *Illinois Brick*. ..... 10

IV. Plaintiffs' Claims Based On The Vertical Agreement Between The NFL And DirecTV Fail As A Matter Of Law ..... 11

CONCLUSION ..... 12

# TABLE OF AUTHORITIES

**Cases**

*American Needle v. Nat'l Football League*,
  560 U.S. 183, 204 (2010) ................................................................................ 6, 9

*Braden Partners, LP v. Twin City Fire Ins. Co.*,
  2017 WL 63019 (N.D. Cal. Jan. 5, 2017) ............................................................ 6

*Carrillo v. County of Los Angeles*,
  2012 WL 12850128 (C.D. Cal. Nov. 14, 2012) ................................................... 6

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
  961 F.2d 667 (7th Cir. 1992) ............................................................................ 2, 3

*Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
  95 F.3d 593 (7th Cir. 1996) .................................................................................. 6

*In re Citric Acid Antitrust Litig.*,
  191 F.3d 1090 (9th Cir. 1999) ............................................................................ 11

*City of Mount Pleasant v. Assoc. Elec. Co-op. Inc.*,
  838 F.2d 268 (8th Cir. 1988) ............................................................................ 7, 8

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
  658 F.2d 139 (3d Cir. 1981) ............................................................................... 12

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) .............................................................................. 8

*Gilliam v. Levine*,
  2023 WL 2770922 (9th Cir. Apr. 4, 2023) ........................................................... 4

*In re HIV Antitrust Litig.*,
  2023 WL 3088218 (N.D. Cal. Feb. 17, 2023) ...................................................... 5

*Honey Bum, LLC v. Fashion Nova, Inc.*,
  2022 WL 385185 (C.D. Cal. Jan. 6, 2022),
  *aff'd*, 63 F.4th 813 (9th Cir. 2023) .................................................................... 12

*Indep. Tube Corp. v. Copperweld Corp.*,
  691 F.2d 310 (7th Cir. 1982), *rev'd*, 467 U.S. 752 ............................................. 7

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ............................................................................ 11

*Levi Case Co. v. ATS Prods., Inc.*,
    788 F. Supp. 428 (N.D. Cal. 1992) .................................................................. 12

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ......................................................................................... 10

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ................................................................... *passim*

*Nat'l Football League v. Ninth Inning, Inc.*,
    141 S. Ct. 56 (2020) ......................................................................................... 10

*Parrish v. Nat'l Football League Players Ass'n*,
    534 F. Supp. 2d 1081 (N.D. Cal. 2007) ............................................................ 12

*Pubali Bank v. City Nat'l Bank*,
    777 F.2d 1340 (9th Cir. 1985) ............................................................................ 6

*Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*,
    61 F.4th 299 (2d Cir. 2023) ........................................................................ 10, 11

*Ross v. Am. Express Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014),
    *aff'd* 630 F. App'x 79 (2d Cir. 2015) ................................................................ 11

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) .............................................................. 8, 12

*Toscano v. Pro. Golfers Ass'n*,
    258 F.3d 978 (9th Cir. 2001) ............................................................................ 11

*United States v. Nat'l Football League*,
    196 F. Supp. 445 (E.D. Pa. 1961) ...................................................................... 2

*United States Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988) ......................................................................... 2, 3

*Washington v. National Football League*,
    880 F. Supp. 2d 1004 (D. Minn. 2012) .......................................................... 8, 9

**Statutes**

15 U.S.C. § 1291 ................................................................................................... 2, 3

iii

Case No. 2:15-ml-02668-PSG (JEMx)                Reply Memorandum in Support of the NFL Defendants' Motion for Summary Judgment

**Other Authorities**

S. Rep. No. 87-1087 (1961), 1961 U.S.C.C.A.N. 3042 ............................................. 2

Plaintiffs' Opposition rests on the premise that the Ninth Circuit's decision allowing their complaint to survive a motion to dismiss dictates the result at summary judgment. That is wrong. The Ninth Circuit addressed only the plausibility of the claims and allegations Plaintiffs pleaded seven years ago in the absence of a factual record. Plaintiffs' obligation now is to demonstrate that their current claims may proceed in light of the record and currently applicable legal principles the Ninth Circuit did not address. Plaintiffs cannot satisfy that obligation, and summary judgment is warranted.

