UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)


IN RE:                          ) CASE NO: 2:15-ml-02668-PSG-SK
                                )
                                )           CIVIL
NATIONAL FOOTBALL LEAGUES       )
SUNDAY TICKET ANTITRUST         )    Los Angeles, California
LITIGATION                      )
                                )    Monday, December 11, 2023
                                )
_____ )    (9:59 a.m. to 11:14 a.m.)


HEARING RE:

MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS AS ASSERTED
BY PLAINTIFFS IN THE SECOND CONSOLIDATED AMENDED COMPLAINT
[ECF.NO.954];

PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH THE COURT'S
AUGUST 11, 2022 ORDER AND TO PERMIT PLAINTIFFS TO TAKE
DEPOSITIONS REGARDING THE NEW SUNDAY TICKET AGREEMENTS
[DKT.NO.1009]


BEFORE THE HONORABLE PHILIP S. GUTIERREZ,
CHIEF UNITED STATES DISTRICT JUDGE



**APPEARANCES**:            SEE PAGE 2

Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Kelly Davis

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES</u>:

For Plaintiffs:               MARC M. SELTZER, ESQ.
                              KALPANA SRINIVASAN, ESQ.
                              Susman Godfrey
                              1900 Avenue of the Stars
                              Suite 1400
                              Los Angeles, CA 90067

                              SATHYA S. GOSSELIN, ESQ.
                              SAMUEL MAIDA, ESQ.
                              Hausfeld
                              888 16th Street NW
                              Suite 300
                              Washington, DC 20006

For Defendants:               BETH A. WILKINSON, ESQ.
                              RAKESH N. KILARU, ESQ.
                              BRIAN L. STEKLOFF, ESQ.
                              JEREMY BARBER, ESQ.
                              Wilkinson Stekloff
                              2001 M Street NW
                              10th Floor
                              Washington, DC 20036

                              JOHN S. PLAYFORTH, ESQ.
                              Covington & Burling
                              One City Center
                              800 Tenth Street NW
                              Washington, DC 20001

1     **Los Angeles, California; Monday, December 11, 2023; 9:59 a.m.**

2                      **(Call to Order)**

3          **THE CLERK:**  Calling Case Number MDL 15-2668-PSG;

4     In Re National Football Leagues Sunday Ticket Antitrust

5     Litigation.

6              Counsel, please state your appearances, starting with

7     Plaintiff.

8          **MR. SELTZER:**  Good morning, Your Honor.  Mark Seltzer

9     of Susman Godfrey on behalf of the Plaintiffs.

10         **MS. SRINIVASAN:**  Kalpana Srinivasan of Susman Godfrey

11    on behalf of the Plaintiffs.

12         **MR. GOSSELIN:**  Sathya Gosselin from Hausfeld on

13    behalf of the Plaintiffs.

14         **MR. MAIDA:**  Samuel Maida, Hausfeld, on behalf of the

15    Plaintiffs.

16         **THE COURT:**  Good morning.

17         **MS. WILKINSON:**  Good morning, Your Honor.  Beth

18    Wilkinson from Wilkinson Stekloff on behalf of the NFL.

19         **MR. KILARU:**  Rekesh Kilaru also from Wilkinson

20    Stekloff on behalf of Defendants.

21         **MR. PLAYFORTH:**  John Playforth, Covington & Burling,

22    also on behalf of the NFL Defendants.

23         **MR. BARBER:**  Good morning, Your Honor.  Jeremy Barber

24    from Wilkinson Stekloff on behalf of the NFL Defendants.

25         **MR. STEKLOFF:**  Good morning, Your Honor.  Brian

4

1    Stekloff from Wilkinson Stekloff on behalf of the NFL

2    Defendants.  We also have Ben Sherman who's one of our

3    paralegals who's going to assist with technology this morning.

4         **THE COURT:**  All right.  Just preliminary

5    housekeeping.  Moving party, NFL, how long would you like?  I'm

6    going to set some time limits but I wanted to start off by

7    asking how long do you think you want to present?

8         **MR. KILARU:**  I would say 15 minutes, Your Honor.

9         **THE COURT:**  Okay that's fine.  And then you had some

10   slides that you wanted to show me.  You can approach with the

11   slides.

12        **MR. KILARU:**  Thanks.

13      **(Counsel approached)**

14        **THE COURT:**  And then from the Plaintiffs' side is

15   15 minutes enough?

16        **MR. SELTZER:**  I would think that's probably all

17   right, maybe 15, 20 minutes.

18        **THE COURT:**  Okay all right.  So let's start with the

19   NFL.

20        **MR. KILARU:**  Thanks, Your Honor.  We're happy to

21   answer any questions you have on any of the arguments but just

22   in terms of the order I was planning to walk through, I thought

23   I'd start with the Sports Broadcasting Act and then move to the

24   remaining arguments.

25        **THE COURT:**  That's what I was going to ask you.  So

5

1    just as we go through the SBA, then if you want to switch gears

2    to standing, you want to switch gears to horizontal agreement,

3    just let me know you're switching gears.

4              **MR. KILARU:**  Of course.  I will do that, Your Honor.

5              **THE COURT:**  All right.  Thank you.

6              **MR. KILARU:**  So to start with the Sports Broadcasting

7    Act, Your Honor, we think that this presents an appropriate

8    ground for judgment for the NFL Defendants on all counts and it

9    really boils down to three simple points -- if you can go to

10   the next slide -- two of which I think are uncontested and the

11   third of which follows logically from the first two.

12             The first point is that the SBA applies to the

13   CBS and Fox agreements.  This I think is clear from the text of

14   the statute that it doesn't just apply to kind of individual

15   provisions in the agreements but to the agreements as a whole.

16   So we start under the statute with the premise that the

17   contract is covered by the SBA.

18             I think the second point, which again should not be

19   in dispute as a legal matter, is that the SBA also protects

20   exclusivity in broadcasts.  This flows from the text of the

21   statute, from the history of the statute, and from all the

22   caselaw interpreting it.  We have not found a single case

23   suggesting that the SBA does not cover exclusivity.  And so

24   what that means as a practical matter is that at minimum, if

25   the NFL only had its agreements with CBS and Fox and there was

1   no output enhancing additional Sunday Ticket product, that

2   arrangement would be immune from antitrust liability.

3          **THE COURT:**  I think everybody agrees on that point

4   that if that was the situation, we wouldn't be here.  But the

5   question that I have and I think throughout many of the

6   arguments that the NFL makes is that you're asking me to do

7   what the Ninth Circuit has told me not to do and that is to

8   view agreements in isolation.  And what happens with many of

9   the arguments that the NFL is making, you're exactly -- you

10  telling me to do exactly that and the Ninth Circuit told me to

11  be wholistic and look at all the horizontal agreements, this

12  agreement and then the DirecTV.  But that's -- I think that's a

13  problem for you.

14         **MR. KILARU:**  So I'm glad you raised that point, Your

15  Honor.  On this one I think we are actually the ones urging you

16  to look at all the agreements that the Plaintiffs are

17  challenging.  So if I could start then if we could go to

18  Slide 16.

19         When the Ninth Circuit confronted this case, it

20  didn't understand that the Plaintiffs were directly challenging

21  the CBS and Fox broadcast agreements that are covered by the

22  SBA.  We looked through the opinion and you can see time after

23  time after time, they understood the challenged conduct in this

24  case to be the two agreements that we were talking about, the

25  agreement between the NFL and the teams and the separate

1    agreement between the NFL and DirecTV.  And it was not

2    presented to them, nor do I think they understood under any

3    fair understanding of that opinion, that the Plaintiffs were

4    also trying to collaterally attack or directly attack the

5    agreements with CBS and Fox.  But that is now clear and that's

6    the problem.

7         **THE COURT:**  Are they really attacking the agreements

8    or basically saying the agreements that are protected under the

9    SBA set the scene, set the picture, the landscape, that you --

10   that tells us how to view the other two agreements, the one

11   with DirecTV and then the one among the teams?

12        **MR. KILARU:**  So I think they are challenging it, Your

13   Honor, and I think the clearest evidence of this is if you look

14   at Slide 14.  They include the CBS and Fox agreements in their

15   definition of challenged conduct and we pointed this out in our

16   brief without any real rebuttal.

