UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

Present: The Honorable    Philip S. Gutierrez, United States District Judge

| Kelly Davis | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings (In Chambers):    Order DENYING Defendants' motion for summary judgment [Dkt. # 954].**

Before the Court is Defendants'[1] motion for summary judgment. *See generally* Dkt. # 962-1 ("*Mot.*").[2]  Plaintiffs, two classes of DirecTV NFL Sunday Ticket subscribers, opposed. *See generally* Dkt. # 975-1 ("*Opp.*").  Defendants replied. *See generally* Dkt. # 1000-1 ("*Reply*").  After considering the parties' papers and listening to the arguments made during the hearing held on December 11, 2023, *see* Dkt. # 1093 ("*Hearing Tr.*"), the Court **DENIES** Defendants' motion for summary judgment.

---

[1] Defendants in this action consist of:  National Football League, Inc. ("NFL"); Arizona Cardinals, Inc.; Atlanta Falcons Football Club LLC; Baltimore Ravens LP; Buccaneers LP; Buffalo Bills, Inc.; Chicago Bears Football Club Inc.; Cincinnati Bengals, Inc.; Cleveland Browns LLC; Dallas Cowboys Football Club, Ltd.; Denver Broncos Football Club; Detroit Lions, Inc.; Football Northwest LLC; Green Bay Packers, Inc.; Houston NFL Holdings LP; Indianapolis Colts Inc.; Jacksonville Jaguars Ltd.; Kansas City Chiefs Football Club, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club LLC; NFL Enterprises LLC; New England Patriots, LP; New Orleans Louisiana Saints LLC; New York Football Giants, Inc.; New York Jets Football Club, Inc.; Oakland Raiders LP; PDB Sports Ltd.; Panthers Football LLC; Philadelphia Eagles Football Club, Inc.; Pittsburgh Steelers Sports, Inc.; San Diego Chargers Football Co.; San Francisco Forty Niners Ltd.; Tennessee Football, Inc.; The Rams Football Company LLC; and, Washington Football Inc.  *See Second Amended Complaint*, Dkt. # 441 ("*SAC*") ¶ 29.  In this order, the individual clubs will be referred to interchangeably as teams or member clubs.

[2] The Court cites the unredacted versions of the parties' briefs.  Defendants' motion itself is at Docket Entry Number 954, Plaintiffs' opposition is at Docket Entry Number 964, and Defendants' reply is at Docket Entry Number 984.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

I.   Background

Plaintiffs assert that Defendants have conspired and entered a set of agreements with each other and their broadcast partners that suppress the output of telecasts of out-of-market professional football games.  This allegedly results in higher prices for the telecasts of out-of-market games—exclusively sold by DirecTV on Sunday Ticket—in violation of § 1 and § 2 of the Sherman Act.  *See In re National Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1148, 1157 (9th Cir. 2019) ("*NFL Sunday Ticket*").  As the Court extensively discusses the alleged conspiracy throughout the Order, the Court will provide a brief overview here of the three agreements, as alleged by Plaintiffs, that set the stage for the case.

(1) *Teams-NFL Agreement*:  Plaintiffs allege that the NFL's member clubs have agreed not to compete with one another in producing telecasts of their games.  Instead, the member clubs, each of which is a separately owned and managed business, have conveyed their telecasting rights to the NFL and granted the NFL the exclusive power to exercise those rights.  *NFL Sunday Ticket*, 933 F.3d at 1148.  As a result, only the NFL can enter into agreements to sell the telecast rights.  *Id.*

(2) *NFL-Network Agreements*:  The NFL, on behalf of its member clubs, has entered into agreements with CBS and FOX to create a single telecast for every Sunday afternoon NFL game.  *See id.*; *SUF Reply* ¶¶ 37–42, 190–94.  CBS and FOX in turn are granted the exclusive right to broadcast a limited number of games through free, over-the-air television in local markets.  *Id.*  And, pursuant to the agreements, CBS and FOX transfer ownership of the copyrights of the telecasts to the NFL.  *SUF Reply* ¶¶ 44–45.

(3) *NFL-DirecTV Agreement*:  The NFL then exclusively licenses to DirecTV the copyrights of the telecasts, which DirecTV bundles into a subscription package called NFL Sunday Ticket.  *NFL Sunday Ticket*, 933 F.3d at 1148; *SUF Reply* ¶ 214.  Football fans who want to watch out-of-market games—those not broadcast locally on CBS or FOX—must purchase the premium offering of Sunday Ticket.  *See NFL Sunday Ticket*, 933 F.3d at 1148; *SUF Reply* ¶¶ 197, 199.

The alleged outcome of these three agreements is that DirecTV has been able to charge supracompetitive prices for Sunday Ticket because fans unwilling to pay for Sunday Ticket cannot, for example, purchase out-of-market games individually or by team.  *NFL Sunday Ticket*, 933 F.3d at 1148.  This is the basis for Plaintiffs' suit:  Absent the agreements, the telecasts solely available on Sunday Ticket would be available through other means, which

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

would result in a greater number of telecasts of NFL games that would be more accessible to more viewers at lower prices. *Order Granting Class Certification*, Dkt. # 894 ("*Class Cert. Order*"), 2.

The Ninth Circuit's opinion in *NFL Sunday Ticket* reversed this Court's decision granting Defendants' motion to dismiss. *See NFL Sunday Ticket* at 1143–44; *Order Granting Motion to Dismiss*, Dkt. # 252 ("*Dismissal Order*"). The Court subsequently granted Plaintiffs' motion for class certification, certifying two classes of Sunday Ticket subscribers: (1) a commercial class and (2) a residential class. *See generally Class Cert. Order*. On behalf of the certified classes, Plaintiffs seek damages for the overcharges they paid DirecTV for Sunday Ticket, declaratory relief, and an injunction restraining Defendants from continuing their anticompetitive conduct. *See id.*

Defendants now move for summary judgment on Plaintiffs' claims of violations of § 1 and § 2 of the Sherman Act. *See Mot.*

II.     Legal Standard

    A.     The Sherman Act

       *i.     Section 1 of the Sherman Act*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "Although on its face, § 1 appears to outlaw virtually all contracts, it has been interpreted as 'outlawing only unreasonable restraints' of trade." *NFL Sunday Ticket*, 933 F.3d at 1150 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)) (cleaned up).

"[W]hen considering agreements among entities involved in league sports, such as here, a court must determine whether the restriction is unreasonable under the rule of reason." *NFL Sunday Ticket*, 933 F.3d at 1150 n.5. To do so, the Court must examine "'the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed,' to determine the effect on competition in the relevant product market." *Id.* at 1150 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).

To state a § 1 claim, the plaintiffs must prove four elements: (1) that there was a contract, combination, or conspiracy among two or more persons or distinct business entities; (2) that the agreement unreasonably restrained trade under the rule of reason; and (3) that the restraint

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|

| Title | In re National Football League's Sunday Ticket Antitrust Litigation |
|---|---|

affected interstate commerce. *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001); *see also NFL Sunday Ticket*, 933 F.3d at 1150. Additionally, the plaintiffs must have antitrust standing, meaning that (4) "they are the proper parties to bring the antitrust action because they were harmed by the defendants' contract, combination, or conspiracy, and the harm they suffered was caused by the anti-competitive aspect of the defendants' conduct." *NFL Sunday Ticket*, 933 F.3d at 1150; *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).

    *ii.*    *Section 2 of the Sherman Act*

Section 1 applies only to concerted action that restrains trade, *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010), but § 2, by contrast, covers both concerted and independent action. *Id.* Under § 2, it is unlawful for a person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

Plaintiffs assert two § 2 violations—a conspiracy to monopolize claim and a monopolization claim. To prove a conspiracy to monopolize, the plaintiffs must show (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury. *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). And, to prove a monopolization claim, the plaintiffs must show (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury. *Qualcomm Inc.*, 969 F.3d at 989.

    B.    <u>Summary Judgment</u>

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party will have the burden of proof at trial, the movant can prevail by pointing out that there is an absence of evidence to support the nonmoving party's case. *See id.* If the moving party meets its initial burden, the nonmoving party must set forth, by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all reasonable inferences in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be capable of being presented at trial in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738–39 (9th Cir. 1979).

