Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668-PSG (SKx) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **MEMORANDUM IN OPPOSITION TO NFL DEFENDANTS' MOTION IN LIMINE NO. 5 TO EXCLUDE CERTAIN OPINIONS OF DANIEL A. RASCHER**<br><br>JUDGE: Hon. Philip S. Gutierrez<br>DATE: February 7, 2024<br>TIME: 2:30 p.m.<br>COURTROOM:<br>  First Street Courthouse<br>  350 West 1st Street<br>  Courtroom 6A<br>  Los Angeles, CA 90012 |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

The NFL Defendants' motion to exclude certain opinions of Plaintiffs' expert Dr. Rascher should be denied because it is nothing more than a rehash of arguments Defendants have made unsuccessfully in the past—in some cases, multiple times. This Court already denied a motion to exclude Dr. Rascher's testimony in the context of Plaintiffs' motion for class certification, and there is nothing in the present motion that provides any basis for a different outcome.

Defendants cite the recent amendments to Federal Rule of Evidence 702 to support their motion. Yet those amendments were made to clarify the existing rule, because the committee believed that certain courts had misinterpreted the rule by applying an incorrect standard of review to certain matters. *See* Fed. R. Evid. 702, Advisory Committee's Note to the 2023 amendment. Defendants do not suggest that the Court applied an incorrect standard of review when it denied their motion to exclude Dr. Rascher's opinions at the class certification stage. Nor do they point to anything in the Court's previous decision that is inconsistent with the Rule 702 as it is written now.

The NFL Defendants themselves understand that they have no basis for distinguishing the Court's prior decision, acknowledging that they have filed their motion "to preserve their arguments as applied to Dr. Rascher's merits opinions" for appeal. NFL Defendants' Mot. in Limine No. 5 to Exclude Certain Opinions of Daniel A. Rascher ("NFL MIL 5"), at 1. The motion should be denied for the same reasons that the arguments have been rejected previously.

## ARGUMENT

### I. THE COURT HAS ALREADY REJECTED THE NFL DEFENDANTS' ARGUMENTS.

As in their previous motion, Defendants assert three broad bases for exclusion. First, they claim that Dr. Rascher's analysis of the but-for world is unreliable, primarily because it fails to account for differences between the market for NFL games and the market for college football games. Second, they claim that

1

Dr. Rascher has not been sufficiently rigorous in his analysis. And third, they claim that he has not properly accounted for differences between the residential and commercial classes. Each of these asserted bases for exclusion was fully briefed in conjunction with Plaintiffs' class certification motion. *See* Mem. in Supp. of NFL Defs.' Mot. to Exclude the Opinions of Daniel A. Rascher, (Nov. 17, 2022) (Dkt. No. 705); Pls.' Mem. in Opp. to NFL Defs.' Mot. to Exclude the Opinions of Daniel A. Rascher (Dec. 9, 2022) (Dkt. No. 778); Defs.' Reply in Supp. of NFL Defs.' Mot. to Exclude the Opinions of Daniel A. Rascher (Dec. 22, 2022) (Dkt. No. 822).

The Court ruled on each, holding, first, in accordance with many years of economic practice and the applicable case law, that "the 'yardstick' methodology … is an accepted methodology in antitrust cases," and that Dr. Rascher "chose to use the college football market as the yardstick, which the Ninth Circuit has recognized as a close analog in this case." Dkt. No. 894 (Feb. 7, 2023) (Class Certification Order), at 13 (citation omitted). The Court specifically found that Dr. Rascher appropriately considered the effect of increased competition in the college football market "and other important factors about the structural similarities between college and professional football and thus has a valid basis to use college football as a yardstick." *Id.* The Court also rejected challenges to the method and rigor he employed in his calculations, specifically holding that they "use reasonable methods and inputs." *Id.* Finally, the Court was also "satisfied that Dr. Rascher sufficiently evaluates the residential and commercial classes." *Id.*

In their current motion, the NFL Defendants do not identify any error that the Court made in its earlier decision. Nor do they identify any change in Dr. Rascher's method or analysis that affect the admissibility of his testimony. Indeed, they have presented no arguments that have not already been considered and rejected by this Court.

## II. DR. RASCHER'S COLLEGE FOOTBALL YARDSTICK IS APPROPRIATE.

The NFL Defendants' principal argument is that Dr. Rascher's opinions should be excluded because of certain claimed defects with his analysis and use of the college-football yardstick. In its order denying summary judgment, this Court noted that it "has already found 'Dr. Rascher's [College Football] model adequate to produce class-wide proof of impact and damages, especially considering that the Ninth Circuit has already recognized college football as a close analog to this case." Order Denying NFL Defendants' Motion for Summary Judgment, Dkt. 1155, at 19 (Jan. 11, 2024) (quoting Class Certification Order at 18) (modifications in original).

