Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | Case No. 2:15-ml-02668-PSG (SKx)<br><br>**MEMORANDUM IN OPPOSITION TO NFL DEFENDANTS' MOTION IN LIMINE NO. 7 TO EXCLUDE CERTAIN TESTIMONY FROM EINER ELHAUGE**<br><br><span style="color:red">**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**</span><br><br>JUDGE: Hon. Philip S. Gutierrez<br>DATE: February 7, 2024<br>TIME: 2:30 p.m.<br>COURTROOM:<br> First Street Courthouse<br> 350 West 1st Street<br> Courtroom 6A<br> Los Angeles, CA 90012 |

# TABLE OF CONTENTS

**Page**

I.    None Of Prof. Elhauge's Opinions Is Legal In Nature ................................... 4

II.   Prof. Elhauge's Critiques Of Procompetitive Justifications Are Wholly Consistent With The Rule Of Reason ........................................................ 13

III.  Conclusion.................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen v. F. Hoffman-La Roche*,
No. 05-12237 WGY, Jan 3, 2008, (D. Mass.) ........................................................ 2

*Applied Med. Res. Corp. v. Ethicon*,
No. SACV 03-1329 (JVS MLGx) (C.D. California) ............................................ 2

*In re Broiler Chicken Antitrust Litigation*,
2023 WL 4303476 (ND. Ill. June 30, 2023) ...................................................... 1

*Castro v. Sanofi Pasteur Inc*.,
134 F. Supp. 3d 820 (D.N.J. 2015) ................................................................... 1

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .................................................... 3, 14, 16, 17

*In Re EpiPen Marketing, Sales Practices, and Antitrust Litigation*,
2020 WL 1164869 (D. Kansas 2020) ............................................................. 1

*In Re EpiPen Marketing, Sales Practices, and Antitrust Litigation*,
2021 WL 2577490 (D. Kansas 2021) ............................................................. 1

*In Re EpiPen Marketing, Sales Practices, and Antitrust Litigation*,
2021 WL 2585065 (D. Kansas 2021) ............................................................. 1

*Garber v. MLB*,
No. 12 CV 3704 (SAS) (S.D.N.Y) .............................................................. 2, 3

*GN Netcom v Plantronics*,
No. 12-1318-LPS (D. Del.) ........................................................................ 2

*It's My Party, Inc., v. Live Nation, Inc.*, 88
88 F.Supp.3d 475, 485 (D. Md. 2015) ....................................................... 2

*King Drug v. Celphalon, Inc.*,
2015 WL 12645766 (E.D. Pa. Dec. 22, 2015) ........................................... 2

*Litton Sys., Inc. v. Am. Tel. & Tel. Co*.,
700 F.2d 785 (2d Cir. 1983) ...................................................................... 8

*Masimo Corp. v. Tyco*,
2004 WL 7094930 (C.D. Cal. May 28, 2004)........................................................2

*Moehrl v Nat'l Ass'n of Realtors*,
2023 WL 2683199 (N.D. Ill. March 29, 2023) ....................................................1

*In re Mushroom Direct Purchaser Antitrust Litigation*,
2015 WL 5767415 (E.D. Pa. July 29, 2015)....................................................1, 2

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018)............................................................2, 8

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
2009 WL 3053855 (D. Mass. 2009).....................................................................1

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
247 F.R.D. 253 (D. Mass. 2008) ..........................................................................1

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008)............................................................................13

*NCAA v. Bd. of Regents of Univ. of Okl.*,
468 U.S. 85 (1984) ....................................................................................6, 7, 8

*O'Bannon v. NCAA*,
7 F. Supp. 3d 955, 979 (N.D. Cal. 2014).........................................................15

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018)...........................................14

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824, 836 (9th Cir. 2022).....................................................................16

*Retractable Technologies, Inc. v. Becton Dickinson and Co*,
2013 WL 12143104, at *2 (E.D. Texas Sept 2, 2013) ........................................2

*Roxul USA, Inc. v. Armstrong World Industries*, Inc., 2019 WL
1101385 (D. Del. March 8, 2019) ........................................................................2

*Savant Systems v. Creston Electronics*,
No. 1:10-cv-11622-WGY..................................................................................2

*Sitts v. Dairy Farmers of America*,
2020 WL 3467993 (D. Vt. 2020).....................................................................1, 2

*Smith v. Pro Football, Inc.*,
593 F.2d 1173, 1186 (D.C. Cir. 1978) .............................................................15

2

*In re: Southeastern Milk Antitrust Litigation*,
2010 WL 114628473 (E.D. Tenn. Dec. 8, 2010) ..................................................2

*The Nat''l Ass'n of Realtors v. The PLS.com, LLC.*, 143 S. Ct. 567
(2023)..................................................................................................................16

*The Pinal Creek Group v. Newmont Mining Corp.*,
352 F. Supp. 2d 1037, 1046 (D. Ariz. 2005) ......................................................2

*United Food & Commercial Workers Local 1776 v. Teikoku Pharma
USA (Lidoderm)* 296 F. Supp. 3d 1142 (N.D. Cal. Nov. 3, 2017) ......................2

*United States v. Wyeth*,
No. 1:03-cv-12366-DPW & 1:06-cv-11724-DPW (D. Mass.) ............................2

*Yerkes v. Ohio State Highway Patrol*
2023 WL 4633896 (S.D. Ohio July 20, 2023). ..................................................17

**Other Authorities**

Fed. R. Evid. 401 ..........................................................................................................18

Fed. R. Evid. 702 ..........................................................................................................18

Professor Einer Elhauge is a rebuttal witness who will provide testimony critiquing the economic soundness of the opinions offered by the NFL Defendants' expert Dr. Douglas Bernheim. Each of Prof. Elhauge's opinions responds directly to an opinion raised by Dr. Bernheim.

