Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max J. Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 10th Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5429
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No. 2:15-ml-02668−PSG (SKx) |
| | **NFL DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Complaint Filed: June 24, 2016 <br> Final Pretrial Conference: February 7, 2024 <br> Trial Date: February 22, 2024 |

# TABLE OF CONTENTS

I.    Plaintiffs' Claims and Defendants' Key Evidence in Opposition [L.R. 16-4.1(a–c)] ....................................................................................... 1

    A.    Plaintiffs' Claims [L.R. 16-4.1(a)] ........................................................ 1

        1.    Claim 1: Violation of Section 1 of the Sherman Act (Unlawful Conspiracy to Restrain Trade) ................................ 1

        2.    Claim 2: Violation of Section 2 of the Sherman Act (Conspiracy to Monopolize) ........................................................ 2

    B.    Elements Required to Establish Plaintiffs' Claims [L.R. 16-4.1(b)] ....................................................................................................... 3

        1.    Claim 1: Unlawful Conspiracy to Restrain Trade ..................... 3

        2.    Claim 2: Conspiracy to Monopolize ........................................... 7

    C.    Key Evidence in Opposition to Plaintiffs' Claims [L.R. 16-4.1(c)] ....................................................................................................... 8

        1.    Claim 1: Unlawful Conspiracy to Restrain Trade ..................... 8

        2.    Claim 2: Conspiracy to Monopolize ........................................... 9

II.   Defendants' Affirmative Defenses and Key Evidence in Support [L.R. 16-4.1(d-f)] .................................................................................................. 10

    A.    Defendants' Affirmative Defenses [L.R. 16-4.1(d)] .......................... 10

        1.    Statute of Limitations ............................................................... 10

        2.    Laches ........................................................................................ 11

        3.    Mitigation .................................................................................. 12

    B.    Elements Required to Establish Defendants' Affirmative Defenses [L.R. 16-4.1(e)] ..................................................................... 12

        1.    Statute of Limitations ............................................................... 12

        2.    Laches ........................................................................................ 13

        3.    Mitigation .................................................................................. 13

i

C.   Key Evidence Relied on in Support of Defendants' Affirmative
     Defenses [L.R. 16-4.1(f)]...................................................................13

     1.   Statute of Limitations .........................................................13

     2.   Laches ..................................................................................14

     3.   Mitigation ............................................................................14

D.   Defendants' Other Defenses ..........................................................14

     1.   Sports Broadcasting Act .....................................................15

     2.   Procompetitive Rationales ...................................................15

     3.   Indirect Injuries...................................................................15

     4.   Standing ...............................................................................16

     5.   Enrichment/No Injury .........................................................17

     6.   Speculative Damages ...........................................................17

     7.   Core Activities of a Legitimate Venture .............................18

     8.   Ancillary Restraints ............................................................18

III.   Similar Statements for All Third Parties [L.R. 16-4.1(g)] ...........................18

IV.    Anticipated Evidentiary Issues and the NFL Defendants' Position on
       Those Issues [L.R. 16-4.1(h)]..............................................................19

A.   Pending Evidentiary Disputes........................................................19

B.   Manner of Playing Deposition Videos............................................19

C.   Disclosure of Exhibits for Examination of NFL and Third-Party
     Witnesses in Plaintiffs' Case-in-Chief...........................................21

V.   Issues of Law [L.R. 16-4.1(i)]...............................................................22

A.   Plaintiffs' Section 2 Claim..............................................................22

     1.   Plaintiffs have abandoned the submarket for out-of-
          market games described in the Complaint.............................22

     2.   Plaintiffs' only potential remaining Section 2 claim

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

overlaps with their Section 1 claim. ...........................................24

B.    Application of the Rule of Reason.....................................25

C.    Additional Depositions ......................................................28

D.    Injunctive Relief................................................................29

VI.   Bifurcation of Issues [L.R. 16-4.3] ............................................29

VII.  Jury Trial [L.R. 16-4.4] ..............................................................29

VIII. Attorneys' Fees [L.R. 16-4.5] .....................................................30

IX.   Abandonment of Issues [L.R. 16-4.6]..........................................30

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
  738 F.3d 960 (9th Cir. 2013) ............................................................................. 17

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ................................................................................. 3, 27

*Apple Inc. v. Pepper*,
  587 U.S. —, 139 S. Ct. 1514 (2019) .................................................................. 15

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
  Carpenters*,
  459 U.S. 519 (1983) ............................................................................................ 25

*Aurora Enters., Inc. v. Nat'l Broad. Co.*,
  688 F.2d 689 (9th Cir. 1982) ............................................................................. 10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) ........................................................................ 5, 18

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ............................................................................................ 23

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) .................................................................................... 26, 28

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
  95 F.3d 593 (7th Cir. 1996) ............................................................................... 27

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984) ............................................................................................ 18

*Costello v. United States*,
  365 U.S. 265 (1961) ............................................................................................ 13

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) ............................................................................. 11

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023), *cert. denied*, — S. Ct. —, 2024 WL
  156473, 2024 WL 156474 (S. Ct. Jan. 16, 2024) ................................. 4, 5, 6, 15

iv

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.*,
786 F.2d 1342 (9th Cir. 1985) ............................................................... 17

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ...................................................... 6, 7, 24

*Fishman v. Estate of Wirtz*,
807 F.2d 520 (7th Cir. 1986) ............................................................... 12

*Fraser v. Major League Soccer, L.L.C.*,
284 F.3d 47 (1st Cir. 2002) ................................................................ 27

*Gerlinger v. Amazon.com Inc.*,
526 F.3d 1253 (9th Cir. 2008) ............................................................. 16

*Golf City, Inc. v. Wilson Sporting Goods, Co.*,
555 F.2d 426 (5th Cir. 1977) ............................................................... 12

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........................................................................... 16

*JUUL Labs, Inc. v. Chou*,
— F. Supp. 3d —, 2023 WL 3886046 (C.D. Cal. June 8, 2023) ...................... 12

*Litton Sys., Inc. v. AT&T Co.*,
700 F.2d 785 (2d Cir. 1983) ............................................................... 12

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) .................................................... 26, 27, 28

*Moheb v. Nutramax Lab'ys Inc.*,
2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ........................................... 17

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. —, 141 S. Ct. 2141 (2021) ........................................... 5, 6, 26

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) ................................................................25, 26, 27, 28

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019) ..................................................*passim*

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) ............................................................. 23

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
  202 F.3d 1088 (9th Cir. 2000) ......................................................... 7, 24

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
  802 F.3d 1049 (9th Cir. 2015) ............................................................. 6

*Ohio v. Am. Express Co.*,
  585 U.S. —,138 S. Ct. 2274 (2018) ............................................... 4, 5, 6

*Oliver v. SD-3C LLC*,
  751 F.3d 1081 (9th Cir. 2014) ............................................................ 11

*Pace Indus., Inc. v. Three Phoenix Co.*,
  813 F.2d 234 (9th Cir. 1987) .............................................................. 10

*Paladin Assocs., Inc. v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) .............................................................. 7

*PlusPass, Inc. v. Verra Mobility Corp.*,
  2021 WL 4775573 (C.D. Cal. Aug. 9, 2021) ...................................... 13

*Ryan v. Microsoft Corp.*,
  147 F. Supp. 3d 868 (N.D. Cal. 2015)............................................ 10, 11

*SaurikIT, LLC v. Apple, Inc.*,
  2023 WL 8946200 (9th Cir. Dec. 28, 2023) ...................................... 11

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*,
  311 F. Supp. 3d 468 (D.R.I. 2018) ...................................................... 12

*Stewart v. Wachowski*,
  574 F. Supp. 2d 1074 (C.D. Cal. 2005)............................................... 11

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) .......................................................... 4, 15, 18, 26

