Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668−PSG (SKx) **PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| THIS DOCUMENT RELATES TO ALL ACTIONS | JUDGE: Hon. Philip S. Gutierrez PRETRIAL CONFERENCE: 2/7/2024 TIME: 2:30 p.m. TRIAL DATE: 2/22/2024 COURTROOM: First Street Courthouse 350 West 1st Street Courtroom 6A Los Angeles, CA 90012 |

# <u>TABLE OF CONTENTS</u>

I.  PLAINTIFFS' CLAIMS ...................................................................................3

    A.  Claim 1: Defendants Entered Into Agreements in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ......................................................................................4

    B.  Claim 2: Defendants Conspired to Monopolize in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) ................................9

II.  DEFENDANTS' DEFENSES..........................................................................11

    A.  Statute of Limitations...........................................................................11

    B.  Laches ....................................................................................................12

    C.  Mitigation of Damages........................................................................13

    D.  Other Defenses .....................................................................................15

        1.  Sports Broadcasting Act .........................................................15

        2.  Procompetitive Benefits .........................................................15

        3.  Indirect Injuries/Standing ......................................................16

        4.  Enrichment/No Injury .............................................................16

        5.  Speculative Damages...............................................................17

        6.  Core Activities of a Legitimate Venture ...............................18

        7.  Ancillary Restraints ................................................................18

III.  THIRD PARTY CLAIMS ...............................................................................19

IV.  ANTICIPATED EVIDENTIARY ISSUES.....................................................20

    A.  Pending Evidentiary Disputes.............................................................20

    B.  Manner of Playing Deposition Videos................................................20

    C.  Disclosure of Exhibits for Cross Examination ..................................22

V.  ANTICIPATED ISSUES OF LAW ................................................................24

    A.  Applicability of the Sports Broadcasting Act and Single Entity Doctrine......................................................................................24

    B.  Leave to Conduct Additional Depositions..........................................24

    C.  Applicability of the "Quick Look" Form of the Rule of Reason..................................................................................................24

i

     D.     Whether to Grant Injunctive Relief ........................................................... 26

     E.     Plaintiffs' Section 2 Claim ........................................................................ 26

VI.   BIFURCATION OF ISSUES ................................................................................ 27

VII.  JURY TRIAL ........................................................................................................ 27

VIII. ATTORNEYS' FEES ........................................................................................... 27

IX.   ABANDONMENT OF ISSUES ........................................................................... 28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABC Distributing, Inc. v. Living Essentials LLC*,
  2017 WL 3838443 (N.D. Cal. Sept. 1, 2017) ......................................................... 17

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
  537 F. Supp. 3d 273 (N.D.N.Y. 2021) ................................................................... 17

*Avaya Inc. v. Telecom Labs, Inc.*,
  2016 WL 10590071 (D.N.J. Sept. 15, 2016) ......................................................... 27

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) ................................................................................... 19

*Cal. Dental Ass'n v. Fed. Trade Comm'n*,
  526 U.S. 756 (1999) ................................................................................................ 25

*Costco Wholesale Corp. v. AU Optronics Corp.*,
  2014 WL 4674390 (W.D. Wash. Sept. 17, 2014) .................................................. 17

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) .................................................................................. 13

*Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*,
  556 F. Supp. 3d 1156 (D. Ore. 2021) ..................................................................... 27

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ..................................................................... 5, 6, 15, 25

*Fed. Trade Comm'n v. Actavis, Inc.*,
  570 U.S. 136 (2013) ................................................................................................ 26

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ................................................................................................ 16

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*,
  136 F.3d 1354 (9th Cir. 1998) ................................................................................ 27

*In re ATM Fee Antitrust Litig.*,
  554 F. Supp. 2d 1003 (N.D. Cal. 2008) ................................................................. 25

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 6216664 (N.D. Cal. Oct. 25, 2016) ....................................................... 14

*In re Cotton Yarn Antitrust Litig.*,
  505 F.3d 274 (4th Cir. 2007) .................................................................................. 12

ii

*In re Glumetza Antitrust Litig.,*
    336 F.R.D. 468 (N.D. Cal. 2020) ........................................................................ 16

*In re Glumetza Antitrust Litig.,*
    611 F. Supp. 3d 848 (N.D. Cal. 2020) ............................................................... 11

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.,*
    933 F.3d 1136 (9th Cir. 2019) ..................................................................... *passim*

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.,*
    622 F. Supp. 3d 22 (E.D. Pa. 2022) .................................................................. 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    2012 WL 6000154 (N.D. Cal. Nov. 30, 2012) .................................................. 14

*In re Zetia (Ezetimibe) Antitrust Litig.,*
    2023 WL 4156858 (E.D. Va. Apr. 5, 2023) ...................................................... 20

*Klein v. Facebook, Inc.,*
    580 F. Supp. 3d 743 (N.D. Cal. 2022) ......................................................... 12, 13

*Law v. Nat'l Collegiate Athletic Ass'n,*
    134 F. 3d 1010 (10th Cir. 1998) ...................................................................... 25

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) ............................................................................. 18

*Mayor of Baltimore v. Actelion Pharms. Ltd.,*
    995 F.3d 123 (4th Cir. 2021) ............................................................................ 11

*Microspheriz LLC v. Merck Sharp & Dohme Corp.,*
    2023 WL 6613306 (D.N.J. Oct. 5, 2023) ......................................................... 23

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,*
    468 U.S. 85 (1984) ...................................................................................... *passim*

*NCAA v. Alston,*
    141 S. Ct. 2141 (2021) ............................................................................... 15, 25

*Oliver v. SD-3C, LLC,*
    751 F.3d 1081 (9th Cir. 2014) ..................................................................... 11, 13

*Royal Printing Co. v. Kimberly Clark Corp.,*
    621 F.2d 323 (9th Cir. 1980) ............................................................................ 17

*Samsung Elecs. Co. v. Panasonic Corp.,*
    747 F.3d 1199 (9th Cir. 2014) ..................................................................... 11, 12

