Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO ALL ACTIONS

Case No.: 2:15-ml-02668-PSG (SKx)

**MEMORANDUM IN OPPOSITION TO NFL DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE AND ARGUMENT SEEKING TO PROVE THAT REVENUE SHARING IS ANTICOMPETITIVE**

JUDGE: Hon. Philip S. Gutierrez
DATE: February 7, 2024
TIME: 2:30 p.m.
COURTROOM:
First Street Courthouse
350 West 1st Street
Courtroom 6A
Los Angeles, CA 90012

The NFL Defendants seek to preclude Plaintiffs from arguing that it would be anticompetitive for the teams to share 100% of their independently generated telecast revenue in a world free from the challenged restraints on the basis that the Plaintiffs have somehow conceded that 100% revenue sharing should be considered to exist in that world. From that premise, the NFL Defendants argue that because 100% revenue sharing, if it existed, would produce the same anticompetitive effects as the pooling of telecast rights, Plaintiffs have no case. Plaintiffs never made such an absurd concession. Nor would they. The claim in this case—which has never changed—is that teams, the NFL and the other parties to the conspiracy colluded to restrict the availability of out-of-market ("OOM") telecasts.[1] As both sides' experts have testified, an agreement among competitors to pool 100% of their *telecast revenue* would defeat any incentive to compete in the same way as does the agreement to pool 100% of their *telecast rights*. The agreement to pool revenue, in other words, is part and parcel of the agreement to pool rights. Plaintiffs made this clear from the beginning. *See, e.g.*, Second Consolidated Amended Complaint ("Second CAC"), ECF 441, ¶ 81 ("[T]he NFL's 32 member Teams have given the league authority to negotiate pooled rights television deals on their behalf, *in exchange for an equal share of the resulting revenues*.") (emphasis added); Consolidated Amended Complaint, ECF 163, ¶ 81 (same).

To support their motion in limine, the NFL Defendants have unjustifiably attempted to use Plaintiffs' recognition that *partial* revenue sharing *could* be a less restrictive alternative to the pooling agreement's *complete* revenue sharing in the unlikely event the jury were to conclude that individual teams could not generate

[1] Congress granted the NFL teams a limited exemption from the antitrust laws in the Sports Broadcasting Act of 1961 ("SBA"), allowing them to sell their rights collectively for telecasts on free over-the-air television. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig*. ("NFLST"), 933 F.3d 1136, 1146-47 (9th Cir. 2019). These over-the-air telecasts are referred to as "in-market" telecasts to contrast them with the OOM telecasts that were jointly sold collectively (and exclusively) to DirecTV.

sufficient independent revenue in the sale of their OOM telecasts to be able to compete with other teams on the field. *See* Second CAC, ECF 441, ¶ 124 ("If the NFL and its Teams were simply interested in competitive balance, they could generate revenues through ordinary competitive means and then engage in some *permissible* form of revenue sharing, or otherwise participate in less restrictive agreements.") (emphasis added). As Plaintiffs emphasized, *some* revenue sharing might exist in the but-for world, *but only if it did not restrict competition*—and even that might not be proven by the NFL Defendants to be necessary.

As this Court recently affirmed, *see* ECF 1155, at 18-19 (order denying NFL Defendants' motion for summary judgment) (Jan. 11, 2024), it is *Defendants'* burden to establish procompetitive justifications such as competitive balance, which the NFL Defendants claim requires revenue sharing.[2] What Plaintiffs have stated is simply that *if* Defendants are able to show that competitive balance is beneficial to competition, and somehow would actually, on balance, enhance consumer welfare, there are other, less restrictive ways to create that competitive balance. Complete or 100% revenue sharing, by contrast, has the same anticompetitive effects as the challenged conduct and thus could not, by definition, be procompetitive, and the

---

[2] The antitrust laws are not interested in competitive balance among teams as an independent goal. Competitive balance can only be a justification for the restraints if the NFL Defendants can prove that maintaining it increases consumer demand or output in the relevant market. *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 119-20 (1984). Yet the NFL Defendants' have made no effort to show that 100% sharing of telecast revenue is necessary or even helpful to achieve any level of competitive balance let alone show that the current level of competitive balance increases demand or output. To the contrary, the NFL Defendants' expert Prof. Bernheim [redacted] Trainer Decl. Ex. 1, Bernheim 6/2/23 Dep. Tr. at 162:10-25 ([redacted]").

suggestion that Plaintiffs have conceded otherwise is sophistry.

