# EXHIBIT 1

# To the Declaration of

# Kevin Trainer

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                         ---oOo---

 4

 5   IN RE:  NATIONAL FOOTBALL )
                                 )
 6   LEAGUE'S "SUNDAY TICKET"  )   CIVIL ACTION NO.
                                 )
 7   ANTITRUST LITIGATION,     )   2:15-ml-02668-PSG(JEMx)
                                 )
 8   _____)

 9

10

11

12           REMOTE VIDEOTAPED DEPOSITION OF

13              B. DOUGLAS BERNHEIM, Ph.D.

14      DEPONENT'S LOCATION:  LOS ALTOS, CALIFORNIA

15                 FRIDAY, JUNE 2, 2023

16

17

18

19

20   STENOGRAPHICALLY REPORTED BY:

21   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

22   CSR LICENSE NO. 9830

23   JOB NO. 897841

24

25
```

```
                                                                      2
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                             ---oOo---

 4

 5    IN RE:  NATIONAL FOOTBALL )
                                )
 6    LEAGUE'S "SUNDAY TICKET"  )    CIVIL ACTION NO.
                                )
 7    ANTITRUST LITIGATION,     )    2:15-ml-02668-PSG(JEMx)
                                )
 8    _____)

 9

10

11

12

13           Remote Videotaped Deposition of

14       B. DOUGLAS BERNHEIM, Ph.D., taken on behalf of the

15       Plaintiff, Pursuant to Notice, commencing at

16       9:00 a.m., and concluding at 6:01 p.m., before me,

17       ANDREA M. IGNACIO, CSR, RPR, CCRR, CRR, CLR ~

18       License No. 9830.

19

20

21

22

23

24

25
```

Case 2:15-ml-02668-PSG-SK  Document 1189-3  Filed 01/19/24  Page 4 of 16  Page ID #:44659
NFL Sunday Ticket Antitrust Litigation                                B. Douglas Bernheim, Ph.D.

3

```
 1   A P P E A R A N C E S:

 2

 3

 4      FOR THE PLAINTIFFS:

 5          LANGER GROGAN & DIVER, PC

 6          By:   EDWARD DIVER, Esq.

 7                PETER LECKMAN, Esq. - iCVNET Streaming

 8                KEVIN TRAINER, Esq. - iCVNET Streaming

 9          1717 Arch Street, Suite 4020

10          Philadelphia, PA 19103

11          215.320.5660

12          ndiver@langergrogan.com

13

14          HAUSFELD - APPEARANCE VIE iCVNET STREAMING

15          By:   MICHAEL P. LEHMANN, Esq.

16                SCOTT MARTIN, Esq. - New York Office

17          600 Montgomery Street, Suite 3200

18          San Francisco, California

19          415.633.1908

20          mlehmann@hausfeld.com

21

22

23

24

25
```

```
                                                                    4
 1   A P P E A R A N C E S:

 2

 3

 4      FOR THE DEFENDANTS:

 5          WILKINSON STEKLOFF

 6          By:   MAX WARREN, Esq.

 7                BLAKE NEAL - iCVNET Streaming

 8                CAROLINE LI - iCVNet Streaming

 9          2001 M Street, NW, 10th Floor

10          Washington, D.C. 20036

11          202.847.4034

12          mwarren@wilkinsonstekloff.com

13

14          COVINGTON & BURLING

15          BY:   JONATHAN PAYFORTH, Esq.

16                DEREK LUDWIN, Esq.

17          850 Tenth Street, NW

18          Washington, D.C. 20001

19          202.662.5429

20          jpayforth@cov.com

21

22

23

24

25
```

5

1 A P P E A R A N C E S:

2

3 ALSO PRESENT:

4 Adriel Olivera, Videographer

5 Andrew Schwarz - Via Zoom

6 Glenn Mitchell - Via Zoom

7 Mathis Wagner, Bates White Economic Consulting

8 Jeff Zhang, Bates White Economic Consulting/iCVNet

9

10 ---oOo---

