# Exhibit 1 to the Declaration of Samuel Maida







DATE DOWNLOADED: Thu May 18 13:59:09 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
I (1985) Televised College Football

ALWD 7th ed.
, Televised College Football, I (1985).

Chicago 17th ed.
"Televised College Football," Televised college football : hearing before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, House of Representatives, Ninety-eighth Congress, second session, July 31, 1984. (1985): I-154

McGill Guide 9th ed.
"Televised College Football" [1985] I.

AGLC 4th ed.
'Televised College Football' [1985] Televised college football : hearing before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, House of Representatives, Ninety-eighth Congress, second session, July 31, 1984. I

MLA 9th ed.
"Televised College Football." Televised college football : hearing before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, House of Representatives, Ninety-eighth Congress, second session, July 31, 1984. , , 1985, pp. I-154. HeinOnline.

OSCOLA 4th ed.
'Televised College Football' (1985) I          Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at
*https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# TELEVISED COLLEGE FOOTBALL

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## OVERSIGHT AND INVESTIGATIONS

OF THE

# COMMITTEE ON
# ENERGY AND COMMERCE
# HOUSE OF REPRESENTATIVES

### NINETY-EIGHTH CONGRESS

SECOND SESSION

JULY 31, 1984

## Serial No. 98–169

Printed for the use of the Committee on Energy and Commerce



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1985

40–972 O

## COMMITTEE ON ENERGY AND COMMERCE

JOHN D. DINGELL, Michigan, *Chairman*

JAMES H. SCHEUER, New York
RICHARD L. OTTINGER, New York
HENRY A. WAXMAN, California
TIMOTHY E. WIRTH, Colorado
PHILIP R. SHARP, Indiana
JAMES J. FLORIO, New Jersey
EDWARD J. MARKEY, Massachusetts
THOMAS A. LUKEN, Ohio
DOUG WALGREN, Pennsylvania
ALBERT GORE, JR., Tennessee
BARBARA A. MIKULSKI, Maryland
AL SWIFT, Washington
MICKEY LELAND, Texas
RICHARD C. SHELBY, Alabama
CARDISS COLLINS, Illinois
MIKE SYNAR, Oklahoma
W.J. "BILLY" TAUZIN, Louisiana
RON WYDEN, Oregon
RALPH M. HALL, Texas
DENNIS E. ECKART, Ohio
WAYNE DOWDY, Mississippi
BILL RICHARDSON, New Mexico
JIM SLATTERY, Kansas
GERRY SIKORSKI, Minnesota
JOHN BRYANT, Texas
JIM BATES, California

JAMES T. BROYHILL, North Carolina
NORMAN F. LENT, New York
EDWARD R. MADIGAN, Illinois
CARLOS J. MOORHEAD, California
MATTHEW J. RINALDO, New Jersey
TOM CORCORAN, Illinois
WILLIAM E. DANNEMEYER, California
BOB WHITTAKER, Kansas
THOMAS J. TAUKE, Iowa
DON RITTER, Pennsylvania
DAN COATS, Indiana
THOMAS J. BLILEY, JR., Virginia
JACK FIELDS, Texas
MICHAEL G. OXLEY, Ohio
HOWARD C. NIELSON, Utah

WM. MICHAEL KITZMILLER, *Staff Director*
SHARON E. DAVIS, *Chief Clerk/Administrative Assistant*
DONALD A. WATT, *Printing Editor*
ARNOLD I. HAVENS, *Minority Counsel*

---

## SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

JOHN D. DINGELL, Michigan, *Chairman*

ALBERT GORE, JR., Tennessee
JIM SLATTERY, Kansas
GERRY SIKORSKI, Minnesota
JIM BATES, California
JAMES H. SCHEUER, New York
JAMES J. FLORIO, New Jersey
EDWARD J. MARKEY, Massachusetts
DOUG WALGREN, Pennsylvania

JAMES T. BROYHILL, North Carolina
BOB WHITTAKER, Kansas
THOMAS J. BLILEY, JR., Virginia
MICHAEL G. OXLEY, Ohio

MICHAEL F. BARRETT, JR., *Chief Counsel/Staff Director*
PATRICK M. McLAIN, *Counsel*
ROBERT CRAIG NORWOOD, *Counsel*
RUSSELL L. SMITH, *Associate Minority Counsel*

(II)

# CONTENTS

Page

Testimony of:
Crouthamel, John J., director of athletics, Syracuse University .................... 69
Davison, Fred C., president, University of Georgia ............................................ 86
Delany, James E., commissioner, Ohio Valley Conference................................ 108
Eckart, Hon. Dennis E., a Representative in Congress from the State of Ohio....................................................................................................................... 83
Hallock, Wiles, former chairman, NCAA Football Television Committee.... 68
Neinas, Charles M., executive director, College Football Association ........... 101
Paterno, Joe, head football coach, Pennsylvania State University ................ 90
Pilson, Neal H., executive vice president, CBS Broadcast Group.................. 124
Robinson, Eddie, director of athletics, Grambling State University ............. 92
Toner, John L., president, National Collegiate Athletic Association............. 4
Watson, Arthur, president, NBC Sports ............................................................. 135
Wormington, Robert J., vice president, KSHB Television, Kansas City, MO.......................................................................................................................... 138
Wussler, Robert J., executive vice president, Turner Broadcasting System, Inc.......................................................................................................................... 135
Young, Charles E., chancellor, University of California at Los Angeles....... 87

(III)

# TELEVISED COLLEGE FOOTBALL

## TUESDAY, JULY 31, 1984

House of Representatives,
Committee on Energy and Commerce,
Subcommittee on Oversight and Investigations,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:10 a.m., in room 2123, Rayburn House Office Building, Hon. Edward J. Markey presiding (Hon John D. Dingell, chairman).

Mr. MARKEY. This is a hearing of the Subcommittee on Oversight and Investigations of the full Energy and Commerce Committee.

There are those who might think that today's subcommittee hearing to be about sports. There are others who might think it to be about television. Neither of those views would be accurate. Yes, much of the discussion will be about the broadcasting of college football games, and in fact, it is that communications aspect upon which this subcommittee's jurisdiction rests. This hearing is about much more. Quite simply, this hearing is about a major contribution to the future of this Nation's institutions of higher learning.

The Supreme Court of the United States, on June 27, 1984, broke up a 32-year reign when it ruled that the National Collegiate Athletic Association [NCAA] may no longer serve as sole agent for colleges and universities in the sale of television rights for football games. Today, the subcommittee will examine the responses by colleges and universities and by broadcasters at all levels to that Supreme Court decision, and attempt to explore the likely impacts of those responses upon colleges and universities.

The entertainment value to our society of college football, and of the televising of those fall events, is beyond question. Indeed, to many, that entertainment value has reached a level of obsession.

Equally beyond dispute is the financial value of football to the well being of most colleges or universities. In many institutions, the football program is a source of revenue distributed through the entire athletic department and to other areas of a university. That revenue oftentimes supports women's sports and other nonrevenue-producing sports. The income from college football is generated from television, it is true, but it is also generated from many other sources. Gate receipts normally provide the largest source of revenue from football events. Beyond this, the football team and the televising of its games often acts as the single most important factor in stimulating contributions from the universities' friends and alumni.

In deciding the case brought by the Universities of Georgia and Oklahoma against the NCAA, the Supreme Court found that the

2

practices of the NCAA constituted a restraint of trade in violation of the Sherman Act. The Supreme Court adopted the findings of the U.S. District Court, which were that the NCAA acted as a "classic cartel" with an "almost absolute control over the supply of college football." The court held that by curtailing output of football games and blunting the ability of member institutions to respond to consumer preference, the NCAA has restricted, rather than enhanced, the place of intercollegiate athletics in the Nation's life.

This subcommittee will not retry the antitrust issues involved in this litigation or second guess the application of the antitrust laws by the Supreme Court. Our purpose is to examine the consequences of that decision. It would appear from a reading of the Supreme Court decision that open competition is now the rule in the televising of college football. Of the broadcasters appearing today, we will ask how they will respond to this new challenge and what it will mean to the consumer—the millions of viewers of televised college football.

Of the distinguished representatives from colleges, universities, and their associations, we will ask what this decision will mean to them. Will it mean more or less revenue for college football? If it means less, how will universities suffer and what programs or activities will be sacrificed? Competition should mean that the university that fields the most successful football team will command the highest television revenues. How will this alter a university's behavior to achieve that successful status? Will professionalism in college football increase? Will recruiting violations flourish? Will academic standards be subservient to television revenues?

It has been asked if the subcommittee's hearing is the first step in the granting of an antitrust exemption to the NCAA such as that enjoyed by major league baseball. That is not the subcommittee's intent. Neither the NCAA nor anyone else asked for these hearings. To discuss an antitrust exemption or any Federal legislation, for that matter, presumes that there is a problem that needs to be addressed. We make no such presumption at this time.

Today we will make no decisions. The subcommittee will make no conclusions. We will raise and debate, in a public forum, issues of concern to broadcasters, young athletes, institutions of higher learning, and the American people.

Are there any other members of the subcommittee who wish to make an opening statement?

Mr. SLATTERY. Mr. Chairman.

Mr. MARKEY. Mr. Slattery.

Mr. SLATTERY. I would like to make an opening statement. I want to thank you and the staff for convening what promises to be a very informative hearing on the consequences of the recent Supreme Court ruling regarding the NCAA and the televising rights of football games.

We will hear from an impressive list of witnesses from the NCAA, the major networks, and representatives of colleges and universities.

We will no doubt hear about the free market, the Sherman Antitrust Act, the protection of gate attendance, program packaging, contract negotiations, media markets, and television revenues. It is

certainly important to review the consequences of the court's decision on the financial aspects of college football, Mr. Chairman, but I am more concerned about what the decision means for the student athlete.

I represent the second district of Kansas, the home of two Big Eight Conference schools—the University of Kansas and Kansas State University.

I am concerned about the potential pressure that may be placed on young men who participate in college football.

The Supreme Court, in effect, deregulated the live broadcast of college football games. The free market will dictate the most attractive package of games that will be televised. Obviously, a winning football team in a strategic media market will be more in demand for television time than a less successful team located in rural areas of the Midwest.

My greatest fear, Mr. Chairman, is that we may lose sight of the more noble objectives of college athletics.

Will free market dictates force football coaches to produce championship teams at all costs because of overzealous alumni?

Will recruiting rules be violated in a search for potential superstars?

Will our student athletes become athlete students and will the profitmaking objectives overshadow educational objectives?

I hope the answer to each of these questions is a firm no. I do not want to dispute the Court's decision, but what I hope to determine from this hearing is the potential effect of the NCAA ruling on the young football players we cheer on fall weekends and who contribute so much to school pride and—yes—to the profits of colleges and the local business community. During today's hearings, I hope we will not lose sight of the individual athlete, of the lessons learned from sports competition, and of the higher education and brighter future that college promises for both the athlete and student.

In addition, Mr. Chairman, I would like to give notice that I would like to ask some questions about the current techniques used by the NCAA to enforce the violations of rules and regulations across this country. It has been my observation in the past that oftentimes what we have had is a situation where the innocent were punished. Oftentimes we pursued a course that resulted in mass punishment of the guilty coaches and players, athletic directors involved oftentimes had moved on to greener pastures, to more pay to the professional ranks of the sports they were participating in and many times the student athlete that was still on the campus that in many instances had nothing to do with the violations that resulted in the probation or suspension are left carrying the burden.

Mr. Chairman, it is my observation that the NCAA needs to make some dramatic changes in the way they currently enforce their rules and regulations. The present system, it appears to me, may have worked well in 1940 or in 1950 or in 1960, but I don't believe under the present situation with the enormous emphasis and the realization that oftentimes denying a young athlete the opportunity to perform on television, dramatically affects that young athlete's potential marketability in the pro draft, and it seems to me we need to do some new thinking in this area.

4

I would hope that the NCAA would seize the initiative. I don't believe this is an area that the Congress should necessarily legislate in, but I do believe that the economic rights and other basic individual rights of student athletes and of coaches across the country are at stake and I don't believe that we have done as good a job as we can do in this area.

I appreciate the attendance of those gentlemen from the NCAA coaching ranks across the country. I know you are all busy and I appreciate your being here.

Thank you.

Mr. MARKEY. The time of the gentleman has expired.

Do any other members of the subcommittee wish to make an opening statement?

Then we will proceed with our first panel, which is Mr. John Toner, the president of the National Collegiate Athletic Association; Mr. Wiles Hallock, former chairman, NCAA Football Television Committee; and John J. Crouthamel, director of athletics at Syracuse University.

I ask before we begin, we have a uniform practice in the Subcommittee on Oversight and Investigations that all of our witnesses are sworn. If I could ask each of you to rise, please, raise your right hand.

[Witnesses sworn.]

Mr. MARKEY. Gentlemen, could you move your microphones a little bit closer to yourselves and identify yourselves for the record.

## TESTIMONY OF JOHN L. TONER, PRESIDENT, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ACCOMPANIED BY WILES HALLOCK, FORMER CHAIRMAN, NCAA FOOTBALL TELEVISION COMMITTEE, AND JOHN J. CROUTHAMEL, DIRECTOR OF ATHLETICS, SYRACUSE UNIVERSITY

Mr. TONER. Chairman Markey, my name is John L. Toner, president of the NCAA and athletic director at the University of Connecticut.

Mr. HALLOCK. I am Wiles Hallock, former chairman of the NCAA Television Committee, a retired executive director of the Pacific Ten Conference.

Mr. CROUTHAMEL. I am John J. Crouthamel, director of athletics, Syracuse University.

Mr. MARKEY. Mr. Toner?

Mr. TONER. Thank you, Chairman Markey.

Also available today with me is NCAA Legal Counsel George Gangware, who is here prepared to answer any questions from counsel's side.

Chairman Markey and members of the subcommittee, as we understand the purpose of these hearings, it is to assess the impact of the recent Supreme Court affirmance of the decision of Federal Judge Juan Burciaga holding that the NCAA's most recent football television plan violated the Sherman Act—on the market for televising football games and on the member institutions and on the sport of intercollegiate football itself. We are happy to provide whatever insights we can on these subjects.

5

My prepared remarks offer a detailed history of the television plans leading up to the 1982–85 plan voided by the Supreme Court. It may be helpful, however, for me at this point to review the 1982–85 plan in some detail.

The most recent NCAA television plan at issue in the Supreme Court was approved by the NCAA membership in May 1981 by a vote of 220 to 6, with 28 abstentions. The vote in division 1A was 60 to 1, with 26 abstentions. Under the plan, the NCAA negotiated separate agreements with two networks, ABC and CBS, and granted each network the right to televise 14 live exposures annually for a period of 14 years in exchange for right fees totaling $263,500,000, $131,750,000 from each network. Each network was authorized to negotiate with NCAA member institutions for the right to televise their games with the networks making alternate selections of the games they wished to televise.

In each of the 2-year periods, the plan was to be in effect each network was required to schedule a minimum of 35 games annually that would include at least 82 different member institutions. No member institution was permitted to be scheduled by the networks more than six times, four of those nationally, during each 2-year cycle. The networks also were required to schedule appearances in the series for each of the NCAA division I-AA conferences over 2 years and annually to broadcast the championship games for division I-AA and division II and the final game of the division III championship.

In 1982, $53,799,990 and in 1983, $57,155,000, which comes to about 80 percent of the available revenues in the package, were received respectively by members of the CFA and the Big Ten/PAC Ten conferences. Rights fees for individual nationally televised games were respectively $1.1 million in 1982, and $1.165 million in 1983.

Regional exposures generated about $620,000 and $672,000 respectively. Program rights in the cable series were $350,000 in 1982 and $475,000 in 1983. Now, as noted, the 1982–85 plan proved most lucrative for those institutions which now comprise the College Football Association as well as members of the Big Ten and Pacific Ten conferences. CFA members received $36.7 million in 1982 and 42.9 million in 1983. Big Ten/PAC Ten institutions received $14.9 million and $14.2 million in those years also. Other division I-A institutions combined received $2.1 million in 1982 and eight-tenths of a million dollars in 1983. The plan also approved attractive for divisions I-AA, II, and III, providing $6.47 million in 1982 and $8.27 million in 1983.

In summary, there were more college games televised in 1983 than any previous year and the 1982–85 plan demonstrated it contained the flexibility to handle a myriad of situations as the association completed its first 2-year cycle on its contracts with ABC and CBS and completed the first ever contract for a supplementary series.

The contracts with the three networks, ABC, CBS, and TBS, provided 212 team appearance opportunities for division I-A and I-AA regular season, divisions II and III regular season, and division I-AA, II, and III championship games for a record $76,068,000.

6

On June 27 of this year, the Supreme Court, by a 7 to 2 vote, determined that the current NCAA plan violated the proscriptions of the Sherman Act. The court held that the plan constituted improper horizontal price fixing of the rights fees to be paid for the televising of games covered by the plan and an improper limitation on output or the number of games that could be televised.

Applying the rule of reason approach by which the procompetitive effects of particular restrictive activity are balanced against its anticompetitive effects to determine whether the restrictions unreasonably restrain competition, the court, on the basis of factual findings by Judge Burciaga, rejected the NCAA claim as to the procompetitive effects of the plan and held the plan invalid.

What I would like to point out is that the court specifically declined to strike down the plan on the more harsh per se analysis traditionally applied by the courts in cases involving alleged price fixing and tort limitation and stated that a fair evaluation of the character of the restrictions requires consideration of the NCAA's justification for these restraints. It thus applied the rule of reason. Why is this sigificant to us? The answer is quite simple because since the earliest base of the NCAA's television plans, the NCAA has been aware of the possibility of a claim that the plan might be subject to scrutiny under the antitrust laws, but it has consistently been advised by counsel retained by the NCAA that the procompetitive purposes of the plan represented a sound basis for justifying the plan's restrictions.

As noted in our prepared statement, the NCAA has been sued several times on an antitrust theory and in each case until the most recent one its restraints have been upheld under the rule-of-reason analysis. I recite this state of affairs in order to give the subcommittee an objective perspective on what I believe to be the absolute scurrilous claims of detractors from the television plan and their counsel that the NCAA over the history of the various plans has been engaged in a knowing and willful violation of antitrust laws.

Quite the contrary is true. Until the ruling by Judge Burciaga in 1982, the NCAA had no reason to believe that its procompetitive justifications for the restrictions contained in the plan, protection of live gate, maintenance of competitive balance among NCAA member institutions, sharing of revenues among a broader group of institutions, and creation of a more attractive product to compete with other forms of entertainment would not be found a sufficient base to sustain the plan as not unreasonable.

After having found that the NCAA plan violated the Sherman Act, Judge Burciaga, in his September 1982 opinion, entered a sweeping injunction enjoining the NCAA, one, from attempting to enforce the contracts which had been entered into pursuant to the plan; two, for making any future contracts which purport to grant any telecaster the right to televize the football games of member institutions; and three, from requiring as a condition of membership that an institution grant the NCAA power to sell its television rights.

Judge Burciaga also determined, however, to retain jurisdiction over the matter on the grounds that the injunction may well lead to circumstances which cannot at this time be foreseen.

7

Following an appeal by the NCAA from Judge Burciaga's decision, the Tenth Circuit Court of Appeals, in a 2 to 1 decision, affirmed the trial court's holding that the plan constituted, both on a per se ground and upon rule-of-reason analysis, a violation of the Sherman Act. Most significantly, however, the court of appeals raised a question as to the validity of the scope of injunctive relief entered by Judge Burciaga.

In response to our contentions that the order could be read as prohibiting broadcast of NCAA divisional championship games, a less restrictive membershipwide contract with passover provisions, blackout rules, or imposition of sanctions for violations of non-television regulations, the court of appeals stated regarding the injunction that it "might be construed to prevent the NCAA from imposing television sanctions on schools that violate regulations unrelated to the television plan.

"[It] might also be read to preclude the NCAA from prohibiting games on Friday night. Neither of these effects is warranted by the violations found. Furthermore, [the injunction] appear(s) to investigate exclusive control of television rights in the individual schools. While we hold that the NCAA cannot lawfully maintain exclusive controls of the rights, how far such rights may be commonly regulated involves speculation that should not be made on the record of the instant case."

The court of appeals thus remanded the case to Judge Burciaga for further consideration. Following a refusal by the court of appeals to rehear the matter, the NCAA filed a petition for certiorari in the Supreme Court. The petition was granted in Oklahoma in 1983 and the trial court's order was stayed pending the Supreme Court's hearing.

Under these difficult circumstances, neither the NCAA nor its members could plan with any certainty for the 1984 season. The court of appeals' decision had left unsettled the basic issue of the extent to which, even if the current plan were illegal, the NCAA could be permitted to formulate and offer a less restrictive plan.

The Supreme Court rendered its decision June 27 and declared the NCAA agreements with CBS, ABC, and ESPN invalid. Left open by the court's affirmance of the court of appeals' decision, however, was the fundamental issue whether in light of the court of appeals' decision and remand, the NCAA was nonetheless authorized to offer a less restrictive plan and to impose other restrictions related to the televising of games by its members.

A special division I-A TV subcommittee conducted hearings in Chicago on June 30 with representatives of division I-A conferences, independents, and network representatives. The great majority opinion at those hearings favored consideration of an NCAA plan for 1984 with the inclusion of all members of division I. With that mandate, the Division I-A subcommittee developed an extremely flexible plan that was counsel believed could be valid under the Supreme Court ruling. It also realized the lateness of planning for 1984 would be crucial. It thus provided that any institution committing to the new plan would be released from their commitments by July 17 to allow them to pursue other football television alternatives in 1984 if Judge Burciaga's original order had not been modified by that date.

8

Prompt review of the matter by Judge Burciaga was crucial. The new NCAA plan was approved by the Football Television Committee on July 2, followed by endorsement by NCAA Council on July 3. A special meeting was arranged for July 10 to consider the new plan and to consider other television principles.

Despite the fact the June 30 hearing indicated a great majority of division I-A favored a plan of this nature, it subsequently was defeated July 10 by a vote of 66 to 44 in division I-A. Unfortunately, there were no other plans made available for comparison or consideration by I-A members at that same meeting.

After the NCAA's proposed TV plan was defeated, the division I-A and I-AA members, including a majority of division I-A, adopted three binding principles for the 1984 season, of course subject to implementation only following modification of the district court's injunction.

These principles are, one, there shall be no televising of collegiate football games on Friday nights and any afternoon football televising on that day of the week must be completed by 7 p.m. local time in each location in which a program is received. Two, no member institution shall be obligated to televise any of its games at home or away. No member institution may make any arrangements for live or delayed televising of any game without the proper consent of its opponent institution.

And three, the gross rights fee paid for each 1984 national telecast or cablecast shall be subject to an assessment of 4 percent to be paid to the NCAA by the home institution. The assessment will be used to fund the costs of the NCAA Postgraduate Scholarship Program and football-related NCAA services.

Any hope of a unified action on July 10 among the division I-A football-playing members of the NCAA was dissipated when the plaintiffs in the original lawsuit, the Universities of Georgia and Oklahoma, refused to join with the NCAA in agreeing upon a modification of the trial court's outstanding injunction, even though the basis for modifying the scope of the injunction clearly had been laid by the ruling of the court of appeals and the Supreme Court.

The terms of the CBS–ABC 1984 NCAA football plan provided for national right fees of an estimated $1.5 million for a national game and more than $700,000 for regional games and more than $360,000 for ESPN cablecasts. The total rights invovled came to approximately $73.6 million.

In 1985, under the NCAA-proposed contracts, the total rights would have been $78 million. Now, according to published reports, the Big Ten, Pacific Ten, has of this date negotiated a contract with CBS for the 1984 season involving 12 exposures and 18 games for rights fees of $9.5 million. The CFA, on the other hand, has negotiated a contract with ABC involving 20 games for a rights fee of $12 million and a cable series with ESPN featuring 14 exposures for $9.3 million.

We understand that under the CFA plan, however, there is a prohibition against crossovers; that is, a CFA member may not, without consent of other CFA members, participate in network televising of a game against a non-CFA member and that CFA members are prevented by the ABC contract from appearing on

9

any other network. These restrictions would appear open to serious question.

Many of the delegates of the July 10 meeting were increasingly conscious of the depressed market for college football. Several expressed a hope that whereas national rights would be substantially less, the colleges might make up the 1984 financial losses from increased regional television. Because negotiation of individual packages is still incomplete as of the date of these hearings, no accurate judgment of aggregate value of these contracts is really possible.

Based on our experience with the television market and in a variety of contexts, however, we believe the aggregate value of those contracts in 1984 will not exceed $16 million to $18 million.

So, where do we find ourselves today? For me it is a time of dismay and sadness because of a concern about the welfare of college football. Despite what the Universities of Oklahoma and Georgia may say, that football is a property right to be used as a business tool to make money for their institutions, it is my view that the vast majority of football-playing members of the NCAA and indeed the public at large, disagree with that highly commercial perspective.

College football is a uniquely American game. It was originated by the colleges, it is one of our Nation's great traditions. College football has been a part of the fabric of our society for more than 100 years. It is a unique, demanding game for young people to play and the more colleges that sponsor the sport, the more people play the game.

Until recently, it was never conceived as a money-making tool for college administrators, who, unable to raise money through their legislature or through their alumni, turned to football teams to build libraries and generate dollars. My dismay stems from the fact that there is no one now looking after the welfare of college football as a whole.

Television is a unique powerful tool that dramatically affects sports. The judicial system of the United States may not appreciate that, although Mr. Justice White understands it because he played the game from high school through college and professional football. In speaking to this and referring to the restraints of the NCAA plan on Georgia and Oklahoma, he said, "* * * insure that they confine their programs within the principles of amateurism so that intercollegiate athletics supplement rather than inhibit educational achievement."

The Supreme Court extolled many of the rules and the activities of the NCAA, but somehow missed the point that unrestricted television on the one hand will give added momentum to prominent institutions to build all winning teams at whatever the cost in order to maximize the television dollars they can obtain.

On the other hand, the decision has turned over to the networks unlimited power to negotiate and obtain college football TV rights and dictate the terms of the plans colleges may develop.

College football is in disarray because a minority of institutions believe they should have unlimited opportunity to use their property to maximize the profits and on the other hand because a small number of television networks now can manipulate the college football markets the way they wish.

10

One may also inquire in this context whether individual institutions in their desire to increase the viewer popularity of their property right will not be forced to focus on development consistent winning percentages and increasingly to attempt to schedule games with other teams which also have demonstrated that capacity.

If these objectives begin to dominate the game, I suggest they will almost inevitably lead to a severe erosion of the conference structure as we know it, which for many years has been a hallmark of college football. I think it not unreasonable in these circumstances to visualize the eventual development of some sort of super conference for the titans of the game, a result I am sure the networks would find attractive but one which will redound to the benefit of only a small minority of NCAA members.

There is no doubt that even under the now voided NCAA television apparatus we have had a difficult time in attempting to keep the game within the confines of our constitutional purpose, to maintain intercollegiate athletics as an integral part of the educational program.

We confront never-ending battles to establish reasonable and enforcible academic standards as preconditions to participation in athletics. We have been required to increase our enforcement staff from 10 to 38 in the past 5 years, to keep tract of and police recruiting violations. The graduation rates of our student athletes is by any measure unsatisfactory and the pressure to win tends more and more to dominate the game. Sadder yet, perhaps, is the fact that with loss of mandated revenue sharing aspects of our plan, numerous less prominent institutions with fine football programs are now essentially shut out of any significant participation in the market for television.

Nothing in the CFA or Big Ten/PAC Ten plans make any provision for them, and indeed unless and until Judge Burciaga modifies his order, serious doubt exists as to our own capacity to provide revenue to smaller colleges through the marketing of division I-AA, II and II championships.

Although the new environment may redound to the benefit of the handfull of college football players destined to become professionals, where does it leave the college player who participates for the love of the game and as a part of his overall educational experience? For many I suggest it will mean a panorama of diminishing opportunity as many of those institutions—previously sharing the revenues from the NCAA plan or enjoying live gate protection because of the plan—find themselves increasingly unable to make ends meet. This is not to speak of the thousands of student athletes, men and women, who participate in nonrevenue-producing sports and championships funded at least in part by football revenues.

Although I find no humor in this situation, I am reminded as I view the now successful effort to dismantle the NCAA's television controls, of a line made famous by Gertrude Stein: "And when you get there, there isn't any there there." The "there" that is now upon us is not very promising.

Mr. Chairman, that concludes my statement. Wiles Hallock and John Crouthamel have short statements.

[Testimony resumes on p. 68.]

[The prepared statement of Mr. Toner follows:]

11

STATEMENT OF JOHN L. TONER, PRESIDENT
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
BEFORE
THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS
COMMITTEE ON ENERGY AND COMMERCE
U.S. HOUSE OF REPRESENTATIVES
July 31, 1984

My name is John L. Toner. I am the current President of
the National Collegiate Athletic Association, an unincorporated
voluntary association of some 970 four-year colleges and
universities and allied members, having its headquarters at
Mission, Kansas. I am also Director of Athletics at the
University of Connecticut.

As stated in Section 1 of our Constitution, a major
purpose of the NCAA is to initiate, stimulate and improve
intercollegiate athletic programs for student-athletes. The
fundamental policy of the NCAA is stated in Section 2 of the
Constitution, as follows:

> "The competitive athletic programs of the
> colleges are designed to be a vital part of
> the educational system. A basic purpose of
> this Association is to maintain inter-
> collegiate athletics as an integral part of
> the educational program and the athlete as an
> integral part of the student body and, by so
> doing, retain a clear line of demarcation
> between college athletics and professional
> sports."

As we understand the purpose of these hearings, it is to
assess the impact of the recent Supreme Court affirmance of the
decision of Federal Judge Juan C. Burciaga -- holding that the

12

NCAA's most recent football television plan violated the Sherman
Act -- on the market for televising college football games and,
at least incidentally, on the member NCAA institutions and on the
sport of intercollegiate football itself. We are happy to
provide whatever insights we can on those subjects.

It would perhaps be most helpful to the Subcommittee if
I first outlined the history of the successive NCAA television
plans and gave you some idea of the income generated under those
plans to NCAA members. I would then briefly like to discuss, at
least from a layman's perspective, the evolving status of the
plans up to and including the Supreme Court's recent decision,
and to give you our perspective on what has occurred in the few
short weeks following the decision. Finally -- and this will be
the principal focus of my oral remarks to the Subcommittee -- I
want to offer some relatively detailed observations on what I
perceive to be the most serious area of concern: what I fear lies
ahead for the game of football as conducted by our member
institutions and as participated in by the students attending
those institutions.

A.      History of the NCAA Television Plan

College football television began in 1938, when one of
the University of Pennsylvania's games was beamed from Franklin
Field to Philco offices-laboratories, also in Philadelphia. As
far as is known, there were six television sets in Philadelphia;
and all were tuned to the game.

13

Ten years later, discussion of television began
occupying a great deal of time at NCAA Conventions. The major
issue was the adverse effect that televising could have on in-
stadium attendance. Early television had little effect because
signals could be beamed only to local areas, and there were few
receiving sets.

There were only 7,000 sets in use nationwide in January
1947. By 1955, there were an estimated 30,000,000 sets.
Currently, there are 83.8 million television households (98.1
percent of the nation's homes are equipped with one or more
television sets).

The concern for in-stadium attendance became an area of
major interest and concern to the Association during the late
1940s. Three studies were reviewed prior to establishment of the
first television plan in 1952, all examining the effects of
television on attendance:

    1.    The 1949 Convention received a report from
        Crossley, Incorporated, of New York. The
        report measured only four Eastern cities and
        thus was not fully representative; however, it
        did indicate a relationship between
        nonattendance and interest in television. A
        portion of the study that specifically
        measured nonattendance noted that 21.8 percent
        of the television viewers questioned did not
        attend a game because they preferred to watch
        the event on television.

    2.    In 1952, a survey was conducted by Jerry N.
        Jordan of the University of Pennsylvania. His
        analysis indicated that college football had
        made "a remarkable record in attendance over
        the past four years" but that colleges in
        television areas had not fared as well during
        that period as those in nontelevision areas.

14

3.  The National Opinion Research Center (NORC)
    was commissioned by the NCAA to conduct a
    nationwide survey concerning the impact of
    television upon attendance. A preliminary
    report to the 1951 Convention showed that
    during the 1949 and 1950 seasons, college
    football attendance had declined by 3.5
    percent. Attendance for colleges in
    television areas had dropped six percent,
    while those outside television areas
    experienced a 2.5 percent increase.

The NORC's final report for 1952, released on April 8, 1953,
verified that live telecasting of college football games again
damaged the gate in 1952 and that this harm was reduced
appreciably by the NCAA's exercise of control over telecasting.
Of particular interest was the fact that in areas where there was
no television competition in 1952, paid admissions were 10.5
percent better than in the pre-TV years 1947-48; but where
television competition was present, attendance was down 16.2
percent.

That NORC report was the beginning of a continuing
documentation of damage caused to in-stadium attendance by
television of live events. The NCAA television Committee at that
time found some indications that attendance was higher on
blackout Saturdays than when a game was televised, but was
"unable to find these differences consistently enough or to a
large enough degree to prove the matter mathematically." Several
examples of apparent attendance damage were cited, including a
Mid-American Conference game between Miami (Ohio) and Cincinnati,
to decide the conference championship. Normal attendance for the

15

game had been 30,000; in 1951, it was played the same date the Michigan/Ohio State game was telecast in the Cincinnati area, and attendance dropped to 16,000.

In addition, at the 1951 Convention, Reaves Peters of the Big Seven Conference (now Big Eight) reported that the University of Oklahoma had suffered a drop in ticket sales in Oklahoma City of 15,000 per year in 1949 and 1950 and attributed the decline to televising of its football games.[1]

Evolution of the plans. The 1951 Convention approved a moratorium on televised college football games in 1951, increased the Television Committee's membership from three persons to six, and directed the committee to develop a plan whereby the televising of college football games could be controlled.

