Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668−PSG (SKx) |
| | **[PROPOSED] FINAL PRETRIAL CONFERENCE ORDER** |
| THIS DOCUMENT RELATES TO ALL ACTIONS | JUDGE: Hon. Philip S. Gutierrez |
| | Final Pretrial Conference: May 16, 2024 |
| | Trial Date: June 5, 2024 |

# **TABLE OF CONTENTS**

1.   THE PARTIES ................................................................. 1

2.   FEDERAL JURISDICTION AND VENUE .................................... 4

3.   LENGTH OF TRIAL ........................................................ 4

4.   JURY TRIAL ............................................................... 4

5.   ADMITTED FACTS.......................................................... 5

6.   STIPULATED FACTS ....................................................... 5

7.   CLAIMS AND DEFENSES ................................................... 7

8.   ISSUES REMAINING TO BE TRIED ........................................ 22

9.   DISCOVERY ............................................................... 26

10.  PRETRIAL DISCLOSURES AND EXHIBITS ................................. 26

11.  WITNESS LISTS ........................................................... 56

12.  LAW AND MOTION MATTERS ............................................ 62

13.  BIFURCATION ............................................................ 71

14.  PLEADINGS................................................................ 71

i

Following pretrial proceedings, pursuant to Fed. R. Civ. P. 16 and L.R. 16, IT IS ORDERED:

**1.     THE PARTIES**

A.     Plaintiffs are:

i.     Plaintiffs Robert Lippincott, Jr. and Jonathan Frantz, on behalf of the certified Residential Class, which consists of: All DirecTV residential subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the date of the Court's class certification order ("Residential Class"). The Residential Class excludes the Defendants and any of their current or former parents, subsidiaries, or affiliates. The Residential Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.[1] *See* Dkt. No. 894.

ii.     Plaintiffs Ninth Inning Inc. dba The Mucky Duck and 1465 Third Avenue Restaurant Corp. dba Gael Pub, on behalf of the certified Commercial Class, which consists of: All DirecTV commercial subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the date of the Court's class certification order ("Commercial Class"). The Commercial Class excludes the

---

[1] The NFL Defendants reserve the right to challenge the empanelment of any juror who was or shared a household with a DirecTV residential subscriber that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the date of the Court's class certification order ("Residential Class"). Plaintiffs disagree with the inclusion of this footnote as no reservation of rights regarding juror empanelment is necessary as part of the final pretrial conference order. Plaintiffs also disagree that the fact that a potential juror shares a household with a class member gives rise to a for-cause challenge.

Defendants and any of their current or former parents, subsidiaries, or affiliates. The Commercial Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.[2] *See id.*

B.  Defendants[3] are:

i.  National Football League, Inc.

ii.  NFL Enterprises, LLC

iii.  Arizona Cardinals Football Club LLC

iv.  Atlanta Falcons Football Club LLC

v.  Baltimore Ravens Limited Partnership

vi.  Buccaneers Team LLC

vii.  Buffalo Bills, LLC

viii.  Chargers Football Company, LLC

ix.  Chicago Bears Football Club, Inc.

x.  Cincinnati Bengals, Inc.

xi.  Cleveland Browns Football Company LLC

xii.  Dallas Cowboys Football Club, Ltd.

xiii.  Detroit Lions, Inc.

xiv.  Football Northwest LLC

---

[2] The NFL Defendants reserve the right to challenge the empanelment of any juror who was a DirecTV commercial subscriber that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and the date of the Court's class certification order ("Commercial Class"). Plaintiffs disagree with the inclusion of this footnote as no reservation of rights regarding juror empanelment is necessary as part of the final pretrial conference order. Plaintiffs also disagree that the fact that a potential juror shares a household with a class member gives rise to a for-cause challenge.

[3] Collectively, Defendants are referred to herein as the "NFL Defendants" or "Defendants."

xv.    Forty Niners Football Company LLC

xvi.   Green Bay Packers, Inc.

xvii.  Houston NFL Holdings LP

xviii. Indianapolis Colts, Inc.

xix.   Jacksonville Jaguars, LLC

xx.    Kansas City Chiefs Football Club, Inc.

xxi.   The Los Angeles Rams LLC

xxii.  Miami Dolphins, Ltd.

xxiii. Minnesota Vikings Football, LLC

xxiv.  New England Patriots LLC

xxv.   New Orleans Louisiana Saints, LLC

xxvi.  New York Football Giants, Inc.

xxvii. New York Jets LLC

xxviii. Panthers Football, LLC

xxix.  PDB Sports, Ltd. d/b/a Denver Broncos Football Club

xxx.   Philadelphia Eagles, LLC

xxxi.  Pittsburgh Steelers LLC

xxxii. Raiders Football Club, LLC

xxxiii. Tennessee Football, Inc.

xxxiv. Washington Football, Inc.

C.    The pleadings which raise the issues are:

i.    Second Consolidated Amended Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman Act (Dkt. 441). Plaintiffs continue to assert all claims pleaded therein.

ii.   NFL Defendants' Answer to Plaintiffs' Second Consolidated Amended Complaint for Damages and Declaratory and Injunctive Relief Pursuant to Sections 1 and 2 of the Sherman

3

Act (Dkt. 442). No counterclaims have been asserted in this action.

## 2.    <u>**FEDERAL JURISDICTION AND VENUE**</u>

Federal jurisdiction and venue are invoked upon the following grounds:

This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 (federal question) because Plaintiffs' causes of action arise under federal law and allege violations of federal statutes, including 15 U.S.C. §§ 1 and 2.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. Moreover, this action is a multidistrict litigation proceeding that was properly transferred by the United States Judicial Panel on Multidistrict Litigation to this Court pursuant to 28 U.S.C. § 1407. *See* Dkt. 1. On May 23, 2016, the Court consolidated the underlying actions that comprised the multidistrict litigation. *See* Dkt. 142.

The parties do not dispute the Court's jurisdiction or venue.

## 3.    <u>**LENGTH OF TRIAL**</u>

The trial is estimated to take up to 12 trial days, excluding the day set aside for jury selection. The parties agree to split time equally between Plaintiffs (collectively) and Defendants (collectively).

## 4.    <u>**JURY TRIAL**</u>

The trial is to be a jury trial. Plaintiffs' request for injunctive relief, however, is equitable in nature and not triable to a jury.

At least sixteen (16) days prior to the trial date the parties shall file with the Court a joint set of jury instructions on which there is agreement, and the parties shall separately file any proposed jury instructions on which there is not agreement.

At least seven (7) days prior to the trial date the parties shall submit any special questions requested to be asked on *voir dire* per the Court's Order for Jury Trial.

Seven (7) days after a jury verdict is made, the parties shall jointly propose a briefing schedule for the injunctive relief phase, if necessary, subject to the Court's agreement.

**5.   ADMITTED FACTS**

The following facts are admitted and require no proof: None

**6.   STIPULATED FACTS**

The following facts, though stipulated, shall be without prejudice to any evidentiary objection:

1.   The NFL is a professional American football league.

2.   There are 32 member clubs in the NFL located throughout the United States.

3.   The NFL Constitution and Bylaws set forth contractual provisions governing the relationship between the 32 member clubs and the NFL.

4.   The 32 NFL member clubs compete against each other in football games organized by the NFL.

5.   The NFL season is split into a preseason period, the regular season, and a post-season period.

6.   The NFL season generally runs from August to February.

7.   From 2011 to 2023, the NFL preseason consisted of three to four exhibition games per club.

8.   The NFL regular season culminates in a postseason period consisting of playoff games and the Super Bowl championship game.

9.  Prior to the start of each season, the NFL sets the schedule of regular season games, and has the ability to revise the schedule as the season progresses.

10. From 2011 to 2023, the NFL regular season lasted 16 to 18 weeks.

11. Currently, the NFL regular season consists of 272 football games, played over an 18-week period.

12. Each week during the NFL regular season, there are 13 to 16 games played.

13. During a typical week of the NFL regular season, one game is played Thursday night, one game is played Sunday night, one game is played Monday night, and the remaining games are played on Sunday afternoons.

14. During a typical week of the NFL regular season, there are 10 to 13 games played during the Sunday afternoon period.

15. The Sunday afternoon games played during the regular season are generally scheduled to occur in one of two potential time slots, at approximately 10:00 am Pacific Time and 1:00 pm Pacific Time.

16. CBS and FOX broadcast the 10 to 13 NFL regular season games played on Sunday afternoons during the Class Period.

17. CBS and FOX decide, in consultation with the NFL, which Sunday afternoon regular season games to televise in which television markets.

18. In deciding which markets to televise the Sunday afternoon regular season games, CBS and FOX must show each member club's games in that club's home television market.

19. Sunday Ticket is a package that includes all the regular-season games on Sunday afternoons that are not available on CBS and FOX in a given local area.

20.     The NFL Sunday Ticket package consists of live feeds of the games produced by CBS and FOX.

21.     Sunday Ticket is available to both residential subscribers and commercial subscribers, such as sports bars.

22.     From 2011 to 2023, the NFL licensed the rights to NFL Sunday Ticket exclusively to DirecTV, which then sold Sunday Ticket to consumers and commercial establishments.

23.     Beginning with the 2023-24 NFL season, the NFL has an exclusive agreement with Google that permits YouTube to sell Sunday Ticket to residential consumers.

24.     Beginning with the 2023-24 NFL season, the NFL has licensed Sunday Ticket exclusively to EverPass Media for commercial subscribers.

**7.     CLAIMS AND DEFENSES**

**A.     Plaintiffs**

**a.     Summary:** Plaintiffs plan to pursue the following claims against all defendants:

Claim 1: Defendants entered into agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and

Claim 2: Defendants conspired to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**b.     Elements:**

Claim 1: The elements required to establish a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, are as follows:

(1)     the existence of a contract, combination, or conspiracy between or among at least two separate entities;

(2)     that the contract, combination, or conspiracy unreasonably restrains trade;

(3)     that the restraint affects interstate or foreign commerce; and

(4)     that the restraint caused Plaintiffs to suffer an injury to its business or property.

Claim 2: The parties disagree regarding the elements required to establish a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, for conspiracy to monopolize. The parties' respective positions are recited below:

Plaintiffs' Position: The elements required to establish a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, for conspiracy to monopolize are as follows:

(1)     two or more persons knowingly entered into an agreement or mutual understanding to obtain or maintain monopoly power in a relevant market;

(2)     defendants specifically intended that one or more of the parties to the agreement would obtain or maintain monopoly power in the relevant market;

(3)     defendants committed an overt act in furtherance of the conspiracy;

(4)     defendant's activities occurred in or affected interstate or foreign commerce; and

(5)     Plaintiffs were injured in their business or property because of the conspiracy to monopolize.

ABA Model Jury Instructions in Civil Antitrust Cases, Instruction 3-E-1 (Conspiracy to Monopolize) (2016); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019) (holding that allegations that "*by entering into interlocking agreements, the defendants* conspired to monopolize the market for professional football telecasts and have monopolized it" sufficient to state a claim under § 2 (emphases added)); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 150 (4th Cir. 1990) (holding that overt acts in furtherance of a conspiracy to monopolize need not "themselves, be predatory" and

include "implementation of [] exclusive agreements"); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 588 (W.D. Va. 2000) ("Unlike in an attempted monopolization claim, it is not necessary that the committed acts, themselves, be predatory."); *Ragner Tech. Corp. v. Berardi*, 324 F. Supp. 3d 491, 515 (D.N.J. 2018) (holding that failure to execute non-disclosure agreements despite prior agreement to do sufficed as overt acts in furtherance of a conspiracy to monopolize).

*Defendants' Position:* The elements required to establish a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, for conspiracy to monopolize are as follows:

(1) two or more persons knowingly entered into a conspiracy to engage in anticompetitive conduct to obtain or maintain monopoly power in a relevant market;

(2) each defendant specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in the relevant market;

(3) each defendant committed an overt act in furtherance of the conspiracy;

(4) each defendant's activities occurred in or affected interstate or foreign commerce; and

(5) Plaintiffs were injured in their business or property because of the conspiracy to monopolize.

ABA Model Jury Instructions in Civil Antitrust Cases, Instruction 3-(Conspiracy to Monopolize) (2016); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 756 (N.D. Ill. 2019) ("[S]imilar to § 1's 'anticompetitive effects' requirement," plaintiffs asserting a Section 2 conspiracy to monopolize claim must prove "that the overt acts constitute 'anticompetitive conduct.'" (citing *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)));

*Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000) ("Under § 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power by anticompetitive means."); *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1236 (10th Cir. 2016) ("§ 2 forbids only conduct which is truly anticompetitive conduct." (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)); *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 2015 WL 7008185, at *3–4 (C.D. Cal. Sept. 18, 2015) ("Ninth Circuit case law holds that to sufficiently state a claim under § 2 for conspiracy to monopolize, the plaintiff must allege facts indicating that a conspiracy exists to create a monopoly *in a single entity*." (emphasis added) (collecting cases)); *Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc.*, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005) ("[A]n allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under section 2.").

**c.**     **Plaintiffs' Key Evidence:** In brief, the key evidence Plaintiffs rely on for each of their claims are:

Claim 1: Plaintiffs intend to introduce documentary and testimonial evidence demonstrating the NFL's model for presenting live broadcasts of NFL games, including preseason, regular season, and post-season games. Such evidence will show that the NFL presents games on television in prime-time spots throughout the week and on Sunday afternoons. The evidence will also show that regular season games on Sunday afternoons are shown on CBS or FOX in a regionalized manner that creates a distinction between "in-market" and "out-of-market" games. The only way to view live out-of-market games in their entirety is through the purchase of a package called NFL Sunday Ticket, which for the entirety of the class period was licensed exclusively to DirecTV.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating the NFL Defendants entered into an array of three interrelated agreements intended to restrict competition, reduce access, and fix, raise, maintain

or stabilize prices for out-of-market games. The first is an agreement between and among all of the teams to eliminate competition in the sale of telecasting rights by pooling their telecasting rights and granting to the NFL the right to enter into agreements as their agent with the broadcast networks and other providers of game telecasts, including pay TV providers. As part and parcel of the agreement to eliminate competition between them, the teams also agreed that all of the revenue derived from those telecasts will be divided equally among the teams. Moreover, the evidence will show that "it is possible for independent entities—*i.e.* individual sports teams—to license telecast rights on their own without pooling their rights." Dkt. No. 1155 at 24. The second are agreements between the NFL and broadcast networks CBS and FOX for Sunday afternoon broadcasts that include restrictions on the distribution of out-of-market games carried on paid television. The third are agreements between the NFL and DirecTV for the Sunday Ticket package that has granted, among other things, exclusive rights to DirecTV to distribute Sunday Ticket.

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that the agreements described above harmed competition—and to a far greater degree than any alleged procompetitive benefits. Among other things, the agreements restricted output, reduced consumer choice, and fixed, raised, maintained, or stabilized prices, especially for the viewing of live out-of-market game broadcasts. Such evidence will demonstrate, for example, that the challenged restraints reduced viewership of out-of-market NFL games and increased the price of Sunday Ticket above competitive levels. To the extent necessary, Plaintiffs' evidence will also demonstrate that a market exists for major league professional football telecasts in the United States.

