Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max J. Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 10th Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5429
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football
League, NFL Enterprises LLC, and the
Individual NFL Clubs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No. 2:15-ml-02668−PSG (SKx) |
| _____ | **DEFENDANTS' DISPUTED FINAL JURY INSTRUCTIONS** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Judge: Hon. Philip S. Gutierrez<br>Trial Date: June 5, 2024<br>Courtroom: First Street Courthouse<br>350 West 1st Street<br>Courtroom 6A<br>Los Angeles, CA 90012 |

# INDEX OF DEFENDANTS' PROPOSED FINAL INSTRUCTIONS

| NO. | TITLE | SOURCE | PAGE |
|---|---|---|---|
| **FINAL INSTRUCTIONS** | | | |
| 27 | Two or More Parties—Different Legal Rights | 9th Cir. § 1.8 | 1 |
| 28 | Corporate Entities | 9th Cir. § 4.1; ABA Antitrust 2-A-3; Cases | 4 |
| 34 | Expert Opinion | 9th Cir. § 2.13 | 8 |
| 37 | Sports Broadcasting Act Exemption | Cases | 11 |
| 38 | Plaintiffs' Claims | Cases | 16 |
| 39 | Sherman Act Section 1 | ABA Antitrust 1-B-2 | 22 |
| 40 | Existence of a Contract, Combination, or Conspiracy | ABA Antitrust 2-A-1; Cases | 25 |
| 45 | Participation and Intent | ABA Antitrust 2-A-4 | 33 |
| 46 | Single Entity | Cases | 38 |
| 47 | Rule of Reason—Overview | ABA Antitrust 1-C-3A; Cases | 47 |
| 48 | Relevant Product Market | ABA Antitrust 3-A-3, 3-A-4 | 53 |
| 49 | Rule of Reason—Proof of Competitive Harm | ABA Antitrust 1-C-3B | 59 |
| 50 | Exclusive Licensing Agreements | 9th Cir. §§ 15.16, 17.13; ABA Antitrust 2-D-5, 4-A-1, 4-A-2; Cases | 64 |
| 51 | Rule of Reason—Evidence of Procompetitive Benefits or Rationales | ABA Antitrust 1-C-3C; Cases | 71 |
| 52 | Rule of Reason—Assessing the Procompetitive Benefits and Rationales | ABA Antitrust 1-C-3C; 1-C-3D Cases | 78 |
| 56 | Elements of Conspiracy to Monopolize | ABA Antitrust 3-E-1; Cases | 84 |
| 57 | Existence of a Conspiracy | ABA Antitrust 3- | 95 |

i

| NO. | TITLE | SOURCE | PAGE |
|---|---|---|---|
| | | E-2, 2-A-1; Cases | |
| 58 | Monopoly Power Defined | ABA Antitrust 3-E-3, 3-A-2; Cases | 99 |
| 62 | Willful Acquisition or Maintenance of Monopoly Power | ABA Antitrust 3-E-3, 3-A-9; Cases | 103 |
| 63 | Specific Intent | ABA Antitrust 3-E-4 | 110 |
| 65 | Injury and Causation | ABA Antitrust 6-A-1 | 115 |
| 66 | Business or Property | ABA Antitrust 6-A-2 | 121 |
| 67 | Relevant Time Period | ABA Antitrust 7-A-1; Cases | 124 |
| 68 | Antitrust Damages—Introduction and Purpose | ABA Antitrust 6-B-1 | 128 |
| 70 | Causation and Disaggregation | ABA Antitrust 6-B-4 | 131 |
| 71 | Damages for Purchasers—Overcharges Based on Horizontal Price Fixing, Output Restriction, Market Allocation, or Other Agreements Not to Compete | ABA Antitrust 6-B-5 | 137 |
| 72 | Damages for Purchasers—Class Damages | ABA Antitrust 6-B-7 | 140 |
| 74 | Mitigation | ABA Antitrust 6-B-14 | 145 |
| 75 | Direct Purchaser Requirement | Cases | 149 |
| 76 | Class-Wide Injury and Causation | Cases | 153 |

Case No. 2:15-ml-02668-PSG (SKx)                    Defendants' Disputed Final Jury Instructions

**FINAL JURY INSTRUCTIONS**

**INSTRUCTIONS ON THE TRIAL PROCESS AND EVIDENCE**

**INSTRUCTION NO. 27: TWO OR MORE PARTIES—DIFFERENT LEGAL RIGHTS**

You should decide the case as to each Plaintiff and each Defendant separately. Unless otherwise stated, the instructions apply to all parties.

**Authority:** MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 1.8 (Two or More Parties—Different Legal Rights) (9th Cir. Jury Instructions Comm. 2017 ed.).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 27: TWO OR MORE PARTIES—DIFFERENT LEGAL RIGHTS

Plaintiffs object to this instruction being read twice, first with the preliminary instructions, and then again with the final instructions. This instruction is duplicative and adds unnecessary length to the already substantial set of final instructions. Further, the Ninth Circuit model instructions do not contemplate reading this instruction twice.

2

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 27: TWO OR MORE PARTIES— DIFFERENT LEGAL RIGHTS

The Court should instruct the jury again at the end of the trial that the case must be decided separately as to each Plaintiff and each Defendant. The parties expect to present a substantial amount of complex evidence regarding both the multiple defendants in this case, as well as the many members of the two plaintiff classes, over the course of the 12-day trial. It is important that jury instructions "instruct the jury clearly regarding the law to be applied," *United States v. Lewis*, 53 F.3d 29, 34 (4th Cir. 1995), and "focus [the jury's] attention on the essential issues in the case," *United States v. Ribaste*, 905 F.2d 1140, 1143 (8th Cir. 1990), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997). Therefore, it is appropriate to remind the jury, after the close of evidence, that they have a duty to consider and weigh the evidence separately as to each of the parties.

## INSTRUCTION NO. 28: CORPORATE ENTITIES

In this case, some of the Plaintiffs and the Defendants are corporate entities. Under the law, a corporate entity is a person, but it acts only through its agents. A corporate entity's agents include its directors, officers, employees, or others acting on its behalf. A corporate entity is not capable under the law of conspiring with itself, including with its own agents, unincorporated divisions, or wholly owned subsidiaries. Through its agents, however, a corporate entity is capable of conspiring with other persons or independent corporate entities.

A corporate entity is legally bound by the acts and statements of its agents or employees done or made within the scope of the agent's employment or apparent authority.

Acts done within the scope of employment are acts performed on behalf of a corporate entity and directly related to the performance of the duties the agent has general authority to perform. Apparent authority is the authority that persons outside the corporate entity could reasonably believe the agent would have, judging from his or her position with the company, the responsibilities previously entrusted to the person or the office, and the circumstances surrounding his or her past conduct. An agent can have apparent authority even when, despite these appearances, the agent is actually acting in a dishonest, fraudulent, or anticompetitive manner.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT §§ 4.1 (Corporations and Partnerships—Fair Treatment), 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2–Section 1 of the Sherman Act—Contract, Combination, or Conspiracy, Instruction 3: Corporations (AM. BAR ASS'N ANTITRUST L. SECTION 2016); Final Jury Instructions Nos. 1-55 at

4

30 (Jury Instruction 25 re Sumotext's Claim 1: Sherman Act Section 1–Conspiracy to Restrain Trade: First Element: Existence of a Contract, Combination, or Conspiracy: Corporations), *Sumotext Corp. v. Zoove Inc.*, No. 5:16-cv-01370-BLF (N.D. Cal. Mar. 1, 2020), ECF No. 461.

5

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 28:**

**CORPORATE ENTITIES**

Plaintiffs object to this instruction because it does not include applicable language from the ABA Antitrust Model Jury Instructions. Plaintiffs intend to propose an amended version of Plaintiffs' Instruction No. 41 which incorporates language from Defendants' proposed instruction and other portions of ABA Antitrust 2-A-3.

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 28: CORPORATE ENTITIES**

Plaintiffs' only objection to Defendants' Instruction 28 is that it omits language from the ABA model. But Plaintiffs' Instruction 41 also excludes language from the model instruction, and they point to no specific, omitted language that is relevant to this case or should be included.

Defendants' proposal strikes the appropriate balance between the need to properly inform the jury as to the legal implications of having corporate entities as parties and streamlining the instruction so as not to include overly legalistic or unnecessary information. As the Ninth Circuit model instructions note, "[j]ury instructions are intended to give the jurors, in understandable language, information to make the trial more meaningful and to permit them to fulfill their duty of applying the law to the facts as they find them."

Defendants note that although they believe that the instruction that all corporate entities (both Plaintiffs and Defendants) are entitled to fair treatment should be given as part of the preliminary instructions, Defendants also have no objection to repeating that guidance during final instructions.

7

## INSTRUCTION NO. 34: EXPERT OPINION

You have heard testimony from experts who testified to opinions and the reasons for their opinions. This opinion testimony is allowed because of the specialized knowledge, skill, experience, training, or education of these witnesses.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

**Authority:** MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 2.13 (Expert Opinion) (9th Cir. Jury Instructions Comm. 2017 ed.).

1
2

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 34: EXPERT OPINION**

3
4
5
6
7

Plaintiffs object to this instruction being read twice, first with the preliminary instructions, and then again with the final instructions. This instruction is duplicative and adds unnecessary length to the already substantial set of final instructions. Further, the Ninth Circuit model instructions do not contemplate reading this instruction twice.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 34: EXPERT OPINION**

The Court should instruct the jury again at the end of the trial how to weigh expert opinions presented during the case. Plaintiffs offer no persuasive argument as to why certain instructions regarding the jury's review of the evidence should be presented again at the end of trial but not the instruction on expert opinions. *Cf.* Joint Proposed Final Jury Instrs., Stipulated Instrs. Nos. 25, 26, 29–33, 35. As explained in Defendants' Argument in Support of Defendants' Instruction 27, by the end of the 12-day trial, the jury will have heard a substantial amount of complex evidence regarding Plaintiffs' claims, and this instruction, like the others on how to consider various types of evidence, will be a helpful reminder to the jury of how to proceed with their deliberations.

# ANTITRUST LAW – INTRODUCTION

## INSTRUCTION NO. 37: SPORTS BROADCASTING ACT EXEMPTION

In 1961, Congress passed a statute, called the Sports Broadcasting Act, that provides that it is not a violation of the antitrust laws for a professional sports league to sell all or part of its telecast rights to broadcast networks like CBS and FOX. Accordingly, you cannot find the NFL or NFL Teams liable in any way for entering contracts with CBS and FOX to produce and distribute games on their free, over-the-air channels. But contracts or provisions in contracts involving the telecasting of games on cable or satellite TV are not included in the SBA, and must be analyzed separately.[1]

**Authority**: *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1358 (2d Cir. 1988) (upholding similar jury instruction as "consistent with the Sports Broadcasting Act"); 15 U.S.C. § 1291 (Sports Broadcasting Act of 1961); *In re Nat'l Football League's Sunday Ticket Antitrust Litig. ("Sunday Ticket")*, 933 F.3d 1136, 1149 n.4 (9th Cir. 2019) ("The defendants argue, and the plaintiffs do not dispute, that the NFL-Network Agreement[s] [are] covered by the SBA."); *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n ("Bulls I")*, 961 F.2d 667, 670 (7th Cir. 1992) ("Any transfer of broadcast rights entails exclusion of the competing uses of the same rights.").

---

[1] Defendants maintain that the SBA protects the aspects of the NFL's agreements with CBS and FOX that Plaintiffs challenge. *See* ECF Nos. 954, 984. Defendants offer this instruction only under protest and in accordance with the Court's summary judgment opinion. ECF No. 1155.

11

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 37: SPORTS BROADCASTING ACT EXEMPTION**

Plaintiffs object to this instruction in its entirety. The jury has no role in determining the applicability of the SBA to the challenged conduct. That is a question for the Court, which it already decided on summary judgment: "The SBA does not exempt the NFL-Network Agreements from antitrust scrutiny." Summary Judgment Opinion, Dkt. 1155 at 14.

Moreover, the instruction misstates the SBA, which immunizes from liability only "any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, ... by which any league of clubs participating in professional football ... contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football ... engaged in or conducted by such clubs." 15 U.S.C. § 1291. The SBA does not, as the NFL's instruction posits, provide complete immunity for any provision contained in an agreement to pool team rights for the purpose of sponsored television.

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 37: SPORTS BROADCASTING ACT EXEMPTION

Plaintiffs' objection to Defendants' proposed Instruction 37 misstates the law of this case. The Court should give Defendants' proposed instruction, which describes the SBA exemption consistently with this Court's summary judgment opinion, and provides guidance to the jury on an aspect of the antitrust laws directly relevant to their consideration of the case.

Plaintiffs suggest that the protections afforded by the SBA are not relevant to this lawsuit. That is not correct. Both Plaintiffs and this Court have recognized that significant aspects of the NFL's broadcasting model are protected by the SBA. For example, "no party disputes that the SBA grants the NFL and clubs the right to enter fully exclusive contracts with CBS and FOX for free, over-the-air broadcasting." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *11 (C.D. Cal. Jan. 11, 2024) (internal quotation marks omitted). Similarly, there is no dispute that the SBA "protects the NFL's collective sale of telecast rights to free, over-the-air television networks." *Id.* at *12. And while Plaintiffs insist that this Court's ruling took the SBA out of this case, its holding was much narrower: That "Plaintiffs' theories do not fail as a matter of law for being inconsistent with the SBA." *Id.* It is now up to the jury to decide, as a matter of *fact* whether Plaintiffs can prove their claims based on conduct that is not immunized by the SBA.

The jury should be instructed as to these effects of the SBA, such that they can appropriately focus on the question of whether other conduct, not protected by the SBA, unreasonably restrains competition. It is critical for the jury to receive instruction on the SBA exemption that applies to the NFL-Network Agreements, as Plaintiffs plan to present a theory to the jury that "the agreements with CBS and

13

Fox were part of the conspiracy to restrain competition outside of the protection of the SBA." ECF No. 964 (Plfs.' Mem. Opp. Defs.' Mot. Summ. J.) at 8–9.

Without an instruction on the SBA (or with Plaintiffs' proposed instruction on the SBA), there is a significant risk of confusion that the jury could believe that all aspects of NFL-Network Agreements are subject to antitrust challenge, opening the door to a jury finding that SBA-protected conduct is anticompetitive. Such a finding would violate not only the plain terms of the SBA, *see* 15 U.S.C. § 1291, but also the core purpose of the SBA, which is to afford certain protections to sports leagues for conduct that might otherwise be found to have an anticompetitive effect, *see Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n* ("*Bulls I*"), 961 F.2d 667, 670 (7th Cir. 1992) (Easterbrook, J.) ("To have any (antitrust) effect at all, the Act must allow the league to keep some games off the air."). Moreover, a jury verdict that imposes antitrust liability for both lawful conduct and allegedly unlawful conduct would violate the Supreme Court's ruling in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), which holds that models of injury and damages in class actions may not be used to impose liability for lawful conduct as well as allegedly unlawful conduct. *Id.* at 37–38.

Defendants' proposed instruction accurately reflects the Court's summary judgment order and would make clear to the jury that key aspects of the NFL-Network Agreements cannot be found unlawful. *See Sunday Ticket*, 2024 WL 168298, at *11–12; *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1147–49 & n.4 (9th Cir. 2019). The proposed instruction properly situates the SBA in the context of this Court's rulings in this case and protects against the risk of confusion described above.

Finally, the Second Circuit has upheld a similar jury instruction as "consistent with the Sports Broadcasting Act." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1358 (2d Cir. 1988) (upholding instruction that

1  "[I]n 1961 Congress passed a statute that provides that a contract between a

2  professional sports league and a television network for the sale of pooled telecast

3  rights is not a restraint of trade in violation of the antitrust laws. Accordingly, I

4  instruct you that the making of these contracts by the NFL with the television

5  networks constitutes the lawful acquisition of power, even if you were to find that

6  these contracts gave the NFL monopoly power, unless you found that the intent and

7  effect of these agreements is to exclude a competing league or its members from

8  selling any of their television rights." (cleaned up)).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

# INSTRUCTION NO. 38: PLAINTIFFS' CLAIMS

Plaintiffs allege two claims.

1. First, they allege that the NFL, the NFL Teams, and DirecTV entered into an unlawful conspiracy that unreasonably restrained trade in the alleged market for professional football telecasts in violation of Section 1 of the Sherman Act.

2. Second, they allege that the NFL, the NFL Teams, and DirecTV conspired to monopolize the alleged market for professional football telecasts in the United States, in violation of Section 2 of the Sherman Act.

I will now explain what Plaintiffs must establish by a preponderance of the evidence for each of their claims against Defendants.

**Authority**: Final Jury Instructions Nos. 1–55 at 27 (Jury Instruction 21), *Sumotext Corp. v. Zoove Inc.*, No. 5:16-cv-01370-BLF (N.D. Cal. Mar. 1, 2020), ECF No. 461; Final Jury Instructions at 4 (Jury Instruction No. 3), *In re Capacitors Antitrust Litigation*, No. 17-md-028010JD (N.D. Cal. Dec. 13, 2021), ECF No. 2899.

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 38:
## PLAINTIFFS' CLAIMS

Plaintiffs object to the NFL Defendants' proposed instruction 38 in its entirety.

First, the NFL Defendants' omission of the terms "agreement," "contract" and "combinations" risks giving the jury the false impression that it must find some sort of secret "conspiracy" to find for the Plaintiffs. The Sherman Act requires no such thing. Indeed, the notes to ABA-Antitrust-2-A-1 explain that the term "agreement" or "contract" should be substituted for "conspiracy" where the conduct is *not* per se unlawful.

Second, the NFL Defendants seek to delete all references to "agreement" from Plaintiffs' proposed instruction—a term that will help the jury in understanding Plaintiffs' claims at trial. That is how the Ninth Circuit and this Court have described Plaintiffs' claims. *See In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d 1133, 156 (9th Cir. 2019) ("We conclude that the complaint adequately alleges the element of injury to competition by alleging that the interlocking Teams-NFL and NFL-DirecTV Agreements injure competition."); Summary Judgment Order, Dkt. 1155 at 2 ("Plaintiffs assert that Defendants have conspired and entered a set of agreements with each other and their broadcast partners that suppress the output of telecasts of out-of-market professional football games."). The deletion of all references to the term "agreement" may mislead the jury into believing that only formal contracts not to compete—or conspiracies hatched in secret—are unlawful under the antitrust laws. The law says no such thing. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 113, 104 (1984) (holding that "television plan" constituted unreasonable restraint on competition); *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 310 (2d Cir. 2023) (finding public league "policy"

17

would qualify as anticompetitive restraint).

Third, Plaintiffs object to the addition of the phrase "*unlawful* conspiracy." Whether the agreements at issue here are "unlawful" is a legal conclusion. Section 1 prohibits contracts, combinations, conspiracies, or agreements that unreasonably restrain trade. There is no additional, threshold requirement of showing that the agreements are "unlawful." Plaintiffs need only show that they unreasonably restrain trade.

Fourth, Defendants' instruction omits *live* from the description of the relevant market.

Lastly, Plaintiffs' object to the last sentence as improperly shifting the burden of proof onto Plaintiffs on all elements of their claims, when the rule of reason involves a four-part burden-shifting framework. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023).

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 38: PLAINTIFFS' CLAIMS**

Defendants' proposed instruction offers a neutral summary of the claims at issue and tracks closely to comparable instructions in recent antitrust cases in this Circuit. Plaintiffs' objections are baseless and should be rejected.

*First*, Plaintiffs suggest that the use of the term "conspiracy" in this instruction is improper and that the term "agreement" must be included—either in addition to or instead of "conspiracy." This position, which Plaintiffs take throughout their objections, contradicts the model instructions and Plaintiffs' own theory of this case.

To start, Defendants' use of the term "conspiracy" is not an "omission," as Plaintiffs suggest—Defendants' proposal tracks directly to the Section 1 model instructions, which use the term "conspiracy" as the most common standard term throughout. MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2– Section 1 of the Sherman Act–Contract, Combination, or Conspiracy, Instruction 1: Definition, Existence, and Evidence. Nor do the notes to the model instruction support Plaintiffs' claim that the term "agreement" should be used instead of "conspiracy" here. Rather, the notes explain that the term "conspiracy" "may be prejudicial to *defendants* in [some] cases." (emphasis added). There is no such risk here, and Defendants propose an instruction using the term conspiracy, just as the Model envisions.

Moreover, it would be confusing and prejudicial to rely primarily on the term "agreement" before the jury, where Plaintiffs' theory depends on not one, but a *set* of "interlocking agreements." *See Sunday Ticket*, 933 F.3d at 1151; *In re NFL's Sunday Ticket Antitrust Litig.*, 2024 WL 2075095, at *3 (C.D. Cal. Apr. 26, 2024). The Ninth Circuit did not uphold Plaintiffs' challenges to any single commercial agreement; instead, it expressly premised its holdings on the understanding that

19

Plaintiffs challenged multiple "agreement[s], which work together *as a single conspiracy* to limit the output of NFL telecasts." 933 F.3d at 1157 (emphasis added). Plaintiffs likewise used similar language throughout this case. *See, e.g.*, Pls.' Mem. Opp. Defs.' Mot. Summ. J. at 8 ("This is not a new theory. Plaintiffs have consistently claimed that the agreements with CBS and Fox were part of *the conspiracy* to restrain competition[.]"); Compl. ¶ 46(g)–(j) (referring to their claims' in terms of "the alleged conspiracy").

Plaintiffs' new assertion that they do not challenge a "conspiracy"—but instead an "agreement"—attempts to reduce their burden and should be rejected. In particular, Plaintiffs should be held to their allegations that the challenged agreements in this case amounted to a "single conspiracy" because the Ninth Circuit upheld their standing to assert the damages claims they plan to pursue at trial only because they "allege[d] that [their] injuries were proximately caused by a *single conspiracy*." *Sunday Ticket*, 933 F.3d at 1157 (emphasis added). If not for that allegation, Plaintiffs would lack standing to challenge any agreement between the NFL and its member clubs because they did not purchase any product directly from any of those entities. *See id.* at 1156–58.

