Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*pro hac vice*)
hlanger@susmangodfrey.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*pro hac vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668−PSG (SKx) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **PLAINTIFFS' DISPUTED PROPOSED FINAL JURY INSTRUCTIONS** |
| | JUDGE: Hon. Philip S. Gutierrez |
| | TRIAL DATE: June 5, 2024 |
| | COURTROOM: |
| |     First Street Courthouse |
| |     350 West 1st Street |
| |     Courtroom 6A |
| |     Los Angeles, CA 90012 |

# **TABLE OF CONTENTS**

| P## | D## | Title | Source | Status | Page |
|---|---|---|---|---|---|
| **FINAL INSTRUCTIONS** | | | | | |
| 25 | 25 | Duty of Jury | 9th Cir. § 1.4 | Stipulated | |
| 26 | 26 | Preponderance of the Evidence | 9th Cir. § 1.6 | Stipulated | |
| | 27 | Two or More Parties—Different Legal Rights | 9th Cir. § 1.8 | Disputed | |
| | 28 | Corporate Entities | 9th Cir. § 4.1; ABA Antitrust 2-A-3; Cases | Disputed | |
| 29 | 29 | What is Evidence | 9th Cir. § 1.9 | Stipulated | |
| 30 | 30 | What is Not Evidence | 9th Cir. § 1.10 | Stipulated | |
| 31 | 31 | Direct and Circumstantial Evidence | 9th Cir. § 1.12 | Stipulated | |
| 32 | 32 | Ruling on Objections | 9th Cir. § 1.13 | Stipulated | |
| 33 | 33 | Credibility of Witnesses | 9th Cir. § 1.14 | Stipulated | |
| | 34 | Expert Opinion | 9th Cir. § 2.13 | Disputed | |
| 35 | 35 | Charts and Summaries | 9th Cir. §§ 2.14, 2.15 | Stipulated | |
| 36 | 36 | Purpose of Sherman Act | ABA Antitrust 1-A-1 | Stipulated | |
| 37* | 37* | Sports Broadcasting Act/Sports Broadcasting Act Exemption | Cases | Disputed | 6 |
| 38 | 38 | Plaintiffs' Claims | Cases | Disputed | 12 |
| 39 | 39 | Elements of Section 1 Claim/ Sherman Act Section 1 | ABA Antitrust 1-B-2 | Disputed | 17 |
| 40 | 40 | Contract, Combination, Conspiracy, or Agreement/ Existence of a Contract, Combination, or Conspiracy | ABA Antitrust 2-A-1 | Disputed | 22 |
| 41 | | Corporations | ABA Antitrust 2-A-3 | Disputed | 35 |
| 42 | | Absent Co-Conspirators | MIL Order - ECF No. 1293 | Disputed | 38 |
| 43 | | Agreements Between Teams Belonging To Sports Leagues May Violate Sherman Act Section 1 | ABA Antitrust 2-C-10; Cases | Disputed | 41 |
| 44 | | Agreements Between the NFL, DirecTV, CBS, and FOX | Cases | Disputed | 46 |
| | 45 | Participation and Intent | ABA Antitrust 2-A-4 | Disputed | |
| | 46 | Single Entity | Cases | Disputed | |
| 47 | | Rule of Reason—Overview | ABA Antitrust 1-C-3A | Disputed | 50 |
| | 48 | Relevant Product Market | ABA Antitrust | Disputed | |

| P## | D## | Title | Source | Status | Page |
|---|---|---|---|---|---|
| | | | 3-A-3, 3-A-4 | | |
| 49 | 49 | Rule of Reason—Proof of Competitive Harm | ABA Antitrust 1-C-3B | Disputed | 61 |
| | 50 | Exclusive Licensing Agreements | 9th Cir. §§ 15.16, 17.13; ABA Antitrust 2-D-5, 4-A-1, 4-A-2; Cases | Disputed | |
| 51 | 51 | Rule of Reason—Evidence of Procompetitive Benefits or Rationales | ABA Antitrust 1-C-3C | Disputed | 72 |
| 52 | 52 | Rule of Reason—Balancing Competitive Benefits/Rule of Reason––Assessing the Procompetitive Benefits and Rationales | ABA Antitrust 1-C-3D | Disputed | 81 |
| 53 | | Good Intent Not a Defense | ABA Antitrust 2-B-3 | Disputed | 84 |
| 54 | | Reasonableness of Prices No Excuse | ABA Antitrust 2-B-4 | Disputed | 88 |
| 55 | 55 | Interstate Commerce | ABA Antitrust 1-D-4 | Stipulated | |
| 56 | 56 | Elements of Section 2 Conspiracy to Monopolize Claim/ Elements of Conspiracy to Monopolize | ABA Antitrust 3-E-1 | Disputed | 91 |
| 57 | 57 | Existence of a Conspiracy | ABA Antitrust 2-A-1 | Disputed | 99 |
| 58 | 58 | Monopoly Power Defined | ABA Antitrust 3-A-2 | Disputed | 103 |
| 59 | | Relevant Market | ABA Antitrust 3-A-3 | Disputed | 108 |
| 60 | | Relevant Product Market | ABA Antitrust 3-A-4 | Disputed | 113 |
| 61 | | Relevant Geographic Market | N/A | Disputed | 117 |
| | 62 | Willful Acquisition or Maintenance of Monopoly Power | ABA Antitrust 3-E-3, 3-A-9; Cases | Disputed | |
| 63 | 63 | Specific Intent | ABA Antitrust 3-E-4 | Disputed | 120 |
| 64 | 64 | Interstate Commerce | ABA Antitrust 1-D-4 | Stipulated | |
| 65 | 65 | Injury and Causation | ABA Antitrust 6-A-1 | Disputed | 126 |
| 66 | 66 | Business or Property | ABA Antitrust 6-A-2 | Disputed | 131 |
| | 67 | Relevant Time Period | ABA Antitrust 7-A-1; Cases | Disputed | |
| 68 | 68 | Antitrust Damages—Introduction and Purpose | ABA Antitrust 6-B-1 | Disputed | 134 |
| 69 | 69 | Basis for Calculating | ABA Antitrust | Stipulated | |

3

| P## | D## | Title | Source | Status | Page |
|---|---|---|---|---|---|
| | | Damages | 6-B-3 | | |
| | 70 | Causation and Disaggregation | ABA Antitrust 6-B-4 | Disputed | |
| 71 | 71 | Overcharge Damages/ Damages for Purchasers— Overcharges Based on Horizontal Price Fixing, Output Restriction, Market Allocation, or Other Agreements Not to Compete | ABA Antitrust 6-B-5 | Disputed | 137 |
| 72 | 72 | Class Damages/ Damages for Purchasers—Class Damages | ABA Antitrust 6-B-7 | Disputed | 140 |
| 73 | | Joint and Several Liability | ABA Antitrust 6-B-17 | Disputed | 144 |
| 74 | 74 | (No) Duty to Mitigate/Mitigation | See Disputed Instructions | Disputed | 148 |
| | 75 | Direct Purchaser Requirement | Cases | Disputed | |
| | 76 | Class-Wide Injury and Causation | Cases | Disputed | |
| 77 | 77 | Duty to Deliberate | 9th Cir. § 3.1 | Stipulated | |
| 78 | 78 | Consideration of Evidence—Conduct of Jury | 9th Cir. § 3.2 | Stipulated | |
| 79 | 79 | Communication with Court | 9th Cir. § 3.3 | Stipulated | |
| 80 | 80 | Return of Verdict | 9th Cir. § 3.5 | Stipulated | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

   In proposing the following jury instructions, Plaintiffs do not waive any objections to evidence or arguments asserted in motions *in limine*. Nor do Plaintiffs concede the relevance of any issues addressed by these proposed instructions. Plaintiffs also reserve the right to amend or alter these proposed instructions or propose new instructions, including amendments and alterations based on further developments in this litigation, discussions with the Court, discussions with the NFL, and rulings or orders issued by the Court.

17

18

19

20

21

22

23

24

25

26

27

28

## NO. 37: SPORTS BROADCASTING ACT[1]

During trial, you may hear reference to another federal law called the Sports Broadcasting Act, sometimes shortened to the "SBA." The SBA does not exempt league contracts with cable or satellite companies from antitrust liability. The SBA also does not exempt any contracts that restrict competition for paid telecasts from antitrust liability. The SBA also does not exempt from antitrust liability any portion of an agreement with networks that restricts the price or limits the output of games distributed over cable, satellite, or other forms of paid television.

In short, the SBA does not exempt from antitrust liability any of the alleged restraints that Plaintiffs challenge in this case.

---

[1] *In re National Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1146-59 (9th Cir. 2019) ("[T]he SBA does not exempt league contracts with cable or satellite television services, for which subscribers pay a fee, from antitrust liability."); *In re National Football League's Sunday Ticket Antitrust Litig.*, Case No. ML 15-02668 PSG (SK), ECF No. 1155, at 12-18 (Jan. 11, 2024) ("The SBA cannot be read to immunize contracts that restrict competition for paid telecasts."); *id*, at 12 n.8 ("'By its terms, the SBA applies only to Section 1 of the Sherman Act and has no relevance to the plaintiffs' Section 2 claims.'" (quoting *NFL Sunday Ticket*, 933 F.3d at 1159 n.10); *id.* at 13 n.9 ("Further, the SBA places an area telecasting restriction limitation on its exemption: 'Section 1291 of this title shall not apply to any joint agreement . . . which prohibits any person . . . from televising any games within any area, except within the home territory of a member club of the league on a day when such club is playing at home." (quoting 15 U.S.C. § 1292); *See* Order on Defendants' Motion in Limine No. 3, ECF No. 1304 at 4 ("But how the SBA applies to paid telecasts is an issue of law for the Court to instruct the jury on.").

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 37**

Plaintiffs' proposed jury instruction number thirty-seven on the Sports Broadcasting Act ("SBA") is overly broad and misstates the law. The Court should give Defendants' proposed instruction number forty-one, which accurately and narrowly describes the SBA exemption consistently with this Court's summary judgment opinion.

Plaintiffs' proposed instruction asserts that the protections afforded by the SBA are not relevant to this lawsuit. That is not correct. Both Plaintiffs and this Court have recognized that significant aspects of the NFL's broadcasting model are protected by the SBA. For example, "no party disputes that the SBA grants the NFL and clubs the right to enter fully exclusive contracts with CBS and FOX for free, over-the-air broadcasting." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *11 (C.D. Cal. Jan. 11, 2024) (internal quotation marks omitted). Similarly, there is no dispute that the SBA "protects the NFL's collective sale of telecast rights to free, over-the-air television networks." *Id.* at *12. Plaintiffs' own citations in support of their proposed instruction confirm as much. For example, Plaintiffs quote the Ninth Circuit's opinion in this case for the proposition that "the SBA does not exempt league contracts *with cable or satellite television services*[.]" *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1147 (9th Cir. 2019) (emphasis added). But as Plaintiffs themselves have repeatedly asserted, the conduct at issue in this case is not limited to satellite or cable contracts: Plaintiffs also challenge the Network contracts, to which the SBA concededly applies.

The jury should be instructed as to these effects of the SBA, such that they can appropriately focus on the question of whether other conduct, not protected by the SBA, unreasonably restraints competition. It is critical for the jury to receive instruction on the SBA exemption that applies to the NFL-Network Agreements, as Plaintiffs plan to present a theory to the jury that "the agreements with CBS and Fox

were part of the conspiracy to restrain competition outside of the protection of the SBA." ECF No. 964 (Plfs.' Mem. Opp. Defs.' Mot. Summ. J.) at 8–9.

Without an instruction on the SBA (or with Plaintiffs' proposed instruction on the SBA), there is a significant risk of confusion that the jury could believe that all aspects of NFL-Network Agreements are subject to antitrust challenge, opening the door to a jury finding that conduct that is protected by the SBA is anticompetitive. Such a finding would violate not only the plain terms of the SBA, *see* 15 U.S.C. § 1291, but also the core purpose of the SBA, which is to afford certain protections to sports leagues for conduct that might otherwise be found to have an anticompetitive effect, *see Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n* ("*Bulls I*"), 961 F.2d 667, 670 (7th Cir. 1992) (Easterbrook, J.) ("To have any (antitrust) effect at all, the Act must allow the league to keep some games off the air."). Moreover, a jury verdict that imposes antitrust liability for both lawful conduct and allegedly unlawful conduct would violate the Supreme Court's ruling in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), which holds that models of injury and damages in class actions may not be used to impose liability for lawful conduct as well as allegedly unlawful conduct. *Id.* at 37.

Defendants' proposed instruction accurately reflects the Court's summary judgment order and would make clear to the jury that key aspects of the NFL-Network Agreements cannot be found unlawful. *See Sunday Ticket*, 2024 WL 168298, at *11; *see also Sunday Ticket*, 933 F.3d at 1147–49 & n.4. The proposed instruction properly situates the SBA in the context of this Court's rulings in this case and protects against the risk of confusion described above.

Finally, the Second Circuit has upheld a similar jury instruction as "consistent with the Sports Broadcasting Act." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1358 (2d Cir. 1988) (upholding instruction that "[I]n 1961 Congress passed a statute that provides that a contract between a professional sports league and a television network for the sale of pooled telecast rights is not a restraint of trade in

violation of the antitrust laws. Accordingly, I instruct you that the making of these contracts by the NFL with the television networks constitutes the lawful acquisition of power, even if you were to find that these contracts gave the NFL monopoly power, unless you found that the intent and effect of these agreements is to exclude a competing league or its members from selling any of their television rights." (cleaned up)).

1

## **PLAINTIFFS' REPLY RE. NO. 37: SPORTS BROADCASTING ACT**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

Plaintiffs' proposed instruction is consistent with the Court's orders on the scope of the SBA. In its order on Defendants' Motion in Limine No. 3, this Court stated that "how the SBA applies to paid telecasts is an issue of law for the Court to instruct the jury on." ECF No. 1304 at 3. Plaintiffs' proposed instruction on the application of the SBA to the challenged conduct in this case tracks the Ninth Circuit's decision in this case, as well as this Court's summary judgment order. Indeed, this Court explicitly held that "[t]he SBA does not exempt the NFL-Network Agreements from antitrust scrutiny." Summary Judgment Decision, ECF No. 1155 at 14. *See also In re National Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1147–49 (9th Cir. 2019). It is important to instruct the jury that the SBA does not exempt the challenged conduct in this case so that the jury does not reach its own erroneous conclusion otherwise. By contrast, Defendants' proposal to instruct the jury that it cannot find Defendants liable "in any way" for entering contracts with CBS and Fox may mislead the jurors to reach that very conclusion.

16

17

18

19

20

21

22

23

24

25

26

27

Defendants fear that the jury could find that conduct that is protected by the SBA is anticompetitive. This fear is unfounded because Plaintiffs explicitly do not challenge the Defendants' pooling of telecast rights for games on over-the-air television. Nor does this exempted pooling activity factor into Plaintiffs' liability analysis or damages models. Therefore, the jury does not need to be instructed on how the SBA applies to conduct that the Plaintiffs do not challenge. Such an instruction would be doubly confusing because the SBA has no application to Plaintiffs' claim under Section 2 of the Sherman Act. *See* Summary Judgment Opinion, ECF No. 1155 at 12 n.8 ("While Defendants argue that the SBA precludes all of Plaintiffs' claims, the SBA is relevant only to Plaintiffs' claim under § 1 of the Sherman Act. 'By its terms, the SBA applies only to Section 1 of the Sherman Act and has no relevance to the plaintiffs' Section 2 claims.'… As such, any

28

determination of the protections afforded under the SBA only affect Plaintiffs' claim under § 1.") (quoting *In re NFL Sunday Ticket*, 933 F.3d at 1159 n.10).

# NO. 38: PLAINTIFFS' CLAIMS[2]

This type of lawsuit is known as a private antitrust civil action. Private antitrust actions are a way of enforcing the antitrust laws because they serve to return overcharges to purchasers and deter defendants who have violated the antitrust laws from violating the law in the future.

Plaintiffs bring two claims under the Sherman Act in this case.

The first claim is that the 32 NFL teams and their league, the NFL, entered into agreements among themselves and/or with others that unreasonably restrained trade in the market for live professional football telecasts in the United States during the NFL season.

The second claim is that the NFL and its teams conspired to monopolize the market for live professional football telecasts in the United States.

These are two independent claims that each have distinct elements Plaintiffs must prove. You may find that Plaintiffs have proved one or both of these claims. Next, I will be instructing you on the elements required to prove each of these claims.

---

[2] *SumoText Corp. v. Zoove, Inc.. See* Case No. 5:16-cv-01370, ECF No. 468 (N.D. Cal. Mar. 4, 2020); *Masimo Corp. v. Tyco Health Care Grp., L.P.*, No. CV 02-4770 (C.D. Cal. Mar. 18, 2005).

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 38**

Defendants object to Plaintiffs' proposed Instruction 38, which purports to summarize Plaintiffs' claims. The instruction is not only inaccurate and improperly argumentative, but it also is redundant.

*First*, although Plaintiffs' first paragraph purports to explain the purpose of "private antitrust civil actions," it does so only by improperly assuming that Defendants have violated the antitrust laws and caused harm to consumers, such that both damages awards and deterrence are appropriate.

*Second*, the proposed language is unnecessary, as it is redundant of the more balanced stipulated Instruction 36, which already addresses the purposes of the Sherman Act. It is not surprising that Plaintiffs fail to identify any precedent for including this language.

*Third*, although the proposed instruction purports to summarize the beneficial policy effects of antitrust litigation, it fails to offer a balanced assessment of those effects. Contrary to the assertion that private antitrust enforcement necessarily benefits consumers and society, both case law and academic scholarship recognize that incautious application of the antitrust laws can impose unjustified costs and lead to "overdeterrence," preventing socially beneficial collaborations. *See, e.g.*, *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993); Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 16 & n.32 (1984). This case presents particularly acute risks of erroneous overdeterrence, given the multiple complex antitrust doctrines at issue. *Cf. Nat'l Football League v. Ninth Inning, Inc.*, 141 S. Ct. 56, 57 (2020) (statement of Kavanaugh, J.) ("'NFL teams . . . must cooperate in the production and scheduling of games'" such that "antitrust law likely does not require that the NFL and its member teams compete against each other with respect to television rights." (citation omitted)).

*Fourth*, Plaintiffs' proposed instruction incorrectly instructs the jury that it "may find that Plaintiffs have proved one or both of these claims." As explained further in Defendants' Objections to Plaintiffs' Proposed Instruction No. 56, if

Plaintiffs' claims fail under Section 1, they necessarily fail under Section 2. Defendants object to the inclusion of this language in this instruction at all; however, if it is to be included, an explicit instruction that if Plaintiffs were to fail on their Section 1 claim, there would be no basis for a jury to find liability on the Section 2 claim based on the same conduct, also should be included for accuracy and completeness.

*Finally*, Defendants object to Plaintiffs' proposal to omit reference to DirecTV as a member of the alleged conspiracy, as explained further in Defendants' Objections to Plaintiffs' Proposed Instruction No. 39. Given the complexity of the claims that Plaintiffs are asserting, the additional clarity provided by Defendants' proposed Instruction 38 will help the jury understand and evaluate Plaintiffs' claims.

## <u>PLAINTIFFS' REPLY RE. NO. 38: PLAINTIFFS' CLAIMS</u>

Defendants object to the first paragraph and argue that it improperly assumes that Defendants have violated the antitrust laws and fails to offer a balanced assessment of the effects of antitrust litigation. This paragraph simply explains the purpose of private antitrust actions to give the jury context for why private plaintiffs, such as Plaintiffs in this case, bring antitrust actions. There is no need to bring in irrelevant policy discussions about the social costs of such litigation.

Next, Defendants object on the ground that the jury should be told that Plaintiffs cannot prevail on their Section 2 claim if their Section 1 claim fails. This is wrong as a matter of law because the claims are distinct. First, the SBA, to the extent it applies at all, bears only on Plaintiffs' Section 1 claim. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019) ("By its terms, the SBA applies only to Section 1 of the Sherman Act and has no relevance to the plaintiffs' Section 2 claims.").  Second, the elements of a Section 2 conspiracy to monopolize claim vary from the elements of a Section 1 claim.  For example, the Court may, over Plaintiffs' objection, require a showing of actual market power for Plaintiffs' Section 1 claim, but that is not required for Plaintiffs' Section 2 claim. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980) ("[N]o particular level of market power or 'dangerous probability of success' has to be alleged or proved in a conspiracy [to monopolize] claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken.").

Finally, Defendants' continued insistence on the use of the term "conspiracy" in place of "agreements" is misplaced. This is a case about interlocking agreements. Even the ABA model instructions recommend using "agreements" in place of conspiracy outside of per se price fixing cases. *See* Notes to ABA Antitrust 2-A-1 (In non-per se cases, "the court should substitute the word 'agreement' or 'contract' [for 'conspiracy'] as appropriate."). Further, the use of the term "conspiracy" will suggest to the jury that it must find that all the agreements at issue happened in secret, smoke-

filled rooms to find liability. There is nothing wrong with using the term "agreements" instead of "conspiracy" to describe Plaintiffs' claims.

## NO. 39: ELEMENTS OF SECTION 1 CLAIM

Plaintiffs challenge the Defendants' conduct under Section 1 of the Sherman Act. Section 1 prohibits contracts, combinations, conspiracies, and agreements that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, Plaintiffs must prove the following:

(1)    the existence of any contract, combination, conspiracy, or agreement between or among at least two separate entities;

(2)    that any of those contracts, combinations, conspiracies, or agreements unreasonably restrained trade, either individually or in combination; and

(3)    that the restraint caused plaintiffs to suffer an injury to their business or property.

1

### <u>DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 39</u>

2

Defendants object to Plaintiffs' unjustified deviations from the model

3

instruction regarding the elements of a Section 1 claim.

4

*First*, Defendants object to Plaintiffs' proposed alteration to the model

5

instruction to add the word "agreement." Plaintiffs offer no legal justification for this

6

alteration, which does not appear in the relevant provision of the Sherman Act. The

7

alteration also would be confusing and prejudicial to use before the jury, where

8

Plaintiffs' theory depends on not one, but a *set* of "interlocking agreements." *See In*

9

*re Nat'l Football League's Sunday Ticket Litig.*, 933 F.3d 1136, 1151 (9th Cir. 2019);

10

*In re NFL's "Sunday Ticket" Antitrust Litig.*, 2024 WL 2075095, at *3 (C.D. Cal.

11

Apr. 26, 2024). The Ninth Circuit did not uphold Plaintiffs' challenges to any single

12

commercial agreement; instead, it expressly premised its holdings on the

13

understanding that Plaintiffs challenged multiple "agreement[s], which work together

14

as a single conspiracy to limit the output of NFL telecasts."  933 F.3d at 1157.

15

Plaintiffs likewise used similar language throughout this case. *See, e.g.*, Pls.' Mem.

16

Opp. Defs.' Mot. Summ. J. at 8 ("This is not a new theory. Plaintiffs have consistently

17

claimed that the agreements with CBS and Fox were part of *the conspiracy* to restrain

18

competition[.]"); Compl. ¶ 46(g)–(j) (referring to their claims in terms of "the alleged

19

conspiracy"). The sudden assertion that they do not challenge a "conspiracy"—but

20

instead an "agreement"—attempts to reduce their burden and should be rejected.

