Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 10th Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5429
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>———————————————<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. 2:15-ml-02668−PSG (SKx)<br><br>**NFL DEFENDANTS' TRIAL BRIEF**<br><br>Complaint Filed: June 24, 2016<br>Final Pretrial Conference: June 4, 2024<br>Trial Date: June 5, 2024 |

# TABLE OF CONTENTS

I. Introduction ...................................................................................................... 4

II. Updated Case Law and Responses to Plaintiffs' Memorandum of Contentions of Facts and Law ........................................................................ 4

    A. Plaintiffs cannot satisfy the prerequisites for application of the "quick look" doctrine. ............................................................................. 4

    B. Defendants have correctly described the rule of reason framework. ........................................................................................... 7

    C. The SBA protects the NFL-network agreements. ................................. 9

    D. Whether the NFL is a "single entity" is a question for the jury. ........ 10

    E. Plaintiffs should not be allowed to assert a Section 2 claim at trial. ...................................................................................................... 11

        1. Plaintiffs' Section 2 claim is duplicative of their Section 1 claim. ........................................................................................ 12

        2. Plaintiffs abandoned their "out-of-market" submarket. ........... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Adelphia Supply USA*,
   2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017) .................................................... 16

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010) ...................................................................................... 6, 10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021) ................................................................................. 6

*Brown Shoe Co. v. United States*,
   270 U.S. 294 (1962) ............................................................................................ 15

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .............................................................................................. 10

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
   610 F.3d 820 (3d Cir. 2010) ......................................................................... 5, 6, 7

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ........................................................................ passim

*Fed. Trade Comm'n v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .............................................................................. 14

*In re Live Concert Antitrust Litig.*,
   247 F.R.D. 98 (C.D. Cal. 2007) ................................................................... 15, 16

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) .................................................................. 5, 11, 13

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   2024 WL 168298 (C.D. Cal. Jan. 11, 2024) ................................................. 10, 11

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
   270 F. App'x 56 (2d Cir. 2008) ............................................................................ 5

*Nat'l Football League v. Ninth Inning, Inc.*,
    141 S. Ct. 56 (2020) .................................................................................. 10

*Newcal Indus., Inc. v. Ikon Off.,
    Sol.*, 513 F.3d 1038 (9th Cir. 2008) ....................................................... 15

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000) ................................................................. 14

*Ohio v. Am. Express Co.*, ("Amex"),
    585 U.S. 529 (2018) .................................................................................. 7

*United States v. Brown Univ. in Providence in State of R.I.*,
    5 F.3d 658 (3d Cir. 1993) .......................................................................... 5

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ..................................................................... 6

**Statutes**

15 U.S.C. § 1291 ........................................................................................ 12, 13

## I. INTRODUCTION

Pursuant to Local Rule 16-10, the NFL Defendants hereby submit this trial brief to address the following issues identified in the Proposed Final Pretrial Conference Order:

1. Whether ordinary rule of reason antitrust analysis applies, as opposed to a more abbreviated "quick look" review;
2. How the rule of reason operates in this case in light of the Ninth Circuit's decision in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023);
3. The effect of the Sports Broadcasting Act on the jury's consideration of Plaintiffs' claims;
4. Whether the jury should decide whether the NFL is a "single entity" for purposes of producing and licensing NFL game telecasts; and
5. Whether Plaintiffs are precluded from presenting their Section 2 claim to the jury.

*See* ECF No. 1331-1, Proposed Final Pretrial Conf. Order, at 63; ECF No. 1187, Plfs.' Mem. of Contentions of Fact & L. ("Plaintiffs' Contentions Memorandum"); ECF No. 1185, Defs.' Mem. of Contentions of Fact & L. ("Defendants' Contentions Memorandum").

