Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (2121) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No.: 2:15-ml-02668–PSG (SKx) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **PLAINTIFFS' AMENDED DISPUTED PROPOSED FINAL JURY INSTRUCTIONS – 37A AND 51**<br><br>JUDGE: Hon. Philip S. Gutierrez<br>TRIAL DATE: June 5, 2024<br>COURTROOM:<br>    First Street Courthouse<br>    350 West 1st Street<br>    Courtroom 6A<br>    Los Angeles, CA 90012 |

# TABLE OF CONTENTS

| P## | D## | Title | Source | Status | Page |
|---|---|---|---|---|---|
| **FINAL INSTRUCTIONS** | | | | | |
| 25 | 25 | Duty of Jury | 9th Cir. § 1.4 | Stipulated | |
| 26 | 26 | Preponderance of the Evidence | 9th Cir. § 1.6 | Stipulated | |
| | 27 | Two or More Parties— Different Legal Rights | 9th Cir. § 1.8 | Disputed | |
| | 28 | Corporate Entities | 9th Cir. § 4.1; ABA Antitrust 2-A-3; Cases | Disputed | |
| 29 | 29 | What is Evidence | 9th Cir. § 1.9 | Stipulated | |
| 30 | 30 | What is Not Evidence | 9th Cir. § 1.10 | Stipulated | |
| 31 | 31 | Direct and Circumstantial Evidence | 9th Cir. § 1.12 | Stipulated | |
| 32 | 32 | Ruling on Objections | 9th Cir. § 1.13 | Stipulated | |
| 33 | 33 | Credibility of Witnesses | 9th Cir. § 1.14 | Stipulated | |
| | 34 | Expert Opinion | 9th Cir. § 2.13 | Disputed | |
| 35 | 35 | Charts and Summaries | 9th Cir. §§ 2.14, 2.15 | Stipulated | |
| 36 | 36 | Purpose of Sherman Act | ABA Antitrust 1-A-1 | Stipulated | |
| 37* | 37* | Sports Broadcasting Act/Sports Broadcasting Act Exemption | Cases | Disputed | |
| 37A | | Intellectual Property | Cases | Disputed | 6 |
| 38 | 38 | Plaintiffs' Claims | Cases | Disputed | |
| 39 | 39 | Elements of Section 1 Claim/ Sherman Act Section 1 | ABA Antitrust 1-B-2 | Disputed | |
| 40 | 40 | Contract, Combination, Conspiracy, or Agreement/ Existence of a Contract, Combination, or Conspiracy | ABA Antitrust 2-A-1 | Disputed | |
| 41 | | Corporations | ABA Antitrust 2-A-3 | Disputed | |
| 42 | | Absent Co-Conspirators | MIL Order - ECF No. 1293 | Disputed | |
| 43 | | Agreements Between Teams Belonging To Sports Leagues May Violate Sherman Act Section 1 | ABA Antitrust 2-C-10; Cases | Disputed | |
| 44 | | Agreements Between the NFL, DirecTV, CBS, and FOX | Cases | Disputed | |
| | 45 | Participation and Intent | ABA Antitrust 2-A-4 | Disputed | |
| | 46 | Single Entity | Cases | Disputed | |
| 47 | | Rule of Reason— Overview | ABA Antitrust 1-C-3A | Disputed | |

| P## | D## | Title | Source | Status | Page |
|-----|-----|-------|--------|--------|------|
| | 48 | Relevant Product Market | ABA Antitrust 3-A-3, 3-A-4 | Disputed | |
| 49 | 49 | Rule of Reason—Proof of Competitive Harm | ABA Antitrust 1-C-3B | Disputed | |
| | 50 | Exclusive Licensing Agreements | 9th Cir. §§ 15.16, 17.13; ABA Antitrust 2-D-5, 4-A-1, 4-A-2; Cases | Disputed | |
| 51 | 51 | Rule of Reason—Evidence of Procompetitive Benefits or Rationales | ABA Antitrust 1-C-3C | Disputed | 11 |
| 52 | 52 | Rule of Reason—Balancing Competitive Benefits/ Rule of Reason––Assessing the Procompetitive Benefits and Rationales | ABA Antitrust 1-C-3D | Disputed | |
| 53 | | Good Intent Not a Defense | ABA Antitrust 2-B-3 | Disputed | |
| 54 | | Reasonableness of Prices No Excuse | ABA Antitrust 2-B-4 | Disputed | |
| 55 | 55 | Interstate Commerce | ABA Antitrust 1-D-4 | Stipulated | |
| 56 | 56 | Elements of Section 2 Conspiracy to Monopolize Claim/ Elements of Conspiracy to Monopolize | ABA Antitrust 3-E-1 | Disputed | |
| 57 | 57 | Existence of a Conspiracy | ABA Antitrust 2-A-1 | Disputed | |
| 58 | 58 | Monopoly Power Defined | ABA Antitrust 3-A-2 | Disputed | |
| 59 | | Relevant Market | ABA Antitrust 3-A-3 | Disputed | |
| 60 | | Relevant Product Market | ABA Antitrust 3-A-4 | Disputed | |
| 61 | | Relevant Geographic Market | N/A | Disputed | |
| | 62 | Willful Acquisition or Maintenance of Monopoly Power | ABA Antitrust 3-E-3, 3-A-9; Cases | Disputed | |
| 63 | 63 | Specific Intent | ABA Antitrust 3-E-4 | Disputed | |
| 64 | 64 | Interstate Commerce | ABA Antitrust 1-D-4 | Stipulated | |
| 65 | 65 | Injury and Causation | ABA Antitrust 6-A-1 | Disputed | |
| 66 | 66 | Business or Property | ABA Antitrust 6-A-2 | Disputed | |
| | 67 | Relevant Time Period | ABA Antitrust 7-A-1; Cases | Disputed | |
| 68 | 68 | Antitrust Damages— | ABA Antitrust | Disputed | |

