Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max J. Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 10th Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5429
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. 2:15-ml-02668−PSG (SKx)<br><br>**DEFENDANTS' PROPOSED SUPPLEMENTAL FINAL JURY INSTRUCTIONS**<br><br>Judge: Hon. Philip S. Gutierrez<br>Trial Date: June 5, 2024<br>Courtroom: First Street Courthouse<br>    350 West 1st Street<br>    Courtroom 6A<br>    Los Angeles, CA 90012 |

# INDEX OF DEFENDANTS' PROPOSED SUPPLEMENTAL FINAL INSTRUCTIONS

| NO. | TITLE | SOURCE | PAGE |
|------|-------|--------|------|
| **FINAL INSTRUCTIONS** | | | |
| 33.1 | Documents Admitted for Impeachment Purposes | 9th Cir. MMCJI §§ 1.11, 2.9; Cases | 1 |
| 40.1 | No Price-Fixing Conspiracy Claim | Cases | 7 |
| 40.2 | .TV Pricing | Cases | 18 |
| 54 | Reasonableness of Price | Cases | 23 |

# FULL INDEX OF DEFENDANTS' PROPOSED FINAL INSTRUCTIONS

| NO. | TITLE | SOURCE |
|-----|-------|--------|
| 27 | Two or More Parties—Different Legal Rights | 9th Cir. § 1.8 |
| 28 | Corporate Entities | 9th Cir. § 4.1; ABA Antitrust 2-A-3; Cases |
| 33.1 | Documents Admitted for Impeachment Purposes | 9th Cir. §§ 1.11, 2.9; Cases |
| 34 | Expert Opinion | 9th Cir. § 2.13 |
| 37 | Sports Broadcasting Act Exemption | Cases |
| 38 | Plaintiffs' Claims | Cases |
| 39 | Sherman Act Section 1 | ABA Antitrust 1-B-2 |
| 40 | Existence of a Contract, Combination, or Conspiracy | ABA Antitrust 2-A-1; Cases |
| 40.1 | No Price-Fixing Conspiracy Claim | Cases |
| 40.2 | .TV Pricing | Cases |
| 45 | Participation and Intent | ABA Antitrust 2-A-4 |
| 46 | Single Entity | Cases |
| 47 | Rule of Reason—Overview | ABA Antitrust 1-C-3A; Cases |
| 48 | Relevant Product Market | ABA Antitrust 3-A-3, 3-A-4 |
| 49 | Rule of Reason—Proof of Competitive Harm | ABA Antitrust 1-C-3B |
| 50 | Exclusive Licensing Agreements | 9th Cir. §§ 15.16, 17.13; ABA Antitrust 2-D-5, 4-A-1, 4-A-2; Cases |
| 51 | Rule of Reason—Evidence of Procompetitive Benefits or Rationales | ABA Antitrust 1-C-3C; Cases |
| 52 | Rule of Reason—Assessing the Procompetitive Benefits and Rationales | ABA Antitrust 1-C-3C; 1-C-3D Cases |
| 54 | Reasonableness of Price | Cases |
| 56 | Elements of Conspiracy to Monopolize | ABA Antitrust 3- |

ii

| NO. | TITLE | SOURCE |
|-----|-------|--------|
| | | E-1; Cases |
| 57 | Existence of a Conspiracy | ABA Antitrust 3-E-2, 2-A-1; Cases |
| 58 | Monopoly Power Defined | ABA Antitrust 3-E-3, 3-A-2; Cases |
| 62 | Willful Acquisition or Maintenance of Monopoly Power | ABA Antitrust 3-E-3, 3-A-9; Cases |
| 63 | Specific Intent | ABA Antitrust 3-E-4 |
| 65 | Injury and Causation | ABA Antitrust 6-A-1 |
| 66 | Business or Property | ABA Antitrust 6-A-2 |
| 67 | Relevant Time Period | ABA Antitrust 7-A-1; Cases |
| 68 | Antitrust Damages—Introduction and Purpose | ABA Antitrust 6-B-1 |
| 70 | Causation and Disaggregation | ABA Antitrust 6-B-4 |
| 71 | Damages for Purchasers—Overcharges Based on Horizontal Price Fixing, Output Restriction, Market Allocation, or Other Agreements Not to Compete | ABA Antitrust 6-B-5 |
| 72 | Damages for Purchasers—Class Damages | ABA Antitrust 6-B-7 |
| 74 | Mitigation | ABA Antitrust 6-B-14 |
| 75 | Direct Purchaser Requirement | Cases |
| 76 | Class-Wide Injury and Causation | Cases |

iii

# FINAL JURY INSTRUCTIONS

## INSTRUCTIONS ON THE TRIAL PROCESS AND EVIDENCE

## INSTRUCTION NO. 33.1: DOCUMENTS ADMITTED FOR IMPEACHMENT PURPOSES

Certain documents have been admitted into evidence only for the limited purpose of assessing the credibility of certain deposition testimony that has been played by video.

Those documents are: [LIST OF ADMITTED 806 DOCS].

These documents may be considered in deciding whether or not to believe the video deposition testimony allegedly contradicted by such documents and how much weight to give to such testimony. Those documents may not be used or considered for any other purpose.

