Beth A. Wilkinson (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max J. Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter, 850 10th Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5429
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION | Case No. 2:15-ml-02668−PSG (SKx) **NFL DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Judge: Hon. Philip S. Gutierrez Hearing Date: June 25, 2024 Courtroom: First Street Courthouse 350 West 1st Street Courtroom 6A Los Angeles, CA 90012 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 25, 2024, in the courtroom of the Honorable Philip S. Gutierrez, Chief United States District Judge, Courtroom 6A, United States Courthouse, 350 West 1st Street, Los Angeles, CA 90012, the NFL Defendants[1] will, and hereby do, move pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, for judgment as a matter of law.

Defendants seek a ruling under Federal Rule of Civil Procedure 50(a) that Plaintiffs did not present a legally sufficient basis for any reasonable jury to find that Plaintiffs met their burden of showing that: (i) their proffered experts were reliable under Rule 702 or that the experts' testimony was sufficient to sustain a verdict; (ii) Defendants conspired to monopolize in violation of Section 2 of the Sherman Act; (iii) Plaintiffs' "college football" but-for world proved anticompetitive effects in any relevant market or constituted a substantially less restrictive alternative to the NFL's procompetitive telecasting arrangement; (iv) the NFL Defendants are capable of "concerted action" under the Sherman Act; (v) Plaintiffs' "multiple distributor" but-for world proved anticompetitive effects in any relevant market or constituted a substantially less restrictive alternative to the NFL's procompetitive telecasting arrangement; (vi) injury or damages occurred on a class-wide basis; (vii) the commercial class suffered injury or damages; or (viii) Plaintiffs even *could* recover as a matter of law, in light of the bars on their claims under *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), and the Sports Broadcasting Act, 15 U.S.C. § 1291.

---

[1] The NFL Defendants consist of: Arizona Cardinals Football Club, LLC.; Atlanta Falcons Football Club, LLC; Baltimore Ravens Limited Partnership; Buffalo Bills, LLC; Panthers Football, LLC; The Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns Football Company LLC; Dallas Cowboys Football Club, Ltd.; Denver Broncos Team, LLC; The Detroit Lions, Inc.; Green Bay Packers, Inc.; Houston NFL Holdings, L.P.; Indianapolis Colts, Inc.; Jacksonville Jaguars, LLC.; Kansas City Chiefs Football Club, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football, LLC; National Football League, Inc; NFL Enterprises LLC; New England Patriots LLC; New Orleans Louisiana Saints, LLC; New York Football Giants, Inc.; New York Jets LLC.; Raiders Football Club, LLC; Philadelphia Eagles, LLC; Pittsburgh Steelers LLC.; Chargers Football Company, LLC; Forty Niners Football Company LLC; Football Northwest LLC; The Los Angeles Rams, LLC; Buccaneers Team LLC; Tennessee Football, LLC.; and Pro-Football LLC.

Plaintiffs have been fully heard and have not presented legally sufficient evidence for the Jury—or any reasonable jury—to find in their favor on any of these issues. Defendants' motion is based upon this notice of motion and motion, the concurrently filed memorandum of points and authorities, all pleadings on file in this matter, all testimony and evidence at trial, any argument that may be presented to the Court on this motion, and such other matters as the Court deems appropriate.

Dated: June 24, 2024

Respectfully submitted,

/s/ *Beth A. Wilkinson*

Beth A. Wilkinson (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max J. Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Neema T. Sahni (Bar No. 274240)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
nsahni@cov.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

LEGAL STANDARD ............................................................................................ 2

ARGUMENT ........................................................................................................ 3

I.   The Testimony Of Plaintiffs' Experts Cannot Support A Plausible
     Verdict In Favor Of Plaintiffs. ............................................................... 3

     A.   Dr. Rascher's "college football" but-for world cannot support a
          verdict in Plaintiffs' favor. ............................................................ 3

     B.   Dr. Zona's "multiple distributor" but-for world cannot support a
          verdict in Plaintiffs' favor. ............................................................ 7

II.  Plaintiffs Failed To Prove Their Theories Of Liability .......................... 10

     A.   Plaintiffs' challenge to pooling and exclusivity (the college
          football theory) fails. ................................................................... 10

          1.   No reasonable jury could conclude that the NFL and the
               NFL teams are not a single entity for purposes of
               licensing telecasts. ............................................................. 10

          2.   No reasonable jury could find that Plaintiffs proved
               substantial anticompetitive effects in a purported market
               for NFL telecasts. ............................................................... 12

          3.   No reasonable jury could find that Plaintiffs identified
               substantially less restrictive alternatives. ......................... 12

     B.   Plaintiffs' challenge to exclusivity (the multiple distributor
          theory) fails. ................................................................................. 17

          1.   No reasonable jury could find that Plaintiffs proved
               substantial anticompetitive effects. ................................... 17

          2.   No reasonable jury could find that Plaintiffs identified
               substantially less restrictive alternatives to the exclusive
               license. .............................................................................. 19

III. Plaintiffs Failed To Prove Classwide Injury Or Damages. .................... 21

IV.   Plaintiffs Failed To Provide Sufficient Evidence Of Liability, Injury, Or Damages For The Commercial Class. ........................................................ 22

V.    Plaintiffs Failed To Prove Damages Under *Illinois Brick*. ........................... 23

VI.   Plaintiffs Failed To Establish Liability Based On Conduct That Is Not Protected By The Sports Broadcasting Act. .................................................... 25

CONCLUSION .................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Abuan v. Gen. Elec. Co.*,

5

3 F.3d 329 (9th Cir. 1993)..................................................................22

6

*Am. Needle, Inc. v. Nat'l Football League*,

7

560 U.S. 183 (2010) ........................................................................ 10

8

*Apple Inc. v. Pepper*,

9

587 U.S. 273 (2019) ........................................................................ 23

*Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.*,

10

509 U.S. 209 (1993) ......................................................................3, 9

11

*Cablevision Sys. Corp. v. Fed. Commc'ns Comm'n*,

12

649 F.3d 695 (D.C. Cir. 2011) ........................................................ 19

13

*Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*,

14

613 F.2d 727 (9th Cir. 1979).............................................................2

15

*Comcast Corp. v. Behrend*,

16

569 U.S. 27 (2013)........................................................................9, 24

17

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,

18

433 U.S. 36 (1977) ..........................................................................20

19

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,

773 F.2d 1506 (9th Cir. 1985) ..................................................6, 8, 16

20

*Equal Emp. Opportunity Comm'n v. Freeman*,

21

778 F.3d 463 (4th Cir. 2015).............................................................3

22

*Epic Games, Inc. v. Apple, Inc.*,

23

67 F.4th 946 (9th Cir. 2023) .....................................................*passim*

24

*Est. of Barabin v. AstenJohnson, Inc.*,

25

740 F.3d 457 (9th Cir. 2014)............................................................3

26

*Fed. Trade Comm'n v. Qualcomm Inc.*,

27

969 F.3d 974 (9th Cir. 2020)................................................1, 10, 18

28

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983) ........................................................................... 19

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ......................................................................................... 3

*Gold Medal LLC v. USA Track & Field*,
   187 F. Supp. 3d 1219 (D. Or. 2016) .............................................................. 23

*Gray v. Hudson*,
   28 F.4th 876 (9th Cir. 2022) ........................................................................... 2

*Ill. Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ....................................................................................... 23

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) ................................................... 3, 4, 8

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018) .............................................................. 3

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) ....................................................................... 23

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   2024 WL 168298 (C.D. Cal. Jan. 11, 2024) ............................................. 10, 11

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 914 (9th Cir. 2015) ........................................................................... 3

*In re Prempro Prods. Liab. Litig.*,
   586 F.3d 547 (8th Cir. 2009) ........................................................................... 2

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   934 F.3d 619 (D.C. Cir. 2019) ....................................................................... 22

*In re Roundup Prods. Liab. Litig.*,
   2024 WL 3074376 (N.D. Cal. June 20, 2024) .................................................. 7

*Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*,
   34 F.3d 410 (7th Cir. 1994) ........................................................................... 11

*Johnson v. Am. Honda Motor Co.*,
   923 F. Supp. 2d 1269 (D. Mont. 2013) ............................................................ 2

iv

*Kurtz v. Costco Wholesale Corp.*,
  818 F. App'x 57 (2d Cir. 2020) .................................................22

*Landes Constr. Co. v. Royal Bank of Can.*,
  833 F.2d 1365 (9th Cir. 1987) ...................................................2

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007).............................................................23, 24

*Masimo Corp. v. Apple Inc.*,
  2023 WL 3432126 (C.D. Cal. Mar. 15, 2023)...............................24

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)...................................................................23

*Murphy Tugboat Co. v. Crowley*,
  658 F.2d 1256 (9th Cir. 1981) ....................................................8

