Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN & DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | Case No. 2:15-ml-02668-PSG (SKx)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>JUDGE: Hon. Philip S. Gutierrez<br>DATE: June 5, 2024<br>COURTROOM:<br> First Street Courthouse<br> 350 West 1st Street<br> Courtroom 6A<br> Los Angeles, CA 90012 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTE THAT on June 25, 2024 at 1:30 p.m., before the Honorable Philip S. Gutierrez, Chief United States District Judge, Courtroom 6A, United States Courthouse, 350 West 1st Street, Los Angeles, CA 90012, Plaintiffs will, and hereby do, move the Court for an order granting Plaintiffs' Motion for Judgment as a Matter of Law.

This motion is based on this notice and supporting memorandum of points and authorities and the other records, papers, and orders in this action, as well as such additional evidence and arguments as may be presented by the parties before or at the hearing.

Dated: June 24, 2024

Respectfully submitted,

By: */s/ Marc. M. Seltzer*

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
Eliza Finley (301318)
efinley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
One Manhattan West
New York, NY 10001
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com

1

SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN & DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | Case No. 2:15-ml-02668-PSG (SKx)<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>JUDGE: Hon. Philip S. Gutierrez<br>TRIAL DATE: June 5, 2024<br>COURTROOM:<br>First Street Courthouse<br>350 West 1st Street<br>Courtroom 6A<br>Los Angeles, CA 90012 |

I.     INTRODUCTION ................................................................................................ 1

II.    STANDARD FOR GRANTING JUDGMENT AS A MATTER OF
       LAW .................................................................................................................. 2

III.   ARGUMENT ..................................................................................................... 2

       A.    No Reasonable Juror Could Conclude That Plaintiffs Have
             Failed to Meet Their Initial Burden. ..................................................... 2

       B.    The Teams Are Not a Single Entity Incapable of Concerted
             Action ...................................................................................................... 8

       C.    Defendants Have Not Met Their Burden of Proof of Establishing
             Procompetitive Justifications Capable of Outweighing the Direct
             Harm to Competition. .......................................................................... 10

             1.    No Reasonable Juror Could Find the Defendants'
                   "Competitive Balance" Is a Proper Procompetitive
                   Justification. .............................................................................. 12

             2.    Defendants' Have Not Presented Evidence that Quality
                   Enhancements Can Justify the Restraints at Issue .................. 16

             3.    The Defendants Have Not Met Their Burden of Showing
                   that the Availability of OTA Telecasts or "Matching" is a
                   Procompetitive Benefit ............................................................ 19

       D.    No Reasonable Juror Could Accept Defendants' Statute of
             Limitations and Laches Defenses. ....................................................... 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AGC of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ................................................................................................................ 5

*Am. Needle, Inc. v. NFL*,
   560 U.S. 183 (2010) ........................................................................................................... 8, 9

*Bd. of Regents of Univ. of Okla. v. NCAA*,
   546 F. Supp. 1276 (W.D. Okla. 1982) ................................................................................. 6

*Fishman v. Estate of Wirtz*,
   807 F.2d 520 (7th Cir. 1986) ................................................................................................ 6

*In re Cotton Yarn Antitrust Litig.*,
   505 F.3d 274 (4th Cir. 2007) .............................................................................................. 23

*In re Glumetza Antitrust Litig.*,
   611 F. Supp. 3d 848 (N.D. Cal. 2020) ............................................................................... 23

*In re NFL's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) .................................................................................... *passim*

*In re NFLST Antitrust Litig.*,
   2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) ........................................................................ 3

*In re NFLST Antitrust Litig.*,
   2024 WL 168298 (C.D. Cal. Jan. 11, 2024) ..................................................................... 4, 8

*Int'l Boxing Club of N.Y., Inc. v. United States*,
   358 U.S. 242 (1959) .............................................................................................................. 6

*Klein v. Facebook, Inc.*,
   580 F. Supp. 3d 743 (N.D. Cal. 2022) ............................................................................... 24

*L.A. Mem'l Coliseum Comm'n v. NFL*,
   726 F.2d 1381 (9th Cir. 1984) ............................................................................................. 6

*Laumann v. NHL*,
   907 F. Supp. 2d 465 (S.D.N.Y. 2012) ................................................................................. 6

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998) ..................................................................................... 12, 13

*Law v. NCAA*,
   902 F. Supp. 1394 (D. Kan. 1995) ..................................................................................... 13

*Mayor of Baltimore v. Actelion Pharms. Ltd.*,
   995 F.3d 123 (4th Cir. 2021).................................................................... 23

*Metro. Intercollegiate Basketball Ass'n v. NCAA*,
   339 F. Supp. 2d 545 (S.D.N.Y. 2004) ....................................................... 6

*Mid-South Grizzlies v. NFL*,
   720 F.2d 772 (3d Cir. 1983)....................................................................... 6

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978) ............................................................................ 10, 21

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021) ............................................................................... 2

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) ............................................................................*passim*

*O'Bannon v. NCAA*,
   7 F. Supp. 3d 955 (N.D. Cal. 2014), 802 F.3d 1049 (9th Cir. 2015) ............... 13, 14

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018)................................................................................ 2, 3

*Oliver v. SD-3C, LLC*,
   751 F.3d 1081 (9th Cir. 2014)............................................................. 23, 24

*Phila. World Hockey Club v. Phila. Hockey Club*,
   351 F. Supp. 462 (E.D. Pa. 1972) ............................................................. 6

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014).................................................................. 23

*Smith v. Pro-Football*,
   420 F. Supp. 738 (D.D.C. 1976), 593 F.2d 1173 (D.C. Cir. 1978)......................... 13

*Torres v. City of Los Angeles*,
   548 F.3d 1197 (9th Cir. 2008).................................................................... 2

*U.S. Football League v. NFL*,
   644 F. Supp. 1040 (S.D.N.Y. 1986), 842 F.2d 1335 (2d Cir. 1988)....................... 6

*United States v. NFL*,
   196 F. Supp. 445 ....................................................................................... 8

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972).................................................................................. 10

**Statutes**

15 U.S.C. § 15b............................................................................................ 23

Sherman Act ........................................................................................................ *passim*

**Rules**

Federal Rule of Civil Procedure 50(a) ..................................................................... 1, 2

**I.     INTRODUCTION**

Plaintiffs move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).

