Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN & DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | Case No. 2:15-ml-02668-PSG (SKx)<br><br>**PLAINTIFFS' OPPOSITION TO NFL DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>JUDGE: Hon. Philip S. Gutierrez<br>HEARING DATE: June 25, 2024<br>COURTROOM:<br> First Street Courthouse<br> 350 West 1st Street<br> Courtroom 6A<br> Los Angeles, CA 90012 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 1

    I.      PLAINTIFFS' EXPERTS OFFER PLAUSIBLE BUT-FOR
          WORLDS. ............................................................................................ 1

    II.     PLAINTIFFS' THEORIES OF LIABILITY ARE SUPPORTED
          BY EVIDENCE. ................................................................................ 7

         A.     The Teams Are Not a Single Entity Incapable of
                Concerted Action. ........................................................................ 7

         B.     The Evidence Demonstrates The Challenged Restraints
                Had Anticompetitive Effects. ....................................................... 8

         C.     Plaintiffs Have Identified Less Restrictive Alternatives for
                Each of Defendants' Claimed Justifications............................. 10

         D.     Plaintiffs' Section Two Claim Should Go to the Jury.............. 13

    III.    PLAINTIFFS HAVE PROVEN CLASSWIDE INJURY AND
          DAMAGES. ...................................................................................... 13

    IV.    PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE
          REGARDING THE COMMERCIAL CLASS. ................................. 19

    V.     PLAINTIFFS ARE DIRECT PURCHASERS OF THE
          CONSPIRACY. ............................................................................... 21

    VI.    DEFENDANTS' CONDUCT IS NOT PROTECTED BY THE
          SPORTS BROADCASTING ACT ("SBA"). ................................... 23

CONCLUSION .............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. NFL,*
  560 U.S. 183 (2010) ....................................................................................... 7, 8

*Bigelow v. RKO Radio Pictures, Inc.,*
  327 U.S. 251 (1946) .............................................................................................. 2

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ........................................................................................... 12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ........................................................................................... 12

*Copperweld Corp. v. Independence Tube Corp.,*
  467 U.S. 752 (1984) ............................................................................................. 7

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,*
  773 F.2d 1506 (9th Cir. 1985) ............................................................................ 17

*Epic Games, Inc. v. Apple, Inc.,*
  67 F.4th 946 (9th Cir. 2023) ................................................................................. 9

*Fed. Trade Comm'n v. Qualcomm Inc.,*
  969 F.3d 974 (9th Cir. 2020) ................................................................................ 9

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,*
  627 F.2d 919 (9th Cir. 1980) .............................................................................. 13

*In re Bextra & Celebrex Marketing Sales Practices and Product
  Liability Litigation,*
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) .......................................................... 4, 5

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.,*
  2024 WL 168298 (C.D. Cal. Jan. 11, 2024) ............................................... 7, 9, 13

*In re NFL's Sunday Ticket Antitrust Litig.,*
  933 F.3d 1136 (9th Cir. 2019) .................................................................... *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
  267 F.R.D. 583 (N.D. Cal. Mar. 28, 2010) ....................................................... 20

*Kurtz v. Costco Wholesale Corp.*,
  818 F. App'x 57 (2d Cir. 2020) ........................................................... 14

*Murphy Tugboat Co. v. Crowley*,
  658 F.2d 1256 (9th Cir. 1981) ........................................................... 16

*NCAA v. Bd. of Regents of the Univ. of Oklahoma*,
  468 U.S. 85 (1984) ................................................................... 2, 7, 8

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) ............................................... 20

*Paladin Assocs., Inc. v Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ........................................................... 13

*Prime Media Group, LLC v. Acer America Corporation*,
  2015 WL 452192 (N.D. Cal. Jan 22, 2015) ........................................... 20

*RePET, Inc. v. Zhao*,
  2018 WL 6003586 (C.D. Cal. July 13, 2018) ......................................... 1

*Shaw v. Dallas Cowboys Football Club, Ltd.*,
  172 F.3d 299 (3d Cir. 1999) ............................................................. 24

*Spin Master, Ltd. v. Zobmondo Ent., LLC*,
  944 F. Supp. 2d 830 (C.D. Cal. 2012) .................................................. 2

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931) ................................................................... 1, 14

*Tawfilis v. Allergan, Inc.*,
  2017 WL 3084275 (C.D. Cal. June 26, 2017) ........................................ 1, 3

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...................................................................... 14

**Rules**

Fed. R. Evid. 702 ............................................................................. 16

Fed. R. Evid. 801 ............................................................................. 22

Fed. R. Evid. 806 ............................................................................. 22

**Statutes**

Sherman Act § 1 ............................................................................... 7, 13

**INTRODUCTION**

Defendants' motion largely repeats arguments that the Court has previously and correctly rejected—as to summary judgment, class certification, and multiple *Daubert* motions. The latest attempt ignores the extensive evidence presented at trial showing that the challenged restraints had anticompetitive effects, that the claimed procompetitive justifications are not tethered to the restraints and can be achieved through less restrictive means, and that the but-for-worlds offered by Plaintiffs' experts provide a reasonable basis for calculating damages for both classes. Given that all reasonable inferences must be drawn in favor of Plaintiffs on a Rule 50 motion and credibility determinations and the weighing of evidence lie with the ultimate factfinder, *see RePET, Inc. v. Zhao*, 2018 WL 6003586, at *1 (C.D. Cal. July 13, 2018), the Defendants' motion must be denied.

**ARGUMENT**

**I.   PLAINTIFFS' EXPERTS OFFER PLAUSIBLE BUT-FOR WORLDS.**

Defendants attempt to impose a legally impermissible burden for the liability and damages caused by their own anticompetitive conduct. "[D]amages resulting from an antitrust injury [are] measured by comparison to a 'but-for' world that reflects conditions in the actual world ***in all respects*** except for the alleged anticompetitive conduct." Dkt. No. 1325 n. 7 (citing ABA Section of Antitrust Law, Proving Antitrust Damages: Legal And Economic Issues 4 n.2 (3d ed. 2017) (emphasis added)). Antitrust plaintiffs need only "show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *Tawfilis v. Allergan, Inc*., 2017 WL 3084275, at *14 (C.D. Cal. June 26, 2017) ("After demonstrating antitrust impact, Plaintiffs may rely on the Supreme Court's relaxed standard of proof for quantifying antitrust damages.") (citing *Story Parchment Co*., 282 U.S. at 563). "While a jury may not award damages based on 'speculation and guesswork,' the jury 'may make a just and reasonable estimate of

the damage based on relevant data, and render its verdict accordingly,' including by relying on 'probable and inferential' proof." *Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 842 (C.D. Cal. 2012) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) (cleaned up)).

