Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Phone: (310) 789-3100
Fax: (310) 789-3150

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
LANGER GROGAN & DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

[Additional Counsel on Signature Page]

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | Case No. 2:15-ml-02668-PSG (SKx)<br><br>**PLAINTIFFS' OPPOSITION TO NFL DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL**<br><br><span style="color:red">**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**</span><br><br>JUDGE: Hon. Philip S. Gutierrez<br><br>HEARING DATE: July 31, 2024<br><br>HEARING TIME: 9:00 a.m.<br><br>COURTROOM:<br> First Street Courthouse<br> 350 West 1st Street<br> Courtroom 6A<br> Los Angeles, CA 90012 |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................... 1

II.    LEGAL STANDARD ............................................................................... 4

III.   ARGUMENT ........................................................................................... 5

       A.   The Verdict on Liability for Claim 1 Should Not Be Disturbed .......... 5

            1.   Defendants, CBS, FOX, and DirecTV Knowingly
                 Conspired .................................................................................. 5

                 a.   Defendants' "Single Entity" Defense Failed.................... 6
                 b.   DirecTV Knowingly Joined the Conspiracy .................... 6
                 c.   Defendants Were Not Surprised by "Price-Fixing" ......... 7
                 d.   Rule 806 Documents Were Properly Admitted .............. 8

            2.   The Conspiracy Harmed Competition. ....................................... 9

                 a.   Rule of Reason Step 1: Anticompetitive Effects............. 9
                 b.   Rule of Reason Step 2: Procompetitive
                      Justifications ............................................................... 10
                 c.   Rule of Reason Step 3: LRAs and Prof. Elhauge .......... 11
                 d.   Rule of Reason Step 4: Balancing................................. 11

            3.   Defendants' Conspiracy Injured Plaintiffs .............................. 12

       B.   The Verdict on Liability for Claim 2 Should Not Be Disturbed ........ 12

       C.   Defendants' Attacks on the Damages Award Lack Merit ................. 12

            1.   The Award Does Not Negate Class-Wide Injury ..................... 13

            2.   The Jury's Estimate of Damages Should Not Be
                 Disturbed ................................................................................ 14

                 a.   The Jury Could Have Awarded Up To $7 Billion ......... 15
                 b.   The Decision Awarding Less Cannot Be Set Aside ...... 17
                 c.   Speculation into the Jury's Methodology is Barred ....... 19

       D.   Defendants' Other New Trial Arguments Should Be Rejected .......... 23

            1.   Evidence about *NFL I* and *NFL II* Was Properly Admitted ..... 23

            2.   Defendants' Juror Bias Argument Fails ................................... 23

            3.   The Court Properly Instructed the Jury on Class-wide
                 Proof ....................................................................................... 24

IV.    CONCLUSION ....................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abuan v. Gen. Elec. Co.*,
3 F.3d 329 (9th Cir. 1993) ....................................................................................... 25

*Am. Nat. Bank & Tr. Co. of Chicago v. Reg'l Transp. Auth.*,
125 F.3d 420 (7th Cir. 1997) .................................................................................... 18

*American Needle, Inc. v. NFL*,
560 U.S. 183 (2010) .................................................................................................... 6

*Arroyo v. Volvo Grp. N. Am. LLC*,
2022 WL 17960686 (N.D. Ill. Dec. 27, 2022) ...................................................... 13

*Asdale v. Int'l Game Tech.*,
549 F. App'x 611 (9th Cir. 2013) ........................................................................... 20

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946) .............................................................................................. 2, 14

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ................................................................................... 25

*Brewer v. Hustler Magazine, Inc.*,
749 F.2d 527 (9th Cir. 1984) ................................................................................... 20

*Burnett v. Nat'l Assoc. of Realtors, et al.*,
No. 4:19-cv-00332 (W.D. Mo. Oct. 31, 2023), Dkt. 1294 .................................... 2

*Cal-Agrex. Inc. v. Tassell*,
258 F.R.D. 340 (N.D. Cal. 2019), *aff'd*, 408 F. App'x 58 (9th Cir.
2011) ............................................................................................................................ 18

*Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643 (1980) ............................................................................................... 3, 8

*Celador Int'l Ltd. v. Walt Disney Co.*,
2010 WL 11505709 (Dec. 21, 2010) ....................................................................... 19

*Cnty. of Tuolumne v. Sonora Comm. Hosp.*,
236 F.3d 1148 (9th Cir. 2001) ................................................................................. 12

ii

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ......................................................................... 14

*Conwood Co., L.P. v. U.S. Tobacco Co.,*
    290 F.3d 768 (6th Cir. 2002) ..................................................... 2, 18

*Cook v. County of Los Angeles,*
    2022 WL 1470574 (C.D. Cal. Mar. 21, 2011) ................................ 11

*Cornwell Entertainment, Inc. v. Anchin, Block & Achin, LLP,*
    830 F.3d 18 (1st Cir. 2016) ...................................................... 13, 23

*Coughlin v. Tailhook Ass'n,*
    112 F.3d 1052 (9th Cir. 1997) ........................................................ 24

*D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.,*
    692 F.2d 1245 (9th Cir. 1982) ........................................................ 17

*Darbin v. Nourse,*
    664 F.2d 1109 (9th Cir. 1981) ........................................................ 24

*Domeracki v. Humble Oil & Refining Co.,*
    443 F.2d 1245 1247-48 (3d Cir. 1971) ............................................ 19

*E.E.O.C. v. Pape Lift, Inc.,*
    115 F.3d 676 (9th Cir. 1997) ............................................................ 4

*Eastman Kodak Co. of New York v. Southern Photo Materials Co.,*
    273 U.S. 359 (1927) .......................................................................... 2

*Epic Games, Inc. v. Apple, Inc.,*
    67 F.4th 946 (9th Cir. 2023) ................................................. 4, 10, 12

*Experience L.L.C. v. Hendrixlicensing.com Ltd.,*
    762 F.3d 829 (9th Cir. 2014) .......................................................... 21

*Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc.,*
    243 F.3d 980 (6th Cir. 2001) .......................................................... 23

*F.T.C. v. Qualcomm, Inc.,*
    969 F.3d 974 (9th Cir. 2020) .......................................................... 12

*Fields v. Brown,*
    503 F.3d 775 (9th Cir. 2007) .......................................................... 24

*Fikes Wholesale, Inc. v. HBSC Bank USA, N.A.*,
   62 F.4th 704 (2d Cir. 2023) ............................................................... 1

*First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co.*,
   612 F.2d 1164 (9th Cir. 1980) ......................................................... 15

*Fisher v. Smith*,
   2009 WL 10698910 (C.D. Cal. Mar. 25, 2009) ................................. 8

*Goyal v. Thermage, Inc.*,
   2012 WL 3240381 (D. Md. Aug. 2, 2012) ....................................... 19

*Hatami v. Kia Motors Am., Inc.*,
   2010 WL 11475044 (C.D. Cal. July 7, 2010) ................................. 13

*Holmes v. Harris*,
   2019 WL 12070347 (C.D. Cal. Oct. 4, 2019) ................................. 19

*ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*,
   442 F. Supp. 3d 1329 (D. Or. 2020) ............................................... 23

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ................................................. 14, 16

*In re Credit Default Swaps Antitrust Litig.*,
   2016 WL 2731524 (S.D.N.Y Apr. 26, 2016) ..................................... 1

*In re Exxon Valdez*,
   270 F.3d 1215 (9th Cir. 2001) ....................................................... 17

*In re First Alliance Mortgage Co.*,
   471 F.3d 977 (9th Cir. 2006) ................................................. 3, 20, 21

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ..................................... 1

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) .............................................. 6, 7, 16

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   842 F.3d 34 (1st Cir. 2016) ........................................................... 11

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ....................................................... 13

iv

*In re Rubber Chemicals Antitrust Litig.*,
　232 F.R.D. 346 (N.D. Cal. 2005) ................................................................ 16

*In re Scrap Metal Antitrust Litig.*,
　527 F.3d 517 (6th Cir. 2008) ...................................................................... 14

*In re Urethane Antitrust Litig.*,
　768 F.3d 1245 (10th Cir. 2014) .............................................................. 2, 18

*In re Vitamins Antitrust Litig.*,
　2000 WL 1737867 (D.D.C. Mar. 31, 2000) .............................................. 1

*Kaffaga v. Est. Steinbeck*,
　938 F.3d 1006 (9th Cir. 2019) .................................................................... 20

*Kline v. Coldwell, Banker & Co.*,
　508 F.2d 226 (9th Cir. 1974) ...................................................................... 25

*Krechman v. Cty. of Riverside*,
　723 F.3d 1104 (9th Cir. 2013) .................................................................. 1, 4

*Lewis v. Woodford*,
　2007 WL 196635 (E.D. Cal. Jan. 23, 2007) ............................................ 24

