# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

| | |
|---|---|
| IN RE: | Case No. |
| NATIONAL FOOTBALL LEAGUE'S | MDL 15-2668-PSG (SKx) |
| SUNDAY TICKET ANTITRUST LITIGATION | |
| | Volume 1 |
| | (Pages 1 - 89) |

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
TRIAL DAY 1
WEDNESDAY, JUNE 5, 2024
12:36 P.M.
LOS ANGELES, CALIFORNIA

MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA  90012
(213) 894-2305

---

## APPEARANCES OF COUNSEL:

**FOR THE PLAINTIFFS:**

SUSMAN GODFREY
BY:  MARC M. SELTZER
BY:  AMANDA K. BONN
Attorneys at Law
1900 Avenue of the Stars, Suite 1400
Los Angeles, California  90067
(310) 789-3100

SUSMAN GODFREY
BY:  WILLIAM C. CARMODY
Attorney at Law
One Manhattan West, 50th Floor
New York, New York  10001
(212) 336-8334

SUSMAN GODFREY
BY:  IAN M. GORE
Attorney at Law
401 Union Street, Suite 3000
Seattle, Washington  98101
(206) 505-3841

**FOR THE DEFENDANTS:**

WILKINSON STEKLOFF, LLP
BY:  BETH WILKINSON
BY:  BRIAN L. STEKLOFF
BY:  RAKESH N. KILARU
Attorneys at Law
2001 M Street NW, 10th Floor
Washington, DC  20036
(202) 847-4000

ALSO PRESENT:

JOSH DUBIN, Consultant

---

## INDEX OF WITNESSES

| WITNESSES | PAGE |
|---|---|
| (NONE OFFERED.) | |

---

## INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| | (NONE OFFERED.) | | |

**65**

1    wants to get on his vacation.

2    THE COURT:  It's a risk.

3    MS. WILKINSON:  But we have alternates.

4    MR. CARMODY:  Can we make him an alternate?

03:13PM 5    THE COURT:  What do you think?  Want to stipulate

6    that he's an alternate?  Leave him in Seat No. 10 --

7    MS. WILKINSON:  Who would the other alternate be?

8    THE COURT:  Leave him in Seat No. 10 the whole time,

9    I guess.  It's still risky.

03:13PM 10   MS. WILKINSON:  Yeah.  I would prefer not to do

11   that.  I just think it puts pressure on people.

12   THE COURT:  I just don't want -- what I'm thinking

13   is I don't want the -- I'm not necessarily as worried about

14   that, the pressure aspect of it.  I think there's no reason to

03:13PM 15   believe he's not going to do the right thing.  But I hate

16   starting with 10 and -- with the prospect that we realistically

17   might lose one off the bat.  That's -- that's kind of -- we

18   really have -- I mean, we are going to go right up against the

19   27th, and especially if something goes wrong, somebody gets

03:13PM 20   sick or something, I -- I think for -- not for cause but for

21   prudence, we might want to get rid of 10.

22   What do you -- plaintiff, what do you think?

23   MR. CARMODY:  I mean, my suggestion is I think we're

24   going to be arguing and it's going to be in the jury's hands by

03:14PM 25   Monday, the 24th.  I would bet some fair money on that.  And

**66**

1    having said that, I think it's -- I think if we make him an

2    alternate, we're fine, personally.

3    THE COURT:  So you -- let me count my days here.

4    Day 10 is -- day 10 is 24.  So I would think we

03:14PM 5    would instruct and argue the -- 25.  I think that's --

6    MR. CARMODY:  That's certainly possible, Your Honor.

7    THE COURT:  So basically he's got to -- he's got to

8    get a verdict in one day.

9    MS. WILKINSON:  No, we don't want to start with an

03:15PM 10   alternate that we think -- the whole reason we're starting with

11   10 is so we would have alternates, not one that we think is

12   most unlikely to be able to serve if we need an alternate.  So

13   we think he should be excused for hardship, Your Honor.

14   THE COURT:  I agree.  I think -- I just don't want

03:15PM 15   to start with -- with --

16   Go ahead.

17   MR. CARMODY:  That's fine, Your Honor.

18   THE COURT:  Yeah.  I don't really want to start with

19   9 when we want 10.

03:15PM 20   Thank you.

21   Okay.

22   MR. CARMODY:  Your Honor, can we just get

23   confirmation when you get a moment of who's going to be gone?

24   THE COURT:  I'm sorry.  Who's left?

03:15PM 25   MR. CARMODY:  No --

**67**

1    THE COURT:  Who are the 10?

2    MR. CARMODY:  Either way.  Who's gone?  Who's left?

3    THE COURT:  I keep losing my list.  I'm sorry.  Here

4    it is.  Okay.

03:16PM 5    Okay.  So Navarrete, Desiongco, Lall, and Govindan

6    are gone.  So that leaves us up to Salas Barron as the

7    10th juror.

8    MR. CARMODY:  Yes, Your Honor.

9    THE COURT:  Okay.  Next peremptory is with the

03:16PM 10   plaintiff.

11   MR. CARMODY:  I'm not sure if I can pronounce her

12   last name, Ms. Gastelum --

13   THE COURT:  I got you.  Luz?  First name Luz?

14   MR. CARMODY:  Yes.

03:17PM 15   THE COURT:  Yeah.  Okay.  Now we're up to St. John

16   as the 10th juror.

17   Next peremptory is with the defense, which would be

18   your last peremptory.

19   MS. WILKINSON:  We pass, Your Honor.

03:17PM 20   THE COURT:  Okay.  Plaintiff?

21   MR. CARMODY:  One moment, Your Honor.

22   THE COURT:  Sure.

23   (Pause in the proceedings.)

24   MR. CARMODY:  We'll pass, Your Honor.

03:17PM 25   THE COURT:  All right.  So then we have a jury up to

**68**

1    Ms. St. John.  I told them 15 minutes, so we'll bring -- I'll

2    bring them back in, in five minutes.  What I'm going to do is

3    then take them to the jury room, get them acquainted with the

4    phone numbers and how to get in and out, and then bring them

03:18PM 5    back in for preliminaries, and then we'll adjourn for the day.

6    All right.  Thank you.  See you in five.

7    THE COURTROOM DEPUTY:  All rise.  This court is in

8    recess.

03:26PM 9    (Break taken.)

10   (In the presence of the prospective jurors:)

11   MS. WILKINSON:  Your Honor, we need a sidebar.

12   (At sidebar:)

03:28PM 13   MS. WILKINSON:  Your Honor, we were reviewing the

14   questionnaires one more time.

03:28PM 15   THE COURT:  Yes.

16   MS. WILKINSON:  And we realized we missed --

17   THE COURT:  18.

18   MS. WILKINSON:  Yeah.  In fact, Mr. Perez is a --

19   anyone in your household subscribes to Sunday Ticket?  He says

03:29PM 20   yes.

21   THE COURT:  Let me explore it because -- let's

22   explore it with him, like who in the household, who pays for

23   it.  Okay.

24   MS. WILKINSON:  I mean --

03:29PM 25   MR. CARMODY:  Our position it's not automatically

## 69

1  disqualifying.  He's not a Sunday Ticket subscriber and we've
2  used the strikes.
3          (In the presence of the prospective jurors:)
4          THE COURT:  Mr. Perez, in your questionnaire, you
03:29PM 5  indicated that someone in your household was a subscriber to
6  NFL Sunday Ticket.  Is that right?
7          PROSPECTIVE JUROR PEREZ:  Yes.
8          THE COURT:  Who -- who in your household?
9          PROSPECTIVE JUROR PEREZ:  That would be my husband.
03:29PM 10         THE COURT:  And for what period of time was that?
11         PROSPECTIVE JUROR PEREZ:  Last year.  I -- I don't
12  watch football, so I wouldn't be able to tell you what period
13  of time.  I just know that I pay for it.
14         THE COURT:  You paid for it?
03:30PM 15         PROSPECTIVE JUROR PEREZ:  Yes.
16         THE COURT:  But you started -- when did you start
17  paying for it?
18         PROSPECTIVE JUROR PEREZ:  Last year, February.
19         THE COURT:  Last year.
03:30PM 20         PROSPECTIVE JUROR PEREZ:  Around there.  I don't
21  recall exact --
22         THE COURT:  So you've basically been on for one
23  season.
24         PROSPECTIVE JUROR PEREZ:  Yeah.  Yes.
03:30PM 25         THE COURT:  Sort of -- after -- sort of after the --

## 70

1  because you don't watch football, doesn't mean anything to you,
2  but sort of after the Super Bowl, around the Super Bowl you got
3  on NFL Sunday Ticket for the next season.
4          PROSPECTIVE JUROR PEREZ:  Yes.
03:30PM 5          THE COURT:  As far as you know.
6          PROSPECTIVE JUROR PEREZ:  As far as I know, yes.
7          THE COURT:  You're sure it's NFL Sunday Ticket?
8          PROSPECTIVE JUROR PEREZ:  Yes.
9          THE COURT:  Is it with DirecTV or is it YouTube?
03:31PM 10         PROSPECTIVE JUROR PEREZ:  YouTube.
11         THE COURT:  Okay.  Thank you.
12         Let's go sidebar.
13         (At sidebar:)
14         MR. CARMODY:  That's outside the class period.
03:31PM 15         MS. WILKINSON:  Your Honor, he has a financial
16  interest in the outcome or he's going to believe -- I mean, he
17  paid for the subscription himself, so he shouldn't be on the
18  jury.
19         MR. CARMODY:  But the class period --
03:31PM 20         MS. WILKINSON:  We have enough jurors here to get
21  what we want.  Right now we have nothing against the man.
22  We -- we didn't try and strike him, but he shouldn't be on the
23  jury.
24         MR. CARMODY:  I just respectfully disagree.  It's
03:31PM 25  outside the class period.  This guy is not partial.  You can't

## 71

1  see a partial bone in his body, and to have something in the
2  household -- I mean, listen, if he's a class member, that's one
3  thing, that automatically -- I think we've all agreed it's
4  disqualifying.  It's a household, he's outside the class
03:31PM 5  period.  You can look at the guy's face and see he is not
6  impartial.  And so we used our strikes.  This is -- you know, I
7  mean, we've been through this and I just politely object and
8  say we need to -- you know, there's nothing unfair about what's
9  happened here.
03:32PM 10         THE COURT:  All right.  Excused for cause.  Excused
11  for cause.
12         MR. DUBIN:  Your Honor --
13         THE COURT:  Want another sidebar?
14         MR. DUBIN:  Yes.
03:32PM 15         MR. CARMODY:  We were just going to tell the Court
16  we're missing a juror.
17         I guess here she comes.  Okay.
18         THE COURT:  Okay.
19         (In the presence of the prospective jurors:)
03:33PM 20         THE COURT:  Again, the following jurors have been
21  excused.  If you've been excused, let the -- go downstairs, let
22  them know you've been excused from this case.
23         Mr. Lall, thank you.
24         Mr. Govindan, thank you.  Safe travels.
03:33PM 25         Mr. Navarrete.

## 72

1          PROSPECTIVE JUROR NAVARRETE:  Navarrete.
2          THE COURT:  Navarrete.
3          PROSPECTIVE JUROR NAVARRETE:  There you go.  Thank
4  you.
03:33PM 5          THE COURT:  Thank you.
6          I know I'm going to mess this up again.
7          Desiongco.  Desiongco.
8          PROSPECTIVE JUROR DESIONGCO:  Desiongco.
9          THE COURT:  Desiongco.  You're excused.  Thank you.
03:33PM 10         Ms. Gastelum Reed, you're excused.  Thank you.
11         Okay.  Now I'm going to play musical chairs again.
12         Mr. Perez, slide over one.
13         Ms. Velasco, if you go back over there.
14         Mr. Salas Barron, go to that last chair over there.
03:34PM 15         Ms. St. John, if you'd go over there.
16         If the courtroom --
17         Everybody okay?
18         We'll hold.  I'm just going to hold until after we
19  swear in and excuse just in case anything happens in the next
03:34PM 20  five minutes.  We're not -- not excusing yet.
21         So I'm going to ask the first 10 jurors to rise and
22  the courtroom deputy will administer -- including you,
23  Ms. St. John.  You too.  You can sit.
24         The first 10.  Okay.  Rise.
03:35PM 25         THE COURTROOM DEPUTY:  Please raise your right hand.

90

```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3       HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   IN RE:                      )   Case No.
     NATIONAL FOOTBALL LEAGUE'S  )   MDL 15-2668-PSG (SKx)
 6   SUNDAY TICKET ANTITRUST LITIGATION )
                                 )   Volume 2
 7   _____)   (Pages 90 - 299)

 8

 9        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                        TRIAL DAY 2
10                  THURSDAY, JUNE 6, 2024
                         8:58 A.M.
11                  LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22   _____

23   MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
          FEDERAL OFFICIAL COURT REPORTER
24         350 WEST 1ST STREET, ROOM 4455
          LOS ANGELES, CALIFORNIA  90012
25                (213) 894-2305
```

91

```
 1              APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4      SUSMAN GODFREY
        BY:  MARC M. SELTZER
 5      BY:  AMANDA K. BONN
        BY:  KALPANA SRINIVASAN
 6          Attorneys at Law
        1900 Avenue of the Stars, Suite 1400
 7      Los Angeles, California  90067
        (310) 789-3100
 8

 9      SUSMAN GODFREY
        BY:  WILLIAM C. CARMODY
10          Attorney at Law
        One Manhattan West, 50th Floor
11      New York, New York  10001
        (212) 336-8334

12      SUSMAN GODFREY
        BY:  IAN M. GORE
13          Attorney at Law
        401 Union Street, Suite 3000
14      Seattle, Washington  98101
        (206) 505-3841

15

16

17   FOR THE DEFENDANTS:

18      WILKINSON STEKLOFF, LLP
        BY:  BETH WILKINSON
19      BY:  BRIAN L. STEKLOFF
        BY:  RAKESH N. KILARU
20          Attorneys at Law
        2001 M Street NW, 10th Floor
21      Washington, DC  20036
        (202) 847-4000

22

23
24
25
```

92

```
 1              INDEX OF WITNESSES

 2
```

| 3 | PLAINTIFFS' WITNESSES | PAGE |
| 4 | ROBERT STECKLOW | |
| 5 | Examination by videotaped deposition | 186 |
| 6 | JAMES DYCKES | |
| 7 | Examination by videotaped deposition | 188 |
| 8 | STEVE BORNSTEIN | |
| 9 | Direct Examination by Mr. Carmody | 189 |

93

```
 1              INDEX OF EXHIBITS

 2
```

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 44 | 2009 NFL & DirecTV Sunday Ticket Agreement | 289 | 289 |
| 45 | 2014 NFL & DirecTV Sunday Ticket Agreement | 293 | 293 |
| 188 | 2006 NFL & CBS Longform AFC Agreement | 199 | 199 |
| 269 | E-mail | 188 | 188 |
| 272 | Letter | 251 | 251 |
| 326 | E-mail | 283 | 283 |
| 390 | Letter | 230 | 231 |
| 457 | E-mail | 186 | |
| 481 | E-mail | 187 | 186 |
| 536 | E-mail | 186 | |
| 608 | NFL/DirecTV Amended and Restated Indemnification Agreement | 215 | |
| 742 | Memo | 240 | |
| 750 | Terms Sheet comments (pages 537-540 only) | 272 | 274 |
| 751 | Impact of DISH deal on NFL business partners | 217 | |
| 765 | E-mail | 186 | |
| 766 | E-mail | 186 | |
| 773 | DirecTV contract issues | 221 | |
| 774 | Draft DirecTV main points of agreement | 233 | |
| 779 | E-mail | 186 | |
| 780 | E-mail | 186 | |
| 805 | E-mail | 186 | |

**114**

1    by agreeing with their competitors to limit distribution, that

2    is the functional equivalent -- it's the exact same thing as an

3    agreement to raise prices.  That is exactly what they're doing.

4    What was the result for the fans?  If you were a fan

5    who wanted to watch a game in your local market other than the

6    three to four being aired by FOX and CBS, you couldn't just go

7    buy a single game.  For example, if you were a Green Bay fan

8    living in L.A., you couldn't just go buy one game of the

9    Green Bay Packers.  You couldn't even buy a single team

10    package.  You couldn't say, You know what?  I don't really care

11    about all of the teams.  I just want to see my favorite team,

12    the Green Bay Packers.  Can I buy a package of their games?

13    No, you couldn't.

14    The only choice was to buy a package called

15    Sunday Ticket of every game, of every team, and the DirecTV

16    television service.  And you will hear that the all-in cost of

17    this on average during the class period was over $1300 a year.

18    Why?

19    Because people had to pay $1100 already for the

20    satellite subscription from DirecTV and to get that dish

21    installed on their house.  And then on top of that, because of

22    these agreements that the defendants made, they ensured you

23    also had to buy a premium subscription for another $273 in

24    order to watch Sunday Ticket on DirecTV.  That is the expensive

25    toll road they set up.

**116**

1    it, and they did it anyway so that they could keep this

2    firehose of billions of dollars flowing into the NFL at the

3    expense of their own fans.

4    I told you that this is about a darker side of the

5    NFL behind the shield.  And what I just described, this

6    anticompetitive scheme, that's bad enough.  But what you will

7    also hear is that the NFL knew, the NFL knew that what they

8    were doing was against the law.  They knew it violated the

9    antitrust laws.  But instead of stopping, you will see that

10    they came up with increasingly clever schemes to cover it up

11    because they knew this very day could come some day.  They

12    might be called to account, and they wanted to have something,

13    some cover story that they could point to instead of the truth.

14    And to understand that, it's important that we go

15    back to the beginning, back to the beginning of how this system

16    really came about, because it didn't even start in the current

17    era of satellite and cable.  You'll see that the idea for a

18    scheme just like this started decades ago, at the dawn of

19    television.

20    You will hear that back in the 1950s, the teams came

21    up with a different scheme.  You'll hear the facts of that

22    scheme explained to you in court.  Dr. Rascher, a sports

23    economist, is going to explain what the teams did.  But at that

24    time, they divided the country into exclusive territories.

25    Each team had exclusivity in its own territory.  Only the home

**115**

1    And guess what?  It worked.  It worked.  You will

2    see documents from the NFL's files that show they knew that out

3    of their avid fans, these are big-time NFL fans, there were

4    35 million avid fans who would have wanted to watch these games

5    but couldn't.  And actually, there were even more than that if

6    you think about casual fans.  There were as many as 70 million

7    casual fans who also wanted to watch out-of-market games and

8    couldn't.  And the NFL knew why.  The NFL knew why.

9    They saw a family in L.A.  They said we're keeping

10    these games away from you.  All of these other games being

11    played you can't watch unless you pay the toll.  And they knew

12    what the result was:  Most people couldn't afford it, wouldn't

13    buy it, would be priced out.

14    This is another internal NFL document.  And they

15    knew that cost was the biggest barrier to a subscription to

16    Sunday Ticket.  And also not wanting a satellite dish is also a

17    factor.  42 percent of people said it was too expensive:

18    21 percent, I don't want a satellite subscription: 15 percent,

19    I don't want a dish installed on my house.

20    And for the fans who did buy Sunday Ticket -- and

21    these were incredibly avid fans, these were the most loyal

22    fans, because you would have to be a pretty avid fan to pay

23    $1300 a year to watch Sunday Ticket -- they knew that of those

24    people who are in the classes in this case, 70 percent of them

25    had a household income less than $100,000 a year.  The NFL knew

**117**

1    teams' games could be shown on TV.  So in Los Angeles, you

2    could only watch a Rams game on TV, even if the Rams were

3    playing away.

4    And that allowed these teams that had monopolies to

5    extract much more by doing exclusive deals.  And guess what?

6    ==The United States Department of Justice sued the NFL and all of==

7    ==its teams saying that scheme violates the antitrust laws, it==

8    ==violates the Sherman Act.==

9    ==And you'll hear the outcome of the case.  The Court==

10    ==hearing that case agreed with the Government and said that the==

11    ==NFL was doing is illegal.  And the Court made them stop.==

12    And so what happened?  You will hear that from 1953

13    to 1961, because of this Court order, NFL teams actually had to

14    compete with each other both on the field in the game and off

15    the field in licensing their TV rights.

16    And guess what?  They did.  Some teams did deals

17    with CBS.  Other teams made their own deals with NBC.  One team

18    made a deal with a local sports network, and it led to more

19    choices for fans.  Fans could watch more games on TV than they

20    could before.

21    But guess what the problem was?  Less money.  Less

22    money for the NFL.  And you'll hear that the teams said, You

23    know what?  What if we try something else?  What if we try to

24    have the teams agree to pool our rights, our TV rights, all

25    together in the NFL so that we can let the NFL do an exclusive

Timestamps (left column 114): 09:51AM (5, 10, 15, 20), 09:52AM (25)
Timestamps (left column 115): 09:52AM (5, 10), 09:53AM (15, 20), 09:54AM (25)
Timestamps (right column 116): 09:54AM (5, 10), 09:55AM (20, 25)
Timestamps (right column 117): 09:55AM (5), 09:56AM (10, 15, 20), 09:57AM (25)

**118**

```
 1    deal with CBS on all of our behalf.  They said, Let's ask the
 2    Court if we can have permission to do that.
 3              And you will hear that the Government opposed.  The
 4    United States Department of Justice said, No, that's an
 5    anticompetitive agreement too.  And the Court said, No, you
 6    can't.  I will not allow you to do this deal.  I will not allow
 7    you to pool these rights to do an exclusive deal with CBS.
 8              You will hear what the NFL did next.  The NFL went
 9    to Congress and they asked Congress to pass a law called the
10    Sports Broadcasting Act.  They asked for something that's
11    called a limited exemption from the antitrust laws.  It's like
12    the little hall pass that says, Even if this might otherwise
13    violate the antitrust laws, Congress is going to give us a
14    special pass to do it.  And Congress said, We're willing to
15    help but on one condition, one condition that's very important.
16    Only on free TV.  Only on free TV, not on paid TV, not on what
17    would eventually become decades later satellite and cable.
18              And you'll see that when the NFL wanted Congress to
19    pass this law, what did they do?  Then Commissioner
20    Pete Rozelle, on behalf of the NFL, testified before Congress.
21    He testified before the House Antitrust Committee.  And during
22    his testimony, the chief counsel, Mr. Maletz, asked him, You
23    understand, do you not, Mr. Rozelle, that this bill covers only
24    the free telecasting of professional sports contests and does
25    not cover pay TV?
```

**119**

```
 1              How did Mr. Rozelle -- how did the commissioner of
 2    the NFL answer?  He said, "Absolutely.  Absolutely."  And
 3    that's absolutely right.
 4              The NFL absolutely knew that if they tried to run
 5    this playbook on the pay TV side, on satellite, on cable, that
 6    would violate the antitrust laws.
 7              You'll hear they did it anyway.
 8              MS. WILKINSON:  Your Honor, I'm sorry.  I'm just
 9    going to object to that statement, the last statement.
10              THE COURT:  Overruled.
11              MS. BONN:  You will hear after this law was passed,
12    the NFL took off in popularity.  Back in the '50s, it wasn't
13    America's most popular sport.  Baseball was.  College football
14    was even more popular.  But over time doing these deals on free
15    TV, their popularity grew and grew.
16              They merged with the American Football League, which
17    was then a big competitor to the NFL, and that's how we wound
18    up with the NFC and the AFC.  After they merged, the old AFL
19    teams became the American Football Conference, the old NFL
20    teams became the NFC, and as new teams joined the league, they
21    joined one or the other.
22              But you will hear just what I explained here, it
23    wasn't enough.  They wanted to come up with this way of making
24    even more money on the pay TV side, even though they knew it
25    was illegal.
```

**120**

```
 1              This is one of the most important documents in the
 2    case.  It's Trial Exhibit 751.  It came from the NFL's files
 3    and it has never been seen by the public until today.  As far
 4    as we know, there is one original copy of this document.  It
 5    was a hard copy.  It was scanned, and that is how we have it.
 6    And you will have a chance to see this document as you
 7    deliberate in this trial.
 8              And what did they say?  This is in 2001, maybe early
 9    2002 from context.  And for the first time in a long time, the
10    NFL started to get a little worried.  Why?  News had just come
11    out that DirecTV might merge with another satellite company
12    called Dish.  And the NFL got worried.  They said, Well, what
13    if we keep doing our deal with DirecTV and then they merge with
14    Dish?  Does that mean that Sunday Ticket would be available to
15    more fans?  Does that mean more people might stop watching FOX
16    and CBS and watch Sunday Ticket over here?  Would that upset
17    the apple cart?  Would that disrupt this whole scheme and make
18    FOX and CBS want to pay us less money?  What can we do to stop
19    that from happening?  And you'll see they said under what terms
20    would the NFL want to continue on DBS, Direct Broadcast
21    Satellite.  At a minimum, the NFL must ensure that it maintains
22    complete control over the pricing and packaging of
23    Sunday Ticket and any future program offerings.
24              And you'll see in the memo why.  They wrote, "How do
25    we address the networks' concerns, FOX and CBS's concerns,
```

**121**

```
 1    about subscriber levels?"  So what do they say?
 2              They say that the ability to control pricing should
 3    enable the NFL to manage the subscriber level to a range that
 4    is within acceptable limits to the networks.
 5              What do they mean by that?  If we can make
 6    Sunday Ticket more expensive, fewer people are going to buy it.
 7    That's how we protect the networks.  No matter what we do, we
 8    have to maintain control over how much DirecTV charges.  That
 9    is price fixing.  That is an agreement on price.
10              But you will see, they had a problem.  In December
11    of 2002, the NFL's deal with DirecTV was up for renewal.  And
12    you will hear that, as the parties were negotiating, there were
13    a series of key meetings in New York at the NFL's headquarters.
14    On Tuesday, December 3rd, 2002, the NFL had an internal meeting
15    with their investment bankers and their lawyers, and they were
16    preparing for two more days of meetings that they would have
17    with executives from DirecTV on the 4th and the 5th, before
18    they signed their next deal.
19              And we have yet another document.  It's an agenda of
20    what the NFL was discussing during this meeting.  It's Trial
21    Exhibit 773.  And it's another one of the most important
22    documents in this case that you will see in evidence.
23              Look what they're discussing.
24    Pricing/discounting/promotional packaging of Sunday Ticket.
25              And look at Item D.  Degree of DirecTV involvement
```

## Page 150

1  chance to hear the testimony and to read those documents, we
2  are going to ask that you hold the NFL accountable for their
3  actions.  We're going to ask that you find them liable for
4  breaking the antitrust laws.  And we're going to ask that you
10:47AM 5  make it right for the plaintiffs and the class members who
6  never should have been forced to make this choice and never
7  should have been overcharged simply to line the pockets of
8  these owners of these teams who were already making billions of
9  dollars.
10:48AM 10          Thank you.
11          THE COURT:  All right.  Ladies and gentlemen, we're
12  going to take a 15-minute break, and then we'll hear the
13  defendants' opening statement.
14          Remember not to discuss the case among yourselves or
10:48AM 15  with anyone else.  Don't form or express any opinions about the
16  case until it's submitted to you.  And we'll see you in
17  15 minutes.
18          THE COURTROOM DEPUTY:  All rise.  This court is in
19  recess.
10:48AM 20          (Break taken.)
21          (In the presence of the jury:)
22          THE COURT:  Defendants' opening.
23          MS. WILKINSON:  Thank you, Your Honor.
24          Good morning, everyone.  As you heard yesterday, I
11:06AM 25  have a bit of a cold, and I apologize.  So I'm using this

## Page 151

1  microphone and if you can't hear me, just give me a little high
2  five and I'll try and speak even louder.
3          You know that yesterday when you were chosen and we
4  chose you and we know you didn't choose us to be here, we chose
11:07AM 5  you really for one reason, because you told his Honor that you
6  could be impartial.  Whether you liked NFL or you didn't,
7  whether you liked big corporations or you didn't, you would set
8  that aside, and those are perfectly legitimate opinions, and
9  decide the case on this evidence.
11:07AM 10          Today I want to talk to you about what the evidence
11  is: not what the story is, not what the terms that they use to
12  try and incite your emotions like corporate greed.  Why did
13  they say that?  Because we heard that from a juror yesterday
14  who said he couldn't be fair.
11:07AM 15          Conspiracy, secret documents, there is nothing
16  secret in this case.  We will show you for years how the NFL
17  did its broadcasts, has been public and well-known and talked
18  about for -- to everyone in the country, including the Federal
19  Communications Commission, the Texas legislature, every kind of
11:07AM 20  Government agency you can imagine.  None of this was secret.
21          None of these documents reveal something that isn't
22  known about how this system is broadcast.  But I have to start
23  with one of the most surprising things I saw.
24          This is from plaintiffs' deck.  And they showed
11:08AM 25  you -- excuse me -- and claimed that the price went down in

## Page 152

1  2012, it never went up again.  Let's start with the who, what,
2  when, and where.  This case starts in 2011: not in 2002, not in
3  1994 or 1984, even 1961.  The class -- they're asking for
4  $7 billion for the time period of 2011 to 2022, maybe the very
11:08AM 5  beginning of '23.  That's what this case is about.  That's what
6  the evidence should be about.
7          And in 2011, the NFL didn't control the price.  In
8  fact, what -- what she showed you right here, that's not what
9  the price was.  Their own expert who's sitting right in the
11:09AM 10  back of the courtroom, Dr. Zona, he calculated the actual
11  average price that every one of these residential consumers
12  paid.  And you know what it was?  It's not even on their chart.
13  It's $102.70.  They didn't even make room for it on the chart.
14  This is what the average price was.
11:09AM 15          Now, why wouldn't they show you that?  Because it
16  doesn't fit their story.  But that's their evidence.  It's not
17  our evidence.  It's their evidence.
18          And why is that price $102?  Because Sunday Ticket
19  and pricing was run by DirecTV.  And you know why?  They gave
11:09AM 20  discounts.  In fact, they often gave it away for free because
21  they wanted people to subscribe to DirecTV.  Makes sense:
22  right?  People do that all the time.
23          You could get it for an entire year for free.  So
24  when they had to calculate what people paid, they had to take
11:10AM 25  into account that, they had to take into account discounts.

## Page 153

1  That's the average price paid by every one of the people in
2  this class: $102.70 to watch every NFL game on Sunday, beyond
3  the ones you get for free on network TV.  If you want all those
4  additional games, that's what you paid on average.
11:10AM 5          The other thing I think has to go -- responded to
6  right away was the outrageous claim about the military.  Now,
7  you -- if you've been to any sports game --
8          Excuse me while I switch.  I may need some help,
9  Ken.  Which button?  Sorry.
11:11AM 10          Thank you.
11          The NFL, like other sports leagues, is big in
12  honoring the military.  You see that if you go to the game.
13  But every military family around the world gets all the games
14  for free.  You saw some kind of -- I don't know what it was --
11:11AM 15  demonstrative that they created that claimed that the military
16  families were denied it?  Thankfully we have Cathy Yancy here,
17  the vice president of broadcasting.  And one of her many jobs
18  is to oversee the quality of the broadcast, the compliance to
19  make sure it meets the highest standards, and to make sure
11:11AM 20  we're serving as many fans as possible.  And she's going to get
21  up on that witness stand and tell you that what they told you
22  was absolutely false.
23          If you live with a family, if you're from the
24  military, from a military family, and you live on a base, you
11:11AM 25  can get all of those games for free.  Why would they say that?

282

1 we move on.

2 Q. (BY MR. CARMODY:) You're saying when Mr. McManus

3 from CBS Sports, the top guy there, says, "The concept here has

4 always been that these packages are sold at a premium, thereby

5 limiting distribution," was that accurate? Did the NFL and FOX

6 always have an understanding that the Sunday Ticket packages

7 were going to be sold at a premium price?

8 A. I don't know if that statement is accurate. The NFL

9 always wanted Sunday Ticket to be an additional package and to

10 put it behind a subscription wall. That was how it was

11 designed and -- from its inception, and that's how we kept it

12 going through the term I was there.

13 The only thing we changed was the ability not to

14 market, not to have a marketing department, not to have

15 marketing expense, and not to set pricing, and allow them to

16 set pricing.

17 Q. Allow who to set pricing?

18 A. DirecTV.

19 Q. Oh. That didn't work out so well. We saw in the

20 2004 contract they needed your -- the NFL's explicit control on

21 the premium pricing which had to be 15 percent of the whole

22 Sunday Ticket subscriber base; correct?

23 A. Yeah, I certainly saw that as -- when I talk about

24 pricing, they're establishing the basic price of Sunday Ticket.

25 Q. Sir, was the NFL keeping any secrets; in other

283

1 words, it talked to a lot of people, I'm guessing, regulators,

2 authorities, people wanted to know about what kind of deal the

3 NFL had here.

4 Did the NFL ever disclose to anybody publicly that

5 it had an understanding with the networks that Sunday Ticket

6 would be priced at a premium?

7 A. I have no idea.

8 Q. Okay. Let's look at the NFL response.

9 And we see you're involved here about --

10 MR. CARMODY: Oh, let's offer 326. It's not

11 objected to.

12 (Exhibit No. 326 for identification.)

13 THE COURT: Yeah. Take it down for a sec.

14 Any objection?

15 MR. STEKLOFF: No objection, Your Honor.

16 THE COURT: Okay. 326 is admitted.

17 (Exhibit No. 326 received into evidence.)

18 Q. (BY MR. CARMODY:) So what we're looking at here --

19 and let's put everything back in context. I wish I had a

20 constant timeline up here, but I don't.

21 But, sir, this is dated May 5th of 2009. Remember

22 the e-mail that we've just been talking about for Mr. McManus,

23 the top guy at CBS Sports to you, is four days earlier. Okay?

24 That's when he says, the concept here, you know, it's always

25 been our understanding, Sunday Ticket packages are going to be

284

1 premium priced. This is four days later. Okay?

2 Now, let's take a look. We have Hans Schroeder, top

3 guy at the NFL, to you, Brian Rolapp --

4 MR. CARMODY: Oh, look at this. I can underline it.

5 I didn't realize where I was going.

6 Q. (BY MR. CARMODY:) -- Howard Katz and it says,

7 "Steve, Brian, Howard" -- and Steve is you; right?

8 A. I assume so, yes.

9 Q. Okay.

10 -- "took a stab at putting CBS's preliminary issue

11 list in a doc with preliminary NFL response based on our

12 conversations to date. Figured it may be helpful for shaping

13 tomorrow's discussions."

14 And so it looks like you at the NFL and a couple of

15 other, you know, heavyweights are going to be meeting with CBS

16 and negotiating this deal; correct?

17 A. Yeah. If -- if tomorrow's discussion was with CBS,

18 I don't know. It could easily be amongst ourselves, but it

19 could have been CBS as well.

20 Q. Let's take a look at -- let's go to the list that's

21 an attachment here.

22 MR. CARMODY: How do I erase that red line?

23 Thank you.

24 Let's go to No. 10, please.

25 Q. (BY MR. CARMODY:) Okay. Now, this is the NFL --

285

1 oh, this is the CBS issue. I'm sorry. So CBS -- the NFL is

2 writing up what the issue is; right? So we have the NFL

3 saying, "We will need clarification" -- it's referring to what

4 CBS wanted from you, Mr. McManus; correct?

5 A. Yeah. That's the same -- I think the words.

6 Q. So the NFL is saying internally to itself, "We will

7 need clarification on the premium pricing for Sunday Ticket and

8 any other such packages."

9 Fair read; correct?

10 A. Yeah, but this -- they're just transcribing Sean's

11 e-mail to me.

12 Q. We haven't got to the fun yet. Just stay with me.

13 This is the first sentence.

14 "The concept here has always been" --

15 MR. STEKLOFF: I just object to the extra -- he --

16 THE COURT: It's argumentative.

17 MR. STEKLOFF: Just ask questions.

18 THE COURT: It's argumentative.

19 Go ahead.

20 Q. (BY MR. CARMODY:) The second sentence says, "The

21 concept here has always been these packages are sold at a

22 premium, thereby limiting distribution."

23 So it's repeating everything that Sean McManus had

24 told you about, about this long-term relationship; correct?

25 A. Yeah. It seems like it's taking those words and

290

1  pricing section here in the 2009 contract between the NFL and
2  DirecTV, and after all the preamble into it, it says, "Provided
3  that, for clarity, in all cases" -- and "all cases" refer to
4  both Sunday Ticket Basic and Sunday Ticket Max; correct?
04:21PM 5  A.    "All cases," I assume all the packaging they do,
6  yes.
7  Q.    Okay.  "So provided that, for clarity, in all cases
8  NFL Sunday Ticket shall be marketed and offered in a manner
9  consistent with its status as a high-quality, premium
04:21PM 10 subscription sports offering."
11  Correct?
12  A.    That's what it says, yes.
13  Q.    The same premium that Mr. McManus was talking to you
14  about; correct?
04:21PM 15 A.    Again, you're using "premium" as -- as a case study.
16  I use "premium" as they're charging extra for the -- for the
17  package.
18  Q.    No, I was using "premium" in the context Mr. McManus
19  wrote to you and the NFL responded back "premium pricing."
04:22PM 20 Those two words together.  That's what I'm referring to.
21  A.    And -- I'm sorry.  The NFL responded back?
22  Q.    Oh, yeah.  Let's go -- yeah.  Let's go.
23  The NFL wrote down the premium pricing and said, "Is
24  there language in effect in the contract?"  And we see there
04:22PM 25 is.

291

1  A.    I thought you said they communicated that to CBS.
2  My mistake.
3  Q.    Okay.  But we see the NFL made sure that DirecTV
4  charged their customers a premium price to access
04:22PM 5  Sunday Ticket; correct?
6  A.    Sunday Ticket always was assigned as a subscription
7  package, yes.
8  Q.    A premium subscription package; correct?
9  A.    Subscription package, yes.
04:22PM 10 Q.    See the word "premium" before that word
11  "subscription"?
12  A.    I do.
13  Q.    And do you disagree or agree that that word
14  "premium" is there, it's the same word Mr. McManus at CBS was
04:23PM 15 talking about, it was that same response that the NFL made,
16  it's all premium pricing; correct?
17  A.    "Premium" is in all those statements, yes.
18  Q.    And "premium" refers to premium pricing, just like
19  Mr. McManus said to you, "It's always been our
04:23PM 20 understanding" -- he said the concept here has always been our
21  understanding that there's premium pricing to limit the
22  distribution.  Didn't he say words to that effect?
23  A.    Yeah, I mean, that's what he wrote down.  I don't
24  know what he meant by "premium"; I know what I mean by
04:23PM 25 "premium."

292

1  Q.    You never asked him what he meant by "premium"?
2  A.    I have no -- I don't remember doing that at all.
3  Q.    But we see the word "premium" appear in this
4  contract -- this is the first contract -- I've looked at them
04:23PM 5  all.  I have never seen the word "premium" appear before
6  "subscription" in an NFL contract with DirecTV.  Can you prove
7  me wrong?
8  MR. STEKLOFF:  Objection.  Argumentative.
9  THE COURT:  Sustained.
04:23PM 10 Q.    (BY MR. CARMODY:)  Do you know of any other contract
11  where DirecTV has to charge this premium price?
12  A.    Yeah.  Again, you're focused on "premium."  It means
13  something to me that -- that doesn't mean -- what it means to
14  you doesn't appear to mean to me.  To me, "premium" is another
04:24PM 15 word for "subscription."  They do use the word "subscription."
16  Why do they put it twice?  I don't know.  And I do not -- to
17  answer your question, I'm not aware of any contract that would
18  use the word "premium," but, honestly, I didn't read too many
19  of the contracts and I certainly didn't read boilerplate like
04:24PM 20 this.
21  Q.    Well -- and what we have --
22  MR. CARMODY:  I'm going to offer now the next
23  contract there's no objection to, the final one, sir, while you
24  were there, and it's the last contract in the class period with
04:24PM 25 DirecTV.  It's Exhibit 45 I'd like to offer.

293

1  (Exhibit No. 45 for identification.)
2  THE COURT:  Any objection?
3  MR. STEKLOFF:  No objection, Your Honor.
4  THE COURT:  Admitted.  45 is admitted.
04:24PM 5  (Exhibit No. 45 received into evidence.)
6  THE COURT:  This might probably be a good time to
7  break for the day.
8  MR. CARMODY:  I only got about two -- one minute and
9  a half or --
04:25PM 10 THE COURT:  Okay.
11  MR. CARMODY:  Okay.
12  THE COURT:  I'll keep you to your word.
13  Q.    (BY MR. CARMODY:)  Does "premium subscription" mean
14  premium price?
04:25PM 15 A.    Again --
16  Q.    Just a yes or no.  I mean, give us your best shot.
17  A.    To me, a premium subscription would imply a premium
18  price.
19  Q.    Thank you.
04:25PM 20 And now we're looking at the last contract here.
21  It's Exhibit 45 and I show you this one, sir, because it covers
22  the Seasons 15 through 22.  And that ends our class period.
23  This is the last season, the 22 season.
24  No basis to disagree; correct?
04:25PM 25 A.    If you say so, yes.

462

```
 1                UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   IN RE:                        )    Case No.
     NATIONAL FOOTBALL LEAGUE'S    )    MDL 15-2668-PSG (SKx)
 6   SUNDAY TICKET ANTITRUST LITIGATION )
                                   )        Volume 4
 7   _____)    (Pages 462 - 683)

 8

 9        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                      TRIAL DAY 4
10              MONDAY, JUNE 10, 2024
                      8:32 A.M.
11              LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22   _____

23   MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
          FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, ROOM 4455
          LOS ANGELES, CALIFORNIA  90012
25                (213) 894-2305
```

---

464

## INDEX OF WITNESSES

| PLAINTIFF'S WITNESSES | PAGE |
|---|---|
| LAWRENCE A. JONES | |
| Direct Examination by Ms. Bonn | 483 |
| Cross-examination by Ms. Wilkinson | 595 |
| Redirect Examination by Ms. Bonn | 656 |
| Recross-examination by Ms. Wilkinson | 675 |

---

463

```
 1                APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4       SUSMAN GODFREY
         BY:  MARC M. SELTZER
 5       BY:  AMANDA K. BONN
         BY:  KALPANA SRINIVASAN
 6           Attorneys at Law
         1900 Avenue of the Stars, Suite 1400
 7       Los Angeles, California  90067
             (310) 789-3100
 8
         SUSMAN GODFREY
 9       BY:  WILLIAM C. CARMODY
             Attorney at Law
10       One Manhattan West, 50th Floor
         New York, New York  10001
11           (212) 336-8334

12       SUSMAN GODFREY
         BY:  IAN M. GORE
13           Attorney at Law
         401 Union Street, Suite 3000
14       Seattle, Washington  98101
             (206) 505-3841
15

16
     FOR THE DEFENDANTS:
17
         WILKINSON STEKLOFF, LLP
18       BY:  BETH WILKINSON
         BY:  BRIAN L. STEKLOFF
19       BY:  RAKESH N. KILARU
             Attorneys at Law
20       2001 M Street NW, 10th Floor
         Washington, DC  20036
21           (202) 847-4000

22

23

24

25
```

---

465

## INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 39 | FOX presentation re: FOX Sports Budget & Long Range Plan | 630 | 631 |
| 145 | E-mail | 497 | 499 |
| 146D | E-mail | 564 | 565 |
| 153 | E-mail | 614 | 615 |
| 169 | E-mail | 541 | 556 |
| 187 | 2006 NFL & FOX Longform NFC Agreement | 572 | 572 |
| 212 | E-mail | 645 | 646 |
| 221 | 2011 NFL & FOX NFC Term Sheet | 573 | 577 |
| 231 | 2009 NFL & FOX Letter Agreement re: Extension | 572 | 573 |
| 257 | E-mail | 520 | 520 |
| 331 | Letter | 577 | 578 |
| 441 | E-mail | 563 | |
| 660 | Letter | 581 | 582 |
| 869 | Letter | 588 | 589 |
| 1000 | E-mail | 560 | |
| 1001 | E-mail | 538 | |

---

514

1    A.   Yes.  It has to be behind a pay wall.

2    Q.   And when we say that it had to be on a subscription

3    basis and behind a pay wall, I want to give an example of what

4    that means.  That means that DirecTV would not be allowed to

10:01AM 5    simply include Sunday Ticket with the base -- basic charge for

6    their television service; correct?

7         MS. WILKINSON:  Objection.  Foundation.

8         THE COURT:  Overruled.

9         THE WITNESS:  Say it again?

10:01AM 10    Q.   (BY MS. BONN:)  Sure.

11         Your understanding of this provision, sir, the

12    subscription requirement was that Sunday Ticket couldn't just

13    be included in the basic cost of DirecTV's television service;

14    there had to be an additional separate subscription charged for

10:01AM 15    Sunday Ticket; true?

16    A.   Yes.

17    Q.   And that was always FOX's understanding ever since

18    they acquired the rights in '94, to the best of your knowledge?

19    A.   I frankly don't remember the '94 contract on that,

10:01AM 20    but -- yeah.

21    Q.   But since '98, you can confirm; true?

22    A.   Yes.

23    Q.   Thank you, sir.

24         Now, we'll come back to the subscription basis

10:02AM 25    requirement in just one moment.  I'd like to address one issue

---

515

1    with respect to advertising on Sunday Ticket.

2         So if we could please go down and pull out 2.5B

3    content of resale programming and we're going to carry over

4    into the next page, 22, where we see little 1 and little 2.

10:02AM 5    Okay.  So this says, "League and FOX hereby agree

6    that any resale that involves the distribution of complete game

7    broadcasts on a simulcast basis shall be subject to the

8    following rules."

9         Do you see that, sir?

10:02AM 10    A.   I do.

11    Q.   And No. 1 -- or a little "i," romanette "i," says,

12    "FOX commercial announcements shall be carried in any game

13    broadcast so distributed."  True?

14    A.   FOX -- it says FOX commercial announcements, FOX

10:03AM 15    national commercial announcements, not the local commercials.

16    Q.   Exactly, sir.  This provision requires that if the

17    NFL engages in resale and sells Sunday Ticket, they have to

18    make sure that DirecTV carries through FOX's national ads;

19    correct?

10:03AM 20    A.   National ads but not the local ads.  So the local --

21    the local stations would lose the revenue on any local ads, and

22    we own a lot of local stations.

23    Q.   Correct, sir.  And we can see that in the next

24    little 2.  That's what governs the local ads.  And it says, "If

10:03AM 25    and only if the resale is through cable television systems,

---

516

1    such cable television systems shall carry and distribute local

2    affiliate commercial announcements in any game broadcast."

3         Do you see that, sir?

4    A.   I do.

10:03AM 5    Q.   And so what this is saying is if for some reason the

6    NFL were going to sell Sunday Ticket on cable, they would have

7    to make sure that cable operators carried the local affiliate

8    ads through too, but if you're on satellite like Sunday Ticket

9    on DirecTV, you don't have to carry through the local ads;

10:04AM 10    correct?

11    A.   I don't have to carry through the local ads?

12    Q.   DirecTV wouldn't, sir.

13    A.   Well, in this case -- whoever the resale operator

14    is, it says, "If and only if the resale is through cable

10:04AM 15    television, such cable television systems shall carry and

16    distribute local affiliate commercial announcements in any game

17    broadcast."

18    Q.   Thank you, sir.

19         Now, why don't we turn back to the page before.

10:04AM 20    We're going to go back to the subscription basis requirement in

21    2.5.

22         And, sir, why don't we go ahead and highlight "on a

23    subscription basis."

24         **Isn't it true, sir, that, in addition to this**

10:04AM 25    **requirement that -- in the contract that Sunday Ticket be sold**

---

517

1    **on a subscription basis, FOX and the NFL have also long had an**

2    **agreed principle that Sunday Ticket would remain a**

3    **complementary premium product that would not materially compete**

4    **with FOX's in-market games?**

10:05AM 5    **A.   Yes.  The -- the idea that it was for the avid fan**

6    **and it would be a premium service that would offer the resale**

7    **partner to sell the games.**

8    Q.   And that was always, while you've been at FOX, FOX's

9    agreed principle and understanding, not only would it be sold

10:05AM 10    on a subscription basis, but it would be sold as a premium

11    subscription so that it wouldn't materially compete with FOX's

12    in-market games.  True, sir?

13    A.   Well, we talked about a lot of different ideas.

14    We -- we never got most of the things we asked for, but the

10:06AM 15    concept that we did get was it would be for the avid fan and be

16    a premium service.

17    Q.   Now, sir, nowhere in this Section 2.5 on resale that

18    governs Sunday Ticket does it use the words "premium service"

19    or "premium subscription"; true?

10:06AM 20    A.   I'd have to read the entire paragraph.  If you want

21    me to, I will.

22         (Pause in the proceedings.)

23         THE WITNESS:  I don't see the word "premium," no.

24    Q.   (BY MS. BONN:)  And yet, despite the fact that the

10:07AM 25    word "premium" isn't here in this contract language, it was

---

518

1  your understanding and FOX's understanding with the NFL that it
2  would be a premium product for avid fans; true?
3      A.   Yes.  The idea is that we want viewers watching our
4  games.
5      Q.   How did the NFL and FOX first come to this agreed
6  principle that Sunday Ticket had to be a premium for avid fans?
7  How did you come to that understanding with each other if it's
8  not in the words of the contract?
9      A.   How did we come -- I don't know how we came to that
10  understanding, what the mechanics were.
11      Q.   How long have you known about that understanding
12  that FOX had, that Sunday Ticket would be a premium product for
13  avid fans?  From day one?
14      A.   I don't -- I guess so, yes.
15      Q.   And over the years, the 30 or so years that you
16  have -- had been at FOX Sports since '94, did you have
17  conversations with counterparts at the NFL that gave you the
18  confidence that the NFL had the same understanding, that it
19  would be a premium product, Sunday Ticket, for avid fans?
20      A.   Well, it was a -- it was a constant conversation in
21  the negotiations in -- that was the benchmark we were looking
22  for.
23      Q.   And when you say it was a constant conversation in
24  negotiations, I want to get a sense of who at the NFL FOX would
25  have spoken to to get that understanding.

519

1  Are there conversations that you can recall between
2  members of the FOX team and, say, former Commissioner Tagliabue
3  that led you to believe, you know what,
4  Commissioner Tagliabue's got the same understanding,
5  Sunday Ticket is going to be a premium product for avid fans?
6      A.   I have no memory whatsoever of ever having that
7  conversation with Commissioner Tagliabue.
8      Q.   How about with Commissioner Goodell?  Have there
9  been conversations between Commissioner Goodell and FOX that
10  have given FOX the confidence, you know what,
11  Commissioner Goodell has the same understanding,
12  Sunday Ticket's got to be a premium product for avid fans?
13      A.   I don't recall any conversations with
14  Commissioner Goodell on the subject.
15      Q.   How about with Steve Bornstein?
16      A.   I don't really remember doing that many negotiations
17  with Steve.
18      Q.   Who did you negotiate with, sir?
19      A.   Well, over the 30 years, it would be different
20  people, but it would be Brian Rolapp, Hans Schroeder,
21  Cathy Yancy, Howard Katz, whoever at the time that was
22  representing the NFL in the negotiations.
23      Q.   And, sir, based on your experience and negotiations
24  that you had with those people -- with Mr. Rolapp, with
25  Mr. Schroeder, with Ms. Yancy -- FOX had confidence that FOX

520

1  and the NFL, in fact, shared this understanding that
2  Sunday Ticket would be a premium product for avid fans; true?
3      A.   Yes.  Those would be the general guidelines.
4      Q.   Let's please look in your binder at Trial
5  Exhibit 257.
6          (Exhibit No. 257 for identification.)
7      Q.   (BY MS. BONN)  And, sir, this is an e-mail dated
8  December 7th, 2020, from a Mr. John Nallen at FOX to
9  Brian Rolapp at the NFL, copying you; correct?
10      A.   Yes.
11      Q.   You recall this e-mail; true?
12      A.   I recall the e-mail, yes.
13      Q.   And there's an attached issue grid, and I believe
14  you said at your deposition you and a FOX lawyer prepared that
15  issue grid together; true?
16      A.   Correct.
17      Q.   Okay.
18          MS. BONN:  Your Honor, we offer Trial Exhibit 257 in
19  evidence.
20          THE COURT:  Any objection?
21          MS. WILKINSON:  No objection.
22          THE COURT:  Admitted.
23          (Exhibit No. 257 received into evidence.)
24          MS. BONN:  Okay.  Why don't we go ahead and just
25  pull out the e-mail so that people can see it a little more

521

1  clearly, Mr. Spalding.  Thank you.
2      Q.   (BY MS. BONN)  Okay.  Let's take it from the top.
3  We see that this e-mail came from someone named John Nallen; is
4  that correct?
5      A.   Nallen, yes.
6      Q.   I apologize.  John Nallen.
7          And Mr. Nallen, at this time, I think maybe now, is
8  the chief operating officer of FOX; correct?
9      A.   Correct.
10      Q.   He was senior to you, you were an executive vice
11  president, I believe, at FOX Sports; correct?
12      A.   Correct.
13      Q.   Mr. Nallen is, in many ways, a consigliere to
14  Lachlan Murdoch and maybe before him to Rupert Murdoch;
15  correct?
16          MS. WILKINSON:  Objection.
17          THE COURT:  Rephrase.
18      Q.   (BY MS. BONN)  He's a senior advisor to
19  Lachlan Murdoch and, prior to Lachlan Murdoch, to
20  Rupert Murdoch; true?
21      A.   He's the chief operating officer of a company.  What
22  his relationship with Rupert or Lachlan is not my business.
23      Q.   Fair, sir.
24          And is it true that you were assisting Mr. Nallen in
25  preparing materials related to this negotiation with the NFL?

526

```
 1      A.      Yes.
 2      Q.      And just to kind of put ourselves in context here,
 3  you're talking about the potential growth of Sunday Ticket
 4  subscribers; true?  That's what you meant by growth?
 5      A.      Yes.
 6      Q.      And FOX, you can confirm, has generally communicated
 7  to the NFL that it wanted a limitation on the number of
 8  subscribers to Sunday Ticket; correct?
 9      A.      Well, again, it's important for FOX that our games
10  are what people are watching in the market and exclusivity of
11  that game in the market.  That's why we, um, produce a -- a
12  terrific telecast and we invest in all of the -- the
13  innovations because that's our brand, that's -- we want the
14  viewer to be looking at our games, the most amount of people
15  looking at our games, and saying that's a FOX telecast and
16  that's what FOX stands for.
17              So, yes, it was important for us, um, to make sure
18  we preserved that position.
19      Q.      And in order to preserve that position, you can
20  confirm that FOX has generally communicated to the NFL that it
21  wanted a limitation on the number of subscribers to
22  Sunday Ticket; correct?
23      A.      We wanted to make sure that Sunday Ticket was
24  available to the avid fan on a complementary basis to our
25  telecast as a premium product.
```

527

```
 1      Q.      Let me just try one more time, because I understand
 2  that's -- you know, the principle that you're talking about.
 3  But specifically, specifically, FOX has generally communicated
 4  to the NFL that it wanted a limitation on the number of
 5  Sunday Ticket subscribers; correct, sir?
 6      A.      As I said, we wanted Sunday Ticket to be available
 7  to the avid subscriber -- the avid fan so they had a premium
 8  service, it was a premium product, they were going to get all
 9  of the great FOX telecasts for a premium fee.
10              MS. BONN:  Your Honor, I'd like to play a video from
11  deposition, page 47:16, through 48:06.
12              THE COURT:  One moment.
13              (Pause in the proceedings.)
14              MS. WILKINSON:  Your Honor, I don't think this is
15  proper impeachment for what he just said.  She can elicit
16  that -- this question.  I don't think it's proper impeachment
17  for what he just said.  She can ask those questions first to
18  see if he agrees, but this is improper impeachment at this
19  point.
20              THE COURT:  Overruled.
21              You may play.
22              (Videotape played, not reported.)
23              MS. WILKINSON:  Your Honor, I'm going to object for
24  complete -- and ask for completeness for lines 7 through 15
25  where he was asked these exact same questions --
```

528

```
 1              THE COURT:  One moment.
 2              MS. WILKINSON:  Lines 7 through 15 on 47, which she
 3  did not play, which are the exact questions.
 4              THE COURT:  Hang on.
 5              You may read 11 through -- 11 or -- play 11 through
 6  15.
 7              MS. BONN:  Why don't we put up the transcript,
 8  please.
 9              We don't have a video cut, but I can put the
10  transcript on the screen, Your Honor, if that's all right.
11              Thank you.
12      Q.      (BY MS. BONN)  And, sir, the question that was
13  asked before the passage that was just read was, "Are you aware
14  of any communications FOX has had with the NFL concerning the
15  number of subscribers to Sunday Ticket?"
16              And my answer was, "The number of subscribers, no.
17  Any specific number, no."
18              Do you see that?
19      A.      Yes.  The question was, "Are you aware of any
20  communications that FOX had with the NFL concerning the number
21  of subscribers to Sunday Ticket?"  And I answered no as to the
22  number of subscribers.
23      Q.      Correct, sir.
24              But one thing you can confirm for us is that in June
25  of 2020, FOX communicated to the NFL that its preference was
```

529

```
 1  that the number of subscribers to Sunday Ticket not increase by
 2  more than 20 percent; correct?
 3      A.      Correct.
 4      Q.      Whatever that number was -- you didn't tell them a
 5  specific number, but whatever the current number was, you
 6  didn't want it to grow by more than 20 percent.  That is what
 7  you communicated to the NFL; correct?
 8      A.      That's what we asked for but did not get.
 9      Q.      Now, when you say that's what you asked for but did
10  not get, let's go back to Exhibit 257.  And in that
11  33 resale/growth, we see in the NFL column it says, "Rejected."
12              Is that what you mean, that you said we want
13  subscriber growth to be capped at 20 percent and the NFL
14  rejected it?  Is that what you're talking about, sir?
15      A.      Well, in the far column there's no reference to the
16  20 percent.  What was rejected was what was in the far column.
17      Q.      Okay.  So you're not sure what exactly it was that
18  the NFL rejected?
19      A.      The NFL did reject the 20 percent.
20      Q.      Thank you, sir.
21              Now, if we could go ahead and look at the rightmost
22  column.  Let's highlight the second sentence.
23              "FOX's proposal was based on the agreed principle
24  that Sunday Ticket would remain a complementary premium product
25  that would not materially compete with FOX's in-market games.
```

654

1 FOX network?

2    A.    Sunday Ticket viewer gets to see every single thing

3 that we put on the air on FOX.

4    Q.    Now, you said -- you've been in sports 40 years or

5 so?

6    A.    30 years.

7    Q.    30 years.  Sorry.  Don't mean to age you.

8    A.    I was in the entertainment for ten more.

9    Q.    Okay.  Fair.

10       And you have a lot of experience with the college

11 football system; right?

12    A.    Very much so.

13    Q.    And what is your -- what has happened with college

14 football recently in terms of the distribution model?

15    A.    College football right now is -- it's a bit of a

16 mess.

17    Q.    Why is that?

18    A.    It's no secret, um, that teams left their conference

19 to go join another conference so they could make more money.

20 The parity in college football is really going the wrong way.

21 You're going to have more of the haves and the have-nots,

22 you're going to -- the Oklahomas, the Ohio States, the

23 Alabamas, hopefully the SCs.

24       MS. BONN:  Objection, Your Honor.  I'm going to

25 raise the MILs.

655

1       THE COURT:  Overruled.

2       THE WITNESS:  Um, they're going to get more money

3 and they're going to be -- and the smaller schools or the

4 smaller programs are going to get less money, and there's going

5 to be a big difference between the big teams and the other

6 teams in college football.

7       And you saw SC and UCLA leave to go to the Big Ten

8 because there was an opportunity to get more money.  And they

9 were the most important schools in the Pac-12, and they were

10 distributing the money equally.  And SC said, Why should

11 Washington State get the same amount of money as SC and I'm

12 going to go join the -- the Big Ten.  Oklahoma started it and

13 Texas when they left the Big 12 to go to the SEC.

14       So it's pretty chaotic.  I can't -- and with name,

15 image, and likeness, I really don't know where it's going.

16    Q.    (BY MS. WILKINSON:)  You said a "change" or "lack of

17 parity."  What do you mean by "parity"?

18    A.    Well, there's going to be a -- I don't know the

19 number -- eight very good programs like the programs I said.

20 And then there's going to be a lot of mediocre programs, so

21 you're not going to have a lot of great games because you're

22 going to have some very good teams and a lot of very -- or

23 not-so-good teams, and some very bad teams.

24       So if you're a television broadcaster, you want

25 parity because you want good games.  You want to have the

656

1 you want good games.

2       And for -- to have a lot of good games, you have to

3 have a lot of good teams.

4    Q.    When you negotiated for college football rights, did

5 you negotiate with all the colleges or through the NCAA, any

6 kind of joint organization?

7    A.    No.  College is set up totally different so that

8 each conference, whether it's the Big Ten, the SEC, the Big 12,

9 the ACC, the Big East in basketball -- excuse me -- they each

10 negotiate, um, their own broadcast rights.

11    Q.    With the NFL, you negotiate with the NFL or the

12 32 teams or the conferences?

13    A.    Negotiate with the NFL.

14    Q.    And do you believe that the NFL games are

15 competitive?

16    A.    Very competitive.

17    Q.    Even with a small market team like the Saints?

18    A.    I'll use Green Bay, and it's a small market team,

19 and they're very competitive team.

20       MS. WILKINSON:  Thank you very much.

21       Turn the witness over, Your Honor.

22       REDIRECT EXAMINATION

23 BY MS. BONN:

24    Q.    Okay, sir.  We've heard a little bit about some

25 innovations by FOX.  And as I've heard you talking about these

657

1 innovations, I've also heard you using terms like "we want to

2 distinguish ourselves" and "we want to be the best in the

3 business."

4       Who does FOX try to distinguish itself from?

5    A.    From other broadcasters.

6    Q.    From your competitors; right?  That's why you want

7 to distinguish yourself; competition, sir?

8    A.    From other broadcasters.

9    Q.    Yeah.

10       And when you talk about some of the innovations that

11 you mentioned, I want to go through each of them.  You talked

12 about FOX Box, and I think you mentioned that David Hill

13 actually came up with that in England for soccer first;

14 correct, sir?

15    A.    Yes.

16    Q.    So the FOX Box innovation, it didn't come into

17 existence in the first instance because Sunday Ticket is

18 charged as a premium price; correct, sir?

19    A.    I don't understand your question.

20    Q.    Yeah.  You would agree with me that Mr. Hill's

21 invention of the thing that led to FOX Box in England with

22 soccer --

23    A.    Yes.

24    Q.    -- didn't come about because of any relationship

25 with Sunday Ticket being a premium price; correct, sir?

658

1    A.    No.
2    Q.    Thank you.
3    A.    But it was given to the Sunday Ticket viewer for
4  free.
03:50PM 5    Q.    Oh.  The Sunday Ticket viewer had to pay quite a bit
6  to access it?
7    A.    From us --
8    Q.    Ah.
9    A.    -- for free.
03:50PM 10    Q.    And as we talked about earlier, once FOX produces
11  the games, the NFL owns the IP in it; right?  So it's the NFL
12  that's giving the right to access its IP and its games to
13  Sunday Ticket; right?  It's not FOX giving something it owns to
14  DirecTV, is it, sir?
03:50PM 15    A.    No.  We don't own the telecast.
16    Q.    Thank you.
17          You mentioned a virtual first down line.  The
18  concept that that came from originally was invented in a
19  different sport, hockey; true?
03:50PM 20    A.    No.
21    Q.    Oh, I'm sorry.  You know what?  I'm -- I'm mixing
22  everything up.
23    A.    It's okay.
24    Q.    I thought you mentioned that there was an innovation
03:51PM 25  that started with hockey pucks, sir?

659

1    A.    I said we had a innovation in hockey to light up the
2  puck.  So there were certain technology that the company that
3  invented that, we went back to that company because we knew
4  that they could create things like this and say, Okay, now can
03:51PM 5  you get us a yellow line?
6    Q.    Right.
7          So the technology that led to the lighting up of the
8  hockey puck and that later FOX acquired, that was invented by a
9  third-party company; correct?
03:51PM 10    A.    Yes.
11    Q.    And then you said that Mr. Madden had the idea,
12  wouldn't it be great if we could use some technology like that
13  for football too; right?
14    A.    No.  He just said, Wouldn't it be great if we could
03:52PM 15  see where the first down line was, if we could put a yellow
16  line?  He didn't say anything about technology.  John wouldn't
17  have said that.
18    Q.    And I'm assuming that when he said that, he didn't
19  say, You know what?  The fact that Sunday Ticket is charged at
03:52PM 20  a premium price has given me a brilliant idea to bring this
21  hockey innovation to football.  It didn't have anything to do
22  with Sunday Ticket, did it, sir?
23    A.    It had nothing to do with Sunday Ticket, and he
24  didn't have anything to do with hockey.
03:52PM 25    Q.    Thank you, sir.

660

1          And let's talk about these parabolic mics, I think,
2  that you use in NFL football.
3          Again, that's part of FOX's desire to be the best of
4  the business and distinguish itself from other broadcasters;
03:52PM 5  true?
6    A.    It's designed to bring sound into the home of the
7  viewer.
8    Q.    And when you all are deciding how many parabolic
9  mics do you want to have in any given NFL game, you're not
03:52PM 10  sitting there studying the price of Sunday Ticket and going,
11  Well, I don't know the amount of mics that we use; that really
12  depends on how premium the price of Sunday Ticket is.  Right?
13  Those two things are not connected?
14    A.    Correct.
03:53PM 15    Q.    Thank you, sir.
16          Now, we've heard a little bit about an idea of
17  exclusivity, and the word has been used in a lot of different
18  ways today, and so I just want to clarify a couple of the ways
19  that it's been used.
03:53PM 20          MS. BONN:  And maybe someone could just help me get
21  a little flip chart up here.  I don't know, Billy, if you could
22  help me with that.
23          Okay.  Thank you so much, Billy.
24    Q.    (BY MS. BONN:)  I want to talk about something and
03:53PM 25  I'll just use a shorthand so we all know what we're talking

661

1  about.  We'll call it "same game exclusivity"; right?
2          So let's imagine you're talking about a home market,
3  Los Angeles, and FOX is airing a Rams game.
4    A.    Yes.
03:54PM 5    Q.    One form of exclusivity that FOX expects is that
6  that same Rams game is not going to be broadcast in Los Angeles
7  by some other broadcaster, whether it be CBS or DirecTV;
8  correct?
9    A.    That's one form of the exclusivity.
03:54PM 10    Q.    Correct.  So we'll call this "same game exclusivity"
11  and we'll say there's a FOX Rams game and your expectation with
12  respect to this type of exclusivity is that at the same time,
13  CBS cannot air the Rams game and at the same time DirecTV
14  cannot air the Rams game; true?
03:55PM 15    A.    That's true.  But at the same time, CBS can air a
16  game against the Rams game.
17    Q.    Right.  Fair enough.
18          And, sir, let's talk about DirecTV for a minute.
19          Isn't it true that, by contract, DirecTV actually
03:55PM 20  blocks out this game when Sunday Ticket is being accessed in
21  the Los Angeles market?
22    A.    Blocks out the Rams game?
23    Q.    Correct, sir.
24    A.    Correct.
03:55PM 25    Q.    Okay.  So on the Sunday Ticket package of games

685

```
 1                UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3         HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   IN RE:                        )   Case No.
     NATIONAL FOOTBALL LEAGUE'S    )   MDL 15-2668-PSG (SKx)
 6   SUNDAY TICKET ANTITRUST LITIGATION )
                                   )   Volume 5
 7   _____)   (Pages 685 - 918)

 8

 9         REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                          TRIAL DAY 5
10              TUESDAY, JUNE 11, 2024
                        8:33 A.M.
11               LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22        _____

23     MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
             FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                   (213) 894-2305
```

686

```
 1              APPEARANCES OF COUNSEL:

 2

 3     FOR THE PLAINTIFFS:

 4        SUSMAN GODFREY
          BY:  MARC M. SELTZER
 5        BY:  AMANDA K. BONN
          BY:  KALPANA SRINIVASAN
 6        Attorneys at Law
          1900 Avenue of the Stars, Suite 1400
 7        Los Angeles, California  90067
          (310) 789-3100
 8
          SUSMAN GODFREY
 9        BY:  WILLIAM C. CARMODY
          Attorney at Law
10        One Manhattan West, 50th Floor
          New York, New York  10001
11        (212) 336-8334

12        SUSMAN GODFREY
          BY:  IAN M. GORE
13        Attorney at Law
          401 Union Street, Suite 3000
14        Seattle, Washington  98101
          (206) 505-3841
15

16

17     FOR THE DEFENDANTS:

18        WILKINSON STEKLOFF, LLP
          BY:  BETH WILKINSON
19        BY:  BRIAN L. STEKLOFF
          BY:  RAKESH N. KILARU
          Attorneys at Law
20        2001 M Street NW, 10th Floor
          Washington, DC  20036
21        (202) 847-4000

22

23

24

25
```

687

```
 1              INDEX OF WITNESSES

 2
```

```
 3   PLAINTIFF'S WITNESSES                      PAGE

 4   HANS SCHROEDER

 5     Examination by videotaped deposition    694

 6   DANIEL RASCHER, Ph.D.

 7     Direct Examination by Ms. Srinivasan    695

       Cross-examination by Mr. Stekloff

                                               791
```

688

```
 1              INDEX OF EXHIBITS

 2
```

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 47 | Constitution and Bylaws of the National Football League | 710 | |
| 50 | E-mail | 742 | |
| 51 | E-mail | 743 | |
| 113 | NFL Core Objectives and Media Strategy | 735 | |
| 172 | E-mail | 739 | |
| 351 | E-mail | 727 | |
| 393 | Letter | 912 | |
| 401 | Draft PowerPoint re: Broadcast/Cable Television Negotiations | 736 | |
| 413 | Draft letter | 912 | |
| 612 | E-mail | 694 | 694 |
| 618 | E-mail | 694 | 694 |
| 659 | E-mail | 767 | |
| 672 | NFL TV deals Q&A | 732 | |
| 725 | NFL Contract Summary | 912 | |
| 726 | NFL Media - Sunday Ticket related negotiations | 912 | |
| 736 | Fax | 912 | |
| 770 | E-mail | 745 | |
| 771 | E-mail | 694 | 694 |
| 772 | E-mail | 694 | 694 |
| 775 | E-mail | 694 | 694 |
| 777 | E-mail | 694 | 694 |
| 779 | E-mail | 694 | 694 |
| 787 | E-mail | 694 | 694 |
| 790 | NFL Sunday Ticket pricing overview | 912 | |
| 799 | E-mail | 694 | 694 |
| 800 | E-mail | 694 | 694 |
| 801 | E-mail | 694 | 694 |
| 802 | E-mail | 694 | 694 |
| 806 | E-mail | 694 | 694 |
| 808 | E-mail | 694 | 694 |
| 822 | E-mail | 694 | 694 |
| 830 | E-mail | 694 | 694 |
| 855 | DTV 2012 NFL Sunday Ticket marketing presentation | 912 | |
| 856 | E-mail | 912 | |
| 1136 | "Competitive Balance in Sports, Peculiar Economics Over the Last 30 Years." | 850 | |

701

1  a little bit about the structure of the National Football
2  League?
3      A.   Certainly.  So the National Football League consists
4  of the 32 teams.  Um, they're in two separate divisions, you
5  can see here.  The AFC, which we've heard about has the -- CBS
6  has the AFC package.  There's the NFC.  FOX currently has the
7  NFC package.  And then within each of those conferences,
8  there's four divisions with four teams each.  So you sort of
9  add all that up and you get the 32 teams.
10     Q.   Now, does the NFL, the league, own the individual
11 teams?
12     A.   No.  The teams are -- are independent companies.
13 They own the NFL.  They are the NFL.  And some of them even
14 predate the -- the existence of the NFL, some of the teams,
15 like the Chicago Cardinals, for instance.  Currently the
16 Arizona Cardinals, but they were the Chicago Cardinals.  They
17 existed even prior to the NFL.
18     Q.   So then what is the role of the NFL as an
19 organization with respect to the teams and the games that are
20 played?
21     A.   So the NFL sets the schedule, conducts the draft of
22 the college athletes coming out, puts on the playoffs, the
23 Super Bowl, obviously.  Um, and in this case, they sell media
24 rights, and I think that's obviously one of the main issues in
25 this case.

702

1      Q.   Okay.  For some context, how are the NFL games
2  organized throughout the year?
3      A.   So in August, the teams play three preseason games.
4  They used to play four.  And then in September, October,
5  November, December, sometimes early January, they play the rest
6  of the season.  It used to be 16 games during the class period,
7  now they've added a 17th game.  And then once they sort of get
8  to early January, depending on where everyone stands, then they
9  start the playoffs and they march on to the Super Bowl which we
10 see in early February.
11     Q.   And during the course of the week, when are the most
12 games played?
13     A.   Sunday afternoon, say, a typical week we have
14 16 games, 32 teams each playing each other, that's 16 games.
15 13 of them, 12 of them will be on Sunday afternoon typically.
16     Q.   And who owns the broadcast of those games?
17     A.   So the NFL, on behalf of the teams -- because the
18 teams are the NFL, the NFL on behalf of the teams -- teams own
19 the copyright, that they own the broadcasts.
20     Q.   All right.  I'd like to kind of go back in time to
21 talk about the history of the broadcast rights, and can you
22 tell us why that's important to your analysis as an economist?
23     A.   Yes.  Again, one of the natural experiments that we
24 see here is in the early days of -- of putting live sporting
25 events on television, um, as the NFL became more popular, um,

703

1  individual teams controlled -- you can see here -- controlled
2  the right to telecast their own games.  And so they sold their
3  own games to media companies, and those media companies put
4  them on television.
5      Q.   And at that point, were there different games that
6  could be played through different networks?
7      A.   Yes.  Different teams could contract with different
8  networks, the network would come to their home game, they would
9  produce the game, and -- and broadcast it.  Um, yes.
10     Q.   And did there come a point where that changed in
11 terms of the teams being able to have these games on different
12 networks and decide where they would be shown?
13     A.   Well, so you could see here, you know, once you sort
14 of hit the 1950s, a lot of the -- the NFL teams were -- were
15 selling their -- their games to the networks.  As I mentioned
16 here, the Rams and the Washington Redskins became the first NFL
17 teams to have all of their games televised, both home and away.
18         And right about that time in 1951, the NFL teams
19 decided that they didn't want to broadcast a game into another
20 team's market.  So they were competing and they were
21 broadcasting and different markets were seeing multiple games,
22 but they decided to add what's called "Article X" to their
23 NFL Constitution.  And the constitution is just the rules that
24 they abide by.  It has nothing to do with the U.S.
25 Constitution.

704

1         So SO they added Article X.  And Article X
2  essentially said if two teams -- if the Rams are playing the
3  Giants and they wanted to broadcast that game in San Francisco,
4  right, which they were doing before, they couldn't do that if
5  the San Francisco 49ers were playing a game at home or if they
6  were playing a game on the road and then broadcasting that game
7  back into their home market.  So the idea was they wanted to
8  sort of protect the markets from each other.
9      Q.   And you explained a little bit about the
10 NFL Constitution.  Who decides what goes into the
11 NFL Constitution?
12     A.   So the teams do.  So, again, the teams run the NFL.
13 They decide what goes into the NFL Constitution and the bylaws.
14 They have certain voting procedures if they want to change
15 something.
16     Q.   And how -- how can a team make a change to what is
17 in the constitution?
18     A.   So many of the rules in the constitution require
19 three-quarters of the owners to, say, vote to change something.
20 Other rules require a unanimous vote by all of the owners, so
21 it just sort of depends on the rule.
22     Q.   All right.  Well, let's go back to the timeline.
23 You talked about the addition of Article X to the
24 NFL constitution.  What happened after that was added?
25     A.   So once the teams started to restrict their

1  competition, the Department of Justice, which is one of the
2  agencies that enforces the antitrust laws in the U.S., they
3  sued the NFL in what you see here is a case called
4  *United States v. NFL.* It's often called "NFL 1."
09:21AM 5      Q.    And what was the determination of the Court in
6  NFL 1?
7      A.    So the Court determined that -- let's use our
8  Rams/Giants example. If the Rams were playing the Giants and
9  they wanted to broadcast the game into San Francisco, they
09:21AM 10  would be allowed to as long as the San Francisco 49ers were not
11  playing a home game. But if they were playing a game on the
12  road and they were broadcasting it back into San Francisco, the
13  Rams could also broadcast their game into San Francisco and so
14  fans in San Francisco could sort of choose which games they
09:21AM 15  wanted to watch.
16      Q.    What happened in the marketplace for these games
17  after the Court's ruling in 1953 in NFL 1?
18      A.    So the NFL teams, you know, abided by that rule, but
19  they -- but they were still continuing to -- to market their
09:21AM 20  games individually to -- to, you know, individual media
21  companies. And so you can see here throughout the 1950s up
22  until 1960, you know, four networks were showing professional
23  football games. Three of those were showing NFL games, but one
24  of them was showing American Football League games, which was a
09:22AM 25  new upstart that eventually merged with the NFL that became the

1  AFC.
2      Q.    What happened after this time in 1960 with the teams
3  being able to negotiate independently for their television
4  rights?
09:22AM 5      A.    So the teams decided to get together and consolidate
6  all of their rights up to the NFL. So that's sort of when that
7  first happened, you know, in 1961. And then the NFL tried to
8  cut a deal with CBS to -- to show some of those games.
9      Q.    So what happened when the NFL took these rights and
09:22AM 10  then tried to get a deal done with CBS?
11      A.    So the Department of Justice, again, went to the
12  same Court and decided that that was anticompetitive or thought
13  it was anticompetitive and sued the NFL. So that's
14  *United States v. NFL*, and it's usually called "NFL 2." Um, and
09:23AM 15  that Court found that the new deal, the consolidation deal was
16  illegal.
17      Q.    After that time after the Court's ruling in NFL 2,
18  did the NFL and its teams then stop combining their rights for
19  sale and broadcast?
09:23AM 20      A.    No. They went to Washington, D.C., to ask Congress
21  to give them like a little exemption from the antitrust laws,
22  allowing them to consolidate their rights -- again, they were
23  competing -- now consolidate their rights to a single -- to the
24  NFL and that the NFL then sell those into the marketplace.
09:23AM 25      Q.    And you described that as a little exemption, and in

1  opening, we heard about it kind of being described as a hall
2  pass.
3      Q.    And what's your understanding of the scope of the
4  exemption that the NFL and the teams got from Congress?
09:23AM 5           MR. STEKLOFF:  Objection.  Argumentative.
6           THE COURT:  Sustained.
7      Q.    (BY MS. SRINIVASAN:)  Dr. Rascher, what's your
8  understanding, for purposes of your analysis, of the scope of
9  the exemption that the NFL and the teams got from Congress?
09:24AM 10          MR. STEKLOFF:  Objection.  Calls for legal
11  conclusion.
12          THE COURT:  Overruled.
13          THE WITNESS:  So it is my understanding that the
14  teams were allowed to sell -- you know, the consolidated group
09:24AM 15  could sell their -- their media rights to free over-the-air
16  broadcast stations like NBC, CBS, ABC at the time, and now
17  obviously FOX. But they weren't allowed to sell those games to
18  any sort of paid TV service.
19      Q.    (BY MS. SRINIVASAN:)  And we've all heard a fair bit
09:24AM 20  about over-the-air versus paid TV. But can you remind us
21  again, when we're talking about the exemption applying to free
22  over-the-air television, what does that mean?
23      A.    Right. So ABC, NBC, CBS, FOX are over-the-air
24  networks. There are some others, but those are the main ones.
09:24AM 25  And, you know, ESPN is not. Amazon Prime is not. DirecTV is

1  not: right? That's -- you know, except for the channels on
2  DirecTV that are, but Sunday Ticket is certainly not: right?
3  That's a paid service that if you want to watch those games,
4  you have to pay for them.
09:25AM 5      Q.    And based on your understanding, did the Sports
6  Broadcasting Act allow the NFL teams to license all of the team
7  games to paid television?
8           MR. STEKLOFF:  Objection.  Calls for a legal
9  conclusion.
09:25AM 10          THE COURT:  Overruled.
11          THE WITNESS:  It's my understanding that they were
12  not allowed to consolidate to sell their games to paid
13  television. They could do that independently like they were in
14  the 1950s if they found, you know, a paid service that -- a
09:25AM 15  situation where they could do that, but they couldn't do that
16  as a -- as the consolidated rights.
17      Q.    (BY MS. SRINIVASAN:)  And also, based on your
18  understanding, Dr. Rascher, did anything in the Sports
19  Broadcasting Act prevent the teams from licensing their games
09:25AM 20  individually?
21      A.    No. It is my understanding that the teams, if they
22  wanted to -- the act didn't say that they couldn't do that. If
23  they wanted to, they could sell to, again, paid TV but sell
24  directly to over-the-air televisions themselves if they wanted
09:26AM 25  to.

709

1    Q.    After the passage of the Sports Broadcasting Act,

2  what did you see, observe in the marketplace for the NFL games?

3    A.    Well, so, immediately, the number of -- the number

4  of stations, the number of channels where people could watch

09:26AM 5  games went down because the NFL did its package with CBS.  So

6  there was really one -- one provider.  And then the price for

7  those went up.  The media had to pay more than they were in the

8  past because in the past it was a competitive market which we

9  tend to see lower prices, but when it's a monopolistic market,

09:26AM 10  a market that's being sold by a single entity, they're able to

11  cause a higher price.

12    Q.    And in terms of the teams, did they make more or

13  less money during this timeframe following their -- their

14  exemption under the SBA?

09:26AM 15    A.    Their revenues went up, which isn't surprising,

16  again, just given the situation because they were the single

17  seller.  So their revenues went up.  And I believe within a --

18  about a ten-year period, they went up by -- by, I think, 10X,

19  if I remember correctly.

09:27AM 20    Q.    All right.  I'd like to turn to the time period

21  that's at issue in this case.

22        Dr. Rascher, you're familiar with that; correct?

23    A.    Yes.

24    Q.    And what time period is that?

09:27AM 25    A.    That's 2011 through the 2022, '23 season.

710

1    Q.    And during the period at issue in this case, has the

2  NFL and its teams continued to combine their broadcast rights

3  for their games?

4    A.    Yes.

09:27AM 5    Q.    And if an individual team wanted to license a game

6  on its own, could it do so?

7    A.    Um, no, because they've agreed to not allow

8  themselves to do that.  Right.

9    Q.    Dr. Rascher, can I have you look at TX47 in your

09:27AM 10  binder?

11        (Exhibit No. 47 for identification.)

12        THE WITNESS:  Oh.  These are Larry Jones's binders.

13  Can I put them here?  It says, "Larry Jones."

14        Okay.  Is that mine?  Okay.

09:28AM 15        All right.  Which one?  I'm sorry.

16    Q.    (BY MS. SRINIVASAN:)  TX47.

17    A.    Okay.  Let me put my glasses on here.

18        Okay.  I'm there.

19    Q.    And, Dr. Rascher, can you explain what this document

09:28AM 20  is?

21    A.    Oh.  This is the constitution and bylaws of the

22  National Football League.  So, again, this is sort of their

23  governing rules that they agree upon.

24    Q.    And did you review this constitution for purposes of

09:28AM 25  your expert opinion in this case?

711

1    A.    Yes.

2        MS. SRINIVASAN:  Plaintiffs offer TX47 for

3  admission.

4        THE COURT:  Any objection?

09:28AM 5        MR. STEKLOFF:  Your Honor, we don't object under 703

6  for it to be shown, but I -- I don't -- I don't know if it

7  needs to be admitted through an expert.

8        THE COURT:  For the moment, you may publish.

9        MS. SRINIVASAN:  Thank you, Your Honor.

09:28AM 10    Q.    (BY MS. SRINIVASAN:)  And, Dr. Rascher, can you

11  explain the way the constitution of the NFL lays out their --

12  what ability teams have or don't have to license their

13  broadcast rights?

14    A.    So, generally, again, once they've agreed to

09:29AM 15  consolidate them with the NFL, other than selling preseason

16  games, which they do sell independently, but for the regular

17  season games, um, the NFL does them, and the teams can't sell

18  them.  You can see here that the -- any sort of telecasting or

19  broadcasting of the games must be approved by the commissioner.

09:29AM 20    Q.    And what happens with the money that's earned from

21  the telecasts of the games?

22    A.    So the teams share in that equally.

23    Q.    And is that also a provision contained in their

24  constitution?

09:29AM 25    A.    Yes.

712

1    Q.    And is it shared on any kind of pro rata basis, or

2  how is that revenue divided among the teams?

3    A.    Those revenues are shared equally amongst all

4  32 teams.

09:30AM 5    Q.    Are there situations today -- and I think you

6  referenced one at least -- where the NFL teams can directly

7  license their broadcast rights?

8    A.    Yes.  So those preseason games, the NFL teams

9  themselves can -- can sell those rights.

09:30AM 10    Q.    Dr. Rascher, in your opinion, by the agreements that

11  the NFL teams and the league reached together, what did they

12  create, from your economic perspective?

13    A.    I mean, they created from a competitive environment

14  to a monopoly.  Again, monopoly, mono, means single, so a

09:30AM 15  single seller of the product, which again gives them all that

16  leverage to be able to go to the media and sort of play one off

17  the other to try to get the highest price, as opposed to a

18  bunch of sellers trying to get the media company to buy their

19  product.

09:30AM 20    Q.    And the NFL and the teams together, what market did

21  they have a monopoly in?

22    A.    Professional football telecasting.

23    Q.    And where?

24    A.    In the United States.

09:31AM 25    Q.    How about other sports?  There are other

**713**

```
 1   professional sports.  Do those sports compete with telecasts of
 2   professional football games?
 3        A.   No.  There's a fair amount of -- of academic
 4   research, and some research I did in this case, that shows that
 5   the -- that the NFL games are really in a market of themselves.
 6   They compete with each other somewhat; right?  And we heard
 7   from some of the -- I think the NFL's witnesses that, you know,
 8   the NFL games are in a league by themselves.  They're very
 9   unique, they're very sought after, you know, by the media
10   industry.
11        Q.   And what about the NFL's views of its own games?
12        A.   I mean, the NFL -- so as Brian Rolapp says here,
13   "The NFL football is in a class of its own and is a premium
14   product in and of itself."  And I think that -- that sort of
15   summarizes, I think, the NFL's opinions, and -- and we heard
16   from Mr. Jones I think that summarizes the opinions of some of
17   the media companies too.
18        Q.   Dr. Rascher, are there competitors within the market
19   for telecasts of professional football games?
20        A.   No.  Just the NFL.  In other words, the other -- you
21   may have heard of other upstart leagues:  The United States
22   Football League; right now we have the UFL, United Football
23   League, but they don't compete with NFL.  Fans -- NFL fans and
24   fans in general who are watching pro football are watching the
25   NFL, and they're not switching channels to watch the UFL.
```

**714**

```
 1        So all of these upstart leagues over history have
 2   generally failed except -- when they haven't is when the NFL
 3   has merged with them.  The All-America Football Conference, way
 4   back in the day -- that's how we got the 49ers -- and also the
 5   American Football League I mentioned earlier, right, they were
 6   competing at one point for a very short period of time and then
 7   they merged together.
 8        Q.   And in your expert opinion, does the NFL have market
 9   power in this market for professional football telecasts?
10        A.   Yes.  The NFL has market power, and it has monopoly
11   power.  It's really the only seller of professional football
12   telecasting.
13        Q.   Do individual teams in other professional sports
14   leagues have the ability to sell and negotiate broadcast rights
15   on their own?
16        A.   Yes.  Yes.  The NBA, Major League Baseball, for
17   example, those teams sell their rights locally, then they
18   also -- some of those rights go up to the league, and the
19   league may sell them for a national game of the week or
20   something like that, TNT, basketball if you were a basketball
21   fan.  But, um -- but ultimately most of those games are sold by
22   the teams individually themselves.
23        Q.   And just looking at the monopoly formed by the teams
24   and the NFL league, what is the impact on consumers by the NFL
25   having a monopoly for professional football telecasts?
```

**715**

```
 1        A.   So consumers on Sunday afternoons, a typical -- in a
 2   typical market, they might see three games, but there's
 3   13 games being played.  And so if they want to see those other
 4   ten games, right, they have to go subscribe to DirecTV, put a
 5   dish on their house, pay a -- you know, a thousand dollars a
 6   year, whatever the TV package costs, and then purchase the
 7   Sunday Ticket product.  So it -- it causes harm financially
 8   because they have to make -- take all those steps, but it also
 9   results in the fans not getting to watch those games.
10        And so the -- the household penetration of these NFL
11   games is actually quite low.
12        Q.   Dr. Rascher, we've heard quite a bit about the
13   agreements reached between the NFL league and the over-the-air
14   networks.  How much have the networks paid the NFL for the
15   rights to Sunday afternoon over-the-air games?  During the
16   relevant period in this case.
17        A.   Of course.  Yes.
18        During the class period, FOX and CBS combined have
19   paid over $23 billion to the NFL.
20        Q.   And does that include revenue from the other
21   football games the NFL might show on Sunday, Monday, or
22   Thursday nights?
23        A.   No.  On Thursday nights, sort of when the week kicks
24   off for the NFL, and Sunday nights on NBC and Monday nights on
25   ESPN or ABC, they paid a combined $38 billion during the class
```

**716**

```
 1   period.
 2        Q.   We heard some testimony about something called the
 3   NFL Network.  What is that, Dr. Rascher?
 4        A.   So the NFL in early 2000s -- I would say around
 5   2003, maybe 2004 -- launched its own channel competing with CBS
 6   and FOX and -- and Sunday Ticket.  And that channel shows lots
 7   of programming related to the NFL.  Um, it also has shown
 8   games -- I think we've heard a little bit about showing games
 9   on Thursday nights.  It will show preseason games.  It will
10   often show reruns of games.  So it's a competitor alongside FOX
11   and -- and CBS and Sunday Ticket.
12        Q.   And, by the way, is that NFL Network carried on free
13   television, over-the-air television?
14        A.   No.  It's -- it's carried on in -- by cable packages
15   and other MVPDs, so, you know, your DISH, your DirecTV, your
16   Comcast, Time Warner and so forth.
17        Q.   Does the NFL Network air any Sunday afternoon games?
18        A.   No.  The NFL Network does not air Sunday afternoon
19   games.
20        Q.   Okay.  And I think you started to talk about the
21   availability of games to Sunday afternoon fans.  So I'd like to
22   go back there.
23        We talked about what the number of games fans might
24   be able to watch on Sunday afternoon.  And can you walk us
25   through this demonstrative, Dr. Rascher?
```

721

```
1    One thing we've heard over the course of the trial
2  is that people can go to a bar and watch out-of-market games
3  there.
4         Can you explain why that would be part of what our
09:42AM  5  analysis is here about availability?
6    A.   Yes.  If you choose to go to a bar to watch it
7  because you don't subscribe to Sunday Ticket, that bar has to
8  subscribe to Sunday Ticket in order for you to be able to watch
9  it.  So someone has to subscribe to Sunday Ticket in your area
09:43AM 10  for you to go watch it.
11    Q.   And, Dr. Rascher, what were the number of paid
12  subscriptions for Sunday Ticket during the class period?
13    A.   So the annual paid subscriptions are around
14  24 million for the residential customers.  And so, again, what
09:43AM 15  that means is, in a given year, if you subscribe to
16  Sunday Ticket, that's one paid subscription.  If you subscribe
17  the next year, that's two paid subscription.  That's sort of
18  how the accounting works here.
19         So 24 million annual paid subscriptions for
09:43AM 20  residential customers, and then a little over 500,000 annual
21  paid subscriptions for the -- for the commercial customers.
22    Q.   Yesterday there was some testimony about what games
23  might be shown at the same time as an over-the-air game on
24  Sunday afternoon.  And I wanted to be clear, when DirecTV,
09:43AM 25  through Sunday Ticket, is broadcasting games, are they able to
```

722

```
1  show a game in a local market to compete with that local
2  over-the-air game?
3    A.   No.  So I -- I think I understand your question.
4         So -- right.  If the game was on FOX here, you can
09:44AM  5  see Green Bay Packers at Los Angeles, if that game's being
6  shown on FOX, then Sunday Ticket has to black it out.  So
7  there's never a period where the same game is being showed to
8  the same people.  Right?  It may be shown to Sunday Ticket
9  people over here and it may be shown to -- to people watching
09:44AM 10  FOX over here, but in a given household, there's not a
11  simulcast of it.  It's not occurring at the same time on two
12  different channels.
13    Q.   And you use that term "simulcast."  What is the
14  difference between a simulcast and what we're talking about
09:44AM 15  with Sunday Ticket versus over-the-air games that are offered
16  on Sunday afternoon?
17    A.   So a simulcast really isn't part of this -- of the
18  issues in this case.  The Sunday afternoon games are never
19  simulcast by DirecTV and, say, FOX and CBS.  They -- FOX and
09:45AM 20  CBS show the games where they want to show them, and then
21  DirecTV sort of picks up the open spots in the country and
22  shows the games there, but they're never being shown at the
23  same time on -- on Sunday afternoons in the same spot.
24    Q.   We've heard testimony over the past few days about
09:45AM 25  the nature of the exclusive relationship between the NFL and
```

723

```
1  DirecTV -- and the NFL on behalf of the teams.
2         How long did DirecTV have this exclusivity with the
3  NFL?
4    A.   It's my understanding -- or my recollection that in
09:45AM  5  1994 is when they first contracted with the NFL for the
6  Sunday Ticket, and they had it all the way through 2022 when,
7  then, the NFL, um, contracted instead with YouTube Television
8  for Sunday Ticket.
9    Q.   And in your experience as an economist, is that --
09:46AM 10  do you consider that period of time to be relatively lengthy
11  for an exclusive relationship of the nature here?
12    A.   I mean, that is quite a long time.  You might
13  typically have exclusivity if you've started a product to get
14  it into the marketplace and -- and allow that partner that
09:46AM 15  you're working with to sort of grow it in the marketplace.  And
16  then it might be available in other -- you know, in other
17  distributions.  You may start it at Walmart and you try to get
18  it going, and then you throw it into Target and so forth.
19    Q.   Do other sports leagues, like the NFL or the NBA, do
09:46AM 20  they have exclusive deals with distributors of their games?
21    A.   No.  Um, Major League Baseball, if you want to get
22  the EXTRA INNINGS package, which is their out-of-market
23  package, you can get that through lots of different
24  distributors.  You can get it directly from Major League
09:47AM 25  Baseball and MLB.TV, but you can also get it through Comcast,
```

724

```
1  Time Warner, Spectrum, whatever service that you happen to use.
2    Q.   And is the NFL unusual in that regard from other
3  sports in terms of having an exclusive relationship with one
4  distributor for its Sunday afternoon content?
09:47AM  5    A.   Yes.
6    Q.   We've heard a few times about the types of exclusive
7  arrangements, as they're called, that you might have with some
8  type of content.  And I want to talk to you about that.
9         For example, we've heard this example a few times
09:47AM 10  about the *Game of Thrones* being on HBO.  Is that the kind of
11  exclusivity that we are talking about here when we talk about
12  the DirecTV relationship?
13    A.   No.  *Game of Thrones* -- yes.  It's on HBO.  So it's
14  exclusive to HBO, but it competes with many, many other
09:47AM 15  programs.  Um, HBO competes with Apple TV, Netflix, Hulu, all
16  these other providers.  For that -- so that's exclusivity in a
17  competitive market.  Here, the exclusivity is in a monopoly
18  market: right?  If the NFL teams each sold their games
19  independently to a single channel, they would have an exclusive
09:48AM 20  deal with those channels, but then you could see all the
21  different channels and, say, watch the game.
22         So in order for the -- for the *Game of Thrones*, I
23  think, concept to be relevant here, you would really have to
24  have Apple TV and Amazon and Netflix and Hulu, all of them to
09:48AM 25  come together to collude and then sell their -- their shows,
```

737

1　Dr. Rascher?

2　　　A.　Yeah.  This is a -- this looks like a PowerPoint

3　document studying their broadcast and cable television

4　negotiations.  It's an internal NFL document.

10:06AM 5　　　Q.　Did you rely on that document in the course of

6　preparing your opinions today?

7　　　A.　Yes.

8　　　　　MS. SRINIVASAN:  Any objection to publishing TX401

9　to the jury?

10:06AM 10　　　　　THE COURT:  You may publish.

11　　　　　MS. SRINIVASAN:  Thank you, Your Honor.

12　　　Q.　(BY MS. SRINIVASAN)  What did the NFL know about

13　the impact they would have if they had gone to cable instead of

14　satellite?

10:06AM 15　　　A.　So similar to the other document we looked at, they

16　realized that they could grow the potential universe of

17　households, how many people that they could potentially reach,

18　from 13 million to approximately 90 million.  So cable

19　households continue to rise over this time period.

10:06AM 20　　　　　And so, you know, that's a big jump in the number of

21　potential customers for your product and yet they chose not to

22　do that.

23　　　Q.　We've talked about it from the perspective of the

24　NFL.  Have you seen evidence from the teams that they,

10:07AM 25　likewise, shared the view, along with the NFL, that

739

1　economist, do you study the demand for product?

2　　　A.　Yes.

3　　　Q.　In this case, did you look at the type of demand

4　there was for out-of-market games?

10:08AM 5　　　A.　Yes.

6　　　Q.　Okay.  And I'm just going to show you a slide that

7　was presented in opening, which showed the percentage of

8　subscribers to NFL Sunday Ticket from the total NFL fans.

9　　　　　You were here for that?

10:09AM 10　　　A.　Yes.

11　　　Q.　Does this reflect the demand for out-of-market games

12　that you observed in the course of your analysis?

13　　　A.　No.  When the NFL -- when this was shown by the NFL

14　during the opening statements, I quickly -- you know, I knew

10:09AM 15　how small the Sunday Ticket subscriber base was, but I'm also

16　aware of how many avid fans there are who are interested in

17　watching out-of-market games and then casual fans who are

18　interested in watching out-of-market games.

19　　　Q.　I --

10:09AM 20　　　A.　They're being underserved because I know it's a much

21　bigger number than 3 percent of the fan base.

22　　　Q.　Dr. Rascher, if you could look at TX172 in your

23　binder.

24　　　　　(Exhibit No. 172 for identification.)

10:09AM 25　　　　　THE WITNESS:  Yes.

738

1　distribution should be limited?

2　　　A.　Yes.  We've heard from -- from different witnesses

3　in this case.  Robert Kraft, who owns the New England Patriots

4　who was also, I believe, head of the -- of the NFL's

10:07AM 5　broadcast/media committee at one point, he says -- Mr. Rolapp

6　is indicating that Apple wanted to get a Sunday Ticket package

7　instead of DirecTV, that it could reach 15 to 20 million

8　subscribers.  And his response, Well, if they're outside of the

9　U.S., that may be fine because they're not affecting FOX and

10:07AM 10　CBS.  But it's his opinion, if it's inside the U.S., that

11　that's having too many customers, too many subscribers.

12　　　Q.　And, finally, since we talked about the teams and

13　the networks and the NFL, have you seen evidence about

14　DirecTV's view as to -- and its understanding about the

10:08AM 15　distribution of Sunday Ticket?

16　　　A.　Yes.  Here's Mr. Stecklow who's with DirecTV.  He

17　was a senior executive at DirecTV.  He's explaining this to

18　someone else that the NFL via the broadcast deals don't

19　necessarily want the NFL Sunday Ticket to be available to

10:08AM 20　everyone in the country.  It could affect the ratings of the

21　local games, which are the FOX and CBS games.  So it's to

22　protect the -- those broadcast deals, he essentially says.

23　　　Q.　Dr. Rascher, over the course of this trial, we've

24　heard about Sunday Ticket -- from the NFL -- sorry --

10:08AM 25　Sunday Ticket being for avid fans.  And in your role as an

740

1　　　Q.　(BY MS. SRINIVASAN:)  And can you describe what this

2　document is?

3　　　A.　This is a series of e-mails discussing a research

4　project, a fan research project, from 2019.

10:10AM 5　　　Q.　And who conducted that fan research project?

6　　　A.　The NFL -- or someone on behalf of the NFL.  I'm not

7　certain if it was the NFL internal folks.

8　　　Q.　And did you rely on this analysis in the course of

9　your opinions in this --

10:10AM 10　　　A.　Yes.

11　　　　　MS. SRINIVASAN:  Publish TX172 to the jury.

12　　　　　THE COURT:  You may.

13　　　Q.　(BY MS. SRINIVASAN:)  What did this internal study,

14　either done by the NFL or on behalf of the NFL, what did it

10:10AM 15　find with respect to interest in out-of-market games?

16　　　A.　So there's a lot of interest in out-of-market games.

17　If you sort of look to the left, they're saying there's around

18　75 million avid NFL fans.  Now, 37 million of them in gray may

19　be not interested in out-of-market games.  They live in the

10:11AM 20　market of their favorite team, those are the games they want to

21　watch.  But the difference there, from 75 to 37, is, I think,

22　38 million -- hopefully I did my math right -- so there's

23　around 38 million fans who would like to watch out-of-market

24　games, and farther on the right you see that there's only about

10:11AM 25　3 million who actually get to do that because they subscribe to

743

1  Sunday Ticket or they're, you know, given a subscription to
2  Sunday Ticket as part of joining DirecTV.
3      So there's 38 million fans who want to watch
4  out-of-market games and only 2 to 3 million of them can.  So
10:11AM 5  there's 35 million underserved fans, according to this study,
6  in 2019 in the middle of the class period.
7      Q.   And to be clear, the 35 million, those are -- those
8  are not casual fans, at least according to this study; right?
9      A.   That's very important.  These are 35 million avid
10:11AM 10  fans who are interested in watching out-of-market games.
11      Q.   In the same study that you have before you,
12  Dr. Rascher, that you looked at, was the NFL aware that there
13  was a lot of interest in out-of-market games?  Did you see that
14  in your analysis?
10:12AM 15      A.   Yes.  And this study and in other studies from the
16  NFL.
17      Q.   And what did the NFL studies show about the needs or
18  desires of its fans to be able to get out-of-market games?
19      A.   Yes.  They -- they sort of summarize it here in the
10:12AM 20  subtitle where it says, "Fans' ability to watch their preferred
21  game depends on access.  Fans that don't subscribe to
22  Sunday Ticket and want" -- over the -- or -- "out-of-market
23  games have a high unmet need," and then they sort of describe
24  that on the right, that the primary interest in out-of-market
10:12AM 25  games results in a high unmet need.

---

743

1  gray how many out-of-market fans that they estimate there were
2  that week.  And then there's other slides in this -- in this
3  research package that sort of breaks it out by team, how
4  many -- you know, of the different teams, which teams have the
10:14AM 5  most out-of-market fans, which teams have the least
6  out-of-market fans, but the bottom line is that there are at
7  least 32 million out-of-market fans here.
8      Q.   All right.  And if -- if you could look in your
9  binder, Dr. Rascher, at TX51.
10:14AM 10          (Exhibit No. 51 for identification.)
11      THE WITNESS:  Yes.
12      Q.   (BY MS. SRINIVASAN:)  What is this document,
13  Dr. Rascher?
14      A.   This is another internal NFL document about NFL
10:14AM 15  digital media.
16      Q.   And did you rely on this document in the course of
17  preparing your opinions in this case?
18      A.   Yes, I did.
19      MS. SRINIVASAN:  Your Honor, may I publish to the
10:14AM 20  jury?
21      THE COURT:  You may.
22      Q.   (BY MS. SRINIVASAN:)  All right.  And can you
23  describe what you found from this study, Dr. Rascher, in the
24  course of preparing your opinions?
10:15AM 25      A.   So this study, um, showed that there are around

---

742

1      Q.   And, Dr. Rascher, you mentioned that there were --
2  there were a few studies that you looked at that, likewise,
3  found that there was a large volume of out-of-market interest
4  in -- by fans?
10:13AM 5      A.   Yes.
6      Q.   Can you look at TX50 that's in your binder?
7          (Exhibit No. 50 for identification.)
8      THE WITNESS:  Yes.
9      Q.   (BY MS. SRINIVASAN:)  And is this a -- can you
10:13AM 10  describe what this document is, Dr. Rascher?
11      A.   Yes.  This is -- this is another internalable --
12  internalable -- internal NFL study looking at the Sunday Ticket
13  addressable market.
14      Q.   And did you rely on this study in the course of
10:13AM 15  preparing your opinions in this case?
16      A.   Yes, I did.
17      MS. SRINIVASAN:  And I'll publish TX50 to the jury.
18      THE COURT:  You may.
19      Q.   (BY MS. SRINIVASAN:)  And what did this study find,
10:13AM 20  Dr. Rascher?
21      A.   So this study, um, in 2017, so a few years -- or
22  the -- the assessment is from a few years earlier shows
23  something similar, that there were around 32 million
24  out-of-market fans on average each week.  This particular
10:14AM 25  picture is sort of looking at each week, and you can see in

---

744

1  184 million NFL fans in the United States, which is impressive.
2  I mean, I think everyone agrees that the NFL is very popular
3  and it's the most popular sport in the United States.  And
4  then, of those 184 million, 75 million of them are interested
10:15AM 5  in out-of-market games.  And then, of those 75 million, about
6  31 million are avid fans who are interested in out-of-market
7  games.
8      So, again, you have 75 million fans, either avid or
9  casually, interested in watching out-of-market games and yet
10:15AM 10  you've got a few million who actually subscribe to
11  Sunday Ticket.
12      Q.   And, Dr. Rascher, this presentation's called "NFL
13  Digital Media."  Do you know the context under which the NFL
14  was looking at this fan interest in these different games?
10:16AM 15      A.   Well, the NFL, um, based on the documents I've seen,
16  was constantly looking at -- at potentially moving
17  Sunday Ticket to a -- to what we talked about cable before, we
18  talked about having -- they looked at potentially selling it
19  through, um, some sort of digital package and not just
10:16AM 20  through -- through DirecTV.
21      Q.   And at this time in 2019, were out-of-market games
22  available anywhere but Sunday Ticket?
23      A.   No.
24      Q.   As part of your analysis in this case, did you look
10:16AM 25  at the factors that were keeping fans from being able to join

---

745

```
 1    Sunday Ticket or keeping viewership low for these games?
 2        A.    Yes.
 3        Q.    And if you can look in your binder at TX770.
 4              (Exhibit No. 770 for identification.)
 5        THE COURT:  I'm sorry.  The number again?
 6        MS. SRINIVASAN:  TX770.  770.
 7        MR. STEKLOFF:  Your Honor, no objection to it being
 8    published.
 9        THE COURT:  You may go ahead and publish.
10        MS. SRINIVASAN:  Thank you, Your Honor.
11        Q.    (BY MS. SRINIVASAN)  And, Dr. Rascher, can you
12    explain what this document is?
13        A.    This -- the e-mail here is an internal e-mail
14    between two NFL employees, and they're talking about some of
15    their main takeaways from the insights team.  So the insights
16    team at many companies is what they call the folks who do
17    research about their customers.  Right?  And so you can see the
18    bullet point down there that's highlighted.  It says the cost
19    is far and away the main reason why fans aren't buying
20    Sunday Ticket.  It's the biggest barrier to the subscription of
21    Sunday Ticket.
22        Q.    And that e-mail's attached to an actual study;
23    correct?
24        A.    Yes.
25        Q.    Okay.  And I'm going to have you take a look at this
```

746

```
 1    page from the study that the NFL conducted about the barriers
 2    to subscribers getting on Sunday Ticket.
 3              Dr. Rascher, what did you consider when you looked
 4    at this internal NFL study?
 5        A.    This is -- this was consistent with what I had seen
 6    elsewhere, and the main reason -- or the most common reason why
 7    folks didn't subscribe to Sunday Ticket was it was too
 8    expensive, as you saw summarized in the e-mail, but also they
 9    didn't want to get a satellite subscription.  They might have
10    been happy with their cable or other methods of getting
11    television.  And then they didn't want to put a dish on their
12    roof.  And so those three reasons make it more difficult to
13    join DirecTV and subscribe to Sunday Ticket.
14        Q.    Thank you.
15        MS. SRINIVASAN:  Your Honor, I'm about to move to
16    another topic, if the Court wanted to break or -- I can keep
17    going.
18        THE COURT:  Keep going.
19        MS. SRINIVASAN:  All right.
20        THE COURT:  A few more minutes.
21        MS. SRINIVASAN:  Okay.
22        Q.    (BY MS. SRINIVASAN:)  Looking, Dr. Rascher, at the
23    agreements in this case, along with the evidence you've seen
24    with respect to both price and what was available to potential
25    subscribers or consumers, what was the impact of the agreements
```

747

```
 1    on consumers?
 2        A.    Well, so the agreements harmed consumers because the
 3    price was higher than it would have been in a competitive
 4    situation.  And also, many consumers didn't get Sunday Ticket
 5    who wanted to get Sunday Ticket.  So you sort of have the
 6    overcharge harm, but then you also have the harm to the folks
 7    who don't get to watch the -- the games that they wanted to
 8    watch.
 9        Q.    You previewed for us at the beginning of your
10    testimony that you looked at some natural experiments for what
11    would have happened if this had been a competitive marketplace.
12              Can you tell us a little bit about, as an economist,
13    why you look at these kinds of experiments or what a
14    competitive world would have looked like in performing your
15    analysis?
16        A.    Yeah.  So one of the -- you know, one of the goals
17    is to figure out what the market would have looked like, and
18    yet we don't know because it didn't happen.  Right?  So we try
19    to find indicators -- you know, comparable situations,
20    analogies; sometimes we call them benchmarks, yardsticks, all
21    sorts of different names -- but, essentially, we're looking for
22    information we can use to try to figure out what things would
23    have looked like.  So in this case we happen to have a number
24    of natural experiments that you don't always get when you --
25    when you work on these sort of projects.
```

748

```
 1        Q.    And you mentioned you don't always get them.  In
 2    those cases where you don't have a natural experiment, how do
 3    you go about assessing a competitive world?
 4        A.    Well, you gather data, you -- from maybe the -- you
 5    know, the relevant entities, you analyze that data, um, you
 6    look at maybe before-and-after situations.  Really, you sort of
 7    spend time in these cases.  And I did so, looking at -- you
 8    know, grasping around, trying to find different methodologies,
 9    discovery's coming in, there's depositions, there's data.
10    You're trying to figure out how do we determine what this
11    market would have looked like and then can we measure the harm
12    if, in fact, it is found to be anticompetitive to the class
13    members in this case.
14        Q.    And can you talk about one of those natural
15    experiments -- we'll start with college football -- and why you
16    looked at that as a model of what would happen in the absence
17    of the competitive restraints?
18        A.    Yes.  So college football, I thought, was a -- was a
19    pretty good natural experiment because, prior to 1984, college
20    football looked a little bit like the NFL in that the NCAA had
21    all of the rights of the major colleges, and they -- they took
22    those rights and they sold them as -- as that single monopolist
23    down into the market.  And so on Saturdays pre-1984 -- and I
24    remember this as a kid -- you could really only see a few
25    games, a few college football games on television because,
```

749

1  again, the NCAA had consolidated all of the rights of the -- of

2  the college football games and sold them into the marketplace.

3  So as this shows here, um, you know only one game a

4  week can be shown in each area, so you got that one game.  They

10:22AM 5  even blacked out three of the ten Saturdays of the NFL season,

6  the -- I mean, the college football season used to be ten

7  games, now they actually play 12 games.  And then the team

8  could only appear on television twice, so even a popular team

9  that people might have wanted to see.

10:22AM 10  And so I looked at -- at college football because

11  there are many, many parallels to NFL football.  They're both

12  football.  The production function is similar, like the way

13  that they -- that they play the game and they -- and they get

14  the wins and things like that.  The demand factor that drives

10:23AM 15  people to watch football games, whether live at the stadium or

16  on television, are similar.  They play during the same season.

17  The NFL is very popular, college football is often the second

18  most popular sport.

19  One's on Saturday, one's on Sunday.  So if you look

10:23AM 20  at what's happening on Saturday, right, and you see what is now

21  a competitive market for college football, if you turn your

22  television on Saturday, college football games are everywhere.

23  And yet on Sunday you don't see that.  So I saw a lot of

24  parallels with what a competitive NFL market could look like if

10:23AM 25  it looked more like college football.

751

1  before, and we'll come back to the -- the different members of

2  the conferences.

3  But can you tell us what this is, Dr. Rascher?

4  A.  Yes.  So this is from November 12th of 2022.  This

10:25AM 5  is what you could see on Saturday if you were a college

6  football fan.  I think I counted the other day that there's

7  40 games on here.

8  So -- and these channels are mostly generally

9  available on over-the-air or on -- on basic cable packages.  So

10:25AM 10  you have choices as a fan, regardless of where you live, to be

11  able to watch all of those games.

12  Q.  And how did that compare with the professional

13  football games available on the same weekend?

14  A.  Yeah.  So the next day, this is what you get to see.

10:26AM 15  Um, on CBS you get to see the Jacksonville/Kansas City game, on

16  FOX there's the Minnesota/Buffalo game.  So you're sort of

17  getting a choice of two games, not -- not -- you know -- and

18  then Arizona at Los Angeles Rams, so you get those three games.

19  And then you get the Sunday evening -- so you get four games

10:26AM 20  instead of 40 games, which we see in college sports, the

21  40 games.

22  Q.  And I wanted to go back to something that you raised

23  just now, which is that there are conferences, and that those

24  are reflected in some of the media deals that you talked about.

10:26AM 25  And can you describe generally the conferences in college

750

1  Q.  And we're going to look at some of those schedules

2  for college football, but you talked about college football

3  before 1984, and there was a change in the rules in 1984.  So

4  after that point, what happened with respect to college

10:24AM 5  football teams being able to license their broadcast rights?

6  A.  Yeah.  So after 1984, the rules changed.  And so you

7  can see here, say, the Big Ten, the SEC, and the ACC would give

8  all their rights to the NCAA, like the NFL, and they would sell

9  their rights downstream, in this case, to a single channel,

10:24AM 10  ABC, and you would see that one or maybe sometimes two games on

11  a Saturday.

12  But after 1984, the -- the individual colleges could

13  sell their own rights, and they often sold them through their

14  individual conferences.  So you have multiple conferences.

10:24AM 15  You -- you know, you've got the -- the Pac-12 and the SEC and

16  the Big Ten and the ACC and the Big 12, and you've got the

17  Mountain West.  And you have all of these different college

18  conferences that are all separately competing to sell their

19  games into the media market.  And so you get all these

10:24AM 20  different channels, and there's many more than just the ones

21  listed here, that are showing college football games on

22  Saturday.  So that movement from monopoly or collusive monopoly

23  to competition resulted in a plethora of college football games

24  being shown on Saturdays.

10:25AM 25  Q.  And I want to show the schedule that you referenced

752

1  football?

2  A.  Yeah.  So there are five power conferences.  There

3  were during the -- during the class period.  Then there were

4  five other conferences, like Conference USA and then the

10:26AM 5  Mountain West Conferences.  So you've got all of these teams.

6  The power conferences had around 65 teams; now they have around

7  68 teams.

8  And they compete with each other to sell their media

9  rights.  And, in fact, Notre Dame itself, as a single school,

10:27AM 10  has a deal -- a longstanding deal with NBC.  So when games are

11  played at Notre Dame, those games are on NBC.  That's a single

12  team, single school, selling those rights into the media.

13  And prior to sort of the current era, many of the

14  universities sold their games individually into the media

10:27AM 15  market: Penn State, University of Miami, University of

16  Massachusetts, and others, BYU.  Now most of them sell their

17  rights through these individual conferences.  But the key here

18  is that the conferences compete with each other, and there are

19  many of them.

10:27AM 20  Q.  Now, Dr. Rascher, looking at the 40 games available

21  Saturday in the college football model, did you then determine

22  a way in which the NFL games could be more broadly available

23  during the Sunday afternoon telecast?

24  A.  Yes.

10:27AM 25  Q.  And how did you do that?

753

1    A.    So I looked to see if it was feasible to -- to do
2  what was happening in college football into the NFL.  Could you
3  have the individual teams sell their games, you know,
4  individually, like they used to do in the 1950s, or could you
10:28AM 5  have them in small groups -- in colleges we call them
6  conferences: right?  But in the divisions, earlier we saw that
7  there were the AFC, NFC, and then within each of those
8  conferences, there are four divisions.  So you could have eight
9  divisions.  They could be selling those games as a group into
10:28AM 10  the marketplace, and that is a sufficient amount of competition
11  that you would end up with a situation that's similar to
12  college football.
13    Q.    And I want to talk through a couple of schedules
14  that you prepared as -- during the course of your expert
10:28AM 15  analysis, to show how that would work to give more competition
16  among Sunday afternoon games.
17    Can you walk us through this -- this schedule first
18  that you put together, Dr. Rascher?
19    A.    Yes.  So this is an example schedule from
10:29AM 20  December 13th of 2015.  And choices like the TV -- one of the
21  TV packages on DirecTV.  And so you could take the games that
22  actually existed in the NFL schedule, that the NFL, you know,
23  sets the schedule.  And you can see that CBS and FOX could be
24  showing a couple of games at 10:00 a.m.: ABC, NBC, ESPN, ESPN2,
10:29AM 25  and so forth.  So all the games are available.  Just like a

755

1  having to purchase a Sunday Ticket subscription.
2    A.    Right.  So this is sort of the divisions selling to
3  the major over-the-air networks: ABC, CBS, FOX, NBC.  And then
4  those four sort of act like the way FOX and CBS does today.
10:31AM 5  They rotate -- you know, they put the games on and decide which
6  markets that they're going to put them in.  And if you don't
7  get to see the game at the top, the Eagles at the Seahawks, if
8  it's on ABC, if you're in the North or the East.  But if you
9  want to watch that and you're living in the South, then you go
10:31AM 10  over to the right and you can see that you watch that on ESPN,
11  for instance.
12    So sort of the same idea we have now where the
13  over-the-air games get sort of flexed or moved around by the
14  networks themselves.
10:31AM 15    Q.    And, Dr. Rascher, in both the college schedule we
16  looked at and some of the schedules you showed, there are games
17  that are being shown on channels that are part of a broader
18  media group.  And can you explain how that would work?
19    A.    Yes.  So you can see here, Disney, Paramount, FOX,
10:32AM 20  and Comcast, they each own the four major over-the-air networks
21  in the United States: ABC, CBS, FOX, and NBC.  And then each of
22  those over-the-air networks have sort of sister channels: the
23  ESPNs, CBS Sports Network, FOX Sports 1, FOX Sports 2, the USA
24  channel, which during much of the -- the class period was
10:32AM 25  NBC Sports, right, a separate channel now.  Now they -- they

754

1  Saturday.  You turn your television on, you watch these games,
2  you don't pay, you know, $295 for Sunday Ticket in this more
3  competitive market.
4    Q.    And did you perform other variations of those
10:29AM 5  schedules to make sure that it was feasible to have these
6  games on in a more competitive environment?
7    A.    Yeah.  So in this competitive world that we're
8  trying to figure out what it might have looked like, um, again,
9  we don't know exactly what would have happened, so you look at
10:29AM 10  different variations of, you know, what's likely and what's
11  not, and so forth.  And so this world here still has the NFL
12  selling those games to the over-the-air networks because
13  they're allowed to from the Sports Broadcasting Act.  So
14  they're still selling these CBS and FOX games.  And when now
10:30AM 15  those out-of-market games go to DirecTV and they create the
16  Sunday Ticket package, instead, those out-of-market games would
17  be sold directly by the teams or by -- by the -- by the
18  divisions, um -- I guess in this case it's an example from the
19  teams -- directly into the marketplace.
10:30AM 20    So, again, the result is really the same.  You get
21  to watch the games on CBS and FOX.  If your game you want to
22  watch is not being shown, you turn to ABC, NBC, and so forth.
23    Q.    Finally, here's another schedule that you prepared
24  to show how more games could be shown and, frankly, with the
10:30AM 25  goal that all games be shown nationally on television without

756

1  tend to put those games on USA.
2    Q.    Dr. Rascher, you were here yesterday for the
3  testimony of Mr. Jones from FOX; correct?
4    A.    Yes.
10:32AM 5    Q.    And he -- he made a comment that he thought college
6  football was "a bit of a mess," I think was his term that he
7  used.  And I wanted to get your input, from an economic
8  perspective, of how college football has done since this period
9  after 1984 where it has been competitive.
10:32AM 10    A.    Yes.  I've been studying the economics of college
11  football for 25 years.  Um, college football ratings are up
12  right now.  The media is paying the most money they've ever
13  paid in order to get those games.  Um, there are more teams
14  that are in these power conferences than ever.  We're at
10:33AM 15  68 teams now.
16    Viewership is up.  Attendance is up.  So, since
17  these games have become available since 1984, college football
18  has grown in terms of viewership, in terms of attendance, in
19  terms of revenues.  The revenues have grown at a very high
10:33AM 20  pace, 7 to 8 percent a year: growing, growing, growing each
21  time.
22    And so while teams -- while schools, rather, have
23  moved around some recently, because they're sort of chasing
24  those media dollars, right, college football really is as
10:33AM 25  popular as it's ever been.

769

1    A.    Correct.

2    Q.    And at that time, the NFL continued to proceed with

3  DirecTV; correct?

4    A.    Yes.

11:13A 5    Q.    And so all of those other games that it looked at

6  potentially making available without having to buy

7  Sunday Ticket, that did not come to pass; correct?

8    A.    True.

9    Q.    We've used the term "natural experiment," and it was

11:13A 10  also used yesterday in the examination of Mr. Jones in a

11  different context, and so I'd like to talk about that.

12        It was described -- Thursday Night Football was

13  described as a natural experiment of what would happen if you

14  had other broadcasters showing NFL games.

11:14A 15        MR. STEKLOFF:  Objection to lack of question.

16        MS. SRINIVASAN:  I'll proceed, Your Honor.

17    Q.    (BY MS. SRINIVASAN)  Can you describe what happens

18  on Thursday night with football?

19    A.    So, currently, um, the NFL is contracted with Amazon

11:14A 20  Prime, so if you want to watch Thursday Night Football, unless

21  you live in one of the two markets where it's going to be shown

22  locally on over-the-air channels, you have to subscribe to

23  Amazon Prime's package.

24        In the past, during a part of the class period, FOX

11:14A 25  was showing Thursday Night Football, and then I think we saw

---

770

1  yesterday an example of sometimes when FOX would be showing a

2  particular game on Thursday Night Football, the NFL Network

3  would be showing the same game in the same household.  So

4  that's different than Sunday Ticket, right, where

11:15A 5  Sunday Ticket's showing the game to people who don't have it

6  over the air, right, or you have it over the air and you don't

7  have it -- it's blacked out by Sunday Ticket.  But in this

8  case, the game is being shown on FOX -- you can see here in the

9  graphic -- being shown on the NFL Network, and then also was

11:15A 10  being shown on Amazon Prime.

11        So this is when -- I think I said the phrase

12  before -- a "simulcast," the simultaneous broadcast of the same

13  game.  And this is in the same household in the same markets.

14        And so my -- any of the but-for worlds don't include

11:15A 15  the simulcasting of these games into the same households.  It's

16  really -- you can watch the game on one channel in your market,

17  in your household.  It's either going to be on the over-the-air

18  channel in certain but-for worlds or it's going to be -- or

19  competitive worlds, or it's going to be on ESPN or something

11:16A 20  like that.

21    Q.    All right.  So just to break this down.  When the

22  discussion related to Thursday Night Football, that was about

23  different networks showing the same game?

24    A.    Yes.

11:16A 25    Q.    And your analysis is about there being other games

---

771

1  available to viewers, different games?

2    A.    Yes.  It's essentially taking the Sunday Ticket

3  package, which shows all the games where they're not shown so

4  that way everyone can see them, but -- if you sign up for

11:16A 5  Sunday Ticket and putting those games on -- on broadcast and --

6  and basic cable channels.

7    Q.    Dr. Rascher, did you look at any other actual-world

8  experiments in reaching your opinions in this case?

9    A.    Um, see, we have the 1950s NFL where they sold their

11:16A 10  teams, we have the -- we have the NFL preseason, NFL radio

11  broadcasts.  So, again, I mentioned this earlier that the NFL

12  teams do market and sell their own games during the preseason.

13        During the regular season, they have their own radio

14  deals.  Individual teams have their own radio deals to -- to

11:17A 15  broadcast those games.

16    Q.    And, by the way, before I leave this Thursday night

17  issue that we were talking about, are there other differences

18  between Thursday night and Sunday afternoon games that are

19  relevant, from an economic perspective?

11:17A 20    A.    Yes.  Thursday night, the ratings are higher on --

21  for regular television.  This is an example from one of my

22  reports showing that folks aged 18 to 49, these are the ratings

23  for the top 10 nonsports programs in 2019.  And so you can see

24  the blue line at the top is Thursday prime time.  And those

11:17A 25  ratings are high, and so if you were a network like FOX and you

---

772

1  were thinking of -- of having -- you know, doing an NFL package

2  and showing NFL games, you've got to think about, well, maybe I

3  can show these other programs because lots of people are

4  watching TV on Thursday nights, especially during the class

11:18A 5  period.

6        But that's not the case, you can see, on Saturday

7  and Sunday.

8        So on Sunday, ratings are low, people are doing

9  other things other than watching NFL football.  And same with

11:18A 10  Saturday:  ratings tend to be low except for college football.

11        And so this shows that -- that for the Sunday

12  afternoon packages, there really isn't many alternatives for

13  these channels to be able to show -- they would all love to

14  show -- NFL games, again, the most popular sport in the U.S.

11:18A 15  And this also shows why comparing Saturday afternoon to Sunday

16  afternoon is more appropriate than sort of thinking about

17  what's happening on Thursday nights because you can see similar

18  ratings, so it's a similar media market on those days.

19    Q.    Okay.  Dr. Rascher, in addition to looking at other

11:19A 20  sports, did you also consider things the NFL does today that

21  are relevant -- or, during the class period in this case, that

22  was relevant to your determination of what they could have done

23  in the absence of these competitive limits?

24    A.    Yes.  So I -- I -- as I mentioned before, I looked

11:19A 25  at the NFL preseason and radio just to see that it's feasible

773

1   to be able to do this.  We saw 1950s it was feasible to be able
2   to do this.  I also looked at how Sunday Ticket is sold in
3   Canada where the regulatory requirements require more
4   competition than they do here in terms of these
5   Sunday Ticket-type packages have to be available on multiple
6   distributors.
7       Q.    And what did you learn by looking at how the NFL
8   offers Sunday Ticket in Canada?
9       A.    So, again, you -- you get it through multiple
10  distributors, um, and the price is around $149 U.S. as opposed
11  to $295, and then you can get a streaming version for about
12  $75.  So it's less expensive, same product, but available on
13  multiple distributors.
14      Q.    And have you seen other evidence that support --
15  well, you talked about this ESPN, ABC discussion with the NFL.
16  Did they also talk about a potential price to offer
17  Sunday Ticket at?
18      A.    Yes.  They wanted to offer it around -- for around
19  70 or $75 as opposed to $295 at the time that it's on
20  Sunday Ticket -- I mean, DirecTV, excuse me.
21      Q.    And, Dr. Rascher, can you describe this document?
22  Did you look at it in the course of preparing your opinions in
23  this case?
24      A.    Yes, I did.  This is an e-mail from Brian Rolapp to
25  Roger Goodell who's the commissioner of the NFL.

774

1       Q.    And what did Mr. Rolapp tell Mr. Goodell about
2   ESPN's interest in offering out-of-market NFL games?
3       A.    So Mr. Rolapp was telling Jimmy Pitaro from ESPN
4   that there were elements that they didn't like about ESPN's
5   offer.  Those elements included the low NFL Sunday Ticket price
6   that they wanted to offer at around $70 per season.  ESPN also
7   wanted to sell a team-by-team product, so, again, like
8   Mr. Lippincott, if you're a fan of the New Orleans Saints and
9   you're living in San Francisco Bay area, maybe you just want to
10  buy the Saints package and you don't want to watch -- watch the
11  other teams, and you could have done that through ESPN.  Could
12  have bought the whole package for $70 and then -- and then an
13  individual team package for a price that we don't know what
14  that is.  But presumably less because you wouldn't --
15  otherwise, you'd buy the whole package.
16      Q.    And, to your understanding, did the NFL decide to
17  work with ESPN and come up with the Sunday Ticket package that
18  would be in this price range?
19      A.    No.
20      Q.    The streaming option we saw in Canada, is that
21  available in the United States for out-of-market games?
22      A.    Not if you're able to get a satellite dish on your
23  roof.  I think if you're not able to get a satellite dish on
24  your roof, DirecTV has sort of their Internet package.
25      Q.    But -- but is there a streaming option instead of

775

1   going to Sunday Ticket?
2       A.    No.
3       Q.    And that's an option that's made available in
4   Canada?
5       A.    Yes.
6       Q.    And what's that done through, what service is that?
7       A.    I believe that's done through DAZN and then -- if I
8   remember correctly, it's done through DAZN, which is a -- a
9   sports streaming package.  DAZN's here in the U.S., but it
10  doesn't have Sunday Ticket.  You can watch other things like
11  boxing and so forth.
12      Q.    And, Dr. Rascher, I know you talked earlier about
13  how other professional sports teams don't have the kind of
14  exclusivity that the NFL does with DirecTV.
15            Do some of those sports have streaming options
16  available for their fans?
17      A.    Yes.  You can see Major League Baseball: you want
18  their out-of-market package, you can do it through your normal
19  television provider, but you can also do a direct streaming
20  package to MLB.
21            The NHL actually has a streaming package that they
22  just run through ESPN Plus.  So if you sign up for ESPN Plus,
23  you get all the other sports programming that they offer plus
24  you get the NHL's out-of-market package, and I think that's
25  currently around $10 a month.

776

1       Q.    And, Dr. Rascher, if you could just pull your mic
2   maybe a little bit closer to you.
3       A.    Sorry.
4       Q.    We have heard, and you've heard, over the course of
5   this case that one of the reasons the NFL wanted to limit
6   distributorship is concerns about how many viewers they would
7   get for their over-the-air local games.  Now, you, yourself,
8   did an analysis about what happens to the amount of viewership
9   when you add games.
10            Did you study that in this case?
11      A.    Yes.
12      Q.    And can you explain what you did?
13      A.    So we had another sort of natural experiment
14  where -- on some of the Sunday afternoons, if you remember,
15  there are -- there are one -- there's one game you can see at a
16  particular time slot.  Right?  This is over the air on FOX,
17  let's say.  Other times, there are two games.  And so we wanted
18  to see what's the difference in viewership when you have one
19  game, when you add a second game, what happens to that total
20  viewership?  Does it go up?  What happens to each of the
21  viewerships of the individual games?
22      Q.    And what did you find in your analysis?
23      A.    So over here on the right is sort of adding that one
24  additional game, and so my analysis -- I did a number of
25  different analyses, and it showed that adding that additional

777

1　game increases the total viewership, say, of those two games by

2　25 to 29 percent.

3　　　　So -- and that's not surprising: right?  You have

4　one game on.  If you add a different game, you're going to get

11:25AM 5　some people coming over from that one game to watch, but then

6　you're also going to get people who weren't going to watch

7　that -- that first game, they decide they want to watch a

8　second game because it's teams maybe that they care about.

9　　　　And so you see an increase in the viewership.

11:26AM 10　　Q.　　And did you look at what might happen if you then

11　added multiple games; not just one more game option on Sunday

12　afternoon but multiple games?

13　　A.　　Yes.  And, again, we don't have that same natural

14　experiment, we don't have the third game and a fourth game

11:26AM 15　being shown, um, on -- on the over the air.  But we do have

16　some information from DirecTV itself where you could look at

17　sort of the viewership patterns of the over-the-air games by

18　Sunday Ticket subscribers, and then the viewership patterns of

19　Sunday Ticket subscribers to watch the particular out-of-market

11:26AM 20　games, and so, using that information, you might get up to an

21　additional 43 percent increase in viewership.  So somewhere

22　between sort of just adding the one game for 25 percent, you

23　add additional percentages as you add more games.

24　　Q.　　And, based on your analysis, the idea that

11:26AM 25　viewership would decline by adding more games, which is what

778

1　we've heard, was that consistent with your analysis in this

2　case?

3　　A.　　No.  And, of course, it's illogical in the sense

4　that if you add more choices, right, you're going to increase

11:27AM 5　the total viewership: you're not going to decrease the total

6　viewership.

7　　Q.　　Do you see other things in the course of your work

8　that confirmed your own findings, which you performed with

9　DirecTV data?

11:27AM 10　　A.　　Yes.

11　　Q.　　And can you describe those, Dr. Rascher?

12　　A.　　Yes.  Here's a study from 2011 by Scott Tainsky and

13　Chad McEvoy.  And they were looking at sort of similar

14　questions, even though it was prior to when this case was

11:27AM 15　filed, what happens when you add an additional game in the

16　Sunday afternoon time slots.

17　　　　And so they -- their estimate comes up with

18　24 percent -- jumps are very consistent with the numbers I

19　found, with 25 percent to 29 percent for that single game.

11:28AM 20　　　　And then there's other research that others have

21　published that -- that isn't up here on the screen that also

22　found increases in viewership when you add more choices or more

23　games for the fans.

24　　Q.　　And, from an economic perspective, what does an

11:28AM 25　increase in viewership mean in terms of competition?

779

1　　A.　　So it's a -- in a marketplace, it's increasing

2　output, it's increasing sales: right?  It's -- it benefits

3　those folks who now get to purchase or use that product.  So

4　it's a more competitive outcome to have higher sales, higher

11:28AM 5　viewership, higher subscriptions, and those sorts of things

6　than it is to have lower sales, viewership, and subscriptions.

7　　Q.　　Dr. Rascher, let's talk about how you quantified the

8　harm to Sunday Ticket competitive -- Sunday Ticket customers by

9　the conduct at issue in this case.  And can you tell us what

11:29AM 10　you did to make that determination?

11　　A.　　So I looked at the one example of the college

12　football market and said if these games were made available by

13　the NFL teams, they stopped colluding and selling their games

14　through the NFL -- or at least their out-of-market games, they

11:29AM 15　sold them independently, they sold them in divisions -- like

16　the NFC West had an out-of-market package and went to ABC and

17　sold that, and the AFC goes to NBC and sells that.  In that

18　process, those games then become available, just like on

19　Saturday, on over-the-air channels and on these -- these basic

11:29AM 20　sports cable channels, and so customers don't pay anything

21　extra above what they were already paying for their TV package.

22　　　　So instead of paying, as an example, $295 for

23　Sunday Ticket, they get all those games for zero dollars.

24　　Q.　　And are those class members still paying something?

11:30AM 25　I mean, you say zero dollars, you mean with respect to

780

1　Sunday Ticket?

2　　A.　　Yes, that's right.  So they are paying for the --

3　the -- their television package: right?  And so -- yeah, so

4　they're paying for the television package, whether it's -- in

11:30AM 5　this case the class members were DirecTV class members -- or

6　DirecTV customers, so they would still have their DirecTV

7　package.

8　　Q.　　And how did you determine the total number of -- the

9　total amount of damages in this case?

11:30AM 10　　A.　　So, as I said, instead of paying the amounts that

11　each of the customers paid, right, calculating essentially what

12　is the amount that each customer paid each year, they would

13　have paid zero, and so you just tally up their total payments

14　for Sunday Ticket, and that's about 5.6 billion for the

11:30AM 15　residential subscriptions on the left and then about

16　1.3 billion for the commercial customers.

17　　Q.　　And, to be clear, this is reflective of what

18　customers actually paid for Sunday Ticket?

19　　A.　　Yes.

11:31AM 20　　Q.　　During the opening, there was a reference to the

21　average price that class members paid being $102, 102.74.

22　　　　Do you recall that, Dr. Rascher?

23　　A.　　Yes.

24　　Q.　　And the -- what was said was that the average price

11:31AM 25　was paid by every one of the people in this class.  That means

805

1    on the field; correct?

2        A.    Yes.  Both in rights fees and in production costs,

3    yes.

4        Q.    They -- but they pay hundreds of millions of

01:45PM 5    dollars, the NFL teams, every week to put -- every -- over a

6    season, each NFL team pays hundreds of millions of dollars to

7    put games on the field; right?

8        A.    You mean because they pay their players and they pay

9    their staff, is that what you mean by that?

01:45PM 10        Q.    Exactly.  I'd like to walk through some of those

11    things they have to pay for.  But they do have to pay hundreds

12    of millions of dollars each season, each team, to put games on

13    the field; right?

14        A.    Yes.

01:45PM 15        Q.    That's not something you mentioned when you were

16    showing the revenue, the broadcasting deals; right?

17        A.    No.  I was showing the revenues that were paid by

18    the media companies.

19        Q.    Right.  And you understand basic economics -- I

01:45PM 20    think you usually look at revenues minus costs to determine

21    profits; right?

22        A.    Yes.

23        Q.    Okay.  So some of the things -- and -- and you

24    started to mention them -- that the teams have to pay for, they

01:45PM 25    have to pay the players; correct?

806

1        A.    Yes.

2        Q.    They have to pay their coaches; right?

3        A.    Yes.

4        Q.    Trainers and other staff, including scouts; correct?

01:45PM 5        A.    Yes.

6        Q.    They have to pay for equipment?

7        A.    Yes.

8        Q.    The field?

9        A.    Yes.

01:46PM 10        Q.    There are stadium costs?

11        A.    Yes, there are often stadium costs.

12        Q.    Referees?

13        A.    Yes.

14        Q.    Facilities like locker rooms and training

01:46PM 15    facilities?

16        A.    Yes.

17        Q.    Technology that they have to pay for; right?

18        A.    Yes.

19        Q.    And people like Ms. Yancy who are at the NFL who we

01:46PM 20    heard are watching the games every Sunday to report back to

21    people like Mr. Jones, like we heard yesterday; correct?

22        A.    Yes.

23        Q.    Okay.  That's part of putting on an NFL season are

24    the NFL teams paying these hundreds of millions of dollars

01:46PM 25    every year to put the product on the field; right?

807

1        A.    Yes.

2        Q.    Okay.  Now, Dr. Rascher, you also discussed this

3    morning the fact that before 1961 the Department of Justice

4    sued the NFL; correct?

01:47PM 5        A.    Yes.

6        Q.    Now, since 1961, when Congress passed something

7    called the Sports Broadcasting Act, the Department of Justice

8    has not sued the NFL; right?

9        MS. SRINIVASAN:  Object.  Calls for a legal opinion.

01:47PM 10    It's beyond the scope of the history of broadcasting that

11    Dr. Rascher was to testify to.

12        THE COURT:  Overruled.

13        Q.    (BY MR. STEKLOFF:)  Do you need me to repeat the

14    question?

01:47PM 15        A.    No.  I -- to my knowledge, I don't think the

16    Department of Justice has sued the NFL since 1961.

17        Q.    Okay.  Since the Sports Broadcasting Act; correct?

18        A.    Yes.

19        Q.    Okay.  And we'll come back to talk about the Sports

01:47PM 20    Broadcasting Act.

21        Okay.  Now, I'd like to talk, Dr. Rascher, about

22    what you at the end were referring to as your model.  Do you

23    remember using that language, your model?

24        A.    I don't remember using it, but I'm not surprised if

01:48PM 25    I said that.

808

1        Q.    Another way of putting it it's called -- that you've

2    referred to is the "college football model"; correct?

3        A.    Yes.

4        Q.    And when we talk about -- if we use the word "model"

01:48PM 5    or "analysis," you were trying to do something and create

6    something called a but-for world; right?

7        A.    Yes.

8        Q.    And let's just break that down what that means.

9        The class period is 2011 through the beginning of

01:48PM 10    2023; right?

11        A.    Yes.

12        Q.    And what -- in a but-for world, what you tried to do

13    was to say, Okay, if the behavior that I don't believe should

14    have happened wasn't in place, what would have happened; right?

01:48PM 15        A.    Yes.

16        Q.    Okay.  And what you think would have happened is

17    that the NFL teams should have followed college -- what college

18    football does; right?

19        A.    Well, I wouldn't say "should."  I think that that's

01:49PM 20    a very likely outcome, given the -- you know, the structure and

21    the economic situation.

22        Q.    Okay.  That's -- that's the main outcome that you

23    think is likely of what would have occurred between 2011 and

24    2023 if the teams -- and for out-of-market games had not been

01:49PM 25    allowed to negotiate through the NFL; right?

809

1    A.    Right.  So I think their games would have appeared
2  on over-the-air channels and basic cable channels.
3    Q.    Right.  But my question isn't what you think would
4  have happened; I'm just saying what you were trying to
5  analyze -- you think that the college -- what college football
6  does is the best analogy for what would have happened if the
7  NFL had nego- -- had different negotiations for their
8  out-of-market games; right?
9    A.    Yeah.  That's what I said.
10   Q.    Okay.  And the reason we keep using the phrase "out
11  of market" is because of the Sports Broadcasting Act; correct?
12   A.    Well, I mean, a game that's shown in a market and a
13  game that's shown -- that's not shown in a market, I think
14  that's out of market.  I don't know if that's where the phrase
15  was coined -- coined -- first coined, so I don't --
16   Q.    That was a bad question.
17         In the context of looking backwards in your but-for
18  world of taking away the conduct, the -- the NFL negotiating on
19  behalf of all of the teams for in-network games, to be able to
20  show the games locally for local fans, for the 70 --
21  approximately 70 percent of local fans, that is protected by
22  the Sports Broadcasting Act; correct?
23   A.    Right.  If it's over-the-air games on -- on free
24  television, and so that's -- that's the in-market games, so to
25  speak.  I mean, they -- yeah.  That's good.  Yeah.

810

1    Q.    So I just want to -- this can be confusing, so I
2  just want to make it very clear.
3         There's no dispute in this case that for the
4  in-market games, the local games, for -- for over-the-air
5  broadcasts, the NFL is allowed to negotiate, say, with CBS and
6  FOX for those games under the Sports Broadcasting Act; correct?
7         MS. SRINIVASAN:  Objection, Your Honor.  It does
8  call for a legal conclusion about what the ultimate
9  interpretation of the SBA is.
10        THE COURT:  Overruled.
11        THE WITNESS:  I believe that's true, yes.
12   Q.    (BY MR. STEKLOFF)  Okay.  And that was true from
13  2011 to 2022 -- '3; right?
14   A.    Yes.
15   Q.    It's true today; correct?
16   A.    Yes.
17   Q.    Been true since 1961; right?
18   A.    Yes.  I believe so.
19   Q.    Okay.  And so in your but-for world where you're
20  saying college is the best analogy, you were looking at, well,
21  what should the teams do with respect to the out-of-market
22  games, the games that aren't being broadcast over-the-air
23  locally; right?
24   A.    I mean, that was part of the analysis, yes.
25   Q.    Okay.  So let's talk about college football.  Okay?

811

1    A.    Okay.
2    Q.    Because you say it's the best analogy; right?
3    A.    Yes.
4         MR. STEKLOFF:  Okay.  And may we please pull up the
5  slide -- actually, you know -- well, let me -- I'm going to
6  switch back, hopefully.
7    Q.    (BY MR. STEKLOFF:)  Okay, Dr. Rascher.  This was a
8  slide that you showed during your presentation; right?
9    A.    Yes.
10   Q.    And this slide says, "NCAA as of 2023"; right?
11   A.    Yes.
12   Q.    And that is the National Collegiate Athletic
13  Association?
14   A.    Yes.
15   Q.    So basically this -- these are the teams that play
16  at the highest level of college Football called the Football
17  Championship Series; right?  Or Football Bowl Series?
18   A.    Football Bowl Series, yes, that's correct.
19   Q.    And there are 134 schools listed here; right?  Does
20  that sound right?
21   A.    That sounds about right.  I didn't count them, but
22  yes.
23   Q.    Okay.  Okay.  So 134 schools in the Football Bowl
24  Series that are all competing to try to win the national
25  championship; right?

812

1    A.    Yes.
2    Q.    Now, we can agree some of these teams probably have
3  zero shot at the start of the season; right?
4    A.    Yes.
5    Q.    It's a very narrow group of teams that really have a
6  shot of winning the national championship when the season
7  starts; correct?
8    A.    Yeah.  It tends to be a -- a smaller group of teams
9  obviously than all of FBS, yeah.
10   Q.    Okay.  And of that group, there are five that during
11  the class period, 2011 to 2023, were called, I think you said
12  the "Power Five" or the "Autonomous Five"; right?
13   A.    Yes.  The Power Five, yes.
14        MR. STEKLOFF:  Okay.  So now can we please pull up
15  that slide?  Plaintiff or defendant?  Plaintiff, got it.  Thank
16  you.
17   Q.    (BY MR. STEKLOFF:)  Okay.  And these are those
18  Power Five conferences that existed during that time period;
19  right?
20   A.    Yes.
21   Q.    And so we'll just briefly explain what they are.
22        The Big Ten Conference, that, during this time
23  period, generally had teams that were in the midwest; right?
24   A.    Yes.
25   Q.    Ohio State and Michigan are, for example, two of the

897

1  to the feed in L.A., and the people on -- they're cable, and
2  the people in L.A. don't have access to the feed in New York;
3  correct?
4      A.     So it depends on the situation.  Often there's one
04:01PM 5  feed, there's one production, and then there's two crews, and
6  they take the -- the camera angles and do what they want.
7  Sometimes -- and this is not as common -- it does happen,
8  though -- two production crews come in there.  But, again, you
9  wouldn't need to do that in this situation.
04:02PM 10     Q.     And in this but-for world where -- let's go back to
11  CBS and FOX.  So CBS sends its feed to NBC.
12      Are you with me?
13      A.     Yes.
14      Q.     Are the national ads passing through?
04:02PM 15      A.     So, I mean, now we have the national ads passing
16  through to DirecTV.  Um, one could do it that way, or the
17  national ads don't pass through and then -- and NBC basically
18  pays in order to get those ad rights.
19      Q.     Well, which one do you think is more economically
04:02PM 20  rational, Dr. Rascher?
21      A.     I mean, I don't know which one is, but both of them
22  lead to a similar outcome.
23      Q.     So it doesn't matter?
24      A.     It doesn't really matter.  They would negotiate what
04:02PM 25  to do with the feeds and we -- again, this happens when they

898

1  did it with DirecTV.  This happens anytime, you know, games are
2  broadcast and then feeds head over into different markets.
3  They have to figure out who gets the local ads, who gets the
4  national ads; right?
04:03PM 5      Q.     The broadcasters would certainly care.
6      A.     Yes.
7      Q.     CBS would care if NBC was going to show its -- its
8  ads or not; right?
9      A.     I mean, CBS would like if NBC just showed the CBS
04:03PM 10  thing with all the ads; right?  So that's worth more to CBS:
11  right?  So they would pay more for those rights.  But if,
12  instead, NBC were to receive the feed and they were going to
13  put on their own commercials, then CBS would have paid less for
14  those rights in the first place.
04:03PM 15      I mean, these are sophisticated entities involved in
16  this, and they figured it out in college sports, they would
17  certainly figure it out at the NFL.
18      Q.     Right.  But you're here to tell the jury what the
19  but-for world would have been; right?
04:03PM 20      A.     I'm here to provide -- yes, what are examples of
21  what the but-for world would have been.  Again, we're lucky in
22  this case because all these different but-for worlds lead to
23  the same thing.
24      Q.     They lead to the same thing when you don't consider
04:04PM 25  all of these consequences that you didn't consider; right?

899

1      A.     No.  They still lead to the same outcomes.  This
2  is -- again, this is the most popular programming on
3  television.  You told us, I think, on day one that 93 of the
4  top 100 programs on television are NFL football games.  Right?
04:04PM 5  They will find their way on to these major networks and these
6  major cable stations.
7      Q.     And there will be a lot of eyes on any single game
8  because -- right?
9      A.     More eyes total by quite a bit based on my analysis
04:04PM 10  and that of others --
11      Q.     That wasn't my question.
12      A.     Fewer eyes on individual games.
13      Q.     Right.  Which has advertising consequences; right?
14      A.     Sure.  But there's more total eyes.
04:04PM 15      Q.     It has advertising consequences.  Yes or no?
16      A.     Sure.  So those -- those channels may pay less for
17  those rights; right?  That's what we expect.  When you go from
18  monopoly to competition, we expect the monopolist to do worse
19  off in a competitive market because all those teams are
04:05PM 20  competing with each other.  That's a competitive outcome.
21      And more eyeballs watching more games, up to
22  43 percent more, at least 25 percent more, according to other
23  published research but also the work that I did in this case.
24      Q.     So, Dr. Rascher, I just want to summarize this and
04:05PM 25  then move on to a new topic.

900

1      I'm trying to figure out where the top is.  All
2  right.
3      So I'm going to write here -- sorry --
4  "Dr. Rascher's college football but-for world."
04:06PM 5      And you agree -- sorry.  You agree with me that you
6  can't tell me whether the teams would have negotiated
7  individually or in groups from 2011 to 2023; right?
8      A.     Again, the NFL, FOX, CBS, and DirecTV caused the
9  situation that we can't know exactly what would happen because
04:06PM 10  of the challenged conduct.  So I'm giving you different but-for
11  worlds that tend to end up in the same spot, but I can't tell
12  you exactly whether they would keep the FOX and the CBS deals
13  or whether the individual teams would go out and strike
14  deals -- again, we've seen that in college sports -- or whether
04:06PM 15  they would form small groups like their divisions and go out
16  and strike deals, which we also see in college sports.  But in
17  the end, these games would appear on over-the-air networks and
18  on the -- on the major cable stations.
19      Q.     Okay.  I'm going to ask my question again.
04:07PM 20      You can't tell the jury whether in your but-for
21  world the teams would have negotiated individually or in
22  groups; correct?
23      A.     Again, those are both possible outcomes.  I don't
24  know which one -- I think probably in groups because, as I
04:07PM 25  said, competitive firms tend to collude together if they're

919

```
 1            UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3       HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   IN RE:                        )   Case No.
     NATIONAL FOOTBALL LEAGUE'S    )   MDL 15-2668-PSG (SKx)
 6   SUNDAY TICKET ANTITRUST LITIGATION )
                                   )   Volume 6
 7   _____)   (Pages 919 - 1154)

 8

 9       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                      TRIAL DAY 6
10            WEDNESDAY, JUNE 12, 2024
                       8:35 A.M.
11             LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22

23   MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
          FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, ROOM 4455
          LOS ANGELES, CALIFORNIA  90012
25               (213) 894-2305
```

920

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4      SUSMAN GODFREY
        BY:  MARC M. SELTZER
 5      BY:  AMANDA K. BONN
        BY:  KALPANA SRINIVASAN
 6      Attorneys at Law
        1900 Avenue of the Stars, Suite 1400
 7      Los Angeles, California  90067
        (310) 789-3100

 8

 9      SUSMAN GODFREY
        BY:  WILLIAM C. CARMODY
10      Attorney at Law
        One Manhattan West, 50th Floor
11      New York, New York  10001
        (212) 336-8334

12      SUSMAN GODFREY
        BY:  IAN M. GORE
13      Attorney at Law
        401 Union Street, Suite 3000
14      Seattle, Washington  98101
        (206) 505-3841

15

16

17   FOR THE DEFENDANTS:

18      WILKINSON STEKLOFF, LLP
        BY:  BETH WILKINSON
19      BY:  BRIAN L. STEKLOFF
        BY:  RAKESH N. KILARU
20      Attorneys at Law
        2001 M Street NW, 10th Floor
21      Washington, DC  20036
        (202) 847-4000

22

23

24

25
```

921

```
 1            INDEX OF WITNESSES

 2
```

| 3 | PLAINTIFF'S WITNESSES | PAGE |
|---|---|---|
| 4 | DANIEL RASCHER, Ph.D. | |
| 5 | Cross-examination (Resumed) by Mr. Stekloff | 931 |
| 6 | Redirect Examination by Ms. Srinivasan | 956 |
| 7 | BRIAN ROLAPP | |
| 8 | Direct Examination by Mr. Carmody | 965 |
| 9 | Cross-examination by Mr. Kilaru | 1049 |
| 10 | Redirect Examination by Mr. Carmody | 1110 |
| 11 | ALEX KAPLAN | |
| 12 | Examination by videotaped deposition | 1150 |
| 13 | FRANK HAWKINS | |
| 14 | Examination by videotaped deposition | 1150 |
| 15 | STEVEN SMITH | |
| 16 | Examination by videotaped deposition | 1151 |

```
17
18
19
20
21
22
23
24
25
```

922

```
 1            INDEX OF EXHIBITS

 2
```

|  |  |  | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|---|
| 3 | NUMBER | DESCRIPTION | | |
| 4 | 151 | E-mail | 1035 | 1035 |
|  | 172 | E-mail | | 1105 |
| 5 | 190 | E-mail | 1075 | 1075 |
|  | 198 | E-mail | 1080 | 1080 |
| 6 | 206 | E-mail | 1112 | |
|  | 243 | E-mail | 1025 | 1025 |
| 7 | 279 | Transcription of podcast episode | 1043 | |
| 8 | 401 | Draft PowerPoint re: Broadcast/Cable Television Negotiations | | 1150 |
| 9 | | | | |
| 10 | 416 | E-mail | 994 | 994 |
|  | 417 | E-mail | 986 | 986 |
|  | 438 | E-mail | 1121 | 1128 |
| 11 | 440 | E-mail | 1006 | 1006 |
|  | 465 | E-mail | 1017 | 1017 |
| 12 | 504 | E-mail | 1151 | 1151 |
|  | 692 | E-mail | 1111 | 1111 |
|  | 697 | E-mail | 1023 | 1023 |
| 13 | 700 | E-mail | 1016 | 1016 |
| 14 | 788 | E-mail | 1030 | 1030 |
|  | 870 | Sports Media Watch article: "2021 College Football TV Ratings" | 961 | |
| 15 | | | | |
| 16 | 1000 | E-mail | | 1001 |
|  | 1125 | E-mail | 1067 | |

```
17
18
19
20
21
22
23
24
25
```

967

1  Q.   Sure.

2       Because NFL professional football is so valuable, it
3  comes with a high media -- excuse me -- a high advertising
4  demand; correct?

09:58AM 5  A.   Yes.  It is consistently the most viewed programming
6  on television and as a result it attracts a lot of advertisers.

7  Q.   And you previously testified that the only sure bet
8  for advertisers is NFL football.  Fair?

9  A.   I believe that's the case.

09:58AM 10  Q.   And you've also said that the NFL is a media company
11 as much as it's a sports company; correct?

12 A.   I think when you look at the percent of revenues
13 that the NFL makes, media certainly is the highest percent of
14 revenues, so by that -- by that math, I'd say it's more of a
09:58AM 15 media company in how it makes its money.

16 Q.   And your testimony in this case, you've been --
17 you've testified a couple of times in this case.  Fair?

18 A.   I've been deposed.  I haven't testified.  I don't
19 know if that's the same thing.

09:59AM 20 Q.   Yeah.  Under oath in a -- in a conference room, now
21 you're in the courtroom.  Fair?

22 A.   Fair.

23 Q.   Okay.  And when you testified previously, you said
24 the lion's share of the NFL's annual revenues comes from the
09:59AM 25 licensing of its media rights; correct?

968

1  A.   Correct.

2  Q.   Now, I want to kind of go back to the beginning.

3       The NFL is made up, we know, of 32 teams; correct?

4  A.   Correct.

09:59AM 5  Q.   And before the start of any regular season of the
6  NFL, there's a preseason; correct?

7  A.   Yes.

8  Q.   And in that preseason, the 32 teams compete against
9  one another for the licensing of their own telecast rights;
09:59AM 10 correct?

11 A.   In the preseason, each club has the ability to
12 license preseason games within their franchise territory.

13 Q.   And that's worked out well over the years; correct?

14 A.   I think it's -- it's worked fine.  I think it's
09:59AM 15 fine.  I think preseason, um, is probably our least viewed and
16 interesting games, um, so I think clubs have had varying levels
17 of success when you look at revenue or the production quality
18 of those games.

19 Q.   But the bottom line is that process continues, that
10:00AM 20 is, in a preseason, the teams actually compete against one
21 another by setting up their own local telecast rights.  Fair?

22 A.   I don't know if they compete with one another
23 because they don't really distribute outside of their local
24 territory.

10:00AM 25 Q.   Same with radio, correct?

969

1  A.   Radio is similar, yes.

2  Q.   But the regular season is very different; correct?

3  A.   Regular season is different.

10:00AM 4  Q.   The fact of the matter is the 32 teams do not
5  compete against one another for the sale of their telecast
6  rights; correct?

7  A.   I think the -- the clubs pool all of their rights at
8  the league level and it's the league's responsibility to then
9  license those rights.

10:00AM 10 Q.   And what you previously said is the 32 teams have
11 ceded their telecast rights to the NFL, the league; correct?

12 A.   Yeah.  They've decided, as ownership, because they
13 own the league, to collectively negotiate the rights from the
14 league level.

10:01AM 15 Q.   And so the NFL, then, acting as the agent for the
16 32 teams goes out, and that's your job, to monetize, to make
17 money on those telecast rights; correct?

18 A.   Yeah.  It's my job to make sure we secure broad
19 national distribution to keep viewership up, and as part of
10:01AM 20 that, those negotiations also get economic return.

21 Q.   And the teams' 32 owners have to approve all the
22 contracts that you would enter into on their behalf; correct?

23 A.   Correct.

24 Q.   And, in fact, they're the beneficiaries of all the
10:01AM 25 profits from the telecast rights that the NFL as an agent

970

1  monetizes for the teams owners; correct?

2  A.   Yeah.  They get half of the revenue from those
3  contracts, the other half goes to the players.

4  Q.   And you, sir, work at the league office; correct?

10:01AM 5  A.   Yes.

6  Q.   And the league office serves as a kind of
7  administrative function to -- on behalf of the 32 teams;
8  correct?

9  A.   Correct.

10:02AM 10 Q.   And you serve at the pleasure of those teams;
11 correct?

12 A.   Yeah.  We work for the -- for the owners of the
13 National Football League.

14 Q.   Now, I'm going to talk for a moment about
10:02AM 15 exclusivity.  It's something we haven't yet heard in this case.

16       We know that the NFL gave DirecTV exclusivity for
17 the out-of-market games; correct?

18 A.   Correct.

19 Q.   And that was for a full 28 years; correct?

10:02AM 20 A.   That sounds right.

21 Q.   That's a long period of time.  Fair?

22 A.   Yeah.  There were several renewals they would have
23 to renegotiate along those 28 years, so the initial term wasn't
24 28 years, but that represents several different negotiations.

10:02AM 25 Q.   From 1994 to 2022; correct?

1011

1        Q.    I mean, looking at this now, in fairness, the Judge
2   and the jury, we can't see what the NFL response is on
3   January 13th to FOX's position that they want a floor of the
4   Sunday Ticket pricing to be $293.96?
11:16AM 5        A.    Yeah.  What I would say is in these negotiations,
6   there is a ton of back and forth -- verbal, written, ton of
7   documents.  This document may exist in a separate document.  I
8   don't remember it.  What I do remember is what the
9   conversations were and what the agreement was.  And we were
11:16AM 10  very clear that the restrictions that FOX wanted, we would not
11  do for numerous reasons.  And our view was we would make it a
12  complementary product that is premium, and that's where we
13  ended up.
14                And I think FOX tried a lot of things to -- they
11:17AM 15  tried price, they tried distribution, they tried -- which I
16  think is -- you'll see in all these documents.  They tried
17  every which way to do it.  But that's not -- that's not what we
18  agreed to.
19        Q.    Okay.  Go back to Exhibit 1000, please, and all I
11:17AM 20  want to look at is 1A and I want to go down a few where it
21  talked about the streaming price.
22                So here's the question.
23                You have -- yeah.  Right --
24        A.    I'm sorry.  This is which document, sir?
11:17AM 25       Q.    I'm sorry, sir.  We're going to go back to what we

1013

1        A.    I don't remember, but that sounds directionally
2   right.
3        Q.    Which is -- in fairness, I mean, that's materially
4   higher than 300; correct?
11:19AM 5        A.    That is higher, yes.
6        Q.    Materially.  I mean 16.3 percent higher?
7        A.    Again, it's higher, sure.  It's higher.
8        Q.    Well, if we go back to Exhibit 417 for a moment, we
9   can see the pricing historically, and is it accurate to say
11:19AM 10  that when we look at 417, we can see the highest price increase
11  ever was 8.6 percent and that would be in the year 2014;
12  correct?
13        A.    Yeah.  That's it.
14        Q.    So in fairness, we're like doubling -- you know, we
11:19AM 15  have 16.3 percent.  And you would agree that's materially
16  higher than 300; correct?
17        A.    Yeah.  I think the price is higher than it was --
18  materially than it was ten years ago.
19        Q.    Why was FOX demanding a price or wanting a price
11:20AM 20  that you'd been telling it was impossible to get?
21        A.    Well, because FOX always felt that Sunday Ticket was
22  going to be a substitute for what they did, which was free
23  football over the air, and was going to erode into their
24  exclusivity.  They were also concerned that if it did, they
11:20AM 25  would invest less in football, they would look at different

1012

1   were just looking at.  It's Exhibit -- this is it.
2                So right here where it says "Outside Pay TV," again,
3   we just looked forward and we can't see the January 13th
4   response.  But we see what FOX wanted, which is a price that's
11:17AM 5   going to begin for the season 2023 that's materially higher
6   than 300.
7                Do you see that?
8        A.    Yeah, I do.
9        Q.    Did they get what they wanted?
11:18AM 10       A.    No.  I mean, they were -- they were looking for us
11  to put all sorts of restrictions how the product was priced and
12  distributed that we never agreed to.
13       Q.    No.  But what I'm saying specifically, sir, it's the
14  first two lines of -- of this.  It says that any price that is
11:18AM 15  materially greater than the current fee.  The current fee was
16  the $294.  My question is, in real life, didn't FOX get what it
17  wanted?  In other words, wasn't the price for Sunday Ticket in
18  the year 2023 materially greater than $300?
19       A.    I -- I don't remember the price, um, that YouTube
11:18AM 20  set it up.  That sounds directionally right.  I don't recall
21  offhand, but at the end of the day, I think when we ended up
22  doing our YouTube agreement with the same provisions -- which
23  is we don't set price, they do -- they made the decision to
24  price it the way they priced it.
11:19AM 25       Q.    They priced it at $349; correct?

1014

1   models like putting on cable television which people would have
2   to pay for.  And so I think if FOX had their druthers, it would
3   probably go away altogether.  I don't know.  You'd have to ask
4   them.  So -- so they -- they thought that Sunday Ticket could
11:20AM 5   be a threat to what -- what they -- what they did.
6        Q.    Okay.  Now, before we get -- we're going to end with
7   what happens with Google, which is the current contract,
8   correct, for Sunday Ticket?
9        A.    Yep.
11:20AM 10       Q.    Before we get there, it didn't just start and stop
11  with Google.  In fairness, the NFL was talking to other bidders
12  for Sunday Ticket as well; correct?
13       A.    Yes.  We had lots of conversations.
14       Q.    And when the NFL spoke with these other bidders, one
11:21AM 15  of the topics the NFL wanted to talk about was their potential
16  pricing of Sunday Ticket; correct?
17       A.    I think everybody had a view on price who bid for
18  the product, yes.
19       Q.    But my specific question is one of the key factors
11:21AM 20  the NFL was thinking about is, if I'm talking to you, Apple, or
21  I'm talking to you, ESPN or others, we want to know how you're
22  thinking about the pricing of Sunday Ticket.  Fair?
23       A.    Yeah.  In order to achieve our objective of -- to
24  make it a premium complementary product, we were interested in
11:21AM 25  a lot of things: the product, the marketing, the distribution.

1   Pricing was one of the elements, one of the many elements. We

2   were interested -- whenever we license our rights to somebody,

3   it's important that we understand how they're going to

4   distribute to our fans and what it's going to look like.

11:21AM 5   Q.    And so is it accurate to say, when you spoke with

6   Apple, for example, you wanted to incentivize them to keep the

7   Sunday Ticket price high?

8   A.    We wanted to incent them to make sure it maintained

9   to be a premium product.  We don't control price, so there's --

11:22AM 10  there's no way we could control price.  We wanted to make sure

11  it was primarily complementary and additive to our Sunday

12  afternoon model.

13  Q.    Is the answer to my question "yes"?

14  A.    What is your question?

11:22AM 15  Q.    My question is:  When you were speaking with Apple,

16  did you want to incentivize them to keep the price of

17  Sunday Ticket high?

18  A.    We wanted them to keep the price consistent with the

19  premium product as long as -- with the distribution, everything

11:22AM 20  else, whatever that happened to be, knowing that we can't

21  control price.

22  Q.    But you told them you wanted a high Sunday Ticket

23  price.  Fair?

24  A.    We told them we wanted to make sure it was

11:22AM 25  consistent with the premium product, whatever that meant.

---

1   Q.    Okay.  Let's offer Exhibit No. 100.  This is an

2   e-mail from you to Robert Kraft -- or 700, I'm sorry.

3   A.    700?

4   Q.    Yes.

11:23AM 5   MR. KILARU:  No objection, Your Honor.

6   THE COURT:  Admitted.

7   (Exhibit No. 700 for identification

8   and received into evidence.)

9   Q.    (BY MR. CARMODY:)  So what we're looking at, sir, is

11:23AM 10  a September 23rd, 2021, e-mail, from yourself to Robert Kraft

11  who owns the New England Patriots.  Correct?

12  A.    Correct.

13  Q.    And you're filling him in on -- you're keeping him

14  abreast of negotiations you had been having with Apple to be

11:23AM 15  potentially the next distributor of Sunday Ticket; correct?

16  A.    Correct.

17  Q.    Okay.  And if we just turn to just the last sentence

18  of the last paragraph -- this paragraph, it says, "The

19  counter" -- and you're talking about a counter from the NFL to

11:24AM 20  FOX -- "The counter would also include a suggested retail price

21  model that would provide incentive for them to keep the price

22  high."  And "them" is referring to Apple; correct?

23  A.    Correct.

24  Q.    And now, take a look -- you prepared for Mr. Kraft,

11:24AM 25  again for the New England Patriots, talking points for a

---

1   meeting he was going to have with Tim Cook who was the CEO of

2   Apple; correct?

3   A.    Correct.

4   Q.    Now let's take a look and offer 465.

11:24AM 5   (Exhibit No. 465 for identification.)

6   THE WITNESS:  465?  Okay.  Here we go.

7   MR. KILARU:  Just a foundation, Your Honor.

8   Q.    (BY MR. CARMODY:)  Sir, this is an e-mail from you

9   to Roger Goodell and talking about talking points for

11:25AM 10  Robert Kraft's meeting with Tim Cook; correct?

11  A.    Correct.

12  Q.    You remember writing this; correct?

13  A.    It's coming back to memory, yes.

14  Q.    Okay.

11:25AM 15  MR. CARMODY:  I offer it.

16  THE COURT:  Admitted.

17  (Exhibit No. 465 received into evidence.)

18  Q.    (BY MR. CARMODY:)  Now, let's take a look at 465.

19  What we have here is an e-mail, as I said, from yourself to the

11:25AM 20  commissioner, Mr. Goodell.  We see the date, 11/27/2018.  And

21  if we look at the title, it says, "RKK," referring to

22  Robert Kraft, the owner of the Patriots, his talking points

23  with Tim Cook who's the CEO of Apple; correct?

24  A.    Correct.

11:26AM 25  Q.    And you wrote this up to kind of arm Mr. Kraft

---

1   some points that he should make in his meeting with Mr. Cook.

2   Fair?

3   A.    Fair.

4   Q.    And if we look under "Why Apple," what you say is,

11:26AM 5   "NFL Sunday Ticket is a subscription/premium-priced product."

6   Correct?

7   A.    Correct.

8   Q.    And there's no dispute here, is there, that

9   Sunday Ticket, when DirecTV had it, was always premium-priced.

11:26AM 10  Is that fair?

11  A.    I think for the most part we felt that it was

12  premium-priced and was positioned as a premium product.

13  Q.    But I'm just -- I'm saying -- let's forget about the

14  word "product" for a moment and talk about the pricing.

11:26AM 15  I mean, you've spoken publicly during the class

16  period about Sunday Ticket being premium-priced; correct?

17  A.    I think price is one of the many factors that goes

18  into what a premium product is.

19  Q.    So we can agree, before we move on, that you wanted

11:27AM 20  Mr. Kraft to know to communicate with Apple's Tim Cook, that

21  NFL Sunday Ticket is a subscription, then it says, slash,

22  premium-priced product; correct?

23  A.    Yeah.  We felt our product, Sunday Ticket, was

24  premium -- of value and should -- and should reflect that,

11:27AM 25  certainly relative to other sports packages and everything else

---

1023

1    dated in May when you were taken individually.

2    A.    May 18?

3    Q.    Yes, sir.

4    A.    Okay.  Yes.

11:32AM 5    Q.    So we see here -- the question was asked -- on page

6    129 on line 10, the question to you was:  "Who would you say is

7    the person most knowledgeable at the league about how

8    Sunday Ticket is priced?"

9          And your answer was:  "I don't know -- I don't

11:33AM 10   know -- I don't know who that would be, quite frankly."

11          Correct?

12   A.    Yes.

13   Q.    Okay.  Now, let's take a look, sir --

14         MR. CARMODY:  And I'm going to offer 697.  Let me

11:33AM 15   get a copy for you.

16         THE COURT:  Any objection?

17         MR. KILARU:  No, Your Honor.

18         THE COURT:  697 admitted.

19             (Exhibit No. 697 for identification

11:33AM 20              and received into evidence.)

21   Q.    (BY MR. CARMODY:)  So what we're looking at here,

22   sir, there's a couple e-mail -- or let me see.  I guess it's

23   just two e-mails in sequence.

24         First, we have one of you below and then we see one

11:33AM 25   up top from Mr. Kraft to yourself and to the commissioner,

1025

1    idea of ESPN coming in and for the entirety of the whole season

2    charging $70 for Sunday Ticket; correct?

3    A.    I think that was one of the elements.  I think $70

4    and the team-by-team, the entire product and offering they were

11:35AM 5    going to make to consumers, we felt was not going to be

6    complementary to Sunday afternoon.  So those things all put

7    together did not feel right, which is one of the principal

8    reasons we didn't go with Disney.

9    Q.    Okay.  And now, after this bidding ended, you talked

11:35AM 10   to a number of people, you do a deal with Google; correct?

11   A.    Correct.

12   Q.    And Google, as I said earlier but just to be sure,

13   they own YouTube TV; correct?

14   A.    Yes.

11:36AM 15   Q.    And so now Sunday Ticket is distributed over

16   YouTube TV?

17   A.    As well as YouTube itself, yes.

18   Q.    And on behalf of the NFL --

19         MR. CARMODY:  And let me offer Exhibit 243.  That's

11:36AM 20   the contract.

21         THE COURT:  Any objection?  Any objection?

22         MR. KILARU:  No, Your Honor.

23         THE COURT:  243 admitted.

24             (Exhibit No. 243 for identification

11:36AM 25              and received into evidence.)

1024

1    Roger Goodell, and talking about hosting him at a fireside chat

2    on Monday, but the person you're talking about is a gentleman

3    named Jimmy Pitaro who is the president of ESPN; correct?

4    A.    Correct.

11:34AM 5    Q.    And when we take a look together at your e-mail

6    below, what you're informing them is you're giving them a

7    little status update about negotiations you have had with

8    Jimmy Pitaro about ESPN coming in and potentially being the new

9    Sunday Ticket distributor; correct?

11:34AM 10   A.    Correct.

11   Q.    And if we look at the fifth paragraph down, it says,

12   "There were elements of the structure I told him we do not

13   like."  It goes on to say, "Those elements included the low NFL

14   Sunday Ticket price points they were willing to offer, $70 a season,

11:34AM 15   and offering to sell on a team-by-team product."

16         And what "team-by-team product" means is a fan could

17   turn on Sunday Ticket and instead of buying all the teams, the

18   entirety of the package, if someone was a New Orleans Saints

19   fan, he or she could just turn on and watch the Saints;

11:35AM 20   correct?

21   A.    Correct.

22   Q.    And when you said, "We don't like that," you're

23   referring to the NFL didn't like that; correct?

24

11:35AM 25   Q.    And to be clear about it, the NFL did not like the

1026

1    Q.    (BY MR. CARMODY:)  So without getting into the

2    details, we know you signed the contract on behalf of

3    NFL Enterprises with Google; correct?

4    A.    I believe that's right, yeah.

11:36AM 5    Q.    And the 32 owners approved it; correct?

6    A.    Yes.

7    Q.    And unlike with DirecTV, this was a little bit

8    different because with DirecTV, if you recall, for a subscriber

9    to be able to access Sunday Ticket, they first had to buy the

11:36AM 10   underlying service of DirecTV, which, during the class period,

11   was typically about a thousand dollars.  Fair?

12   A.    That sounds directionally right.  I don't remember

13   the exact number.

14   Q.    And then, after paying the thousand dollars for the

11:37AM 15   subscription, they had to continue to pay -- during the class

16   period, I think the low is $200 for the subscription -- I'm

17   talking about just the basic package -- and the high was 335.

18         Does that sound about right?

19   A.    I don't remember.  I just remember it was pretty

11:37AM 20   consistent with cable and pay TV generally.

21   Q.    But now what we have with Google is somebody could

22   come on, even if they're not a Sunday Ticket -- excuse me --

23   even if they're not a YouTube TV subscriber or anything to do

24   with YouTube, they could come in and buy that same package that

11:37AM 25   used to cost about $1300 and now they get it for $449 about ten

1027

| | |
|---|---|
| 1 | years later; correct? |
| 2 | A.    Yeah, you could -- right now with YouTube, if you |
| 3 | wanted to get YouTube TV, you could buy YouTube TV and get |
| 4 | Sunday Ticket.  If you had -- did not want YouTube TV, maybe |
| 11:37AM 5 | you had a different cable subscription or maybe you were just |
| 6 | getting the games over the air in your local market, you could |
| 7 | then also buy Sunday Ticket through YouTube. |
| 8 | Q.    My point is, though, if you're already a YouTube |
| 9 | subscriber, it would be one price cheaper, but even if somebody |
| 11:38AM 10 | like myself wants nothing to do with YouTube, on a standalone |
| 11 | basis, I could come in and buy the Sunday Ticket now for $449; |
| 12 | correct? |
| 13 | A.    Do you mean YouTube or YouTube TV? |
| 14 | Q.    YouTube TV. |
| 11:38AM 15 | A.    So can you repeat your question? |
| 16 | Q.    Of course.  I'm sorry. |
| 17 | A.    It's okay. |
| 18 | Q.    Right now, as opposed to what happened during the |
| 19 | class period, someone who's not even a subscriber of YouTube or |
| 11:38AM 20 | YouTube TV can come, sign up, get Sunday Ticket for the total |
| 21 | all-in price of $449.  Fair? |
| 22 | A.    Yes, they could do that.  They could do that in some |
| 23 | instances when DirecTV had it because we started this product |
| 24 | called -- I think we called it "White Space," which is if you |
| 11:38AM 25 | couldn't get a satellite dish on your home or maybe you lived |

1029

| | |
|---|---|
| 1 | Q.    Is your answer yes, no, or I don't know? |
| 2 | I don't remember. |
| 3 | Q.    Let me just put up Exhibit 44.  I think it's 2G with |
| 4 | two little i's.  It's already in evidence. |
| 11:40AM 5 | And if we go to that provision to -- it's a G and we |
| 6 | go to the second little "i." |
| 7 | Can you look at the parenthetical up here -- |
| 8 | right -- okay, slow down.  Here it is. |
| 9 | So in this contract right here -- and this is the |
| 11:40AM 10 | 2009 contract, I believe -- it says, "DirecTV shall have the |
| 11 | right to distribute NFL/DirecTV co-branded NFL Sunday Ticket |
| 12 | subscription product and offer to potential purchasers in a |
| 13 | manner comparable to the corresponding NFL Sunday Ticket |
| 14 | subscription package for television." |
| 11:41AM 15 | I want to stop there. |
| 16 | See that parenthetical? |
| 17 | A.    I do. |
| 18 | Q.    That denotes, then, there should be price parity |
| 19 | between the broadband product and the Sunday Ticket satellite |
| 11:41AM 20 | product, correct, even though the word "price" isn't mentioned? |
| 21 | A.    Again, I'm not a lawyer, but that's not how I would |
| 22 | look at it.  I think when it says "offered" -- "offered" could |
| 23 | mean a lot of things -- how it's marketed, how it's |
| 24 | positioned -- but, again, you're asking me to interpret legal |
| 11:41AM 25 | language. |

1028

| | |
|---|---|
| 1 | in a condominium that didn't allow it or whatever it happened |
| 2 | to be, we started, towards the end of the deal, using the |
| 3 | Internet to get Sunday Ticket to those people as well. |
| 4 | Q.    But in fairness, sir, we know that was limited. |
| 11:39AM 5 | They -- you're talking about the .TV product? |
| 6 | A.    That's right. |
| 7 | Q.    The broadband product? |
| 8 | A.    That's right. |
| 9 | Q.    But we know, under the contract with the NFL on one |
| 11:39AM 10 | hand and DirecTV on the other, that was limited to two small |
| 11 | groups of people, the existing DirecTV subscribers or folks who |
| 12 | couldn't get satellite access; correct? |
| 13 | A.    That's right.  It was meant to get to people who |
| 14 | couldn't -- didn't -- couldn't get satellite access, and we |
| 11:39AM 15 | were excited after '22 when the Internet kind of, I think, |
| 16 | matured enough where we could broaden that access much more, |
| 17 | and that's one of the reasons why we went with YouTube. |
| 18 | Q.    And you made sure that the pricing of this broadband |
| 19 | product, what we know as ST .TV, was in parity with |
| 11:39AM 20 | Sunday Ticket satellite product; correct? |
| 21 | A.    I don't remember -- I know we had much more |
| 22 | latitude, but if I remember correctly, our influence on pricing |
| 23 | for the .TV product, because it was structured completely |
| 24 | different, it was a joint venture, I think it was structurally |
| 11:40AM 25 | different. |

1030

| | |
|---|---|
| 1 | Q.    Okay.  Let's turn, then, to Exhibit 788. |
| 2 | Let's look at an e-mail you wrote to Mr. Bornstein, |
| 3 | who was then your boss, talking about this exact issue, and |
| 4 | let's do an exact comparison. |
| 11:41AM 5 | MR. CARMODY:  Let's offer 788.  It's your e-mail to |
| 6 | Mr. Bornstein.  I think the date was, like, July of '09. |
| 7 | MR. KILARU:  No objection, Your Honor. |
| 8 | Q.    (BY MR. CARMODY:)  Do you have it? |
| 9 | A.    I'm sorry.  Which number? |
| 11:42AM 10 | Q.    788, sir. |
| 11 | A.    788.  Yes, I have it. |
| 12 | MR. CARMODY:  We offer that. |
| 13 | THE COURT:  Admitted. |
| 14 | (Exhibit No. 788 for identification |
| 11:42AM 15 | and received into evidence.) |
| 16 | Q.    (BY MR. CARMODY:)  So let's see what you said to |
| 17 | Mr. Bornstein then.  The subject says, "NFL Sunday Ticket |
| 18 | broadband."  And it says, "The language in the current NFL |
| 19 | Sunday Ticket agreement related to the pricing of broadband |
| 11:42AM 20 | says that the product must be" -- and you put in parentheses |
| 21 | "offered in a manner comparable to the corresponding NFLST |
| 22 | subscription package for TV" |
| 23 | Those words are not the same -- I mean, they're |
| 24 | identical -- |
| 11:42AM 25 | Let's put an overlay on what we were just looking at |

1031

1 in 44G2.

2 So the only difference I saw was that you have it

3 in -- in the contract, it's in parentheses and here you put it

4 in quotes.  But what you finish with is "that means price as

11:43AM 5 well."  Correct?

6 A. Sure.  I think that's consistent with what I just

7 said.  And this is -- now it's refreshing my memory a bit, and

8 I think that's why I put it in quotations.  "Offered in a

9 manner comparable" means everything.  Price is a component, but

11:43AM 10 it's also what's the product look like, how it's marketed, is

11 it a premium product, all the things we've been talking about.

12 Q. What we can agree on, though, if we're looking at

13 this together, is the language, whether it's your quotes or in

14 the contract in parentheses, the word "price" isn't mentioned;

11:43AM 15 correct?

16 A. In the contract is "price" mentioned?

17 Q. Yeah.  We're looking at the language.

18 A. In this highlighted portion, I don't see it, no.

19 Q. Exactly.

11:43AM 20 So if it was someone other than someone maybe like

21 you at NFL or DirecTV, it was some third party coming in and

22 looking at this, they might not know that that parenthetical

23 means that broadband Sunday Ticket's got to be priced in parity

24 with satellite Sunday ticket.  Fair?

11:43AM 25 A. I don't know how someone would interpret that.  I

---

1032

1 can just tell you what it means in business practice is we

2 wanted to make sure the Sunday Ticket Internet product was,

3 again, premium complementary to Sunday afternoon in all

4 aspects, as price is a component but is a component of many

11:44AM 5 others.

6 Q. Sir, let's take a look at Exhibit 800, which is in

7 evidence.  And we see a little e-mail string here in 2018.  And

8 this is during the negotiations with Google, before you signed

9 off on behalf of the NFL on the Google contract.  That's the

11:44AM 10 context.  Okay?

11 So what we're seeing here -- and you can now refresh

12 yourself and see what's being discussed by -- and Hannah Farr

13 here, one of your team members?

14 A. At the time she was, yes.

11:44AM 15 Q. And we know Brent Lawton is -- you know, was and is;

16 correct?

17 A. Correct.

18 Q. And what they're talking about is early negotiations

19 between the NFL on one hand and Google on the other.  Fair?

11:44AM 20 A. Appears to be.  I'm not on this e-mail, so I'm just

21 reading it.

22 Q. Exactly.  You're mentioned a couple of times,

23 though.  So let's go over it.

24 It says, "Brent, Please see below for the list of

11:45AM 25 takeaways."  This is what Hannah Farr is writing to

---

1033

1 Brent Lawton.  "Next steps based on feedback we received today.

2 I led each bullet with person that made the suggestion just to

3 jog your memory."  And the examples we see are Kevin -- that

4 must be Kevin LaForce; correct?

11:45AM 5 A. It seems to be.

6 Q. Hans must be Hans Schroeder; correct?

7 A. Yes.

8 Q. And you are BR; correct?

9 A. Yes.

11:45AM 10 Q. "But will plan to remove for any version we send

11 around to the broader team."

12 So let's see below, and specifically let's turn to

13 Item No. 8.  So we see your initials with Hans Schroeder there.

14 Does that mean you weighed in, as she said, on this issue?

11:45AM 15 A. I -- I don't know.  I didn't write the e-mail, so

16 I'm not sure what she meant.

17 Q. Okay.  Well, let's look at it together.  It says,

18 "First, Form stances on key questions that will inform a

19 go-forward strategy."  And on that second little "i," it says,

11:46AM 20 "Maintain premium."  Let's stop there.

21 "Maintain premium" is referring to with -- when

22 DirecTV was a distributor of Sunday Ticket, they sold that, you

23 say, at a premium price; correct?

24 A. Again, price was a component of what a premium

11:46AM 25 product is.  It means a lot of things, as far as I'm

---

1034

1 concerned -- how it's marketed, how it's positioned, the

2 quality of the product -- so price is not the only indicator of

3 it.  Again, we were very focused on maintaining that premium

4 positioning.

11:46AM 5 Q. Okay.  So after that, it says, "Yes."  And this is

6 someone at the NFL writing this; correct?

7 A. It looks like it, yes.

8 Q. And then in the parenthetical where it says

9 "maintain premium," it says -- "e.g." means example; right?

11:47AM 10 A. It means example, yes.

11 Q. Okay.  "Maintain premium, yes; e.g., Google must

12 sell at a high price point."  Correct?

13 A. Yeah.  I think it's sort of making my point.  It's

14 an example, meaning one of many, of how you define a premium

11:47AM 15 product.  Positioning, marketing, however it is.  And, again,

16 whether it was -- I don't have a price specific for it, but we

17 wanted to make sure that it felt like a premium product, and

18 that was one component.

19 Q. But in fairness, in the context of this NFL document

11:47AM 20 that was produced to us in this case, when it talks about

21 maintaining premium of Sunday Ticket, we see no mention of the

22 quality of the Sunday Ticket product.  The only thing we see

23 is, "Yes, example, Google must sell at a high price point."

24 That's the only thing written.

11:47AM 25 A. It is an example, which, I think, implies there's

---

1137

1    Q.   (BY MR. CARMODY:)  So we've established that you
2    didn't know about the fact that the NFL did a study and there's
3    no relationship in a ten-year period between revenue and
4    winning.
03:56PM 5          Did you know -- did anyone at the NFL tell you,
6    furthermore, that revenue and spending levels have had no
7    effect on the probability of a team making the playoffs in the
8    last five seasons?
9    A.   No, I've never seen that, no.
03:56PM 10   Q.   I mean, you know it makes me think of the Dallas
11   Cowboys -- I spent 19 years in Dallas -- and the Cowboys are
12   the richest team ever in professional sports.  Correct?
13   A.   Um, they're near the top.
14   Q.   I mean, they beat the heck out of Real Madrid and
03:56PM 15   even the soccer teams.  I mean, they're the most valuable
16   sports franchise; correct?
17   A.   I think they're near the top, yeah.
18   Q.   Okay.  And of the NFL teams by far, they have the
19   most revenue; correct?
03:57PM 20   A.   I think they're the leading revenue generator, yes.
21   Q.   And they've been that way for a long time; correct?
22   A.   Yes.
23   Q.   Okay.  And yet the richest team in the NFL from 1996
24   to 2009 never won a single playoff game; correct?
03:57PM 25   A.   That's right.

1    independent club telecasts, distribution would affect the
2    prices consumers pay for those telecasts?
3    A.   No.  I don't know of any studies that do that.
4    Q.   Are you aware of any studies examining how
03:59PM 5    independent club telecast distribution would affect the price
6    of a competing package of NFL telecasts?
7    A.   No.
8    Q.   Are you aware of any studies examining how
9    independent club telecast distribution would affect the
03:59PM 10   league's ability to share revenue?
11   A.   No.  I don't know of any independent studies.
12   Q.   Now, earlier when your counsel was examining you, he
13   put up Exhibit No. 686, and even though you weren't listed on
14   the e-mail, you said you had an -- a recollection of -- I guess
03:59PM 15   you said being at a meeting?
16        Let's look at 686, please.
17        So we're back in 2017.  And even though you're not
18   listed here as someone to or from on this -- on this attachment
19   that we've been looking at in this case, which is admitted in
04:00PM 20   evidence, you said you remember this -- discussing this
21   document; correct?
22   Q.   Where were you?
23        A.   Where was I?
24   Q.   Yes.

1136

1    Q.   Okay.  And it's -- since 2004 -- or in 2004,
2    sir, is it fair to say that revenue and spending gaps between
3    opposing teams had zero impact on the probability of winning?
4    A.   I'm sorry.  Repeat the question?
03:57PM 5    Q.   Sure.
6         I'm hearkening back to when you were younger at the
7    NFL, and my question is:  Did you ever come to know in all your
8    years at the NFL that the NFL commission research would show
9    that revenue and spending gaps between opposing teams had zero
03:58PM 10   impact on the probability of winning?
11   A.   No.  I'm not familiar with that study.
12   Q.   I want to talk about a couple studies.
13        Are you aware of any studies examining the effect of
14   independent team telecasts on the overall viewership of NFL
03:58PM 15   telecasts?
16   A.   No.
17   Q.   Are you aware of any studies examining whether
18   independent team telecasts would expand viewers to NFL
19   telecasts?
03:58PM 20   A.   No.
21   Q.   Are you aware of any studies examining how
22   independent club, independent team, telecast distribution would
23   affect the quality of NFL telecasts?
24   A.   Independent studies?  Not that I remember.
03:58PM 25   Q.   Are you aware of any studies examining how

1138

1    A.   I think in New York.
2    Q.   Was the meeting in New York at the NFL headquarters?
3    A.   I don't remember.  I think -- I think it might have
4    been a conference call.  I don't remember.
04:00PM 5    Q.   Who was there?  Who were the attendees at this
6    meeting?
7    A.   I think probably the people on this e-mail would be
8    my guess, but I'm not entirely -- I can't remember.  It was a
9    long time ago.
04:00PM 10   Q.   Let me see if I can't remind you because I think
11   there's a whole lot more.  We have you, we have Mr. Schroeder,
12   we have Maryann Turcke, who at the time was the president of
13   NFL media; correct?
14   A.   President of NFL Network.
04:00PM 15   Q.   Okay.  That's even -- then we have Tod Leiweke?
16   A.   Yep.
17   Q.   He is chief operating officer of the NFL?
18   A.   Yes.
19   Q.   We have Mark Quenzel, who is senior vice president
04:00PM 20   of NFL media; correct?
21   A.   NFL Network.
22   Q.   And these are all people who were there.
23        Do you have an independent recollection of all these
24   folks being there?
04:01PM 25   A.   That would make sense.

1155

```
1              UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5    IN RE:                      )   Case No.
     NATIONAL FOOTBALL LEAGUE'S  )   MDL 15-2668-PSG (SKx)
6    SUNDAY TICKET ANTITRUST LITIGATION )
                                 )   Volume 7
7    _____)   (Pages 1155 - 1380)

8

9         REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                         TRIAL DAY 7
10                  THURSDAY, JUNE 13, 2024
                          8:35 A.M.
11                  LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22

23        MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, ROOM 4455
                LOS ANGELES, CALIFORNIA  90012
25                    (213) 894-2305
```

1156

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:

    SUSMAN GODFREY
    BY:  MARC M. SELTZER
    BY:  AMANDA K. BONN
    BY:  KALPANA SRINIVASAN
         Attorneys at Law
    1900 Avenue of the Stars, Suite 1400
    Los Angeles, California  90067
    (310) 789-3100

    SUSMAN GODFREY
    BY:  WILLIAM C. CARMODY
         Attorney at Law
    One Manhattan West, 50th Floor
    New York, New York  10001
    (212) 336-8334

    SUSMAN GODFREY
    BY:  IAN M. GORE
    BY:  IAN B. CROSBY
         Attorneys at Law
    401 Union Street, Suite 3000
    Seattle, Washington  98101
    (206) 505-3841

    HAUSFELD
    BY:  SATHYA S. GOSSELIN
         Attorney at Law
    888 16th Street NW, Suite 300
    Washington, DC  20006
    (202) 5407175


FOR THE DEFENDANTS:

    WILKINSON STEKLOFF, LLP
    BY:  BETH WILKINSON
    BY:  BRIAN L. STEKLOFF
    BY:  RAKESH N. KILARU
         Attorneys at Law
    2001 M Street NW, 10th Floor
    Washington, DC  20036
    (202) 847-4000

1157

INDEX OF WITNESSES

WITNESSES                                        PAGE

JOHN DOUGLAS ZONA, Ph.D.

    Direct Examination by Mr. Crosby             1168

    Cross-examination by Ms. Wilkinson           1192

    Redirect Examination by Mr. Crosby           1273

    Recross-examination by Ms. Wilkinson         1281

JONATHAN FRANTZ

    Direct Examination by Mr. Gosselin           1283

    Cross-examination by Mr. Stekloff            1297

    Redirect Examination by Mr. Gosselin         1309

ALI YURUKOGLU, Ph.D.

    Direct Examination by Mr. Kilaru             1311

    Cross-examination by Mr. Gosselin            1362

1158

INDEX OF EXHIBITS

|        |             | FOR | FOR |
|        |             | IDENTIFICATION | EVIDENCE |
| NUMBER | DESCRIPTION | PG. | PG. |
| 13 | E-mail | | 1370 |

1183

1     which is -- which is just 24.6 percent less than 295.
2          Q.     Did it surprise you when you found that the actual
3     price that they were charging at different points in time was
4     more than the price that you thought they should if they were
09:31AM 5   trying to maximize their own self-interest?
6          A.     I'm not sure "surprise" is exactly the right word.
7     But it was -- it was something that I wanted to investigate
8     because it was a mismatch between what they were doing,
9     actually doing, and what I would expect as an economist and
09:31AM 10    knowing what they would do -- or having a good estimate of what
11    they should be doing.  So what they were doing is very far from
12    what they should be doing if they're just interested in
13    maximizing their own profits.
14         Q.     And did that cause you to doubt in any way the
09:31AM 15   reliability of your model, that maybe your model was wrong?
16         A.     No, because that difference is consistent with the
17    evidence that I've seen in this case and what I've heard about
18    this week, as well, that prices were not what technically
19    DirecTV was setting but, rather, they were -- they were
09:32AM 20   influenced by the NFL in their interest in keeping -- limiting
21    distribution of the product.
22               So that squares with -- with that fact.
23         Q.     So why would DirecTV agree to something that doesn't
24    maximize their own profits for this particular product?
09:32AM 25   A.     Well, um, they're not doing the very best that they

1184

1     could do, but they're doing okay in the sense that it's better
2     to make this deal than make -- than not have Sunday Ticket at
3     all, let it go to DISH.
4          Q.     And who gets the benefit of the difference between
09:32AM 5   the best they could do and how they did pricing it this way?
6          A.     Well, I think ultimately it's a benefit that's
7     shared between the NFL and CBS and FOX.
8          Q.     Do you have a term for that, that you used in your
9     report in this case?
09:33AM 10   A.     I called that difference the "NFL tax," that's what
11    I --
12         Q.     All right.  Let's go pull up 4 here.
13               Do you recall during opening statements when NFL's
14    counsel said the average price paid by every one of the
09:33AM 15   people -- and this is in the residential class we're talking
16    about here -- in the real world, in the real life, was just
17    102.70?
18               Do you recall that?
19         A.     Yes, I do.
09:33AM 20   Q.     And highlight that, please.
21               Is that true?
22         A.     No.  It's not true.
23         Q.     Why is that not true?
24         A.     It's not true because that number, which is a number
09:33AM 25   that I calculated in the bowels of my model, that number is for

1185

1     all subscriptions.  And it includes paid and free.  But I
2     think, most importantly is that it includes subscriptions for
3     people who are not class members.  So that part of the
4     statement is just false.
09:34AM 5   Q.     So there are subscriptions in there for people who
6     never paid for a subscription; correct?
7          A.     Correct.  Yes.
8          Q.     And people who never paid for a subscription are not
9     class members; right?
09:34AM 10   A.     Correct.
11         Q.     Okay.  And do you recall that NFL's counsel also
12    said that customers actually paid only 102.74?
13         A.     I do.
14         Q.     And did any class member actually pay $102.74 for
09:34AM 15   Sunday Ticket?
16         A.     I'd be shocked if they had.  Um, if they did, it
17    would be a statistical accident because it's -- it's an
18    average -- it's a weighted average calculated over ten years of
19    time and nobody would pay that.  Most people pay, something
09:34AM 20   close to zero or something close to the list price.  It's
21    basically two kinds of observations in the data and not much in
22    the middle, which is where, you know, that $100 is.
23         Q.     So taking that 102.74 for what it is, this average
24    revenue per subscription, including both paid subscriptions and
09:35AM 25   nonpaid subscriptions, would that number also be subject to

1186

1     your reduction factor in differing competitive situations?
2          A.     Sure.  There's lots of different statistics that you
3     could use -- or calculate out of my model and that would have
4     that property and that -- the reduction -- it would show the
09:35AM 5   same reduction factor and you could calculate the reduction
6     factor that way.
7          Q.     Can you bring up 5, please?
8                Do you recognize this table from Dr. Yurukoglu's
9     report?
09:35AM 10   A.     Yes.  I think so.
11         Q.     And is that exactly what he's doing here?
12         A.     Yeah.  That's precisely what he's doing.  The
13    102.74, he's -- you know, he has it lined up with a label that
14    says "actual," which is the number that's coming out of the
09:35AM 15   model, and then, as I said before, the 24 -- if you apply
16    24.6 reduction, then you'd get to $77.  And so on for the other
17    numbers that are in there.
18               So all those numbers are just -- they're the same
19    statistic, just applied in these different scenarios, and
09:36AM 20   they'll show the reduction factor.
21         Q.     Let's go ahead and do 6 here.
22               So are you able, using the information in your
23    report, to tell us the true average price paid by class members
24    for paid Sunday Ticket subscriptions at issue in this case?
09:36AM 25   MS. WILKINSON:  Your Honor, we're going to object.

1187

```
 1    That's not a finding in his report.  He did not report that
 2    opinion at all.
 3              MR. CROSBY:  Your Honor, this is literally two
 4    numbers that are in his report that can be divided one by the
 5    other.
 6              MS. WILKINSON:  Your Honor, he was -- I don't want
 7    to -- he was asked in the deposition, he did not give this
 8    information.
 9              THE COURT:  Sidebar.
10              (At sidebar:)
11              THE COURT:  I don't have the report, but.
12              MS. WILKINSON:  Your Honor, we've read all his
13    reports and his deposition.  He said the average price paid per
14    subscriber was 102.74 which we'll go over.  He never said the
15    average price per class member.  He did not say that.  This
16    gentleman was named in the case, but he's never said that.  So
17    to ambush us at the trial saying there's this number that we
18    didn't know about and he didn't calculate and we can't even
19    check his calculation, so Dr. Yurukoglu can't even check his
20    calculations because he didn't turn it out.
21              MR. CROSBY:  Your Honor, counsel said in opening
22    statement that this 102.74 was the average price paid by class
23    members, and that's not true.  And so we need to demonstrate
24    that that's not true.  We're doing it with two numbers that are
25    in his report.
```

1188

```
 1              THE COURT:  Did you get that number from the expert?
 2              MS. WILKINSON:  Yes.
 3              THE COURT:  And then why was it in rebuttal?
 4              MR. CROSBY:  So the number from the expert is the
 5    average revenue per subscription, not the average price paid by
 6    class members.  And so this shows why that contention was
 7    wrong.  Using the data that's in his report is literally just
 8    dividing the number of paid subscriptions by the number of
 9    subscribers.
10              THE COURT:  You're going to have to show me where it
11    is in his reports.
12              MR. CROSBY:  Okay.  All right.
13              MS. WILKINSON:  No.  The number, not the math.
14              (In the presence of the jury:)
15              MR. CROSBY:  All right.  Let's move on.
16        Q.    (BY MR. CROSBY:)  So we've talked about your
17    calculations from the residential subscriber numbers and data.
18              Did you analyze the effects of the conduct at issue
19    on commercial subscribers?
20        A.    Yes, I did.
21        Q.    And what reduction factors did you conclude should
22    apply to commercial subscribers in this case?
23        A.    I believe that we should apply the same reduction
24    factors.
25              THE COURT:  I'm sorry, I just didn't hear.
```

1189

```
 1              THE WITNESS:  I would apply the same reduction
 2    factors.
 3        Q.    (BY MR. CROSBY:)  And why would you apply the same
 4    reduction factors to commercial subscribers?
 5        A.    Because, fundamentally, the issue has to do with
 6    change in the amount of competition and the structure of the
 7    residential market in terms of going from monopoly to a
 8    situation where they're either facing competition -- more
 9    competition from CBS and FOX or they're facing more competition
10    from an additional distributor of Sunday Ticket.  Those
11    circumstances are the same on the residential side and on the
12    business side.  They're going from one to two suppliers.
13              THE COURT:  I'm sorry, can you move the microphone
14    just a little closer to you?
15              MR. CROSBY:  Let's bring up 7 here.
16        Q.    (BY MR. CROSBY:)  Did you calculate the total amount
17    that customers paid for Sunday Ticket during the class period?
18        A.    Yes, I did.
19        Q.    Okay.  And does this demonstrative show the results
20    of that calculation?
21        A.    Yes, it does.
22        Q.    So what is the total amount that residential
23    subscribers paid during the class period?
24        A.    That top number, $5.66 billion over the ten years.
25        Q.    And what did commercial subscribers pay during the
```

1190

```
 1    class period?
 2        A.    1.35 billion.
 3        Q.    And so applying the reduction factors that your
 4    model generated, how much less would the residential class
 5    members have paid had DirecTV not charged more than their
 6    optimum price during the class period?
 7              MS. WILKINSON:  Your Honor, I'm going to object
 8    again.  He didn't do this math in his report.  He gave
 9    percentages.  Dr. Rascher did the math, not Dr. Zona.  This is
10    something, again, that wasn't in his report and he kept saying,
11    I just gave percentages.
12              THE COURT:  Overruled.
13              THE WITNESS:  It would be $1.39 billion less.
14    Residential class members would have paid 1.39 billion less in
15    that circumstance.
16        Q.    (BY MR. CROSBY:)  And so how much -- what did
17    commercial subscribers pay?  How much less would commercial
18    subscribers have paid?
19        A.    About $330 million, or .33 billion less.
20        Q.    And that's without any additional competitors.
21    That's just optimum pricing; right?
22        A.    That's correct.
23        Q.    So if they had additional -- one additional
24    competitor, how much less, using your reduction factors, would
25    residential class members have paid during the class period?
```

1267

```
 1        A.    It was much fewer observations.  I didn't do that,
 2   that's right.
 3        Q.    Okay.  Much fewer, over 380 --
 4        A.    Much fewer than Wave 1.
 5        Q.    And that somehow wasn't reliable enough or wouldn't
 6   make a difference?
 7        A.    I was doing -- I only did this to test a criticism
 8   that it mattered which one you did and the stat -- the models
 9   weren't statistically different, so I thought that was
10   sufficient to refute the -- the criticism.
11        Q.    All right.  Let's try to get to the end here.
12              And in Model No. 1, because I think you told us
13   what -- what came out of your Model No. 1, in the real world,
14   the average price was 102.74; right?
15        A.    I mean, we talked about 102.74 a lot, the average
16   revenue per subscription for free and unfree subscriber --
17   class members, not class members is 102.74.
18        Q.    Okay.  Now -- but you didn't -- your model
19   doesn't -- it doesn't only calculate class members.  It
20   calculates all subscribers; right?
21        A.    So for purposes of --
22        Q.    All I'm asking you is does your model calculate
23   specifically for subscribers that are in the class or for all
24   Sunday Ticket subscribers of the data you got?
25        A.    It depends on what you mean by "model."  The demand
```

1268

```
 1   curve is only that, but --
 2        Q.    Is only the DirecTV subscribers?
 3        A.    The model is only DirecTV subscribers.
 4        Q.    Okay.  Now, Model No. 2 with one -- I believe --
 5   with competition, you say Model No. 2 says that the price
 6   should be in the real world 121.50?  Or is that the price when
 7   there's a discount -- when there's a reduction factor?
 8        A.    I'm not sure.
 9        Q.    Do you know?
10        A.    I would look at my report.
11        Q.    Go ahead.  Look at your deposition, 347.
12        A.    347.
13              THE COURT:  What lines?
14        Q.    (BY MS. WILKINSON:)  Take a look at your -- this
15   price comes from your testimony in the report.  Look at your
16   merits report at page 21.
17        A.    21.
18              MS. WILKINSON:  Put that up.  50.  Sorry.  It's
19   Exhibit 21.  Sorry about that, Cort.
20        Q.    (BY MS. WILKINSON:)  All right.  Here you're talking
21   about Model No. 2.  You call it the "Alternative Survey Based
22   on Simulation Results"; right?
23        A.    I mean, this is not --
24        Q.    Is that what you call --
25        A.    Is that what I called it?  That's the title of the
```

1269

```
 1   box.
 2        Q.    Yes.  And this is your report that you stand by?
 3        A.    Yes.  This is an alternative.
 4        Q.    And if we look at this -- here, you don't report
 5   this average price paid by all subscribers; right?
 6        A.    It comes from totally different data, totally
 7   different circumstances.
 8        Q.    You just report -- and you call it the existing
 9   price, 295; right?
10        A.    Yes.
11        Q.    That didn't exist in the real world until 2018;
12   right?
13        A.    The survey was conducted in 2020, 2021.
14        Q.    Right.  So you could have compared it back to 2011
15   or '12.  You chose to compare it to this price; right?
16        A.    Well, yes.
17        Q.    And this is a price not everyone paid because people
18   got discounts all the time like some of the class reps; right?
19        A.    The average price paid was $235 by --
20        Q.    That's not what I asked.
21              MS. WILKINSON:  Your Honor, I move to strike.
22              THE COURT:  Granted.
23        Q.    (BY MS. WILKINSON:)  Okay.  Existed -- existing
24   price is 295 in your chart; right?
25        A.    In the chart, yes.
```

1270

```
 1        Q.    And if we go down to one additional DTC, you predict
 2   for Wave 1 that the price would be 121.50; right?
 3        A.    That's what the table says, using Wave 1.
 4        Q.    And in your other model, you said the average price
 5   was 102.  So this predicts people would pay a higher price than
 6   what Model No. 1 does on average; right?
 7        A.    Those are not comparable at all.
 8        Q.    So that's why you didn't include 102.74 in the
 9   existing price.  You only compared it to -- to the -- I mean,
10   you didn't include the real average price your other model
11   produced.  You only compared it to the list price; right?
12        A.    That comparison would be very misleading and I
13   wouldn't do it.
14        Q.    And you know that the -- that price 102.74 is far
15   lower than any of the other leagues' packages that exist; the
16   NBA, the NHL, and the MLB.  Right?
17        A.    So it's not an average price.  It's an average.  And
18   it might be lower than their average prices.  I don't know.
19        Q.    You've looked at the other leagues' prices?
20        A.    Some of them.
21        Q.    And some of them are -- all of them are higher than
22   102.74, aren't they?
23        A.    My understanding is that the NFL's price in Canada
24   is less than 102.74.
25        Q.    Right.  But we're talking about the United States.
```

1381

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   IN RE:                          )   Case No.
     NATIONAL FOOTBALL LEAGUE'S      )   MDL 15-2668-PSG (SKx)
 6   SUNDAY TICKET ANTITRUST LITIGATION )
                                      )   Volume 8
 7   _____)   (Pages 1381 - 1610)

 8

 9         REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                         TRIAL DAY 8
10               MONDAY, JUNE 17, 2024
                       8:32 A.M.
11               LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22

23        MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                  (213) 894-2305
```

1382

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:

SUSMAN GODFREY
BY:  MARC M. SELTZER
BY:  AMANDA K. BONN
BY:  KALPANA SRINIVASAN
      Attorneys at Law
1900 Avenue of the Stars, Suite 1400
Los Angeles, California  90067
(310) 789-3100

SUSMAN GODFREY
BY:  WILLIAM C. CARMODY
      Attorney at Law
One Manhattan West, 50th Floor
New York, New York  10001
(212) 336-8334

SUSMAN GODFREY
BY:  IAN M. GORE
      Attorney at Law
401 Union Street, Suite 3000
Seattle, Washington  98101
(206) 505-3841

HAUSFELD
BY:  SATHYA S. GOSSELIN
      Attorney at Law
888 16th Street NW, Suite 300
Washington, DC  20006
(202) 5407175

FOR THE DEFENDANTS:

WILKINSON STEKLOFF, LLP
BY:  BETH WILKINSON
BY:  BRIAN L. STEKLOFF
BY:  RAKESH N. KILARU
      Attorneys at Law
2001 M Street NW, 10th Floor
Washington, DC  20036
(202) 847-4000

1383

INDEX OF WITNESSES

| DEFENDANTS' WITNESSES | PAGE |
|---|---|
| ALI YURUKOGLU, Ph.D. | |
| Cross-examination (Resumed) by Mr. Gosselin | 1392 |
| Redirect Examination by Mr. Kilaru | 1439 |
| ROGER GOODELL | |
| Direct Examination by Ms. Wilkinson | 1441 |
| Cross-examination by Mr. Carmody | 1477 |
| Redirect Examination by Ms. Wilkinson | 1550 |
| Recross-examination by Mr. Carmody | 1554 |
| JERRAL W. JONES | |
| Direct Examination by Ms. Wilkinson | 1556 |
| Cross-examination by Ms. Srinivasan | 1582 |

1384

INDEX OF EXHIBITS

| | | FOR IDENTIFICATION | FOR EVIDENCE |
|---|---|---|---|
| NUMBER | DESCRIPTION | PG. | PG. |
| 703D | Dallas Cowboys v. NFL Complaint | 1588 | |
| 874 | E-mail | | 1504 |
| 879 | Document | | 1494 |

1397

1    Q.    Now, you understand in this matter that Dr. Zona had
2    two assignments.  Right?  First, to calculate the amount of
3    Sunday Ticket purchases by class members and, second, to
4    determine whether the prices for those purchases would have
09:13AM 5    been lower and by how much if other providers had supplied
6    out-of-market NFL games; right?
7        A.    Correct.
8        Q.    Okay.  So let's talk about Dr. Zona's first
9    assignment.  Right?  You don't have any criticism of Dr. Zona's
09:13AM 10   calculations of the amount of Sunday Ticket purchases by class
11   members; right?
12       A.    No.
13       Q.    You understand that Dr. Zona looked at DirecTV's
14   transactional data and documents in the record to calculate
09:13AM 15   that total dollar amount paid by class members for
16   Sunday Ticket; right?
17       A.    Yes.
18       Q.    Okay.  And Dr. Zona concluded that residential class
19   members paid a total of $5.66 billion for Sunday Ticket during
09:13AM 20   the class period, 2011 to 2022; right?
21       A.    Yes.
22       Q.    Okay.  And according to Dr. Zona's calculations,
23   that $5.66 billion corresponds to roughly 24 million annual
24   subscriptions by -- to Sunday Ticket by residential class
09:14AM 25   members; right?

1398

1        A.    Yes.
2        Q.    Okay.  Dr. Zona also concluded that commercial class
3    members paid a total of $1.35 billion for Sunday Ticket during
4    the class period; right?
09:14AM 5        A.    Yes.
6        Q.    Okay.  And Dr. Zona calculated that the total number
7    of class members, residential and commercial, is approximately
8    6.8 million individuals and businesses at the lower bound;
9    right?
09:14AM 10       A.    It sounds right.  I don't remember the exact figure.
11       Q.    Okay.  Well, we can take a look at some point.
12   Again, you don't challenge any of these calculations by
13   Dr. Zona?
14       A.    No.  That's not where the problems were.
09:14AM 15       Q.    Okay.  In fact, you looked at his revenue
16   calculations and you didn't see any problems; right?
17       A.    That's right.
18       Q.    Okay.  And you haven't separately calculated the
19   amount of NFL Sunday Ticket purchases by class members?
09:14AM 20       A.    I did the same calculations he did.
21       Q.    But you didn't report some separate set of
22   calculations?
23       A.    No, I -- that's not where the problems were.
24       Q.    Okay.  Let's return to the 102.74 figure that
09:15AM 25   Dr. Zona calculated which we started discussing on Thursday.

1399

1        A.    Sure.
2        Q.    That 102.74 number is a measure -- that dollar
3    number is a measure of the average price that all DirecTV
4    subscribers, including nonclass members, paid for
09:15AM 5    Sunday Ticket; right?
6        A.    That's right.
7        Q.    Okay.  I want to make a note of that.
8            MR. KILARU:  Your Honor, is it okay if I move to see
9    the --
09:15AM 10           THE COURT:  Go ahead.
11           MR. KILARU:  Thanks.
12       I can't see it.
13           THE COURT:  Yeah, I can't see it either.
14           MR. GOSSELIN:  I will try to --
09:16AM 15           THE COURT:  You can pull it up here.  If you'd like,
16   you can pull it up here.
17           MR. GOSSELIN:  Let me pull it up a little.  Is that
18   better?
19           THE COURT:  Not from my distance.
09:16AM 20           MR. GOSSELIN:  Let me read from it and I'll try to
21   write larger.
22       Q.    (BY MR. GOSSELIN:)  102.74 is the average price paid
23   by DirecTV customers for Sunday Ticket, including nonclass
24   members; right?
09:16AM 25       A.    Yes, it -- yes.

1400

1        Q.    Okay.  Now, 102 -- $102.74 is not the average price
2    paid by class members for Sunday Ticket; right?
3        A.    No.
4        Q.    Okay.  Let's break down everyone that's included in
09:17AM 5    that 102.74 number, that average price for Sunday Ticket.
6        If you signed up for DirecTV television, received
7    Sunday Ticket as part of a promotional package and never
8    renewed Sunday Ticket, you paid zero dollars for Sunday Ticket;
9    right?
09:17AM 10       A.    That's right.
11       Q.    Okay.  And that zero dollar purchase is included in
12   the average of 102.74; right?
13       A.    Yes.  It's -- it's everyone who ever received
14   Sunday Ticket.
09:17AM 15       Q.    Right.  And that zero dollar purchase that I just
16   mentioned, that example, that brings down the average price
17   paid by DirecTV customers for Sunday Ticket; right?
18       A.    I mean, it's included in the average.  If you --
19   exclude the zeros, the number would be higher.
09:17AM 20       Q.    Okay.  And in that scenario that I described in
21   which you signed up for DirecTV television, you received
22   Sunday Ticket as part of a free promotion and you never
23   renewed, you're not a class member; right?
24           MR. KILARU:  Objection, Your Honor.  Calls for a
09:18AM 25   legal opinion.

1401

```
1        THE WITNESS:  Yeah, I'm not -- I don't believe so.
2   I'm not a lawyer as we all know.
3        Q.    (BY MR. GOSSELIN.)  Well, you understand, don't you,
4   that class members are those who paid actual dollars for
09:18AM 5   Sunday Ticket above and beyond any initial promotion?  Right?
6        MR. KILARU:  Objection, Your Honor.
7        THE COURT:  Overruled.
8        THE WITNESS:  That's my understanding, yes.
9        Q.    (BY MR. GOSSELIN.)  Do you know how many people fit
09:18AM 10  the description that we've been talking about so far, received
11  Sunday Ticket initially for free and thereafter never renewed?
12       MR. KILARU:  Objection Your Honor.  This goes
13  beyond the scope of both his and Dr. Zona's reports.
14       THE COURT:  Overruled.
09:18AM 15       THE WITNESS:  I don't know the exact number.
16       Q.    (BY MR. GOSSELIN.)  Okay.  That's not something you
17  investigated for your purposes?
18       A.    No.  This is Dr. Zona's number, so I was --
19       Q.    I'm just asking if you investigated that number for
09:18AM 20  your purposes?
21       A.    I'm telling you I -- I did not because it was
22  appropriate --
23       Q.    I'm not asking for the reasons.  I'm just asking
24  whether --
09:18AM 25       A.    Sure.
```

1402

```
1        Q.    The 102.74 number includes DirecTV customers who
2   aren't even NFL fans and may not have watched even a single
3   game on Sunday Ticket; right?
4        A.    That's possible.
09:19AM 5        Q.    Okay.  That's -- that, too, is not something you
6   investigated for your purposes?
7        A.    No.
8        Q.    Okay.  Now, I think we're finally clear on the
9   102.74 and what that number represents, even if my writing is a
09:19AM 10  little small.
11       Let's talk about how much class members paid for
12  Sunday Ticket.
13       Earlier we discussed --
14       MR. KILARU:  Objection, Your Honor.  Your Honor, we
09:19AM 15  object.
16       MR. GOSSELIN:  There's no question, Your Honor.
17       MR. KILARU:  Right.  But we object to going into
18  this topic as beyond the scope of his report and Dr. Zona's
19  report.  This is the issue that came up on Dr. Zona's exam.
09:19AM 20       MS. WILKINSON:  Sidebar.
21       MR. GOSSELIN:  Your Honor, we're talking about the
22  calculations of total class members and the price.  We've
23  talked extensively about the 102.74 and what's --
24       THE COURT:  Was it included in Dr. Zona's report?
09:19AM 25       MR. GOSSELIN:  This -- the -- the numerator and the
```

1403

```
1   denominator are in Dr. Zona's report.
2        THE COURT:  Sustained.
3        MR. GOSSELIN:  And the materials are in his backup
4   materials.
09:19AM 5        THE COURT:  Sustained.
6        (In the presence of the jury:)
7        Q.    (BY MR. GOSSELIN.)  I'll limit my questions to those
8   things that are in Dr. Zona's report.
9        Earlier we discussed the total number of annual
09:20AM 10  residential class member subscriptions to Sunday Ticket; right?
11       A.    Yes.
12       Q.    And that number was about 24 million?
13       A.    Yes.
14       Q.    Okay.  And we talked about the total price that
09:20AM 15  those people paid for Sunday Ticket which was 5.66 billion?
16       A.    Total revenue.
17       Q.    Total revenue?
18       A.    Yes.
19       Q.    So if we divide --
09:20AM 20       MR. KILARU:  Your Honor, same objection.  Same
21  objection.
22       MR. GOSSELIN:  These are numbers in the report.  I'm
23  limiting my questions to numbers that are in --
24       THE COURT:  I think this is what we had the sidebar
09:20AM 25  about.
```

1404

```
1        MR. KILARU:  It is.
2        THE COURT:  No, you may not proceed.
3        MR. GOSSELIN:  Understood.
4        Q.    (BY MR. GOSSELIN.)  Let's return to the live
09:20AM 5   streaming of sports telecasts during and after the class period
6   that we talked about on Thursday.
7        If you turn in your binder to the tab --
8        THE COURT:  Can we have a brief sidebar?
9        MR. GOSSELIN:  Sure.
09:21AM 10       (At sidebar:)
11       THE COURT:  I am getting weary, and this is coming
12  from the plaintiffs' side, when I make a ruling, it's getting
13  very tiring of repeated attempts to get around my ruling.  And
14  that's happened multiple times with regard to documents, and
09:21AM 15  it's going to stop or I'm going to call you out in front of the
16  jury.
17       (In the presence of the jury:)
18       Q.    (BY MR. GOSSELIN.)  Dr. Yurukoglu, your role in this
19  case, as you testified on Thursday, is to evaluate Dr. Zona's
09:21AM 20  economic modeling; right?
21       A.    That's right.
22       Q.    Those were the instructions given to you by NFL's
23  counsel?
24       A.    They asked me evaluate Dr. Zona's models, yes.
09:21AM 25       Q.    And you don't have any other role in this litigation
```

**1489**

1 watching the NFL by cable -- they couldn't do it on their own

2 independent cable channel --

3     A.   I'm sorry. You said NFL cable?

4     Q.   Let me back up.

11:35AM 5        Because the NFL games were behind a subscription pay

6 wall, the only people who could watch those games watching

7 cable couldn't watch them independently on a cable channel like

8 TNT. They had to specifically have a cable service that would

9 offer the NFL in-market games through some affiliate -- for

11:36AM 10 some cable affiliate of CBS and FOX. Is that correct?

11     A.   Counsel, you've lost me. We didn't -- we didn't

12 license our games to TBS. We licensed our game to CBS and FOX

13 on Sunday afternoons. So that's -- that's where they would

14 watch it, on those platforms.

11:36AM 15     Q.   I guess maybe the easiest way to say it is

16 80 percent or more who are watching CBS and FOX

17 are not doing it over the air. They're doing it through their

18 local cable; correct?

19     A.   Through a local cable -- it could be also a

11:36AM 20 satellite.

21     Q.   Okay.

22     A.   Right? There would be other alternatives.

23     Q.   Okay. Now, one way we can agree that the NFL could

24 prevent -- or excuse me -- DirecTV -- one way that DirecTV

11:37AM 25 could be prevented from cannibalizing viewers of CBS and FOX

**1490**

1 would be to ensure that DirecTV's prices for Sunday Ticket were

2 kept high; correct?

3     A.   It was a premier product. They determined what --

4 what the value of it was, that was DirecTV's decision.

11:37AM 5     Q.   But is the answer to my question yes?

6     A.   I said DirecTV made that decision. They believed

7 that it was a premium content also.

8     Q.   The NFL, though, wanted to make sure, as well, that

9 DirecTV Sunday Ticket pricing was premium-priced, was a high

11:38AM 10 price. Is that fair?

11     A.   Well, it wasn't just pricing. Premium is more than

12 just pricing. Premium is the service that you get. And

13 DirecTV offered promotions around that, and that was -- that

14 was their decision on how they did that.

11:38AM 15     Q.   But my question, sir, is just referring to the

16 pricing of Sunday Ticket. For a moment, can we just talk about

17 the pricing of Sunday Ticket and can we agree that one way to

18 keep the viewership of Sunday Ticket limited would be to ensure

19 that its price was high?

11:38AM 20     A.   Well, that decision was made by DirecTV.

21     Q.   Okay.

22     A.   They ultimately make that decision based on the

23 quality of the content.

24     Q.   Okay. Pull up 750, please. We're going to look at

11:38AM 25 a document in evidence. And I want to give you the context of

**1491**

1 this document, sir.

2        You were involved, weren't you, in the negotiation

3 of an extension contract between CBS and FOX in the spring of

4 '09; correct?

11:39AM 5     A.   I was Commissioner then, so, yes, but I -- I have

6 staff that are doing a lot of the negotiations.

7     Q.   Exactly. I mean, I can -- I mean, yourself and

8 Mr. Kraft, who owns the Patriots, were actually meeting with

9 CBS and FOX to try to get an extension contract to cover the

11:39AM 10 '12 and '13 seasons; correct?

11     A.   I don't remember the specifics, but I know we did a

12 short-term extension during that period of time.

13     Q.   All right. Maybe we can help. Let's go to the last

14 page of this exhibit, very last page.

11:39AM 15        THE COURT: Hold on a second.

16        MR. CARMODY: I'm sorry.

17        JUROR NO. 5: I'm okay.

18        THE COURT: Do you have water?

19        JUROR NO. 5: I have water.

11:39AM 20        THE COURT: Okay. Thanks.

21     Q.   (BY MR. CARMODY:) We can see on the last page of

22 this, when we see the initials RG, that's referring to

23 yourself; RKK is Mr. Kraft who owns the Patriots; and LM is

24 Les Moonves who was then CEO and chairman of CBS; correct?

11:40AM 25     A.   I don't know. I assume RKK is Robert Kraft, but I

**1492**

1 have not seen this document. This isn't -- is there someone

2 who wrote this document?

3     Q.   Well, I think so. Take a look at the page before.

4        Is this your handwriting?

11:40AM 5     A.   I don't believe so.

6     Q.   Are you -- okay. Going back then to the page we

7 just were, we can see notes. It says, "Memo to file for the

8 CBS and FOX meetings." And what at least we can see in the CBS

9 meeting we have three attendees, one of which is you, one of

11:40AM 10 which is Mr. Kraft, and you're not sure if LM is referring to

11 Les Moonves who is running CBS at the time; correct?

12     A.   If -- if that is just who attended the meeting,

13 Les Moonves would have probably represented CBS.

14     Q.   Okay. So what we can see together is a negotiation

11:40AM 15 of an extension contract between the NFL on one hand here and

16 CBS on the other; correct?

17     A.   It's notes from a meeting, yes.

18     Q.   Okay. And the meeting, to be sure about it, was a

19 meeting talking about negotiations, what the NFL wanted, what

11:41AM 20 CBS wanted to be the terms to extend the '06 contract to

21 cover -- supposed to end in '11. It was going to then cover

22 two more seasons, '12 and '13; correct?

23     A.   As I said, we were talking about an extension. I

24 don't -- I haven't read this document.

11:41AM 25     Q.   Okay.

1521

1    Q.    (BY MR. CARMODY:)  The setup is we're in -- oh, it
2  did this again.  Oh.  Bottom left?  Okay.
3         The setup here is we are in early '19, you're
4  getting an e-mail here, number of people -- excuse me.  You're
01:57PM 5  not getting this one directly here.  It's right here.  Uh,
6  "Attached is the deck for RG summarizing the four bids."
7         You, sir, are that RG; correct?
8    A.    Yes.
9    Q.    And so as you sit here today, I'm guessing you don't
01:58PM 10  have an independent recollection of what may have or not have
11  happened in February of '19 and on a specific day, but I think
12  it's fair to say you would have seen this slide deck then;
13  right?
14    A.    I don't know whether I saw this.
01:58PM 15    Q.    Okay.  Well, let's assume the e-mail's correct, and
16  now we go to the slide that I was talking about.  And what --
17  what is being looked at here, there's an analysis done by the
18  NFL.  And if we take a look at the left side first, we see
19  "exclusive."  And what it says up top I don't want to blow by
01:58PM 20  the title, it says, "Preferred NFL Sunday Ticket model."
21         Do you see that?
22    A.    I do.
23    Q.    Okay.  So on the top left, we see "exclusive."  And
24  AT&T is the same as DirecTV.  And that's who the NFL had been
01:58PM 25  doing business with as its exclusive distributor since '94;

1523

1    A.    Probably.
2    Q.    Okay.  Now, if we take a look at the negatives on
3  the right column, it says one of the negatives of staying with
4  either DirecTV or even switching and being exclusive with ESPN,
02:00PM 5  it says a negative of that is being reliant on one partner for
6  innovation and product development.  Fair?
7    A.    Yes.
8    Q.    Okay.  But now we go back down and we look and see,
9  if we bring some competition into the market, that is, if you
02:00PM 10  team up DirecTV with ESPN, Amazon, couple others mentioned,
11  what happens as a negative, the first one we see is it says
12  that competition could destroy direct and indirect value.
13         Do you see that?
14    A.    I do.
02:01PM 15    Q.    And that's talking about destroying direct and
16  indirect value to the NFL; correct?
17    A.    I assume so.
18    Q.    Okay.  Destroying the NFL's direct and indirect
19  value, because DirecTV, because it has some competition, isn't
02:01PM 20  going to be paying you the same rights fees; correct?
21    A.    I don't know that.
22    Q.    That's -- all we can --
23    A.    I don't know if we knew that at the time.
24    Q.    All we can do together now is see what it says
02:01PM 25  because you don't have the memory and I wasn't there.  But it

1522

1  correct?
2    A.    Correct.
3    Q.    Now, there's a consideration for Disney/ESPN because
4  Disney owns ESPN at that point; correct?
01:59PM 5    A.    Yes.
6    Q.    Okay.  Going now on the bottom, there's another
7  consideration at issue.  It says, "Digital only."  But then it
8  says, "Co-exclusive with AT&T."  So at the bottom option would
9  mean is the NFL sticking with DirecTV but also teaming it up
01:59PM 10  with some digital Sunday Ticket distributors; correct?
11    A.    I assume so.  I didn't write this.
12    Q.    Okay.  When we look together at the pluses and
13  minuses of each, what we see under a plus, for example, the
14  third one from the bottom, right there, "Best model to drive
01:59PM 15  indirect value," you can see by sticking with AT&T there,
16  DirecTV, it's the best model to drive indirect value for the
17  NFL; correct?
18    A.    I believe that's what that means, yes.
19    Q.    And then if we look below that, if we say what's the
02:00PM 20  plus?  If it's going to someone other than DirecTV, it says,
21  "Marketplace competition:  Looks like it's going to result in
22  product innovation."
23         Is that a fair read?
24    A.    I didn't write this.  I don't recall it, but --
02:00PM 25    Q.    In context does it seem fair?

1524

1  does say competition could destroy direct and indirect value,
2  and you agree in context that means destroying the NFL's
3  competition, could destroy the NFL's direct and indirect value;
4  correct?
02:02PM 5    A.    Somebody wrote that and said it could, yes.
6    Q.    And that's a money term.  That's an economic term,
7  direct and indirect value.  That's about the NFL getting money
8  or less of it; correct?
9    A.    Or less of it?
02:02PM 10    Q.    Yeah.
11    A.    What do you mean?
12    Q.    With competition it looks like could destroy direct
13  and indirect value, competition could cause people out there
14  competing -- listen, if it's not -- if it's not AT&T or DirecTV
02:02PM 15  anymore, it's a bunch of others, they're not going to pay the
16  same rights fees, are they?
17    A.    No, I think, Counsel, that's the point.  You're
18  splitting the package, I think, in this second alternative --
19    Q.    Exactly.
02:02PM 20    A.    -- which is a hypothetical.  It is -- it is not a
21  deal term.  We don't know -- I don't know if that was actually
22  proposed.
23    Q.    All we know is right below that, it says that's a
24  greater risk for the NFL; correct?
02:02PM 25    A.    It does say that.

06/17/2024  06:32:12 PM                    Page 1521 to 1524 of 1610                    36 of 95 sheets

1525

1 Q. I mean those were the NFL's words?

2 A. It's whoever put this proposal together or this
3 document.

4 Q. And it says impact -- it's also what's considered as
5 impact to other NFL media objectives. And what we see on the
6 bottom, it's like a broken rectangle with a box around it. It
7 says, "Exclusive deal" -- and that's referring to AT&T,
8 DirecTV -- "remains the best option to maintain long-term value
9 of NFL Sunday Ticket rights." Correct?

10 A. That's what it says, yes.

11 Q. That's the value, the economic value to the NFL;
12 correct?

13 A. That's the best option for us is what it says.

14 Q. Okay. Thank you.

15 MR. CARMODY: Your Honor, I'm done with the
16 impeachment. I'd like to offer this substantively under
17 Rule 801. For all the reasons we talked about, offer 206 into
18 evidence.

19 MS. WILKINSON: Objection, Your Honor. He said he's
20 never seen it.

21 THE COURT: Sustained.

22 Q. (BY MR. CARMODY:) Now, you talked -- let me see if
23 we can get back to our agreements.

24 I think we can agree that the salary floor, the
25 salary cap, and the draft all help the competitive balance on

1527

1 talking about the collective bargaining agreement; right?

2 A. That is correct.

3 Q. Where the players get 48 percent -- well, first of
4 all, the whole pot of money comes into the NFL, the NFL then
5 gets to keep 52 percent of it, and the owners can put it in
6 their pocket if they choose, but the other 48 percent gets paid
7 by the NFL to the players. Is that fair?

8 MS. WILKINSON: Object only to the argumentative
9 statement, Your Honor.

10 THE COURT: Overruled.

11 Q. (BY MR. CARMODY:) Is that fair?

12 A. That the split of revenue, not costs, split of
13 revenue roughly was 50/50 at that time.

14 Q. But the 50 percent wasn't going to the players. I
15 mean, it was the owners' investment in human capital. It's to
16 build their franchises and make them these multibillion dollar
17 franchises. It's not like they're saying, Here, players, you
18 get 50 percent and I get 50 percent. That wasn't the deal, was
19 it?

20 MS. WILKINSON: Same objection.

21 THE COURT: Overruled.

22 THE WITNESS: That's how the cap is calculated. The
23 cap is calculated on the percentage of revenue.

24 Q. (BY MR. CARMODY:) That's right.

25 A. There's a minimum and there's a maximum.

1526

1 the field at the NFL; correct?

2 A. Yes.

3 Q. Okay. But what I clocked you at, at 10:24 this
4 morning is you read revenue sharing is important to competitive
5 balance; correct?

6 A. Yes.

7 Q. The NFL has no studies whatsoever that would support
8 that point; that is, the NFL does not have any study that we
9 can look at that says revenue sharing among the teams from
10 these TV revenues helps competitive balance.

11 A. I disagree with you, Counselor. We may not have a
12 study, but we don't believe that the union would agree to a
13 salary cap if there wasn't revenue sharing. That wouldn't be
14 in their best interest.

15 MR. CARMODY: Let me object as nonresponsive.

16 Q. (BY MR. CARMODY:) Sir, my question is -- is a
17 simpler one. Just to be sure about it, before we move on,
18 you're not aware of any study the NFL did that said revenue
19 sharing from the TV -- the TV numbers among the teams is going
20 to help them in competition against one another?

21 A. A study wouldn't be what I was looking for. We've
22 had a long relationship with the union. We've talked to
23 this -- with the union. That was one of the reasons they
24 entered into a cap system back in the early '90s.

25 Q. Sir, I don't want to get off point here, but you're

1528

1 Q. And with the 3,000 or so players in the league, if I
2 do the arithmetic, they're getting -- out of the TV revenues,
3 if they're getting, you know, 2.8 million apiece and the
4 owner's walking away with 162 million apiece of just money,
5 they can spend it any way they want?

6 A. They have to pay their costs outside of that. This
7 is just player costs.

8 Q. Exactly. It's -- it is paying your players because
9 that's what draws fans to the games. It's why you say eyeballs
10 want to watch it on TV. It is an investment the owners are
11 making in their franchises. Fair?

12 A. It's an investment they're making in those players
13 as well as their franchise, yes.

14 Q. Now, let's get back to revenue sharing and
15 competitive balance.

16 A. Uh-huh.

17 Q. You say you're not aware of any study.

18 Can I show you -- have you look at a document in
19 evidence -- in fact, you know, as Commissioner, the opposite is
20 true, I mean, there are studies and we have more than one here
21 that go the other way.

22 MS. WILKINSON: Objection. Testimony again,
23 Your Honor.

24 Q. (BY MR. CARMODY:) We have studies here, sir, that
25 show -- let me back up.

1611

```
 1                    UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3            HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   IN RE:                          )   Case No.
     NATIONAL FOOTBALL LEAGUE'S      )   MDL 15-2668-PSG (SKx)
 6   SUNDAY TICKET ANTITRUST LITIGATION )
                                      )        Volume 9
 7   _____)   (Pages 1611 - 1840)

 8

 9           REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                            TRIAL DAY 9
10                    TUESDAY, JUNE 18, 2024
                            8:31 A.M.
11                    LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22   _____

23        MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
             FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, ROOM 4455
                LOS ANGELES, CALIFORNIA  90012
25                     (213) 894-2305
```

1612

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFFS:

SUSMAN GODFREY
BY:  MARC M. SELTZER
BY:  AMANDA K. BONN
BY:  KALPANA SRINIVASAN
   Attorneys at Law
1900 Avenue of the Stars, Suite 1400
Los Angeles, California  90067
(310) 789-3100

SUSMAN GODFREY
BY:  WILLIAM C. CARMODY
BY:  SETH ARD
   Attorneys at Law
One Manhattan West, 50th Floor
New York, New York  10001
(212) 336-8334

FOR THE DEFENDANTS:

WILKINSON STEKLOFF, LLP
BY:  BETH WILKINSON
BY:  BRIAN L. STEKLOFF
BY:  RAKESH N. KILARU
   Attorneys at Law
2001 M Street NW, 10th Floor
Washington, DC  20036
(202) 847-4000

1613

### INDEX OF WITNESSES

PLAINTIFF'S WITNESSES                                       PAGE

JERRAL W. JONES

  Cross-examination (Resumed) by Ms. Srinivasan       1637

  Redirect Examination by Ms. Wilkinson               1643

SEAN MCMANUS

  Direct Examination by Mr. Stekloff                  1645

  Cross-examination by Mr. Ard                        1671

  Redirect Examination by Mr. Stekloff               1709

  Recross-examination by Mr. Ard                     1723

MICHAEL WHITE

  Examination by videotaped deposition               1726

JAMES DANA DYCKES

  Examination by videotaped deposition               1727

ROBERT THUN

  Examination by videotaped deposition               1728

CATHY YANCY

  Direct Examination by Ms. Wilkinson                1728

  Cross-examination by Ms. Bonn                      1768

  Redirect Examination by Ms. Wilkinson              1793

  Recross-examination by Ms. Bonn                    1796

BERT DOUGLAS BERNHEIM, Ph.D.

  Direct Examination by Mr. Stekloff                 1799

1614

### INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 47 | Constitution and Bylaws of the National Football League | | 1616 |
| 127A | E-mail | 1757 | 1758 |
| 139C | E-mail attachment | 1685 | 1689 |
| 146A | E-mail attachment | 1673 | 1674 |
| 150 | E-mail | 1683 | 1683 |
| 194 | E-mail | 1686 | 1686 |
| 271 | E-mail | 1616 | 1616 |
| 313 | E-mail | 1778 | 1778 |
| 431 | E-mail | 1680 | 1680 |
| 470 | E-mail | 1781 | 1782 |
| 471 | E-mail | 1784 | 1784 |
| 672 | NFL TV deals Q&A | 1616 | |
| 770 | E-mail | | 1616 |

1671

```
1    May it please the Court?
2    THE COURT:  You may.
3             CROSS-EXAMINATION
4    BY MR. ARD:
10:14AM  5    Q.    Good morning, Mr. McManus.
6    A.    Good morning.
7    Q.    In the last 15 years I think CBS has negotiated
8    three AFC packages with the NFL; right?  2009, '11, and '21.
9    Does that sound right?
10:14AM  10   A.    I believe so.
11   Q.    Okay.  And you were personally involved in those
12   negotiations?
13   A.    I was.
14   Q.    And during those negotiations, CBS told the NFL that
10:14AM  15   it wanted Sunday Ticket to continue to be a premium package for
16   avid fans; correct?
17   A.    That was our opinion, yes.
18   Q.    And CBS explained to the NFL this meant that
19   Sunday Ticket is now a premium package with certain pricing
10:14AM  20   parameters and CBS would expect that to continue.  Fair?
21   A.    That's what we asked for.
22   Q.    And the price of Sunday Ticket was very important to
23   CBS because CBS needed to make sure that the Sunday Ticket
24   package wouldn't interfere with CBS's ability to have the
10:14AM  25   broadest distribution and television ratings.  Fair?
```

1672

```
1    A.    Uh-huh.  Yes.
2    Q.    In other words, CBS wanted a premium price for
3    Sunday Ticket because CBS didn't want Sunday Ticket taking away
4    more eyeballs from CBS viewership.  Fair?
10:15AM  5    A.    Yes.
6    Q.    And having more viewers is good for CBS because CBS
7    makes more money from having more viewers; right?
8    A.    Yes.
9    Q.    And it's good for the NFL because CBS is willing to
10:15AM  10   pay the NFL more money if CBS makes more money.  Fair?
11   A.    Fair.
12   Q.    And I think you testified there were three basic
13   features of Sunday Ticket that CBS and NFL agreed to.
14   Sunday Ticket would have a distinct price, it would be sold as
10:15AM  15   a premium product, and local fans would be watching games on
16   CBS rather than on Sunday Ticket.  Fair?
17   A.    Can you say that again, please?
18   Q.    Sure.  I think you testified that there were three
19   basic features of Sunday Ticket that CBS and NFL agreed to.
10:16AM  20   Sunday Ticket would have a distinct price, it would be sold as
21   a premium product, and local fans would be watching games on
22   CBS rather than on Sunday Ticket.  Fair?
23   A.    Yeah.  The last part I'm a little confused about as
24   far as watching games on CBS.  So, um, that was one of our
10:16AM  25   goals, yes.  But, um -- yes.  I think the answer to your
```

1673

```
1    question is yes.
2    Q.    Thank you.
3    Let's quickly walk through a few CBS contract
4    negotiations.
10:16AM  5    Your most recent contract with the NFL was signed in
6    2021; is that right?
7    A.    Yes.
8    Q.    I'm going to show you TX146A.  I'm not going to
9    publish it.  It's not been admitted yet.  It should be on your
10:16AM  10   screen.  It's in your binder, but if you want to move more
11   quickly, I'm just showing you the cover on your screen.
12             (Exhibit No. 146A for identification.)
13   MR. ARD:  I'm not showing on your screen, I
14   apologize.  It's in your binder.  It's 146A.
10:17AM  15   THE WITNESS:  Okay.  I have it, the March 16th,
16   2021?
17   Q.    (BY MR. ARD:)  Yes.  Correct.
18   A.    Yes.
19   Q.    And if you look on the fourth page of the document,
10:17AM  20   the Bates number on the bottom right ends in 532.
21   You signed this agreement on behalf of CBS; right?
22   A.    I did.
23   Q.    Okay.  And this is the 2021 contract with CBS, sir,
24   and the NFL for the CBS package?
10:17AM  25   A.    Yes, it is.
```

1674

```
1    Q.    Okay.
2    MR. ARD:  Your Honor, I'd like to move this into
3    evidence.
4    THE COURT:  Any objection?
10:17AM  5    MR. STEKLOFF:  No, Your Honor.
6    THE COURT:  Admitted.
7             (Exhibit No. 146A received into evidence.)
8    Q.    (BY MR. ARD:)  If you can turn to the -- it will be
9    on your screen now if it's easier to see.
10:18AM  10   If you turn to the last sentence of 5 --
11   THE COURT:  Just when we finalize the exhibits --
12   MR. ARD:  Yes, Your Honor.
13   THE COURT:  I'm not sure if it's intentional or not,
14   but my copy's redacted.  So I just point it out, that's all.
10:18AM  15   MR. ARD:  Our copy's redacted, too.  We never got
16   full copies.
17   THE COURT:  I just want to be on the same page.
18   MR. ARD:  Yes, Your Honor.
19   THE COURT:  Okay.
10:18AM  20   Q.    (BY MR. ARD:)  If you turn to the last sentence of
21   5C1 -- well, first, let's look at the first sentence.  It talks
22   about a subscription requirement.
23   Do you see that?
24   A.    I'm not there yet.
10:18AM  25   Q.    I'm sorry.
```

1675

```
 1         A.   What am I looking for?
 2         Q.   It's on your screen if you want to just look on the
 3   screen.
 4              Do you see that?
 5         A.   I'm reading it.
 6              (Pause in the proceedings.)
 7         THE WITNESS:  Yes, I have read it.
 8         Q.   (BY MR. ARD:)  The first part talks about a
 9   subscription requirement.
10              Do you see that?
11         A.   I do.
12         Q.   I think you said that was in all the deals with the
13   NFL, right, and CBS?
14         A.   Correct.
15         Q.   And the subscription requirement meant that the
16   consumer would have to pay a separate fee to get the
17   Sunday Ticket package on top of the price of getting the
18   regular cable channels like ESPN, TNT, and so forth; correct?
19         A.   That's correct.
20         Q.   And so this sort of shows how that works; right?
21   You have your cable package, your satellite package on the
22   left, and then the requirement is you have to pay something
23   extra in order to watch out-of-market games; right?
24         A.   Yeah.  I've not seen this before, but let me just
25   try to understand what it is saying.
```

10:18AM (line 5), 10:19AM (line 10), 10:19AM (line 15), 10:19AM (line 20), 10:20AM (line 25)

1676

```
 1              Can you explain what you think it's saying again?
 2         Q.   I think it's saying what you just said, which is
 3   that the subscription requirement meant that the consumer would
 4   have to pay a separate fee --
 5         A.   Yes.
 6         Q.   That's the plus.
 7         A.   Yep.
 8         Q.   On top of the price of getting regular cable
 9   channels.  Fair?
10         A.   Correct.
11         Q.   Okay.  And so, among other things, that means that
12   NFL couldn't just put the games on the regular cable channels.
13   Fair?  You had to pay something on top of that to get that --
14         A.   That's correct.
15         Q.   That's correct?
16         A.   Yes.
17         Q.   Let's go back to the contract, please.
18              Let's go to the second sentence now.
19              And you see where it says that the -- resale package
20   here refers to Sunday Ticket; right?
21         A.   Uh-huh.
22         Q.   And it says "marketed as premium products."
23              Do you see that?
24         A.   I do.
25         Q.   And premium products there refers, among other
```

10:20AM (line 5), 10:20AM (line 10), 10:20AM (line 15), 10:21AM (line 20), 10:21AM (line 25)

1677

```
 1   things, to the pricing of products; right?
 2         A.   And the quality of the presentation.
 3         Q.   Okay.  But it's referring to a premium price of the
 4   product, among other things.  Fair?
 5         A.   Uh-huh.  Yes.
 6         Q.   And CBS preferred that Sunday Ticket have a limited
 7   number of subscribers.  Fair?
 8         A.   That was our request -- our goal, yes.
 9         Q.   And CBS conveyed that to the NFL.  Fair?
10         A.   We did.
11         Q.   And the agreement on that is reflected in Part 5C
12   here.  Fair?
13              Can you go back up to 5C?
14              Is that fair?
15         A.   Yes.
16         Q.   Okay.  So CBS and NFL agreed to a premium price for
17   Sunday Ticket which limits distribution of Sunday Ticket.
18   Fair?
19         A.   We agreed to the -- yes.
20         Q.   Um, let's also look at 5C3.
21         A.   If I can just say, I don't know if that did, in
22   fact, limit the distribution.  I know that that was what we
23   have in the contract.  I don't know what the effect of that was
24   on the distribution.
25         Q.   But you agree that the goal of limiting the
```

10:21AM (line 5), 10:21AM (line 10), 10:21AM (line 15), 10:22AM (line 20), 10:23AM (line 25)

1678

```
 1   subscribers of Sunday Ticket is reflected in this Part 5C.
 2   Fair?
 3         MR. STEKLOFF:  Objection.  Asked and answered and
 4   argumentative, Your Honor.
 5         THE COURT:  Overruled.
 6         THE WITNESS:  I'm sorry.  Could you repeat that?
 7         Q.   (BY MR. ARD:)  Sure.
 8              You agree that the goal of limiting the number of
 9   subscribers to Sunday Ticket is reflected in this Part 5C.
10   Fair?
11         A.   I'm not sure.
12         MR. ARD:  Um, can I show 53:15 to 54:1 in his
13   deposition, Your Honor?
14         THE COURT:  One moment.  Could you repeat that
15   again?
16         MR. ARD:  Yeah.  53:15 to 54:2, actually.
17         THE COURT:  I need the deposition transcript.  I
18   need a transcript.
19         MR. ARD:  It's in the binder, I think, maybe on the
20   left.  In the flap, yeah.
21              (Pause in the proceedings.)
22         THE COURT:  I'm not sure -- any objection?
23         MR. STEKLOFF:  I think these questions have been
24   answered -- asked and answered, Your Honor.
25         THE COURT:  I'm not sure it's -- I'm not sure it's
```

10:23AM (line 5), 10:23AM (line 10), 10:24AM (line 15), 10:24AM (line 20), 10:25AM (line 25)

1679

1 impeachment.

2          MR. ARD:  Well, is it reflected -- is the

3 agreement --

4     Q.    (BY MR. ARD:)  Is the goal of limiting the number of

10:25AM 5 subscribers to Sunday Ticket reflected in this Part 5C?

6     A.    Our goal, yes.

7     Q.    It's reflected in 5C; right?

8     A.    Yes.

9     Q.    Okay.  Let's also look at 5C3.

10:25AM 10         Do you see that?  It's on your screen, too, if you

11 want to look at it.

12     A.    "For clarity, neither league" -- yes, I see that.

13     Q.    Okay.  And this means that if somebody was going to

14 buy Sunday Ticket package, they had to buy the whole package of

10:26AM 15 games, not individual games.  Fair?

16     A.    That's what it says.

17     Q.    And it also meant that the games could not be sold

18 on a team-by-team basis either; correct?

19     A.    That's correct.

10:26AM 20     Q.    And that was always the understanding between CBS

21 and the NFL; right?

22     A.    Correct.

23     Q.    Let's talk about the 2020 negotiations quickly that

24 led to this contract.

10:26AM 25         TX431, if you can look at that.

1680

1          (Exhibit No. 431 for identification.)

2          THE WITNESS:  TX431.  Okay.

3     Q.    (BY MR. ARD:)  This is an e-mail sent from somebody

4 at CBS to NFL copying you on November 16th, 2020.  Is that

10:27AM 5 fair?

6     A.    Yes.

7     Q.    And you received this e-mail?

8     A.    Yes.

9     Q.    And if you look at about three pages in and Bates

10:27AM 10 ending 472, it's on your letterhead.  Is that fair?

11     A.    I'm sorry.  Say that again.

12     Q.    The Bates ending on the bottom right, 472, there's a

13 letter there that's on your letterhead.  Is that fair?

14     A.    Yes.

10:27AM 15         MR. ARD:  Your Honor, I'd like to move this into

16 admission.

17         THE COURT:  Any objection?

18         MR. STEKLOFF:  No, Your Honor.

19         THE COURT:  Admitted.

10:27AM 20         (Exhibit No. 431 received into evidence.)

21     Q.    (BY MR. ARD:)  And if you look at that same page, it

22 says it's a draft letter that extends and amends the 2014

23 agreement; right?  If you look on the screen, I kind of

24 underlined it.  Extend and amend -- yeah, sorry.

10:28AM 25     A.    Right.  That is -- I believe that's what it says,

1681

1 yes.

2     Q.    Okay.  And we can talk about it in a second.  But

3 the 2014 agreement was just a -- what's called a "long form

4 agreement" that memorialized a short agreement you had signed

10:28AM 5 in 2011.  Does that sound right?

6     A.    I don't remember that but --

7     Q.    Okay.  We'll get there in a second.

8         Let's now turn to the page that says it's consistent

9 with current practice.

10:29AM 10         There it is.  Okay.

11         This is resale.  This is talking about

12 Sunday Ticket; right?

13     A.    I don't know what you're looking at.

14     Q.    On your screen, sorry.  The resale package, again,

10:29AM 15 refers to Sunday Ticket; right?

16     A.    Resale package refers to Sunday Ticket.

17     Q.    Okay.  And these are your statements -- these

18 redlines are your redlines to NFL; right?

19     A.    I don't know.  I mean, I haven't looked at this, but

10:29AM 20 I -- I don't know.

21     Q.    Can you go back to the front page?  No, the very

22 first e-mail.

23         So this is -- it says from CBS.  It says, "Our

24 revised draft."

10:30AM 25         Do you see that?

1682

1     A.    Okay.  Yep.

2     Q.    So let's go back to that page we were just looking

3 at.

4     A.    Okay.  Yep.  I got it.

10:30AM 5     Q.    All right.  If you look down the middle, it says,

6 "Consistent with current practice."

7         Do you see that?

8     A.    Uh-huh.

9     Q.    Okay.  And the current practice you're referring to

10:30AM 10 is the same things we were just talking about.  Right?  That

11 Sunday Ticket was intended to be a premium product for avid

12 fans.  Right?

13     A.    Yes.

14     Q.    And Sunday Ticket subscriber levels would be

10:30AM 15 reasonably consistent with the deal that was made the year the

16 deal was made.  Fair?

17     A.    Yes.

18     Q.    And Sunday Ticket's not intended to take viewership

19 away from CBS; right?

10:30AM 20     A.    Uh-huh.  Yes.

21     Q.    Okay.  And NFL never wrote back saying that's not

22 the current practice; right?

23     A.    The NFL did what?

24     Q.    Never wrote back saying that's not the current

10:31AM 25 practice.  Fair?

1695

1697

MR. ARD:  Okay.  Thank you, Your Honor.

2     Q.     (BY MR. ARD:)  CBS has been a leader in programming

3  innovations in all sports it broadcasts.  Fair?

4     A.     I think that's fair.

5     Q.     In golf, it pioneered 3D technology at the Masters;

6  is that right?

7     A.     Yes.

8     Q.     One of my favorites in tennis, it was the first

9  network to use the MacCam.

10          Do you remember that?

11    A.     Uh-huh.

12          THE COURT:  Is that "yes"?

13          THE WITNESS:  Yes.

14    Q.     (BY MR. ARD:)  With a high speed camera --

15    A.     Yes.

16    --     that John McEnroe had been begging for, showed

17  Serena getting bad calls against Capriati in the --

18    A.     Yes.

19          I should stop.

20          In the -- and CBS tries to bring technological

21  innovations in all the programming it does.  Fair?

22    A.     Yes.

23    Q.     And CBS innovates in all the programming it does to

24  differentiate its product from competitors; right?

25    A.     Yes.

1  A.     I believe Chris Schenkel and Jim McKay, but I'm not

2  totally sure.

3     Q.     Your father.  Right?

4     A.     Okay.

5     Q.     Is that right?

6     A.     Yes.

7     Q.     Your father was the announcer?

8     A.     I think he did radio, actually.  He did a

9  combination of radio and television, so I'm not sure on that

10  game which it was.

11    Q.     Okay.  But he did television broadcasting for the

12  New York Giants in the 19' -- I think '57 to '58; does that

13  sound about right?

14    A.     Yes.  Correct.

15    Q.     Okay.  And I think we can all agree that your father

16  was one of the greatest sports broadcasters of all time.  I

17  mean, let me set it up this way.  He announced the Summer

18  Olympics three years later; right?

19    A.     Correct.

20    Q.     He announced the famous Munich games; correct?

21    A.     Correct.

22    Q.     And I think that he's regarded -- I think he's in

23  the Broadcasting Hall of Fame.  Is that fair?

24    A.     He is.

25    Q.     Okay.  And do you know the Giants were -- in 1957,

1696

1  Q.     And CBS and FOX often broadcast NFL games at the

2  same time; right?

3     A.     Yes.

4     Q.     And CBS tries to innovate in those games to

5  differentiate its NFL product from FOX.  Fair?

6     A.     Yes.

7     Q.     Okay.  And you never had discussions with NFL about

8  whether Sunday Ticket would be an exclusive or nonexclusive

9  provider -- strike that.

10          You never had discussions with NFL about whether

11  DirecTV would be an exclusive or nonexclusive provider of

12  Sunday Ticket.  Fair?

13    A.     I'm not sure I understand this.

14    Q.     You never had any discussions with the NFL about

15  whether DirecTV would be an exclusive or nonexclusive provider

16  of Sunday Ticket.  Fair?

17    A.     That is fair, yes.

18    Q.     Okay.  I was trying to find video highlights of a

19  1957 Giants football game.  They were broadcast on CBS.

20          Do you know who the announcer at that time would

21  have been?

22    A.     On radio or television?

23    Q.     Television.

24    A.     I do not.

25    Q.     On radio?

1698

1  '58 were competing with other teams not only on the field but

2  off the field for selling the television rights?

3     A.     I'm not sure.

4     Q.     Okay.  Let's talk about your history at CBS very

5  quickly.

6          When you came there, CBS had just lost NFL football;

7  right?

8     A.     It lost it in 1994.  I came in 1996.

9     Q.     And I was reading an article about -- giving some

10  quotes from you, I think you said the primary -- your primary

11  goal by a hundred percent was to get the NFL back and you

12  thought about nothing else for a year and a half.

13          Does that sound about right?

14    A.     A bit of an overstatement, but yes.

15    Q.     Okay.  And I think you said that was by far

16  professionally the most satisfying moment of your life; is that

17  correct?

18    A.     Yes.  Professionally, yes.

19    Q.     And when NFL came back to CBS, CBS went to being the

20  number one television network again?

21    A.     Yes.

22    Q.     Is that right?

23          And I should have said that '94 when it lost --

24  well, before 1994 it was the number one network.  Fair?

25    A.     Yes.

1791

1       teams.

2            A.    Right, yes.

3            Q.    Do you remember offering those viewpoints?

4            A.    Yes.  What didn't make sense, yes.

03:02PM 5        Q.    And so my question is:  Are you aware through any of

6       your work -- have you gotten any indication from any of the

7       owners that in a world where they couldn't collectively sell

8       the rights to the game, that they somehow wouldn't want to

9       coordinate on setting standards or creating common feeds if

03:02PM 10      that would benefit the fans?

11           A.    I've never had any conversations with owners.

12           Q.    Okay.  And you talked about some innovations during

13      your examination that have happened, requirements about the

14      number of microphones, about the use of Sky Cams.  And are you

03:03PM 15      aware of any conversations or any information that the owners

16      wouldn't want to set standards around the number of cameras or

17      microphones in games if they couldn't sell the rights to the

18      games collectively as a league?

19           A.    I -- I've never had any conversations with owners

03:03PM 20      about that.

21           Q.    And you've never had any conversations within the

22      NFL suggesting that if Sunday Ticket were exclusive to DirecTV,

23      the NFL would no longer be interested in placing requirements

24      on the number of cameras or microphones on the games?  No

03:03PM 25      conversations like that either; correct?

1792

1            A.    Can you state the question again?

2            Q.    Sure.

3            A.    I'm sorry.  I'm just getting a little lost.

4            Q.    Sure.  You've never had any conversations indicating

03:03PM 5        that if Sunday Ticket were not exclusive on DirecTV, were more

6       broadly distributed on cable, like Major League Baseball, that

7       somehow the NFL would want to get rid of their production

8       requirements around number of cameras or number of microphones?

9            A.    I don't know what that world looks like, but I

03:04PM 10      haven't had those conversations.

11           Q.    And, likewise, you've never had any conversations

12      suggesting that the league would abandon common officiating

13      rules if Sunday Ticket were no longer exclusive on DirecTV;

14      correct?

03:04PM 15           A.    I don't know.  There are so many variables here.  I

16      can't speak to any of that because I just don't know what this

17      looks like.

18           Q.    And what you can say is that you've never received

19      an indication that any part of your job and the quality control

03:04PM 20      that you impose would disappear or go away if somehow

21      Sunday Ticket were nonexclusive?

22           A.    I've never had that conversation.

23                 MS. BONN:  Thank you so much.

24                 THE COURT:  We'll go ahead and take the afternoon

03:04PM 25      break of 15 minutes.  We'll see you in 15 minutes.

1793

1                 THE COURTROOM DEPUTY:  All rise.  This court is in

2       recess.

3                     (Break taken.)

4                     (In the presence of the jury:)

03:24PM 5        THE COURT:  Redirect.

6                 MS. WILKINSON:  Thank you, Your Honor.

7                     REDIRECT EXAMINATION

8       BY MS. WILKINSON:

9            Q.    Ms. Yancy, you were asked to look at some document

03:25PM 10      where you wrote an e-mail to someone else at the NFL about

11      various ideas you had.

12           A.    Yes.

13           Q.    You didn't have any role in the actual negotiations,

14      did you?

03:25PM 15           A.    No.  None.

16           Q.    So those are just internal suggestions you were

17      making?

18           A.    Yes.

19           Q.    And in there, you said something about digital

03:25PM 20      rights and I don't think you were allowed to explain.  So could

21      you tell us what kind of digital rights you were talking about

22      back in 2009?

23           A.    I read that to mean digital highlight rights.  That

24      was a request that was coming from partners all the time, every

03:26PM 25      partner constantly asking for digital highlights.  And it was

1794

1       just shorthand digital -- digital rights.  That's what I

2       assume -- that's what I believed that was.

3            Q.    Digital highlights, just -- I'm sorry, but what does

4       that mean?

03:26PM 5        A.    So it's the right to put highlights on your website.

6       So "digital rights" was saying they want digital rights to

7       highlights.  It's just a shorthand.

8            Q.    So it's almost like an advertisement on the website?

9            A.    No.  It's to show highlights.  You know, everyone

03:26PM 10      was --

11           Q.    Oh, highlights from the game?

12           A.    -- building their websites.  So CBS and FOX, ESPN,

13      they all wanted to be able to put highlights on their dot com

14      sites, ESPN.com.

03:26PM 15           Q.    In the 2012 document TX471 that counsel showed you,

16      it was talking about feedback on marketing presentations and

17      scripts feedback.  Right?  You could turn to 471, page 3.

18           A.    Yes.

19           Q.    That has nothing to do with contracts between

03:27PM 20      DirecTV or CBS or FOX and the NFL; right?

21           A.    No.  It's marketing.

22           Q.    And did you always review marketing presentations

23      and scripts from the networks?

24           A.    All networks, yes.

03:27PM 25           Q.    And from DirecTV?

1841

```
1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5  IN RE:                    )     Case No.
   NATIONAL FOOTBALL LEAGUE'S )    MDL 15-2668-PSG (SKx)
6  SUNDAY TICKET ANTITRUST LITIGATION )
                             )        Volume 10
7  _____)     (Pages 1841 - 2062)

8

9       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                    TRIAL DAY 10
10            THURSDAY, JUNE 20, 2024
                    8:35 A.M.
11            LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22  _____

23     MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
            FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
            LOS ANGELES, CALIFORNIA  90012
25                (213) 894-2305
```

1842

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFFS:

4        SUSMAN GODFREY
         BY:  MARC M. SELTZER
5        BY:  AMANDA K. BONN
         BY:  KALPANA SRINIVASAN
6          Attorneys at Law
         1900 Avenue of the Stars, Suite 1400
7        Los Angeles, California  90067
         (310) 789-3100
8

9        SUSMAN GODFREY
         BY:  WILLIAM C. CARMODY
10       BY:  SETH ARD
           Attorneys at Law
11       One Manhattan West, 50th Floor
         New York, New York  10001
12       (212) 336-8334

13

14   FOR THE DEFENDANTS:

15       WILKINSON STEKLOFF, LLP
         BY:  BETH WILKINSON
16       BY:  BRIAN L. STEKLOFF
         BY:  RAKESH N. KILARU
17         Attorneys at Law
         2001 M Street NW, 10th Floor
18       Washington, DC  20036
         (202) 847-4000

19

20

21
22
23
24
25

1843

1              INDEX OF WITNESSES

2

3    DEFENDANTS' WITNESSES                        PAGE

4    BERT DOUGLAS BERNHEIM, Ph.D.

5    Direct Examination (Resumed) by Mr. Stekloff    1868

6    Cross-examination by Mr. Ard                    1982

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1844

1              INDEX OF EXHIBITS

2                          FOR        FOR
                     IDENTIFICATION  EVIDENCE
3    NUMBER  DESCRIPTION         PG.         PG.

4    911  E-mail                     1880

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1921

```
 1              (In the presence of the jury:)
 2       THE COURT:  You may.
 3       MR. STEKLOFF:  Thank you, Your Honor.
 4    Q.    (BY MR. STEKLOFF:)  Dr. Bernheim, when we left off,
11:07AM 5 you were discussing this concept of free riding in the context
 6    of investment innovation -- and innovation; correct?
 7    A.    Yes.
 8    Q.    Now, I think you said you saw some evidence of that
 9    problem in this case.  Is that right?
11:07AM 10   A.    I did.  There is a description of what happened in
11    the preseason for the NFL.  And the -- I think it was
12    Mr. Rolapp describing that in the preseason -- remember hearing
13    the preseason quality is lower and also that preseason revenues
14    are not pooled across teams.  Maybe I wasn't clear enough
11:08AM 15 earlier.  When I said the constitution requires equal pooling
16    of telecast revenues, that -- that applies to the regular
17    season, not to the preseason.
18         So the preseason revenues are not shared.  So that's
19    a situation in which the free riding problem could, in
11:08AM 20 principle, arise.  And you've heard testimony that the
21    preseason quality of telecasts were low.  Apparently that
22    problem was so bad at one point that the NFL had to step in to
23    try to raise the quality of those broadcasts.  And that's
24    exactly what you expect to happen when the free riding problem
11:08AM 25 is a real problem.
```

1922

```
 1    Q.    Okay.  Now given that, and you described this a
 2    little bit before, couldn't the NFL just step in, in
 3    Dr. Rascher's but-for world?
 4    A.    And as I said before, you can accomplish certain
11:08AM 5 things by stepping in.  You know, you can get an increase in
 6    quality by stepping in.  But it's not the same as providing
 7    incentives because there are so many things you can't control
 8    contractually.  Quality is just hard to describe, contractual
 9    provisions applying to it are vague.  So there's only so much
11:09AM 10 you can do.
11    Q.    Now, do you also recall that Dr. Rascher testified
12    that competition generally produces as much, if not more,
13    innovation than a monopoly?
14    A.    Yes, I do.
11:09AM 15   Q.    Do you disagree with him?
16    A.    At that level of generality, no, I don't disagree.
17    I favor competition, in part, because it does a good job of
18    producing innovation.  But here we're dealing with a very
19    specific issue, not that general issue about competition versus
11:09AM 20 monopoly but the specific issue of when there are free riding
21    problems arising from demand spillovers, reputational
22    spillovers.  Allowing competition can do worse.  And that's
23    well-established.  This is a well-known fact in the economic
24    literature.
11:10AM 25   Q.    Now, everything you've discussed about investment
```

1923

```
 1    and innovation, does it have anything to do with intellectual
 2    property law, things like patents, trademarks, or copyrights?
 3    A.    Nothing at all.  No -- no aspect of what I just
 4    described is tied to intellectual property.  This isn't a
11:10AM 5 matter of whether you can protect your intellectual property.
 6    This is a matter of whether you have incentives to spend money
 7    on quality of broadcasts.
 8    Q.    And is that how an economist would look at it?
 9    A.    It is, yes.
11:10AM 10   Q.    So let's turn to a slightly different topic relating
11    to pooling.  Do you recall that Dr. Rascher argues that pooling
12    telecast rights reduced output?
13    A.    Yes.  I recall that.
14    Q.    Do you agree with him?
11:10AM 15   A.    I do not agree with him at all.
16    Q.    Okay.  What is the correct measure of output for --
17    for purposes of this case?
18    A.    Well, Dr. Rascher has defined the relevant market as
19    being NFL broadcasts.  Given that market definition, the right
11:11AM 20 measure of quantity is total viewership over all NFL games.
21    Q.    And we've heard a lot about access.  So access to
22    games.  Is that -- is the appropriate measure of output access
23    to games?
24    A.    No.  Access does not mean the people are watching
11:11AM 25 the games.  That's not consumption.  We don't measure output
```

1924

```
 1    simply by asking could somebody buy something if they wanted
 2    to.
 3    Q.    Do we measure -- if you were trying to see if people
 4    are watching the games, do you look at viewership?
11:11AM 5 A.    Yes.  That's right.
 6    Q.    Do you recall this slide from Dr. Rascher's
 7    testimony?
 8    A.    I do.  This refers to various estimates that appear
 9    in his reports.
11:11AM 10   Q.    Can you remind the jury what Dr. Rascher claimed
11    this slide showed?
12    A.    Dr. Rascher is claiming that he has various
13    estimates of the degree to which viewership would expand in the
14    but-for world and, to be more specific, basically what that
11:12AM 15 means is for these calculations, he is assuming all games are
16    available for free to everyone.  Okay?  And when he makes that
17    assumption -- and the games aren't going to be a different
18    level of quality, no -- no differences in broadcast quality, no
19    differences in game quality, exactly the same as now, but
11:12AM 20 everything available, for free, to everyone.  And his claim is
21    that, depending upon which of these numbers you look at,
22    viewership would be up by anywhere between 25 and 43 percent.
23    Q.    Do you agree with those estimates?
24    A.    Absolutely not.
11:12AM 25   Q.    Did you identify problems with Dr. Rascher's
```

(In the presence of the jury:)

THE COURT: You may.

MR. STEKLOFF: Thank you, Your Honor.

Q. **(BY MR. STEKLOFF:) Good afternoon, Dr. Bernheim.**

01:35PM A. Good afternoon.

Q. **Let's talk about DirecTV's exclusivity regarding Sunday Ticket. Okay?**

A. Yes.

Q. **In DirecTV's case -- or in DirecTV's situation, have you seen evidence that exclusivity incentivized innovation?**

01:35PM A. Yes, I have.

Q. **What was that? Briefly, what was that?**

A. There is evidence on -- wait a minute. I'm getting it confused with the other evidence on free riding.

01:36PM Oh, yes. In the context of DirecTV's experience, DirecTV was the exclusive provider for many years. Towards the end of that period, Amazon acquired DirecTV. Around that time --

Q. **When you say "Amazon," are you -- do you recall if it was Amazon or another company?**

01:36PM A. Yeah. It was -- I'm sorry. It was AT&T. Thank you.

AT&T acquired DirecTV. And at that point in time, this was -- 20, 24 years after the original DirecTV deal -- there was some dissatisfaction at the NFL with the innovations

01:36PM



that -- the level of innovation that was going on at DirecTV. And so the NFL had begun to look for alternatives.

Negotiations continued with AT&T. And what I've seen in the record are clear indications that, once AT&T became concerned that it might lose the deal going forward, it stopped investing in -- in innovation.

01:37PM

So this is basically what not having exclusivity is about. If you're not sure you're going to have the next contract, then whatever investments you make are going to benefit the next party that holds the Sunday Ticket contract.

01:37PM

Q. **Now, some of the earlier innovations that the jury heard about from Mr. Bornstein, Mr. Rolapp, and others, for example, RedZone, Fantasy Channel, those types of innovations, do you believe DirecTV would have made those innovations and investments if they had nonexclusive rights to Sunday Ticket?**

01:38PM

MR. ARD: Objection, Your Honor. Not in the report remotely.

MR. STEKLOFF: Your Honor, I'll -- paragraph 525.

MR. ARD: It's not --

01:38PM THE WITNESS: I can't speak to --

MR. STEKLOFF: Hold on, Dr. Bernheim.

THE WITNESS: Oh, I'm sorry.

MR. STEKLOFF: Is it okay for him to answer, Your Honor?

01:38PM Q. **(BY MR. STEKLOFF:) Go ahead.**



A. I can't speak to any particular innovation and say whether any particular innovation would have occurred or would not have occurred in the but-for world. That's very idiosyncratic. What I do note is that Mr. Bornstein

01:38PM specifically referred to RedZone and explained that he didn't think it would happen because RedZone would not -- would not have had -- I'm sorry -- because DirecTV, without exclusivity, wouldn't be able to differentiate itself.

And that is essentially the point that I'm making

01:38PM about free riding, that if the distribution arrangement is nonexclusive, that means that if you create innovation like RedZone, it can be copied very easily by the other distributors. And then you're losing some of the benefits of that to others.

01:39PM So what Mr. Bornstein testified to about this is very plausible.

Q. **Now, if you look in your binder quickly at TX13, is that a document you relied on in forming your opinions?**

A. TX13.

01:39PM Yes, it is.

MR. STEKLOFF: Your Honor, may I publish TX13 to the jury?

THE COURT: You may.

Q. **(BY MR. STEKLOFF:) And you mentioned that when AT&T**

01:39PM **acquired DirecTV, that changed DirecTV's perspective to**



**innovate, from your perspective. How does this document support that opinion?**

A. Well, this is an internal document for the NFL. And you can see it says, "AT&T not investing in Legacy platform.

01:40PM Additional innovation in app. AT&T chose not to invest when it was unclear if AT&T was to keep the contract."

So this is a reflection of, if you're not sure that the benefits flow to you, that is, in this case, AT&T is not sure that they will, then AT&T stops investing.

01:40PM Nonexclusivity has the same effect because if you've only got one-third of the market, it's like having a one-third probability of getting the next contract, two-thirds that somebody else gets it. It's the same idea.

Q. **And if you look at the document in front of you, was**

01:40PM **this an NFL document -- look at the hard copy.**

**Dr. --**

A. I'm sorry.

Q. **-- Bernheim, was this an NFL document or a DirecTV document?**

01:40PM MR. ARD: Objection. Leading, Your Honor. He already gave his answer.

THE COURT: Overruled.

THE WITNESS: I may have misspoken. I think this is a DirecTV -- yes. This is a DirecTV document. I misspoke.

01:41PM Q. **(BY MR. STEKLOFF:) Okay. And so was DirecTV**

1977

1  motivation to doing exclusivity agreements implies that its
2  true motivation must involve procompetitive considerations.
3  That's very different from saying that the per-subscriber fee
4  itself is procompetitive.  He's not saying that.
5  01:58PM          THE COURT:  I don't see that.  I just don't.
6          MR. ARD:  Okay.  Thank you.
7          (In the presence of the jury:)
8      Q.   (BY MR. STEKLOFF:)  I'm going to repeat the
9  question, Dr. Bernheim.
10 01:59PM          According to antitrust policy, is charging a
11 per-subscriber fee anticompetitive?
12     A.   Well, I can answer that question in terms of
13 antitrust economics, which may be what you meant.  So it is not
14 generally anticompetitive.  In fact, these sorts of rate
15 01:59PM structures are very common in the economy.  This is a special
16 case of what's known as a "two-part tariff."  The two-part
17 tariff is when there's a fixed fee and then a price.  So here
18 it would be the fixed -- the fixed, right -- you know, the
19 fixed payments to the NFL plus the per-subscriber fee.  That's
20 01:59PM the two-part tariff.
21          These things are very common, as I said, throughout
22 the economy.  To condemn them as a matter of principle I think
23 would be an economic disaster.
24          So one has to be very cautious here.
25 02:00PM     Q.   But doesn't the use of a per-subscriber fee allow

1978

1  the NFL to charge -- if it had happened, to be clear, in 2011
2  to 2023, wouldn't that have allowed them to charge a higher
3  price for Sunday Ticket?
4      A.   Well, yes.  It does allow them to charge a higher
5  02:00PM price, but that is simply a matter of exercising market power.
6  And I talked about this in the context of the general antitrust
7  principles.
8          The issue here is -- or the issue in antitrust
9  economics isn't whether you can -- whether you have market
10 02:00PM power or whether you can raise price by virtue of having that
11 market power.  It's whether you acquire that market power
12 through illegitimate means.
13          And as far as I'm aware in this case, there's no
14 allegation that the NFL acquired whatever market power it has
15 02:00PM as a professional football league through illegitimate means.
16 It hasn't killed off another league or something like that.
17          So antitrust policy would focus on the conduct, not
18 the prices, and ask whether -- whether the NFL is doing
19 something to damage competition.
20 02:01PM     Q.   And what was your conclusion about whether that
21 happened or not?
22     A.   Well, it hasn't happened.  To damage competition,
23 one of DirecTV's rivals would have to be damaged in a -- in a
24 durable and persistent way so that -- like the next time the
25 02:01PM bidding event came along, they weren't as viable.  But that

1979

1  hasn't happened.  In fact, you know, eventually AT&T, now the
2  parent of DirecTV, lost the bidding to another party.  So
3  there's no indication that competition has been harmed through
4  this process.
5  02:01PM          It is true that competition leads to winners and
6  losers, and being a loser means that you were excluded from a
7  transaction.  That's always true.  That's just part of
8  competition.  We accept that as part of competition.
9      Q.   Okay.  So let's talk about one last issue related to
10 02:02PM exclusive distribution and then wrap up.
11          Do you recall that Dr. Rascher said that Canada and
12 the sale of Sunday Ticket in Canada provided a natural
13 experiment for evaluating the effects of exclusivity?
14     A.   Yes, I -- I recall that.
15 02:02PM     Q.   Okay.  Does the fact that -- that -- the price of
16 Sunday Ticket in Canada was lower where distribution was
17 nonexclusive prove that there was something wrong with
18 exclusivity with DirecTV?
19     A.   Not at all.
20 02:02PM     Q.   Why not?
21     A.   Well, one of the basic premises -- premises of
22 economics is that prices are determined by supply and demand.
23 And when demand is higher, prices tend to be higher.  When it's
24 lower, prices tend to be lower.
25 02:02PM          The NFL is a big deal in the U.S., huge demand.

1980

1  It's not such a big deal in Canada.  The NHL is the big deal in
2  Canada.
3          So demand is lower.  It's hardly surprising that
4  prices would be lower.  That comparison is apples to oranges.
5  02:03PM It doesn't -- it doesn't prove a thing.  It can't prove a thing
6  unless you do something to adjust for the difference in demand.
7      Q.   Did Dr. Rascher, during his testimony in this trial,
8  discuss at all the difference in demand for NFL football in
9  Canada as compared to the United States?
10 02:03PM     A.   He didn't.  And the only thing I remember him saying
11 about it in his reports is that the price of -- of
12 paraphernalia, T-shirts, for example, is the same in Canada as
13 in the U.S.  But if you think about it, that's not surprising.
14 If you're selling T-shirts for less in Canada than you are in
15 02:03PM the U.S., there's just going to be a black market.  People are
16 going to buy them in Canada and sell them in the U.S.
17          So for these kinds of things, you have to keep those
18 sorts of prices pretty even.  It's not true for things like
19 distribution of Sunday Ticket.
20 02:04PM     Q.   So from your -- from your economic perspective, was
21 Dr. Rascher's analysis and discussion of Canada proper economic
22 analysis?
23     A.   No, it's not proper at all.  You can't -- you can't
24 draw a conclusion for that without doing something --
25 02:04PM something -- something basically serious about the difference

2021

1    (Break taken.)

2    (In the presence of the jury:)

3    THE COURT:  You may.

4    MR. ARD:  Thank you, Your Honor.

03:18PM 5    Q.    (BY MR. ARD:)  Dr. Bernheim, you testified a minute

6    ago that you didn't think there was an agreement between the

7    networks and NFL to charge a premium price, but you see here

8    that there's been testimony in this case in the last few days

9    that CBS and NFL agreed to a premium price for Sunday Ticket

03:19PM 10    which limits distribution of Sunday Ticket.

11        Do you see that, Dr. Bernheim?

12    A.    Well, I see what you've -- what you're citing here.

13    I know there's been a lot of testimony on this issue.

14    Q.    And you see here below, there's testimony from

03:19PM 15    Mr. Bornstein.

16        Do you know who Mr. Bornstein is?

17    A.    Yes, I do.

18    Q.    He was the person who negotiated with DirecTV in

19    discussing the DirecTV contract between NFL and DirecTV.  The

03:19PM 20    question was:  Does premium subscription mean premium price?

21        Again, just yes or no.  I mean, give us your best

22    shot.

23        To me, a premium subscription would imply a premium

24    price.

03:19PM 25        Do you see that?

2022

1    A.    I do see that.  That's different than agreeing to a

2    particular price, which is what your question to me earlier was

3    about.

4    Q.    My question earlier was did they agree to a premium

03:20PM 5    price and you said you don't know.

6    A.    I understood that to mean agree to a specific price,

7    and as far as I know, they don't do that.  I understand that

8    there are various agreements that refer to premium pricing.  I

9    think that that's different.  And as I said, there's been a lot

03:20PM 10    of testimony about why it's different.

11    Q.    And if we can put up 750, paragraph 10.

12    A.    Could you send me to the right binder?

13    Q.    3.

14    A.    3.  Which one am I in?  2.

03:21PM 15        The number, please?

16    Q.    I'm sorry.  Of the exhibit or the page?

17    A.    The exhibit, please.

18    Q.    Oh, the exhibit.  750.

19    A.    750.  And let me just look at what we have here.

03:21PM 20        Okay.  Yes.  Go ahead.

21    Q.    If you look at the second sentence, it says, "The

22    concept here has always been that these packages are sold at a

23    premium, thereby limiting distribution."

24        Do you see that?  This is an e-mail between CBS --

03:21PM 25    A.    I'm catching up with you.  You said second

2023

1    sentence -- I was looking at the second sentence of the

2    document.

3    Q.    I apologize.  On the front, you can see that it's an

4    e-mail between CBS and NFL, 2009.  And paragraph 10 is where

03:21PM 5    we're at, second sentence.

6    A.    I have it now.

7    Q.    Okay.  Sorry.

8        "The concept here has always been that these

9    packages are sold at a premium, thereby limiting distribution."

03:21PM 10        Do you see that?

11    A.    I do.  Again, same interpretation --

12    Q.    I just asked if you saw it.  That's all.

13    A.    Yes, I see it.

14    Q.    Okay.  And the networks here wanted the premium

03:22PM 15    price in order to limit distribution.

16        Do you see that?

17    A.    Which sentence are you referring to?

18    Q.    Same sentence.  It's right there on the screen, the

19    highlighted one.  They wanted the premium price, they wanted

03:22PM 20    the packages to be sold at a premium to limit distribution.

21    A.    Well, actually, you -- you -- you're asking me just

22    to confirm words.

23    Q.    That's correct.

24    A.    The words are not the words that you are using

03:22PM 25    because it just says, "The concept here has always been."  It

2024

1    doesn't say anything about the source of the concept.  So if

2    you're just asking me about the sentence, it doesn't say that.

3    Q.    Are you aware of testimony that the networks, and

4    CBS in particular, wanted to charge a premium price in order to

03:22PM 5    limit the distribution of Sunday Ticket?

6    A.    I'm aware that they wanted the price to be in a

7    premium category, not that they were looking for a particular

8    price.

9    Q.    Okay.  And so, Dr. Bernheim, the point, then, is in

03:23PM 10    your report, you didn't consider whether the NFL, networks, and

11    DirecTV agreed there were a series of interlocking agreements

12    to raise the price of Sunday Ticket in order to limit

13    distribution of Sunday Ticket.  Yes or no?

14    A.    That was not what Dr. Rascher was discussing in his

03:23PM 15    report, so no.  That's --

16    Q.    Okay.

17    A.    That's not germane to the opinion of the

18    anticompetitive or procompetitive effects of the exclusive

19    conduct.

20        MR. STEKLOFF:  Your Honor, can he please stop

21    interrupting the witness in the middle of his answer?

22        THE COURT:  Proceed.

23    Q.    (BY MR. ARD:)  And this document is not in your

24    report; correct?  Not cited in your report; correct?

03:23PM 25    A.    There are an awful lot of documents that are not

2053

1    But the more relevant consideration is how unequal
2    is the revenue distributed?
3         This -- this particular scenario is one of the
4    three -- three that I was referring to.  And it will -- I don't
04:07PM 5    remember which of the three it was, but it will make revenue in
6    the NFL distributed more equally -- more unequally than -- is
7    it the NHL or the NBA?  I can't remember.
8         But it's moving -- even this scenario, moves the NFL
9    considerably over in terms of revenue inequality where you
04:07PM 10   could see from the figure that I was showing that that's
11   accompanied with a -- with a corresponding increase in
12   expenditure inequality on players.
13        So, yes, I've seen this.  I don't think that it
14   proves what you think it proves.
04:08PM 15        THE COURT:  Can we -- I'd like to break a little
16   earlier today.
17        We're going to break for the day, resume again
18   Monday at 9:00 o'clock.  Remember not to discuss the case among
19   yourselves or with anyone else, don't form or express any
04:08PM 20   opinions until it's submitted to you, and we'll see you Monday
21   at 9:00 o'clock.
22        THE COURTROOM DEPUTY:  All rise.
23        (Out of the presence of the jury:)
24        THE COURT:  I want to have that discussion about
04:09PM 25   where we are on Monday.

2054

1    What's your estimate as to how much --
2         MR. ARD:  Well, Your Honor, the weekend should help
3    me prepare sort of a lot because, like I said, a lot of what he
4    said today wasn't in his report.  So I can analyze it and try
04:09PM 5    to get it done, hopefully in an hour, yeah.
6         THE COURT:  Okay.  And your rebuttal, best guess?
7         MR. STEKLOFF:  Right now, it would be five questions
8    or less.
9         THE COURT:  Okay.  All right.  Let's talk now --
04:09PM 10   let's wrap up what we're going to do with Elhauge on -- during
11   the trial.
12        Here -- I wrote down some preliminary thoughts, and
13   then we can discuss them.  But I think at this stage -- I'm
14   very concerned about the testimony of Elhauge.  I think it is
04:10PM 15   proper rebuttal to Dr. Bernheim's procompetitive opinion and I
16   think our order on Motion in Limine No. 7 provides the proper
17   guidance.  And let me just repeat some things.
18        Defendants are required to provide some evidence for
19   their procompetitive rationale.  Plaintiffs argue that they
04:10PM 20   have failed to provide some evidence.  Defendants have not
21   shown that they have -- they claim that the defendants have not
22   shown a procompetitive rationale.  Plaintiffs argue -- intend
23   to argue defendants have not shown a procompetitive rationale
24   by having Professor Elhauge talk about the lack of quantitative
04:10PM 25   evidence.

2055

1    This ignores the qualitative evidence presented at
2    trial.
3    According to our motion in limine order,
4    Professor Elhauge can testify Professor Bernheim has no
04:11PM 5    quantitative evidence.  He can also say he does not find the
6    qualitative reasons believable without the quantitative
7    support.  But he is not allowed to offer the opinion that,
8    without quantitative evidence, defendants have not shown a
9    procompetitive rationale.
04:11PM 10        Not only would that be burden shifting, it would
11   also be a legal conclusion.
12        We highlighted that in our order, saying that the
13   lawyers were allowed to make arguments about whether the
14   procompetitive rationale burden has been met or claim that the
04:11PM 15   rationale is weak or pretextual.
16        And then simply we remind the plaintiffs that
17   Professor -- that the order precludes his opinion that
18   Professor Bernheim fails to establish any procompetitive
19   justification for the challenged restraints because he provides
04:12PM 20   no evidence to quantify the benefit to consumers.
21        I think it's pretty clear.  And that's -- that's why
22   I overruled the objection on quantitative because that's the
23   point that's being made.  But I think that's the limitation
24   that has to exist.  He -- he can talk about it, but he can't
04:12PM 25   say that the -- the defendants have not met a procompetitive

2056

1    rationale.
2         MR. SELTZER:  I think that's fine, Your Honor.  And
3    I understood that.  I've read this order I don't know how many
4    times to try to make sure we adhere to it.  But because he is
04:12PM 5    not -- Your Honor states the law and instructs the jury on the
6    law, and it's not his job to tell the jury what the law is.
7    That's Your Honor's job.
8         THE COURT:  And then just looking at -- some of the
9    debate this morning was whether Professor Elhauge's report
04:13PM 10   contains some "less restrictive means" paragraphs, and I think
11   they did at paragraphs 10 and 30 which talk about the spending
12   caps and floors in those two paragraphs.
13        So with that in mind and the weekend to prepare, I
14   think my ruling would be that he would be allowed to testify in
04:13PM 15   rebuttal as the only rebuttal witness.
16        MR. SELTZER:  Very well, Your Honor.  And we'll
17   adhere to the motion in limine order, of course, and your
18   order, Your Honor, you know, denied their motion to exclude his
19   report, which includes all of the matters that were in there,
04:13PM 20   but we're going to adhere totally to what the motion in limine
21   order says, of course.
22        THE COURT:  Okay.  Anything else on Elhauge?
23        MR. SELTZER:  Not on Elhauge.
24        On the plaintiff, we discussed it -- I think we have
04:14PM 25   an agreement in principle.  There's some wordsmithing going on

2063

```
1              UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5   IN RE:                     )   Case No.
    NATIONAL FOOTBALL LEAGUE'S )   MDL 15-2668-PSG (SKx)
6   SUNDAY TICKET ANTITRUST LITIGATION )
                               )       Volume 11
7   _____)   (Pages 2063 - 2251)

8

9         REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                        TRIAL DAY 11
10                  MONDAY, JUNE 24, 2024
                         8:34 A.M.
11                 LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22  _____

23     MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
           FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, ROOM 4455
            LOS ANGELES, CALIFORNIA  90012
25                 (213) 894-2305
```

2064

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:

SUSMAN GODFREY
BY:  MARC M. SELTZER
BY:  KALPANA SRINIVASAN
    Attorneys at Law
1900 Avenue of the Stars, Suite 1400
Los Angeles, California  90067
(310) 789-3100

SUSMAN GODFREY
BY:  WILLIAM C. CARMODY
BY:  SETH ARD
    Attorneys at Law
One Manhattan West, 50th Floor
New York, New York  10001
(212) 336-8334

FOR THE DEFENDANTS:

WILKINSON STEKLOFF, LLP
BY:  BETH WILKINSON
BY:  BRIAN L. STEKLOFF
BY:  RAKESH N. KILARU
    Attorneys at Law
2001 M Street NW, 10th Floor
Washington, DC  20036
(202) 847-4000

2065

INDEX OF WITNESSES

WITNESSES                                              PAGE

BERT DOUGLAS BERNSTEIN, Ph.D.

    Cross-examination (Resumed) by Mr. Ard      2069

    Redirect Examination by Mr. Stekloff        2091

    Recross-examination by Mr. Ard              2100

EINER ELHAUGE, J.D.

    Direct Examination by Mr. Seltzer           2104

    Cross-examination by Ms. Wilkinson          2173

    Redirect Examination by Seltzer             2229

2066

INDEX OF EXHIBITS

|        |             | FOR            | FOR      |
|        |             | IDENTIFICATION | EVIDENCE |
| NUMBER | DESCRIPTION | PG.            | PG.      |

(NONE OFFERED.)

2115

1  exclusive dealing that's at issue here.  And if -- if it had
2  this kind of example -- we don't see this going on.  The reason
3  we don't see it going on is it's highly anticompetitive.
4      Q.   Okay.  And are there other examples of how his
10:35AM 5  approach is, in your opinion, wrong in terms of economic
6  analysis?
7      A.   Yeah.  One other problem that form his failure to
8  consider the combined effects of the restraints is you may
9  remember he has an argument that exclusive dealing can't have
10:35AM 10  any anticompetitive effects because the NFL could have simply
11  added a high per-subscriber fee in order to inflate the
12  Sunday Ticket price and suppress its supply.
13          Well, that whole argument assumes that the NFL is
14  able to set a price, but they're only able to set one price for
10:36AM 15  this collection of out-of-market telecasts because of the
16  pooling agreement that's being challenged.
17          So without that pooling agreement, they wouldn't be
18  able to impose this high subscriber price.
19      Q.   By ignoring the pooling agreement, what does that
10:36AM 20  say about his analysis of market power?
21      A.   Um, well, he's -- he's ignoring the fact that the
22  market power to impose this high price, which, you know, if you
23  don't have market power, you can't just inflate prices to
24  whatever you want.  That market power results from the
10:36AM 25  horizontal agreement among the NFL teams to pool their

2116

1  out-of-market telecasts.
2      Q.   And why is the existence, in your opinion, of market
3  power important to consider?
4      A.   Well, market power is important because that's --
10:37AM 5  his whole hypothetical is the NFL could simply raise price --
6  this per-subscriber price to achieve the same effect.  Market
7  power is, you know, in part, just a power over price.  If you
8  have no power over price, you can't do that.  So if the
9  individual teams were selling out-of-market telecasts in
10:37AM 10  competition with each other, the pricing would be much lower.
11      Q.   Okay.  Your second point is Professor Bernheim was
12  wrong that a joint venture means no collusion.  Can you explain
13  first, as an economic matter, what is meant by collusion?
14      A.   So as an economic matter, collusion simply means
10:37AM 15  there's some sort of agreement to work together on something
16  that -- it could be anything.  Could be procompetitive or it
17  could be anticompetitive, but it's an agreement.
18      Q.   And what is the economic concern with collusion?
19      A.   Well, the concern with collusions is that firms,
10:37AM 20  especially horizontally competing firms, have economic
21  incentives to reach agreements that suppress supply and raise
22  prices in ways that harm consumers.
23      Q.   And those would be rational economic incentives by
24  firms.  Is that right?
10:38AM 25      A.   Yeah.  That's what firms might rationally want to

2117

1  do.
2      Q.   In other words, they might rationally want to agree
3  not to compete with each other so they could raise prices or
4  reduce output.  Is that right?
10:38AM 5      A.   Uh-huh.  That would be rational to do unless the
6  legal penalties were too high to make it.
7      Q.   But doing so could be anticompetitive.  Is that
8  correct?
9      A.   It could be.  So that's why one -- one looks for
10:38AM 10  collusion as a first step in a lot of the analyses.
11      Q.   And why do you think that Professor Bernheim was
12  incorrect in saying that members of a joint venture cannot
13  collude or agree with each other?
14      A.   Yeah.  So being a joint venture simply means that
10:38AM 15  there are some of the agreements between the participants on
16  things like setting schedules and game rules do create value.
17  I don't dispute that.
18          But that doesn't magically mean that every single
19  agreement between the members of a joint venture suddenly
10:39AM 20  aren't -- don't constitute collusion.  Instead, you have to
21  look at each agreement in particular and see.  Sometimes
22  they're procompetitive agreements, sometimes they're
23  anticompetitive agreements.  So you have to analyze the precise
24  agreements being challenged as -- you know, in the end, I think
10:39AM 25  Professor Bernheim did concede, but that seems inconsistent

2118

1  with his claim that there's no collusion to review at all.
2      Q.   By the way, are you aware of anybody suggesting in
3  this case that the teams should not or could not continue to
4  work together on things like the scheduling of games and the
10:39AM 5  setting of game rules?
6      A.   No.  I don't think -- there's been no -- certainly
7  no challenge to that kind of agreement among the teams, and
8  it's -- there's no reason to connect that to what are the
9  challenged restraints.
10:39AM 10      Q.   And it's your opinion that the NFL and the teams
11  could continue to do those things even if they can't agree to
12  limit the distribution of out-of-market games; is that correct?
13      A.   Yes.
14      Q.   And just because the teams have to work together on
10:40AM 15  things like scheduling and game rules to create value, do you
16  agree with Professor Bernheim that they must also work together
17  to sell telecasts?
18      A.   I don't.  And if you look at, you know, the history
19  and other leagues, it's quite clear that there's no necessary
10:40AM 20  connection between collectively setting rules and schedules and
21  pooling all the telecasts.
22      Q.   And can you go through your -- your slide here to
23  explain what is depicted?
24      A.   Sure.  First, there's the NFL itself.  So the NFL in
10:40AM 25  the 1950s, the teams individually sold telecasts.  But they

2119

1  also, clearly, were, at the same time, collectively setting the

2  rules of the game and schedules.  So they themselves have done

3  it.  It's not like they're necessarily linked together.

4          It's also true that in baseball, basketball, and

10:41AM 5  hockey, teams individually sell telecasts.  Any telecast that's

6  basically not nationally shown is individually telecast by the

7  teams, even though those leagues obviously, again, are

8  collectively setting rules and schedules.  And then finally

9  there's the NCAA itself, which collectively sets the rules for

10:41AM 10  college football but no longer collectively pools all the

11  telecasts by college teams.

12     Q.     So do these examples show that it's not necessary to

13  pool all telecasts in order to be able to establish and set

14  rules of the games?

10:41AM 15     A.     Yes.

16     Q.     Okay.  What do you think the relevance is of

17  Professor Bernheim's discussion about what creates value for

18  the NFL game is the whole season, its role in the season?

19     A.     I don't think that's relevant to this case because

10:41AM 20  the NFL, without these challenged restraints, would still have

21  every incentive to and would create a season because that's

22  what makes the product attractive.  So I don't dispute the fact

23  that creating the season makes it attractive.  There's just

24  no -- no connection between that and the restraints that are

10:42AM 25  actually being challenged in this case.

2120

1     Q.     Now, going back to the slides listing your critiques

2  of Professor Bernheim's errors in defining the restraints at

3  issue here, your third point is that he ignores the fact that

4  plaintiffs don't challenge the collective licensing or revenue

10:42AM 5  sharing for over-the-air telecasts.

6          Can you explain what you mean by that?

7     A.     Yeah.  So at several parts of his analysis,

8  Professor Bernheim adopts the assumption that the teams would

9  not be able to engage in collective licensing or revenue

10:42AM 10  sharing for over-the-air telecasts.  But those are simply not

11  being challenged in this case.  And when you take that into

12  account, it changes the economic analysis.

13     Q.     And do you mean to suggest that the plaintiffs are

14  not challenging the agreements with CBS and FOX to limit

10:43AM 15  distribution of out-of-market games?

16     A.     No.  They are challenging agreements between the

17  NFL, CBS, and FOX to the extent that they have provisions

18  restricting the distribution of out-of-market games.  But

19  there's no challenge to the collective licensing or revenue

10:43AM 20  sharing between the NFL teams as regards to over-the-air

21  telecasts.

22     Q.     Let me ask you this:  Can you give us an example

23  where you think Professor Bernheim has mischaracterized the

24  challenged restraints?

10:43AM 25     A.     Yeah.  So, here, he indicated in his testimony that

2121

1  if the plaintiffs' challenge was successful, that -- if they

2  had their way, he says, the provision requiring equal revenue

3  sharing would be removed from the NFL Constitution.  But,

4  again, there's no challenge to the applicability of this

10:44AM 5  provision to over-the-air telecasts.  This -- the only

6  challenge is to the applicability of this provision to the

7  out-of-market telecasts.

8     Q.     And can you explain to the jury what the

9  significance or implication of this is for a proper or a sound

10:44AM 10  economic analysis?

11     A.     Yeah.  So in economics -- you've heard this term

12  before -- we focus on what the but-for world would have been

13  like.  And so what does that mean?  It means we have to look at

14  what the world would have looked like but for the challenged

10:44AM 15  restraints.  So to construct such a but-for world, you have to

16  include all the existing restraints and subtract only the ones

17  that are actually being challenged.  So properly conducting a

18  but-for analysis, you would keep in the restraints that

19  currently exist, involving the collective licensing of

10:44AM 20  over-the-air telecasts and this constitutional provision

21  requiring equal sharing of all revenue on over-the-air

22  telecasts.

23          MS. WILKINSON:  Your Honor, I'm going to object

24  under your ruling because of that last and move to strike that

10:45AM 25  last part of the answer about what would stay in place, the

2122

1  constitution.

2          THE COURT:  Sustained.

3     Q.     (BY MR. SELTZER:)  Okay.  Professor Elhauge, let me

4  ask you a question this way:  In constructing a but-for world,

10:45AM 5  is it the role of the economist who's trying to -- to compare

6  the world as of the actually exists and the world as it would

7  have existed subtracting just the challenged restraints?

8     A.     Yes.  That's the but-for analysis that we do in

9  economics.

10:45AM 10     Q.     And your critique of Professor Bernheim is that he

11  failed to apply that fundamental precept of how you construct a

12  but-for world.  Is that right?

13     A.     Yes.

14     Q.     Okay.  And how do you respond to

10:45AM 15  Professor Bernheim's argument that the NFL teams would not have

16  incentives to agree to collectively license and share revenue

17  for the over-the-air telecasts in a but-for world?

18     A.     Well, first, I think he's, again, misdefining the

19  but-for world, which by definition, should include these

10:46AM 20  restraints.

21          But, second, he's not taking into account the

22  implications of something he himself stressed, which is that it

23  takes a unanimous vote in order to change this constitutional

24  provision on revenue sharing.

25          That means in a but-for world where this provision

2139

1   even though -- I know there's a big dispute between him and

2   Professor Rascher about the size of the viewership effect, in

3   the end, he just argues that it's a lot less than

4   Professor Rascher says.  He doesn't dispute that there is some

11:09AM 5   adverse viewership effect from the pooling, leaving aside the

6   procompetitive effects that we're going to get to.

7        Q.    Professor Elhauge, it may be straightforward to

8   someone who's a specialist in the field like yourself.  But

9   could you explain to the jury the relationship between output

11:10AM 10  restrictions and -- and price?

11       A.    Well, price and output are a matter of

12   economically -- in some ways, it's the flip side of each other.

13   That is, if you set a high price, you end up with a low output:

14   if you set a low output, you end up with a high price.  And

11:10AM 15  that basically just reflects the fact that -- you know, that

16   people buy less of something, the more it costs.  So the higher

17   you raise the price, the fewer people want to buy it and, thus,

18   the lower the market output is.

19       Q.    So in this case, it's undisputed that there was an

11:10AM 20  anticompetitive effect in terms of higher prices and lower

21   output.  Is that correct?

22       A.    Yes.  Again, importantly, leaving aside the

23   arguments about is there an offsetting procompetitive effect.

24       Q.    Now let's move to your second point on

11:10AM 25  anticompetitive effects.  Why do you say that

2140

1   Professor Bernheim wrongly assumes that exclusive dealing here

2   cannot have an anticompetitive effect?

3        A.    Well, so in his testimony here and in his report, he

4   doesn't really directly analyze the effects of exclusive

11:11AM 5   dealing.  He just relies on a theory that it could not possibly

6   have anticompetitive effects because he says, well, the NFL

7   could achieve equal anticompetitive effects simply by raising

8   or adding a per-subscriber fee that's very high to charge

9   DirecTV and that could produce the same kind of effect.

11:11AM 10  So the reason, I think, that assumption is wrong is,

11   first, he's ignoring the fact that the NFL would only have the

12   power to raise the per-subscription fee that way because of the

13   pooling agreement, the horizontal agreement among the teams, to

14   collectively license over-the-air games.  Without that, they

11:11AM 15  can't just add a high per-subscriber fee and thus can't achieve

16   this effect.

17       So, again, this is an instance of him missing the

18   economic analysis because he didn't consider the combination

19   of -- of the restraints.

11:12AM 20  Second, even if we treated the exclusive dealing in

21   isolation, his own report acknowledges in this Footnote 647

22   that it is the case that exclusivity can, in fact, lead to

23   adverse effects on prices in cases where a firm might use

24   exclusive dealing to make a commitment not to undercut earlier

11:12AM 25  deals that it's made with distributors.  That is a notion that

2141

1   you make some initial set of deals with distributors, teams --

2   sellers actually have an incentive in subsequent deals to

3   undercut those prices.

4        Exclusive dealing, as he points out, the literature

11:12AM 5   shows -- and this is literature by two Nobel Prize winning

6   economists.  The literature shows that exclusivity in these

7   cases can, in fact, lead to higher prices because of that.

8        Q.    So, in essence, this research by these other

9   economists, academics who won the Nobel Prize in economics, is

11:13AM 10  that if the NFL were to adopt this per-subscriber fee

11   alternative in the but-for world, it actually would have

12   undercut its rational economic incentives if it needed to lower

13   the per-subscriber price.  Is that right?

14       A.    Yeah.  That notion is that -- if other firms --

11:13AM 15  distributors can anticipate this, they won't agree to the high

16   price in the beginning -- to begin with because they don't have

17   any exclusivity and they worry about being undercut in

18   subsequent distribution deals.

19       So exclusivity is a way to suppress this

11:13AM 20  procompetitive price effect.

21       Q.    Now, in his report, doesn't Professor Bernheim argue

22   that, without exclusive dealing, this problem, which he

23   recognizes exists with his -- with his approach on a

24   per-subscriber fee alternative, is that it could be avoided by

11:14AM 25  using what's called a "most favored nations clause"?  Is that

2142

1   right?

2        A.    He does say that, yes.  First, I guess I should

3   begin by explaining what is a most favored nations clause.  A

4   most favored nations clause is basically an agreement between

11:14AM 5   sellers and buyers that the seller will not undercut that price

6   in deals with other buyers.

7        So his argument is basically, well, this whole

8   price-reducing effect in subsequent deals, instead of

9   eliminating it with exclusive dealing, you could eliminate it

11:14AM 10  with a most favored nations clause.

11       The trouble is that doesn't make any economic sense

12   because if he's right, that would mean that the most favored

13   nations clause itself is an anticompetitive agreement in the

14   stream of trade that you wouldn't expect to see in the but-for

11:15AM 15  world.

16       MS. WILKINSON:  Objection.  This is a legal

17   conclusion, Your Honor.

18       THE COURT:  Sustained.

19       MS. WILKINSON:  And move to strike.

11:15AM 20  THE COURT:  Motion to strike granted.

21       Q.    (BY MR. SELTZER:)  Professor Elhauge, could -- put

22   aside any legal considerations.  From an economist's point of

23   view, would this be regarded as anticompetitive as an

24   alternative?

11:15AM 25  A.    Yes.  And I'm sorry I didn't phrase it correctly.

2143

1    It's still -- the substitute conduct he's talking about would

2    still have an anticompetitive effect.  So let me draw an

3    analogy to medical science.

4           In medical science, if you were trying to study

11:15AM 5    whether a poison had fatal effects, you wouldn't say, well,

6    it's true that the poison has killed everybody we've -- who

7    received it, but if they hadn't gotten this poison, they could

8    have gotten another poison that would have killed them anyway

9    and the fact that another poison could have been used on them

11:15AM 10    means that, therefore, there's no fatal effect.

11           I think it's a similar argument here; that is, if

12    the concern with exclusive dealing is that it has this

13    particular anticompetitive effect, then that anticompetitive

14    effect doesn't go away because you can imagine another

11:16AM 15    agreement that would have equal anticompetitive effects to

16    substitute for it.

17           Q.    Let me ask you to turn to the third step in your

18    analysis of the way you approached Professor Bernheim's

19    opinions.  And how did you, as an antitrust economist, analyze

11:16AM 20    his opinions about the procompetitive effects of the challenged

21    conduct?  And that is the third step; is that right?

22           A.    That's the third step.  So, yeah, the third step we

23    get to procompetitive effects and say, okay, we've got some

24    conduct, we have some likely anticompetitive effects: now we

11:16AM 25    need to think are there some procompetitive effects to weigh

2144

1    against those anticompetitive effects.

2           Q.    And these are the steps you took in analyzing

3    Professor Bernheim's arguments about the procompetitive

4    justifications for these restraints.  Is that right?

11:16AM 5           A.    Yes.  So as a matter of economics, you want to ask

6    four questions in order to figure this -- this overarching

7    question about procompetitive effects out.

8           The first is simply is the claimed justification

9    procompetitive even in theory?  Just as a matter of economic

11:17AM 10    principle, would it count as procompetitive if it could be

11    shown?

12           Second, is there evidence of that the procompetitive

13    effect actually occurred?

14           Third, is there a less anticompetitive alternative

11:17AM 15    that could achieve the same goal?  It's often called the less

16    restrictive alternative.  Here, I'm calling it the less

17    anticompetitive alternative.  If there is, then the restraints

18    aren't really necessary to get the procompetitive effect and,

19    thus, it doesn't really have a procompetitive effect relative

11:17AM 20    to what we could have had.

21           And then, lastly, assuming you got through all that

22    and you've proven a really bona fide procompetitive effect, the

23    question is, well, do the anticompetitive effects outweigh the

24    procompetitive effects.

11:18AM 25           Q.    What did you use as a measure for trying to

2145

1    determine if there was evidence of a procompetitive effect?

2           A.    Well, for purposes of responding to and assessing

3    Professor Bernheim's analysis, I adopted his own premise that

4    the relevant measure of output is viewership.  So I asked the

11:18AM 5    question, was there evidence in the end that the restraints

6    caused a positive effect on viewership?

7           Q.    And can you explain what viewership means in this

8    context?  Is it a measure of how a market is responding to the

9    existence of a product?

11:18AM 10           A.    Yes.  So if viewership here basically is just the

11    total number of persons who are watching NFL games.  It's not

12    the only measure of output you could have.  You could have a

13    measure of output by access or things like that.  But this is

14    one important measure.  It's the one Professor Bernheim used,

11:19AM 15    so I -- to -- to try to assess his analysis, I adopted that

16    definition of output.

17           Q.    And focusing on the viewership measure, how do you

18    think one should go about assessing whether the anticompetitive

19    effects outweigh the procompetitive effects?

11:19AM 20           A.    Well, you basically would compare the viewership

21    increasing effect to the viewership decreasing effect.  So

22    there's some viewership decreasing effect from the

23    anticompetitive effects because -- from restricted supply,

24    higher prices, reduced consumer choice.  They're going to have

11:19AM 25    some, you know, viewership-reducing effect, and thus the

2146

1    question becomes is the magnitude of the procompetitive effect

2    on viewership enough that it's not offset by that anti- --

3    those anticompetitive effects.

4           Q.    All right.  I'd like to go through each of the

11:20AM 5    justifications or arguments that Professor Bernheim made as to

6    why these restraints caused procompetitive effects.

7           And let's start with the one that he says it might

8    help protect the number of over-the-air games in a way that

9    enhances the long-term interest of fans of the NFL.  Can you

11:20AM 10    address that?

11           A.    Sure.  So that argument, I think, is one of the

12    arguments that it's not even procompetitive in theory because

13    what he's saying is we want to protect over-the-air games from

14    consumers switching from them to these out-of-market games.

11:20AM 15    That is, he's saying -- want to directly deny consumers their

16    consumer preference.  His concern here is some consumers would

17    prefer to watch out-of-market games over these over-the-air

18    in-market games and, thus -- and the restraints preventing them

19    from doing so.

11:21AM 20           But that, in principle, is anticompetitive, not

21    procompetitive because it undermines consumer preferences.

22           Q.    And consistent with economic theory, is thwarting

23    consumer preferences like that regarded as anticompetitive?

24           MS. WILKINSON:  Objection.

11:21AM 25           THE WITNESS:  I think it is, as a matter of

2155

1 among the top sellers -- the top ratings of any games, even --

2 even on prime time, they top all these other fancy shows.

3        So ratings are very high.  The only reason that a

4 network might not want to put it on is if the NFL charged too

11:32 5 high a rates fee.  If they're charging too much for it -- if

6 they don't charge enough, it could be unprofitable for the

7 networks.

8        So the less restrictive alternative is, if the NFL

9 really wants to make sure that the games are shown over the

11:32 10 air, it just has to reduce the price it charges the networks.

11 And they'll certainly put it on because the production costs,

12 even though there's talk about how big they are, it's way lower

13 than for these prime time shows that have, you know, less good

14 ratings than NFL games do.

11:32 15        So that will be one easy alternative.  And, in fact,

16 if the NFL really wanted to push over-the-air games, they could

17 license them to all four major networks.  Instead of just two

18 networks, we could have all four networks in every region: not

19 only FOX and CBS, but, you know, we could have ABC and NBC on

11:33 20 Sunday afternoons watching.

21        So they could -- if they want to advance

22 over-the-air games because they're so vital to maintain

23 interest -- long-term interest in the NFL, there are other

24 alternatives to do it.

11:33 25    Q.    Are there any other less anticompetitive

2156

1 alternatives, in your opinion?

2    A.    Yes.  So the NFL, alternatively, could simply

3 require that any shower of out-of-market games also show them

4 over the air.  They could adopt a rule about that, requiring

11:33 5 that.  That wouldn't be collective licensing or pricing.  They

6 would just say, if you're going to show -- telecast your game,

7 individual team, you've also got to offer it over the air.

8        And, in fact, the NFL does something similar right

9 now for Monday Night Football and Thursday Night Football.  In

11:33 10 both those cases -- you know, Monday Night Football is on ESPN

11 and so you need cable to get access to that, and Thursday Night

12 Football they've moved on to Amazon so that you got to go

13 behind the pay wall to see that.

14        For both of those, the NFL has required teams to

11:34 15 make those games available over the air in their local areas.

16 So there's no reason they couldn't do a similar thing to

17 increase over-the-air coverage in the but-for world.

18    Q.    And did Professor Bernheim consider that this

19 alternative would, in fact, guarantee that each team's games

20 would remain available over the air in their local markets

21 regardless of how the out-of-market games were telecast?

22    A.    No.  He didn't consider either of those less

23 restrictive alternatives.

24    Q.    Let's move on to the final step.

11:34 25        MS. WILKINSON:  Objection, Your Honor.  That's

2157

1 burden shifting.  And I object and move to strike.  He says --

2        THE COURT:  Hold on.

3        MS. WILKINSON:  He didn't consider any of those less

4 restrictive alternatives.

11:34 5        THE COURT:  Overruled.

6    Q.    (BY MR. SELTZER:)  Okay.  As I was saying,

7 Professor Elhauge, let's move to the final step, if we may.

8        Did Professor Bernheim offer any quantitative or

9 qualitative evidence, in your opinion, as to whether keeping

11:35 10 games on over-the-air television resulted in more overall

11 viewers than in a world without the restraints?

12    A.    No, I don't think he did.

13        So remember, again, on one side of the ledger we

14 have some likely anticompetitive effects.  On the other side of

11:35 15 the ledger, we have some speculation about an effect on

16 over-the-air games but no real evidence of it.  And it's not

17 really linked to, certainly any quantifiable way, to the

18 viewership.

19        But the key point is I don't think there's any

11:35 20 reason to expect that over-the-air games would go down in the

21 but-for world at all.  No evidence really has been presented to

22 show that.  And certainly no evidence has been presented to

23 show that these restraints are reasonably necessary to preserve

24 over-the-air games.

11:35 25        So I think in the end, the evidence adds up to --

2158

1        MS. WILKINSON:  Objection, Your Honor.  Calls for a

2 legal conclusion and --

3        THE COURT:  I think that's where we're going so --

4 yeah.  Move on.

11:36 5    Q.    (BY MR. SELTZER:)  Okay.  All right.

6 Professor Elhauge, let's move on to the next of his

7 justifications, competitive balance.  If true, in your opinion,

8 does this justification make sense in -- as a matter of

9 economic principle?

11:36 10    A.    Yes.  I think, as a matter of economic theory,

11 competitive balance would be a procompetitive effect because,

12 if it's true that competitive balance increases viewership,

13 you're expanding the market by making a product more valuable.

14 So that would be procompetitive in theory.

11:36 15    Q.    And did you assume that that was true just for

16 purposes of your analysis, even though there's some dispute

17 about the issue?

18    A.    Well, I want to be careful.  I don't assume that

19 there is a procompetitive effect, but I do assume that, if it

11:36 20 increases competitive balance, I assume Professor Bernheim is

21 right in his assumption that that will increase viewership,

22 that he's got some evidence on that.  I'm not disputing that

23 for purposes of my analysis.  I know -- I know there's some

24 argument in the literature of whether a competitive balance

11:37 25 really increases viewership or by how much.  But I'm assuming

2159

```
 1    it does for purposes of my analysis critiquing what
 2    Professor Bernheim did with this.
 3         Q.    And let's move to the next step.  Was there evidence
 4    that you saw that Professor Bernheim presented showing that the
11:37AM  5    challenged restraints were needed, in fact, to present --
 6    protect competitive balance?
 7         A.    No, I don't think there was.  And, again, we have to
 8    be careful to separate out two things.  One is whether
 9    competitive balance increases viewership.  On that,
11:37AM 10    Professor Bernheim has a lot of evidence, including quantified
11    evidence, about that effect.  What's missing is evidence
12    showing that the challenged restraints increase competitive
13    balance.
14         You need that link in order to show that the
11:38AM 15    restraints have a procompetitive effect.  It's not enough just
16    to show that increased competitive balance increases
17    viewership.
18         MS. WILKINSON:  Objection.  Again move to strike.
19    Calls for a legal conclusion.
11:38AM 20         THE COURT:  I would grant as to the last sentence.
21         Q.    (BY MR. SELTZER:)  In terms of the evidence that you
22    saw, was there any quantitative or qualitative evidence
23    supporting, in your opinion, the contention that competitive
24    balance increased viewership?
11:38AM 25         A.    Oh, yeah, on whether competitive balance increased
```

2160

```
 1    viewership, yes, I think there was evidence offered, both
 2    qualitative and quantitative, to show that.  What was missing,
 3    I think, is evidence linking the restraint to an increase --
 4    the challenged restraints to an increase in competitive
11:38AM  5    balance.
 6         Q.    So that's the preceding step, whether or not the
 7    restraint enabled competitive balance to be increased.  That
 8    was what was missing, in your opinion; is that right?
 9         A.    Yes.  And I will add that there's not even an
11:39AM 10    attempt to link two of the bundled restraints -- two of the
11    restraints, that is, bundling an exclusive dealing to
12    competitive balance.  I mean, those have nothing to do with it,
13    really.  The argument on competitive balance is limited to the
14    pooling agreement.  There's no real even argument offered to
11:39AM 15    suggest that bundling or exclusive dealing could be justified
16    by -- by an effect on competitive balance.
17         Q.    And what about the connection to pooling?  Did you
18    see any?
19         A.    I didn't.  I mean, the problem, I think, with this
11:39AM 20    argument is, again, this relates to the over-the-air telecasts.
21    Because, in the but-for world, the teams would continue to
22    offer telecast over the air, they would continue to share all
23    the revenue on those over-the-air telecasts.  And the evidence
24    showed that even if you took out all the shared revenue on
11:40AM 25    these out-of-market games, the shared revenue on the
```

2161

```
 1    over-the-air telecasts is more than enough to make every firm
 2    very profitable and able to meet any salary cap or salary
 3    floor.
 4         Q.    Now, Professor Bernheim did do some analysis showing
11:40AM  5    that without the hundred percent shared television revenue,
 6    some teams would be losing money at their actual current levels
 7    of spending.  Did that analysis provide any evidence, in your
 8    view, that the restraints promoted competitive balance?
 9         A.    I don't think so.  So the key thing here on what he
11:40AM 10    calls the likely outcome on the right, he's assuming there's no
11    revenue sharing at all of telecasts, including on the
12    over-the-air telecasts.  So this is an example of how he -- his
13    failure to see that over-the-air telecasts are not being
14    challenged distorts his analysis.
11:40AM 15         If you included the sharing on that over-the-air
16    telecast, every team would make a ton of money under the likely
17    outcome.  So this argument he has here depends critically on
18    him excluding all the revenue and revenue sharing -- sorry -- I
19    should say the revenue sharing from the over-the-air telecasts
11:41AM 20    that would continue to be collectively offered.
21         Q.    Did you prepare a demonstrative that helps
22    illustrate this point?
23         A.    Yes.  So this just gives you a sense of scale.  This
24    is overall profits or revenue that are made for different kinds
11:41AM 25    of telecasts.  So the Sunday Ticket in red here is the
```

2162

```
 1    out-of-market games that they're offering now and that's a
 2    certain number of billions of dollars there, but it's dwarfed
 3    by the other sources of revenue.  So the CBS and FOX deals that
 4    is the Sunday afternoon over-the-air games, those make a lot
11:41AM  5    more money, and the nighttime football games also make a ton of
 6    money.
 7         So none of that blue or dark blue revenue is
 8    relevant to the challenged restraints here because they're not
 9    challenging any restraints for nighttime football or for the
11:42AM 10    CBS and FOX Sunday afternoon.  They're only challenging it for
11    the Sunday Ticket.
12         So, at most, you remove revenue sharing on that
13    small red portion of it, and it turns out that's just not
14    enough to cause any firms to be losing money or be anywhere
11:42AM 15    near unable to make their salary cap or floor.
16         Q.    Okay.  And do you have other opinions about
17    Professor Bernheim's claim that a link to competitive balance
18    is established by showing that without 100 percent shared
19    television revenue, some teams would be losing money at their
11:42AM 20    actual current levels of spending?
21         A.    Yeah.  Yeah.  So an alternative to simply continuing
22    to share, as I think they would, the over-the-air revenue, you
23    could imagine them instead, in the but-for world, simply
24    reducing the amount of revenue sharing without entirely
11:43AM 25    eliminating it.
```

2163

1   And since, even -- you know, the current team that
2   makes the least money makes about $60 million.  If you reduced
3   revenue sharing levels in a way that, you know, gave them
4   $60 million less in revenue, they'd still be able to maintain
5   current levels of spending and, thus, we wouldn't have these
6   anti- -- these unbalanced competition kind of concerns.  And I
7   think -- yeah, I said in -- in my deposition, about 28 percent
8   revenue sharing is all you'd need for this.
9        So you could do it with lesser revenue sharing.
10       Q.   Let's move on to the next step, if we can.  Did
11  Professor Bernheim adequately consider, in your opinion, less
12  anticompetitive alternatives to pooling and sharing 100 percent
13  of telecast revenue?
14       A.   I don't think he did.  So the less anticompetitive
15  alternatives, I think, are clearly salary caps and salary
16  floors.  Now, he basically is rejecting them because he thinks
17  there won't be enough revenue sharing in the but-for world as
18  we just talked about.  I think there would be more than enough
19  revenue sharing that would continue in the but-for world to
20  meet any salary cap or floor.  Also, a cap has no connection to
21  this revenue sharing.  You don't need to share revenue in order
22  to set an upper-bound cap.
23       Now, for the floor, there's an issue about maybe
24  need enough revenue sharing in order to meet the floor, but
25  there, I think, the claim just falls apart factually as a

2164

1   result.
2        So really his whole argument here rests on the
3   argument we talked about earlier, claiming that firms would no
4   longer share over-the-air telecast revenue.
5        Q.   And, finally, did Professor Bernheim provide, in
6   your opinion, any quantitative or concrete evidence of the
7   effect of the restraints on competitive balance and viewership
8   that would be relevant to rebutting a showing that the
9   anticompetitive effect outweighed the procompetitive effect?
10       MS. WILKINSON:  Objection.  Calls for a legal
11  conclusion and the ultimate issue.
12       THE COURT:  Sustained.
13       Q.   (BY MR. SELTZER:)  I'm asking you,
14  Professor Elhauge, from the point of view of an economist.  In
15  terms of looking at the -- the -- the qualitative or
16  quantitative evidence, was there evidence presented that you
17  think was greater in size or lesser in size with respect to the
18  evidence of the anticompetitive effect?
19       MS. WILKINSON:  Same objection, Your Honor.
20       THE COURT:  Overruled.
21       THE WITNESS:  Yeah, I would say, although there is
22  both qualitative and quantitative evidence of a link between
23  competitive balance and viewership, there was no qualitative or
24  quantitative evidence showing a link between the restraint and
25  competitive balance.

2165

1        Q.   (BY MR. SELTZER:)  Let me ask you about a slide that
2   Professor Bernheim showed.  This was one about the viewership
3   depending upon when teams were closer or not in their scores.
4        Isn't this quantitative evidence that the restraints
5   caused viewership to increase?
6        A.   No.  I mean, this is quantitative evidence that
7   close games lead to more viewership, and that's certainly
8   relevant to the issue of does competitive balance increase
9   viewership.  But it doesn't show that the restraints are what
10  led to this -- these close games.
11       So you have to connect up the restraints somehow to
12  this claim that the -- the fact that some games are closer.
13       So, you know, I think with more balanced teams, it's
14  reasonable to expect you have more close games, but you still
15  have to link it to the restraint somehow.
16       Q.   And let's move on to innovation and telecast
17  quality.  Can those justifications be procompetitive in theory?
18       A.   Yes, I think so.
19       Q.   And did Professor Bernheim provide any evidence that
20  the restraints at issue caused any specific innovations or
21  quality improvements?
22       A.   I don't think so.  I mean, he talked about a lot of
23  innovations that occurred, but he never really linked them up
24  to the claim that the -- the increase in profits from these
25  restraints were necessary to induce those innovations.  So the

2166

1   connection was never really made.  And a lot of these
2   innovations actually were not made on Sunday afternoon NFL
3   television, so they're not really related to the restraints.
4        Q.   Did Professor Bernheim point to evidence that the
5   additional profits created by the challenged restraints were
6   necessary to induce the investments in the specific innovations
7   or improvements in quality?
8        A.   No.  That's what was missing.  And I would say not
9   only not relating them to any specific innovations, but then
10  even really generally related to some argument that led to a
11  more optimal amount of innovation or quality.  The argument's
12  really just basically, if you make more money, you'll do more
13  innovation and quality to some extent.  But there's not much
14  else there in terms of what's going on.
15       Q.   What do you think about his -- his --
16  Professor Bernheim's claim that by increasing profits, the
17  restraints allowed the networks to make bigger investments,
18  innovation in telecast -- telecast quality?  I'm sorry.
19       A.   Well, I think, again, as a general matter of theory,
20  I think the problem is that's basically saying that it's okay
21  to adopt restraints that lead to anticompetitive profits
22  because some of them might trickle down to improvements and
23  innovation and -- and equality.
24       And one thing that ignores is that the economic
25  literature is pretty clear that, generally, competition leads

2336

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3        HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   IN RE:                        )    Case No.
     NATIONAL FOOTBALL LEAGUE'S    )    MDL 15-2668-PSG (SKx)
 6   SUNDAY TICKET ANTITRUST LITIGATION )
                                   )    Volume 13
 7   _____)    (Pages 2336 - 2485)

 8

 9         REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                        TRIAL DAY 13
10              WEDNESDAY, JUNE 26, 2024
                        8:33 A.M.
11              LOS ANGELES, CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22

23        MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
               FEDERAL OFFICIAL COURT REPORTER
24             350 WEST 1ST STREET, ROOM 4455
               LOS ANGELES, CALIFORNIA  90012
25                   (213) 894-2305
```

2337

```
 1              APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4      SUSMAN GODFREY
        BY:  MARC M. SELTZER
 5      BY:  AMANDA K. BONN
        BY:  KALPANA SRINIVASAN
 6           Attorneys at Law
        1900 Avenue of the Stars, Suite 1400
 7      Los Angeles, California  90067
        (310) 789-3100
 8
        SUSMAN GODFREY
 9      BY:  WILLIAM C. CARMODY
             Attorney at Law
10      One Manhattan West, 50th Floor
        New York, New York  10001
11      (212) 336-8334

12

13   FOR THE DEFENDANTS:

14      WILKINSON STEKLOFF, LLP
        BY:  BETH WILKINSON
15      BY:  BRIAN L. STEKLOFF
        BY:  RAKESH N. KILARU
16           Attorneys at Law
        2001 M Street NW, 10th Floor
17      Washington, DC  20036
        (202) 847-4000

18

19

20

21
22
23
24
25
```

2338

```
 1              WEDNESDAY, JUNE 26, 2024: 8:33 A.M.

 2              LOS ANGELES, CALIFORNIA

 3                      -oOo-

 4        (Out of the presence of the jury:)

08:25AM   5        THE COURTROOM DEPUTY:  Calling Item 1,

 6   Case No. 15-ML-2668, in re: National Football League

 7   Sunday Ticket Antitrust Litigation.

 8        Counsel, please state your appearances.

 9        MR. CARMODY:  Good morning, Your Honor.

08:33AM  10   Bill Carmody on behalf of the plaintiffs.

11        MR. SELTZER:  Good morning, Your Honor.

12   Marc Seltzer on behalf of the plaintiffs.

13        MS. SRINIVASAN:  Kalpana Srinivasan on behalf of the

14   plaintiffs.

08:34AM  15        MS. BONN:  Good morning, Your Honor.  Amanda Bonn

16   for the plaintiffs.

17        MS. WILKINSON:  Good morning, Your Honor.

18   Beth Wilkinson on behalf of the NFL.

19        MR. STEKLOFF:  Good morning, Your Honor.

08:34AM  20   Brian Stekloff on behalf of the NFL.

21        MR. KILARU:  Good morning, Your Honor.

22   Rakesh Kilaru for the NFL.

23        THE COURT:  Good morning.

24        The only thing on my agenda is the plaintiffs'

08:34AM  25   motion for substantive admission of exhibits admitted under
```

2339

```
 1   Rule 2 -- 806, and it's Docket 1459.

 2        I've reviewed the paperwork.  And I think, for the

 3   reasons I've stated before, the motion is denied.

 4        Before we wait for the jurors, is there anything

08:34AM   5   else that we need to deal with before closings?

 6        MS. WILKINSON:  Your Honor, I know you gave a very

 7   clear instruction yesterday about how to use the 806 -- the

 8   documents admitted under 806.  And I'm sure counsel will follow

 9   it.  But if I have to object, I'm just going to say "806" and

08:34AM  10   "403," obviously.

11        THE COURT:  That's fine.

12        MS. WILKINSON:  Okay.

13        THE COURT:  Understood.

14        All right.  Anything else?

08:34AM  15        MR. SELTZER:  No, Your Honor.

16        THE COURT:  Okay.  Thank you.

17        THE COURTROOM DEPUTY:  All rise.

18        (Break taken.)

19        (In the presence of the jury:)

09:21AM  20        THE COURT:  Good morning.

21        "Members of the jury, now that you've heard all of

22   the evidence, it is my duty to instruct you on the law that

23   applies to this case.

24        "It is your duty to find the facts from all of the

09:21AM  25   evidence in the case.  To those facts, you will apply the law
```

**2380**

1   I don't know how mu- -- if you guys like NFL games
2   as much as our class reps do.  And I'm not sure if you even
3   watch football.  But this case transcends football.  This case
4   matters.  And it matters because it's holding -- we are here to
10:54AM 5   hold accountable the owners of the 32 teams who got together
6   with DirecTV to overcharge their most loyal fans and to limit
7   Sunday Ticket distribution.
8        And more than that, we want to hold them accountable
9   for violating the antitrust laws of the United States.
10:55AM 10       The antitrust laws were designed to protect
11  consumers in any industry.  And it could be football, it could
12  be video games, it could be the price of milk.  It's about
13  justice.  It's about telling the 32 team owners who
14  collectively own all the big TV rights, the most popular
10:55AM 15  content in the history of TV -- that's what they have.  It's
16  about telling them that even you cannot ignore the antitrust
17  laws.  Even you cannot collude to overcharge consumers.  Even
18  you can't hide the truth and think you're going to get away
19  with it.
10:55AM 20       And so, whether you're football fans or not, the
21  antitrust laws of the United States of America empower you,
22  allow you to send a message and to tell the 32 team owners it's
23  not okay to compete on the field but to collude off the field.
24       And so now, with that, I want to go in and walk you
10:56AM 25  through the evidence.  The Court read you the charge.  And I

**2381**

1   want to walk you through the evidence that you've seen over the
2   last few weeks and help you understand why we think it's
3   important and to put it in context.
4        But, first, I just want to say thank you.  I can't
10:56AM 5   believe this is our fourth week together.  And we just really
6   appreciate your commitment and dedication to service.  So let's
7   get going.
8        Why don't we go to the first slide.
9        Let me start up, if I can, with the burden of proof.
10:56AM 10  I want to start off here because we've all watched TV, and it
11  can be confusing because most of the stuff we see on TV dealing
12  with the burden of proof are criminal cases where the burden of
13  proof is really, really high.  It's called "beyond a reasonable
14  doubt."  And so if you're thinking about football, it would be
10:57AM 15  like taking the ball from one end zone and moving it all the
16  way up the field to the other party's end zone but stopping
17  short maybe a yard.  About the one yard out.  That's -- that is
18  beyond a reasonable doubt.
19       You may have also heard terms like "clear and
10:57AM 20  convincing evidence": taking a football, moving it past the
21  50-yard line and getting it to about -- I don't know -- the
22  30-yard line of the other side.  That is not this case.  This
23  is preponderance of the evidence.
24       What's a tad unusual about this case, though, is
10:57AM 25  both sides have burdens of proof here, and the Court has

**2382**

1   explained to you this four-part balancing test, and we'll talk
2   more about that, but I want you to appreciate that, and what I
3   want you to realize is that whoever has the burden of proof on
4   any issue just needs to tip the scales, you know, just the
10:58AM 5   teeniest bit.  That's why we put the feather here.  It's not
6   51 percent: it's 50.00000001.  That's the burden of proof.  If
7   the feather tips the scale, the party has met its burden.
8        We brought two claims here, as the Court has said.
9   We have our Claim 1, which is that the defendants in this case,
10:58AM 10  which include DirecTV, include the NFL, and the 32 teams of the
11  NFL, that they restrained -- unreasonably restrained trade.
12  And then a second claim we have is their conspiracy to
13  monopolize.
14       Let's start with the first one and go right to it.
10:58AM 15       I'm starting here with we have to prove that an
16  agreement existed between the NFL, the NFL Teams, and DirecTV.
17  And so what we've done here is we purposely highlighted the
18  word "agreement" or "understanding" to let you know how liberal
19  and what a low threshold that is.
10:59AM 20       This agreement can be spoken -- excuse me --
21  entirely unspoken.  Co-conspirators do not even have to have
22  met one another.  Just having a common purpose and,
23  importantly, it doesn't need to be secret.  It can be out in
24  the broad daylight, and what you're going to learn -- what
10:59AM 25  you've seen and what we're going to show you right now is

**2383**

1   agreements here at issue are in writing -- they're written
2   contracts -- and are also evidenced by e-mail.  So that's what
3   we have here.
4        I put up an old nostalgic piece of football here
10:59AM 5   because the first agreement we're going to hear about is an
6   agreement that the teams have with one another not to compete.
7   Think about it.  You have 32, now, NFL Teams.  They have chosen
8   not to compete in the licensing of their paid TV rights.
9        Back in the day, in the '50s, they actually
11:00AM 10  competed.  I mean, they competed on the field and off the
11  field.  And what we had there -- I think it was 12 teams --
12  nine of them, on their own, struck deals with CBS.  Two of
13  them, I think, were with NBC.  One, the Cleveland Browns, had
14  their own independent network.  But that's the way it was until
11:00AM 15  the teams got together and said, We got a better idea to make
16  money.  Why don't we all pool our rights together, give them to
17  CBS because, with that leverage, with that combined leverage,
18  we'll have more might and we can get more money from CBS than
19  we're getting on our own.
11:00AM 20       And so that happened.  And then what we have here --
21  you've heard about it, and Dr. Rascher has talked about it, the
22  Government came in, challenged that, and said, Hey, that
23  violates the antitrust laws.  The Court agreed, said pooling
24  between the teams, not competing, to go air your games is not
11:01AM 25  legal.

2448

1    says.  And the subject is:  Did Sunday Ticket lower the price?
2    And in the opening, they weaved a tale saying, See, they knew.
3    And Mr. Bornstein, the first witness, came in and said, No, I
4    didn't know.  I didn't want to look stupid in front of my boss,
5    which we can all understand.  Of course the NFL wanted to know
6    the price.  But when they actually asked the witness what the
7    document said, totally disputes their argument.  That's
8    evidence.  That is evidence that you can consider.
9            Now, what about the price?  Plaintiffs put this
10   chart -- this chart up in their opening trying to suggest --
11   and, again, I think today -- trying to suggest, oh, the price
12   went up and up and up.  First of all, let's be very clear what
13   it is.  It's DirecTV gave many discounts to Sunday Ticket
14   subscribers.  That's my title.  Their title was the NFL made
15   sure the price always went up.  This is the retail price, and
16   it's for every subscriber, not just class reps, every
17   subscriber.  And look what they did.  They show you 2012, they
18   don't even show you 2011.
19           I don't know if I can write on that.
20           2011 it was way up here.  So they didn't want you to
21   focus on the fact that the price actually went down.  And why
22   does that matter?  DirecTV got control of the pricing that
23   year.  That's when they paid more for it.  And I'm going to
24   show you some documents about that.
25           And what is the first thing DirecTV did?  They

2449

1    lowered the price.  And plaintiffs want you to just ignore
2    that, and then they show you this retail price that went up
3    every year, and he said, When does that ever happen?  Well, I
4    don't know if you've been to the grocery store recently, but
5    usually the price of the basic things go up every year.  They
6    don't go down.  There may be discounts, but, unfortunately,
7    prices go up year after year after year.  And that's what
8    happened here.
9            But this was not the average price paid by all the
10   subscribers.  Not just the class members, and if I said that, I
11   misspoke.  This document shows you all subscribers.  And guess
12   what?  Their own expert said the average price was 102.74.
13   Now, if the NFL wanted to control the price and they had an
14   agreement, why was DirecTV receiving on -- approximately
15   $102.74 from a subscriber?  That's either a really crappy
16   conspiracy or there wasn't one.  There wasn't one.
17           There was no agreement.  They take the price down
18   right after they get control, and then they start to give
19   discounts.
20           Dr. Zona even admits this is the average price in
21   his own document.  I don't know --
22           Cort, can I erase my red mark or is that me?  That's
23   all right.  It's me.
24           Thank you.
25           So I'll do it again, then.  Here's the price.  He

2450

1    says the actual price that includes the discounts was 102.74.
2    That's their expert.  And now they're trying to walk away from
3    it.  In the closing, plaintiff put up some numbers, $233 that
4    he calculated.  There's nothing in the record about that.  He
5    said, "Oh, you can just do the math."
6            You can't just do the math.
7            You heard Dr. Zona say he had to build a model to
8    calculate this.  And now that they see this and they know it
9    undermines their entire story that there was price fixing or a
10   conspiracy, they want to walk away from this number.  That is
11   the number that was charged, and that certainly isn't evidence
12   of a conspiracy.
13           When they did try to look at the price, Dr. Zona --
14   you all heard him -- agreed that he never looked at the most
15   basic thing anyone would do.  They would look at the
16   per-subscriber fee, because that's what all the other leagues
17   do when they sell their own package, and they sell their
18   out-of-market rights, which they all pool, and they all sell --
19   by the league, and they sell through multiple distributors.
20   And Dr. Zona -- I mean, Dr. Yurukoglu told you he didn't even
21   look at that.  So all those numbers they're relying on from
22   Dr. Zona and that they weren't challenged, that's just not
23   fact.  You heard Dr. Yurukoglu say the model was totally
24   unreliable.
25           But the biggest fundamental problem with the model

2451

1    is it didn't even -- it didn't even look at the real world.
2    This is what happens in the real world.  Every one of these
3    other sports -- NBA, MLB, NHL, and even ESPN -- they charge a
4    per-subscriber fee.  And guess what?  When you look at the
5    different distributors, the price is all the same.  Having one
6    more distributor doesn't make the price go down automatically.
7            And why didn't Dr. Zona even look at that?  Because
8    he knows it would have shown that the price didn't go down.
9    And then their theory falls apart.
10           Dr. Yurukoglu is very honest with you about economic
11   theory and said, Look, if they wanted to keep the price high --
12   and there's nothing wrong with it, it's certainly not price
13   fixing -- they could have done the per-subscriber fee, and
14   that's what everybody else does.
15           Now, Mr. Bornstein came in and was asked directly
16   about this price fixing.  And he said he wanted to make sure
17   that they took control.  But they paid an increased fee.
18   DirecTV actually paid more to control the price.  That's in the
19   documents.  You didn't see that from the plaintiffs.
20           And he -- they wanted to control the packaging, the
21   pricing, and how much marketing.  And he wanted to do it
22   because he thought the NFL wasn't that capable of doing it,
23   that great at it.  And you know when you heard counsel say the
24   most important thing is contemporaneous documents, which means
25   they were created at the time without a lawsuit in mind, and he

2452

```
      1   said we couldn't find one?  I guess he just forgot.
      2          Here was a document from March 14th, 2003, way back
      3   at that same time, and it was from Roger Goodell and Steve
      4   Bornstein.  They fired the pricing department.  That's pretty
01:43PM 5   good evidence that occurred at the same time that they weren't
      6   having control.  That's what you call contemporaneous evidence,
      7   and that's the evidence you can consider in this case.
      8          Then counsel tried to say, Well, there were these
      9   secret side agreements, remember, in the contracts?  Again,
01:43PM 10  every witness that came in -- Mr. Jones, Mr. McManus -- said
     11   there were no side deals.  There was no need for side deals.
     12   Everybody knew what was going on and how it worked.
     13          And then plaintiff said, oh, they scored big points
     14   because Mr. Goodell, Commissioner Goodell, said we pushed back.
01:43PM 15  Right?  When DirecTV set a price they didn't like, we pushed
     16   back.
     17          Go back to common sense.  If you have a conspiracy,
     18   if you have an agreement to set prices, why do you have to push
     19   back?  The whole point of an agreement is you all agree and you
01:44PM 20  go off and do it.
     21          The most common sense point in the world.  Roger
     22   said, We push back and we try and they didn't do what we
     23   wanted.  That is the definition of no conspiracy.
     24          There's no need to fight over it if you agree.
01:44PM 25          And guess what?  Like I told you, they lowered the
```

2453

```
      1   price right after they had the ability to.
      2          And Commissioner Goodell told you he didn't like it,
      3   he didn't like when they gave it away for free.  Again, if you
      4   have a conspiracy to control the price, why would DirecTV give
01:44PM 5   it away for free when the NFL doesn't like that?  Well, we know
      6   why they wanted to: right?  It helped them get subscriptions to
      7   DirecTV.  But that certainly is not evidence of a conspiracy to
      8   keep it at a premium price in some illicit way when he said he
      9   didn't like it and they still did it.
01:44PM 10          So plaintiffs said in their opening that this was
     11   kind of dark and behind the shield and secret and they had
     12   exposed all the documents.  And then Commissioner Goodell came
     13   up and said, It wasn't a secret.  We screamed it from the
     14   mountaintops.  We told everyone.  I talked to the Government.
01:45PM 15  I talked to legislators.  I talked to the public.  I talked to
     16   fans, because we're proud of our model.  We're proud that we
     17   serve most people through basic television over the air and
     18   that we have other choices for them.
     19          So now they say, Oh, you can have an open
01:45PM 20  conspiracy.  Again, it's not a conspiracy.  And the question
     21   is:  Were the restraints in the contract reasonable?  Did they
     22   make sense?  They all make sense together.  And nobody else
     23   thought it was a problem.
     24          Here's another contemporaneous document that they
01:45PM 25  didn't talk about.  This came into evidence.  It's TX219.  And
```

2454

```
      1   you might recall --
      2          MR. CARMODY:  Objection.  Not in evidence.
      3          MS. WILKINSON:  Yes, it is.
      4          THE COURT:  Hold on one second.  Give me one second.
01:46PM 5          MR. CARMODY:  No, it's not.
      6          MS. WILKINSON:  Hold on.
      7          MR. CARMODY:  It's 219.
      8          THE COURT:  It's not.
      9          MS. WILKINSON:  Excuse me.
01:46PM 10          THE COURT:  It's not.
     11          MR. CARMODY:  I know that.
     12          MS. WILKINSON:  I'm sorry, Your Honor.  It was shown
     13   to the jury.  I apologize.
     14          So counsel showed this.  This is a document that --
01:46PM 15          MR. CARMODY:  Your Honor, I'm checking, and it's not
     16   in evidence showing a document that never made it into
     17   evidence.
     18          THE COURT:  But it was shown to the jury.
     19          MR. CARMODY:  Are those the new rules?  Because we
01:46PM 20  had -- you know, honestly, this never came in evidence.  I'm
     21   objecting to showing a document now.  You let certain people
     22   publish them during the right time for impeachment or other
     23   purposes but this never came into evidence.
     24          THE COURT:  Overruled.
01:46PM 25          MS. WILKINSON:  So Commissioner Goodell told you he
```

2455

```
      1   talked to the FCC.  And this shows you there were talking
      2   points for him.  And look what he said.  "Because the NFL is
      3   uniquely committed to free, over-the-air distribution of its
      4   core Sunday Afternoon Game package, it designed its
01:47PM 5   supplementary out-of-market package for its avid fans" --
      6          If we could keep highlighting.
      7          -- "in a way that did not undermine its appeal to
      8   free broadcast."
      9          So it's no secret that it was trying to protect, if
01:47PM 10  you want to use those words, the exclusivity of CBS and FOX.
     11   There's nothing wrong with that.  They wanted them to get those
     12   games out to as many people and they wanted to be supplementary
     13   or complementary.
     14          That's what he told everyone.  And that's what
01:47PM 15  everyone knew.  It's been going on for 30 years.
     16          And it's still true today.  Plaintiffs tried to show
     17   this video of Mr. Rolapp from just a year ago saying, Oh, my
     18   goodness, he's talking about all of it.  Exactly.  Let's hear
     19   exactly what he had to say about what the strategy is and what
01:47PM 20  they were doing.
     21          (Videotape played, not reported.)
     22          MS. WILKINSON:  No dispute.  It's a premium additive
     23   product.  And now YouTube sets the price.
     24          No secret he's out on television at the Super Bowl
01:48PM 25  saying this.  Again, it's got to be the most ridiculous
```

2472

1   this the other day, and I showed the Commissioner's testimony
2   when I cross-examined him.  I said:  "Just to refresh your
3   recollection, the second sentence" -- I'm talking about this
4   document -- "head of CBS Sports" write -- excuse me -- "writes,
02:34PM 5   'In the midst of your contract renewal, the concept here has
6   always been that these packages are sold at a premium, thereby
7   limiting distribution.'"
8         "My quick question is:  Did anyone on behalf of the
9   NFL ever say those words or anything close like that to a
02:35PM 10   regulator?"
11        "I don't recall.  I can't speak for other people in
12   the NFL."
13        The bottom line is no one is screaming from the
14   mountaintops and saying, Hey, this is what's really going on.
02:35PM 15   You all are the first people ever to see these documents
16   publicly.  I don't know if you appreciate that.  You are the
17   first human beings to see this stuff.  No one screamed from the
18   mountaintops, and whether it's secret or not, you know, that's
19   not an element of a conspiracy.  When the Feds came after them
02:35PM 20   in '60, all their conduct was out in the open.  The Federal
21   Government still came after them.  They were found to have
22   violated the antitrust laws, and then they went to Congress to
23   use their political power to get an exemption.  That's the way
24   the stuff really worked out.
02:35PM 25        They keep talking about IP.

2473

1         Would you put up 11.3 in the FOX contract.  I think
2   it's 187.
3         They started out in the opening statement by saying,
4   Why would FOX and CBS allow this sort of stuff to go on?  It's
02:36PM 5   their IP.
6         Do we have that, by the way, from opening statement?
7   Okay.
8         You do.  Okay.
9         This is what was said in opening statement by
02:36PM 10   counsel.  "Why would CBS and FOX be interested in what happens
11   with Sunday Ticket?  Because it's their broadcast.  They are
12   giving it to the NFL and sharing it for limited purposes, only
13   for Sunday Ticket.  That's what people do with their
14   intellectual property."
02:36PM 15        Folks, it was not their intellectual property.  I
16   thought it came out very clearly in the Larry Jones testimony.
17        Why don't we put up even the Larry Jones snippet.
18        Here's Larry Jones, my colleague questioning:  "We
19   heard, 'Why would CBS and FOX be interested in what happens
02:36PM 20   with Sunday Ticket?  Because it's their broadcast.  They are
21   giving it to the NFL and sharing it for limited purposes, only
22   for Sunday Ticket.  That's what people do with their
23   intellectual property.'  Do you see that?"
24        The response from the gentleman from FOX:  "FOX does
02:37PM 25   not own the intellectual property of the NFL."

2474

1         And I want to show you one last punch here on --
2   it's paragraph 11.3 of -- Section 11.3.
3         It's right here.
4         So head of the FOX -- this is the 2006, I believe,
02:37PM 5   agreement with the NFL -- in short, what it says, because the
6   NFL owns all the IP, they require FOX to run those 10-second
7   spots, so if you all had watched the games from time to time
8   and you see those spots where it says News Corp., or once FOX,
9   shall broadcast a 10-second videotaped notice of league
02:37PM 10   ownership and proprietary rights in all the game broadcasts.
11        I want to move on here.
12        What --
13        Counsel, can we use your Slides 42 and 43?
14        MS. WILKINSON:  Sure.
02:38PM 15        MR. CARMODY:  Can we pop up 42 and 43?  That's not
16   it.
17        MS. BONN:  That's 42.  "Wouldn't have."
18        MR. CARMODY:  Oh, yeah.  "Wouldn't have."  Okay.
19        So there's an instruction in this case.  And, gosh,
02:38PM 20   I don't know -- it's Instruction 25 that's going to guide you,
21   the Court says -- it's not "would," it's "could."  It's a big
22   difference.  All of their witnesses are saying "what I would
23   do, what we would have done in some other world."  You know
24   what the question is?  It's "could."  Right here.  See this
02:38PM 25   word?  I'm actually circling it.  It says "could have."  And

2475

1   what that means is the law requires someone to do what they
2   could have done if it's a better way, a less restrictive way,
3   to hurt people the way they were doing it with the high pricing
4   and low output of Sunday Ticket.  And the best answer to that
02:39PM 5   is a document called New Frontier.  It may be the most
6   important document in the case.  It's Exhibit 686.
7         The reason why this document is so important, it
8   starts out -- and --
9         Is this Slide 12?  You're going right to 12?  Okay.
02:39PM 10        What it shows here is the NFL back in '17 was
11   conducting their own analysis here.  They are trying to figure
12   out is there a less restrictive alternative?  Is there a way
13   not to hurt people by making -- schticking them on this
14   exclusive DirecTV platform, but is there another place we can
02:39PM 15   put them that can make us money and obviously not require
16   subscription fee?
17        And so what they did is they analyzed it --
18        And highlight that one, Matt, right below that.
19        It says, "Distribute regular season out-of-market
02:39PM 20   simulcasts on basic cable and then also maintain local
21   distribution through FOX and CBS."
22        So you can do all that.
23        Now run to Slide 12.
24        And I showed you this, I think, earlier.  And what
02:40PM 25   we have here, you can see the games still on FOX and still on