UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| IN RE: | ) CASE NO: 2:15-ml-02668-PSG-SKx |
| | ) |
| | )               CIVIL |
| NATIONAL FOOTBALL LEAGUES | ) |
| SUNDAY TICKET ANTITRUST | )    Los Angeles, California |
| LITIGATION | ) |
| | )    Wednesday, July 31, 2024 |
| | )    (9:02 a.m. to  9:34 a.m.) |
| | )    (9:47 a.m. to 11:26 a.m.) |

HEARING RE:

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
ON THE BASIS OF FEDERAL RULE OF CIVIL PROCEDURE 50(b)
[DKT.NO.1490]

BEFORE THE HONORABLE PHILIP S. GUTIERREZ,
CHIEF UNITED STATES DISTRICT JUDGE

APPEARANCES:            SEE PAGE 2

Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Derek Davis

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES**:

For Plaintiffs:              MARC M. SELTZER, ESQ.
                             KALPANA SRINIVASAN, ESQ.
                             AMANDA BONN, ESQ.
                             BILL CARMODY, ESQ.
                             Susman Godfrey
                             1900 Avenue of the Stars
                             Suite 1400
                             Los Angeles, CA 90067

                             HOWARD LANGER, ESQ.
                             Langer Grogan & Diver
                             1717 Arch Street
                             Suite 4130
                             Philadelphia, PA 19103


For Defendants:              BETH A. WILKINSON, ESQ.
                             RAKESH N. KILARU, ESQ.
                             BRIAN L. STEKLOFF, ESQ.
                             Wilkinson Stekloff
                             2001 M Street NW
                             10th Floor
                             Washington, DC 20036

3

**Los Angeles, California; Wednesday, July 31, 2024; 9:02 a.m.**

**(Call to Order)**

THE CLERK:  All rise.  This United States District Court for the Central District of California is now in session, presenting the Honorable Philip S. Gutierrez, United States District Judge, presiding.  You may be seated.

Calling Case Number 15-ML-2668-PSG, *In Re: National Football League Sunday Ticket Antitrust Litigation*.

Counsel, please state your appearances starting with the Plaintiff.

MR. CARMODY:  Good morning, Your Honor, Bill Carmody for Plaintiffs.

MS. BONN:  Good morning, Your Honor, Amanda Bonn for the Plaintiffs.

MS. SRINIVASAN:  Good morning, Your Honor, Kalpana Srinivasan for the Plaintiffs.

MR. SELTZER:  Good morning, Your Honor, Marc Seltzer of Susman Godfrey for the Plaintiffs.

MS. WILKINSON:  Beth Wilkinson on behalf of the NFL. Good morning, Your Honor.

MR. STEKLOFF:  Good morning, Your Honor, Brian Stekloff on behalf of the NFL.

MR. KILARU:  Good morning, Your Honor, Rakesh Kilaru on behalf of the NFL.

THE COURT:  Good morning.  First, it looks here from

4

the NFL.

            MR. STEKLOFF:  I think -- yes.

            THE COURT:  Go ahead.

            MR. STEKLOFF:  Thank you, Your Honor.  May it please the Court?

            THE COURT:  I want to address three things.

            MR. STEKLOFF:  Okay.

            THE COURT:  You probably have them on your list.

            MR. STEKLOFF:  Yes.

            THE COURT:  But the three things on my mind is I want to talk about Rascher.  I want to talk about Zona and the damages verdict.  If you look solely at the damages verdict, if the Court is persuaded by your argument that the damages verdict is not supported by the evidence because of the methodology used and because if they used that methodology, it's contrary to the jury instruction, that gets you a new trial.

            It seems you have to knock out Zona and Rascher under 702 to get to the judgment.  I -- that's my perspective.  So to put in parlance of the game, it's the ruling of the Court where the field was to admit under 702 after further review, seeing Rascher and Zona testify, the ruling is -- shouldn't it be under 702?  Or the Plaintiffs would say the ruling is confirmed.  Those -- that's what's on my own mind.  And after that, you can talk what -- whatever other points you want to

raise.

MR. STEKLOFF:  You'll be happy to hear that those were the only two -- of the arguments that we made and I was going to be happy to answer questions on any of them, those were the only two that I wanted to focus on today.  So we're on the same page.

The only thing that I want to raise immediately in reaction to what you just said is that we believe that even if you were -- I want to address the *Daubert* issues, of course --

THE COURT:  Yes.

MR. STEKLOFF:  -- but even if we were -- even if you were to say that somehow Rascher and Zona -- I'm not even sure matters for purposes -- second purpose but Zona survived *Daubert*, we think that you need to enter judgment as a matter of law because of the disconnect between the Plaintiffs' theory of liability and the need for class-wide proof and the rejection of that class-wide proof that's clear from the verdict itself in terms of the damages.

THE COURT:  I'll listen to your argument.  I'm not sure I'll be persuaded on that but, also, don't -- in the papers, I think both parties to a certain extent say, well, the jury verdict -- or the jury verdict indicates that Zona was disregarded.  So you shouldn't consider it but I think the standard is any -- could a rational jury, not necessarily this jury -- so because it's any rational jury, I think despite the

fact that this jury may not have considered Zona, we have to consider Zona if we're looking at the rational -- what a rational jury would do.

MR. STEKLOFF:  Understood, Your Honor, and I think from a *Daubert* perspective, we think both should be excluded but -- and I was planning on addressing that.

THE COURT:  Okay.  Go ahead.

MR. STEKLOFF:  Your Honor, the verdict in this case is indefensible and confirms the Court's worst fears about Plaintiffs' case and their experts.  This verdict is precisely why Rule 50 exists.  The Court's power to correct it by entering judgment as a matter of law for the Defendants is supported by clear authority from the Supreme Court and the Ninth Circuit.

And I think this is a specific instance in which for very position we have taken in our papers, you have both Supreme Court precedent directly on point and you have Ninth Circuit precedent directly on point.  That's whether you're taking on the *Daubert* issues and the methodologies of Dr. Rascher and Dr. Zona or if you're taking on the disconnect here looking first at *Comcast* and then looking at the damages result from the jury looking at the *First Alliance* case from the Ninth Circuit.

From day one of this litigation, Plaintiffs' case has had that one element throughout.  It was a challenge to two

alleged restraints.  The first was the pooling of the rights to out-of-market games.  The second was exclusive licensing of Sunday Ticket to DIRECTV.  Plaintiffs' only class-wide proof of liability and damages based on these restraints was the analysis of Dr. Rascher and Dr. Zona.

The trial exposed the fundamental weaknesses of Plaintiffs' proof and the jury's irrational verdict shows that Plaintiffs failed to meet their burden despite being given every opportunity to do so.

So starting with the *Daubert* issue, Your Honor, as a -- just as an upfront point, there's no doubt that you can re-assess your earlier *Daubert* rulings at this stage today and exclude the testimony.

**THE COURT:**  I agree.

**MR. STEKLOFF:**  Okay.  So I will skip over that.  In fact, Your Honor, as you know, and you --

**THE COURT:**  I think that's why you said the analogy after further review.  So I've -- I looked at the papers. Plaintiffs' prevailed on the *Daubert* and multiple stages, they prevailed at certification.  They prevailed motion in limine. It is what it is.  That was the ruling.  I've now seen Rascher and Zona testify and so I have new information if --

**MR. STEKLOFF:**  We agree, Your Honor.  So let's go directly to the flaws in both of their methodologies.  Let's start with Dr. Rascher.  Dr. Rascher created, we believe, a

8

fantasy world by cherry-picking different aspects of college football that fit the narrative he was trying to create.  He did none of the work required by the law to come up with a plausible but-for world.

The methodology he used -- and you've now seen it both live and subject to cross examination -- is completely at odds with the law and basic economic principles and that's why it never should have been introduced to the jury.

And after seeing it, Your Honor, in fact, said that you -- in the middle of trial made the point that having seen it and having seen the experts give their best shot, you weren't that impressed by their best shot and that you should re-assess *Daubert* and that's why we're here today, to re-assess *Daubert* and the Rule 50(a) motion that you left pending at the end of the trial allowing the case to go to the jury but with that motion pending.

There are three fundamental flaws to Dr. Rascher's analysis.  The first is he did not consider whether his but-for world represents economically rational action by key actors in the but-for world.

The second is that he cherry-picked elements of college football to fit his narrative and ended up with a purported yardstick that looks nothing like college football.

And the third is that he did not explain how things would work in the but-for world.  When pushed on cross

9

examination -- and if it's helpful, we can give you cite after cite to the trial transcript -- he said things along the lines of, the good news is it doesn't matter because it will just all work out.  He said that time after time and after time and that's ipse dixit which it's clear throughout the case law, experts are not supposed to come in and just have ipse dixit, it will all work out.  So those are the three flaws.

So let's start with the first, his failure to explain economically rational action by key actors in the but-for world.  First, as a matter of law, the *Dolphin Tours* case, which is a Ninth Circuit case, is directly on point and says that expert -- the expert in creating a but-for world must "presume the existence of rational economic behavior in the hypothetical free market."

And the *Concord Boat* case that we cite from the Second Circuit is aligned with that.  The -- that's at -- the *Concord Boat* case actually involved antitrust issues and the Second Circuit made very similar statements about the requirement that experts in creating a but-for world have to explain how the key actors would act rationally economically.

Dr. Rascher did not do that in several ways and I don't want to regurgitate the chart that I made during his cross examination entirely but he couldn't explain, as you may recall, whether the teams, if they weren't pooling their rights -- and his -- and the key here is he was the witness for

10

pooling.

That was the restraint that he was very focused on. He couldn't explain whether the teams, if the rights weren't pooled, would be selling all Sunday afternoon games, just the out-of-market games, would they include the primetime games? So that -- he couldn't explain the economic rational actions of the teams themselves.

He couldn't explain whether the CBS and Fox contracts would remain in place. He couldn't explain whether the teams would negotiate individually or in groups. If they were in groups, he couldn't explain which groups they would be, how many teams would be in each group. He couldn't explain who would produce the games, how they would be broadcast, how the feeds might or might not be shared, how advertising would work or how revenue sharing would work.

And when pushed on all of those issues, his answer was, it doesn't matter. It will work itself out. That is ipse dixit. It violates *Dolphin Tours* here in the Ninth Circuit and it is not what a -- it is -- so it's contrary to the law. It's contrary to economic -- basic economic principles and it's contrary to common sense.

You can't just say, there won't be pooling and there won't be exclusivity and then everything will work out because I want to take one -- because I say this is like a Saturday in college football and I can come up with a hypothetical scenario

**EXCEPTIONAL REPORTING SERVICES, INC**

11

on one Sunday in which the games fit into a schedule. That's not playing out what an expert needs to do and it's not helpful to the jury. It doesn't fit the facts of the case.

THE COURT: It seems to me you're basically saying it's not even a methodology. It's basically saying, look at college football. That's the model I'm going to use and the NFL is composed of very smart people who would want to continue to make billions and they'll figure it out. That's the model. That's the --

MR. STEKLOFF: I couldn't agree more, Your Honor. I think that's exactly what he did. He said, look, Board of Regents says that college football is somehow some sort of comparison. I'm just going to say this will be like college football. That's all I have to say. That is literally what he did. He said, this is like college football. That's all I have to say.

And that segues to the second point which is the cherry-picking because what is college football? And he manipulated college football depending on the point he was trying to make. So at different times, he would point to all of the football bowl series which is sort of Division I football in shorthand which has, I think, slightly over 150 teams. He would start there.

Then he would say, no, that makes some point about how this is college football and output would increase but also

12

you should look at the Power Five conferences.  And then he would say, but in some instances, you should just look at one conference because the SEC and the Big Ten are the most powerful conferences.  So I would compare this to the SEC.

Well, then when he puts together a schedule of the SEC -- which by the way, all the teams pool their rights -- many of those games on Saturday on his own chart were on the SEC network which is a paid channel or regional sports networks.

THE COURT:  I'm sorry.  I didn't understand because if you say -- at the end of the day, if you say a but-for world would yield an eventuality that all the games would be on for free, if you look at the college model, they're not free.  I mean, it -- again, I used Notre Dame as my example.  If I want to watch all the Notre Dame games, I've -- for away-games, I might have to watch them on ESPN.  So I have to go to Charter and make sure I buy a package that has ESPN.  If I want to watch other away-games that aren't being broadcast by ABC or ESPN, I have to purchase the ACC network to watch the games. So that's not free.

