EXHIBIT 9
Demonstratives Shown during the June 24, 2024 Examination of Einer Elhauge

# In re NFL Sunday Ticket Antitrust Litigation

## Einer Elhauge Rebuttal

1



**EINER ELHAUGE**

Petrie Professor of Law, Harvard University

Antitrust Economics Author & Expert

 Author of *U.S. Antitrust Law & Economics*

 Co-Author of *Global Antitrust Law & Economics*

 Co-Author of *Volume X of Areeda, Elhauge, Hovenkamp, Antitrust Law*

 Editor of *The Research Handbook on the Economics of Antitrust Law*

 Member of the Advisory Boards for multiple antitrust publications, including the *Journal of Competition Law & Economics*

# An Antitrust Economist's Approach

| 1 | **What exact conduct is being challenged?** |
|---|---|

| 2 | **Is it likely that conduct had anticompetitive effects?** |
|---|---|

| 3 | **Are there procompetitive effects to weigh against any anticompetitive effects?** |
|---|---|

3

# An Antitrust Economist's Approach

| 1 | **What exact conduct is being challenged?** |
|---|---|
| **2** | **Is it likely that conduct had anticompetitive effects?** |
| **3** | **Are there procompetitive effects to weigh against any anticompetitive effects?** |

4

# Professor Bernheim's Errors in Defining the Restraints

| 1 | Fails to consider combined effects of the restraints |
|---|---|
| 2 | Wrong that being a joint venture means no collusion |
| 3 | Ignores that no challenge to collective licensing or revenue sharing for over-the-air telecasts |
| 4 | Wrong that what is challenged is just the fact of high pricing |
| 5 | Ignores bundling |

# Professor Bernheim's Errors in Defining the Restraints

| 1 | **Fails to consider combined effects of the restraints** |
|---|---|
| 2 | Wrong that being a joint venture means no collusion |
| 3 | Ignores that no challenge to collective licensing or revenue sharing for over-the-air telecasts |
| 4 | Wrong that what is challenged is just the fact of high pricing |
| 5 | Ignores bundling |

6

# Professor Bernheim Misstates Plaintiffs' Theory



# Plaintiffs' Actual Theory



# Professor Bernheim Misstates Plaintiffs' Theory



Plaintiffs' Actual Theory

# Examples Of Exclusive Distribution Arrangements





43

10

# Professor Bernheim's Errors in Defining the Restraints

**1** **Fails to consider combined effects of the restraints**

**2** Wrong that being a joint venture means no collusion

**3** Ignores that no challenge to collective licensing or revenue sharing for over-the-air telecasts

**4** Wrong that what is challenged is just the fact of high pricing

**5** Ignores bundling

# Professor Bernheim's Errors in Defining the Restraints

**1**    Fails to consider combined effects of the restraints

**2**    **Wrong that being a joint venture means no collusion**

**3**    Ignores that no challenge to collective licensing or revenue sharing for over-the-air telecasts

**4**    Wrong that what is challenged is just the fact of high pricing

**5**    Ignores bundling

| Example | Collectively Set Rules | Pool all Telecasts |
|---|:---:|:---:|
| NFL Pre-1960s | ✔ | ✖ |
| MLB | ✔ | ✖ |
| NBA | ✔ | ✖ |
| NHL | ✔ | ✖ |
| NCAA | ✔ | ✖ |

13

# Professor Bernheim's Errors in Defining the Restraints

| | |
|---|---|
| **1** | Fails to consider combined effects of the restraints |
| **2** | Wrong that being a joint venture means no collusion |
| **3** | **Ignores that no challenge to collective licensing or revenue sharing for over-the-air telecasts** |
| **4** | Wrong that what is challenged is just the fact of high pricing |
| **5** | Ignores bundling |



**Dr. Douglas Bernheim**
NFL Expert Witness

"So right now teams are operating under a particular set of rules where the revenues for media are split equally.

If the plaintiffs have their way, that provision would be removed from the NFL Constitution."



