# EXHIBIT 5

# Doug Bernheim, Ph.D.

# Doug Bernheim, Ph.D., Positions

## Current Positions



**Professor of Economics, Former Chair of Economics Department**



**Partner**

## Former Positions



**Professor, Kellogg Graduate School of Management, Dep't of Finance**



**Professor of Economics**

# Doug Bernheim, Ph.D., Education



**Ph.D.**



**Honorary Doctorate**



**A.B., summa cum laude**

# Dozens Of Articles In Top Economic Journals



4

# Notable Publications On Antitrust



**1990**

**The RAND Journal of Economics**

## Multimarket contact and collusive behavior

B. Douglas Bernheim*
and
Michael D. Whinston**

Traditional analyses of industrial behavior typically link the exercise of market power in an industry to internal features such as demand conditions, concentration, and barriers-to-entry. Nevertheless, some economists have remained concerned that contact across markets, may also play a significant role in determining the level of competitiveness in any particular industry. In this article, we examine the effect of multimarket contact on the degree of competition that firms can sustain in settings of repeated competition. We isolate conditions under which multimarket contact facilitates collusion and show that these collusive gains are achieved through modes of behavior that have been identified in previous empirical studies of multimarket firms.

### 1. Introduction

■ Traditional analyses of industrial behavior typically link the exercise of market power in an industry to internal features such as demand conditions, concentration, and barriers-to-entry. Nevertheless, some economists have remained concerned that external factors may also play a significant role in determining the level of competitiveness in any particular industry. One aspect of this concern relates to the potential effects of multimarket contact between firms. The possibility that such contact could foster anticompetitive outcomes was first raised in 1955 by Corwin Edwards, who said

When one large conglomerate enterprise competes with another, the two are likely to encounter each other in a considerable number of markets. The multiplicity of their contact may blunt the edge of their competition.[1]

This potential for "mutual forebearance" is not limited to conglomerates but exists for any multiproduct firms, including "single-product" firms that operate in a number of distinct geographic markets.

*Northwestern University and the National Bureau of Economic Research.
**Harvard University and the National Bureau of Economic Research.
   We would like to thank Dilip Abreu, Richard Caves, Ken Hendricks, Paul Klemperer, Eric Maskin, Garth Saloner, Lawrence Summers, an anonymous referee, and seminar participants at Harvard University, the University of Chicago, Queen's University, M.I.T., the Department of Justice, and the Stanford IMSSS Summer Workshop for their helpful comments. We would also like to thank Nancy Evans for her help in the preparation of this manuscript. M. D. Whinston thanks the National Science Foundation for providing financial support under grant SES-8618773.
   [1] Corwin Edwards, as quoted in Scherer (1980, p. 340).

**1998**

**Journal of Political Economy**

## Exclusive Dealing

B. Douglas Bernheim
*Stanford University*

Michael D. Whinston
*Northwestern University, Harvard University, and National Bureau of Economic Research*

In this paper, we provide a conceptual framework for understanding the phenomenon of exclusive dealing, and we explore the motivations for and effects of its use. For a broad class of models, we characterize the outcome of a contracting game in which manufacturers may employ exclusive dealing provisions in their contracts. We then apply this characterization to a sequence of specialized settings. We demonstrate that exclusionary contractual provisions may be irrelevant, anticompetitive, or efficiency-enhancing, depending on the setting. More specifically, we exhibit the potential for anticompetitive effects in noncoincident markets (i.e., markets other than the ones in which exclusive dealing is practiced), and we explore the potential for the enhancement of efficiency in a setting in which common representation gives rise to incentive conflicts. In each instance, we describe the manner in which equilibrium outcomes would be altered by a ban on exclusive dealing. We demonstrate that a ban may have surprisingly subtle and unintended effects.

We would like to thank Jean Tirole and seminar participants at the European Science Foundation conference in Toulouse, George Mason University, the Kennedy School of Government, Massachusetts Institute of Technology, Princeton University, the University of Chicago, and the University of Texas—Austin, as well as an anonymous referee, for their comments on earlier versions of this material. We would also like to thank Claudia Napolilli, Deborah Johnston, and Sharon Sacharow for their assistance in the preparation of this and previous manuscripts. Financial support from the Sloan Foundation and the National Science Foundation (grants SBS-90-22598 and SBS-91-10714) is gratefully acknowledged.

