# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge | |
|---|---|---|
| Derek Davis | | Not Reported |
| Deputy Clerk | | Court Reporter |
| Attorneys Present for Plaintiff(s): | | Attorneys Present for Defendant(s): |
| Not Present | | Not Present |

**Proceedings (In Chambers):** Order GRANTING Defendants' motion for judgment as a matter of law.

Before the Court is Defendants'[1] motion for a judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("FRCP") 50(b), or in the alternative, a new trial per FRCP 59. *See generally* Dkt. # 1490 ("*50(b) Mot.*"). Plaintiffs, two classes of DirecTV NFL Sunday Ticket subscribers,[2] opposed, *see generally* Dkt. # 1500 ("*50(b) Opp.*"),[3] and Defendants replied, *see* Dkt. # 1504 ("*50(b) Reply*"). After considering the parties' papers and the arguments made

---

[1] Defendants in this action consist of: National Football League, Inc. (the "NFL"); Arizona Cardinals, Inc.; Atlanta Falcons Football Club LLC; Baltimore Ravens Limited Partnership; Buccaneers Limited Partnership; Buffalo Bills, Inc.; Chicago Bears Football Club Inc.; Cincinnati Bengals, Inc.; Cleveland Browns LLC; Dallas Cowboys Football Club, Ltd.; Denver Broncos Football Club; Detroit Lions, Inc.; Football Northwest LLC; Green Bay Packers, Inc.; Houston NFL Holdings LP; Indianapolis Colts Inc.; Jacksonville Jaguars Ltd.; Kansas City Chiefs Football Club, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club LLC; NFL Enterprises LLC; New England Patriots, LP; New Orleans Louisiana Saints LLC; New York Football Giants, Inc.; New York Jets Football Club, Inc.; Oakland Raiders LP; PDB Sports Ltd.; Panthers Football LLC; Philadelphia Eagles Football Club, Inc.; Pittsburgh Steelers Sports, Inc.; San Diego Chargers Football Co.; San Francisco Forty Niners Ltd.; Tennessee Football, Inc.; The Rams Football Company LLC; and Washington Football Inc. *See Second Amended Complaint*, Dkt. # 441 ("*SAC*"), ¶ 29.

[2] One class includes residential subscribers—the "Residential Class"—and the other includes commercial subscribers—the "Commercial Class."

[3] The Court cites the unredacted version of the opposition. The original filing can be found at Docket Entry Number 1495.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

during the hearing on July 31, 2024, the Court **GRANTS** Defendants' motion for judgment as a matter of law.

### I. Background

Plaintiffs brought an antitrust lawsuit against Defendants, asserting that Defendants entered a set of agreements with each other and their broadcast partners that suppressed the output of telecasts of out-of-market professional football games, resulting in higher prices for Sunday Ticket. From June 5, 2024 to June 26, 2024, a trial took place, *see* Dkts. # 1391, 1464, where the jury found that Defendants' conduct violated § 1 and § 2 of the Sherman Act. *See* Dkt. # 1488 ("*Verdict*").[4] The jury awarded the Commercial Class $96,928,272.90 and the Residential Class $4,610,331,671.74 in damages. *Id.*

After the close of evidence, both parties filed motions for judgment as a matter of law under FRCP 50(a). *See Plaintiffs' 50(a) JMOL Motion*, Dkt. # 1457; *Defendants' 50(a) JMOL Motion*, Dkt. # 1456 ("*50(a) Mot.*"); *see also Plaintiffs' Opposition to Defendants' 50(a) JMOL Motion*, Dkt. # 1458 ("*50(a) Opp.*"). The Court denied Plaintiffs' motion and took Defendants' motion under submission to be considered with Defendants' potential FRCP 50(b) motion.[5] Dkt. # 1461; *06/27/24 Tr.* 2504:4–16; *06/25/24 Tr.* 2321:9–18. Defendants now renew their motion for judgment as a matter of law pursuant to FRCP 50(b), or, in the alternative, move for a new trial pursuant to FRCP 59. *See generally 50(b) Mot.*

### II. Legal Standard

#### A. Judgment as a Matter of Law

FRCP 50(b) provides that a party may file a renewed motion for judgment as a matter of law. Fed. R. Civ. P. 50(b). Like a pre-verdict motion for judgment as a matter of law under FRCP 50(a), a post-verdict motion under FRCP 50(b) challenges the sufficiency of the evidence to support a party's case. Fed. R. Civ. P. 50(a)–(b). By definition, a FRCP 50(b) motion renews the prior FRCP 50(a) motion and, as such, is limited to those issues raised in the previous motion. *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). Judgment as a matter of law is proper only if the evidence and all reasonable inferences in favor of the verdict

---

[4] The Court cites the unredacted verdict form, but the original filing can be found at Docket Entry Number 1481.