## ARGUMENT

### I. Plaintiffs' Claims Are Barred By The Sports Broadcasting Act.

Plaintiffs do not dispute that their alleged proof of (i) anticompetitive harm, (ii) antitrust impact, and (iii) damages all depends on substantially revising or eliminating altogether central provisions of the NFL's agreements with CBS and FOX (the NFL-Network Agreements). These direct challenges to the NFL-Network Agreements cannot proceed consistent with the SBA. The Ninth Circuit did not address this issue; it expressly noted Plaintiffs' agreement that "the NFL-Network Agreement[s] [are] covered by the SBA" and limited its analysis to the alleged interaction of the "Teams-NFL and NFL-DirecTV Agreements." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1147–48, 1149 n.4 (9th Cir. 2019). Plaintiffs' attempt to reverse position by seeking to invalidate key provisions of those agreements cannot be reconciled with the SBA.

### A. Plaintiffs' Claims Depend On Attacking SBA-Protected ███████████ In The NFL-Network Agreements.

There is no dispute that Plaintiffs' claims now depend on successfully attacking the NFL-Network Agreement provisions that ███████████████████████████████████████████████████████████████████████████████. Mot. 6–10; Opp. 8–10; SUF Reply ¶¶ 94, 108–138. The theories that Plaintiffs

currently advance would gut these protective provisions and enable ████████████████████████████████████████████████████████████████████.

The text and history of the SBA confirm that protecting the exclusivity of game broadcasts is at the core of the statute. The SBA grants an antitrust exemption for the sale of "all or any part" of broadcasting rights. 15 U.S.C. § 1291. Plaintiffs appear to suggest that the SBA protects only the sale of *non-exclusive* broadcast rights—*i.e.*, that it permits the NFL and clubs to contract for broadcast productions, but does not allow broadcasters to protect their viewership by precluding or limiting alternative productions from broadcast or other distributors. There is no such limitation in the text. *See USFL v. NFL*, 842 F.2d 1335, 1354 (2d Cir. 1988) ("the [SBA] does contain express limitations" relating to college football, "which suggests by implication that no other limitations exist"). Reading in such a limitation would not only violate principles of statutory interpretation but also make no sense; there would be no need for an antitrust exemption to cover only licensing of non-exclusive broadcast rights.

The legislative history confirms that the SBA was designed to protect broadcast exclusivity. It was enacted "to overrule the effect of [the *NFL II*] decision," which enjoined the execution of a "contract between the [NFL] and [CBS] granting CBS the *exclusive* right to televise league games." S. Rep. No. 87-1087 (1961), 1961 U.S.C.C.A.N. 3042, 3042 (emphasis added); *see also Sunday Ticket*, 933 F.3d at 1145–46. The agreement at issue in *NFL II* actually provided *greater* exclusivity than the NFL-Network Agreements: it involved a single network, left no residual rights to be sold, and thus resulted in lower output of Sunday afternoon telecasts. *See United States v. Nat'l Football League*, 196 F. Supp. 445, 446–47 (E.D. Pa. 1961).

SBA precedent is to the same effect. "Any transfer of broadcast rights entails exclusion of the competing uses of the same rights." *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) (Easterbrook, J.) ("*Bulls I*"). Indeed, "[u]nless the [SBA] allows the league to bar broadcasting of at least some games," such as by an exclusive license, "it is hard to see why it is cast as

an exemption from the antitrust laws." *Id.* Thus, for example, in *USFL v. NFL*, the Second Circuit upheld application of the SBA to the NFL's then-current broadcast agreements despite noting that "the NFL was forbidden by [the] network contracts to televise games *on cable*." 842 F.2d at 1348, 1353–55 (emphasis added).