17        On page 6 of our brief we pointed out that their

18   expert includes the CBS and Fox agreements in his definition of

19   the challenged conduct at issue here, in his description of

20   monopoly power, in his description of the anticompetitive

21   effects of the agreements, and on impact and damages.  So they

22   are front and center square in the Plaintiffs' theory.

23        And they don't just set the scene because I think the

24   key point that I would make kind of the whole thesis of this

25   argument, is that what the Plaintiffs are doing is essentially

1  saying that CBS and Fox should be buying a different set of

2  rights than they're actually buying. What CBS and Fox are

3  buying under the contracts that have been agreed to is

4  essentially an exclusive right to broadcast Sunday afternoon

5  NFL games, subject only to a narrow carveout for Sunday Ticket.

6  So they could, as you said earlier, get a hundred percent of

7  the rights and there's no question that that would be

8  completely immune from antitrust liability under the SBA.

9          The rights they're instead purchasing are a slightly

10  narrower set. It's the right to broadcast games on a Sunday

11  afternoon and to have the only competing broadcast of that be

12  Sunday Ticket. And what the Plaintiffs are saying is, that

13  isn't appropriate. They're trying to change the scope of

14  rights in the CBS and Fox agreements and say CBS and Fox should

15  be buying some different part of the rights than they are or

16  invalidating the agreements that convey part of the rights to

17  CBS and Fox. And that's why they're not just stage setting,

18  they're essential to the arguments that the Plaintiffs have

19  made because every single one of their but-for worlds and all

20  of their proof depends on taking that language in the SBA

21  agreements, the exclusivity language, and changing it and

22  saying it must go away.

23          And I think the simplest way to think of it before

24  walking through some of the ingredients is this: If the

25  Plaintiffs walked into court and sued CBS and Fox and said we

9

1    don't like the scope of agreements that you have negotiated

2    with the NFL, you should get something less so there should be

3    more competition, I don't think anyone would hesitate

4    respectfully to find that that lawsuit was foreclosed by the

5    SBA.  Because if we look at Slide Number 2, the text of the

6    statute, it would clearly cover that type of lawsuit.  It says

7    the antitrust laws do not apply to any joint agreement.  So you

8    would have an agreement between CBS and the NFL or Fox and the

9    NFL, by which part of the rights of such league's member clubs

10   in the sponsored telecasting of the games football are

11   produced.  So if they came into court and said, CBS and Fox, we

12   don't like the part of the rights that you have negotiated to

13   purchase, it needs to be different, I don't think there's any

14   question that that lawsuit would be precluded by the SBA.

15           And what you have here is essentially that lawsuit,

16   which would clearly be an SBA violation, inextricably embedded

17   in the different claim that Plaintiffs say they're bringing and

18   it pervades every aspect of their case.  And allowing the case

19   to go forward would essentially allow that other lawsuit to go

20   forward too and say that the Plaintiffs can target and

21   challenge, not just the scope of rights, but also the

22   exclusivity that CBS and Fox are buying, and it would

23   essentially say they have to buy a different part of the rights

24   than what they have contracted to provide.

25           So to take a step back and just walk through it a

1   little bit more, then I'll go quickly on this because I think,

2   as Your Honor said, we may have an agreement on this point.

3           Before 1961, the agreement that the NFL entered into

4   -- and this is Slide 3 then -- was an agreement that would have

5   given CBS the exclusive right to control the distribution of

6   NFL games.  And so CBS would have had the right to determine

7   which games to televise at all and where to televise those

8   agreements.  And I think there's no question that that would be

9   a worse outcome for consumers than what we have today.  There

10  would be one producer and one method of distribution.  And

11  that's from the Second Circuit decision in *USFL*.

12          And if we go to the next slide, the whole purpose of

13  the SBA was to reinstate that exclusive agreement.  When

14  Congress was passing the SBA, it said this legislation is

15  needed to overrule the effect of a decision in validating a

16  contract, quote, "granting CBS the exclusive right to televise

17  league games."  So that was what the statute was intended to do

18  and as multiple courts have concluded, the Second Circuit and

19  the Seventh Circuit, that's what it does do.

20          If you look at the next slide, the *USFL* case from the

21  Second Circuit, the whole point of the SBA was to alter the

22  order banning exclusivity.

23          If you look at the next slide, the Second Circuit

24  talks about all the broadcast contracts that followed the

25  passage of the SBA.  And every one of them involved full

1    exclusivity to a broadcast provider.  They said you can't have

2    games on cable, you can't have games in any other forum.

3    Again, from the perspective of looking at then versus now,

4    these are all worse outcomes for consumers in that there's only

5    one way to get these games.  Sunday Ticket is an add-on to that

6    that increases output.

7            And then last if you look at the Seventh Circuit's

8    decision in the *Bull's* case which we cite in the briefs and

9    that's the next slide, they also recognize the straight-forward

10   point that exclusivity is clearly covered by the SBA.  And

11   again, we looked and I don't think there's -- and I don't think

12   there's one cited in the briefs -- no case suggesting that the

13   SBA does not cover exclusivity.

14           So that leaves us in the position -- which is where I

15   started -- of the next slide -- if all you had was the NFL

16   contracting with CBS and Fox for its rights would there be

17   antitrust liability and the answer to that is no.  And so then

18   the question is how does that principle, if at all, translate

19   into this case where you now have Sunday Ticket that's also

20   created on top of the baseline broadcasting offers?

21           Well we know why Congress was so focused on

22   exclusivity.  If we look at the next slide, it's because

23   exclusivity is central to broadcasters.

24           This is from the deposition of Mr. Jones at Fox and

25   it's literally in response to a question about a principle in

1    negotiations that Sunday Ticket doesn't meaningfully compete

2    with Fox's end-market games.  And the broadcasters view this as

3    part and parcel of the exclusivity that they're contracting to

4    get under the contracts, and they view that as essential for

5    the simple reason that their whole model depends on viewership.

6            And it's particularly essential if you look at the

7    next public slide which would skip over one that Your Honor has

8    -- this would be Slide 11 -- because Sunday Ticket is literally

9    the feeds that CBS and Fox are producing.  If you watch the

10   Rams game here in Los Angeles on Fox and you watch the Rams

11   game in Washington where I live through Sunday Ticket, it is

12   the same game.  It's the same video cameras, it's the same

13   audio, it's the same commentary.  Second by second it's the

14   exact same thing.  So it's not surprising that in creating this

15   additional product -- which is a resale product and a

16   retransmission -- the broadcasters wanted there to be some

17   parameters around that.  And so that then brings us to the

18   language which I won't put on the screen --

19           **THE COURT:**  The -- go ahead.

20           **MR. KILARU:**  No, no, please.

21           **THE COURT:**  Go ahead.

22           **MR. KILARU:**  I was going to say I guess it brings us

23   to the language -- which is on Slide 13 that you have that's

24   not in the public dec -- about what the scope is of the thing

25   that CBS and Fox are purchasing.  And it's a resale right,

13

1    first of all, and then it's subject to specific terms and

2    conditions.

3            And I think the right way to think about that is that

4    CBS and Fox could buy everything.  And instead the NFL has

5    said, well we want there to be an additional offering that

6    allows fans to access out-of-market games.  And so they

7    negotiated with the broadcasters and these negotiations have

8    taken place time and again.  And instead of everything, the

9    broadcasters are purchasing something slightly less than that

10   which is essentially to have all the rights to the games,

11   subject to a narrow carveout for Sunday Ticket that is defined

12   and delimited by not just the terms on this slide but other

13   provisions in the agreement.

14           The part of the rights that they are purchasing is

15   the right to broadcast all Sunday afternoon NFL games, subject

16   to this narrow carveout.  And that right and that contract is

17   expressly permitted by the SBA and there aren't allowed to be

18   antitrust lawsuits that come out of that.

19           And if you look at all of the worlds that the

20   Plaintiffs have put together -- and I direct Your Honor in

21   particular to the Statement of Undisputed Facts Number 113 and

22   then 136 through 39 -- we put out the question, do these

23   contracts have to change in order for your but-for worlds to

24   exist?  And it is now an undisputed fact that they do.  The

25   language in the CBS and Fox agreements would have to change in

14

1    some way.  And that's not just a technical thing, it's not just

2    an add-on, it means that the scope of rights that's being

3    purchased is different.  The scope of exclusivity that's being

4    purchased is different.  The part of the rights that the

5    broadcasters are buying, the part of the rights that's covered

6    by the SBA is being altered.  And that I think is the key point

7    for understanding this argument and why it's a straight-forward

8    violation of the SBA.