III.   Discussion

Defendants argue that the Court should grant summary judgment on both Plaintiffs' § 1 and § 2 claims, raising four arguments: (A) Plaintiffs lack standing to bring damages claims against the NFL and its member clubs as Plaintiffs have purchased nothing from the NFL and cannot prove a conspiracy involving DirecTV ("Standing"), *Mot.* 20:1–24:2; (B) the Sports Broadcasting Act ("SBA") bars Plaintiffs' claims because Plaintiffs are directly challenging the NFL's broadcast agreements with CBS and FOX, which are protected by the SBA ("The Sports Broadcasting Act"), *id.* 4:6–11:15; (C) Plaintiffs can neither show that Defendants took concerted action nor that the concerted action unreasonably restrained trade or resulted in monopolization ("Horizontal Agreement"), *id.* 11:16–19:23; and (D) based on these fundamental defects, Plaintiffs' only remaining challenge is to the vertical agreement between the NFL and DirecTV, and Plaintiffs cannot show that the agreement, standing alone, is anticompetitive ("Vertical Agreement"), *id.* 24:3–25:24. The Court will address Defendants' arguments in turn.

A.   Standing

Defendants argue that Plaintiffs lack standing to bring their antitrust claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|

| Title | In re National Football League's Sunday Ticket Antitrust Litigation |
|---|---|

     *i.*     *There is a dispute of fact as to whether Plaintiffs have standing for their § 1 claim.*

Standing is a question of law for the district court to decide. *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 747–48 (9th Cir. 2012) (citing *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). But "when standing is challenged on summary judgment, '[t]he court shall [not] grant summary judgment if . . . there is [a] genuine dispute as to any material fact.'" *Id.* (quoting Fed. R. Civ. P. 56(a)); *see also Fanning v. HSBC Card Servs. Inc.*, No. SACV 12-00885-JVS (RNBx), 2014 WL 12783362, at *8 (C.D. Cal. May 5, 2014) ("If [d]efendants were to bring a motion for partial summary judgment on the issue of standing, [plaintiff] would only need to show a genuine dispute as to the standing elements.").

To establish antitrust standing, Plaintiffs must prove "they were harmed by the defendants' contract, combination, or conspiracy, . . . the harm they suffered was caused by the anti-competitive aspect of the defendants' conduct," *NFL Sunday Ticket*, 933 F.3d at 1150, and that their harm was directly caused by the antitrust violator, *see Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977). In *Illinois Brick*, the Supreme Court incorporated "principles of proximate cause" into an action for violation of the Sherman Act, holding "that indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520–21 (2019). The Supreme Court sought to limit antitrust liability in this way because "allowing every purchaser in a distribution chain to claim damages flowing from a single antitrust violation 'would create a serious risk of multiple liability for defendants.'" *NFL Sunday Ticket*, 933 F.3d at 1156 (quoting *Illinois Brick*, 431 U.S. at 730).

At the motion to dismiss stage, Ninth Circuit found that Plaintiffs had standing to sue the NFL and its member clubs, despite having purchased the Sunday Ticket package from DirecTV because "[Plaintiffs'] complaint adequately alleges that DirecTV conspired with the NFL and the NFL Teams to limit the production of telecasts to one per game and that plaintiffs suffered antitrust injury due to this conspiracy to limit output." *Id.* at 1158. The Ninth Circuit explained that "[the] principles of proximate cause apply differently when the injury to [the] plaintiffs is caused by a multi-level conspiracy to violate antitrust laws." *Id.* As a result, "when co-conspirators have jointly committed the antitrust violation, a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation." *Id.* at 1157. In other words, *Illinois Brick* was inapplicable as Plaintiffs adequately alleged that DirecTV acted as a co-conspirator.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

Defendants now argue that Plaintiffs have failed to produce any evidence of a conspiracy between the NFL, the member clubs, and DirecTV and therefore cannot show that DirecTV is a co-conspirator. *See Mot.* 20:19–21:2; *Reply* 10:7–11:23. Accordingly, *Illinois Brick* should apply and Plaintiffs, as indirect purchases, are barred from bringing their damages claims. *See Mot.* 20:3–13.

To show a conspiracy, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that [the defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (cleaned up). In *Monsanto*, the Supreme Court explained that courts should look for evidence that "tends to exclude the possibility that the [defendants are] acting independently." *Id.* In *Matsushita*, the Supreme Court further explained that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

Defendants argue that Plaintiffs have failed to show that DirecTV had a conscious commitment to the conspiracy because DirecTV cannot conspire with the member clubs as the member clubs are not parties to the NFL-DirecTV Agreement. *Mot.* 21:3–22:17. They further argue that the NFL-DirecTV Agreement is an exclusive license, which is a legal method of distributing intellectual property. *Id.* 22:18–23:20; *see also Hearing Tr.* 22:2–24 (arguing that DirecTV merely accepted a contract bid from the NFL, which does not show agreement to be part of the conspiracy). Defendants' arguments fail.

Defendants place great weight on the fact that the member clubs are not part of the NFL-DirecTV Agreement. *See Mot.* 21:3–22:17. But this fact is misleading. It does not follow that, because the member clubs are not parties to the NFL-DirecTV Agreement, DirecTV and the member clubs are not connected in the overall conspiracy. The member clubs sanction the NFL-DirecTV Agreement: Defendants admit that "club owners [] ratify those [DirecTV] agreements." *Id.* 22:6–9; *see also SUF Reply* ¶ 149 (quoting language from the NFL Constitution that "any contract involving substantial commitment by the League or its members shall not be binding unless first approved by an affirmative vote of not less than three-fourths . . . of the members of the League"); *Leckman Decl.* ¶ 1, Ex. 1, *NFL Constitution*, Dkt. # 964-3 ("*NFL Const.*"), 2003 Resolution BC-1. Further, the NFL, through the NFL-Network Agreements—which the member clubs ratify, *see SUF Reply* ¶ 27—comes to own the copyrights of the game telecasts produced by CBS and FOX, *id.* ¶¶ 44–46. It is those copyrights that the NFL licenses to DirecTV. *See Mot.* 21:22–22:3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

And Defendants' arguments imply that Plaintiffs' claims fail unless the four corners of
the NFL-DirecTV Agreement evinces a conspiracy, yet the Ninth Circuit has already rejected
Defendants' attempts to assess the conspiracy agreement by agreement: "'[T]he essential
inquiry' is 'whether or not the challenged restraint enhances competition,' which is assessed by
considering the totality of 'the nature or character of the contracts.'" *NFL Sunday Ticket*, 933
F.3d at 1152 (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okl.*, 468 U.S.
85, 103–04 (1984) ("*NCAA*")).  Indeed, "the law requires that the 'character and effect of a
conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by
looking at it as a whole.'" *Id.* (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690, 698–99 (1962)).  The Court is therefore "required to take a holistic look at how
the interlocking agreements actually impact competition." *Id.*

The Court finds that Plaintiffs have proffered sufficient evidence to raise a dispute of fact
as to whether the provisions in each of the three agreements—Teams-NFL, NFL-Network, and
DirecTV-NFL—result in DirecTV's monopoly of out-of-market telecasts, and to show
DirecTV's conscious commitment to the alleged conspiracy.  Plaintiffs provide the following
evidence:

*First*, Plaintiffs point to the alleged Teams-NFL Agreement to show that the member
clubs have consolidated would-be competing telecasts in the NFL.  *Opp.* 20:24–25; *SUF Reply*
¶ 150.  As discussed in subsequent sections, there is a dispute of fact as to whether the NFL and
its member clubs made an agreement to pool their telecasting rights and eliminate competition
between themselves.  *See infra* § III.B.ii.  There is also a dispute of fact as to whether the
individual member clubs could produce telecasts of their games individually, and therefore
whether their agreement to pool their telecast rights restricts the output of competing telecasts.
*See infra* § III.C.  If the member clubs have agreed not to produce their own telecasts, then the
member clubs can individually compete neither with DirecTV—for out-of-market telecasts—nor
CBS and FOX—for local broadcasts.

*Second*, provisions in the NFL-Network Agreements also restrict the NFL and its member
clubs from offering their own out-of-market telecasts.  *See Opp.* 20:25–21:2.  Under the NFL-
Network Agreements, no more than two telecasts can be broadcast at the same time in a given
local market.  *SUF Reply* ¶ 194.[3]  For instance, the CBS and FOX contracts say that the "League

---

[3] Defendants only dispute Plaintiffs' assertion that "no more than two telecasts can be broadcast
over-the-air at the same time" because the evidence shows that all regular-season NFL games are
available for free over-the-air in some local market.  *SUF Reply* ¶ 194.  But it is clear by the
contract language Plaintiffs quoted that their assertion applied to any given local market, and not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

shall not Distribute . . . into the Broadcast Area . . . video images (with or without audio) of any regular-season or post-season NFL games then in progress . . . in its entirety or substantially in its entirety at any time during the period when the applicable Game Broadcast is in progress . . . . [T]he League shall not schedule any regular season games to be telecast by League Telecast Partners other than FOX [or CBS] to have a kickoff less than three and one half hours before, or within three and one-half hours after, the originally scheduled commencement of any Game Broadcast." *Id.* Thus, NFL-Network Agreements provide exclusive rights to CBS and FOX for broadcasts of certain games in a given area.