### A. Being a member of a "league" does not mandate joint ownership or control of broadcast rights.

The first claimed basis for the NFL's argument that college football is not an appropriate yardstick is that Dr. Rascher assumes that individual teams would sell their own rights, whereas in college football, the rights are sold by conferences, not teams, which are essentially "leagues," just like the NFL. The NFL Defendants suggest that "[a]nalyzing college conferences cannot explain what would happen in a world where leagues *do not* license telecasting rights jointly because college football conferences *do* license their telecast rights jointly." NFL MIL 5, at 3.

As a factual matter, this is incorrect. While *many*—but not all—colleges license their rights jointly through a conference for *some*—but not all—of their games, not all do so. Notre Dame famously sells the rights to its home games, as did BYU for many years. Moreover, *all* top-level colleges play interconference games each season, and the rights for those games are not sold jointly through a member "league." See ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. These are not "league" games, but neither are they exhibition games. They affect rankings and playoff eligibility and are routinely (and often prominently) televised on over-the-air or basic-cable channels. In short, some

3

televised games are conference games, some are not. Some games are televised pursuant to a contract entered into by a conference, some games are televised through individual negotiations between schools in different conferences. In any event, using the word "league" to describe college football conferences does nothing to change the fact that there are multitudes of different arrangements in that market that bear no resemblance to the monopolistic behavior exhibited by the NFL, which, by agreement among the teams, controls 100% of the market for NFL football game telecasts. Simply put, just because some schools are in a league does not change the fact that college football provides a valid yardstick.

Moreover, as an economic matter, whether the teams or the conferences sell the rights is irrelevant. What matters for this case is the effect of contractual restraints on competition in the marketplace. No college conference possesses monopoly power in a relevant market. The five power conferences, together with the major independents, compete economically through separately and independently negotiated contracts with networks in a manner that has dramatically increased output and lowered prices. As Dr. Rascher explains:



ECF 962-5, Expert Reply Report of Daniel A. Rascher, dated June 9, 2023

4

("Rascher Merits Reply Rpt.") ¶ 428; *see also* ECF 962-29, Expert Rebuttal Report of Einer Elhauge, dated June 9, 2023, ¶ 25.

As Dr. Rascher notes, certain NFL teams might find it useful to jointly license their telecast rights in the but-for world, such as members of a single division. There is no reason that they could not do so, so long as they do not possess market power. What they may not do is continue to conspire to monopolize the market for game telecasts and eliminate competition in order to reduce output and increase prices. The college football experience offers a clear and compelling yardstick for understanding the positive effect of genuine economic competition for televised football games, whether it be carried out by individual teams or schools, conferences, leagues, divisions, or through any other arrangement involving free and open economic competition.

### B. Individual teams have the ability to license their own games.

Defendants further argue that the but-for-world posited by Dr. Rascher includes "legally impermissible" and "legally impossible" outcomes. This is especially puzzling since what Dr. Rascher proposes is indistinguishable from what the NFL did prior to Congress enacting the Sports Broadcasting Act of 1961, 15 U.S. Code § 1291 *et seq.*, from what colleges routinely do today, and from what NFL teams do with respect to preseason games and radio broadcasts. *See generally In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1144-55 (9th Cir. 2019).

At bottom, this is no more than yet another version of the NFL's argument that the need or desire for cooperation in some matters, such as the use of the NFL logo in broadcasts, necessarily requires collective ownership or control of telecasting rights—an argument that is plainly false as a matter of fact and law.

*First*, the position that the cooperation needed to put games on the field implies antitrust immunity for the consolidation of broadcast rights is flatly inconsistent with the history of game broadcasts, and the holdings of the Ninth Circuit and the Court in this case. The Ninth Circuit already expressly rejected the

NFL Defendants' argument that it is immunized because "the telecasts could only be created through cooperation between competitors." *Id.* at 1153. The Ninth Circuit concluded, after conducting a painstaking analysis of the law and historic practice, that "Defendants have failed to identify, and we are unaware of, any binding precedent requiring the teams and the NFL to cooperate in order to produce the telecasts," and thereafter concluded that "the agreements not to compete concern separately owned intellectual property, and impose an unlawful restraint on independent competition." *Id.* at 1154. Simply put, the need to "cooperate" by agreeing to play a game does not imply the need, as a matter of law or fact, that the NFL must necessarily own or control all television broadcasting rights. This Court's decision of January 11, 2024, denying the NFL Defendants' motion for summary judgment has put this argument to rest once again, holding that "the evidence shows that it is possible for the member clubs to act individually to produce telecasts." Dkt. No. 1155 (Order Denying Summary Judgment), at 27.