The NFL Defendants nonetheless try to dismiss Prof. Elhauge as a law professor, suggesting that his position renders his testimony legal rather than economic. This attempt ignores that *all 23* judicial opinions involving cases in which Prof. Elhauge has offered opinions on antitrust economics have admitted his expert testimony.[1] Several have referred to him as an "antitrust titan." This list of cases

---

[1] *See Moehrl v Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *5 (N.D. Ill. March 29, 2023) ("Plaintiffs have retained Professor Einer Elhauge to conduct an economic analysis of the evidence and provide his expert opinion on whether common economic evidence can answer questions related to market definition, market power, liability, and impact.. . . There is no question that Elhauge is qualified to opine on antitrust matters. . . . Multiple district courts before which he has testified have gone so far as to describe Elhauge as 'an antitrust titan.'"); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 827, 830, 835 (D.N.J. 2015) (calling Prof. Elhauge "a preeminent antitrust scholar" who is "eminently qualified" to testify on antitrust economics and has "been described as a 'highly qualified antitrust titan.'"); *In re Mushroom Direct Purchaser Antitrust Litigation*, 2015 WL 5767415 at *4-5 (E.D. Pa. July 29, 2015) ("courts have admitted Prof. Elhauge as an expert in antitrust economics generally… Prof. Elhauge has been described as a 'highly qualified antitrust titan[].'"); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 273 (D. Mass. 2008) (describing Prof. Elhauge as a "highly qualified antitrust tita[n]"); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 2009 WL 3053855, at *3 (D. Mass. 2009) (qualifying Professor Elhauge as an expert in the field of antitrust economics); *In Re EpiPen Marketing, Sales Practices, and Antitrust Litigation*, 2021 WL 2577490, *12 n.3, 15-16, 21, 23, 26-27 (D. Kansas 2021) ("the court finds Prof. Elhauge sufficiently qualified to provide expert testimony in this case…. Similar to the conclusions reached in the cited cases, the court here finds Prof. Elhauge's methodology reliable and scientifically sound."); *In Re EpiPen Marketing, Sales Practices, and Antitrust Litigation*, 2021 WL 2585065, at *53 (D. Kansas 2021) ("As the court has explained … it finds Prof. Elhauge's reverse payment analysis sufficiently reliable and scientifically sound to qualify for admission as evidence…. And, consistent with other courts who have considered Prof. Elhauge's proffered expert testimony in pay-for-delay cases, the court finds Prof. Elhauge's analysis qualifies as admissible expert opinion"); *In Re EpiPen Marketing, Sales Practices, and Antitrust Litigation*, 2020 WL 1164869, *23, 26 (D. Kansas 2020) ("Courts have referred to Prof. Elhauge as a 'highly qualified antitrust titan.'…. For the same reasons, the court finds that Prof. Elhauge is qualified to render his expert opinions in this case [on antitrust economics]."); *In re Broiler Chicken Antitrust Litigation*, 2023 WL 4303476, at *8 (ND. Ill. June 30, 2023) (rejecting Daubert challenge to Prof. Elhauge's testimony); *Sitts v. Dairy Farmers of America*, 2020 WL 3467993, at *1, 11 & n.2 (D. Vt. 2020) ("Numerous federal courts have determined that Professor Elhauge is qualified to opine on antitrust