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................ 16

*U.S. Football League v. Nat'l Football League*,
  842 F.2d 1335 (2d Cir. 1988) ............................................................. 17

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) ................................................................. 11

vi

*In re Visa Check/Mastermoney Antitrust Litig.*,
  2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003)..................................................... 12

*Wanke Cascade Distrib. Ltd. v Forbo Flooring, Inc.*,
  2017 WL 2403039 (D. Or. May 4, 2017).........................................................20

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  401 U.S. 321 (1971) ..........................................................................................10

*In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis
  with Kinectiv Tech. & Versys Femoral Head Prods. Liab. Litig*,
  No. 18-md-2859 (S.D.N.Y. July 8, 2021), Dkt. No. 448 ............................ 19, 20

**Rules**

Fed. R. Civ. P. 23.....................................................................................................17

Fed. R. Evid. 702 .....................................................................................................17

**Statutes**

Clayton Act, 15 U.S.C. § 15b.................................................................................10

Sherman Act, 15 U.S.C. §§ 1, 2 ........................................................................*passim*

Sports Broadcasting Act, 15 U.S.C. § 1291 ............................................................15

**Other Authorities**

3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An
  Analysis of Antitrust Principles and Their Application* (4th ed.
  2022)....................................................................................................................7

*Model Jury Instructions in Civil Antitrust Cases* (Am. Bar Ass'n, Sec.
  Antitrust L. 2016) ...........................................................................................*passim*

Defendants the National Football League (the "NFL"), NFL Enterprises LLC, and the 32 NFL Clubs[1] (collectively, "NFL Defendants") submit this Memorandum of Contentions of Fact and Law pursuant to Civil Local Rule 16-4 and this Court's Standing Orders. This Memorandum does not purport to exhaust or address every fact Defendants may seek to establish at trial or every point of law on which Defendants may rely. Defendants reserve the right to amend and supplement their contentions of fact and law, and to supplement the evidence referenced below with additional evidence at trial.

# I.   PLAINTIFFS' CLAIMS AND DEFENDANTS' KEY EVIDENCE IN OPPOSITION [L.R. 16-4.1(A–C)]

## A.   Plaintiffs' Claims [L.R. 16-4.1(a)]

Plaintiffs' Second Consolidated Amended Complaint for Damages and Declaratory and Injunctive Relief (the "Complaint"), Dkt. No. 441, asserts two causes of action for violations of Sections 1 and 2 of the Sherman Act. As explained further below, Defendants submit that only the Section 1 claim should be submitted to the jury.

### 1.   Claim 1: Violation of Section 1 of the Sherman Act (Unlawful Conspiracy to Restrain Trade)

Plaintiffs allege in Count I of the Complaint that the NFL Defendants and DirecTV entered into an unlawful agreement, combination, and conspiracy in

---

[1] The NFL Club Defendants consist of: Arizona Cardinals Football Club, LLC; Atlanta Falcons Football Club, LLC; Baltimore Ravens Limited Partnership; Buffalo Bills, LLC; Panthers Football, LLC; The Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns Football Company LLC; Dallas Cowboys Football Club, Ltd.; Denver Broncos Team, LLC; The Detroit Lions, Inc.; Green Bay Packers, Inc.; Houston NFL Holdings, L.P.; Indianapolis Colts, Inc.; Jacksonville Jaguars, LLC; Kansas City Chiefs Football Club, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football, LLC; New England Patriots LLC; New Orleans Louisiana Saints, LLC; New York Football Giants, Inc.; New York Jets LLC; Raiders Football Club, LLC; Philadelphia Eagles, LLC; Pittsburgh Steelers LLC; Chargers Football Company, LLC; Forty Niners Football Company LLC; Football Northwest LLC; The Los Angeles Rams, LLC; Buccaneers Team LLC; Tennessee Football, LLC; and Pro-Football LLC.

restraint of trade, in violation of 15 U.S.C. § 1. Plaintiffs allege that the NFL Defendants and DirecTV agreed to unreasonably restrain competition for the licensing and distribution of live video presentations of NFL games in the alleged antitrust market for professional football telecasts in the United States. Plaintiffs claim that Defendants' alleged anticompetitive conduct harms competition, lacks procompetitive benefits, and commonly injured the two certified classes in this case. Dkt. No. 441, 2d Am. Compl. ("Compl.") ¶¶ 155–58.

Defendants deny all aspects of this claim, including on the grounds that Defendants did not unreasonably restrain competition in the alleged market for professional football telecasts in the United States by giving NFL fans another option to view NFL games; that Sunday Ticket expanded output of NFL game telecasts; that any alleged restraints regarding Sunday Ticket are supported by procompetitive rationales; that Plaintiffs have failed to demonstrate any workable less restrictive alternatives that serve Defendants' procompetitive rationales without significantly increased cost; and that Plaintiffs cannot demonstrate harm to competition, injury, or damages.

## 2.    Claim 2: Violation of Section 2 of the Sherman Act (Conspiracy to Monopolize)

Plaintiffs allege in Count II of their complaint that Defendants engaged in a conspiracy to monopolize multiple alleged relevant antitrust markets. Defendants submit that this claim should not be submitted to the jury. As detailed in Part V.A. below, Plaintiffs' allegations as to certain of these alleged markets have been abandoned—specifically, Plaintiffs' own experts repudiate the idea of a "submarket" consisting only of out-of-market NFL games.

As a result, the only Section 2 theory Plaintiffs could pursue consistent with their complaint is that the NFL and the NFL Clubs conspired to give the NFL a monopoly in the alleged market for professional football telecasts. Under established Ninth Circuit precedent, that theory would require proof of the same elements as

Plaintiffs' Section 1 claim (as well as others). Simply put, there is no universe in which Plaintiffs could succeed on their Section 2 claim if they fail on their Section 1 claim, and no universe in which succeeding on the Section 2 claim could yield a non-duplicative recovery. Instructing the jury on the Section 2 claim thus would serve only to create confusion and inject potential error.

**B.     Elements Required to Establish Plaintiffs' Claims [L.R. 16-4.1(b)]**

**1.     Claim 1: Unlawful Conspiracy to Restrain Trade**

Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, Plaintiffs must prove the following:

1.     the existence of a contract, combination, or conspiracy between or among the NFL, the 32 NFL Clubs, and DirecTV;

2.     that the contract, combination, or conspiracy unreasonably restrained trade;

3.     that the restraint affects interstate commerce; and

4.     that the restraint caused Plaintiffs to suffer an injury to their business or property.

*Mod. Jury Instrs. in Civ. Antitrust Cases*, Chapter 1 – Sherman Act— General, Instruction 2: Sherman Act Section 1 (Am. Bar Ass'n, Sec. Antitrust L. 2016).

To demonstrate a contract, combination, or conspiracy between or among the NFL and the NFL Clubs, Plaintiffs must first prove that the NFL and the NFL Clubs are not a "single entity," *i.e.*, that the NFL and the NFL Clubs are "independent sources of economic power" in licensing professional football telecasts, such that an agreement among them could reduce "actual or potential competition." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195–96 (2010) (internal quotation marks and citations omitted). At minimum, Plaintiffs must prove that "it is possible for the member clubs to act individually to produce telecasts." Dkt. No. 1155, Order Denying Defs.' Mot. Summ. J. ("MSJ Op.") at 27. If they make these showings,

Plaintiffs must also prove that the NFL, the NFL Teams, and DirecTV knowingly entered a conspiracy to—and did in fact—unreasonably restrain competition in the alleged relevant antitrust market for professional football telecasts in the United States. *Mod. Jury Instrs. in Civ. Antitrust Cases*, Chapter 2 – Section 1 of the Sherman Act—Contract, Combination, or Conspiracy, Instruction 1: Definition, Existence, and Evidence; *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019).