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.,*
    2017 WL 525668 (D. Del. Feb. 8, 2017) ......................................................... 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Statutes**

Clayton Act, 15 U.S.C. § 26 ...................................................................... 8, 11, 26, 27

Sherman Act ................................................................................................ 18, 19

Sherman Act, 15 U.S.C. § 1 ....................................................................... 4, 24, 27

Sherman Act, 15 U.S.C. § 2 ........................................................................... 4, 9

Sherman Act, 15 U.S.C. § 15 ....................................................................... 11, 27

Sports Broadcasting Act, 15 U.S.C. § 1291 ................................................ 15, 18, 24

**Rules**

Fed. R. Civ. P. 23(b)(2) ...................................................................................... 3

Fed. R. Civ. P. 23(b)(3) ...................................................................................... 3

Fed. R. Evid. 611(c) .......................................................................................... 23

L.R. 16-4 ...................................................................................................... 3, 15

L.R. 16-6.1 ....................................................................................................... 20

L.R. 32-1 ......................................................................................................... 20

Pursuant to Civil Local Rule 16-4 and the Court's Standing Orders, Class Plaintiffs submit the following Memorandum of Contentions of Fact and Law. As required by L.R. 16-4, this Memorandum provides a "brief description of the key evidence in support of each of the claims" asserted and does not purport to exhaust or address every fact Plaintiffs may seek to establish at trial or every point of law on which Plaintiffs may rely. Plaintiffs reserve the right to amend or supplement this Memorandum and to supplement the evidence referenced below with additional evidence at trial.

## I.      PLAINTIFFS' CLAIMS

Plaintiffs bring claims against Defendants based on their efforts to restrict competition in the distribution of NFL telecasts, including the illegal restriction of output of NFL telecasts and in fixing, raising, maintaining, or stabilizing prices for NFL telecasts. The Court certified damages and injunctive classes of commercial and residential subscribers of NFL Sunday Ticket under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). *See* Dkt. No. 894 (Order Denying All Motions to Exclude, Granting Plaintiffs' Motion for Class Certification, and Denying Defendants' Motion for Sanctions). The certified classes are:

**Commercial Class:** All DirecTV commercial subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the date of the Court's class certification order ("Commercial Class"). The Commercial Class excludes the Defendants and any of their current or former parents, subsidiaries, or affiliates. The Commercial Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

**Residential Class:** All DirecTV residential subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the date of the Court's class certification order

("Residential Class"). The Residential Class excludes the Defendants and any of their current or former parents, subsidiaries, or affiliates. The Commercial Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action. Plaintiffs are asserting two causes of action for violations of Sections 1 and 2 of the Sherman Act. All claims are being pursued on behalf of both classes certified by the Court. Plaintiffs submit that both claims should be submitted to the jury.

### A.    Claim 1: Defendants Entered Into Agreements in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

Summary: Defendants agreed to restrain competition in the licensing and distribution of live video presentations of NFL games with the purpose, intent, and effect of restraining trade and commerce, restricting output, and fixing, raising, maintaining, or stabilizing prices.

Elements: The elements required to establish a violation of Section 1 of the Sherman Act are as follows:

> (1)    the existence of a contract, combination, or conspiracy between or among at least two separate entities;
>
> (2)    that the contract, combination, or conspiracy unreasonably restrains trade;
>
> (3)    that the restraint affects interstate or foreign commerce; and
>
> (4)    that the restraint caused plaintiff to suffer an injury to its business or property.[1]

As to the second element—whether the challenged restraints are unreasonable—the rule of reason applies. The rule of reason involves a multi-step

---

[1] American Bar Association Antitrust Section, Model Jury Instructions in Civil Antitrust Cases (A.B.A. 2016) § 1.A.1; *see also* Ninth Circuit Manual of Model Civil Jury Instructions § 14 (2017) (referring to ABA Antitrust Section Model Jury Instructions); *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig.* ("*Sunday Ticket*"), 933 F.3d 1136, 1150 (9th Cir. 2019).

4

framework that involves shifting evidentiary burdens. The Ninth Circuit's most recent exposition on the rule of reason was last year in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023).

The first step of the rule of reason analysis requires the plaintiff to prove that the challenged restraint "has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* at 983. That proof can be done either directly or indirectly. *See id.* Direct proof of anticompetitive harm includes proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market. *Id.* Indirect proof can be shown by proof that the Defendants have market power combined with "some evidence that the challenged restraint harms competition." *Id.* (quotations omitted). "This inquiry need not always be extensive or highly technical. It is sufficient that the plaintiff prove the defendant's conduct, as matter of economic theory, harms competition[.]" *Id.* at 983-84.

"If a plaintiff establishes at step one that the defendant's restraints impose substantial anticompetitive effects, then the burden shifts back to the defendant to show a procompetitive rationale for the restraints." *Id.* at 985-86 (quotations and alterations omitted). The Supreme Court has characterized this as a "heavy burden" where a naked restraint on competition exists. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.* ("*NCAA*"), 468 U.S. 85, 113 (1984). A procompetitive rationale is a (1) nonpretextual claim that the defendant's conduct is (2) indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal. *See Epic Games*, 67 F.4th at 986. Establishing a procompetitive rationale is the Defendants' burden and the magnitude of procompetitive benefits proven by the Defendants, if any, has implications for the rest of the rule of reason analysis. *See id.* ("Because the NCAA's amateurism-as-consumer-appeal rationale was nebulously defined and

weakly substantiated, the plaintiffs had more flexibility at step three to fashion less restrictive alternatives.").