Plaintiffs have explained that in a world in which the teams compete in the sale of their telecast rights, teams could still share the revenue generated by the League (most notably the collective sale of in-market telecasts allowed under the SBA) on top of the portion of the teams' local revenues they already share. *See, e.g.*, ECF 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023 ("Rascher Merits Rpt.") ¶¶ 272-73. If those amounts were somehow not enough to meet the teams' minimum salary obligations, which is how competitive balance is actually maintained (assuming for the sake of argument that Defendants can prove that the current level of competitive balance is indeed procompetitive), an additional partial sharing of local revenue would be a less restrictive alternative to the equal sharing of revenue because it would not eliminate the teams' competitive incentives. *Id.*

Neither Plaintiffs nor their experts have ever suggested that *complete* sharing of the teams' telecast revenue would be allowed in a but-for world free from the web of contractual restraints at issue in this case. That would make no sense because it would leave fans in no better position than they are in now: facing an arrangement that effectively prevents competition in the sale of the teams' OOM telecast rights.

## ARGUMENT

Plaintiffs have consistently claimed that the teams' agreement to share revenue equally is an integral element of the challenged pooling arrangement. This is expressly stated in the Second Consolidated Amended Complaint: "[T]he NFL's 32 member Teams have given the league authority to negotiate pooled rights television deals on their behalf, *in exchange for an equal share of the resulting revenues*." ECF 441, ¶ 81 (emphasis added). Plaintiffs made clear that the pooling of the rights and the equal sharing of the revenues derived from the League's sale of

those pooled rights work together to unreasonably restrain the market for professional football telecasts.

If there were any doubt about this, when discussing possible less restrictive alternatives for the NFL's stated justification of fostering competitive balance, Plaintiffs allege that "some *permissible* form of revenue sharing" might be available were the teams otherwise allowed to compete in the telecast market. ECF 441, ¶ 124 (emphasis added). The obvious point of allowing "some *permissible* form of revenue sharing" is of course that not all revenue sharing is permissible and, in particular, that the "equal share of the resulting revenue," identified in Paragraph 81 of the Complaint, would *not* be permissible.

The teams' agreement to share all of their telecast revenue is necessarily part and parcel of the challenged pooling arrangement at the heart of Plaintiffs' case, and, as the Ninth Circuit held, "'the essential inquiry' is 'whether or not the challenged restraint enhances competition,' which is assessed by considering the totality of 'the nature or character of the contracts." *NFLST*, 933 F.3d at 1152 (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. Of Regents of Univ. of Okl.*, 468 U.S. 85, 103-04 (1984)); *see also id*. (requiring the court to "take a holistic look at how the interlocking agreements actually impact competition"). Plaintiffs' complaint challenges the pooling of telecast rights and both sides' experts agree that sharing telecast revenues equally would have the same price and output effects as a horizontal agreement to fix a common pooled price. As the NFL Defendants' own expert Prof. Bernheim opined in his report:



ECF 962-10, Expert Report of B. Douglas Bernheim ("Bernheim Merits Rpt.") ¶ 257.

Prof. Bernheim thus confirms that [REDACTED]. Plaintiffs' rebuttal expert Prof. Elhauge points this out in his rebuttal report:

[REDACTED]

ECF 962-29, Expert Rebuttal Report of Einer Elhauge, dated June 9, 2023, ¶ 26; *see also* ECF 962-5, Expert Reply Report of Daniel A. Rascher, dated June 9, 2023, ¶ 199 ("[REDACTED].").

Challenging the pooling rights arrangement, in other words, necessarily (and obviously) includes a challenge to 100% revenue sharing of the pooled OOM telecasts because the but-for world must be assumed not to include antitrust violations. *See NFLST*, 933 F.3d at 1152; *see also* ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 89 (3d ed. 2017) ("The purpose of this analysis is to isolate the effects of the challenged conduct so as to ascertain what would have happened 'but for' the defendants' unlawful activities.").

The NFL Defendants' claim that Prof. Rascher did not challenge 100% revenue sharing until his Reply Report is just not true. Prof. Rascher explained in his opening Merits Report that [REDACTED]. Rascher Merits Rpt., ¶ 57 ("[REDACTED]

.”). Prof. Rascher’s opening Merits Report then specifically discusses revenue sharing in the context of rebutting the NFL’s arguments regarding competitive balance. In doing so, Prof. Rascher never conceded or opined that 100% revenue sharing would be part of the but-for world. Quite the opposite:

Rascher Merits Rpt. ¶ 273.[3]

Far from being a surprise, Defendants’ own expert acknowledged that . *See* Bernheim Merits Rpt., ¶ 24 (“ .”). Indeed, at his deposition, which was taken before Prof. Rascher filed the reply report where the NFL Defendants now claim Plaintiffs first revealed their challenge to 100% revenue sharing, Prof. Bernheim testified:

[3] Revenue from ticket sales are not shared equally. Rascher Merits Rpt., ¶ 273 n.375.