```
                                                          6
 1                        I N D E X

 2

 3    WITNESS:  B. DOUGLAS BERNHEIM, Ph.D.

 4

 5    EXAMINATION                                       PAGE

 6    BY MR. DIVER                                        8

 7

 8                       E X H I B I T S

 9    EXHIBIT                                           PAGE

10    Exhibit 1    Expert Report of                      62

11                 B. Douglas Bernheim, Ph.D.

12    Exhibit 2    NFL Core Objectives and Media         62

13                 Strategy, Bates NFL_0239782 - '86

14    Exhibit 3    Broadcasting and Team Sports by      142

15                 Roger G. Noll

16    Exhibit 4    Competitive Balance in Sports        198

17                 Leagues An Introduction by

18                 Andrew S. Zimbalist

19    Exhibit 5    Media Committee 2019 Spring          203

20                 Committee Meetings, Bates

21                 NFL_0155597 - '637

22    Exhibit 6    NFL Rights Current Package Implied   239

23                 Valuations, Bates 00002 - '21

24

25                        ---oOo---
```

7

1              REMOTE DEPOSITION PROCEEDINGS

2                  FRIDAY, JUNE 2, 2023

3                       ---oOo---

4

5          THE VIDEOGRAPHER:  We are now on the record.

6   Today's date is June 2nd, 2023, and the time is

7   8:58 a.m. Pacific Time.

8          This is the video deposition of Douglas

9   Bernheim.  In regard of National Football League

10  Sunday Ticket Antitrust Litigation.  Filed in the

11  United States District Court, Central District of

12  California.  Case No. 2:15-ML-02668-PSG.

13         This deposition is taking place via web video

14  conference, with all participants attending remotely.

15         Counsel on the conference, please identify

16  yourselves and state whom you represent, beginning

17  with the questioning attorney.

18         MR. DIVER:  This is Edward Diver from Langer

19  Grogan & Diver, representing the Plaintiffs.

20         MR. PLAYFORTH:  John Playforth, Covington &

21  Burling, representing NFL defendants and the witness.

22         And with me are Derek Ludwin, also of

23  Covington, and Max Warren, Wilkinson Stekloff.

24         MR. DIVER:  And so for the Plaintiffs, also

25  Peter Leckman, Kevin Trainer, and Scott Martin.

8

1            THE VIDEOGRAPHER:  Anyone else?
2            STENOGRAPHIC REPORTER:  And Mathis Wagner; is
3    that correct?
4            MR. WAGNER:  Yes, that's correct.  I'm from
5    Bates White Economic Consulting.
6            MR. ZHANG:  Jeff Zhang as well from Bates
7    White.
8            THE VIDEOGRAPHER:  Thank you.
9            My name is Adreil Olvera, representing
10   Lexitas.
11           The court reporter is Andrea Ignacio,
12   representing Lexitas as well.
13           The court reporter will now administer the
14   oath.
15
16                   DOUGLAS BERNHEIM, Ph.D.,
17                having been sworn as a witness
18             by the Certified Shorthand Reporter,
19                      testified as follows:
20
21                          EXAMINATION
22   BY MR. DIVER:
23      Q   Good morning, Dr. Bernheim.
24          I take it you've been deposed in the past
25   before?

9

1      A    I have, yes.

2      Q    And about how many times?

3      A    I don't have a count.  It's a few dozen, but
4  I can't tell you how many.

5      Q    Okay.  Great.

6           So you understand that the oath you just took
7  has the full weight of law as it would in a court;
8  correct?

9      A    Of course.

10     Q    And as -- as the reporter reminded us, we
11  need to be careful to try to keep a clean record.  So
12  we'll try not to speak over each other.  And I'm
13  certainly guilty of that sometimes, so I'll do my
14  best.

15     A    Me, too.

16     Q    Great.

17          When were you retained in this case,
18  Dr. Bernheim?

19     A    Oh, that's a good question.  It was a number
20  of years ago.  The case started, and then stopped for
21  the appeals, and then restarted.  So I can't -- I
22  can't pinpoint when in time I was initially retained,
23  but it was several years ago.

24     Q    Was it before the appeal?

25     A    Yes, as far as I know.  I mean, that -- that

158

1  procompetitive reasons.
2          MR. DIVER:  Q.  And when you say it's best to
3  leave it to markets, that includes best to -- to leave
4  it to monopolists?
5          MR. PLAYFORTH:  Objection to form.
6          THE WITNESS:  So that's why we ask whether
7  the activity is anticompetitive or procompetitive.
8  We -- we want to know whether we're talking about an
9  activity where potentially, there is something harmful
10 going on or not.
11         If there -- if -- if the effects of the
12 activity are procompetitive, then the point is that we
13 don't second-guess it.  We say, Okay.  Here is an area
14 where we have every reason to think that the market
15 would work well.  And so we should leave it alone and
16 not second-guess whether this particular configuration
17 happens to be optimal or not.  The market is providing
18 incentives.  The firm is responding to it.
19         If the firm is trying to kill competition,
20 that's a different matter if they're behaving
21 anticompetitively.  But that's not what's going on
22 here.
23         MR. DIVER:  Q.  On page 181 in paragraph 419,
24 I think you make this point.  And in the middle of it,
25 you say:

159

1      ███████████████████████████████████████

       ███████████████████████████████████████

       ███████████████████████████████████████

       ████████████████████████████

       ███████████████████████████████████████

       ███████████████████████████████████████

       ███████████████████████████████████████

       ███████████████████████████████████████

9           And then you say:

10     ████████████████████████████████

       ███████████████████████████████████████

       ████████████████████████████████

13          What do you mean that it may not be possible
14     to thread that needle?
15          A    So Dr. Rascher's report ████████████████

       ███████████████████████████████████████

       ███████████████████████████████████████

       ███████████████████████████████████████

       ███████████████████████████████████████

       ████████████████████████████████

21     ████████████████████████████████

       ███████████████████████████████████████

       ███████████████████████████████████████

       ███████████████████████████████████

       ███████████████████████████████████████

1 █████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████

5       So you can't go too far in one direction.
6  You can't go too far in the other direction.
7       Is there a sweet spot in the middle where,
8  you know, you -- you have competition, but don't run
9  into this problem of -- of having so little revenue
10 sharing that you undermine competitive balance?
11      This is an issue that, had Dr. Rascher done a
12 proper analysis of this conduct, he would have
13 addressed this issue head on front and center.  And
14 instead, he kind of swept it under the rug. ████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████

18      So that's what I'm talking about here.  Okay.
19 There -- can this needle be thread?  Who knows?  He
20 didn't analyze it.
21      Would it be thread?  Well, the answer to that
22 is clearly no, because if there is nothing that stops
23 the NFL from revenue sharing in its current form -- as
24 I said before, it would be economically irrational for
25 the NFL to give it up.

161