The plan, submitted to the 46th annual Convention, January 10-12, 1952, established the machinery by which NCAA-controlled television could be implemented. The 1952 season marked the beginning of the program that served the interests of college football for over 30 years. The 1952 Plan contained the following primary objectives and purposes, which remained the

---

[1] Efforts to document attendance damage since 1951 have followed the specific example approach. Quite recently, for example, the NCAA documented apparent damage to in-stadium attendance in Columbus, Ohio, related to Warner Cable (Qube) telecasts of Ohio State football games during 1978 and 1979. A study of responses viewers gave during these cablecasts to the question, "Would you have attended another college football game if this game had not been televised?" indicated that 1,138 spectators per weekend in the Columbus area (of an average Qube viewing audience of 21,500) were lost to college football because of the Ohio State cablecasts.

16

guiding principles for the Television Committee until the voiding
of the Association's most recent plan:

1. To reduce, insofar as possible, the adverse
   effects of live television upon football game
   attendance and, in turn, upon the athletic and
   education programs dependent upon that
   football attendance;

2. To spread television among as many NCAA member
   colleges as possible; and

3. To provide football television to the public
   to the extent compatible with the other two
   objectives.

After a year of operation, the Television Committee added an
important fourth objective: "To strive for enduring principles
appropriate for utilization in television plans for future
years." As noted, succeeding plans have shared the same
objectives: For the Subcommittee's purposes, however, I suggest
at this point that it was the second objective -- to spread
television among as many NCAA members as possible -- which, as
revenues from the successive plans grew to staggering figures,
ultimately proved to be both the principal virtue of the plans
and the source of their destruction.

The National Broadcasting Company (NBC) was the original
carrying network of NCAA football, telecasting 12 national games
in 1952 and a package in 1953 that involved 11 national games and
eight regional presentations on two dates. In those two years
and in the 1954 contract with the American Broadcasting Company
(ABC), a team was permitted one appearance per year on the

17

series.  This appearance limitation, I suggest to you, was the
feature of the original plan and albiet more liberal successive
plans, which eventually led to deep divisions between some of the
more agressive CFA members and the balance of the NCAA Division
I-A football-playing membership, and was the proximate cause of
the litigation with which the Subcommittee is concerned today.

In 1955, the Association's series moved back to NBC for
the start of a five-year relationship.  The appearance limit was
raised to two per year, and that remained the basic rule for the
next 25 years.  The 1955 contract also saw the beginnings of a
new kind of regional package.  Limited regional televising had
been included in the 1953 and 1954 seasons, but the 1955
arrangement expanded the regional presentations to five dates.
In addition, the format basically permitted each region of the
country to determine its own regional package for those dates,
rather than the system used today whereby the carrying network
selects and produces the regional telecasts.  One effect of this
new regional philosophy was the televising of college football on
more than one network in some parts of the country.  The
"independent" regional system remained in effect through 1959,
varying from three to five Saturdays per year.

Beginning in 1960, the NCAA package began to take on
more of the features included in today's telecasts.  ABC was the
carrying network, and the series included nine national and four
regional exposures.  For the first time, the rights for the
series surpassed $3 million ($3,125,000).

18

The character of the series changed again in 1964 when NBC began a two-year contract. At that time, the number of games within each regional exposure was increased to four, which resulted in a rise in the number of teams appearing on the series. Generally, about 35 different institutions had been appearing each year; with the new arrangement, approximately 50 appeared each season. That number remained relatively constant through 1977, even though the number of national telecasts in the package climbed from eight to 13.

In 1966, ABC again took over as the carrying network, beginning a relationship that has extended through the current contract, -- although ABC began sharing its rights with CBS in 1982. ABC's most recent contract, prior to the 1982-85 contract, started with the 1978 season and marked a new course. It was the first four-year pact; in addition, there was a 15 percent increase in the number of telecasts, from 20 to 23 (13 national, 10 regional), and the number of annual team appearances increased 41.5 percent. The number of games within each regional presentation also was increased, with 45 games being required among the 10 regional exposures. That 4.5 ratio was the largest in the history of the series.

In 1982, ABC and CBS were awarded a four-year contract for over-the-air rights extending through 1985. At the same time, the NCAA began to experiment with a supplemental cable series at night, with a two-year agreement with Turner

19

Broadcasting System. The supplemental series was developed primarily for institutions that received limited or no television opportunities on the network series. Rights to these cablecasts were awarded to ESPN for the 1984 and 1985 seasons.

Revenues. Corresponding with the growth in telecasts has been a greater growth in the financial aspect of the series. The initial NBC contract provided a rights fee of $1,144,000, and through the 1950s the value of the package remained under or near $2 million. In 1960, however, ABC provided an agreement worth $3,125,000 per year, a 41 percent increase from the 1959 NBC agreement. In 1962, CBS paid $5,100,000 for the rights, a gain of more than 63 percent. The next three contracts saw increases to $6,522,000, $7,800,000 and $10,200,000. Thus, by the end of the decade, the value of the NCAA football contract stood 226 percent higher than in 1960.

The financial gains continued throughout the 1970s. ABC paid $18 million per year for the 1976 and 1977 rights; in the 1978 agreement, the fee jumped to $29 million per year for the first two years and $31 million per year the second two years, due in no small part to the increased number of telecasts and the resultant increase in salable commercial time.

Within the $31 million, a total of $750,000 was paid for the Division I-AA football championship television rights, $520,000 for the Division II football championship and $150,000 for television rights to the Division III football championship.

20

In addition, institutions that appeared on the Divisions II and
III regular-season telecasts collected $165,000; while the rights
fees for five NCAA championships televised by ABC totaled
$250,000.

In the next section of this statement, beginning on page
12, I will discuss in greater detail the features and financial
aspects of the now-voided 1982-85 plan, for the two-year period
that plan remained in effect.

NCAA Assessment. The first NCAA assessment on the
Series rights fees in 1952 was 12 percent; after declining to
seven percent in 1963, it fluctuated between four and one-half
and six percent over the next 13 years. It was 7% in 1982 and
1983, and a major portion of the funds realized went to pay
transportation costs for all student-athletes participating in
NCAA championships. The basic assessment on the series rights
fees would have been 6.5% in 1984 and would have been 6% in 1985.
The assessment has at various times funded the NCAA postgraduate
scholarship program (90 scholarships in 1983, with a minimum of
25 for Divisions II and III), football promotion, television
administration, sports development and general administration --
as well as most recently student-athlete travel for NCAA
championships.

Attendance. As mentioned earlier, stadium attendance
was one of the big concerns at the time controlled football
television first was being considered. Several institutions had

21

reported drops in attendance during the period of uncontrolled
television.

In 1950, college football attendance stood at 19 million
persons nationwide. That figure was down 3.51 percent from the
previous year; and the attendance drop continued in 1951, the
year NCAA members placed a moratorium on college football
television.

Controlled television did not bring about an immediate
reversal in this trend, with attendance declining to 17.3 million
in 1952 (the first year of the plan) and finally to 16.7 million
in 1953. Beginning in 1954, though, national attendance started
to climb, first by 2.20 percent to 17 million. Since that first
increase 27 years ago, college football attendance has more than
doubled, to an all-time high of 36.5 million during the 1982
season. There have been only two seasons in the past decade in
which total attendance dropped from the previous year, 1974 and
1983. The per-game average in 1983 for Division I-A did
increase, however, and the Big Ten, Southeastern and Atlantic
Coast Conferences, and the Southern independents, enjoyed record
attendance years.

In addition to the revenue generated by the series, NCAA
member institutions rely heavily on income from ticket sales for
home football games. It already has been documented that college
football attendance is essentially at an all-time high; with that
increase in fans has come a corresponding gain in dollars

22

generated from ticket sales, a primary objective of the NCAA
television controls since the adoption of the first plan.

B.        The 1982-85 Plan.

          The most recent NCAA television plan, at issue in the
Supreme Court, was approved by the NCAA membership in May 1981 by
a vote of 220 to 6, with 28 abstentions (the vote in Division I-A
was 60 to 1, with 26 abstentions). A substantial majority of the
members of the College Football Association voted in favor of the
plan. Under the plan, the NCAA negotiated separate agreements
with two networks, ABC and CBS, and granted each network the
right to televise 14 live exposures annually for a period of four
years in exchange for rights fees totalling $263,500,000 --
$131,750,000 from each network. Each network was authorized to
negotiate with NCAA member institutions for the right to televise
their games, with the networks making alternate selections of the
games they wished to televise.

          In each of the two-year periods the plan was to be in
effect, each network annually was required to schedule a minimum
of 35 games that would include at least 82 different member
institutions. No member institution was permitted to be
scheduled by the networks more than six times (four times
nationally) during each two-year cycle. The networks also were
required to schedule appearances in the series for each of the
NCAA Division I-AA conferences over two years, and annually to
broadcast the championship games for Divisions I-AA and Division
II, and the final game of the Division III championship.

23

In 1982 and 1983, Division I-A members received about
$55 million each season, or about 82% of the available revenues,
and members of the CFA and Big Ten/Pacific Ten respectfully
annually received $51.6 and $57.1 million. Rights fees for
individual nationally-televised games were respectively $1.1
million in 1982 and $1.165 million in 1983. Regional exposures
generated about $620,000 and $672,000 respectively. Program
rights in the cable series were $350,000 in 1982 and $475,000 in
1983.

As noted, the 1982-85 plan proved most lucrative for
those institutions which now comprise the College Football
Association, as well as members of the Big Ten and Pacific Ten
conferences. CFA members received $36.7 million in 1982 and
$42.9 million in 1983; Big Ten/Pacific Ten institutions received
$14.9 and $14.2 in those years respectively. Other Division I-A
institutions, combined, received $2.1 million in 1982 and $0.8
million in 1983. The plan also proved attractive for
Divisions I-AA, II and III:

| | 1982 | $ millions | 1983 |
|---|---|---|---|
| Division I-AA | $4.34 | | $6.01 |
| I-AA Championship | 1.10 | | 1.23 |
| Division II | 0.27 | | 0.27 |
| II Championship | 0.52 | | 0.52 |
| Division III | 0.09 | | 0.09 |
| III Championship | 0.15 | | 0.15 |
| | $6.47 | | $8.27 |

It is perhaps instructive to the Subcommittee to note at this
point that none of these revenues to Divisions I-AA, II and III

24

are provided for in the plans which have now been announced for
the 1984 season by the CFA and Big Ten/Pacific Ten.  Institutions
in those divisions have been to fend for themselves.

Due to revenue-sharing arrangements in most of the major
conferences, income from the series is spread among a substantial
number of institutions.  In 1982 and 1983, for example, the
$122,111,990 paid by ABC and CBS to the 113 teams appearing on
the two series actually was shared by 177 institutions.

In summary, there were more college games televised in
1983 than any previous year, and the 1982-1985 Plan demonstrated
it contained the flexibility to handle a myriad of situations as
the Association completed its first two-year cycle on its con-
tracts with ABC and CBS and completed the first-ever contract for
a Supplementary Series.  The contracts with the three networks --
ABC, CBS and TBS -- provided 212 team-appearance opportunities
for Division I-A and I-AA regular season, Divisions II and III
regular season and Divisions I-AA, II and III championship games,
for a record $76,068,000.  The NCAA Television Committee effec-
tively administered and approved a record number of applications
for exception telecasts.  Teams from a total of 173 institutions
were televised in 1983 by the networks or on exception and other
telecast opportunities available in the NCAA Football Television
Plan 1983.

During the first two years of contracts with ABC and
CBS, each network televised games involving 78 different

25

Division I-A and I-AA institutions.  A combined 102 different
institutions received network exposure and 12 additional teams
that did not appear on network programming were cablecast by TBS.

C.     Antitrust Considerations

On June 27 of this year, the Supreme Court, by a 7-2
vote, determined that the current NCAA plan violated the
proscriptions of the Sherman Act.  The Court held that the plan
constituted improper horizontal price fixing of the rights fees
to be paid for the televising of games covered by the plan and an
improper limitation on "output," or the number of games that
could be televised.  Applying the so-called "Rule of Reason"
approach -- by which the pro-competitive effects of a particular
restrictive activity are balanced against its anti-competitive
effects to determine whether the restrictions unreasonably
restrain competition -- the Court on the basis of factual
findings by Judge Burciaga rejected the NCAA's claims as to the
pro-competitive effects of the plan and held the plan invalid.

Although I disagree with the result reached by the
Court, I do not intend by this testimony to criticize the Supreme
Court's opinion.  In light of the factual determinations of the
trial court necessarily (relied on heavily by the Supreme Court
in rejecting the NCAA's pro-competitive justification for the
plan), our lawyers had advised us in advance that the legal bases
for overturning the trial court's decision, at least to the
extent affirmed by the Court of Appeals, were significantly
limited.

26

What I would like to point out, however, is that the
Court specifically declined to strike down the plan on the more
harsh "per se" analysis traditionally applied by the courts in
cases involving alleged price-fixing and output limitation, and
stated that a fair evaluation of the character of the
restrictions "requires consideration of the NCAA's justification
for these restraints." It thus applied the "Rule of Reason"
approach.

Why is this significant to us? The answer is quite
simple: Because since the earliest days of the NCAA's television
plans, the NCAA has been aware of the possibility of a claim that
the plan might be subjected to scrutiny under the antitrust laws,
but has consistently been advised by counsel retained by it that,
even if the antitrust laws were to be applied to the plan, the
procompetitive purposes of the plan represented a sound basis for
justifying the plan's restrictions.

Thus, in 1951, when the first plan was being formulated,
the NCAA retained the services of a prominent Washington
attorney -- Joseph L. Rauh, Jr. -- to provide antitrust advice.
Mr. Rauh advised the NCAA that in his opinion, reasonable
controls on telecasting would not violate the antitrust laws and
that the controls proposed by the NCAA were reasonable in law and
in fact. The essential features of that plan were no different
than those contained in the plan voided 30 years later by Judge
Burciaga. The NCAA took the additional precaution of submitting

27

the plan to the Department of Justice. The Department took the
plan under study but at no time did the Department formally
inform the NCAA that it entertained doubts as to the legality of
the plan.

Indeed, during all the early years of the plan, there
existed serious question whether the plan was subject to scrutiny
under the antitrust laws at all. I am advised by our counsel
that at least until the mid-1970's, the Supreme Court interpreted
the Sherman Act as being applicable only to the business world,
at that as recently as 1970, the federal court of appeals here in
Washington had declined to apply the Sherman Act to an
educational accrediting organization which refused to accredit a
proprietary college.

This situation apparently changed in 1975 with a
decision involving a minimum fee schedule of the Virginia State
Bar Association, in which the Supreme Court made clear that the
professions (and inferentially non-profit educational organiza-
tions such as the NCAA) did not enjoy blanket exemption from the
antitrust laws. Even so, however, the Court suggested that the
same antitrust standards traditionally applied to business
organizations might not be applicable to the professions.

Since the rendering of this decision, the NCAA has been
sued a number of times on antitrust grounds, and in each case
until this most recent one, the courts have analyzed the alleged
restraint on a "Rule of Reason" basis, and have uniformly

28

declined to strike down the NCAA rule or practice as
unreasonable. In many of these cases, the NCAA restrictions
impacted on business interests. Thus, some five years ago, NCAA
restrictions forbidding the commercial marketing of student-
athletes for college admission were upheld. In 1977, an NCAA
rule restricting the number of assistant football coaches was
sustained as not unreasonably restraining competition. More
significant, perhaps, a federal district court in Columbus, Ohio,
just four years ago refused injunctive relief to a cable
television system seeking to televise Ohio State football games
in violation of the then-existing NCAA television plan. Again,
the court reached its decision by application of a Rule of Reason
analysis.

        I recite this state of affairs in order to give the
Subcommittee an objective perspective on what I believe to be the
absolutely scurrilous claims of the detractors from the NCAA
television plan, and their counsel, that the NCAA over the
history of the various plans has been engaged in a knowing and
willful violation of the antitrust laws.[2]  Quite the contrary is
true. Until the ruling by Judge Burciaga in 1982, the NCAA had

_____

2/  Minutes of the CFA Board of Directors meeting held December
    3, 1981, record that Mr. Andy Coats, one of the attorneys for
    Oklahoma, advised on that date that "[in]the past, antitrust
    laws did not apply to self-regulatory bodies. On the last
    ten years, however, the U.S. Supreme Court has ruled that in
    areas of commerce self regulatory bodies cannot be involved
    in price fixing or anti-competitive in the market place."
    (Emphasis added).

29

no reason to believe that its pro-competitive justifications for
the restrictions contained in the plan -- protection of live
gate, maintenance of competitive balance among NCAA member
institutions, sharing of revenues among a broader group of
institutions, and creation of a more attractive "product" to
compete with other forms of entertainment -- would not be found a
sufficient basis to sustain the plan as not unreasonable.

It is perhaps noteworthy that in reaching its result,
the Supreme Court essentially rejected all of the NCAA's non-
economic justifications for the plan and, like the trial court,
analyzed the impact of the plan strictly in terms of traditional
economic antitrust analysis. Mr. Justice White, writing the
minority opinion for himself and Mr. Justice Rehnquist, commented
on this approach in the following terms:

> "_Professional Engineers_ [a recent Supreme
> Court decision in the area] did make clear
> that antitrust analysis usually turns on
> "competitive conditions" and "economic
> conceptions." Ordinarily, the inquiry
> mandated by the Rule of Reason is whether the
> challenged agreement is one that promotes
> competition or one that suppresses
> competition. The purpose of antitrust
> analysis, the Court emphasized, is to form a
> judgment about the competitive significance of
> the restraint; it is not to decide whether a
> policy favoring competition is in the public
> interest, or in the interest of the members of
> an industry. Broadly read, these statements
> suggest that noneconomic values like the
> promotion of amateurism and fundamental ·
> educational objectives could not save the
> television plan from condemnation under the
> Sherman Act. But those statements were made
> in response to public interest justifications
> proffered in defense of a ban on competitive
> bidding imposed by practitioners engaged in

30

standard, profit-motivated commercial
activities. The primarily noneconomic values
pursued by educational institutions differ
fundamentally from the overriding commercial
purpose of [the] day-to-day activities of
engineers, lawyers, doctors, and businessmen,
and neither _Professional Engineers_ nor any
other decision of this Court suggests that
associations of nonprofit educational
institutions must defend their self-regulatory
restraints solely in terms of their
competitive impact, without regard for the
legitimate noneconomic values they promote.

    When these values are factored into the
balance, the NCAA's television plan seems
eminently reasonable. _Most fundamentally, the_
_plan fosters the goal of amateurism by_
_spreading revenues among various schools and_
_reducing the financial incentives toward_
_professionalism._ As the Court observes, the
NCAA imposes a variety of restrictions perhaps
better suited than the television plan for the
preservation of amateurism. Although the NCAA
does attempt vigorously to enforce these
restrictions, the vast potential for abuse
suggests that measures, like the television
plan, designed to limit the rewards of
professionalism are fully consistent with, and
essential to the attainment of, the NCAA's
objectives. In short, [t]he restraints upon
Oklahoma and Georgia and other colleges and
universities with excellent football programs
insure that they confine those programs within
the principles of amateurism so that
intercollegiate athletics supplement, rather
than inhibit, educational achievement. _The_
_collateral consequences of the spreading of_
_regional and national appearances among a_
_number of schools are many; the television_
_plan, like the ban on compensating student-_
_athletes, may well encourage students to_
_choose their schools, at least in part, on the_
_basis of educational quality by reducing the_
_perceived economic element of the choice, it_
_helps ensure the economic viability of_
_athletic programs at a wide variety of schools_
_with weaker football teams; and it promot[es]_
_competitive football among many and varied_
_amateur teams nationwide._ These important
contributions, I believe, are sufficient to

31

> offset any minimal anticompetitive effects of
> the television plan." (Citations omitted;
> emphasis added).

That two Justices of the Supreme Court (including the only
Justice personally experiencing the pressures involved in "big
time" college football and professional football) were prepared
to sustain the plan -- even in the face of the factual findings
made by the trial court -- suggests to me that those who publicly
characterize the NCAA as a 30-year knowing antitrust violator
entertain motives not necessarily related to a vindication of the
Sherman Act.

D.  Events flowing from the judicial decisions.

After having found that the NCAA plan violated the
Sherman Act, Judge Burciaga in his September 1982 opinion entered
a sweeping injunction, enjoining the NCAA (a) from attempting to
enforce the contracts which had been entered into pursuant to the
plan, (b) from "making any future contracts which purport to
grant any telecaster the right to televise the football games of
member institutions", and (c) from requiring as a condition of
membership that an institution grant the NCAA power to sell its
television rights. Judge Burciaga also determined, however, to
retain jurisdiction over the matter, on the grounds that the
"injunction . . . may well lead to circumstances which cannot at
this time be foreseen."

Following an appeal by the NCAA from Judge Burciaga's
decision, the Tenth Circuit Court of Appeals, in a 2-1 decision,

32

affirmed the trial court's holding that the plan constituted,
both on _per se_ grounds and upon Rule of Reason analysis, a
violation of the Sherman Act. Most significantly, however, the
Court of Appeals raised question as to the validity of the scope
of injunctive relief entered by Judge Burciaga. In response to
our contentions that the order could be read as prohibiting
broadcast of NCAA divisional championship games, a less
restrictive membership-wide contract with "opt-out" or "pass-
over" provisions, blackout rules, or imposition of sanctions for
violation of non-television regulations, the Court of Appeals
stated:

> "[The injunction] might be construed to
> prevent the NCAA from imposing television
> sanctions on schools that violate regulations
> unrelated to the television plan. [It] might
> also be read to preclude the NCAA from
> prohibiting games on Friday night. Neither of
> these effects is warranted by the violations
> found. Furthermore, [the injunction]
> appear[s] to vest exclusive control of
> television rights in the individual schools.
> While we hold that the NCAA cannot lawfully
> maintain exclusive control of the rights, how
> far such rights may be commonly regulated
> involves speculation that should not be made
> on the record of the instant case."

The Court of Appeals thus remanded the case to Judge Burciaga for
further consideration. Following a refusal by the Court of
Appeals to rehear the matter, the NCAA filed a petition for
certiorari in the Supreme Court. The petition was granted in
October 1983, and the trial court's order was stayed pending the
Supreme Court's hearing of the matter. Under these difficult

33

circumstances, neither the NCAA nor its members could plan with
any certainty for the 1984 season: The Court of Appeals decision
had left unsettled the basic issue of the extent to which, even
if the current plan were illegal, the NCAA could be permitted to
formulate and offer a less restrictive plan.

Against this unsettled background, the NCAA Football
Television Committee conducted a meeting January 11, 1984, in
Dallas, Texas, in conjunction with the 1984 NCAA Convention.  At
that meeting, the committee adopted proposed principles to modify
the existing contracts with ABC and CBS.  It also voted to
eliminate the Supplementary Series for the 1984 and 1985 seasons,
permitting institutions and conferences opportunities to
experiment with organized local programming outside the network
time period.  ABC and CBS subsequently indicated they were not
interested in modifying the existing agreement that would have
allowed conferences and independents to establish their own
Saturday night packages, unless the rights fees in network
contracts were renegotiated downward.

The Football Television Committee's second meeting in
1984 occurred February 22 in Kansas City.  It rescinded its
January vote that eliminated the Supplementary Series and
considered options for the Series under provisions of the 1982-
1985 NCAA Football Television Plan.  The committee also accepted
certain flexible modifications to the 1982-1985 Plan as offered
by the networks as quid pro quos to provide more flexibility to a

34

new carrier for the Supplementary Series. Modifications to the
existing plan were approved by the NCAA Council in an April 4,
1984, mail referendum.

Members of the committee's Negotiating and Nonnetwork
Subcommittees held a meeting March 6-7, 1984 in Chicago to meet
with representatives of ESPN and Turner Broadcasting regarding
their interest in rights to the Supplementary Series in 1984-85.
Both cable networks subsequently submitted bids for rights to the
Supplementary Series in 1984 and 1985.  ESPN was awarded rights
for $11.1 million and a commitment for extensive NCAA promotional
programming.

The Administrative Subcommittee of the Football
Television Committee began preliminary discussion for future
television planning in Chapel Hill, North Carolina, on May 7 and
8.  This meeting was held to establish some basic principles that
might be applicable under the anticipated Supreme Court ruling.
A May 25, 1984, meeting of the full committee created an ad hoc
Division I-A Football Television Subcommittee that was to develop
modifications in the Football Television Plan that might be
required by the Supreme Court decision.

The Supreme Court rendered its decision June 27 and
declared the NCAA agreements with CBS, ABC, and ESPN invalid.
Left open by the Court's affirmance of the Court of Appeals
decision, however, was the fundamental issue whether, in light of
the Court of Appeals decision and remand, the NCAA was

35

nonetheless authorized to offer a less restrictive plan and to
impose other restrictions related to the televising of games by
its members.  Particularly was this so in light of Mr. Justice
White's comments in his minority opinion:

> "As I shall explain, in reaching this result,
> the Court traps itself in commercial antitrust
> rhetoric and ideology and ignores the context
> in which the restraints have been imposed.
> "[It] is essential at this point to emphasize
> that neither the Court of Appeals nor this
> Court purports to hold that the NCAA may not
> (1) require its members who televise their
> games to pool and share the compensation
> received among themselves, with other schools,
> and with the NCAA; (2) limit the number of
> times any member may arrange to have its games
> shown on television; or (3) enforce reasonable
> blackout rules to avoid head-to-head
> competition for television audiences.  As I
> shall demonstrate, the Court wisely and
> correctly does not condemn such regulations."
> What the Court does affirm is the Court of
> Appeals' judgment that the NCAA may not limit
> the number of games that are broadcast on
> television and that it may not contract for an
> overall price that has the effect of setting
> the price for individual game broadcast
> rights."  (Emphasis added).

In a footnote to these statements, Mr. Justice White
commented on the potential impact of the decision on other
organizations:

> "This litigation was triggered by the
> NCAA's response to an attempt by the College
> Football Association (CFA), an organization of
> the more dominant football-playing schools and
> conferences, to develop an independent
> television plan.  To the extent that its plan
> contains features similar to those condemned
> as anticompetitive by the Court, the CFA may
> well have antitrust problems of its own.  To
> the extent that they desire continued
> membership in the NCAA, moreover,
> participation in a television plan developed

36

> by the CFA will not exempt football powers
> like respondents from the many kinds of NCAA
> controls over television appearances that the
> Court does not purport to invalidate."

Coincident with the issuance of the Supreme Court
decision, the Division I-A Subcommittee had scheduled its first
meeting for June 28 in Chicago, in conjunction with the
Division I-A Summer Legislative Meeting. The Subcommittee
immediately began work on a National Football Television Plan to
present to the Division I-A membership at a special meeting of
members of those divisions on July 10 to consider television
options for 1984. The special meeting also was conducted in
Chicago and was authorized by the 1984 NCAA Convention.

The Division I-A Subcommittee conducted hearings in
Chicago on June 30 with representatives of Division I-A
conferences, independents and network representatives. The
majority opinion at those hearings favored an NCAA plan for 1984
and the inclusion of all members of Division I-A. With that
mandate, the Division I-A Subcommittee developed an extremely
flexible plan that was believed by counsel to be valid under the
Supreme Court's ruling. It also realized the lateness of
planning for 1984 would prove crucial. It thus provided that any
institutions committing to the new plan would be released from
their commitments by July 17, to allow them to pursue other
football television alternatives in 1984, if Judge Burciaga's
original order had not been modified by that date. Prompt review
of the matter by Judge Burciaga was thus crucial.

37

The plan (attached) was approved by the Football
Television committee on July 2, followed by endorsement by the
NCAA Council on July 3. The special meeting was arranged for
July 10 to consider the new plan and consider other television
principles. Despite the fact the June 30 hearings indicated a
majority of Division I-A favored a plan of this nature, it
subsequently was defeated 66 to 44. What appears to be a widely
accepted assessment of that vote came from the current president
of the CFA, Otis A. Singletary, president of the University of
Kentucky:

> "Don't misread the vote. It's not anti-
> NCAA. What it shows is that there was
> uncertainty and pressure because the NCAA
> would have had to go back to court to get it
> approved and the opening game is only six
> weeks off."

After the NCAA's proposed TV plan was defeated by
the Division I-A members in the July 10 special meeting, the
Divisions I-A and I-AA members -- including a majority vote of
Division I-A -- adopted three binding principles for the 1984
football season:

> 1. There shall be no televising of collegiate
> football games on Friday nights, and any
> afternoon football televising on that day of
> the week must be completed by 7 p.m. local
> time in each location in which the program is
> received.
>
> 2. No member institution shall be obligated
> to televise any of its games, at home or away.
> No member institution may make any
> arrangements for live or delayed televising of
> any game without the prior consent of its
> opponent institution.

38

> 3. The gross rights fee paid for each 1984 national telecast or cablecast shall be subject to an assessment of four percent to be paid to the NCAA by the home institution. The assessment will be used to fund the costs of the NCAA postgraduate scholarship program and football-related NCAA services.

In fact, any hope of unified action on July 10 among the Division I-A football-playing members of the NCAA was dissipated when the plaintiffs in the original lawsuit, the Universities of Georgia and Oklahoma, refused to join with the NCAA in agreeing upon a modification of the trial court's outstanding injunction, even though the basis for modifying the scope of the injunction clearly had been laid by the rulings of the Court of Appeals and the Supreme Court. A copy of the NCAA's proposed modification is attached.

The plaintiffs' attorney, Clyde Muchmore of Oklahoma City, declared that it was the intention of his clients to ask the trial court to "fence out" the NCAA organizational structure from further college football television activities for violations of the antitrust laws. When asked what position he had taken with the trial court concerning a modified injunction, Muchmore told USA Today, "We took the strong position that the NCAA should not be allowed to have any TV plan, because they were judged guilty of using the power of the NCAA to monopolize."[3]

---

3/ The Court of Appeals never reached the monopolization claim, declaring that a "reversal of the court's [monopolization] ruling would not affect the scope of relief granted."

39

This posture on behalf of the plaintiffs' advocate again raises question as to the CFA's motives in the weeks immediately following the Supreme Court decision. Aware of the Court of Appeals' reservations concerning the scope of Judge Burciaga's injunction and the limited thrust of the Supreme Court opinion, the CFA seemed more intent upon making certain that the NCAA could not offer a plan for 1984 than upon fostering the competition among various marketing plans for which it had so vigorously battled during the course of the lawsuit.

The only plan presented to the July 10 meeting was the national television program recommended by the NCAA Football Television Committee. No other plan had been presented -- even by the CFA, although the efforts were made by the NCAA Council to encourage other institutions, conferences and groups to submit alternate plans. Opponents argued that the pending injunction of Judge Burciaga could not be modified in time to permit an NCAA plan to operate for 1984 and urged support for an undeveloped College Football Association plan, which Mr. Muchmore and the plaintiffs apparently believed could meet the trial court's requirements or at least could operate in 1984 before being outlawed by subsequent court decision.

The CFA, reportedly with support from an estimated 60 members, proceeded to market its "plan"; and the Big Ten and Pacific-Ten Conferences, in a joint effort approved by the chief executive officers of the two conferences, also went into

40

negotiation with the national networks. Both CBS and ABC indicated interest in putting together national packages, whereas NBC, due to extensive fall baseball commitments, said it would be interested in some games but not in a season-long package.

CBS, through its president, Neal H. Pilson, clearly indicated a desire to put together a national package, and reports indicated that he hoped to deal with the Big Ten and Pacific-Ten Conferences to form a nucleus, add key games from such Eastern football powers as Pittsburgh, Syracuse, Boston College and the service academies, and encourage other CFA members to join the CBS presentations. When reportedly told by a CFA spokesman that CFA games would not be made available separately but only as a part of the CFA package, Pilson responded that such action would constitute a "boycott" and would be faced with immediate legal challenge.

The terms of the defeated 1984 NCAA football plan provided for national rights fees of an estimated $1.5 million for a national game and more than $700,000 for regional games on ABC and CBS and more than $360,000 for ESPN cablecasts. The total rights involved came to approximately $73.6 million. In 1985, under the NCAA proposed contracts, the total rights would have been $78 million.

In May and June, the CFA leadership predicted that the CFA package would achieve $50 million in 1984 rights and that there would be $250,000 "passover" payments to all members of the

41

CFA that agreed to abide by the terms of the CFA plan. Those figures were repeated at the Division I-A meeting in Chicago June 28-29, despite contradiction by representatives of the television industry and by members of the NCAA Football Television Committee. A much more conservative tone was evident at the July 10 special television meeting, although CFA officials reportedly ridiculed a suggested price of $25 million for the CFA package.

According to published reports, the Big Ten/Pacific Ten has as of this date negotiated a contract with CBS for the 1984 season involving 12 exposures and 18 games, for rights fees of $9.5 million. CFA, on the other hand, has negotiated a contract with ABC involving 20 games, for a rights fee of $12 million and a cable series with ESPN featuring 14 exposures for $9.3 million -- about $5 million less than the amount reportedly ridiculed earlier this month. We understand that under the CFA plan, however, there is a prohibition against "crossovers", that is, a CFA member may not -- without consent of other CFA members -- participate in the network televising of a game against a non-CFA member, and that CFA members are prevented by the ABC contract from appearing on any other network.[4] These restrictions would appear open to serious question under the

4/  Minutes of the November 1, 1982 CFA TV Committee, held following Judge Burciaga's decision, state that ". . . it was agreed that any CFA television arrangement must be voluntary and that non-exclusivity provisions would be helpful in avoiding the establishment of a monopoly."