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, rebutting the alleged procompetitive benefits

claimed by the NFL Defendants as a justification for the challenged restraints. In addition, the evidence offered by Plaintiffs will demonstrate the existence of substantially less restrictive alternatives that would accomplish those same alleged benefits. Plaintiffs' evidence shall further demonstrate that the anticompetitive harm outweighs any procompetitive benefits that may result from the challenged restraints.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating that the Defendants' agreements affected interstate commerce. The challenged restraints are nationwide in scope and the relevant geographic market is the United States.

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that Plaintiffs suffered injury or damage to their business or property as a result of Defendants' conduct. Plaintiffs will show that they were overcharged for the NFL Sunday Ticket product because of Defendants' conduct and, as a result, are entitled to monetary damages of up to $7.01 billion before mandatory trebling.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating that the challenged restraints are ongoing (and would be reasonably likely to recur even if discontinued) and, as a result, warrant permanent injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26).

Claim 2: Plaintiffs intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that a market exists for major league professional football telecasts in the United States.

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that the defendants knowingly entered into agreements to obtain or maintain monopoly power in the market for major league professional football telecasts in the United States, and those agreements were entered into with the specific intent of obtaining or maintaining

monopoly power in that market. For example, the agreement amongst the NFL's teams and the NFL eliminated all competition among the NFL's teams in licensing regular season game broadcasts and created a monopoly in the NFL in selling those rights. Moreover, the agreement between the NFL and DirecTV vested exclusive distribution rights for the NFL Sunday Ticket package in DirecTV.

The Defendants improperly assert that Plaintiffs have abandoned the existence of a submarket of out-of-market games. While Plaintiffs' principal theory for liability rests on the larger market for professional football telecasts in the United States, the Defendants' conduct effectively treats out-of-market broadcasts as a differentiated good. That submarket is an artifact of the Defendants' illegal conduct as was explained by Plaintiffs' expert Dan Rascher.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating that the Defendants' agreements occurred in or affected interstate commerce. The agreements are nationwide in scope and the relevant geographic market is the United States.

Plaintiffs further intend to introduce documentary and testimonial evidence, including expert opinion and analysis, demonstrating that Plaintiffs suffered injury or damage to their business or property as a result of Defendants' conduct. Plaintiffs will show that they were overcharged for the NFL Sunday Ticket product because of Defendants' conduct and, as a result, are entitled to monetary damages of up to $7.01 billion.

Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating that the challenged restraints are ongoing and, as a result, warrant permanent injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26).

**d.** **Defendants' Positions and Key Evidence:** In brief, the Defendants' positions and key evidence regarding each of Plaintiffs' claims are:

Claim 1: Defendants contend that Plaintiffs will not be able to establish a violation of Section 1 of the Sherman Act. Defendants will present some or all of the following evidence in opposition to Plaintiffs' claim. Defendants note that some categories of evidence oppose multiple elements of Plaintiffs' claim; the inclusion of a category of evidence as to one element does not indicate that it is not also relevant to other elements.

1) *The existence of a contract, combination, or conspiracy between or among the NFL, the 32 NFL Clubs, and DirecTV*:

   o Evidence and testimony that the NFL and the 32 NFL Clubs are operating a legitimate joint venture, the core purpose of which includes the production and distribution of NFL football game telecasts;

   o Evidence that the challenged restraints are ancillary to the joint venture's creation and distribution of NFL football telecasts;

   o Evidence and testimony that the NFL and 32 NFL Clubs by necessity cooperate to create each season of games, including coordinating on scheduling and elements of production, and to create telecasts of those games;

   o Evidence and testimony about the NFL's decision to partner with DirecTV for the distribution of NFL Sunday Ticket; and

   o Evidence and testimony, including from DirecTV witnesses, that DirecTV determined the price and packaging of Sunday Ticket at all times relevant to this case.

2) *That the contract, combination, or conspiracy unreasonably restrained trade*:

   o Evidence and testimony about the NFL's agreements with CBS and FOX to distribute Sunday afternoon NFL games on free, over-the-air television;[4]

---

[4] Defendants maintain they are not liable to the extent that Plaintiffs challenge conduct that is exempt from antitrust scrutiny under the Sports Broadcasting Act

- o  Evidence and testimony that NFL football game telecasts are a high-quality and popular entertainment product based on the combined efforts of the NFL and its broadcast partners.

- o  Evidence and testimony that the NFL offers fans various ways to access NFL content, including many games on free, over-the-air television and numerous supplementary offerings for avid fans, including but not limited to Sunday Ticket;

- o  Evidence and testimony that NFL Sunday Ticket expands output by providing avid fans with a high-quality option to ensure access to live telecasts of all Sunday afternoon NFL games;

- o  Evidence and testimony that the NFL's distribution of Sunday afternoon football game telecasts has procompetitive benefits for consumers, including but not limited to promoting competitive balance, incentivizing investments and innovation by CBS and FOX in their broadcasts, incentivizing investments and innovation by DirecTV to improve the quality of Sunday Ticket, incentivizing promotion and discounts to consumers, ensuring the efficient matching of games to television slots, promotion of competition among multi-channel video programming distributors ("MVPDs") and other distributors, ensuring compensation for use of intellectual property, facilitating cooperation and coordination among the NFL and NFL Clubs, maximizing fan reach and access, increasing game exposure, increasing consumer choice, promoting smaller-market teams, and promoting the distribution of games on free, over-the-air television;

- o  Evidence and argument that subscribers, including the named Plaintiffs, were satisfied with NFL Sunday Ticket because of the

---

("SBA"), 15 U.S.C. § 1291.  Plaintiffs bear the burden of proving that conduct not protected by the SBA caused them anticompetitive harm.

quality of Sunday Ticket and the broadcasts that CBS and FOX agreed to retransmit;

- o Evidence and testimony about the named Plaintiffs' decision to subscribe to NFL Sunday Ticket and continue subscribing to NFL Sunday Ticket because of the quality of Sunday Ticket and the broadcasts that CBS and FOX agreed to retransmit;

- o Evidence and testimony about innovation in the production and distribution of NFL football game telecasts;

- o Evidence and argument that Plaintiffs and Plaintiffs' expert Dr. Daniel Rascher have failed to properly define a relevant antitrust market; and

- o Evidence and argument that Plaintiffs and Plaintiffs' expert Dr. Daniel Rascher have failed to offer a substantially less restrictive alternative to the challenged conduct.

3) *That the restraint caused Plaintiffs to suffer an injury to their business or property*:

- o Evidence that Plaintiffs did not purchase Sunday Ticket from either the NFL or any of the NFL Clubs, but rather from DirecTV;

- o Evidence and argument that Plaintiffs derived a benefit from the procompetitive effects of the challenged conduct, rather than suffering harm from that conduct;

- o Evidence and argument that Plaintiffs and Plaintiffs' experts Dr. Douglas Zona and Dr. Daniel Rascher have failed to offer reliable, non-speculative models of injury or damages; and

- o Evidence and argument that Plaintiffs were not injured.

Claim 2: Defendants contend that Plaintiffs will not be able to establish a violation of Section 2 of the Sherman Act. As Defendants explained in their Memorandum of Contentions of Fact and Law, Plaintiffs' Section 2 claim should not be submitted to the jury. *See* Dkt. No. 1185, at 22.  Plaintiffs' only cognizable

Section 2 claim, in light of their strategic choices and the evidence developed during discovery, is that the NFL and the NFL Clubs conspired to give the NFL a monopoly in the alleged market for professional football telecasts. That theory would require proof of the same elements as Plaintiffs' Section 1 claim (as well as others). Simply put, there is no universe in which Plaintiffs could succeed on their Section 2 claim if they fail on their Section 1 claim, and no universe in which succeeding on the Section 2 claim could yield a non-duplicative recovery. Instructing the jury on the Section 2 claim thus would serve only to create confusion and inject potential error.

Because proving a Section 2 claim would require at least the same proof as a Section 1 claim, the NFL Defendants will rely on the same key evidence in opposition. If necessary, Defendants will present some or all of the following additional evidence and argument: that no Defendant had the requisite specific intent and that even if Defendants have a monopoly on professional football telecasts in the United States, they have not engaged in any anticompetitive conduct, as "[t]he acquisition or maintenance of monopoly power by supplying better products . . . is not unlawful." *ABA Model Instruction #9 (Willful Acquisition or Maintenance of Monopoly Power).*

**B.    Defendants**

 **a.    Summary:** Defendant plans to pursue the following counterclaims and affirmative defenses[5]:

Affirmative Defense 1: Statute of Limitations

Affirmative Defense 2: Laches

---

[5] Defendants preserve, for appellate purposes, their argument that they are entitled to present their well-pleaded mitigation defense, Dkt. No. 442 (NFL Defs.' Ans. to Plfs.' Second Cons. Am. Compl.) at 28 (Fourth Defense); *but see* Dkt. No. 1292 (Order Granting Plfs.' Mot. *In Limine* No. 2) at 6 (holding that "Defendants cannot make arguments that Plaintiffs had a duty to mitigate").

1      **b.**    **Elements:**  The elements required to establish Defendants'

2 counterclaims and affirmative defenses are:

3     <u>Affirmative Defense 1</u>: The parties disagree regarding the elements and

4 scope of a statute of limitations defense in this case:

5         *Defendants' Position:* Defendants must prove by a preponderance of

6 the evidence that at least some of the challenged conduct occurred outside of

7 the relevant limitations period. *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v.*

8 *Hazeltine Rsch., Inc.*, 401 U.S. 321, 338–39 (1971).

9         *Plaintiffs' Position:* Plaintiffs disagree with Defendants' recitation of

10 the elements insofar as showing that "at least some" of the challenged

11 conduct occurred outside of the relevant limitations period is sufficient as a

12 result of the continuing violation doctrine discussed below.

13     <u>Affirmative Defense 2</u>: The parties disagree regarding the elements of a

14 laches defense:

15         *Defendants' Position*: To succeed on this defense, Defendants must

16 prove by a preponderance of the evidence a lack of diligence by Plaintiffs

17 and prejudice to Defendants. *PlusPass, Inc. v. Verra Mobility Corp.*, 2021

18 WL 4775573, at *6 (C.D. Cal. Aug. 9, 2021) (quoting *Costello v. United*

19 *States*, 365 U.S. 265, 282 (1961)).

20         *Plaintiffs' Position*: "Laches is an equitable time limitation on a

21 party's right to bring suit, resting on the maxim that one who seeks the help

22 of a court of equity must not sleep on his rights." *Klein*, 580 F. Supp. 3d at

23 804-05 (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829,

24 835 (9th Cir. 2002)). The Defendants bear the burden of establishing a laches

25 defense. To invoke a laches defense, the Defendants must show that:

26       (1)    Plaintiffs knew (or should have known) of the allegedly

27           unlawful conduct yet delayed the initiation of the lawsuit;

28       (2)    the delay was unreasonable; and

(3)     prejudice to the Defendants.

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001).

     **c.**     **Defendants' Positions and Key Evidence:** In brief, the key evidence Defendants rely on for each counterclaim and affirmative defense is:

     <u>Affirmative Defense 1</u>: Plaintiffs' claims are barred, at least in part, by the applicable statute of limitations, which precludes recovery of damages arising from any acts that caused injury to Plaintiffs that were committed more than four years before the filing of the complaint. The applicable limitations date is June 17, 2011. Plaintiffs cannot recover for alleged injuries caused by conduct occurring before the applicable limitations date or for alleged injuries sustained before the applicable limitations date unless they can establish an overt act by Defendants that restarted the statute of limitations within four years before the filing of the complaint. Plaintiffs' expert reports assert purportedly anticompetitive conduct and effects that occurred prior to the applicable date, which cannot be used to establish injury or damages. Defendants' position is further explained in Defendants' Memorandum of Contentions of Fact and Law filed on January 19, 2024. *See* Dkt. No. 1185 at 10-11.

     If necessary, Defendants will present some or all of the following evidence and argument in support of their affirmative defense.

1) *At least some of the challenged conduct occurred outside of the relevant limitations period*:

     o  Evidence and argument that some of the challenged conduct and some of Residential Plaintiffs' alleged injuries occurred before June 17, 2011; and

     o  Evidence and argument that some of the challenged conduct and some of Commercial Plaintiffs' alleged injuries occurred before June 17, 2011.

Affirmative Defense 2: The applicable laches date is June 17, 2011. Plaintiffs cannot seek equitable relief based on conduct occurring before the applicable laches dates. Plaintiffs' expert reports assert purportedly anticompetitive conduct and effects that occurred prior to the applicable date, which cannot be used as a basis to seek equitable relief. Defendants' position is further explained in Defendants' Memorandum of Contentions of Fact and Law filed on January 19, 2024. *See* Dkt. No. 1185 at 10-11.

If necessary, Defendants will present some or all of the following evidence and argument in support of their affirmative defense.

1) *Lack of diligence by Plaintiffs and prejudice to Defendants:*

    o  Evidence and argument that some of the challenged conduct and some of Residential Plaintiffs' alleged injuries occurred before June 17, 2011; and

    o  Evidence and argument that some of the challenged conduct and some of Commercial Plaintiffs' alleged injuries occurred before June 17, 2011.

**d.    Plaintiffs' Positions and Key Evidence:**

Affirmative Defense 1: To the extent Defendants are arguing that Plaintiffs' claims are barred in their entirety by the statute of limitations, that argument is without merit. At most, the statute of limitations limits the amount of damages that Plaintiffs may recover in this action. Plaintiffs do not seek damages pre-dating the limitations period for the classes certified by the Court.

"The governing statute, 15 U.S.C. § 15b, sets a four year statute of limitations on private antitrust actions." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014). "But an exception to this time limit exists for continuing violations." *Id.* "To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: 1) it must be a new and

independent act that is not merely a reaffirmation of a previous act; and 2) it must inflect new and accumulating injury on the plaintiff." *Id.* (quotation marks omitted).

Courts throughout the country have consistently concluded "that continued overcharges constitute a continuing violation." *In re Glumetza Antitrust Litig.*, 611 F. Supp. 3d 848, 861 (N.D. Cal. 2020) (collecting cases). As a result, "each new sale" of an overpriced product subject to an illegal antitrust conspiracy triggers the statute of limitations anew for that act. *Id.*; *see also Oliver v. SD-3C, LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (stating that numerous courts "have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act"); *Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 132 (4th Cir. 2021) ("Virtually every court faced with similar allegations has held, citing the continuing-violation doctrine, that a new cause of action accrues to purchasers upon each overpriced sale of the drug.") (quotation marks omitted); *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 291 (4th Cir. 2007) (holding that "each sale to the plaintiff[] starts the statutory period running again"). Thus, a continuing violation occurred every time Plaintiffs paid for the Sunday Ticket product.