*Second*, Plaintiffs object to the use of the term "unlawful" to describe the conspiracies they allege. But this is language they themselves used in bringing these claims. Compl. ¶ 156 (alleging that Defendants "entered into an unlawful . . . conspiracy"). And the use of the term "unlawful" is accurate—the jury cannot find liability without finding that the conspiracy is an unlawful one. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203–04 (2010). It is accordingly no surprise that the use of the term "unlawful conspiracy" is commonplace in this Circuit. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022), *cert. denied sub nom. The Nat'l Ass'n of Realtors v. The PLS.com, LLC.*, 143 S. Ct. 567 (2023) (quoting *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939)); *William*

1  *O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 663 (9th Cir. 2009);

2  *Vizio, Inc. v. Funai Elec. Co.*, 2010 WL 7762624, at *4, 6 (C.D. Cal. Feb. 3, 2010);

3  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 WL 1429631, at *3 (N.D.

4  Cal. Mar. 29, 2019).

5      *Third*, Plaintiffs object to Defendants' description of the relevant market, but

6  Defendants' description is a direct quote from Plaintiffs' language from the Pretrial

7  Conference Order. *See* ECF No. 1331-1 at 13 ("Plaintiffs' evidence will also

8  demonstrate that a market exists for major league professional football telecasts in

9  the United States.").

10     *Finally*, this instruction does not burden-shift. It correctly asserts that

11  Plaintiffs bear the ultimate burden of proof on every element of their claims—the

12  rule of reason's burden-shifting framework does not relieve Plaintiffs of that

13  burden. *See, e.g.*, *Snapp v. United Transp. Union*, 889 F.3d 1088, 1102 (9th Cir.

14  2018) ("[B]urden-shifting frameworks . . . are merely analytical tools for focusing

15  arguments, they typically fall away at the end of the analysis and leave the ultimate

16  burden of proof (the burden of persuasion) on the plaintiff.").

17

18

19

20

21

22

23

24

25

26

27

28

**Case No. 2:15-ml-02668-PSG (SKx)**                          **Defendants' Disputed Final Jury Instructions**

## SECTION I CLAIM

## INSTRUCTION NO. 39: SHERMAN ACT SECTION 1

Plaintiffs challenge Defendants' conduct under Section 1 of the Sherman Act. Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, Plaintiffs must prove the following:

(1) the existence of a contract, combination, or conspiracy between or among the NFL, the NFL Teams, and DirecTV;

(2) that the contract, combination, or conspiracy unreasonably restrained trade; and

(3) that the restraint caused Plaintiffs to suffer an injury to their business or property.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1–Sherman Act—General, Instruction 2: Sherman Act Section 1 (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 39: SHERMAN ACT SECTION 1

Plaintiffs object to the omission of the term "agreement" from the preface and numbers (1) and (2) of the instruction for the reasons stated in Plaintiffs' objection to NFL Instruction No. 38. Plaintiffs further object to the use of the singular for contract, combination, or conspiracy (or agreement) as misstating the nature of Plaintiffs' claims—namely that *various* agreements work together to unreasonably restraint competition. *See* Summary Judgment Order, Dkt. 1155 at 2 ("Plaintiffs assert that Defendants have conspired and entered a set of agreements with each other and their broadcast partners that suppress the output of telecasts of out-of-market professional football games.").

23

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 39: SHERMAN ACT SECTION 1

As explained in full with respect to Defendants' Instruction 38, Plaintiffs' attempts to write the term "conspiracy" out of the jury instructions misrepresent the model instructions, and conflict with Plaintiffs' own allegations. Their attempt to do so in this instruction is even more egregious when compared to the underlying model instruction. Despite Plaintiffs' insistence that Defendants have "omi[tted]" the term "agreement," the word "agreement" does not appear anywhere in the model instruction. MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1–Sherman Act—General, Instruction 2: Sherman Act Section 1 (AM. BAR ASS'N ANTITRUST L. SECTION 2016). Nor are there any notes to this instruction suggesting that the term "agreement" could be appropriate here.

Plaintiffs' citations further emphasize why the use of the singular "agreement" would confuse the jury and conflict with Plaintiffs' own allegations. They point to this Court's Summary Judgment Order, which correctly characterized Plaintiffs' allegations as follows: "[T]hat Defendants have *conspired* and entered *a set of agreements* with each other and their broadcast partners." *See* Summary Judgment Order, Dkt. 1155 at 2 (emphases added). The use of the singular term "agreement" would deflect the jury from what Plaintiffs must actually prove—that a single overarching conspiracy links *multiple* agreements between Defendants and their broadcast partners. Plaintiffs have relied on precisely this theory throughout this case, *see, e.g.*, Pls.' Mem. Opp. Defs.' Mot. Summ. J. at 8 ("This is not a new theory. Plaintiffs have consistently claimed that the agreements with CBS and Fox were part of *the conspiracy* to restrain competition[.]"), and the jury instructions should reflect the theory that they have pursued.

24

## INSTRUCTION NO. 40: EXISTENCE OF A CONTRACT, COMBINATION, OR CONSPIRACY

Plaintiffs allege that the NFL, the NFL Teams, and DirecTV participated in an unlawful conspiracy to restrain competition in the market for professional football telecasts in the United States with the purpose, intent, and effect of unreasonably restraining trade and commerce and increasing prices paid by consumers of NFL telecasts in the United States.

Plaintiffs must first prove both of the following elements by a preponderance of the evidence:

(1) that the alleged conspiracy among the NFL, the NFL Teams, and DirecTV to restrain competition in the market for professional football telecasts in the United States existed; and

(2) that each Defendant and DirecTV knowingly became a member of that conspiracy. To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

A conspiracy is an agreement or understanding between two or more persons to unreasonably restrain trade. An agreement or understanding between two or more persons exists when they share a commitment to a common scheme to achieve an unlawful objective.

To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement. The agreement itself may have been entirely unspoken. A person can become a member without full knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts such members played in the charged conspiracy. The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. To prove a conspiracy existed, the evidence must

1   show that the alleged members of the conspiracy came to an agreement or

2   understanding among themselves to accomplish a common unlawful purpose.

3          A conspiracy may be formed without all parties coming to an agreement at

4   the same time. Similarly, it is not essential that all persons acted exactly alike, nor

5   is it necessary that they all possessed the same motive for entering the agreement. It

6   is also not necessary that all of the means or methods claimed by Plaintiffs were

7   agreed upon to carry out the alleged conspiracy, nor that all of the means or

8   methods that were agreed upon were actually used or put into operation, nor that all

9   the persons alleged to be members of the conspiracy were actually members. It is

10  the agreement or understanding to unreasonably restrain trade in the relevant

11  antitrust market for professional football telecasts in the United States that

12  constitutes a conspiracy. Therefore, you may find a conspiracy existed regardless of

13  whether it succeeded or failed.

14         Plaintiff may prove the existence of the alleged conspiracy through direct

15  evidence, circumstantial evidence, or both. Direct evidence is explicit and requires

16  no inferences to establish the existence of the alleged conspiracy. Direct evidence

17  of an agreement may not be available, and therefore a conspiracy also may be

18  shown through circumstantial evidence. You may infer the existence of a

19  conspiracy from the circumstances, including what you find the alleged members

20  actually did and the words they used. Mere similarity of conduct among various

21  persons, however, or the fact that they may have associated with one another and

22  may have met or assembled together, does not by itself establish the existence of a

23  conspiracy. If they acted similarly but independently of one another, without any

24  agreement among them, then there would not be a conspiracy.

25         In determining whether an agreement or understanding between two or more

26  persons has been proved, you must view the evidence as a whole and not

27  piecemeal.

28

**Authority**: Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); Model Jury Instructions in Civil Antitrust Cases, Chapter 2–Section 1 of the Sherman Act—Contract, Combination, or Conspiracy, Instruction 1: Definition, Existence, and Evidence (Am. Bar Ass'n Antitrust L. Section 2016); Final Jury Instructions at 35 (Instruction 26), *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981 (N.D. Cal. Dec. 6, 2023), ECF No. 850; Final Jury Instructions Nos. 1-55 at 30–31 (Jury Instruction 24); Final Jury Instructions Nos. 1-55 at 30–31 (Jury Instruction 24), *Sumotext Corp. v. Zoove Inc.*, No. 5:16-cv-01370-BLF (N.D. Cal. Mar. 1, 2020), ECF No. 461.

# PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 40: EXISTENCE OF A CONTRACT, COMBINATION, OR CONSPIRACY

Plaintiffs object to the NFL Defendants' proposed instruction number 40.

First, the exclusion of the terms "contracts," "combinations," and "agreements" in favor of "conspiracy" is misleading given the facts of this case. *See* ABA-JI-CIVANTI 2.A.1, notes. ("These instructions generally use the term 'conspiracy' to describe the alleged arrangement among defendants. Section 1 of the Sherman Act, however, proscribes contracts, combinations, and conspiracies in restraints of trade, and therefore the terminology of the instructions should be adjusted to fit the facts of a particular case.").

Second, Plaintiffs object to the NFL's inclusion of DirecTV where the model instructions call for a defendant. DirecTV is not a defendant at trial and instructing the jury to make findings about DirecTV may confuse the jury or lead to an improper inference about their absence from the courtroom. *See* Dkt. 1293 at 4 (granting "Plaintiffs' motion [in limine] to the extent that it limits both parties from mentioning the absence of Defendants' television partners or attempting to lead the jury to draw any inference from that fact"). The instruction is legally incorrect for the same reasons as it instructs the jury that Plaintiffs must establish DirecTV's knowing membership in a conspiracy to find any of the NFL Defendants liable.

Third, Plaintiffs also object to the description of Plaintiffs' claims. Defendants' insertion of the phrase "purpose, intent, and effect" creates a new object of proof that is found nowhere in the Sherman Act or the Model Instructions. The use of the "intent" is particularly problematic, as it purports to import an intent element into Section 1 of the Sherman Act. The description of anticompetitive harms also omits Plaintiffs' claims that the challenged agreements reduce output and responsiveness to consumer demand. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 106–07 (1984) ("The

28

anticompetitive consequences of this arrangement are apparent. Individual competitors lose their freedom to compete. Price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference. This latter point is perhaps the most significant …").

Fourth, Plaintiffs object to the repeated addition of the modifier "unlawful"--("unlawful conspiracy" and "unlawful purpose")--which is not in the ABA Model Instruction or in the text of the Sherman Act. Section 1 prohibits contracts, combinations, conspiracies or agreements that unreasonably restrain trade. There is no threshold requirement of showing that the agreements are "unlawful"; only that they unreasonably restrain trade. Similarly, the NFL Defendants improperly add that an agreement only exists if there is a "common scheme *to achieve an unlawful objective.*" This is an improper addition to the ABA Model Instruction which does not include "to achieve an unlawful purpose." *See* ABA-JI-CIVANTI 2.A.1. This addition conflicts with other portions of the same instruction, which state it is not necessary that all defendants "possessed the same motive for entering the agreement."

Fifth, the instruction adds to the ABA Model Instruction's list of elements that the object of the conspiracy was "to restrain the market." That addition risks jury confusion by conflating the first and second elements of a Section 1 claim.

29

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 40: EXISTENCE OF A CONTRACT,**

**COMBINATION, OR CONSPIRACY**

Plaintiffs' objections (i) to the use of "conspiracy," (ii) to the term "unlawful," and (iii) to the relevance of DirecTV in this suit—are addressed in Defendants' arguments in support of proposed Instructions 38, 39, and 75, respectively. Those arguments are incorporated in full here, and they demonstrate that Plaintiffs' claims are premised on the existence of a "conspiracy," *see Sunday Ticket*, 933 F.3d at 1157, that Plaintiffs' claims necessarily require the existence of an "unlawful" conspiracy, *see Am. Needle*, 560 U.S. at 202–04, and that Plaintiffs cannot pursue their damages claims relating to any agreement among the NFL and its member clubs absent proof that such agreements were part of a "single conspiracy" that DirecTV joined, *see Sunday Ticket*, 933 F.3d at 1156–58.

Plaintiffs next suggest that the Sherman Act does not require them to prove Defendants entered into a conspiracy "with the purpose, intent, and effect of unreasonably restraining trade." But that is language that they themselves have used to describe their claims. Compl. ¶ 156. Moreover, Defendants' instruction accurately summarizes Plaintiffs' Section 1 claim by laying out the requirements to (i) establish a conspiracy, and (ii) prove that it is an unlawful one. As this Court has explained, a Defendant cannot be held liable for conspiracy in violation of Section 1 without "conscious commitment to a common scheme designed to achieve an unlawful objective." *Sunday Ticket*, 2024 WL 168298, at *5 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). That is exactly what Defendants' proposed instruction requires: a finding that each defendant entered into the conspiracy "with the purpose [and] intent . . . of unreasonably restraining trade." Moreover, in order to establish a violation of Section 1, a plaintiff must show that the challenged restraint actually did have the effect of

unreasonably restraining trade in the relevant market. That is the very purpose of the Rule of Reason—to "assess the restraint's actual effect on competition." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022), *cert. denied sub nom. The Nat'l Ass'n of Realtors v. The PLS.com, LLC.*, 143 S. Ct. 567, 214 L. Ed. 2d 336 (2023).  Defendants' proposed instruction therefore properly focuses the jury on the type of conspiracy that can violate Section 1.

Plaintiffs' objection to the requirement for a "common scheme to achieve an unlawful objective" is similarly baseless. This requirement is black letter law under Section 1. *Sunday Ticket*, 2024 WL 168298, at *5 (requiring a "conscious commitment to a common scheme designed to achieve an unlawful objective." (quoting *Monsanto*, 465 U.S. at 764)). And it is consistent with the model instruction, which states only that all defendants need not "possess[] the same *motive* for entering the agreement." As one court in this circuit recently explained, in rejecting a similar argument:

> Although, to be held a part of a conspiracy, a conspirator need not know all dimensions of the wrongful conduct taken in its furtherance, a plaintiff must still show that each defendant had knowledge of an agreement as to the overall conspiracy – *i.e.*, must prove that each defendant was *united in a common unlawful goal or purpose*, or knew of the conspiracy's general scope and purpose.

*Intel Corp. v. Fortress Inv. Grp. LLC*, 2020 WL 6390499, at *17 (N.D. Cal. July 15, 2020) (cleaned up) (emphasis added).  While *motivations* may differ, proof of a common, unlawful *purpose* is required.

Finally, Plaintiffs' attempt to eliminate the requirement that the object of the conspiracy was "to restrain competition in the market." But this explanation is necessary to distinguish the conspiracy to *restrain trade* claims under Section 1 from the conspiracy to *monopolize* claims under Section 2. The model instructions

31

specifically call for parallel conspiracy instructions to be given. MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3–Section 2 of the Sherman Act—Conspiracy to Monopolize, Instruction 2: Existence of a Conspiracy. Clarification of which conspiracy is challenged under Section 1 is necessary to keep the claims separate.

## INSTRUCTION NO. 45: PARTICIPATION AND INTENT

Before you can find that the NFL, the NFL Teams, and DirecTV were members of the conspiracy alleged by Plaintiffs, the evidence must show that that they each knowingly joined in the unlawful plan at its inception, or at some later time, with the intent to further the unlawful purpose of the conspiracy.

To act knowingly means to participate deliberately and not because of mistake, accident, or other innocent reason. A person may become a member of a conspiracy without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts they played. Knowledge of the essential nature of the plan is enough. On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator.

A person who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if he or she had been one of those who formed or began the conspiracy and participated in every part of it.

In determining whether the NFL, the NFL Teams, or DirecTV were members of the alleged conspiracy, you should consider only the evidence about that particular entity's statements and conduct, including any evidence of its knowledge and participation in the events involved and any other evidence of that particular entity's participation in the conspiracy alleged.

You may not find that an entity was a member of a conspiracy based only on its association with or knowledge of wrongdoing, but it is a factor you may consider to determine whether an entity was a member of the alleged conspiracy.

If you find that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on all of those whom you find were members of the conspiracy.

33

Once you have found that an entity is a member of a conspiracy, it is presumed to remain a member and is responsible for all actions taken by all coconspirators during and in furtherance of the conspiracy until it is shown that the conspiracy has been completed or abandoned.

**Authority**: Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); Model Jury Instructions in Civil Antitrust Cases, Chapter 2– Section 1 of the Sherman Act—Contract, Combination, or Conspiracy, Instruction 4: Participation and Intent (Am. Bar Ass'n Antitrust L. Section 2016).

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 45:
## PARTICIPATION AND INTENT

Plaintiffs object to the entirety of this instruction as unnecessary, as the first element of a Section 1 claim—the existence of a contract, combination, conspiracy, or agreement between or among at least two separate entities—is not in dispute in this case. With respect to the NFL-Teams agreement, it is undisputed that each of the 32 NFL teams agreed to adhere to league rules, which constitutes an agreement under the Sherman Act. *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 307 (2d Cir. 2023). It is similarly undisputed that the NFL has entered into contracts with DirecTV, CBS, and Fox. *See* Summary Judgment Opinion at 10 ("it is undisputed that the NFL-DirecTV Agreement, since 1995, provides that DirecTV is the exclusive distributor of out-of-market games"). While this instruction may be appropriate for a case in which there was a question of whether some of all of the Defendants were parties to an agreement, its inclusion would only confuse the jury in this case.

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 45: PARTICIPATION AND INTENT**

Defendants' proposed Instruction 45 regarding participation and intent accurately reflects the law and adapts the ABA's model instruction to permit the jury to consider the critical question of whether Plaintiffs can prove the existence of the alleged "single conspiracy" on which they predicate their Section 1 claim.

Plaintiffs cannot dispute that they must establish that each alleged participant of the conspiracy knowingly joined the conspiracy with the intent to further the purpose of the conspiracy in order to meet their burden. *See, e.g.*, *Morning Star Packing Co. v. Los Gatos Tomato Prods.*, 839 F. App'x 116, 118 (9th Cir. 2020) (affirming summary judgment dismissing Section 1 conspiracy claim because "[m]ere knowledge . . . without more, does not show that [defendant] participated in, or even acquiesced, in the scheme"); *United States v. Townsend*, 924 F.2d 1385, 1391 (7th Cir. 1991) ("mere knowledge" not enough to "tie the conspiracy together"); *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 636 F. Supp. 3d 539, 554 (E.D. Pa. 2022) ("[A] plaintiff must show that the defendant (1) had knowledge of the agreement, and (2) intended to join the agreement.").

Nor can they contest that disputed facts remain as to whether NFL, the NFL Teams, and DirecTV joined Plaintiffs' alleged, overarching "single" conspiracy. Plaintiffs cannot succeed on their claims based merely on a finding that the NFL entered into certain commercial agreements, and Defendants have never conceded the existence of the only conspiracy that the Ninth Circuit held could give Plaintiffs standing to assert their damages claims: a "conspiracy [that] involves both the Teams-NFL agreement and the NFL-DirecTV agreement, which work together as a single conspiracy to limit the output of NFL telecasts." *Sunday Ticket*, 933 F.3d at 1157. Moreover, as this Court held at summary judgment, there remain disputes of

36

1   fact as to (i) whether "DirecTV had a conscious commitment to participate in the

2   conspiracy;" *Sunday Ticket*, 2024 WL 168298, at *8; (ii) "whether an agreement

3   exists, outside of the NFL-Network Agreements, that pools the member clubs'

4   telecast rights;" *id.* at 13; and (iii) whether the NFL and its member clubs are

5   capable of concerted action," *id.* at 15.

6         The jury should therefore be instructed on how to evaluate whether the

7   defendants participated in the alleged "single conspiracy," as that question is

8   dispositive of Plaintiffs' Section 1 claim. *See United States v. Gomez-Rodriguez*, 91

9   F.3d 156, 1996 WL 387658, at *3 (9th Cir. July 10, 1996) ("The purpose of jury

10   instructions is to 'provide the jury with adequate guidance to consider evidence

11   relating to the defense.'" (cleaned up)).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INSTRUCTION NO. 46: SINGLE ENTITY

Section 1 of the Sherman Act only applies to conspiracies between two or more persons. Under Section 1 of the Sherman Act, separate persons or corporations may be treated as a single person, known as a "single entity," for specific purposes. If separate persons or corporations are a single entity for a particular purpose, then they cannot conspire with each other.

The parties dispute whether the NFL and the NFL Teams constitute a single entity for the purpose of producing and licensing telecasts of NFL football games. It is for you to determine, on the basis of all the facts and circumstances, whether the NFL and the NFL Teams constitute a single entity for this purpose.

To determine whether the NFL and NFL Teams are a single entity for purposes of producing and licensing NFL telecasts, you must decide whether the NFL and NFL Teams must cooperate in order to produce and license telecasts of NFL football games. If the production and licensing of NFL football telecasts requires cooperation among the NFL and NFL teams, then you must find they are a single entity for that purpose. If Plaintiffs prove that the production and licensing of NFL football telecasts does not require cooperation among the NFL and NFL teams, then the NFL and NFL teams are not a single entity for that purpose.

**Authority**: Jury Instructions Given, *United States v. Katakis*, No. 2:11-cr-00511-WBS, 2014 WL 1265290 (E.D. Cal. Mar. 5, 2014), Jury Instruction No. 15; *Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005) (agreement among officers or employees of the same firm cannot constitute a violation of the Sherman Act because they are "not separate economic actors pursuing separate economic interests."); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984); *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186, 190–91, 195, 197, 202–04 (2010); *Freeman v. San Diego Ass'n of*

38

*Realtors*, 322 F.3d 133, 1148–49 (9th Cir. 2003); *City of Mount Pleasant v. Assoc. Elec. Coop Inc.*, 838 F.2d 268, 276–77 (8th Cir. 1988); *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n* ("*Bulls II*"), 95 F.3d 593, 599–600 (7th Cir. 1996); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1179 (D.C. Cir. 1978); *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 114 (S.D.N.Y. 2015) (quoting *Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012)); *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 642–43 (9th Cir. 1969) (rejecting plaintiff's argument that company agent was "sufficiently implicated" to be viewed as coconspirator with the company).