21

*Second*, Plaintiffs compound this confusion with the suggestion that they can

22

make out a Section 1 claim by proving that the contracts at issue "either individually

23

or in combination" unreasonably restrained trade. Again, despite years of insisting

24

that the challenged agreements must be viewed together as part of a "single

25

conspiracy," *Sunday Ticket*, 933 F.3d at 1157, Plaintiffs' instruction now suggests

26

that one agreement, standing alone, can give rise to antitrust liability. Defendants

27

object to this eleventh-hour change, which contravenes the Ninth Circuit's opinion,

28

1    *see* 933 F.3d at 1151, and which is legally incorrect, *see* Defendants' Objections to

2    Plaintiffs' Instruction 34.

3            *Third*, Plaintiffs' proposal should be rejected because it uses generic language

4    that fails to identify the members of the alleged conspiracy. By contrast, Defendants'

5    approach provides a clear instruction that Plaintiffs must prove "the existence of a

6    contract, combination, or conspiracy between or among the NFL, the NFL Teams,

7    and DirecTV." *See* Defs.' Proposed Instr. No. 37. Jury instructions must "focus [the

8    jury's] attention on the essential issues in the case," *United States v. Ribaste*, 905

9    F.2d 1140, 1143 (8th Cir. 1990), and "[w]ell-tailored and specific instructions may

10   be necessary . . . in complex antitrust cases where abstract legal principles are not

11   self-explanatory to a lay jury, and the facts to which they must be applied are

12   complex." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381,

13   1398 (9th Cir. 1984) (cleaned up), *cert. denied*, 469 U.S. 990, 105 S. Ct. 397, 83

14   L.Ed.2d 331 (1984). The core allegation of Plaintiffs' complaint is "that DirecTV

15   conspired with the NFL and the NFL Teams," and that "the conspiracy involves both

16   the Teams-NFL agreement and the NFL-DirecTV agreement, which work together

17   as a single conspiracy to limit the output of NFL telecasts." *Sunday Ticket*, 933 F.3d

18   at 1157–58. Given the complexity of the claims that Plaintiffs are asserting, the

19   additional clarity provided by Defendants' proposed instruction will help the jury

20   understand and evaluate Plaintiffs' claims.

21

22

23

24

25

26

27

28

**PLAINTIFFS' REPLY RE. NO. 39: ELEMENTS OF SECTION 1 CLAIM**[3]

Plaintiffs' proposed instruction is based on ABA Antitrust 1-B-2 with only two minimal edits.

First, Plaintiffs added the word "agreement" to "contract, combination, and conspiracy." The use of the word "agreement" in non-per se cases is recommended by the ABA model instructions (in the notes to ABA Antitrust 2-A-1). This case is about an interlocking set of agreements, and Plaintiffs should be allowed to use a simple word—agreements—to describe their claims. This is exactly how the Ninth Circuit and this Court have described Plaintiffs' claims. *See In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d 1133, 1156 (9th Cir. 2019) ("We conclude that the complaint adequately alleges the element of injury to competition by alleging that the interlocking Teams-NFL and NFL-DirecTV Agreements injure competition."); Summary Judgment Order, Dkt. 1144 at 2 ("Plaintiffs assert that Defendants have conspired and entered a set of agreements with each other and their broadcast partners that suppress the output of telecasts of out-of-market professional football games."). Defendants suggest that the use of the term "agreements" would be misleading because Plaintiffs "are not challenging the mere existence of commercial agreements" between the alleged co-conspirators, but that is baseless. Under that logic, the term "contracts," as used by the model instruction, would also be "misleading." The use of the term "agreements" here is necessary for the jury to understand that Plaintiffs need not show a formal contract or a conspiracy hatched in secret to prevail on their claims.

Second, Plaintiffs use the term "any contract . . ." instead of "a contract . . ." to make clear that the jury need only find that *one or more of* the several agreements among the alleged co-conspirators unreasonably restrained trade. This is a simple update to the model instruction to reflect that this case involves several challenged agreements, any of which could be found to unreasonably restrain trade.   For

---

[3] ABA Antitrust 1-B-2.

example, Plaintiffs have long contended that the NFL can be held liable for the NFL-DirecTV agreement *alone*. That is why Dr. Rascher's report contains a separate damages estimate for just "No DirecTV exclusivity," in addition an estimate for "No Challenged Conduct," which incorporates *both* exclusivity and pooling. *See* ECF No. 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023, ¶¶ 51-56, 405-418.

Finally, Defendants object to Plaintiffs' supposed failure to identify each member of the alleged conspiracy. This is unnecessary. The ABA model instruction does not invite parties to identify specific co-conspirators. Naming every alleged co-conspirator would mislead the jury into thinking that it must find that every alleged co-conspirator was part of the agreement to find an antitrust violation. That implication would be particularly problematic here given that Plaintiffs offer various alternative theories of liability, as described above.

1

## NO. 40: CONTRACT, COMBINATION, OR AGREEMENT[4]

Plaintiffs allege that the Defendants participated in a contract, combination, or agreement with each other and with FOX, CBS, and DirecTV to limit the output of live professional football telecasts in the United States. Limiting output in this context can include: (1) reducing viewership of some live professional football telecasts; (2) limiting the number of telecasts of some live professional football games; (3) reducing access to such telecasts; or (4) limiting the options that viewers have for obtaining access to some live professional football games.

A contract, combination, conspiracy or agreement must be an understanding between two or more persons or businesses to restrain trade in the way alleged by Plaintiffs. In this context, the term "conspiracy" means an agreement.

Plaintiffs must prove both of the following elements by a preponderance of the evidence:

(1)   that any alleged contract, combination, conspiracy or agreement existed; and

(2)   that the Defendants knowingly became a member of that contract, combination, conspiracy, or agreement. To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

An agreement or understanding between two or more persons exists when they share a commitment to a common scheme. To establish the existence of a contract, combination, conspiracy, or agreement, the evidence need not show that the defendants entered into any formal or written agreement. No written document is necessary for an agreement to exist.  The agreement itself may have been entirely unspoken. A party can become a member of an agreement without full knowledge of all of the details of the agreement, the identity of all of the parties of that agreement, or the parts such parties played in the agreement. The parties of the agreement need

---

[4] ABA Antitrust 2-A-1 (modified); CACI No. 3406 (modified).

not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose.  An agreement also may exist if a company unwillingly participates—that is, if another company coerces it to join the agreement against its wishes.  To prove an agreement existed, the evidence must show that the alleged parties of the agreement came to an agreement or understanding among themselves to accomplish a common purpose.

An agreement may be formed without all parties coming to an agreement at the same time. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed by Plaintiffs were agreed upon to carry out the alleged agreement, nor that all of the means or methods that were agreed upon were actually used or put into operation, nor that all the persons alleged to be parties of the agreement were actually parties. It is the agreement or understanding to restrain trade that matters. Therefore, you may find an agreement existed regardless of whether it succeeded or failed.

Plaintiffs may prove the existence of the alleged agreement through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the alleged agreement.

Direct evidence of an agreement may not be available, and therefore an agreement also may be shown entirely through circumstantial evidence. You may infer the existence of an agreement from the circumstances, including what you find the alleged parties actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a contract, combination, conspiracy, or agreement. If they acted similarly but independently of one another, without any agreement among them, then there would not be a contract, combination, conspiracy, or agreement.

Plaintiffs are not required to bring a lawsuit against every single party to a contract, combination, conspiracy, or agreement. Each member of a contract, combination, conspiracy, or agreement that violates the Sherman Act is individually responsible for all damage caused by that agreement. Likewise, it is not essential that each member of the alleged agreement is a party to each specific contract.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.

In addition, in determining whether an agreement or understanding between two or more parties has been proved, you must keep in mind that each individual NFL team is a substantial, independently owned, and independently managed business that owns the copyrights and other rights to telecast their own regular season games.  The teams compete with one another, not only on the playing field, but in various commercial ways too. Each NFL team is an independent company with separate economic interests.

If you find that the NFL teams adopted and adhered to a league rule, then that constitutes an agreement among the NFL teams.[5]

---

[5] ABA Antitrust 2-A-1 (modified); *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010); *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002); *United States v. Nat'l Football League*, 196 F. Supp. 445, 446-47 (E.D. Pa. 1961); *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 307 (2d Cir. 2023) ("Business, professional, trade, and sports organizations and associations, for instance, are all subject to federal antitrust laws if their members demonstrate a conscious commitment to a common scheme to achieve an unlawful objective. . . . It follows from this precedent that the adoption of a binding association rule designed to prevent competition is <u>direct evidence</u> of concerted action. No further proof is necessary.") (internal quotation marks and citation omitted); *National Soc. Of Prof. Engineers v. U.S.*, 435 U.S. 679, 693 (1978); *NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 99 (1984) ("By participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint—an agreement among competitors on the way in which they will compete with each other.").

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 40**

Defendants object to Plaintiffs' proposed instruction number forty because (i) it omits crucial language from the ABA model instruction about the requirements to prove a conspiracy to unreasonably restrain trade; (ii) it incorrectly incorporates legal instructions based on California law that are not applicable to this case; (iii) it omits relevant language from the ABA model as to what type of evidence does not establish a conspiracy; (iv) it purports to answer as a legal matter a question that this Court has held is for the jury: whether the NFL and its member clubs are a single entity with respect to the licensing of telecasting rights; and (v) it mischaracterizes what Plaintiffs must prove in order to show a conspiracy that violates Section 1 of the Sherman Act. The Court should instead adopt Defendants' proposed Instruction 38, which accurately adapts the ABA model instruction to the facts of this case.

*First*, the Court should reject Plaintiffs' attempts to shift the jury's focus away from the conspiracy they alleged and onto the individual agreements in this case. Plaintiffs propose two deviations from the model language: To begin, they refer to the existence of a "contract, combination, conspiracy or agreement," where the model instruction recommends using *only* the term "conspiracy." Then, in their explanations of the elements, Plaintiffs replace "conspiracy" with "agreement"—a second unwarranted substitution. These baseless alterations are especially confusing considering that the core allegation of Plaintiffs' complaint is of a "conspiracy [that] involves both the Teams-NFL agreement and the NFL-DirecTV agreement, which work together as a single conspiracy to limit the output of NFL telecasts." *Sunday Ticket*, 933 F.3d at 1157; *see also, e.g.*, 2d Am. Compl. ¶ 46(i), ECF No. 441 (alleging that a common question at trial will be "Whether the alleged conspiracy violated Section 1 of the Sherman Act"). Plaintiffs nevertheless propose to remove from the ABA model instruction most references to the word "conspiracy." Moreover, the changes result in confusing—and in some cases nonsensical—language, *e.g.*, "[t]o

prove an agreement existed, the evidence must show that the alleged parties of the agreement came to an agreement." Plfs.' Proposed Instr. No. 31. Plaintiffs similarly confuse the issues by asserting that "it is not essential that each member of the alleged agreement is a party to each specific contract," which is not an intelligible statement of the law. That assertion, moreover, is but one part of a larger paragraph of non-standard language that Plaintiffs have added addressing who needs not be named as a defendant in an antitrust case and how damages are assessed. None of this information is necessary for the jury at all, much less as an addition to an already-lengthy instruction on what a conspiracy is.

*Second*, Plaintiffs seek to omit from this instruction any reference to the fact that a Section 1 claim requires proof of an "unreasonable" restraint of trade. Plaintiffs' proposed instruction thus fails to state the requirements of their Section 1 claim accurately, as there can be no dispute that Section 1 "has been interpreted as outlawing only unreasonable restraints of trade." *Sunday Ticket*, 933 F.3d at 1149 (cleaned up).

*Third*, Plaintiffs propose to instruct the jury on the California law principle that "an agreement also may exist if a company unwillingly participates," but this proposition is not inherently correct under the Sherman Act, which is not interpreted identically to the Cartwright Act.[6] Rather, and as the ABA's model instruction on participation and intent explains, under federal law "the evidence must show that that [each member of the alleged conspiracy] knowingly joined in the unlawful plan at its inception, or at some later time, with the intent to further the purpose of the

---

[6] *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 1408 (Coerced Agreements; Acts Motivated by Fear of Another) (4th ed. 2022) (when considering a "defendant who acts not to serve its own immediate interest but to satisfy another," courts have held that "no single answer governs all situations, and careful discriminations must precede extension of any clear answers to the wide variety of acts motivated by fear of another"); *see also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 985–86 (9th Cir. 2000) ("federal antitrust precedents are properly included in a California Cartwright Act analysis, but their role is limited: they are 'often helpful' but not necessarily decisive"); *Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 877 (Cal. 2013) (rejecting the argument that "judicial interpretations of the Sherman Act and the Clayton Act apply fully to . . . the Cartwright Act" because "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century").

conspiracy. To act knowingly means to participate deliberately and not because of mistake, accident, or other innocent reason." MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2–Section 1 of the Sherman Act—Contract, Combination, or Conspiracy, Instruction 4: Participation and Intent (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

*Fourth*, Plaintiffs' proposed language that each NFL team is "an independent company with separate economic interests" would provide an erroneous instruction on the disputed issue of whether the NFL and the teams are a single entity for purposes of licensing telecasts. This Court concluded that whether the NFL and the NFL Clubs constitute a single entity for that purpose remains a triable issue of fact. *See Sunday Ticket*, 2024 WL 168298, at *15 ("There is a dispute of fact whether the NFL and its member clubs are capable of concerted action."). Therefore, the question of whether the NFL Teams and the NFL constitute a single entity for the purposes of licensing telecasts of NFL football games is a question for the jury. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)).

In addition, Plaintiffs propose a number of additional elements in their proposed instructions that seek to usurp the jury's role in determining whether the NFL and its member clubs are a single entity for purposes of telecast licensing. Plaintiffs assert that "each NFL team" "owns the copyrights and other rights to telecast their own regular season games," but that is not correct. Games themselves are not subject to "copyrights"—those attach to the created telecasts, and those copyrights are assigned by contract to the NFL, not the Clubs. *Sunday Ticket*, 933 F.3d at 1148, 1153. Plaintiffs are similarly incorrect to assert that any individual Club owns all necessary rights to telecast any given game, which also requires consent, trademarks, and other rights from, at a minimum, both participating Clubs and the NFL. Moreover, Plaintiffs' proposal to instruct the jury that "if the NFL teams adopt and adhere to a league rule, then that constitutes an agreement among the teams," is

27

an unjustified deviation from the model and is misleading in the context of Plaintiffs'
claim, which is dependent upon the existence of a single, overarching conspiracy.
*See* Defs.' Objs. to Plfs.' Instr. No. 34. Whether that overarching conspiracy exists is
one of the issues that the jury must decide.

*Fifth*, Plaintiffs misstate what they must show in order to prove that Defendants
engaged in a conspiracy that violates Section 1 of the Sherman Act. As an initial
matter, Plaintiffs' proposed lengthy insert on what "limiting output" means has no
place in this instruction, which is intended to define the meaning of a contract,
combination, or conspiracy. Plaintiffs' proposed deviation from the model,
moreover, is incorrect: Plaintiffs present multiple flawed examples as to what would
constitute a reduction in output in the relevant market, all of which describe reduced
access to or limiting options for "*some* live professional football telecasts." These
options misstate both legal measurements of output and Plaintiffs' own defined
market.

Courts consistently reject the suggestion that a reduction in availability is
evidence of anticompetitive effects. *See Brantley v. NBC Universal, Inc.*, 675 F.3d
1192, 1202 (9th Cir. 2012) (Allegations that conduct "has the effect of reducing
consumers' choices or increasing prices to consumers do[ ] not sufficiently allege an
injury to competition ... [because] [b]oth effects are fully consistent with a free,
competitive market." (citations omitted)); *see also Ohio v. Am. Express Co.*, 585 U.S.
529, 549 (2018) ("This Court will 'not infer competitive injury from price and output
data absent some evidence that tends to prove that output was restricted or prices
were above a competitive level.' " (quoting *Brooke Grp. Ltd. v. Brown & Williamson
Tobacco Corp.*, 509 U.S. 209, 237 (1993))). For example, contract provisions that
provide for exclusivity in distribution necessarily restrict "availability" in some
sense, but courts recognize that such agreements are typically both procompetitive
and lawful. *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir.
2020) ("Because there are 'well-recognized economic benefits to exclusive dealing

arrangements, including the enhancement of interbrand competition, an exclusive dealing arrangement is not per se illegal." (cleaned up)); *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th Cir. 2013) ("The Supreme Court has recognized that vertical restraints on intrabrand competition can actually promote interbrand competition and are therefore consistent with a competitive market." (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889–92 (2007))).

These legal errors play out in Plaintiffs' flawed suggestions about possible output reductions true to their own market definition. Plaintiffs premise their case on a relevant market of *all* professional football telecasts. ECF No. 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023 ¶ 177; ECF No. 962-29, Expert Rebuttal Report of Einer Elhauge, dated June 9, 2023 ¶ 7, 25. But their proposed examples of reductions in output point the jury to the impacts on access only to "some" telecasts. This is highly misleading, as it is entirely possible for the alleged restraints to reduce access to *some* telecasts, while increasing access to others or providing other procompetitive benefits, ultimately *increasing* output.

Moreover, Plaintiffs suggest that the jury could find a violation of Section 1 if they prove "[a] contract, combination, conspiracy or agreement . . . between two or more persons or businesses to restrain trade *in the way alleged by Plaintiffs*." This addition is unnecessary and also incorrect; the jury can only find a Section 1 violation if Plaintiffs prove the existence of a conspiracy to restrain trade in a way that is actually proscribed by the antitrust laws, not just in the way Plaintiffs may have alleged.

Finally, Defendants object to Plaintiffs' revision of their market definition to include only "live" telecasts. This is an alteration of the relevant market as defined by Plaintiffs in the Final Pretrial Conference Order. *See* ECF No. 1331.1, Proposed Final Pretrial Conf. Order at 13. As the rules of this district make clear, "parties will be precluded from presenting claims or defenses not set forth in this order, in the

manner required by this order, unless the order is modified to prevent manifest injustice." Local Rules, App'x A, ¶ 7.

## PLAINTIFFS' REPLY RE. NO. 40:

## CONTRACT, COMBINATION, OR AGREEMENT

Plaintiffs' proposed instruction modifies ABA Antitrust 2-A-1 to help jurors better understand how the law applies to the facts of this case.

First, Plaintiffs added an explanation of "limiting output" and what it means in the context of this particular case. Without this explanation, the jury may not understand how the term output applies to the market for live professional football telecasts. This explanation follows the ABA model instruction's prompt to define the "alleged conduct or restraint." Plaintiffs have done exactly that, consistent with the way they alleged reduced output in the operative complaint and in their motion for class certification. *See* Motion for Class Certification, Dkt. No. 633-1 at 3:11–13 ("Pursuant to a limitation in DirecTV's contract with the NFL, only two NFL telecasts—*at most*—can ever be aired head-to-head at a given time in a local television market."), 4:6–8 ("DirecTV's exclusivity significantly reduces the number of consumers who can watch out-of-market games."), 6:1–4 ("stating that this agreed-upon suppression of output permits DirecTV to charge supra-competitive prices for Sunday Ticket"). The addition of the modifier "some" is likewise consistent with Plaintiffs' contentions of antitrust injury—namely that the challenged restraints injured viewers of the *out-of-market* games available only on Sunday Ticket.

Second, Plaintiffs added the sentence, "In this context, the term 'conspiracy' means an agreement." Plaintiffs also added the terms contract, combination, and agreement to each mention of "conspiracy" in the model instruction or otherwise just replaced "conspiracy" with "agreement." This is because the facts of this case primarily concern publicly known agreements, and the jury should not be led to believe they can only find for Plaintiffs if there was a secret conspiracy in a smoke-filled room. *See* Notes to ABA Antitrust 2-A-1 (stating "the terminology of the instructions should be adjusted to fit the facts of a particular case" and explaining

that "'conspiracy' may be appropriate where the conduct is per se unlawful" and the court should "substitute the word 'agreement' or 'contract' as appropriate"). It is well-settled law that conspiracy means agreement. *United States v. Warneke*, 310 F.3d 542, 546 (7th Cir. 2002) ("Conspiracy means agreement, and agreement is an 'act' rather than just a thought.").

To guard against the jury reaching the conclusion that an agreement cannot exist if one of the parties was unwilling or unhappy with the arrangement, Plaintiffs added the sentence: "An agreement also may exist if a company unwillingly participates—that is, if another company coerces it to join the agreement against its wishes." Contrary to Defendants' arguments, this principle is consistent with Ninth Circuit precedent on the Sherman Act. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 917 (9th Cir. 2008) (an antitrust conspiracy exists under the Sherman Act "even though [defendant] participates in the conspiracy only under coercion").

Plaintiffs also added the following paragraph to guard against the jury reaching conclusions based on the absence of the networks and DirecTV at trial:

> Plaintiffs are not required to bring a lawsuit against every single party to a contract, combination, conspiracy, or agreement. Each member of a contract, combination, conspiracy, or agreement that violates the Sherman Act is individually responsible for all damage caused by that agreement. Likewise, it is not essential that each member of the alleged agreement is a party to each specific contract.

This is consistent with the principle of joint and several liability under the Sherman Act. It is well-established that once a defendant joins a conspiracy it is jointly and severally liable for any actions taken in furtherance of the conspiracy. *See, e.g., Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 646 (1981); *Paper Systems Inc. v. Nippon Paper Industries Co., Ltd.,* 281 F.3d 629, 633 (7th Cir. 2002); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2018 WL 659084, at *9 (N.D. Cal. Feb. 1, 2018).

Plaintiffs also added the following paragraph to make clear to the jury that just because the NFL teams are members of National Football League, there can still be agreement among them:

32

1
2
3
4

> In addition, in determining whether an agreement or understanding between two or more parties has been proved, you must keep in mind that each individual NFL team is a substantial, independently owned, and independently managed business that owns the copyrights and other rights to telecast their own regular season games.  The teams compete with one another, not only on the playing field, but in various commercial ways too. Each NFL team is an independent company with separate economic interests.

This is consistent with Supreme Court precedent. *See NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 99 (1984) ("By participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint—an agreement among competitors on the way in which they will compete with each other."); *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 198 (2010) ("Although NFL teams have their common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities . . ."). *See also U.S. v. National Football League*, 196 F. Supp. 445, 446 (E.D. Pa 1961) ("Defendants concede that the 1961 NFL-CBS contract marks a basic change in National Football League television policy. Prior to this contract each member club individually negotiated and sold the television rights to its games to sponsors or telecasters with whom it could make satisfactory contracts.").

Plaintiffs added the following sentence to instruct the jury that adopting a league rule is an agreement: "If you find that the NFL teams adopted and adhered to a league rule, then that constitutes an agreement among the NFL teams." This principle was recently confirmed by the Second Circuit Court of Appeals in a case involving restraints imposed by international soccer leagues. *See Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 307 (2d Cir. 2023) ("Business, professional, trade, and sports organizations and associations, for instance, are all subject to federal antitrust laws if their members demonstrate a conscious commitment to a common scheme to achieve an unlawful objective. . . . It follows from this precedent that the adoption of a binding association rule designed to prevent

competition is <u>direct evidence</u> of concerted action. No further proof is necessary.") (internal quotation marks and citation omitted).  The ABA model instructions, which were last amended in 2016, do not yet incorporate this concept.

Defendants' objection to Plaintiffs' market definition is groundless. It has been clear throughout this case that Plaintiffs mean "live telecasts" when they use the word "telecasts." *See* ECF No. 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023, ¶ 10 ("As I use the term, 'telecasts' means simulcasts distributed to consumers live (as the game occurs)[.]").  The Ninth Circuit recognized this as well. *See In re NFL Sunday Ticket*, 933 F.3d at 1148 ("Under the NFL-DirecTV Agreement, the NFL allows DirecTV to obtain all of the ***live*** telecasts produced by CBS and Fox, package those telecasts, and deliver the bundled feeds to NFL Sunday Ticket subscribers." (emphasis added)).  Plaintiffs use the term "live telecasts" instead of just "telecasts" throughout the jury instructions to make this clear to the jury. There is no "revision" or change from the proposed pretrial order because, again, "telecasts" has always meant "live telecasts" in this case.