## II. UPDATED CASE LAW AND RESPONSES TO PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACTS AND LAW

### A. Plaintiffs cannot satisfy the prerequisites for application of the "quick look" doctrine.

As Defendants demonstrated in their Contentions Memorandum, Plaintiffs' claims must be adjudicated under the full rule of reason. ECF No. 1185 at 25–28. Plaintiffs have not offered any credible basis to invoke the "quick look" doctrine, nor does any basis exist. Indeed, this Court already has held that the rule of reason will apply at trial, requiring Plaintiffs to prove substantial anticompetitive effects in the

relevant market. ECF No. 1325, Order Granting in Part Defs.' MIL No. 7, at 6 ("'[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market' ("step one") and then 'the burden shifts to the defendant to show a procompetitive rationale for the restraint' ("step two")." (citation omitted)).

Where, as here, Defendants offer evidence that the challenged restraints have "plausible" procompetitive benefits, "the restraint[s] [are] subjected to general rule of reason analysis requiring a full consideration of power and anticompetitive effects." Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1911c (4th & 5th eds. 2018–23). In such circumstances, the jury is "properly instructed to analyze the alleged restraints under the rule of reason." *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 (3d Cir. 2010); *see also, e.g.*, *Madison Square Garden, L.P. v. Nat'l Hockey League*, 270 F. App'x 56, 58 (2d Cir. 2008) ("A court must abandon 'quick look' and proceed to a full-blown rule of reason analysis, however, once the defendant has shown a procompetitive justification for the conduct." (internal quotation marks and citation omitted)); *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 669 (3d Cir. 1993) ("If the defendant offers sound procompetitive justifications, however, the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis.").

Plaintiffs' response ignores the current procedural posture of the case. Plaintiffs cite the Ninth Circuit's observation that they had *alleged* a "naked restriction" on trade in their complaint. ECF No. 1187 at 24–26 (citing *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152, 1156 (9th Cir. 2019)). But that ruling is no longer relevant. The case is on the eve of trial, and so long as "procompetitive justifications are proffered, their logic must be assessed and rejected in order to avoid reverting to full-scale rule of reason analysis." *Deutscher Tennis*, 610 F.3d at 832. The Ninth Circuit could not have assessed that

question for two reasons: (i) Plaintiffs had alleged that the challenged conduct had no procompetitive effects, ECF No. 163 ¶ 119; and (ii) Defendants had no opportunity, at the motion to dismiss stage, to proffer any such justifications.

The Court cannot, in the current procedural posture, "reject[]" Defendants' procompetitive rationales. As a legal matter, Plaintiffs cannot reasonably dispute whether Defendants have proffered legally viable procompetitive rationales.[1] That is evident from their arguments here as well as the fact that they did not move for summary judgment on the issue of anticompetitive effects, or otherwise attempt to satisfy their "burden" to "demonstrate that the proffered procompetitive effect[s] do[] not plausibly result in a net procompetitive effect, or possibly no effect at all on competition." *See Deutscher Tennis*, 610 F.3d at 832 (internal quotation marks and citation omitted). Any such arguments would in any event fail as an evidentiary matter. Defendants' experts and witnesses have demonstrated and will demonstrate that the challenged conduct has multiple procompetitive justifications. *E.g.*, ECF No. 962-10, Expert Report of B. Douglas Bernheim, dated April 28, 2023 ("Bernheim Rep.") ¶¶ 352–568.[2] Moreover, Defendants also dispute that there are

---

[1] As Defendants explained in their Contentions Memorandum, the evidence has shown that the challenged restraints were core activities of a joint venture. ECF No. 1185 at 18. Even if the Court rejects that view, the restraints are indisputably ancillary to the creation and distribution of NFL football telecasts. *Id.* As a matter of law, an ancillary restraint cannot be a naked restraint for purposes of applying the quick look doctrine. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021).