| P## | D## | Title | Source | Status | Page |
|-----|-----|-------|--------|--------|------|
| | | Introduction and Purpose | 6-B-1 | | |
| 69 | 69 | Basis for Calculating Damages | ABA Antitrust 6-B-3 | Stipulated | |
| | 70 | Causation and Disaggregation | ABA Antitrust 6-B-4 | Disputed | |
| 71 | 71 | Overcharge Damages/ Damages for Purchasers— Overcharges Based on Horizontal Price Fixing, Output Restriction, Market Allocation, or Other Agreements Not to Compete | ABA Antitrust 6-B-5 | Disputed | |
| 72 | 72 | Class Damages/ Damages for Purchasers—Class Damages | ABA Antitrust 6-B-7 | Disputed | |
| 73 | | Joint and Several Liability | ABA Antitrust 6-B-17 | Disputed | |
| 74 | 74 | (No) Duty to Mitigate/Mitigation | See Disputed Instructions | Disputed | |
| | 75 | Direct Purchaser Requirement | Cases | Disputed | |
| | 76 | Class-Wide Injury and Causation | Cases | Disputed | |
| 77 | 77 | Duty to Deliberate | 9th Cir. § 3.1 | Stipulated | |
| 78 | 78 | Consideration of Evidence—Conduct of Jury | 9th Cir. § 3.2 | Stipulated | |
| 79 | 79 | Communication with Court | 9th Cir. § 3.3 | Stipulated | |
| 80 | 80 | Return of Verdict | 9th Cir. § 3.5 | Stipulated | |

In proposing the following jury instructions, Plaintiffs do not waive any objections to evidence or arguments asserted in motions *in limine*. Nor do Plaintiffs concede the relevance of any issues addressed by these proposed instructions. Plaintiffs also reserve the right to amend or alter these proposed instructions or propose new instructions, including amendments and alterations based on further developments in this litigation, discussions with the Court, discussions with the NFL, and rulings or orders issued by the Court.

## NO. 37A: INTELLECTUAL PROPERTY[1]

You are instructed that each individual NFL team separately owns the intellectual property rights to the telecasts of their own home games and have the right to control those telecasts. You are further instructed that only the agreements that are the subject of this case prevented the individual NFL teams from independently contracting for the telecasting of their games.

---

[1] *See In re National Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1154 (9th Cir. 2019) ("Indeed, the history of the NFL, as well as the practice in other professional sports leagues, supports our conclusion" that "the agreements not to compete concern separately owned intellectual property[.]").

**DEFENDANTS' OBJECTION TO PLAINTIFFS' INSTRUCTION NO. 37A:**

**INTELLECTUAL PROPERTY**

Plaintiffs' proposed Instruction 37A suggests that a single team, acting alone, could license all rights necessary to telecast an NFL game. That suggestion is legally and factually wrong, vague, and contradicted by evidence in the trial record. The Court should reject this attempt to rewrite the law and facts of the case.

*First*, Plaintiffs have conceded that an NFL game requires the participation and consent of at least three separate entities: each of the two participating teams and the NFL itself. *See, e.g.*, ECF 975-1 at 18 n.17 (recognizing the "cooperation required to schedule and create an NFL game (on the field of play)"); *see also* 6/11/24 Trial Tr. at 874:21–23 ("Q: You need two teams in the NFL to make a game; correct? A: Yes."); *id.* at 875:9–10 ("[T]he NFL consents if they're going to use . . . their marks" in a telecast). As a result, no team acting alone can license the rights to telecast a game that they cannot create alone. Plaintiffs' experts have admitted exactly that. 6/11/24 Trial Tr. at 710:5–8 (**"Q: And if an individual team wanted to license a game on its own, could it do so? A: Um, no[.]"** (emphasis added)); *see also id.* at 711:10–17. Plaintiffs should not be permitted to seek a legal instruction that contradicts this clear factual record.