**Authority:** MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT §§ 1.11 (Evidence for Limited Purpose), 2.9 (Impeachment Evidence) (9th Cir. Jury Instructions Comm. 2017 ed.); *Gregory v. City of Vallejo*, 2015 WL 13655455, at *2 (E.D. Cal. Jan. 22, 2015) (allowing admission of extrinsic evidence for "the sole purpose of impeachment" and anticipating issuing a limiting instruction on that issue); *United States v. Gomez-Gallardo*, 915 F.2d 553, 555 (9th Cir. 1990) ("The maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer[.]" (cleaned up)); *United States v. Gilbert*, 57 F.3d 709, 711 (9th Cir. 1995) ("Impeachment is improper when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible."); *United States v. Finley*, 934 F.2d 837, 839 (7th Cir. 1991) ("Rule 806 extends the privilege of impeaching the declarant of a hearsay statement but does not obliterate the rules of evidence that govern how impeachment is to proceed."); *Smith v. California*, 350 F. App'x 178,

1    180 (9th Cir. 2009) (emphasizing the importance of a limiting instruction to

2    "ameliorate possible prejudice" when evidence is admitted for limited impeachment

3    purposes).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 33.1:**

**DOCUMENTS ADMITTED FOR IMPEACHMENT PURPOSES**

Defendants' proposed instruction is unnecessary and improper because each one of the trial exhibits that the Court admitted under Rule 806 is independently admissible as relevant, authentic, and non-hearsay.  It is well-settled that evidence *admitted* for impeachment purposes can be considered for its truth so long as it is independently admissible. *See United States v. Morgan*, 555 F.2d 238, 242 (9th Cir. 1977) (affirming admission of statements "not only for impeachment purposes, but also as substantive evidence of the appellant's guilt"); *United States v. Castro-Ayon*, 537 F.2d 1055, 1057 (9th Cir. 1976) (stating that "[s]ome prior statements are now admissible for their substantive value as well as for impeachment" under the Federal Rules of Evidence).

Each of the documents bears on the NFL's control over the price that DirecTV charged class members for NFL Sunday Ticket. This Court has recognized the relevance of that contention to Plaintiffs' claims. *See* Dkt. 1303 at 1 ("any evidence of price fixing between Defendants and DirecTV is plainly relevant to Plaintiffs' claims."). The documents admitted to impeach the deposition testimony of Brent Lawton and Hans Schroeder are party-opponent statements contained in documents produced from the NFL's own files. They are therefore deemed authentic by operation of law. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 972 (C.D. Cal. 2006) ("Authentication can be accomplished by judicial admission, such . . . production of the items at issue in response to a discovery request[.]"). The statements contained therein are not hearsay because they were made by NFL employees on matters within the scope of that employment relationship, including the pricing of NFL Sunday Ticket. Fed. R. Evid. 801(d)(2)(D). Each of the documents admitted to impeach DirecTV employees Robert Stecklow, Jamie Dyckes, and Alex Kaplan are DirecTV documents that have been authenticated

by a business records affidavit.  Fed. R. Evid. 902(11).  They are non-hearsay for two reasons: as records of a regularly conducted activity under Rule 803(6) and as statements made by the NFL's coconspirator during and in furtherance of the conspiracy to fix prices under Rule 801(d)(2)(E).

The jury should consider these documents for the truth.  There should be no limiting instruction.

4

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 33.1: DOCUMENTS ADMITTED FOR IMPEACHMENT PURPOSES

Having submitted several documents for the purposes of impeachment, Plaintiffs now seek to expand their use—without sufficient foundation or establishing admissibility—and offer them as substantive proof of their underlying claims. The Court should reject this improper bait-and-switch and offer Defendants' instruction to clarify the limited purpose for which the jury can consider these documents.

Plaintiffs explicitly sought to admit the evidence at issue "under Rule 806, which allows for *impeachment* evidence for hearsay declarants." 6/6/24 Trial Tr. at 187:1–3 (emphasis added); *accord* 6/7/24 Trial Tr. at 310:9–312:1. As a result, the limitations inherent to impeachment evidence mean that the documents that have been admitted under Rule 806 are relevant *only* to witness credibility and cannot be considered for any substantive purpose. The Ninth Circuit has been explicit on this point: "**The maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised.**" *United States v. Gomez-Gallardo*, 915 F.2d 553, 555 (9th Cir. 1990) (emphasis added) (cleaned up); *see Masimo Corp. v. Apple Inc.* 2023 WL 3432126, at *1 (C.D. Cal. Mar. 15, 2023) (admonishing parties not to step outside of the bounds set by *Gomez*). "Impeachment in this context refers to attacks on the credibility of a witness," whereas testimony is "substantive . . . if it relates to a plaintiff's prima facie case or a defendant's affirmative defenses." *Mort v. DeJoy*, 2022 WL 14129778, at *1 (E.D. Cal. Oct. 24, 2022) (cleaned up).

Notwithstanding the limits that apply to impeachment evidence, Plaintiffs have been clear that they intend improperly to use these documents substantively—as purported evidence of their theory that the NFL and not DirecTV controlled the price of Sunday Ticket. 6/7/24 Trial Tr. at 310:9–312:1. Their opposition to this limiting

instruction therefore amounts to just another attempt to ambush Defendants with documents that this Court has repeatedly rejected. *See* 6/6/24 Trial Tr. at 223:10–25; *id.* at 233:15–23; 6/11/24 Trial Tr. at 914:12– 915:8; 6/13/24 Trial Tr. at 1160:17– 1163:8. Having failed to admit these evidence for any purpose other than impeachment, Plaintiffs should not now be permitted to oppose a routine instruction explaining the limitations inherent to impeachment evidence.