*Nat'l Collegiate Athletic Ass'n v. Alston*,
  594 U.S. 69 (2021)....................................................................15

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
  202 F.3d 1088 (9th Cir. 2000) ..................................................10

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
  802 F.3d 1049 (9th Cir. 2015) .............................................13, 15

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)............................................................12, 19

*Paladin Assocs., Inc. v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ..................................................21

*Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols., Inc.*,
  2023 WL 5635772 (E.D. Pa. Aug. 31, 2023) ................................2

*Parrish v. Nat'l Football League Players Ass'n*,
  534 F. Supp. 2d 1081 (N.D. Cal. 2007) ......................................18

*Perez v. State Farm Mut. Auto. Ins. Co.*,
  291 F.R.D. 425 (N.D. Cal. 2013).................................................23

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) .....................................................18

v

*Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos.*,
   598 F. Supp. 694 (N.D. Cal. 1984) ........................................................................ 20, 21

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ........................................................................................ 19

*Tawfilis v. Allergan, Inc.*,
   2017 WL 3084275 (C.D. Cal. June 26, 2017) ................................................................ 4

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) .................................................................................................... 12, 24

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ...................................................................................................... 21

*Tripati v. McKay*,
   211 F. App'x 552 (9th Cir. 2006) ................................................................................... 2

*United Farmers Agents Ass'n v. Farmers Ins. Exch.*,
   89 F.3d 233 (5th Cir. 1996) .......................................................................................... 12

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund
   v. Teikoku Pharma USA*,
   296 F. Supp. 3d 1142 (N.D. Cal. 2017) .......................................................................... 9

*United States v. Gomez-Gallardo*,
   915 F.2d 553 (9th Cir. 1990) ........................................................................................ 24

*United States v. J-M Mfg. Co.*,
   2020 WL 4196880 (C.D. Cal. June 5, 2020) ................................................................... 2

**Statutes**

15 U.S.C. § 1291 ................................................................................................... 12, 25

**Rules**

Fed. R. Civ. P. 50(a) ............................................................................................... 1, 2

Fed. R. Evid. 702 ................................................................................................. *passim*

# INTRODUCTION

Plaintiffs' case depends entirely on the validity of their experts' models of the but-for world. Those models are critical to establishing anticompetitive effects, less restrictive alternatives, injury, and damages—each of which Plaintiffs have the burden to prove.

Plaintiffs have no valid models. Rule 702 prohibits models based on speculation and unsupported assumptions, rather than sound economics. Plaintiffs' primary expert, Dr. Rascher, has offered nothing more than a thought experiment, based on cherry-picked facets of different slices of college football broadcasting, with no real-world analogue. Worse, he ignored the building blocks of economics: the changed incentives created by changes to the real world. Dr. Rascher's approach raises countless questions that he does not—and cannot—answer. Saying "it will all work out" is not a substitute for sound economic analysis, particularly when the trial record contradicts his assumptions at every turn. Plaintiffs' other expert, Dr. Zona, prepared something that *looks* like a model but is riddled with flaws that were fully exposed—and unaddressed—at trial. And Plaintiffs have not come close to providing a valid model (or any evidence at all) for the commercial class. The models should thus be excluded under Rule 702. They are also insufficient to establish critical elements of Plaintiffs' case under Rule 50, warranting judgment.

Judgment is particularly appropriate as to Plaintiffs' Section 2 "conspiracy to monopolize" claim. Binding Ninth Circuit precedent holds that "[i]f, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). Plaintiffs' Section 1 and 2 claims are indisputably based on the same "conduct." At trial, Plaintiffs did not distinguish between the two claims or offer any evidence specific to their Section 2 claim. While they attempted to defend the Section 2 claim in pretrial briefs by reference to a submarket for out-of-market ("OOM") games, they presented literally no supporting testimony or evidence at trial. Submitting that claim to the Jury would thus be legally improper,

1

needlessly complicate the jury instructions, substantially confuse the jurors, and risk an inconsistent verdict.

For these and other reasons noted below, the Court should grant a Rule 50 judgment.

## LEGAL STANDARD

Judgment as a matter of law is appropriate if there is no "legally sufficient evidentiary basis" for "a reasonable jury . . . to find for [the non-moving] party on that issue." Fed. R. Civ. P. 50(a)(1); *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 734 (9th Cir. 1979). To defeat such a motion, Plaintiffs must present substantial evidence as to every element of their claims. *Cal. Comput. Prods.*, 613 F.2d at 734. "Substantial evidence" is "more than a mere scintilla," *id.*; it is "such relevant evidence as reasonable minds might accept as adequate to support a conclusion," *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987). Conclusory and speculative testimony is insufficient. *Tripati v. McKay*, 211 F. App'x 552, 553 (9th Cir. 2006). The Court "should also give credence to evidence supporting defendants that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Gray v. Hudson*, 28 F.4th 87, 96 (9th Cir. 2022) (cleaned up).

Judgment as a matter of law is also proper where critical expert evidence does not pass muster under Rule 702. *See, e.g.*, *In re Prempro Prods. Liab. Litig.*, 586 F.3d 547, 570 (8th Cir. 2009). After the close of evidence, "it is not unheard of—and certainly entirely appropriate where warranted—to strike testimony of an expert witness" and enter judgment for the opposing party. *Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols., Inc.*, 2023 WL 5635772, at *2 (E.D. Pa. Aug. 31, 2023); *see also Johnson v. Am. Honda Motor Co.*, 923 F. Supp. 2d 1269, 1279–80 (D. Mont. 2013) (striking expert testimony "necessary" to "establish" liability and granting judgment for the defense); *United States v. J-M Mfg. Co.*, 2020 WL 4196880, at *41 (C.D. Cal. June 5, 2020) (same).

# ARGUMENT

## I. THE TESTIMONY OF PLAINTIFFS' EXPERTS CANNOT SUPPORT A PLAUSIBLE VERDICT IN FAVOR OF PLAINTIFFS.

### A. Dr. Rascher's "college football" but-for world cannot support a verdict in Plaintiffs' favor.

Plaintiffs' ability to show that the challenged conduct violates the antitrust laws hinges on Dr. Rascher. He is the only witness who purports to describe the but-for world ("BFW") absent that conduct—his so-called "college football" BFW. But Dr. Rascher's analysis is not the product of reliable economic methodology. It is devoid of economic reasoning and contrary both to basic economics principles and *all* of the trial testimony offered by witnesses other than Dr. Rascher.

"When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993). Exclusion is also warranted where an expert "cherry-pick[s]" data and "reject[s] or ignor[es] . . . evidence that contradicts his conclusion." *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 252 (S.D.N.Y. 2018) (expert "choos[ing] not to consider evidence that undercuts his opinion" is a "methodological failing"), *aff'd*, 982 F.3d 113 (2d Cir. 2020); *see also EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) (collecting cases excluding testimony on this basis). Courts regularly exclude expert opinions that that suffer from these flaws, as well as opinions that rely solely on the "*ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), that are "founded on speculation," *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 924 (9th Cir. 2015), or that are based on "junk science," *Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014).

Dr. Rascher's testimony must be excluded under these principles. The things he cannot explain outnumber those he tried to explain, and the few explanations he offered

are contradicted by the testimony of every percipient witness. A review of the questions Dr. Rascher did not and cannot answer proves the point:

Is his model even based on college football? Dr. Rascher's BFW looks nothing like college football. In his view, the most likely version of this BFW retains the NFL's current distribution of games in-market on CBS and FOX, with some undefined group of actors (*see infra* at 5) distributing games wherever CBS and FOX are not showing them. 06/11/24 Tr. (Rascher) 890:8–841:16. *Nothing of the sort occurs in college football*, which involves single national feeds of each game and no guaranteed access to local teams. *E.g.*, *id.* 837:1–13; *see also* 06/18/24 Tr. (McManus) 1710:3–1711:2. Dr. Bernheim further explained how Dr. Rascher's BFW involves "cherry pick[ing]" different slices of college football at different times in an unprincipled manner. 06/20/24 Tr. 1936:19–1937:10, 1946:16–1947:1. It is not sound methodology to select a "yardstick" or "benchmark" and then cherry-pick parts of it to build a but-for world that bears no resemblance to the chosen benchmark—or anything in the real world. *See Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *6 (C.D. Cal. June 26, 2017) ("[T]he yardstick market [must] be as comparable as possible in all respects" to the but-for world.); *Bextra*, 524 F. Supp. 2d at 1176.