Plaintiffs move, first, for a determination as a matter of law that they have met their initial burden of establishing a substantial anticompetitive effect stemming from the challenged restraints. Plaintiffs have met this burden in three distinct and independently sufficient ways: (1) by showing that the restraints at issue are "naked restraints," i.e., an actual integrated web of agreements to reduce output and raise prices, (2) by showing the restraints caused substantial detrimental effects on competition such as reduced output and increased prices, and (3) by showing the Defendants' market power in the market for professional football telecasts coupled with "some evidence" the challenged restraints harmed competition. Defendants contest this as a matter of argument, but not as a matter of substance. Trial testimony confirmed that the very purpose of the restraints was to limit horizontal competition between the NFL teams and between CBS, Fox, and DirecTV.

Second, Plaintiffs move for a determination as a matter of law that the NFL and its member teams are capable of concerted action and therefore cannot collectively be considered a "single entity."

Third, Plaintiffs move for a determination as a matter of law that the NFL Defendants have failed to put forth sufficient evidence to sustain their evidentiary burden on their purported procompetitive justifications, including competitive balance, quality enhancement, or over-the-air television availability. The NFL has never, in their business or in this litigation, established *any* fact-based connection between "competitive balance" and the restraints at issue here. The NFL claims that sharing telecast revenue promotes competitive balance, but putting to one side the unsupported, conclusory and self-serving statements of the NFL's witnesses, none of the evidence adduced at trial shows that revenue sharing itself promotes competitive balance. Nor have Defendants connected any purported "quality enhancements" to

the challenged conduct or shown that the interest in maintaining access to a few games on over-the-air television justifies explicit restraints that decrease overall viewership and prevent tens of millions of fans from accessing their preferred telecasts.

Finally, Plaintiffs move on the Defendants' perfunctory affirmative defenses of laches and statute of limitations.

## II.   STANDARD FOR GRANTING JUDGMENT AS A MATTER OF LAW

Once "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may… resolve the issue against the party." Fed. R. Civ. P. 50(a). In the Ninth Circuit, "judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008) (cleaned up).

## III.   ARGUMENT

### A.   No Reasonable Juror Could Conclude That Plaintiffs Have Failed to Meet Their Initial Burden.

Defendants explicitly agreed not to compete in the sale of their telecast rights. In most any other context, a horizontal agreement not to compete would be a *per se* violation of Section 1. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984) ("*NCAA*") (holding that the NCAA's television restraints amounted to "[h]orizontal price fixing and output limitation[s]" of the sort that are "ordinarily condemned" as "'illegal per se.'"). But because some cooperation is necessary for sports leagues to operate, the Supreme Court has held that the *per se* rule does not apply to agreements among members of a sports league of this type, and courts should instead evaluate agreed-upon league restraints under the rule of reason. *NCAA v. Alston*, 141 S. Ct. 2141, 2157 (2021) (citing *NCAA*).

Under the rule of reason, the plaintiff has the initial burden to prove the challenged restraint "has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("*Amex*").

They may do so in any of three ways: by establishing that the defendants have implemented a naked restraint on competition; by directly assessing the effects on competition; or indirectly, by assessing the defendants' power in a defined product market coupled with evidence of likely harm to competition.[1] Once they do so, the burden shifts to defendants to justify the restraints. *Id.* Plaintiffs have met their burden under all three frameworks.

First, as the Ninth Circuit held in this case, "plaintiffs can show that a restraint injures competition if they plausibly allege 'a naked restriction on price or output,' such as 'an agreement not to compete in terms of price or output.'" *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1151 (9th Cir. 2019) ("*NFLST*") (quoting *NCAA*, 468 U.S. at 109).[2] The Ninth Circuit held that, as alleged, the restraints at issue in this case are naked restraints of this kind: "[B]ecause the alleged restrictions on the production and sale of telecasts constitute 'a naked restriction' on the number of telecasts available for broadcasters and consumers, the plaintiffs were not required to establish a relevant market." *Id.* at 1152 (quoting *NCAA*, 468 U.S. at 109). "Here, as in *NCAA*, 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" *NFLST*, 933 F.3d at 1156 (quoting *Cal. Dental Ass'n*, 526 U.S. at 770). Indeed, the restraints are set out in the contracts that govern NFL telecast distribution, which is why this Court held that "if the contracts match-up to the allegations, then there will be a violation applicable to the whole class." *In re NFLST Antitrust Litig.*, 2023 WL 1813530, at *11 (C.D. Cal. Feb. 7, 2023). Those contracts are not disputed.

---

[1] Plaintiffs also can show that the conduct of the NFL Defendants violated Section 2 of the Sherman Act by showing that they conspired to create a monopoly over the telecast of their games with the purpose of inflicting anti-competitive harm.

[2] It is well-settled that direct proof of market power in a defined antitrust market is not required to prove an antitrust violation based on a "the absence of proof of market power does not justify a naked restriction on price or output. To the contrary, when there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" *NCAA*, 468 U.S. at 109 (quoting *Nat'l Soc'y Prof'l Eng'rs*, 435 U.S. 679, 692 (1978)).

Second, the direct effects of the restraints are undeniable because Defendants have *conceded* the anticompetitive purpose and effects of the restraints, contending that they are necessary to support their purported procompetitive justifications. *See In re NFLST Antitrust Litig.*, 2024 WL 168298, at \*13 (C.D. Cal. Jan. 11, 2024) ("Defendants argue that the exclusivity provisions are essential to CBS and FOX and eliminating them would harm fans and essentially destroy the NFL's broadcasting model."). Instead of denying that they have intentionally restricted output (in part by keeping Sunday Ticket prices high enough to discourage millions of NFL fans from subscribing to Sunday Ticket and in order to protect CBS and Fox from competition), they have made that a cornerstone of their defense, emphasizing that this output limitation has been the league's official policy for decades.[3]

These explicit limitations are set out in the Defendants' contracts with CBS, Fox, and DirecTV. The agreements with the Networks expressly limit competition by requiring that Sunday Ticket be offered as a "premium product" only "for avid League fans" to "satisfy complementary demand."[4]

---

[3] *See, e.g.*, Dkt. No. 1413-4, Kraft Depo. 29:03-29:09 ("Q: And how is it that offering Sunday Ticket product at less than the premium price would harm the over-the-air broadcast? I think that would devalue our over-the-air partners' packages. And then they wouldn't be incented to continue to pay us the way they pay us"); Tr. 1114:7-11 (Brian Rolapp: "Was it the NFL's goal to make Sunday Ticket -- to make sure it was a complement to and not a substitute of the network Sunday Afternoon Games? A. I think that's fair."); Tr. 1682:18-20 (Sean McManus: Q: "And Sunday Ticket's not intended to take viewership away from CBS, right?" A: "Uh-huh. Yes."); Tr. 516:24-518:4 (Larry Jones: Q: "Isn't it true, sir, that in addition to this requirement that – in the contract that Sunday Ticket be sold on a subscription basis, FOX and the NFL have also long had an agreed principle that Sunday Ticket would remain a complementary premium product that would not materially compete with FOX's in-market games? A: Yes. The – the idea that it was for the avid fan and it would be a premium service that would offer the resale partner to sell the games.").