Plaintiffs have done just that, notwithstanding Defendants' claim that a series of hypotheticals under the heading of "changed incentives" reveals some flaw in the expert analysis. But the law requires Plaintiffs only to compare the world with and without the challenged restraints. This is exactly the analysis performed by Dr. Daniel Rascher, the only sports economist to testify at trial. To calculate the amount of the overcharge for class members, Dr. Rascher estimated what would have happened in the absence of ***the challenged conduct***.

Dr. Rascher used the model of college football – because it had been subject to similar anticompetitive restraints prior to 1984. Tr. 750: 1-24. Consistent with this Court's ruling on Motion *in Limine* No. 2, Dkt 1320, Dr. Rascher did not expressly reference *NCAA v. Bd. of Regents of the Univ. of Oklahoma*, 468 U.S. 85 (1984) in his testimony, discussing instead the evolution of college football telecasts after those restraints were lifted. Specifically, prior to the ruling, the NCAA permitted member schools to make agreements to license their telecast rights only to ABC and CBS, limited the total number of games that could be televised and the number of games that any one team could televise. *NCAA*, 468 U.S. at 91-94. The Ninth Circuit likewise recognized the value of *NCAA* in showing the before-and-after effects of eliminating restraints on the licensing of broadcasts. *In re NFL's Sunday Ticket Antitrust Litig.,* 933 F.3d 1136, 1154 (9th Cir. 2019) ("*NFLST*") (citing *NCAA*, 468 U.S. at 114 n.53). This Court recognized the same regarding Dr. Rascher's use of college football. Dkt. 894 at 13.

Consistent with the Ninth Circuit's guidance, Dr. Rascher testified to the many parallels with the NFL that make college football a useful yardstick. Tr. 749:10-25. This is true even though the NCAA is not identically situated to the NFL.

The NCAA, for example, does not enjoy an antitrust exemption like the SBA, which would have allowed NFL teams to continue to license their rights to over-the-air games to CBS and Fox. Tr. 885:11-18. These differences do not invalidate the yardstick as the cases cited by the NFL Defendants recognize. In *Tawfilis*, the Court found a yardstick methodology reliable over an objection that the expert failed "to control for any economic factors that might influence the price" in the yardstick market, noting that such arguments "generally go to the weight, rather than the admissibility, of the expert's testimony" and are "issues [] properly raised on cross-examination." 2017 WL 3084275, at *6 (C.D. Cal. June 26, 2017). So too here.

In the but-for-world, where individual teams had the ability to license their out-of-market games for paid television, those games could have been made available on regular cable or satellite channels—and class members would not have had to pay the subscription fee required for the Sunday Ticket product. Tr. 779:7-23 ("In that process, those games then become available, just like on Saturday, on over-the-air channels and on these -- these basic sports cable channels, and so customers don't pay anything extra above what they were already paying for their TV package.").

Dr. Rascher testified that this end result – where out-of-market games are available on the cable and satellite television packages that all class members already paid for– could be achieved by several methods. For example, Dr. Rascher and Prof. Elhauge both testified it was likely teams would continue to pool their rights to over-the-air games to CBS and Fox, and that only the rights to license out-of-market games would revert to teams. Tr. 754:4-22 (Rascher); Tr. 2123:22-24 (Elhauge)**.** Individual teams could have reached individual deals for their games or licensed those games as a group (like through a division). Tr. 754:23-755:14. Either scenario would enhance competition, Tr. 753:1-12, and lead to the same outcome of increased availability: "They still lead to the same outcomes. This is -- again, this is the most popular programming on television. . . . They will find their way on to these major networks and these major cable stations." Tr. 899:1-8. In other words, the licensing

of games outside of the monopoly control conferred on the NFL by agreement of the teams would likely have resulted in games making their way to television channels that were widely distributed and not bundled in an exclusive specialized Sunday Ticket package. Tr. 753:13-754: 22 (testifying regarding schedules he prepared for how out-of-market games could be shown on basic cable).

Dr. Rascher testified as relevant to his ultimate conclusions:

- The college football rule change led to 40 games being available on television each Saturday. Tr. 750:6-751:7. With far fewer games played on NFL's Sunday afternoon, there would be adequate capacity for such games to be available on cable/satellite channels. Tr. 752:20-754:3; 750:6-24;

- NFL football is highly coveted programming, and there would be no impediment for teams to obtain a deal to show out-of-market games. Tr. 772:8-18; 840:9-17, 844:17-845:1, 870:12-14, 881:23-882:6; 899:1-6.

- Making out-of-market games more available would—as one would expect—increase overall viewership, by as much as 29% for adding a single game. Tr. 776:13-778:6.

To corroborate his findings, Dr. Rascher also cited the NFL's own 2017 "New Frontier" analysis, which also had as its aim "[d]istribut[ing] regular season out-of-market simulcasts on basic cable networks instead of exclusively through DirecTV Sunday Ticket (ST)." TX686 at NFL_0889280. The NFL showed how "average distribution for NFL regular season games has potential to double from -39% to -77% of U.S. TV HHs" through the model proposed by Dr. Rascher. *Id*. at 13. It also confirmed an increase in viewership by making out-of-market games available outside of Sunday Ticket. *Id*. at 48. The NFL's plan confirmed the feasibility of unbundling the Sunday Ticket and showing those games on cable channels. Tr. 758:4-759:14; 760:11-761:17. Unlike the methodology rejected in *In re Bextra & Celebrex Marketing Sales Practices and Product Liability Litigation,* Dr. Rascher did not favor certain studies "over the great weight of" contrary evidence. 524 F.

Supp. 2d 1166, 1176 (N.D. Cal. 2007). He relied on the *NFL's* own studies that *confirmed* his findings.