*Lillie v. ManTech Int'l Corp.*,
　2019 WL 3387732 (C.D. Cal. July 26, 2019) ........................................... 23

*Litton Sys., Inc. v. Honeywell, Inc.*,
　1996 WL 634213 (C.D. Cal. July 24, 1996) ............................................. 22

*Los Angeles Mem'l Coliseum Com'n v. NFL*,
　791 F.2d 1356 (9th Cir. 1986) ........................................................... 2, 15, 17

*Luna v. Allison*,
　2023 WL 2799262 (C.D. Cal. Feb. 15, 2023) .......................................... 24

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
　806 F.3d 835 (5th Cir. 2015) ...................................................................... 16

*Moore v. James H. Matthews & Co.*,
　682 F.2d 830 (9th Cir. 1982) ...................................................................... 17

*Morgan v. City of Chicago*,
　2014 WL 4745574 (N.D. Ill. Sept. 18, 2014) ........................................... 24

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) .................................................................... 10, 16

*Out of the Box Enters., LLC v. El Paseo Jewelry Exch., Inc.*,
    732 F. App'x 532 (9th Cir. 2018)................................................ 23

*Parrish v. NFL Players Ass'n*,
    534 F. Supp. 2d 1081 (N.D. Cal. 2007)....................................... 9

*Prendeville v. Singer*,
    155 F. App'x 303 (9th Cir. Nov. 28, 2005) ........................... 13, 23

*Rex Med. v. Intuitive Surgical, Inc.*,
    2023 WL 6142254 (D. Del. Sept. 20, 2023) .............................. 23

*Russo v. Ballard Mrd. Prods.*,
    550 F.3d 1004 (10th Cir. 2008) ................................................. 18

*Sidibe v. Sutter Health*,
    103 F.4th 675 (9th Cir. 2024) .................................................... 23

*Smart Mktg. Grp. v. Publ'ns Int'l Ltd.*,
    624 F.3d 824 (7th Cir. 2010) ..................................................... 23

*Smith for J.L. v. Los Angeles Unified School Dist.*,
    2018 WL 6137133 (C.D. Cal. Feb. 13, 2018) .............................. 8

*Smith v. Cupp*,
    457 F.2d 1098 (9th Cir. 1972) ................................................... 19

*Stallworth v. Nike Retail Servs., Inc.*,
    2021 WL 6618781 (C.D. Cal. Dec. 1, 2021)................................ 11

*Story Parchment Co. v. Paterson Parchment Paper*,
    282 U.S. 555 (1931) ..........................................................2, 13, 15

*Tanno v. S.S. President Madison Ves*,
    830 F.2d 991 (9th Cir. 1987) ....................................................... 3

*Tawfilis v. Allergan, Inc.*,
    2017 WL 3084275 (C.D. Cal. June 26, 2017)............................. 16

*Tercero v. Texas Southmost College Dist.*,
    989 F.3d 291 (5th Cir. 2021)...................................................... 22

*Traver v. Meshriy,*
    627 F.2d 934 (9th Cir. 1980) ................................................................. 19

*Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.,*
    223 F.3d 585 (7th Cir. 2000) ................................................................. 22

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016) ............................................................................. 25

*U.S. v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015) ................................................................... 8

*U.S. v. Bao,*
    189 F.3d 860 (9th Cir. 1999) ................................................................... 8

*U.S. v. Clark,*
    617 F.2d 180 (9th Cir. 1980) ................................................................. 11

*U.S. v. Finley,*
    934 F.2d 837 (7th Cir. 1991) ................................................................... 8

*U.S. v. Gonzalez,*
    214 F.3d 1109 (9th Cir. 2000) ............................................................... 24

*U.S. v. Hirokawa,*
    342 F. App'x 242 (9th Cir. 2009) .......................................................... 11

*U.S. v. J-M Mfg. Co., Inc.,*
    2020 WL 4196880 (C.D. Cal. June 5, 2020) ........................................ 23

*U.S. v. Klaus,*
    519 F. App'x 437 (9th Cir. 2013) .......................................................... 17

*U.S. v. Martinez-Salazar,*
    528 U.S. 304 (2000) ............................................................................. 24

*U.S. v. Olsen,*
    704 F.3d 1172 (9th Cir. 2013) ............................................................... 24

*U.S. v. Reid,*
    751 F.3d 763 (6th Cir. 2014) ................................................................. 24

*U.S. v. Saada,*
    212 F.3d 210 (3d Cir. 2000) ................................................................... 8

*U.S. v. Socony-Vacuum Oil*,
    310 U.S. 150 (1940) ........................................................................ 8

*U.S. v. Thuan Huy Ha*,
    390 F. App'x 649 (9th Cir. 2010)................................................. 24

*Union Oil Co. of Cal. v. Terrible Herbst, Inc.*,
    331 F.3d 735 (9th Cir. 2003) .......................................................... 4

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*,
    89 F.3d 233 (5th Cir. 1996) ............................................................ 9

*Venegas v. Wagner*,
    831 F.2d 1514 (9th Cir. 1987) ........................................................ 4

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.*
    447 F.3d 769 (9th Cir. 2006) ........................................................ 17

*Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*,
    850 F.2d 803 (1st Cir. 1988) ........................................................ 23

**Rules**

Fed. R. Civ. P. 50....................................................................... 4, 10

Fed. R. Civ. P. 59............................................................................ 4

Fed. R. Civ. P. 61............................................................................ 4

Fed. R. Evid. 606(b)(1) ................................................................. 19

Fed. R. Evid. 607 ............................................................................ 9

Fed. R. Evid. 611 ...................................................................... 8. 119

Fed. R. Evid. 806 ............................................................................ 9

**Other Authorities**

9B Charles A. Wright & Arthur R. Miller, FED. PRAC. & PROC.
    CIV. § 2524 (3d ed. 2024)............................................................... 4

## I.     INTRODUCTION

After three weeks of trial and considering the testimony from 27 witnesses and 82 admitted exhibits, the jury—heeding this Court's instructions—unanimously found that Defendants conspired to restrain trade in and monopolize the market for professional football telecasts in violation of Sections 1 and 2 of the Sherman Act, DirecTV knowingly joined the conspiracy, and as a result, the residential and commercial classes were injured by being overcharged for Sunday Ticket. Dkt. 1481 (Verdict Form "VF") at Nos. 1–12. Substantial evidence supports the jury's findings.

Rather than accept the jury's verdict, the NFL asks the Court to grant its motion for judgment as a matter of law or a new trial based primarily on three grounds that lack merit. On the motion for judgment as a matter of law, the Court must view all of the evidence and all reasonable inferences from that evidence in Plaintiffs' favor. *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013). Due respect for the jury's verdict after a full and fair trial counsels against granting a do-over.

First, Defendants argue a "runaway jury" awarded damages irrationally, necessitating that the Court set aside both liability and damages. Mot. 1. Not so. The Court closely supervised and managed the trial and carefully instructed the jury on the law. The $4.7 billion award here was substantially less than the total amount Plaintiffs reasonably asked for ($7 billion) and $10 billion less than the total licensing revenue the NFL received from DirecTV for Sunday Ticket during the class period ($15 billion). Nor is it unusual for modern antitrust cases to have a recovery in the billions of dollars given the volume of commerce at stake.[1]

Defendants' line of argument runs contrary to basic antitrust principles that

---

[1] *Fikes Wholesale, Inc. v. HBSC Bank USA, N.A.*, 62 F.4th 704, 712 (2d Cir. 2023) (affirming district court's approval of $5.6 billion class action settlement); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *1 (S.D.N.Y. Nov. 8, 2018) (settlements totaling $2,310,275,000); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *1, *19 (S.D.N.Y Apr. 26, 2016) (approving settlement totaling $1,864,650,000); *In re Vitamins Antitrust Litig.*, 2000 WL 1737867, at *2, 7 (D.D.C. Mar. 31, 2000) (approving settlement valued at $1.05 billion).

once fact of injury is proved, the jury need only reach a just and reasonable estimate of damages, even if the amounts are uncertain. Seminal decisions on antitrust damages, *Story Parchment Co. v. Paterson Parchment Paper*, 282 U.S. 555, 562–66 (1931), *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 378–79 (1927), and *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 261–66 (1946), cited in hundreds, if not thousands, of decisions and embedded in the Court's instructions, make this clear. To disallow recoveries in such cases, as the Supreme Court has said, would be a "certainty of injustice." *Story Parchment*, 282 U.S. at 564.

Far from "irrational," the jury's award was within the range of proof, which is all the law requires. The jury heard a proper model, the history of college football telecasts, as a real-world yardstick from which it could have concluded class members would not have paid anything above the price of a regular DirecTV subscription but for the restraints, yielding $7 billion in damages over a 12-year class period. This model is akin to one a jury recently adopted, fully awarding a requested $1,785,310,872 in damages in *Burnett v. Nat'l Assoc. of Realtors, et al.*, No. 4:19-cv-00332 (W.D. Mo. Oct. 31, 2023), Dkt. 1294 (accepting, based on Australian benchmark, class members would not have paid any commissions to buyer brokers).