MR. STEKLOFF:  I agree again, Your Honor.  And that's the problem where he would then say -- I think of Dr. Rascher. He would say, oh, but we should only look at the top 25 games, Your Honor.  And that type of cherry-picking is exactly what also *Daubert* does not allow.  You can't -- when challenged with

EXCEPTIONAL REPORTING SERVICES, INC

13

the fact that your sort of yardstick doesn't work, then just say, oh, well, I'm going to pick a different aspect of the yardstick.

And that's what he did throughout.  He, again, referred at different times to all of FBS, just the Power Five, just a single conference or just two single conferences and then subsets within the conferences and then just picking across conferences to -- that's not work.  That's just trying to say when challenged, ah, ha, but I have a response.  But, again, it's just ipse dixit.  How is that even comparing anything about how economically rational actors in the NFL but-for world would act?

And so we have -- now that you've seen his testimony, which is different than reviewing it on the papers, his yardstick doesn't work.  He cherry-picked his yardstick within his yardstick.  And he didn't explain economically rational actions.

Again, just to take another example, he repeatedly referred to the SEC because it's sort of viewed as -- Big Ten fans might challenge but it's sort of viewed as the most powerful conference with the most money.  They pooled their rights.  So Vanderbilt pools its rights with Alabama and Georgia.  Vanderbilt doesn't get the same television outcomes as Alabama and Georgia.  Vanderbilt often is on the SEC network which you have to pay for.

14

And so you can't pick and choose different aspects of college football and say that that's work.  He really did no work.  He basically just said, this is college football.  This will all work out.

The other point that we want to make is that New Frontier is not an answer to this.  Cherry -- I don't know if Plaintiffs will bring that up but they suggest it in their papers.  Cherry-picking one document from the NFL's files does not then mean that that is a valid methodology when you haven't done the work to analyze that document.

THE COURT:  Well, the New Frontier still envisions that the NFL, not the individual teams, would broadcast the games.

MR. STEKLOFF:  Exactly, and he didn't even acknowledge that point.  And so New Frontier doesn't fit at all, let alone make the rest of his alleged methodology work.  It actually undermines it because there's pooling in the New Frontier world and his entire model is based on the premise that there can't be pooling.

THE COURT:  It doesn't address the anticompetitive behavior.

MR. STEKLOFF:  Agree.

THE COURT:  New Frontier -- the New Frontier still has pooling.  The NFL pools all its games and distributes them.

MR. STEKLOFF:  Exactly.  And I think that that's the

key here is this whole case makes -- I'll talk about Dr. Zona but this is why -- and I understand I'm fighting uphill here a little bit but this is why the verdict is inconsistent with the theory's underlying model upon which you let this case go forward.

If you go back to your class cert opinion, you -- the Plaintiffs relied on Dr. Rascher and then Dr. Zona, who I'll talk about in a moment, to prove anticompetitive effects, class-wide injury and class-wide damages.  And at the class cert stage, what you said is that those models, meaning Dr. Rascher's college football but-for world and then Dr. Zona's econometric model, were capable -- that's the exact word you used -- were capable of persuading a jury of -- or convincing a jury of establishing class-wide injury, damages and the anticompetitive effects.

And so they had -- the jury had to accept that either Dr. Rascher's but-for world of college football was valid or they had to accept that Dr. Zona's econometric model was valid. And I'll push this off for a moment but we know from their result that they did not accept either of those models.  They did not accept Dr. Rascher's college football but-for world because he took a simple all-or-nothing approach.

It was, if you accept my model, all of the games will be available for free.  The cost of out-of-market games would be zero.  You won't have -- you -- the consumers from 2011 to

2023 would not have had to pay a thing whether they lived in a home, whether they were a bar.  They could just turn on their TV and every single game would be on on Sunday afternoon -- zero.

And that's why by not accepting the 7 billion-dollar figure or even the two subparts with the two subclasses, the jury rejected that model.  The jury clearly found that they did not believe in the college football but-for-world model that Dr. Rascher created because it was all or nothing.  There's no other way when you look at their calculations to say that there was some sort of compromise or some sort of acceptance of Dr. Rascher's model.

**THE COURT:**  This is -- it's not a compromise because it's not the case where you have something intangible like pain and suffering and we're not speculating what the jurors did where the plaintiff asked that the pain was worth a million dollars and the defense said it was nothing.  And back there, the juror -- one juror said it was nothing.  The other juror said it was a million.  So they compromised and say 250.

That's the typical case where you wouldn't grind into trial because you're speculating as to what they did.  Here there's no doubt about what they did.

**MR. STEKLOFF:**  Exactly.  And so there also isn't -- in some overcharge cases -- and I think the Tenth Circuit *Urethane* case that they rely on, there's a completely different

17

model.  It's not an all-or-nothing model.  There's some sort of overcharge.  It's a percentage and you could have a jury who says, well, there was an 11-year class period and we think that the overcharge existed during six of the years but not five of the years.

That is not the case here.  We know that they used -- exactly how they came to their calculation and they did not say, oh -- they did not do anything accepting the 7 billion-dollar figure.  They ignored the 7 billion-dollar figure and they did that because they rejected Dr. Rascher's college football but-for world.

So turning to Dr. Zona, Your Honor, we believe that Dr. Zona's models were just as egregious.  First, at trial, as you will recall, they only presented the first model.  They didn't even present the second model.  That, I think, can go into your *Daubert* decision as evidence that the second model which was so weak that they didn't present it which was his corroboration both when you addressed class cert and the motion -- the later motion in limine and allowed the case to go forward.  You considered both models because they supported each other.

They at trial abandoned the second model.  They did not have enough confidence in the second model to say that it supported the first model.

Second, when you look at both models, there were

18

fundamental flaws that were brought out by Dr. Urakolu (phonetic) with both that were undisputed.  Dr. Zona knew about these challenges you heard about and Your Honor is aware.  Even the jury heard about -- a little bit about the back and forth, how Dr. Zona would send a report, Dr. Urakolu would respond and they could each see their criticisms of each other.

So Dr. Zona was well aware of Dr. Urakolu's criticisms.  The key ones were, he predicted higher prices.  I mean, that at its core demonstrates that his math methodology was unreliable.  In the models, you may recall, for one, he had to use the list price and say that there was a price that was below the list price to say that the price would have been less if there had not been exclusivity.

In the second model, instead of using the list price because he wouldn't have liked the results, he chose a lower price and so that he could compare prices differently.  That is junk.  It's just pure junk.  I think Your Honor called it "gobbledygook" when you heard it and that is the exact right word.  I would use "junk."

He also -- and I don't remember the exact percentages sitting here -- for each model predicted completely irrational decisions by a large percentage of the sort of but-for subscribers in the but-for world.  So my recollection is for each model, it was approximately 15 to 20 percent of the people in his but-for world under the model would have chosen prices

19

that were substantially higher if it was on -- for example,
stayed with DIRECTV for hundreds or thousands of dollars more
than moving to the second choice.  That is, from an
econometrics standpoint, gobbledygook.

And then third, the third flaw with him is that his
entire premise was that there would have been a direct-to-
consumer streaming action throughout the entire class period
from 2011 to 2023.  And there is simply no evidence either in
the record or from common sense that there could have been a
streaming option from 2011 through at least, yeah, 2018 or '20
or something along those lines.

And so to be able to come in here and that's the
model that you use shows that his factual basis sort of
underlying his assumptions that went into the model also were
completely flawed.

And so those are the three real flaws of Dr. Zona and
I think it played out very clearly in court.  We had to
introduce the second model on cross examination.  He didn't
explain any of the flaws knowing them that we just discussed
and then Dr. Urakolu which you can consider.  Often there are
*Daubert* hearing in which both sides present live testimony and
experts.

And so you can consider without any doubt under the
law Dr. Urakolu's testimony including the cross examination of
Dr. Urakolu in whether or not you think Dr. Zona from an

20

econometric standpoint had a reliable methodology that fits the facts of the case that survived Rule 702.

We're not aware of any case in which -- and I don't think the Plaintiffs cited one -- in which an expert is critiqued for flaw after flaw after flaw in his methodology. And then I understand it was a trial and not a pure *Daubert* hearing but doesn't even address any of those flaws.

So that was sort of my discussion on *Daubert*.  I'm happy to answer any other questions on *Daubert*.  But I would then turn to the second argument which is the failure of the models.  And I think as opposed to -- and I understand Your Honor said you would like to discuss the damages verdict but I think that I view this more as a failure of the models.

So let's take a step back again.  If you look at your class cert opinion that allowed the case to go forward, it was clear that the Plaintiffs had to establish that one or both of the two restraints, pooling or exclusivity, through the models. That was it.  There is nothing else that was going to allow them to establish that.

THE COURT:  I don't necessarily disagree in writing an opinion that it would be favorable to your side but I don't think I can ignore -- so it seems like you're saying, stop right there.  It's 702.  Rascher and *Daubert* are gone but I think in terms of really addressing all of the issues in the case, it would be a mistake for me not to talk about the

21

damages verdict.

MR. STEKLOFF:  Oh, no, I agree.  I'm more saying I think that -- I think that you should grant, if you were write an opinion favorable for us, both issues.  I would recommend that you exclude Dr. Rascher and Dr. Zona and then you also say that the damages -- the verdict of the jury demonstrates -- I mean, I think both demonstrates their unreliability but then it also demonstrates the invalidity of -- or it demonstrates a failure of the Plaintiffs to prove class-wide anticompetitive effects, injury and damages as they were required to do based on the models of Dr. Rascher and Dr. Zona.

THE COURT:  You made a comment earlier and I think you're repeating yourself right now but if you look at the damages verdict just by itself, explain to me why you think that -- just the damages verdict by itself, how does that get to the judgment as a matter of law as opposed to just a new trial?

MR. STEKLOFF:  It gets us to judgment as a matter of law because it is an explicit rejection of the two models.  So what the jury did was take -- they --

THE COURT:  That's what you just said.  I just wanted to make sure I understood.

MR. STEKLOFF:  Yeah.

THE COURT:  That's what you just said.

MR. STEKLOFF:  Okay.  So -- well, let's talk about

what the jury did.  The jury did exactly what you told them not to do.  They looked at the reasonableness of the price of Sunday Ticket and said that the price of Sunday Ticket should be lower.  That is not what they were supposed to do.

What they were supposed to do was look at the reasonableness of the two alleged restraints and decide whether they were anticompetitive or pro-competitive under the rule of reason.  And we know that by their calculation because they took a list price and then subtracted what they had heard was the actual price for all consumers of -- all -- anyone -- all subscribers of Sunday Ticket and basically said there should have -- the price should have been $191 lower or the price should have been $102.74.

That is not anything that Dr. Rascher presented.  It is not anything that Dr. Zona presented.  And under *Comcast*, it is clear that -- and this is a quote.  It says, "At the class

> certification stage, as at trial, any model
> supporting a plaintiff's damages case must be
> consistent with its liability case, particularly with
> respect to the alleged anticompetitive effect of the
> violation."

The two models that the Plaintiffs offered were, one, everything would be free.  The jury rejected that at its core based on their calculation.  And the second is that if there had been two -- at least two providers of Sunday Ticket,

23

DIRECTV and a streaming option that there would have been the 48-percent reduction factor.

But they rejected the reduction factor because they did exactly what you feared when the jury notes came out. They did their own calculations that they weren't supposed to do and, unfortunately, they ignored the instruction that they weren't here to judge the price of Sunday Ticket. But their calculation is exactly that. It's saying, would you like there to be a lower price of Sunday Ticket? It should have been less. It should have been $191 less.

And if you think about it, Your Honor, what would you even do with that? I don't think we should get to an injunctive stage but what would you do with it? The jury has rejected all NFL games on Sunday Ticket would be free and it's rejected Dr. Zona's model. So would you give -- would you say you have to charge $102.74? You, the NFL, have to charge $191 less? That isn't allowed under Supreme Court precedent. Courts aren't here to set price.