**Dr. Douglas Bernheim**
NFL Expert Witness

"Television revenues were shared equally among all the teams. That's actually in the NFL Constitution. And it takes a unanimous vote to change it. It's one of the very few provisions in the constitution, so far as I'm aware, that requires unanimity to change."

# Professor Bernheim's Errors in Defining the Restraints

| | |
|---|---|
| **1** | **Fails to consider combined effects of the restraints** |
| **2** | **Wrong that being a joint venture means no collusion** |
| **3** | **Ignores that no challenge to collective licensing or revenue sharing for over-the-air telecasts** |
| **4** | **Wrong that what is challenged is just the fact of high pricing** |
| **5** | **Ignores bundling** |

17

# Professor Bernheim's Errors in Defining the Restraints

**1** Fails to consider combined effects of the restraints

**2** Wrong that being a joint venture means no collusion

**3** Ignores that no challenge to collective licensing or revenue sharing for over-the-air telecasts

**4** **Wrong that what is challenged is just the fact of high pricing**

**5** Ignores bundling

18

# Professor Bernheim Ignores Case Evidence



**Dr. Douglas Bernheim**
NFL Expert Witness

Q.   . . . As a matter of antitrust economics, is there anything automatically wrong with trying to set prices to make something a premium product?

A.   No. There -- there isn't. In -- in fact, I've -- I've written -- I mentioned earlier that I've written a paper on premium pricing. It was in the context of what are called "prestige goods," and as I think everybody knows, there are companies that sell prestige goods and raise the prices of those goods specifically for the purpose of establishing some sort of prestige or exclusivity among consumers.

**That is not considered an antitrust problem. That's simply a matter of choosing to set a price.**

Trial Tr. 1817:8-20

19

# Professor Bernheim's Errors in Defining the Restraints

| 1 | Fails to consider combined effects of the restraints |
|---|---|

| 2 | Wrong that being a joint venture means no collusion |
|---|---|

| 3 | Ignores that no challenge to collective licensing or revenue sharing for over-the-air telecasts |
|---|---|

| **4** | **Wrong that what is challenged is just the fact of high pricing** |
|---|---|

| 5 | Ignores bundling |
|---|---|



**Brian Rolapp**
NFL Executive

Q. The fact of the matter is the 32 teams do not compete against one another for the sale of their telecast rights; correct?

A. I think the -- **the clubs pool all of their rights at the league level** and it's the league's responsibility to then license those rights.

Tr 969:4-9 (Rolapp)

Trial Tr. 969:4-9

21



**Dr. Douglas Bernheim**
NFL Expert Witness

"And as far as I'm aware in this case, there's no allegation that the NFL acquired whatever market power it has as a professional football league through illegitimate means. **It hasn't killed off another league or something like that**."

Trial Tr. 1978:13-1979:4

22

# Professor Bernheim's Errors in Defining the Restraints

**1** | Fails to consider combined effects of the restraints

**2** | Wrong that being a joint venture means no collusion

**3** | Ignores that no challenge to collective licensing or revenue sharing for over-the-air telecasts

**4** | Wrong that what is challenged is just the fact of high pricing

**5** | **Ignores bundling**

# Professor Bernheim References Irrelevant Conduct

## Challenged Conduct

- Agreeing not to compete in licensing out-of-market games on paid TV
- Exclusively licensing out-of-market games to DirecTV at a premium price
- Bundling all out-of-market games in a single package

## Unchallenged Conduct

- Collective license and revenue sharing over-the-air telecasts
- Single-firm pricing
- Scheduling games
- Creating a season
- Working together to produce telecasts
- Monitoring quality of telecasts
- Setting NFL game rules



## Procompetitive Effect?

24

# An Antitrust Economist's Approach

| 1 | **What exact conduct is being challenged?** |
|---|---|

| 2 | **Is it likely that conduct had anticompetitive effects?** |
|---|---|

| 3 | **Are there procompetitive effects to weigh against any anticompetitive effects?** |
|---|---|

25

# Anticompetitive Effects

| 1 | **Professor Bernheim does not dispute that pooling has some anticompetitive effects** |
|---|---|

| 2 | **Professor Bernheim wrongly assumes exclusive dealing is not anticompetitive** |
|---|---|