[Journal of Political Economy, 1998, vol. 106, no. 1]
© 1998 by The University of Chicago. All rights reserved. 0022-3808/98/0601-0003$02.50

**2017**

**The American Economic Review**

## Price Cutting and Business Stealing in Imperfect Cartels[†]

*By B. Douglas Bernheim and Erik Madsen*

Although economists have made substantial progress toward formulating theories of collusion in industrial cartels that account for a variety of fact patterns, important puzzles remain. Standard models of repeated interaction formalize the observation that cartels keep participants in line through the threat of punishment, but they fail to explain two important factual observations: first, apparently deliberate cheating actually occurs; second, it frequently goes unpunished even when it is detected. We propose a theory of equilibrium price cutting and business stealing in cartels to bridge this gap between theory and observation. (JEL D43, L12, L13)

An important objective of theoretical research in industrial organization is to achieve a conceptual understanding of the mechanisms through which actual price-fixing cartels arrive at collusive outcomes. Analyses of strategic models involving repeated interaction have yielded important insights but also leave significant gaps.[1] Our object in this paper is to provide a theoretical account of two important, but thus far unexplained, empirical regularities. First, cartel members sometimes *deliberately* cheat on price-fixing agreements. Second, when cheating is detected, punishment does not always follow. Instead, cartel members often urge each other to recall their common interests and let cooler heads prevail. See Section I for a discussion of historical examples of this pattern.

Existing theories of collusion cannot account adequately for these observations. Theories with imperfect monitoring, such as Green and Porter (1984), were originally formulated to explain why cartels tend to break down, giving way to price wars

*Bernheim: Department of Economics, Stanford University, Stanford, CA 94305, and NBER (e-mail: bernheim@stanford.edu); Madsen: Department of Economics, New York University, 19 W. 4th Street, New York, NY 10012 (e-mail: emadsen@nyu.edu). We would like to thank Susan Athey, Kyle Bagwell, Lanier Benkard, Jeremy Bulow, Ben Golub, Leslie Marx, David McAdams, Andy Skrzypacz, Takuo Sugaya, Robert Wilson, Alex Wolitzky, and three anonymous referees for valuable comments and discussions. We are especially indebted to Jonathan Levin for insightful guidance that helped to shape the project at critical stages. We are also grateful for comments by seminar participants at Stanford University, Stanford GSB, and the 2012th Columbia/Duke/MIT/Northwestern IO theory conference. Both authors acknowledge financial support from the National Science Foundation. The authors declare that they have no relevant or material financial interests that relate to the research described in this paper.
[†] Go to https://doi.org/10.1257/aer.20140559 to visit the article page for additional materials and author disclosure statement(s).
[1] Leading theories of collusion in price-fixing cartels include Green and Porter (1984); Rotemberg and Saloner (1986); Abreu, Pearce, and Stacchetti (1986); Athey (1986); Bernheim and Whinston (1990); Athey and Bagwell (2001); Athey, Bagwell, and Sanchirico (2004); Athey and Bagwell (2008); and Harrington and Skrzypacz (2011).

5

# Summary Of Opinions

**1** NFL teams **must work together** to deliver high value to fans.

**2** The NFL has successfully **created enormous value for fans.**

**3** **Mandatory pooling of telecast rights** has enabled the NFL to create high value for fans.

**4** **Exclusive distribution** of Sunday Ticket has enabled the NFL to create high value for fans.

# Summary Of Opinions: Opinion 1

**1** | **NFL teams must work together to deliver high value to fans.**

**2** | The NFL has successfully created enormous value for fans.

**3** | Mandatory pooling of telecast rights has enabled the NFL to create high value for fans.

**4** | Exclusive distribution of NFL Sunday Ticket has enabled the NFL to create high value for fans.

# Pro-Competitive Joint Ventures



# The Value Of A Game Comes Mostly From The Season



**Average Viewership Per Telecast For NFL Games**

# Summary Of Opinions: Opinion 2

**1**  NFL teams **must work together** to deliver high value to fans.

**2**  **The NFL has successfully created enormous value for fans.**

**3**  Mandatory pooling of telecast rights has enabled the NFL to create high value for fans.

**4**  Exclusive distribution of NFL Sunday Ticket has enabled the NFL to create high value for fans.

# Contributors To The NFL's Popularity

**Easy Access To Games Fans Care About On Free, Over-the-Air Broadcasts**

**High-Quality And Innovative Broadcasts**

**Competitive Balance**

# NFL Fans Can View Every Local Game For Free



**2021**

**Percent Of Local Games Available Over-The-Air**

# Most Fans Live In-Market
# Of Their Favorite Team



**Dr. Daniel Rascher**
Plaintiffs' Expert

Q. Okay. And you agree, Dr. Rascher, that for every NFL team, **approximately 70 percent of their fan base resides in the local and network area**; right?