[5] The Court will accordingly assess both filings when making its ruling.

Case 2:15-ml-02668-PSG-SK Document 1551-2 Filed 08/30/24 Page 4 of 17 Page ID #:63193
Case 2:15-ml-02668-PSG-SK Document 1513-2 Filed 08/01/24 Page 3 of 16 Page ID #:53193

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

could lead a reasonable person to only one conclusion, that the moving party was entitled to judgment. *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002).

      B.    <u>New Trial</u>

FRCP 59 permits a court to grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Although FRCP 59 does not specify the grounds on which a motion for a new trial may be granted, a court is "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). In considering a motion for a new trial, courts have discretion to weigh the evidence and assess the credibility of witnesses. *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 190 (9th Cir. 1989). The grant of a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).

A court may grant a new trial if, in its view, the verdict is against the clear weight of the evidence, and the evidence adduced at trial is insufficient to support the jury's verdict. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). A court may also grant a new trial if the damages awarded at trial are excessive or if the trial was otherwise unfair. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

      C.    <u>FRE 702</u>

Federal Rule of Evidence ("FRE") 702 provides that expert opinion evidence is admissible if the proponent demonstrates that it is more likely than not that: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702; *see also Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1023 (9th Cir. 2022). "[P]roponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.'" Fed. R. Evid. 702, advisory committee note 1 to 2023 amendment (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).

FRE 702 thus requires district courts to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Elosu*, 26 F.4th at 1024 (quoting

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Id.* (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)).

With respect to reliability, the test is "whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 597). And an expert cannot "make claims that are unsupported by the expert's basis and methodology." Fed. R. Evid. 702, advisory committee note 2 to 2023 amendment. "To evaluate reliability, the district court 'must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance.'" *Elosu*, 26 F.4th at 1024 (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)). "These factors are nonexclusive, and 'the trial court has discretion to decide how to test an expert's reliability based on the particular circumstances of the particular case.'" *Id.* (quoting *City of Pomona*, 750 F.3d at 1044)) (cleaned up); *see also Alaska Rent-A-Car, Inc.*, 738 F.3d at 969 (explaining that the *Daubert* reliability requirement "is flexible").

III. Discussion

    A. Inadmissible Expert Evidence

As "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," the Court will engage in a post-trial *Daubert* analysis. *United States v. J-M Mfg. Co.*, Inc., No. EDCV 06-55-GW-PJWx, 2020 WL 4196880, at *20 (C.D. Cal. June 5, 2020), *aff'd sub nom. Hendrix ex rel. United States v. J-M Mfg. Co., Inc.*, 76 F.4th 1164 (9th Cir. 2023) (citing *Daubert*, 509 U.S. at 589). Defendants argue that Dr. Rascher's and Dr. Zona's testimonies should be excluded under FRE 702 because the models they developed are not products of sound methodologies. And because their models are Plaintiffs' only evidence that all class members were injured and damaged by the challenged conduct, without their testimony, Defendants should be granted judgment as a matter of law on those issues. *50(b) Mot.* 1:1–9, 5:20–19; *50(a) Mot.* 1:2–10:2. The Court agrees that Dr. Rascher's and Dr. Zona's testimonies based on their flawed methodologies should be excluded. And because there was no other support for the class-wide injury and damages elements of Plaintiffs' § 1 and § 2 claims, judgment as a matter of law for the Defendants is appropriate. *See Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000) (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it

Case 2:15-ml-02668-PSG-SK Document 1553-2 Filed 08/30/24 Page 6 of 17 Page ID #:55325

Case 2:15-ml-02668-PSG-SK Document 1551-2 Filed 08/01/24 Page 5 of 16 Page ID #:55195

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.")).

*i.* *Dr. Rascher*

Dr. Rascher used college football as his model of what would happen in the absence of the competitive restraints at issue in the case ("college football but-for world"). *06/11/24 Tr.* (Rascher) 748:14–749:25. He opined that if the NFL Teams stopped "colluding and selling" their out-of-market games through the NFL, but sold them either independently or in divisions, the result would be like college football as the games would "become available, just like on Saturday, on over-the-air channels and . . . basic sport cable channels" and customers would not "pay anything extra above what they were already paying for their TV package." *06/11/24 Tr.* (Rascher) 779:7–22; *50(a) Opp.* 3:10–16 (explaining that in Dr. Rascher's "but-for-world, where individual teams had the ability to license their out-of-market games for paid television, those games could have been made available on regular cable or satellite channels—and class members would not have had to pay the subscription fee required for the Sunday Ticket product"). In support, he "looked to see if it was feasible . . . to do what was happening in college football in[] the NFL" by preparing schedules showing games "that actually existed with the NFL schedule" on alternative channels where they could have been shown. *06/11/24 Tr.* (Rascher) 752:20–754:3 ("And you can see that CBS and FOX could be showing a couple of games at 10:00 a.m.; ABC, NBC, ESPN, ESPN2, and so forth. So all the games are available.").