But Plaintiffs' whole case is built on undermining the exclusivity protected by the SBA. ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████. Mot. 6. Their models assume ██████ ██████████████████████████████████████████ ██████████████████████████████████████████ █████████████████ of the NFL-Network Agreements. SUF Reply ¶¶ 94, 108–138. Contrary to Plaintiffs' suggestion (Opp. 8), Defendants are not re-litigating *Shaw* or the motion to dismiss ruling, and are not seeking to extend the protections of the SBA to a license for "paid telecasting" (*i.e.*, the vertical NFL-DirecTV Agreement). Defendants explain in section IV, below, why any challenge to that vertical agreement fails on the merits. Here, Defendants argue only that the SBA protects the ██████████████████████████████████████████.

The key point for present purposes is this. All should agree that the SBA grants the NFL and clubs the right to enter fully exclusive contracts with CBS and FOX, under which the only Sunday afternoon telecasts are the ones they produce and air. Plaintiffs offer no legal or logical explanation for why the SBA provides less protection for the output-enhancing (and plainly more consumer-friendly) scenario in which Sunday Ticket supplements the CBS and FOX broadcasts ████████ ██████████████████████████████████████████.

Finally, Plaintiffs are incorrect to claim that the SBA is relevant only to their claims under Section 1 of the Sherman Act. Opp. 8 n.6. The SBA unambiguously provides an exception to "[t]he antitrust laws," including "as defined in section 1 of the Act of October 15, 1914," 15 U.S.C. § 1291, which in turn defines "the antitrust

laws" to include the entirety of the Sherman Act, 38 Stat. 730. Accordingly, the SBA precludes all of Plaintiffs' claims and compels entry of judgment for Defendants.

### B. There Is No Evidence Of A Horizontal Teams-NFL Agreement Separate From The SBA-Protected NFL-Network Agreements.

A separate core factual premise of Plaintiffs' case is that there is an unlawful agreement by which the NFL clubs transferred telecast rights to the NFL. Plaintiffs define this as another part of the Challenged Conduct, calling it the "Teams-NFL Agreement" to pool licenses. *See Sunday Ticket*, 933 F.3d at 1148–49. But Plaintiffs offer no evidence that any such separate agreement exists—the "pooling" conduct that Plaintiffs challenge occurs through the SBA-protected NFL-Network Agreements. This independent factual defense limits Plaintiffs to challenging just the vertical NFL-DirecTV Agreement, which they fail to do, *see infra* § IV.

As the undisputed record demonstrates, (i) the NFL Constitution assigns certain telecast rights to the individual clubs and (ii) the NFL acts as agent for the clubs in negotiating and executing the SBA-protected NFL-Network Agreements. SUF Reply ¶¶ 4–7, 26–28. Those SBA-protected NFL-Network Agreements are the only pooling agreements in the record. *Id.* ¶¶ 26–28. The evidence supporting these straightforward points was not—and could not have been—addressed at the motion to dismiss stage. *See, e.g.*, *Gilliam v. Levine*, 2023 WL 2770922, at *2 (9th Cir. Apr. 4, 2023) ("law of the case does not apply because this appeal concerns a motion for summary judgment, whereas the prior appeal involved a motion to dismiss").

Plaintiffs offer no contrary evidence. Plaintiffs cite ███████ ███████████████████████████████ (Opp. 13), but ███████████ confirms that ███████████████████████████████████████████████. For example, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████ (Leckman Decl. Ex. 13 at 19 (emphasis added)), not some separate agreements antecedent to the NFL-Network Agreements. *See* SUF Reply ¶¶ 26–28.

4

1     Plaintiffs' reliance (Opp. 14) on an obscure reference to a ▮▮▮▮▮
2 ▮▮▮▮▮ changes nothing. Plaintiffs claim that ▮▮▮▮▮ described a ▮▮▮▮▮
3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. But there is
4 no evidence of what ▮▮▮▮▮ is (or was), or that it has (or had) any relation to
5 the issues in this case. The document, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, would in any
6 event be superseded by the operative agreements in the record that do not mention
7 (let alone incorporate) any such ▮▮▮▮▮. SUF Reply ¶ 185. Citing language from
8 a document with no context or evidence of its relevance does not create a triable issue
9 of fact. *See, e.g.*, *In re HIV Antitrust Litig.*, 2023 WL 3088218, at *2 (N.D. Cal. Feb.
10 17, 2023) ("[T]here must be evidence on which the jury could reasonably find for the
11 nonmoving party."). There is accordingly no potentially unlawful horizontal
12 "pooling" conduct among the NFL clubs for Plaintiffs to challenge.