9              And I think it also makes sense if you step back and

10   just look at it in a logical matter as well and this takes us

11   to Slide 15 which I think is the last one on this argument.

12             Under the Plaintiffs' construction of the SBA, it

13   would be totally fine -- and I think this is true as a legal

14   matter -- for the NFL to exclusively contract with CBS and Fox

15   for live sports broadcasts and to have no other form of

16   redistribution, retransmission, resell, anything, of those

17   broadcasts.  Instead, the world we live in is one in which they

18   have negotiated with the broadcasters to create a narrow and

19   supplemental additional offering that's Sunday Ticket, that

20   increases output, that takes the high quality games that CBS

21   and Fox produces and makes them more available.  And it seems

22   very odd, as just a logical matter to say, that doing something

23   that increases output nullifies your protections under the SBA.

24   And it's not just whether or not you think it's odd as a

25   logical matter, we think that it's wrong as a legal matter

1    because it involves changing the scope of rights and changing

2    the text of the agreements that CBS and Fox have entered into

3    with the NFL that all agree are covered by the SBA.  And

4    there's no end run around that, the Plaintiffs don't have a

5    model that doesn't have these features.  There's no way in

6    which these language and this theory is just window dressing.

7            And whether or not the Ninth Circuit thought -- and

8    this goes to the next slide -- whether or not the Ninth Circuit

9    thought that there may be such a theoretical claim out there,

10   it's clear that that's what they thought they were getting when

11   they reversed the decision below.  There's a theory and a case

12   that did not challenge the SBA-protected agreements.  There's a

13   footnote that says we don't really understand the SBA

14   agreements to be at issue in this case.  But instead, the

15   Plaintiffs have developed a case that involves attacking,

16   invalidating, restricting, changing, the CBS and Fox agreements

17   and saying that, effectively, they need to purchase a different

18   part of rights or they need to purchase some other thing, or

19   the exclusivity that they've contracted to produce is not

20   something that they can keep.  And that's why this violates the

21   SBA.  The SBA contracts and the invalidation of the SBA

22   contracts is baked into their entire liability case from start

23   to finish.

24           So that's my argument on the SBA.  If there are no

25   questions, I can move on to the next topic, Your Honor.

```
 1            THE COURT:  Go ahead.

 2            MR. KILARU:  Okay.  So think the next issue goes to

 3    Slide 18 and this is the joint venture single entity issue.

 4            I think we start with the comments from Justice

 5    Kavanaugh in the -- and I should note, Your Honor, I'm not

 6    necessarily covering every argument in the brief.  I wanted to

 7    focus a little bit for the presentation today so --

 8            THE COURT:  Well you couldn't do it in 15 minutes

 9    so --

10            MR. KILARU:  I'm going to do my best.  I think I'm

11    still on track for that.

12            On the joint vent -- on the single entity piece, Your

13    Honor, I think we start with the observation of Justice

14    Kavanaugh when looking at this case in the cert posture; and

15    that is, a common-sense observation that antitrust law likely

16    does not require that the NFL and its member teams compete

17    against one another with respect to television rights.  And

18    that's not just sort of a stray observation.  We think that

19    that's an accurate understanding of, and an appropriate way to

20    look at, the way television rights actually operate in sports

21    and how that applies to the single entity framework.

22            The legal framework -- and this is on the next slide

23    -- which I think is undisputed --

24    Again, I don't really see there being any disagreement among

25    the parties on the law.
```

1          -- is that the question is, are we looking at actual

2     or potential competitors in distributing a product or in

3     creating the item?  Are we looking at people who would do this

4     separately if they could?

5          And I think it's important to note here -- because

6     we've heard a lot of talk about other sports -- there is not a

7     single sport anywhere where there are competing nationally

8     distributed feeds of the same sports game -- which is the

9     Plaintiff saying there should be.  So in the NFL there's a

10    system -- and I know Your Honor is very familiar with that --

11    in baseball and basketball, professional sports, if there's a

12    national game, there's one feed and one feed alone.  If it's

13    not a national game, then the cable networks can produce a

14    regional feed but that's only available in the local region.

15    You can buy the Denver feed in Denver from the Denver RSN.  You

16    can buy the Los Angeles feed in Los Angeles from I believe only

17    one provider that actually offers it.  But wherever you are --

18    and there are blackouts and all other issues that tie with that

19    -- there's a system that ensures that there aren't nationally

20    competing broadcasts.  And that's because you can't make these

21    games without the consent and the involvement and the

22    intellectual property of all the teams.  Even in --

23          Go ahead, Your Honor.

24          **THE COURT:**  What about the -- I believe this is

25    correct if my memory serves correctly -- but the example that

1    they give with regard to the college athletics and Notre Dame

2    and BYU.  BYU is not part of a conference.  (inaudible) that's

3    changed but that's the example that they give.

4         **MR. KILARU:**  I'm glad you asked that question, Your

5    Honor, and I think the key answer to that is at Footnote 16 of

6    Dr. Rausher's (phonetic) report where he says, and I quote:

7              "In the college sports context, the term 'conference'

8              is often used to describe what is properly understood

9              to be a sports league in and of itself."

10        So if you look at the contracts that the Big 10 has,

11   if you look at the contracts that the SEC has, those are

12   actually the same as the type of arrangements the NFL has, it's

13   just that there are effectively more leagues.  And even in the

14   case of the Notre Dames of the world and the BYUs of the world,

15   they still need to come to some agreement with the other teams

16   in order to produce the telecast.  So even on NBC, it's only

17   some games that Notre Dame has the right to negotiate for, and

18   they make trades and contract with their opponents and with the

19   conferences of those opponents to make sure that they can put

20   together a unified broadcast of that game.

21        The question isn't can you come up with some

22   different set of arrangements for sports broadcasting, the

23   question -- the legal question is, do these people compete in

24   producing the telecasts or is all of their participation

25   necessary to produce the telecasts?  And that's where I think

```
1    the examples fall short because in pro sports, in college

2    sports, in the NFL, you need to have the consent of all the

3    teams, the consent of the league, the right to distribute and

4    display the intellectual property, logos, all of that.  You

5    need to have that by agreement.  And if you need to have that

6    by agreement and that level of cooperation is required to

7    produce a telecast, then that is true in every sport, even

8    college.  If you need that, then you have the single entity

9    issue we've talked about.

10           And I think in this case on the facts -- going to the

11   next slide -- those points are not really in dispute.

12           It's undisputed that an NFL game requires the

13   participation of two clubs in the NFL.  It's undisputed that a

14   telecast of an NFL game displays the trademarks and the

15   intellectual property of both participating clubs.  Their

16   expert admitted this -- I don't think it's really controversial

17   -- the game gets some of its value and its stature from being

18   associated with the NFL, having the NFL logo in it, being part

19   of the push to the playoffs, and everything that goes along

20   with that.

21           And you also need the telecasts and intellectual

22   property of the teams.  So if you need all of the participants

23   to cooperate and their shared intellectual property is

24   essential in order to produce the game, you have the single

25   entity issue that we mentioned which is a complete defense to
```

1    the horizontal claims.

2            And I'd just note and sort of leading this argument

3    if we go to the next slide, there are other cases that have

4    addressed this question of how single entity works in the

5    specific context of the NFL.  And these cases have found that

6    the NFL as a single entity in the teams in way more -- in my

7    view -- more challenging questions than this one.

8            The first case, *Washington*, is about archival game

9    footage, so old game footage.  The second case is about

10   photographs of team events.  In both of these cases, the courts

11   confronting them found that they are single entities, the teams

12   in the NFL, because you need the intellectual property of

13   everyone to make the product; and therefore, you have to have

14   cooperation and you have to have the consent of everyone.

15           **THE COURT:**  If they were a single entity, why would

16   you need the SBA if they were a single entity?

17           **MR. KILARU:**  Well it's a great question, Your Honor.

18           The SBA was passed at a time when there was something

19   called the intra-enterprise conspiracy doctrine.  That is

20   Copperweld (phonetic) was about, that basically put into

21   question whether an organization can conspire with separate

22   business units within it.  And so the SBA was enacted against

23   the framework of it being possible to conspire within a single

24   entity.