Although the NFL-Network Agreements provide that the NFL becomes "the exclusive owner of all copyrights worldwide in and to all Game Broadcasts" and, that as the "exclusive owner," the NFL "reserves the exclusive right . . . to engage in Resale" of the copyrights, *SUF Reply* ¶¶ 44–46, the NFL-Network Agreements place restrictions on any "resale" product, *id.* ¶ 201. For example, the resale product must "be marketed as premium products for avid League Fans that satisfy complementary demand to the offering of in-market Game Broadcasts by CBS [or FOX] and League will not license or authorize League Resale Parties the right to use League Marks in a contrary manner."[4] *Id.* ¶ 202. Further, the FOX and CBS contracts both state that the NFL may resell the telecasts produced by FOX and CBS, but that it must be "on a subscription basis." *Id.* ¶ 201. The CBS contracts in particular require that (1) out-of-market telecasts be available through a "discrete purchase"; (2) out-of-market packages must be "marketed as premium products for avid League fans"; and (3) no out-of-market telecast can be sold on an "a la carte or 'pay per view'" basis. *Id.* ¶ 195.

As further evidence that NFL-Network Agreements were drafted to reduce competition for the CBS and FOX broadcasts, the NFL's chief media and business officer, Brian Rolapp, testified that the NFL intended its resale offering—Sunday Ticket—to be "a complementary premium product for avid fans," that it "should be a complementary premium product," and that "[t]o me 'premium' means that it is marketed and distributed as a high quality product . . . [and] should be priced and distributed as premium." *Id.* ¶ 205; *Declaration of Peter Leckman*, Dkt. #

---

nationally. *See id.* Defendants concede that "CBS and FOX only show a select number of over-the-air telecasts in any given local market." *Id.*

[4] Defendants do not dispute that the contracts contained this language in 2021, but that the prior agreements did not necessarily have this language. *SUF Reply* ¶ 202. But Defendants only cite the 2006 and 2014 CBS agreements and the 2006 and 2015 FOX agreements as examples where this provision was absent. *Id.* Defendants do not dispute elsewhere that the NFL-Network Agreements place limitations on NFL's resale of Sunday games. *Id.* ¶ 201.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

964-2 ("*Leckman Decl.*"), ¶ 12, Ex. 12, *Deposition of Brian Rolapp*, Dkt. # 975-13 ("*Rolapp Dep. Tr.*"), 201:6–22.

As a result of the above restrictions, the only option for the NFL and its member clubs to resell out-of-market telecasts is as a premium subscription package, which DirecTV has purchased the right to provide.[5]

*Third*, it is undisputed that the NFL-DirecTV Agreement, since 1995,[6] provides that DirecTV is the exclusive distributor of out-of-market games. *SUF Reply* ¶ 214.

The NFL-DirecTV Agreement also limits the NFL and its member clubs from offering additional over-the-air broadcasts, enhancing the value of Sunday Ticket. *Opp.* 21:2–9. The agreement achieves this through three provisions:

(1) The NFL-DirecTV Agreement restricts how many over-the-air broadcasts can be distributed nationally. *Id.* 21:3–4. The agreement specifies a minimum number of games that must be "regionalized," which means that they are restricted to certain local markets and cannot be made available as over-the-air broadcasts to the entire country. *SUF Reply* ¶ 208. This leaves DirecTV as the only provider of those regionalized games to out-of-market viewers.

(2) The NFL-DirecTV Agreement prevents telecasts from appearing on more than one channel, reducing the number of games being shown locally as free, over-the-air broadcasts and leaving DirecTV as the only option to view many games. *See Opp.* 21:4–5. The contracts require that "each Originating Network Telecaster [*i.e.*, CBS or FOX] (together with its local affiliates, if any) does not make available more than one [over-the-air broadcast] Game in any one market in the Territory at a particular time, subject to market overlap consistent with current practice." *SUF Reply* ¶ 209. There are between ten and thirteen games played during two

---

[5] Additionally, where the games are sold as a premium package, the NFL-Network Agreements ensure that that product does not compete with their over-the-air broadcasts. For example, the NFL must require the resale party (*i.e.*, DirecTV) to make the game broadcast unavailable in the area where the game broadcast is being distributed by CBS or FOX over-the-air, so that even a subscription package does not compete with the CBS or FOX broadcast of the local game. *See SUF Reply* ¶ 201.

[6] Plaintiffs say DirecTV has been the exclusive provider since 1994, but Defendants dispute that the 1994 NFL-DirecTV Agreement provided exclusivity. *SUF Reply* ¶ 214. Defendants concede the contracts 1995 onwards grant exclusivity.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

windows on Sundays during the regular season. *Id.* ¶¶ 197, 199. This means that there are multiple games being played at a time. Thus, if CBS and FOX are only able to each broadcast a football game on one channel in a given area, then necessarily there are many games not being broadcast in that area. And most consumers will only be able to watch three of the ten to thirteen games being played on a Sunday via free, over-the-air broadcasts. *Id.* ¶ 199.

(3) The NFL-DirecTV Agreement requires that no more than two over-the-air broadcasts can be shown in any location at one time, *Opp.* 21:5–6: "[T]he Originating Network Telecasters [*i.e.*, CBS or FOX] collectively (together with their local affiliates, if any) do not make available more than two [over-the-air broadcast] Games in any one market in the Territory at a particular time, subject to market overlap consistent with current practice," *SUF Reply* ¶ 210.[7] Just as with the restriction on channels, this allows DirecTV to provide to a region telecasts of all the other contemporaneous games besides the two currently provided over-the-air by CBS or FOX.

When drawing all reasonable conclusions in favor of Plaintiffs, the above evidence creates a triable issue as to whether DirecTV had a conscious commitment to participate in the conspiracy. The evidence provides that DirecTV was given exclusive control of out-of-market telecasts; both the NFL-Network Agreements and the NFL-DirecTV Agreement limit competition with DirecTV's paid telecasts from the NFL and its member clubs; and the NFL-DirecTV Agreement contains provisions that also restrict over-the-air broadcasts. A reasonable trier of fact could find that these interlocking provisions show DirecTV was aware and participating in the overall scheme to limit output of paid telecasts. Moreover, the various agreements are all designed to protect their piece of the conspiracy from intrusion from the other pieces. This "tends to exclude the possibility that [Defendants are] acting independently." *Monsanto*, 465 U.S. at 764. The output-limiting mechanisms are not "conduct [] consistent with permissible competition," and thus do support an inference of antitrust conspiracy. *Matsushita*, 475 U.S. at 588.

As a result, whether *Illinois* Brick applies, barring Plaintiffs from having standing, is dependent on a material issue of fact. Because "[t]his order finds this [standing] dispute dependent on a predicate issue of material fact," *Network Prot. Scis., LLC v. Fortinet, Inc.*, No.

---

[7] Defendants dispute that the contract language requires that the over-the-air broadcasts shown in any location at the same time must be limited to two. *SUF Reply* ¶ 210. Defendants argue the language instead should be interpreted to mean that the NFL "may authorize" certain broadcasts, subject to the quoted limitations. *Id.* The Court finds that the competing interpretations come to the same result: The NFL can authorize certain broadcasts, but only as long as no more than two CBS and FOX over-the-air broadcasts are available at one time in a given area.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

C 12-01106 WHA, 2013 WL 4479336, *3–4 (N.D. Cal. Aug. 20, 2013), the Court declines to grant summary judgment as to Plaintiffs' § 1 claim on these grounds. Thus, the disputed issues of fact that influence determination of standing in this case will be decided at trial. *See id.*

> ii. *There is a dispute of fact as to whether Plaintiffs have standing for their § 2 claim.*

For their § 2 conspiracy claim, Plaintiffs must also prove, in addition to establishing the agreement, "an overt act in furtherance of the conspiracy" and "the specific intent to monopolize." *Paladin*, 328 F.3d at 1158. Defendants argue that for the same reasons Plaintiffs lack standing for their § 1 claim, Plaintiffs have not established a triable issue of fact as to whether the member clubs had a common purpose with DirecTV, so Plaintiffs cannot establish that the member clubs agreed with DirecTV with the specific intent to monopolize. *Mot.* 21 n.7.