Ignoring the fact that NFL teams engage in this "legally impossible" outcome with respect to its preseason games and radio broadcasts, the NFL Defendants attempt to distinguish independent college football schools like Notre Dame by claiming that they are different because they do not "participate in any league." NFL MIL 5, at 5. This is a distinction without a difference. Schools like Notre Dame still need to cooperate not only with other teams, but also with the NCAA, which sets the rules, and with its broadcast partner (NBC in the case of Notre Dame). As this Court recognized in its summary judgment decision, all these other parties have certain intellectual property, such as team logos, that appears in each such broadcast. *See* Dkt. No. 1155 (Order Denying Summary Judgment), at 26 ("Notre Dame has also been successful in forming an agreement with the NCAA and other schools' teams to display their respective trademarks."). As Defendants acknowledge, Notre Dame does this through contract or consent, not pre-existing joint ownership. And equally, when Notre Dame plays away games, it must

"cooperate" with the team that owns the rights to broadcast the game. But that means little more than it must agree to play the game knowing that it is being televised. In fact, Notre Dame partners not only with other schools, but also with the ACC to schedule five of its games, some of which Notre Dame sells on its own. The telecasts of these games are consequently the result of cooperation between a "league," a conference team, and a non-conference team. *See* ECF 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023 ("Rascher Merits Rpt.") ¶ 157 n.224.

The NFL's so-called "legal impossibility" is also inconsistent with both *United States v. NFL*, 116 F. Supp. 319 (E.D. Pa. 1953), *United States v. NFL*, 196 F. Supp. 445 (E.D. Pa. 1961), and the SBA, where the courts found and Congress presumed that individual teams have the capacity to arrange for telecasts of their own games. The Supreme Court itself noted this in *NCAA*, highlighting that legislative history of the SBA shows:

> Congress' recognition that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act, and in particular reflects its awareness of the decision in *United States v. National Football League*, 116 F. Supp. 319 (E.D. Pa. 1953), which held that an agreement among the teams of the National Football League that each team would not permit stations to telecast its games within 75 miles of the home city of another team on a day when that team was not playing at home and was televising its game by use of a station within 75 miles of its home city, violated § 1 of the Sherman Act. *See* S. Rep. No. 1087, 87th Cong., 1st Sess. (1961).

468 U.S. at 104 n.28; *accord In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1146. Indeed, the NFL's own Constitution—to this day—*requires compliance* with *United States v. NFL* in at least two separate provisions.[1] The idea that this prior

---

[1] First, "[e]each member club … consent[s] to be bound by the provisions of the Final Judgment of the United States District Court for the Eastern District of Pennsylvania entered against the National Football league and certain of its member clubs on December 28, 1953, and as thereafter modified[.]" Dkt. 954-4 (NFL

7

litigation and decisions against the NFL Defendants' agreement to restrict competition over game telecasts is ancient, irrelevant history is simply untrue.

### C. Dr. Rascher has accounted for the SBA in his comparison with college football.

Finally, the NFL Defendants invoke the SBA once again, this time arguing that the fact that certain games may continue to be broadcast pursuant to the SBA creates a difference with college football that renders the college-football yardstick inapt. NFL MIL 5, at 6-7.

As an initial matter, the Court has now rejected the NFL Defendants' unjustified effort to expand the coverage of the SBA to protect agreements regarding paid telecasts from antitrust scrutiny. It has concluded, as have all other courts that have considered the issue, that the SBA applies only to the pooling of teams' rights for purposes of broadcasting games on free, over-the-air television. Dkt. No. 1155 (Order Denying Summary Judgment), at 12-18. In any event, it is simply false that Dr. Rascher has not considered the applicability of the SBA in the market for NFL games. In particular, Dr. Rascher analyzes the economic effect of arrangements with and without pooled over-the-air ("OTA") broadcasts and concludes that they make no economic difference. As he states in his Merits Reply Report:

> Whether the NFL Defendants would have opted to continue to pool their Sunday afternoon content for OTA telecasts in the absence of the Challenged Conduct in the BFW is an empirical question that can never be answered with certainty: Defendants actual-world alleged misconduct has precluded any direct empirical comparison and the

---

Constitution & Bylaws) at -395-96. Second, "All provisions of Article X are intended to conform to and are subject to the Final Judgment of the United States District Court for the Eastern District of Pennsylvania, entered December 28, 1953, and as thereafter modified, against the National Football League and certain of its member clubs. In the event of any conflict between the Constitution and Bylaws and said judgment, the provisions of said Final Judgment, as modified, shall prevail." *Id.* at -434.