1

2   economics… Defendants' motion to exclude is DENIED with regard to Professor
    Elhauge's regression analysis…. 'There is no serious question that Prof[essor]
3   Elhauge 'posses[es] skill or knowledge' in conducting regression analysis in antitrust
    cases[.]'" (quoting *In re Mushroom*, 2015 WL 5767415, at * 5); *It's My Party, Inc.,*
4   *v. Live Nation, Inc.*, 88 F.Supp.3d 475, 485 (D. Md. 2015) ("I deny the motion to
    exclude Elhauge based on his qualifications…. Elhauge has an extensive background
5   in the study of antitrust law and regulation, and he has taught on the subject for more
    than a decade."); *United Food & Commercial Workers Local 1776 v. Teikoku*
6   *Pharma USA (Lidoderm)*, 296 F. Supp. 3d 1142, 1162-64, 1186-88 (N.D. Cal. Nov.
    3, 2017) (qualifying Prof. Elhauge to testify on antitrust economics); *In re Namenda*
7   *Direct Purchaser Antitrust Litigation*, 331 F.Supp.3d 152, 172-174 (S.D.N.Y. 2018)
    (qualifying Prof. Elhauge to testify on antitrust economics); *Retractable*
8   *Technologies, Inc. v. Becton Dickinson and Co*, 2013 WL 12143104, at *2 (E.D.
    Texas Sept 2, 2013) (qualifying Elhauge to testify on antitrust economics); *In re:*
9   *Southeastern Milk Antitrust Litigation*, 2010 WL 11462847, at *1, 3 (E.D. Tenn. Dec.
    8, 2010) ("Mr. Elhauge is qualified by both education and experience to testify as an
10  expert in an antitrust case. That he holds no degree in economics does not disqualify
    him; instead, his credentials . . . are imposing."); *Masimo Corp. v. Tyco*, 2004 WL
11  7094930, at *4 (C.D. Cal. May 28, 2004) ("despite his lack of an economics degree,
    Mr. Elhauge's 'knowledge, skill, experience, training or education' give him special
12  expertise in the area in which he seeks to testify."); *King Drug v. Celphalon, Inc.*,
    2015 WL 12645766, at *4 (E.D. Pa. Dec. 22, 2015) (rejecting Daubert motion to
13  exclude Prof. Elhauge's testimony); *Applied Med. Res. Corp. v. Ethicon*, No. SACV
    03-1329 (JVS MLGx), Tentative Minute Order re Motions in Limine, at 24 (C.D.
14  California) ("The Court finds that Elhauge's background and experience . . . qualify
    him as an expert in the field of antitrust economics."); *Garber v. MLB*, No. 12 CV
15  3704 (SAS), Nov. 24, 2015 Hearing, Transcript at 11 (S.D.N.Y) ("I think he's
    qualified to give his testimony…. he has testified in this area before. He has an
16  extensive background in the area. He seems to be well regarded in the field"); *Roxul*
    *USA, Inc. v. Armstrong World Industries*, Inc., 2019 WL 1101385 at *1 (D. Del.
17  March 8, 2019) ("we find Professor Elhauge's testimony based on his disclosed
    opinions is reliable, fits the issues, and will assist our jury."); *United States v. Wyeth*,
18  No. 1:03-cv-12366-DPW & 1:06-cv-11724-DPW, February 8, 2016 hearing,
    Transcript at 8 (D. Mass.) ("I am denying the motion in limine or to exclude his
19  testimony."); *GN Netcom v Plantronics*, No. 12-1318-LPS (D. Del.), August 29,
    2017 hearing, Transcript at 73-74 ("Turning next to the Daubert motion…. I'm
20  denying that motion… I see no real dispute over the qualifications of Professor
    Elhauge."); *Amgen v. F. Hoffman-La Roche*, No. 05-12237 WGY, Jan 3, 2008,
21  Electronic Order Denying Motion to Exclude Expert Report and Testimony of
    Professor Elhauge Due to Lack of Qualification (D. Mass.) (rejecting motion
22  claiming Professor Elhauge was not qualified to testify on antitrust economics);
    *Savant Systems v. Creston Electronics*, No. 1:10-cv-11622-WGY, Sept. 24, 2014,
23  Electronic Order Entered Denying Motion To Exclude the Expert Report and
    Accompanying Testimony of Einer Elhauge, (D. Mass.) (same); *Hynix Antitrust*
24  *Cases*, No. JCCP 4607 (Cal. Superior Court, County of San Francisco Sept 9, 2010),
    hearing at 82 (same). *Sitts* is not to the contrary because it admitted the economic
25  substance of Prof. Elhauge's testimony and simply limited his phrasing of certain
    points. 2020 WL 3467993, at *5-7, 9-10. *Pinal Creek* is not to the contrary because
26  it was an environmental cleanup case in which Professor Elhauge offered no opinions
    on antitrust economics, his testimony on corporate norms was admitted, and all that
27  was excluded was a few pages of his report on whether the history of antitrust case
    law meant that certain ancient documents from the DOJ antitrust division indicated
28  joint operation. *The Pinal Creek Group v. Newmont Mining Corp.*, 352 F. Supp. 2d
    1037, 1046 (D. Ariz. 2005).

rejecting motions to exclude Prof. Elhauge's testimony on antitrust economics includes *Garber v. MLB*, which involved Major League Baseball's restraints on telecasts that parallel those at issue in this case and in which Prof. Elhauge offered testimony on topics parallel to those at issue here. No. 12 CV 3704 (SAS) (S.D.N.Y). Contrary to the NFL Defendants' misleading characterization of the caselaw concerning Prof. Elhauge's expert testimony, an uninterrupted line of cases has found his testimony on antitrust economics to be admissible.

In reality, the motion to preclude Prof. Elhauge's testimony as improper "legal opinion" is a thinly veiled attempt to keep two legitimate criticisms of Prof. Bernheim from the jury. First, Prof. Bernheim's opinion that ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████, Bernheim Report ¶ 250, is contradicted by both economic principles and the history of sports broadcasting. Second, Prof. Bernheim fails to support his proffered justifications for the contractual restraints that Plaintiffs challenge in this litigation with quantitative evidence that demonstrate that they actually promote competition. None of these criticisms purports to explain or apply the law governing this case.

Each is also consistent with the applicable law on the Rule of Reason. Binding precedent, including *Epic Games, Inc. v. Apple, Inc.,* makes this clear. The NFL Defendants bear the burden of establishing a legitimate and non-pretextual explanation why the challenged conduct promotes competition. Prof. Elhauge opines that the explanations offered by the NFL Defendants cannot withstand economic scrutiny. The NFL Defendants' argument that this criticism somehow flips the burden of proof rests on the assumption that they can satisfy their burden merely by claiming a supposed procompetitive rationale. But that is not the law. As this Court has recognized, under the Rule of Reason, defendants bear the "heavy burden of establishing an affirmative defense which competitively justifies th[e] apparent

deviation from the operations of a free market." Dkt. 1155 at 18 (quoting *NCAA v. Bd. of Regents of Univ. of Okl.*, 468 U.S. 85, 113 (1984)). Prof. Elhauge opines that the NFL Defendants have not proffered quantitative evidence that supports any procompetitive justification much less met this heavy burden.

The NFL Defendants' motion should be denied.

## I. None of Prof. Elhauge's Opinions Is Legal in Nature

Each of the opinions challenged by the NFL Defendants is an economic critique of a specific economic opinion offered by Prof. Bernheim. The NFL Defendants' efforts to characterize these rebuttal opinions as improperly legal cannot be reconciled with Prof. Elhauge's opinions themselves.