In evaluating whether the Defendants unreasonably restrained trade, courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

The rule of reason is a three-step, burden-shifting framework that requires the factfinder to conduct a fact-specific assessment of "market power and market structure . . . to assess the [restraint]'s actual effect" on competition. *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. —, 138 S. Ct. 2274, 2284 (2018) (citation and internal quotations omitted); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023), *cert. denied*, — S. Ct. —, 2024 WL 156473, 2024 WL 156474 (S. Ct. Jan. 16, 2024).

1.     "At step one, 'the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market.'" *Epic Games*, 67 F.4th at 983 (quoting *Amex*, 138 S. Ct. at 2284). Plaintiffs must establish both the existence of the relevant market and substantial anticompetitive effects in that market. *Epic Games*, 67 F.4th at 974, 983; *see also Amex*, 138 S. Ct. at 2285 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market.").

While Plaintiffs initially alleged the existence of two relevant markets—(i) the market for professional football telecasts in the United States, and (ii) a submarket

consisting of out-of-market ("OOM") telecasts of NFL games—they have no competent evidence regarding the alleged submarket. Most to the point, their *own economic experts* reject the submarket, claiming instead that the only relevant antitrust market in this case is the broader market for professional football telecasts in the United States. *See* Dkt. No. 962-4, Rascher Rep. § 6.1, ¶ 177 (defining only an alleged "relevant market . . . for major league professional football telecasts in the United States, including those of the NFL"). Contrary to Plaintiffs' suggestion in their memorandum, Dr. Rascher affirmatively *rejects* the notion of a distinct OOM submarket by opining that "the NFL OOM telecasts are in the same relevant market as the rest of the NFL telecasts." *Id.* ¶ 200; *see also* Dkt. No. 962-5, Rascher Reply Rep. § 6.1, ¶ 110 (defending his relevant market for "NFL telecasts"); Dkt. No. 962-29, Elhauge Rebuttal Rep. § 3, ¶¶ 36–39 (defending Rascher's "NFL telecasts" market).

To be clear, Defendants disagree that Plaintiffs can show substantial anticompetitive effects in this antitrust market and dispute that this element has been met. *Cf.* MSJ Op. at 19. Plaintiffs must show that the challenged conduct raised prices, reduced output, or decreased product quality in the alleged market for professional football telecasts. *Epic Games*, 67 F.4th at 983; *accord Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111–12 (9th Cir. 2021). As explained below, Defendants do not believe Plaintiffs can meet that burden given the many different options consumers have to watch NFL games, including watching all local games and many of the most popular NFL games every year for free.

2.     "If a plaintiff establishes at step one that the defendant's restraints impose substantial anticompetitive effects, then the burden shifts back to the defendant to 'show a procompetitive rationale for the restraints.'" *Epic Games*, 67 F.4th at 985–86 (cleaned up) (quoting *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. —, 141 S. Ct. 2141, 2160 (2021)); *Amex*, 138 S. Ct. at 2284 (same). In the most recent pronouncement from the Ninth Circuit on this element, the Court held that a

defendant need only show "a [1] nonpretextual claim that [the defendants'] conduct is [2] indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Epic Games*, 67 F.4th at 986 (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020)) (alterations in original).

   3. "At step three of the Rule of Reason, 'the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.'" *Epic Games*, 67 F.4th at 990 (cleaned up) (quoting *Alston*, 141 S Ct. at 2160); *Amex*, 138 S. Ct. at 2284 (same). To meet this standard, Plaintiffs must establish an alternative that is substantially—not marginally—less restrictive, and that is "'virtually as effective' in serving the [defendant's] procompetitive purposes . . . without significantly increased cost." *Epic Games*, 67 F.4th at 990 (quoting *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1064 (9th Cir. 2015) (citation omitted)). Where a plaintiff fails to establish "viable less restrictive alternatives" at step three, they are not able to satisfy their burden under the rule of reason. *See Epic Games*, 67 F.4th at 994. While *Epic Games* discussed a fourth step of the rule of reason where "the plaintiff fails to carry its step-three burden of establishing less restrictive alternatives," it also (i) expressed skepticism "of the wisdom of superimposing a totality-of-the-circumstances balancing step onto a three-part test that is already intended to assess a restraint's overall effect"; (ii) questioned "what value a balancing step adds"; and (iii) ultimately held that "[i]n most instances," the fourth step "will require nothing more than . . . briefly confirming the result suggested by a step-three failure: that a business practice without a less restrictive alternative is not, on balance, anticompetitive." *Id. Epic Games* was also a bench trial, where the finder of fact was experienced in the law and the type of head-of-a-pin analysis that would occur at a fourth step. For all these reasons, Defendants submit that there is no warrant to impose a fourth step in a jury trial.

## 2.     Claim 2: Conspiracy to Monopolize

As explained briefly above and in further detail below, Defendants contend that Plaintiffs should not be permitted to present their Section 2 claim to the jury. *See* Part I.A.2; *see also* Part V.A. However, if Plaintiffs were permitted to proceed with their Section 2 conspiracy to monopolize claim, Plaintiffs would be required to prove:

1.     an agreement or mutual understanding among the NFL, the 32 NFL Clubs, and DirecTV to obtain monopoly power in the relevant market;

2.     that each Defendant specifically intended to give the NFL monopoly power in the relevant market;

3.     that each Defendant committed an overt act in furtherance of the conspiracy;

4.     that Defendants' activities occurred in or affected interstate commerce; and

5.     that Defendants engaged in anticompetitive conduct that injured Plaintiffs.

*Mod. Jury Instrs. in Civ. Antitrust Cases*, Chapter 3 – Section 2 of the Sherman Act, Conspiracy to Monopolize, Instruction 1: Elements; *see also Sunday Ticket*, 933 F.3d at 1159 (outlining elements of a conspiracy to monopolize claim under § 2 (citing *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003)));

This claim requires the same proof as a Section 1 violation, plus more. *See infra* Part V.A; *see also, e.g.*, *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("Because [plaintiff's] claim under § 1 fails, its claim of a conspiracy to monopolize under § 2 based on the same conduct necessarily fails as well."); *Qualcomm*, 969 F.3d at 991–92 ("If, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2."); 3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 809 (4th ed. 2022) ("Any arrangement that could be considered a

7

'conspiracy' to monopolize must necessarily also be an unreasonable 'contract,' 'combination,' or 'conspiracy' in restraint of trade offending §1.").

## C. Key Evidence in Opposition to Plaintiffs' Claims [L.R. 16-4.1(c)]

### 1. Claim 1: Unlawful Conspiracy to Restrain Trade

Below is a brief description of Defendants' key evidence concerning Plaintiffs' Section 1 claim. This brief description is not intended to be an exhaustive summary of all such evidence.