Assuming a defendant offers sufficient proof of a procompetitive rationale, an antitrust plaintiff may succeed on their claim in one of two ways. The first is that a plaintiff may "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 990 (quotations omitted). Such a less restrictive alternative must be substantially less restrictive such that it would serve the procompetitive purposes without significantly increased cost. *Id.*

Even where a plaintiff cannot fully satisfy their burden in proving less restrictive alternatives, however, "the district court must proceed to step four and balance the restriction's anticompetitive harms against its procompetitive benefits." *Id.* at 993-94. Thus, a plaintiff may still succeed on a rule of reason claim even without proof of a less restrictive alternative. To the extent Defendants' recitation of the rule of reason ignores this final balancing step, it is incomplete.

As described more fully below, Plaintiffs contend that the "quick look" form of the rule of reason is applicable here. Under that framework, Plaintiffs are presumed to have satisfied step one of the analysis and are not required, to the extent it was necessary at all, to prove a relevant market.

Key Evidence:

Plaintiffs intend to introduce documentary and testimonial evidence demonstrating the NFL's model for presenting live broadcasts of NFL games, including preseason, regular season, and post-season games. Such evidence will show the NFL presents games on television in prime-time spots throughout the week and on Sunday afternoons. The evidence will also show that regular season games on Sunday afternoons are shown on CBS or FOX in a regionalized manner that creates a distinction between "in-market" and "out-of-market" games. The only way to view live out-of-market games in their entirety is through the purchase of a

package called NFL Sunday Ticket, which for the entirety of the class period was licensed exclusively to DirecTV.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating the NFL Defendants entered into an array of three interrelated agreements intended to restrict competition, reduce access, and fix, raise, maintain, or stabilize prices for out-of-market games. The first is an agreement between and among all of the teams to eliminate competition in the sale of telecasting rights by pooling their telecasting rights and granting to the NFL the right to enter into agreements as their agent with the broadcast networks and other providers of game telecasts, including pay TV providers. As part and parcel of the agreement to eliminate competition between them, the teams also agreed that all of the revenue derived from those telecasts will be divided equally among the teams. Moreover, the evidence will show that "it is possible for independent entities—*i.e.* individual sports teams—to license telecast rights on their own without pooling their rights." Dkt. No. 1155 at 24. The second are agreements between the NFL and broadcast networks CBS and FOX for Sunday afternoon broadcasts that include restrictions on the distribution of out-of-market games carried on paid television. The third are agreements between the NFL and DirecTV for the Sunday Ticket package that has granted, among other things, exclusive rights to DirecTV to distribute Sunday Ticket.

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that the agreements described above harmed competition—and to a far greater degree than any alleged procompetitive benefits. Among other things, the agreements restricted output, reduced consumer choice, and fixed, raised, maintained, or stabilized prices, especially for the viewing of live out-of-market game broadcasts. Such evidence will demonstrate, for example, that the challenged restraints reduced viewership of out-of-market NFL games and increased the price of Sunday Ticket above

competitive levels. To the extent necessary, Plaintiffs' evidence will also demonstrate that a market exists for major league professional football telecasts in the United States.

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, rebutting the alleged procompetitive benefits claimed by the NFL Defendants as a justification for the challenged restraints. In addition, the evidence offered by Plaintiffs will demonstrate the existence of substantially less restrictive alternatives that would accomplish those same alleged benefits. Plaintiffs' evidence shall further demonstrate that the anticompetitive harm outweighs any procompetitive benefits that may result from the challenged restraints.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating that the Defendants' agreements affected interstate commerce. The challenged restraints are nationwide in scope and the relevant geographic market is the United States.

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that Plaintiffs suffered injury or damage to their business or property as a result of Defendants' conduct. Plaintiffs will show that they were overcharged for the NFL Sunday Ticket product because of Defendants' conduct and, as a result, are entitled to monetary damages of up to $7.01 billion before mandatory trebling.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating that the challenged restraints are ongoing (and would be reasonably likely to recur even if discontinued) and, as a result, warrant permanent injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26).

**B.    Claim 2: Defendants Conspired to Monopolize in Violation of
Section 2 of the Sherman Act (15 U.S.C. § 2)**

<u>Summary:</u> Defendants entered into agreements that were intended to obtain or maintain monopoly power with the effect of restraining trade and commerce, restricting output, and fixing, raising, maintaining, or stabilizing prices.

<u>Elements:</u> The elements required to establish a violation of Section 2 of the Sherman Act for a conspiracy to monopolize are as follows:

(1)    two or more persons knowingly enter into an agreement or mutual understanding between two or more persons to obtain or maintain monopoly power in a relevant market;

(2)    defendant specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in the relevant market;

(3)    defendant committed an overt act in furtherance of the conspiracy;

(4)    defendant's activities occurred in or affected interstate or foreign commerce; and

(5)    plaintiff was injured in its business or property because of the conspiracy to monopolize.[2]

<u>Key Evidence:</u>

Plaintiffs intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that a market exists for major league professional football telecasts in the United States.

---

[2] American Bar Association Antitrust Section, Model Jury Instructions in Civil Antitrust Cases (A.B.A. 2016) § 3.E.1; *see also* Ninth Circuit Manual of Model Civil Jury Instructions § 14 (2017) (referring to ABA Antitrust Section Model Jury Instructions); *Sunday Ticket*, 933 F.3d at 1159.

9

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that the defendants knowingly entered into agreements to obtain or maintain monopoly power in the market for major league professional football telecasts in the United States, and those agreements were entered into with the specific intent of obtaining or maintaining monopoly power in that market. For example, the agreement amongst the NFL's teams and the NFL eliminated all competition among the NFL's teams in licensing regular season game broadcasts and created a monopoly in the NFL in selling those rights. Moreover, the agreement between the NFL and DirecTV vested exclusive distribution rights for the NFL Sunday Ticket package in DirecTV.

The Defendants improperly assert that Plaintiffs have abandoned the existence of a submarket of out-of-market games. While Plaintiffs' principal theory for liability rests on the larger market for professional football telecasts in the United States, the Defendants' conduct effectively treats out-of-market broadcasts as a differentiated good. That submarket is an artifact of the Defendants' illegal conduct as was explained by Plaintiffs' expert Dan Rascher.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating that the Defendants' agreements occurred in or affected interstate commerce. The agreements are nationwide in scope and the relevant geographic market is the United States.