"[REDACTED]." Trainer Decl. Ex. 1, Bernheim 6/2/23 Dep. Tr. 159:17-20. As Prof. Bernheim acknowledged, [REDACTED]

The NFL Defendants' cherry-picked snippets from discovery confirm the distinction between prohibiting complete revenue sharing and the less restrictive alternative of partial revenue sharing. The quote they seize upon in their introduction is from Prof. Rascher's Class Certification Reply Report—not his merits report—where he was critiquing the NFL Defendants' now abandoned expert, Dr. Israel, who had argued that "[REDACTED]." Prof. Rascher explained in a footnote that [REDACTED] ECF 778-3, Expert Reply Report of Daniel A. Rascher in Support of Plaintiffs' Motion for Class Certification, dated December 2, 2022 (Rascher Class Cert. Reply Rpt.) ¶ 27. In an alternative, more competitive but-for world, the teams could still share nationally-generated revenue equally and could still share local revenue partially. This distinction was made clearer later in the very same report where Prof. Rascher explained:

[REDACTED]

[redacted]

Rascher Class Cert. Reply Rpt., ¶145 (citations omitted).

Prof. Racher is explaining that [redacted]. Nowhere in Prof. Rascher's report does he concede, agree, or imply that complete revenue sharing, which would eliminate competitive incentives, would be part of or allowed in the but-for world.

There was likewise no need for Plaintiffs to amend interrogatory responses that already drew this distinction between complete and partial revenue sharing, specifically explaining that the "NFL Defendants have an extensive revenue-sharing program that extends beyond broadcast revenue, and other sports leagues use a variety of means to share revenue." *See* Residential Pls.' Resp. Interrog. 24 (attached as Exhibit 1 to Pastan Declaration). Nowhere in this response did Plaintiffs claim that the teams could lawfully share 100% of their independently generated OOM telecast revenue in the but-for world or disclaim the Complaint's clear distinction between the current world's "equal" revenue sharing and the prospect of "some permissible form of revenue sharing" in the but-for world. *See* ECF 441 (Second CAC), ¶¶ 81, 124.

In their opposition to the NFL Defendants' motion for summary judgment, Plaintiffs explained:

> Nor do Plaintiffs or their experts claim that the League may not share the revenue generated from the sale of their collectively licensed OTA rights. What the teams cannot do is agree to share *100%* of their *non-SBA immunized* telecast revenue for the purpose or effect of restraining competition among them. As the Defendants' own expert explained: [REDACTED] " Dkt. 956-10 (Bernheim Rpt.) ¶ 257. Accordingly, if a horizontal agreement on pooling OOM telecasts is anticompetitive, a horizontal agreement to share 100% of OOM telecast revenue would also be anticompetitive.

Memorandum in Opposition to the NFL Defendants' Motion for Summary Judgment, ECF 975-1, at 12. The NFL Defendants did not respond to this argument in their reply brief and certainly did not argue that Plaintiffs' distinction between partial and complete revenue sharing came as a surprise to them.

In any event, because the effects of pooling rights and pooling revenues are the same, the NFL Defendants' claim of prejudice is misplaced. Plaintiffs' experts have shown that pooling telecast rights depresses output and raises prices. Because both sides agree that pooling rights and pooling revenues have the same effects on price and output, no new analysis is necessary for Plaintiffs to demonstrate the harms that would emerge from the teams' agreement to pool completely the revenue they would generate in the but-for world.

If the NFL Defendants wish to argue that the current pooling arrangement and equal sharing of telecast revenue is necessary to maintain some countervailing procompetitive benefit, such as competitive balance, then it is their burden to prove: (1) that the restraints are necessary to maintain competitive balance, and (2) that the current levels of competitive balance cause consumer demand to be greater than it would be in a free market. *See, e.g.*, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 979 (N.D. Cal. 2014), *aff'd*, 802 F.3d 1049, 1072 (9th Cir. 2015) ("Even if the NCAA had presented some evidence of a causal connection between its challenged rules and its current level of competitive balance, it has not shown

that the current level of competitive balance is necessary to maintain its current level of consumer demand.”).

The NFL Defendants’ motion is based on circular logic that the pooling of rights must be allowed because the complete sharing of revenue would be allowed in the but-for world. *See* Bernheim Merits Rpt., ¶ 256 [REDACTED] That argument makes no sense because it would maintain the very harm Plaintiffs seek to remedy.

Ultimately, this motion is not about surprise or prejudice. It is an unjustified attempt to prevent Plaintiffs from pointing out the fallacy in Prof. Bernheim’s defense of the NFL Defendants’ complete elimination of competition. It would be prejudicial in the extreme to forbid Plaintiffs from pointing this out to the jury because the goal of this litigation is to restore competition in the market for NFL football telecasts, not to allow the very collusion at issue in the case to go on without any remedy.

**CONCLUSION**

For the foregoing reasons and authorities, it is respectfully submitted that the NFL Defendants’ motion in limine should be denied.

Dated: January 19, 2024

Respectfully submitted,

By: *_/s/ Marc M. Seltzer_*
Marc M. Seltzer

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)

ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*