```
 1          And that means the needle is not being
 2   thread.  That means that there are no games along the
 3   lines of what he thinks competition would yield.
 4      Q   And just to be clear, you haven't done any
 5   such analysis to show that it can or can't be thread?
 6      A   Well, I don't --
 7          MR. PLAYFORTH:  Objection to form.
 8          THE WITNESS:  For my conclusions, I don't
 9   need to.  And my conclusion is, it wouldn't happen.
10          MR. DIVER:  Okay.
11          THE WITNESS:  The reason it wouldn't happen
12   is, revenue sharing would still be present in largely
13   its current form.  And therefore, this competition
14   that he envisions wouldn't break out.
15          And that's just what you see in college
16   football conferences where, by the way, they do have
17   the option to break away.  They don't.  They stick
18   with the conference and the revenue sharing and do it
19   jointly.  They don't compete within the conferences.
20          MR. DIVER:  Q.  Are you familiar with the
21   revenue sharing schemes in other professional sports?
22      A   I've discussed them in my report, yes.
23      Q   And is it possible to analyze which system is
24   optimal?
25          MR. PLAYFORTH:  Objection to form.
```

162

1    THE WITNESS: It's certainly possible to do
2    it. And there are portions of my report that shed
3    light on that. There are comparisons of competitive
4    balance across the sports leagues that show that the
5    NFL is the most competitively balanced. And that's --
6    I don't think that's controversial. There is a fair
7    amount of literature that supports it. And there is
8    also literature that ties that to the NFL's aggressive
9    revenue sharing.
10   MR. DIVER: Q. But -- but you haven't
11   conducted any quantitative analysis to determine what
12   form of revenue sharing is -- is optimal?
13   MR. PLAYFORTH: Objection to form.
14   THE WITNESS: That -- that wasn't necessary
15   for reaching the opinions that I reached, because
16   there is -- if you had an answer to that question, how
17   would you get to that level of revenue sharing? Who
18   would dictate it?
19   ███████████████████████████████████████████
     ███████████████████████████████████████████████
     ████████████████████████████████████████
     ██████████████████████████████████████████
     ███████████████████████████████████
24   So for my analysis, there is -- no, I -- I --
25   it's just not necessary to do that.

163

1      MR. DIVER:  Q.  So let -- let me ask you:  Is
2 revenue sharing -- is the -- is the common sharing of
3 television revenue the reason that the current system
4 promotes competitive balance, or is there anything
5 else?
6      MR. PLAYFORTH:  Objection to form.
7      THE WITNESS:  The current system promotes
8 competitive balance through a variety of measures.
9 Revenue sharing is one of them.  The reverse order
10 draft is another one.  Unbalanced schedules is another
11 one.
12      There are various things that the NFL does
13 that promote competitive balance of the salary caps
14 and the salary minimums, of course, and the -- these
15 all work together.  The salary floors in particular
16 work with the revenue sharing in an important way to
17 make competitive balance feasible.
18      So the competitive balance comes from a
19 variety of things, but revenue sharing plays an
20 important role in the NFL.
21      And as I said, this is sort of between a rock
22 and a hard place for Dr. Rascher's argument, because
23 either the revenue sharing gets compromised and
24 competitive balance suffers, or it remains intact and
25 the incentives to compete just don't materialize.