42

principles of Judge Burciaga's decision, but perhaps more importantly, will prevent the viewing public from seeing such significant games as that scheduled between Nebraska and UCLA for September 22. That CFA is aware of these potential problems is evident from the opinion letter it received from Oklahoma's counsel on June 14, attached.

I believe -- and this view is apparently shared by counsel for the Big Ten and Pacific Ten -- that the question of the impact of Judge Burciaga's decision and injunction on the validity of the CFA plan is a serious one. CFA members were the dominant beneficiaries of the now-voided NCAA plan, having received respectively $36.7 million and $42.9 million of the rights fees paid under the plan in 1982 and 1983. And yet they now appear to be participants in the self-same activities that were characterized by Judge Burciaga as involving illegal conduct by the NCAA. Although the Court of Appeals declined to follow Judge Burciaga's reasoning on group boycott, the Judge's injunction -- which at least in major part rested on this ground and on output limitation -- still stands and raises the question whether those who were in privity with the NCAA plan, by virtue of their approval thereof and acceptance of large benefits thereunder, may simply under another guise participate in actions that the Judge has enjoined.

Many of the delegates at the July 10 meeting were increasingly conscious of the depressed market for college

43

football. Several expressed the hope that, whereas national rights would be substantially less, the colleges might make up the 1984 financial losses from increased regional television. Because negotiation of "individual packages" is still incomplete as of the date of these hearings, no accurate judgment of the aggregate value of these contracts is really possible. Based on our experience with the television market in a variety of contexts, however, we believe the aggregate value of those contracts in 1984 will not exceed $16 to $18 million -- one half of which will be received by Big Ten and Pacific Ten colleges.

In the scramble now occurring to recoup lost revenue through national and regional syndication, the potential for damage to revenues from in-stadium attendance is manifest. Protection of in-stadium attendance was a basic principle of the first and all succeeding NCAA plans. It is curious indeed that the Division I-A members voted on July 10 not to broadcast on Friday nights in competition with the high schools; one may will wonder whether protection for college game attendance will not be lost in the shuffle.

E. The future for college football.

So where do we find ourselves today? For me personally, it is a time of personal sadness, because I am concerned about the welfare of college football, a sport with which I have been personally associated for most of my adult life. Despite what the Universities of Oklahoma and Georgia may say, that football

44

is a property right to be used as a business tool to make money
for their universities, it is my view that the vast majority of
football-playing members of the NCAA and, indeed, the public-at-
large disagree with that highly commercial perspective.

College football is a uniquely American game. It was
originated by the colleges and it is one of our nation's great
traditions. People may use the expression "American as apple
pie," but I submit to you that college football on Saturday
afternoon is as much an American tradition as anything that has
persisted in this country, and college football has been a part
of the fabric of our society for more than 100 years. It's a
unique, demanding game for young people to play and the more
colleges that sponsor the sport, the more young people play the
game. Until recently, it was never conceived as a money-making
tool for college administrators who, unable to raise money
through their legislatures or through their alumni, turned to
their football teams to build their libraries or to generate
general funds.

My dismay and sadness stem from the fact that I sense
that there is no one now looking after the welfare of college
football as a whole. Television is a unique, powerful tool that
dramatically affects sports. The judicial system of the United
States may not appreciate that, although Mr. Justice White
understands it because he played the game from high school
through college and professional football:

45

> "[T]he restraints [of the NCAA plan] on
> Georgia and Oklahoma . . . insure that they
> confine their programs within the principles
> of amateurism so that intercollegiate  .
> athletics supplement, rather than inhibit,
> educational achievement."

The plaintiffs and their lawyer contend that college football is just like college basketball, for television purposes, and since there are no national controls in college basketball, we do not need any in college football. The trial court, the 10th Circuit of Appeals and the Supreme Court all accepted or noted that argument. I will not go into the vast distinctions between the two sports other than to say that college football plays 95% of its games on Saturday in open air stadiums, is an expensive sport because of the number of participants, dollar income is much more governing to football than to basketball and the publicity factor in college football television is critical in the recruiting process, regardless of how the money may be divided among the conferences and other organizations.

Mr. Justice White appreciated all of that, but the antitrust experts, caught up in the plaintiffs' arguments and the jargon of antitrust business terms and application, ignored the fact that national controls on football television are as essential to keeping a relative balance in college football as are limits on grants-in-aid, limits on coaching staffs and, for that matter, limits on the number of games institutions may play.

46

The Supreme Court extolled many of the rules and the
activities of the NCAA, but somehow missed the point that
unrestricted television on the one hand will give added momentum
to prominent institutions to build all winning teams at whatever
the cost, in order to maximize the television dollars they can
obtain. On the other hand, the decision has turned over to the
networks unlimited power to negotiate and obtain college football
TV rights and dictate the terms of the plans colleges may develop
and -- it has been my experience -- the major television networks
generally use their power in a most aggressive manner.

I am dismayed and saddened because I feel that college
football is in disarray because a minority of institutions
believe they should have unlimited opportunity to use their
"property" to maximize their profits and, on the other hand,
because a small number of television networks that now can
manipulate the college football market the way they wish.

One may also inquire in this context whether individual
institutions, in their desire to increase the viewer popularity
of their "property right", will not be forced eventually to focus
on developing consistent winning percentages and increasingly to
attempt to schedule games with other teams which have also
demonstrated the capacity to win consistently. If these
objectives begin to dominate the game, I suggest, they will
almost inevitably lead to a severe erosion of the conference
structure which for many years has been a hallmark of college

47

football. I think it not unreasonable in these circumstances to visualize the eventual development of some sort of "super-conference" for the titans of the game -- a result I am sure the networks would find attractive but one which will redound to the benefit of only a small minority of NCAA (or indeed CFA) members.

There is no doubt that even under the now-voided NCAA television apparatus, we have had a difficult time in attempting to keep the game within the confines of our constitutional purpose -- to maintain intercollegiate athletics as an integral part of the educational program. We confront never-ending battles within our membership to establish reasonable and enforceable academic standards as pre-conditions to participation in athletics, we have been required to increase our enforcement staff from 10 to 30 in the past five years to keep track of and police recruiting violations, the graduation rates for our student-athletes is by any measure unsatisfactory, and the pressure to win tends more and more to dominate the game.

Sadder yet, perhaps, is the fact that with loss of the mandated revenue-sharing aspects of our plan, numerous less prominent institutions with fine football programs are now essentially shut out of any significant participation in the market for television. Nothing in the CFA or Big Ten/Pacific Ten plans makes any provision for them and indeed unless and until Judge Burciaga modifies his order, serious doubt exists as to our own capacity to provide revenue to smaller colleges through the marketing of Division I-AA, II and III championships.

48

It takes no economist to foresee with any accuracy what
lies ahead. The networks are now in control of the market, and
as would any business enterprise, these networks will seek to
sell the most attractive product, commanding the highest prices,
at the lowest acquisition cost. Their power in an uncontrolled
football television market is already manifest; the CFA and Big
Ten/Pacific Ten colleges, comprising most of NCAA Division I-A,
have succeeded in selling their "packages" to the networks at
prices far below those which they would have realized under the
now-voided NCAA plan, or what they could have expected under the
NCAA's modified national plan involving the entire Division I-A
membership that was developed following the Supreme Court
decision.

What also obviously lies ahead, in response to this
network power, is an effort among those major institutions
seeking to operate football as a business, to aggrandize the
value of their product by creating a more attractive product,
that is, by recruiting only the most talented athletes to their
institution with possibly less than necessary regard for the
educational capacity and welfare of those athletes.

Saddest of all to me is the potential impact of this
situation on the student-athlete. Although the "new environment"
may redound to the benefit of that handful of college football
players destined to become professionals, where does it leave the
college player who participates because of his love for the game,

49

and as a part of his overall educational experience?  For many, I
suggest, it will mean a panorama of diminishing opportunity, as
many of those institutions -- previously sharing in the revenues
from the NCAA plan or enjoying live gate protection because of
the plan -- find themselves increasingly unable to make ends
meet.  And this is not to speak of the thousands of student-
athletes, men and women, who participate in non-revenue producing
sports and championships funded, at least in part, by football
revenues.

Although I find no humor in this situation, I am
reminded as I view the now-successful effort to dismantle the
NCAA's television controls, of the line made famous by Gertrude
Stein:  "And when you get there, there isn't any there there."
The "there" that is now upon us is a not promising.

50

Proposal No. 2

RECOMMENDED NATIONAL FOOTBALL TELEVISION PLAN

1984

ARTICLE 1

Purposes of Plan

The purposes of this Plan shall be through live television (see Note 1)
to reflect properly the image of universities and colleges as educational
institutions; to promote college football through the use of national
television, and to advance the overall interests of intercollegiate
athletics.

Note 1:   As used in this Plan, the terms television and televising shall
mean all types of television delivery systems, including, without
limitation, conventional broadcast, cable and other television
transmissions and delivery systems.

ARTICLE 2

Implementation

This Plan is conditional to the extent that it shall not take effect
except upon a determination that it is legally and practically appropriate
to implement it.  Such determination shall be made by the chair of the
NCAA Football Television Committee and the NCAA officers president and
secretary-treasurer acting in concert.

ARTICLE 3

Administration

The Plan shall be in effect from September 1, 1984, through the second
Saturday in December of 1984, and shall apply to the 1984 football season
only.

The Plan shall be administered by the NCAA Football Television Committee
(hereinafter referred to as the "committee").

51

RECOMMENDED NATIONAL
FOOTBALL TELEVISION PLAN
Page No. 2

## ARTICLE 4

### Participating Members

Any member institution classified in Division I-A football may elect
to participate in the ~~NCAA~~ National Football Television Series ("The
NCAA National Series"). Members electing to participate in the NCAA
National Series agree to televise their football games only in accordance
with the provisions of the Plan. Members of Divisions I-A not
participating in the ~~NCAA~~ National Series are free to televise their
football games without restrictions except for the provisions of Articles
~~8,~~ 9 and 10, second paragraph.

Members of Divisions I-AA, II or III are free to televise their football
games without restrictions except for the provisions of Articles 9 and
10, second paragraph.

Members of Division I-A football electing to participate in the NCAA National
Series shall make such elections on or before July 12, 1984, by written declara-
tion on forms submitted to them by the committee. If it is not legally permis-
sible to implement this Plan ~~is not implemented on or about~~ by July 17, then
such elections filed prior thereto shall be deemed withdrawn. Elections to
participate may be accepted after this Plan is implemented.

## ARTICLE 5

### ~~Award of~~ Rights for ~~NCAA~~ National Series
### Saturday Afternoon Games

The committee shall ~~submit to "qualified organizations"~~ requests
applications from television networks and other television and cable
organizations for certification as a qualified carrier. The committee
shall ~~determine on the basis of the bids~~ identify and certify those
carriers ~~to whom the rights for televising and/or cablecasting the NCAA
Series shall be awarded~~ that have elected to present National Series
games and have agreed to the administrative requirements determined by
the committee.

Qualified carriers then will have the right to negotiate directly with
the participating institutions for the right of simultaneously ~~broadcasting~~
televising ~~via~~ (including television ~~or~~ and cablevision per Note 1)
Division I-A games scheduled for Saturday afternoons during each week
of the season.

a.   "Qualified ~~organizations~~ carriers" are those national networks or
     other television or cablevision organizations which ~~broadcast~~ can
     televise to at least 20 million homes in at least 30 states and
     agree to present at least 10 National Series exposures, with a minimum
     of 18 to 24 games (number to be determined by the committee) if
     the carrier has the ability to regionalize. If a carrier cannot
     regionalize, it must agree to present a minimum of 12 exposures.

52

RECOMMENDED NATIONAL
FOOTBALL TELEVISION PLAN
Page No. 3

b.   An exposure shall ~~be~~ constitute the ~~release~~ televising on a single
date of a live game or games ~~telecast or cablecast into~~ made available
to markets constituting at least 90 percent of the television markets
served by the qualified ~~organization~~ carrier, provided that at no
time shall the qualified ~~organization's~~ carrier's coverage be less
than that specified in paragraph a.

Each qualified carrier will determine the game or games ~~to be~~ it will
televised on each date ~~shall be determined by the selected carriers and
they shall~~ freely ~~negotiate~~ negotiating and contract contracting ~~indivi-
dually and directly~~ with the participating member colleges for such
compensation ~~as~~ may be agreed upon.  The carriers shall be free to
arrange with the consent of the ~~participants~~ participating institutions
for the movement of games to the preferred dates of presentations.

Each qualified ~~organization successfully bidding and procuring~~ carrier
which a contracts for a National Series game shall promptly notify the
committee of the game, date and rights fee to be paid to the participating
institutions.

The rights fees for each National Series game shall be paid to the home
institution and shall be subject to an assessment to be paid to the NCAA
by the carrier of four percent to meet the requirements of NCAA television
administration and to ~~advance the interests of intercollegiate~~ fund
football-related services, ~~and athletics in general, including the NCAA
Postgraduate Scholarship Program~~ and an additional 16 percent to provide
~~compensation~~ passover revenue to Division I-A members that elected to
participate but had no games televised ~~in~~ on the NCAA National Series
~~but were not selected for presentation~~. There shall be no additional
assessment by the NCAA upon the rights fees paid to the participating
institutions.

A game selected may involve one nonparticipant in this Plan provided
both institutions participating in the game agree that the game shall
be subject to all the terms of this Plan and the committee is so notified
by the carrier presenting the game.


ARTICLE 6

~~Award of~~ Rights for ~~NCAA~~ National Series Special Dates

In accordance with the procedures and terms set forth in Article 5, the
committee may identify one or more of the following dates, in addition
to the 14 Saturdays, for which the qualified ~~organizations~~ carriers
may ~~bid~~ acquire rights ~~for rights~~:  Thanksgiving, the Friday afternoon
following Thanksgiving and Labor Day ~~and a maximum of six nights excluding
Fridays~~.

53

RECOMMENDED NATIONAL
FOOTBALL TELEVISION PLAN
Page No. 4

## ARTICLE 7

### Coverage Rights and Requirements

Each carrier shall ~~offer~~ provide complete ~~simultaneous~~ coverage of one
or more games of participating members for each date and special date
for which it ~~has~~ contracts. A carrier may change coverage from a one-sided
game to a more competitive game during presentation of regional telecasts.
Such coverage shall not be changed until after completion of the half-time
program and then only in a  game in which the point differential is 18
points or more. Even for such a game, it shall not be changed in the
home television area of either of the participants. These areas shall
be determined in each such case by the committee or its designated
representatives. Each carrier may change coverage in this manner no
more than once per season for any team.

Each carrier shall have the right to simultaneously transmit via television
or cable transmission the games selected by it throughout the world in
any area in which simultaneous transmission is possible. Additionally,
such rights shall include the right to release each such game on a delayed
basis in Hawaii and Alaska within seven (7) days following the game,
provided such release shall not conflict with any high school game on
Friday night.

The rights granted to each carrier shall include the right to use excerpts
of any game released hereunder of any length on a delayed basis anywhere
in the world in any news or sports program within 48 ~~days~~ hours of the
conclusion of the game, and thereafter excerpts of two minutes or less
for newscasts, promotional purposes and anthologies released by the
carrier.

## ARTICLE 8

### Time of Presentations and Appearance Limitations

The ~~NCAA~~ National Series games shall be available to be televised
~~simultaneously~~ during a period of three and one-half hours on each date
as determined by the committee. The specific ~~starting~~ times period for
each date ~~of the presentation on each date~~ shall be announced by the
committee on or before August 1. There shall be no other televising
by participating members of Division I-A during the announced three and
one-half hours ~~following the announced starting time of the presentation
on each date~~ time period. The ~~starting~~ times periods shall ~~be~~ commence
either at 12 p.m. ET or 3:30 p.m. ET.

A carrier may receive credit (if approved by the committee) for a
National Series presentation for an exposure presented in whole or in
part at a time other than the announced time period if said game is
televised as a National Series game subject to the conditions of the
Plan.

No member of NCAA Division I-A may appear on ~~football television during
such three and one-half hour periods~~ a National Series game more than
four times during the year, provided if only one carrier televises the
~~...~~ ~~Series games during the year~~ the limit shall be three.

54

### ARTICLE 9

#### Friday Night Television

There shall be no simultaneous television of collegiate football games on Friday nights. Any afternoon football television on that day of the week must be completed by 7 p.m. local time in each location in which the program is received.

### ARTICLE 10

#### Member Institution Game
#### Contracts and Consent of Opponents

Each member institution shall contract for its own ~~NCAA~~ National Series television appearance(s).

No member institution shall be obligated to televise any of its games, home or away. No member institution may make any arrangements for live or delayed television of any game without the prior consent of its opponent institution.

### ARTICLE 11

#### Standards of Presentation

Only sponsors approved by the Football Television Committee may be utilized for ~~NCAA~~ National Series games or other supporting programs televised by a qualified carrier.

Those sponsors approved shall be organizations of high standards whose products and advertising are consistent with the promotion of college football and present the sport as an integral part of higher education.

Advertising policies established in NCAA Executive Regulations 1-17 shall apply to all National Series telecasts.

#### Beverage Advertising Restrictions

Sponsors advertising malt beverages, beer or wine are approved on a limited basis for television of a series game, including special date games, pregame shows and postgame shows. In each pregame show, three such 30-second commercials and, in each postgame show originating from the site of a game, two such 30-second commercials may be presented. There shall be no limitations with respect to such commercials in postgame shows originating from the carrier's home studio or other location clearly

55

RECOMMENDED NATIONAL
FOOTBALL TELEVISION PLAN
Page No. 6

There shall be within each such game a maximum of nine such 30-second commercials: one within positions one to three, one within positions four to six, one within positions seven to nine, one within positions 10 to 11, one within positions 12 to 14, one within positions 15 to 17, one within positions 18 to 20, one within positions 21 to 23 and one within positions 24 and 25 (as such positions are set forth in the Commercial Format set forth in this Article). There shall be no more than 270 seconds of commercial time for such sponsors permissible in the aforesaid nine allowable positions during each game.

### Commercial Format

In each game program, there shall be not more than 26 commercial minutes presented in 25 commercial periods, 22 of not more than 60 seconds each and one of 30 seconds, one of 120 seconds and one of not more than 90 seconds, and not more than two station breaks of no more than 63 seconds each, in each such game telecast.

Start of Game
    (1)  Commercial (30 seconds or 60 seconds)**
    (2)  Commercial
Start of First Quarter
    (3)  Commercial
    (4)  Commercial
    (5)  Commercial
    (6)  Commercial
End of First Quarter
    (7)  2 Commercials (60 plus 60)
Start of Second Quarter
    (8)  Commercial
    (9)  Commercial
    (10) Commercial
    (11) Commercial
End of Second Quarter
       Half time
       Station break (63 seconds)++
    (12) Commercial*
    (13) 2 Commercials (60 plus 30)
Start of Third Quarter
    (14) Commercial
    (15) Commercial
    (16) Commercial
    (17) Commercial
End of Third Quarter
    (18) Commercial
       Station break (63 seconds)++
Start of Fourth Quarter
    (19) Commercial
    (20) Commercial
    (21) Commercial
    (22) Commercial

56

RECOMMENDED NATIONAL
FOOTBALL TELEVISION PLAN
Page No. 7

---

<u>End of Fourth Quarter</u>
    (23)  Commercial#
    (24)  Commercial#
    (25)  Commercial (30 seconds or 60 seconds )**#
<u>End of Game</u>

("Commercial" means an interval for presentation of commercials by the
carrier.)


### Notes

*30 seconds of this time may run adjacent to commercial position No. 2.

.**Commercial positions Nos. 1 and 25 are to total 90 seconds.  Duration
of each to be carrier's option.

#Commercial No. 25 may not be inserted into fourth quarter.  .

Commercial Positions Nos. 23 and 24 may be inserted into the fourth quarter
if Position No. 23 is preceded by a natural timeout used for game commen-
tary, and if there are sufficient natural timeouts thereafter to accommo-
date them.  In addition, if the length of the game telecast will exceed
three hours and five minutes, measured from the beginning of that portion
of the program containing Commercial No. 1, then, following another natural
timeout used for game commentary, an additional 60 seconds of commercial
time may be used during the fourth quarter within a natural timeout
following a score (touchdown, field goal or safety).  Malt beverage,
beer or wine advertising may be used in this commercial position.

++If the policy of the carrying network concerning the length of station
breaks changes from 63 seconds, the ~~Football Television~~ committee will
consider the change and will approve it if reasonable.


### Liaison Official

For each such ~~NCAA~~ National Series game, the agency which assigns officials
for the host institution shall appoint a Liaison Official, who shall
serve as coordinator between the producer and field officials in assuming
observance of the commercial format described in Article 11.  His functions
shall be prescribed by the committee in a pamphlet which shall be made
available to each game official, liaison official and assigning agency,
and to the head football coach and director of athletics of each member
participating in the ~~NCAA~~ National Series.

The Liaison Official shall have sole authority to call or extend timeouts
for use by the awardee for insertion of commercial messages according
to the format herein, although the referee retains ultimate control of
the administration of the game.  The Liaison Official shall not agree
to any special format or deviation from the regular format or procedures
for any game.  One of his primary goals shall be the presentation of
the necessary commercials without affecting the flow of the game.

RECOMMENDED NATIONAL
FOOTBALL TELEVISION PLAN
Page No. 8

The carrier shall provide the Liaison Official with a telephone headset over which he can communicate with the producer of the telecast, and he is to wear the headset and be in direct personal contact with the producer throughout the game. The carrier shall provide a cable handler to assist the Liaison Official if requested to do so.

The Liaison Official will be reimbursed for his fee and expenses by the carrier through his assigning agency.

### Promotional Announcements

To avoid distractions from such game presentations, the carrier shall utilize good taste and judgment in restricting the number of announcements it uses on each program to promote other programs or the game hereunder. During the period from the beginning of the pregame show to the conclusion of the game presentation, the carrier shall be limited in the promotion of any and all other shows or events, including games hereunder, to the same amount of time per presentation which is allocated herein to the NCAA and the participating colleges for promotional messages.

The committee expects the support of each carrier in furthering the demarcation between collegiate and professional sports activities. In that regard, the carrier may present during each presentation hereunder not in excess of two promotional announcements for professional football television. Any such announcement shall not exceed 15 seconds in length, shall be of a billboard nature only and shall not include any action excerpts of any professional game. Only one such announcement may be presented in each half of a game presentation. It may be aired adjacent to a commercial position.

### ARTICLE 12

#### Selection of Announcers

Each carrier shall consult with the committee on the play-by-play announcers and color commentators it plans to utilize for the game presentation hereunder prior to their selection. The final decision concerning any announcer shall be that of the carrier.

58

RECOMMENDED NATIONAL
FOOTBALL TELEVISION PLAN
Page No. 9

## ARTICLE 13

### Other Requirements for Awardees

In the interest of promoting intercollegiate athletics, each awardee
shall meet the following requirements:

#### NCAA/Institutional Announcements

(a)  During each game presentation hereunder, the NCAA shall be allotted
not--to--exceed from two to four minutes of time during which
announcements by or of interest to the NCAA or the participating
institutions shall be presented by the carrier. Materials for these
announcements shall be provided to the carrier by the committee
or institution. At least 60 seconds of this time on each game
presentation shall be devoted to presentation of information on
higher education and the contributions of NCAA member colleges to
society.

During such game presentation, the time shall be allocated as follows:

| NCAA | |
|---|---|
| NCAA | ~~120~~ 60 seconds* |
| 30-second message for each institution | 60 seconds |
| ~~30-second message for each conference~~ | ~~60 seconds~~ |

*~~60 seconds of~~ This time shall be devoted to presentation of messages on higher
education.

#### Videotapes

(b)  Each carrier shall provide to the NCAA and the participating institutions
at their request at the cost of the raw video cassette stock one complete
set of three-quarter inch video cassettes for the program of each game
televised as a NCAA National series game program. The NCAA may use at
no cost to the networks all or
any part of each program for any purpose, except television
broadcasting or cablecasting, and the NCAA may use excerpts (not
exceeding five minutes in length) of each program for any purpose,
including television broadcasting or cablecasting. Except as limited
above, the right to use each program shall include the right to
do, and the right to authorize anyone else to do, any of the following
with respect to the program:  to reproduce the program; to prepare
derivative works based on the program; to distribute to the public
copies of the program, by sale or other transfer of ownership, or
by rental, lease or landing; to perform publicly the program; and
to display publicly the program.  Upon the NCAA's request and at
its expense for any additional costs incurred, such video cassettes
shall be made available to the NCAA in New York City on Monday
following each game.

59

RECOMMENDED NATIONAL
FOOTBALL TELEVISION PLAN
Page No. 10
_____

### Team Areas

(c)  The carrier of ~~an~~ a ~~NCAA~~ National Series game hereunder shall not
allow its personnel or its equipment to be in the team areas during
a game.  The carrier and its personnel shall observe all rules of
college football at all times during preparation for production
of a television presentation.

### Game Officials

(d)  It is permissible for a carrier to place a microphone on the referee
of a game televised hereunder.  Identification by the referee of
a player who commits a violation for which a penalty is assessed
is authorized by the committee, subject to the approval of the host
institution of the game, the rules of the host institutions'
conference, if it is a member of such an organization, and the rules
of the agency which assigns the game officials.

### ARTICLE 14

### Modification of Plan

The committee shall have authority to modify this Plan to further its
stated purposes, provided any substantive change shall be subject to
approval of the Division I-A members of the NCAA Council, and any change
adversely affecting the rights of any carrier must be approved by such
carrier.

Source:  University of Florida, University of Michigan, University of
Nebraska, University of North Carolina, Chapel Hill, Pacific-10
Conference, University of Pittsburgh, Rice University, Syracuse
University and Western Athletic Conference.

Intent:  To provide a national Division I-A football television plan
for 1984.

The National Collegiate Athletic Association
Mission, Kansas       DEC:ers      July 6, 1984

60

.IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

THE BOARD OF REGENTS OF THE )
UNIVERSITY OF OKLAHOMA and )
the UNIVERSITY OF GEORGIA )
ATHLETIC ASSOCIATION, )
                    )
         Plaintiffs, )
                    )
  v. )        No. CIV-81-1209-BU
                    )
NATIONAL COLLEGIATE )
ATHLETIC ASSOCIATION, )
                    )
        Defendant. )

## DEFENDANT'S MOTION TO MODIFY JUDGMENT

COMES NOW defendant, The National Collegiate Athletic
Association, and respectfully moves the Court for an order
modifying this Court's judgment in light of the views expressed
in the opinion of the Court of Appeals as affirmed by the United
States Supreme Court. In support of its motion, defendant
further states:

1. In its opinion on defendant's appeal from this Court's
judgment, the Court of Appeals held (707 F.2d 1147, 1162):

> Paragraph four [of the District Court's judgment] might be
> construed to prevent the NCAA from imposing television sanc-
> tions on schools that violate regulations unrelated to the
> television plan. [footnote omitted]  Paragraph four might
> also be read to preclude the NCAA from prohibiting games on
> Friday night.  Neither of these effects is warranted by the
> violations found.  Furthermore, paragraphs one and four
> appear to vest exclusive control of television rights in the
> individual schools.  While we hold that the NCAA cannot law-
> fully maintain exclusive control of the rights, how far such
> rights may be commonly regulated involves speculation that
> should not be made on the record of the instant case.  The
> NCAA's arguments regarding the specificity and self-

61

sufficiency of the injunction should also be addressed by the district court.

　　　We REMAND to permit the district court to consider its injunction in light of the views expressed in this opinion. In all other respects consistent herewith the judgment of the district court is AFFIRMED.

2.　The Supreme Court affirmed the Court by Appeals' direction to modify the remedy (Slip Opinion, p. 1, attached hereto) and its remand to the District Court "for an appropriate modification in its injunctive decree" (Slip Opinion, p. 11).

3.　Fed. R. Civ. P. 65(d) provides:

Every order granting an injunction . . . shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . .

4.　Based on the record of the instant case, considered in light of the views expressed in the Supreme Court's and the Court of Appeals' opinions, this Court's judgment should be modified so that if and when it becomes effective it will read substantially as follows:

　　　IT IS ORDERED, ADJUDGED AND DECREED:

　　　(1) The National Collegiate Athletic Association's 1982-1985 Football Television Plan and the National Collegiate Athletic Association's existing football television contracts with ABC Sports, Inc. and CBS, Inc. violate the antitrust laws, are null and void, and may not be enforced;

　　　(2) The National Collegiate Athletic Association and its members are prohibited from jointly adopting or entering into any football television plan or contract which limits output by restricting the total number of games which NCAA members may televise, or which fixes the price for individual games.

　　　(3) The National Collegiate Athletic Association and its members are prohibited from enforcing football television rules and regulations which unreasonably restrain trade.

62

(4) Nothing herein contained shall be construed as pro-
hibiting the National Collegiate Athletic Association and its
members from:

    (a) Requiring its members who televise their games
to pool and share among themselves, and with the NCAA,
the compensation which they receive;

    (b) Limiting the number of times any member may
arrange to have its games shown on television in order
to increase or maintain athletically balanced competi-
tion;

    (c) Enforcing reasonable blackout rules to avoid
head-to-head competition for television audiences;

    (d) Marketing packages of television rights to its
members' football games when such packages compete with
other ways of showing games and thus increase viewers'
options;

    (e) Restricting television of its members' football
games on Friday evenings in order to protect gate atten-
dance at high school football games;

    (f) Restricting televising of a members' football
games as a sanction for a members' violation of NCAA
rules and regulations.

    5.  This decree shall be binding upon the National
Collegiate Athletic Association, its members, officers,
agents, servants, employees, and attorneys, and upon those
persons in active concert or participation with them who
receive actual notice of this order by personal service or
otherwise.

WHEREFORE, defendant, the National Collegiate Athletic

Association, respectfully requests that the Court enter an order

modifying its judgment as set out in paragraph No. 4 above.

James D. Fellers
Burck Bailey
Fellers, Snider, Blankenship,
  Bailey & Tippens
24th Floor, First National Center
Oklahoma City, Oklahoma  73102

George H. Gangwere
Richard K. Andrews
Swanson, Midgley, Gangwere,
  Clarke & Kitchin
1500 Commerce Bank Building
Kansas City, Missouri  64106

63

Frank H. Easterbrook
1111 East 60th Street
Chicago, Illinois  60637

Attorneys for Defendant.

CERTIFICATE OF SERVICE

I hereby certify that the foregoing motion was served on counsel for all parties by mailing copies thereof by regular United States mail, postage prepaid, this _____ day of July, 1984, to the following attorneys for plaintiffs-appellees:

Mr. Andy Coats
Mr. Clyde A. Muchmore
Mr. Harvey D. Ellis, Jr.
Crowe & Dunlevy
1800 Mid-America Tower
20 N. Broadway
Oklahoma City, OK  73102

Mr. Stanley M. Ward
Office of Legal Counsel
University of Oklahoma
660 Parrington Oval Room 213
Norman, OK  73019

Mr. Philip R. Hochberg
Baraff, Koerner, Olender & Hochberg
2033 M Street, N.W.
Suite 203
Washington, DC  20036

64

CROWE & DUNLEVY
A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW
1000 MID-AMERICA TOWER
20 NORTH BROADWAY
OKLAHOMA CITY, OKLAHOMA 73102
(405) 236-7700
TELEX TWX · 910-831-4081
CABLE · C & D LAW OKC

June 14, 1984

Charles M. Neinas
Executive Director of the
   College Football Association
P.O. Box 4148
Boulder, Colorado 80306

Dear Chuck:

          Sorry to be so late in responding to your May 30,
1984, letter.  It came while Clyde and I were both on vaca-
tion, and I had some urgent matters to attend to immediately
when I got back on June 11th.

          You request a brief explanation of our position
that the CFA proposed television plan may not constitute an
illegal group boycott under Section 1 of the Sherman Act,
although the plan will exclude certain non-CFA members who
are NCAA Division I-A members.

          First, I will presume for the purpose of this
explanation that the membership of the CFA, the Big Ten
Conference and the Pacific-Ten Conference will have market
power.  The inquiry, then, becomes whether the exclusion
of some schools from the proposed CFA television plan will
constitute an exercise of market power having an adverse
effect upon competition, and irrespective of the effect
upon competition, whether the exclusion of these schools
will constitute a _per se_ illegal boycott.

          The classic definition of a group boycott is a
concerted refusal to deal with a competitor.  The kind of
boycott over which you express concern is that reflected
in the United States Supreme Court's decision in Associated
Press v. United States, 326 U.S. 1 (1945), where the Court

65

Charles M. Neinas
June 14, 1984
Page Two

hold that an association rule forbidding members of the Associated Press from selling news to non-members of the Association was in contravention to the proscription of the Sherman Act. Similarly, in Silver v. New York Stock Exchange, 373 U.S. 341 (1963), a membership rule forbidding wire hookups between members and non-members was held to be an illegal boycott.

Deferring for a moment consideration of any constraints on participants in the CFA television plan preventing them from dealing at all with non-participants in certain time slots or geographic areas, there is no apparent legally relevant comparison between the CFA plan and the rules condemned in Associated Press and Silver.

The principle governing in those decisions cannot apply here because non-participants of the CFA plan would be just as free to deal with television broadcasters outside the CFA television plan as they would within it. The only substantial loss to such non-participants by exclusion from membership in the television plan would be that they could not draw upon the superior bargaining strength resulting from the combination of participants in the television plan (which, for example, permits them to each receive a uniform fee in exchange for the right of first refusal for their games). But this cannot be characterized as a competitive injury to non-participants, because (a) presumably they are excluded on the ground that there is some relevant difference between their football programs and those of the participants, and (b) an addition to a permitted aggregate of bargaining power in an entity is not procompetitive.