Moreover, a continuing violation can occur each time Defendants enter into new agreements that renew elements of the alleged conspiracy. *See Samsung*, 747 F.3d 1199, 1203-04 (holding that creation of a second license was a new and independent act restarting the statute of limitations for a claim that the original license was anticompetitive); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 797 (N.D. Cal. 2022) ("Facebook's argument ignores the Ninth Circuit's clear guidance that, if a defendant commits the same anticompetitive act multiple times, each new act restarts the statute of limitations for *all* the acts.") (emphasis in original). Therefore, each time the NFL Defendants entered into a new agreement with CBS, Fox, or DIRECTV, a continuing violation occurs that covers *all* of the challenged restraints.

Plaintiffs intend to produce evidence demonstrating that Plaintiffs purchased a Sunday Ticket package one or more times within the limitations period. Each sale of Sunday Ticket constituted a continuing violation. Plaintiffs further intend to produce evidence demonstrating that the NFL entered into media rights agreements impacting Sunday Ticket with CBS, Fox, or DirecTV within the limitations period. Each new agreement constituted a continuing violation.

Affirmative Defense 2: In applying laches in an antitrust case, the Ninth Circuit has instructed that the same rules that animate the Sherman Act's statute of limitations—including the continuing violation doctrine—are applicable. *Oliver*, 751 F.3d at 1086. If a plaintiff's claims are timely under those principles, the "strong presumption is that laches is inapplicable." *Klein*, 580 F. Supp. 3d at 805 (quotation marks omitted).

The same evidence that will be used to establish a continuing violation for purposes of the statute of limitations is also applicable to Defendants' laches defense, namely: (a) evidence establishing that Plaintiffs purchased Sunday Ticket during the limitations period; and (b) Defendants entered into new agreements with CBS, Fox, or DirecTV during the limitations period.

### C.    Third Party Plaintiffs and Defendants

There are no claims made in this case by any third-party plaintiffs or defendants. Plaintiffs have also asserted the claims above against DirecTV Holdings LLC and DirecTV, LLC (the "DirecTV Defendants"). On April 20, 2021, the Court granted the DirecTV Defendants' motion to compel arbitration and to stay further proceedings as to them. While those claims are stayed, the DirecTV Defendants have not been dismissed from this action.

### 8.    ISSUES REMAINING TO BE TRIED

In view of the admitted facts and the elements required to establish the claims and affirmative defenses, the following issues remain to be tried. The parties

disagree regarding the recitation of the issues to be tried and state their respective positions below:

**Plaintiffs' Position:**

    **A.**    **Count 1: Sherman Act, 15 U.S.C. § 1 (Conspiracy in Restraint of Trade)**

        a.    Whether the NFL and its member clubs entered into a contract, combination, or conspiracy between and among themselves.

        b.    Whether the NFL and CBS entered into a contract, combination, or conspiracy between and among themselves.

        c.    Whether the NFL and FOX entered into a contract, combination, or conspiracy between and among themselves.

        d.    Whether the NFL and DirecTV entered into a contract, combination, or conspiracy between and among themselves.

        e.    Whether the agreements entered into by the NFL with its teams, its television network partners CBS or FOX, or DirecTV unreasonably restrains trade in the market for major league professional football telecasts in the United States.

        f.    Whether the challenged restraints affect interstate or foreign commerce.

        g.    Whether the challenged restraints caused Plaintiffs to suffer an injury to their business or property.

        h.    The amount of damages the Defendants owe Plaintiffs for violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

        i.    Whether an injunction should issue to enjoin the Defendants from restraining the relevant market (to be decided determined by the Court).

    **B.**    **Count 2: Sherman Act, 15 U.S.C. § 2 (Conspiracy to Monopolize)**

a.   Whether the Defendants entered into an agreement or mutual understanding amongst themselves, or with CBS, FOX, or DirecTV to obtain or maintain monopoly power in the market for major league professional football telecasts in the United States.

b.   Whether Defendants specifically intended that one or more of the parties to such an agreement would obtain or maintain monopoly power in the market for major league professional football telecasts in the United States.

c.   Whether Defendants committed an overt act in furtherance of such an agreement.

d.   Whether the Defendants' activities occurred in or affected interstate or foreign commerce.

e.   Whether the challenged restraints caused Plaintiffs to suffer an injury to their business or property.

f.   The amount of damages the Defendants owe Plaintiffs for violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

g.   Whether an injunction should issue to enjoin the Defendants from restraining the relevant market (to be decided determined by the Court).

**Defendants' Position:**

**A.   Threshold Issues**

a.   Whether Plaintiffs have proven the existence of a relevant antitrust market for professional football telecasts in the United States.

b.   Whether Plaintiffs have proven that the NFL and the NFL teams are not a single entity for the purpose of licensing telecasts of NFL football games.

**B.** **Count 1: Sherman Act, 15 U.S.C. § 1 (Conspiracy in Restraint of Trade)**

    a.    Whether Plaintiffs have proven that the NFL, its member clubs, CBS, FOX, and DirecTV entered into a conspiracy to unreasonably restrain trade in the market for major league professional football telecasts in the United States.

    e.    Whether Plaintiffs have proven that the alleged conspiracy affected interstate or foreign commerce.

    f.    Whether Plaintiffs have proven that the alleged conspiracy caused each Plaintiff to suffer an injury to their business or property.

    g.    If Plaintiffs prove that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, whether Plaintiffs have also proven that they are entitled to damages.

    h.    If Plaintiffs prove that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, whether an injunction should issue to enjoin the Defendants from restraining the relevant market (to be decided determined by the Court).

**C.** **Count 2: Sherman Act, 15 U.S.C. § 2 (Conspiracy to Monopolize)**

    a.    Whether Plaintiffs have proven that the NFL, its member clubs, CBS, FOX, and DirecTV entered into a conspiracy to engage in anticompetitive conduct to obtain or maintain monopoly power in the market for major league professional football telecasts in the United States.

    b.    Whether Plaintiffs have proven that each Defendant specifically intended that the NFL would obtain or maintain monopoly power in the market for major league professional football telecasts in the United States.

c. Whether Plaintiffs have proven that each Defendant committed an overt act in furtherance of such the conspiracy.

d. Whether Plaintiffs have proven that each Defendant's activities occurred in or affected interstate or foreign commerce.

e. Whether Plaintiffs have proven that the conspiracy to monopolize caused each Plaintiff to suffer an injury to their business or property.

f. If Plaintiffs prove that Defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, whether Plaintiffs have also proven that they are entitled to damages.

g. If Plaintiffs prove that Defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, whether an injunction should issue to enjoin the Defendants from restraining the relevant market (to be decided determined by the Court).

**9.     DISCOVERY**

All discovery is complete.

**10.     PRETRIAL DISCLOSURES AND EXHIBITS**

All disclosures under Fed. R. Civ. P. 26(a)(3) have been made.

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6.1. The parties' objections, and the grounds therefore, to the opposing party's exhibits are noted in the Amended Joint Exhibit List filed on May 10, 2024, Dkt. No. 1329, and any subsequent amendments thereto. Those objections are incorporated by reference. Unless all parties agree that an exhibit shall be withdrawn, all exhibits not objected to will be admitted without objection at trial.

The parties reserve all rights regarding the objections to exhibits referred to in the parties' Amended Joint Exhibit List. To streamline and simplify the Court's review of the objections on the exhibit list, the parties agreed to each submit "priority" objections to categories of evidence (including deposition designations) as part of this filing.

## A.    Plaintiffs' Objections and Defendants' Responses

*Plaintiffs' Objection #1: Defendants' Unidentified Catch-All Exhibits*

The NFL Defendants include on their trial exhibit list numerous exhibits purporting to span "[a]ll publicly available documents cited" in their various expert reports. These exhibits, along with the NFL Defendants' descriptions, include:

- **TX1040**. "All Publicly Available Documents Cited in the Merits Expert Report Prepared by NFL Expert D. Bernheim, Ph.D., dated April 28, 2023."

- **TX1041.** "All Publicly Available Documents Cited in the Merits Expert Report Prepared by NFL Expert N. Pilson, dated April 28, 2023."

- **TX1042.** "All Publicly Available Documents Cited in the Merits Expert Report Prepared by NFL Expert A. Lotz, April 28, 2023."

- **TX1043.** "All Publicly Available Documents Cited in the Merits Expert Report Prepared by NFL Expert N. Mathiowetz, April 28, 2023."

- **TX1044.** "All Publicly Available Documents Cited in the Corrected Merits Expert Report Prepared by NFL Expert A. Yurukoglu, June, 2, 2023."

- **TX1045. "**All Publicly Available Documents Cited in the Class Expert Report Prepared by NFL Expert A. Yurukoglu, November 4, 2022."

Although styled as six trial exhibits, TX1040 through TX1045 sweep in *thousands* of web pages, news reports, textbooks, articles, legal filings, court opinions, and governmental publications, as well as any portions of deposition

transcripts, documents produced by parties and nonparties, and even other expert reports that are now public.

These proposed exhibits violate the pretrial disclosure requirements of Rule 26 and this Court's Local Rules—as well as various Federal Rules of Evidence.[6] Rule 26 requires "an identification of *each* document or other exhibit, including summaries of other evidence—separately identifying those items the party expects to offer and those it may offer if the need arises." Fed. R. Civ. P. 26(a)(3)(A)(iii) (emphasis added). Further, Local Civil Rule 16-6.1 instructs that "all parties shall file a joint list of exhibits containing the information required by [Rule] 26(a)(3)(A)(iii)," and that exhibit list must provide a description of *each* discrete exhibit that a party intends to use. *See* C.D. Cal. R. 16-6.1 (listing appropriate exhibit descriptions as "1/30/80 letter from Doe to Roe" or "Handwritten notes dated 1/16/80"); *see also McDermott v. Palo Verde School Dist.*, 2013 WL 5525007, at *4 (C.D. Cal. Oct. 4, 2013) (a "threadbare catalog of documents" does not comply with Rule 26(a)(3)(A)(iii) and Local Civil Rule 16-6.1).

TX1040 through TX1045 tell this Court and Plaintiffs nothing about which exhibits—among thousands—the NFL Defendants intend to use at trial. That smokescreen is counterproductive, at odds with the governing rules, and designed to prevent Plaintiffs from any meaningful consideration of, and objections to, the NFL Defendants' real exhibits.

*Defendants' Response*

Exhibits 1040, 1041, 1042, 1043, 1044, and 1045 cover the publicly available materials cited in certain of the NFL Defendants' experts' reports. These category entries effectuate the parties' shared goal of streamlining the joint exhibit list and

---

[6] Plaintiffs reserve the opportunity and all other rights to challenge specific documents contained within these "catch-all" trial exhibits, whether under the Federal Rules of Evidence or any other applicable rule or law.

will not cause any inefficiencies at trial or unfair prejudice to Plaintiffs.  The Court should overrule Plaintiffs' blanket objection.

As background, on December 28, 2023, the parties conferred about the exchange of exhibit lists.  Plaintiffs' counsel proposed shortening the joint exhibit list by excluding documents on experts' reliance lists on the basis that the parties had already disclosed these materials. The NFL Defendants agreed. Following from that discussion, the NFL Defendants included on the exhibit list category entries for certain expert reliance materials rather than listing them all out specifically.[7] Plaintiffs used neither exhibit list category entries nor specific documents entries for the reliance materials of their experts.

The NFL Defendants' approach does not cause any prejudice or inconvenience. First, these category entries are cross references that clearly identify the documents the NFL Defendants may use.  Indeed, the parties have had the relevant reliance materials for well over a year. Second—and more importantly— the parties already agreed to disclose direct examination exhibits 48 hours before a witness's testimony.  Plaintiffs will have ample notice of the specific exhibits to be used on direct with the NFL Defendants' experts, and the ability, following a meet and confer, to object to those exhibits before the experts testify.  To be clear, the NFL Defendants do not anticipate seeking to admit many of the documents on the expert reliance lists. Rather, the category entries are designed to provide notice that the NFL Defendants may do so, including in response to Plaintiffs' case-in-chief, but without forcing the parties and the Court to address hundreds of potential

---

[7] Plaintiffs point to nothing in the Federal or Local Rules that precludes a party from including discrete categories of evidence on its exhibit list.  The only case cited by Plaintiffs, *McDermott v. Palo Verde Sch. Dist.*, 2013 WL 5525007 (C.D. Cal. Oct. 4, 2013), does not say otherwise. There, the plaintiff belatedly submitted an exhibit list that included several deposition exhibits listed by number without description, and at least one entry for all documents produced by the opposing party on a particular subject.  Pl.'s Ex. List 2, ECF No. 56, *McDermott v. Palo Verde Sch. Dist.*, No. 5:12-cv-01112.

exhibit objections that are unlikely to matter. For the limited number of reliance materials that may be offered on direct, Plaintiffs can decide whether to object at that time based on the 48-hour disclosure process and how each exhibit is ultimately used with an expert.

*Plaintiffs' Objection #2: Third-Party Hearsay Articles and Publications*

The NFL Defendants also include on their trial exhibit list **articles** from sports and trade publications that are all hearsay without an exception. Those exhibits, along with the NFL Defendants' descriptions, include:

- **TX0901.** "Email from J. Dyckes to D. York and C. Lauricella re: NFL ST Article in SB Journal – Rolapp Quote // Email Attachment re: Sports Business Journal Article: 'The Rise of Sunday Ticket.'"
- **TX1019.** "Sports Business Journal Article: 'Forty Under 40 – Alex Kaplan, DirecTV.'"
- **TX1020.** "NY Press Article: 'The Gael is Gone.'"
- **TX0254.** "2014 Speech by B. Rolapp at The Jockey Club: An Inside Look at NFL Media Strategies."

Courts have long held that news articles and related commentary are inadmissible hearsay if offered to prove the truth of their contents. *AFMS LLC v. United Parcel Service Co.*, 105 F. Supp. 3d 1061, 1070 (C.D. Cal. 2015) (internal citation omitted) ("It is axiomatic to state that newspaper articles are by their very nature hearsay evidence and are thus inadmissible if offered to prove the truth of the matter asserted."). Here, the relevance of these articles is only to prove the truth of the matter asserted, as is evident from the NFL's responses below. For example, the NFL intends to introduce news articles presumably to explain **why** the NFL partnered with DirecTV—a clear admission that the NFL intends to use these

publications for the truth of the matter asserted. They are thus impermissible hearsay, and they must be excluded.[8]

*Defendants' Response*

Plaintiffs' challenge is now limited to four exhibits containing public news articles or public speeches that are on the NFL Defendants' exhibit list.  As an initial matter, the NFL Defendants submit that the admissibility of these exhibits, which have different characteristics and may be used for different purposes, is better resolved in context at trial, as necessary. *See W. Coast Acquisitions, Inc. v. HCI Steel Bldg. Sys., Inc.*, 2013 WL 12116406, at *3 (W.D. Wash. Apr. 24, 2013); *see also De Contreras v. City of Rialto*, 894 F. Supp. 2d 1238, 1245 (C.D. Cal. 2012). More to the point, Plaintiffs ignore that public statements like those in the at-issue exhibits may be admissible either because they fall within an exception to the hearsay rule or because they are not being admitted for the truth of the matter asserted and are therefore not hearsay.[9] Applying those principles, the documents at issue here are admissible.