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 46: SINGLE ENTITY

Defendants improperly seek to ask the jury to decide "whether the NFL and the NFL Teams constitute a single entity for the purpose of licensing telecasts of NFL football games." The NFL points to no authority that suggest that this determination is one for the jury—or that Plaintiffs would have the burden to prove the NFL Defendants are *not* a single entity.

This Court has already determined that "it is possible for independent entities—*i.e.*, individual sports teams—to license telecast rights on their own without pooling their rights with a conference or league" in denying summary judgment, laying to rest the NFL's single-entity contentions. Summary Judgment Decision, Dkt. 1155 at 24. And whether "the *production* of NFL football telecasts requires *cooperation* among the NFL and NFL teams" is a distinct question that likewise has no place in a jury instruction.

The instruction commits two additional errors. First, it wrongly states that the necessity of cooperation for one purpose– like the organization of games -- transforms concerted action for other purposes– like the licensing of games -- into the action of a single entity. The Supreme Court has rejected that argument. *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 199 (2010) ("Any joint venture involves multiple sources of economic power cooperating to produce a product. And for many such ventures, the participation of others is necessary. But that does not mean that necessity of cooperation transforms concerted action into independent action.").

Second, the NFL further conflates the production of the game with the subsequent licensing and sale of the game. As this Court expressly held on summary judgment, the only factual dispute remaining is whether the NFL teams agreed, as alleged, to limit the availability of those telecast. Summary Judgment

1   Decision at 24; *See In re NFL's Sunday Ticket Antitrust Litig*., 933 F.3d 1136, 1154

2   (9th Cir. 2019) ("Only the agreements that are the subject of plaintiffs' antitrust

3   action prevent such independent actions. Thus, we reject the defendants' argument

4   that *American Needle*, 560 U.S. at 190, is inapposite; here, like in *American Needle*,

5   the agreements not to compete concern separately owned intellectual property, and

6   impose an unlawful restraint on independent competition.").

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Case No. 2:15-ml-02668-PSG (SKx)**                              **Defendants' Disputed Final Jury Instructions**

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 46: SINGLE ENTITY**

Defendants' proposed jury instruction on the single entity doctrine accurately states the law, and the jury will not be able to evaluate Plaintiffs' claims properly without this instruction.

*First*, this instruction properly states the law on single entities. Section 1 of the Sherman Act "applies only to concerted action that restrains trade," *Am. Needle*, 560 U.S. at 190, and a section 2 conspiracy to monopolize claim likewise requires an agreement among "two or more persons," *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 2017 WL 6059299, at *4 (N.D. Cal. Dec. 7, 2017) (allegations of a single corporate entity are insufficient to plead a Section 2 claim). Defendants will argue to the jury that the NFL and its teams "must cooperate in the production . . . of games," *Am. Needle*, 560 U.S. at 202, as it is impossible to produce either games or the resulting telecasts "without agreements and joint action with every other team," *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1179 (D.C. Cir. 1978).

Defendants thus seek only to instruct the jury on the law of this case, that, "[i]f the evidence shows it is possible for independent entities—*i.e.*, individual sports teams—to license telecast rights on their own without pooling their rights with a conference or league, that raises a dispute of fact as to whether the NFL and its member clubs' decision not to produce telecasts independently is a sudden joining of two independent sources of economic power previously pursuing separate interests"; whereas, "[i]f it is not possible, then the NFL and its member clubs are properly considered a single entity incapable of concerted action." *Sunday Ticket*, 2024 WL 168298, at *16 (internal citation and quotation marks omitted).

Plaintiffs' misleading (and incomplete) quotation from *American Needle* does not overturn that legal conclusion. To the contrary, reading the statement in

context makes clear that it is a restatement of the long-established *Copperweld* test for a single entity: whether the joint venture "deprives the marketplace of independent centers of decisionmaking." *Am. Needle*, 560 U.S. at 199 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)). And the analogy that immediately follows makes this even more clear.  "[A] nut and a bolt can only operate together, but an agreement between nut and bolt manufacturers is still subject to § 1 analysis." *Am. Needle*, 560 U.S. at 199. In other words, just because *two products* work only together does not mean that cooperation between their two separate producers is immune under § 1. That is not this case. Defendants maintain—and will argue to the jury—that football games and the associated telecasts would not exist *at all* without cooperation, making the NFL and its teams a single entity for the purpose of their production.

*Second*, although Plaintiffs assert that "no authority . . .  suggests that this determination [of whether the NFL and its teams are a single entity] is one for the jury," this Court has already concluded exactly that. *Sunday Ticket*, 2024 WL 168298, at *18 (quoting *Am. Needle*, 560 U.S. at 196). The Court stated explicitly that "[t]here is a dispute of fact whether the NFL and its member clubs are capable of concerted action." *Id.* at *15. Plaintiffs cite the Court's opinion for the proposition that "it is possible for the member clubs to act individually to produce telecasts"—but the Court made that statement only after "[d]rawing all inferences in Plaintiffs' favor." *Id.* at *18. Moreover, Plaintiffs bear the burden of proof on this question, as the existence of "concerted" action or "conspiracy" are elements of the claims that they assert. *See* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2–Section 1 of the Sherman Act—Contract, Combination, or Conspiracy, Instruction 1: Definition, Existence, and Evidence (AM. BAR ASS'N ANTITRUST L. SECTION 2016); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3–Section 2 of the Sherman Act—Conspiracy to Monopolize, Instruction 1: Elements

43

(AM. BAR ASS'N ANTITRUST L. SECTION 2016).

Plaintiffs also assert that this Court concluded "the only factual dispute remaining is whether the NFL teams agreed, as alleged, to limit the availability of those telecast[s]," but that assertion is even more misleading. The discussion they cite assumed that a dispute in fact remained as to whether it was "possible for the member clubs to act individually to produce telecasts," and that because Plaintiffs survived summary judgment based on "drawing all inference in favor of Plaintiffs," Plaintiffs still *might* be able to prove the allegations in their complaint that "[o]nly the agreements" challenged in the complaint prevented that outcome. *Id.* at *19. Neither of these out-of-context quotes change this Court's holding on summary judgment—that these are factual issues and it will be up to the jury to decide them.

Plaintiffs now bear the burden of making this showing at trial by offering proof that, in fact, "it is possible for independent entities—*i.e.*, individual sports teams—to license telecast rights on their own without pooling their rights with a conference or league." *Id.* at *16. Defendants' Instruction 46 provides the jury with the background necessary to make this determination, and it frames the question in the same terms that the Court determined was appropriate at summary judgment.[2]

---

[2] *Compare Sunday Ticket*, 2024 WL 168298, at *16 ("If the evidence shows it is possible for independent entities—*i.e.*, individual sports teams—to license telecast rights on their own without pooling their rights with a conference or league, that raises a dispute of fact as to whether the NFL and its member clubs' decision not to produce telecasts independently is 'a sudden joining of two independent sources of economic power previously pursuing separate interests.' If it is not possible, then the NFL and its member clubs are properly considered a single entity incapable of concerted action." (citation omitted)), *with* Defendants' Proposed Instruction No. 46 ("To determine whether the NFL and NFL Teams are a single entity for purposes of licensing NFL telecasts, you must decide whether the NFL and NFL Teams must cooperate in order to license telecasts of NFL football games. If the production of NFL football telecasts requires cooperation among the NFL and NFL teams, then you must find they are a single entity for that purpose. If Plaintiffs prove that the production of NFL football telecasts does not require cooperation among the NFL and NFL teams, then the NFL and NFL teams are not a single entity for that purpose.").

44

The absence of a model instruction does not mean that the jury should not receive an instruction on this dispositive legal issue. That absence is not surprising; the single-entity doctrine applies only in limited circumstances, including most prominently when evaluating sports leagues. *See Am. Needle*, 560 U.S. at 198 ("It is true that 'the clubs that make up a professional sports league are not completely independent economic competitors, as they depend upon a degree of cooperation for economic survival.'" (quoting *Brown v. Pro Football, Inc.*, 518 U.S. 231, 248 (1996))); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.* ("*NCAA*"), 468 U.S. 85, 101 (1984) ("'Perhaps the leading example'" of a business activity that "'can only be carried out jointly . . . is league sports.'" (quoting R. Bork, The Antitrust Paradox 278 (1978))). Jury instructions must "instruct the jury clearly regarding the law to be applied," *Lewis*, 53 F.3d at 34, and "focus [the jury's] attention on the essential issues in the case," *Ribaste*, 905 F.2d at 1143. The model instructions do not purport to cover every arcane issue that might come up in an antitrust trial.

Instead, given the need to instruct juries on both common and arcane issues, model instructions—including the ABA Model Antitrust Jury Instructions—caution that courts "in every instance" must match the instructions given with the "fact questions raised by the evidence." Mod. Jury Instrs. Civ. Antitrust Cases, Preface (Am. Bar Ass'n Antitrust L. Sec. 2016); *see also* Man. Mod. Civ. Jury Instrs. D. Cts. Ninth Cir. at ii (Ninth Cir. Jury Instrs. Comm. 2017) (cautioning that model instructions are "not a substitute for the individual research and drafting that may be required in particular case"); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1398 (9th Cir. 1984) ("Well-tailored and specific instructions may be necessary, however, in complex antitrust cases where abstract legal principles are not self-explanatory to a lay jury, and the facts to which they must be applied are complex." (cleaned up)). That is because "[i]n general, a

1    defendant is entitled to have the judge instruct the jury on his theory of defense,

2    provided that it is supported by law and has some foundation in the evidence."

3    *United States v. Dees*, 34 F.3d 838, 842 (9th Cir. 1994) (cleaned up)).

4           Defendants' proposed instruction accurately states the law and provides the

5    jury with guidance on one of the NFL's theories of defense, and it reflects the

6    Court's summary judgment opinion and practice in other trials in this Circuit. *See*

7    *Sunday Ticket*, 2024 WL 168298, at *15–18; Jury Instructions Given at 20, *United*

8    *States v. Katakis*, No. 11-cr-00511, 2014 WL 1265290 (E.D. Cal. Mar. 5, 2014)

9    (Instruction No. 15).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Case No. 2:15-ml-02668-PSG (SKx)**                    **Defendants' Disputed Final Jury Instructions**

# INSTRUCTION NO. 47: RULE OF REASON—OVERVIEW

To determine whether Plaintiffs have met their burden to show that the conduct of the NFL and the NFL Teams unreasonably restrained trade, you must apply what is called the "rule of reason." The rule of reason has three steps.

**First**, Plaintiffs have the initial burden of showing that Defendants' conduct produced significant anticompetitive effects that harm consumers within a relevant antitrust market.

**Second**, if Plaintiffs meet that burden, Defendants may then come forward with evidence that their conduct had procompetitive benefits or rationales. A procompetitive rationale is an explanation that Defendants' conduct furthers its ability to compete on the merits. A defendant's conduct is a form of competition if undertaken to enhance the quality or attractiveness of its product or service, to increase efficiency by reducing costs, or to otherwise benefit consumers.

**Third**, if Defendants make that showing, then the burden shifts back to Plaintiffs to rebut those claimed procompetitive benefits or rationales or to show that any procompetitive benefits or rationales could have been reasonably achieved in a substantially less restrictive manner. If Plaintiffs make either of these showings, they will have met their burden to show that the challenged conduct was unreasonable. If Plaintiffs fail to make either of these showings, then they have failed to establish a conspiracy to unreasonably restrain trade.

I will now review each step of the analysis in more detail.

**Authority**: Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); Model Jury Instructions in Civil Antitrust Cases, Chapter 1– Sherman Act—General, Instruction 3A: Rule of Reason—Overview (Am. Bar Ass'n Antitrust L. Section 2016); Closing Jury Instructions at 18 (Jury

47

Instruction No. 12), *In re HIV Antitrust Litig.*, No. 3:19-cv-02573-EMC (N.D. Cal. June 27, 2023), ECF No. 2018; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023).

48

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 47: RULE OF REASON OVERVIEW**

Plaintiffs object to this instruction. The Court should instead adopt Plaintiffs' proposed instruction, which is also based on the ABA Model Instruction, but correctly recites the four-step rule-of-reason framework outlined in *Epic Games.*

The NFL Defendants' instruction on step 2 fails to instruct the jury that the proof of anticompetitive harm shifts the burden to the Defendants to prove a non-pretextual procompetitive justification not to provide a "explanation". As this Court recognized in denying summary judgment, Defendants bear a "heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." Dkt. 1155 at 18 (quoting *NCAA*, 468 U.S. at 113). Defendants further misstate the law by asserting that the procompetitive rationale applies to their "conduct" rather than to the challenged restraints. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985–86 (9th Cir. 2023) ("If a plaintiff establishes at step one that the defendant's restraints impose substantial anticompetitive effects, then the burden shifts back to the defendant to "show a procompetitive rationale for the restraints." (cleaned up)).

Finally, the NFL does not include the final step of the Rule of Reason analysis: the balancing of competitive effects. The Ninth Circuit has held that "where a plaintiff's case comes up short at step three, the district court *must* proceed to step four and balance the restriction's anticompetitive harms against its procompetitive benefits." *Epic Games,* 67 F.4th at 994.

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'
DISPUTED INSTRUCTION NO. 47: RULE OF REASON  OVERVIEW**

Defendants' Instruction 47 closely follows the model instructions and accurately states the law. The limited proposed deviations from the model instructions are intended to: (i) streamline the instructions to include only relevant material; (ii) align the instructions with recent and controlling developments in antitrust law, both in Supreme Court and Ninth Circuit jurisprudence; and (iii) follow recent instructions within this Circuit. By contrast, Plaintiffs' proposed instruction number thirty-five deviates greatly from the model, does not account for this Circuit's recent clarification of the rule of reason analysis, and would serve only to confuse the jury.

While the model instruction provides a helpful starting point, there have been important legal developments since they were promulgated in 2016. Both the Supreme Court and the Ninth Circuit have issued decisions developing the law around the rule of reason analysis. The most substantive developments affect steps two and three of the rule of reason, as well as the possible existence of a fourth step. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985–86, 990, 993–94 (9th Cir. 2023). Defendants' proposed instruction incorporates the Ninth Circuit's guidance from *Epic Games* on all of these topics. The Northern District of California recently approved nearly identical instructions on the rule of reason as what Defendants have proposed here. *See* Closing Jury Instructions at 18–22, 24–25 (Jury Instructions No. 12–15, 17–18), *In re HIV Antitrust Litig.*, No. 3:19-cv-02573-EMC (N.D. Cal. June 27, 2023), ECF No. 2018; *see also* Final Jury Instructions Nos. 1-55 at 32–36 (Jury Instructions 27–30), *Sumotext Corp. v. Zoove Inc.*, No. 5:16-cv-01370-BLF (N.D. Cal. Mar. 1, 2020), ECF No. 461.

Plaintiffs' proposal departs from precedent and inappropriately suggests a heightened or "heavy" burden; the implication that "countervailing" "benefits"

50

must "overcome the harm" suggests, incorrectly, that some form of balancing applies at the second step. *See* ECF No. 1325 (Order on Defs.' MIL No. 7) at 8–9 & nn.12–13 ("Plaintiffs [] cannot argue or imply that Defendants have an "empirical burden" to prove procompetitive effects. . . . Any implication that Professor Bernheim or Defendants have a duty to provide a quantitative analysis would be improper under the rule of reason.").

Moreover, Plaintiffs mischaracterize *Epic Games*'s discussion of procompetitive rationales. Both the Supreme Court and the Ninth Circuit have explained: "If a plaintiff establishes at step one that the defendant's restraints impose substantial anticompetitive effects back to the defendant to 'show a procompetitive rationale for the restraints.' [] A procompetitive rationale is 'a nonpretextual claim that the defendant's *conduct* is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Epic Games*, 67 F.4th at 985–86 (cleaned up) (emphasis added) (quoting *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96 (2021); *Fed. Trade Comm'n v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020). Defendants' proposed instruction thus accurately instructs the jury on the law.

Finally, Defendants have accurately adapted the ABA model instruction's formulation of a "fourth step" of the rule of reason to account for more recent precedent. As the Ninth Circuit explained in *Epic Games*, Supreme Court precedent does not require a fourth step, and the three-part test "is already intended to assess a restraint's overall effect." 67 F.4th at 993–94. The three-part test explained in Defendants' proposed instruction thus "is already designed to identify . . . an imbalance" among the anticompetitive effects and procompetitive benefits, and proceeding to a fourth balancing step, "in most instances," will merely "confirm[] the result suggested by a step-three failure: that a business practice without a less restrictive alternative is not, on balance, anticompetitive." *Id.* at 994. Plaintiffs offer

1  no reason to believe that this is the unique case in which that "confirmation" does

2  not apply, and there is no need here to instruct the jury to proceed to a fourth step

3  merely to confirm the third step. Moreover, *Epic Games* reviewed a bench trial

4  decision, where the finder of fact was experienced in the law and the analysis that

5  would occur at a fourth step. Asking the jury to conduct this superfluous totality-of-

6  the-circumstances analysis—about which even the Ninth Circuit has expressed

7  skepticism—will needlessly further complicate an already complicated case and

8  would risk inviting error.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INSTRUCTION NO. 48: RELEVANT PRODUCT MARKET

In the first step of the rule of reason, Plaintiffs have the initial burden of showing that Defendants' conduct has resulted in a substantial harm to competition within the relevant antitrust market. Defining the relevant market is essential to this inquiry. There are two aspects you must consider in determining whether Plaintiffs have met their burden to prove the relevant antitrust market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market. The parties do not dispute that the relevant geographic market is the United States. It is for you determine whether Plaintiffs have established a relevant product market.

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking,

a small but significant and sustained increase in price is approximately a 5 percent increase in price above competitive levels not due to cost factors. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- consumers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of Plaintiffs and Defendants regarding who Defendants' competitors are; and
- the existence or absence of different customer groups or distribution channels.

In this case, Plaintiffs contend that the relevant product market is the market for professional football telecasts. By contrast, Defendants contend that Plaintiffs have failed to prove the proper relevant product market. Defendants contend that Plaintiffs' alleged product market does not include all reasonable substitutes. If you find that Plaintiffs have proven a relevant product market, then you should continue to evaluate the remainder of Plaintiffs' claim. However, if you find that Plaintiffs have failed to prove such a market, then you must find in Defendants' favor.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm.

2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3–Section 2 of the Sherman Act, Monopolization–General, Instruction 3: Relevant Market—General, Chapter 3–Section 2 of the Sherman Act, Monopolization–General, Instruction 4: Relevant Product Market (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 48: RELEVANT PRODUCT MARKET

Plaintiffs object to this instruction in its entirety because it implies that Plaintiffs have a threshold burden of proving a relevant product market in their Section 1 claim. This is not the law, and that is why there is no equivalent instruction in the ABA Model Instructions for a Section 1 claim.

Plaintiffs may meet their initial burden of proving competitive harm in three separate ways – only one of which may require finding market power in a relevant market. First, Plaintiffs can meet their burden by showing that the challenged restraint is a "naked restraint" that is so facially anticompetitive that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)). Alternatively, Plaintiffs can show anticompetitive effects directly or indirectly: either directly through "proof of actual detrimental effects on competition" or indirectly through "proof of market power plus some evidence that the challenged restraint harms competition." *Ohio v. American Express*, 585 U.S. 529, 540 (2018).

Because a showing of market power is unnecessary if the Plaintiff presents direct evidence of anticompetitive effects, the jury need not be instructed on a definition of relevant market. It is also inconsistent with ABA Model Instruction 1.C.2, which provides that "If defendant does not possess market power," it is merely "less likely" that the challenged restraint will have harmful effects on competition.

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 48: RELEVANT PRODUCT MARKET**

Defendants' proposed Instruction 48 accurately states the law and is necessary to instruct the jury on how to evaluate Plaintiffs' Section 1 claim, which requires proof of a relevant market.

Precedent confirms that Plaintiffs must define a viable relevant antitrust market as part of their Section 1 claim. At step one of the rule of reason, "'the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market.'" *Epic Games*, 67 F.4th at 983 (quoting *Ohio v. Am. Express Co. ("Amex")*, 585 U.S. 529, 541 (2018)). Because this is not a price-fixing case and Plaintiffs cannot proceed under a quick-look framework, Plaintiffs must establish both the existence of the relevant market and substantial anticompetitive effects in that market. *Epic Games*, 67 F.4th at 974 & n.6, 983. Therefore, a "'threshold step' is "defining the relevant market in which the alleged restraint occurs," *id.* at 974; (quoting *Qualcomm*, 969 F.3d at 992; *see also Amex*, 585 U.S. at 543 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."). This case is no exception. *Sunday Ticket*, 933 F.3d at 1151 ("In order to show that an agreement injures competition, a plaintiff must generally show that the defendants have market power within a relevant market, [] meaning that the defendants have 'the ability to raise prices above those that would be charged in a competitive market.'"); *see also Amex*, 585 U.S. at 543.

A plaintiff's burden to prove a relevant market may be relaxed if the plaintiff proves "a naked restriction on price or output," *Sunday Ticket*, 933 F.3d at 1151, but that limited exception has no application here, where Defendants have proffered a number of procompetitive effects of the challenged conduct. Plaintiffs previously argued that this Court could truncate the full rule of reason analysis and instead

1   apply "quick look" review, but that argument rests entirely on the Ninth Circuit's

2   statement, at the motion to dismiss stage, that Plaintiffs had *pleaded* a naked

3   restraint similar to those in *NCAA*. *See Sunday Ticket*, 933 F.3d at 1152 ("[*B*]*ecause*

4   *the alleged restrictions on the production and sale of telecasts constitute 'a naked*

5   *restriction'* on the number of telecasts available for broadcasters and consumers,

6   the plaintiffs were not required to establish a relevant market." (emphasis added)).