Lastly, Plaintiffs' instruction makes no reference to an "unreasonable" restraint of trade because that concept is not pertinent to an instruction on the definition of a contract, combination, or conspiracy.  The phrase "unreasonable" is not found in the ABA model instruction because the concept is addressed elsewhere, namely in the instructions on the rule of reason.

# NO. 41: CORPORATIONS[7]

Each team, the NFL itself, DirecTV, and the television networks are all corporations.

Under the law, a corporation is a person, but it acts only through its agents. A corporations' agents include its directors, officers, employees, or others acting on its behalf. A corporation is not capable of conspiring with its own agents. Through its agents, however, a corporation is capable of conspiring with other persons or independent corporations.

A corporation is legally bound by the acts and statements of its agents or employees done or made within the scope of the agent's employment or apparent authority.

The fact that a corporation has instructed its agents not to violate the antitrust laws does not excuse the corporation from responsibility for the unlawful acts of its agents done within the scope of their employment or apparent authority.

A corporation is entitled to the same fair trial as a private individual. The acts of a corporation are to be judged by the same standard as the acts of a private individual, and you may hold a corporation liable only if such liability is established by a preponderance of the evidence. All persons, including corporations, are equal before the law.

---

[7] ABA Antitrust 2-A-3 (modified).

## DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 41

Plaintiffs' Instruction 41 presents an overly complicated version of the Model Instruction, which will only serve to confuse the jury. For example, Plaintiffs have included language about the inability of a corporation to conspire with its agents—an issue that is completely irrelevant to their theory of the case. As the Ninth Circuit model instructions note, "[j]ury instructions are intended to give the jurors, in understandable language, information to make the trial more meaningful and to permit them to fulfill their duty of applying the law to the facts as they find them."

Plaintiffs' instruction is also unbalanced because it notes that Defendants are corporations without indicating that many members of the Plaintiff classes—including the named commercial class representatives—also are corporations.

The Court should reject this unnecessarily confusing instruction in favor of Defendants' clear, concise Corporate Entities instruction. Defendants also note that the term "corporate entities" is more accurate in this context because some Defendants (and presumably also some Plaintiffs) are corporate entities that are not specifically corporations, such as partnerships.

1

## PLAINTIFFS' REPLY RE. NO. 41: CORPORATIONS

2    Plaintiffs' instruction is based on ABA Antitrust 2-A-3 but omits two
3    paragraphs explaining apparent authority because the facts of this case do not require
4    it. The instruction does not include any description of class members because the
5    conduct of class members is not at issue in this litigation. To address Defendants'
6    specific objections, Plaintiffs are willing to omit the sentence, "A corporation is not
7    capable of conspiring with its own agents," and to replace the term "Corporations"
8    with "Corporate Entities."

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **NO. 42: ABSENT CO-CONSPIRATORS**[8]

You may not consider, for any purpose, the fact that DirecTV, CBS, or FOX are not appearing as Defendants in this case.

---

[8] Order on Plaintiffs' Motion in Limine No. 3, ECF No. 1293, at 4 ("The Court GRANTS Plaintiffs' motion to the extent it limits both parties from mentioning the absence of Defendants' television partners or attempting to lead the jury to draw any inference from that fact.")

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 42**

Defendants object to Plaintiffs' Instruction 42 as unnecessary. Both parties have already agreed not to make any "empty chair" arguments about DirecTV, CBS, or FOX. *See* ECF No. 1168 at 4 (Defs.' Mem. Opp. Pls.' Mot. in Limine No. 3). This Court has issued an order reflecting that. *See* ECF No. 1293 at 4. Giving this instruction will only draw the jury's attention to the absence of other alleged conspirators, confusing the jury and distracting them from the issues.

1

## **PLAINTIFFS' REPLY RE. NO. 42: ABSENT CO-CONSPIRATORS**

Plaintiffs proposed this instruction so that the jury will not draw any adverse inferences based on the absence of DirecTV, FOX, or CBS from trial. This instruction flows from the Court's order on Plaintiffs' Motion in Limine No. 3. *See* ECF No. 1293, at 4 ("The Court GRANTS Plaintiffs' motion to the extent it limits both parties from mentioning the absence of Defendants' television partners or attempting to lead the jury to draw any inference from that fact.").  Failure to address the absence of DirecTV, FOX, or CBS may lead the jury to speculate about the reasons why.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NO. 43: AGREEMENTS BETWEEN TEAMS BELONGING TO SPORTS LEAGUES MAY VIOLATE SHERMAN ACT SECTION 1[2]

A sports league and its member teams are capable of committing violations of the antitrust laws. If you find that the NFL teams agreed, as separate decisionmakers, to combine their telecast rights and concentrate them in the NFL, rather than licensing telecast rights on their own, then you must find that the teams and the NFL entered into a horizontal agreement to restrain competition between and among themselves. If you find any such horizontal agreement, you must consider whether that horizontal agreement is an unreasonable restraint of trade under the four-part Rule of Reason test detailed in instructions 47 through 52.

No matter whether you find a horizontal agreement among the NFL teams, you must still consider Plaintiffs' contentions that the NFL entered into agreements with DirecTV, CBS, and Fox that unreasonably restrained trade.

---

[9] ABA Antitrust 2-C-10 (modified); *In re National Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *16 (Jan. 11, 2024) ("If it is not possible [for independent entities—*i.e.*, individual sports teams—to license telecast rights on their own without pooling their rights with a conference or league], then the NFL and its member clubs are properly considered a single entity incapable of concerted action."); *Am. Needle, Inc. v. National Football League*, 560 U.S. 183, 195 (2010) (To identify concerted action, "the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense. The key is whether the alleged ' contract, combination ..., or conspiracy' . . . joins together separate decisionmakers."); *Biddle v. Walt Disney Co.*, 2023 WL 6453799, at *7 (N.D. Cal. Sept. 30, 2023) ("An arrangement is said to be 'horizontal' when its participants are (1) either actual or potential rivals at the time the agreement is made; and (2) the agreement eliminates some avenue of rivalry among them") (quotation marks and citation omitted); *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 106 (1984) (recognizing that "agreements among [NFL] league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act"), quoted in *In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1146 (9th Cir. 2019).

1    **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 43**

2        Defendants object to the inclusion of Plaintiffs' Instruction 43, which is

3    irrelevant, completely unmoored from the model instructions, and legally incorrect.

4        *First*, Plaintiffs "modified" version of the ABA model instruction on "trade

5    organizations" retains essentially none of the model's language: Mod. Jury Instrs.

6    Civ. Antitrust Cases, Chapter 2 – Section 1 of the Sherman Act, Horizonal Nonprice

7    Restraints, Instruction 10: Trade Organization May Commit Antitrust Violations

8    (Am. Bar Ass'n Antitrust L. Sec. 2016). And at any rate, there is no basis for the use

9    of a "trade organizations" instruction here. The NFL and its member clubs are not

10   properly characterized as a trade association in that sense, and Plaintiffs cite no

11   precedent for using this instruction in a case where there is no trade association at

12   issue, or for tenuously adapting the instruction to address the positioning of sports

13   leagues in antitrust lawsuits.

14       *Second*, the Plaintiffs' use of the term "separate decisionmakers," without

15   context or explanation, is highly prejudicial.  This Court has held that whether the

16   NFL and its member clubs can be separate decisionmakers with respect to producing

17   and licensing NFL telecasts is one of the issues that the jury must decide at trial. *See*

18   *Sunday Ticket*, 2024 WL 168298, at *15 ("There is a dispute of fact whether the NFL

19   and its member clubs are capable of concerted action."). Including an instruction

20   using the term "separate decisionmakers" without presenting the alternative (that the

21   NFL and its clubs act as a single entity for the purpose of producing and licensing

22   professional football telecasts) will imply to the jury that this factual question has

23   already been decided. Compounding this misleading language is Plaintiffs' failure to

24   include a single entity instruction. Without such an instruction, the jury will have no

25   basis for deciding when an entity is, or is not, a separate decisionmaker for purposes

26   of antitrust liability. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769

27   (1984).

28

*Third*, it is legally incorrect to suggest that the jury can consider a horizontal agreement among the NFL and the teams on a stand-alone basis under the rule of reason. As detailed below in Defendants Objections to Plaintiffs' Instruction 34, Plaintiffs lack standing under *Illinois Brick* to assert damages claims as to any such stand-alone agreement. Plaintiffs are similarly incorrect to characterize their claims as involving an alternative theory that does not involve any agreement among the NFL teams. Rather, as also detailed in Defendants Objections to Plaintiffs' Instruction 34, Plaintiffs' claims are premised on the existence of "single conspiracy," *Sunday Ticket*, 933 F.3d at 1157, and Plaintiffs should not be permitted to present theories to the jury that are inconsistent with the positions they took in order to overcome the legal challenges to their case at the motion-to-dismiss and summary-judgment stages.

*Finally*, Plaintiffs' cited cases do not support their attempt to direct the jury's factual findings on the issue of whether the NFL and its member clubs are a single entity or separate decisionmakers. They cite only two cases on this issue: first to an opinion from this Court, *see In re National Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *16 (Jan. 11, 2024), and then *Am. Needle, Inc. v. National Football League*, 560 U.S. 183, 195 (2010). But both of those citations, unlike Plaintiffs' instruction, leave open the factual possibility that members of sports leagues can act as a single entity for certain purposes—critical context that is excluded from Plaintiffs' instruction. These citations provide no basis for Plaintiffs' apparent attempt at directing the jury's factual findings regarding the single entity issue.

1

2

3

**PLAINTIFFS' REPLY RE. NO. 43:**

**AGREEMENTS BETWEEN TEAMS BELONGING TO SPORTS LEAGUES**

**MAY VIOLATE SHERMAN ACT SECTION 1**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

This instruction is based on ABA Antitrust 2-C-10, which explains to a jury that trade organizations may commit antitrust violations. To make this instruction relevant to the facts of this case, Plaintiffs changed "association" to "sports league." Plaintiffs also added instructions to aid the jury in resolving any factual dispute raised by Defendants' purported single entity defense. To do this, Plaintiffs tracked the Court's language and language from *American Needle*, which clearly states that the NFL and its member teams are not a single entity if the teams are separate decisionmakers with respect to telecasting rights. *See In re National Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *16 (Jan. 11, 2024) ("If it is not possible [for independent entities—*i.e.*, individual sports teams—to license telecast rights on their own without pooling their rights with a conference or league], then the NFL and its member clubs are properly considered a single entity incapable of concerted action."); *Am. Needle, Inc. v. National Football League*, 560 U.S. 183, 195 (2010) (To identify concerted action, "the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense. The key is whether the alleged ' contract, combination . .., or conspiracy' . . . joins together separate decisionmakers."). Contrary to Defendants' arguments, Plaintiffs' instruction asks the jury to determine the factual predicate to their single-entity defense: whether the NFL teams entered into an agreement as separate decisionmakers.

25

26

27

28

The remainder of the instruction is intended to help the jury understand that regardless of whether the NFL and the NFL teams constitute a single entity, they must still consider whether the agreements between the NFL, DirecTV, CBS, and FOX unreasonably restrained trade. Without this instruction, the jury may be misled

44

into believing that NFL's single entity defense applies to its agreements with DirecTV, CBS, and FOX. And contrary to Defendants' mischaracterization of Plaintiffs' claims, the jury may still find the NFL liable even if it concludes that the teams' pooling of rights is not anticompetitive.  Although Plaintiffs allege a single conspiracy among the NFL Defendants, DirecTV, CBS, and Fox, they have long contended that the NFL can be held liable for the NFL-DirecTV agreement *alone*, as demonstrated by the alternative damages models in Dr. Rascher's report. *See* ECF No. 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023, ¶¶ 51-56, 405-418.  Defendants are incorrect to argue that Plaintiffs' claims hinge on proving a single conspiracy involving each and every of the alleged coconspirators.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NO. 44: AGREEMENTS BETWEEN THE NFL, DIRECTV, CBS, AND FOX[10]

Whether or not you find any horizontal agreement among the NFL teams to restrain telecasts, you should also consider Plaintiffs' claim that the NFL, on behalf of the NFL Teams, entered into agreements with DirecTV, CBS, and/or FOX that unreasonably restrained trade.

Plaintiff has alleged that the NFL, on behalf of the NFL teams, entered into agreements with DirecTV, FOX, and CBS to make DirecTV the exclusive distributor of out-of-market games, to tie the sale of all out-of-market games together, and to require that DirecTV charge premium prices for Sunday Ticket in order to insulate FOX and CBS's over-the-air games from competition with those out-of-market games. If you find that those agreements existed, you must consider whether they are unreasonable restraints of trade under the four-part Rule of Reason test detailed in instructions 47 through 52.

---

[10] *See Biddle v. Walt Disney Co.*, 2023 WL 6453799, at *6 (N.D. Cal. Sept. 30, 2023) ("Vertical restraints are presumptively examined under a rule of reason analysis.").

46

1    **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 44**

2    Defendants object to Plaintiffs' Instruction 44 because it is unnecessary, one-

3    sided, and legally incorrect.

4    *First*, Plaintiffs again seek to reverse course on their position—which was a

5    legally necessary component of their case—that they are challenging a single

6    conspiracy between DirecTV, the NFL, and its teams. As explained in Defendants'

7    response to Plaintiffs' Instruction 30, the Ninth Circuit did not uphold Plaintiffs'

8    challenges to any single commercial agreement; instead, it expressly premised its

9    holdings on the understanding that Plaintiffs challenged multiple "agreement[s],

10   which work together as a single conspiracy to limit the output of NFL telecasts." 933

11   F.3d at 1157. Plaintiffs likewise used similar language throughout this case. *See, e.g.*,

12   Pls.' Mem. Opp. Defs.' Mot. Summ. J. at 8 ("This is not a new theory. Plaintiffs have

13   consistently claimed that the agreements with CBS and Fox were part of *the*

14   *conspiracy* to restrain competition[.]") (emphasis added); Compl. ¶ 46(g)–(j)

15   (referring to their claims' in terms of "the alleged conspiracy"). But in this

16   instruction, Plaintiffs lead the jury away from this overarching conspiracy, instead

17   telling jurors that a finding that any of the individual agreements is sufficient. This is

18   particularly incorrect because this Court's holding at summary judgment was focused

19   squarely on this issue of whether an independent agreement exists, tying Plaintiffs'

20   alleged conspiracy together  *See In re Nat'l Football League's Sunday Ticket*

21   *Antitrust Litig.*, 2024 WL 168298, at *13 (C.D. Cal. Jan. 11, 2024) ("There is a

22   dispute of fact as to whether an agreement exists, outside of the NFL-Network

23   Agreements, that pools the member clubs' telecast rights.").

24   *Second*, Plaintiffs are incorrect to suggest that they can assert either a stand-

25   alone challenge to an agreement among the NFL and its clubs, or stand-alone

26   challenge to the NFL-DirecTV agreement. Plaintiffs lack standing to assert damages

27   claims as to any agreement among the NFL and its member clubs under *Illinois*

28   *Brick*'s "bright-line rule that authorizes suits by direct purchasers but bars suits by

47

1   indirect purchasers." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019). Under the

2   Ninth Circuit's opinion in this case, Plaintiffs can only overcome this bright-line rule

3   by proving that "they were directly injured by the conspiracy among the NFL teams,

4   the NFL, and DirecTV." *Sunday Ticket*, 933 F.3d at 1157; *accord Sunday Ticket*,

5   2024 WL 168298, at *8 ("whether *Illinois Brick* applies, barring Plaintiffs from

6   having standing, is dependent on a material issue of fact," namely, "whether DirecTV

7   had a conscious commitment to participate in the conspiracy"). Similarly, Plaintiffs'

8   allegations regarding the NFL-DirecTV agreement have survived legal challenge

9   only because Plaintiffs have alleged that that vertical, intellectual property license is

10  part of a larger conspiracy that restrained trade. *See Sunday Ticket*, 2024 WL 168298,

11  at *19 (rejecting challenge to the vertical agreement because "[t]he Court is indeed

12  required to take a holistic look at how the interlocking agreements actually impact

13  competition and cannot evaluate the NFL's vertical conduct in isolation" (internal

14  quotation marks and citation omitted)).

15      *Finally*, this instruction has no basis in the Model Instructions or in the law.

16  Plaintiffs have not pointed to a single case where any remotely analogous instruction

17  was given. In fact, the only case they cite stands for the proposition that "[v]ertical

18  restraints are presumptively examined under a rule of reason analysis." This is wholly

19  unnecessary, as the Ninth Circuit has already ruled that this case is subject to the rule

20  of reason. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d

21  1136, 1150 (9th Cir. 2019).

22

48

1

2

**PLAINTIFFS' REPLY RE. NO. 44:**

**AGREEMENTS BETWEEN THE NFL, DIRECTV, CBS, AND FOX**

3      This instruction is intended to help the jury understand that the agreements

4    between the NFL, DirecTV, CBS, and FOX are also subject to the rule of reason,

5    whether or not the jury finds that a horizontal agreement exists among the teams.

6    Plaintiffs did not adopt the ABA Antitrust model instruction on the elements of

7    vertical restraints (2-D-1) because it only applies to per se cases.

8      And contrary to Defendants' mischaracterization of Plaintiffs' claims, the jury

9    may still find the NFL liable even if it concludes that the teams' pooling of rights

10   does not violate the antitrust laws. Although Plaintiffs allege a single conspiracy

11   among the NFL Defendants, DirecTV, CBS, and Fox, they have long contended that

12   the NFL can be held liable for the NFL-DirecTV agreement *alone*, as demonstrated

13   by the alternative damages models in Dr. Rascher's report. *See* ECF No. 962-4,

14   Expert Report of Daniel A. Rascher, dated February 17, 2023, ¶¶ 51-56, 405-418.

15   Lest there by any doubt, Plaintiffs explained in their opposition to summary judgment

16   that the agreements between the NFL and its television partners caused independent

17   harm by "manipulat[ing] the NFL telecast market to limit the output that would have

18   existed absent the restraints." Plaintiffs' Opposition to Summary Judgment, ECF No.

19   964-1 at 25. The jury is free to find the NFL liable for only this aspect of the

20   conspiracy. Defendants are incorrect to argue that Plaintiffs' claims hinge on proving

21   a single conspiracy involving each and every of the alleged coconspirators.

22

23

24

25

26

27

28

49

### NO. 47: RULE OF REASON – OVERVIEW[11]

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable. You must determine, therefore, whether the restraints challenged here were unreasonable.

In making this determination, you must first determine whether Plaintiffs have proven that the challenged restraints have resulted in a substantial harm to competition. In making this determination, you must look at how the various alleged agreements work together to actually impact competition. If you find that Plaintiffs have proven that one or more of the agreements at issue collectively or individually had the purpose or effect of (a) restricting the output or viewership of live professional football telecasts, or of (b) raising, fixing, maintaining, stabilizing, or otherwise operating to affect the price of Sunday Ticket, then you must find that Plaintiffs have proven substantial harm to competition. Restrictions on price and output are the clearest examples of unreasonable restraints on trade that the antitrust laws were intended to prohibit.

If you find that Plaintiffs have shown that the challenged restraints result in a substantial harm to competition, then you must consider whether the Defendants have proven that the restraints were adopted by them for the purpose of advancing competition and produced the intended countervailing benefits. If Defendants have not carried their heavy burden of proving that the restraints were adopted for that purpose and, in fact, had such countervailing benefits, then the challenged restraints are illegal under Section 1 of the Sherman Act and you should go no further and find for Plaintiffs.

If, however, you find that Defendants have proven that the restraints produced countervailing procompetitive benefits, then you must determine whether Plaintiffs

---

[11] ABA Antitrust 1-C-3A (modified); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 993-94 (9th Cir. 2023); *In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1155-56 (9th Cir. 2019); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); Final Jury Instructions for Epic Trial, Instruction No. 27, *In re Google Play Store Antitrust Litig.*, Case No. 20-cv-05671-JD, ECF No. 850; VII Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1502, at 398–99. (4th ed. 2017); *NCAA v. Board of Regents*, 468 U.S. 85, 104-05, 107, 113 (1984).

have proven that these same countervailing procompetitive benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition. The challenged restraints are illegal under Section 1 of the Sherman Act if you find that these countervailing procompetitive benefits could reasonably have been achieved in a less restrictive manner and you should go no further and find for Plaintiffs.

If you find that Plaintiffs have *not* proven that these same countervailing procompetitive benefits could reasonably have been achieved in a less restrictive manner, then you must balance the competitive harm against the competitive benefits of the restraints. The challenged restraints are illegal under Section 1 of the Sherman Act only if you find the anticompetitive harm outweighs the procompetitive benefits from those restraints.

I will now review each step of the analysis in more detail.

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 47**

Defendants' proposed instruction on the rule of reason closely follows the model instructions and accurately states the law. Defendants' limited proposed deviations from the model instructions are intended to: (i) streamline the instructions to include only relevant material; (ii) align the instructions with recent and controlling developments in antitrust law, both in Supreme Court and Ninth Circuit jurisprudence; and (iii) follow recent instructions within this Circuit. By contrast, Plaintiffs' Instruction 47 misstates the law, deviates greatly from the model, does not account for this Circuit's recent clarification of the rule of reason analysis, and would serve only to confuse the jury. The Court should therefore reject Plaintiffs' proposed instruction and accept Defendants' proposed instruction.

While the model instruction provides a helpful starting point, there have been important legal developments since they were promulgated in 2016. Both the Supreme Court and the Ninth Circuit have issued decisions developing the law around the rule of reason analysis. The most substantive developments affect steps two and three of the rule of reason, as well as the possible existence of a fourth step. *See Epic Games*, 67 F.4th at 990, 993–94. Defendants' proposed instruction incorporates the Ninth Circuit's guidance from *Epic Games* on all of these topics. The Northern District of California recently approved nearly identical instructions on the rule of reason to what Defendants have proposed here. *See* Closing Jury Instructions at 18–22, 24–25 (Jury Instructions No. 12–15, 17–18), *In re HIV Antitrust Litig.*, No. 3:19-cv-02573-EMC (N.D. Cal. June 27, 2023), ECF No. 2018; Final Jury Instructions Nos. 1-55 at 32–36 (Jury Instructions 27–30), *Sumotext Corp. v. Zoove Inc.*, No. 5:16-cv-01370-BLF (N.D. Cal. Mar. 1, 2020), ECF No. 461.

Plaintiffs' instructions, by contrast, are misleading and misstate the law in multiple respects.

*First*, Plaintiffs propose to instruct the jury that Defendants must show "that Defendants have proven by a preponderance of the evidence that the restraints

produced countervailing procompetitive benefits," however, both the Supreme Court and the Ninth Circuit have explained that, at step two of the rule of reason, the defendant must only "show a procompetitive rationale for the restraint," *i.e.*, the defendant must show that its conduct is "indeed a form of competition on the merits." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96 (2021) (quoting *Am. Express*, 585 U.S. at 541); *Epic Games*, 67 F.4th at 985–86; *Qualcomm*, 969 F.3d at 991. Plaintiffs' language departs from precedent and inappropriately suggests a heightened or "heavy" burden, including that the use of "countervailing" and "benefits" that their proposal asserts must "counteract the anticompetitive effects," *see* Plfs.' Proposed Instr. No. 47, suggests incorrectly, that some form of balancing applies at the second step. *See* ECF No. 1325 (Order on Defs.' MIL No. 7) at 8–9 & nn.12–13 ("Plaintiffs [] cannot argue or imply that Defendants have an 'empirical burden' to prove procompetitive effects. . . . Any implication that Professor Bernheim or Defendants have a duty to provide a quantitative analysis would be improper under the rule of reason.").