[2] *See also, e.g.*, *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203–04 (2010) (noting that evidence that restraints "are essential if the product is to be available at all" and "maintain [] a competitive balance" are procompetitive justifications for the restraints (internal quotation marks and citations omitted)); *Epic Games*, 67 F.4th at 986–90 (identifying "[intellectual property] compensation," "improved quality," "tapping into consumer demand," and increasing the "*total number*" of consumers as procompetitive justifications); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 478 (7th Cir. 2020) (recognizing that "higher output, improved product quality, energetic market penetration, [and] successful research and development" are procompetitive justifications (internal quotation marks and citations omitted)).

any anticompetitive effects of the challenged conduct in the first place, which makes quick look treatment even more inappropriate. *See*, *e.g.*, *id.* ¶¶ 244–351.

In sum, the applicable standard is "full-scale rule of reason analysis." *Deutscher Tennis*, 610 F.3d at 832; *see also id.* at 833 (holding that "jury was properly instructed to analyze the alleged restraints under the rule of reason" where "defendant comes forward with [a] plausible procompetitive justification").

**B.    Defendants have correctly described the rule of reason framework.**

Plaintiffs identified, as one of the "pending" matters from their Contentions Memorandum, "[t]he appropriate burden-shifting framework in applying the rule of reason under the Ninth Circuit's decision in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023)." ECF No. 1331-1 at 63. The disputes between the parties as to the appropriate contours of the rule of reason are detailed in the Parties' respective submissions regarding disputed final jury instructions. *See* ECF Nos. 1360, 1364. Defendants nevertheless briefly address the relevant framework in response to Plaintiffs' contentions. *See* ECF No. 1187 at 4–6.

To evaluate a restraint under the rule of reason, "a three-step, burden-shifting framework applies." *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 541 (2018).

At step one of the rule of reason, the parties agree that "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Epic Games*, 67 F.4th at 983 (quoting *Amex*, 585 U.S. at 541).

At step two, the parties similarly agree that, "[i]f a plaintiff establishes at step one that the defendant's restraints impose substantial anticompetitive effects, then the burden shifts back to the defendant to show a procompetitive rationale for the restraint[s]." *Id.* at 985–86 (alteration in original) (internal quotation marks and citation omitted). Defendants bear no burden to "quantify" the extent to which those procompetitive rationales play out in the market. *See* ECF No. 1325, Order Granting in Part Defs.' MIL No. 7, at 8 ("Plaintiffs . . . cannot argue or imply that Defendants

have an 'empirical burden' to prove procompetitive effects."). Attempts to impose such a burden on Defendants—and evade the Court's order—should be rejected. *See, e.g.*, ECF No. 1187 at 5 (referring vaguely to the purported "implications" of the "magnitude" of the procompetitive rationales).

At step three, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Epic Games*, 67 F.4th at 990 (internal quotation marks and citation omitted). As the Ninth Circuit explained:

> When evaluating proposed alternative means, courts must give wide berth to defendants' business judgments and must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. As such, this circuit's test—which the Supreme Court approved in *Alston*—requires a *substantially* less restrictive alternative. To qualify as substantially less restrictive, an alternative means must be virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost.

*Id.* (internal quotation marks, citations, and alterations omitted; emphasis in original). Of note, although Plaintiffs acknowledge that they must prove a "*substantially* less restrictive means" exists, ECF No. 1187 at 6 (emphasis added), they omitted this requirement from their proposed jury instruction, *see* ECF No. 1364 at 51.

Finally, this is not a case that requires "balancing" beyond the third step. No such further balancing is appropriate given that "the three-step framework is already designed to identify [any] imbalance" between competitive harms and competitive benefits in cases in which both are present. *Epic Games*, 67 F.4th at 994. With that in mind, the Ninth Circuit explained that any "fourth step" requirement can be satisfied in the *bench trial* context by "briefly confirming the result suggested by a step-three failure: that a business practice without a less restrictive alternative is not, on balance, anticompetitive." *Id.* But this is a jury trial, and because the confirmation envisioned by the Ninth Circuit is essentially coextensive with the preceding steps,

there is no need to risk confusing the jury with instructions on a purported "balancing" inquiry. That is particularly true here, as Plaintiffs have offered no reason to believe that this is the unique case requiring more than a "confirm[ation]" that "a business practice without a less restrictive alternative is not, on balance, anticompetitive." *Id.*