*Second*, Plaintiffs have admitted that the consent of both participating teams and the NFL is necessary to telecast an NFL game because any NFL game incorporates the trademarks, logos, and other intellectual property of both participating teams and the NFL.[2] 6/11/24 Trial Tr. at 876 ("Q: And you agree that in . . . your but-for world, both NFL teams would have to have had to consent for the

---

[2] Plaintiffs' single citation in support of this proposed instruction is not to the contrary. The Ninth Circuit's opinion in this case was issued at the motion to dismiss stage, based solely on Plaintiffs' allegations about the creation of telecasts and not accounting for evidence in the record. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1153 (9th Cir. 2019). Indeed, once the factual record had developed, this Court determined that a question of fact remained as to whether the NFL and its member clubs acted as a single entity in producing telecasts. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *15 (C.D. Cal. Jan. 11, 2024).

broadcaster, whichever one it was, to air the game; correct? A: Yes.”); *see also Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship.*, 34 F.3d 410, 416 (7th Cir. 1994) (affirming an injunction against a Canadian football team for use of the name “Baltimore CFL Colts” in telecasts as infringing the trademark rights of *both* the NFL and the Indianapolis Colts).

*Finally*, Plaintiffs’ proposed instruction is vague as to which “intellectual property” rights are at issue. As the evidence admitted in this trial confirms, a wide range of intellectual property rights are necessary to create an NFL telecast. The NFL’s broadcast agreements, **TX-146A** and **TX-146D**, illustrate this point: through these agreements, the NFL licenses a variety of NFL- and team-owned intellectual property to CBS and FOX for use in their broadcasts, including NFL and team marks and logos, highlights of other games, highlights of historical games, and the rights to broadcast live-look ins. *See*, *e.g.*, TX-146D at §§ A.5.f, B.3.c.  No single team owns—and thus no single team could license the use of—all of that intellectual property.

**PLAINTIFFS' REPLY IN SUPPORT OF ITS INSTRUCTION NO. 37A:**

**INTELLECTUAL PROPERTY**

To avoid confusion, the jury should be instructed that, as a matter of law, the individual NFL teams separately own the intellectual property rights to the telecasts of their own home games and have the right to control those telecasts. This is consistent with the Ninth Circuit's ruling in this case: "[T]he agreements not to compete [with respect to telecast rights] concern ***separately owned intellectual property***."[3] *In re National Football League's Sunday Ticket Antitrust Ticket Litig.*, 933 F.3d 1136, 1154 (9th Cir. 2019) (emphasis added) (explaining that this conclusion is supported by "the history of the NFL" and "the practice in other professional sports leagues" and citing various cases).[4] *See also U.S. v. National Football League*, 196 F. Supp. 445, 446–47 (E.D. Pa. 1961) ("*NFL II*") ("It is implicit in the 1961 contract that the member clubs have agreed among themselves and with the League that each club will not sell ***its television rights*** separate and apart from those of the other clubs." (emphasis added)); *Pittsburg Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490, 492 (W.D. Pa. 1938) ("[T]he Pittsburg Athletic Company, by reason of its creation of the game, its control of the park, and its restriction of the dissemination of news therefrom, has a property right in such news, and the right to control the use thereof . . ."); *Laumann v. NHL*, 907 F. Supp. 2d 465, 474 (S.D.N.Y. 2012) ("[E]ach team owns the initial right to control telecasts of its home games . . ."). The Sports Broadcasting Act also expressly recognizes that the broadcasting rights are owned by the teams, not the League. *See* 15 U.S.C. § 1291 (providing a limited exemption where "any league of clubs participating in professional football .

---

[3] The NFL contends that the term "intellectual property" is vague, but this language is consistent with the Ninth Circuit's holding in this case.

[4] Contrary to the NFL's argument, the Ninth Circuit did not base this holding on the Plaintiffs' factual allegations but rather looked to the actual history of the NFL's licensing practices and how such intellectual property rights operate in other sports. Nor does the Court's order on Defendants' Motion for Summary Judgment suggest otherwise. Whether the teams must cooperate to *license* their independently owned intellectual property does not mean that the teams do not own those rights in the first instance.

. . sells or otherwise transfers all or any part of ***the rights of such league's member clubs*** in the sponsored telecasting of the games of football . . ." (emphasis added)).