6

## SECTION I CLAIM

## INSTRUCTION NO. 40.1: NO PRICE-FIXING CONSPIRACY CLAIM

You may have heard references during attorneys' arguments and during trial to the concept of "price-fixing" or "fixed prices."  I instruct you to disregard any such references.  This is not a price-fixing case.   You should evaluate Plaintiffs' claims applying only the law as I have instructed you.

**Authority**: *Compare Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (The term price-fixing refers to "horizontal agreements among competitors to fix prices."); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2–Section 1 of the Sherman Act—Horizontal Price Fixing, Instruction 1: General Elements (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (requiring proof of an "agreement among *competitors*" (emphasis added)), *with* Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 2000 (The "price-fixing" label "is not invoked by [vertical] agreements that merely 'affect' the price;" instead "a rather explicit agreement setting 'price or price levels,'" is required before an agreement constitutes "price-fixing"); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979) (explaining that the literal use of the term "price fixing" any time two entities set a price for a product "is overly simplistic and often overbroad"); *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006) (distinguishing between "price fixing in a literal sense" and "price fixing in the antitrust sense"); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019) ("Here, the plaintiffs allege that DirecTV has conspired with the NFL and the NFL teams. According to the complaint, the conspiracy involves both the Teams-NFL agreement and the NFL-DirecTV agreement, which work together as a single conspiracy to limit the *output* of NFL telecasts. This *output limitation* in turn results in prices for out-of-market games

7

being higher than they would be in the absence of the conspiracy." (emphasis added)); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *1 (C.D. Cal. Jan. 11, 2024) ("Plaintiffs assert that Defendants have conspired and entered a set of agreements with each other and their broadcast partners that suppress the *output* of telecasts of out-of-market professional football games." (emphasis added)); ECF No. 184 (Pls.' Opp. Defs.' Mot. Dismiss) at 22–23 ("Defendants have manipulated the market at the retail level, *not by an explicit agreement on price*, but through a series of agreements to divide the market and restrain output." (emphasis added)); Opening Brief for Plaintiffs-Appellants at 70, *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, No. 17-56119 (9th Cir. Feb. 5, 2018) ("Here, defendants have manipulated the market not by an explicit agreement on price, but through a series of agreements to divide the market and restrain *output* at the retail level, which results in supracompetitive pricing." (emphasis in original)); ECF No. 628 (Pls.' Mot. Cert. Class) at 2 & n.2 (describing their case as a conspiracy to "restrain competition . . . in the output of telecasts" and adopting the "detailed recitation of Plaintiffs' claims . . . in the Ninth Circuit's opinion."); ECF No. 964 (Pls.' Mem. Opp. Defs.' Mot. Summ. J.) at 2 n.1 ("Plaintiffs have consistently . . .  argued that the[ challenged agreements] operate together to restrain the output of OOM telecasts."); Respondents' Brief in Opposition at 30–31, *Nat'l Football League v. Ninth Inning, Inc.*, No. 19-1098 (S. Ct. July 14, 2020) (arguing that the price-fixing conspiracy exception to *Illinois Brick* "is equally applicable to an output-restriction conspiracy, *such as the situation here*" (emphasis added)).

8

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 40.1: NO PRICE-FIXING CONSPIRACY CLAIM

Defendants' proposed instruction is unnecessary, confusing, and contrary to the law. There is no dispute that Defendants' liability should be determined by the rule of reason. Plaintiffs' proposed jury instructions reflect that. Defendants' proposed final instruction is nothing but a reiteration of the proposed curative instruction that this Court has already rejected. *See* June 10, 2024 Transcript at 473-474.

Even though Plaintiffs do not contend that Defendants' conduct amounts to a *per se* violation of the antitrust laws, price fixing is nevertheless a core issue in this case. In denying a defense motion *in limine* on pricing, this Court held that "Defendants' role in Sunday Ticket pricing is a key issue at trial[.]"). Order on Defendants' Motion *in Limine* No. 4, Dkt. No. 1305 at 4.  And in denying a motion to compel privileged documents, this Court explained, "At issue in the case is whether Defendants and their broadcast partners have conspired and entered a set of agreements that have enabled DirecTV to charge supracompetitive prices for Sunday Ticket…. Accordingly, any evidence of price fixing between Defendants and DirecTV is plainly relevant to Plaintiffs' claims." Order Denying Motion to Compel Documents Withheld as Privileged at 2 (Dkt. 1303) (internal citation omitted).

Defendants are wrong to suggest that proof of price-fixing is improper in Rule of Reason cases. The controlling law is exactly the opposite. In *NCAA*, the Court held that plaintiff proved anticompetitive effects in a Rule of Reason case—what is now Step 1 in Rule of Reason analysis—precisely because plaintiffs proved horizontal price-fixing:

> The anticompetitive consequences of this arrangement are apparent. Individual competitors lose their freedom to compete. Price is higher and output lower than they would otherwise be, and both are

9

1      unresponsive to consumer preference… Restrictions on price and output

2      are the paradigmatic examples of restraints of trade that the Sherman

3      Act was intended to prohibit.

4  *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 106 (1984); *National*

5  *Collegiate Athletic Association v. Alston*, 594 U.S. 69, 91 (2021) (observing that

6  "*Board of Regents* explained that the league's television rules amounted to

7  'horizontal price fixing and output limitations'") (cleaned up); *F.T.C. v. Superior*

8  *Court Trial Lawyers Ass'n*, 493 U.S. 411, 423 (1990) (describing *Board of Regents*

9  as a "horizontal arrangement among these competitors" and that such a horizontal

10  agreement "was unquestionably a 'naked restraint' on price and output"); *Dagher v.*

11  *Saudi Refining, Inc.*, 369 F.3d 1108, 1118 (9th Cir. 2004) (describing *Board of*

12  *Regents* as concluding that 'an agreement among NCAA schools restricting the

13  broadcasting of football games was an invalid 'naked restraint on price and output'").