Further, Dr. Rascher confirmed that each college football "conference" is in fact a sports league, 06/11/24 Tr. 822:2–18, and that college conferences collectively license the game telecasting rights for their respective teams, *id.* 883:25–884:8. His college football BFW thus cannot represent a BFW without joint licensing by the NFL and teams because college football conferences *do* jointly license their telecasting rights. "[I]f Dr. Rascher had stuck with that analogy, he would have to have thrown out college football altogether as a comparison." 06/20/24 Tr. (Bernheim) 1938:7–8. Nor is it any answer for Dr. Rascher to claim that there are multiple versions of the BFW, some of which may look more like college football than others. 06/11/24 Tr. (Rascher) 866:1–7. The solution to idle speculation is not to layer on additional—and even less realistic—idle speculation.

Who would be selling rights and for which games? Dr. Rascher cannot explain what rights are being sold in his BFW. Is it all Sunday afternoon games, or just the right to show

those games wherever CBS and FOX are not? 06/11/24 Tr. (Rascher) 886:23–887:5. Is it only Sunday afternoon games, or also primetime games? *Id.* 903:1–14. Are teams selling whatever rights they have individually, or in groups? *Id.* 883:15–22. If in groups, what are the groups? *Id.* 864:24–865:22 (possibilities include everything from eight groups of four to four groups of eight); *see also id.* 883:23–25. And since no individual team can license rights alone, *id.* 710:5–8, how are agreements even reached? Dr. Rascher could not say.

<u>Who would be producing and distributing games</u>? Dr. Rascher similarly could not explain how games would be produced and distributed in his BFW. He testified that networks would share their feeds with their rivals, *id.* 894:17–895:5, but also that "two production crews" is an option, *id.* 897:4–9. If there is just one feed, he "can't think of an example" where that happens in the real world, *id.* 895:9–10, and does not know whether the rival networks would add their own graphics and announcers, or how much that additional production would cost, *id.* 895:11–896:4. If there are two feeds, he has never offered an accounting or explanation of what the costs or quality would be.

Uncontroverted testimony showed that none of these alternatives would have worked. The former head of CBS Sports, Sean McManus, testified that he is not aware of "an infrastructure existing in this country that could support that kind of programming." 06/18/24 Tr. 1711:25–1712:2. He also explained that in this BFW, CBS would not have been interested in in-market rights, *id.* 1667:23–1668:4; that CBS would not have shared its feeds with rivals, *id.* 1668:8–20; and that Plaintiffs' approach would be "chaotic" from both sales and production standpoints, *id.* 1712:2–6. The NFL's VP of Broadcasting, Cathy Yancy, confirmed that none of this was workable. *Id.* 1764:20–1765:16; 1766:17–1768:13. Dr. Rascher had no response.

<u>How would revenue sharing work</u>? Knowing how revenues are shared is critical to understanding the BFW because it drives all economic incentives. Dr. Rascher hypothesizes that revenue sharing would not be equal. 06/11/24 Tr. (Rascher) 862:18–21. But he had no explanation of which revenues would be shared in the but-for world, or at what percentages. *Id.* 902:14–904:25, *see also id.* 869:19–870:14, 833:23–834:17.

5

How would advertising work? It was uncontroverted at trial that advertising is the engine of broadcast television. 06/18/24 Tr. (McManus) 1653:6–11; 06/10/24 Tr. (L. Jones) 614:14–18. But Dr. Rascher could not explain how advertising would work in the BFW, 06/11/24 Tr. 897:14–22, and both Mr. McManus and Ms. Yancy offered uncontroverted testimony that any such system would have been unworkable, 06/18/24 Tr. (McManus) 1668:21–23; *id.* (Yancy) 1765:17–1766:7.

These questions are not inconsequential details. Dr. Rascher agrees, as he must, that all actors make economically "rational" choices, 06/11/24 Tr. 882:9–12, and that "once you change one thing, there can be consequences," *id.* 878:8–11; *see Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985) (parties must "presume the existence of rational economic behavior"). But as Dr. Bernheim explained, in uncontroverted testimony, economics is fundamentally a study of incentives. 06/20/24 Tr. 1891:11–25. Dr. Rascher did not account for any of the changed incentives in the BFW, let alone create a coherent model of them. *Id.* (Bernheim) 1894:20–25 ("[H]e's . . . basically saying that he can imagine an outcome that would be, in his view, beneficial. But he doesn't go beyond imagining that outcome."); *id.* 1895:1–3. "It'll all work out" is not an acceptable answer, yet it is the only answer Dr. Rascher gave. *See, e.g.*, 06/11/24 Tr. 897:24 ("It doesn't really matter."); *id.* 886:9–10 (it all ends up "[i]n the same spot").

Nor can Dr. Rascher plausibly rely on the NFL's "New Frontier" study from 2017. *See* TX-686; 06/11/24 Tr. (Rascher) 758:19–25. The testimony indisputably established that it is not proof of any realistic BFW or of something the NFL seriously considered or endorsed. The Executive Vice President of NFL Media, Hans Schroeder, described New Frontier as "a brainstorming document," "a hypothetical analysis," and, ultimately, a "pie-in-the-sky type exercise." *See* ECF No. 1413-6 (Schroeder Dep.) Tr. 152:24–153:9. And the NFL's Chief Media and Business Officer, Brian Rolapp, explained he "didn't spend much time . . . on th[e] idea because I didn't think it worked or was a very good one." 06/12/24 Tr. 1103:12–16. That was because that document, like Dr. Rascher, failed to

account for practical realities, like who would produce the broadcasts or how advertising would work, and conflated access with viewership.[1]

In sum, Dr. Rascher's ill-defined college football BFW raises many questions that should have been answered as a matter of sound economic analysis, but that he completely failed to answer other than with his unsupported and sharply contradicted say-so. Rule 702 requires exclusion of his models under these circumstances. *See In re Roundup Prods. Liab. Litig.*, 2024 WL 3074376, at *6 (N.D. Cal. June 20, 2024) (excluding expert who was unable "to answer basic and straightforward questions" about her opinion).

**B. Dr. Zona's "multiple distributor" but-for world cannot support a verdict in Plaintiffs' favor.**

As an alternative, Plaintiffs presented forty-five minutes of testimony from Dr. Zona, who purported to model the BFW without exclusivity. But the undisputed flaws in Dr. Zona's models preclude their use.

***First***, *Dr. Zona's models predict higher prices in the BFW.* Dr. Zona calculated $102.74 as the average actual price paid by Sunday Ticket subscribers during the class period.[2] Neither of Dr. Zona's models reliably establishes lower prices in the BFW.

The viewership model Dr. Zona presented (Model 1) involves the flawed assumption that the NFL would continue using a flat fee structure when licensing to multiple distributors. That assumption contradicts undisputed evidence about economic theory and real-world business practices.[3] When that improper assumption is removed—part of the

---

[1] 06/12/24 Tr. (Rolapp) 1102:19–1103:16; *see also* 06/20/24 Tr. (Bernheim) 2013:2–4 (testimony showed that New Frontier proposal was misinformed); *id.* 2012:5–18 (New Frontier document conflated access with viewership); *id.* 2011:23–2012:18 (New Frontier's discussion of distribution undermines Dr. Rascher's but-for-world).

[2] *See* 06/13/24 Tr. (Zona) 1216:14–17 ("But you did calculate average over the country and you came up with 102.74 as the average of all the zip codes; correct? A. That's correct."); *id.* (Yurukoglu) 1327:12–14 ("Q. So, Doctor, is it fair to call [$102.74] an average real price? A. I think that's a fair characterization, yeah."); *id.* 1325:25–1326:11.

[3] *See, e.g.*, 06/13/24 Tr. (Yurukoglu) 1339:9–12 (economic theory predicts licensors will use per-subscriber fees with multiple distributors); *id.* 1342:12–13 (same); *id.* 1360:1–3 (same); ECF No. 1444-2 (Dyckes 30(b)(6) Dep.) Tr. 34:3–35:19 (other sports leagues such (continued…)

pressure-testing that is essential to sound economic analysis[4]—Model 1 indisputably predicts higher but-for prices than real-world prices.[5] "A reasonable jury could not . . . indulge in the assumption that a [company] would follow a course of behavior other than that which it believed would maximize its profits." *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981).

Plaintiffs tried to hide their survey model (Model 2), which is both bad science, 06/13/24 Tr. (Yurukoglu) 1330:24–1331:13, and legally improper cherry-picking, *see Bextra*, 524 F. Supp. 2d at 1176. But it was undisputed that Model 2 also shows higher prices than in the real world. 06/13/24 Tr. (Yurukoglu) 1353:12–22.