[4] *See, e.g.*, TX146A (CBS-NFL agreement) at -542; TX146D (FOX-NFL agreement) at -742; TX44 at -440; TX45 at -469 (2015-22 agreement with DirecTV stating that "in all cases NFL Sunday Ticket shall be marketed and offered in a manner consistent with its high-quality, premium subscription sports offering."). There is no other way to interpret "complementary demand" other than as non-substituting demand—the very definition of an anticompetitive agreement. Tr. 1114:7-11 (Brian Rolapp) ("Was it the NFL's goal to make Sunday Ticket—to make sure it was a complement to and not a substitute of the network Sunday Afternoon Games? A. I think that's fair.").

In addition to the reduction in the output of telecasts and deliberate suppression of viewership, the restraints also diminish NFL telecast quality by making telecast availability unresponsive to consumer preference. By design, the restraints force a limited subset of games to be aired in any given market. If "out of market" telecasts were more widely available at reasonable, non-"premium" prices, consumer welfare would increase because many fans currently forced to watch a less desired telecast (or not watch at all), would instead be able to watch their first choice telecast. *See NFLST*, 933 F.3d at 1143 ("But if NFL fans happen to live far away from their favorite team—such as a Seattle Seahawk fans living in Los Angeles—they can watch every Seahawks game only if they purchase DirecTV's NFL Sunday Ticket…"). The NFL has estimated that 35 million avid fans are "underserved" because they want to watch games unavailable locally but do not have access via ST. TX172 at -541. And this is only avid fans. The NFL determined that there are "*75 million* fans, either avid or casual, interested in watching out-of-market games." Tr. 744:8-9 (Dr. Rascher) (emphasis added).

Increased prices and decreased consumer choices are core antitrust injuries. When considering the NCAA's broadcast restraints in *NCAA*, the Supreme Court held that the "anticompetitive consequences of this arrangement are apparent. Individual competitors lose their freedom to compete. Price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." 468 U.S. at 106-07; *see also, e.g., AGC of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions…"). Perhaps because this output limitation is undeniable, the NFL's principal focus at trial was that their intentional restriction of output had *secondary* procompetitive purposes and effects. But that is just to say that Plaintiffs have met their initial burden of proving a direct impact on competition.

Finally, Plaintiffs have shown that the Defendants have market power in the market for live professional football telecasts. "In order to show that an agreement injures competition, a plaintiff must generally show that the defendants have market power within a relevant market, meaning that the defendants have 'the ability to raise prices above those that would be charged in a competitive market.'" *NFLST*, 933 F.3d at 1151 (citations omitted).

As the Ninth Circuit held, "Given that professional football games have no substitutes (as fans do not consider NFL games to be comparable to other sports or forms of entertainment), *see L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984), the defendants in this case have effective control over the entire market for telecasts of professional football games." 933 F.3d at 1155. Even if it were not already the law of the case, the law is consistent that the leagues of individual sports are an appropriate product market.[5] Most comparably, in *NCAA*, the Supreme Court recognized that college football telecasts constituted a separate market from telecasts of other sports and, indeed, from professional football telecasts. 468 U.S. at 111.[6] That holding only makes sense if professional football telecasts are an independent and separate market.[7]

---

[5] *See, e.g.*, *Laumann v. NHL*, 907 F. Supp. 2d 465, 491-92 (S.D.N.Y. 2012) ("It is well established that there are peculiar and unique characteristics that set major league men's ice hockey and baseball apart from other sports or leisure activities, that close substitutes do not exist and that the Leagues possess monopolies of their respective sports.") (cleaned up); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986) (professional basketball); *L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984) (professional football); *Metro. Intercollegiate Basketball Ass'n v. NCAA*, 339 F. Supp. 2d 545, 550 (S.D.N.Y. 2004) (college basketball); *U.S. Football League v. NFL*, 644 F. Supp. 1040, 1056 (S.D.N.Y. 1986) (professional football), *aff'd*, 842 F.2d 1335 (2d Cir. 1988); *Mid-South Grizzlies v. NFL*, 720 F.2d 772, 783 (3d Cir. 1983) (same); *Phila. World Hockey Club v. Phila. Hockey Club*, 351 F. Supp. 462, 501 (E.D. Pa. 1972) (major league hockey).

[6] The Supreme Court has also held that championship boxing matches constituted a separate market from non-championship boxing. *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959).

[7] In *NCAA*, the district court found the NCAA to have violated Section 2 of the Sherman Act, finding that it was "clear that NCAA exercises monopoly power," because "NCAA controls all of regular season college football television." *Bd. of*

The testimony in this case uniformly supports this conclusion. No witness suggested that anything else on a Sunday afternoon—other than the restrained out of market telecasts—competed or could compete in any meaningful way with the Sunday afternoon football broadcasts. Defendants stressed that their broadcasts alone dominated the television ratings with no other programming coming close.[8] Indeed, the NFL's economic expert, Dr. Bernheim, did not contest that the relevant market is NFL telecasts. *See, e.g.*, Tr. 2029:25-2030:3 ("But for the purpose of evaluating the effect on overall output, you have to use the market definition. I used Dr. Rascher's market definition."). Dr. Bernheim also testified that the NFL teams have market power. Tr. 1948:4-5 (NFL teams could use other means "to charge a higher price, but that is simply a matter of exercising market power").

Defendants' own supposed procompetitive justifications confirm that the NFL has market power within the relevant market of NFL telecasts. If other programming were in the same market and competed for viewers' attention, CBS and Fox would not demand that Sunday Ticket viewership be limited. Similarly, the NFL claims that the added revenue DirecTV earned by having Sunday Ticket exclusively encouraged DirecTV to invest in the product. Leaving aside the dubious merits of that justification, which runs counter to the idea that competition (rather than the lack of it) spurs innovation, it only makes sense if DirecTV can charge a supracompetitive price. If other products constrained Sunday Ticket pricing, then DirecTV's exclusive

---

*Regents of Univ. of Okla. v. NCAA*, 546 F. Supp. 1276, 1323 (W.D. Okla. 1982). While the Supreme Court did not reach the Section 2 issue, it held that "the NCAA's complete control over those broadcasts provides a solid basis for the District Court's conclusion that the NCAA possesses market power with respect to those broadcasts." 468 U.S. at 112.