The only contrary evidence about the feasibility of his but-for-world was speculation by defense witnesses – reiterated in the NFL's series of hypotheticals in their brief. But those created confusion where there was none: as to revenue sharing, Dr. Rascher and Prof. Elhauge explained only a sliver of revenue would not be subject to 100 percent pooling, leading to plenty of revenue for the teams to meet their operating costs, Tr. 874:6-10 (Rascher), Tr. 2161:15-2162:25 (Elhauge); that broadcasting entities would reach deals as to advertising and transmission of the NFL-owned game feeds much as they do in the real world, including in the current retransmission of feeds from Amazon and ESPN to local television stations, Tr. 898:9-14 (Rascher), 2206:23-2207:2 (Elhauge); and the scheduling of games could continue as a non-challenged function of the NFL, Tr. 879:11-18; *see also* Tr. 2169:6-15 (Elhauge). Dr. Rascher's modeling, along with the NFL's own analysis, confirmed that in the but-for-world in which teams or groups of teams did not pool their rights to sell exclusively to one distributor, class members would not have paid for a Sunday Ticket bundled product. Because class members by definition subscribed to DirecTV satellite service, they would have had access to the out-of-market game telecasts without having to buy the additional Sunday Ticket subscription bundle. Tr. 779:7-780:7.

In a but-for-world without the challenged restraints, class members would not have needed to buy Sunday Ticket to watch out-of-market games. The total damages was the actual amount of subscriptions paid during the class period. For residential subscribers, there were around 24 million paid subscriptions and 500,000 paid subscriptions for the commercial customers. Tr. 721:11-21; 782:24-783:6. The total damages were $5.6 billion for the residential subscriptions and $1.3 billion for the commercial customers totaling $7 billion. Tr. 780:8-16. These damages omit the cost to class members of paying for an underlying subscription to the DirecTV service

costs even though the NFL obtained indirect value of another $8 billion for that through the rights fees DirecTV paid. Tr. 782:18-783:6, 785:16-786:1.

Dr. Rascher also provided an alternative model of damages focusing ***solely*** what would have happened had there been another competitive offering of a Sunday Ticket bundled package – in other words if DirecTV had faced competition for its subscription bundled Sunday Ticket offering. Tr. 783:7-784:12. Dr. Rascher relied on a model generated by Dr. Douglas Zona for the reduction in price if a second Sunday Ticket distributor were added. Tr. 783:16-23. The model he relied on "uses actual transactions, all the -- millions of transactions data that we got from DirecTV, and then viewership data, [] increments like 6-minute increments of people watching DirecTV programming, sports programming, for instance." Tr. 783:7-23. As Dr. Rascher explained, Dr. Zona "took that data and, using the transaction data and the viewership data, [] created a model that shows what would happen if instead of Sunday Ticket just being available on DirecTV, it was available in just one other spot, another -- one other competitive situation where you could then purchase DirecTV, and so that competition leads to lower prices, as competition does." *Id.*

Based on billions of DirecTV records, Dr. Rascher relied on Dr. Zona's finding that with one additional distributor, the price of Sunday Ticket would have dropped 49.7%. Tr. 783:24-784:24. Dr. Rascher then applied that 49.7% reduction factor to class members' purchases in the case ($7 billion) to arrive at an alternative damages model of $3.5 billion. *Id*. Dr. Rascher further opined that the price reduction calculated was similar to the price for Sunday Ticket in Canada (roughly half of the U.S. price), where there are multiple distributors rather than a single exclusive distributor. *Id.* The Canada experience is a natural experiment that provides independent evidence to support the findings from Dr. Zona's viewership model.

Dr. Rascher did not rely on any other modeling performed by Dr. Zona, including models in which he looked at adding more than one additional provider of a Sunday Ticket bundled product – which would have further reduced the price. *Id.*

Dr. Rascher assumed only a single additional option for buying Sunday Ticket for a consumer. 785:9-11. This reduction factor has no bearing on the primary damages model of $7 billion, which does not depend on any of Dr. Zona's work or findings.

## II.   PLAINTIFFS' THEORIES OF LIABILITY ARE SUPPORTED BY EVIDENCE.

### A.   The Teams Are Not a Single Entity Incapable of Concerted Action.

This Court has correctly stated that Defendants' single-entity argument succeeds only if it is not "*possible* for independent entities—*i.e.*, individual sports teams—to license telecast rights on their own without pooling their rights with a conference or a league." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *16 (C.D. Cal. Jan. 11, 2024) (emphasis added). The single-entity doctrine applies only when otherwise separate entities "'are incapable of conspiring with each other for purposes of § 1 of the Sherman Act.'" *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 194 (2010) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984). Here, no reasonable juror could find the teams incapable of concerted action given that it is undisputed that the teams—both historically and presently—sell their telecasts rights individually. [1]

Defendants' only response is to continue to conflate the necessity of some cooperation among the teams with the notion that they are incapable of concerted action. That position has been repeatedly rejected in this case and by the Supreme Court. In *NCAA*, the Court recognized that some cooperation was necessary for college football telecasts to exist, but the consequence of that was simply that the rule of reason applied. 468 U.S. at 117. And in *American Needle*, the Court emphasized that "[a]ny joint venture involves multiple sources of economic power cooperating to produce a product. And for many such ventures, the participation of others is

---

[1] Tr. 968:5-12 (Rolapp testimony that teams sell their preseason telecast rights independently); 1638:6-11 (J. Jones testimony that Cowboys license their preseason telecasts rights "on their own without the NFL"); 1752:17-19 (Yancy testimony that teams broadcast their own preseason games); 703:10-17; 705:18-706:1 (Rascher testimony that teams sold rights independently in the 1950s).

1   necessary. But that does not mean that necessity of cooperation transforms concerted

2   action into independent action." 560 U.S. at 199.

3       "Only the agreements that are the subject of plaintiffs' antitrust action prevent

4   such independent actions. Thus, we reject the defendants' argument that *American*

5   *Needle*, 560 U.S. at 190, is inapposite; here, like in *American Needle*, the agreements

6   not to compete concern separately owned intellectual property, and impose an

7   unlawful restraint on independent competition." *NFLST*, 933 F.3d at 1154; *see also*

8   *NCAA*, 468 U.S. at 99. Because individual NFL teams have in the past broadcast

9   games individually and even today continue to broadcast games individually, as

10  professional teams outside of the NFL do on a routine basis, it is undeniably possible

11  for them to do so. *See* Tr. 2119:4-8 (E. Elhauge) ("It's also true that in baseball,

12  basketball, and hockey, teams individually sell telecasts…"). Defendants have

13  offered no evidence to suggest otherwise.