Under black-letter law, juries have wide discretion to issue damages verdicts that are *below* what could be reasonably awarded. Where the damages "lie within the range sustainable by the proof," the Court must decline Defendants' invitation to "'play Monday morning quarterback' and supplant the jury's evaluation of the complex and conflicting evidence with [its] own." *Los Angeles Mem'l Coliseum Com'n v. NFL*, 791 F.2d 1356, 1366 (9th Cir. 1986). The jury's discount of damages here is like those affirmed by the Courts of Appeals in *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1268 (10th Cir. 2014), or *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 780, 795 (6th Cir. 2002), where the awarded damages were lower than what plaintiffs' experts proposed and the juries' rationales were unknown.

Defendants do not know how or why the jury arrived at its reduced damages

award. The jury could have arrived at a round number like $5 billion, depriving Defendants of their primary argument. The jury reached a more specific number instead. Either way, Defendants' pure conjecture into the jurors' mental processes is legally impermissible. "Public policy has long dictated that such explorations impeaching the result not be tendered or heard." *Tanno v. S.S. President Madison Ves*, 830 F.2d 991, 993 (9th Cir. 1987) (affirming denial of new trial where jury damages award was less than plaintiffs sought and had inconsistencies). Unless it can be shown that the jury's decision is unquestionably contrary to law by, for example, awarding damages under a theory that was legally impermissible as instructed by the court, *see In re First Alliance Mortgage Co.*, 471 F.3d 977, 1002 (9th Cir. 2006), the award cannot be set aside based on a reconstruction of the jury's process. Defendants cite no case overturning a jury's damages award that was within the range of evidence, let alone an entire verdict, on the grounds they advance here.

Second, Defendants claim Plaintiffs "reinvent[ed] their case on the first day of trial around a 'price-fixing' theory." Mot. 1–2. Not so. From day one, Plaintiffs alleged the purpose and effect of Defendants' conspiracy was to restrict output and overcharge Plaintiffs. Plaintiffs' key pleadings and interrogatory responses have consistently alleged that Defendants conspired to make Sunday Ticket only available as a premium-priced paid television product to limit output. Dkt. 1155, MSJ Order at 9 (noting NFL's intent for Sunday Ticket to "be priced and distributed as premium" was "evidence that NFL-Network Agreements were drafted to reduce competition"). Agreeing that Sunday Ticket could only be sold as a premium-priced subscription is just as much price-fixing as agreeing to a specific price. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648–50 (1980).

Third, Defendants argue that the Court's jury instruction on the fourth step of the rule of reason was erroneous because it did not say that Plaintiffs had to show that the anticompetitive harm "substantially" outweighed the alleged pro-competitive benefits. Mot. 2. If the fourth step was even reached, and there is no basis to assume

so, the instruction was clearly proper and consistent with the Ninth Circuit's most recent pronouncement in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 993–94 (9th Cir. 2023). Defendants offer no Ninth Circuit case law to suggest otherwise.

Defendants' other arguments largely rehash disputes they have previously raised and lost—whether the SBA applies, *Illinois Brick* standing, the history of *NFL I* and *II*, their challenges to Prof. Elhauge, their complaints about jury instructions on class-wide injury, and their objection to Juror No. 7—and none come close to meeting the high standards to justify judgment as a matter of law or a new trial.

## II.    LEGAL STANDARD

Harmless errors are not grounds for "a new trial" or "setting aside a verdict." Fed. R. Civ. P. 61. "A district court can grant a Rule 50[] motion for judgment as a matter of law only if there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman*, 723 F.3d at 1109 (reversing grant of Rule 50 motion). The Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor," and "may not make credibility determinations or weigh the evidence" or "substitute its view of the evidence for that of the jury." *Id.* at 1109–10 (cleaned up).

A "stringent standard applies" to a Rule 59 new trial motion "based on insufficiency of the evidence." *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987). "It is not the courts' place to substitute [their] evaluations for those of the jurors." *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003) (reversing grant of new trial). Defendants must show the verdict "is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997) (cleaned up). "The fundamental principle is that there must be a minimum of judicial interference with the proper functioning and legitimate province of a jury." 9B Charles A. Wright & Arthur R. Miller, FED. PRAC. & PROC. CIV. § 2524 (3d ed. 2024).

## III.   ARGUMENT

### A.   The Verdict on Liability for Claim 1 Should Not Be Disturbed

#### 1.   Defendants, CBS, FOX, and DirecTV Knowingly Conspired

Defendants, the networks, and DirecTV entered a web of interlocking agreements to limit output of game telecasts, resulting in higher prices. Defendants all but conceded the facts below at trial:

The NFL-Teams Agreement: The teams agreed to "pool" their paid telecast rights "at the league level," to allow the league to "collectively negotiate" on their behalf, and to "approve all the contracts" the NFL enters. Trial Transcript ("TT") 969:4–23 (Rolapp).

The NFL-Network Agreements: The NFL (on behalf of the teams) also agreed with CBS and FOX to restrict the output of competing telecasts, including by requiring the NFL to only sell out-of-market ("OOM") telecasts to a paid television provider who would offer Sunday Ticket on a subscription basis and for a price high enough to limit distribution and ensure they would "complement" rather than compete with the networks' broadcasts.[2]

The NFL-DirecTV Agreements: The NFL entered into interlocking and mirror-image agreements with DirecTV that restricted output, providing that DirecTV had exclusivity over OOM games; only two network broadcasts could be shown at the same time in one location; and DirecTV had to "offer" Sunday Ticket

---

[2] TX-145 §§ 1.4(a–b), 2.5(a); TX-187 §§ 1.4(a–b); TX-188 §§ 1.4(a–b), 2.5(a). For the requirements that Sunday Ticket be sold at a "premium price" to limit distribution and ensure OOM games were "complementary" to network broadcasts, see TX-750, TX-326, and TX-257 (admitted without objection). Testimony from Mr. McManus of CBS and Mr. Jones of FOX Sports also confirmed the "premium price" aspect of Defendants' agreements with the networks. TT 1677:16–19 ("Q. CBS and NFL agreed to a premium price for Sunday Ticket which limits distribution of Sunday Ticket. Fair? A. We agreed to the – yes."); TT 516:24–517:7; 518:5–14; 519:23–520:3; 527:1–9 (L. Jones explaining FOX and CBS shared this agreed principle that Sunday Ticket would be "complementary" and offered for a "premium fee" since the 1990s). The purpose was to protect the networks from Sunday Ticket competition. TT 1672:2–5 (McManus: "CBS wanted a premium price for Sunday Ticket because CBS didn't want Sunday Ticket taking away more eyeballs from CBS viewership.").

as a "premium subscription[.]" TX-44 §§ 2(f), 3.a–b; TX-45 §§ 2(c), 3.a–b.

The subscription restraint meant the "NFL couldn't just put the games on regular cable channels," the "games could not be sold on a team-by-team basis," and consumers could only buy "the whole package of games, not individual games." TT 1676:11–16, 1679:13–19 (McManus). Witnesses admitted "premium" meant a premium *price*.[3] Mr. Kraft testified that "*ensuring* a high subscription price for Sunday Ticket is a priority for the NFL and its member clubs" to protect Defendants' income stream from CBS and FOX. Dkt. 1413-4 at 20:22–23:1.

### a.   Defendants' "Single Entity" Defense Failed

As to the "single entity" defense, the jury was told if "Plaintiffs prove that it is possible for the NFL Teams to produce and license telecast[s] on their own, then the NFL and NFL Teams are not a single entity for that purpose." Dkt. 1482, Final Jury Inst. ("JI") 21. The jury reasonably concluded that the NFL teams could do so based on evidence that they separately sold their telecast rights in the 1950s, they do so now for the pre-season, some college football teams have done so since 1984, and other professional sports teams currently do so as well. TT 748:14–749:25, 771:7–15 (Rascher); 2118:14–2119:15 (Elhauge). "Only the agreements that are the subject of plaintiffs' antitrust action prevent" NFL teams from acting independently. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1154 (9th Cir. 2019) (citing *American Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010)).

### b.   DirecTV Knowingly Joined the Conspiracy

The jury also reasonably found based on evidence admitted for all purposes that DirecTV knowingly joined the conspiracy—and had sufficient evidence from which to decide CBS and FOX did so as well—so a "single entity" defense would not undermine the verdict even if credited (it shouldn't be). As DirecTV put it:

---

[3] Dkt. 1413-5 at 94:06–10 (Lawton: "it should be priced as a premium product"); TT 293:13–18 (Bornstein: "a premium subscription would imply a premium price."); *id.*1018:13–18 (Rolapp) ("price is one of the many factors"); *id.*1490:8–14 (Goodell) ("Premium is *more* than *just pricing*….").