They can't point to any way in which the damages verdict accepts any aspect of either of the two models that they gave. That's why they abandoned for this purpose Dr. Zona which means really for the second purpose, it's only about Dr. Rascher. And Dr. Rascher said everything would be free, not 294 minus 191 to get -- not doing this math that the jury did that has nothing to do with it being available for free

24

because that calculation is very easy.  Zero dollars -- whatever people paid, they get it back.

I mean, here you could have people -- and this is why it wouldn't have even been a valid model if they came with it at class cert.  You could have people who paid $120 in a year.  And then if we go all the way forward, they're going to get $191 back.  So they're going to get a 71-dollar profit for a year in which they paid $120?  It's completely irrational and it is exactly why Rule 50 exists.

*Comcast* makes that entirely clear and so if the Plaintiffs get up and try to point to cases from 1931 that say you shouldn't look at verdicts, that's just not the law.  *First Alliance* makes that clear.  The *Apple v Samsung* makes that clear and they don't do anything to dispute the calculations because they can't be disputed.  They're down to the dollar and down to the penny.

They -- what I would say, Your Honor, is -- and I realize I might be repeating myself but the jury rejected -- in this instance, I actually think you only need to look at Dr. Rascher.  They rejected Dr. Rascher.  That is a rejection based including on your class cert order but also based on common sense of the anticompetitive effects, class-wide proof of injury, class-wide proof of damages that they were required to bring forth.

The jury did its own calculations based on numbers

25

they pulled from the record but it was -- they just said that this costs too much.  That's not a liability finding.  That's why it's not just that there should be a new trial.  It's why there should be judgment entered in favor of the NFL because the Plaintiffs failed on their only proof of class right proof.  They rejected Dr. Rascher.

I think, unless you have any other questions, Your Honor, I'll wrap it up which is just by saying throughout this trial, we believe on behalf of the NFL that you appropriately expressed concerns about the Plaintiffs' presentation, the Plaintiffs' experts and when the jury sent notes indicating that it might make up its own calculations, you expressed concerns about the path they appeared to be taking.  And you were pressing it in all respects, Your Honor.

This verdict is precisely why Rule 50 exists.  It's to undo indefensible outcomes.  And having now seen all of the evidence presented at trial, including the testimony of Dr. Rascher, Dr. Zona, including their cross examinations, the Court should undo the verdict and grant judgment for the NFL Defendants in all respects.

THE COURT:  All right, thank you.

Let me just take a five-minute break.  Thank you.

THE CLERK:  All rise.  This court is in recess.

(A recess is taken from 9:34 a.m. to 9:47 a.m.)

//

26

THE CLERK:  All rise.  This court is again in session.  You may be seated.

THE COURT:  Plaintiff's argument?

MR. SELTZER:  Good morning, Your Honor, if it --

THE COURT:  Good morning.

MR. SELTZER:  -- please the Court, Mark Seltzer for the plaintiffs.  I'm going to try to answer the Court's questions that were raised --

THE COURT:  Thank you.

MR. SELTZER:  -- but I'd like to begin with some first principles here on this motion.

A motion for judgment as a matter of law can't be granted unless there -- no reasonable jury could have found in our favor.  The Court can't weigh the evidence, the Court can't assess the credibility of the witnesses, it's a very stringent standard.

I submit it's not met here, Your Honor.  The evidence before the jury supported very much our case from the very beginning, which even know is attempted to be sliced and diced as if it were just two separate agreements, a pooling agreement and an agreement to limit the distribution by an exclusive agreement with DIRECTV.

Our case has always been based upon how the agreements all work together, the agreements within networks and the NFL, the agreements between the teams, the agreements

between the NFL and DIRECTV and interlocking web agreements. That's what the Ninth Circuit said when it reversed the decision to dismiss our case. That was the fundamental flaw in the Court's ruling long before Your Honor had the case, saying that we hadn't alleged an anti-trust violation.

The evidence that we submitted at trial supports I think to a fare thee well that the defendants agreed that over the aired television games that were broadcast by the networks would be protected from competition with out of market game telecasts by limiting the distribution to a single provider, a pay TV provider, and that that pay TV provider would charge high enough prices to dissuade people from subscribing to their product, to limit the distribution of the product, to protect the networks from competition with those games.

It was an essential element of that agreement that the price of Sunday ticket be raised to those levels, non-competitive levels.

The defendants in their motion haven't even tried to engage with the evidence that we submitted on these points, Your Honor. They prove our liability in violation case, they show there wasn't an agreement made that -- they were all interrelated agreements that had that purpose in effect of limiting the output of the games and raising the price of those games to --

THE COURT: What would the price have been?

28

**MR. SELTZER:** Well, that's a different question, Your Honor, in terms of what the price would have been. But the price -- the fact that the price is raised to an artificial level, that is an anti-trust violation. A specific level doesn't have to be proved in order to establish that a violation took place. And that's a very, very important point for Your Honor to consider.

The way that the anti-trust laws work is that if competition between competitors is limited so they don't compete on price, prices or they limit the output of their product to limit competition between themselves, that has the effect of raising the price. The plaintiff doesn't have to establish a particular price or price level to establish a violation, that's enough. That's a violation.

Now, in this case, the --

**THE COURT:** How do you calculate damages?

**MR. SELTZER:** Okay. In this case, damages were calculated using two different methodologies. The first methodology was used by Professor Rascher. And what did Professor Rascher do? Professor Rascher made a comparison between college football, which is the nearest analog to pro football and said, in college football there was a situation where the games' broadcast were centrally controlled by the NCAA.

The NCAA limited the number of broadcasts and was

29

able to exact high license fees by doing that.  Individual teams couldn't license their own broadcast, nor could conferences.  Everything was centrally controlled by the NCAA.

The Supreme Court said that arrangement was an agreement that violated the anti-trust laws, because what it did was it limited the output of the games that could be broadcast and enabled high prices to be charged to broadcast those games.

The Court said that's really the equivalent of price fixing, not a particular price as part of the Court's holding, that was an agreement that violated the anti-trust laws. That's exactly what we have here.

You couldn't -- if you tried to dream it up, you couldn't imagine a situation that's more closely analogous to what the Supreme Court said was illegal in the NCAA than what you have here.  That's why the Ninth Circuit said this was a very apt analogy, close analogy to what our case is about because that's what the anti-trust violation is all about.

You limit competition by agreement and by limiting that competition you restrict output.  And by limiting the output you raise prices.  That's an anti-trust violation.

THE COURT:  I guess my -- I'm not necessarily disagreeing with anything you've said so far except to get to the models and how you get to damages.

So okay, the Ninth Circuit said as you've argued that

30

the NCAA cases were the best analogy to what was going on here. You limit output, it's anti-competitive, it could lead to higher prices.

Now, in this particular case, what do the models tell us about did it lead to a higher price and what are the damages. That's -- I think that's the issue. I don't think any -- I'm not arguing with you that what the Ninth Circuit said is not a correct legal analysis of this particular case, that the NCAA cases were you had the NCAA controlling the number of games that would be broadcast, in order to exact higher licensing fees. In this particular case, the Ninth Circuit said you had a pooling agreement that limited output, sort of spot on. But I'm having trouble with the models and the damages that the jury came up with.

MR. SELTZER: All right. Let me now talk about the model because the NCAA case said college football was an apt analogy here so --

THE COURT: Not on damages. I think you're assuming too much, not on damages.

MR. SELTZER: No, I'm turning to damages, Your Honor, if I may.

THE COURT: But no, the non-damages I think that's where the plaintiffs go -- fall here because they just assume just because the liability model is college football that the damages model therefore, the right one is college football.

31

The Ninth Circuit didn't say that. The Ninth Circuit didn't address damages, they just addressed the liability models, the liability situation. But I think then the plaintiffs jump to and just grab on to that college football is the damages model and the Ninth Circuit didn't say that I don't think.

MR. SELTZER: No, but the Ninth Circuit did say that based on what we alleged, following the example of what happened before and after once the restraints were lifted the NCA, it was easy to see that subscribers to a Sunday ticket would have been overcharged. Now, you want to talk about the amount, the model, how do you measure the amount.

A yard stick model which one industry or group of people are compared with another that's similar is one of the most well accepted models in anti-trust cases. It goes back a hundred years. And what Dr. Rascher did is said, I can compare what happened once the restraints were lifted in the college football with what happened -- what would have happened if the restraints hadn't existed in this case.

And what he said, is that if you look at what happened after the restraints were lifted in college football, the availability of those games on free television proliferated.

THE COURT: That's not true.

MR. SELTZER: No, I think that's --

THE COURT: Free television, that's just not true.

EXCEPTIONAL REPORTING SERVICES, INC

MR. SELTZER: Well, Your Honor, I think there's a confusion here about what does free television mean.

THE COURT: Okay.

MR. SELTZER: Free television doesn't mean that there's no cost whatsoever to see the games, all that was meant by the word free in this context is that it would have been available even over the air or alternatively as part of a basic cable or satellite subscription for no extra charge.

THE COURT: But they're --

MR. SELTZER: You want to use the example of ESPN.

THE COURT: Well then I'm confused about, because he basically says free, therefore you've got the $7 billion in damages. Free means free and you're telling me free doesn't mean free.

MR. SELTZER: He never said that free meant absolutely free. What he said was that the games would be available either over the air or on basic cable or satellite, that's all that free means.

THE COURT: But isn't the $7 billion premise based on the fact that zero charge?

MR. SELTZER: Zero additional charge. That's the critical point that I think is being --

THE COURT: Explain that to me. What do you mean by additional, zero --

MR. SELTZER: Additional charge meaning the price

33

that you had to pay for Sunday ticket over and above the price for a DIRECTV subscription.  That's the additional charge.  It was charged as a premium product at a premium price on top of what you would get from a regular DIRECTV subscription.  And this is an absolutely fundamental point, Your Honor.

If you think about the games that were available in college football, almost all the games of the top teams are available either over the air or on basic cable or satellite for no extra charge.  That's the reality.

What Dr. Rascher was saying is that that same reality would have existed for the NFL if you didn't have these restraints.  And the reason why that would have existed is because without the restraints there would be every incentive to follow that model that college football used by individual teams or by conferences or even the NFL deciding that that's a better way to distribute the games.

The critical point, Your Honor, and this is I think -- for the medal and I think it's -- I don't know how to drive this home more clearly, if you look at the availability of the games that people watch on television, most people don't get it over the air anymore.  They don't use a rabbit ear, they have a cable subscription or a satellite subscription.

Included in that subscription, basic cable, you get the local TV stations, you get I don't know, the Food Network, you get a variety of things, you get ESPN, you get Fox Sports

34

1, you get, you know, other channels as part of that basic subscription for no extra charge.  That's what was meant by for free.  In other words, it's not for an extra charge.

And what Dr. Rascher was saying is that you would have had these games available for no extra charge.  That was the whole point of Sunday Ticket, to put it behind, not just a paywall so it could only be a satellite distributor, but that it had to be an additional premium product charged at a premium price over and above the basic cable charge.  That's the whole case, Your Honor.

So what Dr. Rascher was saying --

THE COURT:  I don't mean to --

MR. SELTZER:  -- is that if you look at the amount that was paid for Sunday ticket, that was over and above the amount that was paid for DIRECTV, a regular subscription.  The regular subscription price, we're not saying that would change --

THE COURT:  All right.  Address my confusion then.

MR. SELTZER:  Yes.

THE COURT:  So what I've -- I've used myself as a specific example.  I'm not evidence --

MR. SELTZER:  Right, Your Honor.

THE COURT:  -- but you're saying for free and I know in my life it ain't free.  I know that -- the avid Notre Dame fan, which I am, I'm cheap.  I won't pay for Peacock when they

35

won't -- Notre Dame is paying whoever, NBC decides it's a week game, so all of a sudden they announce it's going to be on Peacock. I now have to go get Peacock streaming to watch this one game and hopefully remember to cancel it after I watch that one game. That's not free.

Also, if they play an away game that's not shown on ESPN or ABC, I've got to go subscribe to the ACC network, that's not free. And on top of that, you know, I'd have to go back to look at my Spectrum bill, but they are different levels of packages and I've got to pay extra to buy the package that has ESPN.

**MR. SELTZER:** Well, actually ESPN is included in the basic package I believe.

**THE COURT:** I'm sorry?

**MR. SELTZER:** I believe ESPN is part of the basic package. I'm also a Spectrum subscriber and I think it's included in the basic package.