26

# Anticompetitive Effects

**1** **Professor Bernheim does not dispute that pooling has some anticompetitive effects**

**2** **Professor Bernheim wrongly assumes exclusive dealing is not anticompetitive**

# Anticompetitive Effects

**1** | Professor Bernheim does not dispute that pooling has some anticompetitive effects

**2** | **Professor Bernheim wrongly assumes exclusive dealing is not anticompetitive**



**Dr. Douglas Bernheim**
NFL Expert Witness

The economic literature proposed a particular scenario where exclusivity can facilitate the exercise of market power by an upstream firm if the upstream firm lacks the commitment to not undercut earlier deals it has made with downstream firms by making later deals with other downstream firms at lower prices. If downstream firms anticipate this dynamic, the upstream firm cannot exercise its market power.

Report, FN 647

29

# Anticompetitive Effects

**1** Professor Bernheim does not dispute that pooling has some anticompetitive effects

**2** **Professor Bernheim wrongly assumes exclusive dealing is not anticompetitive**

30

# An Antitrust Economist's Approach

| 1 | **What exact conduct is being challenged?** |
|---|---|

| 2 | **Is it likely that conduct had anticompetitive effects?** |
|---|---|

| 3 | **Are there procompetitive effects to weigh against any anticompetitive effects?** |
|---|---|

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

32

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

33



34

# Professor Bernheim's False Comparison





**Dr. Douglas Bernheim**
NFL Expert Witness

**Report, ¶437**

Sufficient dilution of viewership runs the ***risk*** of fewer games being offered on OTA TV.

36

# Professor Bernheim Claims Only That Effects "May" Occur

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

# Protecting Over-the-air Television





# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

**Is there a less anticompetitive alternative that could achieve the same goal?**

Do the anticompetitive effects outweigh the procompetitive effects?

40

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

41

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

42

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

43

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

44

# Professor Bernheim Ignores Revenue Sharing That Would Exist



# Total NFL Telecast Revenues



**Nighttime Football** (Thursday, Sunday, Monday)

**CBS & FOX Deals**

**Sunday Ticket**

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

47

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

**Is there a less anticompetitive alternative that could achieve the same goal?**

Do the anticompetitive effects outweigh the procompetitive effects?

48

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

49

# Professor Bernheim Cannot Connect Restraint To Competitive Balance



# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

51

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

52

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

53



**Dr. Douglas Bernheim**
NFL Expert Witness

"I can't speak to any particular innovation and say whether any particular innovation would have occurred or would not have occurred in the but-for world."

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

58

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

59

# Professor Bernheim Claims Only That Effects "May" Occur

**DEFENDANTS' SLIDE**



## What Would Actually Happen In The BFW

- Teams may have incentives to move high-value games behind a subscription.

- Fewer games may be shown free over-the-air.

- NFL TV scheduling may be impaired.

32

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

**Is there a less anticompetitive alternative that could achieve the same goal?**

Do the anticompetitive effects outweigh the procompetitive effects?

61

# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

Is the claimed justification procompetitive in theory?

Is there evidence of a procompetitive effect?

Is there a less anticompetitive alternative that could achieve the same goal?

Do the anticompetitive effects outweigh the procompetitive effects?

GRAVEYARD

# Professor Elhauge's Responses to But-For World Opinions of Professor Bernheim

- Did not include possibility NFL could require networks showing over-the-air games to retransmit their video feeds to individual teams for their out-of-market telecasts. Depo. at 98-100, 224.

64

# Professor Bernheim Misstates Plaintiffs' Theory



# Plaintiffs' Actual Theory



# Professor Bernheim Ignores Economic Incentives



# An Antitrust Economist's Approach

## Are the Challenged Restraints Procompetitive?

- Is the claimed justification procompetitive in theory?

- Is there evidence of a procompetitive effect?

- Is there a less anticompetitive alternative that could achieve the same goal?

- Do the anticompetitive effects outweigh the procompetitive effects?