A. Yes. I think I recall that's about what the number is, yes.

\*   \*   \*

A. I mean, that's the average for the NFL. It does vary from team to team, but, **yes, so the average for the NFL, it's around 70 percent**.

# Even for Sunday Ticket Viewers, OTA Games Are Most Popular

**2018-2020**



**Hours Watched Of NFL Games Among Sunday Ticket Viewers**

Legend: Over-the-air (green), Not over-the-air (yellow)

Y-axis: % Of Hours Watched (0% to 80%)

X-axis: Game Rank According To Viewership Within DMAs (OTA, 1, 2, 3, 4, 5, 6, 7, 8, 9)

# Contributors To The NFL's Popularity

Easy Access To Games Fans Care About On Free, Over-the-Air Broadcasts

## High-Quality And Innovative Broadcasts

Competitive Balance

# Contributors To The NFL's Popularity

Easy Access To Games Fans Care About On Free, Over-the-Air Broadcasts

High-Quality And Innovative Broadcasts

## Competitive Balance

# The NFL Is More Competitively Balanced

# Dr. Rascher Agrees



**Dr. Daniel Rascher**
Plaintiffs' Expert

Q.   Right. And you agree that **the NFL, of any sport, has the most what's called "competitive balance"**; right?

A.   **Yes**. Generally.

Q.   Okay. The NFL games are closer. Whether you look game-by-game, week-by-week, or season-by-season, **there is more balance at -- than any other sport including college football**; right?

A.   **Yes**.

# Evidence That Competitive Balance Is Important

## Witness Trial Testimony

## NFL's Research

## My Own Data Analysis

## Academic Literature

# Competitive Balance Is A Demand Enhancing Factor



**Dr. Daniel Rascher**
Plaintiffs' Expert

Q. But **you agree competitive balance can be procompetitive**; correct?

A. I guess it depends on how they get to the competitive balance. **It's a demand enhancing factor. It can be.** As I said, it depends. But it depends really on how they get to that competitive balance.

# Fans Care About Competitive Balance, Per The NFL

## 2009



# Summary Of Opinions: Opinion 3

**1**  NFL teams **must work together** to deliver high value to fans.

**2**  The NFL has successfully **created enormous value for fans.**

**3**  **Mandatory pooling of telecast rights** has enabled the NFL to create high value for fans.

**4**  **Exclusive distribution** of NFL Sunday Ticket has enabled the NFL to create high value for fans.

# Impact Of Not Having Pooled Telecast Rights

- Resources would have been distributed much less equally across teams.

- Spending on players would have been much less equal across teams.

- Competitive balance would have been significantly lower.

- 100% of teams' games would not have been available locally for free.

- Free, over-the-air stations would not televise best and most interesting games.

- Broadcast quality would have suffered.

- Overall viewership would have been lower.

# Incentives Are Essential To Economics



Because **rational people** make decisions by comparing costs and benefits, they **respond to incentives**. You will see that **incentives play a central role in the study of economics**. One economist went so far as to suggest that the entire field could be summarized simply: "People respond to incentives. The rest is commentary."

Public policymakers should **never forget about incentives**: Many policies change the costs or benefits that people face and, therefore, alter their behavior.

# Dr. Rascher Did Not Consider Changing Incentives



**Dr. Daniel Rascher**
Plaintiffs' Expert

Q. Did you talk about any of these changing financial incentives in the but-for world? That's my question.

A. I mean, **I don't recall specifically talking about changing financial incentives.**

# Comparison Of Inequality Across Sports



# Popular Teams Are More Subject To The Penalty



**Number Of Nationally Televised Games**

# Operating Incomes Greater Than $250 Million And Less Than $50 Million



**Operating Income Of NFL Teams**

2021

# Comparison Of Inequality Across Sports



Revenue And Player Expenditure Inequality — 2021

# Dr. Rascher Agrees Equal Player Spending Maintains Competitive Balance

Case 2:19-cv-03566-PSG-SK Document 9789 Filed 08/30/2... Page ... of ... Page ID#: 6955...