As the NFL out-of-market games would have been available for free on top of a cable subscription, Dr. Rascher calculated the damages for the 11-year class period by adding all the "total payments for Sunday Ticket"—roughly $5.6 billion for the residential customers and $1.3 billion from the commercial customers—as these customers "would have paid zero." *Id.* (Rascher) 780:8–16, 782:24–783:6.

Defendants have requested a post-trial *Daubert* review of Dr. Rascher's testimony based on his college football but-for world. *50(a) Mot.* 3:2–7:8. Defendants argue that Dr. Racher's college football but-for world "is not the product of reliable economic methodology" as it "is devoid of economic reasoning and contrary both to basic economics principle and *all* of the trial testimony offered by witnesses other than Dr. Rascher." *Id.* 3:7–10. As such, they maintain that "Dr. Rascher's testimony must be excluded," *id.* 3:27, because his "ill-defined college football BFW raises many questions that should have been answered as a matter of sound economic analysis, but that he completely failed to answer other than with his unsupported and sharply contradicted say-so," *id.* 7:3–5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

While the Court previously denied Defendants' *Daubert* motion and motion *in limine* on Dr. Rascher's opinions, Dr. Rascher's trial testimony revealed his college football but-for world was not the product of sound economic methodology. Dr. Rascher needed to explain how these out-of-market telecasts would have been available for free to cable and satellite customers in the but-for world. Dr. Rascher did not do so. Instead, he hypothesized there could have been numerous but-for worlds, asserting that regardless of the but-for world's structure, consumers would not have paid for an additional subscription. He supported his decision to provide multiple variations of a but-for world with the assumption that Defendants and their broadcast partners "are sophisticated entities . . . and they figured it out in college sports, [so] they would certainly figure it out at the NFL." *06/11/24 Tr.* (Rascher) 898:7–17. While FRE 702 certainly does not require a but-for world to perfectly reflect what the real world would have been, it requires more than just saying market participants would have figured it out.

For example, Dr. Rascher's college but-for world began with each NFL Team owning and negotiating media rights for the out-of-market Sunday afternoon games—games sold on Sunday Ticket. *06/11/24 Tr.* (Rascher) 868:9–21. From there, he offered two "core" but-for worlds: One where the SBA-protected CBS and FOX deals would have still existed and the NFL Teams would have negotiated their own media rights for the out-of-market games that were aired on Sunday Ticket; and one where the NFL Teams would have negotiated their media rights for all the games available during Sunday afternoon. *Id.* (Rascher) 886:23–887:5.

For each one of those scenarios, "one likely but-for world" would have been the NFL Teams negotiating their media rights individually, and "another likely but-for world" would have been the teams negotiating in groups. *Id.* (Rascher) 883:15–22. As to what the groups would have looked like, Dr. Rascher believed there could have been numerous groups into which the NFL Teams organized themselves. *Id.* (Rascher) 901:6–7 ("I mean, there's sort of an infinite number of groups—not an infinite number, I guess. There's some known number, but it's very high. So I chose as examples the existing divisions that already exist."). It could have been "eight groups of four"—like the current NFL divisions—or "four groups of eight"—one group for each major network—or any other combination. *Id.* (Rascher) 864:24–866:7.

From this set of four but-for worlds, Dr. Rascher proposed additional but-for worlds in response to questions on how the broadcasting of the games would have worked. For example, while Dr. Rascher could not answer how the production, distribution, advertising, or revenue sharing for the out-of-market telecasts would have worked in his most likely but-for world—where the CBS and FOX deals still existed—he made several hypotheses as to these issues.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

    As to production and distribution of the out-of-market telecasts, one solution Dr. Rascher posed was that CBS and FOX could have shared their feeds of NFL games with their rivals NBC and ABC. *Id.* (Rascher) 894:17–895:5. Another solution, could have been "two production crews," one for each broadcaster, though that "is not as common." *Id.* (Rascher) 896:25–897:9. He also offered an entirely separate third possibility: "I mean, heck, it could have been a separate entity produces the games, gives the feed to FOX, gives the feed to NBC, and then they show the games in the local markets and—and out of market." *Id.* (Rascher) 908:16–909:16. As to advertising for those out-of-market telecasts, Dr. Rascher testified it could have been the same as it is with Sunday Ticket, where "the national ads pass[ed] through to DirecTV," or broadcast competitors could have "pa[id] in order to get those ad rights." *Id.* (Rascher) 897:14–18.[6]

    As to revenue sharing, Dr. Rascher testified that in his but-for worlds, the NFL Teams would not have shared their revenue equally. *Id.* (Rascher) 862:18–21. But he could not definitively answer how they would have shared revenues. A but-for world could have included revenue sharing between "individual teams or small divisions" such that the NFL Teams may have shared "revenue within divisions," *see id.* (Rascher) 904:9–25, or the league could have required "limited revenue sharing," *id.* (Rascher) 869:19–870:14.