13 **II.**     **Plaintiffs' Horizontal Theories Fail Because The NFL And Its Member Clubs Must Cooperate To Produce NFL Telecasts.**
14

15     Defendants' opening brief demonstrated that the NFL Defendants operate as a
16 single entity for purposes of licensing NFL Football telecasts. Mot. 12–18. Plaintiffs
17 respond primarily with a series of procedural objections, none of which precludes
18 this Court from considering Defendants' arguments. More important, on the merits,
19 Plaintiffs have effectively conceded that Defendants are right.

20     **A.**     **There Is No Barrier To This Court's Consideration Of The NFL Defendants' Arguments.**
21

22     Plaintiffs misrepresent the law in suggesting that either the Ninth Circuit's
23 prior decision or *American Needle* precludes this single-entity argument. As to the
24 Ninth Circuit, Defendants did not move to dismiss on single-entity grounds, and the
25 court's opinion did not rule on that question. *See Sunday Ticket*, 933 F.3d at 1154.
26 That argument had to wait for a factual record. Nor did the Ninth Circuit implicitly
27 reject this argument in ruling that it could identify no "*binding precedent* requiring
28 the teams and the NFL to cooperate in order to produce . . . telecasts," *id.* at 1153

(emphasis added). The fact that at the motion to dismiss stage, the Court identified no clear *legal* obstacle to Plaintiffs' case does not mean that they have now produced sufficient *factual* evidence to allow their claims to survive.

That distinction—between the allegations at issue in the Ninth Circuit's ruling and the evidence available now—makes all the difference. A district court may not assess a summary judgment motion "solely in reliance on [prior] appellate holdings"; it instead "must examine whatever materials" are presented at the time. *Pubali Bank v. City Nat'l Bank*, 777 F.2d 1340, 1342 (9th Cir. 1985). As is evident from *Pubali Bank*—and basic principles of civil procedure—the law-of-the-case doctrine has no application here. "Given the different standards for motions to dismiss and motions for summary judgment, courts may (and routinely do) reconsider the same legal arguments at the summary judgment stage." *Braden Partners, LP v. Twin City Fire Ins. Co.*, 2017 WL 63019, at *6 (N.D. Cal. Jan. 5, 2017).

Nor did the Ninth Circuit's discussion of other sports leagues' telecast arrangements reflect a merits ruling on Defendants' single-entity argument. *See* Opp. 18–19 (citing *Sunday Ticket*, 933 F.3d at 1154). As a legal matter, a court's recitation of facts from other judicial opinions is not admissible evidence. *See, e.g.*, *Carrillo v. County of Los Angeles*, 2012 WL 12850128, at *4 n.4 (C.D. Cal. Nov. 14, 2012) ("[A prior court's] findings are inadmissible evidence in this case."). More important, the record here shows that those leagues and teams also must agree with each other to produce game telecasts. SUF Reply ¶¶ 74–79. That those leagues have agreed to different allocations of telecast rights does not change the undisputed fact that agreements are necessary to produce the telecasts in the first place. *See* Mot. 16–18.

As to *American Needle v. NFL*, that case addressed whether the NFL was a single entity only "when it comes to the marketing of *the teams' individually owned* intellectual property." 560 U.S. 183, 204 (2010) (emphasis added). It expressly left open the question whether the NFL and its clubs might be a single entity for other purposes. *Id.*; *see also Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95

F.3d 593, 600 (7th Cir. 1996) (Easterbrook, J.) ("Sports are sufficiently diverse that it is essential to investigate their organization and ask *Copperweld*'s functional question one league at a time—and perhaps one facet of a league at a time.").

Finally, Plaintiffs assert an illusory contradiction between Defendants' single-entity and SBA arguments, claiming the SBA presumes that the NFL and its clubs are capable of a Section 1 conspiracy. Opp. 15. Not so. The single-entity arguments are based on the Supreme Court's 1984 *Copperweld* decision, which postdates the SBA by more than 20 years and rejected the "intra-enterprise conspiracy doctrine" prevailing when the SBA was enacted in 1961. *See, e.g.*, *Indep. Tube Corp. v. Copperweld Corp.*, 691 F.2d 310, 316–20 (7th Cir. 1982) (discussing and applying doctrine), *rev'd*, 467 U.S. 752; *see also Copperweld*, 467 U.S. at 760–65 (discussing development of intra-enterprise conspiracy doctrine between 1947 and 1951).