25           Now that the SBA has been passed -- and we think it's

1   still good law and it still clearly precludes the claims here

2   -- there is a separate body of law that's developed under

3   Copperweld that says and by the way, that theory is rejected.

4   Independent, sort of corporate units within a corporate

5   structure can not conspire with each other under the antitrust

6   laws.  So that's where this argument fits in.  It's actually

7   they're not inconsistent at all, they're consistent.  It's just

8   that you had the SBA and then you have a change of law on top

9   of that that further explains why we're right.

10          But if you look at these contexts, Your Honor, old

11   photos, old game footage, I would just say that in the realm of

12   possibility, especially in our current day and age, it might be

13   possible, I suppose, to go in and like take out the NFL's

14   trademark or take out the other teams' trademark, and then you

15   wouldn't have as much of an issue.  You cannot do that with

16   live sports telecasts.  You can't do it.  And so if these cases

17   held what they held -- and we think that they were right -- we

18   think this case follows more strongly from that.

19          So then turning to the last two arguments that I

20   would raise today, we raise in our brief an argument about

21   indirect purchaser standing and if you could go to the next

22   slide which is 22.

23          I think the key point to note here is that the

24   Plaintiffs would need to show, we think under the law, and I

25   think the *Nexium* (phonetic) case is on point here and the

22

 1    *Relevant Sports* case that we mentioned in our brief is on point
 2    here.  In order for the Plaintiffs to prevail, it's not enough
 3    for them to just say that DirecTV took the contract offer that
 4    the Plaintiff -- that the NFL and the teams are offering.  So
 5    if there's terms that are offered in the marketplace by the NFL
 6    and the teams and the DirecTV comes out and they say we're
 7    going to bid on that and we're going to accept it, and others
 8    bid on it and say we'll accept it if you give it to us -- and
 9    there's always been a competitive bidding process for this --
10    if they accept that, that alone isn't proof of an antitrust
11    conspiracy.  I think there needs to be something more that
12    shows that when DirecTV actually implemented that agreement, it
13    went about trying to further what the conspiracy is that's
14    alleged here.  And there's been a lot of discovery in this
15    case, as Your Honor knows, a lot of depositions, and I think as
16    we point out in our briefs -- and I don't think that there was
17    any meaningful rebuttal, certainly' s not sufficient to raise a
18    material issue of fact, there's no proof that DirecTV actually
19    ever agreed with or conspired with the Plaintiff on price.  And
20    I think the proof in the record -- which I won't read aloud but
21    that we put in our brief- --- is that they had decisions, they
22    had the ability to make decisions regarding the packaging of
23    the product as well.  So I think there needs to be something
24    more for DirecTV to be part of the conspiracy.
25             And this isn't -- Your Honor, just to answer the

1    concern you raised earlier -- this isn't us saying atomize it

2    and look at one agreement here and one agreement over here.

3    What this argument is saying is even if you accept the premise

4    that the Plaintiffs have proved that all three of these people

5    could have been involved, there still needs to be some evidence

6    that DirecTV actually joined the conspiracy.  Some evidence

7    that they took some step to join it and to further the overall

8    objective.  The Ninth Circuit couldn't have resolved that issue

9    because it didn't have any facts in front of it.

10          And our point here is that on the facts, even if you

11   think of it as a joint --

12          **THE COURT:**  Don't they address -- even though it's at

13   the motion to dismiss stage, doesn't Judge Ikuta address the

14   point that you're making?  Or else how could she say that the

15   claim was viable?

16          **MR. KILARU:**  I think she was saying that the claim

17   was viable and that it's possible the Plaintiffs could bring

18   forward proof that DirecTV had joined this unified conspiracy.

19   You could imagine a scenario which is different from here,

20   where everyone gets in a room and agrees on the key points

21   whatever the contracts say.  They all get together and they

22   say, here's what the price should be.  We all get together and

23   they say, here's what the packages should be.  Saying that

24   something is sufficient to state a claim as a legal matter

25   doesn't mean that the Plaintiffs have proved the facts

24

1    necessarily to substantiate that claim.

2            **THE COURT:**  I think you mentioned the case from the

3    Second Circuit.  You seem to be arguing that the Court can't

4    rely on circumstantial evidence, circumstantial evidence being

5    the DirecTV agreement.  Is there anything -- I don't think

6    there's anything in the Ninth Circuit that directs me that way.

7            **MR. KILARU:**  Your Honor, I'm certainly not saying you

8    can't rely on circumstantial evidence.  I think the point is

9    different.  I think the point is that we think the Second

10   Circuit cases are probably the best cases on point for this.

11   When you're trying to prove an antitrust conspiracy, it's a

12   simple element of liability that you need to show that DirecTV

13   took some step to actively further the conspiracy.

14           And the point I'm making is if they're just taking

15   the offer that's given to them and implementing it, that's not

16   taking an overt act to further the conspiracy.  And the point

17   as a factual matter is that there's nothing in this bucket of

18   overt act to further the conspiracy that's actually been proven

19   here by the Plaintiffs because there's no evidence on price and

20   no evidence that the NFL was controlling the output or the

21   packaging of the product.  And so that would be a bar to their

22   claims for damages.

23           And then last and just briefly, Your Honor, to the

24   extent you agree with our argument on the SBA, that would be in

25   our view a complete defense to all of the claims in this

25

1    lawsuit and a reason to grant judgment for us.  If you agree

2    with either any of our other arguments, that should at minimum

3    get rid of the horizontal agreements from the teams then of all

4    the teams in the NFL, so then you would just be left looking at

5    the DirecTV agreement.  And this is not --  again it's not kind

6    of atomizing it, it's just saying if they can't prove the

7    unified conspiracy, then you would have to look at the parts.

8    And I don't think there's any law that suggests -- and the

9    Plaintiffs haven't to build a case that suggests that just an

10   exclusive agreement between the NFL and DirecTV standing alone

11   is a violation of the antitrust laws.  And given how common

12   exclusivity is in the media industry generally, that's not in

13   our view a viable theory, nor is it one they've tried to prove.

14         That's all I have for now, Your Honor.

15         **THE COURT:**  Thank you.

16         MR. KILARU:  Thanks.

17         **MR. SELTZER:**  Please the Court?  Mark Seltzer on

18   behalf of the Plaintiffs.  Let me begin it this way, Your

19   Honor, and in response to your question.

20         The Ninth Circuit decision I believe controls the

21   outcome of this case.  Judge Ikuta held that the interrelated

22   agreements at issue here, viewed wholistically, as they must

23   be, are alleged to operate to limit the availability of outer-

24   market games to paid subscribers of Sunday Ticket.  Plaintiffs

25   allege that the teams jointly agreed to convey all of their

26

1    broadcast rights to the NFL -- it's a joint agreement -- and

2    the agreement included the rights to license the broadcasts for

3    pay television; and in turn, the NFL, acting as the teams'

4    agent -- the NFL is controlled by the teams -- entered into an

5    exclusive contract with DirecTV to provide out-of-market games

6    to paid subscribers.

7         Plaintiffs have offered evidence to prove every

8    aspect of those agreements and the existence of those

9    agreements is not really in doubt.  The argument that the

10   decision on the -- at the Ninth Circuit level was about a

11   motion to dismiss a pleading, ignores the fact that the

12   allegations are ones that were based upon really facts that are

13   undisputed about the terms of the agreements at issue in this

14   case.  There are additional facts that go beyond those

15   agreements but they only further support Plaintiffs' claims.

16        As for the SBA, the critical point -- and I emphasize

17   this -- is that it doesn't provide any protection for joint

18   agreements by the teams for licensing pay telecasts.  It only

19   allows the teams to pool broadcast rights for free, over-the-

20   air broadcast and that's the core problem with the Defendants'

21   argument.

22        Just like they did on the motion to dismiss and on

23   appeal, they try to dismember the conspiracy into constituent

24   parts.  Analyze them separately and argue that somehow the

25   Court's opinion allows them to argue they can't be found to

27

 1   have violated the antitrust laws.

 2            This argument turns the Court's opinion on its head.

 3   Neither the Plaintiffs nor the Circuit said that the web of

 4   agreements in question were immune from scrutiny -- and their

 5   argument is they're immune from scrutiny -- because the

 6   agreements include a license to the networks for free

 7   over-the-air broadcasts.