At the motion to dismiss stage, Defendants had similarly argued that Plaintiffs' § 2 claims failed, in part, because "plaintiffs have failed to allege that the defendants had the specific intent to monopolize a relevant market." *NFL Sunday Ticket*, 933 F.3d at 1159. The Ninth Circuit rejected this argument, finding that "the complaint adequately alleges that the interlocking Teams-NFL and NFL-DirecTV Agreements were designed to maintain market power, which is sufficient to allege defendants' specific intent." *Id.* As discussed above, Plaintiffs have provided sufficient evidence to show there is a triable issue as to whether the agreements between the NFL, the member clubs, and DirecTV were designed to maintain market power by reducing the number of telecasts available of the games. Thus, there is a triable issue of fact as to whether Defendants had the specific intent to monopolize. Because determining standing for § 2 depends on a predicate issue of material fact, the Court denies Defendants' request for summary judgment as to Plaintiffs' § 2 claims on these grounds.

B.    The Sports Broadcasting Act

Defendants argue that they are entitled to summary judgment on Plaintiffs' claims because the "undisputed record evidence shows that Plaintiffs' claims are barred by the Sports Broadcasting Act."[8] *Mot.* 4:6–7; *Hearing Tr.* 5:6–8.

---

[8] While Defendants argue that the SBA precludes all of Plaintiffs' claims, the SBA is relevant only to Plaintiffs' claim under § 1 of the Sherman Act. "By its terms, the SBA applies only to Section 1 of the Sherman Act and has no relevance to the plaintiffs' Section 2 claims." *NFL Sunday Ticket*, 933 F.3d at 1159 n.10. As such, any determination of the protections afforded under the SBA only affect Plaintiffs' claim under § 1.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

In response to the NFL's lobbying, Congress passed the SBA in 1961, which provides an exemption to § 1 of the Sherman Act.  15 U.S.C. § 1291; *NFL Sunday Ticket*, 933 F.3d at 1146.  In doing so, Congress recognized "'that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act,' and that therefore an exemption from § 1 of the Sherman Act was required."  *Id.* (quoting *NCAA*, 468 U.S. at 104 n.28).  As such, the SBA exempts:

> any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, . . . by which any league of clubs participating in professional football . . . contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football . . . engaged in or conducted by such clubs.

15 U.S.C. § 1291.[9]

 Defendants make two arguments for why the SBA precludes Plaintiffs' claims.

*First*, Defendants assert that the NFL-Network Agreements are "exempt from antitrust scrutiny," *Mot.* 5:4–5, and, because Plaintiffs' liability theories depend on eliminating in their entirety or altering the NFL-Network Agreements, Plaintiffs are seeking to impose liability for lawful conduct, *id.* 6:2–15.  Specifically, as clarified in Defendants' reply, Defendants "argue only that the SBA protects the longstanding exclusivity provisions of the horizontal NFL-Network Agreements," *Reply* 3:16–17, which provide that CBS's and FOX's telecasts are the only available telecasts of Sunday afternoon football games.  Accordingly, Plaintiffs "do not have a valid liability case if their claims are predicated on terminating or altering" those exclusivity provisions that "are immune from antitrust scrutiny."  *Mot.* 6:14–16.

*Second*, Defendants argue that the only "horizontal pooling" of the member clubs' telecast rights occurs through contract provisions in the SBA-protected NFL-Network Agreements, and that Plaintiffs have failed to proffer any evidence of a separate agreement between the NFL and its member clubs to pool their telecast rights.  *Id.* 10:9–18.  Thus, there is

---

[9] Further, the SBA places an area telecasting restriction limitation on its exemption:  "Section 1291 of this title shall not apply to any joint agreement described in the first sentence in such section which prohibits any person to whom such rights are sold or transferred from televising any games within any area, except within the home territory of a member club of the league on a day when such club is playing at home." 15 U.S.C. § 1292.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | | Date | January 11, 2024 |
|---|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | | |

no "unlawful 'pooling' conduct" among the member clubs for Plaintiffs to challenge because the pooling occurs through agreements that are exempt from antitrust scrutiny. *Id.* 11:12–15.

The Court addresses each of Defendants' SBA arguments in detail below.

> i.   *The SBA does not exempt the NFL-Network Agreements from antitrust scrutiny.*

As an initial matter, Defendants accuse Plaintiffs of engaging in a "bait and switch," stating that Plaintiffs have changed their theory of liability and are now "rely[ing] on a challenge to the NFL-Network Agreements," which is irreconcilable with the representations that Plaintiffs made to the Ninth Circuit. *Mot.* 1:9–2:25, 4:7–5:3. Defendants suggest that Plaintiffs did not challenge the NFL-Network Agreements because the Ninth Circuit stated "[t]he defendants argue, and the plaintiffs do not dispute, that the NFL-Network Agreement is covered by the SBA." *NFL Sunday Ticket*, 933 F.3d at 1149 n.4. Plaintiffs contend, however, that challenging aspects of the NFL-Network Agreements "is not a new theory," and that they have "consistently claimed that the agreements with CBS and Fox were part of the conspiracy to restrain competition outside of the protection of the SBA." *Opp.* 8:21–9:8; *Hearing Tr.* 30:12–15 ("[Plaintiffs] always contended the network agreements are part of an illegal web of agreements that restrict the availability to viewers of out-of-market broadcasts.").

The Court agrees with Plaintiffs. Plaintiffs have always claimed that the interlocking agreements between the NFL, its member clubs, DirecTV, and the television networks have suppressed competition for the sale of professional football game telecasts. *See SUF Reply* ¶¶ 257–63. For example, in their first amended complaint,[10] Plaintiffs alleged that the NFL-DirecTV Agreement "along with other contractual arrangements between the NFL, its member teams, and DirecTV, as well as Fox, ESPN, CBS, and NBC (collectively, the 'Networks'), results in the blackout or unavailability of out-of-market games, except through the bundled NFL/DirecTV Sunday Ticket." *First Amended Complaint*, Dkt. # 163, ¶ 10; *see also SAC* ¶ 10.

Indeed, Plaintiffs have indicated that their challenges are to provisions of the NFL-Network Agreements that affect the prices charged by DirecTV. The Ninth Circuit neither discussed the challenged aspects of the CBS and FOX agreements nor determined the CBS and FOX agreements to be exempt from antitrust liability. *See NFL Sunday Ticket*, 933 F.3d at 1149 n.4 ("The defendants argue, and the plaintiffs do not dispute, that the NFL-Network Agreement

---

[10] The first amended complaint was filed prior to the Court's order originally dismissing the action and the Ninth Circuit's reversal.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

is covered by the SBA.  But the parties do not argue that *the agreements at issue here* are exempt from antitrust liability merely because the NFL-Network Agreement has such immunity.") (emphasis added).  Nor could it.  The Court did not consider the language of the agreements at the motion to dismiss stage.[11]

Instead, the Ninth Circuit described the function of the NFL-Network Agreement generally:

> Under the NFL-Network Agreement, CBS and Fox coordinate to create a single telecast for every Sunday-afternoon NFL game.  Pursuant to that agreement, [the] NFL owns the copyright in the telecasts . . . .  The NFL, in turn, permits CBS and Fox to broadcast a limited number of games through free, over-the-air television.  These are the so-called local games.

*NFL Sunday Ticket*, 933 F.3d at 1148.  And the Ninth Circuit expressly distinguished between "the NFL's collective sale of telecast rights to free, over-the-air television networks [which] was squarely covered by the SBA" with "league contracts with cable or satellite television services, for which subscribers are charged a fee," which the SBA does not exempt from antitrust liability. *NFL Sunday Ticket*, 933 F.3d at 1147.

As Plaintiffs have consistently challenged aspects of the agreements between the NFL and the networks, the Court interprets the Ninth Circuit's language to mean that Plaintiffs did not challenge the premise that the SBA exempts the "NFL's collective sale of telecast rights to free, over-the-air television networks." *Id.* at 1148.  It, therefore, does not stand to reason that Plaintiffs have engaged in a "bait and switch" by including aspects of the CBS and FOX agreements in their theory of liability.

Turning to the substantive arguments, Defendants assert that Plaintiffs do not have a valid liability case if their claims are predicated on eliminating or altering the NFL-Network Agreements provisions that provide CBS and FOX with exclusivity for the Sunday afternoon NFL games that they produce and broadcast. *Mot.* 6:14–16; *Reply* 1:24–26.  Specifically, Defendants argue because Plaintiffs' "alleged proof of (i) anticompetitive harm, (ii) antitrust impact, and (iii) damages" rely on eliminating or revising the exclusivity provisions of the NFL-

---

[11] Further, the Court declined to grant judicial notice of the agreements when deciding the motion to dismiss.  *Dismissal Order* 9.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

Network Agreements with CBS and FOX, they cannot proceed consistent with the SBA.[12]
*Reply* 1:11–15. And because the SBA allows for the exclusivity provisions in the NFL-Network
Agreements, it follows that it should also protect the "output-enhancing" Sunday Ticket
supplement to the CBS and FOX broadcasts. *Id.* 3:18–24.