8

past cannot be unwound. Nevertheless, my prior report shows that *regardless of which version of the [but-for world] would have occurred, damages are the same*.

Rascher Merits Reply Rpt., at ¶ 416 (emphasis added). As such, Dr. Rascher has appropriately contrasted the current restraints with a but-for world in which "NFL fans would have access to telecasts of their favorite teams at negligible costs (above what fans already pay to watch television)" no matter whether teams pooled licensing for OTA telecasts. *Id.* ¶ 413.

### III. DR. RASCHER'S OPINIONS REGARDING DAMAGES ARE RELIABLE.

The NFL Defendants simply repeat their prior arguments that Dr. Rascher's calculation of damages is improper because, first, it uses mathematics that is allegedly too simple, and second, because it relies on Dr. Zona's econometric modeling. These arguments fare no better than before.

Dr. Rascher has rigorously examined the various but-for world scenarios and calculated the difference between the prices consumers paid for Sunday Ticket and the prices they would have paid for those telecasts in each scenario. That the calculations that can be applied after this extensive analysis in his college football model is straightforward is not a rationale for exclusion. The case cited by Defendants is not to the contrary. In *Waymo LLC v. Uber Technologies, Inc.*, 2017 WL 6887043 (N.D. Cal. Nov. 14, 2017), the court excluded the expert's testimony not because the math he used was simple, but because he offered nothing beyond that simple math. The court reasoned, "[o]ther than grade-school arithmetic, however, he did not apply any coherent principle, methodology, theory, or technique, much less one possessing any discernible indicia of reliability. Instead, he made the same arguments that the lawyers can make based on other evidence in the case that can speak for itself." *Id.* at *2. Here, by contrast, the NFL Defendants seek to exclude extensive analysis by a widely recognized expert in the sports-economics field simply because the mathematics he used to make the final

9

calculation was relatively straightforward.

The claim that Dr. Rascher should not have relied on Dr. Zona's calculations is similarly misplaced. Dr. Rascher brought his own expertise (and a wealth of independent evidence he cited and relied upon) to bear when applying Dr. Zona's findings to the but-for worlds that Dr. Rascher described and analyzed. Dr. Rascher independently reviewed Dr. Zona's method and conclusions, ultimately deciding to use one application of one of Dr. Zona's model to provide the basis for one of his damages calculations.[2] Rascher Merits Rpt., at ¶ 406. This division of labor was proper and routine. *See, e.g.*, *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014) (holding that "an expert can appropriately rely on the opinions of others if other evidence supports [the expert's] opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence"); *Mendoza v. Intuitive Surgical, Inc.*, 2020 WL 1976472, at *8 (N.D. Cal. Apr. 24, 2020) (same).

## IV. DR. RASCHER'S OPINIONS ON THE COMMERCIAL CLASS ARE RELIABLE.

Defendants similarly repeat prior arguments in contending that Dr. Rascher's analysis of the commercial class is inadequate. In doing so, they not only add nothing to the arguments already rejected by this Court, they also misdescribe Dr. Rascher's discussion of the commercial class in his Merits and Reply Reports. In those reports, Dr. Rascher examines the features specific to commercial establishments, including the way prices are set for Sunday Ticket and the tiers of programming to which commercial customers typically subscribe. Rascher Merits Rpt., ¶¶ 150-52; Rascher Merits Reply Rpt., ¶ 265. He then observes that

---

[2] Defendants repeat the argument that they made in their prior *Daubert* motion against Dr. Rascher that he (and Dr. Zona) should have considered the possibility that the NFL would impose a marginal cost through alternative licensing structures, such as a per-subscriber-fee basis, in the but-for world. As discussed in Plaintiffs' opposition to the motion to exclude certain of Dr. Zona's opinions, there are a host of sound economic reasons that the NFL would continue to employ the same licensing structures it has now.

10

"[REDACTED]," Rascher Merits Reply Rpt., ¶ 11, and concludes that the "[REDACTED]." Rascher Merits Reply Rpt., ¶ 410; *see also id.* ¶ 11 ("[REDACTED]"). Dr. Rascher has provided a reasoned basis for his application of reduction factors to both residential and commercial customers. At the end of the day, any relevant differences between commercial and residential customers are already represented in prices that DirecTV actually charged. The NFL Defendants have never explained why the elimination of the contracted restraints of competition would affect one set of prices differently than the other set of prices, since any pertinent differences between the two sets of prices and the portions of the market in which they operate would remain essentially constant.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the NFL Defendants' motion to exclude certain opinions of Dr. Rascher should be denied.

Dated: January 19, 2024

Respectfully submitted,

By: /s/ *Marc M. Seltzer*

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400

Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com

12

Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*