Plaintiffs do not dispute that Prof. Elhauge may testify about economics but not about law. The NFL Defendants likewise acknowledge that his economic analysis is admissible, Mot. at 1, and base their motion on a mischaracterization of that analysis. Far from offering legal opinions, Prof. Elhauge repeatedly declined to do so when defense counsel asked him deposition questions that raised legal issues.[2]

The characterization of Prof. Elhauge's analysis as legal is not only incorrect but also internally inconsistent because the NFL Defendants' own economics expert Prof. Bernheim will seek to testify about the very matters challenged in this motion. The NFL Defendants necessarily take the position that *those* are economic matters. Their position thus boils down to a claim that when Prof. Bernheim opines on a matter, it involves economics because he is an economics professor, but when Prof. Elhauge opines on precisely the same matter—in a report limited to rebuttal of Prof. Bernheim's opinions—it somehow becomes a legal issue.

---

[2] *See* Finn Decl., Ex. 1 (Elhauge Dep. Tr.) at 62:5-6 ("Sorry. I'm not opining on any questions of law."); *id.* at 39: 12-13 ("I'm not opining on the scope of the SBA because that's a legal question."); *id.* at 39:25-40:1 ("That's a legal question, and I don't want to give an opinion on legal issues."); *id.* at 19:4-5 ("I don't want to offer any legal opinions"); *id.* at 113:2-4 ("the scope of the SBA . . . is a legal issue on which, you know, I am not opining on that."); *id.* at 142:19-20 ("I am . . . not offering any opinions on legal topics.").

1    Most centrally, Prof. Bernheim offers the opinion that ████████████

2    ████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████

4    ████. Dkt. 956-8, Bernheim Report ¶¶ 22, 248-251, 253-254. In response, Prof.

5    Elhauge offers the contrary opinion that ██████████████████████████

6    ██████████████████████████████████████████. Dkt. 962-29,

7    Elhauge Report ¶¶ 20-22. Prof. Elhauge did not base his analysis on case law or other

8    legal sources, but rather on the norms that initially governed broadcasts of sporting

9    events, both outside and inside the NFL, and predated the relevant caselaw and any

10   restraining league agreements. Elhauge Report ¶¶ 20-22; Elhauge Dep. Tr. at 120:18-

11   123:9, 125:7-25, 127:17-128:13, 131:10-137:17. If this topic is economic when Prof.

12   Bernheim discusses it, it must equally be economic when Prof. Elhauge discusses it.

13   Yet the NFL Defendants take the position that only Prof. Elhauge's testimony on the

14   topic must be excluded, while Prof. Bernheim's contrary opinions are admissible.

15   Mot. at 2. That makes no sense.

16       The NFL Defendants further argue that the Court should exclude portions of

17   one paragraph of Prof. Elhauge's report because they offer opinions on the scope of

18   the SBA. Mot. at 2. But Prof. Elhauge offers no affirmative opinion on the scope of

19   the SBA. Indeed, he explicitly declined to do so: "I'm not opining on the scope of

20   the SBA because that's a legal question." Elhauge Dep. Tr. at 39:12-13; *see also id.*

21   at 39:23-40:16 ("Q…. Do you know what over-the-air telecast rights [the SBA]

22   exempts? A. That's a legal question, and I don't want to give an opinion on legal

23   issues. . . . [W]hat the scope of the SBA is, is a legal question to be resolved by you

24   guys in briefing to the court, it seems to me."). In responding to Prof. Bernheim's

25   claim about the initial allocation of rights, Prof. Elhauge merely articulates his

26   understanding of the SBA's scope—an understanding on which he relied to explain

27   why its limits did not alter the initial allocation for the telecast rights at issue in this

28   case. Elhauge Report ¶ 21. *See also* Elhauge Dep. Tr. 40:22-41:5 ("It was relevant to

1  consider various understandings of what the scope might be in terms of rebutting

2  Professor Bernheim's analysis. . . . And so, in critiquing his methodology, I do

3  consider alternative understandings of the SBA's scope; but I myself am not offering

4  any affirmative opinion about the scope of the SBA in this case."). To the extent that

5  NFL Defendants assert that mere citation to the understanding of the SBA that an

6  economics expert employed in his analysis merits exclusion of that analysis, that

7  assertion conflicts with Prof. Bernheim's repeated citations to the SBA. *See*

8  Bernheim Report ¶¶ 167, 407, 409 & n.75. Moreover, the understanding on which

9  Prof. Elhauge relied matches this Court's recent holding on summary judgment.

10  *Compare* Dkt. 1155-2 at 13, 18, 20 & n.9 (SBA does not exempt the collective

11  licensing of paid telecasts nor agreements to prohibit telecasts other than local

12  blackouts) *with* Elhauge Report ¶ 21 (same understanding). The scope of the SBA

13  will be a legal question for this Court's instructions to the jury.

14      The NFL Defendants also seek to exclude a sentence in Prof. Elhauge's report

15  that states ████████████████████████████████████████████

16  ████████████████████████████████████████████████████.

17  Mot. at 2. But the challenged sentence responds to Prof. Bernheim's claim ████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████. *See* Bernheim Report ¶¶ 264-265. In response, Prof. Elhauge

21  first notes that Prof. Bernheim "provides no support for that position." Elhauge

22  Report ¶ 24. He then states, "████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████." *Id.* (emphasis added). The italicized portion makes it

25  clear that he offers an opinion only on economics, not the law. Yet the NFL

26  Defendants omit that clause from their quotation. Mot. at 2. Prof. Elhauge then points

27  out ████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████

1

2

3

Elhauge Report ¶¶ 24-25. Prof. Elhauge's mere reference to the economic nature of the agreement at issue in the *NCAA* case does not turn a comparison between the pooling of telecasts rights by college football conferences and the pooling of telecasts rights by NFL Clubs into a legal opinion.