The key evidence refuting Plaintiffs' Section 1 claim includes, but is not limited to:

- Evidence and testimony that NFL football game telecasts are a high-quality and popular entertainment product;

- Evidence and testimony that the NFL and 32 NFL Clubs by necessity cooperate to create each season of games, including coordinating on scheduling and elements of production, and to create telecasts of those games;

- Evidence and testimony that the NFL offers fans various ways to access NFL content, including many games on free, over-the-air television and numerous supplementary offerings for avid fans, including but not limited to Sunday Ticket;

- Evidence and testimony about the NFL's agreements with CBS and FOX to distribute Sunday afternoon NFL games on free, over-the-air television;

- Evidence and testimony that NFL Sunday Ticket expands output by providing avid fans with a high-quality option to ensure access to live telecasts of all Sunday afternoon NFL games;

- Evidence and testimony that the NFL's distribution of Sunday afternoon football game telecasts has procompetitive benefits for consumers, including but not limited to promoting competitive balance, incentivizing investments and innovation to improve product quality, incentivizing promotion to consumers, ensuring the efficient matching of games to television slots, promotion of competition among multi-channel video programming distributors ("MVPDs") and other distributors, ensuring compensation for use of intellectual property, facilitating cooperation and coordination among the NFL and NFL teams, maximizing fan reach and

8

access, increasing game exposure, increasing output, increasing consumer choice, promoting smaller-market teams, and promoting the distribution of games on free, over-the-air television;

- Evidence and argument that subscribers, including the named Plaintiffs, were satisfied with NFL Sunday Ticket;

- Evidence and testimony about the named Plaintiffs' decision to subscribe to NFL Sunday Ticket and continue subscribing to NFL Sunday Ticket;

- Evidence and testimony about the NFL's decision to partner with DirecTV for the distribution of NFL Sunday Ticket;

- Evidence and testimony, including from DirecTV witnesses, that DirecTV determined the price and packaging of Sunday Ticket;

- Evidence and testimony about innovation in the production and distribution of NFL football game telecasts;

- Evidence and argument that Plaintiffs' expert Dr. Daniel Rascher has failed to properly define a relevant antitrust market;

- Evidence and argument that Plaintiffs' expert Dr. Daniel Rascher has failed to offer a less restrictive alternative to the challenged conduct;

- Evidence and argument that Plaintiffs' experts Dr. Doug Zona and Dr. Daniel Rascher have failed to offer reliable models of injury or damages; and

- Evidence and argument that Plaintiffs were not injured.

### 2.    Claim 2: Conspiracy to Monopolize

As explained *supra*, Defendants contend that Plaintiffs should not be permitted to present their Section 2 claim to the jury. *See* Part I.A.2; *see also* Part V.A. Nonetheless, if Plaintiffs are permitted to proceed with their Section 2 conspiracy to monopolize claims, Defendants contend that Plaintiffs will be unable to establish the elements of that claim. Because proving a Section 2 claim would require at least the same proof as a Section 1 claim, the NFL Defendants will rely on the same key evidence in opposition, as well as evidence and argument that no Defendant had the requisite specific intent and that Defendants have taken no actions to prevent other

9

leagues from competing in the alleged market for professional football telecasts in the United States, but have instead created and maintained a popular, high-quality product.

## II. DEFENDANTS' AFFIRMATIVE DEFENSES AND KEY EVIDENCE IN SUPPORT [L.R. 16-4.1(D-F)]

### A. Defendants' Affirmative Defenses [L.R. 16-4.1(d)][2]

The NFL Defendants pleaded and plan to pursue the following affirmative defenses:

#### 1. Statute of Limitations

Plaintiffs' claims are barred, at least in part, by the applicable statute of limitations, which precludes recovery of damages arising from any acts that caused injury to Plaintiffs that were committed more than four years before the filing of the complaint. *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338–39 (1971). The applicable limitations dates are June 17, 2011 for the residential class and July 13, 2011 for the commercial class. Plaintiffs cannot recover for alleged injuries caused by conduct occurring before the applicable limitations dates or for alleged injuries sustained before the applicable limitations dates unless they can establish an overt act by Defendants that restarted the statute of limitations within four years before the filing of the complaint. *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987).

In the Ninth Circuit, continued payments for an existing alleged illegal agreement do not constitute an overt act. *See Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982) ("[T]he mere fact that defendants receive a benefit today as a result of a contract [that violated the Sherman Act] is not enough to restart the statute of limitations."). "Merely carrying out during the limitations period a final, binding decision made prior to the limitations period does not qualify as a new overt act," *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 884 (N.D. Cal. 2015), as

---

[2] The NFL Defendants assert no counterclaims against Plaintiffs.

"permitting new unchanged . . . agreements to establish continuing violations would vitiate the purpose of the statute of limitations," *SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023).

Sales of a "price-fixed product" can constitute "a new overt act causing injury," *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014), only where there is an ongoing conspiracy. Where, as here, the allegedly "supra[-]competitive price charged" is instead pursuant to a pre-limitations contract, the new purchases are "not an overt act of [their] own, but a manifestation of the prior overt act of entering into the [pre-limitations] contract." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019); *see also Ryan*, 147 F. Supp. 3d at 885 (holding that the "maintenance and renewal of the preexisting non-solicitation agreements [did] not qualify as an overt act"). As a result, where a plaintiff challenges a series of agreements, some of which were entered prior to the limitations period, it is necessary to "limit [plaintiff's] damages to those arising out of" the post-limitations conduct. *US Airways*, 938 F.3d at 69.

Plaintiffs' expert reports assert purportedly anticompetitive conduct and effects that occurred prior to the applicable dates, which cannot be used to establish injury or damages.

## 2. Laches

Laches is "an equitable defense that prevents [suit by] a plaintiff, who with full knowledge of the facts, acquiesces in a transaction and sleeps on his rights." *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1111 (C.D. Cal. 2005) (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001)). Plaintiffs' claims are barred, at least in part, by the doctrine of laches, which precludes imposition of equitable relief based on conduct occurring more than four years before the filing of the complaint. *Oliver*, 751 F.3d at 1085. The applicable laches dates are June 17, 2011 for the residential class and July 13, 2011 for the commercial class. Plaintiffs cannot seek equitable relief based on conduct occurring before the applicable laches dates. Plaintiffs' expert

reports assert purportedly anticompetitive conduct and effects that occurred prior to those applicable dates, which cannot be used as a basis to seek equitable relief.

### 3. Mitigation

Plaintiffs may not recover damages for any portion of their injuries that they could have avoided through the exercise of reasonable care and prudence. *Mod. Jury Instrs. in Civ. Antitrust Cases*, Chapter 6 – Causation and Damages – Damages, Instruction 14: Mitigation; *see also JUUL Labs, Inc. v. Chou*, — F. Supp. 3d —, 2023 WL 3886046, at *14 (C.D. Cal. June 8, 2023); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 558 (7th Cir. 1986) (an antitrust plaintiff has a duty to mitigate damages); *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 436 (5th Cir. 1977) (same); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 311 F. Supp. 3d 468, 511 (D.R.I. 2018) (same); *In re Visa Check/Mastermoney Antitrust Litig.*, 2003 WL 1712568, at *8 (E.D.N.Y. Apr. 1, 2003) (citing *Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785, 820 n.47 (2d Cir. 1983)) (same). "Plaintiff[s] [are] not entitled to increase any damages through inaction." *Mod. Jury Instrs. in Civ. Antitrust Cases*, Chapter 6 – Causation and Damages— Damages, Instruction 14: Mitigation. "The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss." *Id.* "If [P]laintiffs failed to take reasonable steps available to [them], and the failure to take those steps resulted in greater harm to [P]laintiffs than [they] would have suffered had [they] taken those steps, then [P]laintiffs may not recover any damages for that part of the injury [they] could have avoided." *Id.*

### B. Elements Required to Establish Defendants' Affirmative Defenses [L.R. 16-4.1(e)]

#### 1. Statute of Limitations

To succeed on this defense, Defendants must prove that some of the conduct that Plaintiffs challenge occurred prior to June 17, 2011 (for the residential class) and July 13, 2011 (for the commercial class).

### 2. Laches

Defendants bear the burden of establishing that Plaintiffs' recovery is barred by the doctrine of laches. Defendants have the burden of proving by a preponderance of the evidence:

    1.    lack of diligence by Plaintiffs; and

    2.    prejudice to Defendants.

*PlusPass, Inc. v. Verra Mobility Corp.*, 2021 WL 4775573, at *6 (C.D. Cal. Aug. 9, 2021) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)).