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that Plaintiffs suffered injury or damage to their business or property as a result of Defendants' conduct. Plaintiffs will show that they were overcharged for the NFL Sunday Ticket product because of Defendants' conduct and, as a result, are entitled to monetary damages of up to $7.01 billion.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating that the challenged restraints are ongoing and, as a result, warrant

1   permanent injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. §
2   26).

3   **II.    DEFENDANTS' DEFENSES**

4       **A.    Statute of Limitations**

5       <u>Summary:</u> Defendants claim that Plaintiffs' claims are limited by the four-
6   year statute of limitations found in 15 U.S.C. § 15b. To the extent Defendants are
7   arguing that Plaintiffs' claims are barred in their entirety by the statute of
8   limitations, that argument is without merit. At most, the statute of limitations limits
9   the amount of damages that Plaintiffs may recover in this action.

10       <u>Elements:</u> "The governing statute, 15 U.S.C. § 15b, sets a four year statute of
11   limitations on private antitrust actions." *Samsung Elecs. Co. v. Panasonic Corp.*,
12   747 F.3d 1199, 1202 (9th Cir. 2014). "But an exception to this time limit exists for
13   continuing violations." *Id.* "To state a continuing violation of the antitrust laws in
14   the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act
15   during the limitations period that meets two criteria: 1) it must be a new and
16   independent act that is not merely a reaffirmation of a previous act; and 2) it must
17   inflect new and accumulating injury on the plaintiff." *Id.* (quotation marks omitted).

18       Courts throughout the country have consistently concluded "that continued
19   overcharges constitute a continuing violation." *In re Glumetza Antitrust Litig.*, 611
20   F. Supp. 3d 848, 861 (N.D. Cal. 2020) (collecting cases). As a result, "each new
21   sale" of an overpriced product subject to an illegal antitrust conspiracy triggers the
22   statute of limitations anew for that act. *Id.*; *see also Oliver v. SD-3C, LLC*, 751 F.3d
23   1081, 1086 (9th Cir. 2014) (stating that numerous courts "have recognized that each
24   time a defendant sells its price-fixed product, the sale constitutes a new overt act
25   causing injury to the purchaser and the statute of limitations runs from the date of
26   the act"); *Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 132 (4th Cir.
27   2021) ("Virtually every court faced with similar allegations has held, citing the
28   continuing-violation doctrine, that a new cause of action accrues to purchasers upon

each overpriced sale of the drug.") (quotation marks omitted); *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 291 (4th Cir. 2007) (holding that "each sale to the plaintiff[] starts the statutory period running again"). Thus, a continuing violation occurred every time Plaintiffs paid for the Sunday Ticket product.

Moreover, a continuing violation can occur each time Defendants enter into new agreements that renew elements of the alleged conspiracy. *See Samsung*, 747 F.3d 1199, 1203-04 (holding that creation of a second license was a new and independent act restarting the statute of limitations for a claim that the original license was anticompetitive); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 797 (N.D. Cal. 2022) ("Facebook's argument ignores the Ninth Circuit's clear guidance that, if a defendant commits the same anticompetitive act multiple times, each new act restarts the statute of limitations for *all* the acts.") (emphasis in original). Therefore, each time the NFL Defendants entered into a new agreement with CBS, Fox, or DIRECTV, a continuing violation occurs that covers *all* of the challenged restraints.

Key Evidence:

Plaintiffs intend to produce evidence demonstrating that Plaintiffs purchased a Sunday Ticket package one or more times within the limitations period. Each sale of Sunday Ticket constituted a continuing violation.

Plaintiffs further intend to produce evidence demonstrating that the NFL entered into media rights agreements impacting Sunday Ticket with CBS, Fox, or DirecTV within the limitations period. Each new agreement constituted a continuing violation.

Plaintiffs do not seek damages pre-dating the limitations period for the classes certified by the Court.

**B.    Laches**

Summary: Defendants assert that Plaintiffs' claims for equitable relief are barred, at least in part, by the doctrine of laches.

Elements: "Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights." *Klein*, 580 F. Supp. 3d at 804-05 (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002)). The Defendants bear the burden of establishing a laches defense. To invoke a laches defense, the Defendants must show that:

    (1)    Plaintiffs knew (or should have known) of the allegedly unlawful conduct yet delayed the initiation of the lawsuit;

    (2)    the delay was unreasonable; and

    (3)    prejudice to the Defendants.

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001). In applying laches in an antitrust case, the Ninth Circuit has instructed that the same rules that animate the Sherman Act's statute of limitations—including the continuing violation doctrine—are applicable. *Oliver*, 751 F.3d at 1086. If a plaintiff's claims are timely under those principles, the "strong presumption is that laches is inapplicable." *Klein*, 580 F. Supp. 3d at 805 (quotation marks omitted).

Key Evidence: The same evidence that will be used to establish a continuing violation for purposes of the statute of limitations is also applicable to Defendants' laches defense, namely: (a) evidence establishing that Plaintiffs purchased Sunday Ticket during the limitations period; and (b) Defendants entered into new agreements with CBS, Fox, or DirecTV during the limitations period.

### C.   Mitigation of Damages

Summary: Defendants assert that Plaintiffs' damages should be reduced to the extent Plaintiffs could have mitigated the harm arising from Defendants' conduct through reasonable care and prudence.

Elements: Defendants bear the burden of proving that Plaintiffs failed to mitigate damages. The elements of a mitigation defense are:

(1)    Plaintiffs acted unreasonably in failing to take specific steps to minimize or limits their losses;

(2)    that the failure to take those specific steps resulted in their losses being greater than they would have been had they taken such steps; and

(3)    the amount by which Plaintiffs' loss would have been reduced had Plaintiffs taken those steps.