The first reason, which would be sufficient in itself, is exemplified in the Third Circuit's decision in Deesen v. Professional Golfers' Assn. of America, 358 F.2d 165 (1966), where the Court held that the plaintiff's exclusion from membership in the PGA was not a violation of the antitrust laws because the plaintiff had failed to qualify under the association's reasonable rules (e.g., requiring a certain level of abilities and frequency of participation in golfing events, etc.).

The second rationale, that the failure to add to a permitted aggregate of bargaining strength is more procompetitive than anticompetitive, is illustrated in a recent (and as far as I can determine, as yet unpublished) opinion

66

Charles M. Neinas
June 14, 1984
Page Three

by the Third Circuit, <u>Midland South Grizzlies v. Nat'l
Football League</u>, No. 82-1793, (3d Cir. Nov. 4, 1983),
discussed in ATRR 753 (Nov. 10, 1983).  There, the Court
held that the NFL's denial of a franchise to the plaintiff
team (the "Grizzlies") in the Memphis, Tennessee area was
not anticompetitive because it left the NFL with a stronger
potential competitor should the Grizzlies join a competing
league.  The NFL's aggregate of bargaining strength was, of
course, specifically sanctioned by Congress, as the Court
observed.  The permissibility of the aggregate of bargaining
strength in the CFA television plan will depend upon the
disposition of the Supreme Court in O.U. v. NCAA.  Hopefully,
the Supreme Court's opinion will leave room for such combin-
ations by members of sports associations for commercial
purposes.

          A more substantial question embroiled in your
May 30th inquiry, however, is whether the CFA television plan's
provision granting exclusivity to the purchaser within certain
geographical areas and certain time frames creates an illegal
boycott of non-participants for those time frames and geo-
graphical areas.  The answer to this very sensitive question
will be wholly dependent upon disposition by the Supreme
Court in <u>O.U. v. NCAA</u>.  Any disposition upon <u>per se</u> grounds
would be a severe (and perhaps fatal) blow to such a contem-
plated provision in the CFA television plan.  However, if
the case is decided on rule of reason analysis, the restric-
tive provisions <u>may</u> be lawful under the following analysis:

          As appellees conceded in briefing before the Tenth
Circuit and Supreme Court, while football television consti-
tutes a relevant submarket for antitrust purposes, there may
be a more broadly defined relevant market (constituting other
kinds of television broadcasts, e.g., entertainment, news,
etc.) of which football television is a part.  Therefore,
if the CFA television plan contains moderate exclusivity pro-
visions for certain time frames and geographical areas which
have a favorable impact upon the marketability of the plan,
competition may be increased in the broadly defined market,
with a smaller degree of anticompetitive consequences in the
submarket for football television programming.  The net
competitive effect, then, may be procompetitive.  An even
stronger argument, dependent upon the present state of the
market in college football television, can be made also.
The NCAA has dominated the market practically since its incep-
tion.  Thus, some restrictive measures in the CFA television
plan may have the substantially beneficial effect of creating a

67

Charles M. Neinas
June 14, 1984
Page Four

challenger to what would otherwise be NCAA's impregnable
competitive superiority. This latter justification would
be valid, of course, only until the market in college foot-
ball television "normalizes", after having been monopolized
by NCAA for some 32 years.

A final admonition is in order. Any opinion upon
the validity of the CFA television plan now is nothing more
than an educated guess. An informed legal opinion as to the
legality of such a plan will have to await the Supreme Court's
decision in O.U. v. NCAA, which will most certainly have critical
implications for any such television plan.

I hope that this letter is of some assistance to
you. Please call if you have any further questions.

Sincerely,

Harvey D. Ellis
For the Firm

HDE:mlb

68

Mr. MARKEY. I would ask Mr. Hallock and Mr. Crouthamel if you could summarize your statements so we could get to the questions from subcommittee members.

### STATEMENT OF WILES HALLOCK

Mr. HALLOCK. My statement is quite brief and deals with an altogether different aspect of the possible effect of unrestricted TV. I have been closely associated with college football television for the greater part of 21 years, going back to 1963. During 5 years on the NCAA staff as direct liaison with the networks carrying college football, I have had the opportunity to work with CBS, ABC and NBC, and have had similar acquaintanceship as a member of the NCAA Television Committee for 9 years while serving the Western Athletic and Pacific Ten Conferences. During this time, I have observed the influence which television has had on intercollegiate football, the influence TV might wish to exercise in presentation of the game and the effectiveness with which NCAA as a single entity has been able to resist the persistent attempts of television to create its own version of the college game.

I am not being critical of the networks recognizing that their approach is bound to be in terms of their own self-interest in producing what they believe to be the highest degree of entertainment and the ultimate use of the technology available to turn out the most sophisticated product, but their interests often are to do a great deal more than report what is happening on the field. They would embellish the game to make a good show, sometimes at the sacrifice of what the rulemakers feel is best for the game and to the detriment of in-stadium attendees.

The networks do some marvelous things, but constantly pressure to do more. They need to be held in check. The NCAA has done an exemplary job in my view of maintain a balance between the unique spirit of college football and a tendency to submit to to alteration to serve television's purpose.

Some examples: Encroachment of cameras and microphones into team bench areas; locker room displays of coaches' exhortations which you see in bowl games regulated by the promoters and participating teams for whom the revenues from TV are the only concern and a practice of professional football which may come into use to identify the players guilty of violations on penalties.

There are others which the NCAA has resisted through the years. In the television climate which now exists, I have serious concern for the loss of regulation by the body responsible for the state of college football and most responsive to it, the NCAA. It is an aspect of this committee's overview which should be noted. It is an aspect which those selling their product to all varieties of TV producers should not forget. Preserving the integrity of the great game of college football is more important than all the money in the world.

Thank you.

Mr. MARKEY. Thank you, Mr. Hallock.

Mr. Crouthamel?

69

## STATEMENT OF JOHN J. CROUTHAMEL

Mr. CROUTHAMEL. Thank you, Mr. Chairman.

I represent an institution which plays division I-A football and is a member of the NCAA and the CFA. I am a 5-year member of the NCAA Football Television Committee, was involved in the initial ad hoc TV committee to deal with football television on a contingency basis for the 1983 season, and sat on the special committee to draft a NCAA plan as a result of the Supreme Court decision.

These associations provided access to the thoughts and ideas of a large number of conferences and individual institutions. I think it is fair to say that from the outset when it appeared that the NCAA television plan could be struck down, there was near unanimous opinion among division I-A that nationally imposed controls of football television was highly desirable. Indeed it was felt that a grouping representing the largest number of football-playing institutions in the country would have the strongest appeal in terms of marketing and controlling football on television.

Frankly, the plan declared illegal by the Supreme Court provided the best of all worlds to the most number of people. It protected the gate and generated large dollars for both the football powers and many other football-playing institutions. That was made possible because of the leverage of numbers and exclusivity in the marketplace and protected the game of football from overcommercialization. The fear was, and this has been substantiated by recent events, that any fragmentation of division I-A institutions would place the leverage and controls of college football in the hands of the television industry and jeopardize the protections incorporated in the NCAA plan.

With a wide-open marketplace, many schools are in a dilemma. Television becomes a necessary evil. Despite what some would say, college football thrives because of attendance at games. Overexposure without controls gives the potential spectator too many alternatives for the spectacle that is college football, but in that wide-open marketplace, we are forced to appear on television in whatever ways we can develop. It becomes a matter of keeping up with the Joneses.

I am afraid that what is best for college football and the student at least is not encouraged by the environment in which we find ourselves today.

Thank you.

Mr. MARKEY. Thank you very much.

We will begin with questions from subcommittee members.

Mr. Toner, you are aware that the inquiry of this subcommittee is upon the question of the likely response of broadcasters and universities to the Supreme Court's decision and the impact of those responses upon colleges and universities. Your statement makes clear, I think, your belief that the new environment will result in significant adverse consequences to colleges and universities. With as much specificity and evidence as you possess, could you try to describe the relative financial positions of colleges and universities under contracts which have recently been entered into by the College Football Association and the Big Ten/PAC Ten coalition as

70

compared to the financial positions of those universities under the
now-invalid NCAA television plan?

Mr. TONER. Chairman Markey, I cannot give you specific dollars
on current plans being negotiated by CFA and various conference
affiliate organizations, but I did in my statement this morning
speak to what has been publicly stated as contracts which they
have engaged in. It would be my estimation that from what has
been published to date and what we can estimate, that individual
schools and conferences may continue to negotiate, the market
may well be cut in half.

Mr. MARKEY. What do you mean by the market being cut in
half?

Mr. TONER. Well, the 70-odd millions of dollars that would have
been a part of the 1984 ABC-CBS and ESPN package in the struck-
down plan of the NCAA may really turn out to be somewhere in
the neighborhood of $35 to $40 million.

Mr. MARKEY. And how many of the participating schools will
enjoy the benefits of that $35 million?

Mr. TONER. Well, the CFA member institutions and the PAC Ten
conferences are the only ones that so far I have been able to deter-
mine have contracts, so that it certainly strikes out a group of ap-
proximately 20 to 25 I-A institutions without contracts currently.
It strikes out all of I-AA divisions, too, as far as in-season capabil-
ity is concerned, and of course it has struck out all of the champi-
onships played in I-AA and divisions II and III.

Mr. MARKEY. So you have half the money available this year as
was available last year to universities in the country, instead of $70
million, perhaps $35 million, and you have significantly lower, less
than half the number of schools now participating in the benefits
of that $35 million, so there is less money now available than
would have been if the existing plan stayed in place and fewer
schools participate in that small amount of money.

Mr. TONER. Chairman Markey, I do have specific dollar amounts
that were paid in 1982 and 1983 to all NCAA members enjoying
the football contract. I would leave this with you, if you would like.
I do not have those specific figures in regard to the contrtacts that
are being negotiated currently.

Mr. MARKEY. Have you factored in all of the conference and syn-
dication deals that have been enacted or are in the process of being
consummated?

Mr. TONER. In that figure of 50-percent or 35 to 40, yes.

Mr. MARKEY. You have?

Mr. TONER. Yes.

Mr. MARKEY. And you think that is the ceiling, that is——

Mr. TONER. I want to make it plain that that is just my own per-
sonal summation and not that of NCAA or any other group.

Mr. MARKEY. Could you try to describe specifically how colleges
and universities will suffer and how and which programs or activi-
ties might suffer or be sacrificed by the loss of revenue or exposure
you envision from the current television football arrangement?

Mr. TONER. I am not sure that I can answer you completely, but
I might give you an example of an institution very close to your
situation, Boston College. They perhaps have the most attractive
television package or at least among the very best attractive televi-

71

sion packages in the upcoming year. As recently as Friday, it was reported to me by its athletic director that if the current plan that was struck down had been allowed to exist, that Boston College could have made as much as $2 million, and that even though they were one of the few institutions that had a carryover contract for a game with CBS this year, and even though it was an attractive part of the new CFA plan, and a syndicated plan locally, the best he could hope for was 50 percent or $1 million of that, but he might have to settle for $700,000 or $800,000. So that example is one that is known to me.

Mr. MARKEY. Now, what does that mean? What does that mean for not just Boston College, but what does it mean for universities across the country in terms of their programs, in terms of activities at the university which might suffer? What, in your experience as an athletic director with a long history, does that mean?

Mr. TONER. Once an institution receives revenue from any source, their programs soon become dependent upon that source of revenue, and when it is not there any longer, then you have a crisis. I gave you an example of an institution that can survive with a 50-percent decrease—1984 experience because 1984 would have been a very unusual year—but there are institutions now in conferences even at the 1-A level that have been used to a conference sharing as well as an institutional revenue-producing situation that no longer is there at all.

In other words, budgets that are planned to include $x$ number of dollars from the CBS–ABC–ESPN plan for 1984 and 1984 are not there at all. This makes a very serious impact on major programs that are usually funded by a combination of university support and income derived at the gate.

Mr. MARKEY. What kind of universities are you speaking about specifically now?

Mr. TONER. I am speaking about predominately division I institutions. I think a little later you may hear from others who will refer to divisions II and III, but the division I primarily has been the recipient of about 90 percent of television revenues from NCAA TV contracts.

Mr. MARKEY. You indicated your belief that the Supreme Court's decision and its responses will give added momentum to prominent institutions to build winning teams, "whatever the cost in order to maximize the television dollars they can obtain." Specifically, what are the costs which you make reference to and what activities do you envision increasing as a consequence of this effort to maximize television revenues?

Mr. TONER. I made mention of the fact that in recent years we have increased the size of our enforcement staff for a very definite need. I did make note of the fact that it seems as though the urge to win has exacerbated enforcement problems and the temptations to recruit outside the framework of the rules. I don't think that is going to go away and I don't think it is going to reach a plateau and stay there. I think it will continue to get worse as the pressure to be on that television show becomes stronger.

Mr. MARKEY. So what kind of program alterations do you see? What kind of changes in attitude in universities? What kind of recruiting or promotion activities do you now envision?

. 72

Mr. TONER. Well, at the July 10 meeting of division I-A institutions when the television proposal developed by the subcommittee and approved by the council was considered by the membership, and was voted down, I reported in a closing statement that the NCAA Council and its officers would be waiting for indications from the I-A and I-AA members of division I to signal for any kind of assistance or any kind of an aid they would want in pursuing further controls for television, and I think in that spirit we are waiting to see what develops right now from our membership and we will take our signals from them.

Mr. MARKEY. Just let me ask one final question on this round. There are many who believe that the current level of professionalism in intercollegiate athletics is totally out of control. How would you characterize the NCAA attitude and overall assessment of the current level of professionalism that exists today in college football?

Mr. TONER. You have asked me a question for which I could give you quite a broad answer because I am very concerned about the impact of professionalism at our Olympic level and how it may ultimately affect amateurism at the college level to a far greater extent than any professionalism on our campus. To me the most important thing on our campuses today is to increase our demands in terms of academic standards for eligibility to compete in sports as our primary objective. Now, the enforcement program that concentrates on recruiting violations, that is an ongoing thing that keeps increasing in its need to be exercised each year. That is not going to go away.

I do not think, though, that professionalism in college athletics is the problem. I think that putting emphasis on academic progress toward a degree is the solution for a problem we do have in colleges.

Mr. MARKEY. Thank you.

Mr. Slattery?

Mr. SLATTERY. Thank you, Mr. Chairman.

Mr. Toner, in response to the chairman's question, you indicated that in your judgment there would be more pressure on various institutions to win and this will naturally exacerbate the temptation to obtain the edge in recruiting players. Is that a fair characterization of your response?

Mr. TONER. Yes; I think competition requires that you seek that winning edge.

Mr. SLATTERY. Let me ask you, how many division I schools are currently on some kind of probation or being punished for violations of existing rules and regulations?

Mr. TONER. I really don't know how many as of today are on probation.

Mr. SLATTERY. Approximately.

Mr. TONER. I think it is a safe assumption to say that 10 to 15 percent of our membership may be in violation of recruiting rules at any one time.

Mr. SLATTERY. At any one time? Just give me an approximation. Do you have half a dozen, a dozen?

Mr. TONER. Ten to fifteen percent would put you in the 10 to 20 range.

73

Mr. SLATTERY. How many Pac Ten schools?

Mr. TONER. The Pac Ten has gone through some excruciating times recently and I would rather think that the Pac Ten is making a great effort. We have a former commissioner of the Pac Ten to my right.

Mr. SLATTERY. How many Pac schools are under some kind of sanction by the NCAA?

Mr. HALLOCK. I believe there are three institutions under some kind of sanction.

Mr. SLATTERY. How many from the Big Eight?

Mr. HALLOCK. I don't know.

Mr. TONER. It would be a guess. I would say one, maybe two.

Mr. SLATTERY. How many from the Big Ten?

Mr. TONER. There is at least one that I know of.

Mr. SLATTERY. Which one is that?

Mr. TONER. I am not sure it is public information. It is public—It is Illinois.

Mr. SLATTERY. How many are currently under investigation? Is it safe to say maybe 15 percent?

Mr. TONER. The President of the NCAA is not privy to how many are under investigation. It is a highly confidential matter up to the point where there are findings.

Mr. SLATTERY. I will come back to this question in just a few minutes.

The question I would like to ask is, in light of how this whole process is changing and in fact it is, and I think we ought to sort of fess up to that point, we are talking about money here today and nothing less; we are talking about money for television, about money for the NCAA, money for the institutions and we are talking about money for advertisers and promoters and we are talking about the good of the game. That term is thrown out pretty loosely, but really what we are talking about when we talk about the good of the game, in many instances, and I dare say there are probably many outstanding players and coaches that would be offended by this, but we are talking about maximizing profits by the good of the game, how we can generate more money from television and advertisers and what-have-you.

I want to focus on what we do to the student at least that generates all this money, because it is those young men on Saturday afternoon, Friday afternoon or evening all across this country that generate all this money and, as I look at what we do, I question whether these students have any input at all.

It seems to me in many instances they are the pawn of this whole system protected only by many outstanding coaches in this country that really have their best interests at heart.

Now, specifically, let's focus in on exactly how we punish the institutions that are members of the NCAA that you, Mr. Toner, indicate there will probably be more infractions, not less, because of the pressure that will be brought to bear to get on television to make more money so that you can build more facilities, win more games, get on television, and make more money in a never-ending circle.

**74**

We can focus on Illinois. This is all a matter of public record. I don't think we will be saying anything that you couldn't find in the Illinois newspapers.

First of all, describe for me, if you would, the infractions. We don't have to pick on Illinois. I don't want to do that necessarily. I am curious. All this information I am sure has been in the newspapers, but describe briefly the kind of infractions, how the NCAA responded to those infractions, describe for me who was punished and how they were punished.

Mr. TONER. I have just been handed an updated report on those NCAA members who are currently on probation.

Mr. SLATTERY. Respond to my question first.

Mr. TONER. They do number 16. The infractions are not listed here, but having served for a long period of time as chair of the NCAA eligibility committee which deals with student athlete eligibility specifically whereas our infractions committee deals with institutional infractions, I can say that the great majority of infractions occur around recruiting violations as it pertains to the number of contacts, a coach or an institution or a person in the interest of the institution may make to that student athlete's home or high school, but perhaps more importantly extra benefits that might come the way of the student at least.

The NCAA's definition of amateurism is that a grant in aid, which is a scholarship for athletic ability, may permit the costs of education, limited to those published costs that the institution makes for room, board, tuition fees, all requires fees and the use of course-related books is the limit to the recognition, the material recognition an athlete may receive.

Anything more than that is an extra benefit and extra benefits for the most part constitute student athlete violations.

Mr. SLATTERY. I understand the basics. I would like you to specifically respond to my questions for the purpose of illustrating exactly how the NCAA currently enforces the rules and regulations to give us some indication as to how we are going to respond to the anticipated problems that you yourself admit you are going to have to confront.

So I would like you to describe how we do it. It is all a matter of public record, I believe. I would just like to get it on the record today.

Mr. TONER. When an infraction is reported to the NCAA enforcement department, it may be reported by media reports or a letter or phone call received from a known or unknown source and an investigation is immediately undertaken.

The school is alerted, the chief executive officer of that school is alerted and an investigation is requested to be made by the institution first as well as by the enforcement staff of the NCAA.

Mr. SLATTERY. Let me interject. We are under a tight timeframe today. Say your investigation that, is internally conducted by the NCAA determines that, in fact, the rules have been violated. Let's make that assumption. Say planes were used to transport people improperly, say cars were made available to students improperly, say money was made available to the students improperly and the superstars were signed up, and the NCAA is able to corroborate all

75

these charges and convince whatever body it is that has to be convinced that the rules were violated so you go to the institution.

You have a very popular coach of the institution who has just produced a winner, a big winner, so you go to the school and say, Mr. Coach, we have found that you have flagrantly violated the rules and regulations. What does the NCAA then do? What have they done in the past?

Mr. TONER. Well, we have a famous case involving that very example. It is about 7 years old now. The NCAA asked a member institution to show cause why the coach of a particular sport involved in serious violations of NCAA rules and regulations should not be prohibited from being any part of the athletic program.

The coach involved took it to a State district court——

Mr. SLATTERY. I am familiar with the case.

Mr. TONER. And received an injunction and still lives under that injunction.

Mr. SLATTERY. And still coaches at that institution.

Mr. TONER. And still coaches at that institution. There have been efforts made to penalize schools in the dollars.

The NCAA does have the mechanisms to prevent athletic personnel from continuing in their employ in that particular area of athletics.

Mr. SLATTERY. Just the point that I wanted you to make. The question beyond this is in your judgment, as you look into the future, what kind of tools does the NCAA need to better enforce the rules in this ever-changing environment that you work in?

Specifically——

Mr. TONER. Unfortunately, the enforcement program does not have subpoena power to go in and get records and take sworn statements. It takes the absolute cooperation of the very people that are alleged to be in violation to really get a quick solution to an NCAA enforcement problem.

Mr. SLATTERY. My point is that what we have here is a question of big money. It is a question of institutions losing thousands of dollars. We have a question of student athletes being denied the opportunity to play on television and thereby enhancing their value in the pro drafts or enhance their sheer enjoyment of being able to participate in big time intercollegiate athletics?

Mr. TONER. I might say that the NCAA has legislation that permits a student at least who has been inadvertently involved in an institutional violation or a violation that rendered that student ineligible to seek a waiver so that he or she can play at another institution.

Mr. SLATTERY. Extremely difficult for a young man in his junior or senior year. You know as well as I do that is not a very good remedy.

Mr. TONER. A very prominent quarterback went from the Southwest Conference to the Big Eight Conference and played a lot of football.

Mr. SLATTERY. A prominent basketball player did that, too. I am saying in many instances that is not a good remedy.

Mr. TONER. I agree.

Mr. SLATTERY. I would hope that you are thinking and planning how you are going to deal with this, but how in the future can we

76

structure the NCAA in such a way to make sure that those people who violate the rules and regulations are punished?

The fact of the matter is, right now what we have is a situation where we oftentimes engage in mass punishment of the innocent. You know as well as I do we are doing that because our system today lacks the structural and systematic capability to deal with these kinds of flagrant violators because you are acting in an environment that is really a big business environment, big money involved.

We are pretending like it isn't and we are saying you are all voluntarily involved in this NCAA organization, which is critical, and I am not critical of the NCAA in terms of what it has historically done.

I am saying we need to start responding to the reality of big time athletics in this country which we are not doing and we are punishing thousands of athletes, affecting their economic future, because we lack the ability now to punish the coaches and players that have individually flagrantly violated the rules and made thousands of dollars in the process for themselves and for the institutions they work for.

This system needs to be changed.

I am saying that if the NCAA does not change it internally, then somebody in this country is going to clobber the NCAA or you are going to have more problems similar to what you have been dealing with.

I have observed this for 10 years and you can tell it is sort of a pet peeve of mine as to how student athletes have been flimflammed around and be the pawns in this game. The *Clifford Wiley* case at KU is a horrible example of this kind of problem and it just needs to be changed.

I yield back the balance of my time.

Mr. MARKEY. The gentleman's time has expired and the witness may respond to any and all points which he feels are necessary to be dealt with.

Mr. TONER. I am happy to learn that it has been a concern of yours for 10 years. I know it has been a concern of this committee for at least 8. I was one of the NCAA witnesses in my role as chair of the eligibility committee at the previous hearing of this committee during the 95th and the 96th Congresses and I would like to just read for the record what the report on the activity of the Committee on Energy and Commerce for the 97th Congress did in response to the enforcement question of Congressman Slattery.

During the 95th and 96th Congresses the Oversight Committee conducted extensive hearings regarding the process and procedures of the NCAA enforcement program. In 1978 the subcommittee issued a report on the program which found the NCAA wielded overwhelming power affecting the careers and ambitions of coaches and student athletes as well as the status of every institution in the country.

The subcommittee found there was no observance of the minimal standards of fairness and due process. The report contained 18 recommendations calling for self-corrective procedural changes of the NCAA.

77

On May 10, 1982, the subcommittee reviewed the recommendations. The subcommittee determined that the NCAA has made significant progress in attempting to protect the procedural rights of individuals subject to the enforcement process and still vigorously investigating improprieties in intercollegiate athletics.

Of the 18 recommendations contained in the subcommittee report, the NCAA has implemented either the spirit or letter of 17 with the remainder determined to be unnecessary in light of procedural changes.

The subcommittee determined that as a result of the NCAA good faith effort to implement the subcommittee recommendations, there exist increased procedural safeguards for institutional coaches and student athletes.

I know that Congressman Slattery is trying to help us in building for the future. We appreciate that very much. I do not think though without a sort of subpoena power we can speed it up, make it more certain and more thorough.

Thank you.

Mr. MARKEY. The gentleman from Pennsylvania, Mr. Walgren?

Mr. WALGREN. Thank you, Mr. Chairman.

Mr. Toner, the thought of building for the future and the thought—the point that Mr. Slattery makes that this system has broken down indicates there has got to be change of some kind, and, as I understand it, there is very little framework now to work for that change and to try to protect some of the values that the NCAA has over the years—what I would like to ask is, what are the suggestions for going forward?

What attempts were made between the NCAA and the College Football Association to try to reach some kind of an agreement, if any, and do you see any possibility down that line?

Before asking you to respond to those kinds of questions, a couple of thoughts came into mind that seem to be points that deserve to be made.

We talk about money for the NCAA in this operation and in your testimony you indicate that about 7 percent of the revenues, is that correct, 7 percent of the revenues went to the NCAA and that a major portion of those funds went to very directly transport students and carry on the conference activities. The question is, when we talk about money and the NCAA's financial interest in this, is it a substantial financial interest, how much money goes to the conference, and are there substantial moneys left over for the particular purpose of the NCAA?

Mr. TONER. In the CBS/ABC/ESPN contract, in 1982 and 1983, I will read figures to you.

CFA schools in 1982 received $36,704 million. Big Ten/Pacific Ten, $14,971 million. Other division 1A, $2,124,000. All of division I-A, $53,799,000. Division 1-AA, $4,340,000. Division I total, $58,139,990.

The NCAA assessment, $4,497,000.

Now, that is from a total package of $64 million. The NCAA's assessment was $4,497,000. It increased to $5,075,000 in 1983, but the $64 million total increased to $74 million in 1983. So——

Mr. WALGREN. Am I correct in understanding that the balance of the money remained with the schools involved in the games?

78

Mr. TONER. Yes. In the whole history of the NCAA television package, the NCAA, I believe the highest percentage assessment was——

Mr. HALLOCK. I think the highest assessment came right at the very beginning when there was very little money involved and that was 12 percent.

Mr. TONER. In recent history it hasn't been higher than 8 and it has been on its way down.

Mr. WALGREN. But 5 percent can be a lot of money.

Now, what happens to that money?

Mr. TONER. The primary purpose of that money was to provide a base for the support of the postgraduate scholarship program for football graduate students, the enforcement program itself, the other costs related to football services, and there were moneys to help support the championships in terms of travel costs for men and women's championships in nonrevenue-producing sports.

Mr. WALGREN. Could I give you an opportunity for the record to break down the amount of money that went to each of those categories in a given recent year? Perhaps you can't do it right now.

Mr. TONER. The ones that I just read?

Mr. WALGREN. Yes.

The point I would like to understand is, how much of this money is going for things that we all instinctively know is for the direct benefit of students as opposed to some other purpose?

I will let you detail that for the record unless you would like to comment briefly now.

Mr. TONER. It is pretty tough for me to answer that accurately because we pool all of our moneys and budget accordingly, but the total NCAA budget this current year is $37 million and the vital services to maintain itself as an organization, provide services to its members, comes to between $10 and $11 of those millions.

The rest is shared with member institutions.

Now, the division I basketball championship of itself earns as much as $27 million and that is a basketball championship.

The football television package, although it may amount to $74 million, the NCAA assessment is 6.5 percent of that or about $5 million, whereas a division I basketball championship that returns $27 million after the gross expenses of that championship are paid, 60 percent of the net goes to the competing institutions and the other 40 percent returns to NCAA because of the exacerbated prices that the television industry has been given recently. The current basketball contract in force right now has made it possible for the NCAA to reduce its net take to 40 percent, and to give back to the competing institutions 60 percent. So a division I basketball and the assessment from the football television package is the source of revenue that underwrites all the cost of our championship program.

Mr. WALGREN. My point in this was to give an opportunity for the record to reflect what the disposition of some of these funds that are gathered by the NCAA in their assessment was so others could make judgments about it.

As the College Football Association developed, isn't it also true that they certainly reflected substantial interest in the same goals as the NCAA, in particular, protecting high school athletes and is

79

it not true that they also even proposed to the NCAA certain rules
that would have been effective enforcement tools in protecting high
school athletes; is that not a fair characterization?

Mr. TONER. Yes.

Mr. WALGREN. And the same thing is true with regard to aca-
demic requirements of athletes while they are in college. They cer-
tainly have shown an interest in that area, have they not?

Mr. TONER. Yes, they have.

Mr. WALGREN. Well then, the question comes, how do we go for-
ward from this? Have there been suggestions made in efforts to ac-
commodate these two groups or are we on a collision course almost
like the farm problem in this country where each pursues his own
individual self-interest, that total self-destructs as is in, as I under-
stand it, the economics of farm——

Mr. TONER. If I may make a statement in answer to that ques-
tion, which is strictly mine, and not that of the association, it is my
feeling that a great majority of the College Football Association
has always believed in the need for the NCAA to retain its ability
to govern nationally those things important to it. I think that
group will remain, but I think if the current deregulated football
television situation continues, if the membership of division I-A
does not sense the need for a regulatory effort in college football
television in the same sense that they feel that all matters of com-
petition should be regulated between schools, then siphoned out
from the group that will always feel that there is a need for a na-
tional association will remain a certain few institutions who have
not in recent history, who seem not to now, really want the NCAA
at all.

But I don't think they want to admit it even to themselves.

Mr. WALGREN. Are there ongoing contacts between all these
schools that might lead to some concrete promises?

Mr. TONER. I have never put in a year when there have been
more meetings of the entire membership of division I-A than this
current, and in each of these meetings great effort has been made
from every direction to bring together important things, and I
stressed earlier the need for academic standards, important things
such as standards and such as enforcement control.

I think we have the—I think we right now have a reassurance
from some schools that may have been on the doubting edge that
there is a very great need for the NCAA to continue its regulating
capability in all phases of athletic competition.

Mr. WALGREN. Thank you, Mr. Chairman.

Mr. MARKEY. The gentleman's time has expired. Let me ask a
few brief questions here.

The Supreme Court decision does not result in the loss or modifi-
cation of any of the NCAA regulations relating to amateurs or re-
cruiting or academic standards nor does it modify or limit any of
your enforcement tools or sanctions with the possible exception of
the television sanction, is that not correct?

Mr. TONER. That is correct.

Mr. MARKEY. So you are still in a position to impose tough sanc-
tions on these schools where there are violations?

Mr. TONER. As you have indicated, yes.

Mr. MARKEY. The College Football Association has indicated that they will expect and honor the NCAA enforcement powers, is that correct?

Mr. TONER. I assume that they have. I am sure you can ask that of the College Football Association people who are here.

I really would rather have them answer it.

Mr. MARKEY. We have been told that in fact the CFA will expect and abide by the television sanctions through the television plans that would be imposed by the NCAA.

Mr. TONER. I have not seen that nor have I heard it until this time.

Mr. MARKEY. So those powers, if that be the case, and I am relatively confident that is the case, those powers would still reside with the NCAA and you would be given the authority to take those steps if it would be necessary to do so?

Mr. TONER. That is correct.

Mr. MARKEY. Is the only way under this new system for a school to reach football excellence to engage in policies of cheating and sacrificing of educational standards, will there be any other way in order to reach this magical 20 or 10 teams that will be able to compete adequately for this pot of gold?

Mr. TONER. Well, we have very strong hopes that the effort to emphasize academic standards as a condition of eligibility for athletics will carry us a long way, and to do that we have some unfinished business that will be considered next January and that is that every member institution's chief executive officer will certify as to the admission standards of the institution, special admission standards and where athletes fit and to annually report the normal proceedings and graduation rates of the student athletes as compared to the normal progress and graduation rates of the student body and also of any special programs they might have for special students and where athletes fit in those.

We think that that approach will be an umbrella to capture a lot of other things and we are very hopeful that it will work.

Mr. MARKEY. Well, one of the real truths of American college football right now is that money has become the mother's milk of athletic departments and now with the smaller amount available and each in a Darwinian sense capable of going out there and destroying opportunities of others to gain access to that money, there is a very great responsibility that now has to be shouldered by the NCAA and very rigid, tough enforcement of existing regulations has to be made the top priority of the association and a beefing up of enforcement mechanisms is now more important than ever to guarantee that in fact the violations which can be rightly anticipated now given the temptation to scrap for those limited dollars now available will place upon the shoulders of athletic directors and football coaches in trying to make their reputations by the amount of money that they can bring into their institutions.

Mr. Hallock, for many years you were the Commissioner of the Pacific Eight and then the Pac Ten Conference. Could you tell the subcommittee why the Pac Ten Conference and the Big Ten Conference chose not to join the College Football Association at the time of its formation?

81

Mr. HALLOCK. I think there are probably a number of reasons. The primary reason in my opinion was the conviction, the feeling among Pac Ten and Big Ten members that the College Football Association was not needed as a separate entity between the conference and the NCAA.

I think there were some doubts as to the ultimate objectives of the CFA. I think there were some feelings that CFA had some objectives in terms of conditions of competition, the numbers of grants in aid and so on that the two conferences, Pac Ten and Big Ten, did not wish to become involved in in a political way.

There may be other reasons which others may speak to, but I think those were the basic reasons.

Mr. MARKEY. Well, this is my final question:

This is for any of the panelists that wish to respond to it.

Do you have any knowledge of any individual representing the NCAA who recommended to member institutions of the Big Ten and of the Pac Ten Conferences that they not join with the College Football Association in a coalition plan?