- **TX0901:**  This is an internal DirecTV email attaching a published interview with trial witness Brian Rolapp.  If the NFL Defendants offer this exhibit, it would not be for the truth, but as contemporaneous evidence of the NFL's knowledge, intent, and motive in selecting and maintaining DirecTV as a partner, *see* Fed. R. Evid. 803(3), and for the proposition that the NFL openly

---

[8] Portions of TX0219 and TX0220 also are excludable as impermissible hearsay. Pages 13–20 and 31–32 of both contain an attachment titled "New Member Briefing Book." In turn, the New Member Briefing Book contains a mix of NFL memoranda and articles to welcome new members to the NFL Media Committee. Included in the New Member Briefing Book are Wall Street Journal articles and a Sports Business Daily article concerning facts that the parties dispute here. As above, those articles, which Plaintiffs specifically object to, are hearsay.

[9] Indeed, Plaintiffs themselves include many news articles on the exhibit list, demonstrating that they do not believe that all news articles constitute inadmissible hearsay.

discussed its media model in public settings, including in a manner followed by DirecTV employees, demonstrating that neither the NFL nor DirecTV was engaged in a secret unlawful conspiracy, *see* Fed. R. Evid. 801.

- **TX1019:** This 2013 *Sports Business Journal* article about Alex Kaplan includes a quote from trial witness Brian Rolapp about Mr. Kaplan's effective management of a sports subscription business. If the NFL Defendants offer this exhibit, it would not be for the truth, but as corroborating, contemporaneous evidence of Mr. Rolapp's belief at the time (and before the complaint in this case was filed) that DirecTV was a dynamic and innovative partner for Sunday Ticket, *see* Fed. R. Evid. 803(3), as well as for the proposition that DirecTV publicized a national discount on Sunday Ticket, *see* Fed. R. Evid. 801.

- **TX1020:** This article about the closing of commercial named Plaintiff Gael Pub contains numerous quotes from owner Gene Lennon that the NFL Defendants may rely on as party admissions. *See* Fed. R. Evid. 801(d)(2).

- **TX0254[10]:** This is a transcript of a speech by trial witness Brian Rolapp. If the NFL Defendants offer this document, it would not be for its truth, but as contemporaneous and corroborating evidence of Mr. Rolapp's knowledge, at the time, about the demand for NFL football telecasts, as well as the NFL's motive and intent in shifting to a streaming platform in 2023. *See* Fed. R. Evid. 801, 803(3).

Because none of the challenged articles are excludable hearsay, the Court should overrule Plaintiffs' objection.

*Plaintiffs' Objection #3: Impermissible External Advocacy*

---

[10] Plaintiffs previously represented to the NFL Defendants that they had no objections to TX0254 and it could be made a joint exhibit. Indeed, Plaintiffs originally included TX0254 on their own exhibit list as PX0161.

Finally, the NFL Defendants include on their trial exhibit list various position papers, talking points, and external advocacy that contain hearsay, advance impermissible lay opinions, and are unfairly prejudicial. These exhibits, along with the NFL Defendants' descriptions, include:

- **TX0986.** "Testimony of J. Pash, Executive Vice President National Football League, before the Senate Committee on the Judiciary."
- **TX0987.** "Letter from F. Hawkins to FCC re: TiVoGuard and Helix DRM Technologies."

These documents, expressing the NFL's scripted remarks on a range of topics at issue in this litigation, are inadmissible hearsay to the extent that they are being offered for the truth of what they assert, Fed. R. Evid. 801.[11] Furthermore, these documents provide impermissible lay opinions on issues such as the economic effects of the NFL's broadcast arrangements, including the NFL Sunday Ticket package, and a host of other issues like the primacy of satellite over cable, none of which are "rationally based on the witness's perception," among other requirements to be admissible. *See* Fed. R. Evid. 701. Indeed, the NFL Defendants' description below of the intended purposes for introducing these exhibits shows that they are for an improper purpose.

Furthermore, these documents contain inadmissible legal conclusions concerning topics such as the Sports Broadcasting Act, the legality of the NFL's broadcasting arrangements, and even how the Sunday Ticket package "furthers the goals of antitrust law," (TX0987). *United States v. Crawford,* 239 F.3d 1086, 1090 (9th Cir. 2001) ("The lay witness may not, however, testify as to a legal conclusion"); *Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1398 n.3 (9th Cir. 1985) (same).

---

[11] To the extent that authorship information of these documents is known, the declarant or authors of the documents will not be appearing at trial.

33

1   Finally, the self-serving nature of these documents risk unfairly prejudicing

2   the jury. The NFL's carefully worded manuals, talking points, and letters present

3   the NFL's talking points as if they were fact. *See* Fed. R. Evid. 403. Given the risk

4   of confusing or misleading the jury, these exhibits are inadmissible.

5   *Defendants' Response*

6   Plaintiffs next challenge two exhibits as containing hearsay, advancing

7   impermissible lay opinions, and being unfairly prejudicial. As explained above,

8   whether something is excludable hearsay is a context-specific inquiry, *e.g.*, *De*

9   *Contreras*, 894 F. Supp. 2d at 1245, better reserved for trial.  To the extent the

10  Court wishes to resolve the issue now, each of the exhibits Plaintiffs challenge is

11  admissible either because it is not hearsay, or because it falls within an exception to

12  the hearsay rule.  Moreover, Plaintiffs fail to establish that the challenged exhibits

13  contain inadmissible lay opinion testimony.  Lay opinion testimony is admissible if

14  (a) rationally based on the witness's perception; (b) helpful to clearly understanding

15  the witness's testimony or to determining a fact in issue; and (c) not based on

16  scientific, technical, or other specialized knowledge.  *See* Fed. R. Evid. 701.  To the

17  extent Plaintiffs challenge these exhibits on this basis, the statements within the

18  exhibits meet this standard.[12]  The Court should overrule Plaintiffs' objections.

19  - **TX0986:**  This is 2006 testimony from Jeff Pash, General Counsel of the

20    NFL, before the Senate Judiciary Committee.  If the NFL Defendants

21    offered this document, it would not be for its truth, but for the proposition

22    that the NFL openly discussed its policies and goals with the U.S. Senate,

23    thereby demonstrating that the NFL was not engaged in any secret

24

---

25  [12] Although some of the exhibits Plaintiffs object to on this basis are dozens of pages, Plaintiffs fail to identify the specific statements they contend are improper lay opinion testimony, improper legal conclusions, or unfairly prejudicial.  The NFL Defendants have responded to Plaintiffs' objections as thoroughly as possible, but reserve the right to respond in the event Plaintiffs further clarify their objections.

26

27

28

unlawful conspiracy.  *See* Fed. R. Evid. 801.  Even if this testimony is otherwise excludable hearsay, it may be used with the expert witnesses.  *See* Fed. R. Evid. 703.  Plaintiffs' further argument that this document includes, or could form the basis of, improper lay opinion is unavailing.  Mr. Pash merely describes the NFL's broadcast policy and basic facts such as the availability of games and how flex scheduling works—facts that Mr. Pash became aware of through his work with the NFL.  Those facts provide helpful context to the jury in understanding the NFL's broadcast system, and do not require any scientific or technical knowledge.  *See, e.g., Vasserman v. Henry Mayo Newhall Mem'l Hosp.*, 65 F. Supp. 3d 932, 946 (C.D. Cal. 2014) (that witness "knows the information as a result of his work . . . does not convert factual observations into expert testimony")*; N. Face Apparel Corp. v. Dahan,* 2014 WL 12558010, at *4 (C.D. Cal. Oct. 6, 2014) (that witnesses' "knowledge derives from their work experience does not convert factual observations into expert testimony").  If Plaintiffs believe that the NFL Defendants' witnesses' characterizations of the broadcast system are unfounded, they can attempt to undermine such testimony on cross-examination.[13]   Finally, Plaintiffs do not (and could not) dispute the relevance of this document, which offers important factual background about the NFL broadcast system they challenge.  Nor have they identified any prejudice, let alone unfair prejudice, warranting exclusion.

- **TX0987:**  This is a 2004 letter from Frank Hawkins to the FCC regarding how certain technologies might affect the distribution of NFL broadcasts.  The letter—prepared by Mr. Hawkins in the ordinary course of his

---

[13] While Mr. Pash's testimony does include statements opining about the pro-competitive nature of the NFL broadcasting system, the NFL Defendants do not intend to rely on the document for any legal conclusions contained therein.

business responsibilities as an attorney at the NFL, which included communications with regulators—is admissible as a business record. *See* Fed. R. Evid. 803(6). Separately, the document could be admitted not for its truth, but for the proposition that the NFL openly discussed its policies and goals with a government agency, thereby demonstrating that the NFL was not engaged in a secret unlawful conspiracy. *See* Fed. R. Evid. 801. Plaintiffs' separate contention that this document includes, or could form the basis of, improper lay opinion or legal conclusions is also unavailing. As to the former, Mr. Hawkins merely describes the NFL's broadcast policy and basic facts such as where games are available and how the blackout rule works—knowledge Mr. Hawkins obtained through his work with the NFL. Those facts provide helpful context to the jury in understanding the NFL's broadcast system and do not require any scientific or technical knowledge. *See, e.g.*, *Vasserman*, 65 F. Supp. 3d at 946; *N. Face Apparel Corp.*, 2014 WL 12558010, at *4. If Plaintiffs believe that the NFL Defendants' witnesses' characterizations of the broadcast system are unfounded, they can attempt to undermine such testimony on cross-examination.

Nor do the statements that "[t]he NFL's plan has been the subject of extensive scrutiny for nearly five decades by Congress, the Commission, and numerous federal courts," and "[t]hese reviewers have recognized that the plan is consistent with the public interest and that it promotes the welfare of fans throughout the country," constitute improper legal conclusions. Mr. Hawkins' observation of *others*' findings about the NFL's broadcast system is not itself a legal conclusion, and it is consistent with this Court's prior rulings on how certain prior lawsuits against the NFL can be discussed at trial. *See* Dkt. 1304.

1
2
3
4

Finally, Plaintiffs do not (and could not) dispute the relevance of this document, which offers important factual background about the NFL broadcast system they challenge.  Nor have they identified any prejudice, let alone unfair prejudice warranting exclusion.

5
6

Because none of the challenged exhibits are excludable hearsay, the Court should overrule Plaintiffs' objection.

7

_Plaintiffs' Objection #4: Evidence of Other Professional Sports Leagues_

8
9
10
11
12

The NFL Defendants' designation of hours of deposition testimony comparing the availability of NFL telecasts over-the-air to other professional sports should be excluded as it would improperly turn the Court's recent ruling on the NFL's Motion _In Limine_ No. 2 into a sword and a shield in a way that would run afoul of Rule 403.

13
14
15
16
17
18
19
20
21
22

Defendants moved in Motion _in Limine_ No. 2 to exclude reference to the _Garber_, _Laumann_, and _Chicago Professional Sports_ antitrust cases, which (1) challenged anticompetitive restraints related to telecasting games in Major League Baseball, the National Hockey League, and the National Basketball Association, respectively and (2) resulted in settlements rather than a judgment as the _NCAA_ case did. In doing so, Defendants argued to the Court that facts related to these other sports leagues "are so far removed from the facts of this case, [that] any attempt to permit a fair evaluation of how they compare to this suit is likely to give rise to time-consuming tangents." Dkt. 1110-1 at 6. The Court granted Defendants' motion with respect to all three of these other sports league antitrust cases.

23
24
25
26
27
28

Having won the motion, the NFL Defendants intend to use the Court's ruling as a sword and a shield by designating reams of deposition testimony from fact witnesses offering speculation and improper opinions that NFL telecasts are more widely available on free, over-the-air television than in these other sports leagues (improperly implying that this comparison somehow justifies the NFL's restraints). _See_, _e.g._, Pietrycha Tr. 140:13-16; Carey Tr. 126:5-25; White Tr. 212:7-215:7;

37

Magnus 231:13-25, 233:14-234:11. The NFL's attempt to do so should be rejected. As Dr. Rascher points out, any such argument is misleading if taken out of the context of how those other professional sports operate and the critical fact that their telecasts are less available because of *those professional sports leagues' own anticompetitive restraints*, which explain why their distribution models are the way they are. *See* Rascher Report ¶ 390 (discussing how *Garber* shaped the MLB out-of-market package). Even the NFL's expert Dr. Bernheim opines that one should not compare the price of the NFL OOM package to OOM packages in MLB and NHL because those prices "resulted from litigation rather than market forces." *See* Bernheim Report ¶ 336.

Yet now, after successfully moving to exclude reference to these other litigations, the NFL Defendants seek to prejudice Plaintiffs and mislead the jury by (1) arguing or implying that the NFL's restraints must be pro-competitive because there were more NFL games available over-the-air than in these other sports while also (2) preventing Plaintiffs from fully explaining that a lack of availability of over-the-air telecasts in those sports was *also* the product of anticompetitive restraints. Put simply, having won its Motion *in Limine*, the NFL should not now be permitted to imply to the jury that other professional sports leagues are examples of unrestrained markets to which the NFL should be favorably compared.

Importantly, neither Plaintiffs' expert Dr. Rascher nor Defendants' expert Dr. Bernheim opines that these other sports constitute a relevant "but-for" world. To the contrary, Dr. Bernheim opined that comparisons between other sports "are akin to observing that apple production exceeds orange production, and that apples are cheaper than oranges" and concluding "from those observations that orange suppliers engage in anticompetitive conduct." Bernheim Report ¶ 335. In moving the Court to exclude reference to litigation in these other sports, the NFL itself argued that each of these sports involves "a different broadcasting arrangement, by a different entity, in a different market." Dkt. 1110-1 at 5.

Whether the NFL's restraints caused anticompetitive harm or had procompetitive benefits turns on comparing the actual market outcomes to the outcomes in a but-for world that "reflects conditions in the actual world *in all respects except for the alleged anticompetitive conduct.*" ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 4 n.2 (3d ed. 2017) (emphasis added). Entirely different professional sports leagues with radically different schedules and telecast viewership—and their own anticompetitive restraints, which cannot now be discussed—clearly cannot provide such a but-for baseline. No expert in this case claims otherwise.

The only non-NFL benchmark to the NFL is college football. This Court found Dr. Rascher's college football model to be "adequate to produce class-wide proof of impact and damages, especially considering that the Ninth Circuit has already recognized college football as a close analog to this case." Dkt. 1155 at 19. College football involves the same sport, the same number of comparable games, the same season, and a comparable level of popularity. And unlike the other sports leagues discussed above, the *NCAA* case resulted in a final judicial determination that the market was anticompetitive and an injunction that fully eliminated the anticompetitive restraints. This before-and-after experience of college football when similar restraints on telecasts were lifted is directly probative of Plaintiffs' claims—as this Court and the Ninth Circuit have recognized. That is the type of apples-to-apples comparison that will help the jury measure competitive harm and damages. Evidence about the relative output levels of the NFL compared to professional sports, by contrast, will improperly lead the jury to draw unfairly prejudicial inferences, confuse the issues, and/or make this case devolve into mini-trials about the reasons for the restraints in these other sports – precisely the side-show this Court hoped to avoid in its ruling on MIL 2. These risks substantially

outweigh whatever probative value, if any, such comparisons may have in the absence of a complete explanation of the circumstances.