7   Now that fact and expert discovery is complete, however, there can be no dispute

8   that the NFL Defendants have extensive evidence of the procompetitive rationales

9   for the challenged restraints. The existence of even the potential for procompetitive

10  effects means that quick look analysis is inapplicable. As explained further in NFL

11  Defendants' Memorandum of Contentions of Fact and Law, "more than a 'quick

12  look' is required" if the challenged restraint "'might plausibly be thought to have a

13  net procompetitive effect, or possibly no effect at all on competition.'" *Major*

14  *League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 318 (2d Cir. 2008)

15  (quoting *Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 771 (1999)); *see*

16  *also Cal. Dental*, 526 U.S. at 778 (declining to apply "quick look" review where

17  "the plausibility of competing claims about the effects of the [challenged restraints]

18  rules out the indulgently abbreviated review"). And because Plaintiffs cannot

19  invoke either a *per se* or a quick look standard, they face the "threshold" burden of

20  "defining the relevant market in which the alleged restraint occurs." *Epic Games*,

21  67 F.4th at 974 & n.6.

22      Finally, Plaintiffs admit that they must make a showing of market power in

23  the relevant market *at least* if they cannot show direct evidence of anticompetitive

24  effects. They offer no explanation for why the jury should not receive instructions

25  on how to evaluate the relevant market in the context of Section 1 given their

26  admission that this inquiry at least may be necessary to evaluate their Section 1

27  claims.

28

# INSTRUCTION NO. 49: RULE OF REASON—PROOF OF COMPETITIVE HARM

To meet their burden under the first step of the rule of reason, Plaintiffs must also demonstrate that the restraint has resulted in a substantial harm to competition in the alleged relevant market.

Although it may be relevant to the inquiry, harm that occurs merely to the individual business of a Plaintiff is not sufficient, by itself, to demonstrate harm to competition generally. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in higher prices, decreased output, or lower product quality in the relevant market. If the challenged conduct did not result in higher prices, decreased output, or lower quality in the relevant market, then there was no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced competitive harm in that market, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;
- the purpose and nature of the restraint;
- the nature and structure of the relevant antitrust market;
- the number of competitors in the relevant antitrust market and the level of competition among them, both before and after the restraint was imposed; and
- whether Defendants possessed market power in the relevant antitrust market.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power.

59

**Authority**: Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); Model Jury Instructions in Civil Antitrust Cases, Chapter 1–Sherman Act—General, Instruction 3B: Rule of Reason—Proof of Competitive Harm (Am. Bar Ass'n Antitrust L. Section 2016).

60

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 49: RULE OF REASON  PROOF OF COMPETITIVE HARM

Plaintiffs object to the NFL Defendants' deviations from the ABA Model Instruction, which are improper and confusing. The Court should adopt Plaintiffs' instruction which adapts the model instruction to the particular facts of the case.

The reference in the first sentence of the proposed instruction to harm to the "individual business of a Plaintiff" will confuse the jury because it implies that a different standards of proof apply to members of the commercial class than the residential class. The language from the model rule addresses a different and inapposite circumstance in which a *competitor* to the defendant suffers harm to their business due to the presence of competition. That instruction has no place here where all class members were purchasers.

Plaintiffs further object to the NFL Defendants' omission of the Model Instruction's discussion of competitive benefits "such as lower prices, increased output, or higher product quality." The NFL Defendants provide no basis to insert that instruction into a discussion of competitive harm that repeats the instruction in the subsequent sentence. The ABA Model Instruction's discussion of competitive benefits and competitive harm are critical to the jury's analysis of the rule of reason.

Plaintiffs further object to the NFL Defendants' unexplained replacement of "relevant market" with "relevant antitrust market," which risks confusing the jury.

The instruction also excludes the Model Instruction's explanation for how a juror may conclude that a defendant possesses market power. *See* ABA-JI-CIVANTI 1.C.2 ("An important factor in determining whether defendant possesses market power is defendant's market share, that is, its percentage of the products or services sold in the relevant market by all competitors.").

61

1
2
3

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 49: RULE OF REASON  PROOF OF COMPETITIVE HARM

4   Defendants' proposed Instruction 49, which addresses the critical instruction

5   that Plaintiffs must demonstrate harm to competition is faithful to the model and

6   includes only minor deviations to streamline the discussion and make adaptations

7   specific to this case.

8   Plaintiffs cite no authority for their proposal to remove the language,

9   "Although it may be relevant to the inquiry, harm that occurs merely to the

10   individual business of plaintiff is not sufficient, by itself, to demonstrate harm to

11   competition generally." They cannot dispute that it accords with established

12   precedent, *see, e.g.*, *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158

13   (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without

14   adversely affecting competition generally, there is no antitrust injury."); *Spanish*

15   *Broad. Sys. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir.

16   2004) ("Critically, under both sections [of the Sherman Act], an antitrust plaintiff

17   must show harm to competition in general, rather than merely damage to an

18   individual competitor."), and they cannot reasonably argue that it is not relevant to

19   this case, *see, e.g.*, *Brantley v. NBC Universal, Inc.*, 2009 WL 10671189, at *3–8

20   (C.D. Cal. Oct. 15, 2009) (rejecting consumer plaintiffs' argument that they did not

21   need to prove harm to competition on the theory that it "would only be necessary to

22   establish a claim brought by an excluded competitor"). Contrary to Plaintiffs'

23   suggestion, the proposed instruction does not state or imply a "different standard[]

24   of proof" for the two classes; it accurately states the standard of proof for

25   competitive harm.

26   Plaintiffs also cite no authority that would suggest that Defendants' proposed

27   edits to the model instruction to streamline and clarify the discussion of harmful

28

effects on competition are inaccurate or otherwise contrary to the law.  Defendants' proposed edits do not change the meaning of the instruction; rather, they accurately state the law and would more clearly explain to the jury what is considered a harm to competition (rather than what is not harm to competition).

**INSTRUCTION NO. 50: EXCLUSIVE LICENSING AGREEMENTS**

Plaintiffs contend that the NFL and the NFL Teams entered into exclusive licensing agreements that gave only DirecTV the right to distribute Sunday Ticket. These agreements involved a license of the NFL's intellectual property. The law recognizes an intellectual property holder's right to decide to whom to license its property. The exercise of this right is not anticompetitive conduct for purposes of the antitrust laws. The mere existence of an exclusive deal to license the NFL's and the NFL Teams' intellectual property thus does not violate the antitrust laws or constitute anticompetitive conduct.

**Authority:** MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT §§ 14 (Antitrust), 15.16 (Trademark Ownership—Licensee), 17.13 (Copyright Interests—Exclusive Licensee) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2–Section 1 of the Sherman Act—Vertical Restraints, Instruction 5: Elements of Exclusive Dealing, Chapter 4–Patents—General, Instruction 1: Introduction, Instruction 2: Relation to Antitrust Laws (AM. BAR ASS'N ANTITRUST L. SECTION 2016); *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 698 (9th Cir. 2015) (Wardlaw, J., concurring) ("The constitutional policy underlying copyright protection is to 'promote the Progress of Science and useful Arts.' 'The immediate effect of our copyright law is to secure a fair return for an author's creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good.'" (cleaned up) (quoting U.S. CONST. art. 1, § 8, cl. 8; *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975))); *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1153 (9th Cir. 1982) ("The [Lanham] Act protects against fraud and consumer confusion." (citing *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir. 1976))); *Data*

*Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1187 (1st Cir. 1994) ("[A]n author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers."), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1092 (N.D. Cal. 2007); *Spinelli*, 96 F. Supp. 3d at 116–19; *Levi Case Co. v. ATS Prods., Inc.*, 788 F. Supp. 428, 432 (N.D. Cal. 1992) ("[An] exclusive license, by itself, does not constitute an illegal restraint under the antitrust laws."); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 153 (3d Cir. 1981) ("[A]s a licensor, the MLBPA is free to grant licenses to any competitor, or none at all."); 2 Gilson on Trademarks § 6.03; *Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 644 (10th Cir. 1987) ("Exclusive licensing of a patent, copyright, or trademark is not a violation of section 1 of the Sherman Act so long as the agreement does not extend beyond marketing arrangements reasonably necessary to effectuate the rights granted." (citing *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19 (1979))).

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 50: EXCLUSIVE LICENSING AGREEMENTS

Plaintiffs object to Instruction No. 50 in its entirety as contrary to law, confusing, and unnecessary in the context of Plaintiffs' claims. Defendants import this instruction from the ABA Model Instructions on the elements of exclusive dealing, yet Plaintiffs do not allege an exclusive *dealing* arrangement, "which is an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016).

This instruction encourages jurors to examine the various agreements in isolation – an approach this Court and the Ninth Circuit have repeatedly rejected. *See* 2024 WL 168298 at *19 ("The Court is indeed 'required to take a holistic look at how the interlocking agreements actually impact competition' and cannot evaluate the NFL's vertical conduct in isolation.") (quoting *NFL Sunday Ticket*, 933 F.3d at 1152).

More problematic is the NFL Defendants' incorporation of disputed facts that must be decided by a jury. Plaintiffs contest that the NFL's agreement with DirecTV was a license of "the NFL's" intellectual property rather than a license of the intellectual property of 32 independent businesses who agreed to pool those rights in a horizontal agreement not to compete amongst themselves in the sale of those rights. It is that horizontal agreement not to compete that allows the NFL to enter into licensing agreements like the one with DirecTV. Absent that horizontal agreement no to compete, those teams would be competitors of DirecTV. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 110, 104 S. Ct. 2948, 2965, 82 L. Ed. 2d 70 (1984) ("'a court would not hesitate in enjoining a domestic selling arrangement by which, say, Ford and General Motors distributed their automobiles nationally through a single selling agent.'") (quoting

66

P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37–38 (Federal Judicial Center, June 1981)).

67

1
2
3

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 50: EXCLUSIVE LICENSING AGREEMENTS

4        One aspect of Plaintiffs' allegations is their contention that the NFL and the

5    NFL Teams entered into exclusive licensing agreements that granted only to

6    DirecTV the right to distribute telecasts of out-of-market NFL football games.

7    Defendants' proposed jury instruction on exclusive licensing agreements provides

8    the jury with the necessary legal background to address that aspect of Plaintiffs'

9    claims.

10       Plaintiffs must establish that the challenged conduct produced "'a substantial

11   anticompetitive effect that harms consumers in the relevant market,'" *Epic Games*,

12   67 F.4th at 983 (quoting *Amex*, 585 U.S at 541), and they plan to present to the jury

13   evidence of the NFL's exclusive licensing agreements in support of this element.

14   The jury accordingly should be provided with legal instructions as to the treatment

15   of exclusive licensing agreement of intellectual property under the antitrust laws,

16   including the principle that "[t]he mere existence of an exclusive deal between the

17   [NFL] and its licensee[] does not violate the antitrust laws or significantly threaten

18   competition." *Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d

19   1081, 1092 (N.D. Cal. 2007); *see also Spinelli v. Nat'l Football League*, 96 F.

20   Supp. 3d 81, 116–19 (S.D.N.Y. 2015) (rejecting the argument that the NFL and the

21   clubs' limited exclusive licensing arrangements with stock photo agencies violated

22   the Sherman Act); *Levi Case Co. v. ATS Prods., Inc.*, 788 F. Supp. 428, 432 (N.D.

23   Cal. 1992) ("[An] exclusive license, by itself, does not constitute an illegal restraint

24   under the antitrust laws."). Absent such an instruction, the jury could be under a

25   mistaken impression that the NFL's lawful exercise of its intellectual property

26   rights constitutes cognizable anticompetitive activity.

27       Plaintiffs also will argue to the jury that Defendants violated the antitrust

28

68

laws by not licensing its intellectual property to other entities, in addition to DirecTV, who may have wished to distribute NFL telecasts. Therefore, the jury should be instructed that an intellectual property holder's exercise of its right to exclude others from using the intellectual property is not, alone, anticompetitive conduct that violates the antitrust laws. *Parrish*, 534 F. Supp. 2d at 1092; *see also Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 153 (3d Cir. 1981) ("[A]s a licensor, the MLBPA is free to grant licenses to any competitor, or none at all."); *Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 644 (10th Cir. 1987) ("Exclusive licensing of a patent, copyright, or trademark is not a violation of section 1 of the Sherman Act so long as the agreement does not extend beyond marketing arrangements reasonably necessary to effectuate the rights granted." (citing *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19 (1979)).

Plaintiffs' complaint that this instruction "encourages jurors to examine the various agreements in isolation" is not only inaccurate but also inconsistent with their arguments in these same objections that "the use of the singular for contract, combination, or conspiracy (or agreement) . . . misstat[es] the nature of Plaintiffs' claims—namely that *various* agreements work together to unreasonably restrain [*sic*] competition." *See* Plfs.' Obj. Defs.' Disp. Instr. No. 38. So long as Plaintiffs argue that the individual agreements that are part of their alleged conspiracy are themselves anticompetitive, it is necessary to instruct the jury on the relevant intellectual property laws that govern the agreements at issue.

Plaintiffs also are incorrect to suggest that the ownership of the copyrights at issue in this case is disputed. To the contrary, both the Parties and this Court have recognized that, "pursuant to the [NFL-Network] [A]greements, CBS and FOX transfer ownership of the copyrights of the telecasts to the NFL." *Sunday Ticket*, 2024 WL 168298, at *2.

Defendants' proposed instruction thus should be given because it accurately explains Defendants' intellectual property rights, the laws governing the licensing of that intellectual property, and the relevance of those licensing agreements to Plaintiffs' Section 1 claim.

70

## INSTRUCTION NO. 51: RULE OF REASON—EVIDENCE OF PROCOMPETITIVE BENEFITS OR RATIONALES

If you find that Plaintiffs have proven that the challenged restraint resulted in substantial harm to competition in a relevant market, then you should turn to the second step in the rule-of-reason framework, in which you must determine whether Defendants have shown that the restraint benefits competition in other ways or that Defendants had procompetitive rationales for their conduct.

A procompetitive benefit or rationale is a claim that the defendant's conduct furthers its ability to compete on the merits. For example, a defendant's conduct is procompetitive if it enhances the quality or attractiveness of its product or service, enables it to create new products, increases efficiency by reducing costs, or otherwise benefits consumers.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1– Sherman Act—General, Instruction 3C: Rule of Reason—Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST L. SECTION 2016); *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258-59 (9th Cir. 1990) (plaintiff bears the burden of proving defendant's "conduct [was not] redeemed by a legitimate business purpose"); *Epic Games*, 67 F.4th at 986 ("A procompetitive rationale is a [1] nonpretextual claim that the defendant's conduct is [2] indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." (quotations and alterations omitted) (citing *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020))); *id.* at 987 ("Antitrust law assumes that competition best allocates resources by allowing firms to compete on all elements of a bargain—quality, service, safety,

1   and durability—and not just the immediate cost." (citation omitted)); *id.* at 990

2   ("To qualify as "substantially less restrictive," an alternative means "must be

3   'virtually as effective' in serving the [defendant's] procompetitive purposes ...

4   without significantly increased cost." (citing *Cnty. of Tuolumne v. Sonora Cmty.*

5   *Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))); *Am. Needle*, 560 U.S. at 190–91,

6   195, 197, 202–04; *Copperweld Corp.*, 467 U.S. at 769; *Freeman*, 322 F.3d at 1148–

7   49; *Mount Pleasant*, 838 F.2d at 276–77; *Bulls II*, 95 F.3d at 599–600; *Smith*, 593

8   F.2d at 1179; *Dagher*, 547 U.S. at 6.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Case No. 2:15-ml-02668-PSG (SKx)**                    **Defendants' Disputed Final Jury Instructions**

1
2
3

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 51: RULE OF REASON  EVIDENCE OF PROCOMPETITIVE BENEFITS OR RATIONALES

4      Plaintiffs object to this instruction as it omits critical language from the

5  ABA's Model Instruction. *See* ABA Antitrust 1-C-3. It ignores entirely the Rule of

6  Reason's less restrictive alternatives element, in contradiction of binding Ninth

7  Circuit law. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023)

8  (describing step 3 as requiring the plaintiffs to demonstrate that the procompetitive

9  efficiencies could be achieved through less anticompetitive means). As stated in the

10  ABA Model Instruction, "If you find that the challenged restraint does result in

11  competitive benefits, then you also must consider whether the restraint was

12  reasonably necessary to achieve the benefits. If plaintiff proves that the same

13  benefits could have been readily achieved by other, reasonably available alternative

14  means that create substantially less harm to competition, then they cannot be used

15  to justify the restraint." *Id. See also* Court's Order on Defendants' Motion in

16  Limine No. 9, Dkt. 132 at 7 ("If the defendant makes this showing, then the burden

17  shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could

18  be reasonably achieved through less anticompetitive means" ("step three").)

19  (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 540, 542 (2018)).

20      The NFL's proposed instruction includes none of this critical language.

21  Furthermore, the instruction does not recognize that in the circumstance of this case

22  – where there is a naked restraint – the Defendants bear a "heavy burden" to justify

23  their deviation from the free market. The Court made this point explicitly when

24  denying Defendants' motion for Summary Judgment, quoting the language from

25  the Supreme Court that "'Under the Rule of Reason, these hallmarks of

26  anticompetitive behavior place upon petitioner a heavy burden of establishing an

27  affirmative defense which competitively justifies this apparent deviation from the

28

operations of a free market.'" Summary Judgment Opinion, Dkt. 1155 at 18 (citing *NCAA*, 468 U.S. at 113). The NFL's instruction also misleads the jury into believing that Defendants can meet their burden under step 2 merely by asserting a procompetitive explanation. That contradicts this Court order on Defendants' Motion in Limine No. 7. *See* Dkt. 1325 at 7 ("At step two—determining whether there is a procompetitive rationale that is not pretextual and actually improves competition—Defendants are obligated to produce some kind of evidence in support of their procompetitive rationale.").

The NFL's proposed instruction also omits important guidelines to aid the jury in understanding what constitutes a procompetitive justification. These guidelines are set forth in Plaintiffs' Amended Instruction No. 51.

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 51: RULE OF REASON  EVIDENCE OF PROCOMPETITIVE BENEFITS OR RATIONALES

Defendants' instruction accurately explains step two of the rule of reason, updating the model language to account for developments in the law promulgated by the Supreme Court and the Ninth Circuit.

Plaintiffs reiterate many of the same objections here. As explained in Defendants' Argument in Support of Defendants' Disputed Instruction No. 47, the limited proposed deviations from the model instructions are intended to align the instructions with recent and controlling developments in antitrust law, both in Supreme Court and Ninth Circuit jurisprudence and follow recent instructions within this Circuit. As explained in Defendants' Argument in Support of Defendants' Disputed Instruction No. 48, the limited naked restraint exception has no application here, where Defendants have proffered a number of procompetitive effects of the challenged conduct. And as explained in Defendants' Argument in Support of Defendants' Disputed Instruction No. 48, Defendants' proposed instructions accurately describe the procompetitive rationale standard, including the Defendants' burden to produce such a rationale if Plaintiffs meet their initial burden.

Plaintiffs object that Defendants must show that their procompetitive rationale "improves competition," but that is not an accurate statement of the law. Defendants do not have a burden to show that their conduct "improves competition"; rather, Defendants must show that their conduct is "a *form* of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Epic Games*, 67 F.4th at 986 (emphasis added); *Qualcomm*, 969 F.3d at 991; *cf. Epic Games*, 67 F.4th at 989 (rejecting Epic's argument that rationales must increase competition in the antitrust market where the

conduct has anticompetitive effects). Not every procompetitive rationale will "improve competition" as that phrase is likely to be understood colloquially by a jury. For example, in *Epic Games*, the Ninth Circuit credited Apple's argument that "it implemented the restrictions to be compensated for its IP investment" because the "desire to profit from intellectual property is presumptively procompetitive." *Epic Games*, 67 F.4th at 986 (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997) (cleaned up)). The Ninth Circuit similarly accepted Apple's argument that its security and privacy features, which were shown to have anticompetitive effects, were justified by Apple's objective to "tap[] into consumer demand and differentiat[e] its products from those of its competitors" because those "are plainly procompetitive rationales." *See id.* at 987. Plaintiffs' approach would be likely to mislead the jury to believe, wrongly, that certain of Defendants' proffered procompetitive rationales here—such as protecting Defendants' IP, incentivizing investments and innovation to improve product equality, facilitating cooperation and coordination among the NFL and NFL teams, maximizing fan reach and access, and promoting smaller-market teams—are not cognizable at step two of the rule of reason.

Plaintiffs also object that this step two instruction does not also instruct the jury on step three, but that objection is baseless. The rule-of-reason framework is a three-step, burden-shifting framework that requires the factfinder to complete the analysis at one step before progressing to the next. *See, e.g.*, *Epic Games*, 67 F.4th at 983–94 (analyzing each step separately); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1256–63 (9th Cir. 2020) (same), *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021). Defendants do not omit the step three analysis; rather, Defendants include it, appropriately, in a separate proposed instruction (No. 52), which accurately describes the analysis required at step three. That instruction explains: "If you find

that Defendants proved that their conduct had procompetitive benefits or rationales, then you should turn to the third step in the rule-of-reason framework, in which you must assess whether Plaintiffs have rebutted the procompetitive benefits or rationales or shown that those benefits or rationales could have been achieved through substantially less anticompetitive means."

It will be far more logical, and more consistent with recent authority, to provide separate instructions for each of the three steps of the rule of reason. Such a step-by-step approach accords with how the Ninth Circuit has applied the rule-of-reason framework. *See Epic Games*, 67 F.4th at 983–94. It also accords with recent instructions on the rule of reason in this Circuit. *See, e.g.*, Closing Jury Instructions, *In re HIV Antitrust Litig.*, No. 3:19-cv-02573-EMC (N.D. Cal. June 27, 2023), ECF No. 2018. That Defendants' instructions update the model to accurately state the law while following the basic structure implemented by courts in this circuit should therefore be uncontroversial.

## INSTRUCTION NO. 52: RULE OF REASON—ASSESSING THE
## PROCOMPETITIVE BENEFITS AND RATIONALES

If you find that Defendants proved that their conduct had procompetitive benefits or rationales, then you should turn to the third step in the rule of reason framework, in which you must assess whether Plaintiffs have rebutted the procompetitive benefits or rationales or shown that those benefits or rationales could have been achieved through substantially less anticompetitive means.

Any alternative presented by Plaintiffs must be a substantially—not marginally—less restrictive means for achieving the same procompetitive rationales. The alternative must also be virtually as effective in serving the Defendants' procompetitive purposes without significantly increased cost. The law does not require Defendants to use the least restrictive means of achieving a legitimate business purpose.