*Second*, Plaintiffs' assertion that Defendants must prove that the alleged agreements "enhance competition in ways that benefit consumers and counteract the harm to competition that Plaintiffs have shown" misstates the law and will mislead the jury. Defendants do not have a burden to show that their conduct "enhance[s] competition"; rather, Defendants must show that their conduct is "a *form* of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Epic Games*, 67 F.4th at 986 (emphasis added); *Qualcomm*, 969 F.3d at 991; *cf. Epic Games*, 67 F.4th at 998 (rejecting Epic's argument that rationales must increase competition in the antitrust market where the conduct has anticompetitive effects).

Not every procompetitive rationale will "enhance competition" as that phrase is likely to be understood colloquially by a jury. For example, in *Epic Games*, the Ninth Circuit credited Apple's argument that "it implemented the restrictions to be

53

compensated for its IP investment" because the "desire to profit from intellectual property is presumptively procompetitive." *Epic Games*, 67 F.4th at 986 (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997) (cleaned up)). The Ninth Circuit similarly accepted Apple's argument that its security and privacy features, which were shown to have anticompetitive effects, were justified by Apple's objective to "tap[] into consumer demand and differentiat[e] its products from those of its competitors" because those "are plainly procompetitive rationales." *See id.* at 987. Plaintiffs' proposed instruction would be likely to mislead the jury to believe, wrongly, that certain of Defendants' proffered procompetitive rationales here—such as protecting Defendants' intellectual property, incentivizing investments and innovation to improve product equality, facilitating cooperation and coordination among the NFL and NFL teams, maximizing fan reach and access, and promoting smaller-market teams—are not cognizable at step two of the rule of reason.

*Third*, Plaintiffs propose to add the inaccurate and unnecessary assertion that "Restrictions on price and output are the clearest examples of unreasonable restraints on trade that the antitrust laws were intended to prohibit." That assertion is an unnecessary deviation from the model that fails to offer a balanced assessment of the purposes of the Sherman Act and seeks to merely direct the jury's verdict.

*Fourth*, Plaintiffs also improperly suggest here that it would be sufficient to prove that "one or more of the agreements at issue collectively or individually" unreasonably restrained trade. Plaintiffs provide no justification for these deviations from the model instructions, and as explained in Defendants' Objections to Plaintiffs' Instructions 30 and 34, the Ninth Circuit did not uphold Plaintiffs' challenges to any single commercial agreement; instead, it expressly premised its holdings on the understanding that Plaintiffs challenged multiple "agreement[s], which work together as a single conspiracy to limit the output of NFL telecasts." Plaintiffs should be held to their allegations that the challenged agreements in this case amounted to a "single

conspiracy," including because allowing Plaintiffs to proceed on this new piecemeal theory would undermine the Ninth Circuit's reasoning for upholding Plaintiffs' standing to assert their damages claim. *See Sunday Ticket*, 933 F.3d at 1156–58; *see also* Defs.' Objs. to Plfs.' Instr. No. 34.

*Fifth*, Plaintiffs' description of the third step of the rule of reason is contrary to law and inappropriately suggests that their burden is lower than required by the Ninth Circuit. Plaintiffs propose to instruct the jury that if Defendants carry their burden to show a procompetitive rationale at step two, the jury should only consider whether Plaintiffs proved that the procompetitive benefits "could reasonably have been achieved in a manner that is less restrictive of competition without significantly increased cost." This assertion conflicts with the Ninth Circuit's explanation that at step three, the burden shifts back to the plaintiff to demonstrate that the procompetitive rationales could reasonably achieved through "*substantially* less restrictive alternatives." *See Epic Games*, 67 F.4th at 990 (emphasis in original) (quoting *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015)). Moreover, a plaintiff must show that their proposed alternative is "virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost." *Id.* (cleaned up) (quoting *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001)). Plaintiffs' formulation of the third step ignores the Supreme Court's warning that, "when evaluating proposed alternative means, courts 'must give wide berth to [defendants'] business judgments' and 'must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives.'" *See Epic Games*, 67 F.4th at 990 (quoting *Alston*, 594 U.S. at 102, 106); *see also Alston*, 594 U.S. at 98 ("[A]ntitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes."); *id.* ("[C]ourts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'" (quoting *Rothery Storage & Van Co. v. Atlas*

*Van Lines, Inc.*, 792 F.2d 210, 227 (D.C. Cir. 1986))). The Court should therefore reject Plaintiffs' attempt to lower their burden because it risks inviting error into the jury's analysis at step three.

*Finally*, Plaintiffs fail to adapt the ABA model instruction's formulation of a "fourth step" of the rule of reason to account for more recent precedent. As the Ninth Circuit explained in *Epic Games*, Supreme Court precedent does not require a fourth step, and the three-part test "is already intended to assess a restraint's overall effect." 67 F.4th at 993–94. The three-part test explained in Defendants' proposed instruction thus "is already designed to identify . . . an imbalance" among the anticompetitive effects and procompetitive benefits, and proceeding to a fourth balancing step, "in most instances," will merely "confirm[] the result suggested by a step-three failure: that a business practice without a less restrictive alternative is not, on balance, anticompetitive." *Id.* Plaintiffs offer no reason to believe that this is the unique case in which that "confirmation" does not apply, and there is no need here to instruct the jury to proceed to a fourth step merely to confirm the third step. Moreover, *Epic Games* reviewed a bench trial decision, where the finder of fact was experienced in the law and the analysis that would occur at a fourth step. Asking the jury to conduct this superfluous totality-of-the-circumstances analysis—about which even the Ninth Circuit has expressed skepticism—will needlessly further complicate an already complicated case and would risk inviting error.

### **PLAINTIFFS' REPLY RE. NO. 47: RULE OF REASON – OVERVIEW**

Plaintiffs' overview of the rule of reason follows the ABA model instructions, the law specifically applicable to this case, and comports with the cases cited by Defendants. Defendants' approach, by contrast, would work a radical change in the law by essentially eliminating their burden of proof on procompetitive benefits and permitting the jury to rule in their favor even if the overall effect of their conduct is anticompetitive—exactly the opposite of what the Rule of Reason requires.[12]

First, Defendants object to the Plaintiffs' use of the term "countervailing competitive benefit," which comes directly from the ABA model instruction.[13] That language is also inherent in the logic of the Rule-of-Reason analysis, which seeks an ultimate determination of "whether the challenged restraint enhances competition." *NCAA*, 468 U.S. at 104. Defendants' apparent suggestion that the procompetitive benefits do not have to have anything to do with the anticompetitive harm that the Plaintiffs must show in the first step of the analysis is nonsensical. Nor do the cases cited by Defendants change this analysis. Only if they are *countervailing* are the Defendants' justifications capable of affecting the ultimate determination under the Rule of Reason. *See* Order on Plaintiffs' Motion in Limine No. 2, ECF No. 1292 at 5 ("The only permissible [procompetitive justification] argument is that *the restraints* are what make the product high quality, and consumer's actions then can only be used if it clearly supports the specific ways in which *the restraints* have improved the product. . . Without *that link* this evidence is inadmissible as irrelevant." (emphases added)).

Second, and similarly, Defendants object to the language that the procompetitive benefit must "enhance competition." Yet that is what the Rule of Reason is all about. As the Supreme Court in *NCAA* stressed, "the essential inquiry [under the Rule of Reason always] remains the same—whether or not the challenged

---

[12] Plaintiffs have already addressed a portion of Defendants' first objection by removing "preponderance of the evidence" from the instruction.
[13] ABA Antitrust 1-C-3A.

restraint *enhances competition*." 468 U.S. 85 at 104 (emphasis added). The Ninth
Circuit quoted this language in its opinion in this case as well. *See* 933 F.3d at 1152.
None of the cases cited by Defendants reflects a rejection of this black-letter law.

Defendants' proposed changes would rewrite the Rule of Reason standards,
asking the jury to evaluate "benefits" entirely disconnected from their impact on
competition. This is not the law. It has long been established that, under the Rule of
Reason, "*the inquiry is confined to a consideration of impact on competitive
conditions*." *Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 690 (1978)
(emphasis added). A procompetitive effect cannot simply increase profits, spread
wealth to others, or achieve some laudable social purpose. *See id*. at 692 ("the
purpose of the analysis is to form a judgment about the competitive significance of
the restraint; it is not to decide whether a policy favoring competition is in the public
interest, or in the interest of the members of an industry.").

The Supreme Court's consideration of the NCAA's proposed procompetitive
benefit of "competitive balance" exemplifies the required approach. "The hypothesis
that legitimates the maintenance of competitive balance as a procompetitive
justification under the Rule of Reason is that equal competition will maximize
consumer demand for the product. The finding that consumption will materially
increase if the controls are removed is a compelling demonstration that they do not
in fact serve any such legitimate purpose." 468 U.S. at 119-20. The Court rejected
competitive balance as a procompetitive justification because the NCAA failed to
show that it increased consumption – especially when weighed against the NCAA
direct restraints on consumption. Simply put, a purported justification untethered
from its ability to enhance competition is not a procompetitive justification under the
Rule of Reason.

Defendants similarly ignore settled precedent when they assert that it is an
"inaccurate and unnecessary assertion that 'Restrictions on price and output are the
clearest examples of restraints on trade that the antitrust laws were intended to

prohibit.'" That language, again, comes straight from the Supreme Court's *NCAA* decision, although it has been changed slightly to make it more understandable to the jury. The Court there stated, "Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." 468 U.S. at 107–08. Defendants suggest that this language is inappropriate for failing to include a limitation to "reasonable" restrictions. But whether the restriction is reasonable is the *conclusion* of the multiple-step rule-reason-analysis. Plaintiffs, as did the Supreme Court in *NCAA*, use this language only in reference to the first step, in assessing whether the conduct in question has impacted competition sufficiently to continue to the next stage of the analysis.

It would also be inappropriate to delete "one or more of the agreements at issue collectively or individually." It would still be a violation of the antitrust laws, for example, if the jury were to conclude that the teams' agreement with the NFL was reasonable but that their exclusive arrangement with DirecTV (protecting horizontal competitors CBS and Fox from would-be competing telecasts) was not. Without this instruction, the jury could have the mistaken belief that if they find *any* component of any agreement to be reasonable, then Plaintiffs claims must fail. That is obviously wrong. Specifically, the jury may still find the NFL liable even if it concludes that the teams' pooling of rights is not anticompetitive. Although Plaintiffs allege a single conspiracy among the NFL Defendants, DirecTV, CBS, and Fox, they have long contended that the NFL can be held liable for the NFL-DirecTV agreement *alone*, as demonstrated by the alternative damages models in Dr. Rascher's report. *See* ECF No. 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023, ¶¶ 51-56, 405-418.  Defendants are incorrect to argue that Plaintiffs' claims hinge on proving a single conspiracy involving each and every of the alleged coconspirators.

Defendants' arguments regarding the third step are also misplaced as Plaintiffs' proposed instruction faithfully follows the language in the ABA Model Instruction 1-C-3C.  It is also consistent with recent Supreme Court precedent on the

subject. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 103 (2021) (affirming judgment based on finding that relaxing restrictions "represented a significantly (not marginally) less restrictive means of achieving the same procompetitive benefits as the NCAA's current rules.").

Defendants' argument concerning the ABA model instruction's "fourth step"—in which the jury is instructed to weigh the harms and benefits to competition—works particular mischief given their objections to the earlier steps. It is true that courts have, at different times, spoken of a three-step or a four-step process. But whether the analysis is in three steps or four, the "essential inquiry" is *always* whether the conduct at issue "enhances competition" or suppresses it. *NCAA*, 468 U.S. at 104. Balancing competitive effects is the point of any Rule of Reason analysis. The best instruction, as reflected in the ABA model, is to make this balancing explicit to the jury by adding a fourth step to the analysis. Defendants rely on a misreading of *Epic Games* to argue that a fourth step is inappropriate. The Ninth Circuit actually determined that the fourth, balancing step *was required*. 67 F.4th at 993. It simply found that the district court's failure to label it as such was harmless, because "it stated that it 'carefully considered the evidence in the record and ... determined, based on the rule of reason,' that the distribution and IAP restrictions 'have procompetitive effects that *offset* their anticompetitive effects' (emphasis added)." *Id.*

At the end of the day, Defendants are seeking to avoid any balancing, offsetting, or analysis of the overall effects of their so-called procompetitive benefits. They oppose any comparative evaluation of their proposed benefits at *any* stage of the analysis, seeking an instruction that would ask the jury to find for them if they proffer a (non-countervailing) procompetitive benefit of *any* kind, even if the overall effect is harmful to competition. That is the opposite of what the rule of reason requires, and there is no reason to depart from the model instructions on this point.

1    **NO. 49: RULE OF REASON – PROOF OF ANTICOMPETITIVE HARM[14]**

2    *Quick Look Instruction*

3        I instruct you that Plaintiffs have satisfied their burden of proving

4    anticompetitive harm.  You should therefore proceed to the next instruction, and

5    determine whether Defendants have met their burden of proving countervailing

6    procompetitive benefits.

7

8    *Full Rule-of-Reason Instruction*

9        As I mentioned, to prove that the challenged restraints are unreasonable,

10   Plaintiffs first must demonstrate that the restraint has resulted in a substantial harm

11   to competition. A harmful effect on competition, or anticompetitive harm, refers to a

12   reduction in competition that results in the loss of some of the benefits of competition,

13   such as lower prices, increased output, or responsiveness to consumer preferences.

14       An agreement between competing firms to fix prices can cause

15   anticompetitive harm even if there is not an agreement on the exact price to be

16   charged. For example, it is anticompetitive for competing companies to agree on

17   maximum or minimum prices, a range within which prices will fall, a formula to set

18   prices, or a component of prices, such as a shipping charge or an interest rate or a

19   subscription fee.

20       It is also anticompetitive for actual or potential competitors to agree on a plan

21   or scheme that will tend to stabilize prices. Any agreement among competitors to

22   raise, fix, maintain, or stabilize prices, or that otherwise operates to affect the price,

23   is anticompetitive.

24       If you find that Plaintiffs have proved by a preponderance of the evidence that

25   the challenged restraints had the purpose or effect of (a) reducing the output of some

26   live professional football telecasts or (b) of raising, fixing, maintaining, stabilizing,

27

28   ---
     [14] ABA Antitrust 1-C-3B; ABA Antitrust 2-B-1 (modified); *In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1155-56 (9th Cir. 2019); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460–61 (1986); *Ohio v. American Express Co.*, 138 S.Ct. 2274, 2284 (2018).

or otherwise operating to affect the price of Sunday Ticket, no further analysis is required and you must find that Plaintiffs have proved substantial harm to competition.

If you do not find such direct proof of anticompetitive harm in this manner, you may also infer anticompetitive harm indirectly from the fact that the parties subject to the restraints had collective market power, and used that power to restrain trade.

To show an effect on competition indirectly, Plaintiffs must show that the harm to competition occurred in an identified market, known as a relevant market. There are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market. To prove harm to competition indirectly, it is Plaintiffs' burden to prove the existence of a relevant market. Plaintiffs allege that the relevant market is the market for live professional football telecasts in the United States.

If you find that Plaintiffs have proven the existence of a relevant market, then you must determine whether Plaintiffs also have proven that the Defendants have sufficient market power in that market such that the challenged restraints have a substantial harmful effect on competition in that market. "Market power" has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. An important factor in determining whether Defendants possess market power is Defendants' market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Defendants have market power include the existence of barriers to entering the market, the absence of potential competitors, and the ability of the NFL and its teams to raise or maintain prices above competitive levels. If Defendants do not possess a substantial market share, it is less likely that Defendants possess market power. If Defendants

do not possess market power, it is less likely that the challenged restraint has resulted in a substantial harmful effect on competition in the market.

If the Defendants possess market power, you should consider whether it is more likely than not that one can infer that the challenged restraints resulted in harmful effects on competition in the relevant market given that the Defendants possessed the power to affect the market in that way.

In determining whether the challenged restraints have produced anticompetitive harm, you may look at the following factors:

- the effect of the restraints on prices, output, product quality, and service, and consumer choice;
- the purpose and nature of the restraints;
- the nature and structure of the relevant market;
- the number of competitors in the relevant market and the level of competition among them, both before and after the restraints were imposed; and
- whether the defendants possess market power.

### DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 49

Defendants object to Plaintiffs' attempt to direct the jury's finding on competitive harm through the application of a "quick look" analysis, which is inapplicable in this case. Moreover, Plaintiffs' Instruction 49 omits critical language from the ABA's model instruction on how to prove competitive harm and adds language that misstates the law and Plaintiffs' burden. This Court should adopt Defendants' instruction, which is faithful to the model and includes only minor deviations to streamline the discussion and make adaptations specific to this case.

*First*, this Court should reject Plaintiffs' proposal to include a "quick look" instruction directing the jury to skip the first step of the rule of reason and proceed to the second step. As a preliminary matter, this Court has not made any finding that the "quick look" analysis applies here. To the contrary, as this Court explained in its summary judgment order, "'when considering agreements among entities involved in league sports, such as here, a court must determine whether the restriction is unreasonable under the rule of reason.'" *Sunday Ticket*, 2024 WL 168298, at *2 (quoting *Sunday Ticket*, 933 F.3d at 1150 n.5). Moreover, as Defendants explained in detail in their Memorandum of Contentions of Fact and Law, because Defendants have offered evidence that the challenged restraints at issue "'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,'" *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 771 (1999), quick look review is not appropriate here. ECF No. 1185 at 25–28. That Plaintiffs may have plausibly *alleged* a "naked restraint" at the pleading stage, *see Sunday Ticket*, 933 F.3d at 1152, carries no weight now that the evidentiary record has developed. The Court should therefore not give any instruction to the jury on "quick look" analysis.

*Second*, Plaintiffs cite no authority for their substantial deviations from the model instruction. They have no support for their proposal to remove the language, "Although it may be relevant to the inquiry, harm that occurs merely to the individual business of plaintiff is not sufficient, by itself, to demonstrate harm to competition

generally." They cannot dispute that it accords with established precedent, *see, e.g.*, *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury."); *Spanish Broad. Sys. v. Clear Channel Comm'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004) ("Critically, under both sections [of the Sherman Act], an antitrust plaintiff must show harm to competition in general, rather than merely damage to an individual competitor."), and they cannot reasonably argue that it is not relevant to this case.

Similarly, Plaintiffs cite no authority for their proposal to remove the language: (i) "A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power."; or (ii) "If the challenged conduct has not resulted in at least one of the following anticompetitive effects—higher prices, decreased output, lower quality, or the loss of some other competitive benefit—then there has been no competitive harm, and you should find that the challenged conduct was reasonable." These deviations from the model instruction have no basis in the law and should be rejected.

Plaintiffs likewise cite no authority for their deviation from the model instruction to add a lengthy insert that begins with the assertion that, "If you find that Plaintiffs have proved by a preponderance of the evidence that the challenged restraints had the purpose or effect of (a) reducing the output of some live professional football telecasts or (b) of raising, fixing, maintaining, stabilizing, or otherwise operating to affect the price of Sunday Ticket, no further analysis is required and you must find that Plaintiffs have proved substantial harm to competition." Their entire insert not only deviates drastically from the model, but also introduces three fundamental errors of law. First, it suggests that any "restraint" on trade is anticompetitive and thus illegal, when there can be no dispute that Section

1   "has been interpreted as outlawing only unreasonable restraints of trade." *Sunday*
2   *Ticket*, 933 F.3d at 1149 (cleaned up). Second, it suggests that Plaintiffs could meet
3   their burden of proof without defining a relevant antitrust market, contrary to the
4   Ninth Circuit's holding that—apart from *per se* and quick look cases—"a 'threshold
5   step' is defining the relevant market in which the alleged restraint occurs." *Epic*
6   *Games*, 67 F.4th at 974 & n.6. Third, it suggests that an *agreement* to restrain
7   competition without *actual* competitive harm is sufficient to satisfy the first step of
8   the rule of reason. However, it is black letter law that proof of conduct that does not
9   harm competition is insufficient to show antitrust injury. *See, e.g.*, *Paladin Assocs.*,
10  328 F.3d at 1158.

11      Moreover, most of the content of the third and fourth paragraphs of Plaintiffs'
12  new insert appears to be loosely derived from the model instruction on price fixing
13  claims, which are subject to the *per se* rule. *See* Mod. Jury Instrs. Civ. Antitrust
14  Cases, Chapter 2 – Section 1 of the Sherman Act, Horizontal Price Fixing, Instruction
15  1: General Elements (Am. Bar Ass'n Antitrust L. Sec. 2016) ("This instruction is
16  appropriate if a court determines that the alleged restraint is illegal per se."). Those
17  *per se* principles do not apply to this case, which must be analyzed under the rule of
18  reason. *See Sunday Ticket*, 2024 WL 168298, at *2; *Sunday Ticket*, 933 F.3d at 1150
19  & n.5 ("Although this case concerns a horizontal agreement, the Supreme Court has
20  concluded that the per se rule does not apply to agreements involving teams engaged
21  in league sports, on the ground that such sports "'can only be carried out jointly.'"
22  (citation omitted)).

23      Plaintiffs further cite no authority for their proposal to change the title of this
24  instruction to use "anticompetitive" instead of "competitive." Plaintiffs' proposal is
25  redundant (competitive harm is inherently anticompetitive), and it serves no purpose
26  other than to confuse the jury. Similarly, Plaintiffs cite no authority for the addition
27  of "one can infer that" in the model instruction's statement about the import of a
28  finding of market power in the competitive harm analysis; there is no reason to add

this language, which is redundant and likely to confuse the jury as to what it means to be able to infer competitive harm.

*Finally*, as explained in Defendants' Objections to Plaintiffs' Instruction 31, Defendants object to Plaintiffs' revision of their market definition to include only "live" telecasts. This is an alteration of the relevant market as defined by Plaintiffs in the Final Pretrial Conference Order, *see also* ECF No. 1331.1, Final Pretrial Conf. Order at 13, and Plaintiff is "precluded from presenting claims or defenses not set forth in" the Pretrial Order. Local Rules, App'x A, ¶ 7.

**PLAINTIFFS' REPLY RE. NO. 49: RULE OF REASON – PROOF OF ANTICOMPETITIVE HARM**

This instruction follows the ABA model instruction and the governing decisions of this Court and the Ninth Circuit.

First, this case is the paradigmatic fact pattern for the application of the "quick look" doctrine because there can be no serious dispute that the restraints impact competition in a relevant market. As in *NCAA*, a "quick look" is all that is needed when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n*, 526 U.S. at 770. When quick-look analysis applies, the Plaintiffs are presumed to have proven anticompetitive harm at step one of the rule of reason, "shifting to a defendant the burden to show empirical evidence of procompetitive effects." *Id.* at 775 n.12. For similar reasons, the application of quick-look analysis obviates the need for proof of the relevant market or market power in that market. *Carter v. Variflex, Inc.*, 101 F. Supp. 2d 1261, 1266 (C.D. Cal. 2000); *see F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460–61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'").

The Ninth Circuit has already held that the restraints here fall into this category. *In re NFLST*, 933 F.3d at 1156 ("Here, as in *NCAA*, 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'") (quoting *Cal. Dental Ass'n*, 526 U.S. at 770). Indeed, the restraints are set out in the contracts that govern NFL telecast distribution, which is why this Court held that "if the contracts match-up to the allegations, then there will be a violation applicable to

68

1    the whole class." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023
2    WL 1813530, at *11 (C.D. Cal. Feb. 7, 2023).