Moreover, and as the Ninth Circuit noted in *Epic Games*, Supreme Court precedent does not require a fourth step. The Ninth Circuit thus noted that it was "skeptical of the wisdom of superimposing a totality-of-the-circumstances balancing step onto a three-part test that is already intended to assess a restraint's overall effect." *Id.* Indeed, both parties already have dedicated more than 45 pages collectively of proposed instructions and briefing as to the first three steps of the rule of reason. ECF No. 1360 at 59–83; ECF No. 1364 at 61–80. Plaintiffs' proposed instructions, moreover, exemplify that Ninth Circuit's observation that no one has even been able to "articulate[] what [fourth-step] balancing really entails in a given case." *Epic Games*, 67 F.4th at 994. Plaintiffs propose to tell the jury only that they "must balance those procompetitive benefits against the anticompetitive harms resulting from the same restraints." ECF No. 1364 at 81. Plaintiffs do not even attempt to specify what it means for the jury to "balance" the alleged effects, much less specify what metric the jury should use or how that metric can be applied.

### C. The SBA protects the NFL-network agreements.

This Court has already held that the Sports Broadcasting Act has important implications for both liability and damages at this trial. As explained *infra* at 12–13, that is true for both Plaintiffs' Section 1 and Section 2 claims.[3]

"[N]o party disputes that the SBA grants the NFL and clubs the right to enter

---

[3] Defendants maintain that the Sports Broadcasting Act (SBA) bars this suit as a matter of law and incorporate their arguments on that issue here for purposes of appeal. *See* ECF No. 956-1, Defs.' Mem. Supp. Mot. Summ. J., at 4–11. Defendants now argue in the alternative that the application of the SBA turns on the factual record only in light of this Court's ruling against those arguments at summary judgment.

9

**NFL DEFENDANTS' TRIAL BRIEF**
Case No. 2:15-ml-02668-PSG (SKx)

fully exclusive contracts with CBS and FOX for free, over-the-air broadcasting." *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *11 (C.D. Cal. Jan. 11, 2024) (internal quotation marks and citation omitted). The Court's order holds that it is only the "provisions [that] protect CBS's and FOX's local broadcasts from competition from the paid telecasts that are excluded from the SBA." *Id.* Plaintiffs confirm this understanding of what conduct they can—and more importantly, cannot—argue violates the Sherman Act. ECF No. 1187 at 15 ("[T]he network agreements are not immunized *to the extent they include provisions that restrict competition for paid telecasts* such as those provided through Sunday Ticket." (emphasis added)).

Because the parties agree that the majority of the NFL-Network contracts are legally protected, it is critical that the jury understand that it may impose liability and award damages based only on conduct that falls outside of the scope of that protection. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013). Any purported proof of injury or damages from analyses or models that fail to "isolate" only the effects of conduct subject to challenge under the Sherman Act cannot suffice. *See id.* at 32, 37.

**D.     Whether the NFL is a "single entity" is a question for the jury.**

Defendants demonstrated in their Contentions Memorandum that all of Plaintiffs' claims require threshold proof that Defendants are not a single entity for purposes of producing and licensing NFL football telecasts. ECF No. 1185 at 3–4. To reiterate: Plaintiffs must prove that the NFL and the NFL Clubs are each "independent sources of economic power" in the production and licensing of professional football telecasts, such that an agreement among them could reduce "actual or potential competition." *Am. Needle*, 560 U.S. at 195–96 (internal quotation marks and citations omitted); *see also Nat'l Football League v. Ninth Inning, Inc.*, 141 S. Ct. 56, 57 (2020) (statement of Kavanaugh, J.) (citing *American Needle*'s remark that "NFL teams . . . must cooperate in the production and scheduling of

games," and concluding that "antitrust law likely does not require that the NFL and its member teams compete against each other with respect to television rights"); ECF No. 1360, Defs.' Disp. Final Jury Instrs. at 42–46 (Defs.' Arg. Supp. Defs.' Disp. Instr. No. 46). As a practical matter, Plaintiffs' trial evidence must establish, at a minimum, that "it is possible for the member clubs to act individually to produce telecasts." *Sunday Ticket*, 2024 WL 168298, at *18.