Defendants' arguments to the contrary have already been rejected by the Ninth Circuit. *See In re National Football League's Sunday Ticket Antitrust Ticket Litig.*, 933 F.3d at 1154–55 ("[W]e reject defendants' argument that the complaint fails to allege a Section 1 violation because the telecasts can be created only through cooperation among competitors."). An individual team still owns the intellectual property rights to telecasts of its home games *even if* that team may need to reach agreements to display logos or other intellectual property belonging to others to avoid infringement claims. For this reason, *Indiana Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship.*, 34 F.3d 410, 416 (7th Cir. 1994) is inapposite. This case says nothing about who owns the intellectual property rights to the *telecasts* of an NFL team's home game but instead addresses whether a new football team in Baltimore could use the name "Colts," or "Baltimore Colts," or "Baltimore CFL Colts" to describe itself. Although the new Baltimore team was enjoined from using those names in connection with the broadcast of football games, there was no ruling that the team no longer owned intellectual property rights to telecasts of its home games. *See id.* at 411–416.

1
2
3

## NO. 51: RULE OF REASON – EVIDENCE OF PROCOMPETITIVE BENEFITS AND CONSIDERATION OF LESS RESTRICTIVE ALTERNATIVES FOR ANY SUCH BENEFITS

4
5
6
7
8
9
10
11
12
13
14

If you find that Plaintiffs have proven that any of the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways.[5] Defendants bear a "heavy burden" to show "a procompetitive rationale for the restraint[s]."[6] Defendants also "bear the burden of producing evidence regarding the existence of competitive benefits."[7] These benefits must be "[non]pretextual and [must have] actually improve[d] competition."[8] "The Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable."[9] With respect to quality, Defendants' burden is to prove the specific ways in which the restraints have improved the quality of the product and that those specific improvements led to a greater overall number of viewers than there would have been without the restraints.[10]

15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

[5] ABA Antitrust 1-C-3

[6] Order on Defs. MIL No. 7, ECF No. 1325, at 7; MSJ Order, ECF No. 1155 at 18 ("Under the Rule of Reason, these hallmarks of anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." (quoting *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 113 (1984)).

[7] ABA Antitrust 1-C-3, Notes ("Defendant has the burden of producing evidence regarding the existence of competitive benefits . . .") (quoted in Order on Defs. MIL No. 7, ECF No. 1325, at 7).

[8] *See* Order on Defs. MIL No. 7, ECF No. 1325, at 7 ("At step two—determining whether there is a procompetitive rationale that is not pretextual and actually improves competition—Defendants are obligated to show *some* kind of evidence in support of their procompetitive rationale."); *id.* at 6–7 ("A procompetitive rationale is a [1] nonpretextual claim that defendant's conduct is [2] indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." (quoting *Epic Games*, 67 4th at 986 (cleaned up)).

[9] *Nat'l Soc. of Prof. Eng'rs v. U.S.*, 435 U.S. 679, 696 (1978).

[10] Order on Plaintiffs' MIL No. 2, ECF No. 1292 at 5 ("While product quality is a factor that can be relevant to showing a procompetitive rationale . . . it is only relevant if it is related to the challenged restraint."; "[P]roduct quality evidence [is permissible when] the quality [is] linked directly to the restraint"); *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 119–120 (1984) ("Perhaps the most important reason for rejecting the argument that the interest in competitive balance is served by the television plan is the District Court's unambiguous and well-supported finding that many more games would be televised in a free market than under the NCAA

11

With respect to all other alleged procompetitive benefits, Defendants' burden is to prove that those alleged benefits led to a greater overall number of viewers than there would have been without the restraints.[11] It is not procompetitive to restrict the number of out-of-market game telecasts available to be seen or raise the price to see those telecasts in order to protect the number of viewers for in-market game telecasts on over-the-air television or to protect DirecTV from competition by cable TV, satellite, or internet streaming providers.[12]

---

plan. The hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of Reason is that equal competition will maximize consumer demand for the product. **The finding that consumption [*i.e.*, number of viewers] will materially increase if the controls are removed is a compelling demonstration that they do not in fact serve any such legitimate purpose**."); *see also id.* at 97 (explaining that the Court of Appeals noted that "since the plan involved a concomitant reduction in viewership the plan did not result in a net increase in output and hence was not procompetitive."); *Bd of Regents of Okla. v. NCAA*, 707 F.2d 1147, 1154 (10th Cir. 1983) (using "consumption" and "viewership" interchangeably); *In re National Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) ("Our analysis of the complaint's allegations regarding those agreements is largely governed by the Supreme Court's decision in *NCAA*, which analyzed a similar league sports broadcasting arrangement under the Sherman Act, without any applicable statutory exemption." (cleaned up)).