14  The same is true here: Plaintiffs plan to prove that the anticompetitive effects in Step

15  1 include the horizontal price-fixing. Here, among the networks, DTV, the NFL and

16  its 32 member teams.

17      Following the *NCAA* decision, it is black-letter law that price-fixing is a

18  cognizable restraint under the Rule of Reason. *State Oil Co. v. Khan,* 522 U.S. 3, 22

19  (1997) ("vertical maximum price fixing, like the majority of commercial

20  arrangements subject to the antitrust laws, should be evaluated under the rule of

21  reason."); *accord Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006) (holding that

22  allegations of price-fixing should have been evaluated under the rule of reason). It

23  would therefore be error to instruct the jury to "disregard" any evidence of, or

24  references, to price-fixing in this case.

25      Plaintiffs have long contended that the NFL, networks, and Direct TV agreed

26  to charge an artificially high premium price for Sunday Ticket, as a method of

27  maintaining a low number of telecasts to protect the rights fees that CBS and Fox pay

28

Defendants. Plaintiffs' expert Professor Dan Rascher has always been clear that a core allegation in this case is that the defendants, networks, and DirecTV agreed to artificially raise the price of Sunday Ticket in order to limit distribution, which is the core price-fixing allegation.  *See* Rascher, Merits Report, ¶ 87 ("by jointly agreeing to restrict many of the weekly telecasts into a specific, premium product, Defendants have raised the price"); ¶ 93 n. 105 ("It is my understanding that this economic finding of direct competitive effects may be pertinent to what the Supreme Court called "naked restriction on price or output…" (NCAA v. Board of Regents of University of Oklahoma (1984), 468 U.S. 85, p. 109)" and similar cases explain "why I do not discuss market power in this direct effects portion of my analysis: "when there is an agreement not to compete in terms of price or output,'"); ¶ 98 ("From Defendant witness testimony and documents, it is clear is the NFL Defendants' goal for imposing this "premium" was to ensure that fewer consumers would subscribe to the product than if DirecTV (or any provider) had freedom to set their preferred pricing levels."); ¶ 99 ("The testimony of the CBS and FOX witnesses also makes clear that for those contracts to be considered "premium," Sunday Ticket had to carry a high price."); ¶ 117 ("the Challenged Conduct explicitly elevated price" and "the price for Sunday Ticket was relatively high as a result of the requirement to sell only a premium subscription product"); ¶ 133 ("The limited availability of the Sunday Ticket product, through its premium price and its limited reach via DirecTV, was and is intentional"); ¶ 407 ("the restraint imposed by the NFL on DirecTV, requiring that Sunday Ticket be sold as a "premium" standalone product, i.e., a higher priced product, would be unnecessary if the NFL were not concerned that DirecTV would otherwise want to lower the price. Thus, the economic evidence demonstrates that in the BFW with more competition, prices would decline.").

This theory was also pled in the complaint and argued at class certification and summary judgment. *See, e.g.,* Second Amended Complaint ¶ 46 (Dkt. 441)

("Defendants have engaged in and are continuing to engage in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of video presentations of live Sunday NFL games by eliminating competition among presenters of out-of-market NFL games."); Plaintiffs' Motion for Class Certification at 14-15 (Dkt. 630) ("Plaintiffs will show that the NFL and its clubs intended to restrain trade by restricting the output of the out-of-market telecasts and by making the high price of Sunday Ticket a 'priority.'"); Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defendants have been upfront that they insisted Sunday Ticket be sold exclusively on DirecTV at supracompetitive 'premium prices' to protect the networks from competing telecasts so that those networks would pay Defendants more."); Plaintiffs' Statement of Undisputed Facts (Dkt. 964-1) No. 245 ("The NFL exerts influence over the retail price and package composition of NFL Sunday Ticket."); Plaintiffs' Motion to Compel Production of Documents Withheld as Privileged at 9 (Dkt. 1265-1) ("Direct evidence of price fixing plainly supports Plaintiffs' claims in this case and also directly bears on the NFL's arguments and contentions to the contrary."). The evidence has amply supported these allegations. *See, e.g.*, TX-750 (CBS email to NFL: "The concept has always been that these packages are sold at a premium, thereby limiting distribution").

Defendants overlook all this and contend that this case is not about horizontal price-fixing because it allegedly only involves a "vertical" constraint. At best, that is a hotly disputed issue of fact: plaintiffs' theory, supported by ample proof, is that there are several sets of interlocking *horizontal* restraints affecting price: (a) CBS, FOX, DTV and NFL Network are head-to-head competitors that have improperly made agreements affecting the price of Sunday Ticket; and (b) the 32 teams are horizontal competitors that have improperly made agreements that affect the price of Sunday Ticket.