***Second***, *Dr. Zona's models predict irrational behavior by consumers.* The unreliability of Dr. Zona's models is also exemplified by their undisputed, outlandish predictions. Plaintiffs did not dispute that both of Dr. Zona's models predict that DirecTV and its undefined direct-to-consumer ("DTC") competitor would charge wildly different prices. That conclusion makes no sense. 06/13/24 Tr. (Yurukoglu) 1347:21–1348:1, 1356:14–19. Moreover, Plaintiffs did not dispute that in both of Dr. Zona's models, many DirecTV subscribers make the irrational choice to pay much more for a product equivalent to what they can get on DirecTV. *See id.* (Yurukoglu) 1348:19–1349:6 (Model 1 prediction); 1357:1–19 (Model 2 prediction). Models that fail to "presume the existence of rational economic behavior," *see Dolphin Tours*, 773 F.2d at 1511, are inadmissible and

---

as the NBA, MLB, and NHL license their OOM packages to DirecTV using a per-subscriber fee comprising a percentage of the suggested retail price set by the leagues); 06/07/24 Tr. (Bornstein) 403:13–404:3 (ESPN uses per-subscriber fees when contracting with multiple providers); *id.* 404:7–11 (per-subscriber fees are "common in all cable television"); 06/12/24 Tr. (Rolapp) 1089:10–1090:2 (the NFL used a per-subscriber fee when distributing Sunday Ticket non-exclusively in Canada before 2017); *id.* 1090:17–1091:5 (DAZN uses a per-subscriber fee when sub-licensing Sunday Ticket non-exclusively in Canada). While Mr. Elhauge opined that such agreements *may* be anticompetitive, neither he nor Plaintiffs actually analyzed that matter, whether in Dr. Zona's BFW, or as to the many other real-world examples of this business strategy. 06/24/24 Tr. (Elhauge) 2224:19–22.

[4] 06/13/24 Tr. (Yurukoglu) 1325:10–21, 1332:24–1333:12, 1333:24–1334:5.

[5] 06/13/24 Tr. (Yurukoglu) 1340:5–14, 1341:3–22; 06/17/24 Tr. (Yurukoglu) 1422:19–24.

insufficient, *see United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1179 (N.D. Cal. 2017) ("[O]nly opinions that are economically rational may be provided[.]").

**Third**, *Zona's models rest on the unsupported assumption that an alternative provider would have distributed Sunday Ticket from 2011 to 2023.* Dr. Zona failed to substantiate his critical presumption that all class members could have obtained Sunday Ticket from a DTC service, 06/13/24 Tr. (Zona) 1227:6–16—*i.e.* through live streaming, *id.* 1228:10–14. In fact, Dr. Zona never identified *any* alternative provider interested in and capable of carrying Sunday Ticket. *Id.* 1228:17–21, 1229:5–17, 1229:25–1230:22, 1231:16–20. Moreover, fact witnesses provided uncontroverted testimony that there was no streaming alternative to DirecTV for Sunday Ticket. *See* 06/12/24 Tr. (Rolapp) 1000:3–10, 1083:16–1085:4, 1115:20–1116:3; 06/17/24 Tr. (Goodell) 1463:7–23. Models cannot be predicated on an impossibility. *See Brooke Grp.*, 509 U.S. at 242.

**Fourth**, *Dr. Zona's eleventh-hour "NFL tax" calculation is not a timely or valid model of damages.* At trial, Dr. Zona presented a damages calculation based on the theory that prices would have been lower if DirecTV had charged the "optimal" price for Sunday Ticket, free from alleged NFL influence (the "NFL tax"). 06/13/24 Tr. 1182:7–11, 1183:2–22; Zona Direct Demonstrative Slide 3 ($1.72B in damages based on "Optimal Price" theory). But this calculation—which was not included in any of Dr. Zona's or Dr. Rascher's eight expert reports and was offered for the first time on the seventh day of trial—is as flawed as it is untimely. The fact that Dr. Zona's models fail to predict real-world Sunday Ticket prices simply "reflect[s] the deficiencies of his models," 06/13/24 Tr. (Yurukoglu) 1345:25–1346:3, rather than proving the NFL controlled pricing contrary to the testimony of every witness. *See infra* at Part V. Further, this "NFL tax" theory is not predicated on removing any aspect of the challenged conduct—it takes pooling and DirecTV's exclusivity as a given—and thus cannot be the basis for damages. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 36–38 (2013) (damages must fit theory of liability).

\*          \*          \*

Neither Dr. Rascher's nor Dr. Zona's model is admissible under Rule 702. Without those models, Plaintiffs cannot satisfy their burden to prove liability, injury, and damages.[6]

## II.    PLAINTIFFS FAILED TO PROVE THEIR THEORIES OF LIABILITY.

For their Section 1 claim, Plaintiffs must prove (among other elements): "(1) that there was a contract, combination, or conspiracy among two or more persons or distinct business entities; [and] (2) that the agreement unreasonably restrained trade under the rule of reason." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *2 (C.D. Cal. Jan. 11, 2024). No reasonable jury could find that Plaintiffs have met their burden as to either (A) all of the challenged conduct or (B) just exclusivity standing alone.

For their Section 2 conspiracy to monopolize claim, Plaintiffs must prove all of the same elements as their Section 1 claim. *See Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000); *Qualcomm*, 969 F.3d at 991; ECF No. 1370 (Defs.' Trial Br.) at 12–17. Plaintiffs identified no separate conduct or evidence relevant to their Section 2 claim, and they abandoned the submarket they previously asserted to defend this claim, *see* ECF No. 1331-1 (Proposed Final Pretrial Conf. Order) at 14–15. Accordingly, Plaintiffs' failure on Section 1 means their Section 2 claim fails as well. Further, proving a Section 2 violation "is more exacting" than proving a Section 1 violation, *Qualcomm*, 969 F.3d at 992, because it requires proof of specific intent to monopolize *and* anticompetitive conduct, *id.* at 991. Plaintiffs made no showing as to either element.

### A. Plaintiffs' challenge to pooling and exclusivity (the college football theory) fails.

#### 1.    No reasonable jury could conclude that the NFL and the NFL teams are not a single entity for purposes of licensing telecasts.

Plaintiffs have failed to prove that the NFL and its member teams are capable of "concerted action" for purposes of licensing telecast rights. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) (addressing single-entity argument as to

---

[6] While Mr. Elhauge attempted to offer opinions about bundling, *i.e.* the absence of single-team packages, Plaintiffs presented no model, let alone any BFW, matching this claim. So it is likewise irrelevant under *Comcast*.

merchandising and requiring evaluation of specific concerted activity at issue). As this Court has held, Plaintiffs must prove "it is possible for the member clubs to act individually to produce telecasts." *Sunday Ticket*, 2024 WL 168298, at *18. The trial record indisputably proves the opposite.

Plaintiffs conceded that (1) an NFL game requires the participation and consent of both teams and the NFL itself;[7] (2) production of an NFL game telecast similarly requires consent from both teams and the NFL;[8] and (3) a wide range of intellectual property rights are necessary to create an NFL telecast, *See, e.g.*, TX-146D at §§ A.5.f, B.3.c (separately owned IP necessary); 06/17/24 Tr. (J. Jones) 1578:16–25; 06/18/24 Tr. (Yancy) 1752:24–1753:11, 1765:9–15. Moreover, the evidence showed that absent joint licensing of the telecasting rights and exclusivity, broadcasters would not agree to produce the telecasts in the first place. *E.g.*, 06/18/24 Tr. (McManus) 1667:23–1668:4.

As a result, Dr. Rascher admitted that it is not possible for a team to act individually to produce telecasts—the test this Court established. 06/11/24 Tr. 876:18–21 ("Q: And you agree that in . . . your but-for world, *both NFL teams would have had to consent* for the broadcaster, whichever one it was, to air the game; correct? A: Yes." (emphasis added)).

Moreover, undisputed evidence showed that the value consumers derive from NFL telecasts comes from their being part of the NFL season, which necessarily requires cooperation among multiple teams and collective activities directed by the NFL. *See* 06/18/24 Tr. (Bernheim) 1827:23–24; *id.* 1828:7–8 (referring to Ms. Yancy's testimony that the NFL and teams' collaboration ensures high telecast quality); 06/24/24 Tr. (Bernheim) 2076:9–11. Thus, the NFL and its teams' telecasting arrangements are at a

---

[7] *See, e.g.*, 06/11/24 Tr. (Rascher) 874:21–23 ("Q: You need two teams in the NFL to make a game; correct? A: Yes."); *id.* 875:9–10 ("[T]he NFL consents if they're going to use . . . their marks" in a telecast); ECF No. 975-1 (Mem. Opp. Defs.' Mot. Summ. J.) at 18 n.17 (recognizing the "cooperation required to schedule and create an NFL game").