[8] *See, e.g.,* 1478:6-1479:14 (Roger Goodell: NFL accounted, *inter alia*, for 46 of top 50 shows in 2021); 967:7-9 (Rolapp testifying that NFL telecasts are advertisers' only "sure bet");614:5-9 (Larry Jones: "Q: And did you get more for advertising for NFL games than any other sport? A: By far . . . [b]ecause we get more eyeballs."); 967:2-9 (Rolapp testifying that NFL telecasts are "consistently the most viewed programming on television and as a result it attracts a lot of advertisers.").

rights to out-of-market NFL game telecasts would have no effect and the NFL's justification would not make sense.

No matter how you analyze it—naked restraint, direct effects, or indirect effects—no reasonable juror could conclude that Plaintiffs have not met their initial burden. As a result, Defendants face "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." Summ. J. Order, Dkt. 1155 at 18 (quoting *NCAA*, 468 U.S. at 113).

### B.    The Teams Are Not a Single Entity Incapable of Concerted Action

This Court has correctly stated that Defendants' single-entity argument succeeds only if it is not "*possible* for independent entities—i.e., individual sports teams—to license telecast rights on their own without pooling their rights with a conference or a league." 2024 WL 168298 at *16 (emphasis added). The single entity doctrine applies only when otherwise separate entities "'are incapable of conspiring with each other for purposes of § 1 of the Sherman Act.'" *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 194 (2010) (quoting *Copperweld*, at 777). Here, no reasonable juror could find the teams incapable of concerted action given that it is undisputed that they—both historically and presently—can sell their telecasts rights individually. [9]

Defendants' only response is to continue to elide the necessity of some cooperation between the teams with the notion that they are incapable of concerted action. That position has been repeatedly rejected in this case and by the Supreme Court. In *NCAA*, the Court recognized that some cooperation was necessary for college football telecasts to exist, but the consequence of that was simply that the rule

---

[9] Tr. 968:5-12 (Rolapp testimony that teams sell their preseason telecast rights independently); 1638:6-11 (J. Jones testimony that Cowboys license their preseason telecasts rights "on their own without the NFL"); 1751:17-19 (Yancy testimony that teams broadcast their own preseason games); 703:10-17; 705:18-706:1 (Rascher testimony that teams sold rights independently in the 1950s); 1649:13 (McManus, CBS Executive, testimony that CBS began working with the teams in 1950s); *see also United States v. NFL*, 196 F. Supp. 445, 446 ("Defendants concede that the 1961 NFL-CBS contract marks a basic change in National Football League television policy. Prior to this contract each member club individually negotiated and sold the television rights to its games to sponsors or telecasters with whom it could make satisfactory contracts.").

of reason applied. 468 U.S. at 117. And in *American Needle*, the Court emphasized, in a case involving the NFL, "[a]ny joint venture involves multiple sources of economic power cooperating to produce a product. And for many such ventures, the participation of others is necessary. But that does not mean that necessity of cooperation transforms concerted action into independent action." 560 U.S. at 199. The Court noted, for example, that NFL teams compete economically for, among other things, "gate receipts," *id*. at 197, even though the fans are charged for a game involving two cooperating teams in a league-set schedule.

"Only the agreements that are the subject of plaintiffs' antitrust action prevent such independent actions. Thus, we reject the defendants' argument that *American Needle*, 560 U.S. at 190, is inapposite; here, like in *American Needle*, the agreements not to compete concern separately owned intellectual property, and impose an unlawful restraint on independent competition." 933 F.3d at 1154; *see also NCAA*, 468 U.S. at 99 ("By participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint—an agreement among competitors on the way in which they will compete with each other."). Because individual NFL teams have broadcast and continue to broadcast games individually, as professional teams outside of the NFL do on a routine basis, it is undeniably possible for them to do so. *See* Tr. 2119:4-8 (E. Elhauge) ("It's also true that in baseball, basketball, and hockey, teams individually sell telecasts. Any telecast that's basically not nationally shown is individually telecast by the teams, even though those leagues obviously, again, are collectively setting rules and schedules."). Defendants have offered no evidence to suggest otherwise. There is thus no disputed fact for the jury to resolve.

### C. Defendants Have Not Met Their Burden of Proof of Establishing Procompetitive Justifications Capable of Outweighing the Direct Harm to Competition.

Because Plaintiffs have met their initial burden of proving impact on competition, Defendants face the "heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." Summ. J. Order, Dkt. 1155 at 18 (quoting *NCAA*, 468 U.S. at 113). Defendants have mentioned a few purported procompetitive benefits—including competitive balance and telecast quality—but have not come close to meeting their burden.

A legally cognizable procompetitive effect is not one that simply increases profits, spreads wealth to others, or achieves some laudable social purpose. *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978) ("*NSPE*") ("the purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry."). To truly be procompetitive, a justification must promote or sustain competition in the market harmed by the restraint. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) (competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy").

As this Court recently emphasized in the context of product quality, evidence of a procompetitive benefit "is only relevant if it is related to the challenged restraint." Dkt. 1292 at 5 (citing *NCAA*, 468 U.S. at 104). At every turn, Defendants have failed to meet their burden of establishing this relationship. This is especially so as they have ignored this Court's and the Ninth Circuit's repeated admonitions that the restraints must be considered as a connected whole.  *See NFLST*, 933 F.3d at 1152 ("Contrary to the defendants' argument, we are required to take a holistic look at how the interlocking agreements actually impact competition."). Dr. Bernheim

testified only that the Teams' pooling agreement was procompetitive *in isolation*. Tr. 1931:12-16. He did the same with respect to the NFL's agreement to distribute Sunday Ticket exclusively through DirecTV. Tr. 1967:2-5. He offered no opinion on whether the challenged interlocking web of agreements *as a whole* promoted competition. In fact, he defended the NFL's fixing of price as simply the use of the NFL's market power, testifying, "And as far as I'm aware in this case, there's no allegation that the NFL acquired whatever market power it has a professional football league through illegitimate means." Tr. 1978:8-15. This, of course, ignores Plaintiffs' allegations that the teams agreed not to compete and create a monopoly in the NFL, acting as their joint single seller of all of their telecast rights, and limited the distribution of the out-of-market telecasts at the behest of CBS and Fox. *See* Tr. 2110:24-2111:2 (E. Elhuage) ("So in this case, there's multiple restraints being challenged and [Dr. Bernheim] failed to consider the combined effects of them. Instead, he artificially separated them out and treated them in isolation.")