14      **B.      The Evidence Demonstrates The Challenged Restraints Had**

15              **Anticompetitive Effects.**

16      Under the rule of reason, Plaintiffs may prove anticompetitive harm in any of

17  three ways: by showing a naked restraint on competition; by directly showing the

18  effects on competition; or by indirectly showing the defendants' power in a defined

19  product market, coupled with evidence of likely harm to competition. Plaintiffs have

20  met their burden under all three frameworks and incorporate by reference the

21  arguments made in their Motion for Judgment as a Matter of Law. *See* Dkt. 1457 at

22  2-8. In addition, the NFL's argument that no jury could ever find the exclusive

23  arrangement with DirecTV had substantial anticompetitive effects—and Plaintiffs'

24  challenge to the vertical aspect is untenable as a matter of law—is a repackaging of

25  unsuccessful arguments made at summary judgment.[2] The NFL again attempts to

26  isolate its exclusivity with DirecTV and treat it as a run-of-the-mill exclusive deal.

27

28  _____
    [2] The NFL even incorporates its summary-judgment briefing here, which lays to rest
    any questions whether this is a bona fide Rule 50 issue or merely an effort to preserve
    previous arguments.

But the jury is required, as was this Court previously, "'to take a holistic look at how the interlocking agreements actually impact competition' and cannot evaluate the NFL's vertical conduct in isolation." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2024 WL 168298, at *19 (C.D. Cal. Jan. 11, 2024) (quoting *NFLST*, 933 F.3d at 1152). Professor Elhauge likewise testified about the interaction between the vertical and horizontal aspects here, which enables the NFL to use its market power to raise the licensing fee (whether per-subscriber or otherwise) for downstream distributors. These unique features of the restraint—singular in the world of American professional sports—distinguish exclusivity here from the misleading testimony about the prevalence of exclusivity in other settings. *See also* Tr. 2114:19-2115:3 (Elhauge).

Plaintiffs were not required to prove that the effect of the restraint was to "foreclose competition in a substantial share of the line of commerce affected." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) (cleaned up). The NFL borrows that requirement from the law of exclusive dealing—confined to "an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Id.* (cleaned up). At the first step of the rule of reason, Plaintiffs need only prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in a relevant market. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023). The NFL's citations actually make Plaintiffs' point. The limited number of NFL fans who were Sunday Ticket subscribers at a given time is evidence of the *effectiveness* of the restraint, not the absence of anticompetitive consequences. Tr. (Rolapp) 1144:7-1145:5; TX-172 at NFL_0609540. Dr. Rascher testified about his review of numerous other NFL studies and correspondence that point to similar counts, significant unmet demand, and deliberately erected barriers to subscription. Tr. 742:1-746:13.

**C.**     **Plaintiffs Have Identified Less Restrictive Alternatives for Each of
Defendants' Claimed Justifications.**

Defendants' argument that no reasonable jury could find less restrictive alternatives to the challenged restraints rests on the mistaken premise that Defendants proved a legally cognizable procompetitive justification for *the challenged restraints.* Mot. at 12. Defendants proved no such thing. As detailed in Plaintiffs' Motion for Judgment as a Matter of Law, Defendants failed at every turn to consider the combined effects of the interlocking restraints challenged by Plaintiffs. *See* Dkt. No. 1457 at 10-11. Moreover, many of the contended procompetitive effects result from unchallenged conduct, such as the revenue sharing of over-the-air telecasts or the teams working together to produce better telecasts. Others are relevant only to one form of conduct alleged to be anticompetitive by the Plaintiffs, without regard to the interlocking nature of all of the restraints at issue. Tr. 2135:10-21 (Elhauge). In any case, Plaintiffs identified less restrictive alternatives to ***each*** of the purportedly procompetitive rationales that Defendants presented to the jury.

As to the protection of over-the-air broadcasts, Professor Elhauge testified that the NFL could continue its commitment to such telecasts in the but-for-world by simply reducing the price that it charges the networks, or by licensing the games to all four, rather than just two, major networks. Tr. 2155:3-24. The NFL could also require that any broadcaster of out-of-market games show that game over-the-air in local markets, as is current practice for the Monday Night Football and Thursday Night Football games that are shown via paid cable and streaming services, respectively. Tr. 2156:2-17. These alternative means of maintaining over-the-air broadcasts are consistent with testimony given by Dr. Rascher about the NFL's New Frontier Study and the conclusion that household distribution could double if the networks put their out-of-market games on cable channels. Tr. 760:5-761:17.

As to competitive balance, Dr. Rascher gave unrebutted testimony that the salary cap and the salary floor are the principal drivers of that balance—not the

challenged restraints. Tr. 828:7-14. Those guarantors of competitive balance would continue in a world in which the restraints on Sunday Ticket were removed. Professor Elhauge further testified that "salary caps and salary floors" are less anticompetitive alternatives to the pooling of all telecast rights that Defendants argue promoted competitive balance. Tr. 2163:14-16. The teams could also continue to share revenues sufficient to meet that salary floor—including by sharing the revenues just from the primetime and over-the-air games—without needing to resort to restraining the distribution of out-of-market games. Tr. 2162:21-2163:9 (Elhauge). Both Dr. Rascher and Professor Elhauge made clear that the teams could continue to share telecast revenues from these sources—the bulk of their annual media revenue. Tr. 903:6-19 (Rascher); *see also* Tr. 2202:12-16 (Elhauge).

As to "innovations and product quality," numerous fact and expert witnesses testified that competition—not exclusivity—drives innovations. *See* Tr. 1695:23-1696:6 (McManus); Tr. 2166:23-2167:2 (Elhauge) ("the economic literature is pretty clear that, generally, competition leads to more innovation than monopoly"). Dr. Rascher testified that there was no connection between any innovations of NFL broadcasters and charging $295 for Sunday Ticket, because "those are the sort of innovations that a network would put on because it's competing with other networks." Tr. 788:24-789:9. Because those networks are trying to out-compete each other, "they're going to make those investments sort of regardless of -- of the Sunday Ticket package." Tr. 789:7-9.