> The NFL via their broadcast deals don't necessarily want NFLST to be available to everyone in the country, could affect their ratings in how the local games are programmed now. So its a little bit to protect DirecTV, a little bit to protect the NFL's broadcast deals. They like that NFLST is to a defined amount of people, if that makes sense.

TX-481 (4/20/2016 Stecklow email).[4] The jury's finding was supported by substantial evidence, demonstrated standing under *Illinois Brick*, and confirms that Defendants' interlocking agreements are not exempt under the SBA. Mot. 24.

c.    Defendants Were Not Surprised by "Price-Fixing"

Defendants claim *surprise* about Plaintiffs' "allegation that the NFL had agreed with CBS, FOX, and DirecTV that DirecTV would maintain the Sunday Ticket price at an allegedly elevated level," Mot. 10, but there was none. 2d Am. Compl. Dkt. 441 ¶ 46 (alleging agreements to "reduce output and/or to fix, raise, maintain, or stabilize prices"); Dkt. 1331 (Proposed PTCO) at 10–11 (same); *Sunday Ticket*, 933 F.3d at 1158 (holding output restriction and price-fixing are functional equivalents). The Court's summary judgment order discussed evidence of Defendants' agreements to ensure Sunday Ticket remained a "complementary, premium product for avid fans," meaning it "should be *priced* and distributed as *premium*." Dkt. 1155 (MSJ Order) at 9 (emphasis added); Dkt. 1304 (Order on D. MIL No. 4) at 4 ("Defendants' role in Sunday Ticket pricing is a key issue at trial."). Defendants also had notice of the "premium" pricing claims from Plaintiffs' March 2022 interrogatory response (Ex. 2 at 4), questions asked in numerous depositions

---

[4] Evidence admitted for all purposes showed that DirecTV allowed the NFL to monitor its prices to ensure they were high enough to limit distribution. Dkt. 1413-6 113:08–19; 115:09–16 (Schroeder confirming NFL was "updated and informed" on Sunday Ticket pricing and "expect[ed]" them to offer Sunday Ticket as a "premium product"); TX-44 at § 4.i and TX-45 at § 4.i (DirecTV contracts requiring NFL approval for marketing); TX-146A at § 5.c, TX-146D at Schedule 5 (network contracts promising NFL would use marketing approval to ensure Sunday Ticket remained "complementary" and "premium"); TX-271 (DirecTV CEO prepared to tell Commissioner Goodell that NFL could "control" DirecTV); TX-267 (DirecTV "Sunday Ticket 101" saying pricing "subject to NFL approval"); TX-684 (Schroeder requesting "agreed-to" pricing from Lawton).

(Dkt. 1413), Dr. Rascher's expert reports, and multiple briefs.[5]

Defendants admitted in the PTCO that "Plaintiffs think they have sufficient evidence of a price conspiracy during the class period," but disagreed. Dkt. 1331-1 at 44. Defendants well understood that "price fixing" is not reserved for "agreements that literally set or restrict prices," but is "any conspiracy 'formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity,'" regardless of the "precise 'machinery employed[.]'" *U.S. v. Apple, Inc.*, 791 F.3d 290, 328 (2d Cir. 2015) (quoting *U.S. v. Socony-Vacuum Oil*, 310 U.S. 150, 223 (1940), and citing *Catalano*, 446 U.S. at 647–48)). In any event, Defendants fail to establish any prejudice given that the Court rejected Plaintiffs' proposed price-fixing instructions and the jury applied the rule of reason.

### d.   Rule 806 Documents Were Properly Admitted

Defendants' related argument about documents admitted under Rule 806 ignores that the Court (1) carefully considered each document, admitting some while excluding others, and (2) in its discretion under Rule 611 even gave Defendants' proposed limiting instruction for the jury to consider the documents "only for the limited purpose of assessing the credibility of certain deposition testimony." JI 9. Defendants' cases merely say a party cannot use impeachment to introduce otherwise inadmissible evidence.[6] But Defendants do not argue the documents here, all party

---

[5] Merits Report Dkt. 956-4, ¶¶ 13a, 13c, 65, 87, 88 n.99, 97–100, 102, 105, 117, 121, 133, 199, 407, 421(b); Merits Reply Report, Dkt. 956-5 ¶¶ 116, 123, 196, 270; Class Report Dkt. 633-4 ¶¶ 13(b), 62, 96; Class Reply Report Dkt. 753-4 ¶¶ 43, 48, 180; MSJ Opp., Dkt. 964 at 7; Class Cert. Br., Dkt. 630 at 14–15.

[6] *U.S. v. Bao*, 189 F.3d 860, 865–66 (9th Cir. 1999) (defendant precluded from introducing his *own* inadmissible hearsay to "contradict" government testimony); *U.S. v. Saada*, 212 F.3d 210, 221 (3d Cir. 2000) (Rule 806 does not modify Rule 608(b)'s ban on extrinsic evidence of prior bad acts); *see also U.S. v. Finley*, 934 F.2d 837, 839 (7th Cir. 1991) (stating Rule 806 "does not allow the use of evidence made inadmissible by some other rule"); *Smith for J.L. v. Los Angeles Unified School Dist.*, 2018 WL 6137133, at *3 (C.D. Cal. Feb. 13, 2018) (evidence about plaintiff's emotional health was generally admissible and could be used for impeachment); *Fisher v. Smith*, 2009 WL 10698910, at *5 (C.D. Cal. Mar. 25, 2009) (plaintiff's irrelevant prior drug use could not be put at issue through cross-examination).

admissions, were otherwise inadmissible. Mot. 14. Defendants' claims as to who may impeach, and with what, are simply wrong: "Any party, including the party that called the witness, may attack the witness's credibility." Fed. R. Evid. 607. A Rule 806 "declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified" live, including "evidence of the declarant's inconsistent statement *or conduct*."[7] Fed. R. Evid. 806.

### 2. The Conspiracy Harmed Competition.

#### a. Rule of Reason Step 1: Anticompetitive Effects

Plaintiffs presented substantial evidence of anticompetitive harm in the market for professional football telecasts. Dr. Rascher testified Defendants had monopoly power in this market (TT 712:10–714:12), and Dr. Bernheim did not disagree (*id.* 1923:16–20, 1978:4–7). That in-market and OOM games are substitutes, Mot. 23, confirms as much, JI 33 (market includes "reasonable substitutes"). The agreements also worked as intended, limiting output and raising prices. The NFL's New Frontier study showed that without the interlocking restraints, Sunday afternoon games would have been much more widely distributed like college football: available through a combination of free TV and basic cable channels with no additional subscription charge required. TX-686 at 12–13.[8] Defendants rely on two off-point cases. Mot. 23–24. In *Parrish v. NFL Players Ass'n*, 534 F. Supp. 2d 1081, 1092 (N.D. Cal. 2007), the "mere existence of an exclusive deal," without more, was insufficient at the pleading stage. And in *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 238 (5th Cir. 1996), "the insurance sales market [wa]s highly competitive,"

---

[7] For example, Mr. Lawton's testimony that the NFL did not "review" Sunday Ticket prices (Dkt. 1413-5 at 94:11–18) was thus impeached with a document he *received* from a coworker about "NFL Reviewing" "Satellite Pricing 2018." TX-801 at 4.

[8] NFL research showed at least 35 million avid fans, and even more casual fans, are "underserved." TT 740:13–744:11 (Rascher); TX-172 at 12. The biggest reason for dropping Sunday Ticket was "cost/price too high…" TX-151 at 9. The NFL rejected ESPN's plan to offer Sunday Ticket at $70 as "too low" and "not complementary," accepting instead a YouTube bid to charge $349 and $449 for annual subscriptions for Sunday Ticket. TT 1012:13–1013:2, 1024:25–1025:8, 1027:18–22 (Rolapp).

preventing insurers "from imposing above-market prices on its agents." Here, there was a *monopolized* market in which the restraints *deterred* switching from CBS or FOX to watch OOM games and required OOM games be offered as a premium-priced subscription with limited distribution.

### b.  Rule of Reason Step 2: Procompetitive Justifications

At Step 2, Defendants faced "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." MSJ Order, Dkt. 1155 at 18 (quoting *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984)). They were required to offer a "non-pretextual, legally cognizable procompetitive rationale" for the challenged restraints. *Epic Games*, 67 F.4th at 985–86. As shown in the Plaintiffs' prior Rule 50 briefing, Defendants failed completely on this score—as Dr. Bernheim conceded he did not analyze the effect of the "series of interlocking agreements to raise the price of Sunday Ticket in order to limit distribution of Sunday Ticket." TT 2024:9–19; Dkt. 1457 at 10–23; Dkt. 1458 at 10–13. Defendants have not responded to these points.