**THE COURT:** I have to go back and look at the bill because I remember every time I have an argument with my wife as to what -- we need to lower the Spectrum bill, and I have to make sure, whatever you do, don't -- make sure you don't eliminate ESPN.

**MR. SELTZER:** Your Honor, you're reminding of my discussions at home about the bill. But let me make this point, because it's absolutely critical because I think there's

36

a confusion about this.

The basic channels that you can see from a Spectrum or from another cable provider or from satellite, they include a lot of channels with no extra charge, that's called the basic subscription.

If you look at the college football games that are played on Saturday, almost all of them are part of the basic subscription, you don't pay extra for them.

Now, Your Honor has an example of a Notre Dame game being behind a Peacock wall, maybe one game out of the season or two games out of the season, that's an exception.  And the analogy of the college football model doesn't have to be absolutely perfect, to say that every single game was on basic cable and there may not be any games at all on a special package.  That's -- that kind of perfection is not the test of a valid yardstick.

The question before the Court presented by Dr. Rascher's testimony is if you looked at what happened to the most popular games among college football, and remember there are hundreds of college football games, we're talking that comparable games are the ones of the top 25 or the Power 5 conferences, those are the ones where across the country people want to see those games.  Those games are on basic cable, with very few exceptions.

If you look at the list that was in evidence on the

37

Saturday schedule, I think on that list there may have been one game out of 25 that wasn't on basic cable, if my memory serves me correctly.

And the NFL only has 13 games on Sunday. So there's every reason to believe that every one of those games absent the restraints would have been part of a basic cable package. Now, that's not free, in the sense that you have to buy the cable subscription, but the cable subscription price was never part of the damage claim in this case. And it's never been part of the theory of the case that everything would be available over the air. First of all, most people don't even get it by rabbit ears these day.

The over the air broadcast, if you want to watch Caicos News at 9 or whatever and you have Spectrum, that's part of the basic Spectrum package. You don't need rabbit ears to be able to see it that way, it's part of the basic package. The same thing would have been true with the football games in the but-for world.

And that's absolutely critical to understand that, because I think there's been a real confusion here by using the term free with meaning that no cost whatsoever as opposed to an additional charge for a premium package to see it.

And the college football model shows that once the restraints were lifted, that's exactly what happened, almost all the games of the most 25 top teams or whatever, however you

**EXCEPTIONAL REPORTING SERVICES, INC**

38

want to divide it up, those games were available as part of a basic cable subscription.

THE COURT: Is my summary of Dr. Rascher's testimony then, tell me why it's not fair or it's not accurate? It seems to me, what I said before, was that Dr. Rascher says the but-for model is the college football model. And then you ask him, how we're going to get there, he says, I don't know, the owners are smart people, they'll figure it out. Is that an accurate summary?

MR. SELTZER: It's an accurate summary but only goes so far, Your Honor.

THE COURT: Okay.

MR. SELTZER: Because the issue again in constructing a but-for model of the world is to say, okay, what would happen if the restraints were lifted. How the parties without the restraints would arrange their affairs can't be precisely predicted or dictated as part of constructing a but-for world.

What Professor Rascher was saying is that the demand for these games is so intense, the desire of the teams to make money by selling television rights is so intense, that they would have arranged one way or the other by some contractual arrangement with a network or a cable provider or somebody else to make these games available.

The precise details of how they would do it, that's not part of an expert's test for whether or not the yardstick

EXCEPTIONAL REPORTING SERVICES, INC

39

analogy is a good analogy or not.  What the defendants have tried to do is press the point too far by saying, unless you tell me exactly what contract would be made by which team or which conference over the NFL after the fact, you haven't a valid but-for world.  That's just not the law.  It's a misleading characterization of what is required for a but-for world to say that an expert must do that.

THE COURT:  I guess we're somewhere in the middle.  Is it enough to say, look at college football, that's the model and that's all you need to say?  Is that enough I guess is my question.

MR. SELTZER:  But that's not all he did.

THE COURT:  Okay.

MR. SELTZER:  That's not all he did.  He said, look, here's how college football has arranged their affairs the last several years and going back to 1984 when the Supreme Court decision came down and they had to arrange their affairs by a variety of means.

Some of the teams have conferences, and they've arranged deals with those conferences to have those games available on basic cable.  Other conferences have done the same thing with different providers.  Some have done it with networks, so that they're available on the air and basic cable, so you can see it with a rabbit ear if that's the way you see it.

40

Some individual teams have made their own deals, Notre Dame was a classic example, BYU was another, Texas used to do it that way, all these teams could have done it all these variety of methods, but all of them, the end result was the same.  That's the key point, the end result was the same, they were all on basic cable for nothing.  No additional charge and that's what Dr. Rascher was saying.  I don't need to specify what exact arrangement would occur.

THE COURT:  I have to criticize Dr. Rascher, let's say that the but-for world doesn't look like college football, the of for world would look more like baseball, is that a valid criticism?  And if you look at baseball and there was some cross-examination about it, so if you look at the Dodgers and the Yankees, the Dodgers have a separate deal where they charge quite a bit of money to the subscribers and they have -- the Oakland A's don't have, or soon to be Las Vegas A's, certainly don't have that kind of clout to have that kind of deal.

Is it valid to say that the but-for world doesn't look like what you're saying.  The but-for world looks like baseball.  Is that a fair criticism?

MR. SELTZER:  I don't think so for this reason.

THE COURT:  Okay.

MR. SELTZER:  First of all, baseball wasn't used as the yardstick model --

THE COURT:  Right.

41

**MR. SELTZER:** -- by Dr. Rascher. And that's a very important point.

Second, there are extremely important differences between baseball and the NFL. Baseball doesn't have the same kind of centralization where all the games are controlled by the MLB. Different teams make different arrangements with different providers.

**THE COURT:** Isn't that what Rascher is saying? He's saying that you shouldn't have this pooling, what you should have is that each individual team, the Cowboys, the Rams, the Bengals should have their own ability to independently market, whether they would do that by themselves like the Dodgers, or they would do it collectively like a division or maybe, you know, geographically, whatever, he doesn't really answer that question.

**MR. SELTZER:** Well, but here's the point about that. The -- again it goes to the bottom line. What would have happened in the but-for world without the agreements restraining competition? They could have arranged to make these games available by any number of different contractual arrangements. That's not required to be specified.

Looking at the way baseball does it is not an apt analogy for a couple of reasons. First of all, baseball, and as Your Honor knows from the in limine motions was subject to an anti-trust violation claim. The way it arranged their --

42

and restricted the output of games was illegal.  So -- and what baseball has continued to do may or may not be illegal in terms of what it's doing.  So it's not an untainted yardstick comparison to be used to compare the NFL with.

The same thing is true of hockey.  Hockey was also accused of an anti-trust violation and it limited the availability of out of market telecasts.  And remember when this case -- when we were arguing class certification, we talked about the Lauhman (phonetic) and the Garber cases as being examples where a Court found a similar restriction on out of pocket -- out of market -- I'm sorry, out of market games, the OAMs, those games was an anti-trust violation.

So trying to say well, baseball, you know, it would have done exactly the same way that baseball would have done it is not an apt analogy for that reason.  But also, baseball doesn't control the games the way the NFL does.  And baseball games are actually more plentifully available than NFL games, as a matter of fact.

So the arrangements are actually more --

THE COURT:  I guess I got side tracked --

MR. SELTZER:  -- consumer friendly --

THE COURT:  I got side tracked with baseball, but I mean, because -- anyway, I think I just dug myself in a hole with baseball.  But you still -- I guess what I'm struggling with is how specific does Rascher have to be to create a but-

for world that we can rely on?  What's the -- sort of what's enough.  And you're telling me that's enough and that's what I'm struggling with.

MR. SELTZER:  Okay.  Well, let me explain to you why I think what he did was enough.  What he did is he considered several different alternatives, this was laid out in his testimony and also in his expert reports.

He said, look, if the restraints didn't exist and taking into account the economic incentives of the teams, the NFL and the people who would want to be broadcast the telecast, there are several different ways they could have arranged to make these games more freely available and they would have been more freely available, and I say, use the word for free, in other words for no extra charge and here's how they could have done it and he lays out in detail how that could have happened.

And why it's reasonable to conclude any one of those arrangements would have been a likely outcome without the restraints.  He's not required to say, this is exactly what would have happened that --

THE COURT:  I know that.  That's the other extreme. I know that he doesn't say -- I mean, because that's why it's a but-for world and you're trying to predict something that nobody knows, nobody knows what the exact way the but-for world will look.  So you have that, I'm not demanding that, the extreme that I'm indicating with my right hand.  Everybody -- I

44

think everybody agrees it's not perfect, it's but-for.  We're not guessing, but we don't know because it didn't happen, you know, exactly what it is, so that's the one extreme.

And then I'm struggling well what's -- on my left hand, what's the minimum that you have to show to make it work, that's --

**MR. SELTZER:**  And the answer is the question of how good the analogy is, whether it's more or less perfect, whether or not it's more likely than not certain things would have happened, that's exactly the question for the jury to decide after listening to the expert, hearing the cross-examination of the expert, hearing whatever arguments the defendants want to make about why it's not a good analogy.  That's for the jury to decide.

In other words, there's something in that range.  They look at the details.  They look at what the arguments are.  They look at what was considered and not considered and they decide whether or not the opinion is to be accepted or not accepted, credited in whole or in part, all of that is for the jury.  That's why a JNOV motion here would be absolutely in my opinion totally out of bounds in terms of what the governing law is from the Ninth Circuit and the Supreme Court, in fact, as well.

So getting back to Dr. Rascher, because I want to make sure I've answered Your Honor's concerns about it.  What

he did is he looked at what happened before and after the NCAA decision, when there were restraints and the restraints were lifted.  And when the restraints were lifted, by the way, the NCAA could no longer control the output of the games.

They're only like maybe a month left before the season, college season was about to start.  It only took a month or thereabouts for the teams to rearrange everything that they needed to do to put the games on television.  So they figured out a way to do it.

And in this situation, the teams and the NFL would figure out a way to do it.  Why, because if you think -- and there's an argument here that he didn't consider the economic incentives of the parties.

THE COURT:  Let me interrupt there.

MR. SELTZER:  Of course he did.

THE COURT:  It took them 30 days -- college football figured it out in 30 days.

MR. SELTZER:  Yes.

THE COURT:  Is it a proper argument to say well therefore, the NFL will figure it out as well?  I mean, is that a valid argument?

MR. SELTZER:  Yes, I think it is.

THE COURT:  Okay.

MR. SELTZER:  You know why?

THE COURT:  Go ahead.

46

**MR. SELTZER:** It's a demonstration as a matter of fact, you have a real world experiment, the restraints were lifted, the teams were wanting to have these games on television, that was -- they had a strong economic desire to do that. Once the teams and the conferences could arrange to make different contracts, they did it immediately because that was their economic incentive to do that.

Here, if the restraints were lifted, the same thing would happen. Is it reasonable to assume that if the teams conclude among themselves and with DIRECTV and with the networks, they wouldn't want their games on television? That just flies in the face of all economic common sense. Of course they would. It's the most popular broadcast on television of anything. The top -- like the top 90 out of a hundred programs are NFL games.

The foregone revenue if they didn't put those games on television would be --

**THE COURT:** Wait a minute, I guess --

**MR. SELTZER:** -- billions of dollars.

**THE COURT:** There was lots of cross-examination about the but-for world and the what if, so if you look at the college model and you lose -- based on the way the construct is and probably if you're taking a but-for world it's going to get worse, the competitiveness of the games, the marketing of the games. I mean, I don't see how Alabama beat somebody 44 to

**EXCEPTIONAL REPORTING SERVICES, INC**

nothing, that's not a game I'm going to watch.

MR. SELTZER:  Well, that's --

THE COURT:  And if that turns out, I guess the -- I'm asking about what's the relevance of the cross-examination with all of a sudden the Cowboys now and the Rams and the Giants can -- and the Bears can now independent do their broadcast and since more people like those four teams centered in huge markets, that all of a sudden we'll be watching the Rams beat the Seahawks 44 to 0 and then all of a sudden the but-for world falls apart.

MR. SELTZER:  Well, Your Honor --

THE COURT:  I guess, is that relevant -- was the cross-examination relevant --

MR. SELTZER:  No.