**Dr. Douglas Bernheim**
NFL Expert Witness

Q. Is this description here another way of saying that -- exactly what we've been discussing, broad access to over-the-air games, quality and innovation, and competitive balance are all a result of pooling of telecast rights?

A. Well, I think that's stated a little bit too strongly. All of -- the pooling of telecast rights **contribute in an important way** to all of those features.

Trial Tr. 1886:2-8

69

# Professor Bernheim Offered No Evidence to Support these Claims

**DEFENDANTS' SLIDE**

## Impact Of Not Having Pooled Telecast Rights

- Resources would have been distributed much less equally across teams.

- Spending on players would have been much less equal across teams.

- Competitive balance would have been significantly lower.

- 100% of teams' games would not have been available locally for free.

- Free, over-the-air stations would not televise best and most interesting games.

- Broadcast quality would have suffered.

- Overall viewership would have been lower.

23



**Dr. Douglas Bernheim**
NFL Expert Witness

Q.   So, given this incentive for teams to withdraw their games from the over -- from the in-network shared pool, did you do an analysis of which telecasts this penalty that you've discussed would -- would affect the most?

A.   Well, I just think that it's obvious that the penalty most affects the games that generate the most revenues.

If you have a local game, paying a 94 percent penalty on, you know, the high revenues that are -- that are generated by televising that game locally gives you an incentive to take that out. When you have a national telecast and that goes into the general pool, that's often really popular games by really popular teams, there's an incentive to take that out.



**Dr. Douglas Bernheim**

NFL Expert Witness

Q.  And leaving aside the salary cap, there are many other ways the NFL achieves competitive balance that have nothing to do with revenue sharing. Fair?

A.  Well, that's true, but Dr. Rascher's testified that the salary caps and floors drive competitiveness – competitive balance. That was -- that is literally a statement of his. So yes, there are other factors, but the salary caps and floors, I think we all agree, are absolutely critical.

Trial Tr. 2042:19-2043:1

# Deposition Testimony of Einer Elhauge

Q.   As you said earlier, you are not offering any opinions on the proper but-for world in this case; right?

A.   I am offering some opinions about possibilities that could or would likely occur that -- that Professor Bernheim ignored for the purpose of critiquing him, but I'm not offering any affirmative opinion about what the but-for world would look like.

"And as part of that critique, I -- you know, I do at points say that part of the problem with his analysis is that he is ignoring features that either likely would exist in the but-for world, or they could exist in the but-for world and thus could be used, if necessary, to advance what he thinks of as procompetitive justifications."

"I'm just opining about Professor Bernheim's methodology and aspects of the but-for world that either could occur or likely to occur that he, at -- at points does not take into account in his analysis."

Dep. Tr. at 93-94, 207, 225

73

26.     Prof. Bernheim concludes that a horizontal agreement to share 100% of telecast revenue has the same effects as a horizontal agreement to fix a common pooled price.  Bernheim Report ¶¶ 23, 256-258.   He is correct about that, but he misses the point that his conclusion necessarily means that any showing that a horizontal agreement on pooling telecasts is anticompetitive necessarily also shows that its associated horizontal agreement to share 100% of telecast revenue is also anticompetitive and thus would not exist in the but-for world.  Prof. Bernheim argues to the contrary that 100% revenue sharing should be assumed to exist in the but-for world based on his assertion that plaintiffs have not challenged it, but he cites no support for any claim that plaintiffs have conceded that 100% revenue sharing is lawful.  Bernheim Report ¶ 23, 259.   Indeed, Prof. Bernheim notes it is reasonable to read plaintiff expert Prof. Rascher as assuming there would be some restrictions on revenue-sharing in the but-for world, Bernheim Report ¶ 24, 260, which conflicts with Prof. Bernheim's assertions in other paragraphs that Prof. Rascher's analysis assumes unrestricted revenue sharing in the but-for world.   Bernheim Report ¶ 23, 259.  Moreover, Prof. Bernheim ignores the fact that Prof. Rascher explicitly states that in his posited but-for world, "revenue sharing could still occur" but that, without the challenged pooling restraints, revenue sharing would be partial, like the current revenue sharing levels for NFL ticket revenue and in other professional sports.[6]