**Dr. Daniel Rascher**
Plaintiffs' Expert

Q. And in the NFL, because of the narrow salary cap and narrow salary floor, we see much more balance across the way teams spend and then the results on the field; right?

A. Yes. **The floor and the cap is what drives the competitive balance in the NFL.**

# NFL's Revenue Sharing Works

**Oct. 27, 2004**



## General Observations

- Little correlation between revenue and winning percentage
  - ➢ Most teams have been at or near the Salary Cap
  - ➢ So to date, teams have had equal shot at talent
  - ➢ Sustainability of this situation unclear

- Little correlation between most single variables and revenue except ticket price
  - ➢ Multivariable analysis is ongoing

- Profit potential (on a standardized basis) may be more appropriate focus than revenue disparity

8

# What Would Actually Happen In The BFW

- **Teams may have incentives to move high-value games behind a subscription.**

- **Fewer games may be shown free over-the-air.**

- **NFL TV scheduling may be impaired.**

# Over-The-Air Games Are Most Popular



Case 2:15-cv-01045-RFB-BNW Document 815-3 Filed 09/01/21 Page 35 of 51 Page ID #:60460



# Problems With Dr. Rascher's Viewership Analysis

- **Dr. Rascher focuses only on two of five time slots.**

- **Dr. Rascher ignores or understates cannibalization of viewership.**

- **Dr. Rascher ignores that additional games will be the less popular ones.**

- **Dr. Rascher ignores the procompetitive benefits of pooling.**

# Viewership Expansion: Theoretical Maximum



# NFL's Popularity Rose Around The Same Time Telecast Rights Were Centralized



## Gallup Poll: Americans' Favorite Sport To Watch

%Football

# The Structure Of College Football



# College Football Conference Media Deals



# College Football Teams Seek Higher Revenues For A Competitive Advantage



**Dr. Daniel Rascher**
Plaintiffs' Expert

Q. And when I say "people," **schools are trying to go where the money is**; correct?

A. Yes.

Q. **So they can gain a competitive advantage**; correct?

A. I mean, **that's one thing they do with their money, yes**. But they're chasing the highest revenues, yes.

# More NFL Games Are Telecast Over-The-Air

## 2021



# Summary Of Opinions: Opinion 4

**1** NFL teams **must work together** to deliver high value to fans.

**2** The NFL has successfully **created enormous value for fans.**

**3** **Mandatory pooling of telecast rights** has enabled the NFL to create high value for fans.

**4** **Exclusive distribution** of NFL Sunday Ticket has enabled the NFL to create high value for fans.

# Examples Of Exclusive Distribution Arrangements







# AT&T Stopped Investing When They Thought NFL May Not Renew Their Contract

**2021**



## THINGS WE HAVE CONSIDERED BUT NOT EXECUTED

- **Differentiated Packages** (i.e. Team package, divisional, game day for .TV)
  - Teams only offers present value and pricing challenges because teams are blacked out or appear limited times on NFL ST

- **Team audio selection** (i.e. allow subscriber to choose local team radio broadcast)
  - Rights issue with CBS / FOX. Syncing issues with video

- Additional **innovation suppressed on DBS**.....AT&T not investing in legacy platform

- Additional **innovation in app**....AT&T chose not to invest when it was unclear if AT&T was to keep contract. Even now with 3 seasons left there is a pushback on whether to invest in platform
  - Examples include integration of next generation statistics, more clips, highlights, gamification concepts

# Exclusivity Helped DirecTV Compete As An MVPD



**DirecTV's Subscriber Base One Year
After Launching Sunday Ticket**

# The Plaintiffs' Theory Of Exclusion



# The Plaintiffs' Theory Of Exclusion



# The Plaintiffs' Theory Of Exclusion



# Summary Of Opinions

**1** The 2011–2023 media agreements provided **tremendous value** for fans.

**2** Dr. Rascher **misapplied economic principles** in critiquing those agreements.

**3** Dr. Rascher **did not identify a better alternative**.

DALLAS    V.    SAN FRANSISCO

OTA FOX                    Dallas   1/32
Broadcast                    SF      1/32
  in-network                30 teams· 94%

─────────────────────────────────

Out of Market            Dallas
                           SF    > 100%
                                    ↓
                                50/50%