    As to why Dr. Rascher proposed all these variations, he had the same refrain. Whether the teams negotiated for all the Sunday afternoon games or the NFL maintained the CBS and FOX agreements, it did not matter because "guess where it all ends up . . . [i]n the same spot with the teams being on over the air and on—on the major cable channels." *Id.* (Rascher) 886:7–11. Whether teams negotiated individually or in groups, it did not matter because "in the end, these games would appear on over-the-air networks and . . . on the major cable stations." *Id.* (Rascher) 900:5–18.

    Dr. Rascher's support for his assertion that the "different but-for worlds . . . tend to end up in the same spot," *id.* (Rascher) 900:10–11, was his assumption that Defendants would figure it out. As he explained, "this is the most popular programming on television . . . . They will find their way on to these major networks and these major cable stations." *Id.* (Rascher)

---

[6] Not only does Dr. Rascher provide multiple solutions for what could have happened, Dr. Rascher's solutions were contradicted by the record. Sean McManus, President of CBS, testified that CBS would not share its feeds with competitors, *06/18/24 Tr.* (McManus) 1668:8–20, or let those networks "advertise however they wanted" with their feeds. *Id.* (McManus) 1668:21–23; *see also id.* (McManus) 1765:17–1766:7. And Dr. Rascher did not account for whether competitor networks could have even created programming for such a schedule. *Cf. 06/18/24 Tr.* (Yancy) 1766:17–1768:13.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

898:18–899:6. Indeed, "these are sophisticated entities involved in this, and they figured it out in college sports, they would certainly figure it out at the NFL." *Id.* (Rascher) 898:7–17. But that assumption is not a reliable methodology nor does it substitute for a model of a but-for world grounded in economic analysis showing how the Defendants and their broadcasting partners would have arrived at the spot where every out-of-market game was available for free on top of a cable or satellite subscription.

Dr. Rascher's failure to produce a coherent model is particularly problematic as there are significant differences between college football and the outcome in his college football but-for world. Unlike Dr. Rascher's college but-for world, not all college football games are available on over-the-air networks and on the major cable stations as some college football games—including games of top 25 ranked teams—were available only by purchasing premium offerings like the Pac 12, SEC, or ACC network packages or viewable only on local regional networks. *Id.* (Rascher) 835:17–837:13. Further, Dr. Rascher's most likely version of the but-for world that retained the NFL's distribution of in-market games on CBS and FOX did not resemble college football broadcasting. *See id.* (Rascher) 890:8–891:10. For instance, college football does not have guaranteed access to telecasts of local teams, *id.* (Rascher) 837:1–13, and it does not involve sharing feeds, *see id.* (Rascher) 894:17–895:10. As shown above, Dr. Rascher accounted for the differences in this but-for world by proposing multiple variations of the but-for world, without analysis of how the economically rational actors would have acted. As the outcome in the but-for world contrasted with the real world, Dr. Rascher could not have relied on his assumption that the out-of-market games would have made it on over-the-air networks and on the major cable stations. *Cf. In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974–976 (C.D. Cal. 2012) (excluding testimony when the expert "simply assume[d]—without further examination—that the [yardstick damages were] due entirely to Defendants' allegedly anticompetitive conduct").

After review of Dr. Rascher's testimony, the Court finds that his college but-for world was not based on a reliable methodology but rather *ipse dixit* opinion untethered to an economic analysis of what would have likely occurred in the but-for world and must be excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the he Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) ("The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

Plaintiffs' arguments that the law only requires presenting a world without the challenged restraints, that the Ninth Circuit blessed Dr. Rascher's "yardstick" of college football, and that Dr. Rascher's findings were corroborated by the NFL's 2017 "New Frontier" presentation are unpersuasive. *See 50(a) Opp.* 1:15–3:9, 4:17–5:2.

First, Dr. Rascher had to present a but-for world grounded in economic rationality. *See Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985) ("[Plaintiff] must presume the existence of rational economic behavior in the hypothetical free market.").