### B. The NFL Defendants Are A Single Entity For Purposes Of Telecast Licensing.

Plaintiffs do not dispute that under *Copperweld* and its progeny, the operative legal question is whether the NFL and its clubs exercise "independent sources of economic power" in licensing telecasts or, instead, exercise economic power that "depends, and has always depended, on the cooperation among [them]." Mot. 12–13 (also citing *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148–49 (9th Cir. 2003), and *City of Mount Pleasant v. Assoc. Elec. Co-op. Inc.*, 838 F.2d 268, 276–77 (8th Cir. 1988)). Nor do Plaintiffs dispute that the relevant factual question posed by this legal test is whether the NFL and its member clubs can each license telecasting rights to an NFL game without the consent of the others. Mot. 12–13.

Plaintiffs admit that the answer to this question is no. *First*, Plaintiffs admit that "cooperation [is] required to schedule and create an NFL game (on the field of play)." Opp. 18 n.17 (emphasis omitted); *see also* SUF Reply ¶¶ 5, 8–14, 19–21. Because a game is a necessary input to a game broadcast, the need to cooperate to create the game *a fortiori* proves the need to cooperate to create the game telecast:

without that cooperation, there is no game to be telecast at all. *Second*, Plaintiffs admit the need for agreement among the clubs to license the intellectual property rights necessary to telecast a single game. Opp. 17; *see also* SUF Reply ¶¶ 16–18, 22–23. If a club needs an agreement with another club and the NFL to license a telecast, it does not have "independent" ability to license that telecast, nor is it a "competitor" to the other club or to the NFL with which it must cooperate to create the telecast. *See Freeman*, 322 F.3d at 1148–49; *Mt. Pleasant*, 838 F.2d at 276–77.

These admissions are dispositive. In *Washington v. National Football League*, 880 F. Supp. 2d 1004 (D. Minn. 2012), the court ruled that the NFL and its member teams are a single entity regarding historical game footage, and thus cannot engage in "concerted action that is illegal under the Sherman Act." *Id.* at 1006. The court found that the NFL and its teams cannot conspire to market "property the teams and the NFL can only collectively own." *Id.*; *see Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 114 (S.D.N.Y. 2015) (same for game photographs). That conclusion follows more strongly for *live* game footage. Although Plaintiffs assert that these cases involve different "types of cooperation" (Opp. 18 n.17), they do not identify any difference that would change the analysis or the conclusion.

Plaintiffs' remaining arguments also fail. They argue (Opp. 17) that clubs would have an incentive to agree to other clubs' telecast licensing. But even if that incentive exists, it would not obviate the need for cooperation in the first place, which is the relevant question. Plaintiffs likewise suggest that college football involves consent between two teams and one or more governing bodies, such as conferences, and tout that Notre Dame "has no trouble reaching agreements with the NCAA or the teams it plays" to license telecasts. *Id.* (citing AUF ¶¶ 81–82, which are the only two facts cited in Plaintiffs' entire response to Defendants' single-entity argument). That again proves Defendants' point: a single college team cannot act alone to license telecasts; it must cooperate and obtain consents from competing teams and conferences. It is telling that team licenses are the extreme outlier in college football;

8

the far more common outcome is for conferences—which Plaintiffs say are sports leagues like the NFL—to license telecasts rights collectively. SUF Reply ¶¶ 80–82.

Plaintiffs fare no better in repeating their appeals to NFL telecast licensing practices in the 1950s (Opp. 15–17), when broadcast agreements were subject to the approval of the League Commissioner, SUF Reply ¶¶ 72, 73. The fact that CBS "still needed to negotiate contracts with each team independently" after reaching that "initial agreement" with the League (Opp. 16 (emphasis and citation omitted)), is irrelevant. The relevant fact is that CBS needed an "initial agreement" with the League before contracting with individual clubs. That fact is undisputed, and it confirms that telecasts involve "property the teams and the NFL can only collectively own." *Washington*, 880 F. Supp. 2d at 1006. Defendants are a single entity for purposes of game telecasts, precluding Plaintiffs from stating an antitrust claim.