 8            When Judge Ikuta held that we stated valid claims for

 9   relief, she did so with full knowledge of what the SBA said.

10   The whole point of her decision is that the agreements at

11   issue, including we think the restraints on pay telecasts that

12   are part of the agreements with the networks, go beyond what

13   the SBA authorizes the teams to do and operate, working

14   together to limit competition in the broadcast of games found

15   -- founded on a joint agreement and they are founded on a joint

16   agreement by the teams to license the rights to broadcast over

17   pay television.

18            The argument that they're making now is directly at

19   odds with the Circuit's decision holding that those agreements,

20   if proven, would violate the antitrust laws.  They plainly

21   misinterpret the Ninth Circuit decision by trying to take the

22   Court's comments about the fact that neither side questioned

23   the right of the teams to jointly agree to license the rights

24   to free, over-the-air broadcasts and parlay that fact into a

25   right to suppress competition for pay telecasts.  That's the

28

1   stretch, the unjustified stretch that the Defendants are trying

2   to make.

3           Judge Ikuta's decision assumed that the joint

4   licensing of rights to free, over-the-air broadcasts were

5   immune under the SBA but that assumption didn't affect one bit

6   or conclusion that the web of agreements, which include the

7   network contracts, could be found to violate the antitrust laws

8   as imposing a naked restraint on competition.

9           And I want to note one thing about the network

10  contracts.  They go beyond a simple license to broadcast games

11  over free, over-the-air television.  They agreed with the NFL

12  to limit their broadcasts to a handful of games they produce

13  and to require the NFL to limit the licensing of outer-market

14  games to a paid subscription service in ways that are designed

15  to limit competition with the games they broadcast.  That's not

16  taking a simple license to broadcast games over free

17  television.  This is taking -- making an agreement to limit

18  what can be done on pay telecasts.  That's not authorized by

19  the SBA.  And those limitations, they go hand in hand with the

20  other interrelated agreements between the teams, the NFL and

21  DirecTV to limit the output of games to be seen.

22          **THE COURT:**  What do you make of the point that

23  Counsel makes that the arguments the Plaintiff makes, you would

24  have to change the NFL agreements with Fox and CBS?  What do I

25  make of that?

**EXCEPTIONAL REPORTING SERVICES, INC**

1          **MR. SELTZER:**  You wouldn't have to change any of

2     those agreements.  The fact is that what we're saying and what

3     our expert said, if the agreement to jointly license the

4     telecast rights to paid broadcasts were eliminated -- could not

5     have been done, it was illegal and should be enjoined -- then

6     there would probably be changes in the but-for world and among

7     those changes --

8          **THE COURT:**  Okay.

9          **MR. SELTZER:**  -- would be one where the networks

10    couldn't impose limitations on what happens over pay

11    television, over DirecTV.

12          Now -- and I want to say this.  That the Circuit

13    didn't hold that any limitations in the network contracts fall

14    within the protection of the SBA just because they're embodied

15    in those contracts.  They're going beyond what the Circuits

16    held.  They want to say that anything in the CBS network

17    contracts is ipso facto lawful because those contracts include

18    the right given to them jointly by the teams to broadcast over

19    free, over-the-air television but they go beyond that.  One --

20    it's a non sequitur to say that one implies the other.

21          And if that weren't enough -- and this is very

22    important, Your Honor.  Judge Ikuta endorsed the Third Circuit

23    decision in *Shaw*.  There, the Third Circuit held that the very

24    same Sunday Ticket program at issue in this case isn't

25    protected by the SBA precisely because -- and this is a quote

30

1    from her decision:

2         "The SBA does not exempt league contracts with cable

3         or satellite television services for which

4         subscribers are charged a fee from antitrust

5         liability."

6         Now they cited too to Footnote 4 of the decision and

7    they say that there was an argument that the network NFL

8    agreement was not covered by the SBA but that's true but only

9    to the extent that the agreement with the networks gave them

10   the right to distribute free, over-the-air broadcasts.  We

11   never conceded that all aspects of those agreements were

12   lawful.  To the contrary, we always contended the network

13   agreements are part of an illegal web of agreements that

14   restrict the availability to viewers of out-of-market

15   broadcasts.  And that doesn't mean that the -- that footnote

16   doesn't mean the network contracts can't be considered or

17   should be a slight -- they should be excised from consideration

18   of the web of agreements that exist and the slate wiped clean

19   so they can't even be thought about in terms of how these

20   agreements work together.  They do work together.  And they

21   operate together with all of the agreements with the team

22   agreement to jointly licensed to the NFL, the NFL's agreements

23   with the networks, the NFL's agreements with DirecTV, to

24   restrict the output of out-of-market games to one single

25   channel, a paid channel.  That paid channel is not protected

1    and licensing rights for that paid channel aren't protected by

2    the SBA.

3         And in the Circuit's decision, in Footnote 4, in the

4    language that wasn't quoted by the Defendants, the very next

5    sentence says:

6         "The parties do not argue that the agreements at

7          issue here are exempt from antitrust liability merely

8          because the NFL network agreement has such immunity."

9         Now the Defendants are exactly making the same

10   argument, the one argument that Judge Ikuta said no party

11   argues.  They're now arguing what they chose not to argue

12   before.  They didn't choose to raise an argument about what

13   Judge O'Connell had said when she said the SBA doesn't protect

14   these agreements.  There were her whole argument there that

15   just as you heard a while ago, the retransmission of these

16   broadcasts somehow means that there are residual rights that

17   are retained and that those residual rights mean that they

18   could actually have an agreement to restrain pay telecasts.

19   That's just contrary to what the Circuit said.

20         And let me just, if I may, Your Honor?

21         At page 148 of the decision by Judge Ikuta, this is

22   what she said and this is at page, I say 148 of the decision.

23         "Courts considering challenges to the telecasting

24          arrangements between sports leagues and satellite

25          television services have concluded that sponsored

1    telecasting refers to broadcasts which are financed

2    by business enterprises, the sponsors, in return for

3    advertising time and are therefore provided free to

4    the general public."

5    Citing and quoting *Shaw* in the Third Circuit.

6    She then went on to say:

7    "Therefore, the SBA does not exempt league contracts

8    with cable or satellite television services for which

9    the subscribers are charged a fee from antitrust

10    liability."

11    She also cites the *Chicago Pro Sports*, a decision she

12    considered that she was aware of it.  And supporting that

13    proposition.  And she says that *Chicago Pro Sports*, from the

14    Seventh Circuit, held that the SBA applies when the league has

15    transferred rights to sponsor telecasting and therefore does

16    not apply to the NBA's effort to limit distribution by the

17    Bulls of their games on a cable network.

18    That statement is then followed by this comment and

19    this is a quote again by Judge Ikuta:

20    "Sponsored telecasting under the SBA pertains only to

21    network broadcast television and does not apply to

22    non-exempt channels of distribution such as cable

23    television, Pay-Per-View and satellite television

24    networks."

25    That's exactly what's at issue in this case.  They

33

1   have agreed, through this web of agreements, to limit pay

2   telecasts just to one channel, namely DirecTV Sunday Ticket

3   program -- as the Third Circuit dealt with previously, and as

4   the Ninth Circuit dealt with in this very case -- and say that,

5   well, you know, had the right to a jointly licensed free,

6   over-the-air broadcasting and all we're doing is protecting

7   that -- those broadcasts from competition from pay telecasting.

8   That's exactly what the antitrust laws prohibit.  That's what

9   they're asking the Court to find.

10          And let me make some points about the SBA.

11          They concede that it doesn't apply to pay

12   telecasting.  That we share common ground with them on that.

13   But they argue that the SBA exempts restraints on competition

14   from pay telecasts that will increase the viewership of free,

15   over-the-air telecasts.  That's just what they argue in a

16   quotation from network executives, that they thought that

17   exclusivity would be important to them.  They didn't say it was

18   necessary or essential.  They wanted it.  Why?  Because it

19   limits the competition they confront for free, over-the-air

20   broadcasts.  They're limiting competition to protect that.

21   That's why --

22          **THE COURT:**  And that's why you argue that that's why

23   they selected DirecTV.