Defendants, however, mischaracterize Plaintiffs' arguments and infer a broader antitrust
exemption than the SBA provides.

    *a. The SBA's antitrust exemption must be narrowly applied.*

According to Defendants, Plaintiffs seek to rewrite contractual provisions in the NFL-
Network Agreements that are exempted by the SBA. For instance, Defendants argue that
Plaintiffs' expert, Professor Rascher, created but-for worlds showing that Plaintiffs' theory of
liability incorporates eliminating or eviscerating conduct protected by the SBA. *Mot.* 7:1–10:8.

While aspects of the agreements with CBS and FOX are part of the conduct Plaintiffs
challenge, Plaintiffs' experts do not seek the elimination or evisceration of the NFL and its
member clubs' agreements with CBS or FOX and admit that provisions of the CBS and FOX
agreements are protected by the SBA. For example, Professor Rascher states that he
"understand[s] that a substantial portion of the transactions involved in these agreements are not
part of the Challenged Conduct—including the pooling of rights for the purposes of production
and broadcasting of NFL telecasts on [over-the-air] channels that I understand the SBA provides
a degree of protection from antitrust scrutiny." *Kilaru Decl.* ¶ 4, Ex. 4, *Rebuttal Expert Report*

---

[12] Defendants also rely on *Comcast v. Behrend*, 569 U.S. 27 (2013) and *Ohio v. American
Express Co.*, 138 S. Ct. 2274 (2018) to support the proposition that "Plaintiffs do not have a
valid liability case if their claims are predicated on terminating or altering fundamental
provisions of agreements that are immune from antitrust scrutiny." *Mot.* 6:9–21, 7:5–7, 7:24–27.
But Defendants' cited case law does not support Defendants' proposition. In *Comcast*, the
Supreme Court reversed an order granting class certification because the plaintiffs relied on a
model that did not isolate damages resulting from any one theory of antitrust impact and as such
it fell "far short of establishing that damages are capable of measurement on a classwide basis."
569 U.S. at 34, 36. *Comcast* does not stand for Defendants' stated proposition and is irrelevant
here as the Court has determined that "Plaintiffs' methods and models are *capable* of proving
impact and damages on a class-wide basis." *Class Cert. Order* 19 (emphasis in original).
Likewise, *Ohio v. American Express Co.* also does not stand for Defendants' proposition as it
simply lays out the framework for determining whether a restraint on trade violates the rule of
reason. 138 S. Ct. at 2284.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

*of Daniel A. Rascher,* Dkt. # 956-5 ("*Rascher Rebuttal Rep.*"), ¶ 51.  Indeed, no party disputes that the "SBA grants the NFL and clubs the right to enter fully exclusive contracts with CBS and FOX" for free, over-the-air broadcasting.  *Reply* 3:18–20; *see Opp.* 9:22–10:6.

Plaintiffs instead are arguing that specific provisions of the CBS and FOX agreements are part of the challenged conduct to the extent that they "suppress competition outside of the limited area protected by the SBA."  *Opp.* 8:22–24.  For example, Plaintiffs point to evidence showing that, as part of their exclusive deal for free over-the-air broadcasts, the CBS and FOX contracts "place limitations on the NFL's 'resale' of Sunday games that are not distributed over-the-air in a particular television market."  *SUF Reply* ¶ 201; *see also id.* ¶ 195, 202; *supra* § III.A.i.  These provisions protect CBS's and FOX's local broadcasts from competition from the paid telecasts that are excluded from the SBA.  This is part of the challenged conduct—"agreements that, working together, suppress competition for the sale of professional football game telecasts"—that Plaintiffs remove from their but-for worlds.  *Opp.* 8:22–9:8.

Defendants argue that "Plaintiffs' approach to the NFL-Network Agreements would neuter the SBA":  While the SBA "would grant antitrust immunity to licensing agreements that enable NFL games to appear on free over-the-air television," under Plaintiffs' interpretation, the SBA would also allow the "restructuring, through antitrust litigation, of protections in those agreements that are fundamental to the broadcasters' investment in NFL telecast rights and production, and willingness to distribute the games on free over-the-air television."  *Mot.* 10:1–7.  In other words, Defendants are arguing that without the limitations the NFL-Network Agreements place on paid telecasting, CBS and FOX would have less financial incentive to enter into contracts with the NFL to offer the over-the-air broadcasts.  *See Hearing Tr.* 12:14–17 ("So it's not surprising that in creating [Sunday Ticket]—which is a resale product and a retransmission—the broadcasters wanted there to be some parameters around that."); *id.* 48:5–17 ("[T]he whole point of CBS getting full exclusivity over its broadcasts was to not have competition from pay television.").  "The SBA, and the immunity it provides, would have no meaning if the agreements it protects could be hollowed out so easily."  *Mot.* 10:7–8.

But Defendants' position seeks to expand the SBA's exemption to antitrust laws outside of the conduct permitted by the SBA.  For even though Defendants state that they "are not seeking to extend the protections of the SBA to a license for 'paid telecasting,'" *Reply* 3:13–14, Defendants' position taken to its logical conclusion would allow the NFL to do just that.

The SBA "did not pronounce a broad, sweeping policy, but rather engrafted a narrow, discrete, special-interest exemption upon the normal prohibition on monopolistic behavior." *Shaw v. Dallas Cowboys Football Club, Ltd.*, No. CIV.A. 97-5184, 1998 WL 419765, at *5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

(E.D. Pa. June 23, 1998), *aff'd* 172 F.3d 299 (3d Cir. 1999). As an exemption to the antitrust laws, the SBA "must be narrowly applied." *Id.* at *3; *Union Lab. Life Ins. Co. v. Pireno*, 458 U.S. 119, 126, (1982) ("[O]ur precedents consistently hold that exemptions from the antitrust laws must be construed narrowly."). It protects the NFL's collective sale of telecast rights to free, over-the-air television networks. *NFL Sunday Ticket*, 933 F.3d at 1147. It, however, does "not exempt league contracts with cable or satellite television services, for which subscribers are charged a fee, from antitrust liability." *Id.*; *see also id.* at 1148 ("'Sponsored telecasting' under the SBA pertains only to network broadcast television and does not apply to non-exempt channels of distribution such as cable television, pay-per-view, and satellite television networks." (quoting *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1183 (S.D. Cal. 2002))).

If the Court were to agree with Defendants' logic and not allow Plaintiffs' challenges to proceed, "the NFL could circumvent the statutory confines, nullify the statutory scheme, simply by" including provisions in the NFL-Network Agreements that restrict paid telecasts. *See Shaw*, 1998 WL 419765 at *3. Indeed, the Court "would allow the exception to swallow the rule: a sponsored telecast to a limited geographic area would secure an antitrust law exemption for nationwide sales." *Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299, 302 (3d Cir. 1999). The SBA, "as a special-interest exception to the antitrust laws, receives a beady-eyed reading. A league has to jump through every hoop; partial compliance doesn't do the trick." *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 596 (7th Cir. 1996) ("*Bulls II*"). The SBA cannot be read to immunize contracts that restrict competition for paid telecasts. Therefore, Plaintiffs' theories do not fail as a matter of law for being inconsistent with the SBA.

        *b.*    *Defendants have the burden of establishing a procompetitive rationale.*

Defendants argue that Plaintiffs' theories that rewrite provisions of the CBS and FOX agreements are irrational, but this argument actually goes to Defendants' burden to establish a procompetitive rationale for its current broadcasting model.

To determine whether a restraint violates the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market" and then "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Am. Express Co.*, 138 S. Ct. at 2284; *see also NCAA*, 468 U.S. at 113 ("Under the Rule of Reason, these hallmarks of anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market.").

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

Defendants do not challenge whether Plaintiffs have met their initial burden, as Defendants do not argue that Professor Rascher's but-for worlds fail to show a restraint on output of paid telecasts. Indeed, the Court has already found "Dr. Rascher's [College Football But-For World] model adequate to produce class-wide proof of impact and damages, especially considering that the Ninth Circuit has already recognized college football as a close analog to this case." *Class Cert. Order* 18 (discussing how the college football telecast arrangement that the Supreme Court struck down as anticompetitive in *NCAA* is like the purported anticompetitive arrangement here, and that post-*NCAA*, college football telecasts increased, while costs decreased); *see also NFL Sunday Ticket*, 933 F.3d at 1156 ("Here, . . . 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" (quoting *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999))).