The NFL Defendants' position thus amounts to a claim that their economics expert may properly proffer an opinion that the *NCAA* decision preserves an option for college football conferences to pool telecast rights, even though that plainly involves a legal interpretation of the *NCAA* opinion, but that it is wrong for Prof. Elhauge to point out in rebuttal: 1) that Prof. Bernheim offers no support (legal or otherwise) for his interpretation, 2) that Prof. Bernheim's position conflicts with the economic understanding of agreements, and 3) that Prof. Bernheim's position ignores the possibility that the agreements of college football conferences are less likely to involve market power and anticompetitive effects. To state the NFL Defendants' position is to refute it. In any event, none of Prof. Elhauge's conclusions would change if the Court excluded this one sentence indicating that the selling of pooled telecast rights by college football conferences would be an agreement under economic principles.[3]

The NFL Defendants further argue that this Court should exclude Prof. Elhauge's opinions in three paragraphs about how to construct a but-for world. Mot.

---

[3] The NFL Defendants also complain Prof. Elhauge discussed in deposition the challenged restraints and holding in the *NCAA* case, Mot. at 2 n.1, but Prof. Elhauge only did so in response to questions by defense counsel demanding that he discuss those issues. Elhauge Dep. Tr. at 165:20-174:8. Indeed, when responding to this line of defense counsel questions about the restraints and holding in the *NCAA* case, Prof. Elhauge expressly pointed out that "[n]one of this is relevant to any opinion I offer in terms of rebutting Professor Bernheim. You are just asking me whether what you are reading to me from this opinion supports what you are saying. And so far no. But I -- I don't think any of this is relevant to my opinions in my rebuttal report." *Id.* at 173:7-13 (as corrected in Errata Sheet).

at 2. In the first challenged paragraph, Prof. Elhauge responds to Prof. Bernheim's

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████. Bernheim Report ¶¶ 25, 262, 267, 271. In addition to noting that this

claim rests on Prof. Bernheim's unsupported legal interpretation that ████████████

████████████████████████████████████████████████████████████████

████████████, Prof. Elhauge points out that "████████████████████████████████

████████████████████████████████████████████████████████." Elhauge

Report ¶ 24. In support of this point, Prof. Elhauge does not cite legal authority, but

rather an ABA book on the economic proof of damages.[4] The fact that the sort of but-

for analysis developed in economics has been adopted into caselaw does not alter the

fact that it remains an economic concept on which economic experts can opine. *See*

*Litton Sys., Inc. v. Am. Tel. & Tel. Co*., 700 F.2d 785, 822 (2d Cir. 1983) (sustaining

antitrust verdict based on expert analysis that "was typical of its genre in that it was

. . . based on an estimate of what [plaintiff's] experience would have been. . . in the

absence of the [challenged conduct] (the 'but for' world) as opposed to [plaintiff's]

actual experience."); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp.

3d at 174 (admitting Prof. Elhauge's testimony about the but-for world). The NFL

Defendants' argument is once again internally inconsistent—claiming that Prof.

Bernheim is free to claim that the but-for world should include the NFL's pooling of

telecast rights, but that Prof. Elhauge is not free to disagree with that claim.

Moreover, Prof. Elhauge's position is consistent with the NFL Defendants' own

---

[4] Elhauge Report ¶ 24 n.5 (stating "*See, e.g.*, ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 4 n.2 (3d ed. 2017) ('damages resulting from an antitrust injury [are] measured by comparison to a "but-for" world that reflects conditions in the actual world in all respects except for the alleged anticompetitive conduct')." *See also id.* at 89 ('The purpose of this analysis is to isolate the effects of the challenged conduct so as to ascertain what would have happened 'but for' the defendant's unlawful activities.')").

position in other motions that the but-for world should exclude any challenged restraints. *See* Dkt. 1141 (NFL Defendants' Motion in Limine No. 1) at n.1.

In the second paragraph challenged for allegedly offering opinions on the legal standards of a but-for-world, Prof. Elhauge merely responds to Prof. Bernheim's argument that " ███████████████████████████████████████████ ██████████████████████████████████████ Elhauge Report ¶ 26 (citing Bernheim Report ¶¶ 23, 259). Prof. Elhauge states in rebuttal that Prof. Bernheim cites "no support for any claim that plaintiffs have conceded ████████ ██████████████████," and indeed Prof. Bernheim expressly admitted it was "reasonable to read plaintiff expert Prof. Rascher as assuming ███████████████ ████████████████████████." Elhauge Report ¶ 26 (citing Bernheim Report ¶¶ 24, 260) Prof. Elhauge further pointed to other evidence supporting that reading of Prof. Rascher's report. *Id.* In his deposition, Prof. Elhauge also pointed to several places where Plaintiffs' complaint challenged the NFL's 100% revenue sharing. Elhauge Dep. Tr. at 48:3-49:7. None of these opinions concern the legal standards applicable to defining the but-for world. Instead, they rebut the factual premises for Prof. Bernheim's own claims about the but-for world.[5]

In the third challenged paragraph, Prof. Elhauge responds to Prof. Bernheim's argument " ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████." Elhauge Report ¶ 44 (citing Bernheim Report ¶¶ 317-331). In response, Prof. Elhauge points out, " ███████████████████████████████████████████████ █████████████████████████████████████." *Id.* The NFL