### 3. Mitigation

Defendants bear the burden of establishing that Plaintiffs failed to mitigate their damages. Defendants must prove by a preponderance of the evidence that:

    1.    Plaintiffs acted unreasonably in failing to take specific steps to minimize or limit their losses;

    2.    that the failure to take those specific steps resulted in their losses being greater than they would have been had they taken such steps; and

    3.    the amount by which Plaintiffs' loss would have been reduced had Plaintiffs taken those steps.

*Mod. Jury Instrs. in Civ. Antitrust Cases*, Chapter 6 – Causation and Damages—Damages, Instruction 14: Mitigation.

### C. Key Evidence Relied on in Support of Defendants' Affirmative Defenses [L.R. 16-4.1(f)]

### 1. Statute of Limitations

The key evidence supporting Defendants' statute of limitations affirmative defense includes, but is not limited to:

- Evidence and argument that some of the challenged conduct and some of Residential Plaintiffs' alleged injuries occurred before June 17, 2011; and

- Evidence and argument that some of the challenged conduct and some of Commercial Plaintiffs' alleged injuries occurred before July 13, 2011.

### 2. Laches

The key evidence supporting Defendants' laches affirmative defense includes, but is not limited to:

- Evidence and argument that some of the challenged conduct and some of Residential Plaintiffs' alleged injuries occurred before June 17, 2011; and

- Evidence and argument that some of the challenged conduct and some of Commercial Plaintiffs' alleged injuries occurred before July 13, 2011.

### 3. Mitigation

The key evidence supporting Defendants' mitigation affirmative defense includes, but is not limited to:

- Evidence that class members continued to subscribe to Sunday Ticket after filing the lawsuit.

Defendants emphasize that this evidence's relevance is not limited to the mitigation defense. As noted above, it is also important evidence as to other elements of the rule of reason analysis. The fact that class members continued to purchase the product confirms that Defendants are providing valuable choices to consumers in the antitrust market actually pursued. It also confirms that the conduct at issue enhanced competition by benefiting consumers, including by providing a quality additional option for viewing NFL games that increased output in the alleged relevant market.

### D. Defendants' Other Defenses

Defendants also pleaded and plan to either pursue or preserve the following defenses for which they contend that they do not carry the burden unless specified otherwise below:

14

### 1. Sports Broadcasting Act

Defendants are not liable to the extent that Plaintiffs challenge conduct that is exempt from antitrust scrutiny under the Sports Broadcasting Act ("SBA"), 15 U.S.C. § 1291. Plaintiffs bear the burden of proving that conduct not protected by the SBA caused them anticompetitive harm. Defendants incorporate by reference, for preservation purposes, the arguments set forth in their motion for summary judgment regarding the application of the SBA. *See* Dkt. Nos. 956-1, 986-1.

### 2. Procompetitive Rationales

Defendants contend that they are not liable because the challenged conduct had procompetitive rationales. *Epic Games*, 67 F.4th at 985–86, 990. Analysis of procompetitive rationales is part of the analysis required by the antitrust rule of reason; while Defendants have the burden of presenting procompetitive rationales, the ultimate burden of proof remains with Plaintiffs. *See id.* at 983, 985–86, 990; *Dagher*, 547 U.S. at 5. Defendants will present evidence of the procompetitive rationales for the challenged conduct, including, without limitation, promoting competitive balance, incentivizing investments and innovation to improve product quality, incentivizing promotion to consumers, ensuring the efficient matching of games to television slots, promoting competition among MVPDs and other distributors, ensuring compensation for use of intellectual property, facilitating cooperation and coordination among the NFL and NFL teams, maximizing fan reach and access, increasing game exposure, increasing output, increasing consumer choice, promoting smaller-market teams, and promoting the distribution of games on free, over-the-air television, as further detailed in Defendants' discovery responses and expert reports, as well as in forthcoming trial testimony.

### 3. Indirect Injuries

To recover damages for their alleged injuries, Plaintiffs bear the burden of establishing that they are "direct purchasers—that is, those who are 'the immediate buyers from the alleged antitrust violators.'" *Apple Inc. v. Pepper*, 587 U.S. —, 139

S. Ct. 1514, 1521 (2019) (citation omitted).[3] Plaintiffs did not purchase Sunday
Ticket from either the NFL or any of the NFL Clubs, but rather from DirecTV.
Whether DirecTV was a party to any conspiracy remains a triable issue of fact. MSJ
Op. at 11 ("[W]hether *Illinois Brick* applies, barring Plaintiffs from having standing,
is dependent on a material issue of fact."). Defendants do not believe Plaintiffs can
prove at trial that DirecTV was a party to any conspiracy involving any NFL
Defendants.

### 4.    Standing

Plaintiffs bear the burden of establishing that each and every class member has
antitrust standing to pursue their claims. *See, e.g.*, *Gerlinger v. Amazon.com Inc.*, 526
F.3d 1253, 1256 (9th Cir. 2008) ("Lack of antitrust standing affects a plaintiff's
ability to recover[.]"); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)
("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing
for each claim that they press and for each form of relief that they seek."). To
establish standing, Plaintiffs must prove actual injury that (i) was directly caused by
Defendants' alleged violation of the antitrust laws and (ii) is of the type that the
antitrust laws were intended to prevent. *See Gerlinger*, 526 F.3d at 1256. Whether
Plaintiffs have standing to pursue their claims is a triable issue of fact. *See* MSJ Op.
at 6 ("There is a dispute of fact as to whether Plaintiffs have standing for their § 1
claim."), 12 ("There is a dispute of fact as to whether Plaintiffs have standing for
their § 2 claim."). Defendants contend that Plaintiffs have not established that any
member of the class suffered antitrust injury and are unable to prove antitrust injury
on a class-wide basis.

---

[3] For preservation purposes, Defendants maintain that there is no so-called "co-
conspirator exception" to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and to
the extent that one does exist, it is limited to alleged price-fixing conspiracies and
does not extend to non-price-fixing conspiracies of the kind alleged here. *See Sunday
Ticket*, 933 F.3d at 1158.

### 5.   Enrichment/No Injury

Plaintiffs bear the burden of establishing that they were in fact injured as a result of Defendants' conduct and not unduly enriched. *See Moheb v. Nutramax Lab'ys Inc.*, 2012 WL 6951904, at *3 (C.D. Cal. Sept. 4, 2012) (collecting cases). Whether Plaintiffs were injured in fact as a result of Defendants' conduct remains a triable issue of fact. Defendants contend that Plaintiffs "derived [a] benefit" from the procompetitive effects of the challenged conduct, rather than suffering harm from that conduct, precluding recovery. *Id.*

### 6.   Speculative Damages

Plaintiffs bear the burden of providing the jury with a reasonable basis on which to determine damages that does not involve guesswork or speculation. *See, e.g., U.S. Football League v. Nat'l Football League* ("*USFL*"), 842 F.2d 1335, 1378 (2d Cir. 1988); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1350–51 (9th Cir. 1985). Plaintiffs must prove the reasonableness of each of the inferences upon which their damages calculation is based. *USFL*, 842 F.2d at 1378. Whether Plaintiffs' damages estimate is supported by reasonable assumptions remains a triable issue of fact; even if Plaintiffs' experts' opinions are admissible under Federal Rule of Evidence 702 or sufficient to support certification under Federal Rule of Civil Procedure 23, the jury could still find that their experts' damages are speculative or the product of guesswork. *See* Dkt. No. 894, Order Denying All Mots. to Exclude ("Defendants, of course, may give the jury good arguments for rejecting the testimony, but this Court is within its discretion to allow the jury to listen to Plaintiffs' expert as well as Defendants'." (cleaned up) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013))). Defendants contend that the assumptions underlying Plaintiffs' damages estimate are unreasonable, and that Plaintiffs' damages models are not rigorous or reliable, including for the reasons detailed in Defendants' expert reports.