Mitigation is not a valid defense in this case. *See In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 6216664, at *11 (N.D. Cal. Oct. 25, 2016) ("[T]he law does not require mitigation in a price-fixing conspiracy case."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6000154, at *3 (N.D. Cal. Nov. 30, 2012) ("While an antirust plaintiff alleging a refusal to deal or vertical price-fixing could reasonably be expected to mitigate damages by finding another supplier, a victim of horizontal price-fixing does not have this option."). The evidence will show that Defendants fixed, raised, maintained, or stabilized prices for the Sunday Ticket product. Moreover, as the Ninth Circuit recognized in this case, "price-fixing conspiracies are functionally indistinguishable from output-restricting conspiracies." *Sunday Ticket*, 933 F.3d at 1158.

Evidence:

Plaintiffs intend to offer documentary and testimonial evidence demonstrating that Defendants engaged in conduct that fixed, raised, maintained, or stabilized prices.

Plaintiffs further intend to offer documentary and testimonial evidence demonstrating that the only provider of professional football telecasts is the National Football League and the exclusive distributor of out-of-market telecasts is DirecTV. As a result, Plaintiffs had no other supplier for the good that they purchased.

### D.    Other Defenses

Despite the fact that none of them are "affirmative defenses" as outlined in L.R. 16-4.1, Defendants raise several "other defenses" that Plaintiffs briefly address below.

#### 1.    Sports Broadcasting Act

Defendants claim that their broadcast agreements with over-the-air networks cannot form the basis for any claim for relief under the Sports Broadcasting Act ("SBA"), 15 U.S.C. § 1291. However, as the Court recognized in denying the Defendants' motion for summary judgment, the SBA is a narrow exemption to the antitrust laws. *See* Dkt. No. 1155 at 17-18. The SBA does not exempt contracts that implicate paid television services such as cable or satellite. *See In Sunday Ticket*, 933 F.3d at 1148. As the Court recently held on this very issue, the network agreements are not immunized to the extent they include provisions that restrict competition for paid telecasts such as those provided through Sunday Ticket. To hold otherwise would "circumvent the statutory confines, nullify the statutory scheme, . . . and allow the exception to swallow the rule." Dkt. No. 1155 at 18.

#### 2.    Procompetitive Benefits

To the extent Defendants suggest that they do not carry the burden of proving that the challenged restraints have procompetitive benefits, that argument is wrong and contradicted by binding precedent. Indeed, the Court has already recognized that it is the Defendants—not the Plaintiffs—that carry the burden to show that the challenged restraints have a procompetitive rationale. The Ninth Circuit clearly laid out that Defendants carry this evidentiary burden at the second step of the rule of reason analysis less than a year ago: "If a plaintiff establishes at step one that the defendant's restraints impose substantial anticompetitive effects, ***then the burden shifts back to the defendant*** to show a procompetitive rationale for the restraints." *Epic Games*, 67 F.4th at 985-86 (quotation marks omitted); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021). In denying the Defendants' motion for

summary judgment, the Court also recognized that procompetitive rationales are the Defendants' burden to carry. Dkt. No. 1155 at 18-19 ("[I]t is Defendants' burden to establish a procompetitive rationale."). The rule of reason places a "heavy burden of establishing an affirmative defense which competitively justifies [the Defendants' conduct] from the operations of a free market." *NCAA*, 468 U.S. at 113.

### 3.     Indirect Injuries/Standing

Defendants next assert two "defenses" that are effectively the same related to antitrust standing. Defendants repeat their prior arguments that Plaintiffs are indirect purchasers that lack standing under the principles set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). As both the Ninth Circuit and this Court have recognized in this case, however, Plaintiffs have standing to the extent that DirecTV was a member of the alleged conspiracy. *See Sunday Ticket*, 933 F.3d at 1156-58; Dkt. No. 1155 at 11-12 ("A reasonable trier of fact could find that these interlocking provisions show DirecTV was aware and participating in the overall scheme to limit output of paid telecasts.").

### 4.     Enrichment/No Injury

Defendants have not stated the supposed "benefit" that Plaintiffs received that provide the basis for this "defense." To the extent Defendants are claiming that the "benefit" Plaintiffs received was the product they paid an inflated price for—the Sunday Ticket product—then Defendants ignore that an overcharge is a well-recognized form of antitrust injury. *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 481 (N.D. Cal. 2020) ("[A]ntitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset.") (quotation marks omitted).

To the extent that Defendants are referring to any benefit received by commercial class members in using Sunday Ticket to market themselves to potential patrons, that is irrelevant. Courts have consistently held that an antitrust

16

plaintiff can recover the full measure of their damages even if an overcharge is passed on to the plaintiffs' customers. *See, e.g.*, *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980); *Costco Wholesale Corp. v. AU Optronics Corp.*, 2014 WL 4674390, at *3 (W.D. Wash. Sept. 17, 2014) (stating "there is no need to consider burdening the jury with otherwise irrelevant pass-through evidence"). Indeed, the Court has already recognized that the NFL Defendants "are not asserting a pass-through defense." Dkt. No. 472 at 2. These issues are addressed in part in Plaintiffs' pending Motion *in Limine* No. 2 to Exclude Improper Evidence and Argument Regarding the Relief Sought by Plaintiffs. *See* Dkt. No. 1102-1 at 4-6.

### 5.    Speculative Damages

As the Court previously recognized in denying the Defendants' prior motions to exclude the opinions of Plaintiffs' experts, Plaintiffs' damages calculations are not speculative or the result of guesswork. *See* Dkt. No. 894 at 13-14 (stating that the exclusion motions were primarily a dispute over whether Plaintiffs' damages models were products of mere speculation or grounded in accepted methodologies and holding that "Plaintiffs here have reached the admissibility first down with their experts").