Mr. HALLOCK. I guess I did not understand the question.

Mr. MARKEY. The question is, were there any at the NCAA that recommended to Big Ten or Pac Ten schools that they not join with the College Football Association in a coalition television plan to negotiate with the networks?

Mr. HALLOCK. I think perhaps Mr. Toner can answer that question. I was not a part of the recent series of meetings which involved the television interests.

Mr. TONER. No, I am not aware that there was any such talk or conversation or persuasiveness in that direction.

On the contrary, certainly the leadership of the NCAA's value as Mr. Crouthamel pointed out in as many football playing institutions as can get together.

There may have been references to the district court's injunction that raises some serious question on any group representing a majority of schools in I–A to be able to negotiate for television.

Now, I don't know where your information comes from. But the efforts to bring about a coalition of CFA, Pac Ten, Big ten members has never been thwarted by anyone that I know of in the leadership of the NCAA.

Mr. HALLOCK. I would like to add one thing.

During my tenure as executive director up to last July, the conference had these priorities.

First choice, the NCAA plan; second choice, a coalition of CFA, Pac Ten, Big Ten; and the third choice, the present course which they are on.

Mr. MARKEY. Thank you.

A couple of quick questions?

Mr. SLATTERY. Yes.

First of all, a comment. I wanted to thank Mr. Toner and the others for appearing here today. I don't envy your position, Mr. Toner. You are in a difficult situation I understand. I didn't mean by my harsh earlier questions to suggest anything to the contrary. Your situation is perhaps akin to the situation of the chairman of the board of AT&T recently when Judge Greene said Humpty Dumpty just fell off the wall.

82

Mr. TONER. He gave him 3 years to fall.

Mr. SLATTERY. I understand that times are a-changing as the song says, and I think this is true of the NCAA, and I think the member institutions of the NCAA need to recognize this and get on with making the changes necessary to respond to the problems that you have.

I have just a few questions that we need to get in the record.

Is it not true that last week the NCAA's Committee on Infraction perhaps because of some uncertainty surrounding the Supreme Court decision, indicated that those schools under television sanctions for 1984 might have those sanctions stayed and be allowed to commit to television football contracts this season?

Mr. TONER. That is true.

Mr. SLATTERY. Is it also true that should a member institution choose to make such a commitment and the court allows the NCAA to maintain its television sanction authority, those sanctions would be imposed during the 1985 season?

Mr. TONER. Yes, that is true.

Mr. SLATTERY. Isn't it also true that those schools under 1984 television sanctions were informed that if a court decree precluded the NCAA from imposing television sanctions, those schools would have their penalties reconsidered with the possible imposition of a substitute penalty?

Mr. TONER. That is true.

Mr. SLATTERY. How many schools are currently under television sanctions and what is the distribution of those schools between the College Football Association and the Big Ten and the Pac Ten Conferences?

Mr. TONER. I think the number is eight and——

Mr. SLATTERY. Eight total? I think based on your earlier comment——

Mr. TONER. Eight total.

Mr. SLATTERY. I think based on your earlier comment there are four Big Ten, Pac Ten schools, three in the Pac Ten, one in the Big Ten.

Mr. HALLOCK. When I mentioned three institutions being on probation, one of those institutions is on for basketball. So there are two in the Pac Ten.

Mr. SLATTERY. So two in the Pac Ten. How many in the Big ten then? what is your testimony now?

Mr. TONER. There are two in the Big ten.

Mr. SLATTERY. Two in the Pac Ten, three CFA schools; is that correct?

Mr. TONER. There's four.

Mr. SLATTERY. Four CFA schools?

Mr. TONER. Yes, according to my notes, there's four.

Mr. SLATTERY. Isn't it true that the state of these television sanctions made it possible for the Big Ten and the Pac Ten Conferences to contract with CBS for the 1984 season?

Mr. TONER. I don't think that is correct because there was a Pac Ten team sanction.

Mr. SLATTERY. Well, certainly those teams that were not under sanction would not have been able to participate, is that correct, so

83

by waiving those sanctions for the 1984 season, those teams will now be able to play on television; is that correct?

Mr. TONER. Well, the NCAA Infractions Committee did not waive the sanction. They gave to the institution a choice, so the institution could pick whichever course of action it wishes. It would either keep the sanction in place for 1984 for television appearances, postpone it until 1985, or in the absence of modification of the injunction receive a substitute penalty.

Mr. SLATTERY. But the net effect was that the schools this year are given the option to play on television, in effect, and, of course, by being able to do that, the conference was able to better negotiate with the network for the television rights for this year if the institutions elect to postpone their penalty?

Mr. TONER. Yes, I think that is reasonable to say.

Mr. HALLOCK. Mr. Slattery, I believe the CBS contract was agreed upon prior to the NCAA waiver. CBS may be able to answer that later.

Mr. SLATTERY. So your testimony is that CBS did, in fact enter into this contract prior to the waiver of the sanctions?

Mr. HALLOCK. That is my understanding.

Mr. SLATTERY. Thank you very much.

Mr. MARKEY. The gentleman from Ohio.

## TESTIMONY OF HON. DENNIS E. ECKART, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF OHIO

Mr. ECKART. I thank the chairman.

My concern is the marketing of what people will tell you is quasi-professional football already at some levels of the NCAA. Are we going to see a greater influence of money, as a result of this?

Mr. TONER. Influencing what, sir?

Mr. ECKART. Influencing scheduling, recruitment, athletic department budgets. Are we going to the highest bidder now?

Mr. TONER. Yes; I think in my statement I did express some concern about that in the future. Maybe Mr. Crouthamel may have some observations being a member of the NCAA Television Committee and also a member of the CFA.

Mr. ECKART. Would you respond to that?

Mr. CROUTHAMEL. Yes; following up on John's statement earlier on, I share those concerns. In my statement, I tried to point out the fact that I think there is a give and take in this thing. There are a number of institutions in this country that now, that we have an open marketplace, really don't want it. It becomes, as I have pointed out, a necessary evil because we don't run our programs on football television.

The spectacle on college football is not perpetuated by football on television. It is perpetuated by the crowds that we get at our games, and they eat hotdogs and they yell and they cheer and they have parties outside the stadium, that is the spectacle of college football. And if we lose that through too many alternatives, our athletic programs, not just our football programs, are going to suffer.

Mr. ECKART. Are you concerned that you can increase the disparity between the few successful schools and the less successful

84

schools and the schools that don't have major programs? Is television going to dictate who is going to be successful in this?

Mr. TONER. Well, that is my view. I am sure you may ask that same question of the television representatives over here, as well as others.

Mr. ECKART. Someone once said that where money goes, greed can't be far behind.

My concern would be the corollary of my friend from Kansas, Mr. Slattery's question. More money is more temptation, and more temptation leads to either playing on the margins or to breaking the rule.

Do you feel that you have now, as a result of the Supreme Court decision, lost a major enforcement tool? Can you replace that enforcement tool if you can't deal with people appearing on television?

Mr. TONER. I haven't considered it as much of a loss of an enforcement tool as much as it is a loss of a very necessary regulatory requirement, recognizing that television exposure is worth more than money in terms of competitive recruiting and selections of schools by individual student athletes.

We are more concerned in that area, the need for a national regulatory ability in terms of football television and, of course, concerned about the narrowing of the number of schools that can be seen on television. Those are two big concerns.

Mr. ECKART. There have been a number of folks who have called for a national playoff system for some time. Do you feel now that there are no constraints on your ability to schedule television and that the big money in TV may bring about a national playoff system?

Mr. TONER. The I–A championship playoff matter surfaced for the first time in my experience about 2 years ago, and it surfaced outside the NCAA Council, its postseason football committee, and any of its television committees.

When the NCAA leadership was asked to address this problem, I happened to take a role in that and said that until the great majority of I–A institutions decide that they want a national championship, there would be no effort on the part of the NCAA leadership to try to create one. Recognizing the tremendous traditional bowl game atmosphere that we all have, I think you might remember just a short time ago, at the first ever I–A mid-summer mid-year meeting for legislative purposes a straw vote of that group indicated that it did not want to see a I–A championship created.

I think though that this interest in a I–A championship will exist, and all it would take to bring it before the membership of I–A would be a minimum of six institutions that feel persuaded that way to offer it for legislative consideration next January.

Mr. ECKART. Could it happen without you?

Mr. TONER. It can't happen without the legislative process.

Mr. ECKART. It is not possible for a major television network to offer a televised package without you changing the rules regarding scheduling?

Mr. TONER. It can happen within the membership of the NCAA.

Mr. ECKART. Thank you for your forthright answers to my questions. I thank the chairman for his courtesy.

85

Mr. MARKEY. Thank you.

And I thank this panel for their courtesy. There are many more questions which we would like to ask you here this morning. Because of time constraints, we will not have the opportunity to do that. However, what we would like to do is submit to you additional questions in writing that you would have the ability to respond to that we can insert in the record and ask that you be willing to give the committee the courtesy of your responses to those questions.

Mr. TONER. Mr. Chairman, we will be delighted to do that and also provide more specific dollar amounts to questions asked of me earlier.

Mr. MARKEY. Thank you. And the committee gives its thanks to the panel. Thank you very much.

Mr. TONER. We thank you also.

Mr. MARKEY. Our second panel is a panel consisting of Fred Davison, Joe Paterno, Charles Young, Edward Robinson, James Delany, and Charles Neinas.

Would you all please come forward and sit at the table. Before you do that, I would ask that each of you raise your right hand.

[Witnesses sworn.]

Mr. MARKEY. Thank you.

Gentlemen, would you please go from my left to my right and please identify yourselves for the record.

Mr. NEINAS. Charles Neinas, executive director of the College Football Association.

Mr. DAVISON. Fred C. Davison, president of the University of Georgia.

Mr. YOUNG. Charles Young, chancellor of UCLA.

Mr. PATERNO. Joe Paterno, Penn State University.

Mr. DELANY. Jim Delany, commissioner of the Ohio Valley Conference.

Mr. ROBINSON. Eddie Robinson, football coach at Grambling University.

Mr. MARKEY. We will begin the testimony with Mr. Davison's statement, but we will make the request of each of you that you try as best you can to summarize and give the highlights of your statement to the subcommittee. Because of the nature of the panel, we could wait an hour to go through the opening statements before the question and answer period.

So as best you can, we would ask that you summarize, so we can get to the important questions that have to be answered here this morning.

We will begin with Mr. Davison.

TESTIMONY OF FRED C. DAVISON, PRESIDENT, UNIVERSITY OF
GEORGIA; CHARLES E. YOUNG, CHANCELLOR, UNIVERSITY OF
CALIFORNIA, LOS ANGELES; JOE PATERNO, HEAD FOOTBALL
COACH, PENNSYLVANIA STATE UNIVERSITY; EDDIE ROBINSON,
DIRECTOR OF ATHLETICS, GRAMBLING STATE UNIVERSITY;
CHARLES M. NEINAS, EXECUTIVE DIRECTOR, COLLEGE FOOT-
BALL ASSOCIATION; AND JAMES E. DELANY, COMMISSIONER,
OHIO VALLEY CONFERENCE

Mr. DAVISON. Thank you, Mr. Chairman.

I appreciate the invitation from you and others to come to this
subcommittee and participate in this hearing.

The University of Georgia Athletic Association joined the Uni-
versity of Oklahoma Regents in filing suit against the National
Collegiate Athletic Association [NCAA] out of a concern that we
were involuntarily breaking the law. We believed the NCAA was
in violation of antitrust laws in requiring members to assign con-
trol of their property rights to the organization.

It seemed to us that competition was being restrained, prices
were being fixed, opportunities were being limited, and sanctions
were threatened against individual institutions. The courts have
agreed with our belief that these actions by the NCAA restrained
trade unreasonably, inhibited competition in the marketplace and
constituted price fixing, the classic elements of an illegal monopoly.

Although some institutions in our Nation receive State funds for
intercollegiate athletics, the University of Georgia receives no
State support for its athletic programs. This difference in depend-
ence on self-generated revenues reflects a difference between insti-
tutions in the importance of being able to control the ability to gen-
erate revenues. The University of Georgia Athletic Association has
a long-term capital debt of over $15 million which it must retire
from football revenues.

At the University of Georgia, football revenues support all nonre-
venue producing sports and all women's intercollegiate sports. It is
the university's responsibility to meet its financial obligations. The
NCAA assumes no responsibility for an institutions financial obli-
gations though it has restricted the return from an institution's
property essential to meet those financial obligations.

It should be noted here that the NCAA imposes its control over
television broadcasts of college football but no other sport. Basket-
ball and other sports are healthy and fare quite well in an uncon-
trolled market of television broadcasts, and there is really no
reason for football to be treated differently. It is vital to our overall
sports program, therefore, that football be competitive in the mar-
ketplace of attendance and in television revenues.

By controlling and limiting a major source of revenue generated
by our program, the NCAA imposed an unfair burden in light of
our institution's responsibilities and financial obligations. As costs
increased for all sports and women's athletics were dramatically
expanded, the weight of this NCAA-imposed burden grew even
heavier.

Since organizational control of televised football rights is a re-
quirement of NCAA membership and since competition against
nonmembers is prohibited by the NCAA, our options were to par-

87

ticipate under those conditions or disband our athletic program. Our grave concern that the NCAA system violated the Sherman Act was underscored by our vulnerability to recovery of damages as a party to this violation, should a party outside the NCAA bring suit.

The University of Georgia supports the purposes for which the NCAA was formed and continues to exist: Protection of the amateur status of student athletes and college athletics, organizing play and the avoidance of excesses inconsistent with the concept of athletics performed by scholar-athletes. The NCAA's numerous rules restricting the number and dollar amount of scholarships, setting rules of competition, setting limits on recruiting incentives and training seasons, and setting academic standards for eligibility are totally consistent with the organization's true purpose.

But NCAA control of the commercial aspects of the property interests of its member institutions is not that organization's purpose. In fact, it is my concern that the NCAA has become preoccupied with commercial aspects of college athletics as opposed to its legitimate, noncommercial purposes.

Individual institutions should control their property and business interests just as they should bear the total responsibility for meeting their financial obligations by making sound decisions. The governing factors of televised college football should be good judgment by colleges and universities, and the conditions in the marketplace to which it is made available.

That is my belief and that is the position upheld by the Supreme Court of the United States.

Thank you.

Mr. MARKEY. Thank you, Mr. Davison.

Mr. Young.

## TESTIMONY OF CHARLES E. YOUNG

Mr. YOUNG. Mr. Chairman, I too appreciate the opportunity to appear before your subcommittee today to comment on the current state of affairs with respect to telecasting of the regular season football games of NCAA member institutions.

I have served since 1969 as chancellor of the University of California Los Angeles. I am also the current chairman of the Association of American Universities and the chairman of that association's Intercollegiate Athletic Committee. I have served for the past 2 years on both the Intercollegiate Athletics Committee of the American Council on Education and was a member of the NCAA Select Committee on Athletic Problems and Concerns on Higher Education. It has also been my privilege over the last several years to participate in several intercollegiate athletic media negotiations.

I offered testimony on behalf of the NCAA in the initial trial of this case, or the *Burciaga* case in Oklahoma City in 1982. I said then, as I still believe, that the NCAA football television plan or one very much like it was not only appropriate but essential to the maintenance of any degree of fairness and rationality in the telecasting of regular season college football.

Once the NCAA football television plan was invalidated I, along with my colleagues in the Pac Ten and the Big Ten Conferences,

88

supported the adoption of a substitute NCAA television plan which
would meet the test of the new legal criteria. When that plan was
defeated by a vote of the NCAA division I-A membership, we, in
the Pac Ten, preferred a plan bringing together a coalition of the
major football playing universities and colleges.

However, when advised by legal counsel that the plan proposed
for some 83 universities was probably not in conformity with the
judicial decision, the Pac Ten and Big Ten Conferences offered to
put forth a two-conference plan leaving open the option of a larger
grouping in the future.

Following that decision, I served as head of the Joint Negotiating
Committee of the conferences which conducted a series of meetings
with NBC, ABC, and CBS in New York during July 16 to July 20.
Meetings that ultimately resulted in an agreement between these
two conferences, the Pac Ten and the Big Ten, and CBS were a
series of football telecasts in the upcoming fall 1984 season.

It is clear to me that the total cost to the networks in 1984 for
the regular season college football will be substantially less than
what it would have been had the NCAA plan remained in effect.
My own estimates are that CBS and ABC would have paid in
excess of $64 million under the NCAA plan for 28 football times,
exposures, between September 1 and December 1984. For approxi-
mately the same number of exposures under the current Pac Ten,
Big Ten, and College Football Association agreements, as best I can
determine, CBS and NBC will probably pay less than $25 million.

In these 28 exposure periods in 1984, CBS and NBC will telecast
a total of approximately 40 games rather than the total of 70,
which would have been required under the NCAA plan. Conse-
quently, not only has there been a significant reduction in the
amount of the networks' rights fees, but also a substantial reduc-
tion in production costs as a result of the fact that 30 fewer games
will now be televised by ABC and CBS combined.

Unquestionably then, the major television networks, while not
initiating the legal actions themselves, and indeed I believe not de-
siring the outcome, have benefited economically from the invalida-
tion of the NCAA football television plan for 1984.

It could be argued, and has been, that the U.S. television audi-
ence will benefit since the 40 games to be televised in 1984 by ABC
and CBS will be the premier college football games that would be
telecast in any event. What is being lost are the 30 or so games
between NCAA division I-A teams of lesser national prominence or
between NCAA division I-AA or division II teams that would have
been included to the NCAA football television plan's requirement
for a minimum number of team appearances and games among
these several groups.

I believe that not only these universities which are no longer in-
cluded in national television, among them the members of the Pa-
cific Coast Athletic Association, the Mid-American Conference, the
Ivy League, and the traditional black institutions, but also the na-
tional sports audiences will be substantial losers by the reduction
and participation of these important representatives of American
higher education.

There has been much speculation as to whether the overall eco-
nomic effect on the universities involved will be positive or nega-

89

tive. The combined financial effect of the network and syndicated television agreements for the Pac Ten Conference are very fortunate for in 1984 we will do reasonably well, probably exceeding by a small amount the amount we received last year.

However, if my estimates of the total television income available to all college football in 1984 are correct, the combined income to all division I institutions from television networks, syndicators, cable companies, and individual television agreements will result in substantially less than the aggregate received last year by these same institutions.

For other than the Big Ten and Pac Ten Conferences, I believe this statement will hold true for almost every conference or independent school in NCAA division I-A and I-AA. Further, the overall negative impact is in the face of a significant increase in the number of football games that will be televised nationally, regionally, and by other forms. While many have theorized as to the impact such an increase in the number of televised games will have on in stadium attendance, I believe it cannot help but have a very negative effect.

The most troubling part of this matter for me, however, is not so much the direct impact on college football income, but the longer range impact of the U.S. Supreme Court decision on the nature of higher education and the relationship of the institutions which are the leading edge of higher education in the United States.

For essentially legal reasons exacerbated by timing considerations, the Pac Ten and Big Ten Conferences did not believe it in their best interests to join this year with the 63 members of the College Football Association in a voluntary national coalition to govern regular season college football television. We did, however, unsuccessfully encourage the major television networks to bring together a unified college football television series by the joint packaging of separately arranged programs.

We also attempted to provide for open competition among the members of the networks' packages by providing for cross-over television arrangements. The complications which have been created by the Burciaga decision have resulted, I fear, in a series of actions that appears to be encouraging an environment of antagonism between some of the leading educational institutions in this Nation.

The litigation initiated by the two NCAA member instituions has led to a series of judicial determinations regarding the application of the U.S. antitrust laws to a property right of each NCAA member institution resulting in the conclusion that such property rights are to be treated like other consumer products in the American marketplace. In my opinion, that is a very dangerous precedent.

Admittedly, college football is not a major element of higher education from an economic standpoint. To get that into the proper context, for instance, at UCLA the football program, gate receipts, and television income combined amounts to less than four-tenths of 1 percent of the university's total annual revenue.

However, football is certainly a major element of a university's program from the standpoint of community visibility, student participation, alumni recognition, and support among many others. It is for these reasons that we engage in intercollegiate athletics and

90

football income is extrinsic to those goals. The minority opinion of
the U.S. Supreme Court stated this in a most appropriate fashion.

But the precedent has now been established that a major extra-
curricular activity program of higher education establishes a prop-
erty right that is to be regarded as a consumer product similar to
those produced for profit alone. This is a new and, I submit, dan-
gerous state of affairs for intercollegiate athletics.

College football, as a single category, has been a widely sought
advertising value product, since it is a program that as a whole at-
tracts a higher income level of audience than most other sports
programs on television. But the important fact is that it is college
football as a whole that has that claim, not the football program of
any one or any limited group of institutions.

College football may now become in the public's mind a for-profit
commodity and no longer have the public recognition that it is the
intercollegiate football programs of this Nation which provide the
financial wherewithal for the coaching, training and equipping of
some of this Nation's leading gymnists, swimmers, track and field
athletes that represent this Nation in the Olympics and other
international competition.

Having spent many days, indeed weeks, on this matter during
the past 18 months, I can only conclude by urging reasonableness
on all concerned in the hope that we will be able to fashion a pack-
age that will meet the legal test of current or future laws while
protecting our ability to continue to provide football programs
which will serve the universities' basic interests, continue to be at-
tractive to the television viewing public and, therefore, continue to
enable us to provide the support we need at the collegiate level for
the totality of this Nation's sports program.

I thank you for an opportunity to appear before you.

Mr. MARKEY. Thank you, Mr. Young.

Mr. Paterno.

### TESTIMONY OF JOE PATERNO

Mr. PATERNO. Thank you, Mr. Chairman.

In contrast to many of the people who are here, I am not so sure
I am glad to be here. I only have a few comments to make, and I
am very anxious to ask any questions you may have as it relates to
the coach and the student athlete relationship, but my feeling is
the law is the law and there is no sense doing a lot of rehashing
about what has happened.

In my business, if you lose a football game and you hang around
all week crying about how you lost it instead of evaluating the cur-
rent situation and then moving on to handle it, you are going to
get licked again. We could spend a lot of time this morning, with
everybody giving you educated guesses as to what is going to
happen and not really knowing what we are talking about. All
these people are people of good intentions.

We have argued for several years now trying to work out a com-
promise. We now have ourselves in a situation which may force us
into a compromise. That may well be good. We may have to stop
worrying about our vested interests aren't as vested anymore and

91

the interests aren't as good anymore, and we may have to realize
that together is our best way of doing things.

I am a little bit more concerned about the situation that Con-
gressman Slattery presented. I am worried about the fact that the
NCAA as it is presently constructed is probably a dinosaur, that we
are not facing up to the reality of the world that we are living in
now. There is tremendous pressure on athletes, coaches, institu-
tions for the dollar.

I am concerned with the fact that we cannot regulate recruiting
and in my brief tenure on the CFA Television Committee, which
negotiated a contract with NBC 2 years ago, a 4-year contract
which the CFA members refused to ratify, I insisted in all our ne-
gotiations that we do two things: that, No. 1, every institution in
the CFA be guaranteed two appearances every 4 years and would
be guaranteed $1 million for the very fact that the Kansas State
had not been on for years and Virginia had not been on television
for years.

My feeling that you cannot ask a coach to go into a situation and
tell him to win if he does not have some money for facilities, and
he does not have the opportunity to say to a kid "You are going to
have some exposure on television." I have felt very strongly about
that, and in my position on the CFA Television Committee I advo-
cated, "Let's give the coach a chance to win honestly. Let's not
jump on every young coach at 35 or 36 that goes into a situation
where it is impossible to win unless you cheat, unless we start to
clean that thing up.

Give him a different environment. Allow him the ability to re-
cruit. Allow him the ability to compete. That is all I have ever
been concerned about. I think television dollars can be useful and
television exposure can be useful if we are enlightened enough to
use it to help us eliminate some of the problems we have, and we
do have tremendous problems.

Enforcement alone is not the answer. We have rules that cannot
be enforced. I mean, we are just kidding ourselves that they can be
enforced. That means to say, well, you have got cheaters in your
business. We don't have cheaters in our business. We have people
who literally do not have control over alumni and other people who
get involved in their business and cheat for the school without
some of our people even being aware of it.

I guess what I am trying to say, without making the speech I am
making, is that we have a situation now that nobody really knows
what will happen. It does, I think, everything that has ever hap-
pened to anybody creates problems, but also creates challenges. I
think we have a great challenge now as reasonable people who, if
we are genuinely concerned with a student athlete and intercolle-
giate football have an opportunity to sit down and clear up our dif-
ferences and go, and I leave you with that last thought.

When we went to Chicago for the NCAA Division I television
meeting, I had a meeting with my President, Dr. Jordan. I said
there are three things I want you to know, Dr. Jordan. Number
one, we don't want to be hogs. We are not interested in just how
much we can get out of this for Penn State football because we
don't want to be hogs. We are not interested in getting every
dollar, and I want to say that the University of Notre Dame, which

92

could have made more money than anybody has constantly, Father Joyce and Gene Corrigan have constantly echoed the same thing.

The second thing I said, we are not going out there in fear. We are not going out there with the idea we are going to react to everything.

The third thing I said, and the one that probably made the most sense, is college football is too good, means too much to everybody that we can screw it up in 1 year, and we have a 1-year arrangement now, and I probably would be more happy to be at this session if it were 1 year from now, because I think maybe we could help you a little bit more with what you are looking for.

Thank you.

Mr. MARKEY. Thank you, Mr. Paterno.

Mr. Robinson.

## STATEMENT OF EDDIE ROBINSON

Mr. ROBINSON. Mr. Chairman, and distinguished members of the Subcommittee on Oversight and Investigations, I am pleased to testify at your request at this hearing on circumstances surrounding the recent U.S. Supreme Court's ruling invalidating the National Collegiate Athletic Association's television football contracts and the consequences it has on the Nation's colleges and universities.

Today I am attempting to speak for the 400 members who have not been included in the television package.

From the outset, let me be emphatic in saying that after 42 years of working, I do not feel that there is any other organization that has the sensitivity possessed by the NCAA for college athletics.

I strongly feel that the Court's decision, abolishing central NCAA control of television, will destroy the very structure of college athletics.

This is not a criticism of the Court's decision, based on law, rather it is a reflection of my experience with the NCAA college football television program over the last 30 years, and its great common concern for all of its membership.

When I speak of common concern for its membership, I am talking about academic standards, government aid to athletes, enforcement recruiting eligibility, discipline of members, and ethical conflict. Here are a few facts to support this contention.

In 1982, $53.7 million went to division A. We were fortunate because of the NCAA organization and its concern about the membership that we in division 1-AA received $4.3 million for television appearances and $750,000 for additional semifinals and championship playoff games.

Of course, you know that we are not fortunate enough to have the opportunity to play in the postseason games like the Rose Bowl and the Sugar Bowl, et cetera, but this organization made provisions for us to have playoff games so that after the end of the season, those with outstanding records could take part in the championship playoff.

In this same year, the schools within division II for appearances received $270,000 and $520,000 in playoff money, and the division II received $90,000 in appearances and $150,000 in playoff money.

93

Gentlemen, from the foregoing I have provided an objective, comprehensive overview of how the NCAA provided access to the television marketplace for all segments of its membership. It was good for college athletics and was reflective of the Democratic process. To some degree, everyone received a piece of the pie. Contrast this with the present college football division package.

We lost, at a minimum, this is I, II-A, $7,800,000 with the termination of the NCAA program and will get nothing in return. Indeed, everybody loses because television packages negotiated with the networks this year by the largest schools would be well below that which was received by the NCAA last year.

Not only do hard times loom ahead for division I-A, division II and III, but members of division I-A schools face some of the similar problems. The revenue from television has been the lifeblood for division I, II-A leagues, like our conference.

Naturally the loss of these revenues will have a devastating effect. It will force curtailment of a number of progams and create funding problems for Federal compliance with things like title IX. We have to deal with declining student enrollment and reduced public funding on college revenues. We will not have an opportunity to get the good public relations that is typical of a regional television game or of the national television game. So it stands that we are naturally locked out.

In our conference, things like basketball tournaments for men and women, golf and baseball playoffs, tennis and track championships all have been funded by television revenues, and we face serious setbacks.

Indeed money received from television since 1977 has enabled the Southwestern Athletic Conference to wipe out a $100,000 operating debt, build a league surplus of over half a million dollars, and operate at the level of other conferences our size across the country.

Television has been our lifeblood. It was a public relations catalyst, enabling us to showcase our programs and a boon for recruiting. You have to understand that when you don't have an opportunity to appear on television, you are not going to be able to recruit the same kind of football players or athletes that we have been within the last decade.

I go back to the 1960's before we were permitted to be on television whenever we would contact the recruits, they wanted to know, "Will I be able to play on television coming to your university?" But the NCAA gave us help in this, that we were able to have regional television, and we were able to have playoff games.

The NCAA program was designed to promote the growth of college football through greater fan interest while protecting, to the greatest extent possible, the instadium attendance of each football playing member of the association.

Gentlemen, I would like to say that there is a proposal now with so-called windows, and that is from 12 to 3, from 3 to 7 and the other networks will carry it from 7 on. Now it is no protection. Since the NCAA has handled it, in the last 3 years, we have doubled the attendance of the instadium crowd.

So I think here that our games and a lot of the other games will suffer greatly. Our conference, in the past couple of years, has led

94

most of the conferences in I-AA in attendance. Like many of my coaching colleagues in division I-AA, my feeling is one of frustration. So much is at stake and the educational developing of so many young people is involved. Somehow, some way, something must be done to make certain that all of us share in the American dream.

Schools like ours are not a part of the College Football Association's television agenda this year, yet we play an important role in molding student athletes into productive citizens.

Our needs and aspirations are the same as the big schools. And we do a better job of graduating our athletes.

I am proud that Grambling, my school, has graduated over 80 percent of its athletes. Few schools outside the Ivy League can make this claim. We are proud today that we stand shoulders above most of the schools. We graduate more football players than most schools because we feel that we are dealing with America's most precious possession, and I am really proud that we do this in graduating our people.

Note that CBS's 18-game schedule contains no division I-AA games. The same can be said for ABC's 20-game card and 10 ESPN's cablevision Saturday night games.

We are locked out with seemingly no place to turn.

Gentlemen, I hope that members of this committee will give every consideration to our problems and offer constructive solutions.

I feel now that the tail is about to wag the dog. It is television today. It will be recruiting tomorrow. It will be academic standards after that, and then it will be buying athletes next until the whole college athletic structure tumbles down.

I am pleased to have this opportunity to appear before you.

Mr. MARKEY. Thank you, Mr. Robinson.

[The prepared statement of Mr. Robinson follows:]

95

### SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS
### OF THE
### COMMITTEE ON ENERGY AND COMMERCE

Honorable John D. Dingell, Chairman, and distinguished
Members of the Subcommittee on Oversight and Investigations. I
am pleased to testify at your request at this hearing on circum-
stances surrounding the recent U.S. Supreme Court's ruling
invalidating the National Collegiate Athletic Association's
(NCAA) Television Football Contracts and the consequences it has
on the Nation's colleges and universities.

From the offset, let me be emphatic in saying that I do not
feel that there is any other organization that has the sensitivity
possessed by the NCAA for college athletics.

I strongly feel that the Court's decision--abolishing central
NCAA control of television--will destroy the very structure of
college athletics.

This is not a criticism of the Court's decision, based on
law, rather it is a reflection of my experience with the NCAA
College Football Television program over the last 30 years, and
its great concern for all of its membership.

The NCAA made provisions for dividing College Television
revenues among Division I-A, Division I-AA, Division II and
Division III football playing schools.

NCAA control of the overall television package proved a
bonanza for schools outside Division I-A.  It enabled many of
us to remain competitive.

Here are a few important facts to support this contention.

In 1982, schools in Division I-A, the Nation's biggest
football powers, received $52-million in television receipts
under NCAA control.

96

Eighty-three members of this august group--including the
College Football Association (CFA), Big 10 and PAC 10 divided
$49.5 million of the $52-million allocated for Division I-A
schools that year.

Concurrently in 1982, Division I-AA colleges received
$5-million for regular season appearances and $750,000 addition-
ally for semi-final and championship play-off games.

Television shares for Division II schools amounted to
$520,000 in play-off money. Forty-five thousand dollars were
paid Division II schools for four regular season appearances.

For championship competition, Division III members received
$150,000, and $22,500 for four regular season games.

Under the NCAA formula, the nine I-AA conferences, the
Southwestern Athletic Conference included, were guaranteed two
regional appearances each year worth $620,000 per appearance.
This is the same amount paid Division I-A schools for regional
telecasts.

Last season (1983), teams in Division I-A received $54.6-
million in television revenues.

Again as in 1982, the payoff for 83 schools--including the
College Football Association, PAC 10 and Big 10--amounted to
$53.3 million of the $54.6-million allocated to Division I-A
members.

During the same period in 1983, revenue for Division I-AA
schools increased to $6.4-million for regional television.

It is important to note that only Division I-A schools make
national television appearances. The only exception, being a
national television game by Grambling and Morgan State in 1970,

CRITICAL_PLACEHOLDER

The $5-million received by Division I-AA schools in 1982 and the $6.4-million in 1983 came from regional telecasts.

The NCAA increased its coverage further in 1982 and 1983 for Divisions I-A and I-AA through addition of a supplementary cable television package, amounting to $385,000 per appearance.

Gentlemen, from the foregoing, I have provided an objective, comprehensive overview of how the NCAA provided access to the television market place for all segments of its membership.

It was good for college athletics and was reflective of the democratic process.

To some degree, everyone received a piece of the pie.

Contrast this with the present college football television packages.

We lost at a minimum seven million eight hundred thousand dollars with the termination of the NCAA program and will get nothing in return.