*Defendants' Response*

Frustrated that they cannot prejudice the jury by introducing legal opinions from unrelated cases, Plaintiffs belatedly raise an untenable argument: that no facts concerning other professional sports leagues should be admitted at trial. This matter has already been settled by this Court's ruling in response to Defendants' Motion *in Limine* No. 2, where the Court explained that it "will allow Plaintiffs to rely on the underlying facts of the Non-NFL Lawsuits, make comparisons with other sports leagues, and use college football as an analog." ECF No. 1320 at 3. Plaintiffs appear to have now realized that making comparisons to other sports leagues undermines rather than aids their case. But that is not a valid basis for undoing what the Court has already ordered. That would be reason enough to overrule any such objection. But Plaintiffs' position also has several other death knells. As a threshold matter, Plaintiffs' position is premised on a misrepresentation. Contrary to their arguments, the deposition testimony they challenge makes up just a few lines of Defendants' designations, and will take just minutes to present at trial. Even setting that aside, the argument is being raised too late, is inconsistent with the position that Plaintiffs and the expert witnesses have taken the entirety of this litigation, and is wrong on the merits.

*First*, the proper way to move to exclude evidence about other professional sports leagues would have been to file a motion *in limine*. Plaintiffs failed to do so, and the deadline for such motions has long passed. Nor did Plaintiffs object to the relevance of such evidence in response to Defendants' deposition designations or in their objections to the exhibit list. The first time Plaintiffs raised any such objections was on May 8—after the Court had already ruled on and considered such evidence and any of the many prior opportunities to object had long been squandered.

*Second*, throughout the many years of this litigation—including up to just 7 days ago when Plaintiffs argued their response to Defendants' Motion *in Limine* No. 2—Plaintiffs took a contrary position and maintained that evidence of other sports leagues is relevant.  Starting in 2015 when Plaintiffs first brought this case, they referred to other professional sports leagues.  *See* ECF No. 1 at ¶ 5 (While Major League Baseball ("MLB"), the National Hockey League ("NHL"), and the National Basketball Association ("NBA") have each allocated markets geographically and pooled so-called "out-of-market" rights, none has agreed to centralize control and sale of all broadcast rights.").   And Plaintiffs stuck by comparing the NFL to other professional sports leagues for nearly a decade.  Plaintiffs' expert, Dr. Daniel Rascher clearly opined that "the closest potential competition to the NFL's major league football telecasts would be either other football telecasts (such as college) *or other major league sports (such as MLB or the NBA)*."  Rascher Merits Report ¶ 214 (emphasis added).  And he then expended pages upon pages to compare the NFL's system to these other professional sports leagues.  *See, e.g.*, *id.* ¶¶ 154 ("Other major sports' premium channel offerings serve as examples of premium products with more options that are distributed more widely."), 272 (comparing the competitive balance and revenue sharing practices of MLB teams), 389 ("Another comparable product for NFL telecasts can be telecasts for other major sports leagues in the United States. Both MLB and the NBA choose to license non-exclusive distribution."), fn. 409 ("In addition, the many less restrictive frameworks that have been adopted by other leagues, such as college football, the NBA, or MLB, or even the NFL in other countries, also serve as viable alternative structures with fewer restrictions on competition rights for OOM telecasts."), 391 ("Major League Baseball provides a useful comparable for the NFL in this case").  And just a week ago, at the hearing on the motions *in limine*, the Court was clear that it intended to allow Plaintiffs to present evidence regarding other sports' leagues and Plaintiffs did not raise the objection that they are raising

now.  *See* 5/2/24 Hr'g Tr. at 7:23-8:1 ("MS. WILKINSON: I mean, but they can talk about, baseball has this system and therefore they think it's better -- THE COURT: This is what the -- this is what the NFL would look like if they changed their rules.")

In response to Dr. Rascher, Defendants' expert, Dr. Douglas Bernheim also examined other sports leagues and explained why the NFL's system presents consumers with far more benefits.  *See, e.g.*, Bernheim Merits Report at ¶¶ 365–370 (comparing the competitive balance of the NFL to other professional sports leagues, including MLB, NHL and NBA), ¶¶ 431–435 (explaining that "other professional sports have far fewer OTA telecasts than the NFL"), ¶¶ 468–488 (explaining why the NFL's system is superior to the college football system).  Plaintiffs never raised any objections to Dr. Bernheim's opinions, nor moved to strike or exclude them in any way, and it would be unfairly prejudicial to omit this evidence from the case now.

*Finally*, this is proper evidence for the jury to consider and even if Plaintiffs had properly presented this objection (which they have not), it would nevertheless fail.  As Plaintiffs' own response to Defendants' Motion *in Limine* No. 2 recognized, the Ninth Circuit has already stated "that the National Hockey League and Major League Baseball are 'comparable sports leagues.'" ECF No. 1192 at 6 (quoting *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1154 (9th Cir. 2019)).  The reason for this is clear:  Plaintiffs are challenging the reasonableness of the NFL's broadcast system and the jury needs to be able to consider all potential alternatives and how they would affect consumers in Plaintiffs' alleged market of professional football telecasts.  Plaintiffs don't disagree that such comparison would be proper.  Plaintiffs, however, claim that the only proper comparison is to the world of amateur college sports and not to other professional sports leagues.  But the jury should be able to consider all of the potential alternatives that could have transpired, not just the one alternative that

Plaintiffs like best.  Plaintiffs' position is cherry-picking of the utmost degree and it is improper.  Furthermore, part of Defendants' case is that the the restraints being challenged here have resulted in a broadcasting system that is better than other leagues' systems on multiple metrics, including the wide availability of over-the-air broadcasts and the competitive balance of the league as a whole.  Plaintiffs now seek to hamstring Defendants from presenting the procompetitive benefits of the NFL's system—a matter that Defendants bear the burden on—simply because they now have concerns about how the jury will react to evidence they used to like. Plaintiffs not only want to argue that Defendants have not quantified certain procompetitive benefits, but unfairly prevent Defendants from presenting qualitative evidence of those same benefits.  There is no basis for stacking the deck in this manner on the eve of trial.

In short, Plaintiffs' objection fails on any metric it is evaluated on and the Court should reject it.

### B.    Defendants' Objections and Plaintiffs' Responses

*Defendants' Objection #1: Agency Agreements*

Defendants object, under Federal Rules of Evidence 402 and 403, to exhibits and evidence (or portions thereof) regarding the distribution of Sunday Ticket via agency agreements between the NFL and DirecTV from 1994 to 2002.[14]  The final agency agreement between the NFL and DirecTV expired nearly *ten years* before the start of the class period, at which point the contractual agreement shifted to one in which DirecTV licensed Sunday Ticket from the NFL for a fixed yearly fee.  The structure and substance of the agency agreements are fundamentally different from

---

[14] This objection applies to the following exhibits: TX0542, TX0604, TX0605, TX0606, TX0607, TX0608, TX0619, TX0623, TX0644, TX0660, TX0661, TX0663, TX0674, TX0679, TX0724, TX0725, TX0726, TX0730, TX0731, TX0736, TX0737, TX0738, TX0740, TX0741, TX0746, TX0747, TX0751, TX0752, TX0773, TX0774, TX0792 and TX0811, as well as any other exhibits or evidence that Plaintiffs seek to present on this point at trial.

the Sunday Ticket license agreements at issue in this case.  To be clear, the NFL Defendants agree that the history of the *challenged* restraints is relevant.  But Plaintiffs seek to introduce evidence about *decades-defunct* agreements with no legal effect during the class period.  This evidence should be excluded because it is irrelevant, would be unfairly prejudicial, and is likely to confuse the jury and waste the court's time, including by prompting a mini-trial about contracts that have been defunct for over two decades.

Courts routinely exclude evidence of contracts that are no longer in effect in circumstances where the expiration date was much closer in time to trial.  *See UMG Recordings, Inc. v. Aguila Recs., Inc.*, 2011 WL 13213922, at *4 (C.D. Cal. 2011) (expired contract not relevant).  Moreover, the danger of unfair prejudice is high.  Plaintiffs concede their intent to argue that because the NFL lawfully set the price of Sunday Ticket under the agency agreements in effect from 1994 through 2002, it continued to influence Sunday Ticket's price under a different contract structure in effect two decades later, from 2011 through 2023.

If Plaintiffs think they have sufficient evidence of a price conspiracy during the class period (and Defendants submit they do not), there should be no need to resort to outdated evidence.  *Cf. Intern. Shoe Mach. Corp. v. United Shoe Machinery Corp.*, 315 F.2d 449, 459 (1st Cir. 1963) (explaining that "if a plaintiff has the independent evidence to demonstrate antitrust violation and injury during the appropriate limitations period, then it would seem that he would not have to resort to [past acts] as background").  If they do not have such evidence, then they should not be allowed to manufacture it through such attenuated and off-point evidence.

Moreover, permitting Plaintiffs to rely on the defunct agency agreements risks confusing jurors and lengthening the trial. The parties and the Court have already agreed that this trial—involving complex antitrust claims and a class period spanning over a decade will last twelve days.  That schedule favors a focused

44

presentation of evidence pertinent to the claims Plaintiffs brought and the class the Court certified.   Evidence about outdated agreements, on the other hand, would generate a mini-trial about (a) why the NFL entered an agency relationship with DirecTV over two decades ago; (b) why that relationship changed; and (c) substantive differences between the two agreements.  *See, e.g.*, *Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 690 (9th Cir. 2001) (excluding past evidence that might lead to a "mini trial"). The Court should preclude Plaintiffs from wasting the Court's, the parties', and the jurors' time by inflating an already dense record with irrelevant agency-period evidence.

*Plaintiffs' Response*

Evidence of how the NFL distributed Sunday Ticket from 1994 to 2002, when the League explicitly controlled pricing and the other terms of the NFL Sunday Ticket package under an agency arrangement, is material to the jury's determination of liability in this case because that evidence will demonstrate that the restraints that the NFL has imposed on the Sunday Ticket package have remained essentially unchanged since 1994.

This evidence is admissible for at least three reasons. *First,* it is black letter antitrust law that conduct under the rule of reason "can only be evaluated by analyzing the … the history of the restraint, and the reasons why it was imposed." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). The Ninth Circuit concluded that was so in this case. *See In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019); *id.* at 1144 ("To analyze the challenged arrangement between the NFL teams, the NFL, and DirecTV, it is necessary to understand the history of television broadcasting of NFL games."). Indeed, the NFL concedes that the history of the restraints are undoubtedly relevant. *Second,* the NFL's prior conduct is probative of intent to monopolize, an element of Plaintiff's claim under Section 2 of the Sherman Act. Proposed exhibits from the 2002 period show that the NFL sought to "*maintain[] complete control* over the pricing and

packaging of Sunday Ticket" even as it negotiated the licensing arrangement that remained operative throughout the class period. *See* Dkt. No. 1271, Ex. 9, at -787 (emphasis added). *Third,* this evidence is independently admissible under Fed. R. Evid. 404(b) to show the NFL's "intent, preparation, [and] plan" to continue fixing price under the new contractual arrangement. A pricing memo from this period "discusses several courses of action through which the NFL could take a more active role in the pricing of the NFL Sunday Ticket service *under new contractual arrangements*." *Id.* Ex. 16, at -555 (emphasis added). As the NFL notes in its objection, this evidence can be used to show that the NFL "continued to influence Sunday Ticket's price under a different contract structure in effect … from 2011 through 2023." *See supra* at 44. That is exactly why it is relevant. This Court has stated that "any evidence of price fixing between Defendants and DirecTV is plainly relevant to Plaintiffs' claims." Dkt. 1303 at 2.

And, here, the only change relevant to this point was the nominal alteration of the contract from an agency to a licensing agreement. It was, in all respects, a continuation of the same broadcast-rights pooling arrangement implemented through an exclusive arrangement with DirecTV as the distributor of the NFL Sunday Ticket package. There is evidence that the agency relationship continued past the contractual change because the NFL acted as though it were paying DirecTV commissions in 2002 and 2004—just as it had under the old agency relationship—for purposes of calculating the "allocation payments" the NFL owed to the networks as their share of revenue from the Sunday Ticket agreement with DirecTV. A commission agreement, in which an agent is paid a commission of sales, is the hallmark of an agency relationship. This is just one of many points of contractual similarity that demonstrate that the change from an agency to a licensing structure was a sham in an effort to minimize antitrust scrutiny.  The jury should be permitted to find that it is a single ongoing common course of conduct, not two separate agreements, that are somehow independent of one another.

*Defendants' Objection #2: International NFL Products*

Defendants object, under Rules 402 and 403, to exhibits and evidence (or portions thereof) referencing the foreign distribution and pricing of NFL telecasts. [15] The parties have agreed that the relevant geographic market in this case is the United States.  While the NFL has an international product called "Sunday Ticket," it includes different games, and more importantly is subject to different legal requirements that vary from country to country.  Because neither the products nor the markets are comparable, the Court should exclude such evidence as irrelevant, unfairly prejudicial, and likely to confuse the jury.

Evidence about foreign Sunday Ticket packages has no probative value in a case involving only the domestic Sunday Ticket package.  The products and audiences are fundamentally different.  In the U.S., television networks broadcast three to four games locally every Sunday afternoon, guaranteeing fans access to local teams' games and choosing which other games to show based on perceived consumer interest.  Domestic Sunday Ticket includes the rest of the Sunday afternoon games, but since there may be no in-market games in other countries, foreign Sunday Ticket often includes all the games.  Moreover, it is indisputable that NFL football is much more popular in the United States than in other countries (just as other sports, such as hockey in Canada or soccer in Europe, are more popular abroad than here).  The difference in demand for NFL games is one of several factors leading to different prices.  Any evidence of these foreign products would thus invite apples-to-oranges comparisons that are misleading and prejudicial to Defendants.  *See Tate & Lyle Ams. LLC v. Glatt Air Techniques, Inc.*, 2016 WL 9710007, at *2 (C.D. Ill. Jun. 10, 2016) (excluding evidence of a different product as irrelevant and likely to confuse the jury); *Sec. Nat'l Bank of Sioux City, Iowa v.*

---

[15] This objection applies to the following exhibits: TX0581, TX0583, TX0588, TX0589, TX0590, TX0611, TX0639, TX0641, TX0642, TX0666, TX0667, TX0668 and TX0683, as well as any other exhibits or evidence that Plaintiffs seek to present on this point at trial.

*Abbott Labs*, 2013 WL 12140998, at \*16–17 (N.D. Iowa Aug. 13, 2013) (same) (collecting cases)).