If Plaintiffs rebut the procompetitive rationales or show that they could have been achieved through substantially less restrictive means, they have established an unreasonable restraint of trade.

If Plaintiff fail to make those showings, then they have failed to establish an unreasonable restraint of trade.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1– Sherman Act—General, Instruction 3: Rule of Reason, Instruction 3C: Rule of Reason–Evidence of Competitive Benefits, Instruction 3D: Rule of Reason– Balancing the Competitive Effects (AM. BAR ASS'N ANTITRUST L. SECTION 2016); *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96–97, 100–01, 106–07 (2021); *Qualcomm*, 969 F.3d at 98889 (Under § 1, . . . if the defendant [proves that

1   it had a procompetitive rationale for its conduct], then the burden shifts back to the

2   plaintiff to demonstrate that the procompetitive efficiencies could be reasonably

3   achieved through less anticompetitive means." (citations omitted)); *Epic Games*, 67

4   F.4th at 990 ("To qualify as "substantially less restrictive," an alternative means

5   "must be 'virtually as effective' in serving the [defendant's] procompetitive

6   purposes ... without significantly increased cost." (citing *Cnty. of Tuolumne*, 236

7   F.3d at 1159; *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070

8   (9th Cir. 2015))); *id.* at 99394 ("[T]he three-step framework is already designed to

9   identify such an imbalance: A court is likely to find the purported benefits

10  pretextual at step two, or step-three review will likely reveal the existence of viable

11  [less restrictive alternatives]. . . . [W]here a plaintiff's case comes up short at step

12  three, the district court must proceed to step four and balance the restriction's

13  anticompetitive harms against its procompetitive benefits. In most instances, this

14  will require nothing more than . . . briefly confirming the result suggested by a step-

15  three failure: that a business practice without a less restrictive alternative is not, on

16  balance, anticompetitive." (citing *Alston*, 594 U.S. at 107)).

17

18

19

20

21

22

23

24

25

26

27

28

**Case No. 2:15-ml-02668-PSG (SKx)**                    **Defendants' Disputed Final Jury Instructions**

1
2
3

# PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 52: RULE OF REASON  ASSESSING THE PROCOMPETITIVE BENEFITS AND RATIONALES

4    Plaintiffs object to this instruction in its entirety as it completely rewrites the

5    ABA Model Instruction and misstates the law, which was set forth in the Court's

6    Order on Defendants' Motion in Limine No. 9. *See* Dkt. 132 at 7 ("[W]here a

7    plaintiff's case comes up short at step three, the district court must proceed to step

8    four and balance the restriction's anticompetitive harms against its procompetitive

9    benefits" ("step four").) (quoting *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 994

10   (9th Cir. 2023)). The final ABA Model Instruction regarding the Rule of Reason

11   focuses – as it is titled – on the "Balancing of Competitive Effects." See ABA

12   Antitrust 1-C-4. Instead of basing its instruction on the Model Instructions, the

13   NFL's proposed instruction focuses on Plaintiffs' ability to show that the stated

14   procompetitive benefits could be achieved through less restrictive alternatives. But,

15   as is the case in the ABA Model Instructions, this element is properly included in

16   the earlier instruction regarding "Evidence of Competitive Benefits."

17   The NFL Defendants' language, moreover, would mislead the jury into

18   believing that if Plaintiffs fail to prove that *all* claimed pro-competitive benefits

19   could be achieved through less restrictive means, the jury must return a verdict for

20   the NFL. However, even if some pro-competitive benefits could not be achieved

21   through less restrictive means, the jury must balance the unattained benefits against

22   the harm to competition, as explained in the Model Instruction and required by law.

23   See *FTC v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020) ("If the plaintiff cannot

24   rebut the monopolist's procompetitive justification, 'then the plaintiff must

25   demonstrate that the anticompetitive harm of the conduct outweighs the

26   procompetitive benefit'"); *United States v. Microsoft*, 253 F.3d 34, 59 (D.C. Cir.

27   2001) ("In cases arising under § 1 of the Sherman Act, the courts routinely apply a

28

1    similar balancing approach under the rubric of the 'rule of reason'").

2         The Court should adopt Plaintiffs' proposed instruction on this topic which is

3    consistent with Ninth Circuit law.

81

# DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 52: RULE OF REASON  ASSESSING THE PROCOMPETITIVE BENEFITS AND RATIONALES

As explained in Defendants' Argument in Support of Defendants' Instruction No. 47, the limited proposed deviations from the model instructions are intended to align the instructions with recent and controlling developments in antitrust law, both in Supreme Court and Ninth Circuit jurisprudence and follow recent instructions within this Circuit.

In particular, Defendants have specifically adapted the ABA model instructions to account for more recent precedent, including the Ninth Circuit's acknowledgements in *Epic Games* that (i) Supreme Court precedent does not require a fourth step, and (ii) the three-part test "is already designed to identify . . . an imbalance" among the anticompetitive effects and procompetitive benefits, such that proceeding to a fourth balancing step, "in most instances," will merely "confirm[] the result suggested by a step-three failure." 67 F.4th at 994; *see* Defendants' Argument in Support of Defendants' Disputed Instruction No. 42. Plaintiffs offer no reason to believe that this is the unique case in which there is a need to instruct the jury to proceed to a fourth step merely to confirm the third step.

Plaintiffs' argument regarding balancing "the unattained benefits" similarly fails. As the Ninth Circuit explained, "There is no legal requirement . . . that district courts make pretext findings on an all-or-nothing basis. When district courts at step two partially credit a rationale, step three will necessarily take that partial finding into account." *Epic Games*, 67 F.4th at 986. The three-part test is therefore already designed to identify these imbalances. Plaintiffs' reliance on *Qualcomm* is similarly misplaced; *Qualcomm*'s statement of the rule of reason under Section 2 was intended to illustrate the Ninth Circuit's position that "the three-part burden-shifting test under the rule of reason is essentially the same" for conduct under Sections 1

82

1   and 2. *See Qualcomm*, 969 F.3d at 991. Defendants' description of the rule of

2   reason as more recently clarified in *Epic Games* is therefore accurate and

3   appropriate.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

83

## SECTION 2 CLAIM

## INSTRUCTION NO. 56: ELEMENTS OF CONSPIRACY TO MONOPOLIZE

Plaintiffs also allege a conspiracy to monopolize in violation of Section 2 of the Sherman Act, which declares unlawful every conspiracy to monopolize interstate commerce.

This claim involves the exact same conduct as Plaintiffs' claim that Defendants and DirecTV conspired to unreasonably restrain trade under Section 1 of the Sherman Act. Accordingly, if you find for the Defendants on Plaintiffs' Section 1 claim, you must rule for the Defendants on Plaintiffs' Section 2 claim.

If, however, you find for the Plaintiffs on their Section 1 claim, you should consider their Section 2 claim of a conspiracy to monopolize. That claim requires proof of all the elements of Section 1—specifically, proof of anticompetitive conduct, including an unreasonable restraint of trade, as well as additional elements. Specifically, to prevail against each defendant on a claim of conspiracy to monopolize, Plaintiffs must prove, by a preponderance of the evidence, each of the following elements:

(1) two or more persons knowingly entered into a conspiracy to engage in anticompetitive conduct to monopolize the market for professional football telecasts;

(2) each Defendant specifically intended that the NFL would monopolize the market for professional football telecasts;

(3) each Defendant committed an overt act in furtherance of the conspiracy; and

(4) Plaintiffs were injured in their business or property because of the conspiracy to monopolize.

If you find that the evidence is insufficient to prove any one or more of these elements as to a defendant, then you must find for that defendant and against

84

Defendants' Disputed Final Jury Instructions

Plaintiffs on Plaintiffs' conspiracy to monopolize claim. If you find that the evidence is sufficient to prove each element as to a defendant, then you must find for Plaintiffs and against that defendant on Plaintiffs' conspiracy to monopolize claim.

**Authority**: Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); Model Jury Instructions in Civil Antitrust Cases, Chapter 3– Section 2 of the Sherman Act—Conspiracy to Monopolize, Instruction 1: Elements (Am. Bar Ass'n Antitrust L. Section 2016); *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("Because [plaintiff's] claim under § 1 fails, its claim of a conspiracy to monopolize under § 2 based on the same conduct necessarily fails as well."); *Qualcomm*, 969 F.3d at 991–92 ("If, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2."); 3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 809 (4th ed. 2022) ("Any arrangement that could be considered a 'conspiracy' to monopolize must necessarily also be an unreasonable 'contract,' 'combination,' or 'conspiracy' in restraint of trade offending §1."); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 756 (N.D. Ill. 2019) ("[S]imilar to § 1's 'anticompetitive effects' requirement," plaintiffs asserting a Section 2 conspiracy to monopolize claim must prove "that the overt acts constitute 'anticompetitive conduct.'" (citing *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004))); *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000) ("Under § 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power by anticompetitive means."); *Auraria Student Hous. at the*

1    *Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1236 (10th Cir.

2    2016) ("§ 2 forbids only conduct which is truly anticompetitive conduct." (citing

3    *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The purpose of the

4    [Sherman] Act is not to protect businesses from the working of the market; it is to

5    protect the public from the failure of the market. The law directs itself not against

6    conduct which is competitive, even severely so, but against conduct which unfairly

7    tends to destroy competition itself."))).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Case No. 2:15-ml-02668-PSG (SKx)**                    **Defendants' Disputed Final Jury Instructions**

**PLAINTIFFS' OBJECTIONS TO NFL INSTRUCTION NO. 56: ELEMENTS
OF A CONSPIRACY TO MONOPOLIZE**

Plaintiffs object to multiple aspects of the NFL Defendants' Instruction 56.

First, Plaintiffs object to the NFL Defendants' lengthy preamble about the overlap between Plaintiffs' Section 1 and Section 2 claims, which is incorrect, unnecessary, confusing (e.g., "if you find for"), and prejudicial.

Second, Plaintiffs object to the NFL Defendants' importation of elements supporting a monopolization claim into this instruction on *a conspiracy to monopolize* claim. Defendants' instruction departs from the ABA Model Instruction in significant ways, each of which results in inaccurate descriptions of applicable law. As to the additional supposed requirement of conspiring "to engage in anticompetitive conduct"—which again is not found in the ABA Model Instruction—there is no such element of Plaintiffs' claims. The NFL Defendants insist that without this first-of-its-kind addition, "working to obtain monopoly power could be illegal even if only procompetitive methods are used, in clear conflict with bedrock Section 2 law." NFL Defs' Objections to Pls' Jury Instruction No. 56. But that, again, seeks to apply inapposite caselaw concerning monopolization claims and is at odds with the Rule of Reason analysis in any event. Indeed, Defendants cite *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000), which is *not* a conspiracy to monopolize case.

Third, Plaintiffs object to the NFL Defendants' substitution of "a conspiracy to engage in anticompetitive conduct to monopolize" in place of "an agreement or mutual understanding between two or more persons to obtain or maintain monopoly power," as the ABA Model Instruction advises. As to conspiracy, the NFL Defendants are not entitled to their preferred word, with its intimations of secrecy and smoke-filled rooms; any agreement or mutual understanding suffices and is therefore the better description. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*,

2012 WL 4858836, at *3 (N.D. Cal. Oct. 11, 2012) (civil antitrust jury instruction as to whether a defendant "entered into an agreement or mutual understanding"); *see also United States v. Lischewski*, 860 F. App'x 512, 514 (9th Cir. 2021) (upholding jury instruction in criminal antitrust conspiracy case concerning proof of "an agreement or mutual understanding").

Fourth, Plaintiffs object to the NFL Defendants' inclusion of "that" before "each Defendant" in clauses (2) and (3), which is at odds with clauses (1) and (4), inconsistent with the ABA Model Instruction, and is potentially prejudicial because it calls special attention to these clauses.

Fifth, Plaintiffs object to the NFL Defendants' invocation of "each Defendant" in clauses (2) and (3), as confusing and misleading, including because it suggests that league action on behalf of *all* NFL Defendants could not suffice as a qualifying act in furtherance of the conspiracy or show specific intent.

Sixth, Plaintiffs object to the insertion of "each Defendant specifically intended that *the NFL* would monopolize the market for professional football telecasts," which misconstrues Plaintiffs' allegations. The NFL *singular* does not capture the specific intentions alleged, and the jury will understandably be confused about the NFL's "monopolization" as it relates to professional football telecasts. For the same reasons as above, Plaintiffs also object to the use of the word "monopolize" here in place of "obtain or maintain monopoly power," as found in the ABA model instruction.

Finally, Plaintiffs object to the use of the phrase "market for professional football telecasts" which misconstrues Plaintiffs' contentions. Plaintiffs insist that any instruction on this topic use the phrase "live professional football telecasts" instead of "market for professional football telecasts."

Plaintiffs incorporate their arguments on this subject in the proposed final pretrial order.

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 56: ELEMENTS OF CONSPIRACY TO MONOPOLIZE

The Court should adopt Defendants' Instruction 56 because it: (i) explains to the jury the relationship between Plaintiffs' Section 1 and 2 claims; (ii) accurately states the complete elements of Plaintiffs' Section 2 claim; and (iii) appropriately adapts the model instruction to the needs of this case.

*First*, Defendants' proposed instruction accurately instructs the jury on the relationship between Plaintiffs' Section 1 and Section 2 claims. Proving Plaintiffs' Section 2 theory would require Plaintiffs to prove every element of their Section 1 claim, *plus* the additional elements of the Section 2 claim. *See Qualcomm*, 969 F.3d at 992 ("[P]roving an antitrust violation under § 2 of the Sherman Act is more exacting than proving a § 1 violation."). This duplication arises because Plaintiffs' Section 2 claim is based on the same conduct as the Section 1 claim, and the Ninth Circuit has consistently held that failure to prove a Section 1 claim dooms a Section 2 claim based on the same conduct. *See, e.g.*, *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("Because [plaintiff's] claim under § 1 fails, its claim of a conspiracy to monopolize under § 2 based on the same conduct necessarily fails as well."); *see also* 3B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 809 (4th ed. 2022) ("Any arrangement that could be considered a 'conspiracy' to monopolize must necessarily also be an unreasonable 'contract,' 'combination,' or 'conspiracy' in restraint of trade offending §1."); ECF No. 1185 (NFL Defs.' Mem. Contentions of Fact & L.) at 7–8, 24–25.

As a result, if Plaintiffs' claims fail under Section 1, they necessarily fail under Section 2. As the Ninth Circuit has explained, "[i]f, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is *not*

anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *Qualcomm*, 969 F.3d at 991 (emphasis in original).

The jury should be instructed as to this blackletter principle of antitrust law. In the absence of an instruction, a jury could misunderstand the relationship between Plaintiffs' two separate claims and render a verdict that is economically irrational and legally impermissible. For example, if the jury returns a verdict for the NFL Defendants on the Section 1 claim and for Plaintiffs on the Section 2 claim, the jury will have rendered a factually and legally inconsistent and irreconcilable verdict under governing law. An explicit instruction that, if Plaintiffs were to fail on their Section 1 claim, there would be no basis for a jury to find liability on the Section 2 claim based on the same conduct, avoids that risk.

*Second*, Defendants' proposed instruction accurately states the elements required for a Section 2 claim. Plaintiffs first challenge the inclusion of the language, "engage in anticompetitive conduct," but this language is not only consistent with the law of this Circuit, it is also supported by the model instructions for a conspiracy to monopolize claim. Efforts to obtain monopoly power violate Section 2 only when (among other requirements) they involve the use of *anticompetitive conduct*; courts in the Ninth Circuit have consistently held that, to prevail on a conspiracy to monopolize claim, a plaintiff must show "specific intent to monopolize and anticompetitive acts designed to effect that intent." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980), *cert. denied*, 450 U.S. 921 (1981); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1154 (9th Cir. 2003) (same); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *27 (E.D. Cal. Sept. 3, 2010) (same). A conspiracy to "monopolize" necessarily incorporates this requirement because the verb "to monopolize" as a legal matter requires anticompetitive conduct—working to obtain a monopoly through legitimate competitive means is not "monopolization." *See*

**Defendants' Disputed Final Jury Instructions**

*Stanislaus Food*, 2010 WL 3521979, at *27 (quoting *Carpet Seaming Tape Licensing Corp. v. Best Seam. Inc.*, 616 F.2d 1133, 1141 (9th Cir. 1980)); *see also Truck-Rail Handling Inc. v. Burlington N. Santa Fe R.R. Co.*, 2005 WL 1629949, at *1–2 (N.D. Cal. 2005) (granting summary judgment to defendant on conspiracy to monopolize claim because plaintiffs could not establish that defendant "engaged in anti-competitive acts designed to effectuate the alleged intent to monopolize"); *Freeman*, 322 F.3d at 1155 (evidence failed to show that adoption of shareholder agreements were "anticompetitive acts" to supported conspiracy to monopolize); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 1001 (9th Cir. 1986) ("But we know of no authority that a Section 2 conspiracy may be established without some showing that more than one of the alleged co-conspirators had at least some awareness that the underlying conduct was anticompetitive or monopolistic.").

Ignoring this requirement, Plaintiffs propose to instruct the jury that they must prove only that "two or more persons knowingly enter[ed] into an agreement or mutual understanding between two or more persons *to obtain or maintain monopoly power*" and similarly that Defendants are required only to have "specifically intended that one of the parties to the agreement *would obtain or monopoly power*." *See* Plfs.' Disp. Instr. No. 56. Those assertions are legally incorrect because obtaining monopoly power is, of course, not inherently illegal. *Qualcomm*, 969 F.3d at 990 ("'The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not itself unlawful; instead, it is an important element of the free-market system.'" (cleaned up) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004))). Any legal test that would find liability based on a mere "agreement or mutual understanding" and intent "to obtain or maintain monopoly power" without a requirement of anticompetitive conduct would therefore improperly condemn and deter most procompetitive commercial activity, as the "intent to obtain a monopoly

91

or to capture an ongoing increase in market share" is "*of course* the aim of *every* business endeavor." *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000) (emphasis added).

While Plaintiffs' proposed language derives from the ABA's model instruction, it fails to "instruct the jury clearly regarding the law to be applied," *Lewis*, 53 F.3d at 34, because—unlike in most Section 2 cases—Plaintiffs are not also asserting a standard monopolization claim. The ABA model Section 2 instructions outline the necessity of anticompetitive conduct to any finding of liability under Section 2 but avoid repetition by not including that language again in the conspiracy to monopolize instruction. Where, as here, *only* a conspiracy to monopolize claim is at issue, the instruction is not complete without the addition of the general—and presumably uncontroversial—language from the ABA model that Section 2 requires anticompetitive conduct.

The model instructions on Section 2 conspiracies further confirm this point. The model instruction for the specific intent element explains, "you must decide whether the evidence shows that defendant entered into the agreement with the *conscious aim of using anticompetitive conduct* to acquire or maintain the power to control prices and exclude competition." Model Jury Instructions in Civil Antitrust Cases, Section 2 of the Sherman Act, Conspiracy to Monopolize, Instruction 4: Specific Intent (ABA Antitrust L. Sec. 2016) (emphasis added).

As the Ninth Circuit has explained, "[w]ell-tailored and specific instructions may be necessary . . . in complex antitrust cases where abstract legal principles are not self-explanatory to a lay jury, and the facts to which they must be applied are complex." *L.A. Mem'l Coliseum*, 726 F.2d at 1398 (cleaned up) (citation omitted). Application of that principle here requires a clear instruction that distinguishes between (a) procompetitive conduct seeking to gain market share or even monopoly power, on the one hand, and (b) a conspiracy to use anticompetitive conduct to

92

monopolize a market, on the other. Defendants' proposed Instruction 56 provides that necessary clarity.

Plaintiffs also object to the inclusion of the language "each defendant" as "confusing and misleading," but that charge is baseless. Defendants' instruction follows the model which makes clear: "*To prevail against a defendant* on its claim of conspiracy to monopolize, *plaintiff must prove*, by a preponderance of the evidence *as to that defendant*, *each of the following elements* . . ." Model Jury Instructions in Civil Antitrust Cases, Section 2 of the Sherman Act, Conspiracy to Monopolize, Instruction 1: Elements (ABA Antitrust L. Sec. 2016) (emphasis added). The jury should be properly instructed as to this burden, and Plaintiffs cite *no authority* to suggest that they do not need to prove each element for every defendant in order to prevail against each defendant. Indeed, Plaintiffs recently agreed that their burden was to prove that each defendant "specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in the relevant market." ECF No. 1187, Plfs.' Mem. Contentions of Fact & L., at 9 (stating the elements of their Section 2 claim).

*Third*, Defendants' proposed instruction appropriately adapts the model instruction to the facts and needs of this case. Plaintiffs attempt to argue that they should not be required to prove that the Defendants specifically intended that a specific entity (the NFL) would obtain or maintain monopoly power. But Plaintiffs cannot dispute that it would be legally insufficient for the jury to find that Defendants sought to obtain *collective* monopoly power; instead, Plaintiffs must prove that the Defendants specifically intended that *one* of the parties to the agreement would obtain or maintain monopoly power. The jury instructions must specify *which entity* Plaintiffs allege purportedly would be given monopoly power. *See, e.g.*, *Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc.*, 405 F. Supp. 2d 1141, 1152–53 (C.D. Cal. 2005) (dismissing plaintiffs' conspiracy to monopolize

claim because they "fail[ed] to allege a specific intent by Defendants to empower *one of them* with monopoly power (emphasis added)); *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 2015 WL 7008185, at *3–4 (C.D. Cal. Sept. 18, 2015) (collecting cases). And in their Complaint, Plaintiffs specified who the "one" entity is:  they alleged that the challenged agreements "allow *the NFL* to unlawfully monopolize" the relevant market. ECF No. 441 ¶ 20 (emphasis added).