3            That the agreements at issue constitute "naked restraints" is not merely a
4    technical conclusion, nor is it simply a matter of law of the case. The NFL has
5    *conceded* the anticompetitive purpose and effects of the restraints, contending that
6    they are necessary to support their purported procompetitive justifications. *See In re*
7    *Nat'l Football League's Sunday Ticket Antitrust Litig.*, No. ML 15-02668 PSG (SK),
8    2024 WL 168298, at *13 (C.D. Cal. Jan. 11, 2024) ("Defendants argue that the
9    exclusivity provisions are essential to CBS and FOX and eliminating them would
10   harm fans and essentially destroy the NFL's broadcasting model. To be sure,
11   Defendants can argue to a jury that the current framework 'in which Sunday Ticket
12   supplements the CBS and FOX broadcasts' is 'output enhancing (and plainly more
13   consumer-friendly)' and justifies the challenged restraint…. But it is Defendants'
14   burden to establish a procompetitive rationale."). By holding that the "Quick Look"
15   variant of the Rule of Reason applies, the Court would only be putting the emphasis
16   of the trial on the issues that are actually disputed: whether the NFL Defendants'
17   purported justifications for the restraints hold up to scrutiny. That the restraints exist
18   and were designed to impact the market is not actually in dispute.

19           Second, Defendants contend that it is inappropriate to remove the language
20   from the ABA model instruction that "harm that occurs merely to the individual
21   business of plaintiff is not sufficient, by itself, to demonstrate harm to competition
22   generally." But this instruction does not fit the facts of this case and would give the
23   jury the false impression that the overcharge to the Plaintiffs was irrelevant. The
24   model includes this instruction for circumstances where the plaintiff is a *competitor*
25   of the defendant. But this is not a case of a frustrated competitor worried about
26   increased competition in the marketplace. This is a case involving increased prices
27   and reduced output as a direct result of agreements intended to do just that. That is
28   the definition of harm to competition. Defendants do not provide any example of

what, under the facts of this case, would constitute injury to a business that does not reflect harm to competition.

Third, Defendants' objection regarding market power is misplaced. Plaintiffs merely reframed negative language ("If the challenged conduct has not resulted in at least one of the following anticompetitive effects …") with positive language ("In determining whether the challenged restraint has produced anticompetitive harm, you may look at the following factors …") for clarity. Given that market power instruction includes the ability to raise prices above the level that would be charged in a competitive market, it would be superfluous and confusing to include the Defendants' proposed language that "the ability to charge higher prices for better products or services is not market power."

Fourth, Defendants provide no basis to omit Plaintiffs' instruction explaining the various forms of price fixing that have been recognized by longstanding precedent. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) (agreement to maintain price constitutes unreasonable restraint of trade); *United States v. Container Corp. of Am.*, 393 U.S. 333, 336 (1969) (finding that reciprocal exchange of prices to stabilize prices constituted restraint of trade). Because Plaintiffs contend that Defendants agreed to fix the price of NFL Sunday Ticket paid by class members, jurors need to be instructed that the antitrust laws ban price fixing in its many various forms. Absent such an instruction, the jury may be misled into believing that a price-fixing agreement requires proof that Defendants and DirecTV agreed on a specific price to charge class members, which is contrary to binding precedent. The instruction, does not, as Defendants imply, instruct the jury that they must find liability upon a finding of price-fixing.  The instruction merely explains that various types of price-fixing should be considered in the jury's determination of anticompetitive harm under step one of the Rule of Reason. Defendants' authority about *per se* violations is therefore inapposite.

Fifth, Defendants provide no legitimate basis to object to Plaintiffs' use of the phrase "anticompetitive harm" instead of "competitive harm." Plaintiffs have also replaced "competitive benefit" with "procompetitive benefit." This additional clarification may be helpful to jurors given the complexities attendant to the burden-shifting framework of the rule of reason. The instruction's use of "infer" is likewise appropriate to explain to the jury that Plaintiffs may prove anticompetitive effects "directly or indirectly." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition.").

Finally, Defendants' objection to Plaintiffs' market definition is groundless. It has been clear throughout this case that Plaintiffs mean "live telecasts" when they use the word "telecasts." *See* ECF No. 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023, ¶ 10 ("As I use the term, 'telecasts' means simulcasts distributed to consumers live (as the game occurs)[.]"). The Ninth Circuit recognized this as well. *See In re NFL Sunday Ticket*, 933 F.3d at 1148 ("Under the NFL-DirecTV Agreement, the NFL allows DirecTV to obtain all of the ***live*** telecasts produced by CBS and Fox, package those telecasts, and deliver the bundled feeds to NFL Sunday Ticket subscribers." (emphasis added)). Plaintiffs use the term "live telecasts" instead of just "telecasts" throughout the jury instructions to make this clear to the jury. There is no "revision" or change from the proposed pretrial order because, again, "telecasts" has always meant "live telecasts" in this case.

## NO. 51: RULE OF REASON – EVIDENCE OF PROCOMPETITIVE BENEFITS AND CONSIDERATION OF LESS RESTRICTIVE ALTERNATIVES FOR ANY SUCH BENEFITS[15]

If you find that Plaintiffs have proven that any of the challenged agreements, either collectively or individually, resulted in substantial harm to competition, then you must next determine whether Defendants have proven that the restraints also benefitted economic competition in other ways that benefitted consumers and counteracted those these anticompetitive effects.

Defendants bear a heavy burden to prove that the restraint resulted in procompetitive benefits sufficient to overcome the anticompetitive harms of the challenged restraints.

A procompetitive justification must improve competition in a way that benefits consumers by, for example, improving product efficiency or quality. A procompetitive justification cannot be based on the notion that competition itself is unreasonable or harmful. Protecting financially weaker participants in a league or

---

[15] ABA Antitrust 1-C-3C; Order Regarding Defendants' Motion *In Limine* No. 7, Dkt. 1325 at 7 ("At step two—determining whether there is a procompetitive rationale that is not pretextual and actually improves competition—Defendants are obligated to produce some kind of evidence in support of their procompetitive rationale."); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); Final Jury Instructions for Epic Trial, Instruction No. 29, *In re Google Play Store Antitrust Litig.*, Case No. 20-cv-05671-JD, ECF No. 850; *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 116-117, 120 (1984) ("There is, however, a more fundamental reason for rejecting this defense. The NCAA's argument that its television plan is necessary to protect live attendance is not based on a desire to maintain the integrity of college football as a distinct and attractive product, but rather on a fear that the product will not prove sufficiently attractive to draw live attendance when faced with competition from televised games. At bottom the NCAA's position is that ticket sales for most college games are unable to compete in a free market. The television plan protects ticket sales by limiting output—just as any monopolist increases revenues by reducing output. By seeking to insulate live ticket sales from the full spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act.").
.

leveling the playing field between more popular and less popular teams is not a procompetitive justification, unless that protection improves product quality.  It is not procompetitive to restrict the output of out-of-market game telecasts or raise their price in order to protect viewership for in-market game telecasts on over-the-air television. Protecting over-the-air telecasts out of fear that the product will not prove attractive enough to draw viewership when faced with competition from out-of-market telecasts is not procompetitive; rather, reducing competition is inconsistent with the basic policy of the antitrust laws. Earning greater revenues or profits, standing alone, is also not a procompetitive benefit.

It is not sufficient to simply identify or list procompetitive benefits. Defendants must produce some kind of evidence to prove that the restraints directly resulted in the alleged competitive benefits such as lower price or greater availability and viewership. If you find that any procompetitive benefit asserted by Defendants is false, you must reject that procompetitive benefit. If you find that Defendants have not met their burden to prove that the challenged restraints result in sufficient procompetitive benefits, you must find for Plaintiffs.

If you find that the challenged restraints do result in procompetitive benefits, then you also must consider whether the restraints were reasonably necessary to achieve the benefits. If Plaintiffs prove that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraints.

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 51**

Defendants object to Plaintiffs' proposed Instruction 51 because: (i) Plaintiffs' proposed instruction does not reflect developments in the case law on the rule of reason, both from the Supreme Court and in the Ninth Circuit; (ii) it conflates two distinct steps in the rule of reason analysis and will confuse the jury as to the proper analysis; (iii) it improperly seeks to direct the jury to reject Defendants' procompetitive rationales on legally incorrect grounds; and (iv) it would be sufficient to prove that "any of the challenged agreements, either collectively or individually" unreasonably restrained trade. The Court should therefore reject Plaintiffs' proposed instruction and instead adopt Defendants' proposed Instructions 51 and 52, which accurately reflect the state of the law and will provide clear guidance to the jury on these steps of the rule of reason.

*First*, Plaintiffs' proposed Instruction 51 does not reflect the most recent statement from the Ninth Circuit of what constitutes a cognizable procompetitive benefit or rationale. Plaintiffs seek to instruct the jury that Defendant must proffer evidence of "procompetitive benefits" or a "procompetitive justification," which they define as one that "must improve competition." They cite no precedent for this deviation from the Ninth Circuit's statements on what is required at step two. *See* Defs.' Objs. to Plfs.' Instr. No. 47.

Moreover, Plaintiffs insert the language "It is not sufficient to simply identify or list competitive benefits. Defendants must produce some kind of evidence to prove that the restraints directly resulted in the alleged competitive benefits such as lower price or greater availability and viewership." However, both the Supreme Court and the Ninth Circuit have explained that, at step two of the rule of reason, the defendant must only "show a procompetitive rationale for the restraint," *i.e.*, the defendant must show that its conduct is "indeed a form of competition on the merits." *Alston*, 594 U.S. at 96 (quoting *Am. Express*, 585 U.S. at 541); *Epic Games*, 67 F.4th at 985–86; *Qualcomm*, 969 F.3d at 991. Plaintiffs also repeat the assertion that Defendants must

show benefits that "overcome" or are "sufficient to overcome" the purported anticompetitive harms; as detailed above in Defendants' Objections to Plaintiffs' Proposed Instruction No. 47, that assertion misstates the law.

Defendants' proposed Instructions 51 and 52, by contrast, closely match the governing precedent, and do not include the misleading suggestion that the procompetitive effects of a restraint on competition must directly increase competition. Defendants' instructions also provide the jury with the Ninth Circuit's definition of a procompetitive rationale: "a [i] nonpretextual claim that the defendant's conduct is [ii] indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *See Epic Games*, 67 F.4th at 986 (citing *Qualcomm*, 969 F.3d at 991)); *id.* at 987 ("Antitrust law assumes that competition best allocates resources by allowing firms to compete on all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost." (quotations omitted)); *see also* Defs.' Objs. to Plfs.' Proposed Instr. No. 47.

*Second*, Plaintiffs' attempt to combine the distinct steps two and three of the rule of reason will confuse the jury. The Supreme Court has explained that "[t]o determine whether a restraint violates the rule of reason, . . . a three-step, burden-shifting framework applies." *Amex*, 585 U.S. at 541; *accord Alston*, 594 U.S. at 96. The Ninth Circuit has similarly used this framework to evaluate restraints. *See Epic Games*, 67 F.4th at 983, 985–86, 990; *O'Bannon*, 802 F.3d at 1070. And in evaluating restraints under this framework, courts have addressed the framework by moving from one distinct step to the next, *i.e.*, without combining the steps. *See, e.g.*, *Epic Games*, 67 F.4th at 983, 985–86, 990 (discussing and evaluating evidence separately at each "step" in the rule of reason); *O'Bannon*, 802 F.3d at 1070–79 (same); *see also Alston*, 594 U.S. at 102 (upholding the district court's "straightforward application of the rule of reason"). Here, Plaintiffs' proposal to address steps two and three of the rule of reason within the same instruction would risk confusion and invite error

into the jury's analyses of whether Defendants have met their burden of production on procompetitive rationales and whether Plaintiffs have met their burden of proof as to substantially less restrictive alternatives. Moreover, as explained in Defendants' Objections to Plaintiffs' Instruction No. 47, Plaintiffs misstate their own burden at the third step to show a "substantially less restrictive alternative" that is "virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost." *See Epic Games*, 67 F.4th at 990 (cleaned up) (quoting *Cnty. of Tuolumne*, 236 F.3d at 1159).

Defendants' proposed instructions, on the other hand, follow the model instruction's approach of separately addressing step two and step three. Defendants' instructions also appropriately update the step three instruction to incorporate the Ninth Circuit's guidance from *Epic Games* on (i) the burden-shifting framework, (ii) the "substantially less restrictive alternative" standard at step three, and (iii) the importance of "'resist[ing] the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objections.'" *Epic Games*, 67 F.4th at 990 (quoting *Alston*, 594 U.S. at 106); *see also Alston*, 594 U.S. at 99 ("[A]ntitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes."), 101 ("Firms deserve substantial latitude to fashion agreements that serve legitimate business interests[.]").

*Third*, Plaintiffs propose to instruct the jury that "protecting financially weaker participants in a league or leveling the playing field between more popular and less popular teams is not a procompetitive justification, unless that protection improves product quality" and "[i]t is not procompetitive to restrict the output of out-of-market game telecasts or raise their price in order to protect viewership for in-market game telecasts on over-the-air television," among other statements in the third paragraph of the proposed instruction purporting to explain what are not cognizable procompetitive rationales. There is no basis for these proposed deviations from the model. Instead, these statements attempt to summarize (in a biased and inaccurate

way) certain of the NFL's properly articulated procompetitive rationales and then to direct the jury to reject them as a matter of law. That attempt has no basis in the law (or in fact), and it reflects another attempt by Plaintiffs to argue their case through the jury instructions and direct the jury's verdict in their favor. Plaintiffs cite no authority that Defendants cannot present a cognizable procompetitive rationale based on the argument that the NFL's agreements collectively maintained and improved competitive balance and therefore increased quality, as well has having the effect of increasing free, over-the-air broadcasting, increasing output, and increasing quality (including of Sunday Ticket itself) given the importance of telecasting exclusivity, afforded and protected by the SBA, to OTA broadcasters.

*Finally*, Defendants object to the suggestion that Plaintiffs need only prove "that any of the challenged agreements, either collectively or individually" harmed competition. As explained in full in Defendants' Objections to Plaintiffs' Instruction 47, Plaintiffs should be held to their allegations that the challenged agreements in this case amounted to a "single conspiracy," including because allowing Plaintiffs to proceed on this new piecemeal theory would undermine the Ninth Circuit's reasoning for upholding Plaintiffs' standing to assert their damages claim. *See Sunday Ticket*, 933 F.3d at 1156–58; *see also* Defs.' Objs. to Plfs.' Instr. No. 44.

## PLAINTIFFS' REPLY RE. NO. 51: RULE OF REASON – EVIDENCE OF PROCOMPETITIVE BENEFITS AND CONSIDERATION OF LESS RESTRICTIVE ALTERNATIVES FOR ANY SUCH BENEFITS

Defendants' objections to Instruction 51 misstate governing law.

First, Defendants object to instructing the jury that they face a "heavy burden" of justifying their deviation from the free market. As the Ninth Circuit held, this matter "is largely governed by the Supreme Court's decision in *NCAA*, 468 U.S. 85, which analyzed a similar league sport broadcasting arrangement under the Sherman Act." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984) ("*NCAA*"). And in *NCAA*, the Supreme Court held that under "the Rule of Reason, these hallmarks of anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *NCAA*, 468 U.S. at 113. This Court embraced this language in its decision denying Defendants' motion for summary judgment, specifically quoting *NCAA's* "heavy burden" standard to describe Defendants' burden of showing a procompetitive rationale for the restraint. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *12 (C.D. Cal. Jan. 11, 2024).

Second, Defendants claim that the Plaintiffs' proposed instruction does not properly define what constitutes a procompetitive justification. They appear to be arguing that a procompetitive justification does not actually have to be procompetitive. That, of course, make no sense: "Under the Rule of Reason, these hallmarks of anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *NCAA*, 468 U.S. at 113. As described in Plaintiffs' reply to Defendants' objection to Instruction 47, the point of procompetitive justifications is that they must be capable of overcoming the direct

harm. That is how they affect the ultimate rule of reason question: whether the conduct at issue restrains competition or promotes it, on balance. *See NCAA*, 468 U.S. at 104. For example, the Supreme Court rejected the NCAA's purported "competitive balance" justification because it did *not* promote competition: "The hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of Reason is that equal competition will maximize consumer demand for the product. The finding that consumption will materially increase if the controls are removed is a compelling demonstration that they do not in fact serve any such legitimate purpose." *Id*. at 119–20. Defendants cannot simply wave at some possible benefit without tying that benefit to economic competition. This Court has already made that determination. *See* Order on Defendants' Motion in Limine No. 7, ECF No. 1325 at 7 ("At step two—determining whether there is a procompetitive rationale that is not pretextual and actually improves competition—Defendants are obligated to produce some kind of evidence in support of their procompetitive rationale.").

Third, Defendants object to Plaintiffs' inclusion of language explaining that restraints can never be justified on the ground that they *eliminate* competition among would-be competitors. The NFL cannot justify the restraints by claiming that they are necessary to protect the telecasts of one team from the telecasts of another. Similarly, they cannot justify the restraints by claiming that broadcast networks must be protected from would-be competing telecasts. It is black letter law that antitrust laws are meant to protect *competition* not *competitors*. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488 (1977) ("The antitrust laws … were enacted for 'the protection of competition not competitors.'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

The best example of why this instruction is necessary is once again the Supreme Court's *NCAA* decision. In that case, the NCAA argued that its television plan was necessary to protect live attendance; "that the product will not prove

sufficiently attractive to draw live attendance when faced with competition from televised games." *NCAA*, 468 U.S. 85 at 116. The Court rejected the argument because it implied that competition itself was harm, not a benefit:

> At bottom the NCAA's position is that ticket sales for most college games are unable to compete in a free market. The television plan protects ticket sales by limiting output—just as any monopolist increases revenues by reducing output. By seeking to insulate live ticket sales from the full spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act.

*Id*. at 117. "'[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.'" *Id*. (quoting *Professional Engineers*, 435 U.S. at 696).

It would also be inappropriate to delete "one or more of the agreements at issue collectively or individually." It would still be a violation of the antitrust laws, for example, if the jury were to conclude that the teams' agreement amongst themselves and with the NFL was reasonable but that their exclusive arrangement with DirecTV (protecting horizontal competitors CBS and Fox from would-be competing telecasts) was not. Without this instruction, the jury could have the mistaken belief that if they find any component of any agreement to be reasonable then Plaintiffs' claims must fail. That is obviously wrong. Although Plaintiffs allege a single conspiracy among the NFL Defendants, DirecTV, CBS, and Fox, they have long contended that the NFL can be held liable for the NFL-DirecTV agreement *alone*, as demonstrated by the alternative damages models in Dr. Rascher's report. *See* ECF No. 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023, ¶¶ 51-56, 405-418.

## NO. 52: RULE OF REASON – BALANCING COMPETITIVE EFFECTS[16]

If you find that the challenged restraints resulted in procompetitive benefits in a relevant market that could not have been achieved through substantially less restrictive means, then you must balance those procompetitive benefits against the anticompetitive harms resulting from the same restraints.

If the anticompetitive harm outweighed the procompetitive benefits, then the challenged restraints are unreasonable. If the anticompetitive harm did not outweigh the procompetitive benefits, then the challenged restraints are reasonable. In conducting this analysis, you must consider the benefits and harms to competition and consumers in the market as a whole, not just to a single competitor or group of competitors. Plaintiffs bear the burden of proving that the anticompetitive effect of the conduct outweighed any procompetitive benefits that could not have been achieved though less restrictive alternatives.

---

[16] ABA Antitrust 1-C-3D; *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); Final Jury Instructions for Epic Trial, Instruction No. 30, *In re Google Play Store Antitrust Litig.*, Case No. 20-cv-05671-JD, ECF No. 850.

1    **<u>DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 52</u>**

2         The jury should not be instructed on a fourth step of the rule of reason. The

3    Supreme Court has referred to "a three-step, burden-shifting framework" for

4    applying the rule of reason. *Alston*, 594 U.S. at 96. Where a plaintiff fails to establish

5    "viable less restrictive alternatives" at step three, they are not able to satisfy their

6    burden under the rule of reason. *See Epic Games*, 67 F.4th at 993–94.

7         While *Epic Games* discussed a fourth step of the rule of reason where "the

8    plaintiff fails to carry its step-three burden of establishing less restrictive

9    alternatives," it also (i) expressed skepticism "of the wisdom of superimposing a

10   totality-of-the-circumstances balancing step onto a three-part test that is already

11   intended to assess a restraint's overall effect"; (ii) questioned "what value a balancing

12   step adds"; and (iii) ultimately held that "[i]n most instances," the fourth step "will

13   require nothing more than . . . briefly confirming the result suggested by a step-three

14   failure: that a business practice without a less restrictive alternative is not, on balance,

15   anticompetitive." *Id.* at 994. *Epic Games* was also a bench trial, where the finder of

16   fact was experienced in the law and the type of analysis that would occur at a fourth

17   step. It would be virtually impossible for the jury to separate out the supposed fourth

18   step from the analysis it has already done—as evidenced by the Ninth Circuit's

19   struggle with the same issue.

20        In addition, and as explained further in Defendants' Objections to Plaintiffs'

21   Proposed Instruction No. 35, *supra* at 95–98, both *Alston* and *Epic Games* post-date

22   the ABA model instructions, so the model should be modified on this point to reflect

23   controlling precedent. Finally, Plaintiffs do not justify their proposed deviations from

24   the model, which further complicate this unnecessary instruction.

25

26

27

28

**PLAINTIFFS' REPLY RE. NO. 52: RULE OF REASON – BALANCING COMPETITIVE EFFECTS**

As noted in Plaintiffs' reply to Defendants' Objection to Instruction 47, the Defendants are seeking to rewrite the Rule of Reason to eliminate the required balancing of competitive effects. That effort continues in their objection to Instruction 52. It is true that courts have, at different times, spoken of a three-step or a four-step process. But whether the analysis is in three steps or four, the "essential inquiry" is always whether the conduct at issue "enhances competition" or suppresses it. *NCAA*, 468 U.S. at 104. Balancing competitive effects is the point of any Rule of Reason analysis. The best instruction, as reflected in the ABA model, is to make this balancing explicit to the jury by adding a fourth step to the analysis. Defendants reply on *Epic Games* in trying to eliminate this fourth step, but the Ninth Circuit there actually determined that the fourth, balancing step *was* required. 67 F.4th at 993. It simply found that the district court's failure to label it as such was harmless, because "it stated that it 'carefully considered the evidence in the record and ... determined, based on the rule of reason,' that the distribution and IAP restrictions 'have procompetitive effects that *offset* their anticompetitive effects' (emphasis added)." *Id*.

At the end of the day, Defendants are seeking to avoid any balancing, offsetting, or analysis of the overall effects of their so-called procompetitive benefits. They oppose any quantification of their proposed benefits at any stage of the analysis, seeking an instruction that would ask the jury to find for them if they can merely articulate some (non-countervailing) procompetitive benefit of any kind, even if the overall effect is harmful to competition. That is the opposite of what the Rule of Reason requires, and there is no reason to depart from the model instructions on this point.

## NO. 53: GOOD INTENT NOT A DEFENSE[17]

If you find that Defendants unreasonably restrained trade, it is not a defense that Defendants acted with good motives or thought their conduct was legal.

---

[17] ABA Antitrust 2-B-3 (modified).

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 53**

Defendants object to the inclusion of this instruction because it is irrelevant to the claims at issue in this case. *First*, Plaintiffs propose to include an instruction that is intended for price-fixing conspiracy cases, which this is not. They cite no precedent for using this instruction outside of that context, and its inclusion would only serve to confuse the jury given that the rule of reason *requires* the jury to consider "the purpose and nature of the restraint" and "the effect of the restraint on . . . product quality[] and service" in order to determine whether the restraint produced competitive harm. *See* Mod. Jury Instrs. Civ. Antitrust Cases, Chapter 1 – Sherman Act–General, Rule of Reason, Instruction 3B: Rule of Reason—Proof of Competitive Harm (Am. Bar Ass'n Antitrust L. Sec. 2016). In a rule of reason case, unlike a price-fixing case, it is thus appropriate for the jury to consider Defendants' "intent"— indeed, Plaintiffs' own proposed Instruction 47 instructs the jury to consider the "purpose or effect" of the alleged conspiracy, and their proposed Instruction 49 instructs the jury that it "may look at" the "purpose and nature of the restraints." Plaintiffs may not direct the jury to ignore these factors by relying in inapposite precedent regarding *per se* cases.