Plaintiffs' contrary arguments misread the Court's summary judgment order. The Court did not resolve the single entity issue *for the Plaintiffs*;[4] indeed, Plaintiffs did not even move for summary judgment on this basis. The Court has never been asked to conclude, nor has it concluded, that the NFL and its member Clubs are not a single entity for the purposes relevant to this lawsuit. Instead, in its order denying Defendants' motion, the Court expressly reserved this question for the jury: "[t]here is a dispute of fact whether the NFL and its member clubs are capable of concerted action," *id.* at 15, because there is a dispute of fact as to whether "it is possible for the member clubs to act individually to produce telecasts," *id.* at 18.

Nor did the Ninth Circuit resolve this issue. The Ninth Circuit held only that there was no legal rule—*i.e.*, no "binding precedent"—that would overcome Plaintiffs' allegations that the NFL and the Clubs were not required to cooperate to produce telecasts. *See Sunday Ticket*, 933 F.3d at 1153. That *legal* decision cannot resolve the *factual* dispute that this Court identified in its summary judgment order, of "whether the NFL and its member clubs are engaging in concerted action or acting like a single entity as to the conduct of producing telecasts." *See Sunday Ticket*, 2024 WL 168298, at *16.

### E. Plaintiffs should not be allowed to assert a Section 2 claim at trial.

Plaintiffs' Section 2 claim should not be permitted to proceed at trial, let alone submitted to the jury, because it is wholly duplicative of their Section 1 claim. *See*

---

[4] *See, e.g.*, *See* ECF No. 1187 at 18 (arguing otherwise); *see also* ECF No. 1362-1, Plfs.' Stmt. on Verdict Form at 4–5 (same).

ECF No. 1185 at 2–3, 22–25. Plaintiffs' only responses rely on misstatements of the law and underscore that submitting both claims to the jury creates a substantial risk of a verdict that is both economically irrational and legally impermissible.

### 1. Plaintiffs' Section 2 claim is duplicative of their Section 1 claim.

As Defendants have previously explained, the Court should preclude Plaintiffs from pursuing their Section 2 claim at trial because, to the extent Plaintiffs have not effectively abandoned the claim, it is superfluous. There is no dispute that Plaintiffs' Section 1 and 2 claims are based on the same conduct. If Defendants win on Section 1, then Plaintiffs could not possibly win on their Section 2 claim, which requires all the same proof as Section 1 and more. If Plaintiffs win on the Section 1 claim, then the Section 2 claim adds nothing because there can only be one recovery of damages for the same conduct. Leaving the Section 2 claim in the case thus serves only to create the risk of an inconsistent jury verdict. ECF No. 1185 at 7–8, 24–25.

Plaintiffs fail to refute these well-established principles. Indeed, Plaintiffs have not once—neither in their Contentions Memorandum, nor in the Pretrial Conference Order, nor in their arguments in support of their disputed jury instructions—identified a *single* case that held a Section 2 conspiracy claim can proceed where a Section 1 claim based on the same conduct fails.

The few responses Plaintiffs make do not pass muster. Plaintiffs first contend that the SBA applies to their Section 1 claim but has "no bearing" on their Section 2 claim. ECF No. 1364 at 97. That assertion misreads the plain text of the statute. The SBA unambiguously provides an exception to "[t]he antitrust laws," including "as defined in section 1 of the Act of October 15, 1914." 15 U.S.C. § 1291. Section 1 of the Act of October 15, 1914 (the Clayton Act), in turn, defines "the antitrust laws" to include the entirety of the Sherman Act. 38 Stat. 730. If Plaintiffs read footnoted dicta in the Ninth Circuit's opinion to suggest the contrary, *see Sunday Ticket*, 933 F.3d at

1159 n.10, that reading cannot be squared with the plain language of section 1 of the 1914 Act.