[11] *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 119–120 (1984) ("Perhaps the most important reason for rejecting the argument that the interest in competitive balance is served by the television plan is the District Court's unambiguous and well-supported finding that many more games would be televised in a free market than under the NCAA plan. The hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of Reason is that equal competition will maximize consumer demand for the product. **The finding that consumption [*i.e.*, number of viewers] will materially increase if the controls are removed is a compelling demonstration that they do not in fact serve any such legitimate purpose**."); *see also id.* at 97 (explaining that the Court of Appeals noted that "since the plan involved a concomitant reduction in viewership the plan did not result in a net increase in output and hence was not procompetitive."); *Bd of Regents of Okla. v. NCAA*, 707 F.2d 1147, 1154 (10th Cir. 1983) (using "consumption" and "viewership" interchangeably); *In re National Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) ("Our analysis of the complaint's allegations regarding those agreements is largely governed by the Supreme Court's decision in *NCAA*, which analyzed a similar league sports broadcasting arrangement under the Sherman Act, without any applicable statutory exemption." (cleaned up)).

[12] *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 116-17, 119-20 (1984) ("There is, however, a more fundamental reason for rejecting this defense. The NCAA's argument that its television plan is necessary to protect live attendance is not based on a desire to maintain the integrity of college football as a distinct and attractive product, but rather on a fear that the product will not prove sufficiently attentive to draw live attendance when faced with competition from televised games. At bottom the NCAA's position is that ticket sales for most college games are

If you find that the challenged restraints did result in procompetitive benefits, then you also must consider whether the restraints were reasonably necessary to achieve the benefits.[13] If Plaintiffs prove that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraints.[14]

---

unable to compete in a free market. The television plan protects ticket sales by limiting output—just as any monopolist increases revenues by reducing output. By seeking to insulate live ticket sales from the full spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act.").

[13] ABA Antitrust 1-C-3.

[14] *Id.*

13

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' INSTRUCTION NO. 51:
RULE OF REASON – EVIDENCE OF PROCOMPETITIVE BENEFITS
AND CONSIDERATION OF LESS RESTRICTIVE ALTERNATIVES FOR
ANY SUCH BENEFITS**

Defendants object to Plaintiffs' proposed Instruction 51 because: (i) Plaintiffs' proposed instruction is an unjustified deviation from the model instruction that does not reflect developments in the case law on the rule of reason, both from the Supreme Court and in the Ninth Circuit; (ii) it conflates two distinct steps in the rule of reason analysis and will confuse the jury as to the proper analysis; and (iii) it improperly seeks to direct the jury to reject Defendants' procompetitive rationales on legally incorrect grounds. The Court should therefore reject Plaintiffs' proposed instruction and instead adopt Defendants' proposed Instructions 51 and 52, which accurately reflect the state of the law and will provide clear guidance to the jury on these steps of the rule of reason.

*First*, Plaintiffs' proposed Instruction 51 is a near complete deviation from the model instruction. Plaintiffs propose "modifications" that are untethered from the model language, and, unlike Defendants' proposed instruction, are not intended to update the instructions to account for recent and controlling developments in antitrust law. Rather, Plaintiffs' proposal is a hodge-podge of one-sided and out-of-context quotes intended to direct the jury to find in their favor, not to actually evaluate the reasonableness of the restraints.

Plaintiffs' proposed Instruction 51 is also not consistent with the most recent statement from the Ninth Circuit of what constitutes a cognizable procompetitive benefit or rationale. Plaintiffs seek to instruct the jury that Defendant must proffer evidence of "competitive benefits", which they define as those that "actually improved competition." Moreover, Plaintiffs insert the language "Defendants bear a

'heavy burden' to show 'a procompetitive rationale for the restraints.'"[15] However, both the Supreme Court and the Ninth Circuit have explained that, at step two of the rule of reason, the defendant must only "show a procompetitive rationale for the restraint," *Alston*, 594 U.S. at 96 (quoting *Am. Express*, 585 U.S. at 541), *i.e.*, the defendant must show that its conduct is "indeed a form of competition on the merits," ECF No. 1325, Order on Defs.' Mot. *in Limine* No. 7 (citing *Epic Games*, 67 F.4th at 986); *Qualcomm*, 969 F.3d at 991. The assertion that Defendants have a heavy or heightened burden in this case is a misstatement of the law. Plaintiffs rely on *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), for this proposition, but that case involved a "naked restriction on price or output," which imposes a higher burden for procompetitive justifications. As explained in Defendants' Objections to Plaintiffs' Proposed Instruction 49, ECF No. 1364 at 64, and in Defendants' Memorandum of Contentions of Fact and Law, ECF No. 1185 at 25–28, there is no naked restraint at issue in this case, and thus application of the standards for naked restraints is irrelevant and certainly has no place in the jury instructions.