As to the first set of interlocking horizontal agreements, there is ample testimony that CBS, Fox and DTV are direct head-to-head competitors who have made agreements affecting price in order to limit their competition. *See* Rascher, p. 725:8-12 (6/11/24) ("So the impact is that Sunday Ticket is very expensive because of the exclusivity, but also because of the horizontal -- you know, horizontal control from FOX and CBS through the NFL to then cause an even higher price for Sunday Ticket to keep those subscriptions down."); *id.* at 7:16:2–11 ("So [NFL Network is] a competitor alongside FOX and – and CBS and Sunday Ticket."); Larry Jones p. 543:5-18 (June 10) (testimony that Fox likes to view DirecTV as "complementary" to its Sunday Afternoon games rather a competitor because of restrictions that protect the exclusivity of Fox's games); *id.* at 392:9-15 ("Q: And then we see the NFL with DirecTV requiring, on that same day, that if DirecTV's going to be offering RedZone, you got to pay – a fan has to pay $100 more, correct? A: Yeah. I – you've kind of lost me, but the answer to your question is that CBS, like FOX, was concerned about negatively impacting their Sunday Afternoon packages. So they would love to have as little competition as possible."); B. Rolapp (6/12/24) p. 1114:7–11 ("Q: My question—I'll make it as simple as I can. Was it the NFL's goal to make Sunday Ticket – to make sure it was a complement to and not a substitute of the network Sunday Afternoon games? A: I think that's fair.").

Even the NFL's opening argued that CBS and FOX wanted to limit distribution of Sunday Ticket so they are not giving their games away "to their competitors," namely DTV.  NFL Opening, 162:21-163:4 ("You didn't hear that. You heard this **why would CBS and FOX be interested in what happens with Sunday Ticket**? **Because it's their broadcast**. They are giving it to the NFL and sharing it for limited purposes, only for Sunday Ticket. That's what people do with their intellectual property. **They don't just give it to their competitors** so that they spend all the money creating it and making it and then give it away. They are doing that to serve

those avid fans in the out-of-market games, but they're still watching their game.").

The NFL also was a head-to-head competitor with the streaming product joint venture (if that's what we're calling it) with DTV. Each team and the NFL were potential direct head-to-head competitors for at least a streaming product for out-of-market games.  The agreement between CBS, Fox, and DTV, orchestrated by the NFL and acting an intermediatior between CBS, Fox and DTV was to artificially fix the price of ST sold by DTV to subscribers for the purpose of depressing subscriptions and viewership of the games.  The agreed upon restriction in output was expressly tied to—and went hand in hand with—the raising of the price of Sunday Ticket.  Output was restricted by raising the price.   NFL also stood in a licensing arrangement with CBS, Fox and DTV which allowed it to use its monopoly power to control the price of Sunday Ticket for the express purpose of limiting competition between CBS, Fox and DTV in making the same product, namely, NFL game telecasts, available to be seen.   Doing so enabled it to extract monopoly profits from CBS, Fox and DTV.  This was a web of agreements that had as a core element the fixing of prices of the same product.  Defendants' instruction would be another example of their effort to slice and dice the web of agreements into component parts and consider them separately in violation of the 9th Circuit's mandate and basic principles of antitrust law. And that is what Plaintiffs have always alleged contrary to the Defendants' efforts to mischaracterize the case. *See also* TX-416 (Brent Lawton shares "proposed" NFL Sunday Ticket pricing with Brian Rolapp before price is announced publicly); TX-438 (Talking points in which NFL told CBS that broadband Sunday Ticket product will be priced at $250-$300); TX-457 (email from Robert Stecklow stating that the NFL "100% have agreed on pricing every year in a meeting just like yesterday"); TX-536 (DirecTV emails stating that NFL wants streaming packages to "mirror" the satellite pricing); TX-618 (NFL presentation noting that NFL wants all streaming subscribers "at satellite parity"); TX-684 (Brent

14

Lawton sends Hans Schroder "agreed-to" pricing for Sunday Ticket).

As to the fact that the NFL agreements affecting price involve horizontal restraints among the 32 NFL teams, *NCAA* is squarely on point. *NCAA*, 468 U.S. at 99 ("By participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint—an agreement among competitors on the way in which they will compete with one another."). The same is true here: by participating in NFL agreements affecting price, and agreeing not to compete with the Sunday Ticket package or its premium price, the NFL teams "have create a horizontal restraint." At the very least, that is an issue of fact for the jury.

Defendants' instruction is confusing for another reason. Instructing the jury that "[t]his is not a price-fixing case" would only confuse the jury's role under the rule of reason. Plaintiffs do not need to prove an express agreement to control the exact amount of price as price fixing can be effectuated by any kind of mechanism, including restricting output or buying up supply. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se."); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("the fixing of a component of price violates the antitrust laws"); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) ("[C]redit terms must be characterized as an inseparable part of the price. An agreement to terminate the practice of giving credit is thus tantamount to . . . price fixing.").

15

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 40.1: NO PRICE-FIXING CONSPIRACY CLAIM

Plaintiffs' opening statement fundamentally misstated what is at issue in this case. Counsel told the jury, on at least twelve separate occasions, that this is a price-fixing case. *See* 6/6/24 Trial Tr. at 104:9–105:19; 110:17–23; 121:5–9; 122:9–22; 123:5–7; 129:16–20; 131:4–8, 19–23; 132:11–13; 134:12–16; 137:18–19; 294:11–18. Plaintiffs also asked at least one witness if he knows that price fixing is illegal. *Id.* at 294:11–18.