[8] 06/11/24 Tr. (Rascher) 876:18–21; *see also Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 416 (7th Cir. 1994) (affirming an injunction against the use of the name "Baltimore CFL Colts" in telecasts as infringing the trademark rights of *both* the NFL and the Indianapolis Colts).

minimum characterized as a production joint venture as to NFL football telecasts, regardless of whether or not Plaintiffs claim they are challenging certain features of those agreements. 06/18/24 Tr. (Bernheim) 1826:12–16. The Supreme Court has been clear that the only potential challenge to joint selling by a venture that creates and sells an integrated product is to the creation of the joint venture (the NFL) itself. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006). Plaintiffs do not and cannot challenge the creation of the NFL. *See* 15 U.S.C. § 1291 (Congress's explicit 1966 approval of the AFL-NFL merger).

Because the evidence demonstrated that the NFL and the teams are either a single entity or a production joint venture, Plaintiffs cannot prove unlawful "concerted action."

### 2. No reasonable jury could find that Plaintiffs proved substantial anticompetitive effects in a purported market for NFL telecasts.

At step one of the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 541 (2018). Here, Plaintiffs premise their case on a relevant market of all professional football telecasts, *see* 06/11/24 Tr. (Rascher) 712:20–25, and admit that in-market and out-of-market telecasts *"compete with each other*," *id.* 713:3–10. Plaintiffs' theory thus fails on its face: The allegedly restrained OOM games face competition from in-market games which are indisputably (i) close substitutes and (ii) available for free. There are no anticompetitive effects where consumers have close substitutes available at competitive prices—let alone for free. *See United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 238 n.6 (5th Cir. 1996) ("The existence of a good substitute at a competitive price (in this case . . . for free) prevents a producer from selling its product at an above-market price.").

### 3. No reasonable jury could find that Plaintiffs identified substantially less restrictive alternatives.

Even if Plaintiffs had met their burden at step one, no reasonable juror could find (i) that Defendants failed to satisfy their burden at step two to show procompetitive rationales or (ii) that Plaintiffs identified viable, less restrictive alternatives at step three.

*See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985–94 (9th Cir. 2023).

**Defendants have shown multiple, legally cognizable procompetitive rationales.** "A procompetitive rationale is a nonpretextual claim that the defendant's conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Id.* at 986 (cleaned up); *see also O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1059, 1073 (9th Cir. 2015) (restraints need not be the "primary driver" of a procompetitive rationale). Defendants have offered overwhelming evidence that the challenged conduct enhances competitive balance, increases output by promoting over-the-air telecasts, drives efficient scheduling to give most consumers the games they want, and promotes telecast quality and innovation.

**i. *Competitive balance.*** The pooling of telecast rights and resulting revenue sharing protects the NFL's competitive balance, a well-established procompetitive rationale. *See O'Bannon*, 802 F.3d at 1059, 1072. Plaintiffs have not contested that the NFL has the most competitive balance of any league or that the closeness of NFL games drives engagement and viewership.[9] Defendants have offered evidence from lay and expert witnesses that the NFL's equal sharing of its media revenues enhances competitive balance, both directly and through the associated salary caps and floors.[10] Plaintiffs offered only theoretical speculation in response, not evidence establishing that the teams and players would set the same salary caps and floors—which Plaintiffs admit ensure the NFL's competitive

---

[9] 06/11/24 Tr. (Rascher) 827:2–828:14 (conceding that the NFL has more competitive balance than any other sports league); *id.* 828:20–829:3; *id.* 832:1–17; *id.* 833:17–22; 06/10/24 Tr. (L. Jones) 656:14–21 (similar); *see also* 06/11/24 Tr. (Rascher) 849:4–850:3 ("generally speaking" fans are more likely to tune in for a close game); *id.* 852:22–853:24 (studies suggesting the same); *id.* 855:17–856:9 (Rascher agrees "competitive balance" can be procompetitive); 06/13/24 Tr. (Frantz) 1300:5–17 (agreeing that a closer game is more exciting); 06/12/24 Tr. (Rolapp) 1101:6–1102:4.

[10] 06/12/24 Tr. (Rolapp) 1130:4–21 (revenue sharing drives competitive balance); *id.* 1132:4–9 (same); *id.* 1058:24–1059:13 (same); 06/17/24 Tr. (Goodell) 1455:3–1457:1 (revenue sharing is important to competitive balance); *id.* 1526:3–24 (revenue sharing is necessary to maintain the salary cap); *id.* (J. Jones) 1569:10–1571:21 (explaining the need for media revenue sharing to maintain competitive balance and enhance the fan experience); 06/20/24 Tr. (Bernheim) 1907:22–1911:9.

balance—with less revenue sharing.[11]

**ii. *Protection of over-the-air access to popular games*.** The evidence showed that the challenged conduct promotes and protects over-the-air telecasts, increasing output. Plaintiffs' expert testified that the "vast majority of current over-the-air customers do not want different games than the over-the-air networks choose." 06/11/24 Tr. (Rascher) 801:21–25, 804:5–14. This procompetitive benefit of giving the vast majority of fans what they want for free depends critically on the NFL's current pooling strategy, 06/20/24 Tr. (Bernheim) 1930:5–25; *see also* 06/18/24 Tr. (McManus) 1667:23–1668:4 (CBS would not have been interested in telecasts without pooling).

**iii. *Efficient and pro-consumer scheduling of games*.** Pooling also promotes efficient matching between NFL games and network timeslots, thereby providing consumers with the games they want and stimulating demand and output. Dr. Bernheim's testimony here was unrebutted, other than Mr. Elhauge's speculation unsupported by any models or quantitative analysis. 06/20/24 Tr. 1916:11–1917:24; *see also* 06/18/24 Tr. (McManus) 1655:13–1656:23, 1711:16–1712:6; *id.* (Yancy) 1766:23–1768:13.

**iv. *Quality and innovation in broadcasts*.** Finally, pooling of telecast rights promotes innovation, and incentivizes, enhances, and maintains high quality telecasts. *Epic*, 67 F.4th at 987–88. For example, pooling of rights and revenues ensures consistent telecast quality across teams.[12] Similarly, the shared telecast rights ensure that fans get to watch a high-quality broadcast, no matter who they root for. 06/18/24 Tr. (Yancy) 1751:10–17, 1733:11–19.[13] Dr. Bernheim and fact witnesses explained how pooling and exclusivity drive innovation by the networks, including incorporation of fan preferences, ad innovations through NFL guidelines, and ensuring CBS and FOX's feeds remain high

---

[11] 06/20/24 Tr. (Bernheim) 1908:21–1910:17 (without revenue sharing, salary caps and floors would change); 06/17/24 Tr. (J. Jones) 1569:10–1571:21; *id.* (Goodell) 1526:3–24.

[12] 06/18/24 Tr. (Bernheim) 1827:23–1828:8 (testimony on value created through pooled telecasts).

[13] *See also* 06/17/24 Tr. (Goodell) 1451:22–1452:8, *id.* 1474:15–21; 06/20/24 Tr. (Bernheim) 1918:5–1920:17.

quality.[14] Finally, Defendants offered unrebutted testimony that shared revenue and telecast rights allow the NFL to set league-wide standards for games and telecast production, improving player safety and game quality.[15]

In response to these "non-pretextual and legally cognizable" procompetitive rationales, Plaintiffs bore the burden to prove that the same procompetitive benefits could be reasonably achieved through "*substantially* less restrictive means." *Epic*, 67 F.4th at 973, 986, 990. In evaluating Plaintiffs' proof, the Jury would have to "give wide berth to business judgments," and "resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives." *Nat'l Collegiate Athletic Ass'n v. Alston* 594 U.S. 69, 102, 106 (2021); *see also* 06/20/24 Tr. (Bernheim) 1879:19–1880:1. Plaintiffs' less restrictive alternatives must be "viable," *O'Bannon*, 802 F.3d at 1074, and "virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost," *Epic*, 67 F.4th at 990 (cleaned up).

For multiple reasons, Plaintiffs came nowhere close to meeting these burdens. As an initial matter, multiple fact witnesses explained why college football is not a better alternative overall. *See, e.g.*, 06/10/24 Tr. (L. Jones) 654:15–16 (college football is "a bit of a mess"); 06/12/24 Tr. (Rolapp) 1100:14–15 ("college football suffers from their model"). By Dr. Rascher's chosen metrics of viewership and revenue, college football falls short of the NFL. *See* 06/20/24 Tr. (Bernheim) 1943:17–1944:6. Plaintiffs likewise failed

---

[14] 06/18/24 Tr. (Bernheim) 1828:2–6 (referring to C. Yancy testimony about teams' collaboration "to ensure that the telecast quality is really high"); 06/20/24 Tr. (Bernheim) 1877:5–1878:1 (pooling is connected to the investments made to improve the viewing experience, including video quality and commentators); *id.* 1952:20–24 (mandatory pooling of telecast rights enabled NFL to create high value for fans); 06/17/24 Tr. (Goodell) 1450:24–1452:8, 1474:15–1477:8; *cf.* 06/18/24 Tr. (McManus) 1669:9–1670:2.