Dr. Bernheim even testified that he did not analyze the effect of "a series of interlocking agreements to raise the price of Sunday Ticket in order to limit distribution of Sunday Ticket"—which is a summary of much of the challenged conduct in this case—stating, "That was not what Dr. Rascher was discussing in his report, so no .... That's not germane to the opinion of the anticompetitive or procompetitive effects of the exclusive conduct." Tr. 2024:9-19. That, of course, is *precisely* what Dr. Rascher discussed in multiple parts of his report. *See, e.g.*, Dkt. 956-4, Rascher Rpt. at 23 ("Defendants effectuated these restrictions through three sets of interlocking agreements that captured, collectively, the allegedly anticompetitive conduct ('Challenged Conduct'): the concerted action by the teams (through the NFL), their broadcast partners, and DirecTV to restrict output, raise prices, and increase profits."); *see also id.* at 44-46 (discussing "premium" requirement as a means to raise prices and protect the networks).

### 1. No Reasonable Juror Could Find the Defendants' "Competitive Balance" Is a Proper Procompetitive Justification.

No reasonable juror could find that the Defendants' evidence regarding "competitive balance" meets their "heavy burden" to prove their affirmative defense. While courts have often recognized that competitive balance is the kind of factor that *could* serve as a procompetitive justification, they have been consistently wary of its assertion in the absence of analysis to show its *actual* effects. This is because the antitrust laws are not interested in competitive balance among teams as an independent goal. Competitive balance can only be a justification for the restraints if Defendants can prove that maintaining it increases consumer demand and output in the relevant market. "The hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of Reason is that equal competition will maximize consumer demand for the product." *NCAA*, 468 U.S. at 119-20. The Supreme Court in *NCAA* rejected the NCAA's proffered competitive balance justification both because the NCAA had not shown a connection between the challenged conduct and competitive balance ("is not even arguably tailored to serve such an interest. It does not regulate the amount of money that any college may spend on its football program, nor the way in which the colleges may use the revenues that are generated by their football programs," 468 U.S. at 119) and because it was inconsistent with the finding that output would increase without the restraints. "The finding that consumption will materially increase if the controls are removed is a compelling demonstration that they do not in fact serve any such legitimate purpose." 468 U.S. at 120.

Similarly, in *Law v. NCAA*, 134 F.3d 1010, 1024 (10th Cir. 1998), the Tenth Circuit affirmed the district court's conclusion at summary judgment that the NCAA had failed—as a matter of law—to justify restraints on coaching salaries on the basis of competitive balance ("Nowhere does the NCAA prove that the salary restrictions enhance competition, level an uneven playing field, or reduce coaching inequities.").

The district court in *Law* found that the defendants had not produced "any plausible evidence that the rule's restraint relates directly and effectively to the preservation of competitive balance ...; instead, it offers only argument on this point." *Law v. NCAA*, 902 F. Supp. 1394, 1409 (D. Kan. 1995).

The court in *O'Bannon v. NCAA* rejected a similar competitive-balance justification for the same reason it must be rejected here: the NCAA self-servingly put forth "competitive balance" as a justification without analyzing the connection between the restraints and competitive balance let alone showing that the NCAA's level of balance increased output:

> Even if the NCAA had presented some evidence of a causal connection between its challenged rules and its current level of competitive balance, it has not shown that the current level of competitive balance is necessary to maintain its current level of consumer demand. It is undisputed that the ideal level of competitive balance for a sports league is somewhere between perfect competitive balance (where every team has an equal chance of winning every game) and perfect imbalance (where every game has a predictable outcome). The NCAA has not even attempted to identify the specific level of competitive balance between those extremes that is ideal or necessary to sustain its current popularity. Given the lack of such evidence in the record, the Court finds that the NCAA's challenged rules are not needed to achieve a level of competitive balance necessary, or even likely, to maintain current levels of consumer demand for FBS football and Division I basketball.

*O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 979 (N.D. Cal. 2014) (citations omitted), *aff'd in relevant part*, 802 F.3d 1049, 1072 (9th Cir. 2015).

Indeed, defendants have never cited *any* case in which competitive balance was accepted as a justification for its otherwise anticompetitive conduct.[10]

As in *NCAA* and *Law*, the evidence at trial failed to support this purported justification for two independent reasons. First, there is zero evidence that the joint licensing arrangement contributes to competitive balance. To the contrary, the evidence at trial was consistent that it does not do so. And second, there is no evidentiary basis for the conclusion that any competitive balance that it might cause

---

[10] Even the NFL's argument that the player draft promoted competitive balance sufficiently to justify restraining competition was rejected in *Smith v. Pro-Football*, 420 F. Supp. 738, 746 (D.D.C. 1976), *aff'd in relevant part*, 593 F.2d 1173 (D.C. Cir. 1978).

13

has had any significant, quantifiable effect on price or output. To borrow the words of Judge Wilken from *O'Bannon*, "It is undisputed that the ideal level of competitive balance for a sports league is somewhere between perfect competitive balance (where every team has an equal chance of winning every game) and perfect imbalance (where every game has a predictable outcome). The [NFL] has not even attempted to identify the specific level of competitive balance between those extremes that is ideal or necessary to sustain its current popularity." 7 F. Supp. 3d at 979.

There is no evidence that the NFL itself ever conducted a study aimed at that question, which the NFL's witnesses repeatedly admitted. Tr. 1526:3-14 (Goodell: "Q: The NFL has no studies . . . that we can look at that says revenue sharing among the teams from these TV revenues helps competitive balance. A: . . . We may not have a study . . ."). Indeed, what analysis the league has done is directly contrary to its litigation position. *See* TX336 at NFL_0494190 (internal NFL document for the special committee on league economics stating "little correlation between revenue and winning percentage"). Moreover, the NFL's economic expert did not even attempt to tie competitive balance to any of the alleged restraints other than pooling. *See* Tr. 1886:23-25. Dr. Bernheim had nothing to say about the effects of exclusivity or the premium-price requirement on competitive balance. Nor did he express a view about whether the challenged conduct *as a whole* promoted competitive balance (or any other alleged procompetitive benefit). Tr. 2160:13-16 (E. Elhauge) ("The argument on competitive balance is limited to the pooling agreement. There's no real even argument offered to suggest that bundling or exclusive dealing could be justified by – by an effect on competitive balance."). At bottom, all Defendants have is a raw assertion that some kind of "competitive balance," divorced from the challenged restraints, provides a defense to their clear (profit-enhancing) restraint on trade.