For the same reason, the Defendants' "promotion and price discounts" justification fails. DirecTV's promotion of a free year of Sunday Ticket for new customers of DirecTV satellite service was a method to entice customers to get locked into a long-term contract.[3] Distributors of Sunday Ticket would be incentivized to engage in promotion and price discounts to have customers use their

---

[3] *See, e.g.*, Tr. 1301:22-1302:1 (Frantz) ("Well, to be clear, I had to sign a two-year contract.").

platforms absent exclusivity. Any discounts offered by DirecTV would have been a feature of the but-for world and do not diminish the anticompetitive effect of the challenged restraints—the overcharge that class members actually paid.[4]

Defendants' argument that the exclusivity preserved DirecTV's ability to compete with other MVPDs has nothing to do with any purported procompetitive justification. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for 'the protection of competition not competitors.'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). As Professor Elhauge clarified, "adopt[ing] restraints that lead to anticompetitive profits" is in contrast to the economic literature which says that competition leads to more innovation. Tr. 2166:15-2167:2. Witnesses testified that, during the class period, several other content distributors were more innovative, demonstrating that the restraints inhibited real competition. Tr. 1554:10-21 (Goodell testifying that Google and Amazon were more innovative than DirecTV).[5]

Lastly, Defendants made no attempt to connect DirecTV's exclusive distribution of Sunday Ticket—a key component of the challenged restraints—to the final procompetitive justification, the efficient matching of games to TV time slots. *See* Tr. 2169:4-5 (Elhauge) ("And there's no real connection between them."). Because the SBA antitrust exemption would allow the teams to continue pooling their over-the-air rights in the but-for-world, there is no reason why the NFL teams could not continue "flexing" games and generally matching the most popular games in the most watched timeslots. Tr. (E. Elhauge) 2169:6-15. And the NFL could continue

---

[4] Furthermore, "[t]hose who received the product for free as part of DirecTV's program to entice new customers, for example, are not included [in the class definition]." Dkt. No. 894 at n. 1.

[5] Further, conflicting testimony at trial would suggest that the NFL's proffered justification is pretextual as DirecTV was "a viable competitor" during the class period. *See, e.g.,* Tr. 1460:17-1461:6 (Goodell testifying that DirecTV was already "the largest carrier of sports," had more reach than cable operators, and was "one of the leaders into 4K and some of the newer technologies").

this process for out-of-market games as a less restrictive alternative to "collectively licensing and charging a price." Tr. (E. Elhauge) 2170:13-25.

### D.    Plaintiffs' Section Two Claim Should Go to the Jury

"To prove their § 2 conspiracy claim, Plaintiffs must also prove, in addition to establishing the agreement, 'an overt act in furtherance of the conspiracy' and 'the specific intent to monopolize.'" *In re NFLST Antitrust Litig.*, 2024 WL 168298, at *8 (Jan. 11, 2024) (quoting *Paladin Assocs., Inc. v Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003)). Here, the jury may consider the evidence that the Teams-NFL, NFL-Networks, and NFL-DTV Agreements "were designed to maintain market power, which establishes the defendants' specific intent." *See NFLST*, 933 F.3d at 1159. Specifically, Plaintiffs have provided more than sufficient evidence for the jury to find that the agreements among the NFL, the member clubs, DirecTV, and the networks were designed to maintain market power by reducing output, creating artificial scarcity, and raising prices.

Defendants claim Plaintiffs cannot prevail on their Section 2 claim if their Section 1 claim fails. This is wrong as a matter of law because the claims are distinct. The elements of a Section 2 conspiracy to monopolize claim vary from the elements of a Section 1 claim. For example, a showing of market power is not required for Plaintiffs' Section 2 claim. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, In*c., 627 F.2d 919, 926 (9th Cir. 1980) ("[N]o particular level of market power or 'dangerous probability of success' has to be alleged or proved in a conspiracy [to monopolize] claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken.").

## III.   PLAINTIFFS   HAVE   PROVEN   CLASSWIDE   INJURY   AND DAMAGES.

There is ample record evidence that Plaintiffs have proven causation and classwide injury and damages. There is no dispute that every class member had only one option to watch out-of-market games—purchasing Sunday Ticket from DirecTV.

Class members were required to install a dish and purchase DirecTV's satellite service as a prerequisite to purchasing Sunday Ticket. *See* Tr. 196:2-12, 266:11-267:6. And the evidence is clear that the NFL required DirecTV to charge a "premium" price for Sunday Ticket. TX-045 at -469 (premium subscription requirement in DTV-NFL contract); Tr. 277:4-25, 280:4-8, 290:16-17, Tr. 293:17-18 (testimony of Steve Bornstein that premium subscription meant premium price). All class members paid that "premium" price. The specific facts supporting Article III standing are "supported adequately by the evidence adduced at trial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Further, it is the jury's duty to evaluate the reliability of Plaintiffs' experts' methodologies pertaining to injury and damages. Because the precise economics of a world absent the alleged anticompetitive conduct cannot be known with certainty, courts only require antitrust plaintiffs to put forth reasonable estimates of antitrust damages. *See Story Parchment*, 282 U.S. at 562. Plaintiffs have met that burden. Though the NFL Defendants quibble with Plaintiffs' experts' methodologies, it is the jury's duty to evaluate the reliability of the but-for world Plaintiffs' experts have presented, as evident by the case the NFL Defendants rely on. *See Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) ("Defendants' central contention is that Weir's analysis either does not or cannot establish a price premium because of issues such as an incomplete dataset, flawed parameters of the regression, or business considerations not captured by the model. *A factfinder may ultimately agree*. But *if* that is the case, then the class claims will fail as a unit.") (emphasis added).

Dr. Zona's modeling of a world in which Sunday Ticket was distributed on a non-exclusive basis (like every other sport), supports a verdict in plaintiffs' favor. Dr. Zona's econometric modeling—described in nearly three hours of testimony—uses as an input DirecTV's extensive transactional data, spanning billions of data points. Tr. (Zona) 1174:3-1176:2; Tr. (Yurukoglu) 1411:6-7. Specifically, Dr. Zona

used "nested logit models" using the "Berkson-Theil method," which has more than a 50-year history in applied economics. Tr. (Zona) 1177:2-1178:2. That modeling showed a reduction factor (*i.e.*, a discount) of 49.7% had there been even a single distributor-competitor in addition to DirecTV during the class period. Tr. (Zona) 1173:7-10. And fundamentally, Dr. Zona's modeling quantifies the application of a fundamental economic principle *on which there is consensus*: class members "would have paid less if there had been more competition." Tr. (Zona) 1172:14-15; Tr. (Yurukoglu) 1409:22-24 ("But you agree that competition leads to lower prices? A. Again, generally, yes.").

To assure himself of the reliability of his modeling, Dr. Zona examined the statistical fit in his computing and as it relates to particular variables. Tr. 1179:9-15. Dr. Zona also tested the "internal validity" of his modeling by applying it to actual prices in the real world and observed "estimates of what the demand would be that are within less than 1 percent of the actual numbers" (*i.e.*, more than 99% accurate). Tr.1179:16-25.