There was also ample evidence from which the jury could have concluded the justifications were a pretext. Not a single contemporaneous document showed that Defendants entered the restraints for the purpose of enhancing competition. TT 1136:6–1137:11 (Rolapp admitting no studies). Mr. Jones (FOX), Mr. McManus (CBS), and Ms. Yancy declined to state any of the "innovations" about which they testified resulted from agreements to limit Sunday Ticket's output by requiring DirecTV exclusivity and a premium-priced subscription. TT 657:16–658:1, 659:18–24, 660:8–14 (Jones); 1695:2–1696:17 (McManus); 1791:5–1792:22 (Yancy). The NFL's documents undermined their justifications,[9] leaving the jury to find readily

---

[9] DirecTV engaged in "no real product innovation over the past 5 years" and eventually became a "dying platform" and a "crappy product." TX-198 at 6; TX-504 at 7; TX-692 at 2. *See also* TT 1522:6–1525:13 (Goodell impeached with TX-206 showing "being reliant on one partner for innovation and product development" was a "negative"). Contrary to its competitive balance justification, there was "little correlation between revenue and winning percentage." TX-336 at 21.

1    that the NFL's true purpose was, in Mr. Kraft's words, to make sure their "partners"

2    would "continue and pay us the way they pay us." Dkt. 1413-4 at 29:03–09.

3                    c.      Rule of Reason Step 3: LRAs and Prof. Elhauge

4            Even assuming the jury went past Step 2, there was significant evidence that

5    any procompetitive benefit *could* have been achieved through substantially less

6    restrictive alternatives ("LRAs"). JI 25. The NFL's New Frontier is one such LRA,

7    showing games could be made available on basic cable for no extra charge without

8    harming the availability of in-market games on free TV, innovation, product quality,

9    or competitive balance. TX-686 at 12–13. The jury was also entitled to credit Prof.

10   Elhauge's testimony on LRAs, including that the NFL could have (1) required that

11   telecasts be maintained on free TV, charged the networks lower prices, or contracted

12   with additional networks; and (2) maintained salary caps and funded salary floors by

13   sharing free TV revenue. TT 2155:8–10, 2156:2–17, 2162:21–2164:4. The Court's

14   decision to allow Prof. Elhauge to testify in rebuttal to Dr. Bernheim was appropriate

15   and well within the Court's discretion under Rule 611.[10] And the Court ensured Prof.

16   Elhauge testified about economics and not law.[11]

17                   d.      Rule of Reason Step 4: Balancing

18           The jury also would have been justified in concluding at Step 4 that the

19   anticompetitive effects outweighed any procompetitive benefits. Defendants'

20

21   _____

     [10] Not a single case Defendants cite applies in a burden-shifting case like this one. *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 55 (1st Cir. 2016) (holding
22   court properly refused rebuttal evidence because it pertained to "an essential part of the Plaintiffs' prima facie case," *i.e.*, establishing antitrust injury); *U.S. v. Hirokawa*,
     342 F. App'x 242, 247 (9th Cir. 2009) (defendant denied from presenting *surrebuttal*
23   case revisiting defendant's prior testimony); *U.S. v. Clark*, 617 F.2d 180, 187 (9th Cir. 1980) (same); *Cook v. County of Los Angeles*, 2022 WL 1470574, at *2–3 (C.D.
24   Cal. Mar. 21, 2011) (analyzing whether expert opinions were "related to issues that were the subject of the plaintiff's case-in-chief") (cleaned up); *Stallworth v. Nike*
25   *Retail Servs., Inc.*, 2021 WL 6618781, at *1–2 (C.D. Cal. Dec. 1, 2021) (finding defendant's rebuttal expert opinions directly rebutted plaintiff's expert).
26

27   [11] Prof. Elhauge's opinion that the "anticompetitive effect" of "exclusive dealing" "doesn't go away because you can imagine another agreement that would have equal
28   anticompetitive effects to substitute for it," was made from an "economist's point of view," and Defendants did not object. Mot. 21; TT 2142:21–2143:16.

argument that the test is "substantially outweigh" (Mot. 16–17) has no support in Ninth Circuit or Supreme Court precedent. *F.T.C. v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) ("plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit") (cleaned up); *Epic Games*, 67 F.4th at 993–94 (explaining "balancing" stage with no mention of a "substantial outweighing" standard); *Cnty. of Tuolumne v. Sonora Comm. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (same). In any event, (1) there is no basis to assume the jury made it to this step, and (2) regardless, the significant output reduction and increased prices *did* substantially outweigh any benefit, which was equivocal and unquantified. TT 1962:11–1963:3; 2024:9–19.[12] Any error (there was none) was harmless.

### 3.    Defendants' Conspiracy Injured Plaintiffs

The jury's conclusion that Plaintiffs were harmed is also well supported. New Frontier shows that, absent the restraints, games would have been on free and basic channels. TX-686 at 13. Plaintiffs thus would not have had to pay add-on subscriptions totaling billions more than the damages awarded. TT 1189:16–1190:2 (Zona); 1397:8–1398:14 (Yurukoglu). The verdict on Claim 1 liability must stand.

### B.    <u>The Verdict on Liability for Claim 2 Should Not Be Disturbed</u>

Defendants' sole challenge to Claim 2 liability is that Claim 1 liability was necessary first. Mot. 16. The jury found just that with ample support. VF Nos. 6–10.

### C.    <u>Defendants' Attacks on the Damages Award Lack Merit</u>

Defendants argue the jury's verdict should be overturned in its *entirety* by picking apart the precise calculations the jury may have used to estimate damages, ascribing motives they claim are "irrational," and claiming, based on unfounded assumptions, the amount of the damages negates liability. Mot. 4–9, 23. Defendants flip on their head nearly 100 years of the Supreme Court's Sherman Act jurisprudence, decades of Ninth Circuit law on damages, and the jury's findings.

---

[12] Nor is it true that "Plaintiffs capitalized" by "arguing that they need to show only a '50.00000001 percent' outweighing to prevail". Mot. 17. This reference explained the civil burden of proof, not any rule of reason threshold. *See* TT 2381:9–2382:7.

### 1.    The Award Does Not Negate Class-Wide Injury

In the seminal case on antitrust damages, the Supreme Court made clear that "[i]f the damage is certain, the fact that its extent is uncertain does not prevent a recovery." *Story Parchment*, 282 U.S. at 566. Proving the ***fact*** of damage "and the measure of proof necessary to enable the jury to fix the ***amount***" are not the same:

> Where the tort itself is of such a nature as to preclude the ascertainment of damages with certainty, it would be a **perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts**. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

*Id.* at 563 (emphasis added). Applying Defendants' demanded scrutiny and excusing them from liability based on inherent uncertainty would be an act of injustice: "[T]he adoption of any arbitrary rule in such a case which will relieve the wrongdoer from any part of the damages, and throw the loss upon the injured party would be little less than legalized robbery." *Id.* at 565. Defendants have zero support for their upside-down notion that uncertainty as to the "damages portion of the verdict" would "similarly negate[] the underlying liability findings." Mot. 23.

Defendants' cases are readily distinguishable.[13] *Id.* (citing cases). This is not a case lacking a method to distinguish between injured and uninjured class members, as in *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252–53 (D.C. Cir. 2013), where the regression model was *incapable* of distinguishing between

---

[13] Some involve "no evidence of damages of any kind," raising concerns the entire verdict was the "product of passion and prejudice. *Arroyo v. Volvo Grp. N. Am. LLC*, 2022 WL 17960686 at *2 (N.D. Ill. Dec. 27, 2022); *see also Prendeville v. Singer*, 155 F. App'x 303, 306 (9th Cir. Nov. 28, 2005) (plaintiff "waived any damages claim for lost profits," "offered scant testimony on harm to his professional reputation," and presented "no evidence" of "emotional harm"). One involved a general verdict form that "encompassed multiple theories, one of which [was] defective." *Cornwell Entertainment, Inc. v. Anchin, Block & Achin, LLP*, 830 F.3d 18, 20 (1st Cir. 2016). And in *Hatami v. Kia Motors Am., Inc.*, 2010 WL 11475044, at *4 (C.D. Cal. July 7, 2010), the court granted a new trial as to damages and liability because it was unable to reconcile the jury's factual findings with the jury's damages determination.

"class members" and uninjured parties who purchased from "legacy contracts" outside the relevant time frame. Nor is this a case where Plaintiffs' damages model was not "consistent with its liability case," Mot. 9 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). Here, there was extensive evidence from which the jury could conclude that every class member who bought Sunday Ticket was overcharged, even though they discounted Dr. Rascher's estimate of the overcharge *amount*.