THE COURT:  -- to the destruction of the model?

MR. SELTZER:  No.  No, it's not.

THE COURT:  Okay.  Tell me why.

MR. SELTZER:  Because what that is, is that's a separate -- an entirely separate point that was being made by the defendants and it's important not to confuse the two.

THE COURT:  Okay.

MR. SELTZER:  That was an argument about why the restraints on balance actually are pro-competitive.  And what was the argument about that?  The argument was that well, by virtue of pooling these rights and selling them jointly and

collectively, they have all this revenue and they share their revenue, and they distribute it equally among the teams and that keeps the balance of the teams equal on the field and therefore that's a plus for competition.

That's an -- entirely different from what the but-for world would look like without the restraints.  That's an argument in favor of keeping the restraints in place, even if, even if you assume that Dr. Rasher is correct and the games would proliferate on basic cable and satellite for no extra charge.  That's -- in other words, it assumes that's the case and says well that's a negative, that's a negative because they wouldn't be sharing the income.

But the evidence on that point, Your Honor --

THE COURT:  Is the but-for world -- I guess, does it tie into the criticism of the model, is that yeah, all the games would be available but nobody would watch, because the games aren't competitive?

MR. SELTZER:  No, again, that goes back -- that's a different issue.  And that's -- it's very important to keep them distinct.  That's an issue about whether or not, keeping restraints in place is pro-competitive.  And what was the evidence on that point because here, the jury was totally free to reject the defendant's argument and Dr. Bernheim's (phonetic) arguments about that and I think they were demolished by Professor El Hague (phonetic) by the way.

49

The argument is that look, we have to pool the rights so that we can then sell them collectively, then share the revenue and then share the revenue equally and that will enable each team to be equally competitive in terms of buying talent to play on the field.  That was the argument.

There were no facts to back that up.  Their argument was unsupported by the facts.  In fact, what the NFL did, it had its own internal study which was admitted into evidence, it shows that there was no correlation between competitiveness on the field and how much revenue was being shared by the teams. There was no fact to back that argument up.

So you wouldn't have this 44 to 0 game in the but-for world because there's no causal or logical connection between the pooling restraint and the sharing of the revenue and competitiveness on the field.  That argument was totally blown out of the water by the evidence in this case.

But it's critically important, Your Honor, to understand, that's entirely different from how the but-for world would look like in terms of games being available for no extra charge.  That's the anti-competitive effect of this agreement, though not available and extra charge, the only way you could see an out of market game was by subscribing to DIRECTV and we're not saying that the amount you paid to subscribe for a basic subscription was damages, that's never been part of the case, you had to pay extra for Sunday ticket,

50

the $300 a year approximately to see those games and that was the only way to see them.

And that price was set to discourage people from buying that package for the precise purpose of protecting networks from competition from telecasts that would compete with their broadcast of the over the market games.  That -- out of market games.

That is the core of the case and the evidence overwhelmingly supports it.  You have witnesses on the witness stand the jury heard, of course the price was set at a premium price, and the reason it was set that way was to curry favor with the networks, because if we didn't do that, they wouldn't pay us the amount of licensing fees that they were paying us. Because why were they paying those fees, because it would protect them from competition.  That's the anti-trust violation.

Because who gets hurt by doing that?  It's the subscribers for Sunday ticket, they're overcharged, they would not have had to pay that additional charge to see the out of market games in the but-for world.

The argument that well, we had to do that because we have balance on the field, that's an argument to justify the restraint.  And what did we show, not just that there was no evidence to support that claim justification.  Under the law, there's another step, called the least restrictive alternative.

51

That's the third step.

What's the third step?  You know, you can achieve exactly the same result, the claim benefit by a less restrictive means that is less anti-competitive.  What could you have done?  Exactly what they did.  They established salary minimums and caps.  And those salary minimums and caps were ones that actually had any connection at all with competitive balance, not the sharing of the revenue.  And that's from the evidence in the record, Your Honor.

There's no question about that being the reason why there was no need to share this revenue and split it evenly, you accomplish that result by these salary minimum caps. That's called a least restrictive alternative or less restrictive alternative.

**THE COURT:**  I guess I got sidetracked but can we talk also about Zona and also about -- well, more specifically the way the damages were -- the way we know that the -- we know how the jury calculated the damages.

**MR. SELTZER:**  Let me, if I can just finish up --

**THE COURT:**  Sure.

**MR. SELTZER:**  -- on Dr. Rascher.

**THE COURT:**  Sure.

**MR. SELTZER:**  The -- here's what he did in detail. He said, let's compare college football with the NFL.  Why make the comparison?  It's the closest comparator you could possibly

52

have for all these reasons.  It's the second most popular programming on television, it's next to the NFL.  The teams play each other once a week, they're all on Saturday, the NFL is on Sunday, the ratings for these games are very high, not as high as the NFL with few exceptions, rare exceptions.

The games are available on Saturday when they used not to be.  You can see 25 games from morning to night on regular basic cable and over the air television.  Maybe there's one game you -- they have to pay extra for out of the 25, maybe 2.  That's all.  And the NFL you only have 13 games.

So you can see what happens when the restraints are lifted in the real world, what would happen in the but-for world.  Because the economic incentives would be to have those games on television if they couldn't collude with each other to limit the output, which is what they did.  They colluded on the output.  And they did that so they could exact additional fees from the networks and exact fees from DIRECTV.

That was -- they figured that was the way to maximize their profits.  And they established a monopoly by agreement to accomplish that result.  The monopoly by agreement was all the teams pooling their rights and making the NFL their joint negotiating agent.  That was the essence of the pooling agreement was declared to be unlawful by Judge Grimm in 1961.

It's the same kind of agreement, it's identical in all pertinent respects.  So that's really what you have in this

53

case and the evidence came out not just from Dr. Rascher, but out of the mouths of the witnesses that that enabled, and not just enabled, required DIRECTV to charge a premium price for the precise purpose of protecting networks from competition, which otherwise would have existed.  That's the case, Your Honor, and as I said, the proof is overwhelming on this issue.

And the defendants in these motions, they don't even engage with that evidence at all.  They don't say that findings that there was a conspiracy to monopolize, or conspiracy to limit competition, or that the conspiracy injured both classes --

**THE COURT:**  You don't need Rascher or Zona to prove those points.

**MR. SELTZER:**  I think that's right, Your Honor.

**THE COURT:**  There is difficulty with the damages model.  That's the problem.

**MR. SELTZER:**  Right.  Let me turn to the yardstick model.  The yardstick model again doesn't have to be perfect, it can't be.  If perfection were demanded, a yardstick model couldn't prevail.  There are all kinds of issues that can always be raised with a yardstick model as to why it's not a perfect comparison.

But here you've got probably the closest one, as I said, you couldn't dream up a closer comparison than college football, for all the reasons that Dr. Rascher said.  So what

54

happened before and after is then a real world experiment of what would happen without the restraints here.

What the defendants have argued is that well, he's got two mistakes.  One, the -- he says free, but look at this, you've got to be a cable TV subscriber to see these games on ESPN or ABC or whatever network they're on on cable, you have to pay for a cable subscription.  That's true, but that's not what was meant by free.

Free meant that it would not -- you have to pay extra for it.  So that's the first confusion that they want to talk about.

Second, they want to say, well he hasn't specified exactly how the NFL teams would arrange their affairs.  Will they all make their own individual contracts?  Maybe.  That's a likely outcome.  Or instead, might they arrange their affairs and do it like more closely to what some of the colleges do by a conference, so you have a division making an agreements and saying, you networks want to see these four teams play, don't make a separate deal with this division.  That's also a possibility.

All of these are outcomes that could occur, similar to those that occur in college football, enabling the games to be seen for no extra charge.  That was Dr. Rascher's point.  And demanding more from him is -- it's contrary to law.

Let me give you an example, a recent example.  Real

55

estate commissions, it's got a little bit of velocity.  There's an anti-trust case against the National Association of Realtors and the theory was that they adopted rules which require every seller broker to make an offer of compensation to a buyer broker which couldn't be negotiated once it was put on the multiple listing service.

An anti-trust case was brought, to say that that was a violation of the anti-trust laws.  First you had to overcome well it was a rule, is that an agreement.  The Court said, absolutely that's an agreement, at least can be found in the agreement by the jury.

And just like here, the rules of the NFL are agreements.  That's what the Second Circuit recently held in the Relevant Sports case, that agreements that were adopted by a league, those satisfy the element of agreement for Section 1 of the Sherman Act.

So the rule was an agreement.  Now, the question is that rule have an anti-competitive effect.  Well, their arguments say, well, maybe brokers would make the same kind of offers anyway off the MLS or maybe in a non-binding way, so things would continue the way they are.  And you don't know what would have happened in the real world just like here, because there was no comparison with the United States.  These rules were effectively nationwide in effect, across the country.

56

And the argument was is that these rules have the effect of elevating commissions, so that you know, traditionally the 6 percent, you pay the seller broker and they divide it 50/50 with the buyer broker. So the argument was, is that this set of rules elevated the commissions above what they would have been without the restraint.

So how do you establish what would have happened in the but-for world. Well, you have experts who looked at other markets elsewhere in the world to see what would be a good analogy, it looked in Europe, but there was no such rule or maybe there's some variation of it.

Finally they settled on Australia as being a good comparison, a good yardstick to what would happen without the rule. And they presented evidence about why that was a good comparison.

The defendants went to town on all the reasons why Australia was different than the United States, different history, different kinds of arrangements with brokers, lawyers got involved in settlement of real estate transactions, which doesn't happen very much in the United States, all -- and it varied over time, it was different in different years versus what was happening in the United States.

That evidence of a yardstick was presented to the jury and what the Court found quite properly I believe that it was admissible evidence, subject to cross-examination. The

defendants could argue their hearts out and cross-examine the experts about why Australia wasn't a good comparison, why it couldn't be used as a model for the United States.

The jury rejected those arguments and awarded damages and that case was -- the damages were the full amount that was paid as the commission.  So it wasn't any -- it was a class-wide proof and like here, the jury came up with an aggregate damage award for the class as a whole.

That's the real estate case, tried just last year.  So that's the kind of case where yardsticks are used very effectively and where Courts have said they do satisfy admissibility and it's up to the jury to decide what weight to give to them, whether the distinctions are important or not important in trying to hypothesize what would have happened.

And there was a mention made of the New Frontier model.  That was independent support for the cause football Model Y (phonetic).

**THE COURT:**  It wasn't.  New Frontier is still a pooling arrangement.

**MR. SELTZER:**  No, it -- think about this, Your Honor.  Even if pooling were in place, what New Frontier was was an analysis by the NFL, would they be better off if they made all these games available for no extra charge on basic cable and network television, that's what they were saying.

So that in our case, even if you assume the pooling

58

existed, even if you make that assumption, and that wasn't anti-competitive, which it I think it most surely is anti-competitive, even if that were not in place, there could have been a way of making these games available that the NFL considered as certainly a viable option of making them available essentially for free with no additional charge.  So that -- I'm sorry, Your Honor, I didn't mean to interrupt.

THE COURT:  New Frontier didn't address the anti-competitive behavior that was being complained about in this case.

MR. SELTZER:  Absolutely does because what the anti-competitive behavior -- and that was part of the slicing and the dicing of the case.

Our case is based on the web of agreements, but each element of the web was also illegal.  And remember when we had the jury charge and we were talking about whether there should be an instruction about whether part or all of the conspiracy would be enough to find a violation here by the defendants?

If the NFL assuming you had the pooling agreement, made this exclusive arrangement with DIRECTV and to -- with DIRECTV to require the product to be at a premium price and only on DIRECTV exclusively to protect the networks from competition by agreement with the networks, that would be an anti-trust violation itself without pooling.

So what the New Frontier arrangement shows that even

if you accept pooling as being existing in the but-for world,

the contrary to the defendant's argument, they could have made

all these games available for free.  And I say for free, for no

extra charge on basic cable or network television over the air.

That's the point, Your Honor.  And in fact, what they did --

**THE COURT:**  I'd like -- we've been going --

**MR. SELTZER:**  -- if you look at the document --

**THE COURT:**  We've been going at it for a while, I'd

like to move on and address the verdict.