44.     Third, Prof. Bernheim argues that exclusive dealing for Sunday Ticket cannot possibly be anticompetitive because the NFL is the sole seller and because it could always raise the per-subscriber fee that it charges to achieve the same inflated downstream price.  Bernheim Report ¶¶ 317-331.  But the NFL is the sole seller only because of the horizontal agreement to pool telecast rights, which would not exist in the but-for world.  Moreover, even if we assume that NFL teams could pool telecast rights in the but-for world, Prof. Bernheim himself recognizes that the economic literature shows that exclusive dealing could prevent the NFL from acting on incentives to undercut any price it initially charged distributors in later distribution deals.  Bernheim Report n.647.  His only response to this anticompetitive effect is that it could equally be advanced through most-favored nation clauses, *id.*, but that would simply mean that such most-favored nation clauses would also be anticompetitive restraints on competition that could not exist in the but-for world.

Elhauge Rebuttal Report, ¶ 44

10. ==Spending caps and floors provide a less restrictive alternative for maintaining competitive balance.== Spending caps require no revenue sharing. As for spending floors, Prof. Bernheim expressly refuses to opine that they are necessary for competitive balance, and even if they were, he provides no showing that 100% sharing of telecast revenue would be necessary for teams to meet but-for salary floors. Indeed, his own figures show that significantly reducing the sharing of telecast revenues below 100% would be consistent with maintaining the current salary floor, let alone whatever lower salary floor would exist in the but-for world.

Elhauge Rebuttal Report, ¶ 10

30.     Spending caps and floors provide a less restrictive alternative for maintaining competitive balance.  A spending cap does not require sharing revenue at all.  Prof. Bernheim suggests that competitive balance may require not only the player salary cap that already exists, but also more equal spending on things like coaching staff, scouting, and training facilities.  Bernheim Report ¶ 392.  But he provides no proof that is the case, and even if he did, a substantially less restrictive alternative would be to have spending caps on those other things as well, rather than to have a horizontal agreement that creates monopoly power over telecasts and then shares those monopoly profits among the teams.

Elhauge Rebuttal Report, ¶ 30

77

31.     Prof. Bernheim argues that the NFL's salary floor also contributes to competitive balance, and he suggests that, without revenue sharing, some teams might not be able to cover the salary minimum.  Bernheim Report ¶¶ 399-405.  But Prof. Bernheim explicitly refuses to opine that a salary floor is necessary for competitive balance.  Bernheim Depo at 181.16-23.  Thus, even if (contrary to fact) he showed that the current level of revenue sharing was necessary for a salary floor, he would not have shown that the current level of revenue sharing was necessary for competitive balance.

Elhauge Rebuttal Report, ¶ 31

32.    In any event, even if we assume a salary floor is necessary for competitive balance, Prof. Bernheim's analysis fails to show that that would justify 100% revenue sharing.  It would, at the most, justify enough revenue sharing to allow each team to meet the but-for salary minimum.  Prof. Bernheim endeavors to show that without the shared television revenue, some teams would be losing money at their actual current levels of spending.   Bernheim Report ¶¶ 402-405.  But that argument fails on several scores.

33.     First, Prof. Bernheim's analysis initially tendentiously assumes that without the shared television revenue, teams would earn *zero* television revenue. Bernheim Report ¶¶ 402-403.  This is clearly incorrect because in the but-for world each team would continue to earn: (a) an equal share of revenue for the collectively pooled OTA rights that the NFL could continue to offer in the but-for world under the SBA; and (b) revenue for licensing its own paid telecasts of home and away games, either in single-team packages or in licenses to others providing a non-exclusive bundle of telecasts.[8]