Second, the Ninth Circuit recognized that after Supreme Court "struck down the NCAA's restrictive telecast agreements as violating the Sherman Act" in *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma,* 468 U.S. 85 (1984), there was increased competition in college football telecasts as the number of televised football games grew exponentially. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136,1146–49 (9th Cir. 2019). The Ninth Circuit certainly did not indicate that because college football was a helpful analog at the pleading stage, *see id.* 1151–52, Dr. Rascher could offer any opinion for a but-for world between 2011 and 2023 by invoking the proliferation of college football of games after 1984.

Lastly, Dr. Rascher cannot rely on the NFL's 2017 "New Frontier" as evidence of what could have happened in his college but-for world because the document does not contemplate his fundamental premise of the NFL Teams owning and negotiating media rights for the out-of-market Sunday afternoon games—games sold on Sunday Ticket. *Compare Declaration of Tyler Finn*, Dkt. # 1495-1, ¶ 5, Ex. TX-686, *NFL New Frontier Presentation*, Dkt. # 1500-15, 13–14 *with 06/11/24 Tr.* (Rascher) 868:9–21. The NFL's 2017 New Frontier envisioned replicating Sunday Ticket on basic cable, which involved the NFL Teams continuing to pool their rights with the NFL.

Because Dr. Rascher's testimony relied on a college football model that was developed based on speculation and *ipse dixit* opinion, the Court excludes Dr. Rascher's testimony under FRE 702.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

        *ii.*    *Dr. Zona*

    Dr. Zona provided two models purporting to describe the but-for world without exclusivity. Defendants argue Dr. Zona's testimony based on his models should be excluded for four reasons: (1) Dr. Zona's models predicted higher prices for Sunday Ticket in the but-for world; (2) his models irrationally predicted that consumers would pay higher prices from an alternative distributor of Sunday Ticket instead of purchasing from DirecTV; (3) his models rested on the unsupportable assumption that there was an alternative possible distributor available—specifically, a streaming service—during 2011 to 2023; and (4) Dr. Zona's calculation and presentation of an "NFL tax" was untimely and an invalid model. *50(a) Mot.* 7:9–9:27. The Court finds that the second and third arguments have merit as Plaintiffs' responses to them conflict with each other.

    Defendants argue that Dr. Zona's models resulted in irrational behavior by consumers because they predicted that a second distributor of Sunday Ticket would have charged much higher prices than DirecTV did and yet some consumers would have purchased from that higher-priced distributor. *Id.* 8:10–9:3. Dr. Zona's justification for this behavior was that the price charged by the higher-priced distributor was without the need for a satellite dish and the $1,100 underlying DirecTV subscription. *See 06/13/24 Tr.* (Zona) 1225:23–1226:9 (describing that he modeled the alternative distributor to be "[s]omeplace where you didn't have to pay for the platform to get it"). So the overall price could have been comparable.

    If this is true, then the alternative distributor of Sunday Ticket, which Dr. Zona said was "direct-to-consumer," could not have required an underlying subscription and must have been able to sell Sunday Ticket as a standalone service—*i.e.*, streaming. But Dr. Zona repeatedly stated that he did not need to define what "direct-to-consumer" meant in his models and that it could have included other satellite and cable providers. *See id.* (Zona) 1223:2–1226:9. If a "direct-to-consumer" provider included cable or satellite, then there would have been an underlying subscription that consumers would have had to pay to receive Sunday Ticket. This directly undermines Dr. Zona's justification for why a consumer would pay a higher price for the additional Sunday Ticket package. Accordingly, the Court must assume that the "direct-to-consumer" provider would have been a standalone service, because if not, Dr. Zona's models were irrational.

    The question then becomes, would this have been feasible? Plaintiffs provided some evidence that streaming of Sunday Ticket may have been available as early as 2011 or 2012. For instance, Dr. Yurukoglu testified that live-streaming of sports—including of Sunday Ticket— existed before the class period. *Id.* (Yurukoglu) 1368:18–1372:4. Cathy Yancy, Vice President

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

of Broadcasting for the NFL, testified that she had been involved in discussion with DirecTV about marketing a streaming product of Sunday Ticket as early as 2012. *06/18/24 Tr.* (Yancy) 1781:9–12, 1783:18–1784:8. But Plaintiffs provided no evidence that any distributor other than DirecTV was working to provide live streaming of sports during the entire class period. *06/13/24 Tr.* (Zona) 1228:17–21, 1229:5–17, 1229:25–1231:20 (failing to identify another streaming service). Plaintiffs needed to offer evidence that *another* distributor—outside DirecTV—existed that could have provided live streaming of Sunday Ticket since 2011 for Dr. Zona's models to be feasible. There was no evidence to make this predicate fact conclusive, so Defendants' third criticism of Dr. Zona's models is correct.