### C. Plaintiffs Proffer No Evidence That The Challenged Cooperation To License NFL Football Telecasts Had Anticompetitive Effects.

Even if the NFL and its clubs were not a single entity for telecast licensing purposes, Plaintiffs would still need to demonstrate a triable issue as to whether the challenged cooperation was anticompetitive. Mot. 18–19. Plaintiffs cannot make that showing because cooperation is necessary to create NFL telecasts. The Ninth Circuit's conclusion that Plaintiffs plausibly *alleged* that telecasts can be created without "cooperation among competitors," 933 F.3d at 1154–55, does not answer the question whether Plaintiffs have offered *evidence* to support those allegations.

Rather than offer such evidence, Plaintiffs concede that cooperation among the NFL and the clubs is required to create and license NFL Football telecasts. SUF Reply ¶¶ 5, 8–23. And they cannot walk away from their expert's admission—writing about the NFL—that "if there could be no product without the agreement, then the agreement does not restrain any competition." Kilaru Decl. Ex. 40; *accord Am. Needle*, 560 U.S. at 203. It is not surprising that Plaintiffs offer no support—factual or legal—for the proposition that the NFL and the clubs must (i) engage in the

cooperation necessary to produce the NFL Football product and then (ii) dismember that same product for separate sale. Mot. 19; *see also Nat'l Football League v. Ninth Inning, Inc.*, 141 S. Ct. 56, 57 (2020) (statement of Kavanaugh, J.) (citing *American Needle*, noting that "NFL teams . . . must cooperate in the production and scheduling of games," and concluding that "antitrust law likely does not require that the NFL and its member teams compete against each other with respect to television rights").

### III. Plaintiffs Lack Evidence Of DirecTV's Involvement In The Alleged Conspiracy And Therefore Lack Standing Under *Illinois Brick*.

At the motion-to-dismiss stage, the Ninth Circuit held that Plaintiffs' damages claims survived *Illinois Brick* because "the complaint adequately *alleges* that DirecTV conspired with the NFL and the NFL Teams to limit the production of telecasts to one per game." *Sunday Ticket*, 933 F.3d at 1158 (emphasis added). But at summary judgment, Plaintiffs must proffer *evidence* of DirecTV's participation in that alleged conspiracy—*i.e.*, that DirecTV had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). They have no such evidence.

Plaintiffs disclaim any argument that the NFL-DirecTV Agreement itself violates the antitrust laws. Opp. 20–21. They rely instead on alleged anticompetitive effects of a purported "scheme" of "interlocking agreements." Opp. 23. Plaintiffs thus must prove DirecTV's "conscious commitment" to a scheme that extends beyond the NFL-DirecTV Agreement. As their cited case explains, "[i]f the plaintiff alleges that [certain conduct] is in service of a plan to restrain competition, then it must [offer] enough additional facts to show that agreement to such a plan exists." *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 308 (2d Cir. 2023).

Plaintiffs do not proffer any "additional facts" that DirecTV agreed to any such "scheme" or "plan." Instead, their "primary evidence" of DirecTV's participation is "the agreements themselves." Opp. 20. But allegations of agreements that Plaintiffs assert are interlocking says nothing about DirecTV's conduct outside the four corners

10

1  of its own agreement. Plaintiffs have failed to identify any direct or circumstantial
2  evidence of any scheme or plan extending beyond those four corners.

3        Plaintiffs have no direct evidence—"evidence that is explicit and requires no
4  inferences to establish the proposition or conclusion being asserted"—of DirecTV's
5  participation in such a broader scheme. *In re Citric Acid Antitrust Litig.*, 191 F.3d
6  1090, 1094 (9th Cir. 1999). All Plaintiffs have is proof that DirecTV accepted the
7  NFL's terms and entered into an ordinary commercial contract of the kind that occurs
8  every day in the entertainment industry, where exclusive licenses are common. That
9  is not enough. *See Relevant Sports*, 61 F.4th at 308; *Toscano v. Pro. Golfers Ass'n*,
10 258 F.3d 978, 983 (9th Cir. 2001).