24          **MR. SELTZER:**  Yeah.  And that's not -- that's not a

25   permissible purpose for -- you know to limit the out-of-market

34

1    games to a one-pay channel that costs an enormous amount of

2    money so that you would limit the competition with the free

3    broadcasts.  That's not something that the SBA authorizes the

4    teams to agree to or the NFL to agree to.  Their argument,

5    therefore, it ignores the statutory texts, confuses exclusive

6    rights to air a given game with a right to be protected from

7    competition with telecasts of other games, and defies common

8    sense.

9            Now this is important.  This is a question of

10   statutory construction and the statute is very short but it's

11   very clear.  There are three relevant provisions in the

12   statute, one of which they selectively quote I think in a

13   misleading way and the other two they ignore.

14           The first provision exempts any joint team agreement

15   among clubs in a sports league that sells all -- sells or

16   otherwise transfers all or any part of their rights to a

17   league's member clubs in the sponsored telecasting of games.

18   They concede the exemption for sponsored telecasting is limited

19   to free, over-the-air telecasts and thus exclude pay telecasts;

20   namely what DirecTV sells.  But they argue that this grants an

21   antitrust immunity for the sale of all or any part of the

22   broadcasting rights.  They assert that this language gives the

23   NFL the right to sell exclusive broadcast rights that

24   implicitly allow the NFL to protect viewership of those

25   broadcasts by precluding or limiting alternative productions

35

1    from broadcasts.  And there's no limitation on such restraints.

2    That's their argument.

3         And they argue that the right under the SBA to grant

4    licenses for free broadcasts implies that the over-the-air

5    telecast rights must be exclusive against competition from all

6    telecasts, not just local telecasts of home games but all pay

7    telecasts.  This is a giant non sequitur.  I can't emphasize

8    that enough.  And it's indistinguishable from the implied

9    residual rights theory that Judge O'Connell rejected -- and

10   which they didn't challenge on appeal -- and which the Third

11   Circuit directly addressed in *Shaw*.  And moreover, it ignores

12   the other two provisions in the SBA.

13        The second provision affirmatively provides that the

14   SBA does not protect any joint agreement that prohibits any

15   person, to whom such rights are sold or transferred, from

16   televising any games within any area except within the home

17   territory of a member club of a league on a day when such club

18   is playing a game at home.  That's Section 1292, the very next

19   section of the statute in Title 15.

20        Here, the teams have not only transferred to the NFL

21   and the networks the rights to air certain games but through

22   agreement prohibits the televising by networks of most NFL

23   games in most areas of the country in direct contravention of

24   that provision.  That's not protected by the SBA.

25        The third provision of the SBA provides that nothing

1    contained in this chapter shall be deemed to change the

2    applicability or non-applicability of the antitrust laws to any

3    agreement except the agreements to which Section 1291 apply.

4          This provision -- and I want to emphasize this --

5    affirmatively rejects Defendants' argument that the agreements

6    to license free, over-the-air broadcasts covered by

7    Section 1291 should be read to be extended by implication to

8    cover agreements to restrain competition from pay telecasts

9    which is exactly what you heard this morning, that they had the

10   right to do what they did to protect the free telecasts from

11   competition from pay telecasts.  And the plain language of the

12   statute, Your Honor, I think it contradicts Defendants'

13   position.

14         And if the issue were at all ambiguous -- and I don't

15   think it is -- there is a critically important canon of

16   statutory construction that requires reading antitrust

17   exemptions narrowly in resolving any ambiguity against the

18   Defendants .

19         Now, in addition to contradicting the statutory text,

20   the argument relies on conflating exclusive rights to air a

21   given game with a right to restrain competition from the

22   telecasts of other games.  We don't dispute that when

23   transferring their rights to air certain games within the SBA,

24   the teams can transfer all of those rights to a network and

25   thus give the network the exclusive right to air those games.

37

1    The NFL can grant exclusive rights to protect the viewership of

2    those very same games from being taken away by others

3    broadcasting the same game in the home area of a team to the

4    same local audience.  That is the exclusivity if there's any at

5    all that the SBA would contemplate.  But that is not to say the

6    same is far different from saying the NFL can restrain

7    competition from pay telecasts of other games in order to

8    increase the viewership of the games that are aired in the

9    limited locations.  That's exactly what they've done with

10   DirecTV.  They've limited the broadcast of other games outside

11   the area except through one channel, DirecTV, for which you

12   have to pay $300 a year if you're -- roughly if you're a

13   consumer and thousands of dollars if you're a commercial

14   enterprise for the right to show those games.  And that's

15   exactly the kind of restraint the Supreme Court ruled

16   anticompetitive on principle in the NCAA case, *Board of Regents*

17   case, because it amounts to, quote:

18             "A fear that the product, here the aired games, will

19             not prove sufficiently attractive when faced with

20             competition from other televised games."

21             That's from the Supreme Court's decision, it's at

22   page -- Volume 468 at pages 116 to 117.

23             And the argument also defies common sense and you --

24   actually they made this argument.  It was unbelievable but they

25   made this argument.

38

1          That the reason to limit the SBA to collective

2    licensing of free, over-the-air games was to prevent

3    authorizing joint agreements imposing restraints on pay

4    television.  It makes no sense for the SBA to treat -- to be

5    read as treating collective licenses to offer pay telecasts

6    better than restraints that prevent or restrain those

7    broadcasts from being offered at all.  Given the latter is even

8    more anticompetitive.  Yet, if the Defendants were right, they

9    could consistently with the SBA jointly refuse to license any

10   paid broadcast for any games in order to protect the networks

11   over-the-air broadcast, the free, over-the-air broadcasts.

12   That's exactly the argument that was made just a few minutes

13   ago and that's completely at odds with the antitrust laws.

14          And as far as the issue regarding what would happen

15   to the contracts, although many of the provisions in the NFL

16   contracts probably could and should be revised or eliminated

17   because they go beyond the SBA protections, Plaintiffs' showing

18   of harm, impact and damages don't depend on making those

19   changes at all.  And that's a very important point, Your Honor.

20   If the agreement on pooling for pay telecasts were eliminated,

21   then the NFL wouldn't have any contractual authority to impose

22   restraints on those pay telecasts.  So any terms would not be

23   enforceable against the teams.

24          And in addition, of course, Professor Rausher, quoted

25   by the Defendants, found separate harm impacting damages from

39

1    the exclusive arrangement with DirecTV which doesn't come from

2    anything having to do with the network contracts.

3            And then this final point on this issue, Your Honor.

4            The experts, Plaintiffs' experts, never assumed that

5    the NFL network agreements on a standalone basis, without

6    imposing restraints on paid broadcasts, violate the antitrust

7    laws and never assumed they would entirely go away in the

8    but-for world.  To the extent the network agreements would be

9    modified, would only be due to the voluntary action of the

10   parties after determining that different agreements or maybe no

11   agreement are more profitable in the competitive circumstance

12   of the but-for world.

13           In addition, Professor Rausher shows -- and I think

14   this is also important -- that the disappearance of over-the-

15   air broadcasts would be very unlikely to occur in the but-for

16   world if these joint agreements for pay telecasts couldn't be

17   made.

18           And I think that covers the SBA arguments, Your

19   Honor.  It really would be going against the Circuit, going

20   against the Third Circuit, going against what Judge O'Connell

21   held, going with every other court has dealt with, that

22   sponsored telecasts are different from pay telecasts.  Only the

23   sponsored free, over-the-air telecasts have any protection or

24   joint licensing for those contracts.

25           Now on the other points that were raised regarding

1   the single entity, the Copperweld test didn't make Congress'

2   adoption of the SBA somehow meaningless, an idle act.  The

3   teams are not a single entity with the NFL.

4        The *American Needle* court, which was decided

5   obviously after Copperweld, the Court said that a joint venture

6   and specifically the NFL could not be considered a single

7   entity when two factors are met.  The joint venture is subject

8   to ongoing control by the teams, they have their own

9   independent management and economic interests, and the teams

10  are potential competitors in the relevant market.

11       The first factor should suffice here because it

12  matches the Copperweld test and would require ongoing

13  restraints imposed by the joint venture to be assessed when

14  they occur, rather only when the joint venture was formed.  But

15  any event, both factors are clearly met in this case.