Defendants instead are challenging Professor Rascher's opinion of what agreements the NFL, its member clubs, and the broadcasters would likely form in his but-for worlds. *See Mot.* 7:1–10:8. Defendants' arguments, however, go towards whether Defendants have a procompetitive rationale for their current model. For example, Defendants argue that the exclusivity provisions are essential to CBS and FOX and eliminating them would harm fans and essentially destroy the NFL's broadcasting model. *Id.* To be sure, Defendants can argue to a jury that the current framework "in which Sunday Ticket supplements the CBS and FOX broadcasts" is "output enhancing (and plainly more consumer-friendly)" and justifies the challenged restraint. *Reply* 3:21–24. But it is Defendants' burden to establish a procompetitive rationale.

> ii.     There is a dispute of fact as to whether an agreement exists, outside of the NFL-Network Agreements, that pools the member clubs' telecast rights.

Defendants argue that, at a minimum, Plaintiffs' challenges to the NFL's horizontal pooling of telecast rights cannot proceed because the NFL only pools the individual member clubs' telecast rights through the SBA-protected NFL-Network Agreements. *Mot.* 10:9–18. As such, Defendants argue there is "no potentially unlawful horizontal 'pooling' conduct among the NFL clubs for Plaintiffs to challenge." *Reply* 5:11–12. Defendants' argument is twofold: (1) There is no evidence of a separate Teams-NFL Agreement pooling the member clubs' telecast rights and, thus (2) "[t]here is no *horizontal* conduct to challenge other than the CBS and FOX agreements," which are exempt under the SBA. *Mot.* 11:14–15.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

As an initial matter, Defendants' argument again misstates the protection afforded by the SBA. As discussed above, the SBA is a narrow exemption to antitrust laws that allows for NFL's collective sale of telecast rights to free, over-the-air television networks. Even if Plaintiffs could not show a separate agreement—outside of the agreements with CBS and FOX—where the member clubs pooled their telecast rights, the SBA does not immunize agreements that affect paid telecasts. If the Court were to agree with Defendants' position, it would encourage the NFL to put any anticompetitive provision that restricts competition for the out-of-market paid telecasts in the agreements with CBS and FOX. "The NFL got what it lobbied for [in the SBA]; it cannot now expect the federal courts to transform narrow, discrete, special-interest legislation into a far broader exemption. This is particularly so, once again, because the Act must be narrowly applied." *Shaw*, 172 F.3d at 302–03 (cleaned up).

To support the first part of their argument—that there is no separate Teams-NFL Agreement—Defendants point to the NFL Constitution, which sets forth provisions governing the relationship between the NFL and its member clubs. *See SUF Reply* ¶ 4. Defendants explain that "the NFL Constitution assigns certain telecast rights to the individual clubs" and that "the NFL acts as agent for the clubs in negotiating and executing the SBA-protected NFL-Network Agreements." *Reply* 4:13–15. For instance, the NFL Constitution provides that "member clubs participating in any game are authorized to telecast and broadcast such game anywhere," subject to certain restrictions, *SUF Reply* ¶ 6, and that "[a]ny contract entered into by any club for telecasting or broadcasting its games . . . must be approved in writing by the Commissioner in advance of such telecast or broadcast," *id.* ¶ 7. Defendants argue that the freedom afforded to each member club by this provision exemplifies that the NFL Constitution "creates no horizontal agreement." *Mot.* 10:21–23.

Instead, according to Defendants, the only evidence of horizontal pooling is in the NFL-Network Agreements. The NFL, on behalf of the member clubs, negotiates and executes agreements to license telecast rights. *SUF Reply* ¶ 27. The member clubs then vote on resolutions to approve the contracts. *Id.* ¶ 27; *NFL Const.*; *e.g.*, NFL 1998 Resolution BC-1 ("[T]he membership hereby approves the eight-year television contracts with ABC, ESPN, CBS, and FOX . . . ."); NFL 2011 Resolution BC-2 ("[T]he membership now desires to ratify and approve the CBS, FOX and NBC agreements . . . ."). Relevant here, in accordance with the NFL Constitution, the NFL, "acting as exclusive agent for and on behalf of each of the member clubs of the NFL," has "negotiated and executed broadcasting agreements with CBS and FOX for the production and distribution of Sunday afternoon, regular season NFL football games." *SUF Reply* ¶ 28. Defendants assert this proves that the pooling of the member clubs' telecasts rights occurs solely through the NFL-Network Agreements.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

Plaintiffs disagree, arguing that the "agreement to pool the clubs' rights to license telecasts of their games is enshrined in various provisions of the NFL Constitution." *Id.* ¶ 26. Indeed, although the NFL Constitution provides authorization for the member clubs to individually telecast games, the restrictions that the NFL places on the telecasts potentially disincentivizes the member clubs from producing telecasts.  The restrictions included in NFL Constitution provide that (1) no member club can distribute a game telecast into the home territory of another member club playing at home, (2) no game can be telecast within the home territory of a member club playing at home except by agreement of the participating member clubs, and (3) each member club playing at home grants the visiting member club the exclusive right to telecast that game within the visiting member club's home territory.  *See id.* ¶ 6.  Based on these restrictions, if the Los Angeles Rams desired to offer a telecast one of its games to an out-of-market viewer, it could not:  (1) telecast the game in New York City if the Jets or the Giants were playing at home; (2) would have to enter an agreement with the San Francisco 49ers to telecast the Rams home game against the 49ers in Los Angeles; (3) and would not be able to telecast that same game in San Francisco if the 49ers wanted to telecast the game in their home territory.  With these restrictions, it is unclear whether the Rams could offer telecasts to the out-of-market Rams fans who would be interested in purchasing them.  As such, the restrictions in the NFL Constitution may reflect an agreement between the member clubs to pool their telecasts rights.

Plaintiffs further argue that an agreement must exist because the NFL would not be able to enter the network agreements if the member clubs did not grant the NFL their rights:  The "NFL-Network contracts presuppose the collectivization of rights in the NFL." *Opp.* 13:8–9.  In support, Plaintiffs provide deposition testimony from the NFL's corporate representative Hans Schroeder.  Presumably[13] in response to a question regarding the NFL's model telecast game distribution, Mr. Schroeder testified that he thought "the league had the right to distribute the collective set of [the] clubs['] games as part of media deals that the league offered." *Leckman Decl.* ¶ 13, Ex. 13, *Deposition of Hans Schroeder*, Dkt. # 975-14 ("*Schroeder Dep. Tr.*"), 19:3–10.  Defendants argue that the media deals referred to by Mr. Schroeder consisted solely of the NFL-Network Agreements, *Reply* 4:22–28, but when he was asked to clarify how the league could participate in such media deals, Mr. Schroeder explained that "the teams granted to the league and the league offered those collective set of rights related to all regular season and post season games across the league." *Schroeder Dep. Tr.* 19:11–22.  As such, "the teams have not been permitted to license television broadcast of their regular season games" because the "clubs granted those rights to the league." *Id.* 19:23–24; *see also id.* 21:24–22:2 ("The clubs have

_____

[13] Plaintiffs' exhibit did not contain the complete line of questioning from the deposition transcript.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | | Date | January 11, 2024 |
|---|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | | |

granted to the league the right to license all broadcast[s] related to regular season and post season games on the television.").

Plaintiffs also cite testimony from Mr. Rolapp, who similarly testified that the member clubs have ceded their television rights of games to the league to be sold collectively, such that the member clubs may not sell telecasts themselves or enter into individual agreements with any networks, satellite TV providers, or internet services. *Rolapp Dep. Tr.* 50:7–51:7.

Lastly, Plaintiffs point to the NFL-DirecTV Agreement where the NFL contracted with DirecTV to exclusively sell out-of-market telecasts. *SUF Reply* ¶ 207. Plaintiffs contend that this arrangement on its face shows that the member clubs have agreed to cede their rights to the out-of-market games to the NFL, which is how the NFL was able to sell them collectively and exclusively to DirecTV.

Considering the evidence in the light most favorable to Plaintiffs, as the non-moving party, the restrictions in the NFL Constitution, the unequivocal testimony from the NFL that the member clubs have ceded their television rights to the NFL, and that, regardless of the contractual mechanism, the NFL ends up with the right to sell the member club's out-of-market games, the Court is satisfied that Plaintiffs have advanced sufficient evidence to raise a genuine dispute of material fact as to the existence of an agreement between the NFL and its member clubs that grants the NFL the exclusive right to license NFL telecasting rights.

Based on the foregoing reasons, the Court declines to grant summary judgment as to Plaintiffs' § 1 claim on these grounds.

C.    Horizontal Agreement

Defendants challenge both of Plaintiffs' Sherman Act claims on the grounds that producing telecasts of NFL games requires cooperation between the NFL and its participating member clubs, and, therefore, that cooperation cannot constitute a horizontal agreement—*i.e.*, an agreement between competitors—that restrains trade or threatens monopolization. *Mot.* 11:16–22; *see NFL Sunday Ticket*, 933 F.3d at 1150.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

      i.    *There is dispute of fact as to whether Defendants' pooling conduct violates § 1.*

Defendants argue that Plaintiffs' challenges to the alleged horizontal or pooling conduct between the NFL and its member clubs fail as a matter of law as Plaintiffs have not provided evidence to meet either the first or second elements of Plaintiffs' § 1 claim.