---

[5] Indeed, Prof. Elhauge expressly declined to offer any opinion on the legality of revenue sharing. *See* Elhauge Dep. Tr. at 62:1-15 ("Q. So is it your view that 100 percent revenue sharing would be unlawful in the -- in the but-for world? . . . A. Sorry. I'm not opining on any questions of l ████████████████████████████ ████████████████████████████████████████████████████

Defendants' challenge to that sentence again repeats the flawed argument about Prof. Elhauge's testimony on the lack of challenged restraints in the but-for world: his testimony is improper but their expert's testimony on the same premise is proper. That argument fails for all the reasons noted above. Moreover, this Court just reached the same conclusion as Prof. Elhauge—that defense of the NFL's exclusive dealing agreement was premised on its defense of its pooling agreement. Dkt. 1155 at 29.

Prof. Elhauge's other response to Prof. Bernheim's argument that exclusive dealing cannot possibly be anticompetitive is to point out that "

" Elhauge Report ¶ 44 (citing Bernheim Report n.647). Prof. Elhauge further notes that Prof. Bernheim's "

." *Id.*; *see also* Elhauge Dep. Tr. at 204:6-205:7 (pointing out that given Prof. Bernheim's own position

Contrary to the NFL Defendants' assertions, this analysis does not offer any opinions on the legal standards for defining the but-for world. It merely demonstrates that Prof. Bernheim's analysis is self-contradictory because

The NFL Defendants' apparent position is that it is fine for Prof. Bernheim to define the but-for world in a way that uses internally inconsistent economic analysis, but

somehow improper for Prof. Elhauge to point out Prof. Bernheim's internal inconsistency. That position is nonsensical.

In a footnote, the NFL Defendants halfheartedly assert other areas in which they contend Prof. Elhauge offers legal claims. Mot. at 2 n.1. First, in response to Prof. Bernheim's claim that ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅" Bernheim Report ¶ 340, Prof. Elhauge points out that Prof. Bernheim cites no support for that claim, noting in part that ▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ Elhauge Report ¶ 45. In the footnote supporting this sentence, Prof. Elhauge cites the same cited source, and then adds a "see also" cite to a volume of the Areeda-Hovenkamp-Elhauge antitrust treatise as "discussing when two items should be considered distinct products or instead as parts of a single product". *See* Elhauge Report ¶ 45 n.15. This "see also" cite is what the NFL Defendants assert makes the claim improperly legal. But Prof. Elhauge makes no claim at all in this "see also" cite, and there is nothing improper with citing an antitrust treatise that relies on a mix of economic and legal analysis. Nor is there any dispute with the substantive point that ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅. Indeed, the NFL Defendants' motion raises no dispute with Prof. Elhauge's factual point—that Prof. Bernheim cites no support for his claim ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅. In any event, even if this "see also" citation were excluded, it would not alter a single sentence of Prof. Elhauge's report.

Second, in response to Prof. Bernheim's claim that the restraints promote ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅, Bernheim Report ¶¶ 518-548, Prof. Elhauge observes that this argument fails to address the benefits that NFL telecasts already derive ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

1  [REDACTED].” Elhauge Report ¶ 69. The NFL

2  Defendants insist that this paragraph makes a legal claim about intellectual property

3  protection. Mot. at 2 n.1. It does no such thing. Rather, it points out that Prof.

4  Bernheim's assertions [REDACTED]

5  [REDACTED]. Elhauge

6  Report ¶ 69; *see also* Elhauge Dep. Tr. at 233:8-237:14 ([REDACTED]

7  [REDACTED]

8  [REDACTED]   In any event, none of Prof. Elhauge's conclusions would be altered if this

9  paragraph were excluded.

10       Third, in response to Prof. Bernheim's claim that the challenged restraints must

11  be allowed [REDACTED], Prof. Elhauge observes the

12  extreme implications of Prof. Bernheim's claim, including that it contradicts standard

13  antitrust economics on reverse payment patent settlements. Elhauge Report ¶ 73. The

14  NFL Defendants complain that this point cites a law review article by Prof. Elhauge.

15  Mot. at 2 n.1. But that law review article offered a mathematical proof that was based

16  on economics rather than law, and Prof. Elhauge also cites an article in an economics

17  journal by an economics professor that supports the same point. Elhauge Report ¶ 73

18  n.32. Prof. Elhauge also points out that another extreme implication of Prof.

19  Bernheim's claim is that "[REDACTED]

20  [REDACTED]

21  [REDACTED]

22  [REDACTED].” Elhauge Report ¶ 73. The

23  NFL Defendants do not deny that accepting Prof. Bernheim's argument would permit

24  [REDACTED]. They argue only that the claim that

25  [REDACTED] conflicts with the very existence

26  of antitrust law is an improper legal claim about the underpinnings of antitrust law.

27  Mot. at 2 n.1. But that is so only if one thought there were some plausible legal

28  dispute about whether antitrust law allows [REDACTED],

which is not a claim that the NFL Defendants or Prof. Bernheim have ever attempted to offer.