### 7.   Core Activities of a Legitimate Venture

Plaintiffs bear the burden of establishing the existence of a contract, combination, or conspiracy between two or more separate entities that unreasonably restrains trade. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768–69 (1984). Whether the NFL and the NFL Clubs constitute a single entity remains a triable issue of fact. *See* MSJ Op. at 23 ("There is a dispute of fact whether the NFL and its member clubs are capable of concerted action."). Defendants contend that the NFL and the NFL Clubs constitute a single entity, and in any event are operating a legitimate joint venture, the core purpose of which includes the production and distribution of NFL football game telecasts. *See Dagher*, 547 U.S. at 6. This core business venture requires the NFL and the Clubs to cooperate in the production of games, which renders them incapable of concerted action or competition in the licensing of telecast rights, as further detailed in Defendants' expert reports.

### 8.   Ancillary Restraints

Defendants contend that even if the challenged restraints were not the core activities of the joint venture (and they are), those restraints are at a minimum ancillary to the joint venture's creation and distribution of NFL football telecasts, as detailed in Defendants' expert reports. As a result, Plaintiffs bear at least the burden of establishing that the challenged agreements are unreasonable restraints on trade that are not ancillary to the legitimate and competitive purposes of Defendants' joint venture. *See Dagher*, 547 U.S. at 7. Contrary to the suggestion in Plaintiffs' memorandum, an ancillary restraint cannot be a "naked" restraint for purposes of applying the quick look doctrine; "'[n]aked restraints' are categorically not 'ancillary restraints.'" *Aya Healthcare Servs.*, 9 F.4th at 1109 (citation omitted).

## III.   SIMILAR STATEMENTS FOR ALL THIRD PARTIES [L.R. 16-4.1(G)]

This action does not involve any claims by third parties.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.   ANTICIPATED EVIDENTIARY ISSUES AND THE NFL DEFENDANTS' POSITION ON THOSE ISSUES [L.R. 16-4.1(H)]

### A.   Pending Evidentiary Disputes

The parties have filed motions *in limine* raising various evidentiary issues. *See* Dkt. Nos. 1101–03, 1106, 1108, 1112–14, 1118, 1122, 1126. Defendants refer the Court to the arguments set forth in their motions *in limine* and in their oppositions to Plaintiffs' motions *in limine*. Defendants do not oppose Plaintiffs' motion *in limine* no. 1. *See* Dkt. No. 1101. Defendants oppose, at least in part, Plaintiffs' motions *in limine* nos. 2, 3, and 4.

### B.   Manner of Playing Deposition Videos

The parties disagree about the manner of playing deposition videos at trial. Defendants' position is that each witness's deposition testimony should be played once, in chronological order, by the party first offering the witness's testimony into evidence. By contrast, Plaintiffs propose playing each witness's deposition video twice, with some of a witness's testimony played during their case-in-chief and the remainder later during Defendants' case-in-chief. That approach makes no practical sense: it would confuse the jury, complicate the presentation of evidence, and create needless inefficiencies and additional work for the parties and the court.

Playing each witness's testimony once will streamline the presentation and avoid juror confusion. Plaintiffs do not appear to dispute that live witnesses should be examined in a single, continuous block of time, regardless of whether the live witness is called in Plaintiffs' or Defendants' case-in-chief. There is no reason to part course for deposition testimony. Playing the witness's testimony all at once will help the jury's understanding of the full scope of that witness's testimony. It will also avoid juror confusion about which witnesses said what, and when, given how many witnesses will be testifying via deposition in this case. For those reasons, federal courts in complex cases regularly decide to play all the designations from one deposition at the same time during trial. *See, e.g.*, Order No. 62 at 3, *In re Zimmer*

1   *M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis with Kinectiv Tech. & Versys*
2   *Femoral Head Prods. Liab. Litig*, No. 18-md-02859 (S.D.N.Y. July 8, 2021), Dkt.
3   No. 448 (playing the witness's testimony once is "more efficient and will minimize
4   juror confusion"); *see also Wanke Cascade Distrib. Ltd. v. Forbo Flooring, Inc.*,
5   2017 WL 2403039, at *2 (D. Or. May 4, 2017) ("[T]he court prefers deposition
6   testimony offered by both parties from a single witness be combined and read
7   together.").

8        Playing the videos all at once also avoids needless work for the parties and the
9   Court. Under Plaintiffs' approach, there would inevitably be arguments about
10  whether certain testimony is properly a "counter" (that could be played along with
11  the original video) or an "affirmative" (that should be reserved for the other side's
12  case-in-chief). These arguments would serve no practical purpose—at the end of the
13  day, all the testimony would go before the jury.

14       To the extent Plaintiffs are concerned that playing a single video in their case-
15  in-chief may make it appear that Plaintiffs are offering all of the testimony in the
16  video, the parties can devise solutions. The Court might offer an instruction to make
17  clear to the jury that the videos consist of testimony designated by both parties and
18  that each video is being played only once for efficiency purposes. The parties could
19  also make clear which portions of the video involve questioning by Plaintiffs and by
20  Defendants.

21       Plaintiffs' claim that they are disadvantaged by "the asymmetric availability
22  of witnesses" changes nothing. If all the NFL witnesses on Plaintiffs' list were to
23  come live to trial, they would presumably each testify in one single block of time.
24  Plaintiffs do not explain why they are at any disadvantage by treating the deposition
25  videos in the same way. Moreover, Plaintiffs will have the opportunity to examine
26  several live witnesses as part of their case-in-chief, including Brian Rolapp (from the
27  NFL), and potentially others they have subpoenaed for trial (Steve Bornstein,
28  formerly of the NFL, and Larry Jones, formerly of FOX Sports).

The most efficient and sensible approach, therefore, is to play each deposition video once by the party first offering the witness's testimony into evidence.

**C.      Disclosure of Exhibits for Examination of NFL and Third-Party Witnesses in Plaintiffs' Case-in-Chief**

The parties have generally agreed on a protocol for disclosing witnesses and exhibits on direct examination during trial, but disagree as to whether Defendants must disclose exhibits they intend to use in the examination of NFL witnesses and third-party witnesses who are called in Plaintiffs' case-in-chief. Defendants' position is that they should not have to disclose exhibits for this narrow set of live witnesses.

It appears that Plaintiffs are in agreement that the one live NFL witness on both sides' list, Brian Rolapp, will testify once in Plaintiffs' case, with Plaintiffs cross-examining first and no scope limits on Defendants' subsequent examination. Plaintiffs have taken the position that they will not disclose exhibits to be used in their adverse examination of NFL and third-party witnesses who are called in their case-in-chief. Given Plaintiffs' position, Defendants should not be required to disclose the exhibits they intend to use in their direct examination of those witnesses, which would follow that adverse examination. If Defendants are required to disclose their exhibits in advance, Plaintiffs would have an asymmetrical advantage and could entirely preempt Defendants' examination. That result is antithetical to the adversarial process. Instead, the appropriate solution is for neither side to disclose exhibits for the examination of NFL or third-party witnesses who are called in Plaintiffs' case-in-chief.

To be clear, this issue is limited in scope. Contrary to the suggestion in Plaintiffs' Memorandum of Contentions of Fact and Law, Defendants do not take the position that all exhibits on cross-examination (except those used for impeachment) must be disclosed in advance. Defendants submit only that if Plaintiffs will not disclose the exhibits they will use in their initial examinations of NFL or third-party witnesses called in Plaintiffs' case-in-chief, then Defendants should not be required

1    to disclose the exhibits to be used subsequently in Defendants' examinations of those

2    witnesses.