It is a well-recognized rule that antitrust plaintiffs are excused from an unduly rigorous standard of proving antitrust injury and benefit from a "relaxed standard [of] proof of antitrust injury." *ABC Distributing, Inc. v. Living Essentials LLC*, 2017 WL 3838443 (N.D. Cal. Sept. 1, 2017). As several courts have recognized, this is to ensure that a defendant—once a plaintiff has shown competitive injury—cannot benefit from the uncertainty that its own wrongdoing has created. *See id.*; *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 335 (N.D.N.Y. 2021) ("The actual amount of an antitrust plaintiff's damages need not be proven to the same degree of certainty as proving some quantum of damages given the difficulty (and, at times, impossibility) of accurately constructing a

hypothetical world untainted by the defendant's challenged conduct.") (quotations and alterations omitted); *LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) ("Once a jury has found that the unlawful activity caused the antitrust injury, the damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork."); *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 66 (E.D. Pa. 2022) ("[I]n constructing a hypothetical world free of defendants' exclusionary activities, the plaintiffs are given some latitude in calculating damages, so long as their theory is not wholly speculative.") (quotations and alterations omitted).

Plaintiffs present models from their experts that are based on methodologies recognized by antitrust authorities for determining damages.

### 6.    Core Activities of a Legitimate Venture

Defendants re-assert their prior failed attempts to claim that they are a single entity incapable of conspiring with itself for purposes of the Sherman Act. *See Sunday Ticket*, 933 F.3d at 1153 ("We disagree. Defendants have failed to identify, and we are unaware of, any binding precedent requiring the teams and the NFL to cooperate in order to produce the telecasts."); Dkt. No. 1155 at 23-27 (holding that "the evidence shows it is possible for the member clubs to act individually to produce telecasts"). The NFL's own history confirms that teams are capable of licensing game telecasts on their own. Moreover, as the Court recognized, the Defendants' claim of being a single entity contradicts the NFL's arguments regarding the applicability of the SBA. *See* Dkt. No. 1155 at 25 n. 15.

### 7.    Ancillary Restraints

Defendants' invocation of the "ancillary restraints" doctrine is nothing more than disguising their prior—and, to date, rejected twice—argument that the challenged restraints are the core activities of a joint venture in different clothing. Instead of claiming the challenged restraints go to a "core activity" of a joint

venture, they are instead "ancillary" to whatever joint venture may exist. But the ancillary restraints doctrine is inapplicable to this case.

The ancillary restraints doctrine is used to determine whether a particular restraint among horizontal competitors is *per se* illegal under the Sherman Act or whether some form of the rule of reason must be used to analyze the restraint's effects on the marketplace. *See Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021) ("Under the ancillary restraints doctrine, a horizontal agreement is exempt from the *per se* rule and analyzed under the rule-of-reason, if it meets two requirements.") (quotations omitted). Plaintiffs, however, have never pursued this case as a *per se* violation of the Sherman Act and have consistently based their claims on a variation of the rule of reason.

To the extent the Defendants are claiming that an ancillary restraint can never be a naked restraint for purposes of applying the "quick look" form of the rule of reason, Plaintiffs disagree. The Supreme Court previously held that the NCAA's restrictions on television broadcasts of college football games were a naked restraint and applied the quick look framework. *See NCAA*, 468 U.S. 85 at 110 ("This naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis."). And the Ninth Circuit has already stated that the restraints in this case "constitute a 'naked restriction' on the number of telecasts available for broadcasters and consumers." *Sunday Ticket*, 933 F.3d at 1152 (citing *NCAA*, 468 U.S. at 109).

## III.   THIRD PARTY CLAIMS

This case does not involve claims by third parties. Plaintiffs have also asserted the claims above against DirecTV Holdings LLC and DirecTV, LLC (the "DirecTV Defendants"). On April 20, 2021, the Court granted the DirecTV Defendants' motion to compel arbitration and to stay further proceedings as to them. While those claims are stayed, the DirecTV Defendants have not been dismissed from this action.

## IV.   ANTICIPATED EVIDENTIARY ISSUES

### A.   Pending Evidentiary Disputes

The parties have filed motions in limine raising evidentiary issues. *See* Dkt. Nos. 1101-03, 1106, 1108, 1112-14, 1118, 1122, 1126. Plaintiffs incorporate the arguments set forth in their motions in limine and in their oppositions to Defendants' motions in limine.

The parties have also exchanged objections to their respective trial exhibits. The grounds for objections are set forth in the parties' joint exhibit list, filed under separate cover as required by Local Rule 16-6.1 and the Court's civil trial order. Plaintiffs incorporate their objections to Defendants' proposed trial exhibits as set forth on the parties' joint exhibit list.

The parties are in the process of exchanging deposition designations and objections. To the extent any objections are made to deposition designations, they will be provided to the Court at the time designations are required to be lodged as required by Local Rule 32-1.

### B.   Manner of Playing Deposition Videos

In addition to the issues described above, the parties disagree regarding the manner of playing deposition videos at trial. Where both sides intend to offer deposition testimony of a witness, Plaintiffs' position is that each party's affirmative deposition designations (together with proper designations made by the opposing party for optional completeness) should be played separately during each party's case in chief. Defendants, however, argue that the videos should be played as a single video *during Plaintiffs' case in chief*. "[B]asic fairness in the presentation of evidence forecloses Defendants from playing affirmative deposition designations in the [Plaintiffs'] case-in-chief." *In re Zetia (Ezetimibe) Antitrust Litig.*, 2023 WL 4156858, at *3 (E.D. Va. Apr. 5, 2023) (granting plaintiffs' motion in limine to preclude defendants' affirmative deposition designations from being played in plaintiffs' case-in-chief).

Defendants seek to take advantage of the asymmetric availability of witnesses. Outside of the class representatives, who have no personal knowledge of the defendants' conduct, the key fact witnesses in this case are NFL witnesses or those aligned with the NFL as its business partners (such as DirecTV, CBS, and Fox). For example, the NFL has indicated that Sean McManus—the president of CBS Sports and who resides outside of subpoena range for Plaintiffs—may appear live in the NFL's case in chief. The result of this asymmetry is that Plaintiffs are relegated to presenting their case almost entirely (other than class representatives and experts) through deposition testimony. Because significant witnesses that Plaintiffs will present by deposition are under Defendants' control, it is unfair to allow them to take advantage of this asymmetry to compromise presentation of Plaintiffs' case.