Indeed, everybody loses, because television packages negotiated with the networks this year by the big schools fall well below what was received by the NCAA last season.

Not only do hard times loom ahead for Division I-AA, Division II, and Division III programs, but a number of Division I-A schools face major revenue shortfalls.

The situation is disturbing. Greed has replaced sound judgment.

Revenues from television have been the lifeblood for Division I-AA leagues like the Southwestern Athletic Conference.

Naturally, the loss of these revenues will have a devastating effect. It will force curtailment of a number of programs and create funding problems for federal compliance with Title IX.

98

In our conference, basketball tournaments for men and women, golf, baseball, tennis and track and field championships, all funded from television revenues, face serious cutbacks.

Indeed, money received from television since 1977, has enabled the Southwestern Athletic Conference to wipe out a $100,000 operating debt, build a league surplus of over half a million dollars, and operate at the level of other conferences our size across the country.

Television has been our lifeblood. It was a public relations catalyst, enabling us to showcase our programs, and a boon for recruiting. It made possible a wide variety of programs for student participation.

The NCAA program was designed to promote the growth of college football through greater fan interest while protecting, to the greatest extent possible, the in-stadium attendance of each football playing member of the association.

Gate attendance of college football games have more than doubled since NCAA controls were instituted some 30 years ago.

Our conference, the SWAC, led the Nation in Division I-AA attendance last fall with 709,160 fans in 43 games, a direct spin-off of interest created by television.

Like many of my coaching colleagues, in Division I-AA, my feeling is one of frustration.

So much is at stake and the educational developing of so many young people is involved. Somehow, someway, something must be done to make certain that all of us share in the American dream.

99

Schools like ours are not a part of the College Football
Association's television agenda, yet we play an important role
in molding student athletes into productive citizens.

Our needs and aspirations are the same as the big schools.
And we do a better job of graduating our athletes.

I am proud that Grambling, my school, has graduated over
80 percent of its athletes. Few schools outside the Ivy League
can make this claim.

A schedule listing possible games for 1984 television is
shown below.



# Football powerhouses may be TV regulars

NEW YORK — College football fans should be prepared to
see a lot of Michigan, Ohio State, Southern California,
Penn State, Alabama, Texas and Notre Dame on network
TV in 1984.

CBS' 18-game schedule, which is nearing completion,
has no restrictions on the number of appearances on the Big Ten
and Pacific 10 conference schools. ABC's 20-game College
Football Association schedule
— September games will be announced next week — allows three appearances a
school, with two teams to be picked for additional wild-card games.

Here are the games with the best chance of appearing on
the network TV schedules:

## SPORTS ON TV
## BY RUDY MARTZKE

100

Note that CBS's 18-game schedule contains no Division I-AA games. The same can be said for ABC's 20-game card and ESPN's Cablevision Saturday night games.

We are locked out with seemingly no place to turn.

Gentlemen, I hope that members of this committee will give every consideration to our problems and offer constructive solutions.

The tail is wagging the dog.

It is television now, it will be recruiting tomorrow, buying athletes next until the whole college athletic structure tumbles down.

I appreciate the opportunity to appear before you and hope that my appraisal offered meaningful insight on the television problem.

Allow me to thank you Mr. Chairman, and each member of the Committee for hearing me out.

                    Eddie Robinson
                    Athletic Director
                    Grambling State University

101

## STATEMENT OF CHARLES M. NEINAS

Mr. MARKEY. Mr. Neinas.

Mr. NEINAS. Mr. Chairman, I thank you for the opportunity to address the committee on what is a very popular and important subject as we are about 1 month away from the start of the college football season.

If the Chair will allow, I am accompanied today by Clyde Mouchmore, attorney at law, Oklahoma City, who was one of the attorneys involved in the University of Georgia and the University of Oklahoma versus NCAA case. He may be able to provide more succinct answers to some questions that may be raised.

I shall not read from my prepared remarks but try to briefly summarize and indicate that I think we are all interested in improving the academic standards. Seated to my left at this table are gentlemen who fought hard to improve the academic standards on the NCAA convention floor. I don't think there is any question or doubt about the intense interest in trying to improve the academic standards of today's student athletes.

We are all interested in enforcement. We are interested in how recruitment goes. I appeared before this committee, I think it was 1978, and at that time I offered some of my own suggestions. At that time, I was the commissioner of the Big Eight Conference. I offered some of my own suggestions about the NCAA enforcement program.

The NCAA has been responsive to some of those suggestions, but I would repeat one that I made then. I think it should be considered by the NCAA, especially as we discuss the future, the possibility of establishing a blue ribbon panel of notable NCAA members which would not only include adminstrative staff but chief executive officers, faculty representatives, former officers of the association and by all means coaches.

When I was here before, I suggested Joe Paterno and Dean Smith, two of the best known and most reputable coaches in the country, would be people to serve on that panel.

I think there is a misunderstanding on the part of many that coaches are not interested in enforcement. In recent years the legislation adopted by the NCAA, which required that an institution include in its contract that a coach found in serious violation of NCAA rules and regulations could be terminated without pay was stimulated by the coach's group within the College Football Association.

Let me clear up one point. The CFA is not a unidimensional organization. Our interest is not just television. In fact, we have spent more time on academic standards than we have television. We are interested in recruiting. I, personally, take great pride in the contribution that the coaches have made in the College Football Association. After all, they are the ones that are in the field and can understand what type of legislation can be effective and what is practical.

Our interest in television started in 1979, concern about the decline in ratings and although I don't wish to step on the toes of my friend, Joe Paterno, I do feel some background is necessary to realize why we are seated here today. The CFA sought and obtained a

102

lucrative contract with the National Broadcasting Co. for four years, as Coach Paterno said, which would have provided a guaranteed $1 million to each of the 60 at that time, 61 I believe it was, CFA members, plus two guaranteed television appearances over the 4-year duration of the contract.

The NCAA position, which was enunciated in a telephone conference of the NCAA's policymaking council in April 1981, was that the NCAA through tradition and history controlled not only the over-the-air television rights of its members, but for the first time mentioned control of pay, cable and subscription.

Interestingly enough, it was the University of Texas, without any prompting by the CFA, including myself, that fired the first shot across the bow of the NCAA's ship. The NCAA could not seize that institution's property rights.

So the argument was very simple: Is it an obligation of membership that you automatically give up your television rights to the NCAA, or does the institution have the opportunity to dispose of its television rights?

Judge Burciaga said simply, those rights belong to the university, and they may assign or sell those rights at the university's discretion. As we know, the case was appealed all the way to the Supreme Court. The Supreme Court has now rendered its decision. Unfortunately, the Court's decision was rendered very late in the game.

I would agree with Coach Paterno. If we were here in 1985, we could give you a more careful, reasoned analysis about the future, but right now the future is clouded, and we need to address what is going to happen in 1984, which I think everyone agrees is not a normal year.

This committee may wish to reconvene this hearing sometime in 1985 so that we could better evaluate the future.

What is the CFA's interest in college football and television? As Justice Stevens said in his majority opinion, where the NCAA may have failed in more than any other area is to fail to recognize your preference. That the marketplace will determine.

What we would like to do is simply provide a national marketing effort on behalf of our members while also allowing time during the day for individual institutions and conferences to explore the television marketplace on their own.

We have attempted to construct a television plan that to the best of our knowledge will meet the test of the antitrust laws. The courts found that if the NCAA controls were removed, more teams would have an opportunity to appear on television.

I think that has already been proven although 1984 remains uncertain.

For example, it is my understanding in a conversation with Jim Litvak of the Ivy League that the Ivy League normally had one game on television each year and obtained about $600,000.

It is my understanding that the Ivy League will have nine games on television this year and their income will be $900,000 to $1 million.

The commissioner of the Missouri Valley Conference mentioned to me this week that his conference, which also had limited television exposure, will have nine games on television this year. The

103

Missouri Valley is primarily a I-AA conference. The Southland Conference, which is also primarily I-AA, I understand, is exploring a television arrangement with Premier Productions of Dallas.

And, although I am not familiar with the contract which the Mid-America Conference has entered into with Sports Time, I believe it will give that conference increased television exposure.

What we need to do is analyze 1984. To be quite candid, the networks had us over a barrel. They had a great advantage with the shortness of time and the general disruption in the marketplace.

Let me clear the record on two points if I may, Chairman Slattery.

I believe there are three CFA members currently on probation with television sanctions. Also, I would say that I would probably find that Mr. Toner's figures are too low.

I am not at this time able to give an accurate assessment of television income but I believe he indicated $35 to $40 million.

I would agree with Mr. Toner that the aggregate amount will probably not reach what the NCAA plan would have produced this year, but I believe his figures may be too low.

In conclusion, I appreciate the opportunity to appear before you.

Mr. MARKEY. Thank you, Mr. Neinas.

[The prepared statement of Mr. Neinas follows:]

104

STATEMENT OF CHARLES M. NEINAS, EXECUTIVE DIRECTOR, COLLEGE FOOTBALL ASSOCIATION

Mr. Chairman, members of the committee...My name is Charles M. Neinas and I am Executive Director of the College Football Association. It is a privilege for me to appear before you today.

The College Football Association is not the result of a revolt or a sudden move on the part of the major football-playing universities to grab more television exposure and revenue. Far from it.

The CFA evolved slowly, over a period of years and a long series of meetings of athletic and academic people who believed then, as now, that they needed a forum to examine common problems.

These people felt both concern and frustration...concern over the direction being taken by the NCAA in both athletic and academic matters, and frustration that within the large structure of the NCAA there was no place for a small group with common problems to discuss and resolve their concerns.

These problems did not center on television. Indeed, the issues that first caused these major institutions to meet on their own was the need to strengthen academic standards for athletes. The majority of NCAA members had voted to reduce such standards when the times called not for retreat but for strengthening those standards. And the NCAA's mass membership refused to grant the major schools a stronger voice in determining their own destiny. Thus the stage was set for the emergence of the CFA.

105

In July of 1976, representatives of every major conference and the major independents assembled and a steering committee proposed a formal association. A year later, the CFA conducted its first annual meeting with 60 charter members. The Pacific-10 and Big Ten conferences elected not to join.

From that start, the CFA has acted to improve the quality of college football. It has proposed legislation either through individual members or eventually through the appropriate NCAA body for consideration by NCAA conventions. Some of the proposals have resulted in improvements in such areas as recruitment and academic standards although the CFA has not always received credit for these proposals.

In the summer of 1982, CFA members and some other invited institutions, developed, in two days of meetings, a meaningful academic standard proposal. The 1983 NCAA convention adopted the proposal that was sponsored by the American Council on Education. And the executive vice president of the ACE, perhaps the nation's most prestigious academic group, recognized the CFA as providing the foundation on which its proposal was built.

But, admittedly, we are best known for our involvement in television, because that is where the greatest interest of the public and the media, lies. In 1981, NBC television, recognizing the potential of the CFA, offered the association a contract totalling $180 million -- a contract that would have paid $50 million this season.

**106**

When the NCAA learned the CFA was considering this offer, it threatened severe sanctions -- including probation and exclusion from all NCAA meets and tournaments -- for any CFA member participating in the NBC plan. Facing that threat, a majority of CFA members declined the NBC offer. But the NCAA's action, more than anything else, fueled the now-famous lawsuit by the universities of Georgia and Oklahoma against the NCAA that eventually brought college football to where it is today.

At issue, basically, was the question of property rights. Who owned a school's television rights? The school or the NCAA? Did the school have autonomy, or did the NCAA own not only the live television rights plus -- as it was claiming at the time -- the rights to pay, subscription and cable television? The battle lines were drawn and the outcome was more far-reaching than almost anyone had imagined.

Federal District Judge Juan Burciaga ruled that the schools did, indeed, own their television rights, but he went much farther. He also ruled that the NCAA was in violation of antitrust laws in its handling of television, and that the NCAA should be permanently barred from such activity. A U.S. Court of Appeals upheld the lower court and the U.S. Supreme Court agreed. Following this, the NCAA made one last effort to retain control, asking its members to ratify a plan that it would present to Judge Burciaga for his approval. The plan was rejected on a 66-44 vote, and the NCAA, for the first time ever, was out of the television business.

107

The stage then was set for a coalition of the CFA and the Pacific-10 and Big Ten conferences to develop a plan to present to the networks. The coalition plan had been developed in previous meetings, attended by all parties concerned. But in the end, the two conferences rejected the coalition movement and formed a coalition of their own. And I want to make it clear that the Pacific-10 and Big Ten left of their own volition -- They were not in any way pushed.

With little time remaining before the 1984 season, and with the college forces divided, it was obvious that it would be a buyer's market. And when the Pacific-10 and Big Ten quickly allowed CBS to choose selected games rather than follow a package formula, it further damaged the market for the CFA.

The CFA adhered to its philosophy and sold packages to ABC and ESPN for a price substantially below what it would have been in more normal times, or with the coalition intact. In short, the CFA did the best it could under the circumstances and will work diligently in the months ahead to enhance the marketability of its product.

The CFA is dedicated to working to improve the quality of college football and to recognize the integrity and autonomy of its members. It will continue to support the NCAA financially but desires the opportunity to explore new methods of marketing college football on television.

I thank you again for this opportunity to appear and I will be pleased to answer questions.

108

Mr. MARKEY. Mr. Delany.

## STATEMENT OF JAMES E. DELANY

Mr. DELANY. Thank you, Mr. Chairman and members of the committee.

I am commissioner of the Ohio Valley Conference since 1979, sponsoring men's and women's championships. I am a 3-year member of the NCAA football committee. I am president of the University Commissioners Association which is a coalition of I-AA conferences and basketball only conferences. I am a former attorney with the NCAA enforcement department and former student athlete at the University of North Carolina.

I will attempt to give a perspective of I-AA's position in the reordered environment. The health of intercollegiate football and sports in general is dependent in my opinion on a reasonable level of cooperation and competition between and among all of its members in order to provide for survival of the whole. This cooperation has broken down and threatens the present health of all intercollegiate athletics.

There is a question of reduced revenues. There is pressure on the central enforcement machinery and scores of midmajor colleges are under the gun insofar as football television revenues as compared with the 3 previous years.

I-AA football members suffered a severe financial blow when the Supreme Court invalidated the NCAA–CBS–ABC contract. Specifically I-AA institutions received approximately $70,000 per year per institution over the first 2 years of this contract. In most cases this amounted to between 5 and 10 percent of most operating budgets for intercollegiate athletics.

In addition, the football championship games involves I-AA. Two and three were undercut as a result of the Court's decision. This resulted in loss of national exposure and attendant rights fees.

In response to this loss of revenue the Ohio Valley Conference is exploring the possibility of a tiered concept for our men's and women's programs.

We know that the revenues will be lost and will not be replaced by revenues generated at the gate. We are looking at the possibility of cutting aid in some of our nonrevenue men's and women's sports. We are also looking at the possibility of cutting aid both in the men's and women's basketball programs and possibly the reduction of coaching staffs within all sports.

In a totally laissez-faire marketplace, it appears that I-AA, II and III institutions will find TV and cable opportunities few and far between.

The NFL enjoys Sunday football without competition from the colleges. Division I-A institutions will dominate airways on Saturday from late morning through prime time and the colleges have traditionally respected Friday night as high school football night.

Basically you have heard a lot of statements about the amount of money spread through the NCAA football plan. Division I-AA, and division III have received collectively about 10 percent of the total dollars from the television package.

109

In this reordered environment of college football television, there appear to be some winners and some losers.

The I–A football constituency, or fragments thereof, would appear to be in a less favorable bargaining position vis-a-vis the network and cable companies.

Although some argue that 1984 is not a good test year due to the shortness of time available to negotiate and plan, I would imagine your committee would find a strong consensus among I–A institutions that collective rights fees available to I–A institutions over the next 2 years would be substantially less than were generated the 2 previous years under the NCAA plan. Clearly I–A institutions will be unable to earn the kinds of dollars generated by their participation in the NCAA TV plan.

The trickle-down effect will be that NCAA championships will suffer in the men's and women's nonrevenue areas. The NCAA assessment is reduced from 7 percent to 4 percent to fund this competition. In addition, these same sports on I–A and I–AA campuses will be negatively impacted by the loss of dollars attributable to the new college football TV marketplace.

It would appear that the network will pay less for the rights to major college football games. However, whether the reduced rights fees translate into stronger network profits is conditioned on what impact the loss of exclusivity has on network ratings and advertising sales.

A couple of major independent football playing powers will make more money in this environment. The Big Ten and Pac Ten Conferences will improve their financial position compared to the NCAA payouts of the last 2 years. They have approximately 45 percent of the TV homes in the country. I would guess that on the average a majority of CFA members will receive fewer dollars under the CFA arrangement compared with the former NCAA plan.

I have no idea how the consumer, that is, TV viewer, will be affected by this new marketplace. With the exception of a few basketball junkies, most college fans are not terribly excited about the quantity and quality of college basketball on the airways.

I believe that the explosion of basketball television on the airways has injured midmajor college basketball programs from an instadium attendance standpoint and placed our institutions at a terrible recruiting and marketing disadvantage.

I believe that the loss of NCAA controls in football will lead to less rather than more competition on the football playing fields of this country and be particularly harmful to all but a minority of the division I–A membership.

Mr. DELANY. I think that there is an environment within which this television struggle occurs. Arguments concerning property rights and antitrust rationale are on the forefront, but beyond that the struggle over college football television symbolizes a difference of opinion over which coalition of Division I institutions will set the philosophical tone concerning the place of intercollegiate athletics within higher education. For 10 years, debate at NCAA conventions has centered on who should be allowed to participate and vote on issues related to division I intercollegiate athletic and academic matters.

110

Some 40 colleges were wooed out of I-A into I-AA several years
ago with a promise of revenue and TV exposure. Under the new
TV arrangements, these institutions received no exposure or reve-
nue. In the past 3 weeks, 25 colleges were de facto removed from
division I by being excluded from any major TV arrangement.

The whole process from the initiation of litigation by Georgia
and Oklahoma to the present reality has an ironic tone to it. Politi-
cal and economic leverage has been effectively employed by the
CFA to wrestle political power from the moderate majority of divi-
sion I football playing institutions.

It appears that those institutions within the CFA who collective-
ly supported the Georgia and Oklahoma litigation initially and
then voted en bloc to defeat NCAA control and broad institutional
participation will make fewer dollars in 1984 than in previous
years.

On the other hand, the Big Ten and Pac Ten Conferences sought
NCAA control and broad institutional participation in TV matters.
These two conferences lost the vote on NCAA control yet they ap-
parently will make increased or similar dollars in this new envi-
ronment.

Overall, the midmajor colleges, some 91 I-AA's and 25 lower I-
A's, are the real losers because we will not share in a pie which
appears to be $20 million smaller this year. Other apparent ironies
which have resulted from this process:

One, prosports organizations may use collective pooling of TV
rights and bargaining techniques in their negotiations with the
major networks while colleges and universities have somewhat un-
clear limitations in this area.

Two, the CFA television agreement contains provisions which
were roundly critized by CFA members when they were included in
the former NCAA plan, such as limitations on the number of times
an outstanding team may appear on network TV, the use of guar-
anteed appearances or dollars to enable weaker football playing
CFA members to prosper even though the quality of their pro-
grams precludes them from making it in an open competitive mar-
ketplace.

A well-known consumer activist has called practices of this type
socialism for the rich and capitalism for the poor.

And then, finally, control of 7 hours of broadcast time when CFA
members are prohibited from appearing on TV unless under the
CFA banner. The NCAA received uniform legal opinion to the
effect that a plan controlling and subjugating its members to this
extent would be in conflict with the court's mandate against con-
trolling the marketplace, and finally an agreement by CFA mem-
bers to boycott the televising of college football games played
against non-CFA members.

It seems to me that of the three major problems facing division
I-A institutions in this country, one relates to recruiting; one re-
lates to academic standards; and one relates to football college tele-
vision.

Of the three, it seems to me the one that is the most susceptible
to solution on a national basis is college football television. In the
areas of recruiting and academics, those issues have been pushed to

111

the forefront and the NCAA has been held collectively responsible for not solving them.

These are problems that are indigenous to each campus. Each institution must define academically what their mission is and live with that mission regardless of the competitive advantages which occur.

In the area of recruiting, there are no national creative ways to solve the problems that accrue as a result of the pressure on campus. Those must be solved at the local level.

Finally, in the area of television marketing, the most effective way to do it is on a national level, yet the thrust for the last year and a half has been to return those rights to the local level.

Thank you.

Mr. SLATTERY. Gentlemen, unfortunately, we are called upon at this time to vote. We occasionally have to do that around here. I am going to recess the meeting for one hour and give you folks the opportunity to maybe grab a bite to eat and let's reconvene at 2 p.m. We will see you then.

[Whereupon, at 12:55 p.m., the subcommittee was recessed, to reconvene at 2 p.m. the same day.]

### AFTER RECESS

Mr. MARKEY. We will begin our afternoon session with some questions of the panel. Let me ask this question in general to the panel.

Does anyone believe that schools are going to be better off under this new arrangement? If so, which schools and how are they going to be better off?

Mr. ROBINSON. Well, I believe that the schools in I–A, those schools who will be permitted to appear on television, I think they are going to benefit more than the other persons who will not be able—I know in our State if there is a school in Louisiana who might be on television, they are going to have the opportunity to recruit the best football players and the fine public relations and that type of thing. We are out seeking private and public funds for education and if you are unable to show your program—you know many times people have thought in Louisiana that the fact that we had a number of football players in professional football had helped our program, but I think the fact that we had made quite a few appearances on television, we got a lot of support.

So these people are going to benefit in recruiting. They are going to benefit with television revenues.

Mr. MARKEY. What about the schools that will suffer financially? Who are they?

Mr. ROBINSON. Well, I can speak for the schools in I, II–A. I know we are going to suffer. For instance, without those television receipts, the NCAA will not be able to sponsor the playoff for us in division II and division I, II–A, nor will the people in II and III receive these playoffs. When I talked about sensitivity with the membership letting some of the money come down to everybody, realizing that we were playing and we had no place to go when the season was over, and they created the playoffs so we would have a chance to play, and within a championship or the division II or the

112

other persons in division III, and I think with that exposure, you are going to have that type of problem trying to get money and to get those persons, and it is pretty tough to go out and get the athletes today, as I reminded a moment ago.

In the sixties, they would ask me, "Will you make any television appearances," so now we are going to go back to the sixties because when it is known the top athlete today, he is going to say, "I am not going to appear on television. I want to get into professional football and et cetera." There are other problems, too, but the immediate problem is the business of recruiting and the revenues to create other programs.

Let me just give you this: Prior to 1977, we were not able to sponsor the baseball tournaments, the tournaments for women athletics and golf and this type of thing. With the revenue that we received from the NCAA television program, we have been able to sponsor those programs. We have been able to do something about title IX, so now we left out—I don't know what we are going to do.

The thing that is going to really hurt us is protecting that in-stadium crowd. If you are not going to get the television money, what about your in-stadium crowd? If a game is being televised, you are going to have a problem. This has always been protected and the organization tried to include a large participation and we won't have that now.

Mr. MARKEY. Do you have any football contracts for this year?

Mr. ROBINSON. We don't.

Mr. MARKEY. Any television? Is your school going to be on television this fall?

Mr. ROBINSON. We don't have any now and nobody has talked to us. I guess it was a very disappointing thing when it was in the newspapers, they said we could televise any time and those in division I-A, II, and III, you can televise any time you get ready, but they knew we wouldn't have any.

Mr. MARKEY. Mr. Davison?

Mr. DAVISON. I am sure it is speculation to think whether it will hurt or help. I anticipate that it will help the University of Georgia and schools like the University of Georgia if for no other reason than it gives me as an administrative officer closer control of our interest and our business which is my responsibility. If it does not benefit the University of Georgia, that will be my fault. The benefits beyond that are that it is focusing attention on some problems and in a sense almost causing a reorganization in the NCAA, one that we have been trying to get for a long time in which schools with common interest are being drawn toward certain ends.

I am a little bit surprised at the Chicken Little attitude that the sky is falling. I think things are going to be different, but I do think that we have before us a whole new set of options for entrepreneurship and one of the things that has brought us to this point isn't television. It is a litany of woes by intercollegiate athletics over the past few years, all of which developed under the system that we are leaving. If our problems get worse, we will have made bad decisions, but when you look at the problems of recruiting, academics, all of those developed under the system that we are talking about right now, so I think the change itself will be good and I expect the University of Georgia to benefit from it.

Mr. MARKEY. Mr. Young?

Mr. YOUNG. I hate to, Mr. Chairman, disagree with my friend, Mr. Davison, but I do not believe it is going to benefit any significant number of universities. I think that there are a few universities, perhaps ours being among them, which could reap economic benefit from this if we chose selfishly to do so. I don't believe we should. I think the only way that could be accomplished is if something substantially smaller than the combined number of the institutions in the CFA and the Big Ten/PAC Ten came together and developed a program and excluded everyone else from it and divided up the loot, I think we could come out better off then we were before, but I don't believe that is in the best interests of our own institutions or in the best interests of college sports or in the best interests of higher education.

Relatively speaking, some institutions are going to come out better than others as a result of what has happened, but I believe in the long run and in the short run as well, higher education, intercollegiate athletics are going to come out worse than they have before and to the extent that that is true, I think that any of us is a loser as a result of that.

Mr. MARKEY. Mr. Paterno.

Mr. PATERNO. No. 1, I do think it will help several schools and not necessarily schools such as Penn State or UCLA or Georgia. I can give a particular instance in our area. Temple University will be on television this year. Temple University has an arrangement with a syndicator and they are going to have a game on television. Rutgers will have some games televised this year that they would not have. I think being overlooked is in the long run this may be detrimental to the people that are at the head of the pack because we have heard that exposure is even more important than the money and we are creating opportunities for exposure.

I think regional schools will have an opportunity to say to a kid from Kansas, if he knows Kansas State is going to have four or five games televised even if it is in a very concise market, at least his friends are going to see him play, the girls back home and the whole bit, so there is going to be some opportunities for those schools to benefit.

The second point I would like to make is that I am in complete agreement with Mr. Delany and Eddie on the fact that we are in a position of creating some damage to their programs. However, if, as Chancellor Young said, we could get the CFA, the Big Ten, and PAC Ten together to talk, we might be able to put something together if we work together to help them with their particular problem. But as long as we stay apart, it is very difficult for either one of us to give them any relief as they have been accustomed to previously.

Mr. MARKEY. Mr. Robinson, what do you think about what he just said? Are you guys going to be better off in the long run even though you don't have any contracts this year? Will you be able to sign regional contracts, be very popular in Louisiana and Texas?

Mr. ROBINSON. I don't think that we are going to have this opportunity because you have a lot of schools in Louisiana, larger than we are, and I feel that those persons maybe now, they are going to make a move to incorporate them. I would never give up. I feel if it

114

is out there, that we would try to get it, but I like what Joe said
about talking. We would feel good if we thought that other people
were concerned about the other 400 schools.

There are a lot of schools out there and you have to have an ap-
preciation for an organization that has included you into this and
has given you an opportunity to operate like the other conferences
and to have the same kind of program. We look at the other pro-
grams and we want to do what the other people are doing and in
fact try to do it better if we can.

Mr. MARKEY. Mr. Delany?

Mr. DELANY. I think one of the myths that has been destroyed
over the last 4 months is the myth that somehow division III, divi-
sion II, and division I–AA institutions were in some way trying to
kill the goose that laid the golden egg. Obviously the golden egg
has been reduced substantially as a result of the court decision and
the inability of the I–A institutions to agree on a marketing con-
cept. So whatever dollars we have lost in the process, I–A institu-
tions have not gained in the process. That is one of the sad and
ironic things about the process, that $25 million has been lost and
our take was less than $6 million a year.

Insofar as Coach Paterno's point about possibly a reconciliation
between the PAC Ten, Big Ten, and the CFA, that is a positive
statement, but my understanding of the coalition TV plan—which
did include CFA, Big Ten, PAC Ten groups—was that it provided
no exposure for I–AA. What is the reason for I–AA, II, or III to be-
lieve that the future planwill be any better than the past plan?

Mr. NEINAS. In my comments before the recess, I pointed out
that 1984 is going to be an unnatural year and perhaps we will be
in a better position to evaluate what is going to happen in 1985. I
think we have to define the term better off as you used. The Ivy
League, for example, indicates that they are "going to be better off,
more games on TV, more money." Other institutions, as Coach Pa-
terno suggested, may be getting more television exposure than they
have enjoyed in the past.

What do we have to use as a barometer to assess potential? One
would be basketball. Some will claim that proliferation of basket-
ball on television has hurt the sport and they can make an argu-
ment for it. I would point out that one of the primary beneficiaries
of proliferation of basketball on television is the NCAA. Their con-
tract for the tournament went from $48 million to $93 million over
3 years and there is an executive waiting to testify who is willing
to pay that amount of money for basketball.

I submit that even though there is more basketball on television,
I submit that college basketball attendance is going up. College bas-
ketball seems to be in a healthy state.

Mr. Toner's own institution has probably benefited as much as
any from the fact that there is a free marketplace in college bas-
ketball on television. The one thing that people apparently fail to
overlook is the obvious. We have done some research into what
effect television would have on attendance. We may not have the
most sophisticated research bureau, but I don't think it will come
as a surprise that there is one variable that has an effect upon at-
tendance. That is whether your team will win or lose.

115

Judge Burciaga pointed out when we talk about protection of in-stadium attendance that if the NCAA had been interested in pro-tecting that, it would not have had 9 hours of college football on television which they did. This is a long way around the barn to say "I think we will know a lot more at this time next year than we do now."

Mr. MARKEY. Mr. Slattery?

Mr. SLATTERY. Thank you, Mr. Chairman.

In summing up my observations of what I have heard today, it seems we could put division I into four different categories. You would have the big football powers in urban areas, the big football powers in rural areas, and then the schools that aren't football powers in urban areas and those that are in rural areas. Now, those that benefit are at the top of that list that I just made and the benefits derived diminish as you go down the list.

The losers in terms of the division I schools are those that aren't football powers that happen to be located in rural areas. Those that are football powers that happen to be located in rural areas are not going to benefit as much as those that happen to be football powers that are located in urban areas, in big media markets.

I would venture to say that the UCLA's of the world will benefit more under this proposal than the Nebraskas of the world that happen to be also a great football power. The Ivy League schools, as we have heard today, are going to have more TV exposure next year and I would venture to say they will gain. Why? Because they are in a larger urban area and there is a TV audience there that wants to see that football and they will see that football if this pro-posal and these kinds of measures that we are talking about here today continue.

To sum up what I have heard today that would be my conclusion in terms of shaking out who the winners and losers are, that is the way I think we can best do it. Beyond that, it seems to me Coach Paterno put it very well in saying we don't know for sure who the winners are going to be over the long term. We do know that we have a lot of challenges facing us and it seems the fundamental question is whether the NCAA is the institution or can provide the framework, the direction needed to make sure that we can respond to the changes of the times, you might say.

It is going to be a tremendous challenge for those at the NCAA and the athletic directors and the coaches and the presidents of the member universities and colleges to prepare a plan that will enable them to adequately enforce the rules and regulations.

I would observe in response to Mr. Davison's comments that if we take away with the earlier court decision regarding the Univer-sity of Nevada at Las Vegas, the authority of the NCAA to impose any meaningful sanction against the coaches, if we take away the question of television rights as an enforcement tool, I have some concern as to what is left in terms of what tools the NCAA has to enforce its rules and regulations.

Granted the only tool left is the question of football scholarships, but it is interesting, the courts now of course have gotten involved in saying that this whole question of the football organization is a proprietary right possessed and controlled by the university. That is the peanut of the lawsuit, and the decision that was made. So I

116

question whether the NCAA may not even have a right to get involved in tampering with the number of scholarships. There is a real question in my mind.

The next point is one about the proprietary rights and the rights of the student athletes that are generating the activity that generates the money involved here. What about their rights and how far are we in the day when the students organize and say, "Folks we have a new program for you. We are generating millions of dollars for people and we want a part of the action."

I am saying that as we look into the future, where is all this taking us? And the challenge to the NCAA and the member institutions, I don't think the responsibility should be laid at the feet of Mr. Toner or those running the NCAA. It should be laid at the feet of every institution to come up with a program that is truly modern and that is capable of responding to the kind of changes and challenges that we all face.

I have some questions for you, Mr. Neinas, and then I will return the balance of my time.

Mr. Neinas, could you please describe for the subcommittee and provide any evidence that you might have that would indicate which colleges and universities from your perspective will fare financially better under the new scheme of things? What is your perspective?

Mr. NEINAS. I would take a little bit of exception with one of your positions. I think if you will analyze college football as we have attempted to do to try to determine a major factor in why individuals gravitate toward an institution if they are a good football player, the one thing that stands out is tradition. Basketball has fewer numbers, football is a numbers game, and basically tradition is the foundation upon which the typical strong football program is built.

You have mentioned Nebraska. Nebraska certainly has developed a football tradition in what you would have to say with 1.5 million population is a rural State. How will Nebraska benefit? One way Nebraska will benefit, as you probably know, they have a NCAA record for the number of consecutive sellout games, so there is obviously a demand for their product even though their market may be smaller than others. This will be one way for them to satisfy that demand.

If you analyze institutions located in large metropolitan areas where they have competition from professional football, they have not fared as well as the gate. USC and UCLA would be exceptions to the rule, but Southern Methodist University still has trouble attracting a good solid attendance base because of the fact they are in direct competition with the Dallas Cowboys, which is a popular team.