Still more, in many international markets, distribution and pricing is subject to different regulatory regimes than in the United States.  *See, e.g., Apple Inc. v. Samsung Elecs. Co. Ltd*., 2016 WL 777924, at \*5 (N.D. Cal. Feb. 29, 2016) (excluding evidence because it did not focus on the specific product at issue and because the "global nature" of the evidence led to a substantial risk of jury confusion and unfair prejudice); *Masimo Corp. v. Apple Inc*., 2023 WL 3432126, at \*1–2 (C.D. Cal. Mar. 15, 2023) (excluding evidence about Apple's foreign operations because it was irrelevant to the case at issue and risked jury confusion). Plaintiffs' objection underscores that they intend to make improper and inflammatory arguments based on these legal differences.  For example, Plaintiffs' expert seeks to compare Sunday Ticket in Canada, where there are multiple distributors, to Sunday Ticket in the United States, where there is one.  Not only are the two products materially different, but as at least one of Plaintiffs' exhibits makes clear, Canadian law does not permit "exclusive deals for PPV products." *See* TX0611.  These arguments comparing domestic law to foreign law have no place in this trial, and underscore the unfairly prejudicial evidence of this evidence. Because of the substantial differences between foreign and domestic versions of Sunday Ticket, and the complicated evidence (and legal instruction) required to give context, the Court should exclude such evidence.

*Plaintiffs' Response*

The NFL's objection to trial exhibits concerning its international Sunday Ticket offerings is meritless for similar reasons. Plaintiffs have long cited the NFL's practices in markets with far fewer restraints as probative of anticompetitive harm, the but-for-world, and damages. Dr. Rascher's expert report cites those markets for precisely those reasons. Dr. Rascher compares the NFL's conduct in the United States with its conduct abroad to show that the higher prices for the same

product are driven by exclusivity. Expert Report of Daniel A. Rascher ("Rascher Report"), at ¶ 105 (Dkt. No. 962-4). Relatedly, Dr. Rascher uses those lower price points to inform the jury of what the market for Sunday Ticket would look like but for the restraint of exclusivity. Lastly, Dr. Rascher's yardstick measure of damages compares the prices in Canada, where NFL Sunday Ticket is available through multiple distributors, to the prices in the United States, where the NFL confines the product to a single distributor. *See id*. ¶¶ 382–388. That use of foreign conduct as a yardstick is commonplace in antitrust proceedings.[16] *See, e.g.*, *Moherl v. Nat. Assoc. of Realtors*, 2023 WL 2683199, at *7–10 (N.D. Ill. Mar. 29, 2023). Each of the challenged exhibits will help Dr. Rascher explain this analysis to the jury. They are only prejudicial because they undermine the NFL's claim that non-exclusive distribution of Sunday Ticket is impossible.

*Defendants' Objection #3: Recent Sunday Ticket Negotiations*

Defendants object, under Rules 402 and 403, to exhibits and evidence (or portions thereof) regarding negotiations for the Sunday Ticket agreements that became effective in the 2023–2024 season.[17] Those agreements were not operative during the class period, and the Court has already ruled that the trial is about Plaintiffs' claim for damages during the class period. *See* Dkt. 1292, at 7.

---

[16] This Court has already rejected the NFL's *Daubert* motion directed at Dr. Rascher's analysis, including his use of a yardstick measure of damages comparing Sunday Ticket prices abroad. *See* Dkt. No. 894, at 11–13.

[17] This objection applies to the following exhibits: TX0501, TX0502, TX0503, TX0504, TX0505, TX0506, TX0507, TX0508, TX0509, TX0510, TX0511, TX0512, TX0513, TX0514, TX0515, TX0516, TX0517, TX0518, TX0519, TX0520, TX0521, TX0522, TX0523, TX0524, TX0525, TX0526, TX0527, TX0528, TX0529, TX0530, TX0531, TX0548, TX0549, TX0550, TX0551, TX0552, TX0553, TX0554, TX0555, TX0556, TX0557, TX0558, TX0559, TX0560, TX0561, TX0562, TX0563, TX0681, TX0682, TX0692, TX0693, TX0696, TX0697, TX0698, TX0699, TX0700, TX0701, TX0702, TX0706, TX0707, TX0708, TX0709, TX0710, TX0711, TX0712, and TX0714, as well as any other exhibits or evidence that Plaintiffs seek to present on this point at trial.

Evidence about negotiations for agreements taking effect after that period is both irrelevant and unfairly prejudicial, including because it will invite prejudicial speculation about injunctive relief and the effects of a verdict on the future.

Evidence about the most recent round of Sunday Ticket negotiations is not relevant to this case. The current Sunday Ticket agreements have no effect on any class member's claims. The class period ended on February 7, 2023, and the class includes only subscribers who "purchased NFL Sunday Ticket from DirecTV, or its subsidiaries." Dkt. 894, at 25. The most recent Sunday Ticket agreements took effect starting six months after the class period.

Against that backdrop, evidence about the recent Sunday Ticket negotiations would substantially risk jury confusion and wasting the Court's time, and unfairly prejudice Defendants. Plaintiffs currently seek to admit dozens of documents and deposition testimony from potential bidders for Sunday Ticket, but many of these bidders did not win the rights to Sunday Ticket, and all were bidding for contracts with no legal effect on the class. Plaintiffs contend that the evidence regarding recent negotiations should be admissible because it will prove an ongoing course of conduct—but that is flawed for two reasons. First, discussing the various options that were in play for the current and future distribution of Sunday Ticket will invite discussion of the types of injunctive relief this Court may order, which is already forbidden Dkt. 1292. Second, and more importantly, Plaintiffs ignore the conflicting evidence on each purportedly relevant fact they cite. If admitted, this evidence would generate unnecessary mini-trials, as the NFL Defendants would have to explain their priorities and concerns during negotiations with each third party, as well as why they eventually chose Google as their new partner, for an agreement that has no effect on class members. *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 7803893, at *2 (N.D. Cal. Nov. 15, 2016) ("One function of Rule 403 is to avoid the introduction of 'large quantities of extrinsic evidence to create mini-trials.'" (citation omitted)); *Tennison*, 244 F.3d at 691

(excluding evidence of events that occurred outside the statute of limitations where "[a]dmitting [the] testimony might have resulted in a 'mini trial'").  And as noted above, all of this evidence and argument would invite improper speculation about the injunctive claims that all agree—and the Court has ordered—should not be part of the case.

*Plaintiffs' Response*[18]

The NFL's objections to the trial exhibits concerning the recent Sunday Ticket negotiations seek to relitigate the issues of those negotiations' relevance to this case, an issue the NFL lost years ago. *See* Dkt. 607 (permitting discovery on "NFL Defendants' [then-]ongoing negotiations with third parties for the sale of the future rights to NFL Sunday Ticket"). These objections also ignore the fact that the negotiations at issue—with Google, Apple, and Goldman Sachs—took place during the class period. So did the execution of the new agreement with Google. As evidenced by the documents Plaintiffs seek to show the jury, the NFL's conduct during negotiations demonstrates an intent to perpetuate under the new contract the restraints the NFL imposed during the class period. These include the requirement that Sunday Ticket be sold to fans at a high price, that it be sold only as a package of all out-of-market games (without an option to purchase just the games of a single team or division), and that Sunday Ticket be licensed to a single exclusive provider. The documents show that the NFL discussed retail price with prospective bidders, rejected proposals to offer cheaper alternatives, and ultimately chose the partner who would agree to the existing restrictions. Last season YouTube sold Sunday Ticket for $349 per season, nearly $50 more than the price charged by DirecTV.

---

[18] It is important to recognize that the NFL's priority objections #1 and #3 are akin. The NFL hopes to eliminate the early history *and* the recent history of the restraint, effectively denying the jury the beginning and end of a book on the NFL's control over Sunday Ticket pricing and its protection of the networks from "cannibalization." But the jury deserves all this evidence of the NFL's uninterrupted conduct and intent, before, during, and after the class period, however damaging to the NFL's defense. None of it is *unfairly* prejudicial.

The only package offered by YouTube is the one that contains every out-of-market game. And YouTube, like its predecessor DirecTV, is the exclusive provider of Sunday Ticket to residential consumers in the United States. The NFL's imposition of these restraints on its new partner bears directly on the restrictions that imposed on DirecTV during the class period. For those same reasons, evidence of those negotiations is admissible under Fed. R. Evid. 404(b) as probative of the NFL Defendants' motive, intent, and opportunity to control the price and packaging of Sunday Ticket during the class period.

*Defendants' Objection #4: Foundation*

The NFL Defendants have made foundation objections to exhibits included on Plaintiffs' exhibit list where there is no apparent trial witness with personal knowledge able to testify about the document. Plaintiffs disagree with those foundation objections as a general matter, and they would like this issue heard at the Pretrial Conference.  Here is Defendants' position on that issue.

It is a key tenet of the rules of evidence that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." F.R.E. 602.  And it is further widely recognized by courts that "[t]he foundation is laid for receiving a document in evidence by the testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document and, where appropriate, its delivery." *Preston v. Mayo Clinic*, No. CV 09-8543 SVW (RZX), 2010 WL 11597464, at *8 (C.D. Cal. May 4, 2010) (quoting *United States v. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970)); *see also Velasco v. Broadway Arctic Circle, LLC*, No. 4:11-CV-00102-BLW, 2012 WL 13024726, at *2 (D. Idaho Feb. 16, 2012) ("Defendants are right that there must be a proper foundation before the Court admits the document.  Accordingly, the Court will only admit the document at trial if the proper foundation is laid.").  These requirements are additional to Rule 901's requirement that evidence be authenticated, and authentication cannot supplant the

requisite foundation. *Cf. Van Sweden Jewelers, Inc. v. 101 VT, Inc.*, No. 10 Civ. 253, 2012 WL 4074620, at *6 (W.D. Mich. June 21, 2012) ("[W]here Plaintiff can establish a foundation showing that the evidence satisfies the requirements of Rule 803(6), the Rule 901 authentication requirements are also met, and no additional foundation is necessary to admit the evidence."); *see also Carter v. Monarch Recovery Mgmt., Inc.*, No. 16 C 6376, 2018 WL 1394034, at *3 n.4 (N.D. Ill. Mar. 20, 2018) ("Additionally, even if she were able to establish the document's authenticity, Mazzacano cannot provide the foundation necessary to establish that the document is a business record of Citibank under Rule 803(6), and it would constitute inadmissible hearsay."). Despite Plaintiffs' protestations to the contrary, Defendants' position is merely that these core pillars of evidence law be respected at trial.

And Plaintiffs' claim that a sponsoring witness is not necessary to lay a foundation to admit statements by the NFL's co-conspirators, *see infra* at 56, is belied by the authority Plaintiffs rely on. Indeed, in a case cited by Plaintiffs, the government argued that it should be able to introduce thirteen exhibits that contained statements by a particular witness [Mr. Abramoff] who was not expected to testify at trial, because they were statements made in furtherance of a conspiracy. *United States v. Safavian*, 435 F. Supp. 2d 36, 47–48 (D.D.C. 2006). The court "reject[ed] this argument as a basis for admitting the thirteen e-mails which are not otherwise admissible" and explicitly stated that "[c]ertainly, each of these exhibits, having been sent to or received by Mr. Abramoff, would be admissible *if he were called as a sponsoring witness*." *Id.* at 48 (emphasis added).

*Plaintiffs' Response*

Defendants are wholly misguided in their insistence that Plaintiffs must have a sponsoring witness to lay a foundation for any exhibit on Plaintiffs' exhibit list. To the contrary, there is "***no freestanding 'sponsoring witness' requirement*** in the Federal Rules of Evidence." *See TEK Glob., S.R.L v. Sealant Sys. Int'l, Inc.*, 2017

WL 952955, at *1 (N.D. Cal. March. 12, 2017) (emphasis added). Courts routinely admit documentary evidence without a sponsoring witness. *See, e.g.*, *U.S. v. Safavian*, 435 F. Supp. 2d 36, 39–43 (D.D.C. 2006) (admitting email communications between defendants and third parties who were not expected to testify); *Adams v. U.S.*, 2009 WL 1884387, at *1–*3 (D. Idaho June 28, 2009) (admitting e-mails and memorandum "without a sponsoring witness"); *cf. Anand v. BP West Coast Prods. LLC,* 484 F. Supp. 2d 1086, 1092 n.11 (C.D. Cal. 2007) ("[d]ocuments produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent").

To lay a foundation for documentary evidence, Plaintiffs need only show that the evidence satisfies the requirements for admissibility. There are certainly times when a sponsoring witness may be necessary to lay such a foundation, such as authenticating a document that bears no indicia that it is what the proponent says it is (*e.g.*, an undated, unsigned handwritten note that was not produced in discovery). This is **not** one of those times. The exhibits that Defendants object to as lacking foundation were produced in response to discovery requests and almost all were generated by the NFL, DirectTV, CBS, or FOX—all party opponents or alleged co-conspirators. *See* MSJ Decision, Dkt. No. 1155, at 14. Plaintiffs can establish that these documents are authentic and not hearsay, by definition under Rule 801, without a sponsoring witness.

Regarding authenticity, documents produced by the NFL and DirecTV were authenticated by law when they were produced in response to Plaintiffs' discovery requests. *See, e.g.*, *Adams v. U.S.*, 2009 WL 1884387, at *1, *3 (D. Idaho June 28, 2009) (allowing introduction of e-mails and memoranda at trial "without a sponsoring witness" when they were "provided by [defendant] from its [own] files during discovery"). *See also Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 (9th Cir. 1996) (the "district court did not err in considering the

documents" that were not authenticated by a witness because "MPI produced the documents to GoodTimes, many of the documents were on MPI letterhead and MPI does not contest their authenticity."); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004) ("[T]he documents are deemed authentic because Plaintiff identified the documents as being produced by parties in discovery"); *Metro-Goldwyn-Mayer Studios, Inc.*, 454 F. Supp. 2d 966, 972 (C.D. Cal. 2006) ("Authentication can be accomplished by judicial admission, such . . . production of the items at issue in response to a discovery request"). This also applies to DirecTV because it is still a defendant in this case, *see* Dkt. 320 (staying proceedings against DirecTV), and DirecTV's judicial admission as to the authenticity of its documents is binding on the NFL. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002) ("We now hold that when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties . . .").[19] Moreover, the NFL has not questioned the authenticity of these documents.[20]

The cases cited by the NFL Defendants are inapposite. The documents at issue in those cases did not involve documents where foundational issues such as authenticity and hearsay can be shown by operation of law. Moreover, cases cited

---

[19] The remaining exhibits (documents not produced by the NFL or DirecTV) were authenticated through business records affidavits signed by the parties that produced those documents. *See* Joint Exhibit List (TX0287-303); Fed. R. Evid. 902(11); Fed. R. Evid. 803(6)(D).