In addition to accurately capturing Plaintiffs' allegations, defendants' proposed language is also consistent with the model instructions. *See* Model Jury Instructions in Civil Antitrust Cases, Section 2 of the Sherman Act, Conspiracy to Monopolize, Instruction 1: Elements (ABA Antitrust L. Sec. 2016) (emphasis added) ("To prevail against a defendant on its claim of conspiracy to monopolize, plaintiff must prove, by a preponderance of the evidence as to that defendant, each of the following elements: . . . (2) defendant specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in [segment of commerce alleged][.]"). Moreover, the Ninth Circuit has explicitly rejected a "shared monopoly" or "joint monopoly"; as another court in this district has explained, "Ninth Circuit case law holds that to sufficiently state a claim under § 2 for conspiracy to monopolize, the plaintiff must allege facts indicating that a conspiracy exists to create a monopoly *in a single entity*." *Lenhoff*, 2015 WL 7008185, at *3–4 (emphasis added) (collecting cases); *Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc.*, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005) ("[A]n allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under section 2.").

*Finally*, as explained in Defendants' Argument in Support of Defendants' Disputed Instruction No. 38, Defendants' use of the word "conspiracy" accurately describes the claim that Plaintiffs asserted and is consistent with the model instruction and the law.

94

## INSTRUCTION NO. 57: EXISTENCE OF A CONSPIRACY

Plaintiffs allege that the NFL Defendants and DirecTV entered into a conspiracy to engage in anticompetitive conduct with the specific intent of giving the NFL a monopoly in the market for professional football telecasts. As I explained earlier, to establish a conspiracy, Plaintiffs must prove both of the following elements by a preponderance of the evidence as to each defendant:

(1) that the alleged conspiracy among the NFL, the NFL Teams, and DirecTV to engage in anticompetitive conduct with the specific intent of giving the NFL a monopoly in the market for professional football telecasts existed; and

(2) that that each Defendant and DirecTV knowingly became a member of that conspiracy.

The instructions I read you previously regarding the existence of a conspiracy under Section 1 of the Sherman Act apply equally to Plaintiffs' claim of a conspiracy under Section 2 of the Sherman Act. As I explained, this means that if you found no conspiracy to unreasonably restrain trade on Plaintiffs' Section 1 claim, you must find for the NFL Defendants on Plaintiffs' Section 2 claim.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3– Section 2 of the Sherman Act—Conspiracy to Monopolize, Instruction 2: Existence of a Conspiracy, Chapter 2–Section 1 of the Sherman Act—Contract, Combination, or Conspiracy, Instruction 1: Definition, Existence, and Evidence (AM. BAR ASS'N ANTITRUST L. SECTION 2016); *Nova Designs*, 202 F.3d at 1092 ("Because [plaintiff's] claim under § 1 fails, its claim of a conspiracy to monopolize under § 2 based on the same conduct necessarily fails as well."); *Qualcomm*, 969 F.3d at 991– 92 ("If, in reviewing an alleged Sherman Act violation, a court finds that the

conduct in question is not anticompetitive under § 1, the court need not separately
analyze the conduct under § 2."); 3B Areeda & Hovenkamp, *Antitrust Law* ¶ 809
("Any arrangement that could be considered a 'conspiracy' to monopolize must
necessarily also be an unreasonable 'contract,' 'combination,' or 'conspiracy' in
restraint of trade offending § 1.").

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 57: EXISTENCE OF A CONSPIRACY

Plaintiffs object to this instruction in its entirety.[3] All parties agree this instruction is explicitly duplicative of the earlier Contract, Combination, or Conspiracy instruction under Section 1: "The instructions I read you previously regarding the existence of a conspiracy under Section 1 of the Sherman Act apply equally to Plaintiffs' claim of a conspiracy under Section 2 of the Sherman Act." NFL Defs' Jury Instruction No. 57; Pls' Jury Instruction No. 57. The better course is to say nothing more and explicitly cross-reference the applicable earlier instruction, as Plaintiffs propose with their instruction 57 and as the court did in *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370, ECF No. 499, Instruction No. 42 (N.D. Cal. Nov. 22, 2019).

Failing that, Plaintiffs propose inserting the earlier Contract, Combination, or Conspiracy instruction here in its entirety, after resolving objections and as the ABA Model Instruction supports, rather than the NFL Defendants' halfway measure, which purports to cover the same territory ("as I explained earlier") while adding and omitting significant information. *Compare* NFL Defs' Jury Instruction No. 57 *with* NFL Defs' Jury Instruction No. 40.

Plaintiffs otherwise object to this instruction for the same reasons set forth in their objection to Defendants' Proposed Instruction No. 40.

---

[3] Because Plaintiffs object to the NFL Defendants' proposed instruction 49 in its entirety, for the reasons stated, Plaintiffs do not inventory their specific objections to the NFL Defendants' proposed instruction 49, while reserving all rights.

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 57: EXISTENCE OF A CONSPIRACY**

Defendants' Instruction 57 accurately states the law and provides the jury with a clear guide to analyzing the first element of Plaintiffs' Section 2 claim.

Defendants' proposed instruction briefly reminds the jury of the two elements required to establish that parties entered into a conspiracy under the Sherman Act. Additionally, the proposed instruction explains to the jury the relationship between the burdens of proof for Plaintiffs' Section 1 and Section 2 claims. By contrast, Plaintiffs propose to merely redirect the jury to an earlier instruction on conspiracy. But this is insufficient. Jury instructions must "instruct the jury clearly regarding the law to be applied," *Lewis*, 53 F.3d at 34, and "focus [the jury's] attention on the essential issues in the case," *Ribaste*, 905 F.2d at 1143.

The ABA's model instruction on the existence of a conspiracy under Section 2 supports Defendants' proposed instruction. That instruction directs parties: "The Contract, Combination, or Conspiracy instructions at Chapter II.A and other pertinent conspiracy instructions *should be inserted here and modified as necessary to fit a conspiracy to monopolize case*" (emphasis added). MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3–Section 2 of the Sherman Act—Conspiracy to Monopolize, Instruction 2: Existence of a Conspiracy (AM. BAR ASS'N ANTITRUST L. SECTION 2016) Instead of inserting the instructions after making the necessary modifications "to fit a conspiracy to monopolize case," Plaintiffs suggest that the jury just refer back to the earlier conspiracy instruction (nearly a dozen instructions before hearing the Section 2 instructions) which would lead to confusion, especially given that that prior instruction is drafted with specific references to the Section 1 claim.

# INSTRUCTION NO. 58: MONOPOLY POWER DEFINED

To prove their conspiracy to monopolize claim, Plaintiffs must prove that the purpose of the conspiracy was to give the NFL monopoly power in the market for professional football telecasts.

Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3– Section 2 of the Sherman Act—Conspiracy to Monopolize, Instruction 3: Monopoly Power, Chapter 3–Section 2 of the Sherman Act—Monopolization– General, Instruction 2: Monopoly Power Defined (AM. BAR ASS'N ANTITRUST L. SECTION 2016); *Epic Games*, 67 F.4th at 974, 998 (requiring identical rule of reason inquiries for a plaintiff's claims under both Section 1 and Section 2 of the Sherman Act).

# PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 58: MONOPOLY POWER DEFINED

Plaintiffs object to three aspects of the NFL Defendants' proposed instruction 58.

First, Plaintiffs object to the NFL Defendants' reference to Plaintiffs' conspiracy to monopolize claim as "its" (singular) instead of "their" (plural).

Second, NFL Defendants' use of the conjunctive formation in the test for determining market power is contrary to Ninth Circuit law. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (defining monopoly power as the substantial ability "to control prices *or* exclude competition" (emphasis added)). The ABA Model Instructions recognize that "a number of courts have stated the test for determining market power in the disjunctive (i.e., the power to control prices or exclude competition)." ABA-JI-CIVANTI 3.A.2 n.2.

Third, the instruction improperly requires Plaintiffs to prove that the "purpose of the conspiracy was to give the NFL monopoly power." This language has no place in an instruction on the definition of monopoly power and is contrary to law. As the ABA Model Instructions recognize (in the appropriate section), a conspiracy to monopolize claim does not require Plaintiffs to prove "the purpose of the conspiracy" but rather its intent.

Fourth, Plaintiffs object to the use of "the NFL" in place of "one of the parties to the agreement," which is all that is required. The NFL *singular* does not capture the members of the conspiracy alleged, and the jury will understandably be confused about the NFL's "monopoly power" as it relates to professional football telecasts.

Lastly, Plaintiffs object to the absence of the word "live" preceding the "market for professional football telecasts," without which the instruction misconstrues Plaintiffs' contentions. *See* Pls' Jury Instruction No. 59.

100

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'
DISPUTED INSTRUCTION NO. 58: MONOPOLY POWER DEFINED**

Defendants' Instruction 58 accurately states the law and will allow the jury to
understand how to evaluate Plaintiffs' Section 2 claim.

*First,* as the ABA model instructions (and Plaintiffs) recognize, several
courts "have suggested monopoly power requires the ability to control prices *and*
exclude competition," MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES,
Chapter 3–Section 2 of the Sherman Act—Monopolization–General, Instruction 2:
Monopoly Power Defined n.2 (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (citing
1 ABA Sec. Antitrust L., *Antitrust Law Developments* 230-31 & n.6 (7th ed. 2012);
*City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 654 (10th Cir. 1992),
*overruled on other grounds by Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d
1137, 1145 (10th Cir. 1997); *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.*, 783 F.2d
159, 164 (10th Cir. 1986), including courts in this Circuit, *see, e.g.*, *Shields v.
Federation Internationale de Natation*, 649 F. Supp. 3d 904, 926 (N.D. Cal. 2023)
("Monopoly power is the ability to control prices and exclude competition in a
given market. If a firm can profitably raise prices without causing competing firms
to expand output and drive down prices, that firm has monopoly power." (citation
omitted)). On the other hand, Plaintiffs provide no justification for their proposal to
depart from the ABA's model language that "Monopoly power is the power to
control prices, restrict output, and exclude competition in a relevant antitrust
market." Plaintiffs' proposal to change "and" to "or" would improperly suggest that
proof of just one of these indicators—higher prices, restricted output, *or* excluded
competition—can prove monopoly power.

*Second*, Plaintiffs' objection to the use of the word "purpose" is baseless.
Plaintiffs admit that they must prove that the "intent" of the conspiracy, *i.e.*, the
purpose of the conspiracy, was to give the NFL monopoly power in the market for

professional football telecasts. They make no colorable argument that Defendants'
proposed language is inaccurate or confusing, and in any event, Plaintiffs' argument
would at most support replacing the word "purpose" with its synonym "intent" in
Defendants' proposed instruction.

*Third*, as explained in Defendants' Argument in Support of Defendants'
Instruction No. 56, Plaintiffs only recently disagreed that their burden was to prove
that *each* defendant "specifically intended that one of the parties to the agreement
would obtain or maintain monopoly power in the relevant market." *Cf.* ECF No.
1187, Plfs.' Mem. Contentions of Fact & L., at 9 (stating the elements of their
Section 2 claim); *see also* ECF No. 441 ¶ 20. And Plaintiffs cannot backtrack from
their contention that the NFL is that "one" party. Defendants' instruction accurately
states the law for the claim that Plaintiffs have alleged, and they cannot continue to
hide the ball on their theory; the jury must be properly instructed how to evaluate
Plaintiffs' claims.

Finally, Defendants' proposed instruction uses the relevant market as defined
*by Plaintiffs* in the Final Pretrial Conference Order. *See* ECF No. 1331-1, Final
Pretrial Conf. Order at 13. As the rules of this district make clear, "parties will be
precluded from presenting claims or defenses not set forth in this order, in the
manner required by this order, unless the order is modified to prevent manifest
injustice." Local Rules, App'x A, ¶ 7. Plaintiffs had every opportunity to define the
relevant market how they wanted in the Order, and Defendants' instructions are
accurate as to Plaintiffs' own statement of their claims.

## INSTRUCTION NO. 62: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER

To prove its conspiracy to monopolize claim, Plaintiffs also must prove that the means of the conspiracy was to use anticompetitive conduct to obtain monopoly power in the market for professional football telecasts.

Market participants, including monopolists, may compete aggressively without violating the antitrust laws and may charge monopoly prices without violating the antitrust laws. Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful. A market participant's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether the NFL Defendants' conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

As these examples show, the acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for

competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skills; or because of economic or technological efficiency; or by obtaining lawful intellectual property.

In determining whether the NFL Defendants engaged in conduct that was anticompetitive or whether it was legitimate business conduct, you should apply the rule of reason analysis that I explained to you earlier in connection with Plaintiffs' Section 1 claim. If that analysis led you to conclude that Plaintiffs did not meet their burden as to the Section 1 claim, you must reach the same conclusion as to their Section 2 claim.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3–Section 2 of the Sherman Act—Conspiracy to Monopolize, Instruction 3: Monopoly Power, Chapter 3–Section 2 of the Sherman Act—Monopolization–General, Instruction 9: Willful Acquisition or Maintenance of Monopoly Power (AM. BAR ASS'N ANTITRUST L. SECTION 2016); *Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d at 756 ("[S]imilar to § 1's 'anticompetitive effects' requirement," plaintiffs asserting a Section 2 conspiracy to monopolize claim must prove "that the overt acts constitute 'anticompetitive conduct.'" (citing *Trinko*, 540 U.S. at 407)); *Endsley*, 230 F.3d at 283 ("Under § 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power by anticompetitive means."); *Auraria Student Hous.*, 843 F.3d at 1236 ("§ 2 forbids only conduct which is truly anticompetitive conduct." (citing *Spectrum Sports*, 506 U.S. at 458 ("The purpose of the [Sherman] Act is not to protect businesses from the working

104

of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.")).

1
2

# PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 62: WILLFUL
# ACQUISITION OR MAINTENANCE OF MONOPOLY POWER

3        Plaintiffs object to the NFL Defendants' proposed instruction 62 in its

4   entirety because this instruction is appropriate only for a claim of actual

5   monopolization and Plaintiffs bring no such claim.

6        The "willful acquisition or maintenance of monopoly power" is *not* an

7   element of the claim that Plaintiffs *do* bring under Section 2 of the Sherman Act,

8   conspiracy to monopolize. *See In re National Football League's Sunday Ticket*

9   *Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019) (distinguishing the elements of

10  monopolization, and conspiracy to monopolize); *In re Pandora Media, LLC*, 2022

11  WL 19299126 at *9 (C.D. Cal. Oct. 26, 2022) (same); *CollegeNet, Inc. v. Common*

12  *Application, Inc.* 355 F. Supp. 3d 926 (D. Ore. 2018) (same); *compare* ABA Model

13  Instructions 3.A.1 (describing "willful acquisition or maintenance of monopoly

14  power" as an element of a Section 2 Monopolization claim) *with* ABA Model Jury

15  Instructions 3.E.1 (describing elements of a conspiracy to monopolize claim).

16       The NFL Defendants effectively acknowledge this mismatch in identifying

17  the source of their proposed instruction as "Monopolization–General, Instruction 9:

18  Willful Acquisition or Maintenance of Monopoly Power (AM. BAR ASS'N

19  ANTITRUST L. SECTION 2016)," and the caselaw they cite applies to the second

20  prong of *a conspiracy-to-monopolize claim*, and has no bearing on willful

21  acquisition or maintenance of monopoly power. *See Auraria Student Hous. at the*

22  *Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1236 (10th Cir.

23  2016); *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000); *City of*

24  *Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 756 (N.D. Ill. 2019).

25
26
27
28

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 62: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER

The Court should give Defendants' Instruction 62 regarding willful acquisition or maintenance of monopoly power, which accurately reflects the law that the jury must apply and appropriately adapts the ABA's model instruction to the facts of this case.

Contrary to Plaintiffs' argument, the inclusion of this instruction is directed by the ABA's model instructions themselves. Specifically, the model instruction on "Monopoly Power" for a conspiracy to monopolize claim directs parties as follows: "The Monopolization—General instructions at part A of this chapter, and other relevant instructions *should be inserted here*" (emphasis added). The "Monopolization—General" instructions include the "Willful Acquisition or Maintenance of Monopoly Power" model instruction on which Defendants' proposed instruction is closely modeled.

More importantly, the instruction is also required as a matter of law. "Under § 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power by anticompetitive means." *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000). Antitrust law thus distinguishes between the willful acquisition of monopoly power through anticompetitive conduct and "development as a consequence of a superior product, business acumen, or historic accident." *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *see also, e.g.*, *Qualcomm*, 969 F.3d at 1005 ("Anticompetitive behavior is illegal under federal antitrust law. Hypercompetitive behavior is not."); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is

competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.").

As a result, "[t]o prevail on a conspiracy to monopolize, plaintiff must show 'specific intent to monopolize and anticompetitive acts designed to effect that intent.'" *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *27 (E.D. Cal. Sept. 3, 2010) (quoting *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980), *cert. denied*, 450 U.S. 921 (1981)); *Truck-Rail Handling Inc. v. Burlington N. Santa Fe R.R. Co.*, 2005 WL 1629949, at *2 (N.D. Cal. 2005) (granting summary judgment to defendant on conspiracy to monopolize claim because plaintiffs could not establish that defendant "engaged in anti-competitive acts designed to effectuate the alleged intent to monopolize"); *see also Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 1001 (9th Cir. 1986) ("But we know of no authority that a Section 2 conspiracy may be established without some showing that more than one of the alleged co-conspirators had at least some awareness that the underlying conduct was anticompetitive or monopolistic"); *Rockford*, 360 F. Supp. 3d at 756 ("In addressing the second prong [of the conspiracy to monopolize elements], similar to § 1's 'anticompetitive effects' requirement, plaintiffs must allege that the overt acts constitute 'anticompetitive conduct.' (citing *Trinko*, 540 U.S. at 407)).

The other model instructions for conspiracy to monopolize claims further confirm this point: The model instruction for the specific intent element explains, "you must decide whether the evidence shows that defendant entered into the agreement with the *conscious aim of using anticompetitive conduct* to acquire or maintain the power to control prices and exclude competition." Model Jury Instructions in Civil Antitrust Cases, Section 2 of the Sherman Act, Conspiracy to Monopolize, Instruction 4: Specific Intent (ABA Antitrust L. Sec. 2016) (emphasis added). Plaintiffs' instructions recognize the requirement that defendants conspire

"with the conscious aim of using anticompetitive conduct to acquire or maintain the power to control prices and exclude competition in telecasts of NFL games." Plfs.' Proposed Instr. No. 63.

But without Defendants' Instruction 62, the jury will not receive appropriate guidance regarding the admittedly hard-to-define line "between anticompetitive conduct and conduct that has a legitimate business purpose." This instruction, therefore, must be given so that the jury understands how to differentiate between the acquisition of monopoly power through lawful and unlawful means.

## INSTRUCTION NO. 63: SPECIFIC INTENT

If you determine that there was a conspiracy among the NFL Defendants and DirecTV to engage in anticompetitive conduct to monopolize the market for professional football telecasts, you must then decide, as to each Defendant, whether Plaintiffs have proven that that Defendant specifically intended that the NFL would acquire or maintain monopoly power in the market for professional football telecasts. In other words, you must decide whether the evidence shows that that Defendant entered into the conspiracy with the conscious aim of using anticompetitive conduct to acquire or maintain the power to control prices and exclude competition in the market for professional football telecasts. Neither proof of use of the power to exclude, nor proof of actual exclusion of existing or potential competitors, is essential to sustain the charge of conspiracy to monopolize.

There are several ways in which a plaintiff may prove that a defendant had the specific intent to monopolize. There may be evidence of direct statements of that defendant's intent to use anticompetitive means to acquire monopoly power in the market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of defendant at about the time of the agreement or by testimony concerning statements of responsible officers or employees of defendant. However, you should be careful to distinguish between a lawful intent to compete vigorously, which may be accompanied by aggressive language, and a specific intent to monopolize by using anticompetitive conduct.

Even if you decide that the evidence does not prove directly that a defendant actually intended to exercise monopoly power by using anticompetitive conduct, specific intent may be inferred from what defendant did. For example, if the evidence shows that the natural and probable consequence of the agreement or of the conduct of the parties to the agreement was to exclude or destroy competition in the market for professional football telecasts, that there was no legitimate business

**Defendants' Disputed Final Jury Instructions**

justification but the destruction or damage to competition, and that this was plainly foreseeable by defendant, then you may (but are not required to) infer that defendant specifically intended to acquire monopoly power by using anticompetitive conduct.

In determining whether each defendant had a specific intent to monopolize, you should take into consideration the extent of competition all defendants would face from producers of identical or equivalent goods and whether they had or probably could have acquired sufficient power, acting together as a group, to control prices in and to exclude competition from the market for professional football telecasts. If you find that it is unlikely that the NFL Defendants could have achieved the power to exclude competition from an appreciable segment of commerce, then you may consider this as circumstantial evidence that none of them had the required specific intent to monopolize.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3–Section 2 of the Sherman Act—Conspiracy to Monopolize, Instruction 4: Specific Intent (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1
2

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 63: SPECIFIC INTENT

3    First, Plaintiffs object to the NFL Defendants' addition of "to engage in
4  anticompetitive conduct" to the description of the conspiracy to monopolize found
5  in the ABA's model instruction, as detailed *supra* in Plaintiffs' objection to
6  Instruction No. 56.

7    Second, Plaintiffs object to Defendants' selective pluralization and
8  capitalization, which is inconsistent with the ABA's model instruction and likely to
9  cause confusion: "There are several ways in which *Plaintiffs* may prove that *a*
10 *defendant* had the specific intent to monopolize. There may be evidence of direct
11 statements of *that defendant*'s intent to use anticompetitive means to acquire
12 monopoly power in the market." For the same reasons, Plaintiffs object to the
13 capitalization and singular in this passage: "In other words, you must decide
14 whether the evidence shows that *Defendant* entered into the conspiracy with the
15 conscious aim of using anticompetitive conduct to acquire . . . ." Plaintiffs propose
16 adoption of its proposed instruction on this topic, which tracks the ABA's model
17 instruction.

18    Third, Plaintiffs object to the use of "the NFL" in place of "the members of
19 the conspiracy," as found in the ABA's model jury instruction. The NFL *singular*
20 does not capture the members of the conspiracy alleged, and the jury will
21 understandably be confused about the NFL's "monopoly power" as it relates to
22 professional football telecasts.