## PLAINTIFFS' REPLY RE. NO. 53: GOOD INTENT NOT A DEFENSE

Plaintiffs' Instruction 53 is based on ABA Antitrust 2-B-3. Plaintiffs made two changes to fit the circumstances of this case. First, instead of "price-fixing," as listed in the ABA model instruction, Plaintiffs altered the instruction to fit the facts of this case by noting that good intent is not a reasonable defense if the jury finds that the Defendants "unreasonably restrained trade." This instruction is important. Without it, even if the jury were to conclude that the Defendants *unreasonably* restrained trade, they could still come to a defense verdict on the mistaken belief that the Defendants acted with good intentions. The antitrust laws care about the effects on competition. Defendants' supposedly pure motives are not a defense. *See Associated Press v. United States*, 326 U.S. 1, 17 n.15 (1945) (good motive does not mitigate violations of the Sherman Act); *Christiansen v. Mechanical Contractors Bid Depository*, 230 F. Supp. 186 (D. Utah 1964) (good intent is "in and of itself no defense to an unreasonable combination or conspiracy in restraint of trade").

Defendants are incorrect that good intentions excuse unreasonable restraints in a Rule of Reason case. Indeed, as the Ninth Circuit held, this matter "is largely governed by the Supreme Court's decision in *NCAA*, 468 U.S. 85, which analyzed a similar league sport broadcasting arrangement under the Sherman Act." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984) ("*NCAA*")). And in *NCAA*, a rule of reason case, the Supreme Court specifically noted that it is "well settled that good motives will not validate an otherwise anticompetitive practice." *Id.* at 101 n.23 (collecting cases); *see also, e.g.*, *Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1492–93 (D.C. Cir. 1984) ("The District Court found that the limited practice requirement passed muster under the rule of reason. … The District Court seems to have felt that where a defendant to a Section 1 claim presents a justification for a questioned practice the absence of anticompetitive *intent* is determinative. *This is an erroneous application of the rule*

*of reason* and necessitates reversal of the District Court decision pertaining to this aspect of the case."). The jury must not be allowed to believe that "good intentions" excuse unreasonable restraints.

## NO. 54: REASONABLENESS OF PRICES NO EXCUSE[18]

If you find that Defendants agreed to raise, fix, maintain, stabilize, or otherwise affect prices, it does not matter whether the prices agreed upon were high or low or reasonable or unreasonable.

---

[18] ABA Antitrust 2-B-4 (modified)

## DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 54

As with Plaintiffs' proposed Instruction 53 (Good Intent Not a Defense), Defendants object to the inclusion of this instruction because it is irrelevant to the claims at issue in this rule of reason case. As with their proposed Good Intent instruction, Plaintiffs' proposed Instruction 54, which purports to assert that certain aspects of "reasonableness" are not relevant, is intended for price-fixing conspiracy cases. Plaintiffs cite no precedent for using this instruction outside of that context, and its inclusion would only serve to confuse the jury. *See* Mod. Jury Instrs. Civ. Antitrust Cases, Chapter 1 – Sherman Act–General, Rule of Reason, Instruction 3B: Rule of Reason—Proof of Competitive Harm (Am. Bar Ass'n Antitrust L. Sec. 2016).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' REPLY RE. NO. 54:**

**REASONABLENESS OF PRICES NO EXCUSE**

Plaintiffs included this instruction to fit the facts of this case. Contrary to the statement in Defendants' objection, Plaintiffs *do* assert that Defendants engaged in a price-fixing conspiracy that had the purpose and effect of raising, fixing, stabilizing, or otherwise affecting prices. *See* Proposed Final Pretrial Conference Order, at 10-11 ("Plaintiffs further intend to introduce documentary and testimonial evidence demonstrating the NFL Defendants entered into an array of three interrelated agreements intended to restrict competition, reduce access, and fix, raise, maintain or stabilize prices for out-of-market games.").

Defendants raised the price of Sunday Ticket above what it would otherwise have been through agreements intended to protect DirecTV's horizontal competitors—CBS and FOX—from competition. While this is a rule of reason case, this instruction is necessary to help the jury understand the effects of price-fixing as part of the overall restraints. *See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 213 (1951) (maximum and minimum price fixing); *United States v. Line Material Co*., 333 U.S. 287 (1948) (the reasonableness or unreasonableness of fixed prices does not affect the legality of price fixing). Whether that fixed price was reasonable or unreasonable is legally irrelevant, as this Court has already recognized. *See* Order on Plaintiffs' Motion in Limine No. 3, Dkt. 1293 at 3 ("Yet the jury will not determine whether the price of the package is reasonable, but whether the alleged restraints are reasonable.") (citing *Epic Games*, 67 F.4th at 974). Without this instruction, there is a risk that the jury will find for the Defendants on the basis of its mistaken belief that the price of Sunday Ticket was reasonable – rather than that it was higher than what it would have been absent the challenged restraints.

## NO. 56: ELEMENTS OF SECTION 2 CONSPIRACY TO MONOPOLIZE CLAIM[19]

Plaintiffs also allege a conspiracy to monopolize in violation of Section 2 of the Sherman Act, which declares unlawful every conspiracy to monopolize interstate commerce.

To prevail against Defendants on a claim of conspiracy to monopolize, Plaintiffs must prove, by a preponderance of the evidence as to those Defendants, each of the following elements:

(1)   Two or more persons knowingly enter into an agreement or mutual understanding between two or more persons to obtain or maintain monopoly power in the market for live professional football telecasts in the United States;

(2)   Defendants specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in the market for live professional football telecasts in the United States;

(3)   One or more Defendants committed an overt act in furtherance of the conspiracy;

(4)   Defendants' activities occurred in or affected interstate commerce; and

(5)   Plaintiffs were injured in their business or property because of the conspiracy to monopolize.

However, Plaintiffs do not have to show that the conspiracy was successful in giving one member of the conspiracy monopoly power.

If you find that the evidence is insufficient to prove any one or more of these elements as to a defendant, then you must find for that defendant and against Plaintiffs on Plaintiffs' conspiracy to monopolize claim. If you find that the evidence is sufficient to prove each element as to a defendant, then you must find for Plaintiffs and against that defendant on Plaintiffs' conspiracy to monopolize claim.

---

[19] ABA Antitrust 3-E-1; *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, Case No. 5:16-cv-06370, ECF No. 499 (Nov. 22, 2019).

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 56**

Defendants object to Plaintiffs' proposed Instruction 56 on several grounds: (i) it fails to provide the explanation of the relationship between the Section 2 claim and the Section 1 claim that is necessary to avoid illogical and inconsistent verdicts; (ii) it wholly omits the central requirement of anticompetitive conduct and instead incorrectly asserts that any collaboration to obtain market power—even solely through procompetitive means—can violate the antitrust law; (iii) it fails to summarize Plaintiffs' theory accurately; and (iv) it will confuse the jury as to the Plaintiffs' burden. The Court should reject Plaintiffs' proposed instruction and instead adopt Defendants' Instruction 56, which accurately states the law and guides the jury through the analysis appropriate to Plaintiffs' Section 2 conspiracy claim.

*First*, Plaintiffs' instruction fails to instruct the jury on the relationship between their Section 1 and Section 2 claims. Proving their Section 2 theory would require Plaintiffs to prove every element of their Section 1 claim, plus the additional elements of the Section 2 claim. *See Qualcomm*, 969 F.3d at 992 ("[P]roving an antitrust violation under § 2 of the Sherman Act is more exacting than proving a § 1 violation."). This duplication arises because Plaintiffs' Section 2 claim is based on the same conduct as the Section 1 claim, and the Ninth Circuit has consistently held that failure to prove a Section 1 claim dooms a Section 2 claim based on the same conduct. *See, e.g.*, *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("Because [plaintiff's] claim under § 1 fails, its claim of a conspiracy to monopolize under § 2 based on the same conduct necessarily fails as well."); *see also* 3B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 809 (4th ed. 2022) ("Any arrangement that could be considered a 'conspiracy' to monopolize must necessarily also be an unreasonable 'contract,' 'combination,' or 'conspiracy' in restraint of trade offending §1."); ECF No. 1185 (NFL Defs.' Mem. Contentions of Fact & L.) at 15–16, 32–33.

As a result, if Plaintiffs' claims fail under Section 1, they necessarily fail under Section 2. As the Ninth Circuit has explained, "[i]f, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is *not* anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *Qualcomm*, 969 F.3d at 991 (emphasis in original) (citing *Williams v. I.B. Fischer Nev.*, 999 F.2d 445, 448 (9th Cir. 1993)).

The jury should be instructed as to this blackletter principle of antitrust law. In the absence of an instruction, a jury could misunderstand the relationship between Plaintiffs' two separate claims and render a verdict that is economically irrational and legally impermissible. For example, if the jury returns a verdict for the NFL Defendants on the Section 1 claim and for Plaintiffs on the Section 2 claim, the jury will have rendered a factually and legally inconsistent and irreconcilable verdict under governing law. An explicit instruction that, if Plaintiffs were to fail on their Section 1 claim, there would be no basis for a jury to find liability on the Section 2 claim based on the same conduct, avoids that risk.

*Second*, Plaintiffs' proposed instruction suggests that working to obtain monopoly power could be illegal even if only procompetitive methods are used, in clear conflict with bedrock Section 2 law. Efforts to obtain monopoly power violate Section 2 only when (among other requirements) they involve the use of *anticompetitive conduct*; as the Seventh Circuit has explained, "[u]nder § 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power *by anticompetitive means*." *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000). To the contrary, Plaintiffs propose to instruct the jury that they must prove only that "two or more persons knowingly enter into an agreement or mutual understanding between two or more persons *to obtain or maintain monopoly power*" and similarly that Defendants are required only to have "specifically intended that one of the parties to the agreement would *obtain or maintain monopoly power*." Those assertions are legally incorrect because obtaining

monopoly power is, of course, not inherently illegal. *Qualcomm*, 969 F.3d at 990 ("'The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not itself unlawful; instead, it is an important element of the free-market system.'" (cleaned up) (quoting *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004))). Any legal test that would find liability based on a mere "agreement or mutual understanding" and intent "to obtain or maintain monopoly power" without a requirement of anticompetitive conduct would therefore improperly condemn and deter most procompetitive commercial activity, as the "intent to obtain a monopoly or to capture an ongoing increase in market share" is "*of course* the aim of *every* business endeavor." *Endsley*, 230 F.3d at 283 (emphasis added).

While Plaintiffs' proposed language derives from the ABA's model instruction, it fails to "instruct the jury clearly regarding the law to be applied," *Lewis*, 53 F.3d at 34, because—unlike in most Section 2 cases—Plaintiffs are not also asserting a standard monopolization claim. The ABA model Section 2 instructions outline the necessity of anticompetitive conduct to any finding of liability under Section 2 but avoid repetition by not including that language again in the conspiracy to monopolize instruction. Where, as here, only a conspiracy to monopolize claim is at issue, the instruction is not complete without the addition of the general—and presumably uncontroversial—language from the ABA model that Section 2 requires anticompetitive conduct.

As the Ninth Circuit has explained, "[w]ell-tailored and specific instructions may be necessary . . . in complex antitrust cases where abstract legal principles are not self-explanatory to a lay jury, and the facts to which they must be applied are complex." *L.A. Mem'l Coliseum*, 726 F.2d at 1398 (cleaned up) (citation omitted). Application of that principle here requires a clear instruction that distinguishes between (a) procompetitive conduct seeking to gain market share or even monopoly power, on the one hand, and (b) a conspiracy to use anticompetitive conduct to

monopolize a market, on the other. Defendants' Instructions 56 provides that necessary clarity.

*Third*, Plaintiffs' proposed instruction on the "specific intent" element uses generic language that fails to specify which entity purportedly would be given monopoly power. This contrasts with Defendants' approach, which provides a clear instruction that Plaintiffs must prove that "each Defendant specifically intended that the NFL would monopolize the market for professional football telecasts." As explained in more detail in Defendants' Objections to Plaintiffs' Proposed Instruction No. 58, it is not sufficient for the jury to find that Defendants sought to obtain *collective* monopoly power; instead, Plaintiffs must prove that the Defendants specifically intended that *one* of the parties to the agreement would obtain or maintain monopoly power. Given the complexity of the claims that Plaintiffs are asserting, the additional clarity provided by Defendants' proposed instruction will help the jury understand and evaluate Plaintiffs' claims.

*Finally*, Plaintiffs propose to add language that they do not need to prove the "success" of the conspiracy, which is an inappropriate deviation from the model instruction. Plaintiffs' proposed addition does not offer the jury any additional context or clarity on the elements of the claim, and instead could serve only to suggest that the jury apply a lesser burden.

As support for this language, Plaintiffs cite the instructions given in another case, which relied on the Modern Federal Jury Instructions for Section 1 price-fixing claims. Joint Proposed Jury Instrs. at 81, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, No. 5:16-cv-06370 (N.D. Cal. Oct. 4, 2019) (citing Leonard B. Sand, et al., 4 Modern Federal Jury Instructions–Civil ¶ 79.02, Instr. 79-11 (Restraint of Trade)). But that precedent instead demonstrates why their proposed addition should not be included in a Section 2 instruction. The authority for that instruction is an outdated version of the Fifth Circuit's pattern jury instructions from 1980 and the jury charge delivered in a case in 1978 in the Western District of Texas. *Id.* Notably, there is no

more current or in-circuit authority supporting such an instruction, even in the Section 1 context. In addition, the cited instruction, "Success Immaterial—Need Only an Overt Act," makes clear that a plaintiff does not need to prove the success of the conspiracy "so long as the plaintiff proves that it suffered some damage because of the conspiracy" and "that one of the conspirators took some identifiable action," *i.e.*, an overt act, " to bring about the aims of the conspiracy." *Id.* Both of these elements are already captured by the ABA's model instruction; a separate instruction that the conspiracy need not "succeed" easily could mislead a jury to believe that it is not necessary for Plaintiffs to prove, for example, that the challenged conduct caused antitrust impact or damages.

## PLAINTIFFS' REPLY RE: NO. 56: ELEMENTS OF SECTION 2 CONSPIRACY TO MONOPOLIZE CLAIM

Plaintiffs' instruction No. 56 concerning the elements of a conspiracy to monopolize elements is a near verbatim repetition of the ABA's model instruction (Antitrust 3-E-1).

Plaintiffs' only departure from the ABA model instruction is the addition of an accurate statement of law: "Plaintiffs do not have to show that the conspiracy was successful in giving one member of the conspiracy monopoly power." *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co*., 513 F. Supp. 1100, 1319 (E.D. Pa. 1981) ("Proof of such a conspiracy does not require successful accumulation of monopoly power. In other words, conspiracy to monopolize essentially applies the law of criminal conspiracy to the monopolization context.").  The additional clarification is necessary to help the jury distinguish Plaintiffs' Section 2 claim from Plaintiffs' Section 1 claim, which does require proof of "successful" anticompetitive harm. This clarification creates no risk of prejudice in light of the subsequent instruction that Plaintiffs must still prove injury to their business or property because of the conspiracy.

Defendants' request for an instruction that Plaintiffs' Section 2 claim is dependent on their Section 1 claim is baseless.  First, the SBA has no bearing on Plaintiffs' Section 2 claim as a matter of law. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig*., 933 F.3d 1136, 1159 n.10 (9th Cir. 2019) ("By its terms, the SBA applies only to Section 1 of the Sherman Act and has no relevance to the plaintiffs' Section 2 claims.").  Second, the elements of a Section 2 conspiracy to monopolize claim vary from the elements of a Section 1 claim. For example, the Court may, over Plaintiffs' objection, require a showing of actual market power for Plaintiffs' Section 1 claim, but that is not required for Plaintiffs' Section 2 claim. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980) ("[N]o particular level of market power or 'dangerous probability of success' has to

be alleged or proved in a conspiracy [to monopolize] claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken."). There is thus no risk of inconsistent verdicts in this particular case, even if both claims are based on the same conduct.

Defendants' second objection is similarly meritless because it conflates the elements of a monopolization claim with a claim for *conspiracy to* monopolize. A claim for conspiracy to monopolize does not require independent proof that Defendants engaged in anticompetitive conduct. *See Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.,* 910 F.2d 139, 150 (4th Cir. 1990) ("Unlike an attempted monopolization claim, it is not necessary that the committed acts, themselves, be predatory."). The cases on which Defendants rely, by contrast, concern claims for actual or attempted monopolization. *See Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) (actual monopoly); *FTC v. Qualcomm Inc.,* 969 F.3d 974, 990 (9th Cir. 2020) (same). That is why the concept of anticompetitive conduct appears nowhere in the ABA model instruction on conspiracy to monopolize.

Defendants' third objection provides no basis to deviate from the ABA model instruction on specific intent. By imposing the additional requirement of specifying which entity would purportedly be given monopoly power in order to avoid the suggestion of collective or shared monopoly power. Plaintiffs' instruction clarifies that the jury needs to determine that "Defendants specifically intended that *one of* the parties to the agreement would obtain or maintain monopoly power in the market for live professional football telecasts in the United States."

## <u>NO. 57: EXISTENCE OF A CONSPIRACY</u>[20]

I previously read you Instruction Number 40 regarding the existence of an agreement under Section 1 of the Sherman Act. This instruction applies equally to Plaintiffs' claim of a conspiracy to monopolize under Section 2 of the Sherman Act.

---

[20] ABA Antitrust 3-E-2; 2-A-1; *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, Case No. 5:16-cv-06370, ECF No. 499 (Nov. 22, 2019).

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 57**

Defendants object to Plaintiffs' proposed Instruction 57 as inadequate and misleading. The Court should instead accept Defendants' Instruction 57, which accurately states the law and provides the jury with a clear guide to analyzing the first element of Plaintiffs' Section 2 claim.

Defendants' proposed instruction briefly reminds the jury of the two elements required to establish that parties entered into a conspiracy under the Sherman Act. Additionally, the proposed instruction explains to the jury the relationship between the burdens of proof for Plaintiffs' Section 1 and Section 2 claims. By contrast, Plaintiffs propose to merely redirect the jury to an earlier instruction on conspiracy. But this is insufficient.[21] Jury instructions must "instruct the jury clearly regarding the law to be applied," *Lewis*, 53 F.3d at 34, and "focus [the jury's] attention on the essential issues in the case," *Ribaste*, 905 F.2d at 1143.

The ABA's model instruction on existence of a conspiracy under Section 2 supports Defendants' proposed instruction. That instruction directs parties: "The Contract, Combination, or Conspiracy instructions at Chapter II.A and other pertinent conspiracy instructions *should be inserted here* and modified as necessary to fit a conspiracy to monopolize case." Model Jury Instructions in Civil Antitrust Cases, Chapter 3 – Section 2 of the Sherman Act—Conspiracy to Monopolize, Instruction 2: Existence of a Conspiracy (emphasis added). Instead of inserting the instructions after making the necessary modifications "to fit a conspiracy to monopolize case," Plaintiffs suggest that the jury just refer back to the earlier conspiracy instruction, which would lead to confusion given that that prior instruction is drafted with specific references to the Section 1 claim.

Moreover, as explained in further detail in Defendants' Objections to Plaintiffs' Proposed Instruction No. 56, it is crucial that the jury be clearly instructed

---

[21] Even if this were sufficient to properly instruct the jury on the Section 2 claim, Defendants maintain that Plaintiffs' Instruction 40 should be rejected for the reasons in Defendants' objection to that instruction.

1  that if Plaintiffs failed to prove a Section 1 conspiracy, they must find for the NFL

2  Defendants on Plaintiffs' Section 2 claim.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' REPLY RE: NO. 57: EXISTENCE OF A CONSPIRACY**

Both parties appear to agree that the meaning of conspiracy under Section 1 of the Sherman Act is identical to the meaning of that term in Section 2.  That is why other courts in this Circuit have instructed the jury to determine the existence of a conspiracy under Section 2 by reference to the corresponding instruction under Section 1, just as Plaintiffs propose here. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370, ECF No. 499, Instruction No. 42 (N.D. Cal. Nov. 22, 2019) ("The instructions I read you previously regarding the existence and formation of a conspiracy under Section 1 of the Sherman Act apply equally to Plaintiff's claim of a conspiracy to monopolize under Section 2 of the Sherman Act.").  Defendants provide no explanation, or authority, for why the jury should be given two distinct instructions on the same issue.

Failing that, Plaintiffs propose repeating Instruction No. 40 here but omitting repetition of the prefatory paragraph.

## NO. 58: MONOPOLY POWER DEFINED[22]

To prove their conspiracy to monopolize claim, Plaintiffs must show that Defendants reached an agreement with the specific intent to obtain or maintain monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above (or reduce or maintain quality substantially below) the competitive level for a significant period of time.

I will provide further instructions about how you may determine whether Plaintiffs have met their burden of proving specific intent to obtain or maintain monopoly power in a relevant antitrust market.

---

[22] ABA Antitrust 3-E-3; 3-A-2; Final Jury Instructions for Epic Trial, Instruction No. 30, *In re Google Play Store Antitrust Litig.*, Case No. 20-cv-05671-JD, ECF No. 850.

## DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 58

Defendants object to three aspects of Plaintiffs' proposed instruction number fifty-eight: (i) it uses insufficiently specific language about the relevant market; (ii) it misstates the element Plaintiffs must prove; and (iii) it needlessly changes and omits critical language from the ABA's model instruction on how monopoly power is defined.

*First*, Defendants object to Plaintiffs' use of the generic language, "a relevant antitrust market," in the first sentence of the proposed instruction. The sentence is specific as to what these Plaintiffs must prove, so it should name the antitrust market Plaintiffs have alleged: the market for professional football telecasts in the United States. Without this language, the jury could erroneously believe that the conspiracy to monopolize claim could apply to a different market.

*Second*, Plaintiffs' proposed language that they "must prove that Defendants reached an agreement with the specific intent to obtain or maintain monopoly power in a relevant antitrust market" is inaccurate as a matter of law. It is not sufficient for the jury to find that Defendants sought to obtain *collective* monopoly power; instead, Plaintiffs must prove that the Defendants specifically intended that *one* of the parties to the agreement would obtain or maintain monopoly power. The Ninth Circuit has explicitly rejected a "shared monopoly" or "joint monopoly"; as another court in this district has explained, "Ninth Circuit case law holds that to sufficiently state a claim under § 2 for conspiracy to monopolize, the plaintiff must allege facts indicating that a conspiracy exists to create a monopoly *in a single entity*." *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 2015 WL 7008185, at *3–4 (C.D. Cal. Sept. 18, 2015) (emphasis added) (collecting cases); *Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc.*, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005) ("[A]n allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under section 2."). And as explained further in Defendants' Objections to Plaintiffs' Proposed Instruction No. 56, the jury

104

instructions must specify which entity Plaintiffs allege purportedly would be given monopoly power: the NFL. Defendants' proposed instruction appropriately describes Plaintiffs' burden as to this element.