Plaintiffs also fail in suggesting that a Section 1 claim *might* require a showing of actual market power, which (they claim) is not an element of a Section 2 conspiracy claim. *See* ECF No. 1364 at 97 (Plfs.' Reply re: No. 56). This argument has no bearing on how this case will be presented to the jury because neither side has proposed jury instructions indicating that a Section 1 claim requires proof of market power. *See* ECF No. 1331-1 at 7–9 (outlining the parties' positions on the elements of the claims).

Plaintiffs also ignore the substantial difficulties that would arise from any attempt to submit both claims to the jury. For one, any such attempt would require the Court, the parties, and ultimately the jury to argue, decide on, and then apply a complex—but wholly unnecessary—set of jury instructions. *See* ECF No. 1360 at 84–114; ECF No. 1364 at 91–125. Moreover, Plaintiffs' Section 2 theories ignore that any market power that the NFL may have in the alleged market for professional football telecasts is not the result of any challenged conduct, but instead arose necessarily from the merger of the NFL and the AFL in 1966, which was specifically exempted from the antitrust laws by Congress. *See* 15 U.S.C § 1291 (stating that the antitrust laws "shall not apply to a joint agreement by which the member clubs of two or more professional football leagues . . . combine their operations in [an] expanded single league"). Because it was unquestionably lawful for the NFL and AFL to merge, and for the Clubs in the merged league to pool their rights for purposes of broadcast licensing, *see id.*, there is no plausible way in which the NFL and the Clubs can be said to have *unlawfully* conspired to give the NFL a monopoly in the market for professional football telecasts.

Ultimately, the question of whether Plaintiffs' Section 2 claims should be submitted to the jury is resolved by the Ninth Circuit's repeated guidance that proving a Section 2 conspiracy would require Plaintiffs to prove their Section 1 claim, *plus*

1  more. *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020)

2  ("If, in reviewing an alleged Sherman Act violation, a court finds that the conduct in

3  question is *not* anticompetitive under § 1, the court need not separately analyze the

4  conduct under § 2."); *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088,

5  1092 (9th Cir. 2000) ("Because [plaintiff's] claim under § 1 fails, its claim of a

6  conspiracy to monopolize under § 2 based on the same conduct necessarily fails as

7  well."); *see also* Areeda & Hovenkamp, *supra* ¶ 809 ("Any arrangement that could

8  be considered a 'conspiracy' to monopolize must necessarily also be an unreasonable

9  'contract,' 'combination,' or 'conspiracy' in restraint of trade offending §1.").

### 2. Plaintiffs abandoned their "out-of-market" submarket.

Plaintiffs abandoned in their proposed jury instructions their earlier argument, suggested in their Contentions Memorandum, that they might continue to assert that Defendants conspired to monopolize a purported submarket for "out-of-market" telecasts. *Compare* ECF No. 1364 at 91 (asserting a conspiracy to monopolize only "the market for live professional football telecasts in the United States") *with* ECF No. 1187 at 10–11. Plaintiffs could not have done otherwise. As Defendants demonstrated, the concessions of Plaintiffs' experts required them to abandon any argument premised on the existence of a "submarket" limited to out-of-market ("OOM") professional football telecasts.[5]

Even had Plaintiffs not abandoned this argument, it would fail. A relevant antitrust market must be a product market that "encompass[es] the product at issue