Defendants' proposed Instructions 51 and 52, by contrast, closely match the governing precedent, and do not include the misleading suggestion that the procompetitive effects of a restraint on competition must directly increase competition. That is not an accurate statement of the law. Defendants do not have a burden to show that their conduct "improves competition"; rather, Defendants must show that their conduct is "a *form* of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Epic Games*, 67 F.4th at 986 (emphasis added); *Qualcomm*, 969 F.3d at 991; *id.* at 987 ("Antitrust law assumes that competition best allocates resources by allowing firms to compete on

---

[15] Defendants also object to Plaintiffs' general use of quotes throughout these instructions. There is no reason the language must be quoted, and doing so runs the risk of confusing and misleading the jury about the import of the language in quotes.

all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost." (quotations omitted)); *cf. Epic Games*, 67 F.4th at 989 (rejecting Epic's argument that rationales must increase competition in the antitrust market where the conduct has anticompetitive effects). Not every procompetitive rationale will "improve competition" as that phrase is likely to be understood colloquially by a jury. For example, in *Epic Games*, the Ninth Circuit credited Apple's argument that "it implemented the restrictions to be compensated for its IP investment" because the "desire to profit from intellectual property is presumptively procompetitive." *Epic Games*, 67 F.4th at 986 (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997) (cleaned up)). The Ninth Circuit similarly accepted Apple's argument that its security and privacy features, which were shown to have anticompetitive effects, were justified by Apple's objective to "tap[] into consumer demand and differentiat[e] its products from those of its competitors" because those "are plainly procompetitive rationales." *See id.* at 987. Plaintiffs' approach would be likely to mislead the jury to believe, wrongly, that certain of Defendants' proffered procompetitive rationales here—such as protecting Defendants' IP, incentivizing investments and innovation to improve product equality, facilitating cooperation and coordination among the NFL and NFL teams, maximizing fan reach and access, and promoting smaller-market teams—are not cognizable at step two of the rule of reason.

*Second*, Plaintiffs' attempt to combine the distinct steps two and three of the rule of reason will confuse the jury. The Supreme Court has explained that "[t]o determine whether a restraint violates the rule of reason, . . . a three-step, burden-shifting framework applies." *Amex*, 585 U.S. at 541; *accord Alston*, 594 U.S. at 96. The Ninth Circuit has similarly used this framework to evaluate restraints. *See Epic Games*, 67 F.4th at 983, 985–86, 990; *O'Bannon*, 802 F.3d at 1070. And in evaluating restraints under this framework, courts have addressed the framework by moving from one distinct step to the next, *i.e.*, without combining the steps. *See, e.g.*, *Epic*

*Games*, 67 F.4th at 983, 985–86, 990 (discussing and evaluating evidence separately at each "step" in the rule of reason); *O'Bannon*, 802 F.3d at 1070–79 (same); *see also Alston*, 594 U.S. at 102 (upholding the district court's "straightforward application of the rule of reason"). Here, Plaintiffs' proposal to address steps two and three of the rule of reason within the same instruction would risk confusion and invite error into the jury's analyses of whether Defendants have met their burden of production on procompetitive rationales and whether Plaintiffs have met their burden of proof as to substantially less restrictive alternatives. Moreover, as explained in Defendants' Objections to Plaintiffs' Instruction No. 47, Plaintiffs misstate their own burden at the third step (relying on the outdated model instruction language), which is to show a "substantially less restrictive alternative" that is "virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost." *See Epic Games*, 67 F.4th at 990 (cleaned up) (quoting *Cnty. of Tuolumne*, 236 F.3d at 1159); *see also* ECF No. 1325, Order on Defs.' Mot. *in Limine* No. 7 at 7 ("'If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means' ('step three')." (quoting *Am. Express*, 585 U.S. at 542)); *Epic Games*, 67 F.4th at 990 (As such, this circuit's test [for whether the procompetitive efficiencies could be reasonably achieved through less anticompetitive means]—which the Supreme Court approved in *Alston*—requires a "substantially less restrictive" alternative.").

Defendants' proposed instructions, on the other hand, appropriately update the step three instruction to incorporate the Ninth Circuit's guidance from *Epic Games* on (i) the burden-shifting framework, (ii) the "substantially less restrictive alternative" standard at step three, and (iii) the importance of "'resist[ing] the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objections.'" *Epic Games*, 67 F.4th at 990 (quoting *Alston*, 594 U.S. at 106); *see also Alston*, 594 U.S. at 99 ("[A]ntitrust law does not require

17

businesses to use anything like the least restrictive means of achieving legitimate
business purposes."), 101 ("Firms deserve substantial latitude to fashion agreements
that serve legitimate business interests[.]").