But this case does not involve price-fixing. "Price-fixing" is a term of art in antitrust law, referring to agreements between horizontal competitors to fix prices, which are per se illegal. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. at 9. ("As generally used in the antitrust field, 'price fixing' is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable."); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006) (distinguishing between "price fixing in a literal sense" and "price fixing in the antitrust sense"); *see also Perez v. State Farm Mutual Automobile Insurance Company*, 291 F.R.D. 425 (N.D. Cal. 2013), *aff'd*, 628 F. App'x 534 (9th Cir. 2016) (rejecting an attempt to "reframe" a Section 1 claim theory based on quality restrictions as a "price-fixing" conspiracy after expert discovery had closed, despite references to "price-fixing" in the complaint and mention of "anticompetitive prices" in a Ninth Circuit opinion on the case).

That description does not fit this case at all. Plaintiffs' opening statement at this trial was the very first time that Plaintiffs have suggested that this case involves *per se* price-fixing—until last week, their representations to Defendants, to the Ninth Circuit, and to this Court had been that this was a rule of reason case. *See, e.g.*, ECF No. 184, Pls.' Opp. Defs.' Mot. Dismiss at 22–23 ("Defendants have manipulated

the market at the retail level, *not by an explicit agreement on price*, but through a series of agreements to divide the market and restrain output." (emphasis added)); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019) (distinguishing between a price-fixing conspiracy and "the conspiracy in this case[,which ] involved an output restriction"); *see also id.* at 1150 (applying the rule of reason to this case).

Plaintiffs thus concede that they are not asserting a case that follows from the template of *per se* illegal price fixing that they presented to the jury in the form of their coffee-shop example. They "do not contend that Defendants' conduct amounts to a *per se* violation of the antitrust laws." Nor could they.

Plaintiffs' repeated efforts to cast about to find a set of horizontal competitors that allegedly agree on price ultimately proves Defendants' point. The Ninth Circuit did not describe this case as a price-fixing case, or as one where horizontal competitors agreed on price—to the contrary, the Ninth Circuit asserted that the horizontal and vertical agreements need to be evaluated together under the rule of reason. *Sunday Ticket*, 933 F.3d at 1150–52. Plaintiffs likewise have always claimed that this case is about a restriction on output, as the examples above show.

Nor is this just a situation of loose language that can be disregarded. Plaintiffs repeatedly said during opening this is a price-fixing case, which is a term with prejudicial connotations that do not fit the facts of this case. A curative instruction is necessary to make clear what is, and is not, for the jury to decide.

17

### INSTRUCTION NO. 40.2: .TV PRICING

You have heard evidence and argument throughout trial regarding the nflsundayticket.TV product (sometimes referred to as just ".TV" or as the broadband or whitespace product). You are not being asked to determine whether the agreements that created the .TV product unreasonably restrained trade, or to consider the effect of Defendants' conduct on prices or purchases of the .TV product. The parties agree that purchases of the .TV product are not at issue in this case. Instead, the members of the class in this case are only those people and businesses that purchased the Sunday Ticket product available on satellite television.

**Authority**: ECF No. 633-1 (Mem. Supp. Pls.' Mot. Class Cert.) at 1 n.1 ("Purchasers of the NFLST.tv streaming service are not DirecTV satellite subscribers and are therefore not part of either class."); ECF No. 1305 (Order on Defs.' Mot. *in Limine* No. 4) at 2 ("The alleged outcome of these agreements is that DirecTV has been able to charge supracompetitive prices for Sunday Ticket, a subscription package that provides telecasts of all NFL games."); *id.* ("The NFL and DirecTV, as part of the NFL-DirecTV Agreement directly at issue in the case, agreed to create a limited offering, nflsundayticket.TV ('.TV'). . . . The purpose of .TV was to offer Sunday Ticket over the internet to customers who lacked the ability to receive DirecTV's satellite service."); *id.* at 4 ("Defendants' role *in Sunday Ticket pricing* is a key issue at trial." (emphasis added)); *id.* ("The fact that Defendants negotiated to have a role in the pricing of .TV in the NFL-DirecTV Agreement is probative to *Plaintiffs' claim that Defendants maintained a role in the pricing of Sunday Ticket*." (emphasis added)); *id.* ("Given the relevance of .TV, . . . Defendants [may] introduce evidence explaining *the differences between .TV and Sunday Ticket and distinguishing the pricing authority*." (emphasis added)).

## PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 40.2: .TV PRICING

This instruction is misleading. As this Court has already recognized, "[e]vidence of the .TV pricing arrangement is relevant to Plaintiffs' claims" because "the interlocking agreements at issue must be viewed holistically." Order on D. MIL No. 4, ECF No. 1305 at 4. Indeed, "[t]he fact that Defendants negotiated to have a role in the pricing of .TV in the NFL-DirecTV Agreement is probative to Plaintiffs' claim that Defendants maintained a role in the pricing of Sunday Ticket." *Id.* Defendants' request to instruct the jury not to "determine whether the agreements that created the .TV product unreasonably restrained trade" is another improper attempt to slice and dice the interlocking agreements at issue. Defendants' conduct in using .TV pricing to control the price of Sunday Ticket is a highly relevant component of the interlocking arrangements that are being challenged in this case. It would be error to instruct the jury otherwise.