[15] 06/18/24 Tr. (Yancy) 1751:10–1752:16 (attributing fairness in rule changes and assurances on equipment and safety to team revenue sharing); TX-127A (NFL-wide research on game presentation); TX-212 (email from C. Yancy to FOX sharing league presentation guidelines and encouraging further innovation).

to show their alternatives achieve the procompetitive benefits of the current system.[16]

*First*, as to competitive balance, Dr. Rascher admitted that "in college football, . . . there is not close to as much competition as there is in the NFL." 06/11/24 Tr. 874:11–17. Plaintiffs acknowledge that college conference realignment, which exacerbates competitive imbalance, resulted in large part from individual teams' pursuit of higher revenues but ignore that NFL teams would have the same incentives in Dr. Rascher's but-for world. *See* 06/20/24 Tr. (Bernheim) 1940:2–23. Other witnesses confirmed that a world without pooling would also be a world without equal revenue sharing, and thus would reduce competitive balance similar to college football. 06/17/24 Tr. (J. Jones) 1580:22–25; 1581:5–24; *see also* 06/17/24 Tr. (Goodell) 1455:9–1457:1 (explaining that equal revenue sharing is essential to competitive balance); 06/18/24 Tr. (McManus) 1671:17–22.

*Second*, the college football BFW would not achieve widespread distribution of free, over-the-air telecasts. The uncontroverted evidence was that it would have been *impossible* to regionalize games to permit free broadcasts in-market and other telecasts out-of-market. 06/18/24 Tr. (Yancy) 1766:17–1768:13. And in reality, college football does not provide all local games over-the-air,[17] or achieve the same high share of over-the-air games as the NFL. 06/20/24 Tr. (Bernheim) 1908:21–1910:17, 1947:23–1948:12.

*Third*, Plaintiffs offered no evidence of efficient matching of games to timeslots in their college football BFW. There is no flexing of games between college conferences; Plaintiffs did not suggest otherwise. *See* 06/20/24 Tr. (Bernheim) 1916:11–1917:24; 06/12/24 Tr. (Rascher) 946:1–10 (testimony only of flexing *within* conferences).

*Finally*, the evidence showed that college football broadcasts do not feature

---

[16] Although Mr. Elhauge purported to identify other less restrictive alternatives, he conceded that he had no opinion regarding the BFW and presented no valid model of these alternatives (including whether economic incentives would have led to their adoption). Proposed less restrictive alternatives are irrelevant if they are not based on reliable analyses of whether those alternatives would arise from "rational economic behavior." *Dolphin Tours*, 773 F.2d at 1511.

[17] 06/11/24 Tr. (Rascher) 836:3–11 (NCAA packages require "premium" purchases); *id.* 837:1–17 (telecasts of local college games unavailable); 06/10/24 Tr. (L. Jones) 630:2–5.

investment, innovation, and quality to the degree seen in the NFL. Uncontroverted testimony showed that networks invest more in NFL games, 06/10/24 Tr. (L. Jones) 492:2–24, 633:3–11; 06/20/24 (Bernheim) 1876:22–1877:4, and roll out key innovations in NFL games, *id.* 643:7–17. Moreover, Plaintiffs did not dispute that in the one context in which NFL teams do not pool rights (preseason), the broadcasts are substantially lower quality.[18]

Plaintiffs' failure to offer any feasible alternative to achieve Defendants' procompetitive benefits reflects the Ninth Circuit's understanding that "a business practice without a less restrictive alternative is not, on balance, anticompetitive." *Epic*, 67 F.4th at 994. In any event, Plaintiffs failed to establish that any purported anticompetitive effects outweighed the clear procompetitive benefits. *See* 06/20/24 Tr. (Bernheim) 1931:6–11; *see also id.* 1931:12–21, 2031:17–24, 2032:3–23.

### B. Plaintiffs' challenge to exclusivity (the multiple distributor theory) fails.

Plaintiffs' second theory fails for similar reasons. This theory is more limited—it is a challenge to exclusivity alone, and asserts that the NFL should have licensed to at least one unspecified, additional distributor. 06/13/24 Tr. (Zona) 1173:3–10.[19] As explained *supra* at Part I.B, Dr. Zona's model of this multiple distributor but-for world is wholly unreliable and should be excluded under Rule 702. The model also fails as a matter of law for several additional reasons.

#### 1.     No reasonable jury could find that Plaintiffs proved substantial anticompetitive effects.

Plaintiffs' challenge to the vertical, exclusive copyright license between the NFL and DirecTV is not tenable as a matter of law or fact. The evidence showed that: (i) NFL telecasts could not be created or distributed without obtaining intellectual property right

---

[18] 06/18/24 Tr. (Yancy) 1752:24–1754:5 (preseason broadcasts have different appearance, reduced levels of talent, and reduced variability in camera angles); 06/18/24 Tr. (Bernheim) 1827:23–1828:8 (value created through pooled telecasts); *id.* 1921:8–17; 06/12/24 Tr. (Rolapp) 968:5–24 (preseason "is probably our least viewed and interesting games").

[19] *See also, e.g.*, 06/13/24 Tr. (Zona) 1182:12–14; *id.* 1228:1–4; *id.* 1238:14–20 (admitting that his results would differ if he considered more than one additional competitor).

licenses from the NFL, the teams, and the broadcasters, *see supra* at Part II.A.1; (ii) under the NFL's agreements with CBS and FOX, the copyrights for the network telecasts vest in the NFL, *see, e.g.*, TX-145 (2014 NFL-FOX agreement) at § 11.1; and (iii) in turn, the NFL granted DirecTV an exclusive license to resell the network transmissions and sole pricing and packaging authority on the product, *see, e.g.*, TX-44 (2009 NFL-DirecTV Agreement) at §§ 2(c), 3(a); TX-45 (2014 NFL-DirecTV Agreement) at §§ 2(c), 3(a).

As a matter of law, "[t]he mere existence of an exclusive deal between the [NFL] and its licensee[] does not violate the antitrust laws or significantly threaten competition." *Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1092 (N.D. Cal. 2007); *see* ECF No. 962-1 (Mem. Supp. Defs.' MSJ) at 22–25 (collecting authorities). Indeed, several witnesses, including Sean McManus of CBS Sports, testified that such arrangements are common. *See, e.g.*, 06/18/24 Tr. (McManus) 1651:22–24.[20]

Plaintiffs also had to prove that the effect of the exclusive license was to foreclose competition in a "*substantial share* of the line of commerce affected." *Qualcomm*, 969 F.3d at 1003 (emphasis added); *see also PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022). Plaintiffs offered no such proof. *See supra* Part II.A.2.

*First*, Plaintiffs failed to show foreclosure of any competition in the market they alleged, let alone of a substantial share. The vast majority of viewership of NFL Football is of in-market games.[21] Moreover, only three million of approximately 200 million NFL

---

[20] *See also, e.g.*, 06/07/24 Tr. (Lippincott) 451:7–17 (Residential Plaintiff subscribes to Apple TV because he "wanted to be able to watch Ted Lasso," and "that was the only place" he could get it); 06/10/24 Tr. (L. Jones) 599:4–6 (exclusivity is "the essence of [FOX's] business model"); 06/12/24 Tr. (Rolapp) 1093:12–22; 06/13/24 Tr. (Yurukoglu) 1342:21–1343:1 (exclusivity is common in the media and entertainment industries); 06/18/24 Tr. (McManus) 1651:9 (exclusivity "was vital to CBS"); *id.* (Yancy) 1740:8–17; 06/20/24 Tr. (Bernheim) 1954:1–2 (exclusivity "happens all the time in the economy").

[21] *See, e.g.*, 06/12/24 Tr. (Rolapp) 1145:6–8 ("Another way to look at it is there's 200 million fans. We have a model that's serving the vast, vast majority – 94, 95 percent[.]"); *see also* 06/20/24 Tr. (Bernheim) 1871:10–23 (explaining that "approximately 70 percent of the teams' fans are located within their local market area"); *id.* 2034:1–19; 06/11/24 Tr. (Rascher) 804:5–14 (acknowledging that "the vast majority of current over-the-air customers do not want different games than the over-the-air networks choose").

fans were Sunday Ticket subscribers at a given time, *see* 06/12/24 Tr. (Rolapp) 1144:24–25; TX-172 at 12, and witnesses testified that only 5–6% of all NFL fans had interest in watching OOM games and willingness to purchase Sunday Ticket during the class period, 06/12/24 Tr. (Rolapp) 1144:7–1145:5. Thus, even assuming that the Sunday Ticket agreement limited competition for OOM games, Plaintiffs failed to show that it foreclosed competition in the relevant market. *See Qualcomm*, 969 F.3d at 1004–05.