Second, just as in *NCAA*, the NFL has offered no basis whatsoever for the conclusion that the challenged conduct promotes competitive balance at all. They have simply asserted the claim that the revenue that is shared through this

arrangement leads to competitive balance. As in *NCAA*, the restraints at issue do "not regulate the amount of money that any [team] may spend on its football program, nor the way in which the [teams] may use the revenues that are generated by their football programs." *Id.* at 119. As the experts testified, the league has a host of *other* mechanisms, including the salary floor and cap, that do these very things.  *See* Tr. 833-17-18 (Dr. Rascher) ("The floor and the cap is what drives competitive balance in the NFL."); Tr. 2163:15-16 (E. Elhauge) ("So the less anticompetitive alternatives, I think, are clearly salary caps and salary floors.")

Nor did Dr. Bernheim discuss any research by sports economists that would tend to support his view that universal revenue sharing of broadcasting money is necessary for competitive balance, and for good reason: the broad consensus among economists that revenue sharing does *not* promote competitive balance. It is universally accepted among sports economists that revenue sharing merely transfers money between wealthy owners who have no lack of access to resources. And it does so without providing them any incentive to invest in quality that they did not already have.[11] Dr. Bernheim repeatedly emphasized the importance of analyzing the incentives of the owners, but never explained how their incentives to invest in team quality are affected by receiving revenue that is unrelated to team quality, especially in the context of a league with a salary cap and floor.

Moreover, Dr. Bernheim expressly disavowed any attempt to quantify the effects of revenue sharing, either on competitive balance, or on the ultimate question of price and output. Instead, remarkably, Dr. Bernheim simply denied that the league would be interested in achieving the ideal level of revenue sharing in the but-for world, so it was not relevant to his analysis. 2029:15-18. He acknowledged in his

---

[11] This not a controversial point in the sports economics world. Roger Blair's basic textbook, Sports Economics, which Bernheim cites in his report makes the point clearly: "[R]evenue sharing can help the teams in weak markets and enable them to be more competitive in the market for player talent. We would expect that, with better talent, the weak-market teams will improve, and competitive balance will likewise be improved. However, as we will see, this is a myth because teams will still choose the quality level that maximizes profits." Roger Blair, Sports Economics, (Cambridge University Press, 2011): 75.

deposition that while "a proper analysis of this conduct" would require "address[ing] this issue head on front and center," he testified that Dr. Rascher is the one who should have done so.[12] But this is an issue on which *Defendants*, not Plaintiffs, bear the burden of proof, and they are left with no evidence or expert opinion that supports their position. By contrast, Dr. Rascher has provided testimony concerning the level of revenue sharing that could arguably be necessary to promote competitive balance: the minimum—if any—needed to ensure that teams can meet the salary floor. Tr. 832:8-832:11 ("Q: And so the more narrow a salary cap and salary floor are, the more competitive balance there is. Ever team has a better shot; right? A: Yes. That's generally true."). While it is exceedingly unlikely that any would be needed (particularly because the floor is calculated by total revenue and thus would drop if revenue dropped), the obvious less restrictive alternative to eliminating competition within the telecast market is a degree of partial revenue sharing necessary to ensure each club can meet the salary floor. *See* Tr. 2197:22-23 (E. Elhauge) ("significantly lower revenue sharing could have enabled teams to meet current expenditures").

Simply put, Dr. Bernheim has admitted that he has made no effort to meet *Defendants'* burden of proof on the issue, and he has made no effort to tie it to the challenged conduct as a whole. There is no other competent evidence in support of this position.

### 2.    Defendants' Have Not Presented Evidence that Quality Enhancements Can Justify the Restraints at Issue

While evidence of improved "quality" of the product *can* be a procompetitive justification, a quality improvement is relevant only if it is *caused* by the challenged conduct and can be shown to enhance competition by increasing demand to the point

---

[12] See Tr. 2029:7-18 ("You haven't done any analysis to show whether the needle can be thread of having a revenue sharing position—number that gives you enough competition but doesn't undermine competitive balance. Fair? A. I don't think that's fair. What I've shown is that the needle would not be thread. And whether it could be thread, whether there's some other ideal thing that could happen that could thread the needle, that's not relevant for me. That's relevant for Dr. Rascher because he's claiming it's not just possible, but that he thinks it would happen.").

that it increases output. "The only permissible argument is that the restraints are what make the product high quality, and evidence of Plaintiffs' and consumers' actions then can only be used if it clearly supports the specific ways in which the restraints have improved the product. The evidence must be used to show that because the restraints made the product high quality, this is *why* consumers are willing to pay high prices for Sunday Ticket and continue to buy it." Dkt. 1292 at 5-6.

The NFL's witnesses have testified repeatedly that NFL television is a high-quality product that has seen various quality improvements over the years. But, with one possible exception, none of these so-called quality improvements have been tied to the challenged restraints in any way. For example, the NFL's Cathy Yancy spent the bulk of her time testifying about the work she does to ensure that NFL telecasts meet the NFL's quality standards. Yet when she was asked whether the same systems for ensuring quality could be in place without the limitations on the sale of Sunday Ticket or without the limitations on individual team sales of rights, she had no answer.[13]

The NFL has tried to suggest, without evidence, that "exclusivity" drives quality. Yet Sean McManus, head of sports programming at CBS, agreed with the common-sense view that *competition* drives quality. Tr. 1695:23-1696:6 ("Q. And CBS innovates in all the programming it does to differentiate its product from competitors; right? A. Yes. Q. And CBS and FOX often broadcast NFL games at the same time; right? A. Yes. Q. And CBS tries to innovate in those games to differentiate its NFL product from FOX. Fair? A. Yes.").

Dr. Bernheim similarly claimed that exclusivity improved quality but could not identify a *single innovation* that could be tied to the challenged conduct. "I can't speak to any particular innovation and say whether any particular innovation would have occurred or would not have occurred in the but-for world." Tr. 1963:1-3.

---

[13] *See*, *e.g.*, Tr. 1773:10-19 ("Q. And do you have any reason to believe that in any world, even where the teams are selling their own rights or where Sunday Ticket is not exclusive to DirecTV, the owners and the NFL wouldn't want to have a central officiating rule? A. I don't know. I don't know what that world looks like.").