Dr. Zona's models *do not* predict higher prices in the but-for world, as the NFL suggests. It was only when Dr. Yurukoglu applied his own set of assumptions to Dr. Zona's modeling that any of these supposed issues arose. Tr. (Yurukoglu) 1418:25-1419:3 ("Now, that 148.86 that you have here is a number that you generated after making changes to Dr. Zona's model; right? A. At a high level, yes."). Chief among Dr. Yurukoglu's assumptions is that the NFL would have used a per-subscriber fee structure when licensing to multiple distributors. But Dr. Yurukoglu acknowledged in his testimony "that in real life the NFL licensed Sunday Ticket and other telecasts on a nonexclusive basis using a flat fee," and that the NFL licensed Thursday Night Football to both Amazon and FOX on a nonexclusive basis using a flat fee. Tr. 1436:7-20. A second undisputed example is the 2002 DirecTV-NFL contract for Sunday Ticket, which featured a flat fee for each of the five years (2003-2007) but was explicitly non-exclusive for the final two years (2006-2007). TX-390 at

NFL_0000418 ("Scope of contractual exclusivity on out-of-market games . . . 2006 and 2007 NFL seasons – vs. [other] satellite platforms only . . . ").[6]

Against this backdrop, a reasonable jury could well conclude that the NFL would have continued to use a flat-fee structure when licensing to multiple distributors.[7] Plainly, the NFL "believed" that its real-life strategy of a flat fee with multiple distributors before and during the class period "would maximize its profits." *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981).[8] But even a per-subscriber fee in the but-for-world would not be saddled with Defendants' other anticompetitive conduct, including its created monopoly and collusive behavior with competitors. Tr. 2232:7-16 – 2233:1 (Elhauge).

Dr. Zona's modeling is also reliable under Federal Rule of Evidence 702 notwithstanding the NFL's accusations of "undisputed, outlandish predictions." Competitors charge different prices all the time; that is the essence of price competition. Tr. (Zona) 1172:14-15 (competition causes prices to fall); Tr. (Yurukoglu) 1409:22-24 (same). That is particularly so here, where the price assumed to be charged by the other competitor was *without* the need for a satellite dish and a $1100 plus subscription just to get on the DirecTV service. Tr. 1226:4-9.

Even the NFL Defendants' preferred authority emphasizes as much: "[R]ational economic behavior in the hypothetical free market . . . includes a rational

---

[6] And, as another example, Dr. Yurukoglu affirmed that at one time Major League Baseball made use of flat fees but was unaware of the details. Tr. (Yurukoglu) 1434:23-1435:10.

[7] In its order denying the NFL Defendants' Motions *in Limine* 5 and 6, ECF No. 1334, this Court noted its "satisf[action] with Dr. Zona's reasons to maintain the fixed-fee structure in his models: Each of the NFL's current broadcast agreements is for a fixed fee, and thus keeping this structure could contribute to the model's comparability." *Id*. at 5. For all the reasons outlined here and at trial, Dr. Zona's "fixed-fee structure could very well be a rational economic choice, [and] its inclusion in Dr. Zona's models does not make the models unreliable." *Id*.

[8] Elsewhere, the NFL Defendants accuse Plaintiffs of "hid[ing]" Dr. Zona's survey model, which is inaccurate. Dr. Zona's survey model is simply not the basis for any damages estimate in the case. *See, e.g.*, Tr. (Yurukoglu) 1412:21-25 ("And, again, you agree with the statement that you made nearly a year ago in your report that Dr. Rascher does not rely on other reduction factors estimated by Dr. Zona [outside of Model 1] to calculate damages; right? A. Yes.").

price differential between [competitor] prices based on all competitors['] attempts to maximize their own profits . . . and the potential entry of other competitors into the market." *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985). Dr. Yurukoglu's critique here is fundamentally that he has not seen similar price dispersion with respect to other sports leagues' packages. But, as with past *Daubert* attempts against Dr. Zona rejected by this Court, "Defendants do not explain why the structures of the out-of-market packages of the MLB, NHL, and NBA are good comparators with respect to 'practices' or 'incentives.'" Dkt. No. 1334 at 5.

The NFL is also mistaken that there could not have been a second provider of Sunday Ticket from 2011 to 2023, particularly when every other sports-league out-of-market package had multiple distributors during the same period. Tr. (Yurukoglu) 1434:5-8 ("And during the class period, NFL Sunday Ticket was the only U.S. professional sports league that licensed its out-of-market package to a single distributor? A. Of those four [NBA, MLB, NHL, NFL], yes."). For his modeling purposes, Dr. Zona did not "have any particular supplier in mind" with the entry of a "direct to consumer" competitor. Tr. 1222:20-1224:6, 1228:1-4 ("My model doesn't rely on anything specific. It's just an additional competitor.");1225:23-1226:5; 1233:1-3 ("you don't have to pay the underlying subscription service like cable or satellite" because "[y]ou may already have it"). This "direct-to-consumer" alternative could be a cable offering for those who already have cable service; a DISH network offering for those who already have satellite service, or a "Netflix-like" service for those who already have internet service. Tr. 1223:12-17, 1225:23-1226:5, 1227:13-25, 1233:1-3, 1277:14-19. Dr. Yurukoglu understood Dr. Zona's "direct-to-consumer" scenario to "encompass[] many possibilities, including MVPDs [multichannel video programming distributors]," which Dr. Yurukoglu defined as "a cable, satellite, or telco company from whom you buy television service." Tr.

1364:11-24. Dr. Yurukoglu specifically acknowledged DISH Network among these possibilities. Tr. 1367:3-15.