"[T]he fact that the jury chose to assess damages in an amount substantially below that recommended by plaintiff's expert does not mean that the evidence offered in support of" the *fact* of damage "was inadequate as a matter of law." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532–34 (6th Cir. 2008) (affirming jury award of $11.5 million despite defendants' argument that "the jury must have resorted to speculation" in awarding less than expert's $20.9 million in damages). Defendants' contrary argument that the jury's award of $4.7 billion in damages shows they *rejected* Plaintiffs' theory of class-wide harm is utterly meritless, ignoring that (1) the jury made separate findings of class-wide injury *before* estimating damages (VF Nos. 4–5, 9–10); (2) independent, factual evidence supported that finding (such as New Frontier, TX-686); and (3) the jury's award of billions of dollars in overcharges shows they found substantial class-wide harm.

### 2.    The Jury's Estimate of Damages Should Not Be Disturbed

It is also black-letter law that the standard for reviewing the jury's estimate of the *amount* of damage is "relaxed," precisely because "market uncertainties often preclude a precise showing of 'where' the plaintiff would have been absent the proven antitrust violation." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997). This relaxed standard reflects "[t]he most elementary conceptions of justice and public policy requir[ing] that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow*, 327 U.S. at 265 (finding before-and-after model a "sufficient basis" to calculate damages, despite criticism the model failed to account for various outcomes).

Defendants' attack on the jury's damages estimate is counter to the Court's instructions, which was based on legal principles flowing directly from *Story Parchment*. The jury was instructed to (1) make "just and reasonable estimates in calculating Plaintiffs' damages" based on the difference between the prices "Plaintiffs actually paid for Sunday Ticket and the prices they would have paid had there been no agreement to restrict output," and (2) determine the "average overcharge paid by class members or estimate the overcharge paid by class members," rather than attempting to determine "the overcharge paid by each class member with mathematical certainty or precision." JIs 40–42. The Court also instructed the jury not to base the "damages award on guesswork or speculation," JI 42, and the jury is "presumed to have followed its instructions," *First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co.*, 612 F.2d 1164, 1176 (9th Cir. 1980).

As instructed, the jury approximated class-wide damages based on the evidence and should not be second guessed based on supposed "irrationality." Mot. 23. The jury could have awarded the full $7,011,977,211. That the jury conservatively *discounted* this damages number gives Defendants no leg to stand on: "[W]here, as here, the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof, we will not 'play Monday morning quarterback' and supplant the jury's evaluation of the complex and conflicting evidence with our own." *Los Angeles Mem'l Coliseum*, 791 F.2d at 1366.

a.    The Jury Could Have Awarded Up To $7 Billion

The jury heard evidence that would have supported a damages award of more than $7 billion—the amount of all actual payments for Sunday Ticket by class members during the class period. Dr. Rascher based this damages estimate on his opinion that in the but-for world, class members would not have had to pay an extra charge to see OOM games because NFL games "would have appeared on [OTA] channels and basic cable channels." TT 753:25–754:3; 809:1–2. Dr. Rascher supported this conclusion with evidence that college football games became widely

available on free and basic cable channels after the 1984 *NCAA* decision eliminated similar restraints on the licensing of college football broadcasts. TT 750:1–752:19.

The Ninth Circuit embraced college football as a valid before-and-after comparison, *Sunday Ticket*, 933 F.3d at 1154–1155 (discussing *NCAA*, 468 U.S. at 114 n.53), as recognized by the Court in denying the initial *Daubert* motion as to Dr. Rascher. Dkt. 894 (Order on Class Cert.) at 13 ("And [Dr. Rascher] chose to use the college football market as the yardstick, which the Ninth Circuit has recognized as a close analog in this case."). This Court further recognized that under the model developed by Dr. Rascher "class members would have gotten all of the content in Sunday Ticket as part of their basic television package" leading to "damages as the amount paid by each class member for Sunday Ticket." *Id*. at 11. As this Court previously recognized, Dr. Rascher's yardstick approach is a well-accepted method of estimating antitrust damages.[14] *Image Tech.*, 125 F.3d at 1221–22 (affirming antitrust damages based on yardstick of plaintiffs' non-Kodak revenues; whether the yardstick "properly compares to the relevant market presents a question of fact for the jury"); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 851–52 (5th Cir. 2015) (affirming use of a "yardstick" in $52 million damage award where plaintiffs compared their profits with "a study of the profits of business operations that are closely comparable to the plaintiff's").

The jury also had sufficient fact evidence from which to award up to $7 billion even without Dr. Rascher's college football opinions. The evidence shows the networks and Defendants conspiring with DirecTV to require Sunday Ticket to be sold as a premium-priced subscription because they believed DirecTV would, unless so restrained and in its own economic self-interest to attract more customers, offer Sunday Ticket in its basic package. TX-750 (CBS concerned Sunday Ticket could be

---

[14] *See, e.g.*, *Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *6 (C.D. Cal. June 26, 2017) (certifying class where damages were calculated on the basis of the yardstick method)*; In re Rubber Chemicals Antitrust Litig*., 232 F.R.D. 346, 354 (N.D. Cal. 2005) (same); *see also* Dkt. 1458 (Pltfs.' Opp'n to NFL's Mot. for JMOL) at 1–7.

"offered as non-premium or even free packages"). And the NFL's *own* internal "New Frontier" study would have had the **exact** same result as Dr. Rascher's college football but-for world: "[d]istribute regular season out-of-market simulcasts on basic cable networks instead of exclusively through DirecTV Sunday Ticket" and also "[m]aintain local distribution through FOX and CBS." TX-686 at 13.

b.     The Decision Awarding Less Cannot Be Set Aside

Despite the ample support for a $7 billion award and Defendants' refusal to offer an alternative damages calculation, the jury nevertheless *reduced* Plaintiffs' requested damages, awarding only approximately (1) 82% of the damages sought for the residential class and (2) 7% for the commercial class.

Ninth Circuit precedent is crystal clear: if the jury's award is "within the range" supported by the evidence, courts *do not* touch it. *Los Angeles Mem'l Coliseum*, 791 F.2d at 1366. That is especially true in cases like this where the defense rolled the dice by "refus[ing] to present a reasonable alternative" damages calculation and therefore "may not now argue that those used are fatally speculative." *D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982)*; see also Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836–37 (9th Cir. 1982) (same).

True, the jury did not adopt the exact damages figures Dr. Rascher or Dr. Zona proposed.[15] But "[r]easonable jurors need not accept the views of one side's expert or the other's, but may make their own reasonable judgement on the evidence, accepting part, all, or none of any witness's testimony." *In re Exxon Valdez*, 270 F.3d 1215, 1248 (9th Cir. 2001). The jury may "arrive at its own proper calculation" and need "not [] accept the bottom line" from any "particular damages expert[.]" *U.S. v. Klaus*, 519 F. App'x 437, 437–38 (9th Cir. 2013). So long as the award is "within the range" supported by experts or other evidence, it will not be disturbed. *Wall Data Inc. v. Los Angeles County Sheriff's Dept.* 447 F.3d 769, 787 (9th Cir. 2006).

---

[15] For the reasons set forth at Dkt. 1458 (Pltfs.' Opp'n to Mot. for JMOL) at 14–19, Dr. Zona's testimony is reliable and valid. In any event, his analysis is no longer at issue because the jury awarded more than his estimated damages amount.

17

For example, the Tenth Circuit in *In re Urethane*, 768 F.3d at 1268, upheld the jury's award of $400,049,039 even though the expert calculated damages of $496,680,486, and there was no explanation how the jury reached a lower and yet specific number. The court rejected a nearly identical defense argument that the jury's assessment "deviated" from the plaintiffs' expert's damages figure and "it lacked any other evidentiary support." *Id.* The court noted that the damages award might have discounted the expert's figure based on arguments including the duration of the conspiracy. *Id.* Those were qualitative, not quantitative arguments, not subject to ready calculation. The defendant argued that "the jury could not adjust [the plaintiffs' expert's] damages figure without his 'underlying calculations or some other 'tool'" *Id*. The court squarely held this was "incorrect, for a jury can reduce an expert's calculations on damages even when unable to 'run the exact numbers and calculations of [a damages] model with 'mathematical certainty.'" *Id*.

Similarly, the Sixth Circuit in *Conwood Co*., 290 F.3d at 780, 795, affirmed a jury antitrust award of $350 million where plaintiffs' expert found damages amounted to a figure between $313 million and $488 million but had not provided the number awarded by the jury, as the award was "well within that range."

And in *Russo v. Ballard Mfd. Prods.*, 550 F.3d 1004, 1018 (10th Cir. 2008), the court held: "As is often the case, the jury found the truth to lie somewhere in between the extremes suggested by the evidence received at trial, returning an award [of $17 million] that represented 53% of the damages Mr. Russo sought [$32 million]. When the damages awarded by the jury fall within the range permitted by the evidence admitted at trial . . . we may not second guess the award." Many other cases have held likewise,[16] and the same holds here.