**MR. SELTZER:**  Okay.

**THE COURT:**  The damages verdict.

**MR. SELTZER:**  Okay.  Let me talk about the verdict.

And the whole argument on the verdict is that it was

irrational.  Why was it irrational?  It's based upon an

assumption and it's just that, that the jury found that 102.74

was the but-for world price and that 294 was the actual price.

And they say that's completely irrational and you should throw

the verdict out.

Now, let me talk about the one case that they pin

this argument on.  The Ninth Circuit case in First Alliance and

why it's distinguishable and why it has nothing to do with this

case.  We talk about that case.

First Alliance was a case against I think it was

Lehman Brothers for aiding and abetting of fraud.  And in that

case, which was tried I think before Judge Carter down in Santa

60

Ana, the jury was instructed that there were two measures of damages available.  One was the benefit of the bargain measure, and one was the out of pocket measure.

Plaintiff's expert put on the stand said that the benefit of the bargain measure was about $50 million, roughly, actually about $85 million I'm sorry.  The defendant's expert said, well, out of pocket it's 15 million.

The jury's instructed either measure is okay.  Four days into the deliberations, a lightbulb goes off, you know what, benefit of the bargain damages aren't available for a fraud case.  They're just not available.  It's not legally permitted to award damages on the facts of this case for a benefit of the bargain damages.

So what Judge Carter did was re-instruct the jury, brought them back in, gave them a new set of instructions and said only out of pocket damages could be awarded.  The jury didn't get the message apparently.  What'd they do?  They awarded damages by adding the 85 million from the plaintiff's expert, the 15 million from the defendant's expert, divided by 2 and came up with an exact dollar amount which showed that was the arithmetic they used and they awarded I think it was 50 million in damages.  I'll have to check numbers to be exact, but I think that's -- those are the numbers.

It was plain as day that the jury had disobeyed the Court's instructions.  The Court said you can't use the out of

61

pocket measure as a means of awarding damages in this case, but that's exactly what they did.  They used both the out of pocket and the benefit of the bargain and put them both together and came up with a number, which was the equivalent of dividing the two numbers on two.

On those facts, where the jury actually awarded more damages, much more damages than they could have awarded in the out of pocket measure, that's where the Ninth Circuit said, that verdict can't stand.

What did the Court do?  It wasn't sent jaywalked, it was sent back down for a new trial.  That's what happened in that case.  That's not what happened here at all.

Let me give you this analogy --

**THE COURT:**  Well, is the -- is it rational to take a list price for a certain number of years, not even an entire class period, is that rational to accept that list price and then to come up with the average price, subtract them, multiply them by subscribers, you've basically multiplied the damages are really the discounts.  That's not rational.

**MR. SELTZER:**  No, and let me tell you --

**THE COURT:**  Is that rational?

**MR. SELTZER:**  Your Honor, that's -- there's no way to tell that's what the jury did.

**THE COURT:**  To the penny as to what they did.

**MR. SELTZER:**  No, no, to the penny but why did they

62

use those numbers?  Let me step --

THE COURT:  Because they didn't follow the jury instructions.

MR. SELTZER:  No, they did follow the instructions. The instructions were to say to come up with a --

THE COURT:  Let me read the jury instructions because I want to make sure you address this.  This is what I told the jury to do and this is what they didn't do.

I said, the Court instructed the jury that the proper way to calculate, allocate the amount of damages to award plaintiffs is to determine the difference the prices plaintiffs actually paid for Sunday ticket and the prices plaintiffs would have paid had there been no agreement to restrict Upwood (phonetic).

The jury may determine the average overcharge paid by class members or estimate the overcharged paid by class members, it must base the average or estimate on evidence and reasonable inferences and not guesswork or speculation.  That's not what they did.

MR. SELTZER:  No, I think, Your Honor, in terms of what they did the jury, you know, may have used those two numbers, but not for the reason the defendants are arguing. And let me -- it's very important, Your Honor --

THE COURT:  What reason --

MR. SELTZER:  -- as a fact matter --

THE COURT:  What's the reason?

MR. SELTZER:  As a fact matter.  There are a number of reasons they could have used it, but let me give the facts that the jury had.

The jury was told by the evidence that the 294 price was a list price.  The jury was also told that when computing the number, the 102.74 number, that took into account not just class members, but non-class members.

So what the jury had was a number, this 102.74 that was never part of plaintiff's case by the way, it was injected by the defendants.  They took an arithmetic average of the total amount paid for all subscriptions and then divided that by the number of -- the total number of all subscriptions, class members and non-class members alike to come up with this 102.74.

It was not a price that was paid by any class member or shown to be one that was paid by a class member and they -- that average, that 102.74 price was driven down by including non-class members who got a free introductory year just subscribing to DIRECTV and not thereafter subscribed to --

THE COURT:  Let me ask --

MR. SELTZER:  -- pay for DIRECTV.

THE COURT:  Let me ask it this way.

MR. SELTZER:  Yeah.

THE COURT:  You presented, the plaintiffs presented a

64

model 7 billion and change, was one damages model.  The second damages was the 3. whatever model.  Third model was the NFL tax 1. something million.

MR. SELTZER:  Right.

THE COURT:  So what the jury did was rejected all three models and concocted a new model that wasn't supported by the evidence.  That's what they did.  And it -- the methodology isn't supported by the evidence.  And the methodology is contradicted -- contradicts the jury instruction.

MR. SELTZER:  Let me -- there are several ways that the methodology the jury used wouldn't be supported by the evidence, Your Honor.

THE COURT:  Okay.

MR. SELTZER:  And this is I think an extremely important point.  Let's take that 102.74 number, that 102.74 number was not an average price paid by members of the class. The jury was incorrectly told that by the defendants.  That that was the average price paid by class members.  It wasn't.

In fact, the average price paid by the residential class members was $233, more than the 102.74 by $130.

The price that was paid by the commercial subscribers was even ten times higher on average, paid by the class members.  Those are the numbers that the jury was given.  The defendants used this 102.74 number that was designed to be a comparison with list prices, as if that was a fair comparison.

65

They actually compared that price with the price that was paid for a subscription for Major League Baseball or another sport and saying, you know, that cost X and 102.74 is less, therefore, people couldn't have been overcharged.  That wasn't a measure of overcharge at all.  That wasn't -- that was just an average price paid by all the subscribers.

They then used that number to create -- sow doubt in the mind of the jury about what actually was paid by class members.  In fact, the class members who actually paid for a subscription, paid close to list price or list price.  They didn't pay this average number, they paid a list price number.

And Dr. Zona testified that when you get the average number, in fact, you got two numbers that basically make up the average.  One is zero and the other one is list price.  And that's how you get to this 102.74.  So there's --

**THE COURT:**  I guess --

**MR. SELTZER:**  -- nothing in between.

**THE COURT:**  But you're not addressing my point.  The plaintiff says the damages -- the correct amount is zero, that's what they would have paid.  Therefore, the class members are owed residential, commercial 7. whatever billion.  That's Rascher.

And then a combination of Rascher and Zona, the 48 percent I believe is the right number, it's 3. something billion, that's fall back number two.

**EXCEPTIONAL REPORTING SERVICES, INC**

Then the third one is the NFL tax, 1. whatever billion.  The jury says, I buy none of that, I'm going to create my own model, maybe you're right, based on confusion caused by argument, maybe.  Okay.  That -- but the fact remains that the model they chose is not supported by the evidence.

MR. SELTZER:  But the numbers that they used could only -- you know, here's where the defendants I think go wrong.  They're saying that you have to now reconstruct what the jury must have thought, why they used those numbers.  That's not proper.

Take a case that --

THE COURT:  It's not proper when you're speculating.  We know exactly what they did.

MR. SELTZER:  You may know exactly what they did by any number of means, that doesn't mean you set aside the verdict.  Let me give you this example.  Suppose that the jury took the 7 billion number that Dr. Rascher gave and said, you know, we have so much uncertainty about the but-for world, we'll reduce the damages by 25 percent, and we'll award the balance as damages.  You would know exactly what they did, you could see mathematically they took a precise percentage, applied it to the total number and reduced it by that number.

That wasn't part of this model.  That wasn't something that he said.  But the jury has discretion to do that.  The jury has the ability to make an agreement among

themselves when they're trying to come to a verdict to effectively negotiate what they think a fair result is. And it doesn't matter that it's a -- you can determine mathematically what they did. The issue is whether or not it falls within the range supported by the evidence and here, the number falls within that range.

They don't have to accept Dr. Rascher's testimony a hundred percent in order to award damages in this case, they could award less damages and they could do it by a means that to us outsiders as transparent in terms of the math they used, that's not a basis to set aside a verdict.

THE COURT: You --

MR. SELTZER: There's case after case that says that.

THE COURT: You say that and you say it's within a range --

MR. SELTZER: Yes.

THE COURT: -- but I think you're ignoring Los Angeles Memorial Coliseum where it says the jury verdict must both, quote find substantial support in the record and lie within the range sustainable by the proof. That's not what happened here.

MR. SELTZER: No, no. Just accept for the sake of discussion, Your Honor, that the 7 billion is supported by the record.

THE COURT: Pardon me?

68

MR. SELTZER:  That the $7 billion is supported by the record.  Why?  There's record evidence that says that's what the --

THE COURT:  If you accept Rascher, you're exactly right.

MR. SELTZER:  Assume that's true.

THE COURT:  Yeah.

MR. SELTZER:  Okay.  Then if the jury awarded less damages because they accepted part of what he said, or they accepted the arguments about the uncertainty of the but-for world and awarded less damages, that would be within their province.

THE COURT:  It would be if we didn't know what they did I think.

MR. SELTZER:  Even if you know what they did, you take my point, my 25 percent example.  You know exactly what they did.  They would have the right to do that.

And now take why the jury might have used these numbers, and again, I'm speculating, the defendants are speculating, we're all speculating and before I engage in speculation, let me remind the Court of a decision that's in our papers, it's the Selador (phonetic) by Judge Phillips.

In that case, you have an expert for the plaintiffs that came with four different damage numbers.  And the jury came back with another number down to the dollar.  How they got

69

there is totally unclear.  But -- and the experts didn't give anybody on the jury a tool to adjust those numbers, but the jury came in with a dollar number that was in the range of all the numbers that the experts came up with, they had some lower, some higher, it was all within the range.

Judge Phillips said, it's not for the Court to try to delve into the mental processes of the jury to figure out what they did.  More importantly, why they did it.  Because what the defendants are saying is that Your Honor has to assume that they made this calculation because they impliedly found that 102.74 was the but-for price and 294 was the actual price when they may have done no such thing.

Instead, Your Honor, going back to the point about the issue on pricing, there was good evidence in the record from which the jury could say, you know, most class members would have paid the list price, would have paid 294 for the years and that was in effect or whatever the prices were in other years.  And there's also evidence in the record that the defendants introduced that question what jurors actually would have paid.

So what the jurors could have concluded is look, we've got this 102.74 number that defendants have argued that's the average price that class members paid and that was completely wrong for them to say that.  They admitted it in closing argument that was a mistake.  That they could have

70

taken that number and said, you know, to resolve the

uncertainty about what was actually paid, not but-for price,

just what was paid, well assume that the but-for price is zero,

but we have doubt about what was actually paid, so we'll -- so

to be conservative we'll take the 102.74 deduct that from the

294 number, that comes up to 191.26 and that produces the exact

damage number they came up with.  That's a completely rational

way for the jury to have proceeded here.

            THE COURT:  Is it rational to say that the damages

are the discounts?

            MR. SELTZER:  Not the discounts, Your Honor.  That

again is another confusion.  The 102.74 --

            THE COURT:  Why am I so confused?  It is a discount.

That is the discount.

            MR. SELTZER:  It's not, Your Honor.

            THE COURT:  What is it then?

            MR. SELTZER:  That's a -- again, you have to look at

what -- who the plaintiffs are.  The plaintiffs are the people

who paid for Sunday ticket.  They paid the list price for

Sunday ticket.

            THE COURT:  I'm not disagreeing with that.

            MR. SELTZER:  Okay.  Now, now --

            THE COURT:  What I'm saying is what they used was the

list price versus some average price to concoct some -- that

is -- can only be a discount.  It's not even a discount that

71

applies to this case.