Elhauge Rebuttal Report, ¶ 33

80

34.    Second, Prof. Bernheim later shows that if he instead assumed that in the but-for world each team would earn a share of television revenue that matches its share of total NFL fans, but assumed no change in operating income, ten teams would have negative operating incomes.  Bernheim Report ¶¶ 404-405.  ==But his analysis does not: (a) take into account that, in the but-for world, teams would continue to get an equal share of revenue on collectively pooled OTA rights; or (b) address whether teams would be losing money if they spent the salary minimum in the but-for world.==  Nor does his analysis address the reality that in the but-for world without monopoly prices on telecasts, player salaries would also be lower (and thus the salary cap and salary floor would be lower), given that aggregate player salary levels are determined through a collective bargaining agreement between the NFL and player union that is designed to give players a certain share of NFL revenue.  Bernheim Report ¶¶ 88-89.  Thus, but-for operating expenses would be lower, and it is even less likely that teams in the but-for world would have negative operating income that would preclude them from meeting the salary minimum that would be set in the but-for world.

Elhauge Rebuttal Report, ¶ 34

81

35.     Third, ==Prof. Bernheim's analysis does not address whether *partial* revenue sharing would suffice to enable teams to meet the salary minimum.==  His own statistics indicate that all teams had operating income of at least $60 million in 2011.  *See* Bernheim Report Figure 17.  It thus follows that all teams could maintain their current level of spending (and thus meet or exceed the salary minimum) if revenue sharing levels were reduced in a way that resulted in the least profitable team receiving $60 million less in telecast revenue, and even more clearly could meet the lower salary minimum that would prevail in the but-for world.  Given that a $60 million reduction in shared revenue to the least profitable team is clearly a "significant" reduction in shared revenue, Prof. Bernheim's own figures disprove his repeated assertions that any significant reduction in the sharing of telecast revenues below 100% would make maintaining current levels of competitive balance impossible or difficult.  Bernheim Report ¶¶ 24, 260, 419.

Elhauge Rebuttal Report, ¶ 35

82

have every incentive to do so for the reasons noted above. Pricing OTA games lower to keep them on air is a clear less anticompetitive alternative to the current approach of using the challenged restraints to inflate prices for OOM games to keep OTA games profitable for the networks even at high NFL prices for them.

Elhauge Rebuttal Report, ¶ 60

83

64. First, in the but-for world, the SBA would still protect the NFL's horizontal agreements on the slotting of OTA games.

65. Second, in the but-for world, the NFL teams could still give the NFL a right to collectively negotiate with the networks over timeslots for non-OTA games. The NFL would simply be constrained in such negotiations by the fact that it would face greater competition from telecasts by individual teams and other OOM telecast distributors.

Elhauge Rebuttal Report, ¶ 64-65

66.    Prof. Bernheim argues that it is important to give the NFL the power to flex the telecast slots of a few games to adjust for the fact that playoff races change which games become of greater interest.   Bernheim Report ¶¶ 503-510.  But the NFL only began flex scheduling in 2006, Bernheim Report ¶ 76, thus suggesting it is hardly vital to offering an attractive product.  Further, even if this power to engage in flex scheduling were vital, in the but-for world teams could still give the NFL the power to flex the scheduling of the OTA games it telecast, while allowing teams to telecast other games.  More generally, what Prof. Bernheim describes as the benefit of flex scheduling is that it permits the NFL to move important games from local to nationwide telecast timeslots.  Bernheim Report ¶¶ 503-510.   In the but-for world, every game would be available nationwide according to Prof. Rascher,[28] in which case there would be no need for flex scheduling to make important games nationally available.

15.   As I show in Part VI.A, Prof. Bernheim's claim that the challenged restraints procompetitively protect over-the-air (OTA) telecasts also fails on several other grounds.  To begin with, his claim is internally inconsistent with his arguments on market definition and market power and would, if true, mean that the challenged restraints are inherently anticompetitive because they directly thwart consumer preferences.  Moreover, his claim rests on factual speculation that competition with out-of-market (OOM) games would cause fewer OTA games to be offered, contrary to the conclusion of fellow defense expert Neal Pilson and to his own argument that the NFL has strong incentives to continue to offer OTA games, which it could continue to collectively pool under its SBA exemption in the but-for world.  His argument that networks would no longer find it profitable to show OTA games in the but-for world not only assumes an exaggerated cannibalization rate that contradicts his own earlier analysis, but also ignores the fact that even at that exaggerated rate, the resulting viewership would still put OTA NFL games at the top of all prime-rated shows, with the advantage that OTA NFL games have much lower production costs.  He also refuses to claim anything more than a "risk" that some OTA games might not be offered or to quantify the effect on future viewership, which hardly suffices to show this was a likely effect with a magnitude that would offset the anticompetitive effects.