Ultimately, and regardless of whether a competitive live streaming service existed, this issue reveals the main flaw with Dr. Zona's models: He failed to define an assumption that was necessary for evaluating the rationality and reliability of his models by never deciding what a "direct-to-consumer" product entailed. Without knowing what "direct-to-consumer" meant, it is impossible to determine if it would have been economically rational for consumers to purchase Sunday Ticket from an alternative distributor at a higher price. And, that definition was necessary for determining whether a viable alternative distributor even existed during the class period. Without that information, the Court cannot determine whether the but-for worlds without exclusivity were modeled reliably.

As a result of the flaws in his models, the Court excludes Dr. Zona's testimony under FRE 702.

### iii. Judgment as a Matter of Law

To prove a § 1 claim under the Sherman Act, Plaintiffs needed to establish the following elements: (1) the existence of a contract, combination, or conspiracy between or among the NFL, the NFL Teams, and DirecTV; (2) that the contract, combination, or conspiracy unreasonably restrained trade; and (3) that the restraint caused Plaintiffs to suffer an injury to their business or property. *Jury Instructions*, Dkt. # 1482 ("*Jury Instructions*"), Instr. 15; *see also* ABA-JI-CIVANTI 1.B. Defendants assert that if the Court excludes Dr. Rascher's and Dr. Zona's testimonies, no jury could reasonably find an unreasonable restraint on trade, injury, or damages. *See 50(b) Mot.* 2:24–3:9, 5:20–6:19. And, if Plaintiffs cannot establish a § 1 claim, then a § 2 claim based on the exact same conduct also fails.[7]

---

[7] To establish a conspiracy to monopolize under § 2 of the Sherman Act, Plaintiffs had to prove: (1) two or more persons knowingly entered into an agreement or mutual understanding between two or more persons to obtain or maintain monopoly power in telecasts of professional football;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

Despite finding Dr. Rascher's and Dr. Zona's opinions unreliable, the Court does not find that it would be unreasonable for a juror to find that there was a conspiracy that unreasonably restrained trade. *Verdict* 1. There was evidence in the record—even without the testimonies of Dr. Rascher and Dr. Zona—to support a reasonable jury's finding of an unreasonable restraint of trade at each step of the rule of reason. *See 50(b) Opp.* 9:7–12:10 (citing the trial exhibits and testimony in support of each step). Given a reasonable jury could find that there were anticompetitive effects, that Defendants' procompetitive justifications were pretextual or unrelated to the restraints, and/or that there were less-restrictive alternatives based on the record, judgment as a matter of law is inappropriate on these grounds.

But without Dr. Rascher's and Dr. Zona's testimonies, it is impossible for a jury to determine on a class-wide basis that Sunday Ticket subscribers would have indeed paid less in the absence of Defendants' anticompetitive conduct. Thus, Plaintiffs failed to provide evidence from which a reasonable jury could make a finding of injury and an award of actual damages that would not be erroneous as a matter of law, be totally unfounded and/or be purely speculative. *See J-M Mfg.*, 2020 WL 4196880, at *41. As a result, the Court **GRANTS** Defendants' motion for judgment as a matter of law.

B. Jury's Verdict on Damages

Even if the Court did not find that judgment as a matter of law was appropriate, the Court would have vacated the jury's damages verdict, remitted Defendants' award to nominal damages, and conditionally granted a new trial based on the jury's irrational damages award. *See* Fed. R. Civ. P. 50(c)(1) ("If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed.").

While Dr. Rascher calculated $7.01 billion in damages based on his college but-for world and $3.48 billion in damages based on Dr. Zona's reduction factor derived from his model for one additional competitor, *06/11/24 Tr.* (Rascher) 781:21–784:8, the jury awarded $4,610,331,671.74 to the Residential Class and $96,928,272.90 to the Commercial Class, *Verdict* 5. Defendants argue that the jury verdict shows that judgment as a matter of law is

---

(2) Defendants specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in telecasts of professional football; (3) Defendants committed an overt act in furtherance of the conspiracy; and (4) Plaintiffs were injured in its business or property because of the conspiracy to monopolize. *Jury Instructions*, Instr. 29; *see also* ABA-JI-CIVANTI 3.E.1.

Case 2:15-ml-02668-PSG-SK Document 1513-2 Filed 06/03/24 Page 14 of 17 Page ID #:55195

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

appropriate because the "jury's rejection" of Plaintiffs' experts and models "confirms that Plaintiffs failed to introduce" valid proof "of anticompetitive effects, injury, and damages," that Plaintiffs' lack proof of class-wide injury, and that "the law does not permit juries to create speculative and irrational measures of damages." *50(b) Mot.* 5:14–19. At a minimum, Defendants assert that the Court should "reduce or remit" the jury's verdict to nominal damages because there was no justifiable basis for the jury's award. *50(b) Mot.* 8:22–25.