11       Plaintiffs also have no circumstantial evidence of DirecTV's participation in a
12 scheme extending beyond its own contract. They cite (Opp. 22) the *NFL's* asserted
13 motivations in contracting with DirecTV, but it is *DirecTV's* perspective that is
14 relevant in assessing whether DirecTV agreed to conspire. And DirecTV's choice to
15 contract with the NFL is "consistent with"—and thus does not "tend to exclude the
16 possibility of"—legitimate behavior. *Citric Acid*, 191 F.3d at 1095; *see Toscano*, 258
17 F.3d at 984 ("merely agree[ing] to purchase products or provide a service under
18 conditions set by the other party" is not evidence of conspiracy). The court should
19 not "read evidence of [a] benign agreement as evidence of a separate, illegal
20 agreement." *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014), *aff'd*
21 630 F. App'x 79 (2d Cir. 2015); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042,
22 1048 (9th Cir. 2008) (banks' participation in consortium was not evidence that they
23 "conspired or agreed with each other or with the Consortiums to restrain trade").

24 **IV.   Plaintiffs' Claims Based On The Vertical Agreement Between The NFL And DirecTV Fail As A Matter Of Law.**
25

26       As discussed above, the record confirms that Plaintiffs have identified no
27 triable issue—and have no viable claim—arising from any agreement between the
28 NFL clubs and the NFL or between the NFL and the Networks. Plaintiffs' only

11

Case No. 2:15-ml-02668-PSG (JEMx)    Reply Memorandum in Support of the NFL Defendants' Motion for Summary Judgment

potential remaining argument would be that the vertical NFL-DirecTV Agreement restrains competition. But Plaintiffs offer no argument explaining how that vertical agreement—standing alone—either restrains competition or harms consumers.

The Opposition does not contend with the longstanding precedent that the NFL's vertical agreement with DirecTV, in which the NFL simply licenses its own copyrights to game feeds, "by itself, does not constitute an illegal restraint under the antitrust laws." *Levi Case Co. v. ATS Prods., Inc.*, 788 F. Supp. 428, 432 (N.D. Cal. 1992). "An exclusive license, which merely confers upon the licensee the ability to exploit the licensor's exclusive intellectual property rights, does not violate the antitrust laws." *Spinelli*, 96 F. Supp. 3d at 118; *see Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1092 (N.D. Cal. 2007) ("The mere existence of an exclusive deal between the NFLPA and its licensees does not violate the antitrust laws or significantly threaten competition."); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 153 (3d Cir. 1981) ("[A]s a licensor, the MLBPA is free to grant licenses to any competitor, or none at all."). Instead, Plaintiffs largely rehash their failed arguments that DirecTV was part of a broader conspiracy. *See* Opp. 23–25.

Plaintiffs argue in a footnote (Opp. 24 n.22) that this precedent does not apply because the Ninth Circuit "held" that this is not a "run-of-the-mill" agreement. But once again, the Ninth Circuit took as true Plaintiffs' allegations that the NFL-DirecTV Agreement was part of a broader "conspiracy." Based on the actual evidence, Plaintiffs' allegations of a broader conspiracy are superseded by the SBA (*see* § I, *supra*), are barred by the single-entity doctrine (§ II), and are factually unsupported (§ III). The precedents above thus remain controlling. *See, e.g.*, *Honey Bum, LLC v. Fashion Nova, Inc.*, 2022 WL 385185, at *3 (C.D. Cal. Jan. 6, 2022), *aff'd*, 63 F.4th 813 (9th Cir. 2023) (granting summary judgment and declining to "deem an agreement horizontal based only on evidence of vertical agreements . . . .").

## CONCLUSION

The Court should grant summary judgment in favor of Defendants.

Dated: September 29, 2023

Respectfully submitted,

/s/ *Rakesh N. Kilaru*

Rakesh N. Kilaru (admitted *pro hac vice*)
Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com

Neema T. Sahni (Bar No. 274240)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
nsahni@cov.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*