16       The first factor is met, Your Honor, because the

17  teams clearly have their own independent management and

18  economic interests as the Supreme Court held in *American*

19  *Needle*.  The second factor is also clearly met because even if

20  the teams did not currently compete in the market for NFL game

21  telecasts, clearly they are potential competitors because if

22  they didn't agree to allow the NFL to collectively license

23  their telecast rights, they could individually do so -- which

24  is what they did before the SBA was enacted.  It's what was

25  held to be illegal in the Department of Justice's case against

41

```
1    the NFL when they were found to have violated the antitrust

2    laws by collectively, jointly licensing their telecast rights.

3              And furthermore, the NFL isn't like some independent

4    third-party commercial licensing company, hired by the teams to

5    market their rights.  The teams control the NFL and the NFL

6    acts as their agent on behalf of each of the teams.

7              And I may make this point as an evidentiary matter,

8    Your Honor.

9              The agreement between the NFL and the networks, CBS

10   and Fox, expressly recites it's being made on behalf of the

11   teams.  That's a recital in the agreement.  The agreement with

12   DirecTV and the NFL says it's subject to approval by the teams.

13   This was not some third-party company that was hired, you know,

14   to make independent decisions about licensing telecast rights.

15             And let me turn to the argument about -- the argument

16   you have to cooperate to produce a telecast.

17             The production of the telecast is by the networks

18   pursuant to agreements by them.  But even if cooperation were

19   required -- and that's different from collusion -- it isn't

20   necessary to license the broadcast rights as we discussed at

21   the time of the class certification hearing.

22             Notre Dame is a perfect example.  It doesn't have to

23   belong to a conference to broadcast its telecast rights to its

24   games.  Indeed all the top level schools play inter-conference

25   games every season and these games don't require the joint
```

42

1    ownership of telecast rights, any more than the Notre Dame

2    games do or BYU for that matter.  I think they're in the same

3    situation.

4              And they say that the -- this argument was made that

5    they -- there's an agreement that needs to be made among the

6    clubs to license intellectual property to telecast the game.

7    And they rely upon the NFL's shield and the team logos that

8    appear on their uniforms I guess, and saying that you have to

9    have cooperation for a telecast.

10             But the agreement of the NFL isn't necessary to

11   telecast any NFL game.  It's necessary only if they wish to

12   include the trademark in a game.  Now the trademark may confer

13   some value so it's not surprising that they would want to pay

14   some money to the NFL to be able to use it but they would still

15   be plenty valuable, these telecasts, without the (inaudible).

16   And it could be provided completely without the consent of the

17   NFL.

18             And what they've done is confused whatever

19   cooperation may be necessary if you want to use the logo with

20   ownership of the rights.  The teams are the copyright owners in

21   the first instance.  They own the rights to the telecasts.  The

22   NFL doesn't own those rights.  And that's what Judge Ikuta very

23   meticulously discussed in her opinion when she traced all

24   history of the ownership of these rights, going back to the

25   first time that there were broadcasts of sports games.

1           And clearly, college teams haven't needed the NCAA's

2    consent in order to sell rights to telecast their games.  The

3    same is true of the appearance in a broadcast of any of the

4    teams' logos.  They are not an impediment to competition among

5    the teams for selling telecast rights.  And consent, as I said,

6    is not the same as ownership which belongs in the first

7    instance to the teams.

8           Let me make one point.  The *USFL* case was cited.  The

9    Second Circuit's decision.  And that case by the way was not

10   raised in the initial brief, it was in their reply brief the

11   first time they raised it.  But on the merits, it involved a

12   very different claim by the -- that the NFL telecast contracts

13   weren't covered by the SBA because they licensed the right to

14   three networks rather than to one.

15          The reply brief argues that the statement in the

16   opinion that expressed limitations on collective licensing to

17   air NFL games conflict with traditional times where college

18   football suggests that by implication nor the limitation exist

19   on the rights.  That claim isn't relevant to this case at all.

20          The opinion recites the fact that the NFL was

21   forbidden by its contracts to televise games on cable but no

22   challenge to that provision was raised in that case, nor could

23   it have been, because that provision could only benefit the

24   *USFL*, the Plaintiff in the case, and it played no role in the

25   Court's analysis concluding that collectively licensing three

44

1    networks to air games was covered by the SBA.  So that opinion

2    is not only improperly cited for the first time in a reply

3    brief.

4           And by the way, Judge Ikuta was aware of it.  It's in

5    her decision as well.  Doesn't in any way contradict the

6    conclusion that these agreements, viewed wholistically, viewed

7    collectively, operate to suppress competition which is not

8    protected by the SBA.

9           As far as Judge -- Justice Kavanaugh's statement --

10   which was kind of an oddball thing in my opinion.  It wasn't a

11   dissent from denial of certiorari, it wasn't argument the Court

12   should take the case up, it was just a statement, you know,

13   just making an observation.  He only states possible

14   disagreement with conclusions of the Ninth Circuit that did not

15   consider briefing on the merits.  And that such agreement, if

16   there is disagreement, necessarily means the statements concern

17   issues on which the Ninth Circuit opinion is binding on this

18   Court.  And its statement as to -- it's a statement of an

19   individual justice and no other justice, none of the other

20   eight justices saw fit to join in that statement so it's really

21   a nonissue.  It's like some observation of somebody, you know,

22   who just serves as a kibitzer on the bystander making the

23   statement.

24          And as far as the indirect purchaser agreement is

25   concerned, the purchase argument is concerned, the Court could

45

1    not have been more clear that this is an agreement which has

2    the effect of reducing the output of the games to be seen which

3    causes an overcharge to be paid directly by these Plaintiffs.

4    And that you have to look this -- this is not simply a vertical

5    arrangement.  Again, this is part of the Defendants' strategy

6    to dismember the conspiracy and say each part has to be

7    considered separately.  That's exactly contrary to the way the

8    Circuit said the case needs to be analyzed.

9              And as to the exclusive DirecTV agreement, if that

10   were viewed separately, there is all kinds of reasons to find

11   that agreement, just standing alone, if you even look at it

12   standing alone as anticompetitive -- as our experts showed.

13   And the cases that they cited in support of these motions are

14   easily distinguishable.

15             The *Spenelli* (phonetic) and *Washington* cases, the --

16   *Spenelli*, for example, which was a case that they cited both to

17   District Court and also to the Ninth Circuit which the Ninth

18   Circuit didn't even think was worth mentioning.  The Court in

19   that case said that the injury in question didn't result from

20   the collective licensing of rights to photograph games by the

21   NFL teams but from the photographer contributor agreement with

22   the Associated Press and other agencies that paid the

23   photographers to photograph the games.  And the reasoning of

24   that Court made clear that its rationale did not depend on

25   whether the photographs reflected the intellectual property of

46

1     only a single team or instead included the property of both the

2     team and the NFL.  The Plaintiff in that case failed to show

3     that they were harmed by the reduction in stock photography.

4     And that case by the way went up to the Second Circuit and that

5     was the ultimate holding by the Circuit about the case about a

6     failure to show that there was harm.

7             The Circuit went on to say, we're not saying that

8     this agreement was lawful.  Some other Plaintiff might be able

9     to make a good claim based upon the arrangement that's

10    described by the plaintiffs in that case.  So in no way

11    exonerates the NFL.

12            So Your Honor, again I come back to this point.  The

13    Circuit decision provides almost as clear guidance as a court

14    could possibly have as to how to analyze and deal with this

15    case.

16            And as the Court said at the very outset about the

17    NFL network contracts, they set the stage, they set the scene.

18    The agreements all intermesh with each other.  First you have

19    to have the agreements by the teams to jointly license the

20    rights to broadcast, including not just free broadcasts, but

21    sponsored broadcasts.  Sponsored broadcasts or free broadcasts

22    but paid broadcasts.  So it's encompassing both kinds of

23    broadcasts.  That was a joint agreement they made.

24            Second is the agreement with the NFL taking those

25    rights and making a deal with the networks to produce the games

47

1    but limit what they can show.  And in turn, impose limitations

2    on what the NFL could agree to do in terms of providing games

3    and competition with those games with a paid outlet;

4    namely, DirecTV.  And then you have the agreement with DirecTV

5    that requires that those games be shown as part of a premium

6    subscription product, not part of basic cable so the price is

7    up.  Why?  To limit competition with the free television

8    broadcasts.  And that they can only be sold as a bundle.  Can't

9    show the games ala carte.  The Defendants have argued, well the

10   agreements gave that discretion to DirecTV.  Well the evidence

11   shows that when DirecTV said can we do that, that was rejected

12   by the owners.  And that the contracts require the consumers

13   not just to pay for Sunday Ticket, you've got to become a

14   DirecTV subscriber, that's costs a thousand dollars a year.  In

15   addition to that you have to pay the $300 for Sunday Ticket.