The first element of a § 1 violation requires "that there was a contract, combination, or conspiracy." *Tanaka*, 252 F.3d at 1062. This element "is informed by the basic distinction in the Sherman Act between concerted and independent action that distinguishes § 1 of the Sherman Act from § 2." *Am. Needle*, 560 U.S. at 190 (cleaned up). Defendants argue that the member clubs and the NFL should be considered a single entity and that cannot satisfy the basic Sherman Act element of "concerted action." *See Mot.* 12:1–18:7.

The second element of a § 1 claim requires that Plaintiffs show "that the agreement unreasonably restrained trade under . . . a rule of reason analysis." *Tanaka*, 252 F.3d at 1062. Defendants contend that even if the NFL and the member clubs are not considered a single entity incapable of concerted action, Plaintiffs have failed to provide any evidence that Defendants' cooperation has unreasonably restrained trade. *See Mot.* 18:8–19:23. The Court addresses each argument in turn.

      a.    *There is a dispute of fact whether the NFL and its member clubs are capable of concerted action.*

The Supreme Court has "long held that concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities." *Am. Needle*, 560 U.S. at 191. Instead, the Supreme Court has "eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Id.* To identify concerted action, "the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense. The key is whether the alleged 'contract, combination . . . , or conspiracy' . . . joins together separate decisionmakers." *Id.* at 195. Thus, "[t]he relevant inquiry is whether there is a 'contract, combination . . . , or conspiracy' amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *Id.* (cleaned up). If that occurs, "the entities are capable of conspiring under § 1, and the court must decide whether the restraint of trade is an unreasonable and therefore illegal one." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

When assessing concerted action, a court should examine only the specific conduct at issue. *See Bulls II*, 95 F.3d at 599–600; *see also Am. Needle*, 560 U.S. at 197, 203–04 (framing the question of whether the member clubs compete in the market for intellectual property from the perspective of "a firm making hats"). Here, the Court must determine whether the NFL and its member clubs are engaging in concerted action or acting like a single entity as to the conduct of producing telecasts. If the evidence shows it is possible for independent entities—*i.e.*, individual sports teams—to license telecast rights on their own without pooling their rights with a conference or league, that raises a dispute of fact as to whether the NFL and its member clubs' decision not to produce telecasts independently is "a sudden joining of two independent sources of economic power previously pursuing separate interests." *Am. Needle*, 560 U.S. at 196. If it is not possible, then the NFL and its member clubs are properly considered a single entity incapable of concerted action.

Defendants argue that the NFL and its member clubs function as a single entity because the factual record shows that creating NFL "game broadcasts 'depends and has always depended on the cooperation among' the NFL and the NFL clubs." *Mot.* 13:24–26; *see generally id.* 13:20–16:2.[14] "While clubs may be able to compete with one another along other dimensions—for example, to license their own marks and logos for use on apparel, *cf. Am. Needle*, 560 U.S. 183—they cannot compete to produce telecasts of an NFL game because such productions cannot exist without the cooperation of the NFL and its member clubs." *Mot.* 13:26–14:2. According to Defendants, this is because (1) the NFL and its member clubs must cooperate to produce the live underlying game, *id.* 14:3–14:21, and (2) the NFL and its member clubs must cooperate in sharing intellectual property to produce a telecast of the game, *id.* 14:22–15:5.

In support of their first argument, Defendants point out that producing games involves "multi-employer bargaining to establish processes for hiring players who comprise the member teams," *id.* 14:4–6; *see SUF Reply* ¶ 9, "establish[ing] the rules by which the football games between the teams are played," *Mot.* 14:6–7; *SUF Reply* ¶ 10, "maintain[ing] and grow[ing] viewership and fan interest in all NFL Football games," *Mot.* 14:8–9; *see SUF Reply* ¶¶ 13–15, and creating the schedule for season games, *Mot.* 14:9–10; *see SUF Reply* ¶ 12. Because it is impossible to produce live games without cooperation as to each of these actions, Defendants

---

[14] The Ninth Circuit has already determined that there is no law requiring that the NFL and its member clubs cooperate to produce telecasts. *NFL Sunday Ticket*, 933 F.3d at 1153 ("Defendants have failed to identify, and we are unaware of, any binding precedent requiring the teams and the NFL to cooperate in order to produce the telecasts.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

argue, NFL Football is one product from a single source instead of the joining of separate interests. *Mot.* 14:12–21.

Plaintiffs do not dispute that cooperation is necessary to put on a football game, s*ee Opp.* 18 n.17, but they do disagree that the cooperation required to produce the underlying game means that Defendants are a single entity when producing telecasts. Plaintiffs' expert, Professor Elhauge, opines that "agreements on common game rules and similar matters are needed to have a league that sells sporting competitions, whereas agreements to collectively pool telecast rights are not . . . . Further, in college football today, the NCAA sets common game rules and similar matters without pooling television rights." *Kilaru Decl.* ¶ 30, Ex. 30, *Rebuttal Expert Report of Einer Elhauge*, Dkt. # 962-29 ("*Elhauge Rebuttal Rep.*"), ¶ 23.

To that end, Defendants argue that cooperation is necessary for creating telecasts because a telecast must feature the participating member clubs' trademarks, the marks of other member clubs, the NFL's own marks, and the NFL's other intellectual property such as historical highlights or highlights from other contemporaneous games. *Mot.* 14:22–15:5. Additionally, Defendants assert that, as Plaintiffs have failed to provide a single example of a sport where teams produce different, nationally competing telecasts of a game, it is not possible for the NFL and its member clubs to produce telecasts without acting as a single entity. *Id.* 15:6–10.

Plaintiffs respond that Defendants miss the mark and that the issue is whether the "teams, operating independently, can reach agreements even when the telecast rights are not owned by a single entity." *Opp.* 17:13–14. To show that the member clubs *can* operate independently in this regard,[15] Professor Rascher, reports that in 1956, CBS negotiated with the NFL and each

---

[15] Additionally, Plaintiffs' point is well taken that the Defendants' argument that the NFL and its member clubs are a single entity for the production of game telecasts is in conflict with the Defendants' argument about the SBA applying to the entirety of the NFL-Network Agreements. *See Opp.* 15:4–11. If the NFL and its member clubs are not capable of concerted action, then there would be no need for the SBA to exempt from antitrust scrutiny the "collective sale of telecast rights to free, over-the-air television networks." *NFL Sunday Ticket*, 933 F.3d at 1147. Defendants reply that their arguments are not in conflict because the single entity theory was not recognized until more than 20 years after enactment of the SBA. *Reply* 7:4–12. When the SBA was passed, instead of the single entity doctrine, there was the intra-enterprise conspiracy doctrine. *See Indep. Tube. Corp. v. Copperweld Corp.*, 467 U.S. 752, 760–65 (discussing the development of the intra-enterprise doctrine). The intra-enterprise conspiracy doctrine "provide[d] that § 1 liability is not foreclosed merely because a parent and its subsidiary are subject to common ownership." *Id.* at 759. But Defendants have never tried to argue that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

member club independently for the rights to broadcast an entire season of football. *Kilaru Decl.* ¶ 3, Ex. 3, *Expert Report of Daniel A. Rascher*, Dkt. # 956-4 ("*Rascher Rep.*"), ¶ 77.[16] Plaintiffs also point out that the University of Notre Dame and Brigham Young University[17] do not belong to sports conferences—which both parties agree are akin to the NFL, *see Reply* 8:28–9:2; *Opp.* 17:15–17; *SUF Reply* ¶ 81—and each school has its own agreement to sell their telecast rights directly to a broadcast network, *id.* Notre Dame has also been successful in forming an agreement with the NCAA and other schools' teams to display their respective trademarks. *Id.*; *see Rascher Rebuttal Rep.* ¶¶ 420–22.

Further, it is plausible that the NFL and the member clubs do not cooperate in sharing intellectual property because it is necessary to produce a telecast but because it is mutually beneficial to do so. *See Opp.* 17:3–14. For example, Professor Elhauge stated in his deposition that "the NFL would have incentives to have its logo shown in those games because it wants to promote its brands and because all the teams after all control the NFL." *See Leckman Decl.* ¶ 3, Ex. 3, *Deposition of Einer Elhauge*, Dkt. # 966-4 ("*Elhauge Dep. Tr.*"), 128:15–23. Defendants' intellectual property arguments are also undermined by the fact that multiple conferences in

---

NFL and its member clubs share common ownership; it has always been understood that each member club is its own distinct legal entity. *See SUF Reply* ¶ 2 ("The NFL member clubs are separately owned."). Therefore, the Court is not convinced that the intra-enterprise doctrine was what precipitated the need for the SBA's protection back in 1961. Moreover, if Defendants' understanding were correct, then the change brought forth by *Copperweld* would negate the need for the SBA currently, and there would be no reason to extensively discuss it. Defendants' arguments are merely inconsistent.