In sum, none of the opinions of Prof. Elhauge challenged by the NFL Defendants comes close to the type of opinion deemed impermissible by the caselaw. Prof. Elhauge's rebuttal report bears no relation to the expert report excluded in *Nationwide*, which discussed how the Uniform Commercial Code and other commercial law "related to the facts of this case." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1056 (9th Cir. 2008). Even under those circumstances, the district court struck "only those portions of the report that discuss the law and its application." *Id.*

## II.     Prof. Elhauge's Critiques of Procompetitive Justifications Are Wholly Consistent with the Rule of Reason

Prof. Elhauge opines that "Prof. Bernheim fails to establish any procompetitive justification for the challenged restraints" because "he provides no evidence to quantify their benefit to consumers, or show that the size of any benefit to consumers outweighs the anticompetitive effects on prices, output, and consumer choice." Elhauge Report ¶ 14. The NFL Defendants argue (1) that Prof. Elhauge asserts that defense experts bear the burden of proof on procompetitive benefits and (2) that that supposed assertion is contrary to the law. Mot. at 3-5. They are wrong on both scores.

First, Prof. Elhauge offers no opinion on the burden of proof. The word "burden" does not appear in his report or his deposition. The sole support the NFL Defendants cite for that claim is Prof. Elhauge's observation that Prof. Bernheim failed to quantify the procompetitive effects he claimed or prove that they outweighed the anticompetitive effects of the challenged restraints. Mot. at 4. That factual claim says nothing about whether Prof. Bernheim or the NFL Defendants have the burden of proof on those issues. It is simply a factual point for the jury to consider as they weigh the evidence offered by both parties. This point is relevant regardless of who

bears the burden of proof on those issues under the jury instructions the Court ultimately issues.

Second, this critique is entirely consistent with the Rule of Reason. "The rule of reason requires courts to conduct a fact-specific assessment" to "distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (cleaned up). In the Ninth Circuit, this fact-specific assessment comprises four steps, as recognized by the principal case on which the NFL Defendants rely, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 993-94 (9th Cir. 2023).[6] At step one, the plaintiff bears the burden of proving that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. *Id.* at 983. If the plaintiff establishes substantial anticompetitive effects, the burden then shifts back to the defendant to "show a procompetitive rationale for the restraints." *Id.* at 985-86 (cleaned up). "A procompetitive rationale is a [1] nonpretextual claim that the defendant's conduct is [2] indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Id.* at 986 (cleaned up). If the defendant proves a legitimate procompetitive rationale, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 990. "[W]here a plaintiff's case comes up short at step three, the district court must proceed to step four and balance the restriction's anticompetitive harms against its procompetitive benefits." *Id.* at 994.

Prof. Elhauge's critiques of Prof. Bernheim's proffered justifications are helpful to the jury's fact-specific assessment of the restraints' effect on competition because they bear directly on steps two, three, and four of this framework. At step

---

[6] Although the Court of Appeals may have questioned the wisdom of the fourth step in *Epic Games*, it recognized that it was bound by precedent to apply it. 67 F.4th at 994.

two, assuming Professor Bernheim, who is not an expert in sports economics,[7] is permitted to opine regarding the alleged procompetitive effects of the challenged restraints despite failing to quantify them,[8] Prof. Elhauge's testimony bears on the jury's assessment of whether the NFL Defendants' proffered rationales are pretextual

---

[7] Finn Decl., Ex. 2 (Bernheim Dep. Tr.) at 24:18-25:4.

[8] The absence of a quantification of procompetitive benefits in an opinion by one who is not an expert in sports economics is no small omission. In *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 979 (N.D. Cal. 2014), *aff'd in part, vacated in part*, 802 F.3d 1049 (9th Cir. 2015) the Court rejected arguments based on competitive balance for exactly this reason:

> Even if the NCAA had presented some evidence of a causal connection between its challenged rules and its current level of competitive balance, it has not shown that the current level of competitive balance is necessary to maintain its current level of consumer demand. It is undisputed that the ideal level of competitive balance for a sports league is somewhere between perfect competitive balance (where every team has an equal chance of winning every game) and perfect imbalance (where every game has a predictable outcome). The NCAA has not even attempted to identify the specific level of competitive balance between those extremes that is ideal or necessary to sustain its current popularity. Given the lack of such evidence in the record, the Court finds that the NCAA's challenged rules are not needed to achieve a level of competitive balance necessary, or even likely, to maintain current levels of consumer demand for FBS football and Division I basketball.

*See also Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1186 (D.C. Cir. 1978) (rejecting alleged competitive balance justification, noting "[b]ecause the draft's 'anticompetitive' and 'procompetitive' effects are not comparable, it is impossible to 'net them out' in the usual rule-of-reason balancing. The draft's 'anticompetitive evils,' in other words, cannot be balanced against its 'procompetitive virtues,' and the draft be upheld if the latter outweigh the former. In strict economic terms, the draft's demonstrated procompetitive effects are nil."). The absence of quantification undermines any foundational basis for Prof. Bernheim's opinion. The very academic literature referenced in Prof. Bernheim's report makes clear that those who are experts in sports economics and who have studied the issue empirically have found no basis for the alleged pro-competitive effects that he opines exist:

> This essay examines how game coverage, revenues, and competitive balance are affected by competition in commercial television and sales of rights. It argues that consumers are better off if television is competitive and leagues do not centralize rights sales. We conclude that centralization of rights sales does not improve competitive balance or benefit financially weak teams.

Roger G. Knoll, "Broadcasting and Team Sports," *Scottish Journal of Political Economy*, Vol. 54, No. 3, July 2007.