3    **V.    ISSUES OF LAW [L.R. 16-4.1(I)]**

4          **A.    Plaintiffs' Section 2 Claim**

5          Plaintiffs should not be permitted to present their Section 2 claim at trial

6    because, to the extent Plaintiffs have not effectively abandoned the claim, it is

7    superfluous. There are two parts to this argument.

8          *First*, Plaintiffs' Complaint might be read to allege a theory that some

9    combination of Defendants conspired to monopolize a market limited to an alleged

10    "submarket" of out-of-market NFL games. As explained above, Plaintiffs' experts

11    do not define any such submarket and in fact reach conclusions at odds with its

12    existence. *See supra* Part I.B.1. Plaintiffs should not be able to argue theories their

13    own experts have disavowed.

14          *Second*, that leaves Plaintiffs with the theory that the NFL and the NFL Clubs

15    conspired to give the NFL a monopoly in the alleged market for professional football

16    telecasts. That theory would require proof of the same elements as Plaintiffs'

17    Section 1 claim (as well as others). Simply put, there is no universe in which

18    Plaintiffs could succeed on their Section 2 claim if they fail on their Section 1 claim,

19    and no universe in which succeeding on the Section 2 claim could yield a non-

20    duplicative recovery. Instructing the jury on the Section 2 claim thus would serve

21    only to create confusion and inject potential error.

22          Plaintiffs therefore should not be permitted to present these theories at trial.

23                 **1.    Plaintiffs have abandoned the submarket for out-of-market**

24                        **games described in the Complaint.**

25          Plaintiffs cannot present to the jury any theory of antitrust liability premised

26    on the existence of a submarket for "out-of-market" NFL games, as any such theory

27    would be both legally impermissible and inconsistent with Plaintiffs' allegations of

28    a market for all professional football game telecasts. *See* Dkt. No. 441, Compl. ¶ 162

(alleging that Defendants "conspired to give DirecTV a monopoly in the [the alleged OOM submarket], making it the only source for the vast majority of NFL games in any given location.").

Plaintiffs' alleged submarket for "out-of-market" NFL games is legally impermissible. "As the Supreme Court has instructed, '[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Plaintiffs' own economic expert explained that after "assessing possible substitute products through which competition may occur, and identifying the most reasonable narrow set of products containing the reference product that are sufficiently close substitutes," his opinion is that all NFL telecasts "are in *the same relevant market*." Dkt. No. 962-5, Rascher Reply Rep. ¶¶ 110, 112 n.166 (emphasis added); *see also id.* ¶ 117 ([The market for NFL telecasts] "remains the sole Relevant Market I have put forward[.]"); Dkt. No. 962-4, Rascher Rep. ¶ 199 ("On the consumer side, the OOM package stands out as requiring a premium payment that other NFL telecasts do not require. *The substitute products constraining this price are the other telecasts that consumers could view without obtaining the OOM package*." (emphasis added)).

Moreover, submarkets are legally cognizable only where the plaintiff has established "that the alleged submarket is economically distinct from the general product market." *Newcal*, 513 F.3d at 1045. Plaintiffs have made no attempt to adduce evidence, expert or otherwise, that there is a distinct submarket for out-of-market games. To the contrary, Plaintiffs' expert has explicitly disavowed that the alleged OOM submarket is economically distinct from the broader market for all professional football telecasts. As he explained, absent the "Challenged Conduct," any purported OOM submarket would be "fully subsumed within the single broader market and those products [would] simply compet[e] as differentiated goods." Dkt.

No. 962-4, Rascher Rep. ¶ 200 n.295. Plaintiffs' economic experts thus offer the opinion that there is only a relevant antitrust market for professional football telecasts in the United States. *See id.* § 6.1, ¶ 177 (defining only an alleged "relevant market . . . for major league professional football telecasts in the United States, including those of the NFL"); *see supra* Part I.B.1 (collecting additional citations).

Because Plaintiffs' own experts disavow the originally pleaded submarket, there is no basis for presenting any theory that relies on such a market to the jury.

### 2.   Plaintiffs' only potential remaining Section 2 claim overlaps with their Section 1 claim.

As a result, Plaintiffs' only potential Section 2 theory is that the NFL and the NFL Clubs conspired to give the NFL a monopoly in the alleged market for professional football telecasts. But proving that theory would require Plaintiffs to prove *every element of a Section 1 claim*, including an agreement to restrain trade, the unreasonableness of the restraint under the rule of reason, antitrust injury, and damages. This duplication arises because this claim would be based on the same conduct as the Section 1 claim, and the Ninth Circuit has consistently held that failure to prove a Section 1 claim dooms a Section 2 claim based on the same conduct. *See, e.g.*, *Nova Designs*, 202 F.3d at 1092 ("Because [plaintiff's] claim under § 1 fails, its claim of a conspiracy to monopolize under § 2 based on the same conduct necessarily fails as well."). "If, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *Qualcomm*, 969 F.3d at 991. As courts have explained, "proving an antitrust violation under § 2 of the Sherman Act is more exacting than proving a § 1 violation." *E.g.*, *id.* at 992. Therefore, if Plaintiffs were to fail on their Section 1 claim, there would be no basis for a jury to find liability on the Section 2 claim based on the same conduct.

Moreover, if Plaintiffs were to succeed on their Section 1 claim, they would not be able to recover any additional damages by also prevailing on their Section 2

claim, as both claims are based on the same conduct and the same injuries. *See* Dkt. No. 441, Compl. ¶¶ 155–63. It is well-settled that an antitrust plaintiff may not recover more than once for the same injury. As the Supreme Court explained in warning against "the risk of duplicative recovery," allowing "two recoveries based on the very same injuries would be contrary to the basic statutory scheme governing damage actions, for the result would be to subject antitrust defendants to sextuple-damage awards rather than the treble-damage awards that Congress contemplated." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 550 n.7 (1983).

As a result, none of the relief Plaintiffs seek would or could be changed by instructing the jury on their Section 2 claim. Plaintiffs' Section 2 liability claims cannot succeed if their Section 1 claims fail, and asking a jury to consider Section 2 liability if they decline to find Section 1 liability would create unnecessary confusion, add substantial length to the jury instructions, and create the risk of an inconsistent verdict. This Court accordingly should not instruct the jury on Plaintiffs' Section 2 claim.

## B.    Application of the Rule of Reason

Defendants disagree that the Court can or should truncate the full rule of reason analysis and instead apply "quick look" review.

Plaintiffs' argument on this score rests entirely on the Ninth Circuit's statement, *at the motion to dismiss stage*, that the Plaintiffs had pleaded a "naked restriction" similar to those in *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma ("NCAA")*, 468 U.S. 85 (1984). *See Sunday Ticket*, 933 F.3d at 1152. Nothing about that early observation justifies truncating the rule of reason inquiry based on the evidentiary record that has since been developed.

The Supreme Court has limited its application of quick look analysis to "business activities that are so plainly anticompetitive that courts need undertake only

a cursory examination before imposing antitrust liability." *Dagher*, 547 U.S. at 7 n.3; *NCAA*, 468 U.S. at 109 & n.39. Specifically:

> Recognizing the inherent limits on a court's ability to master an entire industry—and aware that there are often hard-to-see efficiencies attendant to complex business arrangements—we take special care not to deploy these condemnatory tools until we have amassed "considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances."

*Alston*, 141 S. Ct. at 2156 (citation omitted).

As a result, "more than a 'quick look' is required" if the challenged restraint "'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition.'" *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 318 (2d Cir. 2008) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999)); *see also Cal. Dental*, 526 U.S. at 778 (declining to apply "quick look" review where "the plausibility of competing claims about the effects of the [challenged restraints] rules out the indulgently abbreviated review"). For example, the Supreme Court did not apply "quick look" review in *Alston*—despite its prior experience with the NCAA in *Board of Regents*.