Because Plaintiffs are relegated to playing deposition videos (which Plaintiffs intend to edit to be short and to the point for the benefit of the jury), the Defendants should not be permitted to dilute and distract from Plaintiffs' presentation by adding testimony Defendants seek to have presented during Plaintiffs' case in chief.

Requiring a single video to be played will only compound jury confusion and boredom. When a single video is played, there is nothing to indicate what specific testimony is being offered by which side. As a result, the jury is left without a clear understanding of what testimony is being offered by Plaintiffs and which is offered by Defendants. While this may require showing two videos of the same witness, it will aid the factfinder by having a clear understanding of what testimony from that witness was put forth by which party. That distinction is obviously clear with a live witness in light of the differences between direct and cross examination. But that distinction is lost in a deposition video, especially where, unlike at trial, deposition designations might include questions posed by the opposing party's counsel.

In addition to confusing the jury, a single deposition video risks boring the jury by increasing the length of a particular deposition video. This may prejudice Plaintiffs by causing the jury—with the video being played during Plaintiffs' case in chief—to think that Plaintiffs are wasting their time.

There is also no risk of prejudice in playing separate videos in each side's case in chief. While there may be circumstances where a live witness should only be called to testify once during trial for the convenience of the witness, that is *not* an issue with deposition videos. There is no live witness whose schedule must be accommodated when their deposition video is being played. And Defendants will still be able to play the testimony they seek to introduce for the same amount of time during their case in chief.

### C.   Disclosure of Exhibits for Cross Examination

While the parties have agreed on a timeline to disclose witnesses and exhibits on direct examination during trial, the parties disagree regarding the necessity of disclosing exhibits intended for cross examination in advance. Plaintiffs' position is that no exhibits intended for cross examination—whether for impeachment or otherwise—should be disclosed in advance. Defendants argue that exhibits on cross-examination should be disclosed in advance except for those intended only to be used for impeachment.

Trial is an adversarial process and there is nothing more adversarial at trial than cross examination. But again, the NFL Defendants are seeking to take advantage of the asymmetric availability of witnesses. Most of the live witnesses offered by Plaintiffs are class representatives (who have little direct knowledge of the Defendants' conduct) and experts (for whom the NFL already knows what will be discussed during direct examination as a result of Plaintiffs' expert disclosures). The key fact witnesses appearing live are those associated with the NFL or its business partners. As a result, the NFL has little to lose through advance disclosure

of cross exhibits and everything to gain by gaining access to Plaintiffs' exhibits on cross examination in advance.

There are also practical reasons against advance disclosure of cross examination exhibits. While any counsel preparing for cross examination will have some idea which lines of questioning they intend to pursue, the reality is that plans change in light of the direct examination that was actually offered immediately prior to cross examination. Thus, it is not practical to expect to know every exhibit that may be used in a cross examination in advance.

There is no rule that requires the advance disclosure of any exhibits, especially those intended for cross examination, at trial. Moreover, courts regularly exempt from advance disclosure exhibits intended for use on cross examination— including exhibits intended to be offered for their substance. *See, e.g.*, *Microspheriz LLC v. Merck Sharp & Dohme Corp.*, 2023 WL 6613306, at *14 (D.N.J. Oct. 5, 2023) ("The advanced notification provision for exhibits does not apply to exhibits to be used during cross-examination, whether for impeachment ***or to be offered into evidence***.") (emphasis added); *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 2017 WL 525668, at *2 (D. Del. Feb. 8, 2017) (adopting proposal "that specific exhibits to be used for cross-examination need not be disclosed the day before a witness is expected to testify").

Regarding adverse witnesses, if any, called during Plaintiffs' case in chief, Plaintiffs disagree that the Defendants should not have to disclose exhibits to be used with the witness. The examination of an adverse witness during a parties' case in chief is effectively the same as cross-examination. Indeed, that is why Federal Rule of Evidence 611(c) permits leading questions of witness that are hostile, adverse, or identified with an adverse party. As the notes to Rule 611 explain, such witnesses are "automatically regarded and treated as hostile." Fed. R. Evid. 611 notes.

## V.      ANTICIPATED ISSUES OF LAW

### A.      Applicability of the Sports Broadcasting Act and Single Entity Doctrine

On August 4, 2023, Defendants filed a summary judgment motion arguing, among other things, that the conduct at issue was protected under the Sports Broadcasting Act, 15 U.S.C. § 1291. Defendants also argued in their motion that they are a single entity under the antitrust laws for purposes of Section 1 of the Sherman Act. Plaintiffs opposed the motion and a hearing was held on December 11, 2023. On January 11, 2023, the Court issued an order denying Defendants' motion. Nevertheless, Defendants intend to pursue these defenses at trial. Plaintiffs incorporate their arguments in opposition to Defendants' motion for summary judgment.

### B.      Leave to Conduct Additional Depositions

On October 13, 2023, Plaintiffs filed a Motion to Compel Compliance With the Court's August 11, 2022 Order and to Permit Plaintiffs to Take Depositions Regarding the New Sunday Ticket Agreements. Defendants opposed the motion and it was scheduled to be heard on December 11, 2023. At the hearing, the Court stated: "Let me take care of the summary judgment first and then once I do that I'll ask the parties to meet and confer, to have a status conference on what further discovery is necessary." The motion remains pending at this time. Plaintiffs incorporate their arguments in the motion.