Mr. SLATTERY. Mr. Neinas, I would observe that the analogy that I made with respect to Nebraska and UCLA and USC, meaning absolutely no disrespect to SMU, is probably more legitimate in terms of the analogy and the point I was trying to make. I would like to know from your perspective which schools stand to benefit, which stand to lose under the new scheme of things with the CFA? What is your perspective? There are winners and there are losers and I

think the answer to my question is an obvious one, but I want to hear it from you.

Mr. NEINAS. Based upon our previous contract with NBC, if we had been allowed to implement that contract, the CFA membership would have been further ahead than under the first 2 years of the ABC and CBS contracts.

Mr. SLATTERY. Don't you think that it is fair to say that those members and those institutions, principally the football powers that initiated this action, this court action, felt like that they were getting the short end of the stick financially and they truly felt like that they would be far better off if they could negotiate their own television deal separate from the NCAA? Is that——

Mr. NEINAS. Yes.

Mr. SLATTERY. Pardon me?

Mr. NEINAS. Affirmative.

Dr. Davison wants to tag in on that. Before I relinquish the mike to him——

Mr. SLATTERY. Before you relinquish the mike, I have more questions.

Mr. NEINAS. You mentioned about your concern relative to the Supreme Court's decision and what impact and effect it would have upon the operation of the NCAA. I submit—and I think the NCAA attorneys will concur—that one benefit of the Supreme Court decision, although it may have been adverse to the NCAA from a television standpoint, it strengthened the NCAA position relative to making clear that the association had the right to establish certain rules and regulations for the conduct of the sport, for the benefits of intercollegiate athletics and the benefit of amateurism.

Mr. SLATTERY. I don't dispute that point, but I raise the question about what that means and once the Supreme Court has recognized that the institution has a proprietary interest in its football program, which this decision indicated, then I question whether this atonomous body voluntarily composed does in fact have the right to in any way have the right to interfere with that proprietary interest. That is an interesting question that we can't speculate on today.

In a January 13, 1982, memo, Mr. Neinas, you said in a letter to the CFA board of directors, you discussed the major football-playing universities' option similar to what you described as "financing a welfare system for intercollegiate athletics." I would observe that this comment that you made in this January 1982 memo supports I would argue the point that I am making, is that there are definitely going to be some winners and some losers in this new scheme of things and the winners are going to be the big schools in the urban areas that are big football powers and the losers are going to be in my judgment the Gramblings of the country, the Kansas States of the country and others perhaps and I think that the memo that you sent probably reflected your thinking certainly at that time that there were going to be winners and losers.

Mr. NEINAS. May I respond?

Mr. SLATTERY. Absolutely.

Mr. NEINAS. I think the one thing you have to recognize is that CFA became involved in television because of the decline in the ratings. I submit that I thought that Justice Stevens addressed that

118

point when he indicated that perhaps the weakness of the NCAA television plan was a failure to recognize viewer preference.

In terms of having the opportunity to put your best foot forward, yes, I think the plan has restrained a more imaginative marketing approach that could help college football. Your next response is some people are going to get hurt. There is probably no sport on television more today than major league baseball because each team has their own television operation plus two major networks carry major league baseball. Yet based on the information that I have read, pro baseball attendance is up both at the major and minor league level and according to the Collegiate Baseball, which is the so-called sporting news of college baseball, college baseball attendance is up.

If people are concerned about inperson attendance, let's evaluate to see if by more imaginative programming and marketing if college football in general will not improve in popularity.

Mr. SLATTERY. Mr. Neinas, what is wrong, or maybe you do agree with the logic of Mr. Toner that the new scheme of things will in fact place more emphasis on winning so that you can get on television, so that you can generate the money you need to fund your program and to continue to be a winner? Do you agree with Mr. Toner's logic that this will put additional pressure on institutions to win and win at all costs?

Mr. NEINAS. I do not agree with that and I think the person who is probably best versed to respond to that question is Coach Paterno. Much of the pressure on coaches is self-imposed and under the current scheme of things, regardless of what happens to television, there is still a pressure on a coach to provide a successful team, and coaches live under that pressure and as a matter of fact even in nonrevenue sports coaches put pressure on themselves to win.

Mr. SLATTERY. In response to that, I would observe that there are probably psychiatrists in this country, many of whom may reside in the Meninger Foundation in my district, that would say that all pressure is self-imposed. It seems like to me that Mr. Toner's points are somewhat legitimate. There is going to be more visibility, that is what we are talking about with being on television, more people aware of what is going on.

Mr. Neinas, I was wondering also why did the College Football Association find it necessary to go through this whole operation in just a couple of sentences? Would you agree that they did this to increase the profitability of their football program? Would that be a fair characterization?

Mr. NEINAS. Probably a threefold purpose. That would be No. 1. No. 2, as I indicated before, I think that it would be an opportunity to explore different marketing approaches; and, No. 3, to serve a need in terms of trying to serve your public through the medium of television.

Mr. SLATTERY. Wouldn't you say on a scale of 1 to 10 that maximizing profitability of the football program was probably 9.9 on a 10-point scale and the others were somewhere below 5?

Mr. NEINAS. Mr. Slattery, I don't know that I would put a number on it, but I understand we live in a capitalist society and I didn't know that there is something wrong with a profit.

Mr. SLATTERY. I think we ought to be honest in talking about these issues and the fact of the matter is that these schools joined together, the University of Georgia and the University of Oklahoma, wisely recognized that under the existing situation they were on the funding end of a welfare system with intercollegiate athletics and resented paying the tab. They thought they could cut themselves a better deal. They probably sought your advice and the advice of other great minds of this country as to how they should join together to improve their profitability. I don't know why we should duck that. We are talking about the big and the best today getting bigger and even better and we are going to do that with the new revenues they are going to generate by this new scheme of things with television.

There is nothing wrong with that, but let's talk about it as it really is and I think I have fairly characterized how we have changed things.

Mr. NEINAS. We have two college presidents in attendance. They could speak to this better than I. It is my perception, there have been critics of college athletics from day one and always will be.

Mr. SLATTERY. I am not one of those.

Mr. NEINAS. I understand. Second, the institutions in the College Football Association basically do not rely upon State aid and student fees to underwrite and finance their program so if the money is not earned, it cannot be spent. In my opinion, a college president looks at a college athletic program, in the words of the president of Kansas State University, as the doorstep to the university. That is the first way that many people become introduced to the university is through the athletic program. Kansas State has been successful in basketball and attracted a lot of attention.

I think a college president can stand the criticism that will be directed toward him if he is, No. 1, convinced that the people playing the game are bona fide students and, No. 2, that his program is being operated in an above-board fashion. If he can do that, he can take the heat that they are putting too much emphasis on an athletic program.

Mr. SLATTERY. I appreciate your being here today.

Mr. ROBINSON. I would be interested in knowing whether invitations were extended to anybody in I, II–A or if any of those teams were attractive enough. I address that to Mr. Neinas.

Mr. NEINAS. The CFA has a criteria for membership. We entertain any applications for membership and the board of directors has to assess the criteria.

Mr. MARKEY. Let me ask you this, Mr. Robinson, what role do you think the television networks should play in helping to ensure that smaller schools, less well-known schools, or schools outside of major media markets get an opportunity to have their football programs exposed as well? Do you think there is any responsibility they have as well or should there just be now some kind of Darwinian test?

Mr. ROBINSON. The only contact that I have had with the networks was through the NCAA and they were very cooperative with us. Now, under a new plan I never had any, but they did on Monday make the selection as to the team that would appear after having received the mandate or having been advised by the NCAA

120

that you would have one or—I, II-A appearances and I, II or I, III.
I don't have any other knowledge of the networks. I would hope
that they would have thought about it.

Mr. MARKEY. Have you been approached by any local television
stations, by any syndicators, by anyone other than the networks?

Mr. ROBINSON. We haven't. The networks are not paying
money--it is a matter of they probably would, you know, get you to
be a part of a program, but they don't have a plan.

Mr. MARKEY. They don't have any money?

Mr. ROBINSON. They don't have any money either.

Mr. MARKEY. Mr. Delany?

Mr. DELANY. Mr. Chairman, when it became clear that there was
a possibility that this year would be far different than other years,
a collection of I-AA administrators started meeting in September
1988. We went to New York and met with the three networks, na-
tional cable companies, and syndicators. We met with them again
in Chicago, held conference calls, gave them a possible inventory of
games, told them we were flexible. Basically we tried to put our
product in its best light in the marketplace and it has not been suc-
cessful.

Right now the NCAA is attempting to sell the three champion-
ships as a combined package with the possibility of a regular
season Thursday night package for I-AA. The reactions have not
been overwhelming from the cable companies or the networks and
presently the NCAA is restrained from entering into contracts on
behalf of its members with regard to regular season football televi-
sion, so unless that injunction is modified, it becomes very difficult,
Mr. Chairman, for us to sell our rights to a television package.

So there have been attempts to find out what value our product
has by itself. It seems to me to be a matter of degree. The CFA, Big
Ten, and PAC Ten provide for passover payments and guarantees
appearances for its weaker members, but when it comes to other
members in the community, those passover payments and guaran-
teed appearances become socialism.

My question is, When is socialism socialism and when is it the
marketplace? It seems to me some of the same vehicles that were
used within the NCAA package to provide exposure opportunity
are also used in the present package. I guess socialism is within the
NCAA, but not within the CFA.

Mr. NEINAS. Under our plan, those institutions which voluntarily
assign their rights are paid a participation fee in lieu of the fact
that they have assigned their rights. That is part of the plan.

Mr. MARKEY. Any other comments on that?

Mr. Paterno? Mr. Young?

Mr. PATERNO. My original comment on it—and Congressman
Slattery is not here—is that I take exception to the fact that we
are in this only for profit. As a member of the CFA Television
Committee, I felt that we had an obligation to secure money and
exposure for each member in the best way we could and we negoti-
ated that way.

In response to Mr. Delany's question, what is socialism, he may
be absolutely right. We may have a socialistic system within the
CFA that we opposed outside of the CFA, but who do we have an
obligation to first? We have an obligation to Kansas State, we have

an obligation to Virginia, we have an obligation to those people first who are in the same arena that we are in and the level of football.

I am not indicating that our football is better or what, but we have joined together because we have similar problems and we started out with academic and recruiting problems and television became a way for us to try—as far as I was concerned, I go back to what I said originally—to use television and the exposure that would come from television to try to offset the inequities of a school such as Penn State as opposed to a school such as Kansas State. We are both rural schools.

I got a kick out of the Congressman—Lawrence, KS, is the biggest rural college.

Mr. MARKEY. Would you dispute the contention that the decision means big money for big winners and that there is an ever bigger pressure now placed on schools to win, and that—you know, Vince Lombardi used to say winning may not be everything, but I think now we can say it may not be the only thing, but it sure will be profitable if you can win, and that that puts tremendous pressure not on you necessarily—let's not use it as an example—not your conversations with the president of Penn State.

Your institution is held up as a model and Notre Dame and other schools, but we have other schools out there that have these renegade piratical attitudes about putting in athletes to bring in the big bucks for their school, and doesn't this only exacerbate that pressure and put tremendous likelihood into the whole process that, in fact, that is going to become a much worse problem than it is right now?

Mr. PATERNO. I am kind of getting a kick out of the discussions that have gone on here. John Toner is an old buddy of mine from coaching days. He made one argument that the CFA package and the Big 10 package is peanuts compared to what the NCAA package would have been, but the fact that the NCAA package was big money didn't necessarily mean that that was bad.

The money thing has gotten us so fouled up. The big schools are going to make less money, Penn State and Notre Dame. You heard the statement of BC. You can't argue both sides so that the fight for that buck is not going to maybe be as intense.

I have no idea what is going to happen out there. I know what is happening in basketball. Basketball went hog wild because of the fact that there was supposed to be a lot of money out there and overexposure. Now the money is coming down but the game benefits by the overexposure. If I were a coach and somebody starting out again and I had an opportunity to go to someplace where there was no exposure, I would really have pressure.

I again take exception to Eddy saying he could be on but they are not offering him any money. You can't have both. When I started at Penn State, being in the State College area, without a public television station or AP station, I made up my mind there was some way we were going to get Penn State in the media mainstream. We paid a syndicator to develop a delayed television network and I sold that as an advertising dollar. We had an $8 million budget for intercollegeate athletics and if you were running a corporation you would spend that to advertise your product. We paid

122

that to a syndicator to get us put on television where high school kids in New Jersey and New York could see it.

All I guess I am saying is that this country was built with guys that could figure out how to handle a challenge. Hopefully we have people out there who are going to make this better. I do think we have to stop everybody blaming everybody else and get people to say I screwed it up, I am sorry, how about you, and get together and try to solve the problems.

Jim doesn't like the fact that we didn't make any arrangements for the division 1(a). We are trying to survive in 1984. We are trying to survive for our members without worrying about somebody else right now because of the fact that we didn't get a coalition agreement. If there is anybody to point a finger at, it is ABC and CBS, because they had a chance to be magnanimous that they believed in college football, and hopefully in 1985 we are going to have more cards.

Mr. MARKEY. What did they do wrong?

Mr. PATERNO. They squeezed every buck they could out of it, which is certainly their prerogative. I have no problem with that. If I was in their shoes I may have done the same thing, but I go back to the way we handled the Germans after World War II.

I think they showed farsightedness in trying to help us get through 1984 into a more meaningful situation without creating the problems we have because we have a problem with some of our membership. Penn State is not going to make more money out of this, and I don't think there is going to be more pressure on schools to get on television. Exposure is up, but not the money. Exposure is more important.

Mr. MARKEY. If they are smaller schools, if they are not able to gain the access or to have the collective clout of the organization to get them on TV once in a while or to get them a few bucks because they are part of a package, that is all right because that is the way the world is and if they can't hack it—you say that is the way life is, and you can't have people helping people along, because they look similar to the general public.

Mr. PATERNO. There are dollars for athletics. At Penn State we have 29 sports. Twenty-eight of them cost of money. It all has to be generated by football. If we don't get x number of dollars we have to start thinking about eliminating some of our sports. Our athletic director is hired to handle the Penn State athletic program, not to handle Grambling's. If we deprive 10 girls from playing on a field hockey team at Penn State because we want Grambling to be able to get $50,000 in football, that is a moral problem for me.

Where do you start? I don't know. I haven't got the answer, but I know we have to judge every decision we make based on No. 1, we have 500 athletes performing at Penn State.

Mr. MARKEY. Let me interrupt you. I have a roll call I will have to make so we will have to recess, but before, I would like 2 minutes from Mr. Robinson and 2 minutes from Mr. Young.

Mr. ROBINSON. I wanted to direct this to Joe. I realize that no particular school is obligated to look out for Grambling and let your program go beyond the limit, but I do feel that under—this is why I spoke about the NCAA, because under this formula and when they were controlling the television, we had this and I think

123

that Joe will agree with me that without the TV, I don't even
think that the NCAA has a tool for enforcement. So the thing that
I am saying, we had it and it has been taken away from us.

Now, where we go from here, I feel that I am going to do what
you did, I am going to do something, but the fact that we had it
and it has been taken away and the people that are mostly respon-
sible are not concerned, this is the thing. What we have to do now,
and this is why we spoke and said that under the NCAA how we
have prospered and that we had playoffs, we received money, and
now we are out there without anything.

Mr. MARKEY. Mr. Young?

Mr. YOUNG. I hesitate, Mr. Chairman, to get back into this issue
because I said at the outset my real concern is not the financial
aspects of all this but what I think are really more important
issues in the long run.

I do want to say something about the finances, because I think
you have heard some things which are confusing to all of us. They
are certainly confusing to me. It is true that there are going to be
more games on television than there have ever been before. There
were 70 games on live television last year plus whatever as on the
supplementary package. That number is probably going to double
or triple this year but they are not going to be on national or re-
gional television, they are going to be in fragmented television
packages which in terms of visibility is not going to have much
meaning.

There are universities that have never been on television before
but in their home areas and therefore competing with home at-
tendance at their games. So while you have the total amount of
money that is going to be divided up among the several universities
involved coming from all live television, whether it is national net-
works, syndication, cable or individual television arrangements
with a particular station in a particular area, that is going to be
cut from around $75 million to around $45 million—I agree that
Mr. Toner's figures were a little low—to around $45 million, and
the number of games are going to be at least double the number of
live television games that are going to be available are going to be
doubled and tripled.

I suspect that is the natural consequence of the decision that this
was an organization operating in violation of the Antitrust Act in
breaking it up, but the consequences of that are going to be very,
very hard for the small institutions. Yes, the Ivies now have a
package but it is a package on PBS, not a national network pro-
gram that is going to bring the kind of benefits that have been
brought to them in the past.

We have a rollcall on and I don't want to hold this panel longer
than necessary. We thank you for your participation. We will
submit to you written questions on the subject and would ask for
your prompt and concise answers to them so we can flesh out the
record here. We are trying to develop the record so we can make
an informed judgment on this subject.

We will take a brief recess and then we will bring back the net-
work witnesses for their testimony. We will now be in a brief
recess.

[Brief recess.]

124

Mr. MARKEY. We will convene with the third and final panel of witnesses. Mr. Arthur Watson, Mr. Robert Wussler, Mr. Neal Pilson, and Mr. Robert J. Wormington. If you could come forward. I will ask you to please rise.

[Witnesses were sworn.]

Mr. MARKEY. Could you begin by identifying, from my left, yourselves for the record?

Mr. WORMINGTON. I am Bob Wormington, vice president and general manager of KSHB-TV, a Scripps-Howard television station in Kansas City, MO.

Mr. WATSON. Arthur Watson, president, NBC Sports.

Mr. PILSON. Neal Pilson, I am executive vice president of CBS Broadcast Group. In the absence of a president of the sports division, I am still functioning in that capacity.

Mr. WUSSLER. Robert Wussler, executive vice president, Turner Broadcasting Systems.

Mr. MARKEY. We will begin with your testimony, Mr. Pilson. I would ask if it is possible to summarize your testimony and keep the opening statements down to 5 minutes.

TESTIMONY OF NEAL H. PILSON, EXECUTIVE VICE PRESIDENT, CBS BROADCAST GROUP; ARTHUR WATSON, PRESIDENT, NBC SPORTS; ROBERT J. WUSSLER, EXECUTIVE VICE PRESIDENT, TURNER BROADCASTING SYSTEM, INC.; AND ROBERT J. WORMINGTON, VICE PRESIDENT, KSHB TELEVISION, KANSAS CITY, MO.

Mr. PILSON. Thank you, Mr. Chairman.

I don't really have a statement. What I have is a collection of observations and comments based on the testimony that has been given before this subcommittee during the day. I hope I can be helpful in explaining the network perspective or at least explaining CBS's perspective with respect to college football. It is a viewpoint that hasn't been expressed before this subcommittee up to this point.

As we attempted to measure the impact of the Supreme Court decision we set up a model for the 1984 season. It wasn't formal, just a conception of what we thought might occur. We are faced with totally new experience, something that has no precedent in college football. College basketball is perhaps the closest analogy. It was an analogy argued by the attorneys for CFA and accepted by the district court and the Supreme Court that the college basketball analogy has some relevance to college football today.

We saw what has happened in college football: that syndicator, cable broadcasters, local television, regional distributors all have been active in seeking to secure broadcast rights. We also looked back and I think the committee should understand that we had an unhappy experience with NCAA football over the past 2 years. Frankly, we misjudged the marketplace. When the deal was negotiated between ABC, CBS, and the NCAA, we estimated that we would do better in terms of ratings than we actually did. That was alluded to by Mr. Neinas earlier and all three carriers, ABC, CBS and WTVS have acknowledged publicly that they have lost money

125

on college football over the past 2 years. In fact, we were support-
ing college football over the past 2 years.

We tried to envision what role should the networks play in this
new marketplace that no one had had substantive experience with.
The role we felt for CBS—and as a result of the negotiations play-
ing out, ABC accepted this role as well—was that for us to contin-
ue, the regional form of distribution didn't make a lot of sense in
this new marketplace. Under the NCAA plan both ABC and CBS
had done close to 40 games each year and many were regionalized
and we saw a whole new class of television carriers, the regional
distributors.

The role we envisioned was to attempt to provide for our con-
stituencies, which are the viewers, our affiliates and our advertis-
ers, we felt we had to provide them with distinctive games. Other-
wise we were simply going to duplicate what was already going to
be available in their markets, namely regional games.

We felt that the role of the syndicators would be to do what they
are doing, and our schedule in our prepared testimony indicates
that there are numerous syndicators putting into place numerous
deals with conferences, some of which we didn't reflect in the state-
ment because we weren't aware of them.

CBS is prepared to compete in that new marketplace, however
the marketplace is structured. We appeared at the invitation of the
NCAA and suggested that with really only one proviso, we were
prepared to purchase ball games just as we did in college basket-
ball. We asked, given the peculiarity of college football playing on
Saturday, that the NCAA provide one window for the networks.
Regional conference games could make it difficult for us to do that
in a totally unstructured marketplace.

In fact, the NCAA adopted some of our suggestions but that was
voted down by the colleges. We then were faced with a marketplace
that was determined, structured and formed by the colleges them-
selves. The networks didn't create this situation. They are not re-
sponsible for it, they didn't initiate the lawsuit, didn't appear in
the lawsuit, and had no influence on what eventually occurred in
terms of the decision by the Supreme Court.

What we were presented with after the turndown by the NCAA
were two groups bringing us plans. The first group was the CFA.
Their plan called for 33 to 50 games, 14 to 20 exposures and they
were going to be in the late time period only. They did not want to
go in the early time period and of course they didn't include Big
Ten or PAC Ten schools.

We told CFA we couldn't subscribe to that view. We felt that
would take us back to the kind of regionalization, the kind of mul-
tiple game syndrome that we had experienced under the NCAA
plan and which we found to be unhappy for us. We said we would
be interested in much more limited number of games consistent
with our overall plan of basically providing major national attrac-
tions and not getting involved in regionalization.

We weren't able to make a deal with the CFA. We ended up
making a deal with the Big Ten, PAC Ten, because their plan was
more consistent with our goals. Their plan referred to a fewer
number of games and a more limited number of exposures. We are

126

in a 1 year experimental period. That has been emphasized by some of the prior speakers, but I think it needs restatement.

We are not even in true experimental season because of the 6-week time period within which all of the syndicators and all the networks and all the colleges need to act before the beginning of the season. For example, my associate from NBC has said publicly that they had no time to get into college football this season. Advertisers have said that some of their money is already committed. So what we have here is a very limited opportunity to televise and exploit college football during 1984 and I think it is unfortunate that this year is going to be cited as the measuring rod when it is an awkward year, it is an unusual year and I frankly think more time is needed to assess the impact of the free marketplace.

The laws of supply and demand are operating right now in this business and there has been a tremendous increase in supply, a relatively constant demand, and the price per game to no one's surprise has gone down. But while there will be some dislocations and inevitably some schools will benefit and some won't, the opportunities are there for those schools that seek to exploit them—and Coach Paterno said that in the old days he paid to get on television—and there is room for aggressive marketing here on the part of colleges.

There are hundreds of stations out there. There are numerous program services that have been developed in the last 5 years that didn't exist 5 years ago. We think the benefits of the current free unstructured marketplace will eventually outweigh the disadvantages and that when the 1984 college football season is complete, I think we will find more and more games on television than ever before, more schools being exposed, more schools generating revenue.

We see a healthy, competitive marketplace going for college football which will give the viewers more choices and more alternatives. We are not unmindful that some colleges will generate less revenue but some will earn more and all will have the opportunities to be exposed on the new media as well as of course on network televison.

Thank you.

[The prepared statement of Mr. Pilson follows:]

127

BEFORE THE SUBCOMMITTEE ON OVERSIGHT
AND INVESTIGATIONS OF THE
HOUSE COMMITTEE ON ENERGY AND COMMERCE

Statement by NEAL H. PILSON,
Executive Vice-President,
CBS Broadcast Group

July 31, 1984

I appreciate this opportunity to meet with you today
to discuss intercollegiate football and the broadcast of
that sport during the 1984 season and beyond.

As you know, the Supreme Court decision of June 27
invalidated the NCAA Television Plan and the contracts
with ABC, CBS and WTBS. This ended the NCAA's 32 year
reign as the exclusive grantor of television broadcast
rights to college football games. During that period, the
number of television appearances of NCAA member schools

128

was strictly controlled by the NCAA. The decision marks the beginning of an era where individual schools and conferences are free to offer the television broadcast rights to their games to a variety of communications media - over-the-air networks, over-the-air stations, regional networks, cable networks, even pay-per-view. The spectrum of existing communications media is available to any college or university willing to sell the telecast rights which it controls.

CBS' obligation as a broadcaster is to provide the highest possible quality program service to the greatest number of American viewers. In furtherance of that responsibility, CBS identified its role in this new marketplace and stated its interest in broadcasting a limited number of nationally attractive football games. Our rationale was that we needed to differentiate our games from those of the numerous syndicators, local stations and other packagers who would be entering the field. We envisioned a marketplace (as did the Supreme Court in the NCAA case) similar to that which prevails for college basketball games, where individual schools and conferences sell the broadcast rights to their games to any of a variety of telecast entities. We are active

129

participants in the college basketball marketplace and remain willing to compete against any broadcaster or cablecaster in that environment.

Events since the Supreme Court's decision have, in large part, borne out the accuracy of our expectation of the market for television rights. I have attached to this statement a list of the packagers which have entered into agreements to broadcast or cablecast college football games in the upcoming season. This data would certainly indicate a robust demand for these games and we are confident that in 1984 more college football games will be available, and more viewers will watch college football, than ever before in the history of the sport.

Our broadcast schedule for the 1984 season will be built around the Big 10 and Pac 10 conferences. How this came about is a matter which might interest this committee.

After the Supreme Court decision, we were invited to attend hearings held by the NCAA in Chicago on June 30, 1984 and offered our comments with respect to a television plan for Division I colleges and universities which the NCAA might design which would allow for free market competition and pass muster under the Supreme Court

130

decision. Following the hearing, the NCAA proposed a plan which contained three "windows" or time periods during which football games would be broadcast. One of these time periods would have been set aside for competitive network broadcasts, another for syndicators and the third (during the evening) for cable and syndicators. During the network window, full competition was contemplated i.e., buyers and sellers would freely negotiate the terms and conditions, including price, applicable to the sale of the television broadcast rights. Exclusivity would be granted only with respect to the game purchased. The network broadcasters would then compete for sponsorship commitments and viewers. That plan was voted down by the NCAA Division 1 membership.

After the failure of this NCAA proposal, the remaining forces in the Division I college football marketplace were, and continue to be, two groups: the College Football Association, or CFA, and the Big 10/Pac 10 conferences. We negotiated with both parties in an attempt to satisfy our limited programming needs. Of the two, only the Big 10 and Pac 10 were willing to deal on the limited basis we sought. The package offered by the CFA was far larger than we were able to accommodate,

131

calling for 33 to 50 game telecasts in 14 to 20 exposures
and only in the late afternoon time period. The CFA
rejected our offer to acquire broadcast rights to a
limited number of games. In order to protect our
interests and to remain consistent with our market
strategy outlined above, we entered into an agreement with
the Big 10 and Pac 10 granting us the right to 10
exposures, comprised of 14 games during the upcoming
season, both in the early and late time periods. As
originally agreed with the Big 10 and Pac 10, CBS would
only have had a "first claim" position with respect to the
Big 10 and Pac 10 schedules, not an exclusive position.
The Big 10 and Pac 10 anticipated selling rights to other
games in their schedules to other network broadcasters and
CBS still hoped to acquire rights to games between CFA
members not chosen by any other network. Since both CBS
and the Big 10 and Pac 10 were disappointed in their
efforts to acquire, or sell, respectively, these
additional rights, we have expanded our schedule of
exposures to 12 and our relationship with the Big 10 and
Pac 10 is now on an exclusive basis.

For the benefit of this subcommittee, I have attached
a copy of our anticipated broadcast schedule for the 1984
college football season.

132

This marketplace has given rise to a new controversy, that of the "cross-over" game, (a game involving a CFA member and a Big 10 or Pac 10 member). We originally had 3 such cross-over games on our broadcast schedule where the CFA member plays in the home stadium of the Big 10 and Pac 10 member. As of this date, a controversy exists as to which network broadcaster, if any, will have the rights to these games. Historically, the negotiation rights to sports events have been controlled by the home team and our schedule was prepared with that experience in mind. We trust that the academic institutions involved will reach an agreement along these lines in the near future.

In closing, it is clear to us that the result of the Supreme Court's decision will be a more freely competitive market which will better serve the American television viewer. That viewer will be offered a greater and more diverse sample of college football games than he has ever been offered before.

133

## SCHEDULE OF REPORTED COLLEGE FOOTBALL BROADCAST AGREEMENTS

### 1984*

| Network/Syndicator | Licensor | Games |
|---|---|---|
| ABC | College Football Association | 20 |
| CBS | Big 10/Pacific 10 Conferences<br>Army vs. Navy<br>Boston College vs. Miami (Fla.) | 15<br>1<br>1 |
| ESPN | College Football Association | 15 |
| Jefferson Productions | Atlantic Coast Conference | 12 |
| Katz Communications | Big Eight Conference<br>Eastern Independents<br>(Boston College/Pittsburgh/Syracuse/Miami) | 11-14<br><br>15 |
| TCS/Metro Sports | Big 10 Conference<br>Notre Dame<br>Pacific 10 Conference<br>Penn State | 12-15<br>4<br>12-15<br>3 |
| Raycom | Southwest Conference | 8 |
| SportsTime | Missouri Valley Conference<br>Mid-American Conference | 8-12<br>8-12 |
| WTBS | Southeastern Conference | 12-14 |
| Public Broadcasting | Ivy League | 8 |

### 1983

| Network/Syndicator | Licensor | Games |
|---|---|---|
| ABC | National Collegiate Athletic Association | 35 |
| CBS | National Collegiate Athletic Association | 35 |
| WTBS | National Collegiate Athletic Association | 19 |

*As of July 30, 1984

134



CBS SPORTS WORKING 1984 COLLEGE FOOTBALL SCHEDULE

| DATE | GAME | TIME ET (Pacific Time—PT) | COVERAGE |
|------|------|---------------------------|----------|
| Sept. 15 | Washington at Michigan | 12:00 NOON | National |
| Sept. 22 | Nebraska at UCLA or Iowa at Ohio State | 3:30 PM | National |
| Sept. 29 | Illinois at Iowa | 12:00 NOON | National |
| Oct. 13 | Illinois at Ohio State and Washington at Stanford | TBA TBA | Split National |
| Oct. 20 | * Michigan at Iowa UCLA at California | 12:00 NOON 3:30 PM | National National |
| Oct. 27 | Illinois at Michigan or Ohio State at Wisconsin and UCLA at Arizona State | 12:00 NOON 3:00 PM, PT | Split National |
| Nov. 3 | Michigan at Purdue or Wisconsin at Iowa and USC at Stanford | 12:00 NOON 3:00 PM, PT | Split National |
| Nov. 10 | Washington at USC | 3:30 PM | National |
| Nov. 17 | * Michigan at Ohio State USC at UCLA | 12:00 NOON 3:30 PM | National National |
| Nov. 23 | Boston College at Miami | 2:30 PM | National |
| Nov. 24 | TBA | 3:30 PM | National |
| Dec. 1 | Army vs. Navy at Philadelphia | 12:00 NOON | National |

* Indicates CBS Sports Doubleheader

•          •          •

51 WEST 52 STREET, NEW YORK, NY 10019

## STATEMENT OF ARTHUR WATSON

Mr. WATSON. Thank you, Mr. Chairman.

I appreciate this opportunity to discuss the future of televising college football, particularly in light of the recent developments arising from the Supreme Court's NCAA football antitrust decision. NBC recognizes the status of college football as a special American institution. NBC Sports has long held and continues to have an interest in broadcasting this special institution to our viewers. Indeed, were it not for the timing of the Supreme Court's decision, I might well be here as a rights purchaser rather than as a potential bidder for college football in the near future.

NBC Sports has not been an active bidder for 1984 college football rights. Because of our prior commitments to major league baseball, including the 1984 World Series, and substantial investments in prime time programming for the fall season, NBC Sports has been forced to stand to the side while the shape of college football television in 1984 takes form. It is from this unique vantage point that we appear today. And it is from this unique vantage point that we invite those who are seeking to crystal ball the future to step back and not jump to premature conclusions based on this year's experience.

One thing is certain, 1984 is a year of uncertainty. For universities, broadcasters, networks, advertisers, and the public, the Supreme Court's decision could not have come at a worse time. Coming so close, in television terms, to the beginning of the college football season, it has spawned hasty arrangements, the result of which will be unclear for months to come. In those months, all of the interested parties should be examining the Supreme Court's decision and the emerging realities of its effects so that they can chart the course of college football's television future.

It is our belief that a voluntary umbrella organization or system would serve to assist individual schools, universities, and conferences with the coordination of scheduling, television rights negotiations, and review of network, regional and local television plans. We believe that the schools may conclude that such a concept is worthy of serious exploration.

Finally, let me say again that college football is a very special American institution. For NBC Sports, our participation here today and in the marketplace tomorrow is dedicated to making that special institution's future as bright as its past.

I thank you.

Mr. MARKEY. Mr. Wussler?

## STATEMENT OF ROBERT J. WUSSLER

Mr. WUSSLER. Thank you, Mr. Chairman.

I appreciate the opportunity to provide you with our views on the impact of the recent Supreme Court decision in *NCAA v. the Board of Regents of the University of Oklahoma.* By freeing the college football marketplace from the artificial restraint imposed by the NCAA, new opportunities for programming flexibility should have been created. In eliminating the NCAA's stranglehold on the telecasting of college football, the Supreme Court held that "by curtailing output and blunting the ability of member institutions to

186

respond to consumer preference, the NCAA has restricted rather than enhanced the place of intercollegiate athletics in the Nation's life." Thus, what the Court found objectionable was that the NCAA football TV plan created artificially higher prices and lower output of product than would have existed in a free marketplace.