[20] As to hearsay, a sponsoring witness is not necessary to establish that the NFL's documents (and other documents generated the NFL) are statements by a party opponent. *See TEK Glob., S.R.L.*, 2017 WL 952955, at *1 (overruling hearsay objection "in light of the party-admission exclusion" despite objecting party's invocation of a "sponsoring witness" requirement); *Metro-Goldwyn-Mayer Studios*, 454 F.Supp.2d at 973 (overruling hearsay exceptions to emails, business plans, and presentations generated by defendants); *U.S. v. Pacific Gas and Electric Co.*, 178 F. Supp. at 964 (overruling hearsay objections to documents bearing defendant's logo).

by the NFL involve the business records hearsay exception rather than the admissibility of party-opponent statements and ones where authenticity has never been questioned.

Nor is a sponsoring witness necessary to lay a foundation to admit statements by the NFL's coconspirators (*i.e.*, DirecTV, CBS, and FOX) "during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Plaintiffs need only show the existence of a conspiracy by a preponderance of the evidence, *see Bourjaily v. U.S.*, 483 U.S. 171, 175 (1987), and Plaintiffs can lay this foundation using "evidence independent of the challenged statements[.]" *See U.S. v. Town of Colorado City*, 935 F.3d 804, 812 (9th Cir. 2019).[21]

## 11.  <u>WITNESS LISTS</u>

Witness lists of the parties have been filed with the Court. *See* Dkt. No. 1298 (Amended Joint Witness List).

Only the witnesses identified in the lists will be permitted to testify (other than solely for impeachment).

Each party intending to present evidence by way of deposition testimony has marked such depositions in accordance with L.R. 16-2.7. For this purpose, the following depositions shall be lodged with the Clerk as required by L.R. 32-1:

- *Deposition Designations by Plaintiffs*: James Dyckes, Alex Kaplan, Robert Stecklow, Michael White, Frank Hawkins, Jerry Jones, Robert Kraft, Brent Lawton, Sean McManus, Brian Rolapp (individually and as corporate representative of the NFL Defendants), Hans Schroeder (individually and as corporate representative of the NFL Defendants),

---

[21] Defendants' criticism of Plaintiffs' reliance on *Safavian* is also inapposite. As Defendants point out, the documents in question in that case were not "otherwise admissible." Here, however, the documents ***are*** otherwise admissible as Plaintiffs demonstrate above and where Plaintiffs also have business records affidavits on file.

Paul Tagliabue, Brian Siebenburgen (as corporate representative of Goldman Sachs), and Stephen Smith (as corporate representative of Apple);

- *Deposition Designations by the NFL Defendants*: Chase Carey, Jon Cruz, James Dyckes (individually and as corporate representative of DirecTV), Frank Hawkins, Jerry Jones, Alex Kaplan, Robert Kraft, Brent Lawton, Burke Magnus, David Pietrycha, Hans Schroeder, Robert Thun (individually and as corporate representative of DirecTV), Justin Smith, Michael White, and Daniel York.

Each party reserves the right to serve deposition designations for witnesses on their respective witness lists that are currently expected to appear live at trial in the event that the witness becomes unavailable.

## A.   Plaintiffs' Objections and Defendants' Response

Plaintiffs' Objections: Plaintiffs object to the NFL's presentation of testimony by deposition of Hans Schroeder as Plaintiffs have properly served a subpoena to Mr. Schroeder to appear live at trial. Defendants have filed a motion to quash that subpoena, which is currently pending before the Court. To the extent the motion is denied and Mr. Schroeder appears live, then the NFL should not be permitted to present any of his deposition testimony because he will not be considered unavailable under Federal Rule of Civil Procedure 32 and no other provision in Rule 32 permits the use of that deposition testimony.

Defendants' Response: In the event that Mr. Schroeder is compelled to testify live at trial, which Defendants maintain is inappropriate, the NFL would not seek to present his testimony by deposition.

## B.   Defendants' Objections and Plaintiffs' Response

<u>Defendants' Objections</u>: The NFL Defendants object to the presentation of testimony by deposition of the following witnesses[22]:

- Brian Rolapp 30(b)(1) deposition (May 18, 2022)
- Brian Rolapp 30(b)(6) deposition on behalf of the NFL (December 14, 2023)
- Robert Kraft deposition from the case *Shaw v. Dallas Cowboys Football Club, Ltd.*, E.D. Pa. 97-CV-5184 (May 5, 2000)
- Paul Tagliabue deposition from the case *Shaw v. Dallas Cowboys Football Club, Ltd.*, E.D. Pa. 97-CV-5184 (June 22, 2000)
- Stephen Smith 30(b)(6) deposition on behalf of Apple, Inc. (January 11, 2024)
- Brian Siebenburgen 30(b)(6) deposition on behalf of Goldman Sachs & Co. LLC (March 13, 2024)

The NFL Defendants object to the presentation of Mr. Rolapp's deposition testimony because he is appearing live at trial in Plaintiffs' case-in-chief. Presenting Mr. Rolapp's testimony in multiple ways—once live, once by video presentation of excerpts of his May 2022 deposition, and once by video presentation of his December 2023 30(b)(6) deposition—would be cumulative and confusing to the jury. Plaintiffs can examine Mr. Rolapp live on any issue covered during his prior depositions, and it is unclear why it makes sense for them to try to shorten his live testimony in favor of playing video about topics he can be questioned about in person. Given the preference for live testimony and the cumulative nature of the deposition testimony, the Court should deny presentation of testimony from either of Mr. Rolapp's two depositions, except for impeachment

---

[22] To the extent that Plaintiffs seek to play deposition testimony of any other witnesses who will testify live at trial, the NFL Defendants reserve the right to object to the presentation of that deposition testimony by video (except for impeachment), because doing so would violate Rule 32 and/or would be cumulative and confusing to the jury.

purposes. *See, e.g., Corcoran v. CVS Pharmacy, Inc*., 2021 WL 1721056, at *5 (N.D. Cal. Apr. 30, 2021), *aff'd sub nom.*, 2022 WL 17430289 (9th Cir. Dec. 6, 2022) (denying presentation of 30(b)(6) video testimony where witnesses were available to testify live); *Rigsbee v. City & Cnty. of Honolulu*, 2019 WL 1089636, at *2 (D. Haw. Mar. 7, 2019) (same); *Mighty v. Miami-Dade Cnty.*, 2021 WL 4022616, at *8–9 (11th Cir. Sept. 3, 2021) (upholding district court decision to "preclude[] [the p]laintiff from using deposition testimony as a substitute for live testimony from an available witness").

The NFL Defendants further object to the presentation at trial of Mr. Kraft's and Mr. Tagliabue's deposition testimony given in a different case about a different set of agreements operative more than 20 years ago, well before the class period in this case began. Mr. Kraft and Mr. Tagliabue were also deposed by Plaintiffs in this case, and Plaintiffs have designated portions of that testimony for trial in this case as well. Presenting additional testimony from those same witnesses from a separate case—which would have to be read to the jury as the parties do not have access to video files from the Shaw depositions—would be cumulative and confusing to the jury. *See Medline Indus., Inc. v. Kimberly-Clark Corp*., 2019 WL 12518593, at *3 (N.D. Ga. Apr. 2, 2019) (denying admission of witnesses' deposition testimony from a prior case under Rule 32(a)(8) where those witnesses were noticed for deposition in the current case). Moreover, the Court recently "exclude[d] evidence of *Shaw*" (Dkt. No. 1304), the case in which these depositions were taken. But more generally, reading from depositions that pre-date the present case will risk the jury becoming aware that the NFL was subject to similar prior litigation, which would not only to confuse the jury, but prejudice the NFL by creating an implication of Defendants' liability based on prior litigation. The Court should deny presentation of Mr. Kraft's and Mr. Tagliabue's deposition testimony from the Shaw litigation.

1    The NFL Defendants also object to presentation at of testimony by

2   deposition by Apple's and Goldman Sachs' 30(b)(6) designees for reasons

3   explained *supra*, at 49-51.

4    <u>Plaintiffs' Response</u>: Regarding Mr. Rolapp, his appearance as live witness at

5   trial does not preclude Plaintiffs from designating portions of his depositions.

6   Federal Rule of Civil Procedure 32(a)(3) makes that clear, as it permits Plaintiffs to

7   use Rolapp's deposition "for any purpose" because he is an officer and managing

8   agent of the NFL and is not based on whether he is unavailable or not. The NFL

9   does not dispute that.

10    The Court should follow the majority of courts that have considered this

11   question and exercise its discretion to permit designations. *See  Bos. Sci. Corp. v.*

12   *Cook Med. LLC*, 2023 WL 3604030, at *6 (S.D. Ind. May 22, 2023) ("the Court

13   will not categorically and preliminarily preclude Plaintiffs from using Ms. Smith's

14   deposition testimony even though she will testify live at trial"); *Keawsri v. Ramen-*

15   *Ya Inc.*, 2022 WL 2391692, at *2 (S.D.N.Y. July 1, 2022) (rejecting argument that

16   deposition excepts should be precluded because witness would be testifying live);

17   *Capitol Recs., Inc. v. MP3tunes, LLC*, 2014 WL 503959, at *16 (S.D.N.Y. Jan. 29,

18   2014) (same); *Luxco, Inc. v. Jim Beam Brands Co.*, 2016 WL 6193794, at *1 (N.D.

19   Ill. Oct. 24, 2016) (granting request to introduce deposition testimony of live

20   witnesses; *Parr v. Sunbeam Prods., Inc.*, 2009 WL 10682255, at *3 (C.D. Ill. Oct.

21   5, 2009) (permitting deposition testimony of live witness under Rule 32(a)(3)).

22   There is no confusion inherent in presenting testimony from a witness through more

23   than one medium.

24    The key inquiry, as recognized by these cases and those cited by the NFL, is

25   preventing repetitive testimony.  There is no danger of that here, as Plaintiffs seek

26   to designate portions of Rolapp's testimony for the express purpose of limiting the

27   scope of his live examination before the jury.

28

Regarding the depositions from *Shaw*, the NFL does not contest that the depositions of Kraft and Tagliabue are admissible under Federal Rule of Civil Procedure 32(a)(8). Nor could it. There is a "substantial identity of issues" between the prior depositions and the instant action such that the NFL had a "similar enough opportunity and motive in the prior litigation to be expected to defend its interests via cross-examination." *Travelers Prop. Cas. Ins. Co. v. Electrolux Home Prod. Inc.*, 2013 WL 12114615, at *2 (C.D. Cal. June 7, 2013) (denying Defendant's motion *in limine* to preclude prior deposition testimony); *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 2017 WL 1436080, at *3 (N.D. Cal. Apr. 24, 2017) (granting Plaintiff's motion *in limine* to admit prior deposition testimony).[23] Both Kraft and Tagliabue gave testimony in *Shaw* about the Sunday Ticket package, the NFL's authority to set prices for the Sunday Ticket package, and the NFL's relationship with the broadcast networks, among other topics that bear on this lawsuit. Moreover, both testified as to aspects of the NFL-Teams agreement whereby the teams pooled their television rights to the league that is entirely distinct from the former agreements with DirecTV. The NFL—then represented by Covington, which continues to represent the NFL—had the same motivation to elicit testimony as here, because *Shaw* was a class action antitrust lawsuit concerning the NFL's pooling of broadcast rights to sell a package to DIRECTV.

The proposed testimony is also consistent with Rule 403. Plaintiffs' designations of the testimony from *Shaw* are not cumulative of Plaintiffs' designations of depositions in this case. That is precisely why Plaintiffs seek to introduce the testimony here. Courts have admitted the use of prior deposition testimony even when the witness-in-question was re-deposed in that case. *See*

---

[23] *Medline Indus., Inc. v. Kimberly-Clark Corp*., 2019 WL 12518593, at *3 (N.D. Ga. Apr. 2, 2019), the single case cited by the NFL, is no different. *Medline* is a pre-discovery holding that depositions taken in a prior action qualify as being taken in the instant action while excluding three depositions that had already been noticed.

*Cloud v. Fl. Dep. of Corrections*, 2020 WL 12182757, at *1, 8 (favorably citing to the Ninth Circuit's *Hub* opinion and permitting the use of a prior deposition of Defendants' employee despite his deposition having been taken in instant matter). In *Cloud*, the Court focused on the fact that the witnesses whose testimony was designated were unavailable for trial.  So too here, as the NFL has refused to bring either Kraft or Tagliabue as witnesses.

Nor does the admission of prior testimony run afoul of the Court's ruling precluding Plaintiffs from introducing evidence of *Shaw.* Dkt. 1304. The Court precluded any evidence of *Shaw* given the danger that the jury could be confused by testimony about the applicable law, particularly the scope of the Sports Broadcasting Act. The admission of prior testimony creates no such danger as Plaintiffs intend to introduce these depositions as prior testimony in an earlier proceeding without any reference to *Shaw* or what the case was about. Nor does the testimony designated by Plaintiffs refer to the Sports Broadcasting Act. There is no reason to expand the scope of the Court's order so as to exclude these depositions.

The NFL's attempt to reject designated testimony of the corporate representatives from Apple and Goldman are nothing but a repackaging of arguments that this Court rejected **on multiple occasions** during discovery, as explained *supra* at 51-52.

## 12.   <u>LAW AND MOTION MATTERS</u>

The following law and motion matters and motions in limine, and no others, are pending:

- NFL Defendants' Motion in Limine No. 5 to Exclude Certain Opinions of Daniel A. Rascher (Dkt. No. 1118);
- NFL Defendants' Motion in Limine No. 6 to Exclude Certain Opinions of J. Douglas Zona (Dkt. No. 1122); and

- NFL Defendants' Motion to Quash Plaintiffs' Trial Subpoena (Dkt. No. 1294).
- Issues of law raised in Plaintiffs' Memorandum of Contentions of Fact and Law, Dkt. No. 1187, including:
  - Whether the "quick look" form of the rule of reason applies in this case;
  - The appropriate burden-shifting framework in applying the rule of reason under the Ninth Circuit's decision in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), whether under the "full" rule of reason or the "quick look" form of the rule of reason;
  - Whether Plaintiffs' claims are barred by the Sports Broadcasting Act;
  - Whether the single entity doctrine applies[24]; and
  - Whether to grant injunctive relief.[25]
- Issues of law raised in Defendants' Memorandum of Contentions of Fact and Law, Dkt. No. 1185, including:
  - Whether, under Ninth Circuit precedent, Plaintiffs are precluded from presenting their Section 2 claim to the jury, given that their Section 2 claim is entirely duplicative of their Section 1 claim, *see FTC v. Qualcomm Inc.*, 969 F.3d 974, 991–992 (9th Cir. 2020);

---

[24]  The NFL Defendants object to the inclusion of the single-entity issue as a question before the Court at the Pretrial Conference.  This Court has already ruled that the jury will decide at trial whether the NFL and its member clubs are capable of concerted action under Section 1.  *See* Dkt. No. 1155 at 27.

[25]  The NFL Defendants object to the inclusion of injunctive relief as a question before the Court at the Pretrial Conference.  It will be decided by the Court following the trial, if the jury returns a finding of liability on either of Plaintiffs' claims.  *See., e.g.*, *In re Google Play Store Antitrust Litig.*, 3:21-md-02981-JD, Dkt. No. 917 at 2 (explaining process for post-trial proceedings on injunctive relief).