23    Fourth, Plaintiffs insist on changing the language on line 5 starting at
24 "maintain monopoly power" to "maintain monopoly power in live professional
25 football telecasts."

26    Fifth, Plaintiffs object to the use of the term "conspiracy" throughout rather
27 than "agreement" as confusing and prejudicial, as stated in earlier objections. The

28

1    notes to ABA Antitrust 2-A-1 explain that the term "conspiracy" may be "unfairly

2    prejudicial" and recommends that cases substitute the word "agreement" where

3    appropriate.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 63: SPECIFIC INTENT**

Plaintiffs repeat several of their objections here, but Defendants' Instruction 63 accurately states the law and instructs the jury as to how to determine whether Plaintiffs have met their burden to prove the specific intent element. As explained in Defendants' Argument in Support of Defendants' Instruction No. 56, Plaintiffs bear the burden of showing that each defendant specifically intended that *the NFL* would obtain or maintain monopoly power in the relevant market, and they cite no authority to the contrary. As explained in Defendants' Argument in Support of Defendants' Instruction 58, Defendants' proposed instruction uses the relevant market as defined *by Plaintiffs* in the Final Pretrial Conference Order. *See also* ECF No. 1331-1, Final Pretrial Conf. Order at 13. Finally, as explained in Defendants' Argument in Support of Defendants' Instruction 38, Defendants' use of the word "conspiracy" is proper in this context, as it is Plaintiffs who alleged that Defendants entered into an unlawful conspiracy to monopolize the relevant market.

114

**ANTITRUST INJURY**

**INSTRUCTION NO. 65: INJURY AND CAUSATION**

If you find that Defendants have violated either or both of Sections 1 and 2 of the Sherman Act, then you must decide if Plaintiffs are entitled to recover damages from Defendants.

Plaintiffs are entitled to recover damages for an injury to their business or property if they can establish three elements of injury and causation:

(1) Plaintiffs were in fact injured as a result of Defendants' alleged violation of the antitrust laws;

(2) Defendants' alleged illegal conduct was a direct cause of Plaintiffs' injury; and

(3) Plaintiffs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Plaintiffs to establish that they are entitled to recover damages, they must prove that they were injured as a direct result of Defendants' alleged violation of the antitrust laws. Proving the fact of damage does not require Plaintiffs to prove the dollar value of their injury. It requires only that Plaintiffs prove that they were in fact injured by Defendants' alleged antitrust violation.

If you find that Plaintiffs have established that they were in fact injured, you may then consider the amount of Plaintiffs' damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Plaintiffs have established that they were in fact injured.

Plaintiffs must also offer evidence that establishes by a preponderance of the evidence that Defendants' alleged illegal conduct was a direct cause of Plaintiffs' injury. This means that Plaintiffs must have proved that some damage occurred to

115

them as a direct result of Defendants' alleged antitrust violation, and not some other cause. Plaintiffs are not required to prove that Defendants' alleged antitrust violation was the sole cause of their injury; nor need Plaintiffs eliminate all other possible causes of injury. It is enough if Plaintiffs have proved that the alleged antitrust violation was a direct cause of its injury.

Finally, Plaintiffs must establish that their injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Plaintiffs' injuries are antitrust injuries. On the other hand, if Plaintiffs' injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Plaintiffs' injuries are not antitrust injuries and Plaintiffs may not recover damages for those injuries under the antitrust laws.

In summary, if Plaintiffs can establish that they were in fact injured by Defendants' conduct, that Defendants' conduct was a direct cause of Plaintiffs' injury, and that Plaintiffs' injury was the type that the antitrust laws were intended to prevent, then Plaintiffs are entitled to recover damages for the injury to their business or property.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6– Causation and Damages–Clayton Act Section 4 Requirements, Instruction 1: Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 65: INJURY
AND CAUSATION**

Plaintiffs object to the NFL Defendants' substantial and legally inaccurate
deviation from the ABA Model Instruction by substituting "direct cause" in place
of "material cause" to require that Defendants' alleged illegal conduct be "a *direct*
cause of Plaintiffs' injury. The NFL Defendants misconstrue the Ninth Circuit's
opinion in this case to justify their departure. When the Ninth Circuit flagged that
"plaintiffs must allege that their harm was caused directly by the antitrust violator,"
it was plainly discussing antitrust standing under *Illinois Brick* (i.e., the direct
purchaser rule and its "principles of proximate cause"). *See In re Nat'l Football
League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1156-57 (9th Cir. 2019)
("In other words, when co-conspirators have jointly committed the antitrust
violation, a plaintiff who is the immediate purchaser from any of the conspirators is
directly injured by the violation.").

The Ninth Circuit did not reverse nearly a century of Supreme Court
precedent on the standard for causation in antitrust cases, dating back to *Story
Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 560-62 (1931).
*See, e.g., Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 487 (9th
Cir. 2021)) ("[A] plaintiff need not prove that the antitrust violation was the only
cause of its injury in order to recover damages[;] proof that the violation was a
material cause is sufficient."). ABA Antitrust 6-A-1 also notes "Plaintiff is not
required to prove that defendant's alleged antitrust violation was the sole cause of
its injury; nor need plaintiff eliminate all other possible causes of injury. It is
enough if plaintiff has proved that the alleged antitrust violation was a material
cause of its injury."

Nor do the NFL Defendants' citations support this stark departure from
antitrust precedent. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.

117

118, 132 (2014) (discussing generally principles of causation for statutory causes of action); *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (considering injury to plaintiff that was "neither a consumer nor a competitor in the market in which trade was restrained"); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 140 (2d Cir. 2021) ("Under the [first-step] rule, injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior. Accordingly, *'[d]irectness in the antitrust context means close in the chain of causation.'*") (citation omitted and emphasis added).

1   **DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

2   **DISPUTED INSTRUCTION NO. 65: INJURY AND CAUSATION**

3   The Court should reject Plaintiffs' objections to Defendants' Proposed

4   Instruction 65, as they ignore this Circuit's well-settled precedent.

5   *First,* directness of injury is indisputably a requirement of antitrust standing.

6   *See*, *e.g.*, *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458 (9th Cir. 2021)

7   ("The second factor in the antitrust standing inquiry 'looks to whether [the

8   plaintiff's] alleged injury was the direct result of [the defendant's] allegedly

9   anticompetitive conduct.'" (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,

10  190 F.3d 1051, 1058 (9th Cir. 1999)). Contrary to Plaintiffs' suggestion, this is not

11  merely a recitation of the indirect purchaser rule announced in *Illinois Brick Co. v.*

12  *Illinois*, 431 U.S. 720, 746 (1977). Rather, the Ninth Circuit has applied the

13  requirement in cases not governed by *Illinois Brick*, including to distinguish

14  between the injury incurred by purchasers and non-purchasers, *Oakland Raiders*, 20

15  F.4th at 458, and for entities whose claims of injury are overly speculative, *id.* at

16  459–60.

17  *Second*, none of Plaintiffs' citations contradict the correct statements of the

18  law in this instruction. Defendants' proposed instruction requires only that

19  Plaintiffs prove the alleged conduct was *a* direct cause of Plaintiffs' harm, not the

20  "sole" or "only" cause. An antitrust injury may have more than one direct cause,

21  and Defendants' proposed instruction does not extend beyond this Court's holding

22  that Plaintiffs must prove that "their harm was directly caused by the antitrust

23  violator." *Sunday Ticket*, 2024 WL 168298, at *4; *see also Inst. of Cetacean Rsch.*

24  *v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 951 (9th Cir. 2014) ("An event

25  may have multiple proximate causes.").

26  *Finally*, Plaintiffs themselves recognize that they must prove that they

27  suffered a *direct injury* in order to recover in this case.  In their objection to

28

Defendants' proposed Instruction 75, Plaintiffs describe their own burden to show that their "harm was caused directly by an antitrust violator." For all of these reasons, the Court should reject Plaintiffs' objections and adopt Defendants' proposed instruction.

120

# INSTRUCTION NO. 66: BUSINESS OR PROPERTY

Plaintiffs must establish that the injury they claim to have suffered was an injury to their businesses or property. The term "business" includes any commercial interest or venture. Plaintiffs have been injured in their businesses if you find that they have suffered injury to any of their commercial interests or enterprises as a result of Defendants' alleged antitrust violation. The term property includes anything of value Plaintiffs own, possess, or in which Plaintiffs have a protectable legal interest. Plaintiffs have been injured in their property if you find that anything of value that they own, possess, or have a legal interest in has been damaged as a result of Defendants' alleged antitrust violation. Plaintiffs have been injured in their property if you find that they have paid an inflated price for goods, services, any legal interest of value, or have lost money as a result of Defendants' alleged antitrust violation.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6–Causation and Damages–Clayton Act Section 4 Requirements, Instruction 2: Business or Property (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 66: BUSINESS OR PROPERTY**

Plaintiffs propose a version of this instruction that makes one minor addition to the ABA model instruction by adding "money" as an example of "property." The term "property" connotes real property, so it will be helpful to instruct the jury that "property" includes money. This addition is also consistent with the law. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 340 (1979) ("A person whose property is diminished by a payment of money wrongfully induced is injured in his property.") (quoting *Chatanooga Foundry Pipe Works v. Atlanta*, 203 U.S. 390, 396 (1906).

Plaintiffs do not otherwise object to this instruction.

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 66: BUSINESS OR PROPERTY

Defendants' Instruction 66 is identical to the model, and Plaintiffs lack any valid basis for objecting to it. Plaintiffs' proposed Instruction 66, by contrast, needlessly strays from the model instructions with its inclusion of "including money" in the explanation of "property." This proposed departure from the model instruction is especially confusing for the jury when taken with the following sentence: "Plaintiffs have been injured in their property if you find that they *have paid an inflated price* for goods, services, any legal interest of value, *or have lost money* as a result of Defendants' alleged antitrust violation." (emphases added). The addition of "including money" to the definition of property is unfounded, redundant, and will only confuse the jurors.

## INSTRUCTION NO. 67: RELEVANT TIME PERIOD

The law precludes Plaintiffs from recovering for any injuries to the residential or commercial subscriber Plaintiffs caused by conduct that occurred prior to June 17, 2011. You have heard evidence in this trial about Defendants' conduct prior to these dates. That conduct may be considered as background to help you understand the claims in this case, but you may not consider it as part of the conduct that the Plaintiffs are challenging in this case. You may consider only Defendants' conduct that occurred after June 17, 2011, in determining liability and damages in this case.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 7– Miscellaneous–Certain Defenses and Exemptions, Instruction 1: Statute of Limitations (AM. BAR ASS'N ANTITRUST L. SECTION 2016); 15 U.S.C. § 15b; Final Jury Instructions at 52 (Instruction No. 40: Relevant Time Period), *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981 (N.D. Cal. Dec. 6, 2023), ECF No. 850.

1
2
**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 67: RELEVANT TIME PERIOD**

3       Plaintiffs object to Instruction No. 67 in its entirety as unnecessary and
4  contrary to law.

5       The ABA Model Instruction on which Defendants' proposal is purportedly
6  based states "[t]he statute of limitations for the antitrust laws does not permit
7  recovery of damages for any injuries sustained by plaintiff prior to [date X]."
8  Defendants' replacement of "injuries sustained" for "conduct that occurred"
9  misstates the law. There is similarly no basis to instruct the jury not to consider "as
10 part of the conduct that Plaintiffs are challenging in this case." The history of the
11 challenged restraints is relevant to the jury's analysis of the rule of reason, as the
12 Ninth Circuit recognized in this case. *In re NFL's Sunday Ticket Antitrust Litig.*,
13 933 F.3d 1136, 1144 (9th Cir. 2019) ("To analyze the challenged arrangement
14 between the NFL teams, the NFL, and DirecTV, it is necessary to understand the
15 history of television broadcasting of NFL games."). So have Defendants. *See* Pre-
16 Trial Order, Dkt. 1331-1 at 46.

17
18
19
20
21
22
23
24
25
26
27
28

**Case No. 2:15-ml-02668-PSG (SKx)**                              **Defendants' Disputed Final Jury Instructions**

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 67: RELEVANT TIME PERIOD**

Defendants' proposed instruction regarding the relevant time period accounts for the rule that (just as Plaintiffs suggest), evidence regarding the pre-limitations period may be admitted at trial "to understand the history of television broadcasting of NFL games," but the statute of limitations bars Plaintiffs from seeking to impose liability based on pre-limitations conduct. Plaintiffs' objections to this proposed instruction, which closely tracks the instruction given in *In re Google Play Store Antitrust Litigation*,[4] are without merit.

Plaintiffs' further objections ignore the consistent application of those principles in this Circuit. The applicable statute of limitations precludes recovery of damages arising from any acts that were committed more than four years before the filing of Plaintiffs' complaint. *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338–39 (1971). Plaintiffs cannot recover for injuries or conduct outside of that time period unless they can establish an overt act by Defendants that restarted the statute of limitations. *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987).

In the Ninth Circuit, continued payments pursuant to an existing alleged illegal agreement do not constitute an overt act. *See Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982) ("[T]he mere fact that defendants receive a benefit today as a result of a contract [that violated the Sherman Act] is not enough to restart the statute of limitations."). Instead, any such new payments would be "a manifestation of the prior overt act of entering into the [pre-limitations period] contract." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019); *see also Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 885 (N.D. Cal.

---

[4] Final Jury Instructions at 52, *In re Google Play*, No. 3:21-md-02981, ECF No. 850.

126

2015) (holding that "maintenance and renewal of the preexisting non-solicitation agreements [did] not qualify as an overt act").

As a result, where, as here, a plaintiff challenges a series of agreements, some of which were entered prior to the limitations period, the court must "limit [plaintiff's] damages to those arising out of" the post-limitations conduct. *US Airways*, 938 F.3d at 69. Defendants' proposed instruction properly conveys this rule, ensuring that Plaintiffs' claims will be limited by the applicable statute of limitations.

127

## INSTRUCTION NO. 68: ANTITRUST DAMAGES — INTRODUCTION AND PURPOSE

If you find that Defendants violated the antitrust laws and that this violation caused injury to Plaintiffs, then you must determine the amount of damages, if any, Plaintiffs are entitled to recover. The fact that I am giving you instructions concerning the issue of Plaintiffs' damages does not mean that I believe Plaintiffs should, or should not, prevail in this case. If you reach a verdict for Defendants on the issue of liability or the issue of injury, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that Plaintiffs should be fairly compensated for all damages to their business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to Plaintiffs an amount for attorneys' fees or the costs of maintaining this lawsuit.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6–Causation and Damages–Damages, Instruction 1: Antitrust Damages—Introduction and Purpose (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 68: ANTITRUST DAMAGES  INTRODUCTION AND PURPOSE

This instruction departs from ABA Antitrust 6-B-1 to add the following italicized language: "If you reach a verdict for Defendants on the issue of liability *or the issue of injur*y, you should not consider the issue of damages . . ." Plaintiffs object to this unnecessary departure from the ABA model instructions as antitrust injury is a necessary component of liability.

129

1
2

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 68: INTRODUCTION AND PURPOSE

3
4
5
6
7
8
9

Defendants propose a minor—and legally accurate—variation from the model instruction for clarity. There can be no damages without injury. *TransUnion*, 594 U.S. at 423. Plaintiffs implicitly acknowledge this by citing no case law in their opposition to Defendants' proposed instruction. And this addition is worthwhile: including the explanation that a finding of no injury *requires* an award of no damages will help the jury understand the implications of each element of their verdict and prevent internal inconsistencies.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INSTRUCTION NO. 70: CAUSATION AND DISAGGREGATION

If you find that Defendants violated the antitrust laws and that Plaintiffs were injured by that violation, Plaintiffs are entitled to recover for such injury that was the direct result of the unlawful acts of Defendants. Plaintiffs bear the burden of showing that their injuries were caused by Defendants' antitrust violation, as opposed to any other factors. If you find that Plaintiffs' alleged injuries were caused by factors other than Defendants' alleged antitrust violation, then you must return a verdict for Defendants. If you find that Plaintiffs' alleged injuries were caused in part by Defendants' alleged antitrust violation and in part by other factors, then you may award damages only for that portion of Plaintiffs' alleged injuries that was directly caused by Defendants' alleged antitrust violation.

Plaintiffs claim that they suffered injury because they paid higher prices for the cost of DirecTV's Sunday Ticket product than they would have paid absent an illegal conspiracy. Defendants claim that the prices that Plaintiffs paid occurred as a result of other factors that have nothing to do with the alleged conspiracy. These include the high quality of the NFL Sunday Ticket product that Plaintiffs purchased, the greater popularity of the NFL as opposed to other entertainment options, and DirecTV's unilateral authority to set the price of Sunday Ticket. Plaintiffs are not entitled to recover for changes in price that resulted solely from these or other causes arising from the normal course of business activity. Plaintiffs may recover only for injury caused by the alleged antitrust violation. If you find that Plaintiffs' alleged injuries were caused by factors other than Defendants' alleged antitrust violation, then you must return a verdict for Defendants.

Plaintiffs bear the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that Plaintiffs were injured by Defendants' alleged antitrust violation, and there is a reasonable basis to apportion Plaintiffs' alleged injury between lawful and

1   unlawful causes, then you may award damages. If you find that there is no

2   reasonable basis to apportion Plaintiffs' alleged injury between lawful and unlawful

3   causes, or that apportionment can only be accomplished through speculation or

4   guesswork, then you may not award any damages at all.

5

6   **Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT

7   COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm.

8   2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6–

9   Causation and Damages–Damages, Instruction 4: Causation and Disaggregation

10  (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 70: CAUSATION
AND DISAGGREGATION**

Plaintiffs object to the entirety of this instruction because it is incorrect and inapplicable to the facts of this case.

The concept of disaggregation applies where there are multiple causes of the same injury and the jury must distinguish the causes that are basis of Plaintiffs' claim from those that are not. In that event, the plaintiff may be "required to segregate damages attributable to particular business practices or, at a minimum, to distinguish between losses attributable to lawful competition and those attributable to unlawful anticompetitive conduct." *Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996). This rule is a narrow exception to the "*relaxed standard* for proving the amount of damages in an antitrust case once the fact of damages has been shown." *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982). An "antitrust plaintiff is only obligated to provide the trier-of-fact with *some* basis from which to estimate reasonably, and without *undue speculation*, the damages flowing from the antitrust violations." *Id.* at 836. That rule has no place in this case because Plaintiffs do not contend that there were multiple concurrent causes for anticompetitive harm. Instead, Plaintiffs contend that Defendants entered into a series of interlocking agreements that together injured class members.

The NFL's instruction rests on the faulty premise that paying a price is a form of injury. In reality, the injury lies in paying a price that is higher than it would have been absent the Defendants' wrongdoing. What the NFL refers to as different sources of injury are not sources of injury all—they are attempted explanations for price. This is not a case in which two causes resulted in the same injury. There is nothing to disaggregate here.

Plaintiffs further object because other instructions proposed by both Plaintiffs

and Defendants already adequately instruct the jury as to the causal link that must be shown. The addition of an inconsistent instruction on the same subject will only confuse the jury.

Further, none of Defendants' witnesses nor Defendants' experts claim Plaintiffs' damages models fail to control for the factors identified in Defendants' instruction. Instead, these factors remain constant in Plaintiffs' but-for-world by definition. In the absence of any evidence or expert testimony to support Defendants' novel theory of disaggregation, this instruction will be confusing to the jury and prejudicial to Plaintiffs.

If the Court is inclined to use this instruction, Plaintiffs also object to this instruction to the extent it departs from ABA Antitrust 6-B-4. For example, Defendants use the term "illegal conspiracy" where that term is nowhere in the model instruction. A more appropriate description of the alleged antitrust violation is: "an agreement to limit output or raise the price of telecasts of live professional football games." Further, the instructions should include the rule that Plaintiffs are not required to show disaggregation where it is impossible to impractical to do so. *See Litton Sys., Inc.*, 1996 WL 634213, at *2.

**Defendants' Disputed Final Jury Instructions**

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 70: CAUSATION AND DISAGGREGATION

Defendants' proposed Instruction 70 tracks closely to the model instruction and is necessary to ensure that the jury awards damages in compliance with the law. Plaintiffs can offer no case to the contrary, and this Court should overrule their objections.

*First*, Plaintiffs' response focuses primarily on the "relaxed standard" applied when antitrust plaintiffs attempt to prove damages. But as the model instructions explain, "[t]he latitude allowed as to proof of damage is constrained by the requirement that all damages be traced to an injury that was in fact caused by defendants, so it is appropriate to remind the jury of this fact." *See* Model Jury Instructions in Civil Antitrust Cases, Chapter 6–Causation and Damages– Damages, Instruction 4: Causation and Disaggregation (Am. Bar Ass'n Antitrust L. Section 2016) (citing *Comcast*, 569 U.S. at 37). In other words, this instruction is given exactly to cabin the discretion Plaintiffs describe.

*Second*, Plaintiffs' insistence that disaggregation "has no place in this case because Plaintiffs do not contend that there were multiple concurrent causes for anticompetitive harm" fundamentally misunderstands the role of disaggregation. In fact, if multiple *anticompetitive* factors caused Plaintiffs' harm, Defendants would not ask the jury to disaggregate them. *See Comcast*, 569 U.S. at 37. Disaggregation is necessary when some entirely legal conduct may have contributed to the plaintiff's injury. This is why Defendants point to other factors that may have increased the prices paid by Plaintiffs, completely independent from the alleged antitrust violations: the high quality of the NFL Sunday Ticket product, the greater popularity of the NFL, and DirecTV's unilateral authority to set the price. The same reasoning explains why Plaintiffs' experts claim to have held these factors constant

in their analysis: but-for worlds are meant to isolate the effects of unlawful behavior—they are defined by the removal of unlawful conduct and the maintenance of lawful conduct. *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007). The jury is nevertheless entitled to consider whether Plaintiffs' experts *in fact* have isolated the effects of only the allegedly illegal conduct, and this model instruction explains how to conduct that inquiry.