*Third*, Defendants object to Plaintiffs' removal of standard language from the ABA model. Plaintiffs propose to remove the statement that "possession of monopoly power, in and of itself, is not unlawful." That deletion exacerbates Plaintiffs' failure to explain the difference between merely having market power and the kind of anticompetitive conduct that is necessary to sustain a Section 2 claim. Plaintiffs offer no reason to cut this language, they cannot dispute that the language accords with established precedent, and they cite no authority to support their proposed deletion. *See, e.g.*, *Qualcomm*, 969 F.3d at 990 ("'The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not itself unlawful; instead, it is an important element of the free-market system.'") (cleaned up) (quoting *Trinko*, 540 U.S. at 407). In fact, Plaintiffs cite as authority the final jury instructions from the Epic-Google trial, and those instructions include the specific language Plaintiffs propose to excise here. Final Jury Instructions at 27 (Instruction No. 17), *In re Google Play Store Antitrust Litig.*, No. 20-cv-05671-JD (N.D. Cal. Dec. 6, 2023), ECF No. 850.

Plaintiffs also provide no justification for their proposal to depart from the ABA's model language that "Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market." Plaintiffs' proposal to change "and" to "or" would improperly suggest that proof of just one of these indicators— higher prices, restricted output, and excluded competition—can prove monopoly power. The model instruction accurately states the contrary. *See, e.g.*, *Shields v. Federation Internationale de Natation*, 649 F. Supp. 3d 904, 926 (N.D. Cal. 2023) ("Monopoly power is the ability to control prices and exclude competition in a given market. If a firm can profitably raise prices without causing competing firms to

expand output and drive down prices, that firm has monopoly power." (citation omitted)).

**PLAINTIFFS' REPLY RE: NO. 58: MONOPOLY POWER DEFINED**

Plaintiffs' proposed instruction on the definition of monopoly power faithfully adapts the ABA model instruction to the context of a claim for conspiracy to monopolize, just as the ABA recommends.

Plaintiffs are willing to agree to Defendants' replacement of "a relevant antitrust market" with appropriate language describing the market at issue, which is the "market for live professional football telecasts." Although Plaintiffs do not agree that their proposed instruction would mislead the jury, Plaintiffs are also willing to clarify—consistent with elements of the instruction on the elements of a claim for conspiracy to monopolize—that "Plaintiffs must prove that Defendants reached an agreement with the specific intent *that one of the parties to the agreement would* obtain or maintain monopoly power . . ."

Defendants' remaining objections are meritless. *First,* Plaintiffs' use of the disjunctive formulation—raise prices *or* reduce quality—is consistent with Ninth Circuit precedent on the subject. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (defining monopoly power as the substantial ability "to control prices *or* exclude competition" (emphasis added)).  And the ABA model instruction on which Plaintiffs' proposed instruction is based expressly acknowledges that some courts "have stated the test for determining market power in the disjunctive (i.e., the power to control prices or exclude competition)."  *Second*, Defendants have no basis to include the sentence about how monopoly power is not, in and of itself, unlawful. This instruction is not relevant to a claim for conspiracy to monopolize because, as stated above, the successful acquisition of a monopoly is not necessary in a conspiracy to monopolize claim.  *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1319 (E.D. Pa. 1981). The jury instructions in *In re Google Play Store Antitrust Litigation* are similarly inapposite because they concerned a claim for illegal monopolization, not a conspiracy to monopolize. *In re Google Play Store Antitrust Litig.*, No. 20-cv-05671-JD (N.D. Cal. Dec. 6, 2023), ECF No. 850.

## NO. 59: RELEVANT MARKET[23]

Plaintiffs must prove by a preponderance of the evidence that Defendants' agreement sought to obtain or maintain monopoly power in the relevant market. Defining the relevant market is essential because you are required to make a judgment about whether Defendants sought to obtain or maintain monopoly power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain Defendants' freedom to set prices for or to restrict the production level of live professional football telecasts in the United States.

The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on Defendants' intent to set prices as they please because customers could switch to them if Defendants set their own prices somewhat higher. All the firms and products that exert such restraining force are within what is called the relevant market.

There are two aspects you must consider in determining whether Plaintiffs have met their burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market.

---

[23] ABA Antitrust 3-A-3.

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 59**

Defendants do not object to the inclusion of instructions on the relevant market, however, Defendants do object to Plaintiffs' proposal that the relevant market instructions be given exclusively with the Section 2 instructions and not with the Section 1 instructions. That result is not appropriate because it is undisputed that proving the existence of a viable relevant antitrust market is a requirement of Plaintiffs' Section 1 claim as well.

Plaintiffs' own proposed jury instructions confirm that they must define a viable relevant antitrust market for the Section 1 claim as well as their Section 2 claim. Their proposed Instruction 49 states that, "Plaintiffs must show that the harm to competition occurred in an identified market, known as a relevant market. . . . *It is Plaintiffs' burden to prove the existence of a relevant market*." (emphasis added).[24] They have no justification for why the jury should not be instructed at the appropriate time how to assess whether they have met that burden.

Legal precedent likewise confirms that Plaintiffs must define a viable relevant antitrust market as part of their Section 1 claim. At step one of the rule of reason, "'the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market.'" *Epic Games*, 67 F.4th at 983 (quoting *Amex*, 585 U.S. at 541). Because this is not a price-fixing case and Plaintiffs cannot proceed under a quick-look framework, Plaintiffs must establish both the existence of the relevant market and substantial anticompetitive effects in that market. *Id.* at 974 & n.6, 983. Therefore, a threshold step is "defining the relevant market in which the alleged restraint occurs," *id.* at 974; *accord Qualcomm*, 969 F.3d at 992; *see also Amex*, 585 U.S. at 543 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market.").

---

[24] Plaintiffs' proposed instruction suggests that they bear this burden under some but not all circumstances; that is not correct for the reasons explained in Defendants' Objections to Plaintiffs' Instruction No. 49.

This case is no exception. *Sunday Ticket*, 933 F.3d at 1151 ("In order to show that an agreement injures competition, a plaintiff must generally show that the defendants have market power within a relevant market, [] meaning that the defendants have 'the ability to raise prices above those that would be charged in a competitive market.'"); *see also Amex*, 585 U.S. at 543. A plaintiff's burden to prove a relevant market may be relaxed if the plaintiff proves "a naked restriction on price or output," *Sunday Ticket*, 933 F.3d at 1151, but that limited exception has no application here, where Defendants have proffered a number of procompetitive effects of the challenged conduct.

Plaintiffs previously argued that this Court can or should truncate the full rule of reason analysis and instead apply "quick look" review, but that argument rests entirely on the Ninth Circuit's statement, at the motion to dismiss stage, that Plaintiffs had *pleaded* a naked restraint similar to those in *NCAA*. *See Sunday Ticket*, 933 F.3d at 1152 ("[B]ecause the alleged restrictions on the production and sale of telecasts constitute 'a naked restriction' on the number of telecasts available for broadcasters and consumers, the plaintiffs were not required to establish a relevant market." (emphasis added)). Now that fact and expert discovery is complete, however, there can be no dispute that the NFL Defendants have extensive evidence of the procompetitive rationales for the challenged restraints. The existence of even the potential for procompetitive effects means that quick look analysis is inapplicable. As explained further in NFL Defendants' Memorandum of Contentions of Fact and Law, *see* ECF No. 1185 at 33–36, "more than a 'quick look' is required" if the challenged restraint "'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,'" *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 318 (2d Cir. 2008) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999)); *see also Cal. Dental*, 526 U.S. at 778 (declining to apply "quick look" review where "the plausibility of competing claims about the effects of the [challenged restraints] rules out the indulgently abbreviated review").

Thus, consistent with Plaintiffs' Instruction 49, the jury should be instructed that "It is Plaintiffs' burden to prove the existence of a relevant market," and as a result should receive the instructions on market definition that would permit them to conduct that inquiry.

## PLAINTIFFS' REPLY RE. NO. 59: RELEVANT MARKET

Defendants do not dispute the content or the form of this instruction but rather object on the basis that these instructions are "given exclusively with the Section 2 instructions and not with the Section 1 instructions."

Defendants object solely because they believe this instruction should be included with Plaintiffs' Section 1 instructions. But Plaintiffs do not have a threshold burden of formally proving a relevant market in their Section 1 claim. Rather, Plaintiffs can meet their burden by showing that the challenged restraint is a facially anticompetitive "naked restraint," *see FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013), or by showing "proof of actual detrimental effects on competition," *Ohio v. American Express*, 585 U.S. 529, 540 (2018). *See also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1006 n.6 (collecting authorities holding that relevant market inquiry is not always necessary). Further, Defendants are simply wrong in their assertion that Plaintiffs cannot proceed under a quick-look framework. See *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 110 (1984) (applying quick look framework to NCAA's restrictions on television broadcasts of college football games). *See also Law v. Nat'l Collegiate Athletic Ass'n*, 134 F. 3d 1010, 1020 (10th Cir. 1998) ("We find it appropriate to adopt such a quick look rule of reason in this case."). Defendants are also incorrect in arguing that quick look does not apply just because defendants plan to put on evidence of procompetitive effects. *See Fed. Trade Comm'n v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) ("Quick-look analysis in effect shifts to a defendant the burden to show empirical evidence of procompetitive effects.").

## NO. 60: RELEVANT PRODUCT MARKET[25]

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant and sustained increase in price is approximately a 5 percent increase in price above competitive levels not due to cost factors. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just give you, you may also consider:

---

[25] ABA Antitrust 3-A-4.

- consumers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of Plaintiffs and Defendants regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

In this case, Plaintiffs contend that the relevant product market is live professional football telecasts. By contrast, Defendants contend that Plaintiffs have failed to allege the proper relevant product market. If you find that Plaintiffs have proven a relevant product market, then you should continue to evaluate the remainder of Plaintiffs' Section 2 claim. However, if you find that Plaintiffs have failed to prove such a market, then you must find in Defendants' favor on Plaintiffs' Section 2 claim.

1

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 60**

2      Defendants do not object to the inclusion of instructions on the relevant

3   product market; however, Defendants do object to Plaintiffs' proposal that the

4   relevant market instructions be given with the Section 2 instructions and not with the

5   Section 1 instructions, as it is undisputed that proving the existence of a viable

6   relevant antitrust market is a requirement of Plaintiffs' Section 1 claim. *See* Defs.'

7   Objs. to Plfs.' Proposed Instr. No. 59.

8      Because this instruction should be included alongside the Section 1

9   instructions, this Court should accept Defendants' proposed instruction which

10  includes an introductory paragraph about Plaintiffs' initial burden in the rule of

11  reason analysis of showing that Defendants' conduct has resulted in a substantial

12  harm to competition within the relevant antitrust market. The jury should be

13  instructed as to how and why the relevant market analysis fits into the larger rule of

14  reason analysis. Without this language, the jury may misunderstand the purpose of

15  the instruction.

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PLAINTIFFS' REPLY RE. NO. 60: RELEVANT PRODUCT MARKET**

Defendants do not dispute the content or the form of this instruction but rather object on the basis that these instructions are "given exclusively with the Section 2 instructions and not with the Section 1 instructions."

Defendants object solely because they believe this instruction should be included with Plaintiffs' Section 1 instructions. But Plaintiffs do not have a threshold burden of proving a relevant market in their Section 1 claim. Rather, Plaintiffs can meet their burden by showing that the challenged restraint is a facially anticompetitive "naked restraint," *see FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013), or by showing "proof of actual detrimental effects on competition," *Ohio v. American Express*, 585 U.S. 529, 540 (2018). *See also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1006 n.6 (collecting authorities holding that relevant market inquiry is not always necessary).

116

## NO. 61: RELEVANT GEOGRAPHIC MARKET[26]

Regarding the relevant geographic market, the parties agree that the relevant geographic market in this case is the United States.

---

[26] ABA Antitrust 3-A-6 (modified).

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 61**

Defendants object to Plaintiffs' proposed Instruction 61 as redundant and unnecessary. The parties do not dispute the relevant geographic market, so there is no question of fact for the jury and therefore no need for a separate, additional instruction in an already lengthy jury charge. Defendants have proposed language as part of their instruction on the relevant product market to make clear to the jury that the geographic market is not disputed. *See* Defs.' Proposed Instr. No. 48.

However, if the instruction is to be given, Defendants object to Plaintiffs' proposal that the relevant market instructions be given with the Section 2 instructions and not with the Section 1 instructions for the reasons identified in Defendants' Objections to Plaintiffs' Proposed Instruction No. 59.

1

## **PLAINTIFFS' REPLY RE. NO. 61: RELEVANT GEOGRAPHIC MARKET**

2
3
4
5
6

Defendants object to the inclusion of this instruction solely because it is "redundant and unnecessary" and "[t]he parties do not dispute the relevant geographic market." But this instruction is necessary to eliminate any confusion about the relevant geographic market, particularly if Defendants refuse to stipulate to this fact.

7
8
9
10
11
12
13

Defendants also object because they believe this instruction should be included with Plaintiffs' Section 1 instructions. But Plaintiffs do not have a threshold burden of proving a relevant market in their Section 1 claim. Rather, Plaintiffs can meet their burden by showing that the challenged restraint is a facially anticompetitive "naked restraint," *see FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013), or by showing "proof of actual detrimental effects on competition," *Ohio v. American*, 585 U.S. 529, 540 (2018).

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NO. 63: SPECIFIC INTENT[27]

If you determine that there was an agreement among Defendants to monopolize telecasts of live professional football games, you must then decide, as to each Defendant, whether Plaintiffs have proven that that Defendant had specifically intended that the members of the conspiracy would collectively acquire or maintain monopoly power in telecasts of live professional football games. In other words, you must decide whether the evidence shows that Defendants entered into the agreement with the conscious aim of using anticompetitive conduct to acquire or maintain the power to control prices and exclude competition in telecasts of NFL games. Neither proof of use of the power to exclude, nor proof of actual exclusion of existing or potential competitors, is essential to sustain the charge of conspiracy to monopolize.

There are several ways in which a plaintiff may prove that a defendant had the specific intent to monopolize. There may be evidence of direct statements of defendants' intent to use anticompetitive means to acquire monopoly power in the market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of defendant at about the time of the agreement or by testimony concerning statements of responsible officers or employees of defendant. However, you should be careful to distinguish between a lawful intent to compete vigorously, which may be accompanied by aggressive language, and a specific intent to monopolize by using anticompetitive conduct.

Even if you decide that the evidence does not prove directly that a defendant actually intended to exercise monopoly power by using anticompetitive conduct, specific intent may be inferred from what Defendants did. For example, if the evidence shows that the natural and probable consequence of the agreement or of the conduct of the parties to the agreement was to exclude or destroy competition in telecasts of live professional football games, that there was no legitimate business justification but the destruction or damage to competition, and that this was plainly

---

[27] ABA Antitrust 3-E-4.

foreseeable by Defendants, then you may (but are not required to) infer that Defendants specifically intended to acquire monopoly power by using anticompetitive conduct.

In determining whether each Defendant had a specific intent to monopolize, you should take into consideration the extent of competition all Defendants would face from producers of identical or equivalent goods and whether they had or probably could have acquired sufficient power, acting together as a group, to control prices in and to exclude competition for telecasts of live professional football games. If you find that it is unlikely the defendants could have achieved the power to exclude competition from an appreciable segment of commerce, then you may consider this as circumstantial evidence that none of them had the required specific intent to monopolize.

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 63**

Defendants object to four aspects of Plaintiffs' proposed Instruction 63: (i) Plaintiffs' proposal to replace references in the model instruction to "conspiracy" with "agreement"; (ii) Plaintiffs' omission of the requirement that they prove the NFL Defendants had the specific intent to give monopoly power in the relevant market to the NFL; (iii) Plaintiffs' omission of DirecTV as a member of the alleged conspiracy; and (iv) Plaintiffs' alteration of the relevant market. The Court should instead adopt Defendants' Instruction 63, which accurately states the law and adapts the ABA model instruction to the facts of this case.

*First*, Defendants object to Plaintiffs' attempt to avoid the word "conspiracy" from the instructions on their Section 2 conspiracy to monopolize claim. The core allegation of Plaintiffs' Section 2 claim is that DirecTV conspired with the NFL and the NFL Teams to limit the productions of telecasts, and that Plaintiffs suffered antitrust injury due to this conspiracy to limit output. *Sunday Ticket*, 933 F.3d at 1159. As explained in Defendants' Objections to Plaintiffs' Proposed Instruction No. 56, Plaintiffs' use of the word "agreement" in place of "conspiracy" is likely to mislead the jury as to the relevant substantive standard.

*Second*, Defendants object to Plaintiffs' obfuscation of what they must prove on the specific intent element. As explained in Defendants' Objections to Plaintiffs' Proposed Instruction No. 58, this Circuit does not recognize "collective" or "shared" monopoly power; Plaintiffs must prove that the Defendants specifically intended that *one* of the parties to the agreement—the NFL—would obtain or maintain monopoly power, and the additional clarity provided by Defendants' proposed instruction will help the jury understand and evaluate this aspect of Plaintiffs' claims.

*Third*, Defendants object to Plaintiffs' proposal to not include DirecTV as a member of the alleged conspiracy to monopolize in their proposed jury instructions. Not only will omitting any mention of DirecTV as a member of the conspiracy confuse the jury as to the facts of the case, but it will also mislead the jury as to the

law of the case. Whether DirecTV was a party to any conspiracy remains a triable issue of fact. *See Sunday Ticket*, 2024 WL 168298, at *8. And this Court has additionally held that there are triable issues of fact as to "whether the member clubs had a common purpose with DirecTV," "whether the agreements between the NFL, the member clubs, and DirecTV were designed to maintain market power by reducing the number of telecasts available of the games," and "[t]hus . . . whether Defendants had the specific intent to monopolize." *See id*.

The jury must be instructed that Plaintiffs can recover damages only for subscriptions purchased directly from a participant in the alleged conspiracy. *See Pepper*, 139 S. Ct. at 1529 . If the jury finds that DirecTV was not a participant in the alleged conspiracy, then the jury cannot award damages to Plaintiffs, who indisputably did not purchase Sunday Ticket directly from the NFL or the NFL Teams. *Sunday Ticket*, 2024 WL 168298, at *4–5; *see also Sunday Ticket*, 933 F.3d at 1158 (applying the same rule at the motion to dismiss stage). It is crucial, therefore, for the Court to instruct the jury on the requirement that DirecTV be a member of the alleged conspiracy in order for Plaintiffs to succeed on their Section 2 claim.

*Finally*, as explained in Defendants' Objections to Plaintiffs' Instruction 31, Defendants object to Plaintiffs' revision of their market definition to include only "live" telecasts. This is an alteration of the relevant market as defined by Plaintiffs in the Final Pretrial Conference Order, *see also* ECF No. 1331.1, Final Pretrial Conf. Order at 13, and Plaintiff is "precluded from presenting claims or defenses not set forth in" the Pretrial Order. Local Rules, App'x A, ¶ 7.

**PLAINTIFFS' REPLY RE. INSTRUCTION NO. 63: SPECIFIC INTENT**

Plaintiffs' instruction is identical to the ABA model instruction (Antitrust 3-E-4). Defendants' objections are all baseless.

First, Defendants argue Plaintiffs are attempting to avoid the word "conspiracy," but Plaintiffs have simply adopted the model instruction, including where the model instruction uses the term "agreement" instead of "conspiracy." Moreover, the use of "agreement" in place of "conspiracy" is perfectly appropriate because this case involves public agreements and is not limited to secret conspiracies hatched in smoke-filled rooms. *See* Notes to ABA Antitrust 2-A-1 (stating "the terminology of the instructions should be adjusted to fit the facts of a particular case" and explaining that "'conspiracy' may be appropriate where the conduct is per se unlawful" and the court should "substitute the word 'agreement' or 'contract' as appropriate").

Second, Defendants raise the point that the ABA model instruction does not reflect the Ninth Circuit's rejection of "collective" or "shared" monopoly power. Plaintiffs are willing to amend their proposed instruction to conform to Ninth Circuit precedent by making the following change (in italics):

> If you determine that there was an agreement among Defendants to monopolize telecasts of live professional football games, you must then decide, as to each Defendant, whether Plaintiffs have proven that that Defendant had specifically intended that *one member* of the conspiracy would collectively acquire or maintain monopoly power in telecasts of live professional football games.

Third, the NFL Defendants object because Plaintiffs' instruction does not explicitly identify DirecTV as a member of the alleged conspiracy. Plaintiffs did not specifically include DirecTV in this instruction (or any specific party or non-party) as it is not contemplated, nor is it necessary, pursuant to the ABA model instruction (Antitrust 3-E-4).

Finally, Defendants' objection to Plaintiffs' market definition is groundless. It has been clear throughout this case that Plaintiffs mean "live telecasts" when they

use the word "telecasts." *See* ECF No. 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023, ¶ 10 ("As I use the term, 'telecasts' means simulcasts distributed to consumers live (as the game occurs)[.]"). The Ninth Circuit recognized this as well. *See In re NFL Sunday Ticket*, 933 F.3d at 1148 ("Under the NFL-DirecTV Agreement, the NFL allows DirecTV to obtain all of the ***live*** telecasts produced by CBS and Fox, package those telecasts, and deliver the bundled feeds to NFL Sunday Ticket subscribers." (emphasis added)). Plaintiffs use the term "live telecasts" instead of just "telecasts" throughout the jury instructions to make this clear to the jury. There is no "revision" or change from the proposed pretrial order because, again, "telecasts" has always meant "live telecasts" in this case.

1

## <u>NO. 65: INJURY AND CAUSATION</u>[28]

2   If you find that Defendants have violated Sections 1 and/or 2 of the Sherman

3 Act, then you must decide if Plaintiffs are entitled to recover damages from

4 Defendants.

5   Plaintiffs are entitled to recover damages for an injury to its business or

6 property if they can establish three elements of injury and causation:

7   (1) Plaintiffs were in fact injured as a result of Defendants' alleged violation

8      of the antitrust laws;

9   (2) Defendants' alleged illegal conduct was a material cause of Plaintiffs'

10      injury; and

11   (3) Plaintiffs' injury is an injury of the type that the antitrust laws were

12      intended to prevent.

13   The first element is sometimes referred to as "injury in fact" or "fact of

14 damage." For Plaintiffs to establish that they are entitled to recover damages, they

15 must prove that they were injured as a result of Defendants' alleged violation of the

16 antitrust laws. Proving the fact of damage does not require Plaintiffs to prove the

17 dollar value of their injury. It requires only that Plaintiffs prove that they were in fact

18 injured by Defendants' alleged antitrust violation. If you find that Plaintiffs have

19 established that they were in fact injured, you may then consider the amount of

20 Plaintiffs' damages. It is important to understand, however, that the fact of injury and

21 the amount of damages are different concepts and that you cannot consider the

22 amount of damage unless and until you have concluded that Plaintiffs have

23 established that they were in fact injured.

24   Plaintiffs must also offer evidence that establishes by a preponderance of the

25 evidence that Defendants' alleged illegal conduct was a material cause of Plaintiffs'

26 injury. This means that Plaintiffs must have proved that some damage occurred to

27 them as a result of Defendants' alleged antitrust violation, and not some other cause.

28

---

[28] ABA Antitrust 6-A-1.

126

Plaintiffs are not required to prove that Defendants' alleged antitrust violation was the sole cause of their injury; nor need Plaintiffs eliminate all other possible causes of injury. It is enough if Plaintiffs have proved that the alleged antitrust violation was a material cause of their injury.

Finally, Plaintiffs must establish that their injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then plaintiffs' injuries are antitrust injuries. On the other hand, if Plaintiffs' injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Plaintiffs' injuries are not antitrust injuries and Plaintiffs may not recover damages for those injuries under the antitrust laws.

In summary, if Plaintiffs can establish that they were in fact injured by Defendants' conduct, that Defendants' conduct was a material cause of Plaintiffs' injury, and that Plaintiffs' injury was the type that the antitrust laws were intended to prevent, then Plaintiffs are entitled to recover damages for the injury to their business or property.