---

[5] *E.g.*, ECF No. 1185 at 23 (citing ECF No. 962-4, Expert Report of Daniel A. Rascher, dated February 17, 2023 ("Rascher Rep.") § 6.1, ¶ 177 (defining only an alleged "relevant market . . . for major league professional football telecasts in the United States, including those of the NFL")). Dr. Rascher, for example, affirmatively rejected any notion of a distinct OOM submarket by opining that "the NFL OOM telecasts *are in the same relevant market* as the rest of the NFL telecasts." ECF No. 962-4, Rascher Rep. ¶ 200 (emphasis added); *see also* ECF No. 962-5, Expert Reply Report of Daniel A. Rascher, dated June 9, 2023 ("Rascher Reply Rep.") § 6.1, ¶ 110 (defending his relevant market for "NFL telecasts"); ECF No. 962-29, Rebuttal Expert Report of Einer Elhauge, dated June 9, 2023 ("Elhauge Rebuttal Rep.") § 3, ¶¶ 36–39 (defending Rascher's "NFL telecasts" market).

as well as all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). And while it is "legally permissible to premise antitrust allegations on a submarket," submarkets must still meet the standard of any antitrust product market, *see id.*, and are legally cognizable only where the plaintiff has established "that the alleged submarket is *economically distinct* from the general product market," *id.* (emphasis added) (quoting *Brown Shoe Co. v. United States*, 270 U.S. 294, 325 (1962)).

Plaintiffs' previous argument that the NFL Defendants "treat" out-of-market broadcasts as a differentiated good does not meet this standard. As a preliminary matter, Plaintiffs concede that "the close substitutes for the NFL telecasts accessed via subscriptions [*i.e.*, via Sunday Ticket] are the other NFL telecasts not accessed via subscriptions."[6] This leaves no dispute that all NFL telecasts are in the same product market. *See Newcal*, 513 F.3d at 1045. The fact that Defendants allegedly treat the Sunday Ticket product as "differentiated" from the free OTA telecasts does not change this result, as courts have routinely defined product markets to include "differentiated" goods, especially whether the goods are close substitutes. *See In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 129 (C.D. Cal. 2007) (noting that the "contention that [the allegedly differentiated products] are differentiated products does not necessarily compel the conclusion that [products at issue], when aggregated, cannot be defined as a single market"); *see also id.* at 129–30 (collecting cases).[7]

---

[6] ECF No. 962-5, Rascher Reply Rep. ¶ 132; *see also* ECF No. 962-4, Rascher Rep. ¶ 199 (explaining that the "substitute products [for Sunday Ticket] are the other telecasts that consumers could view without obtaining [Sunday Ticket]"); ECF No. 962-5, Rascher Reply Rep. ¶ 112 ("[T]he set of reasonably close substitutes for the products exchanged in the conduct at issue was NFL telecasts."); *id.* ¶ 122 ("As my analysis shows, there are no reasonably close substitutes for an NFL telecast apart from other NFL telecasts, which is why NFL telecasts is the Relevant Market.").

[7] *See also, e.g.*, Areeda & Hovenkamp, *supra* ¶ 563 ("For antitrust purposes, we apply the differentiated label to products that are distinguishable in the minds of buyers but not so different as to belong in separate markets."); *see also Abbott Lab'ys v. Adelphia Supply USA*, 2017 WL 5992355, at *11 (E.D.N.Y. Aug. 10, 2017) ("Although all antitrust markets *by definition* exhibit cross-elasticity of demand, few (continued…)

\# \# \# \# \#

In the end, submitting the Section 2 claim to the jury serves no purpose. It adds nothing to the case and would only serve to give Plaintiffs two bites at the same apple (which is improper) or invite inconsistent or irreconcilable verdicts (which is obviously undesirable).

---

feature *completely* interchangeable or non-differentiated goods." (emphasis in original)).

| | |
|---|---|
| May 29, 2024 | Respectfully submitted, |
| | /s/ *Rakesh N. Kilaru* |

Rakesh N. Kilaru (admitted *pro hac vice*)
Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max J. Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Neema T. Sahni (Bar No. 274240)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
nsahni@cov.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*