*Finally*, Plaintiffs propose to instruct the jury that "[w]ith respect to quality,
Defendants' burden is to prove the specific ways in which the restraints have
improved the quality of the product and that those specific improvements led to a
greater overall number of viewers than there would have been without the restraints,"
"[w]ith respect to all other alleged procompetitive benefits, Defendants' burden is to
prove that those alleged benefits led to a greater overall number of viewers than there
would have been without the restraints," and "[i]t is not procompetitive to restrict the
number of out-of-market game telecasts available to be seen or raise the price to see
those telecasts in order to protect the number of viewers for in-market game telecasts
on over-the-air television or to protect DirecTV from competition by cable TV,
satellite, or internet streaming providers," among other statements in the first
paragraph of the proposed instruction purporting to explain what are not cognizable
procompetitive rationales. There is no basis for these proposed deviations from the
model. Instead, these statements attempt to summarize (in a biased and inaccurate
way) certain of the NFL's properly articulated procompetitive rationales and then to
direct the jury to reject them as a matter of law. That attempt has no basis in the law
(or in fact), and it reflects another attempt by Plaintiffs to argue their case through
the jury instructions and direct the jury's verdict in their favor by implying that
Defendants have a heavier or higher burden in this case than is actually required.

Plaintiffs cite no authority that Defendants cannot present a cognizable
procompetitive rationale based on the argument that the NFL's agreements had the
effect of increasing free, over-the-air broadcasting, increasing output, and increasing
quality (including of Sunday Ticket itself) given the importance of telecasting
exclusivity, afforded and protected by the SBA, to OTA broadcasters. *See, e.g.*, ECF
No. 1292, Order on Pls.' Mot. *in Limine* No. 2 at 5 (explaining that "product quality

is a factor that can be relevant to showing a procompetitive rationale," so long as it is "related to the challenged restraint" (quoting *Epic Games*, 67 F.4th at 987; *NCAA*, 468 U.S. at 104)); *Epic Games*, 67 F.4th at 987 ("tapping into consumer demand" is a "plainly procompetitive rationale[]); *Qualcomm*, 969 F.3d at 991 (enhanced "consumer appeal" is a legitimate procompetitive rationale); *id.* at 986 ("We have held that IP-compensation is a cognizable procompetitive rationale[.]" (citing *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997) ("desire to profit from . . . intellectual property" is presumptively procompetitive))). Plaintiffs' citation to *Professional Engineers* is no more support for including these biased statements in the jury instructions; as the Ninth Circuit just explained in *Epic Games*, *Professional Engineers* involved a request for a judge-made exemption from the Rule of Reason, but it did not change the "normal operation of the Rule of Reason." *See Epic Games*, 67 F.4th at 988–89 ("[Plaintiff's] selection of quotes from *Professional Engineers* and other cases—without acknowledging the distinct context in which they occurred—is unconvincing."). Moreover, Plaintiffs cite no justification for separating the quality procompetitive justification from "all other[s]," especially given that the instruction to the jury for evaluating those justifications is the same.

**PLAINTIFFS' REPLY IN SUPPORT OF INSTRUCTION NO. 51: RULE OF REASON – EVIDENCE OF PROCOMPETITIVE BENEFITS AND CONSIDERATION OF LESS RESTRICTIVE ALTERNATIVES FOR ANY SUCH BENEFITS**

Plaintiffs' proposed instruction hews closely to the ABA model instruction on the Rule of Reason, with additional clarifications to tailor the instructions to the facts of this case. These clarifications are necessary so that the jury understands how to analyze Defendants' evidence about product quality—among other alleged procompetitive justifications—that is untethered to any of the ***challenged restraints*** (namely (1) the teams' agreement not to compete with one another in the licensing of their telecast rights; (2) the NFL's licensing of out-of-market telecasts to a single, exclusive provider; and (3) the NFL's requirement that Sunday Ticket be sold to consumers at a high, "premium" price). As this Court has recognized, "the ***only permissible argument*** is that the restraints are what make the product high quality." Dkt. 1292, Order on Plaintiffs' Motion *in Limine* No. 2 at 5. Plaintiffs' instruction makes this clear to the jury.

As an initial matter, it is the ABA model instruction, not Plaintiffs, that recommends combining steps two and three of the Rule of Reason analysis into one instruction. *See* ABA Antitrust 1-C-3. That model instruction makes clear that Defendants bear the burden of establishing procompetitive benefits at Step 2 and that Plaintiffs bear the burden of demonstrating less restrictive alternatives at Step 3. Plaintiffs' instruction on the general operation of Steps 2 and 3 are near-verbatim replications of the ABA model. The instruction in Step 3 that the same benefits could have been achieved "by other reasonable available alternative means" is consistent with the longstanding law cited by Defendants in their objection. Defendants present no reason to deviate from that model instruction in this case.

Plaintiffs' additions to the ABA model instruction will help the jury analyze the procompetitive benefits that Defendants allege in this case. Each addition is

supported by relevant caselaw. Most reflect orders issued by this Court on these very issues.