This instruction also incorrectly states that the jury is not to "consider the effect of Defendants' conduct on prices or purchases of the .TV product." This Court has decided otherwise, stating that "[t]he pricing arrangement of .TV is [] relevant to supply, demand, and the price of Defendants' out-of-market telecasts." Order on D. MIL No. 4, ECF No. 1305 at 3. Furthermore, Plaintiffs have elicited evidence at trial that the NFL required the .TV product to be priced at parity with the satellite product. *See also* TX-416; TX-438; TX-457; TX-536; TX-612; TX-618; TX-684; TX-771; TX-775.

Further, this instruction is unnecessary. The class definition does not include .TV subscribers, *see* Order on Class Certification, ECF No. 894, at 25, and Plaintiffs did not present a damages model at trial that includes .TV subscribers. There is no danger that the jury will mistakenly consider .TV purchases when it calculates damages. Defendants may well contend that .TV has nothing to do with the issues in

this case, but that position must be presented through "*evidence* explaining the differences between .TV and Sunday Ticket and distinguishing the pricing authority." Order on D. MIL No. 4, ECF No. 1305 at 4 (emphasis added), not an improper instruction to the jury to simply disregard Defendants' conduct as it relates to .TV.

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 40.2: .TV PRICING

Defendants' proposed Instruction 40.2 is necessary to avoid jury confusion and error resulting from Plaintiffs' presentation of evidence of .TV pricing in this case.

Plaintiffs concede in their objection—and through their presentation at trial—that they intend to do exactly what Defendants worried would happen: blur any distinction between .TV and the Sunday Ticket satellite pricing in an effort to mislead and confuse the jury as to the NFL's role in pricing the satellite product. *See* ECF No. 1145, Defs.' Mot. *in Limine* No. 4 at 2. Rather than use evidence that "the Defendants negotiated to have a role in the pricing of .TV" to show that Defendants may have "maintained a role in the pricing of Sunday Ticket," as this Court held was permissible, ECF No. 1305, Order on Defs.' Mot. *in Limine* No. 4 at 4, Plaintiffs have used evidence that was clearly about .TV and presented it to the jury as if it discussed the satellite product. These misleading assertions are prejudicial (and Defendants maintain that the prejudice substantially outweighs any probative value[1]).

For example, during their opening statement, Plaintiffs displayed TX-457, an email from Robert Stecklow to his colleagues at DirecTV, to the jury and emphasized the language "they [the NFL] 100% have agreed on pricing every year in a meeting just like yesterday." But Plaintiffs did not disclose that this statement was about .TV, nor did they assert—along the lines of this Court's order on MIL No. 4—that the arrangement for .TV pricing is evidence that the parties had a similar or the same arrangement for the satellite product. Instead, they explicitly represented that Stecklow was saying that the NFL and DirecTV were agreeing on the price of the *satellite* product. Plaintiffs made this argument explicitly: "Mr. Stecklow is writing

---

[1] As this Court recognized, "[r]egardless of a court's initial decision on a motion *in limine*, however, it may revisit the issue at trial." ECF No. 1305, Order on Defs.' Mot. *in Limine* No. 4 at 2.

to his colleagues every year in a meeting just like yesterday. We get together with the NFL and we agree on what the price will be. That is price fixing. That is the coffee shop example I showed you earlier. That is illegal." 06/06/24 Trial Tr. at 131:9-23. This intentional conflation has been a theme of Plaintiffs' case, resulting in significant prejudice to Defendants. *See, e.g.*, *id.* at 136:2-14 (telling the jury that the discussion of pricing in TX-777 about "white space/.TV" was about the satellite product); 06/07/24 Trial Tr. at 305:4 (arguing that TX-536 "relate[s] to the pricing" of the satellite product such that it could be used to impeach Kaplan's testimony, even though TX-536 only discusses how to price .TV).

An instruction is necessary to ameliorate that prejudice. *See, e.g.*, *DCD Partners, LLC v. Transam. Life Ins. Co.*, 2018 WL 3770030, at *6 (C.D. Cal. Aug. 1, 2018) (approving use of curative instruction, "in addition to the standard instruction that attorneys' statements and arguments are not evidence," to "mitigate the risk of unfair prejudice and juror confusion" after the plaintiffs' counsel gave a "somewhat problematic" opening statement and introduced evidence that was irrelevant to their claim); *United States v. Rodriguez*, 971 F.3d 1005, 1016 (9th Cir. 2020) ("The district court has 'substantial latitude' in formulating jury instructions[.]").

Plaintiffs' only response is to suggest that Defendants are proposing to instruct the jury that evidence of .TV pricing is irrelevant to the issues in this case and that the agreements should not be viewed holistically. But the instruction says no such thing. To the contrary, Defendants' instruction is intended only to make clear to the jury that the pricing of .TV is not at issue in this case, as a remedy for Plaintiffs' deliberate conflation of the issues. This instruction is wholly in line with what this Court has already ordered on the question of .TV pricing, and it is narrowly tailored to avoid jury error.

**INSTRUCTION NO. 54: REASONABLENESS OF PRICE**

Your role as jurors in this case is not to determine whether the price of the Sunday Ticket package is reasonable. Your duty is instead to apply the rule of reason to the conduct being challenged in this case.