*Second*, Plaintiffs failed to prove the feasibility of a multiple distributor BFW because Dr. Zona never identified the alternative provider of Sunday Ticket and there was no evidence of an interested and capable provider. *See supra* at Part I.B.

*Third*, as explained *supra* in Part I.B, Dr. Zona's models predict higher prices in the BFW, which cannot support a finding of anticompetitive effects. *See Amex*, 585 U.S. at 547–48 (no anticompetitive effects where there is no evidence that the actual price "was higher than the price one would expect to find in a competitive market").

### 2. No reasonable jury could find that Plaintiffs identified substantially less restrictive alternatives to the exclusive license.

Defendants proffered legitimate procompetitive rationales at step two of the rule of reason, and Plaintiffs failed to establish a less restrictive alternative. Starting with procompetitive rationales, Defendants proved the following:

**i. *Incentivizing innovation and increasing quality*.** The exclusive licensing conduct promoted innovation by DirecTV, which results in a higher quality Sunday Ticket product. *See, e.g.*, *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 542 (9th Cir. 1983) ("Product innovation . . . is in many cases the essence of competitive conduct."); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 435 (4th Cir. 2015) (recognizing the creation of "incentives to innovate" as a cognizable procompetitive benefit); *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 721 (D.C. Cir. 2011) (noting that "exclusivity can further competition in certain circumstances," including by "encouraging innovation and investment" (internal quotation marks and citation omitted)).

The evidence showed that, because DirecTV had the exclusive right to distribute

Sunday Ticket, it had the incentive to innovate in its offerings. *See* 06/07/24 Tr. (Bornstein) 365:12–20; 06/12/24 Tr. (Rolapp) 1116:9–19; 06/20/24 Tr. (Bernheim) 1962:11–15, 1963:4–16; *see also* 06/13/24 Tr. (Yurukoglu) 1342:14–17. DirecTV acted on that incentive, including by creating RedZone, Fantasy Zone, the multiview option, and a streaming version of Sunday Ticket. 06/17/24 Tr. (Goodell) 1452:15–24.[22] The evidence— including class representative testimony—also showed that DirecTV's investments in innovation improved the package's actual value to customers. 06/07/24 Tr. (Lippincott) 443:6–444:21; 06/13/24 Tr. (Frantz) 1304:18–1305:13.[23] While Plaintiffs contend that DirecTV stopped innovating at some point in the 2010s in anticipation of AT&T's loss of exclusivity over Sunday Ticket, that does not undermine the innovations that occurred beforehand, 06/20/24 Tr. (Bernheim) 1961:9–1962:10, and in any event, is immaterial because Plaintiffs identified no workable alternative to DirecTV at that time.

> **ii. *Incentivizing investment in promotion and price discounts.*** Defendants established that exclusivity also incentivized DirecTV's investment in promotion and discounts of Sunday Ticket. *See, e.g.*, *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54–55 (1977) (one of the "redeeming virtues" of vertical restraints is that they may "induce retailers to engage in promotional activities"); *see also Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos.*, 598 F. Supp. 694, 706 (N.D. Cal. 1984) (same). The evidence showed that DirecTV invested in promotion, which stimulated demand and output by enhancing the package's perceived value. 06/20/24 Tr. (Bernheim) 1955:6–1956:4.[24] Many subscribers also received Sunday Ticket for free or at a discount, because DirecTV was incentivized to

---

[22] *See also, e.g.*, 06/07/24 Tr. (Bornstein) 363:21–365:7; 06/12/24 Tr. (Rolapp) 1067:8–13, 1070:14–1074:25.

[23] *See also, e.g.*, 06/07/24 Tr. (Bornstein) 384:22–385:16; 06/07/24 Tr. (Lippincott) 444:8– 21; ECF No. 1444-1 (White Dep.) Tr. 193:12–195:2, 196:14–197:2.

[24] *See also, e.g.*, 06/12/24 Tr. (Goodell) 1452:15–24 ("the way [DirecTV] promote[s] the game," and "the quality of how they do that" is a reason for exclusivity); 06/07/24 Tr. (Bornstein) 365:12–366:10.

offer discounts and promotions that would not occur without exclusivity.[25] *See, e.g.*, *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Lower prices are almost always procompetitive.").

      **iii. *Promoting MVPD competition*.** DirecTV's exclusive license also led to increased competition among MVPDs. It differentiated DirecTV from its competitors, *see* 06/07/24 Tr. (Bornstein) 365:12–366:14; 06/17/24 Tr. (Goodell) 1452:15–24; 06/12/24 Tr. (Rolapp) 1074:3–25, and helped DirecTV establish itself as a viable competitor in content distribution, which has in turn increased competition among MVPDs, 06/20/24 Tr. (Bernheim) 1965:8–1966:3. *See Ralph C. Wilson Indus.*, 598 F. Supp. at 706.

      Plaintiffs offered no evidence addressing how any of these procompetitive benefits could be achieved in the BFW, much less demonstrating any alternative that is "virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost." *Epic*, 67 F.4th at 986, 990 (cleaned up). "[A] business practice without a less restrictive alternative is not, on balance, anticompetitive," *id.* at 994, and any purported anticompetitive effects do not outweigh the clear procompetitive benefits of the exclusive Sunday Ticket agreement with DirecTV. *See* 06/20/24 Tr. (Bernheim) 1955:6–1956:11, 1961:9–11, 1963:1–16, 1965:8–1966:3.

## III.    PLAINTIFFS FAILED TO PROVE CLASSWIDE INJURY OR DAMAGES.

      Even if Plaintiffs could establish a violation of the Sherman Act, they failed to prove classwide injury. Plaintiffs had to establish that each and every class member has standing to pursue their claims. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."). At the class certification phase, Plaintiffs asserted that their common

---

[25]*See, e.g.*, 06/12/24 Tr. (Rolapp) 1050:8–13; 06/13/24 Tr. (Zona) 1215:10–17 ( "roughly half" of subscribers received Sunday Ticket for free); 06/17/24 Tr. (Yurukoglu) 1439:11–15 (there were "certainly" some class members who paid zero [dollars for Sunday Ticket] in certain years as a result of discounts); 06/13/24 Tr. (Yurukoglu) 1343:2–13 (explaining that, in a per-subscriber fee arrangement like that which other sports leagues use to distribute OOM packages non-exclusively, distributors will be less likely to offer discounts to consumers); 06/12/24 Tr. (Rolapp) 1021:2–19, 1050:22–24.

evidence proves harm to every member of the class. ECF No. 633-1 (Mem. Supp. Pls.' Mot. Class Cert.) at 17–21. But Plaintiffs failed to make that showing at trial, including as to causation and damages. *See Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 334 (9th Cir. 1993); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019).

That is first and foremost because Plaintiffs' models fail as a matter of law. *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) (when purported common expert evidence of injury is unreliable, "the class claims will fail as a unit"). But Plaintiffs' inability to establish the models' prerequisites—including the feasibility of the college football BFW, *see supra* at Part I.A, and the availability of an additional DTC provider in Dr. Zona's BFW, *see supra* at Part I.B—also leaves them unable to prove *classwide* injury.

## IV. PLAINTIFFS FAILED TO PROVIDE SUFFICIENT EVIDENCE OF LIABILITY, INJURY, OR DAMAGES FOR THE COMMERCIAL CLASS.

Plaintiffs failed to meet their burden to prove every element of their claim as to any—much less each—member of the Commercial Class. Dr. Zona admitted that the prices for commercial subscribers were "quite different," 06/13/24 Tr. 1219:9–15, and that the "*demand curve would be different*" for the commercial class, *id.* 1276:19–23 (emphasis added). Despite these admissions, Plaintiffs did literally nothing to build their case as to the commercial class and said nothing about the commercial class other than to add up their purchases. *Id.* 1189:25–1190:2; 06/11/24 Tr. (Rascher) 721:20–21, 729:3–4, 780:16, 783:3–6. Dr. Rascher never explained how commercial class members would be affected in his BFW with all games available on cable television. As their own expert, Mr. Elhauge, testified, that would eliminate the need for many consumers to go to a bar to watch the games at all.[26] And Dr. Zona did not use data from the commercial class, 06/13/24 Tr. 1218:6–16; create a demand curve for the commercial class, *id.* 1222:13–16; or otherwise generate any model relevant to the commercial class, *id.* (Yurukoglu) 1358:2–20

---

[26] 06/24/24 Tr. (Elhauge) 2195:19–2196:4; *cf.* 06/07/24 Tr. (Lippincott) 427:10–12 (testifying that he watched Saints games at bars after cancelling his subscription); 06/13/24 Tr. (Frantz) 1290:20–22 (explaining that he watches NFL games at bars or friends' houses).

1  (unrebutted testimony that Dr. Zona's figures "don't apply to the commercial class").