The *only* innovation that Defendants tie to Sunday Ticket is Red Zone, which was created by DirecTV in 2005. But the fact that DirecTV created Red Zone does not imply that it is the result of its exclusivity. To the contrary, DirecTV would have been equally or *more* likely to create innovations of that type if it faced competition from other providers.[14] And the record is clear that the NFL, consistent with common sense, held the view that DirecTV's exclusivity was a *hindrance* to innovation, not a cause of innovation.[15] Indeed, the evidence in this case unambiguously showed that the exclusive arrangement led to a decline in quality with the ultimate conclusion that Sunday Ticket had become in the NFL's words, a "crappy" product.[16]

Moreover, Red Zone was *not* an enhancement to Sunday Ticket itself, because the NFL initially *prevented* DirecTV from including it in the basic package and required it to set an artificially high price (around $100) whose express purpose was to ensure that no more than a small fraction of the already constrained Sunday Ticket subscriber base received it. TX272 at -736 (2004 agreement with DirecTV for Sunday Ticket, outlining that the Max Sunday Ticket package must be priced at $100 more than the basic package and be limited to 15% of the Sunday Ticket subscriber base); Tr. 256:8-18, 388:1-6, 391:18-22 (Steven Bornstein: agreeing that the NFL

---

[14] Indeed, were exclusivity the spur to innovation, one would be hard pressed to understand why the NFL appropriated Red Zone from DirecTV and made it available through multiple other channels of distribution. What incentive would DirecTV have had in the future if its innovations were spurred by exclusivity, but the innovation was then made generally available?

[15] Tr: 1514:11-14 (Goodell) ("Q: And my question is, is it accurate to say from this point in November '18 through February of '23 there were still no real innovations by DirecTV? A: I don't recall anything"); TX 198 (internal NFL slide deck stating that there was as of 2018 "[n]o real product innovation over past 5 years."); TX-401 (internal March 2004 NFL slide deck discussing NFL Sunday Ticket on digital cable and noting that "digital cable infrastructure in place" and that it could "grow[] potential universe from 13.5 million households to ~90 million households."); TX-504 at Apl-NFL_00000007 (Apple document discussing the "decline in the # [of Sunday Ticket subscribers] is a direct result of a crappy product and the decline of pay TV.").

[16] *See, e.g.*, Depos. of Steve Smith at 60:18-60:22 (Q: Well, Apple has no understanding of what 'crappy product' refers to in this paragraph? A: It could be the crappy product of DIRECTV. And it could be the product—crappy product of the NFL Sunday Ticket on DIRECTV."); TX-504 at Apl-NFL_00000007 (Apple document discussing the "decline in the # [of Sunday Ticket subscribers] is a direct result of a crappy product and the decline of pay TV.")

specified in TX272 that the Max package be $100 more than the basic package and be limited to about 15% of the total Sunday Ticket subscribers). Put another way, the NFL suppressed the one material innovation of DirecTV, whose exclusivity was widely accepted to be an obstacle to innovation. Later, the league took Red Zone and offered it widely itself, meaning that it was not even an exclusive innovation whose benefits flowed solely to the innovator. This is not evidence of the procompetitive benefits of exclusivity or any other aspect of the challenged conduct. It also occurred outside of the class period, and the evidence is undisputed that *during* the class period, DirecTV's exclusivity was anything but a driver of innovation.

### 3.    The Defendants Have Not Met Their Burden of Showing that the Availability of OTA Telecasts or "Matching" is a Procompetitive Benefit

The NFL offers a purported procompetitive justification that limiting viewership of out-of-market games through Sunday Ticket was needed to protect OTA telecasts, another issue on which Defendants bear the burden of proof. But that justification fails as a matter of law for three different reasons. First, it is inconsistent with the Sherman Act, for the exact same reasons that the Supreme Court rejected the NCAA's purported procompetitive justification that the agreements by the colleges to limit television viewership embodied in the NCAA's rules protected live attendance. Second, there is nothing about OTA telecasts that provides them special status over other means of distribution. They are beneficial in this context only if they increase overall viewership and access to programming that consumers want, and Defendants have offered no evidence to show that this scheme increases output in any sense relevant to the antitrust laws. Third, Defendants have not offered any competent evidence to show that the availability of games over the air would decrease in the but-for world. They have simply stated in the most conclusory manner that the amount paid for the rights for Sunday OTA broadcasts would decline, again and again, without a hint of economic analysis to actually support it. There was *no* testimony that those broadcasts would cease. That is because it would be implausible,

if not impossible, to believe the major networks would give up what is far and away their most popular television content that transforms Sunday afternoons into a prime-time-like audience. Even were the Sunday afternoon OTA broadcasts to lose as much as 30% of their viewership to out-of-market games (an unlikely scenario in light of the NFL's repeated contention at trial that the overwhelming number of viewers want to watch the home games in their market) the viewership of Sunday afternoon games would not only far exceed any other Sunday afternoon programming content, but would exceed virtually all prime time content.

In *NCAA*, the NCAA made a functionally identical argument when it argued that suppressing the output of live television was necessary to protect live attendance. Here, the NFL has simply swapped out-of-market games for live television and OTA broadcasts for live attendance. The Supreme Court rejected that argument as inconsistent with the Sherman Act because it was based on the premise that one product (live attendance) was insufficiently attractive to consumers to face the competitive pressure from another product (televised games):

> There is, however, a more fundamental reason for rejecting this defense. The NCAA's argument that its television plan is necessary to protect live attendance is not based on a desire to maintain the integrity of college football as a distinct and attractive product, but rather on a fear that the product will not prove sufficiently attractive to draw live attendance when faced with competition from televised games. At bottom the NCAA's position is that ticket sales for most college games are unable to compete in a free market. The television plan protects ticket sales by limiting output—just as any monopolist increases revenues by reducing output. By seeking to insulate live ticket sales from the full spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act. "[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable."

468 U.S. 85, 116-17 (1984) (quoting *NSPE*, 435 U.S. at 696).

One can simply swap out "live attendance" for "OTA viewership" and the analysis is exactly the same. The NFL's argument is based on "a fear that the product will not prove sufficiently attractive to draw [OTA viewership] when faced with competition from [other] televised games. At bottom, the [NFL's] position is that

[OTA telecasts] are unable to compete in a free market. … By seeking to insulate [OTA telecasts] from the full spectrum of competition because its assumption that the product itself is insufficiently attractive to consumers, [the NFL] forwards a justification that is inconsistent with the basic policy of the Sherman Act." *Id.*

In both cases, the argument is the same: that the defendants need to prevent consumers from watching the game they want to protect a particular avenue of product distribution from the "harm" of facing competition. "[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." *NSPE*, 435 U.S. at 696.