In other words, Dr. Zona never limited his but-for world to streaming competitors alone. In any event, streaming options for live sports—and even Sunday Ticket—were prevalent during the entire class period, as numerous witnesses and trial exhibits confirmed. Dr. Yurukoglu verified that live-sports streaming existed before and during the class period. Tr. 1313:20-1314:13, 1368:15-21, 1369:9-11. Cathy Yancy testified that she was personally involved in discussions with DirecTV about their marketing of a streaming Sunday Ticket product as early as 2012. Tr. 1781:9-12. Indeed, DirecTV's "NFL Sunday Ticket 2012 Marketing Plan," which was shared with the NFL, details the ability to "[g]et every NFL Sunday Ticket game on any device. Watch every NFL Sunday Ticket game live, anywhere, on your laptop, phone, or tablet. You'll never miss a game, even when you're nowhere near a TV." TX470 at NFL_0868426; Tr. (Yancy) 1782:6-1784:8. And Ms. Yancy agreed—"that sounds about right"—that the first Super Bowl to be livestreamed was in 2012. Tr. (Yancy) 1798:12-18.[9]

Nor is there anything new or undisclosed about Dr. Zona's discovery of an "NFL Tax" through his modeling, which is the difference between DirecTV's profit-maximizing list price for Sunday Ticket of $222 and its actual list price of $295 (a 24.6% variation) and which he interprets as consistent with Plaintiffs' allegations of the NFL's control over price. Those figures appear in Dr. Zona's reports, even expressly as a "price reduction factor." Dr. Yurukoglu's say-so at trial, meanwhile, that the profit-maximizing list price must be the actual list price (and any other result reflects "deficiencies," Tr. 1345:25-1346:3) is no reason to deny the jury consideration of both experts' opinions, particularly when Dr. Yurukoglu did not

---

[9] The earliest evidence of live-streaming possibilities in the trial record is the NFL's 2009 Sunday Ticket contract with DirecTV. That contract, dated more than two years before the start of the class period, details at length DirecTV's rights to distribute Sunday Ticket over broadband and mobile and the joint development of those offerings. TX44, at NFL 0000440-43.

calculate a profit-maximizing list price or perform any modeling whatsoever. Tr. 1405:25-1406:3.

## IV. PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE REGARDING THE COMMERCIAL CLASS.

Defendants' arguments regarding the commercial class ignore the many commonalities between the residential and commercial classes; both "uniformly purchased NFL Sunday Ticket packages at supracompetitive prices because of Defendants' restrictions on telecasts" and "share a common interest." Dkt. No. 894 at 23-24. For starters, the Defendants ignore the fact that the anticompetitive conduct challenged by Plaintiffs was the same between the two classes: the pooling agreement among the NFL's teams applied equally to commercial subscribers; the restraints imposed by the networks such as charging a "premium" price applied equally to commercial subscribers; and DirecTV was the exclusive provider of Sunday Ticket for commercial subscribers. The limitations on Sunday Ticket in the NFL-DirecTV agreements and NFL-Network agreements applied equally to residential and commercial subscribers.

The same is true for injury and damages. Both Dr. Rascher and Dr. Zona calculate damages for commercial subscribers separate and apart from residential subscribers as noted above. Under Dr. Rascher's College Football but-for world, the result is the same between residential and commercial subscribers. All games would be available on free over-the-air or basic cable channels, eliminating the need to purchase any add-on Sunday Ticket package.

As for Dr. Zona's analysis in a world without DirecTV's exclusivity, he separately calculated the total amount of business from commercial Sunday Ticket subscribers. Tr. (Zona) 1189:16-1190:2; Tr. (Yurukoglu) 1398:2-5. Dr. Zona went on to assess whether the same reduction factor he applied to the residential class could also apply to the commercial class. Tr. (Zona) 1189:3-12; 1219:9-15; 1220:21-1221:1. In particular, Dr. Zona testified that demand in commercial settings is driven

by "the underlying demand from the viewers [patrons] at the establishment that has the service," *i.e.*, individuals who are also potentially viewing games at home. Tr. (Zona) 1277:3-9. Even Dr. Yurukoglu—who did not conduct his own empirical analysis or modeling of the impact on commercial class members—conceded that commercial subscribers purchased the same Sunday Ticket product, from the same exclusive distributor (DirecTV), for the same reason: to access out-of-market games. Tr. (Yurukoglu) 1415:3-20.

Antitrust courts routinely approve of the use of overcharge percentages that straddle discrete but similarly affected populations *See, e.g., Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 661, 684–85 (9th Cir. 2022) (en banc) (affirming certification of a class "[i]n a complex market such as the one at issue here, where different purchasers with different bargaining power purchased a range of products at different prices from different suppliers"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 603 (N.D. Cal. Mar. 28, 2010) ("Numerous courts have held that variations in products and complexities in a distribution chain do not preclude an estimation of whether an overcharge impacted end purchasers."); *cf. Prime Media Group, LLC v. Acer America Corporation*, 2015 WL 452192, at *4 (N.D. Cal. Jan 22, 2015) (denying motion to exclude expert testimony) ("Extrapolating results from a sample to a population is a routine statistical technique and indeed is often necessary in the face of an incomplete or intractably large data set.").

Defendants make an irrelevant argument based on the fact that the two residential class representatives may go to bars to watch football games, and that going to these establishments "would eliminate the need for many consumers to go to a bar to watch the game." *See* Mot. at 22. The issue is whether class members were overcharged for Sunday Ticket, not whether they also watched games at a bar or restaurant.

## V.   PLAINTIFFS ARE DIRECT PURCHASERS OF THE CONSPIRACY.

The Ninth Circuit clearly held that *Illinois Brick* is inapplicable in this case. *NFLST*, 933 F.3d at 1158. Moreover, in denying the Defendants' motion for summary judgment, the Court rejected the Defendants' argument that Plaintiffs were indirect purchasers with no standing to sue because there was sufficient evidence to raise a material question of fact regarding whether the interlocking web of agreements alleged by Plaintiffs resulted "in DirecTV's monopoly of out-of-market telecasts and to show DirecTV's conscious commitment to the alleged conspiracy." Dkt. No. 1155 at 8.

Evidence at trial confirms each of the agreements this Court referenced. First, several witnesses conceded that the teams have pooled their independent telecast rights in the league.[10] Second, the NFL-Network contracts provide that no more than two telecasts can be broadcast at the same time in a given market[11] and impose limitations on the league's "resale" of those telecasts out of market, including by requiring that those telecasts be sold on a subscription basis. Moreover, the NFL and the Networks had a common understanding that Sunday Ticket would be sold at a premium price, thereby limiting distribution.[12]

Third, the NFL-DirecTV agreements demonstrate that DirecTV agreed to, and benefited from, those agreements. Those agreements protected DirecTV by providing exclusivity, specifying a minimum number of games that must be regionalized (leaving DirecTV as the sole provider of those games to out-of-market viewers), reducing the number of games that could be telecast by CBS and FOX, and providing

---

[10] *See* Tr. (Rolapp) 969:7-9 ("[T]he clubs pool all of their rights at the league level and it's the league's responsibility to then license those rights."); Tr. (Rolapp) 968:5-12 (teams sell preseason rights independently); Tr. (J. Jones) 1638:6-8 (same); Tr. (Yancy) 1751:17-19 (same); Tr. (Rascher) 703:10-17; 705:18-706:1 (teams historically sold telecasts independently).