---

[16] *See, e.g.*, *Am. Nat. Bank & Tr. Co. of Chicago v. Reg'l Transp. Auth.*, 125 F.3d 420, 439 (7th Cir. 1997) (affirming award of "nearly half a million dollars less than" the $25,026,028 calculated by plaintiff's expert because a jury could have concluded that "although WH's project was very likely to occur, it was not a certainty"); *Cal-Agrex. Inc. v. Tassell*, 258 F.R.D. 340, 350 (N.D. Cal. 2019), *aff'd*, 408 F. App'x 58 (9th Cir. 2011) (rejecting argument that award of $2,501,595, which approximately

### c.    Speculation into the Jury's Methodology is Barred

Defendants attempt to escape this line of authority by speculating *why* the jury may have used certain numbers in arriving at their damages award, contending the jury must have irrationally used $102.74 as a "but for" price and subtracted it from $294 which it used as the "actual price" paid. Mot. 4–5. Reverse-engineering a jury's damages verdict, speculating about the reasons the jury may have relied on certain evidence, and drawing inferences in favor of the movant is completely impermissible. The Federal Rules expressly prohibit juror testimony on "any juror's mental processes concerning the verdict." Fed. R. Evid. 606(b)(1). And the Ninth Circuit forbids inquiry into the jurors' deliberations and decision, by affidavits ***or otherwise***." *Traver v. Meshriy*, 627 F.2d 934, 941 (9th Cir. 1980); *Smith v. Cupp*, 457 F.2d 1098, 1100 (9th Cir. 1972) ("[N]either a trial court nor an appellate court has the authority to inquire into the jury's decisional processes[.]"). In *Celador Int'l Ltd. v. Walt Disney Co*., 2010 WL 11505709, at *23, *24 n.16 (C.D. Cal. Dec. 21, 2010), the district court rejected defendants' attempts to "get to what the jury did" in arriving at a damages award that did not "correspond precisely to any of [plaintiff's expert's] damages scenarios" because such arguments were "an inappropriate inquiry into the jury's deliberative process." And in *Domeracki v. Humble Oil & Refining Co*., 443 F.2d 1245 1247-48 (3d Cir. 1971), the court came to possess the jury's handwritten damages calculations, making it "wonder whether [the jury] had followed the Court's instructions precisely." The court properly sustained the verdict because it "was

---

split the difference between both sides' expert damages numbers, is "incorrect" because "the jury did not adopt the specific figures from either expert" and explaining that "the evidence could support a wide range of figures"); *Holmes v. Harris*, 2019 WL 12070347, at *3 (C.D. Cal. Oct. 4, 2019) (disagreeing that "jury's award [of $765,952] is invalid because it does not exactly reflect the Plaintiff's expert testimony" and lacks "foundation for the specific sum" and finding jury award "well supported by evidence in the record" when it was "less than the sum of the expert's economic loss estimates [$1,016,212]"); *Goyal v. Thermage, Inc.*, 2012 WL 3240381, at *17 (D. Md. Aug. 2, 2012) (in awarding "about half what [plaintiff] sought . . . [t]he jury may have simply discredited both parties' positions regarding the amount of a reasonable [damages award] and independently determined that [$2,250,000] was a reasonable amount of economic damages").

incompetent to provide a basis for a finding that the jury failed to adhere to the court's instructions." If courts may not inquire into the jury's deliberative process based on the jury's own handwritten notes, it follows that they may not do so based on Defendants' speculation. Not surprisingly, the Ninth Circuit has ***repeatedly*** rejected similar arguments to those Defendants advance here.

In *Brewer v. Hustler Magazine, Inc.*, 749 F.2d 527, 529 (9th Cir. 1984), the defendants claimed the jury had "utilized a speculative measure of damages by multiplying the royalty for one postcard by the number of issues of Hustler magazines sold." The Ninth Circuit disagreed: "We decline to second-guess the jury's award of damages. The jury is not required to specify its method of computing damages. We will not disturb an award of damages unless it is clearly unsupported by the record." *Id.* (citations omitted).

In *Asdale v. Int'l Game Tech.*, 549 F. App'x 611, 614 (9th Cir. 2013), the defendants argued the jury erred in awarding "the exact amount of his lost and unvested stock options" despite recognizing that the plaintiff "failed to mitigate." The Ninth Circuit noted "the amount of damages awarded is not likely coincidental," but refused to "speculate about the jury's thought process" and deferred to the verdict "because substantial evidence supports the award." *Id.*

And in *Kaffaga v. Est. Steinbeck*, 938 F.3d 1006, 1014–1015 (9th Cir. 2019), the defendants argued the jury improperly awarded a double recovery. The Ninth Circuit agreed the award was "indeed suspicious," but held "suspicion" was "not enough to reverse a jury's verdict" and "the record contain[ed] substantial evidence to support the awards." *Id.*

Defendants rely on *First Alliance*, 471 F.3d at 1001–02, a "rare case" that does not help them. Despite the court's instruction not to consider benefit-of-the-bargain damages, the jury indisputably averaged the plaintiffs' proposed benefit-of-the-bargain damages ($85,906,995) with defendants' proposed out-of-pocket damages ($15,920,862), yielding a $50,913,928 verdict ***higher*** than the *maximum* damages

supported by evidence. *Id.* at 1002. The Ninth Circuit found the jury "did not follow the law according to its instructions" and awarded damages based on "improperly considered evidence."[17] *Id.* at 1001–03. There, (1) the *only* permissible inference was that the jury had calculated damages using evidence in violation of their instructions, and (2) the damages award thereby *exceeded* the amount that was sustainable by evidence in the record.

That is simply not the case here. There is no reason to believe the jury relied on evidence they were instructed to disregard. And while Defendants posit one reason the jury may have used certain numbers, there are other possible and permissible reasons—proving why speculating into the jury's thought process is not permitted. For instance, a juror may have believed the but-for price would be $0, but voted for a lower damages award to partially credit defense arguments that created uncertainty about the actual prices class members paid. Defendants interjected the $102.74 number into this case, told the jury it could be used as a benchmark, and now cannot be heard to complain that the jury might have used it in some fashion in discounting damages. Defendants claimed in opening that $102.74 was the "average price paid by every one of the people in this class" because Plaintiffs' numbers did not account for "free years." TT 152:7–25. This claimed average price was not accurate,[18] but the significance of that number was for the jury to decide. The NFL also presented $102.74 as a reasonable price for Sunday Ticket relative to the price of OOM packages offered by other sports leagues. *See id.* at 1270:14–16 ("[T]hat price 102.74 is far lower than any of the other leagues' packages that exist; the NBA, the NHL,

---

[17] Defendants rely on *Experience L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 846–48 (9th Cir. 2014), similarly granting a new trial where jury's awards were inconsistent with jury instructions and evidence supporting awards was "minimal."

[18] Defendants (often successfully) objected to Plaintiffs' attempts to clarify that, in fact, the average per-subscription price for residential class members was $233. TT 1186:21–1188:15 (Zona); 1402:17–1403:3 (Yurukoglu). Defendants' counsel finally corrected herself briefly in closing argument, but perhaps the jury credited the misimpression Defendants created throughout the trial. TT 2449:9–16.

and the MLB. Right?"). The jury also heard evidence relating to a range of possible prices for Sunday Ticket in the but-for world.[19] The jury could have used these numbers that came entirely from evidence in the record to discount the total damages to partially credit Defendants' arguments, account for uncertainty, or to reach a conservative estimate. Defendants complain that the jury then had no basis to apply the average overcharge it determined for the Residential Class to the Commercial Class. Mot. 8. But the jury may have merely concluded that the overcharge would have been at least as much as the average residential subscription overcharge, particularly as there was evidence that commercial subscription payments were generally higher. TT 721:11–21, 780:8–16 (Rascher).

Ultimately, it does not matter why the jury reduced damages for the residential class by 18%, or why they discounted damages for the commercial class by 93%, or why they may have subtracted $102.74 from $294 along the way. All that matters is there were legally permissible ways the jury *could* have reached its damages estimate. That is because the "court looks only at the 'bottom line,' to make sure [the award] is reasonable, and doesn't worry about the mental process that led there." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Defendants have not cited a *single case* where a court has overturned a jury's verdict for awarding *less* than what the plaintiff's expert estimated as damages on the grounds that the jury acted irrationally. Defendants' cases involve other defects not at issue here,[20] or awards that lacked *any* basis or fell outside the range of proof.[21] That is not this case.

---

[19] This included evidence from Dr. Rascher that it could have been $0, evidence ███████ $70, TX-697, evidence that ████████████████ ████████, TX-504 at 506, and evidence ███████ket for $149 with a streaming option for $75, *see* TT 773:7–13.

[20] *Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213 at *1 (C.D. Cal. July 24, 1996) (expert did not disaggregate damage from conduct jury found did *not* violate antitrust laws); *Tercero v. Texas Southmost College Dist.*, 989 F.3d 291, 300–01 (5th Cir. 2021) (plaintiff failed to establish causation).