MR. SELTZER:  That's right.  It doesn't --

THE COURT:  It --

MR. SELTZER:  It doesn't apply to this case.  That --

THE COURT:  That makes it even more irrational if he doesn't apply to this case.

MR. SELTZER:  No, no, no.  But the 102.74 isn't -- it was arrived at by taking into account the three years that was given to non-class members.

THE COURT:  Right.

MR. SELTZER:  That -- it was a -- you can call it a discount for them, but it didn't reduce the number that the class members paid at all.

And another thing I think is critical because there's another confusion and the defendants have thrown out a lot of arguments, but they're -- a lot of them are based really on confusing issues, confusing actual prices to but-for prices, et cetera, confusing --

THE COURT:  Let's talk about what the jury did.

MR. SELTZER:  Okay.

THE COURT:  What they did, they took the list price for a portion of the class period --

MR. SELTZER:  Yes.

THE COURT:  -- they subtracted the average price, they came up with a number and then they multiplied it by what

72

the plaintiffs told them was the number of subscribers during closing argument.

MR. SELTZER: That's right.

THE COURT: That's exactly what they did. Is any of that supported by the evidence?

MR. SELTZER: Yes, and I'll try to make the point again. It can be supported several different ways, but one way that it is supported, assume that there's some doubt in the juror's mind about what the actual price is that class members paid. No confusion about a but-for price, the actual price, based on what the defendants argued.

They were saying the actual average price the class members paid was 102.74. It wasn't. It was $233. But they were told that repeatedly, that was the actual price class members paid on average.

They also had evidence that class members paid 294. Assume that the jury concluded, agreeing with Dr. Rascher that zero was the but-for price, in other words, people would not have had to pay extra to see these games. Separate is theory in full. But they had a doubt about what class members actually paid.

To resolve that doubt, they could take the 294 number, which was the most recent number they had on Exhibit 417 and they could take the 102.74 number, the defendant's argument about what the actual average price is that class

73

members paid and say, you know what, to be on the conservative side, let's assume that we think that class members who paid for a subscription paid 294, but there's some doubt about it. So what we'll do is reduce the amount of damages by taking the 102.74 out of the equation and award just the difference between those numbers as damages, multiply that by the number of subscriptions.  That would have been a perfectly rational way of doing business without accepting their argument that they must have found that the but-for price was zero.  That's not what they did.

And, Your Honor, here's -- again going back to the point I was making, is a chart that illustrates this.  I'm told I should ask the Court to see if that's possible.  Anyway, I don't want to interrupt the flow here.

The point is, is that you can take those two numbers as trying to resolve a dispute that was in the record about what the prices were that were actually paid by the class members, not dispute about but-for prices at all.

Let me see if we got this.  Yeah, I'm not allowed to touch these machines, Your Honor, because if I do I'll blow up the entire courthouse.

**THE COURT:**  Okay.

**MR. SELTZER:**  So.

(Pause)

**MR. SELTZER:**  Look at this chart, Your Honor, and

74

this just illustrates the numbers.  It doesn't really -- you know, it's an explanation.

If you look at the first row, that's the college model, which is the damage that would've been for the residential class if you assume that the average price paid was 233.84 and that really is an arithmetic number derived from the total number of subscriptions and the total prices that are paid by class members.

That would yield damages of 5.66 billion.  If you -- the defendants are saying that 102.74 was the but-for price.  The jury must have found that.  And they say, therefore, the damages are zero.  The jury made no such finding, expressly or impliedly.  And to argue that they made that finding impliedly is actually delving into the mental process of the jury to figure out why they did what they did, which is not permissible.

THE COURT:  And so that's -- well, isn't that permissible in light of what the Court told the jury how to calculate damages?

MR. SELTZER:  It's totally consistent because what Your Honor said is measure the overcharge.  Well, the -- try and place the overcharge --

THE COURT:  And they measured the overcharge --

MR. SELTZER:  -- deciding the place of the overcharge --

75

THE COURT:  -- exactly the way the defendants say they measured the overcharge.

MR. SELTZER:  No, the starting place of the overcharge, what did you pay.  That's the starting place.  The dispute about what you paid, they're resolving the first part of the formula, what you paid versus what you would have paid.

So that's the -- that's exactly consistent with Your Honor's instructions to the jury.  So the first issue they were trying to resolve is well what did people really pay.  And if you look at the last column or the last row I should say, if you take the 294 which is in evidence as a number that people paid, the class members paid, take the defendant's number and they're saying that class members actually paid 102.74 and they used that as a -- you know, a number that they said really you could apply to an individual class member which is also completely wrong.  And you take that difference, that yields then -- and then assume a but-for price as zero, so they're accepting Dr. Rascher's testimony that the games would have been available for no extra charge.

And you say that what we'll do is we'll effectively try to resolve the dispute by saying at least the difference between the two would be the amount the people were overcharged and that would yield exactly the number they came up with. That would be a perfectly rational way of doing business for the jury.

76

And therefore, Your Honor, there's no basis to upset the jury verdict on the theory that they somehow disobeyed Your Honor's instructions.  That's just -- that's a non-sequitur, they didn't do any such thing.

They're -- they -- this would be entirely consistent with following every word of Your Honor's instructions in terms of coming up with a damage number.  And now I was about to tell you about Judge Phillips' decision in Selador.

You know, there the expert, you know, came up with four different damage numbers, the jury didn't accept any.  The jury didn't have to accept any of them.  They came up their own number and Judge Phillips, in the face of an argument by the defendants, well, we'd like to -- here's what we think the jury must have done and why it's wrong, why it's irrational.  She said you can't do that.  And her words were very clear on the point.

She's saying not that the proper role of a judge on a motion to set aside a jury verdict.  This was within their province to decide.  They could use those numbers in other ways as well to try to use it as a metric, or they could have simply said you know what, we think 7 billion is too much, so we're going to come up with an alternative number.  And we've got these numbers in the record, that's what we're going to use. We don't know that.  We have no idea what they did.

Unless you bring the jury back and cross-examine

them, there's no way the Court will know what they did.  And that's exactly the situation where the courts have said, there's no basis to overturn a jury verdict.

And what the defense is saying, you must assume they did the calculation the way the defendant say they did it.  Let me just make this point to Your Honor, about what the jury must have done and a contradiction in their position.

You see the first row, the 233.84, that was the actual price that jurors paid, the average price.  If you tolled up all the subscriptions, and why is it less than 294 because it takes into account that the list price varied a bit from year to year.  It's not because of discounts, although there may be some that are in there, but not a lot.  That's really why the 233 is less than 294.

Assume that that's the actual average price and assume that 102.74 was the but-for price, which is all the defendants are insisting that the Court must say that the jury impliedly found 102.74 was a but-for price.  Again and again they say that.

Well, if you subtract that but-for price from 233, which would be a fair comparison because they admit the 233 was the average price actually paid and if 102.74 was the but-for price, then class members were damaged by the difference between 233 and 104, which is about $130.  That would produce damages of $3 billion, Your Honor.

78

So let's assume that the defendants are right and the jury found that 102.74 was the but-for price.  If they accept that as being true and their arguments being true, that's what they say again and again, they have to admit that 233 was the average price.

So if you subtract 102.74 from 233 this -- the damages weren't zero.  The damages were at least $3 billion on their own terms.  But you think the defendants are saying there should be a remittitur to that amount?  No, they say unless the jury awarded every dollar that Rascher testified they were overcharged, the answer is nothing.  That's just not the law.

A jury is free to discount an expert's damage estimate by any number they think is reasonable based on all the evidence they've heard.  And if they do that, if they come up with a different number, that's not to be set aside, even if, you know, the number might have been arrived at by some means that a professional court or judge would disagree with if they had the same calculation.

Take another case, anti-trust class action case which they don't discuss.  The scrap metal case.  They had an expert in that case who testified that all class members were overcharged by 16 percent, that was his testimony.

THE COURT:  I think I -- I understand the point.  I think you can wrap up, we've been going at it for a while.

MR. SELTZER:  But there, you know, the expert said

EXCEPTIONAL REPORTING SERVICES, INC

it's 20 million in damages, what'd the jury do, they came in with 10 million in damages.  That wasn't a reason to overturn the verdict.  They -- by not accepting the --

THE COURT:  Well, that's -- I think that's an example that I've given.  I don't necessarily disagree with you and we'll wrap up, that I agree, and 99.9 percent of the time it's not proper to guess about what a jury did.  I'm -- I get that point.

MR. SELTZER:  Right.  But that's exactly what they want you to do.  They want you to guess what the jury did.  And say, you admit, to find -- they must have done this and it was wrong and what's the case they have to rely on?  One where the jury evidently and absolutely disobeyed the Court's express instruction on how to calculate damages.

I'll give you one example, this is my analogy here, just to make the point, Your Honor.  Take this case.  Suppose we put up two numbers.  We put up the $7 billion number as the overcharge and $15 billion as unjust enrichment, that's the money the NFL made from Sunday ticket.  And said, jury, you can award either number.  And the Court instructed that either number was okay.

Four days into deliberation, been here two days or whatever, the Court said you know what, that's a mistake, I'm going to reinstruct you.  You can only award --

THE COURT:  You're describing Carter's case again --

80

**MR. SELTZER:** Yeah. You only award the overcharge.

**THE COURT:** I don't want to hear it again. I said let's move on. I've heard enough. I don't want to hear Carter's case again.

**MR. SELTZER:** I'm just telling you, but that would be the analogy to this case.

**THE COURT:** I know, you've said -- you've made that point already.

**MR. SELTZER:** All right. Now, let me talk briefly about Dr. Zona. What is the argument -- there are -- and my time -- Your Honor's indulged me quite a bit and I appreciate that.

Let me make a couple of points about Dr. Zona. First of all, model 2, it's -- what it was is an alternative way of trying to measure demand using a consumer survey. He decided -- it was decided that the viewer and transaction model which relied on millions of pieces of data from DIRECTV actual data would be a better data source to come up with what the prices would have been in the but-for world. That's what was decided.

It wasn't -- it didn't say that the model 2 was wrong or anything like that, we just said, this is the model we're going to present. The defendants said, well, you must have not wanted to use model 2 because it was bad or something. That wasn't the case at all. That was decided to be the better of the two models. And rather than confuse things and present two

81

models, we presented one model.

Now with respect to the model, what are the two arguments?  Again, the -- you say -- they take this 102.74 model or number, which all it is is a number, an average number for all subscriptions, including free years that nobody paid for, nobody wanted, nobody watched TV, nobody watched a NFL game, add those together with everybody else's subscriptions and say, that's the average price for us, a class member and the average price that would have been paid for Sunday ticket.

And they say, well the average price was actually paid.  And compare that with the numbers that Dr. Zona came up with as his damage numbers if they were higher than that number, then his damage model is no good.

But they're comparing apples and oranges.  He was coming up with a number that would have been charged by DIRECTV going in.  It wasn't taking into account all of the discounts and other numbers that might adjust that number.  It was an unfair comparison.  It was a misleading comparison.  And they used that same number in comparing it with a list price of Major League Baseball.  That was an unfair comparison.  It was not an average price paid by class members.

And so they use that to give rise to an argument about --

THE COURT:  I guess my only --

MR. SELTZER:  -- irrationality.

82

THE COURT:  My only question about that, doesn't Zona's model rely on exclusively in order to work on streaming?

MR. SELTZER:  No, no.  And that's a very important, Your Honor.  Again, it's a confusion in the record, but the evidence is clear, his model wasn't based upon a streaming alternative at all, it was a direct to consumer model, which could've been by cable, by satellite, by streaming, by anything.  It didn't depend upon the existence of streaming during the class period at all.  And it was an attempt to confuse the issue by saying he depended on the existence of streaming during the class period, he did no such thing.

The model was based upon what the alternatives would have been through another method of distribution.  It could have been streaming, but it didn't have to be.  And he wasn't -- it wasn't dependent on streaming, it could have been entirely on cable.  It could have been entirely on satellite, or a combination of cable and satellite without streaming at all.

So it didn't turn on whether or not streaming existed during the class period.  And the last point on that, Your Honor, I would make there was a further confusion, that streaming wouldn't have been available at all during the class period.  Well, in fact, it was.

THE COURT:  By who?

MR. SELTZER:  By the NFL itself.  The NFL used streaming going back 20 years of games.