71.  Fourth, Prof. Bernheim's claim that suppressing competition necessarily encourages more investments in innovation also conflicts with the economic literature, which instead finds that competition can often spur greater investments in innovation.[30]  The reasons are straightforward.  The total gains from innovation are the per-unit benefit from that innovation times the market output.  Because a monopoly has lower output than a competitive market, that means any innovation that produces a given per-unit gain results in lower total gain.  Further, a monopolist gains less from innovation because any monopoly profits that result from that innovation in part replace monopoly profits it was already earning.  Finally, competition gives firms a strong incentive to invest in innovation to avoid losing sales to rivals who might offer a cheaper or better product, perhaps through their own innovations.  Economic theory thus indicates that greater competition could spur more innovation.  This economic theory is confirmed by empirical studies, which show that in fact competitive markets create more innovation than monopoly markets.[31]

Elhauge Rebuttal Report, ¶ 71

87

72.     Fifth, although Prof. Bernheim refers to various telecast innovations that did occur, Bernheim Report ¶¶ 519-521, 541, Prof. Bernheim points to no evidence that: (1) the additional profits created by the challenged restraints were necessary to induce investments in those innovations; and (2) greater competition would not have created even higher incentives to invest in such innovations.

Elhauge Rebuttal Report, ¶ 72

88

# Deposition Testimony of Einer Elhauge

Q.   You believe that every team would be able to secure --
for every team or some collection of teams would be
able to secure distribution of their out-of-market
games; right?

A. Yes. I think that's the most likely but-for outcome.

**Deposition Testimony of Einer Elhauge**

Q.   So the NFL would be requiring CBS and Fox to be giving their feeds to whoever is retransmitting the games?

A.   I think it is likely, as Professor Rascher found, that they would have economic incentives to do so. That it's -- would be efficient and therefore you would predict that the parties could find a mutually beneficial contractual solution that would involve such retransmission -- of at least the camera feeds, I think.

# Deposition Testimony of Einer Elhauge

"And the NFL would have incentives to, in their negotiation, insist that they retransmit to the out-of-market networks for a -- a lower fee than one that includes all advertising."

Dep. Tr. at 224:12-15

# Deposition Testimony of Einer Elhauge

"So the logo of the NFL couldn't be shown without their agreement, but the NFL would have incentives to have its logo shown in those games because it wants to promote its brands and because all the teams after all control the NFL."

Dep. Tr. at 128:19-23

92



**Dr. Douglas Bernheim**
NFL Expert Witness

"What we as economists normally think of as collusion is when two companies that are producing substitutable products and they're doing this independently and they're -- they're selling them independently, they get together and agree on prices or agree on quantities or otherwise coordinate in that way, that's collusion. **That's not what's going on here**."

Trial Tr. 1825:16-21

93



**Dr. Douglas Bernheim**
NFL Expert Witness

Q. You don't try to quantify how much total viewership would decline in the but-for world. Fair?

A. So no, I don't think that's fair. What I don't try and do is give a specific number.

A. By how much really -- it isn't important for me to settle on a particular number.

Q. You don't give any number. Fair?

A. I don't need to give a particular number for that. That's true.

Q. But you don't try to do the math, sir, to figure out how many more viewers there would be in a but-for world. Fair?

A. It is quite obvious just for -- from looking at those numbers that what's at stake here is far bigger than 3 percent. Did I do a calculation? No, because, you know, there's no gain to having a false sense of precision.

# Plaintiffs' Actual Theory



43

# Professor Bernheim Misstates Plaintiffs' Theory



# Plaintiffs' Actual Theory



At least $295 per sub

52

# Professor Bernheim Raises Issues Not Related to Competition



fn647