As to Defendants' argument that the jury's verdict serves as evidence that entitles them to a judgment as a matter of law, the Court agrees with Plaintiffs that the jury verdict cannot be used to establish a wholesale failure of proof by Plaintiffs. *See 50(b) Opp.* 14:7–18. Even if the jury did not credit Dr. Rascher's and Dr. Zona's damages calculations, this does not necessarily mean that the jury rejected their opinions in their entirety or establish on its own that no reasonable jury could have found anticompetitive liability, harm, or damages. The Court has no insight as to how the jury decided that Plaintiffs "prov[ed] that there was a conspiracy that unreasonably restrained trade" and both classes "suffered injury to their business or property as a result of this conspiracy." *Verdict* 1–2. Indeed, the fact that the jury disagreed with Plaintiffs' experts as to the amount of damages does not mean that the evidence in support of the fact of damages was inadequate as a matter of law. Whether or not the Court agrees that there is a basis supported by the record for the jury's damages, the damages verdict itself does not allow the Court to disturb the jury's other findings.

Nevertheless, the Court is concerned about whether the jury's damages verdict can stand. "Generally, a jury's award of damages is entitled to great deference, and should be upheld unless it is 'clearly not supported by the evidence' or 'only based on speculation or guesswork.'" *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006) (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986)).

Neither of the jury's damages awards to the Residential nor Commercial Classes were proposed by Plaintiffs or found in the record. Defendants argue that while "the jury did not detail the basis for its calculations, its highly specific damages figures leave no doubt what it did." *50(b) Mot.* 4:18–19. The Court agrees. The jury awarded damages to the cent and basic arithmetic shows their methodology.

Dividing the award of $4,610,331,671.74 to the Residential Class and $96,928,272.90 to the Commercial Class by the number of Sunday Ticket subscriptions during the class period for each—24,105,049 residential subscriptions and 506,788 commercial subscriptions—results in $191.26 per subscription for both classes. Defendants proffer that to arrive at that number the jury started with the list price of $294 for Sunday Ticket Basic—offered to residential

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

consumers—in 2018 and 2019. *Id.* 4:19–22. The jury then subtracted $102.74, Dr. Zona's calculation for the average price paid by residential Sunday Ticket subscribers, *see 06/13/24 Tr.* (Yurukoglu) 1325:25–1327:14, yielding the $191.26. The jury then multiplied the $191.26 by the number of subscriptions to arrive at its damages figure. Indeed, given the precision of the jury's damages awards, awarding damages to the cent, the Court finds Defendants' reverse engineering to be compelling.[8]

| Class | A "Actual Price" | B "But-For Price" | C "Overcharge" (C = (A – B)) | D Number of Subscriptions | E "Damages" (E = C x D) |
|---|---|---|---|---|---|
| Commercial | $294.00 | $102.74 | $191.26 | 506,788 | $96,928,272.88 |
| Residential | $294.00 | $102.74 | $191.26 | 24,105,049 | $4,610,331,671.74 |

Defendants ask the Court to assess whether the jury's inputs to its calculations are supported by the evidence or only based on speculation or guesswork. *See In re First All. Mortg. Co.*, 471 F.3d at 1001. Plaintiffs argue that (1) the "jury heard evidence that would have supported a damages award of more than $7 billion," *50(b) Opp.* 15:21–17:5, (2) any award "within the range" supported by evidence "cannot be set aside," *id.* 17:6–18:24, and (3) it is "impermissible" to speculate into the jury's methodology, *id.* 19:1–22:21.

Here, the Court takes issue with Plaintiffs' second and third arguments. The Court disagrees with Plaintiffs' argument that as long as a damages award is "within the range" supported by evidence it "cannot be set aside." The jury verdict must both "find substantial support in the record ***and*** lie within the range sustainable by the proof." *Los Angeles Mem'l Coliseum Comm'n*, 791 F.2d at 1366 (emphasis added). It cannot be that any award less than the maximum amount sought by Plaintiffs escapes scrutiny and may be untethered to the record.

As to Plaintiffs' third argument—that the Court cannot speculate as to the jury's deliberations—this is a rare situation where it is clear, without speculation, that the award was based on improperly considered evidence. This is not a case where a jury deviated from an

---

[8] Plaintiffs proffered for the first time at oral argument that the jury could have relied on a different methodology to arrive at the damages. Plaintiffs argued that the jury may have assumed that the actual price was $191.26, after subtracting $102.74 from $294.00, and that the "but-for price" was really $0, as Dr. Rascher suggested. Nevertheless, even if the jury used this methodology, it also relies on inputs not supported by the record and in violation of the Court's jury instructions as explained below.