16   That's what the case is about, it's the overcharge to the

17   consumers who paid for Sunday Ticket and that's what it's

18   always been about.

19          The case has never changed from day one and any

20   argument to the contrary just really misstates -- misstates the

21   record.  I'd go back to our complaint and give you a chapter,

22   line and verse in the complaint, this case is the same case

23   from the day we filed it as it is today.

24          Unless Your Honor has any questions --

25          **THE COURT:**  I don't.

48

1          MR. SELTZER:  Okay, thank you, Your Honor.

2          THE COURT:  Just briefly.

3          MR. KILARU:  Your Honor, just a few brief points

4    primarily on the SBA.

5          First, Mr. Seltzer said several times that the SBA

6    does not protect free broadcasts from competition from pay

7    television.  That is just not correct.  If you look at the

8    contractual history, the whole point of CBS getting full

9    exclusivity over its broadcasts was to not have competition

10   from pay television.  And every contract after that -- and this

11   is in the *USFL* decision -- had clauses saying you can't put

12   games on cable.  That is clearly a provision that's designed to

13   protect the free broadcasts from competition from pay

14   television.  So that has to be something that the SBA covers is

15   the ability to protect the pay telecasts that CBS and Fox are

16   purchasing from competition of pay television.  From the moment

17   the SBA was enacted, that was in their minds.

18          The second point is that the motion to dismiss ruling

19   did not dispose of this claim, it didn't.  The clearest

20   evidence of that is two things.  The first, when Judge

21   O'Connell confronted the motion to dismiss in this case, we

22   asked her to consider the CBS and Fox agreements as fairly

23   included within the four corners of the complaint for purposes

24   of making arguments and she said that they weren't.  She

25   wouldn't consider the broadcast agreements at the motion to

49

1    dismiss stage.  And I think the reason for that is that at the

2    time, the Plaintiffs didn't set out to say, we need to change

3    all the language of these agreements to make our case, they

4    said something else.  And that's what went up to the Ninth

5    Circuit and why the Ninth Circuit only talked about the CBS and

6    Fox decisions in a footnote and didn't think that they were

7    sort of a core part of the case.

8         And this claim made about *Shaw* and the motion to

9    dismiss case, a fundamentally different argument.  That

10   argument, like the argument that was pressed earlier in this

11   case, was that because the broadcast and Sunday Ticket are the

12   same ones on CBS and Fox, the SBA should apply.  That's not our

13   argument.  And it isn't the case in any context that the motion

14   to dismiss precludes consideration of any facts that could

15   occur after that.  You have to look at the record that's

16   actually been developed.

17        So then looking at the record that's been developed,

18   it doesn't work, respectfully, for them to just say, well, you

19   know, the but-for rule to be what it is and maybe there'll be

20   some changes and that could involve some changes to CBS and Fox

21   and it could not, that doesn't work practically because imagine

22   they came into court and said, our case is premised on the idea

23   that there are no CBS and Fox agreements and those completely

24   vanished the day after and we want liability on those bases.  I

25   don't think there would be a question that that lawsuit

50

1    directly contradicts the SBA and would throw SBA-protected

2    agreements under the bus to make a liability theory but that's

3    effectively what they're doing here.  And even if their theory

4    in the abstract or argument is, you know, oh, we're not worried

5    about what the world would look like later, take a look at what

6    we cited to you during the initial presentation.  They include

7    the CBS and Fox agreements in the challenged conduct.  They

8    want to put those agreements on trial.  They want those

9    agreements to be part of the record the jury sees and they want

10   to argue that that language is inappropriate.  So it's not just

11   something to worry about tomorrow, it a core part of the case.

12              Which brings me to my last point on this which is to

13   just think about what a jury instruction would have to look

14   like on this case, given the SBA.  There's no question that the

15   NFL is allowed to contract with CBS and Fox.  So we think that

16   would have to be in the instruction.  There's no question that

17   CBS and Fox are allowed to get exclusivity and are allowed to

18   protect their broadcasts from competition from pay television.

19   That's the text in the history of the SBA.  So if the jury is

20   instructed on that, what are they supposed to do?  What are

21   they supposed to evaluate in deciding whether or not this

22   agreement is permissible or not?  They'd have to go through

23   some metaphysical exercise that's actually impossible because

24   at the end of the day what the Plaintiffs are doing is saying

25   to the jury, you should invalidate and restrict the CBS and Fox

51

1   agreements, you should change the rights that they are

2   purchasing, and you should change the part of the rights that

3   they've bought and make it something else.  There's no way to

4   instruct the jury consistent with the text and the history of

5   the SBA and its focus on exclusivity and on permitting there to

6   be provisions to protect pay television from competition from -

7   - or excuse me -- free television from competition from paid

8   broadcasting.

9           So the Plaintiffs may have -- could have tried to

10   build a different case after the Ninth Circuit's ruling.  They

11   could have tried to build a case that was consistent with what

12   the Ninth Circuit thought it was getting, which was a challenge

13   just to the NFL teams and just to the NFL DirecTV agreement.

14   They chose to go in a different way.  They chose to make this

15   case about the NFL and CBS agreements and the NFL and Fox

16   agreements, and the consequence of that is dismissal.  Thanks.

17           **THE COURT:**  Thank you.  And just move on briefly to

18   the motion to compel.  What's -- I have just a couple of

19   questions on that.  I'd like to hold off until I get the order

20   out on the summary judgment but since the filing on the motion

21   and the reply, have the 30(b)(6) depositions been taken?

22           **MR. GOSSELIN:**  Good morning, Your Honor.  Sathya

23   Gosselin for the Plaintiffs.

24           The 30(b)(6) deposition of the NFL witness will

25   occur --

52

1          **THE COURT:**  You're taller.  Can you move to the

2    lectern.  I can't hear you.

3          **MR. GOSSELIN:**  Happy to do so.

4          The 30(b)(6) deposition of the NFL witness will occur

5    this week.

6          **THE COURT:**  And every time I ask, depending on what

7    information, are the other four depositions necessary if you

8    get what you need at the 30(b)(6)?  So is that a fair question?

9          **MR. GOSSELIN:**  It is a fair question, Your Honor.  We

10   very much believe that the 30(b)(1) depositions, which are

11   limited in scope under this Court's order from August 2022,

12   confined to the negotiations and the new deal are necessary in

13   addition to the 30(b)(6) deposition.

14         We don't think that it's fair for the NFL to dictate

15   to us our discovery strategy.  We think that based on the

16   documents that we have seen and the respective roles of the

17   individuals involved in the negotiating, it would be too

18   ambitious to try and cover that within the seven hours of the

19   30(b)(6) deposition across that range.

20         We also too need the 30(b)(1) deposition as we

21   further refine our witness list in preparation for trial and we

22   think for those reasons, Your Honor, these limited additional

23   depositions are appropriate.

24         **THE COURT:**  How much time do you need on the -- if

25   the Court were to allow additional depositions, how much time

53

1    are you talking about?

2            **MR. GOSSELIN:**  Your Honor, we believe that we'd be

3    entitled to seven hours for each of those 30(b)(1) depositions.

4    We would also be willing to confine each of those 30(b)(1)

5    depositions to five hours on the record.

6            **THE COURT:**  Okay.  Let me do this.  Let me take care

7    of the summary judgment first and then once I do that I'll ask

8    the parties to meet and confer, to have a status conference on

9    what further discovery is necessary.

10           **MR. GOSSELIN:**  Thank you, Your Honor.

11           **THE COURT:**  All right.  Thank you.

12           **THE CLERK:**  All rise.

13       **(Proceeding adjourned at 11:14 a.m.)**

14

15

16

17

18

19

20

21

22

23

24

25

54

## CERTIFICATION

      **I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

 

 

_____                  **December 12, 2023**

        **Signed**                               **Dated**

 

           *TONI HUDSON, TRANSCRIBER*