[16] Plaintiffs also appeal to the history of the NFL recounted by the Ninth Circuit, showing that "[i]n the 1950s, the right to telecast NFL games was 'controlled by individual teams,' which independently licensed the telecasts of their games to television networks." *NFL Sunday Ticket*, 933 F.3d at 1144 (quoting the findings of fact—after trial—in *U.S. Football League v. NFL*, 842 F.2d 1335, 1346 (2d Cir. 1988)); *see Opp.* 15:24–16:2. So, "'[b]y the late 1950s, eleven individual teams had signed contracts with the Columbia Broadcasting System; two teams—Baltimore and Pittsburgh—had signed contracts with the National Broadcasting Company; and one team—Cleveland—had organized its own network.'" *NFL Sunday Ticket*, 933 F.3d at 1145 (quoting H.R. Rep. No. 93-483 at 4 (1973)); *see Opp.* 16:3–7.

[17] After the issuance of Professor Rascher's rebuttal report, BYU has since joined a conference and now pools its telecast rights. This does not affect Plaintiffs' argument, which is not that independent telecasting has been widely done, but that it *can* be done.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

college sports must form agreements with each other when their respective teams compete, *Opp.* 18:8–9, and in-stadium advertising involves separate entities agreeing to share intellectual property, *see id.* 17:17–20.

While Defendants are correct that Plaintiffs' examples reinforce that sports teams must cooperate with each other and their conferences/league to produce a telecast containing the relevant trademarks and intellectual property, *see Reply* 8:21–28, not all levels of cooperation indicate the existence of a single entity. Instead, the Supreme Court recognized in *American Needle* that:

> Any joint venture involves multiple sources of economic power cooperating to produce a product. And for many such ventures, the participation of others is necessary. But that does not mean that necessity of cooperation transforms concerted action into independent action; a nut and a bolt can only operate together, but an agreement between nut and bolt manufacturers is still subject to § 1 analysis . . . . The mere fact that the teams operate jointly in some sense does not mean that they are immune.

560 U.S. at 199.[18]

Drawing all inferences in favor of Plaintiffs, the evidence shows it is possible for the member clubs to act individually to produce telecasts. Therefore, a reasonable trier of fact could find that the alleged horizontal pooling of telecast rights is concerted action subject to § 1.

---

[18] Defendants point to two cases for the proposition that the member clubs cannot individually own—and therefore sell—the telecasts. *Mot.* 15:11–20; *see Washington v. NFL*, 880 F. Supp. 2d 1004 (D. Minn. 2012); *Spinelli v. NFL*, 96 F. Supp. 3d 81, 114–15 (S.D.N.Y. 2015). Neither case is binding on this Court, and the Ninth Circuit did not acknowledge them even though this Court applied those cases when it initially dismissed this case. *See Dismissal Order*, 25–28. "Thus, we reject the defendants' argument that *American Needle*, 560 U.S. at 190, 130 S. Ct. 2201, is inapposite; here, like in *American Needle*, the agreements not to compete concern separately owned intellectual property, and impose an unlawful restraint on independent competition." *NFL Sunday Ticket*, 933 F.3d at 1154.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

> **b.**     *There is a dispute of fact as to whether the pooling conduct unreasonably restrains trade.*

The second element of a § 1 claim requires the plaintiffs to identify a harm that is "attributable to an anticompetitive aspect of the practice under scrutiny." *NFL Sunday Ticket*, 933 F.3d at 1150 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). To do so, the plaintiffs can show that a restraint injures competition if they plausibly allege "a naked restriction on price or output," such as "an agreement not to compete in terms of price or output." *NCAA*, 468 U.S. at 109. A horizontal agreement is sufficient to show injury to competition if it reduces competitors' independent decisions about "whether and how often to offer to provide services," *F.T.C. v. Sup.Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990), or limits competitors' "freedom to compete," *NCAA*, 468 U.S. at 106.

Defendants argue that even if the NFL and its member clubs are not considered a single entity, Plaintiffs still have failed to show that Defendants' conduct unreasonably restrains competition because there is no evidence that the telecasts could be produced without cooperation. *See Mot.* 18:10–17. Thus, the cooperation does not harm competition. *Id.*; *see Am. Needle*, 560 U.S. at 203 ("When restraints on competition are essential if the product is to be available at all, . . . the agreement is likely to survive the Rule of Reason." (cleaned up)).

But as discussed above, drawing all inferences in favor of Plaintiffs, the evidence shows it is possible for the member clubs to act individually to produce telecasts. "In the absence of a legal requirement that the NFL teams, NFL, and broadcasters coordinate in filming and broadcasting live games, the Los Angeles Rams (for instance) could contract for their own telecast of Rams games and then register the telecasts for those games with the Rams (and perhaps the team against whom they are playing). Only the agreements that are the subject of plaintiffs' antitrust action prevent such independent actions." *NFL Sunday Ticket*, 933 F.3d at 1154. The decision not to individually control their telecast rights is "an agreement not to compete in terms of . . . output." *NCAA*, 468 U.S. at 109. It reduces the member clubs' decisions about "whether and how often to offer to provide services." *Sup.Ct. Trial Lawyers Ass'n*, 493 U.S. at 422.

Therefore, based on the record before the Court, a reasonable trier of fact could find that the alleged horizontal pooling of the member clubs' telecast rights is an unreasonable restraint. Defendants are not entitled to summary judgment of Plaintiffs' § 1 claim on this basis.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

       i.       *There is dispute of fact as to whether Defendants' conduct amounts to monopolization in violation of § 2.*

Section 2 "covers both concerted and independent action, but only if that action monopolizes or threatens actual monopolization, a category that is narrower than restraint of trade." *Am. Needle*, 560 U.S. at 190 (citing 15 U.S.C. § 2 and *Copperweld*, 467 U.S. at 767) (cleaned up).

Plaintiffs have alleged that Defendants have violated § 2, in part, because the member clubs "agreed to consolidate all licensing rights for live video presentations of regular season NFL games into a single entity, with the purpose, intent, and effect of monopolizing the relevant market and submarket described above." *SAC* ¶ 161. Defendants assert that the § 2 claim also cannot be met under the single entity theory—that the NFL and its member clubs *must* act as a single entity to produce game telecasts—because there are no separately owned broadcast rights for the member clubs to consolidate and constitute a monopolization. *Mot.* 16 n.4.

As discussed above, however, the Ninth Circuit has already held that there is no law or precedent preventing the telecast rights from being separately owned. *NFL Sunday Ticket*, 933 F.3d at 1153–54. Further, for the same reasons as for the § 1 claim, there is a triable issue of fact as to whether the NFL and its member clubs must function as a single entity to produce the telecasts. Defendants, therefore, are not entitled to summary judgment of Plaintiffs' § 2 claim on this basis.

      A.    <u>Vertical Agreement</u>

Lastly, Defendants argue that Plaintiffs' challenges to "the NFL's vertical conduct, namely its exclusive distribution of Sunday Ticket," fails because there is no evidence that such an agreement is anticompetitive. *Mot.* 24:4–9. But Defendants' argument is premised on "Plaintiffs hav[ing] identified no triable issue—and hav[ing] no viable claim—arising from any agreement between the NFL clubs and the NFL or between the NFL and the Networks." *Reply* 11:26–28. As explained above, Defendants are not entitled to summary judgment as to Plaintiffs' challenges to the NFL-Network Agreements or to the Teams-NFL Agreement. The Court is indeed "required to take a holistic look at how the interlocking agreements actually impact competition" and cannot evaluate the NFL's vertical conduct in isolation. *NFL Sunday Ticket*, 933 F.3d at 1152. As such, the NFL is not entitled to summary judgment on Plaintiffs' challenge to the vertical NFL-DirecTV Agreement.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SK) | Date | January 11, 2024 |
|---|---|---|---|
| Title | In re National Football League's Sunday Ticket Antitrust Litigation | | |

IV.   <u>Conclusion</u>

      For the foregoing reasons, the Court **DENIES** Defendants' motion for summary judgment.  Accordingly, the following causes of action remain for trial:  Violation of § 1 of the Sherman Act, *SAC* ¶¶ 155–58, and violation of § 2 of the Sherman Act, *SAC* ¶¶ 159–63.

**IT IS SO ORDERED.**