*and* whether they in fact promote competition on the merits. The absence of any empirical evidence establishing that the restraints protect the existence of over-the-air broadcasts or promote innovation in broadcasting is an indication that those explanations are pretextual. This absence further indicates that the NFL Defendants have no factual basis to suggest that the restraints actually promote "greater efficiency or enhanced consumer appeal," *Epic Games*, 67 F.4th at 986. When assessing whether the challenged restraints are necessary to ███████████████ ████████████████████████, for example, the jury can and should consider that neither Prof. Bernheim nor the NFL has ever determined ███████████████████ ████████████████████████████████████████████████████████████████ ███████████████████ *See* Elhauge Report ¶ 54. In lieu of such analysis, Prof. Bernheim speculates ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████, without further specification. Bernheim Report ¶¶ 437-39. Highlighting the speculative and nebulous nature of these opinions will help the jury evaluate whether this rationale is *in fact* pro-competitive. The NFL Defendants cannot satisfy their burden at step two merely by articulating a supposed rationale. Precedent makes clear that the NFL Defendants bear an empirical burden to prove procompetitive effects, not just a burden of articulating some procompetitive rationale that may or may not have any basis in fact. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022), *cert. denied sub nom. The Nat'l Ass'n of Realtors v. The PLS.com, LLC.*, 143 S. Ct. 567 (2023). ("A procompetitive justification must explain why the challenged restraint enhances competition."). Prof. Elhauge's critiques show that the NFL Defendants have failed to do so.

These critiques are also relevant to the jury's assessment of Plaintiffs' burden at step 3. As the *Epic Games* court explicitly recognized, deficiencies in the proof of procompetitive benefits at the second step influence, if not eliminate the need for any analysis at the third step. 67 F. 4th at 986 ("Because the NCAA's amateurism-as-

consumer-appeal rationale was nebulously defined and weakly substantiated, the plaintiffs had more flexibility at step three to fashion less restrictive alternatives" (citing *NCAA v. Alston*, 141 S. Ct. 2141)). This framework makes clear that critiques of the *substantiation* of a procompetitive rationale are at a minimum, helpful to a jury's assessment of step 3. Prof. Elhauge's opinions do exactly that.

Prof. Elhauge's opinion that the evidence proffered by Prof. Bernheim "█████████████████████████████████████████████████████████████████████████████████████████████████" is likewise relevant to step 4. Elhauge Report ¶ 61. The "fourth, totality-of-the-circumstances step in the Rule of Reason" calls for "balancing the anticompetitive effects of [defendants'] conduct against its procompetitive benefits." *Epic Games*, 67 F.4th at 993. Prof. Elhauge's opinions that the NFL Defendants' justifications are insufficient to counteract the anticompetitive effects are tailored precisely to this step.

Nowhere in Prof. Elhauge report does he state, or imply, that the law imposes on the NFL Defendant a burden to "quantify the procompetitive effects of its behavior" or "affirmatively prove that its conduct has a net positive effect on competition." *See* Mot. at 4.[9] Prof. Elhauge expresses no opinion about the allocation of burdens of proof under the rule of reason. His critiques instead will demonstrate to the jury that the NFL Defendants' justifications are based on flimsy, if not non-existent, economic evidence. Because that critique correctly applies the rule-of-reason framework, the cases cited by the NFL Defendants on "misapplication of the law" are irrelevant. *See id.* Unlike the precluded expert testimony in *Yerkes v. Ohio State Highway Patrol*, which criticized the plaintiff's expert for failure to include hypothetical jobs the plaintiff may have obtained in its calculation of back pay in a Title VII case, Prof. Elhauge's opinions do not imply that Prof. Bernheim was required to account for facts that plaintiffs bear the burden of proving. 2023 WL

---

[9] It is anticipated that issues about the allocation of the burdens of proof will be addressed through the Court's jury instructions on this matter.

4633896, at *13 (S.D. Ohio July 20, 2023). Instead, they are straightforward criticisms of the methods that Prof. Bernheim applied and absence of evidentiary support for his conclusions on which the NFL Defendants bear the burden of proof. The NFL Defendants point to no case in which such a critique of expert testimony on procompetitive justifications was excluded.

Here, the NFL Defendants' failure to adequately substantiate their procompetitive rationales will help the jury assess the legitimacy of those rationales, an assessment that is plainly relevant to the proper application of the Sherman Act to the NFL Defendants' conduct. There is thus no basis to exclude these opinions under either Federal Rule of Evidence 401 or 702(a).

## III.    Conclusion

For the foregoing reasons, the NFL Defendants' motion to exclude certain testimony from Einer Elhauge should be denied.


Dated: January 19, 2024                    Respectfully submitted,


By: /s/ *Marc M. Seltzer*

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330

1

Fax: (212) 336-8340

2

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com

3

SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000

4

Seattle, WA 98101
Tel: (206) 505-3841

5

Fax: (206) 516-3883

6

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com

7

HAUSFELD LLP
33 Whitehall Street, 14th Floor

8

New York, NY 10004
Tel: (646) 357-1100

9

Fax: (212) 202-4322

10

Christopher L. Lebsock (184546)
clebsock@hausfeld.com

11

Samuel Maida (333835)
smaida@hausfeld.com

12

HAUSFELD LLP
600 Montgomery St., Suite 3200

13

San Francisco, CA 94111
Tel: (415) 633-1908

14

Fax: (415) 633-4980

15

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com

16

Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com

17

HAUSFELD LLP
888 16th Street, N.W., Suite 300

18

Washington, DC 20006
Tel: (202) 540-7200

19

Fax: (202) 540-7201

20

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com

21

Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com

22

Peter Leckman (235721)
pleckman@langergrogan.com

23

Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com

24

LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020

25

Philadelphia, PA 19103
Tel: (215) 320-5660

26

Fax: (215) 320-5703

27

*Plaintiffs' Co-Lead Counsel*

28