There would be even less of a basis in this case to conclude that the kinds of arrangements at issue would be invalid in all or almost all instances. For starters, Defendants dispute that the agreements at issue are naked restraints that restrict competition and decrease output. The Ninth Circuit made that observation before the evidentiary record was developed, and at a time when Plaintiffs pleaded a submarket of out-of-market NFL telecasts. Now, the record makes clear that there is at least a jury question as to whether there is a restriction of output in the actual market Plaintiffs have attempted to develop, especially in light of the multiple procompetitive rationales that Defendants have proffered for the challenged conduct. In that broader market for professional football telecasts, the NFL provides many

1    options at many price points (including $0) to watch NFL telecasts, such that NFL

2    telecasts have achieved more output (*i.e.*, more viewership) than any other televised

3    product.

4         More generally, courts have routinely rejected "quick look" analysis in cases

5    involving sports leagues. As the Supreme Court explained in *American Needle*, "[t]he

6    fact that NFL teams share an interest in making the entire league successful and

7    profitable, and that they must cooperate in the production and scheduling of games,

8    provides a perfectly sensible justification for making a host of collective decisions."

9    560 U.S. at 202; *see also id.* at 203 (noting that many such restraints could be upheld

10   "in the twinkling of an eye"). Thus, in *Chicago Professional Sports Limited*

11   *Partnership v. National Basketball Association* ("*Bulls II*"),  the Seventh Circuit held

12   that the NBA's broadcast rules "may not be condemned without analysis under the

13   full Rule of Reason." 95 F.3d 593, 600 (7th Cir. 1996). The Second Circuit reached

14   the same conclusion in a case concerning an agreement among Major League

15   Baseball clubs to jointly license intellectual property rights. *Salvino*, 542 F.3d at 323

16   ("[T]he fact that the MLB Clubs exist as members of a sports league, and [that] their

17   interests are interdependent," "plainly foreclose[s] the imposition of *per se* or quick-

18   look liability."). And the First Circuit reached the same conclusion when considering

19   a challenge to the joint hiring of players by Major League Soccer. *Fraser v. Major*

20   *League Soccer, L.L.C.*, 284 F.3d 47, 55, 58–59 (1st Cir. 2002) (finding "the rejection

21   of the *per se rule*" to be "straightforward" and requiring full rule-of-reason scrutiny

22   where the core product of the league could be created only jointly, as "individual

23   sports teams, after all, must collaborate to produce a product"). There is no reason to

24   treat the NFL any differently.

25        *Board of Regents*—which preceded all these cases—does not suggest

26   otherwise. The challenged agreement in *NCAA* was a direct output limitation,

27   unrelated to any joint licensing agreements and unsupported by potential

28   procompetitive effects. *NCAA*, 468 U.S. at 99, 104–15. Indeed, *NCAA* did not involve

an integrated venture that created, licensed, or distributed a joint venture product. *See id.* at 118 ("[T]here is no single league or tournament in which all college football teams compete."). As Plaintiffs' expert recognizes, the NCAA is not a league; instead, the individual college football conferences are "properly understood to be sports leagues in and of [themselves]." ECF No. 962-4, Rascher Rep. ¶ 37 n.16.

In contrast to *NCAA*, this case "involves an integrated professional sports league in which the competitors are not independent but interdependent, [and] competitive balance among the teams is essential to both the viability of the [Teams] and public interest in the sport." *Salvino*, 542 F.3d at 331–32.

As further contrast, the NCAA—unlike the NFL and other sports leagues, *see id.* at 323–32—was not engaged in either joint production or joint licensing; the association did not "act as a selling agent for any school or for any conference of schools." *NCAA*, 468 U.S. at 113.

Moreover, the fact that the NCAA was not engaged in joint production or licensing meant that it was unable to justify the challenged restraints based on the "procompetitive" effects and "efficiencies" of a "joint selling arrangement." *Id.* Here, by contrast, Defendants have proven that those efficiencies are indisputably implicated by the challenged agreements, and have further offered evidence that no game telecast could be distributed without the consent of both participating teams and the NFL to use their respective trademarks.

Because Defendants have offered evidence that the challenged restraints at issue "'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,'" *Cal. Dental*, 526 U.S. at 771, quick look review is not appropriate here.

## C. Additional Depositions

In October 2023—fourteen months after the close of fact discovery and just four months before trial—Plaintiffs filed a motion to compel four additional 30(b)(1) depositions of NFL employees about the new Sunday Ticket agreements. Defendants

opposed that motion, and incorporate their arguments in the opposition brief. *See* Dkt. No. 1025-1.

But Plaintiffs' position has proved to be even weaker today than it was when they filed their motion. One of Defendants' main arguments against additional 30(b)(1) depositions is that Plaintiffs would have an opportunity to take a 30(b)(6) deposition of the NFL's Chief Media Officer, Brian Rolapp. At the summary judgment hearing, Plaintiffs' counsel represented that the 7 hours they had with Mr. Rolapp would not be enough time to fully explore the issues. That proved to be false. Plaintiffs took that deposition on December 14, 2023, and used *less than 3 hours* of their allotted time. Moreover, much of that time was spent on topics wholly outside the scope of the deposition notice, such as establishing basic facts about the NFL's broadcast system. There also was not—nor has there been—any claim that the witness was not adequately prepared to testify to the topics in the notice. Given that Plaintiffs did not utilize their full time to depose the NFL corporate representative on the new agreements, Plaintiffs cannot credibly claim to need four additional 30(b)(1) depositions (including one of the *same deponent*, Mr. Rolapp) to retread the same ground.

### D.    Injunctive Relief

Defendants oppose any request for injunctive relief and will respond in the event that Plaintiffs submit a proposal for such relief following trial.

## VI.    BIFURCATION OF ISSUES [L.R. 16-4.3]

The NFL Defendants do not believe it is necessary to bifurcate any issues.

## VII.    JURY TRIAL [L.R. 16-4.4]

Plaintiffs and Defendants timely demanded a jury trial. *See* Dkt. No. 441, Compl. at 58; Dkt. No. 442, Answer at 31. To the extent Plaintiffs pursue claims for equitable relief, Defendants respectfully submit that these claims should be tried to the Court, following resolution of Plaintiffs' legal claims by the jury.

## VIII.  ATTORNEYS' FEES [L.R. 16-4.5]

The NFL Defendants understand that Plaintiffs are seeking reasonable attorneys' fees. Dkt. No. 441, Compl. at 57 ¶ 4. Defendants are not seeking attorneys' fees.

## IX.    ABANDONMENT OF ISSUES [L.R. 16-4.6]

To the extent that Plaintiffs once asserted a monopolization claim as opposed to or in addition to a conspiracy to monopolize claim, Defendants understand that Plaintiffs do not intend to pursue an actual monopolization claim and that that claim is abandoned. As explained above, Plaintiffs have also effectively abandoned their claim under Section 2 of the Sherman Act that the NFL Defendants and DirecTV conspired to give DirecTV a monopoly in the alleged submarket for "out-of-market" NFL games played on Sunday afternoon and not broadcast on CBS or FOX within the viewer's local television market. *See* Part V.A.

Defendants do not currently anticipate asserting the following defenses, but reserve the right to assert them if Plaintiffs' case-in-chief so warrants: adequate remedy at law; arbitration; conduct approved by court, arbitral body, or government agency award; rights of non-parties; independent conduct; unclean hands; duplicative recovery; waiver, acquiescence, and estoppel; and all other separate or affirmative defenses that the NFL Defendants may have had against each putative class member.

Dated: January 19, 2024

Respectfully submitted,

/s/ *Beth A. Wilkinson*

Beth A. Wilkinson (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max J. Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Neema T. Sahni (Bar No. 274240)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
nsahni@cov.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*