### C.      Applicability of the "Quick Look" Form of the Rule of Reason

By the time the jury charge is decided, Plaintiffs believe the Court will need to weigh in on the form of the rule of reason that will govern the jury's deliberations. In some "rule of reason" cases—including the Supreme Court's decision in *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma ("NCAA")*, 468 U.S. 85, 104-13 (1984), regarding television broadcasts in college football—courts apply a truncated form of the rule

of reason known as "quick look" review. *See also Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2158 (2021) (stating that "quick look" review was appropriate where the NCAA's television rules amounted to output limitations of the sort that are ordinarily condemned as illegal per se). "[T]he decision of what mode of analysis to apply—per se, rule of reason, or otherwise—is entirely a question of law for the Court, even though the question might involve factual disputes." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010 (N.D. Cal. 2008).

"Quick look" review is appropriate where there is a "naked restraint" such that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 770 (1999). The "quick look" form of review has been applied in the context of sports leagues. *See NCAA*, 468 U.S. at 104-13; *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F. 3d 1010, 1020 (10th Cir. 1998) ("We find it appropriate to adopt such a quick look rule of reason in this case.").

The Ninth Circuit—in binding precedent in this very case—has already made this determination. On appeal, a unanimous panel held that the NFL's restrictions on television broadcasts constituted a "naked restriction" and involved "the same sorts of restrictions that *NCAA* [*v. Bd. of Regents*] concluded constituted an injury to competition." *Sunday Ticket*, 933 F.3d at 1152. Moreover, the Ninth Circuit concluded that the types of restraints at issue here—just as in *NCAA v. Bd. of Regents*—are ones that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* at 1156.

The decision of whether to apply the "quick look" form of review will impact the jury's analysis under the rule of reason. The full rule of reason is a multi-step analysis with the burdens of proof shifting between the parties. *See Epic Games,*

*Inc. v. Apple, Inc.*, 67 F.4th 946, 983-94 (9th Cir. 2023). If "quick look" applies, the first step—Plaintiffs' burden of showing anticompetitive harm—is presumed proven and the burden then shifts to Defendants to prove their procompetitive justifications. Moreover, Plaintiffs need not prove a relevant market. *See NCAA*, 468 U.S. at 109 ("[N]o elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement."); *Fed. Trade Comm'n v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) ("Quick-look analysis in effect shifts to a defendant the burden to show empirical evidence of procompetitive effects.").

Plaintiffs believe this issue should be resolved in deciding the final form of the jury charge but are prepared to address the issue in another manner if the Court desires.

### D.    Whether to Grant Injunctive Relief

Because the challenged restraints are continuing in nature (and would be reasonably likely to recur even if discontinued), Plaintiffs are entitled to injunctive relief in the form of an injunction that prohibits Defendants' anticompetitive conduct. *See* 15 U.S.C. § 26 (permitting injunctive relief for private parties in antitrust actions). Plaintiffs intend to submit proposed forms of injunctive relief at the appropriate juncture following trial.

### E.    Plaintiffs' Section 2 Claim

Defendants contend that Plaintiffs' Section 2 claim for conspiracy to monopolize should not be tried to a jury on the grounds that it overlaps—in their view—with Plaintiffs' Section 1 claim. While some overlap exists, a Section 2 conspiracy to monopolize claim has distinct elements of proof—such as specific intent—that are distinct from a Section 1 claim. It is therefore, not superfluous.

Plaintiffs further disagree with Defendants' characterization of Plaintiffs' claims regarding a "shared monopoly." The NFL's teams conspired amongst each other to pool all of regular season telecast rights into a *single* licensor—the league itself. Moreover, the exclusivity afforded to DirecTV creates a *single* distributor for

the Sunday Ticket out-of-market package of games—DirecTV. In any event, Defendants' arguments go to a claim of actual monopolization, rather than a conspiracy to monopolize claim. Plaintiffs are only pursuing a conspiracy to monopolize claim, so Defendants' argument on "shared monopoly" is irrelevant.

## VI.   BIFURCATION OF ISSUES

Plaintiffs do not believe that any issues need to be bifurcated.

## VII.   JURY TRIAL

Plaintiffs timely demanded trial by jury on all issues so triable. Plaintiffs' first and second claims for violation of Sections 1 and 2 of the Sherman Act are triable to a jury. However, Plaintiffs' request for a permanent injunction is triable to the Court.

## VIII.   ATTORNEYS' FEES

Plaintiffs claim that their attorneys' fees, expenses, and costs are recoverable pursuant to Section 15 of the Sherman Act, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15. Recovery of attorneys' fees is mandatory for a successful plaintiff in an antitrust case. *See Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1357 (9th Cir. 1998) ("The fee award is mandatory . . . and the purpose of such an award in antitrust cases is threefold: 1) to encourage private enforcement of the antitrust laws, 2) to insulate the treble damages award from the costs of obtaining recovery, and 3) to deter violations of the antitrust laws[.]"); *Avaya Inc. v. Telecom Labs, Inc.*, 2016 WL 10590071, at *3 (D.N.J. Sept. 15, 2016) ("Section 4 of the Clayton Act provides for a mandatory award of attorneys' fees for a party that proves it has suffered an antitrust injury."); *cf. Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 556 F. Supp. 3d 1156, 1168 n.7 (D. Ore. 2021) (acknowledging that treble damages are

"automatic" in antitrust actions). Thus, Plaintiffs are entitled to mandatory treble damages of up to $21.03 billion and attorneys' fees, expenses, and costs for their successful antitrust claims. Plaintiffs will request an award of attorneys' fees, expenses, and costs in a post-trial motion.

## IX.   ABANDONMENT OF ISSUES

Plaintiffs have not abandoned any of their pleaded claims. Plaintiffs understand that Defendants do not anticipate pursuing the following defenses: adequate remedy at law; arbitration; conduct approved by court, arbitral body, or government agency award; rights of non-parties; independent conduct; unclean hands; duplicative recovery; waiver, acquiescence, and estoppel; and all other separate or affirmative defenses that the NFL Defendants may have had against each putative class member.

Dated:  January 19, 2024              Respectfully submitted,

By:   */s/ Marc M. Seltzer*
Marc M. Seltzer

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330

Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*

29