Unfortunately, Mr. Chairman, I must report that, despite the Court's decision, there is far less freedom in the new marketplace than we had expected. While the NCAA decision eliminated the competitive bottleneck that the NCAA administered, it merely created a vacuum into which the College Football Association has stepped.

Instead of exercising a leadership role in leading college football into a new competitive era, the CFA has instead sought to recreate the worst aspects of the NCAA's restrictions on its members. It has thereby pushed against the outermost limits of the Supreme Court's and district court's decisions defining permissible behavior. We believe that in some aspects it has gone too far.

Soon after the Court's decision, we entered into serious negotiations with the CFA. We were attempting to secure the rights for the CFA's exclusive nighttime package. Our negotiations, however, broke down because the CFA insisted on imposing restrictions on the nighttime package which we found unacceptable and which we believed to be inconsistent with the letter and spirit of the Court's decision.

The most onerous restriction and the one with the greatest impact on the workings of the free marketplace, is the CFA's limitation on the number of times any one team can appear on national or regional television. This is precisely the same kind of restriction the Court found objectionable in the NCAA case. For the package that TBS was negotiating, the limit was one national appearance per team, per season.

The impact of this restriction can be illustrated by our scheduling preference for the first two telecasts of the season. We had requested that the CFA permit us to kickoff the package with the game between Florida and defending national champion Miami on September 1. In our judgment, the best available game the next week would have been Florida versus LSU, and we therefore requested it. These games would have been very popular with our audience and were critical to our interest in the package. The CFA would not permit this alignment simply because we would have aired Florida twice.

The focus on two Florida games was not borne of an arbitrary desire to air Florida football. It was a careful, deliberate decision based upon our view of the best available games for telecasting that weekend. We were responding to the marketplace. The CFA was not willing, however, to allow these market forces to shape the football schedule.

Perhaps as serious, the CFA appears to have forbidden its members to authorize the sale of TV rights to crossover games, those games in which a CFA member is playing a non-CFA member, even though the members may otherwise want to sell the rights. This prohibition on the airing of crossover games appears to us to constitute a group boycott which, in our opinion, violates the Nation's antitrust laws. Some of these games are among the most in-

137

teresting to our viewers, and we are very interested in televising them.

Our negotiations with the CFA poignantly illustrate the anticompetitive effects of the CFA's ban on crossover telecasts. When the CFA refused to agree to our potential airing of the Florida-LSU game on September 8, we proposed as an alternative that we air the Notre Dame-Purdue game on the same date. This is a crossover game since Notre Dame is a CFA member and Purdue, a member of the Big Ten Conference, is not a CFA member. This proposal was rejected by the CFA, and we were informed that the CFA was opposed to the telecasting of crossover games during the restricted nighttime package. Once again, the CFA's restrictive rules prevented the marketplace choice.

The CFA also insisted on imposing certain other appearance requirements on its nighttime package. As you may know, the CFA is composed of schools in five athletic conferences and two groups of independent schools, one group of Northern and one group of Southern schools. As a part of the nighttime package the CFA further required that each of these seven constituent groups receive at least two school appearances in the nighttime telecasts. Thus, on any given Saturday night, WTBS might have been required to televise a less desirable game just to satisfy this obligation.

Although the CFA television plan provides for an early afternoon "window" wherein any CFA member school or conference can contract for the telecast of its games, the CFA has imposed restrictions on the telecast of these games that make them less desirable for telecast than they might be otherwise.

For example, the CFA requires that a central time zone team kickoff no later than 11:20 in the morning if it wants to televise its game in the early afternoon window. Beginning the telecast of a college football game at 11 in the morning is not desirable from the standpoint of the broadcaster who seeks to televise them or, we submit, to the college which must break long-standing traditions for kickoff times.

The CFA has further impaired the attractiveness of these early afternoon games by allowing the broadcasters who have obtained the rights to the late afternoon and nighttime packages the first and second choice in the telecasting of these games. It is only those teams who are not selected to be televised in the late afternoon and nighttime games who may seek to sell their games by moving to the early afternoon slot.

The CFA, then, by all appearances, is attempting to control the market just as the NCAA did. These restrictions have all the earmarks and much the same impact that the NCAA's restrictions had. This is unfortunate. If the CFA's attempt to reestablish this control is successful, the worthy efforts by individual schools and conferences to recapture their own TV rights and to manage their own games will be nullified. We do not think this was the result the Supreme Court intended.

Thank you very much.

Mr. MARKEY. Thank you, Mr. Wussler.

Mr. Wormington?

138

## STATEMENT OF ROBERT J. WORMINGTON

Mr. WORMINGTON. Thank you, Mr. Chairman.

I would like to clarify that I am here as a member of the board of directors and former chairman of the board of the Association of Independent Television Stations, and I am here representing the INTV.

Accompanying me is Forrest Hainline III, our antitrust counsel. He represented the INTV before the recent Supreme Court hearing. ing.

I would like to clarify some questions raised about the essence of broadcasts, because there is a feeling that broadcasting consists of three major networks. People don't watch networks. They tend to watch stations, who may be affiliated with networks, but all broadcasting in the United States comes over a local station, and yet, a lot of those stations are not affiliated with any network.

The INTV is a trade association representing over 130 independent television stations located everywhere from the Nation's largest capital down to Albany, GA, which is the 150th television market.

To give you an idea of the size and growth the independent television industry, the number of independents has doubled since 1979, and we are adding new stations at a rate of nearly 30 a year.

Many of these stations are springing up and they are serving the Nation's smaller cities, where before there only used to be the three networks available, and now we are bringing additional service to each of those.

It is localism and regionalism which is part of the spirit of our country. While you can understand why we are testifying today, the single most distinguishing feature of an independent television station is that we must purchase or produce every single minute of our programming every day.

We don't have the luxury of flipping a switch and bringing in Mr. Watson's station or Mr. Pilson's service. We have to produce it all ourselves, buying it or putting it on the air, and as such, the availability of programming is the No. 1 priority for independent television stations, whether that station is a WPIX in New York, or a station in Kansas City or a station in Albany, GA.

Mr. Chairman, you said that in your opening remarks, that open competition should be the rule. The NCAA contracts were held by our entire court system to be illegal, and you just heard Mr. Wussler raise some serious reservations about the legality of the new CFA contracts and the other proposals for college football.

Others who appeared earlier today, including Mr. Toner at the NCIA, raised exactly the same reservations and I am here because we have similar and serious questions about the same issue. Are we simply substituting illegal restrictions by one association with similar restrictions by another association?

Let explain why we are concerned. Based upon the information available to us, we think that the very colleges which violated the antitrust laws as members of the NCAA are now continuing to engage in anticompetitive practices by simply changing the name of their marketing arrangement.

Whereas at least the NCAA had justification in its historical role in the preservation and encouragement of intercollegiate amateur

athletics, new associations, like CFA, have no reason for existence
except to increase profits by artificially restricting the number of
games that can be telecast.

The Supreme Court held colleges ought to be competing with
each other for the loyalty of the television viewer and individual
schools should be free to televise its own games without restraint,
and instead, the principal colleges apparently have decided to keep
the competition on the gridiron, and all but eliminate competition
in the marketplace.

We have tried unsuccessfully to obtain copies of the actual con-
tracts involved, so some of our statements may not be totally accu-
rate, but I am sure I can be corrected by our partners along the
table here.

Here is what we think are the facts. Is that the CFA signed a
contract with ABC, which gives that network exclusive rights to all
CFA games on Saturdays from 3:30 p.m. to 7 p.m., eastern time.
Even though the ABC network will normally televise only one
game during this time period, the remaining 61 CFA members will
not be allowed to sell their games to other stations during this time
period.

In short, ABC is demanding not only the exclusive rights to
whatever game it chooses to televise, but also the exclusive right to
deny coverage by others to all CFA football games during this time
period. That is tantamount to saying that football is football. If
they were to make the same proposal, for instance, in prime time,
they would say that if they were televising a movie, I cannot tele-
vise a movie, because it would conflict with it, or if they were tele-
vising a sitcom, no one else could televise a sitcom.

Football games have different audiences, different appeals in dif-
ferent places in the country, and we think they should be permit-
ted to be head to head. The fact is that the CFA and the ABC con-
tract has several features which make it difficult for the local sta-
tions to carry CFA games early Saturday morning before the ABC
window took effect.

Mr. Wussler addressed some of those. One he didn't mention was
that ABC will not have to select its game until 12 days before a
given Saturday. For a local station that means we wouldn't know
what game will be available to us until less than 2-weeks notice.
This is too short a time period to adequately promote the game, but
it makes the sale of advertising difficult, because we don't know
what product we will be selling, and it creates many technical
problems of a pickup, because we may have to do an alternate
game hundreds of miles away. We would have the problem of
moving the window earlier and earlier as we go over to other time
zones. In the central time zone, it is 11:20; Rocky Mountain time
zone, it is 10:20.

The attendance problems at colleges, if you had to go on less
than 2-weeks' notice, try to work an arrangement with another
school, get it to move its football game that much earlier and
notify tens of thousands of people, wonder what would happen to
their attendance? You would never get an alternate game. It is too
early, and it forecloses any possibility of head-to-head competition
with ABC.

140

The fact is that the CFA has also signed a contract with ESPN, the ABC-owned cable network, which provides for exclusive coverage from the end of the network's window at 7 p.m., to 10 p.m. eastern time.

Individual stations would be prohibited from carrying any other CFA games during this time. Let me make several observations about why independents are really concerned about this state of affairs.

Mr. MARKEY. Very quickly, please.

Mr. WORMINGTON. What we are talking about is a situation that falls far short of what the Supreme Court had in mind when it ruled on the *NCAA* case. An independent station is a local station, and it has to serve a local market and what works in one local market will not work in another.

Joe Paterno mentioned that he would like to see Kansas State or Virginia on football. It ought to be televised. Kansas City is a good example. We might be able to work out a schedule to carry PAC Ten football games.

The people in our area want to see Missouri, KS, or Kansas State. We want the ability to put a football game on the air that people in our area can see. The networks would outbid us, that is fine, but to prevent independent stations from running any CFA game during a network's telecast of a national game is not fair.

I would be glad to take any questions that you have.

[The prepared statement of Mr. Wormington follows:]

141

STATEMENT OF
ROBERT J. WORMINGTON
VICE PRESIDENT AND GENERAL MANAGER
KSHB - TV
KANSAS CITY, MISSOURI
AND
A MEMBER OF THE BOARD OF DIRECTORS

Good morning Mr. Chairman and Members of the Subcommittee. My name is Robert J. Wormington and I am Vice President and General Manager of KSHB-TV, an independent station in Kansas City which is owned by the Scripps-Howard Company. I am appearing before you today in my role as a member of the Board of Directors and former Chairman of INTV, the Association of Independent Television Stations.

INTV is a trade association representing over 130 independent stations located everywhere from the nation's largest market, New York City, to Albany, Georgia, the 150th television market. To give you an idea of the growth and vitality of the independent side of the television industry, the number of independents has doubled since 1979, and we are adding new stations at a rate of nearly 30 a year. Many of these new stations are springing up to serve the nation's smaller towns and cities whose residents heretofore had to reply solely on the big-three networks for their television fare.

So that you can understand why we are testifying today, you should appreciate the single most distinguishing feature of independent stations: an independent must purchase or produce every single minute of programming for every single broadcasting day. We do not have the luxury of flipping a switch and having a network in New York provide a steady stream of programming for the bulk of our hours of operation. As such, the availability of programming is the number one priority of every independent station, whether that station is WPIX-TV in New York, KSHB-TV in Kansas City, or WTSG-TV in Albany, Georgia.

142

Consequently, it should not be surprising that we participated in the legal battle which overturned the NCAA's monopoly control of major football telecasts. As we explained in the brief we filed with the Supreme Court (a copy of which is supplied for the record of this hearing), college football is a unique programming product. On autumn Saturdays it consistently outdraws any other type of programming, attracting large audiences with ideal demographic characteristics for many advertisers. But under the NCAA's football plan, independent stations were completely shut out of the market; only CBS and ABC had the right to carry major college football on Saturday afternoons; any independent station -- or NBC affiliate for the matter -- was prohibited from negotiating with any major team for the rights to live coverage. It was this provision of the NCAA plan -- the inability of individual colleges to control the television rights to their individual games -- that the Supreme Court concluded was a violation of the anti-trust laws.

Independents, therefore, were understandably delighted when the Court announced its decision. At long last, we believed, independents could also carry Division I college football head-to-head against the networks. True, the enormous economic power of the networks might enable them to buy the hottest, most popular game or games each weekend, but that would still leave plenty of other games with great local or regional appeal for independent station audiences. Or so we thought.

Mr. Chairman, I'll be candid with you. When I heard about this hearing several weeks ago, my first reaction was that it was premature. At that time, the status of this season's college football telecasts was mass confusion. No one -- the colleges, the syndicators, the

148

individual stations, the networks -- had any idea of which or how
many games would be available, at what times or under what terms and
conditions.  In short, there was nothing to impart to this subcommittee
than this sense of confusion -- a commodity I assume you have more
than enough of around here without us exporting more.

Within the past week or so, however, some of the dust has begun to
settle as network and cable deals have been announced in the papers.
Unfortunately, it is becoming clear that the dust is settling largely
on the heads of individual stations - and we don't like it.  As a
result, I have come to see this hearing as an opportunity -- for those
of you whose responsibility is to the public interest to see what is
happening and to take an active role during the formative stages.

Based on the information available to us, we believe that the very
colleges which violated the antitrust laws as members of the NCAA now
continue to engage in anticompetitive practices, merely giving their
joint marketing arrangements different names.  And whereas NCAA at
least had the justification of its historic role in the preservation
and encouragement of intercollegiate amateur athletics, the new
associations such as CFA have no reason for existence except to
increase profits by artificially restricting the number of games that
can be telecast.  The Supreme Court held that colleges ought to be
competing with each other for the loyalty of the television viewer,
that individual schools should be free to televise its own games
without restraint.  Instead, the principal colleges apparently have
decided to keep the competition strictly on the gridiron, and to all
but eliminate competition in the television market place by severely

144

restricting the number and times during which games may be televised. This behavior is that of the classic cartel: restrict out-put, with the consequence that the price will rise. Convenient as that may be to certain college football powers, it happens to be illegal because its impact falls on the consumer, who receives _fewer_ games than he/ she desires, and who will often receive games of lesser interest.

Mr. Chairman, I would like to state that we have tried, unsuccessfully, to obtain copies of the actual television contracts involved. As a result, some of the allegations I make may not in fact be true, but with my network colleagues at this table this morning, I hope I will be corrected if the need arises. In any event, let me explain to you what we believe to be the facts:

FACT: The 63-member College Football Association ("CFA") has signed a contract with ABC which gives that network exclusive rights to all CFA games on Saturdays from 3:30 to 7:00 PM Eastern Time. Even though ABC will normally televise only one game during this time period, the remaining 61 CFA members will not be allowed to sell their games to other stations during this time period. In short, ABC is demanding not only the exclusive rights to whatever game it chooses, but exclusive rights to deny coverage by others of all CFA college football during this time-period.

FACT: The CFA-ABC contract has several features which make it more difficult for local stations to even carry CFA games early Saturday afternoon, before the ABC window takes effect. For example, ABC will not have to select its game of the week until 12 days before a given Saturday. For a local station, this means we may not know what game

145

will be available to us until less than two weeks in advance. Not
only is this too short a time period to adequately promote our game,
but it will make the sale of advertising difficult since we do not
know exactly what "product" we are selling. In addition, there are
many technical problems for an independent station in changing
location on short notice. Such problems include necessary inter-
connect arrangements, microwave construction and re-routing of
television equipment. Independent of problems created by last minute
location changes the impact of the ABC window starting at 3:30
Eastern Time gets progressively more severe as one moves west. In
Kansas City, for example, an early non network CFA game would have
to start at about 11:30 AM in order to be completed prior to 2:30
Central Time start of the ABC game. In the Mountain Time zone, this
would translate into a 10:30 AM starting time, which is unattractive
to both the school and the broadcaster. Of course, this forecloses
any possible head-to-head competition with ABC. Combined with the
12 day notice rule, a school would be faced with notifying tens of
thousands of ticket holders that the kickoff has been changed to an
earlier, less attractive time.

FACT: The CFA has also signed a contract with ESPN, the ABC-owned
cable network which provides for exclusive CFA coverage from the end
of the network's window at 7:00 PM to 10:00 PM Eastern Time. Again,
individual stations would be prohibited from carrying any other CFA
game during this window.

FACT: Some, perhaps all, CFA member conferences are creating their
own television packages for the early afternoon, pre-network window,
time period. Reports indicate these packages will further restrict the

146

availability of CFA games during non-window periods. For example,
the Southeastern Conference ("SEC") has reportedly signed a contract
with Turner Broadcasting giving that company exclusive rights to one
SEC game a week. SEC teams playing opposite the Turner game would
not be allowed to sell television rights. Our objection to this
type of arrangement is that it reduces competition. It is one thing
for the SEC or the Big Eight to allow a syndicator such as Turner
the right  to pick what it sees as the most popular SEC game each
week; it is quite another matter to prohibit all the teams not
selected from negotiating the broadcast rights to their games.

Mr. Chairman, it is our belief that the CBS contract with the Big
Ten and PAC Ten is similar to the CFA-ABC agreement, and that the
two conferences involved have similar plans to limit exposure of
their teams' during the non-network window periods. However, I have
not seen the contract nor read any detailed press reports of it, so
I will not address it at this time.

Let me make several observations about why independents are distressed
about the developing state of affairs.

First, while it is true that in the future, independent stations will
have the opportunity to carry some major college football -- an
opportunity denied us for many years under the NCAA plan -- the improve-
ment is modest and falls far short of what we believe the Supreme
Court has in mind when it ruled on the NCAA case.

An independent station, as opposed to a network, has to serve a local
market. What works in one local market will not work in another. To
say, for example, that during the ABC and ESPN windows for CFA football,

independent stations might be able to carry a Big Ten or PAC Ten
game is little consolation for the independent stations serving
those areas of the country without Big Ten or PAC Ten teams.  In
those markets -- and Kansas City is a good example -- Big Ten
football is not a viable substitute for one or more CFA teams.  In
my market, Missouri or Kansas football will be far more popular
than Minnesota-Northwestern or Oregon-Oregon State.

As I said before, I fully expect the buying power of a network will
enable it to out-bid us for the rights to the games with the most
national appeal.  That's fine.  However, to prevent independent
stations from running any CFA game during the network's telecast of
a national game is not fair.  It may be true that the CFA believes
such an arrangement will maximize its television revenues, but that
was the same rationale used by the NCAA and struck down by the Court
as an unreasonable restraint of trade.  Similary, the efforts by
individual conferences to restrict the televising of their member
teams' games is equally noxious.  As I said earlier, in Kansas City,
I would be extemely interested in Big Eight games involving Kansas
or Missouri, for example; but, if the Big Eight is allowed to parcel
out one game a week, I could be stuck with, say, Colorado and Iowa
State -- two fine colleges with great appeal in their states, but
not particularly popular in Kansas City.

My point is not that the Congress or the Courts ought to award
me the college games.  I am only asking for the opportunity to
bid for them.  In some instances I may be out-bid by a
competitor; in other cases, the individual college may decide
not to televise a game.  But at least I will have had a fair shot,
unencumbered by artificial restraints intended (to paraphrase the

148

the Supreme Court) to restrict output and blunt the ability of
individual schools to respond individually to consumer preference

My remarks this morning have been from the perspective of an
independent station general manager. But in the wonderful way the
free and open market works, I believe I have been talking for the
consumers as well. My objective is to maximize the audience of KSHB-
TV. The only way I can do that is to provide the programming the
viewers in the Kansas City area want to see. I can tell you that they
don't want to be restricted to only the game or games the networks
put on, nor do they want to watch games starting mid-morning in some
time zones. Given a free and open market, I believe I can provide
the viewers with attractive games running opposite the networks.
I'm not afraid to compete with the networks, so I don't see why
they're afraid to compete with me. In the end, competition is going
to benefit the consumer by providing a wider variety of games at all
times of the day.

The problem, it seems to me, comes from the colleges which have grown
up under a television enviornment which was non-competitive. Once
those schools were successful in over-throwing the NCAA's control,
the only behavior they knew was to replicate the conditions which
has existed for thirty years. In short, they have simply forgotten
what it is like to compete in a free and open market. Colleges and
universities compete all the time. They compete for students, for
facilty, for government grants, for philanthropic suffort. They
compete for athletes. Colleges and universities compete on the
football fileds. They can compete on the television screen. Our
antitrust laws and free market tradition demands that they do so.

Thank you for your attention, and I will be happy to answer any
questions you may have.

Mr. MARKEY. Are you thinking of bringing a suit, Mr. Wormington?

Mr. WORMINGTON. We are simply taking a hard look at exactly what—we have not seen the contracts, and it is difficult to say what a position would be until we could have an opportunity to examine the contracts.

Mr. MARKEY. Mr. Pilson, comment on Mr. Wormington's comments, the effect it has on the ability of consumers to have access to the other games.

Mr. PILSON. The Supreme Court acknowledged a rule of reason, and a certain amount of exclusivity is contemplated in all of the deals that we have talked about.

In point of fact, it is difficult for me to comment legally on what another network may have entered into, but the CFA–ABC–ESPN restrictions are quite extensive compared to all of the other packages in existence.

For example, the only limitation that CBS has with its Big Ten, PAC Ten arrangement, they won't play opposite the network game, and also as a result of the crossover issue, we have another problem, but the limitations are far less extensive than the CFA–ABC–ESPN arrangement calls for.

The crossover issue is a particularly difficult one and what it results in is the unmarketability of some very attractive games. Historically, the home team has negotiated for television rights, I don't use the word "controlled," because the visiting team had a voice in terms of the rights fees, start time, and so forth.

What has happened here is that the CFA position is that no CFA team may appear on another network. So you have, in the case of CBS, three games that we think are extraordinarily attractive, Penn State at Iowa, for example, where the position basically is the three teams, Penn State, Nebraska, Notre Dame, cannot appear on another network, and even though we have the basic agreement with the home team in each instance, our position is that there is a very simple response here, and that is, the plain element of reciprocity and home team control, which we think would solve the crossover issue very quickly.

If Notre Dame is playing at Southern California this year, it is a PAC Ten team under contract to CBS, it appears only on CBS.

Next year, Southern California plays at Notre Dame, and it can appear on ABC. There are numerous crossover games. This crossover issue is a very difficult one for us to handle because it has to be resolved basically between the schools, and the CFA has taken the position that the 63 teams have all agreed they will not appear on another network.

That is the most difficult problem that we have to face.

Mr. MARKEY. Mr. Wussler?

Mr. WUSSLER. To add to the crossover situation, as Mr. Pilson so wisely pointed out, in those three examples, there are others, there are in excess of 80 crossover games this year, and at this point in time, it appears they will not be on national television or any form of regional television.

We are not alone in wanting to get those games on television, but all of us have been unsuccessful at this point.

150

Mr. MARKEY. OK, let me ask the panel this question: Do you believe the broadcasters and the viewers of television football are better served by some organization administering televised college football on behalf of a group of football playing institutions.

Mr. WATSON. We do believe that. There has to be one force, one group, voluntary, that can bring the groups together, market it in a reasonable way to the benefit of all the parties, so that there is an opportunity for local and regional telecast and an opportunity for national telecast; it may be for only one network, maybe for two.

Unless a group comes forth, an organization—a system that serves as a device—you will see a continuation of these problems not being resolved, and important games not being offered to the total public, being very restricted to a given city, and a lot of other things, so I think an organization is required to do that.

Mr. MARKEY. But to the extent that such an organization limits its members' ability to compete against or outside the particular plan, isn't that restrictive? Isn't that basically limiting the ability of the viewer to have access to these other games across the country?

Mr. WATSON. Those restrictions do not have to be there in any organization. They can devise a system that can meet today's marketplace, because they are going to have to, if it continues in this fashion, as we have seen in a very short period of time, and I think the next 6 months will give us a great indication of how chaotic the situation is.

Unless something is—unless an organization is there in place, to resolve some of these issues without being restrictive, I don't think I am being idealistic in that respect, you will continue to see an excessive number of games, conflicts, nothing getting resolved.

Mr. MARKEY. Mr. Pilson?

Mr. PILSON. Mr. Chairman, the world has changed in the last few years. Over the past 5, you have a considerable number of new distribution services that are now available and aggressive. Mr. Wussler represents one such organization, and ESPN is another, of the various regional distributors, Katz, Metrosports, and many others.

You now have a totally different broadcast universe and what you have, in a sense, with the Supreme Court decision, which is probably consistent with other deregulatory principals that are current here in Washington and around the country, you have new businesses beginning, flourishing, dying in some cases, and we cannot roll the clock back.

I don't think we can go back to the kind of restrictive plans that have existed.

I look to the college basketball as an indication of a flourishing, free market situation, and I would say if an omnibus or one unit is needed to oversee college football, it should be done in the context of what we suggested to the NCAA in Chicago, and that is, a unit set up to structure a marketplace.

And we had suggested the concept of three windows, one for the networks, which would slide early or late, so it is not a uniform time period, and the other window for afternoon syndication, and a nighttime window for syndication and cable, and that is it.

151

That is it. Don't structure how many appearances, how many games. Let the marketplace operate, and frankly, the colleges voted that down, and that is unacceptable to them. We can't impose on the colleges what is best for the colleges, they have to come to that conclusion themselves. Then I would say, let the free market operate. There are enough broadcast media out there, enough alternatives out there, so that the schools can operate in that medium.

Mr. WORMINGTON. I think that as independent stations, we have no objection to a CFA or an NCAA putting together packages of games for national distribution, because of the ranking systems, the ease, the scheduling, there is nothing wrong with that.

We are not in opposition to that. What we are in opposition to are the windows which still keep coming up that Mr. Pilson describes, where you are saying that teams cannot compete horizontally against each other.

It has been so long since the schools have competed in a fair and open and competitive market, they don't really know what the advantages would be.

Over the span of this day, you have heard a lot of conversation about some of the problems with students, with what happens to the athletes, what happens to the schools. What happens is that public attention is focused within certain windows.

There is no denying that at certain times of the day, ratings are a lot better than at other times of the day and the networks are simply looking to exclude certain schools from having an opportunity to be in that window.

A Kansas State, if it is running in the morning, can't begin to compete against a Penn State, and it will never get the exposure, and yet, the Kansas State within its own area is competing just as hard as it can for athletes, faculty, endowments and it needs the exposure to say, "Here I am, I am a major school."

Mr. PILSON. It has been our experience that it is not a uniform desire on the part of the local schools to have their games televised. Most of the schools, certainly the conferences that we have talked to, as a matter of choice, limit the number of games they want televised in order to protect their gate. The most common rule has been to have a network game and then to have a regional game of the week, one game, which would go to all of the markets in that conference. There may be instances where schools want all of their local games televised.

Every one of the schools in that conference, we ask only for exclusivity in that time period, but in the other time period, every one of those schools could televise every one of their games locally, regionally, however they choose.

In fact, most of them choose to have only one game up as a regional game of the week.

Mr. WORMINGTON. We would say that would be fine, if the schools were given the options, as long as there are no restrictions and we can talk to any school and say, do you want to have your game televised, yes or no, and let the school make the decision, not a conference or a network agreement.

Mr. MARKEY. Let me ask you this, Mr. Wormington.

We had Eddie Robinson here today, and he was talking about the fact that he has not had any offers or any contacts from syndica-

tors, from networks, from local stations, even to broadcast the
Grambling games.

Don't you think southern independent broadcasters might find
the Grambling football schedule fairly attractive?

Mr. WORMINGTON. They might. I don't hope to speak for the
southern markets. I can take and apply it to some of our own
schools that we would like to televise and relate it to that, is that
we have been attempting to work out some schedules of games, and
while they are division I-A schools, we keep running into road-
blocks to the scheduling.

We keep hearing no, no because of restrictions. Because of all of
this and because we really don't know what is going on with the
network contracts, you will find a lot of individual stations have
pulled in their horns because they don't know what they can and
can't do and that has hurt what has happened at Grambling, and
Kansas State, and the University of Missouri, for instance.

Mr. MARKEY. What is the relationship between ABC Sports, ABC
Video and ESPN?

Mr. WUSSLER. It is all one company.

Mr. MARKEY. Do you have any information about any role played
by ABC and receiving the CFA rights package?

Mr. WUSSLER. It is hearsay, but my understanding is that ap-
proximately 7 days ago, when ESPN had all but closed an arrange-
ment with the Big Ten and the PAC Ten, representatives of ABC
Home Video came in and said no, you are going to put those two
deals on the side and we are going to make an arrangement with
the CFA for you, on the nighttime package.

I believe that that is what did happen. There are obvious exam-
ple of ABC's ability to marshal their forces both day and night in
this case, and in effect, do several things for their own benefit.

They have a CFA monopoly basically, from 3:45 in the afternoon
until post-11 eastern time. They also have the capability of ware-
housing certain games by keeping them off the schedule and not
making ABC affiliates unhappy at night by putting a lesser game
on television than perhaps a better game that might be available,
and there are numerous examples of where their marketplace
power is quite heavy.

Mr. WORMINGTON. May I add to that, as an interlocking—say, co-
incidence. We had been exploring with the University of Missouri,
during the Missouri-Illinois night game on September 8, and that
happened to be the one night that ABC was flip-flopping with
ESPN on its priorities, so that ABC was taking exclusivity one
night and swapping with ESPN for a daytime window.

Mr. MARKEY. What is a right-to-match provision?

Mr. WUSSLER. Many football contracts, when they come to the
end of a 1-, 2- or 3-year period, have first negotiation, first refusals.
Some first refusals have a right to match whereby if I am the
holder of the right, say, I am dealing with the Southeastern Confer-
ence, they go off and they get a big higher than I have offered, and
if I have a right to match, they bring that offer back to me, and I
have the right to match that offer, and I can then keep the ar-
rangement.

They are fairly common in the sports world.

Mr. MARKEY. Were you seeking to negotiate such a contract with the CFA?

Mr. WUSSLER. Yes, that is correct.

Mr. MARKEY. Was that one of the reasons why your deal fell through?

Mr. WUSSLER. Yes, it was.

Mr. MARKEY. It was.

Mr. Pilson, have you made any representation to anybody, including representatives from the University of Nebraska or Syracuse University, about CBS' ability or willingness to indemnify those or other colleges from resulting loss, if those universities participate in so-called crossover games, such as Nebraska games against UCLA or loss from CFA schools, such as Nebraska and Syracuse, should they choose to contract for telecast with CBS?

Mr. PILSON. No, sir, we have not. That situation relates to one of the crossover games, which we hope to broadcast.

The University of Nebraska was contacted, as far as I know, by the University of UCLA, and asked to please let them know whether they would allow that game to be televised, whether they would participate with them on CBS.

In subsequent discussions, we were informed that the University of Nebraska was concerned about losing its CFA eligibility as a result of agreeing to appear in the crossover game on CBS.

We were asked if we could possibly schedule either additional games or in some way protect the University of Nebraska from the onerous consequences of being canceled by—under its CFA contract.

We have not responded to that request. Basically, we have simply asked whether the University of Nebraska is prepared to play in the crossover game or not, and we have not received any indication as to their choice.

Mr. MARKEY. OK.

Mr. Wussler, Mr. Pilson, Mr. Watson, Mr. Wormington, do you have any concluding statements? You may each have a minute and a half a piece. We have a roll call which is coming up, and we will have adjourn the hearing at that point.

If you want to make a summation of your most compelling points about what you want this committee to know about what is going to happen in this field, and your recommendations.

Mr. WUSSLER. In theory, it would be wonderful if college football had some kind of overseeing body that could establish certain ground rules. I am not sure that in theory that works out. I do think that college basketball, who has the NCAA as its parent organization, has worked out very well.

The NCAA establishes certain eligibility rules, and they establish when the season is, a postseason tournament which they are the television contractors for, but if Notre Dame wishes to play Purdue on Tuesday, January 27, they can sell that game to anybody that they choose to and that has gone on for some time, and in the area of college basketball, it has worked out very well.

I see no reason down the road that that couldn't suffice for college football as well.

Mr. PILSON. I share Mr. Wussler's view, on the issue of what will happen in 1984, we can't look into that crystal ball and it is prema-

154

ture to judge 1984 as against 1983 or 1982 until this year has played out and my feeling is that the free marketplace, the opportunity of the schools to generate their revenue and make their deals eventually will be beneficial for the sport.

Mr. MARKEY. Mr. Watson?

Mr. WATSON. I concur in that comment that this is an atypical year and time and patience and observation of what is going to happen this coming year and maybe for another year is the proper course before anybody takes specific action.

Mr. WORMINGTON. I think that the specific action that is not being taken here is really addressing the spirit of the Supreme Court ruling, that it should be a free and open market. We have no objection to letting the people of the United States see the so-called superpowers of football play every week, but there should be nothing that would restrict the local area teams being able to compete with them.

Football teams start at the same time traditionally throughout the year. It is a limited season, and afternoon games without windows would be what we would like to televise.

If a school chooses to televise, it should have that right to do so.

Mr. MARKEY. Thank you very much. We also request from this panel this they be willing to respond in writing to questions which we will be submitting to you. I want to thank all of the panelists for their participation today.

This is just the beginning of the process. We are trying to flesh out a record that will be used by the Congress and this committee as part of its oversight and perhaps ultimately its legislative responsibilities, but that remains yet to be seen, depending upon how, as you gentlemen have pointed out, this year plays out, so we thank you for your participation and with that, this hearing is adjourned.

Thank you.

[Whereupon, at 4 p.m., the subcommittee was adjourned.]

O