- o   Whether Plaintiffs have abandoned the alleged submarket for "out-of-market" NFL games; and

- o   Whether the Court should apply the ordinary Rule of Reason analysis, or (as Plaintiffs contend) should instead apply "quick look" review.

The parties disagree regarding two trial presentation issues to be resolved by the Court: (a) the manner of playing deposition videos; and (b) the advance disclosure of exhibits for adverse witnesses called live during Plaintiffs' case in chief. The parties' positions are described below:

### A.   Manner of Playing Deposition Videos

_Plaintiffs' Position_

The parties disagree regarding the manner of playing deposition videos at trial. Where both sides intend to offer deposition testimony of a witness, Plaintiffs' position is that each party's affirmative deposition designations (together with proper Rule 106 designations made by the opposing party for optional completeness) should be played separately during each party's case in chief. Defendants, however, argue that the videos should be played as a single video _during Plaintiffs' case in chief_. "[B]asic fairness in the presentation of evidence forecloses Defendants from playing affirmative deposition designations in the [Plaintiffs'] case-in-chief." _In re Zetia (Ezetimibe) Antitrust Litig._, 2023 WL 4156858, at *3 (E.D. Va. Apr. 5, 2023) (granting plaintiffs' motion in limine to preclude defendants' affirmative deposition designations from being played in plaintiffs' case-in-chief).

Defendants seek to take advantage of the asymmetric availability of witnesses. Outside of the class representatives, who have no personal knowledge of the defendants' conduct, all of the key fact witnesses in this case are NFL witnesses or those aligned with the NFL as its business partners (such as DirecTV, CBS, and Fox). For example, the NFL has indicated that Sean McManus—the president of

64

CBS Sports and who resides outside of subpoena range for Plaintiffs—will appear live in the NFL's case in chief. The result of this asymmetry is that Plaintiffs are relegated to presenting much of their case through deposition testimony.

Because Plaintiffs are relegated to playing deposition videos (which Plaintiffs intend to edit to be short and to the point for the benefit of the jury), the Defendants should not be permitted to dilute and distract from Plaintiffs' presentation by adding much more testimony Defendants seek to have presented during Plaintiffs' case in chief. Requiring a single video to be played will only compound jury confusion and boredom: when a single video is played, there is nothing to indicate what specific testimony is being offered by which side. As a result, the jury is left without a clear understanding of what testimony is being offered by Plaintiffs and which is offered by Defendants. Moreover, a combined much longer video could certainly prejudice Plaintiffs by causing the jury—with the video being played during Plaintiffs' case in chief—to think that Plaintiffs are wasting their time.

There is also no prejudice whatsoever in playing separate videos in each side's case in chief. While there may be circumstances where a live witness should only be called to testify once during trial for the convenience of the witness, that is **not** an issue with deposition videos. There is no live witness whose schedule must be accommodated when their deposition video is being played. With deposition videos, no witness is being asked to come back twice. And each side will still have the same amount of deposition video time to play whether bunched together or as separate videos. Deposition videos may be played at the push of a button: when Plaintiffs play their video, their hot-seat operator need only push a button. The same is true for Defendants.

While this Court has discretion, Plaintiffs bear the burden of proof and respectfully request that they be allowed to present their case to the jury in a tight and clear manner—and one which in no way causes the Defendants any prejudice.

*Defendants' Position*

The NFL Defendants take the position that witnesses whose testimony will be presented by video deposition should be presented to the jury once, just as they would be if they were appearing live.  Thus, each witness's deposition testimony—regardless of which party has designated that testimony—should be played once, in chronological order, by the party first offering the witness's testimony into evidence.

Plaintiffs do not appear to dispute that live witnesses should be examined in a single, continuous block of time, regardless of whether the live witness is called in Plaintiffs' or Defendants' case-in-chief.  There is no reason to part course for deposition testimony.  Playing the witness's testimony all at once will streamline the presentation and help the jury's understanding of the full scope of that witness's testimony. It will also avoid juror confusion about which witnesses said what, and when, given how many witnesses will be testifying via deposition in this case.  By contrast, Plaintiffs' proposal to play each witness's deposition video twice, with some of a witness's testimony played during their case-in-chief and the remainder later during Defendants' case-in-chief, would confuse the jury, complicate the presentation of evidence, and create needless inefficiencies and additional work for the parties and the Court.  And Plaintiffs' concern about jurors lacking a clear understanding of what testimony is being offered by which party is without merit—for reasons explained, federal courts in complex cases regularly decide to play all the designations from one deposition at the same time during trial.  *See, e.g.*, Order No. 62 at 3, *In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis with Kinectiv Tech. & Versys Femoral Head Prods. Liab. Litig*, No. 18-md-02859 (S.D.N.Y. July 8, 2021), Dkt. No. 448 (playing the witness's testimony once is "more efficient and will minimize juror confusion"); *see also Wanke Cascade Distrib. Ltd. v. Forbo Flooring, Inc.*, 2017 WL 2403039, at *2 (D. Or. May 4,

2017) ("[T]he court prefers deposition testimony offered by both parties from a single witness be combined and read together.").

Further, playing the videos all at once also avoids needless work for the parties and the Court. Under Plaintiffs' approach, there would inevitably be arguments about whether certain testimony is properly a "counter" (that could be played along with the original video) or an "affirmative" (that should be reserved for the other side's case-in-chief). These arguments would serve no practical purpose—at the end of the day, all the testimony would go before the jury.

Lastly, Plaintiffs' claim that they are disadvantaged by "the asymmetric availability of witnesses" lacks merit. The majority of fact witnesses will appear in *Plaintiffs'* case, including those associated with the NFL. In their case-in-chief, Plaintiffs will have the opportunity to examine Brian Rolapp; Steven Bornstein; and Larry Jones, former Executive Vice President of FOX Sports. If anything, the asymmetry is tilted towards Plaintiffs, and is neither outweighed by a few hours of deposition testimony nor justifies creating the confusion explained above. The most efficient and sensible approach, therefore, is to play each deposition video once by the party first offering the witness's testimony into evidence.

**B.   Advance Disclosure of Exhibits for Adverse Witnesses**

*Plaintiffs' Position*

The parties have generally agreed on a protocol for disclosing witnesses and exhibits but dispute the applicability of that protocol for adverse witnesses called during Plaintiffs' case in chief. Now, contrary to the parties' agreement and the NFL's prior representations to the Court, the NFL claims that both sides should disclose all exhibits in advance for such adverse witnesses. To put this into context, it is helpful to see what the parties previously agreed to:

- The NFL agreed with Plaintiffs that trial exhibits used during a <u>direct</u> examination shall be disclosed 48 hours in advance. The NFL does not dispute that.

- The parties agreed, as is customary, **not** to disclose any exhibits to be used during cross examination in advance. *See, e.g.*, Dkt. No. 1185 at 21 ("Defendants do not take the position that all exhibits on cross-examination . . . must be disclosed in advance."). Moreover, the NFL acknowledged to the Court that an adverse examination is the functional equivalent of a cross examination. *See id.* ("It appears that Plaintiffs are in agreement that the … live NFL witness on both sides' list, Brian Rolapp, will testify once in Plaintiffs' case, **with Plaintiffs cross-examining first**.") (emphasis added).

- The parties further agreed that adverse witnesses called during Plaintiffs' case in chief need only testify once at trial and the NFL may conduct a full direct examination for those witnesses after the conclusion of Plaintiffs' questioning. *See id.* (. . . "will testify once in Plaintiffs' case, with Plaintiffs cross-examining first and no scope limits on Defendants' subsequent examination.").

Despite these agreements and representations to the Court, the NFL has now taken contradictory positions on the application of these agreed-to protocols for adverse witnesses (predominantly NFL executives) called live during Plaintiffs' case in chief. In January 2024, the NFL took the position that—if Plaintiffs were not required to disclose exhibits used on cross for this set of witnesses—then it should not have to disclose any either. Now, the NFL has flip-flopped to take the position that both sides should disclose in advance all exhibits used with these witnesses.

Not only does the NFL's current position contradict its prior agreements, but it is improper. Trial is an adversarial process and there is nothing more adversarial at trial than cross examination. There is no rule that requires advance disclosure of exhibits intended for cross examination. In fact, courts regularly exempt from advance disclosure exhibits intended for use on cross examination. *See, e.g.*, *Microspheriz LLC v. Merck Sharp & Dohme Corp.*, 2023 WL 6613306, at *14

(D.N.J. Oct. 5, 2023) ("The advanced notification provision for exhibits does not apply to exhibits to be used during cross-examination, whether for impeachment *or to be offered into evidence*.") (emphasis added); *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 2017 WL 525668, at *2 (D. Del. Feb. 8, 2017) (adopting proposal "that specific exhibits to be used for cross-examination need not be disclosed the day before a witness is expected to testify"). Additionally, while any counsel preparing for cross examination will have some idea which lines of questioning they intend to pursue, the reality is that, unlike a direct examination that is often pre-planned, plans change. Thus, it is not practical to expect to know every exhibit that may be used in a cross examination in advance. And while Defendants point out that Plaintiffs "could have chosen to wait until the NFL's case-in-chief to cross-examine" its witnesses, that argument ignores the fact that Plaintiffs bear the burden of proof.

Plaintiffs respectfully request that the Court order the parties to comply with a compromise proposal made by Plaintiffs to the NFL. To the extent the NFL intends to stay within the scope of Plaintiffs' adverse examination, the NFL is free not to disclose its direct exhibits in advance. ***But*** if the NFL intends to go outside the scope of Plaintiffs' adverse examination—and thereby treat their examination as a true direct examination—then it should disclose all exhibits for that witness 48 hours in advance in accordance with the parties' prior agreement.

*Defendants' Position*

As Plaintiffs note, the parties have agreed on a protocol for disclosing witnesses and exhibits on direct examination during trial. But Plaintiffs have taken the position that the protocol should not apply to any NFL witnesses who Plaintiffs plan to call affirmatively in their case-in-chief.  The NFL Defendants disagree. Plaintiffs could have chosen to wait until the NFL's case-in-chief to cross-examine these NFL witnesses.  But they have opted otherwise, and have made the choice to affirmatively call these NFL during *their* case.  Notably, none of these NFL

witnesses are within the Court's subpoena power, so they will only appear live during Plaintiffs' case-in-chief because the NFL Defendants have agreed to make them available. There is no sound reason to have different disclosure rules for certain witnesses that Plaintiffs are calling in their case-in-chief simply because they are affiliated with the NFL, and Plaintiffs cite to no case suggesting otherwise.

And now it appears Plaintiffs hope to exploit a loophole, created by NFL Defendants agreeing to make those witnesses available during Plaintiffs' case, to get access to documents underlying NFL Defendants' planned examinations before Plaintiffs' examination. Contrary to Plaintiffs' suggestion, that is not how the adversarial process is supposed to work. Because those witnesses will be questioned first by Plaintiffs, requiring the NFL Defendants (and only the NFL Defendants) to disclose their exhibits prior to Plaintiffs' examination would give Plaintiffs an unfair, asymmetric advantage. *See* Defendants' Memorandum of Contentions of Fact and Law, Dkt. No. 1185, at 21–22. Defendants believe the appropriate course is for both sides to disclose their exhibits for these examinations. *See* Defendants' Memorandum of Contentions of Fact and Law, Dkt. No. 1185, at 21–22.

In an attempt to bridge the difference with Plaintiffs, the NFL Defendants suggested that the appropriate course is for both sides to simultaneously disclose their exhibits for these examinations. *See* Defendants' Memorandum of Contentions of Fact and Law, Dkt. No. 1185, at 21–22. Doing so would eliminate any asymmetric advantage for either party. It would also minimize any evidentiary issues that might arise *during* the examination of these witnesses.

On the other hand, Plaintiffs' "compromise" proposal, that NFL Defendants be excused from having to disclose exhibits for the NFL witness called in Plaintiffs' case-in-chief so long as the NFL Defendants agree to stay within the scope of Plaintiffs' adverse examination, is nonsensical. If Plaintiffs will not disclose their intended exhibits for their "adverse examinations" in advance, then

the NFL Defendants cannot know what the scope of Plaintiffs' exam will be.  It would be impossible for the NFL Defendants to agree to stay within some unknown scope, when the only reason that NFL Defendants are questioning second is because of NFL Defendants' helpful agreement to make its own employees available during Plaintiffs' case.

### C. Confidentiality Issues

The parties, as well as third parties who have produced documents in this litigation and whose information may be contained in other parties' documents, have been meeting and conferring about how to address potential confidentiality issues at trial.  Plaintiffs and the NFL Defendants understand that the third parties may request an opportunity to be heard on confidentiality issues at the upcoming pretrial conference.    Plaintiffs disagree with third parties interrupting the proceedings in the final pretrial conference and have expressed that third parties should pursue normal motion practice on any such issues. The NFL Defendants defer to the Court on whether such an appearance is appropriate.  The parties will continue to work together, including with the third parties, to try to reduce disputes needing court resolution, consistent with governing law regarding confidentiality at trial.

### 13.   **BIFURCATION**

Bifurcation of the following issues for trial is ordered: None

### 14.   **PLEADINGS**

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial Conference Order shall supersede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

Dated: _____                    _____
                                                PHILIP S. GUTIERREZ
                                                United States District Judge

Approved as to form and content.

Dated: May 10, 2024

By:    /s/ *Marc M. Seltzer*

SUSMAN GODFREY L.L.P.
Marc M. Seltzer
William C. Carmody, *Admitted PHV*
Kalpana Srinivasan
Ian M. Gore, *Admitted PHV*
Amanda Bonn
Seth Ard, *Admitted PHV*
Tyler Finn, *Admitted PHV*
Eliza Finley

HAUSFELD LLP
Scott Martin, *Admitted PHV*
Sathya S. Gosselin
Christopher L. Lebsock
Farhad Mirzadeh, *Admitted PHV*
Samuel Maida

LANGER GROGAN AND DIVER PC
Howard Langer, *Admitted PHV*
Edward Diver, *Admitted PHV*
Peter Leckman
Kevin Trainer, *Admitted PHV*

*Plaintiffs' Co-Lead Counsel*

By:    /s/ *Beth A. Wilkinson*

WILKINSON STEKLOFF LLP
Beth A. Wilkinson, *Admitted PHV*
Brian L. Stekloff, *Admitted PHV*
Rakesh N. Kilaru, *Admitted PHV*
Jeremy S. Barber, *Admitted PHV*
Anastasia M. Pastan, *Admitted PHV*
Blake Neal, *Admitted PHV*
Jennifer H. Pavelec, *Admitted PHV*
Max J. Warren, *Admitted PHV*
Roxana C. Guidero

COVINGTON & BURLING LLP
Gregg H. Levy, *Admitted PHV*
Derek Ludwin, *Admitted PHV*
John S. Playforth, *Admitted PHV*
Neema T. Sahni

*Counsel for Defendants National Football
League, NFL Enterprises LLC, and the
Individual NFL Clubs*

73