*Third*, Plaintiffs object to the use of the term "illegal conspiracy." But as addressed in more detail in Defendant's argument in support of proposed Instruction 38, Plaintiffs' attempts to write the term "conspiracy" out of the jury instructions misrepresent the model instructions (and the notes to the model instructions), and Plaintiffs' attempts to assert a mere "agreement" conflicts with their own allegations.

*Finally*, Plaintiffs' suggestion that there are circumstances in which a plaintiff does not have to identify which portion of alleged damages arise from a defendant's allegedly illegal conduct has no basis in the model instructions. Their citation to a single, unpublished district court case cannot overcome the Supreme Court's plain instruction in *Comcast* that where a Plaintiff cannot prove their damages were attributable to illegal, rather than legal, conduct, there can be no recovery. *Comcast*, 569 U.S. at 37.

# INSTRUCTION NO. 71: DAMAGES FOR PURCHASERS— OVERCHARGES BASED ON HORIZONTAL PRICE FIXING, OUTPUT RESTRICTION, MARKET ALLOCATION, OR OTHER AGREEMENTS NOT TO COMPETE

If you have determined that there was an unlawful agreement among competitors to fix prices or restrict output that caused some injury to Plaintiffs, you must now determine the amount of damages to award to Plaintiffs. The proper way to calculate those damages is to determine the difference between the prices Plaintiffs actually paid for DirecTV's Sunday Ticket product and the prices Plaintiffs would have paid to receive the same or an equivalent product if there had not been, as Plaintiffs allege, an agreement to fix prices or restrict output. This is referred to as the overcharge.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6– Causation and Damages–Damages, Instruction 5: Damages for Purchasers— Overcharges Based on Horizontal Price Fixing, Output Restriction, Market Allocation, or Other Agreements Not to Compete (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 71: DAMAGES FOR PURCHASERS—OVERCHARGES BASED ON HORIZONTAL PRICE FIXING, OUTPUT RESTRICTION, MARKET ALLOCATION, OR OTHER AGREEMENTS NOT TO COMPETE**

Plaintiffs largely agree to Defendant's proposed instruction but propose the following changes which are more faithful to ABA Antitrust 6-B-5 and eliminate the Defendants' confusing additions:

If you have determined that there was an unlawful agreement among competitors to fix prices or restrict output that caused some injury to Plaintiffs, you must now determine the amount of damages to award to Plaintiffs. The proper way to calculate those damages is to determine the difference between the prices Plaintiffs actually paid for ~~DirecTV's~~ Sunday Ticket ~~product~~ and the prices Plaintiffs would have paid ~~to receive the same or an equivalent product if there~~ had **there** ~~not~~ been, ~~as plaintiffs allege, an~~ **no** agreement to fix prices or restrict output. This is referred to as the overcharge.

Plaintiffs' proposed language eliminates the description of Sunday Ticket as DirecTV's product, which improperly resolves a disputed issue of fact as to the NFL's control over its pricing and packaging. Plaintiffs have also omitted the referenced to "as plaintiffs allege," which has no place in an instruction about damages, since the jury will reach that question only if it has already found for Plaintiffs on liability.

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 71: DAMAGES FOR PURCHASERS—**

**OVERCHARGES BASED ON HORIZONTAL PRICE FIXING, OUTPUT**

**RESTRICTION, MARKET ALLOCATION, OR OTHER AGREEMENTS**

**NOT TO COMPETE**

Plaintiffs include two objections to Defendants' proposed Instruction 71, neither of which find any support in the law.

*First*, Plaintiffs seek to remove the reference to DirecTV as the entity that sold Sunday Ticket. This reference does not "resolve[] a disputed issue of fact"; there is no dispute that DirecTV sold Sunday Ticket to Plaintiffs. For example, this Court's class certification order defines the classes as commercial and residential subscribers that purchased NFL Sunday Ticket *from DirecTV*, or its subsidiaries, between 2011 and the date of class certification." *Sunday Ticket*, 2023 WL 1813530, at *2 (emphasis added). Regardless of what arguments Plaintiffs may seek to make about the NFL's purported "control," they have not and cannot offer evidence that Plaintiffs made direct purchases from anyone else.

*Second*, Plaintiffs oppose the inclusion of "as Plaintiffs allege" in describing the alleged conspiracy. But the jury will hear these instructions before they begin deliberations. Hearing a judge instruct them on a comparison world in which there "had been no agreement to fix prices" will at best confuse the jury as to what they are meant to decide and at worst lead them to believe the existence of a conspiracy has already been determined, prejudicing Defendants.

# INSTRUCTION NO. 72: DAMAGES FOR PURCHASERS—CLASS DAMAGES

Plaintiffs Mucky Duck and Gael Pub are seeking to recover damages on behalf of a class of purchasers that includes all DirecTV commercial subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and February 7, 2023.

Plaintiffs Lippincott and Frantz are seeking to recover damages on behalf of a class of purchasers that includes all DirecTV residential subscribers that purchased the NFL Sunday Ticket from DirecTV, or its subsidiaries, at any time between June 17, 2011 and February 7, 2023.

To award damages for a class, you do not need to determine the overcharge paid by each class member with absolute mathematical certainty or precision. It is sufficient for you to determine the average overcharge paid by class members or estimate the overcharge paid by class members, as long as the average or estimate is based on evidence and reasonable inferences. You may not base your damages award on guesswork or speculation. If determining the amount of damages requires you to guess or speculate, or make speculative assumptions or inferences, you may not award damages.

In this case, Plaintiffs have proposed, through their expert witnesses, different approaches to calculating damages in this case. Plaintiffs must prove that these approaches are reasonable and reliable for you to be able to use these approaches in determining what, if any, damages are appropriate.

**Authority**: MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm. 2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6–Causation and Damages–Damages, Instruction 7: Damages for Purchasers—Class

1  Damages (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 72: DAMAGES**

**FOR PURCHASERS  CLASS DAMAGES**

Plaintiffs object to the Defendants' addition to the model jury instruction of determining that the expert's models are "reasonable and reliable," which inappropriately asks the jury to determine whether expert testimony meets the requirements of Federal Rule of Evidence 702. It is the Court that must determine whether the expert's testimony "is the product of reliable principles and methods" as a threshold *before* that testimony gets to the jury. Moreover, this instruction is duplicative of Instruction No. 15 on the jury's treatment of expert opinion, which is based on the model instruction on the subject.

142

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 72: DAMAGES FOR PURCHASERS— CLASS DAMAGES**

Defendants' proposed instruction tracks closely to the model instruction on class damages and hews closely to the balanced approach taken by the ABA. Plaintiffs oppose Defendants' single addition:

> In this case, Plaintiffs have proposed, through their expert witnesses, different approaches to calculating damages for the two classes in this case. Plaintiffs must prove that these approaches are reasonable and reliable for you to be able to use these approaches in determining what, if any, damages are appropriate.

This addition to the instruction properly states the law and will help the jury understand that it need not blindly accept expert testimony when it comes to damages. The Ninth Circuit has explained this same requirement, holding that, "[a]s to the reasonableness of the assumptions underlying the experts' [damages] analysis, criticisms of an expert's method of calculation are a matter for the jury's consideration in weighing that evidence." *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) (internal alterations and citation omitted). Expert opinions still need to be proven reasonable before the jury, even when they have been admitted at trial under *Daubert. See, e.g.*, *Yacht West, Ltd. v. Christensen Shipyards, Ltd.*, 702 F. Supp. 2d 1292, 1301 (D. Or. 2010) (where expert's testimony "was supported adequately to survive a challenge under *Daubert*," the opposing party had the opportunity "to convince the jury that its concerns undermined [the expert's] testimony to the point that the jury should reject his opinions"). Defendants' addition clarifies this burden.

Because it both includes all necessary elements of the model instruction and adds a clarifying, legally accurate change, Defendants' proposed instruction will

143

make the jury's duty clear and should be adopted by the Court.

# INSTRUCTION NO. 74: MITIGATION[5]

Plaintiffs may not recover damages for any portion of their injuries that they could have avoided through the exercise of reasonable care and prudence. Plaintiffs are not entitled to increase any damages through inaction. The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If Plaintiffs failed to take reasonable steps available to them, and the failure to take those steps resulted in greater harm to Plaintiffs than they would have suffered had they taken those steps, then Plaintiffs may not recover any damages for that part of the injury they could have avoided.

Defendants have the burden of proof on this issue. Defendants must prove by a preponderance of the evidence:

(4) that Plaintiffs acted unreasonably in failing to take specific steps to minimize or limit their losses;

(5) that the failure to take those specific steps resulted in their losses being greater than they would have been had they taken such steps; and

(6) the amount by which Plaintiffs' loss would have been reduced had Plaintiffs taken those steps.

In determining whether Plaintiffs failed to take reasonable measures to limit their damages, you must remember that the law does not require Plaintiffs to take every conceivable step that might reduce their damages. The evidence must show that Plaintiffs failed to take commercially reasonable measures that were open to them. Commercially reasonable measures mean those measures that a prudent person in Plaintiffs' position would likely have adopted, given the circumstances as

---

[5] Defendants preserve, for appellate purposes, the argument that they are entitled to present their well-pleaded mitigation defense. ECF No. 442 (NFL Defendants' Answer to Plaintiffs' Second Consolidated Amended Complaint) at 28 (Fourth Defense); *but see* ECF No. 1292 (Order Granting Plaintiffs' Motion *In Limine* No. 2) at 6 (holding that "Defendants cannot make arguments that Plaintiffs had a duty to mitigate").

145

1  they appeared at that time. Plaintiffs should be given wide latitude in deciding how

2  to handle the situation, so long as what Plaintiffs did was not unreasonable in light

3  of the existing circumstances.

4

5  **Authority:** MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT

6  COURTS OF THE NINTH CIRCUIT § 14 (Antitrust) (9th Cir. Jury Instructions Comm.

7  2017 ed.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6–

8  Causation and Damages–Damages, Instruction 14: Mitigation (AM. BAR ASS'N

9  ANTITRUST L. SECTION 2016).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 74: MITIGATION**

Plaintiffs object to this instruction. As Defendants acknowledge, this instruction is inconsistent with the Court's Order Granting Plaintiffs' Motion *In Limine* No. 2, which held that "Defendants cannot make arguments that Plaintiffs had a duty to mitigate." *See* Dkt. No. 1292.

1
2

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 74: MITIGATION**

3
4
5
6
7
8
9

Defendants' proposed mitigation instruction accurately tracks the ABA model and properly states the law. *See, e.g.*, *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 436 (5th Cir. 1985) ("Of course, an antitrust plaintiff, like other injured parties, must mitigate damages."); *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 820 n.47 (2d Cir. 1983) ("An antitrust plaintiff has a duty to mitigate damages."); *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 436 (5th Cir. 1977) ("An antitrust plaintiff has a duty to mitigate damages.").

10
11
12
13

Defendants therefore maintain, for appellate purposes, their position that they are entitled to an instruction on this accurate proposition of law. *See also* ECF No. 1185, Defs.' Mem. Contentions of Fact and L. at 12 (arguing that Plaintiffs had a duty to mitigate in this case).

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

148

## INSTRUCTION NO. 75: DIRECT PURCHASER REQUIREMENT

Plaintiffs can recover damages only if they made a purchase directly from a participant in an unlawful conspiracy. Because Plaintiffs purchased subscriptions to NFL Sunday Ticket from DirecTV, you may award damages only if you conclude that DirecTV participated in an unlawful conspiracy.

**Authority**: *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977); *Apple Inc. v. Pepper*, 587 U.S. --, 139 S. Ct. 1514, 1520–21 (2019); *Sunday Ticket*, 933 F.3d at 1158.

149

1
2

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 75: DIRECT PURCHASER REQUIREMENT

3       Plaintiffs object to the Defendants' proposed instruction No. 75 as contrary to
4   Ninth Circuit law and because it improperly asks the jury to determine antitrust
5   standing, which is an issue for the Court. Defendants' direct purchaser instruction is
6   relevant only to the issue of antitrust standing, which "is a question of law for the
7   district court to decide." *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 747 (9th Cir.
8   2012). This instruction is both improper and unnecessary. That is why the ABA
9   model rules include no such instruction.

10      Defendants' instruction will cause jury confusion because it incorrectly
11  asserts that Plaintiffs can demonstrate standing only through direct proof that
12  DirecTV "participated in an unlawful conspiracy." In reality, Plaintiffs need to
13  show only that that they were harmed by the injury to competition and that that
14  harm was caused directly by an antitrust violator, the NFL. *In re Nat'l Football*
15  *League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1156 (9th Cir. 2019); *see*
16  *also* Summary Judgment Opinion, Dkt. 1155 at 6 ("To establish antitrust standing,
17  Plaintiffs must prove "they were harmed by the defendants' contract, combination,
18  or conspiracy, . . . the harm they suffered was caused by the anti-competitive aspect
19  of the defendants' conduct," and that their harm was directly caused by the antitrust
20  violator." (citations omitted)). Plaintiffs can show antitrust standing in a number of
21  ways, including through evidence that the NFL set the price paid by Plaintiffs. *In re*
22  *ATM Fee Antitrust Litig.*, 686 F.3d at 750.

23
24
25
26
27
28

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 75: DIRECT PURCHASER REQUIREMENT

Defendants' proposed jury instruction on the direct purchaser requirement will explain to the jury that Plaintiffs can recover damages only for subscriptions purchased directly from a participant in the alleged conspiracy among the NFL Teams, the NFL, and DirecTV. That is a necessary instruction, because if the jury finds that DirecTV was not a participant in the alleged conspiracy, then the jury cannot award damages to Plaintiffs, who indisputably did not purchase Sunday Ticket directly from the NFL or the NFL Teams.

It is well established that only direct purchasers may sue for antitrust violations. *See Pepper*, 139 S. Ct. at 1520. Defendants' proposed instruction succinctly explains how this principle applies in the context of this case. *See Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) ("Jury instructions must be supported by the evidence, fairly and adequately cover the issues presented, correctly state the law, and not be misleading."). Omitting this instruction could result in the jury awarding damages in contravention of the direct-purchaser requirement. *See Ill. Brick*, 431 U.S. at 731 (dismissing antitrust claim by indirect purchasers).

Plaintiffs' suggestion that they "can show antitrust standing in a number of ways, including through evidence that the NFL set the price paid by Plaintiffs" is contrary to Ninth Circuit law and to the rulings of this Court. Plaintiffs lack standing to assert damages claims as to any agreement among the NFL and its member clubs under *Illinois Brick*'s "bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers." *Pepper*, 139 S. Ct. at 1520. Under the Ninth Circuit's opinion in this case, Plaintiffs can overcome this bright-line rule only by proving that "they were directly injured by the conspiracy among the NFL

teams, the NFL, *and DirecTV*." *Sunday Ticket*, 933 F.3d at 1157 (emphasis added). And this Court applied that decision to hold that "whether *Illinois Brick* applies, barring Plaintiffs from having standing, is dependent on a material issue of fact," namely, "whether DirecTV had a conscious commitment to participate in the conspiracy." *Sunday Ticket*, 2024 WL 168298, at *8.

The alleged participation of DirecTV in a single, overarching conspiracy is the only basis on which either the Ninth Circuit or this Court has upheld Plaintiffs standing to sue the NFL, and the jury accordingly must be instructed as to how decide the "material issue of fact" as to "whether DirecTV had a conscious commitment to participate in the conspiracy." *Id.*

152

1

## INSTRUCTION NO. 76: CLASS-WIDE INJURY AND CAUSATION

2   As I explained to you earlier, this case has been brought on behalf of all NFL

3   Sunday Ticket Purchasers from June 17, 2011 to February 7, 2023. This type of

4   case is called a class action. In order to find for Plaintiffs on the issues of injury and

5   causation, Plaintiffs must prove that each and every member of each class was

6   injured as a result of Defendants' alleged violation of the antitrust laws. Evidence

7   that some or even most members of one of the classes were injured is not sufficient

8   to establish liability to the class.

9

10  **Authority**: *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("Every class

11  member must have Article III standing in order to recover individual damages.

12  'Article III does not give federal courts the power to order relief to any uninjured

13  plaintiff, class action or not.'" (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S.

14  442, 466 (2016) (Roberts, C. J., concurring))); *Kline v. Coldwell, Banker & Co.*,

15  508 F.2d 226, 236 n.8 (9th Cir. 1974) ("It has been suggested that generalized proof

16  of damages might suffice under Rule 23. But the rule does not eliminate the

17  ultimate need for individual proof of damages by each member of the class.");

18  *Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 334 (9th Cir. 1993) ("It is clear that at some

19  point in the litigation Plaintiffs would be required to prove individual causation and

20  damages."); *Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005) (in an

21  antitrust class action, plaintiffs must prove that each member of the class was

22  injured by the alleged antitrust violation); *Alabama v. Blue Bird Body Co.*, 573 F.2d

23  309, 317, 324–27 (5th Cir. 1978) (same); *In re Bulk (Extruded) Graphite Prods.*

24  *Antitrust Litig.*, 2006 WL 891362, at *10 (D.N.J. Apr. 4, 2006) ("for impact to be

25  proven on a class-wide basis, the common proof must adequately demonstrate

26  damage to each individual"); *accord Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454

27  (3d Cir. 1977); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir.

28

1988) ("Although such generic and individual causation may appear to be inextricably intertwined, the procedural device of the class action permitted the court initially to assess the defendant's potential liability for its conduct without regard to the individual components of each plaintiff's injuries. However, from this point forward, it became the responsibility of each individual plaintiff to show that his or her specific injuries or damages were proximately caused by ingestion or otherwise using the contaminated water. We cannot emphasize this point strongly enough because generalized proofs will not suffice to prove individual damages."); *Cannon v. Tex. Gulf Sulphur Co.*, 55 F.R.D. 306, 307 (S.D.N.Y. 1971) ("If it was, potential liability would be established, leaving only the issue of reliance and damages to be determined as to the individual plaintiffs.").

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 76: CLASS-WIDE INJURY AND CAUSATION**

Plaintiffs object to the entirety of Defendants' instruction No. 76 as misleading and contrary to law by inviting the jury to determine class certification, which is a question for the Court. Contrary to Defendants' instruction, the jury is not required to conclude "that each and every member of each class was injured as a result of Defendants' alleged violation of the antitrust laws" in order to find for Plaintiffs on the issues of injury and causation. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir.), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.,* 143 S. Ct. 424 (2022). Plaintiffs are required only to establish antitrust impact and damages through "class-wide proof." Class Certification Opinion, Dkt. 894 at 19.

Defendants cite no case in which a court instructed the jury that it was required to determine injury and causation on an individual basis. And nearly all of their citations are outmoded and pre-date important recent Supreme Court and Ninth Circuit precedent.

**DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS'**

**DISPUTED INSTRUCTION NO. 76: CLASS-WIDE INJURY**

Defendants' proposed instruction addresses the bedrock principle that "[e]very class member must have Article III standing in order to recover individual damages. 'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.'" *TransUnion*, 594 U.S.at 431 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C. J., concurring)).

Because uninjured class members cannot recover, Plaintiffs bear the burden to establish injury and damages as to every class member that would receive an award of damages. Plaintiffs have two options to establish injury for each class member. They can either (i) try to "prove, through common evidence, that *all* class members were in fact injured," *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (emphasis added), or (ii) offer an appropriate "winnowing mechanism" that would permit the jury to identify and exclude from recovery all uninjured class members, *see Rail Freight II*, 934 F.3d at 625.

In this case, Plaintiffs pursue only the first route: they assert that their common evidence proves harm to every member of the class. If a jury agrees that all members of the class were harmed, then it may award damages. But if the jury "conclude[s] that the [Plaintiffs] failed to prove antitrust impact on a class-wide basis," *Olean*, 31 F.4th at 681, then the only permissible outcome would be a verdict in Defendants' favor. Defendants' proposed instruction explains this necessary implication of how Plaintiffs propose to prove their case. *See id.* at 685 (defendants must be given "the opportunity to convince a jury that not all class members were overcharged").

There is no third option of a jury verdict that concludes that there are some uninjured class members, but that fails to identify with specificity which class

1  members were not harmed. *See Tyson Foods*, 577 U.S. at 466 (Roberts, C. J.,

2  concurring)) ("if there is no way to ensure that the jury's damages award goes only

3  to injured class members, that award cannot stand").

1    Dated: May 22, 2024                    Respectfully submitted,

2
                                            /s/ *Beth A. Wilkinson*
3                                           Beth A. Wilkinson (admitted *pro hac vice*)
                                            Rakesh N. Kilaru (admitted *pro hac vice*)
4                                           Brian L. Stekloff (admitted *pro hac vice*)
                                            Jeremy S. Barber (admitted *pro hac vice*)
5                                           Max J. Warren (admitted *pro hac vice*)
6                                           **WILKINSON STEKLOFF LLP**
                                            2001 M Street NW, 10th Floor
7                                           Washington, DC 20036
                                            Telephone: (202) 847-4000
8                                           Facsimile: (202) 847-4005
                                            bwilkinson@wilkinsonstekloff.com
9                                           rkilaru@wilkinsonstekloff.com
10                                          bstekloff@wilkinsonstekloff.com
                                            jbarber@wilkinsonstekloff.com
11                                          mwarren@wilkinsonstekloff.com

12
                                            Neema T. Sahni (Bar No. 274240)
13                                          **COVINGTON & BURLING LLP**
                                            1999 Avenue of the Stars
14                                          Suite 1500
                                            Los Angeles, CA 90067-6045
15                                          Telephone: (424) 332-4800
16                                          Facsimile: (424) 332-4749
                                            nsahni@cov.com
17
                                            Gregg H. Levy (admitted *pro hac vice*)
18                                          Derek Ludwin (admitted *pro hac vice*)
19                                          John S. Playforth (admitted *pro hac vice*)
                                            **COVINGTON & BURLING LLP**
20                                          One CityCenter
                                            850 Tenth Street NW
21                                          Washington, DC 20001
                                            Telephone: (202) 662-6000
22                                          Facsimile: (202) 662-6291
23                                          glevy@cov.com
                                            dludwin@cov.com
24                                          jplayforth@cov.com

25                                          *Counsel for Defendants National Football*
26                                          *League, NFL Enterprises LLC, and the*
                                            *Individual NFL Clubs*
27

28