1    **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 65**

2    Defendants object to the use of "material" rather than "direct" in this proposed

3    instruction. Defendants' proposed instruction tracks closely to the ABA's model

4    instruction, deviating only to clarify, as confirmed by recent case law, the

5    requirement that Plaintiffs must prove "that their harm was caused *directly* by the

6    antitrust violator." *Sunday Ticket*, 933 F.3d at 1156 (emphasis added); *see* Defs.'

7    Proposed Instr. No. 65.

8    The requirement to show "direct" or "proximate" causation is based on the

9    general presumption "that a statutory cause of action is limited to plaintiffs whose

10   injuries are proximately caused by violations of the statute." *Lexmark Int'l, Inc. v.*

11   *Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). This proximate causation

12   inquiry "generally follows the first-step rule," the longstanding common-law

13   principle under which only "injuries that happen at the first step following the

14   harmful behavior are considered proximately caused by that behavior." *In re Am.*

15   *Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 139–40 (2d Cir. 2021); *see*

16   *also Assoiated. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,

17   459 U.S. 519, 534 (1983) ("The general tendency of the law, in regard to damages at

18   least, is not to go beyond the first step." (quoting *S. Pac. Co. v. Darnell-Taenzer*

19   *Lumber Co.*, 245 U.S. 531, 533 (1918) (Holmes, J.))). It is appropriate to instruct jury

20   on this directness requirement for standing, as Supreme Court precedent confirms

21   that "directness" or "proximity" is a requirement that "must be met in every case."

22   *Lexmark*, 572 U.S. at 135.

23

24

25

26

27

28

## **PLAINTIFFS' REPLY RE. NO. 65: INJURY AND CAUSATION**

Plaintiffs' proposed instruction adopts the ABA model instruction verbatim.

Defendants' insistence on inserting a direct causation requirement is based on misreading of the Ninth Circuit's decision in *In re National Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136 (9th Cir. 2019). When the Ninth Circuit flagged that "plaintiffs must allege that their harm was caused directly by the antitrust violator," it was plainly discussing antitrust standing under *Illinois Brick* (i.e., the direct purchaser rule and its "principles of proximate cause"). *See id.* at 1156–57 ("In other words, when co-conspirators have jointly committed the antitrust violation, a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation.").

The Ninth Circuit did not reverse nearly a century of Supreme Court precedent on the standard for causation in antitrust cases, dating back to *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 560-62 (1931). *See, e.g., Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 487 (9th Cir. 2021)) ("[A] plaintiff need not prove that the antitrust violation was the only cause of its injury in order to recover damages[;] proof that the violation was a ***material cause*** is sufficient.") (emphasis added).

Nor do Defendants' citations support a stark departure from antitrust precedent. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (discussing generally principles of causation for statutory causes of action); *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (considering injury to plaintiff that was "neither a consumer nor a competitor in the market in which trade was restrained"); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 140 (2d Cir. 2021) ("Under the [first-step] rule, injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior. Accordingly, *'[d]irectness in the*

*antitrust context means close in the chain of causation.*'") (citation omitted and emphasis added).

## NO. 66: BUSINESS OR PROPERTY[29]

Plaintiffs must establish that the injury they claim to have suffered was an injury to their business or property. The term "business" includes any commercial interest or venture. Plaintiffs have been injured in their businesses if you find that they have suffered injury to any of their commercial interests or enterprises as a result of Defendants' alleged antitrust violation. The term "property" includes anything of value Plaintiffs own, possess, or in which plaintiffs have a protectable legal interest, including money. Plaintiffs have been injured in their property if you find that anything of value that they own, possess, or have a legal interest in has been damaged as a result of Defendants' alleged antitrust violation. Plaintiffs have been injured in their property if you find that they have paid an inflated price for goods, services, any legal interest of value, or have lost money as a result of Defendants' alleged antitrust violation.

---

[29] ABA Antitrust 6-A-2.

1    **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 66**

2         Defendants object to Plaintiffs' Instruction 66, as it needlessly strays from the

3    Model Instructions with its inclusion of "including money" in the explanation of

4    "property." This departure from the Model Instruction is especially confusing for the

5    jury when taken with the following sentence: "Plaintiffs have been injured in their

6    property if you find that they *have paid an inflated price* for goods, services, any

7    legal interest of value, *or have lost money* as a result of Defendants' alleged antitrust

8    violation." (emphases added). The addition of "including money" to the definition of

9    property is unfounded, redundant, and will only confuse the jurors.

## PLAINTIFFS' REPLY RE. NO. 66: BUSINESS OR PROPERTY

Plaintiffs make one minor addition to the ABA model instruction by adding "money" as an example of "property." This is uncontroversial. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 340 (1979) ("A person whose property is diminished by a payment of money wrongfully induced is injured in his property.") (quoting *Chatanooga Foundry Pipe Works v. Atlanta*, 203 U.S. 390, 396 (1906). Because the term "property" connotes real property in common usage, it is both helpful and harmless to emphasize to the jury that property includes money.

Defendants argue that this addition is confusing because of other language in the instruction about having "paid an inflated price" or having "lost money." But there is nothing confusing here because the fact that "property" includes "money" is *consistent* with the rest of the instruction.

## NO. 68: ANTITRUST DAMAGES—INTRODUCTION AND PURPOSE[30]

If you find that Defendants violated the antitrust laws and that this violation caused injury to Plaintiffs, then you must determine the amount of damages, if any, Plaintiffs are entitled to recover. The fact that I am giving you instructions concerning the issue of Plaintiffs' damages does not mean that I believe Plaintiffs should, or should not, prevail in this case. If you reach a verdict for Defendants on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that Plaintiffs should be fairly compensated for all damages to their business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages— or to deter particular conduct in the future. Furthermore, you are not permitted to award to Plaintiffs an amount for attorneys' fees or the costs of maintaining this lawsuit.

---

[30] ABA Antitrust 6-B-1.

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 68**

Plaintiffs' proposed instruction omits critical language to help the jury understand damages in this context. There can be no damages without injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Including the explanation that a finding of no injury *requires* an award of no damages will help the jury understand the implications of each element of their verdict and prevent internal inconsistencies and is an accurate statement of the law.

1

2

## **PLAINTIFFS' REPLY RE. NO. 68: ANTITRUST DAMAGES—**

## **INTRODUCTION AND PURPOSE**[31]

3

4

5

6

7

Plaintiffs' Instruction No. 68 the adopts the ABA model instruction (Antitrust 6-B-1) verbatim and does not omit "critical language," as the NFL contends. There is no reason to insert, as the NFL insists, that "[t]here can be no damages without injury" because this concept is already discussed in the opening sentence and more thoroughly in Instruction No. 65 – Injury and Causation.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[31] ABA Antitrust 6-B-1.

## NO. 71: OVERCHARGE DAMAGES[32]

If you have determined that there was an unlawful agreement among competitors to limit output or to fix, raise, maintain, or stabilize prices of live professional football telecasts that caused some injury to Plaintiffs, you must now determine the amount of damages to award to Plaintiffs. The commonly accepted method to calculate those damages is to determine the difference between the prices Plaintiffs actually paid for Sunday Ticket and the prices Plaintiffs would have paid had there been no agreement to limit output or to fix, raise, maintain, or stabilize prices. This is referred to as the overcharge.

---

[32] ABA Antitrust 6-B-5 (modified).

1

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 71**

2

Plaintiffs offer no basis for their proposed deviations to the model jury

3

instruction regarding overcharges. Plaintiffs' proposed additions regarding

4

"maintaining" or "stabilizing" prices will be confusing to the jury, and these

5

deviations are particularly unnecessary in the context of an instruction designed to

6

provide an explanation of how damages are to be calculated, not to characterize (or

7

recharacterize) Plaintiffs' allegations.

8

As is a common theme in their instructions, Plaintiffs attempt to introduce a

9

new theory of liability through their instruction fifty-five without any basis in the

10

Model Instructions.  Specifically, Plaintiffs have added the term "stabilize prices" to

11

the list of potential purposes of the alleged conspiracy.  The Model Instructions make

12

no mention of "stabiliz[ing] prices."  Nor had Plaintiffs—until the eve of trial, when

13

they began including this language.  The Court should reject this baseless addition to

14

the Model Instruction.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **PLAINTIFFS' REPLY RE. NO. 71: OVERCHARGE DAMAGES**

2

3

4

5

6

7

8

9

10

11

12

13

14

Defendants object to the use of the words "maintaining" or "stabilizing" prices in Plaintiffs' description of the purpose of Defendants' unlawful agreements because this is purportedly a "new theory of liability." Defendants are wrong. Plaintiffs alleged in their *complaint* that Defendants entered into agreements to maintain and stabilize prices. *See* Plaintiffs' Second Consolidated Amended Complaint, ECF No. 441, at ¶ 46 ("Whether the NFL and its Teams engaged in a contract, combination, or conspiracy to reduce output and/or fix, raise, maintain or stabilize prices of live video presentations of regular season NFL games . . ."). *See also* Plaintiffs' Memorandum of Contentions of Fact and Law, ECF No. 1187 at 7, filed Jan. 19, 2014 ("Plaintiffs bring claims against Defendants based on their efforts to restrict competition in the distribution of NFL telecasts, including the illegal restriction of output of NFL telecasts and in fixing, raising, maintaining, or stabilizing prices for NFL telecasts.").

15

16

17

18

19

20

Defendants also argue, without explanation, that this terminology is confusing. It is not. Indeed, the ABA model instruction on price fixing describes agreements "to maintain a floor under prices, to increase the stability or firmness of prices . . . [or] to stabilize prices." *See* ABA Antitrust 2-B-1. It is important to describe the broad range of price-fixing activities so that the jury is not misled into believing that price-fixing can only be established through agreements to set a specific price.

21

22

23

24

25

26

27

28

139

1

## NO. 72: CLASS DAMAGES[33]

2   Plaintiffs are seeking to recover damages on behalf of a class of residential

3   purchasers of Sunday Ticket and a class of commercial purchasers of Sunday Ticket.

4   To award damages for the classes, you do not need to determine the overcharge paid

5   by each class member with absolute mathematical certainty or precision. It is

6   sufficient for you to determine the average overcharge paid by class members or

7   estimate the overcharge paid by class members, as long as the average or estimate is

8   based on evidence and reasonable inferences. You may not base your damages award

9   on guesswork or speculation.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[33] ABA Antitrust 6-B-7.

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 72**

Plaintiffs' proposed instruction omits a critical portion of the ABA's model instruction and would leave the jury without context for its role in deciding class damages. The Court should adopt Defendants' proposed instruction, which reflects the balanced approach taken by the ABA's model instruction, does not leave the instruction unbalanced by omitting portions of the instruction, and provides clear guidance for how the jury should handle an outcome involving speculative or otherwise unsupported damages claims. There are two differences between the Parties' drafts.

*First*, Plaintiffs have omitted the final sentence from the model instruction: "If determining the amount of damages requires you to guess or speculate, or make speculative assumptions or inferences, you may not award damages." Plaintiffs offer no reason for omitting this statement, which correctly summarizes the law; nor do they offer a single case in which this sentence was omitted from the jury instructions given. *See*, *e.g.*, Final Jury Instructions at 42, *In re Korean Ramen Indirect Antitrust Litig.*, No. 3:13-cv-04115-WHO (N.D. Cal. Dec. 14, 2018), ECF No. 914 (providing the class damages instruction in full, as proposed here by Defendants). The Court should not accept this proposal to offer an unbalanced damages instruction.

*Second*, Defendants have proposed the following addition to the model instruction, which will further clarify the jury's role:

> In this case, Plaintiffs have proposed, through their expert
> witnesses, different approaches to calculating damages for
> the two classes in this case. Plaintiffs must prove that these
> approaches are reasonable and reliable for you to be able to
> use these approaches in determining what, if any, damages
> are appropriate.

This addition to the instruction properly states the law and will help the jury understand that it need not accept expert testimony when it comes to damages. The

Ninth Circuit has explained this same requirement, holding that, "[a]s to the reasonableness of the assumptions underlying the experts' [damages] analysis, criticisms of an expert's method of calculation are a matter for the jury's consideration in weighing that evidence." *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) (internal alterations and citations omitted). Expert opinions still need to be proven reasonable before the jury, even when they had been admitted at trial under *Daubert*. *See Yacht West, Ltd. v. Christensen Shipyard, Ltd.*, 702 F. Supp. 2d 1292, 1301 (D. Or. 2010) (where expert's testimony "was supported adequately to survive a challenge under *Daubert*," the opposing party had the opportunity "to convince the jury that its concerns undermined [the expert's] testimony to the point that the jury should reject his opinions"). Defendants' addition clarifies this burden for the jury.

Because it both includes all necessary elements of the model instruction and adds a clarifying, legally accurate change, Defendants' proposed instruction will make the jury's duty clear and should be adopted by the Court.

1

## **PLAINTIFFS' REPLY RE. NO. 72: CLASS DAMAGES**

2
3
4
5

As a preliminary matter, Plaintiffs agree to add this sentence (from ABA Antitrust 6-B-5) to the end of the instruction: "If determining the amount of damages requires you to guess or speculate, or make speculative assumptions or inferences, you may not award damages."

6
7
8
9
10
11

But Plaintiffs disagree with Defendants' proposed addition of one-sided language about the reasonableness and reliability of Plaintiffs' expert damages calculations. This language is not found in the ABA model instruction and for good reason: the jury should not be asked to determine whether Plaintiffs' expert testimony meets the requirements of Federal Rule of Evidence 702. That is the province of the Court.

12
13
14
15
16
17
18
19

Further, this instruction is cumulative of (agreed) Instruction No. 22—Expert Opinion, which instructs the jury on how to *weigh* expert testimony. Indeed, *Humetrix*, cited by Defendants, reiterates the concept set forth in Instruction No. 22, by stating that "criticisms of an expert's methods of calculation are a matter for the jury's consideration in *weighing* that evidence." 268 F.3d at 919. *Yacht West* is inapposite because it did not concern jury instructions and simply explained that plaintiffs failed to convince the jury to reject the defense expert's testimony "through cross examination or contradiction of another expert." 702 F. Supp. 2d at 1301.

20
21
22

At bottom, Defendants' deviation from the ABA model instruction is unnecessary, cumulative, and unfairly directs the jury to consider only the reliability of Plaintiffs' damages expert testimony.

23
24
25
26
27
28

## NO. 73: JOINT AND SEVERAL LIABILITY[34]

Each participant in an agreement that violates the antitrust laws is jointly and severally liable for all of the damages resulting from the contract, combination, agreement, or conspiracy. This means that each party to the agreement is fully liable for all of the damages caused by the agreement and not solely for damages caused by an individual party. One who knowingly joins an ongoing agreement is liable for the previous acts of the other parties in furtherance of the agreement.

If you find that plaintiffs have proven the existence of the alleged agreement, that Defendants participated in the agreement, and that Plaintiffs are entitled to recover damages based on the other instructions in this case, then Defendants would be liable for all damages caused by the agreement including any overcharges on purchases of Sunday Ticket.

Thus, in that event, Defendants would be liable for overcharges on all purchases of Sunday Ticket by Plaintiffs from all members of the conspiracy, and not merely on any purchases directly from Defendants.

You should not make any deductions to damages because you think DirecTV, CBS, FOX, or any other nonparty played a role in causing damages.

---

[34] ABA Antitrust 6-B-17; *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981).

1

## **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 73**

2
3

Defendants oppose Plaintiffs' Proposed Joint and Several Liability instruction as unnecessary, confusing to the jury, and an incorrect statement of the law.

4
5
6
7
8
9
10

At the outset, the Court should reject Plaintiffs' Joint and Several Liability Instruction because it is unnecessary. Defendants have already agreed not to make any "empty chair" arguments before the jury. *See* ECF No. 1112, Defs.' Opp. Pls.' Mot. *in Limine* No. 3 at 4. This is not a case where the jury would have any reason to consider apportionment of blame between multiple defendants, so any explanation of joint and several liability is irrelevant. Indeed, giving the instruction is likely to invite further, irrelevant speculation by the jurors of DirecTV's role in the case.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Moreover, by raising an irrelevant legal issue, Plaintiffs' instruction is more likely to confuse the jurors than to clarify the issues for them. There are multiple legal rules addressing calculation of damages and other forms of relief, including rules addressing the trebling of damages, the recoverability of attorney's fees, and the potential for injunctive relief. The parties already have agreed that these post-verdict consequences of the jury's findings should not be discussed at trial, to avoid jury confusion and the potential that knowledge of these *consequences* of the jury verdict might influence the verdict itself. *See* ECF No. 1101-1, Pls.' Mot. *in Limine* No. 1 at 1–2 (treble damages); ECF No. 1102-1, Pls.' Mot *in Limine* No. 2 at 1–2 (injunctive relief). The same applies to the legal rule regarding joint and several liability, which is a rule relating to the collection of damages. *See, e.g.*, *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981) ("joint and several liability simply ensures that the plaintiffs will be able to recover the full amount of damages from some, if not all, participants"). The legal structure used to ensure the payment of damages is independent of the jury's damages calculation, and they should not be given this instruction, which will only serve as a distraction.

27
28

Finally, Plaintiffs' proposed addition regarding "deductions" is overbroad. It incorrectly ignores the possibility that the jury might find pricing outcomes

1   attributable (in part or in full) to the independent, economically rational, and entirely

2   legal actions of third parties (or parties the jury may find not to have participated in

3   any conspiracy). In such a case, the jury would have to disaggregate the damages

4   attributable to legal action and the damages attributable to illegal action. *See*

5   *Comcast*, 569 U.S. at 37.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **PLAINTIFFS' REPLY RE. NO. 73: JOINT AND SEVERAL LIABILITY**

2
3

Plaintiffs' proposed instruction adopts ABA model instruction 6.B.17 with minor changes, including to replace "conspiracy" with "agreement" throughout.

4
5
6
7
8
9
10
11

Defendants insist this instruction in unnecessary and irrelevant, but it is plainly helpful to the jury. Though the NFL Defendants have agreed not to make any "empty chair" arguments before the jury, that does not prevent the jury from independently wondering about the absence of DirecTV, CBS, and Fox at trial, trying to apportion damages among absent co-conspirators, or considering that Plaintiffs purchased Sunday Ticket from DirecTV and not directly from one of the NFL Defendants. This instruction ensures that the jury understands joint and several liability under the antitrust laws.

12
13
14
15
16
17
18

The NFL Defendants do nothing to develop their arguments that this might open the door to discussion of injunctive relief or treble damages, and their citation to *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981), undermines their suggestion that joint and several liability has only to do with post-verdict consequences. As the Supreme Court explained, "joint and several liability simply ensures that the plaintiffs will be able to recover the full amount of damages from some, if not all, participants." *Id.*

19
20
21
22
23
24
25
26
27

Nor is Plaintiffs' addition regarding "deductions" overbroad. Plaintiffs added this sentence to clarify that, pursuant to the doctrine of joint and several liability, the jury should not subtract from damages just because another party is also at fault for the antitrust violations. This is the point of the joint and several liability doctrine. *See Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981) ("[J]oint and several liability simply ensures that plaintiffs will be able to recover the full amount from damages from some, if not all, participants."). Defendants' arguments about disaggregation fail for the same reasons set forth in Plaintiffs' objections to Defendants' Instruction No. 70 – Causation and Disaggregation.

28

## NO. 74: NO DUTY TO MITIGATE[35]

Plaintiffs have no duty to mitigate, or lessen, their damages. This means you may not consider whether the Plaintiffs could have passed on any overcharges for Sunday Ticket to their customers or whether Plaintiffs made any profits by playing Sunday Ticket games. Nor may you consider whether Plaintiffs could have avoided any overcharges by not purchasing Sunday Ticket.

---

[35] *See* Order on Plaintiffs' Motion in Limine No. 2, ECF No.1292, at 4.

1  **<u>DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 74</u>**

2  Defendants object to Plaintiffs' proposed "no mitigation" instruction, which

3  stands in direct opposition to the ABA model instruction explaining that mitigation

4  generally is required. Model Jury Instructions in Civil Antitrust Cases, Chapter 6–

5  Causation and Damages–Damages, Instruction 14: Mitigation (Am. Bar Ass'n

6  Antitrust L. Section 2016).

7  Defendants recognize that the Court has rejected the argument for a mitigation

8  instruction in this case. We have offered our own instruction to preserve our argument

9  on this score, Defendants' Instruction 74, and incorporate those arguments here. But

10  there is no basis for giving a "no mitigation" instruction to a group of lay jurors, who

11  are likely not familiar with the existence of any affirmative mitigation requirement

12  in the first place. Plaintiffs cannot cite a single case where this instruction has been

13  given, and Defendants will of course respect the Court's order on mitigation

14  arguments at trial.

15  Plaintiffs' instruction also risks hamstringing Defendants in their presentation

16  of evidence of procompetitive benefits. This Court held plainly that Defendants could

17  offer evidence linking the challenged restraints to increases in quality of game

18  telecasts, which ultimately increased product value.  *See* ECF No. 1292 (Order on

19  Pls. Mot. in Limine No. 2) at 5. Put simply, that means the jury can and *must* consider

20  whether Sunday Ticket allowed commercial class members to bring in more business

21  as part of the rule of reason analysis. *Epic Games.*, 67 F.4th at 987. The assertion that

22  the jury may not consider whether "Plaintiffs made any profits by playing Sunday

23  Ticket games" at their commercial establishments therefore contravenes this Court's

24  ruling and the Ninth Circuit's precedent.

25

26

27

28

1

## **PLAINTIFFS' REPLY RE. NO. 74: NO DUTY TO MITIGATE**

2

This instruction tracks the parties' briefing on Plaintiffs' Motion in Limine No.

3

2 on the duty to mitigate, as well as the Court's order on the same. *See* ECF No. 1292

4

at 6 ("Given that there is no such duty [to mitigate] arising from horizontal restraints

5

that cause supracompetitive prices, Defendants cannot make any mitigation

6

arguments because they would be irrelevant and confusing."). *See also In re Nat'l*

7

*Football League's Sunday Ticket Antitrust Litig.*, 2022 WL 1766927, at *1 (C.D. Cal.

8

May 9, 2022) (recognizing the unavailability of a pass-through defense and noting

9

that "the NFL Defendants are not asserting a pass-through defense" in this litigation).

10

This instruction is necessary so that jurors do not reach their own, improper

11

conclusions about mitigation based on their own idiosyncratic views on fairness.

12

Defendants object on the basis that this instruction would hamstring the jury's

13

ability to consider whether Sunday Ticket allowed commercial class members to

14

bring in more business. This shows just how confusing this evidence will be to a jury.

15

Without this instruction, the jury may think that damages should be reduced if Sunday

16

Ticket helped increase revenue. To ameliorate Defendants' concern, Plaintiffs are

17

willing to make the following amendment to the instruction (in italics):

18

> Plaintiffs have no duty to mitigate, or lessen, their damages. This
> means*, when calculating damages,* you may not consider whether the

19

> Plaintiffs could have passed on any overcharges for Sunday Ticket to
> their customers or whether Plaintiffs made any profits by playing

20

> Sunday Ticket games. Nor may you consider whether Plaintiffs could

21

> have avoided any overcharges by not purchasing Sunday Ticket.

22

23

24

25

26

27

28

150

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  May 22, 2024                              Respectfully submitted,

By:   */s/ Marc M. Seltzer*
        Marc M. Seltzer

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
Eliza Finley (301308)
efinley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*pro hac vice*)
bcarmody@susmangodfrey.com
Seth Ard (*pro hac vice*)
sard@susmangodfrey.com
Tyler Finn (*pro hac vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
One Manhattan West
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*pro hac vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*pro hac vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfled.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111

Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*pro hac vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*pro hac vice*)
hlanger@langergrogan.com
Edward Diver (*pro hac vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*pro hac vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*