The first addition—the instruction that "Defendants bear a heavy burden to show a procompetitive rationale for the restraints"—comes directly from this Court's orders on Defendants' Motion for Summary Judgment *and* Defendants' Motion *in Limine* No. 7. Dkt. 1325, Order on Defs. MIL No. 7 at 7; Dkt. 1155, MSJ Order at 18 ("Under the Rule of Reason, these hallmarks of anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." (quoting *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 113 (1984)). The Court appropriately cited language directly from the Supreme Court's decision in *Board of Regents*, which the Ninth Circuit determined "controls [the] analysis" here. *In re NFL Sunday Ticket,* 933 F.3d 1136, 1151 (9th Cir. 2019).

The second addition—that Defendants "bear the burden of producing evidence regarding the existence of competitive benefits."—likewise comes from this Court's order on Defendants' Motion in Limine No. 7. *See* Dkt. 1325 at 7 ("Defendant has the burden of producing evidence regarding the existence of competitive benefits . . .").

The third addition—that procompetitive benefits must be "[non]pretextual and [must have] actually improve[d] competition."—is again drawn from this Court's orders. *See id.* ("At step two—determining whether there is a procompetitive rationale that is not pretextual and actually improves competition—Defendants are obligated to show *some* kind of evidence in support of their procompetitive rationale."). Instructing jurors that the alleged rationale must improve competition is not only consistent with the law, but also a concept that jurors are likely to understand.  By contrast, Defendants propose to use the term "form" of competition on the merits, an unclear term that is not readily applicable to product quality, innovation, or competitive balance and may lead to jury confusion.

The fourth addition—that "The Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable"—comes directly from *Board of Regents. See* 468 U.S. at 117 ("[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." (quoting *Nat'l Soc. of Prof. Eng'rs v. U.S.*, 435 U.S. 679, 696 (1978)). The same is true of Plaintiffs' addition that "[i]t is not procompetitive to restrict the number of out-of-market game telecasts available to be seen or raise the price to see those telecasts in order to protect the number of viewers for in-market game telecasts on over-the-air television or to protect DirecTV from competition by cable TV, satellite, or internet streaming providers." In *Board of Regents*, the Supreme Court rejected "[t]he NCAA's argument that its television plan is necessary to protect live attendance," or "to maintain the integrity of college football as a distinct and attractive product." *Id.* The Court found that limiting output of telecasts in order "to insulate live ticket sales from the full spectrum of competition" was "inconsistent with the basic policy of the Sherman Act" because it was based on an "assumption that the product itself is insufficiently attractive to consumers." *Id.* Defendants' alleged procompetitive justification that limiting the output of *out-of-market* games is necessary to protect the *in-market* games broadcast by CBS and Fox from competition is based on the same flawed assumption—that in-market games would be unable to compete in a free market. Indeed, although Defendants replace "live attendance" with "in-market games," they are proffering the same affirmative defense that the Supreme Court rejected in *Board of Regents*. The jury must therefore be instructed that such a defense is not cognizable under the Sherman Act.

Lastly, the jury must be instructed that they should consider only alleged procompetitive benefits that actually promote competition in the relevant market. Defendants' bear the burden of proving that each of their procompetitive justifications—whether product quality, product innovation, or competitive balance—resulted in "greater efficiency or enhanced consumer appeal." *Epic Games*,

67 F.4th at 986 (emphasis added).  In this case, however, the relevant indicator of consumer appeal (or competition) in the market for live telecasts of professional football games is viewership. *Board of Regents* made this clear in rejecting the NCAA's proffered justification of competitive balance:

> Perhaps the most important reason for rejecting the argument that the interest in competitive balance is served by the television plan is the District Court's unambiguous and well-supported finding that many more games would be televised in a free market than under the NCAA plan. The hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of Reason is that equal competition will maximize consumer demand for the product. **The finding that consumption will materially increase if the controls are removed is a compelling demonstration that they do not in fact serve any such legitimate purpose**.").

*Id.* at 119–20. The Supreme Court further endorsed the Tenth Circuit Court of Appeals' view that "since the plan involved a concomitant reduction in viewership the plan did not result in a net increase in output and hence was not procompetitive."). *See also Bd of Regents of Okla. v. NCAA*, 707 F.2d 1147, 1154 (10th Cir. 1983) (using "consumption" and "viewership" interchangeably).  In sum, any alleged benefits to the product are only cognizable as procompetitive benefits if they enhance the viewership of NFL football. It is therefore appropriate to instruct the jury that "Defendants' burden is to prove that those alleged benefits led to a greater overall number of viewers than there would have been without the restraints."

Dated:  June 14, 2024                                Respectfully submitted,

By:   /s/ Marc M. Seltzer
        Marc M. Seltzer

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
Eliza Finley (301308)

23

efinley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
One Manhattan West
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfled.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)

24

hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*