**Authority**: ECF No. 1293 (Order on Pls.' Mot. *in Limine* No. 3) at 3 ("Yet the jury will not determine whether the price of the package is reasonable, but whether the alleged restraints are reasonable." (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024), and *cert. denied*, 144 S. Ct. 682 (2024) (defining the rule of reason as "a multi-step, burden-shifting framework that requires courts to conduct a fact-specific assessment to determine a restraint's actual effect on competition")).

**PLAINTIFFS' OBJECTION TO NFL INSTRUCTION NO. 54:**

**REASONABLENESS OF PRICE**

Plaintiffs object to this instruction because it could mislead the jury into believing that they need not consider whether the Defendants' *conduct* in fixing the price of Sunday Ticket was reasonable. For this reason, the Court should adopt Plaintiffs' proposed version of this instruction which is based on the model ABA Antitrust instructions (2-B-4) and makes clear that the jury is not to consider the reasonableness of the price *if* they find that there was an agreement to raise, fix, maintain, stabilize, or otherwise affect prices.

Plaintiffs further object to the term "business agreements" in the instruction. This is an incorrect statement of the law. The jury is to consider whether there was *any* agreement to restrain trade, which includes not just "business agreements" but also "understandings" and "unspoken" agreements. *See* ABA Model Instruction 2-A-1; *U.S. v. General Motors Corp.*, 384 U.S. 127, 142–43 (1966) ("[I]t has long been settled that explicit agreement is *not* a necessary part of a Sherman Act conspiracy."); *Cal. ex re. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1132–33 (9th Cir. 2011) ("Agreements of competitors, whether express or implicit [or] whether by formal agreement or otherwise, in restraint of trade are outlawed.").

24

## DEFENDANTS' ARGUMENT IN SUPPORT OF DEFENDANTS' DISPUTED INSTRUCTION NO. 54: REASONABLENESS OF PRICE

Defendants' proposed Instruction 54 appropriately instructs the jury as to the meaning of "reasonable" in the context of a rule of reason antitrust case. As this Court has explained, "the jury will not determine whether the price of the package is reasonable, but whether the alleged restraints are reasonable." ECF No. 1293 (Order on Pls.' Mot. *in Limine* No. 3) at 3 (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023) (defining the rule of reason as "a multi-step, burden-shifting framework that requires courts to conduct a fact-specific assessment to determine a restraint's actual effect on competition")).

Far from being misleading, this instruction is necessary to correct the misimpression that may have been created by Plaintiffs' emphasis, in their opening and throughout the presentation of their case-in-chief, on implications that Sunday Ticket is unreasonably priced. *See, e.g.*, 06/06/24 Trial Tr. at 115:12-13 ("Most people couldn't afford it, wouldn't buy it, would be priced out."); *id.* at 115:20-25 ("And for the fans who did buy Sunday Ticket – and these were incredibly avid fans, these were the most loyal fans, because you would have to be a pretty avid fan to pay $1300 a year to watch Sunday Ticket – they knew that of those people who are in the classes in this case, 70 percent of them had a household income less than $100,000 a year.").

Plaintiffs, moreover, do not contest that it is appropriate to instruct the jury that the relevant question is not whether the prices that were charged is reasonable. Instead, they seek to offer their own instruction on the same issue (Plaintiffs' Proposed Instruction 54), but that proposed instruction is wholly inappropriate for two reasons: (i) it explicitly instructs the jury that an issue in this case is whether Defendants conspired to fix prices, and (ii) it is based on a model instruction intended only to be used in *per se* horizontal price-fixing conspiracy cases, which Plaintiffs

agree this case is not.

*First*, as explained in detail in Defendants' Argument in Support of Defendants' Disputed Instruction No. 40.1, this is not, and never has been, a *per se* price fixing case, and thus the jury instructions in this case should not be premised on addressing the question of whether "Defendant agreed to … fix … prices."

*Second*, Plaintiffs' proposed Instruction 54 is misleading given Plaintiffs' admission that "[t]here is no dispute that Defendants' liability should be determined by the rule of reason." Pls.' Obj. Defs.' Instr. No. 40.1. As Defendants noted in their objection to Plaintiffs' proposed instruction, it would be wholly inappropriate to give the jury an instruction that is intended to be given only in *per se* horizontal price-fixing cases. *See* Plaintiffs' Proposed Instruction No. 54 (citing Model Jury Instructions in Civil Antitrust Cases, Chapter 2–Section 1 of the Sherman Act—Horizontal Price Fixing, Instruction 4: Reasonableness of Prices No Excuse (Am. Bar Ass'n Antitrust L. Section 2016). If there was any doubt that such an instruction should not be given, the same model instruction explains, "**This instruction is appropriate where the court determines that the alleged restraint, if proven, is illegal per se**. **If the court were to determine that the alleged restraint should be evaluated under the rule of reason, then the rule of reason instructions should be given instead.**" Model Jury Instructions in Civil Antitrust Cases, Chapter 2–Section 1 of the Sherman Act—Horizontal Price Fixing, Instruction 4: Reasonableness of Prices No Excuse (Am. Bar Ass'n Antitrust L. Section 2016) (emphasis added).

*Finally*, while Defendants do not agree that the use of the term "business agreements" is improper or incorrect in this context, Defendants have agreed to remove the language in the interest of compromise.

Dated: June 14, 2024

Respectfully submitted,

/s/ *Beth A. Wilkinson*

Beth A. Wilkinson (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max J. Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Neema T. Sahni (Bar No. 274240)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
nsahni@cov.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*