2  ## V.    PLAINTIFFS FAILED TO PROVE DAMAGES UNDER *ILLINOIS BRICK*.

3         Even if Plaintiffs could establish liability, they failed to establish that they are

4  entitled to any damages. The default rule is that Plaintiffs' claims based on any horizontal

5  agreement among the NFL and its member teams are barred by the "bright line rule" of

6  *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), because they did not purchase any product

7  directly from the NFL or the teams, *Apple Inc. v. Pepper*, 587 U.S. 273, 282 (2019); *see*

8  Stip. Fact 22. To get around this rule, Plaintiffs promised to show a "conspiracy among the

9  NFL teams, the NFL, and DirecTV[.]" *In re Nat'l Football League's Sunday Ticket*

10 *Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019).[27] They did not do so.

11        Plaintiffs were required to prove that DirecTV "conscious[ly] commit[ted] to a

12 common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite*

13 *Serv. Corp.*, 465 U.S. 752, 764 (1984); *Gold Medal LLC v. USA Track & Field*, 187 F.

14 Supp. 3d 1219, 1224 (D. Or. 2016), *aff'd*, 899 F.3d 712 (9th Cir. 2018). Plaintiffs' only

15 theory at trial of any overarching conspiracy is their late-in-the-game price-fixing claim

16 that the NFL influenced the pricing of Sunday Ticket. This claim falls short.

17        *First*, Plaintiffs never asserted a price-fixing claim before trial so it is not properly

18 presented. *See Sunday Ticket*, 933 F.3d at 1157 (distinguishing between a price-fixing

19 conspiracy and the "output restriction" conspiracy alleged here); *see also Perez v. State*

20 *Farm Mut. Auto. Ins. Co.*, 291 F.R.D. 425, 433 (N.D. Cal. 2013) (rejecting an attempt to

21 "reframe" a Section 1 claim based on quality restrictions as a "price-fixing" conspiracy),

22 *aff'd*, 628 F. App'x 534 (9th Cir. 2016). Price-fixing means "horizontal agreements among

23 competitors to fix prices," and DirecTV is not a horizontal competitor to the NFL, CBS, or

24 FOX. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *see*

25 *also Dagher*, 547 U.S. at 6 (distinguishing between "price fixing in a literal sense" and

26

27 _____

   [27] Defendants maintain that there is no "co-conspirator exception" to *Illinois Brick*, and to

28 the extent that one exists, it is limited to price-fixing conspiracies and does not extend to
   non-price-fixing conspiracies of the kind alleged here. *See Sunday Ticket*, 933 F.3d at 1158.

"price fixing in the antitrust sense"). Moreover, if Plaintiffs wanted to present a theory of vertical price maintenance by the NFL, they would still have to prove anticompetitive effects, *Leegin*, 551 U.S. at 907, which they failed to do, *see supra* at Parts II.A.2, II.B.2.

*Second*, Plaintiffs' experts did not timely offer any model of the BFW that satisfies their burden under *Comcast* to isolate the effects of any alleged price-fixing. *See supra* at Part I.B (no NFL tax model before trial); *Comcast*, 569 U.S. at 36. Moreover, the uncontroverted evidence was that *even if* the NFL exercised authority over the price of Sunday Ticket, that would not be anticompetitive, but a ubiquitous practice. 06/17/24 Tr. (Yurukoglu) 1426:21–1427:14, 1428:10–12; 06/18/24 Tr. (Bernheim) 1817:3–20.

*Third*, Plaintiffs' theory does not fit the facts, as Plaintiffs failed to overcome the plain language of the relevant agreements granting DirecTV sole pricing authority. TX-390 (2002 DirecTV Agreement) at § 1.b.ii; TX-44 (2011 NFL-DirecTV Agreement) at § 2.c; TX-45 (2014 DirecTV Agreement) at § 2.c; 06/06/24 Tr. (Bornstein) 239:2–240:9. Every witness to address the issue testified that DirecTV set the price of Sunday Ticket from 2002 onward. *See, e.g.*, 06/06/24 Tr. (Bornstein) 225:1–12, 357:4–12.[28]

Documents entered under Rule 806 cannot prove otherwise. "The maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised." *United States v. Gomez-Gallardo*, 915 F.2d 553, 555 (9th Cir. 1990) (cleaned up); *see Masimo Corp. v. Apple Inc.* 2023 WL 3432126, at *1 (C.D. Cal. Mar. 15, 2023). Rule 806 documents can at most be used to question the *credibility* of witnesses who testified that DirecTV set the price of Sunday Ticket (or that the witness was not involved in pricing), but not to *affirmatively prove* NFL control over pricing. And setting aside evidence admitted for impeachment purposes,[29]

---

[28] *See also, e.g.*, 06/17/24 Tr. (Goodell) 1466:14–24, 1498:19–20; 06/12/24 Tr. (Rolapp) 998:4–5, 1052:5–7; ECF No. 1444-1 (White Dep.) Tr. 206:19–207:2.

[29] The following exhibits were admitted only for impeachment: TX-457, TX-536, TX-612, TX-618, TX-771, TX-772, TX-775, TX-777, TX-779, TX-780, TX-787, TX-799, TX-800, TX-801, TX-802, TX-805, TX-806, TX-808, TX-810, TX-818, TX-822, and TX-830.

Plaintiffs have no substantive evidence of agreement on or control over price.[30] Plaintiffs' damages claims are thus foreclosed by *Illinois Brick*.

## VI. PLAINTIFFS FAILED TO ESTABLISH LIABILITY BASED ON CONDUCT THAT IS NOT PROTECTED BY THE SPORTS BROADCASTING ACT.

The evidence confirms that Plaintiffs' proposed BFWs rely on the invalidation of provisions in the SBA-protected network agreements, 15 U.S.C. § 1291. The college football BFW infringes on provisions designed to protect broadcaster exclusivity, *compare, e.g.*, 06/11/24 Tr. (Rascher) 752:20–756:1, *with, e.g.*, TX-145 at §§ 1.4, 2.5 (exclusivity and resale provisions of 2015 NFL-FOX agreement), and the multiple distributor BFW eliminates some aspects of those agreements, 06/13/24 Tr. (Zona) 1181:23–1182:20.

Defendants preserve their arguments that all aspects of the network agreements—including their exclusivity provisions—are protected by the SBA. *See* ECF No. 962-1 (Mem. Supp. Defs.' MSJ) at 4–11; ECF No. 1000-1 (Reply Supp. Defs.' MSJ) at 1–4. In addition, the evidence confirmed that the only agreement *outside* of the network agreements that could be challenged is the agreement through which the NFL licenses redistribution rights to DirecTV. *See* TX-44; TX-45. That exclusive licensing agreement—standing alone—does not violate the law. *See supra* at Part II.B.1.

## CONCLUSION

The Court should grant judgment as a matter of law to the NFL on all counts.

---

[30] TX-172 (discussing pricing of the separate.TV joint venture, *not* satellite Sunday Ticket); TX-269 (DirecTV's finance department "said no" to dropping the price of Sunday Ticket); TX-422 (some NFL executives did not know about pricing changes for Sunday Ticket made unilaterally by DirecTV in 2012); TX-428 (same); TX-419 (NFL had, in direct response to changes in Sunday Ticket agreement, eliminated positions related to "marketing, pricing, promotion, and administration" of Sunday Ticket satellite product); TX-481 (discussing pricing of the .TV product); TX-457 (same); TX-536 (same); TX-771 (same); TX-775 (any "approval" over pricing from NFL comes after DirecTV has publicly implemented the price); TX-805 (NFL team asking DirecTV employees what Sunday Ticket prices will be for the following season); TX-822 (pricing presentation for a potential (unrealized) joint venture "OTT" product, *not* satellite Sunday Ticket); TX-818 (internal DirecTV emails discussing pricing with no NFL input); TX-788 (Rolapp email discussing how .TV, *not* satellite Sunday Ticket, was to be offered).

Dated: June 24, 2024

Respectfully submitted,

/s/ *Beth A. Wilkinson*
Beth A. Wilkinson (admitted *pro hac vice*)
Rakesh N. Kilaru (admitted *pro hac vice*)
Brian L. Stekloff (admitted *pro hac vice*)
Jeremy S. Barber (admitted *pro hac vice*)
Max J. Warren (admitted *pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
bstekloff@wilkinsonstekloff.com
jbarber@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Neema T. Sahni (Bar No. 274240)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Suite 1500
Los Angeles, CA 90067-6045
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
nsahni@cov.com

Gregg H. Levy (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
John S. Playforth (admitted *pro hac vice*)
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
glevy@cov.com
dludwin@cov.com
jplayforth@cov.com

*Counsel for Defendants National Football League, NFL Enterprises LLC, and the Individual NFL Clubs*