Second, the NFL's position assumes that telecasts on OTA television are inherently favored under the antitrust laws, which is false. The availability of games over the air is relevant to the analysis only to the extent that it increases output or otherwise improves competitive outcomes for consumers. Yet the NFL has not made any effort to show that to be true. It is conceded that more people would watch games—viewership would go up—if additional games viewers wanted to watch were available. Defendants criticize the comparison to college football, for example, by suggesting that, unlike college football (for some unstated reasons), the NFL games would disappear from OTA channels. But even if that were true, it may not be accepted as a justification if "consumption will materially increase if the controls are removed." *NCAA*, 468 U.S. at 119-20. Here, as the NFL's own New Frontier study shows, the typical major college football game is available in far more households than the average NFL game, and that viewership would increase by 8.1% if games were broadcast on national cable networks. TX-686 at -271, -316. A free market increases output and lower prices, not the market manipulations of a monopolist.

Finally, the Court should reject the proposed OTA procompetitive justification as a matter of law because there is no competent evidence that supports the view that there would have been fewer NFL games available on OTA networks during the class period. This is yet another issue on which the Defendants have done little more than

assert that some games might disappear from OTA networks. First of all, it contradicts the NFL's repeated insistence that it has maintained a "bedrock" commitment to maintaining OTA coverage for over fifty years, and nothing would prevent them from continuing to prioritize OTA coverage.

The networks, too, would still have an interest in carrying professional football telecasts in a world without the restraints. They have continued to carry major college football games on over the air networks notwithstanding the "cannibalization" of other college football games that has driven viewership levels far below what Dr. Bernheim hypothesizes "would likely compromise" NFL games on OTA television. No reasonable juror could conclude from the testimony at trial that fewer NFL game telecasts would have been available on OTA television in a competitive world than there were.

Moreover, despite making this a central argument in their opening, Defendant have not introduced *any* evidence that OTA Sunday broadcasts would cease without the challenged evidence. The testimony at trial merely supports the view that the rights would be less valuable to CBS and Fox (and consequently to the NFL). No witness from CBS or Fox testified they would cease to broadcast games.

For essentially the same reason, the Court should reject as a matter of law the NFL's argument that "chaos" would result from the lack of league control of telecasting and scheduling. At bottom, this is simply another argument that competition is a problem. The presumption of the law is that free and open competition in a competitive market will best match the output of products to consumer demand. "A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law." *NCAA*, 468 U.S. at 107.[17]

[17] Tr. 954:9-12 (Dr. Rascher: Q: You wouldn't agree yesterday that college football is a mess, but would you agree that college football is chaos? A: No. I don't—I don't know how—how—chaos is competition the way you're describing it."); *see also* Tr: 954:22-25 (Dr. Rascher: Q: So you don't think it's chaos? A: Well, if that's chaos, people seem to want chaos. I mean, demand is up. Chaos is not really an economic term of art.").

### D.   No Reasonable Juror Could Accept Defendants' Statute of Limitations and Laches Defenses.

Defendants' statute of limitations and laches affirmative defenses fail as a matter of law. First, Plaintiffs do not seek damages pre-dating the limitations period for the classes certified by the Court. "The governing statute, 15 U.S.C. § 15b, sets a four year statute of limitations on private antitrust actions." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014). "But an exception to this time limit exists for continuing violations." *Id*. "To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: 1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflect new and accumulating injury on the plaintiff." *Id*. (quotation marks omitted).

Courts throughout the country have consistently concluded "that continued overcharges constitute a continuing violation." *In re Glumetza Antitrust Litig.*, 611 F. Supp. 3d 848, 861 (N.D. Cal. 2020) (collecting cases). As a result, "each new sale" of an overpriced product subject to an illegal antitrust conspiracy triggers the statute of limitations anew for that act. *Id.*; *see also Oliver v. SD-3C, LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (stating that numerous courts "have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act"); *Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 132 (4th Cir. 2021) ("Virtually every court faced with similar allegations has held, citing the continuing-violation doctrine, that a new cause of action accrues to purchasers upon each overpriced sale of the drug.") (quotation marks omitted); *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 291 (4th Cir. 2007) (holding that "each sale to the plaintiff[] starts the statutory period running again"). Thus, a continuing violation occurred every time Plaintiffs paid for the Sunday Ticket product.

Moreover, a continuing violation can occur each time Defendants enter into new agreements that renew elements of the alleged conspiracy. *See Samsung*, 747

F.3d 1199, 1203-04 (holding that creation of a second license was a new and independent act restarting the statute of limitations for a claim that the original license was anticompetitive); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 797 (N.D. Cal. 2022) ("Facebook's argument ignores the Ninth Circuit's clear guidance that, if a defendant commits the same anticompetitive act multiple times, each new act restarts the statute of limitations for *all* the acts.") (emphasis in original). Therefore, each time the NFL Defendants entered into a new agreement with CBS, Fox, or DIRECTV, a continuing violation occurs that covers all of the challenged restraints.

No reasonable juror could accept Defendants' statute of limitations defense because the undisputed record evidence shows that Plaintiffs purchased a Sunday Ticket package one or more times within the limitations period. Each sale of Sunday Ticket constituted a continuing violation. There is also no dispute that the NFL entered into media rights agreements impacting Sunday Ticket with CBS, Fox, or DirecTV within the limitations period, and each new agreement constituted a continuing violation.

The NFL Defendants' second affirmative defense—laches—fails for the same reasons. In applying laches in an antitrust case, the Ninth Circuit has instructed that the same rules that animate the Sherman Act's statute of limitations—including the continuing violation doctrine—are applicable. *Oliver*, 751 F.3d at 1086. If a plaintiff's claims are timely under those principles, the "strong presumption is that laches is inapplicable." *Klein*, 580 F. Supp. 3d at 805 (quotation marks omitted).

Because there is no dispute that Plaintiffs purchased Sunday Ticket during the limitations period and that Defendants entered into new agreements with CBS, Fox, or DirecTV during the limitations period, no reasonable juror could accept their laches defense.

///

///

///

| | |
|---|---|
| 1 | Dated: June 24, 2024 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |

Dated: June 24, 2024

Respectfully submitted,

By: /s/ *Marc M. Seltzer*

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
Eliza Finley (301318)
efinley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*