[11] *See, e.g.*, TX-145 at NFL_0419945; TX-188 at NFL_0862671-72.

[12] Tr. 538:8-13 (Larry Jones: "A: FOX just wanted to make sure, as I said, [Sunday Ticket] was a complementary package of a premium product sold behind a pay wall. Q: Right. Because the pricier it is, the fewer subscribers it will have; true, sir? A: Yes."); Tr. 1677:6-19 (Sean McManus: CBS and NFL agreed to a premium price for Sunday Ticket which limits distribution of Sunday Ticket); TX-750.

that no more than two over-the-air broadcasts can be shown in any location at one time.[13] Additional evidence offered at trial further shows that DirecTV overcharged subscribers to Sunday Ticket, as intended by the conspiracy.[14]

DirecTV also contractually agreed—consistent with the agreements between the NFL and the networks—to sell Sunday Ticket at high "premium" prices.[15] Despite the contractual provisions that purportedly gave DirecTV discretion over pricing, the evidence demonstrates that DirecTV and the NFL reached agreements that a premium price should be charged to class members.[16] The Defendants' motion does not address any of this evidence. These documents contradict the Defendants' self-serving testimony regarding the NFL's role in Sunday Ticket pricing (or supposed lack thereof). Moreover, the documentary evidence of the NFL's influence over pricing extends beyond the additional exhibits admitted under Rule 806.[17] *See, e.g.*, TX-267 (DirecTV internal document stating that pricing and packaging is "Subject to NFL approval"); TX-269 (DirecTV internal email that the "two entities required to lower the price" of Sunday Ticket were the NFL and DirecTV's finance department).

---

[13] *See, e.g.*, TX-045 at NFL_000468 and NFL_000481.
[14] Tr. (Bornstein) 206:16-T9; 207:20-209:10; 355:13-19; 364:3-8; 366:2-14; Tr. (Rolapp) 971:2-16; 974:7-20; Hawkins Video (Dkt. No.) 108:10-15; White Video (Dkt. No. ) 193:12-18; TX-271; TX-481.
[15] TX-044 at -440 (stating that "in all cases NFL Sunday Ticket shall be marketed and offered in a manner consistent with its status as a high quality, premium subscription sports offering"); TX-045 at -469 (same).
[16] *See, e.g.* TX-806 (showing AT&T "ask" for a "4%/5% increases" to "Satellite Pricing" and NFL Response of "Okay"); TX-808 (marketing spreadsheet maintained outlining NFL's response to DTV's submission of "recommended pricing for 2016"); TX-804 (NFL marketing spreadsheet stating that "NFL reviewing" and later "confirm[ing]" satellite pricing for 2018 season").
[17] The plain text of Rule 806 establishes that the documents used to attack the deponents' credibility was admitted into evidence. *See* Fed. R. Evid. 806 ("The court may *admit evidence* of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it." (emphasis added)). Each of these documents is also admissible for substantive purposes, and is not hearsay. The documents produced by the NFL are party-opponent statements under Fed. R. Evid 801(d)(2)(D) while those produced by DirecTV are statements of a co-conspirator in furtherance of the conspiracy under Fed. R. Evid 801(d)(2)(E), or business records under Rule 803(6).

Given this evidence, a "reasonable trier of fact could find that these interlocking provisions show DirecTV was aware and participating in the overall scheme to limit output of paid telecasts. Moreover, the various agreements are all designed to protect their piece of the conspiracy from intrusion from the other pieces." Dkt. No. 1155 at 11. This evidence includes the evidence supporting Plaintiffs' claims, which, contrary to Defendants' argument, are hardly new.[18] Finally, based on the teams' agreement to limit the output of their own telecasts, Plaintiffs would have antitrust standing in any event.

## VI.   DEFENDANTS' CONDUCT IS NOT PROTECTED BY THE SPORTS BROADCASTING ACT ("SBA").

The Defendants' reliance on the SBA has been rejected numerous times in this litigation. In denying Defendants' motion for summary judgment, the Court explicitly held that "[t]he SBA does not exempt the NFL-Network Agreements from antitrust scrutiny." Dkt. No. 1155 at 14. "Defendants' position seeks to expand the SBA's exemption to antitrust laws outside of the conduct permitted by the SBA. For even though Defendants state that they 'are not seeking to extend the protections of the SBA to a license for "paid telecasting,"' . . . Defendants' position taken to its logical conclusion would allow the NFL to do just that." *Id*. at 17.

Defendants claim that Plaintiffs are seeking to impose liability based on their contracts with CBS and FOX, which – Defendants insist – cannot be questioned given the SBA's protections. But, as this Court has already held, the SBA does not immunize contracts or agreements. *Id*. at 18. All it does is protect at most the NFL teams' collective sale of telecast rights to free, over-the-air television networks. *NFLST,* 933 F.3d at 1147. The teams may not turn that limited protection into unlimited protection by claiming that the SBA protects any provision in any contract that concerns over the air telecasting. "If the Court were to agree with Defendants'

---

[18] *See* Dkt. No. 441 at ¶¶ 46, 126, 146; Dkt. No. 630 at 14-15; Dkt. No. 913-1 at 18; Dkt. No. 964 at 7; Dkt. No. 964-1 at No. 245; Dkt. No. 1265-1; Dkt. No. 1155 at 2.

logic and not allow Plaintiffs' challenges to proceed, the NFL could circumvent the statutory confines, nullify the statutory scheme, simply by including provisions in the NFL-Network Agreements that restrict paid telecasts." *Id*. at 18 (quotation marks omitted). "Indeed, the Court 'would allow the exception to swallow the rule: a sponsored telecast to a limited geographic area would secure an antitrust law exemption for nationwide sales.'" *Id*. (quoting *Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299, 302 (3d Cir. 1999)).

In sum, Plaintiffs are *not* challenging Defendants' pooling of rights for over the air distribution. Rather, Plaintiffs challenge provisions that place restrictions on telecasts for *paid* distribution, conduct that falls outside the SBA's narrow confines. *Id*. ("The SBA cannot be read to immunize contracts that restrict competition for paid telecasts.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny the NFL Defendants' Motion for Judgment as a Matter of Law.

Dated: June 25, 2024

Respectfully submitted,

By: */s/ Marc M. Seltzer*

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
Eliza Finley (301318)
efinley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

William C. Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com

Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
One Manhattan West
New York, NY 10001
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020

Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*