[21] *Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 991 (6th Cir.

**D.** **Defendants' Other New Trial Arguments Should Be Rejected**

**1.** **Evidence about *NFL I* and *NFL II* Was Properly Admitted**

The facts and outcome of *NFL I* and *II* were necessary to understand the NFL's broadcasting history, which "the Ninth Circuit described as very important to understanding this case." Dkt. No. 1304 (Order on D. MIL No. 3) at 6. The Court's ruling permitting such evidence is consistent with the Ninth Circuit's recent reversal of a defense verdict for excluding evidence of anticompetitive purpose. *Sidibe v. Sutter Health*, 103 F.4th 675, 686–88, 694–95 (9th Cir. 2024) (holding "past anticompetitive conduct and the history of competition may establish the intent, motive and method" of a restraint and ascertain "monopolistic intent"). Plaintiffs did not present improper evidence or argument that the holdings in *NFL I* or *II* were *conclusive*. Mot. 21. Dr. Rascher confined his testimony to the facts and outcome of *NFL I* and *II* and their role in connection with the SBA's passage. TT 704:25–707:18. In opening, Plaintiffs argued what the Ninth Circuit has allowed: history, purpose, and intent. TT 115:1–8, 116:14–117:3, 119:22–25. In closing arguments, Defendants wrongly suggested their agreements must be lawful because they were not a "secret," were disclosed to "the Government" and "legislators," and yet it's "been going on 30 years[.]" TT 2453:10–18, 2455:14–15. Plaintiffs refuted this improper implication in rebuttal by noting *NFL I* and *II* were based "on conduct [that] was out in the open" and still "were found to have violated the antitrust laws . . . ." TT 2472:13–24.

**2.** **Defendants' Juror Bias Argument Fails**

Defendants' argument regarding Juror No. 7 also fails. Despite each side

---

2001); *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 816 (1st Cir. 1988), *Prendeville v. Singer*, 155 F. App'x 303, 305 (9th Cir. 2005); *Cornwell Ent., Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 31–33 (1st Cir. 2016); *Smart Mktg. Grp. v. Publ'ns Int'l Ltd.*, 624 F.3d 824, 832–833 (7th Cir. 2010); *ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*, 442 F. Supp. 3d 1329, 1363 (D. Or. 2020); *Rex Med. v. Intuitive Surgical, Inc.*, 2023 WL 6142254, at *7–8 (D. Del. Sept. 20, 2023); *Lillie v. ManTech Int'l Corp.*, 2019 WL 3387732, at *24 (C.D. Cal. July 26, 2019); *Out of the Box Enters., LLC v. El Paseo Jewelry Exch., Inc.*, 732 F. App'x 532, 535 (9th Cir. 2018); *U.S. v. J-M Mfg. Co., Inc.*, 2020 WL 4196880, at *37–41 (C.D. Cal. June 5, 2020).

having hours to review the jurors' written questionnaires with their jury consultants, Defendants did not raise any issue with Juror No. 7 until the Court indicated voir dire was complete. TT 68:13–23. The Court properly denied their cause challenge because Juror 7's husband was a Sunday Ticket subscriber only for the last year with YouTube—not DirecTV. TT 68:18–70:10. Juror No. 7 and his husband were not class members, did not stand to benefit financially from this case, and would have had no reason to believe otherwise. JI 41 (past overcharge); Dkt. 1292 (Order on P. MIL No. 2) (barring argument re: future). Once that happened, Defendants did not ask to use their last peremptory, TT 67:17–19, and thus any challenge is waived.[22] And because Juror 7 made no statement indicating partiality, expressing a view adverse to Defendants' position, or answering dishonestly, any bias claim fails. *U.S. v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013); *Fields v. Brown*, 503 F.3d 775, 767 (9th Cir. 2007). Defendants' cases are not to the contrary.[23]

### 3. The Court Properly Instructed the Jury on Class-wide Proof

The Court did not err in rejecting Defendants' misleading instruction that Plaintiffs "must prove that each and every member of each class was injured." Mot. 18. Plaintiffs are only required to establish antitrust impact and damages through

---

[22] Defendants cite *U.S. v. Martinez-Salazar*, 528 U.S. 304 (2000), where a defendant struck the offending juror using a peremptory. Defendants' argument also fails on the merits. Courts continue to rely upon the refusal to exercise a peremptory, depending on the facts. *U.S. v. Thuan Huy Ha*, 390 F. App'x 649, 651 (9th Cir. 2010) (noting counsel "opted not to peremptorily strike" juror); *U.S. v. Reid*, 751 F.3d 763, 766 (6th Cir. 2014) (no harm where defendant "did not exhaust his stock of peremptory challenges); *Luna v. Allison*, 2023 WL 2799262, at *15 (C.D. Cal. Feb. 15, 2023) (rejecting argument where peremptory challenges were not exhausted); *Lewis v. Woodford*, 2007 WL 196635, at *16 n.8 (E.D. Cal. Jan. 23, 2007) (same); *Morgan v. City of Chicago*, 2014 WL 4745574, at *4 (N.D. Ill. Sept. 18, 2014) ("Plaintiffs' claim must fail because he did not exhaust his peremptory challenges[.]").

[23] *Darbin v. Nourse*, 664 F.2d 1109, 1115 (9th Cir. 1981) (noting that for-cause challenges are "narrowly confined" to cases where "threats to impartiality are admitted or presumed from the relationships, pecuniary interests, or clear biases of a prospective juror"); *U.S. v. Gonzalez*, 214 F.3d 1109, 1113 (9th Cir. 2000) (bias shown where juror's ex-husband also dealt cocaine and where juror "equivocated" each time on whether she could be impartial); *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1059–62 (9th Cir. 1997) (rejecting claim of bias where juror was statutorily disqualified from being on jury and was not honest on voir dire).

24

"class-wide proof." *See* Dkt. 894 (Class Cert. Order) at 19; Dkt. 1360 at 155 (Pltf.'s Obj.). Defendants' cases involve specific circumstances where such class-wide proof was unavailable.[24] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016), does not support Defendants' position. There, a class damage award was upheld where proof of harm was based on a representative sample, *id.* at 454, and any challenges to the "proposed method of allocation" could be raised when the award was disbursed. *id.* at 461. The conduct and overcharge here applied class-wide, no individualized proof was needed, and any dispute about the amount each class member is owed can be determined during claims administration. And the Court did not err in adopting the Ninth Circuit's model on weighing expert testimony (JI 10) rather than modifying the ABA instruction as Defendants proposed. Mot. 18–19; Dkt. No. 1360 at 140.

## IV.   CONCLUSION

It is hard to imagine a more blatant antitrust violation than the one the jury concluded Defendants committed: "Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." *NCAA*, 468 U.S. at 107–08. In arguing the Court should second-guess the jury's reasonable estimate of damages and thereby unwind liability altogether, Defendants' motion runs afoul of nearly 100 years of Sherman Act decisions based on this bedrock principle: Those who violate the antitrust laws and thereby prevent a competitive market from existing may not escape accountability by complaining that damages cannot be measured with precision. Granting the motion would be a "certainty of injustice." *Story Parchment*, 282 U.S. at 564. The motion should be denied.

---

[24] *See Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 236 n.8 (9th Cir. 1974) (class action not manageable given 2,000 defendants); *Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 334 (9th Cir. 1993) (class members had "varying degrees of exposure" to toxic substances); *Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005) (differences in farming conditions meant no common proof of but-for market conditions).

Dated: July 17, 2024

Respectfully submitted,

By: /s/ *Marc M. Seltzer*

Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Amanda Bonn (270891)
abonn@susmangodfrey.com
Eliza Finley (301318)
efinley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Bill Carmody (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
Seth Ard (*Pro Hac Vice*)
sard@susmangodfrey.com
Tyler Finn (*Pro Hac Vice*)
tfinn@susmangodfrey.com
SUSMAN GODFREY L.L.P
One Manhattan West
New York, NY 10001
Tel: (212) 336-8330
Fax: (212) 336-8340

Ian M. Gore (*Pro Hac Vice*)
igore@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883

Scott Martin (*Pro Hac Vice*)
smartin@hausfeld.com
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322

Christopher L. Lebsock (184546)
clebsock@hausfeld.com
Samuel Maida (333835)
smaida@hausfeld.com
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fax: (415) 633-4980

Sathya S. Gosselin (269171)
sgosselin@hausfeld.com
Farhad Mirzadeh (*Pro Hac Vice*)
fmirzadeh@hausfeld.com
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Howard Langer (*Pro Hac Vice*)
hlanger@langergrogan.com
Edward Diver (*Pro Hac Vice*)
ndiver@langergrogan.com
Peter Leckman (235721)
pleckman@langergrogan.com
Kevin Trainer (*Pro Hac Vice*)
ktrainer@langergrogan.com
LANGER GROGAN AND DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703

*Plaintiffs' Co-Lead Counsel*