83

**THE COURT:** Live.

**MR. SELTZER:** Live games streaming.

**THE COURT:** Live.

**MR. SELTZER:** There was a streaming option for example to the Super Bowl going back 20 years ago. That was the evidence in the record. The European Sunday ticket is made available by streaming in Europe and was during the class period, one of my partners actually used to subscribe to it when he was in Europe.

So streaming was available. The idea that it wasn't, is just wrong factually. But the critical point for Dr. Zona, his model doesn't depend upon usage of the streaming at all, that's not his point. That wasn't the object of his proof. So that's another reason why the argument against Dr. Zona is just flat out wrong.

So both experts' testimony was admissible as Your Honor, I know, ruled in advance of trial and, of course, you have the ability to, you know, reconsider whatever rulings Your Honor makes, but the evidence that was given first by Dr. Rascher at trial was exactly consistent with what his report said and what he testified to in deposition.

And the same thing is true of Dr. Zona. His reports and testimony were consistent, all the way down the road and the two confusions that were introduced here I think created an issue where none really exists as a matter of fact with regard

84

to Zona.  And Dr. Rascher, I know we've spent enough time going over that.

I don't know if I've forgotten anything I need to raise.  Let me just ask my partners or ask Mr. Carmody.

(Pause)

**MR. SELTZER:**  Okay.  Let me -- there are two points that I wanted to make and that is that first of all, on Dr. Rascher's direct or consumer point.  Dr. Urakolu in his testimony admitted and confirmed it was his understanding that Zona's direct to consumer to DTC model could have been on the DISH Network, for example, a satellite network.  So it wasn't exclusive as to streaming, that's what Dr. Urakolu himself admitted that was the understanding of the term.  So they took that term out of context and tried to say it was only about streaming.  And that it could have been on cable too, it didn't have to just be the DISH Network, it could be any other provider.

And then on the but-for model here of what the jury would have paid, let's put Dr. Rascher aside for a moment.  The record evidence from the testimony of the witnesses is that Sunday ticket could have been made available at a much lower price or for nothing.

Think about this, Your Honor, DIRECTV had an incentive, an economic incentive to increase its subscriber base.  One way to do that is to include Sunday ticket as part

85

of the basic package, that would induce people to buy DIRECTV and become a subscriber and pay the $1,000 a year.  No extra charge for Sunday ticket.  That would have been the economic incentive of DIRECTV and there was evidence in the record that DIRECTV wanted to lower the price, wanted to charge less, and it would have been in its interests to charge nothing for Sunday ticket, but it was restrained from doing so.  It was restrained by the agreement that was made pursuant to the conspiracy between the networks, the NFL and DIRECTV.  They required that it be priced at a number above zero.

There was testimony, Your Honor, that the networks, you know, were unhappy that there were these introductory offers given.  They didn't want that.  But one thing they insisted on is that when you assign the product, it has to be a premium product at a premium price.

And there's evidence that the defendants actually got involved in trying to set the price.  You remember from Fox there was evidence that they wanted 294.96 or 296 as the number for Sunday ticket.  They were involved in making sure that price stayed up.

So put aside Dr. Rascher, suppose he never testified, there's evidence from which the jury could have reasonably inferred that if they hadn't made this set of agreements, DIRECTV -- and there was a Sunday ticket, DIRECTV would have given it away for no extra charge over and above the basic

86

subscription price.  That supports the but-for world that it would have been available for no extra charge.

But what Dr. Rascher does, he says that's part of the incentives the parties had here, here's what they did.  And if they didn't agree to these things, it would've been available at no extra charge.  So the evidence directly supports his testimony, but even without his testimony the number is supported and the jury was well within its rights in finding a violation.

So again in closing, Your Honor, I know you've been very indulgent and I appreciate it, I've gone on a little bit, but it's important, thanks for your understanding.

The standard on a JNOV motion is very, very stringent.  There's evidence in the record that would permit the jury to do exactly what it did here on both violation, on impact, that's defective injury and damages.  There's no way in the world I think that a JNOV motion is justified here.

New trial, no basis on liability on violation or impact, there's record evidence that shows the jury could have reasonably concluded that the object and purpose of these agreements was to restrict competition and raise the price of Sunday ticket.

Now, Your Honor raised a few minutes ago, okay, well, what about the exact price that was charged.  Well, there's good evidence that the price would not have been any higher

87

than what's included in the basic package and would've been available on over the air television too and for no extra charge because of the fierce demand for these games.

That would have been the incentive, economic incentive which Dr. Rascher did take into account, contrary to their argument in assessing what would have happened in the but-for world. And if that happened, then the games would have been available at no extra charge.

The jury could have believed that a hundred percent and said we proved the case, but you know what, there's some doubts in these other issues. And in our discretion, we're going to lower the damage amount and then we'll use these two numbers as a metric to come up with a lower number, not because we're concluding that zero wasn't the but-for price, but-for some other reason and we will never know what that reason was. The why we don't know. Why they used those numbers.

But there are good and sufficient reasons why it would have been rational to use those numbers. That's why a new trial motion on damages also is not justified. Thank you, Your Honor.

**THE COURT:** Thank you.

**MR. STEKLOFF:** Just briefly, Your Honor. I actually want to start where Mr. Seltzer ended, because I think I heard him say that the verdict would be justifiable even if they rejected Rascher's model and that's an outrageous comment in

88

light of Comcast.  He is completely ignoring Comcast which requires liability to match up with the models that prove anti-competitive effects, class-wide injury and class-wide damages and there is no dispute that Comcast says that.

And every case that they've cited in their brief that tried to undermine this motion that you couldn't look into damages award or things of that nature do not involve Comcast in the context we are in.

And I think it's important to refer back to your class certification order because there's also been a suggestion that again that Dr. Rascher's number -- that Dr. Rascher's proof only relates to damages.  But on page 17 of your order, February 7th, 2023 under the section where you're deciding they've met the standard for class certified titled anti-trust impact and damages, so it is not just damages, it is anti-trust impact and damages.

You first walk through on page 17 Dr. Zona's model and then starting on page 18 you walk through Dr. Rascher's model.  And I want to pause there for a moment, because let's look at what Dr. Rascher as you describe it, and I think is undisputed did.

He -- I'm going to read your words.  He offers three admissible but-for worlds to show that impact and damages are capable of being proven on a class-wide basis.  The college football but-for world, we know that's about pooling, the non-

exclusivity but-for world, we know that that's about exclusivity, and the no pooling but-for world.  The college football but-for world was actually both and then then no pooling but-for world.

So his models that he chose, the restraints that they said they could prove to prove not only class-wide damages but class-wide injury were only about pooling and exclusivity.  And that's why Your Honor concluded, and this is on page 19, to be sure, defendants can argue to a jury that plaintiff's models are unpersuasive and do not, in fact, prove class-wide anti-trust impact and damages.

But that argument alives (sic) the inquiry here. Whether plaintiff's models and methods and models are capable of proving impact and damages on a class-wide basis.  So I think we have to step back and say, what did they choose as their models.  They were models taking out only two restraints, pooling and exclusivity and what were they capable of proving, class-wide impact and class-wide damages and also the anti-competitive effects as required under Comcast.

So now let's talk about Dr. Rascher's model itself briefly.  First of all, when you -- I don't want to paraphrase but you basically said to Mr. Seltzer, is my description of what Dr. Rascher did fair and you gave a description and he said, yes, it's fair, but it only goes so far.  That is a stunning admission that demonstrates that he did nothing.

90

You have this spectrum of absolute precision on one side about what would happen in the but-for world and nothing. You said well, where does one fall in between.  Dr. Rascher did nothing beyond saying, it would all work out and the games would be available for free.

And to compare college football in 1984 when there were three networks and they made a decision about what to do in 30 days, to what Dr. Rascher had to do which was assess broadcasting and professional football as it existed between 2011 and 2023 is not an accurate comparison.

Mr. Seltzer then went on to say, well, there's Texas and BYU and Notre Dame, and they're all free, but we know they're not free, even during that time period.  Your Honor has mentioned Notre Dame.  All the BYU games were not available for free.  Texas had its own network that wasn't always offered on basic cable.  They were not free.

You asked some questions about revenue sharing, of course, revenue sharing in part went to pro competitive benefits.  But revenue sharing also went to Dr. Rascher's methodology, because again the case law and basic economic principles, he's an economist, made clear that you have to assess the actions of rational economic actors.

And part of that is what's going to happen with the revenue not being shared, which he did not account for and could not explain.

And finally I want to address this point by Mr. Seltzer which is that this is what the jury's there to decide.  Daubert is a gatekeeping function.  Rule 702, whether the old version or the new version makes that clear.  The answer can't be you can take unreliable methodologies that don't fit the facts and let the jury decide whether or not they accept them or not.

And so we're asking the Corut as you suggested in mid-trial after hearing the experts to engage in that gatekeeping function and grant our Daubert motions.

And then briefly turning to Dr. Zona, I just want to read quickly from paragraph 92 of his -- I'm trying to find a date, Your Honor.  It's his merits report.  The date is February 17, 2023.

In paragraph 92 which falls under but-for simulations, Section 4.22, he wrote, the competitive interaction enters the but-for simulation as content providers can access directly to customers, DTC by streaming content to anyone, regardless of their MVPD choice.

For this competitive interaction the content provider seeks to maximize total content revenue, I assume marginal costs are negligible for these streamers regardless of the MVPD used by the consumer choosing the DTC product.

And then finally, Your Honor, on the sort of what we call speculation on speculation.  The jury didn't accept

Dr. Rascher no matter what we speculate.  I don't think we're speculating.  We agree with you.  We know exactly what the jury did.  It was irrational.  And the best example of how irrational it was is not on their chart.  It's what they did with the commercial class.

Mr. Seltzer said, the jury heard that the prices for commercial subscribers were ten times higher than residential subscribers.  I actually don't think that's true, they didn't hear any numbers.  They just vaguely heard because the plaintiffs didn't do anything to prove the commercial class that prices were higher and that the demand curve was different because of commercial class.

But they used the exact same numbers 294 and 102.74 and then multiplied it to give the commercial class damages.  They multiplied it by the number of commercial subscribers.  Talk about irrationality, you couldn't have a more irrational calculation given the difference between residential subscribers and commercial subscribers.

Had they come to you, they chose a model that was all or nothing.  The price was zero dollars.  There was never a single dispute in front of the jury that the total price that the subscribers paid was the $7.01 billion.  It was the 5.66 for the residential and then approximately 1.5 for the commercial, it was never disputed.

If you accept Dr. Rascher's model, there's no need to

do a different calculation.  The damages were $7.01 billion.  They clearly rejected Dr. Rascher's model.  The $233 that they have on this chart was never even introduced into evidence, that's what you prohibited them from introducing into evidence multiple times and then they tried to back door it in, but you prohibited them from doing it during Dr. Zona's testimony and Dr. Urakolu's cross-examination.

Had they come to you at class certification with a model that said, whichever version, we're going to take two years of the list price, $294, Your Honor, and then we're going to subtract let's say 233, the actual average price that subscribers paid and so the difference is $61.  That's our model, Your Honor and everyone should get $61 back.  That's our common proof of class-wide injury and class-wide damages.  I suspect Your Honor would have said, how can that be common proof, everyone didn't pay $233.  Some people paid less, some people paid more, not everyone paid the 294 because the list price changed, you would have rejected that model out of hand.

So now, to stand up here and say somehow that that model is defensible or rational or based on the evidence or based on anything their experts did or said is fundamentally unsound and it is exactly why not only -- there shouldn't be a new trial, Your Honor.  The jury rejected their models in their entirety.  You very accurately stated the three alternatives they gave, the 7.01, the 3.5 or the 48 percent reduction factor

94

and then the 1.8 billion with the NFL tax, all three were rejected.

We know it from what they did, we know the jury ignored your instructions.  We know that damages were irrational and we know that they didn't meet their burden under Comcast and under your class certification order.  So we ask you to grant judgment for the NFL.

**THE COURT:**  Thank you.  I'm going to submit the matter.  Thank you.

**THE CLERK:**  All rise.  This court is adjourned.

**(Proceeding concluded at 11:26 a.m.)**

**\* \* \* \* \***

## CERTIFICATION

     I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                              **August 1, 2024**

       **Signed**                                                      **Dated**


       *TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**