Case 2:15-ml-02668-PSG-SK Document 1513-2 Filed 08/30/24 Page 16 of 17 Page ID #:55235

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

experts' damages figure for an arbitrary reason. *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1268 (10th Cir. 2014) (rejecting defendants' argument that a damages award of $400,049,039 was speculative even though defendants had calculated damages of $496,680,486 because the award could have been possibly discounted and the jury a "can reduce an expert's calculations on damages even when unable to run the exact numbers and calculations of a damages model with mathematical certainty" (cleaned up)). Nor is it a case where the jury split the difference or arrived at a damages amount within a calculated range. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 795 (6th Cir. 2002) (sustaining a damages award that fell "well within" the expert's estimated damages range of $313 million and $488 million). Instead, the jury came up with its own specific damages based on a methodology,[9] detached from Dr. Rascher's opinion or calculations, that the Court can definitively trace. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009) (reviewing a juror's damages methodology as "it is difficult to understand how the jury could have chosen its lump-sum figure down to the penny unless it used a running royalty calculation"). As a result, this "appears to be the rare case in which it is sufficiently certain that the jury award was not based on proper consideration of the evidence." *In re First All. Mortg. Co.*, 471 F.3d at 1001; *see also In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1019 (N.D. Cal. 1979), *aff'd sub nom. Transamerica Computer Co. v. Int'l Bus. Machines Corp.*, 698 F.2d 1377 (9th Cir. 1983) ("Guesswork is guesswork, whether it originates on the witness stand or in the jury room.").

The Court instructed the jury that the "proper way to calculate [the amount of damages to award to Plaintiffs] is to determine the difference between the prices Plaintiffs actually paid for Sunday Ticket and the prices Plaintiffs would have paid had there been[] no agreement to restrict output." *Jury Instructions*, Instr. 41. The Court cautioned that while the jury may "determine the average overcharge paid by class members or estimate the overcharge paid by class members," it must base "the average or estimate . . . on evidence and reasonable inferences" and not on "guesswork or speculation." *Id.*, Instr. 42.

The Court finds that the jury's damages awards were not based on the "evidence and reasonable inferences" but instead were more akin to "guesswork or speculation." For the price Plaintiffs actually paid for Sunday Ticket, the jury relied on the residential list price for two years in the class period. There was no evidence that supported the jury's determination this represented the price paid for Sunday Ticket for the whole class period or that any member of

---

[9] The jury asked the Court for pricing inputs for its calculations. At the time, the Court remarked that the jury could be working "with [their] phone calculator[s] creating [a] model." *06/27/24 Tr.* 2496:11–22.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ML 15-02668 PSG (SKx) | Date | August 1, 2024 |
|---|---|---|---|
| Title | In re: NFL "Sunday Ticket" Antitrust Litigation | | |

the Commercial Class actually paid that price. Further, the evidence demonstrated that list prices for Sunday Ticket were not the actual prices paid.

For the price that class members would have paid had there been no agreement to restrict output, the jury used $102.74. The record shows that this number is the average price paid by all residential DirecTV subscribers who received Sunday Ticket. This is a problematic because the average price actually paid cannot be the price that the class members should have paid.

Relying on these two inputs, the jury attempted to calculate the average "overcharge" per each subscription. But the jury instead calculated the average "discount" a residential consumer received.[10] Awarding discounts as damages is nonsensical. It is opposite of what the Court instructed and gets the relationship between overcharges and discounts backwards—awarding damages based on the money the residential class members theoretically saved. Further, there is nothing in the record that supports the Commercial Class receiving any similar discount, as commercial customers paid different prices and had a different discount structure. *See 06/13/24 Tr.* (Zona) 1219:9–15; *id.* (Yurukoglu) 1357:25–1358:20.

The jury did not follow the Court's instructions and instead relied on inputs not tied to the record to create its own "overcharge." *In re First All. Mortg. Co.*, 471 F.3d at 1003 (overturning a jury's damages award because their "rationale is obviously not tethered to the law or the facts of the case"). And "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, (1946). The Court thus finds that jury's damages verdict is clearly not supported by the evidence and must be vacated.

IV. Conclusion

For the forgoing reasons, the Court **GRANTS** Defendants' judgment as a matter of law as, without the testimonies of Dr. Rascher and Dr. Zona, no reasonable jury could have found class-wide injury or damages.

**IT IS SO ORDERED.**

---

[10] Plaintiffs' suggested methodology, *see supra* n.9, suffers from a similar flaw. It uses inputs that estimate a "discount" and treat it as the actual price paid. As $0 would have to be the but-for price, it awards discounts as damages and not overcharges.